**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| **VOICE OF THE EXPERIENCED**, a membership organization on behalf of itself and its members; and **MYRON SMITH, DAMARIS JACKSON, NATE WALKER** and **DARRIUS WILLIAMS**, on behalf of themselves and all others similarly situated,<br><br>    *Plaintiffs*,<br><br>v.<br><br>**JAMES LEBLANC**, in his official capacity as Secretary of the Louisiana Department of Public Safety & Corrections; **TIMOTHY HOOPER**, in his official capacity as Warden of Louisiana State Penitentiary; **MISTY STAGG**, in her official capacity as Director of Prison Enterprises, Inc.; the **LOUISIANA DEPARTMENT OF PUBLIC SAFETY & CORRECTIONS**; and **PRISON ENTERPRISES, INC.**,<br><br>    *Defendants*. | Civil Action No. <u>3:23-cv-1304</u><br><br>CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

**<u>INTRODUCTION</u>**

1.    This action challenges the unconstitutional and gratuitously harsh conditions of forced agricultural labor at the Louisiana State Penitentiary in Tunica, Louisiana. Built on the grounds of former slave plantations, the penitentiary was—and remains—known as "Angola," reportedly because the "best" enslaved people came from that African country. Today, Angola is an 18,000-acre penal plantation.

2.    Every day, the State of Louisiana subjects incarcerated men to cruel, inhuman, and degrading forced labor at Angola. Often overseen by armed guards, these individuals—most of whom are Black—must walk or ride into the fields, sometimes carrying hoes and shovels, to dig

1

ditches and pick plantation crops on the so-called "Farm Line." Some are paid two cents an hour for their labor. Many are paid nothing at all. They are forced to work in extreme weather conditions, without basic safety gear or modern agricultural equipment—even though the State has that equipment—under threat of serious harm if their work is unsatisfactory. This labor serves no legitimate penological or institutional purpose. It is purely punitive, designed to "break" incarcerated men and ensure their submission.

3.       The Farm Line is particularly and obviously dangerous during the summer months, when the heat index in the Angola fields regularly reaches into the "danger" and "extreme danger" zones. The Louisiana Department of Health has warned that "heat exposure is intensifying as the frequency, severity, and duration of extreme heat events increase due to climate change."[1] These changes are particularly concerning in Louisiana, which experiences some of the highest average summer temperatures in the nation.

4.       The combination of these intolerable and obviously dangerous conditions subject putative class members to the substantial risk of serious psychological and physical harm, including life-threatening, heat-related disorders due to their prolonged exposure to extremely dangerous heat indexes. These health risks are particularly acute for individuals with disabilities, who should be excused from manual agricultural labor, but are not. People with certain chronic health conditions, or who are taking certain medications, have a decreased ability to regulate their body temperatures, or "thermoregulate." These men are still forced to work the Farm Line, notwithstanding their increased risk of illness and injury. They suffer severe injuries, unnecessary

---

[1] Louisiana Department of Health, *Heat-Related Illness in Louisiana: Review of Emergency Department and Hospitalization Data from 2010-2020*, 4 (March 2023) https://ldh.la.gov/assets/docs/lah/HRI_in_Louisiana_from_2010-2020.pdf.

pain, loss of function, and psychological distress because of the State's failure to accommodate their disabilities and deliberate indifference to their serious medical needs.

5.     For incarcerated men who were not "duly" convicted by unanimous juries, these conditions of compulsory labor also violate the Thirteenth Amendment's prohibition of involuntary servitude.

6.     Associational Plaintiff **VOICE OF THE EXPERIENCED (VOTE)**, on behalf of itself and its members, and individual Plaintiffs **MYRON SMITH**, **DAMARIS JACKSON**, **NATE WALKER**, and **DARRIUS WILIAMS**, on behalf of themselves and all others similarly situated, bring this action to remedy (a) the Defendants' administration of the Farm Line in violation of their Eighth Amendment right to be free of cruel and unusual punishment; (b) the Defendants' failure to provide individuals with disabilities the accommodations and services to which they are entitled under Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131 *et seq*. and Section 504 of the Rehabilitation Act (Section 504), 29 U.S.C. § 794; and (c) the Defendants' administration of the Farm Line in violation of the Thirteenth Amendment's prohibition of involuntary servitude for individuals who were not "duly" convicted by unanimous juries.

7.     Plaintiffs seek declaratory and injunctive relief for the inhumane, discriminatory, and unconstitutional practices and conditions they face at Angola every day.

## JURISDICTION AND VENUE

8.     Plaintiffs bring this action pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 12131 *et seq.*, and 29 U.S.C. § 794.

9.     This Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a).

10.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because many of the events or omissions complained of occurred here, the Department of Public Safety and Corrections and Prison Enterprises are headquartered here, and the individual Defendants reside here.

## PARTIES

### A. Plaintiffs

11.     Plaintiff **VOICE OF THE EXPERIENCED (VOTE)** is a grassroots nonprofit organization comprised of currently and formerly incarcerated people, including approximately 150 men who are currently incarcerated at Angola. The organization was established in 1987 by several men who were then incarcerated at Angola, including VOTE's Executive Director, Norris Henderson. VOTE's work, then and now, seeks to secure, protect, and advocate for the civil, constitutional, and human rights of its members. VOTE is dedicated to restoring the full human and civil rights of those most impacted by the criminal justice system. VOTE is headquartered in New Orleans, with chapters in Baton Rouge and Lafayette. In addition, the organization has members in prisons throughout the state, including Angola.

12.     VOTE engages its Currently-Incarcerated Members (CIMs) through a program called "Mission Possible." Based on their level of engagement with the organization, CIMs are classified as either Supporters, Members, or Leaders. At all levels, CIMs are germane to the mission and operation of the organization: they engage others with VOTE's work, share information, and provide critical input on VOTE's initiatives, policies, and goals.

13.     VOTE is aware of members—including individuals with disabilities and/or health conditions that interfere with their ability to thermoregulate and individuals who were convicted by non-unanimous juries—who have been, are currently, and/or are at risk of being forced to work on the Farm Line at Angola. Each of these individuals has been harmed by the Defendants' policies

4

and practices related to the administration of the Farm Line, and each would have standing to sue individually.

14.     VOTE brings this suit as an associational plaintiff on behalf of itself and its members. VOTE does not seek monetary damages or individualized relief for any particular individual.

15.     Plaintiff **MYRON SMITH** has been incarcerated at Angola since 1998. Defendants have subjected Mr. Smith to unsafe conditions of forced agricultural labor several times. He is currently forced to work on Farm Line 15b. Mr. Smith did not volunteer to work the Farm Line; he does so only to avoid serious harm and punishment. He has been exposed to inhumane conditions in violation of the Eighth Amendment. Mr. Smith is a representative of the class.

16.     Plaintiff **DAMARIS JACKSON** has been incarcerated at Angola since 2002. He is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(A) and (B). Specifically, he has high blood pressure, which significantly impairs his ability to thermoregulate and subjects him to an increased risk of severe harm in the heat and humidity of Angola's fields. Mr. Jackson is currently forced to work on Farm Line 25. That work exceeds his strength and physical abilities, causes him unnecessary pain and suffering, and has significantly worsened his medically-serious pathological condition. Mr. Jackson has requested reasonable accommodations for his disability, and is being denied those accommodations. He is also exposed to inhumane conditions in violation of the Eighth Amendment. Mr. Jackson represents the class and the disability subclass.

17.     Plaintiff **NATE WALKER** has been incarcerated at Angola since 2009. He is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(A) and (B). Mr.

Walker suffers from high blood pressure, glaucoma, thyroid cancer, and depression. He also has a family history of sickle-cell anemia. Defendants prescribe Mr. Walker medications, including levothyroxine, to manage his disabilities and serious medical conditions. Those conditions substantially limit Mr. Walker's major life activities, including his ability to stand, lift, bend, and otherwise engage in the intense manual agricultural labor that Defendants require of him. That work exceeds Mr. Walker's strength and physical abilities, causes him unnecessary pain and suffering, and has significantly worsened his medically-serious pathological conditions. Mr. Walker has requested reasonable accommodations for his disabilities, and is being denied those accommodations. He is also exposed to inhumane conditions in violation of the Eighth Amendment. Mr. Walker is a representative of the class and the disability subclass.

18.     Plaintiff **DARRIUS WILLIAMS** has been incarcerated at Angola since 2011. He was convicted by a non-unanimous jury in Caddo Parish. Defendants have forced Mr. Williams to work on the Farm Line, against his will and in unsafe conditions. When Mr. Williams protested the dangerous and unsafe conditions of forced labor on the Farm Line, Defendants subjected him to lockdown, or disciplinary confinement. He has been exposed to inhumane conditions in violation of the Eighth Amendment. Mr. Williams is a representative of the class and the non-unanimous jury (NUJ) subclass.

**B.  Defendants**

19.     Defendant **JAMES LEBLANC** is the Secretary of the Louisiana Department of Public Safety and Corrections (DOC) and is sued in his official capacity. As the agent and official representative of DOC, Defendant LeBlanc is responsible for protecting the constitutional and statutory rights of all people in DOC custody, including those incarcerated at Angola. Defendant LeBlanc is aware of and has consciously disregarded a substantial risk of serious harm to the

Plaintiffs and class members. At all times relevant to this Complaint, Defendant LeBlanc was acting under color of law.

20.    Defendant **TIMOTHY HOOPER** is the Warden of the Louisiana State Penitentiary (Angola) and is sued in his official capacity. As the agent and official representative of Angola, Defendant Hooper oversees disciplinary actions and decisions, classification decisions, and the supervision of and care for people with disabilities. Defendant Hooper is aware of and has consciously disregarded a substantial risk of serious harm to the Plaintiffs and class members. At all times relevant to this Complaint, Defendant Hooper was acting under color of law.

21.    Defendant **MISTY STAGG** is the Director of Prison Enterprises, Inc., and is sued in her official capacity.  As the agent and official representative of Prison Enterprises, Defendant Stagg oversees all industrial, agricultural, and service operations at Angola, including the Farm Line. Defendant Stagg is aware of and has consciously disregarded a substantial risk of serious harm to the Plaintiffs and class members. At all times relevant to this Complaint, Defendant Stagg was acting under color of law.

22.    Defendant **DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS (DOC)** is the administrative arm of the State of Louisiana responsible for administering the State's correctional facilities, including Angola. DOC is an instrumentality of the State of Louisiana and a recipient of federal funding. As an entity, it is sued pursuant to the ADA and Section 504 only.

23.    Defendant **PRISON ENTERPRISES, INC.**, is a division of Louisiana's Department of Public Safety and Corrections (DOC). Prison Enterprises directs agricultural and industrial programs at eight Louisiana prisons, including Angola. Prison Enterprises is an

instrumentality of the State of Louisiana and a recipient of federal funding. As an entity, it is sued pursuant to the ADA and Section 504 only.

## HISTORICAL CONTEXT

### A. The Thirteenth Amendment

24.     Enacted in 1865, the Thirteenth Amendment to the U.S. Constitution states, in part, "[n]either slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." U.S. Const. amend. XIII § 1.

25.     The Thirteenth Amendment "is not a mere prohibition of State laws establishing or upholding slavery, but an absolute declaration that slavery or involuntary servitude shall not exist in any part of the United States." *Griffin v. Breckenridge*, 403 U.S. 88, 105 (1971) (citations omitted). The aim of the Thirteenth Amendment was "a system of completely free and voluntary labor throughout the United States." *Pollock v. Williams*, 322 U.S. 4, 17 (1944). However, by permitting involuntary servitude "as punishment for crime whereof the party shall have been duly convicted," the Thirteenth Amendment has incentivized the arrest, incarceration, and subsequent re-enslavement of Black people.

### B. Louisiana's plantation labor system

26.     After the formal abolition of chattel slavery in 1865, Louisiana turned to the criminal legal system to "get[] things back as near to slavery as possible."[2] The legislature expanded its discriminatory "Black Codes," which subjected Black people to criminal prosecution for everyday behavior like loitering, breaking curfew, vagrancy, and not carrying proof of

---

[2] Andrea C. Armstrong, *Slavery Revisited in Penal Plantation Labor*, 35 Seattle U. L. Rev. 869, 902 (2012) (citing William M. Wiecek, *Emancipation and Civic Status: The American Experience, 1865-1915* in THE PROMISES OF LIBERTY: THE HISTORY AND CONTEMPORARY RELEVANCE OF THE THIRTEENTH AMENDMENT, 84 (Tsesis, ed., 2010)).

employment. As a result, the prison population grew exponentially, providing the State with a captive workforce at low and sometimes no cost. For the first time, the Louisiana prison system incarcerated more Black people than white.

27.    In 1869, former Confederate Major Samuel James assumed operation of the state prison. Under this system of "convict leasing," James provided for the basic care of convicts while leasing them out to work on railroads, mines, and private plantations. In 1880, James bought the Angola plantation from the widow of a wealthy slave trader. He moved the State's prisoners into the plantation's former slave quarters and settled his own family into the Big House. Racial hierarchies determined the work assignments at the James Prison Camp: white prisoners, seen as more intellectual, were given clerical and craftsmanship work. Black prisoners were forced to build levees and work the fields.

28.    Like chattel slavery before it, convict leasing was brutal. But unlike enslaved people, who were considered an investment, Black prisoners were considered expendable. An editorial in the *Daily Picayune* of New Orleans reportedly observed that it would be more humane "to impose the death sentence immediately" upon anyone sentenced to more than six years, "because the average convict lived no longer than that, anyway."[3]

29.    When the James lease expired in 1901, the State bought the Angola plantation and established the Louisiana State Penitentiary there. Little changed for the incarcerated people, who still lived in slave quarters and picked cotton in the now State-owned fields. They also still worked on levees, plantations, and road crews via convict leasing.

30.    Profit—not rehabilitation, retribution, or deterrence—was the goal of Louisiana's penal system. Governor William Heard reportedly observed that the State was engaged not only

---

[3] Mark T. Carleton, *Politics and Punishment: The History of the Louisiana State Penal System*, 37 (Louisiana State University Press, 1971) (citing New Orleans *Daily Picayune*, June 30, 1884).

in "the handling of a large prison as such, but in the establishment of a great industrial and business enterprise."[4] To that end, the State concentrated incarcerated labor on agricultural production.

31.    By the mid-1920s, Angola was among the largest penal plantations in the United States. By 1940, people incarcerated at Angola produced agricultural products worth $1.3 million (about $28 million in today's dollars).[5] The State developed other prison industries—including a sugar mill, cannery, and slaughterhouse—to support its lucrative agricultural operations. Even as Louisiana became increasingly urban, its prison system remained focused on the cultivation and sale of agricultural commodities.

32.    Meanwhile, the State continued to incarcerate Black people at disproportionate rates. Jim Crow laws, rooted in Black Codes, ensured a steady supply of incarcerated Black workers. The legislature "increased penalties for crimes, reduced the amount of time off prisoners could earn for good behavior, and cut back on the number of people being paroled[.]"[6] By the early 1980s, Louisiana was a national leader in incarceration. In 2023, it still is.

## DEFENDANTS' ADMINISTRATION OF THE FARM LINE

### A.  The physical plant of Angola.

33.    Angola occupies a 28-square-mile area, roughly the size of the island of Manhattan.

34.    The plantation is divided into several compounds. The Main Prison complex consists of the East Yard and the West Yard. The East Yard has 16 minimum and medium custody dormitories and one maximum custody extended lockdown cellblock known as the "dungeon." The dungeon houses long-term extended-lockdown prisoners, in-transit administrative segregation

---

[4] *Id.* at 94.
[5] Armstrong (2012) at 905-06 (citing *Prison Labor in the United States*, 53 MONTHLY LAB. REV. 578, 585 (1941)).
[6] William P. Quigley, *Louisiana Angola Penitentiary: Past Time to Close*, 19 LOY. J. PUB. INT. L. 163, 209 (2018).

prisoners, inmates who need mental health attention, and protective-custody inmates. The Main Prison complex includes approximately eight dormitories and four cellblocks, or disciplinary segregation cells.

35.     Individuals serving disciplinary time in the cellblocks and lockdown units have extremely limited human interaction. The extreme isolation, deprivation of stimuli, and severe punishments all work to create a significant risk of harm to the mental and physical health of people incarcerated at Angola.

36.     Angola also has several "out camps." Camp C includes eight minimum and medium custody dormitories, one administrative segregation and working cellblock, and one extended lockdown cellblock. Farm Line 15, among others, operates out of Camp C. Camp D has similar features to Camp C, but without an extended lockdown cellblock. Farm Lines 15b, 24, and 25, among others, operate out of Camp D.

**B.  Defendants' uniform policies and practices.**

37.     Defendants operate each Farm Line in the same manner and pursuant to the same uniform policies and practices.

38.     Defendant Prison Enterprises directs the agricultural program at Angola. It employs incarcerated people in various industrial, service and agricultural positions. As of 2019, nearly 30 percent of Prison Enterprises' incarcerated workforce were laboring in the fields. Prison Enterprises also sells incarcerated goods and labor to state, parish, and local governments and non-profit organizations. It operates like a business, though it must also follow all guidelines set forth by regulatory agencies, including the Office of State Procurement.

39.     In 2021 and 2022, incarcerated men forced to work under the direction of Prison Enterprises planted, grew, and harvested nearly 3,000 acres of wheat, corn, soybeans, cotton, and

grain sorghum at Angola. Prison Enterprises used some of those crops to feed its livestock and flight birds, but most were sold on the open market.

40.    By policy and practice, nearly every person who is transferred to Angola is assigned to the Farm Line at some point. After working in the field and remaining without a disciplinary write-up for 90 days, an incarcerated person can request a job change through his unit Classification Officer. People who apply for a job change are routinely rejected, despite having perfect disciplinary records. Even after reassignment, a person who receives a disciplinary write-up may be sent back to the Farm Line as punishment. People have been transferred to the Farm Line by the Disciplinary Board and by individual prison administrators for disciplinary infractions.

41.    Plaintiffs are forced to hoe, dig, and weed for hours, sometimes without access to clean drinking water. Breaks are uncommon. Shade and sanitary toilet facilities are nearly unheard of. Despite the availability of modern agricultural machinery, Plaintiffs and class members are forced to pick plantation crops by hand or use outdated tools, without training or standard protective gear. As described below, this work is particularly dangerous in the extreme heat and humidity of Louisiana's summers.

42.    Most incarcerated men who are assigned to the Farm Line are Black.

43.    People incarcerated at Angola must work at least three years before they are eligible for compensation, also called "incentive pay." Then—after three years of labor—they may be paid $0.02 an hour for their work, no matter the position, for at least six months. Louisiana has among the lowest incentive pay rates for incarcerated people working in correctional industries. Prison Enterprises pays all incentive wages in the State's prisons. Prison Enterprises could pay higher rates if it chose to. *See* La. R.S. § 15:873. Defendant LeBlanc could also set higher wages. *See id.*

44.    Some incarcerated people can opt for "good time" credits to reduce the length of their sentences—two days for every day worked—instead of receiving incentive pay. Others work in exchange for basic necessities, like extra food.

45.    Incarcerated people are left with even less earned income because the State charges exorbitant rates for necessities like food, hygiene products, warm clothing, medications, and medical care. Angola's canteen, or store, is the only approved method for incarcerated people to purchase goods from the outside on a daily basis.

46.    Prison Enterprises buys canteen items in bulk, marks those items up by approximately 20%, and then resells them to correctional facilities. Then, the correctional facilities charge another 33.3% markup on those items. From 2021 to 2022, Prison Enterprises conducted more than $30.5 million in industry, agriculture, and retail sales combined. Nearly 35% of that sum—more than $10.5 million—was from sales to canteens that incarcerated people and their families depend on.

**C. Defendants' administration of the Farm Line subjects all incarcerated people to a significant risk of serious psychological harm.**

47.    Defendants threaten incarcerated people with serious harm—including confinement in the dungeon—to prevent them from challenging the unsafe nature of their compulsory fieldwork assignments.

48.    Pursuant to Angola's disciplinary matrix, failure to perform compulsory work with "reasonable speed and efficiency" could result in five days of "disciplinary detention," forfeiture of 15 days of good time, two weeks of confinement, and/or inability to earn incentive wages for three months. In practice, "failing to perform work with compulsory speed and efficiency" encompasses a wide range of benign behavior.

49.    "Aggravated" work offenses include refusing to work, asking to go to segregation rather than work, disobeying repeated instructions as to how to perform work assignments (even if the instruction makes a person unsafe), and "[f]alling far short of fulfilling reasonable work quotas[.]"[7]

50.    Disciplinary infractions can also result in placement in disciplinary or solitary confinement for 30 days for first offense and 180 days for a third offense. Individuals in disciplinary confinement are deprived of their personal property and contact with others. They are allowed out of their cells for one hour daily to shower or exercise in a small, kennel-like enclosure.

51.    Defendants have imposed indefinite segregation in response to nonviolent and minor rule violations, including failure to complete a job assignment. The risks of noncompliance include losing crucial connections with friends and family, losing access to essential food, privileges, recreation, and freedom of movement.

52.    Those who refuse to work also typically lose privileges, including access to personal telephone calls, family visitation, and access to the canteen to buy food, clothing, hygiene products, and other necessities.

53.    These conditions are dehumanizing, authoritarian, and punitive. This ensures that Angola is not only a painful place in which to live, but that the administration of its agricultural program is inherently coercive.

54.    Solitary confinement and disciplinary segregation subject every class member to a significant risk of serious harm. That harm includes psychological and physical damage that can prove long-lasting and even fatal.

---

[7] Louisiana Department of Public Safety and Corrections, *Disciplinary Rules Procedures for Adult Offenders* at 39 (Sept. 12, 2021).

**D.  The Farm Line has no penological or institutional purpose.**

55.    At Angola, many daily tasks assigned to incarcerated men on the Farm Line are designed to enforce powerlessness. For instance, Plaintiffs and class members have been forced to dig and refill holes. Some must "goose-pick," or pull blades of grass by hand.  Others must water crops using a Styrofoam cup. This definitionally pointless labor—extracted under threat of further punishment and serious harm—is humiliating and degrading. It is arbitrary and traumatic. An exercise of power, the Farm Line systematically treats Plaintiffs and class members as deserving of little, if any, dignity.

56.    The Farm Line is not calculated to lead to gainful future employment, as the State has projected agriculture "to have a decrease in future employment."[8] Prison Enterprises actually loses money because of its inefficient and outdated work methods, intentionally pointless labor, and reluctance to reclassify incarcerated people to jobs that offer more valuable work skills.

<u>THE FARM LINE IS INHERENTLY AND OBVIOUSLY DANGEROUS</u>

57.    Every person incarcerated at Angola, including Plaintiffs and the class members, is at substantial risk of serious physical and psychological harm due to their extensive and continued exposure to high temperatures and heat indices during the summer months in Louisiana. This is especially true for people with medical or mental health conditions that make them more susceptible to heat-related injuries, or who are taking certain medications that adversely affect their body's ability to thermoregulate.

---

[8] *See* Louisiana Legislative Auditor, Performance Audit Services, "Prison Enterprises – Evaluation of Operations (May 1, 2019) at 3, 9 (hereinafter, "Legislative Audit"), *available at* https://s3.documentcloud.org/documents/6430079/Louisiana-Legislative-Auditor-Prison-Enterprises.pdf.

**A.  Extreme heat and humidity in Angola's fields.**

58.    The science is clear that prolonged exposure to high heat places people – even younger and healthier people – at serious risk of death or permanent physical injury. The risk of heat-related illness accelerates sharply when the heat index exceeds 88°F.

59.    The temperature in the Angola fields regularly rises above 95°F and the relative humidity regularly exceeds 92%, according to local weather data tracked by the National Weather Service (NWS). By another measure, the heat index—i.e. the apparent temperature, which measures how hot it *feels*—regularly reaches into the "danger" and "extreme danger" zones, according to the National Oceanic and Atmospheric Administration (NOAA) and the NWS.

60.    The New Orleans/Baton Rouge office of the NWS, which covers Angola, issues "heat advisories" when the heat index reaches 108°F or when the temperature reaches 103°F. The NWS issues "excessive heat warnings" if the heat index reaches 113°F or if the temperature reaches 105°F.[9] An excessive heat warning indicates that "extreme heat and humidity will significantly increase the potential for heat related illnesses, particularly for those working or participating in outdoor activities."[10]

61.    This summer was the hottest on record.[11] Experts agree that this extreme weather is part of a long-term trend of human-driven warming.[12]

---

[9] *NWS LIX - Watch, Warning, Advisory Criteria*, National Weather Service, *available at* https://www.weather.gov/lix/wwa_criteria#Heat%20Products.

[10] Janel Loehrke and George Petras, *How to Keep Cool and Recognize the Warnings Signs of Heatstroke*, USA TODAY (June 29, 2023), *available at* https://www.usatoday.com/story/graphics/2023/06/28/heat-exhaustion-heat-stroke-symptoms-treatment/70357416007/.

[11] *See* Drew Broach, "Triple-digit heat wilts Louisiana yet again, threatens all-time record highs," THE TIMES-PICAYUNE/NOLA.COM (August 23, 2023).

[12] "NASA Clocks July 2023 as Hottest Month on Record Ever Since 1880," NASA (August 14, 2023), *available at https://climate.nasa.gov/news/3279/nasa-clocks-july-2023-as-hottest-month-on-record-ever-since-1880/*

62.     According to the NWS, Angola's heat index qualified for an excessive heat warning on 97 days between May 1 and September 14, 2023. *See Figure 1, infra*. Defendants have forced Plaintiffs to work on the Farm Line during that period.

*Figure 1: Heat Index at Angola*

| | May 2023 | | | | June 2023 | | |
|---|---|---|---|---|---|---|---|
| Date | Max Temp (°F) | Humidity | Heat Index | Date | Max Temp (°F) | Humidity | Heat Index |
| 5/1 | 78.2 | 60.9 | * | 6/1 | 90 | 68.2 | 105 |
| 5/2 | 79.6 | 60.5 | * | 6/2 | 91.1 | 65.7 | 106 |
| 5/3 | 82.1 | 59.7 | 85 | 6/3 | 91.9 | 65.7 | 108 |
| 5/4 | 85.1 | 58.4 | 89 | 6/4 | 89.8 | 76.2 | 110 |
| 5/5 | 85 | 81.4 | 97 | 6/5 | 85.1 | 80.7 | 97 |
| 5/6 | 74.6 | 93 | * | 6/6 | 86.3 | 76.3 | 99 |
| 5/7 | 84.6 | 83.5 | 97 | 6/7 | 88.9 | 73.4 | 105 |
| 5/8 | 82.7 | 86.8 | 93 | 6/8 | 91.6 | 71.6 | 112 |
| 5/9 | 80.7 | 90.2 | 88 | 6/9 | 92.1 | 70.6 | 113 |
| 5/10 | 81.1 | 86.5 | 88 | 6/10 | 92.2 | 74 | 116 |
| 5/11 | 87.1 | 81.2 | 104 | 6/11 | 90.6 | 71.9 | 109 |
| 5/12 | 88.9 | 81 | 110 | 6/12 | 91.3 | 76.2 | 115 |
| 5/13 | 88.6 | 74.8 | 105 | 6/13 | 92.4 | 74.8 | 118 |
| 5/14 | 89.2 | 79.3 | 110 | 6/14 | 93.5 | 73.2 | 120 |
| 5/15 | 88.5 | 83.2 | 110 | 6/15 | 93.3 | 77.6 | 124 |
| 5/16 | 86.7 | 77.6 | 101 | 6/16 | 95.7 | 69.9 | 125 |
| 5/17 | 83.1 | 77.8 | 91 | 6/17 | 96.1 | 75.9 | 134 |
| 5/18 | 85.9 | 72.8 | 96 | 6/18 | 94.4 | 75.3 | 126 |
| 5/19 | 90.6 | 70.4 | 108 | 6/19 | 95.8 | 73.7 | 130 |
| 5/20 | 90.2 | 75.9 | 111 | 6/20 | 94.6 | 78.5 | 130 |
| 5/21 | 79.1 | 75.5 | * | 6/21 | 91 | 76.3 | 114 |
| 5/22 | 84.8 | 69.7 | 92 | 6/22 | 89.5 | 72.8 | 106 |
| 5/23 | 87.3 | 67 | 97 | 6/23 | 91.8 | 70.9 | 112 |
| 5/24 | 83.8 | 75.2 | 92 | 6/24 | 91.7 | 76.1 | 116 |
| 5/25 | 86.2 | 70 | 96 | 6/25 | 94.9 | 76.8 | 130 |
| 5/26 | 86.7 | 61.8 | 93 | 6/26 | 90 | 81.6 | 115 |
| 5/27 | 86.7 | 66.6 | 95 | 6/27 | 95.4 | 74 | 128 |
| 5/28 | 87.5 | 67.9 | 98 | 6/28 | 96.3 | 72.2 | 130 |
| 5/29 | 88.4 | 66.7 | 99 | 6/29 | 97.3 | 71.2 | 133 |
| 5/30 | 89.3 | 67.1 | 102 | 6/30 | 97.7 | 68.1 | 131 |
| 5/31 | 89.5 | 65.7 | 102 | | | | |

**Figure 1: Heat Index at Angola (continued)**

| | July 2023 | | | | August 2023 | | |
|---|---|---|---|---|---|---|---|
| Date | Max Temp (°F) | Humidity | Heat Index | Date | Max Temp (°F) | Humidity | Heat Index |
| 7/1 | 97.3 | 68.8 | 130 | 8/1 | 99 | 75.1 | 146 |
| 7/2 | 95.2 | 67.2 | 120 | 8/2 | 97 | 79.6 | 143 |
| 7/3 | 94.6 | 67.6 | 119 | 8/3 | 97.7 | 72.8 | 137 |
| 7/4 | 92.4 | 72.2 | 115 | 8/4 | 97.8 | 71 | 135 |
| 7/5 | 93.5 | 76.3 | 123 | 8/5 | 98.6 | 71.7 | 139 |
| 7/6 | 92.2 | 77.1 | 119 | 8/6 | 98.1 | 71.9 | 137 |
| 7/7 | 93.9 | 73.6 | 122 | 8/7 | 98.2 | 71.7 | 137 |
| 7/8 | 91.3 | 73.1 | 112 | 8/8 | 96.4 | 73.8 | 132 |
| 7/9 | 90.9 | 78.8 | 116 | 8/9 | 97 | 71.7 | 132 |
| 7/10 | 88.1 | 77.9 | 105 | 8/10 | 99.1 | 70.1 | 139 |
| 7/11 | 95 | 74.6 | 128 | 8/11 | 100 | 70.3 | 143 |
| 7/12 | 94.9 | 72 | 124 | 8/12 | 99.4 | 70.4 | 141 |
| 7/13 | 96.5 | 72.2 | 131 | 8/13 | 98.9 | 70.6 | 139 |
| 7/14 | 95.7 | 71.5 | 127 | 8/14 | 99 | 68.1 | 136 |
| 7/15 | 96.3 | 71.3 | 129 | 8/15 | 95.7 | 69.7 | 125 |
| 7/16 | 97.3 | 78.8 | 143 | 8/16 | 91.9 | 52.2 | 100 |
| 7/17 | 94.4 | 77.4 | 128 | 8/17 | 96.6 | 60.1 | 118 |
| 7/18 | 95.3 | 71.9 | 126 | 8/18 | 99.7 | 64.7 | 134 |
| 7/19 | 94.3 | 74.1 | 124 | 8/19 | 101.1 | 64.8 | 140 |
| 7/20 | 95.8 | 73.1 | 129 | 8/20 | 102.4 | 62.6 | 142 |
| 7/21 | 96 | 72.9 | 130 | 8/21 | 99.3 | 66.6 | 135 |
| 7/22 | 98.5 | 82.1 | 154 | 8/22 | 100.1 | 67.4 | 140 |
| 7/23 | 89.7 | 76.6 | 110 | 8/23 | 101.8 | 65 | 143 |
| 7/24 | 92.8 | 67.9 | 113 | 8/24 | 101.9 | 73.1 | 156 |
| 7/25 | 93.2 | 71.2 | 117 | 8/25 | 100.5 | 71.9 | 148 |
| 7/26 | 94 | 70.4 | 119 | 8/26 | 100.7 | 68.9 | 144 |
| 7/27 | 95.1 | 68.9 | 122 | 8/27 | 101.8 | 61.9 | 139 |
| 7/28 | 94.9 | 69.8 | 122 | 8/28 | 90.9 | 80.2 | 117 |
| 7/29 | 96.2 | 69.2 | 126 | 8/29 | 91.6 | 77.2 | 117 |
| 7/30 | 98.2 | 68.7 | 133 | 8/30 | 93.7 | 53.9 | 105 |
| 7/31 | 98.2 | 73.4 | 140 | 8/31 | 92.8 | 51.6 | 101 |

*Figure 2: Heat Index at Angola (continued)*

| September 2023 | | | |
|---|---|---|---|
| **Date** | **Max Temp (°F)** | **Humidity** | **Heat Index** |
| 9/1 | 96.3 | 58.7 | 116 |
| 9/2 | 93 | 74.1 | 119 |
| 9/3 | 96.2 | 77.1 | 136 |
| 9/4 | 92.6 | 83.1 | 127 |
| 9/5 | 93.8 | 78.6 | 127 |
| 9/6 | 96.5 | 72.7 | 133 |
| 9/7 | 98.5 | 74 | 115 |
| 9/8 | 88.9 | 87.6 | 105 |
| 9/10 | 89.2 | 62.9 | 99 |
| 9/11 | 92.1 | 66.1 | 109 |
| 9/12 | 91.8 | 72.2 | 113 |

**B. The impact of extreme heat and humidity on the human body.**

63.     Thermoregulation is the process by which the human body maintains its temperature within a safe physiological range, in response to internal and external thermal stimuli. The inability to properly thermoregulate impairs the function of multiple bodily systems, including the nervous system, pulmonary system, cardiovascular system, gastrointestinal system, and kidney function.

64.     When the body needs to emit heat, the heart pumps faster and squeezes harder in order to pump more blood to the skin. Heat dissipates from the body's surface, primarily through evaporation. Evaporation is the process of vaporization of water or sweat and is responsible for large amounts of heat loss from the skin. Perspiration, or sweating, brings water to the skin, where it evaporates and causes heat to dissipate from the body.

65.     Evaporative cooling becomes less effective as humidity rises, since the air is already saturated with moisture. As a result, the body cannot release as much heat, and body

temperatures may continue to rise, possibly leading to hyperthermia. Hyperthermia occurs when the body's natural thermoregulatory processes are insufficient and overwhelmed, and the body begins to accumulate heat.

66.    Under these conditions of heat and humidity, the body must work harder to cool itself by increasing vasodilation and perspiration. The heart also increases its cardiac output, pumping faster and harder in order to pump more blood through the body to maintain blood pressure and cooling.

67.    The act of sweating depletes the body of water and salt. Without adequate repletion, a person will become dehydrated. Dehydration can cause light-headedness or dizziness, a lack of energy, low blood pressure, weakness, and increased heart rate. A person who is dehydrated may be unable to increase cardiac output adequately to meet the demands of the heat stress. If fluids are not replaced, core temperature will rise, and hyperthermia will result.

68.    Dehydration is particularly dangerous for African Americans of any age with sickle cell anemia or sickle trait. Heat and dehydration increase sickling (deformation into the shape of a sickle) of blood cells, causing pain and blockage of vessels. This can cause many life-threatening situations, such as acute chest pain, kidney failure, stroke, and myocardial infarction (heart attack).

69.    Dehydration also causes abnormal electrolytes, including very high sodium or very low sodium. These cause subtle mental status changes and can cause dehydrated individuals to be less active, sleepier than usual, less cooperative, and apathetic. In the heat, behaviors that seem abnormal may be manifestations of electrolyte disorders due to heat-induced changes.

70.    Certain medical conditions and pharmaceutical agents may impair these critical thermoregulation processes. Any medication that limits vasodilation or sweat gland function will limit the ability to thermoregulate in the heat.

### C.  Heat-related disorders and heat stroke.

71.    Heat-related disorders occur when the body's temperature control system is overloaded, and the body is unable to adequately dissipate heat. The term "heat stress" refers to environmental conditions that cause the body's thermoregulatory systems to engage and enhance heat loss from the body.

72.    The body's safe physiologic range is typically a set point of plus or minus 0.8°F range around 98.6°F. The risk for heat stroke and heat-related disorders increases sharply when the heat index exceeds 88°F. Heat-related disorders include heat syncope (fainting), heat cramps, heat exhaustion, and heat stroke. *See Figure 2, infra (Progression of Heat-Related Illness).*

73.    Heat exhaustion results when heat stress begins to overwhelm the ability of the body to dissipate heat. A person suffering from heat exhaustion may feel chilled even though it is hot. They can also feel light-headed, thirsty, nauseous, weak, faint, or dizzy, or have unsteady gait. Their heartbeat is rapid, and they may also experience muscle aches (myalgia), headache, or abdominal cramps.

74.    Heat stroke is a severe medical emergency caused by persistent heat stress and inadequate dissipation of heat from the body. It commonly occurs when a person is engaged in physically strenuous activity in a high heat index and hot environment. Heat stroke is defined as an elevation of body temperature above 105.5°F. A person experiencing a heat stroke may exhibit an alteration of mental status. The altered mental status could be subtle, manifesting as inappropriate behavior or impaired judgment, or it could include confusion, delirium, and seizures.

75.    The symptoms of heat stroke—including altered mental status, slurred speech, and irritability—can be misinterpreted as misbehavior, rather than the physiological response to the excessive heat.



*Figure 2: Progression of Heat-Related Illness[13]*

76.    Heat stroke carries a significant risk of death and permanent disability, including the failure of multiple organ systems and permanent neurological damage, if emergency treatment is not provided.

77.    Heat stroke may occur without warning when thermoregulation fails. Heat stroke can occur in persons who have never complained about heat before. The rapid onset of heat stroke has important implications: even frequent observations of persons at high risk of heat stroke may not give adequate warning of impending collapse.

78.    Persistent exposure to extreme heat also causes or exacerbates medical conditions that are not traditionally thought of as "heat-related." For example, in extremely hot environments like Angola's plantation fields, people who suffer from cardiovascular disease are more prone to

---

[13] Louisiana Department of Health, *Heat-Related Illness in Louisiana: Review of Emergency Department and Hospitalization Data from 2010-2020*, 4 (March 2023), *available at* https://ldh.la.gov/assets/docs/lah/HRI_in_Louisiana_from_2010-2020.pdf.

morbidity and mortality. People with diabetes may suffer acute complications such as electrolyte and fluid abnormalities and exacerbation of the coexistent cardiovascular complications that result from diabetes. People with respiratory ailments, like asthma, are more prone to suffer from an exacerbation of those respiratory ailments. These medical events cause pain and suffering, permanent injury, or death, while not directly attributed to heat exposure.

**D. People with certain medical or psychiatric conditions, or who take certain medications, are at a higher risk of heat-related disorders.**

79.     All people, including healthy people with no known medical problems, are at risk for heat-related disorders during persistent exposure to a heat index above 88° F. However, certain people are at greater risk of heat-related disorders. This includes (a) people with chronic illnesses or medical conditions that impair thermoregulation; (b) people with psychiatric or mental health disorders; and/or (c) people taking drugs or medications that impair thermoregulation. People who fall into more than one of these categories are at an even higher risk of injury.

80.     People with chronic illnesses or medical conditions such as heart disease, hypertension, diabetes, pre-diabetes, obesity, and respiratory diseases like asthma or chronic obstructive pulmonary disease (COPD) are much more likely to succumb to heat stroke when under heat stress due to their body's inability to fully thermoregulate. Other conditions, such as fatigue associated with a recent deficit in sleep, poor physical conditioning, a recent febrile illness (fever), extensive skin conditions affecting the sweat glands and the blood vessels, including burns, scleroderma or psoriasis, are also precipitating factors for heat stroke.

81.     People with psychiatric disabilities or mental health disorders are at increased risk of heat stroke and heat-related disorders because they may have impaired behavioral responses to heat stress. People with mental illness may not have the ability to reason, take precautions, or help themselves during a period of heat stress. People suffering from heat disorder must be able to

express themselves, and have the cognitive awareness and interpersonal skills to ask for help. People who suffer from depression or anxiety may be unable to communicate well with others, or may experience apathy and inability to take on and overcome challenging circumstances, during times of physiologic heat stress.

82.    Certain medications that impair the body's ability to dissipate heat, circulate blood, or interfere with salt and water balance increase the risk of heat stroke and heat-related disorders. Medications that impair vasodilation and sweating – the primary processes of thermoregulation – will place persons at greater risk of heatstroke and heat related disorders.

83.    Many, if not most, medications used to treat mental illness increase the risk of heat-related health problems. Antipsychotic, antidepressant, and anticholinergic medications all impair the body's ability to perspire, and hence cool itself off. For instance, Lithium causes significant fluid loss that can exacerbate heat-related health problems. And Selective Serotonin Reuptake Inhibitors (SSRIs), which are prescribed for people suffering depression, decrease its ability to respond to and regulate the body's temperature.

84.    Drugs used to prevent or treat cardiovascular disease, known as Beta blockers, calcium channel blockers, and diuretics, depress cardiac function, or cause dehydration, impair cardiac output and place persons at greater risk of heat stroke and heat-related illness. Even common nasal decongestants, antihistamines, and over-the-counter cold remedies can cause narrowing of the blood vessels, or vasoconstriction, which inhibits the loss of heat from the body.

**E. Adverse health outcomes due to excessive heat exposure are well-known and entirely preventable.**

85.    The National Institute for Occupational Safety and Health (NIOSH) recommends that workers doing moderate activity in moderately hot conditions should drink about a cup of

water or fluids every fifteen to twenty minutes.[14] If activity in the heat lasts longer than two hours, fluids with balanced electrolytes should also be provided.[15] Water provided near the worksite should be potable and no warmer than 59°F.[16] NIOSH also recommends the following work practices to reduce the risk of heat-related illness and death:

- limit time in the heat and increase recovery time spent in a cool area;

- reduce the physical demands of the job;

- use tools intended to minimize manual strain;

- train supervisors and workers about heat stress;

- implement a system of self and peer monitoring for heat illness symptoms;

- use a heat alert program whenever a heat wave is forecasted;

- institute a heat acclimatization plan; and

- train supervisors to recognize heat illness symptoms, follow emergency response procedures, and respond to heat advisories.[17]

86.    Defendants do not follow or implement these recommendations regarding the Farm Line.

87.    The State is well aware of the dangers of heat exposure at Angola.[18] In 2013, a federal judge found that heat conditions on Angola's death row constituted cruel and unusual punishment in violation of the Eighth Amendment and ordered the State to reduce and maintain

---

[14] *Protect Your Workers from Heat Stress,* National Institute for Occupational Safety and Health, *available at* https://www.cdc.gov/niosh/topics/heatstress/infographic.html.
[15] *Heat Stress - Recommendations,* National Institute for Occupational Safety and Health, *available at* https://www.cdc.gov/niosh/topics/heatstress/recommendations.html.
[16] *Id.*
[17] *Id.*
[18] *See, e.g.*, Julia O'Donoghue, *Louisiana Prison Officials Push for Air Conditioning After Fighting Lawsuit*, WWNO (Mar. 22, 2022), https://www.wwno.org/law/2022-03-22/louisiana-prison-officials-push-for-air-conditioning-after-fighting-lawsuit (Secretary LeBlanc discussing how the high temperatures and lack of air conditioning in Louisiana's prisons contribute to staffing issues).

the heat index to at or below 88 degrees. *Ball v. LeBlanc*, 792 F.3d 584, 598 (5th Cir. 2015) (citing

*Ball v. LeBlanc*, F. Supp. 2d 639, 689 (M.D. La. 2013))

<u>**DEFENDANTS ARE DELIBERATELY INDIFFERENT**</u>
<u>**TO A SEVERE RISK OF SERIOUS HARM**</u>

88.    Defendants, through their policies and practices administering the Farm Line, fail

to prevent serious harm to Plaintiffs. First, by forcing incarcerated men—who are primarily

Black—to engage in pointless manual agricultural labor under threat of serious harm or

punishment, Defendants expose every class member to a significant risk of serious psychological

and physical harm. Second, Defendants fail to consistently or meaningfully identify individuals

with disabilities and/or health conditions that impede their ability to thermoregulate. Even when

an individual with a disability and/or health condition is identified, Defendants fail to

accommodate those individuals and still force them to work the Farm Line. Finally, Defendants

knowingly subject individuals who were convicted by non-unanimous juries to forced agricultural

labor, even though those men were never "duly convicted" within the meaning of the Thirteenth

Amendment.

89.    Each of these failed policies put incarcerated individuals at severe risk of serious

psychological and physical harm. These policies have caused actual harm to each Plaintiff and all

class members. Defendants act with deliberate indifference to these risks.

<u>**INDIVIDUAL ALLEGATIONS**</u>

**A. Myron Smith**

90.    Plaintiff Myron Smith has been incarcerated at Angola since 1998. He has had

various jobs at Angola, including being a yard orderly, a cook, and working on the range crew. On

several occasions, Defendants have forced Mr. Smith to engage in manual labor on the Farm Line,

including in extreme heat and humidity. Sometimes, Defendants reassigned Mr. Smith to the Farm Line as punishment for a disciplinary infraction.

91.    Defendants currently force Mr. Smith to work on Line 15b, out of Camp D.

92.    Approximately 10 men work on line 15b on any given workday, though sometimes Line 15b works alongside Lines 24 and 25. Work call occurs every weekday around 6 a.m. Mr. Smith, along with the putative class members, work in the fields starting at approximately 7 a.m. They are forced to walk or take a bus to the work site, where officers known as "freemen" assign them tasks. That manual labor includes picking crops, cutting grass, and sometimes doing maintenance chores. Mr. Smith is sometimes provided with a weed eater, but other times he is forced to use his hands to complete his tasks.

93.    Mr. Smith and the class members have also been forced to engage in humiliating and punitive "make work." For example, in 2023, prison officials gave Mr. Smith a five gallon bucket and a Styrofoam cup, and forced him to hand-water rows of watermelons. This was physically painful and difficult work, particularly because of the extremely hot and humid weather in the fields. Mr. Smith, along with putative class members, has also been forced to hand-pick grass. Mr. Smith could not refuse to do this make-work without risking disciplinary action and serious harm.

94.    The working conditions are harsh. The drinking water is dirty, in a moldy cooler that often contains dead insects. There is no shade. Breaks are rare. Armed guards patrol the fields, sometimes riding four-wheelers. There is often no place to use the bathroom. On the rare occasion that toilet facilities are available, they are extremely unsanitary.

95.    Mr. Smith, like all class members, is not provided with sunscreen, proper work gloves, proper work boots, sunglasses, or other safety equipment necessary to safely work in the

fields. Instead, he has been issued black rubber boots, which cause painful blisters and provide inadequate protection from the elements. Like others in the class, Mr. Smith has had to buy his own work boots, at significant expense, for basic safety.

96.    Mr. Smith, like all other class members, has been forced to work in the extreme heat and humidity. This has caused him serious physical harm, including symptoms of heat-related illness. He often feels woozy, dehydrated, and dizzy while conducting compulsory manual labor in the fields. Once, in approximately 2021, Mr. Smith was working on Line 15b when his muscles seized up. An emergency medical technician instructed Mr. Smith simply to drink more water and rest. Instead of being taken inside to cool off, Mr. Smith was forced to sit in the field, in the hot sun, for the rest of the shift.

97.    Mr. Smith did not volunteer to work the Farm Line. He did not choose to participate in Angola's program of compulsory agricultural labor. He only does so to avoid serious harm and punishment, like disciplinary confinement, loss of phone time, loss of access to loved ones, and loss of canteen access.

**B.  Darrius Williams**

98.    Plaintiff Darrius Williams has been incarcerated at Angola since 2011.

99.    Like all members of the NUJ subclass, Mr. Williams was convicted by a non-unanimous jury.

100.    On several occasions, Defendants have forced Mr. Williams to engage in manual labor on the Farm Line, including in extreme heat and humidity. Defendants have also reassigned Mr. Williams to the Farm Line as punishment for alleged disciplinary infractions.

101.    Mr. Williams has been forced to work on the Farm Line several times. He would report to the call-out around 6 a.m. every morning, along with dozens of others. They would walk

into the fields or ride an old school bus, where they would pick crops starting around 7 a.m. Defendants forced Mr. Williams, along with the others on the Farm Line, to engage in heavy manual labor in the fields, even when there was a heat advisory.

102.    Like all members of the class, Mr. Williams is not provided with sunscreen, proper work gloves, proper work boots, sunglasses, or other equipment necessary to safely work in the fields.

103.    Defendants have confined Mr. Williams to lockdown, or disciplinary confinement, for protesting the dangerous and unsafe conditions of forced labor on the Farm Line.

**C.  Nate Walker**

104.    Plaintiff Nate Walker has been incarcerated at Angola since 2009.

105.    Like all members of the disability subclass, Mr. Walker is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(A) and (B). He suffers from high blood pressure, glaucoma, thyroid cancer, and depression. He also has a family history of sickle-cell anemia. These conditions substantially limit Mr. Walker's major life activities, including his ability to stand, lift, bend, and otherwise engage in intense manual agricultural labor. Defendants prescribe Mr. Walker medications, including levothyroxine, to manage his disabilities.

106.    In apparent recognition that Mr. Walker's disabilities and serious medical conditions seriously limit his major life activities, including his ability to thermoregulate, Defendants have provided Mr. Walker with a temporary duty status. That status provides that because Mr. Walker takes medications that cause heat-related side effects, his duty status from May to October is "regular duty with restrictions; indoors, no kitchen duty, no sports[.]"

107.    Mr. Walker is still forced to engage in intense manual agricultural labor at other times, including earlier this year when there were heat advisories. That work exceeds his strength

and physical abilities, causes him unnecessary pain and suffering, and has significantly worsened his medically-serious pathological conditions.

108.    Mr. Walker has requested reasonable accommodations for his disabilities, including a permanent duty status so he will not be forced to work on the Farm Line. He is being denied those accommodations.

**D.  Damaris Jackson**

109.    Plaintiff Damaris Jackson has been incarcerated at Angola since 2002.

110.    Like all members of the disability subclass, Mr. Jackson is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(A) and (B). He suffers from high blood pressure, which significantly impairs his ability to thermoregulate and subjects him to an increased risk of severe harm in the heat and humidity of Angola's fields. Prison officials know about Mr. Jackson's condition and prescribe him valsartan to manage it.

111.    Mr. Jackson is currently forced to work on Farm Line 25. On any given day, the work crew includes approximately 20 other incarcerated men. Every weekday, Mr. Jackson reports to work call-out around 6 a.m. He either walks or takes a bus to the field, where an officer, or "freeman," assigns tasks. Mr. Jackson, like the class members he seeks to represent, typically works in the fields starting at 7 a.m.

112.    Like every Farm Line, Defendants do not generally provide Line 25 with tools or equipment to use in the fields. Instead, the prison officials force Mr. Jackson and the putative class members to use their hands to cultivate crops like squash, zucchini, and okra.

113.    Mr. Jackson has not been provided with sufficient gloves, protective work boots, sunscreen, sunglasses, a sunhat, or other equipment necessary to safely work in the fields.

114.    For Mr. Jackson, like all members of the class and the disability subclass, the heat and humidity in the fields are unbearable. When working outside on the Farm Line, Mr. Jackson has often suffered from symptoms of heat-related illness: he has felt dehydrated, lightheaded, dizzy, and chilled despite the extreme heat and humidity. He has suffered from muscle aches and headaches. These symptoms are worse in the extreme heat and humidity.

115.    Forced manual labor in Angola's plantation fields exceeds Mr. Jackson's strength and physical abilities, causing him unnecessary pain and suffering. He has requested reasonable accommodations for his disability in the form of a permanent duty status, and is being denied those accommodations.

## CLASS ALLEGATIONS

116.    Named Plaintiffs **SMITH**, **WALKER**, **JACKSON,** and **WILLIAMS** bring this action, on behalf of themselves and all others similarly situated, to assert the claims alleged in this Complaint on a common basis pursuant to Federal Rule of Civil Procedure 23(b)(2).

**A.  The Plaintiff Class and Subclasses**

117.    Named Plaintiffs represent a proposed class of: all current and future persons who are incarcerated at the Louisiana State Penitentiary and who are currently or might in the future be compelled to participate in compulsory agricultural labor.

118.    Additionally, Plaintiffs **JACKSON** and **WALKER** seek to represent a subclass defined as: all current and future persons with disabilities as defined under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act who are incarcerated at the Louisiana State Penitentiary and who are currently or might in the future be compelled to participate in compulsory agricultural labor (the "disability subclass").

119.    Additionally, Plaintiff **WILLIAMS** seeks to represent a subclass defined as: all persons incarcerated at the Louisiana State Penitentiary who were convicted by a non-unanimous jury and who are currently or might in the future be compelled to participate in compulsory agricultural labor (the "Non-Unanimous Jury (NUJ) subclass").

## B.  Rule 23(a)

120.    The proposed class and subclasses satisfy the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a).

121.    ***Numerosity.*** The class is so numerous that joinder of all members is impracticable. The precise number of class members is in the Defendants' own records. On information and belief, hundreds of individuals are forced to work the Farm Line every year. There are currently approximately 3,850 men incarcerated at Angola.

122.    Because of the Defendants' policies and practices, every person incarcerated at Angola is subject to working the Farm Line upon entrance or as punishment for a disciplinary infractions, and nearly every person has in fact worked the Farm Line. The proposed class and subclasses are fluid due to the ever-changing populations of Angola, which "counsels in favor of certification of all present and future members." *Lewis v. Cain*, 324 F.R.D. 159, 168 (M.D. La. 2018). The indeterminate number of future class members also makes joinder impracticable. *See Nelson v. Constant*, No. 17-14581, 2018 U.S. Dist. LEXIS 164853, at *9 (E.D. La. Sep. 25, 2018); *see also Mullen v. Treasure Chest Casino LLC*, 186 F.3d 620, 624 (5th Cir. 1999).

123.    ***Commonality.*** All members of the class and subclasses have been harmed in essentially the same way. Each has been subject to the same systemic unconstitutional policies, acts, and omissions on the part of Defendants described in this Complaint. All class members have suffered or will suffer violations of their constitutional and statutory rights as a result of the

Defendants' administration of the Farm Line. Further, all class members seek common declarative and injunctive relief concerning the administration of the Farm Line.

124.    Common questions of law and fact exist as to all class and subclass members, including whether Defendants' policies, practices, and procedures violate the Eighth Amendment, the ADA and Section 504, and the Thirteenth Amendment.

125.    With respect to the disability subclass, common questions include:

    a.  Whether Defendants are failing to provide individuals with disabilities with reasonable accommodations, including permanent no-duty statuses and reassignment to appropriate jobs that afford individuals with disabilities an equal opportunity to participate in and benefit from DOC's programs;

    b.  Whether Defendants are failing to reasonably modify DOC policies, practices, or procedures where necessary to avoid discrimination against individuals with disabilities; and

    c.  Whether Defendants, through their policies and practices, are denying qualified individuals with disabilities an equal opportunity to participate in or benefit from its services, programs, or activities.

126.    With respect to the NUJ subclass, common questions include whether individuals convicted by non-unanimous juries are "duly" convicted for purposes of the Thirteenth Amendment, and whether Defendants violate those individuals' constitutional rights by forcing them to work on the Farm Line.

127.    For the proposed class, the disability subclass, and the NUJ subclass, answers to the common questions will yield common answers and results. In other words, a determination of the constitutionality of the Farm Line will apply relief equally across class members, without differentiation. The same is true of the NUJ subclass. Similarly, the disability subclass is defined by the bounds of the ADA and Section 504, and relief would apply equally to all subclass members.

128.    *Typicality.* Named Plaintiffs' claims are typical of those of the class and subclasses, as their claims arise from the same policies, practices, or courses of conduct as those of the class

and subclasses. Further, their claims are based on the same theories of law as those of the class and subclasses. *See James v. City of Dallas*, 254 F.3d 551, 571 (5th Cir. 2001) (factual differences will not defeat typicality if the claims arise from a similar course of conduct and share the same legal theory). The injuries that Named Plaintiffs have suffered and will suffer because of Defendants' unconstitutional and illegal course of conduct are typical of the injuries suffered by the class and subclasses.

129.    *Adequacy.* The Named Plaintiffs are adequate representatives of the class and the subclasses because their interests in the vindication of the legal claims they raise are entirely aligned with the interests of the other class members, each of whom has the same constitutional and statutory claims. There are no known conflicts of interest among members of the proposed class, and the interests of the Named Plaintiffs do not conflict with those of the other class members.

130.    Plaintiffs are represented by counsel with experience and success in litigating complex civil rights matters related to prisoners' rights in federal court. Class counsel have a detailed understanding of local law and practices as they relate to federal constitutional requirements. The interests of the members of the class and subclasses will be fairly and adequately protected by the Named Plaintiffs and their attorneys.

## C.  Rule 23(b)(2)

131.    Certification under Rule 23(b)(2) is appropriate because "[Defendants] [have] acted [and] refused to act on grounds that apply generally to the class, so that final injunctive relief [and] corresponding declaratory relief [are] appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Moreover, all class members are "harmed in essentially the same way" and seek only "specific" injunctive relief. *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 845 (5th Cir. 2012)

(citations omitted); *see also Dockery v. Fischer*, 253 F. Supp. 3d 832, 855 (S.D. Miss. 2015). Because Defendants' operation of the Farm Line is the result of a sustained pattern of deliberate indifference, an injunction would provide relief to all members of the class. As a result, certification under Rule 23(b)(2) is appropriate and necessary.

## CLAIMS FOR RELIEF

### COUNT I
### Cruel and Unusual Punishment
### Eighth Amendment, 42 U.S.C. § 1983
### (Against Defendants LeBlanc, Hooper, and Stagg in their official capacities)

104.    Plaintiffs repeat and re-allege the preceding paragraphs as if fully set forth in this Count.

105.    Prison work conditions may amount to cruel and unusual punishment. *See Jackson v. Cain*, 864 F.2d 1235, 1245 (5th Cir. 1989); *Howard v. King*, 707 F.2d 215, 219-20 (5th Cir. 1983).

104.    The Farm Line causes great physical and psychological hardship to Plaintiffs and all class members.

105.    The Farm Line is unreasonably punitive. Defendants force Plaintiffs and class members to work the Farm Line with the deliberate and knowing effect of causing physical pain and psychological harm. As a result, the Farm Line involves the unnecessary and wanton infliction of pain.

106.    Defendants LeBlanc, Hooper, and Stagg have subjected Plaintiffs to inherently and obviously dangerous conditions of forced agricultural labor, with full knowledge of the dangerousness of those conditions. These Defendants are acting and have acted with deliberate indifference to Plaintiffs' serious health and safety needs, in violation of their rights under the Eighth Amendment to the United States Constitution.

107.    Defendants LeBlanc, Hooper, and Stagg are well aware of the obvious risks and serious physical and psychological harm attendant to compulsory agricultural labor at Angola. Despite this knowledge that a substantial risk of serious harm exists, these Defendants continue to force Plaintiffs, including class members, to work in the fields in these dangerous conditions.

108.    The failure by Defendants LeBlanc, Hooper, and Stagg to adopt policies to prevent physical and psychological harm is deliberately indifferent because "it is obvious that the likely consequences of not adopting a policy will be a deprivation of constitutional rights." *Rhyne v. Henderson Cnty.,* 973 F.2d 386, 392 (5th Cir. 1992) (citing *City of Canton v. Harris*, 489 U.S. 378 (1989)).

109.    Defendants LeBlanc, Hooper, and Stagg have the authority and ability to cease the current operation of the Farm line.

110.    Plaintiffs have suffered and will imminently suffer irreparable injury as a result of Defendants' policies, practices, and failures to act. They seek, and are entitled to, declaratory and injunctive relief to avoid any further injury.

**COUNT II**
**Disability Discrimination**
**Americans with Disabilities Act and Rehabilitation Act**
**(Against Defendants DOC and Prison Enterprises)**

111.    Plaintiffs repeat and re-allege the preceding paragraphs as if fully set forth in this Count.

112.    By their policies and practices described herein, Defendants DOC and Prison Enterprises subject VOTE, its members, Plaintiffs Jackson and Walker, and all members of the disability subclass to regular and systemic discrimination based on their disabilities, in violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131-12134, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

113.    Title II of the ADA requires that public entities refrain from discriminating against qualified individuals on the basis of disability. 42 U.S.C. § 12132. The regulations implementing Title II of the ADA enshrine an "affirmative obligation" requiring that public entities avoid policies, practices, criteria, or methods of administration that have the effect of excluding or discriminating against people with disabilities in the entity's programs, services, or activities. 28 C.F.R. § 35.130(a), (b)(3), (b)(8). Further, a public entity must "make reasonable modifications in policies, practice, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i).

114.    Section 504 of the Rehabilitation Act states that "[n]o otherwise qualified individual with a disability … shall, solely by reason of … disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794(a). The regulations implementing Section 504 of the Rehabilitation Act require that entities receiving federal financial assistance avoid unnecessary policies, practices, criteria, or methods of administration that have the effect of discriminating against people with disabilities. 28 C.F.R. § 41.51(b)(3)(i).

115.    Defendants DOC and Prison Enterprises are public entities that receive federal financial assistance.

116.    As the recipient of federal funds, Defendants DOC and Prison Enterprises are required under the Rehabilitation Act to reasonably accommodate persons with disabilities in their facilities, program activities, and services and reasonably modify such facilities, services, and programs to accomplish this purpose. *See* 29 U.S.C. § 794 (2008).

104.    The ADA defines "a qualified individual with a disability" as a person who suffers from a "physical or mental impairment that substantially limits one or more major life activities," including but not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(1)(A), (2)(A).

105.    Plaintiffs Jackson and Walker are qualified individuals with disabilities as defined in the ADA, as they have impairments that substantially limit one or more major life activities. VOTE's membership also includes individuals with disabilities under the ADA and Section 504. As individuals held in DOC custody, these plaintiffs are "qualified" for the programs, services, and activities being challenged here. *See* 42 U.S.C. § 12131(2).

106.    Defendants DOC and Prison Enterprises are violating the ADA and Section 504 by employing methods of administering the Farm Line that discriminate against people with disabilities by placing them at heightened risk of serious physical and psychological harm. Defendants discriminate against individuals with disabilities by assigning them manual agricultural work they cannot do with their limitations, failing to accommodate those limitations, and then punishing them for failing to perform work that exceeds the bounds of those limitations.

107.    Plaintiffs Jackson and Walker, the disability subclass, and VOTE members are directly discriminated against when they are punished for being unable to safely perform labor on the Farm Line because of their disabilities and are denied access to programs, services, or activities, including safe working conditions.

108.    These policies and practices continue to be implemented by Defendants DOC and Prison Enterprises and their agents, officials, employees, and all persons acting in concert with

them under color of state law, in their official capacities, and are the proximate cause of the Plaintiffs' ongoing deprivation of rights secured by federal law.

109.    Defendants DOC and Prison Enterprises further violate the ADA and Section 504 by forcing individuals with disabilities to work the Farm Line in conditions likely to exacerbate their disabilities and health conditions.

110.    By knowingly compelling Plaintiffs to perform physical labor which constitutes a danger to their lives and health, and which is unduly painful, Defendants DOC and Prison Enterprises have violated the Eighth Amendment's prohibition against cruel and unusual punishment.

111.    Defendants DOC and Prison Enterprises have failed to make reasonable accommodations for the Plaintiffs' disabilities and health conditions. "[F]ailure to make reasonable accommodations to the needs of a disabled prisoner may have the effect of discriminating against that prisoner because the lack of an accommodation may cause the disabled prisoner to suffer more pain and punishment than non-disabled prisoner." *Cleveland v. Gautreaux*, 198 F. Supp. 3d 717, 746 (M.D. La. 2016) (citations omitted).

112.    Plaintiff VOTE, Plaintiffs Walker and Jackson, and the disability subclass have suffered and will suffer irreparable injury as a result of DOC and Prison Enterprises' policies, practices, and failures to act.

113.    Plaintiffs are entitled to declaratory and injunctive relief to avoid any further injury.

**COUNT III**
**Involuntary Servitude**
**Thirteenth Amendment, 42 U.S.C. § 1983**
**(Against Defendants LeBlanc, Hooper, and Stagg in their official capacities)**

114.    The Thirteenth Amendment provides, in part, that "[n]either slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been <u>duly</u>

convicted, shall exist within the United States, or any place subject to their jurisdiction." U.S. Const. amend. XIII, §1 (emphasis added). This entails a broad prohibition against forced labor, with a narrow exception.

115.    The Thirteenth Amendment unambiguously and clearly establishes the broad principle that individuals who have not been "duly convicted" shall not be subject to involuntary servitude. *See* U.S. Const. amend. XIII; *Wendt v. Lynaugh*, 841 F.2d 619, 620 (5th Cir. 1988) ("When a person is duly tried, convicted and sentenced in accordance with the law, no issue of peonage or involuntary servitude arises." (emphasis added)) (citations omitted).

116.    The term "involuntary servitude" means "a condition of servitude in which the victim is forced to work for the defendant by the use or threat of physical restraint or physical injury, or by the use or threat of coercion through law or legal process." *United States v. Kozminski*, 487 U.S. 931, 952 (1988).

117.    On April 20, 2020, the U.S. Supreme Court held that the Sixth Amendment right to a jury trial, as incorporated against the States by way of the Fourteenth Amendment, requires a unanimous verdict to convict a defendant of a serious offense. *Ramos v. Louisiana*, 140 S.Ct. 1390, 1394, 1408 (2020). This Sixth Amendment guarantee of unanimity, which applies equally to the states and federal system, is "fundamental to the American scheme of justice." *Id.* at 1397 (citations omitted); *see also id*. at 1396 ("[T]he law not only presumes every man innocent, until he is proved guilty; but unanimity in the verdict of the jury is indispensable.") (quoting 2 J. Story, Commentaries on the Constitution of the United States § 777, p. 248 (1833)).

118.    The Louisiana Supreme Court has subsequently explained that "any defendant convicted and sentenced based on a nonunanimous verdict has suffered a violation of a

fundamental constitutional right." *State v. Reddick*, 2021-01893 (La. 10/21/22); 351 So. 3d 273, 279 (citing *Ramos*, 140 S.Ct. at 1408).

119.    The rule announced in *Ramos* concerns "only the manner of determining the defendant's culpability," as opposed to, for instance, "the range of conduct or the class of persons that the law punishes." *Edwards v. Vannoy*, 141 S.Ct. 1547, 1562 (2021) (citations omitted).

120.    In violation of their Sixth and Fourteenth Amendment rights, *see Ramos*, 140 S.Ct. at 1394, VOTE members, Plaintiff Williams, and all NUJ subclass members were convicted by non-unanimous juries. As a result, they were not "duly" convicted for purposes of the Thirteenth Amendment. *See Wendt*, 841 F.2d at 620. Because they were not "duly" convicted, they are not within the category of persons excluded from the protection of the Thirteenth Amendment.

121.    Plaintiffs, including VOTE members, Plaintiff Williams, and the NUJ subclass, have been subjected to compulsory agricultural labor in the plantation fields at Angola on or after April 20, 2020, in violation of their Thirteenth Amendment right to be free from involuntary servitude. They have suffered and will imminently suffer irreparable injury as a result of Defendants' policies, practices, and failures to act.

122.    Plaintiffs do not, through this lawsuit, seek to challenge any individual's conviction on federal or state collateral review. They likewise do not seek, through this lawsuit, the retroactive application of the *Ramos* rule to any individual's conviction or term of years.

123.    Plaintiffs seek, and are entitled to, declaratory and injunctive relief to avoid any further injury of their right to be free from involuntary servitude under the Thirteenth Amendment.

## ATTORNEYS' FEES AND COSTS

124.    Pursuant to 42 U.S.C. § 1988, Plaintiffs are entitled to recover attorneys' fees and costs. Plaintiffs also request attorneys' fees, costs, and expenses against DOC and Prison Enterprises for the ADA and Rehabilitation Act claims, pursuant to 42 U.S.C. §§ 12205 and 1983.

## PRAYER FOR RELIEF

VOTE, the individual Plaintiffs, and the putative class members respectfully request that the Court:

a. Certify the proposed class and subclasses pursuant to Federal Rule of Civil Procedure 23(b)(2);

   1. Appoint Named Plaintiffs as class representatives for the proposed class and subclasses;

   2. Appoint undersigned counsel as class counsel for the proposed class and subclasses;

b. Enter a declaratory judgment in favor of Plaintiffs declaring that Defendants are violating each class members' constitutional rights by forcing them to work on the Farm Line in unsafe and inhumane conditions;

c. Enter a declaratory judgment in favor of the NUJ subclass declaring that Defendants are violating each class members' Thirteenth Amendment rights by forcing them to work on the Farm Line without being duly convicted;

d. Enter a declaratory judgment in favor of the disability subclass declaring that Defendants DOC and Prison Enterprises are violating each class members' rights under the Americans with Disabilities Act and § 504 of the Rehabilitation Act of 1973 in their administration of the Farm Line;

e. Issue a permanent injunction requiring all Defendants to end compulsory agricultural labor at Angola and provide appropriate accommodations for the disability subclass, as required by the Americans with Disabilities Act and § 504 of the Rehabilitation Act of 1973;

f. Issue a permanent injunction preventing Defendants from forcing members of the NUJ subclass to perform compulsory labor;

g. Enjoin Defendants and their staff from retaliating against any Plaintiff or class member in any manner for filing this Complaint;

h.  Award reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

i.  Retain jurisdiction of this case until all Defendants have fully complied with the orders of this Court and there is a reasonable assurance that Defendants will continued to comply in the future absent continuing jurisdiction; and

j.  Award such other and further relief as this Court deems just and proper.


Respectfully submitted this 16th day of September, 2023.


/s/ *Lydia Wright*
Lydia Wright, La. Bar No. 37926
Samantha Bosalavage, La. Bar No. 39808
Claude-Michael Comeau, La. Bar No. 35454
Kenyatta Barthelemy, La. Bar No. 40664
**THE PROMISE OF JUSTICE INITIATIVE**
1024 Elysian Fields Avenue
New Orleans, LA 70117
Telephone: (504) 529-5955
lwright@defendla.org
sbosalavage@defendla.org
ccomeau@defendla.org
kbarthelemy@defendla.org

/s/ *Oren Nimni*
Oren Nimni* MA Bar No. 691821
Amaris Montes* MD Bar No. 2112150205
**RIGHTS BEHIND BARS**
416 Florida Avenue NW, Ste. 26152
Washington, D.C. 20001
Telephone: (202) 455-4399
oren@rightsbehindbars.org
amaris@rightsbehindbars.org

*\*Pro hac vice* motion forthcoming


*Attorneys for Plaintiffs and the Proposed Classes*