## IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **VOICE OF THE EXPERIENCED**, a membership organization on behalf of itself and its members; and **MYRON SMITH**, **DAMARIS JACKSON**, **NATE WALKER**, **DARRIUS WILLIAMS**, **KEVIAS HICKS**, **JOSEPH GUILLORY**, **KENDRICK STEVENSON**, **and ALVIN WILLIAMS**, on behalf of themselves and all others similarly situated, | |
| *Plaintiffs*, | Civil Action No.: 3:23-cv-1304-BAJ-EWD |
| v. | |
| **JAMES LEBLANC**, in his official capacity as Secretary of the Louisiana Department of Public Safety and Corrections; **TIMOTHY HOOPER**, in his official capacity as Warden of Louisiana State Penitentiary; **MISTY STAGG**, in her official capacity as Director of Prison Enterprises, Inc.; the **LOUISIANA DEPARTMENT OF PUBLIC SAFETY & CORRECTIONS**; **and PRISON ENTERPRISES, INC.** | |
| *Defendants*. | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION
## FOR A PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER

# <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT .............................................................................................1

FACTS .....................................................................................................................................2

A.     Background ....................................................................................................................2

B.     Conditions on the Farm Line ......................................................................................3

C.     The Risk of Serious Health Disorders from Heat Exposure on the Farm Line ...............5

D.     Plaintiffs Suffer in the Extreme Heat ...........................................................................9

E.     Defendants' Heat Precaution Policies Are Inadequate and Not Followed ...................10

F.     Plaintiffs' Complaint and Request for Temporary and Preliminary Relief ..................12

LEGAL STANDARD ..............................................................................................................12

ARGUMENT ...........................................................................................................................13

I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIMS UNDER THE EIGHTH AMENDMENT ..............................................................................................13

A.     Working on the Farm Line during Periods of High Heat Poses a Substantial Risk of Serious Harm .............................................................................................14

B.     Defendants Are Deliberately Indifferent to the Risks of High Heat ...........................17

        1.     Defendants Know of the Substantial Risk of Serious Harm Caused by Heat Conditions on the Farm Line .......................................................17

        2.     Defendants' Knowing Disregard of Heat-Related Risks of the Farm Line ...................................................................................................20

II.     PLAINTIFFS FACE A SUBSTANTIAL THREAT OF IRREPARABLE INJURY. .....................................................................................................................22

III.     THE EQUITIES AND PUBLIC INTEREST FAVOR AN INJUNCTION. ....................23

IV.     THE PROPOSED RELIEF IS NARROW, NECESSARY, AND NON-INTRUSIVE. .............................................................................................................24

CONCLUSION........................................................................................................................25

## TABLE OF CONTENTS
### (Continued)

**Page**

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Adams* v. *Davis*,
2022 WL 263287 (E.D. Tex. Jan. 6, 2022)..............................................................21

*Ball* v. *LeBlanc*,
792 F.3d 584 (5th Cir. 2015) ........................................................ *passim*

*Ball* v. *LeBlanc*,
988 F. Supp. 2d 639 (M.D. La. 2013).............................................. *passim*

*Blackmon* v. *Garza*,
484 Fed. App'x 866 (5th Cir. 2012) ....................................................7, 14, 19

*Book People, Inc.* v. *Wong*,
91 F.4th 318 (5th Cir. 2024) ......................................................22, 23

*Brown* v. *Plata*,
563 U.S. 493 (2011)..............................................................24

*Byrum* v. *Landreth*,
566 F.3d 442 (5th Cir. 2009) .......................................................12

*Canal Authority of State of Fla.* v. *Callaway*,
489 F.2d 567 (5th Cir. 1974) .......................................................12

*City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*,
636 F.2d 1084 (5th Cir. 1981) .......................................................25

*Cole* v. *Collier*,
2017 WL 3049540 (S.D. Tex. July 19, 2017)...............................16, 20, 23, 25

*Daniels Health Scis., L.L.C.* v. *Vascular Health Scis., L.L.C.*,
710 F.3d 579 (5th Cir. 2013) .......................................................13

*Elrod* v. *Burns*,
427 U.S. 347 (1976)..............................................................22

*Farmer* v. *Brennan*,
511 U.S. 825 (1994)..............................................................13. 14, 17

*Gates* v. *Cook*,
376 F.3d 323 (5th Cir. 2004) ....................................14, 15, 16, 17, 19

**TABLE OF AUTHORITIES**
**(Continued)**

Page(s)

*Gober* v. *Collier*,
 2021 WL 2008812 (E.D. Tex. April 14, 2021)..................................................................16

*Harris* v. *Angelina Cnty., Tex.*,
 31 F.3d 331 (5th Cir. 1994) ............................................................................................19

*Helling* v. *McKinney*,
 509 U.S. 25 (1993)..........................................................................................................14

*Hinojosa* v. *Livingston*,
 807 F.3d 657 (5th Cir. 2015) ................................................................................. *passim*

*Hope* v. *Pelzer*,
 536 U.S. 730 (2002)........................................................................................................14

*Jackson Women's Health Org.* v. *Currier*,
 760 F.3d 448 (5th Cir. 2014) ..........................................................................................23

*Janvey* v. *Alguire*,
 647 F.3d 585 (5th Cir. 2011) ..........................................................................................12

*Lewis* v. *Cain*,
 2021 WL 1219988 (M.D. La. Mar. 31, 2021) ........................................................14, 15, 20

*Lewis* v. *Cain*,
 2023 WL 7299130 (M.D. La. Nov. 6, 2023) ..............................................8, 15, 16, 17, 22

*Lewis* v. *S.S. Baune*,
 534 F.2d 1115 (5th Cir. 1976) ........................................................................................12

*McCollum* v. *Livingston*,
 2017 WL 608665 (S.D. Tex. Feb. 3, 2017) ..................................................................7, 15

*Mendoza* v. *Lynaugh*,
 989 F.2d 191 (5th Cir. 1993) ..........................................................................................21

*Miss. Power & Light Co.* v. *United Gas Pipe Line Co.*,
 760 F.2d 618 (5th Cir. 1985) ..........................................................................................12

*MMR Constructors, Inc.* v. *JB Grp. of LA, LLC*,
 2022 WL 1223919 (M.D. La. Apr. 26, 2022)..................................................................12

*Planned Parenthood Gulf Coast, Inc.* v. *Kliebert*,
 141 F. Supp. 3d 604 (M.D. La. 2015)..............................................................................13

# TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Robinson* v. *Ardoin*,
  605 F. Supp. 3d 759 (M.D. La. 2022) .......................................................................23

*Tiede* v. *Collier*,
  No. 1:23-CV-1004-RP, ECF No. 17 (W.D. Tex. Sept. 13, 2023) ..............................13, 15, 23

*Univ. of Texas* v. *Camenisch*,
  451 U.S. 390 (1981) ...................................................................................................13

*Valigura* v. *Mendoza*,
  265 Fed. App'x 232 (5th Cir. 2008) ..........................................................................14

*Webb* v. *Livingston*,
  618 Fed. App'x 201 (5th Cir. 2015) ......................................................................14, 20

**Statutes**

18 U.S.C. § 3626 (Prison Litigation Reform Act of 1995) .................................................2, 24, 25

**Other Authorities**

Fed. R. Civ. P. 65 ........................................................................................................1, 25, 26

Plaintiffs, on behalf of themselves and those similarly situated, respectfully submit this memorandum of law in support of their motion, brought pursuant to Federal Rule of Civil Procedure 65, for a preliminary injunction and temporary restraining order enjoining Defendants' operation of the "Farm Line" whenever the heat index is at or above 88 degrees Fahrenheit.

## PRELIMINARY STATEMENT

Within days of this filing, as the heat and humidity rise to levels generally recognized as dangerous to human health, the unconstitutional and inhumane conditions of the "Farm Line" will become life-threatening. The Farm Line is unlawful under the U.S. Constitution, as well as Title II of the Americans with Disabilities Act (the "ADA") and Section 504 of the Rehabilitation Act of 1973, for numerous reasons that Plaintiffs will prove as this litigation proceeds, including, but not limited to, the narrow focus of this motion, the Eighth Amendment violations stemming from heat-related dangers inherent to the Farm Line. Indeed, beginning as early as this month, temperatures on the Farm Line are expected to routinely reach or exceed safe levels, creating a serious risk of injury or death to even the healthiest of individuals and an even greater risk to those with underlying health conditions. Accordingly, while the Court adjudicates Plaintiffs' broader constitutional and statutory challenges to the Farm Line, Plaintiffs seek on behalf of themselves and those similarly situated, a temporary and preliminary injunction prohibiting Defendants from operating the Farm Line when the heat index is at or above 88 degrees Fahrenheit ("High Heat").[1] Such injunctive relief is plainly warranted.

*First*, Plaintiffs are likely to prevail on their heat-related claims under the Eighth Amendment. The extreme heat that men are forced to endure on the Farm Line poses a

---

[1] The "heat index," or apparent temperature, is a measurement that combines air temperature and relative humidity. It is a better indication of how the body "feels" heat than air temperature alone. *See* Vassallo Decl. ¶ 31; *Ball* v. *LeBlanc*, 988 F. Supp. 2d 639, 671–72 (M.D. La. 2013) (Jackson, J.), *aff'd in part, vacated in part, remanded*, 792 F.3d 584 (5th Cir. 2015).

substantial risk of serious harm. Defendants are aware of this risk. The risk is open and obvious, it is documented in Defendants' own policies, and it has been brought to their attention through Plaintiffs' grievances, medical requests, complaints, and numerous lawsuits concerning similar conditions. And yet, Defendants have utterly failed to take appropriate action.

*Second*, absent the requested injunction, Plaintiffs face irreparable harm, including the deprivation of their constitutional rights and severe physical and psychological injury.

*Third*, the balance of equities and public interest strongly favors the requested relief. The public interest never favors the deprivation of constitutional rights, and Defendants will suffer no cognizable harm if an injunction is granted.

*Finally*, the requested relief is narrow, necessary, and non-intrusive and therefore permissible under the parameters of the Prison Litigation Reform Act of 1995 (the "PLRA").

## FACTS

### A.    Background

The Louisiana State Penitentiary, commonly known as "Angola," is the nation's largest maximum-security prison and one of several prisons under the control of Defendant Louisiana Department of Public Safety and Corrections ("DOC"), of which Defendant James LeBlanc is Secretary. *See* Ex. 1. Defendant Timothy Hooper currently serves as Angola's Warden. *Id.*

Built on the grounds of former slave plantations, Angola began functioning as a prison agricultural complex shortly after the end of the Civil War and the end of chattel slavery in Louisiana. Ex. 3, at 903–09; Exs. 4–6. Today, incarcerated men continue to work in those same plantation fields, earning as little as two cents an hour—or nothing at all—for their farm labor. Ex. 4; Henderson Decl. ¶ 12. These agricultural and industrial programs are administered by DOC and Defendant Prison Enterprises, Inc. ("Prison Enterprises"), of which Defendant Misty Stagg is the Director. *See* Ex. 2, at 017642, 017645.

Separate from the "productive" farming programs at Angola exists the so-called "Farm Line"—a punitive, dangerous, and grossly inhumane form of discipline akin to nineteenth-century slavery.[2]  *See* Ex. 3 at 903–09.  On the Farm Line, as during chattel slavery, men are forced to work Angola's fields, tending crops in oppressive heat without protection, modern farming equipment, or even clean drinking water.  *See* Exs. 4–7; Guillory Decl.; Smith Decl.

Among those subjected to the cruel and unusual discipline of the Farm Line are members of Plaintiff Voice of the Experienced ("VOTE"), a grassroots nonprofit comprised of currently and formerly incarcerated people, and Plaintiffs Myron Smith, Damaris Jackson, Nate Walker, Darrius Williams, Kevias Hicks, Joseph Guillory, Kendrick Stevenson, and Alvin Williams, each of whom is incarcerated at Angola and is, has been, or could be assigned to the Farm Line at any time.

## B.    Conditions on the Farm Line

On the Farm Line, Defendants force Plaintiffs and other incarcerated men to perform arduous physical labor in the fields under conditions that are cruel, unusual, and anathematic to civilized society.  Defendants assign new arrivals at Angola to the Farm Line as a way to "break" them and ensure their submission.  *See, e.g.*, Smith Decl. ¶ 3; Jackson Decl. ¶ 5; D. Williams Decl. ¶ 3; A. Williams Decl. ¶ 3; Guillory Decl. ¶ 3; Henderson Decl. ¶ 18.  Later, they use the Farm Line as punishment.  Jackson Decl. ¶ 5; Stevenson Decl. ¶ 4; Walker Decl. ¶ 3; Smith Decl. ¶¶ 3–5; D. Williams Decl. ¶ 5; A. Williams Decl. ¶ 5; *see also* Exs. 8–14.  Refusal to work the line can result in solitary confinement.  *See* Guillory Decl. ¶ 4; Henderson Decl. ¶ 17.

Work on the Farm Line is difficult, degrading, and dangerous.  Days begin around 6 a.m., when men make the journey from their dormitory to the work site in the fields, often by foot.

---

[2]    While discovery will further define the precise contours of the "Farm Line," for purposes of this motion, the "Farm Line" refers to the compulsory agricultural or farming labor program operated at Angola, including but not limited to Lines 15a, 15b, 24, and 25.  It does not include all agricultural programs at Angola.

Walker Decl. ¶ 5; Jackson Decl. ¶ 7; Hicks Decl. ¶ 4. They are forced to work until mid-morning and are sometimes called back for a second shift from 11 a.m. to 3 p.m. Walker Decl. ¶ 5; *see also* Ex. 15 (showing men working Lines 15a and 15b, 24 and 25 are assigned to morning and afternoon shifts). During their shifts, the men perform grueling, but pointless, manual agricultural labor, like picking rotten watermelons, okra, and other crops with their bare hands, weeding and plucking grass by hand, and watering crops using Styrofoam cups. Walker Decl. ¶ 5; Hicks Decl. ¶ 5; Smith Decl. ¶ 15; *see also* Ex. 15 (showing Lines 15a, 15b, 24, and 25 routinely assigned to plant and pick watermelons; pick okra; cut grass and weed). Although Angola has modern farming equipment, Defendants deprive the men of even basic tools and equipment, forcing them to grub in the dirt with bare, ungloved hands. Jackson Decl. ¶ 8; Walker Decl. ¶ 5; Stevenson Decl. ¶¶ 5, 7–8. Sometimes men are forced to fill sacks or crates of vegetables and stack these heavy crates onto a trailer; if they fail to stack an arbitrary quota of crates, they are sent back to the fields for more "backbreaking" work. Walker Decl. ¶ 6.

Conditions on the Farm Line are made worse by Defendants' withholding of basic necessities. Drinking water is sometimes not available, and when it is, it is dirty and full of insects; the men drink it "just to stay hydrated and avoid passing out." Thompson Decl. ¶ 7; Smith Decl. ¶ 9; Henderson Decl. ¶ 11. There is no shade, and breaks are infrequent, short, or non-existent. Walker Decl. ¶ 7; Thompson Decl. ¶ 7; *see also* Henderson ¶ 11. Sunglasses, sunhats, or sunscreen are not provided. Walker Decl. ¶ 8; Smith Decl. ¶ 11; Jackson Decl. ¶ 8. Adequate medical care, which is critical to preventing serious heat-related injury, does not exist. Vassallo Decl. ¶¶ 99–102; Henderson Decl. ¶ 14.

Under any circumstances, working the Farm Line is unbearable, but it is most inhumane in the summer when heat advisories are commonly in effect, and the heat index can top

140 degrees Fahrenheit.  *See* Vassallo Decl. ¶¶ 15, 17–18; *id.* Ex. B.  Even when "the temperature is so hot in the fields that the watermelons are rotting on the vine," the men are sent out to labor.  Hicks Decl. ¶ 5; *see also* Henderson Decl. ¶ 11.  The armed officers overseeing the Farm Line previously rode horses.  They eventually started using four-wheelers instead, to protect the horses from the "blistering" heat.  Smith Decl. ¶ 9.

Conditions on the Farm Line are utterly unlike those on commercial farms in Louisiana, which generally "cover" the fields during the hottest summer months, in part to protect farm workers from exposure to High Heat.  Green Decl. ¶ 35.  Unlike Defendants, commercial farmers in Louisiana routinely ensure the basic safety of their farm workers, including by providing or requiring personal protective equipment (PPE), cold drinking water, and regular breaks.  *Id.* ¶¶ 36–39.  To both lessen physical exertion and increase crop yield, workers on commercial farms use tools and equipment, not their bare hands.  *Id.* ¶¶ 18–20.  This is standard practice across the farming industry.  *Id.* ¶ 24.

### C.    The Risk of Serious Health Disorders from Heat Exposure on the Farm Line

The summer of 2023 was the hottest summer in Louisiana's recorded history, Ex. 16, at 2, with prolonged periods of High Heat and heat indices as high as 154 degrees Fahrenheit, Vassallo Decl. Ex. B.  This summer is very likely to be as hot or hotter.  Ex. 17.  This intense heat creates serious and obvious health concerns, as Defendants are keenly aware.  In addition to being the focus of widespread news coverage, *see, e.g.*, Ex. 16, the dangers of exposure to intense heat are well documented in reports and guidance from federal and state agencies and in DOC's own policies, *see* Exs. 18, 19, 25, 39.  Heat-related risks have been the subject of numerous lawsuits, many against the same Defendants here, in which courts, including this one, have held that subjecting people in prison to extreme heat violates the Constitution.  *See infra* at 14–15.  Those risks are the subject of numerous complaints filed by men on the Farm Line,

Exs. 20–23, and are visible in the symptoms of heat-related illness exhibited by men laboring in the State's fields, Hicks Decl. ¶ 6; Stevenson Decl. ¶ 10; D. Williams Decl. ¶ 12; Ex. 24 at 013173–78.

Dr. Susi Vassallo, a medical doctor with deep expertise in thermoregulation,[3] has been qualified as an expert by this Court and others in cases concerning heat-related conditions in prison. Vassallo Decl. ¶¶ 3–7. Dr. Vassallo describes the life-threatening risks of heat stroke and heat-related disorders when the heat index exceeds 88 degrees Fahrenheit, a danger zone that was reached or exceeded at Angola nearly every day last summer. *Id.* ¶ 17; *id.*, Ex. B (heat index exceeded 88 degrees on all but 18 days between May 1 and October 31, reaching a peak of 154 degrees on July 22). Exposure to that level of heat is likely to cause significant damage to people of all ages and health levels. *Id.* ¶¶ 67, 71, 86. Health risks only increase when performing the kinds of tasks required on the Farm Line such as bending, lifting, digging, and hauling. *See id.* ¶¶ 15, 72–73; Ex. 25, at 5 (observing that "[w]orkers in outdoor settings" are at greater risk of developing heat-related illness).

To maintain a safe internal body temperature when exposed to High Heat and humidity, the body sweats to cool; the loss of sweat can cause dehydration and hyperthermia without adequate replacement of water and salt. Vassallo Decl. ¶¶ 24–31. Once dehydration and hyperthermia set in, dizziness, lack of energy, low blood pressure, weakness, exhaustion, fainting, muscle cramps, and/or cardiac stress may occur. *Id.* ¶¶ 26–37. Heat stroke, which comes on rapidly and with little warning, can be fatal or may cause permanent disability, including neurological damage in 17% of survivors. *Id.* ¶¶ 38–44. Exposure to High Heat and

---

[3]    Thermoregulation is the process by which the human body maintains its temperature within a safe physiological range in response to internal and external thermal stimuli. The body's safe physiologic range is typically a set point plus or minus 0.8 degrees Fahrenheit of 98.6 degrees. Vassallo Decl. ¶¶ 19–27.

humidity also puts immense stress on critical organs (*e.g.*, the kidneys, liver, heart, brain, and lungs) and can cause organ damage or failure, heart attack, and stroke. *Id.* ¶¶ 71, 73. There is also a close link between exposure to High Heat and increased rates of suicide. *Id.* ¶¶ 46–47, 78.

Tragically, the deadly risks of heat-related illness for incarcerated persons are well known to courts in the Fifth Circuit. *See Blackmon* v. *Garza*, 484 Fed. App'x 866, 871 (5th Cir. 2012) ("Heat stroke can cause organ failure and, ultimately, death."); *McCollum* v. *Livingston*, 2017 WL 608665, at *1 (S.D. Tex. Feb. 3, 2017) (noting that, in Texas prisons, at least 20 men died from hyperthermia or other heat-related illness between 1998 and 2011).[4]

Numerous medical conditions impair the body's ability to thermoregulate, making people with such conditions more likely to succumb to heat stroke. *Id.* ¶¶ 51–57. The interaction between these conditions and the body's ability to thermoregulate varies by condition.

- Cardiovascular disease, including hypertension (referred to more commonly as high blood pressure), impairs the body's ability to thermoregulate because such diseases reduce cardiac output, which makes it difficult for the body to cool itself naturally. *Id.* ¶¶ 52–54, 56.

- Diabetes impacts the body's ability to deliver sufficient blood and nutrients to the various parts of the body, impairing the body's ability to cool itself and increasing the risk of heat stroke, *id.* ¶ 55; diabetes may also impair kidney function, limiting the body's ability to respond to heat stress, *id.*

- Respiratory diseases, such as asthma or COPD, reduce the lungs' ability to oxygenate the body, increasing the risk of heat stroke and other heat-related disorders because heat increases the body's need to oxygenate. *Id.* ¶ 57.

People with mental health disorders, including depression and anxiety, are also uniquely vulnerable to the risk of heat-related harms. People with these conditions have difficulty

---

[4]  The serious health impacts of extreme heat are confirmed by materials issued to the Louisiana public by the State's Department of Health. *See* Ex. 25, at 4 (explaining the causes and symptoms of heat-related illness and noting that heat "also has indirect health impacts" including "exacerbate[ion of] chronic conditions such as respiratory, cardiovascular, and kidney disease, increase[d] injuries and accidents, and strain[s on] mental health").

distinguishing the effects of heat stress from the symptoms of their mental health disorders, thereby limiting their ability to take precautions when they are experiencing heat stress. *Id.* ¶ 58.

Medications used to treat physical and mental health conditions—including Synthroid, Benadryl, Zyprexa, Zyrtec, Losartan, Elavil, and most antidepressants—themselves impair the body's ability to thermoregulate, increasing the risk of heat stroke and other heat-related disorders. *Id.* ¶¶ 59, 68. For example, medications used to treat cardiac and mental health illnesses impair the body's ability to dissipate heat and circulate blood or interfere with its salt and water balance, increasing the risk of heat stroke and heat-related disorders. *Id.* ¶ 59.

To prevent heat stroke and other heat-related illness and injuries requires measures that do not and cannot exist on the Farm Line. These would include the ability to access air conditioned cooling centers, the freedom to take breaks as needed to rest and hydrate, and the ability to wear appropriate protective clothing and to use machines to reduce physical exertion. *Id.* ¶ 19. And critically, preventing and treating heat-related injuries requires adequate medical care. As the Middle District of Louisiana has repeatedly held, the medical system at Angola *itself* constitutes cruel and unusual punishment. *Lewis* v. *Cain*, 2023 WL 7299130, at *1 (M.D. La. Nov. 6, 2023) (making "detailed and extensive findings of the callous and wanton disregard for the medical care of inmates at Angola. The finding is that the 'care' is not care at all, but abhorrent cruel and unusual punishment that violates the United States Constitution.").

All the risk factors for heat stroke and heat-related disorders—high heat indices, intense physical exertion, underlying medical conditions, lack of preventative measures, and inadequate medical care—are present on the Farm Line. This has led Dr. Vassallo to conclude "that the Farm Line at Angola is unsafe for every incarcerated person, and especially for people with disabilities and health conditions that impede their ability to thermoregulate." *Id.* ¶ 103.

### D.    Plaintiffs Suffer in the Extreme Heat

The perils of heat exposure are all too familiar to the men forced to labor on the Farm Line. Plaintiffs have experienced nausea, dizziness, dehydration, exhaustion, and intense muscle cramping while working in the fields. *See* Walker Decl. ¶ 9; Stevenson Decl. ¶ 10; Jackson Decl. ¶ 10; Henderson Decl. ¶ 16. When Myron Smith experienced severe and immobilizing muscle cramps while working, he was told by an emergency medical technician to drink more water and rest; however, "instead of being taken inside to cool off, [he] was forced to sit in the field, in the hot sun, for the rest of the shift." Smith Decl. ¶ 12. Darrius Williams similarly once reported to officials that he was feeling chills while laboring on the Line in the hot summer—a symptom of heat disorder:

> Once, I was forced to work the Farm Line in the summer and was in the corn fields. The temperature was over 100 degrees and I started feeling chills. I lost control of my limbs and fainted. Medical came and reported that my blood pressure was very high. Despite all this, prison officials sent me back out into the field the next day. I refused. I was placed in lockdown.

D. Williams Decl. ¶ 13.

Rather than heeding Williams' complaints and symptoms of heat stress, Defendants punished him with solitary confinement and the loss of one week of canteen privileges. *Id.*; Ex. 20, at 013111; Ex. 27.

Plaintiff Nate Walker was likewise punished for asking for help:

> The heat and humidity in the fields are unbearable. . . . For instance, in approximately 2017, I was working in the field on a hot day. I was feeling weak and light headed. I notified the guards that I was not feeling good, but I was ignored. I could barely stand or walk. When I tried to walk, I began to sway. The guards called medical and told them that I was intoxicated. I was arrested and received a disciplinary write-up for intoxication. I was not intoxicated.

Walker Decl. ¶ 9; *see also* Ex. 28, at 013310.

### E.    Defendants' Heat Precaution Policies Are Inadequate and Not Followed

Defendants maintain various heat-related policies.  For example, a May 9, 2005, policy purports to enhance the safety of the incarcerated population by requiring temperatures in living and work areas to be monitored.  Ex. 29.  Defendants' March 21, 2019 "Heat Pathology" policy establishes "Heat Precaution Duty Status" for medically vulnerable individuals that purports to exempt them from outside work from May 1 to October 31 when the heat index is above 88 degrees Fahrenheit and requires limited accommodations for all persons assigned to outdoor work when the heat index is 88 degrees or higher.  Ex. 18.  These policies, however, are facially inadequate.  Among other things, Defendants' heat policies:

- Do not mandate access to cooling centers, appropriate clothing, protective equipment, or tools for persons working outside that would alleviate heat stress and exertional strain;

- Are underinclusive in its list of medications known to impact thermoregulation and do not include a number of medications commonly known to impact thermoregulation, including, but not limited to, common antidepressants, hypertension medications, antipsychotics, and allergy medications; and

- Do not ensure adequate medical care at the onset of symptoms of heat stress.

*See infra* Sec. I.B.2; *see* Vassallo Decl. ¶¶ 99–102.

Moreover, Defendants fail to even follow their own deficient policies.  For example, Defendants (i) routinely understate and incorrectly record the heat index, *see* Ex. 30; (ii) do not provide the mandatory rest and water breaks, *id.*; (iii) do not reduce work hours even during extraordinarily hot days, *id.*; and (iv) fail to identify and accommodate medically vulnerable or disabled individuals who are entitled to a Heat Precaution Duty Status, *see, e.g.*, Ex. 26, at 013311; Ex. 26 at 013322; Ex. 28, at 013311; Ex. 31, at 013140–41; Smith Decl. ¶ 9.

In addition, the Heat Pathology policy requires Defendants to measure and report the outdoor temperature every two hours.[5] Ex. 18. Defendants' records show that they routinely fail to take multiple temperature readings, *see generally* Ex. 32, and on some of the hottest days of the year, they failed to issue any heat alert at all,[6] *see id.*; Ex. 30, at June 26, Aug. 23, Sept. 28.

Plaintiffs Jackson, Hicks, Guillory, Stevenson, Walker, as well as some members of VOTE, *see* Henderson Decl. ¶ 13, (the "Medically Vulnerable Plaintiffs"), who suffer from health conditions and/or have been prescribed medications that limit their ability to thermoregulate, have been forced to work the Farm Line during periods of High Heat, despite having health conditions that make such work particularly dangerous:

- Multiple Medically Vulnerable Plaintiffs suffer from high blood pressure. *See* D. Jackson Decl. ¶ 11; K. Stevenson Decl. ¶ 11. High blood pressure limits the heart's ability to increase cardiac output during periods of heat stress, leaving people with high blood pressure more susceptible to heatstroke and heat-related disorders. Vassallo Decl. ¶ 54.

- Mr. Guillory suffers from hyperthyroidism. Guillory Decl. ¶ 12. To treat this, he takes Synthroid, *id.*, which inhibits his ability to thermoregulate, *see* Vassallo Decl. ¶¶ 57, 66.

- Mr. Hicks and Mr. Stevenson suffer from anxiety and depression, and Mr. Walker also suffers from depression. Hicks Decl. ¶ 11; Stevenson Decl. ¶ 11; Walker Decl. ¶ 10. Mr. Hicks and Mr. Stevenson take Prozac and Zyprexa, respectively. Hicks Decl. ¶ 11; Stevenson Decl. ¶ 11. Individuals with mental health disorders are at increased risk of heat stroke and heat-related disorders because they may have impaired behavioral responses to heat stress and because medications used to treat mental health disorders interfere with the body's ability to thermoregulate. *See* Vassallo Decl. ¶¶ 56–57, 63–64.

---

[5] From May 1 through October 31, Heat Pathology Directive 13.067 requires the outside temperature to be "recorded every two hours, and reviewed and approved by the Warden or designee." Ex. 18, at 4. Although Plaintiffs have requested that Defendants produce temperature logs, Defendants have not produced any records indicating that temperatures are monitored in compliance with Directive 13.067. McTootle Decl. ¶ 19.

[6] Under Defendants' policies, a "heat alert" is "[a] designation when the apparent temperature (heat index) outdoors has exceeded 88 degrees Fahrenheit, requiring special provisions." Ex. 18, at 017895.

**F.      Plaintiffs' Complaint and Request for Temporary and Preliminary Relief**

Plaintiffs filed this class action lawsuit to vindicate their constitutional and statutory rights.  They seek to enjoin Defendants' continued use of the Farm Line for reasons including, but not limited to, the cruel and unusual heat-related risks inherent to the Farm Line for which Plaintiffs assert violations of the Eighth Amendment.  The Medically Vulnerable Plaintiffs additionally bring claims under the ADA and Section 504.  Finally, Plaintiffs D. Williams, Stevenson, A. Williams, and VOTE bring claims under the Thirteenth Amendment.  ECF No. 21.

Within days of this filing, temperatures undoubtedly will begin to rise to dangerous heat indexes, creating a serious risk of injury or death to anyone assigned to the Farm Line.  At present, so that they and those similarly situated survive the summer months, Plaintiffs seek a temporary restraining order and preliminary injunction enjoining the operation of the Farm Line whenever the heat index is at or above 88 degrees Fahrenheit.

## LEGAL STANDARD

"The purpose of a preliminary injunction is to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits."  *Miss. Power & Light Co.* v. *United Gas Pipe Line Co.*, 760 F.2d 618, 627 (5th Cir. 1985) (citations omitted).  When the status quo "itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent injury."  *Canal Authority of State of Fla.* v. *Callaway*, 489 F.2d 567, 576 (5th Cir. 1974).  Because "[a] temporary restraining order is simply a highly accelerated and temporary form of preliminary injunctive relief," the standard for granting a temporary restraining order and a preliminary injunction is the same where notice and an opportunity to present evidence is provided.  *MMR Constructors, Inc.* v. *JB Grp. of LA, LLC*, 2022 WL 1223919, at *3 (M.D. La. Apr. 26, 2022); *see Lewis* v. *S.S. Baune*, 534 F.2d 1115, 1121 (5th Cir. 1976).

A temporary restraining order or preliminary injunction is appropriate when the movant demonstrates: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not granted, (3) that the threatened injury to the movant outweighs any injury to the nonmovant, and (4) that the injunction will not disserve the public interest. *See Janvey* v. *Alguire*, 647 F.3d 585, 595 (5th Cir. 2011); *Byrum* v. *Landreth*, 566 F.3d 442, 445 (5th Cir. 2009); *Tiede* v. *Collier*, No. 1:23-CV-1004-RP, ECF No. 17, at 2 (W.D. Tex. Sept. 13, 2023). "A party [] is not required to prove his case in full at a preliminary-injunction hearing." *Univ. of Texas* v. *Camenisch*, 451 U.S. 390, 395 (1981) (citation omitted). Instead, to "show a likelihood of success, the plaintiff must present a prima facie case." *Daniels Health Scis., L.L.C.* v. *Vascular Health Scis., L.L.C.,* 710 F.3d 579, 582 (5th Cir. 2013). In applying the four-factor analysis, a court must consider the factors on a "sliding scale"—a greater threat of irreparable injury may justify issuance of preliminary relief in a situation with a less certain likelihood of success, and vice versa. *Planned Parenthood Gulf Coast, Inc.* v. *Kliebert*, 141 F. Supp. 3d 604, 635 (M.D. La. 2015).

## ARGUMENT

## I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIMS UNDER THE EIGHTH AMENDMENT.

Prison conditions violate the Eighth Amendment when a two-pronged test is satisfied. *First*, the objective prong requires a showing that the conditions are sufficiently serious so as to pose a substantial risk of serious harm. *Farmer* v. *Brennan*, 511 U.S. 825, 834 (1994). *Second*, the subjective prong requires a showing that prison officials were deliberately indifferent to these conditions and the harms to health and safety that they cause. *See id.*; *Hinojosa* v. *Livingston*, 807 F.3d 657, 665 (5th Cir. 2015); *Ball* v. *LeBlanc*, 792 F.3d 584, 592 (5th Cir. 2015).

Here, Plaintiffs have more than met their burden of showing that (i) the conditions on the Farm Line during periods of High Heat pose substantial risks of serious physical and psychological harm, and (ii) Defendants have long known of and been deliberately indifferent to those risks. Plaintiffs are therefore likely to prevail on their Eighth Amendment claims.

**A.    Working on the Farm Line during Periods of High Heat Poses a Substantial Risk of Serious Harm.**

Prison conditions are "objectively, sufficiently serious" when they "pos[e] a substantial risk of serious harm." *Farmer*, 511 U.S. at 834 (internal quotation marks omitted). Conditions rise to this level when they result in the "denial of the minimal civilized measure of life's necessities," *id.* (citations omitted), or "offend contemporary concepts of decency, human dignity, and precepts of civilization." *Hope* v. *Pelzer*, 536 U.S. 730, 737 (2002); *see also Ball* v. *LeBlanc*, 988 F. Supp. 2d 639, 662 (M.D. La. 2013) (Jackson, J.). This includes situations where prison officials fail to take reasonable steps to ensure the safety of the people in their custody, including by failing to ensure adequate medical care. *See Gates* v. *Cook*, 376 F.3d 323, 332 (5th Cir. 2004); *Lewis* v. *Cain*, 2021 WL 1219988, at *6 (M.D. La. Mar. 31, 2021). A substantial risk of serious harm in the future will also satisfy the objective prong. *See Helling* v. *McKinney*, 509 U.S. 25, 33 (1993) ("[A] remedy for unsafe conditions need not await a tragic event."). Conditions on the Farm Line during periods of High Heat clearly meet these criteria.

The Fifth Circuit has repeatedly articulated the simple rule that extremely hot prison conditions, when not appropriately mitigated, constitute a substantial risk of serious harm under the Eighth Amendment. *See, e.g.*, *Ball*, 792 F.3d at 592–94 (affirming this Court's finding that extreme heat conditions at Angola pose a substantial risk of serious harm); *Hinojosa*, 807 F.3d at 669 (5th Cir. 2015) ("[T]he Eighth Amendment guarantees inmates a right to be free from exposure to extremely dangerous temperatures without adequate remedial measures."); *Webb* v.

*Livingston*, 618 Fed. App'x 201, 207 (5th Cir. 2015) ("[E]xposure to extremely hot temperatures" is a condition that "presents a substantial risk of serious harm."); *Blackmon*, 484 Fed. App'x at 869–72 (finding Eighth Amendment violation where "extreme heat in [plaintiff's] dorm caused substantial health risks" and that remedial measures were inadequate); *Valigura* v. *Mendoza*, 265 Fed. App'x 232, 235 (5th Cir. 2008) (finding that exposure to "temperatures consistently in the nineties without remedial measures" violate the Eighth Amendment); *see also Ball*, 792 F.3d at 596; *McCollum*, 2017 WL 608665, at *19 (collecting cases and concluding that "extreme heat constitutes an Eighth Amendment violation"); *Tiede*, No. 1:23-CV-1004-RP, ECF No. 17, at 4–5 (granting temporary restraining order due to the plaintiff's enhanced risk of injury or death from extreme heat).

Despite this, Defendants routinely force incarcerated men to labor on the Farm Line under extreme heat conditions that pose substantial risks of physical injury, ranging from dehydration, dizziness, and fainting to permanent organ damage, disability, or death, even among healthy people. Vassallo Decl.¶¶ 24–44, 67–71. Those same conditions have significant and serious deleterious psychological effects. *See* Vassallo Decl. ¶¶ 46–47, 78; *see also Gates*, 376 F.3d at 332 ("Mental health needs are no less serious than physical needs.").

For medically vulnerable persons (*i.e.*, persons with underlying health conditions or who take medications that impair thermoregulation) this risk is even greater. Vassallo Decl. ¶¶ 48–66; *see also Ball*, 792 F.3d at 593 (crediting Dr. Vassallo's testimony that people with medical conditions and who take certain medication regimes are at substantial risk of serious harm from extreme heat); *Gates*, 376 F.3d at 334 ("The probability of heat-related illness is . . . dramatically more so for mentally ill inmates who often do not take appropriate behavioral steps to deal with

the heat.  Also, the medications often given to deal with various medical problems interfere with the body's ability to maintain a normal temperature.").

Compounding these risks, medical care on the Farm Line, and at Angola more broadly, is woefully inadequate.  Indeed, Chief Judge Dick has *twice* issued "detailed and extensive findings of the callous and wanton disregard for the medical care of inmates at Angola."  *See Lewis*, 2023 WL 7299130, at *12; *see also Lewis* v. *Cain*, 2021 WL 1219988, (M.D. La. Mar. 31, 2021).  As the court detailed in two separate orders, the medical "'care' [at Angola] is not care at all, but abhorrent cruel and unusual punishment that violates the United States Constitution."  *Lewis*, 2023 WL 7299130, at *12.  This combination of extreme heat and lack of adequate medical care to treat heat-related illness satisfies the objective prong of the Eighth Amendment analysis.  *See*, *e.g.*, *Gober* v. *Collier*, 2021 WL 2008812, at *3 (E.D. Tex. April 14, 2021), *report and recommendation adopted*, 2021 WL 1998790 (E.D. Tex. May 19, 2021).

Dr. Vassallo has concluded that "the Farm Line at Angola is unsafe for every incarcerated person, and especially for people with disabilities and health conditions that impede their ability to thermoregulate."  Vassallo Decl. ¶ 103.  Federal courts have consistently relied on Dr. Vassallo's expertise to find that heat-related prison conditions pose a substantial risk of serious harm.  *See, e.g.*, *Gates*, 376 F.3d at 339 (relying on Dr. Vassallo to find the temperature on Mississippi's Death Row constituted a substantial risk of harm); *Ball*, 988 F. Supp. 2d at 665 (Dr. Vassallo's testimony "underscored" the fact that extreme heat posed a substantial risk of serious harm to medically vulnerable people incarcerated at Angola); *Cole* v. *Collier*, 2017 WL 3049540, at *14 n.16, *47 (S.D. Tex. July 19, 2017) (ordering preliminary injunction requiring heat mitigation based on Dr. Vassallo's "expert report and testimony . . . [and] extensive

16

knowledge"); *see also Lewis*, 2023 WL 7299130, at *21 (crediting Dr. Vassallo and finding Angola's emergency care "constitutionally deficient."). The same result is warranted here.[7]

In sum, conditions on the Farm Line under High Heat pose a substantial risk of physical and psychological harm, satisfying the objective prong of the Eighth Amendment.

**B.    Defendants Are Deliberately Indifferent to the Risks of High Heat.**

Prison officials violate the Eighth Amendment where they "know[] of and disregard[] an excessive risk" resulting from unconstitutional conditions of confinement. *Farmer*, 511 U.S. at 837. Thus, the subjective prong of the Eighth Amendment is satisfied when officials (i) have knowledge—either actual or inferred—that a substantial risk of serious harm exists; and (ii) fail to act reasonably to abate the risk of serious harm. *Id.*; *Ball*, 792 F.3d at 594; *Lewis*, 2023 WL 7299130, at *46. Here, the evidence of deliberate indifference is abundant.

*1.    Defendants Know of the Substantial Risk of Serious Harm Caused by Heat Conditions on the Farm Line.*

It is well-established that the "open and obvious nature of dangerously hot conditions . . . support[s] an inference of deliberate indifference." *Hinojosa*, 807 F.3d at 667; *see also Gates*, 376 F.3d at 340. Thus, the subjective prong can be satisfied where the complained-of conditions are "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to the information concerning the risk and thus 'must have known' about it." *Hinojosa*, 807 F.3d at 665 (quoting *Farmer*, 511 U.S. at 842–43). Such is the case here.

It is no secret that Louisiana faces extreme heat each summer or that such heat poses significant health risks. In August 2023, former Governor John Bel Edwards declared a state of

---

[7]   Forced physical labor on the Farm Line during periods of High Heat poses far greater risk of serious harm than extreme cell temperature alone. *See* Vassallo Decl. ¶¶ 67–71 (explaining how healthy people doing physical work are at risk from heat stress); *see also* Ex. 19, at 5.

emergency due to the "record number of excessive heat warnings." Ex. 33. He warned that the "National Weather Service ha[d] issued a record number of excessive heat warnings, with heat indices in the 100s" that summer, *see id.*, and urged Louisianans to "take precautions when you are outside and check on [people] who might need assistance," Ex. 34. In addition to widespread news coverage warning of those risks, *see, e.g.*, Exs. 34–38, multiple federal and state agencies, including the Louisiana Department of Health, have issued reports, guidance, and warnings about heat-related health risks, *see, e.g.*, Exs. 25, 39.

Notably, DOC's own policies recognize that physical labor in extreme heat is dangerous, particularly for people with risk factors for impaired thermoregulation. *See, e.g.*, Ex. 18 (establishing policies for the reduction of heat pathology and reduce the harmful impacts of heat on medically vulnerable incarcerated people); Ex. 29 (establishing procedures to measure temperatures in indoor living and work areas); Ex. 19 (detailing health care policies with regard to heat pathology). In fact, Defendants' own policies recognize 88 degrees Fahrenheit as a critical tipping point. Under Defendants' Heat Pathology protocol, prison officials must issue a "heat alert" when the heat index reaches 88 degrees and provide all incarcerated people working outside with water and ice every 30 minutes and "a rest break at least 5 minutes long" every 30 minutes. Ex. 18, at 4. In addition, the Heat Pathology protocol authorizes officials to designate individuals who "may be affected by heat or those prescribed medication that may impact sensitivity to heat" with Heat Precaution Duty Status that exempts them from outdoor labor when the heat index exceeds 88 degrees. *See id.* at 1–3. Taken together, widespread public information, guidance from federal and state agencies, and the existence of Defendants' own policies demonstrate both the "open and obvious nature" and Defendants' long-standing knowledge of the substantial risk of serious harm attendant to labor in the extreme heat. *See*

*Hinojosa*, 807 F.3d at 667 (heat-related policies suggested defendants' awareness of the risk).

Further confirming Defendants' subjective knowledge, Defendants have been litigating these issues, in this very Court, for years. In *Ball*, the plaintiffs alleged that extreme heat conditions on Angola's death row put them at risk of heat-related illness and violated their Eighth Amendment right to be free of cruel and unusual punishment. *See* 988 F. Supp. 2d at 642–43. Crediting Dr. Vassallo's testimony, *id.* at 665, this Court held that the plaintiffs faced a substantial risk of serious harm and that the State—including Defendants James LeBlanc and Angola's then-Warden, Burl Cain—was deliberately indifferent to that risk, *id.* at 679. The Court issued a permanent injunction requiring the State to develop a plan to keep the heat index at or below 88 degrees. *Id.* at 687–89.[8] Thus, Secretary LeBlanc and Warden Hooper are clearly aware that extreme heat causes excessive risk to the health and safety of people incarcerated at Angola. *See Harris* v. *Angelina Cnty., Tex.*, 31 F.3d 331, 335 (5th Cir. 1994) (finding defendant "well aware" of unlawful conditions where "evidence [was] brought to the attention of the county through [] ongoing litigation").

Prison officials' use of four wheelers to patrol the Farm Line in recent years is further evidence of Defendants' deliberate indifference. Previously, Angola's officials regularly used horses to patrol the fields. They switched to four-wheelers because the animals could not tolerate the heat. *See* Smith Decl. ¶ 9. Yet, on even the hottest days of summer, Defendants force Plaintiffs and others to labor on the Farm Line. *See Hinojosa*, 807 F.3d at 667 (knowledge could be inferred by defendants' use of greater precautions to protect "the swine that [Texas Department of Criminal Justice] raises for slaughter" than the people in their custody).

---

[8]    On appeal, the Fifth Circuit affirmed this Court's deliberate indifference finding and remanded with instructions to narrow the scope of the injunction. *Ball*, 792 F.3d at 600.

Finally, Plaintiffs and several class members have filed requests for administrative relief (ARPs) complaining that they suffered heat-related illness and injury on the Farm Line during periods of extreme heat.  *See* Exs. 20, 21, 22, 23, 28, 31, 40, 41.  Defendants' failure to act on those grievances further supports a finding of deliberate indifference.  *See Blackmon*, 484 F. App'x at 873; *Gates*, 376 F.3d at 340.

        2.    *Defendants' Knowing Disregard of Heat-Related Risks of the Farm Line.*

Despite knowing of the substantial risk of serious harm on the Farm Line during periods of High Heat, Defendants are unable and unwilling to mitigate these risks.  Although Defendants purport to have heat policies to mitigate risks, those policies are not enforced and are facially inadequate, *supra* at 20–22, and therefore do not reasonably abate the risks Plaintiffs and others face.  *See Webb*, 618 Fed. App'x at 209 n.7 (5th Cir. 2015) (Eighth Amendment violated "where [remedial] measures proved inadequate to protect [plaintiffs] from the extreme heat"); *Lewis*, 2021 WL 1219988, at *23–24 (same); *Cole*, 2017 WL 3049540, at *40 (same).

According to their own records, Defendants routinely fail to provide water breaks or rest breaks to individuals working on the Farm Line as required by their Heat Pathology protocol.  In fact, Defendants' Daily Line Count records indicate only seven days on which Defendants offered water breaks during the period May 1 to October 31, 2023.  Ex. 30; Ex. 42; *see also* Walker Decl. ¶ 7; Hicks Decl. ¶ 4; Thompson Decl. ¶ 7.  In addition, Plaintiffs uniformly swear that on the Farm Line, the only drinking water available is dirty or otherwise hard to come by. *See, e.g.*, Smith Decl. ¶ 9; Hicks Decl. ¶ 4; Walker Decl. ¶ 7.

Defendants also fail to grant Heat Precaution Duty Status to eligible individuals.  For instance, Mr. Stevenson suffers from ventricular tachycardia, high blood pressure, pre-diabetes, and other cardiac conditions.  He is prescribed "[L]osartan, Zyrtec, Zyprexa, among other medications."  Stevenson Decl. ¶ 11.  Under the Heat Pathology protocol, he should be exempted

from outdoor manual labor. *See* Ex. 18; Ex. 43 (identifying Zyprexa as a "heat pathology medication"). But his request for the appropriate duty status was rejected. Exs. 44–46; Stevenson Decl. ¶ 12. Similarly, Mr. Guillory has hyperthyroidism and takes Synthroid, which is known to impact a person's ability to thermoregulate. *See* Vassallo Decl. at ¶ 57; Guillory Decl. ¶ 15; Ex. 47, at 004749. His requests for the appropriate duty status were also denied. Ex. 48, at 2–3 (requesting "appropriate duty status" and "permanent no duty status"); Ex. 49. Both Mr. Stevenson and Mr. Guillory were forced to work on the Farm Line, despite Defendants' knowledge of the substantial risk to their health. *See Adams* v. *Davis*, 2022 WL 263287, at *5 (E.D. Tex. Jan. 6, 2022) ("[K]nowingly placing an [incarcerated person] on a work detail which the prison official knew would significantly aggravate the [his] serious physical ailment [] constitute[s] deliberate indifference." (quoting *Jackson* v. *Cain*, 864 F.2d 1235, 1235 (5th Cir. 1989))); *see also Mendoza* v. *Lynaugh*, 989 F.2d 191, 194 (5th Cir. 1993).

Defendants fail to monitor outside temperature every two hours as mandated in their own safety protocols further demonstrating their indifference to known risks. Defendants' Heat Pathology Directive 13.067 requires diligent monitoring and recording of the temperature every two hours, including by Defendant Hooper. Ex. 18 at 4. In practice, however, Defendants record temperatures far less frequently, generally only once daily or not at all, and without any apparent review from Defendant Hooper. *See* Ex. 32.

Even if Angola's heat protocols were enforced as written, they would be inadequate to alleviate the risks inherent to the Farm Line. Vassallo Decl. ¶¶ 95–98. Dr. Vassallo noted that the Heat Pathology protocol "omits several common medications that are known to impair a person's ability to thermoregulate and thus increase the likelihood of heat illnesses," including common antidepressants like selective serotonin reuptake inhibitors (SSRIs), as well as Vistaril

(hydroxyzine pamoate), Benadryl (diphenhydramine), and the anti-seizure/migraine drug Topiramate. Vassallo Decl. ¶ 97. Dr. Vassallo opines that individuals should be permitted to take breaks and recover from the heat in cool, air-conditioned locations. *See id.* ¶ 98. And critically, whatever alleviation measures are taken, a real risk of serious harm remains absent appropriate medical care, which both Dr. Vassallo and this Court have concluded does not exist at Angola. *See id.* ¶¶ 99-102, *id.* Ex. C; *Lewis*, 2023 WL 7299130, at *1 ("[R]ather than receiving medical 'care,' the inmates are instead subjected to cruel and unusual punishment by medical mistreatment" at "unspeakable" "human cost").

These inadequate and routinely disregarded policies do not come close to reasonably alleviating the risks inherent to the Farm Line. It is still inherently dangerous for individuals to labor outside in the High Heat, and adequate medical care and attention in the event that they experience any heat-related illness does not exist. *See* Vassallo Decl. ¶¶ 99–102, Ex. C. Instead, when individuals on the Farm Line exhibit symptoms of heat stress, those symptoms are treated as disciplinary infractions to be handled by correctional officers rather than serious health concerns requiring immediate and competent medical attention; as a result, Plaintiffs and others suffering heat stress are kept outside or subject to additional punishment. *See, e.g.*, Jackson Decl. ¶ 21; D. Williams Decl. ¶ 13; Smith Decl. ¶ 12.

In short, Defendants have failed to implement reasonable remedial measures to protect against the known, substantial risks of serious heat-related harm on the Farm Line, satisfying the subjective prong and showing Plaintiffs are likely to succeed on their Eighth Amendment claims.

## II.    PLAINTIFFS FACE A SUBSTANTIAL THREAT OF IRREPARABLE INJURY.

Plaintiffs face a substantial threat of irreparable harm absent the requested injunction. A harm becomes "irreparable" where there is no adequate remedy at law. *Book People, Inc.* v. *Wong*, 91 F.4th 318, 340 (5th Cir. 2024). The deprivation of a constitutional right is irreparable.

*Id.* at 340–41; *Elrod* v. *Burns*, 427 U.S. 347, 373 (1976). Plaintiffs have established that the working conditions on the Farm Line during periods of High Heat violate their Eighth Amendment rights; as such, they have shown irreparable harm in the form of a constitutional violation, and no further showing of injury is necessary. *See Book People*, 91 F.4th at 341.

In any case, Plaintiffs have additionally shown the significant risks of substantial physical and psychological harms they face on the Farm Line. *See supra* at Section I.A. These harms are undeniably irreparable. *See Cole*, 2017 WL 3049540, at *43. The Medically Vulnerable Plaintiffs have also shown that absent injunction, they are at "particularly high risk of suffering from heat-related illness, as their thermoregulatory functions are compromised," and thus face unique risks of irreparable harm. *Id.*; *Tiede*, No. 1:23-CV-1004-RP, ECF No. 17, at 2. Thus, Plaintiffs satisfy the irreparable harm element.

## III.    THE EQUITIES AND PUBLIC INTEREST FAVOR AN INJUNCTION.

"Elements three and four of the preliminary injunction test, the balance of the equities and the public interest, merge when the Government is the opposing party." *Robinson* v. *Ardoin*, 605 F. Supp. 3d 759, 852 (M.D. La. 2022) (internal quotation marks and citation omitted); *see also Book People*, 91 F. 4th at 341 ("Neither the state nor the public has any interest in enforcing a regulation that violates federal law" (quotation omitted)). Because Plaintiffs have made the requisite showing that the conditions on the Farm Line during periods of High Heat violate their Eighth Amendment rights, it is in the public interest to prevent those impending violations. *Jackson Women's Health Org.* v. *Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights." (quotation omitted)). By contrast, Defendants have no legitimate interest in maintaining the Farm Line in violation of the Constitution. *See Book People*, 91 F. 4th at 341. The balance of the equities and public interest, therefore, weigh strongly in Plaintiffs' favor.

## IV.    THE PROPOSED RELIEF IS NARROW, NECESSARY, AND NON-INTRUSIVE.

A federal court may grant injunctive relief under the PLRA when the requested relief is narrowly drawn, extends no further than necessary to correct the harm, and is the least intrusive means necessary to correct that harm.  18 U.S.C. § 3626(a)(2).  Plaintiffs' requested relief meets these requirements.  Plaintiffs ask only that they and those similarly situated be exempt from working in conditions that violate their constitutional rights.  That is narrow, necessary, and the least intrusive relief necessary.

The U.S. Supreme Court has made clear that the PLRA permits remedies that reach deep into the operations of penal institutions.  For example, in *Brown* v. *Plata*, 563 U.S. 493 (2011), the Supreme Court affirmed an order requiring California to reduce crowding in its prisons, which would require the state to release as many as 37,000 people, explaining that courts "must not shrink from their obligation" to enforce constitutional rights or "allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration."  *Id.* at 511 (internal citations and quotations omitted).  The remedy requested here is many orders of magnitude less invasive than that ordered in *Plata*.

*First*, the requested injunction—ceasing operation of the Farm Line during periods of High Heat—is the only remedy capable of redressing the constitutional violation that Plaintiffs are suffering, namely, the significant heat-related risks to their health and safety.  As noted above, to prevent heat stroke and heat-related injuries, an individual requires access to air conditioned cooling centers, the freedom to stop working and take breaks when needed to rest and hydrate, protective clothing, and machines to reduce physical exertion.  It also requires adequate medical care.  Defendants simply cannot provide these necessities for men working the Farm Line.  The only remedy, therefore, is to enjoin the Farm Line during periods of High Heat.

*Second*, the requested injunction is tailored and administratively achievable with minimal burdens on Defendants.  The requested injunction would only affect operation of the Farm Line during periods of High Heat; all other agricultural programs at Angola would remain untouched. Defendants routinely reassign men working on the Farm Line to other programs, showing that reassignment is administratively feasible.  And, because the Farm Line serves no productive purpose, Defendants would not suffer any meaningful burden.

Accordingly, the requested relief is well within permissible parameters under the PLRA.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion for a temporary and preliminary restraining order enjoining Defendants from operating the Farm Line when the heat index is at or above 88 degrees Fahrenheit until this action is resolved.[9]

---

[9]  Plaintiffs request that the Court exercise its discretion to waive the bond requirement under Rule 65(c).  Waiver is appropriate here because Plaintiffs are indigent, incarcerated, and bring this suit to enforce their constitutional rights.  *See Cole*, 2017 WL 3049540, at *44; *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. 1981) ("In a real sense, therefore, plaintiffs were engaged in public-interest litigation, an area in which the courts have recognized an exception to the Rule 65 security requirement.").

Dated:   May 13 2024

*/s/ Lydia Wright*
Lydia Wright, La. Bar No. 37926
Samantha Bosalavage, La. Bar No. 39808
Claude-Michael Comeau, La. Bar No. 35454
**THE PROMISE OF JUSTICE INITIATIVE**
1024 Elysian Fields Avenue
New Orleans, LA 70117
Tel: (504) 529-5955
lwright@defendla.org
sbosalavage@defendla.org
ccomeau@defendla.org

*/s/ Oren Nimni*
**RIGHTS BEHIND BARS**
Oren Nimni (PHV) MA Bar No. 691821
Amaris Montes (PHV) MD Bar No. 2112150205
416 Florida Avenue NW, Se. 26152
Washington, D.C. 20001
Tel: (202) 455-4399
oren@rightsbehindbars.org
amaris@rightsbehindbars.org

*/s/ Joshua Hill Jr.*
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Joshua Hill Jr. (PHV) NY Bar No. 4297826
Jeremy A. Benjamin (PHV) NY Bar No. 4770277
Arielle B. McTootle (PHV) NY Bar No. 5993217
Leah R. Weiser (PHV) NY Bar No. 6027601
1285 Avenue of the Americas,
New York, NY 10019-6064
Tel: (212) 373-3000
jhill@paulweiss.com
jbenjamin@paulweiss.com
amctootle@paulweiss.com
lweiser@paulweiss.com

*Attorneys for Plaintiffs and the Proposed Classes*