# Exhibit C

**Louisiana State Penitentiary at Angola**

**Health Care Evaluation**

Submitted April 18, 2022

Prepared by

Mike Puisis DO
Madie LaMarre MN, FNP-BC
Susi Vassallo MD
Angela Goehring RN, MSA, CCHP



# Contents

Introduction and Methodology ................................................................................. 3

Qualifications ............................................................................................................ 5

Documents ................................................................................................................ 7

Executive Summary ................................................................................................... 8

Findings .................................................................................................................... 14
    LSP Health Care Organization and Leadership ....................................................... 14
    Staffing ................................................................................................................... 16
    Credentialing .......................................................................................................... 18
    Peer Review (Clinical Performance Enhancement) ................................................. 21
    Mortality Review .................................................................................................... 25
    Health Care Policies and Procedures ...................................................................... 31
    Clinic Space and Equipment ................................................................................... 36
    Medical Records ..................................................................................................... 38
    Internal Monitoring and Quality Improvement Activities ....................................... 40
    Clinical Care ............................................................................................................ 48
    Medication Management and Administration ......................................................... 71
    Specialty Care ......................................................................................................... 82
    Infirmary Care ........................................................................................................ 100
    Emergency Care ...................................................................................................... 107

Recommendations .................................................................................................... 126
    Clinical/Emergency/Infirmary Care ........................................................................ 126
    Specialty Care ......................................................................................................... 131
    Organizational Structure, Facility Leadership, and Custody Functions .................... 132
    Credentialing .......................................................................................................... 132
    Mortality Review .................................................................................................... 133
    Peer Review ............................................................................................................ 133
    Staffing ................................................................................................................... 134
    Policies and Procedures .......................................................................................... 134
    Medical Records ..................................................................................................... 135
    Internal Monitoring and Continuous Quality Improvement .................................... 135

## Introduction and Methodology

On March 31, 2021, the Court found that Defendants "have been deliberately indifferent to the inmates' serious medical needs in the means and manner of the delivery of health care, in violation of the Eighth Amendment of the Constitution." The Court also found that Defendants violated the American with Disabilities Act, as modified by the American with Disabilities Amendment Act, and Section 504 of the Rehabilitation act of 1973.[1] Following this Opinion, the Court issued a scheduling order to update the record.

On April 6, 7, and 8, 2022, Madeleine LaMarre MN, FNP-BC; Susi Vassallo MD; and Angela Goehring RN conducted a site visit at Louisiana State Penitentiary at Angola, Louisiana. The purpose of the site visit was to inspect the prison and observe health care operations to determine what changes have been made since our previous site visit in March 2016 and to evaluate those changes. We were accompanied by Dora Schriro and Mark Mazz, who assessed compliance with American with Disabilities (ADA) regulations and standards. Their findings are addressed in separate reports. Michael Puisis DO, did not attend the site visit, but he reviewed documents and patient medical records to prepare his contributions to this report.

We were accompanied by Jeffrey Dubner of Democracy Forward; Samantha Bosalavage, Rebecca Ramaswamy, and Elena Malik of the Promise of Justice Initiative; Emily Lubin of the Southern Poverty Law Center; and Brendan Schneiderman of Cohen Milstein.

The medical review team performed the following activities in preparation prior to and during the site visit:
- Reviewed the Liability Opinion of Judge Shelly Dick, United States District Court, Middle District of Louisiana in the matter of *Lewis v. Cain*
- Reviewed health records and other medically related documents produced by Defendants
- Toured LSP, including medical clinics, acute treatment unit (ATU), nursing units, and select inmate housing units, including Death Row
- Observed medication administration
- Observed sick call
- Observed General Medicine Clinic
- Observed emergency response
- Observed infirmary nursing care
- Interviewed inmates

Our methodology for this review was the same as for our report in 2016, except that we were not permitted to speak with staff, and observation of health care operation was limited, in part due to receiving incorrect information about when certain activities occurred (e.g., time of medication administration in assisted living units), as well as other limitations imposed by

---

[1] Opinion. Lewis et al. v. Cain et al. Civil Docket No.: 3:15-CV-318. Pages 2-3.

defense counsel. We thank Warden Tim Hooper, Jacob Johnson Ph.D., Assistant Warden Ashley Oliveaux, and Bill Hawkins RN, DON for their assistance in conducting the site visit.

With respect to record review, we selected records of patients with chronic diseases and other serious medical conditions because these are the patients who use the health care system most regularly and are at risk of harm. We did so by reviewing the lists of patients who had been hospitalized from January 2019 to January 20222, and mortality reviews of patients who had died between January 2019 and January 2022, and selecting a sample of representative records to review. We determined whether medical care is consistent with nationally recognized clinical guidelines such as those published by the American Diabetes Association (ADA), the Centers for Disease Control and Prevention (CDC), and the American Thoracic Society, etc. We used the medical database UpToDate as a general standard of care. Our review focused on the quality of care as well as clinical systems.

In parts of this report, we discuss facts that were related to us by patients and orderlies whom we met during the site visit. Because defense counsel prohibited us from reviewing the medical records for these patients, we were unable to confirm what they told us against documentary evidence. We recognize that patients do not always understand the medical care that they received (particularly when care is not explained to them, as often happens at LSP), and therefore acknowledge the possibility that they may have been mistaken in some particulars. But what we heard from patients and orderlies was consistent with what we saw in the medical records and observed during our site visit. While we view our interviews with patients and orderlies to be supportive of our findings, none of our ultimate conclusions rely solely on those interviews. If we subsequently learn of facts that contradict what we were told by patients and orderlies, we will consider whether they affect any particulars of our opinions.

To avoid duplication and make our evaluation more cohesive, we have combined our expert reports. Each of us was principally responsible for initially drafting various sections as designated below based on our individual areas of expertise. Each of us has reviewed, discussed, and endorsed the contents of this report. Where charts reviewed or site visit observations made by one expert were relevant to a section for which a different expert had principal responsibility, the experts consulted with each other as necessary.

Clinical Care: Madie LaMarre/Angela Goehring
Specialty Care: Mike Puisis
Emergency Care: Susi Vassallo
Infirmary Care/Medications: Angela Goehring
Health Care policies and procedures: Angela Goehring
Clinic Space: Madie LaMarre
Health Records: Madie LaMarre
Health Care Organization, Credentialing and Peer Review: Mike Puisis
Medication Management and Administration: Madie LaMarre
Mortality Review: Mike Puisis
Quality Improvement: Angela Goehring

## Qualifications

Madeleine LaMarre, MN, FNP-BC is an independent consultant in correctional health care with more than 30 years of experience in corrections. Her general qualifications as an expert are set forth in her Curriculum Vitae. She holds current licensure as a family nurse practitioner in the state of Georgia and is nationally certified by the American Nurse Credentialing Center (ANCC). She is a member of the American Nurses Association, the American Association of Nurse Practitioners, and the Academy of Correctional Health Care Professionals. She is familiar with standards of health care in correctional facilities.  Beginning in 1982, she worked as both clinician and administrator of a Georgia Department of Corrections (GDC) facility providing clinical care to inmates. She subsequently became the GDC Nursing Director providing expert clinical assistance in the planning, implementation and evaluation of nursing services.  In 1995, Ms. LaMarre became the GDC Clinical Services Manager and her responsibilities included development of health care policy and oversight of a clinical auditing program to monitor and improve the quality of health care in GDC institutions. She provided technical assistance and consultation to nurses and clinicians to achieve patient care goals. She provided direct care to patients with HIV and hepatitis C infection.  She has been a correctional medical expert monitoring state prison and jail compliance with settlement agreements in the states of California, Delaware, Illinois, New Jersey, Ohio, and Texas. She serves as a consultant to the Department of Homeland Security.   She also served as a consultant to the Centers for Disease Control and Prevention (CDC) regarding the management of Hepatitis C in correctional facilities and HIV testing implementation for correctional settings. Ms. LaMarre has authored and coauthored several publications, including serving as associate editor of *Clinical Practice in Correctional Medicine*, Second Edition, a textbook on correctional medicine.  In this text, she authored a chapter on the nursing role and practice in correctional health care settings.

Michael Puisis, D.O. has worked as a physician in correctional environments for over 30 years. During that time, in addition to direct patient care, he has served as Assistant Medical Director, Medical Director and then Chief Operating Officer for the Cook County Jail, one of the largest jails in the country.  He also served as Regional Medical Director for the state of New Mexico prison system for Correctional Medical Services and corporate Medical Director of correctional facilities for Addus Health Care.  Dr. Puisis has served as an expert or consultant in cases throughout the country since 1989.  He has been retained by the United States Department of Justice and by the Federal Court in the Northern District of California, as well as numerous lawyers and governmental jurisdictions who either seek to improve care or are challenging the provisions of care in prisons and jails.  He has also been a court-appointed expert or monitor in numerous cases. Dr. Puisis has assisted the American Diabetes Association in establishment of standards of care for diabetics in correctional facilities.  He has also assisted in the revision of the standards of medical care for correctional facilities for the National Commission on Correctional Health Care and the American Public Health Association.  He has published articles related to correctional health care and has edited the only textbook of correctional medicine,

*Clinical Practice in Correctional Medicine*, 2nd edition 2006 Mosby Elsevier.  A complete curriculum vitae is attached.

Susi Vassallo, M.D. is a Clinical Professor of Emergency Medicine at the New York University School of Medicine, and a Fellow of the American College of Emergency Medicine and the American College of Medical Toxicology. She actively practices and teaches emergency medicine and medical toxicology at Bellevue Hospital, a large urban emergency department in New York City that treats patients from New York City correctional facilities.  She has a Master's of Science degree in Health Care Management. In the past 15 years, she has served as a medical expert in conditions of confinement litigation in the Texas Department of Justice prison system, on death row at the Louisiana State Penitentiary, at the Mississippi State Penitentiary death row, and at the Rikers Island Jails in New York City. She consults for the Department of Homeland Security Division of Civil Rights and Civil Liberties and, as such, reviews the systems of medical care delivery in Immigrations and Customs Enforcement Detention Centers and advises them on improvements.

Angela Goehring, RN, MSA, CCHP has worked in the correctional health care space for over 25 years in both prison systems and jails.  She is currently employed as a Chief Nursing Officer for a private correctional health care company and for 8 years has practiced privately as an independent consultant.  Her general qualifications as an expert are outlined in her Curriculum Vitae.  She holds licensure as a Registered Nurse in Ohio and Kansas multi-state.  The multi-state compact licensure qualifies her to practice in 37 states. Ms. Goehring is well versed and experienced in the nationally published health care standards.  She is a member of the National Commission on Correctional Health Care and the American Correctional Association. She has served on the American Correctional Association's Commission for Accreditation, granting accreditation status to facilities participating in ACA's accreditation process. Beginning in 1997, she monitored the Kansas Department of Corrections health care contract before assuming the Health Services Administrator roles at a large prison and medium jail in Kansas.  In 2004 she moved to Florida to assist in starting a privately owned correctional health care company and was named the Sr. Vice President of Clinical Operations, developing nursing policy, protocols, and implementing nursing services in contract prison and jail facilities. She also developed the quality improvement program for the company and created an internal auditing team and process to monitor all aspects of comprehensive correctional programs. She also evaluated and determined appropriate staffing levels required for all company correctional health programs. She continues in this role.  In her independent consulting capacity, she has worked with court appointed monitors with the Department of Justice, monitoring the care and compliance of a Federal Consent and Settlement agreement in Miami-Dade, Florida.  Ms. Goehring has also served, and is serving, as an expert or consultant in numerous States including, California, New Mexico, Georgia, Illinois, and Florida.

**Documents**

We reviewed the following documents for this report:

☐ Lewis et al. v. Cain et al.  Liability Opinion, 3/31/2021
☐ LSP Tables of Organization and Staffing
☐ DOC and LSP Health Directives
☐ Performance-Based Standards for Correctional Health Care in Adult Correctional Institutions. 2002. American Correctional Association (ACA).
☐ Performance-Based Standards for Correctional Health Care in Adult Correctional Institutions. 2004. American Correctional Association (ACA).
☐ Standards for Health Care Services in Prisons. 2018. National Commission on Correctional Health Care (NCCHC).
☐ Training Records
☐ Credentialing Files
☐ Death Reports and Reviews
☐ Peer Review Files
☐ Outside Contracts
☐ Quality Improvement Meeting Minutes
☐ Morbidity and Mortality Review Meeting Minutes
☐ CO-5-001 Reports
☐ Medical Utilization Database
☐ LSP Subjective Evaluation Reports
☐ ACA Audits
☐ Refusals
☐ Workload indicator logs
☐ Housing Location Scheduling Worksheets
☐ Eceptionist logs
☐ Health Care Process Tracking Logs
☐ Monthly Management Reports for REB Treatment Center
☐ Department of Public Safety and Corrections   AM-H-2 Audit report
☐ Nursing Administration Policies and Procedures
☐ Sick Call and Emergency Medical Services (EMS) Protocols
☐ Health Record Forms (e.g., Initial Intake Medical Screening, EMT forms, etc.)
☐ Medical Records (See Appendix A)
☐ Fact depositions taken during the remedial phase in this matter
☐ Defendants' Response to Interrogatory 1 in this matter regarding changes in the provision of medical care since the close of liability discovery

☐   Defendants' Response to Interrogatory 20 in this matter regarding changes in LSP's policies or practices regarding communication with DOC HQ regarding scheduling of specialty appointments.


# Executive Summary

***Patients at LSP with serious medical needs continue to face a substantial risk of serious harm, including preventable hospitalizations and deaths.***

Our review showed that Louisiana State Penitentiary (LSP) has made some recent improvements in health care organizational structure, clinic space, and sick call procedures.

However, throughout the relevant period for the remedial phase, from 2019 through the most recent medical records produced, our review showed that patients at LSP still face a substantial risk of serious harm whenever their serious medical needs require significant medical attention. We found that patients with serious medical needs received, and continue to receive inadequate medical care that places them at significant risk of serious harm, unnecessary pain, and preventable death. As was the case with the medical records reviewed during the liability period and the supplemental report, the vast majority of medical records from the remedy period contained multiple examples – typically pervasive – of often grossly substandard medical care. In particular, we found each of the following to be present throughout the records:

1. Lack of timely access to a medical provider licensed to diagnose and treat serious medical conditions;
2. Lack of adequate medical evaluations[2] and failure to timely diagnose and treat patients with serious medical needs;
3. Failure to recognize red-flag or potentially life-threatening signs and symptoms;
4. Failure to provide medical care in accordance with nationally recognized treatment guidelines for serious medical needs such as diabetes, hypertension, chronic obstructive pulmonary disease (COPD), etc.;
5. Failure to coordinate specialty care in a manner to timely send patients for specialty services; failure to update therapeutic plans of the patient to reflect treatments and recommendations of specialists; failure to follow up, as recommended by specialist; failure to inform the patient of how the specialists' recommendations would be addressed; and failure to review and document review of the specialist's consultation.
6. Failure to monitor and evaluate patients' adherence to medication regimens and address obstacles to adherence;

---

[2] Should include a history related to all of the patient's conditions and complaints, an examination related to the patient's conditions and complaints, and an assessment and a therapeutic plan addressing each condition.

7. Failure to monitor patients with serious medical needs in accordance with their disease control;
8. Scheduling health care operations at unreasonable times which deter access to care;
9. Assessing excessive fees for accessing health care;
10. Unprofessional and punitive attitudes towards patients.

The degree of substandard care has not been eliminated by the changes that LSP has made. Principally, LSP has added a Long-Term Care Hospital Administrator with experience and training in health care management; changed sick call procedure so that many patients are seen by a nurse practitioner over telemedicine the following day; and increased nurse and nurse practitioner staffing in the ATU. Despite the changes made, we continue to see care that falls well below the standard of care in these areas. And in most other regards – including clinical care, the process for obtaining specialty services and implementing specialists' recommendations, emergency care outside the ATU, and many other critical areas – their practices are unchanged.

**Clinical Care**

Among other things, our critical findings regarding patient care include:

**Emergency care:** Our remedy period review showed that LSP still does not provide timely and appropriate care when patients present with medical emergencies. Critically ill patients are not transferred directly from the housing unit to the hospital timely. This includes patients with heart attack, stroke, gastrointestinal bleeding, hypoxia,[3] and heat Stroke. Delays in transfer resulted in deterioration, permanent disability, and death.

Emergency Medical Technicians (EMTs or "medics") no longer conduct sick call, but they still respond to Self-Declared Emergencies (SDE). Unless the patient is transported to the ATU, which they often are not, EMTs manage these situations in the same way as before, frequently without contacting a medical provider at all. When they do contact a medical provider, the provider's recommendations are made solely on the basis of the EMT's assessment, and providers often direct EMTs not to transport patients to the ATU – sometimes despite concerning signs and symptoms that indicate a need for immediate assessment and treatment. Thus, in many cases, patients receive no medical evaluation, diagnosis and treatment from a health care provider.

While there is now supposed to be a registered or licensed practical nurse in the ATU at all times, and a nurse practitioner in or near the ATU from 7:30 am to 4 pm Monday to Thursday and at all times on weekends, this still does not ensure adequate care, as the numerous examples of poor treatment in the ATU reflect. We believe a medical provider should staff the ATU 24 hours a day, 7 days a week. A physician should have primary responsibility for the clinical care provided at the ATU working in collaboration with nurse practitioners.

---

[3] Hypoxia is low oxygen levels in the blood stream.

**Sick call:** For the majority of the review period, health records show that patients did not have access to a medical provider that could diagnose and treat their medical conditions. Since November 1, 2021, LSP has utilized a new system in which sick call requests that are submitted before noon Sunday through Thursday lead to a telemedicine visit with a nurse practitioner, facilitated by an EMT.  While telemedicine is a helpful adjunct to in person visits, it is typically used when the patient is unable to be transported, such as after clinic hours when the provider is not physically on-site, and during times such as severe weather, etc.  However, the use of telemedicine as the only mechanism to conduct patient sick call encounters is not optimal.

We observed telemedicine encounters and noted that telemedicine equipment lacks key equipment for the nurse practitioner to conduct an adequate physical examination (auscultation of the heart, lungs and abdomen). This, combined with the poor resolution of the camera also contributed to inadequate physical examinations.  Until these issues are resolved sick call encounters should be conducted in person.

Record reviews of recent sick call requests showed that in many cases EMT obstructed access to care, and in other cases nurse practitioners did not see the patient at all, even a patient complaining of chest pain. Thus, these patients received no medical evaluation at all.

**Clinical care:** LSP does appear to have improved the quality of the clinical spaces in which clinical care is provided. Other than that, however, there do not appear to have been any significant changes to LSP's practices for providing routine clinical care. As the medical records reflect, the quality of care does not appear to be any different than it was during the liability period. Medical needs are treated episodically and patients' ongoing needs often go unaddressed even when they see a health care provider. As a result, patients' long-term conditions are frequently uncontrolled and unaddressed until they deteriorate into acute, life-threatening crises.

**Specialty care:** Defendants acknowledge that they have not changed the process for recommending, authorizing, or scheduling specialty care, nor the process for ensuring that offenders get to appointments with third party providers and have all necessary tests, and paperwork. Nor have there been any changes to Defendants' process for ensuring that specialists' recommendations, indicated tests, and other follow-up occurs. Record reviews also confirm delays in referring and obtaining specialty care. Thus, the Court's findings regarding unnecessary and harmful delays in the assessment and receiving of specialty medical care, as well as failures to follow specialty care recommendations and coordinate care, continue unabated. Indeed, medical leadership was not even aware that LSP policy required documentation of decisions not to carry out specialists' recommendations. This results in persistent failures to obtain tests, treatment, or follow-up care recommended by specialists.

**Medication management:** Medication management is completely broken. LSP does not ensure patients receive ordered medications. As noted in our last report, correctional officers distribute medications everywhere in the prison aside from the Nursing Units and Transitional Unit, but are inadequately trained and supervised to give dangerous medications. In assisted living units, which house the medically fragile patients, officers do not document administration

or refusals of medications on medication administration records (MARs) at the time of medication administration, relying on their memory to document at a later time. This is not consistent with practice standards and renders MARs completely unreliable and unable to be used to assess patient adherence to medications.  Medical providers must be able to rely on medication administration records in order to make appropriate treatment decisions, but this is not possible. Even if the medication administration records were appropriately produced, providers typically do not use them when assessing patients; they are not integrated into the medical record and providers acknowledge that they do not consult them during patient care.

At the last review, LSP conducted medication administration up to four times daily, which permitted appropriate spacing between medication doses, including insulin.  However, LSP has reduced the number of medication administrations from four times daily to twice daily.  For inmates in general population inmates, the time was changed to 08:00-09:00 and 14:00-1500, and includes patients receiving insulin.  This 6-hour interval is too narrow and does not provide adequate coverage over a 24-hour period for antibiotics, blood pressure, and other medications that are ordered to be given at bedtime (e.g., coumadin, statins, psychotropic medications, etc.) Alarmingly, this includes patients receiving insulin, which can contribute to poorly controlled diabetes, demonstrated by episodes of hypoglycemia from receiving insulin too closely together, and hyperglycemia from not receiving insulin from the afternoon until the following morning.  This practice is extraordinarily dangerous and should be changed immediately, so that there are at least 3 medications each day, the last being no sooner than 8 pm.

**Infirmary care:** Infirmary care at LSP remains sub-standard and does not meet nationally published minimal standards put forth by the American Correctional Association and the National Commission on Correctional Health Care.  Vulnerable patients are placed in locked rooms without the ability to notify a nurse when in distress. A patient who had difficulty feeding himself was found dead in the room after he choked to death on a piece of sausage. He had no ability to contact a nurse.[4]  LSP has installed a call light system for the locked rooms, but there is no signal inside the nurses' station and it relies on the nurse seeing the light come on. However, infirmary patients reported that nurses had virtually covered the nurses station windows with paper, obstructing the nurses view of the rooms with call lights and patients in the open dormitory.  (The paper was removed just prior to the site visit, and reportedly has already been put back.) Thus, the system does not ensure that patients are within sight or sound of nurses.

**Inappropriate use of orderlies:** An egregious finding of this review is that inmates provide direct patient care to other inmates. This is a result of lack of health care staffing. In the nursing units, the majority of the care, other than medication administration and taking of vital signs, is done by inmate orderlies. Although a nurse was observed doing wound care during our site visit, patients report and orderlies confirmed that orderlies routinely perform wound care. Orderlies reported or were observed emptying catheter bags, providing meals trays, bathing patients, changing adult diapers and changing empty oxygen tanks.  If there is a nurse vacancy or call-out, additional inmate orderlies are called to work in the nursing units.

---

[4] Patient #22.

Some infirmary patients reported that they prefer receiving care from the orderlies because they treat them better than the nurses. However, documentation in the health record and patient interviews revealed concerning episodes of patient abuse by inmate orderlies.

In addition to providing direct patient care, we observed an inmate orderly perform physical therapy.[5]  We observed an inmate orderly in the laboratory handling patient lab reports which are confidential health information.  An inmate orderly in radiology reported that he had previously taken x-rays.  In the assisted living units, inmate orderlies reported that they monitor and respond to an inmate who has daily episodes of hypoglycemia and give him glucose.

The use of inmate labor to provide health care is in violation of all correctional standards. This is obviously a cost-reducing measure, and reflects an inadequate health care budget and staffing. Although orderly pay was raised to 20 cents for some orderlies working with COVID patients, most inmate orderlies make 4 cents an hour. At either rate, LSP's cost savings are enormous – but the gap in medical care is unconscionable.

LSP must immediately stop using inmate orderlies to provide direct health care or have access to confidential health information. If LSP has insufficient health care staff to provide timely and appropriate medical care, high-risk patients need to be transferred to a facility where they can receive adequate care.

**Administrative Processes**

On the administrative level, LSP stills lacks the infrastructure necessary to create an adequate health care delivery system. This includes lack of an adequate health care budget, health care staffing, credentialing and peer review processes, health information management, health care policies and procedures, and quality improvement program.

Specifically, our findings regarding LSP's administrative processes include:

**Leadership:** LSP has hired a person with health administration training in the position of Long-Term Care (LTC) Hospital Administrator, which is a significant improvement.  However, the lack of effective health care operations as demonstrated in multiple areas of this report confirm ongoing ineffective leadership.  Dr. Toce has acknowledged an inability to provide adequate clinical supervision for providers.[6]  The budget for the medical program is not determined by the medical leadership and is not based on the needs of the program.  Management decisions of the medical program, for example medication management, are not determined based on clinical needs of the population which indicates ineffective medical leadership.

The medical leadership at LSP do not appear to have taken the Court's opinion seriously. The Medical Director took issue with many of the Court's findings[7] and the newly appointed LTCH Hospital Administrator could not even remember reading the opinion.[8]

---

[5] Patient #70.
[6] Deposition of Paul Toce, Page 46.
[7] Deposition of Paul Toce, Page 9-21.

**Credentialing:** LSP acknowledges that no changes have been made to credentialing.  LSP's view of credentialing for all staff is that they only need a license.  For providers, this view does not take into consideration that providers need to have training consistent with their clinical responsibilities.  LSP should not hire providers who do not have training in primary care medicine or other relevant areas, but their credentialing process permits them to do so.  Also, review of credentials at LSP is limited only to verification of a current license when typical credentialing consists of primary source verification of medical school graduation, residency training, board certification as applicable, licensure, DEA licensure, as well as attestation of physical and mental health, criminal background check, and National Practitioner Data Bank report.  Nurse practitioners are required to have a copy of their collaborative practice agreement onsite but these were not available in the credential files.  Performance evaluations of individual staff are not present in their credential file.

**Policies and Procedures:** The  Louisiana State Prison (LSP) Angola Health Care Directives, with individual directives dated in 2019-2022, do not meet minimal standards published by the American Correctional Association (ACA) and the National Commission on Correctional Health Care (NCCHC) and lack operational detail sufficient to guide staff's practice.

Dr. Lavespere acknowledged that DOC and LSP largely had not updated its policies in ways that impacted the overall delivery of care. Asked about 11 DOC policies and 19 LSP directives, the only changes that he identified as potentially impacting patient care were changes to the sick call policy; the peer review policy (which has not yet been implemented at LSP); the infirmary care policy (where the change was only to the amount of time and documentation required for some patients, and didn't "change[] a whole lot of health care"); and the replacement of standing orders with "individual treatment orders" in the ATU. He also noted that changes to ATU staffing were not reflected in the policy.[9]

**Medical records:** As during the liability phase, our review of medical records found that health records were grossly disorganized, out of chronological order, and incomplete.  Some patients' records were missing large periods of time, and most were missing medication administration records, contrary to policy. Documentation of medication orders and expired prescriptions was similarly inconsistent.
As Defendants have recognized for years, LSP is in need of an electronic health record (EHR). Although Defendants said in both 2017 and 2018 that electronic health records would soon be implemented at LSP, that still has not happened. The Louisiana Department of Corrections (DOC) has implemented an EHR at other prisons, and needs to prioritize its implementation at LSP.

**Quality improvement program:**  The quality improvement program at LSP does not meet the standard of national correctional accrediting bodies or even its own policy. LSP directives

---

[8] Deposition of Jacob Johnson, Page 7.
[9] Lavespere 30(b)(6) deposition, pages 41-110.

require outcome-based tools to be used to measure the effectiveness of the Department's health care processes and to evaluate and improve the health care delivery system and clinical outcomes. Rather than using outcome-based tools or being used to evaluate and improve the delivery of health care and outcomes, the tools used in the quality improvement program are simply a compilation of encounters. Simply counting events does not measure the effectiveness of the services delivered nor measure outcomes of healthcare. Indeed, LSP does not appear to have changed *any* care practices as a result of its quality improvement program. The development and implementation of an effective quality improvement program will be paramount in providing a roadmap for establishing and monitoring an effective health services program.

**Mortality review:** Mortality review is effectively the same as in 2016. LSP has recently added a monthly mortality review meeting but these meetings do not critically assess the death. The meetings report no identification of deficiencies or opportunities for improvement even when significant deficiencies and opportunities for improvement exist. No corrective actions are therefore conducted based on mortality review.[10]

Findings

LSP Health Care Organization and Leadership

**Methodology:** We reviewed tables of organization as well as staffing, credentialing, and peer review documents.

**Standards:** The responsible health authority (RHA) ensures that the facility maintains a coordinated system for health care delivery. Health care is the sum of all actions, preventive and therapeutic, taken for the physical and mental well-being of a population. A health administrator "is a person who by virtue of education, experience, or certification (e.g., MSN, MPH, MHA, FACHE, CCHP) is capable of assuming responsibility for arranging all levels of health care and ensuring quality and accessible health services for inmates."[11]

**Findings:** The health care organizational structure has changed since our report of 2016 and is a significant improvement. Dr. Jacob Johnson is the Long-Term Care (LTC) Hospital Administrator. He has a Master's of Public Administration with a concentration in health services administration.[12] He has a doctorate in education. Mr. Johnson reports directly to Warden Hooper. The Medical Director reports to the LTC Hospital administrator.

While the addition of an LTC Hospital Administrator with health care management experience is a commendable change, there are some worrying signs regarding the extent to which that change has truly turned around leadership of the various departments he manages. In his deposition, Dr. Johnson appeared unaware that he frequently received nearly blank monthly

---

[10] This was confirmed by Dr. Lavespere in his 30(b)6 deposition on page 204
[11] Standards of Health Services in Prisons. 2018. National Commission on Correctional Health Care (NCCHC) P-A-02.
[12] Jacob Johnson Deposition. Page 8.

management reports from several departments—which he admitted reflects a "lack of oversight and a lack of leadership" in the departments he supervises.[13] These departments with blank or nearly blank reports for December of 2021 include Administration/Doctors, REBTC NU #1 and NU#2, Respiratory Care, Quality Improvement/ADA, Central Supply, Health Information Management, Laboratory, and Radiology. In these departments, sections of the monthly report like "Unit Priorities," "Major Problems and Plans to Solve Them," "Changes and Developments in Operations," and "Appraisal of Offender Morale" were almost always left blank.

Dr. Paul Toce is the Medical Director and RHA. He reports to the LTC Hospital Administrator. The table of organization shows that Dr. Toce's supervisory responsibilities include the departments of nursing, mental health, dental, laboratory, pharmacy, radiology, and EMTs. He also supervises physicians (although none are presently on staff), including specialists, and all nurse practitioners. He is responsible for supervising emergency medical services (EMS). Dr. Toce is the only full-time physician at the facility with two physician vacancies. There is no Assistant Medical Director position and no one to assist him with supervisory responsibilities. In our opinion, due to physician understaffing, Dr. Toce is not able to meet all his supervisory duties, especially with respect to the quality of clinical care. Nurse practitioners are providing almost all clinical care with no evidence of supervision or collaboration with a physician.[14]

Health care leadership, including Dr. Johnson, Paul Toce MD, and Director of Nursing Bill Hawkins RN, acknowledge that LSP staffing is inadequate. This is due to inability to fill vacancies but also to lack of budgeted positions. Lack of adequate health care staffing has resulted in use of correctional officers to administer medications and inmates to deliver health care. Lack of adequate health care staffing significantly contributes to inadequate health care systems and inadequate quality of care. In addition to reducing the quality of care, lack of adequate health care staffing has resulted in use of inmate orderlies to provide direct health care to other inmates, in violation of LSP policies and correctional standards.

LSP's medical budget is determined at a departmental and legislative level, and is fixed, based upon the prior year's spending.[15] However, if the health care budget is fixed from year to year, it means that the budget is not amended to meet increasing demands in health services and medical inflation. Neither Stacye Rodriguez, the Director Nursing for the Department of Corrections, nor Dr. Lavespere, the Medical Director for the Department of Corrections, has an appreciable role in setting the budget, which is "handed to [them]." LSP needs a data driven

---

[13] Johnson deposition. Pages 156-60

[14] In his deposition (page 46 lines 4-10), Dr. Toce stated with respect to involvement with the nurse practitioners, "I don't think I'm involved enough with them. I want to spend more time in the trenches with them, and the administrative duties just keep coming. I could stay locked in my office all day long doing just administrative work and never even see them, but that would not be – that would not work".

[15] In his deposition Dr. Lavespere states, "Q. Do you have any role in setting the amount of the budget? A. No role in the amount of the budget. That budget is kind of handed to us. I think from the Ways and Means Committee." Dr. Randy Lavespere Deposition, page 78. This was echoed in Stacye Rodriguez' deposition as well. Page 19. From a review of his deposition, Dr. Johnson suggests that it is ad hoc requests without a comprehensive budgeting process. Page 81-84.

analysis of all medical program tasks, performed by the right level of health care professional, in order to develop an adequate staffing plan and budget for the medical program. Health care leadership (Hospital Administrator, Medical Director, and Nursing Director) in coordination with headquarters should propose a budget annually, based on the medical needs for the program. If LSP is unable to secure legislative funding for those needs, then health care leadership should prioritize how funding is allocated to ensure the best use of available funds for patients with serious medical needs.

Health care leadership should also be responsible for all medical policy and revise policy and procedure on an annual basis to ensure safe and effective care is present. All hiring and firing of medical personnel should be done by health care leadership. Management decisions of the health care program, including, for example, timing of medication administration and timing of evaluations, must be determined by health care leadership based on the clinical needs of the population. This is not happening with respect to medication administration (See Clinical Section).

Dr. Lavespere is now the statewide Medical Director. Dr. Lavespere states that he goes to Angola about one day per week or less.[16] His visits to Angola are mostly related to administrative matters.[17] He is responsible for overseeing physicians and medical care throughout the state prison system.[18] Based on testimony, headquarters medical supervision at Angola consists of headquarters' mortality reviews of deaths, onsite walk-arounds, visits by Dr. Lavespere, discussions by Dr. Lavespere with providers, and external peer reviews performed every two years. We found no evidence of formal review of medical performance by headquarters aside from the every-two-year peer review (See Peer Review). A formal review of medical program effectiveness that identifies deficiencies with corrective actions should be conducted annually or every two years by headquarters.

**Staffing**

Dr. Toce is now the Medical Director of LSP and the only physician of the facility. Although the staffing budget allows for two additional physicians, those positions are currently vacant. Salary appears to be the main reason for the inability to recruit physicians,[19] but we acknowledge that other reasons may be present for this disparity. Since our last review, LSP has hired nurse practitioners, which is a positive development. While nurse practitioners are trained and licensed to treat patients with acute and chronic illnesses, the medical complexity of many LSP patients warrants sufficient physician staffing to provide clinical support and

---

[16] Lavespere deposition. Pages 25-26.
[17] Lavespere deposition. Page 27.
[18] Lavespere deposition. Page 14.
[19] There are three physician positions on the table of organization but only one position is filled. There are seven nurse practitioners in the current budget and all are filled. In the deposition of Dr. Lavespere, when asked why mostly nurse practitioners work at Angola, he stated that "You can't find MDs to go work over there for the money that you are paying. The department, as a whole, is going to have to up the salary to get physicians in there." Lavespere deposition. Page 29.

supervision. Nurse practitioners are providing almost all clinical care with no evidence of supervision or collaboration with a physician.[20] While seven nurse practitioners may be necessary, more than three physicians are also necessary, and all positions should be filled under credentialing that requires physicians to complete a primary care residency.

During the liability phase, different physicians at LSP were responsible for different housing units. That is no longer the case; three of the nurse practitioners have regular duties in the ATU or at sick call, while the others rotate through the ATU and general medicine interchangeably.[21]

The medical staff, given the current size of LSP, should include a Medical Director and four physicians. One physician should be in charge of the ATU and emergency services. This physician should clinically supervise EMS Services, which currently is not taking place. EMS should be transferred from a custody program to a medical program, similar to civilian settings.[22]

The ATU should also be the location for all offsite returns. All patients returning from offsite appointments and hospitalizations should return through the ATU and be evaluated by a provider prior to return to their housing unit. The Medical Director should establish medical criteria for which patients can be safely managed at the ATU and which patients should be immediately transported to the hospital (See Emergency Care). This should be defined generally in policy. The number of nurse practitioners in the ATU should be determined based on a reasonable workload analysis in order to have coverage around the clock (See Emergency Care).

The infirmary program should have a physician in charge of clinical care with nurse practitioner coverage assigned based on a workload analysis of acuity levels. A physician should be in charge of the medical dormitories that house higher level patients, and another physician should be in charge of camp medical services. Nurse practitioners should be assigned to each of these areas based on a workload analysis of patient volumes and acuity. For the infirmary, medical dormitories, and general population areas, the team of physician, nurse practitioner and scheduler from the trip office should meet daily to review complex patients, recent emergencies for their population of patients, recent and upcoming consultant appointments, and any other issues related to their patient population.

Medication administration must be performed by licensed health care personnel. Inmates must not provide services on the infirmary. All health requests should be evaluated by a registered nurse or nurse practitioner. Medics can continue their emergency transport function and

---

[20] In his deposition (page 46 lines 4-10), Dr. Toce stated with respect to involvement with the nurse practitioners, "I don't think I'm involved enough with them. I want to spend more time in the trenches with them, and the administrative duties just keep coming. I could stay locked in my office all day long doing just administrative work and never even see them, but that would not be – that would not work.".

[21] Lavespere 30(b)(6) deposition. Pages 153-54.

[22] Nationwide EMS oversight is by a physician. It should be clear at LSP that EMS personnel are supervised by a physician who is responsible for emergency services in the ATU.

otherwise can assist in clinic areas as medical assistants who take vital signs and draw blood in clinics.


## Credentialing

**Methodology:** We reviewed LSP credentialing documents, LSP directive 13.011 (Personnel Qualifications and Credentials Verification), and the depositions of Randy Lavespere MD and Paul Toce MD.

**Standards:** The facility's qualified health care professionals are legally eligible to perform their clinical duties and have training consistent with their clinical responsibilities. A license that limits practice to only correctional institutions is not in compliance with this standard.[23]

**Findings:** We find that the current credentialing process at LSP remains inadequate. Dr. Lavespere testified that "credentialing is the same. There wasn't anything wrong with our credentialing."[24] The practice of hiring physicians with sanctioned licenses has not changed.[25] This is not in compliance with NCCHC standards for credentialling and increases risk of serious harm to patients.

### Physicians

Credentialing is a process of verifying training, licensing, and certification data on physicians to ensure that they have privileges to engage in the practice they are hired to perform. For example, if a doctor wants to deliver babies, a hospital will verify the credentials to ensure that the doctor finished medical school, has a license, finished an obstetrical residency and does not have any character, legal, or malpractice issues that warrant not hiring. If a doctor's credentials are adequate to give privileges to deliver babies, the doctor would not also be given privileges to perform neurosurgery.

The LSP Directive on Personnel Qualification and Credentials is inadequate. The credential policy[26] does not describe what the credentialing process consists of, but does stipulate that the health professional must maintain a current and valid license, which is apparently the only requirement at LSP. The policy does not address typical credentialing processes including review of the following material:
1. Proof of identification

---

[23] NCCHC. P-C-01.
[24] Lavespere 30 (b) 6 deposition on page 213.
[25] Page 31 lines 1-9 of Dr. Lavespere's deposition: "Q. Have you changed your policy on hiring physicians with license issues? A. No."
[26] LSP Directive No. 13.011 Personnel Qualifications and Credentials Verification

2. Primary source verification[27] of education, training, medical certification, current license, and Drug Enforcement Agency (DEA) licensure
3. Review of the curriculum vitae with work history
4. Review of the National Practitioner Data Bank report
5. Review of letters of reference
6. Review of criminal background check
7. Review of an application to include health status and attestation of physical and mental health.

Both Dr. Paul Toce, LSP Medical Director, and Dr. Randy Lavespere, Statewide Medical Director, believe that all of the physicians who work or have worked at LSP were "credentialed" by the state licensing board.[28] State licensing boards do not credential; they issue licenses. The LSP concept of credentialing means that any doctor with a license can practice at Angola. The work at Angola is primary care medicine, but based on the current policy, LSP can hire physicians untrained in primary care medicine.[29]

Our review of credential files show they are incomplete and disorganized. For physicians and nurse practitioners, the only documents provided were the current licenses. For three of the nurse practitioners, the license in the credential file was expired, although our own search of the Louisiana Board of Nursing showed an active license. Nevertheless, the credential file was not up-to-date.

We were provided licensure information for ten physicians, only one of whom currently works at LSP. It does not appear that specialty physicians working at LSP have licensure information available in credential files.[30] Six of the nine licenses for the physicians not working at LSP were

---

[27] Primary source verification is verification using the original source documentation. For example, an official document from the medical school verifying that the individual graduated from that school or an official document from a residency program that the individual completed residency training.

[28] See Toce deposition page 11, line 24 of 3/9/22. Also see Dr. Lavespere deposition on 3/24/22, page 212-213 where he said, Q. ...have there been any changes since September 2016 to LSP's or DOC's practices, policies or procedures regarding medical staffing. A. I think probably the biggest change – you know, we got criticized for credentialing. And although I knew every one of my physicians backwards and forwards, everything that they ever did from a professional standpoint, it wasn't on file. Ans so, if it's not documented, it's not done, right? So the biggest change is, I think, the filing and the files on each of the providers have been updated to include all of their information. So credentialing is the same. There isn't anything wrong with our credentialing. All our credentialing, when we had providers that had individual licenses, we always had to go through the medical board to credential them anyway.

[29] For example Angola's credentialing requirements mean that LSP could hire a radiologist, an anesthesiologist or a pathologist to practice primary care medicine. Radiologists, anesthesiologists, and pathologists do not have training to perform primary care medicine and would never be credentialed to do so in the community.

[30] We are aware of the name of the cardiologist who works at LSP but his license was not in the credential file. We are unaware of the names of the urologists working at LSP and so do not know if their licenses were present in the credential file.

expired.  None of the six nurse practitioners or the physician had a professional performance evaluation[31] in their credential file.

Under current circumstances, our opinion is that LSP needs to ensure that physicians working at LSP have training in the tasks they are expected to perform.  For physicians, the DOC should require that physicians seeing patients at LSP complete residency training in Family Practice, Internal Medicine, or Emergency Medicine. The actual credentialing should include review of an application to determine whether the applicant has any physical, mental, criminal, or character deficiencies that impair ability to practice medicine.  Primary source verification of university, medical school, residency, and any fellowship training should be completed.  A review of the National Practitioner Data Bank should be accomplished to determine whether any license restrictions or significant malpractice issues are present.  A criminal background check should be performed.  A curriculum vitae and work history should be performed.  All these reviews should be completed prior to an interview to determine whether the training and character of the individual is minimally adequate to hire.  All documents related to credentialing mentioned above should be in the credential file.

**Nurse Practitioners**
For nurse practitioners, Louisiana's Nurse Practice Act[32] requires a nurse practitioner to complete education preparing the candidate for one of four recognized roles (certified nurse midwives, certified registered nurse anesthetist, clinical nurse specialists, and certified nurse practitioners).  Nurse practitioners working at LSP should be required to complete training as a certified nurse practitioner or clinical nurse specialist in a primary care field.

The medical staff is now almost entirely a nurse practitioner staff, and almost all clinical care is provided by nurse practitioners.  The single physician is the Medical Director, who has administrative responsibilities in addition to clinical responsibilities.  During the three days of our site visit, all primary and emergency care was provided by nurse practitioners (or nurses), without any physician involvement.  The Louisiana Board of Nursing requires that a collaborative practice agreement between the nurse practitioner and a supervising physician be present onsite where the nurse practitioner works.[33]  Neither Dr. Toce nor Dr. Lavespere, the supervising physicians for the nurse practitioners, were present at any point during our site visit.

Under the Louisiana Board of Nursing's requirements, a collaborative practice agreement must address the parameters of the collaborative practice which are mutually agreed upon by the advanced practice nurse and the collaborating physician(s).  The agreement has to include the

---

[31] Credential files typically include an annual clinical performance evaluation, which is not currently performed at LSP.  A professional performance evaluation is typically an annual evaluation of the competency and professional performance of clinical care.  We were uncertain if all of the nurse practitioners were working at LSP long enough to have a performance evaluation. Nevertheless, none of the practitioners, regardless of how long they have worked at LSP, had a professional performance evaluation.

[32] La. Rev. Stat., Title 37, Chapter 11.

[33] Title 46 Part XLVII, page 85 Collaborative https://www.doa.la.gov/media/gybngco4/46v47.pdf.

availability of the physician for consultation and referral, the methods of management to include clinical practice guidelines, and coverage of health care needs during the absence of the advanced practice nurse. The collaborating physician is required to provide guidance and clinical practice guidelines which "may include textbooks, reference manuals." Collaborative practice agreements should be maintained in the credential file of the advanced practice nurse. That said, we suggest that LSP provide Up-To-Date to be used as the practice guideline, as it is in many HMOs, hospitals, and general practice arrangements. This reference should be available on-line in all clinic examination rooms. This arrangement can be accomplished when the electronic record is implemented.

Defendants do not maintain the collaborative practice agreements in the credentialing files, have not yet produced them, and refused to allow us to review them during our site visit, so we cannot state at this time whether the agreements on paper are adequate. From the credentialing files alone, it is not even clear who the supervising physician for the nurse practitioners is. Dr. Lavespere, who no longer practices at LSP and does not come to the facility at all some weeks, thinks that he is still the supervising physician for some of the nurse practitioners.[34] The collaborating physician relationship should be clearly established.

**On-Site Specialists**
None of the specialists who work onsite at LSP appear to be credentialed, which should be done as they are directly hired by LSP and work at LSP.

**Registered Nurses, Licensed Practical Nurses and EMTs**
All 21 filled registered nurse positions have verification of a current license in the credential file. Of the 22 filled LPN positions, six LPNs do not have verification of a current license in the credential file. One nurse and one EMT had licenses with disciplinary reports on them. The credential files did not address what the discipline was for or indicate how LSP was monitoring the individuals.

**Emergency Medical Technicians**
Nineteen emergency medical technician licenses were included in the credential file. These licenses were up-to-date.

**Peer Review (Clinical Performance Enhancement)[35]**

---

[34] In deposition, Dr. Lavespere, who no longer works at LSP was asked, "Q. Who is the collaborating physician for your nurse practitioners? A. I think I'm still the collaborator for several of them. I think Dr. Toce is the collaborator for the new ones". Lavespere deposition. Page 37, lines 13-17. If Dr. Lavespere doesn't know who he acts as collaborating physician for, it is unlikely that he is providing regular counseling and direction to that person. Dr. Toce testified that he was now the "primary collaborating," but appeared to acknowledge that Dr. Lavespere was still the supervising physician on at least some nurse practitioners' collaborative practice agreements. Toce deposition. Pages 6-7.
[35] By peer review, we mean evaluation of clinical care by a professional peer of the professional delivering care for the purpose of improving quality of care and identifying systemic problems of care.

**Methodology:** We reviewed selected Peer Review, Quality Assessment Meeting Agendas and reports done in 2020, and civil service Performance Evaluation System (PES) evaluations for all medical employees for several years.[36]  There was no data provided with respect to review of nursing clinical performance.

**Standards:** Individuals delivering patient care are reviewed through clinical performance enhancement. This includes providers, registered nurses, licensed practical nurses, psychologists, licensed clinical social workers, and dentists. The responsible health authority implements procedures to improve an individual's competence when such action is necessary.[37] An external peer review program for physicians, mental health professionals, and dentists is implemented. The review is conducted no less than every two years.[38]

**Findings:** Although the DOC has changed its policy on the number of records to be reviewed in the biennial peer review, this has not been implemented at LSP (even though LSP has had a round of peer review since the policy change).[39]  Even once the policy is fully implemented, its methodology will not ensure that an adequate peer review will be conducted for each medical provider.

Dr. Lavespere asserted that there is internal and external peer review.  Dr. Lavespere reported that internal peer review consists of the Performance Evaluation System (PES) review that is done annually and that Dr. Toce does this for the providers. He also confirmed that the external peer review consists of record reviews performed every two years.[40]

To focus first on internal peer review: The credential files contain the PES reviews but no clinical peer review.  In his personal deposition, Dr. Lavespere stated that the PES review constituted LSP's performance of peer review and that this type of review was conducted for all employees.[41]  This is inconsistent with existing LSP policy on peer review, which describes a chart review peer review process for providers that does not include PES.  Nor does the PES meet generally accepted definitions of peer review.  Instead, the PES is a required civil service evaluation for supervisors to evaluate all of their employees on an annual basis.[42]  These forms are used for all civil servants irrespective of their professional training and do not specifically address *clinical* performance evaluation.   There was no evidence of evaluation of clinical care

---

[36] Peer Review, Quality Assessment Meeting Agendas and Reports (prod. 2022.01.25)

[37] NCCHC. 2018. P-C-02.

[38] Performance-Based Standards for Adult Local Detention Facilities. 2004. 4-ALDF-4D-25.

[39] Lavespere 30(b)(6) deposition. Pages 42-47. The relevant DOC policy, HCP 6, was revised on July 12, 2020; LSP's last peer review took place in October 2020.

[40] Pages 214-219 Dr. Lavespere 30 (b) 6 deposition.

[41] Dr. Lavespere stated "We do a peer review on everybody.  It's called a PES review.  Everybody gets reviewed yearly about their work performance" (lines 12-14, page 107, deposition of Dr. Lavespere). Notably, in the 30 (b) 6 deposition, Dr. Lavespere did acknowledge the peer review policy and process so he is aware.

[42] See the description of this system at https://www.civilservice.louisiana.gov/CSRules/Chapter10.aspx

on any of these evaluations, and for that reason the PES should not be used as evidence of or a substitute for peer review.[43]

As to external peer review: The peer review questionnaire used in 2016 for performance of peer review has been minimally modified.[44] Specifics about the prior system of peer review can be examined in our prior report. The methodology of performing peer reviews remains the same apparently as in 2016. We note the same deficiencies that we noted in 2016, which include: 1) failure to evaluate individual providers' clinical work, 2) continued use of random record chart selection, and 3) failure to evaluate whether patients who need specialty care are actually referred.

The last medical peer review in 2020 was a review of nine records[45] done for the entire LSP facility, not for individual providers. This review consisted of review of nine records, two of which were incompletely reviewed. Each review consisted of answering twelve questions. One of the questions was about documentation in record for all Prison Reform Elimination Act claims, for which seven of the eight were answered not applicable. *Of the remaining 84 questions answered, 82 (98%) were answered that care was without problems.* Based on our record reviews, this is not a credible score, as multiple episodes of care we reviewed had some associated problems. Also, the questions asked did not reflect the types of problems we identified in review of records. We found as examples:

- Failure to act on abnormal vital signs;
- Insufficient or no history related to reason for visit;
- Insufficient or no examination for the purpose of the visit;
- Failure to evaluate all of a patient's ongoing serious medical conditions;
- Cause of the complaint not identified in the assessment;
- Failure to review consultant's report including recommendations;
- Failure to update therapeutic plan incorporating consultant's assessment and recommendations;
- Failure to act appropriately on critical laboratory, testing or examination findings; and
- Failure to review abnormal laboratory tests; and
- Failure to monitor and meaningfully address medication adherence.

One or more of these types of problems were identified in the vast majority of records reviewed. For the 2020 peer review, we were not provided the medical records that were included in the performance review. However, the disparity between findings of the LSP peer

---

[43] PES evaluations were performed for four of eight providers.

[44] There are three additional questions and one modified question on the peer review form which attempt to address findings in our prior report. The three new questions include: 1) Dispositions of sick call are appropriate; 2) Appropriateness of specialty care; and 3) Post incident medical follow-up with appropriate documentation in chart for all substantiated PREA claims within past 2 years. The one modified question was 1) Continued follow-up by primary care while specialty appointment is pending. This was modified from 1) When a referral is ordered the offender is followed medically by health care provider.

[45] For the 2020 review only nine records were reviewed and an additional two records were incompletely reviewed.

reviews and our own was such that we believe a careful and meaningful review was not performed.

LSP's peer review policy was revised in July 2020 and states that the Department's peer review program shall consist of an external review of all health care professionals every two years.[46] The policy did not address internal peer review as described by Dr. Lavespere.

In the new policy, a change was made in the number of charts that are reviewed. In the previous policy, ten records were reviewed. The current policy calls for ten charts to be reviewed or 1% of the charts of all patients, whichever is greater. While this may increase the number of records, it does not ensure that adequate peer review is conducted for each provider.[47]

LSP has stated that because 1% of records will be reviewed at LSP, all providers will be adequately reviewed. Even if 47 records are reviewed, policy and practice does not include review of individual providers. LSP made no attempt to review all providers in the single 2020 peer review. LSP record selection should be designed to ensure that peer review is adequately conducted for each medical provider and include a sample of various types of services provided (e.g., sick call; emergency care; specialty service referrals and follow-up; and management of patients with serious medical conditions, including chronic diseases).

Due to the lack of meaningful review, LSP needs to contract with an independent reviewer for peer reviews. For peer review during the time when constitutional issues are being questioned, record review selection should be for persons with serious medical conditions as that is the criteria for 8th Amendment benchmarks. As noted above, we suggest selecting records of patients with higher medical acuity and reviewing care provided for a variety of services (e.g., emergency department; hospitalizations; mortalities; and patients with serious medical conditions such as cancer, diabetes, hypertension, etc.) to assess the quality of care provided by the medical provider. Typically, professional performance evaluations are performed annually, and it is our opinion that given serious concerns about the quality of medical care, LSP should do the same.

LSP should consider an independent outside reviewer until care within LSP is considered constitutionally adequate. Chart selection should be based on persons with serious medical conditions. We suggest using mortality records, a selection of complex medical conditions, and a selection of persons hospitalized for potentially preventable[48] occurrences. All providers should be evaluated, and LSP should develop a methodology to do this. Also, nursing staff should have an annual performance evaluation connected to the skills needed for their

---

[46] Health Care Staffing and Staff Development Peer Review, Internal Review, and Quality Assurance dated 7/12/20 as submitted by LSP
[47] It should include medical, mental health and dental providers.
[48] For this purpose, LSP can review the Agency for Healthcare Research and Quality Prevention Quality Indicators as found at https://qualityindicators.ahrq.gov/measures/pqi_resources

assigned responsibilities.  Performance evaluations should be maintained in the credential or personnel file of the individual.

With respect to supervision, Dr. Toce, stated that he is now the collaborating physician for most of the nurse practitioners and plans to eventually be the collaborating physician for all nurse practitioners.[49]  He also stated that he supervises all nurse practitioners,[50] which he described as scheduling call and evaluation of medical skills.[51]  Dr. Toce is the only physician at LSP.  There are seven nurse practitioners, and Dr. Toce has administrative duties that limit his ability to supervise.[52]  Since Dr. Toce became Medical Director, there has been little documentation or evidence of supervision.  Almost all medical care is provided by nurse practitioners.  Based on record reviews, we have significant concerns about the quality of medical evaluations.  Yet, when asked if care could be improved if he were more involved with nurse practitioners, he responded, "Yes, improve it? They're doing a pretty dang good job right there on their own."  Indeed, the Nurse Practitioners could not identify any regular supervision they received from Dr. Toce outside of collective morning meetings, which LSP would not allow us to attend during our site visit.[53]  Realistically, for a 5,000-bed prison, a single physician cannot effectively supervise seven nurse practitioners, provide some clinical care, and act as Medical Director.

## Mortality Review

**Methodology:**  We selected and reviewed 38 health records from lists of patients that died at LSP between January 1, 2019 to December 31, 2021.  These patients died from various conditions, including cardiac arrest, stroke, cancer, etc. Each record was reviewed for the timeliness and appropriateness of care prior to the patient's death and system issues that may have contributed to the death.

---

[49] Page 6-7 Toce deposition 3/31/22.
[50] Page 43 Toce deposition 3/9/22
[51] Page 44 Toce deposition 3/9/22
[52] Page 46 Toce deposition 3/9/22, "Q. So you're happy with your dynamic with the nurse practitioners in general? A.  In general, yes.  I still think I'm not – I don't think I'm involved enough with them.  I want to spend more time in the trenches with them, and the administrative duties just keep coming."
[53] Bordelon Deposition 3/23/2022 at pages 46-48; Dedeaux Deposition 3/23/2022 at pages 30, 49-50, 73-74; Park Deposition 3/22/2022 at pages 14-19. *See also* Watson Deposition 3/23/2022 (Q: How does Dr. Toce supervise you? A: I mean he's my direct supervisor so, it's…I mean, he'll just be over if like I said, we run our clinics. If we have any questions we'll go to him. If we have a complex case we'll go to him. He has to sign off on all our referrals that we do. Q: Does Dr. Toce ever schedule meetings with you? A: No. Q: Does he oversee the care that you administer? A: Yes Q: How often do you reach out to Dr. Toce? A: Um. Maybe once or twice a week. Q: Do you and Dr. Toce have scheduled regular meetings? A: No. Q: When you're communicating with Dr. Toce, is that over the phone? A: Sometimes Q: Approximately how frequently? A: Well if it's. .. I only speak with him once or twice a week. We speak every morning at the medical meetings. But if I have a question it might be once or twice a week I'll call him. Q: Apart from those morning meetings, how often do you meet with Dr. Toce in person? A: There is no scheduled meetings.). Jenny Watson's deposition transcript was not yet completed at the time of this report's filing.

**Standard:** The responsible health authority conducts a thorough review of all deaths in custody in an effort to improve care and prevent future deaths.[54]

**Findings:** For this review period, we find that LSP conducted no meaningful sentinel event review or mortality review intended to identify individual performance or systemic issues in order to improve care and prevent future deaths. Therefore, there has been no effective change since 2016.

There is no specific mortality review policy. In the section Policy HCP6,[55] there is a single sentence in the quality assurance section of the policy stating that the necessary elements of internal review and quality assurance are to include, "A review of all in-custody deaths, suicides, suicide attempts, and illness outbreaks." No details of how this is to be done are provided.

There is no review of sentinel events that is documented. Dr. Lavespere was unaware of what the Court meant with respect to not reviewing sentinel events.[1] When asked whether he agreed with the Court's finding that there was a failure to conduct mortality review in 2016, Dr. Lavespere disagreed stating that mortality reviews were done but maybe it wasn't at the level expected by the Court. He went on to state that now, mortality reviews are being performed based on the expectation of the Court.[1]

Policy HCP-45, End-of-Life Care, Autopsies and Burial Expenses, states that a Medical Summary Report shall be sent to the Department's Medical/Mental Health Director for every death as soon as it is available but no later than 72 hours later. This policy also states that a written report is to be submitted to the Secretary as soon as it is available but no later than 24 hours after the occurrence. These reports are one or more pages of narrative that contain a non-critical summary of events that occurred at the time of death and a statement of what the patient died of. No critical analysis is provided. These reports do not include identification of deficiencies or opportunities for improvement.

In 2016, the LSP Medical Director conducted a mortality summary within days of the patient's death. These reviews did not identify and correct health care system issues or those related to timeliness, appropriateness, and quality of care. For this review period, we were provided a Medical Summary Report for a Deceased Offender for each death. These summaries were incomplete with respect to the patient's clinical course, failed to identify problems with the health care system or provider performance, and did not document a plan for corrective action.

LSP has conducted four mortality review meetings since January 2021. In October and November 2021, and February and March 2022. These meetings included Dr. Toce, Dr.

---

[54] NCCHC. 2018. P-A-09.
[55] Health Care Staffing and Staff Development, Peer Review, Internal Review, and Quality Assurance dated 12 July 2020.

Johnson, the Warden, EMS, nursing, medical, and security staff.   Minutes from these meetings were provided to us for review. Dr. Lavespere testified that he has not reviewed them.[56]

Generally, the meeting minutes provide brief synopses of a general nature. The minutes do not discuss the deaths critically.  Neither do those meeting minutes identify any opportunities for improvement or corrective actions that might be taken to improve.[57]  In the four monthly mortality meeting minutes that were provided, twenty-six deaths were discussed.  Not a single opportunity for improvement was identified.

One example of the mortality review meeting minute comments, in its entirety was: "[Redacted name and number] 56-year-old HTN [hypertension], HLD [hyperlipidemia], PAD [peripheral arterial disease], MO Lung CA [metastatic lung cancer], cachexia, FFT until death 9/20/21"

There was no critical analysis of this person's death or identification of any opportunities for improvement that could lead to improvement if corrected.  There were two Medical Summary Reports for this patient that had more detail but also identified no opportunities for improvement or corrective actions.  No problems were identified.  We reviewed the death of this patient[58] in the specialty care section.  Our review showed the following:

1. The patient was 55 years old and a previous smoker.  Current recommendations are that people over 50 who are or were smokers should be screened annually for lung cancer with low-dose CT scan.[59]  This was not done, and the patient developed lung cancer that was not identified until the cancer was widely metastatic.  Early screening may have prevented his death.  United States Preventive Services Task Force (USPSTF) A and B recommendations should be instituted as a practice in annual health updates for all inmates.
2. The patient sustained an 81-pound unintentional weight loss without being recognized over an eight-month period.  He weighed 306 pounds on 2/28/20 during a clinic visit at LSP and weighed 225 during hospitalization on 10/28/20.  The practice of obtaining and monitoring weights should be studied so that unintentional weight loss is identified as early as possible so that earlier diagnosis can be made.  Also, the practice of obtaining weight should be standardized to include specification of the type of scale used and what clothing the patient wears when weight is taken and how the weights are monitored.
3. The patient had thrombocytopenia (low platelets) intermittently since at least 2019 without any acknowledgement that this was a problem.  The system should evaluate the process of

---

[56] Page 203-204 Dr. Lavespere 30(b)6 deposition

[57] Dr. Lavespere in his 30 (b) 6 deposition was asked with respect to mortality review at LSP, "To your knowledge, though, there's not corrective action that you're aware of?  A. Not that I'm aware of."

[58] Patient #1. This patient's care is reviewed in the specialty section of this report.

[59] US Preventive Services Task Force Lung Cancer Screening recommendation as found at https://www.uspreventiveservicestaskforce.org/uspstf/recommendation/lung-cancer-screening.  Notably, this recommendation in 2021 was similar to the earlier recommendation in 2013 except that in 2021 the age to screen dropped to age 50 from 55.  The recommendation is that adults aged 50 to 80 who have a 20 pack year smoking history and currently smoke or have quit within the past 15 years should be screened for lung cancer with low-dose computed tomography every year.

how laboratory results are reviewed and managed so that abnormal laboratory results are all integrated into patient care.

4. The patient had 11 episodes over the two-year period prior to his death when blood pressures or pulse were abnormal without recognition or management. The program should develop procedure for how EMS staff, nurses, and providers should address abnormal vital signs during patient visits.

5. The patient developed superior vena cava syndrome[60] shortly after his lung cancer was diagnosed. This evaluation was by a medic, and no provider evaluated the patient until the next day when the patient was sent to a hospital. Why a physician did not promptly evaluate the patient for this red-flag condition should be evaluated and procedures changed to avoid a repeat of this occurrence.

6. This patient's medical record was extremely disorganized. Hospital consultant reports and chemotherapy orders were not all present in the record and providers did not document knowledge of the current therapeutic plan by the oncologists and other specialists caring for the patient. It appeared that consultant care was being managed by the trip nurses and was not being reviewed by providers. Documents were not consistently in chronologic order or organized by type of document. Medication administration documents were inconsistently present in the medical records. A root cause analysis should be done with respect to specialty care to ensure the consultant and offsite care is coordinated with LSP provider care so that the therapeutic plan is acknowledged and documented in the record at LSP.

7. The patient had extensive metastatic cancer from his lung to brain, skull, thoracic spine, liver, pancreas, and eye. The spread of the metastases was gradual and progressive resulting in gradual development of pain. Toward the end of life, the metastases to the spine resulted in need for surgery to repair spinal collapse that threatened to cause compression of the spinal cord. Despite significant pain, especially toward the end of life, the patient was initially not provided pain medication because he did not want to be on the infirmary. Pain management was not good. A review of how pain is managed should be conducted to ensure that all patients are provided adequate pain management.

A second example of LSP mortality meeting minutes was in a patient who was described as follows:

"[name and # redacted] 67-years-old. Somatasizing produces many c/s's [chief complaints] and labs and tests but no etiology for c/o's. Meds refused. Cig cessation refused. OA and disuse atrophy resulted in amb'n with cane then walker and finally wheelchair. He suffered AMI [acute myocardial infarction] with LAD stent in 2020, then refused cardiology meds and f/u. He made 100's of sick calls for secondary gain

---

[60] Superior vena cava syndrome (SVC) is a condition where a lung cancer grows and begins to encroach and compress the superior vena cava, the main vein draining the face and neck. This results in swelling of the face and neck and requires prompt emergency evaluation to determine the extent of disease and whether immediate intervention is necessary.

including BLE dependent edema for which he refused TED's and LE elevation. Vomit and syncope and death October 11, 2021"

This review also includes multiple references that appear to assert that the patient was inappropriately complaining about a condition that did not exist. This case is discussed in the specialty care section of this report as Patient #4. We identified multiple opportunities for improvement in this case which were not identified in the LSP mortality review meeting minutes:

1. After the patient was discharged from the hospital in October of 2020, a dobutamine stress echocardiogram and cardiology consultation to evaluate the status of aortic stenosis was recommended. The dobutamine stress echocardiogram was never done. There was no documentation of this recommendation in Eceptionist. A root cause analysis of consultant recommendations and why LSP providers fail to review these should be done so that recommendations are reviewed and addressed.

2. Instead of being sent to UMCNO cardiology for a dobutamine stress echocardiogram, the patient was evaluated at an onsite cardiology clinic at LSP four times between 10/17/20 and 8/21/21.

   a. On 10/17/20, the LSP cardiologist did not apparently have hospital reports and did not know that a dobutamine stress echocardiogram was recommended. The cardiologist recommended a plain transthoracic echocardiogram. Hospital and consultant reports need to be available to clinicians and in the medical record so that LSP providers are fully informed of consultant recommendations.

   b. On 1/30/21, the LSP cardiologist noted that the echocardiogram he recommended during his last consultation with the patient was not done and the cardiologist re-ordered the echocardiogram. The cardiologist made a note that the patient might have low flow, low gradient aortic stenosis and that a dobutamine stress echo might be indicated but it wasn't clear that hospital records were available. The cardiologist did not change the order to a dobutamine stress echocardiogram. A review of the ordering and timeliness of scheduled tests should be initiated. Frequent huddles between providers and scheduling clerks should be initiated so that scheduling can be reviewed regularly to ensure that patient's needs are timely met.

   c. The echocardiogram, ordered by the LSP cardiologist, was done 4/21/21 and showed moderate-severe aortic stenosis with ejection fraction of 15-20%. The test confirmed low flow, low gradient aortic stenosis for which standard of care is a dobutamine stress echocardiogram.

   d. On 6/19/21 the cardiologist noted that the report of the recently completed echocardiogram was unavailable. The cardiologist continued to document that the ejection fraction was 40-45% indicating that the only information the cardiologist had was from the hospitalization in September of 2020. A 3-month follow up was ordered. A system to ensure that hospital and consultant reports are timely placed in the medical record.

e. On 8/21/21 the cardiologist saw the patient for clearance for a gastroenterology procedure. The cardiologist documented an ejection fraction of 40-45%. The echocardiogram from 4/21/21 was apparently still not available.

f. These visits demonstrate 1) a broken communication and information handoff problem with respect to communication between offsite specialists and clinicians at LSP; 2) process problems in obtaining results of tests internally; 3) process problems with ordering and obtaining timely tests as ordered by clinicians, and 4) a defective medical record system that does not support safe and effective care. A root cause analysis of these processes should be initiated to resolve these types of problems. An electronic health record should be implemented with ability to contain all hospital and consultant reports.

3. When the patient was evaluated by LSP medical providers, his serious medical conditions, including his aortic stenosis, were not monitored. Over the year prior to his death the patient had 19 episodes when he was evaluated for shortness of breath, which is a common presenting symptom of aortic stenosis. He had 17 episodes of edema of the lower extremities which can be related to heart failure which the patient had. Both symptoms of shortness of breath and heart failure support a decision to perform valve replacement surgery in a person with aortic stenosis. Why the chronic care program failed to monitor the patient's aortic stenosis for these progressive and ongoing issues should be studied in a root cause analysis of the chronic care program so that the chronic care program can be improved. The chronic care system should be evaluated to determine why patients with serious chronic illness are not followed in chronic care clinics.

4. The patient had evidence on echocardiograms of aortic stenosis that suggested that valve replacement was needed but these were not critically reviewed by providers in the chronic care program. Why that occurred should be studied and corrected. The chronic care system should be evaluated to determine why patients with serious chronic illness are not followed in chronic care clinics.

5. A discussion should occur as to why valve surgery was not considered for this patient. Were staff unaware of the indications for surgery? Were staff inattentive to the symptoms of the patient and the implications? Was the patient monitored by nurse practitioners who were unaware of when surgery was indicated in aortic stenosis? These questions should be studied so that corrective action can be taken to ensure that future patients with this condition are timely evaluated and treated.

6. On the mortality review meeting minutes discussion of 11/30/21 and on the Standardized Death Report of 10/14/21, LSP reviewers characterize the patient as taking advantage of the health program for "secondary gain", threatening legal actions for unwarranted reasons, unreasonable demands, complaining of shortness of breath "with no clinical correlations", and noncompliant with therapy. These types of comments characterize the patient in a bad light which has nothing to do with his medical care or with the care LSP provided. Mortality review should be conducted to identify correctable deficiencies in the system of care at LSP, not to identify factors that prison staff believe exonerate them from responsibility.

A policy and procedure for mortality review should be developed. That policy should include procedures for who should perform mortality review. The purpose of the reviews should be to

identify opportunities for improvement/deficiencies that include corrective actions to improve care.  These may be simple corrective actions or may be corrective actions that require detailed analysis of processes.  These corrective actions should be referred to the quality improvement committee which should be tasked with following up to ensure that the corrective actions are implemented effectively.  For the time being, and until LSP has established it can provide adequate medical care and until staffing is improved, LSP should consider an independent outside reviewer for mortality review.

**Health care policies and procedures**

**Methodology:** We reviewed selected State of Louisiana Department of Public Safety and Corrections Health Care policies and procedures and the Louisiana State Penitentiary Health Care Directives. The directives were reviewed for compliance with nationally published minimal health care standards by the American Correctional Association and the National Commission on Accreditation. We conducted inmate interviews and observed staff practices during our facility tour and observations of staff practices to published LSP health care directives.

**Standard:**  Each policy, procedure, and program in the health care delivery system is reviewed at least annually by the appropriate health care authority and revised if necessary.[61]

**Findings:** The Louisiana State Prison (LSP) Angola Health Care Directives, with individual directives dated in 2019-2022, do not meet minimal standards published by the American Correctional Association (ACA) and the National Commission on Correctional Health Care (NCCHC) and lack operational detail sufficient to guide staff's practice.  The following policies are examples:

- LSP Directive 13.002, Health Authority, designates the Medical Director as the Health Authority; however, the table of organization indicates that the Long-Term Care Hospital Administrator is the Health Authority to whom the Medical Director reports. The Medical Director has authority for clinical judgments. But section D.3. gives the Warden the final approval for all health services directives.[62]  This policy requires clarification, as it does not meet the ACA Health Authority standard 4-4390, which requires the facility Health Authority to make decisions about the deployment of health resources and the day-to-day operations of the health services program.[63]

NCCHC standard P-A-02, Responsible Health Authority (RHA), requires the RHA to ensure that health services are organized, adequate, and efficient.  Health care services is defined as the sum of all actions, preventive and therapeutic, taken for the physical and mental well-being of a

---

[61] ACA Performance-Based Standards for Correctional Health Care in Adult Correctional Institutions. ACA. 2002. 1-HC-7A-03 (Ref. 3-4329) and NCCHC P-A-05.

[62] The Directive refers to "health services directions," but this appears to be a typo, as it comes in a section entitled "Health Care Services Directives."

[63] Standards for Adult Correctional Institutions, American Correctional Association, 4th Edition, at page 114

population. This standard requires that final clinical judgments rest with a single, licensed responsible physician.[64]  *At LSP, the RHA does not oversee medication administration, a critical health care function, to ensure that patients receive the right medication at the right time, and that medication administration is accurately documented.*

- LSP Directive 13.032, Health Care Co-Payments, A.2. allows for imposing disciplinary action and restitution for infractions, including malingering.  The National Commission on Accreditation Standard P-A-01, Access to Care requires that unreasonable barriers to inmates' access to health services be avoided.  Such unreasonable barriers include punishing inmates for seeking care for their health needs and assessing excessive fees that prevent or deter inmates from seeking care.[65]  *Invoking disciplinary action with attached restitution for seeking care is cruel and places a barrier to care.*  It also discourages inmates from seeking care until their disease process is far advanced, increasing the risk of negative outcomes.  Inmates at LSP are repeatedly charged a $3 access fee for health services requests for which they are not physically evaluated by a medical provider licensed to diagnose their medical condition.  Moreover, inmates are charged an additonal $6 for self-declared emergencies in which they also are typically not seen by a medical provider licensed to diagnose and treat their medical condition. Given that LSP inmates earn as little as 4 cents per hour, a $3.00 copay requires an inmate to work 75 hours to pay the fee, and a $6.00 copay requires 150 hours of work to pay the fee.  This is an unreasonable barrier to health services. During our site visit, multiple inmates stated that they had declined to seek sick call due to the copays and the likelihood that they would not receive medical care even if they requested it.

- LSP Directive 13.042, Health Care Rounds in Segregation Units, is inadequate and fails to meet nationally published minimal standards.  Under ACA standard 4-4400, offenders in segregation should receive a daily visit from a health care provider to ensure access to the health care system.  The presence of the health care provider is announced and recorded.  The frequency of physician visits to the segregation units is determined by the health authority.[66] NCCHC standard P-G-02 distinguishes between offenders in solitary confinement and those offenders who are segregated, with specific requirements for health staff rounds.  Segregated offenders must be monitored 3 times per week and those in solitary confinement must be monitored daily.  NCCHC requires the checks to involve speaking with the offender and to provide an opportunity to request medical, dental, or behavioral health services.  The rounds also provide the health professional with the opportunity to visualize the overall condition of the segregated offender. The standard requires attention by health staff to any bruises, other trauma markings, possibility of injury or depression.  The segregation rounds must be documented in the offender's health record.[67]  The LSP directive simply requires a daily visit in all segregation areas by an EMT, in which the EMT conducting the unit visit must sign the logbook located on each tier.  Inmates in segregation reported that a medic makes rounds at 03:30 each day for the

---

[64] Standards for Health Services in Prisons, National Commission on Correctional Health Care, 2018, at page 4
[65] Standards for Health Services in Prison, National Commission on Correctional Health Care, 2018, at page 3
[66] Standards for Adult Correctional Institutions, American Correctional Association, 4th Edition, at page 122.
[67] Standards for Health Services in Prison, Nation Commission on Correctional Health Care, 2018, at page 129-130.

purposes of collecting health request forms, when they are asleep.  *This is an unreasonable barrier to care. The policy needs to be revised to have medics make rounds when inmates are reasonably expected to be awake and able to discuss health concerns and turn in health requests.*

- LSP Directive 13.061, Access to Sick Call and Clinical Services, does not meet the minimal standards set forth by the ACA and NCCHC. ACA requires a process for offenders to initiate requests for health services on a daily basis and the requests be triaged daily by health professionals or health-trained personnel.[68] NCCHC requires that all inmates are given the opportunity to submit written health care requests for non-emergency services on a daily basis. The standard also requires a daily, 7 days per week, process for review and prioritization of health requests by qualified health care professionals.  The standard also requires the review and prioritization be a face-to-face encounter conducted by a qualified health professional, within 24 hours of the receipt of the request by health staff.[69]

Directive 13.061 was amended on March 3, 2022.  But Defendants say that they began using their new sick call process (described in more detail in the Clinical Care section) on November 1, 2021.  For four months (and at the end of the document discovery period in this case), Defendants were practicing without a policy that accurately reflected their sick call process at all, which may have contributed to the consistent problems observed in their care.

Now that it has been amended, Directive 13.061 A.1.a-g requires Security supervisors to ensure all requests for their areas be in the Entrance Building at 12:00 p.m., Sunday through Thursday. All requests are then typed on a list, given to medical records so the health record is pulled and made available for the Health Care Practitioner during a scheduled sick call the next business day.  The offenders that submit the request for medical treatment are supposed to be seen by a Health Care Provider the next day Monday through Friday, typically by telemedicine.

The Request for Medical Treatment Form (No. HCP13-a) does not have a place for the patient to write the date and time they made their request.  There is no place to date and time when the request was received by health care staff.  The date and time are only recorded at the time the patient is screened by an EMT.  There is no process in place to log each health care encounter received, noting the date and time the offender authored the request, to ensure that security does not delay retrieval and submission to health staff in the Entrance Building and to ensure the date and time of the screening is within the 24-hour time frame required by both ACA and NCCHC.  There is also no system to track receipt of all requests for medical treatment to assist in determining that all requests received are seen and to provide data for quality assurance purposes.

LSP policy requires "Security supervisors" to collect the sick call requests from the box and take them to the entrance building.  NCCHC's standard on nonemergency health care requests

---

[68] Standards for Adult Correctional Institutions, American Correctional Association, 4th Edition, at page 98.
[69] Standards for Health Services in Prisons, National Commission on Correctional Health Care, 2018, at page 98.

clearly states that health staff—not security personnel—go to the locked boxes in all housing areas and collect the request forms.[70] LSP Directive 13.061 fails to meet this national standard.

Directive 13.061 A.3.e requires the medical record to be obtained after the sick call assessments are completed. The medical record should be available during the triage process, so that health staff have the patient's history, prescribed treatment plan, and ordered medications available to them to assist in a complete assessment of the presenting condition.

Directive 13.061 A.3.f allows the provider to review the patient's request of medical treatment and the medical record and write orders that will be noted by the clinic nurse the following morning. Simply reviewing the record and request, without the benefit of a physical examination of the patient does not meet community standard is potentially dangerous.

LSP Directive 13.061 C.8.a requires all diagnostic reports to be initialed by the health care practitioner, but it doesn't require the practitioner to date when the results were reviewed, nor does it establish a timeframe that results must be reviewed in. Legibly signing with provider credentials and recording the date of review is standard practice in both community and correctional health care programs. Without recording the date of the review, it is not possible to determine the timeliness of diagnostic review. Specific timeframes should be established to ensure practitioners review diagnostic tests in timely manner and allow for review of the effectiveness of the diagnostic services via the continuous quality improvement program.

LSP Directive 13.061 C.1.c says that patients referred for evaluation by a health care practitioner will be seen according to a "priority" schedule that Dr. Lavespere testified was no longer used.[71] This reflects a basic confusion about how sick call appointments relate to ongoing clinical care. Dr. Lavespere testified that "the whole goal of sick call … is not to have a subsequent appointment."[72] But providing adequate medical care often requires follow-up appointments. Defendants' use of one-off, episodic telemedicine in lieu of establishing a patient specific plan of care that outlines adequate clinical care, including the recommended cadence of follow-up evaluations, contributes to many of the problems discussed above.

- LSP Directive 13.064, Medication Handling, describes a passive keep on person medication program. C.1 requires offenders to receive and sign for the medications they are provided. C.4 requires the offender to notify the pill call personnel five days in advance of needing a refill. It requires the offender to present the properly labeled medication card to the window to the pill call personnel for reordering. F.4 states offenders are subject to inspection of their medications at any time by health staff and security officer. If the pill count is found to be inaccurate the offender may be removed from the keep on person program. Currently offenders are required to write their need for a medication refill on any piece of paper they have and drop it in the box at the pill window. Several patients who were interviewed indicated they often have to wait for

---

[70] Standards for Health Services in Prison, National Commission on Correctional Health Care, 2018 at page 98.
[71] Lavespere deposition. Page 132.
[72] Lavespere deposition. Page 130.

the refill to arrive and must simply keep checking at the window to see if their medication is available.  One patient reported asking to be removed from the keep on person program because of the ongoing struggle with obtaining refills.

- LSP Directive 13.076, Use of Offenders in Health Care, A.1 prohibits offenders from performing direct patient care.  Direct patient care is not clearly defined in the policy.  The National Commission on Correctional Health Care provides clear compliance indicators including: 1. Inmates are not substitutes for health staff but may be involved in appropriate peer health-related programs.  2.  Inmates in peer-health related programs are permitted to: assist patients in activities of daily living (except for infirmary-level care patients).  Activity of daily living generally refers to ambulation, bathing, dressing, feeding, and toileting.[73]  As discussed above, inmate orderlies perform all of these tasks in the infirmary settings, i.e., REBTC Nursing Units 1 and II, as well as direct medical care such as wound care.

Directive 13.076 B allows offenders under staff supervision to perform familial duties commensurate with their level of documented training.  The duties included: peer instructors, hospice volunteers, tier walker, and offender assistants as outlined in Directive No. 13.088, Assisted Living Dorm.  The policy does not address the use of offenders in the infirmary settings i.e., REBTC Nursing Units I and II.  13.076 lacks specificity in what familial duties entail.  A more precise, distinct definition is required that excludes any direct care activities such as changing of adult diapers, changing of wound dressings, administration of any medications, etc.

The LSP Directives do not provide policies or procedural directives to health staff in infection control practices.  ACA standard 4-4354 requires a written plan to address the management of infectious and communicable diseases.  This plan must include procedures for prevention, education, identification, and surveillance.[74]  NCCHC standard P-B-02, Infectious Disease Prevention and Control, requires a comprehensive institutional program that includes surveillance, prevention, and control of communicable disease. It requires standard precautions are always used by health staff to minimize the risk of exposure to blood and body fluids.[75]  Although LSP has directives specific to certain diseases such as Hepatitis and HIV, the policy manual is void of more general guidelines that encompass standard precautions and expected practices in areas such as clinic areas, pill rooms, infirmaries, and assisted living units.

The LSP Directives do not provide policies and procedural directives relative to equipment, supplies, and materials for health services.  ACA standard 4-4427 requires that equipment, supplies and materials for health services are provided and maintained as determined by the health authority.[76]  NCCHC standard Clinical Space, Equipment and Supplies requires sufficient supplies, space, and equipment for the facilities' comprehensive health services program.[77]  LSP

---

[73] Standards for Health Services in Prisons, National Commission on Correctional Health Care, 2018, at page 59
[74] Standards for Adult Correctional Institutions, American Correctional Association, 4th Edition, at page 101-102
[75] Standards for Health Services in Prison, National Commission on Correctional Health Care, 2018, at page 32
[76] Standards for Adult Correctional Institutions, American Correctional Association, 4th Edition, at page 135
[77] Standards for Health Services in Prisons, National Commission on Correctional Health Care, 2019, at page 74

Directive No 13.068 lacks operational detail sufficient to guide staff's daily practice in all clinical areas.

LSP is not compliant with Centers for Disease Control and Prevention (CDC) Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities that were updated February 15, 2022.[78] The CDC continues to recommend that staff and inmates wear masks when indoors. Although signs were posted throughout the facility that masks were mandatory, we observed almost no staff or inmates wearing masks. Since many inmates have serious medical conditions that place them at higher risk of hospitalization or death, it is important to adhere to CDC guidance.

Dr. Lavespere acknowledged that DOC and LSP largely had not updated their policies in ways that impacted the overall delivery of care. Asked about 11 DOC policies and 19 LSP directives, the only changes that he identified as potentially impacting patient care were changes to the sick call policy; the peer review policy (which has not yet been implemented at LSP); the infirmary care policy (where the change was only to the amount of time and documentation required for some patients, and didn't "change[] a whole lot of health care"); and the replacement of standing orders with "individual treatment orders" in the ATU. He also noted that changes to ATU staffing were not reflected in the policy.[79]

### Clinic space and Equipment

**Methodology:** We toured areas where health care is delivered at LSP to assess whether each area was of adequate size, medically equipped and supplied, and sanitary. These included the Robert E. Barrow Treatment Center (REBTC) which contained medical examination rooms, nursing units 1 and 2, acute treatment area (ATU), specialty services scheduling office and building, medication administration rooms, laboratory, radiology, and health information management.  We also toured selected housing units at the main prison, including assisted living units (Ash 1 and 2), and cell blocks C and D.  We also toured death row.

**Standards:** Adequate space is provided for administrative, direct care, professional and clerical staff. This space includes conference areas, a storage room for records and toilet facilities.[80] Correctional institutions should also have sufficient space, supplies, and equipment readily available for the provision of medical, dental, and mental health services.[81] Environmental inspections are conducted in areas where health services are provided to ensure that equipment is inspected and maintained, the unit is clean and sanitary, and measures are taken to ensure that the unit is occupationally and environmentally safe.[82] There is an effective

---

[78] https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html#Table1.

[80] ACA. 1-HC-7A-08.
[81] NCCHC. P-D-03.
[82] NCCHC. P-B-01 (9), ACA 1-HC-6A-12.

program that includes surveillance, prevention, and control of communicable disease.[83] Discussion of patient information and clinical encounters are conducted in private and carried out in a manner designed to encourage the patient's subsequent use of health care services.[84]

**Findings:** While we noted improvements in clinic space during the tour, these findings were tempered by inmate reports of changes being made in the days just prior to our site visit, rather than being part of standard practices. These include staff being instructed to remove health records and equipment from exam tables and being told they could return the items to the exam table after our site visit.[85]  In at least one nursing unit, paper covering nursing unit windows, obstructing nurses view of the patients, was removed.  Nursing units were cleaned, painted and floors buffed.

At the REBTC, three exam rooms were free of clutter and were clean. Exam table paper was present.  There were functional sinks, soap, and paper towels.  Medical supplies (e.g., tongue blades) were available. However, some rooms were missing ophthalmoscope heads to perform eye examinations.

LSP has designated examination rooms at main prison and outlying camps to enable telemedicine visits.  An EMT is with the patient to take vital signs and follow the direction of the medical provider in conducting the examination.  However, the telemedicine equipment lacks the tools necessary to perform adequate medical evaluations. For example, we were informed that there were no stethoscopes for the equipment for the provider to remotely auscultate the patient's heart, lungs, and abdomen. We did not observe otoscopes or ophthalmoscopes attached to the telemedicine machine to enable the medical provider to examine the patient's inner ear or perform retinal exams.[86]  There was a small light available to inspect the patient's external eye.  We observed a nurse practitioner performing a telemedicine visit and noted the lighting and resolution of the image on the camera was extremely poor, and did not facilitate adequate visualization physical findings.

At the main prison, a building was designated the Doctor's Office that included a main room and 3 examination rooms. At this time, one room was designated for telemedicine. The other two rooms could be used for clinical visits if adequately equipped and supplied.  None of the clinic rooms have sinks, but there is a sink in the main room, near a bathroom.

---

[83] NCCHC. P-B-01.

[84] NCCHC. P-A-09, ACA, 1-HC-3A-10.

[85] An inmate reported that the day before the tour began, while he was receiving his physical therapy treatment, Dr. Jacob Johnson instructed the physical therapist to remove all health records, and equipment from the physical therapy table and that he could restart using the table for storage once the tour was over.

[86] Dr. Lavespere testified that there were both otoscopes and stethoscopes, although "you can't really hear that well with" the stethoscopes.  Lavespere 30(b)(6) deposition. Page 128.  The telemedicine machines that we inspected did not appear to have either (or at least they were not attached when we inspected them).

In Nursing Units 1 and 2, Patients reported that the week before our site visit, the nursing units were cleaned and painted, and the floors were buffed. As noted above, we interviewed an inmate who reported that nurses' station windows had been totally covered by paper, blocking their view of patients, until two days before the tour. This is concerning for patients not being within sight of the nurses, particularly given that patients in the open beds in the nursing do not have call bells or lights to notify nurses.

The ATU is comprised of two separate rooms each equipped with two beds. We observed that the ATU was equipped with standard equipment and supplies. The ATU is supplied with straight catheters, used for in and out catheterization. One of the common uses of straight catheterization of the penis for the purpose of obtaining urine for urine toxicology. This is a pointless and painful procedure. Ophthalmoscopes heads were missing and some otoscope lights were broken.

In the specialty clinics, there was a cardiac monitor/defibrillator that was not ready for use. Unlike a modern automatic external defibrillator (AED), it would have taken more than 5 minutes to activate this machine, which is too long.

We also observed in the main medical clinic that even though the exam tables were not being used for storage of records, the nurse practitioner conducted his examination of the patient in a chair, including an abdominal examination, which is not clinically appropriate.

This information raises concerns that changes were made in preparation for the tour, and do not represent meaningful changes.

## Medical Records

**Methodology:** We toured the Health Information Management Unit, and reviewed the health records for organization, ease of navigation, legibility, and timeliness of filing documents into the health record.

**Standards:** A confidential health record is created and maintained using a standardized format.[87] The health record file (paper and/or electronic) is complete and contains certain items filed in a uniform manner.[88]

**Findings:** We found that health records were grossly disorganized, out of chronological order and incomplete. Our findings are essentially unchanged from 2016.

Directive No. 13.008 was last revised on 11/28/2018. The policy outlines the organization and management of health records. It requires that all entries contain the date, time and place of health care encounters. The policy does not include a physician order sheet to record all

---

[87] NCCHC. 2018 P-A-08.
[88] ACA. 2004. 4-ALDF-4D-13, Not all medical record documents were included in the standard.

medical provider orders in a single location that would enable staff to determine active orders, including medications. The policy does not address the procedure for retrieval and review of specialty services reports and outside hospitalization records. The policy does not address time frames for the timely review of laboratory ad radiology reports and outside records. These are major omissions in the policy.

We reviewed 60 medical records in conducting our review. We found that the records were disorganized and not maintained in the order as dictated by policy. Many records contained no Problem List, or if present, was not current. In one case, a patient's Problem List did not contain the diagnosis of COPD, from which he later died.[89]

There is no single location in the health record for staff to know what medications have been ordered for the patient. Currently, staff prints out a pharmacy printout of current medications, but if a medication order was not filled by the pharmacy or a medication order expired, providers do not have a way to know this unless they go through every progress note that contained a medication order to determine if the patient is receiving ordered medications.

Medical providers do not document orders for sliding scale insulin to instruct how much insulin is to be given based upon blood sugar levels. In addition, medication administration records do not contain orders for sliding scale insulin reflecting how much insulin is to be given based upon blood sugar levels. This is dangerous because there is no way to know how much insulin should be given and how much insulin the patient received. Without this information it is not possible to know if the patient received the correct dose of insulin, and it is not possible to detect medication errors and to prevent future errors. The health record needs to contain complete medication orders for each patient.

Compounding this problem, a major finding is that although policy requires medication administration records (MARs) to be filed in the record, we found that electronic MARs are stored in computers and not printed and filed in the medical record. This does not permit medical providers to review whether the patient is receiving ordered medication, and address issues such as inadvertent discontinuation of orders, and patient noncompliance with medications.

Another problem is that patients have multiple medication administration records for the same time frame, showing different administration results. For example, inmates living in a housing unit may be admitted to a nursing unit. There are two different MARs for the patient at the same time. Officers who document on the outpatient MAR will indicate that the patient is a "No Show" or taking the medication "Keep on Person", but this is inaccurate. Providers who later review the MARs as indicating the patient is a "No Show" presume the patient is noncompliant with medications, which is inaccurate.

---

[89] Patient # 15.

*We found that documentation on medication administration records cannot be relied upon, which is a serious systemic issue (See Medication Management).*

Some records we reviewed of active inmates contained no medical record documents from mid-2021 through the present. *Although we observed no backlog of documents in the Health Information Management office during our tour, the lack of current documents in the records indicate that medical records filing is not current.* The lack of timely filing of medical documents including specialty services reports greatly increases risk of harm to patients. We reviewed records in which the failure to review and address consultant recommendations had negative outcomes.

LSP Directive 13.008 F.1 requires each entry into the medical record to be legibly signed, including their title. They may use ink, type, or stamp under the signature. This practice is not happening. The majority of the signatures and titles are not legible, nor do staff stamp, type, or print their name and title. Health care providers do not date and time medical record entries nor legibly document their full signature and title. Medical providers typically only document their initials with no credentials.

The Louisiana Department of Corrections has implemented an electronic health record (EHR) at other prisons, and it is our understanding that there are plans to implement an EHR at LSP. This is essential to establishing an adequate health record and should be made a priority at LSP. In the interim, health care leadership should address the deficiencies identified in this report, such as staff failure to date, time and legibly sign medical record entries, failure to update problem lists, failure to document sliding scale insulin orders in the record, and failure to accurately document on the MAR and to file MARs in the record.

## Internal Monitoring and Quality Improvement Activities

**Methodology:** The Louisiana State Penitentiary Directive Number 13.014 Peer Review, Internal Review and Quality Assurance was reviewed for compliance with nationally published minimal health care standards by the American Correctional Association and the National Commission on Correctional Health Care Accreditation. Quality Assurance Committee (QAC) reports reviewed include monthly CO5 reports, workload indicator reports, ACA audit reports, internal audits, Quality Improvement quarterly meeting minutes, and depositions of staff.

**Standards:** A continuous quality improvement program monitors and improves health care delivered in a prison. The National Commission on Correctional Health Care states that the program should consist of a structured process to identify areas in need of improvement in the delivery system and implement strategies for improvement.[90] The American Correctional Association requires an internal review and quality assurance process that collects, trends, and analyzes data combined with planning, intervening, and reassessing. It also requires

---

[90] Standards for Health Services in Prison, National Commission on Correctional Health Care, 2018, at page 12

implementing measures to address and resolve important problems and identified concerns through corrective action plans.[91]

**Findings:**

1.    **LSP lacks an effective and meaningful quality improvement program.**  The quality improvement program at LSP does not meet the standard of either national accrediting body. LSP Directive No. 13.014, Peer Review, Internal Review and Quality Assurance, requires outcome-based tools to be used to measure the effectiveness of the Department's health care processes and to evaluate and improve the health care delivery system and clinical outcomes. None of the tools used in LSP's quality assurance program meet this threshold.  The tools used were simply a compilation of encounters.  For example, how many sick call encounters were done, how many lab tests were done, how many wounds needing antibiotics were identified, etc.  Simply counting events does not measure the effectiveness of the services delivered nor measure outcomes of healthcare.

LSP Directive No. 13.014 requires routine monitoring and study of high risk, high-volume areas including but not limited to access to care, intake screening, health assessment, and continuity of care.  The studies being conducted at LSP don't meet this policy requirement.  NCCHC requires that all major health care service areas are measured annually.[92] There have been zero studies that address access to care, health assessments, continuity of care, chronic care, intrasystem transfers, medication services, mental health and dental services, dietary and infirmary services.

Another high-risk area is emergency response and treatment.  The only study related to emergency response focused on documentation of the Emergency Medical Technicians.  The study didn't measure critical aspects such as response time, appropriateness of care rendered, and timeliness of transport to a higher level of care.  The data collection tool is inadequate to measure these critical emergency service components.

The Directive also requires monitoring of corrective action plans.  The quality improvement program is void of meaningful corrective action plans.  The closest that the reports come to providing a corrective action plan is to state "continue to monitor," "will stress the importance of documentation," etc.[93]  Corrective action plans should define the problem, including root cause analysis, define the specific action, determine the due date, state the metric for completion, assign a specific stakeholder as accountable, and determine the timeframe for remeasurement.  Corrective actions plans were not found in the quality improvement documents produced by LSP, and Dr. Lavespere testified that he wasn't aware of any changes in LSP's practices or policies that resulted from its quality improvement process.[94]

---

[91] Standards for Adult Correctional Institutions, 4th Edition, American Correctional Associations, at page 127
[92] Standards for Health Services in Prisons, National Commission on Correctional Health Care, 2018, page 14
[93] Similarly, the only example of corrective action that Jennifer Stickells, the RN who manages the quality improvement program, identified was to "just keep stressing it."  Stickells deposition Pages 106-07.
[94] Lavespere 30(b)(6) deposition.  Page 198.

The quality improvement meeting minutes for 2019, 2020, and 2021 were reviewed.  In essence, the minutes don't change from quarter to quarter or year to year.  The studies cited in 2019 were the date, time, and signature on provider orders; the number of infections found requiring antibiotics; wound care documentation; the number of deaths and suicides; and the use of the Wong-Baker pain scale for Hospice patients.  Those same studies are being reviewed throughout all three years.  In 2020, a 24-hour nursing chart check study was added and in 2021 a workload indicator study was added.

All referenced studies are really just a counting of events and review of documentation.  The QI program simply counts the number of provider notes that aren't dated, timed, and signed.  They count the number of infections, and the number of deaths.  In 2021 they began counting the number of specialty care referrals written and the number of lab tests done.  Although counting of events may be helpful in measuring workload, it doesn't qualify as a quality improvement study.  Likewise, a counting of the number of sick call encounters completed doesn't measure the percentage of patient requests for sick call verses the number completed, nor does it measure the timeliness of the encounters, nor the effectiveness of the care provided during the encounters.  All of these components are critical to ensuring an effective system for access to care and positive outcomes.  LSP is counting the number of specialty referrals written but their study doesn't measure the number of referrals approved, the time frame it takes to obtain the referral, the timeframe it takes to get an appointment scheduled, and the percentage of appointments that are completed.  All of these steps in getting a patient the medically necessary specialty services should be measured to demonstrate the system is adequate and without delays in care.

On October 8, 2021, an AM-H-2 Audit report was submitted to the Chief of Operations at the Louisiana Department of Public Safety and Corrections.  This audit identified the following:

> a. Chronic Care/Special Needs: Documentation does not indicate patients are followed according to chronic disease guidelines.  Medications are refilled for one year, in some instances, with no follow-up appointments.
> b.  Health Screens, Appraisals, and Examinations: The visual acuity and temperatures were not documented.  The annual examinations for offenders of age 50 were not done and the recommendation was "LSP should identify all offenders 50 years of age and older and schedule an annual physical if due."
> c.  Segregation Units: Segregation rounds were not being documented properly, as noted in the prior audit.  Segregation rounds must be made daily and sick call and segregation rounds are to be recorded separately.
> d.  AEDs:  Staff were asked where the nearest AED machine was located, and their response was the MPO office.  Upon review the MPO office did not have an AED. The recommendation was "LSP should ensure AED machines are placed throughout the prison and staff should know where each machine in their area is located".

The issues identified in the October 8, 2021, audit were not addressed by the LPS quality improvement program nor is there any evidence the deficiencies have been addressed and compliance remeasured.

The opinion ordered on March 31, 2021, by Chief District Judge Shelly Dick, Middle District of Louisiana, referenced specific areas of the health services program at LSP that violated patient's Eighth Amendment rights. The health services program areas identified in the order have not been and continue not to be addressed in the quality improvement program at LSP.

A quality improvement program identifies and acknowledges all areas identified as not meeting established thresholds. The quality improvement program at LSP has not acknowledged problems identified by the Department of Public Safety and Corrections or the court. An effective quality improvement program is paramount in making necessary service delivery changes and ensuring positive patient outcomes. Healthcare leaders depend on an effective quality improvement program as a powerful management tool in driving quality in their healthcare organization. This simply is not occurring at LSP resulting in continued constitutional deficiencies.

Finally, during patient interviews conducted during the tour, and evidenced by documentation by medical staff in health records, patient-staff interactions are often accusatory, blaming the patient, and cruel. The National Commission on Correctional Health Care recommends conducting patient satisfaction surveys and monitoring the number and type of grievances for trends. This is not being done at LSP.

**2. The health services leadership staff at LSP lack understanding of quality improvement program components and required compliance.** Dr. Toce is the Medical Director at LSP, and he confirmed that he read Judge Dick's ruling.[95] He also believes the quality improvement program has been adequate for years.[96] The issues identified in the ruling have not been incorporated in the quality improvement program at LSP.

He also reported that the reviewing of charts in 20/20 hindsight was sometimes more punitive than helpful because there were decisions made about treatment delivery that were caustic. He reported there was pressure placed by Warden Falgout to see more patients, and he was verbally disciplined when he restricted water for a patient suffering from low sodium because he was overloading with water.[97] The Medical Director should lead the quality improvement program and not allow decision about treatment to be detrimental.

When asked about the tracking of patient "no shows", he reported that he didn't know if their numbers were going up or down but that he believed it would improve patient care because if you stop wasting clinic space on patients that will not come in, you will see more patients that

---

[95] Paul Toce Deposition. page 9, 17-21
[96] Paul Toce Deposition, page 12, 6-8
[97] Paul Toce Deposition, page 18, 12-25, page 19, 12-13

will come in.[98]  Finally, when asked if he believed his participation in the quality improvement meetings improved the quality of care, he responded yes, "but a lot of this is bean counting."[99] Effective quality improvement activities are much more than counting beans and as leader of the clinical services, the Medical Director should guide the quality improvement program.

When shown the answers to interrogatory where it was stated that LSP's QA/QI has begun looking at more detailed information and more statistical data as part of its evaluation, he responded, "I'm familiar with the number that we're coming up with. I didn't know they were more detailed.  Ever since I got there, they've been detailed."[100]  When asked if there were any studies that he would recommend to the QA/QI committee, he responded, "Not that I could really come up with."[101]   The Medical Director should have intimate knowledge of the challenges facing delivery of quality health services.

Dr. Toce confirmed that he had a problem with one of his nurse practitioners writing legibly and when asked if he spoke with him about the problem he replied, "We joke with him all the time about.  I'm learning how to decipher his handwriting, but yeah, a lot of times I'll go to him and say, what does this mean, and he what that means."[102] A corrective action plan is required to be specific, measurable, assign accountability to a specific stakeholder, and have a limited timeframe for accomplishment.  Joking about the problem and requiring interpretation of illegible provider documentation falls significantly short of effective corrective action.

Dr. Jacob Johnson is the Hospital Administrator at LSP, and when asked what he does to ensure staff are meeting policy expectations, he reported that he does record reviews.  When asked how he decides which records to review, he replied, "Just random."[103] When asked how often he reviewed records, he responded "As I said, it's random.  It's not something that's scheduled or set in stone."[104] He also reported that he does not use data metrics to ensure policy is being followed.[105]  When he was asked what he does to ensure the medical providers are meeting policy expectations, he replied, "making sure that the patients have a meaningful encounter, uh, making sure that the complaints or concerns that they have are addressed and addressed in an empathic way, and trying to ensure that we educate, uh, the population about, uh, the meaningfulness of their appointments and follow-ups and treatment plans and/or medication."[106]  He went on to report that the metrics are included in the monthly CO5 reports.

The administrator of the prison health services program should be well versed in components of an effective quality improvement program and assist in defining the metrics utilized to

---

[98] Paul Toce Deposition, page 78, 17-25
[99] Paul Toce Deposition, page 92, 4-5
[100] Paul Toce Deposition, page 11-19
[101] Paul Toce Deposition, page 128, 20-23
[102] Paul Toce Deposition, page 130, 15-25; page 131, 1-7
[103] Jacob Johnson Deposition, page 34, 5-7
[104] Jacob Johnson Deposition, page 34, 14-17
[105] Jacob Johnson Deposition, page 46, 4-10
[106] Jacob Johnson Deposition, page 49, 22-25; page 50, 1-9

measure the adherence to policy, procedure, and measure patient outcomes as a result of compliant practice. Metrics should be established and measured on a consistent basis at a specific interval. Although patient education is important, positive clinical outcomes are not obtained with random reviews at random times.

Dr. Johnson describes a monitoring system that utilizes data points. When asked to point at the data he uses, he cited the monthly CO5 report, offender letters, and overall backlog reports that counts the number of patients waiting.[107] With the exception of an offender letter, the data points he references are all simply a count of encounters, tasks completed, and patient queues. There were no goals, target percentages, or description of data analysis outlined in his description of his quality monitoring system.

Many of the numbers tracked do not provide meaningful information. For example, the on-site laboratory at LSP closed for approximately a year from May 2021 to the present due to understaffing.[108] As Dr. Lavespere acknowledged in his 30(b)(6) deposition, this change would affect the number of trips out reflected in tracking documents, such as the CO-5 reports.[109] Therefore, any number documenting trips out during the past year must be evaluated in the context of the additional trips specifically for laboratory testing. From our review, there is no data which specifies which trips were for labs alone and therefore that number is not useful in determining utilization.

Dr. Johnson describes his role in quality improvement program as being responsible for ensuring the meetings take place and are meaningful and making sure policy expectations are met. He stated the meeting should have more depth and breadth to them.[110] When asked how he determines what topics should be studied, he replied, "I can't speak to that."[111] Dr. Johnson's command of the quality improvement program is disappointing and concerning.

Bill Hawkins is the Director of Nursing (DON) at LSP. He was aware of the litigation and but had not read Judge Dick's opinion.[112] He assumed the DON role in June of 2021 and reported that he had not discussed the findings with any of his nursing staff as it "wasn't an issue" and "we just tried to move forward."[113] DON Hawkins' opinion of the QA/QI program is that it has improved since he arrived.[114] When asked in what way the program had improved, he reported "I do know that we've made an effort to beef up the QA/QI studies since I've been there. They've become much more detailed and meaningful."[115] When asked to describe how they have become more detailed and meaningful, he responded, "I mean, I think that speaks for

---

[107] Jacob Johnson Deposition, pages 118-120
[108] Toce Deposition, page 15:3-9; Randy Lavespere deposition, page 19.
[109] Randy Lavespere 30b6 Deposition, pages 117-121.
[110] Jacob Johnson Deposition, page 200, 22-25; page 1-4
[111] Jacob Johnson Deposition, page 202, 13-16
[112] Bill Hawkins Deposition, page 6, 23-25
[113] Bill Hawkins Deposition, page 7, 19-25
[114] Bill Hawkins Deposition page 8, 13-18
[115] Bill Hawkins Deposition, page 55, 2-18

itself."[116] When pushed to provide a broader answer on how they are more meaningful, he responded, "I think if anyone were to look over the meeting minutes, they would speak for themselves."[117]

An effective quality improvement program involves all staff, including each nurse practicing within the system.  Healthcare leaders, especially the Director of Nursing, must ensure that the nursing team is involved with quality activities such as measuring outcomes, understanding goals and key data metric thresholds, and working together as a team to accomplish quality initiatives.  This is not occurring at LSP.

Corrective action plans are a key component to a quality improvement program. DON Hawkins reported using corrective action plans when he identified a problem in the health care delivery but that the type of plan depends on the situation.[118] When asked if he had ever counseled or disciplined any of his nursing staff, he responded, "I feel like I counsel nurses every day when I visit with my staff."[119] He also couldn't recall needing to discipline any of his nursing staff.[120] The minutes of the quality improvement meetings contain actions that lack specificity, are not measurable, are not goal oriented with time limits, and don't assign accountability.  The quality improvement corrective action plan should include education of staff where appropriate, ongoing measurement, and result in employee counseling and even disciplinary action when indicated.  A properly planned and executed corrective action plan is a powerful management tool that will drive results and provide documentation of successes, ongoing challenges, and need to re-evaluate corrective action tasks.  Health services leaders lack an understanding of what an effective corrective action planning process requires.

Jennifer Stickells has been the quality assurance coordinator since May 2019.[121]  She is also responsible for conducting hearing tests, teaching healthcare orderlies, and providing staff education.[122] She also provides direct care in a two-week rotation, one or two times per month.[123]  She has limited knowledge of the lawsuit, and reported, "All I know is it has something to do with medical care."[124] She has not read the liability opinion nor has anyone discussed the finding with her,[125] even though she is in charge of the quality improvement program at LSP.

---

[116] Bill Hawkins Deposition, page 55, 17-20
[117] Bill Hawkins Deposition, page 56, 20-23
[118] Bill Hawkins Deposition, page 112, 5-10
[119] Bill Hawkins Deposition, page 111, 9-13
[120] Bill Hawkins Deposition, page 93, 12-16
[121] Ms. Stickells was out from August 2021 through "a few weeks" before her March 10, 2022 deposition, and was unaware what was done with the quality improvement program while she was out.  Jennifer Stickells Deposition, pages 18, 23-25 and 86, 22 to 87, 1.
[122] Jennifer Stickells Deposition, page 14, 4-9
[123] Jennifer Stickells Deposition, page 13, 16-24
[124] Jennifer Stickells Deposition, page 15, 18-22
[125] Jennifer Stickells Deposition, page 16, 1-8

A continuous quality improvement program monitors and improves health care delivered in the prison. The quality improvement coordinator organizes and plans quality studies and activities, ensures line staff involvement, educates the leadership team on how to plan and conduct an effective study, ensure corrective action plans are written, complete, and timely, and schedules re-measurement of key indicators, ensuing timeliness and compliance with the plan.

Ms. Stickells agreed with the Court's finding that there was failure to engage in a meaningful quality improvement program and analysis during the liability period.[126] She believes the program has improved since she took over in May of 2019, stating that she believed more studies and more statistics were needed.[127] Unfortunately, Ms. Stickells lacks the training and experience to lead the quality improvement program or make the necessary improvements. She was unaware of what policies have been changed at LSP, which is key to creating effective data collection tools to facilitate meaningful quality improvement studies.[128] She reported enhancing the program by adding the workload indicators, to measure the workload of medical staff at Angola.[129] When asked what problem the workload indicator study is attempting to address, she replied, "It's not addressing a problem."[130]

She explained that when a trend upward in the numbers is seen, they find out why. That process was described as "We talk."[131] Ms. Stickells had never seen the medical occurrence reports before, a critical data collection component in an effective quality improvement program.[132] Medical occurrence data measures patient safety parameters such as falls, medication errors, and other risk management indicators. She describes the process of determining compliance and reaching quality goals as striving for one hundred percent but that it's determined "on a case by case."[133] Data thresholds in a quality improvement should be established before the study is initiated and utilizing a "case by case" approach does not meet minimal requirements of continuous quality improvement.

Ms. Stickells describes the "quality improvement team" consisting of the Director of Nursing, Assistant Director of Nursing, registered nurses, and herself.[134] She failed to include the Medical Director, Director of EMS, Behavioral Health, dentist, Director of Lab, and other key program leaders as being part of the quality team. When further explored, she indicated other staff are involved depending upon the type of study. She also confirmed that the quarterly quality improvement meetings for 2020 were all held on a single day, January 28, 2021, and

---

[126] Jennifer Stickells Deposition, page 19, 9-21
[127] Jennifer Stickells Deposition, page 2, 8-13
[128] Jennifer Stickells Deposition, page 29, 18-20
[129] Jennifer Stickells Deposition, page 35, 13-17
[130] Jennifer Stickells Deposition, page 92, 12-14
[131] Jennifer Stickells Deposition, page 71, 16-21
[132] Jennifer Stickells Deposition, page 62, 4-6
[133] Jennifer Stickells Deposition, page 105, 3-9
[134] Jennifer Stickells Deposition, page 68, 23-25; page 69, 1

were attended by only four people.[135] Those four people were Jennifer Stickells, Lisa Lemoine, Sherwood Poret, and Jacob Johnson, hardly enough leadership staff to consist of a quorum.

Not one member of the quality improvement team at LSP who were deposed was able to articulate an understanding of the components of a quality improvement program, how to identify areas that need to be studied, how to develop an effective corrective action plan, how to determine compliance, and how to adequately follow-up and execute effective correction action steps. Because of this lack of understanding, and lack of interest in acknowledging program deficiencies pointed out to them by the court, a quality improvement program at LSP simply does not exist.

## Clinical Care

**Methodology:** We evaluated clinical care by reviewing policies and procedures; reviewing health records; observing care provided during sick call; observing routine and urgent medical encounters; observing medication administration; observing care provided in the infirmary; and interviewing inmates who have used the health care system.

**Standards:** There are several standards that relate to clinical care including the following: Inmates should have timely access to a medical professional, be given a professional medical judgement, and receive care that is ordered. Unreasonable barriers should be avoided, such as punishing inmates for seeking care for their serious health needs, assessing excessive fees that prevent or deter inmates from seeking care for their serious health needs or assessing any fees for treatment arising from sexual abuse; deterring inmates from seeking care such as holding sick call in the middle of the night when the practice is not reasonably related to the needs of the institution; and having an understaffed, underfunded and poorly organized system with the result that it is not able to deliver appropriate and timely care for patients' serious health needs.[136] This standard is based upon the basic principle established by the US Supreme Court in the 1976 landmark case, *Estelle v. Gamble.*

NCCHC standards for Non-Emergency Health Care Requests and Services require that all inmates, regardless of housing assignment, are given the opportunity to submit oral or written health requests at least daily; that health care staff pick up and prioritize the request forms daily; and that a face-to-face encounter for a health care request is conducted by a qualified health care provider within 24 hours of receipt by health care staff.

**Findings:** For the period of 2019 to the most recent medical records produced, our review showed that patients with serious medical needs were at a serious risk of receiving inadequate medical care that placed that at a significant risk of serious harm, unnecessary pain, and preventable death. As was the case with the medical records reviewed during the liability

---

[135] Jennifer Stickells Deposition, page 81, 17-25; page 82, 1-14; 85, 1-10.
[136] Standards for Health Services in Prisons. 2018. NCCHC. P-A-01.

period and the supplemental report, the vast majority of medical records from the remedy period contained multiple examples—typically pervasive—of often grossly substandard medical care. In particular, we found each of the following to be present throughout the records:

11. Lack of timely access to a medical provider licensed to diagnose and treat serious medical conditions;
12. Lack of adequate medical evaluations[137] and failure to timely diagnose and treat patients with serious medical needs;
13. Failure to provide medical care in accordance with nationally recognized treatment guidelines for serious medical needs such as diabetes, hypertension, chronic obstructive pulmonary disease (COPD), etc.;
14. Failure to monitor and evaluate patients' adherence to medication regimens and address obstacles to adherence;
15. Failure to monitor patients with serious medical needs in accordance with their disease control;
16. Scheduling health care operations at unreasonable times which deter access to care;
17. Assessing excessive fees for accessing health care;
18. Failure to recognize red-flag or potentially life-threatening signs and symptoms;
19. Unprofessional and punitive attitudes towards patients.

Therefore, we conclude that patients remain at a risk similar to what the Court has previously found to violate their rights under the Eighth Amendment.

**LSP's revised Sick Call policies do not provide unimpeded access to health care services.**

We reviewed LSP's Access to Sick Call and Clinical Services policy 13.061 dated 3/3/2022. This describes a new procedure "To ensure unimpeded access to routine (scheduled) and emergent health care services are available to all offenders in a timely manner." Although the policy was not issued until March 3, 2022, Defendants claim that it has been in place since November 1, 2021. This policy institutes a procedure for inmates to be seen by a nurse practitioner following submission of a health services request, which could in theory be a significant improvement for access to a medical provider. However, the policy, as written and in practice, does not ensure patients are provided unimpeded access.

NCCHC standards require that all inmates, regardless of housing assignment, are given the opportunity to submit oral or written requests daily, and that health requests are reviewed and prioritized daily by health care staff. At LSP, inmates housed in general population are to submit health requests into a locked box and correctional officers collect these routine health requests Sunday through Thursday, go through the requests, and type up lists of inmates to be seen the following day. The officer generated lists and health services forms are to be transmitted to the ATU by noon.

---

[137] To include a history related to all of the patient's conditions and complaints, an examination related to the patient's conditions and complaints, an assessment and a therapeutic plan addressing each condition.

The Request for Medical Treatment Form (No. HCP13-a) does not have a place for the patient to write the date and time they made their request.  There is no place to date and time when the request was received by health care staff.  The date and time are only recorded at the time the patient is screened by an EMT.  There is no process in place to log each health care encounter received, noting the date and time the offender authored the request, to ensure that security does not delay retrieval and submission to health staff in the Entrance Building and to ensure the date and time of the screening is within the 24-hour time frame required by both ACA and NCCHC, or even the slower timeframe required by LSP's policy. An inmate in segregation reported to us that medics threw away his health request form, and on other occasions signed a refusal of care for him, noting "The Patient refused to sign."[138]  Without inmates having an independent ability to submit a health request in a locked box that is taken to the ATU and opened by a licensed practical or registered nurse, LSP does not have the ability to know whether all submitted health services requests are received and track disposition of each request.  This is an essential element for quality assurance purposes.

Having officers collect health requests is a violation of patient confidentiality. Health requests should be collected and triaged by health care staff 7 days a week and patients seen within 24 hours of submission of the complaint.

Although not addressed in policy, inmates housed in cell blocks or administrative segregation, are to submit health requests to medics, at least some of whom make rounds at 03:30, when inmates are asleep. *This is an unreasonable barrier to submitting requests for care, particularly since the deadline for transmitting the forms to the ATU is at noon. Health care staff should collect forms during waking hours.*

There is no provision in the policy to triage the health requests at the ATU for the purpose of identifying inmates with health requests that need to be seen urgently or emergently. This includes inmates with chest pain, palpitation, shortness of breath, stroke symptoms, etc.  *Upon delivery of the health services forms to the ATU, a registered nurse needs to triage the forms to identify inmates who need to be seen the same day. This will also likely reduce the number of self-declared emergencies.*

For Self-Declared Emergencies, the policy designates medics to respond to the patient's location but does not require the patient to be escorted to the ATU for evaluation by a registered nurse or medical provider.  *This practice is unchanged from our previous report and results in delayed diagnosis of patients with serious medical conditions. At a minimum, medics must be required to call a medical provider for a disposition, or to escort the patient to the ATU for medical evaluation and treatment.*

The policy requires patients housed in REBTC Nursing Units to submit forms for routine health requests and self-declared emergencies.  For routine requests, inmates are to complete a

---

[138] Patient #61 ~~Percy Hawthorne, 348602~~. We were not able to independently confirm this complaint.

health services request form and submit it to a correctional officer. As noted above, requiring the patient to submit the health request form to the correctional officer violates the patient's medical confidentiality, and makes no sense, *particularly since there are supposed to be nurses on these units 24/7.* There is no designated time frame for the officer to give the form to a nurse (e.g., immediately). *For emergencies on REBTC units, a nurse must see the patient within three (3) hours. This is not an appropriate time frame for an emergency request.* The nurse must notify the provider in the ATU of the complaint and the provider can decide whether to see the patient on the REBTC unit or give verbal orders for an alternate disposition. The policy does not require the nurse to have the health record present before conducting an assessment. *After* the nursing assessment is completed, the medical record is retrieved and the assessment and request are placed in the medical record and placed in the primary health care practitioner's designated area of the medical records department for paper review.

While the use of the Sick Call system may be appropriate for long-term patients housed in Nursing Unit 2, it is not appropriate for patients with acute medical conditions housed in Nursing Unit 1, whose medical complaints may be related to the reason they were admitted to the unit and which should be treated by a medical provider during patient rounds. *Requiring Nursing Unit 1 patients to submit health requests or a SDE and to be charged for the service is an unreasonable barrier to care. The policy should exempt Nursing Unit 1 patients from this access fee. Patients in Nursing Unit 2 should have the same access to a medical provider as the general population.*

A significant improvement is that since 10/31/2021, inmates submitting health requests are to be medically evaluated by a nurse practitioner either in person or through telemedicine. However, as noted in the Clinic Space section of this report, the telemedicine equipment lacks needed equipment for the nurse practitioner to conduct an adequate physical examination.

Moreover, during our observation of sick call the quality of the camera used to examine the patient was poor with respect to the resolution of the picture, and did not permit an adequate assessment of the patient.[139] *If adequate medical evaluations cannot be conducted, the nurse practitioner needs to see the patient in person, which duplicates effort and delays a medical diagnosis. We recommend that LSP purchase and install all needed equipment to conduct an adequate examination, and in the meantime, examine patients in person.*

The use of telemedicine is a helpful adjunct option when the patient is unable to be transported, such as after clinic hours when the provider is not physically on-site, and during times such as severe weather, etc. The use of telemedicine as the only mechanism to conduct patient sick call encounters is not optimal. Given the limited optics, poor resolution, and placing the responsibility of the physical exam on an EMT is not the same as an in person patient-

---

[139] Patient #62. The patient complained of athlete's foot. The camera enabled a view of the patient's severely macerated skin between his toes, but did not permit an adequate description of whether the patient's skin was red or swollen. The EMT volunteered that the patient's skin was "a little red, no drainage", however the nurse practitioner needs to be able to independently view the patient's skin.

physician/nurse practitioner encounter.  Many physical findings such as heart tones, lung sounds, abdominal examination, and close examination of many skin issues can be easily lost when done via camera.  Every effort should be made to conduct the sick call encounters in person, unless extenuating circumstances place a burden on the patient to travel to the clinic location.

The quality of the physical examinations we observed were inadequate. The encounters appeared to be driven and controlled by the EMT who was with the patient than by the Nurse Practitioner who should be guiding the encounter as the provider. Our review of the medical records after the new policy was enacted confirm the new policy is inadequate as applied. Below are a number of examples from the chart reviews of routine sick call encounters after the new policy was implemented, as well as sick calls observed during the site visit.

**Patient #39:** On an unknown date, the patient submitted a request for health services needing his Glucerna (nutritional diabetic drink) reordered and requesting an eye exam. On December 21, 2021, an EMT saw the patient. Incomplete vitals were done as the respiratory rate was not documented by the EMT.  The EMT wrote "BMI on wt form. 11/19/21 is 25.4. Does not qualify for Glucerna".  The EMT wrote in the physician section "Ophthal appt."  This is an example of the EMT blocking access to the physician and determining whether or not a patient needs a prescription refill, outside the EMT's scope of practice.  This patient should have been referred to the physician for follow-up. Additionally, this patient was charge $3 for simply asking for an eye exam and not getting seen by the physician to renew his prescription.[140]

**Patient #56:** On November 3, 2021, the patient submitted a request for health services complaining of head, neck, shoulder, and hip pain.  The only vital sign taken was respirations of 16.  The EMT documented the patient's right upper extremity strength was greater on the right than the left side, secondary to a history of cardiovascular accident.  There was no neuro assessment, exploration of the head pain e.g., when it started, the type of pain, had the patient taken any Tylenol, etc.  There was not exploration of the pain in the neck, hip, or shoulder, nor was history of injury documented.  The patient was sent to the ATU.

The nurse practitioner did not document a physical exam, did not provide a diagnosis, and simply documented giving the patient an intramuscular injection of Tramadol for pain and Norflex (muscle relaxer).  There was no follow-up appointment recommended. While he was appropriately sent to the ATU, once there, he was not appropriately treated.

**Patient #54:** On an unknown date the the patient submitted a request for health services complaining of pain in his chest "all the time".  He wrote that his chest was tight

---

[140] For the body of this report, we have excerpted chart reviews that particularly illustrate a given issue. Additional examples can be found in Attachment B.

and that his nitro only "lightens it up". He also wrote, please someone needs to check it out ASAP. It hurts worse when I move around. The form is not dated as to when and who collected the form. There were no vital signs obtained and no physical examination performed. The patient was not medically examined.

Instead, on 11/8/2021 a staff member whose signature was illegible wrote, "was seen in ATU on 11-6-21 and sent to Lane-ER R/O ACS (acute coronary syndrome). This patient was not appropriately evaluated for chest pain after being sent the hospital 2 days earlier. All patient reports of chest pain should be thoroughly evaluated and diagnostic testing such as EKG, and cardiac enzymes obtained as indicated.

**Patient #42:**
On January 25, 2022, the patient was seen in sick call and the EMT documented, "Patient complains everything on his body hurts," Alert and oriented x 3, at cell and has no distress, talks in simple sentences. Patient has been seen in sick call. Wants something for all of the pain he is having. Disposition was "MD".
The patient was not seen by the nurse practitioner, no examination was done. Six days after the EMT saw the patient, on January 31, 2022, the nurse practitioner documented "S/C prn" (sick call as needed).
This patient was seen cell side, not in a clinical setting, was not examined by a nurse practitioner and the nurse practitioner's review of the sick call request was delayed six days.

**Patient #49:** On January 24, 2022, the patient submitted a request for health care complaining of his knee hurting and needing "the shot". His blood pressure was significantly elevated at 180/112 mm Hg with an elevated pulse of 94/minute. The EMT documented the patient was requesting shots in both knees as the cold weather was hurting them.
The provider did not complete a physical examination, and the patient's significantly elevated blood pressure was not addressed. Celebrex twice daily for 3 months was ordered and a referral for orthopedics for injections was ordered.

**Patient # 48:** The patient submitted a request for health care on January 7, 2022, complaining of weakness. The EMT recorded a slightly elevated blood pressure of 130/92 mm Hg and an elevated pulse of 110/minute. The EMT documented the patient was alert and oriented x 4 and ambulatory. "Patient states he had heart symptoms x three months ago". Patient appears to be in no acute distress and is requesting an evaluation. The EMT's disposition was "MD".
On January 9, 2022, two days later, Park, ARNP documented "FU PRN" (follow-up as needed). She did not see the patient, no examination was done, no diagnosis was made, and no treatment was provided to the patient. The patient was charge $6 for this encounter.

**Patient #47:** On December 26, 2021, the patient submitted a request for health services for lower back pain and leg pain. The EMT documented the patient ambulated to the ATU with minor difficulty, complaining of lower back pain descending down his left leg. Walks with minor limp. He was given injections of Toradol for pain and Norflex, a muscle relaxer. The orders were given by NP Parks. NP Parks did not examine the patient and didn't sign the ATU documentation until the next day on December 27, 2021.

On December 28, 2021, the patient was seen in sick call for lower back pain beginning one week prior. Vital signs were within normal limits, and he was referred to the MD. The nurse practitioner did not examine the patient and the sick call request was not seen until December 30, 2021. The ARNP wrote "FU PRN" (follow up as needed). No examination was done, no diagnosis made, and no treatment was provided. The patient was charged $6 for the encounter.

On January 4, 2022, the patient submitted a request for health services complaining of back pain and leg pain. The EMT noted the patient to be ambulating with a wheelchair that he had borrowed from another inmate. He reported being in the shower when the pain shot down his left leg causing him to fall and that he hadn't been able to work since. He reported he fell at approximately 7pm the evening before. The EMT sent the patient to the ATU for evaluation.

The provider portion of the sick call form states "Seen in ATU". The patient was seen in the ATU by an EMT and was given Toradol and Norflex injections for muscle spasms, no duty for 3 days, and no lifting over 10 pounds. It is not documented that a call was made to a provider to obtain orders for this treatment. On January 5, 2022, the next day, the ARNP Parks, signed the ATU documentation. The patient was charged $6 for the encounter.

On January 19, 2022, the patient submitted a request for health services complaining of back problems for the past month, and history of making several emergency requests. He described the pain as going down his left leg and having difficulty with the grip in his left hand. He wrote that the pain was at times unbearable and that he hadn't seen a doctor.

The EMT failed to obtain the patient's blood pressure and recorded the pulse as 78, respirations 16, and O2 Sat as 100%. The EMT's documentation included lower back pain radiating down left leg. History of several shots but pain keeps coming back. Ambulates with a slight limp. There was no neurological assessment and no assessment of the left-hand weakness the patient reported.

The provider did not examine the patient and wrote a prescription for Medrol dose pack and Celebrex. The patient was charged $5 for the encounter. This was the fourth complaint by this patient, for the same symptoms in less than a 30-day period, and he was not examined by a physician or nurse practitioner and was charged a total of $17.

**Patient #63:** A NP saw the patient sick call for foot pain due to what appeared to be a large bunion on his left foot. The patient was concerned about having to work in the fields because he was prescribed special orthopedic shoes and he was worried they would be ruined. "I know these shoes are expensive, but they make me go into the fields with them". The patient then stated he hadn't been seen by the podiatrist for many months. The NP told him that was because he had signed a refusal in May of 2021. The patient stated he would have never signed a refusal to see his foot doctor when ARNP rebutted "well it's in your chart." The NP then asked the patient why he wasn't wearing his compression stockings, treatment for his varicose veins, and he reported receiving a pair of compression stockings before the pandemic, but they had worn out. He told the ARNP he knew he had to see Dr. Toce regarding his permanent duty status, but he had been waiting a long time.  The NP abruptly interrupted him and said he would ask Dr. Toce to review his chart. He did not take a history of the patient's foot problems. He did not direct the medic regarding the examination of the patient's foot. The medic independently had the patient take off his shoes and palpated pedal pulses, and pointed the camera to the patient' foot which showed the large bunion.

The patient's blood pressure was significantly elevated (BP=182/92 mm Hg) and he had not been previously diagnosed with hypertension. The NP did not perform a cardiovascular review of systems (e.g., headache, chest pain, shortness of breath, dizziness). The NP told the patient to return for blood pressure checks three times a week for two weeks and he would then be evaluated by the nurse practitioner.

**Patient #64:** A nurse practitioner saw the patient during a telemedicine visit following an injury to his eye and decreased visual acuity. The patient's blood pressure was significantly elevated (BP=171/102 mm Hg).  He was prescribed amlodipine and lisinopril for hypertension.  The NP did not attempt to review the patient's MAR on the computer to assess the patient's medication compliance and later said he did not know how, and never attempted to review MARs on the computer. He said to the patient "Why aren't you taking your medication?". The patient reported not taking his medication for about 10 days, but the provider did not further explore the reasons why with the patient, or counsel the patient about the risks of poorly controlled hypertension such as heart attack and stroke, nor did he plan to monitor the patient's blood pressure, and have him return for a chronic disease visit given his poorly controlled hypertension. Establishing that the patient has not taken his medications, and not developing a plan to address noncompliance falls below the standard of care.[141]

The policy for handling Self-Declared Emergency (SDE) health care requests has not substantially changed in the newly promulgated policy. Self-declared emergencies are still being handled in the same deficient way as exemplified by the Patient encounters below, as well as encounters outlined in the emergency care section.

---

[141] Patient #64.3

**Patient #42:** On January 14, 2022, the patient was seen in emergency sick call by the EMT at cell side, not in a clinical setting. The EMT noted, patient ambulatory to cell bars without difficulty. Alert and oriented. Complaining of chest, abdominal and wrist pain x 2 days. Patient states sternum pain that sometimes comes and goes and then starts in his abdomen. Speaking in complete, full sentences. Appears to be in no acute distress. Remaining PE unremarkable. The disposition was "MD".

Four days later, on January 18, 2022, the nurse practitioner simply documents, "S/C prn" (sick call as needed). The patient was not seen, was not examined, and no diagnostic testing to rule out a cardiac event was done.

The EMT's scope of practice does not allow for ruling out cardiac events and the patient should have been seen by a provider. This did not occur, and the nurse practitioner didn't even know about this patient's request until 4 days after the EMT saw him.

On January 19, 2022, the patient submitted a request for health services complaining that his "heart has been hurting since the 6th of this month, going on two weeks, and I need it checked out before I die. I made an emergency on the 14th about the same problem. Need to see a doctor".

His blood pressure was elevated at 150/96 mm Hgtemperature not taken. The EMT documented Left lower "LW" pain, no shortness of breath. Intermittent pain, increasing when laying on left side. The patient was not examined by the nurse practitioner, no cardiac diagnostic tests were done, and the patient was prescribed Motrin twice daily for 2 months.

**Patient #52:** On November 3, 2021, the patient submitted a request for health services. The EMT obtained vital signs and noted the patient ambulated to the ATU via a wheelchair. He complained of headache, pain and left sided numbness for approximately one year. He was noted to be in no acute distress and rated his pain a 10 out of 10. He also complained of slamming his finger in a door a few weeks prior. The patient also complained of being blind in his left eye and that it wasn't new but was getting worse. He asked to be seen by a physician. He was given triple antibiotic ointment and referred to the MD.

The physician note states, "seen in clinic 11-3-21". There was no examination, no diagnosis, and no treatment. The patient was charged $8 for the encounter.

Eight days later, the patient wrote an emergency request for health services on November 11, 2021, complaining of experiencing pain. The EMT saw the patient in the treatment center and obtained vital signs. The patient reported having a headache and upper gastric pain for three weeks duration. He also reported having constant falls in his dorm. He also complained of having his finger slammed in the door 3 days ago. He was noted to have a healing wound on his thumb from the door incident. He denied abdominal pain upon palpation but reported pain with a deep breath. There was no exploration of the reason for his reported falls, no exploration of the upper gastric pain, e.g., nausea and vomiting, and no exploration of the type of headache he was experiencing. The EMT referred him to the MD.

Three days later, on November 14, 202, the nurse practitioner documented "CAT 1". The patient was not seen, was not examined, no diagnosis made, and no treatment ordered.  The patient was charge $6 for the encounter.

The patient submitted an emergency request for health services on December 4, 2021, complaining of being short of breath.   His vital signs were obtained and were unremarkable.  The EMT documented that he ambulated to the cell bars with a limp secondary to a prior history of stroke.  The patient complained of pain when taking a deep breather and that the "CIA" was sprayed on the tier earlier and that when he was around the spray it gives him a headache with shortness of breath.  He was noted to be breathing even and unlabored and lungs were clear.  Patient was noted to be speaking in complete sentences.  He was referred to the MD.  The patient was seen at his cell and was not taken to a clinical setting for assessment and examination by the EMT.

The patient was not examined by a nurse practitioner or physician.  The note was not seen until two days later and the nurse practitioner wrote "SC PRN" (sick call as needed).  The patient was charged $6 for the encounter and was not seen.

**Patient #48:** He was a 51-year-old patient with a history of heart problems. On November 15, 2021 medics saw the patient with a complaint of "his heart acts up". No history of symptoms was taken.  The medic noted that the patient previously had a wheelchair that had been taken from him.  The medic said that the patient was able to walk to his cell.  The medic referred the chart to a physician who wrote sick call as needed without clear documentation of his/her name or title and the signature was illegible

An improvement is that the policy requires the patient's health record to be retrieved and present at the time of the clinical encounter. We observed this process and found that nurse practitioners reviewed the record both prior to the beginning, and during the encounter. Medical providers addressed several concerns of the patient. This is a significant improvement from our last report. However, the provider did not know how to access the computerized medication administration record. of medication administration. When we asked them to access this part of the health record, the provider indicated they had never accessed the database before.

While a prompt telemedicine sick call conducted by a nurse practitioner could be a valuable *addition* to LSP's medical care, LSP is using telemedicine to *replace* in person medical evaluations. Given the lack of telemedicine equipment (stethoscopes otoscopes, and ophthalmoscopes), nurse practitioners are unable to independently perform adequate examinations of the heart, lungs, and abdomen during telemedicine sick call visits.

This problem is compounded by LSP's deficient policy regarding follow-up appointments after sick call.  Directive 13.061 includes a time frame for follow-up appointments where the health care practitioner recommends it. The categories of follow-up include emergent (1 week), urgent (2 weeks), routine (3 weeks) and stable (4 weeks).  Even though this categorization

system is explicitly in the policy, Dr. Lavespere testified that it is no longer used.[142]  Whether or not it is being used, the policy does not include clinical criteria for whether a provider should schedule a follow-up and how the provider should determine an appropriate follow-up interval. *The timeline for emergent follow-ups is particularly concerning because an emergent follow-up implies that the patient should be seen within 24 to 48 hours in order to evaluate response to treatment and/or consultant recommendations that may be time sensitive – not the 1 week listed in the policy. We recommend that the policy include clinical criteria for assignment of follow-up intervals.*

**Patients lack timely access to a medical provider licensed to diagnose and treat serious medical needs**

Although LSP has made recent changes in sick call policy, for the majority of this review period, from 2019 until 10/31/2021, LSP continued to use emergency medical technicians (medics) to conduct routine sick call in the same way it was done at the time of our last review and patients were deprived access to a medical provider who could diagnose and treat their serious medical conditions.  This included conducting sick call in the housing units rather than an adequately equipped and supplied examination room, without the medical record present, and lacking privacy.  Medic dispositions were typically to: escort the patient to the ATU, which was also staffed by medics; or treat the patient with over-the counter medications (OTCs); or refer the patient to a medical provider, who, in the majority of cases did not medically evaluate the patient for the complaint.

Additionally, to the present, medics respond to inmates who make a Self-Declared Emergency (SDE), including on Fridays and Saturdays, when LSP does not provide routine sick call. In the great majority of records, medics manage these encounters similarly to how they managed them during the liability period – that is, inadequately and beyond the proper scope of an EMT, effectively creating a barrier to professional medical attention.   The following cases are examples:

> **Patient #42:** On 4/3/2020 a 25-year-old man submitted a health services request complaining of spitting up blood. At 18:45 a medic saw the patient. The patient reported it occurred when he awoke and that he had pain when he took a deep breath.  The patient's vistal signs were normal. The medic did not perform a physical examination. He referred the patient to a medical provider.  A medical provider did not review or sign the form. The patient was charged $6.00.
>
> On 4/4/2020 at 15:55, the patient declared an SDE complaining of spitting up blood. Upon interview the patient complained of coughing up blood for 3 days.  Vital signs that were taken were normal, but the medic conducted no examination and did not take

---

[142] Lavespere deposition.  Page 132.

complete vital signs. Temp=97 F.  The plan was MD Review. On 4/6/2020 a provider wrote Sick Call as needed on the form.[143]

On 4/6/2020 at 14:11, a medic responded to the patient's location for an SDE. The patient complained of coughing up blood. BP=132/84 mm hg, pulse=110/minute, resp=18 and Temp=100.5 F. Blood is dark red. Sharp pain in right chest wall. BBS diminished in right upper lobe. Patient says he has been sweating at night…. Patient appears to be in non-acute distress. Plan: ATU.  *A medical provider did not review this form until 4/13/2020, even though the patient was ill enough to need transport to the hospital.*

On 4/6/2020 at 15:18 the patient was transported to the ATU.  At an undocumented time, a physician was notified and ordered a chest x-ray, COVID-19 test, and IM Rocephin.  Although the differential diagnosis should have included tuberculosis and COVID-19, there was no documentation that the patient was masked.   The Chest x-ray showed pneumonia.  The patient was transported to Our Lady of the Lake (OLOL) Regional Medical Center where he was diagnosed with cavitary pneumonia. *He was discharged on 4/10/2020 with an order for antibiotics for 28 days, but MARs do not show he received all doses of his antibiotic.  This patient had delayed diagnosis of pneumonia and did not receive ordered medical treatment.*

Although changes have been made to the role of medics for routine sick call, medics are still performing in the same way for Self-Declared Emergencies as recently *as late January 2022*.  In the same record is the following encounter as an example:

**Patient #42:** On 1/14/2022 at 17:57 a medic responded to the patient's location because he was not feeling well.      The patient complained of CX (chest), abd(ominal) and wrist pain x 2 days. Patient stated sternum pain that sometimes comes and goes and sometimes shooting pain in wrist. Denies N/V/D, dizziness, SOB. Patient states he has no history of chest pain. …. NAD. Vital signs normal. Oxygen saturation=95%.  The medic did not conduct a physical examination of the patient. He was not taken to the ATU.  Plan: MD referral.  The patient was charged $6.00. *On 1/19/2022 a medical provider wrote S/C (Sick Call) PRN (as needed). The physician did not schedule the patient for medical evaluation.*  Eleven days later a nurse practitioner saw the patient, presumably via telemedicine, but did not conduct an examination or establish a diagnosis for the patient.

Other records that showed similar problems with lack of timely access to a medical provider.

---

[143] A medical provider later crossed out SC prn and wrote: Clinic A follow-up in 6 weeks.

**Lack of Adequate Medical Evaluations, Failure to Timely Diagnose and Treat Patients with Serious Medical Needs, and Failure to Recognize Red-Flag or Potentially Life-Threatening Signs and Symptoms.**

As was the case during the liability period, the medical records produced during the relevant remedy period show that LSP medical providers, nurses, and EMTs frequently fail to recognize "red-flag"[144] or potentially life-threatening signs and symptoms. We saw numerous examples throughout the records, including the following:

**Patient #6:** This patient had back pain with difficulty moving as early as 2/10/21. From 4/25/21 until 5/3/21 the patient had six escalating symptoms of back pain or inability to move that increasingly appeared as red-flag symptoms. These symptoms resulted in a physician or nurse practitioner evaluation for only one of these episodes. These episodes should have resulted in physician evaluation with an imaging study to exclude serious pathology. These episodes were as follows.

1. On 4/25/21, a medic saw the patient for back pain. The patient couldn't get out of his bed due to the pain. With assistance the patient was able to be moved to a wheelchair. A nurse practitioner was called and ordered "no transport"[145] and the patient was moved by security by wheelchair to the ATU where another medic evaluated the patient and noted that the pain was chronic in nature. The medic called a provider who ordered a shot of pain medication and Norflex which has an FDA indication for acute painful muscle spasm. A provider should have evaluated the patient.

2. On 4/27/21, a medic evaluated the patient who wheeled himself to the treatment center complaining of his back locking up to the extent he couldn't sit on the toilet. The medic did not call a provider. A provider reviewed the note two days later but no action was taken.

3. Just after midnight on 4/30/21, a medic evaluated the patient for severe pain stating he couldn't move and couldn't sit up. A doctor was called and ordered "no transport" and the patient was placed in a wheelchair and brought to the ATU by security. An hour later a medic saw the patient in the ATU. The medic called a doctor who ordered a shot of pain medication and Norflex. There was no evaluation by a physician or nurse practitioner but a provider wrote on the ATU form that the patient was to keep his follow up appointment.

4. Later that day, on 4/30/21, at 8:50 am a medic saw the patient who wanted another shot for his back pain. The patient was sent to the ATU and instead of taking a history for the patient's back pain, the provider documented knee pain and wrote that an MRI would be scheduled. The doctor prescribed Celebrex, a non-steroidal inflammatory drug.

---

[144] A red-flag signs or symptoms are signs or symptoms that require immediate attention because they portend a life-threatening condition.
[145] "No transport" orders mean that the ambulance is not to transport the patient.

5. On 5/3/21 at 10:24 am medics saw the patient on his living unit for severe back pain. The patient was unable to move and said he hadn't been able to get out of bed for three days. The medics contacted a nurse practitioner who ordered a shot of Toradol and Norflex but gave a "no transport order".

6. On 5/3/21 at 5:11 pm medics evaluated the patient who was unable to get up and had urinated on himself. Incontinence with severe back pain is classic for cord compression. The patient didn't have wheelchair access to a shower so was lying on a mattress near the shower and when medics moved him, he yelled out in pain. A doctor was called and prescribed a pain injection and steroids. The patient was left with custody despite his acute medical distress, without a medical professional examining him. This falls well below the standard of care.

7. On 5/3/21 at 7:43 pm the patient was found on his living unit unresponsive and was moved to the ATU and pronounced dead at 8:25 pm

Care of this patient was incompetent and indifferent to his serious medical needs. The patient had escalating symptoms all of which should have included provider evaluation and imaging. Symptoms progressed to red-flag symptoms by 4/27/21 or 4/30/21 and the patient should have been transported to a hospital or had immediate higher-level imaging studies as these studies were unavailable onsite. Instead, the patient was managed by medics and treated indifferently by providers. On autopsy the patient had a large liver abscess with blood-stream spread of the infection to the spinal cord which caused cord compression. The infection could have been recognized earlier with higher-level diagnostic testing and his death may have been prevented with earlier treatment.

Notably, in deposition of Dr. Toce, when asked what he thought of this presentation he replied, "You know, this is entirely consistent with manipulative behavior that we see so frequently". Later, he added, "but with this ongoing picture and him unable to really get to the bathroom, I'm concerned that it's a bit more serious. Might need to take lab or x-rays or something on him." Even though the patient died, Dr. Toce's first reaction was to presume that the patient was manipulative. This is a pervasive attitude that we found during record and deposition reviews. Until this damaging attitudinal perspective is replaced by a culture of professionalism toward the patients throughout the medical staff, it will be difficult if not impossible to eliminate the risk of serious harm to patients who develop serious medical needs.[146]

**Patient #10:** Another 60-year-old man had hypertension and high blood lipids which are risk factors for stroke. The patient had continuously uncontrolled hypertension for the entire two years of medical records provided, which was a risk for stroke that was correctable but not addressed by LSP staff. The patient also had eight episodes consistent with a transient ischemic attack which are transitory symptoms of stroke. These episodes portend a stroke and should have been evaluated promptly with higher-level diagnostic testing and possibly treatment which could have prevented the patient's death. These episodes should have been recognized in the General Medicine Clinic. Instead, they were unrecognized as transient ischemic attacks

---

[146] Paul Toce Deposition. 3/31/2022. Page 23.

and the patient was never evaluated for cerebrovascular disease with potential for stroke. Eventually, the patient had a severe stroke and died.

These transient ischemic attack episodes included:

1. On 2/20/20 security notified medics about the patient having altered mental status. The patient had slurred speech, was talking nonsense and urinated on himself. The blood pressure was 193/100 mm Hg. The patient was confused to time and date. No action was taken and the patient was not examined by a physician or nurse practitioner. A physician was called but no action was taken including a referral for follow up.

2. On 6/12/20, the patient was transported to the ATU for disorientation to place and person with slurred speech. The patient was lethargic. The patient recovered, became normal and was sent back to his housing unit without an evaluation by a physician.

3. On 7/14/20, security called medics suspecting the patient of altered mental status. The patient was taken to the ATU but in the ATU the patient became normal and was sent back to his housing unit without a physician evaluation or referral. A nurse practitioner was called but said no treatment was indicated.

4. On 7/23/20, security called medics suspecting the patient of having altered mental status. The patient had staggering gait and slurred speech. A drug screen was negative. The altered mental status resolved after about an hour. The blood pressure was 148/95 which is elevated. The patient was sent back to his housing unit without examination or follow up by a physician. A nurse practitioner was called but took no action including no referral for follow up.

5. On 8/4/20 security called medics for altered mental status. The patient was unable to stay awake but responded to verbal stimuli. The patient was sent to the ATU but symptoms resolved in the ATU. A medic called a nurse practitioner and because the mental status issue had resolved, the patient was discharged without follow up.

6. On 10/18/20, security called medics because the patient was shaking and couldn't stand up and had poor balance. In the ATU, the patient had slurred speech and staggering gait. Medics called a nurse practitioner who discharged the patient after symptoms resolved.

7. On 12/9/20, medics responded to an emergency when the patient had left sided weakness for three hours with blood pressure of 155/101 mm Hg. The patient was found on the floor at the cell door saying that his left foot was numb. The patient's left hand was drawn up and he couldn't open a clenched fist or stand up. In the ATU medics evaluated the patient who had blood pressure of 162/107 mm Hg. A physician or nurse practitioner did not evaluate the patient but a nurse practitioner was called and gave a verbal order for an x-ray of the left wrist ankle and foot and an EKG, and a few blood tests. This was incompetent.

8. On 1/23/21, the patient was found in his dorm unresponsive but breathing. He had slurred speech initially with hypotension (BP=71/49 mm Hg) but blood

pressure later increasing to 178/96 mm Hg. The symptoms resolved and the patient was sent back to his housing unit without a provider examination.

9. Finally, on 3/12/21, the patient was found on the floor with left sided weakness and inability to move with significantly elevated blood pressure of 187/113 mm Hg. The patient had slurred speech and was unable to move his left arm or leg. He was sent to a hospital where he was found to have had stroke. Surgeons in the hospital attempted to evacuate a large hemorrhage in his brain but a midline shift and herniation occurred and the patient died.

Each of the eight transient ischemic attacks warranted either hospitalization or prompt neurology follow up for diagnostic testing. Instead, LSP applied an Altered Mental Status protocol which directs that a patient with altered mental status can be discharged back to his housing unit without follow up if the symptoms resolve while in the ATU. A physician is to be called when altered mental status exist. But in this case, nothing was done for any of these episodes. *This procedure is dangerous because it fails to appreciate that altered mental status can be due to a transient ischemic attack which should in some cases be admitted directly to a hospital even when symptoms resolve. Transient ischemic attacks require urgent evaluation as immediate evaluation substantially reduces risk of stroke. This occurred for this patient whose death was possibly preventable if diagnostic evaluation occurred earlier.*

**Patient #48:** Another 51-year-old patient's care demonstrates the problems with management of even known serious medical conditions. On 6/25/19, the patient had a lexiscan that showed no heart ischemia and an echocardiogram showed an essentially normal examination with mild mitral and tricuspid regurgitation. On 10/3/20, the 51-year-old man transferred from Elayn Hunt Correctional Facility to LSP. The transfer form documented that the patient had seizure disorder, schizophrenia, and major depression but was on no medication and no explanation as to why he was not being treated for his stated conditions. There was no provider evaluation. Two months later the patient was emergently seen for feeling weak; the blood pressure was 146/94 mm Hg which is elevated. The medic referred the patient to a physician clinic but that appointment never occurred.

On 5/21/21 an EKG was done for unclear reasons and showed possible left atrial enlargement. There was no evaluation associated with the EKG and it was unclear why it was done. Beginning on 8/18/21 the patient had a series of encounters with rapid pulse that were not properly evaluated.

- On 8/18/21 a medic evaluated the patient with pulse of 146/minute with difficulty breathing. The medic wrote to send the patient to the ATU but no ATU evaluation occurred.
- On 8/24/21 a nurse practitioner (NP) saw the patient for FU of seizure disorder and depression and for follow up of an EKG. The pulse was 116/minute and blood pressure abnormal at 134/98 mm Hg with a complaint of a "racing" heart for a month. The nurse practitioner failed to address the abnormal blood pressure and ordered laboratory tests and a follow up in a month neither of

which occurred.  An EKG was done which showed left atrial enlargement and nonspecific T wave changes.  The NP also referred the patient to cardiology but that appointment did not occur and there was no evidence of a referral in Eceptionist.

- On 8/21/2021 a medic evaluated the patient for headache and the pulse was 130/minute.  An inadequate history was taken and the medic gave the patient ibuprofen for the headache.  A provider didn't evaluate the patient but in the MD review section someone wrote "agree".  The abnormal pulse was ignored.
- On 9/15/21, a medic saw the patient because his heart was racing (pulse 122/minute) with vomiting for 3 days without a bowel movement in a month.  A doctor was called, who without evaluation ordered an abdominal x-ray and magnesium citrate.  Tachycardia, vomiting, and no bowel movement in a month should have resulted in a prompt provider examination which did not occur.  Two days later the patient arrived in the ATU with chest pain, vomiting, bloody emesis and abdominal pain.  The patient was sent to the hospital emergency department (ED).

At the hospital, the patient had a cardiac catheterization for an abnormal EKG; the catheterization was normal but during the procedure the patient developed supraventricular tachycardia. The patient was prescribed medication (beta blocker) and returned to the facility with a recommendation to see a cardiologist.  On return, we could not find evidence that the patient consistently received the beta blocker.  A cardiology referral was also not found and there was no referral in Eceptionist to a cardiologist.

On 9/28/21 the patient was to be seen in general medicine clinic for follow up but was rescheduled because he was not brought to the clinic.  On 10/1/21 the patient was evaluated by a medic emergently for a complaint of **no bowel movement in six weeks**. The pulse was 117/minute.  A provider did not evaluate the patient but the medic obtained an order for a soap suds enema and the medic noted that the patient had a bowel movement in the ATU.  No examination occurred and no follow up was ordered. The tachycardia was unnoticed.  A provider should have evaluated the patient

On 10/2/21 the patient was found lying on the shower cell with fecal incontinence.  He was hypotensive (BP=78/64 mm Hg).  The patient was taken to the ATU.  An NP evaluated the patient and documented that after treatment of the constipation the patient had diarrhea.  The NP ordered blood tests and prescribed an anti-diarrheal agent.  The patient was sent back to his housing unit. Someone with hypotension and apparent syncope should have been sent to the hospital for evaluation.

The following day the patient was weak and dizzy and was evaluated in the ATU.  The patient said that his heart was "acting up".  The pulse was 115/minute, the patient had fever (100.7°F) and low blood pressure (BP=99/71 mm Hg).  Abdominal x-rays showed air fluid levels and the patient was sent to UMC.  The patient was evaluated only in the

emergency room.  A CT scan was done showing stercoral colitis[147] with a large stool burden.  After a mineral oil enema, the patient had a bowel movement.  A recommendation of the hospital was to stop Haldol and to follow up with gastroenterology.  After hospitalization, the patient was admitted to the infirmary unit where he remained for about five days.  On the infirmary unit the recommendation for referral to gastroenterology wasn't referenced. Ten days after hospitalization, according to Eceptionist, the patient was referred to gastroenterology but it was unclear how this occurred.

The gastroenterologist saw the patient on 11/16/21 and noted anemia (hemoglobin 10.2) and noted that the CT scan from the hospital documented rectal wall thickening reflecting proctitis.  The gastroenterologist recommended a colonoscopy, "as he has never had one".  A 51-year-old with constipation and anemia should have a prompt colonoscopy.  Eceptionist recorded a referral for colonoscopy on 11/23/21 but the chart provided to us ended in January of 2022 and the colonoscopy had not occurred as of January, 2022.

The patient's heart issues continued to occur.  On 1/1/22 a medic saw the patient for chest pain.  *A nurse practitioner wrote that the patient's beta blocker had run out.*  The NP ordered the metoprolol and re-referred the patient to cardiology, but no cardiology referral was found in Eceptionist and the referral had not occurred as of the end of the produced medical records.  On 1/7/22 the patient complained of weakness.  The pulse was 110/minute.  The medic seeing the patient took no action and the tachycardia wasn't acknowledged as a problem

This patient had persistent tachycardia diagnosed at the hospital as supraventricular tachycardia (SVT) needing cardiology evaluation.  The SVT was never specifically acknowledged as a problem at the facility and there was no evidence of referral to a cardiologist.  The patient also had severe constipation causing a rare disease of the colon, likely due to inattention to the patient's chronic constipation. Referral for colonoscopy was made but was significantly delayed.  The results of the colonoscopy are unknown.

The episodic nature of this patient's care resulted in the patient failing to have his serious ongoing conditions (SVT, constipation, and colitis) properly or timely evaluated causing potential risk of harm to the patient and delayed diagnosis and treatment.  This patient had abnormal vital signs (blood pressure or tachycardia) on seven occasions over a year which were not acknowledged by a medic or a provider and not addressed.  LSP should study why this happens and attempt to correct it.

---

[147] Stercoral colitis is a rare inflammatory form of colitis that occurs when impacted fecal material leads to distention of the colon and eventually fecaloma formation. Fecalomas can lead to focal pressure necrosis and perforation, while colonic distention and increased intraluminal pressure can lead to compromise of the vascular supply and ischemic colitis.  This occurs in patients with history of chronic constipation, elderly patients with dementia, nursing home or bedbound patients and occasionally young patients with psychiatric conditions. Chronic constipation is the biggest factor for developing stercoral colitis.

**Failure to Monitor and Treat Patients with Serious Medical Conditions in Accordance with Their Disease Control**

We found systemic issues related to failure to monitor and treat patients with serious medical conditions, modify their treatment regimens in accordance with their disease control, failure to monitor and address medication compliance and medication discontinuity.  The following are examples:

**Patient #13:** This 61-year-old man arrived at LSP in December 1979 and died on 4/4/2020. His medical history incudes HIV and hepatitis C infection, cirrhosis, diabetes, hypertension, hyperlipidemia, s/p NSTEMI in 2015, COPD, benign prostatic hyperplasia (BPH) and gout.

The patient had multiple comorbidities but medical providers managed his conditions only episodically in response to exacerbation of his chronic kidney disease, urinary obstruction and fluid overload.

1. The patient had multiple hypertensive crises and episodes of fluid overload, but providers did not treat his blood pressure at any of these events, nor did providers medically evaluate the patient's blood pressure control and medication regimens in accordance with his disease control.
2. On 5/4/2019 the patient's HIV medication orders expired and were not renewed until 5/22/2019.
3. On 7/20/2019 the patient's antihypertensive medication order for lisinopril, recommended by a nephrologist, expired and was not renewed.  An order for Norvasc 10 mg daily expired on 8/19/2019 and was not renewed until 9/19/2019.
4. The patient had multiple abnormal lab and radiology reports that providers did not timely review, nor write a plan associated with the abnormal finding. On August 2019 a CT scan showed the patient had bilateral pneumonia that a medical provider never reviewed, evaluated, or treated.
5. In May 2019 nephrology referred the patient to urology for evaluation of a right renal mass concerning for malignancy, with a recommendation to return in 3 months, however neither the urology referral nor nephrology follow-up timely took place.  On 8/5/2019 abdominal CT showed a Bosnian III cyst, concerning for cancer. Urology did not see the patient until 10/31/2019.
6. Medical providers did not evaluate the patient for other chronic diseases, including cirrhosis, which warranted screening for esophageal varices and hepatocellular carcinoma. The patient had evidence of ascites and elevated ammonia levels but was never evaluated and treated for this. This may have

been a contributing factor to encephalopathy which was his discharge diagnosis when he subsequently went to OLOL, just prior to his death.

7. Medical providers misdiagnosed and treated the patient for COPD. The pulmonologist reported the patient did not have COPD.

8. There are only a few medications administration records (MARS) in the medical record that document that care that was ordered was received by the patient. Therefore, providers were not able to evaluate medication adherence.

9. Staff documented administering medications to the patient in his housing unit, Ash 2, at the same time the patient was in the Nursing Unit, showing that the medication administration records were unreliable.

10. Dr. Lavespere admitted the patient to the nursing unit and ordered lab tests that were abnormal, *but he did not once reference these abnormal labs in his medical evaluation and treatment. Even after labs were available, he wrote, that labs were "pending".*

11. There were delays in transporting the patient to the hospital once decisions were made to send the patient.

12. On 4/8/2020, Dr. Lavespere wrote a mortality summary in which he omitted or minimized the patient's principal medical diagnoses of acute and chronic kidney disease, right renal mass suspicious for renal cell carcinoma, fluid overload, uncontrolled hypertension and cirrhosis.  He did not provide a cohesive chronology of the patient's care, rather writing the review as if all significant findings were associated with the events leading to his hospitalization and death. There are no hospital records in the record other than discharge documents that note the patient's diagnosis is encephalopathy. Lavespere documented his diagnoses as HIV, respiratory failure and sepsis. There were no hospital records in the patient's record to support these diagnoses.  .

13. Disturbingly, Dr. Lavespere noted that the patient was made a Do Not Resuscitate (DNR) upon return to Angola in consultation with his family because the patient could not consent.  However, Dr. Lavespere stated that hospice care was not considered for the patient because the patient could not consent and Dr. Lavespere placed the patient in a locked room, discontinued all medical care, and he died 5 days later.  This caused unnecessary suffering in the patient's last days.

**Patient #16:** This 43-year-old man arrived at LSP on 6/15/2011 and died on 3/17/2021 of cardiac arrest.  His medical history incudes hypertension, left knee ACL and meniscus tear. His medications were carvedilol, losartan, amlodipine, diphenhydramine and paroxetine.

1. The patient had severe hypertension for which he was prescribed therapy, but his hypertension was not controlled.

2. LSP Medical providers did not conduct adequate clinical evaluations of his hypertension by performing a cardiovascular or neurological review of systems (headache, dizziness, blurred vision, chest pain, shortness of breath).

3. Providers did not adequately assess the patient's medication adherence to identify the degree of compliance or obstacles to adherence such as medication side effects, missing medications or medications being administered at unreasonable hours (e.g., 3 am). Medical providers simply concluded the patient was non-compliant and therefore made no changes to the patient's blood pressure regimen.

4. Despite the patient's poor control, they did not consider referral for evaluation of secondary hypertension (e.g., pheochromocytoma).

5. On 9/17/2019 he was sent to UMCNO for EMG testing, but his blood pressure was so poorly controlled (200s/135) that the physician deferred EMG testing and sent him to the emergency department. He reported persistent headaches, dizziness and blurred vision, all signs of symptomatic hypertension warranting treatment that had been missed by LSP providers. At UMCNO the patient received a comprehensive initial evaluation for hypertension and a recommendation that he return to UMCNO in two weeks to manage his hypertension, but this recommendation was not noted nor implemented by LSP physicians.

6. LSP Physicians did not monitor the patient in accordance with his poor disease control and did not see the patient for hypertension management from 6/3/2020 when his blood pressure was 176/117 mm Hg, until his death on 3/17/2021.

7. He was not evaluated for hyperlipidemia, a cardiovascular risk factor.

The LSP mortality review did not assess the timeliness or appropriateness of his hypertension treatment, instead focusing only on the circumstances surrounding the patient's cardiac arrest. The mortality review did not identify lack of timely and appropriate treatment of the patient's hypertension.   The patient's death was possibly preventable with better management of his hypertension.

This 63-year-old man arrived died on 10/24/2019 of COPD.[148]   His medical history includes hypertension, hyperlipidemia, asthma, and left hydrocele.  The patient also had COPD but this was not listed the Problem List.  His medications were carvedilol, hydrochlorothiazide, losartan, diabetol, montelukast, Zyrtec, and hydroxyzine.

Findings:

1. The patent had a history of asthma/chronic obstructive pulmonary disease for which he was treated with an inhaled steroid (budesonide formoterol) and albuterol inhaler since at least since March 2018.

---

[148] Patient #15.

2. The diagnosis of chronic obstructive pulmonary disease was not listed on his Problem List.

3. At clinic appointments, LSP medical providers addressed the diagnosis of asthma, not COPD, however the medical evaluations were woefully inadequate and did not include a review of COPD related symptoms such as frequency of shortness of breath, nighttime awakening, exercise intolerance and frequency of inhaler use. Providers also did not collect objective data such as peak expiratory flow rates (PEFR) at each clinic visit to measure airway obstruction and the need to intensify therapy.

4. Beginning in September 2018, he had more frequent exacerbations resulting in multiple ATU visits. He was assessed only by medic and a registered nurse, and not by a medical provider qualified to medically diagnose and treat him. He was not referred to a pulmonologist for management of his COPD.

5. On 10/4/2019 pulmonary function tests were completed showing severe obstruction, and recommending intensification of therapy However, Dr. Toce who reviewed the report on an unknown date, did not document a plan for follow-up and the patient was not seen prior to his death.

6. The patient also had poorly controlled hypertension and was not managed in accordance with this disease control.

7. Other systemic issues are that there were no medication administration records in the record to enable medical providers to know whether the patient was receiving his medications.

8. Medical providers do not consistently date and time their notes.

**Patient #11:** Another patient had morbid obesity (over 400 pounds), diabetes, hypertension, cirrhosis, and hepatitis C that was successfully treated with antiviral medication. After treatment for the hepatitis C, the patient received sequential ultrasounds at six-month intervals. This is recommended treatment of persons with cirrhosis to screen for hepatocellular carcinoma. In January of 2019, the ultrasound was normal but in July of 2019 the ultrasound showed diffuse infiltrative disease. A follow up ultrasound in March of 2020 again showed diffuse infiltrative disease with backward flow of blood. Clinical correlation and additional testing were recommended by the radiologist but no additional testing occurred, facility providers did not appear to know how to manage the patient, and the patient was not referred to a hepatologist. A biopsy was not done. Though providers wrote that the patient had non-alcoholic fatty liver disease, the lack of further diagnostic testing limited understanding of the patient's condition.

A person with cirrhosis should have regular monitoring including:

- Ultrasound or CT scan to screen for hepatocellular carcinoma every six months
- Upper endoscopy to screen for esophageal varices
- Regular blood tests to monitor albumin, sodium, renal function (creatinine), alkaline phosphatase and liver function tests

- When varices are present treatment with a beta blocker
- Monitoring for ascites, variceal bleeding, encephalopathy, and secondary infections.
- In this case, a liver biopsy might have been considered due to the lack of certainty as to whether the patient had cirrhosis from the prior hepatitis C or from non-alcoholic fatty liver disease.

Other than the ultrasound, the medical records do not reflect any of these basic steps occurring.

Monitoring for this patient was not done. *The last blood tests were 2/12/20.* The last ultrasound was 3/4/20. No further ultrasounds or imaging were done despite the standard of care being that patients with cirrhosis should be screened every six months with an ultrasound or CT scan of the liver to evaluate for hepatocellular carcinoma. A biopsy was not done although the diagnosis of cirrhosis was not confirmed and there were other potential diagnoses including non-alcoholic fatty liver disease or other potential infiltrative diseases. On 2/5/20 a provider saw the patient for blood in his stool. Due to his age, a colonoscopy was indicated. An EGD was indicated to survey for varices. Neither of these tests was done.

The patient was seen by providers in clinic on 2/5/20; 3/11/20; 4/30/20; 8/5/20; and 3/4/21. The patient's cirrhosis and liver disease, hypertension and diabetes were not monitored.

- On 2/5/20, the patient was seen in general medicine clinic for blood in the stool only. The assessment was blood in the stool and hypertension. The rectum was not examined. There was no monitoring of the patient's cirrhosis. Colonoscopy and upper endoscopy were not ordered.
- On 3/11/20 the patient was seen in general medicine clinic for follow up of hypertension, constipation, hepatitis C follow up, diabetes, and blood in the stool. The doctor took no history for any condition. Only the heart, lungs and abdomen were examined. The diabetes was documented as in good control despite no diabetes monitoring lab tests for a year and a half. There was no monitoring for diabetic retinopathy, neuropathy or nephropathy which are standard of care. There was no recognition of the abnormal ultrasound done only a week previous.
- On 4/30/20 a provider saw the patient in general medicine clinic. The patient was only evaluated for shoulder pain. None of the other chronic conditions were monitored.
- On 8/5/20 a provider saw the patient in general medicine clinic for shoulder pain and a skin problem. Though the patient had 3+ edema, the etiology of the edema was not sought. Moreover, the edema may have been a result of the liver disease but the provider did not acknowledge this possibility. The doctor only ordered ted hose for the edema. The liver disease was not assessed or monitored. None of the patient's other problems were monitored.

- On 3/4/21, a provider saw the patient for "neuro" clinic for low back pain.  The doctor diagnosed polyneuropathy or radiculopathy from low back pain complicated by obesity. None of the patient's other medical problems were evaluated.

While none of the patient's chronic medical conditions were being monitored, the patient showed signs of deterioration.  Beginning in July of 2020 the patient began complaining of edema in his legs which is a sign of advanced cirrhosis.  As noted above, the provider who saw him a month later did not explore the etiology of the edema or consider whether the edema was from the cirrhosis.  On 12/21/20 a medic saw the patient for dizziness, inability to walk and edema of his legs.  The patient had fallen.  No provider evaluation occurred.  On 1/5/21, a medic saw the patient for leg edema but no provider evaluation occurred.  On 4/19/21 a medic saw the patient for stomach pain with stools "like gravy".  The medic gave the patient a laxative for what appeared to be diarrhea but no provider saw the patient.  On 4/22/21, a medic saw the patient for stomach pain.  The medic gave Mylanta but a provider did not examine the patient.  On 4/27/21, the patient complained about blood in his stool and urine.  A chart review by a doctor resulted in a clinic visit by a provider.  Three days later a provider saw the patient and sent the patient to the hospital for jaundice, confusion, weakness and decompensated cirrhosis.

This patient was basically unmonitored for over a year and a half despite having cirrhosis, diabetes and hypertension with an abnormal ultrasound of uncertain diagnosis.  There were no further records and there were virtually no hospital records that gave details of what occurred in the hospital.  An autopsy, which did not perform pathologic evaluation of the gallbladder or bile ducts gave a cause of death as septic shock due to bile duct obstruction contributed to by hepatic cirrhosis, and obesity.  The mortality review documented that the hospital believed that the patient had cholangiocarcinoma, a bile duct cancer which likely would have been diagnosed earlier if the patient had been monitored.

## Medication Management and Administration

**Methodology:** We toured medication rooms, observed Main Camp medication administration and reviewed medication administration records. This review excluded pharmacy services. We requested to observe medication administration in Ash 1 and Ash 2, but were given incorrect times by Dr. Johnson and were not able to observe the actual time or the procedure.

**Standards:** Medications are provided in a timely, safe and sufficient manner.[149]  Medication administration and management is in accordance with state and federal laws and supervision by properly licensed personnel.  Administration of medications is by persons properly trained and under the supervision of health authority and facility or program administrator or designee. There is accountability for administering or distributing medications in a timely manner and according to physician orders.[150]

---

[149] NCCHC. 2018. P-D-02.
[150] ACA. 4-ALDF-4C-38.

**Findings:** *We found pervasive problems with medication management that are one of the most alarming findings of this review, as the failure to receive ordered medical treatment has resulted in preventable morbidity and mortality.*

As with the broader failure to manage ongoing conditions adequately, the medical records show that Defendants continue not to ensure medication continuity in their medication management.[151]

These include:

1. Medical providers do not document medication orders in a single location in the medical record as would be true with an electronic medical record;
2. Medical records do not contain a list of all active medication orders;
3. Medical providers do not document sliding scale insulin order dosages in the medical record and doses of regular insulin administered are not documented onto MARs;
4. Medication administration records show lapses in medication orders;
5. Medical providers do not document review of hospital and consultant medication recommendations and the clinical reasons for departure from recommendations, particularly insulin recommendations for type 1 diabetics, medications used to treat neuropathic pain, and narcotics for patients with cancer pain;
6. Medications are not administered by licensed health care personnel due to insufficient staffing;
7. Correctional officers are not adequately trained to administer medications and do not follow standard procedures for medication administration;
8. Medication administration records are completely unreliable and do not enable medical providers to know whether patients receive ordered medications.
9. In nursing units, nurses do not administer ordered medications;
10. LSP has decreased the frequency of medication administration to twice a day, 6 am and 2 pm which does not provide an adequate interval between medication doses, particularly for insulin and substantially increases the risk of harm to patients;
11. There is no policy regarding medication non-compliance and criteria for referral to a medical provider.
12. Medical providers do not address and counsel patients regarding the reasons for noncompliance with patients.
13. LSP has a policy that narcotics are not administered to patients outside the nursing units. As patients with end-state cancer pain may not necessarily be admitted to nursing units, this policy is arbitrary and cruel. Patients needing narcotics should be able to receive adequate pain medication at the ATU.

---

[151] Because Defendants only recently produced the vast majority of medication administration records, we have had only a limited sample of medication administration records to review. We will supplement our opinion on the schedule directed by the Court.

At our last review in 2016, both nurses and correctional officers administered medications at the institution.  Since then, correctional office now all administer medications to inmates except in the nursing units and transitional unit.  Medication administration training was inadequate in 2016 and has not been updated since then.[152]

LSP has also changed medication administration times at the facility.  Previously, medications were given up to 4 times daily. This allowed for administration of medications that were prescribed from one to four times daily at appropriate intervals, including antibiotics, insulin and psychotropic medications. Medications are administered at different times according to housing location.

For inmates in Ash 1 and Ash 2, medications were reported to be administered at 4 am and 6 pm. We requested to observe medication administration in the assisted living units, and were told incorrect times for the medication administration by Dr. Johnson, thus were unable to observe the process. However, LSP told us the process was unchanged from our last report.  We reprint findings from our last report here:

> In Main Prison Ash Unit, we observed officers administering medications to inmates. We did not observe a Sergeant wash her hands prior to administering medications.  The Sergeant prepared to deliver medications by retrieving medications from the storage bin. The officer then announced Keep on Person (KOP) medication administration and inmates came up to the line to receive their medications. Inmates presented their identification cards but the officer did not verify the patient's name and DOC number on the ID with the DOC number on the patient's prescription. The officer did not use a medication administration record to compare the medications against what the patient was supposed to receive and did not document administration of medications at the time they were given to the patient. As noted above, relying on memory as to what medications were administered to whom renders medication administration records unreliable.

> Thus, our review showed that neither licensed practical nurses nor correctional officers following proper procedure to ensure the "5 rights of medication administration." The five rights ensure that the right medication is given to the right patient, at the right dose, by the right route at the right time. However, LPNs are under the supervision of health care professionals, but correctional officers administering medications are not supervised by health care professionals to ensure that they safely perform medication administration. The Pharmacy Director developed a curriculum and provided training to correctional officers 6 or 7 times since September 2015. We reviewed the curriculum and note that this level of training is simply inadequate for officers to safely administer medications to inmates. This is validated by actual

---

[152] See Lavespere 30(b)(6) deposition at 127), and See Response to Interrogatory No. 13)

*practice, showing that officers do not follow correct procedure and have no supervision by qualified health care professionals. This practice is dangerous and creates a systemic risk of harm to inmates at LSP.[153]*

As noted in our last report, correctional officers are inadequately trained and supervised to give dangerous medications, and do not document administration or refusals of medications at the time of medication administration. ***This renders medication administration records completely unreliable and which cannot be used to assess patient adherence to medications.***

In another example, in July 2019, a diabetic patient had two MARs with different and active insulin orders, increasing the risk of medication errors.[154]

Nurses do not accurately transcribe medication orders onto MARs: For example:

A January 2019 Insulin medication administration record (MAR) showed that nurses did not correctly transcribe medication orders onto the MAR.  The orders are written as follows

70/30 40 u AM, Dr. Toce 8/1/2019
70/30 15 u, PM  8/1/2019

R sliding scale BID, Dr. Bunch 12/6/2019

The first order is missing the full name of the medication (Insulin Humulin 70/30), the dose written out (40 units), the start date as well as the stop date.  The second medication order lacks the full name of the medication, the name of the ordering doctor and start and stop dates.  The third medication order is missing the same of the medication Insulin Humulin R, and the sliding scale orders which is the amount of regular insulin to be given based on how high the blood sugar reading (e.g., blood sugar= 200 give 3 units of regular insulin, blood sugar=275 give 8 units of regular insulin, etc.). The order on the MAR does not provide this information increasing the risk of medication errors.

For inmates in general population at the Main Camp, medication administration times have been changed to 08:00-09:00 and 14:00-1500, and includes patients receiving insulin.  This 6-hour interval is too narrow and does not provide adequate coverage for antibiotics, blood pressure and other medications over a 24-hour period.  Some inmates, including those who do not self-administer their medication receive their insulin at the ATU at 14:00-15:00.

---

[153] The electronic medication software is not fully implemented. In the main prison medical dormitories (Ash 2, Cypress 2, and Hickory 4) officers administer medications on the tiers but do not have access to the electronic medication administration (eMAR) software because there is no wireless or hard wire connection to the eMAR server.  This is inadequate access to the medical record and results in potential for inaccurate entries.  Correctional officers enter their administration of medication at a time later than when it is actually administered.  This significantly increases the risk of documentation errors and is not appropriate medical record documentation.
[154] Patient #39.

Alarmingly, this includes patients receiving insulin, which can contribute to poorly controlled diabetes, demonstrated by episodes of hypoglycemia from receiving insulin too closely together, and hyperglycemia from not receiving insulin from the afternoon until the following morning. ***This practice is extraordinarily dangerous.***[155]

We interviewed a patient who reported that the reduction in medication administration times was for the convenience of custody staff not glucose control. Instead of getting insulin with meals he gets sliding scale. He described the problems he was having with his diabetes control due to institutional schedules:

If his blood sugar is 200 in the morning, he will not get sliding scale and at 2 pm his blood sugar is too high, and he has to take sliding scale. He doesn't receive insulin at the same time every day. Sometimes he is brought over to the ATU at 6:30 am and sometimes its 8:30 or 9:00. His Lantus, given in the morning, kicks in at 9 pm. If he eats more than two meals a day, (breakfast and lunch) his sugar is off the charts. He knows he should be given insulin at night but the last med pass is at 2 or 3 pm. He would have to be brought over to the ATU. [156]

We interviewed another patient who reported having frequent episodes of hypoglycemia, "I crash 2-3 times a day". [157] Inmate orderlies in his housing unit also reported he has daily episodes of hypoglycemia especially at night, for which they check on him routinely and provide glucose.

This medication schedule does not permit Type 1 diabetics to receive insulin as recommended by physicians following hospitalization for diabetic ketoacidosis, a life-threatening condition. In multiple records, hospital physicians recommended long-acting insulin to be given at bedtime, with rapid-acting insulin to be given with meals 3 times a day. This is the standard of care for treatment of type 1 diabetes. At LSP, this would necessitate type 1 diabetics being given insulin at meal times (e.g., 4:40 am, 10:30 am and 2:30 pm).

Record review showed LSP medical providers did not acknowledge consultant recommendations to administer long-acting insulin, and automatically changed the orders to Humulin 70/30 to be given once daily in the morning or twice daily with the second dose at 3 pm. Providers also did not order rapid acting insulin to be given with meals. Instead, medical providers ordered sliding scale regular insulin, but this occurs only twice daily, and is not associated with mealtime.

***Medication administration times need to be changed to allow patients to receive recommended medical treatment.***

---

[156] Patient #39.
[157] Patient #71.

Another concern is that medical providers do not write orders for sliding scale regular insulin in the patient's medical record which indicate how much regular insulin is to be given based upon blood sugar measurements. And, medication administration records also do not contain sliding scale orders that describe how much insulin is to be given based upon the blood sugar level and how much insulin the patient actually received. Therefore, the medical record does not contain documentation of regular insulin orders and regular insulin administered. Sliding scale regular insulin orders are posted on the wall of the ATU, but are not documented in the health record.

We observed medication administration at Main Camp. A correctional officer administered medication from a room that contained a computer, medication blister packs, and liquid medications. The inmate stepped up to the window and either presented an identification card or stated his ID. The officer pulled up the inmates' medications from the computer and retrieved the patient's medication blister packs. The correctional officer did not compare the medication order on the blister pack to the order on the computer to make sure both matched. This is not consistent with standards of nursing practice to order medications. In addition, the officer had prepared multiple unlabeled medication cups filled with clear liquid. We were informed that this was Keppra, an antiseizure medication. Preparing unlabeled medication containers in advance of administration also does not meet standards of nursing practice.

Medications that are administered as Keep on Person (KOP) medications are incorrectly documented on the MAR. The proper procedure is for staff to document the amount and type of medication on the day it is administered to the patient. For example, on the MAR staff would document administering #30 tablets of Lisinopril on 4/15/2022. The information would be documented once, so that staff would know the that the date the next KOP medication is to be given to the patient is 30 days (i.e., 5/14/2022).

However, correctional officers document "KOP" on every day of the month, which is stating that the patient took the medication, when in fact the officer does not know if the patient took the medication. This also renders the MAR unreliable. As an example:

*A patient was admitted to the hospital from 3/20 to 4/4/2020. While the patient was in the hospital, correctional staff documented that he was receiving his medication KOP.[158]*

*KOP medications should only be documented on the MAR on the day they are administered to the patient.*

LSP Directive 13.064, Medication Handling, does not describe where the offender is required to sign for the medications they receive. None of the records reviewed had documentation of the date the patient received their keep on person medication supply, nor the number of pills administered.

---

[158] Patient #13.

*Inmates should sign that they received the medication, and it should be filed in the medical record to demonstrate they the medication was received. We found no evidence that patient received KOP medication in the medical record.*

Regarding reordering of medication orders, at the time of our last report, the pharmacy procedure was as follows:

> *Pharmacists receive orders from physicians, a nurse practitioner and EMTs. Pharmacists enter prescription information into the Correctional Institution Pharmacy System (CIPS). Pharmacy technicians fill the prescription via blister pack containers and a pharmacist verifies the filled prescription against the original order. Only pharmacists dispense prescriptions for controlled substances. Pharmacy technicians sort medications by inmate housing location and place them into a box. An inventory list is printed and placed in the box. Drivers take the medication boxes to respective medication rooms located near housing units. Staff at the medication rooms compare the inventory list to medications in the box.  If medications are missing, staff emails the pharmacist.[159]*

> *To renew medication orders (e.g., chronic disease medications, etc.), once a month the pharmacy prints and distributes to physicians a list of medication orders that will soon expire. The physicians are supposed to review and renew medications orders to provide medication.*

It is our understanding that no changes were made to the process of renewal of medication orders.  Review of medication administration records shows lapses in medication orders for patients with serious medical conditions. The following examples are illustrative:

- On 5/4/2019 a patient's HIV medication orders expired and were not renewed until 5/22/2019.
- On 7/20/2019 the patient's antihypertensive medication order for lisinopril, recommended by the nephrologist expired and was not renewed.
- An order for Norvasc 10 mg daily expired on 8/19/2019 and was not renewed until 9/19/2019.
- As of 2/20/2020 the patient was prescribed Amlodipine 5 mg not 10 mg as recommended by the nephrologist.
- Nor was the patient prescribed lisinopril 20 mg twice daily as recommended by the nephrologist.
- On 2/13/2020 nephrology saw the patient…**He says he is taking Lasix 120 twice daily, but his medication list says he is taking 80 mg twice daily.[160]**

---

[159] See PX 6, Attachment B, pages 8-10.
[160] Patient #13.

Regarding medication refills, Directive 13.064, C.4., requires the offender to present their properly labeled medication card, when it has a 5-day supply left, to the pill line window so the security officer can order the refill. Observation of the practice does not match the policy. The team observed offenders writing a note on a piece of paper and placing in the box mounted on the outside of the pill room. Interviewed inmates confirmed the practice was to write the need for refill on any paper and place it in the box. They reported the refills usually were available within a few days. When asked if their keep on person cards were ever inspected and pills counted by staff, they indicated that never occurs.

Review of electronic medication administration records for patients participating in the keep on person program show "KOP" for each day the medication should be taken. Because staff do not observe the patient ingesting their medications, this documentation is not true.  As Tammi Willis, who trained corrections officers in medication administration and documentation, explained at trial, KOP prescriptions should only be documented on the day they were given, and documenting it every day should lead to "reeducation."[161]   The number of pills administered should be recorded on the medication administration record on the date the patient received them. Pharmacy staff should then have a process in place to ensure refills are available at the pill room at the end of the thirty-day supply. Patients not appearing for their refills should be appointed for medication counseling by either a Registered Nurse or provider. Compliance with the program must be measured by unannounced pill counts and assessment of the patient's understanding of what each medicine is for and when they should take it.

This procedure does not assure that inmates who request medication refills will timely receive them. Submitting refill requests on small scraps of paper increases the risk they will be lost or misplaced and provides no documentation in the health record that the patient requested his medication.

*Inmates requesting medication refills need to submit their requests on Health Services Request forms that are forwarded to the pharmacy. The HSRs need to be filed in the medical record to demonstrate that the request was made and to determine the timeliness of medication refills following patient request.*

*MARs show that patients do not receive ordered medications, even when admitted to Nursing Units.*

We found the following examples:

On Monday, 3/16/2020 at 10:10 an HIV patient was admitted to the nursing unit for shingles and isolation. A provider wrote orders for Valtrex and Ultram and to continue other medications on the sheet", but there is no accompanying medication order sheet in the record. On 3/18/2020 a nurse did not administer a noon dose of Ultram.[162]

---

[161] Oct. 24, 2018 trial transcript.  Page 100-01.
[162] Patient #13.

Acknowledging the unreliability of medication administration records, there is no policy that addressed medication noncompliance.  In correctional institutions around the country, nurses monitor medication compliance, counsel patients, and if noncompliance continues, schedules patients for appointments with the medical provider.  This does not happen at LSP.

At the same time, in multiple records, medical providers document that patients are not compliant but do not verify this by reviewing the MAR and if confirmed address the reasons for noncompliance.

*It should be noted that both in the community and corrections, patient noncompliance with a prescribed treatment regimen is common*. It is a responsibility of health care professionals to address reasons for noncompliance with the patient, and to support the patient in reducing obstacles to compliance, including obstacles not of their own making. Common reasons for non-compliance in the community and correctional institutions include:

1. Lack of education and understanding about the reason(s) for the treatment; benefits of the treatment; and risks associated with lack of compliance, particularly medications;
2. Perceived risks of treatment;
3. Lack of notification of scheduled appointments;
4. Conflicting institutional schedules (work schedule conflicts with a scheduled medical appointment).
5. Medication side effects;

 Some of these reasons became apparent during out tour. One patient explained to us that he had a 6th grade education and that providers do not explain things in ways he understands.[163]

In another case, we observed a medical appointment in which the provider planned to prescribe a statin to the patient for high cholesterol, gave the patient an education sheet on high cholesterol, explained the side effects of statins, but never told the patient the name and dose of the medication.[164]

**Unprofessional and Punitive Attitudes Towards Patients**

In record reviews, mortality reviews, and on-site clinical observations, we observed a pervasive pattern of medical providers blaming patients for medical condition, including their own death (See Mortality Review).  This attitude results not only in an adversarial relationship with patients, but also a failure to examine system issues that may negatively impact the patient's health.

---

[163] Patient #72.
[164] Patient #73

An egregious example was a patient with aortic stenosis in which a medical provider documented: "STOP SMOKING! GET OUT OF WHEELCHAIR- GET OFF YOUR BUTT! This occurred two days before the patient the patient died of sudden death from severe aortic stenosis. [165]

Patient's fear being accused of malingering. The following case is an example we observed during a sick call and ATU encounter:

> **Patient #65:** At sick call, the patient complained of recurrent heart palpitations, shortness of breath, and light headedness. He said he could barely walk without symptoms. The provider sent him to the ATU, but we later learned that the patient was not transported in a wheelchair, but walked back to him dorm and then the ATU. At the time of his arrival at the ATU, his blood pressure was 205/137 mm Hg and his pulse was 96/minute and irregular. He has been seen in the ATU the week prior and an EKG was done. He told the provided "I don't want to keep coming because you're going to say I'm malingering, but I'm not." He was admitted to the infirmary for observation. The patient was clearly having cardiac symptoms with uncontrolled hypertension, but still feared being labeled as malingering.

The most common negative documentation in the records relates to noncompliance with the treatment, regimen, notably medications. As noted above, there are many reasons that patients do not take medications as prescribed.

Records reviews show that when patient's chronic diseases were poorly controlled, including patients with hypertensive emergencies, providers invariably documented that the patient was noncompliant, *but providers do not address the reasons for noncompliance with the patient nor schedule the patient for closer monitoring and counseling.* [166]

Medical providers frequently documented patients as No Shows or refusing medical appointments. However, we learned that the system to notify patients of health care appointments flawed. Staff posted a list of call-outs in the housing unit. However, Dr. Toce and Cindy Park testified that inmates in the dorm tore the paper down to use it to smoke cigarettes, and therefore other inmates did not receive notification of their appointments. [167] While this led to a new system of placing video monitors in the housing units to notify inmates of their appointments, medical record reviews show that providers almost always blamed the patient for their failure to appear.

This raises two related issues: first, there should never be No Shows for appointments in a prison. Staff should know the location of inmates at all times, and when they do not appear for appointments, medical staff should call the housing unit to find out where the patient is and

---

[165] Patient # 5.
[166] At the time of our last report, Rr. Randy Lavespere reported that he did not want it reported to him when patients are noncompliant because there are "too many of them".
[167] Park Deposition. Page 59-60.

the reason the inmate is not at the appointment (e.g., work, security reasons). If the patient wishes to refuse, a staff can counsel the patient about the risks and obtain a refusal form. However, review of records show that providers do not routinely ask *why* the patient refuses appointment or treatment.

Additionally, we reviewed the change described by LSP and DOC staff on counseling refusals, and we have seen no evidence that this change reduced refusals in the records reviewed, or resulted in an increase in documented counseling, or improved patient care. Rather, the changes appear to be designed to facilitate LSP's ability to prove refusals for liability purposes. Even the records provided regarding the number of appointments and refusals seem hard to rely on. While Defendants claimed that the "Workload Indicator" on which refusals are now totaled up provides exact numbers, that is plainly incorrect, because numbers for sick call, scheduling, nursing education, and other appointments are usually round numbers (ending in 0 or 5) suggesting that they are routinely estimated.

A few patient encounters related to refusals we observed during our facility tour include the following:

**Patient #66:** During one sick call encounter, a medical provider noted that the patient refused labs in the fall of 2021. He did not ask why the patient refused. We interviewed the patient who told us that he refused because he would have to wait in a crowded bullpen with other inmates during COVID-19, and not because he refused the labs.  This is understandable and the patient should have been rescheduled for labs.

**Patient #63:** A NP saw the patient sick call for foot pain due to what appeared to be a large bunion on his left foot. The patient was concerned about having to work in the fields because he was prescribed special orthopedic shoes and he was worried they would be ruined. "I know these shoes are expensive, but they make me go into the fields with them". The patient then stated he hadn't been seen by the podiatrist for many months. The NP told him that was because he had signed a refusal in May of 2021.  The patient stated he would have never signed a refusal to see his foot doctor when ARNP rebutted "well it's in your chart." The NP then asked the patient why he wasn't wearing his compression stockings, treatment for his varicose veins, and he reported receiving a pair of compression stockings before the pandemic, but they had worn out.  He told the ARNP he knew he had to see Dr. Toce regarding his permanent duty status, but he had been waiting a long time.  The NP abruptly interrupted him and said he would ask Dr. Toce to review his chart. He did not take a history of the patient's foot problems. He did not direct the medic regarding the examination of the patient's foot. The medic independently had the patient take off his shoes and palpated pedal pulses, and pointed the camera to the patient' foot which showed the large bunion.

The patient's blood pressure was significantly elevated (BP=182/92 mm Hg) and he had not been previously diagnosed with hypertension. The NP did not perform a cardiovascular review of systems (e.g., headache, chest pain, shortness of breath, dizziness). The NP told the patient

to return for blood pressure checks three times a week for two weeks and he would then be evaluated by the nurse practitioner.

One of the medical experts attempted to interview this patient the following day, but was not permitted to by Defendant counsel. Two other members of the team interviewed the patient, and asked why he accessed sick call two days in a row, the first day he was seen for a boil on his upper leg and the second day because he needed his work status changed so as not to ruin his specially ordered orthopedic shoes. He reported that inmates are only allowed to discuss one health concern per sick call encounter, resulting in being charged twice. He also reported that he did not sign the refusal to see the orthopedist and that staff commonly documents an inmate's refusal to sign the refusal form, whether or not the patient refuses or not. This is another barrier to access to care. [158]

In another case:

**Patient #64:** A nurse practitioner saw the patient during a telemedicine visit following an injury to his eye and decreased visual acuity. The patient's blood pressure was significantly elevated (BP=171/102 mm Hg). He was prescribed amlodipine and lisinopril for hypertension. The NP did not attempt to review the patient's MAR on the computer to assess the patient's medication compliance and later said he did not know how, and never attempted to review MARs on the computer. He said to the patient "Why aren't you taking your medication?". The patient reported not taking his medication for about 10 days, but the provider did not further explore the reasons why with the patient, or counsel the patient about the risks of poorly controlled hypertension such as heart attack and stroke, nor did he plan to monitor the patient's blood pressure, and have him return for a chronic disease visit given his poorly controlled hypertension. Establishing that the patient has not taken his medications, and not developing a plan to address noncompliance falls below the standard of care. [159]

We asked one patient if he could change anything about health care, what would it be. He said the following:

*I would make mandatory classes for the doctors about how to treat patients. Because of the culture, they don't feel that they need to be nice and have compassion. I would like to see them have a better scheduling system. They are not good with organizing. They get complacent.*

We received many other similar comments.

**Specialty Care**

---

[158] Patient #624.
[159] Patient #64.3

**Methodology:** We toured the specialty services area, reviewed documents and reviewed records of patients receiving specialty services.

**Standard:** Patient medical, dental and mental health care is coordinated and monitored from admission to discharge. For hospitalization, urgent care, emergency department or specialty visits: Patients are seen by a qualified health care professional or health care liaison, if appropriate upon return; recommendations are reviewed for appropriateness of use in the correctional environment; and a provider is contacted in a timely manner to ensure proper implementation of any orders and to arrange appropriate follow-up.[170]

**Findings:** In the liability opinion, the Court found that inmates at LSP experienced unnecessary and harmful delays in the assessment and receiving of specialty medical care; harmful failure to follow specialty care recommendations; and failure to coordinate care. The court also found that specialty care was untimely and that there were systemic and recurring failures by LSP provider to follow-up on specialty care recommendations. Based on record reviews, these findings appear to be continuing as occurred in 2016. Finally, there were repeated breakdowns in communication between specialty care and LSP providers.

In their discovery responses, Defendants describe five changes that they have made that affect specialty care. The first two relate to tracking refusals and counseling patients who refuse specialty care. Third, LSP claims that it has improved communication with headquarters staff with respect to scheduling specialty care. Fourth, LSP installed monitors to notify inmates of their appointments. Lastly, LSP said that UMCNO increased the number of appointments provided to LSP.

Defendants acknowledge that they have not changed the process for recommending, authorizing, or scheduling specialty care, nor the process for ensuring that offenders get to appointments with third party providers.[171] Nor have there been any changes to Defendants' process for ensuring that specialists' recommendations, indicated tests, and other follow-up occurs.

With respect to the increased number of appointments, based on the Eceptionist data provided, there were 10,150 referrals in 2019; 4868 referrals in 2020; and 9905 referrals in 2021. It appears that the increase in slots at UMCNO is largely the increase after a decrease in the main year of the COVID pandemic. While these changes all have some positive effect, the significant findings of the Court remain present as evidenced by record reviews which is demonstrated below. No changes have been made to the internal scheduling, follow up or medical record deficiencies that we have identified. We would suggest a quality improvement effort consisting of a root cause analysis of specialty care using examples from some of our case

---

[170] NCCHC. 2018. P-E-09.
[171] Defendants' Response to Plaintiffs' Interrogatory No. 20; Lavespere 30(b)(6) deposition. Page 110-12, 122-23.

examples below.  The root cause analysis should identify systemic problems that result in harm to patients. Corrective actions should be developed to eliminate the causes of the systemic problems.

There is no Specialty Services policy and procedure describing the process to initiate and track specialty care and recent changes regarding the specialty services procedures. Therefore, procedures for the specialty services process are not standardized in policy, which is reflected in the many lapses in coordinating care across providers.  While LSP Directive 13.001, ContiNU 1ty of Care, requires that decisions "not to carry out any or all recommendations" by non-departmental health care providers "be documented in the offender's medical record," even Dr. Lavespere was unaware of this requirement and it is rarely if ever followed in practice.[172]

Patients with a problem that cannot be addressed by onsite providers are sent offsite to a specialist who can diagnose and/or manage their problem.

The following examples demonstrate how the findings of the Court are still present.

**Patient #1:** One patient was a 55-year-old with a history of smoking, hypertension, peripheral vascular disease, and high blood lipids.  The current recommendation[173] for smokers over 50 years old is to obtain annual low-dose CT scan to screen for lung cancer.  This preventive measure was not done for this individual.  From 2/28/20 until 10/28/20 the patient had unintentional weight loss of 81 pounds that was unrecognized by providers or other clinical staff.  The patient began spitting up blood on 8/10/20 and by 10/28/20 metastatic lung cancer was diagnosed.  With more careful monitoring in the General Medicine Clinic, this cancer may have been picked up earlier.

Once the cancer was diagnosed, the patient underwent intensive follow up for radiation therapy, chemotherapy, diagnostic testing, and oncology follow ups.  Eceptionist, Defendants' database for specialist appointments, did not list all of the patient's consultation or offsite appointments as documented on trip log forms.  For this patient, Eceptionist did not include almost all appointments for radiation therapy or chemotherapy.  Oncology appointments were in Eceptionist but none of the oncology appointments had documentation when or if they occurred.  There were multiple trip return forms documenting a return from an appointment, but the medical record

---

[172] Lavespere deposition.  Page 48-49.
[173] US Preventive Health Services Task Force recommends adults aged 50 to 80 years who have a 20-pack-year smoking history who currently smoke or have quit within the past 15 years have an annual low-dose CT scan to screen for lung cancer.  https://www.uspreventiveservicestaskforce.org/uspstf/recommendation/lung-cancer-screening.

documentation cannot be synchronized with Eceptionist. We could not use Eceptionist to verify whether all referrals were scheduled and whether all scheduled appointments occurred and when they occurred.[174]

An additional problem for this patient and others is that the providers at LSP are disengaged from monitoring the patient's progress based on recommendations and findings of consultants and reports of diagnostic testing. The patient had metastatic cancer for which he was on chemotherapy which included complications. On return from the hospital, on 11/6/20, the patient had a complex arrangement for radiation therapy and chemotherapy, none of which was monitored by an LSP physician or mid-level provider. Trip nurses managed all follow up scheduling and apparent clinical management. After the initial hospitalization discharge on 11/6/20 diagnosing cancer, a provider appointment wasn't scheduled until 1/8/21. In the interim the patient developed problems. On 11/25/20 the patient's chemotherapy was causing low blood counts, specifically low white counts and the oncologist recommended medication to increase the white count.

The oncologist wrote:

> *Pt was supposed to return on Friday for Udenyca. However, the DOC is closed. I contacted the Angola infirmary nurse as well as the trip nurse, [redacted], to inquire about sending a script to the facility for Udenyca or Neulasta to be administered tomorrow or Friday. However, I was told that they would not be able to get the injection to the patient on Friday due to holiday closures. I notified [redacted] of this issue and he gave no new orders. He stated that the patient would just have to start receiving Udenyca on the 2nd cycle.*

Udenyca is a medication to raise the white count but the patient wasn't able to receive it timely. Because the medication records in the charts are so disorganized, there was no evidence in the record to demonstrate if or when the patient received the medication. The patient was not seen during this time period by a provider. The only notes were by nurses, typically the trip nurses. The patient had a very low white count of 1.3 on 11/30/20 which was even lower (0.8) on 12/8/20. This was a life-threatening low level. During this time there were no notes by providers clinically monitoring the patient and no verification in the record that the patient was receiving recommended medication including the medication needed to raise his white count. This placed the patient at significant risk of harm.

An additional problem for this patient and others is that the providers at LSP are disengaged from monitoring the patient's progress based on recommendations and

---

[174] While it is possible that the data exists somewhere within Eceptionist but was not produced correctly, as presented we were unable to verify completion and timeliness of appointments.

findings of consultants and reports of diagnostic testing.  After his diagnosis of cancer in October of 2020, except for being seen in the ATU for an ingrown toenail, the patient was not evaluated in clinic by a LSP provider until 3/26/21.  On 3/17/21 the patient had a visit with the oncologist.  The oncologist noted a two-week history of headache. Because the patient had brain metastases, the oncologist recommended a CT of the head, chest, abdomen and pelvis.  A one month follow up was recommended or sooner if necessary.  Also, on 3/17/21 the patient obtained a test (vascular ultrasound) recommended by a vascular surgeon more than a year earlier, on 12/5/19.  At the 3/26/21 visit, the provider took a history of leg and facial edema with headache.  The examination of the facial edema only documented suborbital edema.  The provider did not associate the headache with the brain metastases and did not acknowledge the peripheral vascular disease.  The provider failed to document that the patient had recently had a test related to a 15-month-old request and did not document the results of the test.  The provider did not document that the patient had a recent oncology visit and update the therapeutic plan. The assessment was tension headache despite the known brain metastases.  The provider did not check when the CT scan would be done. The provider did not evaluate the facial edema more thoroughly for SVC syndrome.  The provider did not document awareness of the oncology plan which called for an earlier evaluation if problems occurred.  The CT scan should have been promptly performed.  A 3-month follow up was ordered and ibuprofen prescribed for the tension headache.

On 6/2/21 the patient arrived for chemotherapy but arrived without recent laboratory tests.  The facility was called but recommended laboratory tests were not done.  The oncologist called the facility and was informed that the machine in the lab at Angola was down and an order (apparently for the labs) needed to be signed.  The oncology staff documented that the patient had missed his last oncology visit.  The chemotherapy had to be cancelled for the day because no labs were available and the patient was rescheduled.

A repeat CT scan on 7/27/21 showed a new large mass in the chest anterior to the superior vena cava with a mass effect on the vena cava and a second mass below.  Brain metastases were increased in size and a new intraocular mass was identified.  New pancreatic and hepatic metastases were noted.  There was no documentation in the record that the CT scans were reviewed by LSP providers.

The patient was evaluated in general medicine clinic at LSP on 8/2/21. He was described as having generalized body aches. Though the patient had metastatic lung cancer with widespread metastases including to the eye, no pain assessment or history was taken. The patient complained of eye irritation and the sclera of the eye was red. The provider did not review the CT scan done five days earlier showing a new intraocular mass because a report was unavailable. The provider asked for the report. The provider failed to develop a pain treatment plan despite the widespread metastatic cancer that was causing pain.

The patient went for chemotherapy on 8/4/21 and the oncologist recommended oxycodone due to pain from the spreading metastatic disease. On return to the facility the pain medication was not provided because the patient did not want to be housed on the infirmary unit. Although statewide DOC policy allows narcotic medication to be ordered, stored, and administered in the same manner as other medications,[175] an LSP directive restricts use of these medications to Nursing Units 1 and 2.[176] A nurse called the LSP Medical Director and notified him about the issue. The Medical Director did not evaluate the patient to assess the pain but ordered "educate [patient] to [continue] taking ibuprofen as ordered for pain, and to make a medical emergency if pain worsens and patient wants to seek recommended narcotic pain relief only offered on nursing units". Remarkably, there was no follow up at LSP for this patient after the oncology visit to assess the pain.

It appears that state policy permits use of narcotics provided narcotic medications are securely managed and administered. Corrections facilities, nationwide, provide narcotics on units other than infirmaries. There is no reason LSP should not do this. In his deposition, Dr. Lavespere made the following comment.

> "There are certain things that we don't follow the recommendation of specialists on, and one of those would be pain medicine, because the physicians at UMCNO have no idea how correction medicine is run. They have no idea, so they make these outlandish recommendations for pain that just are not able to be done within the penitentiary setting".[177]

---

[175] See policy HCP7 Pharmacy and Formulary Pharmaceuticals; item E.1) which states, "Narcotic drugs and other controlled dangerous substances may be ordered, stored and administered or dispensed in the same manner as other medications provided appropriate security measures are used and an accurate record is maintained and kept up to date by the pharmacist".

[176] Directive 13.064 Pharmaceutical Management

[177] Page 44 of deposition of Dr. Lavespere. Dr. Lavespere on page 46 went into a detailed explanation that patients aren't treated with narcotics outside of the treatment facility. He didn't give a rationale for why narcotics must be given only on the treatment units. In correctional centers nationwide, reasonable procedures for narcotic medication administration permit narcotics to be administered in most any areas of a prison.

Administration of pain medication in general population areas can be provided in correctional centers. To not provide pain medication to this patient was cruel.

Shortly after this, on 8/9/21 the ocular cancer worsened and the patient lost vision and was sent to a hospital. The hospital said that the ocular cancer caused the vision loss and recommended expedited follow up with his oncologist and an ocular oncologist and pain control.

On 8/15/21 a medic evaluated the patient for buttock and leg pain. The patient asked for pain medication. The medic noted a new verbal order for ibuprofen.

On 8/16/21 the oncologist saw the patient and documented that new pancreatic and liver metastasis were present and that the eye lesion was untreatable. A referral was made to radiation oncology to see if palliative treatment to the head could be given as the patient had persistent ocular headaches. The consultant wrote, "please order prescription for oxycontin 10 mg [every] 8 hours". The nurse filling out the trip return form documented on that form that a stat dose of Norco 5 mg was given on Nursing Unit 1. The patient was apparently sent back to his housing unit in the camp.

Later that day, at 9:35 pm, a medic evaluated the patient in the ATU for L eye pain. The patient was not evaluated by a provider but the medic called a provider who ordered antibiotic eyedrops but no pain medication.

On 8/17/21 the patient was admitted to the Nursing Unit for pain control. The initial order for pain medication on the nursing unit was at half the dose as prescribed by the oncologist. The nurse practitioner admitting the patient to the infirmary did not review the oncologist's note. Pain medication was on an as needed basis but was only given on 8/17 and 8/18.

On 8/20/21 the patient was admitted to a hospital for a fall on the infirmary. Metastatic spread to the spine had occurred, requiring surgery to remove the cancer in the spine to prevent spinal cord compression. This resulted in additional pain. The patient was discharged 9/2/21 with a recommendation of a 25 mg fentanyl patch and oxycodone 15 mg every 6 hours. On return to LSP the fentanyl patch was not ordered until 9/7/21. Instead of oxycodone 15 mg, Norco 10 mg was prescribed starting on 9/7/21; this was not an equivalent morphine equivalency. Oxycodone is 1.5 times the morphine equivalence as Norco (oxycodone). This means that the patient was receiving less than half the recommended dose. A 25 mg fentanyl patch was documented on a medication record as being given on 9/10/21 and the 75 mg patch, recommended by the hospital on 9/2/21, was documented as being given on 9/13/21. The 75 mg patch was to be given every three days but based on the two medication administration records in the

medical records[178] it appears that the patient received a 25 and 50 mg patch on 9/13/21 and a 75 mg patch on 9/14/21. The Norco was documented as being given only five times from 9/2/21 until the patient died. Monitoring of his pain was not thorough while on the infirmary.

The LSP provider monitoring of this patient for his chronic illnesses including his cancer was inadequate. This patient had known hypertension, peripheral vascular disease, high blood lipids, and osteoarthritis but was not monitored well for these conditions or for other concurrent issues. Monitoring does not include documentation of current medications. At least since 2019 he had low platelets but this abnormality was unrecognized. For 11 visits in 2019 to 2020 the blood pressure was elevated and the pulse was elevated at other clinic visits but these abnormalities were not addressed. Consultation reports were seldom documented as reviewed and providers did not document an update of the therapeutic plan of the patient based on consultant recommendations. It would be an improvement if LSP providers were required to evaluate patients after offsite referral to review the outcome of the referral with the patient and to modify the patient's preexisting treatment plan. Some exceptions could be made, for example, for repetitive treatments like radiation therapy.

> **Patient #2:** A second patient was 78 years old and had a history of hypothyroidism, hypertension and chronic kidney disease (CKD). In February of 2020 a doctor ordered a thyroid ultrasound which showed bilateral cysts. A provider referred the patient to an endocrinologist for follow up. The appointment didn't occur for over a year, possibly due to COVID issues. Nevertheless, when the endocrinologist saw the patient, on 4/13/21, the endocrinologist documented that the patient gave a history of weight loss of 40 pounds and that weight loss was verified in the medical record. The endocrinologist also documented that the patient had severe hoarseness and dysphagia to solid food for a few months. Providers at LSP were unaware of the weight loss, hoarseness, or dysphagia. The endocrinologist was concerned for malignancy and recommended an urgent referral to an ear, nose, and throat (ENT) specialist. The patient was not evaluated by a provider on return from the hospital. On 4/26/21 the patient went for his ENT evaluation but was immediately hospitalized. The patient required major head and neck surgery to remove a metastatic squamous cell carcinoma.

This was the second patient with unrecognized unintentional weight loss that could have been recognized earlier. It would be useful to have a standardized procedure on obtaining weights and standardized reasonable scales in all health clinics.

> **Patient #4:** Another patient had seizure disorder, hypertension, renal cancer, and severe interstitial lung disease. His renal cell cancer was removed surgically in October, 2018. During that hospitalization, the patient was newly diagnosed with interstitial lung disease. This disease had an unknown etiology and further follow up was necessary as

---

[178] pages 52 and 53 of the PDF medical record

this disease requires specialized follow up. At the time of diagnosis, the patient was started on continuous oxygen therapy indicating severe disease. His interstitial lung disease had caused right heart failure with pulmonary hypertension, an advanced stage of this condition. The patient needed careful follow up with specialists, as the disease placed the patient at significant risk. Yet, it appears that from 5/21/19 until 12/2/20, the patient was not sent for pulmonary appointment follow up and was lost to follow up. This patient was not someone who could reasonably or safely not continue follow up. Because of the availability of telemedicine for pulmonary consultation at LSP, it is not clear why he was not evaluated even during the COVID pandemic.

Specialty care follow up[179] was disorganized. LSP providers did not document acknowledgement of the complete treatment plan for this patient. The first documented specialty visit, for interstitial lung disease, in the records provided was on 12/2/20. Prior to the 12/2/20 pulmonary visit at University Medical Center of New Orleans, LSP providers evaluated the patient twice in chronic care clinics and again during an exacerbation of his interstitial lung disease. At one visit on 3/20/20, the provider saw the patient for hypertension, seizure disorder, renal cell cancer and chronic interstitial lung disease. There was no history for any of these conditions including symptom history, medication adherence, or pending specialty care. The provider documented that the interstitial lung disease was stable without taking any history or even taking an oxygen saturation, a test to evaluate the capacity of the lungs to obtain oxygen. The patient's pulmonary hypertension wasn't even recognized as a condition. The provider didn't even acknowledge that the patient was on oxygen therapy or assess whether treatment was sufficient. Instead of addressing these important conditions of the patient, the provider episodically addressed knee and neck pain that the patient sustained in a recent motor vehicle accident on the way for a CT scan. The CT scan of the chest was not mentioned and its findings of more fibrotic non-specific interstitial pneumonia were ignored. There was no plan for the interstitial lung disease even though the patient had missed his specialty appointment follow up. This episodic medical management at LSP combined with lack of specialty follow up contributed to significant delays in treatment of this patient. This is as much a failure of the clinical care program to monitor the chronic illnesses of the patient as it was to manage the specialty care needs of the patient.

The patient experienced multiple episodes of exacerbation of his interstitial lung disease that were not appropriately referred to a higher level of care. On 10/27/20, a physician saw the patient urgently for dyspnea and shortness of breath and wheezing with a cough which the doctor noted was ongoing for two to three months. The oxygen saturation was 78% which was extremely low, warranting hospitalization. Given the

---

[179] By specialty care follow up we mean that 1) the follow up visits with the specialist are referred as recommended except when the primary care physician can document a rationale for not doing so; and 2) that the primary care provider evaluates the patient and updates the status of the patient and updates the therapeutic plan based on the recommendations of the consultant. In this sense the primary care provider demonstrates control over the care of the patient and integrates the consultation of the specialist into the overall care of the patient.

occurrence of these symptoms and oxygen saturation the patient should have been immediately hospitalized for concerns related to COVID or interstitial lung disease. Instead, the patient was sent to the infirmary unit. A chest x-ray was not done. A COVID test was ordered, but under any circumstances given the oxygen saturation level, the patient should have been hospitalized. Testing for other potential viral and bacterial respiratory conditions was not done. A nurse practitioner ordered a chest x-ray "when available", but there was no evidence that this test was ever done. It appeared that a nurse practitioner saw the patient in the ATU and diagnosed community acquired pneumonia, started antibiotics, and admitted the patient to the infirmary. The patient remained on the infirmary for four days without addressing follow up of his interstitial lung disease. The patient was lost to follow up with specialty care but this was unrecognized. A cardiologist saw the patient in a LSP onsite cardiology clinic. The only assessments were hypertension and tachycardia.

After a year and a half of being lost to follow up, a pulmonologist saw the patient via telemedicine on 12/2/20. The pulmonologist recommended a high-resolution CT scan and pulmonary function testing with a six-minute walk test. The CT scan and pulmonary function tests were done about a month later, on 1/8/21, and showed worsening of his condition, yet at the next visit at LSP, on 1/14/21, which was a scheduled visit for the patient's seizure disorder, a provider did not document review of the recent tests.

Including the 12/2/20 specialty visit, the patient had a total of five specialty visits for his interstitial lung disease. Recommendations of the specialists that were not completed included:

- On 12/2/20 a pulmonologist recommendation for the patient to walk 30 minutes a day could not be verified as completed and was not documented as completed.
- On 1/20/21 a pulmonologist's recommended blood tests (ESR, connective tissue panel, CRP, blood gas, and sputum for AFB) were not found in the medical record and appeared not completed. This was one of several patients with blood tests noted to not be completed in our record reviews.
- On 4/28/21 a pulmonologist recommendation for high dose steroids and prophylactic antibiotics could not be verified because medication records were not in the record for this period. Also, a recommendation to send the patient to the pulmonary hypertension center was not completed. A pulmonary function test with 6-minute walk and a CT scan were recommended but only the CT scan was completed.
- On 6/21/21 a pulmonologist recommended blood tests (autoimmune serologies) were not completed. Lung transplant was brought up but the specialist believed that the LSP would not permit a transplant so this was not done.
- On 7/7/21 a pulmonologist recommended Cellcept and daily prednisone but the Cellcept was not started until 7/26/21 and continuation of this medication during and after August 2021 could not be verified because medication

administration records were not produced.  Based on information in the record, orders for medications could not consistently be found and verification that ordered medication was given could seldom be found.  A recommendation to place the patient on an assisted living dormitory due to advanced disease was not completed.  The patient was placed on Ash 1 but there was no evidence of assistance to this patient.

The lack of adherence to consultant recommendations was consistent with physician notes during this time period.  Post-visits, providers did not document review of the consultant reports or indicate the change in status or change of the therapeutic plan based on the consultant recommendations.

From October of 2020 until the patient's death on 10/8/21 the patient had four exacerbations of the interstitial lung disease, each of which warranted admission to a hospital which did not occur; instead, the patient was admitted to the infirmary. Oxygen saturation levels for three of these admissions were 78%, 70%, and 88%.  For one infirmary admissions an oxygen saturation level was not found in the record despite an admission for shortness of breath.   Because each of these admissions occurred during the COVID pandemic and involved oxygen desaturation and shortness of breath and cough, COVID testing should have been done and the patient should have been isolated until proven negative, but this was done only once.  Other testing for bacterial or viral infections of the lung should have been done in this patient but were not done. There was no communication with the specialist consultants during these episodes.

After the last infirmary admission (discharge on 8/9/21) the patient was sent back to Ash 1 housing unit despite the pulmonary recommendation for assistance with activities of daily living.  The patient was seen twice after discharge from the infirmary.  On 8/25/21 a doctor was scheduled to see the patient for interstitial lung disease and hypertension but the doctor wrote that this was a scheduling error and did not see the patient.  There was therefore no follow up monitoring visit after discharge from the infirmary.  The next visit, on 9/18/21, a doctor noted pulse of 118 which was ignored and oxygen saturation of 94%.  The doctor wrote that there were no cardiac complaints and that the patient had dyspnea and shortness of breath "as usual".  The prior infirmary admission, prior consultant recommendations, and status of the patient were not confirmed.  Four days later, the patient experienced tachycardia of 126, and oxygen saturations as low as 58%.  The patient was kept in the ATU for 45 minutes before transport to the hospital; he should have been sent immediately.   The patient died at the hospital from respiratory failure.

**Patient #5:** Another patient was 66 years old.  He had known coronary artery disease, hypertension, gastrointestinal bleeding and aortic stenosis.   The patient was hospitalized on 9/20/20 for a heart attack.  A stent was placed.  An echocardiogram was performed but the report documented that the aortic valve was poorly visualized but

moderate aortic stenosis was diagnosed.[180]  Follow up with a cardiologist in UMCNO was recommended in a week.  About ten days later, the patient was re-hospitalized for shortness of breath and leg swelling.  The stent that was previously placed was not fully deployed and another stent was inserted.  Another echocardiogram was done which showed severe aortic stenosis but due to heart failure the aortic valve was not completely visualized.  Cardiology follow up with a dobutamine stress echocardiogram was recommended in a week at UMCNO to determine if surgical replacement of the aortic valve was needed.  Instead of follow up for a dobutamine stress echocardiogram, the patient was sent to a cardiology clinic at LSP but a dobutamine stress echocardiogram was never done and over a year later the patient died a sudden cardiac death contributed to by aortic stenosis which was incompletely evaluated.

The aortic stenosis was identified in 2014 and at that time was mild.  Aortic stenosis is a disease of the valve between the left ventricle of the heart and the aorta, which is one of the main valves in the heart.  Stenosis of this valve results in reduced ability of blood to leave the heart with attendant oxygen deficiency in the body.  This results in three main symptoms: shortness of breath[181], chest pain from angina[182], and dizziness.  Heart failure is a late, end-stage finding that expresses itself in shortness of breath and edema, particularly of the lower extremities.  Anyone with symptomatic aortic stenosis, particularly involving heart failure, is a candidate for valve replacement.  Measurable criteria for valve replacement include the area of the valve and the gradient of flow across the valve.  Symptomatic aortic stenosis is a risk factor for sudden death and this patient experienced sudden death.

Close monitoring by cardiology and cardiothoracic surgery are necessary when patients with aortic stenosis become symptomatic.  The first step to determine if a patient is a candidate for valve replacement is identification of severe aortic stenosis.  An echocardiogram in October of 2020, while the patient was hospitalized, diagnosed severe aortic valve stenosis with depressed systolic heart function characteristic of heart failure.  The echocardiogram insufficiently visualized the aortic valve and cardiologists recommended follow up as an outpatient within a week of discharge from the hospital for a dobutamine stress echocardiogram to better evaluate the aortic stenosis and to determine if the patient was a candidate for surgical replacement.  *This never occurred.*  Moreover, and more concerning, LSP physicians *never* acknowledged the potential need for surgery or the urgency of this evaluation.

The patient was evaluated at an onsite cardiology clinic at LSP four times between 10/17/20 and 8/21/21.

---

[180] The ejection fraction was 45-50%. Moderate aortic stenosis was diagnosed.
[181] The shortness of breath is due to lack of oxygenated blood leaving the heart.
[182] The lack of oxygenated blood to the heart muscle causes angina.

1. On 10/17/20 the cardiologist did not apparently have hospital reports and did not know that a dobutamine stress echocardiogram was recommended. The cardiologist recommended a plain transthoracic echocardiogram.

2. On 1/30/21 the echocardiogram recommended by the LSP cardiologist was not done and the cardiologist re-ordered the echocardiogram. The cardiologist made a note that the patient might have low flow, low gradient aortic stenosis and that a dobutamine stress echo might be indicated but it wasn't clear that hospital records were available. The cardiologist did not change the order to a dobutamine stress echocardiogram.

3. The echocardiogram was done 4/21/21 and showed moderate-severe aortic stenosis with ejection fraction of 15-20% with low flow, low gradient aortic stenosis. This confirms the hospital information except that the ejection fraction was now worse. The standard of care for this presentation is a dobutamine stress echocardiogram and the patient should have been evaluated for surgery.

4. On 6/19/21 the cardiologist noted that the report of the echocardiogram was unavailable. The cardiologist continued to document that the ejection fraction was 40-45% indicating that the only information the cardiologist had was from the hospitalization in September of 2020. A 3-month follow up was ordered.

5. On 8/21/21 the cardiologist saw the patient for clearance for a gastroenterology procedure. The cardiologist documented an ejection fraction of 40-45%. The echocardiogram from 4/21/21 was apparently still not available.

Due apparently to communication issues, failures to timely obtain tests, and failures to have reports available to clinicians, the recommendations of the hospital cardiologist were never followed.

These visits demonstrate: 1) a broken communication and information handoff problem with respect to communication between offsite specialists and clinicians at LSP; 2) process problems in obtaining results of tests internally; and 3) process problems with ordering and obtaining timely tests as ordered by clinicians. A root cause analysis of these processes should be initiated to resolve these types of problems.

Dr. Lavespere's gave an opinion about documenting a review of consulting reports with a written explanation that we disagree with. He stated the following in his deposition.[183]

"Q. Is there a policy requiring LSP providers to provide a written explanation when they don't follow a specialist's recommendation?

---

[183] Page 48 of the deposition.

A. There is no policy.  Why would it need to be?  I would not advocate for that. I would not think there is going to be a policy to say that, because my physicians are well capable of doing their job. I don't need to have them explaining to physicians at other facilities that are not equipped to practice correctional medicine why they are doing what they're doing. These people are getting standard of care medicine.  Above the standard of care medicine in a large majority of cases. . . . that's just an extra workload added to them to do that.  I'm not going to require that."

Given the dysfunction represented at LSP with failure to complete testing, failing to produce consultant and hospital reports to clinicians, and failure to review or integrate specialists' recommendations, this opinion of Dr. Lavespere contributes to the significant risk that patients face.  Even if reports and tests were done, it is appropriate and safe practice to document an update of consultant reports to communicate an updated therapeutic plan to colleagues.  LSP should consider a requirement that all offsite consultations and diagnostic tests should be followed by a provider evaluation to discuss the results of the consultation or diagnostic tests with the patient and to modify the therapeutic plan based on the consultant recommendation or document why the consultant decision is unnecessary.  This would have ensured that someone reviewed the hospital report of this patient.

To continue with Patient #5:

On 9/23/21, the patient was admitted to nursing unit 1 for COVID-19 infection but was discharge to a step-down unit in Camp J on 9/24/21. COVID testing results were not provided.   A chest x-ray was done on 9/23/21 but showed no evidence of COVID pneumonia.  The patient was treated with Regeneron.  There were no notes from Camp J.  On 9/29/21, the patient was evaluated in the ATU, apparently by a medic, who noted that the patient had body pains and aches with swelling feet.  The medic wrote, "All of these complaints are his standard daily complaints whether he has COVID 19 or not".  The medic called a nurse practitioner who took no action.  The patient wasn't evaluated.  The patient had subsequent episodes of shortness of breath on 10/3/21 but a nurse practitioner only talked to the patient and documented that the patient could speak without difficulty and had unlabored respirations.  No other evaluation occurred.

From 10/7/20 when the patient was discharged from the hospital with severe aortic stenosis until the patient died on 10/11/21, the patient was seen by medics, physicians, or mid-level providers 19 times for shortness of breath, a common presenting symptom of severe aortic stenosis and twice for chest pain, another common presenting symptom of aortic stenosis.  The patient had shortness of breath throughout the entire year before his death and had edema of his lower extremities for the entire year (seen 17 times for edema of his lower extremities) with evidence from echocardiogram and chest x-ray[184] of heart failure.  Despite these overwhelming clinical symptoms and signs of

---

[184] The patient had three chest x-rays (6/13/21; 6/22/21; and 9/23/21) all of which suggested heart failure which when due to the aortic stenosis is an indication for surgical replacement of the valve.

severe aortic stenosis, providers at LSP failed to ensure that the cardiology recommendation to follow up for surgical evaluation occured. It was not clear that the providers and medics understood the connection between the symptoms of the patient and the symptom-relationship to aortic stenosis.

The mortality review includes multiple attempts to blame the patient for his condition and to assert that all of the patient's needs were addressed. One example was the following.

> "On 6/7/21 and 6/8/21 he made sick calls for lower extremity edema and nocturia. He came to the ATU he was eating chips and drinking Coke with complaints of abdominal distention that caused shortness of breath when he stooped forward. On 6/13/21 he came to the ATU with complaints of shortness of breath, chest pain, and bilateral lower extremity edema for 2 weeks. He was treated for GI etiology and referred to hernia clinic".

This was a remarkable statement on three accounts.
1. Eating chips and drinking Coke was not mentioned in the medical record so this information came from elsewhere. Eating chips and drinking Coke have nothing to do with what was wrong with the patient or what the professional responsibility of the LSP medical staff was. It is an unnecessary comment that appears to be reflective of an attitude toward the patient unrelated to his clinical care.
2. The 6/13/21 ATU evaluation documented symptoms of shortness of breath and chest pain and also documented bilateral lower extremity edema. These symptoms are indicative of aortic stenosis with likely heart failure but were not addressed. The ATU physician failed to address the life-threatening symptoms of heart failure in the context of aortic stenosis which placed the patient at significant risk of death. The author of the mortality review did not address this deficiency, instead giving approval that "He was treated for GI etiology and referred to the hernia clinic".
3. The mortality review also failed to acknowledge that symptomatic aortic stenosis supports a decision to surgically replace the aortic valve, or evaluated the failure to consider or provide such surgery. Heart failure also supports such a decision. The physicians and other clinical staff never documented the need for surgical replacement of the valve and it appeared that they were ignorant of this option or ignored this option. The patient deteriorated over time with symptoms of leg swelling and shortness of breath occurring more frequently prior to the patient's death.

The failure of clinical staff to appreciate the patient's condition and their negative attitude toward the patient was exemplified by another encounter on 10/9/21. On 10/8/21 the patient had blood in his stool, abdominal distention, and edema of both of his legs. A physician did not evaluate the patient. The following day, 10/9/21, the patient arrived in the ATU at 1:20 pm with complaints of shortness of breath for four days. A provider saw the patient and ordered a routine blood count and additional diuretic. Later the same day, at 6:05 pm, the patient was described by a medic as having multiple complaints of COPD side effects. The patient did not appear to have COPD, although LSP physicians documented that the patient had this condition and attributed his symptoms, on multiple occasions, to COPD.[185] A physician documented that the patient had shortness of breath for a week. Little history was done. The only assessment was "anxiety-resolved". Next to this physician note in bold letters someone wrote, "STOP SMOKING! GET OUT OF WHEELCHAIR- GET OFF YOUR BUTT! This was cruel. The clinicians were misdiagnosing the patient's condition, and were blaming the patient for his symptoms which they were mis-diagnosing. Two days after this evaluation the patient experienced sudden death.

This patient's autopsy cause of death was severe atherosclerotic and hypertensive cardiovascular disease and aortic stenosis. Because symptomatic aortic stenosis is a risk factor for sudden death, it is very likely that his sudden death was significantly related to aortic stenosis. Valve replacement surgery, which may have been indicated a year earlier, may have prevented his death. Notably, the patient's coronary artery disease, hypertension, gastrointestinal bleeding and aortic stenosis should have been routinely monitored in a chronic clinic program which did not occur for this patient demonstrating an absence of chronic illness management.

**Patient #7:** Another patient was a 65-year-old man with a history of hypertension, chronic obstructive lung disease, reflux, and constipation. Chronic constipation can be a sign of colon cancer. On 5/22/19, the patient completed three fecal occult blood tests *that were all positive*. This called for prompt colonoscopy, yet these abnormal tests appeared to be ignored. Over *two years later* the patient, on 7/19/21, developed a distended painful abdomen and he was sent to a hospital where metastatic and end-stage colon cancer was diagnosed.

A significantly abnormal test that required prompt follow up with a diagnostic specialty test (colonoscopy) wasn't done for 26 months. After the positive fecal occult blood tests, the patient was evaluated twice by physicians for chronic care. The patient was on milk of magnesia for chronic constipation but was not asked about this condition.

---

[185] During two hospitalizations, COPD was not diagnosed. Three chest x-rays were done, none of which showed evidence of COPD. LSP performed a pulmonary function test on 7/29/21 which showed restrictive, not obstructive, disease. We also note that on autopsy, there was no evidence of COPD but there was evidence for pulmonary hypertension which can be associated from heart failure and aortic stenosis. Having spirometry on-site is an excellent practice but the pulmonary function tests should be over-read by a pulmonologist which can be done remotely.

Nor were the abnormal fecal occult blood tests recognized by the physicians. The patient's known medical conditions were not monitored appropriately at one of the visits. Appropriate history was not taken for any of his conditions at one of these visits. This demonstrates a broken system for monitoring ongoing conditions and providing minimally adequate clinical care.

The patient was evaluated by medics for constipation on 8/7/19, 5/5/21, and 7/17/21 yet no follow up with providers occurred. On the 7/17/21 episode the patient also had abdominal pain. The patient was admitted to the hospital on 7/19/21 and died in the hospital of a pulmonary embolism. In the hospital, a large circumferential invasive colon mass was discovered which was found to be adenocarcinoma. The liver was infiltrated with metastases. The patient's final diagnoses were metastatic colon cancer, severe malnutrition, and pulmonary embolism.

On autopsy there was a large obstructing colon mass and a pulmonary embolism. Pulmonary embolism is a common complication of malignancy due to hypercoagulable state.

This death was preventable with earlier evaluation and treatment of his positive fecal occult blood tests which were positive 14 months before he died. Timely specialty care for this patient did not occur.

Medical providers initiate referrals on progress notes that are forwarded to the Specialty Service Trip office, which are filed throughout the record. There is no central place to record physician orders in the medical record, including specialty referrals. Therefore, it is difficult to readily determine who referred the patient and the date of referral.

We were provided several different Eceptionist datasets but we were unable to determine from any of these datasets a trail from the referral to the completed appointment for every referral or consultation found in the medical record that included 1) the provider who referred the patient, 2) the nature of the request, 3) the date of the referral, 4) the date headquarters approved the appointment, 5) the date of the appointment, 6) whether the appointment was completed, and 7) whether a report of the consultation was obtained. These six data elements should be tracked using Eceptionist data and LSP should be required to do so.

Trip Offices appear to obtain consultation reports and request approval for referrals based on their reading of the consultation report. Trip office nurses then enter the request into Eceptionist. Headquarters staff review the requests and may cancel a request but otherwise arrange an appointment date with the specialist or diagnostic center. LSP is not in control of scheduling appointments; that responsibility belongs to headquarters.

When patients return from a specialty provider or hospital, health care staff do not see them upon return, but the paperwork is forwarded to Trip Office nurses. Trip office nurses review

the paperwork and document decision-making regarding which recommendations will be implemented with no documented consultation with a medical provider.

For example, for one patient with diabetes and who had been diagnosed with neuropathy, the hospital recommended gabapentin. However, the nurse documented that "the medication is not available at LSP", the recommendation was ignored, and an alternate treatment plan was not considered.[186] Likewise, hospital physicians have recommended long-acting insulin (e.g., glargine) to be given at night, and short-acting insulin (Lispro) to be given three times a day with meals, however this recommendation is never addressed, and patients have been automatically changed to Humulin 70/30 and sliding scale insulin.[187] It is inappropriate for nurses to make independent decisions regarding which consultant recommendations will be implemented or not. It is also inappropriate for medical providers to ignore hospital discharge recommendations.

We spoke with a physician from UMCNO regarding care coordination with LSP.[188] The physician confirmed that recommendations are not always addressed. Patients sometimes come to UMCNO without a list of current medications. When patients have had service at other hospitals, reports from those hospitals are not present. This physician strongly suggested that LSP implement an electronic record and create a mechanism for reliable transfer of medical information back and forth between LSP and UMCNO. One suggestion for such a plan is for LSP to fund a quality improvement project to be run with UMNCO to evaluate root cause issues with medical handoffs and transfer of information to ensure that patient safety is protected. This physician stated that it was her understanding that all physicians at LSP had access to EPIC, the UMNCO medical record, to look up patient records. Part of a root cause analysis should be to determine why this benefit does not result in the paper record being populated with hospital and consultant reports.

This root cause analysis should result in development of a policy that includes physician review of reports from consultants or hospitals to ensure that orders for medications, therapies and referrals are completed or documentation should be provided to state why a recommendation was not followed.

We recommend that any patient returning from a hospital or specialty services off-site return through the ATU and be seen by a registered nurse who would review the paperwork for any urgent orders or recommendations. Reports should be timely forwarded to a medical provider for review, date and signature.

---

[186] Patient #39.
[187] Patient #39.
[188] Dr. Niyogi, who is a hospitalist at UMCNO

A provider appointment needs to be scheduled with the patient within 5 days, to review the consultant recommendations, develop a plan of care, education the patient and determine the patient's willingness to accept the plan. Follow-up appointments for repetitive treatments such as radiation therapy can be eliminated from this requirement.  If the medical provider disagrees with the consultants' recommendations, the clinical reason for departure from the recommendation needs to be documented with an alternate plan of care.

**Infirmary Care**

**Methodology:** The Louisiana State Penitentiary Directives Number 13.022 REBTC Nursing Units & Infirmary Care, and Number 13.076 Use of Offenders in Health Care were reviewed for compliance with nationally published minimal health care standards by the American Correctional Association and the National Commission on Accreditation. Documentation of infirmary care in patient health records was reviewed, and observation of infirmary care provided, and inmate interviews were accomplished during the facility tour April 6-8, 2022.

**Findings:**  The infirmary care at LSP remains sub-standard and does not meet nationally published minimal standards put forth by the American Correctional Association and the National Commission on Correctional Health Care.

**Patients remain outside of sight or sound of nurses in the infirmaries.** LSP has installed call lights in the locked rooms of both infirmary nursing units I and II.  There remain several concerns. The nursing station in Nursing Unit 1 has black coverings over the windows prohibiting nursing staff from visualizing the patients without standing up.  Although there are call light mounted above the locked cells, patients in open bay area cannot be seen by the staff when they are sitting, nor do they have a call light to summon the nurse. The black covering can be seen in Attachment C, page 21.

In infirmary Nursing Unit 2,  there are lockers placed throughout the open bay area, blocking the line of sight from the nursing station to each patient.  Attachment C, page 26 demonstrates the issue. There are call lights in the locked rooms of this unit, however, patients in the open bay area have no way to summon the nurse.  Patients interviewed in this area reported they must get the attention of an inmate orderly and ask him to get the nurse.

Finally, inmates interviewed in infirmary Nursing Unit 2, report the windows of the nursing station are typically covered in paper such that patients cannot see the nurses in the station and nurses cannot see out to the patients. Inmates reported that a few days before the team toured the facility on April 6-8, 2022, the paper was removed, and it was placed back up after the tour of the facility concluded.

Examples include the following:

A 42-year-old man with a history of type 1 diabetes since 2013 has frequent episodes of hypoglycemia was placed in a locked room in the nursing unit, without the ability to immediately communicate to a nurse.  This is extremely dangerous.[189]

In another case, a 60-year-old man had severe interstitial lung disease resulting in frequent oxygen desaturations requiring multiple hospitalizations.[190]  He was housed in one of the nursing units. At one point was placed in a locked room for 6 weeks without the capacity to notify nurses when he was in respiratory distress. In August 2020, a physician at Our Lady of the Lake (OLOL) Regional Medical Center recommended consideration of compassionate release due to the patient's poor prognosis, however also noted that the patient was refused compassionate release because his prognosis is not less than 60 days.  At the same time, LSP providers counseled the patient about the "futility of care", and that the patient would not agree to an Advanced Medical Directive, but not did not pursue compassionate release for the patient. Compassionate release should be considered for patients whose prognosis is less than 6-12 months. Review of October, November and December 2020 infirmary medication administration records revealed multiple medication dose omissions. The medical record is not well organized.  It is not possible to fully evaluate infirmary care because many forms are undated.

**Inmate orderlies continue to provide direct care to infirmary patients in both Unit I and Unit II.**  LSP Directive 13.076 A.1 states offenders shall not be used to perform direct patient care. Policy 13.076 B states offenders with formal training, under staff supervision, may perform familial duties commensurate with their level of documented training.  These duties include Peer Instructors, Hospice Volunteers, Tier Walker, and Offender Assistant, assisting impaired offenders on a one-on-one basis with activities of daily living such as: feeding, bathing, repositioning, etc.).  This policy does not meet the NCCHC minimal standard P-C-06 Inmate Workers.  The standard requires inmates not be used as substitutes for health staff.  It also prohibits the inmates assisting with activities of daily living with infirmary level-care patients.[191]

Inmates were observed providing direct care in the infirmary. Healthcare orderlies are relied upon for: changing adult diapers, conducting skin care, turning, and repositioning patients every two hours who are suffering from paralysis and unable to turn themselves, feeding patients, many of whom have had strokes and suffer with difficulty in swallowing, emptying catheters, cleaning catheter supplies, and changing oxygen tanks. Attachment C, page 26 shows healthcare orderlies in infirmary Nursing Unit 2  conducting direct patient care behind a privacy screen without staff supervision.

---

[189] Patient #39.
[190] Patient #23.
[191] Standards for Health Services in Prisons, National Commission on Correctional Health Care, 2018, at page 59

**Patient #18:** This patient died on January 6, 2021, from cardiopulmonary arrest, secondary to airway obstruction from a piece of sausage. On August 6, 2020, he was housed in a locked infirmary room and reported an orderly punched him in his head. On August 20, 2020, he fell in his locked infirmary room suffering facial fractures.  He fell again in September and December 2020 while housed in a locked room in infirmary Nursing Unit 2 .  Nursing staff noted him to be frail and suffering from left-sided weakness and verbalized difficulty managing his food tray with one hand. He was found in a locked cell in Infirmary Nursing Unit 2,  and CPR was conducted by a healthcare orderly until EMS arrived and assumed care. This patient, who was frail and had fallen many times, and difficulty feeding himself, choked to death because he could not summon immediate help.

**Patient #68:** We interviewed a patient who was in the acute infirmary, NU I, recuperating from a recent stroke leaving him with left sided weakness.  He reported the nursing staff only take his vital signs and administer his medications.  He reported they did not do a head-to-toe physical assessment once per shift, as is required by LSP Directive 13.033 A.1.b.  Observation of morning nursing rounds confirmed this patient's report as nursing staff indeed obtained vitals and failed to conduct head to toe, meaningful physical assessments.

This patient is also receiving physical therapy four times per week as part of his care plan.  He is taken to the "new building" where the physical therapist is located.  He reported an inmate that used to be a physical therapy assistant before coming to prison, provides physical therapy services, alongside the physical therapist. This was confirmed by observation when the team toured the physical therapy room. Attachment C, page 19 shows the inmate conducting physical therapy.

This inmate also reported the day before the tour began, while he was receiving his physical therapy treatment, Dr. Jacob Johnson instructed the physical therapist to remove health records and equipment from the physical therapy table and that he could restart using the table for storage once the tour was over.

**Patient #50:** This is a 35-year-old patient that has suffered from a serious, stage IV decubitus ulcer on his sacral area since 2018.  He has had multiple admissions to infirmary nursing units I and II as well as the assisted living in the assisted living dorms. When interviewed he reported that healthcare orderlies sometimes do wound care and that he prefers them to do it, because his opinion is that they do a better job.

**Patient #67:** An interview with another patient, who has been a health care orderly in NU1, NU 2, and the assisted living units, confirmed that inmate orderlies provide wound care. He was very fearful of retribution but showed the interviewing team tennis shoes, a sweatshirt, and spoke of a special ball cap that nursing staff provided as additional "payment". This action is a violation of both standard correctional practice and prison rules.

**Inmate Orderlies Abuse Patients in the Nursing Units**

Record review shows incidents inmate orderlies assaulting patients in the infirmary units. . The following cases are examples:

> **Patient #69:** We interviewed a patient who reported that an inmate orderly attempted to choke him on March 17, 2022. The still-healing injury in the middle of his throat, made by the assailant's thumb nails was visible to the team. He reported the orderly was "locked up". This patient also reported the nurses' station windows had been totally covered by paper until two days before the tour. On the day the health care orderly began choking him, he reported another health care orderly saw it happening and intervened until security arrived. He summoned the intervening orderly over to introduce him and thanked him for saving his life.

> **Patient #22~~18~~:** On August 6, 2020, a patient reported he was punched in the head by an infirmary healthcare orderly. The nurse notified the Lieutenant who reported the Warden had been made aware of it.

Jennifer Stickells, RN is responsible for training the healthcare orderlies that work in the infirmary. She reported that she had no knowledge of any incidents of neglect or abuse problems.[192] The Director of Nursing, Bill Hawkins, similarly had no knowledge of complaints about orderlies. He stated that he would investigate it if it was reported and that there is a process for disciplining an orderly but, "It hasn't happened yet".[193]

Ms. Stickells was asked what tasks the healthcare orderlies provide in the infirmary nursing units, she replied, "Whatever need to be done".[194] She elaborated that their tasks included turning, feeding, showering, toileting, brushing of patients' teeth, transfers, and changing bedding. As discussed above, many of these responsibilities exceed the appropriate scope of care that should be provided by inmate orderlies to patients who need infirmary-level care. She also confirmed that security staff supervise them – rather than medical personnel – and that each unit has their own officer.[195]

Director of Nursing Bill Hawkins believes the use of inmate orderlies in the infirmary is appropriate, and believes they only provide assistance with activities of daily living.[196] He also stated they are supervised by nursing staff at all times.[197] Observation during the tour found orderlies providing care without direct supervision of the nurses. The nurses were in the

---

[192] Jennifer Stickells Deposition, page 45, 1-3
[193] Bill Hawkins Deposition, page 104, 9-21
[194] Jennifer Stickells Deposition, page 47, 13-17
[195] Jennifer Stickells Deposition, page 48, 9-19
[196] Bill Hawkins Deposition, page 31, 2-20
[197] Bill Hawkins Deposition, page 33, 9-25

nursing station and the orderlies were changing adult diapers, bathing, and providing skin hygiene.

Dr. Toce was asked about the goal of staffing the acute nursing infirmary with one nurse for every 10 patients, and one nurse for every 15 patients in infirmary Nursing Unit 2 . He replied, "Look, that's a goal, okay. That change is how we would really like to run the units, and most of the time, we can put that together. It does happen like that. It is still a bit of a struggle, because people call-in last-minute sick, and people get sick, and I think we still have an issue with understaffing."[198] Inmate orderlies cannot properly be used to fill shortfalls in staffing, but that is exactly what appears to be occurring.

Both NCCHC and ACA standards prohibit inmates from performing direct patient care services. NCCHC explicitly states that inmates may assist patients with activities of daily living (except for infirmary level care patients).[199] LSP is clearly in violation of these standards.

**The nursing care provided in the infirmaries is sub-standard and the documentation in the health records do not match the observed nursing practice.**

Records reviewed of patients care for in the NU 1 and NU 2  infirmaries identified multiple sub-standard trends. The nursing flowsheets utilized by nursing staff to document rounds are not individually dated. Unless a nurse makes a narrative entry in the bottom section of the form, and dates the note, the date the care was provided is indeterminable. Staff signatures and credentials are more often than not illegible. This is unacceptable standard nursing documentation practice.

Controlled medications (e.g., narcotics) are sometimes documented on the nursing flowsheet, sometimes documented on the medication administration records, and sometimes in both places, but there is no consistency with the practice.

Nurses in the infirmary document rounds being done every two hours, including whether the patient is awake or sleeping. Observation during the tour concluded that nurses do not round every two hours. In fact, multiple team members observed both NU 1 and NU 2  on multiple occasions over the three days, April 6-8 and never observed a nurse rounding on the patients. Inmates consistently reported nurses sitting in the nurses' station and relying on the health care orderlies to provide care.  Inmate healthcare orderlies reported the nurses often watch movies on their computers.

> **Patient #50:** This patient was in NU 1 from June 28, 2019, until August 7, 2019.  During this stay he began refusing wound care and refused off-site specialty care.  He was presented to the prison ethics committee, but his health record is void of what that decision ultimately was.  He was discharged to a housing unit on August 7, 2019. The

---

[198] Paul Toce Deposition, page 86, 1-12
[199] NCCHC. 2018. P-C-06 and ACA-1-HC-2A-18.

provider noted "Despite verbal abuse, belligerence, and caustic personality-wounds healed enough for out-patient dressing changes". On August 21, 2019, while being seen in Clinic A, he requested to see the psychiatrist. On August 28, 2019, he was diagnosed with schizophrenia and reported to the psychiatrist that he had been suffering with auditory and olfactory disturbances for many months. Not one note in the infirmary record, while he was refusing care, indicated he was asked why he refused, nor was behavioral health consulted to assist in assessing his ongoing refusal of treatment. This patient was interviewed on April 8, 2022, and when asked if he was still having auditory and olfactory disturbances, he confirmed he indeed was.

**Patient #20:** This patient was admitted to the infirmary Nursing Unit 1 , on October 31, 2021. Nursing staff documented he was in his wheelchair from 10:00 p.m. until 2:00 a.m., and they also documented he was sleeping at 10:00 p.m. and 2:00 a.m. when he was taken on an outside specialty appointment trip. Leaving the patient in his wheelchair to sleep is below the standard of care.

Infirmary nurses use pre-printed nursing care plans where they place a check mark in front of desired outcomes and corresponding nursing interventions required to reach the selected outcome. Infirmary health records reviews show no reference to the nursing care plan and no documentation of specific chosen interventions.

**Patient #5:** For example, for one patient the nursing plan of care included, "assess if any community resources should be utilized (i.e., Home Health Nurse) and contact appropriate personnel". This care plan was not appropriate for a prison setting and was meaningless to the care of this patient. Additionally noted, was the fact vital signs for this patient were recorded in his infirmary record on September 28, 2021, four days after he had been sent to Camp J.

**Patient #~~112~~:** A patient was admitted to infirmary NU 1 on February 20, 2019, in locked room number 10. His oxygen level fell to 89% while on 2 liters of oxygen, on February 24, 2019. The nursing staff did not notify the physician nor adjust his rate of oxygen, despite an active order to provide oxygen per nasal cannula to maintain his pulse oxygen level $\geq$ 93%. At 8:00 a.m., on February 26, 2019, his blood pressure was elevated and recorded as 176/103. Nursing staff failed to notify the physician of this significant physical finding. At 10:00 a.m., the nurse noted his oxygen level to be 93% and the patient didn't have his oxygen on. The nurse didn't document waking the patient or placing his oxygen cannula on. A prudent nurse would have immediately awakened the patient, placed the oxygen cannula back on and rechecked his oxygen level.

The vital signs flowsheet used for infirmary patients lacks a column to document the time the vital signs were obtained, therefore the time the vital signs were taken is not documented. Basic nursing education includes the requirement to date and time every nursing intervention.

**Patient #15~~18~~:** This patient was admitted to the infirmary on June 2, 2020. The patient fell in his room on June 3, 2020, at 5:07 p.m. He fell three more times between June 9, 2020, at 11:55 p.m. and June 10, 2020 12:25 a.m., which represents three falls within thirty minutes. He was in a locked room during all of the falls. Nursing staff failed to notify the physician and failed to put fall safety precautions in place. He fell again on June 19 at 5: 15 p.m. The patient's left fracture was surgically repaired on June 22, 2020, and upon return he was provided a bedside commode and crutches to assist him in transferring. It took nursing staff 3 days, 16 hours, and allowing the patient to suffer a total of 5 falls before providing him with medical equipment necessary for safety.

**Ordered medical supplies are often not provided.**

**Patient #5:** A patient was admitted to the NU 1 infirmary on September 23, 2021, and was ordered an incentive spirometer to be used ten times each hour for two days. Per his health record, he didn't receive the ordered incentive spirometer.

**Patient #50:** A patient was ordered catheters for self-catheterization, and he was provided single-use, disposable 14 French, 16-inch catheters and told that because of budget restrictions, he would need to rinse them with water in the sink and reuse them. He is a paraplegic, offloading pressure on his serious stage IV decubitus ulcer on his sacrum so is forced to rely on health care orderlies to rinse his catheters for him. Reuse of single use medical supplies is dangerous and does not meet minimal standards of care.

The infirmary care at LSP remains sub-standard, does not meet published correctional minimal standards and involves an unacceptable level of direct care provided by inmate healthcare orderlies. LSP says that it strives to meet a 10:1 or 15:1 patient:staff ratio in the nursing units, but understaffing has been a problem. The majority of the care, other than medication administration and taking of vital signs, is done by inmate orderlies. Although a nurse was observed doing wound care, inmate orderlies and patients report that orderlies routinely do wound care. Orderlies were observed emptying catheter bags, providing meal trays, bathing patients, and changing adult diapers. Incidents of healthcare orderly abuse were found in the health records and inmates interviewed reported occurrences of abuse, even though LSP leadership denies it ever occurs.

The nursing care that staff do provide in the infirmaries is sub-standard and the documentation in the health records do not match the observed nursing practice. During the three-day tour, not one head to toe assessment was observed being accomplished by nursing staff, as required by their own policies. Nurses were primarily observed sitting in the nursing station or administering medications. These activities were consistent with what inmates reported as routine. Documentation in the infirmary record reflects routine rounds in a prescribed interval such as every two, four, or six hours. Nursing rounds were not observed during the three-day tour, even though documentation of such rounds is frequently found in inmate infirmary records.

The infirmary forms utilized by nursing staff are inadequate as they don't provide a space for date and time on each form, and the vital sign flowsheets do not allow for documentation of time the vitals were taken. The pre-printed nursing care plans are not specific to the correctional healthcare space and include interventions more in line with community nursing e.g., contact the home health nurse. Nursing goals and interventions identified in each patient's care plan are not referenced in the daily documentation and discharge summaries. This renders the plans of care meaningless and simply creates busy work.

Adequate equipment and supplies are not provided as ordered and or needed for effective patient care. We found examples where patients were not timely provided crutches, walkers, or bedside commodes until after a patient injury had occurred. Requiring a patient to reuse single use catheters is negligent and cruel.

Replacement of licensed nurses with inmate workers, to provide infirmary level care to patients is unacceptable. The economics of paying an inmate orderly as little as four cents per hour[200] versus a registered nurse making thirty dollars per hour cannot be overlooked. Even if certified nursing aides were used, the cost difference between fifteen dollars per hour and four to twenty cents per hour is significant. Inmates admitted to the infirmary setting are at their most vulnerable and deserve a safe environment with nursing and medical care that is parallel to that received in the community, and care that is provided by professionally trained and experienced professional nurses. The care in the infirmaries at Angola simply does not meet that threshold.

The infirmary program should have a physician in charge of clinical care with midlevel provider coverage assigned based on a workload analysis of acuity levels. Another physician should be in charge of the medical dormitories that house higher level patients and another physician should be in charge of camp medical services. Nurse practitioners should be assigned to each of these areas based on a workload analysis of patient volumes and acuity. For the infirmary, medical dormitories, and general population areas, the team of physician, nurse practitioner and scheduler from the trip office should meet daily in a huddle to review complex patients, recent emergencies for their population of patients, review recent and upcoming consultant appointments, and any other issues related to their patient population.


**Emergency Care**

**Methodology:** We toured the ATU, observed medical response to an emergency in the ATU, and reviewed records containing urgent events, including hospitalizations. We were not permitted to speak to staff or review medical record documentation of patients in the ATU. We were not permitted to observe emergency response and treatment in the ATU after business

---

[200] Although Defendants' interrogatory responses say that inmate orderly pay has been increased to twenty cents an hour, Dr. Lavespere clarified that this was only for four orderlies providing care to COVID patients. Lavespere deposition. Pages 174-77.

hours, being asked to leave the prison at 3:30 on two days, and 1:30 pm on the final day. This did not permit us to review after hours emergency response.

**Standards:** The facility provides 24-hour emergency medical dental and mental health services. Facility (correctional) staff provide emergency services until qualified health care professionals arrive. An emergency response plan includes: responsibilities of health care staff; procedures for triage of multiple casualties; predetermination of the site for care; emergency transport of the patient from the facility; use of emergency medical vehicles; telephone numbers and procedures for calling health care staff and the community response system; use of one or more designated hospital emergency departments or other appropriate facilities; emergency on-call physician, dental, and mental health service when the emergency health care facility is not nearby; security procedures for the immediate transfer of patients for emergency medical care; and notification of the person legally responsible for the facility. Emergency drugs, supplies and medical equipment are regularly maintained. All aspects of the standard are addressed by written policy and procedure.[201]

**Findings:**  During the last review, we found that LSP used emergency medical technicians to respond and treat patients with medical emergencies instead of physicians and failed to refer patients to an outside emergency department when medically necessary.  The delays in access to medical care resulted in preventable morbidity and mortality.  We also found that LSP medical staff subjected patients to unnecessary and inappropriate procedures such as urinary catheterization to obtain urine samples for drug testing and stomach lavage.

Our remedy period review showed that LSP still does not provide timely and appropriate care when patients present with medical emergencies. Critically ill patients are not transferred to the hospital timely. If treatment that can result in resolution of the problem is not available, the patient should be in the hospital. Delays in transfer result in deterioration, permanent disability, and death. The failure to properly treat or transfer patients occurred in a wide variety of presentations:

- Patients with unstable vital signs must be transferred to the hospital.  This did not happen in numerous cases.[202]
- Chest pain is a serious complaint. It has a broad differential diagnosis. Patients with diabetes, hypertension, hyperlipidemia, elevated cholesterol, obesity, family history, smoking history, prior stroke or transient ischemic attack or peripheral vascular disease require not only serial troponins but also stress testing or cardiac imaging and cardiology consultation.[203]

---

[201] NCCHC. 2018. P-E-07. ACA. 2004. 4-ALDF-4C-08.

[202] Patients #36, #58, #1, #13, #59, #26, #29.

[203] Patient # 31.

- Syncope, or fainting, may be a symptom of a serious cardiac or neurological event, and may require urgent cardiac and neurological evaluation. These patients should have an immediately EKG and HCP exam.[204]
- Cardiac arrest patients belong in the hospital and should be transferred immediately to the hospital.  Airway and circulation can be addressed by paramedics in the ambulance. This is the community standard. Anyone with return of spontaneous circulation should be cooled with ice, as neurological recovery is better with cooling. Ice should be available in the ATU and is part of the standard American Heart Association standard for cardiac arrest care.[205]
- Gastrointestinal bleeding must transfer immediately to the hospital. Blood products are not available, endoscopy to identify and control bleeding is not available in prison. Therefore, any gastrointestinal bleeding must be immediately transferred to a higher level of care.[206]
- Heatstroke patients should be cooled by the application of bags of ice to cover the body. There should be an ice machine in the ATU. Unresponsive patients with fever should have cooling started with the application of ice to the entire body and be transported to the hospital without delay.[207]
- Urine toxicology testing is useless in the acute setting and delays recognition of neurological emergencies. LSP staff attribute altered mental status to intoxication despite the lack of a coherent toxidrome. LSP's focus on urine toxicology in emergency situations is distracting and harmful and should be abandoned.[208]

**LSP Policy does not reflect current practice**

The LSP EMS Department is under the medical supervision of the Medical Director. Administrative supervision is provided by Long Term Care Hospital Administrator.  We did not find evidence that the Medical Director supervises the EMS Department with respect to the clinical performance of the medic staff.

The Emergency Health Care Directive was revised August 26, 2021. This policy supersedes Penitentiary Directive No. 13007 dated November 25, 2019. The policy reads in part as the following:

> It is the policy of LSP is to provide continuous 24 hour medical, dental, and mental health care for its offender population, whether the care is delivered on site or off site. EMTs are on duty hours per day at the R. E. Barrow Jr. Treatment Center.  Prehospital care will be provided by the institutional treatment center and by the appropriate off-site medical facilities.

---

[204] Patient #25.
[205] Patients #16, #28.
[206] Patients #33, #30.
[207] Patient #51.
[208] Patient #26.

> All employees of Louisiana State Penitentiary shall be trained to respond to health-related situations within a four-minute response time. Health care professionals are staff who perform clinical duties, such as health care practitioners, nurses, licensed professional counselors, social workers, and emergency medical technicians (EMTs). Clinical duties will be performed in accordance with each health care professional's scope of training and applicable licensing, registration, certification, and regulatory requirements.

The policy also states:

> *Upon arrival at the scene of an emergency the senior medic will assess the situation and provide, definitive care and or as much stabilization as possible, rescue or other treatment as indicated by the situation. They will then transport the patient to the R.E. Barrow Jr. Treatment Center or further evaluation and treatment by ATU staff.*

We were informed that registered nurses (or a licensed practical nurse) now staff the ATU 24 hours a day, with EMTs providing only limited support. In this respect, the policy does not reflect reported practice.

## ATU Staffing

Defendants testified that their current practice is to have a nurse practitioner assigned to the ATU and present somewhere in the Treatment Center from 7:30 am to 4 pm Mondays to Thursdays, and round-the-clock from 4 pm Friday through 7:30 am Monday.[209] Defendants also stated that a registered or licensed practical nurse is assigned to and present in the ATU at all times, along with an EMT basic. Because LSP does not maintain sign-in logs for ATU staffing and we were not permitted to view after-hours care (or any care after 1:30 pm on Friday) during our visit, we could not confirm that this staffing always occurs.

Assuming that staffing occurs as Defendants have represented, that still means that there is no health care provider in the ATU before 7:30 am or after 4 pm most days of the week. As a result, many patients are seen in the ATU without any health care provider assessing the patient. Chart review demonstrates that verbal or telephone orders are standard in the ATU. In some cases, the health care provider arrives later, in other cases the health care provider signs the ATU medical record but was not present in the ATU. The result is that care in the ATU is frequently provided by nurses treating and diagnosing patients, with the health care provider basing any recommendations on the nurse's diagnosis on the telephone.

Even when nurse practitioners are staffing the ATU, there is rarely if ever a physician involved in care in the ATU. Nurse practitioners who work in emergency room settings often complete a fellowship in emergency medicine, but there is no evidence in the credentialing files that any of

---

[209] Lavespere deposition. Page 89-90.

the LSP nurse practitioners have received such training. As a result, even the full staffing of the ATU lacks the training and experience necessary to ensure that emergency medicine reaches the standard of care.

As illustrated below, these staffing issues contribute to pervasive failures to provide adequate emergency care or transfer patients to a facility that can provide a higher level of care.

**EMT and Ambulance Response**

EMTs perform emergency response at LSP. EMTs are alerted most often by a call from security personnel. The Ambulance Run Sheet is the medical record used to document these responses. These ambulances run sheets are documented according to the standards for EMT ambulance prehospital care. However, health records show that EMT emergency response with emergency equipment is not within 4 minutes as required by policy.

There was no evidence in the medical records that (e.g., correctional officers) retrieved and applied an automatic external defibrillator (AED) during when patients were unresponsive and pulseless (i.e., cardiac arrest). On October 8, 2021, an AM-H-2 Audit report was submitted to the Chief of Operations at the Louisiana Department of Public Safety and Corrections. This audit identified that when staff were asked where the nearest AED machine was located, their response was the MPO office. Upon review the MPO office did not have an AED. The recommendation from the Department of Corrections Central Office was "LSP should ensure AED machines are placed throughout the prison and staff should know where each machine in their area is located". During our tours, we inquired about the location of AED's. Health care leadership, including the Director of Nursing was not aware of their locations.

**Self-declared emergencies**

As discussed above, the policies for routine sick call have changed and EMTs are no longer independently conducting sick call visits. However, EMTs continue to respond to all self-declared emergencies (SDE), including Saturday and Sunday when sick call is not performed at LSP. Record reviews show that during this review period, unless the patient was transported to the ATU, EMTs independently assessed patients. These assessments almost always occurred at the inmate's housing unit and without the medical record.

EMTs write the history as they understand it from the patient. Vital signs are usually obtained, although they are not always complete, with temperature the vital sign most often missing. EMTs make observations such as "speaking in complete sentences." A partial physical exam may or may not be performed. EMTs fill out an SDE evaluation including an assessment and a plan. The assessment is frequently the chief complaint and nothing more. For example, if the patient complains of back pain, the assessment is back pain. The plan is typically "MD". Medical providers reviewed the SDE requests the following day or several days later, typically writing "Sick Call PRN"[210] on the form and not evaluating or diagnosing the patient. For some SDEs, the

---

[210] "PRN" means "as needed."

EMT sends the patient to the ATU, although this is less common than the EMT simply assessing the patient themselves and marking the sick call request for review by a health care provider at some later date.

Even when EMTs bring a patient to the ATU, they may play an outsized role in how the patient is subsequently treated. While observing care in the ATU, we saw an EMT try to convince a nurse practitioner that a patient's left-sided pain was musculoskeletal pain.  This patient had been working in the fields and complained of chest pain. The EMT twisted around to demonstrate how the patient's chest pain was reproducible. The EMT's opinion was there was no need for the patient to be evaluated by the HCP and that the patient did not need to be brought to the ATU.  The EMT pushed the HCP to not have the patient come to the ATU. The EMT had already filled out the paperwork, as would be filled out for a self-declared emergency. The EMT had written "MD" in the plan.  The nurse practitioner pushed back. He scratched through the "MD" and wrote ATU. He told the EMT to bring the patient for evaluation into the ATU. The patient was brought to the ATU.  A physical exam, x-rays and EKG were performed. After this evaluation, the patient was diagnosed by the HCP as having musculoskeletal pain and discharged.

The nurse practitioner took appropriate action to evaluate the patient, and it was inappropriate for the EMT to press the nurse practitioner not to medically evaluate the patient.  This appears to reflect a culture where EMTs make independent decisions about who needed medical evaluation.  This is concerning. The Medical Director needs to direct EMTs to bring all patients to a medical provider licensed to diagnose and treat the patient.

Our review of records showed serious concerns as described below:

**Delays in Care For Patients Exhibiting Symptoms of Stroke**

Delay in stroke care results in harm and permanent disability. Transport from LSP to a higher level of care for stroke is consistently delayed, just as it was during the liability period. Such delay results in patients not receiving the standard of care for stroke, including timely "clot busters" (more correctly termed lytics, as they lyse the clot) and endovascular thrombectomy. Notably, there is a relatively short window – typically up to 4.5 hours – in which lytics can be effectively administered to prevent the development of permanent and significant deficits.

We found several cases in which patients were not timely treated for stroke symptoms.

> **Patient #26:** This patient walked to the ATU.  He had slurred speech and complaint of right arm weakness. He was experiencing an acute Left Middle Cerebral artery stroke. He received repeated doses of Narcan although he had no sign of opiate intoxication. Urine toxicology was performed while the patient continued to have a stroke. Over 12 hours, he had increasing aphasia and dysarthria without treatment for his stroke. When he was finally sent to the hospital, the lytic drug TPA was not administered because the patient was "outside the window". Because of the failure to treat his stroke, he

developed a long-term inability to speak and could no longer verbalize his needs, and lost the ability to walk.

**Patient #56:** On June 6, 2021, this patient made a self-declared emergency and was charged $6, but received no physical exam or provider assessment. Three days later, he presented with left side weakness, slurred speech, and a facial droop. The patient had a CT scan from August 23, 2019 that showed signs of previous strokes. Despite the apparent previous history of strokes, the patient's departure to the hospital was delayed. He arrived at the ATU by 5:58 pm and an ambulance was assigned at 6:30 pm, but he did not leave the ATU until 7:48 pm and then left by basic life support, rather than advanced cardiac life support, so he did not arrive at OLOL until 9 pm. By that point, he was out of the window for the lytic drug TPA. He was found to have complete occlusion of the right internal carotid artery.

**Patient #55:** On February 3, 2021, the patient presented to the ATU for hypertension. The assessment was noncompliance with medications. On February 4, 2021, at 5:37pm, the ambulance was called to the patient's housing area. The medics were told by bystanders that the patient "just started drooling and slumped to the side". His blood pressure was 102/69 mm Hg and 110/80 mm Hg.   The patient was taken to the ATU. Telephone orders were called in by the doctor. The order was for an EKG. At 19:30 there had been no change in the patient's neurological status, yet the doctor apparently said the patient was okay to discharge. On February 5, the patient returned to the ATU at 8:12am and was noted to have new left sided weakness. The patient was sent to West Feliciana Hospital for a CT scan of the brain sometime at 10:42am,[211] more than 17 hours after LSP staff became aware of his symptoms. The CT scan showed old strokes, "lacunar infarcts". As is the standard of care, the radiologist commented that an MRI must be done if there is concern. The patient was not referred for a standard stroke work up, including the MRI.

On March 17th, 2021, the patient presented with inability to walk and urinating on himself. The blood pressure was elevated at 229/151. There were telephone orders from the nurse practitioner. The neurological deficits were not addressed. The notes in the medical record are as follows:   blood pressure elevated secondary to noncompliance. "No symptoms of new CVA: admits to not taking meds". The diagnosis was hypertension. The blood pressure was lowered to 157/109 with medications. There was no referral.

On April 26, 2021 an ambulance as dispatched at 15:00pm for "mouth feeling numb. Slurred speech (normal)". The patient was taken to the ATU. In the ATU at 15:32 there is a note about transient drooling and new urinary incontinence, even though urinary incontinence had been present on March 17th as well. The patient left for Our Lady of the Lake for a possible stroke approximately an hour later.  At the hospital the patient

---

[211] The medical record does not appear to contain an ambulance run report for this trip.

was a level one stroke alert and an MRI demonstrated an acute stroke. The patient was left with out the ability to speak or eat.

Notably, the treatment on February 4 – when the patient was discharged from the ATU to his housing unit, and not transferred to the hospital for more than 17 – was per the Altered Mental Status (AMS) protocol, which allows EMTs to treat patients without contacting a health care provider unless the altered mental status is "severe" (which is not defined) or decreases over multiple assessments. All altered mental status is serious and EMTs should not be put in a position of deciding whether or not it is "severe" enough to contact a health care provider. This protocol is one of the reasons that stroke care is delayed.

> **Patient #52:** This patient presented to sick call with symptoms of a stroke. He arrived in the ATU at 12:30pm. Because the patient said that the symptoms had begun the previous night, and LSP staff viewed him as "out of the window for thrombolytics," they sent him to UMCNO by basic life support, rather than sending him to OLOL with the urgency of an ongoing stroke. He arrived at UMCNO 16:30pm. But thrombolytics are not the only treatment for stroke, and faster transportation would have resulted in a faster removal of the clot from his carotid artery with a catheter. This lack of knowledge of stroke care and lack of urgency to get the patient to the hospital for endovascular thrombectomy contributed to the patient's resulting hemiplegia and aphasia.
>
> After this event, and despite providers' knowledge the patient had evidence of multiple ischemic events on imaging, the patient received "no transport" orders preventing the patient from being brought to the ATU by ambulance. The health care provider was betting the patient was not having a serious medical emergency. For example, on March 20, 2019, the patient got weak and fell. There was a no transport order. This is despite the headache, urinary incontinence, coumadin, and trauma and the history of stroke with hemiparesis, partial aphasia, heart failure, and seizure disorder.
>
> On February 16, 2021, the patient presented to the ATU with chest pain and having fallen out of bed. Staff performed a single troponin test and then diagnosed him with probable intoxication and costochondritis (inflammation of the rib cartilages) and sent him to the Nursing Unit. No EKG was performed. The standard of care is to perform two to three troponin tests over a longer period of time, along with an EKG. For roughly 23 hours, he was kept in the Nursing Unit with ongoing congestive heart failure and hyperlipedemia, without appropriate assessments or diagnostic tests. Within 48 hours he had a cardiac arrest. The patient survived but was found to have atrial fibrillation with a competing junctional pacemaker and premature ventricular or aberrantly conducted complexes and a previous anteroseptal infarct.

**Patients who experience trauma or critical progression of their illnesses are not consistently transferred to the hospital. Diagnoses and treatment are delayed.**

As with stroke care, illnesses that reach critical stages are not always recognized and transfer to the hospital does not consistently occur when indicated.

> **Patient #38:** This 49-year-old man had hypertension, mechanical heart valve and COPD. He died of untreated bronchopneumonia on 3/7/2019.
>
> On 3/4/2019 in the morning the patient was placed in the nursing unit for observation following Lovenox bridging (that is, to come off the blood thinner Coumadin). At noon, the patient took a shower and complained of shortness of breath. He was given a nebulizer treatment. At 8pm the patient's Temperature was 102.4 orally. The doctor was notified and gave telephone orders to the LPN. The orders were to move the patient to a locked room, to give Tylenol, and to start Amantadine for a flu-like illness. No provider examined the patient. No antibiotics were administered.
>
> On 3/5/2019 the patient had wheezing in both lungs. He received a Duo nebulizer treatment. His saturation was 96%. At 3pm, the sputum was noticed to be blood tinged. The notes say "MD here to evaluate," but there are no notes from the "MD" and no name. "No new orders" were made and Motrin was given to the patient.
>
> On 3/5/2019 at 15:20 labs were ordered.  There was a record of the INR results recorded on March 5th and 6th. On March 6th at 7am the patient had a productive, blood-tinged mucous cough.
>
> On 3/6/2019 labs were available and the lab report was signed on March 7th. The patient had renal insufficiency with a creatinine of 2.78 (in February the creatinine was normal at 1.0). The patient had a left shift and bands, indicating bacterial infection. He had an anion gap. Despite evidence of bacterial infection, the patient did not receive a chest x-ray, antibiotics, or a health care provider examination.
>
> On 3/7/2019 at 6:20 am the patient's blood pressure was 65/40 mm Hg and the oxygen saturation was 79%. This was reported to Dr. Toce, but there is no record of Dr. Toce conducting any assessment or providing any care.  The patient's blood pressure and oxygen saturation were both extremely low, indicating that the patient was in shock and should have been sent to a hospital.  Instead, he received no care.  The nurse noted only that the blood pressure medications were to be held if the blood pressure was < 120, per a standing order.
>
> At 7:20 am the patient was found on the floor (in the Locked room) and CPR is started. The patient was transferred to the ATU. Resuscitation efforts continued. At 8am an ambulance was assigned. Patient began to bubble blood around nares and in mouth in route. The ambulance was diverted from the destination OLOL to West Feliciana Hospital. He was pronounced dead at the hospital.

This was an egregious example of delayed care, and this lack of care caused this patient's death. He did not have a chest x-ray, antibiotics, or health care provider examination. He deteriorated over two days without any meaningful treatment or examination, resulting in cardiorespiratory arrest. On autopsy the patient had pneumonia.

> **Patient #36:** This patient had a history of chronic obstructive pulmonary disease with previous hospitalizations. On 5/2/2019 he walked into the ATU with shortness of breath and respiratory distress x 2 days.[212] At 08:20am the patient was evaluated at ATU. BP=203/115 mm Hg; pulse=99/minute; respiratory rate=32/minute and oxygen saturation 97% with oxygen. The patient spoke in broken sentences and was using accessory muscles (gasping) and had diminished breath sounds. At this point, staff appropriately treated him with a nebulizer and monitored the patient to determine if the patient's condition improved.
>
> Two hours after he presented, however, his condition had deteriorated. At 10:40 am, his BP=211/125, pulse=115/minute, the respiratory rate 24/minute and oxygen saturation 88% on room air. At 11:30am, 3 hours after presentation, his blood pressure was 228/112 mm Hg, the pulse 87/minute and the respiratory rate 24/minute. The patient was not stable and required treatment for his respiratory distress.
>
> Dr. Crook gave a telephone order and later came in and ordered amlodipine, lisinopril and Coreg (carvedilol, a beta-adrenergic antagonist). This treated the blood pressure, but did nothing for the patient's respiratory distress, which was a red-flag symptom. Dr. Crook noted there was wheezing noted through both lung fields and the heart was mildly tachycardiac (which was the result of the blood pressure medication, rather than indicative of his condition). He wrote Admit to NU #1, even though the patient was unstable.
>
> Within 30 minutes, the patient was brought back to the ATU. The note is that the patient became pulseless and apneic at 12:00 (that is, he entered cardiac arrest). Cardiac resuscitation measures were performed and the patient regained a pulse.
>
> The patient was finally sent to the hospital after his cardiac arrest. Per the ambulance records, the patient lost his pulse again in the ambulance on the way to the hospital. The patient began decorticate posturing approximately ten minutes prior to arrival at OLOL. The patient never woke up and died at OLOL on 5/19/2019.

This patient had a serious exacerbation of COPD and needed to be sent to the hospital when the first round of treatment failed. Despite the urgency of his crisis, he did not receive adequate treatment for his respiratory impairment and was sent to the Nursing Unit, rather than the hospital, when his condition failed to improve. He therefore did not receive potential lifesaving treatment when there still may have been time to save his life.

---

[212] Patient #36.

**Patient #58:** On 12/30/2020 this 58-year-old patient complained of weakness and dizziness. The ambulance was dispatched at 13:16 pm. At 13:28 pm the patient's initial blood pressure was 86/56 mm Hg.  The patient was given a liter of fluids. The ambulance arrived at the ATU at 13:52 pm. The patient was turned over to Dr. Lafleur and RN McClure. The chief complaint is "I was walking and my equilibrium goes out on me for about a week now". Labs were ordered and the results were available the following morning.  CXR demonstrated bilaterally patchy disease. The patient was noted to be hypoxic with the initial oxygen saturation of 88%.

The physician did not make note of the hypotension of 86/56 mm Hg. He noted his finding of hypotension with a less urgent blood pressure of 106/50. He ordered antibiotics, a covid swab, fluids and decadron. There was no documentation of a differential diagnosis. Instead, the only diagnosis was "rule out covid," even though the patient's hypotension suggested he was critically ill. The physician did not indicate why he was ordering antibiotics. There was no mention of the patient's anemia (hemoglobin result 10 days earlier showing a hemoglobin of 8.9), his uncontrolled diabetes with a hemoglobin A1C of 10.2, or his known kidney compromise, all of which, combined with the hypotension, suggested the need to consider other possible diagnoses. At 20:30 the patient left the ATU and was admitted to the nursing unit.

On 12/31/2020 in the morning, labs came back with several abnormal results showing the patient had diabetic ketoacidosis with abnormal kidney function, an anion gap acidosis, severe anemia, and an elevated White blood cell count. Aside from the receipt of insulin, the medical record does not contain any notes of treatment after these findings.

On 1/4/2021 the patient was again severely anemic (hemoglobin=6.5). This is a value that represented a significant decrease in the patient's normal hemoglobin. There was no consideration for the cause of this decrease or documentation of any reason for the decrease. There was no treatment provided. Standard care dictates transfer to the hospital with a patient who presents with near syncope, weak, dizzy and with hypotension, acidosis, and a decreasing hemoglobin.  This care represents substantial risk of serious harm to this patient. There is no further documentation regarding this patient's presentation of diabetic ketoacidosis. There was no documentation that the patient ever tested covid positive. In fact, we could find no further notes regarding this Nursing Unit admission, except his discharge to his housing unit on January 9, 2021.

**Patient #59:** This patient had severe vascular disease. He developed right lower abdominal pain with rebound tenderness, yet it took eight hours before he was transferred to the hospital for evaluation. In the hospital, the differential diagnosis for abdominal pain in the right lower quadrant, especially in a patient with known vascular disease, can indicate many serious conditions. This represents a delay in care.

**Patient #35:** On April 13, 2019, the patient presented confused with a temperature 103.2$^0$F. He was not transferred to the hospital for evaluation until 12 hours later. At the hospital, the patient had a lumbar puncture that demonstrated meningitis. This was a high-risk patient with an aortic valve replacement, a high fever, and an altered mental status. This patient needed transfer to the hospital when he presented, not after a 12-hour delay.

**Patient #33:** The patient had known autoimmune hepatitis, colitis, and anemia. He had known esophageal varices. On January 30, 2020, the patient presented to the ATU with bloody stools. It took three hours before the doctor was called and informed that the patient's hemoglobin was 6.9. The patient was sent to UMCNO.

On May 18, 2020, the patient declared a SDE (self-declared emergency) and was seen by an EMT and referred to the ATU. The medical record of this self-declared emergency indicated this "had never happened before" to the patient. The patient had abdominal pain, bilateral leg swelling and diarrhea. The patient arrived in the ATU at 14:40pm and left the ATU at 17:20pm. He went to Our Lady of the Lake Hospital.

On June 1, 2020, at 10:36, the patient was brought to the clinic for evaluation of lower extremity edema 4+, three weeks of yellowing eyes, and swelling of the abdomen. This indicated acute on chronic hepatic failure, which was not diagnosed or treated. Instead, the provider's disposition was to see the patient in Clinic A in 1-2 weeks.

The patient did not make it to his clinic follow up. On June 13, 2020, eleven days later, the patient presented to the ATU with tarry stools, bright red blood, and coffee ground emesis. He was hypotensive and tachycardic with gastrointestinal bleeding. The patient was sent to OLOL by ALS. He died the same day.

**Patient #53:** This 25-year-old patient with a known history of diabetes and bipolar disease complained of chest pain on 5/21/2019 an ambulance was called to his housing unit. A no transport order was given based on the medic's findings, as related over the telephone. A no transport order is inappropriate for chest pain in a patient with diabetes, which could indicate a number of serious conditions. The patient was ordered a GI cocktail, which is not an adequate treatment for a diabetic patient with chest pain. The patient should have received an EKG and been brought to a healthcare provider for consideration of differential diagnoses.

On May 23rd, the patient received a follow-up evaluation from mental health and told the mental health provider that he had suffered a 60-pound weight loss over five months. The mental health provider requested medical evaluation. In other words, a health care provider refused to see the patient on May 21st, when his condition was so bad that a mental health provider encountering the patient two days later recognized the need for further medical attention.

A health care provider conducted a physical exam and found his diabetes to be in fair control, despite the weight loss, and ordered a chest x-ray and lab work. The lab work showed that the diabetes was not in control.

On May 24th, when the patient's labs came back, the nurse practitioner recognized the patient's diabetic ketoacidosis and sent him to the hospital, where he was immediately admitted to the intensive care unit. The consultation from the LSP physician to the receiving hospital emergency physician, described how the patient complained of six weeks of profound fatigue, weight loss ("His weight loss was noticeable"), decreased appetite, increased frequency of urination, polydipsia, fatigue with walking short distances and tingling on the bottoms of his feet. The patient was found to have diabetic ketoacidosis with severe electrolyte abnormalities. He was admitted to the Medical Intensive care unit from the emergency department.

**Patient #51:** On August 29, 2019 there was a call for an ambulance at 11:19 for an unresponsive patient with symptoms of heatstroke. The patient had been working in the field all day. The patient had suddenly become confused and unresponsive. The axillary temperature was $103.3^0$F. The eyes were rolling back. The capillary glucose measurement was 404. The blood pressure was 120/70, the pulse was 134 and the respiratory rate was 34. The skin was dry. The pupils were nonreactive but equal. These symptoms – particularly fever with altered mental status after working in the summer heat for several hours – all indicated heatstroke. In the ambulance, there is no sign of any cooling; instead, Narcan 4mg was administered in the ambulance, even though opiate intoxication does not cause elevated temperature. The patient arrived in the ATU at 11:37am. An EKG was performed in the ATU. It showed sinus tachycardia.

The patient was intubated. There remained no cooling for the patient's heatstroke. Instead, even though the patient did not have an opiate toxidrome, he was forcibly catheterized for a urine toxicology. While this toxicology was positive for opiates, a subsequent toxicology test at the hospital was negative for opiates. At 12:00 noon an ambulance was assigned to take the intubated patient to the hospital. The patient arrived at the hospital at 14:18pm, five hours after he became unresponsive. Until he got to the hospital, he received no treatment for his heatstroke

This patient had heatstroke. He had several conditions and medications that interfered with his ability to thermoregulate. Diabetes and hypertension predisposed the patient to poor cardiac response to heat. While his preexisting conditions and symptoms all suggested heatstroke, LSP staff appeared to assume that opioid use was responsible, and treated him accordingly rather than diagnosing and treating his actual condition. The urine drug screening in the ATU was inappropriate and would not contribute to the resuscitation or the diagnosis or treatment of heatstroke. Three hours to the hospital is a dangerous delay. Cooling measures were inadequate, which is a persistent problem. Ice should be maintained in the ATU year-round, but during our site visit, there was no ice stored in the ATU, and the medical records do not show instances of it being used.

**Patient #29:** This patient had repeated sick calls that demonstrate no evidence of a physical exam or assessment by a health care provider. The patient presented to the physician's clinic again on March 19, 2019. The medicine was not helping, and one nonsteroidal medication was substituted for another. Although the patient had hypertension and was noted to be hypertensive, on these two visits, antihypertensives were not addressed, nor was there any apparent consideration of the contribution of NSAIDs to worsening of hypertension, or the risk of NSAIDs for worsening of kidney function or gastrointestinal bleeding.

The patient presented for back pain on September 28, 2019. He was evaluated on October 3, 2019, in the physician clinic. There was no examination of the back and no diagnosis. The symptom substituted for the diagnosis. There was again no discussion of the risks of NSAIDs for patients with hypertension.

On March 27, 2020, the patient declared an emergency, complaining of stomach and back pain again. He was evaluated by an EMT at 6:40am and charged $6.00, with no treatment indicated beyond "sick call prn." That afternoon he collapsed, foaming at the mouth with a temperature of $108.2^0$ F temporal, signs of heatstroke. Despite the fact that opiate intoxication does not cause elevated temperature, he was given Narcan instead of cooling, which is the standard of care for heatstroke. He was also catheterized in an apparent attempt at urine toxicology in the ATU. He died in the ATU at 2:34pm, with no evidence of cooling being provided.

**Patient #25:** On 10/2/2020 the patient fainted (syncope). At that time the patient refused ambulance transport. A rhythm strip showed normal sinus rhythm.

On 10/27/2020 the patient was seen in physicians Clinic. There is no documentation of a review of systems or history focused on the cardiovascular system. No EKG was performed in the physician clinic. The previous EKG was recorded as normal. However, there is no EKG in the medical record.

On January 22, 2021, at 5:57am, the patient was in the main prison kitchen and experienced a "slip and fall breathing but unresponsive". Staff administered two doses of Narcan, but security did not attach the AED. This is specifically noted on the ambulance run sheet. The patient lost 10 minutes of time until the first shock was delivered by the ambulance crew. When the ambulance crew attached the pads, the patient was in ventricular fibrillation. The patient died.

The patient died on January 22, 2021, less than three months after the first syncopal episode. On autopsy, the patient had enlargement of both atria, cardiomegaly and left ventricular hypertrophy and aortic stenosis. The missing EKG described in the October 27 note could not have been normal. Syncope may arise from cardiac abnormalities; cardiology referral or a referral for ultrasound of the heart (echocardiogram) was

indicated. An ECHO would have demonstrated aortic stenosis. Then, when the patient's condition became emergent, an AED was not used. This was a preventable death.

**Patient #56:** This patient fell through the roof of a building on August 14, 2019, fracturing his acetabulum (hip socket), which was not diagnosed for more than a week. The patient described a loss of consciousness, yet at the ATU he did not receive a physical exam of the body or a neurological exam. Dr. Crook gave verbal orders for cervical spine, left shoulder, and left hip x-rays, but there was no report of x-ray results at that time.

The following day, the patient was seen multiple times by medics and reported weakness, dizziness, and spinning sensation. Despite having lost consciousness the day before in his fall, he was diagnosed with positional vertigo without a differential diagnosis for concussion or other brain trauma. There is no physical exam except to note "no nystagmus" (involuntary eye movements).

On August 20, 2019, he was seen in the physician clinic, where a CT scan of the patient's head was finally ordered. The CT scan would not be performed until August 23, 2019. In the meantime, the patient filled out another sick call request form on August 21 and was charged $3, despite not being seen by a health care provider. The patient filed another sick call request on August 23 and was sent to the ATU, where there is no record of a physical examination. Finally, the patient was transferred to West Feliciana Hospital for CT scans, where the fracture of the left acetabulum was finally diagnosed. The delays in diagnosis likely caused the patient unnecessary pain, risked a worse recovery for his acetabulum fracture, and risked missing a serious traumatic or neurologic issue associated with his loss of consciousness and fall.

**Patient #30:** This patient presented to the ATU or sick call on November 22, November 26, December 4, December 9, and December 27, complaining each time of abdominal pain, abdominal distension, and/or chest pain. He was never examined by a provider and was instead referred for later clinic evaluations and told to take Milk of Magnesia.

Bloodwork was taken on December 30, which showed a hemoglobin of 5.6 when it was returned the following evening. On December 31, the patient was sent to the hospital and was found to have metastatic colon cancer and severe anemia with a hemoglobin of 5. Three days later January 3, 2021, the patient underwent a colonoscopy. On January 5th, 2021, half of the colon was removed. The patient had advanced metastatic colon cancer.

**Patient #17:** This 60-year-old man died on 10/15/2020 of pulmonary embolism secondary to deep vein thrombosis. His medical history includes atrial septal defect (ASD) right carotid stenosis, a right middle cerebral artery (MCA) cerebrovascular accident (CVA) with left sided weakness and aphasia. His medications were Plavix, aspirin and atorvastatin.

1. On 2/20/2020 a provider documented a diagnosis of venous insufficiency. There is no history or examination to support a diagnosis of venous insufficiency. Venous insufficiency is characterized by edema, which is also associated with other disorders of venous obstruction such as deep vein thrombosis (DVT). Available records do not contain any evaluation of clinical findings that led to this diagnosis or ruling out of other causes for the edema, or an explanation for the provision of TED hose.

2. Eight months later the patient died of pulmonary embolism secondary to deep vein thrombosis. Although it is not possible to know if the patient's condition on 2/20/2020 was directly related to his death, the lack of an adequate medical evaluation raises the question of whether the diagnosis of DVT was missed.

3. On 4/13/2020 the patient declared an emergency and complained of "not feeling right" with shortness of breath and fatigue. The patient's blood pressure was elevated (BP=162/90 mm Hg). The EMT assessed the patient but did not contact a physician. The EMT put the health request form in the physician's box, where the following day a physician reviewed the form but did not schedule the patient for examination. Four months later the patient presented with a stroke.

4. On 8/6/2020 at 22:13 the patient presented with altered mental status, facial droop, and left sided weakness warranting immediate transport to the hospital, However, the physician ordered a work-up of the patient's facial injuries and a decision was not made to transport the patient to the hospital until approximately 23:30. The ambulance did not depart for another 90 minutes and the patient did not arrive at the hospital until 2 am, approximately 4 hours after he initially presented with symptoms of a stroke.

5. At the hospital he was diagnosed with a stroke secondary to an atrial septal defect and internal carotid artery thrombus. The thrombus was removed and ASD was repaired and the patient was treated with Plavix and aspirin for six months.

6. On 10/15/2020 the patient developed chest pain, shortness of breath and diaphoresis, all signs and symptoms of a serious cardiovascular event. The patient was known to have had a stroke 2 months prior. It took 30 minutes for the patient to be transported to the ATU arriving at 02:15. At that time, the patient was cold, his nail beds were cyanotic and the nurse was unable to obtain an oxygen saturation measurement. The nurse did not document notifying a medical provider and 45 minutes elapsed before a medical provider examined the patient and ordered that he be transported to the hospital.

7. The ambulance did not depart until 03:45, 45 minutes after the provider ordered him transported to the hospital. The patient's blood pressure was 81/60 mm Hg. At 04:10 at the prison gate, the patient became pulseless and the ambulance returned to the ATU where resuscitation measures were implemented. An external automatic defibrillator or other defibrillating device was not used during the code. Dr. LaFleur pronounced the patient dead at 04:39. Autopsy showed the patient died of pulmonary embolism secondary to deep vein thrombosis. This case involved serious delays in emergency care.

8. Dr. Lavespere conducted the mortality review that summarized the patient's stroke in August and the terminal event on 10/15/2020. Dr. Lavespere did not identify delays in transport to the hospital or any other aspects of care that could be improved, such as failure to adequately evaluate the patient.

**Patient #18:** This 78-year-old man died on 5/6/2020 of COVID-19 respiratory failure.[213] His medical history includes morbid obesity, diabetes, hyperlipidemia, hypertension, chronic kidney disease, hypothyroidism, glaucoma.   (Page 655 RFP 1 and 2). His medications were metformin 500 mg daily, Humulin 70/30 and regular insulin, losartan, amlodipine, carvedilol, hydralazine simvastatin, levothyroxine, latanoprost eye drops and duloxetine.

1. There were multiple encounters in which medical providers did not take a history of the patient's serious medical conditions or perform a physical examination of any kind. Physicians also did not monitor the patient in accordance with his disease control. For example:
   a. On 7/25/2019 a provider saw the patient for general medicine clinic. BP=160/83 mm Hg. The physician did not perform an examination of any kind. There is no evidence that the provider even spoke to the patient. The provider did not address the patient's poorly controlled hypertension. RTC 5 months. This was not an appropriate interval given the patient's poorly controlled hypertension.
   b. On 2/13/2020 a physician saw the patient for follow-up of DM, LBP, HTN, OB (sic), HLD, venous insufficiency, CCC, CKD, OA, and glaucoma. The physician did not perform a review of systems (ROS) for each problem. BP=140/73 mm Hg.   The physician did not perform any physical examination. The physician assessed hypertension and diabetes control but not the patient's other serious medical conditions.
2. On 4/23/2020 the patient presented with weakness for 3 days, frequent urination and diarrhea. The patient had a fever of 102.3, and rapid pulse of 131/minute. The patient's urinalysis indicated a urinary tract infection.   A medical provider did not medically evaluate the patient but had the patient placed in the nursing unit.  Medical orders included placing the patient on 2 liter of oxygen per minute via nasal cannula to keep the patient's oxygen saturation above 95%.
3. On 4/24/2020 a physician saw the patient, noting that he had a urinary tract infection and a COVID-19 test was pending.
4. On 4/25/2020 the patient's COVID test came back positive, but a physician did not medically evaluate the patient again while he was in the nursing unit
5. On 4/28/2020 the patient was in respiratory distress and hypoxemic. At 5:20 Dr. LaFleur ordered the patient to be sent out to the hospital, however it was not until 6 hours later, at 11:20 that the ambulance was dispatched to the patient's

---

[213] Patient 18.

location, and it took 70 minutes from the time the ambulance arrived at the patient's location to depart for the hospital and another 90 minutes before they arrived at the hospital.

6. By the time the patient arrived at the hospital, he was critically ill.  He was in kidney failure attributed to lack of oral intake. The patient was in septic shock, developed multiorgan failure and died on 5/6/2020.

7. On 5/12/2020 Dr. Lavespere documented a mortality review which did not meaningfully review his medical care prior to the terminal event, or the quality of care at the ATU and in the nursing unit. He failed to identify that a medical provider did not evaluate the patient at the ATU and only once in the 4 days he was in the infirmary, including after the patient had a positive COVID-19 test. This should have been done due to the patient's age and multiple comorbidities that placed the patient at increased risk of death.  Dr. Lavespere did not identify the delay in transport to the hospital.  Dr. Lavespere determined that the death was "expected" although each of the patient's conditions developed over a matter of days. This mortality review is of poor quality as it does not seek to identify individual or system issues requiring improvement.

**Patient #19:** This 43-year-old man arrived at LSP on 10/20/2009 and died on 3/20/2021 of cardiopulmonary arrest. The autopsy revealed extensive cardiovascular disease.  His medical conditions included degenerative joint disease and depression.  His medications were Sulindac, Clonidine, Fluoxetine, Mirtazapine, fiber tabs, and hydrocortisone cream. He was housed on death row.

Findings:
1. This patient submitted multiple health services requests but was not timely and appropriately evaluated by a medical provider for complaints of joint pain that persisted despite high doses of anti-inflammatory medications.  In most cases, the patient received no examination at all.

2. The patient reported submitting health requests for which he received no response at all.

3. Emergency response was not timely. According to available documentation, the patient was on camera and collapsed at approximately 07:55, however emergency response was not initiated until 08:18 when an orderly discovered the patient. It took almost 15 minutes for the ambulance to arrive at the scene.

4. Emergency response did not include use of an AED or defibrillator.

5. The patient not have an annual physical evaluation to assess for age related risks such as hyperlipidemia or other risk factors that contribute to cardiovascular disease,

6. The mortality review did not identify the delay in emergency response, or the lack of adequate medical evaluations for the patient's joint pain.

**Recommendations**

**Clinical/Emergency/Infirmary Care**

1. LSP needs to provide inmates unimpeded access to health care.
   a. Inmates should have the ability to submit health care requests forms into locked boxes accessed only by licensed health care providers 7 days a week;
   b. Correctional officers should have no role in the handling of health services requests;
   c. A registered nurse reviews and prioritizes health requests following collection of the forms;
   d. An in person clinical encounter is conducted within 24 hours of receipt of the request;
   e. Patients are evaluated in a clinical setting with the medical record present; a complete set of vital signs and weight should be conducted at each encounter;
   f. On the segregation units, patients need to have the ability to submit their health request forms into a locked box when they are out of cell; or submit forms to licensed health care personnel during waking hours, and not before 5 am.
   g. All health request forms should be logged and tracked, including the date and time they were written by the offender, the date and time they were received by health staff, the date and the date and time of the clinical encounter, to allow determinations of timeliness of access.
   h. On Nursing Unit 2, patients need to be able to submit health request forms into a locked box accessed only by a licensed health care provider.
   i. On Nursing Units 1 and 2 patients should be exempted from the sick call process and copays. Daily rounds on these units should include nurse evaluation of any new or urgent need of the patient and this should be evaluated by the provider on that unit.
   j. LSP should  eliminate excessive copayments, including fees above $3.00.
   k. Patients should only be charged a copay when they see a medical provider licensed to diagnose and treat their medical condition.  Patients should not be limited to one complaint per encounter.

2. LSP medical providers need to timely diagnose, treat and monitor patients with serious medical needs, including patients with red-flag symptoms.
   a. LSP medical providers need to perform adequate medical histories and hands-on physical examinations, consistent with the complaint of the patient., including inspection, palpation, auscultation, and/or percussion of the patient's body. Patients requiring abdominal examinations  should not be examined sitting in a chair. Patients should be requested to remove clothes needed to perform

adequate medical evaluations (e.g. shoes in order to measure pedal pulses and edema)

b. Telemedicine equipment necessary to perform adequate exams should be purchased (e.g., stethoscope, otoscope, etc.), or providers should conduct medical evaluations in person.

c. Medical providers should provide medical care that is compliant with nationally recognized treatment guidelines.

d. For diabetes, providers should comply with American Diabetes Association standards including prandial insulin at mealtimes as recommended for type 1 diabetics, etc.).

e. Medical providers should conduct and document thorough patient education regarding medications and the treatment plan at each visit,

f. Medical providers should review Medication Administration Records at each clinical encounter and discuss medication adherence and obstacles to compliance with the patient.

g. Medical providers need to determine the frequency of ongoing patient monitoring in accordance with patient's degree of disease control, e.g., Patients in poor disease control need to be seen in 30 days or sooner if clinically indicated.

h. Medical providers should order blood pressure monitoring for patients whose hypertension control is not at goal.

i. United States Preventive Services Task Force A and B recommendations should be instituted as a practice in annual health updates for all inmates.

j. The UpToDate© reference should be available at all clinical examination rooms and work stations to ensure provider have access to standard of care practice recommendations.

k.

3. LSP needs to provide timely and appropriate emergency care to LSP patients.

a. LSP Directive 13.007 should be updated to reflect current emergency care policy.

b. A health care provider should be present in the ATU to evaluate patients 24 hours a day, seven days a week.

c. As soon as possible, a doctor or nurse practitioner credentialed to work in an emergency setting should be hired to practice in the ATU and to supervise other nurse practitioners and nurses who practice in the ATU.

d. A medical safety officer should be added to the health care staff and should conduct ongoing retrospective reviews of care in the ATU, develop an incident monitoring system, study patient outcomes and diagnostic errors to identify factors that caused problems, and direct system improvements.

e. The equipment in the ATU should include a stat machine that can analyze acid-base status, pH, and lactate, to allow for immediate results and identification of acidosis.

f. Consider purchasing an ultrasound for the ATU, and nurses and health care providers should be trained in point-of-care ultrasound standards, including ultrasound-guided peripheral intravenous lines.

g. Electrocardiograms should be interpreted by a health care provider, with results recorded in real time. Verbal orders from a health care provider to a licensed nurse should be accompanied by an in-person evaluation of the patient within 15 minutes, including a documented physical examination and a record of medical decision making at the time of evaluation.

h. Standards should be instituted for diagnostic testing or transfer to a hospital in a number of circumstances that are currently left up to a nurse or nurse practitioner's discretion. These include:

    i. Patients with unstable vital signs must be transferred to the hospital.

    ii. Patients who present with chest pain and have a history of diabetes, hypertension, hyperlipidemia, elevated cholesterol, obesity, family history, smoking history, prior stroke or transient ischemic attack or peripheral vascular disease should receive serial troponins, stress testing, cardiac imaging, and cardiology consultation. EKGs for chest pain should be interpreted by a health care provider within 10 minutes.

    iii. Patients who experience syncope (fainting) should have an immediate EKG and Health Care Provider exam.

    iv. Cardiac arrest patients should be transferred immediately to the hospital. Airway and circulation can be addressed by paramedics in the ambulance, rather than in an ATU visit, that delays transfer to the hospital.

    v. Due to the unavailability of blood products and endoscopy, patients with gastrointestinal bleeding should be transferred immediately to the hospital.

    vi. Endocrinology consultation should be required for all patients with diabetes who cannot be adequately controlled.

    vii. In short, if it can cause death, the patient should be evaluated in the hospital.

i. Heatstroke patients should be cooled by the application of bags of ice to cover the body. There should be an ice machine in the ATU. Unresponsive patients with fever should have cooling started with the application of ice to the entire body and be transported to the hospital without delay.

j. Urine toxicology should not be used in emergent situations, and catheterization of the penis for the purpose of obtaining urine for urine toxicology testing should

cease. Rapid toxicology for urine toxicology testing should be abandoned; if toxicology testing is required, it should be sent out for accurate results.

k. No patient should be transferred from the ATU to the Nursing Units without an in-person examination by a health care provider and review of laboratory results. If this is not possible, the patient should be sent to the hospital for completion of this basic evaluation.

l. For self-declared emergencies, EMTs need to escort or transport patients to a clinical exam room for evaluation by a medical provider licensed to diagnose and treat the patient. The medical record should be retrieved for these encounters. In no case should an EMT make a diagnosis.

m. "No transport" orders should be eliminated.

n. Standing orders should not be used without an evaluation of the patient by a health care provider.

o. Staff should be regularly trained and drilled in use of automatic external defibrillators, which should be available in all prison areas.

4. LSP needs to ensure that patients timely receive ordered medications for serious medical conditions.

a. Licensed health care personnel need to administer all dangerous drugs. Assisted living units should be given priority for implementation.

b. LSP should perform a staffing analysis to determine how many licensed practical nurses are needed to administer all medications. Following the analysis, the needed positions should be budgeted and filled.

c. In the interim, correctional officers need to be retrained regarding the five rights of medication administration. Correctional officers need to document medication administration at the time the medication is given.

d. Medication administration should be under daily medical supervision, not custody supervision.

e. LSP needs to provide medication administration a minimum of three times daily at appropriate intervals, including medications that are ordered at hour of sleep (e.g., coumadin, statins, and some insulins).

f. Medical providers need to follow recommendations for type 1 diabetics to receive prandial insulin with meals three times daily.

g. All medication orders, including short acting insulin, needs to be documented as an order in the medical record, and transcribed onto a medication administration record. Staff should document blood sugar levels and insulin doses on the MAR.

h. Health care leadership needs to conduct an assessment of the timeliness and accuracy of documentation on the Medication Administration Records and address root causes of inaccurate MARs.

    i.  When inmates are admitted to nursing units or are at the hospital, there needs to be a means of communication to ensure that the patient is not documented as a "No Show" or "Refusal".

    j.  Narcotics should not be restricted based upon medical need, rather than housing unit.

    k.  Patients requiring a refill of their medications should affix the sticker from their medication blister pack to a Request for Medical Treatment form and place it in the locked box at the pill call window. The health request should be forwarded to the pharmacy and then filed in the health record.

5.  LSP must provide infirmary level care and assisted living care to meet the health needs of patients

    a.  The use of inmate health care orderlies should be immediately discontinued in nursing units.

    b.  The infirmary program should have a physician in charge of clinical care with nurse practitioner coverage assigned based on a workload analysis of acuity levels.

    c.  Medical leadership needs to establish clinical criteria for admission to a nursing unit. Patients exceeding the clinical criteria should not be admitted, such as patients with unstable vital signs, symptoms of stroke, etc.

    d.  The number of qualified health care professionals providing infirmary level care is based upon the number of patients, the severity of their illnesses, and the level of care for each patient. LSP needs to perform an analysis of staffing needs based upon these criteria. Following this analysis, needed positions (e.g., RN, LPN and certified nurse assistants, etc.) should be budgeted and filled.

    e.  Infirmary patients need to be within sight or sound of a licensed health care provider at all times. Nurses should not be permitted to cover up nurse's station windows to obscure view of the open beds and locked rooms.

    f.  Vulnerable patients should not be placed in locked rooms without the ability to immediately notify nurses of distress.

    g.  In assisted living units, LSP should assign a registered nurse to provide and supervise care of patients in the unit, a minimum of 16 hours a day, 7 days a week.

    h.  A physician should make weekly rounds in assisted living units but see patients as often as clinically necessary based on patient need.

    i.  LSP may continue to use orderlies in assisted living units to assist with activities of daily living under the supervision of a registered nurse.

    j.  For the infirmary, medical dormitories, and general population areas, the team of physician, nurse practitioner and scheduler from the trip office should meet daily in a huddle to review complex patients, recent emergencies for their

population of patients, review recent and upcoming consultant appointments, and any other issues related to their patient population.

6. LSP should immediately discontinue use of health care orderlies to provide direct patient care. This includes use of inmate health care orderlies for the following services or areas where they may have access to confidential health information:
   a. Physical Therapy
   b. Radiology
   c. Laboratory
   d. Inmate orderlies may be used for janitorial duties

7. LSP should comply with CDC recommendations for prevention and management of COVID-19 in correctional institutions, including requiring staff and inmates to wear masks indoors.

**Specialty Care**
1. Eceptionist datasets should track referral to the completed appointment for every referral or consultation, including
   a. the provider who referred the patient,
   b. the nature of the request,
   c. the date of the referral,
   d. the date headquarters approved the appointment,
   e. the date of the appointment,
   f. whether the appointment was completed, and
   g. whether a report of the consultation was obtained.
2. Any patient returning from a hospital or specialty services off-site should:
   a. return through the ATU and be seen by a registered nurse who would review the paperwork for any urgent orders or recommendations.
   b. Reports should be timely forwarded to a medical provider for review, date and signature.
   c. A provider appointment needs to be scheduled with the patient within 5 days, to review the consultant recommendations, develop a plan of care, education the patient and determine the patient's willingness to accept the plan.
   d. If the medical provider disagrees with the consultants' recommendations, the clinical reason for departure from the recommendation needs to be documented with an alternate plan of care.

**Organizational Structure, Facility Leadership, and Custody Functions**

1. Headquarters and LSP Health Leadership need to conduct a data driven analysis of health services demands at LSP and develop a budget adequate to meet the medical needs of the population. If an adequate budget cannot be obtained to meet the medical needs of inmates with serious medical conditions, they should be transferred to other prisons.
2. Health care leadership should ensure that health care directives are regularly updated, comply with ACA and/or NCCHC standards.
3. Health Care Directives should provide sufficient operational detail to provide guidance to staff.  Staff should be trained on the policies.
4. The Warden should ensure that there are adequate custody escorts and transports to ensure that on-site and off-site medical appointments are kept.


5. For the infirmary, medical dormitories, and general population areas, the team of physician, nurse practitioner, nurses assigned to the area, and scheduler from the trip office should meet daily in a huddle to review complex patients, recent emergencies for their population of patients, review recent and upcoming consultant appointments, and any other issues related to their patient population.  A longer weekly meeting should be conducted to discuss, in addition to items in the daily huddle, management of

**Credentialing**

1. Credentialing policy at LSP should require that a typical credentialing practice is to include review and consideration of all of the following (including for specialists who work onsite at LSP):
   a. Proof of identification
   b. Primary source verification of education, training, medical certification, current licensure and DEA licensure
   c. Review of curriculum vitae and work history
   d. Review of National Practitioner Data Bank
   e. Review of letters of reference
   f. Review of criminal background
   g. Review of an application to include health status and attestation of physical and mental health
2. Providers should be privileged and hired based on having appropriate credentials. Physicians should have completed residency taining in Family Practice, Internal Medicine, or Emergency Medicine.
3. Nurse practitioners should be a certified nurse practitioner and have training in primary care.
4. Nurse practitioners and physician assistants should have their collaborative agreement or supervising physician documentation placed in the credential file.

5. All providers and nurses should have a professional performance evaluation annually that is placed in their personnel file with their credentialing information. Credentialing information is maintained in a secure location.
6. Up-To-Date should be placed in every clinic examination area and on the infirmary and used as the basis for nurse practitioner collaborative agreement references.

**Mortality Review**
1. Develop a policy on mortality review to include the following:
   a. Deaths should be tracked.
   b. All deaths should include an autopsy.
   c. Mortality reviews should be completed for each death to include:
      i. Date of review
      ii. Patient name
      iii. Patient DOC number
      iv. Date of Death
      v. Age and date of birth
      vi. Facility
      vii. Place of death (e.g. hospital, infirmary, etc.)
      viii. Category of death (natural, homicide, suicide, etc.)
      ix. Expected or unexpected death
      x. Cause of death
      xi. Mental health diagnoses
      xii. Problem list
      xiii. Medications at time of death
      xiv. Case summary that includes both nursing and physician input that includes a summary of the care of the patient for their illnesses and care related to the cause of death or care that needs to be highlighted that identifies opportunities for improvement
      xv. Autopsy diagnosis
      xvi. A list of opportunities for improvement and recommendations for corrective action
      xvii. Opportunities for improvement should be referred to the quality improvement committee to address and to follow up on until the identified problem is resolved. The goal is to improve care.
   d. Procedures for who should perform mortality review and an independent outside reviewer until LSP has established it can provide adequate medical care and until staffing is improved

**Peer Review**
1. Annual provider peer review should be done. Results of these reviews should be placed in the credential file.
2. Provider peer review based on chart review should include:
   a. Review by an external independent physician until LSP is providing constitutional care.

    b. Select records from those with serious medical conditions including deaths, sentinel events, patients hospitalized for potentially preventable events, and those with high acuity medical conditions.

    c. Establish a record review process that ensures that all providers have a sufficient number of records reviewed.

    d. The duration of time of record review needs to span several chronic care visit episodes.

3. Nursing staff should have an annual performance evaluation completed and placed in their credential file.

**Staffing**

1. A data driven staffing analysis needs to be conducted to determine the numbers and types of staff (medical providers, registered nurses, licensed practical nurses, certified nurse's assistants) needed to provide adequate medical care to patients with serious medical needs.  The analysis should exclude inmates providing direct patient care or working in areas where they have access to confidential medical information.

2. Pending this analysis and given the medical acuity of the population, it is our opinion that current physician staffing is inadequate.

3. We recommend the addition of an Assistant Medical Director to assist the Medical Director with clinical and administrative oversight.

4. Given the complex medical missions of the facility we recommend increasing physician positions.

    a. A physician to have oversight of the ATU and EMS program.

    b. A physician to evaluate patients and have oversight of the infirmary and assisted living units.

5. LSP must hire sufficient nursing staff to administer all medications to the population.

6. Each of the infirmary, high acuity medical dorms, and camp teams should include a trip nurse and staff nurses who assist in clinics, medication administration, and other activities of the team.

**Policies and Procedures**

1. The policies and procedures should reflect the minimal standards as published by the National Commission on Correctional Health Care. A group of policies as represented in the most recent edition of the National Commission on Correctional Health Care prison standards should be included.

2. The policies should be site specific with the procedural section clearly guiding staff on specific tasks.  The policies should be specific enough to guide staff in expectations with patient encounters such as nursing sick call, provider sick call, infirmary admissions, medication administration, and all other service delivery areas.

3. The practice of staff at LSP should follow the policies and procedures and this should be monitored with continuous quality improvement data collection tools that have the policies and procedures as their foundation.
4. Staff should have access to the policies and procedures at all times, and tested for competency.

**Medical Records**
1. LSP should implement an electronic health record should be implemented.
2. Medical records must include copies of reports for all offsite consultant and testing and from all hospitalizations. These reports should be filed within five working days.
3. A complete consultant reports and hospital reports must be provided to the primary care provider for review and filed in the paper record or scanned to the electronic record within five days of occurring.
4. All medication administration records need to be timely filed in the medical record.
5. Medical records policy should be updated to include a physician order sheet to record all medical provider orders in a single location that would enable staff to determine active orders, including medications.
6. Medical providers should update Problem Lists.
7. Access to the electronic health record should be made available to clinicians who are consultants or work in hospitals that serve LSP.

**Internal Monitoring and Continuous Quality Improvement**
1. The administrator of the prison health services program should be well versed in components of an effective quality improvement program and assist in defining the metrics utilized to measure the adherence to policy, procedure, and measure patient outcomes as a result of compliant practice.
2. LSP should appoint a continuous quality improvement coordinator with education and experience specific to quality improvement, to establish, implement, and lead the quality program.
3. The quality assurance program should include a structured process to find areas in need of improvement and measure each major service area at least annually following quality performance measures that include: accessibility, appropriateness of clinical decision making, continuity, timeliness, effectiveness (outcomes), efficiency, health staff-patient interaction, and safety. The major services areas required to be annually measured include: intake processing, acute care (sick call in both general population and segregation housing), medication services, chronic care services, intrasystem transfer services, scheduled off-sites specialty services, unscheduled off-site specialty services, mental health services, dental services, ancillary services (e.g. lab and x-ray), dietary services, infirmary services, and assisted living services. This would include tracking and analyzing more useful data to get a clearer picture of care and outcomes."
4. The quality assurance committee should include representatives from all care areas including provider staff, nursing, dental, mental health, and security.

5. Quality assurance activities should include line staff such that they understand how their practice contributes to the quality program.

6. Fund and initiate a joint quality improvement project to be run with UMNCO to evaluate root cause issues with medical handoffs and transfer of information to ensure that patient safety is protected.