## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **VOICE OF THE EXPERIENCED,** a membership organization on behalf of itself and its members; **and MYRON SMITH, DAMARIS JACKSON, NATE WALKER, DARRIUS WILLIAMS, KEVIAS HICKS, JOSEPH GUILLORY, KENDRICK STEVENSON,** and **ALVIN WILLIAMS,** on behalf of themselves and all others similarly situated, | **CIVIL ACTION** **NO.: 3:23-cv-1304** **JUDGE BRIAN A. JACKSON** |
| **VERSUS** | **MAGISTRATE JUDGE** **ERIN WILDER-DOOMES** |
| **JAMES LEBLANC,** in his official capacity as Secretary of the Louisiana Department of Public Safety and Corrections**; TIMOTHY HOOPER,** in his official capacity as Warden of Louisiana State Penitentiary; **MISTY STAGG,** in her official capacity as Director of Prison Enterprises, Inc.; the **LOUISIANA DEPARTMENT OF PUBLIC SAFETY & CORRECTIONS;** and **PRISON ENTERPRISES, INC.** | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM IN OPPOSITION TO PLAINTIFFS' APPLICATION FOR PRELIMINARY INJUNCTION AND TRO

**NOW INTO COURT,** through undersigned counsel, come Defendants herein, **JAMES LEBLANC,** in his official capacity as Secretary of the Louisiana Department of Public Safety and Corrections, **TIMOTHY HOOPER,** in his official capacity as Warden of Louisiana State Penitentiary, **MISTY STAGG,** in her official capacity as Director of Prison Enterprises, **LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS** and **PRISON ENTERPRISES** ("Defendants"), who file this opposition to Plaintiffs' Application for

1

Preliminary Injunction and TRO. R.Doc. 37. Plaintiffs fail to meet their heavy burden of proof for a preliminary mandatory injunction and their motion should be denied.

## I.    Introduction

In this putative class action, plaintiffs seek overbroad and sweeping injunctive relief to cease all operations of the Farm Line when the heat index exceeds 88 degrees, a request that far exceeds the constitutional requirements, as well as any standard that may apply to any farmer across the United States.  The Farm Line, which is operated in accordance with constitutional and industry standards, is solely used to harvest fruits and vegetables for inmate consumption and is an integral part of the operation of LSP.  Plaintiffs admit that LSP currently has a Heat Pathology policy in place, which governs the very issue here: protection from heat related illnesses while working outdoors. Contrary to plaintiffs' unsupported allegations, the heat policy in effect is followed by LSP, which includes monitoring of temperatures every two hours, issuing heat alerts if the heat index exceeds 88 degrees, providing rest and water breaks every 30 minutes once a heat alert is issued. This policy, and the operation of the Farm Line, is constitutionally appropriate.

Nevertheless, plaintiffs seek a mandatory preliminary injunction to cease any an all operations of the Farm Line. Plaintiffs have failed to show entitlement to relief. Neither of plaintiffs' experts can or do opine that all work outdoors should cease when the heat index exceeds 88 degrees.  In fact, plaintiffs' experts admits that over 32 million people work outdoors across the United States. Yet, despite the current policies in place that provides adequate rest and water breaks for outdoor workers, plaintiffs attempt to impose standards on LSP that do not even apply to the farming industry as a whole.

Plaintiffs' application for a preliminary injunction should be denied for the following reasons:

- Plaintiffs fail to establish a substantial threat of irreparable injury if the injunction is denied because LSP's current Heat Pathology policies already address the issues raised by Plaintiffs.

- Plaintiffs are not likely to succeed on the merits because:
  - LSP implements a Heat Pathology policy for protection of inmates working outdoors once the heat index reaches 88 degrees, including access to ice, water and Gatorade, five-minute breaks every thirty minutes, and adjusted working schedules.

  - The operation of the Farm Line, which harvests vegetables solely for inmate consumption, is run in accordance with modern day industry standards, including the use of machines where appropriate and personal protective gear. Plaintiffs' claims of 8th amendment violations, including all opinions of their experts, are based on demonstrably untrue statements by the named plaintiffs.

  - Plaintiffs cannot demonstrate deliberate indifference where LSP created and implements its Heat Pathology policy, which specifically addresses the alleged constitutional violations.

- The certain and immediate harm to Defendants if the injunction is granted, which includes an enormous financial burden, outweighs plaintiffs' speculation of potential injury if the injunction is denied; and

- The public interest is served if the Motion is denied. A ruling prohibiting any inmate from working on the Farm Line if the heat index exceeds 88 degrees would effectively open the flood gates to cease any and all work in any institution across the South. Given that according to Dr. Vassallo, over 32 million people a year work outdoors, it is an absurd result to cease any and all outdoor operations.

- The requested relief, to cease operation of the Farm Line, far exceeds what is allowed under the PLRA, which requires relief that only remedies the alleged constitutional injury. Plaintiffs cite to no authority for the proposition that a complete stoppage of all outdoor work is constitutionally required.

As such, Defendants pray that plaintiffs' application for preliminary injunction be denied.

## II.    Factual Background
### A. Louisiana State Penitentiary

Louisiana State Penitentiary is a fully self-sufficient facility. LSP is responsible for all maintenance of the entire 18,000 acres including maintenance of all buildings, powerlines, plumbing, electrical, roadways and all of the grounds.[1]

---

[1] Exhibit A, Affidavit of Maghen Gagnard.

In accordance with state law and the constitution, every inmate at LSP is assigned a job, subject to the inmate's "duty status" as determined by a medical health care provider.[2] "It is the policy of LSP to provide as many offenders as possible the opportunity to be employed productively in internal maintenance, culinary, farm operations, and industrial assignments, consistent with their custody status and supervision requirements and the needs of the institution."[3] When an inmate arrives at LSP, LSP will conduct an Initial Classification Board to determine the inmate's custody status, housing assignment and job assignment.[4] The job assignments afford inmates the opportunity to learn job skills and develop good work habits and attitudes.[5] Offenders may be assigned to meaningful work assignments consistent with their ability, interest, medical status, and needs of the facility.[6] Contrary to the declarations of the plaintiffs in this case, new arrivals at Angola are not automatically assigned to the Farm Line.

### B. The LSP Farm Line operations are constitutionally appropriate

LSP grows various fruits and vegetables that are harvested for inmate consumption. Because of the Farm Line, inmates enjoy fresh vegetables at least twice a day.[7] In 2023, over 200,000 pounds of fresh vegetables were issued to the LSP kitchens from the Farm Line to feed over 4,000 inmates.[8] These vegetables are not sold on the open market and LSP does not profit from its Farm Line.[9] Prison Enterprises does not run or operate the Farm Line at LSP.[10] LSP alone operate its Farm Line.[11]

---

[2] Exhibit A, Affidavit of Maghen Gagnard.
[3] Exhibit A-3, LSP Directive 19.003.
[4] *Id*.
[5] *Id*.
[6] *Id*. See also Exhibits A-2 and A-5,  Directive 18.002 and 13.063.
[7] Exhibit A, Affidavit of Maghen Gagnard.
[8] *Id*.; Exhibit A-1, Vegetable Yields.
[9] *Id*.
[10] Exhibit G, Affidavit of Misty Stagg.
[11] Plaintiffs define the Farm Line as Lines 15a, 15b, 24 and 25. However, plaintiffs attach documents regarding other lines at LSP. For clarity, Lines 24 and 25 go out to the fields. Lines 6A and 6B work in the

These vegetables are planted, cultivated and harvested using industry standards according to each vegetable.[12] For example, squash, cucumber, zucchini, snap beans, peas and okra are planted using a six-row planter that is pulled by a tractor.[13] These vegetables are planted after a rain, and generally no initial watering is required.[14] Before these vegetables are harvested, they are cultivated by a six-row cultivator (pulled by a tractor), which is performed as needed every few weeks.[15] Contrary to the declarations, inmates are rarely required to weed or cultivate every vegetable by hand.[16] Because these individual vegetables mature are different rates, they cannot be harvested with a machine and they are harvested by hand.[17] Another example is potatoes. These must be planted by hand, but are cultivated and harvested using machines.[18] The only manual labor that is required is to pick the potatoes up from the top of the ground and place in crates.[19] Similarly, vegetables such as carrots, beets, cabbage, collard greens, carrots, broccoli, beats and turnips are planted with six row planters and cultivated with tractors.[20] They are hand-picked because the vegetables cannot be harvested by a machine.

Inmates on the Farm Line are generally at the fields by 8:00 am. Generally, inmates are transported to the work area by bus.[21] Occasionally, if the work area is close to work crews' dorm (no more than 100 yards), inmates may walk to the work area.[22] They work until about 11:30, and

---

grading shed and processing plant, not outdoors. Lines 15a and 15b are grass cutting lines. Line 15a is a trustee line. Looking to the Lines 15a, 15b, 4 and 25, less than 50 inmates would be out on any given day. See R.Doc. 37-35.

[12] Exhibit C, Affidavit of Tommy Guilino.

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] Exhibit D, Affidavit of Gabriel Hebert.

[22] *Id.*

will be back at the gates by 11:40. Contrary to the declarations, there are no quota requirements and inmates can work at their own pace.[23] They are able to take breaks and get water as needed.[24] Once a heat alert is issued, organized and scheduled breaks are given every 30 minutes.[25]

Inmates who are assigned to grass cutting crews will begin work around 8:00 am and work until around 10:15 am. Because of the needs of the facility and grass maintenance, the grass crew will sometimes work in the afternoon.[26] Like the field crew, the grass crew can work at their own pace and take rests and water breaks as needed.[27]

Plaintiffs mischaracterize the purpose of the "Daily Line Counts" when they assert that no breaks are given because breaks are not recorded in the Daily Line Counts. This is an internal document that officers fill out to document how many offenders are working.[28] The officers are not instructed to document breaks. If a break is not documented in the Daily Line Count, that does not mean a break did not occur. In fact, LSP does not document breaks because inmates can work at their own pace and take breaks as needed.[29]

In the field, inmates are provided water and Gatorade, which are contained in water jugs.[30] These jugs have tops, which remain closed while in the field.[31] The jugs are sanitized daily and brought back out in the field for each shift.[32]

---

[23] *Id.*
[24] *Id.*
[25] *Id.*
[26] Exhibit D, Affidavit of Gabriel Hebert.
[27] *Id.*
[28] *Id.*
[29] *Id.*
[30] *Id.*
[31] *Id..*
[32] *Id..*

All inmates are issued standard clothing, which includes both rubber and lace up boots.[33] Inmates are also issued gloves and a drinking cups.[34] At any time, an inmate can request a sun hat, which would remain with the inmate.[35] Inmates who are assigned to the grass cutting lines are issued vests and protective eyewear.[36]

### C. LSP's Heat Pathology Policies in place are constitutionally appropriate

LSP Directive 13.067 was enacted to "establish provisions for the reduction of heat pathology and to reduce the exposure to offenders identified as more vulnerable to heat."[37] The corresponding DOC Health Care Policy 8 was established using sound medical opinions and was created, evaluated and approved by multiple physicians and psychiatrists.[38] The policy is evaluated for necessary changes annually.[39]

Pertinent to this lawsuit, Directive 13.067 provides the following with regards to outdoor procedures:

1. The Warden or designee shall ensure the following outdoor procedures are implemented for all offenders in all outdoor areas between 9:00 AM and 7:00 PM (May 1st- October 31st)
2. Outside temperatures are monitored using the National Weather Center website https://www.weather.gov/, recorded every two hours, and reviewed and approved by the Warden or designee;
3. When the apparent temperature (heat index) outdoors has exceeded 88 degrees Fahrenheit, a heat alert shall be announced;
4. Upon the announcement of a heat alert, the following measures shall be provided while working outdoors:
   a. Water and ice is available at least every 30 minutes; and
   b. A rest break at least 5 minutes long is offered every 30 minutes.

NOTE: Work hours may be adjusted to accommodate extreme temperatures.

---

[33] Exhibit A, Affidavit of Maghen Gagnard.
[34] Exhibit D, Affidavit of Gabriel Hebert
[35] *Id*.
[36] *Id*.
[37] Exhibit H, LSP Directive 13.067.
[38] Exhibit E, Affidavit of Dr. Lavespere; Exhibit E-1, HPC8.
[39] *Id*.

5. The Warden or designee shall ensure the heat precautions implemented from May 1st through October 31st of each year as outlined in section 3. above are documented and maintained at the facility.

Note: Regardless of time of year or temperature, the above provisions in no way negate the standard requirements regarding the provision of adequate water and or ice for outdoor work crew and housing areas

LSP's records show that LSP does in fact check the temperature every two hours.[40] Heat alerts are issued as needed through the Station Logs.[41] Once a heat alert is issued, officers are notified via radio.

In relation to inmates who may be vulnerable to the heat, the Directive provides that offenders identified by a healthcare practitioner with a chronic illness that may be affected by heat or those prescribed medication that may impact sensitivity to heat shall be evaluated and educated for potential adverse reactions concerning heat or photosensitivity related pathology. Implementation of appropriate measures will be taken, if indicated, to reduce the risk of adverse outcomes."[42] If an inmate is on any medication listed in the Heat Pathology Medications, the inmate shall be issued a heat precautions duty status. Otherwise, the health care provider determines on a case-by-case basis whether a heat precaution duty status is necessary. A Heat Precautions Duty Status is as follows:

1. The Warden or designee shall ensure that the heat precaution duty status includes, but is not limited to the following:
   a. The offender must be brought indoors from May 1st through October 31st of each year; once the apparent temperature reaches 88 degrees;
   b. The offender shall not participate in sports once the apparent temperature reaches 88 degrees; and

---

[40] Exhibit A, Affidavit of Maghen Gagnard; See also Exhibits A-8 and A-9, Temperature Logs.
[41] See Exhibit A-7, Station Logs. Defendants note that its initial production in April mistakenly contained gaps in the Station Logs. Plaintiffs did not notify Defendants of this mistake until after the Application for Preliminary Injunction was filed. Defendants immediately supplemented their production and attach all Station Logs to this opposition.
[42] Exhibit H, Directive 13.067.

    c.    The offender shall not be re-assigned to jobs in environments that are typically hotter than normal indoor temperatures, such as kitchen or warehouse environments.

  2.    The Warden or designee shall ensure a list of all offenders with a heat precaution duty status as outlined above in section 1. of this directive is provided weekly, from May 1st through October 31st of each year, to the designated supervisor responsible for their care and custody.

Two of the named plaintiffs, Nate Walker and Kendrick Stevenson, have been issued Heat Related Duty Statuses.[43] These plaintiffs are not required to work outdoors between May and October when the heat index reaches 88 degrees. In fact, over 500 inmates currently have a heat-related duty status at LSP.[44]

The DPS&C and corresponding LSP Directive for Heat Pathology were prepared and implemented in accordance with medical opinions. DPS&C has a Pharmacy and Therapeutics Committee that annually reviews the medical list to update as necessary.

### D.  Medical care available to inmates working outdoors

Any inmate may declare a medical emergency at any time. If an inmate is working outdoors and declares a medical emergency, the inmate will sit until the health care professional arrives.[45] A health care professional will assess the inmate, communicate with the ATU if necessary, and determine whether the inmate should be taken to ATU.[46]

Contrary to plaintiffs' allegations, inmates regularly use this emergency sick call procedure while working outdoors. However, these complaints rarely concern heat related issues. For example, LSP pulled all sick calls made from the field from April to May 15 of this year. The complaints included shoulder pain, back pain, foot abrasions, finger injury, toothache, hip pain,

---

[43] See Exhibit B-10, Nate Walker duty status; Exhibit B-9, Kendrick Stevenson duty status.
[44] Exhibit A, Affidavit of Maghen Gagnard.
[45] Exhibit B, Affidavit of Ashli Oliveaux; Exhibit D, Affidavit of Gabriel Hebert.
[46] Exhibit B, Affidavit of Ashli Oliveaux.

flank pain, and rash.[47] One inmate complained of chest pain and was brought to the ATU.[48] Another inmate complained of dizziness.[49] He was put in the shade to rest and was not required to work his remaining shift (less than 45 minutes remaining). Clearly, the current medical emergency care is adequate, and inmates working in the field frequently utilize such care, even for minor complaints or issues.

### E. Current job assignments for the named plaintiffs

Per the Court's request, the following is a summary of each named plaintiff's job assignment:

- Kendrick Stevenson – Heat related duty status issued after provided prescription for Zyprexa in March 2024.[50] He is currently located at the Sobriety Dorm Program. He does not currently have a job assignment.
- Nate Walker – Heat related duty status.[51] Walker is currently assigned to a line located at Raven dorms. Raven dorms have not been out to the field since December 2021.
- Myron Smith – Line 15b. From April 22, 2024, to present, Myron Smith has worked a total of 32 hours.[52]
- Alvin Williams – Line 25. From April 22, 2024, to present, Alvin Williams has worked a total of 12 hours.[53]
- Joseph Guillory is currently assigned to Line 10. LSP has not sent Line 10 to the fields since 2021.
- Kevias Hicks is currently a Grounds Keeper on Falcon Yard. Grounds Keepers are not considered a part of the Farm Line (even under Plaintiffs' definition) and they keep the outside area of Falcon Unit neat and clean.
- Damarius Jackson is currently located at the Sobriety Dorm Program. He does not currently have a job assignment.[54]
- Darrius Williams is currently in Preventative Segregation. He does not currently have a job assignment.[55]

---

[47] Exhibit B, Affidavit of Ashli Oliveaux.
[48] Exhibit B, Affidavit of Ashli Oliveaux; See also Exhibit B-1, Self-Declared Emergencies.
[49] *Id*.
[50] Exhibit B-9, Stevenson Heat Related Duty Status.
[51] Exhibit B-10, Walker Heat Related Duty Status.
[52] See Exhibit B-11, Line 15b Incentive Pay Roster.
[53] See Exhibit B-12, Line 25 Incentive Pay Roster.
[54] Exhibit B, Affidavit of Ashli Oliveaux.
[55] *Id*.

Defendants attach the named plaintiffs' medical records,[56] as well as all emergency sick calls made from the field from April 2024 to present.[57]

## III.    Law and Argument

### A.  The heightened burden for preliminary mandatory injunction

A preliminary injunction is an "extraordinary and drastic remedy" that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.[58] A preliminary injunction is the exception, not the rule.[59] A plaintiff seeking a preliminary injunction must establish (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) that their substantial injury outweighs the threatened harm to the party whom they seek to enjoin; and (4) that granting the preliminary injunction will not disserve the public interest.[60] If the movant fails to carry the "heavy burden" to show each of these prerequisites, a preliminary injunction is not warranted.[61]

The decision to grant or deny a preliminary injunction is discretionary with the district court.[62] However, because a preliminary injunction is an extraordinary remedy, it "should not be granted unless the party seeking it has clearly carried the burden of persuasion on all four requirements."[63]

In addition, mandatory preliminary relief "which goes well beyond simply maintaining the status quo pendente lite, is particularly disfavored, and should not be issued unless the facts and

---

[56] Exhibit F.

[57] Exhibit B-1.

[58] *Munaf v. Geren*, <u>553 U.S. 674, 689</u>, <u>128 S.Ct. 2207</u>, <u>171 L.Ed.2d 1</u> (2008).

[59] *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, <u>760 F.2d 618, 621</u> (5th Cir. 1985).

[60] *Planned Parenthood Ass'n of Hidalgo Cty. Tex., Inc. v. Suehs*, <u>692 F.3d 343, 348</u> (5th Cir. 2012); accord *Canal Auth. of Fla. v. Callaway*, <u>489 F.2d 567, 572</u> (5th Cir. 1974).

[61] See *Enterprise Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, <u>762 F.2d 464, 472</u> (5th Cir. 1985).

[62] *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, <u>760 F.2d 618, 621</u> (5th Cir. 1985).

[63] *Suehs*, <u>692 F.3d at 348</u>.

law clearly favor the moving party."[64] Because "[a]n indispensable prerequisite to issuance of a preliminary injunction is prevention of irreparable injury, [o]nly in rare instances is the issuance of a mandatory preliminary injunction proper."[65]

In the context of injunctions against correctional facilities, based on the PLRA, "preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the violation of the federal right, and be the least intrusive means necessary to correct the harm."[66] Public policy, and the Supreme Court, counsels federal courts to "eschew toward minimum intrusion into the affairs of state prison administration."[67] The Supreme Court warned against federal courts making decisions regarding "the day-to-day functioning of state prisons and involv[ing] the judiciary in issues and discretionary decisions that are not the business of federal judges."[68] Stated differently, "[w]hen weighing any form of injunctive relief, federal courts must be mindful not to jump at the chance to take prison administration into their own hands and out of the hands of the people entrusted with such tasks by the state."[69]

### B. Plaintiffs seek overbroad class wide relief prior to class certification

In this putative class action, plaintiffs seek class wide relief before any certification order has been issued. While courts may issue conditional class relief prior to class certification, plaintiffs fail to even address or show that such conditional relief, on a class wide basis, is warranted. Only two of the named plaintiffs are currently working in the fields.

---

[64] *Three Expo Events, L.L.C. v. City of Dallas, Texas*, 182 F.Supp.3d 614, 622 (N.D. Tex. 2016)(quoting *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976)).

[65] *Tate v. American Tugs, Inc*., 634 F.2d 869, 870 (5th Cir. 1981) (internal quotation marks omitted).

[66] *Ball v. Sanders*, No. CIV.A. 13-282-JWD, 2015 WL 58872, at *1 (M.D. La. Jan. 5, 2015).

[67] *Alex A. by & through Smith v. Edwards*, No. CV 22-573-SDD-RLB, 2022 WL 4445499, at *18 (M.D. La. Sept. 23, 2022)

[68] *Mecham v. Fano*, 427 U.S. 215, 228-229 (1976).

[69] *Alex A. by & through Smith v. Edwards*, No. CV 22-573-SDD-RLB, 2022 WL 4445499, at *18 (M.D. La. Sept. 23, 2022). See also *Creel v. City of Baton Rouge/Par. of E. Baton Rouge*, No. CV 20-880-SDD-EWD, 2021 WL 856710, at *1 (M.D. La. Mar. 8, 2021).

While Dr. Vassallo makes broad sweeping statements that all persons are at risk for heat related illnesses, she admits that "some healthy people with no known medical problems will tolerate heat more easily."[70] Yet, plaintiffs seek a mandatory injunction to cease all operations of the Farm Line for all inmates, whether they are allegedly "medically vulnerable" or healthy.

Dr. Vassallo's opinions demonstrate that the broad sweeping injunctive Plaintiffs seek for all inmates that may be assigned to the Farm Line is inappropriate. Dr. Vassallo asserts that the current policies in place are inadequate because: (1) the heat pathology medications are under inclusive; (2) it fails to indicate that heat worsens underlying medical conditions; (3) it fails to mandate that medically vulnerable inmates receive a duty status from field labor work; and (4) it fails to allow individuals to take breaks in an air-conditioned facility.[71]

At the outset, Defendants dispute these opinions, see Section C(1)(a), *infra*. Regardless, Dr. Vassallo's first three opinions solely concern "medically vulnerable" inmates, and not the broad class for which plaintiffs seek injunctive relief.  As such, her only opinion as to the alleged inadequacy of the Directive that would apply to all inmates assigned to the Farm Line is that inmates are not brought in an air-conditioned facilities for rest breaks. Aside from the fact that Plaintiffs cite to no case law[72] or even industry standards that require rest breaks in an air-conditioned facility, this one opinion does not support an injunction to cease all operations of the Farm Line when the heat index exceeds 88 degrees. As such, this injunctive relief plaintiffs seek on a class wide basis, prior to certification, should be denied.

---

[70] R.Doc. 37-3, p. 20.
[71] R.Doc. 37-3, p. 29.
[72] In facts, the Fifth Circuit has held that LSP was not required to install air conditioning on Death Row because this relief exceeds what is required under the Constitution. *Ball v. LeBlanc*, 792 F.3d 584, 599 (5th Cir. 2015).

**C. Plaintiffs fail to meet their burden for a preliminary mandatory injunction**
**1. Plaintiffs fail to demonstrate a substantial likelihood of success on the merits**

Plaintiffs seek a mandatory preliminary injunction prohibiting the entire operation of the Farm Line for all inmates once the heat index reaches 88 degrees. Plaintiffs cannot show that the law clearly favors this relief where: (1) the heat pathology policies in place are directly on point to plaintiffs' claims and are constitutionally sufficient; (2) Plaintiffs' unsupported allegations cannot support a finding that the current operating conditions of the Farm Line violate the 8th Amendment; and  (3) Plaintiffs cannot show deliberate indifference.

**a. LSP's Heat Pathology policy is constitutionally appropriate**

Plaintiffs admit that there are specific heat pathology policies in place to govern the very crux of Plaintiffs' claims. Plaintiffs argue that the policy is inadequate and that the policy is not followed. Both arguments are without merit.

Dr. Vassallo states that the Heat Pathology as written is "inadequate to protect incarcerated people at Angola from the risk of heat-related illness." She opines that the Heat Pathology medications that require a heat related duty status is under inclusive. While Defendants dispute this statement, it is irrelevant to plaintiff's request for a preliminary injunction to cease all farm Line Operations for all inmates, even those who are not prescribed any medication. Further, DPS&C created this Heat Pathology medication list with the assistance of Dr. Lavespere (DPS&C Chief of Medical Operations), Dr. Gamble (LSP Medical Director) and Dr. Herman Soong (Psychiatrist).[73] DPS&C's Pharmacy and Therapeutics Committee, which is comprised of all institution's Medical Directors and the Chief Pharmacists, review the medical list yearly to update

---

[73] Exhibit E, Affidavit of Dr. Lavespere.

if required.[74] Based on the Committee's current recommendations, the medication list is adequate.[75]

Dr. Vassallo next states that the policy is inadequate because "It fails to indicate that heat exacerbates or worsens underlying medical conditions and disorders." To the contrary, the policy states that "Offenders identified by a healthcare practitioner with a chronic illness that may be affected by heat … shall be evaluated and educated for potential adverse reactions concerning heat or photosensitivity related pathology" and that the "health care practitioner/provider determines on a case-by-case basis if a heat precaution duty status is to be ordered based on the offender's chronic disease."[76]

Dr. Vassallo further states that the "protocol fails to recognize that to avoid dehydration and heat exhaustion/stroke, individuals should be permitted to take breaks and recover from the heat in a cool, air-conditioned location." She cites to no authority whatsoever for this proposition. Further, as the Fifth Circuit found in *Ball*, in Eighth Amendment cases, plaintiffs can only obtain a remedy that reduces the risk of harm to a socially acceptable level.[77] Requiring LSP to install AC units on death row was held to be outside of the constitutional requirements. Likewise, requiring rest breaks in air conditioned facilities is outside of the constitutional requirements. It is the Chief Medical Director of DPS&C's opinion that the current policy of required 5-minute breaks every 30 minutes and access to water is sufficient to reduce heat pathology among all offenders working outdoors.[78]

---

[74] *Id*.
[75] *Id*.
[76] Exhibit H, Directive 13.067.
[77] *Ball v. LeBlanc*, 792 F.3d 584, 599 (5th Cir. 2015).
[78] Exhibit E, Affidavit of Dr. Lavespere.

In addition, plaintiffs' arguments that the current policies are not being followed are without merit. Plaintiffs created a Heat Index Tracker and attached to their motion for the proposition that the Heat Pathology Policies are not followed. R.Doc. 37-50. This Comparative Heat Index Tracker is based on flawed information and misinterpretations of LSP's internal documents. At the outset, plaintiffs rely on a "NWS (Temp/Heat Index)."[79] This heat index chart was purportedly created by Plaintiffs' counsel. See R.Doc. 37-3, p. 25, para 89. Dr. Vassallo attempts to authenticate this chart by stating that she reviewed the chart created by Plaintiffs' counsel.[80] However, Dr. Vassallo is not a meteorologist and neither Dr. Vassallo nor Plaintiffs' counsel cite to any authority for the creation of this heat index chart. As such, the entire basis of the chart, which purportedly compares whether LSP issued a heat alert when the heat index exceeds 88 degrees, is flawed. Regardless, even based on Plaintiffs' flawed chart which is not supported by the documents they attach,[81] a heat alert was documented: 17 of the 22 days in June;19 of the 20 days in July; 21 of the 23 days in August; 9 of the 10 days in September. Based on Plaintiffs' unsupported temperature data and its misinterpretation of LSP's documents, LSP issues heat alerts nearly every day. Any instance that plaintiffs allegedly show where a heat alert was not issued, at best, evidences negligence, which is not the standard to prove deliberate indifference.[82]

---

[79] See R.Doc. 37-50, footnote 1. Plaintiffs cite to the Heat Index Chart attached to Dr. Vassallo's Affidavit. R.Doc. 37-5. However, Dr. Vassallo merely states that she looked at the Heat Index Chart that was prepared by Plaintiffs' counsel. R.Doc. 37-3, p. 25, para 89.

[80] *Id.*

[81] The Comparative Chart also includes incorrect data. For example, chart alleges that no heat alert was issued on 6/7/2023. However, R.Doc. 37-52 p. 2 shows a heat alert was issued at 12:18 pm. Plaintiffs further assert that no heat alert was issued on 6/26/2023. R.Doc. 37-52, p. 39 shows that a heat alert was issued at 8:58 am on that date. Due to the time constraints on filing this opposition, Defendants have not been able to check each of plaintiffs' entries with the LSP station logs.

Another example of flawed data is that plaintiffs assert that the heat index exceeded 88 degrees on 6/5/2023. However, LSP's temperature logs show that the heat index was only at 86 degrees. Exhibit A-8.

[82] *Valentine v. Collier*, 956 F.3d 797, 802 (5th Cir. 2020).

Further, the Comparative Heat Index Tracker makes conclusory statements that rest and water breaks were not provided because the Daily Line Counts did not indicate such breaks were provided. As discussed above, the Daily Line Counts do not indicate when rest and water breaks are provided. Contrary to plaintiffs' allegations, inmates can take rest and water breaks whenever they need because inmates may work at their own pace, and can stop and get water at any time. LSP does not document the rest breaks provided since breaks are allowed at any time. However, LSP Field Operations Colonel attests that the required rest breaks once a heat alert is issued are given every 30 minutes.[83]

Further, inmates working in the fields will generally only work in the morning hours. Line 15b, which is a grass cutting crew, will occasionally work some afternoons due to the needs of the facility. However, these inmates are provided with the required rest breaks per the policy, and can take breaks at any time.

As the Fifth Circuit has made clear, federal courts cannot issue injunctions to state entities that require the entities to follow their own policies. *Valentine v. Collier*, 956 F.3d 797, 802 (5th Cir. 2020)(finding that an injunction that would promote compliance with a prison's own COVID-19 policies was prohibited under *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)). As such, any showing that LSP may not issue a heat alert on discreet days cannot form the basis for a preliminary injunction.

**b. The operation of the Farm Line is constitutional**

The entire crux of the motion, and plaintiffs' expert opinions, are based on the allegations of the named Plaintiffs. These allegations are simply false. The current operation of the Farm Line

---

[83] Exhibit D, Affidavit of Gabriel Hebert.

complies with industry standards and therefore goes above and beyond what is required under the constitution.

The fact that inmates are required to work does not raise a constitutional claim for deliberate indifference.[84] In determining whether to uphold an eighth amendment challenge to prison conditions, the court must consider whether the totality of the circumstances violates "contemporary standards of decency."[85]

In *Clarke v. Collins*, 5 F.3d 1494 (5th Cir. 1993), an inmate sought declaratory and injunctive relief arising from his claims that his work on the agricultural lines violated his constitutional rights. The Fifth Circuit held:

> A prison inmate has no constitutional right to a job of his choice and cannot base a civil rights action on general dissatisfaction with a job assignment. *Harris v. Greer*, 750 F.2d 617, 618 (7th Cir.1984). The Constitution does not mandate comfortable prisons, and to the extent that conditions of confinement may be restrictive and even harsh, they are ordinarily considered part of the penalty that criminal offenders pay for their offenses against society. See *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981). An inmate's feeling that he is being treated harshly, without more, does not qualify him for relief under section 1983. Rather, the Eighth Amendment's prohibition against cruel and unusual punishment requires a demonstration of "unnecessary and wanton infliction of pain." *Whitley v. Albers*, 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986). Though Clarke has convinced this court that he is no Thoreau, he has not demonstrated that his work on the agricultural line meets the threshold requirements for an Eighth Amendment claim.
>
> The uncomfortable conditions Clarke painstakingly describes, including the episodes with fire ants, poison ivy, cold weather, and cotton picking, do not raise questions of constitutional magnitude. They are simply part of working the agricultural line. As such, they represent "a de minimis level of imposition with which the Constitution is not concerned." *Simons v. Clemons*, 752 F.2d 1053, 1056 (5th Cir.1985).

---

[84] *Winston v. Stacks*, 243 F. App'x 805, 807 (5th Cir. 2007).
[85] *Rhodes v. Chapman*, 452 U.S. 337, 345–50, 101 S.Ct. 2392, 2398–2400, 69 L.Ed.2d 59 (1981).

In *Sampson v. King*, 693 F.2d 566, 568 (5th Cir. 1982), an inmate housed at LSP brought a 1983 action against DPS&C and LSP alleging that his exposure to a pesticide while working in the fields at LSP constituted cruel and unusual punishment. The court ruled:

> In general, the state has a responsibility to protect the safety of its prisoners. *Streeter v. Hopper*, 618 F.2d 1178, 1182 (5th Cir.1980); *Smith v. Sullivan*, 553 F.2d 373, 380 (5th Cir.1977). In operating a prison, however, the state is not constitutionally required to observe all the safety and health standards applicable to private industry. *Ruiz*, at 1159. Nor is it bound by the standards set by the safety codes of private organizations. *Bell v. Wolfish*, 441 U.S. 520, 543 n. 27, 99 S.Ct. 1861, 1876 n. 27, 60 L.Ed.2d 447 (1979). Standards suggested by experts are merely advisory. *Bell*, at 543 n. 27, 99 S.Ct. at 1876 n. 27; Ruiz, at 1149–50. A federal court required to gauge the conduct of state officials must use minimum constitutional standards as the measure.
>
> The magistrate erred in concluding that Sampson's work with Parathion constituted cruel and unusual punishment. No showing was made that Parathion is not regularly used by private farmers engaged in the sort of agriculture practiced by the prison. Prison officials should not be held to a higher standard of care than that practiced by responsible farmers in the surrounding agricultural community. A prison farm which adheres to the reasonable customs and usages of the surrounding area cannot be said to be imposing cruel and unusual punishment.

Here, Plaintiffs argue that the LSP Farm Line is inconsistent with industry practices. Plaintiffs' expert opinion is solely based on the named Plaintiffs' declarations. At the outset, these declarations are inconsistent with the current operation of the Farm Line, as discussed above. Further, the Farm Line does in fact comply with the "industry standards" cited by Green.

In her affidavit, Green cites to NIOSHI recommendations that commercial farmers should implement to mitigate heat-related illness among farm workers.[86] First, Green cites to case studies and recommendations given to farmers after a heat related incident takes place. Green cites to no current standards from OSHA or NIOSHI that apply to farmers across the nation. Further, while

---

[86] R.Doc. 37-7, p. 11.

the state is not constitutionally required to observe all the safety and health standards applicable to private industry,[87] the "recommendations" cited by Green are in fact implemented at LSP. LSP has implemented its Heat pathology Directive, which includes training of officers and inmates on heat illnesses; LSP provides potable water and Gatorade during the summer months and allows and encourages inmates to drink at regular intervals; LSP monitors the heat index and will adjust work schedules accordingly; and any inmate at any time may declare himself a medical emergency and receive medical attention in the field.

As such, plaintiffs failed to show that the conditions on the Farm Line fail to meet constitutional requirements.

### c. Plaintiffs fail to establish the likelihood of success on the deliberate indifference standard

"Deliberate indifference is an extremely high standard to meet."[88] In a constitutional claim alleging deliberate indifference to the conditions of a prisoner's confinement, the plaintiff must satisfy both the "subjective and objective requirements" of the Eighth Amendment inquiry.[89] To satisfy the objective requirement, the plaintiff must show an "objectively intolerable risk of harm."[90] To satisfy the subjective requirement, the plaintiff must show that the defendant: "(1) was 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists'; (2) subjectively 'dr[e]w the inference' that the risk existed; and (3) disregarded the risk."[91] In *Farmer*, the Supreme Court held that deliberate indifference requires the defendant to have a subjective "state of mind more blameworthy than negligence,"[92] akin to criminal recklessness.[93]

---

[87] *Sampson v. King*, 693 F.2d 566, 568 (5th Cir. 1982).
[88] *Cadena v. El Paso Cty.*, 946 F.3d 717, 728 (5th Cir. 2020).
[89] *Farmer v. Brennan*, 511 U.S. 825, 846, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).
[90] *Id.*
[91] *Cleveland v. Bell*, 938 F.3d 672, 676 (5th Cir. 2019).
[92] *Farmer*, 511 U.S. at 835, 114 S.Ct. 1970
[93] I*d*. at 839–40, 114 S.Ct. 1970.

Although a court may disagree with a defendant's actions, "mere disagreement" "does not establish deliberate indifference."[94]

Here, plaintiffs cannot show that Defendants have a subjective state of mind. LSP and DPS&C have implemented policies that govern outdoor work when the heat index exceeds 88 degrees. Defendants are not disregarding a substantial risk, but instead are implementing policies to protect inmates from the very risk they complain of.

In *Valentine v. Collier*, 956 F.3d 797, 802 (5th Cir. 2020), an inmate sought a preliminary injunction regarding COVID-19 precautions. It was undisputed that the prison has a COVID-19 policy in place. With regards to the deliberate indifference standard, the Fifth Circuit held that the district court collapsed the objective and subjective component. The Fifth Circuit held that the district court treated alleged inadequate measures as dispositive of Defendants' mental state, which resembled the standard of civil negligence that has been rejected by the Supreme Court. The question was not how the prison's policies were being administered, but whether Defendants subjectively believed the measures they were taking were inadequate.

The same reasoning applies here. Plaintiffs do not dispute that a Heat Pathology policy, which specifically governs outdoor work when the heat index exceeds 88 degrees, is in place. The policy itself is the antithesis of deliberate indifference. The policy was created by various doctors based on medical opinions. Based on Defendants' subjective state of mind, the policies are sufficient to protect against heat-related risks. Further, the operation of the Farm Line exceeds constitutional requirements. There is no evidence that given the current policies in place, coupled with the safe operation of the Farm Line, Defendants subjectively believe that the measures they are taking are inadequate.

---

[94] *Valentine v. Collier*, 956 F.3d 803.

Further, there is no evidence that the current policies in place are inadequate. There are no heat related illnesses indicated in the named plaintiffs' medical records. The medical records from recent sick calls made from the field demonstrate that most sick calls are not for heat related instances.[95] One inmate complained of dizziness, was immediately treated and allowed to forgo his remaining shift and rest in the shade.[96]

Plaintiffs solely rely on Dr. Vassallo, who cites to one case of an alleged heat related instance stemming from outdoor work from five years ago. While Dr. Vassallo indicates the EMT mistakenly interpreted symptoms of a heat stroke with a drug overdose, that inmate tested positive for opioids.[97] Regardless, this one allegation from 2019 does not show that the current policies in place are inadequate.

Plaintiffs fail to show a likelihood of success on the merits on their extremely high burden to show deliberate indifference. Like in *Valentine*, allegations that the current policies in place are inadequate are insufficient to meet the subjective component for deliberate indifference.

### 2. Plaintiffs fail to show irreparable harm

The Supreme Court has held that for a preliminary injunction, the standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction.[98] The Fifth Circuit has explained the heavy burden to establish irreparable harm or injury where adequate relief is available under the plaintiff's asserted cause of action: Federal courts have long recognized that, when 'the threatened harm is more than de minimis, it is not so much the magnitude but the irreparability that counts for purposes of a preliminary injunction.'"[99]

---

[95] Exhibit B, Affidavit of Ashli Oliveaux.
[96] *Id*.
[97] See redacted medical records from *Lewis* case for patient #51, Exhibit I.
[98] *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 22, 129 S. Ct. 365, 375, 172 L. Ed. 2d 249 (2008).
[99] *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir.1985) (quoting *Canal Auth. v. Callaway*, 489 F.2d 567, 575 (5th Cir.1974)).

"The possibility that adequate compensatory  or other corrective relief will be available at a later

date, in the ordinary  course of litigation, [weighs] heavily against a claim of irreparable  harm."[100]

At the outset, LSP has a policy in place to address the very issues they complain of. As

such, they fail to prove irreparable harm. Further, Of the eight named plaintiffs, only two are

currently assigned to the Farm Line. The most recent records indicate that Myron Smith has only

worked 32 hours over the past month, and Alvin William has only worked 12 hours. Plaintiffs have

failed to show that the current policies in place are insufficient to cause likely irreparable harm for

the two named plaintiffs, much less an un-certified class.

Further, plaintiffs are seeking a permanent injunction in this litigation. As such, there is a

possibility of "other corrective relief." As such, Plaintiffs' motion should be denied.

### 3. Defendants will suffer certain and immediate harm if the injunction is granted that outweighs plaintiffs' speculation of potential injury if the injunction is denied

Contrary to plaintiffs' allegations, the operation of the Farm Line is productive farming and

is essential to the operation of LSP, which incudes maintenance of the grass on the facility, as well

as feeding inmates fresh fruits and vegetables. If the injunction is granted, LSP will suffer

immediate harm. This includes an estimated cost of over $8 million to provide the necessary

vegetables to inmates. The cost to maintain landscaping, hay fields, and cattle operations

throughout the 18,000 acre facility is not capable of being enumerated at this time. In addition, the

current crops that have already been planted will rot and ruin.

Further, "any time a State is enjoined by a court from effectuating statutes enacted by

representatives of its people, it suffers a form of irreparable injury."[101] Here, as in *Valentine*, the

State of Louisiana has "assigned the prerogatives" of  administration of prison policy to

---

[100] (emphasis added) *Morgan v. Fletcher*, <u>518 F.2d 236, 240</u> (5th Cir.1975) (quoting *Va.  Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, <u>259 F.2d 921, 925</u>  (D.C.Cir.1958)).
[101] *Valentine*, <u>956 F.3d at 803</u>.

Defendants, and the Court's injunction would "prevent the State from effectuating the Legislature's choice and hence imposes irreparable injury."[102] As the *Valentine* court explained, the Supreme Court "has repeatedly warned that it is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons."[103] As such, like the *Valentine* defendants, Defendants will be irreparably harmed if the injunction is granted.

Given that Defendants have shown a policy in place that governs the very harm plaintiffs seek to enjoin, and that Defendants will suffer enormous immediate financial harm, plaintiffs' request for an injunction should be denied.

### 4. Public interest is served if the motion is denied

While Plaintiff's Motion asserts it is "always" in the public interest to prevent the violation of constitutional rights, there are limits to this sweeping statement. Indeed, "when a state statute vests state officials with broad discretionary authority  concerning [prison operations], the Constitution affords the prisoners no constitutionally protected interests that might outweigh defendants' or the public interests in prison administration."[104]

Louisiana courts have held it is "against the public interest to issue an injunction based solely on plaintiff's disagreement with the health care being provided" by "corrections officials who are presently charged with that obligation."[105] Again, the Supreme Court "has continuously

---

[102] *Id*.
[103] *Id*. (quotations omitted).
[104] *Patterson v. Daniels*, No. 12-1674, 2010 WL 2100546, at *21 (E.D. La. March 22, 2013).
[105] *Hawkins v. Hawkins*, No. 3:11–cv–1325, 2012  WL 601426, at *9 (W.D. La. Jan. 2, 2012) (where plaintiff inmate complained of denial of prompt  and appropriate medical care and requested injunctive relief for same).

cautioned federal courts from assuming a greater role in decisions affecting prison administration."[106]

Further, the issuance of an injunction in this case will open the flood gates across the South regarding inmate labor outdoors. Public interest is not served where constitutional requirements for laboring outdoors exceeds that of what is required in the farming industry. Therefore, plaintiffs have failed to establish that the public interest will be served if the injunction is granted. The Court should deny the plaintiffs' Motion.

### 5. The requested injunctive relief far exceeds the PLRA and FRCP 65

Under the PLRA, plaintiffs are not entitled to the most effective available remedy; they are entitled to a remedy that eliminates the constitutional injury.[107] In Eighth Amendment cases, plaintiffs can only obtain a remedy that reduces the risk of harm to a socially acceptable level.[108] Some risk is permissible and perhaps unavoidable.[109]

In *Ball*, the Fifth Circuit found that an injunction to install air conditioning on Death Row violated the PLRA.[110] The Fifth Circuit based this ruling on the fact that Dr. Vassallo opined that there were other remedies short of facility wide air conditioning.[111]

Here, plaintiffs seek an injunction to prohibit any outdoor work on the Farm Lines if the heat index exceeds 88 degrees. However, as Dr Vassallo indicates, over 32 million people in the United States work outdoors. Neither Dr. Vassallo nor Green cite to any sources that all outdoor

---

[106] *Id*. (collecting cases); see also *Zantiz v. Seal,* No. 12-1580, 2013 WL 357069, at *4 (E.D. La. Jan. 29, 2013) ("To issue an injunction against this facility would limit those best equipped to make decisions about the proper procedures to maintain safety, and would therefore disserve the public interest in maintaining the safety of the prisoners and officers at the facility.").

[107] See *Westefer v. Neal*, 682 F.3d 679, 683–84 (7th Cir.2012) (vacating an injunction under the PLRA because it exceeded what was required under the Due Process Clause).

[108] *Ball v. LeBlanc*, 792 F.3d 584, 599 (5th Cir. 2015).

[109] *Id*.

[110] *Id*.

[111] *Id*.

work should cease if the heat index exceeds 88 degrees. In fact, when discussing the millions of people who work outdoors in the United States, Dr. Vassallo states that workers and staff should receive heat stress training, staff should monitor heat advisories and encourage adequate fluid and rest breaks.[112] Green cites to recommendations that include development of health programs for prevention of heat related illnesses, training staff on heat related illnesses, establish a hydration program, monitor weather conditions, and provide prompt medical conditions.[113] None of these recommendations cited by Dr. Vassallo or Green include complete stoppage of outdoor work. Further, Defendants demonstrate that they already implement these recommendations by implementing the Heat Pathology policies, which includes training,  outline of required rest and hydration, and monitoring of weather conditions.

Plaintiffs seek to apply standards to LSP that do not even apply to farmers across the country. This requested injunction far exceeds the requirements of the constitution.

Further, even if plaintiffs proved entitlement to injunctive relief, which in denied, the requested injunction fails to comply with FRCP 65.  Federal Rule Civil Procedure 65 requires that an injunction "state its terms specifically; and describe in reasonable detail ... the act or acts restrained or required." FRCP 65(d)(1); *Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 524 (5th Cir. 2007). Plaintiffs seek an injunction to cease operation of the "Farm Line" but fail to identify what activities they consider would be subjected to the requested injunction. Plaintiffs assert that the requested injunction would only affect operation of the Farm Line during periods of high heat and "all other agricultural programs at Angola would remain untouched."[114] However, plaintiffs have failed to adequately define what they contend are included on the Farm Line. They assert that the

---

[112] R.Doc. 37.3, p. 22.
[113] R.Doc. 37-7, p. 11.
[114] R.Doc. 37-1, p. 31.

Farm Line includes, <u>but is not limited to</u>, Lines 15a, 15b, 24 and 25, and that it does not include all agricultural programs.[115] In discovery requests, plaintiffs defined the Farm Line to include agricultural work not performed by trustees. Yet, they now include trustee lines in their definition. Further, they submit evidence regarding Lines 6a and 6b, which are lines that only work in the processing plant, and this work is not done outdoors. As such, the requested injunction fails to comply with <u>FRCP 65</u> and should be denied.

## IV.    CONCLUSION

As demonstrated herein, plaintiff's Motion for Preliminary Injunction and Temporary Restraining Order is unwarranted and should be denied.[116]

Respectfully submitted,

**KEOGH, COX & WILSON, LTD.**

By:    s/Andrew Blanchfield
Andrew Blanchfield, T.A. (#16812)
Email: ablanchfield@keoghcox.com
C. Reynolds LeBlanc (#33937)
Email: rleblanc@keoghcox.com
Chelsea A. Payne (#35952)
Email: cpayne@keoghcox.com
Post Office Box 1151
Baton Rouge, Louisiana 70821
Telephone:  (225) 383-3796
Facsimile:  (225) 343-9612

---

[115] R. <u>Doc. 37-1, p. 9</u>, fn. 2.
[116] In the event this Court orders that a hearing is necessary, Defendants reserve the right to call additional or different witnesses, given the time constraints of this filing, along with witness availability.

**CERTIFICATE OF SERVICE**

I hereby certify that I have this date electronically filed the foregoing with the Clerk of Court by utilizing the CM/ECF system, and a copy of the above and foregoing was this day forwarded by the Court's ECF Delivery System to all counsel of record.

Baton Rouge, Louisiana, this 23rd day of May, 2024.


_____s/Andrew Blanchfield_____
Andrew Blanchfield