# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**VOICE OF THE EXPERIENCED, A**                          CIVIL ACTION
**MEMBERSHIP ORGANIZATION ON**
**BEHALF OF ITSELF AND ITS**
**MEMBERS, ET AL.**

**VERSUS**

**JAMES LEBLANC, ET AL.**                          NO. 23-01304-BAJ-EWD

## RULING AND ORDER

Before the Court is Plaintiffs' **Application For A Preliminary Injunction And Temporary Restraining Order (Doc. 37)**, which requests that the Court immediately enjoin all agricultural labor performed by incarcerated persons on the Farm Line at the Louisiana State Penitentiary in Tunica, Louisiana, otherwise known as "Angola" or "LSP," when heat index values exceed eighty-eight degrees Fahrenheit. Defendants have filed an Opposition, (Doc. 49), to which Plaintiffs filed a reply, (Doc. 51). Considering these pleadings and the materials submitted in support thereof, along with the statements offered by the parties at the June 18, 2024, Oral Argument on Plaintiffs' Motion, and for all of the reasons to follow, Plaintiffs' Motion will be granted in part and denied in part. The Court will not enjoin labor on the Farm Line at this time but will order Defendants to alter Farm Line working conditions to preserve human health and safety.

## I.    BACKGROUND

At Angola, incarcerated persons are sometimes required to perform agricultural labor for a variety of prison programs. The usefulness and sophistication

1

of the labor involved in the various programs allegedly differs substantially, with some programs resembling modern-day farming operations and others, such as the Farm Line, serving an almost purely penological function. At this time, Plaintiffs have defined the Farm Line as those compulsory, punitive agricultural or farming labor programs operated at Angola, including but not limited to Lines 15a, 15b, 24, and 25.[1] (Doc. 37-1 at p. 8 fn. 2). Plaintiffs request that the Court enjoin all operations on the Farm Line when heat index values reach or exceed eighty-eight degrees Fahrenheit.[2] According to Defendants, this definition of the Farm Line encapsulates the work assignments for fewer than fifty inmates on any given day. (Doc. 49 at p. 4 fn. 11).

Plaintiffs filed an Amended Complaint on December 15, 2023, seeking, among other relief, certification of various classes; declaratory judgment in favor of Plaintiffs finding that Defendants are violating the constitutional rights of the members of the putative classes by forcing them to work on the Farm Line in unsafe and inhumane conditions; declaratory judgment in favor of Plaintiffs that those incarcerated persons convicted by non-unanimous juries may not be forced to work on the Farm Line under the Thirteenth Amendment; declaratory judgment in favor of Plaintiffs declaring that Defendants are violating the rights of each member of the putative disability class by

---

[1] The pleadings and arguments contained therein do not identify the crops grown on these Lines, or any other information outside of that which is provided.

[2] The heat index is "[t]he perceived temperature in degrees Fahrenheit derived from a combination of the temperature and humidity for the indicated hour." (Doc. 37-38 at p. 2). It is a more accurate portrayal of how conditions are felt by the human body, and is a metric that has been accepted by numerous courts. *E.g., Ball v. LeBlanc*, 792 F.3d 584, 591–592 (5th Cir. 2015); *Gates v. Cook*, 376 F.3d 323, 339 (5th Cir. 2004).

requiring them to labor on the Farm Line; and a permanent injunction enjoining Defendants from conducting compulsory agricultural labor at Angola. (Doc. 21). The Court dismissed Plaintiffs' Thirteenth Amendment claims in its June 5 Ruling and Order, finding that such claims were barred by *Heck v. Humphrey*, 512 U.S. 477 (1994), and *Edwards v. Vannoy*, 593 U.S. 255 (2021). (Doc. 56). On May 13, 2024, Plaintiffs filed a motion asking that the Court issue a temporary restraining order and provide preliminary injunctive relief by enjoining Defendants from operating the Farm Line when heat index values reach or exceed eighty-eight degrees Fahrenheit. (Doc. 37). The Court held a Telephone Status Conference to discuss the motion with the parties on May 16, 2024. At this Status Conference, the Court ordered additional briefing from the parties. (Doc. 45). Defendants filed an Opposition, (Doc. 49), to Plaintiffs' request. Plaintiffs filed a Reply to Defendants' Opposition. (Doc. 51). On June 18, 2024, the Court heard Oral Argument on Plaintiffs' request for injunctive relief. (Doc. 62).

## II. THE PLAINTIFFS

The named Plaintiffs in this action comprise certain incarcerated persons who have labored on the Farm Line at Angola, along with a grassroots nonprofit organization, the Voice of the Experienced, which advocates for the civil, constitutional, and human rights of its members. (Doc. 21 at pp. 4-8). The named Plaintiffs are and allege as follows.

### A. Myron Smith

Plaintiff Myron Smith is over fifty years old and has been incarcerated at Angola since 1998. (Doc. 37-14 at ¶ 1, hereinafter "Smith Declaration"). Smith avers,

based on his personal knowledge of Angola disciplinary policies and practices, that nearly all incarcerated persons must work on the Farm Line when they first arrive at Angola, and that anyone may be reassigned to and remain on the Farm Line as punishment for a disciplinary infraction. (*Id.* at ¶ 3).

Smith has served on the Farm Line three times, once when he arrived at Angola in 1998, once when he received a disciplinary write-up in 2005, and finally after receiving another disciplinary write-up in 2022. (*Id.* at ¶¶ 4-5, 7). Smith provides that work on the Farm Line earns him as little as two cents an hour, or roughly one-fourth and one-tenth of the wages from his previous prison work assignments as a kitchen orderly and ranch hand. (*Id.* at ¶¶ 5-6, 19). Smith is still working on Line 15b of the Farm Line. (*Id.* at ¶ 7). There, he works "in the fields from approximately 7 a.m. until mid-morning, and then again from around 11 a.m. to around 1:30 p.m." (*Id.* at ¶ 8). The work consists of "pick[ing] crops, cut[ting] grass, and sometimes [] maintenance." (*Id.*). While Smith is sometimes afforded tools such as "weed eaters," "other times [prisoners] are forced to use [their] hands." (*Id.*). Smith declares that the working conditions on the Farm line:

> are harsh. The drinking water is dirty, in a moldy cooler that often contains dead insects. There is no shade. Breaks are rare. Armed guards patrol the fields, sometimes riding four-wheelers. My understanding is that guards generally don't use horses anymore because the weather is too hot for them. There is often no place to use the bathroom. When there are portapotties [sic], they are extremely unsanitary.

(*Id.* at ¶ 9). Smith alleges that due to the "unsanitary water," he has had to purchase his own water at "significant expense." (*Id.* at ¶ 10). To the best of Smith's recollection, he has "never been provided with sunscreen, proper work gloves, proper

work boots, sunglasses, or other safety equipment necessary to safely work in the
fields." (*Id.*). Smith further avers that the "heat and humidity in the fields are
unbearable." (*Id.* at ¶ 12). He provides that he "often feel[s] woozy, dehydrated, and
dizzy." (*Id.*). Smith described one such experience on the Farm Line as follows:

> I was working on Line 15b when my muscles began locking up. I could
> barely move. An emergency medical technician arrived and told me to
> drink more water and rest. But instead of being taken inside to cool off,
> I was forced to sit in the field, in the hot sun, for the rest of the shift.

(*Id.*). Allegedly, on Line 15b, "heat advisories are ignored." (*Id.* at ¶ 13). Smith asserts
that despite the heat advisories being "clearly audible from the prison official's
radios," those advisories are "completely ignored," and prisoners are forced to
continue working in the heat. (*Id.*).

Some of the tasks that Smith has been ordered to perform on the Farm Line
have been needlessly difficult. For instance, Smith asserts that:

> [e]arlier this year, officials gave me a five[-]gallon bucket and a
> [S]tyrofoam cup and forced me to hand-water rows of watermelons. This
> was physically painful and difficult work, particularly given the extreme
> heat and humidity in the fields. I have also been forced to hand-pick
> grass. I could not refuse to do this make-work without risking
> disciplinary action and serious harm.

(*Id.* at ¶ 15). Smith reiterated his above claims via supplemental declaration on May
28, 2024. (Doc. 51-6, hereinafter "Smith Supplemental Declaration"). Therein, he
stated that after laboring on the Farm Line on May 16, 2024, a prison official
informed him that he would no longer be required to work in the field. (*Id.* at ¶ 2). He
was not provided with an explanation for this change. (*Id.*). Smith again stated he
had never been issued adequate safety equipment for labor on the Farm Line, and

that he did "not recall ever being directed or permitted to take breaks every 30 minutes for five minutes." (*Id.* at ¶ 7).

On May 23, 2023, Smith filed a Request for Administrative Remedy (ARP),[3] in which he restated the above, and alleged that prisoners working on the Farm Line were not provided with shade, sanitary toilets, or proper safety equipment, including gloves, work boots, sunscreen, hats, and safety glasses. (Doc. 37-61 at p. 3). Smith stated that work on the Farm Line was "extremely dangerous," in large part due to the "extreme temperatures and high humidity." (*Id.*). Smith requested that Angola officials grant him a "permanent no duty status for all field work, including any future assignment to the [F]arm [L]ine," that the Farm Line be ended, that all work at Angola be made safe for persons with disabilities, and that persons laboring at Angola be provided "safety equipment, adequate breaks and access to shade, clean drinking water, and sanitary toilets." (*Id.* at pp. 3-4). Angola officials denied Smith's ARP, and asserted that his statements regarding working conditions on the Farm Line were "false and untrue," that toilets were provided to persons laboring on the Farm Line, that work gloves were provided on request, that water, Gatorade, and breaks were provided to all prisoners, and that all prisoners laboring on the Farm Line "have been seen and cleared by medical personnel to work in that job." (*Id.* at p. 5). Smith contested this denial, and again asserted that no safety equipment had been provided

---

[3] An ARP is a request for administrative relief submitted to LSP officials, and is generally the first step in the process for an incarcerated person to challenge the legality of prison policies, practices, or events.

to persons laboring on the Farm Line, and that heat advisories issued for the Farm Line were not observed. (*Id.* at p. 6). Smith's ARP was again denied. (*Id.* at p. 2).

Dr. Susi Vassallo, a licensed physician and an expert on thermoregulation,[4] reviewed Smith's medical records. (Doc. 54-1). She concludes that Smith's medical records reflect a significant history of physical injuries, "including a left humerus fracture; ailments related to gunshot wounds in the back, knee, and foot . . . and injuries to the right ankle and left rib." (*Id.* at p. 6). Angola medical personnel prescribe or have prescribed Smith with a variety of medications relating to these injuries, including "Benadryl []; methocarbamol, a muscle relaxant; Demerol [], an opioid used to treat pain; loratadine, an antihistamine; and non-steroidal anti-inflammatory drugs like Advil [], Toradol [], Dolobid [], Celebrex [], and meloxicam." (*Id.*). According to Dr. Vassallo, many of these medications affect the body's ability to regulate temperature, and place Smith "at greater risk of heatstroke and heat related disorders." (*Id.*). Dr. Vassallo also notes that Smith has a history of heat-stress disorders, exhibited by an event in 2021 wherein Smith complained of stomach cramps and was advised to drink more water to stay hydrated. According to Dr. Vassallo, "[t]his symptom is consistent with heat-related illness. . . [and] 'drink more

---

[4] Dr. Vassallo has been admitted as an expert on thermoregulation, or the process by which the human body regulates internal temperatures, on numerous occasions. *See, e.g., Yates v. Collier,* 868 F.3d 354, 363-64 (5th Cir. 2017) ("Dr. Vassallo is a licensed physician and a recognized expert in the field of thermoregulation and hyperthermia, with over twenty-five years treating heat stroke and heat related disorders. Dr. Vassallo has previously served as an expert witness in lawsuits challenging prison conditions, and this court has (at least) twice upheld district court findings that relied heavily on Dr. Vassallo's testimony.") (citations omitted); *Ball,* 792 F.3d at 593; *Gates,* 376 F.3d at 339.

water' is a nonspecific instruction that does not, on its own, mitigate the risk of heat-related illness." (*Id.* at p. 7).

### B. Alvin Williams

Plaintiff Alvin Williams is a thirty-eight-year-old man who has been incarcerated at Angola since 2009. (Doc. 37-17 at ¶¶ 1-2, hereinafter "Alvin Declaration").[5] Alvin likewise avers that "nearly all incarcerated people must work on the Farm Line when they first arrive at Angola, and that anyone may be reassigned to the Farm Line as punishment for a disciplinary infraction." (*Id.* at ¶ 3). In 2022, due to a disciplinary write-up, Alvin was placed on Line 25 within the Farm Line. (*Id.* at ¶ 5). He has worked on the Farm Line ever since, a period of two years. (*Id.*). Alvin offers a similar account to Smith, and avers that on the Farm Line:

> work in the fields [starts] around 7 a.m. Around 9 a.m., there will sometimes be an announcement about whether there is a heat advisory that day. A heat advisory means that the heat and humidity are dangerously high. [Inmates] are still forced to work in the fields, even when there is a heat advisory, until around 11:30 a.m.

(*Id.* at ¶ 6). Laborers are paid two cents an hour. (*Id.* at ¶ 19). Like Smith, Alvin has been assigned such Sisyphean tasks as "goose picking" "where [he] [is] forced to pick blades of grass, by hand, from the dirt." (*Id.* at ¶ 7). Alvin asserts that on the Farm Line, "working conditions are harsh. The drinking water is dirty, in a moldy cooler that often contains dead insects. There is no shade. [] [B]reaks are rare." (*Id.* at ¶ 8). Alvin additionally asserts that he has "never been provided with sunscreen, proper

---

[5] The Court would otherwise refer to Alvin Williams as "Mr. Williams" or "Williams," but because another named Plaintiff possesses the surname "Williams," the Court will respectfully refer to him as "Alvin."

work gloves, proper work boots, sunglasses, a sunhat, or other safety equipment." (*Id.* at ¶ 9). Alvin provides that on several occasions, "prison officials threatened to punish me if I stopped working, encouraged other incarcerated men to stop working, complained about the unsafe work conditions, or failed to work 'efficiently.'" (*Id.* at ¶ 18). Finally, Alvin declares that "[t]he heat and humidity in the fields are unbearable. I often feel lightheaded and exhausted from doing manual labor . . . . I have felt my heart racing and felt chilled, despite the heat. I often feel dehydrated. I have suffered from blistered hands and feet, sunburns." (*Id.* at ¶ 20). According to Alvin, the allegations of Angola's failure to provide sufficient protective equipment and the sporadic and infrequent nature of breaks on the Farm Line were true as of at least the week of May 13, 2024. (Doc. 51-4 at ¶¶ 3, 5, hereinafter "Alvin Williams Supplemental Declaration"). Alvin stated that he did "not recall ever being directed or permitted to take breaks every 30 minutes for five minutes," as Defendants claim. (*Id.* at ¶ 5).

Alvin submitted an ARP setting forth similar accusations on July 6, 2023. (Doc. 37-60 at p. 3). Alvin informed prison officials that Farm Line conditions have been "horrible and unsafe" due to the "extreme heat conditions and high humidity." (*Id.*). Alvin provided that he had been given "dangerous drinking water" with "black mold inside the coolers." (*Id.*). He additionally averred that laborers on the Farm Line have "never" been given "proper breaks, shade, sanitary toilets, proper equipment, like thick gloves and work boots, sunscreen and hats." (*Id.*). Alvin further stated that he had been "denied medical assistance" when he complained about suffering from

"dizziness, dehydration and body temperatures reaching high and unsafe temperatures." (*Id.*). Alvin closed his ARP by asking for relief identical to that requested by Smith. (*Id.* at p. 5). Prison officials denied Alvin's ARP, stating that his claims were "false, and hold no merit," and that Alvin had "not provided sufficient evidence to substantiate [his] claim." (*Id.* at p. 6). Alvin appealed this denial, and prison officials again denied his claim. (*Id.* at p. 2).

Alvin's medical records show that while laboring on the Farm Line, he reported to Angola medical personnel after exhibiting partial numbness in one of his extremities. (Doc. 47-3 at p. 2). Several months prior to this, Alvin again placed a sick call while staffed on the Farm Line. Medical personnel found that he suffered from severe abdominal pain, associated high blood pressure, dizziness, and nausea. (Doc. 47-3 at pp. 7-9). Several weeks prior to this sick call, in mid-October 2023, Alvin reported that he suffered from numbness in his extremities. (*Id.* at p. 13). Throughout the entirety of these medical visits, Alvin repeatedly stressed that work on the Farm Line was exacerbating his symptoms and that such work was especially difficult due to what Alvin believed to be several ruptured tendons in his ankle. (*See, e.g., id.* at p. 14). In September 2023, Alvin again received medical treatment after laboring on the Farm Line. (*Id.* at p. 17). The medical logs show that Alvin was brought to medical personnel by prison officials after he was allegedly "dancing around in the field and had had [sic] slurred speech so they think he is intoxicated." (*Id.*). Alvin informed medical personnel that he thought he was "dehydrated" and that he "got dizzy and sat down." (*Id.*). Alvin exhibited a blood pressure consistent with Stage 2

hypertension at this medical visit. (*Id.*).[6] Medical personnel at this visit noted that Alvin was compliant and his speech was clear. (*Id.* at p. 19).

Dr. Vassallo reviewed Alvin's medical records, and noted that his known conditions included a history of high blood pressure, tuberculosis, and mobility impairments. (Doc. 54-1 at p. 2). These conditions, according to Dr. Vassallo, put Alvin at greater risk of heatstroke and heat related disorders. (*Id.* at pp. 2-3). According to Dr. Vassallo, exacerbating these risks to Alvin are the prescribed medications he is currently taking or has taken in the past. (*Id.* at p. 3). Those medications include rifampin and dicyclomine, each of which inhibit the body's ability to self-regulate temperature. (*Id.*).

### C. Darrius Williams

Plaintiff Darrius Williams is thirty-three-years old and has been incarcerated at Angola since 2011. (Doc. 37-18 at ¶¶ 1-2, hereinafter "Darrius Declaration").[7] Darrius provides similar statements to those of Alvin and Smith, and states that "nearly all incarcerated people must work on the Farm Line when they first arrive at Angola, and that anyone may be reassigned to the Farm line as punishment for a disciplinary infraction." (*Id.* at ¶ 3). Darrius asserts that he has been placed on the Farm Line on three separate occasions, and that, in total, he has worked the Farm Line off and on for around eight years. (*Id.* at ¶¶ 4-6). On the last occasion, Darrius

---

[6] This blood pressure reading is associated with those at highest risk of cardiovascular events. *See* Thomas D. Giles & Barry J. Materson, <u>Treating Stage 2 Hypertension</u>, J. of Clinical Hypertension, 464 (2005).

[7] For considerations previously provided in footnote 5, the Court will respectfully refer to Darrius Williams as "Darrius."

actually refused to go to the Farm Line because he was not provided with "sufficient work boots, jeans, or work gloves," and therefore believed that working on the Farm Line would be unsafe. (*Id.* at ¶ 6). He was given a month in disciplinary segregation for this refusal. (*Id.*). Darrius confirms that laborers on the Farm Line are paid two cents an hour. (*Id.* at ¶ 8). Darrius describes work on the Farm Line as follows:

> [W]e arrived in the fields around 7 a.m., we would be told to pick crops, like digging up sweet potatoes by hand. We were still forced to work, even when there was a heat advisory. . . To the best of my recollection, I have never been provided with sunscreen, proper work gloves, proper work boots, sunglasses, a sunhat, or other safety equipment necessary to safely work in the fields. Conditions in the field are brutal and unsafe. There is no shade. The heat and humidity in the fields are unbearable. It can get to 105 to 110 degrees outside. It's so hot out in the corn fields that it's hard to breathe. I've had to make several medical calls. Once, I was forced to work the Farm Line in the summer and was in the corn fields. The temperature was over 100 degrees and I started feeling chills. I was shaking, as though it was freezing. I started sweating profusely. I started to feel dizzy. I lost control of limbs and fainted. Medical came and reported that my blood pressure was very high. Despite all this, prison officials sent me back out into the field the next day. I refused. I was placed in lockdown.

(*Id.* at ¶¶ 9-13). Additionally, Darrius provides that, like Alvin, on several occasions, "prison officials threatened to punish me if I stopped working, encouraged other incarcerated men to stop working, complained about the unsafe work conditions, or failed to work 'efficiently.'" (*Id.* at ¶ 17).

Like Smith and Alvin, Darrius submitted an ARP setting forth the above and requesting that he be taken off Farm Line duties. (Doc. 37-40). Darrius informed prison officials in this ARP of how he had fainted from the heat on a previous occasion, how this fainting had required emergency medical care, and how his refusal to go out into the fields the next day resulted in him being placed in lockdown. (*Id.* at p. 3).

12

Darrius also stated that laborers were "not given adequate safety equipment" and were not given enough breaks. (*Id.* at ¶ 8). Darrius's ARP was denied because, according to Defendants, his claims were deemed to be 'false, and hold no merit"— the form response also given to Smith and Alvin. (*Id.* at p. 5).

Darrius's medical records show that he has reported to Angola medical personnel with symptoms such as weakness and dizziness. (Doc. 47-52 at p. 23). Darrius's medical records also show that in December 2022, several months after Darrius was placed on disciplinary segregation for refusing to report to the Farm Line for unsafe conditions, he reported to medical personnel after suffering a cardiac event in the early morning. (*Id.* at p. 41). Darrius is currently in "preventative segregation."[8] (Doc. 49 at p. 10). Dr. Vassallo reviewed Darrius's medical records and noted that he has "a history of illness and symptoms consistent with heat-stress disorders." (Doc. 54-1 at p. 9). She states that "[a]s one example, his records indicate that on October 11, 2018, [Darrius] [] presented to the ATU after working in the field, complaining of weakness, tiredness, diarrhea, and vomiting." (*Id.*). Dr. Vassallo also opines that the medications currently or previously prescribed to Darrius have the effect of weakening his ability to thermoregulate. (*Id.*).

**D. Nate Walker**

Plaintiff Nate Walker is forty-three-years old, and has been incarcerated at Angola since 2009. (Doc. 37-16 at ¶¶ 1-2, hereinafter "Walker Declaration"). Walker offers similar descriptions of the Farm Line to those given above. (*Id.*). Like Smith,

---

[8] The Court has not been provided with a description of what preventative segregation is or what preventative segregation is used for.

Alvin, and Darrius, Walker was placed on the Farm Line upon arriving at Angola and was placed back on the Farm Line upon receiving disciplinary write-ups. (*Id.* at ¶¶ 3-4). Walker has roughly thirteen years of experience laboring on the Farm Line. (*Id.* at ¶ 4). He states that work on the Farm Line occurs from approximately "7.am. [sic] until mid-morning, and then sometimes again from around 11 a.m. to around 3:00 p.m." (*Id.* at ¶ 5). Walker avers that recently, laborers were not allowed to go to lunch until they met a work quota. (*Id.* at ¶ 6). Walker also swears that "working conditions are harsh. The drinking water is dirty. There is no shade. Breaks are rare. . . There is often no place to use the bathroom. When we have access to a port-a-potty [sic], they are extremely unsanitary." (*Id.* at ¶ 7). He states that in his decades plus of labor on the Farm Line, he has "never been provided with sunscreen, proper work gloves, sunglasses, or other safety equipment necessary to safely work in the fields." (*Id.* at ¶ 8). Walker also asserts, like other named Plaintiffs, that "[t]he heat and humidity in the fields are unbearable." (*Id.* at ¶ 9). Walker further provides that he underwent a similar experience to Darrius. In his words:

> "[I]n approximately 2017, I was working in the field on a hot day. I was feeling weak and light headed [sic]. I notified the guards that I was not feeling good, but I was ignored. I could barely stand or walk. When I tried to walk, I began to sway. The guards called medical and told them that I was intoxicated. I was arrested and received a disciplinary write-up for intoxication. I was not intoxicated."

(*Id.*). Walker suffers from glaucoma, and working in the fields causes him "severe eye pain." (*Id.*). In addition to glaucoma, Walker asserts that he suffers from high blood pressure, depression, thyroid cancer and other thyroid issues, stomach issues, sleeping problems, and heart arrhythmia. (*Id.* at ¶ 10). He is prescribed a variety of

14

medications to deal with these medical issues. (*Id.*). Walker avers that despite this, Angola officials have refused to give him a permanent duty status that excuses him from labor on the Farm Line. (*Id.* at ¶ 11). In response, Defendants note that Walker has a heat related duty status, but they have neglected to attach documentation supporting this assertion. (Doc. 49 at p. 10).[9] Regardless, Defendants claim that Walker is now staffed on a line located at the "Raven dorms," and that "Raven dorms have not been out to the field since December 2021." (*Id.*).

Walker submitted an ARP to Angola officials on June 1, 2023, wherein he set forth the facts outlined above and requested to be permanently removed from agricultural work, including work on the Farm Line. (Doc. 37-48). In this ARP, Walker stated that he was forced to work the Farm Line as recently as April 2023, that he has been called to work the Farm Line multiple times since, and that he was disciplined for any refusal to do so. (*Id.* at p. 3). Like other Plaintiffs, Walker informed Angola officials that conditions on the Farm Line were unsafe, primarily due to the lack of shade, lack of protective equipment, lack of adequate breaks, and the high heat and humidity. (*Id.*). He went on to report that he once fainted on the Farm Line due to the heat, and that after he fainted, he was "punished and sent to the dungeon." (*Id.*). Walker provided that he suffers from multiple disabilities under the ADA, and that laboring on the Farm Line forces him to perform work that is beyond his physical capabilities. (*Id.* at p. 4). Walker received the same form response as other named Plaintiffs, denying his claims as false. (*Id.* at p. 6).

---

[9] Defendants cite to "Exhibit B-10, Walker Heat Related Duty Status" to support this assertion. A review of the record shows that no such exhibit has been provided to the Court.

Walker's medical records reflect that he was seen by Angola medical personnel for emergency care in 2017 when he suffered from "H/S," presumably referring to heat syncope or fainting, along with feeling weak and dizzy, and being dehydrated. (Doc. 47-48 at p. 29). However, the Court notes that this occurred during or shortly after Walker staged a hunger strike, wherein he did not eat from at least May 26, 2017, to June 4, 2017. (*Id.* at p. 33). Dr. Vassallo reviewed Walker's medical history, and concluded that he suffers from borderline high blood pressure, hyperthyroidism, and a variety of mental illnesses. (Doc. 54-1 at p. 9). She further noted that the medications used to treat these conditions inhibit Walker's ability to regulate his bodily temperature. (*Id.*).

### E. Kendrick Stevenson

Plaintiff Kendrick Stevenson is forty-five-years old and has been incarcerated at Angola since 1999. (Doc. 37-15 at ¶¶ 1-2, hereinafter "Stevenson Declaration"). Stevenson declares that conditions on the Farm Line are as represented by other named Plaintiffs, and that the Farm Line is used as punishment for incarcerated persons at Angola. (*Id.* at ¶ 4). Stevenson declares that he has worked the Farm Line on and off since 2004. (*Id.* at ¶ 5). Defendants provide that Stevenson received a heat related duty status in March 2024 after being prescribed Zyprexa. (Doc. 49 at p. 10).[10] Stevenson avers that, while on the Farm Line and as recently as December 2023, he was forced to hand-pick crops. (Stevenson Declaration at ¶ 7). Stevenson says that the work was "back-breaking. We had to squat and pluck grass with our fingers."

---

[10] Defendants cite to "Exhibit B-9, Stevenson Heat Related Duty Status" for this assertion. A review of the record shows that no such exhibit has been provided to the Court.

(*Id.*). He also claims, like other named Plaintiffs, that prisoners were not given proper safety equipment or tools to engage in this type of labor. (*Id.* at ¶ 8). Stevenson further found the heat and humidity experienced in the fields to be similarly "unbearable." (*Id.* at ¶ 10). He states that prisoners were forced to continue laboring in the fields after the issuance of heat advisories. (*Id.*). While working on the Farm Line, Stevenson "often felt dehydrated, lightheaded, and dizzy." His "muscles have locked up, like a charley horse in my back and arms." (*Id.*). Those symptoms worsen when he labors in extreme heat. (*Id.*). Stevenson additionally alleges that on numerous occasions, he has been disciplined for failing to work "efficiently" while on the Farm Line. (*Id.* at ¶ 15). Stevenson provided a supplemental declaration on May 28, 2024, wherein he reiterated that he had never been issued adequate safety equipment, such as lace-up boots, and that he did "not recall ever being directed or permitted to take breaks every 30 minutes for five minutes," as Defendants claim. (Doc. 51-5 at ¶ 6, hereinafter "Stevenson Supplemental Declaration").

Stevenson also submitted an ARP to prison officials that set forth the above. (Doc. 37-64). Therein, Stevenson notified prison officials that laborers were not given shade, sanitary toilets, adequate safety equipment, or enough breaks. (*Id.* at p. 2). He also asserted that, in light of his disabilities, Angola required him to work beyond his physical capabilities. (*Id.* at p. 3). Stevenson's ARP was denied on procedural grounds. (Doc. 37-43).[11]

---

[11] The records provided to the Court indicate that Angola personnel denied Stevenson's ARP because Stevenson had an active preexisting ARP and "only one complaint may be addressed at a time." (Doc. 37-43).

Dr. Vassallo reviewed the medical chart for Stevenson and found that he had a noted history of "paroxysmal supraventricular tachycardia," a heart condition wherein those afflicted exhibit an elevated and irregular heartbeat, "pre-diabetes, presbyopia, astigmatism, hyperopia, history of syncope [(fainting)], hypomagnesemia, vitamin D deficiency, seasonal allergies, hyperlipidemia" and other afflictions that raise the risk of Stevenson suffering heat-related injury. (Doc 54-1 at p. 5). Dr. Vassallo notes that, according to the medical records provided by Defendants, on one occasion in August 2023, Stevenson was laboring on the Farm Line when he exhibited nausea, dry mouth, and abdominal pressure. (*Id.*). "He was sweating profusely, laying in the field, and could not get up." (*Id.*). He "had not urinated in 5-6 days. These symptoms are consistent with heat distress." (*Id.*). The Court notes that Stevenson submitted a urine sample upon receiving medical treatment on this occasion which registered as positive for the presence of various narcotics in his system. (Doc. 47-6 at p. 18). Stevenson has taken or continues to take approximately ten medications to address the ailments listed above, many of which allegedly impair his ability to regulate his bodily temperature. (Doc 54-1 at p. 6).

**F. Damaris Jackson**

Plaintiff Damaris Jackson is forty-three-years old, and has been incarcerated at Angola since 2002. (Doc. 37-13 at ¶¶ 1-2, hereinafter "Jackson Declaration"). His Declaration is based on his personal knowledge and his intermittent experience on the Farm Line from 2002 to 2023. (*Id.* at ¶¶ 6, 17). According to Jackson, the Farm Line is used to punish inmates at Angola. (*Id.* at ¶ 5). Work on the Farm Line begins at 7:00 A.M., runs until 11:00 A.M. or 11:30 A.M., and prisoners are sometimes

required to perform a second shift in the afternoon. (*Id.* at ¶ 7). Those laboring on the Farm Line are not provided with protective gear and equipment. (*Id.* at ¶ 8). He often feels dehydrated, lightheaded, and dizzy. (*Id.* at ¶ 10). He has felt "chilled despite the extreme heat and humidity." (*Id.*). He "often" gets muscle aches and headaches. (*Id.*). Work on the Farm Line is especially difficult for Jackson because he alleges that he suffers from a disability, namely high blood pressure. (*Id.* at ¶ 11). Based on this disability, Jackson asserts that laboring on the Farm Line exceeds his physical capabilities. (*Id.*). Jackson refused to work the Farm Line in June 2023, because of its unsafe nature and because it served "no rehabilitative purpose." (*Id.* at ¶¶ 18-19). Jackson avers, like other named Plaintiffs, that on numerous occasions prison officials have threatened to punish him if he stops working while on the Farm Line. (*Id.* at ¶ 21). Defendants provide that Jackson does not currently have a job assignment. (Doc. 49 at p. 10).

Jackson filed an ARP on June 12, 2023, which set forth similar allegations to the above. (Doc. 37-51). He informed prison officials that conditions on the Farm Line were unsafe, primarily due to the lack of shade, safety equipment, and adequate breaks. (*Id.* at p. 3). Jackson also notified prison officials through his ARP that he suffers from high blood pressure, and that he was taking medication to combat this infirmity. (*Id.* at pp. 4-5). Because of these limitations, Jackson asserted that laboring on the Farm Line was beyond his physical capabilities. (*Id.* at p. 5). Jackson received the same form denial as other named Plaintiffs. (*Id.* at p. 7).

A review of Jackson's medical records shows that he has often complained to Angola medical personnel that he experiences lower extremity swelling and numbness while laboring on the Farm Line. (Doc. 47-4 at p. 7). In addition, Jackson reported to Angola emergency medical with lightheadedness and vomiting after laboring in the fields on August 14, 2023. (*Id.* at p. 11). On the date in question, Angola experienced heat indices ranging from 95 degrees Fahrenheit to 107 degrees Fahrenheit. (Doc. 49-10 at p. 30). Prior to this, in July 2021, Jackson filed a request for medical treatment wherein he reported that he was suffering from excessive sweating, loose bowels, stomach cramps, headaches, blurry vision, inability to keep food down, and dizziness upon standing. (Doc. 47-4 at p. 23). In addition to these two events, Jackson received emergency medical treatment while working on the Farm Line in 2010, when he reported experiencing weak and dizzy. (*Id.* at p. 39).

Dr. Vassallo reviewed Jackson's provided medical records, and concludes that he has exhibited a history of illness and symptoms consistent with heat-stress disorders. (Doc. 54-1 at p. 4). Contributing to this history are the lingering conditions found in Jackson's medical history, which include high blood pressure, depression, arthritis, and localized swelling and pain in his right ankle. (*Id.*). For these ailments, Jackson takes a variety of medications that Dr. Vassallo finds inhibit the body's ability to combat overheating. (*Id.* at p. 5).

### G. Kevias Hicks

Plaintiff Kevias Hicks is thirty-three-years old and has been incarcerated at Angola since 2013. (Doc. 37-12 at ¶¶ 1-2, hereinafter "Hicks Declaration"). Hicks corroborates the accounts of the Farm Line given above. He states that his crew

worked on the Farm Line "from about 7:30 until 11:30 a.m., even when there was a heat advisory. We rarely got breaks. There is not always drinking water or portapotties [sic]." (*Id.* at ¶ 4). Hicks also avers that "[r]ecently, I was forced to pick rotten watermelons with my hands. My understanding is that the temperature [was] so hot in the fields that the watermelons [were] rotting on the vine. We are forced to pick vegetables, goosepick grass, and sometimes dig ditches." (*Id.* at ¶ 5). Hicks says that because of the extreme heat, he has "seen people pass out in the sun." (*Id.* at ¶ 6). He declares that he once saw a man have a seizure. (*Id.*). Hicks states that he commonly feels light-headed and dizzy while in the fields, and often suffers from headaches and muscle cramps. (*Id.*). In addition, Hicks provides that his feet often swell. (*Id.*). Hicks attributes some of these maladies to Angola's failure to provide him and his fellow inmates with sufficient safety equipment. (*Id.* at ¶ 7). Similar to other named Plaintiffs, Hicks states that he is not at liberty to stop working while on the Farm Line. (*Id.* at ¶ 8). When he has done so, or when he has slowed down or otherwise failed to meet work quotas, he has been disciplined. (*Id.*). Additionally, Hicks asserts that he has been diagnosed with several disabilities, including depression and anxiety, and that working on the Farm Line exceeds his physical capabilities. (*Id.* at ¶ 11). Hicks has been prescribed medication for his mental conditions. (*Id.*). Defendants report that Hicks is now stationed as a "Grounds Keeper," and is no longer staffed on the Farm Line. (Doc. 49 at p. 10).

Based on the above allegations, Hicks submitted an ARP on June 8, 2023. At that time, Hicks was laboring on Lines 24/25 of the Farm Line. (Doc. 37-42). In his

ARP, Hicks notified prison officials that prisoners working on the Farm Line were not given adequate safety equipment or enough breaks. (*Id.* at p. 3). Hicks likewise stated that because of his disabilities, and the medications he was taking for treatment, laboring in the high heat on the Farm Line was especially dangerous for him. (*Id.* at p. 4). Hicks received the same form denial as other named Plaintiffs. (*Id.* at p. 6).

A review of Hicks's medical records shows that he reported for an emergency medical visit from the Farm Line on June 9, 2021, after exhibiting cramping and dehydration. (Doc. 47-8 at p. 2). Dr. Vassallo also reviewed Hicks's medical records and noted both that he suffers from a history of depression and that the medications he takes to address this illness weaken his body's ability to regulate temperature. (Doc. 54-1 at p. 7). Dr. Vassallo also noted that, based on the medical records provided by Defendants, Hicks had "a history of symptoms consistent with heat-stress disorders, like upset stomach diarrhea, and rashes." (*Id.*).

**H. Joseph Guillory**

Plaintiff Joseph Guillory is forty years old, and has been incarcerated at Angola since 2005. (Doc. 37-11 at ¶¶ 1-2, hereinafter "Guillory Declaration"). Guillory was required to work the Farm Line in the summer of 2023. (*Id.* at ¶ 2). He affirms the accounts of the Farm Line given above. He states that his crew generally works for "about five hours a day, five days a week. . . . We can  work long hours and be forced to labor in extreme heat without food for long stretches of time." (*Id.* at ¶¶ 5-6). Guillory claims that he has "never been provided with proper work boots, proper work gloves, sunscreen, sunglasses, a sunhat, or other safety equipment necessary to

safely work in the fields." (*Id.* at ¶ 7). Instead, Farm Line workers are expected to "do

all the field work by hand." (*Id.*). As to the conditions on the Farm Line itself, Guillory

concludes that they are "brutal and unsafe." (*Id.* at ¶ 11). In his words:

> There is no shade. Sometimes there was a portable toilet in the field for
> everyone to share. It is often overflowing with human waste. . . . The
> drinking water was often dirty. The coolers are covered in mildew and
> there [sic] are often bug infested. When I have asked about the mildew
> or bugs in the water, the guards threatened to send me to the dungeon.
> In the triple-digit heat, the prison officials know we'll drink it no matter
> what.

(*Id.* at ¶¶ 11-12). Guillory further states that "[o]ther men on the Farm Line have

been written up for complaining about the unsafe and unsanitary working conditions

on the Farm Line." (*Id.* at ¶ 13). While working on the Farm Line, he has contracted

"heat rashes and poison ivy rashes" due to the "unbearable" heat and humidity. (*Id.*

at ¶ 14). Guillory avows that work on the Farm Line is especially dangerous for him

due to his hyperthyroidism, for which he takes medication. (*Id.* at ¶ 15). Despite this,

he has not been granted a permanent duty status preventing him from working on

the Farm Line. (*Id.* at ¶ 16). Defendants claim that Guillory is presently staffed on

Line 10, which has not been to the fields since 2021. (Doc. 49 at p. 10).

Guillory filed an ARP setting forth the above on August 2, 2023. (Doc. 37-41).

Therein, he asserted that the conditions on the Farm Line are unsafe because of the

heat, the humidity, and the inadequate measures put in place by Defendants to

address both. (*Id.*). Guillory claims in his ARP that he was given access to one cooler

with electrolytes, and several others with ice water. (*Id.* at p. 4). However, Guillory

states that those coolers were "infested" with bugs, mildew, and trash. (*Id.*). Guillory

avers that laborers on the Farm Line are not provided with adequate protective gear. (*Id.*). Guillory's ARP was denied. (*Id.* at p. 7).

A review of Guillory's medical records shows that despite his thyroid issues spanning multiple years and his associated prescriptions being well documented, he was on "regular duty" with "no restrictions" as of July 3, 2023. (Doc. 47-10 at p. 23). Dr. Vassallo noted in her review of Guillory's medical records that he possesses a history of hypothyroidism, hypertension, hyperlipidemia, asthma, and allergies. (Doc. 54-1 at p. 8). These conditions, according to Dr. Vassallo, weaken Guillory's ability to remain cool in high temperatures. (*Id.*). Dr. Vassallo also notes that Guillory has been prescribed a variety of medications that impair Guillory's ability to regulate his bodily temperature efficiently. (*Id.*). Finally, Dr. Vassallo notes that Guillory's medical records show that he has presented with "chest pains, shortness of breath, and accelerated heart rate and tightness of chest and difficulty breathing. These symptoms may be consistent with heat-stress illness." (*Id.*).

## I.  Additional Allegations

In addition to the foregoing, Plaintiffs have provided the Court with two ARPS submitted on behalf of Dexter Vassar and Patrick Ramirez, both of whom have labored on the Farm Line. (Docs. 37-44, 37-46). Vassar's ARP alleges that on July 11, 2023, he received emergency medical treatment after laboring on the Farm Line when he exhibited symptoms of dizziness when standing, elevated heart rate, fatigue, shortness of breath, and pain in the neck and back. (Doc. 37-44 at pp. 7-12). The materials in support of Vassar's ARP provide that at the time of incident, he was a

forty-seven-year-old man with a body mass index (BMI) of 33.37.[12] (*Id.* at p. 8). As a result of this event, Vassar was instructed to remain on bed rest for one week. (*Id.* at p. 3). Vassar claims in his ARP that the lack of shade was a major contributing factor to his overheating. (*Id.*). Vassar's ARP was denied. (*Id.* at p. 2). On the date of Vassar's injury, records show that the heat index at Angola was anywhere from 96 degrees Fahrenheit to 122 degrees Fahrenheit. (Doc. 49-10 at p. 21).

Ramirez's ARP sets forth similar allegations to those of the named Plaintiffs, and states that persons laboring on the Farm Line are not given adequate protective gear. (Doc. 37-46). Ramirez's ARP was denied. (*Id.* at p. 2).

Plaintiffs have also provided a declaration from Damion Thompson, who has been incarcerated at Angola since 2022. (Doc. 37-19 at ¶¶ 1-2, hereinafter "Thompson Declaration"). Thompson, like named Plaintiffs, avers that those working on the Farm Lines do not receive adequate safety equipment, clean drinking water, shade, or adequate breaks. (*Id.* at ¶¶ 7-8). Thompson alleges that he "often" feels dizzy and nauseous. (*Id.* at ¶ 18). Work on the Farm Lines is especially difficult for Thompson because he suffered nerve damage to his legs after sustaining a gunshot wound. (*Id.* at ¶ 17). Because of this, Thompson provides that he is an individual with an ADA disability, and that laboring on the Farm Line is beyond his physical capabilities. (*Id.* at ¶¶ 19-20). Thompson submitted an ARP setting forth the above, which was denied in July 2023. (*Id.* at ¶ 20).

---

[12] A BMI over 30 is considered obese. *See* About Adult BMI, Center for Disease Control, https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/index.html#InterpretedAdults (last visited on June 24, 2024).

III.    POLICIES AND PRACTICES AT ANGOLA

There are essentially three policies at Angola which are at issue here. First, and most importantly, is Directive No. 13.067.

**A. Directive No. 13.067**

Effective as of March 21, 2019, this policy's stated purpose is "to establish provisions for the reduction of heat pathology and to reduce the exposure to offenders identified as more vulnerable to heat." (Doc. 37-38 at p. 2). Heat pathology is defined as "[h]eat induced syndromes, such as heat stroke, muscle cramps and heat exhaustion, due to a failure of the heat regulating mechanisms of the body." (*Id.* at p. 3). The policy applies to all Louisiana State Penitentiary security staff and medical staff. (*Id.* at p. 2). It is provided that:

> It is the Warden's policy that Louisiana State Penitentiary shall have a mechanism to identify offenders more vulnerable to heat and to enforce provisions to reduce heat pathology among all offenders. Offenders on certain types of medications may have increased sensitivity to heat and sunlight and are at a higher risk for developing heat pathology. In addition, offenders with specific chronic illnesses, such as morbid obesity, cardiovascular disease, respiratory disease and diabetes mellitus, may have a higher risk of heat pathology.

(*Id.*). According to Directive No. 13.067, when heat index values reach or exceed eighty-eight degrees Fahrenheit, a "heat alert" is triggered. (*Id.*). Directive No. 13.067 provides that those prisoners "identified by a healthcare practitioner with a chronic illness that may be affected by heat or those prescribed medication that may impact sensitivity to heat shall be evaluated and educated for potential adverse reactions concerning heat." (*Id.* at p. 3). The policy does not detail when this evaluation is to take place. (*Id.*). Those incarcerated persons that fall within this provision's ambit

26

are to be given a "heat precaution duty status." (*Id.*). A heat precaution duty status means that, from the period of May 1 through October 31, inmates with such status are to be brought indoors once heat index values reach or exceed eighty-eight degrees Fahrenheit. (*Id.* at p. 4). Once indoors, those offenders are to be provided with cold water and/or ice, cool showers and/or cool wet towels, and increased ventilation where possible. (*Id.*).

To maintain awareness on when heat alerts need to be issued, Directive No. 13.067 mandates that prison officials monitor outdoor temperatures using information from the National Weather Center and record such temperatures every two hours. These records are to be reviewed and approved "by the Warden or [a] designee." (*Id.* at p. 5). For those incarcerated persons who have not been given a heat precaution duty status, upon the announcement of a heat alert, "the following measures shall be provided while working outdoors: (a) Water and ice is available at least every 30 minutes; and (b) A rest break at least 5 minutes long is offered every 30 minutes." (*Id.*). These measures are to be documented and such records are to be maintained by prison officials. (*Id.*). In addition to these procedures, incarcerated persons laboring outdoors are to:

> [R]eceive heat pathology education that includes, but is not limited to, the following:
> (1) Increased consumption of liquids;
> (2) Avoidance of undue exposure to the sun;
> (3) Signs and symptoms of dehydration;
> (4) Signs and symptoms of dermatological conditions secondary to photosensitivity including sunburn and rashes;
> (5) Signs and symptoms of medication toxicity (any altered mental status); and
> (6) Avoidance of excessive exhausting activities in high temperatures.

27

(*Id.* at p. 6). Incarcerated persons who receive such education are to "document receipt" thereof on Form HC-45-A. (*Id.*). The Court has not been provided with any such documentation from Defendants.

In addition to the mandated offender training, Directive No. 13.067 requires all prison staff to attend an annual training on "the signs and symptoms and prevention of heat pathology as outlined in Heat Pathology Staff Training (Attachment B) and the provisions of this directive. Documentation of this training shall be maintained at the unit." (*Id.*). The Court has not been provided with any such training documentation from Defendants.

Finally, the policy provides that "[t]he DPS&C [(Department of Public Safety and Corrections)] Pharmacy and Therapeutics (P&T) Committee shall be responsible for annually reviewing and updating Heat Pathology Medications (Attachment A) as needed." (*Id.*). Plaintiffs contend that this policy, and those below, are not adhered to by Defendants. According to Plaintiffs, Defendants do not accurately record the heat index, do not issue heat alerts as they arise, do not allow incarcerated persons to take breaks every thirty minutes, and fail to identify and accommodate those who are issued a heat precaution duty status. (Doc. 37-1 at p. 15). As support for these assertions, Plaintiffs have provided the Court with documents that purport to show the daily high heat index values for May 1, 2023, through October 1, 2023, along with dates within this period when heat alerts were issued and breaks were given to those laboring on the Farm Line. (Docs. 37-5, 37-50). At least part of this data, specifically the information relating to whether breaks were taken, was pulled from Defendants'

own records and not the National Weather Service. (Doc. 37-1 at p. 25 (citing Doc. 37-62)). Defendants contest the accuracy of the materials provided by Plaintiffs, and contest Plaintiffs' conclusions as to the number of days on which breaks were given. (Doc. 49 at p. 16).

### B. Health Care Policy No. HCP8

HCP8, effective as of August 21, 2018, sets forth identical obligations to Directive No. 13.067. (Doc. 37-39). It lists as references a publication from the Occupational Safety and Health Administration (OSHA) and a publication from the Centers for Disease Control and Prevention (CDC). (*Id.* at p. 2). HCP8 applies to every DPS&C facility. (*Id.*).

Attachment A to HCP8 is the "Heat Pathology Medications" list, which contains twenty-two different medications. (Doc. 37-63 at p. 2). The Heat Pathology Medications list provides the same effective date as HCP8, August 21, 2018, yet the Court cannot, at this stage, confirm whether the list has been changed or updated since it became effective. (*Id.*). Attachment B to HCP8 provides educational material on the prevalence and dangers of heat-related conditions and heat death. (Doc. 51-11). It asserts that "around 618 people in the United States are killed by extreme heat every year," and lists ten factors that increase a person's risk of developing a heat-related illness, including high levels of humidity, obesity, fever, dehydration, prescription drug use, heart disease, mental illness, poor circulation, sunburn, and alcohol use. (*Id.*). The materials warn that older adults and people with mental illness and chronic disease are at the highest risk of succumbing to heat-related conditions.

(*Id.* at p. 3). Some of those conditions include heat cramps, predominately felt in the abdomen, arms, or legs, heat exhaustion, heat rash, and heat stroke. (*Id.* at pp. 3-4).

The materials suggest that to avoid such heat-related illnesses, persons should take "frequent drink breaks and 'wet down' or mist [themselves] with a spray bottle to avoid becoming overheated." (*Id.* at p. 4). Additionally, persons should "[d]ress in lightweight, light-colored, loose-fitting clothing on hot days. . . take rest periods in shady or cool areas. . . protect [themselves] from the sun by wearing a hat and sunglasses; [and] use a sunscreen that is at least SPF 15." (*Id.*). The materials also suggest that persons spend as much time indoors as possible on hot and humid days, and to monitor for extreme heat alerts. (*Id.*). Attachment B relies on OSHA and CDC guidelines for some of its conclusions. (*Id.*). Finally, various symptoms of heat stroke, heat exhaustion, heat rash, and other heat-related conditions are described, along with recommended mitigation tactics. (*Id.* at pp. 5-7). For each of the various heat-related conditions, it is recommended that those afflicted be moved to a cool location. (*Id.*). The Court assumes that Attachments A and B referred to in Directive No. 13.067 are the same as those HCP8 attachments outlined above.[13]

**C. Directive No. 19.004**

Directive No. 19.004, effective June 7, 2023, establishes "procedures for the issuance of leather work gloves and plastic drinking cups to those inmates assigned

---

[13] The Court assumes that Attachments A and B are functionally the same in both HCP8 and Directive No. 13.067 because Directive No. 13.067 is substantively a verbatim copy of HCP8, and because both policies refer to these attachments in the same manner. (*Compare* Doc. 37-38 *and* Doc. 37-39). Defendants have not provided the Court with the attachments to Directive No. 13.067.

to field operations at Louisiana State Penitentiary." (Doc. 51-10 at p. 2). Incarcerated persons laboring on the Farm Line are to be issued leather work gloves once every six months. (*Id.*). As to the plastic drinking cups, the "inmate's farm line supervisor shall be responsible" for their issuance. (*Id.*). "When the inmate reports to his assigned line on the first day he shall be issued a plastic drinking cup." (*Id.* at p. 3). "The inmate is responsible for maintaining his drinking cup and only receive[s] one every six months, if needed." (*Id.*).

### D. Additional Policies at Angola

The classification procedures at Angola appear to be governed by Directive Nos. 13.063, 18.002, and 19.003. Directive No. 13.063 establishes that all incarcerated persons at Angola are assigned a permanent duty status on their arrival to the facility. (Doc. 49-6 at p. 1). A prisoner's work status may be changed based on "objective evidence of physical defects, limitations, injuries or illnesses," and may only be changed by Angola medical personnel. (*Id.* at pp. 1-2). Directive No. 18.002 provides procedures for the classification of offenders upon their arrival to Angola, and mandates that those decisions be made by "Classification Boards," which must include a staff member from the "Classification, Social Services, Medical/Mental Health" category and a staff member from the "Security" category. (Doc. 49-3 at p. 2). "Offenders who disagree with classification decisions may file a grievance through the Administrative Remedy Procedure." (*Id.*). Directive No. 19.0003 provides substantially similar guidance to the above policies, and indicates that incarcerated persons may apply for a reclassification of job status, but actual reclassification remains at the discretion of prison officials. (Doc. 49-4 at p. 1). It further states that

"[e]very offender will be assigned to some form of job assignment in the institution. . . . Offenders are assigned to job assignments based on [their] physical ability to perform the task. . . . Those offenders who are deemed mentally or physically disabled may be assigned to" less taxing job assignments. (*Id.* at p. 2).

The other operative equipment policy at Angola appears to be Department Regulation No. IS-A-3. (Doc. 37-51 at p. 25). This policy, effective as of January 2, 2022, provides that incarcerated persons shall be issued "standard" work boots, which shall not be "steel toe, military or fatigue type, army issue, or pointed toe," have a heel over 2 inches, or be insulated. (*Id.* at p. 28). The policy does not mandate the issuance of sunhats, and only provides for the provision of regular caps of the "baseball type" or "knit type." (*Id.* at pp. 28-29). Sunglasses are to be provided to incarcerated persons, but only by purchase at the canteen and not at the cost of the state. (*Id.* at p. 29).

### E. Practices at Angola

Defendants claim that the following practices are taken at Angola through the declarations of the following individuals.

### (i)   Maghen Gagnard

Maghen Gagnard is employed at Angola as an Executive Management Officer, and claims to have personal knowledge of operations at Angola. (Doc. 49-1 at ¶ 1, hereinafter "Gagnard Declaration"). Gagnard states that all inmates at Angola "are assigned a job, subject to that inmate's duty status as determined by a health care provider. When an inmate arrives at LSP, LSP will conduct an Initial Classification Board to determine the inmate's custody status, housing assignment and job

assignment." (*Id.* at ¶ 4). "Upon intake, inmates are issued the necessary clothing, footwear and/or supplies necessary to perform their assigned job duties. They are provided with tennis shoes, shower shoes, rubber boots, lace[-]up boots and gloves if their work assignment requires." (*Id.* at ¶ 5). As to labor performed outdoors, when ambient temperatures often exceed eighty-eight degrees Fahrenheit, "a heat alert is issued and recorded on the Station logs. . . . Officers are notified via radio and the field operation officers implement the organized breaks every 30 minutes." (*Id.* at ¶ 6). Gagnard also avers that all inmates who are prescribed medications on the Heat Pathology Medications list are given heat precaution duty statuses, and that other incarcerated persons may acquire a heat precaution duty status upon determination by a health care practitioner. (*Id.* at ¶ 7). Finally, Gagnard asserts that "[i]f operation of the Farm Line was shut down, LSP would suffer immediate harm," and estimates that "it would cost LSP $8,645,373 . . . a year to purchase meal compliments to substitute [the] fresh vegetables and fruit" harvested from the Farm Line for inmate consumption. (*Id.* at ¶ 8). She further states that "[t]he cost to maintain landscaping, hay fields, and cattle operations throughout the 18,000[-]acre facility is not capable of being enumerated at this time." (*Id.*).

The Court notes that this final assertion confirms that Gagnard is addressing the economic harm that Angola would suffer if *all* agricultural labor was enjoined, and not, specifically, Farm Line labor, which, as defined by Plaintiffs, encompasses at present four individual lines, and is staffed by no more than fifty incarcerated

persons at a time.[14] (Docs. 37-1 at p. 8 fn. 2, 49 at p.4 fn. 11). Further, Gagnard appears to not take into consideration that Plaintiffs request that only the Farm Line be enjoined when heat index values reach or exceed eighty-eight degrees Fahrenheit.

**(ii)    Ashli Oliveaux**

Ashli Oliveaux is employed as a Deputy Warden of Quality Management and Assurance at Angola. (Doc. 49-12 at ¶ 1, hereinafter "Oliveaux Declaration"). She asserts that an inmate may declare a medical emergency at "any time" while laboring on the Farm Line, at which point a health care professional will be dispatched to assess the inmate and "call the ATU"[15] as necessary. (*Id.* at ¶ 3). Oliveaux avers that incarcerated persons working on the Farm Line routinely use the emergency sick-call procedures, "even for minor complaints." (*Id.* at ¶ 4). "Of all the sick calls [(from April 1, 2024, to May 15, 2024)], one inmate experienced chest pains and was immediately sent to the ATU," another "complained of dizziness and was allowed to rest in the shade and not work the remaining 45 minutes of his shift," and "[t]he remaining sick calls involved back pain, shoulder pain, abrasions, etc." (*Id.*). Oliveaux's implication on this final point appears to be that those sick calls involving "back pain, shoulder pain, abrasions, etc." are not related to heat conditions on the Farm Line. (*Id.*). As

---

[14] Were Gagnard to be referring to the Farm Line as presently defined by Plaintiffs, Gagnard would be stating that it is her belief that approximately fifty inmates, generally laboring for anywhere between four and five hours a day, will or have produced $8,645,373 in crops annually, primarily without the use of any sort of tool save for the inmate's own hands. The Court does not doubt that inmates sent to the Farm Line work diligently, but this would be a feat of Herculean proportions.

[15] The "ATU" refers to the "Acute Treatment Unit." *Lewis v. Cain*, No. CV 15-318-SDD-RLB, 2023 WL 7299130, at *5 (M.D. La. Nov. 6, 2023).

noted by Dr. Vassallo in Section IV(A) of this Ruling and Order, Oliveaux's implication is not necessarily correct.

An independent review of these sick calls by the Court reveals that on April 26, 2024, an inmate with a history of pre-diabetes and hypertension exhibited back pain while working his job assignment. (Doc. 49-13 at pp. 3-4). On May 7, 2024, a forty-one-year-old inmate lodged an emergency medical request after exhibiting flank pain. (*Id*. at p. 14). This inmate had a standing blood pressure reading of 163 over 98, values consistent with Stage 2 hypertension. (*Id*.). Despite this, his chart reflects that he was assigned a regular duty status with no restrictions. (*Id*. at p. 15). On May 15, 2024, a thirty-five-year-old inmate was sent to the ATU after exhibiting sharp chest pain while laboring in "the field." (*Id*. at p. 16). The man also reported dizziness. (*Id*.). The medical report details that he was working in the field in a sweatshirt. (*Id*.). Also on May 15, 2024, another inmate lodged an emergency medical request after displaying rashes on both arms. (Doc. 49-13 at p. 17). The medical report provides that this inmate exhibited a history of abdominal pain, rash, dysthymia, panic disorder, acquired immune deficiency syndrome (AIDS), vitamin D deficiency, and hyperlipidemia, among other ailments. (*Id*. at p. 18). Despite this, the medical record show that this man had a regular duty status with no restrictions. (*Id*.). In addition, a third emergency sick call was placed on May 15, 2024, regarding a fifty-three-year-old man who requested emergency medical attention from "the field" after experiencing dizziness for an hour. (*Id*. at pp. 20-21). This man has a history of pre-diabetes, fainting, knee pain, asthma, and osteoarthritis, among other ailments. (*Id*.

at p. 21). Prison officials assigned him a regular duty status with no restrictions. (*Id.*).
On the incident in question, he was instructed to "rest in the shade" for the remainder
of his shift. (*Id.*).

### (iii)   Gabriel Hebert

Gabriel Hebert is employed as a Field Operations Colonel at Angola. (Doc. 49-
23 at ¶ 1, hereinafter "Hebert Declaration"). He avers that he has personal knowledge
of Farm Line operations. (*Id.* at ¶ 2). Hebert claims that agricultural programs at
Angola are used to cultivate crops that then feed the inmate population. (*Id.* at ¶ 3).
He further states that "LSP utilizes modern day agricultural practices that are
common amongst all farmers." (*Id.*). It is not clear what materials or expertise Hebert
relies on to reach to this conclusion. Hebert asserts that the Farm Line laborers either
work in the morning, take a lunch break, and perform a second afternoon shift, or
work only a morning shift with approximate times of "about 8:00-11:40" A.M. (*Id.* at
p. 2). Hebert further states that "[a]ll inmates that work on the grass crews or in the
field work at their own pace. There are no quota requirements. LSP only asks that
the inmates keep up with their fellow workers. Inmates may take breaks and/or get
water at any point." (*Id.* at ¶ 9). As to conditions on the Farm Line, Hebert states that
"[a]ll lines are provided with large water coolers that are brought to the work site
every day. These water coolers have tops and remain closed in the field. They are
brought in every day and cleaned and sanitized." (*Id.* at ¶ 10). Hebert additionally
states that prisoners laboring on the Farm Line are "assigned a drinking cup and
gloves. Inmates can also request a sun hat. In my experience inmates do not use the
hats even when they request them." (*Id.* at ¶ 12). Further:

> "[i]f a heat alert is issued, officers are notified via radio. Even though inmates may take breaks when they need them, once a heat alert is issued, organized 5-minute breaks are given every 30 minutes. LSP also provides Gatorade to the lines during the hot months. Further, officers ensure once a heat alert is issued, offenders with a heat precaution duty status are brought indoors in accordance with Directive 13.067."

(*Id.* at ¶ 13). Hebert further asserts that the "Daily Line Counts are internal documents that LSP officers fill out. These documents are not required by anyone, and LSP does not necessarily maintain these documents per any schedule." (*Id.* at ¶ 14). On the Daily Line Counts, "[o]fficers are not instructed to document all breaks that are given. Inmates can work at their own pace so documenting breaks would not be feasible." (*Id.* at ¶ 14). Hebert's understanding of Angola's policies appears to conflict with the language of Directive No. 13.067, which states that the heat prevention measures outlined therein, including allowing inmates to take breaks every thirty minutes upon the issuance of a heat alert, must be "documented and maintained at the facility." (Doc. 37-38 at p. 5). The Court was also unable to confirm that there is any explicit policy at Angola suggesting that incarcerated persons may take breaks while performing a job assignment whenever they wish.

## IV.   HEAT AND HEALTH

Put simply, "[i]t gets real hot down in Louisiana"[16] – and it is only getting hotter. The summer of 2023, according to Ben Schott, the lead meteorologist at the National Weather Service's New Orleans Station, was Louisiana's hottest one to date. (Doc. 37-54 at p. 2). As of August 23, 2023, there were 4,766 heat-related emergency

---

[16] The Oak Ridge Boys, *Leaving Louisiana in the Broad Daylight,* on The Oak Ridge Boys Have Arrived (ABC Records 1979).

visits in the state since April 1. (*Id.*). This was almost double the annual average and prompted former Governor John Bel Edwards to declare a state of emergency on August 11, 2023. (Doc. 37-53 at pp. 2-3). This heat wave caused, as of August 23, 2023, at least twenty-five heat-related deaths. (Doc. 37-36 at p. 3). Stephen Russo, then Secretary to the Louisiana Department of Health, was quoted as saying, "[h]eat-related illness and death are preventable, and I encourage Louisiana residents to know the signs of heat-related illness, stay indoors with air conditioning if possible, and remember to hydrate, rest and stay in the shade if they must be outdoors." (*Id.*). The U.S. National Oceanic and Atmospheric Administration (NOAA) predicted that there is a "one-in-three chance" that 2024 will be even hotter. (Doc. 37-37 at p. 2). NOAA further warned that there was a "99% chance [2024] [will] rank among the five warmest [years] on record." (*Id.* at p. 3). The Louisiana Department of Health has stated that "[h]eat exposure is intensifying as the frequency, severity, and duration of extreme heat events increases due to climate change. These changes are of concern in Louisiana because the state experiences some of the highest average summer temperatures in the nation." (Doc. 37-45 at p. 7). These high temperatures are "compounded by high humidity" which "worsens the impact of heat by impairing the body's ability to cool by evaporation." (*Id.*). The Louisiana Department of Health has further advised that those who work in outdoor settings are especially at risk of developing heat-related conditions, along with those suffer from chronic health conditions. (*Id.* at pp. 8, 18). The CDC notes that those who are exposed to extreme heat are at risk of suffering heat stroke, which requires immediate emergency

38

medical attention and can cause death or permanent disability if such treatment is not provided. (Doc. 37-59 at p. 2). In addition to heat stroke, the CDC provides that victims of other heat-related conditions should seek cool, shady areas and that generally persons should avoid the outdoors in high heat. (*Id.* at pp. 2-6).   The National Weather Service (NWS) issues excessive heat warnings when the heat index reaches 113 degrees Fahrenheit, or the temperature reaches 105 degrees Fahrenheit. (Doc. 21 at p. 18 (citing *NWS LIX - Watch, Warning, Advisory Criteria*, National Weather Service, *available at* https://www.weather.gov/lix/wwa_criteria#Heat%20Products)).  The NWS issued a record-breaking number of excessive heat warnings across the state in 2023, with New Orleans alone suffering from seventeen excessive heat warnings as of August 6, 2023.[17] According to Defendants' temperature logs, conditions at Angola qualified for an excessive heat warning approximately twenty-four times over the summer months, and conditions qualified for a heat alert on roughly 145 days over the same period. (Doc. 49-10).

A. **Dr. Susi Vassallo**

According to Dr. Vassallo, an expert in thermoregulation and the effects of drugs and illnesses on thermoregulation, heat kills. (Doc. 37-3 at p. 20 (extreme heat is "the most common cause of weather-related death in the U[nited] S[tates], killing more people each year than hurricanes, lightning, tornados, floods and earthquakes

---

[17] *See* Excessive Heat Warnings Continue Through August, The City of New Orleans: NOLA Ready (Aug. 6, 2023, 11:45 AM), https://ready.nola.gov/incident/summer-heat-2023/august-heat-warning-(1)/..

combined")). Thermoregulation refers to the "process by which the human body maintains its temperature within a safe physiological range." (*Id.* at p. 7). Thermoregulation is an essential bodily process, and "[i]nability to thermoregulate properly impairs the function of multiple bodily systems, including but not limited to the nervous system, pulmonary system, cardiovascular system, gastrointestinal system, and kidney function." (*Id.*). The human body uses "two primary mechanisms to cool itself: perspiration (sweating) and cutaneous vasodilation (dilation of blood vessels close to the skin)." (*Id.* at p. 8). Both processes depend on neurotransmission and adequate cardiac function. (*Id.*). Similarly, in hotter environments the heart must pump "harder and faster in order to pump more blood through the body to maintain blood pressure and cooling." (*Id.*). Sweating depletes the body of water and salt, and leads to dehydration without adequate measures in response. (*Id.* at p. 9). Dehydration can cause "light-headedness or dizziness, a lack of energy, low blood pressure, weakness, and increased heart rate." (*Id.*). "If fluids are not replaced, core temperature will rise, and hyperthermia will result. Hyperthermia occurs when the body's natural thermoregulatory processes are insufficient and overwhelmed." (*Id.*). Dehydration and hyperthermia can "both be deadly." (*Id.*). Any medication that impacts cardiac function or limits sweat responses will have "profound" effects on the body's ability to thermoregulate. (*Id.*).

Dr. Vassallo reports that "[h]eat-related disorders occur when the body's temperature control system is overloaded, and the body is unable to adequately dissipate heat." (*Id.* at p. 10). Further, the "risk for heat stroke and heat-related

40

disorders increases sharply when the heat index exceeds 88 degrees Fahrenheit."
(*Id.*). Some heat-related disorders include "heat syncope (fainting), heat cramps, heat
exhaustion, and heat stroke." (*Id.*). Heat exhaustion and heat stroke can manifest in
similar ways, including through light-headedness, thirst, nausea, weakness, fainting,
irregular heartbeat, and abdominal cramps, because heat exhaustion can precede
heat stroke. (*Id.* at p. 11). Heat strokes can occur rapidly and without warning. (*Id.*
at p. 12). In fact, two-thirds of victims "experience symptoms for less than one day
before being hospitalized or being found dead." (*Id.*). Victims may also be physically
or mentally incapable of calling for help, as heat stroke can lead to feelings of
confusion and alter the afflicted's mental status. (*Id.*). Heat stroke "carries a
significant risk of death and permanent disability." (*Id.* at p. 13). Dr. Vassallo points
out that "[s]tudies have shown heat stroke mortality rates ranging from 30-80%.
Survivors of heat stroke may have significant heat-related morbidity, such as
permanent inability to walk and talk." (*Id.*). Further, "[p]ermanent neurological
damage occurs in up to 17% of survivors." (*Id.*).

Dr. Vassallo opines that "[a]ll people, including healthy people with no known
medical problems, are at risk for heat related disorders during persistent exposure to
a heat index above 88 degrees Fahrenheit." (*Id.* at pp. 19-20). "In addition to causing
dehydration and heat stroke, extreme heat can 'affect otherwise healthy people's
kidneys, liver, heart, brain, and lungs, which may cause renal failure, heat attack,
and stroke.'" (*Id.* at p. 21 (citing Robert Pistone, <u>Violations of the Eighth Amendment:
How Climate Change Is Creating Cruel and Unusual Punishment</u>, 28 Hastings Envt'l

L.J. 213, 224 (2022))). Further, "deaths due to heat alone, due to cardiovascular disease alone, and due to heat and cardiovascular disease combined, increase with the number of cumulative days of heat exposure." (*Id.* at p. 27). In other words, the risk of death from both heat-related diseases and facially unrelated diseases increases with the temperature.

While heat-related disorders are dangerous for everyone, "[c]ertain people are at greater risk" of developing them. (*Id.* at p. 15). Such people include "(a) people with chronic illnesses or medical conditions that impair thermoregulation; (b) people with psychiatric or mental health disorders; and/or (c) people taking drugs or medications that impair thermoregulation." (*Id.*). Based on her review of the medical records of named Plaintiffs, Dr. Vassallo concludes that Defendants have assigned numerous Plaintiffs who are especially susceptible to high heat to labor on the Farm Line. (Doc. 54-1). Those chronic illnesses or medical conditions that render the afflicted more at risk of heat stroke include hypertension, diabetes or pre-diabetes, "heart disease [and heart conditions], obesity, and respiratory diseases like asthma or chronic obstructive pulmonary disease." (Doc. 37-3 at pp. 15-16). Those psychiatric or mental health disorders that can impair thermoregulation include, most commonly, depression and anxiety. (*Id.* at p. 17). Those medications that impair thermoregulation include, but are not limited to, most medications used to treat mental illness, "including Synthroid, Benadryl, Zyprexa, Zyrtec, Losartan, [and] Elavil," "Vistaril," "Topiramate;" most medications that treat hypertension; "sympathomimetic drugs" commonly used to treat congestion and the cold; diuretics; and "anticholinergic drugs"

42

used to address insomnia, allergies, itching, and gastrointestinal disorders. (*Id.* at pp. 17-18, 29). A review of Angola's Heat Pathology Medications list shows that of these eight named medications, only one has been listed. (Doc. 37-63 at p. 2). In addition to these medicines, antipsychotic medications and selective serotonin reuptake inhibitors, commonly prescribed for persons suffering from depression, inhibit thermoregulation. (Doc. 37-3 at p. 19).

Dr. Vassallo has reviewed "the complaint and other case filings in this case, including the sworn declarations of named plaintiffs," as well as the "Department of Public Safety and Corrections' heat pathology policies, directives, and regulations," and opines that with a "reasonable degree of medical certainty" "[t]he incarcerated men who perform agricultural labor on Angola's Farm Line are at substantial risk of serious physical and psychological harm due to their extensive and continued exposure to high temperatures and heat index." (*Id.* at p. 6). Dr. Vassallo bases this opinion in part on the heat-related conditions experienced by named Plaintiffs. (*Id.* at p. 24).

According to her review of the materials provided, Dr. Vassallo does not believe that Defendants' heat-related policies are facially adequate or followed. (*Id.* at p. 28). She notes that HCP8-a, the education provided to incarcerated persons laboring on the Farm Line, provides that offenders "should avoid excessive exhausting activities in high temperatures" and that it is impossible for inmates to comply with this advice. (*Id.*). Further, Defendants' policies do not allow for inmates to take breaks in the

43

shade or otherwise cool areas, despite this being one of the "only way[s] to . . .avoid or effectively mitigate the detrimental impacts of extreme heat." (*Id.* at pp. 22, 29).

In short, Dr. Vassallo concludes that the Angola's "practice of forcing men to perform strenuous manual labor in the fields in conditions of extreme heat and humidity, without adequate rest and recovery periods, water intake, protective clothing, or modern tools or equipment" places all such men at "substantial risk of serious heat-related disorders" that can lead to "death or permanent physical injury." (*Id.* at p. 6).

B. **Dr. Randy Lavespere**

In response, Defendants offer a sworn statement from Dr. Randy Lavespere. (Doc. 49-24). Dr. Lavespere is the Chief Medical Officer of the Department of Corrections, and has served in this position for three years. (*Id.* at p. 1). Prior to this, he was the Medical Director at Angola for approximately seven years. (*Id.*). Dr. Lavespere is familiar with HCP8 and its various requirements. (*Id.* at p. 2). Further, the Heat Pathology Medications list was "created, evaluated and approved" by Dr. Lavespere, along with a Dr. Gamble and a Dr. Herman Soong. (*Id.* at p. 3). Dr. Lavespere avers that "[t]he medication list is annually reviewed by the DPS&C Pharmacy and Therapeutics Committee, which includes all institutional Medical Directors and the two Chief Pharmacists." (*Id.*). Dr. Lavespere disagrees with Dr. Vassallo's opinion that the Heat Pathology Medications list is underinclusive. (*Id.*). Dr. Lavespere also states, blankly and in part based on the legal ruling in *Ball v. LeBlanc*, 792 F.3d 584, 599 (5th Cir. 2015), that "the current policy of required 5-minute breaks every 30 minutes and access to water is sufficient to reduce heat

pathology among all offenders." (*Id.*). Dr. Lavespere concludes by asserting that, despite recent opinions by courts to the contrary, the "current emergency care at LSP is adequate." (*Id.* at pp. 3-4).[18]

There are numerous factors that significantly weigh against the persuasiveness of Dr. Lavespere's account. First, Defendants have failed to show that Dr. Lavespere has any sort of expertise in the field of thermoregulation. Second, Dr. Lavespere has failed to cite to any materials, facts, medical authorities, treatises, or processes that underly any of his conclusions. Third, specifically relating to Dr. Lavespere's contention that the Heat Pathology Medications list is sufficient because numerous medical personnel have been involved in creating it, receiving more input from potentially unqualified or uninformed sources does not necessarily imply that the list is medically sufficient. The Court has been offered no proof as to credentials and expertise of any of the medical personnel consulted for the list, and therefore has no basis to conclude that such review makes it substantially more likely that the Heat Pathology Medications list is adequate. Fourth, the conclusion that the present policies in place are sufficient to reduce heat stroke because of Angola has "required" breaks every thirty minutes after the issuance of a heat alert misstates the plain language of Directive No. 13.067, which provides that such breaks are optional, not mandatory.

---

[18] To the contrary, this Court recently examined "detailed and extensive findings of the callous and wanton disregard for the medical care of inmates at Angola." *See Lewis v. Cain*, 2023 WL 7299130, at *12 (M.D. La. Nov. 6, 2023); *see also Lewis* v. *Cain*, 2021 WL 1219988, at *6 (M.D. La. Mar. 31, 2021).

## V.    AGRICULTURAL LABOR STANDARDS

The Court has conducted a review of operative federal and state requirements for heat safety in agricultural settings, and preliminarily concludes that Angola fails to meet the minimum standards set forth by such regulations.

For instance, according to the Louisiana Department of Health, and under OSHA regulations generally, "[a]t a minimum, employers should provide adequate cool water, rest breaks, and *shade or a cool rest area* for employees." *Working In Extreme Heat: What Employers and Workers Need To Know*, Louisiana Department of Health, https://ldh.la.gov/page/la-heat (emphasis added) ("Employers have a legal and moral duty to protect workers against heat."). Additionally, employers should "[g]ive new or returning employees the chance to gradually acclimatize (or become used to working in hot temperatures), to be trained and plan for emergencies, and to monitor for heat signs/symptoms." *Id.* The CDC further recommends that should persons working in hot environment become lightheaded, confused, weak, or faint, they "STOP all activity," "get into a cool area," and "rest." (Doc. 37-59 at p. 6) (emphasis in original).

The National Institute for Occupational Safety and Health (NIOSH) has also published criteria for a recommended standard for occupational heat stress, which includes advice to employers for how to prevent heat-related illnesses from developing in workers exposed to hot and humid environments. NIOSH suggests that:

> Employers should have an acclimatization plan for new and returning workers, because lack of acclimatization has been shown to be a major factor associated with worker heat-related illness and death. NIOSH recommends that employers provide the means for appropriate hydration and encourage their workers to hydrate themselves with

potable water <15°C (59°F) made accessible near the work area. Workers in heat <2 hours and involved in moderate work activities *should drink 1 cup (8 oz.) of water every 15–20 minutes*, but during prolonged sweating lasting several hours, they should drink sports drinks containing balanced electrolytes. In addition, *employers should implement a work/rest schedule and provide a cool area (e.g., air-conditioned or shaded) for workers to rest and recover.* These elements are intended to protect the health of workers from heat stress in a variety of hot environments.

BRENDA JACKLITSCH, ET AL., CRITERIA FOR A RECOMMENDED STANDARD: OCCUPATIONAL EXPOSURE TO HEAT AND HOT ENVIRONMENTS, NIOSH, viii (2016) (available at https://www.osha.gov/heat-exposure/standards) (emphasis added).

In addition to this publication, NIOSH has circulated a "Work/Rest Schedules Fact Sheet," which provides heat-dependent recommended rest times. *Heat Stress: Work/Rest Schedules,* NIOSH, available at https://www.cdc.gov/niosh/topics/heatstress/recommendations.html. According to NIOSH, for *light work* conducted in 84-degree weather, with no clouds and with humidity over 60%, employers should give employees 15 minutes rest per 45 minutes of work. *Id.* Should the temperature reach 85 degrees under like conditions, rest should be increased to 20 minutes. *Id.* At 88 degrees with no clouds and high humidity, 15 minutes work per 45 minutes work. *Id.* Any higher than that, NIOSH provides that employers must use "extreme caution" because the "risk for heat injury is high in this situation." *Id.* Those various tasks that Plaintiffs are alleged to have been ordered to complete on the Farm Line, such as picking crops and cutting grass, are not "light work." *See id.* (describing light work as activities such as "[o]perating equipment," "[i]nspection work," and "[w]alking on flat, level ground").

Other states have adopted their own labor regulations. For instance, Colorado's Agricultural Labor Conditions Rules require employers to provide shade when temperatures reach 80 degrees Fahrenheit. It is stated therein that:

> For employee use during rest, meal, cool-down, and other breaks, employers shall provide access to adequate shade located as close as practicable to the worksite, which may be artificial or natural, but does not qualify if:
> (A) any source yields additional heat in the shaded area, such as exhaust, running machinery, heat-radiating structures, or heat in a non-air-conditioned vehicle;
> (B) the shaded area is located further than 0.25 miles from the worksite for employees accessing the shade by foot, or otherwise too far to reasonably access during rest and meal periods;
> (C) the shaded area is too small for employees to sit fully shaded in normal posture, without touching one another;
> (D) the shaded area is neither ventilated nor open to the air; or
> (E) the area has unsafe, unhealthy, unsanitary, or other conditions (*e.g.*, noxious odor from rot or garbage) that deter or discourage accessing or using the shade.

Agricultural Labor Conditions Rules, 7 CCR 1103-15 §§ 3.1, 3.3. California, Oregon, and Washington have similar shade requirements. *See* T. 8 § 3395 Heat Illness Prevention In Outdoor Places of Employment; *see also* Oregon Occupational Safety and Health Division Rules 437-004-1131 (3); *see also* Safety Standards for Agriculture, 296-307-09735 WAC.

A. **Marguerite Green**

Plaintiffs offer a declaration from Marguerite Green, a farmer with "significant experience" operating specialty farms, that concludes that farming operations at Angola do not meet industry standards. (Doc. 37-7 at p. 1). Green received her Bachelor of Science in Agriculture and Plant and Soil Systems from Louisiana State University in 2011. (*Id.*). She has since obtained a horticulture license, which has expired, from the Louisiana Department of Agriculture and Forestry and a teaching

48

certificate from the Louisiana Department of Education. (*Id.* at p. 2). Green served as a farm instructor for a summer program at the LSU Agriculture Center's Burden Research Station for two years, and was a "farm manager and program director" of a farming operation in New Orleans between 2013 and 2020. (*Id.*). Green avers that she has "significant" experience with "prison garden programs," and earned a "Horticulture Therapy Certificate" from the "Chicago and New York Botanical Gardens" in 2019. (*Id.*). Currently, she serves as the executive director of SPROUT, "an organization based in New Orleans that provides technical assistance and training to specialty crop farmers throughout Louisiana." (*Id.*). In this role, Green advises and trains "private and institutional parties, including the United States Department of Agriculture (USDA), Feeding Louisiana,[19] and academic institutions like LSU." (*Id.* at pp. 2-3).

Plaintiffs assert that Green possesses "significant expertise" on the impact of the various seasons, and has trained hundreds of specialty crop farmers on the impact of changing climate on farm production. (*Id.* at p. 3). In this role, Green has provided training and technical assistance for workplace safety and management issues within agricultural organizations, and has taught farmers on "how to protect field workers from injuries, including those associated with chemical and sun exposure, by using personal protective equipment (PPE) and other best practices promulgated by [OSHA]." (*Id.* at pp. 3-4). During the course of Green's career, she has served on

---

[19] Feeding Louisiana is a non-profit organization that represents the state's various food banks and associated networks. Who We Are, Feeding Louisiana, https://www.feedinglouisiana.org/about (last visited on July 1, 2024).

"numerous boards and committees, including the Specialty Crop Subcommittee of the USDA National Agricultural Research, Extension, Education, and Economics Advisory Board (2021-2023)," among others. (*Id.* at p. 4).

Green reviewed the policies and practices in place at Angola, the Amended Complaint, Plaintiffs' various declarations, and "relevant literature, including a survey of agricultural workplace safety practices promulgated by several federal and state agencies" to arrive at her evaluation as to the adequacy of Angola's heat-related policies on the Farm Line. (*Id.* at p. 5). Green concludes that based on these materials and her experience and expertise, the "Farm Line operates in a manner inconsistent with industry customs and practices routinely observed on specialty farms in Louisiana." (*Id.*). She further opines that "the Farm Line does not meet basic work, health, or safety standards applicable to agricultural labor, particularly in conditions of excessive heat and humidity." (*Id.*).

Green bases her conclusions on the following observations. The use of incarcerated persons to hand-water crops, including by "dipping Styrofoam cups in a bucket," is "extremely inefficient and labor-intensive." (*Id.* at p. 7). Further, "[w]eeding by hand is inefficient, expensive, and highly labor intensive. Hand pulling may not extract all the roots, leaving a weed to grow back. This method is physically demanding and can cause injuries." (*Id.*). Hand weeding is "especially inefficient and dangerous in conditions of extreme heat and humidity." (*Id.*). In Green's opinion, "[b]asic PPE" such as "a [long-sleeved] shirt, long pants, lace-up work boots, socks, gloves, eye protection, and a sun hat" can prevent "some injuries." (*Id.* at p. 8).

50

However, such clothing, while presenting benefits through its "impermeab[ility]," will also "prevent heat exchange (i.e., sweat evaporation) from the body to the external environment." (*Id.*). This then requires supervisory persons to take "extra safety precautions" for workers wearing such equipment in hot environments. (*Id.* at p. 9).

It is further appropriate practice in the agricultural sector for employers to provide workers with sunscreen. (*Id.* at p. 12). Also, according to Green, "[r]ubber boots are not safe for daily fieldwork." (*Id.*). After reviewing the materials described above, Green concludes that inmates assigned to the Farm Line are not assigned the types of PPE that are "standard among agricultural workers in Louisiana." (*Id.*).

As to the adequacy of the heat-related policies at Angola, Green notes that they conflict with the various guidelines put forth by NIOSH and OSHA, as discussed above, and further stresses that NIOSH advises employers to suspend all "work that is not urgent" upon the issuance of a heat alert. (*Id.* at p. 11). This is not contrary to industry standards, as, according to Green, "[m]any private farms cease operations in the summer, in part to protect workers and in part because crop yield is generally low during the hottest months." (*Id.* at p. 12). Finally, "[t]o avoid dehydration and heat exhaustion/stroke, farm workers should be given frequent breaks. . . in a cool location. . . . The length and frequency of breaks should increase as heat intensifies." (*Id.* at p. 13). Green concludes that these practices are not followed at Angola. (*Id.* at p. 14).

B. **Tommy Guilino**

Defendants respond to Green's conclusion with the declaration of Tommy Guilino, an Angola employee with twenty-five years of farm experience. (Doc. 49-21 at p. 1). According to Guilino, the Farm Line is operated using industry standards and utilizes "modern day agricultural practices . . . that are common amongst all farmers." (*Id.* at pp. 2-3). Guilino appears to arrive at this conclusion solely on the basis of his own personal experience. He does not provide a description of what "modern day agricultural practices" he is referring to, or even how he would know what modern day agricultural practices are within the private sector, since he avers that he has been exclusively employed by Angola for the past twenty-two years. (*Id.* at pp. 1-3).

VI.   **STATEMENT OF LAW**

A. **Preliminary Injunctive Relief**

Federal Rule of Civil Procedure ("Rule") 65(b) sets forth the requirements that must be met before the Court may issue a TRO. It provides:

> ***(1) Issuing Without Notice.*** The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if:
>
> (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and
>
> (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

> **(2) Contents; Expiration.** Every temporary restraining order issued without notice must state the date and hour it was issued; describe the injury and state why it is irreparable; state why the order was issued without notice; and be promptly filed in the clerk's office and entered in the record.

Fed. R. Civ. P. 65(b)(1)-(2). Additionally, the party requesting the TRO must provide "security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).

A TRO is simply a highly accelerated and temporary form of preliminary injunctive relief, requiring that the movant establish the same four elements for obtaining a preliminary injunction: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest. *See Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011). In applying the four-factor analysis, a court must consider the factors on a "sliding scale"—a greater threat of irreparable injury may justify issuance of preliminary relief in a situation with a less certain likelihood of success, and vice versa. *Planned Parenthood Gulf Coast, Inc. v. Kliebert*, 141 F. Supp. 3d 604, 635 (M.D. La. 2015).

To establish a likelihood of success on the merits, a plaintiff "need not show that success is an absolute certainty. He need only make a showing that the probability of his prevailing is better than fifty percent." *Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988). Irreparable injury is harm that "cannot be undone through monetary damages"—that is, harm for which money damages are inadequate or for

which money damages are "especially difficult" to compute. *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981); *Allied Marketing Group, Inc. v. CDL Marketing, Inc.*, 878 F.2d 806, 810 n.1 (5th Cir. 1989).

## B. Eighth Amendment

The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. To establish an Eighth Amendment violation for conditions of confinement, "an inmate must show that the alleged violation was sufficiently serious, i.e., that it deprived him of the most minimal level of life's necessities, and that prison officials acted with deliberate indifference to his health or safety." *Hewitt v. Henderson*, 271 F. App'x 426, 428 (5th Cir. 2008) (citing *Farmer v. Brennan*, 511 U.S. 825, 834, 847 (1994); *Wilson v. Seiter*, 501 U.S. 294, 303 (1991)). In other words:

> A prison official has violated the Eighth Amendment when he 1) shows a subjective deliberate indifference to 2) conditions posing a substantial risk of serious harm to the inmate. *Farmer*, 511 U.S. at 833–34. Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. *Id.* at 842.

*Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004). Further, "[c]onditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need." *Id.* (citing *Wilson*, 501 U.S. at 304). "The standard against which a court measures prison conditions are 'the evolving standards of decency that mark the progress of a maturing society' and not the

standards in effect during the time of the drafting of the Eighth Amendment." *Gates*, 376 F.3d at 333 (quoting *Estelle v. Gamble*, 429 U.S. 97, 102 (1976)).

"'[T]he unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment.'" *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (some internal quotation marks omitted). The Supreme Court has held that "[a]mong 'unnecessary and wanton' inflictions of pain are those that are 'totally without penological justification.'" *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981). "In making this determination in the context of prison conditions, [the Court] must ascertain whether the officials involved acted with "deliberate indifference" to the inmates' health or safety." *Hope v. Pelzer*, 536 U.S. 730, 737 (2002) (quoting *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)). Courts "may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious." *Id.* (citing *Farmer*, 511 U.S. at 842).

Subjecting incarcerated persons to high heat conditions for sustained periods of time, with inadequate procedures to mitigate the risks inherent in such high heat, is a violation of the Eighth Amendment when prison officials are "deliberately indifferent" to such risks. *See, e.g.*, *Hinojosa v. Livingston*, 807 F.3d 657, 670 (5th Cir. 2015) ("inmates have a right, under the Eighth Amendment, not to be subjected to extreme temperatures without adequate remedial measures"); *Ball*, 792 F.3d at 596 ("[W]e affirm the district court's conclusion that housing these prisoners in very hot cells without sufficient access to heat-relief measures, while knowing that each suffers from conditions that render him extremely vulnerable to serious heat-related

injury, violates the Eighth Amendment'); *Cole v. Collier*, No. 4:14-CV-1698, 2017 WL 3049540, at *39 (S.D. Tex. July 19, 2017) (finding that, due to continued occurrence of high heat and the inadequacy of efforts to mitigate such heat, "[t]he conditions of confinement at the Pack Unit," a prison operated by the Texas Department of Criminal Justice, "violate the Eighth Amendment").[20]

Further, "prison work requirements which compel inmates to perform physical labor, which is beyond their strength, endangers their lives, or causes undue pain constitutes cruel and unusual punishment." *Howard v. King*, 707 F.2d 215, 219 (5th Cir. 1983); *see also Mendoza v. Lynaugh*, 989 F.2d 191, 194 (5th Cir. 1993) ("To be sure, if prison officials assign an inmate to a work detail and they know that such an assignment could exacerbate a serious physical ailment, then such a decision could constitute deliberate indifference"); *Calhoun v. Hargrove*, 312 F.3d 730, 734-35 (5th Cir. 2002) (finding claim sufficient to survive a motion to dismiss where prison official purportedly knew about a four-hour medical work restriction but forced inmate to work long hours, which raised blood pressure to dangerously high levels).

---

[20] *See also Hope,* 536 U.S. at 738 (Eighth Amendment violation was "obvious" in part because plaintiff was subjected to "unnecessary exposure to the heat of the sun"); *Gates*, 376 F.3d at 340 (holding that the probability of heat-related illness based on the conditions of confinement in a certain cellblock and the open and obvious nature of the risk thereof amounted to an Eighth Amendment violation); *Valigura v. Mendoza*, 265 F. App'x 232, 235 (5th Cir. 2008) ("We have held that temperatures [within confinement] consistently in the nineties without remedial measures, such as fans, ice water, and showers, sufficiently increase the probability of death and serious illness so as to violate the Eighth Amendment"); *McCollum v. Livingston*, No. 4:14-CV-3253, 2017 WL 608665, at *18 (S.D. Tex. Feb. 3, 2017) (noting that Fifth Circuit precedent provides "that, in the face of extreme heat, prison officials must fashion adequate mitigating measures").

The adequacy of procedures is a fact-specific question that courts have routinely turned to experts for help answering. *See, e.g., Gates*, 376 F.3d at 339 (upholding the issuance of injunctive relief that relied on Dr. Vassallo's testimony that the conditions of confinement were such that it was "very likely" that incarcerated persons in the relevant facility would die from heat stroke or some other heat-related condition); *Ball*, 792 F.3d at 593 (affirming the district court finding that, based mainly on Dr. Vassallo's testimony, the heat conditions and procedures in place within the relevant prison put incarcerated persons at substantial risk of serious harm); *Collier*, 2017 WL 3049540, at *30 (relying on Dr. Vassallo's testimony to find that a particular heat-related prison policy was ineffective).

Courts will issue preliminary or emergency injunctive relief to command that prisons modify their conditions of confinement so as to preserve human life. *See, e.g., Collier*, 2017 WL 3049540, at *46; *Tiede v. Collier*, No. 1:23-CV-1004-RP, 2023 WL 6345966, at *1 (W.D. Tex. Sept. 28, 2023). That being said, in doing so courts remain "barred from enjoining the state to follow its own laws and procedures." *Valentine v. Collier*, 956 F.3d 797, 802 (5th Cir. 2020).

### C. Title II of the ADA and Section 504 of the Rehabilitation Act

Incarcerated persons may bring claims against their jailers for disability discrimination under Title II of the ADA and Section 504 of the Rehabilitation Act. *Cleveland v. Gautreaux*, 198 F. Supp. 3d 717, 736 (M.D. La. 2016) (citing *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209-10 (1998)). "[A] plaintiff proceeding under Title II must 'show that: (1) he or she is a qualified individual with a disability; (2) he or she

is being excluded from participation in, or being denied the benefits of some service, program, or activity by reason of his or her disability; and (3) the entity which provides the service, program or activity is a public entity." *Id.* (quoting *Douglas v. Gusman*, 567 F. Supp. 2d 877, 889 (E.D. La. 2008)). Within the prison context, this equates to a requirement that prisons make "reasonable modifications" to its policies, practices, or procedures so that a disabled prisoner can have "meaningful access to existing public services or programs." *Id.* (quoting *Borum v. Swisher Cnty.*, No. 2:14–CV–127–J, 2015 WL 327508, at *9 (N.D. Tex. Jan. 26, 2015)).

Additionally, "in the context of the ADA, if not for purposes of the Eighth Amendment, 'international discrimination against the disabled does not require personal animosity or ill will'; 'it may be inferred when a policymaker acted with at least deliberate indifference to the strong likelihood that a violation of federally protected rights will result from the implementation of the challenged policy . . . or custom.'" *Id.* (quoting *Bartlett v. N.Y. State Bd. of Law Examiners*, 156 F.3d 321, 331 (2d Cir. 1998)). "Where a claim is based on the failure to provide reasonable accommodations, the ADA and R[ehabilitation] A[ct] are identical in scope." *Godbey v. Iredell Mem'l Hosp., Inc.*, No. 5:12–cv–00004–RLV–DSC, 2013 WL 4494708, at *3 n. 7 (W.D.N.C. Aug. 19, 2013).

## VII.   ANALYSIS

After examining the factual record at length, and based on the analysis provided below, the Court concludes that Plaintiffs' request for injunctive relief must be granted, at least in part. The Court finds that Plaintiffs have satisfied each requisite element for such relief, and that injunctive relief is required to preserve and

protect human health and safety, especially as the summer heat arrives in full force. At this stage, the evidence shows that it is likely that Angola's present heat-related Farm Line policies do not adequately mitigate the risk of heat-related disorders among those laboring thereon, whether they be especially susceptible to suffering from such maladies or not. While the "sliding scale" on which the Court considers the various elements necessary for injunctive relief favors special emphasis on this point, because it is apparent that the immediate threat of irreparable harm amounts to death and permanent injury for incarcerated persons laboring on the Farm Line, *see Kliebert*, 141 F. Supp. 3d at 635, Plaintiffs have also shown a substantial likelihood of showing that Defendants have been deliberately indifferent to such risks.

Further, in response to Defendants' contention that injunctive relief at this juncture is premature because Plaintiffs have yet to move for class certification, such an argument is without merit. Defendants have cited to no case law for this proposition, and while the Court has yet to address the issue of class certification, this possibility does not preclude the Court from issuing a preliminary injunction that grants relief to any putative class member. *See Alex A.* v. *Edwards*, 2022 WL 3701169, at *3 (M.D. La. Aug. 26, 2022); *see also Gooch* v. *Life Invs. Ins. Co. of Am.*, 672 F.3d 402 (6th Cir. 2012); *Yang* v. *Kellner*, 458 F. Supp. 3d 199, 218 n.5 (S.D.N.Y. 2020), *aff'd*, 960 F.3d 119 (2d Cir. 2020). Put differently, [t]he lack of formal class certification does not create an obstacle to classwide preliminary injunctive relief when activities of the defendant are directed generally against a class of persons."

*Alex A.*, 2022 WL 3701169, at *3. Defendants do not contest that their policies apply in equal measure to all putative class members.

## A. Substantial Likelihood of Prevailing on the Merits

To show a substantial likelihood of prevailing on the merits of their Eighth Amendment claims, Plaintiffs must first show that conditions on the Farm Line render incarcerated persons at substantial risk of suffering serious harm. Plaintiffs must then show that Defendants have likely been deliberately indifferent to such risks. For the following reasons, the Court finds that both tests have been satisfied, and that Plaintiffs have demonstrated a substantial likelihood of prevailing on the merits of their claims.

### i. Substantial Risk of Serious Harm

A substantial risk of harm may be found when prison conditions are such that they deprive an inmate of "the minimal civilized measure of life's necessities." *Wilson*, 501 U.S. at 298 (quoting *Rhodes*, 452 U.S. at 347). As noted above, subjecting incarcerated persons to high heat conditions without adequate mitigatory procedures satisfies the substantial risk of serious injury or death element of an Eighth Amendment claim. *Hinojosa*, 807 F.3d at 670 ("[I]nmates have a right, under the Eighth Amendment, not to be subjected to extreme temperatures without adequate remedial measures").

According to experts like Dr. Vassallo, exposure to heat indexes in excess of eighty-eight degrees Fahrenheit leads to a sharp increase in risk for exposed persons to develop serious, and potentially fatal, injuries that can occur suddenly. (Doc. 37-3 at pp. 10-13). Strenuous labor exacerbates such risks, as do certain medical conditions

60

and the taking of specific medications. (*Id.* at p. 15). Those risks have been proven to be present in both prison settings and in civilian life.

Dr. Vassallo's Declaration, (Doc. 37-3), her Supplemental Declaration, (Doc. 54-1), and the Court's independent review of the medical records for each of the named Plaintiffs, shows that each Plaintiff has suffered from symptoms consistent with significant to severe heat-related illness, including fainting, cardiac events, heat chills, loss of bodily control, vomiting, dizziness, blurry vision, rashes, and dehydration. Named Plaintiffs further allege that they have seen other persons suffering from severe heat-related conditions while laboring on the Farm Line, (*see, e.g.,* Hicks Declaration at ¶ 6), and the emergency sick call records provided by Defendants for the period of April 2024 to May 15, 2024, show that numerous sick calls were placed wherein inmates suffered from symptoms consistent with heat-related illness, as identified by Dr. Vassallo, the CDC, OSHA, NIOSH, and Defendants' own educational materials, (Doc. 49-13). The additional declaration from Damion Thompson and the ARPs submitted by Dexter Vassar and Patrick Ramirez support such a conclusion. (Docs. 37-44, 37-46; Thompson Declaration).

Moreover, the medical records reviewed by the Court support Dr. Vassallo's conclusion that Angola does not maintain an adequate Heat Pathology Medications list or issue heat precaution duty statuses to those with qualifying pre-existing conditions. Of the named Plaintiffs, two have been provided with heat precaution duty statuses. (Doc. 49 at p. 10). Yet each named Plaintiff either possesses a chronic illness or takes a medication that inhibits their ability to thermoregulate. (Doc. 54-

1). Further, the Court's review of the emergency sick-call medical records provided by Defendants for the period of April 2024 to May 15, 2024, shows that multiple inmates with serious illnesses or pre-existing conditions were laboring in the field under no work restrictions. (Doc. 49-13). One of these men suffered from acquired immunodeficiency syndrome (AIDS), and another was a fifty-three-year-old man with a history of pre-diabetes, fainting, knee pain, asthma, and osteoarthritis. (*Id.* at pp. 18, 20-21). Defendants own educational materials, supposedly provided and reviewed by prison officials annually, state that such persons are at greater risk of developing heat-related conditions. (Doc. 51-11).

The wealth of evidence here shows that incarcerated persons laboring on the Farm Line are not provided with shade, sunscreen, or required rest breaks. Further, the declarations from named Plaintiffs uniformly provide that breaks are seldomly given, that the water provided is dirty, that they are required to work beyond their physical capacities, and that they are not provided with other necessary protective equipment, like lace-up boots or sunhats. Defendants contest these claims, but not persuasively. As to the rest breaks, Defendants admit that they do not record them, but nonetheless assert that they are regularly taken and that inmates may rest whenever they like. There is nothing in Angola's policies which indicates that breaks may be taken at will, and Plaintiffs again uniformly aver that the failure to continue working or failure to work efficiently on the Farm Line subjects them to discipline. Further, Defendants' assertion as to why breaks have not been diligently recorded is contradicted by those dates in their records when breaks have been sporadically

recorded, (*see, e.g.*, Doc. 37-62 at p. 143), and by the plain language of Directive No. 13.067, (Doc. 37-38).

Lastly, Defendants provided the declarations of Gagnard and Hebert in support of their assertion that breaks are given along the Farm Line. Yet while each declarant avers to have personal knowledge of the Farm Line, both serve in managerial roles within Angola, and do not appear to actually be responsible for personal and contemporaneous supervision of the taking of breaks on the Farm Line on a day-to-day basis. (*See* Gagnard Declaration; *see also* Hebert Declaration). As such, their statements carry less weight than those of Plaintiffs, who have been physically present and working the Farm Line at the relevant locations and times.

Regarding the protective equipment, there is nothing in Defendants' heat-related or general equipment policies that confirms the provision of such gear. Defendants' equipment policy does not appear to specifically provide for lace-up boots, only "work boots," which Plaintiffs have asserted refers to rubber boots that are allegedly unsafe for field labor. (Docs. 37-51 at p. 28, 37-7 at p. 12).

Dr. Vassallo has reviewed Angola's heat-related policies and concludes that they do not adequately reduce the serious risk of heat stroke and other heat-related conditions for those laboring on the Farm Line. (Doc. 37-3 at p. 6). Dr. Vassallo fears that, without significant changes, "a person forced to labor on the Farm Line will deteriorate or die." (*Id.*). Dr. Vassallo's fears are compounded by the sometimes "callous and wanton disregard" for the safety of those incarcerated at Angola by

medical personnel. *Lewis v. Cain*, No. CV 15-318-SDD-RLB, 2023 WL 7299130, at *1
(M.D. La. Nov. 6, 2023) (Dick, C.J.).

The Court's review of agricultural labor guideline materials from various
national and state agencies supports the conclusions of Dr. Vassallo. OSHA, NIOSH,
the CDC, Colorado, California, and Oregon all require that agricultural workers
laboring in hot environments be provided with shade and adequate rest. The
Louisiana Department of Health itself recommends that "[a]t a minimum, employers
should provide adequate cool water, rest breaks, and shade or a cool rest area for
employees." *Working In Extreme Heat: What Employers and Workers Need To Know*,
Louisiana  Department  of  Health,  https://ldh.la.gov/page/la-heat.  NIOSH
recommends rest/break schedules that exceed those currently in place at Angola, and
provides materials suggesting that the risk of heat injury on the Farm Line during
the summer months is "high." *See Heat Stress: Work/Rest Schedules*, NIOSH,
available at https://www.cdc.gov/niosh/topics/heatstress/recommendations.html.

Further, Marguerite Green opines that, based on her extensive experience in
agricultural management and workplace safety, Angola's Farm Line policies do not
meet "basic work, health, or safety standards applicable to agricultural labor,
particularly in conditions of excess heat and humidity," because inmates are not
provided with frequent breaks in cool locations. (Doc. 37-7 at p. 13). Curiously,
Defendant's own educational materials also recommend, in contrast to actual
practices at present, that persons take "frequent drink breaks and 'wet down' or mist
[themselves] with a spray bottle to avoid becoming overheated." (Doc. 51-11 at p. 4).

Additionally, persons should, but allegedly are not able to, "[d]ress in lightweight, light-colored, loose-fitting clothing on hot days. . . take rest periods in shady or cool areas . . . protect [themselves] from the sun by wearing a hat and sunglasses; [and] use a sunscreen that is at least SPF 15." (*Id.*). The materials also suggest that persons spend as much time possible indoors on hot and humid days, that local news be monitored for extreme heat alerts and safety tips, and that those with a medical condition or that are taking medications consult with their doctor. (*Id.*).

Compounding these factors is the worsening climate situation in Louisiana generally and Angola specifically. As noted above, Defendants' own temperature logs for the period of May 2023 to October 2023 indicated that heat alerts were or should have been issued on approximately 145 days. (Doc. 49-10). Further, heat index values exceeded 113 degrees Fahrenheit on twenty-four of those days. (*Id.*). During this period, the heat caused numerous deaths throughout the state, and thousands of related emergency medical visits. (Doc. 37-36). State officials recommended that all persons remain indoors if possible. (*Id.*). Angola's own educational materials provide that "extreme heat kills 618 people in the United States every year." (Doc. 51-11). This summer could be hotter, and will almost certainly be one of the hottest ones in recorded history. (Doc. 37-37). Adequately dealing with the heat in Louisiana has become a matter of life and death, and, according to Dr. Vassallo, that death can arrive suddenly and without warning. (Doc. 37-3).

The only way to prevent heat stroke and heat-related conditions is to "effectively mitigate the detrimental impacts of extreme heat." (*Id.* at p. 29). Based

on the medical records and declarations provided thus far, which detail a consistent pattern of medically susceptible persons and non-medically susceptible persons developing severe heat-related conditions on the Farm Line, review of Angola's heat-related policies, the opinion of expert medical professional Dr. Susi Vassallo, general labor guidelines from around the country, including Louisiana, Defendants' own educational materials, the opinion of Marguerite Green, the increased occurrence of heat-related conditions statewide and the historic temperatures experienced throughout the South, the Court concludes that Defendants' policies do not appear to provide sufficient mitigation, and that Plaintiffs have shown a substantial likelihood of prevailing on the merits of the first element of their Eighth Amendment claims.

### ii.  Deliberate Indifference

Plaintiffs must additionally show that Defendants acted with deliberate indifference to the substantial risk of serious harm addressed above. "Deliberate indifference is defined as a failure to act where prison officials have knowledge of a substantial risk of serious harm to inmate health or safety." *Collier*, 2017 WL 3049540, at *40 (citing *Farmer*, 511 U.S. at 837)). It is an "extremely high" standard to meet. *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Ball*, 792 F.3d at 594. On this point, "a prison official's knowledge of a substantial risk of harm may be inferred if the risk was obvious." *Collier*, 2017 WL 3049540, at *40 (citing *Farmer*, 511 U.S. at 829)). Despite this high standard, Plaintiffs have provided enough evidence for the Court to determine that

they are likewise substantially likely to prevail on this element of their Eighth Amendment claims.

"In cases asserting deliberate indifference by prison officials where there is excessive heat, the Fifth Circuit has found deliberate indifference where prison officials ignored complaints 'of heat stroke or some other heat-related illness.'" *Ball*, 792 F.3d at 673 (quoting *Gates*, 376 F.3d at 339); *see also Blackmon v. Garza*, 484 F. App'x 866, 872-73 (5th Cir. 2012). Here, Plaintiffs submitted at least eleven separate ARPs to Defendants regarding heat-related working conditions on the Farm Line, essentially all of which were denied in summary fashion by Defendants with the same stated reasons, those being that the claims made in each ARP were "false" and held "no merit." (Docs. 37-40, 37-41, 37-42, 37-43, 37-44, 37-46, 37-48, 37-51, 37-60, 37-61, 37-64). This weighs in favor of a finding of deliberate indifference.

Courts have also found that "deliberate indifference may [] be 'demonstrated straightforwardly, through direct evidence that an administrator was aware of serious systemic deficiencies and failed to correct them.'" *Cain*, 2023 WL 7299130, at *48 (M.D. La. Nov. 6, 2023) (quoting *Dunn v. Dunn*, 219 F. Supp. 3d 1100, 1129 (M.D. Ala. 2016)); *see also Collier*, 2017 WL 3049540, at *40 (finding that defendants knew that a risk of serious harm existed after nearly two dozen men died of heat-related illnesses, and when inmates and correctional officers regularly experienced heat-related illnesses). As noted in the Court's analysis in Section VII(A)(i), the medical records provided to the Court thus far are replete with inmates laboring on the Farm Line alleging symptoms of heat stroke or other heat-related illness. Also, as noted in

Section VII(A)(i), the vast majority of those afflicted prisoners had previously been diagnosed with pre-existing conditions or were taking medications that, according to Dr. Vassallo, inhibited their thermoregulation. The medical records examined spanned multiple years, and each emergency medical visit, or at least the sum total of all such visits, was direct evidence to Defendants of "serious systemic deficiencies" within their heat-related protocols. *Id.* Accordingly, this too weighs in favor of a finding of deliberate indifference.

Defendants' own policies can, and in this case do, help to establish Plaintiffs' case for deliberate indifference. *See Collier*, 2017 WL 3049540, at *40 ("[The prison's] own policies reflect the known danger of the heat in Texas"). As Defendants note, Directive No. 13.067 and HCP8 mandate certain heat-related mitigation efforts. (Doc. 49 at p. 21). Such policies make it clear that Defendants are cognizant of the threats that high heat imposes to human life and safety, both for the regular population of inmates and those exhibiting enhanced heat-susceptibility.

However, Defendants' policies are inadequate, and even conflict with their own educational materials. Attachment B to the HCP8 policy includes descriptions of the serious and sometimes fatal nature of heat-related conditions; notes that certain people that take medication and/or possess pre-existing conditions are more vulnerable to developing heat-related illness; and advises that persons laboring outdoors on hot days should be provided with adequate protective gear, including sunscreen, and be allowed to rest in shady or cool areas. (Doc. 51-11). Attachment B is reviewed by all prison officials annually according to HCP8, and therefore it

appears likely that Defendants have subjective knowledge of the necessity of, for example, shade and sunscreen, which mitigate the dangers of heat-related conditions. Additionally, Attachment B to HCP8 provides references to OSHA and CDC guidelines, which recommend and require similar heat-prevention measures. (*Id.*). The acknowledgement of the dangers that heat has to incarcerated persons working outdoors within Defendants' policies, coupled with the ignored advice contained in their own educational materials, further supports a finding of deliberate indifference.

Finally, Defendants' policies appear, to some degree, irrational. As noted by Plaintiffs, Directive No. 13.067 requires that for those indoors, in the absence of air conditioning, cool showers and cool wet towels be made available, and ventilation be increased as much as possible. (Doc. 37-38). Yet as to those laboring outdoors, who are more at risk of suffering from heat-related conditions insofar as they are performing various physical tasks, the only protections provided are water, ice, and an optional five-minute break every thirty minutes. (*Id.*).

Further, Angola's relatively static policies support Plaintiffs' case for deliberate indifference, as Plaintiffs suffered numerous heat-related injuries on the Farm Line, injuries which are described more thoroughly in Section VII(A)(i). *See Collier*, 2017 WL 3049540, at *42 ("What [defendant] did not do in the face of the substantial risk of harm is also relevant to the Court's [deliberate indifference] analysis"). The chief policies at issue here have been in place since at least 2019. (Docs. 37-38, 37-39). Even being limited to a relatively select sample size of medical records, the Court and Dr. Vassallo have noted numerous serious heat-related

69

injuries that have occurred over the past three years alone. (*See* Doc. 54-1). Each of these events placed Defendants on notice that their policies were potentially insufficient, yet Defendants appear to have taken no mitigating action. The Court therefore deems this inaction to weigh in favor of a finding of deliberate indifference.

Finally, and alternatively, the Court finds that based on the entirety of the evidence before it, including but not limited to the various statewide heat-related warnings, the historic temperatures recorded in Louisiana over the summer of 2023 and the likely reoccurrence of such temperatures in the summer of 2024, the various news articles attesting to the dangers of such temperatures, general agricultural labor guidelines from around the country, including Louisiana, Defendants' own educational materials, and the increased occurrence of heat-related conditions statewide, that the dangers for incarcerated persons working in high-heat environments on the Farm Line is open and obvious, and therefore it is substantially likely that Defendants were deliberately indifferent in refusing to adopt additional mitigatory policies that account for the documented heat increases. *See Hinojosa*, 807 F.3d at 665 (finding that "evidence showing that a substantial risk . . . was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to the information concerning the risk and thus 'must have known about it'" supports a finding of deliberate indifference). As in *Gates*, "the open and obvious nature of the dangerously hot conditions" here supports a finding that Plaintiffs have shown a substantial likelihood of prevailing on the deliberate indifference element of

their Eighth Amendment claims. 376 F.3d at 340. The Court, for this reason and those provided above, concludes that Plaintiffs have sufficiently carried their burden under the preliminary injunction standard as to both elements of their Eighth Amendment claims.

### B. Immediate Risk of Irreparable Harm

Based on the foregoing, the Court concludes that, at this stage, Plaintiffs have shown that conditions on the Farm Line "create a substantial risk of injury or death." *Collier*, 2017 WL 3049540, at *43. Irreparable harm is generally "one for which there is no adequate remedy at law." *Book People, Inc. v. Wong*, 91 F.4th 318, 340 (5th Cir. 2024) (quoting *All. for Hippocratic Med. v. U.S. Food & Drug Admin.*, 78 F.4th 210, 251 (5th Cir. 2023) (internal quotations omitted)). There is no adequate remedy at law for non-economic injuries like death or serious physical injury, and so Plaintiffs have satisfied this element. *See, e.g., Vazquez Barrera v. Wolf*, 455 F. Supp. 3d 330, 340 (S.D. Tex. 2020) (finding that allegations that plaintiffs "face[d] a heightened risk of dying or suffering from serious illness" constituted "imminent and irreparable" harm); *East v. Blue Cross & Blue Shield of Louisiana*, No. 3:14-CV-00115-BAJ, 2014 WL 8332136, at *2 (M.D. La. Feb. 24, 2014).

Additionally, and alternatively, "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 295 (5th Cir. 2012) (quoting 11A WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE, § 2948.1 (3d ed. 1998)). Plaintiffs have shown that they

are likely being denied their Eighth Amendment rights. Accordingly, Plaintiffs have shown an immediate risk of irreparable injury.

### C. Balance of Interests

In determining whether to grant injunctive relief, "a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 542 (1987). In other words, plaintiffs must establish "that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted." *Janvey*, 647 F.3d at 595. Plaintiffs must also establish "that the grant of an injunction will not disserve the public interest." *Id.* However, "[t]hese factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Plainly, "the public interest supports the protection of Eighth Amendment rights." *Marlowe v. LeBlanc*, 2020 WL 1983915, at *2 (M.D. La. Apr. 27, 2020); *see also Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 fn. 9 (5th Cir. 2014). As noted, it is likely that Plaintiffs will succeed on their Eighth Amendment claims, and so the public interest favors an injunction.

Defendants' assertion that they would suffer economic injuries in excess of eight million dollars should work on the Farm Line be enjoined is based on an erroneous understanding of Plaintiffs' requested relief. Plaintiffs' definition of the Farm Line does not include all agricultural work conducted at Angola at all times, but rather, at this time, includes only Lines 15a, 15b, 24, and 25, which are staffed

by approximately fifty incarcerated persons at any given time. Plaintiffs also only seek injunctive relief for those times when heat alerts are issued. (Doc. 51 at p. 12).

Further, even were such a request for injunctive relief before the Court, "inadequate resources can never be an adequate justification for depriving any person of his constitutional rights." *Udey v. Kastner*, 805 F.2d 1218, 1220 (5th Cir. 1986)

Independent of the foregoing, the potential harms suffered by Plaintiffs far exceeds any harm suffered by Defendants by the issuance of injunctive relief, as the potential harms alleged by Plaintiffs are serious and potentially life-threatening. *See Collier*, 2017 WL 3049540, at *43 ("[I]f the Court were to fail to order remedies in this lawsuit, Plaintiffs' safety would be severely undermined, leading to a substantial risk of irreparable injury"); *Harding v. Edwards*, 487 F. Supp. 3d 498, 527 (M.D. La. 2020) (Dick, C.J.) ("Even though Plaintiffs' serious illness or death is not an *inevitable* result . . . the increased risk of such is still more detrimental than the abstract injury the state would suffer"). Accordingly, the balance of interests favors the issuance of injunctive relief.

### D. Bond Requirements

Courts may waive the bond requirement provided in Federal Rule of Civil Procedure 65(c) when appropriate. *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. 1981); *Corrigan Dispatch Co. v. Casa Guzman, S.A.*, 569 F.2d 300, 303 (5th Cir. 1978); *Collier*, 2017 WL 3049540, at *44 (S.D. Tex. July 19, 2017). The Court will do so here, and no bond shall be imposed. The majority of Plaintiffs are incarcerated persons with limited resources, and "Plaintiffs have brought this suit to enforce constitutional rights," a factor which weighs in favor of

waiving the bond requirement. *See Collier*, 2017 WL 3049540, at *44 (S.D. Tex. July 19, 2017) (citing *City of Atlanta*, 636 F.2d at 1094).

### E. Remedies

Plaintiffs request that the Court enjoin Defendants' operation of the Farm Line whenever the heat index is at or above eighty-eight degrees Fahrenheit. For reasons provided below, the Court will issue preliminary injunctive relief that falls short of Plaintiffs' request.

The Prison Litigation Reform Act (PLRA) provides that:

[i]n any civil action with respect to prison conditions, to the extent otherwise authorized by law, the court may enter a temporary restraining order or an order for preliminary injunctive relief. Preliminary injunctive relief must be *narrowly drawn, extend no further than necessary to correct the harm* the court finds requires preliminary relief, and *be the least intrusive means necessary to correct that harm.* The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity set out in paragraph (1)(B) in tailoring any preliminary relief. Preliminary injunctive relief shall automatically expire on the date that is 90 days after its entry, unless the court makes the findings required under subsection (a)(1) for the entry of prospective relief and makes the order final before the expiration of the 90-day period.

18 U.S.C.A. § 3626(a)(2) (emphasis added). Paragraph (1)(B) of the PLRA provides that:

"The court shall not order any prospective relief that requires or permits a government official to exceed his or her authority under State or local law or otherwise violates State or local law, unless –
    (i)    Federal law requires such relief to be ordered in violation of State or local law;
    (ii)   the relief is necessary to correct the violation of a Federal right; and
    (iii)  no other relief will correct the violation of the Federal Right.

*Collier*, 2017 WL 3049540, at *44 (quoting 18 U.S.C.A. § 3626(a)(1)(B)). Within Eighth Amendment cases, "plaintiffs can only obtain a remedy that reduces the risk of harm to a socially acceptable level." *Ball*, 792 F.3d at 599.

As Defendants note, agricultural labor does not cease across the South when heat index values reach eighty-eight degrees Fahrenheit. (Doc. 49 at p. 26). Further, while some of the guidelines and materials reviewed by the Court recommended that persons stay indoors and avoid outdoor labor in high heat, none offered a broad declaration that there were no remedies sufficient to reduce the risks of agricultural laborers developing heat-related maladies. The Court therefore concludes that at this juncture, Plaintiffs' requested relief is overbroad, and that granting such relief would be contrary to the mandate set forth under the PLRA.

Instead, the Court will order that Defendants take immediate measures to correct the glaring deficiencies in their heat-related policies. Such deficiencies include the failure to provide adequate shade, rest, sunscreen, and other protective equipment, as well as the failure to provide accommodations for those incarcerated persons suffering from an illness or ailment that significantly inhibits thermoregulation, and the failure to provide similar accommodations to those inmates who take prescribed medicine that likewise impairs their ability to regulate body temperature. Correcting these deficiencies will bring Angola into accord with consensus opinion on the necessary actions to take in response to high heat conditions. Such relief is well-within Defendants' ability to provide, and will not significantly alter operations on the Farm Line.

While "normally" for injunctive relief issued pursuant to Rule 65 of the Federal Rules of Civil Procedure, a court must "describe, in reasonable detail, the acts required by its injunction," in disputes involving state prisons, "a district court must give 'adequate consideration to the views of state prison authorities.'" *Collier*, 2017 WL 3049540, at *46 (quoting *Lewis v. Casey*, 518 U.S. 343, 362 (1996)). The Court therefore concludes that rather than "dictat[ing] precisely" what actions Defendants must follow, the appropriate next step is to require that Defendants provide the Court with proposed remedies that comply with the findings herein. *Lewis*, 518 U.S. at 362. Given the serious nature of interests at stake here, Defendants shall propose such remedies within seven (7) days of the entry of this Ruling and Order. Defendants' proposal shall contain estimated dates for the implementation of its terms and Defendants shall make every effort to provide for immediate implementation. Plaintiffs' response to Defendants' proposals shall be due seven (7) days thereafter. A hearing to address the proposed remedies may be required. The remainder of Plaintiffs' claims, and the entry of any permanent injunctive relief or declaratory judgment, shall be addressed in due course.

## VIII. CONCLUSION

Accordingly,

**IT IS ORDERED** that Plaintiffs' **Application For A Preliminary Injunction And Temporary Restraining Order (Doc. 37)** be and is hereby **GRANTED IN PART**, and that a temporary restraining order be and is hereby **ENTERED**, **ORDERING** Defendants James LeBlanc, in his official capacity as Secretary of the Louisiana Department of Public Safety & Corrections, Timothy

Hooper, in his official capacity as Warden of Louisiana State Penitentiary, Misty Stagg, in her official capacity as Director of Prison Enterprises, Inc., the Louisiana Department of Public Safety and Corrections, and Prison Enterprises, Inc. to immediately:

1. Correct the deficiencies of Directive No. 13.067 noted herein, including the lack of shade and adequate rest provided to incarcerated persons laboring on the Farm Line;

2. Correct the problems with Defendants' equipment policies noted herein, including the failure to provide sunscreen and other necessary protective clothing and equipment to those laboring on the Farm Line;

3. Submit a revised and expanded Heat Pathology Medications list;

4. Create a procedure to ensure that all incarcerated persons suffering from health conditions that significantly inhibit thermoregulation are assessed by medical personnel and are granted heat precaution duty status; and

5. Develop an additional heat-related policy to protect those laboring outdoors when heat index values reach or exceed 113 degrees Fahrenheit, the temperature at which the National Weather Service issues excessive heat warnings.

**IT IS FURTHER ORDERED** that Defendants shall submit a memorandum containing their proposed remedies within seven (7) days of the entry of this Ruling and Order. Plaintiffs' response to Defendants' proposed remedies shall be submitted

to the Court seven (7) days thereafter.

Baton Rouge, Louisiana, this **2nd** day of July, 2024

_____
**JUDGE BRIAN A. JACKSON**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**