<pre>
 1              UNITED STATES DISTRICT COURT

 2              MIDDLE DISTRICT OF LOUISIANA

 3

 4   VOICE OF THE EXPERIENCED, ET AL  : CIVIL ACTION

 5   VERSUS                           : NO. 23-1304-BAJ-EWD

 6   LEBLANC, ET AL                   : JUNE 18, 2024

 7   ========================================================
                MOTION FOR PRELIMINARY INJUNCTION
 8              AND TEMPORARY RESTRAINING ORDER
              BEFORE THE HONORABLE BRIAN A. JACKSON
 9               UNITED STATES DISTRICT JUDGE

10

                    A P P E A R A N C E S
11

12   FOR THE PLAINTIFFS:

13        PROMISE OF JUSTICE INITIATIVE
          BY: LYDIA WRIGHT, ESQUIRE
14        BY: CLAUDE-MICHAEL COMEAU, ESQUIRE
          1024 ELYSIAN FIELDS
15        NEW ORLEANS, LOUISIANA 70117

16
     FOR THE DEFENDANTS:
17
          KEOGH COX & WILSON
18        BY: ANDREW BLANCHFIELD, ESQUIRE
          BY: CHELSEA ACOSTA PAYNE, ESQUIRE
19        701 MAIN STREET
          BATON ROUGE, LOUISIANA 70802
20

21
          REPORTED BY:  NATALIE W. BREAUX, RPR, CRR
22              UNITED STATES COURTHOUSE
                    777 FLORIDA STREET
23            BATON ROUGE, LOUISIANA 70801
                    (225) 389-3565
24          NATALIE_BREAUX@LAMD.USCOURTS.GOV
     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY USING
25         COMPUTER-AIDED TRANSCRIPTION SOFTWARE
</pre>

1    (JUNE 18, 2024)

2            PROCEEDINGS

3        THE LAW CLERK:  ALL RISE.

4            (CALL TO THE ORDER OF COURT.)

5        THE COURT:  GOOD AFTERNOON, EVERYONE.  BE

6    SEATED.

7            ANDREW, LET ME SEE YOU.

8            (OFF THE RECORD)

9        THE COURT:  GOOD AFTERNOON, EVERYONE.

10           I HOPE YOU-ALL ENJOYED THE

11   ENTERTAINMENT THERE.  THIS IS NOT MY COURTROOM.  THIS

12   IS MY DEAR FRIEND AND COLLEAGUE JUDGE JOHN

13   DEGRAVELLES' COURTROOM.  MY COURTROOM IS UNDERGOING

14   SOME UPGRADES RIGHT ABOUT NOW, SO HE WAS KIND ENOUGH

15   TO ALLOW ME TO USE HIS, AND I'M INDEED VERY GRATEFUL

16   FOR THAT.

17           TO BEGIN, LET ME ASK COUNSEL FOR BOTH

18   SIDES TO ENTER THEIR APPEARANCES.  I WILL ASK YOU TO

19   DO SO FROM THE FORWARD PODIUM.

20           BEFORE WE DO SO, PLEASE CALL THE CASE.

21       THE COURTROOM DEPUTY:  CIVIL CASE NO.

22   23-1304, *VOICE OF THE EXPERIENCED, ET AL, VS LEBLANC,*

23   *ET AL.*

24       THE COURT:  ALL RIGHT.  COUNSEL FOR THE

25   PLAINTIFFS, PLEASE, AGAIN, ENTER YOUR APPEARANCES

1  FROM THE FORWARD PODIUM.

2        **MS. WRIGHT:**  GOOD AFTERNOON, YOUR HONOR.

3             LYDIA WRIGHT FROM THE PROMISE OF

4  JUSTICE INITIATIVE FOR THE PLAINTIFFS.

5        **THE COURT:**  MS. WRIGHT.

6        **MR. COMEAU:**  CLAUDE-MICHAEL COMEAU FOR THE

7  PLAINTIFFS, YOUR HONOR, FROM THE PROMISE OF JUSTICE

8  INITIATIVE.

9        **THE COURT:**  MR. COMEAU.

10            ALL RIGHT.  AND FOR THE DEFENDANTS?

11        **MR. BLANCHFIELD:**  GOOD AFTERNOON, YOUR

12  HONOR.

13            ANDREW BLANCHFIELD ON BEHALF OF THE

14  DEFENDANTS.

15        **THE COURT:**  GOOD TO SEE YOU AGAIN, MR.

16  BLANCHFIELD.

17        **MR. BLANCHFIELD:**  JUDGE.

18        **MS. PAYNE:**  CHELSEA PAYNE ON BEHALF OF

19  DEFENDANTS.

20        **THE COURT:**  THANK YOU, MS. PAYNE.

21            ALL RIGHT.  SO WE HAVE QUITE A BIT TO

22  COVER TODAY.  AS I PREVIOUSLY INDICATED TO COUNSEL,

23  THE PURPOSE OF TODAY'S HEARING IS NOT TO RECEIVE

24  EVIDENCE BUT SIMPLY TO TAKE UP SOME OF THE ISSUES

25  THAT ARE MOST PROMINENT IN THIS LAWSUIT, SHOULD IT

1  BECOME NECESSARY -- AND INDEED IT WILL BECOME

2  NECESSARY -- FOR THE COURT TO RECEIVE EVIDENCE

3  CERTAINLY ON THE APPLICATION FOR INJUNCTIVE RELIEF

4  AND LATER, OF COURSE, IN THE TRIAL ON THE MERITS.

5  AND SO WE'LL TALK ABOUT DEADLINES AND -- FOR THOSE IN

6  JUST A MOMENT AS WELL.  BUT THERE ARE, AGAIN, A FEW

7  THINGS THAT I WOULD CONSIDER TO BE PRELIMINARY

8  MATTERS TO BE TAKEN UP AT THIS TIME.

9           FIRST, READING THROUGH THE -- I WILL

10 TELL YOU NOW, LET ME JUST TELL YOU, I THINK WE

11 BOTH -- BOTH SIDES HAVE AGREED UPON AN ACCURATE

12 DEFINITION OF "HEAT INDEX."  AM I CORRECT?

13           AND I WILL ALLOW EITHER SIDE TO COME TO

14 THE PODIUM TO ANSWER THE QUESTIONS.

15      **MS. WRIGHT:**  I BELIEVE WE DO AGREE ON --

16      **THE COURT:**  THERE IS NO DISPUTE ABOUT WHAT

17 CONSTITUTES --

18      **MS. WRIGHT:**  THERE IS NO DISPUTE.

19      **THE COURT:**  -- SCIENTIFICALLY WHAT THE HEAT

20 INDEX IS.

21           IS THAT CORRECT, COUNSEL?

22      **MR. BLANCHFIELD:**  THAT'S CORRECT, YOUR

23 HONOR.

24      **THE COURT:**  ALL RIGHT.  VERY WELL.

25           NOW, I UNDERSTAND THAT YOU BOTH MOVE

1  FOR AN EXTENSION OF CERTAIN DEADLINES, INCLUDING

2  DISCOVERY DEADLINES.  THAT MOTION WAS GRANTED BY THE

3  MAGISTRATE JUDGE.  BUT I WILL TELL YOU NOW THAT I

4  WILL VACATE THAT ORDER.

5          AND THE REASON FOR THAT IS BECAUSE IT

6  SEEMS TO ME THAT THIS IS NOT A MATTER THAT SHOULD BE

7  TRIED IN 2025.  GIVEN THE NATURE OF THE CLAIMS, I

8  BELIEVE THERE -- WE SHOULD ATTACH, AS ALWAYS IN

9  MATTERS LIKE THIS, SOME DEGREE OF URGENCY AND

10  ALACRITY AND DISPATCH TO THOSE.  SO WE'RE GOING TO GO

11  ON AND I'M GOING TO SET A NEW SCHEDULING ORDER.  SO

12  BEFORE DOING SO, HOWEVER -- I DON'T WANT TO DO SO

13  ARBITRARILY, SO LET'S FIRST TAKE UP THE ISSUE OF

14  DISCOVERY.

15          NOW, IT SEEMS TO ME THAT THE PROPOSED

16  CLASS MEMBERS ARE FAIRLY WELL-DEFINED.  INITIALLY

17  THERE WAS A GENERAL CLASS OF PLAINTIFFS AND TWO

18  SUBCLASSES.  I HAVE ALREADY DISMISSED CLAIMS BY ONE

19  OF THE PROPOSED SUBCLASSES, SO WE'RE LEFT WITH THOSE

20  PLAINTIFFS WHO HAVE A DOCUMENTED HISTORY OF

21  ADA-RELATED MEDICAL ISSUES.

22          BUT THE POINT IS, IS THAT IT SEEMS TO

23  ME THAT WE KNOW WHAT THOSE MEDICAL ISSUES ARE.  THOSE

24  ISSUES ARE VERY WELL-DOCUMENTED IN THE MEDICAL

25  RECORDS AT ANGOLA.

1          AND SO LET ME ASK FIRST, BEGINNING WITH

2  THE PLAINTIFFS, HOW MUCH TIME DO YOU BELIEVE YOU NEED

3  TO PROPOUND DISCOVERY IN THIS CASE FOR A TRIAL ON THE

4  MERITS?

5          **MS. WRIGHT:**  YOUR HONOR, THE -- WE HAVE

6  OUTSTANDING DISCOVERY REQUESTS THAT WE'VE PROPOUNDED

7  TO THE DEFENDANTS RIGHT NOW THAT WE'RE AWAITING

8  DOCUMENTS AND INTERROGATORIES.  WE HAVE --

9          **THE COURT:**  WHAT'S THE NATURE OF YOUR

10  DISCOVERY REQUESTS?

11          **MS. WRIGHT:**  WE'VE REQUESTED DISCOVERY ABOUT

12  THE AGRICULTURAL OPERATIONS AT ANGOLA, THE

13  DISCIPLINARY RECORDS, THE MEDICAL RECORDS.  WE HAVE A

14  REQUEST FOR INSPECTION THAT WE'VE SERVED ON THE

15  DEFENDANTS.  WE'LL BE INSPECTING THE ENTIRE

16  AGRICULTURAL FACILITY WITH OUR EXPERTS ON AUGUST

17  12TH.

18          **THE COURT:**  AUGUST 12TH?

19          **MS. WRIGHT:**  AUGUST 12TH.

20          **THE COURT:**  WE'RE GOING TO HAVE TO MOVE THAT

21  UP.  WHY AUGUST 12TH?  IS THAT THE EARLIEST TIME THAT

22  YOUR EXPERTS ARE AVAILABLE?

23          **MS. WRIGHT:**  WE HAVE -- YES, YOUR HONOR.  WE

24  HAVE AT LEAST FOUR EXPERTS, INCLUDING SOME WHO ARE

25  OUT OF STATE.

1          DR. SUSI VASSALLO, WHO I THINK IS

2    FAMILIAR TO THIS COURT, IS OUR EXPERT IN

3    THERMOREGULATION, AND SHE'S IN NEW YORK AND HAS A

4    BUSY SCHEDULE.

5          THE COURT:  OKAY.  SHE MAY HAVE TO MOVE THAT

6    UP.

7          MS. WRIGHT:  YES, YOUR HONOR.

8          THE COURT:  WHO ARE YOUR -- I KNOW YOU'VE

9    IDENTIFIED MS. GREEN.  BUT WHO ELSE HAVE YOU

10   IDENTIFIED AS A POSSIBLE EXPERT IN THE CASE?

11         MS. WRIGHT:  MR. TERRANCE WINN WILL BE AN

12   EXPERT IN OUR CASE.

13         THE COURT:  AND WHAT IS HIS FIELD OF

14   EXPERTISE?

15         MS. WRIGHT:  HE SERVED NEARLY 30 YEARS AT

16   ANGOLA AND HE CAME HOME A FEW YEARS AGO.  HE WORKED

17   THE FARM LINE.  AND HE MADE THE IMPOSSIBLE CHOICE TO

18   GO TO SOLITARY CONFINEMENT AS OPPOSED TO WORK THE

19   FARM LINE BECAUSE OF PSYCHOLOGICAL HARMS THAT ARE

20   ATTENDANT TO IT.

21         THE COURT:  SO HE'LL BE A FACT WITNESS?

22         MS. WRIGHT:  HE'LL BE A FACT -- HE'LL BE --

23   WE WILL ATTEMPT TO CERTIFY HIM AS AN EXPERT WITNESS,

24   YOUR HONOR.

25         THE COURT:  AGAIN, IN WHAT FIELD OF

1  EXPERTISE?

2          **MS. WRIGHT:**  THE DISCIPLINARY SYSTEM AT

3  ANGOLA AND THE PSYCHOLOGICAL HARM --

4          **THE COURT:**  BUT DOES THAT --

5          **MS. WRIGHT:**  -- OF FIELD WORK.

6          **THE COURT:**  -- REQUIRE AN EXPERT TO TESTIFY

7  ABOUT -- IT SEEMS WHAT YOU'VE DESCRIBED SUGGESTS TO

8  ME THAT HE WILL DESCRIBE THE FACTS AT ANGOLA.  THERE

9  WON'T BE AN ANALYSIS OF THOSE FACTS.  HE'LL SIMPLY

10 DISCUSS OR TESTIFY ABOUT THE FACT, HIS EXPERIENCE.

11          AND SO, AGAIN, I DON'T SEE -- AND I'LL

12 GIVE YOU TIME -- I'M NOT ASKING YOU AT THIS TIME TO

13 MAKE YOUR CASE FOR THE FACT THAT HE IS OR MAY BE AN

14 EXPERT.  BUT I JUST WANT TO, IN FAIRNESS TO YOU,

15 RAISE THESE ISSUES.  I MEAN, IF YOU CALL HIM AS A

16 FACT WITNESS, THAT'S FINE.  BUT I'M HARD-PRESSED TO

17 SEE HOW HE WOULD BE AN EXPERT ON THE CONDITIONS AT

18 ANGOLA.

19          NOW, AGAIN, HE CAN TESTIFY HIS OWN

20 PERSONAL KNOWLEDGE OF THAT, SO -- AND WHO IS YOUR

21 LAST -- ARE WE TALKING BOTH -- WELL, LET'S CONFINE IT

22 NOW TO PROPOSED EXPERTS.

23          WHO WOULD BE YOUR FINAL EXPERT OR

24 PROPOSED EXPERT?

25          **MS. WRIGHT:**  OUR FINAL EXPERT WILL BE AN

1  EXPERT IN THE HISTORY OF FORCED LABOR AT ANGOLA IN

2  PARTICULAR AND ON PRISON ECONOMIES.  JOSH SBICCA IS A

3  PROFESSOR FROM THE UNIVERSITY OF COLORADO AT BOULDER

4  WHO WILL BE OUR EXPERT IN THAT FIELD.

5          **THE COURT:**  ALL RIGHT.  AND I ASSUME THEN

6  THAT IT'S IMPORTANT TO GATHER, AS IN VIRTUALLY EVERY

7  CASE, INCLUDING CASES OF THIS SORT, FACTS TO PROVIDE

8  TO THE EXPERT WITNESSES TO CONDUCT ANALYSIS?

9          **MS. WRIGHT:**  THAT'S RIGHT.

10         **THE COURT:**  ALL RIGHT.

11             MR. BLANCHFIELD OR MS. PAYNE, LET ME

12  ASK YOU:  DO YOU INTEND TO PRESENT EXPERT WITNESSES

13  IN EITHER THE INJUNCTIVE -- HEARING ON THE INJUNCTION

14  OR THE TRIAL ON THE MERITS?

15         **MR. BLANCHFIELD:**  VERY UNLIKELY, YOUR HONOR.

16  WE HAVEN'T SEEN WHAT WE HAVE FROM THE OTHER SIDE.  IT

17  DOES -- I THINK THE TIMING THAT THE FOUR -- THREE OR

18  FOUR EXPERTS, HOWEVER MANY, THAT'S PROBABLY

19  DIFFICULTY IN THE TIMING.

20         **THE COURT:**  SURE.  I UNDERSTAND.

21         **MR. BLANCHFIELD:**  THE ONLY OTHER THING IS

22  SOMETIMES WE GET BOGGED DOWN IN ELECTRONIC -- YOU

23  KNOW, WE AGREE TO -- OR TRYING TO AGREE TO SEARCH

24  TERMS, SEARCHING MAILBOXES, PRODUCING DOCUMENTS WHICH

25  HAVE TO BE REVIEWED FOR PRIVILEGE AND THINGS LIKE

1   THAT, AND THAT -- SOMETIMES WE GET A LITTLE BOGGED

2   DOWN IN THAT.

3          THE COURT:  NO, I UNDERSTAND.  I DON'T SEE

4   THIS, HOWEVER, AS A CORPORATE COMMERCIAL LITIGATION,

5   OF COURSE.  THIS IS NOT THE KIND OF CASE WHERE YOU

6   WANT TO KNOW FROM CHASE BANK HOW MANY APPLICATIONS

7   FOR CREDIT CARDS DID YOU SEND IN A CERTAIN PERIOD OF

8   TIME.  I MEAN, IT SEEMS TO ME THAT, AT LEAST AT THIS

9   JUNCTURE, THE UNIVERSE OF DOCUMENTS AND EVIDENCE AND

10  DATA IS PRETTY CONFINED.  RIGHT?

11         MR. BLANCHFIELD:  I WOULD AGREE.

12         THE COURT:  IT'S PRETTY LIMITED.

13         MR. BLANCHFIELD:  I WOULD AGREE, JUDGE.

14         THE COURT:  AND SO I WOULD IMAGINE THAT -- I

15  MEAN, WE'RE TALKING ABOUT HEALTH RECORDS, WE'RE

16  TALKING ABOUT POLICIES OF LOUISIANA STATE

17  PENITENTIARY.  THOSE POLICIES ARE READILY AVAILABLE

18  WITH THE PRESS OF A BUTTON TODAY.  IT SEEMS LIKE THE

19  MEDICAL RECORDS -- WHO IS THE MEDICAL -- WHO IS

20  CURRENTLY SERVING AS THE MEDICAL DIRECTOR?

21         MR. BLANCHFIELD:  THE ENTIRE DOC IS

22  DR. LAVESPERE.

23         THE COURT:  DR. LAVESPERE IS STILL AT THE

24  HELM.  SO HE'S -- I'M FAMILIAR WITH HIM, HE'S

25  FAMILIAR WITH ME.  AND I THINK HE'S DONE A VERY FINE

1 JOB IN THE PAST OF PROVIDING THOSE RECORDS PRETTY

2 QUICKLY, SO I WOULD HOPE THAT HE WOULD AGREE TO DO

3 SO.  AND I'M SURE HE WILL AGREE TO DO SO.

4           SO, COUNSEL, I GUESS MY POINT TO YOU IS

5 THAT I DON'T SEE WHERE -- WITH THE EXCEPTION OF THE

6 POSSIBLE AVAILABILITY OF THE EXPERTS, I JUST DON'T

7 SEE WHY WE HAVE TO WAIT TWO MONTHS, GIVEN THE NATURE

8 OF THIS CLAIM.

9           THE HEAT INDEX OF 88 DEGREES, I MEAN,

10 YOU NEED ONLY -- AND JUST SO YOU KNOW, WE HAVE

11 REVIEWED THE RECORDS OF THE NATIONAL WEATHER SERVICE

12 ON THIS POINT.  AND SUFFICE IT TO SAY THAT IT'S GOING

13 TO BE 88 DEGREES -- THE HEAT INDEX WILL EXCEED 88

14 DEGREES FAIRLY EARLY IN THE MORNING THROUGH AT LEAST

15 AUGUST, IF NOT EARLY SEPTEMBER OR BEYOND.  AND AGAIN,

16 THAT'S JUST BASED UPON DATA THAT WE HAVE REVIEWED

17 FROM THE NATIONAL WEATHER SERVICE.

18           SO AGAIN, GIVEN THE FACT THAT THE

19 ALLEGATIONS ARE THAT HUMAN HEALTH IS IN JEOPARDY, I

20 WOULD SUGGEST THAT WE HAVE TO TREAT THIS WITH SOME

21 DEGREE OF URGENCY.  RIGHT?

22           AND IT'S NOT UNLIKE -- MR. BLANCHFIELD,

23 I DON'T THINK YOU WERE COUNSEL OF RECORD FOR THE

24 STATE IN THE *BALL* CASE, *BALL VS LEBLANC.*  BUT THE

25 STATE WAS VERY COOPERATIVE IN THAT CASE; THE QUICK

1   TURNAROUND ON ALL THE DISCOVERY, WHICH, OF COURSE, I
2   APPRECIATED.  AND I WOULD APPRECIATE, OF COURSE, THE
3   SAME LEVEL OF ATTENTION IN THIS CASE, SO --
4           **MR. BLANCHFIELD:**  YEAH.
5           **THE COURT:**  ALL RIGHT.  SO --
6           **MR. BLANCHFIELD:**  AND, YOUR HONOR, THE
7   AUGUST 12TH DATE WAS SUGGESTED TO US.  THAT WAS NOT
8   --
9           **THE COURT:**  I'M SURE.  YES, I UNDERSTAND
10  THAT.  AND AGAIN, MR. BLANCHFIELD, YOUR CLIENT IN
11  THESE TYPES OF CASES HAS ALWAYS BEEN VERY
12  FORTHCOMING, AND WE APPRECIATE THAT.
13          **MR. BLANCHFIELD:**  THANK YOU, JUDGE.
14          **THE COURT:**  SO AGAIN, WHAT I WILL DO --
15  THANK YOU, MR. BLANCHFIELD.
16          SO, MS. WRIGHT, AGAIN, I DON'T WANT TO
17  ARBITRARILY ISSUE A SCHEDULING ORDER WITHOUT TAKING
18  INTO ACCOUNT THE CHALLENGES AND AVAILABILITY OF YOUR
19  EXPERT WITNESSES.  WHAT I WILL ASK YOU TO DO,
20  HOWEVER, IS TO CONFER WITH YOUR EXPERTS, IMPRESS UPON
21  THEM -- AND, OF COURSE, THEY ALREADY KNOW, YOU KNOW,
22  THAT, AGAIN, WE'VE GOT TO GET THIS CASE MOVING.
23          AND SO I WOULD ASK YOU, BEFORE CLOSE OF
24  BUSINESS ON FRIDAY, THE 21ST OF JUNE, TO REPLY TO THE
25  COURT WITH DATES WHERE YOUR CLIENTS -- OR YOUR

1  PROPOSED EXPERTS WILL BE AVAILABLE.  I WON'T SET A

2  DEADLINE FOR THAT, BUT AGAIN, I WILL TELL YOU THAT I

3  DON'T SEE -- WELL, I INTEND TO -- LET ME SEE.  I

4  INTEND TO SET A TRIAL IN THIS CASE ON THE MERITS NO

5  LATER THAN MID-SEPTEMBER.  OKAY?

6          **MS. WRIGHT:**  THANK YOU.

7          **THE COURT:**  ALL RIGHT.  NOW, LET ME ASK --

8  AND I DON'T KNOW WHO'S BEST TO -- JUST SO THAT I HAVE

9  AN UNDERSTANDING OF SOME OF THE FACTS ALLEGED HERE,

10 WE'RE TALKING ABOUT -- LET'S SEE -- WE'RE TALKING

11 ABOUT VARIOUS FARM LINES AT THE PENITENTIARY;

12 SPECIFICALLY LINES 15A, 15B, 24 AND 25.

13          SO WHAT I WOULD ASK IS THAT SOMEONE

14 EXPLAIN TO ME THE SIGNIFICANCE OF THOSE FARM LINES

15 VERSUS OTHER FARM LINES.

16          **MS. WRIGHT:**  YES, YOUR HONOR.

17          THE FARM LINE REFERS TO COMPULSORY

18 AGRICULTURAL LABOR THAT OCCURS AT ANGOLA AS A FORM OF

19 DISCIPLINE WHERE THE INDIVIDUALS ARE PAID TWO CENTS

20 AN HOUR IN INCENTIVE PAY OR NOTHING AT ALL.

21          THERE IS OTHER AGRICULTURAL OPERATIONS

22 AT ANGOLA.  THOSE ARE APPARENTLY OPERATED BY PRISON

23 ENTERPRISES.  THOSE ARE THE OPERATIONS THAT USE

24 COMBINES AND TRACTORS, MILLION-DOLLAR AIR-CONDITIONED

25 TRACTORS.  THAT'S NOT THE FARM LINE.  WHAT WE KNOW IS

1   THAT LINES 24 AND 25, LINES 15B, THOSE RUN OUT OF

2   CAMP C AND CAMP D, AND THOSE ARE THE DISCIPLINARY

3   FARM LINES.  THERE MAY BE OTHERS.

4            DURING A MEET-AND-CONFER ON JUNE 4TH,

5   OPPOSING COUNSEL, OUR FRIENDS ON THE OTHER SIDE,

6   AGREED TO GIVE US A LIST OF THE LINES THAT LSP

7   CONSIDERS THE FARM LINES, AND WE HAVEN'T RECEIVED

8   THAT YET.  BUT I DO THINK THAT WE ARE -- THERE IS

9   ACCORD ABOUT WHAT THE FARM LINE IS AND WHAT IT'S NOT.

10       **THE COURT:**  VERY WELL.  I'LL LAY ADDITIONAL

11   INFORMATION ABOUT THAT.

12            AND LET ME JUST MENTION THAT I

13   APPRECIATE COUNSEL FOR BOTH SIDES MEETING AND

14   CONFERRING PRIOR TO THIS HEARING AND TRYING TO REACH

15   AGREEMENT AT LEAST ON THE EVIDENCE, THE DATA THAT

16   WILL BE IMPORTANT AND THAT WILL, OF COURSE, INFORM

17   THE COURT HERE.  SO THANK YOU-ALL FOR DOING SO.

18            ALL RIGHT.  NOW, THE COURT HAS BEEN

19   PRESENTED WITH, BY MY CALCULATION, SOMETHING ON THE

20   ORDER OF 11 DECLARATIONS -- NINE FROM THE PLAINTIFF,

21   THREE FROM THE DEFENSE -- ATTESTING TO THE

22   CONDITIONS; EQUIPMENT THAT IS PROVIDED TO INMATES WHO

23   ARE REQUIRED TO WORK THESE VARIOUS FARM LINES.  THERE

24   SEEMS TO BE SOME -- A BIT OF INCONSISTENCY BETWEEN

25   THE TWO.  SO I WILL TELL YOU THE COURT WILL CERTAINLY

1   HAVE TO HEAR TESTIMONY ON THAT.

2              BUT LET ME TURN NOW -- SPECIFICALLY

3   WITH RESPECT TO THE CONDITIONS, THERE ARE ALLEGATIONS

4   IN THE COMPLAINT, MR. BLANCHFIELD OR MS. PAYNE, THAT

5   THE WATER IS NOT CLEAN; THAT EVEN SOME OF THE

6   GATORADE I GUESS THAT'S PROVIDED TO INMATES IS NOT

7   CLEAN; THE WATER ISN'T COLD AND THAT SORT OF THING.

8              I ASSUME YOU'VE HAD A CHANCE, AT LEAST

9   PRELIMINARILY, TO TAKE A LOOK AT THE CONDITIONS OR TO

10  CONFER WITH YOUR CLIENTS.  WHAT'S THE STATE'S

11  RESPONSE TO THAT ALLEGATION AT LEAST AT THIS

12  JUNCTURE?  I KNOW WE'VE NOT HAD THE BENEFIT OF

13  DISCOVERY.  BUT WHAT IS YOUR RESPONSE TO THAT?

14        **MR. BLANCHFIELD:**  YOUR HONOR, THE VESSELS

15  THAT HOLD THE WATER ARE CHANGED OUT DAILY.  WE HAVE

16  AN AFFIDAVIT FROM SOMEONE WHO HAS FIRSTHAND KNOWLEDGE

17  OF THAT:  WE TAKE THEM IN EVERY DAY; WE CLEAN THEM;

18  WE BRING THEM BACK OUT; COLD WATER; UNLIMITED ACCESS

19  TO THE COLD WATER AND GATORADE.

20        **THE COURT:**  OKAY.  NOW, WHEN YOU SAY

21  "UNLIMITED ACCESS," DOES THAT MEAN -- ARE YOU

22  SUGGESTING OR ASSERTING THAT THE INMATE AT ANY TIME

23  CAN REQUEST WATER?

24        **MR. BLANCHFIELD:**  THAT'S CORRECT.  EXACTLY.

25        **THE COURT:**  ALL RIGHT.

**1**          AND, MS. WRIGHT, WHAT'S YOUR RESPONSE

**2** TO THE DEFENSE POSITION ON THAT POINT?

**3**          **MS. WRIGHT:**  OUR CLIENTS REPORT THAT WATER

**4** IS NOT READILY AVAILABLE, THAT IT RARELY -- THAT ICE

**5** IS RARELY AVAILABLE AND THAT THE IGLOO® COOLERS THAT

**6** DO -- THAT HOLD WATER IN THE FIELDS ARE OFTEN MOLDY,

**7** MILDEWY AND HAVE INSECTS FLOATING IN THEM.  OUR

**8** CLIENTS HAVE ALSO REPORTED THAT THEY'VE NEVER

**9** RECEIVED GATORADE IN THE FIELD.

**10**          **THE COURT:**  HAVE YOU HAD -- YOU'VE NOT HAD

**11** AN OPPORTUNITY TO VISIT ANGOLA TO OBSERVE THE

**12** CONDITIONS, I TAKE IT?

**13**          **MS. WRIGHT:**  I VISITED ANGOLA MANY TIMES.

**14** I'VE NEVER OBSERVED THE FARM LINE IN THIS WAY.

**15**          **THE COURT:**  THE FARM LINE SPECIFICALLY, YES.

**16**          **MS. WRIGHT:**  YES.

**17**          **THE COURT:**  OKAY.  AND HAVE YOU-ALL REACHED

**18** AGREEMENT ON THE REQUEST TO INSPECT THE RELEVANT

**19** PORTIONS OF THE FACILITY?

**20**          **MR. BLANCHFIELD:**  WE HAVE AGREED -- WE HAVE

**21** NOT AGREED SPECIFICALLY AS TO WHAT AREAS WILL BE

**22** INSPECTED, YOUR HONOR, BUT I DON'T THINK THAT'S GOING

**23** TO BE A PROBLEM.

**24**          **THE COURT:**  GOOD.  IF THERE IS A DISPUTE

**25** ABOUT THAT, PLEASE LET ME KNOW AS SOON AS POSSIBLE.

1          I WILL ALSO TELL YOU IT IS LIKELY THAT

2     THE COURT WILL VISIT TO -- ANGOLA TO INSPECT THE

3     CONDITIONS.

4          NOW, HAVING SAID THAT, MR. BLANCHFIELD,

5     I DON'T WANT TO ISSUE AN ORDER PROHIBITING ANGOLA

6     FROM SWITCHING OUT ANYTHING -- NO EQUIPMENT, NO NEW

7     BUCKETS, NO NEW ANYTHING -- WITHOUT MY PERMISSION.

8     NOW, LET ME BE CLEAR:  THESE PERSONS, LIKE ALL

9     PERSONS, LIKE ALL HUMAN BEINGS, ARE ENTITLED TO CLEAN

10    WATER.  AND IF THE STATE BELIEVES THAT WE NEED TO GO

11    ON AND CHANGE THESE OUT -- CHANGE OUT THESE

12    CONTAINERS PRIOR TO A VISIT OF THE COURT OR BY

13    COUNSEL, I NEED TO KNOW THAT.

14          I'VE HAD A CASE BEFORE WHERE THERE WERE

15    CERTAIN -- AND I WILL HASTEN TO ADD THAT IT WAS THE

16    PRIOR LEADERSHIP OF THE PRISON -- I'LL PUT IT THAT

17    WAY -- THAT TOOK STEPS TO CHANGE THE RELEVANT

18    CONDITIONS BEFORE THE COURT HAD AN OPPORTUNITY TO

19    CONDUCT AN INSPECTION.  I DON'T EXPECT THAT TO HAPPEN

20    HERE, AND I KNOW THAT YOU WILL ASSURE ME THAT THAT

21    WILL NOT HAPPEN HERE.

22          HOWEVER, IF UPON INSPECTION, AFTER

23    HEARING FROM MS. WRIGHT, YOUR CLIENT DISCOVERS "YEAH,

24    YOU KNOW, THERE IS PROBABLY SOME MILDEW HERE.  WE

25    NEED TO CHANGE IT OUT IMMEDIATELY OBVIOUSLY" -- I

1  MEAN, THAT'S THE MOST IMPORTANT THING, IS THE

2  PROTECTION OF HUMAN HEALTH.  RIGHT? -- I NEED TO KNOW

3  ABOUT THAT FIRST.  AND I'M GOING TO ASSURE YOU THAT

4  IF YOU CONTACT ME, MY CHAMBERS, YOU FILE A MOTION,

5  THIS IS PRIORITY ONE.  I DON'T CARE IF IT'S DAY,

6  MIDDLE OF THE NIGHT OR WHATEVER, I'M GOING TO MAKE

7  MYSELF AVAILABLE TO TAKE THE MATTER UP.  OKAY?

8         MR. BLANCHFIELD:  YES, YOUR HONOR.  AND I

9  CAN TELL YOU THERE ARE NO PLANS TO CHANGE ANYTHING.

10  AND IF THAT CHANGES, WE WILL NOTIFY YOU IMMEDIATELY.

11         THE COURT:  THANK YOU, MR. BLANCHFIELD.

12         ALL RIGHT.  NOW, LET'S TALK ABOUT -- I

13  THINK WE TALKED A LITTLE BIT ABOUT THE DATA

14  COLLECTION.  THERE IS ALSO A DISPUTE WITH RESPECT TO

15  THE HEAT CONDITIONS, IT APPEARS TO ME.

16         MR. BLANCHFIELD OR MS. PAYNE,

17  WHOEVER -- MS. PAYNE, I DON'T WANT TO LEAVE YOU OUT

18  OF THIS.  I WANT YOU TO GET IN ON THE FUN WHENEVER

19  YOU'D LIKE.  OKAY?

20         SO THE QUESTION BECOMES -- TELL ME, MR.

21  BLANCHFIELD:  HOW IS -- HOW ARE THE TEMPERATURES

22  RECORDED IN THE FIELDS?  I MEAN, I'M VERY MUCH AWARE

23  FROM THE *BALL* CASE, OF COURSE, OF HOW -- IN FACT, I

24  REQUIRED THAT THE TEMPERATURES BE TAKEN BY SPECIFIC

25  INSTRUMENTS AND BY SPECIFIC CONSULTANTS IN THE DEATH

1   ROW TIER.  THIS IS A LITTLE DIFFERENT, OF COURSE.

2          SO YOU HAVE REPORTED, OR YOUR CLIENT

3   HAS REPORTED, CERTAIN HEAT DATA -- HEAT INDEX DATA

4   FOR AT LEAST FOUR DAYS.  I NEED TO KNOW A LITTLE BIT

5   MORE ABOUT, YOU KNOW, HOW THAT INFORMATION IS

6   CAPTURED, WHO IS RESPONSIBLE FOR COLLECTING THAT

7   DATA, AND WHAT YOU-ALL DO WITH IT -- WHAT YOUR CLIENT

8   DOES WITH IT.

9          **MR. BLANCHFIELD:**  YOUR HONOR, SO IN

10  ACCORDANCE WITH OUR HEAT POLICY, THE TEMPERATURES AND

11  HEAT INDEX ARE BASED ON THE NATIONAL WEATHER CENTER.

12  THERE IS A WEBSITE THAT IS CITED IN OUR HEALTH CARE

13  POLICY.  THE HEAT IS RECORDED EVERY TWO HOURS, AS PER

14  THE NATIONAL WEATHER CENTER.  IT'S REVIEWED AND

15  APPROVED BY THE WARDEN OR A DESIGNEE.  I DON'T HAVE A

16  PARTICULAR NAME OF WHO DOES THAT, BUT THEY ARE

17  RECORDED EVERY TWO HOURS.  IN THE EVENT THE INDEX

18  HITS 88, A HEAT ALERT IS ISSUED AND WE FOLLOW THE

19  POLICIES.

20         **THE COURT:**  OKAY.  ALL RIGHT.  THANK YOU,

21  MR. BLANCHFIELD.

22         MS. WRIGHT, MR. COMEAU, DO YOU-ALL

23  BELIEVE THAT TO BE A SUFFICIENT METHOD OF CAPTURING

24  THE RELEVANT DATA?

25         **MS. WRIGHT:**  WE AGREE THAT THE NATIONAL

1   WEATHER SERVICE IS THE SOURCE TO USE TO CAPTURE THE

2   HEAT INDEX.  BUT WE DO NOT SEE EVIDENCE IN THE RECORD

3   THAT THE POLICY IS ACTUALLY FOLLOWED; THAT THE HEAT

4   IS RECORDED -- THE HEAT INDEX IS RECORDED EVERY TWO

5   HOURS OR THAT THE WARDEN OR HIS DESIGNEE VERIFIES

6   THAT RECORD.

7        **THE COURT:**  AND WHAT WOULD YOU HAVE THE

8   WARDEN OR HIS DESIGNEE DO TO VERIFY THAT DATA?

9        **MS. WRIGHT:**  I DON'T KNOW THE ANSWER TO

10  THAT, YOUR HONOR.  WHAT I KNOW IS THAT THE POLICY,

11  HEAT-PRECAUTION POLICY -- NO. 8, I BELIEVE -- STATES

12  THAT THE WARDEN OR HIS DESIGNEE SHOULD VERIFY THE

13  RECORDING EVERY TWO HOURS.

14       **THE COURT:**  SO WHAT I'M GOING TO DO IS ASK

15  THE TWO OF YOU TO MEET AND CONFER AND TO AT LEAST

16  AGREE UPON A PROTOCOL FOR THE COLLECTION OF THAT

17  DATA.  NOW, IN INTERIOR SPACES, OF COURSE, IT'S -- WE

18  CAN AFFIX VERY SENSITIVE, PRETTY HIGH-TECH DEVICES

19  THAT WOULD RECORD TEMPERATURE AND HUMIDITY FOR AN

20  ACCURATE CALCULATION OF THE HEAT INDEX.  WE'RE NOT

21  TALKING ABOUT INDOORS, OF COURSE, NOW.  NOW WE'RE

22  OUTDOORS.

23            SO I'M GOING TO HAVE TO ASK YOU-ALL IF

24  -- I'M GOING TO GIVE YOU-ALL THE FIRST OPPORTUNITY TO

25  MEET AND CONFER AND REACH AGREEMENT ON THAT.  IF YOU

1   CAN'T, I'LL GO ON AND COME UP WITH MY OWN METHOD,

2   EVEN IF I HAVE TO BRING IN A SPECIAL MASTER.  OF

3   COURSE, THAT COST WILL BE BORNE BY THE STATE, SO

4   HOPEFULLY THAT YOU-ALL CAN AGREE TO -- AT LEAST TO A

5   PROTOCOL FOR THE ACCURATE COLLECTION OF TEMPERATURES.

6            AND, MR. BLANCHFIELD, THE REASON I

7   MENTION THAT IS BECAUSE BEFORE ME IN THE PLEADINGS IT

8   -- I BELIEVE THE STATE ALLEGED THAT THERE WERE A HEAT

9   INDEX EXCEEDING 88 DEGREES BY 11 A.M. ON FOUR DATES

10  BETWEEN -- ONLY FOUR DATES -- BETWEEN MAY 8TH AND MAY

11  20TH.  AND THE DATA THAT WE HAVE COLLECTED FROM THE

12  NATIONAL WEATHER SERVICE INDEPENDENTLY SUGGEST THAT

13  IT'S -- ONE, TWO, THREE, FOUR, FIVE -- EITHER FIVE OR

14  SIX, NOT FOUR.

15           SO I'M REALLY GOING TO HAVE TO ASK YOU

16  TO SPEAK TO YOUR CLIENT ABOUT ACCURATELY REPORTING

17  THIS DATA.  THAT'S ONE OF THE REASONS WHY I'M GOING

18  TO HAVE TO ORDER A SPECIAL MASTER TO DO IT FOR ME.

19  OKAY?  I'VE GOT TO RELY ON THIS DATA.  AND IF I -- I

20  DON'T WANT TO SUGGEST THAT THE DATA COMING OUT OF

21  ANGOLA IS NOT TRUSTWORTHY.  TO THE CONTRARY.  IN THIS

22  AND IN ANOTHER CASES OFFICIALS HAVE WORKED WITH THE

23  COURT.  THEY HAVE BEEN VERY GOOD ABOUT SUPPLYING THE

24  DATA.

25           BUT I JUST NEED YOU-ALL TO -- YOUR

1  CLIENT TO BE A LITTLE BIT MORE DILIGENT ABOUT

2  CAPTURING THAT DATA, BECAUSE WHAT I HAVE SO FAR IS

3  THAT SELF-REPORTING ON THE -- ON MAY 8TH, 9TH, 19TH

4  AND 20TH; WHERE OUR REVIEW OF NATIONAL WEATHER

5  SERVICE DATA SUGGEST THAT IT WAS THE 8TH, THE 9TH,

6  THE 10TH, THE 16TH, THE 19TH, THE 20TH AND ON THROUGH

7  THE 22ND.  AND THAT'S WHERE WE STOPPED THE ANALYSIS,

8  AT THE 22ND.

9              SO I MENTION THIS ONLY TO SUGGEST THAT

10  YOU-ALL COME UP WITH AN ACCURATE WAY.  I MEAN, IF

11  YOU-ALL AGREE TO RELY ON THE NATIONAL WEATHER

12  SERVICE, I WILL TAKE THAT INTO ACCOUNT.  BUT WE'VE

13  GOT TO AT LEAST AGREE ON A PROTOCOL FOR THE ACCURATE

14  COLLECTION OF HEAT INDEX DATA.  OKAY?

15              NOW, MR. BLANCHFIELD, IF YOU KNOW --

16  AND YOU CAN COME BACK TO THE FORWARD PODIUM, SIR --

17  DO YOUR CLIENTS PROVIDE ANY SHADE, ANY COVER, FOR THE

18  WORKERS?

19         **MR. BLANCHFIELD:**  I DON'T BELIEVE, YOUR

20  HONOR.  YOU KNOW, I'VE BEEN OUT THERE, I'VE SEEN THEM

21  IN ACTION.  THERE IS NO CREATED SHADE.

22         **THE COURT:**  OKAY.  BUT YOUR CLIENT,

23  ACCORDING TO YOU, DOES PROVIDE WATER BREAKS OR THEY

24  PROVIDE ELECTROLYTE ENHANCED DRINKS, GATORADE AND

25  THAT SORT OF THING.  RIGHT?

1          MR. BLANCHFIELD:  CORRECT.

2          THE COURT:  AND THEY DO THAT HOW OFTEN, IF

3  YOU KNOW, AT THIS JUNCTURE?

4          MR. BLANCHFIELD:  WELL, THE -- YOU KNOW,

5  THERE IS A VERY LARGE VESSEL OF WATER THAT IS THERE.

6  AND IF SOMEONE WANTS SOME WATER, IT'S NOT A -- YOU'RE

7  NOT ENTITLED TO WATER EVERY HOUR OR TWO.  YOU CAN GO

8  GET WATER IF YOU WANT.

9          THE COURT:  UPON REQUEST?

10          MR. BLANCHFIELD:  EXACTLY.

11          THE COURT:  OKAY.  VERY GOOD.

12               NOW, LET'S TALK ABOUT BREAKS.  I'M

13  GIVEN TO BELIEVE THAT THERE ARE BREAKS PROVIDED EVERY

14  30 MINUTES?

15          MR. BLANCHFIELD:  IN THE EVENT THE HEAT

16  INDEX REACHES 88, THE BREAKS ARE MANDATED EVERY 30

17  MINUTES.

18          THE COURT:  ALL RIGHT.  AND LET'S TALK ABOUT

19  ATTIRE AND EQUIPMENT.  ARE HATS PROVIDED?

20          MR. BLANCHFIELD:  YES, YOUR HONOR.  WE

21  PROVIDED A PICTURE OF SUN HATS.  I WILL TELL YOU THAT

22  MOST DON'T CHOOSE TO WEAR THEM.  THEY -- THEY'LL TIE

23  A SHIRT ON THEIR HEAD OR SOMETHING LIKE THAT.

24          THE COURT:  OKAY.  NOW, I DON'T THINK -- I

25  DON'T THINK, MS. WRIGHT, YOU MENTIONED ANYTHING ABOUT

1    SUNSCREEN OR ANYTHING LIKE THAT.  HAVE YOU MENTIONED

2    THAT IN YOUR PLEADINGS?  HAVE YOU?

3              **MS. WRIGHT:**  YES, YOUR HONOR.

4              **THE COURT:**  OKAY, GOOD.

5              **MS. WRIGHT:**  I BELIEVE THAT'S IN OUR

6    COMPLAINT.  WE -- OUR CLIENTS DO NOT RECEIVE

7    SUNSCREEN.

8              **THE COURT:**  MR. BLANCHFIELD, ARE YOU AWARE

9    IF -- WHETHER THEY RECEIVE SUNSCREEN OR NOT?

10             **MR. BLANCHFIELD:**  MY UNDERSTANDING, YOUR

11   HONOR, IS THAT SUNSCREEN IS AVAILABLE THROUGH THE

12   COMMISSARY.  THEY CAN PURCHASE SUNSCREEN.  I DON'T

13   BELIEVE SUNSCREEN IS ONE OF THE ITEMS THAT ARE

14   PROVIDED BY THE -- BY THE STATE.

15             **THE COURT:**  EVERY DERMATOLOGIST IN AMERICA

16   SAYS YOU'VE GOT TO WEAR SUNSCREEN IF YOU'RE GOING TO

17   BE OUT IN THE SUN.  THAT'S GOT TO BE MANDATORY.  IT'S

18   THE NO. 1 FORM OF CANCER, I'M TOLD, IN THE UNITED

19   STATES; MELANOMA.  AND IT CUTS ACROSS ALL RACES.

20             SO ONE OF THE THINGS, MR. BLANCHFIELD,

21   I'M GOING TO ASK YOU TO DO IS SPEAK TO YOUR CLIENT

22   ABOUT THAT.  I MEAN, IT SEEMS TO ME THAT'S AN ISSUE

23   THAT CERTAINLY AFFECTS HUMAN HEALTH.  IN THIS DAY AND

24   AGE, AGAIN, EVERYBODY KNOWS THAT YOU'VE GOT TO HAVE

25   SUNSCREEN IF YOU'RE GOING TO BE OUT IN THE SUN IN ANY

1  MEASURABLE AMOUNT OF TIME.

2           LET'S SEE.  ARE THERE ANY OTHER THINGS,

3  MR. BLANCHFIELD, THAT YOU'RE AWARE OF THAT HAVE NOT

4  BEEN INCLUDED IN YOUR PLEADINGS THAT SHOW THAT YOUR

5  CLIENT HAS MITIGATED THE RISK OF HARM AND

6  SPECIFICALLY HEAT STROKE AND OTHER HEAT-RELATED

7  ILLNESSES TO THE WORKERS?

8       **MR. BLANCHFIELD:**  I THINK IT'S ALL CONTAINED

9  IN THE PLEADINGS, YOUR HONOR.  WE -- YOU KNOW, WE --

10 THERE IS ALLEGATIONS THAT THERE IS NO PERSONAL

11 PROTECTIVE EQUIPMENT GIVEN.  WE -- I THINK WE

12 INCLUDED SOME PICTURES OF GLOVES THAT ARE ISSUED AND

13 THINGS LIKE THAT.  BUT THAT'S ABOUT IT.

14       **THE COURT:**  OKAY.  THANK YOU.

15           MS. WRIGHT, WHAT'S YOUR RESPONSE TO MR.

16 BLANCHFIELD'S REPRESENTATIONS THAT ALL THOSE ITEMS

17 ARE OFFERED AT LEAST TO THE INMATES?

18       **MS. WRIGHT:**  THE DEFENDANTS DID INDEED FILE

19 INTO THE RECORD PICTURES OF WHAT APPEARED TO BE

20 BRAND-NEW CLOTHING ITEMS.  OUR PLAINTIFFS HAVE NOT

21 RECEIVED SUCH ITEMS.  THEY RECEIVE RUBBER BOOTS.

22 THEY'VE NEVER RECEIVED LACE-UP BOOTS.  AND THOSE ARE

23 IN THE SUPPLEMENTAL DECLARATIONS.

24       **THE COURT:**  WHAT'S THE SIGNIFICANCE OF

25 RUBBER BOOTS VERSUS LACE-UP BOOTS?

1    **MS. WRIGHT:**  THE DECLARATION OF MARGUERITE

2    GREEN GOES INTO THIS A BIT MORE.  LACE-UP BOOTS ARE

3    MORE STRUCTURED AND THEY'RE SAFER FOR PEOPLE WHO ARE

4    WORKING -- DOING PHYSICAL MANUAL LABOR; DIGGING

5    DITCHES, PULLING WEEDS, WALKING ON UNEVEN TERRITORY.

6            IT'S ALSO SAFER TO BE WEARING RUBBER

7    BOOTS -- EXCUSE ME.  IT'S SAFER TO BE WEARING LACE-UP

8    BOOTS THAT HAVE A HARDER TOE STRUCTURE.  IN THE HEAT

9    AND THE HUMIDITY WE HAVE MANY PLAINTIFFS WHO HAVE

10   SUFFERED INJURIES FROM WEARING RUBBER BOOTS IN

11   130-DEGREE HEAT INDEXES BECAUSE OF THE SWEATING AND

12   THE HEAT.

13           **THE COURT:**  OKAY.  ANY OTHER -- ANY OTHER

14   PROVISIONS THAT YOU BELIEVE ARE REQUIRED?

15           **MS. WRIGHT:**  I WOULD ALSO --

16           **THE COURT:**  OTHER THAN THE THINGS WE'VE

17   ALREADY TALKED ABOUT, OF COURSE.

18           **MS. WRIGHT:**  I WOULD JUST NOTE THAT THE

19   PROVISION OF HEAT-PRECAUTION DUTY STATUSES CONTINUES

20   TO BE A BIG PROBLEM AT ANGOLA.  AND WE CAN SEE THAT

21   FROM THE EMERGENCY SICK CALLS THAT WERE ATTACHED TO

22   THE AFFIDAVIT OF ASHLI OLIVEAUX IN DEFENDANTS'

23   FILING.

24           ON MAY 15TH ALONE, IN 2024, THERE WERE

25   THREE MEN WHO REPORTED SICK CALLS FROM THE FIELD.

1    THERE WAS A 37-YEAR-OLD WHO HAD SYMPTOMS OF HEAT

2    RASH.  THAT INDIVIDUAL HAD UNSPECIFIED PERSONALITY

3    DISORDER, PANIC DISORDER, AND AIDS.  HE HAD NO

4    HEAT-PRECAUTION DUTY STATUS, EVEN THOUGH MEDICATION

5    USED TO TREAT HIV INCREASES PHOTOSENSITIVITY AND CAN

6    CAUSE HEAT RASH.

7            THE DEFENDANTS HAVE NOT PRODUCED THE

8    MEDICAL RECORDS OR MEDICATION RECORDS FOR THESE

9    PEOPLE, SO I'LL JUST ADD THAT.

10            THERE WAS ALSO ON THAT SAME DAY --

11        **THE COURT:**  SO YOU BELIEVE THAT THAT -- THAT

12    OFFENDER SHOULD BE INCLUDED IN THE SUBCATEGORY OF --

13    THE SUBCLASS, I SHOULD SAY?

14        **MS. WRIGHT:**  YES.

15            AND THESE ARE EXAMPLES OF INDIVIDUALS

16    WHO SHOULD HAVE HEAT-PRECAUTION DUTY STATUSES BUT WHO

17    DON'T.

18            ON THAT SAME DAY, MAY 15TH -- WHICH,

19    ACCORDING TO THE NATIONAL WEATHER SERVICE, IT WAS A

20    93-DEGREE HEAT INDEX DAY -- THERE WAS A 53-YEAR-OLD

21    WHO PRESENTED WITH HIS HEAD SPINNING FOR ABOUT AN

22    HOUR.  ACCORDING TO DEFENDANTS' RECORDS, THAT

23    INDIVIDUAL HAS PREDIABETES, A HISTORY OF SYNCOPE OR

24    FAINTING, ASTHMA, OSTEOARTHRITIS, HERNIAS.

25            THE EMTs WHO REPORTED TO THE FIELD TO

1   TREAT THAT PERSON NOTIFIED FIELD FOREMAN TO LET

2   OFFENDER REST, WHICH SUGGEST TWO THINGS TO ME.  THE

3   FIRST IS THAT THIS INDIVIDUAL SHOULD HAVE A

4   HEAT-PRECAUTION DUTY STATUS.  AND THE SECOND THING IS

5   THAT IT'S EVIDENCE OF EXACTLY WHAT THE PLAINTIFFS

6   HAVE REPORTED IN THEIR AFFIDAVITS, WHICH IS THAT

7   ANGOLA OFFICIALS DO NOT, IN FACT, LET INCARCERATED

8   MEN REST WHEN THEY NEED TO IN THE FIELD.  THEY DON'T

9   PROVIDE REST BREAKS OR WATER BREAKS AT WILL.

10          THE THIRD INDIVIDUAL IN DEFENDANTS'

11  RECORDS THAT PRESENTED WITH AN INJURY ON MAY 15TH IS

12  A 35-YEAR-OLD WHO HAD SHARP CHEST PAINS WHILE WORKING

13  IN THE FIELD.  AGAIN, THERE IS NO MEDICAL RECORDS,

14  THERE IS NO MEDICATION RECORDS THAT DEFENDANTS HAVE

15  PROVIDED.  SO THIS APPEARS TO BE WHAT DR. VASSALLO

16  TALKS ABOUT, WHAT LSP'S OWN POLICIES TALK ABOUT:

17  THAT EVEN YOUNGER AND RELATIVELY HEALTHIER PEOPLE CAN

18  BE AFFECTED WHEN THEY PARTICIPATE IN STRENUOUS

19  PHYSICAL ACTIVITIES DURING HOT WEATHER.

20          I WILL JUST RUN THROUGH.  ALSO IN THOSE

21  RECORDS THERE WAS A 61-YEAR-OLD WITH A BMI OF 40 IN A

22  WHEELCHAIR WHO APPARENTLY WAS WORKING IN THE FARM

23  LINE.  THERE IS A 31-YEAR-OLD WITH PREDIABETES AND

24  HYPERTENSION; A 31-YEAR-OLD WITH ANXIETY DISORDER; A

25  25-YEAR-OLD WITH A HISTORY OF MENTAL ILLNESS; A

1   41-YEAR-OLD WITH HYPERTENSION.  NONE OF THESE PEOPLE

2   HAVE HEAT-PRECAUTION DUTY STATUSES.

3          THE COURT:  LET'S TALK FOR A MOMENT ABOUT

4   THE POLICY.  YOU ASSERT IN YOUR PLEADINGS THAT THE

5   POLICY IS INADEQUATE, BUT YOU ACKNOWLEDGE THAT ANGOLA

6   DOES HAVE A HEAT POLICY.  I THINK THE MOST RECENT

7   HEAT POLICY -- AND MR. BLANCHFIELD WILL CORRECT ME IF

8   I'M WRONG -- GOES BACK TO 2019.  CORRECT?  I BELIEVE

9   IT WAS REVISED FROM THE 2012 EDITION.  IS THAT

10  CORRECT?

11         MS. WRIGHT:  I BELIEVE THAT'S RIGHT.

12         THE COURT:  WHY DO YOU THINK THE CURRENT

13  POLICY IS -- WELL, FIRST OF ALL, DO YOU BELIEVE IT'S

14  INADEQUATE?  ACCORDING TO YOUR PLEADINGS, OBVIOUSLY

15  YOU DO.  BUT WHY?

16         MS. WRIGHT:  THERE IS TWO PROBLEMS WITH THE

17  POLICY.  THERE IS ACTUALLY TWO POLICIES.  THERE IS

18  HEALTH CARE POLICY 8 AND THEN THERE IS LSP DIRECTIVE

19  13.067.  THE POLICIES ARE DEFICIENT AND THEN THEY'RE

20  ALSO NOT EVEN ENFORCED.

21              THE MOST GLARING DEFICIENCY I THINK IS

22  THE HEAT PATHOLOGY, THE HEAT-PRECAUTION PROTOCOL.

23  DR. VASSALLO DISCUSSES THIS AT LENGTH IN HER

24  DECLARATION AND HER SUPPLEMENTAL DECLARATION; THAT

25  THE LIST OMITS MEDICATIONS LIKE SSRIs, LIKE

1  ANTIHISTAMINES THAT ARE ROUTINELY PRESCRIBED BY

2  DEFENDANTS TO PLAINTIFFS AND PEOPLE LIKE THEM TO

3  MANAGE THEIR CHRONIC CONDITIONS.  AND THOSE

4  MEDICATIONS ARE WELL-KNOWN TO IMPAIR A BODY'S ABILITY

5  TO THERMOREGULATE.

6          AS TO THE ACTUAL IMPLEMENTATION OF THE

7  POLICIES, THE POLICIES ARE FACIALLY DEFICIENT.  BUT

8  EVEN IF THEY WERE NOT, THEY ARE IGNORED.  AND WE CAN

9  SEE THAT WITH THE HEAT PATHOLOGY -- EXCUSE ME -- WITH

10 THE HEAT-PRECAUTION DUTY STATUS THAT WE JUST

11 DISCUSSED.  THAT'S ONE EXAMPLE.  DEFENDANTS ROUTINELY

12 FAIL TO GIVE QUALIFYING INDIVIDUALS HEAT-PRECAUTION

13 DUTY STATUSES, EVEN THOUGH THE POLICY SETS OUT A

14 PROCEDURE FOR DOING THAT.

15          AND AS A RESULT, NOT ONLY ARE PEOPLE AT

16 SUBSTANTIAL RISK OF SERIOUS HARM FROM HEAT-RELATED

17 ILLNESS, BUT THEY ARE ACTUALLY BEING INJURED.  THEY

18 ARE ACTUALLY BEING HURT.  AND WE CAN SEE THAT FROM

19 DEFENDANTS' OWN RECORDS, WHICH, I WILL ADD, ARE FROM

20 APRIL 1ST TO MAY 15TH, SO BEFORE EVEN THE HEIGHT OF

21 THE SUMMER.

22          **THE COURT:**  OKAY.  THANK YOU.

23          MR. BLANCHFIELD?

24          **MR. BLANCHFIELD:**  SO, YOUR HONOR, THIS MAY

25 15TH ISSUE, WE REALLY TAKE ISSUE WITH THIS.  THEY

1  REPORT A HEAT INDEX OF 93 ON MAY 15TH.  HOW DO THEY

2  DO THAT?  THEY TAKE THE HIGHEST TEMPERATURE OF THE

3  DAY AND THE HUMIDITY AND THEY MAKE THE CALCULATION.

4       **THE COURT:**  RATHER THAN DURING THE RELEVANT

5  HOURS THAT --

6       **MR. BLANCHFIELD:**  EXACTLY.

7            AND IN THE RECORD, WHICH WE FILED --

8  49-11 AT PAGE 5 -- THE HEAT INDEX THAT MORNING OF THE

9  15TH OF MAY AT 9:00 WAS 72.  SO I GOT ONE FELLOW

10 WHO'S GOT A RASH ON HIS ARM NOW.  DR. VASSALLO SAYS

11 THAT'S HEAT RELATED.  I DON'T KNOW HOW -- YOU KNOW,

12 MAYBE IT'S JUST SOME BASIC RASH THAT WE HAVE.  IT'S

13 CERTAINLY NOT A SERIOUS HARM.

14            THE OTHER -- THE ONE -- THERE WAS ONE

15 AT 10:00 A.M. AND THEN ANOTHER AT 10:11 ON THE SAME

16 DAY.  THE ONE AT 8:41 WAS WORKING IN THE FIELD WITH A

17 SWEATSHIRT WHEN HE HAD THIS -- WHEN HE HAD NAUSEA.

18            SO, YOU KNOW, WE REALLY -- YOU KNOW, WE

19 NEED TO LOOK AT THE TEMPERATURES.  THESE GUYS,

20 THEY'RE ONLY OUT THERE IN THE MORNING.  BY 11:30

21 THEY'RE IN.  WE ALL LIVE HERE IN SOUTH LOUISIANA.  WE

22 KNOW.  IT GET -- MORNINGS CAN BE FAIRLY PLEASANT

23 AROUND HERE.  THE HEAT REALLY COMES IN THE AFTERNOON.

24       **THE COURT:**  SO YOU WOULD AGREE WITH ME,

25 THOUGH, MR. BLANCHFIELD, THAT YOUR CLIENT CAN AT

1  LEAST PROHIBIT FIELD WORKERS FROM WEARING

2  SWEATSHIRTS?

3      **MR. BLANCHFIELD:**  YEAH.  I MEAN, I DON'T

4  KNOW HOW THAT CAME TO BE WHERE SOMEONE WOULD --

5      **THE COURT:**  RIGHT, I UNDERSTAND.  BUT --

6  OKAY.

7          SO THIS IS PRECISELY WHY I BELIEVE IT'S

8  SO CRITICAL THAT YOU AGREE UPON PROTOCOLS TO CAPTURE

9  THE HEAT, HUMIDITY FOR CALCULATION OF THE HEAT INDEX

10 AT THE RELEVANT TIME AND EVEN UNDER THE RELEVANT, OF

11 COURSE, CONDITIONS, SO IF YOU WOULD MAKE THAT A

12 PRIORITY.  AND I'M GOING TO GIVE YOU A DEADLINE TO

13 MEET AND CONFER AND REPORT BACK TO THE COURT.  OKAY?

14     **MR. BLANCHFIELD:**  YES.

15         AND THEN THE SECOND ON THE POLICIES,

16 YOUR HONOR, THERE IS NO SECRET -- EVERYONE IS AWARE

17 OF THE *BALL* CASE.  AND THAT IS WHAT GOT A LOT OF

18 THESE THINGS, YOU KNOW, MODIFYING THE POLICIES AND

19 ADDRESSING THESE ISSUES.

20         DR. VASSALLO SAYS WE'RE UNDER-INCLUSIVE

21 WITH RESPECT TO WHAT MEDICATIONS RENDER SOMEONE

22 VULNERABLE TO HEAT.  WE DISAGREE.  IT'S NOT THAT WE

23 DON'T -- IT'S NOT THAT WE DON'T RECOGNIZE THAT

24 PRINCIPLE.  WE DO.  WE HAVE THREE PHYSICIANS:

25 DR. LAVESPERE, DR. GAMBLE, WHO'S A PSYCHIATRIST, AND

1  DR. HERMAN SOONG, WHO IS A REPUTABLE -- HE'S A

2  PROFESSOR AT TULANE.  HE'S A NEUROPSYCHIATRIST.

3           THESE THREE GET TOGETHER, THEY FORM THE

4  MEDICATION LIST, THEY REVISIT IT ANNUALLY AND PUBLISH

5  IT.  AND ANYONE THAT'S ON THERE GETS A HEAT-RELATED

6  DUTY STATUS.  THERE IS OVER 500 INMATES WHO HAVE THAT

7  STATUS.  THEY'RE EVALUATED, YOU KNOW, ON A

8  CASE-BY-CASE BASIS.

9        THE COURT:  AND I APPRECIATE YOU SHARING

10 THAT WITH ME, BECAUSE THAT WAS GOING TO BE MY

11 QUESTION TO YOU:  HOW ARE THEY EVALUATED?  HOW OFTEN

12 ARE THEY EVALUATED?  DO YOU KNOW AT THIS POINT?

13 AGAIN, I KNOW WE HAVEN'T PROPOUNDED DISCOVERY YET,

14 BUT --

15        MR. BLANCHFIELD:  I DON'T KNOW THE ANSWER TO

16 THE QUESTION HOW OFTEN ARE THEY EVALUATED.  I KNOW

17 THAT IF THEY HAVE ANY PROBLEMS, THEY CAN CALL FOR

18 MEDICAL TREATMENT.

19        THE COURT:  ARE THE -- THE ISSUE OF THE

20 BREAKS, ARE THERE ANY -- IS THERE -- DOES YOUR CLIENT

21 DOCUMENT HOW OFTEN THE WORKERS TAKE BREAKS?

22        MR. BLANCHFIELD:  NO, YOUR HONOR.  IT'S NOT

23 WRITTEN DOWN.

24        THE COURT:  AND SO THAT WILL BE ONE OF THE

25 THINGS THAT WE TAKE UP AT -- SO AGAIN, IN FAIRNESS TO

1  BOTH SIDES, I THINK THESE ARE, FRANKLY, JUST

2  COMMON-SENSE ISSUES WE'RE GOING TO HAVE TO TALK

3  ABOUT.  BECAUSE OBVIOUSLY IF THEY'RE PERMITTED TO

4  TAKE A BREAK, YOU KNOW, AND HAVE WATER -- ACCESS TO

5  WATER AT WILL, IT'S GOING TO BE IMPORTANT.  I MEAN,

6  THE TESTIMONY, OF COURSE, FROM THE CREDIBLE -- THE

7  CREDIBLE TESTIMONY WILL GO A LONG WAY.  BUT IF THERE

8  IS ANY DOCUMENTATION OR VERIFICATION OF THAT

9  TESTIMONY, THAT TOO WOULD BE HELPFUL TO THE COURT.

10  OKAY?

11          **MR. BLANCHFIELD:**  YES, YOUR HONOR.

12          **THE COURT:**  ALL RIGHT.  LET'S SEE NOW.

13          ALL RIGHT.  MS. WRIGHT, SO AGAIN, YOU

14  BELIEVE THAT THERE IS -- THE POLICY IS INADEQUATE.

15  CORRECT?

16          **MS. WRIGHT:**  YES.

17          **THE COURT:**  AND IT'S ALSO YOUR POSITION THAT

18  THE POLICY IS NOT BEING FAITHFULLY FOLLOWED AT

19  ANGOLA.  CORRECT?

20          **MS. WRIGHT:**  YES.

21          **THE COURT:**  AND SO WHAT WOULD YOU HAVE THE

22  COURT DO?

23          **MS. WRIGHT:**  WE WOULD ASK THE COURT TO

24  ENJOIN OPERATION OF THE FARM LINE WHEN THE HEAT INDEX

25  REACHES OR EXCEEDS 88 DEGREES FAHRENHEIT.  AND THE

1  REASON IS BECAUSE THE DEFENDANTS ARE UNABLE OR

2  UNWILLING TO TAKE ANY MITIGATING MEASURES TO ACTUALLY

3  REDUCE THE HARM TO HUMAN HEALTH THAT'S CAUSED BY THE

4  FARM LINE AND BECAUSE CONSTITUTIONALLY ADEQUATE

5  HEALTH CARE IS NOT AVAILABLE AT ANGOLA.

6          MY FRIEND REFERENCED THE ABILITY OF

7  INCARCERATED PEOPLE TO CALL FOR SICK CALLS WHENEVER

8  THEY'RE INJURED.  WELL, A SICK CALL COSTS THREE

9  DOLLARS.  AT TWO CENTS AN HOUR ON THE FARM LINE,

10  THAT'S THREE HUNDRED -- THAT'S A HUNDRED AND FIFTY

11  HOURS OF WORK.  AN EMERGENCY SICK CALL IS SIX

12  DOLLARS, SO THAT'S 300 HOURS OF WORK.  EMERGENCY CARE

13  IS JUST SIMPLY NOT AVAILABLE.

14          AND WE KNOW FROM THE *LEWIS* CASE WITH

15  CHIEF JUDGE DICK, HELD IN NOVEMBER OF 2023, JUST TWO

16  MONTHS AFTER WE FILED THIS CASE, THAT RATHER THAN

17  RECEIVING MEDICAL CARE, MEN INCARCERATED AT ANGOLA

18  ARE SUBJECTED TO CRUEL AND UNUSUAL PUNISHMENT BY

19  MEDICAL MISTREATMENT AT UNSPEAKABLE HUMAN COSTS.

20          SO THERE IS SIMPLY -- CONSTITUTIONALLY

21  ADEQUATE MEDICAL CARE SIMPLY IS NOT AVAILABLE AT

22  ANGOLA.  THE WAY TO SOLVE THIS PROBLEM IS TO ENJOIN

23  OPERATION OF THE FARM LINE UNDER THESE VERY NARROW

24  CIRCUMSTANCES.

25          **THE COURT:**  YOU WOULD AGREE THAT UNTIL AND

1  UNLESS WE CAN -- WELL, AT LEAST I AM SATISFIED THAT

2  THE HEAT INDEX DATA IS ACCURATE, IT'S GOING TO BE

3  DIFFICULT FOR THE COURT TO DO THAT.  RIGHT?

4         **MS. WRIGHT:**  AND THE PLAN TO EXPEDITE THE

5  TRIAL SETTING AND THE SCHEDULING ORDER, YOUR HONOR,

6  WE WELCOME THAT.

7         **THE COURT:**  WELL, YES.  AND I APPRECIATE

8  THAT.  AND I'M SURE MR. BLANCHFIELD AND HIS CLIENTS

9  AS WELL.  I MEAN, I THINK WE ALL HAVE AN INTEREST IN

10 ENSURING THAT THE POLICY IS ADEQUATE AND IT'S BEING

11 FOLLOWED.

12         THE COST OF MEDICAL CARE -- LET ME ASK

13 MR. BLANCHFIELD.  MR. BLANCHFIELD, YOU'VE HEARD MS.

14 WRIGHT.  IS IT -- CAN YOU AFFIRM THAT IF AN OFFENDER

15 WORKING THE FARM LINE SUDDENLY FEELS LIGHTHEADED OR

16 FEELS LIKE THEY ARE UNDER HEAT-RELATED MEDICAL

17 STRESS, THAT THEY HAVE TO ACTUALLY PAY TO RECEIVE

18 TREATMENT?

19         **MR. BLANCHFIELD:**  WE HAVE A DISAGREEMENT ON

20 THAT, YOUR HONOR.  MY UNDERSTANDING IS THAT IN THAT

21 INSTANCE, THAT THERE IS NOT A PAYMENT ON THAT.  I

22 MEAN, THERE ARE SOME PAYMENTS FOR SOME REQUESTED.

23 BUT IF SOMEONE IS UNDER STRESS IN THE FIELD, I DO NOT

24 BELIEVE THEY ARE CHARGED ANYTHING.

25         **THE COURT:**  DID YOU HANDLE THE MATTER THAT

1  CHALLENGED THE ADEQUACY OF THE MEDICAL TREATMENT

2  PROVIDED AT ANGOLA IN THE CASE BEFORE CHIEF JUDGE

3  DICK?

4         **MR. BLANCHFIELD:**  YOUR HONOR, I WAS NOT -- I

5  DID NOT HANDLE THAT.  I'M VERY FAMILIAR WITH IT.  I

6  DID MONITOR IT AT SOME LEVEL.

7               AND I WILL SAY THAT THE MEDICAL CARE

8  THAT JUDGE DICK WAS LOOKING AT IS MEDICAL CARE FROM

9  OVER FIVE YEARS AGO.

10        **THE COURT:**  AND THAT WAS MY QUESTION TO YOU,

11 IF THIS SCENARIO WAS CONTEMPLATED IN THAT CASE; THAT

12 IS, HEAT-RELATED MEDICAL ISSUES THAT MIGHT ARISE IN

13 THE CONTEXT OF WORKING IN THE -- ON THE FARM LINE.

14              BUT YOU DON'T BELIEVE THAT CAME UP.

15 CORRECT?

16        **MR. BLANCHFIELD:**  I DON'T BELIEVE IT CAME

17 UP, YOUR HONOR.

18        **THE COURT:**  DO YOU HAVE ANYTHING SUGGESTING

19 OTHERWISE, MS. WRIGHT?

20        **MS. WRIGHT:**  I DON'T BELIEVE THAT THE *LEWIS*

21 CASE CONCERNED THE FARM LINE SPECIFICALLY.  BUT IT

22 DID CONCERN THE SICK CALL POLICY, IT CONCERNED THE

23 MISDIAGNOSIS, FAILURE TO -- DELAYED DIAGNOSIS, WHAT

24 JUDGE DICK CALLED THE ABHORRENT MEDICAL TREATMENTS OF

25 DETAINED PEOPLE.  IT CONCERNED CONSTITUTIONAL

1   DEFICIENCIES IN EMERGENCY CARE.  AND SPECIFICALLY THE

2   POLICY RELATED TO THAT, WHICH WAS CREATED BY ASHLI

3   OLIVEAUX, REQUIRES EMTs TO MAKE DIAGNOSES.  AND

4   THAT'S BEYOND THE SCOPE OF THEIR PRACTICE, ACCORDING

5   TO JUDGE DICK.

6            THE DECISION CONCERNED DEFICIENT

7   MEDICAL LEADERSHIP AND ADMINISTRATION AND

8   ORGANIZATIONAL STRUCTURE THAT, ACCORDING TO JUDGE

9   DICK, UNDERPINS THE CONSTITUTIONALLY DEFICIENT SYSTEM

10  OF HEALTH CARE.  SO IT'S ONE FULL SYSTEM.

11           AND I WOULD ADD THAT IF AN INDIVIDUAL

12  IS INJURED ON THE FARM LINE BECAUSE OF A HEAT-RELATED

13  ILLNESS, THAT'S ONE THING.  BUT MY UNDERSTANDING FROM

14  DR. VASSALLO'S DECLARATION IS THAT HEAT STRESS

15  ILLNESS CAN MANIFEST ITSELF LATER ON AS WELL.  SO ONE

16  POSSIBLE OUTCOME IN THIS MIGHT BE TO PAUSE THE COPAYS

17  THAT LSP CHARGES TO INDIVIDUALS.

18           **THE COURT:**  ALL RIGHT.  SO ONE OF THE

19  THINGS, MR. BLANCHFIELD, I WILL REQUIRE THAT YOU --

20  YOUR CLIENT THROUGH YOU, OF COURSE, SUBMIT

21  INFORMATION OF ALL MEDICAL CARE -- THE INSTANCES

22  WHERE INMATES WERE CHARGED FOR MEDICAL CARE AS A

23  RESULT OF HEAT-RELATED COMPLAINTS WHILE WORKING THE

24  FARM LINE.  AND I'D LIKE THAT DATA FOR THE LAST 24

25  MONTHS.  OKAY?

1        **MR. BLANCHFIELD:**  YES, YOUR HONOR.

2              AND IF I COULD, YOUR HONOR, YOU KNOW,

3    THE ANGOLA -- YOU KNOW, TAKING THAT *LEWIS* CASE VERY

4    SERIOUSLY, THE EMTs DON'T DO THAT ANYMORE.  THERE

5    HAVE BEEN SUBSTANTIAL MODIFICATIONS.  WE HAVE RNs IN

6    THERE DOING THINGS NOW.

7              SO TO TAKE A SHOT AT ANGOLA IN 2024 FOR

8    WHAT HAPPENED BEFORE 2020 IS NOT FAIR.

9        **THE COURT:**  SURE.  I UNDERSTAND YOUR

10   CONCERN.  AND THAT'S WHY I THINK IT IMPORTANT FOR THE

11   COURT TO CONSIDER AT LEAST BOTH CONTEMPORARY AS WELL

12   AS HISTORICAL DATA ON THAT ISSUE.  OKAY?

13       **MR. BLANCHFIELD:**  YES, YOUR HONOR.

14       **THE COURT:**  ALL RIGHT.

15             OKAY.  MS. WRIGHT, LET ME NEXT ASK

16   YOU -- LET'S COVER THE ELEMENTS REQUIRED TO PROVE FOR

17   THE ISSUANCE OF A TRO.  WHY DO YOU BELIEVE THAT THE

18   COURT, AT LEAST AT THIS JUNCTURE, SHOULD ISSUE THE

19   ORDER?

20             TAKING EACH OF THE ELEMENTS ONE AT A

21   TIME, THE LIKELIHOOD OF SUCCESS ON THE MERITS, WOULD

22   YOU LIKE TO SPEAK TO THAT?

23       **MS. WRIGHT:**  YES, YOUR HONOR.

24             I BELIEVE THAT OUR BRIEFING ALSO LAYS

25   THIS OUT QUITE CLEARLY.  WE'VE DEMONSTRATED A

1  LIKELIHOOD THAT PEOPLE SUCCEED AS TO THE EIGHTH

2  AMENDMENT CLAIM, WHICH IS WHAT THIS INJUNCTION IS

3  ASKING FOR AND THIS TRO IS ASKING FOR.  THE BRIEFING

4  SETS OUT THE DELIBERATE INDIFFERENCE STANDARD AND THE

5  PROOF THAT WE HAVE SET FORTH.  THE STATE IS

6  OBJECTIVELY DELIBERATE INDIFFERENCE AND ALSO

7  SUBJECTIVELY DELIBERATE INDIFFERENCE -- DELIBERATELY

8  INDIFFERENCE.  AND WE KNOW THAT KNOWINGLY PLACING AN

9  INCARCERATED PERSON ON A WORK DETAIL WHERE THE PRISON

10 KNOWS THAT IT COULD SIGNIFICANTLY AGGRAVATE HIS

11 PHYSICAL CONDITION CAN CONSTITUTE DELIBERATE

12 INDIFFERENCE.  WE BELIEVE THAT WE HAVE PROVED A

13 SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS AS TO

14 THAT CLAIM.

15          THERE IS ALSO VERY CLEARLY IRREPARABLE

16 INJURY WILL RESULT TO OUR PLAINTIFFS.  I HAVE GONE

17 THROUGH THE LIST OF INDIVIDUALS WHO WERE HARMED ON

18 THE FARM LINE JUST IN THE MONTH AND A HALF PRECEDING

19 THE STATUS CONFERENCE IN THIS CASE.  WE HAVE, YOU

20 KNOW, CURRENT PLAINTIFFS -- MYRON SMITH, ONE OF OUR

21 CURRENT PLAINTIFFS, HE WAS ASSIGNED TO FARM LINE 15B.

22          FOLLOWING THE STATUS CONFERENCE IN THIS

23 CASE ON MAY 16TH, PRISON OFFICIALS TOOK HIM OFF THE

24 FARM LINE.  THEY TOLD HIM HE DIDN'T HAVE TO REPORT TO

25 DUTY ANYMORE; HE COULD DO ANYTHING HE WANTED.  EXCUSE

1    ME.  HE DOESN'T HAVE A NEW JOB ASSIGNMENT.  THAT

2    MEANS IF HE DOESN'T SHOW UP TO THE FARM LINE DURING A

3    CALL-OUT, HE COULD RECEIVE A DISCIPLINARY VIOLATION.

4           **THE COURT:**  BUT HE HASN'T RECEIVED A

5    DISCIPLINARY WRITE-UP YET?

6           **MS. WRIGHT:**  HE HAS NOT RECEIVED ONE YET.

7           **THE COURT:**  SO THAT'S MY QUESTION TO YOU.

8    ACCORDING TO MR. BLANCHFIELD, HIS CLIENT IS AT LEAST

9    ATTEMPTING TO BE RESPONSIVE TO COMPLAINTS OF

10   HEAT-RELATED ILLNESSES BY THE WORKERS, THE OFFENDERS.

11           DO YOU HAVE ANY REASON TO DISPROVE THAT

12   OR TO DOUBT THAT, AT LEAST WITH RESPECT TO THE LAST

13   MONTH AND A HALF?

14           **MS. WRIGHT:**  I DO.  WE SPOKE YESTERDAY TO

15   ALL EIGHT INDIVIDUAL PLAINTIFFS WHO ARE CURRENTLY

16   INCARCERATED AT ANGOLA.  AND ONE OF THEM, MR.

17   GUILLORY, HE IS -- HE HASN'T HAD TO WORK THE FARM

18   LINE IN SEVERAL YEARS.  HE'S ENROLLED IN THE NEW MAN

19   PROGRAM, WHICH IS A SOBRIETY-BASED EDUCATIONAL

20   PROGRAM.

21           HE REPORTED THAT ANGOLA OFFICIALS HAVE

22   IN THE LAST TWO WEEKS OR SO STARTED COMING TO THE NEW

23   MAN EDUCATIONAL PROGRAM AND ASKING FOR VOLUNTEERS TO

24   PICK POTATOES IN THE FIELD, TO MOW THE LAWN, AND TO

25   USE WEED EATERS.  NOW, IN A COERCIVE ENVIRONMENT LIKE

1   A PRISON, THERE IS NO SUCH THING AS VOLUNTEERING.

2   AND HE HAS GONE OUT AND MOWED THE LAWN AND PICKED

3   WEEDS BECAUSE AN OFFICER HAS TOLD HIM TO.

4          **THE COURT:**  IS HE BEING PAID FOR THAT LABOR?

5          **MS. WRIGHT:**  HE'S NOT BEING PAID FOR THAT

6   LABOR.

7          RETURNING TO THE ELEMENTS OF A TRO, THE

8   THREATENED INJURIES TO -- INJURY TO THE PLAINTIFFS

9   OUTWEIGHS ANY INJURY TO THE DEFENDANTS.  WE'RE

10  TALKING ABOUT CRUEL AND UNUSUAL PUNISHMENT HERE AND

11  SERIOUS RISK TO EVEN THE YOUNGER AND HEALTHIER

12  PEOPLE.

13         BUT AS WE SEE AND AS WE KNOW FROM

14  *LEWIS,* FROM *BALL,* FROM *ALEX A,* FROM *GATES,* FROM THIS

15  LITANY OF CASES, INDIVIDUALS WHO ARE INCARCERATED ARE

16  LIKELY TO SUFFER FROM CHRONIC ILLNESS; THEY'RE LIKELY

17  TO TAKE MEDICATIONS LIKE ANTI-ANXIETY MEDICATIONS OR

18  ANTIDEPRESSANTS OR MEDICATIONS TO TREAT MENTAL

19  ILLNESS THAT IMPAIR THEIR BODY'S ABILITY TO

20  THERMOREGULATE.

21         WE KNOW THAT THOSE INDIVIDUALS, ANYBODY

22  AT ANGOLA -- ACTUALLY NEARLY ANYBODY AT ANGOLA --

23  COULD BE REASSIGNED TO THE FARM LINE AT ANY POINT.

24  INDIVIDUALS ON DEATH ROW, THEY'RE NOT GOING TO WORK

25  THE FARM LINE.  BUT NEARLY EVERYBODY ELSE AS A

1  DISCIPLINARY MEASURE COULD BE REASSIGNED TO THE FARM

2  LINE.  THEY'RE AT RISK OF ASSIGNMENT AT ANY POINT.

3          THE COURT:  BUT THERE IS NOTHING

4  UNCONSTITUTIONAL ABOUT BEING SENTENCED TO HARD LABOR.

5  CORRECT?

6          MS. WRIGHT:  THAT'S CORRECT.  AND THAT'S NOT

7  WHAT WE'RE ARGUING HERE.  IT'S THE FORM OF HARD LABOR

8  THAT IS THE FARM LINE.  AND AGAIN --

9          THE COURT:  THE FORM OF HARD LABOR THAT'S

10  INJURIOUS TO THE HEALTH OF THE OFFENDER?

11          MS. WRIGHT:  THAT'S RIGHT.  THAT'S EXACTLY

12  RIGHT.

13          THE COURT:  I UNDERSTAND.

14          MS. WRIGHT:  THAT'S EXACTLY RIGHT.

15          THE COURT:  AND THE FOURTH ELEMENT, WOULD

16  YOU LIKE TO ADDRESS THAT?

17          MS. WRIGHT:  THE INJUNCTION WILL NOT

18  DISSERVE THE PUBLIC INTEREST HERE.  THERE IS A LITANY

19  OF OTHER OPPORTUNITIES, JOB ASSIGNMENTS THAT ARE

20  AVAILABLE AT ANGOLA FOR INCARCERATED PEOPLE LIKE THE

21  NEW MAN GROUP.  AGAIN, ON THAT DAY OF OUR STATUS

22  CONFERENCE -- MAY 16TH, I BELIEVE IT WAS -- BOTH

23  MYRON SMITH AND ALVIN WILLIAMS WERE SUDDENLY -- FOUND

24  THEMSELVES TO BE PULLED OFF THE FARM LINE AND

25  ENROLLED IN THE NEW MAN GROUP.  THERE IS MANY OTHER

1    JOBS THAT INDIVIDUALS COULD DO.

2          **THE COURT:**  SO LET'S GO BACK TO THE SECOND

3    ELEMENT; THAT IS, THE THREAT OF IRREPARABLE INJURY.

4    HOW WOULD YOU SUGGEST THE COURT CONSIDER THAT

5    ELEMENT?

6               ARE YOU SUGGESTING THAT ALL AN OFFENDER

7    NEED DO IS TO SAY "I'M REALLY HOT.  I'M -- EVEN

8    THOUGH I'VE HAD WATER, I'VE HAD ATTIRE, I'VE HAD THE

9    PROTECTIVE GEAR AND I'VE BEEN ALLOWED," LET'S SAY,

10   SHOULD THE PRISON CREATE, SAY, A COOLING ZONE; THAT

11   ALL AN OFFENDER NEED DO IS COMPLAIN THAT THEY'RE HOT,

12   THEY'RE OVERHEATED AND THAT OFFICIALS WILL BE

13   REQUIRED TO THEN PULL THEM OFF THE LINE?

14         **MS. WRIGHT:**  WE'RE NOT ASKING THE PRISON TO

15   TAKE ANY AFFIRMATIVE STEPS TO MITIGATE THE HEAT

16   INDEX.  THIS IS NOT A CASE ABOUT A HEAT CEILING.

17   THIS IS A CASE ABOUT A HEAT TRIGGER.

18         **THE COURT:**  NO, I UNDERSTAND THAT.  BUT THE

19   ISSUE IS -- BUT HOW -- LET'S SAY IT'S 88, MAYBE

20   EVEN -- NOT EVEN 88 DEGREES INDEX.  LET'S SAY 82

21   DEGREES, AS MR. BLANCHFIELD INFORMED US AT SOME

22   RELEVANT PERIOD DURING THIS.  82-DEGREE HEAT INDEX,

23   LET'S SAY -- OR 72, I BELIEVE HE SAID.  BUT 82-,

24   LET'S SAY, DEGREE HEAT INDEX.  ARE YOU SUGGESTING

25   THAT ALL AN OFFENDER NEED DO IS SAY "I'M HOT.  I'M

1  SWEATING.  I THINK -- I DON'T FEEL WELL.  I'M

2  LIGHTHEADED," AND THAT SHOULD TRIGGER A REACTION OR

3  AN OBLIGATION OF PRISON OFFICIALS TO PULL THE

4  OFFENDER OFF THE LINE?

5          **MS. WRIGHT:**  I DO BELIEVE THAT THERE IS A

6  WAY TO COME UP WITH A PRINCIPLED POLICY AND A

7  WORKABLE POLICY HERE.

8          **THE COURT:**  AND WHAT WOULD THAT LOOK LIKE?

9          **MS. WRIGHT:**  WELL, IT WOULD BE TRIGGERED --

10  IT WOULD BE TIED TO THAT 88-DEGREE THRESHOLD, WHICH I

11  THINK BOTH PARTIES AGREE IS THE THRESHOLD AT WHICH

12  HEAT BECOMES DANGEROUS TO HUMAN HEALTH.  BECAUSE OF

13  THE WAY THAT HEAT ILLNESS WORKS, AN INDIVIDUAL CAN GO

14  FROM ZERO TO 60 IN A MINUTE'S TIME.  SOMEBODY CAN BE

15  HEALTHY AND WALKING AND TALKING AND THEN SUDDENLY BE

16  VOMITING, PASSING OUT, EXHIBITING SYMPTOMS OF

17  INTOXICATION WHEN THEY'RE NOT ACTUALLY INTOXICATED.

18          AND WHAT WE KNOW IS THAT THE PRISON

19  JUST SIMPLY DOES NOT HAVE AND IS NOT WILLING TO

20  IMPLEMENT THE ACTUAL TOOLS THAT IT WOULD NEED TO

21  MITIGATE THIS HARM.  THERE IS NO PPE.

22          **THE COURT:**  BUT YOU DON'T DISAGREE THAT THE

23  PRISON HAS AGREED, AT LEAST THROUGH ITS POLICIES,

24  THAT ONCE THE HEAT INDEX HITS 88, EVERYBODY COMES OFF

25  THE LINE?

1    **MS. WRIGHT:**  THAT IS NOT THE POLICY.  BUT

2    IF -- THAT IS WHAT WE ARE ASKING FOR.  THAT IS THE

3    INJUNCTION THAT WE ARE ASKING FOR.

4          **THE COURT:**  WHAT'S YOUR UNDERSTANDING OF THE

5    POLICY?

6          **MS. WRIGHT:**  MY UNDERSTANDING OF THE POLICY

7    IS THAT WHEN THE HEAT INDEX REACHES 88 DEGREES, THE

8    PRISON RECORDS IT.  PEOPLE ARE STILL WORKING WHEN

9    THERE IS A HEAT-PRECAUTION POLICY.  OUR PLAINTIFFS

10   HEAR -- HEAR IT COMING THROUGH ON THE WALKIE-TALKIES,

11   AND THEY'RE STILL WORKING IN THE FIELDS.

12          **THE COURT:**  ALL RIGHT.  THANK YOU.

13          MR. BLANCHFIELD, WOULD YOU LIKE TO

14   ADDRESS THAT?

15          AND SPECIFICALLY AM I CORRECT THAT THE

16   POLICY MANDATES -- MAYBE THAT'S TOO STRONG A WORD.

17   MAYBE IT'S THE INAPPROPRIATE WORD HERE -- THAT ONCE

18   THE HEAT INDEX HITS 88 DEGREES, THEY COME OFF THE

19   LINE?

20          **MR. BLANCHFIELD:**  ONCE IT HITS 88, YOUR

21   HONOR, ANYONE WITH A HEAT-RELATED ISSUE IS TAKEN

22   INSIDE.

23          **THE COURT:**  BUT NOT ALL OFFENDERS?

24          **MR. BLANCHFIELD:**  NOT ALL OFFENDERS.

25          NOW, WE ARE -- WE MANDATE BREAKS EVERY

1  30 MINUTES, WATER AND THINGS LIKE THAT.  BUT THEY --

2  YOU KNOW, THERE IS WORK GOING ON.  IF THE HEAT INDEX

3  HITS 88 BY 11:30, THERE CAN BE SOME WORK DONE IN THAT

4  HEAT.

5              AND, YOU KNOW, JUDGE --

6         **THE COURT:**  WAIT, WAIT, WAIT.  LET ME

7  UNDERSTAND.

8              AFTER 11:30, HEAT INDEX IS 88 DEGREES

9  PLUS, YOU STILL KEEP -- OR YOUR CLIENT STILL KEEPS

10 OFFENDERS OUT IN THE FIELD?

11        **MR. BLANCHFIELD:**  BEFORE 11:30.

12        **THE COURT:**  BEFORE ELEVEN --

13        **MR. BLANCHFIELD:**  THEY'RE IN BY 11:30.

14        **THE COURT:**  11:30?

15        **MR. BLANCHFIELD:**  CORRECT.

16        **THE COURT:**  VERY WELL.  WOULD YOU LIKE TO

17 REPLY TO MS. WRIGHT'S ARGUMENTS WITH RESPECT TO THE

18 ELEMENTS OF THE TRO?

19        **MR. BLANCHFIELD:**  SURE, YOUR HONOR.

20             YOU KNOW, THE SUBSTANTIAL LIKELIHOOD OF

21 SUCCESS ON THE MERITS, YOU KNOW, THEY'VE GOT TO SHOW

22 A SUBSTANTIAL RISK OF SERIOUS HARM.  WE BELIEVE WE'VE

23 MITIGATED ANY SUBSTANTIAL RISK OF SERIOUS HARM.  I

24 DON'T SEE HOW THEY POSSIBLY GET PAST THE SUBJECTIVE

25 EQUATION HERE, IN LIGHT OF ALL THE THINGS THAT WE'VE

1    DONE WITH OUR POLICIES.

2              YOU KNOW, WE ARE 18,000 ACRES.  WE

3    MAINTAIN THE WHOLE PLACE.  WE HAVE PEOPLE BUILDING

4    ROADS, WE HAVE PEOPLE PAINTING BUILDINGS, FIXING

5    ROOFS ALL DAY LONG.  THEY DON'T GO IN AT 11:30.

6    WE'VE GOT FOLKS RUNNING CATTLE, WE'VE GOT FOLKS

7    RUNNING HORSES.  THEY WORK ALL DAY LONG.  THEY'RE IN

8    THE FIELDS.  THEY'RE WELDING.  THEY'RE IN THE YARDS.

9    THERE IS NO COMPLAINT FROM THESE PEOPLE.  IT'S JUST

10   THE 7:00 A.M. TO 11:30, THE THREE FARM LINES THAT

11   WE'RE COMPLAINING ABOUT.  I DON'T SEE HOW THEY

12   POSSIBLY MEET THAT REQUIREMENT.

13        THE COURT:  WE'RE TALKING ABOUT THOSE WHO

14   DON'T SUFFER FROM THE KIND OF ADA-PROTECTED

15   CONDITIONS?

16        MR. BLANCHFIELD:  CORRECT, YOUR HONOR.

17   CORRECT.

18              AND ACCORDING TO THE WAY I READ

19   DR. VASSALLO'S DECLARATION, IS THAT IT'S UNSAFE TO

20   EVERYBODY; THE YOUNG --

21        THE COURT:  BUT -- AND THAT'S A FAIR

22   READING.  I UNDERSTAND THAT.

23              BUT WITH RESPECT TO THE SUBCLASS, ARE

24   YOU TELLING ME THAT EVEN THOSE PERSONS IN THE

25   SUBCLASS -- THAT IS, THOSE WHO SUFFER ADA-RELATED

1   CONDITIONS -- EVEN THOUGH THEY'RE NOT ON THE FARM

2   LINE, ARE THEY TOO REQUIRED -- DOES THIS POLICY APPLY

3   TO THEM?  THAT IS, IF IT'S AFTER 11:30 -- AND I KNOW

4   THEY'RE NOT PART OF THIS CLASS.  I UNDERSTAND.  BUT

5   NONETHELESS, THEY WILL CONTINUE TO WORK UNDER THOSE

6   CONDITIONS?  OR YOU DO YOU KNOW?  IF YOU DON'T

7   KNOW --

8             MR. BLANCHFIELD:  I DON'T KNOW.

9             THE COURT:  THAT'S FINE.

10            MR. BLANCHFIELD:  I DON'T KNOW THE ANSWER TO

11  THAT, JUDGE.  I DON'T KNOW.

12            YOU KNOW, THE SUBSTANTIAL THREAT OF

13  IRREPARABLE INJURY -- AND, YOU KNOW, THE CASE LAW IS

14  PRETTY CLEAR; THEY DON'T HAVE TO SHOW THAT PEOPLE ARE

15  DYING FROM HEAT.  THEY NEED TO SHOW A SUBSTANTIAL

16  RISK OF SERIOUS HARM.

17            BUT IN EVALUATING THAT RISK, JUST LIKE

18  WE DO IN EVALUATING ANY RISK, IF YOU'RE IN STATE

19  COURT ON A PREMISES LIABILITY, THE GENTLEMAN WHO

20  FALLS IN THE FOOTBALL BLEACHERS AND SAYS "THE

21  BLEACHERS ARE UNREASONABLY DANGEROUS" AND THE JUDGE

22  SAYS "WELL, LOOK, THESE BLEACHERS HAVE BEEN THERE FOR

23  25 YEARS.  NO ONE'S EVER HURT THEMSELVES," HOW CAN

24  THAT BE AN UNREASONABLE RISK OF HARM?

25            YOU KNOW, THEY CITE THIS CASE FROM

1   TEXAS, THE *MCCOLLUM* CASE, SOME PRETTY SERIOUS

2   HYPERTHERMIA ISSUES, SOME PRETTY SERIOUS INJURIES.  I

3   DON'T SEE THAT HERE.  THERE IS -- YOU KNOW, WE'RE NOT

4   SEEING PEOPLE DIE FROM HEAT STROKE.  THERE IS JUST

5   NOT THE HISTORY.

6           THE COURT:  RIGHT.  BUT, OF COURSE, DEATH

7   FROM HEAT STROKE IS NOT WHAT WE'RE CONCERNED ABOUT

8   HERE, OF COURSE, AS YOU ACKNOWLEDGE.

9               BUT WE ARE CONCERNED ABOUT WHETHER THE

10  MEDICAL RECORDS AND RECORDS OF MEDICAL TREATMENT,

11  MORE SPECIFICALLY, ARE ADEQUATELY DESCRIBED AND

12  MAINTAINED AND WHETHER THOSE RECORDS REVEAL THAT A

13  PERSON SHOULD HAVE BEEN TAKEN OFF THE LINE OR PERHAPS

14  WERE NOT TAKEN OFF THE LINE.  OF COURSE, THAT'S ONE

15  OF THE THINGS YOU-ALL WILL HAVE TO TAKE UP IN

16  DISCOVERY.

17          MR. BLANCHFIELD:  AGREEABLE, YOUR HONOR,

18  YES.

19          THE COURT:  NOW, LET ME -- WOULD YOU LIKE TO

20  ADD ANYTHING ELSE AT THIS POINT?

21          MR. BLANCHFIELD:  WELL, YOU KNOW, THERE IS

22  SOME ISSUE ABOUT THE THREATENED HARM.  I MEAN, IF

23  THIS INJUNCTION WERE TO ISSUE, THAT'S THE END OF THE

24  FARM LINE.  WE'VE -- YOU KNOW, WE ARE ABLE TO FEED

25  4,000 INMATES FRESH VEGETABLES DAILY.  WHEN IT'S

1   LEFTOVER VEGETABLES, WE SEND IT TO ANOTHER

2   CORRECTIONAL FACILITY.  IF THERE IS LEFTOVER THERE,

3   WE SEND IT TO THE FOOD BANK.  AN INJUNCTION WOULD LET

4   THOSE CROPS ESSENTIALLY ROT IN THE FIELDS AND --

5          **THE COURT:**  UNDERSTOOD.  UNDERSTOOD.  THANK

6   YOU, MR. BLANCHFIELD.

7          **MR. BLANCHFIELD:**  THANK YOU, JUDGE.

8          **THE COURT:**  NOW, LET'S TALK JUST A COUPLE OF

9   OTHER MATTERS BEFORE WE WRAP UP.  FIRST, THE CLASS

10  CERTIFICATION.

11          MS. WRIGHT, LET'S TALK ABOUT THAT.

12  YOU'VE NOT FILED YOUR -- HAVE YOU FILED YOUR MOTION

13  TO DEFINE THE CLASS?

14          **MS. WRIGHT:**  WE HAVE NOT FILED OUR MOTION

15  FOR CLASS CERTIFICATION YET, BUT OUR CLASSES ARE

16  DEFINED IN OUR AMENDED COMPLAINT.

17          **THE COURT:**  AND TELL ME:  WHAT ARE THE

18  ELEMENTS OR THE PARAMETERS OF THE CLASS AS YOU WOULD

19  HAVE THEM -- AS YOU WOULD DESCRIBE IT?

20          **MS. WRIGHT:**  WELL, AT THIS POINT THE CLASS

21  IS -- THE OPERATIONAL CLASS DEFINITION THAT WE WOULD

22  PROPOSE IS ALL CURRENT AND FUTURE PERSONS WHO ARE

23  INCARCERATED AT THE LOUISIANA STATE PENITENTIARY AND

24  WHO CURRENTLY OR MIGHT IN THE FUTURE BE COMPELLED TO

25  PARTICIPATE IN COMPULSORY AGRICULTURAL LABOR, WITH A

1  DISABILITY SUBCLASS OF ALL CURRENT AND FUTURE PERSONS

2  WITH DISABILITIES AS DEFINED UNDER THE ADA AND

3  SECTION 504 OF THE REHABILITATION ACT WHO ARE

4  INCARCERATED AT LSP AND WHO ARE CURRENTLY OR MIGHT IN

5  THE FUTURE BE COMPELLED TO PARTICIPATE IN COMPULSORY

6  AGRICULTURAL LABOR.

7       THE COURT:  VERY WELL.

8            AND, MR. BLANCHFIELD, OF COURSE, WHEN

9  AND IF THE MOTION FOR CLASS CERTIFICATION IS FILED,

10  YOU KNOW, YOU-ALL WILL HAVE AN OPPORTUNITY TO ADDRESS

11  THAT.

12            THE FINAL THING I WANT TO TAKE UP IS --

13  SECOND TO LAST THING -- AND I DON'T WANT TO BEAT A

14  DEAD HORSE.  BUT IT'S GOING TO BE ABSOLUTELY CRITICAL

15  FOR YOU-ALL TO TRY TO AGREE UPON A HEAT INDEX DATA

16  COLLECTION PROTOCOL.  AND AGAIN, I WILL GIVE YOU-ALL

17  -- I THINK I SAID, ANDREW, UNTIL FRIDAY FOR THAT;

18  FRIDAY, THE 21ST.  SO BY FRIDAY, THE 21ST, YOU-ALL --

19  I WILL ORDER THAT YOU MEET AND CONFER BETWEEN NOW AND

20  THEN AND SUBMIT A JOINT MEMORANDUM ON THAT ISSUE.

21  OKAY?

22            ANDREW, LET ME SEE YOU.

23            **(OFF THE RECORD)**

24       THE COURT:  ALL RIGHT.  SO LET ME ASK YOU --

25  COUNSEL, I INTEND TO SET A TRIAL IN THIS CASE FOR

1  SEPTEMBER.  IT WILL LIKELY BE SEPTEMBER 30TH.  THAT'S

2  THE DATE I'M GOING TO SELECT, NOT LIKELY.  BUT IT

3  WILL BE HELD ON SEPTEMBER 30TH.

4          THAT BEING THE CASE, I THINK IT'S

5  IMPORTANT FOR US TO FINISH UP DISCOVERY WELL BEFORE

6  THAT.  I'D LIKE TO HAVE, YOU KNOW, A FEW WEEKS BEFORE

7  THAT TO ADDRESS ANY PRETRIAL MOTIONS THAT MIGHT

8  ARISE.

9          DO YOU THINK THAT YOU-ALL CAN CONCLUDE

10  DISCOVERY BY AUGUST 9TH?

11          **MS. WRIGHT:**  YES, YOUR HONOR.

12          **THE COURT:**  MR. BLANCHFIELD?

13          **MR. BLANCHFIELD:**  YOUR HONOR, BASED ON THE

14  DISCOVERY THAT I'VE BEEN ISSUED, THERE IS NO WAY THAT

15  I CAN RESPOND TO -- I MEAN, IT'S PRETTY SIGNIFICANT.

16          **THE COURT:**  OKAY.  SO WHAT -- PRECISELY WHAT

17  IS THE -- WHAT'S BEEN REQUESTED THUS FAR?

18          **MR. BLANCHFIELD:**  YOU KNOW, TAKE AWAY THE

19  REQUEST FOR EMAILS.  OKAY?  IF WE DO THAT, I'M IN WAY

20  BETTER SHAPE.

21          **THE COURT:**  OKAY.

22          MS. WRIGHT, WOULD YOU LIKE TO RESPOND?

23          **MS. WRIGHT:**  WE'VE AGREED TO PROVIDE THE

24  DEFENDANTS WITH SEARCH TERMS.  AND I KNOW THAT THE

25  DOC IS WELL ACQUAINTED WITH ESI PROTOCOLS AND WAYS TO

1   SEARCH THEIR EMAILS.  THIS DOES NOT SEEM TO ME TO BE

2   AN INSURMOUNTABLE OR UNIQUE DISCOVERY OBLIGATION.

3          **THE COURT:**  LET'S GO ON AND TRY TO GET THAT

4   AS SOON AS POSSIBLE.  I SEED MR. VINING HERE.

5              I'M NOT CALLING YOU OUT, MR. VINING,

6   BUT YOU'VE ALWAYS BEEN GREAT ABOUT ASSISTING IN

7   MEETING THOSE DEADLINES, AND I'M SURE YOU WILL AGAIN

8   TODAY.  SO THANK YOU, IF YOU COULD WORK CLOSELY WITH

9   MR. BLANCHFIELD AND MS. WRIGHT.  IF NECESSARY, I'D

10  ASK YOU TO REEVALUATE YOUR SEARCH TERM REQUEST SO

11  THAT WE CAN MAKE THAT DEADLINE IF POSSIBLE.

12             BUT AGAIN, THE DISCOVERY DEADLINE WILL

13  BE RESET TO AUGUST 9TH; FRIDAY, AUGUST 9TH.  THE

14  TRIAL IN THIS MATTER, AGAIN, WILL BE SET FOR MONDAY,

15  SEPTEMBER 30TH.  AND I WILL SCHEDULE A PRETRIAL

16  CONFERENCE BEFORE THAT.  I WILL SET THAT AT A LATER

17  TIME.  THAT WILL BE CONTAINED IN THE AMENDED

18  SCHEDULING ORDER THAT THE COURT WILL ISSUE.

19             NOW, ANY OTHER QUESTIONS ABOUT

20  DEADLINES?

21         **MS. WRIGHT:**  NO, YOUR HONOR.

22         **THE COURT:**  AT LEAST AT THIS TIME.

23         **MR. BLANCHFIELD:**  NO, JUDGE.

24         **THE COURT:**  FINALLY LET ME ASK -- FIRST OF

25  ALL, AS I MENTIONED EARLIER, I COMMEND BOTH SIDES.

1    YOU KNOW, THE GOOD THING FOR THE COURT AND I THINK

2    FOR THE PARTIES, THAT THERE ARE OUTSTANDING COUNSEL

3    ON BOTH SIDES OF THIS CASE.  BOTH OF YOU HAVE A

4    STRONG TRACK RECORD OF WORKING WELL WITH YOUR

5    OPPONENTS AND CERTAINLY ACCOMMODATING THE COURT WHEN

6    THE COURT SHOULD BE ACCOMMODATED.

7                    AND THE COURT WILL, OF COURSE, MR.

8    BLANCHFIELD, REQUIRE A VISIT TO ANGOLA TO INSPECT THE

9    CONDITIONS.  I WILL HAVE TO COORDINATE WITH THE U.S.

10   MARSHAL ABOUT THAT, OF COURSE.

11                   AND, OF COURSE, MS. WRIGHT, YOU AND MR.

12   COMEAU WILL BE MADE AWARE OF THAT DATE AS WELL.

13                   I WOULD URGE YOU TO CONTINUE TO DISCUSS

14   POSSIBLE SOLUTIONS, BECAUSE IT SOUNDS TO ME LIKE BOTH

15   SIDES ARE WILLING TO BE REASONABLE.  I DON'T THINK

16   EITHER SIDE HAS TAKEN AN UNREASONABLE APPROACH IN

17   THIS CASE.

18                   I AM A LITTLE CONCERNED, HOWEVER, MR.

19   BLANCHFIELD, THAT NO SHADE IS PROVIDED TO THE

20   OFFENDERS OUT IN THE FIELD.  AND I WOULD ASK YOU TO

21   CONSIDER -- SPEAK TO YOUR CLIENT.  AND I'M SURE MR.

22   VINING CAN BE OF ASSISTANCE TO THIS AS WELL.  YOU

23   KNOW, SHADE IS ESSENTIAL.

24                   AS YOU KNOW, I'M SURE, OSHA, THE

25   OCCUPATIONAL HEALTH AND SAFETY ADMINISTRATION,

1  STRONGLY URGES THAT FIELD WORKERS HAVE COOLING

2  SPACES, I GUESS, AS THEY CALL IT, SOME SHADE THAT

3  THEY CAN TAKE REFUGE IN FOR -- DURING INTERMITTENT

4  TIMES JUST TO GET OUT OF THE SUN.  SOMETIMES YOU NEED

5  TO JUST GET OUT OF THE DIRECT SUNLIGHT TO RECOVER AND

6  TO COMPLETE A TASK.

7          SO I WOULD ASK YOU TO, AT A MINIMUM,

8  COME UP IN THE NEAR TERM NOW -- AND I'M ASKING YOU.

9  I DON'T WANT TO HAVE TO ORDER THAT THIS BE DONE AFTER

10 TRIAL.  I'M NOT SUGGESTING THAT I AM PREDISPOSED TO

11 RULING ONE WAY OR ANOTHER.  BUT BASED UPON

12 RECOMMENDATIONS FROM VARIOUS GOVERNMENT AGENCIES AS

13 WELL AS INDUSTRY ORGANIZATIONS THAT REPRESENT FARMS

14 THEMSELVES AND AGRICULTURAL COMPANIES, THEY TOO

15 RECOMMEND FOR THE FIELD WORKERS -- AND YOU CAN LOOK

16 UP -- I MEAN, IT'S READILY AVAILABLE IN PUBLIC

17 SOURCES -- THEY TOO RECOMMEND SOME KIND OF COOLING

18 SPACES.  SO I WOULD ASK YOU TO DISCUSS THAT WITH YOUR

19 CLIENT.  OKAY?

20          MR. BLANCHFIELD:  YES, YOUR HONOR.

21          THE COURT:  ALL RIGHT.  AND THEN FINALLY

22 WITH RESPECT TO THE, YOU KNOW, QUALITY OF THE WATER

23 AND THAT SORT OF THING, I THINK THAT WOULD BE

24 IMPORTANT TO AT LEAST LOOK INTO.  BUT AGAIN, MR.

25 BLANCHFIELD, NO CHANGES MADE WITHOUT MY CONSENT.

**1**          AND I WOULD ALSO ASK YOU, MR.

**2**   BLANCHFIELD, TO DISCUSS WITH YOUR CLIENT A MEANS OF

**3**   DOCUMENTING THOSE OCCASIONS WHEN THE OFFENDERS TAKE

**4**   BREAKS OR ARE PERMITTED TO TAKE BREAKS.  I THINK THAT

**5**   WILL GO A LONG WAY.  BECAUSE RIGHT NOW I HAVE

**6**   ALLEGATIONS THAT WILL BE BASED, AS YOU-ALL KNOW, ON

**7**   PAROL EVIDENCE, ON TESTIMONY.  AND IT'S ALWAYS GOOD

**8**   TO SEE DOCUMENTATION OF SOME OF THESE FACTORS FOR THE

**9**   COURT TO ISSUE THE APPROPRIATE RULING.  OKAY?

**10**          **MR. BLANCHFIELD:**  YES, YOUR HONOR.

**11**          **THE COURT:**  MR. BLANCHFIELD, SINCE YOU'RE AT

**12**   THE PODIUM, ANY QUESTIONS GOING FORWARD, SIR?

**13**          **MR. BLANCHFIELD:**  I DON'T BELIEVE SO, YOUR

**14**   HONOR.

**15**          **THE COURT:**  OKAY.

**16**          MS. WRIGHT?

**17**          **MS. WRIGHT:**  NO, YOUR HONOR.  THANK YOU.

**18**          **THE COURT:**  OKAY.  THE COURT WILL ISSUE A

**19**   RULING -- OF COURSE, THIS IS A TRO, BUT I WILL ISSUE

**20**   A RULING ON THE TRO FORTHWITH.

**21**          BUT LET ME THANK BOTH OF YOU FOR COMING

**22**   ON IN TODAY, FOR BEING WELL-PREPARED.  THIS HAS BEEN

**23**   VERY HELPFUL TO ME.  I HAVE CERTAINLY A MUCH BETTER

**24**   UNDERSTANDING OF SOME OF THE FACTS THAT WILL INFORM

**25**   THE COURT'S DECISION.  AND SO I AGAIN APPRECIATE BOTH

1   OF YOU JOINING ME AND HELPING OUT WITH THESE MATTERS.

2   OKAY?

3               ALL RIGHT.  THERE BEING NO FURTHER

4   BUSINESS FOR THE COURT, COURT IS NOW ADJOURNED.

5               **THE LAW CLERK:**  ALL RISE.

6               COURT IS NOW ADJOURNED.

7               **(WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)**

8               **C E R T I F I C A T E**

9           **I CERTIFY THAT THE FOREGOING IS A CORRECT**

10  **TRANSCRIPT FROM THE RECORD OF THE PROCEEDINGS IN THE**

11  **ABOVE-ENTITLED NUMBERED MATTER.**

12  **S:/NATALIE W. BREAUX**

13  **NATALIE W. BREAUX, RPR, CRR**

14  **OFFICIAL COURT REPORTER**

15

16

17

18

19

20

21

22

23

24

25