## IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **VOICE OF THE EXPERIENCED**, a membership organization on behalf of itself and its members; and **MYRON SMITH, DAMARIS JACKSON, NATE WALKER, DARRIUS WILLIAMS, KEVIAS HICKS, JOSEPH GUILLORY, KENDRICK STEVENSON,** and **ALVIN WILLIAMS,** on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs*,<br><br>     v.<br><br>**JAMES LEBLANC**, in his official capacity as Secretary of the Louisiana Department of Public Safety and Corrections; **TIMOTHY HOOPER**, in his official capacity as Warden of Louisiana State Penitentiary; **MISTY STAGG**, in her official capacity as Director of Prison Enterprises, Inc.; the **LOUISIANA DEPARTMENT OF PUBLIC SAFETY & CORRECTIONS**; and **PRISON ENTERPRISES, INC.**<br><br>*Defendants*. | Civil Action No.: 3:23-cv-1304-BAJ-EWD |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR CLASS CERTIFICATION

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

FACTUAL BACKGROUND ......................................................................................... 2

    A.    Angola's History of Compelled Labor from Chattel Slavery to Farm Line ........... 2

    B.    Assignment to the Farm Line .............................................................................. 4

    C.    Conditions on the Farm Line ............................................................................. 5

    D.    Defendants' Deficient ADA Policies and Practices ........................................... 10

    E.    Plaintiffs and the Proposed General Class and the ADA Subclass ..................... 11

LEGAL STANDARD .................................................................................................. 12

ARGUMENT ............................................................................................................... 12

I.    THE PROPOSED CLASSES SATISFY THE REQUIREMENTS OF RULE 23(a) ...... 12

    A.    Numerosity ....................................................................................................... 12

    B.    Commonality ..................................................................................................... 14

        1.    General Class .......................................................................................... 15

        2.    ADA Subclass ......................................................................................... 18

    C.    Typicality .......................................................................................................... 19

    D.    Adequacy .......................................................................................................... 20

        1.    Named Plaintiffs ..................................................................................... 20

        2.    Adequacy and Appointment of Class Counsel under Rule 23(g) ............. 21

II.    THE PROPOSED CLASSES SATISFY THE REQUIREMENTS OF RULE 23(b)(2) .................................................................................................................. 22

III.    THE PROPOSED CLASSES ARE ASCERTAINABLE ............................................. 23

CONCLUSION ............................................................................................................ 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alex A. by and through Smith* v. *Edwards*,
2023 WL 5628592 (M.D. La. Aug. 31, 2023) ..................................................................14, 23

*Allison* v. *Citgo Petroleum Corp.*,
151 F.3d 402 (5th Cir. 1998) ...........................................................................................12

*Amchem Products, Inc.* v. *Windsor*,
521 U.S. 591 (1997)...........................................................................................................12

*Cain* v. *City of New Orleans*,
327 F.R.D. 111 (E.D. La. 2018)..........................................................................................20

*Castano* v. *Am. Tobacco Co.*,
84 F.3d 734 (5th Cir. 1996) ...............................................................................................12

*Cole* v. *Livingston*,
2016 WL 3258345 (S.D. Tex. June 14, 2016)..........................................................17, 19, 24

*In re Deepwater Horizon*,
739 F.3d 790 (5th Cir. 2014) .............................................................................................14

*Dockery* v. *Fischer*,
253 F. Supp. 3d 832 (S.D. Miss. 2015).......................................................................*passim*

*Everson* v. *Bunch*,
2016 WL 3255023 (M.D. La. June 13, 2016)......................................................................20

*Frey* v. *First Nat. Bank Southwest*,
602 F. App'x 164 (5th Cir. 2015) .......................................................................................23

*John* v. *Nat'l Sec. Fire & Cas Co.*,
501 F.3d 443 (5th Cir. 2007) .............................................................................................12

*Jones* v. *Gusman*,
296 F.R.D. 416 (E.D. La. 2013)...................................................................................14, 15

*Lane* v. *Campus Fed. Credit Union*,
2017 WL 3719976 (M.D. La. May 16, 2017)......................................................................19

*Lewis* v. *Cain*,
324 F.R.D. 159 (M.D. La. 2018) ...........................................................................12, 13, 17, 19

*Maldonado* v. *Ochsner Clinic Found.*,
   493 F.3d 521 (5th Cir. 2007) ................................................22

*In re Monumental Life Ins. Co.*,
   365 F.3d 408 (5th Cir. 2004) ...........................................23, 24

*Mullen* v. *Treasure Chest Casino, L.L.C.*,
   186 F.3d 620 (5th Cir. 1999) ...........................................12, 19

*Neese* v. *Becerra*,
   342 F.R.D. 399 (N.D. Tex. 2022) ..........................................24

*Pederson* v. *Kinder Morgan Inc.*,
   345 F.R.D. 302 (S.D. Tex. 2024) ..........................................12

*Pederson* v. *La. State Univ.*,
   213 F.3d 858 (5th Cir. 2000) .............................................12

*Prantil* v. *Arkema Inc.*,
   986 F.3d 570 (5th Cir. 2021) .............................................22

*Slade* v. *Progressive Sec. Ins. Co.*,
   856 F.3d 408 (5th Cir. 2017) .............................................21

*Tellis* v. *LeBlanc*,
   2021 WL 4267513 (W.D. La. Sept. 20, 2021) .............................21, 23

*Valentine* v. *Collier*,
   2020 WL 3491999 (S.D. Tex. June 27, 2020) ...............................21

*Yates* v. *Collier*,
   868 F.3d 354 (5th Cir. 2017) .................................14, 17, 22, 23

**Statutes**

Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ................................ *passim*

Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq*..............................1, 11, 19

**Other Authorities**

U.S. Const. amend. VIII.................................................................... *passim*

Fed. R. Civ. P. 23 ........................................................................ *passim*

Plaintiffs respectfully submit this memorandum of law in support of their motion for class certification, brought pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2).

## INTRODUCTION

Plaintiffs, individually, and on behalf of the proposed classes defined below, challenge Defendants' operation of the "Farm Line," an unlawful, degrading, and dangerous disciplinary practice through which Defendants compel men incarcerated at Louisiana State Penitentiary ("LSP" or "Angola") to labor under conditions reminiscent of nineteenth-century slavery.[1]  As Plaintiffs and class members will demonstrate at trial, the Farm Line is unlawful under the U.S. Constitution, Title II of the Americans with Disabilities Act (the "ADA"), and Section 504 of the Rehabilitation Act of 1973 ("Section 504").  The Named Plaintiffs now move for certification of:

1. The General Class, comprising all people incarcerated at LSP who currently are, or may in the future be, assigned to the Farm Line.  Plaintiffs Myron Smith, Damaris Jackson, Nate Walker, Darrius Williams, Kevias Hicks, Joseph Guillory, and Alvin Williams (collectively, the "Named Plaintiffs") seek to represent the General Class.[2]

2. The ADA Subclass, comprising all people incarcerated at LSP who have disabilities that substantially limit one or more of their major life activities and who currently are, or may in the future be, assigned to the Farm Line.  Damaris Jackson, Nate Walker, Kevias Hicks, and Joseph Guillory (collectively, the "ADA Plaintiffs") seek to represent the ADA Subclass.

Because the proposed General Class and proposed ADA Subclass (together, the "Classes"), who bring this action for injunctive and declaratory relief, satisfy the requirements of Federal Rules

---

[1]    The "Farm Line" refers to the compulsory agricultural labor program operated at Angola currently performed by Lines 15, 15b, 24, and 25.  It does not include Angola's commodity crop agricultural labor programs.

[2]    Plaintiff Voice of the Experienced does not seek to act as a class representative in this action.

of Civil Procedure 23(a) and 23(b)(2), and because class certification is essential to the fair and efficient adjudication of this action, Plaintiffs' motion for class certification should be granted.

## FACTUAL BACKGROUND

### A.    Angola's History of Compelled Labor from Chattel Slavery to Farm Line

LSP is the nation's largest maximum-security prison.  Spanning 18,000 acres, it currently incarcerates a population of nearly 4,000 men, approximately 75 percent of whom are Black.  *See* Ex. 1; Ex. 2, Sbicca Dep. 46:16–18.

LSP is commonly known as "Angola," an ignominious moniker that recalls LSP's notorious history:  the penitentiary is built on the grounds of a former slave plantation that was owned by one of the biggest slave traders in the South and that was called "Angola" due to the perception that the "best" enslaved people came from that country in Africa.  *See* Ex. 3, Vittorio Emails 0023677, at -677; Ex. 4, FarmLine_00000632, at -633l; Ex. 55, Sbicca Report ¶ 84.  After the Civil War, the Angola plantation became the site of a new form of forced labor when it was sold to Samuel James, a former Confederate Army major who held the lease to manage the state's prison.  *See* Ex. 5, FarmLine_00001132, at -133; Ex. 6, FarmLine_0000070, at -704, -710; Ex. 55, Sbicca Report ¶ 84.  For several decades, James and his family profited from the land by leasing incarcerated people from the state—a practice known as "convict leasing"—, housing them in dilapidated former slave quarters, and forcing them to perform agricultural labor.  *See* Ex. 6, FarmLine_0000070, at -711–13.  In 1901, the State of Louisiana purchased the property and has operated it ever since.  *See id.* at -713; Ex. 5, FarmLine_00001132, at -135; Ex. 55, Sbicca Report ¶ 84.  The practice of convict leasing continued after the state's purchase up until the point that agricultural production of cotton and sugar cane on the penitentiary grounds became more profitable.  Ex. 55, Sbicca Report  ¶ 84.  Thus, from the pre-Civil War period to this day, Angola

has been the site of uninterrupted dehumanizing agricultural labor performed by people stripped of their freedom.  Today that legacy continues through the Farm Line.

As they have for generations, Defendants continue to run LSP as a plantation via the Farm Line, the punitive agricultural work program that currently operates out of housing Camps C and D.  Thus, on historical plantation grounds, Defendants force incarcerated men—overwhelmingly Black men—to plant and harvest many of the same vegetables that were grown on those same grounds during chattel slavery.  *See* Ex. 7, VOTE000387, at -387–389; Ex. 8, Gulino Dep. 76:1–16, 80:25–81:10.  The operation is not run in a manner that would enhance vegetable yield, but rather in a manner that extracts punishment and degrades the people performing labor.  *See* Ex. 2, Sbicca Dep. 56:7–13; Ex. 55, Sbicca Report ¶ 14; Ex. 56, Green Supp. Decl. ¶ 3.

So-called "pushers," LSP staff who oversee the Farm Line, assign the men to work overgrown vegetable rows that stretch hundreds of feet long.  Ex. 8, Gulino Dep. 55:2–56:10; Ex. 56, Green Supp. Decl. ¶ 16.  Per Defendants' policies, if the men don't work fast enough, they are subject to discipline.  *See* Ex. 9, 022238, at -273; *see also* Ex. 10, Scott Dep. 93:22–97:7 (pushers themselves are subject to disciplinary sanctions, including lost wages or termination, if men on the Farm Line do not satisfactorily complete their work).  If the incarcerated men on the Farm Line refuse to work, they are subject to solitary confinement.  Ex. 11, Hebert Dep. 86:12–24; Ex. 12, Davis Dep. 46:11–14; *see also* ECF No. 37-14, Smith Decl. ¶¶ 20–21; ECF No. 37-16, Walker Decl. ¶¶ 16–17; ECF No. 37-17, A. Williams Decl. ¶¶ 16–17.  The men perform their work surrounded by "gun guards," whose AR-15 rifles are meant to ensure the men do not get out of line.  *See* Ex. 10, Scott Dep. 36:18–38:7; Ex. 13, Sylvester Dep. 20:24–21:4; Ex. 14, FarmLine_00002598, at 2:53–3:15; *see also* Jones Decl. ¶ 3; Ex. 57, Hammonds Report ¶ 17. Although LSP has modern farming equipment, men on the Farm Line are not provided such tools

or adequate protective equipment, but rather are forced to pick vegetables by hand.  Ex. 8, Gulino Dep. 89:2–8, 181:9–12, 182:2–20; Ex. 56, Green Supp. Decl. ¶¶ 4–10.

### B.    Assignment to the Farm Line

Defendants are aware that LSP's status as a former slave plantation "is a very sensitive subject" to "society in general," Ex. 15, Vittorio Dep. 59:25–60:25, and, in recent years, have begun to avoid using the name "Angola" to refer to LSP, *see id.*; Ex. 16, Keldie Dep. 83:1–7, because even outsiders recognize that the term "Angola has negative connotations," *id.* at 82:14–25.[3]  But, while LSP has attempted to white-wash its public-facing narrative, when it comes to assigning men to work the Farm Line, Defendants simply ignore the "sensitivities" raised by LSP's plantation past and the "resemblance" between "slaves working in the field . . . [and] a Farm Line working in the field."  Ex. 15, Vittorio Dep. 61:17–20; Ex. 18, Pidgeon Dep. 159:2–12.

As of the summer of 2024, hundreds of men are assigned to the Farm Line each week across Lines 15, 15B, 24, and 25, and all of these men are thus at risk of being forced to work in the fields.  *See, e.g.*, Ex. 19, 029910, at -910–11; Ex. 14, FarmLine_00002598.  On any given day, anywhere from approximately 20 to 75 men are forced to work on the Farm Line.  *See* Ex. 13, Sylvester Dep. 63:20–64:22.  High ranking Angola officials, including the Head Warden, Timothy Hooper, and the Assistant Warden of Field Operations, Roland Sylvester, have expressed a desire to expand the Farm Line.  Ex. 20, Hooper Dep. 38:1–39:4; Ex. 13, Sylvester Dep. 60:18–63:13.

Nearly all men at LSP are, have been, or will be assigned to the Farm Line.  Defendants require all new arrivals at LSP to work on the Farm Line as their first job assignment at the prison if they are medically cleared to work.  *See* Ex. 21, Vittorio Emails 0019325, at -325.27; Ex. 12,

---

[3]    In unofficial communications, however, staff continue to use LSP and Angola interchangeably, *see e.g.*, Ex. 12, Davis Dep. 71:14–72:3; Ex. 17, Vittorio Emails 0023675, and every person deposed in this action has acknowledged their familiarity with the name Angola as a term for LSP.

Davis Dep. 19:14–20; *see also* Ex. 11, Hebert Dep. 60:12–16 (approximately 70-80% of new arrivals are assigned to the Farm Line as their first job at LSP).  The prevailing wisdom is that Defendants do this as a means to "break" new arrivals and ensure their submission.  For example, the Field Operations Colonel at LSP testified that he believes "every one" of LSP's new arrivals "should start on the field line" to help address "disciplinary problems" at the prison.  Ex. 11, Hebert Dep. 62:23–63:20.  And nearly all men at LSP, regardless of their status, face constant risk of reassignment to the Farm Line as a result of disciplinary infractions, *see* Ex. 12, Davis Dep. 20:18–25; Ex. 20, Hooper Dep. 32:12–15, or indeed for reasons as amorphous as the "needs and resources" of the "institution," Ex. 15, Vittorio Dep. 76:15–18; *see also* Ex. 22, Sanders Emails 045286, at -286 (officers threatening assignment to the Farm Line as a means to coerce behavior).

### C.    Conditions on the Farm Line

The Farm Line is widely considered to be the lowest, least desirable form of labor at Angola.  *See* Ex. 23, Toce Dep. 194:6–195:25; Ex. 12, Davis Dep. 47:7–19; Faria Decl. ¶ 9. Conditions on the Farm Line are dangerous and degrading.

While everyone incarcerated at Angola is required to have a job, unlike other prison jobs and programming, the Farm Line is not intended as educational or vocational training.  Ex. 15, Vittorio Dep. 43:17–44:7; *see also* Ex. 55, Sbicca Report ¶ 86; Faria Decl. ¶ 4.  Rather, as Angola's Medical Director, Dr. Paul Toce, candidly admits, "The Farm Line is considered to be punishment. The Farm Line is considered degrading."  Ex. 23, Toce Dep. 194:6–16.  Dr. Toce describes the "social connotations" of the Farm Line as being shameful, *id.*, explaining, "they're considered subpar inmates if they can't connive their way out of the field, if they can't work some kind of false medical claim or fake some illness or act out and get locked up, if they can't do something else besides working the field," *id.* at 194:17–195:2.

For their labor, men on the Farm Line are either not compensated at all, or their compensation ranges from 2 to 4 cents an hour. *See* Ex. 15, Vittorio Dep. 86:17–89:22. No job assignment at Angola pays less than the Farm Line. *See* Ex. 24, Vittorio Emails 0030376, at -376.05. Indeed, at 2 cents an hour, purchasing basic necessities like a stick of deodorant requires at least 189 hours of work, buying the cheapest soap requires nearly 70 hours of work, and buying a postage stamp requires more than a week's worth of work. *See* Ex. 25, 022745, at -748–49.

Working the Farm Line is physically difficult. It requires constant bending, lifting heavy loads, walking on uneven terrain, and other difficult tasks. *See* Ex. 26, FarmLine_00002614; Ex. 56, Green Supp. Decl. ¶¶ 4–5; *see also* Ex. 27, 022415, at -417 (patient reported that he "stepped off of the tractor from unloading the zuc[c]hini" on the Farm Line and got dizzy and began seeing spots); Morehead Decl. ¶ 8 (witness experienced shooting pain down his back every time he bent down to pick crops from the field). Those tasks are made more difficult and dangerous by the poorly maintained fields that are overgrown with weeds, creating tripping hazards and providing habitats for snakes and other pests. *See* Ex. 56, Green Supp. Decl. ¶¶ 12–13. Sanitary precautions are nearly non-existent: a single port-a-potty is available for the dozens of men working on the line; soap and paper towels are not provided; water jugs are placed directly on the ground; and LSP's policies limiting the distribution of drinking cups means men are forced to bring their cups into the fields as they dig in the earth. *Id.* ¶¶ 8–9; Ex. 28, Green Dep. 75:17-76:5; Ex. 29, FarmLine_00002607, at 1:39.

Conditions on the Farm Line become even more dangerous—indeed, life-threatening—on hot days. *See* ECF No. 37-3, Vassallo Decl. ¶¶ 16–17. Defendants regularly require men on the Farm Line to labor under heat indices of 88 degrees Fahrenheit or higher. *See, e.g.*, ECF Nos. 117, 116, 114. As Dr. Susi Vassallo, a nationally-recognized expert on heat-related illness, opines,

performing labor under heat indices at or above this threshold of 88 degrees is associated with a substantial risk of serious harm to all individuals. *See* ECF No. 37-3, Vassallo Decl. ¶¶ 16–17; Ex. 59, Vassallo Second Supp. Decl. ¶ 1. Defendants' own chief medical director, Dr. Randy Lavespere, agrees that it is important for everyone to exercise caution when the heat index reaches this threshold in order to protect human health. Ex. 30, Lavespere Dep. 103:7–104:17.

Medical care on the Farm Line is constitutionally inadequate. For example, numerous self-declared medical emergencies have taken place on the Farm Line this summer alone, some of which have been serious and apparently heat-related. *See, e.g.*, Ex. 27, 022415 (57-year-old who reported symptoms of dizziness, seeing spots, and cramping while working was transferred to the ATU and treated for clinical dehydration); Ex. 31, 022367 (53-year-old experienced head spinning for an hour). When emergencies take place in the fields, medical care is slow to respond, at times taking half an hour or more to arrive. *See* Ex. 59, Vassallo Second Supp. Decl. ¶ 8.[4]

Beyond being merely deficient, testimony from the medical directors of DOC and Angola, respectively, displays medical personnel's disdain for the people in their care. *See, e.g.*, Ex. 30, Lavespere Dep. 234:21–236:16; Ex. 23, Toce Dep. 194:6–195:25; *see also* Ex. 16, Keldie Dep. 248:21–249:25. Citing the concepts of "soundness" and "feigned illness" to describe enslaved plantation workers, Dr. Evelynn Hammonds, Professor of the History of Science and African and African American Studies at Harvard University, situates such cynicism within a long and "harmful tradition" of medical providers discounting the medical needs of dehumanized laborers. Ex. 57, Hammonds Report ¶¶ 19–22.

---

[4]    *See, e.g.*, Ex. 32, 022443 (patient with prediabetes and hypertension who was unable to walk unassisted and experiencing dizziness); Ex. 33, 022461 (patient with prediabetes and history of syncope experiencing severe dizziness); Ex. 34, 022493 (60-year-old patient with history of syncope and spinal deformity experiencing "shocking" back pain); Ex. 35, 022512 (patient with a BMI of 53.75 and major depression experiencing vomiting); Ex. 36, 022709 (57-year-old patient experiencing dizziness).

Defendants maintain several heat-related policies, including Healthcare Policy No. HCP8 ("HCP8"), which is DOC's department-wide heat pathology policy, *see* Ex. 37, 017941, and LSP Directive No. 13.067, which applies only at LSP but is functionally identical to HCP8, *see* Ex. 38, 017895; Ex. 30, Lavespere Dep. 124:8–21, 125:7–16.  These policies provide for certain precautions to be taken when the heat index reaches 88 degrees Fahrenheit.  *See* Ex. 37, 017941, at -944–45.  Additionally, in response to this litigation and this Court's order providing emergency relief, Defendants implemented preliminary ameliorative measures such as erecting a shade tent in the field, *see* ECF No. 86, which were deemed to be inadequate, *see* ECF No. 109, and later issued a notice stating that further heat-related procedures, such as providing more shade and more frequent and longer breaks, would be required, *see* Ex. 39, ECF No. 111-2.

Defendants' policies nominally recognize that additional precautions are warranted for all individuals who have increased vulnerability to heat-related illness as a result of having chronic illnesses or taking medications that decrease their ability to thermoregulate, and accordingly provide that such individuals should be granted Heat Precaution Duty Status.  *See* Ex. 37, 017941, at -941, 943–44; *see also* Ex. 59, Reynolds-Barnes Report at 2 (Defendants' purported expert agreeing that "[t]here are medications that increase the risk for heat pathology").  In practice, Defendants assign Heat Precaution Duty Status to incarcerated individuals by maintaining a list of "Heat Pathology Medications" and providing Heat Precaution Duty Status to any person who is prescribed a medication on that list.  *See* Ex. 37, 017941, at -940; Ex. 30, Lavespere Dep. 90:2–13.

Defendants have repeatedly conceded that they routinely fail to comply with their heat precaution policies.  *See, e.g.*, Ex. 18, Pidgeon Dep. 146:6–147:5 (agreeing that LSP employees fail to maintain required records documenting breaks and water on the Farm Line); Ex. 11, Hebert

Dep. 98:5–99:18, 102:22–103:5 (agreeing that documentation from the Farm Line had failed to properly document whether or not heat pathology policies were being followed).

But, even if Defendants followed their policies, those policies, as Defendants are well aware, are inadequate to protect against the heat-related harms of the Farm Line.  *See* ECF No. 37-3, Vassallo Decl. ¶¶ 95–98.   For example, Dr. Lavespere has acknowledged that the Heat Pathology Medications list needs to be "looked at" and potentially expanded, but Defendants *still* have not done so and have instead continued to use their out-of-date 2018 list for the hottest months of 2024.  *See* Ex. 30, Lavespere Dep. 152:16–154:20; *see also* Ex. 40, LavespereEmails0015153; Ex. 41.   Indeed, when asked when Defendants plan to incorporate much-needed changes to the Heat Pathology Medications list, Dr. Lavespere gestured to litigation strategy rather than the well-being of the men in Defendants' custody, suggesting that the timing of any updates to the list would revolve around the trial date set in this case.   *See* Ex. 30, Lavespere Dep. 265:8–267:18. Defendants' purported medical expert, Dr. Carl Keldie, confirmed that the additional medications that should be added to the list will be added *because of this litigation*.  Ex. 16, Keldie Dep. 181:18–184:3.  Dr. Toce has conceded that purported institutional penal and labor needs, rather than medical reasons, have guided his decision-making with respect to the medications list.  Ex. 23, Toce Dep. 140:22–141:23.

In sum, men on the Farm Line are forced to perform menial agricultural labor that resembles chattel slavery on former plantation grounds.  That labor is administered in order to inflict punishment and shame rather than promote agricultural productivity or personal growth, and it is further devalued through pay structure and, more importantly, through such an absence of safety measures as to demonstrate callous disregard for human health.  It is no wonder that men

describe themselves as being treated like slaves while on the Farm Line.  *See* Guillory Supp. Decl.
¶¶ 2, 5–6; Jones Decl. ¶ 5; Morehead Decl. ¶¶ 3–6; *see also* Ex. 18, Pidgeon Dep. 158:10–22.

These conditions have led Dr. Joshua Sbicca, a sociologist who studies prison labor, to
opine that the Farm Line both exemplifies the racist through line from chattel slavery to modern
prison labor, and—like the now-condemned institutions of convict leasing and chain gangs—
stands outside of contemporary societal and prison norms.  *See* Ex. 55, Sbicca Report ¶¶ 82–91.
The conditions on the Farm Line have also led Dr. Hammonds to opine that the Farm Line
"straddles a thin line of punishment and humiliation while instigating a considerable risk of
psychological and physical harm."  Ex. 57, Hammonds Report ¶ 14.

### D.    Defendants' Deficient ADA Policies and Practices

Defendants have ADA policies on paper, *see* Ex. 42, 017931; Ex. 43, 017890, but lack any
effective system for actually enforcing the ADA at LSP.  Critically, those LSP staff who are
responsible for implementing the ADA have neither adequate training nor a sufficient
understanding of their roles and responsibilities to meaningfully carry out those responsibilities.
*See, e.g.*, Ex. 44, Ducote Dep. 30:4–23 (ADA coordinator stating that he does not know the
definition of a disability under the ADA, is not familiar with the term "reasonable
accommodation," and cannot define a "major life activity" under the ADA).

LSP's ADA Coordinator, Ashli Oliveaux, testified that Lars Ducote, an ADA coordinator
who assists Oliveaux, reviews ADA accommodations in the first instance and that she has not *ever*
modified Mr. Ducote's assessment of an accommodations request.  *See* Ex. 45, Oliveaux Dep.
82:20–83:2, 173:11–174:4. But Mr. Ducote has not even completed the coursework to become an
ADA coordinator, *see* Ex. 44, Ducote Dep. 28:8–12, and he is largely unaware of the
responsibilities of an ADA coordinator, *see id.* 23:19–24, 45:2–46:10, 47:20–24.   Further
demonstrating systemic deficiencies, Ms. Oliveaux is unable to determine whether inhibited

thermoregulation is an ADA-qualifying disability and has never requested guidance on that issue, *see* Ex.45, Oliveaux Dep. 94:12–96:10, 174:16–175:1, notwithstanding the numerous grievances filed by plaintiffs and witnesses in this case, *see, e.g.*, Ex. 46, 013309; Ex. 47, 013138.

### E.    Plaintiffs and the Proposed General Class and the ADA Subclass

Each of the Named Plaintiffs is currently in LSP custody, has worked on the Farm Line in the past, and faces the constant risk of reassignment to the Farm Line.  *See* ECF No. 37-11, Guillory Decl. ¶¶ 2–3; ECF No. 37-12, Hicks Decl. ¶¶ 2–3; ECF No. 37-13, Jackson Decl. ¶¶ 2, 4–6; ECF No. 37-14, Smith Decl. ¶¶ 2–3, 5, 7; ECF No. 37-16, Walker Decl. ¶¶ 2–4; ECF No. 37-17, A. Williams Decl. ¶¶ 2–5; ECF No. 37-18, D. Williams Decl. ¶¶ 2–6.  The Named Plaintiffs filed this class action seeking to enjoin Defendants' use of the Farm Line in September 2023, ECF No. 1, amended their complaint in December 2023, ECF No. 21, and have diligently pursed their claims since, including by sitting for depositions, filing declarations, and communicating regularly with counsel, *see, e.g.*, D. Williams Supp. Decl. ¶ 9; Guillory Supp. Decl. ¶ 8; Jackson Supp. Decl. ¶ 6.

On behalf of the General Class, the Named Plaintiffs assert that Defendants' operation of the Farm Line violates the Eighth Amendment's bar on cruel and unusual punishment by forcing class members to labor under dangerously high levels of high heat; exposing class members to conditions that are degrading, dehumanizing, and reminiscent of chattel slavery; and by placing class members at a substantial risk of serious psychological harm.

On behalf of the ADA Subclass, the ADA Plaintiffs assert that the Farm Line violates their rights under the ADA and Section 504.  The ADA Plaintiffs assert that Defendants discriminate on the basis of disability because LSP's ADA-related policies and practices fail to identify and protect people with disabilities from being assigned to the Farm Line.  Each of the ADA Plaintiffs has one or more ADA-qualifying disabilities, has previously been assigned to work on the Farm Line, and has had their request to be removed from the Farm Line denied.

## LEGAL STANDARD

A class or subclass should be certified when plaintiffs demonstrate that the class satisfies the four requirements of Federal Rule of Civil Procedure 23(a)—numerosity, commonality, typicality, and adequacy—and the requirements of one of the three subsections of Rule 23(b). *See Amchem Products, Inc.* v. *Windsor*, 521 U.S. 591, 613–14 (1997); *see also Pederson* v. *Kinder Morgan Inc.*, 345 F.R.D. 302, 311–12 (S.D. Tex. 2024). Here, Plaintiffs seek certification under Rule 23(b)(2), which provides for certification when the class alleges that the defendants have "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED. R. CIV. P. 23(b)(2). The proposed class must also be sufficiently ascertainable to proceed on a class-wide basis. *John* v. *Nat'l Sec. Fire & Cas Co.*, 501 F.3d 443, 445 (5th Cir. 2007). District courts possess "broad discretion" in applying these standards. *Castano* v. *Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996); *Allison* v. *Citgo Petroleum Corp.*, 151 F.3d 402, 408 (5th Cir. 1998) ("[T]he district court maintains substantial discretion in determining whether to certify a class action.").

## ARGUMENT

## I.    THE PROPOSED CLASSES SATISFY THE REQUIREMENTS OF RULE 23(a)

### A.    Numerosity

The numerosity requirement is satisfied when a class is so numerous that the joinder of all members is impracticable. FED. R. CIV. P. 23(a)(1). In the Fifth Circuit, there is a presumption that classes containing more than 40 members satisfy this requirement. *Mullen* v. *Treasure Chest Casino, L.L.C.*, 186 F.3d 620, 624 (5th Cir. 1999); *Lewis* v. *Cain*, 324 F.R.D. 159, 168 (M.D. La. 2018). Where membership in a class is fluid and the proposed class includes future members, the law favors finding numerosity satisfied. *Pederson* v. *La. State Univ.*, 213 F.3d 858, 868 n.11 (5th Cir. 2000) ("[T]he fact that the class includes unknown, unnamed future members also weighs in

12

favor of certification."); *Lewis*, 324 F.R.D. at 168 ("[T]he fluid nature of a plaintiff class, as in prison-litigation context, counsels in favor of certification of all present and future members.").

The General Class easily satisfies the numerosity requirement. Approximately 4,000 people are currently incarcerated at Angola. *See* Ex. 1; Ex. 45, Oliveaux Dep. 40:1–5. Almost all are, or are at risk of being, assigned to the Farm Line. *See, e.g.*, Ex. 8, Gulino Dep. 180:12–22; Ex. 10, Scott Dep. 61:1–24; Ex. 15, Vittorio Dep. 76:15–18. And while the General Class includes all persons at risk of being assigned to the Farm Line *in the future*, numerosity is satisfied even if one were to look solely at those people who are currently assigned to the Farm Line: Defendants' records show that, any given week during summer 2024, more than 100 men were assigned to and thus eligible to work on the Farm Line. *See* Ex. 48, VOTE00118 at -118–126.

The ADA Subclass similarly satisfies the numerosity requirement. According to data from the U.S. Census Bureau, 13 percent of the civilian noninstitutionalized population has disabilities affecting their hearing, vision, cognitive functioning, walking, and ability to provide self-care. Ex. 49. Applying that percentage to the population at Angola places the number of incarcerated men with a disability limiting or making more difficult their abilities to perform the work required on the Farm Line at approximately 520, well exceeding the numerosity threshold.[5] That estimation is supported by Defendants' 30(b)(6) witnesses. Dr. Lavespere, for example, testified that he has "probably given thousands of duty statuses," and that "several hundred people at Angola [] have duty statuses like regular duty with restriction, out of field, [and] sit to work." Ex. 30, Lavespere Dep. 80:21–81:20. Many others qualify for heat precaution duty status, *see* Ex. 23, Toce Dep. 62:9–63:13, which reflects ADA-qualifying disabilities, *see* Ex. 51, Spears Dep. 64:6–10.

---

[5]    In fact, this number is quite likely much higher, because incarcerated populations have a higher incidence of disabilities than the general population. *See* Ex. 50, at 2; Ex. 55, Sbicca Report ¶ 55.

Finally, new arrivals are constantly entering Angola, and the vast majority of new men are sent to work on the Farm Line as their first assignment. *See* Ex. 11, Hebert Dep. 60:12–16; Ex. 12, Davis Dep. 19:14–25. Many of those individuals arrive with ADA-qualifying disabilities, and others develop such disabilities while incarcerated. *See* Ex. 45, Oliveaux Dep. 98:21–100:17, 104:4–10. The fact that the composition of the Classes is constantly in flux further supports finding numerosity satisfied. *See Alex A. by and through Smith* v. *Edwards*, 2023 WL 5628592, at *4 (M.D. La. Aug. 31, 2023) (fluid plaintiff classes counsel in favor of numerosity, "particularly" in incarceration situations "where the 'population is constantly in flux'") (quoting *Jones* v. *Gusman*, 296 F.R.D. 416, 465 (E.D. La. 2013)); *Dockery* v. *Fischer*, 253 F. Supp. 3d 832, 853 (S.D. Miss. 2015) (noting that "joinder would not be practical" in a case where class composition "is subject to change as prisoners are transferred into and out of" a carceral facility).

### B.    Commonality

Rule 23(a)(2) requires a showing that the putative class members' claims "depend upon a common contention" that is "capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Yates* v. *Collier*, 868 F.3d 354, 361 (5th Cir. 2017) (quoting *Wal-Mart Stores, Inc.* v. *Dukes*, 564 U.S. 338, 350 (2011)). "To determine whether Plaintiffs present 'common questions of law and fact, a court must trace the class claims and conclude that the common questions, and answers, will resolve them without the need for additional extensive individualized inquiry.'" *Alex A*, 2023 WL 5628592, at *7 (quoting *Dockery*, 253 F. Supp. 3d at 849). To show commonality, plaintiffs must "raise at least one contention that is central to the validity of each class member's claims." *In re Deepwater Horizon*, 739 F.3d 790, 810 (5th Cir. 2014); *see Yates*, 868 F.3d at 365 n.6 (commonality requires "a plaintiff demonstrate at least one common question of law or fact").

The General Class and ADA Subclass satisfy the commonality requirement because each presents claims that depend on common factual and legal questions that are subject to common answers as to all class members.

### 1. General Class

The General Class asserts the common claim that Defendants' operation of the Farm Line violates class members' rights under the Eighth Amendment. The General Class intends to prove that the Farm Line violates their rights to be free from cruel and unusual punishment for three fundamental reasons. First, the General Class will show that the Farm Line violates the Eighth Amendment because class members are forced to labor under heat indices that pose a threat to their health and safety, without adequate mitigation to reduce the serious risks of harm (the "Heat Theory"). Second, the General Class intends to show that the Farm Line violates the Eighth Amendment's guarantee that people in prison are to be afforded basic standards of dignity because Defendants use the Farm Line as a form of discipline that punishes by simulating conditions of chattel slavery, an institution universally understood to be among the most abhorrent in our nation's history (the "Dignitary Harm Theory"). Third, and relatedly, the General Class will prove that Defendants violate the Eighth Amendment because the Farm Line exposes class members to a substantial risk of serious psychological harm by forcing them to perform labor under conditions akin to chattel slavery that are unnecessarily difficult, dangerous, degrading, and that exemplify indifference to human health and wellbeing (the "Psychological Harm Theory").

Each of these theories of harm presents common questions that can be answered on a class-wide basis. *See Jones* v. *Gusman*, 296 F.R.D. 416, 466 (E.D. La. 2013) (commonality satisfied when common questions are "amenable to a common answer"). Further, all three theories of harm revolve around central issues subject to common forms of proof that are universally applicable to every person subject now or in the future to the Farm Line. These forms of proof include the

conditions on the Farm Line; Defendants' classification, disciplinary, and compensation policies; and Defendants' actions and inactions with respect to the Farm Line.

The central questions capable of common answers that underly the Heat Theory include whether the Farm Line exposes class members to dangerous levels of heat; whether Defendants' heat precaution policies and practices are followed in practice and are adequate to protect against heat-related risks; and whether Defendants are aware of and disregard the heat-related risks on the Farm Line. To answer these class-wide questions, the General Class will present numerous forms of common proof, including:

- Historical weather data, Daily Line Counts, and Station Logs demonstrating that the Farm Line regularly operates when the heat index is 88 degrees Fahrenheit or higher, and expert testimony from Dr. Susi Vassallo describing that, at such levels, the heat index poses a threat to health for all individuals, especially during physical exertion and when proper mitigation strategies are not available.

- Defendants' heat-related policies, applicable to all members of the General Class.

- Documentation and testimony showing that Defendants' heat-related policies have not been followed in practice and, in any event, are inadequate. For example, Plaintiffs will present documentation and testimony concerning the near total lack of ameliorative measures existing before this litigation, and the deficiencies in the remedial measures Defendants have purportedly adopted in response to the Court's orders for preliminary relief.

- Documentation and testimony from, among others, Dr. Lavespere and Dr. Toce demonstrating Defendants' awareness as to the inadequacy of the Heat Pathology Medication list, and Defendants' refusal nevertheless to update that list based on non-medical considerations.

The Dignitary Harm Theory and Psychological Harm Theory likewise raise common factual and legal questions susceptible to common proof. Common factual questions include whether conditions on the Farm Line are reminiscent of chattel slavery; whether labor on the Farm Line is made unnecessarily difficult and dangerous; whether Defendants are aware of the risks of the dignitary and psychological harm created by subjecting men to the conditions on the Farm Line; and whether Defendants' have taken steps to mitigate those risks. Common legal questions

16

include whether the operation of a form of discipline that punishes by drawing on the history of slavery and revisiting that history on incarcerated men constitutes cruel and unusual punishment.

Plaintiffs will resolve these common questions through common proof, including:

- Documentation and testimony, including from Defendants' employees and from Dr. Sbicca, concerning the history of Angola and the through line between chattel slavery and Farm Line.

- Documentation and testimony demonstrating that Defendants are well aware that Angola's history as a plantation offends contemporary standards of decency, and that Defendants nevertheless harness that history to discipline and punish through the Farm Line.

- Testimony, including from Defendants' witnesses, Ms. Green, Dr. Hammonds, and Dr. Sbicca, that the conditions and logic of the Farm Line dehumanize and degrade the people who are forced to work in the fields.

- Testimony from Ms. Green, Dr. Hammonds, and Dr. Sbicca about the Farm Line's deviation from contemporary standards of decency.

- Testimony from Dr. Hammonds and others that the Farm Line creates a risk of psychological harm that Defendants are aware of and disregard.

In sum, the core questions raised by each of the theories of harm Plaintiffs will advance to support the claims of the General Class turn on conditions, policies, and actions or inactions by Defendants that are common across the General Class. Accordingly, the commonality requirement is satisfied for the General Class. *See Cole* v. *Livingston*, 2016 WL 3258345, at *8 (S.D. Tex. June 14, 2016) (commonality satisfied when class raised common contentions as to conditions of confinement); *Yates*, 868 F.3d at 363 (commonality met because prison's attempted measures to mitigate dangerous conditions "were ineffective to reduce the risk of serious harm to a constitutionally permissible level for *any* inmate"); *Lewis*, 324 F.R.D. at 169 (commonality met based on "proof that Defendants operated under a general policy that subjected all inmates to unreasonable risks of serious harm"); *Dockery*, 253 F. Supp. 3d at 853 (commonality can be

satisfied based on a "fail[ure] to act in the face of actual or constructive knowledge that there is likely to be a violation of a constitutional right").

### 2.    ADA Subclass

The ADA Subclass similarly presents questions of law and fact common to all members of the subclass.  The ADA Subclass raises a methods of administration claim alleging that Defendants' policies, practices, and procedures for identifying and providing accommodations for men with disabilities are inadequate as it pertains to the Farm Line.  As a result of this inadequate system, people with disabilities, including people with an impaired ability to thermoregulate, can be forced to work on the Farm Line, constituting discrimination on the basis of disability in violation of the ADA.  The injuries of the ADA Subclass members thus all derive from the same systemic failure by Defendants to protect men with disabilities from working on the Farm Line.

The common questions raised by the ADA Subclasses include whether Defendants have ADA policies and practices in place that adequately and reliably identify and accommodate persons with ADA-qualifying disabilities, and whether a physical or mental health disability inhibiting a person's ability to thermoregulate constitutes a disability under the ADA.

These common questions will be resolved on a class-wide basis through common proof. For example, Defendants have policies relating to the ADA that apply to all men incarcerated at LSP.  The interrogation of these polices and their implementation is central to resolving the claims of the ADA Subclass.  Additionally, Defendants' heat pathology policies, and the implementation and adequacy of these policies, will drive answers central to the ADA Subclass's claims. Documentary and testimonial evidence from Defendants' staff will further show the systemic failures of Defendants' ADA procedures, including by demonstrating that LSP's ADA staff are not competent and by proving that men with disabilities are unlawfully assigned to the Farm Line.

The fact that ADA Subclass members have different disabilities does not defeat commonality. Courts "regularly certify classes of inmates who are disabled, even if they do not have the same disability." *Cole*, 2016 WL 3258345, at *6. "Even where individual class members may not be identically situated, commonality exists where a question of law linking class members is substantially related to the resolution of the litigation." *Lane* v. *Campus Fed. Credit Union*, 2017 WL 3719976, at *4 (M.D. La. May 16, 2017) (citing *M.D. ex. rel. Stuckenberg* v. *Perry*, 675 F.3d 832, 839–40 (5th Cir. 2012)). That is true of the ADA Subclass: questions of law and fact are common to the claims of all members, and these questions will be answered by reference to common proof. Thus, the ADA Subclass satisfies Rule 23's commonality requirement.

### C.    Typicality

"[T]he test for typicality . . . focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent." *Mullen*, 186 F.3d at 625 (internal quotation marks omitted). Typicality requires that the proposed class representatives have claims that are shared by all members of the proposed class. *Lewis*, 324 F.R.D. at 169; *see also Dockery*, 253 F. Supp. 3d at 855 (typicality requires only that the claims of the representative parties "have the same essential characteristics of those of the putative class").

Here, each Named Plaintiff is in LSP custody, has been forced to labor on the Farm Line, and is under constant threat of reassignment to the Farm Line, and, as a result, asserts that the Farm Line violates his Eighth Amendment rights. The ADA Plaintiffs assert that Defendants' methods of administration of their ADA policies, practices, and procedures discriminate against the ADA Plaintiffs based on their disabilities as it relates to assignment and work on the Farm Line.

Each of these claims is identical to the claims of the Classes that the Named Plaintiffs and ADA Plaintiffs seek to represent, in that they turn on whether Defendants' operation of the Farm Line violates the Eighth Amendment and the ADA and Section 504. The typicality requirement

is therefore satisfied. *See Cain* v. *City of New Orleans*, 327 F.R.D. 111, 125 (E.D. La. 2018) (typicality requirement satisfied where named plaintiffs' theories challenged defendants' common practices and named plaintiffs' sought relief that would also relieve all putative class members).

   **D.    Adequacy**

   **1.    <u>Named Plaintiffs</u>**

   All Named Plaintiffs are adequate representatives of the General Class, and all ADA Plaintiffs are adequate representatives of the ADA Subclass.

   All Named Plaintiffs are incarcerated at LSP and face constant risk of assignment to the Farm Line.  Additionally, all ADA Plaintiffs also have ADA-qualifying disabilities.  Both groups seek to end the Farm Line.  Each group of plaintiffs thus suffers the same harms, asserts the same claims, and seeks the same injunctive relief as the absent class members they seek to represent, so there is no risk of a conflict of interest between the Named Plaintiffs' interests and the interests of General Class, or the ADA Plaintiffs' interests and the interests of the ADA Subclass. *See Everson* v. *Bunch*, 2016 WL 3255023, at *3 (M.D. La. June 13, 2016) (adequacy satisfied because class representatives raised "identical" Eighth Amendment claims arising out of their conditions of confinement as the rest of the class).

   The Named Plaintiffs have also shown their adequacy by playing an active role in every stage of this litigation, including meeting with counsel prior to the filing of the lawsuit and reviewing the contents of the Complaint prior to filing; attending meetings with counsel for the duration of the litigation; assisting in the preparation of declarations; and sitting for depositions in July 2024. *See* D. Williams Supp. Decl. ¶ 9; Guillory Supp. Decl. ¶ 8; Jackson Supp. Decl. ¶ 6. Furthermore, by participating in this lawsuit, each Named Plaintiff accepted the risk of retaliation at the hands of the prison officers who control their physical and psychological safety.  As such, the Named Plaintiffs have amply demonstrated their adequacy to represent the Classes. *See*

20

*Valentine* v. *Collier*, 2020 WL 3491999, at *12 (S.D. Tex. June 27, 2020) (incarcerated persons adequate class representatives because they had, among other things, read the complaint, assisted throughout the litigation, submitted declarations, and been deposed); *Tellis* v. *LeBlanc*, 2021 WL 4267513, at *12 (W.D. La. Sept. 20, 2021) (named plaintiffs adequate because they "maintained close contact with their attorneys and fully participated in the conduct of the litigation").

### 2. Adequacy and Appointment of Class Counsel under Rule 23(g)

Plaintiffs' counsel—Promise of Justice Initiative ("PJI"), Rights Behind Bars ("RBB"), and Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul, Weiss")—have proven to be zealous and competent advocates for the Named Plaintiffs and absent class members, thereby demonstrating their adequacy under Rule 23(a)(4).  *See Slade* v. *Progressive Sec. Ins. Co.*, 856 F.3d 408, 412 (5th Cir. 2017).  For similar reasons, they have also shown that they should be appointed class counsel under Rule 23(g).

Plaintiffs' counsel have vigorously litigated this case, including by filing an emergency motion in May 2024 seeking to ameliorate the heat-based risks posed by the Farm Line and by seeking extensive documentary and testimonial discovery in a compressed timeframe.  *See Dockery*, 253 F. Supp. 3d at 855 (counsel shows adequacy through the "volume and thoroughness of the pleadings"); FED. R. CIV. P. 23(g) (taking into account "the work counsel has done in identifying or investigating potential claims in the action").  Plaintiffs' counsel have also devoted substantial time to investigating the factual and legal issues in this case and will continue to do so. *See id.* (factoring in "the resources that counsel will commit to representing the class").  Further, PJI, RBB, and Paul, Weiss all have significant experience in litigating complex class actions and have the requisite knowledge of the relevant substantive areas of the law.  *See id.*  (considering counsel's experience in class actions, other complex litigation, and the types of claims asserted in the action, and knowledge of the applicable law).  All Plaintiffs' counsel have previously litigated

complex class actions and Eighth Amendment and ADA claims in prison litigation cases, and PJI and RBB have previously litigated cases involving the conditions at Angola specifically. *See generally* Hill Decl.; Nimni Decl.; Wright Decl.

By way of these actions and qualifications, Plaintiffs' counsel have amply demonstrated their adequacy under Rule 23(a) and that they should be appointed class counsel under Rule 23(g).

## II.    THE PROPOSED CLASSES SATISFY THE REQUIREMENTS OF RULE 23(b)(2)

Certification of the General Class and ADA Subclass is appropriate under Rule 23(b)(2) because, as the Rule requires, Defendants have "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief . . . is appropriate respecting the class as a whole." FED. R. CIV. P. 23(b)(2).  The Fifth Circuit has interpreted Rule 23(b)(2) to require a showing (i) that all class members have "been harmed in essentially the same way" and (ii) that the injunctive relief sought is "specific." *See, e.g.*, *Maldonado* v. *Ochsner Clinic Found.*, 493 F.3d 521, 524 (5th Cir. 2007); *Prantil* v. *Arkema Inc.*, 986 F.3d 570, 580 (5th Cir. 2021).[6]

In *Yates*, the Fifth Circuit affirmed the district court's conclusion that all class members were harmed in essentially the same way when defendant prison officials had engaged in "common behavior" that applied to all class members, such that the class members were all "subject to the *same* policy. . . , all ha[d] the *same* . . . measures available to them (whether or not those measures [we]re effective), and all [we]re (allegedly) harmed in essentially the *same* way."  868 F.3d at 368.

The same is true here:  all men who are or may be assigned to the Farm Line are subject to the same policies and exposed to the same conditions such that they are all at risk of the same types

---

[6]    The third Rule 23(b)(2) requirement, which mandates that injunctive relief predominate over monetary damages claims, is clearly satisfied here because no money damages are sought.  *See Yates*, 868 F.3d at 368 n.7 ("The Plaintiffs are not seeking damages in this case, so there is no issue as to whether injunctive relief predominates over monetary damage claims.") (cleaned up); *Dockery*, 253 F. Supp. 3d at 855 (same).

of injury.  *See id.* at 367 (explaining that Rule 23(b)(2) is satisfied by a showing of "common behavior by the defendant[s] towards the class . . . such that class members have been harmed in essentially the same way") (cleaned up).  With respect to the ADA Subclass, all members of the subclass are subject to the same failures of Defendants' ADA policies, practices, and procedures, rendering the same harm in the form of discrimination on the basis of their disabilities.  *See Tellis*, 2021 WL 4267513, at *13 (finding Rule 23(b)(2) requirements satisfied because plaintiffs "challenge[d] policies and procedures that are broadly applicable to the class and subclass").

The requested injunctive relief also is sufficiently specific.  Rule 23(b)(2)'s specificity element "requires plaintiffs to give content to the injunctive relief they seek so that final injunctive relief may be crafted to describe in reasonable detail the acts required."  *Yates*, 868 F.3d at 367.  Both the General Class and the ADA Subclass seek the same specific remedy:  an injunction requiring the full and complete stoppage of the Farm Line at Angola.  *See* ECF No. 21 at 51.  This relief is sufficiently simple and specific under Rule 23(b)(2).  *See Alex A.*, 2023 WL 5628592, at *10 (holding that request that defendants be forbidden from undertaking certain challenged actions was "specific and quite simple" in satisfaction of Rule 23(b)(2)).

## III.    THE PROPOSED CLASSES ARE ASCERTAINABLE

Finally, the General Class and ADA Subclass each meet Rule 23's implied requirement of ascertainability.  The ascertainability requirement looks to whether classes have a "precise class definition . . . to identify properly those entitled to relief, those bound by the judgment, and those entitled to notice."  *In re Monumental Life Ins. Co.*, 365 F.3d 408, 413 (5th Cir. 2004) (internal quotation marks omitted).  Ascertainability does not require that the court need to "know the identity of each class member before certification; ascertainability requires only that the court be able to identify class members at some stage of the proceeding."  *Frey* v. *First Nat. Bank Southwest*, 602 F. App'x 164, 168 (5th Cir. 2015) (internal quotation marks omitted).  While the

Fifth Circuit has not ruled squarely on the issue, it has recognized that other courts have held that the ascertainability requirement of a "precise class definition" is "not as critical" for a Rule 23(b)(2) class that seeks only injunctive or declaratory relief and that does not request notice and opt-out rights, as is the case here. *See Monumental Life*, 365 F.3d at 413.[7]

The General Class is readily ascertainable. It consists of all present and future persons incarcerated at LSP who are or who may be assigned to the Farm Line, a group that can be identified based on Defendants' records. *See Cole*, 2016 WL 3258345, at *6 (noting that the correctional facility maintained records that would permit the court to ascertain subclass members). The individuals assigned to the Farm Line at any given time are ascertainable by reference to LSP's Job Rosters and Line Rosters. *See, e.g.*, Ex. 52, VOTE000596. As for those who may in the future be assigned to the Farm Line, this group includes nearly everyone at LSP because, as established, the Farm Line is the first job assignment given to most persons coming into LSP custody, and the vast majority of others at LSP can be reassigned to the Farm Line at any time based on disciplinary infractions or LSP's purported "institutional needs and resources" of any given moment. *See* Ex. 15, Vittorio Dep. 76:15–18. According to Defendants, the only groups at LSP who are not subject to assignment to the Farm Line are those persons with "certain Duty Statuses and medical conditions." Ex. 53, Defs' Resps. to Pls' Second Int. Requests, at 4.[8] Defendants' own records will thus enable the Court to ascertain the class by simply including in

---

[7]    Indeed, one district court in this Circuit has concluded that the ascertainability requirement is not applicable to Rule 23(b)(2) classes at all. *Neese* v. *Becerra*, 342 F.R.D. 399, 411 (N.D. Tex. 2022).

[8]    Plaintiffs dispute that Defendants faithfully ensure that men with certain duty statuses and medical conditions are not assigned to the Farm Line. In fact, the record suggests the opposite—that Defendants do assign many men to the Farm Line notwithstanding their duty statuses or medical conditions, including their medication regimens, that make such assignment inappropriate and dangerous. *See, e.g.*, Ex. 54, Sanders Emails 046674.

the class all men at LSP and relying on Defendants' duty status records and medical records to exclude only those who are not subject to assignment on the Farm Line.

The ADA Subclass is also ascertainable.  It consists of all persons in LSP custody who have a disability and are subject to being assigned to the Farm Line as a result of Defendants' inadequate policies and practices relating to the ADA.  Defendants are in possession of the medical records of all persons in their custody, making each member of the ADA Subclass ascertainable.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that this Court grant this motion and certify (i) the General Class of all persons incarcerated at LSP who are currently are, or may in the future be, assigned to the Farm Line, and (ii) the ADA Subclass of all people incarcerated at LSP who have disabilities that substantially limit one or more of their major life activities and who currently are, or may in the future be, assigned to the Farm Line.

Plaintiffs also respectfully request that this Court appoint the Named Plaintiffs as class representatives for the General Class, and the ADA Plaintiffs as class representatives for the ADA Subclass.  Plaintiffs also respectfully request that this Court appoint Plaintiffs' counsel as class counsel under Rule 23(g).

Respectfully Submitted,
Dated:  September 30, 2024

**THE PROMISE OF JUSTICE INITIATIVE**

*/s/ Lydia Wright*
Lydia Wright, La. Bar No. 37926
Samantha Bosalavage, La. Bar No. 39808
1024 Elysian Fields Avenue
New Orleans, LA 70117
Tel: (504) 529-5955
lwright@defendla.org
sbosalavage@defendla.org

**RIGHTS BEHIND BARS**

*/s/ Oren Nimni*
Oren Nimni (PHV) MA Bar No. 691821
Amaris Montes (PHV) MD Bar No. 2112150205
416 Florida Avenue NW, Se. 26152
Washington, D.C. 20001
Tel: (202) 455-4399
oren@rightsbehindbars.org
amaris@rightsbehindbars.org

**PAUL, WEISS, RIFKIND, WHARTON**
 **& GARRISON LLP**

*/s/ Joshua Hill Jr.*
Joshua Hill Jr. (PHV) NY Bar No. 4297826
Jeremy A. Benjamin (PHV) NY Bar No. 4770277
Michael McGregor (PHV) NY Bar No. 5510490
Arielle B. McTootle (PHV) NY Bar No. 5993217
Ricardo R. Sabater (PHV) NY Bar No. 5933379
Leah R. Weiser (PHV) NY Bar No. 6027601
1285 Avenue of the Americas,
New York, NY 10019-6064
Tel: (212) 373-3000
jhill@paulweiss.com
jbenjamin@paulweiss.com
mmcgregor@paulweiss.com
amctootle@paulweiss.com
rsabater@paulweiss.com
lweiser@paulweiss.com

*Attorneys for Plaintiffs and the Proposed Classes*