## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **VOICE OF THE EXPERIENCED,** a membership organization on behalf of itself and its members; **and MYRON SMITH, DAMARIS JACKSON, NATE WALKER, DARRIUS WILLIAMS, KEVIAS HICKS, JOSEPH GUILLORY, KENDRICK STEVENSON,** and **ALVIN WILLIAMS,** on behalf of themselves and all others similarly situated,<br><br>**VERSUS**<br><br>**JAMES LEBLANC,** in his official capacity as Secretary of the Louisiana Department of Public Safety and Corrections**; TIMOTHY HOOPER,** in his official capacity as Warden of Louisiana State Penitentiary; **MISTY STAGG**, in her official capacity as Director of Prison Enterprises, Inc.; the **LOUISIANA DEPARTMENT OF PUBLIC SAFETY & CORRECTIONS;** and **PRISON ENTERPRISES, INC.** | *<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>* | **CIVIL ACTION**<br><br>**NO.:  3:23-cv-1304**<br><br>**JUDGE BRIAN A. JACKSON**<br><br>**MAGISTRATE JUDGE ERIN WILDER-DOOMES** |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

**NOW INTO COURT,** through undersigned counsel, come Defendants herein, **JAMES LEBLANC,** in his official capacity as Secretary of the Louisiana Department of Public Safety and Corrections, **TIMOTHY HOOPER,** in his official capacity as Warden of Louisiana State Penitentiary, **LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS** ("Defendants"),[1] who file this opposition to Plaintiffs' Motion for Class Certification. Plaintiffs

---

[1] Plaintiffs advised the Court that they are not pursing their claims against Misty Stagg or Prison Enterprises. R.Doc. 130.

fail to meet their burden of proof on class certification. At the outset, Plaintiffs seek to certify an ADA Subclass. The purported Subclass members are already included in a pending class action, *Lewis v. Cain*. Here, Plaintiffs bring the exact same methods-of-administration ADA claim. Under the principals of res judicata, and the Fifth Circuit's ruling in *Gillespie v. Crawford*, 858 F.2d 1101, Plaintiffs cannot pursue claims identical to the claims asserted in the *Lewis* class action.

Regarding the requirements of Rule 23, Plaintiff fail to introduce evidence to establish even an estimate of the number of purported class members in either the General Class or the ADA Subclass. Further, commonality is not met where Plaintiffs cannot show that they suffer the same injury. The General Class will seek to prove three separate theories, all of which necessarily implicate differing harms, like alleged psychological harm. The ADA Subclass will likewise fail to have common questions, including whether an offender is disabled and whether that disability would require the same accommodation, i.e., removal from a specific job assignment. For the same reasons, Plaintiffs fail to establish typicality and adequacy. Plaintiffs also fail to meet the requirements of Rule 23(b)(2). For example, for the ADA subclass, Plaintiff seek an injunction to remove ADA offenders from the Farm Line. Plaintiffs cannot show that all ADA subclass members would be entitled to the same accommodation, as the ADA requires a fact-specific, case-by-case inquiry that considers, among other factors, the effectiveness of accommodations in light of the nature of the <u>disability in question</u>. Class certification should be denied.

## I.    Factual Background

This suit concerns the conditions of an agricultural job assignment at Louisiana State Penitentiary. Defendants dispute Plaintiffs' allegations, including the actual conditions of the Farm Line, the purpose of the Farm Line, and whether Defendants are deliberately indifferent or violate the ADA.

Consistent with state law and the Constitution, offenders as LSP hold various jobs.[2] Offenders may be assigned to meaningful work assignments consistent with their ability, interest, medical status, and needs of the facility.[3]  Every offender is evaluated by a medical health care provider and is issued a duty status.[4] Medical providers assess whether an offender should be issued a duty status that limits work assignments based on that offender's specific medical condition. LSP health care providers can issue a variety of duty statuses, to include regular duty, regular duty with restrictions, regular duty out of field, regular duty indoors, limited duty or no duty.[5] Health care providers can further limit duty status, such as no prolonged walking or standing, sit to work, no heights, no food handling, no moving machinery, no use of swinging tools, or seizure precautions.[6]

The Farm Line is an agricultural program that grows various fruits and vegetables. These vegetables are used to feed the inmate population.[7]  LSP provides 2,500 pounds of vegetables each day to feed the roughly 4,000 offenders at LSP.[8] LSP feeds fresh vegetables, and processes any overages to use at a later date. LSP uses tractors and equipment to plant and cultivate vegetables on the Farm Line.[9] Because vegetables mature at different rates, they must be harvested by hand or hand tools.[10] Offenders are provided appropriate clothing, lace up boots, hats and sunscreen.[11]

---

[2] It is well-settled that inmates may be required to work as a part of their sentence. See *Ali v. Johnson*, 259 F.3d 317, 317 (5th Cir. 2001); See also La. R.S. §14:2(A)(4) wherein Louisiana law defines a felony as "any crime for which an offender may be sentenced to death or imprisonment at hard labor."
[3] R.Doc. 49-4.
[4] R.Doc. 49-6; R.Doc. 130-1, p. 9.
[5] R.Doc. 49-6; See also R.Doc. 120-33, p. 22 (p. 81 of deposition).
[6] R.Doc. 49-6.
[7] Deposition of Warden Hooper, Exhibit "A," p. 71-72.
[8] Deposition of Warden Sylvester, Exhibit "B," p. 49.
[9] Deposition of Warden Sylvester, Exhibit "B," p. 22; Deposition of Guilino, Exhibit "C," p. 126-130.
[10] Deposition of Guilino, Exhibit "C," p. 126-130;
[11] R.Doc. 120-13, Deposition of Scott, (p. 125-128, 163-168 of deposition); Deposition of named plaintiff Joseph Guillory, Exhibit "D," p. 34-35.

The evidence shows that the work performed on the Farm Line is not strenuous.[12] Contrary to Plaintiffs' allegations, there are no required quotas, offenders can work at their own pace and take breaks when needed.[13] Like every other job at LSP, if an offender refuses to work, they may be disciplined in accordance with the Disciplinary Matrix.

Offenders are provided a structured 15-minute rest breaks every 45 minutes, are provided shady areas for rest breaks with appropriate seating, and are provided unlimited water and electrolyte drinks.[14] Offenders are also provided cups for drinking.[15] LSP has constructed two shade wagons that include seating, shade and holds water and electrolyte drinks on an elevated area.[16] As Dr. Keldie opines:

> There is little or no risk to field workers who have been acclimated to the environment, have access to risk mitigation measures including shade, iced water and Gatorade and rest periods of 15 minutes every 45 minutes and who perform easy level work the majority of the time with occasional moderate level workload.[17]

The Farm Line serves legitimate institutional purposes, to include needs of the institution, feeding offenders vegetables, job assignments for offenders, and disciplinary requirements.

Regarding offenders who may be more vulnerable to heat, Defendants have had policies in place to "establish provisions for the reduction of heat pathology and to reduce the exposure to offenders identified as more vulnerable to heat."[18]  The Heat Pathology policies set forth both indoor and outdoor procedures to be followed from May to October each year. The policies

---

[12] R.Doc. 120-13, Deposition of  Scott, (p. 63-64 of deposition); Expert report of Dr. Keldie, Exhibit "E," p. 8; 57, wherein Dr. Keldie observed work levels that the US Army would categorize as easy work or moderate work.
[13] R.Doc. 120-14, p. 19, Deposition of Hebert (p. 66 of deposition); Deposition of Roland Sylvester, Exhibit "B," pp. 88
[14] R.Doc. 111-2.
[15] R.Doc. 120-13, p. 34.
[16] See Ex. "F," photograph of shade wagon.
[17] Expert report of Dr. Keldie, Exhibit "E."
[18] HPC8, updated October 20, 2024, Exhibit "G."

provides that offenders identified by a healthcare practitioner with a chronic illness that may be affected by heat or those prescribed medication that may impact sensitivity to heat shall be evaluated and educated for potential adverse reactions concerning heat or photosensitivity related pathology.[19] Certain medications or illness may require that an offender be provided a Heat Precautions Duty status, which means that an offender cannot work outdoors once a heat alert is issued.[20] However, offenders who have chronic illnesses or co-morbidities will have a more restrictive duty status, such as no duty, out of field, sit to work, etc.[21]

Following consultation and recommendations of Defendants' experts, Defendants made modifications to HPC8. Defendants have expanded the Heat Pathology Medication list and added medications based on the anticholinergic scale.[22] While the prior policy listed four chronic illnesses that may make an offender more vulnerable to heat, the modification list 33 chronic illness that would require a health care provider to evaluate an offender for a heat Precaution Duty Status.[23]

HPC 8 now codifies the current procedures implemented by LSP on the Farm Line, to include 15-minute rest breaks every 45 minutes, rest breaks in shaded areas, sunscreen made available.[24] HPC8 now also provides that outdoor work shall cease if the heat index exceeds 113 degrees.[25]

Regarding medical care for offenders assigned to the field, plaintiffs assert that the care is inadequate because self-declared emergencies have taken place on the Farm Line, and some of them are allegedly heat related. Plaintiffs cite to two instances of self-declared emergency in May

---

[19] HPC8, updated October 20, 2024, Exhibit "G."
[20] HPC8, updated October 20, 2024, , Exhibit "G."
[21] R.Doc. 120-33, p. 22.
[22] HPC8, updated October 20, 2024, Attachment A, Exhibit "G"; R.Doc. 120-62.
[23] HPC8, updated October 20, 2024, Attachment B, Exhibit "G."
[24] HPC8, updated October 20, 2024, Exhibit "G."
[25] HPC8, updated October 20, 2024, Exhibit "G."

2024. Both of these were made early in the morning, before heat indexes typically exceed 88 degrees. Further, in both of these examples, those offenders were provided with immediate medical care. Self-Declared Emergencies alone are insufficient to prove inadequate medical care. Plaintiffs also cite to other SDEs with no proof that any of these offenders were working in the fields at that time. Plaintiffs are well-aware that the "Field Triage Logs" include any SDE made outside of a housing area and therefore will encompass more than offenders working in the fields.[26] Further, Dr. Keldie reviewed the SDEs from May to July 2024 and opined that none of the SDEs qualified as exertional heat injuries, which demonstrates the effectiveness of LSP's policies and the quality of medical care.[27]

## II.    Law and Argument

### 1.    Burden of Proof on Class Certification

As explained by the Fifth Circuit, "Rule 23 governs whether a proposed class falls within the limited exception to 'the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Ibe v. Jones*, No. 15-10242, 2016 WL 4729446, at *7 (5th Cir. Sept. 9, 2016), quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01, 99 S. Ct. 2545, 61 L. Ed. 2d 176 (1979). It is well settled that the district court must conduct a "rigorous analysis" of all of the requirements for certification under Rule 23. *Castano v. American Tobacco Co*., 84 F.3d 734, 740 (5th Cir. 1996)(citing *General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147 (1982) ). Plaintiffs bear the burden of proving that those requirements are satisfied. *See* e.g. *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)(" Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule — that is,

---

[26] Deposition of Justin Coley, Exhibit "H," p. 113-114.
[27] Keldie expert report, Exhibit "E."

he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc.").

District courts have broad discretion in determining whether to certify a class, though it must "rigorously analyze" the prerequisites for class certification contained in Rule 23 before doing so. *Prantil v. Arkema Inc*., 986 F.3d 570, 574 (5th Cir. 2021) (quoting *Spence v. Glock, G.m.b.H*., 227 F.3d 308, 310 (5th Cir. 2000)). This analysis requires "the district court to go beyond the pleadings to determine whether the requirements of Rule 23 have been met: 'a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues.'" *Id*. (quoting *Cole v. Gen. Motors Corp*., 484 F.3d 717, 724 (5th Cir. 2007)). A court cannot "merely 'review a complaint and ask whether, taking the facts as the party seeking the class presents them, the case seems suitable for class treatment.'" *Chavez v. Plan Benefit Servs., Inc.,* 957 F.3d 542, 46 (5th Cir. 2020).

The party seeking certification bears the burden of proof." *Castano v. Am. Tobacco Co*., 84 F.3d 734, 740 (5th Cir.1996) (internal citations omitted). Federal Rule of Civil Procedure 23(a) requires a Plaintiff to prove all of the following: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."

In addition to satisfying the four criteria set forth in Fed. R. Civ. P. 23(a), a Plaintiff seeking to certify a class must also satisfy the requirements of Fed. R. Civ. P. 23(b)(1), (2), or (3). *M.D. ex rel. Stukenberg*, 675 F.3d at 837. In this case, Plaintiff is seeking to have the proposed class action to be maintained under Rule 23(b)(2). R.Doc. 120-1, p. 5-6.

The United States Court of Appeals for the Fifth Circuit holds that the following three requirements must be satisfied before a class can be certified under Rule 23(b)(2): "(1) class members must have been harmed in essentially the same way; (2) injunctive relief must predominate over monetary damage claims; and (3) the injunctive relief sought must be specific." *Ward v. Hellerstedt,* 753 F. App'x 236, 249 (5th Cir. 2018) (internal citations omitted). "[S]atisfaction of these requirements is premised on common behavior by the defendant toward the class, as opposed to the presence of common issues." *Id.*

### 2. Plaintiffs' proposed ADA Subclass is barred

At the outset, Plaintiffs' proposed ADA subclass is barred because the same purported class members have litigated the same claims in the *Lewis v. Cain* class action lawsuit. In this action, Plaintiffs assert that "The ADA Subclass raises a methods of administration claim alleging that Defendants' policies, practices, and procedures for identifying and providing accommodations for men with disabilities are inadequate as it pertains to the Farm Line." R.Doc. 120-1. P. 22. The same exact claims have already been litigated in the *Lewis* class action, which involves medical care and ADA policies for all offenders at LSP. In *Lewis*, the district court certified a subclass of "all qualified individuals with a disability, as defined by the ADA/RA, who are now, or will be in the future, incarcerated at LSP." *Lewis v. Cain*, 324 F.R.D. 159, 176 (M.D. La. 2018). In ruling on the merits of the *Lewis'* plaintiffs' ADA methods of administration claim, the district court held:

> The Subclass Plaintiffs' methods-of-administration claim is comprised of the following allegations which, analyzed together, operate to deny programmatic access to, and discriminate against, disabled inmates: LSP (1) fails to maintain a qualified and adequately trained ADA Coordinator; (2) fails to maintain and ADA advisory committee as required by its own policies; (3) inadequately trains its staff regarding the ADA; (4) fails to inform patients of their rights and the procedures for requesting accommodations; (5) **fails to appropriately process accommodation requests and disability-related grievances**; (6) **fails to identify and track patients' disabilities and accommodation requests**; and (7) charges

> patients co-pays to evaluate their accommodation requests. The Court found that Plaintiffs carried their burden on all of the above, except (4) and (7).
>
> …
>
> Applying the foregoing law and jurisprudence to the facts found above, the Court finds that the LSP methods of administration at LSP violate the ADA and RA by failing to provide adequate access and accommodations to its disabled inmates due to neglect and/or failure to follow both Title II's implementing regulations and failure to follow some of LSP's own ADA Directives.

(Emohasis added). *Lewis v. Cain*, No. 3:15-CV-318, 2021 WL 1219988, at *48-50 (M.D. La. Mar. 31, 2021). Following the Liability Trial, the district court conducted a Remedy Trial. The district court entered judgment in favor of Plaintiffs and issued a Remedial Order. *Lewis v. Cain*, 701 F. Supp. 3d 361 (M.D. La. 2023).

Here, the proposed ADA subclass would necessarily be class members in the *Lewis* action. Plaintiffs again bring a "methods of administration claim" regarding LSP' "policies, practices, and procedures for identifying and providing accommodations for men with disabilities are inadequate." These are the same claims in the *Lewis* action where Plaintiffs brought a "methods of administration claim" regarding LSP's policies on "accommodation requests and disability-related grievances" and identification and tracking of "patients' disabilities and accommodation requests." As such, Plaintiffs cannot seek to certify this ADA subclass, as the claims are included in the Lewis action.

In *Pappillion v. Louisiana Dep't of Pub. Safety & Corr.*, No. CV 19-117-SDD-SDJ, 2021 WL 4484992, at *1 (M.D. La. Sept. 3, 2021), report and recommendation adopted, No. CV 19-117-SDD-SDJ, 2021 WL 4480991 (M.D. La. Sept. 29, 2021), an offender at LSP brought §1983 and ADA claims against LSP employees. This Court adopted the magistrate's ruling, which held that plaintiff's claims for injunctive relief were barred by res judicata:

> It is clear that the claims brought by Plaintiff herein are based upon the same nucleus of operative facts as the claims raised in the class action *Lewis v. Cain*.

Plaintiff was included in the class and subclass of prisoners represented in *Lewis*, as the class and subclass were defined as "all inmates who now, or will be in the future, incarcerated at LSP and all qualified individuals with a disability, as defined by the ADA/RA, who are now, or will be in the future, incarcerated at LSP." Here, Plaintiff complains of systematic deficiencies in the medical care provided at LSP, including delaying necessary medical treatment and failing to provide necessary treatments such as physical therapy and follow-up care, as well as exclusion from services and programs as a result of his alleged disability, Lewis also contained claims regarding the systematic failures of LSP to provide medical care and claims regarding the systemic failure of LSP to provide accommodations to disabled inmates.

The *Lewis* class action is one of massive proportions, touching on many aspects of medical care and accommodations, and the remedy phase is to address nearly every facet of medical care at LSP. Thus, an individual cause of action that also includes complaints regarding medical care and accommodations that are subsumed in the class action, is not maintainable. Because Plaintiff brings claims herein that arise from the same common nucleus of operative facts as those claims in *Lewis*, he is barred by the doctrine of res judicata from pursuing his own individual lawsuit that seeks equitable relief within the subject matter of the class action.

*Pappillion v. Louisiana Dep't of Pub. Safety & Corr.*, No. CV 19-117-SDD-SDJ, 2021 WL 4484992, at *3 (M.D. La. Sept. 3, 2021), report and recommendation adopted, No. CV 19-117-SDD-SDJ, 2021 WL 4480991 (M.D. La. Sept. 29, 2021).

In *Gillespie v. Crawford*, 858 F.2d 1101, 1103 (5th Cir. 1988), an offender brought a suit for equitable claims concerning conditions of confinement in Texas. The Fifth Circuit held that the offender could not maintain a claim for declaratory relief because there was a pending class action concerning the conditions of confinement in a Texas prison. In *Ruiz v. Estelle*, 503 F.Supp. 1265 (S.D.Tex.1980), aff'd in part and vacated in part, 679 F.2d 1115, amended in part and vacated in part, 688 F.2d 266 (5th Cir.1982), a plaintiff class composed of all past, present and future inmates confined by the Texas Department of Corrections successfully challenged the constitutionality of conditions at prisons operated by TDC. Plaintiff sought relief that was encompassed by the *Ruiz* class action. The Fifth Circuit held:

Permitting multiple courts to entertain equitable claims and issue decrees that might affect the Texas prison system would require other courts to become familiar with the Ruiz decree, the current problems of the Texas prison system, and the possible disruptive effect of the exercise of equitable powers over matters covered by the Ruiz decree. Moreover, if separate suits for equitable relief are filed in other districts than that in which Ruiz is pending, even with respect to problems not encompassed by the relief granted in Ruiz, the court's orders may hobble the effect of the Ruiz court's continuing decree over the Texas prison system and its power both to enforce and to modify that decree.

The Fifth Circuit held that allowing suits for equitable relief for alleged unconstitutional Texas prison conditions would interfere with the orderly administration of the Ruiz class action and risk inconsistent adjudications.

The same reasoning applies here. Plaintiffs seek to certify an ADA Subclass that is already encompassed in the *Lewis* class action. Plaintiffs bring the same exact claims that are at issue in *Lewis*, and seek injunctive relief. Certifying the same class and allowing the ADA Subclass to bring the same claims that have been adjudicated in *Lewis* would interfere with the *Lewis* class action and risk inconsistent adjudications. As such, Plaintiffs cannot maintain an ADA Subclass in this lawsuit.

### 3. Plaintiffs Failed to Meet Their Burden on Numerosity

"In order to satisfy his burden with respect to this prerequisite, a plaintiff must ordinarily demonstrate some evidence or reasonable estimate of the number of purported class members." *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1038 (5th Cir.1981). "While courts do not require evidence of exact size or identity of class members to satisfy the numerosity requirement, a finding of numerosity may not be based on speculation. A plaintiff cannot rely on conclusory allegations that joinder is impracticable, but must show some evidence or reasonable estimate of the size of the class." *Bozes v. Par. of St. Bernard*, 252 F.R.D. 313, 316 (E.D. La. 2008).

Plaintiffs assert that numerosity is satisfied because 4,000 men are incarcerated at Angola and nearly all are at risk of being assigned to the Farm Line. This is simply incorrect. Many

offenders would not be "at risk" of being assigned to or working the Farm Line. This includes offenders who have a "no duty status," offenders who have an "out of field" duty status, or offenders who have other types of duty statuses that would prevent work in the fields.[28] Plaintiffs further point to a job roster from August 2024 and argues that over 100 men were assigned to the Farm Line. However, some offenders "assigned" to the farm Line are not "at risk" for working on the Farm Line. For example, offenders on the line roster may have a duty status that prevents them from going out to the Farm Line. As such, the fact that an offender is on the line roster does not indicate that they will work on the Farm Line.[29] As such, plaintiffs have failed to show the actual number of offenders who would fall into their class definition.

Regarding the ADA subclass, Plaintiffs have likewise failed to meet their burden of proof. Plaintiffs provide no proof of the number of offenders in their proposed class, and instead attempt to extrapolate US Census Bureau data to the number of offenders at LSP that may have a disability under the ADA. Plaintiffs offer no proof of the number of offenders at LSP with a qualifying disability. Even if they did, this number would not identify the number of offenders within the proposed class. Plaintiffs seek to certify a class of offenders "who have disabilities that substantially limit one or more of their major life activities and who currently are, or may in the future be, assigned to the Farm Line." Plaintiffs submitted no evidence of the number of offenders who have a qualifying disability who may be assigned to the Farm Line. In fact, Plaintiffs cite to Dr. Lavespere testimony that hundreds of people at LSP have out of field duty status. If offenders who have a qualifying disability under the ADA have an out of field duty status, or duty status, or other restrictive duty status, those offenders would not be eligible to work on the Farm Line.

---

[28] Deposition of Davis, p. 21, Exhibit "I"; R.Doc. 120-33, p. 22.
[29] Deposition of Roland Sylvester, Exhibit "B," p. 72.

Plaintiffs have failed to submit any evidence of the actual number of offenders that would be included in both the general class and the sub class. As such, Plaintiffs failed to meet their burden of proof.

### 4.  Plaintiffs Fail to Meet Their Burden on Commonality

"Pursuant to Rule 23(a)(2), there must be "'questions of law or fact common to the class.'" *Ibe*, 2016 WL 4729446, at *7. The United States Supreme Court has explained that "[c]ommonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury." *Ibe*, 2016 WL 4729446, at *7, quoting *Wal-Mart Stores, Inc.*, 564 U.S. at 349 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982)). "Dissimilarities among class members should be considered to determine whether a common question is truly presented." *Ibe*, 2016 WL 4729446, at *7, quoting *Wal-Mart Stores, Inc.*, 564 U.S. at 359.

Rule 23(a)(2)'s commonality requirement demands more than the presentation of questions that are common to the class because "'any competently crafted class complaint literally raises common questions.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, 131 S. Ct. 2541, 2551, 180 L. Ed. 2d 374 (2011). Further, the members of a proposed class do not establish that "their claims can productively be litigated at once," merely by alleging a violation of the same legal provision by the same defendant. *Id*. ("[T]he mere claim by employees of the same company that they have suffered a Title VII injury, or even a disparate-impact Title VII injury, gives no cause to believe that all their claims can productively be litigated at once.").

Additionally, "[m]ere allegations of systemic violations of law…will not automatically satisfy Rule 23(a)'s commonality requirement." *M.D. ex rel. Stukenberg*, 675 F.3d at 844, citing *Lightfoot v. D.C.*, 273 F.R.D. 314, 324 (D.D.C. 2011). Furthermore, in the course of the Court's analysis, "[m]erits questions may be considered to the extent – but only to the extent – that they are relevant to determine whether the Rule 23 prerequisites for class certification are satisfied."

*Steward v. Janek*, 315 F.R.D. 472, 481 (W.D. Tex. 2016), citing *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1195, 185 L. Ed. 2d 308 (2013) (citing *Wal-Mart Stores, Inc*., 131 S. Ct. at 2552, n. 6).

Plaintiffs cannot show that they suffer the same injury and the dissimilarities between the claims and theories preclude a finding of commonality. Regarding the General Class, Plaintiffs assert three theories under the Eighth Amendment: (1) the Heat Theory; (2) the Dignitary Harm Theory; and (2) the Psychological Harm Theory. R.Doc.120-1, p. 19.  Within each of these theories, the alleged injuries suffered by the purported class will necessarily differ. For example, under the Heat Theory, Plaintiffs assert that their Eighth Amendment rights are violated because they are required to work in the heat without adequate mitigation. While Defendants deny that their heat mitigation policies are inadequate, or that the work and conditions of the Farm Line pose a risk, whether individual class members would be at risk or suffer any sort of injury would differ. As Plaintiffs' expert admits, "some healthy people with no known medical problems will tolerate heat more easily."[30] Dr. Vassallo also testified that whether the work on the Farm Line is strenuous would differ depending on each offender's fitness level.[31] Specifically, Dr. Vassallo testified that the risk of heat related injuries will depend on a number of physiological factors concerning that one individual.[32]

Further, Dr. Vassallo's opinions that the heat pathology policies in place are inadequate concern medically vulnerable offenders.  While Dr. Vassallo makes broad sweeping statements that every offender assigned to the Farm Line is at substantial risk of harm, these broad statements are based on lack of "necessary interventions" of adequate rest breaks and access to water and

---

[30] R.Doc. 37-3, p. 20.
[31] Deposition of Dr. Vassallo, Exhibit "J," pg. 59, 76.
[32] Deposition of Dr. Vassallo, Exhibit "J," pg. 84-85.

shade. Since the filing of that declaration, LSP had implemented 15-minute rest breaks every 45 minutes and has built shade wagons with seating. In reality, Dr. Vassallo's opinions are based on the alleged medically vulnerable offenders. As such, under the Heat Theory, each purported class member's claims would not be common where they may not suffer the same injury.

Regarding the Dignitary Harm and the Psychological Harm theories, the nature of these claims will necessarily require offenders to suffer <u>different</u> injuries. Plaintiffs' own expert, which is subject of a *Daubert* motion filed by Defendants,[33] admitted that the alleged risk of psychological ham would not apply equally to Caucasian offenders and African American offenders.[34] The dissimilarities between the purported harm suffered under these theories preclude a finding of commonality.

Regarding the ADA sub-class, these claims likewise lack commonality. In order to determine whether there are common questions of law or fact, a court must trace the class claims and conclude that the common questions will resolve them without the need for additional extensive individualized inquiry. *Dockery v. Fischer*, 253 F. Supp. 3d 832, 849 (S.D. Miss. 2015). Under the ADA, determining a violation requires 'a fact-specific, case-by-case inquiry that considers, among other factors, the effectiveness of ... [a possible] modification in light of the nature of the disability in question.'" *Mealey v. Gautreaux*, No. 16-716-JWD-RLB, 2020 WL 515853, *9 (M.D. La. Jan. 31, 2020).

Plaintiffs seek to certify a subclass of offenders "who have disabilities that substantially limit one or more of their major life activities and who currently are, or may in the future be, assigned to the Farm Line." R.Doc.120-1, p. 5. At the outset, the type of any alleged disability and whether that disability would preclude assignment to the Farm Line would differ. Purported class

---

[33] R.Doc. 125, 126.
[34] R.Doc. 126-8, p. 32 of deposition.

members could claim a wide variety of disabilities which may or may not require an accommodation of no field work.[35] For example, dyslexia is considered a disability under the ADA. If an offender is dyslexic, and requests an "accommodation" of removal from the Farm Line, would any denial of that request violate the ADA? The issue of whether each putative subclass member has a qualifying disability, is being denied access to programs by reason of that disability, or whether the ADA would require that the accommodation be removal from the Farm Line, would not be common.

Looking at the named plaintiffs as an example demonstrates that common questions of law or fact do not exist. For example, Nate Walker claims he has qualifying disabilities of high blood pressure, glaucoma, thyroid cancer and depression. R.Doc. 21, p. 6.  Dr. Vassallo opines that Walker's medications affect his ability to thermoregulate. R.Doc. 54. However, Walker has received a Heat Precaution Duty status since 2017.  R.Doc. 130-1, p. 3.  Walker has not required to work in the field if the heat index exceeds 88 degrees. Even if Walker has a disability, which Plaintiffs have failed to show, Walker has been provided with a Heat Precaution duty status. Whether the ADA would require LSP to issue a more restrictive duty status is a fact intensive question that will wholly depend on the specific medical care of Walker, i.e., an individualized inquiry.

On the other hand, Damaris Jackson seeks to represent the ADA subclass and alleges that he has a disability of high blood pressure, which impairs his ability to thermoregulate. Whether

---

[35] "It is well-established that "[t]he ADA provides for reasonable accommodation, not preferred accommodation. The accommodation of the inmate's disability need not be ideal; instead, it need only be reasonable and effective." *Lewis v. Cain*, 701 F. Supp. 3d 361, 438 (M.D. La. 2023). Further, a correctional facility is afforded deference in its determination of an appropriate accommodation." *Mealey v. Gautreaux*, No. 16-716-JWD-RLB, 2020 WL 515853, *9 (M.D. La. Jan. 31, 2020). "[T]he ADA invariably requires 'a fact-specific, case-by-case inquiry that considers, among other factors, the effectiveness of ... [a possible] modification in light of the nature of the disability in question.'" *Id.*

Jackson's alleged high blood pressure substantially limits his ability to thermoregulate, whether the current heat pathology policies adequately accommodate this alleged disability, and whether the ADA would require LSP to take Jackson out of the field would be fact sensitive inquiries that would not be common with other putative class members. Plaintiffs cannot show commonality among the disability subclass given the individualized, fact specific inquiry required under the ADA.

### 5. Plaintiffs Fail to Meet Typicality

For the same reasons explained above, Plaintiff fails to meet the typicality requirement. Plaintiffs have not shown that under their three different General class theories, whether the named plaintiffs' alleged "heat" harm, "dignitary" harm, or "phycological" harm would be typical of other purported class members. Whether one offender may suffer dignity or psychological harm may not be typical of others. Further, heat sensitivity will differ among individuals, and the named plaintiffs' claims are not typical of other claims. The same reasoning applies to the ADA Subclass.

In addition, none of the named plaintiffs are currently assigned to the Farm Line. In fact, when suit was filed only two named plaintiffs were assigned to the Farm Line.[36] The named Plaintiffs' claims are not typical.

### 6. Plaintiffs Fail to Meet Adequacy

Rule 23(a)(4) requires a showing that "the representative parties will fairly and adequately protect the interests of the class." The named Plaintiffs cannot adequately represent the class where none of the named Plaintiffs are currently assigned to the Farm Line. As such, no named plaintiff could testify as to the current conditions of the Farm Line, to include changes made since June

---

[36] R.Doc. 46-14.

2024.[37] No named Plaintiff is currently as risk for being assigned to the Farm Line. As such, adequacy is not met.

### 7. Plaintiff fails to meet the requirements of Rule 23(b)(2)

Rule 23(b)(2) provides that class certification is appropriate where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed.R.Civ.P. 23(b)(2). By its terms, then, Rule 23(b)(2) imposes two independent but related requirements. In the first place, the Defendants' actions or inactions must be based on grounds generally applicable to all class members. The latter half of Rule 23(b)(2) requires that final injunctive relief be appropriate for the class as a whole. The rule therefore authorizes an inquiry into the relationship between the class, its injuries, and the relief sought, and courts have interpreted the rule to require that a class must be "amenable to uniform group remedies." *Shook v. Bd. of Cty. Commissioners of Cty. of El Paso*, 543 F.3d 597, 604 (10th Cir. 2008). Put differently, Rule 23(b)(2) demands a certain cohesiveness among class members with respect to their injuries, the absence of which can preclude certification. *Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 524 (5th Cir.2007).

This cohesiveness has at least two aspects. First, the class must be sufficiently cohesive that any class-wide injunctive relief can satisfy the limitations of Federal Rule Civil Procedure 65(d)—namely, the requirement that it "state its terms specifically; and describe in reasonable detail ... the act or acts restrained or required." Fed.R.Civ.P. 65(d)(1); *Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 524 (5th Cir. 2007). Second, "[a] class action may not be certified under Rule 23(b)(2) if relief specifically tailored to each class member would be necessary to correct the

---

[37] R.Doc. 130-1, p. 2-3.

allegedly wrongful conduct of the defendant." *Shook v. Bd. of Cty. Commissioners of Cty. of El Paso*, 543 F.3d 597, 604 (10th Cir. 2008). So, if redressing the class members' injuries requires time-consuming inquiry into individual circumstances or characteristics of class members or groups of class members, "the suit could become unmanageable and little value would be gained in proceeding as a class action." *Id.* at 604. Further, individual issues cannot be avoided simply by formulating an injunction at a stratospheric level of abstraction because "injunctions simply requiring the defendant to obey the law are too vague to satisfy Rule 65." *Id.*

Plaintiffs assert that they satisfy Rule 23(b)(2) because the injunctive relief they seek is a complete stoppage of the Farm Line. However, Plaintiffs have asserted that they seek different relief as to the ADA subclass which includes removal of "members of the ADA Subclass from assignment to the Farm Line as required by the ADA and Section 504." R.Doc. 130, p. 4-5. This requested relief would require time-consuming inquiry into individual circumstances or characteristics of class members or groups of class members.

"It is well-established that "[t]he ADA provides for reasonable accommodation, not preferred accommodation. The accommodation of the inmate's disability need not be ideal; instead, it need only be reasonable and effective." *Lewis v. Cain*, 701 F. Supp. 3d 361, 438 (M.D. La. 2023). Further, a correctional facility is afforded deference in its determination of an appropriate accommodation." *Mealey v. Gautreaux*, No. 16-716-JWD-RLB, 2020 WL 515853, *9 (M.D. La. Jan. 31, 2020). Nevertheless, "the ADA invariably requires 'a fact-specific, case-by-case inquiry that considers, among other factors, the effectiveness of ... [a possible] modification in light of the nature of the disability in question.'" *Id*.

As discussed above, even if a purported class member has a qualifying disability under the ADA, this would not automatically require removal from the Farm Line as an accommodation.

Courts must look to the disability in question to assess possible accommodations. For example, an offender who may have a claimed disability of anxiety, without the presence of any medication that may increase sensitivity to heat, would not necessarily be entitled to an accommodation of removal from the Farm Line. While Plaintiffs may argue why a particular offender's anxiety, or some other form of qualifying disability, would require an accommodation of removal from the Farm Line, it would require an individualized assessment to determine whether that offender would be entitled to the requested relief. The injunction sought, removal of ADA individuals from the Farm Line, would not apply equally across the class, because not every class member may be entitled to such an accommodation.

### 8.   Plaintiffs Failed to Exhaust Their Administrative Remedies for Some Claims

As explained by the Fifth Circuit, "[t]he [PLRA] mandates that '[n]o action shall be brought with respect to prison conditions ... by a prisoner ... until such administrative remedies as are available are exhausted.' 42 U.S.C.A. § 1997e(a). The Supreme Court has held that 'the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes.'" *Gates*, 376 F.3d at 329, citing *Porter v. Nussle*, 534 U.S. 516, 532, 122 S. Ct. 983, 152 L. Ed. 2d 12 (2002). In addition, the Fifth Circuit in Gates noted that at least one class member must exhaust his administrative remedies in order for the class to be certified. *Gates*, 376 F.3d at 330, citing *Oatis v. Crown Zellerbach Corp*., 398 F.2d 496, 498–99 (5th Cir. 1968).

Moreover, "[A] class of prisoner-plaintiffs certified under Rule 23(b)(2) satisfies the PLRA's administrative exhaustion requirement through 'vicarious exhaustion,' i.e., when 'one or more class members ha[s] exhausted his administrative remedies with respect to each claim raised by the class.'" *Chandler v. Crosby*, 379 F.3d 1278, 1287 (11th Cir. 2004), citing *Jones v. Berge*, 172 F. Supp. 2d 1128, 1133 (W.D. Wis. 2001).

In *Johnson v. Johnson*, the Fifth Circuit discussed how much detail is required in a grievance for purposes of effectively exhausting administrative remedies. *Johnson v. Johnson*, 385 F.3d 503 (5th Cir. 2004). The *Johnson* Court explained that one of the purposes of the exhaustion requirement is to give officials "time and opportunity to address complaints internally." Therefore, a grievance "should be considered sufficient to the extent that the grievance gives officials a fair opportunity to address the problem that will later form the basis of the lawsuit."

All of the named Plaintiffs filed nearly identical ARPs in this matter setting forth the "Heat Theory" and alleged violations of the ADA where applicable. R.Doc. 37-40, 37-41, 37-42, 37-48, 37-51, 37-60, 37-61, 37-69.  None of the named Plaintiffs included the Dignitary Harm or the Psychological Harm allegations in their ARPs. As such, Plaintiffs failed to exhaust their administrative remedies regarding these claims and a class cannot be certified for these claims.

## III.    Conclusion

Plaintiffs fail to meet their burden of proof on class certification. For the reasons above, the Court should deny Plaintiffs' Motion for Cass Certification.

Respectfully submitted,

**KEOGH, COX & WILSON, LTD.**

By:    s/Andrew Blanchfield
Andrew Blanchfield, T.A. (#16812)
Email: ablanchfield@keoghcox.com
C. Reynolds LeBlanc (#33937)
Email: rleblanc@keoghcox.com
Chelsea A. Payne (#35952)
Email: cpayne@keoghcox.com
Post Office Box 1151
Baton Rouge, Louisiana 70821
Telephone:  (225) 383-3796
Facsimile:  (225) 343-9612

**CERTIFICATE OF SERVICE**

I hereby certify that I have this date electronically filed the foregoing with the Clerk of Court by utilizing the CM/ECF system, and a copy of the above and foregoing was this day forwarded by the Court's ECF Delivery System to all counsel of record.

Baton Rouge, Louisiana, this 21st day of October, 2024.


_____s/Andrew Blanchfield_____
Andrew Blanchfield