# Exhibit E

# PRISON ENTERPRISES - EVALUATION OF OPERATIONS

# DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS



PERFORMANCE AUDIT SERVICES
ISSUED MAY 1, 2019

**LOUISIANA LEGISLATIVE AUDITOR**
**1600 NORTH THIRD STREET**
**POST OFFICE BOX 94397**
**BATON ROUGE, LOUISIANA 70804-9397**

**LEGISLATIVE AUDITOR**
DARYL G. PURPERA, CPA, CFE

**ASSISTANT LEGISLATIVE AUDITOR**
**FOR STATE AUDIT SERVICES**
NICOLE B. EDMONSON, CIA, CGAP, MPA

**DIRECTOR OF PERFORMANCE AUDIT SERVICES**
KAREN LEBLANC, CIA, CGAP, MSW

FOR QUESTIONS RELATED TO THIS PERFORMANCE AUDIT, CONTACT
EMILY DIXON, PERFORMANCE AUDIT MANAGER,
AT 225-339-3800.

Under the provisions of state law, this report is a public document. A copy of this report has been submitted to the Governor, to the Attorney General, and to other public officials as required by state law. A copy of this report is available for public inspection at the Baton Rouge office of the Louisiana Legislative Auditor and online at www.lla.la.gov.

This document is produced by the Louisiana Legislative Auditor, State of Louisiana, Post Office Box 94397, Baton Rouge, Louisiana 70804-9397 in accordance with Louisiana Revised Statute 24:513. Ten copies of this public document were produced at an approximate cost of $19.00. This material was produced in accordance with the standards for state agencies established pursuant to R.S. 43:31. This report is available on the Legislative Auditor's website at www.lla.la.gov. When contacting the office, you may refer to Agency ID No. 9726 or Report ID No. 40170017 for additional information.

In compliance with the Americans With Disabilities Act, if you need special assistance relative to this document, or any documents of the Legislative Auditor, please contact Elizabeth Coxe, Chief Administrative Officer, at 225-339-3800.

LOUISIANA LEGISLATIVE AUDITOR
**DARYL G. PURPERA, CPA, CFE**

May 1, 2019

The Honorable John A. Alario, Jr.,
  President of the Senate
The Honorable Taylor F. Barras,
  Speaker of the House of Representatives

Dear Senator Alario and Representative Barras:

This report provides the results of our performance audit of Prison Enterprises (PE). The purpose of the audit was to evaluate PE's overall operations, including whether it met its statutory purposes.

Overall, we found that PE met its three statutory purposes: to use the resources of the Department of Corrections (DOC) in the production of food, fiber, and other items needed by inmates to help lower the cost of incarceration; to provide products and services to state agencies, parishes, municipalities, other political subdivisions, and public employees; and to provide work opportunities for offenders.

However, we also found some areas in which the organization could strengthen its operations.  For instance, although PE was able to help reduce the costs of incarceration by paying $3.8 million in wages to offenders between fiscal years 2016 and 2018, it could provide officials with information about how it lowered other incarceration costs as well.

In addition, between fiscal years 2016 and 2018, 22.7 percent of PE's total sales were to state agencies other than DOC. Those sales might have been higher if a mechanism were in place to ensure state agencies complied with the law that requires them to buy products and services from PE if the prices are less than those of the Office of State Procurement.

PE also provided work opportunities for offenders. However, nearly 40 percent of the offenders working for PE are serving life sentences, and some offenders are working in fields that the Louisiana Workforce Commission has projected to decrease in the future. This means many of the offenders working for PE may not be learning job skills that could help them after they are released.

We found, as well, that PE's expenses exceeded its revenues and that the organization used more cash than it generated in 11 of the past 23 years. PE also did not comply with its

The Honorable John A. Alario, Jr.,
  President of the Senate
The Honorable Taylor F. Barras,
  Speaker of the House of Representatives
May 1, 2019
Page 2


pricing policy for some manufactured items between fiscal years 2016 and 2018. As a result, the organization overcharged customers by at least $55,306 and undercharged customers by at least $81,947 for items whose prices should have been fixed.

In addition, PE had no comprehensive marketing plan to help promote its products and services, nor did it have a process for tracking whether the approximately $117,000 spent on marketing efforts between fiscal years 2016 and 2018 generated a financial benefit proportionate to the costs.

PE also did not ensure that all complaints were logged and resolved in a timely manner, and it did not have an effective process in place to make sure orders were delivered on time. We found that the number of complaints PE received increased by 121.2 percent between fiscal years 2016 and 2018, and late deliveries increased from 30.7 percent to 40.3 percent.

The following report contains our findings, conclusions, and recommendations. Appendix A contains PE's response to this report. I hope this report will benefit you in your legislative decision-making process.

We would like to express our appreciation to the management and staff of PE and DOC for their assistance during this audit.

Respectfully submitted,

Daryl G. Purpera, CPA, CFE
Legislative Auditor


DGP/aa

PRISON ENTERPRISES

# Louisiana Legislative Auditor

### Daryl G. Purpera, CPA, CFE

### Prison Enterprises - Evaluation of Operations
### Department of Public Safety and Corrections

May 2019



*Audit Control # 40170017*

## Introduction

We evaluated Prison Enterprises' (PE) overall operations, including whether it met its statutory purposes. PE is an ancillary agency within the Department of Public Safety and Corrections. We conducted this audit because of legislative interest, and because we have not conducted a performance audit of PE since 1997.[1] State law (R.S. 15:1153) requires that PE meet the following three purposes, in order of priority:

> **The mission of Prison Enterprises** is to lower the costs of incarceration by providing productive job opportunities to offenders that instill occupational and skills training while producing quality products and services for sale to state and local governments, non-profit organizations, political subdivisions, and others. Operations of PE's programs serve to further the DOC Reentry Initiative by enabling offenders to increase the potential for successful rehabilitation and reintegration into society.

- To utilize the resources of the Department of Corrections (DOC) in the production of food, fiber, and other necessary items used by the inmates in order to lower the cost of incarcerating offenders.

- To provide products and services to state agencies and agencies of parishes, municipalities, other political subdivisions, and public employees.

- To provide work opportunities for offenders.

During fiscal year 2018, PE operated 27 different operations within manufacturing, wholesale, service, and agricultural industries at seven of the state's eight correctional facilities and one privately-run correctional center.[2] PE produces various products, such as garment items, furniture, and license plates, and provides canteen items to state correctional facilities and janitorial services to state buildings. As of June 30, 2018, 62 full-time state employees assist PE with performing administrative functions and overseeing industry operations and transportation activities across the state. PE is funded solely through interagency transfers; fees; self-generated revenues from its sales to state agencies, municipalities, parishes, and non-profit organizations; as well as sales of agricultural products on the open market. In fiscal year 2018, PE's total revenues for all industries were approximately $27.9 million, and total expenditures were approximately $28.0 million. The majority of PE's expenditures (approximately $21.2 million,

---

[1] Our 1997 performance audit of PE can be found here:
http://www.lla.state.la.us/PublicReports.nsf/D4B512B51DF4B38986256FF80067E151/$FILE/00000960.pdf.
[2] Winn Correctional Center in Winnfield, LA

or 75.2%) in fiscal year 2018 was spent on the costs of goods sold, which includes raw materials, factory overhead, and related personnel expenses.

As of June 30, 2018, 767[3] offenders worked for PE operations, representing approximately 7.2% of the 10,692 offenders who were earning incentive wages or good time while incarcerated in state facilities at that time. Exhibit 1 shows PE's operations across the state, and Appendix C contains a detailed overview of these operations.



**Source**: Prepared by legislative auditor's staff using information provided by PE.

The objective of this performance audit was to:

**Evaluate PE's operations, including whether it met its statutory purposes.**

Our results are summarized on the next page and discussed in further detail throughout the remainder of the report. Appendix A contains PE's response to this report, and Appendix B details our scope and methodology. In addition, Appendix D summarizes the findings and recommendations from our 1997 performance audit of PE, Appendix E lists selected best practices from *Correctional Industries: A Guide to Reentry-Focused Performance Excellence*, Appendix F details PE net income by industry for fiscal years 2016 through 2018, and Appendix G details PE expenditures during this time.

---

[3] This number includes 82 offenders working at the privately-run Winn Correctional Center.

## Objective: To evaluate PE's operations, including whether it met its statutory purposes.

Overall, we found that PE met its three statutory purposes; however, we found areas where it could strengthen its operations. We identified the following:

- **PE met its first statutory purpose of reducing the cost of incarceration by paying $3.8 million in offender wages from fiscal year 2016 through 2018, but could better demonstrate how it lowered other incarceration costs.** For example, PE sold $17 million in products and services to DOC in fiscal year 2017 but needs to work with DOC to demonstrate whether these sales reduced costs for correctional facilities.

- **PE met its second statutory purpose of providing products and services to state and local agencies. From fiscal years 2016 to 2018, 22.7% of its total sales were to state agencies other than DOC.** However, sales to state agencies may have been higher if a mechanism existed to ensure that state agencies comply with the law that requires them to purchase products and services from PE if the prices are less than those of the Office of State Procurement.

- **PE met its third statutory purpose of providing work opportunities for offenders. However, this statutory purpose does not align with other states and best practices that recommend correctional industries teach transferable job skills to help offenders get jobs after release. Currently, 39.2% of offenders in PE are serving life sentences, and 32.5% of PE offenders are working in fields that the Louisiana Workforce Commission (LWC) has projected to have a decrease in future employment.** In addition, PE no longer participates in the Prison Industries Enhancement program that includes partnerships with businesses to provide offenders with work opportunities that are relevant to the job market and pay higher wages.

- **During fiscal years 1996 through 2018, PE's expenses exceeded its revenues, and PE used more cash than it generated in 11 (47.8%) of the last 23 years. In addition, operations, such as silk screen, printing, and corn and cotton production were not profitable at all during fiscal years 2016 through 2018.** Because best practices recommend that correctional industries be financially sustainable and maintain positive cash flow in order to ensure long-term viability, PE should document its evaluation of the profitability of each operation and limit non-essential expenditures that affect its financial sustainability.

- **PE did not comply with its pricing policy for some manufactured items during fiscal years 2016 through 2018. As a result, PE overcharged customers by at least $55,306 and undercharged customers by at least $81,947 for items whose prices should have been fixed based on PE's statewide contract.** In addition, unlike other states, both PE and DOC markup

wholesale prices for canteen items, such as candy bars, which may result in offenders paying higher prices for these items.

- **PE has not developed a comprehensive marketing plan that describes how it will promote its products and services, as recommended by best practices.** In addition, PE does not have a process for tracking whether the approximately $117,000 spent on marketing efforts during fiscal years 2016 through 2018 generated a financial benefit, such as increased sales, that is proportionate to the costs, as required by policy.

- **PE has not ensured that all complaints are logged and resolved timely and has not developed an effective process to ensure that orders are delivered on time.** According to best practices, good customer service is important because it directly impacts sales; however, the number of PE complaints increased by 121.2% between fiscal years 2016 and 2018, and late deliveries increased from 30.7% to 40.3%.

Many of these findings are the same or similar to the findings we cited in our 1997 performance audit of PE. These issues and our recommendations to strengthen PE's processes are explained in further detail in the sections below.

---

**PE met its first statutory purpose of reducing the cost of incarceration by paying $3.8 million in offender wages from fiscal year 2016 through 2018, but could better demonstrate how it lowered other incarceration costs. For example, PE sold $17 million in products and services to DOC in fiscal year 2017 but has not demonstrated whether these sales reduced costs for correctional facilities.**

PE's first statutory purpose is to lower the cost of incarcerating offenders, which it meets by paying incentive wages for all DOC offenders, whether they work for PE or DOC, that would otherwise be paid out of the state general fund. As mandated by the Louisiana Administrative Code,[4] PE paid approximately $1,243,779 in incentive wages to all offenders during fiscal year 2018, of which approximately $145,325 (11.7%) was paid to offenders working in PE operations.[5] PE incentive wage rates range from an introductory rate of $0.02 to $0.20 per hour depending on the skill, industry, and nature of the work performed by the offender. According to PE, although state law[6] authorizes it to pay higher salaries to offenders working in PE operations, it has not yet done so because of budget constraints. With the exception of three states,

---

[4] LAC 22:I.331
[5] According to the 2018 National Correctional Industries Association (NCIA) Directory, Louisiana is only one of three states that require its correctional industries to pay non-correctional industry offender wages, along with North Carolina and Massachusetts.
[6] R.S. 15:873 states that the rate of compensation for DOC offenders is no more than 20 cents per hour; for offenders assigned to Prison Enterprises is up to 40 cents per hour; and for offenders who work as certified academic and educational tutors is up to $1.00 per hour.

Louisiana has the lowest incentive pay rate ranges for offenders working in correctional industries,[7] according to the 2018 National Correctional Industries Association (NCIA) Directory.[8]  Some offender workers can choose to earn a reduction in their sentences, known as good time, instead of wages.  However, DOC policy[9] states that offenders not eligible to earn good time must work three years before they can earn incentive pay.  Exhibit 2 shows the pay rates of offenders working for PE as of June 30, 2018.

| Exhibit 2<br>Pay Rates for Offenders Working in PE Operations<br>As of June 30, 2018 | | |
|---|---|---|
| **Pay Rate Per Hour** | **Number of Offenders** | **Percentage of Offenders** |
| $0.00* | 104 | 13.6% |
| $0.02** – 0.10 | 180 | 23.5% |
| $0.11 – 0.20 | 350 | 45.6% |
| Suspended Pay Due To Disciplinary Action | 2 | 0.3% |
| Good Time Earned | 131 | 17.0% |
| **Total** | **767** | **100%** |
| *DOC policy states that offenders not eligible to earn good time must work three years before they can earn incentive pay.<br>**Introductory incentive pay rate starts at $0.02 per hour in accordance with DOC Policy.<br>**Source:** Prepared by legislative auditor's staff using information provided by PE. | | |

PE also states that it reduces the cost of incarcerating offenders by having its staff supervise offenders working in PE operations, reimbursing correctional facilities for correctional officers that supervise PE janitorial crews, and obtaining lower prices for meat and canteen items with bulk purchases for all state correctional facilities.   In addition, PE states that it further lowers incarceration costs because offenders working in its operations consistently have lower recidivism rates than the overall offender population.  According to DOC, the five-year recidivism rate for offenders in state correctional institutions was 43.4% in 2018, compared to 31.9% for offenders working in PE operations.

**Although not required by law, PE could better document how it has lowered other incarceration costs, including how its $17 million in sales to DOC and correctional facilities during fiscal year 2017 helped reduce incarceration costs.**  PE was also cited in our 1997 report for not measuring or documenting the cost-effectiveness of providing products and services to DOC.  Exhibit 3 outlines PE's $17 million in sales to DOC in fiscal year 2017, by PE operation.

---

[7] Best practices refer to PE and its counterparts in other states as correctional industries.
[8] According to the 2018 NCIA Directory, offenders in Arkansas, Georgia, and Texas do not receive incentive wages.
[9] DOC Regulation No. B-09-001, *Offender Incentive Pay and Other Wage Compensation*

| Exhibit 3 PE Sales to DOC by PE Operation Fiscal Year 2017 | | |
|---|---|---|
| **PE Operation** | **Sales $** | **Sales %** |
| Canteen Distribution Center | $7,722,269 | 45.3% |
| Wakefield Meat Plant | 3,704,406 | 21.7% |
| Hunt Soap Plant | 1,140,534 | 6.7% |
| LCIW Garment Factory/Uniforms | 1,087,657 | 6.4% |
| Winn Garment Factory | 1,022,378 | 6.0% |
| Hunt Garment Factory | 631,133 | 3.7% |
| Embroidery/Uniforms | 424,133 | 2.5% |
| Metal Fabrication | 408,384 | 2.4% |
| Mattress, Broom, and Mop Factory | 397,867 | 2.3% |
| Print Shop | 236,705 | 1.4% |
| DCI Chair Plant | 132,683 | 0.8% |
| Allen Furniture Restoration | 94,041 | 0.6% |
| Silk Screen Shop | 34,196 | 0.2% |
| Tag Plant | 741 | 0.0% |
| **Total** | **$17,037,126** | **100.0%** |
| **Source:** Prepared by legislative auditor's staff using information provided by PE. | | |

Demonstrating PE's cost-effectiveness is important, in part, because state law[10] authorizes Louisiana correctional facilities to purchase products and services from vendors located in the parish in which the correctional facility is located, if the prices are less than those of OSP or PE. However, DOC internal policy requires all state correctional facilities to purchase products from PE unless there is a compelling reason to utilize another vendor. Two of the three facilities we spoke with purchased their products from PE without researching other vendors that may have offered products of similar quality at lower prices. The third stated that it rarely gets DOC approval for such purchases from another vendor.

Other states, such as Mississippi and California, are required to issue annual reports to the legislature and other stakeholders that provide information about their correctional industries. Although PE issues an annual report to DOC, this report is not on PE's website and does not include detailed information on how it lowers the cost of incarceration. In contrast, PE's contract of available products with prices is available on OSP's website and is updated annually.

**Matter for Legislative Consideration:** The legislature may wish to consider requiring PE to report annually on how it lowered the cost of incarcerating offenders and complied with its first statutory purpose.

---

[10] R.S. 15:1157, revised by Act No. 248 of the 2017 Regular Legislative Session, effective June 14, 2017.

**PE met its second statutory purpose of providing products and services to state and local agencies. From fiscal years 2016 to 2018, 22.7% of its total sales were to state agencies other than DOC. However, sales to state agencies may have been higher if a mechanism existed to ensure that state agencies comply with the law that requires them to purchase products and services from PE if the prices are less than those of the Office of State Procurement.**

PE met its second statutory purpose to provide products and services to state and local agencies. From fiscal years 2016 through March 2018, PE sold over $74.4 million in products and services. Of this amount, approximately $42.8 million (57.5%) was sold to DOC, and approximately $16.9 (22.7%) million was sold to other state agencies. Exhibit 4 shows a breakdown of all PE sales from fiscal years 2016 through 2018.



**Exhibit 4**
**PE Sales ($74.4 Million Total Sales)**
**Fiscal Years 2016 through 2018***

Other State Agencies $16,869,250 22.7%

Agricultural Commodities $8,716,843 11.7%

Department of Corrections $42,768,634 57.5%

Local Governments 2,924,673 3.9%

Other $3,091,992 4.2%

*We obtained JD Edwards data from PE in March 2018; therefore, this analysis does not include all sales for fiscal year 2018.
**Source**: Prepared by legislative auditor's staff based on JD Edwards data provided by PE.

State agencies purchase items such as furniture, cleaning supplies, license plates, and garments from PE. Exhibit 5 shows what state agencies purchased from PE during fiscal year 2017.

| Exhibit 5 PE Sales to State Agencies Fiscal Year 2017 | | |
|---|---|---|
| **Executive Branch State Agency** | **Examples of Purchases** | **Amount** |
| Department of Public Safety (Excluding DOC) | License plates, cleaning supplies, furniture | $3,226,794 |
| Division of Administration | Janitorial services, furniture | 2,327,921 |
| Department of Transportation and Development | Janitorial services, furniture | 389,661 |
| Office of Juvenile Justice | Meat products, garments, canteen | 323,498 |
| Louisiana Workforce Commission | Janitorial services, garments, cleaning supplies | 252,034 |
| Department of Health | Furniture, garments | 202,510 |
| Department of Children and Family Services | Garments, mattresses | 126,687 |
| Department of Culture, Recreation, and Tourism | Furniture, garments | 37,114 |
| Secretary of the State | Furniture, silk screen services | 24,906 |
| Department of Environmental Quality | Silk screen services | 11,364 |
| Department of Civil Service | Furniture restoration | 9,690 |
| Department of Justice | Furniture, silk screen services | 9,050 |
| Department of Wildlife and Fisheries | Furniture, cleaning supplies | 4,388 |
| Department of Revenue | Silk screen services | 1,515 |
| Department of Natural Resources | Silk screen services | 1,250 |
| Department of Agriculture and Forestry | Embroidery services, cleaning supplies | 984 |
| Department of Veterans Affairs | Print services, silk screen services | 964 |
| Department of Education | Silk screen services | 837 |
| Public Service Commission | Print services, silk screen services | 344 |
| **Total** | | **$6,951,509** |
| **Note:** Total amounts do not match due to rounding. **Source:** Prepared by legislative auditor's staff based on JD Edwards data provided by PE. | | |

      **Sales to state agencies may have been higher if a mechanism existed to ensure that state agencies comply with the law[11] that requires them to purchase products and services from PE if the prices are less than those offered on statewide contracts through the Office of State Procurement (OSP).[12]**  According to OSP management, it does not have any processes to ensure that state agencies follow the statutory requirement to buy from PE.  OSP stated that one way for PE to increase sales would be to monitor invitations for bids from other state agencies and contact these agencies directly with its offer if it can provide the products or services requested.  According to OSP, it advises other state agencies to contact PE when services and products they are requesting for OSP to bid may be available through PE (i.e., furniture, signage, uniforms, etc.).  According to the 2018 NCIA Directory, 12 of the 32 states that mandate their correctional industries receive preference in the State Procurement process also have a mechanism to enforce this requirement.  For example, five of these states[13] require state agencies to obtain a certification from correctional industries staff that correctional industries cannot provide a product as requested before an agency's purchase from another vendor can be approved.

      **Matter for Legislative Consideration:**  The legislature may wish to consider specifying who should enforce R.S. 15:1157(A)(1)(2) to ensure that state agencies are in

---

[11] R.S. 15:1157(A)(1)
[12] OSP manages the purchasing of equipment, goods, supplies, and operating services needed by state agencies by researching, developing, and issuing statewide and agency-specific contracts.
[13] Colorado, Missouri, Ohio, Virginia, and West Virginia

compliance with the requirement to purchase products and services from PE when the prices are less than those offered on statewide contracts through OSP.

---

**PE met its third statutory purpose of providing work opportunities for offenders. However, this statutory purpose does not align with other states and best practices that recommend correctional industries teach transferable job skills to help offenders get jobs after release. Currently, 39.2% of offenders in PE are serving life sentences, and 32.5% of PE offenders are working in fields that LWC has projected to have a decrease in future employment.**

Unlike 21 other states and best practice[14] recommendations, PE's statutory purpose of providing work opportunities for offenders does not require that the work opportunities explicitly assist offenders with finding employment after they are released. Other states' laws require their programs to focus specifically on providing work opportunities to help offenders become productive citizens once they are released. For example, Colorado[15] is required to provide offenders with training and general work skills that will assist them in finding employment upon release, and Washington[16] provides work training and experience so offenders can qualify for better work upon release. Best practices[17] also recommend that PE create a work environment that simulates real world work experience and effectively trains and prepares offenders for the transition to private sector employment upon release. This includes creating a culture focused on offender reentry success through employment readiness, implementing certificate based soft skills training, providing certified technical skills training, and providing post release employment services.

**Most offenders participating in PE are serving sentences longer than 10 years, and 32.5% of PE offenders are working in fields that LWC has projected to have a decrease in employment in the future.** Of 767[18] total offenders working for PE as of June 30, 2018, 301 (39.2%) were serving life sentences and will likely never be released from correctional facilities. However, according to PE, offenders serving life sentences serve as a stable workforce for its operations and provide training to new offenders. Exhibit 6 shows the number of PE offenders working in each industry broken down by their earliest eligible release dates as of June 30, 2018.

---

[14] *Correctional Industries: A Guide to Reentry-Focused Performance Excellence* (see Appendix E)
[15] Colorado R.S.17-24-102
[16] Revised Code of Washington 72.09.100
[17] See Appendix E.
[18] This number includes 82 offenders working at the privately-run Winn Correctional Center.

| Exhibit 6 Earliest Release Dates for PE Offenders As of June 30, 2018 | | |
|---|---|---|
| **Earliest Release Date Eligibility** | **Number of Offenders** | **Percentage of Offenders** |
| Within 10 years | 325 | 42.4% |
| Within 11 to 20 years | 74 | 9.6% |
| Within 21 to 30 years | 29 | 3.8% |
| Within 31 to 40 years | 12 | 1.6% |
| Within 41 to 60 years | 19 | 2.5% |
| Within 61 to 90 years | 7 | 0.9% |
| Life Sentence | 301 | 39.2% |
| **Total** | **767** | **100.0%** |
| **Source**: Prepared by legislative auditor's staff using information provided by PE. | | |

Although any job training for offenders has value, not all of PE's job opportunities mirror employment opportunities available in the private sector in Louisiana. For example, according to PE, 30.1% of its offenders worked in garment factories as of June 30, 2018, but industry projections from LWC from 2016 to 2026 estimate that employment in textile product mills[19] will decrease by 4.3%, and apparel manufacturing jobs will decrease by 4.5%.[20] However, 27.0% of PE offenders worked in the furniture manufacturing and metal fabrication operations during this same time, and LWC projected employment in these areas to increase by 10.0% and 8.4%, respectively.

Best practices[21] recommend that correctional industries conduct research to ensure that the skills offenders learn align with the needs of the current job market. Correctional industries should also consult directly with private sector employers and business associations to determine the types of technical and soft skills they require. One of PE's strategic goals for fiscal years 2015 through 2022 is to increase involvement with DOC's Office of Reentry Services, which aims to prepare offenders for successful reintegration into their communities. By better coordinating with DOC's reentry division, PE could create a mechanism that tracks whether released offenders were successful in finding employment related to the training they received while working for PE. In July 2018, PE and DOC's reentry division received approval from the State Apprenticeship Council to establish a welder/fitter Registered Apprenticeship Program at Angola. Offenders who successfully complete this program will have their certification placed in a nation-wide federal database available to potential employers upon release.

**While PE is certified to participate in the Prison Industries Enhancement (PIE) program,[22] it has not been able to find a private sector partner to participate in the**

---

[19] According to the Bureau of Labor Statistics, textile product mills manufacture textile products by purchasing materials and adding decorative stitching such as embroidery or other art needlework on textile products, including apparel.
[20] "State of Louisiana 2016-2026 Projected Employment by Industry" http://www.laworks.net/LaborMarketInfo/LMI_OccIndustryProj.asp?years=20162026
[21] See Appendix E.
[22] The Bureau of Justice Assistance, a part of the United States Department of Justice, certified the Department of Public Safety and Corrections as a PIE program participant on January 20, 1994.

**program since fiscal year 2011.** The PIE Certification Program was created by Congress in 1979 to encourage states and units of local government to establish employment opportunities for offenders that approximate private sector work opportunities. PIE is designed to place offenders in a realistic work environment, pay them the prevailing local wage for similar work, and enable them to acquire marketable skills to increase their potential for successful rehabilitation and meaningful employment upon release. This program also requires that offenders receive minimum wage and allows that victim restitution, room and board, and other financial obligations be deducted from offender wages. According to the 2018 NCIA Directory, of the 45 correctional industries that were PIE certified as of August 2017, 23 had offenders working in a PIE program.

During our 1997 audit, we found that PE was participating in only one PIE program, Company Apparel Safety Items, Inc. (CASI), which sold garments for medical use and employed 30 offenders. Our report cited PE for not actively pursuing PIE projects and instead, waiting for businesses to approach them. According to PE management, CASI was closed in 2011 because state hospitals consolidated their purchasing and it was cheaper for them to buy overseas. PE management stated it is currently seeking private businesses to partner with for PIE programs.

**Matter for Legislative Consideration**: The legislature may wish to consider amending R.S. 15:1153 to specify that the work opportunities PE is required to provide to offenders reflect LWC's employment projections and be prioritized for offenders who will be released.

**Recommendation 1:** PE should work with DOC's Office of Reentry Services to better coordinate work opportunities in PE industries with those in the current job market to enhance offenders' successful reintegration into their communities.

**Summary of Management's Response:** PE partially agrees with this recommendation and stated that it will continue working with the DOC Office of Reentry Services and will also continue to demonstrate that offenders participating in its programs have lower recidivism than the overall Department. See Appendix A for PE's full response.

**Recommendation 2:** PE should continue to actively seek businesses to partner with and to again participate in the PIE program and provide offenders with work opportunities that are relevant to the job market and pay higher wages.

**Summary of Management's Response:** PE agrees with this recommendation and stated that it will continue to actively seek businesses to partner with and will participate in a PIE program should a viable opportunity become available. See Appendix A for PE's full response.

**During fiscal years 1996 through 2018, PE's expenses exceeded its revenues, and PE used more cash than it generated in 11 (47.8%) of the 23 fiscal years. In addition, operations such as silk screen, printing, and corn and cotton production were not profitable at all during fiscal years 2016 through 2018. Because best practices recommend that correctional industries be financially sustainable and maintain positive cash flow in order to ensure long-term viability, PE should document its evaluation of the profitability of each operation and limit non-essential expenditures that affect its financial sustainability.**

R.S 15:1157 requires PE to sell its manufactured products at a cost that is not less than cost of raw materials[23] and its services at a cost that is not less than the cost for providing the services. Best practices[24] also recommend that correctional industries be financially sustainable and maintain positive cash flow in order to ensure long-term viability (see text box). It is important for PE to be financially sustainable because it is not appropriated any state general funds by the legislature. Our 1997 audit found that expenses exceeded revenues for 17 (43.5%) of PE's 39 operations in fiscal year 1995. To evaluate its financial sustainability, PE policies require it to develop forecasts (such as offender labor projections, inventory requirements, overhead expenses, and cash flow projections), review monthly and annual financial statements for each industry, and develop new product structures[25] reflecting changes in the cost of finished goods. According to PE management, it analyzes gathered information along with any factors[26] that impacted or are expected to impact sales and expenses. However, PE does not document how the review of this information impacts management's decisions concerning financial sustainability.

> **Financial sustainability** exists when sales revenue generated covers all costs and financial obligations associated with correctional industries operations.
>
> **Source**: *Correctional Industries: A Guide to Reentry-Focused Performance Excellence, 2017.*

**During fiscal years 1996 through 2018, PE's expenses exceeded its revenues for 11 of the 23 fiscal years.** Exhibit 7 shows PE's net income for fiscal years 1996 through 2018. Appendix F details PE's net income, by industry, for fiscal years 2016 through 2018, and Appendix G details PE expenditures during this time.

---

[23] While the law requires PE to recoup at least the cost of raw materials, it does not require PE recoup costs associated with personnel expenses, incentive wages, factory overhead, and operating and administrative expenses.
[24] See Appendix E.
[25] A product structure lists all materials needed to produce and ship a particular product.
[26] Since PE provides a wide variety of products and services, different factors drive costs differently in each industry. For example, the floods in 2016 resulted in the LCIW Garment factory moving to a different location and operating at a smaller scale.



**Exhibit 7**
**PE Net Income**
**Fiscal Years 1996 through 2018**

**Source:** Prepared by legislative auditor's staff using information from PE's Income Statements for FY96 through FY18.

      **During fiscal years 1996 through 2018, PE used more cash than it generated in 11 of the 23 years.**  Exhibit 8 shows PE's net cash flow for fiscal years 1996 through 2018.  A cash flow analysis shows how well an agency is generating cash for future operations and, if an agency uses more cash than it is producing, how this will impact future operations.  Best practices[27] state that correctional industries should maintain sufficient operating funds needed to pay monthly bills and to purchase raw materials and goods to efficiently run business operations.  According to PE, it has been able to meet all financial obligations during fiscal years 1996 through 2018.

---

[27] See Appendix E.



**Exhibit 8**
**PE Net Cash Flow**
**Fiscal Years 1996 through 2018**

**Source:** Prepared by legislative auditor's staff using information from PE's Income Statements from fiscal years 1996 through 2018.

      **During fiscal years 2016 through 2018, PE's chair plant, silk screen, print shop, rangeherd,[28] corn, cotton, orchard, and flight bird operations never incurred enough revenue to exceed their expenses and lost a total of $4.7 million during this time period.** According to PE management, while it would be ideal for all of PE's operations to be self-supporting, it believes that financial sustainability only applies to PE overall and not to individual operations. Exhibit 9 summarizes the net income for individual operations from fiscal years 2016 through 2018.

---

[28] Excludes DCI Rangeherd operations.

| Exhibit 9 PE Net Income by Operation Fiscal Years 2016 through 2018 | | | |
|---|---|---|---|
| Industry/Operation | FY16 | FY17 | FY18 |
| **Manufacturing** | | | |
| Garment Operations | | | |
| Hunt Garment Factory | ($193,804) | ($12,787) | $115,679 |
| Winn Garment Factory | 192,384 | 312,588 | 426,330 |
| LCIW Garment Factory | 315,248 | 265,750 | 35,981 |
| Furniture Operations | | | |
| Allen Furniture Restoration | (166,965) | (171,900) | 57,141 |
| DCI Chair Plant | (70,894) | (43,675) | (36,913) |
| Other Manufacturing Operations | | | |
| Silk Screen | (98,692) | (112,671) | (93,445) |
| Embroidery | (7,739) | 42,269 | 60,910 |
| Hunt Soap | 116,870 | 250,993 | 170,126 |
| Tag Plant | 565,688 | 1,181,435 | 346,461 |
| Metal Fabrication | (29,861) | (19,714) | 81,163 |
| Mattress, Broom, and Mop Plant | 12,072 | 149,524 | 66,420 |
| Print Shop | (69,972) | (6,191) | (36,222) |
| *Net Income Manufacturing* | *564,336* | *1,835,620* | *1,193,630* |
| **Wholesale** | | | |
| Canteen Distribution Center | 476,840 | 277,827 | 336,666 |
| Wakefield Meat Plant | 133,573 | 85,412 | 123,939 |
| *Net Income Wholesale* | *610,413* | *363,239* | *460,605* |
| **Services** | | | |
| Janitorial | 47,611 | 122,853 | 127,912 |
| Canteen Package Program | - | 148,676 | 201,392 |
| *Net Income Services* | *47,611* | *271,529* | *329,304* |
| **Agriculture** | | | |
| Rangeherd Operations | | | |
| DCI Rep Heifers | 181,159 | 5,155 | 224,649 |
| LSP Rangeherd | (756,378) | (481,359) | (936,655) |
| Hunt Rangeherd | (155,326) | (35,974) | (83,034) |
| RLCC Rangeherd | (41,543) | (21,711) | (18,129) |
| Wade Rangeherd | (199,544) | (180,290) | (104,025) |
| Crop Operations | | | |
| LSP Corn | (237,314) | (182,168) | (259,315) |
| Cotton | (5,193) | (105,874) | (146,197) |
| Soybeans | (58,805) | (20,880) | 18,451 |
| Milo | (22,889) | (47,113) | - |
| Other Agricultural Operations | | | |
| Land and Ag Management | (62,512) | 34,937 | 197,331 |
| DCI Orchard | (5,719) | (5,733) | (5,762) |
| Horse Program* | (180,737) | 28,178 | - |
| Flight Bird* | (36,824) | (92,903) | (7,486) |
| *Net Income Agriculture* | *(1,581,626)* | *(1,105,735)* | *(1,120,173)* |
| **Support** | | | |
| DOC Incentive Wages | (1,225,375) | (1,076,327) | (1,098,454) |
| Transfer to General Fund | (331,106) | - | - |
| *Net Income Support* | *(1,556,481)* | *(1,076,327)* | *(1,098,454)* |
| **PE Total Net Income** | **($1,915,747)** | **$288,326** | **($235,087)** |

*Horse Program and Flight Bird operations closed in FY17 and FY18, respectively.
**Note:** Total amounts do not match due to rounding.
**Source:** Prepared by legislative auditor's staff using information from PE's Income Statements for FY16 through FY18.

**PE should document its analysis of each operation's financial sustainability and management's subsequent business decisions.**  This documentation should include an assessment of the corrective action needed to improve profitability and whether non-financial benefits, such as providing work opportunities to offenders, outweigh any financial losses. According to PE management, in some cases it operates unprofitable operations because these operations support other profitable operations, such as using corn to feed livestock.  However, other states, such as Colorado, require managers of unprofitable shops to prepare business plans to improve the shops' performance.  These plans are required to include corrective actions, such as market expansion, price adjustments, staffing and offender employment changes, and other efficiency measures that shop managers plan to take to improve profitability.

Providing work opportunities to offenders is a key aspect of PE's statutory purpose and realizing non-financial benefits by utilizing offenders in operations, even if unprofitable, may actually outweigh the losses the operations experience.  In fact, best practices[29] suggest that correctional industries' more lucrative business units can be used to offset the financial losses associated with operating other business units that are not financially self-sufficient but employ numerous offenders or offer valuable work skills. However, PE does not document when a loss is acceptable or whether the losses are offset by the benefits achieved.  For example, PE stated that it shut down its Horse Program in fiscal year 2017 and Flight Bird Operations in fiscal year 2018 because the market shrunk for these operations so revenues did not consistently cover their expenses and management determined that resources could be better used in other operations. PE management should also document what specific factors it takes into consideration when deciding to maintain operations that are not self-sufficient.

**During fiscal years 2016 through 2018, PE's expenditures included mandated payments of over $1.6 million to other state agencies.**  According to PE management, trying to effectively operate a financially sustainable business within a government setting is challenging. For instance, PE is mandated to pay the Office of Technology Services for IT support, the Office of Risk Management for insurance coverage, the Department of Civil Service for the cost of operating the state civil service system,[30] and OSP for bidding services on PE's behalf. Furthermore, the legislature swept $331,106 from PE into the General Fund during fiscal year 2016 even though PE does not receive any state general funds.  Exhibit 10 shows mandated payments PE incurred during fiscal years 2016 through 2018.

---

[29] See Appendix E.
[30] R.S. 42:1383

| Exhibit 10 PE Mandated Interagency Payments Fiscal Year 2016 through Fiscal Year 2018 | | | | |
|---|---|---|---|---|
| **Agency** | **FY16** | **FY17** | **FY18** | **Total** |
| Office of State Procurement | $185,136 | -* | -* | **$185,136** |
| Office of Risk Management | 261,858 | 315,516 | 370,859 | **948,233** |
| Office of Technology Services | 19,063 | 56,314 | 22,990 | **98,366** |
| Department of State Civil Service | 23,940 | 25,296 | 23,949 | **73,185** |
| Transfer to General Fund | 331,106 | - | - | **331,106** |
| **Total** | **$821,103** | **$397,126** | **$417,798** | **$1,636,026** |
| *DOC paid PE's OSP charges for fiscal years 2017 and 2018. Source: Prepared by legislative auditor's staff based on documentation provided by PE. | | | | |

**PE management should consider limiting non-essential expenditures that affect its financial sustainability, including at least $5,164 in agency funds spent during fiscal years 2016 through 2018 that that do not appear necessary to meet its statutory purposes.** According to PE, some of these expenses are used for its Annual Awards and Training Conference to show appreciation for its staff. PE also paid for staff to participate as a team and sponsored a hole during the Louisiana Correctional Association (LCA) Golf Tournament held in Lake Charles, LA during fiscal years 2016 and 2018. According to PE, the golf tournament is part of the LCA conference, which is attended by a large portion of PE customers, and gives PE the opportunity to advertise its products and services as well as interact with existing and potential customers. Exhibit 11 contains PE expenses we identified as not related to its purpose during fiscal years 2016 through 2018.

| Exhibit 11 PE Expenses not Related to Agency Purpose Fiscal Year 2016 through Fiscal Year 2018 | | |
|---|---|---|
| **Expense** | **Purpose** | **Amount** |
| Plaques for PE employees | PE Annual Awards and Training Conference | $2,858 |
| Duffle Bags for PE employees | Annual Awards and Training Conference | 739 |
| Sponsorship of Golf Hole and Team Registration | Louisiana Correctional Association Golf Tournament, FY16 and FY18 | 720 |
| Coasters for PE employees | PE Annual Awards and Training Conference | 653 |
| Screened Shirts | PE Annual Awards and Training Conference | 194 |
| **Total** | | **$5,164** |
| **Source:** Prepared by legislative auditor's staff based on documentation provided by PE. | | |

In addition, even though it is not against the law for PE to use its self-generated funding to feed its offenders or staff that oversee these offenders, PE could improve its financial sustainability by minimizing non-essential expenses. For example, during fiscal years 2016 through 2018, PE spent at least $29,447 on holiday and appreciation meals for offenders and staff and $20,700 for canteen items that PE states was for offenders working overtime and other incentives. According to PE management, it attempts to create an environment similar to a work environment as recommended by best practices.[31] Since PE's budget does not allow it to give pay raises or bonuses to offenders or staff, feeding them during holidays and providing canteen items as incentives is PE's way of showing its appreciation and boosting morale.

---

[31] See Appendix E.

**Recommendation 3:** PE should document how its review of forecasts, financial statements, updated product structures, and other financial information impacts management's decisions concerning financial sustainability.

**Summary of Management's Response:** PE partially agrees with this recommendation and stated that it will continue to produce, analyze, and document its financial position to further enhance its overall financial sustainability. See Appendix A for PE's full response.

**Recommendation 4:** PE should considering limiting non-essential spending on food and other items for offenders and staff.

**Summary of Management's Response:** PE partially agrees with this recommendation and stated that it will continue to monitor and limit non-essential expenses. See Appendix A for PE's full response.

---

**PE did not comply with its pricing policy for some manufactured items during fiscal years 2016 through 2018. As a result, PE overcharged customers by at least $55,306 and undercharged customers by at least $81,947 for items whose prices should have been fixed based on PE's statewide contract. In addition, unlike other states, both PE and DOC markup wholesale prices for canteen items.**

PE's pricing policy states that the current price quoted in its statewide contract through OSP will be utilized when pricing its products. In addition, R.S. 15:1157 requires PE to sell its manufactured products at a cost that is not less than the cost of raw materials used to manufacture the product. For PE to remain financially sustainable, it should charge prices for its manufactured products that cover its operating expenses beyond the cost of raw materials and consider current economic conditions and competitors.

**Some customers were charged less or more for manufactured products than what was allowed by PE's pricing policies.** We identified 1,536 instances when customers were charged prices different from those listed on the statewide contract. During fiscal years 2016 through 2018, PE overcharged customers by approximately $55,306 and undercharged customers by approximately $81,947 for items whose prices should have been fixed based on PE's statewide contract.[32] In some cases, PE charged all customers the same price for an item throughout an entire contract period, but that price was different than the price stipulated in PE's statewide contract and no explanation was provided in its financial system. In other cases, PE charged different prices for the same items for different customers during the same contract

---

[32] Some records where the prices charged did not match statewide contract prices had descriptions in the sales order data explaining why some customers were charged more (added features, different specifications than the contract, etc.) or less (showroom models sold "as is," discounts given for volume, etc.) than the contract price. However, we excluded these sales orders from our analysis.

period, as shown in Exhibit 12.  In our 1997 report, we also found that some products were potentially underpriced or overpriced.

| | | | | | |
|---|---|---|---|---|---|
|  | **Exhibit 12**<br>**Examples of Different Prices Charged by PE for Same Items on Statewide Contract**<br>**Fiscal Years 2016 through 2018** |
| **Item Description** | **Customer** | **Order Period** | **Contract Price** | **Price Charged** | **Number of Units** |
| Bed Locker without Hanger | Sheriff | March 2016 to June 2016 | $130.00 | $85.00 | 8 |
| | Correctional Facility | | | $125.00 | 25 |
| | Correctional Facility | | | $115.00 | 200 |
| Densified Polyester Foam Mattress | Correctional Facility | December 2016 to January 2017 | $42.00 | $42.00 | 553 |
| | Police Jury | | | $40.00 | 1,000 |
| | Sheriff | | | $42.00 | 15 |
| 5 Gallons Non-Skid Floor Wax | Sheriff | August to October 2017 | $61.75 | $61.75 | 4 |
| | DOC | | | $56.75 | 12 |
| | Correctional Facility | | | $56.75 | 8 |
| | Non-Profit | | | $61.75 | 5 |
| One Dozen Heavy Duty Mops | Other State Agency | September 2017 | $73.00 | $73.00 | 2 |
| | Non-Profit | | | $68.00 | 50 |
| | Correctional Facility | | | $73.00 | 40 |
|  | **Source:** Prepared by legislative auditor's staff using data provided by PE. |

        In addition, PE charged customers prices for custom items that were below the set pricing model.[33]  PE's policy stated that prices could be set below the pricing model with approval; however, it did not require this approval to be documented.  We reviewed the product structures and prices of 67 custom items sold during fiscal years 2016 through 2018 and found that 31 (46.3%) had a markup at least 10.0% lower than the pricing model, including 12 (17.9%) with a markup at least 50.0% lower than the pricing model, all without documentation of justification for the lower prices.  Examples of comparable items ordered in the same fiscal year with different markups are shown in Exhibit 13.

---

[33] A pricing model is a factor by which PE multiplies raw material costs in order to calculate the preliminary selling price that will cover overhead costs.  PE management establishes a pricing model for each manufacturing operation annually.

| | | Exhibit 13 | | | | |
|---|---|---|---|---|---|---|
| | | **PE Custom Products Sold at Different Markups for Different Customers** | | | | |
| | | **Fiscal Year 2016** | | | | |
| **Customer** | **Item** | **Pricing Model** | **Actual Markup** | **Pricing Model Price** | **Actual Price Charged** | **Difference in Pricing** |
| Nonprofit Organization | Mahogany Table Desk with One Drawer | 2.85 | 1.03 | $555 | $200 | ($355) |
| Correctional Institution | Mahogany Bookshelf and Cubby | 2.85 | 2.14 | $1,323 | $995 | ($328) |
| Nonprofit Organization | Poplar Porch Swing | 2.85 | 1.03 | $441 | $160 | ($281) |
| Correctional Institution | Mahogany Conference Table | 2.85 | 2.50 | $1,862 | $1,635 | ($227) |
| Nonprofit Organization | Mahogany Printer Table | 2.85 | 1.04 | $329 | $120 | ($209) |
| Sheriff's Office | Mahogany Conference Chairs | 2.85 | 2.13 | $602 | $450 | ($152) |
| State Agency | Reupholstered Side Chairs | 2.85 | 1.26 | $215 | $95 | ($120) |
| Sheriff's Office | Conference Room Chairs with Arms on Casters and Embroidered Logo | 2.85 | 2.43 | $763 | $650 | ($113) |
| **Source:** Prepared by legislative auditor's staff using PE data and information contained in sales order files. | | | | | | |

**PE does not require that deviations from its pricing policy be documented.** PE management stated that they sometimes charge customers lower prices if doing so will allow them to get a sale that would otherwise go to competitors, increase the volume of sales, or create a relationship with a new customer. In addition, according to PE, it may need to change the price of a product from what is listed on its statewide contract if it notices that the statewide contract price is wrong. However, PE's policy does not require that it document the reasons for any deviations from the statewide contract prices, nor that PE staff periodically review the prices posted on OSP's website to ensure they are correct. Requiring and reviewing such documentation would help ensure that PE charges customers consistent and correct prices, which is the goal of setting annual statewide contract prices through OSP.

PE's policy states that the marketing manager or higher level supervisor must approve prices that do not follow the pricing policy; however, the marketing manager is the same person who calculates prices for custom orders. In addition, PE does not document the reasons for changing product prices or markups for customers so it is not possible to determine if price reductions for certain customers generated a sales benefit proportionate to the reduction in prices. Documenting price changes is important because PE changed its pricing policy in fiscal year 2018 to allow it to use the pricing model to determine the preliminary selling price rather than the minimum price of a product. The marketing manager has the latitude to adjust the preliminary selling price as deemed appropriate, but the policy does not require the marketing manager to document an explanation for the price change.

**Unlike other states, both PE and DOC markup wholesale prices for canteen items, which may result in higher prices for offenders.[34]** PE canteen operations consist of PE purchasing canteen items in bulk from vendors, marking the price up by approximately 20%,[35] and then reselling the bulk items to correctional facilities. According to PE, this markup covers PE's costs of operating the Canteen Distribution Center at Louisiana State Penitentiary at

---

[34] State laws and rules governing PE do not provide any specific guidance on pricing for items purchased for resale, such as canteen items.

[35] As of fiscal year 2018, markup on canteen items is 20.5%, 19.0% on tobacco items, and varies for personal property items.

Angola, delivering products to correctional facilities, and other expenses. However, state correctional facilities then further markup canteen prices and resell the items to offenders. According to DOC, this markup is used to cover the costs of operating the individual canteens and to invest in offender programs such as vocational/educational, religious, recreational, or library services.

On average, correctional facilities charge approximately 33.3% markup on canteen items purchased from PE. As a result, both PE and DOC make excess revenue from canteen items sold to offenders (see example at right). In turn, PE is able to subsidize other industries operating at a loss with its net income from canteen operations. During fiscal years 2016 through 2018, PE received approximately $1.1 million in net income from its canteen operations.

> **Canteen Markup Example**
> **Beef Stew (11.25 oz.)**
>
> PE purchases from vendor for $1.66
> ↓
> PE sells to correctional facility for $2.00
> (20.5% markup)
> ↓
> DOC sells to offender for $2.67*
> (Additional 33.3% markup)
>
> *Total markup of $1.01 or 60.8%*

The additional 33.3% markup by correctional facilities on all canteen items sold by PE during fiscal years 2016 through 2018 resulted in DOC making approximately $378,000 in excess revenue from offenders for canteen items. We spoke with officials from 12 other states' correctional industries[36] and found that in all 12 states canteen items are sold directly to offenders, unlike PE's process of selling bulk canteen items to Louisiana correctional facilities who then in turn sell to offenders. The canteen vendors in four states own the inventory and set prices,[37] whereas the remaining eight states' correctional industries that buy items in bulk and sell them directly to offenders provided us with their markup percentages for canteen items. Apart from Minnesota, which charges markups ranging from 0-50%, none of the remaining seven states charge a markup higher than 32.75%.

**Recommendation 5:** PE should document the reasons for the deviations from the statewide contract prices to ensure that PE charges customers consistent prices. In addition, PE should document the reasons for charging customers prices that deviate from the pricing model as well as who authorized any deviations so that these changes can be monitored and analyzed for reasonableness.

**Summary of Management's Response:** PE partially agrees with this recommendation and stated that it does document deviations from the pricing model as reflected in the price of the products it sells. Due to the thousands of items sold throughout the year, it would be difficult to document to the degree that is being recommended since every situation is different and the pricing model is used as a guide and not a unilateral calculation. See Appendix A for PE's full response.

---

[36] We contacted correctional industries in 12 of the 14 states that run canteen operations through correctional facilities: Colorado, Indiana, Iowa, Kansas, Minnesota, Montana, North Dakota, Pennsylvania, Utah, Washington, West Virginia, and Wisconsin.

[37] Four states' correctional industries are contracted to pick and package offenders' individual orders, but canteen vendors own the inventory, price products, and process offenders' orders.

**LLA Additional Comments:**  Documenting the reasons for any deviations from the statewide contract prices as well as who authorized any deviations would help ensure that PE charges customers consistent and correct prices, which is the goal of setting annual statewide contract prices through OSP.

**Recommendation 6:**  PE should require staff to periodically review its statewide contract prices posted on OSP's website for accuracy so that it can ensure that customers are charged correct prices.

**Summary of Management's Response:**  PE partially agrees with this recommendation and stated that it will work with the Office of State Procurement to ensure the prices published on the statewide contract match with what is submitted by PE.  See Appendix A for PE's full response.

**Matter for Legislative Consideration:**  The legislature may wish to consider providing guidance on how PE should price its wholesale products, including markup for canteen products.

## PE has not developed a comprehensive marketing plan that describes how it will promote its products and services, as recommended by best practices.  In addition, PE does not have a process for tracking whether the approximately $117,000 spent on marketing efforts during fiscal years 2016 through 2018 generated a financial benefit that is proportionate to the costs, as required by policy.

PE policy requires that it develop a written marketing plan that is reviewed regularly to ensure it remains consistent with changing markets.  Furthermore, PE policy states that promotional items must be of minimal cost, constitute an expenditure that is dedicated to public purposes, and create a public benefit proportionate to the cost.  According to the Principles of Marketing,[38] a marketing plan enables management to evaluate whether an organization can meet customers' needs in a way that allows for its financial sustainability.  These best practices also state that the process of achieving sustainable growth requires a systematic approach including the evaluation of current operations, the identification of long term goals, and the strategies to reach those goals.  In addition, because of the prohibitions under Article VII, §14 of the Louisiana Constitution regarding the donation of public funds or property, PE should document the public purpose for giving away promotional items and whether this donation created a public benefit proportionate to the cost to ensure compliance with the law.

**While PE has developed a written marketing plan as required by policy, it is not comprehensive as recommended by best practices.**[38]  Instead, PE provided us with a two-page

---

[38]Principles of Marketing, 2010: https://open.lib.umn.edu/principlesmarketing/chapter/16-2-functions-of-the-marketing-plan/

Marketing Overview from July 2016 that discusses how PE serves its customers through an updated website, showrooms, and experiments with email marketing. This document also discusses how the state's budget issues and the privatization of state correctional facilities and parish jails make it more difficult for PE's sales staff to compete with private sector vendors for business in these facilities. However, PE should develop a more comprehensive marketing plan (as outlined below) to ensure it remains financially sustainable in changing markets. Our 1997 report found that PE did not have a marketing plan and recommended that PE develop formal sales and marketing plans that documented the needs of all of PE's product lines. According to the Principles of Marketing, a good marketing plan should do the following:

- Identify customers' needs.

- Evaluate whether the organization can meet those needs in some way that allows for profitable exchanges with customers to occur.

- Develop a mission statement, strategy, and organization centered on those needs.

- Pursue advertising, promotional, and public relations campaigns that lead to continued successful exchanges between the organization and its customers.

- Engage in meaningful communications with customers on a regular basis.

**During fiscal years 2016 through 2018, PE spent $117,058 on travel, conference registrations, promotional items, and samples but did not determine the return on investment, such as whether these costs led to future sales or other positive business outcomes**. According to the Principles of Marketing, a marketing plan allows an organization to pursue successful advertising and promotional activities. While not included in its Marketing Overview, PE management developed a policy that allows it to give away promotional items and product samples to attract new customers and encourage current customers to purchase additional products. For example, during fiscal years 2016 through 2018, PE spent $41,102 in travel expenses for staff to attend conferences and promote PE products and services, $19,759 to register as a vendor at these conferences, and gave away $27,054 worth of promotional items such as coasters, umbrellas, and koozies. In addition, PE spent over $500 on a lunch in March of 2016 for 10 newly-elected sheriffs at its headquarters to introduce them to PE's products and services. Exhibit 14 contains a breakdown of promotional materials given away by PE staff during fiscal years 2016 through 2018.

| Exhibit 14 PE Promotional Items Given Away Fiscal Years 2016 through 2018 | | |
|---|---|---|
| Promotional Item | Quantity | Cost |
| Tote Bags | 2,448 | $5,681 |
| License Plate Candy Dishes | 21,000 | 5,250 |
| Koozies | 3,100 | 4,421 |
| Pens | 4,000 | 3,045 |
| Lip Balm | 3,300 | 2,892 |
| Keychains | 1,100 | 1,906 |
| Coasters | 500 | 1,131 |
| Tape Measures | 1,206 | 993 |
| Umbrellas | 100 | 749 |
| Back Packs | Unknown | 723 |
| USB 2GB | 50 | 263 |
| Total | | $27,054 |
| Source: Prepared by legislative auditor's staff based on documentation provided by PE. | | |

For some orders, customers requested that PE build prototypes of the product, such as triple bunk beds, barbeque pits, locker boxes, and garbage cans. PE documents these expenditures as samples and stores some of the prototypes in the PE showrooms for other potential customers to view. PE also gives away samples of its products, such as cleaning supplies, shirts, and sheets, to potential customers with the hope that they will be satisfied with the product and place an order with PE. However, PE does not consistently document who received the samples or if the expenses incurred by building/giving away these samples resulted in any return on investment, such as attracting new customers or generating additional revenues. For example, according to PE, the $2,856 in furniture prototypes given to Bayou Segnette State Park resulted in more than $175,000 in subsequent furniture sales; however, PE did not designate this additional revenue as a related sale to the prototypes in its financial system. Exhibit 15 lists some examples of the total $28,635 in product samples that PE built or gave away during fiscal years 2016 to 2018 along with the costs for these samples.

| Exhibit 15 Examples of PE Prototypes/Samples Given to Customers Fiscal Years 2016 through 2018 | | | |
|---|---|---|---|
| Sample Product | Customer | Quantity | Cost |
| Furniture Prototypes | Bayou Segnette State Park | 11 | $2,856 |
| High-Back Intensive Use Chairs* | Not documented | 4 | 2,020 |
| Sheets | Not documented | 144 | 760 |
| Mattress | Warden | 2 | 163 |
| Name Plates/Holders | Office of State Parks | 10 | 71 |
| Embroidered Shirts | Allen Parish | 15 | 59 |
| *According to PE, these chairs are used by its sales department as samples to show the product to its customers at trade shows and in its showroom. However, PE could not provide us with supporting documentation. Source: Prepared by legislative auditor's staff based on documentation provided by PE staff. | | | |

**While PE has developed a policy that states that promotional items should be dedicated to public purposes and create a public benefit proportionate to the cost, it does not require staff to document such purposes or benefits.**  We reviewed selected sales documentation[39] for fiscal years 2016 through 2018 and identified $14,081 in products that PE did not charge to customers.  For example, PE embroidered briefcases with the DOC logo and employee names for DOC's Annual Awards Day.  However, PE did not bill DOC for these products because it classified them as promotional since they show potential customers what PE can do.  However, DOC is already PE's biggest customer, as shown in Exhibit 4.  Exhibit 16 details products we identified that PE did not bill to customers during fiscal years 2016 to 2018.

| Exhibit 16 PE Products Delivered But Not Billed* Fiscal Years 2016 through 2018 | | |
| --- | --- | --- |
| **Item** | **Quantity** | **Amount Not Billed** |
| Holiday Decorations | 7,700 | $9,149 |
| Refurbished Furniture for DOC | 30 | 2,736 |
| Inaugural Seals | 3 | 799 |
| Sheets for DOC Awards Day | 108 | 374 |
| Briefcases embroidered with DOC employee names and logo | 25 | 258 |
| Household Items for DOC Credit Union | 9 cases | 213 |
| Golf Signs for Golf Tournament sponsors | 15 | 158 |
| Refurbished chair for DOC employee | 1 | 157 |
| Briefcases embroidered with sheriff logo | 10 | 151 |
| Plaques | 2 | 63 |
| Business cards for DOC employees | 1,000 | 21 |
| **Total** | | **$14,081** |
| **Note:** Total amounts do not match due to rounding. ***This amount could be underestimated because PE expenses non-inventory items at the time of purchase instead of linking the costs to the appropriate interdepartmental sale. **Source:** Prepared by legislative auditor's staff based on documentation provided by PE. | | |

In addition to the prohibitions under Article VII, §14, against the donation of public funds or property, R.S. 15:1157(A)(4) mandates that PE recovers the costs of raw materials used to manufacture its products.[40]  Therefore, to satisfy both R.S. 15:1157 and Article VII, §14, PE must ensure that it receives compensation for its services or products in an amount that covers its costs.  If these products were promotional items or samples, PE should document the public purpose served and whether the public benefit was proportionate to the cost.

If PE staff were required to track promotional materials given away at each conference, entities that attended each conference, and whether these attendees became new customers of PE or increased their current purchasing, management could determine whether PE targeted the right customers at the right locations (i.e., conferences, expos).  According to PE's sales manager, attending conferences is part of PE's marketing process; however, the July 2016 Marketing

---

[39] We reviewed documentation that was designated as interdepartmental sales but had shipping addresses for customers outside of PE industries or operations.

[40] A limited exception is afforded in situations in which the manufactured product is deemed to be spoiled, overstocked, obsolete, or otherwise not saleable at a cost equal to or greater than the raw material costs.  Such situations must be documented before the Director of PE may authorize a sale at less than the raw material cost.

Overview does not list conferences as means of serving current or potential customers. Management could monitor the success of its marketing practices by specifying the business purpose of each employee attending conferences, listing the conferences staff will attend, and requiring staff to track whether the promotions given away at the conferences increase PE sales. Documenting the samples given away to customers and tracking whether those samples generated future orders would also allow PE to determine if the cost spent on samples was justifiable.

**Recommendation 7:**  PE should develop a comprehensive marketing plan that includes factors such as goals and direction for attainable future marketing efforts; clear, realistic, and measurable targets; deadlines for meeting those targets; and a budget for all marketing activities.

**Summary of Management's Response:**  PE partially agrees with this recommendation and stated that it will work to further enhance its marketing plan to meet goals and objectives that will continue to allow PE to be self-sufficient.  See Appendix A for PE's full response.

**Recommendation 8:**  PE should require staff to document customers attending and reasons for attending each conference; track the quantity of promotional items and product samples given away, to whom they are given, and for what purpose; and track whether the public benefit was proportionate to the cost and whether future sales were generated.

**Summary of Management's Response:**  PE disagrees with this recommendation and stated that it will continue to monitor the public benefit of its marketing efforts and ensure the expense is proportionate to the cost of these efforts.  However, to track these efforts to the degree of this recommendation would not align with industry standards and require substantial investment in staff and resources that could potentially create inefficiency with its marketing department.  This recommendation would also provide a result that is not readily defensible as PE cannot prove that a specific promotional item results in a particular or immediate sale and it could even be several years before a customer tries PE's products as a result of repeated marketing efforts over time.  See Appendix A for PE's full response.

**LLA Additional Comments:**  In addition to measuring marketing efforts' success, documenting the recipients and purpose of these efforts would strengthen PE's internal controls to ensure that promotional items are not given away for purposes other than marketing.

**Recommendation 9:**  PE should bill customers for all services and products provided to ensure compliance with R.S. 15:1157 and Article VII, §14 of the Louisiana Constitution.

**Summary of Management's Response:** PE agrees with this recommendation and stated that it will continue to bill customers appropriately and comply with all applicable laws.  See Appendix A for PE's full response.

---

**PE does not ensure that all complaints are logged and resolved timely and has not developed an effective process to ensure that orders are delivered on time.  According to best practices, good customer service is important because it directly impacts sales; however, the number of PE complaints increased by 121.2% between fiscal years 2016 and 2018, and late deliveries increased from 30.7% to 40.3%.**

According to the Principles of Marketing, customer service is important because it directly impacts sales.[41]  In accordance with this best practice, PE has two performance indicators related to customer service.  One states that PE will decrease the percentage of customer complaints received by 5.0% by fiscal year 2019.  The other states that PE will deliver 100% of orders on time.  However, according to PE's complaint log, customer complaints increased from 33 to 73, or by 121.2%, from fiscal year 2016 to fiscal year 2018; and the total cost related to these complaints[42] increased 92.3%, totaling $21,041 as shown in Exhibit 17.  In addition, according to our analysis, late deliveries increased from 30.7% in fiscal year 2016 to 40.3% in fiscal year 2018.

| Exhibit 17 PE Logged Complaints Fiscal Years 2016 through 2018 | | |
|---|---|---|
| **Fiscal Year** | **Number of Complaints** | **Total Cost Related to Complaint** |
| FY16 | 33 | $5,944 |
| FY17 | 50 | 3,665 |
| FY18* | 73 | 11,432 |
| **Total** | **156** | **$21,041** |

*FY18 includes complaints through 6/11/18.
**Source:** Prepared by legislative auditor's staff using information provided by PE.

PE is required by the American Correctional Association (ACA) Standards for Correctional Industries to have a formalized and active customer service program that provides periodic feedback to management to ensure customer satisfaction.  In addition, according to the Principles of Marketing, tracking customer satisfaction is one way to measure marketing effectiveness.  PE developed a policy that complies with ACA Standards and states that when staff receives a complaint about an order of manufactured products, they forward it to the Customer Service Representative (CSR) for resolution.[43]

**PE does not ensure that all complaints and their related costs are logged and resolved timely.**  Although PE's policy establishes a process for tracking and resolving customer complaints for manufactured products, the policy does not clearly define what constitutes a

---

[41] Principles of Marketing, 2010: https://open.lib.umn.edu/principlesmarketing/chapter/16-2-functions-of-the-marketing-plan/
[42] This is the cost of repair or replacement of the item plus transportation cost associated with the pick-up of the damaged item or delivery of the fixed or replacement item.
[43] The CSR is also the PE headquarters warehouse manager but is not a part of PE's sales and marketing staff.

complaint and how to categorize complaints. As a result, some issues are treated as complaints while other similar issues are not. For example, we reviewed sales documentation from fiscal year 2018 and identified 51 issues that were not logged as complaints. These issues, shown in Exhibit 18, were similar to other complaints that were included in the log, such as wrong item specifications, incorrect order quantities, and missing items. Properly capturing and categorizing complaints is important because PE policy requires management to conduct a complete analysis of trends in complaints received at the end of each month and each calendar year.

| Exhibit 18 PE Complaints by Category Fiscal Years 2016 through 2018 | | | | |
|---|---|---|---|---|
| Complaint Category | Number of Complaints in Log | Number of Complaints Not in Log* | Total** Number of Complaints | Number of Complaints by Operation*** |
| Wrong Item Specifications | 91 | 25 | 116 | Silk Screen (37), Print (24), Embroidery (12), Embroidery/Uniforms (9), Tag (7), LCIW Garment/Uniforms (6), Winn Garment (6), LCIW Garment (4), Allen Furniture (3), Mattress/Broom/Mop (3), Hunt Soap (2), Metal Fabrication (2), Canteen Distribution Center (1) |
| Incorrect Quantity of Item | 10 | 8 | 18 | Mattress/Broom/Mop (3), Silk Screen (3), Embroidery/Uniforms (2), Hunt Soap (2), LCIW Garment (2), Allen Furniture (1), Embroidery (1), Hunt Garment (1), Tag (1), Winn Garment (1) |
| Missing Items | 15 | 7 | 22 | Silk Screen (6), DCI Chair (4), Print (4), Embroidery (3), Embroidery/Uniforms (1), LCIW Garment (1), Winn Garment (1) |
| Damaged Items | 7 | 6 | 13 | Allen Furniture (5), DCI Chair (3), Silk Screen (3), Hunt Soap (2) |
| Item Quality | 38 | 12 | 50 | Allen Furniture (21), DCI Chair (11), Silk Screen (7), Metal Fabrication (3), LCIW Garment (2), Print (2), Embroidery/Uniforms (1), Hunt Garment (1), Hunt Soap (1) |
| Return or Exchange | 6 | 1 | 7 | Silk Screen (3), Canteen Distribution Center (1), Embroidery (1), Embroidery/Uniforms (1), Mattress/Broom/Mop (1) |
| **Total** | **167** | **59** | **226** | |

**Note**: Since the complaint log does not categorize the reason for complaints, we created these categories based on our review of the sales documentation.
*Complaints not in the log are only from fiscal year 2018.
**The number of complaints in this table exceeds the total number of complaints received because complaints can fall under multiple categories.
***Five complaints concerned more than one operation and the operation could not be identified for nine complaints.
**Source**: Prepared by legislative auditor's staff using information from PE sales documentation.

PE also does not ensure that the costs of all complaints are included in the complaints log, as required by policy. The cost of a complaint includes the cost of repair or replacement of the item plus transportation costs associated with the pick-up of the damaged item or delivery of

the fixed or replacement item.  In the log, the cost of 63 (44.1%) of 143 closed complaints was blank or marked $0, but we found that 38 of these complaints were missing the associated costs for repaired or replaced items that staff had noted in the supporting documentation.  We also found that 23 (45.1%) of the 51 missing complaints we identified had associated costs, including one complaint that resulted in the reprinting of 20,000 envelopes.

In addition, PE's policy does not specify a timeframe in which complaints should be resolved.  We found that PE sometimes took months to resolve customers' issues.  For example, we found documentation on eight orders in which customers or PE staff specifically stated that the customer reached out to PE between two and five times over a period of up to 74 days before receiving a response.  In addition, our review found that 29 (16.8%) of 173 complaints[44] took at least three months to resolve, with one complaint taking 456 days to be resolved.  According to best practices in resolving customer complaints published by the Federal Benchmarking Consortium,[45] a speedy response to complaints can improve customer loyalty by as much as 25%.  PE could increase customer satisfaction by requiring staff to make initial contact with customers and resolve their complaints within a certain amount of time.

**Unlike its manufacturing industry, PE does not have a formal complaints process established for its wholesale industry.**  According to Income Statements from fiscal years 2016 through 2018, PE's wholesale industry, which includes the sale of canteen and meat products almost exclusively to state correctional facilities, accounted for 45.0% of overall sales. DOC policy requires[46] state correctional facilities to buy their canteen items and meat from PE, but there is no formal process for filing or resolving complaints regarding these items.  According to PE, it does not have a complaints policy for wholesale operations because it does not produce these items.  However, PE is responsible for ordering bulk canteen items, warehousing the bulk items, and transporting the orders to correctional facilities, all of which are activities that could result in customers not being satisfied and thus wanting to file a complaint.  In practice, PE staff responds to canteen complaints when they receive them via email or phone, but they are not required to formally track these complaints for quality control purposes and timely resolution.

**PE does not have an effective process to accurately track or report whether orders were delivered on time.**  The timely delivery of products or services is important because bad customer experiences can negatively impact PE sales and consequently its financial sustainability.  PE's process for calculating delivery time compares the customers' requested delivery dates to the shipped dates instead of the actual delivery dates, so PE management does not know if customers received orders on time.  By tracking the actual delivery date, PE management could accurately determine if its orders are delivered on time and identify and address any production or delivery issues.  Using PE's current methodology comparing requested delivery dates to shipped dates, our analysis of PE sales order data found that the percent of orders not delivered on time increased from 30.7% in fiscal year 2016 to 40.3% in

---

[44] This includes complaints in PE's log and complaints we identified that were missing from the log.
[45] National Performance Review "Serving the American People: Best Practices in Resolving Customer Complaints" https://govinfo.library.unt.edu/npr/library/papers/benchmrk/bstprac.html
[46] DOC policy states that correctional facilities shall purchase PE products unless there is a compelling reason to utilize another vendor.

fiscal year 2018.[47]  Compared to our analysis, the number of orders not delivered on time during fiscal years 2016 and 2017 in LAPAS[48] is understated.  As shown in Exhibit 19, the percent of orders actually not delivered on time was more than twice what PE reported for fiscal years 2016 and 2017, as well as the first two quarters of fiscal year 2018.

| Fiscal Year | Industry | Total Orders (LLA Calculated) | Orders Not On Time (LLA Calculated) | % Not On Time (LLA Calculated) | % PE Reported Not On Time |
|---|---|---|---|---|---|
| **Exhibit 19** **PE Wholesale and Manufacturing Orders Not Delivered On Time** **Fiscal Years 2016 through 2018\*** | | | | | |
| **2016** | Wholesale | 1,985 | 932 | 47.0% | **14.3%** |
|  | Manufacturing | 2,348 | 400 | 17.0% | |
|  | **Total** | **4,333** | **1,332** | **30.7%** | |
| **2017** | Wholesale | 1,791 | 1,047 | 58.5% | **19.7%** |
|  | Manufacturing | 2,340 | 651 | 27.8% | |
|  | **Total** | **4,131** | **1,698** | **41.1%** | |
| **2018\*** | Wholesale | 889 | 457 | 51.4% | **16.6%** |
|  | Manufacturing | 1,145 | 362 | 31.6% | |
|  | **Total** | **2,034** | **819** | **40.3%** | |
| **Total** | | **10,498** | **3,849** | **36.7%** | |

\*Only includes orders through the end of Quarter 2 (December 31, 2017), which was the latest quarter for which LLA had complete sales order data.
**Note:** We excluded 1,464 duplicate orders that PE included in its calculations.
**Source:** Prepared by legislative auditor's staff using PE data.

**According to PE, statutory requirements for bidding sometimes contribute to delays in completing customer orders.**  PE is subject to the state Procurement Code and therefore must go through OSP for purchases of $5,000 or more.  As a result, PE is dependent on OSP to conduct the competitive bidding process to secure raw materials and other products which are necessary to fulfill customer orders.  The bidding process can be delayed if bidders are required to submit product samples to confirm that specifications are met or if vendors protest a bid award.  Also, if vendors who are awarded a purchase order by OSP do not deliver products as required by the quality, quantity, or timeliness of the bid, PE may have to go through the bid process again, which further delays the process.  According to PE, it takes time to file deficiency reports with OSP and go through the process of resolving issues with deliveries for subsequent orders.  If PE attempts to keep excess materials in stock to avoid potential delays, this aids its ability to deliver customer orders timely, but it ties up its storage space and financial resources.

---

[47] In PE's JD Edwards system, the requested delivery date defaults to the order date if staff does not manually change it.  We included in our results the 42.1% of wholesale orders and 2.0% of manufacturing orders that had a requested date equal to the order date, as this is the same data that PE used to calculate its performance indicators for fiscal years 2016 through 2018.
[48] Act 1465 of 1997 (the Louisiana Government Performance and Accountability Act) required that each agency (budget unit) receiving an appropriation in the General Appropriation Act or the Ancillary Appropriation Act produce a series of performance progress reports.  The purpose of these reports is to track the agency's progress toward achievement of annual performance standards.

**Conducting a survey of current and potential customers would allow PE to formally evaluate customer satisfaction with its products and services.**  Obtaining customer feedback through surveys is an important tool in ensuring products and services meet customer needs.  We found that three other states' correctional industries' websites[49] have an online survey asking for feedback on customer satisfaction.  As discussed above, PE has not consistently collected complaint information and our review identified multiple customer service issues.  PE should consider developing an online customer satisfaction survey to put on its website or sending an email or written survey out periodically in order to formally assess customer satisfaction.

**Recommendation 10:**  PE should ensure its complaints process includes (1) how customers should file complaints, (2) which PE staff are responsible for resolving complaints and within what timeframe, (3) a requirement that all complaints be logged, and (4) how each type of complaint should be resolved.

**Summary of Management's Response:**  PE partially agrees with this recommendation and stated that it will work to further enhance its complaint process and continue to resolve each complaint in an appropriate manner.  See Appendix A for PE's full response.

**Recommendation 11:**  PE should categorize complaints to provide feedback to staff and ensure that staff collects all required information in order to use complaints data to identify and address ongoing performance issues.

**Summary of Management's Response:**  PE partially agrees with this recommendation and stated that it will continue to categorize complaints in the manner that best serves its operations.  See Appendix A for PE's full response.

**LLA Additional Comments:**  PE's current process does not require it to categorize the reasons for complaints, so we had to create the categories for our analysis based on our review of the sales documentation.  Properly capturing and categorizing complaints is important because PE policy requires management to conduct a complete analysis of trends in complaints received at the end of each month and each calendar year.  This analysis is also important because according to PE's complaint log, customer complaints increased from 33 to 73, or by 121.2%, from fiscal year 2016 to fiscal year 2018.

**Recommendation 12:**  PE should track all costs of complaints, including transportation costs, in order to measure customer service and industry performance as required by PE policy.

**Summary of Management's Response:**  PE partially agrees with this recommendation and stated that it will work to ensure that all excess transportation and other costs are tracked where applicable.  See Appendix A for PE's full response.

---

[49] Texas, Washington, and Pennsylvania

**Recommendation 13:** PE should analyze delivery times based on the actual delivery dates to determine if orders are on time.

**Summary of Management's Response:** PE partially agrees with this recommendation and stated that it will analyze the feasibility of implementing systems or processes that will further enhance the tracking of on-time deliveries. See Appendix A for PE's full response.

**Recommendation 14:** PE should develop a formal complaints policy for its wholesale operations to help ensure that it addresses all complaints and resolves all issues.

**Summary of Management's Response:** PE disagrees with this recommendation but stated that it will continue to address all complaints and resolve all issues within its wholesale operations and consider the feasibility of implementing these processes into the complaints policy. See Appendix A for PE's full response.

**Recommendation 15:** PE should develop and administer a formal survey to assess customer satisfaction with its products and services.

**Summary of Management's Response:** PE agrees with this recommendation and stated that it will work through its marketing department to create and implement a survey to assess customer satisfaction. See Appendix A for PE's full response.

# APPENDIX A:  MANAGEMENT'S RESPONSE

# Department of Public Safety & Corrections
## State of Louisiana
### Division of Prison Enterprises



**JOHN BEL EDWARDS**
Governor

**JAMES M. LE BLANC**
Secretary

April 15, 2019

Daryl G. Purpera, CPA, CFE, Legislative Auditor
Louisiana Legislative Auditor's Office
P.O. Box 94397
Baton Rouge, LA 70804-9397

Dear Mr. Purpera:

Please accept this as the Department of Public Safety and Corrections – Division of Prison Enterprises (DPS&C-PE) response to the recent performance audit conducted at the Department with regards to Prison Enterprises (PE) Operations.

First, and foremost, it is important to note that the audit report concluded that PE has met all three of its statutory purposes as required by R.S. 15:1153. Although the report cites areas where it could strengthen operations, it is reasonable to conclude that overall, Prison Enterprises is achieving its mission through documented and factual information provided to your staff throughout the course of this audit. There are a few general factors to consider that are not illustrated in the audit report, but are critical to understanding how PE fulfills its mission while meeting its statutory purposes.

Prison Enterprises is an ancillary budget unit operating as an enterprise, and reports results of operations utilizing accrual based accounting as a private business would. PE operates very diverse manufacturing, agricultural, and wholesale operations. Our revenues are totally self-generated and discretionary, unlike other ancillary agencies. It is up to the staff of our agency to market ourselves to our customer base and attract business in order to maintain our ability to be self-sufficient. As acknowledged by your staff in meetings throughout the audit period, PE operates in a difficult environment – trying to run like a business but within the constraints of state government. We are extremely unique among all other Louisiana state agencies and it is difficult to apply the same processes to analyze what is necessary of us in order to succeed from year to year.

Although it was not mentioned in the audit, Prison Enterprises has been accredited by the American Correctional Association (ACA) since 1998. It has met all nationally recognized "Performance Based Standards for Correctional Industries," and is reaccredited through a comprehensive audit by ACA every three years. PE has scored 100% on all of its ACA audits for adherence to both mandatory and non-mandatory standards since the original accreditation. The standards used for accreditation address services, programs and operations essential to good

P. O. Box 44314 ✦ Baton Rouge, Louisiana 70804-4314 ✦ (225) 342-6633 ✦ Fax (225) 342-5556 ✦ www.prisonenterprises.org
An Equal Opportunity Employer

A.1

correctional management, including administrative, staff, and fiscal controls, staff training and development, physical plant, safety and emergency procedures, sanitation, rules and discipline, and a variety of subjects that comprise overall good correctional practice. In addition, PE staff also assist and participate in the yearly institutional ACA audits where our operations are located.

The report makes several references to the "Correctional Industries: A Guide to Reentry-Focused Performance Excellence" published by the National Correctional Industries Association (NCIA) in April of 2015. The report further references this guide and its "Best Practices", but was utilized by the performance auditors as a set of standards to which PE was compared, measured, and cited for not adhering to certain components of the guide. The purpose of this publication was to provide a resource to PE and other correctional industries across the country that we could work towards. It was developed with the knowledge that every correctional industry is unique in its design, operations, state and local statutes within which they operate, the physical locations of resources that are available in the particular State that operates a correctional industry (CI) program as well as the costs of implementation of these components. Furthermore, this guide was not intended for 100% compliance, nor does NCIA expect compliance with the majority of these components after only four years since the publication. PE has shown documented examples of how it has developed as well as aligned with certain components of these Best Practices and will continue to enhance our programs based on the resources made available to our agency. However, to avoid duplication of services and related costs, we do not intend to align with all components of Best Practices if that is already provided for by another division of the Department such as the Office of Reentry Services, etc. Attached is a letter from the Executive Director of NCIA further clarifying the applicability of these Best Practices to correctional industries.

Another factor requiring consideration is understanding the structure of divisions within the Department of Public Safety and Corrections (DOC). Specifically, Prison Enterprises is a separate division within DOC (with a separate budget) and separate from the Office of Reentry Services. Although the two divisions are complementary of one another, the resources utilized in each division are purposely separate as to not duplicate services to the offender population and potentially create inefficiencies within the Department. Therefore, certain services and opportunities might not be offered in PE, but are offered through the Office of Reentry and vice versa. As Prison Enterprises continues to find ways to enhance its programs, we have built upon the collaboration between these two divisions, as well as others, to further the overall goal of assisting offenders with becoming more productive citizens and ultimately lowering recidivism. We provided documented examples of these collaborations and accomplishments, including the first Certified Apprenticeship Program, administered through PE, in a Louisiana State Correctional Facility.

Although the performance auditors reference other states throughout the audit report and compare our operations to those in other areas of the country, the report does not illustrate the uniqueness of Louisiana's prison system. For example, Louisiana has almost half of the Louisiana population of state offenders housed in local jails. Even more unique is the small number of fairly large prisons versus many smaller ones. Other states, specifically states mentioned in the audit, can have double the amount of state prisons with a smaller population at each facility. Those environments can allow for more resources and infrastructure for a statewide correctional industry to operate and other geographical advantages within those states. The vast majority of land and resources available to PE are located at Louisiana State Penitentiary (LSP) which is why approximately half of our operations are located there. Compared to other states, this provides a unique situation in that PE operates in an environment that is relatively limited regarding availability of infrastructure than other states. As we assess expansion and enhancement of programs, we must take into consideration this availability of resources, including offenders, who are participating in reentry programming, transitional work programs, education classes, etc.

A.2

which are all vital to lowering the overall incarcerated population, but can present challenges to the development of additional industry operations.

Our comments in regards to each finding and recommendation are as follows:

Finding #1:

There are numerous tangible and intangible benefits that Prison Enterprises provides to help reduce the cost of incarcerating offenders, many of which do not have a direct way of attributing a dollar value to them. However, if we were not providing these benefits, it would certainly increase the cost of incarceration by the fact that the Department of Corrections (DOC) would be responsible for these expenses, requiring additional appropriations from the State. We have discussed several of these benefits throughout the course of this audit as well as in the financial statements we have provided. As PE does not receive any appropriations from the Legislature, any payments/reimbursements we currently make to the Department (payments/reimbursements from PE are factored in DOC's budget) would have to be covered by further appropriations. Our ability to be self-sufficient and meet our obligations with revenue we currently generate demonstrates that we are providing a cost savings for incarcerating offenders.

PE reimburses as well as directly pays for certain utility bills and other costs at the State Facilities that house our programs (including the PE headquarters office). Since PE pays these amounts out of our self-generated revenue, this is a cost that would become the responsibility of the Department if we did not pay this expense and the facility were to utilize these buildings in our absence. Therefore, it would increase the cost of incarceration by requiring additional appropriations to cover these expenses.

One such example is PE pays the Office of Risk Management (as illustrated in the audit report) for insurance coverage of various buildings, structures, and property that are utilized by our programs. These costs would still exist if we did not occupy these areas since the State requires coverage of buildings, structures, etc., that are located on State property as stated in R.S. 39:1535. This cost has averaged approximately $314,000 annually for the last three fiscal years. As previously mentioned, the Department would be required to carry coverage in the same manner whether or not our programs existed, which would increase their payments to ORM thus requiring more appropriations.

Also, PE has 33 positions that directly supervise offenders on a daily basis. These positions are occupied by our staff who are also mandated to be trained correctional officers serving in the same capacity as regular correctional officers, but with the additional responsibility of supervising the operation and productivity of our programs. PE is paying the salaries of all employees within our agency out of self-generated revenues. The savings we provide in this particular case relates to the supervision of the offenders that work with us on a daily basis. If we did not provide the work opportunities for these offenders, they would need to be supervised by correctional officers working for the institution. If you replaced our positions with correctional officers, it would conservatively cost approximately $1.7M annually in additional staff salaries to supervise the same offenders PE currently supervises. This does not include related benefits for these employees which could add as much as an additional $750,000 annually.

Through our agricultural operations, we maintain thousands of acres of property located within many of the Institutions. For example, when the performance auditors visited Louisiana State Penitentiary, they observed the

vast amounts of land that we maintain through our row crop and cattle operations. If PE did not operate these programs, the Institution would be responsible for maintaining the same areas. It is imperative that the land is well-kept and maintained to prevent security risks. LSP for example, does not currently have the ability to take over maintenance of all the areas we maintain and would require substantial investment in equipment, staff, and infrastructure to maintain the property at the same level it is currently maintained. We provide a savings in up-keep of the grounds where our agricultural operations exist (at PE's cost) that would otherwise be the responsibility of the Institution.

In addition to the grounds, PE also continually maintains, repairs and/or improves the facilities to adhere to ACA standards and other regulatory requirements which house our programs. This could be routine maintenance/repairs throughout the year as well as building additional facilities as necessary on the institutional grounds that would ultimately go back to the Department if PE did not exist. PE incurs the cost of maintaining and improving the facilities in which it operates that would otherwise be left for the institution to maintain at their expense.

As it relates to the cost effectiveness of DOC purchasing from PE, there are several factors that should be considered which include examples referenced above. The price of a product is not the sole measurement of cost-effectiveness. Weighing the quality as well as the benefits of buying from PE is also important. For example, PE purchased approximately $30M worth of items from Louisiana vendors during fiscal years 2016 to 2018. These vendors benefit from PE's operations by being able to deliver to one location in higher quantities that may otherwise not be available if PE did not exist or if the vendors do not have the capability of delivering products to multiple locations statewide.

As stated in the audit report, PE does distribute an annual report to DOC. In addition, PE also submits a required Annual Fiscal Report to the Office of Statewide Reporting and Accounting Policy and your office illustrating all of Prison Enterprises financial information on an annual basis in accordance with the law. PE is willing to submit its annual report to entities outside of the Department as appropriate, as well as publish it on our website for stakeholders to view.

<u>Finding #2:</u>

Although R.S. 1157(A)(1)(2) does not specify who should enforce this law; it is important to note that PE does not currently have a mechanism, staff, or resources in place to monitor all invitations to bid from other state agencies or continually contact all state agency staff directly to present what PE could offer for each specific bid. Also, the audit report does not take into account the numerous purchases that are carried out within an agency's designated purchasing authority to which no invitation to bid would be created through the Office of State Procurement and therefore could not be immediately enforced. Also, if PE was required to enforce this provision, it could lead to strained relationships and jeopardize other sales with existing customers if we were to force them to purchase an item from us that they have attempted to purchase elsewhere.

<u>Finding #3:</u>

Prison Enterprises' operations provide unique work opportunities and job training for offenders, teaching them valuable skills as well as work ethic and a sense of responsibility; all of which are vital for stability and safety within an institution and/or eventual re-entry into society. PE has consistently achieved lower recidivism rates for those offenders who participate in a PE program when comparing to the overall DOC offender population thus

demonstrating the value and role PE plays in re-entry.

As previously mentioned, Prison Enterprises and the Office of Reentry Services complement each other by re-enforcing the soft skills training learned in the classroom through reentry programming and applying these skills to actual work performed. There are many offenders that come through our programs that have never held a job. Although certain items produced by PE may not mirror current markets and jobs that are highest in demand; they are still acquiring valuable and relevant skills about the processes of production, manufacturing, discipline of reporting to work and retaining a job, assembly line production, supply chain management, warehousing, etc. all of which are transferrable skills, upon release, regardless of what job an offender may hold when released. PE also issues competency certificates to all offenders participating in our programs upon receiving a satisfactory performance evaluation. These certificates can be included in the offenders' master prison record and may be used to demonstrate to a potential employer the type of work and length of time they were performing while incarcerated. In addition, the offenders hold job titles associated with the nationally recognized "Dictionary of Occupational Job Titles" which mirrors job titles in the private sector. This is another example of how PE complements the efforts of the Office of Reentry Services to assist offenders with finding employment after release.

Although the audit report lists the percentage of offenders serving life sentences as a finding, there are numerous benefits of providing work opportunities to this population. As mentioned in the audit report, it provides a stable workforce that allow for the mentoring and training of new or shorter term offenders. It is also important to note that providing these work opportunities reduces prison idleness which enhances the security and stability of the prison and reduces costs to the institution with PE providing supervision of these offenders while working within our operations.

The audit report cited PE for providing work opportunities in garment factories, however, these operations provide the same transferrable skills mentioned above. Also, PE cannot simply abandon these operations if there is a market for the products being produced. If we were to shut down these operations, not only would the job opportunities be lost, but our customers would continue buying these products from other vendors likely outside of Louisiana. On the other hand, PE cannot just develop new work programs without an existing market and must also consider avoiding direct competition with Louisiana businesses producing certain items in the current market.

Tracking post-employment statistics is an area that the Office of Reentry is working towards. Currently, we are relying on the offender to self-report data back to the Department as there is no requirement for employers or offenders to report employment data back to the Department. Although most correctional industries do not have a mechanism to track post-employment, PE does track recidivism rates thru DOC for the offenders that worked in our programs which have been historically lower than the overall Department rates. Although the audit report references that some of our programs do not mirror current job markets, they are certainly relevant to lowering recidivism, lowering the incarcerated population, and reducing the overall cost to the Department all while teaching valuable skills that are transferrable to any job they may acquire upon release.

As it relates to the PIE Certification Program, it is important to note that there has been a stagnation in PIE Programs across the country over the last several years according to the National Correctional Industries Association (see attached letter). Although PIE programs can be beneficial to all involved parties, especially to an offender, it requires substantial investment and risk from the private sector employer. Although the idea of employing offenders in a private sector manufacturing environment is attractive on the surface, it is difficult to attract a company that is willing to invest in infrastructure, equipment, and other resources on state property

inside of a prison. The report also does not mention the opportunities available in Transitional Work Programs. These programs are offered separately from Prison Enterprises by the Department and gives those offenders approaching their release date an opportunity to work with a private employer while earning higher wages. This program has become more popular over time and operates somewhat similarly to a PIE Certification Program except usually outside of the prison facility. Even though PIE Programs have not increased in recent years, the same opportunities for the offenders still exist through these Transitional Work Programs offered by DOC.

Recommendation #1:

Prison Enterprises will continue working with the DOC Office of Reentry Services and will also continue to demonstrate that offenders participating in our programs have lower recidivism than the overall Department.

Recommendation #2:

PE will continue to actively seek businesses to partner with and will participate in a PIE program should a viable opportunity become available.

Finding #4:

Prison Enterprises has demonstrated and provided documented examples that it was financially sustainable for the period cited in the audit. We explained to the performance auditors that PE operates on accrual based accounting principles with cash and non-cash expenses, revenues, and account payables and receivables that occur within a fiscal year, from one fiscal year to the next and over multiple fiscal years. Exhibit 8 illustrates that PE's revenues exceeded its expenses from Fiscal Years 1996 through 2018 by over $2.8M. We also generated more cash than we used for the same time period by over $1.8M which is why PE has met all of its obligations throughout this time period and has never requested any appropriation from the legislature or needed to borrow money from the treasury to meet certain obligations.

The Best Practice referenced in this finding was created with the knowledge that financial sustainability is intended for the whole agency and not individual operations due to the fact that certain operations may not generate a profit, but contribute to the overall mission of a correctional industry by providing valuable work opportunities and other benefits to PE and DOC.

PE produces products and services in very diverse and volatile markets. It is reasonable to assume that any business operating in an environment whose customers are primarily driven by state and local budgets will have years that show profits and losses. The overall goal, however, is to monitor the long term sustainability of operations and not just look at one year or even three years. PE has demonstrated that it can be financially sustainable through tough budget times, natural disasters, and other factors that affect not only our ability to produce products and services, but our customers' ability to purchase these products and services within their budgets.

There are several ways PE analyzes its overall financial position. We provided a three-year business plan to the performance auditors that outlines each PE operation, their current market conditions, the outlook for the future, and its overall financial performance.  As stated in the audit report, PE produces labor projections, inventory requirements, overhead expenses, cash flow projections, monthly financial statements and various other reports all of which are reviewed weekly, monthly, quarterly and annually by staff across the agency. PE explained to the

performance auditors that the accounting department meets monthly to review statements, analyze any obscurities and communicate with the individual operations to make sure any and all transactions for that particular month are appropriately classified. PE documents these meetings as well as the fiscal notes that coincide with the closing of each month's financial statements. The monthly financial data is then distributed to all staff members for their respective areas of oversight for analysis and feedback as necessary.

The report cited $5,100 in expenses that the performance auditors classified as not relating our agency's purpose. It is reasonable to assume that the statutory purposes are not intended to capture or dictate each operating activity of the agency. As allowed by Department Regulation, PE holds its Annual Training and Awards Conference that not only provides valuable training topics, but also recognizes its employees for the work they have performed throughout the year. Holding such an event for its employees is directly attributed to fulfilling the purpose and mission of the agency since it is the employees who are responsible for ensuring the agency's purpose and mission are met each year. Unlike each individual institution, PE operates with staff and operations at ten different physical locations throughout the State. Therefore, this event allows the opportunity for staff to come together in one place to provide agency wide training, collaboration, etc.

PE is expected to operate as close to a private sector business as possible in order to achieve our overall mission. This includes promoting our name, products, and services as necessary as we have many competitors providing the same goods and services who we must face day to day when trying to retain customers and develop new business. The Louisiana Correctional Association is comprised of a large portion of our customer base. The annual conference is a great opportunity for PE to interact and meet with potential and existing customers all in one place. As part of the conference events, sponsoring a hole and participating in the golf tournament is another way of advertising at the conference in addition to booth space in the exhibit hall. We have very limited time to interact with our customers at these conferences and being able to advertise and receive name recognition is vital to retaining and gaining new customers. We are not the only vendors attending the conference and our competitors are advertising and participating in all aspects of the conference and competing for the same business. We believe it is important for our customers to see our name advertised in as many places as possible and interact with us which is why we try to participate in every aspect of the conference, as do our competitors.

Although PE limits non-essential expenses to ensure financial sustainability, the food expense cited in the report is actually a component of how PE helps maintain its financial sustainability. There are numerous times throughout the year where it is necessary for our operations to work overtime in order to meet deadlines for manufacturing various items.  By providing items for offenders, who have agreed to work extra hours, illustrates that we incentivize them in one of the only ways possible in an effort to resemble an environment to that of a private sector business. We feel these expenses are limited and monitored for reasonableness since there are multiple levels of approval required in order to provide these items as demonstrated in the documented examples provided to the performance auditors as well as the small cost relative to the additional productivity achieved to complete orders.

<u>Recommendation #3:</u>

PE will continue to produce, analyze, and document its financial position to further enhance its overall financial sustainability.

Recommendation #4:

PE will continue to monitor and limit non-essential expenses.

Finding #5:

Prison Enterprises staff frequently evaluates the costs associated with producing each product and service. The prices published on PE's statewide contract is a result of a comprehensive review performed annually by the executive staff that looks at various factors that may cause a price to increase or decrease. The outcome of this review may change prices for certain items and a comprehensive list is sent to the Office of State Procurement (OSP) once the new pricing list has been finalized. Although the audit report cites an over or undercharge of items from the statewide contract, PE believes it is primarily a result of the timing of when OSP actually published the prices versus when PE began selling the items at the newly established price. Since PE tries to maintain the same price of its statewide contract items on an annual basis, we implement the new pricing when we submit the list to OSP because it is based primarily on a change in the cost to produce the item. When PE sells an item to an agency, a purchase order is created by the agency for the price of the item, which is established before the order is created in our system. All customers know what price they are paying for any product or service before receiving them. It is reasonable to acknowledge that Prison Enterprises does not try to mislead or change a price of a state contract item in order to receive more revenue, but instead acts in good faith to charge a price that was expected to be published on OSP's website based on what our agency deemed as the appropriate price. There are situations where a price might be adjusted down if a customer is ordering a large quantity of a particular item or if our agency believes that lowering a price for new customer could lead to future sales, therefore giving the potential to generate more revenue.

The pricing model referenced in the audit report is a factor that is established each year based on several components including costs associated with operating a particular operation, unusual events that occurred during the previous year that affected revenue, outlook for the upcoming fiscal year and other outside factors that could affect sales. It also takes into account the raw material costs, overhead, transportation, allocations, etc. as well as a small markup above breakeven to provide for reinvestment in assets and other infrastructure. It is important to note that the pricing model is a guide for pricing custom products and is not always a straightforward calculation. When a custom item is produced, consideration for the complexity or simplicity of customization must be considered including the opportunity costs of producing a custom item versus a state contract item. Therefore, custom items will have different markups based on the cost, quantity, customer, competition, time and effort to produce and other factors that all play a part in pricing methodology. PE also benchmarks prices of our competitors on a continual basis. PE cannot use just one pricing algorithm to price every product in every operation due to the diverse nature of the products and various markets PE operates within. Deviations from the pricing model are expected and have resulted in the overall financial sustainability of our agency.

Throughout this audit we have conveyed the benefits Prison Enterprises provides to the Department by operating our wholesale operations. By PE taking on the administrative burden of centralizing the procurement of these items into one physical location, we are able to save institutional administrative costs and create some economies of scale by bulk purchasing in larger volumes and having one single location for outside vendor delivery instead of various locations across the State (each institution). This allows for more frequent deliveries by PE which reduces the amount of cooler space, dry storage, etc. that the facilities would otherwise need to have in place in order to hold the product we currently warehouse. This reduces the cost to the Department and promotes better security in the facilities by minimizing the amount of outside traffic coming in and out of the facilities from numerous

vendors who may be awarded the different items at each institution. PE can currently supply all of these items on one state vehicle as a result of utilizing our storage capacity and in-house transportation fleet. Although the performance auditors compared the percentage of markup for these items, there were no comparisons to the actual price an offender pays for each item which would provide a better depiction of the effect our bulk purchasing has on overall prices. It is important to note that although percentages in markup may vary from state to state, that does not indicate whether or not the offenders are paying a higher price. The comparisons also do not take into consideration the offender population sizes other states are servicing, the procurement laws associated with each state, or the cost of distribution to these offender populations. PE procures all of its wholesale items through the Office of State Procurement and puts each item out for public bid. The cost of sales associated with our wholesale operations is primarily driven by the bid price we receive from the lowest responsive bidder and will fluctuate on an annual and semi-annual basis.

Recommendation #5:

Prison Enterprises does document deviations from the pricing model as reflected in the price of the products we sell. Due to the thousands of items sold throughout a year, it would be difficult to document to the degree that is being recommended since every situation is different and the pricing model is used as a guide and not a unilateral calculation.

Recommendation #6:

Prison Enterprises will work with the Office of State Procurement to ensure the prices published on the statewide contract match what is submitted by our agency.

Finding #6:

As previously mentioned, Prison Enterprises operates very diverse manufacturing, agricultural, and wholesale operations. Our agency's customer base is comprised only of tax supported entities including other state agencies, local governments and municipalities as well as non-profit organizations within the State of Louisiana. PE's marketing initiatives are unique in the sense that we must cater to a limited customer base while trying to compete with national companies whose resources and staff are much more comprehensive than those of our agency. PE is expected to resemble a private sector business while working within the confines and boundaries of being a state agency. Although the performance auditors cited PE's marketing plan for not being comprehensive, it is difficult to mirror some of the same marketing initiatives a large company may have the ability to carry out. Most companies comparable in size have much more staff and resources than our agency has in terms of marketing expertise. Our staff does its best to work within the state guidelines, while promoting ourselves and engaging its stakeholders.

The components of a good marketing plan cited in the audit report such as "Pursue advertising, promotional, and public relations campaigns that lead to continued successful exchanges between the organization and its customers" and "Engage in meaningful communications with customers on a regular basis" are in line with what Prison Enterprises continually demonstrates with new and existing customers and is, in part, being criticized for doing so in other findings.

In researching other companies and marketing statistics, PE found that a typical company comparable in size spends approximately 5-10% of its overall revenues on marketing efforts that closely resemble the efforts for

which PE is currently engaged. Over the three-year period being cited in the report, PE spent .001% of its total revenue on marketing efforts. Because PE is financially sustainable and met its other statutory purposes, we believe this clearly demonstrates a return on investment, future sales, and other positive business outcomes.

We provided the performance auditors with an explanation of promotional items, advertising, samples, etc. and the differences between the various categories. The items that are referenced in exhibit 16 and 17 are examples of what PE provides as samples to advertise what our capabilities are for potential and existing customers. These are classified as such when we account for the expense. As part of our marketing strategy, we sample items to advertise our capabilities to customers that may not realize all that we have to offer. It's one of the costs PE incurs to gain and retain business and is incorporated into our pricing methodology previously mentioned. It is a common business practice to provide samples and often required to be considered for a job. We also advertise our capabilities for name recognition. Although a sample might occur periodically, we believe it is important to maintain name recognition and remind existing customers of what we are capable of producing. Providing certain agency staff with samples of our capabilities is done so with a desire to show our quality and encourage them to have their respective agencies utilize our services and/or promote our agency mission and capabilities to other potential customers. It is a common industry practice to provide samples and promotional items in order to attract business and is even cited in the report by the performance auditors as a best practice per the "Principles of Marketing."

PE staff reviewed the same "Principles of Marketing" publication referenced above. Nowhere could we locate that these were intended to be "best practices" as indicated by the performance auditors. Also, there is no reference as to the necessity of, or how to track promotional activities directly to a resulting sale as recommended in the audit report. It only indicates that these activities, including tradeshows, are very beneficial.

As previously stated, the expense incurred for carrying out these efforts are well below what other private sector companies spend on marketing efforts therefore illustrating the public benefit and that the benefit was proportionate to the cost.

Recommendation #7:

Prison Enterprises will work to further enhance its marketing plan to meet goals and objectives that will continue to allow PE to be self-sufficient.

Recommendation #8:

Prison Enterprises will continue to monitor the public benefit of our marketing efforts and ensure the expense is proportionate to the cost of these efforts. However, to track these efforts to the degree of this recommendation would not align with industry standards and require substantial investment in staff and resources that could potentially create inefficiency within our marketing department. This recommendation would also provide a result that is not readily defensible as we cannot prove that a specific promotional item results in a particular or immediate sale and it could even be several years before a customer tries our products as a result of repeated marketing efforts overtime.

Recommendation #9:

PE will continue to bill customers appropriately and comply with all applicable laws.

**Finding #7:**

Prison Enterprises complaints process tracks complaints in order to identify and improve processes in the manufacturing of items as well as a factor to gage the performance of each individual operation. According to the performance auditors, Prison Enterprises had 226 complaints for almost 6,000 manufacturing orders in the three-year time period referenced. It is reasonable to state that although PE may have had some complaints that were not properly logged or did not attribute a cost to a particular complaint, 96% of all orders produced in this time period did not have issues. Of the 3.8% cited, some of the complaints were not the fault of Prison Enterprises, but we classified them as a complaint to ensure transparency of replacing or repairing items. There are also instances where we catch the issue with the order before the customer receives the items or before the customer files a complaint, but we still capture the issue as a complaint to address with the operation producing the product.

Our wholesale operations distribute items that are not directly related to a manufacturing process, therefore, the purpose of the formal complaints process to enhance the manufacturing processes are not directly applicable. The items we sell through our wholesale operations are all approved through various committees represented by all facilities within the department to which PE is simply the distributor and has no authority to dictate what is offered. We explained to the performance auditors the primary issues that arise with our wholesale operations are issues that are typically outside the span of our control. The main issue being delivery of inventory from outside vendors. Our supervisors work directly with the facilities they service to communicate these delays and resolve discrepancies due to the high volume of items that constantly flow through these operations. Requiring them to document the same complaint repeatedly for all facilities that would likely have the same issue if a vendor has not delivered a product timely and involve additional staff in the process, would create delays in resolving these issues which could decrease customer satisfaction and increase cost to our agency. All of the facilities we service through our wholesale operations know the process of communicating issues back to our supervisors and are monitored by our Regional Quality Assurance Coordinators to ensure these issues are handled appropriately.

As it relates to on-time deliveries, Exhibit 20 illustrates percentages that the performance auditors calculated based on their methodology which is different from our approach. The percentage increase in on-time deliveries that was calculated did not include 1,464 orders that Prison Enterprises included in our figures which ultimately make the number appear larger. We track an order until all line items on that order are completed and delivered. Since we track deliveries monthly, an order might appear in multiple months if all line items are not delivered in the same month. For example, an order could consist of thirty line items, but if one line is not delivered timely (a certain shirt size is unavailable in a certain color for a time) the entire order is deemed late. We believe this is important because we track the production of each individual operation and believe it is necessary to follow the order month to month until the entire order is complete. One order also might have items that more than one operation will produce. On-time deliveries are not just a performance indicator, but is also a management tool used by multiple staff to address various issues in the workflow process.

We also explained that our wholesale operations have set delivery schedules and are delivered on a particular day of each week of each month throughout the year. Although we capture the wholesale deliveries in our system, it is not a true measure of performance since the facilities dictate when they can receive the product.

As stated in the audit, there are several factors that affect our ability to deliver on-time including factors that are outside of our control. Our highest percentage of deliveries not on time occurred in FY17 when the Great Flood of 2016 hit the Baton Rouge and surrounding areas. Our transportation resources where used extensively to move product around to other facilities due to the evacuation of the Louisiana Correctional Institute for Women and

ultimate flooding of that facility. This caused extreme disruption in our ability to produce and deliver orders on time. One of our operations flooded and was shut down for almost a year therefore causing substantial delays in production. We have since recovered and are working towards a higher percentage of on-time deliveries as we had to restructure some operations as a result of this catastrophic event.

Overall, PE continues to maintain a high level of customer satisfaction which is demonstrated through our continued ability to meet our statutory purposes, through repeat orders, positive feedback from customers at tradeshows and otherwise.

Recommendation #10:

Prison Enterprises will work to further enhance its complaints process and continue to resolve each complaint in an appropriate manner.


Recommendation #11:

Prison Enterprises will continue to categorize complaints in the manner that best serves our operations.

Recommendation #12:

PE will work to ensure that all excess transportation and other costs are tracked where applicable.

Recommendation #13:

Prison Enterprises will analyze the feasibility of implementing systems or processes that will further enhance the tracking of on-time deliveries.

Recommendation #14:

Prison Enterprises will continue addressing all complaints and resolving issues within its wholesale operations and consider the feasibility of implementing these processes into the complaints policy.

Recommendation #15:

Prison Enterprises will work through its marketing department to create and implement a survey to assess customer satisfaction.

In closing, I would like to take this opportunity to express our appreciation to your staff for their efforts and cooperation throughout the audit period as well as the presentation of this report. Should you have any questions or require additional information, please do not hesitate to contact my office.

Sincerely,

Michael J. Moore
Director, Prison Enterprises

MJM/jb

Attachment:
Letter from NCIA Executive Director



NATIONAL
CORRECTIONAL
INDUSTRIES
ASSOCIATION

**NATIONAL CORRECTIONAL INDUSTRIES ASSOCIATION, INC.**
800 North Charles St., Ste. 550B  *  Baltimore, MD 21201  *  (410) 230-3972  *  Fax (410) 230-3981

April 10, 2019

Michael Moore
Director
Louisiana Prison Enterprises
604 Mayflower Street
Baton Rouge, LA 70802

Dear Michael:

Following our phone conversation, I wanted to provide you with additional feedback relative to the CI Best Practices that NCIA developed in 2015 and continues to maintain via our Best Practices Committee. It's my understanding that the NCIA Best Practices were referenced during LPE's recent legislative audit; as NCIA Executive Director, I can offer some historical insight into the evolution of NCIA's CI Best Practices that may be helpful to you during this process.

First, some history and background information.  The CI Best Practices were developed by an NCIA Task Force that created 10 key best practice components over the course of two years. They were published in 2015 as an evolving set of practices intended to assist CI programs across the country in striving for performance excellence in their programming. NCIA's Best Practices Committee continues to be a very active committee and is constantly reviewing and modifying/improving these practices to maintain their relevance to the field.  Most recently, the committee decided to add an 11th best practice in the area of safety and security. At the time that this security best practice was being finalized, the committee became concerned with some feedback by non-CI organizations, similar to what took place in your audit, who misunderstood the intent of NCIA's best practices. The CI Best Practices are not intended to be a set of standards by which CI organizations should be measured—this was never the goal of the original Best Practice Task Force nor the current Best Practice Committee.  As such, when NCIA published the new safety and security best practice component, the committee instructed NCIA to revise the Best Practice home page to reflect the following text:

"The Guide is not intended to be used as a set of standards against which CI programs should be measured. It was developed with the knowledge that every CI program is unique in its design and operation as well as where each CI is positioned along the road of Reentry alignment. Each

CI program may develop and use the Reentry-Focused Performance Excellence Guide to integrate and enhance its own existing processes according to its available resources. The implementation of best practice components may need to be modified by your CI based on departmental regulations, institutional policy and/or be contingent upon other factors including physical plant design, level of security, location of plant, cost of implementation, level of programs and state/local statutes. Implementation will assist in developing a culture of offender employability and institutional stability while ensuring the sustainability of the CI program as a whole…"

The committee's goal in updating this introduction was twofold: a) to ensure that non-CI organizations understood the CI Best Practices were developed as a set of guidelines to which CI programs can aspire to achieve—not as a set of standards upon which to be graded and b) to ensure that non-CI organizations also understood that while the title of the CI Best Practices Guide is the "Online Guide to Reentry-Focused Performance Excellence," implementation of these best practices also enhances institutional stability. Because the field of CI believed that CI's impact on safety and institutional stability was already widely established throughout corrections, the original Task Force's goal was to move CI towards being a major stakeholder in the reentry arena. However, this shift towards a focus in reentry in no way was intended to minimize the significant effect that CI work has on inmates (including lifers) and the institution where these inmates work. From documented reductions in behavioral infractions to the positive work ethic and attitudes being developed and modeled by inmates themselves, CI has a significant, positive impact on institutional safety and stability. I hear it all the time at our CI Director Roundtables, NCIA Board Meetings and in my conversations with CI directors and corrections professionals across the country.

I also should point out that NCIA created a national Performance Excellence Award just last year. The award recognizes a CI that has made strides in **two** best practices; this shows that in our field, even making improvements in two of the BPs is something to be recognized.  Additionally, only two CIs have nominated themselves each year for this award, illustrating how challenging it is for CIs to reach these performance excellence goals.  The criteria for the Performance Excellence Award is as follows: "This award recognizes an outstanding State or Federal Correctional Industry that, within the past three years, has implemented a minimum of two best practices and/or programmatic changes that align with NCIA's Correctional Industries Best Practice Model defined in the Guide to Reentry-Focused Performance Excellence."

We also discussed several other topics that I will touch upon here. The first is the importance of soft skills.  While technical skills are clearly important to inmates who one day will release back to society, equally, if not more important, are the work ethic/soft skills that CI programs provide. To quote the experts on this topic, technical skills might get you a job, but soft skills are how you keep a job--and the focus is on retention now, not just employment. Soft skills also encompass life skills and can impact an inmate in so many other ways than obtaining or retaining a job—it teaches them how to behave in the world—how to behave in a group setting, how to take direction, how to get along with others, how to lead or be a mentor—so many behavioral things that, again, impact institutional stability and safety as well as have a positive effect on the inmate

personally. All of these skills are transferable for inmates transitioning back into society as well, regardless of the type of job held while working in a CI program.

The second topic we discussed is post-release employment. I shared with you that we recently had an inquiry from an organization looking for a CI statistic on post-release employment. Unfortunately, we had to tell them that NCIA has no real concrete statistics on post-release employment for CI inmates. This is primarily attributed to the fact that often times DOC's research and statistical departments do not separate CI data as its own data set apart from DOC data, making it very challenging for CI to track its own recidivism and post-release employment data. According to our 2019 Directory published in January, ten CI programs in the country offer some type of post-release services but most, if not all, struggle to find a way to track whether released inmates are successful in finding employment, and none that I am aware of have developed a system that tracks if inmates are employed in their field of training upon release. This is an area NCIA is focusing on currently—finding states that are successful in post-release employment tracking and trying to create a template of sorts that perhaps other states can follow.

The third topic we discussed was profitability. As I mentioned to you, it's commonplace for CI programs across the country to have some industries that are profitable but to have just as many that are not financially profitable but offer other significant benefits, namely to provide work opportunities to a large number of inmates which reduces idleness, enhances security and also teaches transferable technical and soft skills to a greater number of inmates. Based on my conversations at the national level, I am not aware of any one CI in the country whose individual programs are all individually self-supporting and I don't believe that is a practical or attainable endeavor. As the Financial Sustainability Best Practice states, "There may be business units that are not financially self-sufficient but employ numerous offenders or offer valuable work skills. Correctional Industries can balance the benefits and maintain this business unit with a more lucrative business unit that can offset the financial loss."

The fourth discussion topic was the current status of PIECP participation throughout CI programs nationally. Since 2016, the PIECP numbers have plateaued and in some quarters, have actually decreased. It's NCIA's opinion that this stagnancy is due to two main factors: a) many private companies do not want to be associated with the use of inmate labor because of perceived negative PR and b) PIECP is built around program compliance and there are very limited training resources provided to CI for any business development and/or program marketing, making it challenging for CIs to find and secure private sector partners.

Lastly, we discussed CIs' marketing efforts at the national level. NCIA's 2019 Directory reflects the significant market restrictions that CIs face, citing 31of 49 states have procurement laws restricting CI sales to state/local government, making it even more challenging for CI marketing and sales efforts. And while 33 of 49 states have a preference law to purchase from CI, only 11 of those states actually enforce the preference law. Those CIs that push state agencies to enforce the preference law by buying from CI often find this results in negative media scrutiny for such a transaction, so it is often not pursued. As for the specific area of tradeshows, NCIA's 'Engaging Stakeholders' Best Practice Webinar cited that CIs should exhibit at a minimum of 10 conventions per year in order to strengthen customer relationships and showcase new products

and services to those market segments.  NCIA's e-learning marketing course, currently under development, also contains a segment on tradeshows and states this: "Most CIs are state-based and have a presence with state associations that produce tradeshows focused on specific customer segments (K through 12 & Higher education, Health & Social Services, Environmental Protection, and so on).  Trade shows are an excellent way to meet and market to a focused customer segment." As we discussed, promotions and giveaways at tradeshows are commonplace strategies and have been found to be an effective way to increase brand awareness for CI programs.

Michael, I hope this information sheds some light on some of the questions and issues you shared with me during our phone conversations.  As always, please feel free to reach out to me for any additional information or assistance.

Sincerely,

Gina Honeycutt
Executive Director



Louisiana Legislative Auditor
Performance Audit Services

Checklist for Audit Recommendations

**Agency: <u>Prison Enterprises</u>**

**Audit Title: <u>Evaluation of Operations</u>**

**Audit Report Number: <u>40170017</u>**

**Instructions to Audited Agency:** Please fill in the information below for each recommendation. A summary of your response for each recommendation will be included in the body of the report. The entire text of your response will be included as an appendix to the audit report.

| |
|---|
| **Finding 3:** PE met its third statutory purpose of providing work opportunities for offenders. However, this statutory purpose does not align with other states and best practices that recommend correctional industry programs teach transferable job skills to help offenders get jobs after release. Currently, 39.2% of offenders in PE are serving life sentences, and 32.5% of PE offenders are working in fields that LWC has projected to have a decrease in future employment. |

**Recommendation 1:** *PE should work with DOC's Office of Reentry Services to better coordinate work opportunities in PE industries with those in the current job market to enhance offenders' successful reintegration into their communities.*

| Does Agency Agree with Recommendation? | ☐ Agree | ☐ Disagree |
|---|---|---|
| Agency Contact Responsible for Recommendation: | | |
| *Name/Title: Michael J. Moore, Director* | ☑ *Partially Agree* | |
| *Address: 604 Mayflower* | | |
| *City, State, Zip: Baton Rouge, LA 70802* | | |
| *Phone Number: 225-342-6631* | | |
| *Email: micmoore@corrections.state.la.us* | | |

**Recommendation 2:** *PE should continue to actively seek businesses to partner with and to again participate in the PIE program and provide offenders with work opportunities that are relevant to the job market and pay higher wages.*

| Does Agency Agree with Recommendation? | ☑ Agree | ☐ Disagree |
|---|---|---|
| Agency Contact Responsible for Recommendation: | | |
| *Name/Title: Michael J. Moore, Director* | | |
| *Address: 604 Mayflower* | | |
| *City, State, Zip: Baton Rouge, LA 70802* | | |
| *Phone Number: 225-342-6631* | | |
| *Email: micmoore@corrections.state.la.us* | | |

A.18

**Finding 4:** During fiscal years 1996 through 2018, PE's expenses exceeded its revenues, and PE used more cash than it generated in 11 (47.8%) of the 23 fiscal years. In addition, operations such as silk screen, printing, and corn and cotton production were not profitable at all during fiscal years 2016 through 2018. Because best practices recommend that correctional industries be financially sustainable and maintain positive cash flow in order to ensure long-term viability, PE should document its evaluation of the profitability of each operation and limit non-essential expenditures that affect its financial sustainability.

*Recommendation 3*: PE should document how its review of forecasts, financial statements, updated product structures, and other financial information impacts management's decisions concerning financial sustainability.

| Does Agency Agree with Recommendation? | ☐ Agree | ☐ Disagree |
|---|---|---|

Agency Contact Responsible for Recommendation:

| Name/Title: Michael J. Moore, Director | ☑ Partially Agree |
|---|---|
| Address: 604 Mayflower | |
| City, State, Zip: Baton Rouge, LA 70802 | |
| Phone Number: 225-342-6631 | |
| Email: micmoore@corrections.state.la.us | |

*Recommendation 4*: PE should considering limiting non-essential spending on food and other items for offenders and staff.

| Does Agency Agree with Recommendation? | ☐ Agree | ☐ Disagree |
|---|---|---|

Agency Contact Responsible for Recommendation:

| Name/Title: Michael J. Moore, Director | ☑ Partially Agree |
|---|---|
| Address: 604 Mayflower | |
| City, State, Zip: Baton Rouge, LA 70802 | |
| Phone Number: 225-342-6631 | |
| Email: micmoore@corrections.state.la.us | |

**Finding 5:** PE did not comply with its pricing policy for some manufactured items during fiscal years 2016 through 2018. As a result, PE overcharged customers by at least $55,106 and undercharged customers by at least $81,947 for items whose prices should have been fixed based on PE's statewide contract. In addition, unlike other states, both PE and DOC markup wholesale prices for canteen items.

*Recommendation 5*: PE should document the reasons for the deviations from the statewide contract prices to ensure that PE charges customers consistent prices. In addition, PE should document the reasons for charging customers prices that deviate from the pricing model as well as who authorized any deviations so that these changes can be monitored and analyzed for reasonableness.

| Does Agency Agree with Recommendation? | ☐ Agree | ☐ Disagree |
|---|---|---|

Agency Contact Responsible for Recommendation:

| Name/Title: Michael J. Moore, Director | ☑ Partially Agree |
|---|---|
| Address: 604 Mayflower | |
| City, State, Zip: Baton Rouge, LA 70802 | |
| Phone Number: 225-342-6631 | |

*Email: micmoore@corrections.state.la.us*

**Recommendation 6**: *PE should require staff to periodically review its statewide contract prices posted on OSP's website for accuracy so that it can ensure that customers are charged correct prices.*

| Does Agency Agree with Recommendation? | ☐ Agree | ☐ Disagree |
|---|---|---|

Agency Contact Responsible for Recommendation:

*Name/Title: Michael J. Moore, Director* ☑ Partially Agree

*Address: 604 Mayflower*

*City, State, Zip: Baton Rouge, LA 70802*

*Phone Number: 225-342-6631*

*Email: micmoore@corrections.state.la.us*

**Finding 6:** PE has not developed a comprehensive marketing plan that describes how it will promote its products and services, as recommended by best practices. In addition, PE does not have a process for tracking whether the approximately $117,000 spent on marketing efforts during fiscal years 2016 through 2018 generated a financial benefit that is proportionate to the costs, as required by policy.

**Recommendation 7**: *PE should develop a comprehensive marketing plan that includes factors such as goals and direction for attainable future marketing efforts; clear, realistic, and measurable targets; deadlines for meeting those targets; and a budget for all marketing activities.*

| Does Agency Agree with Recommendation? | ☐ Agree | ☐ Disagree |
|---|---|---|

Agency Contact Responsible for Recommendation:

*Name/Title: Michael J. Moore, Director* ☑ Partially Agree

*Address: 604 Mayflower*

*City, State, Zip: Baton Rouge, LA 70802*

*Phone Number: 225-342-6631*

*Email: micmoore@corrections.state.la.us*

**Recommendation 8**: *PE should require staff to document customers attending and reasons for attending each conference; track the quantity of promotional items and product samples given away, to whom they are given, and for what purpose; and track whether the public benefit was proportionate to the cost or whether future sales were generated.*

| Does Agency Agree with Recommendation? | ☐ Agree | ☑ Disagree |
|---|---|---|

Agency Contact Responsible for Recommendation:

*Name/Title: Michael J. Moore, Director*

*Address: 604 Mayflower*

*City, State, Zip: Baton Rouge, LA 70802*

*Phone Number: 225-342-6631*

*Email: micmoore@corrections.state.la.us*

**Recommendation 9**: *PE should bill customers for all services and products provided to ensure compliance with R.S. 15:1157 and Article VII, §14 of the Louisiana Constitution.*

| Does Agency Agree with Recommendation? | ✓ Agree | Disagree |
|---|---|---|

| Agency Contact Responsible for Recommendation: |
|---|
| *Name/Title: Michael J. Moore, Director* |
| *Address: 604 Mayflower* |
| *City, State, Zip: Baton Rouge, LA 70802* |
| *Phone Number: 225-342-6631* |
| *Email: micmoore@corrections.state.la.us* |

**Finding 7:** PE does not ensure that all complaints are logged and resolved timely and has not developed an effective process to ensure that orders are delivered on time. According to best practices, good customer service is important because it directly impacts sales; however, the number of PE complaints increased by 121.2% between fiscal years 2016 and 2018, and late deliveries increased from 30.7% to 40.3%.

**Recommendation 10**: *PE should ensure its complaints process includes (1) how customers should file complaints, (2) which PE staff are responsible for resolving complaints and within what timeframe, (3) a requirement that all complaints be logged, and (4) how each type of complaint should be resolved.*

| Does Agency Agree with Recommendation? | Agree | Disagree |
|---|---|---|

| Agency Contact Responsible for Recommendation: |
|---|
| *Name/Title: Michael J. Moore, Director*    ☑ Partially Agree |
| *Address: 604 Mayflower* |
| *City, State, Zip: Baton Rouge, LA 70802* |
| *Phone Number: 225-342-6631* |
| *Email: micmoore@corrections.state.la.us* |

**Recommendation 11**: *PE should categorize complaints to provide feedback to staff and ensure that staff collects all required information in order to use complaints data to identify and address ongoing performance issues.*

| Does Agency Agree with Recommendation? | Agree | Disagree |
|---|---|---|

| Agency Contact Responsible for Recommendation: |
|---|
| *Name/Title: Michael J. Moore, Director*    ☑ Partially Agree |
| *Address: 604 Mayflower* |
| *City, State, Zip: Baton Rouge, LA 70802* |
| *Phone Number: 225-342-6631* |
| *Email: micmoore@corrections.state.la.us* |

**Recommendation 12**: *PE should track all costs of complaints, including transportation costs, in order to measure customer service and industry performance as required by PE policy.*

| Does Agency Agree with Recommendation? | Agree | Disagree |
|---|---|---|

| Agency Contact Responsible for Recommendation: |
|---|
| *Name/Title: Michael J. Moore, Director*    ☑ Partially Agree |
| *Address: 604 Mayflower* |
| *City, State, Zip: Baton Rouge, LA 70802* |
| *Phone Number: 225-342-6631* |

*Email: micmoore@corrections.state.la.us*

---

**Recommendation 13**: *PE should analyze delivery times based on the actual delivery dates to determine if orders are on time.*

| Does Agency Agree with Recommendation? | ☐ Agree ☐ Disagree |
|---|---|

Agency Contact Responsible for Recommendation:

*Name/Title: Michael J. Moore, Director*   ☑ Partially Agree

*Address: 604 Mayflower*

*City, State, Zip: Baton Rouge, LA 70802*

*Phone Number: 225-342-6631*

*Email: micmoore@corrections.state.la.us*

---

**Recommendation 14**: *PE should develop a formal complaints policy for its wholesale operations to help ensure that it addresses all complaints and resolves all issues.*

| Does Agency Agree with Recommendation? | ☐ Agree ☑ Disagree |
|---|---|

Agency Contact Responsible for Recommendation:

*Name/Title: Michael J. Moore, Director*

*Address: 604 Mayflower*

*City, State, Zip: Baton Rouge, LA 70802*

*Phone Number: 225-342-6631*

*Email: micmoore@corrections.state.la.us*

---

**Recommendation 15**: *PE should develop and administer a formal survey to assess customer satisfaction with its products and services.*

| Does Agency Agree with Recommendation? | ☑ Agree ☐ Disagree |
|---|---|

Agency Contact Responsible for Recommendation:

*Name/Title: Michael J. Moore, Director*

*Address: 604 Mayflower*

*City, State, Zip: Baton Rouge, LA 70802*

*Phone Number: 225-342-6631*

*Email: micmoore@corrections.state.la.us*

---

A.22

# APPENDIX B:  SCOPE AND METHODOLOGY

This report provides the results of our performance audit of Prison Enterprises (PE), an ancillary agency within the Department of Public Safety and Corrections.  We conducted this performance audit under the provisions of Title 24 of the Louisiana Revised Statutes of 1950, as amended.  This audit generally covered the period of July 1, 2015, through June 30, 2018, although our analysis included historical information going back to 1996.  We focused on PE's wholesale and manufacturing operations, as they comprised more than 76.6% of PE's total revenue of approximately $21 million in fiscal year 2018.  Our audit objective was to:

**Evaluate PE's operations, including whether it met its statutory purposes.**

We conducted this performance audit in accordance with generally-accepted *Government Auditing Standards* issued by the Comptroller General of the United States.  Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and our conclusions based on our audit objective.  We believe the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objective.  To answer our objective, we reviewed internal controls relevant to the audit objective and performed the following audit steps:

- Researched and reviewed Louisiana Revised Statutes, Administrative Code, Executive Budget documents, PE and Department of Corrections (DOC) policies, PE's 2017 Annual Report, and PE's website to understand PE's purpose, operational requirements, and goals.

- Interviewed personnel at PE, DOC, selected state correctional facilities, and the Office of State Procurement (OSP) to gain an understanding of PE processes as well as challenges faced by PE and its customers.

- Observed a PE board meeting and operations at the Canteen Distribution Center at Louisiana State Penitentiary, as well as the Garment Factory at Elayn Hunt Correctional Center.

- Researched and reviewed correctional industries audits conducted by other states and literature on best practices for correctional industries in addition to a 1997 performance audit on PE conducted by our office.

- Researched and reviewed the statutory purpose of correctional industries in all other states, excluding four states without correctional industries, in order to determine if other states specifically require that correctional industries provide employment opportunities to assist offenders with finding employment after they are released.

- Obtained and analyzed information from PE staff on PE offenders' pay rates and sentence lengths as of June 30, 2018.  We identified and removed 31duplicates in the offender information provided by PE prior to conducting our analysis.

- Obtained 2016-2026 Projected Employment by Industry for the State of Louisiana from the Louisiana Workforce Commission website.

- Contacted correctional industries in 12 of the 14 states that run canteen operations through correctional industries according to 2017 National Correctional Industries Association Directory, the Department of Corrections in five southern states, and Louisiana's private Transitional Work Program to gather information on canteen and garment prices, pricing practices, and operations.

- Obtained and analyzed DOC Canteen Quarterly Financial Statements to calculate DOC's revenue from canteen sales.

- Obtained and analyzed PE policies, Business Plan, and Marketing Overview, as well as researched and reviewed best practices for marketing and customer service.

- Obtained PE's JD Edwards (JDE) database as of March 16, 2018, containing financial information, sales and purchase order information, and inventory information in order to evaluate types of customers that purchased PE products, PE's types of expenditures, pricing of manufactured products, and timeliness of order delivery.  To assess the reliability and validity of the data, we tested for duplicates and blanks, compared totals from JDE data to financial statements, and determined the data was valid and reliable for the purpose of answering our audit objective.

  - To evaluate financial sustainability of PE operations overall, pulled Income Statements and Balance Sheets from the JDE data for fiscal years 1996 through 2017.  To evaluate PE's financial sustainability by industry and operation, we analyzed Income Statements from the JDE data for fiscal years 2016 through 2018.  Although the data we received did not include complete information for fiscal year 2018, to include fiscal year 2018 results in this analysis, we obtained and analyzed a copy of the fiscal year 2018 Income Statement and Balance Sheet from PE staff after accounting for that period was complete.

  - To evaluate the types of customers who bought PE products, we pulled sales for fiscal years 2016 through 2018 from the General Ledger table in JDE using Audit Command Language (ACL) software and created categories based on the customer name in Excel. This analysis only included sales through March for fiscal year 2018.

  - To evaluate the types of items purchased by state agencies, we pulled sales to state agencies from the General Ledger table using ACL software and recorded the PE operations from which each agency purchased PE

products.  Due to the amount of sales records, we only performed this
analysis for fiscal year 2017.

- To evaluate PE's types of expenditures, we first reviewed expense
  categories in the income statement and used these categories to create the
  chart of expenditures in Appendix G.  Using the Pivot Table function in
  Excel, we analyzed details for purchase orders related to food, samples,
  advertising, travel, or miscellaneous expense categories in the General
  Ledger from the JDE purchase order tables. We also reviewed all records
  in the JDE sales order data for transfer sale transactions, or internal sales
  between PE operations, in order to identify additional promotional
  materials and samples as well as documentation that was designated as
  transfer sales but had shipping addresses for customers outside of PE
  industries or operations.  For purchase and transfer sale order records that
  did not have detailed descriptions in the JDE data, we obtained and
  reviewed selected paper files.

- To evaluate whether PE charged customers established contract prices for
  items listed on State Contract through OSP, we used "Item Numbers"
  identifying unique products to match sales order records from the JDE
  database to tables with products' contract prices obtained from the OSP
  website for fiscal year 2018 and from PE staff for fiscal years 2016 and
  2017.  Since PE does not update its contract prices on a consistent annual
  basis and neither PE nor OSP could provide the precise date that contract
  prices were updated on OSP's website, we used dates provided by PE
  management for when each year's prices became effective.  We manually
  reviewed the 1,794 records where the sale price did not match the
  effective contract price and excluded 258 (14.4%) records from our results
  because the item descriptions included different specifications than the
  contract, extra features, false matches, showroom items that are sold at "as
  is," negative or zero quantity, or because the item description did not
  provide adequate information to determine how to calculate the item's
  price.  We did not review the 10,114 records with contract items where the
  sale price did match the effective contract price; however, these records
  may have included item descriptions indicating that a higher or lower
  price should have been charged.

- To analyze the actual markups used to price custom manufactured
  products not listed on the contract, we narrowed our review to a targeted
  selection of 103 sales order records in the JDE database because PE only
  documents custom orders' cost information in the paper sales order files.
  We selected custom sales order records from a range of business units by
  identifying similar products ordered within the same pricing model year
  that were sold to different categories of PE customers, such as correctional
  facilities, state agencies, sheriffs, local government, and non-profits.
  According to PE, its practice is to attach cost information (i.e., product
  structures) to sales documentation for custom products, but only 67

(65.0%) of the 103 records reviewed had cost information attached. Where available, we used cost information to calculate each product's actual markup and compared it to the effective pricing model when the order was placed.

- To determine the percent of orders not delivered on time, we analyzed JDE sales order records based on the parameters of the JDE report that PE uses to calculate the percent of orders on time for performance indicator reporting.  To compare our results to reported PE performance indicators, we limited our analysis for fiscal year 2018 to the two quarters for which we had complete data.  Our analysis filtered wholesale and manufacturing sales order records to evaluate records based on invoice date, exclude transfer sales, and exclude the six operations that PE does not include in their analysis (e.g., uniforms).  We analyzed sales orders by fiscal year overall rather than by month.  A sales order can have multiple lines shipped at different times.  PE considers an order "not on time" if one line from that order has an Actual Shipped Date after the Requested Delivery Date. By running the JDE report on a monthly basis, PE counts the same order as "on time" or "not on time" in every month that the order was invoiced.  Because orders in our scope had lines invoiced in up to 12 different months, counting orders monthly resulted in 1,464 duplicate orders counted.  We analyzed whether sales orders had at least one line not on time by fiscal year overall in order to calculate the percent of unique orders not on time by fiscal year.  We also calculated the percent of orders where the Requested Delivery Date defaulted to the Order Date in order to determine the percent of orders that may have been misidentified as being not on time; however, we included these orders in our results because they were included in the data that PE used to calculate its performance indicators.

- To analyze PE's process for tracking and resolving complaints, we obtained and analyzed the PE complaints log, PE's binder of paper complaints documentation, information related to complaints found in PE staff emails (obtained by LLA's Investigative Audit section), and paper sales order files.  Due to time constraints, we limited our search for complaints not in the log to fiscal year 2018.  We did not include complaints made after June 11, 2018, the date of the last complaint in the log.  We counted unique complaints made by customers rather than the number of orders with complaints, as the same order can have multiple complaints and the same complaint can involve more than one order.

  - To analyze the reasons and costs of complaints in the log, we reviewed complaint descriptions and cost information from the complaints documentation and PE staff emails, used auditor judgment to create categories of reasons for complaints, and recorded any costs that were not included in the log (excluding transportation costs).  To analyze the time to resolve complaints in the log, we considered a complaint unresolved if the issue had not yet been fully corrected.  For 53 (34.0%) of 156

complaints in the log, we found documentation of an earlier complaint date than the log's complaint date.  For 11 (7.7%) of 143 closed complaints, we found documentation that the complaint was unresolved after the log's close date.  Many complaints were unresolved as of the latest documented discussion of the complaint, so we used the earliest and latest date available for each complaint to calculate the minimum time that each complaint was open before resolution.  For the 13 open complaints, we compared the earliest date to the date that we received the log (August 7, 2018) in order to determine how long the complaints had been open.

- To identify complaints not in the log, we searched available documentation for issues similar to those recorded in the log.  We compared the order number, customer, date, and description of each complaint found to the log to ensure that it was not already recorded.  We categorized complaints by reason, recorded any costs associated with resolving the complaint (excluding transportation), and compared the earliest date and latest date that they were discussed to determine their minimum time to resolution.  For 33 (64.7%) of the 51 unlogged complaints, we only found documentation where the complaint was reported, so it was not possible to determine how long they were open.

- Sent PE the methodologies and preliminary results of our analyses for review; adjusted our analyses based on feedback and additional documentation and information that PE provided.

# APPENDIX C:  OVERVIEW OF PRISON ENTERPRISES OPERATIONS

PE runs its manufacturing, wholesale, service, and agricultural industries at seven of the state's eight correctional facilities and one privately-run correctional center (Winn).  Each correctional facility is responsible for assigning work for the offenders, and any offender can be assigned to work for PE operations.  The exception is Janitorial Services, where the offender must be a trusty.[50] Because of the availability of land and infrastructure, the majority of PE operations are located at the Louisiana State Penitentiary at Angola.  The exhibit bellows contains an overview of PE operations as of June 30, 2018.

| Correctional Institution | Industry | Description of Operations | Established | No. of PE Staff (Filled) | No. of PE Staff (Vacant) | No. of PE Staff (Total) | No. of Offenders |
|---|---|---|---|---|---|---|---|
| **Allen Correctional Center Kinder, LA** | Manufacturing | **Allen Furniture Restoration** is a full service furniture manufacturing and refurbishing operation.  Services offered include rebuilding, stripping, and refinishing wooden desks, chairs, credenzas, and student classroom desks; reupholstering furniture; and manufacturing custom wood and upholstered pieces and production of new chairs. | FY95 | 2 | 0 | 2 | 64 |
| **David Wade Correctional Center Homer, LA** | Agriculture | **Land and Agriculture Management** operations are responsible for managing the timber at each of the state's correctional facilities. | FY95 | 0 | 0 | 0 | 4 |
| | | **Rangeherd** (cattle) operations include the sale of calves and proceeds on the sale of breeding cattle which are culled from the herds. | FY95 | | | | |

---

[50] Trusties are offenders classified as minimum security offenders who are given privileges that are not available to the general offender population.

| Correctional Institution | Industry | Description of Operations | Established | No. of PE Staff (Filled) | No. of PE Staff (Vacant) | No. of PE Staff (Total) | No. of Offenders |
|---|---|---|---|---|---|---|---|
| **Dixon Correctional Center Jackson, LA** | Manufacturing | **Chair Plant** operations produce a complete line of office chairs. | FY02 | 1 | 0 | 1 | 24 |
| | | **Embroidery** operations produce a wide variety of embroidered emblems and designs, which are placed on items sold by PE garment factories as well as other wholesale clothing. | FY01 | | | | |
| | Wholesale | **Wakefield Meat Plant** operations, located in Wakefield, Louisiana, procure meat and related products in bulk and ship ordered quantities to the various correctional facilities in the state. | FY95 | 2 | 0 | 2 | 5 |
| | Agriculture | **Rangeherd** (cattle) operations include the sale of calves and proceeds on the sale of breeding cattle which are culled from the herds. | FY95 | 2 | 1 | 3 | 8 |
| | | **Orchard** operations include growing pecan trees, muscadine trees, etc. | FY99 | | | | |
| | Services | **Janitorial Service** operations use offender labor to provide cleaning and grounds services to various state office buildings in the Baton Rouge area. | FY95 | 2 | 0 | 2 | 119 |
| **Elayn Hunt Correctional Center St. Gabriel, LA** | Manufacturing | **Soap Plant** operations produce and package a wide range of janitorial soaps and chemicals. | FY95 | 2 | 0 | 2 | 93 |
| | | **Garment Factory** operations produce two major products, jeans and pants, as well as custom garment screening. | FY13 | | | | |
| | Agriculture | **Rangeherd** (cattle) operations include the sale of calves and proceeds on the sale of breeding cattle which are culled from the herds. | FY95 | 1 | 0 | 1 | 3 |
| **Louisiana Correctional Institute for Women St. Gabriel, LA** | Manufacturing | **Garment Factory** operations produce T-shirts, scrub suits, offender jumpsuits, sheets, and pillowcases, as well as custom garment screening. | FY95 | 1 | 0 | 1 | 62 |

| Correctional Institution | Industry | Description of Operations | Established | No. of PE Staff (Filled) | No. of PE Staff (Vacant) | No. of PE Staff (Total) | No. of Offenders |
|---|---|---|---|---|---|---|---|
| **Louisiana State Penitentiary Angola, LA** | Manufacturing | **Mattress, Broom, and Mop Factory** operations manufacture cotton, foam, polyester, and innerspring mattresses; pillows; regular and warehouse push brooms, mops, and scrub brushes; and related items. | FY95 | 5 | 0 | 5 | 186 |
| | | **Silk Screen** operations produce plastic and metal nameplates; screened decals, street and highway signs; screened aluminum, steel and corrugated plastic signs; screening services for T-shirts, caps and other textile items; and the sale of sign hardware. Also offers the capability to laser engrave wood and plastic. | FY95 | | | | |
| | | **Tag Plant** operations produce license plates for distribution by the Louisiana Office of Motor Vehicles, including regular plates, personalized and specialty plates, and motorcycle plates. | FY95 | | | | |
| | | **Metal Fabrication** operations produce beds, lockers, cell vents, security screens, and custom metal items. PE has incorporated powder coating of metal products into this operation. | FY95 | | | | |
| | | **Print Shop** operations include a wide range of printing services, including printing forms, brochures, booklets, newsletters, and business cards; binding services; and various special projects. | FY95 | | | | |
| | Wholesale | **Canteen Distribution Center** operations supply items to state correctional facilities for sale to offenders. PE also sells personal property items purchased by offenders. | FY95 | 2 | 0 | 2 | 13 |
| | Services | **Canteen Packaging Program** is a partnership between PE and Union Supply. Family and friends can order pre-approved food and hygiene products and personal property items for eligible offenders incarcerated in state correctional facilities. | FY16 | 1 | 0 | 1 | 21 |

| Correctional Institution | Industry | Description of Operations | Established | No. of PE Staff (Filled) | No. of PE Staff (Vacant) | No. of PE Staff (Total) | No. of Offenders |
|---|---|---|---|---|---|---|---|
| **Louisiana State Penitentiary Angola, LA (Cont.)** | Agriculture | **Rangeherd** (cattle) operations include the sale of calves and proceeds on the sale of breeding cattle which are culled from the herds. | FY95 | 10 | 1 | 11 | 55 |
| | | **Crop** operations are responsible for growing and harvesting corn, cotton, soybeans and milo, which are sold on the open market or used to feed PE livestock. | FY95 | | | | |
| | | **Transportation** operations are responsible for delivering orders to PE customers. | FY95 | | | | |
| | Support Operations | Operations include Administrative Office, Equipment, and Vehicle Maintenance. | FY95 | 5 | 0 | 5 | 24 |
| **Raymond Laborde Correctional Center Cottonport, LA** | Agriculture | **Rangeherd** (cattle) operations include the sale of calves and proceeds on the sale of breeding cattle which are culled from the herds. | FY95 | 0 | 0 | 0 | 0 |
| **Winn Correctional Center Winnfield, LA** | Manufacturing | **Garment Factory** operations produce numerous items including aprons, laundry bags, socks, bath towels, dish towels, boxer shorts, shirts, wash cloths and jackets. | FY95 | 2 | 0 | 2 | 82 |
| **PE Headquarters Baton Rouge, LA** | Support Operations | Operations include Administration, Accounting, Warehouse, etc. | FY95 | 24 | 8 | 32 | 4 |
| | | **Total** | | **62** | **10** | **72** | **767** |

**Source:** Prepared by legislative auditor's staff using information provided by PE.

# APPENDIX D:  SUMMARY OF 1997 PERFORMANCE AUDIT REPORT ON LOUISIANA PRISON ENTERPRISES ISSUED APRIL 1997

| Findings | Recommendation(s) |
|---|---|
| 1. Prison Enterprises (PE) should document its claims of saving the state millions of dollars annually.  The agency has some examples of individual instances, but no cumulative figure.  By developing a cumulative figure, PE can illustrate how effective it is at saving the state money. | PE should establish formal procedures to measure and document the cost effectiveness of its operations *(1997 Recommendation 2.1)*. |
| 2. PE achieved part of its mission of being self-supporting for fiscal year 1995.  However, some individual operations were not self-supporting, particularly agriculture operations. | |
| 3. Some of the Department of Corrections (DOC) policies may make it difficult for PE to reach one of its goals of teaching marketable skills and good work habits.  Several PE industries that teach marketable skills are housed at Louisiana State Penitentiary at Angola, a maximum security prison.  The inmates housed at this facility usually receive lengthy sentences.  Thus, inmates learning skills at these industries may never use them in the private sector or these skills may be obsolete when the inmate is released. | DOC should review its policies that may lessen the impact of PE's efforts to teach marketable skills *(1997 Recommendation 2.2)*.<br><br>PE should review its goals to determine if the goals are realistic or conflicting *(1997 Recommendation 2.3)*. |
| 4. The agency's last long-range strategic business plan covered fiscal years 1989 to 1993.  Since then, PE has developed short-term plans.  These short-term plans do not include formally developed performance measures.  As a result, management does not measure and document whether goals and objectives are achieved. | PE should formally develop and document performance measures for its operations.  These performance measures should reflect PE's mission and goals *(1997 Recommendation 2.4)*.<br><br>PE should develop a strategic business plan that addresses short-term and long-term goals that are in agreement with the mission statement.  The planning process should provide a means to change and alter the business plan to meet changes in the environment *(1997 Recommendation 2.5)*. |

| Findings | Recommendation(s) |
|---|---|
| 5. PE formalized its methodology to price documents in November 1996. In our test of this methodology, we found that some products may be underpriced or over-priced. | PE should use its computer software to price its products *(1997 Recommendation 3.1)*.<br><br>The legislature may wish to consider legislation that clarifies R.S. 15:1153(A)(1). This clarification should state whether its intent is for PE to conduct all operations at cost or to provide each product or service at cost *(1997 Matter for Legislative Consideration 3.1)*.<br><br>Based on clarification by the legislature, PE should examine the selling prices of its products to provide the lowest possible price *(1997 Recommendation 3.2)*. |
| 6. PE developed its last marketing plan in fiscal year 1990. It developed a sales plan in the middle of fiscal year 1996 in response to decreasing sales, but the plan only covered six months. | Using the direction provided by an updated strategic business plan, PE should develop formal sales and marketing plans documenting the needs of all of PE's product lines. Management should communicate the plan to the entire agency and the role personnel will play in achieving sales and marketing objectives *(1997 Recommendation 3.3)*. |
| 7. PE has two public/private partnerships. One is a federal Prison Industries Enhancement (PIE) program. Inmate workers in this program have contributed more than $180,000 in taxes, room and board, and victims' compensation. The other is a cooperative endeavor agreement. Inmates in this program can earn regular incentive wages or a reduction in their sentence at double the normal rate, also known as double good time. However, these inmates do not pay taxes, room and board, or victims' compensation. | DOC and PE should consider the overall benefits of its public/private partnerships before engaging in any future ones. Consideration should be given to partnerships that benefit both the public and inmates *(1997 Recommendation 4.1)*.<br><br>The legislature may wish to consider legislation that provides for a portion of the wages of inmate workers (not exceeding the federal limitations) in the PIE program to go toward family support *(1997 Matter for Legislative Consideration 4.1)*.<br><br>The legislature may wish to consider legislation that enhances the public benefit of public/private relationships between DOC and the private sector. In doing so, the legislature may wish to require the department and PE to engage only in partnerships that are under the PIE program or the Louisiana Restitution Industries program *(1997 Matter for Legislative Consideration 4.2)*.<br><br>Alternatively, the legislature may wish to consider legislation that clearly establishes the types of agreements and partnerships into which PE may engage. This legislation should require that the agreements specify the objectives to be achieved and clearly identify the desired public benefit. The agreements should also include ways to determine if these objectives are achieved and if public benefit is realized *(1997 Matter for Legislative Consideration 4.3)*. |

**Source:** Prepared by legislative auditor's staff using report found at
https://lla.la.gov/PublicReports.nsf/D4B512B51DF4B38986256FF80067E151/$FILE/00000960.pdf.

# APPENDIX E:  SELECTED BEST PRACTICES FROM THE CORRECTIONAL INDUSTRIES: A GUIDE TO REENTRY-FOCUSED PERFORMANCE EXCELLENCE

| Best Practice | Description Summary |
|---|---|
| **Provide Post Release Employment Services** | Post-release employment services connect individual offenders who were trained in Correctional Industries (CI) to long-term employment.  Offenders should be engaged in activities in order to promote retention, help with re-employment in the event of job loss, and assist with advancement opportunities.<br>The goal of post-release employment services is ultimately to reduce recidivism.  The approach is as follows:<br><br>• To increase employment opportunities available to CI trained offenders who are trying to successfully reintegrate and remain crime-free by gaining and retaining employment<br><br>• To encourage employers to make individualized determinations about a person's specific qualifications, including the relevance of a criminal record, rather than having restrictions or bans against hiring people with criminal records. |
| **Replicate Private Industry Environment** | The replication of private sector industries and environments CI operations includes work processes, procedures, equipment, training, certification, and associated methodologies.<br><br>A CI program should create a work environment that emulates real world work experience and effectively trains and prepares offenders for the transition to private sector employment upon release. |
| **Create a Culture of Offender Employment Readiness and Retention** | Employment readiness encompasses several areas including soft skills, cognitive skills and industry-recognized training and certifications employers expect from qualified applicants.  Employment readiness/employability pertains to the offender's ability to both obtain and retain a job.  CI programs should focus on both.  The ability to gain employment and the ability to retain employment are two very different skill sets the offender must acquire to be successful in the workplace.<br><br>CI work assignments should mirror the community workplace, including: job applications, job interviews, orientation (to include workforce expectations and worker engagement), ongoing training and regular work evaluations, termination for unacceptable performance or conduct and opportunities for performance-based pay raises.  Creating a culture of offender employment readiness and retention includes work readiness assessment conducted at entry, at periodic points during employment and at the end of employment with CI.<br><br>In addition, every position in CI should be identified by its Standard Occupational Classification (SOC) code found at the Department of Labor's "O*Net" website.  This is essential in linking CI work with work in the community, and it is the first step in developing a workforce development culture within CI. |

| Best Practice | Description Summary |
|---|---|
| **Implement Certificate-Based Soft Skills Training** | Soft skills are characteristics that are behavioral in nature and include factors such as attitude, work ethic, critical thinking, flexibility and the desire to learn and be trained. Soft Skills include: a strong work ethic, a positive attitude, communication skills, decision-making skills, problem solving skills, social skills, time management, flexibility/adaptability, capability to accept and learn from criticism, getting along with others and understanding team concepts.<br><br>CI will benefit from offenders participating in soft skills programs. As offenders learn these soft skills, which are necessary to excel in a post-release work environment, there will also be a positive impact realized in their CI work assignment and institutional behavior.<br><br>Soft skills programs support the development of personal responsibility that is highly valued by employers. CI should develop partnerships that reinforce the significance of soft skills training. These include potential employers, community-based and non-profit organizations such as Dress for Success, YWCA, etc. |
| **Provide Certified Technical Skills Training** | Certified Technical Skills that lead to professional certification, trade certification, or professional designation, often called simply certification, is a designation earned by a person to assure their qualifications in performing a job or task. Certifications are portable, evidence based credentials that measure essential workplace skills and are a reliable predictor of workplace success.<br><br>Many offender certification programs are created, sponsored, or affiliated with the Department of Labor (DOL), professional associations, trade organizations, or private vendors interested in raising standards.<br><br>Consult with the DOL in your state to determine the current and projected skill/employment needs. The DOL can provide current and relevant data to assist in deciding where certification programs will have the greatest impact. Conduct independent research with employers to determine their specific technical skills they are seeking. Consult employers in the geographic areas where offenders will be released. |
| **Maximize Offender Job Opportunities** | CI programs offer a system that promotes the learning, development of skills, values, behaviors and motivation for offenders to make changes in their lives that assist them in a successful transition into the community. CI programs accomplish this through the context of work.<br><br>In an effort to take full advantage of the impact of industry programming, the maximization of offender job opportunities is critical in assisting a correctional organization with its reentry initiatives. This is accomplished using a systems approach that includes the strategic evaluation of resources and programming resulting in a comprehensive plan.<br><br>A key to sustainable growth is maximizing offender job opportunities. The process of achieving sustainable growth requires a systems approach including the evaluation of current operations, the identification of long term goals, and the strategies to reach those goals.<br><br>The evaluation of current CI skill development is necessary to determine if what is currently offered is relevant to the needs of the current job market. Given the rapidly changing nature of the job market, it is imperative that leaders access, understand, evaluate, and make existing and new business program decisions based upon labor market information. |

| Best Practice | Description Summary |
|---|---|
| **Maintain Financial Sustainability** | Financial sustainability is the generation of sales revenue to cover all costs and financial obligations associated with CI operations.  The concept of a triple bottom line has emerged in CI which focuses not only on the needs of customers, but also the funding of the social mission and value provided by the organization to offenders for successful reentry.<br><br>There may be business units that are not financially self-sufficient but employ numerous offenders or offer valuable work skills.  CIs can balance the benefits and maintain this business unit with a more lucrative business unit that can offset the financial loss.  If long-term unsustainable conditions occur, a reduction of offender work opportunities, DOC/Correctional Industries staff, and closure of entire operations can result.<br><br>CI should maintain positive cash flow.  Revenue streams are the channels through which money flows into an organization.  CI is self-supporting and must rely primarily on sales of products and services.  These streams can be direct sales or contracts.  Maintain sufficient operating funds needed to pay monthly bills and to purchase raw materials and goods to efficiently run its business operations. |

## APPENDIX F:  PRISON ENTERPRISES REVENUES, EXPENDITURES, AND NET INCOME BY INDUSTRY
## FISCAL YEARS 2016 THROUGH 2018

| Categories | Manufacturing | Wholesale | Services | Agriculture | Support* | Total |
|---|---|---|---|---|---|---|
| **FISCAL YEAR 2016** | | | | | | |
| Revenues | | | | | | |
| Operating Revenues | $8,177,468 | $14,179,558 | $2,805,894 | $3,446,421 | - | $28,609,340 |
| Interdepartmental Revenues | 216,658 | - | - | 62,884 | - | 279,542 |
| **Total Revenues** | **8,394,126** | **14,179,558** | **2,805,894** | **3,509,305** | **-** | **28,888,882** |
| Expenditures | | | | | | |
| Cost of Goods Sold | 5,576,884 | 11,752,630 | 1,769,361 | 4,175,890 | - | 23,271,205 |
| Operating Expenditures | 2,303,419 | 1,833,456 | 993,415 | 687,774 | - | 5,821,626 |
| Other Expenses & Income | (50,514) | (16,942) | (4,493) | 227,267 | - | 155,318 |
| Transfers to General Fund | - | - | - | - | 331,106 | 331,106 |
| DOC Incentive Wages | - | - | - | - | 1,225,375 | 1,225,375 |
| **Total Expenditures** | **7,829,790** | **13,569,145** | **2,758,283** | **5,090,931** | **1,556,481** | **30,804,630** |
| **FY16 Net Income** | **$564,336** | **$610,413** | **$47,611** | **($1,581,626)** | **($1,556,481)** | **($1,915,747)** |
| **FISCAL YEAR 2017** | | | | | | |
| Revenues | | | | | | |
| Operating Revenues | $10,522,938 | $11,929,967 | $2,943,124 | $2,499,190 | - | $27,895,219 |
| Interdepartmental Revenues | 325,549 | - | - | 63,691 | - | 389,240 |
| **Total Revenues** | **10,848,487** | **11,929,967** | **2,943,124** | **2,562,881** | **-** | **28,284,459** |
| Expenditures | | | | | | |
| Cost of Goods Sold | 7,037,874 | 9,754,995 | 1,752,882 | 3,006,004 | - | 21,549,244 |
| Operating Expenditures | 2,089,913 | 1,829,624 | 934,914 | 514,547 | - | 5,371,508 |
| Other Expenses & Income | (114,920) | (17,891) | (16,201) | 148,065 | - | (947) |
| Transfers to General Fund | - | - | - | - | - | - |
| DOC Incentive Wages | - | - | - | - | 1,076,327 | 1,076,327 |
| **Total Expenditures** | **9,012,867** | **11,566,728** | **2,671,595** | **3,668,616** | **1,076,327** | **27,996,133** |
| **FY17 Net Income** | **$1,835,620** | **$363,239** | **$271,529** | **($1,105,735)** | **($1,076,327)** | **$288,326** |
| **FISCAL YEAR 2018** | | | | | | |
| Revenues | | | | | | |
| Operating Revenues | $9,079,261 | $12,168,928 | $3,215,202 | $3,273,034 | - | $27,736,426 |
| Interdepartmental Revenues | 176,624 | - | - | 48,922 | - | 225,546 |
| **Total Revenues** | **9,255,885** | **12,168,928** | **3,215,202** | **3,321,956** | **-** | **27,961,971** |
| Expenditures | | | | | | |
| Cost of Goods Sold | 5,969,879 | 9,838,993 | 1,807,538 | 3,579,632 | - | 21,193,401 |
| Operating Expenditures | 2,138,956 | 1,886,965 | 1,094,820 | 318,766 | - | 5,442,148 |
| Other Expenses & Income | (46,581) | (17,636) | (16,459) | 543,731 | - | 463,056 |
| Transfers to General Fund | - | - | - | - | - | - |
| DOC Incentive Wages | - | - | - | - | 1,098,454 | 1,098,454 |
| **Total Expenditures** | **8,062,255** | **11,708,323** | **2,885,898** | **4,442,129** | **1,098,454** | **28,197,059** |
| **FY 18 Net Income** | **$1,193,630** | **$460,605** | **$329,304** | **($1,120,173)** | **($1,098,454)** | **($235,087)** |

*Support operations include PE Headquarters operations, Transportation, Sales and Marketing Department, etc. and are not revenue generating.  Related expenses are allocated to the revenue-generating operations.
**Note:** Total amounts do not match due to rounding.
**Source:** Prepared by legislative auditor's staff using information from PE's Income Statements for FY16 through FY18.

## APPENDIX G:  PRISON ENTERPRISES EXPENDITURES
## FISCAL YEARS 2016 THROUGH 2018

| Expense Category | FY16 | FY17 | FY18 | Total |
|---|---|---|---|---|
| Cost of Goods Sold | | | | |
| Cost of Sales | $20,215,340 | $18,554,425 | $18,096,807 | $56,866,573 |
| Factory Overhead | 350,749 | 406,600 | 424,840 | 1,182,188 |
| Personnel Expenses | 2,705,116 | 2,588,219 | 2,671,754 | 7,965,089 |
| **Total Cost of Goods Sold** | **$23,271,205** | **$21,549,244** | **$21,193,401** | **$66,013,850** |
| Operating Expenses | | | | |
| Personnel Expenses | $4,623,831 | $4,036,986 | $4,213,344 | $12,874,162 |
| Inmate Incentive Wages | 55,890 | 60,229 | 61,683 | 177,803 |
| Travel | 39,059 | 27,217 | 39,167 | 105,444 |
| Operating Services | | | | |
| Rentals | 149,818 | 416,949 | 424,993 | 991,760 |
| Utilities | 243,131 | 286,613 | 294,627 | 824,371 |
| Insurance | 182,951 | 226,398 | 259,602 | 668,951 |
| Miscellaneous Services | 265,010 | 94,186 | 109,389 | 468,585 |
| Licenses, Fees, and Commissions | 51,255 | 63,715 | 70,710 | 185,680 |
| Telephone | 64,517 | 57,590 | 54,686 | 176,793 |
| Freight | 54,929 | 63,883 | 53,713 | 172,525 |
| Other Operating Services | 146,116 | 129,557 | 171,808 | 447,481 |
| Total Operating Services | 1,157,727 | 1,338,890 | 1,439,528 | 3,936,145 |
| Operating Supplies | | | | |
| Fertilizer | 464,687 | 342,195 | 375,162 | 1,182,044 |
| Feed | 479,935 | 377,442 | 308,556 | 1,165,932 |
| Repair Parts – Tractor & Equipment | 356,089 | 353,320 | 376,988 | 1,086,396 |
| Seed | 248,193 | 247,190 | 265,379 | 760,761 |
| Gas and Oil -Autos & Trucks | 222,437 | 201,559 | 213,004 | 637,000 |
| Miscellaneous Operating Supplies | 231,621 | 190,345 | 163,810 | 585,776 |
| Gas and Oil - Tractor & Equipment | 129,386 | 157,475 | 179,757 | 466,617 |
| Food | 161,636 | 134,393 | 140,298 | 436,326 |
| Repair Parts - Auto & Trucks | 157,002 | 136,384 | 138,131 | 431,516 |
| Herbicides | 163,384 | 132,810 | 124,830 | 421,025 |
| Repair Parts - Buildings and Facilities | 203,211 | 110,130 | 101,132 | 414,473 |
| Medicine | 92,782 | 84,807 | 85,949 | 263,539 |
| Household | 56,416 | 55,626 | 52,564 | 164,606 |
| Other Operating Supplies | 284,851 | 290,664 | 242,881 | 818,395 |
| Total Operating Supplies | 3,251,627 | 2,814,340 | 2,768,440 | 8,834,408 |
| Professional Services | 39,929 | 27,782 | 28,939 | 96,650 |
| Other Charges | 539,856 | 569,277 | 626,656 | 1,735,789 |
| Non-Capitalized Outlays | 73,568 | 40,188 | 54,924 | 168,680 |
| Deferred Expenses | (3,959,863) | (3,543,402) | (3,790,534) | (11,293,799) |
| **Total Operating Expenses** | **5,821,624** | **5,371,509** | **5,442,148** | **16,635,282** |
| **Other Expenses & Income** | **155,318** | **(947)** | **463,056** | **617,428** |
| **Transfers to General Fund** | **331,106** | **-** | **-** | **331,106** |
| **DOC Incentive Wages** | **1,225,375** | **1,076,327** | **1,098,454** | **3,400,156** |
| **Total Expenses** | **$30,804,630** | **$27,996,133** | **$28,197,059** | **$86,997,821** |

**Note:** Total amounts do not match due to rounding.
**Source:** Prepared by legislative auditor's staff using information from PE's Income Statements for FY16 through FY18.