## IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF LOUISIANA

**VOICE OF THE EXPERIENCED**, a membership organization on behalf of itself and its members; and **MYRON SMITH, DAMARIS JACKSON, NATE WALKER, DARRIUS WILLIAMS, KEVIAS HICKS, JOSEPH GUILLORY, KENDRICK STEVENSON,** and **ALVIN WILLIAMS**, on behalf of themselves and all others similarly situated,

    *Plaintiffs*,

      v.

**JAMES LEBLANC**, in his official capacity as Secretary of the Louisiana Department of Public Safety and Corrections; **TIMOTHY HOOPER**, in his official capacity as Warden of Louisiana State Penitentiary; **MISTY STAGG**, in her official capacity as Director of Prison Enterprises, Inc.; the **LOUISIANA DEPARTMENT OF PUBLIC SAFETY & CORRECTIONS**; and **PRISON ENTERPRISES, INC.,**

    *Defendants*.

Civil Action No.: 3:23-cv-1304-BAJ-EWD

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS IN LIMINE AND *DAUBERT* MOTIONS TO EXCLUDE OR LIMIT THE TESTIMONY OF DRS. EVELYNN HAMMONDS AND JOSHUA SBICCA**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................. 1

FACTUAL BACKGROUND ................................................................................................... 3

      A.    Through the Farm Line, Defendants Leverage Angola's Uninterrupted
          History of Compulsory Labor to Inflict Punishment ............................................. 3

      B.    Dr. Evelynn Hammonds .......................................................................................... 4

      C.    Dr. Joshua Sbicca .................................................................................................... 5

LEGAL STANDARD ............................................................................................................. 7

ARGUMENT .......................................................................................................................... 8

I.      DRS. HAMMONDS AND SBICCA ARE QUALIFIED .............................................. 9

II.     DRS. HAMMONDS' AND SBICCA'S OPINIONS ARE RELIABLE .......................... 12

      A.    Dr. Hammonds' Opinions Are Reliable ................................................................. 12

      B.    Dr. Sbicca's Opinions Are Reliable ....................................................................... 16

III.    DRS. HAMMONDS' AND SBICCA'S TESTIMONY WILL ASSIST THE COURT
        IN ITS ROLE AS FINDER OF FACT ....................................................................... 20

      A.    Dr. Hammonds' Opinions Will Assist the Court as Factfinder ............................ 20

      B.    Dr. Sbicca Will Assist the Court as Factfinder ..................................................... 21

IV.    DRS. HAMMONDS AND SBICCA WILL NOT OFFER LEGAL CONCLUSIONS ... 21

CONCLUSION ...................................................................................................................... 24

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*United States* v. *14.38 Acres of Land, More or Less Situated in Leflore Cnty.,*
  *State of Miss.,*
  80 F.3d 1074 (5th Cir. 1996) .........................................................................16, 18

*Accresa Health LLC* v. *Hint Health Inc.,*
  2020 WL 6325731 (E.D. Tex. Feb. 26, 2020) ................................................23, 24

*United States* v. *Arthur,*
  51 F.4th 560 (5th Cir. 2022), *cert. denied*, 143 S. Ct. 846 (2023)..........................9

*Bell* v. *Foster Wheeler Energy Corp.,*
  2016 WL 5847124 (E.D. La. Oct. 6, 2016) .............................................................9

*Bocanegra* v. *Vicmar Servs., Inc.,*
  320 F.3d 581 (5th Cir. 2003) ......................................................................17, 20

*City of Allen, Texas* v. *Time Warner Cable Texas, LLC,*
  2021 WL 8053616 (W.D. Tex. Nov. 1, 2021) .......................................................23

*Daubert* v. *Merrell Dow Pharms., Inc.,*
  509 U.S. 579 (1993)...............................................................................8, 12

*DHI Grp., Inc.* v. *Kent,*
  397 F. Supp. 3d 904 (S.D. Tex. 2019) ....................................................11, 16, 18

*First United Fin. Corp.* v. *U.S. Fid. & Guar. Co.,*
  96 F.3d 135 (5th Cir. 1996) ...............................................................................24

*George* v. *Louisiana Dep't of Pub. Safety & Corr.,*
  2016 WL 3455378 (M.D. La. June 20, 2016).....................................................12, 14

*Gibbs* v. *Gibbs,*
  210 F.3d 491 (5th Cir. 2000) .................................................................................8

*Brawhaw ex rel. Hays* v. *Marine Health Care, Inc.,*
  2008 WL 2004707 (N.D. Miss. May 8, 2008).......................................................17

*Helling* v. *McKinney,*
  509 U.S. 25 (1993)..............................................................................................21

*Holcombe* v. *United States,*
  2021 WL 4888337 (W.D. Tex. Mar. 5, 2021) .......................................................23

*Hunters Run Gun Club, LLC* v. *Baker*,
2019 WL 2516876 (M.D. La. June 18, 2019)........................................................22

*Huss* v. *Gayden*,
571 F.3d 442 (5th Cir. 2009) .............................................................................9, 10

*Johnson* v. *Samsung Elecs. Am., Inc.*,
277 F.R.D. 161 (E.D. La. 2011)..........................................................................8, 17

*Jones* v. *Blue Cross Blue Shield of Louisiana*,
2018 WL 585543 (M.D. La. Jan. 29, 2018)............................................................11

*Jones* v. *Cannizzaro*,
514 F. Supp. 3d 853 (E.D. La. 2021).......................................................................13

*In re Katrina Canal Breaches Consol. Litig.*,
2012 WL 4328354 ....................................................................................................15

*Kumho Tire Co.* v. *Carmichael*,
526 U.S. 137 (1999)..................................................................................................8

*Labouliere* v. *Our Lady of the Lake Hosp., Inc.*,
2020 WL 1317732 (M.D. La. Mar. 20, 2020) .........................................................20

*Lewis* v. *Cain*,
2017 WL 4782653 (M.D. La. Oct. 23, 2017) ..........................................................19

*Matthews* v. *Ashland Chemical*,
770 F.2d 1303 (5th Cir. 1985) .................................................................................24

*McKinney* v. *Superior Van & Mobility, LLC*,
2021 WL 1699885 (E.D. La. Apr. 29, 2021) ...........................................................19

*Nale* v. *Finley*,
505 F. Supp. 3d 635 (W.D. La. 2020)................................................................23, 24

*Olivier* v. *Exxon Mobil Corp.*,
596 F. Supp. 3d 606 (M.D. La. 2022).......................................................................23

*Orthoflex, Inc.* v. *ThermoTek, Inc.*,
986 F. Supp. 2d 776 (N.D. Tex. 2013) ....................................................................19

*Pipitone* v. *Biomatrix, Inc.*,
288 F.3d 239 (5th Cir. 2002) ...............................................................................8, 13

*Puga* v. *RCX Sols., Inc.*,
922 F.3d 285 (5th Cir. 2019) ...................................................................................20

*Roake* v. *Brumley*,
   2024 WL 4751509 (M.D. La. Nov. 12, 2024) ................................................................ *passim*

*Rushing* v. *Yeargain*,
   2022 WL 4545612 (M.D. La. June 10, 2022) ...............................................................11, 13, 20

*United States* v. *Simmons*,
   470 F.3d 1115 (5th Cir. 2006) .....................................................................................12, 13

*Smothered Covered, L.L.C.* v. *WH Cap., L.L.C.*,
   2024 WL 4643876 (E.D. La. Oct. 31, 2024) .........................................................................23

*Terrebone Parish NAACP* v. *Jindal*,
   2015 WL 6157912 (M.D. La. Oct. 20, 2015) .....................................................................23, 24

*Trinity Med. Servs., L.L.C.* v. *Merge Healthcare Sols., Inc.*,
   2020 WL 1307045 (M.D. La. Mar. 19, 2020) .....................................................................9, 20

*Urda* v. *Valmont Indus., Inc.*,
   561 F. Supp. 3d 632 (M.D. La. 2021) ...................................................................................15

*Watkins* v. *Telsmith*,
   121 F.3d 984 (5th Cir. 1997) ...............................................................................................19

*Whitehouse Hotel Ltd. P'ship* v. *Comm'r*,
   615 F.3d 321 (5th Cir. 2010) .................................................................................................8

*Young* v. *Am. Eagle Lines*,
   2007 WL 9710791 (M.D. La. Feb. 14, 2007) .......................................................................12

**Other Authorities**

Federal Rule of Evidence 702 ................................................................................7, 9, 13, 16

Federal Rule of Evidence 704 .............................................................................................24

Plaintiffs respectfully submit this memorandum of law in opposition to Defendants' motions to exclude or limit the testimony of Dr. Evelynn Hammonds (ECF No. 126) and Dr. Joshua Sbicca (ECF No. 125).

## PRELIMINARY STATEMENT

At Louisiana State Penitentiary ("LSP" or "Angola"), incarcerated men assigned to the Farm Line—like enslaved people before them—are compelled to perform agricultural labor on the grounds of a former slave plantation under dangerous, degrading, and punitive conditions. On the Farm Line, the men, most of whom are Black, are forced to harvest crops by hand while surrounded by armed guards, under conditions resembling chattel slavery. They often receive no compensation for their labor. When they are paid, they receive 2 to 4 cents per hour, not enough to afford even basic necessities like soap or deodorant. The Farm Line is not primarily a work assignment. It is punishment achieved through simulating conditions of enslavement. Indeed, in sworn testimony, LSP staff and incarcerated men alike have recognized the similarities between the Farm Line and pre-Civil War chattel slavery.

Plaintiffs seek to enjoin the Farm Line under the Eighth Amendment, in part because its traumatic association with chattel slavery deprives incarcerated men of their basic human dignity and creates a substantial risk of physical and psychological harm that adds unnecessary terror, pain, and disgrace to their sentences. In short, it is a cruel and unusual form of punishment that does not comport with evolving standards of decency. In support of these claims, Plaintiffs will proffer Dr. Evelynn Hammonds and Dr. Joshua Sbicca as expert witnesses.

Dr. Hammonds will draw on her expertise in: (i) epidemiology and public health to opine that the Farm Line engenders the risk of harm, noting the well-documented relationship between stressors associated with the legacy of slavery and systemic racism and the negative health

disparities experienced by Black Americans; (ii) the histories of science and medicine to opine that medical professionals operating in regimes that subjugate classes of people to subhuman positions routinely misdiagnose and ignore genuine health emergencies among the subjugated population; and (iii) African American studies to demonstrate similarities between conditions on the Farm Line and conditions during chattel slavery, and to identify similarities in the accounts of medical providers who worked on plantations and those working at LSP.

Dr. Sbicca relies on his expertise in the sociology and history of prison agricultural labor to opine that modern prison agricultural labor is firmly rooted in U.S. chattel slavery. He will describe the evolution of prison agricultural labor, including contemporary trends, and opine that the Farm Line is an outlier that more closely resembles convict leasing and chain gangs—carceral institutions that were abandoned because of the dignitary, psychological, and physical harm they inflicted.

Defendants have not proffered anyone who is able to contest these well-grounded opinions. Unable to rebut Dr. Hammonds or Dr. Sbicca, Defendants seek to prevent them from testifying by lobbing a scattershot of baseless objections to their qualifications, challenging the conclusions they draw from the evidence, accusing them of ignoring supposed counterevidence, and mischaracterizing their testimony. None of this is proper on a *Daubert* motion, especially in the context of a bench trial.

Drs. Hammonds and Sbicca are qualified, their opinions are based on reliable methodologies generally accepted for social scientists, and their testimony will be highly relevant to the facts at issue in this case. For these reasons, Defendants' *Daubert* motions should be denied.

# FACTUAL BACKGROUND

### A.  Through the Farm Line, Defendants Leverage Angola's Uninterrupted History of Compulsory Labor to Inflict Punishment

Built on the grounds of a former slave plantation from which it derives its ignominious nickname, "Angola" has, since the pre-Civil War period, been the site of uninterrupted, compulsory, and dehumanizing agricultural labor performed by people stripped of their freedom. Ex. 1, Expert Rep. of Dr. Evelynn Hammonds ("Hammonds Rep.") ¶ 16; Ex. 2, Expert Rep. of Dr. Joshua Sbicca ("Sbicca Rep.") ¶ 84.  Today, that unbroken history of forced labor is manifest on the Farm Line, where men, primarily Black men, are forced to toil on former plantation grounds to pick crops by hand under dangerous and dehumanizing conditions that resemble chattel slavery. LSP staff are aware of this resemblance.  *See, e.g.*, Ex. 3, Pidgeon Dep. 159:2–12.  They are aware that LSP's status as a former slave plantation "is a very sensitive subject" to "society in general" and have recently sought to downplay that history in public-facing communications.  *See* Ex. 4, Vittorio Dep. 59:25–60:25; Ex. 5, Keldie Dep. 81:13–83:7.  And yet, as Plaintiffs will show at trial, when it comes to the treatment of its incarcerated population, LSP staff continue to reinforce Angola's slave history, most egregiously and harmfully through the Farm Line.

Plaintiffs assert that Defendants' operation of the Farm Line violates the Eighth Amendment's bar on cruel and unusual punishment because, among other things, it punishes Plaintiffs and putative class members in excess of their "hard labor" sentences by exposing them to dangerous conditions that deprive them of human dignity, and by placing them at a substantial risk of physical and psychological harm.  Specifically, Plaintiffs allege that, through the Farm Line, Defendants leverage the legacy of chattel slavery and simulate conditions of enslavement in order to dehumanize, degrade, and punish in violation of the Eighth Amendment.  At trial, Plaintiffs will offer Drs. Hammonds' and Sbicca's expert testimony to help the Court understand

the scientific, historical, and sociological context in which the Farm Line operates and to prove their claims.

**B.    Dr. Evelynn Hammonds**

Dr. Evelynn Hammonds is the Barbara Gutmann Rosenkrantz Professor of the History of Science and a Professor of African and African American Studies in the Faculty of Arts and Sciences at Harvard University. *See* Ex. 1, Hammonds Rep. App'x A. She is also a Professor in the Department of Social and Behavioral Sciences at the Harvard T.H. Chan School of Public Health at Harvard University and the Director of the Project on Race & Gender in Science and Medicine at the Hutchins Center for African American Research at Harvard University, which supports research on the history and culture of people of African descent. *Id.* She has held various other positions at Harvard University, including Dean of Harvard College and Chair of the Department of History of Science, as well as positions at other institutions, such as Princeton University and UCLA. *Id.* Dr. Hammonds received a B.S. in Physics from Spelman College and a Bachelor of Electrical Engineering from the Georgia Institute of Technology, a Master of Science in Physics from Massachusetts Institute of Technology, and a Doctor of Philosophy in the History of Science from Harvard University. *See id.* Dr. Hammonds' research focuses on epidemiology, histories of science, medicine, and public health in the United States; race, gender, and sexuality in science studies; and African American studies. *Id.* She is a frequent lecturer, has published extensively on these topics in leading peer-reviewed academic journals and books, and has edited volumes for academic presses. *Id.*

Dr. Hammonds' expertise in multiple disciplines positions her to provide uniquely insightful expert opinions on a range of issues relevant to this case. *First*, from an epidemiological and public health perspective, Dr. Hammonds will describe the relationship between stressors associated with the legacy of slavery and systemic racism and negative health disparities

4

experienced by Black people in the United States. She will opine that the Farm Line, a simulacrum of chattel slavery, is likely to result in or exacerbate similar negative health outcomes for all those exposed to it, and particularly for Black people. Ex. 1, Hammonds Rep. ¶¶ 12–18. *Second*, from a history of science and history of medicine perspective, Dr. Hammonds will describe how medical professionals working in social regimes in which some people are treated as "sub-human," for example, under chattel slavery and German concentration camps, "have historically misdiagnosed and/or mistreated patients from the subjugated groups in order to prioritize the needs of the social regime." *Id.* ¶ 19. In these social regimes, medical providers internalize and propagate the racist foundations of the regime and, as a result, routinely misdiagnose or ignore genuine health emergencies among the subjugated class. *Id.* ¶¶ 19–26. Dr. Hammonds will also identify similarities between historical accounts of healthcare providers operating under chattel slavery and healthcare providers at LSP. *Third*, from an African American studies perspective, Dr. Hammonds will opine on the similarities of the Farm Line and U.S. chattel slavery. *Id.* Dr. Hammonds grounds each of these opinions in the academic literature and research cited in her report and her personal experience. Ex. 1, Hammonds Rep. App'x B.

### C. Dr. Joshua Sbicca

Dr. Joshua Sbicca is an Associate Professor of Sociology at Colorado State University ("CSU") where he has taught courses on sociology, social movements, and agriculture since 2014. He has earned multiple postgraduate degrees from the University of Florida, including a Ph.D. in Sociology. *See* Ex. 2, Sbicca Rep. App'x A. Dr. Sbicca has also published on topics related to sociology and prison agricultural labor, including numerous articles in leading peer-reviewed academic journals, chapters for academic volumes and encyclopedias, and books, including a forthcoming book entitled *Plantation Prisons*, which discusses the history and rise of prison plantations in the United States. Ex. 2, Sbicca Rep. ¶¶ 3–4, App'x A; Ex. 6, Sbicca Dep. 54:8–22.

In 2019, Dr. Sbicca co-founded the Prison Agricultural Lab, based at CSU, and serves as the Lab's Director.  As Director, his research concentrates almost exclusively on prison agricultural labor and food production in adult state-run prisons.  Since its founding, the Prison Agricultural Lab has developed a first-of-its-kind nationwide study and open-access data set that showcases contemporary prison agricultural trends nationwide.  *See* Ex. 2, Sbicca Rep. App'x A. Under his leadership, the Prison Agricultural Lab has collected data from prison agricultural programs in all 50 states.  Ex. 6, Sbicca Dep. 11:22–12:2.

Dr. Sbicca's opinions in this case relate to the history and sociology of prison agricultural labor systems in the United States and their connection to chattel slavery.  In his expert report, Dr. Sbicca relied on numerous and varied historical and sociological sources, including over 50 peer-reviewed articles and books.  He also relied on statistical research, reviewing state and national statistics on a wide range of topics, including, among other things, incarceration statistics, statewide demographic and population data, the number of people with disabilities in the country, and income estimates for farming households.  *See* Ex. 2, Sbicca Rep. App'x B.  Dr. Sbicca culled data from a variety of primary sources as well, including his own Prison Agricultural Lab dataset, declarations from Plaintiffs and other people currently incarcerated at Angola, statements from people who worked in other prison agricultural programs, and other contemporary accounts of prison agricultural programs.  *See id.*; *see also* Ex. 6, Sbicca Dep. 31:6–20.  Dr. Sbicca also attended Plaintiffs' July site inspection of Angola, where he personally observed and documented conditions on the Farm Line and interviewed men assigned to it.

In his expert report, Dr. Sbicca discusses early theories of incarceration and the development of the prison agricultural labor systems.  *See generally*, Ex. 2, Sbicca Rep.  He describes present-day trends in prison agriculture systems, analyzes various aspects of the Farm

Line, and situates the Farm Line within the evolving history of prison agricultural practices. *Id.* Dr. Sbicca describes agriculture as a prominent part of penal development in the South—as the South continued to rely heavily on cheap labor after enslavement ended, former plantations like Angola shifted from reliance on enslaved people to reliance on incarcerated people and maintained characteristics of slave labor regimes during this transition. *Id.* Dr. Sbicca concludes, among other things, that there is a historical and sociological connection between chattel slavery and prison agricultural labor that can be traced from chattel slavery to sharecropping, convict leasing, the establishment of Black Codes, and other prison agricultural laws. *Id.* He concludes that the Farm Line draws upon this connection and resembles chattel slavery because it, like chattel slavery, convict leasing, and chain gangs that came before it, "is predicated on the social control and labor exploitation of people who had their freedom stripped" from them under dangerous and punitive conditions. Ex. 6, Sbicca Dep. 40:24–41:21. He further concludes that the Farm Line (i) stands apart from contemporary penal agricultural practices, which have trended toward emphasizing vocational training, and (ii) is an outlier that more closely approximates other practices such as convict leasing and chain gangs that were abandoned by society because of their traumatic association with slavery and the resulting risk of psychological and dignitary harm. Ex. 2, Sbicca Rep. ¶¶ 11–16; Ex. 6, Sbicca Dep. 40:24–41:21.

## <u>LEGAL STANDARD</u>

Under Federal Rule of Evidence 702, expert testimony is admissible where the expert's specialized knowledge will help the factfinder understand the evidence or determine a fact at issue, "the testimony is based on sufficient facts or data," "the testimony is the product of reliable principles and methods," and the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702. Thus, trial courts are charged to act as gatekeepers of expert testimony, and to make a "preliminary assessment" about the admissibility of the proffered

testimony. *Daubert* v. *Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592–93 (1993); *see Kumho Tire Co.* v. *Carmichael*, 526 U.S. 137 (1999).

That gatekeeping function, however, "is significantly diminished in bench trials. . . [where] there is no risk of tainting the trial by exposing a jury to unreliable evidence." *Whitehouse Hotel Ltd. P'ship* v. *Comm'r*, 615 F.3d 321, 330 (5th Cir. 2010); *see Gibbs* v. *Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000) ("Most of the safeguards provided for in *Daubert* are not as essential in a case such as this where a district judge sits as the trier of fact in place of a jury."). "Stated another way, there is less need for the gate keeper to keep the gate when the gatekeeper is keeping the gate only for himself." *Roake* v. *Brumley*, 2024 WL 4751509, at *8 (M.D. La. Nov. 12, 2024) (cleaned up).

The admissibility inquiry for expert testimony is a "flexible one" focused "solely" on "the principles that underlie a proposed submission" and methodology, "not on the conclusions that they generate." *Daubert*, 509 U.S. at 594–95. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking [contested] but admissible evidence." *Id.* at 596; *see also Pipitone* v. *Biomatrix, Inc.*, 288 F.3d 239, 250 (5th Cir. 2002). Accordingly, "the rejection of expert testimony is the exception and not the rule." *Johnson* v. *Samsung Elecs. Am., Inc.*, 277 F.R.D. 161, 165 (E.D. La. 2011) (cleaned up).

## ARGUMENT

Defendants seek to exclude or limit the testimony of Drs. Hammonds and Sbicca by challenging those experts' qualifications, the reliability of their methodologies, the relevance of their opinions, and by claiming that they render impermissible legal opinions. There is, however, no legitimate basis to exclude or limit either expert's testimony.

## I.        DRS. HAMMONDS AND SBICCA ARE QUALIFIED

Federal Rule of Evidence 702 permits expert testimony as long as the witness is qualified "by knowledge, skill, experience, training, or education."  Fed. R. Evid. 702; *United States* v. *Arthur*, 51 F.4th 560, 571 (5th Cir. 2022), *cert. denied*, 143 S. Ct. 846 (2023).  Rule 702's qualification standards are "liberal" and set a "low threshold."  *Bell* v. *Foster Wheeler Energy Corp.*, 2016 WL 5847124, at *2 (E.D. La. Oct. 6, 2016); *see Huss* v. *Gayden*, 571 F.3d 442, 452 (5th Cir. 2009) ("Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue.").  In determining whether an expert is qualified, courts look to the expert's degree and research within related subject matter, publications, and university-level teaching experience.  *See, e.g.*, *Roake*, 2024 WL 4751509, at *2, 12; *Trinity Med. Servs., L.L.C.* v. *Merge Healthcare Sols., Inc.*, 2020 WL 1307045, at *7 (M.D. La. Mar. 19, 2020).  Dr. Hammonds' and Dr. Sbicca's qualifications clearly exceed the low threshold set by Rule 702.  Defendants' arguments to the contrary are meritless.

*First*, Defendants argue that Drs. Hammonds and Sbicca are "not qualified to testify whether these Plaintiffs have experienced psychological and physical harm."  ECF No. 126-1 ("Hammonds Br.") at 6; *see also* ECF No. 125-1 ("Sbicca Br.") at 6.  But neither Dr. Hammonds nor Dr. Sbicca has ever purported to diagnose any medical or psychological harm suffered by any named plaintiff or class member, and neither intends to do so at trial.

Rather, Dr. Hammonds will testify that:  (i) epidemiological research shows that the experience of institutionalized racism has a direct and strong correlation to negative physical and psychological health outcomes; (ii) historically, medical professionals operating in racist, forced labor regimes have routinely misdiagnosed serious health conditions and offered medical justifications that prioritize those regimes' labor needs over patient health; (iii) there are striking similarities between U.S. chattel slavery and conditions on the Farm Line; and (iv) the accounts of

healthcare providers who measured the purported deficiencies of enslaved people through concepts such as "soundness" and "running away disease" bear similarities to sworn testimony of LSP and DOC personnel concerning men assigned to the Farm Line. Dr. Hammonds will explain that, from an epidemiological perspective, she would expect that the Farm Line, which draws upon the legacy of slavery in order to effectuate its punitive purpose, risks creating and exacerbating the same types of significant negative health outcomes that already affect African Americans as a result of that same legacy. This testimony will flow directly from Dr. Hammonds' preeminent work in the areas of epidemiology and public health, histories of science and medicine, and African American studies. As Defendants rightly concede, Dr. "Hammonds is imminently (*sic*) qualified in her field." Hammonds Br. 6.

Dr. Sbicca will describe (i) the direct through-line from chattel slavery to modern prison labor; (ii) the philosophical and sociological underpinnings of U.S. penological labor regimes; (iii) the norms and outliers within prison labor regimes; and (iv) the evolution of prison labor as societal mores have developed over time. Dr. Sbicca, one of the foremost academic researchers of prison agricultural labor and the founder and director of the only lab in the United States dedicated to prison agricultural labor, will situate the Farm Line within this historical and sociological context, showing that it, on the one hand, exemplifies the racist underpinnings of the U.S. carceral system and, on the other, stands as an outlier more closely resembling carceral practices like convict leasing and chain gangs that society has deemed abhorrent and outlawed. In addition to his unassailable academic expertise in the area of prison agricultural labor, Dr. Sbicca has significant personal agricultural experience, has inspected the Farm Line, and has spoken with men assigned to it. *See Huss*, 571 F.3d at 455–56 (overruling exclusion of expert lacking specialized training but who possessed ancillary education and knowledge).

*Second*, Defendants suggest that Drs. Hammonds and Sbicca are not qualified because they have never testified as expert witnesses. Hammonds Br. 6; Sbicca Br. 7. Defendants cite no authority—nor is there any—that would preclude an expert's testimony on that basis. To the contrary, this court and others have held that an expert's lack of experience providing testimony is "not grounds for disqualification." *Jones* v. *Blue Cross Blue Shield of Louisiana*, 2018 WL 585543, at *4 (M.D. La. Jan. 29, 2018); *see DHI Grp., Inc.* v. *Kent*, 397 F. Supp. 3d 904, 935 (S.D. Tex. 2019).

*Third*, Defendants suggest that the Court should entirely disregard the depth of research expertise demonstrated by Drs. Hammonds and Sbicca and, instead, focus solely on their more limited experience with in-person observations of prison agricultural operations and direct correspondence with incarcerated people. Hammonds Br. 6–7; Sbicca Br. 7–8. This, too, is absurd. *See Rushing* v. *Yeargain*, 2022 WL 4545612, at *7 (M.D. La. June 10, 2022) ("There is no question that an expert may still properly base his testimony on 'professional study or personal experience'") (quoting *Maiz* v. *Virani*, 253 F.3d 641, 669 (11th Cir. 2001)). Experts commonly testify about topics they know only via research.[1] For example, this Court recently rejected a challenge to a historian testifying about colonial history and the understandings of the Founding Fathers. *See Roake*, 2024 WL 4751509, at *10. Needless to say, the expert in that case had no firsthand experience of such topics.

In sum, both experts are qualified to proffer the testimony they intend to offer at trial.

---

[1] In any event, Dr. Sbicca has both inspected the Farm Line in person, interviewed incarcerated men assigned to it, and corresponded with people incarcerated at prisons other than LSP about their experiences.

## II.    DRS. HAMMONDS' AND SBICCA'S OPINIONS ARE RELIABLE

To determine if an expert's opinions are reliable, courts are to focus solely on the principles and methodology underlying the expert's opinion, not the expert's conclusions. *Daubert*, 509 U.S. at 595. The question is whether the expert's methodology, based "upon [their] professional studies or personal experience, employs . . . the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Young* v. *Am. Eagle Lines*, 2007 WL 9710791, at *2 (M.D. La. Feb. 14, 2007) (quoting *Kumho Tire*, 526 U.S. at 152). Because social science research, theories, and opinions do not "have the exactness of hard science methodologies," the Fifth Circuit has granted trial judges evaluating the reliability of social science experts with "broad discretion" to consider "other indicia of reliability . . . including professional experience, education, training, and observations." *United States* v. *Simmons*, 470 F.3d 1115, 1123 (5th Cir. 2006); *see Roake*, 2024 WL 4751509, at *7; *George* v. *Louisiana Dep't of Pub. Safety & Corr.*, 2016 WL 3455378 (M.D. La. June 20, 2016).

The testimony that Drs. Hammonds and Sbicca will offer at trial satisfies these requirements.

### A.    Dr. Hammonds' Opinions Are Reliable

Dr. Hammonds opines that "the Farm Line at LSP creates a significant risk of exacerbating or generating psychological and physical harm because its operation and punitive power continues, mimics, and relies upon the precise history that has created the differential health outcomes Black people face today." Ex. 1, Hammonds Rep. ¶ 29. To reach that opinion, Dr. Hammonds employed the methodology routinely used by social scientists: she reviewed and applied the findings of numerous articles and books written by scholars to interpret the significance of a subject dataset—here, the discovery record in this case. *See* Ex. 1, Hammonds Rep. App'x B. Dr. Hammonds also based her opinions on her "personal and professional experience, especially [her] familiarity with

12

the historical lineage of scientific practice, health care, and racial discrimination in the United States in conjunction with [her] exposure to and development of the field of the history of science, medicine, and public health in the United States from the 18th century to the present." Ex. 1, Hammonds Rep. ¶ 7. These methodologies render her opinion sufficiently reliable under Rule 702. *See Pipitone* v. *Biomatrix, Inc.*, 288 F.3d 239, 247 (5th Cir. 2002) ("Rule 702 expressly contemplates that an expert may be qualified on the basis of experience" and "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."); *see also Simmons*, 470 F.3d at 1122–23 (recognizing the flexibility *Daubert* allows for evaluating the reliability of social scientists' opinions); *Rushing*, 2022 WL 4545612, at *5 (same).

Defendants' arguments that Dr. Hammonds' opinions are not reliable because she did not review the full evidentiary record and supposedly misinterpreted and cherry-picked from those portions of the record that she did have, Hammonds Br. 11–14, hold no water.

*First*, courts have routinely rejected the argument that an expert must have the entire evidentiary record and cannot rely on counsel to select relevant portions.[2] *See Rushing*, 2022 WL 4545612, at *10 ("A methodology often allowed under the *Daubert* rubric is for an expert to base his or her opinion on a review of records supplied by others . . . and, based on the expert's professional training and knowledge, render an expert opinion within his or her area of expertise."); *Jones* v. *Cannizzaro*, 514 F. Supp. 3d 853, 867 (E.D. La. 2021) (expert's reliance on defense counsel to selectively provide him with documents to review is not a basis to exclude

---

[2]    The soundness of this approach is exemplified here, where the parties have taken 41 depositions and exchanged approximately 134,500 pages of documents. Dr. Hammonds reviewed 11 deposition transcripts and 11 declarations.

testimony).  In fact, Defendants' attorneys likewise provided their own experts with only selected portions of the record.  *See, e.g.*, Ex. 7, Reynolds-Barnes Dep. 16:15–17:9.

*Second*, Defendants' apparent disagreement with what evidence is relevant, what weight should be given to that evidence, and what conclusions one should draw from it are issues for cross-examination, not a *Daubert* motion.  *See George*, 2016 WL 3455378, at *4 ("When one looks carefully at Defendants' allegations, it is clear that they simply disagree with the conclusions of this expert, not on *Daubert*-worthy grounds but rather, for reasons that are most appropriately tested by the traditional means of cross examination and ultimately left to the sound judgment of the [factfinder]".).  Thus, Defendants' disputes with Dr. Hammonds' conclusions from Major Pidgeon's and Officer Scott's testimony concerning the similarity of the Farm Line and chattel slavery, and the lessons to draw from the depositions of Messrs. Walker, Washington, Comeaux, and Morehead, *see* Hammonds Br. 12–14, are matters for trial, not a *Daubert* challenge.

*Third*, Defendants argue that Dr. Hammonds' opinion supposedly contravenes case law concerning hard labor.  *Id.* at 14–15.  To be sure, there is no authority supporting Defendants' positions that (a) the Farm Line is merely hard labor or (b)  Defendants "cannot be responsible for any alleged psychological harm caused by [Plaintiffs'] sentence of hard labor."  *Id.* at 14.  To the contrary, while sentences to hard labor and certain hard labor practices are constitutional, where, as here, prison officials with deliberate indifference devise and subject incarcerated people to forms and conditions of labor that create a substantial risk of serious harm or depart from contemporary standards of decency, they violate the Eighth Amendment.  One needs to look no further than this Court's preliminary injunction order regarding Defendants' deliberate indifference to heat-related harms created through the Farm Line, largely sustained by the Fifth Circuit.  Defendants offer no basis, nor is there one, for why their deliberate indifference to the

risk of other harms—dignitary, psychological, and physical harms resulting from Defendants' leveraging of the near-universally condemned institution of chattel slavey as a means of punishment—would be subject to a different standard.

*Finally*, Defendants' argument that there is no evidentiary basis to support two pillars of Dr. Hammonds' epidemiology opinion—(i) how Angola's plantation past serves to maintain racial and social hierarchy; and (ii) the punitive purpose of the Farm Line—is simply false. Experts provide *ipse dixit* when their testimony is not based on sufficient analysis or reliable methodologies. *See, e.g.*, *Urda* v. *Valmont Indus., Inc.*, 561 F. Supp. 3d 632, 639–40 (M.D. La. 2021) (mechanical engineer expert testimony was not conjecture or *ipse dixit* where it was based on an extensive analysis, methodology, and calculations). Here, Dr. Hammonds relies on, among other things, the testimony of Major Pidgeon, Dr. Toce, and Assistant Warden Sylvester, the common use of the racially and historically loaded term "Angola" by LSP staff to reference LSP, disciplinary policies, and declarations of men recounting the degrading experience and conditions of the Farm Line itself. Dr. Hammonds examines and interprets this evidence from the perspective of a historian and public health expert with extensive knowledge of disparate health outcomes created by American slavery. Ex. 1, Hammonds Rep. ¶¶ 12–18. Put differently, she provides her opinions based on the evidentiary record and analysis thereof. Defendants are free to question her on the significance of this evidence and her opinions, but they cannot escape her testimony by pretending these evidentiary foundations and methodology do not exist. *See In re Katrina Canal Breaches Consol. Litig.*, 2012 WL 4328354, at *1 (motion to exclude expert testimony is improper when it attacks "the underlying facts upon which [an expert's] opinion was based," because "[t]hat approach is not contemplated under a *Daubert* challenge."). Equally unavailing are Defendants' attempts to argue misleadingly that Dr. Hammonds does not actually adhere to her opinion. *See*

15

Hammonds Br. 14–15.  Dr. Hammonds' opinions and testimony are clear:  the fact that Angola

sits on former plantation grounds is highly relevant to her opinion.  Ex. 1, Hammonds Rep. ¶ 16;

Ex. 8, Hammonds Dep. 13:19–14:2, 17:17–18:4.

**B.      Dr. Sbicca's Opinions Are Reliable**

Dr. Sbicca's report and deposition testimony demonstrate that his methodologies are

"grounded in an accepted body of learning or experience" in the fields of sociology and history.

*DHI Grp.*, 397 F. Supp. 3d at 917 (quoting Fed. R. Evid. 702, advisory committee's note, 2000

Amends.).  Dr. Sbicca relied on numerous primary and secondary sources, academic journals,

peer-reviewed articles, and statistical information, *see* Ex. 6, Sbicca Dep. 31:6–20, 34:23–35:6,

41:25–42:24; Ex. 2, Sbicca Rep. App'x B, as well as his firsthand observations of the Farm Line

and conversations with men assigned to it.

Defendants' primary arguments for why Dr. Sbicca's opinions are supposedly not reliable

(articulated in the qualifications section of their brief) appear to be that "Sbicca did not establish

the process by which his sources developed their standards or principles and did not establish the

general acceptance of those standards and principles.  Sbicca announces that LSP deviates from

'prevailing norms' but does not show those 'norms' are prevailing or generally accepted."  Sbicca

Br. 9.  But, "[a]s a general rule, questions relating to the bases and sources of an expert's opinion

affect the weight to be assigned that opinion rather than its admissibility and should be left for the

[factfinder's] consideration."  *United States* v. *14.38 Acres of Land, More or Less Situated in*

*Leflore Cnty., State of Miss.*, 80 F.3d 1074, 1077 (5th Cir. 1996) (internal citation omitted).  In

other words, Defendants are free to challenge whether the extensive source material that Dr. Sbicca

cites in developing his opinion that the Farm Line departs from prevailing norms through cross-

examination, but are not entitled to preclude him from testifying.

Defendants additionally argue Dr. Sbicca is biased toward reformist rather than punitive carceral philosophy. Sbicca Br. 15–17. If true, that would not be a proper basis to exclude his testimony because, on a *Daubert* motion, "the court's primary duty in its gate-keeping function is to determine whether the witness is qualified and whether his opinions are relevant and reliable, not whether the witness has a personal bias." *Brawhaw ex rel. Hays* v. *Marine Health Care, Inc.*, 2008 WL 2004707, at *5 (N.D. Miss. May 8, 2008); *see Johnson* v. *Samsung Elecs. Am., Inc.*, 277 F.R.D. 161, 167 (E.D. La. 2011) (denying *Daubert* motion and holding that it is the factfinder who is to determine questions of bias).

The remainder of Defendants' reliability objections relate to the fact that Dr. Sbicca's report describes the racist foundations of the U.S. carceral system and dangers associated with prison labor generally. *See* Sbicca Br. at 17–20. To the extent that Defendants are arguing that Dr. Sbicca's testimony does not reliably draw a direct causal connection between Defendants' operation of the Farm Line and harms experienced by Plaintiffs, that argument is misguided. Dr. Sbicca is not a damages or causation expert. His opinions relate to the Farm Line as a carceral practice that shares the racist heritage commonly found in prison labor practices but also stands at the outer edges of prevailing prison labor norms. These well-supported opinions will be helpful to the Court as factfinder. *See Bocanegra* v. *Vicmar Servs., Inc.*, 320 F.3d 581, 586–87 (5th Cir. 2003) (trial court erred in finding expert's failure to point to a causal connection between marijuana use and the accident rendered his testimony unhelpful). To paraphrase a recent decision of this Court, if Defendants contend there is a competing view of the relevant social and historical context of the Farm Line, they had a chance to call their own experts to contradict and challenge Drs. Hammonds and Sbicca. That they chose not to is not a basis to exclude Plaintiffs' experts. *See Roark* v. *Brumley*, 2024 WL 4751509, at *10 (M.D. La. Nov. 12, 2024).

Defendants point to additional purported reasons that Dr. Sbicca's testimony is supposedly not reliable: (i) he relied on declarations from people who are not currently assigned to the Farm Line, Sbicca Br. 19–20; (ii) he did not compare the Farm Line to other forms of hard labor or other work programs at Angola, *id.* at 18–19; and (iii) he relies on speculation in drawing his conclusions, *id.* at 17–20. Boiled down to its essence, each argument amounts to Defendants' critique of the bases, sources, and underlying facts of Dr. Sbicca's opinions. These unfounded critiques go to the weight afforded to Dr. Sbicca's testimony but are not a basis to limit his testimony. *See 14.38 Acres of Land, More or Less Situated in Leflore Cnty., State of Miss.*, 80 F.3d at 1079.

Defendants next fault Dr. Sbicca for referencing declarations and narratives from other lawsuits and involving other prisons. This, again, provides no basis for excluding his testimony. Dr. Sbicca inspected Angola's Farm Line first hand and interviewed numerous men who were literally working in the fields at that time. Ex. 2, Sbicca Rep. ¶ 87; Ex. 6, Sbicca Dep. 50:16–21. Moreover, as Defendants' own authority makes clear, such a criticism goes to the probative value of the expert's conclusions and is "more appropriately address[ed] . . . on cross-examination at trial." *DHI Grp.*, 397 F. Supp. 3d at 937.

Defendants' argument that Dr. Sbicca does not opine on other forms of hard labor, other work programs at Angola, or other prison agricultural labor programs in the United States similarly fails. As explained above, Dr. Sbicca undertook a rigorous analysis of academic literature, secondary sources, and primary source materials to reach his conclusions about the Farm Line, Ex. 6, Sbicca Dep. 23:19–24, 31:6–20, 41:25–42:24, and he testified that drawing conclusions about the other work programs at Angola and hard labor elsewhere in the country would require the same level of analysis. *See id.* 56:1–6. Just as attacks on the underlying facts or reliability of

the facts go to the probative value of the expert testimony, whether an expert undertakes to analyze alternatives in reaching his conclusion goes to the weight of the evidence, not its admissibility. *Orthoflex, Inc.* v. *ThermoTek, Inc.*, 986 F. Supp. 2d 776, 810 (N.D. Tex. 2013) (expert testimony that did not include analysis of all alternatives not excluded because the defendants' objections "go to the weight, not admissibility, of his testimony and can be addressed through vigorous cross-examination and the presentation of contrary evidence"). In this regard, Defendants' reliance on *Watkins* v. *Telsmith* is misplaced. 121 F.3d 984, 992 (5th Cir. 1997). In that case, the plaintiffs' expert was a mechanical engineer who testified about the design of a conveyor but did not test any conveyor designs and did not investigate designs of other conveyors. Although the court acknowledged that alternatives need not "always be tested by a plaintiff's expert," that alone did not "save [the expert's] testimony from its lack of empirical support." *Id.* Here, by contrast, there is simply no basis for Defendants to argue that Dr. Sbicca's report lacks empirical support given the breadth of sources and personal observations he relied upon in preparing his opinion.

Defendants' blanket argument that Dr. Sbicca's opinions are speculative reflects a fundamental misunderstanding of the nature of his opinions. Dr. Sbicca draws on his expertise and observations of the Farm Line to provide an objective, sociological analysis of the Farm Line with the context of the development of prison agricultural labor . *See McKinney* v. *Superior Van & Mobility, LLC*, 2021 WL 1699885, at *1 (E.D. La. Apr. 29, 2021) (expert testimony was not speculative *ipse dixit* where it was based on "objective, observable" characteristics). In any event, even if Dr. Sbicca's testimony were speculative—which it is not—courts in this district have held that, in a bench trial, questions of *ipse dixit* are more appropriately addressed at trial. Because the "Court is the trier of fact . . . jury confusion is not a consideration. In the context of a bench trial,

vigorous and skillful cross examination serves as an adequate safe guard" against any challenges to weight. *Lewis* v. *Cain*, 2017 WL 4782653, at *6 (M.D. La. Oct. 23, 2017).

## III.    DRS. HAMMONDS' AND SBICCA'S TESTIMONY WILL ASSIST THE COURT IN ITS ROLE AS FINDER OF FACT

Expert testimony must be "relevant to the facts at issue in the case." *See, e.g.*, *Trinity Med. Servs., L.L.C.* v. *Merge Healthcare Sols., Inc.*, No. 17-CV-592-JWD-EWD, 2020 WL 1307045, at *4 (M.D. La. Mar. 19, 2020). That "low" threshold is met wherever "the expert's opinion will assist the trier of fact." *Puga* v. *RCX Sols., Inc.*, 922 F.3d 285, 293–94 (5th Cir. 2019); *see Bocanegra*, 320 F.3d at 584; *Labouliere* v. *Our Lady of the Lake Hosp., Inc.*, 2020 WL 1317732, at *3 (M.D. La. Mar. 20, 2020).

### A.    Dr. Hammonds' Opinions Will Assist the Court as Factfinder

Dr. Hammonds' opinions are plainly relevant to this case. Plaintiffs allege that the Farm Line is unconstitutional, in part, because Defendants leverage the legacy of chattel slavery to add punishment and degradation on top of hard-labor sentences. Defendants dispute this, putting directly at issue the manner in which Defendants, through the Farm Line, harness the legacy of slavery in order to punish.

From the perspectives of epidemiology, public health, history of science, history of medicine, and African American studies, Dr. Hammonds speaks directly to the crux of Plaintiffs' allegations. Specifically, she opines that the Farm Line mimics and relies upon the history and legacy of chattel slavery, and that Black Americans' lived experience of that legacy displays a strong correlation with disparate negative health outcomes. "This is an area about which most lay persons would not be knowledgeable and where testimony surrounding this issue would require scientific, technical, or other specialized knowledge in order to help the trier of fact understand the evidence and determine a fact in issue." *Rushing*, 2022 WL 4545612, at *9. Likewise, and again

unlike that of a lay witness, Dr. Hammonds' deep understanding of the history and social impact of chattel slavery will assist the Court in connecting the Farm Line to that historical institution and its legacy. *See Roake*, 2024 WL 4751509, at *10 ("the elucidation of complex social and historical issues by experts in the social sciences valuably informs the legal analysis") (cleaned up).

### B.  Dr. Sbicca Will Assist the Court as Factfinder

Dr. Sbicca's opinions and testimony are plainly relevant to the facts at issue in this case. He will testify about the history and legacy of chattel slavery and its connection to prison agricultural programs and the Farm Line, and will thereby assist the Court in situating the Farm Line within historical and contemporary prison agricultural labor practices. Dr. Sbicca's opinions implicate at least two key issues in this litigation—first, whether there is a historical connection between chattel slavery and the practice of the Farm Line and second, whether the Farm Line comports with contemporary standards of decency. *See Helling* v. *McKinney*, 509 U.S. 25, 36 (1993) (an Eighth Amendment violation will be found in prison conditions case where a plaintiff can "show that the risk of which he complains is not one that today's society chooses to tolerate"). This, too, will assist the Court as factfinder.

## IV.  DRS. HAMMONDS AND SBICCA WILL NOT OFFER LEGAL CONCLUSIONS

Cherry-picking various phrases taken out of context and mischaracterizing those statements, Defendants identify purportedly impermissible legal conclusions that Drs. Hammonds and Sbicca are expected to offer at trial. Hammonds Br. 8–10; Sbicca Br. 9–13. Defendants' complaints with respect to most of those statements, however, are more properly understood as reliability or relevancy objections and fail on the grounds set forth above. Other complaints fail because they are simply misstatements of fact.

For example, Defendants object to Dr. Hammonds' opinion that the Farm Line poses a substantial risk of physical and psychological harm because, supposedly, (i) she does not have a

factual basis for testimony that men working the Farm Line are compelled to work at gunpoint; and (ii) it is internally inconsistent with respect to Angola's plantation past and whether that past impacts people who are not Black. Hammonds Br. 8–10. But Dr. Hammonds' testimony is supported by the evidentiary record. *See, e.g.*, Ex. 9, Sylvester Dep. 14:24–21:4; Ex. 10, Jones Decl. And, her opinions are not internally inconsistent. Defendants argue that Dr. Hammonds' equivocal response to their poorly worded deposition question, "Does that [risk of harm] apply equally to white inmates?" somehow means she no longer believes that there is not some risk of harm to white men who are placed into conditions simulating slavery. It clearly does not, and Defendants are welcome to follow up on their line of questioning at trial. Defendants also suggest that Dr. Hammonds is indifferent to Angola's location on the grounds of former slave plantations. Hammonds Br. 9. In fact, she is quite clear that this fact is material but not determinative of her opinion. Ex. 8, Hammonds Dep. 13:19–14:2, 17:17–18:4.

Defendants object to Dr. Sbicca's opinions for reasons already dispensed with, e.g., that they are too general and do not address supposed counterevidence. As noted, these challenges can be raised on cross-examination.

The remaining complained-of statements—for example, Dr. Hammonds' description of the Farm Line as a "continuation and progeny of the plantation" and Dr. Sbicca's description of the Farm Line as "harsh" and "anachronistic"—are simply not legal conclusions.

In any case, Defendants' purported concern about legal opinions being offered is premature and unfounded. Plaintiffs recognize the well-established limits of expert testimony and do not intend to rely upon Dr. Hammonds or Dr. Sbicca to offer any legal conclusions. If Defendants believe any testimony elicited at trial transgresses those limits, they should raise their objections at that time. *See Hunters Run Gun Club, LLC* v. *Baker*, 2019 WL 2516876, at *2 (M.D. La. June

18, 2019) (Dick, C.J.); *Holcombe* v. *United States*, 2021 WL 4888337, at \*4 (W.D. Tex. Mar. 5, 2021).  More fundamentally, "in what will be a bench trial, the Court is capable of sifting a valid expert opinion from an impermissible legal conclusion and evaluating the merits and shortcomings of each expert's testimony." *Smothered Covered, L.L.C.* v. *WH Cap., L.L.C.*, 2024 WL 4643876, at \*5 (E.D. La. Oct. 31, 2024); *compare with Nale* v. *Finley*, 505 F. Supp. 3d 635, 640 (W.D. La. 2020) (Excluding expert statements "*because they are likely to confuse the jury*, which could interpret Wild's 'indifference' and reckless disregard statements to actually mean deliberate indifference.") (emphasis added).

Moreover, expert testimony is not excluded simply because it touches upon a legal topic. The "touchstone for distinguishing opinion on ultimate issues and impermissible legal conclusions is helpfulness to the [factfinder]." *Accresa Health LLC* v. *Hint Health Inc.*, 2020 WL 6325731, at \*7 (E.D. Tex. Feb. 26, 2020).  The "task for the court is to ask whether the expert's opinion bears on some factual inquiry or whether [it bears] solely on the legal conclusions that are urged." *Olivier* v. *Exxon Mobil Corp.*, 596 F. Supp. 3d 606, 611 (M.D. La. 2022).

Courts in this circuit routinely admit expert testimony when the expert relies on "independent factual conclusions or independently develop[s] . . . facts." *Terrebone Parish NAACP* v. *Jindal*, 2015 WL 6157912, at \*3 (M.D. La. Oct. 20, 2015); *see also City of Allen, Texas* v. *Time Warner Cable Texas, LLC*, 2021 WL 8053616, at \*4 (W.D. Tex. Nov. 1, 2021) (expert opinions that "related to facts of the case" were not impermissible legal conclusions).  In *Accressa Health* v. *Hint Health*, the district court found that an expert's opinion was helpful to the factfinder because the expert provided independent factual conclusions that allowed the court to compare two software platforms.  2020 WL 6325731, at \*7.  By contrast, in *Terrebone Parish NAACP*, the district court excluded expert testimony that did not rely on "independent factual conclusions or

independently develop any facts," noting that a "proffered expert [must] bring more to the [factfinder] than the lawyers can offer in argument."  2015 WL 6157912, at *3.

Defendants' own authority—none involving bench trials—demonstrates the same.  In each case they cite, the court excluded expert testimony because the experts had not developed any independent factual basis for their opinions.  *See First United Fin. Corp.* v. *U.S. Fid. & Guar. Co.*, 96 F.3d 135, 136 (5th Cir. 1996) ("The expert testimony was, likewise, properly rejected by the court.  Their opinion of dishonesty goes beyond the scope of expertise. . . Their conclusion will not substitute for evidence of dishonesty."); *Matthews* v. *Ashland Chemical*, 770 F.2d 1303, 1311 (5th Cir. 1985) ("Matthews [asked] his expert to tell the jury what result to reach after having been told all of the facts possibly relevant to the case" but Rule 704 is not "intended to allow a witness to give legal conclusions.  This is what Matthews was attempting."); *Nale* v. *Finley*, 505 F. Supp. 3d 635, 640 (W.D. La. 2020) (expert nurse opined that conduct at issue was "indifference to serious medical needs" and "reckless disregard" without providing sufficient factual bases).

By contrast, Drs. Hammonds' and Sbicca's opinions should be admitted because Dr. Hammonds and Dr. Sbicca developed and rely upon independent factual conclusions that will assist the Court in reaching its own determination about the law at issue in this case.  Consistent with the expert's testimony in *Accressa*, Drs. Hammonds' and Sbicca's testimony will provide factual information about the connections between U.S. chattel slavery and conditions on the Farm Line, which will assist the Court in adjudicating Plaintiffs' claims.  And, unlike in *Terrebone*, both Drs. Hammonds and Sbicca have independently developed ample factual conclusions and will present facts for the Court that lawyers simply cannot provide in argument.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court deny in their entireties Defendants' motions to exclude or limit Drs. Hammonds' and Sbicca's testimony.

24

Respectfully Submitted,
Dated:  January 10, 2025

THE PROMISE OF JUSTICE INITIATIVE

*/s/ Lydia Wright*
Lydia Wright, La. Bar No. 37926
Samantha Bosalavage, La. Bar No. 39808
Kara Crutcher (PHV) IL Bar No. 6337639
1024 Elysian Fields Avenue
New Orleans, LA 70117
Tel: (504) 529-5955
lwright@defendla.org
sbosalavage@defendla.org
kcrutcher@defendla.org

RIGHTS BEHIND BARS

*/s/ Amaris Montes*
Amaris Montes (PHV) MD Bar No. 2112150205
416 Florida Avenue NW, Ste. 26152
Washington, D.C. 20001
Tel: (202) 455-4399
amaris@rightsbehindbars.org

PAUL, WEISS, RIFKIND, WHARTON
  & GARRISON LLP

*/s/ Joshua Hill Jr.*
Joshua Hill Jr. (PHV) NY Bar No. 4297826
Jeremy A. Benjamin (PHV) NY Bar No. 4770277
Michael McGregor (PHV) NY Bar No. 5510490
Arielle B. McTootle (PHV) NY Bar No. 5993217
Ricardo R. Sabater (PHV) NY Bar No. 5933379
Leah R. Weiser (PHV) NY Bar No. 6027601
Chizoba D. Wilkerson (PHV) NY Bar No. 5903943
1285 Avenue of the Americas,
New York, NY 10019-6064
Tel: (212) 373-3000
jhill@paulweiss.com
jbenjamin@paulweiss.com
mmcgregor@paulweiss.com
amctootle@paulweiss.com
rsabater@paulweiss.com
lweiser@paulweiss.com
cwilkerson@paulweiss.com

*Attorneys for Plaintiffs and the Proposed Classes*

25