# Exhibit 6

```
 1              UNITED STATES DISTRICT COURT
 2               MIDDLE DISTRICT OF LOUISIANA
 3
 4
 5
 6   VOICE OF THE EXPERIENCED,      CIVIL ACTION
     A MEMBERSHIP ORGANIZATION      NO.3:23-CV-1304
 7   ON BEHALF OF ITSELF AND
     ITS MEMBERS; ET AL
 8
     VS.                            JUDGE BRIAN A.
 9                                  JACKSON
     JAMES LEBLANC, IN HIS OFFICIAL
10   CAPACITY AS SECRETARY OF THE   MAGISTRATE JUDGE
     LOUISIANA DEPARTMENT OF PUBLIC ERIN WILDER-DOOMES
11   SAFETY AND CORRECTIONS; ET AL
12
13
14                      Testimony of
15                   DR. JOSHUA SBICCA
16   taken on Wednesday, September 18, 2024, before
17   Caroline D. Escude', Certified Court Reporter in
18   and for the State of Louisiana, via Zoom
19   Videoconferencing.
20
21
22         COURT REPORTERS OF LOUISIANA, L.L.C.
            9522 Brookline Avenue, Suite 217
23            Baton Rouge, Louisiana 70809
        PHONE (225) 201-9650 * FAX (225) 201-9651
24         E-Mail:  depos@courtreportersla.com
25
```

Page 1

## INDEX

| | Page |
|---|---|
| Caption | 1 |
| Appearances | 3 |
| Agreement of Counsel | 4 |
| Examination | |
|   BY MR. BLANCHFIELD | 5 |
| Reporter's Certificate | 63 |

* * * * *

Exhibits:
  (None.)

Page 2

## STIPULATION

It is stipulated and agreed by and among Counsel that the deposition of DR. JOSHUA SBICCA, on Wednesday, September 18, 2024, is hereby being taken under the Federal Rules of Civil Procedure for all purposes as permitted under law.

The witness reserves the right to read and sign the deposition. The original is to be delivered to and retained by Mr. Andrew Blanchfield for proper filing with the Clerk of Court.

All objections, except those as to the form of the questions and/or the responsiveness of the answers, are reserved until the time of the trial of this cause.

* * * * *

Caroline D. Escude', Certified Court Reporter in and for the State of Louisiana, officiated in administering the oath to the witness.

Page 4

---

APPEARANCES: (All via Zoom Videoconferencing)

Representing the Plaintiffs:

  THE PROMISE OF JUSTICE INITIATIVE
  1024 Elysian Fields Avenue
  New Orleans, Louisiana 70117
  BY: MS. LYDIA A. WRIGHT
      MS. KARA CRUTCHER

  and

  PAUL WEISS RIFKIND WHARTON & GARRISON, LLP
  1285 Avenue of the Americas
  New York, New York 10019

  BY: MR. JEREMY A. BENJAMIN
      MS. ARIELLE B. MCTOOTLE
      CHIZOBA WILKERSON

Representing the Defendants:

  LIZ MURRILL, ATTORNEY GENERAL
  OFFICE OF THE ATTORNEY GENERAL
  P. O. Box 1151
  Baton Rouge, Louisiana 70821

  BY: MR. ANDREW BLANCHFIELD
    Special Assistant Attorney General
    KEOGH, COX & WILSON, LTD.
    701 Main Street
    Baton Rouge, Louisiana 70802

Also Present:
  Christopher Bilicic, Law Clerk
  Paul Weiss

Reported by:
  Caroline D. Escude', Certified
  Court Reporter No. 91182 in and
  for the State of Louisiana

Page 3

---

DR. JOSHUA SBICCA
Colorado State University, Department of Sociology, Fort Collins, Colorado 80523, having been first duly sworn, was examined and testified as follows:

* * * * * * * * * * * * * * * * * * * *

(Mr. Bilicic was not present at the commencement of the deposition.)

EXAMINATION

BY MR. BLANCHFIELD: (Beginning at 9:02 AM)

Q. Good morning, Doctor. I'm Drew Blanchfield. I'm here to take your deposition today. Your last name is pronounced Sbicca?

A. Yeah, Sbicca.

Q. Okay. Thank you. Doctor, have you ever given a deposition before?

A. I have not. This is my first.

Q. Okay. Then let me just go over a couple of quick ground rules. You've been put under oath here. I'm asking you questions about your role as an expert witness in this matter. The young lady you just saw is taking down everything that we say so we try not to talk at the same time to help her out. So let me get my whole question out before you answer and I'll let you finish your whole answer before we move on to the next question.

Page 5

2 (Pages 2 - 5)

1    It's helpful if we can use yeses and noes
2  as opposed to the uh-uhs and uh-huhs that we often
3  use in conversation.  So, if you say that from time
4  to time, I might remind you that we need to say yes
5  and no.
6           If you don't understand any of my
7  questions or they don't make sense to you or you're
8  confused or you think I'm confused, just tell me
9  and I'll try to rephrase them so we can understand
10 each other, okay?
11   A.   You got it.
12   Q.   I don't expect to be terribly long today,
13 but if at any time you want to take a break for any
14 reason you're more than welcome to do that.
15          Can you state for us your full name,
16 please?
17   A.   My name is Joshua Sbicca.
18   Q.   And where are you located today, sir?
19   A.   I'm located in Fort Collins, Colorado.
20   Q.   You are in -- are you in your office?
21   A.   I'm in my home office.
22   Q.   Okay.  Is anyone in there with you?
23   A.   No.
24   Q.   My understanding is that currently you are
25 an associate professor in the Department of

Page 6

1  Sociology at Colorado State University?
2    A.   Yes.
3    Q.   And you have been in that position since
4  2020?
5    A.   I have been at Colorado State University
6  since 2014.  I was hired as an assistant professor
7  and then I was promoted to an associate professor
8  in 2020.
9    Q.   You finished your PhD in Florida; is that
10 correct?
11   A.   At the University of Florida.
12   Q.   And then you hired on with Colorado State
13 University?
14   A.   Yes.
15   Q.   And Colorado is a state university; is
16 that correct?
17   A.   Correct.  It's a public university.
18   Q.   Okay.  And you -- so are you employed by
19 the State of Colorado?
20   A.   I guess technically I am.
21   Q.   Now, you mentioned -- your CV also
22 references you being the director of the Prison
23 Agriculture Lab, Colorado State University, 2021 to
24 the present.  I assume that the Prison Agriculture
25 Lab is part of the university?

Page 7

1    A.   It's a -- it's a lab that I run and
2  codirect with a colleague of mine who is also at
3  Colorado State University in our capacities as
4  professors.
5    Q.   Okay.  And you're a salaried employee of
6  Colorado State University?
7    A.   Yes.
8    Q.   Is there any distinction made with respect
9  to income you receive as an associate professor
10 versus being the director of the Prison Agriculture
11 Lab?
12   A.   I don't receive separate income as the
13 director of the lab.  The lab is run under my --
14 the expectation to produce research as a professor
15 at CSU.
16   Q.   I understand.  And are you currently
17 teaching any classes at the university?
18   A.   This semester I'm teaching one course, but
19 I teach many other courses as well.
20   Q.   Okay.  And what course are you teaching
21 this semester?
22   A.   It's an upper division undergraduate
23 course called Food Agriculture and Global Society.
24   Q.   Is this the first semester you have taught
25 that class?

Page 8

1    A.   No.  I have taught that -- this class -- I
2  believe this is my fourth semester.
3    Q.   What other classes do you teach in other
4  semesters?
5    A.   I teach a large introductory section of a
6  course called Social Problems.  I teach another
7  upper division undergrad course called Food
8  Justice, another upper division undergraduate
9  course called Social Movements.  And I have also
10 taught the capstone seminar in our department just
11 for graduating seniors.  And then I teach a
12 graduate seminar called the Sociology of Food
13 Systems and Agriculture.
14   Q.   Can you give me that last one?  I missed
15 the last one.
16   A.   Sure.  The Sociology of Food Systems and
17 Agriculture.
18   Q.   And that is a graduate level course?
19   A.   Correct.
20   Q.   What is the capstone seminar?
21   A.   The capstone seminar is a seminar for
22 professionalization for our graduating seniors.
23          (Mr. Bilicic joined the Zoom.)
24 BY MR. BLANCHFIELD:
25   Q.   Okay.  And what is -- what is Food

Page 9

3 (Pages 6 - 9)

```
 1  Justice, if you could define that for me?
 2     A.  Sure.  Really simply it's the idea that
 3  people have a right to healthy and culturally
 4  appropriate food that is sustainably and ethically
 5  grown.
 6     Q.  How many students are at the university?
 7     A.  Good question.  It's in the neighborhood
 8  of 30,000.  I don't have the exact number, but it's
 9  in the neighborhood of that.
10     Q.  Okay.  Do you do anything else
11  employment-wise other than being an associate
12  professor and director of the Prison Agriculture
13  Lab?
14     A.  No.
15     Q.  Okay.  Tell me a little bit about the
16  Prison Agriculture Lab.  What is that?
17     A.  So the lab emerged in 2021 as the result
18  of a fellowship I received through the School of
19  Global Environmental Sustainability at CSU and the
20  original proposal for the project that ultimately
21  became the lab was to understand the scale and
22  scope of prison farming operations in the United
23  States.
24        And in particular we were interested in
25  what was happening where prison farming was taking
```
Page 10

```
 1  place, the reasons for it.  And in the course of
 2  that fellowship the university or I should say
 3  SoGES, the School of Global Environmental
 4  Sustainability, provided resources to do that
 5  initial research.
 6        So I hired graduate students and
 7  undergraduate students and I worked with a post-doc
 8  to build out a data set that identified where
 9  prison agriculture is taking place and their
10  reasons for it.  And in the course of pulling that
11  all together decided that creating a lab would be a
12  nice way to formalize the work that we were doing
13  and then continue to build off of the initial data
14  set that we built on that.
15     Q.  Okay. Is it fair to say that the Prison
16  Agriculture Lab is predominantly focused on
17  research?
18     A.  Correct.  It's predominately research and
19  science translation, so doing primary research and
20  then creating translations of that research that
21  are acceptable to other academics and the public.
22     Q.  And in conjunction with your work as the
23  director are you familiar with prison agriculture
24  in all 50 states?
25     A.  As a result of doing this research I have
```
Page 11

```
 1  a working knowledge of prison agriculture across
 2  the country.
 3     Q.  I saw somewhere in your report that over
 4  600 prisons in the United States actually have
 5  prison agriculture?
 6     A.  That's correct.
 7     Q.  Including your state, Colorado?
 8     A.  That's correct.  At the time of our data
 9  collection, which was between 2019 and 2021, we
10  identified extensive prison operations -- excuse me
11  -- prison farming operations in Colorado as well,
12  uh-huh.
13     Q.  How many prisons in Colorado have prison
14  agriculture?
15     A.  I don't have that number right off the top
16  of my head, but at the time of their data
17  collection it was somewhere in the neighborhood of
18  seven or eight.
19     Q.  And does that include vegetable farming?
20     A.  Correct.  Yes.
21     Q.  And are those jobs voluntary or
22  nonvoluntary in Colorado?
23     A.  The State requires that incarcerated
24  people work, so there's work assignments.
25     Q.  And with respect to the prisons in
```
Page 12

```
 1  Colorado that have agriculture, are they consistent
 2  or are they different with respect to, you know,
 3  what they produce, how they pay inmates or not pay
 4  inmates?
 5     A.  Can you repeat the question?  I'm not --
 6     Q.  Yeah.  Is there a consistency in the
 7  number of prisons in Colorado with respect to how
 8  they handle prison agriculture?
 9     A.  Like, in terms of the different kinds of
10  operations?  Like, are they the same kind of
11  agriculture or, like, workplace conditions?  Like,
12  what exactly?
13     Q.  Yeah, pretty much -- and it's a general
14  question.  I mean the crops that they grow, the
15  manner in which they do it, the way they assign
16  jobs, I mean, is there some consistency or are they
17  just very different?
18     A.  My understanding is that most of the jobs
19  -- most of the prison agriculture jobs are run out
20  of Colorado Correctional Industries and that
21  Colorado is exceptional in some respects compared
22  to many other states in that it's a very -- it was
23  historically a very diversified agricultural
24  operation, so everything from tilapia farming to
25  raising goats, working in orchards.  There's even
```
Page 13

some viticulture that CCI was involved with.
So quite unusual, actually, compared to many places across the US and I should note that in the case of Colorado it's the exception to have a prison industry job. So to be working for CCI is the exception, not the rule.

Q. What is the prison population, the numbers in Colorado, if you know?

A. I don't have that number off the top of my head.

Q. Do you have any idea of how many incarcerated individuals in Colorado work in prison agriculture?

A. If it's consistent with some of the national statistics, then the best working numbers that we have is that it's roughly two percent of people who work in prison agricultural operations in the US, although the number is likely far higher in terms of the churn that these jobs tend to produce.

But we know that nationally there's -- that if you count the prison population where there are prisons with agriculture, there's around 835,000 people in -- like, in total in the prisons where there's prison agricultural operations.

Page 14

Q. All right. Let me make sure I understand that. There's 800- -- approximately 835 prisoners who work --

A. Not who -- not who work. It's 835,000 prisoners, like, the overall population in -- let me try to say this another way. In prisons where there are agricultural operations, the overall population is 835,000 people. Not every single one of those people is working in these operations. Does that make sense?

Q. That means sense.
A. Okay.
Q. That makes sense. And then this two-percent figure, are you saying that two percent or higher of that population actually work in agriculture?
A. Correct.
Q. Okay. Now, with respect to Colorado prisons, are their agricultural products sold on the open market or are they used to feed the inmates?
A. Many of them are sold on the open market.
Q. And are some used to feed the inmates?
A. Historically there have been products that have been used to feed incarcerated people, but CCI

Page 15

is a prison industry. It historically has been charged with making money and so in order to do that they have to sell their products on the open market.

Q. And CCI is Colorado Corrections --
A. Colorado Correctional Industries.
Q. Correctional Industries. Is that a private entity?
A. Yeah, it is, technically, but it's a private -- it's a private entity that is charged with supporting the mission of the Colorado Department of Corrections, so -- in the form of essentially financial resources.
Q. It's a -- it's a -- is it a for-profit corporation?
A. That's -- that's a good question. In terms of what its actual legal designation is, I don't know for sure.
Q. And do you have any idea or estimate that you can give me with respect to what percentage of agricultural products are sold on the open market versus being used to feed inmates?
A. I -- I don't have those numbers.
Q. The Colorado inmates who are working in prison agriculture, are they compensated?

Page 16

A. They are compensated, yes.
Q. And what is the general rate of compensation, if you know?
A. I don't have the exact number, but I know that it's varied over time.
Q. Is it less than a dollar an hour?
A. I believe it's more than a dollar an hour.
Q. Is there -- do you know if we can get that information off the CCI website? I assume there's a website for CCI?
A. CCI has a website, but it's really changed.
         MS. MCTOOTLE:
            Objection.
A. Since the time of our data collection a lot of the agricultural operations have ended. So whether or not there are wage numbers, I'm not sure, but you can very easily go back and find annual reports that CCI produces that have all kinds of information.
BY MR. BLANCHFIELD:
Q. Okay. And you mentioned that a lot of the agricultural activities have ended?
A. To my knowledge, yes.
Q. That's in the Colorado prison system?

Page 17

5 (Pages 14 - 17)

```
 1    A.   That's correct.
 2    Q.   So are they no longer growing crops?
 3         MS. MCTOOTLE:
 4              Objection, relevance.  You
 5    can answer.
 6    A.   Okay.  My understanding is that there is
 7    one more farm or I should say, yeah, one farm that
 8    is still in operation, but compared to, I guess,
 9    the scope of previous operations it's far less.
10    BY MR. BLANCHFIELD:
11    Q.   And when did that happen?  When did --
12    when did the activities either --
13    A.   They started -- I apologize -- they
14    started to taper off after the pandemic.
15    Q.   And do you have an understanding of why
16    they tapered off after the pandemic?
17         MS. MCTOOTLE:
18              Objection.  This goes -- you
19    know, Dr. Sbicca's report is not about the
20    operations in Colorado, so I ask that we get to his
21    report.
22         MR. BLANCHFIELD:
23              Look, look, you can object to
24    the form of my question, but you can't object to
25    that and you can't object to relevance and I'm
                                              Page 18
```

```
 1    certainly going to ask him all about Colorado.
 2    BY MR. BLANCHFIELD:
 3    Q.   Doctor, could you -- could you continue?
 4    A.   Can you restate your question, please?
 5    Q.   Yeah.  You mentioned that the farm
 6    operations started to decrease after the pandemic
 7    and I asked you if you have an understanding as to
 8    why.
 9    A.   I have not spoken with anybody within CCI
10    to know exactly why.
11    Q.   Was there -- was there, like, a movement
12    or any pressure on CCI to curtail prison
13    agriculture?
14    A.   Again, I don't know with any certainty if
15    there was direct pressure to end those specific
16    practices.
17    Q.   And the farming operations that are
18    continuing in Colorado, do you know which prison
19    they're continuing at?
20    A.   I don't remember the exact one, but CCI
21    usually, on their website, provides that
22    information.
23    Q.   And do you have any idea of what kind of
24    agricultural products they're involved with that
25    are still ongoing?
                                              Page 19
```

```
 1    A.   My understanding is that it's some kind of
 2    field crop, but I don't remember exactly which one.
 3    Q.   Okay.  And with that decrease is CCI still
 4    in existence?
 5    A.   It is.
 6    Q.   Doctor, is it your understanding that you
 7    have been retained by the plaintiffs' attorneys in
 8    this matter to function as an expert witness?
 9    A.   Yes.
10    Q.   Have you ever been an expert witness in
11    litigation before?
12    A.   No.
13    Q.   Have you ever testified in court?
14    A.   No.
15    Q.   Do you have an understanding as to what
16    field of expertise you will be tendered in if you
17    do testify at this trial?
18    A.   Yes.
19    Q.   And what is that?
20    A.   The history and sociology of prison
21    agriculture and prison labor.
22    Q.   Okay.  Do you know when you were retained
23    in this matter?
24    A.   I was retained about a year ago.
25    Q.   And what was your understanding of the
                                              Page 20
```

```
 1    purpose of your retention?
 2    A.   To provide an expert report that could
 3    speak to the history and sociology of prison
 4    agriculture in the United States.
 5    Q.   And you actually visited LSP?
 6    A.   I did.
 7    Q.   And that -- by that I mean Louisiana State
 8    Penitentiary, correct?
 9    A.   Correct.
10    Q.   Now, I think that was in July of this
11    year?
12    A.   Uh-huh.  Yes.
13    Q.   And have you been there any other time
14    besides July of this year?
15    A.   No.
16    Q.   Have you visited other prisons in other
17    states?
18    A.   Yes, I have.
19    Q.   Okay.  Tell me, what prisons have you
20    visited?
21    A.   I visited -- my gosh, this is escaping me
22    right now -- a prison in Florida.  I should
23    remember this.  The name of the prison is escaping
24    me, I apologize, but I visited one prison in
25    Florida.
                                              Page 21
```

| | |
|---|---|
| 1  Q. Okay. Do you know -- well, what was the<br>2  purpose of that visit?<br>3  A. The purpose was to visit an in-prison<br>4  education program through Stetson University.<br>5  Q. And what was your affiliation with<br>6  Stetson?<br>7  A. I don't have a direct affiliation, but I<br>8  was on sabbatical living in Florida and a professor<br>9  reached out to me who was running that program.<br>10 And the course that was being offered in prison had<br>11 to do with food and agriculture and so they wanted<br>12 me to come and visit and speak about food and<br>13 agriculture in prison in the education program.<br>14 Q. I see. Have you visited any of the<br>15 Colorado prisons?<br>16 A. I have not.<br>17 Q. So the only two prisons you have visited<br>18 are LSP and the prison in Florida?<br>19 A. Correct.<br>20 Q. Did this Florida have a prison<br>21 agricultural program?<br>22 A. The prison wanted to start some gardens.<br>23 Q. At the time that you went there -- well,<br>24 when was that, when you were on your sabbatical?<br>25 A. This was 2020, like, into 2021.<br>Page 22 | 1  review in this matter?<br>2  A. All of the documents that were provided to<br>3  me from Paul Weiss, and then in conversation making<br>4  sure I had information that could educate me on<br>5  what was being discovered.<br>6  Q. Okay. And have you read any of the other<br>7  expert reports in this matter?<br>8  A. I have not.<br>9  Q. Have you discussed this case with any of<br>10 the experts in this matter?<br>11 A. I have not.<br>12 Q. Have you discussed this case with anyone<br>13 other than the attorneys who retained you?<br>14 A. I have not.<br>15 Q. Have you published anything that<br>16 references LSP?<br>17 A. Like, related to this case?<br>18 Q. Well, let's -- let's take it one at a<br>19 time. Let's -- yeah, related to this case.<br>20 A. No.<br>21 Q. Okay. And what about just in general?<br>22 A. I -- no.<br>23 Q. Okay. Are you familiar with any Louisiana<br>24 laws referencing that when an individual is<br>25 convicted of a felony he is sentenced to hard<br>Page 24 |
| 1  Q. Okay. And at that time did the Florida<br>2  prison already have gardens or were they just<br>3  thinking about starting?<br>4  A. They were thinking about starting. That<br>5  was my recollection.<br>6  Q. And was that discussed during your visit?<br>7  A. It was.<br>8  Q. And did they ask you for advice or<br>9  anything like that on startup or --<br>10 A. Not that I recall.<br>11 Q. Do you know if, in fact, that Florida<br>12 prison now has an agricultural program?<br>13 A. I don't know, actually.<br>14 Q. Okay. So I have your report; I have your<br>15 CV; I have your work cited. Since you've prepared<br>16 your report, Doctor, have you done any additional<br>17 work on this case?<br>18 A. No, I have not.<br>19 Q. And I see a list of VOTE V LeBlanc case<br>20 documents. There's a ruling from the court, a<br>21 bunch of declarations, some ARPs, some e-mails,<br>22 some depositions. Is that the full list of what<br>23 you have reviewed in this matter?<br>24 A. It is.<br>25 Q. And who decided what documents you would<br>Page 23 | 1  labor?<br>2  A. I am familiar with that law.<br>3  Q. Do you have an understanding of what the<br>4  definition of hard labor is?<br>5  A. I have not seen hard labor defined<br>6  anywhere.<br>7  Q. Have you, in your work, come to arrive at<br>8  an understanding or an opinion as to what hard<br>9  labor means in that context?<br>10 A. My understanding of hard labor is that the<br>11 labor is forced and physical.<br>12 Q. Forced and physical, is that what you<br>13 said?<br>14 A. Correct.<br>15    (Mr. Bilicic left the Zoom.)<br>16 BY MR. BLANCHFIELD:<br>17 Q. Thank you. And in light of all of the<br>18 research you have done, have you come to a<br>19 conclusion as to what you believe the purpose of<br>20 incarceration is?<br>21 A. In the historical context in the United<br>22 States, as I've spoken to in my report, the purpose<br>23 of an incarceration has been to discipline deviant<br>24 individuals and most commonly this has meant<br>25 disciplining people to become workers within the<br>Page 25 |

```
 1  larger economy.  And the purpose of incarceration
 2  has toggled between more rehabilitative than
 3  punitive ways of accomplishing those goals, and
 4  currently incarceration is punitive in its approach
 5  to disciplining individuals.
 6     Q.   Okay.  Do you have an opinion as to what
 7  the purpose of incarceration should be?
 8     A.   I can speak to the sociological and
 9  historical understanding of what incarceration was
10  meant to do, but in terms of what it should be is
11  beyond the scope of my report.
12     Q.   Okay.  Do you, as an individual, have an
13  opinion on that?
14     A.   My views are guided by scientific research
15  and sociological understandings of how
16  incarceration has come to be which informs the way
17  I look at the prison system and incarceration
18  itself.
19     Q.   Okay.  And can you share with me those --
20  the individual views that you have?
21     A.   Much like I just mentioned, these views of
22  incarceration is that it's a system to discipline
23  people that are deviant from prevailing norms, most
24  commonly individuals who are economically destitute
25  or socially marginalized, that the prison system is
                                                  Page 26
```

```
 1  a system to control and contain and aim to correct
 2  those individuals in line with dominant
 3  expectations.  Those dominant expectations would be
 4  -- for instance, would be a worker.
 5     Q.   Okay.  I've read a number of articles
 6  discussing the purposes of incarceration and I'm
 7  going to read a few things and ask if you agree
 8  with them.
 9          The first purpose mentioned retribution,
10  meaning the punishment for crimes against society,
11  depriving criminals of their freedom is a way of
12  making them pay a debt to society for their crimes.
13  Do you agree that that is a purpose of
14  incarceration?
15     A.   My understanding is that there are those
16  that hold that belief.
17     Q.   Okay.  Do you hold that belief?
18     A.   As a social scientist my job is to analyze
19  the way in which groups and institutions define and
20  then build the rules and regulations and
21  organizations around those beliefs.  And I believe
22  that there are many examples of prison systems that
23  organize around that idea.
24     Q.   Okay.  Another purpose mentioned is
25  incapacitation.  Incapacitation refers to the
                                                  Page 27
```

```
 1  removal of criminals from society so they can no
 2  longer harm innocent people.  Do you understand
 3  that to be one of the purposes of incarceration?
 4     A.   There are prison systems that absolutely
 5  incarcerate for that reason.
 6     Q.   Okay.  Another purpose is described as
 7  deterrents and deterrents meaning the prevention of
 8  future crime.  Is that your understanding of one of
 9  the purposes of incarceration?
10     A.   My understanding is that some prison
11  systems claim that that is one of the reasons for
12  why they incarcerate people.
13     Q.   Okay.  And then there's a fourth,
14  rehabilitation.  Is that a purpose of
15  incarceration?
16     A.   Again, I think that there are prison
17  systems that claim that rehabilitation is one of
18  the reasons that they incarcerate people.
19     Q.   Do you know if LSP claims that
20  rehabilitation is one of the purposes of
21  incarceration there?
22     A.   I -- you know, that's a -- that's a good
23  question.  I haven't been told directly by any LSP
24  staff that rehabilitation is one of the reasons why
25  they incarcerate people.
                                                  Page 28
```

```
 1     Q.   Okay.  Do you have any opinion as to
 2  whether or not that is a -- one of the reasons LSP
 3  incarcerates people?
 4     A.   The only law that I have seen is the one
 5  you mentioned earlier around a sentence of hard
 6  labor and my understanding is that a sentence of
 7  hard labor isn't rehabilitative.
 8     Q.   Are you familiar with LSP's Reentry
 9  Program?
10     A.   I am not.
11     Q.   Are you familiar with LSP's New Man
12  Program?
13     A.   I am not.
14     Q.   Are you familiar with any of the classes
15  or educational services offered to inmates at LSP?
16     A.   No.
17     Q.   And the day that you were at LSP I think
18  they were picking cucumbers?
19     A.   Correct.
20     Q.   And you participated in the tour that
21  everyone participated in?
22     A.   Yes.
23     Q.   But you have not been to any other prison
24  in the nation to perform a similar type inspection
25  or evaluation of prison agriculture; is that
                                                  Page 29
```

8 (Pages 26 - 29)

**Page 30**

1  correct?
2  A.  That's correct.
3  Q.  Is this the only expert report you have
4  ever prepared?
5  A.  Yes.
6  Q.  In your report at page two you reference
7  your assignment in this matter.  And in paragraph
8  number five it says, I was retained by plaintiffs'
9  counsel to provide expert opinions on the sociology
10 of contemporary prison agriculture systems
11 including the philosophical underpinnings, racist
12 history and contemporary manifestations and to
13 opine on the manner in which the farm line at the
14 Louisiana State Penitentiary illustrates and stands
15 apart from historical and contemporary penal and
16 societal norms.
17      I want to take these one at a time, penal
18 and societal norms, okay?
19 A.  Uh-huh.
20 Q.  And is it your opinion that LSP, in your
21 words, stands apart from contemporary penal norms?
22 A.  Yeah.
23 Q.  And what do you base that on?
24 A.  I base that on a historical understanding
25 of the use of punishment in society and the use of

**Page 31**

1  labor practices within different prison systems and
2  specifically my report focuses on agricultural
3  operations.  And so those norms are intimately tied
4  to my understanding of what agricultural operations
5  look like within US prisons.
6  Q.  And how -- how -- in that you have not
7  been to any prisons, how are you able to gain an
8  understanding of the agricultural operations in
9  prisons throughout the United States?
10 A.  Through many secondary sources, annual
11 reports, social media produced by prison systems,
12 conversations that I've had directly with people
13 working in prison agricultural operations all over
14 the United States, including throughout the south,
15 media coverage of prison agricultural operations,
16 histories written by others on prison agricultural
17 operations of kind of deeper histories and more
18 contemporary accounts of prison agricultural
19 operations and directly from individuals who have
20 been incarcerated.
21 Q.  What individuals have you interviewed that
22 have been incarcerated?
23 A.  I haven't interviewed people, per se, but
24 I have written with incarcerated people in the
25 United States.

**Page 32**

1  Q.  I'm sorry.  I missed that.  You've done
2  what?
3  A.  Exchanged, like, letters, you know,
4  written with.
5  Q.  Okay.  How many inmates or individuals who
6  were incarcerated?
7  A.  Formerly or currently?
8  Q.  Let's take currently.
9  A.  Okay.  Currently, two people that are
10 active that I have been writing with.
11 Q.  And who are those two people?
12 A.  Am I allowed to say their actual names or
13 just, like, where they're from?  I don't -- I don't
14 -- I don't want to, like, breach my sort of -- kind
15 of --
16 Q.  Let me make it easy for you.
17 A.  Yeah.
18 Q.  Are they from Louisiana?
19 A.  Oh, thank you.  I just don't want to like
20 --
21 Q.  No, I don't need their names.
22 A.  Okay.  Thank you.  Yeah.  No, they're not
23 from Louisiana.
24 Q.  Okay.  And they were not incarcerated in a
25 Louisiana prison?

**Page 33**

1  A.  No.
2  Q.  Okay.  The depositions that you mentioned
3  in your materials reviewed, did you read all of
4  those depositions?
5  A.  Yes, I read through the depositions.
6  Q.  And I understand your report -- your
7  report -- your report is focused on what we put in
8  quotations, the farm line; is that fair to say?
9  A.  Yes.
10 Q.  And you define it in footnote one on page
11 two, primarily vegetable field operations at
12 Angola.  It does not refer to Angola's commodity
13 crop operations.
14 A.  Correct.
15 Q.  So these are the farm line produce that is
16 planted, maintained and harvested by inmates at
17 LSP, correct?
18 A.  Correct.
19 Q.  And is it your understanding after review
20 of this matter that those -- those products are
21 consumed by the inmates?
22 A.  Correct.  My understanding is the
23 cucumbers, for instance, went into the kitchen.
24 Q.  You did note -- did you ever hear the term
25 Prison Enterprises?

```
 1    A.   Yes.
 2    Q.   Okay.  And your report and your analysis
 3  and your opinions do not appear to reference in any
 4  way Prison Enterprises; is that accurate?
 5    A.   Correct.
 6    Q.   So it's focused on the produce that is
 7  used to feed LSP inmates?
 8    A.   My report is not focused on the produce,
 9  no.
10    Q.   Well -- but when you're referencing the
11  farm line at LSP, you're referencing the work that
12  is done with respect to the planting and harvesting
13  of vegetables that are used to feed the inmates at
14  LSP?
15    A.   Correct.
16    Q.   Okay.  In research that you have done --
17  we've talked about a little earlier -- did it
18  include determining in the prisons that have prison
19  agriculture whether or not the inmates are
20  compensated for their labor?
21    A.   The research that we initially conducted
22  was not asking about compensation.
23    Q.   Are you familiar with what other prisons
24  do with respect to compensation for prison
25  agriculture?
                                              Page 34
```

```
 1    Q.   With respect to the extensive number of
 2  prisons that engage in prison agriculture, are
 3  there any prisons in which it is voluntary?
 4    A.   There are voluntary programs.  They are
 5  most commonly associated with educational
 6  agricultural programs.  Most often these are some
 7  sort of horticulture or some sort of garden.
 8    Q.   Okay.  And when -- when you visited LSP
 9  did you see any gardens beyond the area of the
10  cucumber farm?
11    A.   We were not shown gardens on our tour.
12    Q.   Do you know if some of the inmates have
13  their -- maintained gardens at the main prison or
14  Camp C or Camp D?
15    A.   I don't know if individual prisoners are
16  maintaining gardens.
17    Q.   Is it fair to say that most of prison
18  agriculture throughout the United States is forced
19  labor?
20    A.   Most prison agriculture throughout the
21  United States -- I can speak to the kind of
22  agriculture and I can speak to the reasons for that
23  agriculture.  My understanding of work requirement
24  laws throughout the United States is just that most
25  prisoners have to work in some capacity.
                                              Page 36
```

```
 1    A.   I'm familiar with what other prisons do
 2  with compensation in their prison industries as
 3  well as in their housework, for lack of a better
 4  word, the internal prison jobs versus the prison
 5  industry jobs.  I've reviewed statistics on a
 6  statewide level.
 7    Q.   Okay.  I saw a reference in, I think, one
 8  of the -- one of your reference materials that
 9  Texas, Georgia, Arkansas and Alabama do not pay
10  anything for prison agriculture.  Do you understand
11  that to be true?
12    A.   That's my understanding.
13    Q.   Are you aware of any laws that require
14  prisons to compensate inmates for prison
15  agriculture?
16    A.   Specifically for prison agriculture?
17    Q.   Yes.
18    A.   Is there a law stating that a prisoner who
19  worked in agriculture must be paid for that work?
20    Q.   Right.
21    A.   I'm not familiar with any law that
22  explicitly states that.
23    Q.   And that would include any Louisiana law,
24  correct?
25    A.   Correct.
                                              Page 35
```

```
 1    Q.   Your statement in your report that
 2  agricultural labor and more specifically crop labor
 3  remains a common practice in southern prisons,
 4  isn't it true that it remains a fairly common
 5  practice in all prisons in the United States?
 6    A.   No, it's not true.
 7    Q.   No?  There are a lot of northern states
 8  that have agricultural operations?
 9    A.   But much different kinds.
10    Q.   Much different than that in the south?
11    A.   Correct.
12    Q.   Are you familiar with the agriculture
13  operations in the northwest United States?
14    A.   I have -- I have some working knowledge of
15  some of the operations in the northwest, yes.
16    Q.   What about Montana?
17    A.   I'm trying to kind of recall if I can
18  speak to Montana with certainty.  I would have to
19  review, you know, my data set and some of the maps
20  that we have produced to speak specifically to
21  Montana.
22    Q.   What about states like Washington, Utah
23  and states in that area?
24    A.   Some states like Washington I have some
25  idea of what's going on there.
                                              Page 37
```

**Page 38**

1  Q. Do they have crop labor in those states?
2  A. Limited. Most of what is going on in
3  Washington is horticulture and gardening.
4  Q. But is there a map on your -- on the
5  website --
6  A. I'm sorry. I --
7  Q. -- the website? You're a director of -- I
8  forgot the name of your --
9  A. The Prison Agriculture Lab.
10 Q. Yes. Is there a website there?
11 A. There is. There's an ArcGIS Map that
12 lives on that website.
13 Q. And did you enter the information in that
14 map?
15 A. I did not directly enter that, but I
16 oversaw all of the work that took place to build
17 that map.
18 Q. Okay. And there's a -- there's a fair
19 amount of prisons in the northern states that have
20 agricultural operations; is that fair to say?
21 A. Correct.
22 Q. And some of those are crops?
23 A. But, comparatively to the south, the south
24 has disproportionately more crop-based operations
25 than other parts of the country, than other regions

**Page 39**

1  of the country.
2  Q. What about the Colorado prisons before the
3  pandemic, were they -- were they growing crops?
4  A. Yeah, there were prisons that were growing
5  crops in Colorado.
6  Q. Okay. Back to your report, I'm reading
7  through it and on page three, specifically
8  paragraph 16, you state that based on historical
9  and sociological evidence it is my belief that
10 Angola's farm line should be ended. The farm line
11 punishes through its traumatic association of
12 forced agricultural labor to chattel slavery
13 through safe and exploitative farm conditions which
14 together produce or risk producing psychological
15 and physical harm. Such harm heaps cruelty upon
16 the punishment of incarceration.
17     Is that kind of your opinion in a
18 nutshell?
19 A. Yeah.
20 Q. Okay. Okay. Are you familiar with the --
21 are you familiar that -- with the fact that
22 everyone at Angola is required to have a job?
23 A. Yes.
24 Q. And are you familiar with jobs at Angola
25 other than the farm line?

**Page 40**

1  A. Yes. If LSP is similar to other prisons,
2  then, you know, there's a lot of standard certain
3  jobs that people tend to have in prisons.
4  Q. Okay. And for the reasons expressed
5  throughout your report you believe that Angola's
6  farm line should cease, should no longer operate?
7  A. Yes.
8  Q. Are there any other jobs at Angola that
9  you feel the same way about?
10 A. I can only speak to the farm line as
11 that's what I've been asked to write an expert
12 report on.
13 Q. I want to try, if we can, to talk about
14 the factual basis upon which your paragraph 16 --
15 your opinion in a nutshell is based. There's
16 reference to Angola, it being a historical -- the
17 explanation of it being a plantation. That is a
18 relevant fact that drives your opinion?
19 A. Yeah.
20 Q. Okay. The fact that the agriculture labor
21 is forced as opposed to voluntary, is that a fact
22 that drives your opinion?
23 A. Yes.
24 Q. What else? What other facts cause you to
25 come to that opinion in paragraph 16?

**Page 41**

1  A. The fact that chattel slavery as an
2  institution is predicated on the social control and
3  labor exploitation of people who had their freedom
4  stripped, that those same logics moved into
5  practices of convict leasing where incarcerated
6  individuals have their freedom stripped, who are
7  controlled and whose labor was exploited.
8      People, same backgrounds, black and
9  African-American individuals, were forced onto
10 chain gangs, freedom was stripped, labor was
11 controlled and exploited and those same people have
12 made their way and now are predominant within the
13 prison system and that these sets of practices were
14 historically concentrated in the south and that
15 those associations produced -- have produced not
16 only physical harms for all of those individuals
17 involved and those groups involved, but the
18 associations produced psychological trauma.
19 Q. Okay.
20 A. And that trauma is above and beyond a
21 sentence of hard labor.
22 Q. In your opinion the psychological trauma
23 is above and beyond a sentence of hard labor?
24 A. Correct.
25 Q. Is there any literature, any peer-reviewed

| | |
|---|---|
| 1  studies that support that opinion?<br>2     A.  There is a lot of literature that points<br>3  to black individuals living, for example, in<br>4  counties where chattel slavery was legal who<br>5  disproportionately faced arrest and incarceration<br>6  and that black individuals disproportionately are<br>7  harmed within the prison system and associate that<br>8  harm with the legacies of chattel slavery and draw<br>9  very explicit connections between incarceration as<br>10  a form of enslavement and that being tied to the<br>11  history of enslavement in the United States.  Those<br>12  -- those findings and those experiences have been<br>13  documented in peer-reviewed research.<br>14     Q.  Can you give me names of any of those<br>15  reports?<br>16     A.  You can read, for example, David<br>17  Oshinsky's book, Worse Than Slavery.<br>18     Q.  Is that in your reference materials?<br>19     A.  It is.<br>20     Q.  David Oshinsky?<br>21     A.  Oshinsky.<br>22     Q.  Okay.  Anything else?<br>23     A.  You can look at Alexander Lichtenstein's<br>24  Twice the Work of Free Labor.<br>25     Q.  Okay. Let me ask you, Doctor, if -- if we<br>Page 42 | 1  agricultural operations, particularly with respect<br>2  to crops?<br>3     A.  There are other prisons throughout the US<br>4  that don't pay much and that require prisoners to<br>5  work on farms.<br>6     Q.  And I assume your opinion would be the<br>7  same with respect to those prisons, that their farm<br>8  lines should be ended?<br>9     A.  I can only speak to LSP and the farm line<br>10  in this specific case.<br>11     Q.  Have you ever in any of your publications<br>12  stated an opinion that prison agriculture should be<br>13  ended?<br>14     A.  Yes.<br>15     Q.  Which publications have you said that in?<br>16     A.  I think I said something to that effect in<br>17  the agriculture and human values article.<br>18     Q.  Where is that?  Is that on your --<br>19     A.  It's on my CV.  It's the Prison<br>20  Agriculture in the United States publication.<br>21     Q.  Is that under public articles?<br>22     A.  No, it's under peer-reviewed articles from<br>23  2022, maybe 2023.<br>24     Q.  I don't see a peer-reviewed section in<br>25  your --<br>Page 44 |
| 1  take away the fact that LSP rests on grounds that<br>2  were originally a plantation, take that fact out of<br>3  the mix, does your report look the same?  Do you<br>4  have the same opinion?<br>5     A.  I do have the same opinion.<br>6     Q.  Okay.  So your opinion is not predicated<br>7  upon or not totally predicated upon the fact that<br>8  LSP rests on what used to be a plantation?<br>9     A.  There are other factors in addition to the<br>10  plantation association that are relevant.<br>11     Q.  Okay.  The factors that you mentioned,<br>12  forced -- forced labor, correct?<br>13     A.  And dehumanizing working conditions.<br>14     Q.  And if I asked you about dehumanizing<br>15  working conditions in other jobs at Angola, you<br>16  would not be able to comment on that?<br>17     A.  That's not what I'm here to do today.  No,<br>18  I can only speak to the farm line and what I have<br>19  written in my expert report.<br>20     Q.  Okay.  Is the fact that the pay is<br>21  limited, does that factor into your opinion?<br>22     A.  That is one factor.<br>23     Q.  Would you agree that or can you agree that<br>24  there are other prisons outside of the state of<br>25  Louisiana that are very similar in their<br>Page 43 | 1     A.  It's on -- sorry, I don't have my CV right<br>2  in front of me.<br>3     Q.  Okay.<br>4     A.  But it's under -- there should be an<br>5  article part of the CV, like one of the first<br>6  sections.<br>7     Q.  Referred journal publications?<br>8     A.  Refereed.<br>9     Q.  I'm sorry?<br>10     A.  That's the one.  Yeah, that's the one.<br>11  Yeah.<br>12     Q.  Okay.  The very first entry, it says<br>13  Chennault, Carrie and Joshua Sbicca, 2023, Prison<br>14  Agriculture in the United States, Racial Capitalism<br>15  and the Disciplinary Matrix of Exploitation and<br>16  Rehabilitation.<br>17     A.  That's the one.<br>18     Q.  That's the one, okay.  If the farm line at<br>19  LSP was voluntary, would that change your opinion?<br>20     A.  That would be a new condition to have to<br>21  consider.<br>22     Q.  What if it was involuntary but they paid<br>23  wages at three, four, five dollars an hour, would<br>24  that change your opinion?<br>25     A.  I would have to think about it some more.<br>Page 45 |

12 (Pages 42 - 45)

**Page 46**

1  Q. It certainly would have the potential to
2  modify your opinion if they were paid wages?
3  A. I would have to consider it in the context
4  of all of the other factors that I've written about
5  in my report.
6  Q. There are grass-cutting crews out at LSP
7  that work all day long in the summer months. Do
8  you have any opinion as to whether or not that type
9  of work should continue or not?
10  A. My opinions in this case have to do with
11  the farm line. I haven't looked at the experiences
12  of those individuals or that job.
13  Q. Okay. Is North Carolina considered a
14  southern state?
15  A. That's my understanding.
16  Q. Do you have an understanding of the
17  percentage of inmates at LSP who are black?
18  A. I do. I believe it's around 75 percent.
19  Q. Do you have a working definition of black?
20  What does that mean to you?
21  A. Black is a self-identified category like
22  all racial categories.
23  Q. Do you differentiate black from
24  African-American?
25  A. No, I don't.

**Page 47**

1  Q. Do you consider any individuals to be
2  black who are not African-American?
3  A. Yes.
4  Q. Can you give me some examples of that?
5  A. Sure. Somebody can be of African descent
6  who lives somewhere in the Caribbean.
7  Q. Do you have any information about the
8  percentage of farm line workers who are black
9  versus white?
10  A. I've never seen statistics. I can only
11  speak to what I witnessed firsthand when I took my
12  tour.
13  Q. And what was that?
14  A. There were majority black.
15  Q. Wouldn't you expect that to be majority
16  black given the fact that 75 percent of the prison
17  population is black?
18  A. On the farm?
19  Q. Yes.
20  A. Yes, I would expect that statistically.
21  If you look at the statistics on the state of
22  Louisiana, black individuals, it's my
23  understanding, is only about 34 percent of the
24  population, so it's nevertheless disproportionate
25  to the state population.

**Page 48**

1  Q. You describe -- in your report you
2  describe the agricultural work as requiring
3  incarcerated people to toil in what is demonstrably
4  difficult and dangerous work. What is demonstrably
5  difficult when it comes to harvesting cucumbers
6  that you saw at LSP?
7  A. One thing that was difficult was the need
8  to have to bend down or squat within completely
9  overgrown rows, to have to walk through weeds that
10  could cause one easily to trip, to work with
11  inadequate gloves that very quickly soaked through,
12  to have inadequate shade structures to protect one
13  from the heat and ultraviolet rays of the sun.
14  Q. And the second half of your statement,
15  dangerous work, that would be the same answers?
16  A. The danger would be, for example, the risk
17  of tripping in rows that were very poorly
18  maintained, the danger being if one were out in the
19  sun for an extended period of time, heat stroke and
20  other sort of heat exposures.
21  Q. You're -- you're not a medical doctor,
22  correct?
23  A. No.
24  Q. And you're not a psychologist, correct?
25  A. No.

**Page 49**

1  Q. You've had no medical training?
2  A. No.
3  Q. Do you know that the inmates are offered
4  sunscreen every day on the farm line?
5  A. That's news to me.
6  Q. Okay. You have not been to the farm line
7  since July of this year, correct?
8  A. Correct.
9  Q. And, again, when your report references
10  the agricultural labor as being difficult and
11  dangerous, you're not in a position to compare
12  agricultural labor with any other jobs performed at
13  LSP?
14  A. I haven't looked closely at any other jobs
15  at LSP.
16  Q. In your work as an expert witness in this
17  matter have you asked the attorneys for information
18  about other jobs at LSP?
19  A. I have not.
20      MS. MCTOOTLE:
21         Objection.
22  BY MR. BLANCHFIELD:
23  Q. There's a reference in your report to
24  quotas. Is it your understanding that there is any
25  quota with respect to the harvesting of vegetables

**Page 50**

```
 1   on the farm line at LSP?
 2      A.   My understanding of quotas comes from the
 3   -- some of the depositions stating that there were
 4   quotas.
 5      Q.   Isn't it fair to say that some of the
 6   depositions that you read reflected just the
 7   opposite, that there is, in fact, no quotas on the
 8   farm line?
 9      A.   Not all -- not all of the depositions
10   spoke to the same effect, then.
11      Q.   So some of the inmates declared that there
12   was a quota while some of the correctional officers
13   who work out there every day say that there is not
14   a quota; is that fair to say?
15      A.   There are some discrepancies.
16      Q.   When you were out there did you see
17   anybody say, Hey, you're not picking enough
18   cucumbers?
19      A.   I heard some incarcerated people -- that
20   they had been given quotas at different times on
21   the farm line.
22      Q.   But none that day?
23      A.   Not from any of the people that were
24   overseeing the operations.
25      Q.   Could you turn to page 19 of -- you have
```

**Page 51**

```
 1   your report there?
 2      A.   I do, uh-huh.
 3      Q.   Yeah.  Would you turn to page 19?  I have
 4   a couple of specific questions.  Under paragraph 73
 5   you referenced sworn declarations from incarcerated
 6   people in Alabama sentenced to work on then
 7   operative chain gangs.  "The chain gangs have
 8   caused me extreme mental anguish.  Wearing chains
 9   made me feel like an animal."
10           When was that?  I mean, Alabama does not
11   have chain gangs anymore, do they?
12      A.   This is from 1998.
13      Q.   1998?  And then on 74 you reference an
14   incarcerated person in Texas.  When was that from?
15      A.   My understanding is that this is from the
16   2000s.
17      Q.   Do you know what Texas prison they're
18   referencing there?
19      A.   I would have to go back and look to see if
20   the exact prison is identified.
21      Q.   Okay.  If you could turn to the next page,
22   paragraph 75, you reference Terrance (Winn) Wynn.
23   Do you know when Mr. Wynn left LSP?
24      A.   I don't have the exact date.
25      Q.   So when he references his experience you
```

**Page 52**

```
 1   don't know what time he's referencing, correct?
 2      A.   I don't know the exact year that that's in
 3   reference to.
 4      Q.   Did you read his deposition in this
 5   matter?
 6      A.   I did.
 7      Q.   You did?
 8      A.   Uh-huh.
 9      Q.   Did you see where he was asked to compare
10   the current conditions on the farm line with the
11   conditions he experienced when he was at Angola?
12      A.   I don't recall that.
13      Q.   You don't recall that he said that it is
14   drastically different today than when he was in
15   prison?
16      A.   I -- I don't recall that.
17      Q.   Paragraph 76, who is Joe Palmer?
18      A.   This comes from the Promise of Justice
19   Initiative, video testimonials of individuals who
20   were incarcerated speaking to a variety of their
21   experiences, including in some cases their
22   experiences on the farm line.
23      Q.   Was Joe Palmer at LSP?
24      A.   That's my understanding.
25      Q.   Is it your understanding that the farm
```

**Page 53**

```
 1   lines during the summer months are all brought in
 2   around 11:30, 11:40 in the morning?
 3      A.   Like, talking about when?  Like, right now
 4   in 2025 or, like, historically?
 5      Q.   2024, this summer.
 6      A.   Excuse me, 2024, time and space.  No, I
 7   had heard when I was visiting that that's when
 8   people were brought in.
 9      Q.   Okay.  And your opinion that the farm line
10   should be ended, it obviously applies to not only
11   African-American workers but white workers as well?
12      A.   Correct.
13      Q.   And how do you -- tell me your analysis
14   with respect to white citizens who don't have the
15   same history as some of the African-American
16   individuals.
17      A.   That any individual who works within a
18   system run in the sense of chattel slavery,
19   regardless of the race, that system is
20   dehumanizing, and if that system has particular
21   logics and particular ways of controlling people
22   that manifests in the prison system, that even for
23   white individuals that's going to be a difficult
24   and, again, traumatic association regardless of
25   their race.
```

**Page 54**

1  Q. Do you see any difference in the impact of
2  the farm line on white individuals versus
3  African-American?
4  A. I think for black individuals that
5  association is particularly acute given the actual
6  history of chattel slavery in the United States and
7  its targeting of black individuals.
8  Q. Are you currently writing any books?
9  A. I am.
10 Q. How many?
11 A. One.
12 Q. Does it have a title yet?
13 A. It has a working title.
14 Q. What's the working title?
15 A. Plantation Prisons.
16 Q. And what -- is there a particular focus of
17 that book?
18 A. Really broadly the book is a historical
19 account of the development of prison agriculture in
20 the United States.
21 Q. It's not limited to the south?
22 A. No, it's not.
23 Q. Do you have any plans with respect to your
24 employment, to seek employment elsewhere or are you
25 relatively well-put there?

**Page 55**

1  A. Yeah, I'm -- no plans.
2  Q. All right. Why don't we -- can we take
3  like a 10-minute break? I think I'm getting pretty
4  close to wrapping up, Doctor.
5  A. Yes, that's fine.
6  Q. Let me look at a few things. Let's see,
7  what time have we got here? 10:34. If we come
8  back at 10:45, does that work?
9  A. That's fine, uh-huh.
10 Q. Okay. Thank you.
11 A. All right. You got it.
12    (A brief recess was taken at 10:34;
13 resuming at 10:46 AM)
14 BY MR. BLANCHFIELD:
15 Q. Doctor, just a few more and I think we're
16 about done. I want to understand -- we talked
17 about paragraph 16 as kind of being your opinion in
18 a nutshell. Can you tell me if that opinion would
19 apply to other prisons in the United States that
20 have forced agricultural labor?
21 A. The opinion that I developed in this
22 particular report is specifically to speak to the
23 farm line.
24 Q. At LSP?
25 A. At LSP.

**Page 56**

1  Q. So you're not able to tell me if that
2  would -- if that opinion would apply to other
3  prisons in the United States?
4  A. I would have to go through a similar level
5  of research and work to kind of arrive at an
6  opinion.
7  Q. Do you know if there are, in fact, prisons
8  in the United States that have a similar type farm
9  line that you see at LSP?
10 A. My understanding of LSP is that it's a
11 particularly anachronistic set of practices aimed
12 at punishing and degrading the prisoners that are
13 working on that particular farm line.
14 Q. And are you saying that LSP sets itself
15 apart from other prisons that have prison
16 agricultural programs in the United States?
17 A. It does in its punitive use of the farm
18 line itself, which itself is different than, for
19 example, the commodity crop agriculture at LSP. So
20 it's even unique within LSP itself.
21 Q. Are you familiar with the agricultural
22 programs at prisons in Texas?
23 A. I have, like, a very sort of working --
24 like, general working knowledge. I haven't
25 researched them extensively.

**Page 57**

1  Q. Do you know if they have inmates
2  harvesting cucumbers in Texas?
3  A. I would assume -- I know they have row
4  crops. I know that prison farming operations are
5  extensive in that state.
6  Q. And do you know if they use the harvested
7  produce to feed the inmates in Texas?
8  A. My understanding is that some of it goes
9  to feed prisoners, yes.
10 Q. And that would apply to other states;
11 Alabama, Arkansas, Georgia? Is that fair to say?
12 A. Yeah, there are many states that use the
13 produce that's produced by prisoners to feed
14 incarcerated people.
15 Q. There was -- there was -- are you familiar
16 with Amendment A to the Colorado Constitution?
17 A. That was the amendment to get rid of the
18 exception clause in the state constitution, yes.
19 Q. Did that pass?
20 A. It did.
21 Q. So is there -- is there forced
22 agricultural labor in prisons in Colorado today in
23 2024?
24 A. I haven't spoken with incarcerated people
25 or prison officials on that matter, so I can't

**Page 58**

1  speak directly to that.
2     Q.  There was a reference to "we don't know
3  what's going on in the Colorado prisons".  Is that
4  -- is that accurate?
5     A.  I -- I -- I can't speak to all of the ins
6  and outs of prison labor in the state.
7     Q.  And, again, you don't know -- before the
8  pandemic you don't know what Colorado prisons were
9  paying inmates to work on the farm lines?
10    A.  I would have to go and look up statistics
11 and reports on what the -- what the average wages
12 were for prison industry workers.
13    Q.  Does 86 --
14    A.  So I don't -- I don't have those figures
15 in front of me.
16    Q.  Okay.  Does 86 cents an hour on average in
17 Colorado, does that sound like it may be accurate?
18    A.  It -- it depends.  There are differences
19 between, again, essentially internal prison
20 facility maintenance kinds of jobs and prison
21 industry jobs.  Across the United States, on
22 average, prison industry jobs tend to get paid
23 more, but, again, without seeing -- without kind of
24 like referencing actual reports and numbers I'm
25 able to -- I'm unable to speak to that.

**Page 59**

1     Q.  Okay.
2     A.  I do know in the case of Louisiana that
3  prisoners on the farm line are paid between two and
4  four cents an hour, though.
5     Q.  You were given that information?
6     A.  Correct.  And I know that that's on the
7  extreme low end across the United States in terms
8  of average wages.
9     Q.  But you also know that there are a number
10 of states that pay nothing, correct?
11    A.  And they are anomalous and they're on,
12 obviously, the lowest end.
13    Q.  Okay.
14    A.  I also know LSP -- my understanding is
15 that that's a more recent change, to offer two to
16 four cents an hour.
17    Q.  Where do you get that understanding from?
18    A.  I think previous reports on wages within
19 state prison systems.  And in Louisiana my
20 understanding is there was a time period where they
21 paid nothing for prison jobs.
22    Q.  Okay.  Doc, I appreciate your time.
23 That's all the questions I have.  Thank you.
24    A.  Thank you.  Appreciate it.
25    Q.  All right.

**Page 60**

1             MR. BLANCHFIELD:
2                Anybody else?
3             MS. MCTOOTLE:
4                No questions.
5        (End of testimony at 10:54 AM)

**Page 61**

1                WITNESS'S CERTIFICATE
2
3
4     I, DR. JOSHUA SBICCA, the undersigned, do
5  hereby certify that I have read the foregoing
6  deposition taken on SEPTEMBER 18, 2024, and it
7  contains a true and accurate transcript of the
8  testimony given by me:
9
10
11 (  )  Without corrections
12
13 (  )  With corrections as reflected on the
14 Errata Sheet(s) prepared by me and attached hereto
15 consisting of _____ pages.
16
17
18                    _____
19                         DR. JOSHUA SBICCA
20                    _____
21                              DATE
22
23
24 Reported by:  Caroline D. Escude', CCR
25

```
 1        R E P O R T E R ' S   C E R T I F I C A T E
 2
 3        I, Caroline D. Escude', Certified Court
 4   Reporter, Certificate #91182, in and for the State
 5   of Louisiana, as the officer before whom this
 6   testimony was taken, do hereby certify that DR.
 7   JOSHUA SBICCA, after having been duly sworn by me
 8   upon authority of R.S. 37:2554, did testify as
 9   hereinbefore set forth in the foregoing 61 pages on
10   September 18, 2024; that this testimony was
11   reported by me in stenographic machine shorthand,
12   was prepared and transcribed by me or under my
13   personal direction and supervision, and is a true
14   and correct transcript to the best of my ability
15   and understanding; that the transcript has been
16   prepared in compliance with transcript format
17   guidelines required by statute or by the rules of
18   the board and that I am informed about the complete
19   arrangement, financial or otherwise, with the
20   person or entity making arrangements for deposition
21   services; that I have acted in compliance with the
22   prohibition on contractual relationships, as
23   defined by Louisiana Code of Civil Procedure
24   Article 1434 and in the rules and advisory opinions
25   of the board; that I have no actual knowledge of
                                                  Page 62
```

```
 1   any prohibited employment or contractual
 2   relationship, direct or indirect, between a court
 3   reporting firm and any party litigant in this
 4   matter nor is there any such relationship between
 5   myself and a party litigant in this matter; that I
 6   am not related to counsel or to the parties herein,
 7   nor am I otherwise interested in the outcome of
 8   this matter.
 9        This certification is valid only for a
10   transcript accompanied by my original signature and
11   original required seal or my certified digital
12   signature on this page.
13        Signed:  September 19, 2024
14   _____
15        Caroline D. Escude', CCR #91182
                                                  Page 63
```

```
 1   Arielle McTootle
 2   AMcTootle@paulweiss.com
 3              September 19, 2024
 4   RE:   Voice Of The Experienced Et Al.  v. Leblanc, James Et Al.
 5      9/18/2024, Dr. Joshua Sbicca (#6911270)
 6      The above-referenced transcript is available for
 7   review.
 8      Within the applicable timeframe, the witness should
 9   read the testimony to verify its accuracy. If there are
10   any changes, the witness should note those with the
11   reason, on the attached Errata Sheet.
12      The witness should sign the Acknowledgment of
13   Deponent and Errata and return to the deposing attorney.
14   Copies should be sent to all counsel, and to Veritext at
15   errata-tx@veritext.com.
16    Return completed errata within 30 days from
17   receipt of testimony.
18    If the witness fails to do so within the time
19   allotted, the transcript may be used as if signed.
20
21
22        Yours,
23        Veritext Legal Solutions
24
25
                                                  Page 64
```

```
 1   Voice Of The Experienced Et Al.  v. Leblanc, James Et Al.
 2   Dr. Joshua Sbicca (#6911270)
 3         E R R A T A  S H E E T
 4   PAGE_____ LINE_____ CHANGE_____
 5   _____
 6   REASON_____
 7   PAGE_____ LINE_____ CHANGE_____
 8   _____
 9   REASON_____
10   PAGE_____ LINE_____ CHANGE_____
11   _____
12   REASON_____
13   PAGE_____ LINE_____ CHANGE_____
14   _____
15   REASON_____
16   PAGE_____ LINE_____ CHANGE_____
17   _____
18   REASON_____
19   PAGE_____ LINE_____ CHANGE_____
20   _____
21   REASON_____
22
23   _____  _____
24   Dr. Joshua Sbicca              Date
25
                                                  Page 65
```

```
 1  Voice Of The Experienced Et Al.  v. Leblanc, James Et Al.
 2  Dr. Joshua Sbicca (#6911270)
 3          ACKNOWLEDGEMENT OF DEPONENT
 4    I, Dr. Joshua Sbicca, do hereby declare that I
 5  have read the foregoing transcript, I have made any
 6  corrections, additions, or changes I deemed necessary as
 7  noted above to be appended hereto, and that the same is
 8  a true, correct and complete transcript of the testimony
 9  given by me.
10
11  _____    _____
12  Dr. Joshua Sbicca                  Date
13  *If notary is required
14          SUBSCRIBED AND SWORN TO BEFORE ME THIS
15          _____ DAY OF _____, 20___.
16
17
18          _____
19          NOTARY PUBLIC
20
21
22
23
24
25
                                                    Page 66
```