# Exhibit 7

```
              THE UNITED STATES DISTRICT COURT FOR
              THE MIDDLE DISTRICT OF LOUISIANA

              CASE NO.:  3:23-cv-1304-BAJ-EWD
```

VOICE OF THE EXPERIENCED, a membership
organization on behalf of itself and its
members; and MYRON SMITH, DAMARIS JACKSON,
NATE WALKER, DARRIUS WILLIAMS,
KEVIAS HICKS, JOSEPH GUILLORY,
KENDRICK STEVENSON, and ALVIN
WILLIAMS, on behalf of themselves and
all others similarly situated,

         Plaintiffs,

         -vs-

JAMES LE BLANC, in his official capacity as
Secretary of the Louisiana Department of
Public Safety & Corrections; TIMOTHY HOOPER,
in his official capacity as Warden of
Louisiana State Penitentiary; MISTY STAGG,
in her official capacity as Director of Prison
Enterprises, Inc.; the LOUISIANA DEPARTMENT
OF PUBLIC SAFETY & CORRECTIONS; and PRISON
ENTERPRISES, INC.

         Defendants.

* * * * * * * * * * *

VIDEOTAPED

DEPOSITION OF:       DELECA REYNOLDS-BARNES

DATE TAKEN:          September 27, 2024

TIME:                9:00 A.M.

PLACE:               BY VIDEOCONFERENCE

REPORTED BY:         MICHELLE PULIDO STUBBEN, FPR,
                     COURT REPORTER, NOTARY PUBLIC

* * * * * * * * * * * *

Deleca Reynolds-Barnes
September 27, 2024

|  | Page 14 |
|---|---|
| 1 | an expert in the case? |
| 2 | A.  The specific case, yes, that is true. |
| 3 | Q.  You said this specific case.  Are there other |
| 4 | cases that you are aware of? |
| 5 | A.  No. |
| 6 | Q.  When you were first contacted about serving as |
| 7 | an expert witness in this case in July or August 2024, |
| 8 | who did you receive that outreach from? |
| 9 | A.  The initial outreach was from Dr. Carl Keldie, |
| 10 | who also I think serves as an expert witness in this |
| 11 | case. |
| 12 | Q.  And what did Dr. Keldie communicate to you at |
| 13 | that point? |
| 14 | A.  Specifically that he was working on a case |
| 15 | regarding heat-related pathology medications and thought |
| 16 | that the case could benefit from an expert in pharmacy |
| 17 | on medications and their -- and their increased |
| 18 | sensitivity to the heat. |
| 19 | Q.  So after the first outreach from Dr. Keldie -- |
| 20 | and let me just clarify -- how did Dr. Keldie first |
| 21 | reach out to you about this case? |
| 22 | A.  By phone. |
| 23 | Q.  And that was in late July or August 2024? |
| 24 | A.  Yes, I think so. |
| 25 | Q.  What happened after you had that first phone |

|  | Page 15 |
|---|---|
| 1 | conversation with Dr. Keldie? |
| 2 | A.  I then had a contact with the counsel for the |
| 3 | State, Keogh Cox, Ms. Chelsea Payne, to discuss what |
| 4 | expertise that I could provide and my willingness to do |
| 5 | so. |
| 6 | Q.  And approximately when did that conversation |
| 7 | with Ms. Payne take place? |
| 8 | A.  Again, late July, early August, I think.  I |
| 9 | don't have the exact dates. |
| 10 | Q.  So when were you formally retained to serve as |
| 11 | an expert witness for defendants in this case? |
| 12 | A.  It would have been during -- shortly after |
| 13 | that conversation with Ms. Payne.  So, again, late July, |
| 14 | early August. |
| 15 | Q.  And after that retention, did you immediately |
| 16 | begin working on the matter? |
| 17 | A.  I think immediately.  "Probably" is not the |
| 18 | right term, but she did provide me documents to start |
| 19 | reviewing at that point. |
| 20 | Q.  What were you retained to do in this case? |
| 21 | A.  So the primary responsibility was specific to |
| 22 | assist with the -- well, the primary responsibility was |
| 23 | to review the heat-duty status medication list that was |
| 24 | currently in place for the DOC, work with the clinical |
| 25 | leadership to see if there were any specific dates that |

|  | Page 16 |
|---|---|
| 1 | needed to be made in regard to that list by reviewing |
| 2 | obviously my knowledge, the current literature, anything |
| 3 | specific to that list.  What needed to happen clinically |
| 4 | to update that list. |
| 5 | Also to look at the -- and that entailed just |
| 6 | reviewing all the documents that I had previously stated |
| 7 | to see, not only what meds I thought needed to be added, |
| 8 | but also to make sure that there were no -- no holes in |
| 9 | that list, in the current list. |
| 10 | Q.  So the DOC specifically asked you to assist in |
| 11 | updating the list? |
| 12 | A.  The DOC specifically asked that I review the |
| 13 | list.  And upon review of the list, obviously I felt the |
| 14 | list needed to be updated. |
| 15 | Q.  You mentioned that Ms. Payne provided you with |
| 16 | a set of materials upon your retention.  And so far you |
| 17 | stated that those materials included Dr. Vassallo's |
| 18 | declaration and documentation from the Promise of |
| 19 | Justice Initiative, PJI.  I'll refer to them as PJI. |
| 20 | Other than those two documents, did Ms. Payne |
| 21 | provide you with any other materials to review at that |
| 22 | point? |
| 23 | A.  There were other documents provided, certain |
| 24 | things that I asked for.  I asked for the DOC's |
| 25 | formulary, the preferred drug list to -- as part of my |

|  | Page 17 |
|---|---|
| 1 | review.  There were -- I don't know the specific.  There |
| 2 | were a number of documents provided as part of that that |
| 3 | she provided that day, but those were the primary ones |
| 4 | that I remember. |
| 5 | I'm trying to think if there is anything |
| 6 | specific.  I think those were the primary ones and a |
| 7 | summary of the declaration, as I said. |
| 8 | Q.  A summary of what declaration? |
| 9 | A.  A summary of the suit -- of the suit. |
| 10 | Q.  Understood.  So you mentioned that there were |
| 11 | certain materials that you requested to see.  What |
| 12 | materials did you affirmatively ask to be provided with? |
| 13 | A.  The main one in addition to the list and the |
| 14 | policy about heat.  That was another document she |
| 15 | provided.  The DOC's policy on heat-duty status was the |
| 16 | DOC's formulary for the development of available meds. |
| 17 | Q.  And all of the documents that you received, |
| 18 | did you receive them through Ms. Payne's office? |
| 19 | A.  I received documents, those documents that I |
| 20 | reviewed through Ms. Payne.  I may have also received -- |
| 21 | like the formulary may have come from Dr. Keldie.  Maybe |
| 22 | she sent it to him and then he sent it over to me.  But |
| 23 | I think most of the doc- -- the other documents came |
| 24 | from her office. |
| 25 | Q.  So at a very high level, can you summarize the |

Deleca Reynolds-Barnes
September 27, 2024

```
                                                      Page 18
 1  opinions that you rendered in this case?
 2      A.   Sure.  So I think the first opinion -- as I
 3  said, my role was specifically related to the heat-duty
 4  status medication list.  And so my opinions were first
 5  specific to reviewing the current list and having an
 6  opinion on whether or not I thought that list was
 7  sufficient.
 8           My first opinion was that, in review of that
 9  list, while I understood the reason for the initial list
10  and its focus on psychotropics, that that was based on
11  the frequency of their use.  But there were additional
12  meds that needed to be added to that list because of
13  their ability to hinder the ability -- the body's
14  ability to respond to heat, i.e. increase sweating.
15           The goal of it was not to -- and so -- so my
16  opinion was, there were a number of drug classes that
17  needed to be added to the list not based on frequency of
18  use.  They may be infrequently and/or never, rarely used
19  in the DOC.  But to make the list complete, those drugs
20  needed to be added.  And so that was my initial opinion.
21           And then the second thing that I provided was
22  the rationale for the addition of those additional
23  classes.  And so, for example, in a review of the list,
24  you might see a drug that is used for bladder spasms
25  that weren't previously on the list that were added
```

```
                                                      Page 19
 1  because one of the chemical profiles of that med is it's
 2  that it is going to reduce your body's ability to sweat,
 3  which is what you need in a situation of increased heat.
 4           And so the list was predicated on adding those
 5  drugs, adding the rationale for why those drugs were
 6  added and being able to communicate that effectively to
 7  the clinical leadership of the DOC.  So as they are
 8  presenting the additions to their clinical team, they
 9  can understand the reasons.
10      Q.   So the two opinions that you just summarized,
11  are those the opinions that you intend to offer at trial
12  in this case?
13      A.   My opinions at trial will be based on what I'm
14  asked.
15      Q.   Are there any other opinions that you intend
16  to offer at trial that you have not just summarized?
17      A.   I'm sorry.  I don't understand that question.
18      Q.   The summary that you just provided, is that a
19  summary of the scope of what you, as of today,
20  understand your expert work in this case to be about?
21      A.   So, in my response, I presented myself as an
22  expert obviously on pharmacy and medication.  And so if
23  I'm asked a question in trial that falls within the
24  scope of my expertise, it is my expectation that I would
25  answer that question.
```

```
                                                      Page 20
 1      Q.   Do you expect that your testimony at trial
 2  will be consistent with the content of the expert report
 3  that you produced in this case?
 4      A.   I expect that, yes.
 5      Q.   So the opinion that you just summarized, and
 6  we'll talk about them in greater detail over the course
 7  of the morning, but at a high level can you explain what
 8  methodology you used to reach those opinions?
 9      A.   So there were a couple of methodologies.
10  Obviously, I have been a clinical pharmacist for now
11  almost 30 years.  So most of it was based -- a lot of it
12  initially was based on training.  This is what I do
13  every day as part of my career.  And so understanding,
14  number one, bringing in the academic training that I
15  have already received.
16           The second part of it obviously is any time
17  you are asked to do a review to -- review of the primary
18  and secondary literature, to say is there any new
19  evidence that would change what I already know and
20  understand.  So obviously a review of the literature to
21  see is there anything new, is there any new science, is
22  there any new thoughts around that that would alter my
23  perception.
24           And between -- and then obviously a review of
25  where "they" are currently with their current list to
```

```
                                                      Page 21
 1  see, based on their perception, how did -- making an
 2  assumption of how they got to where they are and what
 3  would need to be done to further that.
 4      Q.   So in your answer you said where they
 5  currently are with their current list.  When you use the
 6  word they in that sentence, are you referring to the
 7  DOC?
 8      A.   I'm referring to the DOC's current list.
 9  Correct.
10      Q.   So I -- I just want to understand a statement
11  that you just made.  You -- you had said that you
12  performed a review of where the DOC is with their
13  current list to see, based on how the DOC got there, to
14  where they are and what would be needed to be done to
15  further that.
16           Can you explain that statement?
17      A.   Sure.  So I reviewed the DOC's current list,
18  and it was highly focused on the psychotropics.  So, as
19  previously stated, it is obviously because of the side
20  effects profile of those drugs and the frequency of
21  their use within the DOC, that is how the current list
22  was developed.  And that made sense to me based on the
23  high frequency of utilization of the medications and the
24  propensity for those medications to cause heat-related
25  illness.
```

Page 186

1  considered a non- -- nontraditional antidepressant.  I
2  kept thinking atypical was the word that we used.  I
3  couldn't think of the word "atypical."
4      Q.  So you said you kept some of the studies and
5  literature that you reviewed.  Can you elaborate on
6  that?
7      A.  Sure.  Sometimes I would download it, and if I
8  needed to download it because I was going to read it in
9  another location -- this happened over -- this review of
10 literature happened over a period of time.  It wasn't
11 like a day where I just sat down and did everything.
12     So some things, if I downloaded it, I may have
13 kept a copy.  If I wanted to refer back to it later, I
14 may have kept a copy.  Some things it was -- you know,
15 when I wanted -- let me go back and refresh my thoughts
16 on this concept or this thought, then I would not have
17 kept a copy.
18     So it would have been like, okay, that is kind
19 of what I thought that was.
20     Q.  Okay.
21     MS. WEISER:  I have no further questions at
22  this time.
23     MR. BLANCHFIELD:  No questions here.  Thank
24  you.
25     MS. WEISER:  Thank you so much for your time.

Page 187

1  It was nice to meet you.
2      THE WITNESS:  Nice to meet you as well.
3      THE VIDEOGRAPHER:  This concludes today's
4  deposition.  The time is 7:57 p.m. UTC, 2:57 p.m.
5  central.  We are off the record.
6      THE REPORTER:  Mr. Blanchfield, did you need a
7  copy of this?
8      MR. BLANCHFIELD:  Yes.
9      (Deposition concluded at 2:58 p.m.)

Page 188

1                  REPORTER'S CERTIFICATE
2
3  STATE OF FLORIDA
4  COUNTY OF ORANGE
5
6      I, MICHELLE PULIDO STUBBEN, Court Reporter and
7  Notary Public, certify that I was authorized to and did
8  stenographically report the foregoing deposition of
9  AMBER VITTORIO; that a review of the transcript was not
10 requested; and that the transcript, Pages 4 through 187,
11 is a true record of my stenographic notes.
12     I FURTHER CERTIFY that I am not a relative,
13 employee, attorney, or counsel of any of the parties'
14 attorneys or counsel connected with the action, nor am I
15 financially interested in the action.
16     The certification does not apply to any
17 reproduction of the same by any means unless under the
18 direct control and/or direction of the reporter.
19     DATED September 29, 2024.
20
21
22  _____
23  MICHELLE PULIDO STUBBEN, Court Reporter

Page 189

1                  CERTIFICATE OF OATH
2
3  STATE OF FLORIDA
   COUNTY OF ORANGE
4
5      I, MICHELLE PULIDO STUBBEN, Notary Public,
6  State of Florida, certify that AMBER VITTORIO personally
7  appeared before me by videoconference and was duly sworn
8  on September 27, 2024.
9
10     WITNESS my hand and official seal this
11  27th day of September, 2024.
12          Personally Known:
13     Or Produced Identification:  Yes
14  Type of Identification Produced:  Driver's License
15
16
17  _____
    MICHELLE PULIDO STUBBEN, FPR,
18  NOTARY PUBLIC AND COURT REPORTER
    MY COMMISSION #HH 223309
19  EXPIRES:  MARCH 8, 2026
    Bonded Through Notary Association