# Exhibit 8

1              UNITED STATES DISTRICT COURT
2              MIDDLE DISTRICT OF LOUISIANA
3
4
5
6     VOICE OF THE EXPERIENCED,        CIVIL ACTION
      A MEMBERSHIP ORGANIZATION        NO.3:23-CV-1304
7     ON BEHALF OF ITSELF AND
      ITS MEMBERS; ET AL
8
      VS.                              JUDGE BRIAN A.
9                                       JACKSON
      JAMES LEBLANC, IN HIS OFFICIAL
10    CAPACITY AS SECRETARY OF THE     MAGISTRATE JUDGE
      LOUISIANA DEPARTMENT OF PUBLIC   ERIN WILDER-DOOMES
11    SAFETY AND CORRECTIONS; ET AL
12
13
14                  Testimony of
15              DR. EVELYNN M. HAMMONDS
16    taken on Thursday, September 26, 2024, before
17    Caroline D. Escude', Certified Court Reporter in
18    and for the State of Louisiana, via Zoom
19    Videoconferencing.
20
21
22         COURT REPORTERS OF LOUISIANA, L.L.C.
           9522 Brookline Avenue, Suite 217
23           Baton Rouge, Louisiana 70809
        PHONE (225) 201-9650 * FAX (225) 201-9651
24        E-Mail:  depos@courtreportersla.com
25

                                        Page 1

1                    I N D E X
2
3                                    Page
4   Caption                         1
5   Appearances                     3
6   Agreement of Counsel            4
7   Examination
8       BY MR. BLANCHFIELD          5
9
10  Reporter's Certificate          38
11                  * * * * *
12  Exhibits:
13      (None.)
14
15
16
17
18
19
20
21
22
23
24
25

Page 2

1              S T I P U L A T I O N
2
3       It is stipulated and agreed by and among
4   Counsel that the deposition of DR. EVELYNN M.
5   HAMMONDS, on Thursday, September 26, 2024, is
6   hereby being taken under the Federal Rules of Civil
7   Procedure for all purposes as permitted under law.
8       The witness reserves the right to read and
9   sign the deposition.  The original is to be
10  delivered to and retained by Mr. Andrew Blanchfield
11  for proper filing with the Clerk of Court.
12      All objections, except those as to the form of
13  the questions and/or the responsiveness of the
14  answers, are reserved until the time of the trial
15  of this cause.
16
17
18
19
20
21                  * * * * *
22      Caroline D. Escude', Certified Court Reporter
23  in and for the State of Louisiana, officiated in
24  administering the oath to the witness.
25

Page 4

1   APPEARANCES:  (All via Zoom Videoconferencing)
2   Representing the Plaintiffs:
3       THE PROMISE OF JUSTICE INITIATIVE
            1024 Elysian Fields Avenue
4       New Orleans, Louisiana  70117
5   BY: MS. LYDIA A. WRIGHT
            MS. SAMANTHA BOSALAVAGE
6
            and
7
        PAUL WEISS RIFKIND WHARTON & GARRISON, LLP
8       1285 Avenue of the Americas
        New York, New York 10019
9
        BY: MR. JEREMY A. BENJAMIN
10          MS. ARIELLE MCTOOTLE
            CHIZOBA WILKERSON
11
    Representing the Defendants:
12
        LIZ MURRILL, ATTORNEY GENERAL
13      OFFICE OF THE ATTORNEY GENERAL
        P. O. Box 1151
14      Baton Rouge, Louisiana  70821
15      BY: MR. ANDREW BLANCHFIELD
            Special Assistant Attorney General
16          KEOGH, COX & WILSON, LTD.
            701 Main Street
17          Baton Rouge, Louisiana  70802
18          and
19      LOUISIANA DEPARTMENT OF PUBLIC
        SAFETY & CORRECTIONS
20      504 Mayflower Street
        Baton Rouge, Louisiana  70802
21
        BY: MR. JONATHAN R. VINING
22          General Counsel
23  Reported by:
24      Caroline D. Escude', Certified
        Court Reporter No. 91182 in and
25      for the State of Louisiana

Page 3

1          DR. EVELYNN M. HAMMONDS
2   Harvard University, Department of the History of
3   Science, Cambridge, Massachusetts 02138, having
4   been first duly sworn, was examined and testified
5   as follows:
6   * * * * * * * * * * * * * * * * * * * * * * * * *
7       (Ms. Bosalavage and Ms. McTootle were not
8   present at the commencement of the deposition.)
9              EXAMINATION
10  BY MR. BLANCHFIELD:  (Beginning at 8:27 AM)
11      Q.   Good morning, Dr. Hammonds.  How are you?
12      A.   I'm good.  Thank you.
13      Q.   Good.  I hope you recovered from whatever
14  you had and are feeling better?
15      A.   Yes.  It was -- it was COVID, but not
16  COVID.
17      Q.   Okay.  Well, look, I'm Drew Blanchfield
18  and I'm here to ask you some questions about an
19  expert report that you've rendered in this matter.
20      A.   Yes, sir.
21      Q.   Have you ever given a deposition before?
22      A.   Yes, I have.
23      Q.   Okay.  Can you tell me about how many
24  times?
25      A.   Only once before.

Page 5

2 (Pages 2 - 5)

1  Q.  Okay.  And what was the occasion for that
2  deposition?
3  A.  I was, at the time, Dean of Harvard
4  College and I was asked to give a deposition with
5  regard to a case -- a tenure case at the
6  university.
7  Q.  Okay.  Just a couple of ground rules.  We
8  have a court reporter taking down everything that
9  we say so we'll try not to talk at the same time so
10  we don't make it a challenge for her.  And if we
11  can use yeses and noes instead of uh-uhs and
12  uh-huhs, it'll come out better on the record, okay?
13  A.  Okay.
14  Q.  I don't anticipate being very long today,
15  but if you want to take a break at any time please
16  tell us and we'll do that.  If any of my questions
17  are unclear, please tell me and I will rephrase
18  them, okay?
19  A.  Okay.
20  (Unidentified person with PJI joined the Zoom.)
21  BY MR. BLANCHFIELD:
22  Q.  All right.  Can you tell us -- we are now
23  in September of 2024.  What are you -- what are
24  your current duties and what are you doing these
25  days?

Page 6

1  A.  I am currently a professor here at
2  Harvard University.  I'm currently teaching both in
3  the faculty of Arts and Sciences and the Harvard
4  School of Public Health.  That's my primary
5  responsibilities.  I am also the interim director
6  of the Charles Warren Center for Studies in
7  American History.
8  Q.  Okay.
9  A.  And director of the Project on Race and
10  Gender in Science and Medicine at the Hutchins
11  Center for African-American research here at the
12  university.
13  Q.  Okay.  Can you tell me, you're actively
14  teaching classes this semester?
15  A.  Yes, I am.
16  Q.  And what classes are you teaching?
17  A.  I'm teaching a class called The Changing
18  Concept of Race in America from Jefferson to
19  Genomics, which is a graduate course, and I am
20  teaching a course at the Harvard School of Public
21  Health on The Past and The Present: The History of
22  Racism in American Public Health.  I think that's
23  the right title.
24  Q.  Okay.  Do you hold any other forms of
25  employment other than the work that you just

Page 7

1  described?
2  A.  I do not have other forms of employment.
3  I also serve -- I have served in professional -- my
4  professional organization, but it's not -- I am not
5  paid for that position.
6  Q.  Okay.  Are you a -- you're an employee of
7  Harvard?
8  A.  Yes, I am.
9  Q.  Yeah.  Okay.  So you are -- you are --
10  you are a W-2 employee of Harvard University?
11  A.  Yes, I am.
12  Q.  Okay.  Have you ever been involved in --
13  as an expert in litigation before?
14  A.  No, I have not.
15  Q.  Have you ever prepared a similar type
16  expert report for purposes of litigation as you
17  have done in this matter?
18  A.  No, I have not.
19  Q.  Do you -- do you know how the plaintiff
20  attorneys first contacted you, how they learned of
21  your existence and retained you?
22  A.  One of the attorneys was a former student
23  of mine here at Harvard.
24  Q.  Who was that?
25  A.  Kirk McLeod.

Page 8

1  Q.  Okay.  And what -- what was your
2  understanding of their purpose for your retention?
3  A.  I was -- I was asked to give my opinion
4  as a historian of American science, medicine,
5  public health and African-American history on the
6  conditions of -- the psychological and physical
7  conditions of the workers on the farm line and its
8  -- given its similarities or resonances with the
9  same kind of ideas and practices that were
10  expressed by individuals during the history of
11  chattel slavery.
12  Q.  Okay.  Have you ever been involved in
13  litigation as a party, as a plaintiff or a
14  defendant?
15  A.  No.
16  Q.  Now, you gave a list of the documents
17  that you reviewed prior to issuing your report.  Is
18  that list complete?
19  A.  Yes.  In terms of what I did for my
20  report, yes.
21  Q.  Okay.  And who determined what documents
22  to send you?
23  A.  The legal team at -- at -- the
24  plaintiffs' legal team.
25  Q.  Okay.  I see that you've read a bunch of

Page 9

3 (Pages 6 - 9)

1 declarations from inmates and supplemental
2 declarations and some depositions. And they chose
3 -- with respect to the depositions that were sent
4 to you, they chose those depositions?
5    A.   Yes.
6    Q.   I see that you have read depositions of
7 some of the inmates, but there are a number that
8 you have not read. Do you have any understanding
9 why you were not sent additional depositions?
10    A.   No.
11    Q.   Do you have any idea why they
12 particularly chose the inmate depositions that they
13 sent to you?
14    A.   No. We did not discuss why those were
15 chosen.
16    Q.   Okay. And you read all of those
17 materials?
18    A.   Yes, I did.
19    Q.   You didn't have someone read them and
20 summarize them; you individually went through the
21 materials?
22    A.   I read all of the material that was sent
23 to me.
24    Q.   Okay. Your report references -- and I
25 just want to confirm this -- when you talk about

Page 10

1    Q.   Okay. Are you able to give me -- and I
2 see your conclusion on your report, but are you
3 able to kind of give me a summary of what your
4 opinion is in this case?
5    A.   I can give you a summary. My opinion is
6 that as a -- speaking as a historian on African-
7 American history, on the history of medicine in
8 public health in the United States, my -- my
9 opinion -- my summary is based on what I have read
10 and -- about the situation at the farm line.
11       I speak from my understanding of the
12 kinds of labor regimes under chattel slavery and
13 the role of physicians and medical officials in
14 treating those individuals who were enslaved during
15 the slavery period as well as the continuing
16 persistence of practices and ideologies on the part
17 of medical and public health officials with regard
18 to the status of the health status of
19 African-Americans in particular.
20       And so my conclusion is that there were
21 -- there are very serious similarities between what
22 I have -- what I know about the history of racial
23 discrimination and the creation of health
24 disparities between whites and African-Americans in
25 this country that were expressed in what I was able

Page 12

1 the farm line you say in Footnote 1 -- I'm
2 referring to compelled labor vegetable operations
3 at Angola. That's correct?
4    A.   Yes.
5    Q.   Are you aware that inmates at Angola --
6 that all inmates have some job?
7    A.   Yes, I am aware of that.
8    Q.   Okay. Are you aware of the other jobs
9 that are held by inmates at Angola besides
10 compelled labor vegetable operations?
11    A.   I am not aware of the specific job
12 details of the other opportunities -- the other
13 positions of work that people do -- the inmates do
14 at the prison. No, I am not.
15    Q.   Okay. Are you familiar with any other
16 prisons in Louisiana besides LSP?
17    A.   No, sir.
18    Q.   Are you familiar with any other prisons
19 throughout the nation?
20    A.   No, sir.
21    Q.   Do you know Joshua Sbicca?
22    A.   No, I do not.
23    Q.   He was deposed in this matter as an
24 expert. You have not read his deposition?
25    A.   No, I have not.

Page 11

1 to read and understand about what is happening with
2 the practices on the farm line.
3       (Unidentified person with PJI left the Zoom.)
4 BY MR. BLANCHFIELD:
5    Q.   Okay. Can you -- can you -- you lost me
6 there. Similarities between the history of racial
7 discrimination and --
8    A.   The practices on the farm line.
9    Q.   Okay. You have never visited the state
10 prison in Louisiana?
11    A.   No, I have not.
12    Q.   Have you ever visited a prison anywhere?
13    A.   No, sir, I have not.
14    Q.   So the information that you have with
15 respect to what goes on at the farm line you
16 received by reading the documents that you were
17 provided?
18    A.   Yes, I did.
19    Q.   Okay. Now, your report mentions a couple
20 of facts I want to ask you about. One is that the
21 prison grounds rest on what was years ago a
22 plantation; is that correct?
23    A.   That is what I know from the historical
24 record.
25    Q.   Okay. And is that a relevant fact in

Page 13

1  your formulation of your opinion in this matter?
2      A.  Yes.
3      Q.  Okay.  There is also a mention of the
4  forced labor as opposed to voluntary labor.  Is the
5  fact that the labor is forced -- is that a relevant
6  component of your -- of forming your opinion in
7  this matter?
8      A.  Yes.
9      Q.  There's also a reference to low pay or
10 lack of pay for the farm line workers.  Is that
11 also a relevant factor?
12     A.  Yes.
13         (Ms. Bosalavage joined the Zoom.)
14 BY MR. BLANCHFIELD:
15     Q.  And if we could set aside the history
16 that you just described and explained to me, are
17 there any other facts with respect to the prison
18 and the farm line that are relevant like the three
19 things we've talked about, it being a plantation,
20 the labor being forced, there being no pay?  Are
21 there any other facts?
22         MR. BENJAMIN:
23             Objection to form.  You can
24 answer.
25     A.  I would say that the commentary made by

Page 14

1  medical professionals there were an important fact
2  for me in my consideration of -- and upon which I
3  based my conclusion.
4  BY MR. BLANCHFIELD:
5      Q.  Okay.  Anything else?
6      A.  No.
7      Q.  Okay.  Are you aware of farm labor that
8  occurs in other prisons in Louisiana?
9      A.  No.
10     Q.  Are you aware that there is farm labor or
11 agricultural work going on at I think Joshua Sbicca
12 said over 600 prisons in the United States?
13         MR. BENJAMIN:
14             Object to form.
15     A.  No, sir.
16 BY MR. BLANCHFIELD:
17     Q.  One of the articles that you referenced
18 in your report is from Andrea Armstrong.  You're
19 familiar with that?  It's Slavery Revisited in
20 Penal Plantation Labor.  You're familiar with that
21 article?
22     A.  I don't recall specifically, no.
23     Q.  Okay.  Well, it is cited in your report.
24 She goes through a lot of different things
25 including statements that prisons in many states --

Page 15

1  she names Arizona, California, Washington, Utah,
2  Montana, Idaho, Colorado -- they deploy inmates to
3  do agricultural work.  Do you know if that work in
4  any of those prisons is any different from what
5  happens at the state penitentiary here?
6      A.  No, I do not.
7          (Ms. McTootle joined the Zoom.)
8  BY MR. BLANCHFIELD:
9      Q.  If -- if, in fact, the Louisiana State
10 Penitentiary was situated on grounds that were
11 never a plantation, would that change your opinion?
12     A.  No, it would not.
13     Q.  Okay.  What if the labor was voluntary
14 and the inmates signed up to work on the farm line,
15 would that change your opinion?
16     A.  To some extent, yes.
17     Q.  Okay.  Can you explain to me why that
18 would change your opinion and how it would?
19     A.  Because my report is based on looking at
20 the -- the antecedents -- the historical
21 antecedents of contemporary practices and,
22 therefore, the compelling of labor -- if I
23 understand your question correctly -- whether that
24 -- the labor under chattel slavery was not
25 voluntary.

Page 16

1      Q.  Okay.  What about -- you mentioned the
2  lack of pay.  If the -- and there's testimony in
3  the record that the farm line initially there was
4  no pay and then they can get I think two to four
5  cents an hour.  I think there's a statutory limit
6  of 20 cents an hour.  If the inmates were being
7  paid more, would that change your opinion?
8      A.  I don't think in and of itself the amount
9  of pay is -- is -- was a consideration of mine.
10 The fact that the pay that -- I was told what the
11 payments were was so very low that it appeared to
12 me to be almost an insignificant amount of funding,
13 so, of course, I would take that into
14 consideration.  As I said about -- it's the
15 antecedents to and resonances with chattel slavery
16 where slaves were not paid anything.
17     Q.  Okay.  Going back to the issue of the
18 plantation, though, if we take that out of the
19 equation, there was no plantation, would your
20 opinion with respect to the risk of psychological
21 and physical harm be the same?
22         MR. BENJAMIN:
23             Object to form.
24     A.  At this point I would say that the
25 reference to the previous fact that the land of

Page 17

1   this -- where this -- where the prison is -- was
2   situated on a former plantation, I think -- and
3   that that fact is well known, then I think that's
4   an important consideration for me.
5   BY MR. BLANCHFIELD:
6   Q.   Okay.  So all four -- four of the things
7   that we mentioned are relevant or significant with
8   respect to your formulation of your opinion in this
9   matter?
10  A.   I'm sorry.  Could you repeat that?
11  Q.   Yeah.  The four things that we discussed,
12  the issue of the plantation, forced labor, lack of
13  pay and the commentary by the medical
14  professionals, all four of those are significant in
15  your formulation of your opinion in this matter?
16  A.   Yes.
17  Q.   And if we take one or two out, there is a
18  potential that your opinion would be modified?
19  A.   Well, I would have to say, yes, my
20  opinion would be modified.
21  Q.   Okay.  Do you know if there is any laws
22  in Louisiana that require any pay for inmates for
23  hard labor?
24  A.   I am not aware of any such laws.
25  Q.   Okay.  Are you aware of laws in Louisiana

Page 18

1   that require that individuals found guilty of
2   felonies are to be sentenced to hard labor?
3   A.   I am not aware of the legal issues with
4   respect to the inmates at -- in Louisiana.
5   Q.   Okay.  Do you have any opinion as to what
6   the term hard labor means or infers?
7   A.   Well, I think that's a judgment.  I have
8   my own personal opinion.
9   Q.   Okay.  What is your own personal opinion?
10  A.   Well, I consider when one uses the term
11  hard labor as a historian what I want to understand
12  is how that -- how that term is defined by the
13  people who use such terms.  So I would -- if I'm --
14  I would ask what is that supposed to mean.  I won't
15  impose my own personal opinion of the readings and
16  materials that I make my judgment upon.
17  Q.   Okay.  The risk -- the risk of harm that
18  you described in your report, would that same risk
19  apply to other workers at the state penitentiary,
20  like grass-cutting crews or roofers or folks who
21  run cattle, horses or things like that?
22  A.   It depends on the context.
23  Q.   And what do you mean by that?  Can you
24  explain that to me?
25  A.   So I was asked to make some historical --

Page 19

1   take some historical references about the
2   situations that people suffered under -- under
3   chattel slavery.  Certainly that were people who
4   were roofers or cattle herders or whatever, but
5   under chattel slavery they were all slaves.  So
6   that's the context where I began my analysis and,
7   therefore, my opinion.
8          If -- if the circumstances and the
9   conditions under which people served in those other
10  kinds of jobs in the current day, if they are -- if
11  people describe to me what the situation is -- and
12  that's what I meant by defining; it depends on the
13  context -- then I would make -- I can make some
14  assessment as to whether or not those kinds of
15  situations, those kinds of jobs were similar to the
16  ones in which I was trying to draw from in the
17  historical record.
18  Q.   Okay.  And you don't have that
19  information about other jobs, the ones that I spoke
20  about, the kitchen workers and people like -- that
21  are doing that?
22  A.   No, I do not.
23  Q.   Okay.  And if you -- if you were supplied
24  that information you would be able to give us an
25  opinion on that, I assume?

Page 20

1   A.   Yes.
2   Q.   Okay.  Your report also references guards
3   and inmates working at gunpoint.  What do you mean
4   by that?
5   A.   That is that the workers in the -- on the
6   farm line were being supervised or monitored by
7   guards who had the absolute presence of guns.
8   Q.   Okay.  It seems to suggest to me that a
9   gun is being pointed at someone when you say at
10  gunpoint.  Is that what you mean to -- to connote
11  with that phrase?
12  A.   No, I did not mean to use the term
13  gunpoint to indicate that guns were always being
14  pointed at individuals, only that guns were
15  available and visible to the -- to the inmates.
16  Q.   Okay.  All right.  I want to just briefly
17  go over portions of your report.  Do you have your
18  report with you?
19  A.   Yes, I do.
20  Q.   Okay.  Do you have any other documents
21  with you today?
22  A.   I have -- all of the documents that I was
23  sent are present on my -- or most of them are
24  present here on my desk, but they're not opened.
25  Q.   Okay.  Okay.  You talk about on page four

Page 21

1  --
2     A.   Okay.  Hold on one second.
3     Q.   Sure.  Sure.
4     Q.   Page four?
5     Q.   Page four, yes.
6     A.   Okay.
7     Q.   If we start at the top of page
8  four, it reads, Consequently -- and you go -- I'm
9  not ignoring the three pages before that, but I
10  just want to kind of cut to the chase here if I
11  can.
12        It says, Consequently the farm line
13  straddles a thin line of punishment and humiliation
14  while instigating a considerable risk of
15  psychological and physical harm.  In my view these
16  risks stem from two overarching factors.
17     A.   I don't --
18     Q.   You -- you see where I'm reading?
19     A.   Maybe your -- maybe your pagination is
20  slightly different than mine.
21     Q.   Oh, okay.  I'm -- I'm looking at -- now
22  looking at a paragraph that is numbered 16.  It
23  says, First, the physical environment --
24     A.   Yeah, your -- your version is slightly
25  different than mine, but let me just see if I can

Page 22

1  confirm what's what with the pagination.
2  BY MR. BLANCHFIELD:
3     Q.   Okay.  Doctor, is the -- the first page
4  of your report, is it the -- it says United States
5  District Court, Middle District of Louisiana?  It's
6  the --
7     A.   Yes, it does.
8     Q.   Okay.  And then the next page is the
9  table of contents?
10     A.   Yes, sir.
11     Q.   And then the next page starts with your
12  introduction, background, qualifications and
13  experience?
14     A.   Yes, it does.
15     Q.   And then the next page is -- starts with
16  the assignment?
17     A.   Yes.
18     Q.   Okay.  And that page has the assignment,
19  has materials reviewed and summary of opinions,
20  correct?
21     A.   Assignment, materials, yes.
22     Q.   Okay.  And then the next page is -- I
23  have paragraphs -- the end of paragraph 12,
24  paragraphs 13 and 14.  Is that what you have?
25     A.   No, my paragraphs are not numbered that

Page 24

1  find that.  Well, I actually don't see it like
2  that, so, anyway, go -- I'm sorry.
3     Q.   Okay.  Well, let's --
4          THE WITNESS:
5              Maybe I should -- well,
6  Jeremy, I don't know what to --
7          MR. BENJAMIN:
8              Drew, do you want to either
9  share a screen or we can -- we can send over the
10  PDF?
11  BY MR. BLANCHFIELD:
12     Q.   Well, what does -- let me ask you,
13  Doctor, what does your report look like?  How many
14  pages is it?
15     A.   Well, mine is 10 pages.
16     Q.   Okay.  Well, the one I was sent is -- is
17  seven pages.
18     A.   Okay.
19          MR. BLANCHFIELD:
20              Jeremy, do you have any
21  explanation for that?
22          MR. BENJAMIN:
23              I think that your -- I think
24  that there's the cover page and the table of
25  contents that are going on, but we can -- we can

Page 23

1  way.  This is where there's a discrepancy.
2     Q.   Ah, okay.  What is on -- what is on that
3  page?
4     A.   After materials reviewed and summary of
5  my opinions I have paragraphs numbered -- under
6  summary of opinion -- one, two, three, four, five,
7  six through seven.
8     Q.   Okay.  Do you have a scanner available to
9  you?  Is there any way you could scan that and
10  e-mail that to us so we know what your report --
11          MR. BENJAMIN:
12              We'll take it under
13  advisement, Drew.  Why don't we do this?  Why don't
14  we -- if okay by you, we'll go off the record,
15  we'll send -- I think what's happened here is that
16  when we PDFed it it may have gotten -- you know,
17  the formatting may have changed.
18          MR. BLANCHFIELD:
19              Okay.
20          MR. BENJAMIN:
21              But why don't -- why don't --
22  if we can go off the record for two minutes, we
23  will e-mail Dr. Hammonds a copy of the PDF and then
24  we can go from there.
25          MR. BLANCHFIELD:

Page 25

1    That will work.
2    THE WITNESS:
3    Okay.
4    MR. BLANCHFIELD:
5    Thank you.
6    THE WITNESS:
7    Thank you.
8    (A recess was taken at 8:58; resuming at
9  9:05 AM)
10  BY MR. BLANCHFIELD:
11   Q.   Okay.  Maybe we can clear up the
12  confusion then.
13   A.   Yeah.
14   Q.   I think it -- it started to change after
15  your summary of opinions where you get to
16  epidemiology.
17   A.   Okay.
18   Q.   The PDF that you just received, that
19  paragraph Epidemiology is labeled 12?
20   A.   Yes, sir.
21   Q.   And then it goes on to the next page, 13
22  and 14?
23   A.   Yes, sir.
24   Q.   Okay.  But your report -- the one that
25  you have is different?

1    A.   The paragraphs were not numbered in this
2  way.
3    Q.   Okay.
4    A.   This may have been an earlier version.
5    Q.   Okay.  What about content?  Can you
6  confirm for me that the content is the same in the
7  two reports?
8    A.   Yes.
9    Q.   And that is through the end of the report
10  and your conclusion with your signature dated
11  August 30th, 2024?
12   A.   Yes, sir.
13   Q.   Okay.  Okay.  All right.  So I was asking
14  you about -- and if you want to look at the new
15  report that you have it would be on page four, the
16  top of page four.  We were looking at the two
17  overarching factors that you described.
18   A.   Yes, sir.
19   Q.   Are you with me?
20   A.   Yes, I am.
21   Q.   Okay.  So in that paragraph 16 you talk
22  about both plaintiffs and defendants have expressed
23  an understanding that objectively and subjectively
24  the farm line mirrors this vicious past that you
25  describe.  You then go on to quote the field

1  operations currently at Angola, stated that if we
2  were to look, quote, at a picture of a slave and a
3  picture of the farm line, you can see where there
4  is some resemblance and you footnote the deposition
5  of Huey Pidgeon.  Do you see that?
6    A.   Yes, sir.
7    Q.   Okay.  Now, if I pull up that deposition
8  to that page, his answer that you quote from, it
9  says -- at page 159 it says, I mean, if I look at a
10  picture of a slave and a picture of a farm line you
11  can see where there is some resemblance, where
12  slaves working in the fields, picture of a farm
13  line working in the field.
14       And he continues in the same answer and
15  he says, But what's going on is two different
16  things as far as the way that a slave would be
17  treated versus what's going on with this, to me, in
18  my opinion.
19       You did not choose to quote the remainder
20  of his answer in your report?
21   A.   I did not.
22   Q.   Is it fair to say that what he was trying
23  to convey is that the history of slavery and what
24  is going on on the farm line, in his opinion, are
25  actually two different things?

1         MR. BENJAMIN:
2         Objection.
3  BY MR. BLANCHFIELD:
4    Q.   You can answer.
5    A.   I'm sorry?
6         MR. BENJAMIN:
7         You can answer, Dr. Hammonds.
8    A.   Yeah, that is his opinion, that they were
9  two different things.
10  BY MR. BLANCHFIELD:
11   Q.   Okay.  But you didn't -- you didn't quote
12  any part of that.  I mean, it seems to me you're
13  trying to convey that his opinion was that it is
14  reminiscent of slavery when actually he says the
15  exact opposite.  Isn't that fair to say?
16        MR. BENJAMIN:
17        Objection.
18   A.   My opinion is that he said there was some
19  resemblance and that's the part that I was
20  interested in.
21  BY MR. BLANCHFIELD:
22   Q.   You weren't interested in where he says
23  that they were really two different things?
24   A.   Well, I think that's fairly obvious that
25  what's happening at the -- at the farm line is not

Page 30

```
 1  the same as slavery.
 2      Q.  You also read the deposition of Orlando
 3  Scott?
 4      A.  Yes.
 5      Q.  And in his testimony he was asked a very
 6  similar question at page 160 by the plaintiffs'
 7  attorney and he was asked, Do you see any
 8  connection between the history of slavery in
 9  Louisiana and in America and work on the farm line,
10  and he answers, No, I don't see it.
11          Do you remember reading that testimony?
12      A.  Yes, sir.
13      Q.  And then further asked again on that same
14  page, But if we are focused on those lines, the
15  vegetables that Lines 24 and 25 pick, you don't see
16  any connection between the history of slavery in
17  Louisiana and that kind of work, and the answer is,
18  No, ma'am.
19          So another individual out there who is
20  saying, No, I don't see the connection, you don't
21  cite any of that testimony in your report, do you?
22      A.  No, I do not.
23      Q.  And why is that?
24      A.  My -- my -- my -- my concern and what I
25  was interested in trying to understand is not
```

Page 31

```
 1  whether or not what happened under chattel slavery
 2  was exactly the same as what happened in what was
 3  happening on the -- on -- in the prison in Angola.
 4          My -- my -- my -- my -- my concern and
 5  where I focused on as a historian was to say there
 6  are some similarities and I was emphasizing what I
 7  thought would be the similarities.
 8      Q.  Okay.  And you're aware that these two
 9  individuals, Huey Pidgeon and Orlando Scott, are
10  correctional officers who work out on the farm line
11  daily?
12      A.  Yes.
13      Q.  And that they are both African-American?
14      A.  I do not -- I do not know their racial
15  identity.
16      Q.  Okay.  If we proceed to the next
17  paragraph or the second overarching factor, you
18  state in that paragraph among other things that the
19  farm line's modern plantation serves no social
20  scientific purpose other than to punish, degrade
21  and dehumanize its captives beyond the fact of
22  their imprisonment.
23          Is it your understanding that the
24  vegetables that are harvested on the farm line are
25  used to feed the inmates on a daily basis?
```

Page 32

```
 1      A.  Well, yes, I do understand that.
 2      Q.  Okay.  Is that not a purpose for which
 3  the fresh vegetables are grown and harvested?
 4      A.  Yes, it is.
 5      Q.  Is it a relevant factor in the
 6  formulation of your expert report and your opinion?
 7      A.  It's relevant up to a point.
 8      Q.  Explain that to me if you could, Doctor.
 9      A.  In other words, I would say again that my
10  point is not that they are -- what is happening
11  today is exactly the same as what happened under
12  slavery.
13      Q.  That's not your opinion?
14      A.  My opinion is that it is not exactly the
15  same.
16      Q.  Okay.  And tell me, this -- this -- you
17  referenced this considerable risk of psychological
18  and physical harm.  Does that apply equally to
19  white inmates?
20      A.  I would not say that it applies equally.
21  I am not a psychologist and I'm not saying that I
22  understand the psychological state of -- of how the
23  conditions on the farm line could possibly affect
24  the psychological state of white inmates, so that
25  is not -- that is not my expertise.
```

Page 33

```
 1      Q.  Okay.  So you mentioned you're not a
 2  psychologist.  You're also not a medical doctor,
 3  correct?
 4      A.  I am not.
 5      Q.  And I understand that you have not
 6  reviewed any of the medical records of any inmates
 7  in this matter?
 8      A.  I have not.
 9      Q.  And with respect to the declarations and
10  the depositions of inmates that you have read in
11  this matter, do you have any knowledge of the
12  actual amount of time any of these individuals have
13  spent working on the farm line this summer, the
14  year 2024?
15      A.  No, I do not.
16      Q.  Is that relevant when you talk about this
17  risk of psychological and physical harm?  Is the
18  amount of time they work on the farm line relevant?
19          MR. BENJAMIN:
20              Objection.
21      A.  That is not the connection that I was
22  trying to draw.
23  BY MR. BLANCHFIELD:
24      Q.  Okay.  So if -- if -- if we take an
25  individual who worked one day a week on the farm
```

9 (Pages 30 - 33)

**Page 34**

1 line versus someone who worked three days a week on
2 the farm line, your -- your opinion would not
3 change with respect to those two individuals?
4   A.   Again, I was not making any statements
5 about individuals.  I am talking about the overall
6 conditions.  I would -- I would -- I am not -- I
7 did not review the kind of material that you
8 suggest -- that you just indicated, so I could not
9 make that kind of assessment.
10   Q.   Okay.  All right.  Moving forward, I'm
11 actually going to move to the last page of your
12 report.  You reference farm line personnel's
13 troubling -- this is in -- well, it's my paragraph
14 number 28.  It's -- it's right before your
15 conclusion.
16   A.   Yes.
17   Q.   Personnel's troubling comments that men
18 on the farm line fake mental health episodes to
19 shirk punishment, and then it goes on.  You -- you
20 have not reviewed any of what we referred to as the
21 self-declared emergencies on the farm line, have
22 you?
23   A.   No, I have not.
24   Q.   You have not come to an opinion as to the
25 genuineness of any of those complaints?

**Page 35**

1   A.   I cannot make such an assessment.
2   Q.   Okay.  Do you have plans of coming to the
3 trial of this matter that's currently set for
4 November 18th this year?
5   A.   I -- my plan -- my plan is to be a part
6 of that if that is what the plaintiffs -- the
7 lawyers want me to do.
8   Q.   Okay.  Have you ever testified in a court
9 of law?
10   A.   No, I have not.
11   Q.   Well, there's always a first.  You know,
12 Doctor, I think that's all the questions I have for
13 you today.  I sure appreciate your time.  I enjoyed
14 chatting with you.
15   A.   Thank you very much.
16   Q.   Okay.
17       MR. BLANCHFIELD:
18          Any questions, Jeremy?
19       MR. BENJAMIN:
20          None.  Thank you.
21       MR. BLANCHFIELD:
22          Thank y'all.
23
24       (End of testimony at 9:19 AM)
25

**Page 36**

WITNESS'S CERTIFICATE

4     I, DR. EVELYNN M. HAMMONDS, the undersigned,
5 do hereby certify that I have read the foregoing
6 deposition taken on SEPTEMBER 26, 2024, and it
7 contains a true and accurate transcript of the
8 testimony given by me:

11   (   )  Without corrections

13   (   )  With corrections as reflected on the
14 Errata Sheet(s) prepared by me and attached hereto
15 consisting of _____ pages.

18   _____
19       DR. EVELYNN M. HAMMONDS
20   _____
21           DATE

24 Reported by:  Caroline D. Escude', CCR

**Page 37**

1   R E P O R T E R ' S   C E R T I F I C A T E
2
3     I, Caroline D. Escude', Certified Court
4 Reporter, Certificate #91182, in and for the State
5 of Louisiana, as the officer before whom this
6 testimony was taken, do hereby certify that DR.
7 EVELYNN M. HAMMONDS, after having been duly sworn
8 by me upon authority of R.S. 37:2554, did testify
9 as hereinbefore set forth in the foregoing 36 pages
10 on September 26, 2024; that this testimony was
11 reported by me in stenographic machine shorthand,
12 was prepared and transcribed by me or under my
13 personal direction and supervision, and is a true
14 and correct transcript to the best of my ability
15 and understanding; that the transcript has been
16 prepared in compliance with transcript format
17 guidelines required by statute or by the rules of
18 the board and that I am informed about the complete
19 arrangement, financial or otherwise, with the
20 person or entity making arrangements for deposition
21 services; that I have acted in compliance with the
22 prohibition on contractual relationships, as
23 defined by Louisiana Code of Civil Procedure
24 Article 1434 and in the rules and advisory opinions
25 of the board; that I have no actual knowledge of

1  any prohibited employment or contractual
2  relationship, direct or indirect, between a court
3  reporting firm and any party litigant in this
4  matter nor is there any such relationship between
5  myself and a party litigant in this matter; that I
6  am not related to counsel or to the parties herein,
7  nor am I otherwise interested in the outcome of
8  this matter.
9        This certification is valid only for a
10  transcript accompanied by my original signature and
11  original required seal or my certified digital
12  signature on this page.
13    Signed:  September 26, 2024
14    _____
15        Caroline D. Escude', CCR #91182
16
17
18
19
20
21
22
23
24
25
                                              Page 38

1  Voice Of The Experienced Et Al.  v. Leblanc, James Et Al.
2  Dr. Evelyn M. Hammonds 6925720
3         ACKNOWLEDGEMENT OF DEPONENT
4    I, Dr. Evelyn M. Hammonds, do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11  _____  _____
12  Dr. Evelyn M. Hammonds          Date
13  *If notary is required
14        SUBSCRIBED AND SWORN TO BEFORE ME THIS
15    _____ DAY OF _____, 20___.
16
17
18    _____
19    NOTARY PUBLIC
20
21
22
23
24
25
                                              Page 40

1  Voice Of The Experienced Et Al.  v. Leblanc, James Et Al.
2  Dr. Evelyn M. Hammonds Job No. 6925720
3       E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  Dr. Evelyn M. Hammonds          Date
25
                                              Page 39

1  <JBenjamin@PaulWeiss.com>
2        September 26, 2024
3  RE: Voice Of The Experienced Et Al.  v. Leblanc, James Et Al.
4  DEPOSITION OF: Dr. Evelyn M. Hammonds 6925720
5    The above-referenced witness transcript is
6  available for read and sign.
7    Within the applicable timeframe, the witness
8  should read the testimony to verify its accuracy. If
9  there are any changes, the witness should note those
10  on the attached Errata Sheet.
11    The witness should sign and notarize the
12  attached Errata pages and return to Veritext at
13  errata-tx@veritext.com.
14    According to applicable rules or agreements, if
15  the witness fails to do so within the time allotted,
16  a certified copy of the transcript may be used as if
17  signed.
18        Yours,
19        Veritext Legal Solutions
20
21
22
23
24
25
                                              Page 41

11 (Pages 38 - 41)