## IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **VOICE OF THE EXPERIENCED**, a membership organization on behalf of itself and its members; and **MYRON SMITH, DAMARIS JACKSON, NATE WALKER, DARRIUS WILLIAMS, KEVIAS HICKS, JOSEPH GUILLORY, KENDRICK STEVENSON, and ALVIN WILLIAMS**, on behalf of themselves and all others similarly situated, | Civil Action No.: 3:23-cv-1304-BAJ-EWD |
| *Plaintiffs*, | |
| v. | |
| **JAMES LEBLANC**, in his official capacity as Secretary of the Louisiana Department of Public Safety and Corrections; **TIMOTHY HOOPER**, in his official capacity as Warden of Louisiana State Penitentiary; **MISTY STAGG**, in her official capacity as Director of Prison Enterprises, Inc.; the **LOUISIANA DEPARTMENT OF PUBLIC SAFETY & CORRECTIONS**; and **PRISON ENTERPRISES, INC.** | |
| *Defendants*. | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A SECOND TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

Page

INTRODUCTION ...........................................................................................2

FACTS ...........................................................................................................2

    A.    Background ........................................................................2

    B.    This Court Previously Found That Defendants' Operation of the Farm Line During Periods of High Heat Is Likely Unlawful................................2

    C.    Defendants Continue to Fail to Protect People from Heat-Related Harm ..............4

        1.    HCP8's May 1 to October 31 Applicability Period ....................................5

        2.    Heat Alert Threshold.................................................6

        3.    Attachment A – Medications List ..........................9

        4.    Attachment B – Medical Exclusion List................................10

        5.    Heat Precautions in Practice ...............................11

        6.    Risk to People on the Farm Line.................................13

LEGAL STANDARD................................................................................13

ARGUMENT ............................................................................................14

I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR HEAT CLAIMS UNDER THE EIGHTH AMENDMENT ....................................14

    A.    Defendants Are Aware of the Substantial Risk of Serious Heat-Related Harm .....................................................14

    B.    Defendants Continue to Act with Deliberate Indifference to Known Risks.........15

        1.    Defendants' Inadequate Remedial Measures Reflect Deliberate Indifference ...............................................16

            (a)    Arbitrary Time Constraints on Operation of Heat Precautions .... 16

            (b)    Increased Thresholds for Heat Alerts ........................... 17

            (c)    Dangerously High Threshold to Stop Outdoor Work.................. 18

            (d)    Infrequently Monitored Heat Index Data from a Distant Source . 18

            (e)    Deficient HPDS Medications and Medical Exclusion Lists........ 19

### TABLE OF CONTENTS
#### (Continued)

**Page**

(f)     Absence of Protections Previously Ordered by the Court ............ 19

2.     Defendants' Noncompliance with Their (Inadequate) Policies Reflects Deliberate Indifference ................................................................19

3.     Defendants' Attitudes and Conduct Reflect Deliberate Indifference ........20

II.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR ADA CLAIMS ....................21

III.     PLAINTIFFS FACE A SUBSTANTIAL THREAT OF IRREPARABLE INJURY ..................................................................................................24

IV.     THE EQUITIES AND PUBLIC INTEREST FAVOR AN INJUNCTION ....................24

V.     THE PROPOSED RELIEF IS NARROW, NECESSARY, AND NON-INTRUSIVE ..................................................................................................24

CONCLUSION...................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ball* v. *LeBlanc*,
792 F.3d 584 (5th Cir. 2015) .............................................................14, 15, 16, 17

*Blackmon* v. *Garza*,
484 Fed. App'x 866 (5th Cir. 2012) (per curiam)....................................16

*Book People, Inc.* v. *Wong*,
91 F.4th 318 (5th Cir. 2024) ..............................................................24

*Borum* v. *Swisher Cnty.*,
2015 WL 327508 (N.D. Tex. Jan. 26, 2015) ........................................21, 22, 23

*Braggs* v. *Dunn*,
562 F. Supp. 3d 1178 (M.D. Ala. 2021) ...............................................17

*Brown* v. *Plata*,
563 U.S. 493 (2011)..........................................................................25

*Cadena* v. *El Paso Cnty.*,
946 F.3d 717 (5th Cir. 2020) ..............................................................22

*Canal Auth. of Fla.* v. *Callaway*,
489 F.2d 567 (5th Cir. 1974) ..............................................................14

*Cole* v. *Collier*,
2017 WL 3049540 (S.D. Tex. July 19, 2017)................................ *passim*

*Farmer* v. *Brennan*,
511 U.S. 825 (1994)..........................................................................15, 21

*Frame* v. *City of Arlington*,
657 F.3d 215 (5th Cir. 2011) ..............................................................22

*Gates* v. *Collier*,
501 F.2d 1291 (5th Cir. 1974) ............................................................21

*Gates* v. *Cook*,
376 F.3d 323 (5th Cir. 2004) ..............................................................15

*Hale* v. *King*,
642 F.3d 492 (5th Cir. 2011) ..............................................................23

**TABLE OF AUTHORITIES**
**(Continued)**

Page(s)

*United States* v. *Hinds Cnty. Bd. of Supervisors*,
128 F.4th 616 (5th Cir. 2025) ....................................................................15, 17, 25

*Hinojosa* v. *Livingston*,
807 F.3d 657 (5th Cir. 2015) ..........................................................................21

*Lewis* v. *Cain*,
2021 WL 1219988 (M.D. La. Mar. 31, 2021) ..........................................................23

*Lewis* v. *Cain*,
701 F. Supp. 3d 361 (M.D. La. 2023).........................................................16, 19, 21

*Luke* v. *Texas*,
46 F.4th 301 (5th Cir. 2022) ..........................................................................21

*McCollum* v. *Livingston*,
2017 WL 608665 (S.D. Tex. Feb. 3, 2017) ..............................................................22

*Miller* v. *Collier*,
2021 WL 6274450 (S.D. Tex. Nov. 9, 2021) ..............................................................22

*Miss. Power & Light Co.* v. *United Gas Pipe Line Co.*,
760 F.2d 618 (5th Cir. 1985) ..........................................................................13

*United States* v. *Oregon State Med. Soc.*,
343 U.S. 326 (1952)....................................................................................20

*Planned Parenthood Gulf Coast, Inc.* v. *Kliebert*,
141 F. Supp. 3d 604 (M.D. La. 2015)....................................................................14

*Reynolds Metals Co.* v. *Consol. Aluminum Corp.*,
53 F.3d 1281 (5th Cir. 1995) ..........................................................................25

*Robinson* v. *Ardoin*,
605 F. Supp. 3d 759 (M.D. La. 2022)....................................................................24

*Seaman* v. *CSPH, Inc.*,
179 F.3d 297 (5th Cir. 1999) ..........................................................................22

*Silver* v. *City of Alexandria*,
470 F. Supp. 3d 616 (W.D. La. 2020)....................................................................24

*Tellis* v. *LeBlanc*,
2021 WL 4267513 (W.D. La. Sept. 20, 2021)..........................................................22, 23

# TABLE OF AUTHORITIES
## (Continued)

Page(s)

*Tellis* v. *LeBlanc*,
   2022 WL 22861739 (W.D. La. Nov. 1, 2022) .........................................................23

*US Airways, Inc.* v. *Barnett*,
   535 U.S. 391 (2002) .........................................................................................23

*Voice of the Experienced* v. *LeBlanc*,
   2024 WL 3279899 (M.D. La. July 2, 2024) ....................................................... *passim*

*Webb* v. *Livingston*,
   618 F. App'x 201 (5th Cir. 2015) .......................................................................16

**Statutes**

18 U.S.C. § 3626(a)(2) ...........................................................................................25

29 U.S.C. § 794(a) .................................................................................................22

29 U.S.C. § 794(b)(1)(A) .........................................................................................23

42 U.S.C. § 12102 ..................................................................................................22

42 U.S.C. § 12102(2)(A)(1) ......................................................................................22

La. Rev. Stat. § 40:1087.1 .......................................................................................8

**Other Authorities**

28 C.F.R. Pt. 35, App. B at 687 (2017) ........................................................................23

28 C.F.R. § 35.130(b)(7) .......................................................................................22, 23

Federal Rule of Evidence 706 .................................................................................1, 25

Plaintiffs, on behalf of themselves and those similarly situated, respectfully submit this memorandum of law in support of their motion for a second temporary restraining order ("TRO") and preliminary injunction. Specifically, with respect to Defendants' operation of the Farm Line at Louisiana State Penitentiary ("LSP"), Plaintiffs seek: (i) a <u>TRO</u> immediately requiring Defendants to issue a "heat alert" whenever the heat index meets or exceeds 88°F and to monitor the heat index every 30 minutes; (ii) a <u>preliminary injunction</u>, following an evidentiary hearing, requiring Defendants to (a) continue the aforementioned heat alert and heat monitoring practices; (b) prohibit the assignment of people with heat precaution duty status ("HPDS") to the Farm Line on any day that the National Weather Service ("NWS") projects the heat index will meet or exceed 88°F; (c) expand the list of medications and conditions qualifying a person for HPDS as described in the accompanying declaration of Dr. Susi Vassallo, Ex. 1 ("Fourth Vassallo Decl."); (d) grant HPDS to all persons taking such medications or diagnosed with such conditions within 10 days; (e) ensure all protections afforded under Louisiana Department of Public Safety and Correction ("DOC") Health Care Policy No. 8 ("HCP8"), and any preliminary relief ordered by the Court, are available to *all* Farm Lines;[1] (f) lower the threshold for all outdoor work to cease from a heat index of 113°F to a heat index of 103°F; and (g) update LSP Directive 13.067 to reflect the heat protections offered under HCP8, the remedial measures ordered by the Court in its August 15, 2024 order, ECF 109, and the additional relief sought herein; and (iii) the <u>appointment of an expert pursuant to FRE 706</u> to monitor and record Wet Bulb Globe Temperature ("WBGT") on the Farm Line and to consult the Court regarding Defendants' heat-related practices.[2]

---

[1] The Farm Line currently comprises Lines 15, 15b, 24, and 25. It does not include all agricultural assignments.

[2] Plaintiffs intend to prove at trial that a complete injunction of the Farm Line is necessary and appropriate. For purposes of this motion, however, Plaintiffs presently seek more limited relief.

## INTRODUCTION

Last summer, this Court granted in part Plaintiffs' first motion for a preliminary injunction and ordered Defendants to "take immediate measures to correct the glaring deficiencies in their heat-related policies." *Voice of the Experienced* v. *LeBlanc*, 2024 WL 3279899, at *1, *31 (M.D. La. July 2, 2024).  With that injunction now expired, and another heat season fast approaching, Defendants' deliberate indifference to the dangers of working the Farm Line in extreme heat threatens the lives and safety of Plaintiffs and all those similarly situated.  Nearly a year after the Court found Plaintiffs likely to succeed on their heat-related claims, the remedial measures Defendants have purported to adopt remain "inadequate and border on bad faith."  ECF 109 at 2 (internal citation omitted).  Plaintiffs thus seek a TRO and second preliminary injunction requiring Defendants to take narrow and necessary measures to protect people on the Farm Line from heat-related injury.

## FACTS

### A.    Background

On the Farm Line, Defendants dehumanize and endanger men incarcerated at LSP by forcing them to perform punitive agricultural labor under conditions that make their work unnecessarily difficult and by withholding access to healthcare and basic workplace safety precautions.[3]  In the high heat, these conditions quickly become life-threatening.

### B.    This Court Previously Found That Defendants' Operation of the Farm Line During Periods of High Heat Is Likely Unlawful

Last May, Plaintiffs sought a TRO and preliminary injunction to enjoin the Farm Line whenever the heat index meets or exceeds 88°F.  ECF 37.  Plaintiffs presented (a) unrebutted

---

[3]    Plaintiffs recognize the Court's familiarity with the facts of this heavily litigated action and include here only basic factual and procedural background and describe recent developments relevant to this motion.

expert testimony from Dr. Vassallo concerning the substantial risk of heat-related illness that all people, and particularly heat sensitive people such as Plaintiffs Guillory, Hicks, Jackson, Walker, and some members of VOTE (collectively, the "Heat Sensitive Plaintiffs") experience on the Farm Line; (b) declarations from Plaintiffs and others assigned to the Farm Line; (c) voluminous evidence of the life-threatening heat conditions on the Farm Line; and (d) legal authority demonstrating that Defendants' deliberate indifference to the substantial risk of serious harm under these high-heat conditions violates the Eighth Amendment. ECF 37-1–37-70; 51–51-15. This Court concluded that Plaintiffs demonstrated a likelihood of success on the merits of their heat-related claims. Rather than enjoin the Farm Line, the Court ordered Defendants to propose necessary measures to correct the "glaring deficiencies in their heat-related policies" and to "alter Farm Line working conditions to protect human health and safety." *Voice of the Experienced*, 2024 WL 3279899, at *1, *31.

Defendants appealed and sought a stay pending appeal; the Fifth Circuit declined to stay core aspects of the injunction, finding Defendants were unlikely to prevail in appealing this Court's key findings of deliberate indifference and the scope of the injunction with respect to the provision of shade, adequate rest breaks, and protective equipment.[4] Ex. 2 at 8. While the appeal was pending, the injunction expired by operation of law.

On July 19, 2024, Defendants proposed erecting a 10'x10' tent for shade, providing five-minute breaks every 30 minutes once a heat alert is issued, and providing sunscreen. ECF 86. These proposals were inadequate in substance and practice: during a June 22, 2024 inspection of the vegetable fields where men were working, Plaintiffs' representatives observed a single pop-up tent, which cast very little shade and that was placed far from the incarcerated workers. During

---

[4] The Fifth Circuit stayed other injunctive measures that it found would affect operations beyond LSP. Ex. 2 at 10.

their five-minute breaks, most men sat on crates in the field under direct sun, since the tent was so far away.  ECF 95.  Coolers with ice and liquid were placed directly on the muddy ground.  *Id.*

As this Court observed, Defendants' "apparent obstinance towards proposing meaningful changes to conditions on the Farm Line . . . border[ed] on bad faith."  ECF 109 at 2.  Cataloguing ongoing risks caused by Defendants' operation of the Farm Line—such as haphazard and "grossly insufficient" shade and water, the high number of heat-related sick calls, and the insufficient medical response to heat-related emergencies—the Court concluded that Defendants' response reflected "a callous disregard for human health and safety."  *Id.* at 3, 5.  Accordingly, the Court ordered LSP to provide (a) one 15-minute break every hour when the heat index reached or exceeded 88°F; (b) shade structures placed throughout the work area where men could rest without encroaching on others' personal space; (c) ice and water throughout the work area on raised platforms; (d) some form of seating for men to rest; (e) clean cups; (f) lace up boots, sunscreen, protective long-sleeved shirts, gloves, and hats; and (g) free medical care.[5]  *Id.* at 5–6.

### C.    Defendants Continue to Fail to Protect People from Heat-Related Harm

On October 18, 2024, almost four months after the Court found them likely deliberately indifferent to heat-related harms on the Farm Line, and after the height of another heat season had passed, Defendants finally informed the Court it would replace the tents with mobile shade wagons and would modify its heat pathology policy ("HCP8").[6]  ECF 132.

Specifically, Defendants proposed to: (i) *increase* the threshold at which a heat alert would

---

[5]    LSP charges men on the Farm Line, who earn between zero to four cents an hour, $1 to $2 for medical care necessitated by the conditions under which they are forced to work, creating a massive financial disincentive to seek care.  Ex. 3,  Vassallo First Decl. ¶ 82.

[6]    HCP8 sets a baseline heat pathology policy for all DOC facilities.  LSP can, but has not, added additional protections.  Ex. 4,  50:25–51:15 (Lavespere).  In fact, LSP has not yet revised its heat pathology protocol, "LSP Directive 13.067," to reflect even the October 2024 modifications to HCP8.  Ex. 5,  56:5–58:22 (Oliveaux).

be called from a heat index of 88°F to 91°F; (ii) require shaded break areas, sunscreen, and a 15-minute break every 45 minutes (all of which the Court previously ordered); (iii) stop outdoor work at a heat index threshold of 113°F (relief the Court had also previously ordered but that was stayed by the Fifth Circuit); and (iv) revise the medications and medical conditions qualifying a person for HPDS—including by *removing* diabetes as a qualifying condition—and adding an unnecessary layer of provider discretion.  Ex. 6.

Other provisions of HCP8 remain unchanged.  For instance, DOC limits heat protections to May 1 to October 31 and tethers those protections to heat index readings taken in the shade at a NWS station 50 miles from LSP.  *Id.*  HCP8 continues to require LSP to monitor the index only once every two hours, an interval during which, as Defendants admit, "significant" increases in the heat index (up to 14°F) can and do occur.  Ex. 4 at 150:7–12 (Lavespere); Ex. 7.

Notably, the revised HCP8 *still* omits the basic and obvious safety requirements identified in this Court's orders.  Ex. 8.  For instance, HCP8 is silent as to the placement and size of shade structures, the placement of water and ice, and the provision of chairs, cups, lace-up boots, sunscreen, protective long-sleeved shirts, gloves, hats, and free medical care.  *Id.*  LSP Directive No. 13067 is also silent on these issues.  Ex. 9.

As revised, HCP8 is still inadequate for several reasons:

### 1.    HCP8's May 1 to October 31 Applicability Period

Every year between May 1 and October 31, LSP must monitor the heat index once every two hours.  When the heat index exceeds a certain threshold—previously 88°F, now 91°F—the facility must issue a heat alert that triggers protections, including bringing people with HPDS indoors and providing those on the Farm Line with water, ice, and frequent breaks.  Ex. 8.  But outside the May to October period, none of these protections are required.  Ex. 4 at 52:22–53:7 (Lavespere).  By arbitrarily limiting HCP8 to the calendar, instead of actual environmental

conditions, LSP exposes incarcerated men to a substantial risk of serious heat-related harm.

It is obvious and well-known—including to Defendants—that the heat index can and often does exceed 88°F before May and after October.  Ex. 10, 65:21–24 (Toce); Ex. 11.[7]  As one example, on November 7, 2024, the heat index reached a high of 91.89°F.  Ex 11 at 1, 23.  Line 15b was working outside that day, but no heat alert was issued.  Ex. 12 at -928.

There is no scientific or medical basis to apply HCP8 based on the calendar, rather than on environmental conditions.  Ex. 1, Fourth Vassallo Decl. ¶ 7.  Instead, heat protections should be mandatory whenever there is an elevated risk of heat stress, regardless of the date.  *Id.*

### 2.    Heat Alert Threshold

For years before this lawsuit was filed, and based on Dr. Vassallo's opinions, Defendants would issue a heat alert when the heat index reached 88°F.  Ex. 4 at 70:19–72:1 (Lavespere).  As Dr. Vassallo has explained, that threshold is well supported by science.  Ex. 1, Fourth Vassallo Decl. ¶ 31; Ex. 3, Vassallo First Decl. ¶¶ 33, 67, 69, 88; Ex. 13, Vassallo Supp. Decl. ¶ 2; Ex. 14, Vassallo Second Supp. Decl. ¶ 1.

In response to an interrogatory, Defendants attribute their decision to increase the threshold to 91°F to:  Dr. Reynolds-Barnes's expert report, Dr. Keldie's expert report, a NWS website, and page 91 of the National Institute for Occupational Safety and Health's ("NIOSH") Criteria for a Recommended Standard Occupational Exposure to Heat and Hot Environments (the "NIOSH Standards").  Ex. 15 at 4.  None of these supports increasing the heat alert threshold to 91°F.

*First*, Dr. Reynolds-Barnes—a Doctor of Pharmacy—has not opined on the heat alert

---

[7]    Although LSP purportedly monitors heat index data provided by the NWS at the New Roads False River Regional Airport ("New Roads") site, the parties have agreed to rely on heat index data from the nearby Baton Rouge Metropolitan Airport Ryan Field site when heat index data from New Roads is not available.  ECF 121.  Despite their relatively close proximity, the heat index recorded at these two sites often varies significantly, and whether a heat alert is called often depends on where the data is pulled from.  *See* Ex. 11.

threshold at all, as Defendants now admit, Ex. 4 at 75:11–20 (Lavespere), and she has explicitly

stated that she is not acting as an expert on this issue,  Ex. 17 at 178:14–18 (Reynolds-Barnes).

*Second*, Dr. Keldie—who is not an expert in thermoregulation—has never recommended

a 91°F heat alert threshold.  *See* Ex. 18 at 4, 11; Ex. 16 at 21:7–10, 24:3–5, 153:11–13 (Keldie).

That recommendation, it turns out, came from Defendants' counsel.  Ex. 4 at 70:2–18 (Lavespere).

After Dr. Keldie suggested—without any evidence—that a 95°F threshold would be "extremely

safe," Defendants' counsel convinced them that 95°F would be "too high" for the Court to accept.

*Id.*; Ex. 16 at 226:18–227:3 (Keldie).  Dr. Keldie's  report includes a chart he attributes to OSHA

that indicates a heat index of 91°F as requiring "Lower" caution. Ex. 19.  The actual source of Dr.

Keldie's chart is unknown:  it is not the linked OSHA guidance he cites, which contains no chart,

no reference to a 91°F heat index, and no other support for Defendants' modification. Ex. 20.

On the contrary, the OSHA guidance that Dr. Keldie cites clearly states that "[e]mployers

should not rely on Heat Index alone for the most accurate hazard assessment," as it "is measured

in the shade" and "does not account for the effects of wind, sunlight, radiant heat sources, or

workload."[8]  *Id.* 4–5.  Instead, **OSHA recommends the use of wet bulb globe temperature**

**(WBGT) monitor to measure workplace environmental heat**" because it "accounts for all four

major environmental heat factors—temperature, humidity, radiant heat, and wind."  *Id.* at 2, 4

(emphasis in original).  WBGT can also measure conditions at the work site.  *Id.* at 3–4.  OSHA

goes on to caution that "[d]irect sunlight can increase Heat Index by up to 13.5°F" and that

"clothing adjustment factors" should be considered in assessing whether work conditions are too

hot.  *Id.*  It also notes that "[o]utdoor workers have died of heat stroke when the day's maximum

---

[8]    Dr. Vassallo agrees that WBGT is a "far more accurate measurement" and that NWS heat index data "may not
reflect the conditions in LSP's fields."  She nevertheless has based her opinions here on the heat index because it
is collected by a neutral party and can be tracked online. Ex. 1, Fourth Vassallo Decl. ¶¶ 18, 22.

Heat Index was only 86°F" and that "less severe heat-related illnesses can happen at even lower Heat Index values." *Id.* at 4, 5, 10.

*Third*, the NWS website cited in Defendants' interrogatory response contains no support for their decision to increase the heat alert threshold. That site comprises two charts and written guidance. Ex. 21. The first NWS chart indicates that at 91°F, "extreme caution" is warranted and heat stroke and heat exhaustion are "possible with prolonged exposure and/or physical activity."[9] *Id.* Immediately below that, NWS warns, "the heat index values in the chart above are for shady locations. *If you are exposed to direct sunlight, the heat index value can be increased by up to 15°F*." *Id.* (emphasis added). The second chart on the website shows that "extreme caution" is required at a heat index of 90°F (again assuming that direct sunlight is factored into the measurement). *Id.* According to NWS, a heat index of 103°F—i.e., 88°F plus 15°F to account for the effect of direct sun—is in the "Danger" zone, where heat exhaustion is "likely" even without prolonged exposure and/or physical activity. *Id.*

DOC's 30(b)(6) witness confirmed that men on the Farm Line often work under direct sun. Ex. 4 at 83:21–84:7 (Lavespere). But when asked whether DOC will account for the effect of direct sun on the heat index during its next review of HCP8, he answered, "[t]o be honest with you, I'd have to say it depends on how this court case comes out." *Id.* at 96:16–25.

*Fourth*, the NIOSH Standards Defendants claim to rely upon, like the OSHA guidance discussed above, emphasize the superiority of WBGT over the heat index, and note that WBGT is the "index most frequently used and recommended for use throughout the world." Ex. 22 at 114; *see also* LA. REV. STAT. § 40:1087.1 (requiring Louisiana schools participating in interscholastic

---

[9] Prolonged exposure to high heat results in an increased "heat load," which can have significant physiological effects. Ex. 1, Fourth Vassallo Decl. ¶ 8. For men on the Farm Line, who work for hours under high heat only to return to dorms that are unairconditioned, an increased heat load and the associated accumulation of heat stress can exacerbate the risk of serious harm. *Id.*; Ex. 13, Vassallo Supp. Decl. ¶¶ 21, 25.

athletics to follow guidelines of the American College of Sports Medicine and the National Athletic Trainers Association, which includes WBGT policies).  NIOSH explains:

> For normally clothed individuals at low air velocities, a wet bulb temperature of about 30°C (86°F) is the upper limit for unimpaired performance on sedentary tasks and 28°C (82.4°F) is the upper limit for moderate levels of physical work. As [WBGT] increases above these threshold values . . . accidents increase.

Ex. 22 at 110, 70 (Table 5-1).  NIOSH also warns that direct sunlight can result in a heat index increase of 13°F and that clothing must be factored in.  *Id.* at 15–16, 76 (Table 6-2).

### 3.     *Attachment A – Medications List*

Dr. Reynolds-Barnes recommended the medications in HCP8's revised Attachment A. Ex. 23; Ex. 4 at 114:2–6 (Lavespere).  Initially, DOC chief medical officer Dr. Randy Lavespere objected to Dr. Reynolds-Barnes' proposal, which expands the list from 13 psychotropics to include medications with anticholinergic properties; but after reading the official pacing circulars (i.e., the prescription inserts) that come with the medications, Dr. Lavespere relented.  Ex. 4 at 39:7–42:22, 113:24–114:1 (Lavespere).  Because of Dr. Reynolds-Barnes' recommendations, the number of people qualifying for HPDS based on medications rose from approximately 500 people in May 2024, *see* Ex. 24, to approximately 1,500 people in November 2024, *see* Ex. 25.

While Dr. Reynolds-Barnes' recommendations are an obvious and long overdue improvement to HCP8, it is apparent she focused primarily on medications with anticholinergic properties, leading to a significantly underinclusive list of medications associated with impaired thermoregulation.  Ex. 1, Fourth Vassallo Decl. ¶ 34; *see also* Ex. 17 at 116:14–18; 185:20–24 (Reynolds-Barnes) (conceding inability to cite scientific literature to support her conclusions).  Just as anticholinergic drugs affect thermoregulation, "[m]edications that impair or affect the [central nervous system], including the hypothalamus, brain stem, and spinal cord, will likewise affect the body's thermoregulatory responses."  Ex. 1, Fourth Vassallo Decl. ¶ 38.  Thus, SSRIs and SNRIs,

which are well known to impair thermoregulation, should be, but are not, included on the list.  *Id.*
¶ 40; Ex. 26 at 7, 9 (Table 1); Ex. 27.  The same is true for dihydropyridines and medications that
depress cardiac function, impair cardiac output, and/or cause dehydration, including "ACE"
inhibiters and "ARBs."  Ex. 1, Fourth Vassallo Decl. ¶ 44; Ex. 27.

Defendants have not adopted all of Dr. Reynolds-Barnes's recommendations.  According
to Dr. Reynolds-Barnes, anyone taking a listed medication should *automatically* receive HPDS
unless they give informed consent.  Ex. 17 at 164:17–25 (Reynolds-Barnes).  But the updated
HCP8 gives DOC providers wide discretion to grant or deny HPDS, even as to individuals taking
medications on the expanded (but still underinclusive) medication list.  Ex. 8.

Moreover, because Attachment A is underinclusive, some men on the Farm Line are
currently taking medications that are well known to impair thermoregulation but are omitted from
the current Medication List, such as SSRIs.  Ex. 29, Farria Decl.  They, and similarly situated men,
will not receive HPDS so long as these medications are not listed.  *Id.*  Further, there is no assurance
that Defendants will update Attachment A if research indicates other medications in LSP's
formulary impair thermoregulation.  Ex. 8; Ex. 1, Fourth Vassallo Decl. n25.

### 4.    *Attachment B – Medical Exclusion List*

HCP8 Attachment B, Ex. 30, reflects Dr. Keldie's proposed list of medical conditions that
should qualify a person for HPDS.  That list is also underinclusive.  Ex. 1, Fourth Vasallo Decl.
¶ 48.  For instance, it is well-settled that people with diabetes and pre-diabetes are at increased risk
of heat stroke and heat-related disorders.  *Id.* ¶ 48; Ex. 31 at 1255.  Defendants clearly know this:
the prior version of HCP8 identified diabetes mellitus as a chronic condition that carries a higher
risk of heat pathology.  Ex. 32 at 017941.  Inexplicably, Defendants have removed diabetes from
the modified Medical Exclusion List.  Ex. 30.  Coronary artery disease is likewise known to cause
reduced cardiac output, which impairs both vasodilation and sweating, and increases the risk of

heat stroke and other heat-related disorders.  Ex. 1, Fourth Vasallo Decl. ¶ 49.  But it, too, is omitted from the list.  Ex. 30.

Many conditions on Attachment B have medically unsupported qualifiers, for example "*refractory* seizure disorder" and "*resistant* hypertension."  Ex. 30 (emphases added).  In fact, "*any* seizure disorder and *any* hypertension will increase a patient's risk of heat stroke and heat-related disorders."  Ex. 1, Fourth Vasallo Decl. ¶ 50.  Attachment B contains severity scales for which there are no scientific basis; "[t]hey appear to be Dr. Keldie's own creation."  *Id.* at ¶ 51.

Again, contrary to Defendants' litigation positions, HCP8 expressly provides Defendants with wide discretion to grant or withhold HPDS even if a person has a condition on Attachment B.  *Compare* Ex. 8 *with* Ex. 15 at 5.  Moreover, Plaintiffs like Mr. Jackson with medical conditions that impair thermoregulation but are not listed on Attachment B will not receive HPDS, even if they have requested that accommodation.  Ex. 42, Jackson Decl.

> 5.    *Heat Precautions in Practice*

Even if Defendants' new HCP8 adequately protected heat-sensitive putative class members from substantial risk of serious harm (it does not), Defendants are not consistently implementing their modified policies.  Defendants' chronic failures and litigation posturing continues to cause serious health risks to the incarcerated men forced to work the Farm Line.

First, many individuals who now qualify for HPDS based on their medications have not actually been issued a duty status card or been notified of their status at all.  Ex. 28, Hicks Decl. And LSP admits that at least as of February 12, 2025, it had not even *identified* those who qualify for HPDS based on their medical condition.  Ex. 5 at 107:22–108:17 (Oliveaux).

Second, Defendants do not implement their purported safety measures on all Farm Lines. On Line 15b, men also work in the direct sun, yet Defendants have not provided any mobile shade wagons or tents there.  Ex. 33 at 45:8–19 (Sylvester); Ex. 34, Green Decl. ¶ 10.  Defendants suggest

that Line 15b can seek relief from the heat by sitting in the transport bus.  ECF 148-1 ¶¶ 5–7.  But

the bus is parked far from where men are working, Ex. 34, Green Decl. ¶ 11, and is unlikely to

provide relief from the heat, Ex. 33 at 47:6–10 (Sylvester) (explaining that air-conditioning is not

used, even if available).  And Defendants do not provide Line 15b with 15-minute breaks every 45

minutes, as they claim.  *See, e.g.*, Ex. 35; Ex. 36.

Third, Defendants often fail to promptly remove those with HPDS from the Farm Line—

or even to remove them at all—when a heat alert is called.  Ex. 37.

Fourth, Defendants' inadequate policies and deficient responses to medical emergencies

on the Farm Line continue to pose a substantial risk of serious harm to human health and safety.

The following snapshot of events of August 6, 2024, is exemplary.  On that day, the heat index

increased from 88°F to 102°F in the course of only two hours.  *See* Ex. 7 at 1, 11; Ex. 4 at 150:7–

12 (Lavespere) (acknowledging that is a "significant swing").  When Lines 24/25 started at 7:09

a.m. that day, the heat index was already between 80°F and 81°F.  Ex. 38 at -337; Ex. 7 at 1, 11.

By 7:55 a.m., the heat index hit 88°F.  Ex. 7 at 1, 11.  It surpassed 91°F sometime between 8:15

a.m. and 8:35 a.m.  *Id.* at 11.  At 8:53 a.m., a 21-year-old with no significant medical history placed

a self-declared emergency (SDE) from Lines 24/25.  Ex. 39 at -076; Ex. 38 at -337.  He had a

headache and felt faint.  Ex. 38 at 337.  The heat index was approximately 96°F at that time.  Ex.

7 at 11.  At 9:35 a.m., more than 40 minutes later, nurses arrived.  Ex. 38 at -337.  By then, the

heat index was 100°F.  Ex. 7 at 11.  At 9:41 a.m., the heat index was between 100°F to 102°F.  *Id.*

Only then did "Angola announce[] a heat alert."  Ex. 38 at -337.  At 9:42 a.m., the nurse advised

Master Sergeant Scott, the officer "pushing" the Farm Line, to send the patient to Camp D for the

day.  *Id.*  Major Pidgeon arrived at the worksite to take the patient at 10:05 a.m.  *Id.* at -338.  By

then, the patient had waited nearly 50 minutes in extreme heat.  Ex. 7 at 11; Ex. 389 at -337–338.

Meanwhile, Line 15b was also working that day. The men cut grass from 7:05 a.m. to 10:00 a.m., when they received their *first* break. Ex. 38 at -340. That was 20 minutes after the heat index topped 100°F and a heat alert was finally issued, and *two hours* after the heat index surpassed 88°F. *Id.* This is just one of many examples of Defendants' ongoing failure to timely issue heat alerts, offer breaks, and provide emergency care to individuals in the fields. It also underscores Defendants' inexplicable failure to apply HCP8 uniformly across the Farm Lines.

### 6. Risk to People on the Farm Line

Louisiana's hot and humid climate, the conditions on the Farm Line, and Defendants' insufficient efforts to mitigate risks posed thereby have led Dr. Vassallo to conclude that even younger and relatively healthier men forced to work on the Farm Line remain at substantial risk of serious harm from prolonged exposure to heat indices above 88°F, despite Defendants' attempted remedial efforts. It is well-settled that individuals with medical or mental health conditions that make them more susceptible to heat-related injuries, or who are taking certain medications that adversely affect the body's ability to thermoregulate, are particularly at risk. Ex. 1, Fourth Vassallo Decl. ¶ 4; Ex. 16 at 164:13–19, 165:6–8 (Keldie).

These facts apply to every person at risk of assignment to the Farm Line. In fact, despite Defendants' repeated assurances to the contrary, two putative class representatives—Damaris Jackson and Darrius Williams—have recently been assigned to the Farm Line. Ex. 40; Ex. 41; Ex. 42, Jackson Decl.; Ex. 43, Williams Decl. Members of VOTE continue to be assigned or are at risk of being assigned to the Farm Line. Ex. 44, Henderson Decl. ¶¶ 3–4.

## LEGAL STANDARD

"The purpose of a [TRO or] preliminary injunction is to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *Miss. Power & Light Co.* v. *United Gas Pipe Line Co.*, 760 F.2d 618, 627 (5th Cir. 1985). When the "status quo itself

is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent injury." *Canal Auth. of Fla.* v. *Callaway*, 489 F.2d 567, 576 (5th Cir. 1974). "A TRO is simply a highly accelerated and temporary form of preliminary injunctive relief, requiring that the movant establish the same four elements for obtaining a preliminary injunction:  (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Voice of the Experienced*, 2024 WL 3279899, at *22 (citing *Janvey* v. *Alguire*, 647 F.3d 585, 595 (5th Cir. 2011)).  Courts are to consider these factors on a "sliding scale"—a greater threat of irreparable injury may justify issuance of preliminary relief in a situation with a less certain likelihood of success, and vice versa.  *Planned Parenthood Gulf Coast, Inc.* v. *Kliebert*, 141 F. Supp. 3d 604, 635 (M.D. La. 2015).

## ARGUMENT

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR HEAT CLAIMS UNDER THE EIGHTH AMENDMENT

To constitute an Eighth Amendment violation, "prison conditions must pose 'an unreasonable risk of serious damage' to a prisoner's health—an objective test—and prison officials must have acted with deliberate indifference to the risk posed—a subjective test." *Ball* v. *LeBlanc*, 792 F.3d 584, 592 (5th Cir. 2015) (quoting *Helling* v. *McKinney*, 509 U.S. 25, 33–35 (1993)).  Those standards are satisfied here.

### A.    Defendants Are Aware of the Substantial Risk of Serious Heat-Related Harm

This Court has found that the high heat endured by people assigned to the Farm Line satisfies the objective prong of the Eighth Amendment.  *See Voice of the Experienced*, 2024 WL 3279899, at *23 (citing *Hinojosa* v. *Livingston*, 807 F.3d 657, 670 (5th Cir. 2015); *Ball*, 792 F.3d

14

at 596; *Cole* v. *Collier*, 2017 WL 3049540, at *39–40 (S.D. Tex. July 19, 2017)).  The Court has also found Defendants are aware of the substantial risk of serious harm.  *Voice of the Experienced*, 2024 WL 3279899, at *27–28.  Defendants do not, and cannot, dispute those findings.

The very existence of DOC's heat pathology policies (such as they are) confirm Defendants' awareness of the serious risks associated with high heat.  *See id.*; *see also Ball*, 792 F.3d at 594–595 (noting that ameliorative measures taken by Defendants suggest awareness of a substantial risk of serious heat-related harm); *Cole*, 2017 WL 3049540, at *40 ("[Prison's] own policies reflect the known danger of the heat in Texas").  So do the numerous heat-related self-declared emergencies and grievances filed by men on the Farm Line, the Court's prior orders, other heat-related litigations against Defendants, federal and state guidance, widespread news coverage, and common sense confirm "the open and obvious nature of the dangerously hot conditions." *Voice of the Experienced*, 2024 WL 3279899, at *29 (citing *Hinojosa*, 807 F.3d at 665; *Gates* v. *Cook*, 376 F.3d 323, 340 (5th Cir. 2004)).  The only remaining question is whether Defendants have taken reasonable measures to abate that risk.  The answer—still—is a resounding "no."

**B.    Defendants Continue to Act with Deliberate Indifference to Known Risks**

This litigation has compelled Defendants to adopt purportedly ameliorative measures to protect men on the Farm Line during periods of high heat.  But these half-hearted, ineffectual, and insufficient measures do not abate the serious risk of heat-related injury.  Viewed from the "totality of the circumstances," including Defendants' attitudes and conduct, Defendants' response to date confirms their continued deliberate indifference.  *United States* v. *Hinds Cnty. Bd. of Supervisors*, 128 F.4th 616, 631, 632, 634 (5th Cir. 2025) (evaluating the constitutionality of jail practices using a "totality of conditions" test); *see also Farmer* v. *Brennan*, 511 U.S. 825, 843 (1994) ("[I]t does not matter whether the risk comes from a single source or multiple sources . . . ").

1.    *Defendants' Inadequate Remedial Measures Reflect Deliberate Indifference*

The purported measures Defendants have taken since the original injunction, like other "[e]fforts to correct systemic deficiencies that simply do not go far enough, when weighed against the risk of harm," simply "are not reasonable measures to abate" an "identified substantial risk of serious harm." *Lewis* v. *Cain*, 701 F. Supp. 3d 361, 435, 440 (M.D. La. 2023) (rejecting "band-aid" approach to remedies) (cleaned up); *see Webb* v. *Livingston*, 618 F. App'x 201, 209 n.7 (5th Cir. 2015) ("[T]he mere presence of remedial measures [does] not end the inquiry, as such measures must be adequate."); *Cole*, 2017 WL 3049540, at *41 (holding mitigation alone is not dispositive, and courts must also evaluate "the effectiveness of the measures implemented"); *see, e.g.*, *Ball*, 792 F.3d at 595–96; *Blackmon* v. *Garza*, 484 Fed. App'x 866, 871–72 (5th Cir. 2012) (per curiam).  Here, Defendants' ongoing deliberate indifference is clear.  Defendants:

- continue to place arbitrary date limitations on heat pathology policies;
- have *raised* the threshold at which heat alerts are called, thereby *increasing* the risk of heat injury;
- set a dangerously high threshold for outdoor work stoppages;
- conduct lax and inaccurate heat monitoring;
- fail to provide HPDS to all heat-sensitive people who take medications on the Medication List;
- fail to identify heat sensitive people based on the Medical Exclusion List;
- fail to provide even the insufficient protections in HCP8 to all Farm Lines; and
- fail to mandate application and implementation of the very protections this Court has already deemed necessary.

All of this is unreasonable and inadequate.

(a)    *Arbitrary Time Constraints on Operation of Heat Precautions*

By its own terms, HCP8 is applicable only from May 1 to October 31 each year. "From a medical perspective, this time limitation is arbitrary because heat-related illnesses and injuries can

16

occur year-round." Ex. 1, Fourth Vassallo Decl. ¶ 7. "Heat pathology protections should therefore be mandatory whenever atmospheric conditions are conducive to an elevated risk of heat stress, regardless of the calendar date." *Id.* HCP8's arbitrary and unscientific time limitation means that on days when heat protections are needed, they are not mandated or offered even when needed. *See* Ex. 8; *see also Braggs* v. *Dunn*, 562 F. Supp. 3d 1178, 1225 (M.D. Ala. 2021) (rejecting "baseless and arbitrary" decisions that fail to address identified risks).

        *(b)    Increased Thresholds for Heat Alerts*

Defendants' purported attempt to reduce the risk resulting from prolonged heat exposure by *raising* rather than lowering the threshold for heat alerts is clearly unreasonable. Defendants concede that their revised heat alert policy is *less protective* than the prior iteration. Ex. 4 at 73:16–23 (Lavespere). Courts routinely reject mitigation efforts that increase rather than decrease risk. *See, e.g.*, *Hinds Cnty. Bd. of Supervisors*, 128 F.4th at 630 (finding staffing mitigation efforts were inadequate where they resulted in worse staffing levels); *Cole*, 2017 WL 3049540, at *10 (stating "Defendants' actions" making conditions worse for heat-sensitive individuals through purported remedial efforts have "risen beyond indifference to obstruction").

Dr. Vassallo—the only thermoregulation expert in this case—has consistently opined that a heat index of 88°F is the proper threshold for increased heat precautions. Ex. 3, Vassallo First Decl. ¶ 88; Ex. 13, Vassallo Supp. Decl. ¶ 2; Ex. 14, Vassallo Second Supp. Decl. ¶ 1; Ex. 1, Fourth Vassallo Decl. ¶ 31. Her opinion is supported by numerous published articles and studies. Ex. 1, Fourth Vassallo Decl. ¶ 14 n.7. This Court previously credited Dr. Vassallo's testimony that "exposure to heat indexes in excess of eighty-eight degrees Fahrenheit leads to a sharp increase in risk for exposed persons to develop serious, and potentially fatal, injuries that can occur suddenly" and that "strenuous labor" and "certain medical conditions" only exacerbate those risks. *Voice of the Experienced*, 2024 WL 3279899, at *25; *see Ball*, 792 F.3d at 593. Other courts have

also endorsed 88°F as an appropriate threshold to initiate heat-related policies. *See Cole*, 2017 WL 3049540, at *18. DOC *itself* previously adopted Dr. Vassallo's opinions on this issue. Ex. 4 at 70:19–72:1 (Lavespere). DOC's new 91°F threshold is arbitrary, unreasonable, and "unsupported by the scientific literature." Ex. 1, Fourth Vassallo Decl. ¶ 14.

### (c) Dangerously High Threshold to Stop Outdoor Work

DOC's decision to set a heat index of above 113°F before outdoor work must stop is cavalier, particularly in light of their failure to account for the effects of direct sun, clothing, and other factors known to increase heat stress. Ex. 1, Fourth Vassallo Decl. ¶ 29; Ex. 8 at 6. If Defendants were to account for the up to 15°F heat index increase in direct sun as NWS and OSHA instruct, a 113°F heat index could feel like 128°F, well into what NWS identifies as an "Extreme Danger" zone where heat stroke—a severe medical emergency—is "highly likely." Ex. 21 at 1; Ex. 20 at 4. Forcing people to perform farm labor at heat levels that are "highly likely" to be life-threatening is patently unreasonable. Work should cease at a heat index of 103°F, the "Danger" zone threshold identified by NWS. Ex. 21 at 1; Ex. 1, Fourth Vassallo Decl. ¶ 30.

### (d) Infrequently Monitored Heat Index Data from a Distant Source

The risk resulting from all of these failures is compounded by the inadequate monitoring HCP8 requires. LSP, operating under HCP8, relies solely on heat index data that is unlikely to reflect conditions on the Farm Line. *See* Ex. 20 at 4. Additionally, HCP8 requires LSP to monitor the NWS data only once every two hours, an interval during which "significant swing[s]" in the heat index can and do occur. Ex. 4 at 148:3–152:6 (Lavespere); Ex. 7. OSHA, NIOSH, and NWS guidance all confirm serious infirmities with how LSP assesses heat risk, demonstrating the unreasonableness of LSP's methods. *See Cole*, 2017 WL 3049540, at *22 (giving deference to CDC guidance when considering the reasonableness of remedial measures).

18

(e)    *Deficient HPDS Medications and Medical Exclusion Lists*

Defendants' lists of medications (HCP8 Attachment A) and medical conditions (HCP8 Attachment B) are woefully underinclusive, leaving large swaths of heat-sensitive people unprotected. Ex. 1, Fourth Vassallo Decl. ¶¶ 34, 39–44. Likewise, Defendants' excludes from Attachment B conditions widely recognized to cause impaired thermoregulation, like diabetes, *see* Ex. 30, and unsupported restrictions and qualifications of several listed conditions unreasonably leaves heat-sensitive individuals without HPDS. Ex. 1, Fourth Vassallo Decl. ¶ 50. HCP8 also does not *mandate* that HPDS be given to people taking listed medications or diagnosed with conditions. Instead, Defendants retain discretion to make that decision, Ex. 1, Fourth Vassallo Decl. ¶¶ 45, 52, which is cold comfort given that LSP's medical care has been previously found "constitutionally inadequate," *Lewis*, 701 F. Supp. 3d at 387. HCP8 likewise fails to require that new medications be evaluated for their thermoregulatory effect. Ex. 8.

(f)    *Absence of Protections Previously Ordered by the Court*

Several precautionary measures that this Court previously identified as necessary to protect men on the Farm Line—sufficiently spaced and sized shade structures, ice and water throughout the work area kept on raised surfaces, chairs, clean cups, lace-up boots, sunscreen, protective long-sleeved shirts, gloves, hats, and free medical care—are not mandated by HCP8. That omission is inexplicable, even to DOC. Ex. 4 at 161:14–164:1 (Lavespere).

2.    *Defendants' Noncompliance with Their (Inadequate) Policies Reflects Deliberate Indifference*

Defendants' failure to uniformly implement the inadequate measures they purport to have adopted renders their remediation steps all the more unreasonable. Defendants claim to have provided HPDS to anyone at LSP taking a medication listed on HCP8 Attachment A. But months after identifying those people, LSP *still* has not distributed duty status cards or notified those

individuals of modification to their duty status. *See, e.g.*, Ex. 28, Hicks Decl. ¶ 8. Defendants also claim that they will give HPDS to anyone at LSP with a condition listed on HCP8 Attachment B. But they have not even *identified* such people. Ex. 5 at 107:22–108:17 (Oliveaux). Defendants claim they now use mobile shade trailers, but those trailers are not available for Line 15b. Ex. 33 at 24:24–25:6, 45:8–19 (Sylvester). Defendants claim to give 15-minute breaks every 45 minutes. Their records demonstrate otherwise. *See, e.g.*, Ex. 35; Ex. 36. On September 16, 2024, Line 15b received just one 15-minute break, almost two hours after a heat alert was issued. Ex. 45 at -580. Defendants claim that when the heat index hits the threshold for a heat alert, they bring anyone with HPDS inside. This, too, is undermined by Defendants' own records. Ex. 37.

This litany of inaccuracies and noncompliance demonstrates deliberate indifference, if not contempt of court, as this Court has acknowledged. *See* ECF 109 at 7 ("[F]ailure to comply with the remedial measures ordered . . . will almost certainly factor into the Court's decision on Plaintiffs' Eighth Amendment claims, and could subject Defendants to contempt proceedings.").

### 3. *Defendants' Attitudes and Conduct Reflect Deliberate Indifference*

Throughout this litigation, Defendants have all but admitted their purported remedial measures were merely litigation strategy. Ex. 46, 264:8–267:25 (Lavespere); Ex. 4 at 70:2–18, 96:16–25 (Lavespere). They have resisted and delayed making meaningful changes, including those ordered by the Court. When Defendants finally did take (inadequate) steps, they insisted that they did so "voluntarily." Ex. 47 at 1. Even then, Defendants left open the possibility they would revert to their old ways, at any time. *See, e.g.*, Ex. 4 at 141:10– 16 (Lavespere).

The Fifth Circuit has acknowledged that Defendants' actions may merely be litigation posturing as well. Ex. 2 at 5 (noting that it is "not clear that LSP will not resume [its harmful practices] once this litigation ends"); *see United States* v. *Oregon State Med. Soc.*, 343 U.S. 326, 333 (1952) ("It is the duty of the courts to beware of efforts to defeat injunctive relief by

protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption."); *Gates* v. *Collier*, 501 F.2d 1291, 1321 (5th Cir. 1974) ("Changes made by defendants after suit is filed do not remove the necessity for injunctive relief, for practices may be reinstated as swiftly as they were suspended.").

Defendants have never in good faith investigated how to make the Farm Line safe. Ex. 4 at 104:13–105:10 (Lavespere). Rather, DOC's litigation strategy appears to be one of willful blindness, justifying their inadequate policies almost exclusively by reference to the unreliable and unverified opinions of Dr. Keldie, which in turn are based not on science or agency guidance, but on the facts as presented to him by Defendants' counsel. *Id.* at 100:24–103:23; Ex. 16 at 131:1–15, 118:22–119:3 (Keldie). Blind reliance on a knowingly unreliable expert "is not a valid defense to a deliberate indifference claim." *Lewis*, 701 F. Supp. 3d at 433–34; *see also Farmer*, 511 U.S. at 843 n.8 (prison official "would not escape liability if . . . he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist"); *Hinojosa*, 807 F.3d at 668–69 (holding prison officials cannot escape liability by arguing selective ignorance of certain facts). Defendants' "current attitudes and conduct" demonstrate their disregard for the Farm Line's heat-related risks. *Farmer*, 511 U.S. at 827.

## II. PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR ADA CLAIMS

A plaintiff will prevail on a claim under Title II of the ADA when he can show "(1) that he is a qualified individual with a disability; (2) that he was excluded from participation in, or denied the benefits of, services, programs, or activities for which the public entity is responsible, or was otherwise being discriminated against; and (3) that such discrimination is because of his disability." *Luke* v. *Texas*, 46 F.4th 301, 305 (5th Cir. 2022).

Plaintiffs raise both the "'reasonable accommodation' theory of disability-based discrimination," *Borum* v. *Swisher Cnty.*, 2015 WL 327508, at *8 (N.D. Tex. Jan. 26, 2015), and

a methods-of-administration claim, *see Tellis* v. *LeBlanc*, 2021 WL 4267513, at *8 (W.D. La. Sept. 20, 2021). Prisons "have an affirmative *obligation* to make reasonable accommodations for disabled individuals who utilize their services or programs so that a disabled prisoner can have meaningful access to existing public services or programs." *Borum*, 2015 WL 327508, at *21. "The reasonable accommodation obligation arises when the defendant (1) knows of the individual's disability and (2) knows of the physical or mental limitations resulting from the disability." *Id.* at *8; *see also Seaman* v. *CSPH, Inc.*, 179 F.3d 297, 300 (5th Cir. 1999). The entity must provide the reasonable accommodation "unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).

"[T]he ADA recognizes a 'methods of administration' claim that prohibits public entities from using criteria or methods of administration that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability." *Tellis*, 2021 WL 4267513, at *8 (cleaned up). Here, Plaintiffs meet their burden under both theories.[10]

*First*, thermoregulation is a major life activity and major bodily function. *See McCollum* v. *Livingston*, 2017 WL 608665, at *34 (S.D. Tex. Feb. 3, 2017); *Miller* v. *Collier*, 2021 WL 6274450, at *4 (S.D. Tex. Nov. 9, 2021); 42 U.S.C. §§ 12102; 12102(2)(A)(1) (defining "disability" broadly); Ex. 48 at 62:23–64:10 (Spears);. ADA Subclass members are disabled because they are on medications that substantially limit their ability to thermoregulate. *See* Ex. 25; Ex. 28, Hicks Decl.; Ex. 42, Jackson Decl.; Ex. 1, Fourth Vassallo Decl. ¶¶ 32–45. Plaintiffs have requested accommodations for disabilities that are open and obvious from their medical records. Ex. 5 at 79:23–81:24 (Oliveaux), *see Cadena* v. *El Paso Cnty.*, 946 F.3d 717, 724 (5th Cir.

---

[10] Courts interpret Title II and the Rehabilitation Act, 29 U.S.C. § 794(a), *in pari materia*. *See Frame* v. *City of Arlington*, 657 F.3d 215, 225 (5th Cir. 2011).

2020); *see also* Ex. 49; Ex. 24; Ex. 25.

*Second*, the Farm Line is a "service" provided by a public entity, and is therefore within the scope of the ADA—just like all disciplinary activities, work assignments, and virtually everything else inside the context of prison, whether voluntary or not. *See Hale* v. *King*, 642 F.3d 492, 499 (5th Cir. 2011) ("Prison programs fall within Title II's scope."); *Tellis* v. *LeBlanc*, 2022 WL 22861739, at *56–57 (W.D. La. Nov. 1, 2022) (explaining that discipline is a service under the ADA); *Lewis* v. *Cain*, 2021 WL 1219988, at *55 (M.D. La. Mar. 31, 2021) (explaining that the ADA's affirmative "obligation to provide accommodations applies to the discipline of disabled inmates, as well"); *see also* 29 U.S.C. § 794(b)(1)(A) (defining "program or activity" to mean "all" operations of an agency); 28 C.F.R. Pt. 35, App. B at 687 (2017) (Title II applies to "anything a public entity does"). Thus, LSP has an affirmative obligation to make reasonable accommodations for ADA Subclass members. *See Borum*, 2015 WL 327508, at *8.

The evidence is clear: Even under the revised HCP8, Defendants fail to identify men with the disability of impaired thermoregulation. Those who are identified are nonetheless denied reasonable accommodations, since DOC forces them to work in heat indices above 88°F. This has the effect of subjecting individuals with qualifying disabilities to discrimination on the basis of that disability, in clear violation of the ADA. *See Tellis*, 2021 WL 4267513, at *8–10.

The Heat Sensitive Plaintiffs propose a reasonable remedy. *See US Airways, Inc.* v. *Barnett*, 535 U.S. 391, 401 (2002). That is, an Order: (i) lowering the heat alert threshold to 88°F, as it was previously; (ii) prohibiting Defendants from assigning them to the Farm Line when the heat index is projected to reach 88°F; and (iii) promptly bringing anyone with HPDS inside when the heat index hits 88°F. These accommodations would not "fundamentally alter the nature of" the Farm Line. 28 C.F.R. § 35.130(b)(7). The Heat Sensitive Plaintiffs, therefore, are likely to

prevail on their ADA claims.

### III.    PLAINTIFFS FACE A SUBSTANTIAL THREAT OF IRREPARABLE INJURY

Plaintiffs face a substantial threat of irreparable harm absent the requested injunction. A harm becomes "irreparable" where there is no adequate remedy at law. *Book People, Inc.* v. *Wong*, 91 F.4th 318, 340 (5th Cir. 2024).  The deprivation of a constitutional right, including the Eighth Amendment, is irreparable. *Id.* at 340–41.  Plaintiffs have made this showing.  The Heat Sensitive Plaintiffs, too, have also shown that absent injunction, they are at "particularly high risk of suffering from heat-related illness, as their thermoregulatory functions are compromised," and thus face unique risks of irreparable harm. *See Cole*, 2017 WL 3049540, at *43; *see also Silver* v. *City of Alexandria*, 470 F. Supp. 3d 616, 624 (W.D. La. 2020) (violations of the ADA satisfy irreparable harm).  Thus, Plaintiffs satisfy the irreparable harm element.

### IV.    THE EQUITIES AND PUBLIC INTEREST FAVOR AN INJUNCTION

"Elements three and four of the preliminary injunction test, the balance of the equities and the public interest, merge when the Government is the opposing party." *Robinson* v. *Ardoin*, 605 F. Supp. 3d 759, 852 (M.D. La. 2022) (cleaned up).  It is always in the public interest to prevent impending violations of Plaintiffs' constitutional and statutory rights, and Defendants have no legitimate interest in maintaining the Farm Line in violation of the Constitution or federal law. *See Book People*, 91 F.4th at 341 ("[N]either the state nor the public has any interest in enforcing a regulation that violates federal law.") (cleaned up and quotation omitted).  And as the injunction targets only the Farm Line, there is minimal implication to any state interest in administering its prisons.  The balance of the equities and public interest, therefore, strongly favor Plaintiffs.

### V.    THE PROPOSED RELIEF IS NARROW, NECESSARY, AND NON-INTRUSIVE

Injunctive relief is appropriate under the PLRA when it is narrowly drawn, extends no further than necessary to correct the harm, and is the least intrusive means necessary to correct that

harm. 18 U.S.C. § 3626(a)(2).  The PLRA permits remedies that reach deep into the operations of penal institutions.  *See Brown* v. *Plata*, 563 U.S. 493 (2011) (affirming order requiring California to reduce crowding in its prisons); *see also Hinds Cnty. Bd. of Supervisors*, 128 F.4th at 637 (upholding imposition of a receivership to remedy ongoing constitutional violations at a Mississippi jail under the PLRA).  As the Fifth Circuit noted, relief that is "targeted specifically at the Farm Line" does not run afoul of the PLRA.  Ex. 2 at 5.

The injunctive relief that Plaintiffs seek, *see supra* at 1, is narrow, necessary to protect human health and safety, and relates only to Defendants' operation of the Farm Line at LSP.  The Court must appoint an expert pursuant to FRE 706, paid for by Defendants, to monitor and record WBGT on the Farm Line and to consult the Court regarding Defendants' heat-related policies and practices.  *See, e.g.*, *Reynolds Metals Co.* v. *Consol. Aluminum Corp.*, 53 F.3d 1281 (5th Cir. 1995) (appointing Rule 706 witness); *cf. Hinds Cnty. Bd. of Supervisors*, 128 F.4th at 630 (upholding the district court's imposition of a jail administrator and mandated direct supervision where remedial measures were found inadequate).  Onsite WBGT monitoring would yield significantly more accurate heat data than LSP's existing practices and could help prevent serious heat-related injury.  Ex. 1, Fourth Vassallo Decl. ¶¶ 22, 28, *see also supra* n.7.  Given Defendants' track record in this litigation, a neutral party is required to perform these responsibilities.  Accordingly, the requested relief is well within permissible parameters under the PLRA.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion.

Dated: March 26, 2025

**THE PROMISE OF JUSTICE INITIATIVE**

*/s/ Samantha Pourciau*
Samantha Pourciau, La. Bar No. 39808
Kara Crutcher (PHV) IL Bar No. 6337639

1024 Elysian Fields Avenue
New Orleans, LA 70117
Tel: (504) 529-5955
sbosalavage@defendla.org
kcrutcher@defendla.org

**RIGHTS BEHIND BARS**

*/s/ Lydia Wright*
Lydia Wright, La. Bar No. 37926416
Amaris Montes (PHV) MD Bar No. 2112150205
D Dangaran, (PHV) D.C. Bar No. 90023981
1800 M St. NW Fnt. 1 #33821
Washington, D.C. 20033
Tel: (202) 455-4399
lydia@rightsbehindbars.org
amaris@rightsbehindbars.org
d@rightsbehindbars.org

**PAUL, WEISS, RIFKIND, WHARTON
 & GARRISON LLP**

*/s/ Jeremy A. Benjamin*
Joshua Hill Jr. (PHV) NY Bar No. 4297826
Jeremy A. Benjamin (PHV) NY Bar No. 4770277
Michael McGregor (PHV) NY Bar No. 5510490
Arielle B. McTootle (PHV) NY Bar No. 5993217
Ricardo Sabater (PHV) NY Bar No. 5993217
Leah R. Weiser (PHV) NY Bar No. 6027601
Chizoba D. Wilkerson (PHV) NY Bar No. 5903943
1285 Avenue of the Americas
New York, NY 10019-6064
Tel: (212) 373-3000
jhill@paulweiss.com
jbenjamin@paulweiss.com
mmcgregor@paulweiss.com
amctootle@paulweiss.com
rsabater@paulweiss.com
lweiser@paulweiss.com
cwilkerson@paulweiss.com

*Attorneys for Plaintiffs and the Proposed Classes*