# Exhibit 1

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| **VOICE OF THE EXPERIENCED**, on behalf of itself and its members; and **MYRON SMITH, DAMARIS JACKSON, NATE WALKER, DARRIUS WILLIAMS, KEVIAS HICKS, JOSEPH GUILLORY, KENDRICK STEVENSON,** and **ALVIN WILLIAMS,** on behalf of themselves and all others similarly situated, <br><br>    *Plaintiffs*, <br><br>v. <br><br>**JAMES LEBLANC**, in his official capacity as Secretary of the Louisiana Department of Public Safety & Corrections; **TIMOTHY HOOPER**, in his official capacity as Warden of Louisiana State Penitentiary; **MISTY STAGG**, in her official capacity as Director of Prison Enterprises, Inc.; the **LOUISIANA DEPARTMENT OF PUBLIC SAFETY & CORRECTIONS**; and **PRISON ENTERPRISES, INC.**, <br><br>    *Defendants*. | **DECLARATION OF DR. SUSI VASSALLO IN SUPPORT OF PLAINTIFFS' MOTION FOR A SECOND TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

I, Susi U. Vassallo, declare as follows:

1. I submit this declaration in support of Plaintiffs' motion for a second temporary restraining order and preliminary injunction to address measures officials at the Louisiana State Penitentiary (LSP) purport to have undertaken to address the substantial heat-related harms associated with work on the Farm Line.

1

2.  I have previously filed three declarations in this case, and I incorporate those declarations by reference here.[1]

3.  I focus here on LSP's (a) decision to raise the heat alert threshold from a heat index of 88°F to a heat index of over 91°F; (b) revisions to the Heat Pathology Medication List; (c) revisions to the Medical Exclusion List; and (d) reliance upon physical structures to serve as purported cooling stations.

4.  For the reasons set forth below, it is my opinion that those measures, even if diligently implemented, would be insufficient to adequately protect men on the Farm Line. Accordingly, it remains my opinion that incarcerated men forced to work on LSP's Farm Line—including those who are younger and relatively healthier—are at substantial risk of serious harm due to their prolonged exposure to heat indices above 88°F. Individuals with medical or mental health conditions that make them more susceptible to heat-related injuries, or who are taking certain medications that adversely affect the body's ability to thermoregulate, are particularly at risk.

5.  The matters set forth herein are my independent opinions, true and correct of my personal and professional knowledge. If called as a witness to testify, I could and would testify competently.

---

[1] Rec. Doc. 37-3 (Declaration); Rec. Doc. 51-1 (First Supplemental Declaration), Rec. Doc. 120-61 (Second Supplemental Declaration). My credentials are set forth in my initial declaration submitted in this action, I am being compensated at the rate of $450 per hour for my work preparing this report. This compensation is not contingent on my conclusions or the outcome of this litigation.

**A. DOC's Revised Heat Pathology Policy (HCP8)**

6. Around October 20, 2024, the Louisiana Department of Public Safety & Corrections (DOC) modified its health care policy (HCP8) concerning heat pathology in Louisiana prisons. HCP8 applies to all DOC facilities. Each facility, including LSP, can then issue its own directive to add additional protections.[2] It is my understanding that LSP has not revised its facility-specific heat pathology protocol (called Directive No. 13.067) since DOC amended HCP8 in October 2024.[3]

7. HCP8 is deficient in several respects. First, HCP8 sets out heat precautions applicable only from May 1 to October 31 each year. From a medical perspective, this time limitation is arbitrary because heat-related illnesses and injuries can occur year-round. The relevant consideration is not the calendar, but instead the combination of atmospheric conditions that contribute to heat stress, such as temperature, humidity, wind speed, sun angle, and cloud cover.[4] In Louisiana, atmospheric conditions conducive to heat stress often occur outside the arbitrary window of May 1 to October 31. Heat pathology protections should therefore be mandatory whenever atmospheric conditions are conducive to an elevated risk of heat stress, regardless of the calendar date.

8. Second, HCP8 requires heat index monitoring only once every two hours (and, again, only between May 1 and October 31). However, the heat index can change rapidly over short periods. Relatedly, HCP8's monitoring protocol does not account for the physiological effect of accumulated heat on the body (also known as "heat load"). As a result, monitoring the heat

---

[2] HCP8 (October 20, 2024) at ¶ 4; Deposition of Dr. Randy Lavespere, dated Feb. 12, at pp. 50-51.
[3] Deposition of Ashli Oliveaux, dated Feb. 12, 2025, at pp. 56-58.
[4] *See* https://www.osha.gov/heat-exposure/hazards.

3

index only every two hours may not adequately protect the health of all workers on the Farm Line, particularly those who are heat sensitive.

9. The prior version of HCP8, as well as the corollary LSP Directive No. 13.067, required LSP to issue a heat alert whenever (during only the period from May 1 to October 31) the heat index exceeded 88°F. HCP8's heat alert threshold is medically significant because many protections—including bringing heat sensitive people indoors, providing water and ice, and giving work breaks at specified intervals—are mandatory only once a heat alert is called.

10. The new version of HCP8 requires a heat alert to issue only once the heat index exceeds 91°F (and, again, only between May 1 to October 31). DOC has accordingly *increased* the heat alert threshold by 3°F.

11. I understand that DOC's decision to raise the heat alert threshold was based on the opinions of Dr. Deleca Reynolds-Barnes and Dr. Carl Keldie, as well as guidance from the National Weather Service ("NWS")[5] and the Centers for Disease Control and Prevention ("CDC"), and the National Institute for Occupational Safety and Health ("NIOSH").[6]

12. I have reviewed Dr. Reynolds-Barnes's report and see no opinions being offered in that report on this issue.

13. I have also reviewed Dr. Keldie's report. I strongly disagree with Dr. Keldie's conclusions, in part because there is simply no scientific authority supporting the DOC's decision to increase the heat alert threshold to a heat index of 91°F. In fact, the NWS and NIOSH sources cited by the DOC in HCP8 either do not support or outright contradict Dr. Keldie's conclusions.

---

[5] https://www.weather.gov/ama/heatindex
[6] *Recommendations for an Occupational Standard for Workers Exposed to Heat and Hot Environments* (2016) (the "NIOSH Standards") (*available at* https://www.cdc.gov/niosh/docs/2016-106/pdfs/2016-106.pdf?id=10.26616/NIOSHPUB2016106 (p. 91)).

4

14. DOC's decision to raise the heat alert threshold to a heat index of 91°F is unsupported by the scientific literature. As I have said, all people, including young people and those with no known medical problems, are at risk for heat related disorders during persistent exposure to a heat index above 88°F.[7]

15. Studies have shown that the incidence of heat-related emergency department visits, hospitalizations, and death increases sharply when the heat index reaches the mid- to high-80s.[8] The following graph demonstrates the sharp increase in mortality when the apparent temperature (also known as the heat index) reaches 30°C/86°F.[9]



---

[7] *See* Petitti DB, Hondula DM, Yang S, Harlan SL, Chowell G. 2016. Multiple trigger points for quantifying heat-health impacts: new evidence from a hot climate. Environ Health Perspect 124:176–183, http://dx.doi.org/10.1289/ehp.1409119; Basu R, Samet JM. Relation between elevated ambient temperature and mortality: a review of the epidemiologic evidence. *Epidemiol Rev*. 2002;24(2):190-202. doi:10.1093/epirev/mxf007; Skarha J, Dominick A, Spangler K, et al. Provision of Air Conditioning and Heat-Related Mortality in Texas Prisons. *JAMA Netw Open.* 2022;5(11):e2239849. doi:10.1001/jamanetworkopen.2022.39849.
[8] Yard EE, Gilchrist J, et all 2010 Heat illness among high school athletes-United Sates 2005-2009. J Safety Res. 41 (6); Bricknell MC 1996 Heat illness review of military experience JR Amry Med Corpos. 142 (1):34-42; Occupation and Environmental Heat Associated Deaths in Maricopa County, Arizona: A Case-Contol Study Petitti, Diana B, Harlan Sl, Chowelll-Putent and Ruddell Plos One 2013; 8(5) e62596; Centers for Disease Control and Prevention (2008) Heat -related death among crop workers-United States, 1992-2006. MMWR Morb Mortal Wkly Rep. 57(24) 649-653; Mirabelli MD, Richardson, DB (2005) Heat related fatalities in North Carolina. Am J Public Health 95 (4) 635-37; "Update: Heat illness, active component, U.S. Armed Forces, 2020." *MSMR* vol. 28,4 (2021): 10-15.
[9] Davis RE, Knappenberger PC, Michaels PJ, Novicoff WM. Changing heat-related mortality in the United States. *Environ Health Perspect*. 2003;111(14):1712-1718, 1714. doi:10.1289/ehp.6336

5

16. Outdoor workers have died of heat stroke when the day's maximum heat index was only 86°F.[10] OSHA has found that less severe heat-related illnesses can happen at even lower heat index values.[11]

17. The potentially deadly health consequences of DOC's decision to raise the heat alert threshold are compounded by other limitations of DOC's heat related policies and practices under HCP8.

18. Most notably, DOC relies on heat index data recorded some 50 miles from LSP's fields, at the NWS's New Roads/False River weather station. I have also previously relied on heat index data for estimating aspects of heat stress, largely because the data is collected by a neutral party (the NWS) and can be tracked online. However, NWS weather station readings, while useful, may not reflect the conditions in LSP's fields.

19. First, heat conditions at the weather station may be different for multiple reasons, from cloud cover and humidity to local heat sinks. The potential error increases with distance—here, 50 miles—between the weather station and the worksite.[12]

20. Second, the heat index is measured in the shade. LSP's fields—and the manual labor that occurs there—are in the direct sunlight, with conditions significantly hotter than the heat index data may indicate. In fact, the NWS,[13] NIOSH,[14] and OSHA[15] all warn that direct sunlight can <u>increase</u> the heat index by 13.5 to 15°F.

---

[10] https://www.osha.gov/heat-exposure/hazards
[11] https://www.osha.gov/heat-exposure/hazards
[12] *See* NIOSH Standards at 3.
[13] https://www.weather.gov/ama/heatindex
[14] https://www.cdc.gov/niosh/heat-stress/communication-resources/app.html#:~:text=The%20heat%20index%20is%20a,up%20to%2015%C2%B0F.
[15] https://www.osha.gov/heat-exposure/hazards.

21. Third, the heat index combines air temperature and relative humidity to represent how hot the conditions feel at rest. It does not account for the effects of wind, sunlight, radiant heat sources, or workload.[16] These atmospheric and environmental factors are all relevant here.

22. A far more accurate measurement could be achieved on location using Wet Bulb Globe Temperature ("WBGT") monitoring.[17] WBGT monitoring occurs by use of a portable, handheld device that measures multiple atmospheric conditions, including dry air temperature, humidity, and radiant energy, to calculate a thermal load on the worker.

23. WBGT has important advantages over other environmental heat measurements. One major advantage is that WBGT accounts for all four major environmental heat factors: temperature, humidity, radiant heat, and wind.

24. WBGT' is commonly used in industrial settings. In fact, the sources relied upon by Dr. Keldie and the DOC—including from NIOSH, the CDC, and OSHA—widely agree that WBGT is more accurate, efficient, and effective than heat index monitoring alone. According to NIOSH, for example, WBGT monitoring is the "index most frequently used and recommended for use throughout the world."[18] OSHA likewise recommends that "[w]orkplace environmental heat should be measured on-site using WBGT meters. Use of heat index is a less desirable substitute."[19]

25. A hand-held WBGT device contains three different thermometers: (a) a dry bulb thermometer to measure the ambient air temperature; (b) a natural wet bulb thermometer to measure the potential for evaporative cooling; and (c) a black globe thermometer to measure radiant heat.[20] According to OSHA, the WBGT instrument should be placed close to the work

---

[16] https://www.osha.gov/heat-exposure/hazards.
[17] NIOSH Standards at 2–3, 113-114; https://www.osha.gov/heat-exposure/hazards.
[18] NIOSH Standard at 114.
[19] https://www.osha.gov/heat-exposure/hazards
[20] https://www.osha.gov/heat-exposure/hazards

location. For example, if the work is in direct sunlight, then the WBGT instrument should be in the sun.

26. The NIOSH standards cited by the DOC in HCP8 state that "[w]et bulb temperature is easy to measure in industry with a sling or aspirated psychrometer, and it should be applicable in any hot, humid situation where the [wet bulb temperature] approaches skin temperature, radiant heat load is minimal, and air velocity is light."[21]

27. According to those same NIOSH standards, "[f]or normally clothed individuals at low air velocities, a wet bulb temperature of about 30°C (86°F) is the upper limit for unimpaired performance on sedentary tasks and 28°C (82.4°F is the upper limit) for moderate levels of physical work. As the [wet bulb temperature] increases above these threshold values, performance deteriorates and accidents increase."[22]

28. Based on the foregoing, and considering the circumstances of this case, it is my opinion that WBGT monitoring taken by a neutral party at the Farm Line worksites would result in more accurate data than the heat index recorded some 50 miles away.[23]

29. HCP8 also requires outdoor work to cease at a heat index of over 113°F. This metric is extremely high. According to the following NWS heat index charts, which were included in my initial declaration, a heat index of 113°F is well within the "danger" zone, such that heat exhaustion is likely and heat stroke is possible.

30. It is my opinion that all outdoor work at LSP should cease at a heat index of 103°F.

---

[21] NIOSH Standards at 110 (Standard 9.1.2).
[22] NIOSH Standards at 110 (Standard 9.1.2).
[23] NIOSH Standards at 110; *see also* https://www.osha.gov/heat-exposure/hazards.

8



Figure 1. Heat index chart.
https://www.weather.gov/ama/heatindex

31.     As I have indicated in my prior declarations, heat stroke may come on quickly and occur with no prior symptoms or warning. Given this, all people should receive protection as soon as possible once heat stress conditions rise to dangerous levels, *i.e.*, 88°F. For heat sensitive people, those protections should be greater. Indeed, people with conditions or taking medications that impair thermoregulation should not be placed in situations that would likely create the risk of high heat exposure, particularly when they lack freedom of movement and cannot be immediately transported to air-conditioned cooling areas.

9

### B. HCP8 Attachment A (the revised "Medication List")

32.  DOC issued a revised HCP8 Attachment A (the "Medication List") on November 7, 2024. I understand that DOC decided to revise the Medication List in consultation with Dr. Reynolds-Barnes, who recommended the addition of various medications which are widely recognized as having anticholinergic effects.

33.  I agree with Dr. Reynolds-Barnes that each medication listed on the revised Attachment A can interfere with or impair a person's ability to thermoregulate, and that persons taking such medications should receive heat precaution duty status.

34.  However, Dr. Reynolds-Barnes appears to have focused exclusively on medications with anticholinergic properties. She has not included medications that interfere with neurotransmission in the hypothalamus, which is the thermostat for the body.[24] As a result, the revised list remains underinclusive.[25]

35.  I have previously explained that anticholinergic drugs—including antihistamines, cyclic antidepressants, and newer generation antipsychotics—block the action of acetylcholine, a type of neurotransmitter that is critical to sweat gland function.[26] As Dr. Reynolds-Barnes appears to recognize, anticholinergics can impair sweating, which is an important mechanism of cooling.

36.  However, perspiration (sweating) is not the only mechanism of cooling.[27] Cutaneous vasodilation (dilation of blood vessels close to the skin) also facilitates heat dissipation and is critical to effective thermoregulation.

---

[24] *See, e.g.*, https://www.cdc.gov/heat-health/hcp/clinical-guidance/heat-and-medications-guidance-for-clinicians.html#print
[25] The medications referenced here and in my prior declarations are not intended as an exhaustive list of all medications that affect thermoregulation. There are other medications within these classes that impair or affect the central nervous system and affect the body's thermoregulatory responses. The Medication List should be reviewed periodically, including to evaluate the impact on thermoregulation of any medications added to the LSP formulary.
[26] *See* Decl. at ¶ 61.
[27] *See* Decl. at ¶¶ 24-26.

10

37. Thermoregulation is the complex physiological process that serves to maintain hypothalamic temperature within a narrow range of 98.6°F, plus or minus 0.8°F. In the central nervous system (CNS), thermosensitive neurons are located in the hypothalamus. These temperature-sensitive neurons of the hypothalamus detect temperature changes and affect neuronal transmission. In addition to the hypothalamus, the brain stem and spinal cord are also thermosensitive.

38. Medications that impair or affect the CNS, including the hypothalamus, brain stem, and spinal cord, will likewise affect the body's thermoregulatory responses. The following image depicts the response of cutaneous thermoreceptive neurons to external temperature change.[28]



39. DOC's revised Medication List ignores several common medications that impair the critical functioning of the hypothalamus and other aspects of the central nervous system. The most obvious of these omissions is Selective Serotonin Reuptake Inhibitors (SSRIs), which are used to treat depression and anxiety disorders. SSRIs block ("inhibit") the reabsorption ("reuptake") of serotonin by nerve cells in the hypothalamus, causing an increase in serotonin in the brain. Thus,

---

[28] Vassallo, S and Delaney, KA, "Thermoregulatory Principles," In: Nelson LS, Howland M, Lewin NA, Smith SW, Goldfrank LR, Hoffman RS. eds. *Goldfrank's Toxicologic Emergencies, 11e*. McGraw-Hill Education; 2019.

11

SSRIs impair the function of the hypothalamus, which in turn impacts the ability of the hypothalamus to respond to and regulate the body's temperature.[29]

40. The connection between SSRIs and heat-related illness is well known. For instance, an Up-To-Date internet article relied upon by Dr. Keldie explains that both SSRIs and Serotonin and Norepinephrine Reuptake Inhibitors (SNRIs) can increase heat-related morbidity through "increased sweating promoting dehydration, electrolyte derangements (e.g., hyponatremia)."[30] Yet neither SSRIs nor SNRIs were added to the DOC's revised Medication List. SSRIs and SNRIs should be added to the Medication List, and individuals taking any of these medications should receive a heat precaution duty status.

41. The Medication List is defective in other ways. For instance, it includes non-dihydropyridines calcium channel blockers, but omits dihydropyridines. Calcium channel blockers (CCBs) are commonly used to treat hypertension and coronary heart disease. They block the inward movement of calcium by binding to certain calcium channels in the heart, vascular smooth muscle, and pancreas.

42. Both non-dihydropyridines and dihydropyridines can depress cardiac function and cause dehydration.[31] Dihydropyridines, which were omitted from Dr. Reynolds-Barnes' list, cause peripheral vasodilation and can impact myocardial conduction. This lowers blood pressure, predisposing the patient to heat syncope (fainting due to vasodilation in the heat). When cardiac output is reduced during heat stress, there is a greater risk of heat stroke.

43. All calcium channel blockers have the effect of impairing myocardial contraction and/or causing peripheral vasodilation to differing degrees. Thus, non-dihydropyridines and

---

[29] *See* Decl. at ¶ 23.
[30] Keldie Report at pp. 5; *see also* "Drugs and substances that can increase heat-related morbidity – UpToDate.
[31] *See* Decl. at ¶ 58.

12

dihydropyridines should be on the Medication List, and individuals taking any type of CCB should receive a heat precaution duty status.

44. The Medication List omits several other medications that depress cardiac function, impair cardiac output, and/or cause dehydration. These include angiotensin converting enzyme (ACE) inhibiters and angiotensin receptor blockers (ARBs). These medications should be on the Medication List, and individuals taking them should receive a heat precaution duty status.

45. I understand that LSP has represented that it has decided to provide duty statuses to any person who is prescribed a medication on Attachment A, unless he gives informed consent to opt out of the duty status. That decision should be expressly stated in HCP8 and in LSP Directive No. 13.067.

C. **HCP8 Attachment B (the revised "Medical Exclusion List")**

46. DOC has also issued a revised HCP8 Attachment B (the "Medical Exclusion List"). I understand that DOC decided to revise the Medical Exclusion List in consultation with Dr. Keldie.

47. I agree with Dr. Keldie that a person with any of the medical conditions listed on the revised Attachment B is at increased risk of developing a heat-related illness and should not be performing the type of work required on the Farm Line during periods of high heat.

48. However, the revised Medical Exclusion List is underinclusive. One obvious omission is diabetes. It is well settled that people with diabetes or pre-diabetics are at increased risk of heat stroke and heat-related disorders.[32] Diabetes is a chronic disease caused by an insulin imbalance. Diabetes causes blood vessels to be unable to dilate adequately and unable to deliver sufficient blood and nutrients to the body. That compromises vasodilation and increases the risk

---

[32] *See* Sokas RK, Senay E. Preventing Heat-Related Illness among Outdoor Workers - Opportunities for Clinicians and Policymakers. *N Engl J Med*. 2023; 389(14):1253-1256. doi:10.1056/NEJMp2307850.

13

of heat stroke. People with diabetes may also suffer acute complications such as electrolyte and fluid abnormalities and exacerbation of the coexistent cardiovascular complications that result from diabetes. Diabetes and pre-diabetes should be added to the Medical Exclusion List, and people with either of those conditions should be given a heat precaution duty status.

49. Another obvious omission from the Medical Exclusion List is coronary artery disease (CAD). In CAD, there is reduced blood flow to the heart muscle, which is usually caused by buildup of fats, cholesterol and other substances in and on the artery walls. This condition called atherosclerosis. The buildup, or plaque, causes the arteries to narrow. Like other cardiovascular diseases, CAD can cause reduced cardiac output, which impairs both vasodilation and sweating. This increases the chances of heat stroke and other heat-related disorders. CAD should be on the Medical Exclusion List, and a person with CAD should have a heat precaution duty status.

50. The revised Medical Exclusion List contains several conditions that appear artificially qualified or limited, without a scientific basis. For instance, Dr. Keldie lists "refractory seizure disorder" and "resistant hypertension." In fact, *any* seizure disorder and *any* hypertension will increase a patient's risk of heat stroke and heat-related disorders. Those qualifiers (e.g., "refractory," "resistant," and others) should be removed from the List.

51. Finally, there is no scientific basis to support the severity scales proposed by Dr. Keldie. They appear to be Dr. Keldie's own creation.

52. I understand that LSP has represented that it has decided to provide duty statuses to any person who is diagnosed with a condition listed on Attachment B, unless he gives informed consent to opt out of the duty status. That decision should be expressly stated in HCP8 and in LSP Directive No. 13.067.

14

    **D. Physical Safety Measures**

    53.    Since I submitted my last declaration, LSP has purportedly increased the length of work breaks, constructed two shade wagons—trailers with seating and a roof to provide some shade—for men on the Farm Line to use during breaks, and now provides clean drinking water and cups. These are positive steps but remain insufficient to protect men assigned to the Farm Line from suffering serious heat-related illness during periods of high heat.

    54.    First, I understand that the shade wagons are not available to all Farm Lines. Specifically, I understand that neither tents nor shade wagons are available to Line 15b, which performs grass cutting and related tasks.[33]

    55.    My understanding is that LSP believes shade wagons cannot be made available for this line because it is a "mobile" line, meaning men on it are transported to different areas of the prison grounds throughout the day. Whether or not this is true, physically demanding activities like grounds keeping exacerbate the risk of heat-related illness. Therefore, some readily accessible shade structure or other cooling mechanism, like air-conditioned facilities, must be available to protect the men on Line 15b from suffering heat related illness.

    56.    I understand that LSP has represented the bus used to transport the men on Line 15b serves the same function as a shade wagon. However, I have seen videos of men working on Line 15b where the bus was parked far away from where the men were working. Even if those men were free to walk that distance whenever they deemed it necessary to access shade without fear of physical safety or discipline, walking that distance once heat related symptoms (if detected) set would be dangerous. Requiring men on Line 15b to walk long distances to access a bus that may or may not be cooler than outside, presents a significant risk to human health.

---

[33] Deposition of Roland Sylvester, dated Feb. 12, 2025, at pp. 24; 42.

15

57. For those lines where the shade wagons are available, the limited shade does not provide the kinds of protections that I previously described as being necessary to protect the health of men on the Farm Line.

58. Putting aside questions of distance between the worksite and shade wagons and whether the shade being cast actually falls on the seats provided, limited exposure to shade does not mitigate the risk of heat-related illness experienced by men who labor for hours in Louisiana's hot sun and high humidity day and who rarely, if ever, have access to air conditioning and true cooling stations.

Executed on March 14, 2025 in Austin, TX.

*Susi Vassallo MD*
Dr. Susi U. Vassallo, M.D., M.S.