# Exhibit 4

1    THE UNITED STATES DISTRICT COURT FOR

2    THE MIDDLE DISTRICT OF LOUISIANA

3

4
VOICE OF THE EXPERIENCED,
5  a membership organization
on behalf of itself and
6  its members; and MYRON
SMITH, DAMARIS JACKSON,
7  NATE WALKER, DARRIUS
WILLIAMS, KEVIAS HICKS,
8  JOSEPH GUILLORY, KENDRICK
STEVENSON, and ALVIN
9  WILLIAMS, on behalf of
themselves and all others
10  similarly situated
                        Civil Action No.
11                         3:23-cv-1304-BAJ-EWD
vs.
12
JAMES LEBLANC, in his
13  official capacity as
Secretary of the
14  Louisiana Department of
Public Safety and
15  Corrections; TIMOTHY
HOOPER, in his official
16  capacity as Warden of
Louisiana State
17  Penitentiary; MISTY
STAGG, in her official
18  capacity as Director of
Prison Enterprises, Inc.;
19  the LOUISIANA DEPARTMENT
OF PUBLIC SAFETY &
20  CORRECTIONS; and PRISON
ENTERPRISES, INC.
21
* * * * * * * * * * * * * * * * * * * * * * * * *
22    REMOTE VIDEOTAPED 30(b)(6) DEPOSITION OF
LOUISIANA DEPARTMENT OF CORRECTIONS,
23       THROUGH RANDY LAVESPERE

24
             February 12, 2025
25

```
 1   REMOTE APPEARANCES:

 2   REPRESENTING THE PLAINTIFFS AND THE PROPOSED CLASS:

 3
     PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
 4   1285 Avenue of the Americas
     New York, New York  10019
 5   212.373.3000
     BY:  JEREMY A. BENJAMIN, ESQ.
 6   jbenjamin@paulweiss.com
     BY:  CHIZOBA WILKERSON, ESQ.
 7   cwilkerson@paulweiss.com

 8        - AND -

 9
     RIGHTS BEHIND BARS
10   1800 M St NW Front 1 #33821
     Washington, D.C.  20033
11   202.455.4399
     BY:  LYDIA WRIGHT, ESQ.
12   lydia@rightsbehindbars.org

13        - AND -

14
     THE PROMISE OF JUSTICE INITIATIVE
15   1024 Elysian Fields Avenue
     New Orleans, Louisiana 70117
16   504.529.5955
     BY:  SAMANTHA POURCIAU, ESQ.
17   spourciau@defendla.org
     BY:  KARA CRUTCHER, ESQ.
18   kcrutcher@defendla.org

19

20   REPRESENTING THE DEFENDANTS:

21   KEOGH, COX & WILSON, LTD.
     701 Main Street
22   Baton Rouge, Louisiana 70802
     225.383.3796
23   BY:  ANDREW BLANCHFIELD, ESQ.
     ablanchfield@keoghcox.com
24

25
```

Case 3:23-cv-01304-BAJ-EWD   Document 304-6   03/26/25   Page 4 of 206

February 12, 2025

3

1   REMOTE APPEARANCES:  (CONTINUED)

2   REPRESENTING THE DEFENDANTS:

3   LOUISIANA DEPARTMENT OF PUBLIC SAFETY &
    CORRECTIONS
4   504 Mayflower Street
    Baton Rouge, Louisiana  70802
5   225.342.6728
    BY:  JONATHAN R. VINING, ESQ.
6   jonathan.vining@la.gov

7

8

9   Also Present:

10  Jason Levin, Videographer
    Deidre Thomas; PJI
11  Talia Lanckton; PJI
    Christopher Bilicic; Paul, Weiss
12  Arielle McTootle; Paul, Weiss
    Erica Paul; Paul, Weiss
13  Janet Lee; Paul, Weiss

14

15  Reported stenographically by:

16  Rita A. DeRouen, Certified
    Court Reporter #2014018
17  in and for the State of
    Louisiana; Registered
18  Professional Reporter #6908

19

20

21

22

23

24

25

(877) 479-2484

```
 1              I N D E X

 2                              Page

 3   Stipulation                   6

 4   Reporter's Page              166

 5   Reporter's Certification     167

 6
     EXAMINATION
 7     By Mr. Benjamin              8

 8              * * * * *

 9          List of Exhibits

10

11   Exhibit No. 112

12      (LA DPS&C Formulary Committee Meeting,    29
        Wednesday, October 23 at 9:00 a.m.,
13       Location:  Zoom)

14   Exhibit No. 113

15      (Letter from Keogh Cox to Judge Jackson,   49
        10/18/24)
16

17   Exhibit No. 114

18      (Ruling and Order)            60

19   Exhibit No. 115

20      (Ruling and Order)            67

21   Exhibit No. 116

22      (Heat Indices and Steps to be Taken to    77
        Mitigate Risk, Exhibit IV)
23

24   Exhibit No. 117

25      (OSHA Heat Hazard Recognition)      78
```

1  EXHIBITS:  (CONTINUED)

2  Exhibit No. 118

3      (Webpage, "What is the heat index?")     88

4  Exhibit No. 119

5      (Criteria for a Recommended Standard,     100
        Occupational Exposure to Heat and Hot
6       Environment)

7  Exhibit No. 120

8      (Medical Exclusion List, 030603 - 606)   130

9  Exhibit No. 121

10      (Departmental Reg No. HCP8, Attachment   142
        C, 030607 - 612)
11

12  Exhibit No. 122

13      (National Weather Service Data Excerpts)  146

14

15

16        Previously Identified Exhibits

17  Exhibit No. 108                     13

18

19  Exhibit No. 107                     74

20

21  Exhibit No. 109                     105

22

23  Exhibit No. 17                      134

24

25

```
 1              S T I P U L A T I O N

 2

 3      It is stipulated and agreed by and between

 4   counsel that the testimony of the witness,

 5   LOUISIANA DEPARTMENT OF CORRECTIONS, THROUGH RANDY

 6   LAVESPERE, is hereby being taken pursuant to Notice

 7   under the Federal Rules of Civil Procedure for all

 8   purposes permitted under law.

 9

10      The witness reserves the right to read and

11   sign the deposition. The original is to be

12   delivered to and retained by JEREMY BENJAMIN, ESQ.,

13   for proper filing with the Clerk of Court.

14

15      All objections, except those as to the form of

16   the questions and/or responsiveness of the answers,

17   are reserved until the time of the trial in this

18   cause.

19                    * * *

20

21      Rita DeRouen, Certified Court Reporter in and

22   for the State of Louisiana and Registered

23   Professional Reporter, officiated in administering

24   the oath to the witness.

25
```

DVD Randy Lavaspere 30(b)(6)
February 12, 2025                                    7

1

2

3          THE VIDEOGRAPHER:

4              We are on the record at 2:40 p.m.

5          Eastern on February 12, 2025.  This is

6          the video-recorded deposition of

7          Dr. Randy Lavespere in the matter of

8          Voice of the Experienced vs. James

9          LeBlanc.

10             This proceeding is being held

11         remotely via Zoom.  My name is Jason

12         Levin, I'm the videographer on behalf of

13         US Legal Support.  The court reporter is

14         Rita DeRouen, also on behalf of US Legal

15         Support.

16             All counsel will be noted on

17         stenographic record.  Will the court

18         reporter please swear in the witness.

19             RANDY LAVESPERE,

20     having been first duly sworn, was examined and

21     testified as follows --

22         THE COURT REPORTER:

23             We can't hear you, Mr. Benjamin.

24         MR. BENJAMIN:

25             All right.  Off to a good start.

1        Can you hear me now?

2        THE COURT REPORTER:

3            Yes.

4        MR. BENJAMIN:

5            Fantastic.  Thank you.

6                    EXAMINATION

7    BY MR. BENJAMIN:

8        Q.   Good afternoon, Dr. Lavespere.  My name

9    is Jeremy Benjamin.  I am one of the attorneys

10   representing the plaintiffs in this action, and I

11   will be asking you some questions here today.

12       THE COURT REPORTER:

13           Your audio just went out again.

14       MR. BENJAMIN:

15           All right.  We'll try that again.

16   BY MR. BENJAMIN:

17       Q.   Before we go too much further, I'm just

18   going to go over a few terms that I may be using

19   today just to make sure that we're on the same

20   page.

21           If I use the term "DOC" or "the

22   Department" or "Department of Corrections," you'll

23   understand that I mean the Louisiana Department of

24   Public Safety and Corrections, right?

25       A.   Right.

1    Q.   Okay.  And is DOC your current employer?

2    A.   Yes, it is.

3    Q.   Great.

4         And what's your current position at DOC?

5    A.   I'm the chief medical officer with the

6    Louisiana Department of Corrections.

7    Q.   Okay, fantastic.

8         A few other terms.  I may say "LSP" or

9    "Angola"; by that I mean Louisiana State

10   Penitentiary.  I may say "the Secretary"; by that

11   I'm referring to Gary Wescott, secretary of DOC.

12   I might say "NWS," by which I mean the National

13   Weather Service.

14        I might say "NIOSH," N-I-O-S-H,

15   referring to the National Institute for

16   Occupational Safety and Health.  I might use the

17   term "CDC," which I mean the Center for Disease

18   Control.  And I might use "OSHA," by which I mean

19   the Occupational Safety and Health Administration.

20        Are you familiar with those terms?  Do

21   you understand what I mean if I say any of those?

22   A.   I am.

23   Q.   Perfect.

24        And if I use any term that you're not

25   familiar with or acronym, please just stop me and

1    ask me what I'm referring to.

2           Now, I know that you have been deposed

3    before, including in this action and including in

4    a 30(b)(6) capacity, so I'm just going to very

5    briefly remind you of some of the ground rules.

6           You're going to be answering questions

7    under oath today.  I'm going to be asking

8    questions and you're going to be responding under

9    oath to those questions, and the court reporter is

10   going to be taking all of that down.  So please

11   wait for me to finish my question before you begin

12   to answer, and I'll try to wait for you to finish

13   your answer before I ask my next question.

14          Additionally, we need verbal answers, no

15   shakes or nods of the head, no "uh-huh," "huh-uh,"

16   we just need clean "yes" or "no," that kind of

17   thing.  If at any point you want to take a break,

18   you let me know.

19          As long as we don't have a question

20   pending, we can take a break whenever is

21   convenient for you, okay?

22      A.  Sure.

23      Q.  All right.  And then if I ask any

24   question that you don't understand or if you need

25   me to clarify, please just ask me to clarify the

1  question and I'll do my best to do so, all right?

2      A.   Okay.

3      Q.   And if at any point during the

4  deposition you want to go back to a prior answer

5  to clarify, to elaborate, to correct, please let

6  me know that; you'll certainly have the

7  opportunity to do so, all right?

8      A.   Yes.

9      Q.   Do you have any questions about the

10 conduct of this deposition today?

11     A.   I do not.

12     Q.   Okay.  Fantastic.

13         And is there any reason that you can't

14 testify truthfully and honestly and thoroughly

15 today?

16     A.   There is not.

17     Q.   Perfect.

18         Now, as you know, we're proceeding by

19 Zoom and so it's a little bit -- a little

20 different from if we were standing across the

21 table for us.

22         Where are you sitting today?

23     A.   I'm in my office.

24     Q.   Okay.  And where is that?

25     A.   At 504 Mayflower Street in Baton Rouge,

1   Louisiana.

2       Q.  And is anyone in the office with you?

3       A.  Drew Blanchfield.

4       Q.  Anyone else?

5       A.  Nobody else.

6       Q.  You're participating via your computer,

7   I assume.  Can you just confirm that you don't

8   have any other programs or windows up other than

9   the Zoom?

10      A.  I don't have any -- any programs or

11  windows up.

12      Q.  Okay.  And do you have any other devices

13  nearby, a phone or anything like that?

14      A.  Yeah, I have a phone.

15      Q.  Can you just confirm that you'll turn it

16  off or put it on silent and not access it during

17  the course of this deposition?

18      A.  Yeah, no need to access it.

19      Q.  Okay.  Perfect.

20          Do you have any papers, notes, or other

21  reference materials in front of you?

22      A.  I do.  I have HCP8 that is what

23  supposedly this deposition is supposed to be

24  about, with its attachments.

25      Q.  Okay.  And you say you have HCP8 with

1   its attachments.  Does it have -- what's the date

2   on it?

3       A.   That's the one that's Bates-stamped.  So

4   it really --

5       Q.   Perfect.

6            What's the Bates stamp?

7       A.   Well, the first Bates stamp that I have

8   is 017941.

9       Q.   All right.  You know, it's unfortunate,

10  I have a slightly different one.  I think it's

11  probably the same policy, but just to make sure,

12  we're going to put what we have as HCP8 into the

13  chat.

14           It is a document that was previously

15  marked as Plaintiffs' Exhibit 108, and it begins

16  with Bates Number 030613.  And why don't we just

17  share that real quick.

18           MR. BENJAMIN:

19               Janet, can you just scroll down to

20           make sure that Dr. Lavespere is

21           comfortable that this policy is the same

22           one that is in front of him.

23           THE WITNESS:

24               Can you go back up a little bit

25           more, like to page 3.  Hold right there.

 1      Go down a little bit.  Keep going.  Keep

 2      going.  Stop right there.  I just want

 3      to make sure that -- keep going.

 4         Okay, stop right there.  My -- go

 5      back up a little bit.

 6         My times are a little bit different

 7      on when you're talking about outdoor.

 8      Let's see, indoor, yours says --

 9      indoors, yours says 8:00 a.m. to

10       8:00 p.m.; mine says 10:00 a.m. to

11       8:00 p.m.  So...

12  BY MR. BENJAMIN:

13     Q.  Could you go up to the top of yours and

14  check what the date is?

15     A.  Well, I don't have a date on mine,

16  that's --

17     Q.  Okay.  Well, I think that you might have

18  an earlier version of this.  I tell you what,

19  whenever we need to reference HCP8, we're going

20  to -- we can pull this one up, you can review it.

21      MR. BENJAMIN:

22         And, Janet, if you don't mind just

23      scrolling to the very bottom of this

24      document.

25      THE WITNESS:

1          The changes are mine.

2      MR. BLANCHFIELD:

3          And, Jeremy, I've got a -- I've got

4      a hard copy of the final.

5      MR. BENJAMIN:

6          You have a copy of the one beginning

7      with Bates Number 030613, Drew?

8      MR. BLANCHFIELD:

9          Right.  I'll put that in front of

10      the doctor.

11      MR. BENJAMIN:

12          Thank you.  Thank you,

13      Mr. Blanchfield.

14  BY MR. BENJAMIN:

15      Q.  And, Dr. Lavespere, the document that

16  you now have, am I right that it has as its

17  starting Bates Number 030613?

18      A.  Yes.

19      Q.  Okay.  And at the end, the very last

20  page ends with 030619; is that correct?

21      A.  It does.  There are no attachments on

22  this document that I have in front of me now.

23      Q.  I understand.  We'll get to the

24  attachments later on.  I just want to make sure

25  that you have this document in front of you.

1  Again, it's Plaintiffs' Exhibit 108, HCP8, dated

2  October 20, 2024.

3      We'll be referring to this document a

4  lot.  So if we have another document on the screen

5  and you want to take some time and compare it with

6  the HCP8 you have in front of you, that will be

7  helpful.

8      A.  Sure.

9      Q.  Now, you're aware that HCP8 was modified

10  in or around October of 2024, right?

11      A.  Yes.

12      Q.  And do you understand that you have been

13  designated as DOC and the Secretary's official

14  witness to testify as to the modifications of

15  HCP8, including the development of those changes?

16      A.  Yes.

17      Q.  And are you prepared to testify on this

18  topic on DOC's and the Secretary's behalf?

19      A.  I certainly hope so.

20      Q.  Well, tell me, what did you do to

21  prepare to testify on that topic?

22      A.  Well, I just, you know, reviewed the

23  health care policy, I reviewed all the

24  attachments.  There weren't a whole lot of emails

25  going with back and forth, but I reviewed any

1   emails that I had.  I reviewed Dr. Barnes'

2   information, you know, her CV with her report.

3   That's what I read.

4       Q.  Okay.  Anything else that you can

5   recall?

6       A.  You know, I reviewed my chronic care

7   guidelines.  That's pretty much what I reviewed.

8       Q.  Okay.  And did you speak with anybody in

9   connection with this deposition and testifying on

10  the topic you've been designated to testify about?

11      A.  You talking about since we -- since

12  we -- since October?

13      Q.  I'm just talking about in preparation

14  for this deposition.

15      A.  Well, sure.  I've spoken with Drew.

16  I've spoken with Chelsea.  I've spoken with

17  Dr. Toce.  I've spoken with Jonathan Vining.  You

18  know, my leadership group that we've had meetings

19  on, sure.

20      Q.  When you say your "leadership group,"

21  who is that?

22      A.  Well, just people who have had input

23  into what we've been doing since October, you

24  know.  The medical warden at Angola, you know,

25  Drew Blanchfield, Chelsea, Jonathan Vining,

1  Dr. Keldie, Dr. Barnes.

2      Q.  You spoke to Dr. Keldie and Dr. Barnes

3  in connection with this deposition?

4      A.  No, no.  You said since October.  We've

5  had meetings with Dr. Keldie about the changes,

6  right, Zoom meetings with Dr. Keldie.

7          I did see Dr. Keldie at -- when he

8  toured Angola, but not in specifically -- not in

9  specifically to this deposition, I haven't seen

10 him since his tour of Angola.  And I haven't

11 talked to him about this deposition.  I haven't

12 even talked to Dr. Barnes about this deposition.

13     Q.  When was the last time, ballpark, that

14 you spoke to Dr. Keldie?

15     A.  Well, I never spoke to Dr. Keldie

16 directly.  It's always on Zoom with attorneys

17 present.

18     Q.  And Dr. Keldie though?

19     A.  Maybe late December.

20     Q.  Okay.  And what about

21 Dr. Reynolds-Barnes?

22     A.  Probably about the same time.

23     Q.  Late December?

24     A.  Yeah, around about, you know.  I can't

25 tell you 100 percent.  But probably sometime

1    during the holidays when we were in the process of

2    making all these changes.

3       Q.   The -- the HCP8 that we just looked at,

4    Plaintiffs' Exhibit 108, is dated October 20,

5    2024.

6            So presumably the changes were made

7    before the holidays?

8       A.   Well, if it's my understanding, I think

9    y'all sent back an answer to what -- to what we

10   had put in.  And that was going to go before the

11   magistrate.

12           We were supposed to have a meeting

13   before the magistrate, and y'all had sent back the

14   modifications that y'all wanted to see put into

15   our changes.  And we discussed all those, but

16   that's the last time I talked to them.

17      Q.   I see.  You spoke to Dr. Keldie and

18   Dr. Barnes in connection with a settlement

19   discussion in and around December?

20      A.   Yes.

21      Q.   Okay.  And you also mentioned the

22   medical director at Angola.  Is that Dr. Toce that

23   you're referring to?

24      A.   Yeah, Paul Toce.

25      Q.   Anyone else that you spoke to in

1    connection with this deposition?

2        A.  I had -- no.  I hadn't spoken to

3    Dr. Toce about this deposition.  You know, I

4    talked to him about the changes that we had made.

5    But really about, to this deposition, it's been

6    Drew and Chelsea and Jonathan Vining.

7        Q.  I see.  And just to be clear at the

8    outset, I'm not going to ask you -- I don't want

9    you to tell me anything that Mr. Blanchfield or

10   Ms. Payne or Mr. Vining said to you during those

11   conversations, all right?  That should just be an

12   understanding between us right now, okay?

13       A.  Sure.

14       Q.  Okay.  Were you given any kind of

15   written instructions in connection with this

16   deposition?

17       A.  No.

18       Q.  Any draft answers?

19       A.  No.

20       Q.  And did you review any prior testimony

21   that was given in this action in connection with

22   this deposition?

23       A.  I have not.

24       Q.  Let's talk about -- let's talk about

25   health care policies generally, DOC health care

 1  policies.

 2       How often are DOC health care policies

 3  reviewed for potential update?

 4     A.   Yearly.

 5     Q.   Generally once a year?

 6     A.   Generally once a year.

 7     Q.   And who's tasked with conducting that

 8  periodic review?

 9     A.   That would be -- there's a policy team.

10  Stacye Rodriguez, as director of nurses, oversees

11  it.  Leslie Smith is on that team.  Keri Rogillo

12  is on that team.  And then those policies come

13  through me for review and then they go to legal.

14  So...

15     Q.   Is the P&T committee involved in the

16  review?

17     A.   No.

18     Q.   Did it have any role in any approval

19  process for updates to health care policies?

20     A.   Well, I'm the head of the P&T committee.

21  So, you know, in essence, we have input.  But as

22  far as health care policies, those are

23  headquarters-generated policies, and most of

24  the -- I could say all of the policies are

25  reviewed at a headquarters level.

1    Q.  I see.  And that's the policy team?

2    A.  Right.

3    Q.  When you say "all of the policies are

4  reviewed at the headquarters level," are you

5  referring to health care policies?

6    A.  Yes, all health care policies.

7    Q.  Okay.  And is the policy team made up of

8  health care professionals?

9    A.  Yes, health care professionals.  And it

10  goes to legal for the wording, and then it comes

11  back for approval, and then it's signed off on.

12    Q.  And at any point is the P&T committee

13  informed about changes that are being proposed?

14    A.  They could be, yeah.

15    Q.  Are they --

16    A.  We have P&T committee meetings, and if

17  there are changes that they need to be notified

18  on, you know, they will be notified.  And if I

19  personally feel that -- the P&T committee council

20  members consist of pharmacists and my medical

21  directors, right.

22         I'm in contact with my medical directors

23  all the time.  So if I feel that there's something

24  that my medical directors need to be informed

25  about, I send them an email, a group email.

1    Q.  And do you typically send those group

2   emails to the P&T committee in connection with

3   modifications to a health care policy?

4    A.  Not routinely, no.

5    Q.  Who initiates the periodic review of

6   health care policy?

7    A.  That would be Stacye Rodriguez and

8   Leslie Smith.

9    Q.  And under what circumstances do they

10   initiate that kind of review?

11    A.  Well, they have a running record of what

12   policies are up for review.

13    Q.  I see.  So there's -- I'm sorry, I

14   didn't mean to interrupt you.

15    A.  It's a cycling thing.  They keep a

16   running cycle of what policies they need to review

17   and what time frame they need to review them in.

18    Q.  I see.  It's on the calendar, certain

19   policy comes up at a certain time?

20    A.  Right.  It's a continuum.

21    Q.  Okay.  Do -- does DOC have external

22   consultants who are involved in the regular review

23   of health policies reform?

24    A.  No.

25    Q.  Do you ever have experts, outside

1  experts or consultants, review policies and

2  suggest modifications?

3      A.  No.

4      Q.  Well, DOC recently modified HCP8,

5  correct?

6      A.  Right.

7      Q.  And that was in October of 2024?

8      A.  Right.

9      Q.  Was that based on the annual periodic

10 review of HCP8?

11     A.  No.

12     Q.  It was not?

13     A.  It was not.

14     Q.  What was it initiated by?

15     A.  Well, you know, based off of this

16 lawsuit, right.  I mean, we were tasked with

17 hiring experts for this particular lawsuit.  Under

18 normal circumstances, we don't use outside

19 consultants for our routine health care policy

20 reviews.

21         This is a little different.  There was a

22 lawsuit involved and, you know, experts were

23 brought to the table, they reviewed our policies,

24 and they made recommendations.  But under the

25 normal circumstance, you know, they are not --

1    outside consultants are not used.

2        Q.   They were used here though?

3        A.   Sure.

4        Q.   And in this case, outside consultants

5    were who?

6        A.   Dr. Barnes and Dr. Keldie.

7        Q.   And those are the litigation experts

8    that Defendants have hired in this case?

9        A.   Yes, they are.

10        Q.   Who initiated the review of this

11    latest -- or strike that.

12           Who initiated this latest review of

13    HCP8?

14      A.   Well, when the suit was filed, you know,

15    and we found our experts, they asked for all of

16    our policies related to health care, all of our

17    procedures, and all those documents were given to

18    Dr. Keldie and Dr. Barnes through Mr. Blanchfield.

19        Q.   And do you know when the suit was filed?

20        A.   No, I do not.

21        Q.   Well, do you know when the experts were

22    retained?

23        A.   I do not.  The exact date, no, I don't

24    know.  I just know that we found two experts that

25    were highly thought of and, you know, the

1   documents were sent to them.

2       Q.   And was their review of the documents

3   sort of the first substantive step in reviewing

4   HCP8 for this latest modification?

5       A.   Do what now?  Say that again.

6       Q.   Was sending them the documents and

7   having them review the existing policies and

8   documents, was that the first substantive step in

9   this latest review of HCP8?

10      A.   I'd say that's fairly accurate, yeah.

11      Q.   DOC had not initiated a review and

12   considered modifications prior to sending the

13   existing policy to Dr. Keldie and Dr. Barnes?

14      A.   You know, I -- the people in charge of

15   the health care policies had not initiated a

16   review.  We had talked about some potential

17   changes at some meetings that we had, especially

18   through the P&T committee meeting, but never was

19   ever put into play to have the policy actually

20   changed until Dr. Keldie and Barnes came on board.

21      Q.   You just mentioned the -- what did you

22   say, something like the people who are in charge

23   of the policy?  Is that yourself and the policy

24   team, is that what you're referring to?

25      A.   Myself and the policy team.

1    Q.  Got it.

2         And did the P&T committee have any role

3    in this review of HCP8 for potential modification?

4    A.  I think at one of our P&T committee

5    meetings Jonathan Travis, who's the head of the

6    P&T, he had done some research from across the

7    country and just brought some things to -- for the

8    P&T committee to think about, but nothing --

9    nothing factual that was put into policy.

10    Q.  Was that research that you're referring

11    to, was that part of the materials that went to

12    Dr. Keldie and Dr. Reynolds-Barnes?

13    A.  I'm not sure about that.  I don't -- you

14    know, I remember Dr. Keldie and Dr. Barnes asking

15    me about information from the P&T, and I think

16    they requested all the documents from the P&T.  So

17    it's very possible that they had some.

18         You know what, they did have that, they

19    did.  Now that I remember, they did have that.

20    Q.  Okay.  And was that review that was

21    initiated or that research that was initiated by

22    Mr. Travis, was that prior to DOC retaining

23    Dr. Barnes or Dr. Keldie?

24    A.  Yes.

25    Q.  Has there been any discussion since the

1   experts involvement with Mr. Travis?

2      A.  Sure.

3      Q.  About -- and I should be more clear.

4         Has there been ongoing discussion about

5   the research that he was conducting and

6   consultation about potential modifications to

7   HCP8?

8      A.  No.  When the modifications were brought

9   forth, I brought the documents to the P&T

10  committee and told them, This is what we're going

11  to do, guys.

12     Q.  When was that?

13     A.  At our last P&T committee meeting, which

14  I really don't know the date of it.  But I went

15  over the document with the medication changes with

16  them.

17     Q.  Does October 23rd ring a bell in terms

18  of the date when you might have met with the P&T

19  committee?

20     A.  Jeremy, there are so many meetings.  And

21  to be honest with you, I can tell you that I did

22  go over the document with my P&T committee, which

23  is all of my medical directors, which is the

24  perfect time to do that.

25         I went over the medication changes and I

1   went over the document changes; although it

2   doesn't impact a lot of them, you know, the ones

3   that it did impact on were there, and we did go

4   over it in depth.

5      Q.  Was that before or after the policy went

6   into effect, the modified policy, that is?

7      A.  Before.  I would say before.

8         MR. BENJAMIN:

9            Janet, can you pull up --

10     A.  Don't hold me to that.  I'm just telling

11  you that I did go over all these documents with

12  the P&T committee meeting somewhere in and around

13  the time that all this was going on.

14  BY MR. BENJAMIN:

15     Q.  I very much understand the idea of

16  having too many meetings and forgetting which one

17  is when.  Let me show you one document.

18        MR. BENJAMIN:

19            Janet, can you pull up Tab 4, which

20         we're going to mark as Plaintiffs'

21         Exhibit 112.

22         (Exhibit 112 was marked.)

23  BY MR. BENJAMIN:

24     Q.  Dr. Lavespere, this is a document that's

25  titled "LA DPS&C Formulary Committee Meeting,

1  Wednesday, October 23 at 9:00 a.m., Location:

2  Zoom."

3       Is this a -- are these minutes from a

4  recent P&T committee meeting?

5    A.  Yes.

6    Q.  I'm just -- as I say, I'm not -- this

7  isn't a memory test, I'm just trying to maybe jog

8  your memory.

9       Is this the meeting at which you were

10 discussing those changes that you have been

11 referring to with the P&T committee?

12   A.  I don't believe so, because I thought I

13 did that in person with them down in the

14 conference room.

15   Q.  Was it part of an actual P&T committee

16 for which there would be minutes?

17   A.  I take that -- it may have been my

18 medical directors meeting where I went over it

19 with them.  But I did go over it with all the

20 medical directors.  I'm not sure if it was a P&T

21 committee meeting or a medical directors meeting.

22 It may have been a medical directors meeting,

23 because I know I did that in person.

24   Q.  Can you just educate me on what a

25 medical -- what that kind of meeting is, medical

1  directors meeting.

2     A.  Well, bringing all my directors from

3  across the state.  And sometimes we do it Zoom,

4  but sometimes we do it in person.

5        And we just have a meeting about things

6  that are ongoing within the department, whether it

7  be things like these policy changes, you know, how

8  to handle trips out the gate, overdoses.  You

9  know, we talk about all kind of things that are

10  pertinent to our practice.

11     Q.  So this is a meeting of the medical

12  directors of each of the various facilities under

13  DOC?

14     A.  Right.

15     Q.  And I believe you said that you went

16  over these changes presumably with the medical

17  directors.  You said that it wouldn't affect a lot

18  of them.

19        What do you mean by that?

20     A.  Well, some of them don't have field

21  lines at their facilities.

22     Q.  I see.  So does HCP8 only relate to

23  field lines?

24     A.  It doesn't, but that's what this heat

25  pathology was brought to the forefront about, was

1   that the, you know, the field -- the farm lines.

2      Q.   Does HCP8, as modified, apply to every

3   facility under DOC?

4      A.   Yes.  And it will affect them, but not

5   as much as it will affect Angola.  I mean, you

6   still have yard crews, you still have outside

7   crews.  You still have those things at every

8   facility.

9         But I'm talking from a farm line

10  perspective, it's not going to affect the other

11  facilities like it will Angola.

12     Q.   And why is Angola different?

13     A.   Because Angola is the largest prison

14  within our facilities and it has the largest area,

15  it's 18,000 acres, and they have the largest

16  agricultural, you know, production group going on

17  down there.

18     Q.   I see.  When did the --

19        MR. BENJAMIN:

20            And we can take this exhibit down.

21  BY MR. BENJAMIN:

22     Q.   Dr. Lavespere, when did the current

23  version of HCP8 go into effect?

24     A.   Well, the date here says October 20 of

25  '24, so I would have to say that would be the

1  date.

2      Q.   And explain to me, what's the process

3  from the time when Dr. Keldie and Dr. Barnes made

4  suggestions about modifications to the time when

5  this actually becomes DOC policy?  What are the

6  steps of that process?

7      A.   Well, the steps of that process would be

8  they make their recommendations, you know, I look

9  at their recommendations, which I did, and I

10  researched a lot of them, you know, thoroughly.  I

11  touched base with Drew.  We get back on a Zoom

12  call and we discuss the changes.

13         If there are modifications, we make the

14  modifications.  Then I get with the policy team.

15  And then once we get something written, we bring

16  it to Chief Smith for his approval, he's chief of

17  operations.  And then once Chief Smith reads it

18  and says it's approved, then we send it to legal.

19      Q.   And what happens after sending it to

20  legal?

21      A.   Well, once it goes to legal, then it

22  comes back and it's an approved policy.  It's

23  signed off on by the Secretary.  As you can see in

24  this document, the last section is signed off.

25  Once it's signed off on by the Secretary -- and I

1    should have known that, but once it's signed off

2    on by the Secretary, it's policy.

3       Q.  And you mentioned Chief Smith.  I think

4    you said he's in operations?

5       A.  He's the chief of operations.

6       Q.  The chief of operations.  Does he have

7    any sort of medical background?

8       A.  He does.

9       Q.  What's his medical credentials?

10      A.  He's a nurse by trade.  He was actually

11   the director of nursing at the mental health at

12   Angola, and then he was director of nursing at

13   Hunt, then he was chief of operations at Hunt and

14   he was warden at Hunt.  Now he's chief of

15   operations for the Department.  He's very, very

16   good when it comes to medical.  His medical

17   knowledge is very good.

18      Q.  Okay.  Now, you mentioned -- during that

19   process, you mentioned Dr. Keldie and Dr. Barnes

20   reviewed documentation that DOC provided, right?

21      A.  Right.

22      Q.  And then they made recommendations on

23   potential modifications, correct?

24      A.  Right.

25      Q.  And those suggestions went to you and

1    the policy team; is that right?

2    A.  They went to me.

3    Q.  To you, not to the policy team.

4        What -- so you said, then, that you did

5    some research.  What research did you do?

6    A.  Well, I looked at them.  I looked at

7    Attachment A, I looked at Attachment B, I looked

8    at all the medicines.  And my first impression was

9    too much.  You know, I went back to them and I was

10   like, Look, guys, you're asking things that are

11   unreasonable.  And so I told them what I thought

12   was unreasonable and then we talked about it.

13       THE WITNESS:

14           So, Jeremy, one second.  Can I take

15           just about a five-minute break?

16       MR. BENJAMIN:

17           Yes, of course.

18       THE WITNESS:

19           I'll be right back.  You know, I'm

20           old.

21       MR. BENJAMIN:

22           Why don't we go off the record.

23       THE VIDEOGRAPHER:

24           Going off the record at 3:15 p.m.

25       (A break was taken.)

1        THE VIDEOGRAPHER:

2            We are going back on the record at

3        3:17 p.m.

4    BY MR. BENJAMIN:

5      Q.  Great.  Dr. Lavespere, just before we

6    went off the record, you were discussing

7    interactions with Dr. Keldie and Dr. Barnes.  They

8    had made recommendations with respect to the

9    medication list and the medical conditions list

10   and sent those to you.

11           And I believe that you said -- or you

12   said that your reaction to that initially was that

13   those proposals were unreasonable.  So I just want

14   to unpack that a little bit.  First of all, let's

15   talk first about medications.

16     A.  Okay.

17     Q.  Who sent you the proposed medications,

18   was that Dr. Barnes?

19     A.  Drew.  Everything comes through Drew.

20     Q.  Okay.  Did you understand -- did you

21   understand that the list of medications, though,

22   was a list recommended by Dr. Barnes?

23     A.  Yes.  And Dr. Keldie.

24     Q.  Dr. Keldie as well?

25     A.  I'm sure.  You know, they both work

1   together, you know.

2       Q.  Okay.  And when they sent you back a

3   list, you said you thought it was unreasonable.

4       A.  Well, you have to remember, for years --

5   and I've done 15 years with the Department -- you

6   know, our heat precaution medication list was

7   pretty much antipsychotics, right.

8           I had never really even heard of the

9   anticholinergic classifications that Dr. Barnes

10  presented to us, right.  And so when I first saw

11  this list, I was like, My God, that's pretty much

12  the large majority of medications that we use

13  within the Department of Corrections.

14          So sure, my first impression was there's

15  no way that we could do that because we use a

16  number of these medications.

17      Q.  Dr. Barnes is a pharmacist, correct?

18      A.  She's a Pharm.D., is my understanding.

19      Q.  A Pharm.D.

20          Had you ever consulted with a Pharm.D.

21  before about the medications list that Angola

22  was -- I'm sorry, that DOC was operating under?

23      A.  No.  We never had a -- we never had a

24  reason to, you know.  Ever since I started with

25  the Department, we have never been brought to

1  court, we've never been -- had a lawsuit filed on

2  us based on our heat precaution -- our heat

3  precaution or our heat pathology list of

4  medications.

5      Q.   But putting aside whether you've been

6  brought to court, you did understand that you

7  should have a list of medications that could cause

8  heat sensitivity, right?

9      A.   We thought our list was satisfactory.

10     Q.   How did you come to that conclusion?

11 How did you come to the conclusion that this was

12 the correct list?

13     A.   We never had a problem with our list

14 before.

15     Q.   Did you --

16     A.   We never were even questioned about our

17 list.

18     Q.   Did you consult with any Pharm.D. or

19 somebody with similar credentials to confirm that?

20     A.   You have to understand, Jeremy, there

21 were several medical directors before me that had

22 these lists that were probably very instrumental

23 in making these lists, and these lists were just

24 passed down.  So, no, I didn't.  You know, I've

25 only been the chief medical officer for three

1  years here.

2      Q.   But when you were doing your periodic

3  review, your annual review of HCP8, did you

4  conduct any research into what medications make a

5  person heat sensitive?

6      A.   No.

7      Q.   Now, you said that you got a list

8  from -- via Mr. Blanchfield, but effectively from

9  your experts, and you found that list to be

10  unreasonable because it implicated a number of the

11  medications that DOC uses, right?

12      A.   That was my first impression, that it

13  was unreasonable.  And --

14      Q.   So tell me -- go ahead, I'm sorry.

15      A.   But through my research, you come to

16  find out that she's right.  So, you know, when you

17  start looking at the anticholinergic aspect of

18  these medications and how she classified them and

19  what they do as far as the thermoregulatory

20  systems are concerned, she's correct.  So we

21  adopted probably 98 percent of what she sent.

22      Q.   What did she send that you didn't adopt?

23      A.   I think there was -- I think the calcium

24  channel blockers, I think there was

25  non-dihydropyridine calcium channel blockers that

1    she sent.  But I think she had maybe Norvasc on

2    that list, and I think Norvasc was taken off the

3    list.

4          I think one of the muscle relaxers,

5    Robaxin, was taken off the list.  But other than

6    that, we adopted everything she sent.

7    Q.   Did you conduct independent research

8    into each of the drugs that she had recommended?

9    A.   I tried to, yes.

10   Q.   And that research consistently confirmed

11   that these medications that had been proposed do,

12   in fact, create heat sensitivity?

13   A.   I don't know that they create heat

14   sensitivity, but they alter the thermoregulatory

15   system through anticholinergic effects.

16   Q.   That's better put.  Thank you.

17         And with respect to the 2 percent or so

18   of medications that had been proposed that you did

19   not ultimately adopt, what did that research show?

20   A.   Well, there's a couple of systems.  For

21   example, the -- and most of what she set forth,

22   right, is based on the anticholinergic side

23   effects of these medications, right.  She scores

24   them from a 3 all the way down to a 01.

25         And I think one of her -- one of her

1    sources that she uses is UpToDate, which is a very

2    respectable, you know, literature search within

3    the medical community, and you just couldn't

4    hardly refute it.

5        Q.   When you did your research, was that

6    research limited to the support that Dr. Barnes

7    had looked at in order to make her

8    recommendations?

9        A.   What do you mean by that?

10       Q.   Well, tell me, how did you go about

11   researching the medications that were proposed

12   as -- for inclusion on this medications list?

13       A.   Basically I went down and looked at

14   every medication one by one, that's how I did my

15   research.

16       Q.   Not being a physician, when you say you

17   looked at that medication, what -- what I'm asking

18   is:  What did you look at?  How did you confirm

19   that, in fact, this medication that was being

20   proposed had these anticholinergic effect?

21       A.   Well, all the medications online have

22   what's called an official packing circular, you

23   know, that comes with these medications.  And you

24   can just go down and read the official packing

25   circular and pretty much find out what you need to

1  find out about these medications, what they do.

2  So it was exhaustive.  I mean, I spent a lot of

3  time doing it.

4      Q.  And is that packing circular, is that

5  readily available?

6      A.  Yeah, any pharmacy that has a bottle

7  that these medications come in -- the OPC is what

8  we call it, the definition that -- you know, an

9  abbreviation like you had mentioned earlier, we

10  call that OPC, official packing circular.  All of

11  them have an official packing circular attached to

12  them.

13      Q.  I see.  So these medications come with

14  that OPC, and that OPC reveals that they have this

15  effect on thermoregulation; is that right?

16      A.  No.  It doesn't say anything about

17  thermoregulation.  It just may say they have

18  anticholinergic activity.

19      Q.  And what does that mean to you, that

20  something has anticholinergic activity?

21      A.  It could inhibit the thermoregulatory

22  system.

23      Q.  I see.  Did you look into any

24  medications other than those that were recommended

25  by Dr. Barnes for potential inclusion in this

1  expanded medication list?

2      A.  I looked into the SSRIs, the serotonin

3  reuptake inhibitors, I looked into those, because

4  at one point there was question of whether or not

5  they needed to be added or not.

6      Q.  Did -- were SSRIs proposed by either

7  Dr. Keldie or Dr. Barnes for potential inclusion?

8      A.  I can't remember that.  But somehow,

9  way, or another SSRIs came up, and Dr. Barnes, you

10  know, researched it and said they didn't need to

11  be on the list.

12      Q.  Dr. Barnes said that to you?

13      A.  No, she -- in her report, you know,

14  she -- I was researching the SSRIs, I think Paxil,

15  which in one of the categories said it was an

16  anticholinergic 2, okay?  I think I had sent

17  something to Drew and said, you know, Drew, what

18  about the SSRIs?  He sent something to Dr. Barnes,

19  and she said the SSRIs didn't need to be on the

20  list.

21      Q.  Why did you begin researching SSRIs?  Is

22  there something that triggered that inquiry?

23      A.  You know, SSRIs are always a hot topic,

24  right.  Because we had gone over this prior with

25  my psychiatrist years ago about the SSRIs, and

1    they never made it on our antipsychotic list.  He

2    didn't think they needed to be on the list then.

3    And then I wanted to, you know, confirm with

4    Dr. Barnes.

5            I really can't tell you how the SSRIs

6    came into play.  But I did ask about them.

7    Dr. Barnes sent us back that they did not need to

8    be on the list.  And so that's how we left it.

9        Q.   Is it your understanding that SSRIs have

10   some anticholinergic effect?

11       A.   No, it's not.

12       Q.   And you're not sure what prompted you to

13   look into SSRIs?

14       A.   I'm not certain if there was a

15   suggestion made by someone.  I don't know, Jeremy,

16   to be honest with you.  But I did look into them.

17   I sent something through Drew to Dr. Barnes, and

18   she made a determination that they didn't need to

19   be on the list.  She's our expert, so that's what

20   we went with.

21       Q.   But you initiated it to Dr. Barnes, it

22   wasn't the other way around, that Dr. Barnes said,

23   We should look into SSRIs, and concluded whatever

24   she concluded?

25       A.   I can't tell you one way or another.

1   You know, I don't remember that.

2       Q.  You mentioned Paxil.  Is there any

3   reason why that specific SSRI came to your

4   attention?

5       A.  I told you, I researched every one of

6   the medicines on the list individually.  I took

7   Zoloft, I took Paxil, I took Effexor.  I took all

8   the SSRIs and I looked at them.  And I just wanted

9   to make certain because my name is on this, right?

10  And so she's our expert, so I asked her.

11      Q.  So Paxil and Zoloft were on the list?

12      A.  No, they -- I did not say that.  I did

13  not say that.  I said I looked at the SSRIs.  I

14  looked at all of them.  I spent hours doing this.

15  And I wanted to make sure, because I have to

16  answer to my supervisors about this list, right?

17          We use a lot of SSRIs, a lot of SSRIs.

18  This list right here impacts how my providers

19  practice medicine.  So I can't throw a document

20  out there without researching it, because if my

21  supervisor asks me about, you know, What do we

22  have going on there, I want to be complete and

23  thorough with him.

24          So I researched all of them, and I made

25  an inquiry to our experts.  And I didn't want them

1   on the list, and she agreed they didn't need to be

2   on the list.

3        Q.   You said it impacts how your

4   practitioners, your providers, practice medicine.

5   Why would this affect how they practice medicine?

6   If somebody needs a medication that's on the list,

7   they'll get it, right?

8        A.   Sure, they're going to get it.

9        Q.   So in what --

10        A.   It's a different thought process.  It's

11   a different thought process altogether.  You know,

12   when you have a list like this, you know, and you

13   start bringing this list into the provider's daily

14   practice, it alters the way they practice medicine

15   a little bit because it brings a different way of

16   thinking.  Because there are substitute medicines,

17   right?  There are some medicines that you can use

18   in place of these medicines.

19        Q.   Is there some reason why a medication's

20   inclusion on this list would lead a provider to

21   pick a different medication?

22        A.   Not necessarily.  But there are options,

23   you know, there are options.

24        Q.   I guess maybe one question is:  The

25   effect of these medications being on the list is

1  that it implicates this heat pathology protocol or

2  policy, right?

3     A.  Right.

4     Q.  Is there a concern that -- is there a

5  concern that more people will fall under whatever

6  protections this policy offers --

7     A.  No --

8     Q.  -- by including more medications on the

9  list?

10     A.  Absolutely not.  There's not a concern

11  at all.  We're going to practice medicine that's

12  in line with the standard of care.

13     Q.  That's what I would assume.  So I'm just

14  trying to understand what you mean when you say it

15  affects how physicians would practice medicine?

16     A.  It's a whole -- it's a different

17  process, a whole different process.  Because

18  now -- okay.  So I have to have somebody review

19  all the medications that are on this list, all

20  these diagnoses that we have, okay, anybody that

21  that's on one of these medications, and somebody's

22  got to do that, right?

23         That's time intensive, right?  That's

24  time intensive for some provider, you know, when

25  we still have to -- we still have to maintain our

1   number of patients that are seen every day, we

2   still have to run ATUs, we still have to run

3   hospital wards.

4         It's -- now they have to be really in

5   tune with some of these medicines and their

6   anticholinergic properties and how that translates

7   into the practice of correctional medicine, that's

8   all I'm saying.

9      Q.   But that's a good thing, right, that

10  they're attuned to these effects of these

11  medications?

12     A.   Right.  I didn't say it was a bad thing.

13     Q.   It's a good thing, I would assume,

14  right?

15     A.   I would assume.  But it's different.

16  It's different than what we've been doing for

17  years.

18     Q.   I see.  So it's the change that was

19  giving you pause?

20     A.   Right.

21     Q.   We may come back to that list in a

22  minute, but let me pull up another document.

23        MR. BENJAMIN:

24           This is Tab 5, Janet, and I think it

25           will be Plaintiffs' Exhibit 113.

1          (Exhibit 113 was marked.)

2    BY MR. BENJAMIN:

3       Q.   This is a letter from Keogh Cox,

4    Mr. Blanchfield's firm, to Judge Jackson dated

5    October 18, and it has an ECF number of document

6    132 at the top.

7          You can see that document, right,

8    Dr. Lavespere?

9       A.   I can, yes.

10      Q.   Okay.  Are you familiar with this

11   document, this letter?

12      A.   I've never seen it.

13      Q.   You've never seen it.

14         I'm going to -- we'll walk through it.

15   This is a letter -- and you can obviously point

16   out if you think that there's any inaccuracy in

17   it.

18         But this is a letter from your counsel

19   to the Court sort of outlining some of the

20   purported modifications of HCP8.  And I think it's

21   a good -- it's a good way to just take a look at

22   those different modifications.  As I say, if

23   there's anything in here that you disagree with,

24   just flag that for me.

25         MR. BENJAMIN:

1           Janet, if you could just scroll down

2       to page 2.  That's fine.

3  BY MR. BENJAMIN:

4     Q.   There's a header there that says "HCP8

5  Modifications."  Take just a minute to familiarize

6  yourself with what's being stated there and let me

7  know whenever you're ready.

8     A.  Okay.

9       MR. BENJAMIN:

10          Janet, why don't you scroll down

11       just a little bit further.  Okay,

12       perfect.

13  BY MR. BENJAMIN:

14     Q.   And again, just familiarize yourself

15  with this language as well.

16     A.   This pretty much was in the policies.

17     Q.   That was going to be my next question.

18  Does this seem like a fair overview of the main

19  changes as you see it to HCP8?

20     A.   Sure.

21       MR. BENJAMIN:

22          Okay.  Let's go back up to page 2,

23       Janet.

24  BY MR. BENJAMIN:

25     Q.   Just stepping back for a second, I think

1    we have said this, but just to be clear, HCP8 is

2    DOC's health care policy concerning heat

3    pathology, right?

4         A.  Yes.

5         Q.   And that's the policy that sets the

6    floor for all DOC facilities to follow with

7    respect to heat pathology, right?

8         A.  Yes.

9         Q.   Okay.  Individual facilities might do

10   things a little bit differently, but they

11   certainly have to follow what's in HCP8, right?

12        A.  Yes.

13        Q.   Okay.  And --

14        A.  They can go above what HCP8 calls for,

15   they should not go below what HCP8 calls for.

16        Q.   Right.  And just -- I know you have HCP8

17   with you in hand, so feel free to be looking back

18   and forth as we talk through this.

19          You said they can go above but they

20   can't go sort of below the floor that HCP8 sets,

21   correct?

22        A.  Right.

23        Q.   And HCP8 does set floors with respect to

24   certain heat precautions, right?

25        A.  Yes.

1    Q.   Okay.  And am I correct that the heat

2  precautions that are spelled out in HCP8 apply

3  only from May 1 to October 31 each year?

4    A.   They -- yes.

5    Q.   Why do they only apply within that date

6  range?

7    A.   Because that's usually when the

8  temperatures are, you know, in the range of what

9  would be considered hot temperatures.

10    Q.   I understand right now it's hotter than

11  usual in Louisiana, or hotter than one might

12  expect; is that right?

13    A.   Not really.  It's very comfortable, to

14  be honest with you.

15    Q.   I talked to my parents in Houston, they

16  were saying it's hot.

17    A.   Not compared to what we usually see,

18  it's not hot.

19    Q.   Fair enough.

20       Let me ask you this --

21    A.   They're wearing shorts down here.

22    Q.   Let me ask you this:  Is there any

23  reason, if it gets hot in March, that there should

24  be different policies in place than if it got hot

25  in May?

1    A.  I think that if it got hot, you know,

2  incredibly hot, that the administrations that are

3  over these facilities would do the right thing, I

4  just think that they would do that.  So --

5    Q.  But the policy itself doesn't mandate

6  it, correct?

7    A.  No, it doesn't mandate it.

8    Q.  And so my question is:  Why -- why limit

9  it to that date range when what you're really

10  looking at is how hot it is?

11    A.  Well, long before me, that October to

12  May time frame was put into play by someone.  It

13  hasn't been changed since then and it had never

14  been questioned 'til now.  And I don't think

15  that -- you're the first one who's ever asked me

16  about that time frame.  To be honest with you,

17  it's been a set time frame for years, and I think

18  it's just been, you know, routinely adopted.

19    Q.  So institutional inertia, right?

20    A.  Right.  And I think that if you look at

21  the overall weather picture that we have in

22  Louisiana, I think that time frame is a very good

23  time frame to catch the overwhelming majority of

24  days where the heat index would be above 91.

25    Q.  Did you do any analysis as you were

1  modifying HCP8 as to whether the heat index gets

2  above 91, you say --

3      A.  No.

4      Q.  -- outside of that time range?

5      A.  I did not.

6      Q.  This was a good opportunity to review

7  the policy in whole, right?

8      A.  Right.

9      Q.  Now, this letter that we're looking at

10  is dated October 18, 2024.  That's the date it was

11  submitted to the court.  And it describes HCP8 as

12  going into effect on October 20, 2024, which is

13  the date that we previously agreed it did go into

14  effect, right?

15      A.  Right.

16      Q.  Do you have any idea why defendants

17  would alert the Court to modifications that had

18  yet to go into effect?

19      A.  I do not.  You'd have to ask

20  Mr. Blanchfield that question.

21      Q.  All right.  Do you know why DOC chose

22  October 20 as the effective date for the changes

23  to HCP8?

24      A.  I do not.  I mean, it would have had to

25  have gone through legal.  That may be when it came

1  back from legal.  But I noticed that Secretary

2  Wescott, on the back -- I didn't really see a date

3  when he signed it or when Natalie stamped it.  So

4  I couldn't tell you.  That may be the date when it

5  came back.

6      Q.  You're just guessing though on that?

7      A.  Pure speculation though.

8      Q.  Got it, got it.

9          The first paragraph under the heading

10  "HCP8 Modifications" states, "Based on

11  recommendations from Defendants' experts Dr. Carl

12  Keldie and Dr. Deleca Barnes, Defendants have

13  implemented changes to HCP8."

14          You see that, right?

15      A.  Right.

16      Q.  Now, you're familiar with Dr. Susi

17  Vassallo, right?

18      A.  Yes.

19      Q.  You know she's an expert in this case as

20  well?

21      A.  I do.

22      Q.  Did DOC consider Dr. Vassallo's various

23  declarations in connection with the modifications

24  it was considering for HCP8?

25      A.  Did DOC consider her recommendations?

1    Q.  Yes.

2    A.  Well, once we had our expert, we had

3  other experts review her recommendations.

4    Q.  But DOC didn't look at her report and

5  say, That's a good idea, let's do that?

6    A.  No.

7    Q.  Did they -- did DOC consider any of the

8  materials that were referenced by Dr. Vassallo

9  that may have been referenced by Dr. Keldie or

10  Dr. Barnes?

11    A.  Jeremy, once we got our experts, our

12  experts reviewed all of Dr. Vassallo's

13  information, okay?  They looked at it, you know.

14  There was a lot of inaccuracies in that

15  information, and I think they pointed those out to

16  the Court, the inaccuracies.

17        So to say that we looked at -- that DOC

18  looked at her information and considered it

19  heavily, I would say that our experts looked at

20  her information and our experts had their own

21  opinion, and we went with the opinion of our

22  experts.

23    Q.  Did you ask your experts about any of

24  the opinions that Dr. Vassallo had offered?

25    A.  I think there was some discussions on

1   Zoom meetings about her opinions and things in

2   that.

3       Q.   Did you have a batch of different Zoom

4   calls with either Dr. Keldie or Dr. Barnes about

5   these modifications and their opinions?

6       A.   No.  When she wrote her report, I think

7   we had a meeting with Drew and, you know, we went

8   over in detail some of -- some of the narrative

9   that she -- that she put forth, and I found a lot

10  of inaccuracies in it myself.

11      Q.   And on that call, Dr. Barnes was on that

12  call?

13      A.   I'm sure.

14      Q.   And Dr. Keldie too?

15      A.   I'm sure.

16      Q.   Was there any valuable information that

17  you found in Dr. Vassallo's report that wasn't in

18  Dr. Keldie or Dr. Barnes' reports?

19          MR. BLANCHFIELD:

20              Object to the form of the question.

21          That's an incredibly broad question

22          asking him to assimilate hundreds of

23          pages of information.

24          MR. BENJAMIN:

25              So that's a form objection?

1       MR. BLANCHFIELD:

2           Yeah.

3       MR. BENJAMIN:

4           All right, gotcha.

5   BY MR. BENJAMIN:

6       Q.  You can answer, Dr. Lavespere.

7       A.  Can you say that again.

8       Q.  Sure.  Was there any valuable

9   information that you found in Dr. Vassallo's

10  report that wasn't in Dr. Keldie or Dr. Barnes'

11  report?

12      A.  It was pretty much the same information.

13      Q.  How about the materials that she relied

14  on, did you find anything valuable there?

15      A.  That's material that can pretty much be

16  found anywhere, I mean, pretty straightforward.

17      Q.  The first bullet point here talks about

18  a change in the break schedule and implements a

19  rest break of 15 minutes every 45 minutes.

20          Was that break schedule a recommendation

21  made by Dr. Barnes?

22      A.  Probably Dr. Keldie.

23      Q.  Dr. Keldie made the recommendation to

24  give a 15-minute break every 45 minutes?

25      A.  I would say that Dr. Barnes made

1   recommendations pretty much from a medications

2   standpoint, and Dr. Keldie made recommendations

3   pretty much from a procedural standpoint.

4       Q.   So you think this modified break

5   schedule was a recommendation of Dr. Keldie?

6       A.   I would say that -- safely say that it

7   was a recommendation from our experts.

8       Q.   Anything in either of those reports that

9   talks about a 15-minute break being given every 45

10  minutes as an appropriate break schedule?

11      A.   No.  I think that goes to the -- that

12  would lend one to believe that the DOC is trying

13  to be fair with these guys that are working out in

14  the heat.  I don't think in the free world you get

15  15-minute breaks every 45 minutes when you're

16  working on a job.

17          I have several friends of mine that run

18  construction crews, they don't break their workers

19  15 minutes every 45 minutes.  I think that's very

20  reasonable for DOC to come up with that

21  recommendation and it shows a level of fairness

22  we're wanting to go to.

23      Q.   And you think DOC came up with that

24  recommendation based on your experts?

25      A.   I would say that's a safe bet.

1        MR. BENJAMIN:

2            Janet, can you pull up Tab 6.  This

3        is going to be Plaintiffs' Exhibit 114.

4        (Exhibit 114 was marked.)

5    BY MR. BENJAMIN:

6        Q.   This is a Ruling and Order of the court.

7    And if you want to scroll down to the bottom, it's

8    dated the 15th day of August 2024, signed by Judge

9    Jackson.

10            I'm going to refer to this as the

11    remedial orders -- the remedial order, if that's

12    okay.

13       A.   Sure.

14       Q.   If you can go to page 6, does this --

15    have you ever seen this order before?

16       A.   I don't think I've seen that order.

17       Q.   Well, are you aware that the Court

18    actually ordered DOC to implement or, rather, LSP

19    to implement a break schedule of 15 minutes every

20    45 minutes?

21       A.   I'm not, but it seems fair.

22       Q.   So fair to say it was actually the court

23    that mandated this break schedule that DOC

24    ultimately adopted?

25       A.   Okay, that's fair to say.

1    Q.  And do you see that there's a footnote

2   there, Footnote 1, and it references NIOSH

3   recommendations to private employers with respect

4   to break schedules for outside work?

5    A.  Yes, I see it.

6    Q.  Did DOC review those recommendations

7   from NIOSH before drafting HCP8's modifications to

8   the break schedule?

9    A.  I didn't review them and I don't think

10   that routinely we review NIOSH recommendations.

11    Q.  So even though the Court ordered you to

12   put in place a break schedule and referred to

13   specific break schedule recommendations by NIOSH,

14   you didn't bother to look at those

15   recommendations?

16    A.  That's not what you asked me.  Are

17   you --

18    Q.  That's what I'm asking you now.

19    A.  So after this document right here was

20   put out, are you asking me did they review NIOSH

21   recommendations?

22    Q.  I'm asking if DOC reviewed NIOSH

23   recommendations when it decided to modify the

24   break schedule in HCP8?

25    A.  I think that's a question that



1    Dr. Keldie would answer more efficiently than I

2    would.  He would have been the one to -- he and

3    Dr. Barnes would have been the ones to review the

4    NIOSH recommendations.

5        Q.   Well, Dr. Keldie is not DOC's witness.

6            So I'm asking you whether DOC reviewed

7    NIOSH recommendations about a break schedule?

8        A.   DOC did not.  Dr. Barnes and Dr. Keldie

9    very likely did, but DOC did not.

10       Q.   And you're of the opinion that

11   Dr. Keldie was the one who also recommended the

12   break schedule that DOC implemented into HCP8?

13       A.   Well, I didn't recommend it.  It came

14   from somewhere.  I just assumed that our experts

15   recommended it.  I didn't know the judge had

16   ordered it.  But now that you show me the judge

17   ordered it, the judge ordered it, so DOC put it

18   into play.

19       Q.   The court order actually says that the

20   work break schedule is closer to, yet still does

21   not reach, the labor recommendations for private

22   employers put forth by certain federal agencies,

23   and it cites this NIOSH report.

24           So my question is:  Did you consider

25   implementing a break schedule that would be

1  consistent with the NIOSH schedule?  I'm sorry, I

2  misspoke there.

3       Did you consider putting into place a

4  break schedule that would be consistent with the

5  NIOSH standards?

6    A.  No.

7    Q.  All right.  Let's go back to the 18th

8  letter.  This is -- what is it -- this is

9  Plaintiffs' Exhibit 113.

10       The second modification that's noted

11  here is one that says, "HCP8 also implements

12  current practices of providing shaded areas for

13  breaks."

14       What does that mean?

15    A.  Well, that means that HCP8 -- they

16  started putting tents up out there for the inmates

17  to get shade, several tents, that whenever I went

18  out there, they wasn't using the tents.  But they

19  were -- they were there if they wanted to take a

20  break under the tent to get out of the sunlight.

21    Q.  And was the decision to make shade

22  available a recommendation of Dr. Keldie or

23  Dr. Barnes?

24    A.  If it wasn't a recommendation from the

25  Court, I would say that it was a recommendation

1   made by our experts, but I don't know that.

2       Q.   And would it surprise you that, in fact,

3   it was a recommendation from the Court?

4       A.   It wouldn't surprise me.

5       Q.   In fact, I say "recommendation."  It was

6   actually an order of the Court.

7       A.   Okay.  So they did it.

8       Q.   And they did it based on what the Court

9   mandated?

10      A.   Right.  Which still goes to show that

11  we're very flexible and we're very -- we're very

12  much wanting to do what the Court is asking us to

13  do.

14      Q.   So you're flexible and will comply with

15  the court orders?

16      A.   Sure.  Federal court order.

17      Q.   The third modification describes

18  providing sunscreen.  Are you aware that that,

19  too, was something that was ordered by the Court?

20      A.   Well, when I was at Angola from 2009 to

21  probably 2019, I wrote for sunscreen a lot for

22  these guys.  But if it's a court order -- I mean,

23  sunscreen is easily available, made readily

24  available easily to these inmates who work in the

25  field.

1    Q.  Do you know that prior to the Court's

2  involvement, sunscreen was not readily available

3  to the people on the farm line?

4        MR. BLANCHFIELD:

5            Object to the form.

6    A.  I would not say that whenever they went

7  to the field, whenever they were brought to the

8  field, they had sunscreen readily available for

9  them.  But through sick call, if an inmate ever

10  asked me for sunscreen and they had a reason to

11  need sunscreen, we would get it for them.

12  BY MR. BENJAMIN:

13    Q.  I see.  They would have to --

14        (Multiple speakers.)

15        THE COURT REPORTER:

16            I'm sorry, y'all talked over each

17        other and I didn't catch that.

18        (Discussion off the record.)

19  BY MR. BENJAMIN:

20    Q.  Dr. Lavespere, we just had an exchange,

21  I don't think the court reporter caught the whole

22  thing.

23        Fair to say that you testified that if a

24  person made a sick call and came to see you, you

25  might be providing sunscreen to them at that

1  point?

2      A.  I would, yes.

3      Q.  But it wasn't -- but the sunscreen

4  wasn't readily available to them on the line at

5  that time?

6      A.  That's correct to say.

7      Q.  Okay.  Let's look at the next

8  modification.  And this describes a modification

9  that says, "If the heat index exceeds 113 degrees

10  Fahrenheit, all work shall cease."

11          How is it determined that when the heat

12  index exceeds 113 degrees Fahrenheit, work should

13  stop?

14      A.  Again, I would say if it's not court

15  ordered, it come from our expert, Dr. Keldie.

16      Q.  And do you know whether it is court

17  ordered?

18      A.  I do not know that.

19      Q.  I'm going to represent that it was court

20  ordered.  Given that, do you agree that this

21  modification also came in response to a court

22  order?

23          MR. BLANCHFIELD:

24              Object to the form.

25

1   BY MR. BENJAMIN:

2       Q.   Well, I tell you what, why don't we go

3   back to -- well, I tell you what, I think it's

4   going to be Tab 8, and this will be Plaintiffs'

5   Exhibit 115.

6           (Exhibit 115 was marked.)

7   BY MR. BENJAMIN:

8       Q.   This is another ruling and order in this

9   case, and if we could scroll down to the very

10  bottom, it's dated the 2nd of July 2024.  I'm

11  going to refer to this as a preliminary injunction

12  order.

13          If you just go up to page 77, one

14  page above, you see Number 5 listed there ordering

15  LSP to develop an additional heat-related policy

16  to protect those laboring outdoors when heat index

17  values reach or exceed 113 degrees Fahrenheit?

18      A.   I see that.

19      Q.   So fair to say that the 113-degree

20  metric was also a court-ordered metric?

21          MR. BLANCHFIELD:

22              Object to the form.  You're leaving

23          -- you're leaving out -- that was

24          appealed, was it not?  Was it not

25          appealed and modified?  So there was no

1        court order for 113 degrees.

2        MR. BENJAMIN:

3            I understand, Drew.  I understand

4        you're objecting to form.  That question

5        stands, Dr. Lavespere.

6        THE WITNESS:

7            So answer the question?

8        MR. BLANCHFIELD:

9            You can answer the question.

10       A.  I would say, from the document you're

11   showing me, it was directly put into HCP8.  So

12   from a court order, it was put into HCP8.

13   BY MR. BENJAMIN:

14       Q.  Was there anyplace other than this order

15   where DOC got the 113-degree mark?

16       A.  No, not that I'm aware of.

17       Q.  Now, this order says, "reach or exceed

18   113 degrees Fahrenheit," HCP8 says "exceeds

19   113 degrees Fahrenheit."

20           Do you know why there's a distinction

21   there?

22       A.  It seems like the court order gave us an

23   option, right, reach or exceed.

24       Q.  And so DOC chose the higher temperature?

25       A.  Right.

1      MR. BENJAMIN:

2          Okay.  We can take that one down.

3      And let's pull back up the October 18

4      letter.

5   BY MR. BENJAMIN:

6      Q.   I'm going to skip these next two

7   bullets.  We started talking about those earlier.

8   They refer to the medication and conditions lists.

9   But we'll come back to that in a minute.  The

10  final bullet concerns the heat index at which HCP8

11  requires a heat alert to be called, correct?

12     A.   Yes.

13     Q.   Okay.  Now, before the October 20, 2024

14  version of HCP8, at what heat index was a heat

15  alert triggered?

16     A.   88 degrees.

17     Q.   And under the new, modified HCP8, what

18  index is a heat alert triggered?

19     A.   91 degrees.

20     Q.   Over 91 degree, right?

21     A.   Right.

22     Q.   Now, as a result of this change, heat

23  alert protections that had previously applied when

24  the heat index was between 88 degrees and 90.9

25  degrees are no longer mandated by policy, right?

1    A.  Right.

2    Q.  Who was involved in making the decision

3 to raise the heat index at which a heat alert

4 occurs?

5    A.  I think that came from our experts.

6 Actually, it was recommended 95 degrees, but I

7 think Drew, being the guy that he is, you know,

8 thought that would be too high for the Court.

9    Q.  I can't say enough good things about

10 Drew myself, but I tell you what, let's keep that

11 to ourselves.  I don't need to know what Drew was

12 telling you, just for --

13    A.  He wasn't telling -- he wasn't telling

14 us anything.  He was like, Look, guys, you know,

15 it's a big jump from 88 to 95.  I think being more

16 reasonable, you know, we considered 91 as a median

17 and thought it would be more reasonable to the

18 Court.

19    Q.  Now, when you were last deposed in this

20 action, you testified that you did not know how a

21 heat index of 88 degrees had been chosen as the

22 triggering event for a heat alert.

23       Do you remember that?

24    A.  I do.  And I researched that.

25    Q.  What did you find?  Let me rephrase

1    that.

2         You researched how 88 was decided upon?

3    A.  I did.

4    Q.  What did you find?

5    A.  I found that that number came from

6    Dr. Vassallo through the air-conditioning heat

7    case from death row, that's what I think.

8    Q.  So DOC -- DOC previously relied on

9    Dr. Vassallo's recommendations in drafting its

10   heat pathology protocol?

11   A.  No.  What I -- what I did, I asked

12   people in the policy department, Where did the 88

13   come from?  Nobody really knew, you know.  I asked

14   several people.  I asked our legal team over here,

15   Where did the 88 come from?

16        The only thing that they could come up

17   with was that number was used -- I forgot what the

18   name of that case was.  But there was a heat case

19   at death row, and Dr. Vassallo was on that case.

20   And I think that number came out of that case.

21   That's what I researched and found.  So I think

22   that came out of that case.

23   Q.  I see.  You think it came out of the

24   recommendation that Dr. Vassallo had made in a

25   different case?

1    A.  I think so, yes.

2    Q.  Okay.  And you started going into this,

3  but you believe that -- well, let me rephrase

4  this.

5         Why did DOC believe that the previous

6  level of 88 degrees should be changed?

7    A.  Well, I think that had to do with the

8  heat index chart.  And it's pretty low.  You know,

9  in our opinion, it's pretty low.

10    Q.  What do you mean by the "heat index

11  chart"?

12    A.  Just from the National Weather -- can

13  you see that?  National Weather Service chart.

14  Let's see.

15    Q.  You know what, I'm afraid that I can't

16  see it very well because my eyes are terrible.

17  Does it have any indication of what that -- where

18  that chart is from?  Is that from Dr. Keldie?

19    A.  No.  It's National Weather Service.

20       MR. BENJAMIN:

21          Janet, can we just take this one

22          down for a second.

23  BY MR. BENJAMIN:

24    Q.  And, I'm sorry, Dr. Lavespere would you

25  just mind showing me that a little more carefully.

1   I'll see if I can -- okay, I see.  Gotcha.  All

2   right.  We'll come back to that in just a moment.

3        THE WITNESS:

4           Hey, Jeremy?  Five minutes.

5        MR. BENJAMIN:

6           Absolutely.  Let's do it.  Let's go

7        off the record.

8        THE VIDEOGRAPHER:

9           We're going off the record at

10       4:08 p.m.

11       (A break was taken.)

12       THE VIDEOGRAPHER:

13          We're going back on the record at

14       4:11 p.m. Eastern.

15   BY MR. BENJAMIN:

16     Q.   Dr. Lavespere, you agree that a heat

17   index being triggered at around 88 degrees is more

18   protective than a trigger of 91 degrees, correct?

19     A.   That's kind of unfair.  I mean, I would

20   also agree that a heat index of 80 is more

21   protective.  But I mean, sure, you would agree

22   with that, but I don't think there's a whole lot

23   of difference there.

24     Q.   Well, let me ask you this:  Was DOC's

25   decision to raise the heat index trigger to over

1  91 degrees intended to keep more people working

2  outdoors during periods of high heat?

3     A.  No.  I think, if you look at that

4  National Weather Service heat index chart, that

5  that is the lowest number where extreme caution

6  should be employed, and so I think that's why we

7  decided on 91.

8        MR. BENJAMIN:

9          All right.  Why don't we pull up Tab

10         9.  This is a document that was

11         previously marked as Plaintiffs' Exhibit

12         107.  This is titled Responses to

13         Plaintiffs' Third Set of

14         Interrogatories.

15  BY MR. BENJAMIN:

16     Q.  Dr. Lavespere are you familiar with this

17  document?

18     A.  It's likely.

19     Q.  No problem.  I'll tell you what.  Let's

20  just scroll down, Janet, to Interrogatory

21  Number 5, which says, "State in detail your

22  process for increasing the heat index at which a

23  heat alert is announced from 88 degrees in the

24  2018 HCP8 to 91 degrees as set forth in HCP8."

25         And it refers to the reports of

1  Dr. Keldie and Dr. Barnes, including attachments

2  and it also refers to a link that looks like it's

3  the National Weather Service and a link to the

4  CDC.

5        So is that an accurate description of

6  DOC's process for increasing the heat index at

7  which a heat alert is announced from over

8  88 degrees to over 91 degrees?

9     A.  If it was recommended by our experts,

10  I'm sure it is.

11     Q.  Okay.  Well, let's start with

12  Dr. Reynolds-Barnes.  Does her expert report say

13  anywhere that a heat index should be triggered

14  after exceeding 91 degrees?

15     A.  The report that I read on her medication

16  list did not mention anything about that.

17     Q.  Do any of the attachments suggest that a

18  heat index should be triggered only after

19  exceeding 91 degrees?

20     A.  Not on her end, no.

21     Q.  Did Dr. Keldie recommend that DOC

22  implement a heat alert only once the heat index

23  exceeded 91 degrees Fahrenheit?

24     A.  You know, I can't really remember.  But

25  if it did come from our experts, he would have

1   been the one who would have recommended it.

2       Q.  Can you pull up --

3       A.  Like I say -- excuse me.  Like I say, I

4   think he wanted 95.  I think that's what he

5   proposed, 95, but through discussions, we thought

6   that 91 would be more reasonable to the Court.

7           And I want to say that I may have

8   brought out looking at the National Weather

9   Service chart that had the low end of the spectrum

10  for extreme caution was 91.  But I think

11  Dr. Keldie actually wanted 95, to be honest with

12  you.

13          MR. BENJAMIN:

14              Janet, can we put this one down and

15          pull up Tab 10.  And this is going to

16          be -- I'm not sure what exhibit this is

17          going to be.

18              Rita, do you have the last exhibit

19          that we put up?

20          THE COURT REPORTER:

21              One second.

22          MR. BENJAMIN:

23              The last number?

24          THE COURT REPORTER:

25              Yeah, one second.  The next one is

1        116.

2        (Exhibit 116 was marked.)

3   BY MR. BENJAMIN:

4     Q.  Okay.  So this is -- I'm showing you

5   Plaintiffs' Exhibit 116.  This is Dr. Keldie's

6   Exhibit IV.

7        Are you familiar with this document?

8     A.  It's just the same document that we

9   have, just in a little different form.

10    Q.  Are you -- do you know what the source

11  of this chart is?

12    A.  No, I do not.

13    Q.  Do you see down at the bottom there

14  there's a link to OSHA?

15    A.  Okay.

16    Q.  And I think you saw in the October 18

17  letter there's a reference to OSHA guidance as

18  well as CDC and National Weather Service as being

19  bases on which these modifications were made?

20    A.  Right.

21    Q.  Okay.  Let's go to that link that's at

22  the bottom of this page.

23        MR. BENJAMIN:

24            And we'll just open this as a new

25        exhibit.  This will be Tab 11, and it

1        will be called Plaintiffs' Exhibit 117.

2        (Exhibit 117 was marked.)

3    BY MR. BENJAMIN:

4    Q.   This is the OSHA web page that is linked

5    in to Dr. Keldie's Exhibit IV.

6        Are you familiar with this document?

7    A.   I'm not.

8    Q.   Well, are you familiar with OSHA's

9    guidance on heat?

10    A.   No.

11    Q.   Did DOC rely on the OSHA guidance that

12    Dr. Keldie cites to in his report when it was

13    modified in HCP8?

14    A.   Yes.

15    Q.   Let's take a look at this guidance.  Go

16    down to the Environmental Heat section.  Under the

17    Environmental Heat section, OSHA sets forth four

18    factors that affect heat stress in workers, air,

19    temperature, humidity, radiant heat, and air

20    movement.

21        Do you see that?

22    A.   Yes.

23    Q.   Okay.  When DOC decided to update its

24    heat pathology protocol, did it consider those

25    four factors?

1    A.   Again, we considered what our experts

2    told us because they were our paid experts, that's

3    what we considered.

4    Q.   Okay.  Well, let me ask you this, "OSHA

5    rec -- it says in bold letters right below this

6    that "OSHA recommends the use of wet bulb globe

7    temperature (WBGT) monitor to measure workplace

8    environmental heat."

9        Do you see that?

10    A.   Yes, I do.

11    Q.   When DOC decided to update HCP8 based on

12    OSHA guidance, did it consider using wet bulb

13    globe temperature to measure environmental heat?

14    A.   We did not -- I did not.  Dr. Keldie

15    didn't recommend that, so we did not.

16    Q.   So only if Dr. Keldie recommended it did

17    you consider it?

18    A.   Well, he's our expert.  We had a paid

19    expert to give us advice, and so we went with his

20    recommendation.

21    Q.   Did you look any further than his

22    recommendation?

23    A.   No.

24    Q.   You didn't look at the OSHA guidance

25    that he cites to?

1    A.  No.

2    Q.  The OSHA guidance continues to -- it

3  says, "The WBGT instrument should be placed close

4  to the work location.  For example, the work --

5  for example, if the work is in direct sunlight,

6  then the WBGT instrument should be in the sun."

7       When DOC decided to update its heat

8  pathology protocol, did it consider the advantages

9  of measuring temperature in a place close to the

10  work location?

11    A.  We don't have a WBGT instrument.

12    Q.  Are they hard to get?

13    A.  Don't know.

14    Q.  Well, did you consider that it would be

15  important to measure temperature or heat index,

16  other types of heat-related factors, in an area

17  close to where work was actually being performed?

18    A.  You know, the National -- they use the

19  National -- what the National Weather Service puts

20  out, and they do that a couple times an hour, I

21  believe.

22    Q.  I think it's once every two hours; is

23  that right?

24    A.  Once every two hours, yeah.

25    Q.  Where does the National Weather Service

1    data come from?  Do you know where that's

2    recorded?

3        A.  I do not.

4        Q.  Do you know how close it is to Angola?

5        A.  I do not.

6        Q.  Do you know whether it's in direct

7    sunlight?

8        A.  Do not.

9        Q.  In the next paragraph, the OSHA guidance

10   describes the heat index.  And that's the

11   measurement that HCP8 uses to determine whether a

12   heat alert is proper, right?

13       A.  Right.

14       Q.  Okay.  It says, "Heat index is another

15   common way to measure heat stress.  It is measured

16   in the shade and combines air temperature and

17   relative humidity to represent how hot the

18   conditions feel.

19           "The heat index does not account for the

20   effects of wind, sunlight, radiant heat sources,

21   or workload.  Air (dry bulb temperature) also

22   ignore relative humidity.  All of these factors

23   can influence the total heat stress experienced by

24   workers."

25           So when DOC decided to update its heat

1  pathology protocol, did it consider the

2  limitations of using the heat index method for

3  measuring heat stress?

4      A.  We did not.

5      Q.  The second sentence of the next

6  paragraph continues, "Use of heat index is a less

7  desirable substitute.  While local weather reports

8  based on meteorological data from observation

9  stations can be useful, the readings from these

10  stations may not reflect the conditions at the

11  specific work site.

12          "Heat conditions at the work site may be

13  different for multiple reasons, from fog cover and

14  humidity to local heat sinks.  The potential error

15  increases with the distance from the heat station.

16          When --

17      A.  Go ahead.

18      Q.  I'm sorry, what were you saying?

19      A.  Well, It uses the word "may be"

20  different.  It doesn't say they are different;

21  They may be different.

22      Q.  You're not sure whether it's different

23  or not?

24      A.  And neither are you, you know, so it may

25  be different.

1    Q.  Right.  And that's why OSHA recommends

2  that a measurement be taken at the site of work,

3  right?

4    A.  That's what OSHA recommends.

5    Q.  Okay.  But you ignored that?

6       MR. BLANCHFIELD:

7          Objection to the form.

8    A.  I didn't ignore it.  I didn't research

9  it.  I didn't know they made the recommendation.

10  I mean, again, I think that's something that our

11  experts would be more qualified to answer than I

12  am because that's what we paid them for.

13    Q.  Well, do you think they should have

14  considered this guidance from OSHA?

15    A.  I don't know that they didn't.

16    Q.  Do you know that they did?

17    A.  I don't.

18    Q.  Do you have any indication that they did

19  consider this?

20    A.  I don't have any indication either way.

21    Q.  Going on, OSHA lists other factors that

22  can diminish the accuracy of the heat index,

23  including direct sunlight.

24       And it states, "Weather service measure

25  temperature and heat index in the shade.  Work in

1    the sun may be considerably hotter.  Direct

2    sunlight can increase heat index by up to

3    13.5 degrees Fahrenheit."

4         Dr. Lavespere, do you agree that much of

5    the work performed by men on the farm line is

6    under direct sun, right?

7    A.  Yes.

8    Q.  When DOC decided to update its heat

9    pathology protocol, did it consider the potential

10   impact on workers of being subjected to direct

11   sunlight?

12   A.  Again, I don't know if our experts

13   looked at that, Jeremy, but DOC in and of itself

14   did not.

15   Q.  Well, when sending a heat index of over

16   91 degrees as a trigger for the heat alert, did

17   DOC account for the higher heat index associated

18   with working in direct sunlight?

19   A.  But again, that's not a 100 percent.  It

20   says "may be" hotter.  You don't know that it's

21   hotter than what the temperature we have is

22   stating.  So we didn't consider it.  But I don't

23   think it's an absolute.

24   Q.  Well, did DOC consider direct sunlight

25   when it set -- I'm sorry, strike that.

1        Did DOC consider the effect of direct

2   sunlight when it set a heat index of over

3   113 degrees as the trigger for outside work to

4   stop?

5       A.  Well, we didn't consider that,

6   because -- wasn't that a court order?  And, of

7   course, Drew said it was appealed.  But I do

8   remember Dr. Keldie holding pretty firm to that

9   recommendation of 113.

10      Q.  You remember Dr. Keldie recommending

11  113?

12      A.  I want to say I did remember that.

13      Q.  I'm just asking, do you remember that

14  or -- do you remember Dr. Keldie recommending

15  113 degrees as a --

16          MR. BLANCHFIELD:

17              Object to form.

18      A.  What I remember is a Zoom meeting, and I

19  remember him standing on the screen and talking

20  about the heat index.  And I want to say, yes.

21  I'll say yes to that.

22  BY MR. BENJAMIN:

23      Q.  And did -- do you remember him ever

24  commenting on limitations of reliance on a heat

25  index measurement only?

1    A.  No.

2    Q.  Did Dr. Keldie know where the heat index

3  data is recorded that Angola uses for purposes of

4  determining whether a heat alert should be issued?

5    A.  You would have to ask him.  I can't

6  answer for him on that.

7    Q.  In the next section, Use of Heat Index

8  for Screening, OSHA states, "The heat index does

9  not measure worksite heat as accurately as WBGT.

10  Employers should not rely on heat index alone for

11  the most acute hazard assessment."

12       In light of that guidance, do you

13  believe that DOC should rely solely on heat index

14  alone for purposes of HCP8?

15       MR. BLANCHFIELD:

16            Object to the form.

17    A.  I'm going to have to say that we're

18  going to rely on what our experts recommended to

19  us, and our experts recommended that we use the

20  heat index.

21  BY MR. BENJAMIN:

22    Q.  Did -- did you push back on Dr. Keldie

23  to ask him his basis for the recommendations that

24  he was making?

25    A.  I did not.

1    Q.   OSHA's guidance goes on to state that

2  "Outdoor workers have died of heat stroke when the

3  day's maximum heat index was only 86 degrees

4  Fahrenheit.  OSHA has found that less severe

5  heat-related illness can happen at even lower heat

6  index values.

7        "Employers who choose to monitor the

8  heat index should be aware of heat-related illness

9  risks for workers well below the national and

10  local weather service heat advisory warnings for

11  the general public."

12        So my question is:  When DOC decided to

13  update HCP8 and raise the heat index at which a

14  heat alert is triggered from 88 to over

15  91 degrees, did it consider that section of the

16  OSHA guidance that I just read?

17    A.   Again, I don't know if Dr. Keldie

18  reviewed that information that you're just showing

19  me.  I did not review it.  So I would say no.

20        But, again, he may have reviewed it, and

21  his decision may have been made in accordance

22  with -- not in accordance, after the review of

23  that information.

24    Q.   Well, Dr. Lavespere, is there any aspect

25  of this OSHA guidance that DOC did adopt when

1    modifying HCP8?

2       A.   Not that I'm aware of.

3       Q.   You mentioned the National Weather

4    Service.

5           MR. BENJAMIN:

6               Why don't we take this one down and

7           put up Plaintiffs' Exhibit 118, which

8           will be Tab 5.

9           (Exhibit 118 was marked.)

10   BY MR. BENJAMIN:

11      Q.   Give me one second.

12          Dr. Keldie, I am showing you --

13   everything okay?

14      A.   Well, I think you called me Dr. Keldie.

15      Q.   I'm sorry then.  My mistake, my mistake.

16   Dr. Lavespere.  I apologize for that, sorry.

17          Dr. Lavespere, I'm showing you

18   Plaintiffs' Exhibit 118, which -- one second here.

19   Apologies.

20          I'm showing you Plaintiffs' Exhibit 118,

21   which is a National Weather Service web page

22   that's referred to in the interrogatory response

23   that I showed you earlier, and it has a chart

24   here.

25          Is this the -- is this the information

1   you were referring to previously when you said

2   that DOC had relied on National Weather Service

3   information?

4       A.  Right, that's it.

5       Q.  This is the same chart that you showed

6   me when you held up that piece of paper to the

7   camera?

8       A.  That's the same chart.

9       Q.  Okay.  And did DOC rely on the

10  information shown here on Plaintiffs' Exhibit 118

11  in making its determination that 91 degrees would

12  be the new heat index at which a heat alert would

13  issue?

14      A.  Say that again, Jeremy.

15      Q.  Is this the -- did DOC rely on the

16  information in this chart when making its

17  determination to raise the heat index at which a

18  heat alert would issue to over 91 degrees?

19      A.  Yes, this chart in conjunction --

20      Q.  I'm sorry, say that again.

21      A.  Yes, this chart in conjunction with our

22  expert's recommendation.

23      Q.  What specifically in this chart did you

24  rely on in making that determination?

25      A.  Well, you can see the color codes right

1   there with the light yellow, you know, the

2   temperature, that's at what level caution should

3   be observed; the darker yellow, where extreme

4   caution should be observed; and 91 degrees is the

5   low end of the extreme caution range.

6      Q.   And can you go down just a little bit.

7   You see this section, it's got some headers in

8   gray, "Classification," "Heat Index" --

9      A.   Right.

10     Q.   -- "Effect on the body."

11         Now, there it says extreme caution

12  begins at 90 degrees Fahrenheit.

13         Do you see that?

14     A.   That's not how the chart reads.

15     Q.   The chart above?

16     A.   Right.

17     Q.   Did you not consider the classification

18  information that is on -- that's just below the

19  chart you're referring to?

20     A.   I did, but that's not how the chart

21  reads.

22     Q.   But that's how this chart in this same

23  website reads, right, extreme caution begins at

24  90 degrees?

25     A.   That's how that reads, yes.

1     Q.   Okay.  And in this chart it says that

2  extreme caution begins at 90 degrees Fahrenheit,

3  at which point the effect on the body is

4  heatstroke, heat cramps, or heat exhaustion

5  possible with prolonged exposure and/or physical

6  activity, right?

7     A.   I think that -- that, what you just read

8  and the way that you read it, makes it sound like

9  everybody experiences that at those temperatures.

10  That's not true.

11     Q.   I'm not trying to, you know, do any kind

12  of tone here.

13     A.   You're saying that 90 to 103, people

14  get, you know -- potentially, yeah, they can get

15  heatstroke, they can get heat cramps, they can get

16  heat exhaustion.  We never had a case of

17  heatstroke at Angola that resulted from being in

18  the field.

19     Q.   Again, I'm not trying to say anything;

20  I'm just reading what the National Weather Service

21  says.

22          So my question, I guess first and

23  foremost, did DOC rely on this information from

24  the National Weather Service when it decided to

25  raise the heat index at which a heat alert would

1  issue to over 91 degrees?

2      A.  We use more of the chart information

3  than the written information.

4      Q.  So you picked the part of this that is

5  above the information that we're reviewing right

6  now?

7      A.  Exactly.

8      Q.  Okay.  Did you review this portion that

9  we're looking at right now?

10      A.  I'm sure it was reviewed.  It's all one

11  document.

12      Q.  So why -- what is -- strike that.

13          If you reviewed this information that

14  we're looking at where 90 degrees is the beginning

15  of extreme caution, why did DOC choose to pick a

16  trigger of over 91 degrees for a heat alert?

17      A.  Again, this reads differently than the

18  chart reads.  If you look at the chart, the

19  temperature with extreme caution is 91 degrees.

20  That's how the chart reads.

21      Q.  Is it DOC's position that the

22  protections that flow from a heat alert should

23  issue only when you've already passed into the

24  realm of extreme caution?

25      A.  Say that again.

1    Q.  Is it DOC's position that the

2   protections that flow from a heat alert being

3   called should issue only once you have passed into

4   the realm of extreme caution?

5    A.  I would say, yeah, that's why we chose

6   that temperature.

7    Q.  And is there any guidance from the

8   National Weather Service that supports that

9   position?

10    A.  The numbers on that chart that we just

11   read off shows that at 91 degrees, extreme caution

12   should be...

13    Q.  I'm asking a slightly different

14   question, which is, why did DOC choose to require

15   conditions to enter into a realm of extreme

16   caution before deciding to issue a heat alert?

17    A.  Because that's when the most harm can

18   come to somebody working in the field.  It's above

19   caution, but it's extreme caution.  And I think

20   extreme caution is warranted.

21    Q.  But there's nothing -- the National

22   Weather Service doesn't say that's when a heat

23   alert should issue, right?

24    A.  They don't come right out and say that's

25   when a heat alert should be issued.

1    Q.  Okay.  Now, in the paragraph just above

2  this information that we're looking at right now

3  it says, "It surprises many people to learn that

4  the heat index values in the chart above are for

5  shady locations.  When you are exposed to direct

6  sunlight, the heat index value can be increased by

7  up to 15 degrees Fahrenheit."

8        That's similar to the guidance that we

9  just looked at from OSHA, right?

10    A.  Right.

11    Q.  Okay.  So for a person laboring in

12  direct sun, a heat index of 91 degrees could

13  actually be increased to up to 106 degrees, right?

14    A.  It could be.

15    Q.  Okay.  And that would be in the --

16  what's called the danger zone in this chart,

17  right?

18    A.  That would be.

19    Q.  And in that danger zone, heat cramps or

20  heat exhaustion is likely, according to the

21  National Weather Service, correct?

22    A.  If you don't drink enough water and

23  you're not prepared.

24    Q.  It doesn't say that anywhere in these

25  documents, right?

1     A.  No.  But I've worked out in those

2   temperatures before and I never had problems.

3     Q.  Okay.  Well, did DOC consider that by

4   setting a temperature of over -- a heat index of

5   over 91 degrees as the trigger for a heat alert,

6   it could be requiring people to work in

7   temperatures exceeding 106 degrees, the heat index

8   is exceeding 106 degrees?

9     A.  And I keep saying this over and over.

10   We took the recommendation of our experts, that's

11   what we did.  We paid these guys to review

12   information.  They were supposed to be experts in

13   the field.  These numbers were chosen as a result

14   of what they considered to be fair and

15   appropriate, and that's what we did, we adopted

16   these numbers.  So DOC considered what the experts

17   was telling us was acceptable.

18     Q.  Well, DOC, in its interrogatory

19   responses, cited this document right here as a

20   basis for setting the heat index at over

21   91 degrees in HCP8.  So according to DOC, it did

22   rely on this information.

23     A.  It did.

24     Q.  And so your --

25     A.  There's nothing in HCP8 that was put out

1   there without the approval of our experts,

2   nothing.

3       Q.   Did DOC consider the increase of up to

4   115 degrees Fahrenheit -- I'm sorry, scratch that.

5           Did DOC consider the up-to-15-degree

6   Fahrenheit increase in the heat index when setting

7   the trigger for a heat alert at over 91 degrees?

8       A.   I would have to say that this document

9   was fully reviewed by Dr. Keldie, and I would say

10  that it was a consideration.  Again, you'd have to

11  ask him.  I'm not reading his mind, and I don't

12  know everything that he reviewed, but I know he

13  reviewed this document, and it's pretty clear in

14  there what you just pointed out.  So I'm sure he

15  considered it.

16      Q.   When you're -- when DOC conducts its

17  next annual review of HCP8, will it consider this

18  increase of up-to-115-degree Fahrenheit heat index

19  based on working in direct sun?

20      A.   You talking about up to 15 degrees?

21      Q.   Up to 15.  I apologize, I keep

22  misspeaking.

23      A.   It's up to 15.

24           To be honest with you, I'd have to say

25  it depends on how this court case comes out.

1    Q.   That 15-degree increase in the heat

2  index, that would also apply to the 113-degree

3  trigger for stop work, right?

4    A.   Yes, I'm pretty sure it would.

5    Q.   So if you added the up-to-15-degree

6  effect of direct sunlight to a trigger of

7  113 degrees, you're talking about 128 degrees,

8  right?

9    A.   Jeremy, you're talking about absolutes.

10  You're -- it says, If you are exposed to direct

11  sun, the heat index can be up to increase -- it

12  doesn't say it's always increased up to 15.

13  You're talking about if you're working in direct

14  sun it's an absolute that your values increase up

15  to -- that's not what that's saying.

16    Q.   I'm not trying to insinuate that it says

17  absolute.

18    A.   But you're -- the numbers that you're

19  using are insinuating that it is an absolute, and

20  it's not.

21    Q.   The numbers I'm using are --

22    A.   We wrote to 15 really, right?

23    Q.   Right.  And it can be 15, meaning a heat

24  index of 113 measured in the shade could actually

25  be 128 degrees, right?

1        MR. BLANCHFIELD:

2            Object to the form.

3    A.  As its maximum.

4  BY MR. BENJAMIN:

5    Q.  Okay.  But that would be --

6    A.  That would be -- that would be an

7  absolute.

8    Q.  Right.  But that would fall into the

9  extreme danger range, right?

10    A.  It would.  But it would fall -- it would

11  fall into the extreme caution range.  See, you're

12  creating the worst-case scenario there, and I

13  think that's unfair to the Court.  Because the

14  worst-case scenario is not always the absolute.

15    Q.  Was your goal in modifying HCP8 to

16  protect people on the farm line?

17    A.  Our goal in modifying HCP8 was to be

18  fair, fair to the people on the farm line, fair to

19  the Department of Corrections in that there's

20  things that need to be done from an agricultural

21  standpoint.

22        Our goal was to be fair with everybody

23  and to be reasonable with the Court.  That's what

24  our goal was.

25    Q.  When you say you want to be fair to

1   people who are exposed to outside work, wouldn't

2   it be fair to consider that the heat index value

3   can be increased by up to 15 degrees Fahrenheit

4   when people are exposed to direct sun?

5       A.   I'm not saying they didn't consider it.

6   Dr. Keldie very likely considered it.  But he

7   also -- you're looking at the far right.  I mean,

8   what if he were looking at the far left?

9       Q.   When -- when modifying HCP8 and setting

10  those triggers for a heat alert and for a stop

11  work, were you looking, in your words, to the far

12  left?

13      A.   I didn't look at the far left or the far

14  right.  I took a recommendation from my -- my

15  expert.

16      Q.   Well, sitting here today as DOC's

17  representative, what do you think is the right way

18  to account for an increase of up to 15 degrees

19  Fahrenheit in the heat index for persons laboring

20  in direct sunlight?

21      A.   You can ask the same question about how

22  Dr. Vassallo came up with 88, okay.  If you look

23  at her 88-degree temperature, what if you add 15

24  to that, what do you have?

25      Q.   A lot better than 91.

1    A.  3 degrees difference.

2    Q.  Is that insignificant?

3    A.  Is it significant?  You know, I think

4  that's going to be for the Court to decide.  But

5  we think, from DOC, that 91 is a fair temperature

6  for the heat index.  Our experts agreed with us,

7  and that's what we settled on.  I mean --

8    Q.  Is there anyplace where your expert

9  recommended setting the heat index trigger at

10  above 91 degrees for a heat alert?

11    A.  I think that's evident with what we put

12  out in HCP8, 91.

13    Q.  I'm asking, is there some document that

14  you can point me to where your expert said the

15  heat alert trigger should be over 91 degrees?

16    A.  HCP8.  There's nothing in that document

17  that was not approved by our experts.

18        MR. BENJAMIN:

19            All right.  Let's take that one down

20            and move to Tab 14.  This is Plaintiffs'

21            Exhibit 119.

22            (Exhibit 119 was marked.)

23  BY MR. BENJAMIN:

24    Q.  Dr. Keldie, I'm showing you a document

25  that is entitled "Criteria for a Recommended

1  Standard, Occupational Exposure to Heat and Hot

2  Environments."  It's put out by the CDC and NIOSH.

3       Do you see that document?

4  A.  I do.

5  Q.  Do you recognize it?

6  A.  No.

7  Q.  This document is the document that's

8  also linked in your -- and referred to in your

9  interrogatory response as something that DOC

10  considered in setting -- in modifying HCP8.

11       Do you know whether DOC relied upon the

12  guidance of this document when making those

13  modifications?

14  A.  I'm sure, if Dr. Keldie referenced it in

15  his report, then he looked at it.

16  Q.  I'm actually looking at Interrogatory --

17  the response that Defendants gave to Interrogatory

18  Response Number 5 where they cite this report as

19  one of the ways that they in -- they decided to

20  increase the trigger for a heat alert.

21       Let's go down to -- let's go down to

22  chapter 1, page 1.  Let's look at the first

23  sentence there.

24       The first sentence says, "The National

25  Institute for Occupational Safety and Health

1  (NIOSH) recommends that worker exposure to heat

2  stress in the workplace be controlled by complying

3  with all sections of the recommended standard

4  found in this document."

5       So my question is:  When updating HCP8,

6  did DOC attempt to comply with all sections of the

7  recommended standards found in this document?

8     A.  I don't know.

9     Q.  Well, do you know any sections that DOC

10  didn't attempt to comply with?

11     A.  I've never read the document.  I don't

12  know what's in that document.

13     Q.  This is the document that Defendants

14  specifically identify in their interrogatory

15  responses.

16       You've never seen this document?

17     A.  No.  Again, and I've told you over and

18  over, we took the recommendation of our experts.

19  Our experts, if they reference that material, our

20  experts reviewed that material.  Again, that's

21  something you'd have to ask Dr. Keldie.

22     Q.  I should be -- I should be a little

23  clearer.  In the interrogatory response -- and I

24  believe this is true in the October 18 letter that

25  we looked at earlier -- the reference is actually

1  only to page 91 of this document.  So can we go to

2  page 91.

3         This is the page that Defendants claim

4  to have relied upon in setting the new trigger for

5  a heat alert.

6         MR. BLANCHFIELD:

7             Object to the form of your question.

8  BY MR. BENJAMIN:

9    Q.  What on this page did DOC rely upon when

10  modifying HCP8?

11    A.  Again, I have not reviewed that

12  document.  That is something that our experts

13  would be more familiar with answering your

14  question.  That's what I can tell you.

15    Q.  I take it, based on your familiarity or

16  lack of familiarity with this document, you're not

17  able, sitting here today, to point me to any

18  guidance in here that DOC relied upon in setting

19  the trigger for a heat alert in HCP8?

20    A.  I'm not the expert.  Again, that's why

21  we hired these experts, to go over these documents

22  and to make recommendations to us.  So I am not,

23  but Dr. Keldie is.

24         MR. BENJAMIN:

25             Tell you what, let's take a little

1          break and come back in about five

2          minutes, if that's all right.

3          THE VIDEOGRAPHER:

4             Going off the record at 4:54 p.m.

5          (A break was taken.)

6          THE VIDEOGRAPHER:

7             We are going back on the record at

8          5:00 p.m. Eastern.

9    BY MR. BENJAMIN:

10       Q.   Dr. Keldie, when we -- you know what, I

11   just did it again.  Dr. Lavespere, I apologize

12   once again.

13          Dr. Lavespere, when we were talking

14   earlier about the medication list that you

15   received from Dr. Barnes, you described conducting

16   independent research to validate those

17   recommendations.

18          Did you conduct similar research with

19   respect to the heat index at which a heat alert

20   should be issued?

21       A.   No.  I know a heck of a lot more about

22   these medications than I do about, you know, heat

23   alerts, heat indexes.  And, again, that's why I

24   keep telling you I relied on my expert for that.

25          Now, the medication list, I'm familiar

1   with all of these because I've used a bunch of

2   them, and so I knew what my research would

3   conduct.  But on the heat index part of it, I

4   relied heavily on our experts.

5       Q.  You didn't click on any of the links

6   that were provided to see if they actually show

7   what Dr. Keldie purportedly recommended?

8       A.  I did not.

9       Q.  Did anyone at DOC?

10      A.  No.

11      Q.  Do you think that the guidance that I

12  just read from OSHA, the National Weather Service,

13  did that seem complicated to you?

14      A.  It didn't seem complicated, no.

15      Q.  Let's take a look at what has previously

16  been marked as Plaintiffs' Exhibit 109 --

17          THE COURT REPORTER:

18              You were fading out.  You said

19          Plaintiffs' Exhibit 109, and then what

20          after that?

21          MR. BENJAMIN:

22              I was speaking -- my colleague,

23          Janet, the law clerk, is here and she's

24          helping me with the exhibits.  I was

25          actually speaking with her to bring up

1        Tab 15.

2    BY MR. BENJAMIN:

3      Q.   Dr. Keldie -- I'm sorry.  Dr. Lavespere.

4    What is happening here?

5        Dr. Lavespere, this document is titled

6    Departmental Regulation No. HCP8, Attachment A,

7    and it's dated 7th of November 2024.

8        Is this the heat pathology medication

9    list that is currently in effect?

10     A.   Yes, it is.

11     Q.   And is November 7, 2024 the date that it

12   went into effect?

13     A.   I don't think it went into effect.  You

14   know, if that's the date on it, I would have to

15   say it is.  Because mine's not dated.  And if it

16   says November 7, I would say yes.

17     Q.   There was a different heat pathology

18   medication list that was filed with the Court on

19   October 18, 2025, along with the

20   soon-to-go-into-effect October 20, 2024.

21       Are you aware that there was a prior

22   version of this Attachment A dated October 24,

23   2024?  I'm sorry, dated -- are you aware that

24   there was a prior version of this Attachment A

25   that was dated October 20, 2024?

```
 1      A.  Well, if you show it to me and show me

 2   where the differences are, I could -- I would

 3   know.

 4      Q.  Well, let me ask you this way:  Do you

 5   know whether there were any updates to

 6   Attachment A between October 18, 2024 and

 7   November 7, 2024?

 8      A.  I know when the list came out -- when

 9   this list came out and I looked at it, I had some

10   questions about some of the diuretics, and I had a

11   couple of questions about some of the hypertensive

12   medicines and one or two of the muscle relaxers.

13   I'd have to see the old list to know if it -- if

14   it impacted the changes.

15          There's been so many documents, you

16   know.  If you showed me that old list and put it

17   up and shared the screen, I could tell you.

18      Q.  I tell you what, we will pull that up

19   before -- or later if it's helpful.

20          But I guess the question is, just sort

21   of more generally, are you aware of -- of

22   Attachment A going into effect this past fall and

23   then going through further revisions?

24      A.  It's a possibility.

25      Q.  You're not familiar one way or the other
```

1   with it?

2        A.  No.  But there's a distinct possibility.

3        Q.  Fair enough.

4            I'm going to just inform you that it's

5   my understanding that there were about eight

6   additional medications that were added to a

7   version of Attachment A.

8        A.  Do you know what those eight medications

9   are?

10       Q.  I will butcher them in my pronunciation,

11  but maybe you can make your way through my

12  attempts.

13           One is trifluoroperazine.  Another is

14  loxapine.

15       A.  Okay.

16       Q.  Perphenazine.

17       A.  Chlorpheniramine?

18       Q.  It goes by the name Trilafon.

19       A.  Okay.  Those are all mental health

20  medicines.

21       Q.  Those are all antipsychotics.

22           A couple others.  Asenapine, also goes

23  by Saphris.

24       A.  Okay.

25       Q.  This one is tough.  Fluphenazine, this

1  is Prolixin.

2      A.  Okay.

3      Q.  There is Thiothixene, also goes by

4  Navane, something like that.

5      A.  Navane.

6      Q.  Yeah.

7          Lurasidone.  And then also Depakote, or

8  Divalproex.

9      A.  Okay. So --

10     Q.  Do those drugs sound familiar?

11     A.  They do, they sound very familiar.  I

12  think what you're looking at there is Dr. Barnes

13  had put together this list.  Some of those

14  medications that you just mentioned were on the

15  previous antipsychotic list used and they just

16  added them to the list, the ones that were not

17  already on the list.

18     Q.  I see.  So Dr. Barnes -- so the eight

19  medications that I just named plus the ones that

20  Dr. Barnes recommended are -- make up this list

21  that are on Exhibit 109; is that right?

22     A.  That's fair to say.

23     Q.  Do you know why Dr. Barnes had not

24  included those eight medications that I just

25  attempted to name?

1       A.   They're not widely used medicines

2   anymore, you know, they're kind of outdated.

3   There are a lot of newer medicines and they're

4   just -- there's so many antipsychotics out there,

5   just like muscle relaxers and the

6   antihypertensive, I mean, to say you're going to

7   list them all.

8           But I think the list is pretty complete

9   and thorough, you know, with the most popular

10  medications that are being used.  I think it's a

11  good list.

12      Q.   Do the eight medications that I just

13  named that you said may be outdated, are those in

14  use at DOC facilities anywhere?

15      A.   They could be in use at DOC facilities.

16  There's newer medicines out there that are

17  preferred, but some of the doctors like the older

18  medicines.  But, again, you know, they were added

19  to the list to make it a more complete list, which

20  I think is beneficial for everyone.

21      Q.   Are there medications that may be in use

22  at DOC that Dr. Barnes did not consider one way or

23  the other?

24      A.   You know, the list is pretty complete,

25  you know.  There are a lot of medications on the

1  list, you know.  And I'm sure she looked at, you

2  know, the -- we gave her the formulary, you know,

3  so she had our formulary.

4        And that's what I can tell you.  We gave

5  her the formulary and she sent back this

6  anticholinergic classification list.

7    Q.  And when you say "the formulary," that's

8  the full list of medications that are in use at

9  DOC facilities?

10    A.  Right, DOC formulary.

11    Q.  And does that formulary list, does that

12  change?

13    A.  Well, on occasion it will change.

14  Sometimes medications are taken off the market,

15  sometimes there are new medications, sometimes the

16  P&T committee recommends medications to be added

17  to the formulary.  So it's updated probably

18  yearly.

19    Q.  What's the plan for making sure that

20  this heat pathology medication list stays

21  up-to-date with the changes to the formulary?

22        Will you continue to talk to Dr. Barnes

23  about each medication that comes in the formulary?

24    A.  Say that again.

25    Q.  What's the plan to update or amend this

1  heat pathology medication list that we're looking

2  at, Attachment A, as changes occur to DOC's

3  formulary?

4      A.  If newer medicines are added to the

5  formulary, newer medicines are being used or newer

6  medicines come out that are being used, which they

7  do all the time, we'll add them as needed.

8      Q.  How will you decide whether they're

9  needed to be added?

10     A.  Well, based on what she's given us.

11 She's given us a pretty good floor plan.  I mean,

12 any good medical doctor can figure out based on

13 anticholinergic activity if they need to be added

14 to the list or not.

15     Q.  You said earlier that before -- I got a

16 little bit of feedback there, hold on one moment.

17         You said before the prior list, before

18 Dr. Barnes was involved, you thought that list was

19 just fine, as did other medical providers at DOC,

20 but when you pulled in Dr. Barnes with her

21 expertise, she pointed out that there was actually

22 quite a number of medications that were missing.

23         So do you need to have that person on

24 call, or are you going to be -- how are you going

25 to be updating this Attachment A as the formulary

1  changes?

2    A.  Well, I don't know how it's going to

3  play out with Dr. Barnes in the future.  I'm sure

4  they can use her on a consultant basis if they

5  need to.  But if newer medications come out that

6  are going to be widely used in DOC and they have

7  anticholinergic activity, I'm certainly sure that

8  she would help us out.

9    Q.  And would you look at -- I think you

10  called it the OPC -- on any new medications?

11    A.  Sure.  Our pharmacists are very good.

12  We have one guy that's -- he is a Pharm.D., the

13  pharmacist at Angola.  And Jonathan is very good.

14  And they'll bring them to our attention, you know,

15  and we'll look at them.  And if we need to consult

16  Dr. Barnes, we will.

17        I think what you need to realize is

18  we're -- we're willing to be fair about this list.

19  You know, we're not trying to buck everybody and

20  say we're not doing this.  I mean, we adopted this

21  list that she gave us without a hitch.  I mean, we

22  are trying to be very fair about what we're doing

23  here.

24    Q.  You did say, though, that you pushed

25  back a bit on her list, right?

A.  I did.  I questioned a few things, yeah.

Q.   Other than the prior lists and the

medications from Dr. Barnes, is there any other

source from which you developed this list,

Attachment A?

A.  No, not that I'm aware of.

Q.   If you were to determine that the

additional medications should be added to the

list, what would be the process for modifying

Attachment A?

A.  I'm sure we would go through, you know,

our P&T committee for sure.  That P&T committee

would make a recommendation.  Then, of course,

we'd reach out to somebody like Dr. Barnes, if it

wouldn't be Dr. Barnes, somebody like Dr. Barnes,

to give us some advice.

Then it would go to the policy, you

know, department, changes would be made.  It would

go to legal, go to Chief, just like we discussed

earlier.

Q.   So the same process -- if you had -- let

me -- let me just suggest a hypothetical.

Benztropine, that's the first medication

that's listed.  Assume it was not on the list and

starting tomorrow DOC starts using benztropine.

1          If you knew that benztropine had all of

2     the effects that would make it important to

3     include it on Attachment A, you would have to go

4     through the policy team to make that change?

5          A.   What I would do first is I would go to

6     my psychiatrist and say, Look, are y'all planning

7     on using this medication on a routine basis?  If

8     they say yes, I personally wouldn't have to go

9     through that change.

10          I'd go tell Chief that we need to put it

11     on the list, and we would put it on the list, and

12     at the next P&T committee meeting, we'd have a

13     vote to approve it.  That's basically how it would

14     go.

15          Q.   Oh, so in that case, the P&T committee

16     is the approver, not the policy team, the legal

17     team, the Secretary; you don't need to go through

18     all them?

19          A.   No, that's not what I said.  I would

20     approve the drug.  I'm the chief medical officer.

21     I make all decisions based -- I make all of the

22     medical decisions.  If I think that it needs to be

23     approved and it needs to be implemented now, I

24     don't have to wait for the P&T committee meeting.

25          But as a -- as a way of -- I would

1  approve the medicine, I would go to Chief and say,

2  Chief, look, I need to put this medicine on

3  Attachment A, you know, why you need to put it on

4  Attachment A.  I'd give him reasons that we need

5  to put it on Attachment A.  We'd put it on

6  Attachment A pending bringing it before the P&T

7  committee.  But I could approve that tomorrow.

8      Q.   And if you did that, if you approved a

9  new drug tomorrow, how would you communicate that

10  to the facilities?

11      A.   Through email, medical directors.  I

12  have an email chain -- list chain -- a list of

13  doctors that I send emails out all the time, all

14  the time.

15      Q.   So you yourself, you could make the

16  change and you could email it out to the facility

17  tomorrow if you determine that a new medication

18  ought to be added?

19      A.   With Chief's approval, yes.

20      Q.   And that's Chief Smith you're talking

21  about?

22      A.   Right.  Everything goes -- I approve

23  everything through Chief before we do anything.

24  It's just a level of respect that -- he's my boss,

25  you know.

1    Q.  Got it.

2    A.  I think that's appropriate.

3    Q.  But the -- there wouldn't -- you don't

4  need to get legal signoff and the Secretary's

5  signature to add a new medication, right?

6    A.  No.  It's not a legal decision, you

7  know.

8    Q.  What about if it was determined that

9  benztropine had no place on this list, that you

10  did the research and you realized that there is no

11  way that that medication has the kind of effect

12  that would justify being included in this list,

13  could you remove it?

14    A.  Well, it never would have made it to the

15  list, to be honest with you.

16    Q.  Say a new study comes out, a new -- I

17  don't know, whatever the best kind of

18  peer-reviewed study there is and it just found out

19  that actually all your research was wrong and

20  benztropine just doesn't have these effects?

21    A.  Could I remove it?

22    Q.  Yeah, could --

23    A.  I could.  That's what they pay me for,

24  to make decisions like that.  And I'm not being

25  ugly, I'm just telling you.  You know, yeah, I

1    could remove it, you know.  But, again, I would go

2    through the proper channels, I would look at my

3    research.

4         In that case, I would look at my

5    research, I'd go to my Pharm.D. at Angola, I'd go

6    to my pharmacist at Hunt, I would look -- I would

7    probably call a few of my medical directors just

8    because some of them have been around as long as I

9    have, and we'd try to make a -- we'd have a

10   tentative discussion and then I'd go to Chief and

11   tell him what I'm doing, and sure I could remove

12   it.

13        Q.  Okay.

14        A.  But not haphazardly, you know.

15        Q.  Understood, right.

16            MR. BENJAMIN:

17               Can you scroll down to the bottom

18            there, Janet.

19   BY MR. BENJAMIN:

20        Q.  There's this footnote that appears on

21   every page of Plaintiffs' Exhibit 109, and it

22   reads, "The recommendations in this policy are

23   meant to serve as a guideline and are not intended

24   to substitute for the judgment of a physician or

25   midlevel provider providing appropriate health

1   care."

2        Do you see that?

3   A.  Yes.

4   Q.  What does that mean?

5   A.  That's exactly -- it means exactly what

6   it says, that it's just a guideline, and if

7   providers, in their clinical opinion, think that

8   something else needs to be used or looked at,

9   then -- I think that's Dr. Barnes' way of saying,

10  Look, I'm not trying to tell you guys what to do,

11  but this is a guideline that you should go by.

12  Q.  Maybe I should back up just a second.

13  What is Attachment A for, what is the purpose of

14  this attachment?

15  A.  The attachment is so that the providers

16  will know what medications have the ability to

17  impair the thermoregulatory system and their level

18  of anticholinergic effects as classified by our

19  expert.

20  Q.  And if a person comes in who is taking

21  one of these medications that's listed on this

22  Attachment A, what is the health care provider to

23  do?

24  A.  Refill their medicine.

25  Q.  I'm sorry, I don't mean with respect --

1  like you said it was to -- this is in connection

2  with HCP8.

3        Attachment A is there because of a

4  correlation with the heat pathology concerns in

5  HCP8, right?

6     A.  Right.

7     Q.  So a person who is on one of these

8  medications on Attachment A, what is the provider

9  to do with that?  What are they to do with that

10  with respect to heat pathology?

11     A.  Nothing.  If they're doing well on the

12  medicine, you don't change their medicine.

13     Q.  But do you change the -- the heat

14  protections that this person might have?

15     A.  They'll already have that.

16     Q.  Would you, for example, issue a heat

17  duty status to a person that is on one of these

18  medications?

19     A.  When they come in -- are you talking

20  about if somebody comes in the clinic and you put

21  them on those medicines?

22     Q.  Sure.

23     A.  Sure, you give them a heat precaution

24  duty status, they'd go to the medical director for

25  approval, and he'd have a heat precaution duty

1  status.  That's what the policy says.

2      Q.  So the policy is, if you are taking one

3  of these medications, you get a heat duty status?

4      A.  Right.

5      Q.  And what does it mean, then, that the

6  recommendations here are a guideline and not

7  intended to substitute for the judgment of a

8  physician?

9          MR. BLANCHFIELD:

10             Or a midlevel provider.

11     A.  Well, I think -- I think that's

12  Dr. Barnes' way, since she's a Pharm.D. and not an

13  M.D., to try not to tell doctors what to do.

14  BY MR. BENJAMIN:

15     Q.  In terms of whether or not to prescribe

16  the medication?

17     A.  Right.  But if clinical judgment says

18  you need to be on baclofen, which is a restricted

19  medicine, and -- you know, then that person needs

20  to be on baclofen.  And in conjunction, at that

21  visit when you look at the duty status, you would

22  change that to a heat precaution duty status.

23     Q.  Does this language in the footnote we're

24  looking at, does that have the effect of giving a

25  physician or midlevel provider discretion to not

1    grant heat duty status to a person that's taking a

2    medication on this list?

3        A.   Absolutely not.

4        Q.   So anyone on this list -- strike that.

5            Anyone taking a medication on this list

6    will be given a heat duty status?

7        A.   They should be getting -- as per HCP8,

8    which clearly states if they're on a medication

9    that's on the list they should get a heat

10   precaution duty status.

11       Q.   And is the only exception to them

12   getting a heat duty status if they, the patient,

13   opts out?

14       A.   That's one of the ways.

15       Q.   Is there any other way that a person who

16   is taking a medication listed on Attachment A

17   would not receive the heat duty status?

18       A.   I'm not trying to be ugly, but I think

19   the way you asked the question is inappropriate.

20   I think that question would be, if they're

21   prescribed the medication, right.

22       Q.   That's fine.  Let's assume that it's all

23   above board and that they're taking a medication

24   that they are prescribed and that medication is

25   listed on Attachment A.



1    A.  If they're prescribed the medication,

2    say baclofen, for example, okay, and you go into

3    their cell and there's 40 of them in there -- and

4    baclofen has a commodity value on the compound,

5    which they can sell it, okay -- that's a guy who

6    should have his heat precaution duty status

7    revoked because he's not being compliant with his

8    medication, fair?

9    Q.  Whose determination is that?  Is that a

10   corrections --

11   A.  That would be the medical directors --

12   that would be somebody who's not compliant with

13   their medication, right, so why does he need a

14   heat precaution duty status based on the

15   medication?

16   Q.  Okay.  So just so I understand, if a

17   person is prescribed any of these medications on

18   Attachment A and is taking them more or less

19   consistently with the prescription, that person

20   automatically gets a heat duty status unless they

21   opt to not get that status?

22   A.  Right.

23   Q.  In that case, where the person is

24   prescribed the medication, taking it

25   appropriately, there's no discretion to not grant

1  the person a heat duty status unless that patient

2  decides for themselves that they don't want the

3  heat duty status; is that right?

4      A.  That would be fair.

5      Q.  A person who is taking one of these

6  medications but is not prescribed it, that person

7  would not be granted a heat duty status?

8      A.  Well, he shouldn't be taking it if he's

9  not prescribed it.

10     Q.  Right.  And he would not be granted a

11 heat duty status?

12     A.  Right.  He's not prescribed it.

13     Q.  And if a person substantially deviates

14 from the recommended medication regime, that

15 person might have a heat duty status revoked?

16     A.  I'm going to be frank with you.  There's

17 four ways that I think somebody could have a

18 potential revocation of their duty status based on

19 their medication.

20          Number one is they opt out, okay.

21          Number two, if they're simply just

22 non-compliant, if they don't go get it, okay.  If

23 they only take the medication two days out of the

24 month, three days out of the month, they're not

25 compliant with the medicine, they don't need a

1   heat precaution duty status based on medication.

2        Number 3, if they divert medication,

3   they're selling it, okay, they don't need the

4   medication.

5        And Number 4, if they break the

6   restrictions of the duty status, which, for

7   example, says no sports when a certain temperature

8   is reached, 91-degree heat index, and you find

9   them out there playing basketball, you find them

10  out there playing football, you find them out

11  there lifting weights, that's breaking your duty

12  status.

13       You know, all four of those cases I

14  would consider that the medical director would

15  look at revocating that duty status.

16       Q.  Any other situations where revocation

17  would be appropriate?

18       A.  I can't think of any other -- and I was

19  medical director at Angola for several years.  I

20  can't think of any other way that a duty status

21  would be revocated.  And that's being fair, which

22  is what we try to do, we try to be fair.

23       Q.  Let me take that last one.  If a person

24  is on a medication that makes -- that limits their

25  ability to thermoregulate and, therefore, would

1  get a heat duty status --

2      A.  Right.

3      Q.  -- but went out and played basketball,

4  are you saying that person's heat duty status

5  should be revoked?

6      A.  Well, if they don't follow their duty

7  status, which says -- clearly says, the heat

8  precaution duty status, no sports when the heat

9  temperature and the heat index is 91, and they're

10  in the middle of the day -- they don't work

11  because their field line has been brought in but

12  they're out there playing basketball, that don't

13  make a whole lot of sense to me.

14          You know, if you're being brought in

15  from the field because it's too hot to be in the

16  field and work, but you're out there playing

17  basketball, really?  That -- you know.

18      Q.  Does that happen -- does that happen,

19  where duty statuses are revoked on that basis?

20      A.  Let me tell you, there -- not basically

21  on that level.  But there's many inmates that's

22  complained of back pain, leg pain, knee pain, you

23  find them out there playing flag football, you

24  find them out there playing basketball, softball.

25  They do it all the time.

1    Q.   And their duty status is revoked?

2    A.   Not necessarily the heat precaution duty

3    status, but the duty status is revised.

4    Q.   Let's just focus on heat duty status.

5    I'm focused on this hypothetical you raised where

6    a person is deserving of heat duty status in the

7    first instance because they're taking one of these

8    medications listed on Attachment A, they're taking

9    it as prescribed, but they're playing basketball

10   in the middle of day.

11   A.   Right.

12   Q.   Does it happen that the heat duty status

13   is revoked in such circumstances?

14   A.   I never have done that.  I don't think

15   the medical director has done that.  But is that a

16   possibility that they would look at it?  Sure,

17   it's a possibility.  I'm not saying they would

18   revoke it.

19        But there's -- there's cases -- I mean,

20   there's information in here that says that it's

21   really left up to the health care provider.  So if

22   a guy's got a duty status and it's based on either

23   a diagnosis or a medication, then he should honor

24   what duty status he's being given and follow all

25   the recommendations thereof.

1    Q.  But wouldn't revoking the heat duty

2  status in that situation be dangerous?

3    A.  Wouldn't playing basketball in that

4  condition be dangerous?

5    Q.  It may be.  But the idea of revoking the

6  heat duty status and sending the person out onto

7  the line, isn't that dangerous?

8    A.  No more dangerous than playing

9  basketball in the middle of the day or playing

10  football in the middle of the day.

11    Q.  Okay.  Let's go --

12    A.  And, again, we're talking hypothetical.

13  This has not happened.

14    Q.  I understand.

15    A.  I gave you four scenarios where the

16  medical director could potentially look at

17  revoking a duty status.

18    Q.  And just to be clear, those are the only

19  four -- those are the only four categories where a

20  person would not receive heat duty status or where

21  their heat duty status would get revoked if they

22  were taking one of these medications as it's

23  prescribed?

24    A.  Those are the only four that I can come

25  up with.

1    Q.   So is it the DOC's position that

2  everyone in DOC custody who is prescribed one of

3  the medications listed on Attachment A who is

4  taking that medication as it's prescribed is

5  deserving of heat duty status?

6    A.   That's appropriate, yes.

7    Q.   Okay.  And have all those persons been

8  granted heat duty status?

9    A.   They're working on that as we speak.

10    Q.   At all the different facilities?

11    A.   I know for sure at Angola they're

12  working on it, because I was just told this

13  morning I think they've done 13-, 1400 of them

14  already.

15    Q.   But DOC's position is that every one of

16  its facilities needs to implement that program?

17    A.   Yeah.  But you have to understand,

18  Angola is the largest, right.  Most of these

19  facilities don't have 1300, 1400 people in all

20  their facility, so all they have to do is run a

21  pharmacy record, which for them would be very easy

22  to do; for Angola, it's a lot more difficult.

23    Q.   I understand.  The size is different.

24        But every -- DOC's position is that

25  everybody in DOC's custody who is taking one of

1  these medications as it's prescribed should be

2  granted a heat duty status?

3    A.  At least by the effective dates, which

4  are, you know, October to May.

5    Q.  Yeah.

6    A.  Or May to October.

7    Q.  Right, got it.

8      MR. BENJAMIN:

9        Can we pull up Tab 16, which is

10       going to be -- this is going to be --

11     THE COURT REPORTER:

12       120.

13     MR. BENJAMIN:

14       That's what I thought.  It's Exhibit

15       120.

16     (Exhibit 120 was marked.)

17  BY MR. BENJAMIN:

18    Q.  Dr. Lavespere, this is Attachment B to

19  HCP8, and it's entitled "Medical Exclusion List."

20    A.  Yes.

21    Q.  What is the purpose of this list?

22    A.  The purpose of this list is that anybody

23  that falls into one of these categories with a

24  specific diagnosis should not be given -- should

25  be given a heat precaution duty status.

1    Q.   And this list of medical exclusions,

2  those are conditions that were identified by

3  Dr. Keldie?

4    A.   They were conditions that were

5  identified by Dr. Keldie.

6    Q.   Any other source from which these listed

7  medical exclusions came other than Dr. Keldie?

8    A.   Not that I'm aware of.

9    Q.   And just -- I think we're clear on this,

10  but just to be certain, DOC's position is that any

11  person in DOC's custody who presents with one of

12  those medical conditions that's listed on

13  Attachment B should be granted heat duty status;

14  is that right?

15    A.   Yes.  Heat precaution duty status.

16    Q.   Heat precaution duty status.

17       And that's true at every facility?

18    A.   Yes.

19    Q.   How does a facility determine whether

20  people in its custody have one of these listed

21  medical exclusions?

22    A.   Anybody with one of these diagnoses is

23  going to be seen routinely in the clinic, right?

24    Q.   Oh, these particular conditions require

25  fairly constant monitoring?

1    A.  Read them.  Yes, indeed.

2    Q.  So is it right that they're -- that the

3  process for -- well, scratch that.

4        Am I right that this medical exclusion

5  list is expanded from what it was prior to October

6  20, 2024?

7    A.  We never had a medical exclusion list,

8  okay.  What you fail to realize is most of these

9  folks that have these type of ailments, they have

10  a more restrictive duty status than a heat

11  precaution duty status will ever offer them.

12        They've already been given more than a

13  heat precaution duty status.  You're going

14  backwards trying to say that they need a heat

15  precaution duty status.  They have a lot more than

16  a heat precaution duty status.

17    Q.  And they'll maintain that heightened

18  protection that would be appropriate for their

19  individual medical condition, right?

20    A.  Sure.  I mean, being realistic, Jeremy,

21  read the list, if you know anything about

22  medicine.  A doctor would be foolish to put a guy

23  like this out in the field.  I mean, really,

24  there's some common sense here as well, right?

25        This list is very complete.  And anybody

1   that falls within these categories, any doctor

2   with any common sense should not put these folks

3   out in the field working.

4       Q.  Is there any medical condition that's

5   listed here that you think might not have a --

6   have already triggered a greater protection than

7   heat duty protection status?

8       A.  Do what now?

9       Q.  Is there any condition that's listed

10  here that you think doesn't already grant a person

11  some duty status that's more protective than a

12  heat precaution duty status?

13      A.  I can tell you this:  Say, for example

14  you look at history of MI, okay?  You have a lot

15  of people that have MIs that do not have any

16  residual from that MI, okay?

17          They play sports, they work in the hobby

18  craft.  They might have had a mild MI and have no

19  residual.  Now they're going to be given a heat

20  precaution duty status.  Those are the guys that

21  will probably opt out, right?

22          You know, so, you know, there's

23  different levels of some of these disease

24  processes, like MI.  You've got some people that

25  may have had a stroke before that have no

1   residuals.

2        Several -- I know several inmates at

3   Angola that have had what we consider to be a mild

4   stroke, and they have jobs where they're going to

5   opt out, you know.  So there are situations that

6   you described that they're going to be more

7   restrictive with their duty.  But this is a good

8   list.

9        Q.   And is there any other condition that

10  might not trigger these higher protective duty

11  statuses but that you think does implicate heat

12  pathology that's not listed on this attachment?

13       A.   I really can't think of any.  I mean, a

14  lot of them are pretty inclusive, right.

15            MR. BENJAMIN:

16              Can we pull up Tab 19, which was

17              previously marked as Plaintiffs' Exhibit

18              17.  I just want to flag paragraph 5.

19              Oh, I should say, sorry, this is an HCP8

20              dated the 21st of August 2018, and it's

21              got a Bates number starting 017941.

22  BY MR. BENJAMIN:

23       Q.   You're familiar with this document,

24  right?

25       A.   That's the one I have.

1      Q.   All right.  And this is the -- this is

2   the version of HCP8 that was in effect until the

3   October 20, 2024 version came into effect; is that

4   right?

5      A.   Right.

6      Q.   Paragraph -- and this version of HCP8

7   had the same motivating purpose, right, to protect

8   people from heat-related illnesses?

9      A.   Right.

10      Q.   Paragraph 5 titled "Policy" says, "It is

11   the Secretary's policy that each DPS&C facility

12   shall have a mechanism to identify offenders more

13   vulnerable to heat and to enforce provisions to

14   reduce heat pathology among all offenders.

15           "Offenders on certain types of

16   medications have increased sensitivity to heat and

17   sunlight and are at higher risk for developing

18   heat pathology."

19           Then it goes on and says, "In addition,

20   offenders with specific chronic illnesses, such as

21   morbid obesity, cardiovascular disease,

22   respiratory disease, and diabetes mellitus may

23   have a higher risk of heat pathology."

24           Do you see that?

25      A.   Yes.

1    Q.   Now, you have the current version of

2    HCP8 with you, the October 20, 2024 version.  If

3    you compare paragraph 5 in this version and

4    paragraph 5 in the new version, that last sentence

5    is missing, right?

6    A.   Right.

7    Q.   Prior to the chronic illnesses?

8    A.   Right.

9    Q.   Are those -- you said before that there

10   wasn't a medical exclusions list.  Are these four

11   chronic illnesses that are listed as examples

12   included on what is now Attachment B?

13   A.   Every one but diabetes.

14   Q.   Diabetes is not?

15   A.   The diabetes is not.

16   Q.   Why not?

17   A.   Well, I don't think everybody with

18   diabetes ought to have the heat precaution duty

19   status.  There are multiple levels of diabetic,

20   right.  You can have a diabetic that's 100 percent

21   controlled with an A1C of less than six, there are

22   people working like that in the community all day,

23   every day.

24        There's a difference between a diabetic

25   like that than the diabetic that's on insulin and

1    has an A1C of 14, you know.  Now, that's when

2    we're going to leave it up to the medical director

3    to make an appropriate clinical decision.

4          But all diabetics shouldn't -- just

5    because you're a diabetic shouldn't be given a

6    heat precaution duty status, I don't believe that.

7      Q.   Before this new version of the HCP8 went

8    into effect and this one dated the 21st of

9    August 2018 was in effect, did everybody who

10   presents with diabetes automatically get heat

11   precaution duty status?

12     A.   I can't say that they did, but I would

13   doubt that they did.

14     Q.   So this sentence here did not create an

15   automatic trigger entitling somebody to heat duty

16   protective status, that sentence we were just

17   talking about that's now removed, right?

18     A.   Like I said before, people that came

19   with these diagnoses had more restrictive duty

20   statuses than heat precaution duty status.

21     Q.   What about the people with diabetes?

22     A.   Well, if you were an out-of-control

23   diabetic, you usually got more than a heat

24   precaution duty status.

25     Q.   Isn't the purpose of this sentence in

1   paragraph 5 that we're talking about, isn't that

2   to alert medical providers that conditions such as

3   those listed here, which includes diabetes, may

4   cause a person to have a higher risk of heat

5   pathology?

6       A.  Exactly.

7       Q.  And does diabetes have the potential of

8   making a person have a higher risk of heat

9   pathology?

10      A.  It has a potential, but it don't

11  necessarily make it so.  There's a difference,

12  Jeremy, between an out-of-control diabetic and a

13  diabetic who is controlled and in good shape.

14  There's just a difference there.  And so you've

15  got to look at both ends of the spectrum.

16      Q.  I understand that.

17          Your testimony, though, is that this

18  sentence that we're looking at did not entitle

19  everybody who had diabetes to heat duty protective

20  status before this new HCP8 came into effect,

21  right?

22      A.  Well, that's not what the policy said.

23  It doesn't say that they automatically get a heat

24  precaution duty status.

25      Q.  Right.  It just says -- it's just

1   alerting providers that diabetes and other

2   illnesses might cause somebody to have a higher

3   risk of heat pathology?

4      A.  May have a higher.

5      Q.  Is that just to sort of alert providers

6   who may be less familiar with heat pathology about

7   conditions that they should be on the lookout for

8   and do further investigation if their patient is

9   presenting with?

10     A.  Sure.

11     Q.  So if that's the case, why remove it?

12  Why remove this alert to providers?

13     A.  Well, number one, because everybody

14  with -- this list right here includes all those

15  with diabetes, and that sentence was deemed

16  negligible to the policy.

17     Q.  Was there any other sentence that was

18  deemed negligible to the policy?

19     A.  Not that I'm aware of.  I mean, you may

20  show me some and I'll tell you why they were

21  removed.  But -- but --

22     Q.  I -- go ahead, I'm sorry.

23     A.  What you have outlined in blue, there

24  was no Attachment B.  This, what you have outlined

25  in B, is even more defined by Attachment B.

1    Q.  Except for with respect to diabetes?

2    A.  Except for with respect to diabetes.

3    Q.  Did DOC, in modifying HCP8, go through

4  the policy line by line and decide with respect to

5  each sentence whether or not to strike it, amend

6  it, correct it?

7    A.  Yes.

8    Q.  Every sentence in the policy?

9    A.  I would say we went through it with a

10  fine-toothed comb, yeah.

11    Q.  And that was the only -- strike that.

12        Just like with the medical --

13        MR. BENJAMIN:

14            I'm sorry, we can take this exhibit

15        down.

16  BY MR. BENJAMIN:

17    Q.  Dr. Lavespere, just like with the

18  medication list that was listed in Attachment A,

19  with respect to the conditions listed on

20  Attachment B, if it comes to your attention that

21  an additional condition is deserving of heat

22  protective duty status, do you, yourself, have the

23  power to implement a change to include that

24  condition?

25    A.  Yes.  And I would add it without

1  reservation.

2     Q.  And the same process, you would go to

3  your Chief Smith, if I'm remembering his name?

4     A.  If I had good reason, I would go to

5  Chief Smith and we would add it, yes.

6     Q.  And if -- you would then alert the

7  various facilities via email that this additional

8  condition should be on the list?

9     A.  I would alert the providers.

10     Q.  The providers.

11        And the same is true if you determine

12  that a particular condition is not needed, you

13  could strike that condition and go through

14  Officer -- I'm sorry, Chief Smith and alert the

15  providers?

16     A.  Yeah.  But all these are needed.

17     Q.  Okay.

18     A.  I mean, we've gone through this with --

19  I've gone through this 25 times.  They're -- these

20  are needed.  They won't be stricken.

21     Q.  Okay.  So every one on -- every one of

22  those conditions on Attachment B is very obviously

23  needed to protect people from heat-related

24  illness?

25     A.  Yes.  I would say that is as fair as we

 1    can be.

 2       Q.  Okay.

 3          MR. BENJAMIN:

 4            Can we pull up Tab 17, which is --

 5       what's that going to be, 121 -- which

 6       will be Plaintiffs' Exhibit 121.

 7          THE WITNESS:

 8            Hey, Jeremy?

 9          MR. BENJAMIN:

10            Yeah?

11          THE WITNESS:

12            Three minutes?

13          MR. BENJAMIN:

14            Maybe a little more than three, but

15       we're getting there.  Oh, you need three

16       minutes.

17          THE WITNESS:

18            Yeah, I need three minutes.

19          MR. BENJAMIN:

20            I'm sorry, I thought you were asking

21       how much longer it was going to be.

22       Yeah, let's go off the record.

23          (Exhibit 121 was marked.)

24          THE VIDEOGRAPHER:

25            Going off the record at 5:50 p.m.

1       Eastern.

2       THE VIDEOGRAPHER:

3          We are going back on the record at

4       5:52 p.m. Eastern.

5    BY MR. BENJAMIN:

6       Q.  Dr. Lavespere, I'm showing you what is

7    listed as Plaintiffs' Exhibit 121.  And it's

8    entitled Departmental Reg No. HCP8, Attachment C.

9          Are you familiar with this document?

10      A.  Yes.

11      Q.  What is it?

12      A.  I think that's some educational material

13   that they had put out to the security as well as

14   the medical staff just on heat-related illness.

15      Q.  This is a training document of sorts?

16      A.  Yes.

17      Q.  Who all receives this document?

18      A.  Well, security, you know, which has roll

19   call every morning, and I'm sure they present it

20   at roll call, and anybody in the medical

21   department.

22      Q.  Am I right that there were no -- strike

23   that.

24          Did there used to be a similar training

25   attached to the prior version of the HCP8?

1    A.  What do you mean?

2    Q.  I'm asking basically, is this something

3  newly added to HCP8 or was this a training

4  document that was in the prior version as well?

5    A.  It was in the prior version.

6    Q.  And were there any modifications made to

7  this training document as compared to the version

8  that was attached to the 2018 version of the HCP8?

9    A.  I do not think there were any

10  modifications made, but I may be wrong.  But I

11  don't think there were any modifications.

12    Q.  Okay.

13    A.  At least that came across my desk.

14    Q.  Okay.  We can take that one down.

15       We talked before about HCP8's

16  requirement that staff monitor the heat index from

17  the National Weather Service.

18       Do you remember that?

19    A.  Yes.

20    Q.  Now, do you agree that HCP8 requires

21  staff to monitor the heat index from the National

22  Weather Service every two hours?

23    A.  Yes.

24    Q.  And, you know, just in case there's any

25  question, I believe that's in paragraph 7c3(ii).

1  It says, "Outside temperatures are monitored using

2  National Weather Center website," blah, blah,

3  blah, "recorded every two hours and reviewed and

4  approved by the warden."

5        Is that the way that the heat index is

6  monitored at DOC facilities?

7     A.  I think there's a logbook that would

8  verify that.  But, yes, you're right.

9     Q.  Okay.  Every two hours they have to

10  check in with the National Weather Service?

11     A.  During May 1 through October 31.

12     Q.  Right.  They don't have to -- they don't

13  have to conduct that monitoring outside of that

14  date range?

15     A.  Right.

16     Q.  Now, just going back, you said DOC set

17  the trigger for a heat alert at a level already

18  within that extreme caution range, right?

19     A.  At the top of the extreme caution range.

20     Q.  When it set that trigger for a heat

21  alert, did DOC consider whether a significant

22  increase in the heat index could occur before the

23  next monitoring period?

24     A.  No.

25     Q.  Do you agree that significant swings in

1   the heat index could occur over that two-hour

2   period?

3       A.   I wouldn't think over a two-hour period

4   would be that significant.  I mean, the heat is

5   pretty stable down here.  Once it gets hot, it's

6   hot.

7           MR. BENJAMIN:

8               Well, let's pull up Tab 18.  This

9           will be Plaintiffs' Exhibit 122, which

10          is going to show a few examples.

11          (Exhibit 122 was marked.)

12  BY MR. BENJAMIN:

13      Q.   I have a chart here showing a heat index

14  at various times on various dates.  And we can

15  scroll down and see that these -- this chart is

16  backed up with data from the National Weather

17  Service.  And we can certainly go to any

18  particular line if you'd like.

19          I'm just going to discuss some examples

20  at a high level and then ask you some general

21  questions, but you let me know if you want to look

22  at the underlying data in any way.

23          On July 2 at 8:15 --

24          MR. BLANCHFIELD:

25              Jeremy, who made this chart that

1    we're looking at?

2    MR. BENJAMIN:

3       I did.

4    MR. BLANCHFIELD:

5       That's your work product?

6    MR. BENJAMIN:

7       That's my work product, the master

8    of Word tables.

9    MR. BLANCHFIELD:

10      And you took it from actual data

11   that --

12   MR. BENJAMIN:

13      The data that -- the data that is

14   listed below.  And, Drew, if you want to

15   take a minute, we just put in the chat

16   the --

17   MR. BLANCHFIELD:

18      I'm going to trust you on this that

19   you did it accurately, particularly in

20   light of the fact that he's got a

21   Valentine's dinner.

22   MR. BENJAMIN:

23      I appreciate it.  And you can call

24   us out if we messed anything up.  I hope

25   we didn't.  We certainly did not intend

1      to.

2   BY MR. BENJAMIN:

3      Q.  On July 2 at 8:15, there was a heat

4   index of 89 degrees.  Two hours later, that heat

5   index was 102 degrees.

6         Do you think that that's a significant

7   swing in the heat index over a two-hour period?

8      A.  I'm wrong.  You're right.  That's a

9   significant swing.

10      Q.  And then on July 15 at 9:15 there's a

11  heat index of 88, and by 10:55 -- there wasn't a

12  measurement exactly between -- exactly at 11:15,

13  but by 10:55, we hit 99 degrees.

14         Do you think that that's a significant

15  heat index swing?

16      A.  10 degrees, 11 degrees.  Not as big as

17  the first one.  The 89 to 102 is a pretty big

18  swing.

19      Q.  But is the 11-degree swing fairly

20  significant?

21      A.  Yeah, it's fairly significant.

22      Q.  With an eye towards people who are

23  deemed to have medical conditions or on

24  medications that make them more susceptible to

25  heat, is that 11-degree swing significant?

1    A.  Well, they would have already been

2  brought in, wouldn't they?

3    Q.  Well, when would they have been brought

4  in if their first heat index at 8 -- sorry, at

5  9:15, wouldn't they not be brought in -- wouldn't

6  they only get a monitoring at 11:15?

7    A.  In '25, wasn't it 88 degrees on the

8  policy?

9    Q.  It would be over 88 degrees on the

10  policy.  But I'm thinking about under the new

11  policy.

12    A.  Under the new policy, yeah.

13    Q.  And that would be a significant swing

14  for somebody who has medical -- excuse me, medical

15  vulnerabilities?

16    A.  That's a significant swing.

17    Q.  On August 2, we have a heat index at

18  8:15 of 88 degrees, and two hours later you have a

19  heat index of 100 degrees.

20      Is that a significant swing?

21    A.  Well, but it also shows when it -- at

22  9:55 a.m. at 96.  And, you know, they would have

23  been brought in at that point.

24    Q.  If they had monitored it sometime

25  between 8:15 and 10:15, right?

1    A.  Right.  But is this data that you're

2  showing what Angola monitored?

3    Q.  No.  I'm just showing what the National

4  Weather Service actually reports.

5    A.  Okay.  So that would have been

6  significant, yeah.

7    Q.  And then on August 6 you have a

8  7:55 a.m. heat index of 88 and a 9:55 index of

9  102.

10      I assume you would agree that that would

11  be a significant swing, right?

12    A.  Yes.

13    Q.  So --

14    MR. BLANCHFIELD:

15      Can we -- for the record, if I

16      understand it, you've just picked these

17      times; you're not saying that these are

18      the actual times that LSP monitored the

19      heat index this summer?

20    MR. BENJAMIN:

21      That's correct.

22    MR. BLANCHFIELD:

23      Okay.

24    MR. BENJAMIN:

25      That's correct.

1  BY MR. BENJAMIN:

2      Q.   Looking at this data and assuming that

3  I'm right about what I've written here, do you

4  agree that a fairly significant heat index swing

5  can occur over a two-hour period?

6      A.   I would say that's fair.

7      Q.   And that would be important particularly

8  for medically vulnerable people, right?

9      A.   It would be.

10      Q.   So did DOC consider more regular

11  monitoring when it modified HCP8?

12      A.   You know, I haven't seen the reports,

13  what DOC turned in, but I would like to see the

14  data that DOC turned in and see what their

15  temperature records show based on the two-hour --

16  based on a two-hour temperature check with the

17  National Weather Service and just to compare what

18  you have with what they have and just to see what

19  happened.  But --

20      Q.   And when you said "DOC" there, you agree

21  that the actual monitoring is happening on a

22  facility-by-facility basis?

23      A.   Yes.

24      Q.   So -- and the facilities are pulling off

25  whatever the closest National Weather Service

1   station is, right?

2      A.  Right.

3      Q.  Now, you agree in each of these four

4   cases under the current policy, the first time

5   listed would not trigger a heat alert, right?

6      A.  It would not.

7      Q.  And people taking medications that are

8   listed on Attachment A would not have been brought

9   indoors?

10     A.  They would not.

11     Q.  People who were -- have conditions that

12  are listed on Attachment B would not have been

13  brought indoors?

14     A.  Most of them wouldn't have been out

15  there anyway.

16     Q.  But if they were, they would not have

17  been brought indoors?

18     A.  I would say 98 percent of them wouldn't

19  have been out there anyway.

20     Q.  For the remaining 2 percent?

21     A.  No, they would not have been brought in.

22     Q.  And would you agree that in each of

23  these cases that are listed here, the heat index

24  two hours after the first time period listed

25  exceeds the heat index that would be safe for

1  persons who are taking medications that are listed

2  on Attachment A to be working in the fields?

3      A.  I would say that the second temperatures

4  would warrant them to be brought in.

5      Q.  Would it be safe for a person who has --

6  was taking one of those medications on

7  Attachment A to be working in heat that's

8  102 degrees, a heat index of 102 degrees?

9      A.  Again, that would be where your extreme

10  caution would come in.  Is it safe?  It's not

11  opportune.  But is it detrimental?  No, it's not

12  detrimental.  You know, I mean, they would -- they

13  would be brought in within a certain time frame.

14  I'm sure at the next temperature check they would

15  shut it down and be brought in.

16      Q.  But by that time they're working in a

17  heat index of 102 or so, right?

18      A.  For an hour, at max, for an hour.

19      Q.  And that's safe for a person who is

20  taking a medication listed on Attachment A?

21      A.  I'm not saying that it's safe, but I'm

22  not saying it's detrimental either.  I'm saying

23  that the two-hour time frame is going to catch the

24  shifts in temperature that, you know, would keep

25  the individuals from harm.



1   Q.   Taking into account some of the things

2   we looked at earlier, the effect of direct

3   sunlight, for example, does that change your view

4   as to whether having a person who is taking a

5   medication on Attachment A is unsafe in a heat

6   index that's in the shade listed at 102?

7   A.   Jeremy, I'm not the expert on heat

8   pathology.  That's why we hired our experts.  Our

9   experts are going to give us opinions, and their

10  opinions are going to hold a lot of weight with

11  the way the DOC conducts business.  I'm not an

12  expert.

13  Q.   Did your experts recommend that DOC

14  monitor the National Weather Service only once

15  every two hours in order to determine whether to

16  issue a heat alert?

17  A.   They didn't recommend it, but they

18  looked at our procedure and they didn't change it.

19  Q.   Do you know whether they looked at the

20  National Weather Service data at any of the

21  facilities?

22  A.   I know they looked at all the

23  recordkeeping that went on, because I know they

24  asked for those records.

25  Q.   Sitting here today and realizing that

1    there can be fairly significant heat indexes --

2    swings over the course of two hours, do you think

3    DOC should modify the requirement that DOC monitor

4    only once every two hours?  Strike that, because

5    it was a terrible question.

6            Sitting here today with this -- these

7    examples that show a significant heat index swing

8    can occur over a two-hour period, do you believe

9    DOC should revisit the time period by which it

10   monitors National Weather Service data pursuant to

11   HCP8?

12       A.   I think DOC should take this material,

13   let our experts take a look at it and see what

14   they have to say in regards to our policy and

15   monitoring the temperature and discuss that among

16   themselves with our legal team and then make a

17   determination, that's what I think.

18       Q.   So is DOC going to raise this with its

19   experts to determine whether they think a more

20   regular monitoring should occur?

21       A.   Well, I think this is the first time

22   we've seen it.  And Drew's here.  So I would think

23   that they'd probably take a look at it.

24       Q.   And it's possible that they might modify

25   HCP8 to require more regular intervals for

1  monitoring the National Weather Service?

2      A.  I'm not saying that, but I'm saying

3  they'll take a look at it.

4      Q.  Will they take a look at the OSHA

5  guidance that we discussed earlier regarding wet

6  bulb globe temperature?

7      A.  I'm not sure Dr. Keldie didn't already

8  take a look at that.

9      Q.  I'm asking whether DOC will request that

10  he take a look at it?

11     A.  They may ask him that he take a look at

12  it.

13     Q.  Separate from whether they ask

14  Dr. Keldie, will DOC look at it, consider it, and

15  potentially modify HCP8 to be consistent with OSHA

16  standards?

17     A.  No.  We're going to take advice from our

18  expert.

19     Q.  Regardless of what OSHA says?

20     A.  Our expert is hired to give us the

21  highest degree of expertise in this field, and I'm

22  sure if he -- if he does or does not go with

23  what's recommended there, he'll have a good reason

24  for us.

25     Q.  Will you ask what that reason is?



1     A.   I'm sure the Court is going to ask him

2  what that reason is.

3     Q.   My question is:  Is DOC going to ask why

4  not follow the guidance from OSHA?

5     A.   I don't have any problem asking him

6  that.

7     Q.   How about whether or not you should

8  follow the guidance from the CDC?

9     A.   I can tell you Dr. Keldie is a pretty

10  thorough guy and he's already thought about

11  everything that you're probably asking, and that's

12  something that he'll be asked on the stand.  But

13  I'm sure he's looked at it.  He's looked at

14  everything.

15     Q.   Was there a reason that DOC did not

16  include an age limit in modifying HCP8?

17     A.   Well, there's not a reason, but I can

18  tell you my personal opinion, is that, you know,

19  there's a difference between a chronologic and a

20  physiologic age, right.

21        I mean, you've got -- you have people in

22  DOC that may be 65 years old that can run 10,

23  12 miles a day, they lift weights every day.

24  Chronologically they may be 65; physiologically,

25  they may look like they're 40.  And at the same

1   token, you have guys at 40 who look like they're

2   80, you know.

3          So I think age is not the most important

4   factor.  I think it's, you know, your medical

5   conditions and your overall health, and that's

6   what we covered in the HCP.

7      Q.  Are you aware of any studies saying that

8   age is an important factor in heat-related risk?

9      A.  I'm not.

10         But I'm 62 years old, I get out and do

11  things in the sun all the time, you know.  And I'm

12  sure I'm at increased risk, but I don't ever have

13  any problems.  I mean, the attorney sitting next

14  to me right here plays tennis three, four hours a

15  day.  You know, he's -- I don't know how old Drew

16  is.

17         MR. BLANCHFIELD:

18             65.

19      A.  65.  But, you know, I'm sure there are

20  studies that say that.  But, you know, I think the

21  way that we're doing it with the way that we're

22  looking at heat pathology with the diagnoses and

23  medications and all the restrictions that were --

24  I think it's fair.

25

1   BY MR. BENJAMIN:

2       Q.   You mentioned two types of age or two --

3   I don't know, you described them two ways.  One

4   was chronological, and what was the other one?

5       A.   Physiological.

6       Q.   Physiological.

7            What exactly is physiological age?

8       A.   You've got guys that have been locked up

9   for 25, 30 years.  They have maintained an

10  exercise program, they have stayed on a certain

11  dietary regimen, and they are as fit as an

12  individual can be that may look 20 years younger

13  than them, you know.

14           I have an inmate that got let out of

15  Angola that I have living, you know, in my

16  hometown because I just became friends with him

17  and he needed a place to stay.  He's 66 years, 67

18  years old.  He worked me under the table.

19  Physiologically -- chronologically, he may be 67

20  years old, but physiologically, he's 40, 45 years

21  old.

22      Q.   So your opinion is that he is not a

23  greater -- at greater risk of heat-related

24  illness?

25      A.   Well, let me tell you what he does.  He

1  works with my uncle tending thousands of head of

2  cows, you know, bailing hay, you know, feeding the

3  cows, doing bush hog work.  You know, he's out

4  there every day doing that.  He's never had a

5  problem.  I'm not saying he's not at risk, but I'm

6  just saying he's not had a problem.

7      Q.   Okay.  There's a reference in HCP8 at

8  the last page, you can take a look at it, to a

9  Form HCP8-a.

10          What is that form?

11     A.   Are you talking about the attachment?

12     Q.   Yeah.  Well, it's listed on the last

13  page of HCP8, you know, right below --

14     A.   That's information that you had just put

15  up there.

16     Q.   I'm sorry, say that again.

17     A.   That's that educational material that

18  you just put up there.

19          MR. BENJAMIN:

20              Janet, can you pull up HCP8.  I

21          think we might be looking at different

22          things, Dr. Lavespere.

23  BY MR. BENJAMIN:

24     Q.   You see there's Attachment C.  It says

25  "Heat Pathology Staff Training," we did look at

1   that.  But then there's something else called

2   "HCP8 Heat Pathology Inmate Education."

3        What is that?

4     A.  I'd have to look at it to see what it

5   is.  Do you have a copy of it?

6     Q.  I don't, I don't think.  Do you know if

7   that form exists?

8     A.  I'm sure it does if it's listed there.

9        MR. BENJAMIN:

10           Okay.  I may be wrong, but if I'm

11           not, Drew, maybe you could send that our

12           way.

13  BY MR. BENJAMIN:

14    Q.   Dr. Lavespere, in its remedial order the

15  Court ordered Defendants to provide sufficient

16  shade, quote, "such that each incarcerated person

17  on the farm line may rest in shade during breaks

18  without touching or encroaching on the personal

19  space of their fellow inmates," unquote.

20        What was DOC's rationale for not

21  including a provision to that effect in HCP8?

22    A.  I don't know that they didn't.  I was

23  told that they put several tents up out there.

24    Q.  I'm asking about the policy, the HCP8

25  policy.  Why did DOC not include in its policy the

1    recommendation or, rather, in its policy the

2    requirement that each incarcerated person is

3    provided with shade during breaks such that they

4    won't touch or encroach on the personal space of

5    their fellow inmates?

6        A.  I don't know.  I guess it was omitted.

7        Q.  Also in that same remedial order, the

8    Court ordered Defendants to provide shade, quote,

9    "located close to or throughout the space in which

10   prisoners are working, such that inmates do not

11   have to travel a long distance to take their

12   breaks and/or access water and ice," end quote.

13       What was DOC's rationale for not

14   including a provision to that effect in HCP8?

15       A.  Well, the specific provision -- I mean,

16   they did provide a provision for water and ice

17   available every 30 minutes.  But the specific

18   provision, I can't answer that question for you.

19   I don't know why.

20       Q.  In the same order, the Court ordered

21   Defendants to provide, quote, "some form of chair

22   or surface for farm line laborers to rest on

23   during said breaks," end quote.

24       Any idea why DOC did not include a

25   provision to that effect in HCP8?

1    A.  No idea why.

2    Q.   The Court also ordered Defendants to

3  provide men on the farm line with a, quote, "clean

4  cup," end quote.

5        What was DOC's rationale for not

6  including a provision that would require

7  facilities to provide people working outdoors with

8  a clean cup?

9    A.  I'm sure they do, but I don't know why

10  it was left out of the provision.

11    Q.   The Court also ordered Defendants to

12  provide men on the farm line with, quote, "lace-up

13  boots, sun hats, sunscreen, protective

14  long-sleeved shirts, and gloves," end quote, and

15  also later with socks.

16        Any idea why DOC did not include a

17  provision to that effect in HCP8?

18    A.  I think they're following that

19  provision, I don't know why it wasn't put into

20  HCP8.

21    Q.   The Court also ordered Defendants to,

22  quote, "make free medical care available to all

23  men laboring on the farm line," end quote.

24        What was DOC's rationale for not

25  including a provision to that effect in HCP8?

1    A.  Can't answer that.  Don't know why.

2       MR. BENJAMIN:

3          Okay.  Can we go off the record for

4       just a minute.

5       THE VIDEOGRAPHER:

6          We are going off the record at

7       6:18 p.m.

8       (A break was taken.)

9       THE VIDEOGRAPHER:

10         We are going back on the record at

11      6:20 p.m. Eastern.

12   BY MR. BENJAMIN:

13      Q.  Dr. Lavespere, I have one last question,

14   I think it's kind of a softball for you.

15         On your screen is the last two pages of

16   HCP8 2024 -- I'm sorry, yeah, the 2024 version of

17   HCP8 that you also have in hard copy.

18         On Section F there, Staff Training, take

19   a look at that paragraph.  My question is going to

20   be:  Is the reference to Attachment B, is that

21   supposed to be Attachment C?

22      A.  Do you have a copy of Attachment C?

23      Q.  That's that training document we looked

24   at earlier.  We can pull it back up.

25      A.  Attachment B is the medication -- I

1   mean, the diagnoses exclusion list?

2       Q.   Correct.

3            That's not what's intended to be

4   referenced here, right?

5       A.   No.

6       Q.   This is not intending -- this is

7   intending to reference the staff training, right?

8       A.   Right, it should be the staff training.

9       Q.   Okay.  Great.  Thank you for clarifying

10  that.  That is all the questions I have.  I really

11  appreciate your time tonight.

12      A.   All right.

13          MR. BLANCHFIELD:

14              All right.  Thank y'all.

15          THE VIDEOGRAPHER:

16              Going off the record at 6:22 p.m.

17          (END OF TESTIMONY AT 6:22 P.M.)

18

19

20

21

22

23

24

25

1                REPORTER'S PAGE

2          I, RITA A. DEROUEN, Registered

3    Professional Reporter (RPR #6908) and Certified

4    Court Reporter in and for the State of Louisiana,

5    (CCR #2014018), as defined in Rule 28 of the

6    Federal Rules of Civil Procedure and/or Article

7    1434(B) of the Louisiana Code of Civil Procedure,

8    do hereby state on the Record:

9          That due to the interaction in the

10   spontaneous discourse of this proceeding, dashes

11   (--) have been used to indicate pauses, changes in

12   thought, and/or talkovers; that same is the proper

13   method for a Court Reporter's transcription of

14   proceeding, and that the dashes (--) do not

15   indicate that words or phrases have been left out

16   of this transcript;

17         That any spelling of words and/or names

18   which could not be verified through reference

19   material have been denoted with the phrase

20   "(phonetic)";

21         That (sic) denotes when a witness stated

22   word(s) that appears odd or erroneous to show that

23   the word is quoted exactly as it stands.

24

25                RITA A. DEROUEN, RPR, CCR

1          REPORTER'S CERTIFICATE

2          I, Rita A. DeRouen, Registered

3     Professional Reporter (RPR #6908) and Certified

4     Court Reporter (Certificate #2014018) in and for

5     the State of Louisiana, as the officer before whom

6     this testimony was taken, do hereby certify that

7     on February 12, 2025, in the above-entitled and

8     numbered cause, the deposition of LOUISIANA

9     DEPARTMENT OF CORRECTIONS, THROUGH RANDY

10    LAVESPERE, after having been duly sworn by me upon

11    authority of R.S. 37:2554, did testify as

12    hereinbefore set forth in the foregoing 166 pages;

13

14          That this testimony was reported by me

15    in stenographic shorthand, was prepared and

16    transcribed by me or under my personal direction

17    and supervision, and is a true and correct

18    transcript to the best of my ability and

19    understanding;

20

21          That the transcript has been prepared in

22    compliance with transcript format guidelines

23    required by statute or by rules of the board;

24

25          That I have acted in compliance with the

1  prohibition on contractual relationships, as

2  defined by Louisiana Code of Civil Procedure

3  Article 1434 and in rules and advisory opinions of

4  the board;

5

6       That I am not of Counsel, nor related to

7  any person participating in this cause, and am in

8  no way interested in the outcome of this event.

9

10      SIGNED THIS 17TH DAY OF FEBRUARY, 2025.

11

12

13      _____

14      RITA A. DEROUEN
        Registered Professional Reporter
15       Certified Court Reporter

16

17

18

19

20

21

22

23

24

25

1      ACKNOWLEDGMENT OF DEPONENT

2

3        I, RANDY LAVESPERE, do hereby acknowledge I have

4      read and examined the foregoing pages of testimony,

5      and the same is a true, correct and complete

6      transcription of the testimony given by me, and any

7      changes or corrections, if any, appear in the attached

8      errata sheet signed by me.

9

10

11      _____   _____

12        DATE            RANDY LAVESPERE

13

14

15

16      Subscribed and sworn to

17      before me on this_____ day

18      of _____, _____.

19

20      _____

21        Notary Public

22

23

24

25

```
 1        *** ERRATA SHEET ***

 2   NAME OF CASE: Voice of the Experienced v LeBlanc
     DATE OF DEPOSITION: February 12, 2025
 3   NAME OF WITNESS:  RANDY LAVESPERE
     PAGE  LINE  FROM     TO      REASON
 4   ____|____|_____|_____|_____

 5   ____|____|_____|_____|_____

 6   ____|____|_____|_____|_____

 7   ____|____|_____|_____|_____

 8   ____|____|_____|_____|_____

 9   ____|____|_____|_____|_____

10   ____|____|_____|_____|_____

11   ____|____|_____|_____|_____

12   ____|____|_____|_____|_____

13   ____|____|_____|_____|_____

14   ____|____|_____|_____|_____

15   ____|____|_____|_____|_____

16   ____|____|_____|_____|_____

17   ____|____|_____|_____|_____

18   ____|____|_____|_____|_____

19

20            _____

21   Subscribed and sworn before me

22   this____day of_____,20__.

23   _____    _____

24   (Notary Public)      My Commission Expires:
```

## Exhibits

**EX 0112 Dr.**
 **Randy Lavespere**
 **021225**   4:11
 29:21,22

**EX 0113 Dr.**
 **Randy Lavespere**
 **021225**   4:14
 48:25 49:1
 63:9

**EX 0114 Dr.**
 **Randy Lavespere**
 **021225**   4:17
 60:3,4

**EX 0115 Dr.**
 **Randy Lavespere**
 **021225**   4:19
 67:5,6

**EX 0116 Dr.**
 **Randy Lavespere**
 **021225**   4:21
 77:2,5

**EX 0117 Dr.**
 **Randy Lavespere**
 **021225**   4:24
 78:1,2

**EX 0118 Dr.**
 **Randy Lavespere**
 **021225**   5:2
 88:7,9,18,20
 89:10

**EX 0119 Dr.**
 **Randy Lavespere**
 **021225**   5:4
 100:21,22

**EX 0120 Dr.**
 **Randy Lavespere**
 **021225**   5:7
 130:14,15,16

**EX 0121 Dr.**
 **Randy Lavespere**
 **021225**   5:9
 142:6,23 143:7

**EX 0122 Dr.**
 **Randy Lavespere**
 **021225**   5:12
 146:9,11

---

### 0

**01**   40:24

**017941**   13:8
 134:21

**030613**   13:16
 15:7,17

**030619**   15:20

---

### 1

**1**   52:3 61:2
 101:22 145:11

**10**   76:15 148:16
 157:22

**100**   18:25 84:19
 136:20 149:19

**102**   148:5,17
 150:9 153:8,17
 154:6

**103**   91:13

**106**   94:13 95:7,
 8

**107**   74:12

**108**   13:15 16:1
 19:4

**109**   105:16,19
 109:21 118:21

**10:00**   14:10

**10:15**   149:25

**10:55**   148:11,13

**11**   77:25 148:16

**11-degree**
 148:19,25

**112**   29:21,22

**113**   48:25 49:1
 63:9 66:9,12
 67:17 68:1,18,
 19 85:3,9,11,
 15 97:7,24

**113-degree**
 67:19 68:15
 97:2

**114**   60:3,4

**115**   67:5,6 96:4

**116**   77:1,2,5

**117**   78:1,2

**118**   88:7,9,18,
 20 89:10

**119**   100:21,22

**11:15**   148:12
 149:6

**12**   7:5 157:23

**120**   130:12,15,
 16

**121**   142:5,6,23
 143:7

**122**   146:9,11

**128**   97:7,25

**13-**   129:13

**13.5**   84:3

**1300**   129:19

**132**   49:6

**14**   100:20 137:1

**1400**   129:13,19

**15**   37:5 58:19

**59:19 60:19**
 94:7 96:20,21,
 23 97:12,22,23
 99:3,18,23
 106:1 148:10

**15-degree**   97:1

**15-minute**   58:24
 59:9,15

**15th**   60:8

**16**   130:9

**17**   134:18 142:4

**18**   49:5 54:10
 69:3 77:16
 102:24 106:19
 107:6 146:8

**18,000**   32:15

**18th**   63:7

**19**   134:16

---

### 2

**2**   40:17 43:16
 50:2,22 146:23
 148:3 149:17
 152:20

**20**   16:2 19:4
 32:24 54:12,22
 69:13 106:20,
 25 132:6 135:3
 136:2 159:12

**2009**   64:20

**2018**   74:24
 134:20 137:9
 144:8

**2019**   64:21

**2024**   16:2,10
 19:5 24:7
 54:10,12 60:8
 67:10 69:13
 106:7,11,20,

23,25 107:6,7
132:6 135:3
136:2 164:16

**2025** 7:5 106:19

**21st** 134:20
137:8

**23** 30:1

**23rd** 28:17

**24** 32:25 106:22

**25** 141:19 149:7
159:9

**2:40** 7:4

**2nd** 67:10

---

**3**

**3** 13:25 40:24
100:1 125:2

**30** 159:9 162:17

**30(b)(6)** 10:4

**31** 52:3 145:11

**3:15** 35:24

**3:17** 36:3

---

**4**

**4** 29:19 125:5

**40** 123:3 157:25
158:1 159:20

**45** 58:19,24
59:9,15,19
60:20 159:20

**4:08** 73:10

**4:11** 73:14

**4:54** 104:4

---

**5**

**5** 48:24 67:14
74:21 88:8
101:18 134:18
135:10 136:3,4
138:1

**504** 11:25

**5:00** 104:8

**5:50** 142:25

**5:52** 143:4

---

**6**

**6** 60:2,14 150:7

**62** 158:10

**65** 157:22,24
158:18,19

**66** 159:17

**67** 159:17,19

**6:18** 164:7

**6:20** 164:11

**6:22** 165:16,17

---

**7**

**7** 106:11,16
107:7

**77** 67:13

**7:55** 150:8

**7c3(ii)** 144:25

**7th** 106:7

---

**8**

**8** 67:4 149:4

**80** 73:20 158:2

---

**86** 87:3

**88** 69:16,24
70:15,21 71:2,
12,15 72:6
73:17 74:23
75:8 87:14
99:22 148:11
149:7,9,18
150:8

**88-degree** 99:23

**89** 148:4,17

**8:00** 14:9,10,11

**8:15** 146:23
148:3 149:18,
25

---

**9**

**9** 74:10

**90** 90:12,24
91:2,13 92:14

**90.9** 69:24

**91** 53:24 54:2
69:19,20 70:16
73:18 74:1,7,
24 75:8,14,19,
23 76:6,10
84:16 87:15
89:11,18 90:4
92:1,16,19
93:11 94:12
95:5,21 96:7
99:25 100:5,
10,12,15
103:1,2 126:9

**91-degree** 125:8

**95** 70:6,15
76:4,5,11

**96** 149:22

**98** 39:21 152:18

---

**99** 148:13

**9:00** 30:1

**9:15** 148:10
149:5

**9:55** 149:22
150:8

---

**A**

**a.m.** 14:9,10
30:1 149:22
150:8

**A1c** 136:21
137:1

**abbreviation**
42:9

**ability** 119:16
125:25

**able** 103:17

**above** 51:14,19
53:24 54:2
67:14 90:15
92:5 93:18
94:1,4 100:10
122:23

**absolute** 84:23
97:14,17,19
98:7,14

**Absolutely**
47:10 73:6
122:3

**absolutes** 97:9

**acceptable**
95:17

**access** 12:16,18
162:12

**accordance**
87:21,22

**account** 81:19
84:17 99:18

154:1

**accuracy** 83:22

**accurate** 26:10
75:5

**accurately** 86:9
147:19

**acres** 32:15

**acronym** 9:25

**across** 11:20
27:6 31:3
144:13

**action** 8:10
10:3 20:21
70:20

**activity** 42:18,
20 91:6 112:13
113:7

**actual** 30:15
147:10 150:18
151:21

**acute** 86:11

**add** 99:23 112:7
117:5 140:25
141:5

**added** 43:5 97:5
108:6 109:16
110:18 111:16
112:4,9,13
114:8 116:18
144:3

**addition** 135:19

**additional**
67:15 108:6
114:8 140:21
141:7

**Additionally**
10:14

**Administration**
9:19

**administrations**
53:2

**adopt** 39:22
40:19 87:25

**adopted** 39:21
40:6 53:18
60:24 95:15
113:20

**advantages** 80:8

**advice** 79:19
114:16 156:17

**advisory** 87:10

**affect** 31:17
32:4,5,10 46:5
78:18

**affects** 47:15

**afraid** 72:15

**afternoon** 8:8

**age** 157:16,20
158:3,8 159:2,
7

**agencies** 62:22

**ago** 43:25

**agree** 66:20
73:16,20,21
84:4 144:20
145:25 150:10
151:4,20
152:3,22

**agreed** 46:1
54:13 100:6

**agricultural**
32:16 98:20

**ahead** 39:14
82:17 139:22

**ailments** 132:9

**air** 78:18,19
81:16,21

**air-conditioning**
71:6

**alert** 54:17
69:11,15,18,23
70:3,22 74:23
75:7,22 81:12
84:16 86:4
87:14 89:12,18
91:25 92:16,22
93:2,16,23,25
95:5 96:7
99:10 100:10,
15 101:20
103:5,19
104:19 138:2
139:5,12
141:6,9,14
145:17,21
152:5 154:16

**alerting** 139:1

**alerts** 104:23

**alter** 40:14

**alters** 46:14

**altogether**
46:11

**amend** 111:25
140:5

**analysis** 53:25

**and/or** 91:5
162:12

**Angola** 9:9
17:24 18:8,10
19:22 32:5,11,
12,13 34:12
37:21 64:20
81:4 86:3
91:17 113:13
118:5 125:19
129:11,18,22
134:3 150:2
159:15

**announced** 74:23
75:7

**annual** 24:9
39:3 96:17

**answer** 10:12,13
11:4 19:9
45:16 58:6
62:1 68:7,9
83:11 86:6
162:18 164:1

**answering** 10:6
103:13

**answers** 10:14
20:18

**anticholinergic**
37:9 39:17
40:15,22 41:20
42:18,20 43:16
44:10 48:6
111:6 112:13
113:7 119:18

**antihypertensive**
110:6

**antipsychotic**
44:1 109:15

**antipsychotics**
37:7 108:21
110:4

**anybody** 17:8
47:20 130:22
131:22 132:25
143:20

**anymore** 110:2

**anyone** 12:2,4
19:25 105:9
122:4,5

**anyplace** 68:14
100:8

**Apologies** 88:19

**apologize** 88:16

96:21 104:11

**appealed** 67:24,
25 85:7

**appears** 118:20

**applied** 69:23

**apply** 32:2
52:2,5 97:2

**appreciate**
147:23 165:11

**appropriate**
59:10 95:15
117:2 118:25
125:17 129:6
132:18 137:3

**appropriately**
123:25

**approval** 21:18
22:11 33:16
96:1 116:19
120:25

**approve** 115:13,
20 116:1,7,22

**approved** 33:18,
22 100:17
115:23 116:8
145:4

**approver** 115:16

**area** 32:14
80:16

**areas** 63:12

**around** 16:10
18:24 19:19
29:12 44:22
73:17 118:8

**Asenapine**
108:22

**asked** 25:15
45:10 53:15
61:16 65:10
71:11,13,14

122:19 154:24
157:12

**asking** 8:11
10:7 27:14
35:10 41:17
57:22 61:18,
20,22 62:6
64:12 85:13
93:13 100:13
142:20 144:2
156:9 157:5,11
161:24

**asks** 45:21

**aspect** 39:17
87:24

**assessment**
86:11

**assimilate**
57:22

**associated**
84:17

**assume** 12:7
47:13 48:13,15
114:24 122:22
150:10

**assumed** 62:14

**assuming** 151:2

**attached** 42:11
143:25 144:8

**attachment** 35:7
106:6,22,24
107:6,22 108:7
112:2,25
114:5,10 115:3
116:3,4,5,6
119:13,14,15,
22 120:3,8
122:16,25
123:18 127:8
129:3 130:18
131:13 134:12
136:12 139:24,

25 140:18,20
141:22 143:8
152:8,12
153:2,7,20
154:5 160:11,
24 164:20,21,
22,25

**attachments**
12:24 13:1
15:21,24 16:24
75:1,17

**attempt** 102:6,
10

**attempted**
109:25

**attempts** 108:12

**attention** 45:4
113:14 140:20

**attorney** 158:13

**attorneys** 8:9
18:16

**attuned** 48:10

**ATUS** 48:2

**audio** 8:13

**August** 60:8
134:20 137:9
149:17 150:7

**automatic**
137:15

**automatically**
123:20 137:10
138:23

**available** 42:5
63:22 64:23,24
65:2,8 66:4
162:17 163:22

**aware** 16:9
60:17 64:18
68:16 87:8
88:2 106:21,23

107:21 114:6
131:8 139:19
158:7

---

**B**

**back** 11:4 13:24
14:5 16:25
19:9,13 22:11
33:11,22 35:9,
19 36:2 37:2
44:7 48:21
50:22,25 51:17
55:1,2,5 63:7
67:3 69:3,9
73:2,13 86:22
104:1,7 111:5
113:25 119:12
126:22 143:3
145:16 164:10,
24

**backed** 146:16

**background** 34:7

**backwards**
132:14

**baclofen**
121:18,20
123:2,4

**bad** 48:12

**bailing** 160:2

**ballpark** 18:13

**Barnes** 18:1,2,
12 19:18 25:6,
18 26:13,20
27:14,23 33:3
34:19 36:7,18,
22 37:9,17
41:6 42:25
43:7,9,12,18
44:4,7,17,21,
22 55:12 56:10
57:4,11 58:21,
25 62:3,8

63:23 75:1
104:15 109:12,
18,20,23
110:22 111:22
112:18,20
113:3,16
114:3,14,15

**Barnes'** 17:1
57:18 58:10
119:9 121:12

**base** 33:11

**based** 24:9,15
38:2 40:22
55:10 59:24
64:8 79:11
82:8 96:19
103:15 112:10,
12 115:21
123:14 124:18
125:1 127:22
151:15,16

**bases** 77:19

**basically** 41:13
115:13 126:20
144:2

**basis** 86:23
95:20 113:4
115:7 126:19
151:22

**basketball**
125:9 126:3,
12,17,24 127:9
128:3,9

**batch** 57:3

**Bates** 13:6,7,16
15:7,17 134:21

**Bates-stamped**
13:3

**Baton** 11:25

**begin** 10:11
43:21

**beginning** 15:6
92:14

**begins** 13:15
90:12,23 91:2

**behalf** 7:12,14
16:18

**believe** 30:12
31:15 36:11
59:12 72:3,5
80:21 86:13
102:24 137:6
144:25 155:8

**bell** 28:17

**below** 51:15,20
79:5 87:9
90:18 147:14
160:13

**beneficial**
110:20

**Benjamin** 7:23,
24 8:4,7,9,14,
16 13:18
14:12,21 15:5,
11,14 29:8,14,
18,23 32:19,21
35:16,21 36:4
48:23 49:2,25
50:3,9,13,21,
24 57:24 58:3,
5 60:1,5
65:12,19 67:1,
7 68:2,13
69:1,5 72:20,
23 73:5,15
74:8,15 76:13,
22 77:3,23
78:3 85:22
86:21 88:5,10
98:4 100:18,23
103:8,24 104:9
105:21 106:2
118:16,19
121:14 130:8,

13,17 134:15,
22 140:13,16
142:3,9,13,19
143:5 146:7,12
147:2,6,12,22
148:2 150:20,
24 151:1 159:1
160:19,23
161:9,13
164:2,12

**benztropine**
114:23,25
115:1 117:9,20

**best** 11:1
117:17

**bet** 59:25

**better** 40:16
99:25

**big** 70:15
148:16,17

**bit** 11:19 13:24
14:1,5,6 36:14
46:15 50:11
51:10 90:6
112:16 113:25

**blah** 145:2,3

**Blanchfield**
12:3 15:2,8,13
17:25 20:9
25:18 39:8
54:20 57:19
58:1 65:4
66:23 67:21
68:8 83:6
85:16 86:15
98:1 103:6
121:9 146:24
147:4,9,17
150:14,22
158:17 165:13

**Blanchfield's**
49:4

**blockers** 39:24,
25

**blue** 139:23

**board** 26:20
122:23

**body** 90:10 91:3

**bold** 79:5

**boots** 163:13

**boss** 116:24

**bother** 61:14

**bottle** 42:6

**bottom** 14:23
60:7 67:10
77:13,22
118:17

**break** 10:17,20
35:15,25
58:18,19,20,24
59:4,9,10,18
60:19,23 61:4,
8,12,13,24
62:7,12,20,25
63:4,20 73:11
104:1,5 125:5
164:8

**breaking** 125:11

**breaks** 59:15
63:13 161:17
162:3,12,23

**briefly** 10:5

**bring** 33:15
105:25 113:14

**bringing** 31:2
46:13 116:6

**brings** 46:15

**broad** 57:21

**brought** 24:23
27:7 28:8,9
31:25 37:25

38:6 65:7 76:8
126:11,14
149:2,3,5,23
152:8,13,17,21
153:4,13,15

**buck**  113:19

**bulb**  79:6,12
81:21 156:6

**bullet**  58:17
69:10

**bullets**  69:7

**bunch**  105:1

**bush**  160:3

**business**  154:11

**butcher**  108:10

---

**C**

**calcium**  39:23,
25

**calendar**  23:18

**call**  33:12
42:8,10 57:11,
12 65:9,24
112:24 118:7
143:19,20
147:23

**called**  41:22
69:11 78:1
88:14 93:3
94:16 113:10
161:1

**calls**  51:14,15
57:4

**camera**  89:7

**capacity**  10:4

**cardiovascular**
135:21

**care**  16:23 17:6

20:25 21:2,19,
22 22:5,6,8,9
23:3,6 24:19
25:16 26:15
47:12 51:2
119:1,22
127:21 163:22

**carefully**  72:25

**Carl**  55:11

**case**  25:4,8
55:19 67:9
71:7,18,19,20,
22,25 91:16
96:25 115:15
118:4 123:23
139:11 144:24

**cases**  125:13
127:19 152:4,
23

**catch**  53:23
65:17 153:23

**categories**
43:15 128:19
130:23 133:1

**caught**  65:21

**caution**  74:5
76:10 90:2,4,
5,11,23 91:2
92:15,19,24
93:4,11,16,19,
20 98:11
145:18,19
153:10

**CDC**  9:17 75:4
77:18 101:2
157:8

**cease**  66:10

**cell**  123:3

**Center**  9:17
145:2

**certain**  23:18,
19 44:14 45:9
51:24 62:22
125:7 131:10
135:15 153:13
159:10

**certainly**  11:6
16:19 51:11
113:7 146:17
147:25

**chain**  116:12

**chair**  162:21

**change**  48:18
58:18 69:22
111:12,13
115:4,9 116:16
120:12,13
121:22 140:23
154:3,18

**changed**  26:20
53:13 72:6

**changes**  15:1
16:15 18:5
19:2,6,15 20:4
22:13,17 26:17
28:15,25 29:1
30:10 31:7,16
33:12 50:19
54:22 55:13
107:14 111:21
112:2 113:1
114:18

**channel**  39:24,
25

**channels**  118:2

**chapter**  101:22

**charge**  26:14,22

**chart**  72:8,11,
13,18 74:4
76:9 77:11
88:23 89:5,8,
16,19,21,23

90:14,15,19,
20,22 91:1
92:2,18,20
93:10 94:4,16
146:13,15,25

**chat**  13:13
147:15

**check**  14:14
145:10 151:16
153:14

**Chelsea**  17:16,
25 20:6

**chief**  9:5
33:16,17 34:3,
5,6,13,14
38:25 114:19
115:10,20
116:1,2,20,23
118:10 141:3,
5,14

**Chief's**  116:19

**Chlorpheniramine**
108:17

**choose**  87:7
92:15 93:14

**chose**  54:21
68:24 93:5

**chosen**  70:21
95:13

**chronic**  17:6
135:20 136:7,
11

**chronologic**
157:19

**chronological**
159:4

**chronologically**
157:24 159:19

**circular**  41:22,
25 42:4,10,11

circumstance
24:25

circumstances
23:9 24:18
127:13

cite 101:18

cited 95:19

cites 62:23
78:12 79:25

claim 103:3

clarify 10:25
11:5

clarifying
165:9

classification
90:8,17 111:6

classifications
37:9

classified
39:18 119:18

clean 10:16
163:3,8

clear 20:7 28:3
51:1 96:13
128:18 131:9

clearer 102:23

clearly 122:8
126:7

clerk 105:23

click 105:5

clinic 120:20
131:23

clinical 119:7
121:17 137:3

close 80:3,9,17
81:4 162:9

closer 62:20

closest 151:25

codes 89:25

colleague
105:22

color 89:25

comb 140:10

combines 81:16

come 21:12
38:10,11 39:15
42:7,13 48:21
59:20 66:15
69:9 71:13,15,
16 73:2 75:25
81:1 93:18,24
104:1 112:6
113:5 120:19
128:24 153:10

comes 22:10
23:19 33:22
34:16 36:19
41:23 96:25
111:23 117:16
119:20 120:20
140:20

comfortable
13:21 52:13

commenting
85:24

committee
21:15,20
22:12,16,19
23:2 26:18
27:2,4,8
28:10,13,19,22
29:12,25 30:4,
11,15,21
111:16 114:12
115:12,15,24
116:7

commodity 123:4

common 81:15

132:24 133:2

communicate
116:9

community 41:3
136:22

compare 16:5
136:3 151:17

compared 52:17
144:7

complained
126:22

complete 45:22
110:8,19,24
132:25

compliant
123:7,12
124:25

complicated
105:13,14

comply 64:14
102:6,10

complying 102:2

compound 123:4

computer 12:6

concern 47:4,5,
10

concerned 39:20

concerns 69:10
120:4

concluded
44:23,24

conclusion
38:10,11

condition 128:4
132:19 133:4,9
134:9 140:21,
24 141:8,12,13

conditions 36:9

69:8 81:18
82:10,12 93:15
131:2,4,12,24
138:2 139:7
140:19 141:22
148:23 152:11
158:5

conduct 11:10
39:4 40:7
104:18 105:3
145:13

conducting 21:7
28:5 104:15

conducts 96:16
154:11

conference
30:14

confirm 12:7,15
38:19 41:18
44:3

confirmed 40:10

conjunction
89:19,21
121:20

connection 17:9
18:3 19:18
20:1,15,21
23:2 55:23
120:1

consider 55:22,
25 56:7 62:24
63:3 78:24
79:12,17 80:8,
14 82:1 83:19
84:9,22,24
85:1,5 87:15
90:17 95:3
96:3,5,17
99:2,5 110:22
125:14 134:3
145:21 151:10
156:14

**considerably**
84:1

**consideration**
96:10

**considered**
26:12 52:9
56:18 70:16
79:1,3 83:14
95:14,16 96:15
99:6 101:10

**considering**
55:24

**consist** 22:20

**consistent**
63:1,4 156:15

**consistently**
40:10 123:19

**constant** 131:25

**construction**
59:18

**consult** 38:18
113:15

**consultant**
113:4

**consultants**
23:22 24:1,19
25:1,4

**consultation**
28:6

**consulted** 37:20

**contact** 22:22

**continue** 111:22

**continues** 80:2
82:6

**continuum** 23:20

**Control** 9:18

**controlled**
102:2 136:21

138:13

**convenient**
10:21

**conversations**
20:11

**copy** 15:4,6
161:5 164:17,
22

**correct** 11:5
15:20 24:5
34:23 37:17
38:12 39:20
51:21 52:1
53:6 66:6
69:11 73:18
94:21 140:6
150:21,25
165:2

**correctional**
48:7

**corrections**
8:22,24 9:6
37:13 98:19
123:10

**correlation**
120:4

**council** 22:19

**counsel** 7:16
49:18

**country** 27:7

**couple** 40:20
80:20 107:11
108:22

**course** 12:17
35:17 85:7
114:13 155:2

**court** 7:13,17,
22 8:2,12 10:9
38:1,6 49:19
54:11,17 56:16
60:6,17,22

61:11 62:19
63:25 64:3,6,
8,12,15,16,19,
22 65:15,21
66:14,16,19,21
68:1,12,22
70:8,18 76:6,
20,24 85:6
96:25 98:13,23
100:4 105:17
106:18 130:11
157:1 161:15
162:8,20
163:2,11,21

**Court's** 65:1

**court-ordered**
67:20

**cover** 82:13

**covered** 158:6

**cows** 160:2,3

**Cox** 49:3

**craft** 133:18

**cramps** 91:4,15
94:19

**create** 40:12,13
137:14

**creating** 98:12

**credentials**
34:9 38:19

**crews** 32:6,7
59:18

**Criteria** 100:25

**cup** 163:4,8

**current** 9:1,4
32:22 63:12
136:1 152:4

**custody** 129:2,
25 131:11,20

**CV** 17:2

**cycle** 23:16

**cycling** 23:15

---

D

**daily** 46:13

**danger** 94:16,19
98:9

**dangerous**
128:2,4,7,8

**darker** 90:3

**data** 81:1 82:8
86:3 146:16,22
147:10,13
150:1 151:2,14
154:20 155:10

**date** 13:1
14:14,15 25:23
28:14,18 32:24
33:1 52:5 53:9
54:10,13,22
55:2,4 106:11,
14 145:14

**dated** 16:1 19:4
49:4 54:10
60:8 67:10
106:7,15,22,
23,25 134:20
137:8

**dates** 130:3
146:14

**day** 48:1 60:8
126:10 127:10
128:9,10
136:22,23
157:23 158:15
160:4

**day's** 87:3

**days** 53:24
124:23,24

**death** 71:7,19

**December** 18:19,
23 19:19

**decide** 100:4
112:8 140:4

**decided** 61:23
71:2 74:7
78:23 79:11
80:7 81:25
84:8 87:12
91:24 101:19

**decides** 124:2

**deciding** 93:16

**decision** 63:21
70:2 73:25
87:21 117:6
137:3

**decisions**
115:21,22
117:24

**declarations**
55:23

**deemed** 139:15,
18 148:23

**defendants** 25:8
54:16 55:12
101:17 102:13
103:3 161:15
162:8,21
163:2,11,21

**Defendants'**
55:11

**defined** 139:25

**definition** 42:8

**degree** 69:20
156:21

**degrees** 66:9,12
67:17 68:1,18,
19 69:16,19,
24,25 70:6,21
72:6 73:17,18

74:1,23,24
75:8,14,19,23
84:3,16 85:3,
15 87:3,15
89:11,18 90:4,
12,24 91:2
92:1,14,16,19
93:11 94:7,12,
13 95:5,7,8,21
96:4,7,20
97:7,25 99:3,
18 100:1,10,15
148:4,5,13,16
149:7,9,18,19
153:8

**Deleca** 55:12

**Depakote** 109:7

**department**
8:22,23 9:6
31:6 34:15
37:5,13,25
71:12 98:19
114:18 143:21

**Departmental**
106:6 143:8

**depends** 96:25

**deposed** 10:2
70:19

**deposition** 7:6
11:4,10 12:17,
23 17:9,14
18:3,9,11,12
20:1,3,5,16,22

**depth** 29:4

**Derouen** 7:14

**described**
104:15 134:6
159:3

**describes** 54:11
64:17 66:8
81:10

**description**
75:5

**deserving** 127:6
129:5 140:21

**designated**
16:13 17:10

**desirable** 82:7

**desk** 144:13

**detail** 57:8
74:21

**determination**
44:18 89:17,
17,24 123:9
155:17

**determine** 81:11
114:7 116:17
131:19 141:11
154:15 155:19

**determined**
66:11 117:8

**determining**
86:4

**detrimental**
153:11,12,22

**develop** 67:15

**developed** 114:4

**developing**
135:17

**development**
16:15

**deviates** 124:13

**devices** 12:12

**diabetes** 135:22
136:13,14,15,
18 137:10,21
138:3,7,19
139:1,15
140:1,2

**diabetic**
136:19,20,24,
25 137:5,23
138:12,13

**diabetics** 137:4

**diagnoses** 47:20
131:22 137:19
158:22 165:1

**diagnosis**
127:23 130:24

**died** 87:2

**dietary** 159:11

**difference**
73:23 100:1
136:24 138:11,
14 157:19

**differences**
107:2

**different** 11:20
13:10 14:6
24:21 32:12
46:10,11,15,21
47:16,17
48:15,16 49:22
52:24 57:3
71:25 77:9
82:13,20,21,
22,25 93:13
106:17 129:10,
23 133:23
160:21

**differently**
51:10 92:17

**difficult**
129:22

**diminish** 83:22

**dinner** 147:21

**direct** 80:5
81:6 83:23
84:1,6,10,18,
24 85:1 94:5,

**directly** 18:16
68:11

**director** 19:22
21:10 34:11,12
120:24 125:14,
19 127:15
128:16 137:2

**directors**
22:21,22,24
28:23 30:18,
20,21,22 31:1,
2,12,17 38:21
116:11 118:7
123:11

**disagree** 49:23

**discretion**
121:25 123:25

**discuss** 33:12
146:19 155:15

**discussed** 19:15
114:19 156:5

**discussing**
30:10 36:6

**discussion**
19:19 27:25
28:4 65:18
118:10

**discussions**
56:25 76:5

**disease** 9:17
133:23 135:21,
22

**distance** 82:15
162:11

**distinct** 108:2

**distinction**
68:20

**diuretics**
107:10

**Divalproex**
109:8

**divert** 125:2

**DOC** 8:21 9:1,4,
11 16:13 20:25
21:2 23:21
24:4 26:11
27:22 31:13
32:3 33:5
34:20 37:22
39:11 51:6
54:21 55:22,25
56:4,7,17
59:12,20,23
60:18,23 61:6,
22 62:6,8,9,
12,17 68:15,24
71:8 72:5
75:21 78:11,23
79:11 80:7
81:25 84:8,13,
17,24 85:1
86:13 87:12,25
89:2,9,15
91:23 92:15
93:14 95:3,16,
18,21 96:3,5,
16 100:5
101:9,11
102:6,9 103:9,
18 105:9
110:14,15,22
111:9,10
112:19 113:6
114:25 129:2
140:3 145:6,
16,21 151:10,
13,14,20
154:11,13
155:3,9,12,18
156:9,14
157:3,15,22
161:25 162:24

163:16

**DOC's** 16:18
51:2 62:5
73:24 75:6
92:21 93:1
99:16 112:2
129:1,15,24,25
131:10,11
161:20 162:13
163:5,24

**doctor** 15:10
112:12 132:22
133:1

**doctors** 110:17
116:13 121:13

**document** 13:14
14:24 15:15,
22,25 16:3,4
28:15,22 29:1,
17,24 33:24
45:19 48:22
49:5,7,11
61:19 68:10
74:10,17 77:7,
8 78:6 92:11
95:19 96:8,13
100:13,16,24
101:3,7,12
102:4,7,11,12,
13,16 103:1,
12,16 106:5
134:23 143:9,
15,17 144:4,7
164:23

**documentation**
34:20

**documents** 25:17
26:1,2,6,8
27:16 28:9
29:11 94:25
103:21 107:15

**doing** 17:23
39:2 42:3

45:14 48:16
113:20,22
118:11 120:11
158:21 160:3,4

**doubt** 137:13

**DPS&C** 29:25
135:11

**draft** 20:18

**drafting** 61:7
71:9

**Drew** 12:3 15:7
17:15,25 20:6
33:11 36:19
43:17 44:17
57:7 68:3
70:7,10,11
85:7 147:14
158:15 161:11

**Drew's** 155:22

**drink** 94:22

**drug** 115:20
116:9

**drugs** 40:8
109:10

**dry** 81:21

**duly** 7:20

**duty** 120:17,24,
25 121:3,21,22
122:1,6,10,12,
17 123:6,14,20
124:1,3,7,11,
15,18 125:1,6,
11,15,20
126:1,4,6,8,19
127:1,2,3,4,6,
12,22,24
128:1,6,17,20,
21 129:5,8
130:2,25
131:13,15,16
132:10,11,13,

15,16 133:7,
11,12,20
134:7,10
136:18 137:6,
11,15,19,20,24
138:19,24
140:22

**E**

**earlier** 14:18
42:9 69:7
88:23 102:25
104:14 112:15
114:20 154:2
156:5 164:24

**easily** 64:23,24

**Eastern** 7:5
73:14 104:8
143:1,4 164:11

**easy** 129:21

**ECF** 49:5

**educate** 30:24

**Education** 161:2

**educational**
143:12 160:17

**effect** 29:6
32:23 41:20
42:15 44:10
46:25 54:12,
14,18 85:1
90:10 91:3
97:6 106:9,12,
13 107:22
117:11 121:24
135:2,3 137:8,
9 138:20 154:2
161:21 162:14,
25 163:17,25

**effective** 54:22
130:3

**effectively**
39:8

**effects** 40:15,
23 48:10 81:20
115:2 117:20
119:18

**Effexor** 45:7

**efficiently**
62:1

**eight** 108:5,8
109:18,24
110:12

**either** 43:6
57:4 59:8
83:20 127:22
153:22

**elaborate** 11:5

**email** 22:25
116:11,12,16
141:7

**emails** 16:24
17:1 23:2
116:13

**employed** 74:6

**employer** 9:1

**employers** 61:3
62:22 86:10
87:7

**encroach** 162:4

**encroaching**
161:18

**end** 15:19 75:20
76:9 90:5
162:12,23
163:4,14,23
165:17

**ends** 15:20
138:15

**enforce** 135:13

**enter** 93:15

**entitle** 138:18

**entitled** 100:25
130:19 143:8

**entitling**
137:15

**environmental**
78:16,17 79:8,
13

**Environments**
101:2

**error** 82:14

**essence** 21:21

**event** 70:22

**everybody** 91:9
98:22 113:19
129:25 136:17
137:9 138:19
139:13

**everyone** 110:20
129:2

**evident** 100:11

**exact** 25:23

**exactly** 92:7
119:5 138:6
148:12 159:7

**EXAMINATION** 8:6

**examined** 7:20

**examples** 136:11
146:10,19
155:7

**exceed** 67:17
68:17,23

**exceeded** 75:23

**exceeding**
75:14,19 95:7,
8

**exceeds** 66:9,12

68:18 152:25

**exception**
122:11

**exchange** 65:20

**exclusion**
130:19 132:4,7
165:1

**exclusions**
131:1,7,21
136:10

**excuse** 76:3
149:14

**exercise** 159:10

**exhaustion**
91:4,16 94:20

**exhaustive** 42:2

**exhibit** 13:15
16:1 19:4
29:21,22 32:20
48:25 49:1
60:3,4 63:9
67:5,6 74:11
76:16,18 77:2,
5,6,25 78:1,2,
5 88:7,9,18,20
89:10 100:21,
22 105:16,19
109:21 118:21
130:14,16
134:17 140:14
142:6,23 143:7
146:9,11

**exhibits** 105:24

**existing** 26:7,
13

**exists** 161:7

**expanded** 43:1
132:5

**expect** 52:12

**experienced** 7:8

81:23

**experiences**
91:9

**expert** 44:19
45:10 55:19
56:2 66:15
75:12 79:18,19
99:15 100:8,14
103:20 104:24
119:19 154:7,
12 156:18,20

**expert's** 89:22

**expertise**
112:21 156:21

**experts** 23:25
24:1,17,22
25:7,15,21,24
28:1 39:9
45:25 55:11
56:3,11,12,19,
20,22,23 59:7,
24 62:14 64:1
70:5 75:9,25
79:1,2 83:11
84:12 86:18,19
95:10,12,16
96:1 100:6,17
102:18,19,20
103:12,21
105:4 154:8,9,
13 155:13,19

**explain** 33:2

**exposed** 94:5
97:10 99:1,4

**exposure** 91:5
101:1 102:1

**external** 23:21

**extreme** 74:5
76:10 90:3,5,
11,23 91:2
92:15,19,24
93:4,11,15,19,

20 98:9,11
145:18,19
153:9

**eye** 148:22

**eyes** 72:16

---

**F**

---

**facilities**
31:12,21
32:11,14 51:6,
9 53:3 110:14,
15 111:9
116:10 129:10,
16,19 141:7
145:6 151:24
154:21 163:7

**facility** 32:3,8
116:16 129:20
131:17,19
135:11

**facility-by-**
**facility** 151:22

**fact** 40:12
41:19 64:2,5
147:20

**factor** 158:4,8

**factors** 78:18,
25 80:16 81:22
83:21

**factual** 27:9

**fading** 105:18

**Fahrenheit**
66:10,12 67:17
68:18,19 75:23
84:3 87:4
90:12 91:2
94:7 96:4,6,18
99:3,19

**fail** 132:8

**fair** 50:18

52:19 59:13
60:21,22,25
65:23 67:19
95:14 98:18,
22,25 99:2
100:5 108:3
109:22 113:18,
22 123:8 124:4
125:21,22
141:25 151:6
158:24

**fairly** 26:10
131:25 148:19,
21 151:4 155:1

**fairness** 59:21

**fall** 47:5 98:8,
10,11 107:22

**falls** 130:23
133:1

**familiar** 9:20,
25 49:10 55:16
74:16 77:7
78:6,8 103:13
104:25 107:25
109:10,11
134:23 139:6
143:9

**familiarity**
103:15,16

**familiarize**
50:5,14

**fantastic** 8:5
9:7 11:12

**far** 21:22 39:19
99:7,8,11,13

**farm** 32:1,9
65:3 84:5
98:16,18
161:17 162:22
163:3,12,23

**February** 7:5

**federal** 62:22
64:16

**feedback** 112:16

**feeding** 160:2

**feel** 22:19,23
51:17 81:18

**fellow** 161:19
162:5

**field** 31:20,23
32:1 64:25
65:7,8 91:18
93:18 95:13
126:11,15,16
132:23 133:3
156:21

**fields** 153:2

**figure** 112:12

**filed** 25:14,19
38:1 106:18

**final** 15:4
69:10

**find** 39:16
41:25 42:1
58:14 70:25
71:4 125:8,9,
10 126:23,24

**fine** 50:2
112:19 122:22

**fine-toothed**
140:10

**finish** 10:11,12

**firm** 49:4 85:8

**first** 7:20 13:7
26:3,8 35:8
36:14,15
37:10,14 39:12
53:15 55:9
58:17 91:22
101:22,24
114:23 115:5

127:7 148:17
149:4 152:4,24
155:21

**fit** 159:11

**five** 73:4 104:1

**five-minute**
35:15

**flag** 49:24
126:23 134:18

**flexible** 64:11,
14

**floor** 51:6,20
112:11

**floors** 51:23

**flow** 92:22 93:2

**Fluphenazine**
108:25

**focus** 127:4

**focused** 127:5

**fog** 82:13

**folks** 132:9
133:2

**follow** 51:6,11
126:6 127:24
157:4,8

**following**
163:18

**follows** 7:21

**foolish** 132:22

**football** 125:10
126:23 128:10

**footnote** 61:1,2
118:20 121:23

**forefront** 31:25

**foremost** 91:23

**forgetting**
29:16

**forgot** 71:17

**form** 57:20,25
65:5 66:24
67:22 68:4
77:9 83:7
85:17 86:16
98:2 103:7
160:9,10 161:7
162:21

**formulary** 29:25
111:2,3,5,7,
10,11,17,21,23
112:3,5,25

**forth** 16:25
28:9 40:21
51:18 57:9
62:22 74:24
78:17

**found** 25:15,24
39:9 57:9,17
58:9,16 71:5,
21 87:4 102:4,
7 117:18

**four** 78:17,25
124:17 125:13
128:15,19,24
136:10 152:3
158:14

**frame** 23:17
53:12,16,17,
22,23 153:13,
23

**frank** 124:16

**free** 51:17
59:14 163:22

**friends** 59:17
159:16

**front** 12:21
13:22 15:9,22,
25 16:6

**full** 111:8

**fully** 96:9

**future** 113:3

---

**G**

**Gary** 9:11

**gate** 31:8

**gave** 68:22
101:17 111:2,4
113:21 128:15

**general** 87:11
146:20

**generally** 20:25
21:5,6 107:21

**getting** 122:7,
12 142:15

**give** 58:24
79:19 88:11
114:16 116:4
120:23 154:9
156:20

**given** 20:14,21
25:17 59:9
66:20 112:10,
11 122:6
127:24 130:24,
25 132:12
133:19 137:5

**giving** 48:19
121:24

**globe** 79:6,13
156:6

**gloves** 163:14

**goal** 98:15,17,
22,24

**God** 37:11

**goes** 22:10
33:21 59:11
64:10 87:1
108:18,22

109:3 116:22
135:19

**going** 8:18
10:4,6,7,8,10
13:12 14:1,2,
3,19 16:25
19:10 20:8
28:10 29:13,20
32:10,16 35:24
36:2 45:22
46:8 47:11
49:14 50:17
54:12 60:3,10
66:19 67:4,11
69:6 72:2
73:9,13 76:15,
17 83:21
86:17,18 100:4
104:4,7
107:22,23
108:4 110:6
112:24 113:2,6
124:16 130:10
131:23 132:13
133:19 134:4,6
137:2 142:5,
21,25 143:3
145:16 146:10,
19 147:18
153:23 154:9,
10 155:18
156:17 157:1,3
164:6,10,19
165:16

**good** 7:25 8:8
34:16,17 48:9,
13 49:21 53:22
54:6 56:5 70:9
110:11 112:11,
12 113:11,13
134:7 138:13
141:4 156:23

**gotcha** 58:4
73:1

**grant** 122:1
123:25 133:10

**granted** 124:7,
10 129:8 130:2
131:13

**gray** 90:8

**Great** 9:3 36:5
165:9

**greater** 133:6
159:23

**ground** 10:5

**group** 17:18,20
22:25 23:1
32:16

**guess** 46:24
91:22 107:20
162:6

**guessing** 55:6

**guidance** 77:17
78:9,11,15
79:12,24 80:2
81:9 83:14
86:12 87:1,16,
25 93:7 94:8
101:12 103:18
105:11 156:5
157:4,8

**guideline**
118:23 119:6,
11 121:6

**guidelines** 17:7

**guy** 70:7 113:12
123:5 132:22
157:10

**guy's** 127:22

**guys** 28:11
35:10 59:13
64:22 70:14
95:11 119:10
133:20 158:1

159:8

---

### H

**hand** 51:17

**handle** 31:8

**haphazardly**
118:14

**happen** 87:5
126:18 127:12

**happened** 128:13
151:19

**happening** 106:4
151:21

**hard** 15:4 80:12
164:17

**harm** 93:17
153:25

**hats** 163:13

**hay** 160:2

**hazard** 86:11

**HCP** 158:6

**HCP8** 12:22,25
13:12 14:19
16:1,6,9,15
19:3 24:4,10
25:13 26:4,9
27:3 28:7
31:22 32:2,23
39:3 49:20
50:4,19 51:1,
11,14,15,16,
20,23 52:2
54:1,11,23
55:10,13,24
61:24 62:12
63:11,15
68:11,12,18
69:10,14,17
74:24 78:13
79:11 81:11

86:14 87:13
88:1 95:21,25
96:17 98:15,17
99:9 100:12,16
101:10 102:5
103:10,19
106:6 120:2,5
122:7 130:19
134:19 135:2,6
136:2 137:7
138:20 140:3
143:8,25
144:3,8,20
151:11 155:11,
25 156:15
157:16 160:7,
13,20 161:2,
21,24 162:14,
25 163:17,20,
25 164:16,17

**HCP8's** 61:7
144:15

**HCP8-A** 160:9

**he'll** 156:23
157:12

**head** 10:15
21:20 27:5
160:1

**header** 50:4

**headers** 90:7

**heading** 55:9

**headquarters**
21:25 22:4

**headquarters-
generated** 21:23

**health** 9:16,19
16:23 20:25
21:2,19,22
22:5,6,8,9
23:3,6,23
24:19 25:16
26:15 34:11

51:2 101:25
108:19 118:25
119:22 127:21
158:5

**hear** 7:23 8:1

**heard** 37:8

**heat** 31:24 37:6
38:2,3,8 39:5
40:12,13 47:1
51:2,7,24 52:1
53:24 54:1
59:14 66:9,11
67:16 69:10,
11,14,18,22,24
70:3,21,22
71:6,10,18
72:8,10 73:16,
20,25 74:2,4,
22,23 75:6,7,
13,18,22 78:9,
16,17,18,19,24
79:8,13 80:7,
15 81:10,12,
14,15,19,20,
23,25 82:2,3,
6,12,14,15
83:22,25 84:2,
8,15,16,17
85:2,20,24
86:2,4,7,8,9,
10,13,20 87:2,
3,5,8,10,13,14
89:12,17,18
90:8 91:4,15,
16,25 92:16,22
93:2,16,22,25
94:4,6,12,19,
20 95:4,5,7,20
96:6,7,18
97:1,11,23
99:2,10,19
100:6,9,10,15
101:1,20 102:1
103:5,19
104:19,22,23

105:3 106:8,17
111:20 112:1
120:4,10,13,
16,23,25
121:3,22
122:1,6,9,12,
17 123:6,14,20
124:1,3,7,11,
15 125:1,8
126:1,4,7,8,9
127:2,4,6,12
128:1,6,20,21
129:5,8 130:2,
25 131:13,15,
16 132:10,13,
14,16 133:7,
12,19 134:11
135:13,14,16,
18,23 136:18
137:6,10,15,
20,23 138:4,8,
19,23 139:3,6
140:21 144:16,
21 145:5,17,
20,22 146:1,4,
13 148:3,4,7,
11,15,25
149:4,17,19
150:8,19 151:4
152:5,23,25
153:7,8,17
154:5,7,16
155:1,7 158:22
160:25 161:2

**heat-related**
67:15 80:16
87:5,8 135:8
141:23 143:14
158:8 159:23

**heatstroke**
91:4,15,17

**heavily**  56:19
105:4

**heck**  104:21

**heightened**
132:17

**held**  7:10 89:6

**help**  113:8

**helpful**  16:7
107:19

**helping**  105:24

**Hey**  73:4 142:8

**high**  70:8 74:2
146:20

**higher**  68:24
84:17 134:10
135:17,23
138:4,8 139:2,
4

**highest**  156:21

**highly**  25:25

**hired**  25:8
103:21 154:8
156:20

**hiring**  24:17

**history**  133:14

**hit**  148:13

**hitch**  113:21

**hobby**  133:17

**hog**  160:3

**hold**  13:25
29:10 112:16
154:10

**holding**  85:8

**holidays**  19:1,7

**hometown**  159:16

**honest**  28:21
44:16 52:14
53:16 76:11
96:24 117:15

**honestly**  11:14

**honor**  127:23

**hope**  16:19
147:24

**hospital**  48:3

**hot**  43:23 52:9,
16,18,23,24
53:1,2,10
81:17 101:1
126:15 146:5,6

**hotter**  52:10,11
84:1,20,21

**hour**  80:20
153:18

**hours**  45:14
80:22,24
144:22 145:3,9
148:4 149:18
152:24 154:15
155:2,4 158:14

**Houston**  52:15

**huh-uh**  10:15

**humidity**  78:19
81:17,22 82:14

**hundreds**  57:22

**Hunt**  34:13,14
118:6

**hypertensive**
107:11

**hypothetical**
114:22 127:5
128:12

---

**I**

**ice**  162:12,16

**idea**  29:15
54:16 56:5
128:5 162:24
163:1,16

**identified**
131:2,5

**identify**  102:14
135:12

**ignore**  81:22
83:8

**ignored**  83:5

**illness**  87:5,8
141:24 143:14
159:24

**illnesses**
135:8,20
136:7,11 139:2

**impact**  29:2,3
84:10

**impacted**  107:14

**impacts**  45:18
46:3

**impair**  119:17

**implement**
60:18,19 75:22
129:16 140:23

**implemented**
55:13 62:12
115:23

**implementing**
62:25

**implements**
58:18 63:11

**implicate**
134:11

**implicated**
39:10

**implicates**  47:1

**important**  80:15
115:2 151:7
158:3,8

**impression**  35:8
37:14 39:12

**inaccuracies**
  56:14,16 57:10

**inaccuracy**
  49:16

**inappropriate**
  122:19

**incarcerated**
  161:16 162:2

**include** 115:3
  140:23 157:16
  161:25 162:24
  163:16

**included** 109:24
  117:12 136:12

**includes** 138:3
  139:14

**including** 10:3
  16:15 47:8
  75:1 83:23
  161:21 162:14
  163:6,25

**inclusion** 41:12
  42:25 43:7
  46:20

**inclusive**
  134:14

**increase** 84:2
  96:3,6,18
  97:1,11,14
  99:18 101:20
  145:22

**increased** 94:6,
  13 97:12 99:3
  135:16 158:12

**increases** 82:15

**increasing**
  74:22 75:6

**incredibly** 53:2
  57:21

**indeed** 132:1

**independent**
  40:7 104:16

**index** 53:24
  54:1 66:9,12
  67:16 69:10,
  14,18,24 70:3,
  21 72:8,10
  73:17,20,25
  74:4,22 75:6,
  13,18,22 80:15
  81:10,14,19
  82:2,6 83:22,
  25 84:2,15,17
  85:2,20,25
  86:2,7,8,10,
  13,20 87:3,6,
  8,13 89:12,17
  90:8 91:25
  94:4,6,12
  95:4,7,20
  96:6,18 97:2,
  11,24 99:2,19
  100:6,9 104:19
  105:3 125:8
  126:9 144:16,
  21 145:5,22
  146:1,13
  148:4,5,7,11,
  15 149:4,17,19
  150:8,19 151:4
  152:23,25
  153:8,17 154:6
  155:7

**indexes** 104:23
  155:1

**indication**
  72:17 83:18,20

**individual** 51:9
  132:19 159:12

**individually**
  45:6

**individuals**
  153:25

**indoor** 14:8

**indoors** 14:9
  152:9,13,17

**inertia** 53:19

**influence** 81:23

**inform** 108:4

**information**
  17:2 27:15
  56:13,15,18,20
  57:16,23 58:9,
  12 87:18,23
  88:25 89:3,10,
  16 90:18 91:23
  92:2,3,5,13
  94:2 95:12,22
  127:20 160:14

**informed** 22:13,
  24

**inhibit** 42:21

**inhibitors** 43:3

**initially** 36:12

**initiate** 23:10

**initiated** 24:14
  25:10,12
  26:11,15 27:21
  44:21

**initiates** 23:5

**injunction**
  67:11

**inmate** 65:9
  159:14 161:2

**inmates** 63:16
  64:24 126:21
  134:2 161:19
  162:5,10

**input** 17:22
  21:21

**inquiry** 43:22
  45:25

**insignificant**
  100:2

**insinuate** 97:16

**insinuating**
  97:19

**instance** 127:7

**Institute** 9:15
  101:25

**institutional**
  53:19

**instructions**
  20:15

**instrument**
  80:3,6,11

**instrumental**
  38:22

**insulin** 136:25

**intend** 147:25

**intended** 74:1
  118:23 121:7
  165:3

**intending**
  165:6,7

**intensive**
  47:23,24

**interactions**
  36:7

**Interrogatories**
  74:14

**interrogatory**
  74:20 88:22
  95:18 101:9,
  16,17 102:14,
  23

**interrupt** 23:14

**intervals**
  155:25

**investigation**

139:8

**involved** 21:15
23:22 24:22
70:2 112:18

**involvement**
28:1 65:2

**issue** 89:13,18
92:1,23 93:3,
16,23 120:16
154:16

**issued** 86:4
93:25 104:20

**IV** 77:6 78:5

---

**J**

**Jackson** 49:4
60:9

**James** 7:8

**Janet** 13:19
14:22 29:9,19
48:24 50:1,10,
23 60:2 72:21
74:20 76:14
105:23 118:18
160:20

**Jason** 7:11

**Jeremy** 8:9 15:3
28:20 35:14
38:20 44:15
56:11 73:4
84:13 89:14
97:9 132:20
138:12 142:8
146:25 154:7

**job** 59:16

**jobs** 134:4

**jog** 30:7

**Jonathan** 17:17,
25 20:6 27:5
113:13

**judge** 49:4 60:8
62:15,16,17

**judgment** 118:24
121:7,17

**July** 67:10
146:23 148:3,
10

**jump** 70:15

**justify** 117:12

---

**K**

**keep** 14:1,3
23:15 70:10
74:1 95:9
96:21 104:24
153:24

**Keldie** 18:1,2,
5,6,7,14,15,18
19:17 25:6,18
26:13,20
27:12,14,23
33:3 34:19
36:7,23,24
43:7 55:12
56:9 57:4,14,
18 58:10,22,23
59:2,5 62:1,5,
8,11 63:22
66:15 72:18
75:1,21 76:11
78:12 79:14,16
85:8,10,14
86:2,22 87:17
88:12,14 96:9
99:6 100:24
101:14 102:21
103:23 104:10
105:7 106:3
131:3,5,7
156:7,14 157:9

**Keldie's** 77:5
78:5

**Keogh** 49:3

**Keri** 21:11

**kind** 10:16
20:14 23:10
30:25 31:9
73:19 91:11
110:2 117:11,
17 164:14

**knee** 126:22

**knew** 71:13
105:2 115:1

**know** 10:2,18
11:6,18 13:9
16:22 17:2,6,
18,24 18:24
20:3 21:21
22:18 24:15,
22,25 25:14,
19,21,24,25
26:14 27:14,18
28:14 29:2
30:23 31:7,9
32:1,16 33:8,
10 35:9,19
36:25 37:1,6,
24 38:24 39:16
40:13 41:2,23
42:8 43:10,13,
17,23 44:3,15
45:1,21 46:11,
12,23 47:24
50:7 51:16
52:8 53:1,18
54:21 55:19
56:13 57:7
62:15 64:1
65:1 66:16,18
68:20 70:7,11,
14,16,20 71:13
72:8,15 75:24
77:10 80:13,18
81:1,4,6 82:24
83:9,15,16
84:12,20 86:2

87:17 90:1
91:11,14 96:12
100:3 101:11
102:8,9,12
104:10,21,22
106:14 107:3,
5,8,13,16
108:8 109:23
110:2,9,18,24,
25 111:1,2
113:2,14,19
114:11,18
116:3,25
117:7,17,25
118:1,14
119:16 121:19
125:13 126:14,
17 129:11
130:4 132:21
133:22 134:2,5
137:1 143:18
144:24 146:21
149:22 151:12
153:12,24
154:19,22,23
157:18 158:2,
4,11,15,19,20
159:3,13,15
160:2,3,13
161:6,22
162:6,19
163:9,19 164:1

**knowledge** 34:17

**known** 34:1

---

**L**

**LA** 29:25

**labor** 62:21

**laborers** 162:22

**laboring** 67:16
94:11 99:19
163:23

lace-up  163:12

lack  103:16

language  50:15
21:23

large  37:12

largest  32:13,
14,15 129:18

late  18:19,23

latest  25:11,12
26:4,9

Lavespere  7:7,
19 8:8 13:20
15:15 29:24
32:22 36:5
49:8 58:6
65:20 68:5
72:24 73:16
74:16 84:4
87:24 88:16,17
104:11,13
106:3,5 130:18
140:17 143:6
160:22 161:14
164:13

law  105:23

lawsuit  24:16,
17,22 38:1

lead  46:20

leadership
17:18,20

learn  94:3

leave  137:2

leaving  67:22,
23

Leblanc  7:9

left  44:8 99:8,
12,13 127:21
163:10

leg  126:22

legal  7:13,14
21:13 22:10
33:18,20,21
54:25 55:1
71:14 114:19
115:16 117:4,6
155:16

lend  59:12

Leslie  21:11
23:8

letter  49:3,11,
15,18 54:9
63:8 69:4
77:17 102:24

letters  79:5

level  21:25
22:4 59:21
72:6 90:2
116:24 119:17
126:21 145:17
146:20

levels  133:23
136:19

Levin  7:12

lift  157:23

lifting  125:11

light  86:12
90:1 147:20

limit  53:8
157:16

limitations
82:2 85:24

limited  41:6

limits  125:24

line  32:9 47:12
65:3 66:4 84:5
98:16,18
126:11 128:7
140:4 146:18
161:17 162:22

163:3,12,23

lines  31:21,23
32:1

link  75:2,3
77:14,21

linked  78:4
101:8

links  105:5

list  36:9,21,22
37:3,6,11,21
38:3,7,9,12,
13,17 39:7,9
40:2,3,5 41:12
43:1,11,20
44:1,2,8,19
45:6,11,16,18
46:1,2,6,12,
13,20,25 47:9,
19 48:21 75:16
104:14,25
106:9,18
107:8,9,13,16
109:13,15,16,
17,20 110:7,8,
11,19,24
111:1,6,8,11,
20 112:1,14,
17,18 113:18,
21,25 114:4,9,
24 115:11
116:12 117:9,
12,15 122:2,4,
5,9 130:19,21,
22 131:1
132:5,7,21,25
134:8 136:10
139:14 140:18
141:8 165:1

listed  67:14
114:24 119:21
122:16,25
127:8 129:3
131:6,12,20
133:5,9 134:12

136:11 138:3
140:18,19
143:7 147:14
152:5,8,12,23,
24 153:1,20
154:6 160:12
161:8

lists  38:22,23
69:8 83:21
114:2

literature  41:2

litigation  25:7

little  11:19
13:24 14:1,5,6
24:21 36:14
46:15 50:11
51:10 72:25
77:9 90:6
102:22 103:25
112:16 142:14

living  159:15

local  82:7,14
87:10

located  162:9

location  30:1
80:4,10

locations  94:5

locked  159:8

logbook  145:7

long  10:19
53:11 118:8
162:11

long-sleeved
163:14

longer  69:25
142:21

look  33:8 35:10
41:18 42:23
44:13,16,23
49:21 53:20

56:4 61:14
66:7 70:14
74:3 78:15
79:21,24 92:18
99:13,22
101:22 105:15
113:9,15 115:6
116:2 118:2,4,
6 119:10
121:21 125:15
127:16 128:16
133:14 138:15
146:21 155:13,
23 156:3,4,8,
10,11,14
157:25 158:1
159:12 160:8,
25 161:4
164:19

**looked** 19:3
35:6,7 41:7,
13,17 43:2,3
45:8,13,14
56:13,17,18,19
84:13 94:9
101:15 102:25
107:9 111:1
119:8 154:2,
18,19,22
157:13 164:23

**looking** 39:17
51:17 53:10
54:9 76:8
92:9,14 94:2
99:7,8,11
101:16 109:12
112:1 121:24
138:18 147:1
151:2 158:22
160:21

**lookout** 139:7

**looks** 75:2

**lot** 16:4,24
29:2 31:17

33:10 42:2
45:17 56:14
57:9 64:21
73:22 99:25
104:21 110:3,
25 126:13
129:22 132:15
133:14 134:14
154:10

**Louisiana** 8:23
9:6,9 12:1
52:11 53:22

**low** 72:8,9 76:9
90:5

**lower** 87:5

**lowest** 74:5

**loxapine** 108:14

**LSP** 9:8 60:18
67:15 150:18

**Lurasidone**
109:7

---

**M**

---

**M.D.** 121:13

**made** 19:6 20:4
22:7 24:24
33:3 34:22
36:8 44:1,15,
18 45:24
58:21,23,25
59:2 64:1,23
65:24 71:24
77:19 83:9
87:21 114:18
117:14 144:6,
10 146:25

**magistrate**
19:11,13

**main** 50:18

**maintain** 47:25

132:17

**maintained**
159:9

**majority** 37:12
53:23

**make** 8:19
13:11,20 14:3
15:24 33:8,13
39:4 41:7
45:9,15 63:21
103:22 108:11
109:20 110:19
114:13 115:2,
4,21 116:15
117:24 118:9
126:13 137:3
138:11 148:24
155:16 163:22

**makes** 91:8
125:24

**making** 19:2
38:23 70:2
86:24 89:11,
16,24 101:12
111:19 138:8

**mandate** 53:5,7

**mandated** 60:23
64:9 69:25

**March** 52:23

**mark** 29:20
68:15

**marked** 13:15
29:22 49:1
60:4 67:6
74:11 77:2
78:2 88:9
100:22 105:16
130:16 134:17
142:23 146:11

**market** 111:14

**master** 147:7

**material** 58:15
102:19,20
143:12 155:12
160:17

**materials** 12:21
27:11 56:8
58:13

**matter** 7:7

**max** 153:18

**maximum** 87:3
98:3

**Mayflower** 11:25

**mean** 8:23 9:9,
12,17,18,21
23:14 24:16
31:19 32:5
41:9 42:2,19
47:14 54:24
58:16 63:14
64:22 72:10
73:19,21 83:10
99:7 100:7
110:6 112:11
113:20,21
119:4,25 121:5
127:19 132:20,
23 134:13
139:19 141:18
144:1 146:4
153:12 157:21
158:13 162:15
165:1

**meaning** 97:23

**means** 63:15
119:5

**meant** 118:23

**measure** 79:7,13
80:15 81:15
83:24 86:9

**measured** 81:15
97:24

**measurement**
81:11 83:2
85:25 148:12

**measuring** 80:9
82:3

**mechanism**
135:12

**median** 70:16

**medical** 9:5
17:24 19:22
22:20,22,24
28:23 30:18,
20,21,22,25
31:11,16 34:7,
9,16 36:9
38:21,25 41:3
112:12,19
115:20,22
116:11 118:7
120:24 123:11
125:14,19
127:15 128:16
130:19 131:1,
7,12,21 132:4,
7,19 133:4
136:10 137:2
138:2 140:12
143:14,20
148:23 149:14
158:4 163:22

**medically** 151:8

**medication**
28:15,25 36:9
37:6 41:14,17,
19 43:1 46:6,
21 69:8 75:15
104:14,25
106:8,18
111:20,23
112:1 114:23
115:7 116:17
117:5,11
121:16 122:2,
5,8,16,21,23,

24 123:1,8,13,
15,24 124:14,
19,23 125:1,2,
4,24 127:23
129:4 140:18
153:20 154:5
164:25

**medication's**
46:19

**medications**
36:15,17,21
37:12,16,21
38:4,7 39:4,
11,18 40:11,
18,23 41:11,
12,21,23 42:1,
7,13,24 46:25
47:8,19,21
48:11 59:1
104:22 108:6,8
109:14,19,24
110:10,12,21,
25 111:8,14,
15,16 112:22
113:5,10
114:3,8
119:16,21
120:8,18 121:3
123:17 124:6
127:8 128:22
129:3 130:1
135:16 148:24
152:7 153:1,6
158:23

**medicine** 45:19
46:4,5,14
47:11,15 48:7
116:1,2 119:24
120:12 121:19
124:25 132:22

**medicines** 35:8
45:6 46:16,17,
18 48:5 107:12
108:20 110:1,
3,16,18 112:4,

5,6 120:21

**meeting** 19:12
26:18 28:13
29:12,25 30:4,
9,18,21,22,25
31:1,5,11 57:7
85:18 115:12,
24

**meetings** 17:18
18:5,6 22:16
26:17 27:5
28:20 29:16
57:1

**mellitus** 135:22

**members** 22:20

**memory** 30:7,8

**men** 84:5 163:3,
12,23

**mental** 34:11
108:19

**mention** 75:16

**mentioned** 19:21
26:21 34:3,18,
19 42:9 45:2
88:3 109:14
159:2

**messed** 147:24

**met** 28:18

**meteorological**
82:8

**method** 82:2

**metric** 67:20

**MI** 133:14,16,
18,24

**middle** 126:10
127:10 128:9,
10

**midlevel** 118:25
121:10,25

**mild** 133:18
134:3

**miles** 157:23

**mind** 14:22
72:25 96:11

**mine** 14:10,15
15:1 59:17

**mine's** 106:15

**minute** 48:22
50:5 69:9
147:15 164:4

**minutes** 30:3,16
58:19,24
59:10,15,19
60:19,20 73:4
104:2 142:12,
16,18 162:17

**MIS** 133:15

**missing** 112:22
136:5

**misspeaking**
96:22

**misspoke** 63:2

**mistake** 88:15

**modification**
26:4 27:3
63:10 64:17
66:8,21

**modifications**
16:14 19:14
23:3 24:2
26:12 28:6,8
33:4,13,14
34:23 49:20,22
50:5 54:17
55:10,23 57:5
61:7 77:19
101:13 144:6,
10,11

**modified** 16:9

24:4 29:6 32:2
59:4 67:25
69:17 78:13
151:11

**modify** 61:23
155:3,24
156:15

**modifying** 54:1
88:1 98:15,17
99:9 101:10
103:10 114:9
140:3 157:16

**moment** 73:2
112:16

**monitor** 79:7
87:7 144:16,21
154:14 155:3

**monitored**
145:1,6 149:24
150:2,18

**monitoring**
131:25 145:13,
23 149:6
151:11,21
155:15,20
156:1

**monitors** 155:10

**month** 124:24

**morbid** 135:21

**morning** 129:13
143:19

**motivating**
135:7

**move** 100:20

**movement** 78:20

**multiple** 65:14
82:13 136:19

**muscle** 40:4
107:12 110:5

---

### N

**N-I-O-S-H** 9:14

**name** 7:11 8:8
45:9 71:18
108:18 109:25
141:3

**named** 109:19
110:13

**narrative** 57:8

**Natalie** 55:3

**national** 9:12,
15 72:12,13,19
74:4 75:3 76:8
77:18 80:18,
19,25 87:9
88:3,21 89:2
91:20,24 93:8,
21 94:21
101:24 105:12
144:17,21
145:2,10
146:16 150:3
151:17,25
154:14,20
155:10 156:1

**Navane** 109:4,5

**nearby** 12:13

**necessarily**
46:22 127:2
138:11

**need** 10:14,16,
24 12:18 14:19
22:17,24
23:16,17 41:25
43:10,19 44:7,
18 46:1 65:11
70:11 98:20
112:13,23
113:5,15,17
115:10,17
116:2,3,4

117:4 121:18
123:13 124:25
125:3 132:14
142:15,18

**needed** 43:5
44:2 112:7,9
141:12,16,20,
23 159:17

**needs** 46:6
115:22,23
119:8 121:19
129:16

**negligible**
139:16,18

**never** 18:15
26:18 37:8,23,
25 38:1,13,16
44:1 49:12,13
53:13 91:16
95:2 102:11,16
117:14 127:14
132:7 160:4

**newer** 110:3,16
112:4,5 113:5

**newly** 144:3

**NIOSH** 9:14
61:2,7,10,13,
20,22 62:4,7,
23 63:1,5
101:2 102:1

**nods** 10:15

**non-compliant**
124:22

**non-dihydropyridine**
39:25

**normal** 24:18,25

**Norvasc** 40:1,2

**noted** 7:16
63:10

**notes** 12:20

**noticed** 55:1

**notified** 22:17,
18

**November** 106:7,
11,16 107:7

**number** 13:16
15:7,17 37:16
39:10 48:1
49:5 67:14
71:5,17,20
74:5,21 76:23
101:18 112:22
124:20,21
125:2,5 134:21
139:13

**numbers** 93:10
95:13,16
97:18,21

**nurse** 34:10

**nurses** 21:10

**nursing** 34:11,
12

**NWS** 9:12

---

### O

**oath** 10:7,9

**obesity** 135:21

**Object** 57:20
65:5 66:24
67:22 85:17
86:16 98:2
103:7

**objecting** 68:4

**objection** 57:25
83:7

**observation**
82:8

**observed** 90:3,4

**obviously** 49:15
141:22

**occasion** 111:13

**Occupational**
9:16,19 101:1,
25

**occur** 112:2
145:22 146:1
151:5 155:8,20

**occurs** 70:4

**October** 16:2,10
17:12,23 18:4
19:4 24:7
28:17 30:1
32:24 49:5
52:3 53:11
54:10,12,22
69:3,13 77:16
102:24 106:19,
20,22,25 107:6
130:4,6 132:5
135:3 136:2
145:11

**offenders**
135:12,14,15,
20

**offer** 132:11

**offered** 56:24

**offers** 47:6

**office** 11:23
12:2

**officer** 9:5
38:25 115:20
141:14

**official** 16:13
41:22,24
42:10,11

**okay** 9:1,7
10:21 11:2,12,

24 12:12,19,25
14:4,17 15:19
17:4,8 18:20
19:21 20:12,14
22:7 23:21
27:20 34:18
36:16,20 37:2
43:16 47:18,20
49:10 50:8,11,
22 51:9,13
52:1 56:13
60:12,25 64:7
66:7 69:2,13
72:2 73:1
75:11 77:4,15,
21 78:23 79:4
81:14 83:5
88:13 89:9
91:1 92:8
94:1,11,15
95:3 98:5
99:22 108:15,
19,24 109:2,9
118:13 123:2,
5,16 124:20,22
125:3 128:11
129:7 132:8
133:14,16
141:17,21
142:2 144:12,
14 145:9
150:5,23 160:7
161:10 164:3
165:9

**older** 110:17

**omitted** 162:6

**once** 21:5,6
33:15,17,21,25
34:1 56:2,11
75:22 80:22,24
93:3 104:12
146:5 154:14
155:4

**one** 8:9 13:3,
10,22 14:20

15:6 27:4
29:16,17 35:14
40:4,25 41:14
43:4,15 44:25
45:5 46:24
47:21 52:11
53:15 59:12
62:2,11 63:11
67:13 69:2
72:21 76:1,14,
21,25 88:6,11,
18 92:10
100:19 101:19
107:12,25
108:13,25
110:22 112:16
113:12 119:21
120:7,17 121:2
122:14 124:5,
20 125:23
127:7 128:22
129:2,15,25
130:23 131:11,
20,22 134:25
136:13 137:8
139:13 141:21
144:14 148:17
153:6 159:3,4
164:13

**ones** 29:2 62:3
109:16,19

**ongoing** 28:4
31:6

**online** 41:21

**OPC** 42:7,10,14
113:10

**open** 77:24

**operating** 37:22

**operations**
33:17 34:4,5,
6,13,15

**opinion** 56:21
62:10 72:9

119:7 157:18
159:22

**opinions** 56:24
57:1,5 154:9,
10

**opportune**
153:11

**opportunity**
11:7 54:6

**opt** 123:21
124:20 133:21
134:5

**option** 68:23

**options** 46:22,
23

**opts** 122:13

**order** 41:7
60:6,11,15,16
62:19 64:6,16,
22 66:22 67:8,
12 68:1,12,14,
17,22 85:6
154:15 161:14
162:7,20

**ordered** 60:18
61:11 62:16,17
64:19 66:15,
17,20 161:15
162:8,20
163:2,11,21

**ordering** 67:14

**orders** 60:11
64:15

**OSHA** 9:18
77:14,17 78:4,
11,17 79:4,6,
12,24 80:2
81:9 83:1,4,
14,21 86:8
87:4,16,25
94:9 105:12

156:4,15,19
157:4

**OSHA's**  78:8
87:1

**out-of-control**
137:22 138:12

**outdated**  110:2,
13

**outdoor**  14:7
87:2

**outdoors**  67:16
74:2 163:7

**outlined**
139:23,24

**outlining**  49:19

**outset**  20:8

**outside**  23:25
24:18 25:1,4
32:6 54:4 61:4
85:3 99:1
145:1,13

**overdoses**  31:8

**oversees**  21:10

**overview**  50:18

**overwhelming**
53:23

_____

P

**P&t**  21:15,20
22:12,16,19
23:2 26:18
27:2,4,6,8,15,
16 28:9,13,18,
22 29:12 30:4,
11,15,20
111:16 114:12
115:12,15,24
116:6

**p.m.**  7:4 14:10,

11 35:24 36:3
73:10,14
104:4,8 142:25
143:4 164:7,11
165:16,17

**packing**  41:22,
24 42:4,10,11

**page**  8:20 13:25
15:20 50:2,22
60:14 67:13,14
77:22 78:4
88:21 101:22
103:1,2,3,9
118:21 160:8,
13

**pages**  57:23
164:15

**paid**  79:2,18
83:12 95:11

**pain**  126:22

**paper**  89:6

**papers**  12:20

**paragraph**  55:9
81:9 82:6 94:1
134:18 135:6,
10 136:3,4
138:1 144:25
164:19

**parents**  52:15

**part**  27:11
30:15 92:4
105:3

**participating**
12:6

**particular**
24:17 131:24
141:12 146:18

**passed**  38:24
92:23 93:3

**past**  107:22

**pathology**  31:25
38:3 47:1
51:3,7 71:10
78:24 80:8
82:1 84:9
106:8,17
111:20 112:1
120:4,10
134:12 135:14,
18,23 138:5,9
139:3,6 154:8
158:22 160:25
161:2

**patient**  122:12
124:1 139:8

**patients**  48:1

**Paul**  19:24

**pause**  48:19

**Paxil**  43:14
45:2,7,11

**pay**  117:23

**Payne**  20:10

**peer-reviewed**
117:18

**pending**  10:20
116:6

**Penitentiary**
9:10

**people**  17:22
26:14,22 47:5
65:3 71:12,14
74:1 91:13
94:3 95:6
98:16,18 99:1,
4 129:19
131:20 133:15,
24 135:8
136:22 137:18,
21 141:23
148:22 151:8
152:7,11
157:21 163:7

**percent**  18:25
39:21 40:17
84:19 136:20
152:18,20

**perfect**  9:23
11:17 12:19
13:5 28:24
50:12

**performed**  80:17
84:5

**period**  145:23
146:2,3 148:7
151:5 152:24
155:8,9

**periodic**  21:8
23:5 24:9 39:2

**periods**  74:2

**Perphenazine**
108:16

**person**  30:13,23
31:4 39:5
65:24 94:11
112:23 119:20
120:7,14,17
121:19 122:1,
15 123:17,19,
23 124:1,5,6,
13,15 125:23
127:6 128:6,20
131:11 133:10
138:4,8 153:5,
19 154:4
161:16 162:2

**person's**  126:4

**personal**  157:18
161:18 162:4

**personally**
22:19 115:8

**persons**  99:19
129:7 153:1

**perspective**

32:10

**pertinent** 31:10

**Pharm.d.** 37:18, 19,20 38:18 113:12 118:5 121:12

**pharmacist** 37:17 113:13 118:6

**pharmacists** 22:20 113:11

**pharmacy** 42:6 129:21

**phone** 12:13,14

**physical** 91:5

**physician** 41:16 118:24 121:8, 25

**physicians** 47:15

**physiologic** 157:20

**physiological** 159:5,6,7

**physiologically** 157:24 159:19, 20

**pick** 46:21 92:15

**picked** 92:4 150:16

**picture** 53:21

**piece** 89:6

**place** 46:18 52:24 61:12 63:3 80:9 117:9 159:17

**plaintiffs** 8:10

**Plaintiffs'** 13:15 16:1 19:4 29:20 48:25 60:3 63:9 67:4 74:11,13 77:5 78:1 88:7,18, 20 89:10 100:20 105:16, 19 118:21 134:17 142:6 143:7 146:9

**plan** 111:19,25 112:11

**planning** 115:6

**play** 26:19 44:6 53:12 62:18 113:3 133:17

**played** 126:3

**playing** 125:9, 10 126:12,16, 23,24 127:9 128:3,8,9

**plays** 158:14

**please** 7:18 9:25 10:10,25 11:5

**point** 10:17 11:3 22:12 43:4 49:15 58:17 66:1 91:3 100:14 103:17 149:23

**pointed** 56:15 96:14 112:21

**policies** 20:25 21:1,2,12,19, 22,23,24 22:3, 5,6 23:12,16, 23 24:1,23 25:16 26:7,15 50:16 52:24

**policy** 13:11,21 16:23 21:9 22:1,7 23:3,6, 19 24:19 26:13,19,23,25 27:9 29:5,6 31:7 33:5,14, 22 34:2 35:1,3 47:2,6 51:2,5 53:5 54:7 67:15 69:25 71:12 114:17 115:4,16 118:22 121:1,2 135:10,11 138:22 139:16, 18 140:4,8 149:8,10,11,12 152:4 155:14 161:24,25 162:1

**popular** 110:9

**portion** 92:8

**position** 9:4 92:21 93:1,9 129:1,15,24 131:10

**possibility** 107:24 108:2 127:16,17

**possible** 27:17 91:5 155:24

**potential** 21:3 26:16 27:3 28:6 34:23 42:25 43:7 82:14 84:9 124:18 138:7, 10

**potentially** 91:14 128:16 156:15

**power** 140:23

**practice** 31:10 45:19 46:4,5, 14 47:11,15 48:7

**practices** 63:12

**practitioners** 46:4

**precaution** 37:6 38:2,3 120:23, 25 121:22 122:10 123:6, 14 125:1 126:8 127:2 130:25 131:15,16 132:11,13,15, 16 133:12,20 136:18 137:6, 11,20,24 138:24

**precautions** 51:24 52:2

**preferred** 110:17

**preliminary** 67:11

**preparation** 17:13

**prepare** 16:21

**prepared** 16:17 94:23

**prescribe** 121:15

**prescribed** 122:21,24 123:1,17,24 124:6,9,12 127:9 128:23 129:2,4 130:1

**prescription** 123:19

present 18:17
143:19

presented 37:10

presenting
139:9

presents 131:11
137:10

presumably 19:6
31:16

pretty 17:7
37:7,11 41:25
50:16 58:12,
15,16 59:1,3
72:8,9 85:8
96:13 97:4
110:8,24
112:11 134:14
146:5 148:17
157:9

previous 72:5
109:15

previously
13:14 54:13
69:23 71:8
74:11 89:1
105:15 134:17

prior 11:4
20:20 26:12
27:22 43:24
65:1 106:21,24
112:17 114:2
132:5 136:7
143:25 144:4,5

prison 32:13

prisoners
162:10

private 61:3
62:21

probably 13:11
18:22,25 38:22
39:21 58:22

64:21 111:17
118:7 133:21
155:23 157:11

problem 38:13
74:19 157:5
160:5,6

problems 95:2
158:13

procedural 59:3

procedure
154:18

procedures
25:17

proceeding 7:10
11:18

process 19:1
21:19 33:2,6,7
34:19 46:10,11
47:17 74:22
75:6 114:9,21
132:3 141:2

processes
133:24

product 147:5,7

production
32:16

professionals
22:8,9

program 129:16
159:10

programs 12:8,
10

Prolixin 109:1

prolonged 91:5

prompted 44:12

pronunciation
108:10

proper 81:12
118:2

properties 48:6

proposals 36:13

proposed 22:13
36:17 40:11,18
41:11,20 43:6
76:5

protect 67:16
98:16 135:7
141:23

protection
132:18 133:6,7

protections
47:6 69:23
92:22 93:2
120:14

protective
73:18,21
133:11 134:10
137:16 138:19
140:22 163:13

protocol 47:1
71:10 78:24
80:8 82:1 84:9

provide 161:15
162:8,16,21
163:3,7,12

provided 34:20
105:6 162:3

provider 46:20
47:24 118:25
119:22 120:8
121:10,25
127:21

provider's
46:13

providers 45:18
46:4 112:19
119:7,15 138:2
139:1,5,12
141:9,10,15

providing 63:12
64:18 65:25
118:25

provision
161:21 162:14,
15,16,18,25
163:6,10,17,
19,25

provisions
135:13

psychiatrist
43:25 115:6

public 8:24
87:11

pull 14:20
29:9,19 48:22
60:2 69:3 74:9
76:2,15 107:18
130:9 134:16
142:4 146:8
160:20 164:24

pulled 112:20

pulling 151:24

Pure 55:7

purported 49:20

purportedly
105:7

purpose 119:13
130:21,22
135:7 137:25

purposes 86:3,
14

pursuant 155:10

push 86:22

pushed 113:24

put 12:16 13:12
15:9 19:10,14
26:19 27:9
40:16 53:12
57:9 61:12,20

62:17,22
68:11,12
76:14,19 88:7
95:25 100:11
101:2 107:16
109:13 115:10,
11 116:2,3,5
120:20 132:22
133:2 143:13
147:15 160:14,
18 161:23
163:19

**puts** 80:19

**putting** 38:5
63:3,16

---

**Q**

**qualified** 83:11

**question** 10:11,
13,19,24 11:1
43:4 46:24
50:17 53:8
54:20 57:20,21
61:25 62:24
68:4,7,9 87:12
91:22 93:14
99:21 102:5
103:7,14
107:20 122:19,
20 144:25
155:5 157:3
162:18 164:13,
19

**questioned**
38:16 53:14
114:1

**questions** 8:11
10:6,8,9 11:9
107:10,11
146:21 165:10

**quick** 13:17

**quite** 112:22

**quote** 161:16
162:8,12,21,23
163:3,4,12,14,
22,23

---

**R**

**radiant** 78:19
81:20

**raise** 70:3
73:25 87:13
89:17 91:25
155:18

**raised** 127:5

**Randy** 7:7,19

**range** 52:6,8
53:9 54:4 90:5
98:9,11
145:14,18,19

**rationale**
161:20 162:13
163:5,24

**reach** 62:21
67:17 68:17,23
114:14

**reached** 125:8

**reaction** 36:12

**read** 17:3 41:24
75:15 87:16
91:7,8 93:11
102:11 105:12
132:1,21

**readily** 42:5
64:23 65:2,8
66:4

**reading** 91:20
96:11

**readings** 82:9

**reads** 33:17
90:14,21,23,25
92:17,18,20

118:22

**ready** 50:7

**real** 13:17

**realistic**
132:20

**realize** 113:17
132:8

**realized** 117:10

**realizing**
154:25

**realm** 92:24
93:4,15

**reason** 11:13
37:24 45:3
46:19 52:23
65:10 141:4
156:23,25
157:2,15,17

**reasonable**
59:20 70:16,17
76:6 98:23

**reasons** 82:13
116:4

**rec** 79:5

**recall** 17:5

**receive** 122:17
128:20

**received** 104:15

**receives** 143:17

**recent** 30:4

**recently** 24:4

**recognize** 101:5

**recommend** 62:13
75:21 79:15
154:13,17

**recommendation**
58:20,23 59:5,
7,21,24 63:22,

24,25 64:3,5
71:24 79:20,22
83:9 85:9
89:22 95:10
99:14 102:18
114:13 162:1

**recommendations**
24:24 33:8,9
34:22 36:8
41:8 55:11,25
56:3 59:1,2
61:3,6,10,13,
15,21,23 62:4,
7,21 71:9
86:23 103:22
104:17 118:22
121:6 127:25

**recommended**
36:22 40:8
42:24 62:11,15
70:6 75:9 76:1
79:16 86:18,19
100:9,25
102:3,7 105:7
109:20 124:14
156:23

**recommending**
85:10,14

**recommends** 79:6
83:1,4 102:1
111:16

**record** 7:4,17
23:11 35:22,24
36:2,6 65:18
73:7,9,13
104:4,7 129:21
142:22,25
143:3 150:15
164:3,6,10
165:16

**recorded** 81:2
86:3 145:3

**recordkeeping**

154:23

**records** 151:15
154:24

**reduce** 135:14

**refer** 60:10
67:11 69:8

**reference** 12:21
14:19 77:17
102:19,25
160:7 164:20
165:7

**referenced**
56:8,9 101:14
165:4

**references** 61:2

**referred** 61:12
88:22 101:8

**referring** 9:11,
15 10:1 16:3
19:23 22:5
26:24 27:10
30:11 89:1
90:19

**refers** 74:25
75:2

**Refill** 119:24

**reflect** 82:10

**reform** 23:23

**refute** 41:4

**Reg** 143:8

**regarding** 156:5

**regime** 124:14

**regimen** 159:11

**regular** 23:22
151:10 155:20,
25

**Regulation**
106:6

**relate** 31:22

**related** 25:16

**relative** 81:17,
22

**relaxers** 40:4
107:12 110:5

**reliance** 85:24

**relied** 58:13
71:8 89:2
101:11 103:4,
18 104:24
105:4

**rely** 78:11
86:10,13,18
89:9,15,24
91:23 95:22
103:9

**remaining**
152:20

**remedial** 60:11
161:14 162:7

**remember** 27:14,
19 37:4 43:8
45:1 70:23
75:24 85:8,10,
12,13,14,18,
19,23 144:18

**remembering**
141:3

**remind** 10:5

**remotely** 7:11

**remove** 117:13,
21 118:1,11
139:11,12

**removed** 137:17
139:21

**rephrase** 70:25
72:3

**report** 17:2
43:13 56:4

57:6,17 58:10,
11 62:23
75:12,15 78:12
101:15,18

**reporter** 7:13,
18,22 8:2,12
10:9 65:15,21
76:20,24
105:17 130:11

**reports** 57:18
59:8 74:25
82:7 150:4
151:12

**represent** 66:19
81:17

**representative**
99:17

**representing**
8:10

**request** 156:9

**requested** 27:16

**require** 93:14
131:24 155:25
163:6

**requirement**
144:16 155:3
162:2

**requires** 69:11
144:20

**requiring** 95:6

**research** 27:6,
10,21 28:5
35:5 39:4,15
40:7,10,19
41:5,6,15 83:8
104:16,18
105:2 117:10,
19 118:3,5

**researched**
33:10 43:10
45:5,24 70:24

71:2,21

**researching**
41:11 43:14,21
45:20

**reservation**
141:1

**residual**
133:16,19

**residuals** 134:1

**respect** 36:8
40:17 51:7,23
61:3 104:19
116:24 119:25
120:10 140:1,
2,4,19

**respectable**
41:2

**respiratory**
135:22

**responding** 10:8

**response** 66:21
88:22 101:9,
17,18 102:23

**responses** 74:12
95:19 102:15

**rest** 58:19
161:17 162:22

**restricted**
121:18

**restrictions**
125:6 158:23

**restrictive**
132:10 134:7
137:19

**result** 69:22
95:13

**resulted** 91:17

**retained** 25:22

**retaining** 27:22

**reuptake** 43:3

**reveals** 42:14

**review** 14:20
20:20 21:8,13,
16 23:5,10,12,
16,17,22 24:1,
10 25:10,12
26:2,7,9,11,16
27:3,20 39:3
47:18 54:6
56:3 61:6,9,
10,20 62:3
87:19,22 92:8
95:11 96:17

**reviewed** 16:22,
23,25 17:1,6,7
21:3,25 22:4
24:23 34:20
56:12 61:22
62:6 87:18,20
92:10,13 96:9,
12,13 102:20
103:11 145:3

**reviewing** 26:3
92:5

**reviews** 24:20

**revised** 127:3

**revisions**
107:23

**revisit** 155:9

**revocated**
125:21

**revocating**
125:15

**revocation**
124:18 125:16

**revoke** 127:18

**revoked** 123:7
124:15 126:5,

19 127:1,13
128:21

**revoking** 128:1,
5,17

**Reynolds-barnes**
18:21 27:12
75:12

**right** 7:25
8:15,24,25
10:23 11:1,7
13:9,25 14:2,4
15:9,16 16:10
18:6 20:11,12
22:2,21 23:20
24:6,8,16
31:14 34:20,
21,24 35:1,19
37:7,10 38:8
39:11,16
40:22,23 42:15
43:24 45:9,16,
18 46:7,17
47:2,3,22,23
48:9,12,14,20
49:7 51:3,7,
11,16,22,24
52:10,12 53:3,
19,20 54:7,8,
14,15,21
55:14,15,17
58:4 61:19
63:7 64:10
68:23,25
69:20,21,25
70:1 73:2 74:9
77:20 79:5
80:23 81:12,13
83:1,3 84:6
89:4,25 90:9,
16,23 91:6
92:5,9 93:23,
24 94:2,9,10,
13,17,25 95:19
97:3,8,22,23,
25 98:8,9

99:7,14,17
100:19 104:2
109:21 111:10
113:25 116:22
117:5 118:15
120:5,6 121:4,
17 122:21
123:13,22
124:3,10,12
126:2 127:11
129:18 130:7
131:14,23
132:2,4,19,24
133:21 134:14,
24 135:1,4,5,
7,9 136:5,6,8,
20 137:17
138:21,25
139:14 143:22
145:8,12,15,18
148:8 149:25
150:1,11
151:3,8 152:1,
2,5 153:17
157:20 158:14
160:13 165:4,
7,8,12,14

**ring** 28:17

**risk** 135:17,23
138:4,8 139:3
158:8,12
159:23 160:5

**risks** 87:9

**Rita** 7:14 76:18

**Robaxin** 40:5

**Rodriguez** 21:10
23:7

**Rogillo** 21:11

**role** 21:18 27:2

**roll** 143:18,20

**room** 30:14

**Rouge** 11:25

**routine** 24:19
115:7

**routinely** 23:4
53:18 61:10
131:23

**row** 71:7,19

**rules** 10:5

**ruling** 60:6
67:8

**run** 48:2 59:17
129:20 157:22

**running** 23:11,
16

---

**S**

**safe** 59:25
152:25 153:5,
10,19,21

**safely** 59:6

**Safety** 8:24
9:16,19 101:25

**Saphris** 108:23

**satisfactory**
38:9

**saying** 48:8
52:16 82:18
91:13 95:9
97:15 99:5
119:9 126:4
127:17 150:17
153:21,22
156:2 158:7
160:5,6

**says** 14:8,9,10
32:24 33:18
50:4 62:19
63:11 66:9
68:17,18 74:21
79:5 80:3

81:14 84:20
90:11 91:1,21
94:3 97:10,16
101:24 106:16
119:6 121:1,17
125:7 126:7
127:20 135:10,
19 138:25
145:1 156:19
160:24

**scenario** 98:12,
14

**scenarios**
128:15

**schedule** 58:18,
20 59:5,10
60:19,23 61:8,
12,13,24 62:7,
12,20,25 63:1,
4

**schedules** 61:4

**scores** 40:23

**scratch** 96:4
132:3

**screen** 16:4
85:19 107:17
164:15

**Screening** 86:8

**scroll** 13:19
50:1,10 60:7
67:9 74:20
118:17 146:15

**scrolling** 14:23

**search** 41:2

**second** 35:14
50:25 63:10
72:22 76:21,25
82:5 88:11,18
119:12 153:3

**secretary** 9:10,
11 33:23,25

34:2 55:1
115:17

**Secretary's**
16:13,18 117:4
135:11

**section** 33:24
78:16,17 86:7
87:15 90:7
164:18

**sections** 102:3,
6,9

**security**
143:13,18

**see** 14:8 18:7
19:14,17 20:7
22:1 23:13,18
31:22 32:18
33:23 42:13,23
48:18 49:7
50:19 52:17
55:2,14 61:1,5
65:13,24
67:14,18 71:23
72:13,14,16
73:1 77:13
78:21 79:9
89:25 90:7,13
98:11 101:3
105:6 107:13
109:18 119:2
135:24 146:15
151:13,14,18
155:13 160:24
161:4

**sell** 123:5

**selling** 125:3

**send** 22:25 23:1
33:18 39:22
116:13 161:11

**sending** 26:6,12
33:19 84:15
128:6

**sense** 126:13
132:24 133:2

**sensitive** 39:5

**sensitivity**
38:8 40:12,14
135:16

**sentence** 82:5
101:23,24
136:4 137:14,
16,25 138:18
139:15,17
140:5,8

**Separate** 156:13

**serotonin** 43:2

**serve** 118:23

**service** 9:13
72:13,19 74:4
75:3 76:9
77:18 80:19,25
83:24 87:10
88:4,21 89:2
91:20,24 93:8,
22 94:21
105:12 144:17,
22 145:10
146:17 150:4
151:17,25
154:14,20
155:10 156:1

**set** 40:21 51:23
53:17 74:13,24
84:25 85:2
145:16,20

**sets** 51:5,20
78:17

**setting** 95:4,20
96:6 99:9
100:9 101:10
103:4,18

**settled** 100:7

**settlement**

19:18

**several** 38:21
59:17 63:17
71:14 125:19
134:2 161:23

**severe** 87:4

**shade** 63:17,21
81:16 83:25
97:24 154:6
161:16,17
162:3,8

**shaded** 63:12

**shady** 94:5

**shakes** 10:15

**shape** 138:13

**share** 13:17

**shared** 107:17

**shifts** 153:24

**shirts** 163:14

**shorts** 52:21

**show** 29:17
40:19 62:16
64:10 105:6
107:1 139:20
146:10 151:15
155:7

**showed** 88:23
89:5 107:16

**showing** 68:11
72:25 77:4
87:18 88:12,
17,20 100:24
143:6 146:13
150:2,3

**shown** 89:10

**shows** 59:21
93:11 149:21

**shut** 153:15

sick 65:9,24

side 40:22

signature 117:5

signed 22:11
33:23,24,25
34:1 55:3 60:8

significant
100:3 145:21,
25 146:4
148:6,9,14,20,
21,25 149:13,
16,20 150:6,11
151:4 155:1,7

signoff 117:4

silent 12:16

similar 38:19
94:8 104:18
143:24

simply 124:21

sinks 82:14

site 82:11,12
83:2

sitting 11:22
99:16 103:17
154:25 155:6
158:13

situation 128:2

situations
125:16 134:5

size 129:23

skip 69:6

slightly 13:10
93:13

Smith 21:11
23:8 33:16,17
34:3 116:20
141:3,5,14

socks 163:15

softball 126:24
164:14

solely 86:13

somebody's
47:21

soon-to-go-into-
effect 106:20

sort 26:3 34:7
49:19 51:20
107:20 139:5

sorts 143:15

sound 91:8
109:10,11

source 77:10
114:4 131:6

sources 41:1
81:20

space 161:19
162:4,9

speak 17:8
129:9

speakers 65:14

speaking
105:22,25

specific 45:3
61:13 82:11
130:24 135:20
162:15,17

specifically
18:8,9 89:23
102:14

spectrum 76:9
138:15

speculation
55:7

spelled 52:2

spent 42:2
45:14

spoke 18:2,14,
15 19:17,25

spoken 17:15,
16,17 20:2

sports 125:7
126:8 133:17

SSRI 45:3

SSRIS 43:2,6,9,
14,18,19,21,
23,25 44:5,9,
13,23 45:8,13,
17

stable 146:5

Stacye 21:10
23:7

staff 143:14
144:16,21
160:25 164:18
165:7,8

stamp 13:6,7

stamped 55:3

stand 157:12

standard 47:12
101:1 102:3

standards 63:5
102:7 156:16

standing 11:20
85:19

standpoint
59:2,3 98:21

stands 68:5

start 7:25
39:17 46:13
75:11

started 37:24
63:16 69:7
72:2

starting 15:17
114:25 134:21

starts 114:25

state 9:9 31:3
74:21 87:1

stated 50:6

states 55:10
83:24 86:8
122:8

stating 84:22

station 82:15
152:1

stations 82:9,
10

status 120:17,
24 121:1,3,21,
22 122:1,6,10,
12,17 123:6,
14,20,21
124:1,3,7,11,
15,18 125:1,6,
12,15,20
126:1,4,7,8
127:1,3,4,6,
12,22,24
128:2,6,17,20,
21 129:5,8
130:2,25
131:13,15,16
132:10,11,13,
15,16 133:7,
11,12,20
136:19 137:6,
11,16,20,24
138:20,24
140:22

statuses 126:19
134:11 137:20

stay 159:17

stayed 159:10

stays 111:20

stenographic
7:17

step  26:3,8

stepping  50:25

steps  33:6,7

stop  9:25 14:2,
4 66:13 85:4
97:3 99:10

straightforward
58:16

Street  11:25

stress  78:18
81:15,23 82:3
102:2

stricken  141:20

strike  25:11
84:25 92:12
122:4 140:5,11
141:13 143:22
155:4

stroke  87:2
133:25 134:4

studies  158:7,
20

study  117:16,18

subjected  84:10

submitted  54:11

substantially
124:13

substantive
26:3,8

substitute
46:16 82:7
118:24 121:7

sufficient
161:15

suggest  24:2
75:17 114:22

suggestion
44:15

suggestions
33:4 34:25

suit  25:14,19

summer  150:19

sun  80:6 84:1,6
94:12 96:19
97:11,14 99:4
158:11 163:13

sunlight  63:20
80:5 81:7,20
83:23 84:2,11,
18,24 85:2
94:6 97:6
99:20 135:17
154:3

sunscreen
64:18,21,23
65:2,8,10,11,
25 66:3 163:13

supervisor
45:21

supervisors
45:16

support  7:13,15
41:6

supports  93:8

supposed  12:23
19:12 95:12
164:21

supposedly
12:23

sure  8:19 10:22
13:11,20 14:3
15:24 16:8
17:15,19 20:13
25:3 27:13
28:2 30:20
36:25 37:14
44:12 45:15
46:8 50:20
57:13,15 58:8

60:13 64:16
73:21 75:10
76:16 82:22
92:10 96:14
97:4 101:14
111:1,19
113:3,7,11
114:11,12
118:11 120:22,
23 127:16
129:11 132:20
139:10 143:19
153:14 156:7,
22 157:1,13
158:12,19
161:8 163:9

surface  162:22

surprise  64:2,4

surprises  94:3

susceptible
148:24

Susi  55:16

swear  7:18

swing  148:7,9,
15,18,19,25
149:13,16,20
150:11 151:4
155:7

swings  145:25
155:2

sworn  7:20

system  40:15
42:22 119:17

systems  39:20
40:20

---

**T**

Tab  29:19 48:24
60:2 67:4 74:9
76:15 77:25

88:8 100:20
106:1 130:9
134:16 142:4
146:8

table  11:21
24:23 159:18

tables  147:8

take  10:17,20
16:5 30:17
32:20 35:14
49:21 50:5
63:19 69:2
72:21 78:15
88:6 100:19
103:15,25
105:15 124:23
125:23 140:14
144:14 147:15
155:12,13,23
156:3,4,8,10,
11,17 160:8
162:11 164:18

taken  35:25
40:2,5 73:11
83:2 104:5
111:14 164:8

taking  10:10
119:20 121:2
122:1,5,16,23
123:18,24
124:5,8 127:7,
8 128:22
129:4,25 152:7
153:1,6,20
154:1,4

talk  20:24 31:9
36:15 51:18
111:22

talked  18:11,12
19:16 20:4
26:16 35:12
52:15 65:16
144:15

**talking** 14:7
17:11,13 32:9
69:7 85:19
96:20 97:7,9,
13 104:13
116:20 120:19
128:12 137:17
138:1 160:11

**talks** 58:17
59:9

**tasked** 21:7
24:16

**team** 21:9,11,12
22:1,7 26:24,
25 33:14 35:1,
3 71:14 115:4,
16,17 155:16

**tell** 14:18
16:20 18:25
20:9 28:21
39:14 41:10
44:5,25 55:4
67:2,3 70:10
74:19 103:14,
25 107:17,18
111:4 115:10
118:11 119:10
121:13 126:20
133:13 139:20
157:9,18
159:25

**telling** 29:10
70:12,13 95:17
104:24 117:25

**temperature**
68:24 78:19
79:7,13 80:9,
15 81:16,21
83:25 84:21
90:2 92:19
93:6 95:4
99:23 100:5
125:7 126:9
151:15,16

153:14,24
155:15 156:6

**temperatures**
52:8,9 91:9
95:2,7 145:1
153:3

**tending** 160:1

**tennis** 158:14

**tent** 63:20

**tentative**
118:10

**tents** 63:16,17,
18 161:23

**term** 8:21 9:17,
24

**terms** 8:18 9:8,
20 28:17
121:15

**terrible** 72:16
155:5

**test** 30:7

**testified** 7:21
65:23 70:20

**testify** 11:14
16:14,17,21
17:10

**testifying** 17:9

**testimony** 20:20
138:17 165:17

**Thank** 8:5 15:12
40:16 165:9,14

**thereof** 127:25

**thermoregulate**
125:25

**thermoregulation**
42:15,17

**thermoregulatory**
39:19 40:14

42:21 119:17

**thing** 10:17
23:15 48:9,12,
13 53:3 65:22
71:16

**things** 27:7
31:5,7,9 32:7
35:10 51:10
57:1 70:9
98:20 114:1
154:1 158:11
160:22

**think** 13:10
14:17 19:8
27:4,8,15 34:3
39:23,24 40:1,
2,4,25 43:14,
16 44:2 48:24
49:16,20 50:25
53:1,4,14,17,
20,22 56:15,25
57:6 59:4,11,
14,19,23 60:16
61:9,25 65:21
67:3 70:5,7,15
71:7,20,21,23
72:1,7 73:22
74:3,6 76:4,10
77:16 80:22
83:10,13 84:23
88:14 91:7
93:19 98:13
99:17 100:3,5,
11 105:11
106:13 109:12
110:8,10,20
113:9,17
115:22 117:2
119:7,9 121:11
122:18,20
124:17 125:18,
20 127:14
129:13 131:9
133:5,10
134:11,13

136:17 143:12
144:9,11 145:7
146:3 148:6,14
155:2,12,17,
19,21,22
158:3,4,20,24
160:21 161:6
163:18 164:14

**thinking** 46:16
149:10

**Thiothixene**
109:3

**third** 64:17
74:13

**thorough** 45:23
110:9 157:10

**thoroughly**
11:14 33:10

**thought** 25:25
30:12 35:11
37:3 38:9
46:10,11 70:8,
17 76:5 112:18
130:14 142:20
157:10

**thousands** 160:1

**three** 38:25
124:24 142:12,
14,15,18
158:14

**throw** 45:19

**til** 53:14

**time** 16:5
18:13,22 19:16
22:23 23:17,19
28:24 29:13
33:3,4 42:3
47:23,24
53:12,16,17,
22,23 54:4
66:5 112:7
116:13,14

126:25 152:4,
24 153:13,16,
23 155:9,21
158:11 165:11

**times** 14:6
80:20 141:19
146:14 150:17,
18

**titled** 29:25
74:12 106:5
135:10

**Toce** 17:17
19:22,24 20:3

**today** 8:11,19
10:7 11:10,15,
22 99:16
103:17 154:25
155:6

**token** 158:1

**told** 28:10
35:11 45:5
79:2 102:17
129:12 161:23

**tomorrow** 114:25
116:7,9,17

**tone** 91:12

**tonight** 165:11

**top** 14:13 49:6
145:19

**topic** 16:18,21
17:10 43:23

**total** 81:23

**touch** 162:4

**touched** 33:11

**touching** 161:18

**tough** 108:25

**tour** 18:10

**toured** 18:8

**trade** 34:10

**training**
143:15,24
144:3,7 160:25
164:18,23
165:7,8

**translates** 48:6

**travel** 162:11

**Travis** 27:5,22
28:1

**trifluoroperazin
e** 108:13

**trigger** 73:18,
25 84:16 85:3
92:16 95:5
96:7 97:3,6
100:9,15
101:20 103:4,
19 134:10
137:15 145:17,
20 152:5

**triggered** 43:22
69:15,18 73:17
75:13,18 87:14
133:6

**triggering**
70:22

**triggers** 99:10

**Trilafon** 108:18

**trips** 31:8

**true** 91:10
102:24 131:17
141:11

**trust** 147:18

**truthfully**
11:14

**try** 8:15 10:12
118:9 121:13
125:22

**trying** 30:7
47:14 59:12
91:11,19 97:16
113:19,22
119:10 122:18
132:14

**tune** 48:5

**turn** 12:15

**turned** 151:13,
14

**two** 25:24 69:6
80:22,24
107:12 124:21,
23 144:22
145:3,9 148:4
149:18 152:24
154:15 155:2,4
159:2,3 164:15

**two-hour** 146:1,
3 148:7 151:5,
15,16 153:23
155:8

**type** 132:9

**types** 80:16
135:15 159:2

**typically** 23:1

———————————

**U**

———————————

**ugly** 117:25
122:18

**uh-huh** 10:15

**ultimately**
40:19 60:24

**uncle** 160:1

**underlying**
146:22

**understand** 8:23
9:21 10:24
15:23 16:12
29:15 36:20,21

38:6,20 47:14
52:10 68:3
123:16 128:14
129:17,23
138:16 150:16

**understanding**
19:8 20:12
37:18 44:9
108:5

**Understood**
118:15

**unfair** 73:19
98:13

**unfortunate**
13:9

**unpack** 36:14

**unquote** 161:19

**unreasonable**
35:11,12 36:13
37:3 39:10,13

**unsafe** 154:5

**up-to-115-degree**
96:18

**up-to-15-degree**
96:5 97:5

**up-to-date**
111:21

**update** 21:3
78:23 79:11
80:7 81:25
84:8 87:13
111:25

**updated** 111:17

**updates** 21:19
107:5

**updating** 102:5
112:25

**Uptodate** 41:1

**usual** 52:11

## V

**Valentine's**
147:21

**validate** 104:16

**valuable** 57:16
58:8,14

**value** 94:6 99:2
123:4

**values** 67:17
87:6 94:4
97:14

**various** 31:12
55:22 141:7
146:14

**Vassallo** 55:17
56:8,24 71:6,
19,24 99:22

**Vassallo's**
55:22 56:12
57:17 58:9
71:9

**verbal** 10:14

**verify** 145:8

**version** 14:18
32:23 69:14
106:22,24
108:7 135:2,3,
6 136:1,2,3,4
137:7 143:25
144:4,5,7,8
164:16

**video-recorded**
7:6

**videographer**
7:3,12 35:23
36:1 73:8,12
104:3,6 142:24
143:2 164:5,9
165:15

**view** 154:3

**Vining** 17:17,25
20:6,10

**visit** 121:21

**Voice** 7:8

**vote** 115:13

**vulnerabilities**
149:15

**vulnerable**
135:13 151:8

## W

**wait** 10:11,12
115:24

**walk** 49:14

**want** 10:17 11:4
14:2 15:24
16:5 20:8
36:13 45:22,25
60:7 76:7
85:12,20 98:25
124:2 134:18
146:21 147:14

**wanted** 19:14
44:3 45:8,15
63:19 76:4,11

**wanting** 59:22
64:12

**warden** 17:24
34:14 145:4

**wards** 48:3

**warnings** 87:10

**warrant** 153:4

**warranted** 93:20

**water** 94:22
162:12,16

**way** 37:15 40:24
43:9 44:22,25

46:14,15 49:21
81:15 83:20
91:8 99:17
107:4,25
108:11 110:22
115:25 117:11
119:9 121:12
122:15,19
125:20 145:5
146:22 154:11
158:21 161:12

**ways** 101:19
122:14 124:17
159:3

**WBGT** 79:7 80:3,
6,11 86:9

**wearing** 52:21

**weather** 9:13
53:21 72:12,
13,19 74:4
75:3 76:8
77:18 80:19,25
82:7 83:24
87:10 88:3,21
89:2 91:20,24
93:8,22 94:21
105:12 144:17,
22 145:2,10
146:16 150:4
151:17,25
154:14,20
155:10 156:1

**web** 78:4 88:21

**website** 90:23
145:2

**Wednesday** 30:1

**weight** 154:10

**weights** 125:11
157:23

**went** 8:13 27:11
28:14,25 29:1,
5 30:18 31:15

34:25 35:2,9
36:6 41:13
44:20 56:21
57:7 63:17
65:6 79:19
106:12,13
126:3 137:7
140:9 154:23

**Wescott** 9:11
55:2

**wet** 79:6,12
156:5

**widely** 110:1
113:6

**wind** 81:20

**windows** 12:8,11

**witness** 7:18
13:23 14:25
16:14 35:13,18
62:5 68:6 73:3
142:7,11,17

**word** 82:19
147:8

**wording** 22:10

**words** 99:11

**work** 36:25 61:4
62:20 64:24
66:10,12 80:4,
5,10,17 82:11,
12 83:2,25
84:5 85:3 95:6
97:3 99:1,11
126:10,16
133:17 147:5,7
160:3

**worked** 95:1
159:18

**worker** 102:1

**workers** 59:18
78:18 81:24
84:10 87:2,9

**working** 59:13,
  16 74:1 84:18
  93:18 96:19
  97:13 129:9,12
  133:3 136:22
  153:2,7,16
  162:10 163:7

**workload** 81:21

**workplace** 79:7
  102:2

**works** 160:1

**worksite** 86:9

**world** 59:14

**worst-case**
  98:12,14

**written** 20:15
  33:15 92:3
  151:3

**wrong** 117:19
  144:10 148:8
  161:10

**wrote** 57:6
  64:21 97:22

---

### Y

**y'all** 19:9,13,
  14 65:16 115:6
  165:14

**yard** 32:6

**yeah** 12:14,18
  18:24 19:24
  22:14 26:10
  42:6 58:2
  76:25 80:24
  91:14 93:5
  109:6 114:1
  117:22,25
  129:17 130:5
  140:10 141:16
  142:10,18,22

  148:21 149:12
  150:6 160:12
  164:16

**year** 21:5,6
  52:3

**yearly** 21:4
  111:18

**years** 37:4,5
  39:1 43:25
  48:17 53:17
  125:19 157:22
  158:10 159:9,
  12,17,18,20

**yellow** 90:1,3

**younger** 159:12

---

### Z

**Zoloft** 45:7,11

**zone** 94:16,19

**Zoom** 7:11 11:19
  12:9 18:6,16
  30:2 31:3
  33:11 57:1,3
  85:18