# Exhibit 5

1      THE UNITED STATES DISTRICT COURT FOR

2        THE MIDDLE DISTRICT OF LOUISIANA

3

4
   VOICE OF THE EXPERIENCED,
5   a membership organization
   on behalf of itself and
6   its members; and MYRON
   SMITH, DAMARIS JACKSON,
7   NATE WALKER, DARRIUS
   WILLIAMS, KEVIAS HICKS,
8   JOSEPH GUILLORY, KENDRICK
   STEVENSON, and ALVIN
9   WILLIAMS, on behalf of
   themselves and all others
10   similarly situated
                          Civil Action No.
11                          3:23-cv-1304-BAJ-EWD
   vs.
12
   JAMES LEBLANC, in his
13   official capacity as
   Secretary of the
14   Louisiana Department of
   Public Safety and
15   Corrections; TIMOTHY
   HOOPER, in his official
16   capacity as Warden of
   Louisiana State
17   Penitentiary; MISTY
   STAGG, in her official
18   capacity as Director of
   Prison Enterprises, Inc.;
19   the LOUISIANA DEPARTMENT
   OF PUBLIC SAFETY &
20   CORRECTIONS; and PRISON
   ENTERPRISES, INC.
21
   * * * * * * * * * * * * * * * * * * * * * * * * *
22       REMOTE VIDEOTAPED 30(b)(6) DEPOSITION OF
       LOUISIANA DEPARTMENT OF CORRECTIONS,
23         THROUGH ASHLI OLIVEAUX

24
              February 12, 2025
25

 1  REMOTE APPEARANCES:

 2  REPRESENTING THE PLAINTIFFS AND THE PROPOSED CLASS:

 3
    PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
 4  1285 Avenue of the Americas
    New York, New York  10019
 5  212.373.3000
    BY:  JEREMY BENJAMIN, ESQ.
 6  jbenjamin@paulweiss.com
    BY:  CHIZOBA WILKERSON, ESQ.
 7  cwilkerson@paulweiss.com

 8        - AND -

 9
    RIGHTS BEHIND BARS
10  1800 M St NW Front 1 #33821
    Washington, D.C.  20033
11  202.455.4399
    BY:  LYDIA WRIGHT, ESQ.
12  lydia@rightsbehindbars.org

13        - AND -

14
    THE PROMISE OF JUSTICE INITIATIVE
15  1024 Elysian Fields Avenue
    New Orleans, Louisiana 70117
16  504.529.5955
    BY:  SAMANTHA POURCIAU, ESQ.
17  spourciau@defendla.org
    BY:  KARA CRUTCHER, ESQ.
18  kcrutcher@defendla.org

19

20  REPRESENTING THE DEFENDANTS:

21  KEOGH, COX & WILSON, LTD.
    701 Main Street
22  Baton Rouge, Louisiana 70802
    225.383.3796
23  BY:  ANDREW BLANCHFIELD, ESQ.
    ablanchfield@keoghcox.com

24

25



1   REMOTE APPEARANCES:  (CONTINUED)

2   REPRESENTING THE DEFENDANTS:

3   LOUISIANA DEPARTMENT OF PUBLIC SAFETY &
    CORRECTIONS
4   504 Mayflower Street
    Baton Rouge, Louisiana  70802
5   225.342.6728
    BY:  JONATHAN R. VINING, ESQ.
6   jonathan.vining@la.gov

7

8

9   Also Present:

10  Jason Levin, Videographer
    Deidre Thomas; PJI
11  Talia Lanckton; PJI
    Christopher Bilicic; Paul, Weiss
12  Arielle McTootle;Paul, Weiss
    Erica Paul; Paul, Weiss
13  Janet Lee; Paul, Weiss

14

15  Reported stenographically by:

16  Rita A. DeRouen, Certified
    Court Reporter #2014018
17  in and for the State of
    Louisiana; Registered
18  Professional Reporter #6908

19

20

21

22

23

24

25

```
1              I N D E X

2                         Page

3   Stipulation                  5

4   Reporter's Page              128

5   Reporter's Certification     129

6
    EXAMINATION
7     By Ms. Wright              6

8              * * * * *

9          List of Exhibits

10

11  Exhibit No. 109

12     (Department Regulation No. HCP8      89
       Attachment A, 11/7/24, HCP 8 Emails
13      00000224 - 226)

14  Exhibit No. 110

15     (HCP8, 10/20/24, 030613 - 030619, 030600  96
       - 030612)
16

17  Exhibit No. 111

18     (Amended Responses to Plaintiffs' Third  101
       Set of Interrogatories)
19

20

21        Previously Identified Exhibits

22  Exhibit No. 108              46

23

24  Exhibit No. 107              123

25
```

1        S T I P U L A T I O N

2

3     It is stipulated and agreed by and between

4   counsel that the testimony of the witness,

5   LOUISIANA DEPARTMENT OF CORRECTIONS, THROUGH ASHLI

6   OLIVEAUX, is hereby being taken pursuant to Notice

7   under the Federal Rules of Civil Procedure for all

8   purposes permitted under law.

9

10      The witness reserves the right to read and

11   sign the deposition. The original is to be

12   delivered to and retained by LYDIA WRIGHT, ESQ.,

13   for proper filing with the Clerk of Court.

14

15      All objections, except those as to the form of

16   the questions and/or responsiveness of the answers,

17   are reserved until the time of the trial in this

18   cause.

19                    * * *

20

21      Rita DeRouen, Certified Court Reporter in and

22   for the State of Louisiana and Registered

23   Professional Reporter, officiated in administering

24   the oath to the witness.

25

 1       THE VIDEOGRAPHER:

 2          We are on the record at 11:41 a.m.

 3    on February 12, 2025.  This is the

 4    video-recorded deposition of Ashli

 5    Oliveaux in the matter of Voice of the

 6    Experienced vs. James LeBlanc.  This

 7    proceeding is being held remotely via

 8    Zoom.

 9          My name is Jason Levin, I'm a

10    videographer on behalf of US Legal

11    Support.  The court reporter is Rita

12    DeRouen, also on behalf of US Legal

13    Support.

14          All counsel will be noted on the

15    stenographic record.  Will the court

16    reporter please swear in the witness.

17            ASHLI OLIVEAUX,

18  having been first duly sworn, was examined and

19  testified as follows:

20            EXAMINATION

21  BY MS. WRIGHT:

22    Q.  Good morning, Ms. Oliveaux.

23    A.  Good morning.

24    Q.  Ms. Oliveaux, you've been designated as

25  the Department of Public Safety and Corrections

1   witness under Rule 30(b)(6) to testify as to the

2   implementation of the changes to HCP8 at LSP; is

3   that correct?

4        A.  Yes.

5        Q.  Are you prepared to testify as to that

6   topic today?

7        A.  Yes.

8        Q.  How did you prepare for your testimony?

9        A.  I met with Mr. Blanchfield and

10  Ms. Chelsea for about 30 minutes on Monday.

11       Q.  Anything else?

12       A.  That's it.

13       Q.  Is there anybody in the room with you?

14       A.  No, ma'am.

15       Q.  Do you have any documents with you?

16       A.  The only document that I have is the one

17  that Mr. Blanchfield asked me to have present,

18  HCP8, at y'all's request.

19       Q.  Okay.  Can you read the date on that

20  document.

21       A.  It says October the 20th, 2024.

22       Q.  And do you have any attachments with you

23  to that document?

24       A.  No, ma'am, I don't have the attachments.

25  Do you need me to get the attachments?

1    Q.  No.  We'll deal with that if it's easier

2  for you to have a copy.

3    A.  Okay.

4    Q.  Could you just hold up the last page of

5  that document in front of you.

6    A.  (Witness complied.)

7    Q.  There are signatures on the last page?

8    A.  Yes.  It looks like Gary Wescott and --

9  that's it.

10    Q.  Natalie LaBorde maybe?

11    A.  Well, yeah, but -- yeah.

12    Q.  And then, finally, can you read the

13  Bates stamp, the number at the bottom of the first

14  page of that document.

15    A.  Are you talking the 030613?

16    Q.  I am.

17    A.  030613.

18    Q.  Any other documents in front of you?

19    A.  That's it.

20    Q.  Are there any notes on the document that

21  you have in front of you?

22    A.  No.  It's whatever y'all sent me, just

23  that one page.

24    Q.  And you have a screen in front of you

25  right now because this deposition is taking place

1  by Zoom.  Are there any windows open in your

2  screen aside from Zoom?

3     A.  No -- well, I can close my email.

4     Q.  That would be great.  Thank you.

5     A.  It's closed.

6     Q.  Okay.  Warden Oliveaux, you are the

7  deputy warden of quality, management, and

8  assurance at the Louisiana State Penitentiary; is

9  that right?

10    A.  Yes.

11    Q.  And you've held that position since

12  March of 2022?

13    A.  Yes.

14    Q.  In that capacity, you oversee LSP's

15  medical department, fire/EMS department, the ACA

16  department, the training academy, and the legal

17  programs department?

18    A.  They took the training academy out from

19  underneath me about -- I think in November.

20    Q.  Okay.  So in your capacity as deputy

21  warden of quality, management, and assurance at

22  the Louisiana State Penitentiary, you oversee

23  LSP's medical department, the fire/EMS department,

24  the ACA department, and the legal programs

25  department?

1    A.  Yes.

2    Q.  And you are also the ADA coordinator at

3  LSP?

4    A.  Yes.

5    Q.  "ADA" stands for the Americans With

6  Disabilities Act?

7    A.  Yes.

8    Q.  And as ADA coordinator, you're

9  responsible for coordinating LSP's efforts to

10  comply with and carry out the responsibilities

11  defined by the ADA?

12    A.  Yes.

13    Q.  You're also responsible for ensuring

14  that men with disabilities have equal

15  opportunities to all services and programs and

16  activities of the DOC?

17    A.  Yes.

18    Q.  And you're responsible for ensuring that

19  new and existing policies and protocols comply

20  with the ADA?

21    A.  Yes.

22    Q.  And as deputy warden of quality,

23  management, and assurance at LSP, you are

24  responsible for ensuring that LSP has written

25  policies and procedures that comply with DOC's

1  policies and procedures?

2      A.  With -- our policies and procedures are

3  based off of the Department of Corrections

4  regulations.

5      Q.  So are you responsible for ensuring that

6  LSP's written policies and procedures comply with

7  the DOC's regulations?

8      A.  I am.

9      Q.  What's the difference between a

10  regulation, a policy, and a procedure?

11      A.  So a regulation is the -- what the

12  Department sends out.  It's like -- I can describe

13  it as like an outline to a research paper.

14          So it's the outline that you would get

15  for your facility.  You take that outline and then

16  you put your processes in there, like how you're

17  going to achieve to meet the -- what the policy is

18  asking you to meet, like your steps, your

19  processes.

20      Q.  Okay.  So a directive comes from DOC,

21  and it has -- it's broad steps of what needs to be

22  accomplished?

23      A.  No, ma'am.  A departmental reg comes

24  from DOC, it's broad steps.  Then you put it

25  into -- we call them directives.  I think we're

1    using the word "policy" and "directive"

2    intertwined.  So it's called a directive at DOC --

3    I mean, at LSP.

4        Q.   Okay.  So DOC promulgates regulations?

5        A.   Yes.

6        Q.   And the regulations are a broad --

7    broadly state what needs to happen, correct?

8        A.   Yes.  They're the outline of what needs

9    to happen, yes.

10       Q.   And then LSP takes DOC's regulation and

11   creates LSP's own policies and procedures?

12       A.   Yes.  We call them directives actually,

13   but yes.

14       Q.   You know, I've been wondering about this

15   for a long time.  I'm glad I finally asked.  Okay.

16           So DOC creates regulations, LSP creates

17   directives?

18       A.   Yes.  But each prison calls it something

19   different.  This is just LSP.

20       Q.   Thank you for that.  That's good to

21   know.

22           And LSP's written directives must comply

23   with DOC's regulations?

24       A.   Yes.

25       Q.   And you, as deputy warden of quality,

1   management, and assurance at LSP, are responsible

2   for ensuring that LSP's written directives comply

3   with DOC's regulations?

4        A.   In regards to the areas that I'm over.

5        Q.   So with respect to the ADA?

6        A.   Yes, I would -- if the ADA departmental

7   reg updates, then I'll update our directive, yes.

8        Q.   There are several ways in which an

9   incarcerated person can request a reasonable

10  accommodation at LSP, correct?

11       A.   Yes.

12       Q.   What are those ways?

13       A.   They can verbally communicate it, they

14  can do a request for accommodation form, they can

15  go through the ARP process.

16       Q.   Okay.  So an incarcerated person can

17  fill out an ARP, he can fill out a special ADA

18  accommodation form, or he can verbally request an

19  ADA accommodation from an LSP employee or

20  official?

21       A.   Yes, yes.

22            MR. BLANCHFIELD:

23               Let me -- let me interrupt for a

24            second.  This is beyond the 30(b)(6)

25            notice.

1        What does the ADA have to do with

2    HCP8?

3        MS. WRIGHT:

4        The implementation of the

5    attachments to HCP8 have a lot to do

6    with the ADA.

7   BY MS. WRIGHT:

8    Q.   Are there any other methods beyond the

9   three we just discussed by which an incarcerated

10  person can request a reasonable accommodation at

11  LSP?

12   A.   They can write a letter to -- they can

13  write a letter to one of their wardens and then

14  they have to get it to me.

15   Q.   Okay.  Does LSP consider the ADA

16  accommodations form to be the same as an ARP?

17   A.   No.  That's two separate forms, two

18  separate documents.

19   Q.   If a person wants -- if a person files

20  an ARP requesting an ADA accommodation, will that

21  -- does the person also have to fill out the ADA

22  accommodation form?

23   A.   No, they don't have to.

24   Q.   Okay.  So LSP will consider that ARP to

25  be a request for accommodations?



1    A.   They actually do that previously, when

2   you asked me how they can request it.

3    Q.   There's going to be some back-and-forth

4   in this conversation.  I just want to make sure

5   I'm understanding.  So I appreciate your patience

6   in advance.  We'll try to get you out of here as

7   soon as possible.

8        So does LSP consider a verbal request

9   for accommodations about the same thing as an ARP?

10   A.   No, no.  ARP is totally separate.

11   Q.   So if somebody requests a verbal

12  accommodation for a disability, what is the

13  process by which that verbal accommodation is

14  reviewed?

15   A.   So whoever they request it to, they

16  would contact my office, where we have another

17  nurse that's trained to do ADA now too.  And we

18  would reach out to the inmate, speak to them to

19  find out what's going on.  And they'd give us the

20  accommodation that they would need, and then we

21  work from there with them on how to meet the

22  accommodation.

23   Q.   Is that verbal request ever reduced to

24  writing?

25   A.   Eventually, at the end, it has to be.

1  Because once you meet with them, there's a whole

2  database you have to fill out.  So everything is

3  documented, and you have to write saying you

4  approved the accommodation or why you did not

5  approve the accommodation to the offender.  You

6  have to document that.

7      Q.  Do you personally -- are you the one who

8  writes to the offender?

9      A.  So if I approve or disapprove one from

10  the offenders, I do sometimes do that.  As I said,

11  I have a nurse in the medical department that

12  works more so with the offenders now and I do more

13  so our visitors and our employees.

14      Q.  Who is the nurse that works more with

15  the accommodation requests that are placed by

16  offenders?

17      A.  Ms. Jennifer Stickells.

18      Q.  Does Nurse Ducote still review requests

19  for accommodation?

20      A.  He's changed job positions with us.

21      Q.  What does he do now?

22      A.  He's just one of our floor nurses on our

23  nursing unit.  Just takes care of the offenders

24  from a nursing standpoint on the nursing unit.

25      Q.  Is that considered a promotion?

1       A.  I'm not sure if it was a promotion or if

2  he just chose to go back to being a -- I'm calling

3  it a regular nurse, not reviewing bulk files and

4  stuff.  I'm not sure.

5       Q.  Does he get paid the same as he did when

6  he was reviewing the ADA requests?

7       A.  I mean, I don't really know what all my

8  employees make, so that's really not something --

9  he didn't get anything more to make -- to do the

10  ADA requests.  So I don't know what he makes at

11  this time.

12      Q.  Okay.

13      A.  That would be something we'd have to ask

14  HR.

15      Q.  Fair enough.

16          But now Jennifer Stickells is the one

17  who receives ADA requests and makes a

18  determination about it?

19      A.  She receives the majority of the

20  offenders/inmates ADA requests.  If I do get them,

21  I will work them along with her or I will do them

22  myself.

23      Q.  How frequently does LSP receive a

24  request for accommodations under the ADA from an

25  offender?

1    A.  Not that frequently.  At least whenever

2  I was doing it steadily, it wasn't frequent at

3  all.  We tend to address any needs on intake and

4  on the front end so it doesn't turn into anything.

5  We ask them any kind of needs they need at intake.

6    Q.  Can you give me a ballpark of what --

7  what do you mean when you say not frequently?

8    A.  I can -- I'm going to say whenever I was

9  doing it because I haven't been actively doing the

10  offenders in some time now.  I might would have

11  one a month.

12    Q.  So I want to make sure I'm understanding

13  this process correctly.  Sometimes a written ARP

14  is coded as a request for accommodations under the

15  ADA; is that right?

16    A.  A written ARP can be coded as an

17  accommodation for an ADA, yes, it can.

18    Q.  And when that happens, it's routed to

19  Nurse Stickells?

20    A.  Yes.

21    Q.  It used to be to Nurse Ducote?

22    A.  Yes.  Ducote.

23    Q.  Ducote.

24    A.  Yes.

25    Q.  When did that transition happen?

1      A.  Again, I'm guessing here.  I would say

2  around September.

3      Q.  So Nurse Stickells receives the written

4  request and makes a determination about how to

5  resolve it?

6      A.  Yes.  There's a whole process.  You

7  know, you talk with the offender, you talk with

8  the medical provider.  I mean, there's a whole

9  process that you do.  But yes, ultimately at the

10  end.

11      Q.  And then the incarcerated person

12  receives the accommodation as recommended by Nurse

13  Stickells?

14      A.  Yes.

15      Q.  And meanwhile, you review Nurse

16  Stickells' determination and decide whether to

17  sign off on it or not?

18      A.  I do not review them.  I do not have to

19  review them because she has the same training that

20  I have.

21      Q.  I see.  Is that a change, a recent

22  change?

23      A.  We -- for about a year now we've had --

24  Ducote did it, Lars did it, and I did -- I did not

25  review them.  I've never reviewed what they've

1   done unless they have a question and we work

2   together, and at that point, it's usually

3   something we would get with headquarters on.

4       Q.  I see.  So then an ADA request kind of

5   starts and stops with Nurse Stickells; is that

6   right?

7       A.  Yeah, it starts -- we -- she goes

8   through the whole process and gives them an

9   accommodation or doesn't give them an

10  accommodation.

11      Q.  And if the person is not happy with the

12  accommodation and wants to appeal it, do they

13  appeal it to Sharita Spears at DOC headquarters?

14      A.  Yes, that's who they appeal to.

15      Q.  But you do not assess Nurse Stickells'

16  recommendation one way or another?

17      A.  No, ma'am.

18      Q.  Does anybody?

19      A.  You would have to ask Ms. Spears that.

20  They have access to the database.  I don't know

21  what they do as far as compliance checks.

22      Q.  What is your role as ADA coordinator?

23      A.  So as I said earlier, my main role now

24  as ADA coordinator is I address our visitors and

25  our staff's needs.  And our nursing department,

1   Ms. Stickells, addresses the offender population

2   needs.

3       Q.   Previously you've testified that you

4   would review Nurse Ducote's determinations and

5   decide whether to sign off on them, and sometimes

6   you would take corrective action if you disagreed

7   with those determinations.

8          Did you say that?

9       A.   If I did say that, it would be in the

10  process of the ARP process, because I have to read

11  every ARP and sign them.

12      Q.   Okay.  So you read and sign every ARP?

13      A.   Yes.

14      Q.   You do not read and sign every request

15  for accommodations under the ADA?

16      A.   No.  Because the ARP process here, I'm

17  the deputy warden that signs off on every ARP, it

18  doesn't matter if it's ADA or not.  Every ARP

19  crosses my desk.  That's why I would read it, yes.

20      Q.   Okay.  If an ARP that's requesting

21  reasonable accommodations under the ADA -- let me

22  start again.

23          If an ARP request is seeking

24  accommodations under the ADA, will that come

25  across your desk?

```
 1      A.  At the end after the -- after

 2   Ms. Stickells has reviewed it, wrote her -- you

 3   know, for the ARP process, you're well apprised on

 4   that, you know you have to respond to them.  After

 5   she responds, reviews it, I'm the one that signs

 6   off at the end, then it goes back to the legal

 7   programs department.

 8      Q.  And when --

 9      A.  I don't --

10      Q.  I'm sorry.

11      A.  Huh?  It's going to be signed off by

12   Ms. Stickells, it will be signed off by the

13   department head, and then myself.

14      Q.  And when you -- how do you determine

15   whether to sign off on it or not?

16      A.  Well, in general, any ARP, if I have any

17   questions in regards to it, I reach out to the

18   person that completed it and ask the questions

19   like, in general, why did this happen or why are

20   we missing this documentation or anything like

21   that.  So...

22      Q.  Have you ever not signed off on an ARP?

23      A.  For what?  For a --

24      Q.  Anything.

25      A.  At the end of the day, I'm signing off
```

1    on all of them because usually the -- whatever

2    needs to be fixed we can fix, you know, the

3    document or something if it's missing.

4        Q.   Have you ever needed to take corrective

5    action about one of Nurse Ducote's or Nurse

6    Stickells' recommendations as pertaining to the --

7        A.   Not to the best of my knowledge, no.

8        Q.   How frequently does LSP grant an

9    incarcerated person's request for an accommodation

10   under the ADA?

11       A.   I mean, I'm -- are you -- so I'm going

12   back because I haven't done them in a while, I

13   haven't input them into the database for a while

14   for the incarcerated individuals.  So back

15   whenever I would do it, I would have about one a

16   month.

17           Now, hang on, I've got to move around so

18   the lights turn back on.  Okay.

19           So whenever I was doing it, about once a

20   month I would have one that would cross my desk,

21   an ADA accommodation.

22       Q.   Did you generally grant those requests

23   for accommodation?

24       A.   I don't recall a time where any

25   accommodation has not been granted.  I don't

1  recall a time.  In some way, shape, or form, we've

2  always been able to grant the accommodation.

3     Q.   Apologies if you already said this, but

4  when did you transition away from reviewing

5  offender requests for accommodation?

6     A.   So last year about this time,

7  Ms. Stickells and Mr. Lars were trained to be ADA

8  coordinators.  So I'm going to say last June

9  maybe.  I think they completed their training

10  around May or June.

11     Q.   So around May or June of 2024, you

12  stopped reviewing offender requests for

13  accommodation; Nurse Stickells and Nurse Ducote

14  took that task?

15     A.   Yes.

16     Q.   But if a request for accommodation is

17  coded as an ARP or is also within an ARP, you will

18  still review it because that's within your purview

19  as --

20     A.   Yes, because of my other area I'm over.

21     Q.   But if a request for accommodation is on

22  the special ADA form, you won't review that?

23     A.   No, I will not.

24     Q.   Do you know how frequently people fill

25  out the ADA accommodation form as opposed to just

1  writing an ARP to request ADA accommodations?

2     A.  I don't have an answer for that.

3     Q.  Is it frequent?

4     A.  I would think they fill out the form

5  more than they write the ARPs.  I don't -- I can't

6  answer truthfully on that.

7     Q.  Is it correct that a reasonable

8  accommodation under the ADA could include an

9  adjustment of a person's duty status?

10    A.  If needed, yes.  Again, I've never had

11 to do that.

12    Q.  You've never adjusted a person's duty

13 status as a reasonable accommodation under the

14 ADA.

15    A.  No, ma'am.

16    Q.  Has anybody at LSP ever adjusted a

17 person's duty status as a request for reasonable

18 accommodation under the ADA?

19    A.  Not to the best of my knowledge.  Not

20 that I'm aware of.

21    Q.  You mentioned a database earlier.  If an

22 ADA accommodation is requested or received, it's

23 entered into LSP's ADA database; is that right?

24    A.  It's actually the department's database.

25    Q.  It's the DOC's database?

1    A.  Yes, ma'am.

2    Q.  Does it have a name?

3    A.  If you let me pull up my email, I can

4  tell you the name of it.

5    Q.  Sure.

6    A.  It is called "ADA Cases."

7    Q.  If you can close out of your email and

8  let me know when that's done.

9    A.  I'm done.

10   Q.  Okay.  So if an ADA accommodation is

11  requested or received at LSP, it's entered into

12  the DOC's ADA database, which is called ADA Cases?

13   A.  Yes, ma'am.  It's on the Lotus Notes

14  format, yes.

15   Q.  And how frequently is that database

16  updated?

17   A.  Do you mean like -- what do you mean by

18  "updated"?

19   Q.  I mean, how often does an LSP employee

20  enter the DOC database to input new information?

21   A.  Okay.  So for me, I can only speak of

22  current knowledge as far as employees and

23  visitors.  Last month I did one and this month

24  I've done two so far.  So it varies depending on

25  the month how often you'll be in the database.

1    Q.   Who has access to ADA Cases among your

2   staff at LSP?

3    A.   So it's going to be -- what I'm aware

4   of, myself and Jennifer Stickells.  I'm not -- I

5   don't think Lars should still have access, but he

6   should have at one time.

7    Q.   Anyone else?

8    A.   Not that I'm aware of.

9    Q.   Okay.  To determine if a person has a

10   disability under the ADA, you refer to the

11   definition of "disability" in directive HCP37; is

12   that right?

13    A.   I don't know if it's 37 or 36.  But 37

14   sounds right.

15    Q.   And says it's a directive.  That is an

16   LSP --

17    A.   It's a departmental reg.  You quoted the

18   departmental reg number.  I don't have the LSP

19   directive number off the top of my head.  But you

20   quoted the reg number.

21    Q.   So to determine if a person has a

22   disability, you refer to the definition of

23   "disability" that is provided to you in the DOC's

24   regulation?

25    A.   Yes, yes.

1    Q.   And if you're unsure of whether a

2    condition qualifies as a disability under the ADA,

3    you would consult Sharita Spears at LSP

4    headquarters?

5    A.   Yes, ma'am.

6    Q.   Have you ever consulted with Ms. Spears

7    about whether a condition qualifies as a

8    disability under the ADA?

9    A.   Not for the inmate population, but I

10   have for a visitor.

11   Q.   What was the concern about that visitor?

12   A.   She was wanting to bring food in.

13   Q.   And what did you determine?

14   A.   Ms. Sharita Spears and I determined that

15   we offered the foods that she was wanting to bring

16   in in our concession stands during visiting.

17   Q.   What condition did that person have?

18   A.   That's a medical condition.  I don't

19   know that I should speak about that.  I mean,

20   that's her privacy.

21   Q.   You won't tell me what the disability

22   was that you were considering?

23   A.   She had numerous disabilities.  I

24   don't -- I don't -- I mean, you wouldn't want me

25   telling your business to people, so I don't think

1   that's appropriate.

2       Q.  Fair enough.

3          Aside from that one occasion, are there

4   any other occasions where you've consulted with

5   Ms. Spears about whether a condition qualifies as

6   a disability under the ADA?

7       A.  Not where it would pertain to an

8   individual person; maybe just a question I would

9   have as far as like height of something if we were

10  ordering like a table or something like that, you

11  know, make sure I had the height right for the

12  wheelchair to go under, things of that nature.

13  Just general stuff.

14      Q.  But have you ever consulted with

15  Ms. Spears as to whether a condition qualifies as

16  a disability aside from the one case you told me

17  about with respect to the visitor?

18      A.  For myself, just the visitor.

19      Q.  Okay.  Do you supervise Nurse Stickells?

20      A.  I'm not her direct supervisor, no, I'm

21  not.

22      Q.  Who is her direct supervisor?

23      A.  Mr. Will Riche.

24      Q.  What's his title?

25      A.  He is a Sup B.

1    Q.  A what?

2    A.  Supervisor B.  R.N. Supervisor B.

3    Q.   Does he have responsibilities with

4  respect to ADA coordination?

5    A.  No, he does not.

6    Q.   So if Nurse Stickells has a question

7  about her duties with respect to the ADA, who

8  would she ask?

9    A.   She may ask me, but she's also like I

10  am; we basically both would contact Sharita.  So

11  ADA is more like you get -- you're the

12  coordinator, so you're going to speak with -- like

13  my expert for me or my go-to person would be

14  Sharita.

15        So Ms. Stickells would be the same way

16  unless it was something she wanted my opinion on.

17  We've never done that.

18    Q.   Does diabetes qualify as a disability

19  under the ADA?

20    A.   I believe it is one of the

21  qualifications for a diagnosis.

22    Q.   Does hypertension qualify as a

23  disability under the ADA?

24    A.   I'm not 100 percent sure.  I mean, that

25  would be something I would reach out to Sharita or

1    I would do a Google search on the ADA laws.  I

2    don't know every diagnosis that qualifies

3    underneath that.

4        Q.  Have you ever had an occasion to --

5    where you needed to find out whether hypertension

6    qualifies as a disability under the ADA?

7        A.  All of the -- with respect to any of the

8    accommodations that I've done, none of them have

9    never dealt with a diagnosis; it's always been a

10   wheelchair, a walker, maybe a handicapped commode

11   seat or some rails that might need to be put in.

12   None of them have ever dealt with a diagnosis.

13       Q.  Do you know whether impaired

14   thermoregulation qualifies as a disability under

15   the ADA?

16       A.  I don't know that.  And I mean -- I

17   don't know that.

18       Q.  Have you ever asked Ms. Spears whether

19   impaired thermoregulation qualifies as a

20   disability under the ADA?

21       A.  No, ma'am, I have not because it's never

22   came up for me to do that.

23       Q.  Have you ever done a Google search to

24   find out if impaired regulation --

25   thermoregulation qualifies as a disability under

1   the ADA?

2       A.  No, ma'am, I have not.

3       Q.  Has LSP ever received a request for

4   accommodation under the ADA related to the

5   disability of impaired thermoregulation?

6       A.  Not that I'm aware of.

7       Q.  Has LSP ever received an ARP that

8   includes a request for accommodation under the ADA

9   related to impaired thermoregulation?

10      A.  So not to the verbiage that you're

11  saying, but there are some ARPs have been sent

12  about the heat stuff with this lawsuit.  You know,

13  they have to go through that process before you

14  can even have a lawsuit.

15      Q.  Were those ARPs that were related to

16  heat stuff about this lawsuit coded as a request

17  for accommodation under the ADA?

18      A.  I don't believe they were.

19      Q.  Why not?

20      A.  I don't know why not.

21      Q.  In order for an ARP to be coded as a

22  request for accommodation under the ADA, does it

23  have to say, This is a request for accommodation

24  under the ADA?

25      A.  No, ma'am, not necessarily.  If they're

1   screened and everything and it's talking about, in

2   general, like I'm having trouble walking or I'm

3   having trouble getting to the restroom, things of

4   that nature, use the bathroom facilities, anything

5   like that, then they can code it as an ADA

6   accommodation and it's researched to see if it is

7   a true accommodation or not.

8          On the end of -- like Ms. Stickells

9   would get it, and she would do the research and

10  talk to the offender.

11     Q.   When you say "do the research," what do

12  you mean?

13     A.   I mean like go down there, talk to the

14  offender, see what he's actually asking for in the

15  ARP, things of that nature.  You have to have an

16  active verbal role with the inmate whenever you

17  process anything with ADA.

18     Q.   And you recall seeing some ARPs related

19  to heat in this lawsuit?

20     A.   Yes, but I don't know exactly how many

21  or who wrote them.

22     Q.   What do you recall about those ARPs?

23     A.   Just that they were heat-related and

24  they were all about the same time as the lawsuit

25  and everything kicked off.  I don't know verbatim

1    what they said or anything like that.

2        Q.   Do you recall what the resolution was of

3    those ARPs?

4        A.   No, ma'am, I do not.

5        Q.   They would have reached your desk at

6    some point because you were the ADA coordinator;

7    is that right?

8        A.   They wouldn't have reached my desk

9    because I'm the coordinator.  They would reach my

10   desk because I'm over legal programs department

11   and I'm the deputy warden that signs off on every

12   ARP at Louisiana State Penitentiary.

13            So there is no way I can remember the

14   response to every single ARP.  I don't even

15   remember the ones that I read this morning.

16       Q.   I bet you get a lot.

17       A.   A lot.

18       Q.   So just to clarify and then we'll move

19   on, LSP has not received, to your knowledge, ever

20   a request for accommodation under the ADA related

21   to the disability of impaired thermoregulation?

22       A.   Not the verbiage you're using, no,

23   ma'am.  Not impaired thermoregulation, no, ma'am.

24   Not that I'm aware of.

25       Q.   Okay.  Let's talk about duty statuses.

1      A.  Okay.

2      Q.  Is it correct that every person

3  incarcerated at LSP is assigned a duty status?

4      A.  They would be assigned a regular duty

5  status unless they needed something special.

6      Q.  But everybody is assigned a duty status,

7  correct?

8      A.  Yes.

9      Q.  And a duty status refers to the kind of

10  work that a person is permitted to perform?

11      A.  It could, yes.

12      Q.  Is it correct that a duty status is

13  meant to inform LSP personnel that a person has an

14  injury or a health condition that limits their

15  ability to safely perform some certain task at

16  LSP?

17      A.  It can, yes.

18      Q.  And all duty statuses are written?

19      A.  So the duty statuses are inputted into

20  the electronic health record, and from there

21  they're printed and they're given to the

22  offenders.

23      Q.  Do offenders have access to their

24  electronic health records?

25      A.  No, ma'am, they do not.  But they can

1    request anything that they need through our HIM

2    department.

3        Q.   What's HIM?

4        A.   Health information management

5    department.

6        Q.   So an offender can request their medical

7    records through the HIM department?

8        A.   Yes.

9        Q.   Is an offender automatically given their

10   written duty status?

11       A.   At the time it's written, yes, to the

12   best of my knowledge, they are.  It's printed out.

13   It's not handwritten, it's printed out.

14       Q.   And each person -- so each person

15   receives his duty status on a piece of paper?

16       A.   Yes.  It's printed on a piece of paper,

17   yes, ma'am.

18       Q.   And he's then responsible for keeping

19   that paper on his person at all times so that he

20   can show it to officers?

21       A.   Yes, ma'am, he is.

22       Q.   And the purpose of a duty status is to

23   provide written communication to the incarcerated

24   person and also to security and classification

25   personnel as to the level of work activity that

1   the person is medically capable of performing?

2       A.  I wouldn't use the word "medical" there,

3   but I would just say the work activity that

4   they're capable of performing.

5       Q.  So the purpose of a duty status is to

6   provide written communication to the incarcerated

7   person and security and classification personnel

8   regarding the level of work activity the person is

9   capable of performing?

10      A.  Yes.  Some duty statuses are simply for

11  that reason, yes.

12      Q.  And at LSP, duty statuses are assigned

13  by a nurse practitioner or a medical doctor; is

14  that right?

15      A.  Yes.

16      Q.  Can anybody else assign a duty status at

17  LSP?

18      A.  Not that I'm aware of.

19      Q.  And as deputy warden and ADA

20  coordinator, you, Ms. Oliveaux, cannot assign or

21  change or remove a person's duty status, correct?

22      A.  I cannot do that.  The medical -- if I

23  have a request or they have a request for that,

24  the medical director has to evaluate that.  I'm

25  not medical.  That's a written order.  I can't

1   write an order.

2       Q.   So you don't play any role in assigning,

3   removing, or assessing duty statuses at LSP?

4       A.   No, ma'am, I do not.

5       Q.   Okay.  And the classification department

6   actually assigns jobs, correct?

7       A.   I believe so, yes.

8       Q.   But classification can't assign a duty

9   status?

10      A.   No, they cannot.

11      Q.   Okay.  It's correct that a person can

12  receive a duty status for heat pathology?

13      A.   Yes, they can.

14      Q.   And a heat precaution duty status means

15  someone is sensitive to exposure to heat, correct?

16      A.   A photosensitivity to some medication or

17  something like that, yes.

18      Q.   And you're reading from the copy of

19  HCP8?

20      A.   Actually I'm not.  It's not even on

21  here.  But it is written in here about

22  photosensitivity.  The first page doesn't have

23  that on there.

24      Q.   So you agree that a heat precaution duty

25  status means someone is sensitive to exposure to

1  heat?

2      A.  Yes.

3      Q.  What is the process by which people

4  incarcerated at LSP are evaluated for heat

5  precaution duty status?

6      A.  So are we evaluating the current

7  departmental reg or previous?  I just want to see

8  what era of this I'm talking about.

9      Q.  When did the current reg go into effect?

10     A.  October 20, 2024, that's the one that --

11     Q.  Let's talk about before October 20, 2024

12  first and then we'll talk about the current policy

13  in place.

14     A.  So beforehand it was strictly based --

15  it was -- I'm not going to say strictly.  It was

16  based off of psychotropic medications and

17  different medications that had photosensitivity.

18  A list would be produced from our pharmacy.

19         From there, we had a nurse that would

20  get with the provider.  Our provider had the heat

21  pathology duty status written.  He ordered it, and

22  then it was sent into medical records and mailed

23  out to the offender.

24         Also during any type of clinical visit

25  or anything like that at that time, if a provider

1   felt that the offender needed or an innate needed

2   a heat pathology duty status for any other reason,

3   they could assign it at that time.

4       Q.   So you first talked about a medication

5   list and then you talked about clinical discretion

6   to assign a duty status.

7           Are there any other processes by which

8   people were evaluated for a heat precaution duty

9   status before October 20, 2024?

10      A.   That is all that I'm aware of.

11      Q.   Okay.  So if a person took one of the

12  psychotropic medications on the list that you just

13  told me about, would that person automatically

14  receive a heat precaution duty status?

15      A.   Yes, they would -- would have, yes.

16      Q.   And would it matter what dosage of

17  medication the person took?

18      A.   I'm not sure if it was written out by

19  dosage.  I just know that there was a list of

20  medications.

21      Q.   Okay.  Would medication compliance

22  matter when assigning a heat precaution duty

23  status prior to October 20, 2024?

24      A.   So I would think that it would not

25  because you were simply getting the list from the

1  pharmacy of making you aware of all the offenders

2  that are -- that were on medication, you know,

3  that needed the duty status.

4     Q.   And when you say you would receive the

5  list, who precisely would receive that list?

6     A.   That would be -- at the time it was our

7  nurse at the mental health department.

8     Q.   Who was that?

9     A.   At that time, it would have been Ms. Amy

10 Hebert.

11    Q.   Has she left LSP?

12    A.   No, she's just no longer in that

13 department.  She got a promotion.

14    Q.   Okay.  So before October 20 of 2024, the

15 pharmacy department would send a list to Nurse Amy

16 Hebert of individuals who took one of the

17 medications on the medication list, correct?

18    A.   Yes.

19    Q.   And Nurse Hebert would assign every

20 person on that list a heat precaution duty status?

21    A.   Remember, she's a nurse, so she could

22 not write the order for the duty status.  She

23 would have to get with the medical director or one

24 of the health care providers and they would, you

25 know, approve -- they would have to write the

1   order.

2       And then she would make sure that the

3   list of every inmate that has a heat precaution

4   duty status has been sent out to all areas of the

5   department.

6       Q.  Okay.  So Nurse Amy Hebert could not

7   assign, change, or remove a person's duty status?

8       A.  No.  She has to bring the list, consult

9   with the doctor.  She can sign off on the order

10  that the doctor has written, but she cannot

11  physically write the order.

12      Q.  Okay.  The order is like a prescription,

13  I take it?

14      A.  Well, it's like you going to the doctor

15  and the doctor saying, No weight-bearing to your

16  right foot or something like that, like they write

17  that order in your chart.  They're prescribing you

18  that, I guess, for a sense.

19      Q.  Okay.  The other method that you told me

20  about by which people incarcerated at LSP could be

21  evaluated for heat precaution duty status before

22  October 20, 2024 was in clinical encounters where

23  a medical professional would evaluate a person

24  and, in their discretion, whether that person

25  should receive a duty status; is that right?

1    A.   Yes, that's right.

2    Q.   How would the medical professional

3  determine whether a heat precaution duty status

4  was appropriate?

5    A.   I really don't -- I don't have a

6  straight answer to give you for that because I've

7  never sat in on one of them with them while

8  they're doing that.  So I really don't know what

9  they would do.  You'd be better off maybe asking

10  Dr. Lavespere that question.

11    Q.   How frequently were heat precaution duty

12  statuses given based on clinical encounters as

13  opposed to based on the list of medications?

14    A.   I don't have the answer to that.

15    Q.   Who would know?

16    A.   I'm not sure who would know that.  I

17  really don't know.  Because, I mean, if you pulled

18  a random -- the list would just have the

19  offender's names on it.  I wouldn't -- you

20  wouldn't know if it was given based off of

21  medication or clinical.  I really don't know.

22    Q.   So my understanding is that LSP uses a

23  software system called PowerDMS to access any and

24  all regulations from DOC?

25    A.   Yes.

1    Q.   And also directives from LSP?

2    A.   Yes.

3    Q.   I'm deeply proud of myself for getting

4  that right.

5         So all DOC regulations and all LSP

6  directives are uploaded into PowerDMS?

7    A.   Yes.

8    Q.   And are you informed when a DOC

9  regulation or an LSP directive is changed?

10   A.   The medical department will send out an

11  email stating that this had been updated, and yes,

12  and then it shows up in our PowerDMS box as well.

13   Q.   So when that DOC regulation or an LSP

14  directive is changed, LSP's medical department

15  will notify all LSP personnel about that change

16  via email and also you'll get a notification from

17  PowerDMS?

18   A.   So for LSP I'm really -- I'm thinking --

19  for LSP, the lady in charge of updating our

20  directives would update it, she would send an

21  email out departmental wide saying that this has

22  been updated, and then at that time you can go in

23  and view it in PowerDMS.  They'll actually send

24  you a link on the email.

25   Q.   As deputy warden, do you have a role in

1  relaying the update to your staff?

2      A.  I'll usually forward the email to them,

3  to like the department heads, but not the whole

4  staff.  That way the department heads can disperse

5  it.  I'm not required to do that, I just do it.

6      Q.  I see.  So when there's an update to a

7  DOC regulation or an LSP directive, you personally

8  are not required to ensure that your staff knows

9  about it?

10      A.  No.  I just do it.  I mean, because your

11  staff is getting -- like your department heads --

12  if it's a medical regulation that's been updated,

13  the department heads that I would be emailing, the

14  director of nursing, the medical director, things

15  of that nature, they are already getting the email

16  from headquarters, I'm just resending it.

17      Q.  But you don't have to do that?

18      A.  I don't have to do that, no, ma'am.

19      Q.  Okay.  HCP8.

20      A.  Okay.

21      Q.  You have that in front of you.

22      A.  Yes.

23      Q.  DOC's heat pathology policy; is that

24  correct?

25      A.  Yes.

1    Q.   And HCP8 is a DOC regulation?

2    A.   Yes.

3    Q.   HCP8 establishes provisions for the

4    reduction of heat pathology, and it also is

5    intended to reduce the exposure of inmates

6    identified as more vulnerable to heat, to heat

7    pathology; is that right?

8    A.   That's what the purpose is.

9    Q.   I'm sorry, that's what the purpose is?

10   A.   That's what the purpose on page 1 says

11   verbatim.

12   Q.   Is that what HCP8 is intended to do?

13   A.   Yes, ma'am.

14   Q.   If you flip to the bottom -- actually,

15   let me just share my screen, which is what has

16   been marked previously as Exhibit 108.  Let's just

17   make sure we're looking at the same thing.

18        I'm showing you what has previously been

19   marked as Exhibit 108.  Do you see on your screen

20   HCP8 dated 20th October 2024?

21   A.   Yes.

22   Q.   And at the bottom of the first page it

23   bears the Bates number 030613?

24   A.   Yes.

25   Q.   It's a seven-page document that ends

1    with some signatures of, it looks like, Secretary

2    Wescott and Ms. LaBorde?

3        A.  Yes.

4        Q.  Is this the document you have in front

5    of you?

6        A.  Yes.

7        Q.  Now, this document refers to three

8    attachments.  Do you see this on your screen?

9    Attachment A is heat pathology medications,

10   Attachment B is the medical exclusion list, and

11   Attachment C is heat pathology staff training.

12          Do you see that?

13       A.  Yes.

14       Q.  Do you have those attachments with you?

15       A.  No, I do not.

16       Q.  Are those attachments considered part of

17   HCP8?

18       A.  Yes.

19       Q.  Does LSP have authority to revise or

20   change or alter HCP8?

21       A.  No, ma'am.

22       Q.  Does LSP have authority to revise or

23   change or alter any of the attachments to HCP8?

24       A.  No, ma'am.

25       Q.  Is LSP required to implement HCP8?

1    A.  Yes, ma'am.

2    Q.  What happens if LSP does not implement

3  some aspect of HCP8?

4    A.  I'm sure we'd get in trouble by

5  headquarters.  I don't know.  I don't want to

6  know.

7    Q.  So, for instance, if LSP declined to

8  provide ice and water to all inmates working

9  outdoors during heat season, would that be a

10  violation of this policy?

11    A.  Yes.  Because we're supposed to provide

12  them with water.  Yes.

13    Q.  And how would DOC know whether LSP is

14  complying with this policy or not?

15    A.  I don't know how they would know.  I

16  don't -- I don't know.  I guess they would have to

17  do a random check.  I don't know.

18    Q.  Is it correct that DOC last revised HCP8

19  on October 20, 2024?

20    A.  That's the date that's provided.

21    Q.  So is it correct that DOC last revised

22  HCP8 on October 20, 2024?

23    A.  Yes.

24    Q.  Has DOC revised this policy since

25  October 20, 2024?

1    A.  I think maybe one of the attachments has

2  been revised, the medication one, in November

3  maybe.

4    Q.  Okay.  Aside from November revisions to

5  the medication list, have there been any other

6  revisions to HCP8 since October 20, 2024?

7    A.  Not that I'm aware of.

8    Q.  Is this something currently in effect at

9  LSP?

10    A.  Yes.  We are following it, yes.

11    Q.  And has it been in effect at LSP since

12  October 20, 2024?

13    A.  Yes.  I think we started looking at

14  adjusting our directives about that time, and then

15  that's when we noticed that some of the

16  medications were left off.  So we contacted

17  headquarters and they did a review, and that's how

18  the medication list got changed.

19    Q.  So tell me more about that.

20    A.  That's all I know about that.  Our

21  nurses -- we were reviewing it, the nurses were

22  reviewing it.  They realized there was a couple

23  medications that weren't on there.  And we

24  reported it to headquarters and they immediately

25  revised the attachment.  So it was just an

1    oversight.  But that's why we've got checks and

2    balances.

3        Q.   So DOC published or put out this revised

4    HCP8 on October 20, 2024, correct?

5        A.   Yes.

6        Q.   And did they do that through PowerDMS?

7        A.   Yes.  It would have went through

8    PowerDMS, yes.

9        Q.   And subsequent to that, some LSP nurses

10   reviewed HCP8 and the three attachments?

11       A.   Yes.

12       Q.   And those nurses realized that some

13   medications were missing from the HCP8

14   Attachment A, the medication list?

15       A.   Yes.

16       Q.   And what did they do with that

17   information?

18       A.   So we reported it to headquarters, the

19   chief nursing officer's office.  And then from

20   there I assume, because they updated it, they

21   reviewed it as well and updated it.

22       Q.   So who were the LSP nurses that realized

23   that there was an omission?

24       A.   I think it was just Ms. Amy Hebert.  I'm

25   not 100 percent sure, but I really think it was

1  Ms. Amy Hebert.

2      Q.   And who did she take that information to

3  in the first instance?  Did she go directly to the

4  chief nursing office at headquarters?

5      A.   No.  She would have went to -- I'm not

6  sure who she went to, maybe Dr. Toce or our

7  long-term health care administrator at the time.

8  But she wouldn't have went like directly to

9  headquarters.

10     Q.   Do you know who took it to headquarters?

11     A.   Not off the top of my head, no.

12     Q.   When did you first become aware that

13 there were medications missing from Attachment A?

14     A.   Around the same time, in November,

15 whenever it was updated.

16     Q.   So you didn't know until the new list

17 came out?

18     A.   Well, I knew a little bit before because

19 I knew they had to email headquarters about it.

20 So it would be in that time frame.

21     Q.   Would you have been included on the

22 email to headquarters?

23     A.   Not necessarily, no.

24     Q.   Who is the chief nursing officer at

25 headquarters, or who particularly at headquarters

1   would have looked at this?

2      A.  I'm thinking it would have been

3   Ms. Stacye Rodriguez.

4      Q.  And Stacye is S-T-A-C-Y-E?

5      A.  Yes.

6      Q.  Okay.  So then what did headquarters do?

7      A.  I don't know what they did verbatim.

8   But apparently they reviewed the list and updated

9   the attachment because we got an updated

10  attachment.

11     Q.  How did the nurses, Nurse Hebert, if

12  that's who it was, how did she know that there

13  were medications missing?

14     A.  So whenever we get an updated

15  departmental reg, we do sit down together or we'll

16  give it to the department that handles -- like she

17  was -- she always handled the heat pathology in

18  the past with the medication list and asked them

19  to review it to see how we needed to adjust our

20  procedures or changes.  And upon reviewing, I

21  assume she noticed that there were some

22  medications that were left off.

23     Q.  And these are medications that were on

24  the previous version of the list that just hadn't

25  been copy-pasted to the new version?

1    A.  Yes, ma'am.  Yes, ma'am.

2    Q.  Were there any medications that were not

3  on the old version of the list that didn't make it

4  to the new version?

5    A.  What do you mean?  So there was some

6  missing from the old version that didn't make it

7  to the new version, so that's why we sent the

8  email.

9    Q.  And were there any medications that were

10  on the old version that are still not on the new

11  version?

12    A.  Not that I'm aware of, but --

13    Q.  So the new version of the medication

14  list took the old version and added medications to

15  it?

16    A.  The new version took the old version and

17  added medications to it.  So I think y'all

18  probably started the -- they probably started with

19  the old version and added medications to it.

20    Q.  Got it.

21      Okay.  And you said earlier that this --

22  this error was caught because Ms. Hebert was -- or

23  somebody was starting to review the policy -- let

24  me start again.

25      You said earlier that this omission was

1   caught because LSP staff were starting to review

2   HCP8 to turn it into an LSP directive?

3      A.  To update our directive, yes, yes.

4      Q.  What's the status of that updated

5   directive?

6      A.  So I have turned that in to our -- I

7   don't -- I don't have access to update them.  I

8   send what we need updated to our executive

9   management officer, and she updates them and then

10  puts them into PowerDMS.

11     Q.  Who's the executive management officer?

12     A.  Ms. Betty Thompson.

13     Q.  So you have drafted the -- is it a

14  revised version of Directive 13.067?

15     A.  If that's the heat pathology one, it

16  sounds right, corrected that it is, then yes,

17  basically to -- that's when you make the revisions

18  based off of the departmental reg.

19     Q.  And you said it was Ms. Betty -- what

20  was her last name?

21     A.  Thompson.

22     Q.  When did you send that to Ms. Thompson?

23     A.  I think I did a final review about two

24  weeks ago because I was checking on it just to see

25  if it had been processed, and I looked over it

1  again and I resubmitted it to her about two weeks

2  ago.  Originally probably around July I submitted

3  it to the previous EMO.

4      Q.  And is Ms. Betty Thompson an LSP person

5  or DOC person?

6      A.  LSP.

7      Q.  And she has final say on whether the

8  policy is updated as you recommend?

9      A.  She's the person in PowerDMS -- you have

10  to have one sole operator that updates all of your

11  policies, and she puts them into the workflow.

12  And once it's into a workflow, it goes to all your

13  department heads and everything for review and

14  signing off that everything is correct within the

15  policy, and then it's signed after the --

16      Q.  Who ultimately has to sign off on the

17  policy?

18      A.  Dr. Toce will ultimately sign off on it

19  and the warden of the prison, Warden Vannoy.

20      Q.  And Dr. Toce is the --

21      A.  Medical director.

22      Q.  Do you know if Dr. Toce and Warden

23  Vannoy plan to sign off on the directive?

24      A.  I'm sure they will once it completes the

25  process.  I don't see any reason why they would

1  not.

2      Q.  Is there anything in the directive as

3  you revised it that is different from HCP8?

4      A.  No, ma'am.  No, ma'am.

5      Q.  Okay.  So does -- so let me just be

6  clear.  Directive 13.067 is LSP's heat pathology

7  policy, right?

8      A.  Yes, ma'am.

9      Q.  Does DOC have authority to revise or

10  alter Directive 13.067?

11     A.  So DOC has the -- can review any of our

12  policies at any time for accuracy, and they can

13  make recommendations on if we -- maybe verbiage

14  changes or things that we may have -- if we

15  overlooked something.  But it still has to go

16  through the process at LSP.

17     Q.  DOC cannot revise or alter an LSP

18  directive, but DOC can make recommendations?

19     A.  Yes.

20     Q.  Why wasn't Directive 13.067 revised in

21  October of 2024 when HCP8 was revised?

22     A.  I don't have an answer to that.  I know

23  it was worked on and I know it was sent to be

24  placed.  We've had turnover in our office since

25  then.  So I'm just working backwards trying to

1  make sure all my stuff got updated.

2      Q.   What office are you referring to that

3  had turnover?

4      A.   Executive management office.

5      Q.   But you personally updated Directive

6  13.067 to comply with HCP8, right?

7      A.   I made some edits to it, and then I

8  spoke with some of our staff just to make sure we

9  were on the same page.  But, yes, I physically

10  made sure two weeks ago that everything was

11  compliant.

12     Q.   And when did you start the process of

13  updating 13.067?

14     A.   I don't know.  I want to say it was

15  probably -- I mean, I don't know.  Maybe around

16  November after the updated attachment came out we

17  started discussing HCP8 in reference to our

18  directive, things of that nature.

19     Q.   Why did it take so long to update

20  13.067?

21     A.   I have no clue.  It's not -- if you --

22  it's not completely updated through the process

23  yet, so it's still not updated.  I have no idea.

24  But everything that was in practice that was

25  written in here was in practice at the time.



1        Like if it was written in here and the

2    farm lines were going out, they were getting the

3    shade, they were getting the water, they were

4    getting the sunscreen.  They were getting

5    everything that was in this departmental reg at

6    that time.  Because actually, we had started it

7    before this departmental reg was updated.

8        Q.  What do you mean?

9        A.  Well, you know as well as I do that we

10   made those -- that we had tents provided and we

11   provided sunscreen starting as early as, what,

12   August, June, somewhere up in there.  So that's

13   what I mean.  So --

14       Q.  Oh, I see.

15       A.  -- this departmental reg was based off

16   of the changes that was made when y'all initially

17   came.

18       Q.  So LSP had already changed the policies

19   and procedures that were at issue, and this is

20   just putting it in writing?

21       A.  We had changed our practices, and now we

22   just needed to put it into writing.

23       Q.  I got it, okay.

24        So what is the process by which an LSP

25   directive can be revised?  It's you?

1    A.  So the process --

2    Q.  Go ahead, you tell me.

3    A.  So the process is if a -- just in

4  general, when a departmental reg comes out for any

5  type of policy, you go to that -- I mean, for any

6  type of policy, you go to that policy, you pull

7  that policy up, it would be the department heads.

8        I'm just a little more involved than

9  some of the other wardens.  It would be -- I would

10  look at it because I want to know what changed.

11  And you start your workflow kind of -- we would

12  talk amongst ourselves to see what we needed to

13  change and how we needed to make it work for our

14  department.

15        And then I have to request that Ms. --

16  the EMO starts the draft process in PowerDMS.  And

17  then it goes through a whole workflow.

18    Q.  And that's where Directive 13.067 is

19  right now, specifically it's with --

20    A.  It should be --

21        (Multiple speakers.)

22        THE COURT REPORTER:

23          I'm sorry, I didn't hear that.  The

24        last part.

25        MS. WRIGHT:

 1          Let me ask it again.

 2          THE COURT REPORTER:

 3          Thank you.

 4   BY MS. WRIGHT:

 5      Q.   So Directive 13.067, right now, is in

 6   the process of being revised, and specifically you

 7   have submitted your proposed revisions to

 8   Ms. Betty Thompson, who is inputting it into

 9   PowerDMS, correct?

10      A.   Yes.  She will input it into PowerDMS,

11   yes.

12      Q.   And after that, it will go to Dr. Toce

13   and Warden Vannoy for their signatures?

14      A.   No, ma'am.  After that, it has to --

15   like it will go to -- like your director of

16   nursing will look at it, you know, you need to

17   have other staff look at it.

18          I don't know what the workflow would be

19   for it, but it goes through a workflow process.

20   Then it ultimately comes back to me and Dr. Toce,

21   we both sign off on it.  And then our ACA office

22   looks at it for ACA standards.  Then the final

23   approval goes to Warden Vannoy.

24      Q.   So there are still quite a bit more

25   steps in this?

1    A.  Yes.  But it will be put out before it

2    has to start May 1st.

3        Q.  So if HCP8 which is the DOC regulation

4    conflicts with Directive 13.067, which controls?

5        A.  The departmental reg.

6        Q.  Okay.  Let's look back at Exhibit 108,

7    which is the HCP8 that you have in front of you

8    without the attachments.

9            Do you see the document on your screen?

10       A.  Okay, there it is.  It's there.

11       Q.  So this is Exhibit 108 that we looked at

12   a moment ago.

13       A.  Okay.

14       Q.  Let's skip down to page 5.

15       A.  Give me one second.

16       Q.  Feel free to either look on the screen

17   or look on the hard copy that's in front of you.

18       A.  Okay, I'm at page 5.

19       Q.  So let's look at the Outdoor Procedures

20   section.

21       A.  Okay.

22       Q.  "The warden or designee shall ensure the

23   following outdoor procedures are implemented for

24   all inmates in all outdoor areas between 8:00 a.m.

25   and 7:00 p.m. from May 1 to October 31."

1       Did I read that correctly?

2    A.  Yes.

3    Q.  And then it designates that "The

4  following shall be available to all inmates in

5  outdoor areas:  Water and ice, shaded areas for

6  breaks, and sunscreen."

7    A.  Yes.

8    Q.  How has LSP implemented those changes to

9  HCP8?

10    A.  So water and ice are provided, always

11  have been.  Shaded areas originally started with

12  the shade tents, now they have shade trailers, I

13  believe they call them.

14       And the sunscreen, we initially started

15  that probably -- we make sure they have sunscreen

16  on the line.  That was started at the -- in the

17  summertime whenever this all came about.

18    Q.  Why did DOC change the hour by which

19  these procedures must be implemented to 8:00 a.m.?

20    A.  I -- I wasn't involved in that

21  conversation.  You may ask Dr. Lavespere that if

22  y'all are going to talk to him.

23    Q.  Okay.  Further down the page it says, "A

24  rest break at least 15 minutes is offered every 45

25  minutes."

1    A.  Yes.

2    Q.  How has that been implemented?

3    A.  How?

4    Q.  How has that been implemented at LSP?

5    A.  As far as I know -- I don't go to the

6  field area often, I do not work in that area.  As

7  far as I know, they offer rest breaks every 45

8  minutes for 15 minutes and they let them go

9  underneath the shade tents and shade trailers and

10  they have water and everything that they need

11  right there.

12    Q.  How do you know that to be true?

13    A.  Well, I mean, all I can say is I've

14  passed by and I've seen them out there on their

15  breaks.  I don't know how long they've been on

16  their breaks.  But they're underneath the tent --

17  well, they was at one time underneath the tent,

18  now they're under the trailers, and they're

19  drinking water.  So...

20    Q.  So from the times you've passed by --

21    A.  Uh-huh, I've seen them, yes.

22    Q.  From the times that you've passed by

23  driving from one place to another, you've seen

24  what appears to you to be people taking a break?

25    A.  Yes.

1    Q.   Under a shade structure?

2    A.   Yes.

3    Q.   And from that you infer that this policy

4  is implemented at LSP?

5    A.   I would, yes.

6    Q.   Is there any other evidence that you're

7  aware of that indicates to you that this policy is

8  implemented at LSP?

9    A.   Based off the breaks and stuff.  Other

10  than we've sent memos out, we've educated

11  everybody, and everybody is aware of these outdoor

12  procedures.

13    Q.   Who's "everybody"?

14    A.   The whole department, all staff.

15    Q.   All LSP staff are aware of these

16  procedures?

17    A.   Yes, yes, especial -- yes.

18    Q.   What is the cost, in terms of dollars,

19  of ensuring that all inmates in all outdoor areas

20  have access to water, ice, shade, and sunscreen?

21    A.   I have no idea.  That would be like -- I

22  do not do our budget here.  That's a budget

23  question.  I have no idea.

24    Q.   Who is responsible for making sure that

25  there's ice available to all inmates in outdoor

1   areas at LSP?

2       A.  So I would assume that would be their

3   unit wardens or the person over the area that

4   they're working at.

5       Q.  How do you know that to be true?

6       A.  I mean, I don't know that to be true

7   because I haven't physically given them ice or

8   physically seen anybody do it, other than I see

9   the water coolers and stuff out.

10      Q.   Has DOC provided instructions to LSP

11  staff with respect to who is responsible for

12  providing water and ice?

13      A.  I believe that it's the supervisor of

14  the areas.  I don't know -- I think it was -- not

15  currently they provided instructions.  I think

16  this is something that happened previously with

17  all of the other heat pathology policies and

18  regulars.

19      Q.   And who has decided what type of shade

20  structures to provide for all inmates in all

21  outdoor areas at LSP?

22      A.  I believe that was a conversation that

23  Warden Hooper and maybe Mr. Otis Ratcliff in

24  maintenance had.  I wasn't privy to that.  I was

25  just told what it was going to be.

1    Q.   How does DOC ensure that all inmates in

2   all outdoor areas receive a 15-minute rest break

3   every 45 minutes?

4    A.   So all I can say, again, I do not have

5   any offenders under me where I would have to do

6   this.  So all I can say is that the supervisors of

7   the areas have told their employees that this is

8   the protocol, this is the procedure, and this is

9   what we're going to do.

10       I believe Mr. Roland would have been the

11   better person to answer these types of questions

12   for you since he's physically working in that

13   environment and over that environment.

14    Q.   Is the version of Directive 13.067 that

15   you drafted going to include these procedures that

16   we've just discussed?

17    A.   It's verbatim.

18    Q.   Is there anything additional or

19   different about these procedures that will go into

20   Directive 13.067?

21    A.   No, ma'am.

22    Q.   Are there any more specific directions

23   for what these procedures should look like or who

24   should provide them or when or how?

25    A.   No, ma'am.  Again, it's going to go into

1    a draft form.  So whenever some -- if a security

2    area warden looks over it, then they can put their

3    input in and changes can be made.

4        Q.  You said it's going to go into a drive

5    form?

6        A.  A draft.  It goes into PowerDMS --

7        Q.  A draft.

8        A.  -- and it has to be reviewed in a draft

9    form so people can make recommendations and

10   changes as they're reviewing it.

11       Q.  Okay.  Let's go up to look at page 3.

12   So we're looking at page 3 of Exhibit 108, which

13   is HCP8 -- the signed version of HCP8 dated

14   October 20, 2024.  This provision refers to

15   clinical encounters with inmates.

16           Do you see that where I'm reading?

17       A.  Yes.

18       Q.  Can you go ahead and read silently, to

19   yourself, just go ahead and read this whole

20   page to yourself, 1a, b, c, d, and the note, and

21   let me know when you're finished.  Just let me

22   know verbally when you're finished reading page 3.

23       A.  Okay.

24       Q.  Let's look at 1b.

25       A.  Okay.

1    Q.   Let me first ask, is there anything

2  about what you just read on page 3 of HCP8 that is

3  not implemented at LSP today?

4    A.   No, ma'am.

5    Q.   So this is accurate as to the actual

6  procedures in place at LSP today?

7    A.   Yes, ma'am.  All of our providers have

8  been provided a copy of this and the attachments.

9    Q.   And they complied with it?

10    A.   To the best of my knowledge.

11    Q.   So Section B states that during a

12  clinical encounter, "The health care practitioner

13  or provider shall evaluate each inmate with a

14  medical condition listed in Attachment B, the

15  medical exclusion list, or prescribed a medication

16  listed in Attachment A, heat pathology

17  medications, to determine if a heat precaution

18  duty status is indicated, provided the inmate does

19  not have a more restrictive permanent duty

20  status."

21          Did I read that correctly?

22    A.   Yes.

23    Q.   How does a health care practitioner or

24  provider at LSP determine whether a heat

25  precaution duty status is indicated?



1    A.  So whenever they see them in their

2    clinical visit, they can review their medication

3    list and they can review their diagnosis list,

4    compare it to the attachments.

5           And if it is one of the medications or

6    diagnosis on the attachment, then they can discuss

7    heat pathology signs and symptoms, they can

8    educate them, and from there they can write them

9    the duty status.

10   Q.  Well, this doesn't say "can," it says

11   "shall," it shall be --

12   A.  They will write them the duty status.

13   But it also further down says the inmate has the

14   option to opt out of it too, so that's why I say

15   "can."

16   Q.  Well, we're not talking about that part.

17   A.  Right, I know, I'm just saying.

18   Q.  We're talking about what health care

19   practitioners or providers are responsible for

20   doing.

21          So at LSP, during every medical

22   encounter, the health care provider, so the EMT,

23   the nurse, Dr. Toce, whoever the health care

24   provider is, evaluates each person for a medical

25   condition on list B or a medication on list A and

1  determines if a heat precaution duty status is

2  indicated?

3      A.  The health care practitioner/provider.

4  That is a doctor or a nurse practitioner.  It is

5  not a nurse, regular nurse.  It's not an EMT

6  person.  It is the practitioner, which is a nurse

7  practitioner, or the provider, which is the

8  doctor.

9      Q.  Okay.  So during every clinical

10  encounter, a nurse practitioner or a doctor will

11  evaluate whether the inmate should have a heat

12  precaution duty status?

13      A.  Based off of the attachments, yes.

14      Q.  And to do that, the doctor or the

15  registered nurse will look at Attachment A and

16  will look at Attachment B and determine whether

17  the person either has one of the conditions or

18  takes one of the medications; is that right?

19      A.  The doctor or the nurse practitioner.

20      Q.  Right.

21      A.  Not the registered nurse.

22      Q.  Thank you for the correction.

23          So during a clinical encounter, the

24  doctor or the nurse practitioner will evaluate the

25  inmate, and if the person takes one of the

1  medications on Attachment B or has one of the

2  conditions on Attachment A, that person will

3  automatically receive a heat precaution duty

4  status, correct?

5      A.  Correct, unless they opt out.

6      Q.  So let's go to 1c and talk about just

7  that.

8      A.  Okay.

9      Q.  1c states that "A person can opt out of

10  a heat precaution duty status subject to approval

11  of the facility medical director by signing a

12  waiver, known as form HCP10-a, which is refusal to

13  accept medical or mental health care"; is that

14  correct?

15      A.  It also says they're going to be

16  educated on the risks of them opting out by the

17  health care practitioner or provider.

18      Q.  Right.  Is what I said correct?

19      A.  Along with them being educated, yes.

20      Q.  Who is the facility medical director?

21      A.  Dr. Paul Toce.

22      Q.  And is form HCP10-a a form that was in

23  existence before this policy was revised on

24  October 20, 2024?

25      A.  Yes.  It's a refusal form.

1    Q.   How many people have opted out of the

2  heat precaution duty status pursuant to HCP8?

3    A.   I don't know of any at this time.  I

4  haven't been notified of any.

5    Q.   How many people have been evaluated for

6  heat precaution duty status in a clinical

7  encounter?

8    A.   So evaluate -- evaluating for us,

9  because you have 4200-plus inmates here, we had

10  to -- we started on -- I want to say around

11  January 21, we pulled a list of every inmate that

12  was on one of the medications.

13        We took that, I believe it was around --

14  it was over 1500 inmates, I think.  And from

15  there, we started evaluating.  We had the

16  practitioners and the providers start evaluating

17  their medical charts.  We automatically gave them

18  heat pathology duty status.

19        And then after that, now we have the

20  providers and practitioners evaluate all the

21  remaining individuals.  Because you have to

22  individually go into each medical chart and look

23  at the diagnosis because I have no way of pulling

24  a report.

25        So they're individually going into each

1   chart and reviewing the medical records and the

2   diagnosises (sic), prescribing the heat precaution

3   duty status.

4         With that being said, after January 21,

5   on our intake, any offender that comes into LSP

6   during the intake, the medical practitioner or

7   provider is at intake, they do a clinical

8   encounter there, and at that time, they discuss

9   the heat conditions, the Attachment B,

10  Attachment A stuff.

11        And to the best of my knowledge, no one

12  during those clinical encounters had opted out on

13  the duty status.  Now, I'm going to go back to

14  make sure every one -- to meet the criteria of

15  this for May 1, we had to come up with a plan to

16  evaluate 4,200 -- roughly 200 individual charts.

17        So after we get the evaluation

18  completed, they are already getting their duty

19  statuses now, we will ask them, give them the

20  option because this is their health care, if they

21  would like to opt out.

22        And we will do this in a means of --

23  they have their JPay tablets.  We can send a JPay

24  blast out.  We have announcements that we can put

25  out on bulletin boards.



1          And we can also go through the -- if we

2     need to, we can go through the radio here, we have

3     a radio station here, and let them know if at any

4     time they feel that they need to opt out of this

5     duty status or they do not want this duty status,

6     that they can contact us through sick call, we

7     will not charge them for that sick call.  And we

8     will educate them at that time on the risks of

9     opting out of the duty status.

10         Q.  Are you planning to use those methods to

11    inform the population at LSP that they are now

12    entitled to heat precaution duty statuses if they

13    fall on either list?

14         A.  I mean, we can.  I can do that at the

15    same time whenever we send out the opt-out stuff,

16    I can.  I can put that on there.  It's not

17    anything harmful.  I can do that.

18         Q.  So you mentioned that starting on

19    January 21, some staff pulled together a list of

20    people who are taking a medication on -- listed on

21    Attachment A; is that right?

22         A.  Yes, yes.

23         Q.  Who was in charge of that project?

24         A.  The pharmacy can do that.

25         Q.  How many people were working on that

1  project?

2      A.  Honestly, everyone in our medical

3  department is actively working in some shape or

4  form on this project.  The keeper of the list is

5  our HIM department to make sure that we evaluate

6  every inmate here at Angola.

7      Q.  But my understanding is that, from your

8  testimony, that on January 21, the pharmacy staff

9  pulled a list of people who took one of the

10  medications on the list; is that right?

11      A.  Yes, yes.

12      Q.  There were about 1500 people on that

13  list, right?

14      A.  Roughly, yes.

15      Q.  And each of those 1500 people got a heat

16  precaution duty status; is that right?

17      A.  Yes, ma'am.  We are -- I believe they

18  have completed that.  I think Ms. Sharp told me

19  that all -- that everyone on the medication list

20  has officially gotten their duty status written by

21  a provider.  Now we're moving on to the diagnosis

22  part.  Yes, ma'am.

23      Q.  So for those 1500 people who got a heat

24  precaution duty status based on their medications,

25  was there a clinical encounter or a medical visit

1   that had to occur for them to get the heat

2   precaution duty status, or was it just, You have

3   the prescription, here's the status?

4       A.  We did it based off of the

5   prescriptions, here's the status.  Because there's

6   no way, like I said, I could get 4200-plus

7   encounters done in this time frame.

8       Q.  How were those 1500 people informed that

9   they now have a heat precaution duty status?

10       A.  So the 1500 people on the list, the

11   majority of them are the same ones from year to

12   year, you know, you can look at it like that.

13   They were just sent their heat pathology duty

14   status.  We sent it to them through the mail.

15       Q.  Like a physical copy?

16       A.  Yes, ma'am, they get a physical copy.

17       Q.  Okay.  So the 1500 people on the list by

18   now all have been notified that they have a heat

19   precaution duty status, and they have the physical

20   paper providing that status, yes?

21       A.  What I understand and what I'm being

22   told, yes, ma'am.

23       Q.  And in the meantime, everybody who might

24   be on the conditions list is being evaluated; is

25   that correct?

1    A.  So you cannot pull -- we have no way in

2    our EHR, they're working on it at headquarters, to

3    give us a report to pull based off of diagnosises,

4    mostly for Attachment B, I believe it is, based of

5    the diagnosises.  There's no way to pull that

6    through our EHR, so we're having to individually

7    take those 1500 out that got the medication one

8    and go through each one and look at it and see if

9    they meet the diagnosis for heat pathology duty

10   status.

11       Q.  So you're going back now for the 1500

12   who already have --

13       A.  No, ma'am.

14       Q.  -- the heat precaution duty status?

15       A.  No, ma'am.  The 15 -- so say you have --

16   just say you have -- I'm just throwing a number

17   out there.  You have 2000 inmates here at Angola.

18   You know 1500 of them have already gotten their

19   duty status based off of medications.

20           So that leaves you 500 charts that

21   someone has to individually go through.  So that's

22   what point we're at.  We're going through

23   individual charts now.

24       Q.  What a task.  So there's no way that you

25   can just type into a search engine, "morbid

1   obesity" and generate a list of names that way?

2       A.  Our headquarters department is working

3   on that with our EHR vendor, but at this time, no,

4   ma'am, I do not.

5       Q.  How many people are doing that task of

6   going through medical records?

7       A.  All of our providers.

8       Q.  How much time is that taking?

9       A.  We just set aside some time each day.

10  Some of our providers come in and work extra to

11  catch up on it -- or to do it, not catch up; we're

12  doing it.

13      Q.  How much is that costing?

14      A.  I have no idea.  Cost really is not an

15  object at this point.  I mean, we've got to get it

16  done.  We've got to be in compliance.

17      Q.  Is there a date by which you aim to be

18  in compliance?

19      A.  I aim to be in compliance before May 1.

20  I'm shooting for around April 16, but I am not

21  putting that in writing, but I can tell you it

22  will be before May 1.

23      Q.  Why April 16?

24      A.  I don't know.  It's just the date that I

25  just -- we picked.  It just sounds like a good

1    time.  It gives a little leeway to do checks and

2    balance and, you know, educate the population more

3    if we need to, talk about the opt-outs and things

4    like that.

5        Q.   And how many providers are working on

6    this project of going through individual medical

7    records to see if anybody has a medical condition?

8        A.   I have ten providers at any given time,

9    so all ten of them do work on it.

10       Q.   When did they start?

11       A.   We started around the January 21 time

12   frame.

13       Q.   And how -- what training did they

14   receive?

15       A.   So as I said earlier, they all get a

16   copy of the policy -- I mean, the departmental reg

17   and the attachments.  Dr. Toce, our medical

18   director, went over with them, you know, what we

19   were doing, why we were doing it, explained to

20   them -- I'm sure he explained page 3, they can all

21   read page 3.  It's laid out there what we need to

22   do.

23       Q.   So is it the case, then, that one of the

24   providers will receive someone's medical chart and

25   just read through every page, and if that person

1   has been diagnosed with a condition that is on

2   list Attachment B, that person will receive a heat

3   precaution duty status?

4       A.  So in the EHR, it does pull up your

5   diagnosises and your problem list.  So they can do

6   a quick reference there when they're evaluating

7   each one of them and look at it there.

8          They can also, as they see them in

9   clinic -- because, you know, they still hold

10  clinic daily -- they evaluate the inmates that

11  they are seeing at that time as well, and we just

12  strike them off of our list, our master list that

13  we have.

14      Q.  I see.  So in each person's electronic

15  health record, there's a sort of synopsis of

16  diagnoses?

17      A.  Yes, yes.  It's a problem list.

18      Q.  A problem list.  And if that problem

19  list lists a condition that is on Attachment B to

20  HCP8, that person will get a heat precaution duty

21  status?

22      A.  That is how we are initially doing this

23  to make sure everyone receives their duty status,

24  yes, ma'am.

25      Q.  Because some people's medical records

1  are just enormous.

2     A.  Yes, ma'am.

3     Q.  So the ten providers are using that

4  problem list in EHR to identify who should be on

5  the list based on their medical condition?

6     A.  Yes, ma'am.  And then they -- they also

7  have the EHR in front of them, if they need to dig

8  further into it, they can.

9     Q.  How many people have been granted a heat

10 precaution duty status based on their medical

11 conditions?

12    A.  I don't know off the -- I really don't

13 know that.  I just know that all 1500-plus with

14 the medications has been completed.

15    Q.  But you don't know the progress of the

16 medication list -- I'm sorry, the medical

17 conditions list of folks?

18    A.  No, ma'am.  I didn't -- I did not ask

19 for an update.  I asked for the update on the

20 medication list earlier in the week.

21    Q.  Who's responsible for the medical

22 condition project?

23    A.  So keeping track of who hasn't been seen

24 or actually doing the project?

25    Q.  Well, who's responsible for the output?

1   Who's responsible for coming up with the list of

2   names?

3      A.   So our health informations department,

4   like I said, I picked the January 21 date, we went

5   into our master control center, printing the list

6   of every offender that -- or inmate that's housed

7   at Louisiana State Penitentiary on that day.

8          From there, you would have taken your

9   medication list.  You know, you can take your

10  duplicates out, so you remove those things.  And

11  then that will leave you everyone else that you

12  need to review a chart for.

13         And as new intakes come in, like I said,

14  we're catching them as they're coming in, we add

15  them to the list and denote that they were seen.

16     Q.   But just to be clear, the ten providers

17  who are working on this project right now aren't

18  reviewing everybody's medical records, they're

19  reviewing the problem list in EHR?

20     A.   I know they can review the problem list,

21  that's what they see.  They have the option to

22  review the medical record.  I cannot say they are

23  not or they are, because they may very well have

24  -- be doing that.  Because the EHR is in front of

25  them.

1    Q.   Right.  But as far as DOC is aware, the

2    way that people are being put on the -- the way

3    that people are being given a heat precaution duty

4    status based on their medical condition under the

5    revised HCP8 is by one of these ten LSP providers

6    looking at the problem list in the person's

7    electronic health record?

8    A.   So the problem list is the diagnosis, so

9    yes, they do look at that.  But they also can dig

10   further into the EHR, they have the access at that

11   time and they're looking at that.

12   Q.   I understand that they can.  But you

13   don't know whether they are?

14   A.   No, I can't say 100 percent that they

15   are.

16   Q.   Can you say with any percent that they

17   are?

18   A.   I really can't.  That would be a

19   Dr. Toce question.

20   Q.   Okay.  Let's look down at page 4 of HCP8

21   as revised October 20, 2024.  We're going to look

22   at 1d -- there is no 1d.  What was I looking at?

23   We'll come back to that.

24        Okay.  Let's instead let's go to page 2

25   of HCP8, Bates number 030614.  Let's look at the

1   definition of "heat alert" in subsection D.

2      A.  Okay.

3      Q.  The revised version of HCP8 defines

4   "heat alert" as "a designation when the apparent

5   temperature or heat index outdoors has exceeded

6   91 degrees Fahrenheit, requiring special

7   provisions."

8         Did I read that correctly?

9      A.  Yes.

10     Q.  Okay.  And then later on in this

11  document it states that "An inmate must be brought

12  indoors from May 1 through October 31 of each year

13  once the apparent temperature reaches 91 degrees

14  Fahrenheit."

15        Is that an accurate statement?

16     A.  Yes, it's somewhere in here, I've seen

17  it.

18     Q.  But that's the policy?

19     A.  Yes, it's within the policy.

20     Q.  And is that policy going into the LSP

21  directive that you've been working on?

22     A.  Yes.

23     Q.  Why did DOC increase the heat alert

24  trigger from 88 degrees to 91 degrees?

25     A.  I was not involved in that conversation.

1    You need to ask Dr. Lavespere that.

2        Q.   Dr. Lavespere was involved in that

3    conversation?

4        A.   Uh-huh, as far as I know.

5        Q.   And how has DOC implemented this policy

6    in particular, the new heat alert?

7        A.   Do you mean DOC in general or LSP?

8        Q.   We're talking about LSP.

9        A.   So how have we implemented it?  Well,

10   actually, we don't start implementing it until

11   May 1 of each year.  So when May 1 comes, I mean,

12   we pass out the departmental reg to everybody.

13   They all have seen it.  Also, every year in April

14   you're trained on heat pathology, and part of the

15   training is the heat alert, 91 degrees -- now it

16   would be 91 degrees, previously I think it was

17   88 degrees.

18       Q.   So you have not -- sorry, let me start

19   again.

20           So LSP has not implemented this new heat

21   trigger yet?

22       A.   For the 88 -- for the 91 degrees?

23       Q.   Right.

24       A.   So right now, if you read this policy,

25   even the other policy, heat alert, heat pathology

1  does not go into play until May 1 of every year

2  and it lasts 'til October 31.

3      Q.   Yeah, let's go up and look at that.

4      A.   So we have --

5      Q.   This was implemented on October 20,

6  2024, when there were 11 days left in the heat

7  season.  Is it your testimony that LSP has not

8  implemented this policy?

9      A.   I would have to go back and pull data

10  from that time frame because I know we've kept all

11  that to see.  We would have to look.  As far as I

12  know, they were still following the 88 degrees at

13  that time.

14     Q.   So LSP did not implement this policy

15  when it came into effect October 20, 2024?

16         MR. BLANCHFIELD:

17            Object to form.

18     A.   As far as I know, I would -- you'd have

19  to go back and pull the data.  As far as I know,

20  they were still doing the 88 degrees on

21  October 20.

22  BY MS. WRIGHT:

23     Q.   Why would LSP still be implementing the

24  88-degree threshold?

25     A.   I have no idea.  You have to give time

1   for departmental regs to get out to -- and educate

2   staff.  So, I mean, 11 days left in the year.  You

3   have a lot of staff you have to educate here.

4         MS. WRIGHT:

5            Okay.  Why don't we take a quick

6         break.  Let's go off the record.

7         THE VIDEOGRAPHER:

8            We are going off the record at

9         1:13 p.m.

10          (A break was taken.)

11        THE VIDEOGRAPHER:

12           We are going back on the record at

13        1:23 p.m. Eastern.

14  BY MS. WRIGHT:

15    Q.  Okay.  Ms. Oliveaux, welcome back from

16  the break.  We're going to look again at

17  Exhibit 108, which is the revised HCP8.

18        I found the provision that I wanted to

19  ask you about earlier.  If you could flip to

20  page 3.  We're going to look at subsection D, the

21  Bates stamp is 030615.  Let me know when you're

22  there.

23    A.  I'm there.

24    Q.  Okay.  This talks about exceptional

25  cases.  And this provision of HCP8 says, "In

1   exceptional cases, should the health care

2   practitioner or provider determine that a heat

3   precaution duty status is not necessary, the

4   clinical rationale for this determination shall be

5   documented in the inmate's medical record.

6         "Further, additional inmate education

7   regarding heat pathology risks shall be provided

8   and documented in the inmate's medical record."

9         Did I read that correctly?

10      A.   Yes.

11      Q.   Is that policy in place at LSP?

12      A.   Yes.

13      Q.   How frequently does a health care

14   practitioner or a provider at LSP determine that

15   heat precaution duty status is not necessary?

16      A.   I have never known them to do that.

17      Q.   And how would a health care practitioner

18   or provider make the determination that it is an

19   exceptional case where a duty status is not

20   indicated?

21      A.   So if they ask me about this, as their

22   deputy warden over them, I would ask them to

23   gather all their facts and reach out to

24   Dr. Lavespere since he is our chief medical

25   officer just to make sure that it is an

1  exceptional case.  Like I said, I've never known

2  this to happen.

3      Q.   Okay.  And you're -- but you're not

4  aware of a rubric or guidelines to determine

5  whether it's an exceptional case?

6      A.   No, ma'am, I'm not.

7      Q.   Are you aware of any examples or

8  hypotheticals of what might constitute an

9  exceptional case?

10     A.   No, ma'am.

11     Q.   I'm going to show you now what I'm

12  marking as 109.  We'll be marking this as

13  Exhibit 109.

14          (Exhibit 109 was marked.)

15  BY MS. WRIGHT:

16     Q.   On your screen do you see a document

17  titled Department Regulation No. HCP8,

18  Attachment A?

19     A.   Yes, ma'am.

20     Q.   And it's dated November 7, 2024?

21     A.   Yes.

22     Q.   And it is a three-page document.  The

23  Bates stamp on the first page is HCP8 Emails

24  00000224.

25     A.   Okay.

1    Q.  Did I read that correctly?

2    A.  Yes.

3    Q.  Have you seen this document before?

4    A.  That's Attachment A to the heat

5  pathology medication list.

6    Q.  When was the first time that you saw

7  this document?

8    A.  Probably, God, back in October I looked

9  at all the attachments.  I didn't like study them,

10  but I looked at them.

11    Q.  Is this the operative heat pathology

12  medication list at LSP?

13    A.  Yes, because it's the one dated in

14  November.  Because, as I said earlier, they had to

15  update it.

16    Q.  So this version of the medication list

17  includes eight medications that were not listed on

18  the October 20, '24 version of the list, right?

19    A.  Yes.  To the best of my knowledge, yes.

20    Q.  And you told me earlier that Nurse

21  Hebert recognized the omission and escalated it.

22  But who made the ultimate decision to add the

23  additional medications back to --

24    A.  That would have been -- that would have

25  been at headquarters level.  You would have to ask

1  Dr. Lavespere.

2      Q.  Did LSP implement the October 20

3  medication list?

4      A.  No, ma'am.  Because we were reviewing

5  and getting our processes together, so it would

6  have -- the November 7 list is what we would have

7  went off of because that's what we're using now.

8      Q.  So the 1500 people who have a heat

9  precaution duty status based on the heat pathology

10  medication list take one or more medications that

11  are on this list in front of you right now in

12  Exhibit 109?

13      A.  At least one of those medications, yes.

14      Q.  Is the November 7 version of

15  Attachment A, that's the one you're looking at

16  right now, Exhibit 109, in PowerDMS?

17      A.  Yes.

18      Q.  How does LSP know that it has identified

19  every person who gets a heat precaution duty

20  status based on this list?

21      A.  So we have to reconcile the list with

22  pharmacy.  Pharmacy prints us the list.  All of

23  our medication goes through our pharmacy

24  department.  So they're going to have a list of

25  everybody that's on a medication.

1    Q.   So if somebody is not currently taking

2    one of these medications but is today prescribed

3    one of them, will that person receive a heat

4    precaution duty status?

5    A.   Yes.  So when we spoke with the

6    providers -- like I said earlier, you have 4000

7    plus inmates.  We're trying to get everybody the

8    duty status that's needed for them by May 1.

9         So when the providers do see clinical

10   encounters with any offender, if they are newly

11   diagnosed or given a newly med -- new medication,

12   prescribed a new medication that's on this list

13   for a diagnosis that's on the other list, then at

14   that time they do the clinical encounter where

15   they talk to them, speak to them, explain to them

16   the risk of heat ex -- heat pathology, things of

17   that nature.  And they can give them the option at

18   that time if they want the duty status or not.

19   Q.   Why not just have the pharmacy

20   department send an updated list when somebody gets

21   a new prescription?

22   A.   I mean, ultimately, at the end, we could

23   do that, but then every day we would get an

24   updated list because we have clinics every day.

25   And then you would still -- the doctor would still

1   have to -- the doctor would still have to write

2   the order for the duty status.  So why not do it

3   while the person is right there with them?

4       Q.   But doesn't it add another step to

5   require someone to get the prescription and then

6   get another clinical encounter?

7       A.   No.  So you do everything at that one

8   clinical encounter.  So if you're the provider and

9   you're writing for this skeletal muscle relaxant,

10  whatever, one of them that's on there, and you

11  write that medication at that encounter, at that

12  time you educate that person on heat pathology and

13  you give them the duty status.

14         That way it's one visit, one encounter.

15  You're physically sitting there and you're

16  speaking to them about what's going on with them.

17      Q.   Got it, okay.

18         What does the ACH risk score on this

19  chart refer to?

20      A.   Honestly, I do not know.

21      Q.   At LSP, does the ACH risk score factor

22  into the implementation of the policy with respect

23  to the heat pathology medication list?

24      A.   No, ma'am, we don't look at that.  We

25  just base it off the medications.

1    Q.  So just to use the example that you

2  raised, schedule muscle relaxants, if a person is

3  taking a skeletal muscle relaxant and does not opt

4  out, that person will receive a heat precaution

5  duty status?

6    A.  Yes, ma'am.  Yes, ma'am.

7    Q.  And is that any person who takes a

8  skeletal muscle relaxant or only those that take a

9  daily maintenance dose?

10    A.  So anyone that's taking these is

11  probably prescribed this for a daily maintenance

12  dose, so the ones listed are going to be the daily

13  maintenance dose.  I don't know -- I don't really

14  think they would be like a five-day period time

15  frame.  But I guess at that time is whenever it

16  would be at the discretion of the provider.

17        You know, that might be one of these

18  circumstances you talked about.  I mean, I

19  couldn't think of one then, but that might be one

20  of these exceptional cases if it's just for five

21  days, you know.

22    Q.  And so far, nobody has opted out of this

23  new --

24    A.  No, ma'am.  No, ma'am.  I don't look for

25  them too either.

1    Q.  You what?

2    A.  I don't look for our normal people that

3   are normally on the medication list to opt out.

4    Q.  You don't --

5    A.  Like the guys that were previously on

6   the medication list, I don't look for them to opt

7   out.

8    Q.  What do you mean when you say you "don't

9   look for them to opt out"?

10   A.  The guys -- like, you know, our previous

11  medication list, all those guys are fluent with

12  having the heat precaution duty status, so I don't

13  look for none of them to opt out.

14   Q.  You don't expect any of them to opt out?

15   A.  Yeah, I don't expect the -- from the

16  previous list to opt out because they're very

17  familiar with it.

18   Q.  How many new people were added to the

19  heat precaution duty status list?

20   A.  I don't know.  I don't know.  I've been

21  curious of that myself.  I haven't -- I would like

22  to do it at the end, after they've seen everybody,

23  and figure that -- get that number.

24   Q.  Okay.  We're going to look at

25  Exhibit 110.

1        (Exhibit 110 was marked.)

2   BY MS. WRIGHT:

3       Q.  Did somebody say something?

4       A.  I was flipping through this thinking

5   this was 110, but it's not 110.

6       Q.  It's not.  But at the risk of confusing

7   our record, I will just -- just give me one

8   second.  So Exhibit 110 that I'm putting on your

9   screen, do you see it now?

10      A.  Yes.

11      Q.  Okay.  So this is a version of HCP8.

12      A.  Okay.

13      Q.  It is dated 20 October 2024.  It was

14  filed into the record in this case at ECF 136-7 on

15  October 21 of 2024.

16         Do you see all this on your page?

17      A.  Yes, ma'am.

18      Q.  Okay.  So this is the HCP8 that -- I

19  believe the policy itself is what you have in

20  front of you right now.  I'm scrolling through it

21  so that you can see.  Same signatures.  It's what

22  you have in front of you right now, the first

23  seven pages.

24      A.  Yes.

25      Q.  Including Attachment A.

1    A.  Okay.

2    Q.  Attachment A, which is the heat

3  pathology medications list, is dated 20

4  October 2024.

5    A.  Okay.

6    Q.  We've already discussed that this is not

7  the policy that is in place at LSP, right?

8    A.  Yes, you're right.

9    Q.  The policy that's in place at LSP right

10  now is what has been entered into the record as

11  109, Exhibit 109, what we just looked at, right?

12    A.  Yes.

13    Q.  Okay.  The reason why we're looking at

14  this is for Attachment B.  So we're going to look

15  at page 11 of Exhibit 110.  You should see this on

16  your screen.  It is labeled "Medical Exclusion

17  List" and dated 20 of October 2024.

18        Do you see that?

19    A.  Yes.

20    Q.  Are you familiar with this document?

21    A.  I've seen the document, yes, ma'am.

22    Q.  When did you first see it?

23    A.  When I had to review and sign off of it

24  in PowerDMS saying that I had seen it.

25    Q.  Do you remember when that was?

1      A.  It was probably around -- if it came out

2   on October 20, they probably published it that

3   same day in PowerDMS, so give or take a few days.

4      Q.  Is the LSP directive update to -- I'm

5   sorry, let me start again.

6          Is the update to LSP Directive No.

7   13.067 that you've been working on going to

8   include an Attachment A, an Attachment B, and an

9   Attachment C?

10     A.  Yes, ma'am, all the attachments will go

11  with it.

12     Q.  And will those attachments be identical

13  to the HCP8 attachments?

14     A.  Yes, ma'am.

15     Q.  So this medical exclusion list has been

16  in effect at LSP since October 20, 2024, right?

17     A.  I don't want to say that because, like I

18  said before, you know, we have to sit down and

19  review everything and go over -- you know, it has

20  to go out to everybody.

21         So it was -- the department reg was in

22  effect at that time, but I cannot say it was at

23  LSP, like we were using it at that time.  I don't

24  think we were.

25     Q.  When did you start using this at LSP?

1    A.  So this will be with our new group that

2  we're starting now because this is new, you know,

3  like we're starting to write their duty statuses

4  now for them.  So...

5    Q.  Okay.  So even though this is dated

6  October 20, 2024, it's really just going into

7  effect now, as --

8    A.  With the new duty statuses, yes, ma'am.

9    Q.  Let me just finish the question for the

10  record.

11      So even though this medical exclusion

12  list is dated October 20, 2024, at LSP it's going

13  into effect now because of the project you're

14  working on of reviewing everybody's medical file

15  for a heat precaution duty status?

16    A.  Yes, ma'am.

17    Q.  Is this medical exclusion list in

18  PowerDMS?

19    A.  Yes.

20    Q.  And have there been any revisions or

21  amendments to the medical exclusions list since

22  October 20, 2024?

23    A.  Not that I'm aware of.

24    Q.  Can an LSP health care provider or

25  practitioner or official change any of the

1   conditions on this list?

2       A.   No, ma'am.

3       Q.   Can they add any conditions?

4       A.   They could recommend it to

5   Dr. Lavespere's office and they can make

6   adjustments to it.

7       Q.   Could they remove any conditions?

8       A.   No, not without going through

9   Dr. Lavespere's office.

10      Q.   And Dr. Lavespere works for DOC, not

11  LSP?

12      A.   DOC, yes, ma'am.  Headquarters.

13      Q.   So headquarters would have to approve

14  any changes to this list?

15      A.   Yes.

16      Q.   What about in the Directive 13.067 that

17  you're working on, does headquarters have to

18  approve any changes to the list that goes into

19  that directive?

20      A.   So the list that goes in that directive

21  is the list that comes from headquarters.  So if

22  they made changes to it, then I have to make

23  changes to the attachment itself.

24      Q.   But could you have just made changes to

25  the LSP version?

1    A.  No, I cannot.

2    Q.  "You," meaning LSP.  Could anybody at

3  LSP make changes to the --

4    A.  No, no, no, they cannot.

5    Q.  Let's look at Exhibit 111.

6        (Exhibit 111 was marked.)

7  BY MS. WRIGHT:

8    Q.  Have you seen this document before?

9    A.  Can you scroll down some?  I've seen a

10 lot of documents like this, that's why I say.

11   Q.  That's fair.

12   A.  Go back up.  It looks familiar.

13   Q.  So this is Exhibit 111, Defendants'

14 Amended Responses to Plaintiffs' Third Set of

15 Interrogatories.  It is a four-page document.  And

16 it was produced to the Plaintiffs on February 3,

17 2025.

18        Do you see that date?

19   A.  Yes.

20   Q.  And I'm sorry, have you seen this

21 document before?

22   A.  Yes.

23   Q.  When did you see it?

24   A.  Well, probably around January the 31st,

25 if I had to guess.  I think this is the set of

1  documents that I got emailed to me around January

2  sometime.

3      Q.  Why were these documents emailed to you?

4      A.  Emailed to me?  I mean, they're

5  responses, so I'm sure I reviewed them.

6      Q.  Okay.  So there's only one interrogatory

7  in this document, Exhibit 111.  The question that

8  was posed is, "State all steps you have taken to

9  implement HCP8 at LSP, including steps taken to

10  identify any incarcerated person who is prescribed

11  a medication on the heat pathology medication list

12  or is diagnosed with a medical condition on the

13  medical conditions exclusions list."

14          Did I read that correctly?

15      A.  Yes.

16      Q.  Great.  Now, let's look at the answer.

17  The answer reads, in part, "LSP has pulled all

18  offenders who are prescribed medications on

19  Attachment A and has begun to issue heat

20  precaution duty statuses."

21          Is that accurate?

22      A.  Yes.

23      Q.  Which version of Attachment A does this

24  refer to?

25      A.  The November version.

1    Q.   Who made the decision to just

2  automatically issue a heat precaution duty status

3  to any person who takes a medication on that list,

4  was it LSP or DOC?

5    A.   LSP did.

6    Q.   Do you know who at LSP?

7    A.   It was Dr. Toce and myself, and I think

8  our DON was in the meeting with us.  Some of our

9  clinical staff.

10    Q.   What's a DON?

11    A.   Director of nursing.

12    Q.   When was that meeting?

13    A.   Probably the week before the 20th.

14    Q.   So like January?

15    A.   Yeah, it was in January.

16    Q.   In January, okay.

17         January of 2025?

18    A.   Yes.

19    Q.   Were there notes from that meeting?

20    A.   No, ma'am.  We just verbally sat at the

21  table and just talked, discussed it amongst

22  ourselves.

23    Q.   Is there a name for that meeting?

24    A.   No, ma'am.  It was just we decided to

25  sit down.  And it was time, we had to get started

1   reviewing this departmental reg and how we were

2   going to address 4000 inmates and their duty

3   status if they needed it.  So we needed to give

4   ourselves time to work on that.

5      Q.   So why did you decide, along with

6   Dr. Toce and others, to issue a heat precaution

7   duty status to anyone prescribed a medication on

8   the heat pathology medication list?

9      A.   Because, like I said, with 4000 inmates

10  that you would have to physically -- over 4000

11  inmates, that you would have to sit and review and

12  evaluate every chart, it would be very difficult,

13  time-consuming.  I couldn't guarantee that

14  everything would be done by the May 1 date.

15        So the easiest thing to do is you know

16  that you have a defined group off of the

17  medications that I can pull, and start with that.

18  So that took 1500 of those inmates off that we had

19  to review.  It was a good starting point.

20     Q.   Sounds like it.

21        Did DOC have to approve of that process?

22     A.   No, ma'am.

23     Q.   Was there any inquiry about a person's

24  medication compliance as part of that process?

25     A.   No, ma'am.  We did not look at the

1    medication -- I did not look at the medication

2    compliance.  I'm not sure if the providers did.

3    That would be something that I would have to ask.

4         Q.   And is this decision to give everybody

5    on the medication list a heat precaution duty

6    status memorialized in writing?

7         A.   No, ma'am.

8         Q.   Is it -- so it's not in PowerDMS?

9         A.   No, ma'am.  Like I said, it was our

10   starting point.

11        Q.   Are there plans to to take a different

12   path with respect to the medication list going

13   forward?

14        A.   So yes.  Going forward, as you and I

15   have discussed, whenever they have a clinical

16   encounter, if they're newly diagnosed or newly

17   prescribed one of the medications on the

18   attachments, they are discussed -- the heat

19   pathology duty status is discussed at that time,

20   and they are given their option as to if they want

21   the duty status or not, and they're given the

22   risks of not taking the duty status.

23        Q.   And how have staff and incarcerated

24   people been informed about this policy?

25        A.   So I'm not 100 percent sure that the

1  incarcerated people have been informed of the

2  updated policy.  They all know that there's a heat

3  pathology policy and what it endetails (sic).  The

4  staff was given copies of the departmental reg and

5  the attachments.

6     Q.  Have the staff also been informed that

7  every person -- that LSP has made the decision

8  that every person who takes a medication is going

9  to get a duty status?

10    A.  So as I said before, everybody getting

11  the medication was a starting point to initiate

12  this new departmental reg.  Going forward, they

13  will be based off their clinical encounter, you

14  know, when the new prescription is prescribed, so

15  that they have the option to take the duty status

16  for the medication or not.

17        Also, all the guys that were given this

18  duty status will have the option to opt out.  Once

19  we completely give everybody their duty statuses,

20  we will broadcast, you know, These are the steps

21  if you would like to opt out or not.

22    Q.  So but are you saying that the people

23  who are newly prescribed a medication on the list

24  are not automatically going to get it --

25    A.  No.  What I'm saying -- no.  What I'm

1    saying is -- okay, let's use the date January 20.

2    We pulled all -- everybody on Attachment --

3    Attachment A is the medication list, right?  So

4    Attachment A, you pulled every inmate in -- at LSP

5    on that day that was on one of those medications

6    on Attachment A.

7          You knew that that was -- I knew that

8    that was over 1500 inmates.  We knew that those

9    1500 inmates were going to need a heat precaution

10   duty status.

11          Going forward, going forward, at intakes

12   and at clinical encounters, if -- and I'm just

13   taking prescriptions right now, but it can be

14   based for diagnoses too, if someone is prescribed

15   newly medication that meets the criteria of

16   Attachment A or diagnosed that meets the criteria

17   of Attachment B, at that time they are educated

18   about heat pathology, they are offered their duty

19   status, and if they take it, they get it, and if

20   they don't, they sign a refusal with education

21   provided.

22       Q.   The next sentence in Exhibit 111 says,

23   "LSP and DPSC HQ are working to pull offenders

24   with illnesses on Attachment B."

25          So is it correct that LSP and DOC

1    headquarters are engaged in this project to

2    compile a list of people with an illness listed on

3    Attachment B?

4        A.   So LSP reached out whenever all the --

5    when this policy, HCP8, was updated, we reached

6    out to DPS&C headquarters, because when we started

7    trying to pull reports, we realized that you

8    cannot pull one single report with all those

9    diagnoses on it.

10           So headquarters, I guess, is our

11   go-between person and creates the reports for the

12   electronic health records.  So they are working on

13   creating that report.

14           In the meantime, to make sure that

15   everyone gets their precaution -- their duty

16   status, we are individually going through every

17   chart.

18       Q.   To look at the person's diagnoses?

19       A.   Yes, ma'am.

20       Q.   The summary diagnoses?  I'm sorry, what

21   did you call it before?

22       A.   It's called a problem list, but it's the

23   diagnosis, is what it is.

24       Q.   A problem list, okay.

25           So LSP, the ten providers that we talked

1   about earlier, are looking at every person's

2   problem list in their medical record, and if they

3   have a condition that's listed on Attachment B,

4   what is the next step?

5       A.   So if they have a condition that's

6   listed on Attachment B, they will be offered --

7   they will be given, just like the medication, the

8   duty status.  It will be ordered for them, health

9   informations department will issue it out to them,

10  send it to them in a paper copy.

11      Q.   Okay.  So let's go back -- I just want

12  to make sure I'm understanding this.  We're going

13  to go back to Exhibit 110, which we were using to

14  look at the medical exclusion list.

15      A.   Okay.

16      Q.   So if one of the medical providers who

17  is engaged in this chart review project looks at

18  the problem list of someone's file and sees that

19  they have pulmonary hypertension --

20      A.   Okay.

21      Q.   -- that person will get a heat

22  precaution duty status?

23      A.   Yes.  Yes.

24          And then if they are newly diagnosed,

25  say they go to clinic six months from now and they

1   didn't have a duty status and they're newly

2   diagnosed, they will -- you know, that's whenever,

3   you know, we educate them, we talk to them, we ask

4   them, this -- Do you want your heat pathology duty

5   status?  This is what happens if you opt out.  If

6   not, we write it then with the effective dates.

7       Q.   And if one of those health care

8   providers who is doing this review, looking at the

9   problem list, sees that somebody has pulmonary

10  hypertension and realizes that that is one of the

11  conditions listed on this medical exclusions list,

12  will the health care provider then look deeper

13  into the person's medical record, or is that

14  enough, just if it's listed on the problem list?

15      A.   So I cannot speak for each health care

16  provider, but they do have the opportunity

17  because, remember, they have the whole record in

18  front of them at that point.

19      Q.   But they don't have to do further

20  investigation?

21      A.   I do not mandate them to, no, ma'am.

22      Q.   Okay.  Let's go back to Exhibit 111.  So

23  let's go to the next sentence, "Beginning

24  January 20, 2025, all new intakes will be provided

25  a duty status review based on HCP8 and issued a

1   duty status if they are prescribed a medication on

2   Attachment A or illness on Attachment B, unless it

3   is refused."

4         Did I read that correctly?

5      A.  Yes, ma'am.

6      Q.  Is this decision, this policy,

7   memorialized in writing?

8      A.  No, ma'am.  It was just something that

9   we verbally talked about, that at intake, since we

10   already have a provider on staff, we could go

11   ahead and evaluate the need for the duty status at

12   that time.

13      Q.  And you verbally discussed this at the

14   meeting in January of 2025 with Dr. Toce?

15      A.  Yes.  Yes.

16      Q.  Has it been discussed since then?

17      A.  I don't know if he has.  I haven't

18   mentioned it to anyone.  I know that at the

19   intakes that I've attended, I've seen them do

20   this.

21      Q.  What do you mean?

22      A.  Well, I see the provider there sitting

23   with the offender going over his medication list,

24   going over his diagnosises, talking to them.  I

25   mean, I don't necessarily sit there and see if

1  they're on Attachment A or Attachment B, but I see

2  them physically going through each step of the

3  process at intake.

4      Q.   How many intakes have you observed since

5  this new policy has gone into place?

6      A.   Inmates or intake days?

7      Q.   Either.

8      A.   So since the 20th, every Monday except

9  for during the snow, we have been getting

10  approximately 25 to 30 inmates, and I've probably

11  attended three months.

12      Q.   And how many intakes did you see on

13  those -- on each of those three months?

14      A.   I stay the whole time while my medical

15  staff is doing their process, so each -- it

16  varies.  On intake days, 25 to 30 people have been

17  coming in.  So rough number, let's just say 75

18  individuals I've seen go through the process.

19      Q.   Is that a lot, or is it historically the

20  same amount, 25 to 30 new people?

21      A.   Just the past few weeks we've had an

22  increase.  I don't know why.  They've just been

23  sending us an increase of inmates.  So normally it

24  may be four or five inmates on an intake.

25      Q.   So you've seen about 75 new inmates go

1   through this process?

2       A.  Yeah, the one we're talking about right

3   here, yes, the --

4       Q.  Let me just ask the question.

5           So you've seen about 75 new intakes go

6   through this process of being assessed for heat

7   precaution duty status pursuant to this new HCP8?

8       A.  Uh-huh.

9       Q.  That's a yes?

10      A.  Yes.

11      Q.  How many of them were given a heat

12  precaution duty status?

13      A.  Like I said before, I just watch them

14  sit with the provider and the provider go through

15  the diagnosises that they have, medications

16  they're on.  I don't necessarily know.  I don't

17  stand close enough to hear or have Attachment A in

18  front of me or Attachment B.

19          I don't know.  I would have to find that

20  number out.  I just know they go through the

21  process, what your diagnosis is, what do you have.

22  We also have a transfer summary that has all that

23  on there as well.

24      Q.  But that's important, no?

25      A.  Huh?

1    Q.  Would it be important to know how many

2  people have a heat precaution duty status?

3    A.  I mean, at any time I can just ask our

4  health informations department, they can tell me.

5  So it's not a number that I'm going to know off

6  the top of my head.

7    Q.  But would it be important to know?

8    A.  I mean, I guess I feel I have other

9  things that are more important to know than that

10  because I can easily get that information.

11    Q.  So you can easily find out how many

12  people have a heat precaution duty status?

13    A.  Yes, I can.

14    Q.  Who would you ask?

15    A.  Our health informations department.

16    Q.  Who's the person?

17    A.  Ms. Kelly Hawkins or Ms. Jamie Sharp

18  would be the people -- the persons I might would

19  ask, either one of them.

20    Q.  When was the last time you asked them

21  for a number of people with heat precaution duty

22  statuses?

23    A.  Earlier this week I asked Ms. Jamie

24  where we were with the medication heat precaution

25  duty statuses, and she told me that we had

1  completed over 1500.  Just the medication ones, I

2  didn't ask about the other ones.

3      Q.   The next sentence in Exhibit 111 says,

4  "In addition, there will be a duty status review

5  for all clinical encounters, to include a review

6  of the medications and diagnosed illnesses."

7          Did I read that correctly?

8      A.   Yes, ma'am.

9      Q.   And we've talked about this at length.

10  My question is:  Is this a new process with

11  respect to clinical encounters?

12      A.   So the clinical encounters -- okay.

13  Anyone being seen in clinic going forward, they

14  will review their diagnosises, their problem list,

15  their duty status, their medications.  And if --

16  like I said before, if they got a newly diagnosed,

17  previously diagnosed, or on the med -- newly

18  medication or previously on a medication, they

19  will discuss with them what heat pathology is and

20  provide the duty status if the inmate wants the

21  duty status.

22      Q.   So this is the new process?

23      A.   Well, yeah.  But, I mean, at any -- your

24  duty statuses in general can be reviewed at any

25  clinical encounter, have always been reviewed if

1  the inmate wanted them to.  It was kind of if they

2  said they wanted their duty status reviewed.

3      Q.  But now --

4      A.  Now we're looking at them.

5      Q.  -- they are being reviewed?

6      A.  Yes, we are looking at them, yes.

7      Q.  At every clinical encounter?

8      A.  They're supposed to be yes, ma'am.

9      Q.  Does that include emergency medical

10 visits?

11     A.  If it's an emergency, I would say no.

12 More like your primary care visits, those types of

13 things, their health care provider visits.

14     Q.  So if a person places a sick call for a

15 broken toe --

16     A.  Okay.

17     Q.  -- would that person's duty status be

18 reviewed with them?

19     A.  Because it's a broken toe, in that

20 instance, yes, because you would obviously

21 probably give them a duty status because they

22 probably can't wear a shoe or something due to the

23 toe.

24         So I would say, yes, I think our NP that

25 does our sick call, routine sick call, I'm going

1   to call it, he does look at the chart pretty

2   thoroughly.  So I'm confident in saying he

3   probably looks at all the duty statuses when he's

4   seeing them.

5       Q.  Do you know that to be true?

6       A.  Huh?

7       Q.  Do you know that to be true?

8       A.  I don't know that to be true, but I'm

9   confident that he does.

10      Q.  So what about for an emergency sick

11  call, if a person places an emergency sick call

12  from their dorm for whatever reason, will that

13  person's duty status be reviewed during the

14  clinical encounter?

15      A.  No, ma'am, because that's an emergency

16  at that time, so you're addressing the emergent

17  issue at that time.

18      Q.  So what is a clinical encounter?

19      A.  So the definition for me for a "clinical

20  encounter," which it's not written anywhere, would

21  be a routine visit, a scheduled appointment with

22  your primary health care provider.

23      Q.  And is this -- so just so that I am

24  perfectly clear, LSP's policy is that every person

25  will automatically be issued a heat precaution

1  duty status if they take a medication on the HCP8

2  heat pathology medication list or if they have any

3  condition on the HCP8 medical exclusion list; is

4  that correct?

5      A.   Okay.  So right now that's what we had

6  to do because we had 4000 inmates to review, over

7  4000 inmates' charts, you are correct.

8  Automatically, by default, at this moment right

9  now, if they're on that medication list or that

10 diagnosis list, they are getting a duty status.

11        Going forward -- and I'm going to use a

12 date of January 20 because that's, you know, just

13 kind of like the date where we pulled our master

14 list.

15        Going forward, if that offender is a new

16 intake, he's being reviewed at intake and he -- if

17 they are seen in the health care clinic, provider

18 clinic, just like a routine visit clinic or a

19 follow-up visit, they are going to look at their

20 duty statuses, medications, see if they need to

21 prescribe them the heat pathology duty status.

22        If they are newly diagnosed with one of

23 the attached diagnosises or prescribed medication,

24 at that time of the visit, they will be offered

25 the duty status and have the option to accept the

1   duty status or decline the duty status.

2          So after we get the initial done, it

3   will be based off of your clinical visits and your

4   new -- new medication being prescribed and new

5   diagnosises.

6      Q.   Well, right.  But my question is:  Even

7   after that point, if somebody is prescribed newly

8   or not one of the medications or the list or has

9   one of the conditions, newly diagnosed or not on

10  the list, that person will get a heat precaution

11  duty status unless they opt out, right?

12     A.   Yes, yes, yes, yes.

13     Q.   That's what I'm asking.

14          So LSP's policy, the procedure of how

15  it's implemented might evolve, but the policy is

16  that any person who takes one of the medications

17  or who has one of the conditions on the list will

18  get a duty status unless they opt out?

19     A.   Yes.  They'll be offered it, yes.

20     Q.   Now, going back to Exhibit 111 that's on

21  your screen, this amended interrogatory response,

22  will this information be included in the LSP

23  Directive No. 13.067 that you are in the process

24  of revising?

25     A.   I haven't included it at this time.

1   Like I said previously, I just put the guts in

2   there and it will go through the workflow process.

3   So when it reaches Dr. Toce, which is our medical

4   provider who will put steps in if he needs to for

5   his providers, he can at that time.  I did not

6   physically put this in there.

7      Q.  Why not?

8      A.  Because initially the bulk of it, like

9   pulling the medication list from pharmacy and then

10  reviewing every individual chart, was just to get

11  us our -- you know, like get the majority of our

12  inmates done, and then moving forward is when they

13  would have the clinical encounter.

14         And if I'm not mistaken, I believe

15  somewhere in HCP8 it's written about the clinical

16  encounters and stuff like that and them being

17  evaluated.  So we do have everything in HCP8 in --

18  I think you said it was 13.067 -- the policy here

19  at LSP.

20         But if there's a certain procedure that

21  Dr. Toce wants to put in for his doctors or his

22  providers, he can do that.

23      Q.  Well, LSP -- I'm sorry.

24         HCP8 does not say that all offenders who

25  are prescribed a medication on Attachment A get a

1    heat precaution duty status.

2        A.   So I told you just now that we did that

3    initially, all prescribed, all medications, all

4    diagnosis, was to get the bulk of those done.

5    Because it's 4200 something inmates, and to have

6    this done by May 1, there's no way I could have

7    had a clinical encounter on every one of them,

8    okay?

9            So after this initial bulk of inmates

10   are done -- we discussed this a while ago -- you

11   asked me if they would be offered or had the

12   option to get a heat pathology duty status based

13   off the medication and diagnosis.  Yes, that will

14   occur at each clinical encounter.

15       Q.   My question is different.  My question

16   is:  Why not just put this information into the

17   directive that you're writing right now?

18       A.   I guess I just didn't do it because I

19   felt like it was just a process we were getting --

20   we were working through.  It's not a --

21       Q.   So it could change?

22       A.   It could change, yes, you're right.  It

23   could change.

24       Q.   And because LSP's practice of assigning

25   all offenders who have a -- who take a medication

1   on Attachment A or have a condition on Attachment

2   B an automatic duty status might change, it

3   doesn't make sense to put it into policy now; is

4   that right?

5      A.   Repeat yourself.

6      Q.   Yeah, that was -- is it -- am I

7   understanding you correctly that what is written

8   here, that LSP has adopted a new practice and

9   policy of automatically assigning a heat

10  precaution duty status to any person who takes a

11  medication on Attachment A or has a condition on

12  Attachment B, that policy and practice might

13  change, correct?

14     A.   It could change.  Because as you said,

15  we are in the preliminary stages, as you

16  mentioned, and it could change.  Like I said, we

17  -- I look.  It should be everything finalized by

18  May 1, hopefully before then, and we can have a

19  defined process by then.

20     Q.   And so it doesn't make sense to put it

21  into the policy now that you're writing, because

22  if it changes, you would have to change the

23  written policy?

24     A.   Yes, ma'am.  And the policy hasn't

25  been -- it hasn't been approved yet, so it's

1   easier for me to go in and fix it while it's in

2   the workflow than after it's been approved.

3       Q.  Almost done.

4       A.  Okay.  I'm glad.

5       Q.  Let's look at what has been previously

6   marked Exhibit 107.  On your screen you should see

7   Exhibit 107, which is a document entitled

8   Responses to Plaintiffs' Third Set of

9   Interrogatories.

10          Do you see that?

11      A.  Yes, yes.

12      Q.  And it is a seven-page document, and

13  it's dated January 24, 2025.

14          Do you see that?

15      A.  Yes.

16      Q.  Okay.  Have you seen this document

17  before?

18      A.  Yes, I have.

19      Q.  When was the first time you saw this

20  document?

21      A.  Towards the end of January.  About the

22  same time I seen the other document.

23      Q.  Did you personally verify that the

24  answers to the questions laid out in this Exhibit

25  107 were accurate and correct?

1    A.  I signed saying I did.

2    Q.  That wasn't my question.

3        Did you verify that the answers to these

4  questions are true and correct?

5    A.  Yes.  I worked with our attorneys and we

6  went through documents and, yes, we did together,

7  yes.

8    Q.  Interrogatory Number 11, I'm going to

9  scroll down, says -- we're on page 5.  It says,

10  "State the facts and circumstances of Darrius

11  Williams' most recent assignment to Camp D and the

12  farm line."

13       Do you see that?

14    A.  Yes, ma'am.

15    Q.  And then the answer says that "There was

16  an administrative reclassification error that was

17  promptly corrected."

18    A.  Yes.

19    Q.  What steps did you take to verify that

20  there was an administrative reclassification error

21  that was promptly corrected in this case?

22    A.  So actually, when this happened, I was

23  with the lady at the time that she corrected it.

24    Q.  Who corrected it?

25    A.  Ms. Maghen Shipley corrected it.  I was

1   actually in her office.

2      Q.  So how do you know that the reassignment

3   was due to an error?

4      A.  She was discussing it and we were in

5   there talking about it.  And after she did her

6   research, she found that it was due to an error.

7      Q.  What was the error?

8      A.  I did not ask the error.

9      Q.  How do you know that it was an

10  administrative error?

11     A.  Because she told me it was.

12     Q.  It was Ms. Shipley's error?

13     A.  I'm not saying it was Ms. Shipley's

14  error.  I don't know whose error it was.

15     Q.  And how do you know that Williams did

16  not go out to the farm line?

17     A.  Because if I'm not mistaken, at the time

18  of Ms. Shipley reviewing all this, she went back

19  to make -- verify with the farm line records that

20  he did not go out.  I think -- I do not think he

21  went out.  I'm pretty sure that happened in that

22  office.

23     Q.  When was that, that you met with

24  Ms. Shipley about Mr. Williams?

25     A.  That has been like -- whenever this

1   happened, a few months ago.

2        MS. WRIGHT:

3           Okay.  Why don't we take a

4   five-minute break, we'll come back and

5   finish up.

6        THE VIDEOGRAPHER:

7           Off the record at 2:10 p.m.

8   (A break was taken.)

9        THE VIDEOGRAPHER:

10          We are going back on the record at

11  2:11 p.m.

12       MS. WRIGHT:

13          Ms. Oliveaux, those are all the

14  questions that I have for you today.

15  Thank you for your cooperation.

16       THE WITNESS:

17          Thank you.  Have a good weekend,

18  good week.

19       THE VIDEOGRAPHER:

20

21

22

23

24

25

1        We are going off the record at

2   2:11 p.m.

3     (END OF TESTIMONY AT 2:11 P.M.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            REPORTER'S PAGE

2        I, RITA A. DEROUEN, Registered

3   Professional Reporter (RPR #6908) and Certified

4   Court Reporter in and for the State of Louisiana,

5   (CCR #2014018), as defined in Rule 28 of the

6   Federal Rules of Civil Procedure and/or Article

7   1434(B) of the Louisiana Code of Civil Procedure,

8   do hereby state on the Record:

9        That due to the interaction in the

10  spontaneous discourse of this proceeding, dashes

11  (--) have been used to indicate pauses, changes in

12  thought, and/or talkovers; that same is the proper

13  method for a Court Reporter's transcription of

14  proceeding, and that the dashes (--) do not

15  indicate that words or phrases have been left out

16  of this transcript;

17       That any spelling of words and/or names

18  which could not be verified through reference

19  material have been denoted with the phrase

20  "(phonetic)";

21       That (sic) denotes when a witness stated

22  word(s) that appears odd or erroneous to show that

23  the word is quoted exactly as it stands.

24

25            RITA A. DEROUEN, RPR, CCR

1          REPORTER'S CERTIFICATE

2          I, Rita A. DeRouen, Registered

3    Professional Reporter (RPR #6908) and Certified

4    Court Reporter (Certificate #2014018) in and for

5    the State of Louisiana, as the officer before whom

6    this testimony was taken, do hereby certify that

7    on February 12, 2025, in the above-entitled and

8    numbered cause, the deposition of LOUISIANA

9    DEPARTMENT OF CORRECTIONS, THROUGH ASHLI OLIVEAUX,

10   after having been duly sworn by me upon authority

11   of R.S. 37:2554, did testify as hereinbefore set

12   forth in the foregoing 128 pages;

13

14          That this testimony was reported by me

15   in stenographic shorthand, was prepared and

16   transcribed by me or under my personal direction

17   and supervision, and is a true and correct

18   transcript to the best of my ability and

19   understanding;

20

21          That the transcript has been prepared in

22   compliance with transcript format guidelines

23   required by statute or by rules of the board;

24

25          That I have acted in compliance with the

1   prohibition on contractual relationships, as

2   defined by Louisiana Code of Civil Procedure

3   Article 1434 and in rules and advisory opinions of

4   the board;

5

6         That I am not of Counsel, nor related to

7   any person participating in this cause, and am in

8   no way interested in the outcome of this event.

9

10        SIGNED THIS 17TH DAY OF FEBRUARY, 2025.

11

12

13        _____

14        RITA A. DEROUEN
          Registered Professional Reporter
15         Certified Court Reporter

16

17

18

19

20

21

22

23

24

25

1        ACKNOWLEDGMENT OF DEPONENT

2

3      I, ASHLI OLIVEAUX, do hereby acknowledge I have

4    read and examined the foregoing pages of testimony,

5    and the same is a true, correct and complete

6    transcription of the testimony given by me, and any

7    changes or corrections, if any, appear in the attached

8    errata sheet signed by me.

9

10

11    _____   _____

12     DATE              ASHLI OLIVEAUX

13

14

15

16    Subscribed and sworn to

17    before me on this_____ day

18    of _____, _____.

19

20    _____

21     Notary Public

22

23

24

25

```
1          *** ERRATA SHEET ***

2  NAME OF CASE: Voice of the Experienced v LeBlanc
   DATE OF DEPOSITION:  February 12, 2025
3  NAME OF WITNESS:  ASHLI OLIVEAUX
   PAGE  LINE  FROM      TO        REASON
4  _____|_____|_____|_____|_____

5  _____|_____|_____|_____|_____

6  _____|_____|_____|_____|_____

7  _____|_____|_____|_____|_____

8  _____|_____|_____|_____|_____

9  _____|_____|_____|_____|_____

10 _____|_____|_____|_____|_____

11 _____|_____|_____|_____|_____

12 _____|_____|_____|_____|_____

13 _____|_____|_____|_____|_____

14 _____|_____|_____|_____|_____

15 _____|_____|_____|_____|_____

16 _____|_____|_____|_____|_____

17 _____|_____|_____|_____|_____

18 _____|_____|_____|_____|_____

19

20            _____

21 Subscribed and sworn before me

22 this____day of_____,20__.

23 _____    _____

24 (Notary Public)      My Commission Expires:

25
```

| | | |
|---|---|---|

**Exhibits**

**EX 0109 Ashli Ol
iveaux 021225**
   4:11 89:13,14
   91:12,16 97:11

**EX 0110 Ashli Ol
iveaux 021225**
   4:14 95:25
   96:1,8 97:15
   109:13

**EX 0111 Ashli Ol
iveaux 021225**
   4:17 101:5,6,
   13 102:7
   107:22 110:22
   115:3 119:20

**0**

**00000224** 89:24

**030613** 8:15,17
   46:23

**030614** 83:25

**030615** 87:21

**1**

**1** 46:10 61:25
   73:15 78:19,22
   84:12 85:11
   86:1 92:8
   104:14 121:6
   122:18

**100** 30:24 50:25
   83:14 105:25

**107** 123:6,7,25

**108** 46:16,19
   61:6,11 67:12
   87:17

**109** 89:12,13,14

91:12,16 97:11

**11** 86:6 87:2
   97:15 124:8

**110** 95:25 96:1,
   5,8 97:15
   109:13

**111** 101:5,6,13
   102:7 107:22
   110:22 115:3
   119:20

**11:41** 6:2

**12** 6:3

**13.067** 54:14
   56:6,10,20
   57:6,13,20
   59:18 60:5
   61:4 66:14,20
   98:7 100:16
   119:23 120:18

**136-7** 96:14

**15** 62:24 63:8
   77:15

**15-minute** 66:2

**1500** 72:14
   75:12,15,23
   76:8,10,17
   77:7,11,18
   91:8 104:18
   107:8,9 115:1

**1500-plus** 81:13

**16** 78:20,23

**1:13** 87:9

**1:23** 87:13

**1a** 67:20

**1b** 67:24

**1c** 71:6,9

**1d** 83:22

**1st** 61:2

**2**

**2** 83:24

**20** 39:10,11
   40:9,23 41:14
   42:22 48:19,
   22,25 49:6,12
   50:4 67:14
   71:24 83:21
   86:5,15,21
   90:18 91:2
   96:13 97:3,17
   98:2,16 99:6,
   12,22 107:1
   110:24 118:12

**200** 73:16

**2000** 77:17

**2022** 9:12

**2024** 7:21 24:11
   39:10,11 40:9,
   23 41:14 42:22
   46:20 48:19,
   22,25 49:6,12
   50:4 56:21
   67:14 71:24
   83:21 86:6,15
   89:20 96:13,15
   97:4,17 98:16
   99:6,12,22

**2025** 6:3 101:17
   103:17 110:24
   111:14 123:13

**20th** 7:21 46:20
   103:13 112:8

**21** 72:11 73:4
   74:19 75:8
   79:11 82:4
   96:15

**24** 90:18 123:13

**25** 112:10,16,20

**2:10** 126:7

**2:11** 126:11
   127:2,3

**3**

**3** 67:11,12,22
   68:2 79:20,21
   87:20 101:16

**30** 7:10 112:10,
   16,20

**30(b)(6)** 7:1
   13:24

**31** 61:25 84:12
   86:2

**31st** 101:24

**36** 27:13

**37** 27:13

**4**

**4** 83:20

**4,200** 73:16

**4000** 92:6
   104:2,9,10
   118:6,7

**4200** 121:5

**4200-plus** 72:9
   76:6

**45** 62:24 63:7
   66:3

**5**

**5** 61:14,18
   124:9

**500** 77:20

**7**

**7**  89:20 91:6,14

**75**  112:17,25
113:5

**7:00**  61:25

**8**

**88**  84:24 85:17,
22 86:12,20

**88-degree**  86:24

**8:00**  61:24
62:19

**9**

**91**  84:6,13,24
85:15,16,22

**A**

**a.m.**  6:2 61:24
62:19

**ability**  35:15

**able**  24:2

**ACA**  9:15,24
60:21,22

**academy**  9:16,18

**accept**  71:13
118:25

**access**  20:20
27:1,5 35:23
43:23 54:7
64:20 83:10

**accommodation**
13:10,14,18,19
14:10,20,22
15:12,13,20,22
16:4,5,15,19

18:17 19:12
20:9,10,12
23:9,21,23,25
24:2,5,13,16,
21,25 25:8,13,
18,22 26:10
32:4,8,17,22,
23 33:6,7
34:20

**accommodations**
14:16,25 15:9
17:24 18:14
21:15,21,24
25:1 31:8

**accomplished**
11:22

**accuracy**  56:12

**accurate**  68:5
84:15 102:21
123:25

**ACH**  93:18,21

**achieve**  11:17

**across**  21:25

**Act**  10:6

**action**  21:6
23:5

**active**  33:16

**actively**  18:9
75:3

**activities**
10:16

**activity**  36:25
37:3,8

**actual**  68:5

**ADA**  10:2,5,8,
11,20 13:5,6,
17,19 14:1,6,
15,20,21 15:17
17:6,10,17,20,
24 18:15,17

20:4,22,24
21:15,18,21,24
23:10,21 24:7,
22,25 25:1,8,
14,18,22,23
26:6,10,12
27:1,10 28:2,8
29:6 30:4,7,
11,19,23 31:1,
6,15,20 32:1,
4,8,17,22,24
33:5,17 34:6,
20 37:19

**add**  82:14 90:22
93:4 100:3

**added**  53:14,17,
19 95:18

**addition**  115:4

**additional**
66:18 88:6
90:23

**address**  18:3
20:24 104:2

**addresses**  21:1

**addressing**
117:16

**adjust**  52:19

**adjusted**  25:12,
16

**adjusting**  49:14

**adjustment**  25:9

**adjustments**
100:6

**administrative**
124:16,20
125:10

**administrator**
51:7

**adopted**  122:8

**advance**  15:6

**ago**  54:24 55:2
57:10 61:12
121:10 126:1

**agree**  38:24

**ahead**  59:2
67:18,19
111:11

**aim**  78:17,19

**alert**  84:1,4,23
85:6,15,25

**alter**  47:20,23
56:10,17

**amended**  101:14
119:21

**amendments**
99:21

**Americans**  10:5

**amount**  112:20

**Amy**  41:9,15
42:6 50:24
51:1

**Angola**  75:6
77:17

**announcements**
73:24

**answer**  25:2,6
43:6,14 56:22
66:11 102:16,
17 124:15

**answers**  123:24
124:3

**anybody**  7:13
20:18 25:16
37:16 65:8
79:7 101:2

**anyone**  27:7
94:10 104:7
111:18 115:13

Apologies   24:3

apparent   84:4, 13

apparently   52:8

appeal   20:12, 13,14

appears   63:24

appointment   117:21

appreciate   15:5

apprised   22:3

appropriate   29:1 43:4

approval   60:23 71:10

approve   16:5,9 41:25 100:13, 18 104:21

approved   16:4 122:25 123:2

approximately   112:10

April   78:20,23 85:13

area   24:20 63:6 65:3 67:2

areas   13:4 42:4 61:24 62:5,11 64:19 65:1,14, 21 66:2,7

around   19:2 23:17 24:10,11 51:14 55:2 57:15 72:10,13 78:20 79:11 98:1 101:24 102:1

ARP   13:15,17 14:16,20,24

15:9,10 18:13, 16 21:10,11, 12,16,17,18, 20,23 22:3,16, 22 24:17 25:1 32:7,21 33:15 34:12,14

ARPS   25:5 32:11,15 33:18,22 34:3

Ashli   6:4,17

asked   7:17 12:15 15:2 31:18 52:18 81:19 114:20, 23 121:11

asking   11:18 33:14 43:9 119:13

aspect   48:3

assess   20:15

assessed   113:6

assessing   38:3

assign   37:16,20 38:8 40:3,6 41:19 42:7

assigned   35:3, 4,6 37:12

assigning   38:2 40:22 121:24 122:9

assignment   124:11

assigns   38:6

assume   50:20 52:21 65:2

assurance   9:8, 21 10:23 13:1

attached   118:23

attachment   47:9,10,11 49:25 50:14 51:13 52:9,10 57:16 68:14,16 69:6 70:15,16 71:1,2 73:9,10 74:21 77:4 80:2,19 89:18 90:4 91:15 96:25 97:2,14 98:8,9 100:23 102:19,23 107:2,3,4,6, 16,17,24 108:3 109:3,6 111:2 112:1 113:17, 18 120:25 122:1,11,12

attachments   7:22,24,25 14:5 47:8,14, 16,23 49:1 50:10 61:8 68:8 69:4 70:13 79:17 90:9 98:10,12, 13 105:18 106:5

attended   111:19 112:11

attorneys   124:5

August   58:12

authority   47:19,22 56:9

automatic   122:2

automatically   36:9 40:13 71:3 72:17 103:2 106:24 117:25 118:8 122:9

available   62:4

64:25

aware   25:20 27:3,8 32:6 34:24 37:18 40:10 41:1 49:7 51:12 53:12 64:7,11, 15 83:1 89:4,7 99:23

---

**B**

back   17:2 22:6 23:12,14,18 60:20 61:6 73:13 77:11 83:23 86:9,19 87:12,15 90:8, 23 101:12 109:11,13 110:22 119:20 125:18 126:4, 10

back-and-forth   15:3

backwards   56:25

balance   79:2

balances   50:2

ballpark   18:6

base   93:25

based   11:3 39:14,16 43:12,13,20 54:18 58:15 64:9 70:13 75:24 76:4 77:3,4,19 81:5,10 83:4 91:9,20 106:13 107:14 110:25 119:3 121:12

basically   30:10

54:17

**Bates** 8:13
46:23 83:25
87:21 89:23

**bathroom** 33:4

**bears** 46:23

**Beginning**
110:23

**begun** 102:19

**behalf** 6:10,12

**believe** 30:20
32:18 38:7
62:13 65:13,22
66:10 72:13
75:17 77:4
96:19 120:14

**best** 23:7 25:19
36:12 68:10
73:11 90:19

**bet** 34:16

**better** 43:9
66:11

**Betty** 54:12,19
55:4 60:8

**bit** 51:18 60:24

**Blanchfield**
7:9,17 13:22
86:16

**blast** 73:24

**boards** 73:25

**bottom** 8:13
46:14,22

**box** 44:12

**break** 62:24
63:24 66:2
87:6,10,16
126:4,8

**breaks** 62:6

63:7,15,16
64:9

**bring** 28:12,15
42:8

**broad** 11:21,24
12:6

**broadcast**
106:20

**broadly** 12:7

**broken** 116:15,
19

**brought** 84:11

**budget** 64:22

**bulk** 17:3 120:8
121:4,9

**bulletin** 73:25

**business** 28:25

———————

C

**call** 11:25
12:12 62:13
74:6,7 108:21
116:14,25
117:1,11

**called** 12:2
26:6,12 43:23
108:22

**calling** 17:2

**calls** 12:18

**Camp** 124:11

**capable** 37:1,4,
9

**capacity** 9:14,
20

**care** 16:23
41:24 51:7
68:12,23
69:18,22,23

70:3 71:13,17
73:20 88:1,13,
17 99:24
110:7,12,15
116:12,13
117:22 118:17

**carry** 10:10

**case** 29:16
79:23 88:19
89:1,5,9 96:14
124:21

**cases** 26:6,12
27:1 87:25
88:1 94:20

**catch** 78:11

**catching** 82:14

**caught** 53:22
54:1

**center** 82:5

**certain** 35:15
120:20

**change** 19:21,22
37:21 42:7
44:15 47:20,23
59:13 62:18
99:25 121:21,
22,23 122:2,
13,14,16,22

**changed** 16:20
44:9,14 49:18
58:18,21 59:10

**changes** 7:2
52:20 56:14
58:16 62:8
67:3,10
100:14,18,22,
23,24 101:3
122:22

**charge** 44:19
74:7,23

**chart** 42:17
72:22 73:1
79:24 82:12
93:19 104:12
108:17 109:17
117:1 120:10

**charts** 72:17
73:16 77:20,23
118:7

**check** 48:17

**checking** 54:24

**checks** 20:21
50:1 79:1

**Chelsea** 7:10

**chief** 50:19
51:4,24 88:24

**chose** 17:2

**circumstances**
94:18 124:10

**clarify** 34:18

**classification**
36:24 37:7
38:5,8

**clear** 56:6
82:16 117:24

**clinic** 80:9,10
109:25 115:13
118:17,18

**clinical** 39:24
40:5 42:22
43:12,21 67:15
68:12 69:2
70:9,23 72:6
73:7,12 75:25
88:4 92:9,14
93:6,8 103:9
105:15 106:13
107:12 115:5,
11,12,25 116:7
117:14,18,19
119:3 120:13,

15 121:7,14

**clinics** 92:24

**close** 9:3 26:7
113:17

**closed** 9:5

**clue** 57:21

**code** 33:5

**coded** 18:14,16
24:17 32:16,21

**come** 21:24
73:15 78:10
82:13 83:23
126:4

**comes** 11:20,23
59:4 60:20
73:5 85:11
100:21

**commode** 31:10

**communicate**
13:13

**communication**
36:23 37:6

**compare** 69:4

**compile** 108:2

**completed** 22:18
24:9 73:18
75:18 81:14
115:1

**completely**
57:22 106:19

**completes** 55:24

**compliance**
20:21 40:21
78:16,18,19
104:24 105:2

**compliant** 57:11

**complied** 8:6
68:9

**comply** 10:10,
19,25 11:6
12:22 13:2
57:6

**complying** 48:14

**concern** 28:11

**concession**
28:16

**condition** 28:2,
7,17,18 29:5,
15 35:14 68:14
69:25 79:7
80:1,19 81:5,
22 83:4 102:12
109:3,5 118:3
122:1,11

**conditions**
70:17 71:2
73:9 76:24
81:11,17
100:1,3,7
102:13 110:11
119:9,17

**confident**
117:2,9

**conflicts** 61:4

**confusing** 96:6

**consider** 14:15,
24 15:8

**considered**
16:25 47:16

**considering**
28:22

**constitute** 89:8

**consult** 28:3
42:8

**consulted** 28:6
29:4,14

**contact** 15:16
30:10 74:6

**contacted** 49:16

**control** 82:5

**controls** 61:4

**conversation**
15:4 62:21
65:22 84:25
85:3

**coolers** 65:9

**cooperation**
126:15

**coordinating**
10:9

**coordination**
30:4

**coordinator**
10:2,8 20:22,
24 30:12 34:6,
9 37:20

**coordinators**
24:8

**copies** 106:4

**copy** 8:2 38:18
61:17 68:8
76:15,16 79:16
109:10

**copy-pasted**
52:25

**correct** 7:3
12:7 13:10
25:7 35:2,7,12
37:21 38:6,11,
15 41:17 45:24
48:18,21 50:4
55:14 60:9
71:4,5,14,18
76:25 107:25
118:4,7 122:13
123:25 124:4

**corrected** 54:16
124:17,21,23,

24,25

**correction**
70:22

**Corrections**
6:25 11:3

**corrective** 21:6
23:4

**correctly** 18:13
62:1 68:21
84:8 88:9 90:1
102:14 111:4
115:7 122:7

**cost** 64:18
78:14

**costing** 78:13

**counsel** 6:14

**couple** 49:22

**court** 6:11,15
59:22 60:2

**creates** 12:11,
16 108:11

**creating** 108:13

**criteria** 73:14
107:15,16

**cross** 23:20

**crosses** 21:19

**curious** 95:21

**current** 26:22
39:6,9,12

---
D
---

**daily** 80:10
94:9,11,12

**Darrius** 124:10

**data** 86:9,19

**database** 16:2
20:20 23:13

25:21,23,24,25
26:12,15,20,25

**date** 7:19 48:20
78:17,24 82:4
101:18 104:14
107:1 118:12,
13

**dated** 46:20
67:13 89:20
90:13 96:13
97:3,17 99:5,
12 123:13

**dates** 110:6

**day** 22:25 78:9
82:7 92:23,24
98:3 107:5

**days** 86:6 87:2
94:21 98:3
112:6,16

**deal** 8:1

**dealt** 31:9,12

**decide** 19:16
21:5 104:5

**decided** 65:19
103:24

**decision** 90:22
103:1 105:4
106:7 111:6

**decline** 119:1

**declined** 48:7

**deeper** 110:12

**deeply** 44:3

**default** 118:8

**Defendants'**
101:13

**defined** 10:11
104:16 122:19

**defines** 84:3

**definition**
27:11,22 84:1
117:19

**degrees** 84:6,
13,24 85:15,
16,17,22
86:12,20

**denote** 82:15

**department** 6:25
9:15,16,17,23,
24,25 11:3,12
16:11 20:25
22:7,13 34:10
36:2,5,7 38:5
41:7,13,15
42:5 44:10,14
45:3,4,11,13
52:16 55:13
59:7,14 64:14
75:3,5 78:2
82:3 89:17
91:24 92:20
98:21 109:9
114:4,15

**department's**
25:24

**departmental**
11:23 13:6
27:17,18 39:7
44:21 52:15
54:18 58:5,7,
15 59:4 61:5
79:16 85:12
87:1 104:1
106:4,12

**depending** 26:24

**deposition** 6:4
8:25

**deputy** 9:7,20
10:22 12:25
21:17 34:11
37:19 44:25
88:22

**Derouen** 6:12

**describe** 11:12

**designated** 6:24

**designates** 62:3

**designation**
84:4

**designee** 61:22

**desk** 21:19,25
23:20 34:5,8,
10

**determination**
17:18 19:4,16
88:4,18

**determinations**
21:4,7

**determine** 22:14
27:9,21 28:13
43:3 68:17,24
70:16 88:2,14
89:4

**determined**
28:14

**determines** 70:1

**diabetes** 30:18

**diagnosed** 80:1
92:11 102:12
105:16 107:16
109:24 110:2
115:6,16,17
118:22 119:9

**diagnoses** 80:16
107:14 108:9,
18,20

**diagnosis** 30:21
31:2,9,12
69:3,6 72:23
75:21 77:9
83:8 92:13
108:23 113:21
118:10 121:4,

13

**diagnosises**
73:2 77:3,5
80:5 111:24
113:15 115:14
118:23 119:5

**difference** 11:9

**different** 12:19
39:17 56:3
66:19 105:11
121:15

**difficult**
104:12

**dig** 81:7 83:9

**direct** 29:20,22

**directions**
66:22

**directive** 11:20
12:1,2 13:7
27:11,15,19
44:9,14 45:7
54:2,3,5,14
55:23 56:2,6,
10,18,20 57:5,
18 58:25 59:18
60:5 61:4
66:14,20 84:21
98:4,6 100:16,
19,20 119:23
121:17

**directives**
11:25 12:12,
17,22 13:2
44:1,6,20
49:14

**directly** 51:3,8

**director** 37:24
41:23 45:14
55:21 60:15
71:11,20 79:18
103:11

**disabilities**
10:6,14 28:23

**disability**
15:12 27:10,
11,22,23 28:2,
8,21 29:6,16
30:18,23 31:6,
14,20,25 32:5
34:21

**disagreed** 21:6

**disapprove** 16:9

**discretion** 40:5
42:24 94:16

**discuss** 69:6
73:8 115:19

**discussed** 14:9
66:16 97:6
103:21 105:15,
18,19 111:13,
16 121:10

**discussing**
57:17 125:4

**disperse** 45:4

**DOC** 10:16
11:20,24 12:2,
4,16 20:13
26:20 43:24
44:5,8,13 45:7
46:1 48:13,18,
21,24 50:3
55:5 56:9,11,
17,18 61:3
62:18 65:10
66:1 83:1
84:23 85:5,7
100:10,12
103:4 104:21
107:25

**DOC's** 10:25
11:7 12:10,23
13:3 25:25
26:12 27:23

**doctor** 37:13
42:9,10,14,15
70:4,8,10,14,
19,24 92:25
93:1

**doctors** 120:21

**document** 7:16,
20,23 8:5,14,
20 16:6 23:3
46:25 47:4,7
61:9 84:11
89:16,22 90:3,
7 97:20,21
101:8,15,21
102:7 123:7,
12,16,20,22

**documentation**
22:20

**documented** 16:3
88:5,8

**documents** 7:15
8:18 14:18
101:10 102:1,3
124:6

**doing** 18:2,9
23:19 43:8
69:20 78:5,12
79:19 80:22
81:24 82:24
86:20 110:8
112:15

**dollars** 64:18

**DON** 103:8,10

**dorm** 117:12

**dosage** 40:16,19

**dose** 94:9,12,13

**DPS&C** 108:6

**DPSC** 107:23

**draft** 59:16

45:23

**drafted** 54:13
66:15

**drinking** 63:19

**drive** 67:4

**driving** 63:23

**Ducote** 16:18
18:21,22,23
19:24 24:13

**Ducote's** 21:4
23:5

**due** 116:22
125:3,6

**duly** 6:18

**duplicates**
82:10

**duties** 30:7

**duty** 25:9,12,17
34:25 35:3,4,
6,9,12,18,19
36:10,15,22
37:5,10,12,16,
21 38:3,8,12,
14,24 39:5,21
40:2,6,8,14,22
41:3,20,22
42:4,7,21,25
43:3,11 68:18,
19,25 69:9,12
70:1,12 71:3,
10 72:2,6,18
73:3,13,18
74:5,9,12
75:16,20,24
76:2,9,13,19
77:9,14,19
80:3,20,23
81:10 83:3
88:3,15,19
91:9,19 92:4,
8,18 93:2,13
94:5 95:12,19

67:1,6,7,8

99:3,8,15
102:20 103:2
104:2,7 105:5,
19,21,22
106:9,15,18,19
107:10,18
108:15 109:8,
22 110:1,4,25
111:1,11
113:7,12
114:2,12,21,25
115:4,15,20,
21,24 116:2,
17,21 117:3,13
118:1,10,20,
21,25 119:1,
11,18 121:1,12
122:2,10

**E**

**earlier** 20:23
25:21 53:21,25
79:15 81:20
87:19 90:14,20
92:6 109:1
114:23

**early** 58:11

**easier** 8:1
123:1

**easiest** 104:15

**easily** 114:10,
11

**Eastern** 87:13

**ECF** 96:14

**edits** 57:7

**educate** 69:8
74:8 79:2
87:1,3 93:12
110:3

**educated** 64:10
71:16,19

107:17

**education** 88:6
107:20

**effect** 39:9
49:8,11 86:15
98:16,22 99:7,
13

**effective** 110:6

**efforts** 10:9

**EHR** 77:2,6 78:3
80:4 81:4,7
82:19,24 83:10

**eight** 90:17

**either** 61:16
70:17 74:13
94:25 112:7
114:19

**electronic**
35:20,24 80:14
83:7 108:12

**email** 9:3 26:3,
7 44:11,16,21,
24 45:2,15
51:19,22 53:8

**emailed** 102:1,
3,4

**emailing** 45:13

**Emails** 89:23

**emergency**
116:9,11
117:10,11,15

**emergent** 117:16

**EMO** 55:3 59:16

**employee** 13:19
26:19

**employees** 16:13
17:8 26:22
66:7

**EMT** 69:22 70:5

**encounter** 68:12
69:22 70:10,23
72:7 73:8
75:25 92:14
93:6,8,11,14
105:16 106:13
115:25 116:7
117:14,18,20
120:13 121:7,
14

**encounters**
42:22 43:12
67:15 73:12
76:7 92:10
107:12 115:5,
11,12 120:16

**end** 15:25 18:4
19:10 22:1,6,
25 33:8 92:22
95:22 123:21
127:3

**endetails** 106:3

**ends** 46:25

**engaged** 108:1
109:17

**engine** 77:25

**enormous** 81:1

**ensure** 45:8
61:22 66:1

**ensuring** 10:13,
18,24 11:5
13:2 64:19

**enter** 26:20

**entered** 25:23
26:11 97:10

**entitled** 74:12
123:7

**environment**
66:13

**equal** 10:14

**era** 39:8

**error** 53:22
124:16,20
125:3,6,7,8,
10,12,14

**escalated** 90:21

**especial** 64:17

**establishes**
46:3

**evaluate** 37:24
42:23 68:13
70:11,24 72:8,
20 73:16 75:5
80:10 104:12
111:11

**evaluated** 39:4
40:8 42:21
72:5 76:24
120:17

**evaluates** 69:24

**evaluating** 39:6
72:8,15,16
80:6

**evaluation**
73:17

**Eventually**
15:25

**everybody** 35:6
64:11,13 76:23
85:12 91:25
92:7 95:22
98:20 105:4
106:10,19
107:2

**everybody's**
82:18 99:14

**everyone** 75:2,
19 80:23 82:11
108:15

**evidence** 64:6

**evolve** 119:15

**ex** 92:16

**exactly** 33:20

**EXAMINATION**
6:20

**examined** 6:18

**examples** 89:7

**exceeded** 84:5

**exceptional**
87:24 88:1,19
89:1,5,9 94:20

**exclusion** 47:10
68:15 97:16
98:15 99:11,17
109:14 118:3

**exclusions**
99:21 102:13
110:11

**executive** 54:8,
11 57:4

**exhibit** 46:16,
19 61:6,11
67:12 87:17
89:13,14
91:12,16 95:25
96:1,8 97:11,
15 101:5,6,13
102:7 107:22
109:13 110:22
115:3 119:20
123:6,7,24

**existence** 71:23

**existing** 10:19

**expect** 95:14,15

**Experienced** 6:6

**expert** 30:13

**explain** 92:15

**explained** 79:19,20

**exposure** 38:15, 25 46:5

**extra** 78:10

---

**F**

---

**facilities** 33:4

**facility** 11:15 71:11,20

**factor** 93:21

**facts** 88:23 124:10

**Fahrenheit** 84:6,14

**fair** 17:15 29:2 101:11

**fall** 74:13

**familiar** 95:17 97:20 101:12

**far** 20:21 26:22,24 29:9 63:5,7 83:1 85:4 86:11,18, 19 94:22

**farm** 58:2 124:12 125:16, 19

**February** 6:3 101:16

**feel** 61:16 74:4 114:8

**felt** 40:1 121:19

**field** 63:6

**figure** 95:23

**file** 99:14 109:18

**filed** 96:14

**files** 14:19 17:3

**fill** 13:17 14:21 16:2 24:24 25:4

**final** 54:23 55:7 60:22

**finalized** 122:17

**finally** 8:12 12:15

**find** 15:19 31:5,24 113:19 114:11

**finish** 99:9 126:5

**finished** 67:21, 22

**fire/ems** 9:15, 23

**first** 6:18 8:13 38:22 39:12 40:4 46:22 51:3,12 68:1 89:23 90:6 96:22 97:22 123:19

**five** 94:20 112:24

**five-day** 94:14

**five-minute** 126:4

**fix** 23:2 123:1

**fixed** 23:2

**flip** 46:14 87:19

**flipping** 96:4

**floor** 16:22

**fluent** 95:11

**folks** 81:17

**follow-up** 118:19

**following** 49:10 61:23 62:4 86:12

**follows** 6:19

**food** 28:12

**foods** 28:15

**foot** 42:16

**form** 13:14,18 14:16,22 24:1, 22,25 25:4 67:1,5,9 71:12,22,25 75:4 86:17

**format** 26:14

**forms** 14:17

**forward** 45:2 105:13,14 106:12 107:11 115:13 118:11, 15 120:12

**found** 87:18 125:6

**four** 112:24

**four-page** 101:15

**frame** 51:20 76:7 79:12 86:10 94:15

**free** 61:16

**frequent** 18:2 25:3

**frequently** 17:23 18:1,7

23:8 24:24 26:15 43:11 88:13

**front** 8:5,18, 21,24 18:4 45:21 47:4 61:7,17 81:7 82:24 91:11 96:20,22 110:18 113:18

---

**G**

---

**Gary** 8:8

**gather** 88:23

**gave** 72:17

**general** 22:16, 19 29:13 33:2 59:4 85:7 115:24

**generally** 23:22

**generate** 78:1

**getting** 33:3 40:25 44:3 45:11,15 58:2, 3,4 73:18 91:5 106:10 112:9 118:10 121:19

**give** 15:19 18:6 20:9 43:6 52:16 61:15 73:19 77:3 86:25 92:17 93:13 96:7 98:3 104:3 105:4 106:19 116:21

**given** 35:21 36:9 43:12,20 65:7 79:8 83:3 92:11 105:20, 21 106:4,17

109:7 113:11

**glad** 12:15
123:4

**go-between**
108:11

**go-to** 30:13

**God** 90:8

**goes** 20:7 22:6
55:12 59:17
60:19,23 67:6
91:23 100:18,
20

**going** 11:17
15:3,19 18:8
22:11 23:11
24:8 27:3
30:12 39:15
42:14 58:2
62:22 65:25
66:9,15,25
67:4 71:15
72:25 73:13
77:11,22 78:6
79:6 83:21
84:20 87:8,12,
16,20 89:11
91:24 93:16
94:12 95:24
97:14 98:7
99:6,12 100:8
104:2 105:12,
14 106:8,12,24
107:9,11
108:16 109:12
111:23,24
112:2 114:5
115:13 116:25
118:11,15,19
119:20 124:8
126:10 127:1

**good** 6:22,23
12:20 78:25
104:19 126:17,

18

**Google** 31:1,23

**grant** 23:8,22
24:2

**granted** 23:25
81:9

**great** 9:4
102:16

**group** 99:1
104:16

**guarantee**
104:13

**guess** 42:18
48:16 94:15
101:25 108:10
114:8 121:18

**guessing** 19:1

**guidelines** 89:4

**guts** 120:1

**guys** 95:5,10,11
106:17

---

**H**

---

**handicapped**
31:10

**handled** 52:17

**handles** 52:16

**handwritten**
36:13

**hang** 23:17

**happen** 12:7,9
18:25 22:19
89:2

**happened** 65:16
124:22 125:21
126:1

**happy** 20:11

**hard** 61:17

**harmful** 74:17

**Hawkins** 114:17

**HCP10-A** 71:12,
22

**HCP37** 27:11

**HCP8** 7:2,18
14:2,5 38:19
45:19 46:1,3,
12,20 47:17,
20,23,25 48:3,
18,22 49:6
50:4,10,13
54:2 56:3,21
57:6,17 61:3,7
62:9 67:13
68:2 72:2
80:20 83:5,20,
25 84:3 87:17,
25 89:17,23
96:11,18 98:13
102:9 108:5
110:25 113:7
118:1,3
120:15,17,24

**head** 22:13
27:19 51:11
114:6

**headquarters**
20:3,13 28:4
45:16 48:5
49:17,24 50:18
51:4,9,10,19,
22,25 52:6
77:2 78:2
90:25 100:12,
13,17,21
108:1,6,10

**heads** 45:3,4,
11,13 55:13
59:7

**health** 35:14,
20,24 36:4

41:7,24 51:7
68:12,23
69:18,22,23
70:3 71:13,17
73:20 80:15
82:3 83:7
88:1,13,17
99:24 108:12
109:8 110:7,
12,15 114:4,15
116:13 117:22
118:17

**hear** 59:23
113:17

**heat** 32:12,16
33:19 38:12,
14,15,24 39:1,
4,20 40:2,8,
14,22 41:20
42:3,21 43:3,
11 45:23 46:4,
6 47:9,11 48:9
52:17 54:15
56:6 65:17
68:16,17,24
69:7 70:1,11
71:3,10 72:2,
6,18 73:2,9
74:12 75:15,23
76:1,9,13,18
77:9,14 80:2,
20 81:9 83:3
84:1,4,5,23
85:6,14,15,20,
25 86:6 88:2,
7,15 90:4,11
91:8,9,19
92:3,16 93:12,
23 94:4 95:12,
19 97:2 99:15
102:11,19
103:2 104:6,8
105:5,18 106:2
107:9,18
109:21 110:4

113:6,11
114:2,12,21,24
115:19 117:25
118:2,21
119:10 121:1,
12 122:9

**heat-related**
33:23

**Hebert** 41:10,
16,19 42:6
50:24 51:1
52:11 53:22
90:21

**height** 29:9,11

**held** 6:7 9:11

**historically**
112:19

**hold** 8:4 80:9

**Honestly** 75:2
93:20

**Hooper** 65:23

**hour** 62:18

**housed** 82:6

**HQ** 107:23

**HR** 17:14

**hypertension**
30:22 31:5
109:19 110:10

**hypotheticals**
89:8

———————

**I**

———————

**ice** 48:8 62:5,
10 64:20,25
65:7,12

**idea** 57:23
64:21,23 78:14
86:25

**identical** 98:12

**identified** 46:6
91:18

**identify** 81:4
102:10

**illness** 108:2
111:2

**illnesses**
107:24 115:6

**immediately**
49:24

**impaired** 31:13,
19,24 32:5,9
34:21,23

**implement** 47:25
48:2 86:14
91:2 102:9

**implementation**
7:2 14:4 93:22

**implemented**
61:23 62:8,19
63:2,4 64:4,8
68:3 85:5,9,20
86:5,8 119:15

**implementing**
85:10 86:23

**important**
113:24 114:1,
7,9

**incarcerated**
13:9,16 14:9
19:11 23:9,14
35:3 36:23
37:6 39:4
42:20 102:10
105:23 106:1

**include** 25:8
66:15 98:8
115:5 116:9

**included** 51:21

119:22,25

**includes** 32:8
90:17

**including** 96:25
102:9

**increase** 84:23
112:22,23

**index** 84:5

**indicated**
68:18,25 70:2
88:20

**indicates** 64:7

**individual** 29:8
73:16 77:23
79:6 120:10

**individually**
72:22,25 77:6,
21 108:16

**individuals**
23:14 41:16
72:21 112:18

**indoors** 84:12

**infer** 64:3

**inform** 35:13
74:11

**information**
26:20 36:4
50:17 51:2
114:10 119:22
121:16

**informations**
82:3 109:9
114:4,15

**informed** 44:8
76:8 105:24
106:1,6

**initial** 119:2
121:9

**initially** 58:16

62:14 80:22
120:8 121:3

**initiate** 106:11

**injury** 35:14

**inmate** 15:18
28:9 33:16
42:3 68:13,18
69:13 70:11,25
72:11 75:6
82:6 84:11
88:6 107:4
115:20 116:1

**inmate's** 88:5,8

**inmates** 46:5
48:8 61:24
62:4 64:19,25
65:20 66:1
67:15 72:9,14
77:17 80:10
92:7 104:2,9,
11,18 107:8,9
112:6,10,23,
24,25 118:6
120:12 121:5,9

**inmates'** 118:7

**innate** 40:1

**input** 23:13
26:20 60:10
67:3

**inputted** 35:19

**inputting** 60:8

**inquiry** 104:23

**instance** 48:7
51:3 116:20

**instructions**
65:10,15

**intake** 18:3,5
73:5,6,7 111:9
112:3,6,16,24
118:16

intakes  82:13
  107:11 110:24
  111:19 112:4,
  12 113:5

intended  46:5,
  12

Interrogatories
  101:15 123:9

interrogatory
  102:6 119:21
  124:8

interrupt  13:23

intertwined
  12:2

investigation
  110:20

involved  59:8
  62:20 84:25
  85:2

issue  58:19
  102:19 103:2
  104:6 109:9
  117:17

issued  110:25
  117:25

---

**J**

James  6:6

Jamie  114:17,23

January  72:11
  73:4 74:19
  75:8 79:11
  82:4 101:24
  102:1 103:14,
  15,16,17 107:1
  110:24 111:14
  118:12 123:13,
  21

Jason  6:9

Jennifer  16:17
  17:16 27:4

job  16:20

jobs  38:6

JPAY  73:23

July  55:2

June  24:8,10,11
  58:12

---

**K**

keeper  75:4

keeping  36:18
  81:23

Kelly  114:17

kept  86:10

kicked  33:25

kind  18:5 20:4
  35:9 59:11
  116:1 118:13

knew  51:18,19
  107:7,8

know  12:14,21
  17:7,10 19:7
  20:20 22:3,4
  23:2 24:24
  26:8 27:13
  28:19 29:11
  31:2,13,16,17
  32:12,20
  33:20,25 40:19
  41:2,25 43:8,
  15,16,17,20,21
  48:5,6,13,15,
  16,17 49:20
  51:10,16 52:7,
  12 55:22
  56:22,23
  57:14,15 58:9
  59:10 60:16,18
  63:5,7,12,15

65:5,6,14
  67:21,22 69:17
  72:3 74:3
  76:12 77:18
  78:24 79:2,18
  80:9 81:12,13,
  15 82:9,20
  83:13 85:4
  86:10,12,18,19
  87:21 91:18
  93:20 94:13,
  17,21 95:10,20
  98:18,19 99:2
  103:6 104:15
  106:2,14,20
  110:2,3
  111:17,18
  112:22 113:16,
  19,20 114:1,5,
  7,9 117:5,7,8
  118:12 120:11
  125:2,9,14,15

knowledge  23:7
  25:19 26:22
  34:19 36:12
  68:10 73:11
  90:19

known  71:12
  88:16 89:1

---

**L**

labeled  97:16

Laborde  8:10
  47:2

lady  44:19
  124:23

laid  79:21
  123:24

Lars  19:24 24:7
  27:5

lasts  86:2

Lavespere  43:10
  62:21 85:1,2
  88:24 91:1
  100:10

Lavespere's
  100:5,9

laws  31:1

lawsuit  32:12,
  14,16 33:19,24

leave  82:11

leaves  77:20

Leblanc  6:6

leeway  79:1

left  41:11
  49:16 52:22
  86:6 87:2

legal  6:10,12
  9:16,24 22:6
  34:10

length  115:9

letter  14:12,13

level  36:25
  37:8 90:25

Levin  6:9

lights  23:18

limits  35:14

line  62:16
  124:12 125:16,
  19

lines  58:2

link  44:24

list  39:18
  40:5,12,19,25
  41:5,15,17,20
  42:3,8 43:13,
  18 47:10 49:5,
  18 50:14 51:16
  52:8,18,24

53:3,14 68:15
69:3,25 72:11
74:13,19 75:4,
9,10,13,19
76:10,17,24
78:1 80:2,5,
12,17,18,19
81:4,5,16,17,
20 82:1,5,9,
15,19,20 83:6,
8 90:5,12,16,
18 91:3,6,10,
11,20,21,22,24
92:12,13,20,24
93:23 95:3,6,
11,16,19 97:3,
17 98:15
99:12,17,21
100:1,14,18,
20,21 102:11,
13 103:3 104:8
105:5,12
106:23 107:3
108:2,22,24
109:2,14,18
110:9,11,14
111:23 115:14
118:2,3,9,10,
14 119:8,10,17
120:9

**listed**  68:14,16
74:20 90:17
94:12 108:2
109:3,6
110:11,14

**lists**  80:19

**little**  51:18
59:8 79:1

**long**  12:15
57:19 63:15

**long-term**  51:7

**longer**  41:12

**look**  59:10

60:16,17 61:6,
16,17,19 66:23
67:11,24
70:15,16 72:22
76:12 77:8
80:7 83:9,20,
21,25 86:3,11
87:16,20 93:24
94:24 95:2,6,
9,13,24 97:14
101:5 102:16
104:25 105:1
108:18 109:14
110:12 117:1
118:19 122:17
123:5

**looked**  52:1
54:25 61:11
90:8,10 97:11

**looking**  46:17
49:13 67:12
83:6,11,22
91:15 97:13
109:1 110:8
116:4,6

**looks**  8:8 47:1
60:22 67:2
101:12 109:17
117:3

**lot**  14:5 34:16,
17 87:3 101:10
112:19

**Lotus**  26:13

**Louisiana**  9:8,
22 34:12 82:7

**LSP**  7:2 10:3,
23,24 12:3,10,
16,19 13:1,10,
19 14:11,15,24
15:8 17:23
23:8 25:16
26:11,19 27:2,
16,18 28:3

32:3,7 34:19
35:3,13,16
37:12,17 38:3
39:4 41:11
42:20 43:22
44:1,5,9,13,
15,18,19 45:7
47:19,22,25
48:2,7,13
49:9,11 50:9,
22 54:1,2
55:4,6 56:16,
17 58:18,24
62:8 63:4
64:4,8,15
65:1,10,21
68:3,6,24
69:21 73:5
74:11 83:5
84:20 85:7,8,
20 86:7,14,23
88:11,14 90:12
91:2,18 93:21
97:7,9 98:4,6,
16,23,25
99:12,24
100:11,25
101:2,3 102:9,
17 103:4,5,6
106:7 107:4,
23,25 108:4,25
119:22 120:19,
23 122:8

**LSP's**  9:14,23
10:9 11:6
12:11,22 13:2
25:23 44:14
56:6 117:24
119:14 121:24

---

**M**

---

**made**  57:7,10
58:10,16 67:3
90:22 100:22,
24 103:1 106:7

**Maghen**  124:25

**mail**  76:14

**mailed**  39:22

**main**  20:23

**maintenance**
65:24 94:9,11,
13

**majority**  17:19
76:11 120:11

**make**  15:4 17:8,
9 18:12 29:11
42:2 46:17
53:3,6 54:17
56:13,18 57:1,
8 59:13 62:15
67:9 73:14
75:5 80:23
88:18,25
100:5,22 101:3
108:14 109:12
122:3,20
125:19

**makes**  17:10,17
19:4

**making**  41:1
64:24

**management**  9:7,
21 10:23 13:1
36:4 54:9,11
57:4

**mandate**  110:21

**March**  9:12

**marked**  46:16,19
89:14 96:1
101:6 123:6

**marking**  89:12

**master**  80:12
82:5 118:13

**matter**  6:5
21:18 40:16,22

**mean**  12:3 17:7
18:7 19:8
23:11 26:17,19
28:19,24 30:24
31:16 33:12,13
43:17 45:10
53:5 57:15
58:8,13 59:5
63:13 65:6
74:14 78:15
79:16 85:7,11
87:2 92:22
94:18 95:8
102:4 111:21,
25 114:3,8
115:23

**meaning**  101:2

**means**  38:14,25
73:22

**meant**  35:13

**meantime**  76:23
108:14

**med**  92:11
115:17

**medical**  9:15,23
16:11 19:8
28:18 36:6
37:2,13,22,24,
25 39:22 41:23
42:23 43:2
44:10,14
45:12,14 47:10
55:21 68:14,15
69:21,24
71:11,13,20
72:17,22 73:1,
6 75:2,25 78:6
79:6,7,17,24
80:25 81:5,10,
16,21 82:18,22
83:4 88:5,8,24
97:16 98:15
99:11,14,17,21
102:12,13

109:2,14,16
110:11,13
112:14 116:9
118:3 120:3

**medically**  37:1

**medication**
38:16 40:4,17,
21 41:2,17
43:21 49:2,5,
18 50:14 52:18
53:13 68:15
69:2,25 74:20
75:19 77:7
81:16,20 82:9
90:5,12,16
91:3,10,23,25
92:11,12
93:11,23 95:3,
6,11 102:11
103:3 104:7,8,
24 105:1,5,12
106:8,11,16,23
107:3,15 109:7
111:1,23
114:24 115:1,
18 118:1,2,9,
23 119:4
120:9,25
121:13,25
122:11

**medications**
39:16,17
40:12,20 41:17
43:13 47:9
49:16,23 50:13
51:13 52:13,
22,23 53:2,9,
14,17,19 68:17
69:5 70:18
71:1 72:12
75:10,24 77:19
81:14 90:17,23
91:10,13 92:2
93:25 97:3
102:18 104:17

105:17 107:5
113:15 115:6,
15 118:20
119:8,16 121:3

**meet**  11:17,18
15:21 16:1
73:14 77:9

**meeting**  103:8,
12,19,23
111:14

**meets**  107:15,16

**memorialized**
105:6 111:7

**memos**  64:10

**men**  10:14

**mental**  41:7
71:13

**mentioned**  25:21
74:18 111:18
122:16

**met**  7:9 125:23

**method**  42:19

**methods**  14:8
74:10

**minutes**  7:10
62:24,25 63:8
66:3

**missing**  22:20
23:3 50:13
51:13 52:13
53:6

**mistaken**  120:14
125:17

**moment**  61:12
118:8

**Monday**  7:10
112:8

**month**  18:11
23:16,20

26:23,25

**months**  109:25
112:11,13
126:1

**morbid**  77:25

**morning**  6:22,23
34:15

**move**  23:17
34:18

**moving**  75:21
120:12

**multiple**  59:21

**muscle**  93:9
94:2,3,8

———————

**N**

———————

**name**  6:9 26:2,4
54:20 103:23

**names**  43:19
78:1 82:2

**Natalie**  8:10

**nature**  29:12
33:4,15 45:15
57:18 92:17

**necessarily**
32:25 51:23
111:25 113:16

**necessary**  88:3,
15

**need**  7:25 15:20
18:5 31:11
36:1 54:8
60:16 63:10
74:2,4 79:3,21
81:7 82:12
85:1 107:9
111:11 118:20

**needed**  23:4
25:10 31:5

35:5 40:1 41:3
52:19 58:22
59:12,13 92:8
104:3

**needs**  11:21
12:7,8 18:3,5
20:25 21:2
23:2 120:4

**never**  19:25
25:10,12 30:17
31:9,21 43:7
88:16 89:1

**newly**  92:10,11
105:16 106:23
107:15 109:24
110:1 115:16,
17 118:22
119:7,9

**normal**  95:2

**note**  67:20

**noted**  6:14

**notes**  8:20
26:13 103:19

**notice**  13:25

**noticed**  49:15
52:21

**notification**
44:16

**notified**  72:4
76:18

**notify**  44:15

**November**  9:19
49:2,4 51:14
57:16 89:20
90:14 91:6,14
102:25

**NP**  116:24

**number**  8:13
27:18,19,20
46:23 77:16

83:25 95:23
112:17 113:20
114:5,21 124:8

**numerous**  28:23

**nurse**  15:17
16:11,14,18
17:3 18:19,21
19:3,12,15
20:5,15 21:4
23:5 24:13
29:19 30:6
37:13 39:19
41:7,15,19,21
42:6 52:11
69:23 70:4,5,
6,10,15,19,21,
24 90:20

**nurses**  16:22
49:21 50:9,12,
22 52:11

**nursing**  16:23,
24 20:25 45:14
50:19 51:4,24
60:16 103:11

————————

O

————————

**obesity**  78:1

**object**  78:15
86:17

**observed**  112:4

**obviously**
116:20

**occasion**  29:3
31:4

**occasions**  29:4

**occur**  76:1
121:14

**October**  7:21
39:10,11 40:9,
23 41:14 42:22

46:20 48:19,
22,25 49:6,12
50:4 56:21
61:25 67:14
71:24 83:21
84:12 86:2,5,
15,21 90:8,18
91:2 96:13,15
97:4,17 98:2,
16 99:6,12,22

**offender**  16:5,8
17:25 19:7
21:1 24:5,12
33:10,14 36:6,
9 39:23 40:1
73:5 82:6
92:10 111:23
118:15

**offender's**
43:19

**offenders**
16:10,12,16,23
18:10 35:22,23
41:1 66:5
102:18 107:23
120:24 121:25

**offenders/
inmates**  17:20

**offer**  63:7

**offered**  28:15
62:24 107:18
109:6 118:24
119:19 121:11

**office**  15:16
50:19 51:4
56:24 57:2,4
60:21 100:5,9
125:1,22

**officer**  51:24
54:9,11 88:25

**officer's**  50:19

**officers**  36:20

**official**  13:20
99:25

**officially**
75:20

**okay**  7:19 8:3
9:6,20 11:20
12:4,15 13:16
14:15,24 17:12
21:12,20 23:18
26:10,21 27:9
29:19 34:25
35:1 38:5,11
40:11,21 41:14
42:6,12,19
45:19,20 49:4
52:6 53:21
56:5 58:23
61:6,10,13,18,
21 62:23
67:11,23,25
70:9 71:8
76:17 83:20,24
84:2,10 87:5,
15,24 89:3,25
93:17 95:24
96:11,12,18
97:1,5,13 99:5
102:6 103:16
107:1 108:24
109:11,15,20
110:22 115:12
116:16 118:5
121:8 123:4,16
126:3

**Oliveaux**  6:5,
17,22,24 9:6
37:20 87:15
126:13

**omission**  50:23
53:25 90:21

**once**  16:1 23:19
55:12,24 84:13
106:18

**one**  7:16 8:23 14:13 16:7,9, 22 17:16 18:11 20:16 22:5 23:5,15,20 26:23 27:6 29:3,16 30:20 39:10 40:11 41:16,23 43:7 49:1,2 54:15 55:10 61:15 63:17,23 69:5 70:17,18,25 71:1 72:12 73:11,14 75:9 77:7,8 79:23 80:7 83:5 90:13 91:10, 13,15 92:2,3 93:7,10,14 94:17,19 96:7 102:6 105:17 107:5 108:8 109:16 110:7, 10 113:2 114:19 118:22 119:8,9,16,17 121:7

**ones**  34:15 76:11 94:12 115:1,2

**open**  9:1

**operative**  90:11

**operator**  55:10

**opinion**  30:16

**opportunities**  10:15

**opportunity**  110:16

**opposed**  24:25 43:13

**opt**  69:14 71:5, 9 73:21 74:4

**opt-out**  74:15

**opt-outs**  79:3

**opted**  72:1 73:12 94:22

**opting**  71:16 74:9

**option**  69:14 73:20 82:21 92:17 105:20 106:15,18 118:25 121:12

**order**  32:21 37:25 38:1 41:22 42:1,9, 11,12,17 93:2

**ordered**  39:21 109:8

**ordering**  29:10

**originally**  55:2 62:11

**Otis**  65:23

**outdoor**  61:19, 23,24 62:5 64:11,19,25 65:21 66:2

**outdoors**  48:9 84:5

**outline**  11:13, 14,15 12:8

**output**  81:25

**overlooked**  56:15

**oversee**  9:14,22

**oversight**  50:1

---

**P**

**p.m.**  61:25 87:9,13 126:7, 11 127:2,3

**page**  8:4,7,14, 23 38:22 46:10,22 57:9 61:14,18 62:23 67:11,12,20,22 68:2 79:20,21, 25 83:20,24 87:20 89:23 96:16 97:15 124:9

**pages**  96:23

**paid**  17:5

**paper**  11:13 36:15,16,19 76:20 109:10

**part**  47:16 59:24 69:16 75:22 85:14 102:17 104:24

**particular**  85:6

**pass**  85:12

**passed**  63:14, 20,22

**past**  52:18 112:21

**path**  105:12

**pathology**  38:12 39:21 40:2 45:23 46:4,7 47:9,11 52:17 54:15 56:6 65:17 68:16 69:7 72:18 76:13 77:9 85:14,25 88:7 90:5,11 91:9

**92:16 93:12,23 97:3 102:11 104:8 105:19 106:3 107:18 110:4 115:19 118:2,21 121:12**

**patience**  15:5

**Paul**  71:21

**Penitentiary**  9:8,22 34:12 82:7

**people**  24:24 28:25 39:3 40:8 42:20 63:24 67:9 72:1,5 74:20, 25 75:9,12,15, 23 76:8,10,17 78:5 81:9 83:2,3 91:8 95:2,18 105:24 106:1,22 108:2 112:16,20 114:2,12,18,21

**people's**  80:25

**percent**  30:24 50:25 83:14,16 105:25

**perfectly**  117:24

**perform**  35:10, 15

**performing**  37:1,4,9

**period**  94:14

**permanent**  68:19

**permitted**  35:10

**person**  13:9,16 14:10,19,21 19:11 20:11

22:18 27:9,21
28:17 29:8
30:13 35:2,10,
13 36:14,19,24
37:1,7,8 38:11
40:11,13,17
41:20 42:23,24
55:4,5,9 65:3
66:11 69:24
70:6,17,25
71:2,9 79:25
80:2,20 91:19
92:3 93:3,12
94:2,4,7
102:10 103:3
106:7,8 108:11
109:21 114:16
116:14 117:11,
24 119:10,16
122:10

**person's** 23:9
25:9,12,17
37:21 42:7
80:14 83:6
104:23 108:18
109:1 110:13
116:17 117:13

**personally** 16:7
45:7 57:5
123:23

**personnel** 35:13
36:25 37:7
44:15

**persons** 114:18

**pertain** 29:7

**pertaining** 23:6

**pharmacy** 39:18
41:1,15 74:24
75:8 91:22,23
92:19 120:9

**photosensitivity**
38:16,22 39:17

**physical** 76:15,
16,19

**physically**
42:11 57:9
65:7,8 66:12
93:15 104:10
112:2 120:6

**picked** 78:25
82:4

**piece** 36:15,16

**place** 8:25
39:13 63:23
68:6 88:11
97:7,9 112:5

**places** 116:14
117:11

**Plaintiffs**
101:16

**Plaintiffs'**
101:14 123:8

**plan** 55:23
73:15

**planning** 74:10

**plans** 105:11

**play** 38:2 86:1

**please** 6:16

**point** 20:2 34:6
77:22 78:15
104:19 105:10
106:11 110:18
119:7

**policies** 10:19,
25 11:1,2,6
12:11 55:11
56:12 58:18
65:17

**policy** 11:10,17
12:1 39:12
45:23 48:10,
14,24 53:23

55:8,15,17
56:7 59:5,6,7
64:3,7 71:23
79:16 84:18,
19,20 85:5,24,
25 86:8,14
88:11 93:22
96:19 97:7,9
105:24 106:2,3
108:5 111:6
112:5 117:24
119:14,15
120:18 122:3,
9,12,21,23,24

**population** 21:1
28:9 74:11
79:2

**posed** 102:8

**position** 9:11

**positions** 16:20

**possible** 15:7

**Powerdms** 43:23
44:6,12,17,23
50:6,8 54:10
55:9 59:16
60:9,10 67:6
91:16 97:24
98:3 99:18
105:8

**practice** 57:24,
25 121:24
122:8,12

**practices** 58:21

**practitioner**
37:13 68:12,23
70:4,6,7,10,
19,24 71:17
73:6 88:2,14,
17 99:25

**practitioner/
provider** 70:3

**practitioners**
69:19 72:16,20

**precaution**
38:14,24 39:5
40:8,14,22
41:20 42:3,21
43:3,11 68:17,
25 70:1,12
71:3,10 72:2,6
73:2 74:12
75:16,24 76:2,
9,19 77:14
80:3,20 81:10
83:3 88:3,15
91:9,19 92:4
94:4 95:12,19
99:15 102:20
103:2 104:6
105:5 107:9
108:15 109:22
113:7,12
114:2,12,21,24
117:25 119:10
121:1 122:10

**precisely** 41:5

**preliminary**
122:15

**prepare** 7:8

**prepared** 7:5

**prescribe**
118:21

**prescribed**
68:15 92:2,12
94:11 102:10,
18 104:7
105:17 106:14,
23 107:14
111:1 118:23
119:4,7 120:25
121:3

**prescribing**
42:17 73:2

prescription
42:12 76:3
92:21 93:5
106:14

prescriptions
76:5 107:13

present 7:17

pretty 117:1
125:21

previous 39:7
52:24 55:3
95:10,16

previously 15:1
21:3 46:16,18
65:16 85:16
95:5 115:17,18
120:1 123:5

primary 116:12
117:22

printed 35:21
36:12,13,16

printing 82:5

prints 91:22

prior 40:23

prison 12:18
55:19

privacy 28:20

privy 65:24

probably 53:18
55:2 57:15
62:15 90:8
94:11 98:1,2
101:24 103:13
112:10 116:21,
22 117:3

problem 80:5,
17,18 81:4
82:19,20 83:6,
8 108:22,24
109:2,18

110:9,14
115:14

procedure 11:10
66:8 119:14
120:20

procedures
10:25 11:1,2,6
12:11 52:20
58:19 61:19,23
62:19 64:12,16
66:15,19,23
68:6

proceeding 6:7

process 13:15
15:13 18:13
19:6,9 20:8
21:10,16 22:3
32:13 33:17
39:3 55:25
56:16 57:12,22
58:24 59:1,3,
16 60:6,19
104:21,24
112:3,15,18
113:1,6,21
115:10,22
119:23 120:2
121:19 122:19

processed 54:25

processes
11:16,19 40:7
91:5

produced 39:18
101:16

professional
42:23 43:2

programs 9:17,
24 10:15 22:7
34:10

progress 81:15

project 74:23
75:1,4 79:6

81:22,24 82:17
99:13 108:1
109:17

promotion 16:25
17:1 41:13

promptly
124:17,21

promulgates
12:4

proposed 60:7

protocol 66:8

protocols 10:19

proud 44:3

provide 36:23
37:6 48:8,11
65:20 66:24
115:20

provided 27:23
48:20 58:10,11
62:10 65:10,15
68:8,18 88:7
107:21 110:24

provider 19:8
39:20,25
68:13,24
69:22,24 70:7
71:17 73:7
75:21 88:2,14,
18 93:8 94:16
99:24 110:12,
16 111:10,22
113:14 116:13
117:22 118:17
120:4

providers 41:24
68:7 69:19
72:16,20 78:7,
10 79:5,8,24
81:3 82:16
83:5 92:6,9
105:2 108:25
109:16 110:8

120:5,22

providing 65:12
76:20

provision 67:14
87:18,25

provisions 46:3
84:7

psychotropic
39:16 40:12

Public 6:25

published 50:3
98:2

pull 26:3 59:6
77:1,3,5 80:4
86:9,19 104:17
107:23 108:7,8

pulled 43:17
72:11 74:19
75:9 102:17
107:2,4 118:13

pulling 72:23
120:9

pulmonary
109:19 110:9

purpose 36:22
37:5 46:8,9,10

pursuant 72:2
113:7

purview 24:18

put 11:16,24
31:11 50:3
58:22 61:1
67:2 73:24
74:16 83:2
120:1,4,6,21
121:16 122:3,
20

puts 54:10
55:11

putting  58:20
78:21 96:8

Q

qualifications
30:21

qualifies  28:2,
7 29:5,15
31:2,6,14,19,
25

qualify  30:18,
22

quality  9:7,21
10:22 12:25

question  20:1
29:8 30:6
43:10 64:23
83:19 99:9
102:7 113:4
115:10 119:6
121:15 124:2

questions
22:17,18 66:11
123:24 124:4
126:14

quick  80:6 87:5

quite  60:24

quoted  27:17,20

R

R.N.  30:2

radio  74:2,3

rails  31:11

raised  94:2

random  43:18
48:17

Ratcliff  65:23

rationale  88:4

reach  15:18
22:17 30:25
34:9 88:23

reached  34:5,8
108:4,5

reaches  84:13
120:3

read  7:19 8:12
21:10,12,14,19
34:15 62:1
67:18,19 68:2,
21 79:21,25
84:8 85:24
88:9 90:1
102:14 111:4
115:7

reading  38:18
67:16,22

reads  102:17

realized  49:22
50:12,22 108:7

realizes  110:10

reason  37:11
40:2 55:25
97:13 117:12

reasonable  13:9
14:10 21:21
25:7,13,17

reassignment
125:2

recall  23:24
24:1 33:18,22
34:2

receive  17:23
38:12 40:14
41:4,5 42:25
66:2 71:3
79:14,24 80:2
92:3 94:4

received  25:22
26:11 32:3,7
34:19

receives  17:17,
19 19:3,12
36:15 80:23

recent  19:21
124:11

reclassification
124:16,20

recognized
90:21

recommend  55:8
100:4

recommendation
20:16

recommendations
23:6 56:13,18
67:9

recommended
19:12

reconcile  91:21

record  6:2,15
35:20 80:15
82:22 83:7
87:6,8,12
88:5,8 96:7,14
97:10 99:10
109:2 110:13,
17 126:7,10
127:1

records  35:24
36:7 39:22
73:1 78:6 79:7
80:25 82:18
108:12 125:19

reduce  46:5

reduced  15:23

reduction  46:4

refer  27:10,22

93:19 102:24

reference  57:17
80:6

referring  57:2

refers  35:9
47:7 67:14

refusal  71:12,
25 107:20

refused  111:3

reg  11:23 13:7
27:17,18,20
39:7,9 52:15
54:18 58:5,7,
15 59:4 61:5
79:16 85:12
98:21 104:1
106:4,12

regarding  37:8
88:7

registered
70:15,21

regs  87:1

regular  17:3
35:4 70:5

regulars  65:18

regulation
11:10,11 12:10
27:24 31:24
44:9,13 45:7,
12 46:1 61:3
89:17

regulations
11:4,7 12:4,6,
16,23 13:3
43:24 44:5

related  32:4,9,
15 33:18 34:20

relaxant  93:9
94:3,8

| | | | |
|---|---|---|---|
| **relaxants** 94:2 | **require** 93:5 | 19:15,18,19,25 | 25:23 27:12,14 |
| **relaying** 45:1 | **required** 45:5,8 | 21:4 24:18,22 | 29:11 34:7 |
| **remaining** 72:21 | 47:25 | 49:17 52:19 | 37:14 42:16,25 |
| **remember** 34:13, | **requiring** 84:6 | 53:23 54:1,23 | 43:1 44:4 46:7 |
| 15 41:21 97:25 | **research** 11:13 | 55:13 56:11 | 54:16 56:7 |
| 110:17 | 33:9,11 125:6 | 69:2,3 82:12, | 57:6 59:19 |
| **remotely** 6:7 | **researched** 33:6 | 20,22 97:23 | 60:5 63:11 |
| **remove** 37:21 | **resending** 45:16 | 98:19 104:11, | 69:17 70:18,20 |
| 42:7 82:10 | **resolution** 34:2 | 19 109:17 | 71:18 74:21 |
| 100:7 | **resolve** 19:5 | 110:8,25 | 75:10,13,16 |
| **removing** 38:3 | **respect** 13:5 | 115:4,5,14 | 82:17 83:1 |
| **Repeat** 122:5 | 29:17 30:4,7 | 118:6 | 85:23,24 90:18 |
| **report** 72:24 | 31:7 65:11 | **reviewed** 15:14 | 91:11,16 93:3 |
| 77:3 108:8,13 | 93:22 105:12 | 19:25 22:2 | 96:20,22 97:7, |
| **reported** 49:24 | 115:11 | 50:10,21 52:8 | 8,9,11 98:16 |
| 50:18 | **respond** 22:4 | 67:8 102:5 | 107:3,13 113:2 |
| **reporter** 6:11, | **responds** 22:5 | 115:24,25 | 118:5,8 119:6, |
| 16 59:22 60:2 | **response** 34:14 | 116:2,5,18 | 11 121:17,22 |
| **reports** 108:7, | 119:21 | 117:13 118:16 | 122:4 |
| 11 | **responses** | **reviewing** 17:3, | **risk** 92:16 |
| **request** 7:18 | 101:14 102:5 | 6 24:4,12 | 93:18,21 96:6 |
| 13:9,14,18 | 123:8 | 49:21,22 52:20 | **risks** 71:16 |
| 14:10,25 15:2, | **responsibilities** | 67:10 73:1 | 74:8 88:7 |
| 8,15,23 17:24 | 10:10 30:3 | 82:18,19 91:4 | 105:22 |
| 18:14 19:4 | **responsible** | 99:14 104:1 | **Rita** 6:11 |
| 20:4 21:14,23 | 10:9,13,18,24 | 120:10 125:18 | **Rodriguez** 52:3 |
| 23:9 24:16,21 | 11:5 13:1 | **reviews** 22:5 | **Roland** 66:10 |
| 25:1,17 32:3, | 36:18 64:24 | **revise** 47:19,22 | **role** 20:22,23 |
| 8,16,22,23 | 65:11 69:19 | 56:9,17 | 33:16 38:2 |
| 34:20 36:1,6 | 81:21,25 82:1 | **revised** 48:18, | 44:25 |
| 37:23 59:15 | **rest** 62:24 63:7 | 21,24 49:2,25 | **room** 7:13 |
| **requested** 25:22 | 66:2 | 50:3 54:14 | **rough** 112:17 |
| 26:11 | **restrictive** | 56:3,20,21 | **roughly** 73:16 |
| **requesting** | 68:19 | 58:25 60:6 | 75:14 |
| 14:20 21:20 | **restroom** 33:3 | 71:23 83:5,21 | **routed** 18:18 |
| **requests** 15:11 | **resubmitted** | 84:3 87:17 | **routine** 116:25 |
| 16:15,18 17:6, | 55:1 | **revising** 119:24 | 117:21 118:18 |
| 10,17,20 23:22 | **review** 16:18 | **revisions** 49:4, | **rubric** 89:4 |
| 24:5,12 | | 6 54:17 60:7 | **Rule** 7:1 |
| | | 99:20 | |
| | | **Riche** 29:23 | |
| | | **right** 8:25 9:9 | |
| | | 18:15 20:6 | |

## S

**S-T-A-C-Y-E**
52:4

**safely** 35:15

**Safety** 6:25

**sat** 43:7 103:20

**saying** 16:3
32:11 42:15
44:21 69:17
97:24 106:22,
25 107:1 117:2
124:1 125:13

**says** 7:21 27:15
46:10 62:23
69:10,13 71:15
87:25 107:22
115:3 124:9,15

**schedule** 94:2

**scheduled**
117:21

**score** 93:18,21

**screen** 8:24 9:2
46:15,19 47:8
61:9,16 89:16
96:9 97:16
119:21 123:6

**screened** 33:1

**scroll** 101:9
124:9

**scrolling** 96:20

**search** 31:1,23
77:25

**season** 48:9
86:7

**seat** 31:11

**second** 13:24
61:15 96:8

**Secretary** 47:1

**section** 61:20
68:11

**security** 36:24
37:7 67:1

**see** 19:21 20:4
33:6,14 39:7
45:6 46:19
47:8,12 52:19
54:24 55:25
58:14 59:12
61:9 65:8
67:16 69:1
77:8 79:7
80:8,14 82:21
86:11 89:16
92:9 96:9,16,
21 97:15,18,22
101:18,23
111:22,25
112:1,12
118:20 123:6,
10,14 124:13

**seeing** 33:18
80:11 117:4

**seeking** 21:23

**sees** 109:18
110:9

**send** 41:15
44:10,20,23
54:8,22 73:23
74:15 92:20
109:10

**sending** 112:23

**sends** 11:12

**sense** 42:18
122:3,20

**sensitive**
38:15,25

**sentence** 107:22
110:23 115:3

**separate** 14:17,
18 15:10

**September** 19:2

**services** 10:15

**set** 78:9
101:14,25
123:8

**seven** 96:23

**seven-page**
46:25 123:12

**several** 13:8

**shade** 58:3
62:12 63:9
64:1,20 65:19

**shaded** 62:5,11

**shape** 24:1 75:3

**share** 46:15

**Sharita** 20:13
28:3,14 30:10,
14,25

**Sharp** 75:18
114:17

**Shipley** 124:25
125:18,24

**Shipley's**
125:12,13

**shoe** 116:22

**shooting** 78:20

**show** 36:20
89:11

**showing** 46:18

**shows** 44:12

**sic** 73:2 106:3

**sick** 74:6,7
116:14,25
117:10,11

**sign** 19:17

21:5,11,12,14
22:15 42:9
55:16,18,23
60:21 97:23
107:20

**signatures** 8:7
47:1 60:13
96:21

**signed** 22:11,
12,22 55:15
67:13 124:1

**signing** 22:25
55:14 71:11

**signs** 21:17
22:5 34:11
69:7

**silently** 67:18

**simply** 37:10
40:25

**single** 34:14
108:8

**sit** 52:15 98:18
103:25 104:11
111:25 113:14

**sitting** 93:15
111:22

**skeletal** 93:9
94:3,8

**skip** 61:14

**snow** 112:9

**software** 43:23

**sole** 55:10

**someone's** 79:24
109:18

**sort** 80:15

**sounds** 27:14
54:16 78:25
104:20

**speak** 15:18 26:21 28:19 30:12 92:15 110:15

**speakers** 59:21

**speaking** 93:16

**Spears** 20:13,19 28:3,6,14 29:5,15 31:18

**special** 13:17 24:22 35:5 84:6

**specific** 66:22

**specifically** 59:19 60:6

**spoke** 57:8 92:5

**Stacye** 52:3,4

**staff** 27:2 45:1,4,8,11 47:11 54:1 57:8 60:17 64:14,15 65:11 74:19 75:8 87:2,3 103:9 105:23 106:4,6 111:10 112:15

**staff's** 20:25

**stages** 122:15

**stamp** 8:13 87:21 89:23

**stand** 113:17

**standards** 60:22

**standpoint** 16:24

**stands** 10:5 28:16

**start** 21:22 53:24 57:12 59:11 61:2

72:16 79:10 85:10,18 98:5, 25 104:17

**started** 49:13 53:18 57:17 58:6 62:11,14, 16 72:10,15 79:11 103:25 108:6

**starting** 53:23 54:1 58:11 74:18 99:2,3 104:19 105:10 106:11

**starts** 20:5,7 59:16

**state** 9:8,22 12:7 34:12 82:7 102:8 124:10

**statement** 84:15

**states** 68:11 71:9 84:11

**stating** 44:11

**station** 74:3

**status** 25:9,13, 17 35:3,5,6,9, 12 36:10,15,22 37:5,16,21 38:9,12,14,25 39:5,21 40:2, 6,9,14,23 41:3,20,22 42:4,7,21,25 43:3 54:4 68:18,20,25 69:9,12 70:1, 12 71:4,10 72:2,6,18 73:3,13 74:5,9 75:16,20,24 76:2,3,5,9,14, 19,20 77:10,

14,19 80:3,21, 23 81:10 83:4 88:3,15,19 91:9,20 92:4, 8,18 93:2,13 94:5 95:12,19 99:15 103:2 104:3,7 105:6, 19,21,22 106:9,15,18 107:10,19 108:16 109:8, 22 110:1,5,25 111:1,11 113:7,12 114:2,12 115:4,15,20,21 116:2,17,21 117:13 118:1, 10,21,25 119:1,11,18 121:1,12 122:2,10

**statuses** 34:25 35:18,19 37:10,12 38:3 43:12 73:19 74:12 99:3,8 102:20 106:19 114:22,25 115:24 117:3 118:20

**stay** 112:14

**steadily** 18:2

**stenographic** 6:15

**step** 93:4 109:4 112:2

**steps** 11:18,21, 24 60:25 102:8,9 106:20 120:4 124:19

**Stickells** 16:17

17:16 18:19 19:3,13 20:5 21:1 22:2,12 24:7,13 27:4 29:19 30:6,15 33:8

**Stickells'** 19:16 20:15 23:6

**stopped** 24:12

**stops** 20:5

**straight** 43:6

**strictly** 39:14, 15

**strike** 80:12

**structure** 64:1

**structures** 65:20

**study** 90:9

**stuff** 17:4 29:13 32:12,16 57:1 64:9 65:9 73:10 74:15 120:16

**subject** 71:10

**submitted** 55:2 60:7

**subsection** 84:1 87:20

**subsequent** 50:9

**summary** 108:20 113:22

**summertime** 62:17

**sunscreen** 58:4, 11 62:6,14,15 64:20

**supervise** 29:19

supervisor
29:20,22 30:2
65:13

supervisors
66:6

Support  6:11,13

supposed  48:11
116:8

sure  15:4 17:1,
4 18:12 26:5
29:11 30:24
40:18 42:2
43:16 46:17
48:4 50:25
51:6 55:24
57:1,8,10
62:15 64:24
73:14 75:5
79:20 80:23
88:25 102:5
105:2,25
108:14 109:12
125:21

swear  6:16

sworn  6:18

symptoms  69:7

synopsis  80:15

system  43:23

—————

T

—————

table  29:10
103:21

tablets  73:23

take  11:15 21:6
23:4 42:13
51:2 57:19
77:7 82:9 87:5
91:10 94:8
98:3 105:11
106:15 107:19

118:1 121:25
124:19 126:3

taken  82:8
87:10 102:8,9
126:8

takes  12:10
16:23 70:18,25
94:7 103:3
106:8 119:16
122:10

taking  8:25
63:24 74:20
78:8 92:1
94:3,10 105:22
107:13

talk  19:7
33:10,13 34:25
39:11,12 59:12
62:22 71:6
79:3 92:15
110:3

talked  40:4,5
94:18 103:21
108:25 111:9
115:9

talking  8:15
33:1 39:8
69:16,18 85:8
111:24 113:2
125:5

talks  87:24

task  24:14
35:15 77:24
78:5

tell  26:4 28:21
49:19 59:2
78:21 114:4

telling  28:25

temperature
84:5,13

ten  79:8,9 81:3

82:16 83:5
108:25

tend  18:3

tent  63:16,17

tents  58:10
62:12 63:9

terms  64:18

testified  6:19
21:3

testify  7:1,5

testimony  7:8
75:8 86:7
127:3

Thank  9:4 12:20
60:3 70:22
126:15,17

thermoregulation
31:14,19,25
32:5,9 34:21,
23

thing  15:9
46:17 104:15

things  29:12
33:3,15 45:14
56:14 57:18
79:3 82:10
92:16 114:9
116:13

think  9:19
11:25 24:9
25:4 27:5
28:25 40:24
49:1,13 50:24,
25 53:17 54:23
65:14,15 72:14
75:18 85:16
94:14,19 98:24
101:25 103:7
116:24 120:18
125:20

thinking  44:18
52:2 96:4

Third  101:14
123:8

Thompson  54:12,
21,22 55:4
60:8

thoroughly
117:2

three  14:9 47:7
50:10 112:11,
13

three-page
89:22

threshold  86:24

throwing  77:16

til  86:2

time  12:15
17:11 18:10
23:24 24:1,6
27:6 33:24
36:11 39:25
40:3 41:6,9
44:22 49:14
51:7,14,20
56:12 57:25
58:6 63:17
72:3 73:8
74:4,8,15 76:7
78:3,8,9 79:1,
8,11 80:11
83:11 86:10,
13,25 90:6
92:14,18 93:12
94:14,15
98:22,23
103:25 104:4
105:19 107:17
111:12 112:14
114:3,20
117:16,17
118:24 119:25
120:5 123:19,

22 124:23
125:17

time-consuming
104:13

times 36:19
63:20,22

title 29:24

titled 89:17

Toce 51:6
55:18,20,22
60:12,20 69:23
71:21 79:17
83:19 103:7
104:6 111:14
120:3,21

today 7:6 68:3,
6 92:2 126:14

toe 116:15,19,
23

told 29:16
40:13 42:19
65:25 66:7
75:18 76:22
90:20 114:25
121:2 125:11

top 27:19 51:11
114:6

topic 7:6

totally 15:10

track 81:23

trailers 62:12
63:9,18

trained 15:17
24:7 85:14

training 9:16,
18 19:19 24:9
47:11 79:13
85:15

transfer 113:22

transition
18:25 24:4

trigger 84:24
85:21

trouble 33:2,3
48:4

true 33:7 63:12
65:5,6 117:5,
7,8 124:4

truthfully 25:6

try 15:6

trying 56:25
92:7 108:7

turn 18:4 23:18
54:2

turned 54:6

turnover 56:24
57:3

two 14:17 26:24
54:23 55:1
57:10

type 39:24
59:5,6 65:19
77:25

types 66:11
116:12

U

Uh-huh 63:21
85:4 113:8

ultimate 90:22

ultimately 19:9
55:16,18 60:20
92:22

underneath 9:19
31:3 63:9,16,
17

understand

76:21 83:12

understanding
15:5 18:12
43:22 75:7
109:12 122:7

unit 16:23,24
65:3

unsure 28:1

update 13:7
44:20 45:1,6
54:3,7 57:19
81:19 90:15
98:4,6

updated 26:16,
18 44:11,22
45:12 50:20,21
51:15 52:8,9,
14 54:4,8 55:8
57:1,5,16,22,
23 58:7 92:20,
24 106:2 108:5

updates 13:7
54:9 55:10

updating 44:19
57:13

uploaded 44:6

V

Vannoy 55:19,23
60:13,23

varies 26:24
112:16

vendor 78:3

verbal 15:8,11,
13,23 33:16

verbally 13:13,
18 67:22
103:20 111:9,
13

verbatim 33:25
46:11 52:7
66:17

verbiage 32:10
34:22 56:13

verify 123:23
124:3,19
125:19

version 52:24,
25 53:3,4,6,7,
10,11,13,14,
16,19 54:14
66:14 67:13
84:3 90:16,18
91:14 96:11
100:25 102:23,
25

video-recorded
6:4

videographer
6:1,10 87:7,11
126:6,9,19

view 44:23

violation 48:10

visit 39:24
69:2 75:25
93:14 117:21
118:18,19,24

visiting 28:16

visitor 28:10,
11 29:17,18

visitors 16:13
20:24 26:23

visits 116:10,
12,13 119:3

Voice 6:5

vulnerable 46:6

**W**

waiver  71:12

walker  31:10

walking  33:2

want  15:4 18:12
  28:24 39:7
  48:5 57:14
  59:10 72:10
  74:5 92:18
  98:17 105:20
  109:11 110:4

wanted  30:16
  87:18 116:1,2

wanting  28:12,
  15

warden  9:6,7,21
  10:22 12:25
  21:17 34:11
  37:19 44:25
  55:19,22
  60:13,23 61:22
  65:23 67:2
  88:22

wardens  14:13
  59:9 65:3

watch  113:13

water  48:8,12
  58:3 62:5,10
  63:10,19 64:20
  65:9,12

way  20:16 24:1
  30:15 34:13
  45:4 72:23
  76:6 77:1,5,24
  78:1 83:2
  93:14 121:6

ways  13:8,12

wear  116:22

week  81:20

103:13 114:23
126:18

weekend  126:17

weeks  54:24
  55:1 57:10
  112:21

weight-bearing
  42:15

went  50:7 51:5,
  6,8 79:18 82:4
  91:7 124:6
  125:18,21

Wescott  8:8
  47:2

wheelchair
  29:12 31:10

wide  44:21

Williams
  125:15,24

Williams'
  124:11

windows  9:1

witness  6:16
  7:1 8:6 126:16

wondering  12:14

word  12:1 37:2

work  15:21
  17:21 20:1
  35:10 36:25
  37:3,8 59:13
  63:6 78:10
  79:9 104:4

worked  56:23
  124:5

workflow  55:11,
  12 59:11,17
  60:18,19 120:2
  123:2

working  48:8

56:25 65:4
66:12 74:25
75:3 77:2 78:2
79:5 82:17
84:21 98:7
99:14 100:17
107:23 108:12
121:20

works  16:12,14
  100:10

WRIGHT  6:21
  14:3,7 59:25
  60:4 86:22
  87:4,14 89:15
  96:2 101:7
  126:2,12

write  14:12,13
  16:3 25:5 38:1
  41:22,25
  42:11,16 69:8,
  12 93:1,11
  99:3 110:6

writes  16:8

writing  15:24
  25:1 58:20,22
  78:21 93:9
  105:6 111:7
  121:17 122:21

written  10:24
  11:6 12:22
  13:2 18:13,16
  19:3 35:18
  36:10,11,23
  37:6,25 38:21
  39:21 40:18
  42:10 57:25
  58:1 75:20
  117:20 120:15
  122:7,23

wrote  22:2
  33:21

**Y**

y'all  8:22
  53:17 58:16
  62:22

y'all's  7:18

yeah  8:11 20:7
  86:3 95:15
  103:15 113:2
  115:23 122:6

year  19:23 24:6
  76:11,12 84:12
  85:11,13 86:1
  87:2

**Z**

Zoom  6:8 9:1,2