# Exhibit 14

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **VOICE OF THE EXPERIENCED**, on behalf of itself and its members; and **MYRON SMITH**, **DAMARIS JACKSON, NATE WALKER, DARRIUS WILLIAMS**, **KEVIAS HICKS, JOSEPH GUILLORY, KENDRICK STEVENSON,** and **ALVIN WILLIAMS,** on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>**JAMES LEBLANC**, in his official capacity as Secretary of the Louisiana Department of Public Safety & Corrections; **TIMOTHY HOOPER**, in his official capacity as Warden of Louisiana State Penitentiary; **MISTY STAGG**, in her official capacity as Director of Prison Enterprises, Inc.; the **LOUISIANA DEPARTMENT OF PUBLIC SAFETY & CORRECTIONS**; and **PRISON ENTERPRISES, INC.**,<br><br>*Defendants*. | **SECOND SUPPLEMENTAL DECLARATION OF DR. SUSI VASSALLO** |

I, Dr. Susi U. Vassallo, declare as follows:

1. I have reviewed transcripts of depositions taken in this case and additional records produced by Defendants.[1] I also observed operation of Farm Lines 24/25 during an in-person inspection of the Louisiana State Penitentiary (LSP) on July 22, 2024. This evidence confirms the opinions expressed in my initial declaration and first supplemental declaration.[2] Incarcerated men

---

[1] My work in this matter is ongoing. I reserve the right to amend, supplement, update, refine, or revise my opinions as set forth in this declaration. I reserve the right to review additional materials and conduct further analysis.

[2] Rec. Doc. 37-3 (Declaration); Rec. Doc. 51-1 (First Supplemental Declaration). I incorporate those declarations by reference here.

1

forced to work on LSP's Farm Line—including those who are younger and relatively healthier—are at substantial risk of serious harm due to their prolonged exposure to heat indices above 88° Fahrenheit. Individuals with medical or mental health conditions that make them more susceptible to heat-related injuries, or who are taking certain medications that adversely affect the body's ability to thermoregulate, are particularly at risk.

2. I focus here on three issues: (1) LSP's failure to provide adequate medical care to inmates who experience emergencies in the field; (2) LSP's failure to prevent heat-related illness ("HRI") in the field; and (3) LSP's failure to revise its heat pathology medication list to include classes of medications known to impair thermoregulation.[3]

3. I attach the following:

- **Appendix A**: Heat Injury and Illness Prevention in Outdoor and Indoor Work Settings, U.S. Department of Labor, Occupational Safety and Health Administration (OSHA), *also available at* https://www.osha.gov/sites/default/files/Heat-NPRM-Final-Background-to-Sum-Ex.pdf.

- **Appendix B**: Transcript of the deposition of Dr. Paul Toce, LSP's Medical Director, taken in this case on August 7, 2024.

- **Appendix C**: Transcript of the deposition of Dr. Randy Lavespere, the Louisiana Department of Public Safety and Corrections' Medical Director, taken in this case on July 29, 2024.

- **Appendix D**: Heat pathology medication lists from California and Iowa.

I. **Failure to Provide Adequate Emergency Medical Care**

4. Adequate medical care is not available to those suffering heat-related emergencies at LSP.[4] This places incarcerated men at a substantial risk of serious harm.

---

[3] My credentials are set forth in my initial declaration submitted in this action, I am being compensated at the rate of $450 per hour for my work preparing this report. This compensation is not contingent on my conclusions or the outcome of this litigation.

[4] *See* Rec. Doc. 37-3, esp. ¶¶ 99-102; Rec. Doc. 51-3, esp. ¶ 3.

2

5.      At LSP, incarcerated men may place an emergency sick call, also known as a self-declared emergency ("SDE"), for a fee of $2.[5] According to LSP's Field Triage Logs, inmates working on the Farm Lines frequently declare emergencies from the field.[6] According to LSP's records, many of these individuals work in the fields despite having two or more heat-related illness risk factors (i.e. high body mass index, medication use, chronic illnesses, history of prior HRI, extensive skin pathology).

6.      I understand that when an inmate places an SDE from the field, a security officer (known as a field guard or "pusher") assesses the patient and decides whether to summon a nurse, call an ambulance, or take some other action.[7] However, security officers are not medical providers. They are not qualified to triage, diagnose, or treat patients.[8] It is highly likely that some patients are not correctly triaged by security staff.

7.      Assuming the security officer decides to summon help, the patient must then wait in the fields until a medical provider arrives. However, there is no strategy for controlling a patient's exposure to high heat in the field, such as providing access to a climate-controlled space to permit the person to cool down. Simply telling a patient to wait is not an effective strategy to preventing or treating HRIs.[9]

8.      Further, patients are forced to wait long periods—sometimes exceeding an hour—before a medical provider arrives in the field. In an emergency setting, an optimal arrival to proper triage of the patient should occur in 10-15 minutes. Based on my review of the SDEs and Field

---

[5] Toce dep. at p. 234 (**Attached as Appendix B**); VOTE-0022468 (SDE from a 68-year-old working in the field).
[6] See, for instance, VOTE 22321 (May 1, 2024); VOTE 22380 (May 21, 2024); VOTE 22467 (June 10, 2024); VOTE 22672 (July 12, 2024).
[7] Toce dep. at pp.228-229; Scott dep. at pp. 44-46.
[8] Scott dep. at pp.44-46.
[9] *See* Heat Injury and Illness Prevention in Outdoor and Indoor Work Settings, U.S. Department of Labor, Occupational Safety and Health Administration ("OSHA Report") at 440, *available at* https://www.osha.gov/sites/default/files/Heat-NPRM-Final-Background-to-Sum-Ex.pdf.

3

Triage Logs, LSP officials do not routinely or consistently document the time an SDE is placed or the time a medical provider arrives on scene.[10] The data that does exist indicates that many patients wait unacceptably long periods in the field to receive emergency medical care.[11]

9. Triage in the field is likewise inadequate and likely to cause harm to the patient. At LSP, there appears to be no requirement that a medical provider obtain or review a patient's chart or medication list prior to providing care.[12] This data is critical to providing effective treatment, particularly in emergency settings. To access this information from the field, a medical provider must decide to request it by phone from the Assessment and Treatment Unit ("ATU"). This appears to be done on an ad hoc basis.

10. Finally, prejudice among LSP medical providers that incarcerated patients are unreliable historians or prone to malingering further places patients at an unacceptable risk of harm. It is common for patients suffering heat-related distress to nonetheless present with normal vital signs.[13] It is therefore important that a medical provider consider a patient's self-reported symptoms, like dizziness or pain. LSP's medical director, Dr. Paul Toce, testified that his patients often fabricate symptoms for so-called "secondary gain."[14] In fact, Dr. Toce believes that 90 percent of duty status requests are "unfounded."[15]

---

[10] See, for instance, VOTE 22565; VOTE 22653; VOTE 22533.
[11] *See* VOTE 22435 (6/7/2024: 36 minute wait for a patient with prediabetes and hypertension, unable to ambulate and complaining of dizziness); VOTE 22447 (6/10/2024: 54 minutes for a patient with prediabetes and a history of syncope to be seen for severe dizziness); VOTE 22480 (6/13/2024: 34 minute wait for 60-year-old patient with history of syncope and spinal deformity to be seen for "shocking" back pain); VOTE 22509 (6/21/2024: 57 minutes for a patient with a BMI of 53.75 and major depression to be seen for vomiting); VOTE 22700 (7/15/2024: 121 minutes for a 57-year-old patient with AIDS, hypertension, and prediabetes to be seen for dizziness).
[12] Toce dep. at pp. 230-232.
[13] Toce dep. at pp. 189 ("[V]ital signs don't reflect serious dehydration.")
[14] Toce dep. at pp. 190-193.
[15] Toce dep. at pp. 191.

4

## II. Inadequate Safety Measures in the Field

### A. My observations of the Farm Line

11. On Monday, July 22, 2024, I observed operation of Farm Lines 24 and 25 during the site inspection of LSP. My observations confirm that men forced to work on the Farm Lines are at risk of serious harm due to their prolonged exposure to high heat.

12. Around 6:30 a.m. on Monday, July 22, 2024, I observed approximately 25-30 incarcerated men boarded a bus outside Camp D. There was no standard uniform. Men wore rubber or lace-up boots, short or long-sleeved shirts, and a variety of head coverings, including some that appeared homemade. They were bussed to a cucumber field, which had no trees or other natural shade structures. A single portable canopy, about 10 x 10 feet, stood in far corner of the field next to a portable toilet and handwashing station. I observed two Igloo-style coolers, one with water and one containing a red liquid, on either end of the field.

13. I spoke to several incarcerated people who reported that LSP officials do not normally provide them with gloves or regular breaks.

14. I also observed and spoke with a white inmate who spent most of the shift sitting on an upturned plastic carton in the road, while staring into the field or up at the sky. He told me that he would be joining his dead family members by Christmastime. Another inmate working in the field told me the man was "not right." This individual was clearly mentally ill.

15. A guard overseeing the field (the "pusher") assigned each inmate (aside from the individual discussed above) a row of cucumbers to harvest by hand. At one point, the pusher held up a bottle of sunscreen and shouted something inaudible to the incarcerated men. Two individuals came forward and received a single squirt from the bottle.

5

16. The pusher eventually called for a break. Most inmates sat down in their rows. Some were deep into the field, such that walking to and from the single shade structure would likely have taken several minutes. In any event, the canopy was too small to provide shade to the number of people working the Farm Line.

17. These interventions—a small shade canopy and water coolers—are insufficient to reduce the risks posed by exposure to heat hazards while forced to labor in the fields, without the ability to stop when they feel sick. In my opinion, necessary interventions would include, at a minimum: adequate rest breaks and rest areas where people can hydrate and cool down; unlimited access to liquids and shade; effective first aid and emergency response protocols; cessation of the Farm Line altogether during high heat; and adequate climate controls, like portable outdoor mister fans. These interventions described more fully below.

B. **Multi-component interventions are necessary to reduce heat-related illness.**

18. OSHA, NIOSH, American Conference of Governmental Industrial Hygienists, American Society of Safety Professionals, and the State of Louisiana have published recommendations for protecting workers from heat related illnesses (HRIs).[16] These include plans to prevent heat stress, rest breaks in shaded or cooled areas, cool drinking water, cooling methods, acclimatization, observation of symptoms in workers, environmental monitoring, and emergency response procedures.

19. OSHA recently conducted a thorough review of studies providing quantitative evidence of the effectiveness of multi-component interventions in reducing HRIs.[17] Based on that

---

[16] For example, see Rec. Doc. 37-45 (Heat-Related Illness in Louisiana: Review of Emergency Department and Hospitalization Data from 2010-2020, Louisiana Department of Health (March 2024)).

[17] *See* Heat Injury and Illness Prevention in Outdoor and Indoor Work Settings, U.S. Department of Labor, Occupational Safety and Health Administration ("OSHA Report"), *available at* https://www.osha.gov/sites/default/files/Heat-NPRM-Final-Background-to-Sum-Ex.pdf.

6

data, OSHA concludes that HRIs associated with workplace exposure to heat hazards can increase risk to health or the potential for serious adverse effects to health immediately or in the future. I summarize some of OSHA's findings below.

20.     OSHA has reviewed several studies examining the effectiveness of rest breaks in preventing heat strain that could lead to heat-related illness. Those studies, which involve individuals exposed to conditions of high heat stress, demonstrated the effectiveness of rest breaks in reducing the risk of heat-related illness by modulating increases in heat and cardiovascular strain. According to OSHA, adequate break areas where workers can hydrate and cool down are considered a vital component in preventing HRIs and necessary part of a multilayered strategy to control exposure to high heat.[18] Further, "break areas that can only fit the anticipated number of employees on break if employees stand shoulder to shoulder, or in such close proximity that heat cannot dissipate, would not be large enough to accommodate the number of employees on break."[19]

21.     OSHA has similarly found that working or resting in shade reduces the risk of heat-related illness by decreasing exposure to solar radiation and in turn reducing overall heat load. This conclusion is supported by evidence that shade reduces heat exposure and that heat exposure is positively associated with heat strain. Access to shade would also reduce heat strain during rest periods.[20]

22.     Proper hydration is an important intervention for preventing heat-related illness. Providing cool drinking water is especially beneficial.[21] In addition, because cool or cold water

---

[18] OSHA Report at p. 440
[19] OSHA Report at p. 341.
[20] *See generally* OSHA Report (documenting studies supporting the idea that shade reduces heat strain generally).
[21] OSHA Report at p. 247-53.

7

was found to be more palatable than warm water, OSHA finds that providing cool or cold water can lead to higher consumption of water and thereby reduce the risk of dehydration.

23. Multicomponent heat stress interventions reduced the incidence of HRI claims and increased work output.[22] These interventions include medical monitoring and training programs; unlimited access to water and shade; work/rest procedures; effective first aid and emergency response protocols; avoiding intense outdoor activity during high heat; and improving climate control.[23]

24. OSHA has also explained that workers may face pressure to work through hazardous heat.[24] This is particularly true in a prison setting, where individuals face additional punishment—including loss of access to visitation and phone time, solitary confinement, and loss of access to canteen—for disobedience or refusal to work. These pressures can increase the risk of HRIs.

25. Engineering controls are especially critical here, since most living quarters at LSP are not air-conditioned.[25] As a result, incarcerated men simply cycle from a hot dormitory or cellblock to a hot field, and back again. The accumulation of heat stress can exacerbate the risk of serious harm. Given these circumstances, it is likely that a person presenting in the field with symptoms like vomiting, nausea, and dizziness is actually suffering from heat stress.

### III. Incomplete Heat Pathology Medication List

26. I understand that the Department of Public Safety and Corrections' Pharmacy and Therapeutics ("P&T") Committee is responsible for overseeing all medications provided or

---

[22] OSHA Report at pp. 273-75 (summarizing studies).
[23] OSHA Report at pp. 273-75.
[24] OSHA Report at pp. 44.
[25] Toce dep. at p. 214.

8

prescribed at LSP.[26] The P&T Committee also selects the medications on LSP's heat pathology medication list.[27]

27.  Dr. Randy Lavespere, the Medical Director of the DPSC, has acknowledged that the heat pathology medication list is comprised almost entirely of psychotropics.[28] According to Dr. Lavespere, an incarcerated person prescribed one of those psychotropic medications will automatically qualify for a heat precaution duty status.[29]

28.  Antipsychotics are not the only class of medications known to cause heat intolerance.[30] In fact, the P&T Committee has reviewed heat pathology medication lists used by correctional systems in California and Iowa.[31] In addition to antipsychotics, those lists include:

- Antiparkinsons (benztropine);

- Antidepressants (e.g., amitriptyline, clomipramine, protriptyline, trazodone, amoxapine);

- Stomach, intestinal, bladder medications (e.g., hyoscyamine/Levsin, diphenoxylate/atropine, glycopyrrolate);

- Mood stabilizers and anticonvulsants (lithium, topiramate, zonisamide);

- Promethazine/Phenergan;

- Diuretics (thiazides);

- Antihistimes (e.g. promethazine); and

- Cardiovascular medications (ACE inhibitors, beta blockers, nifedipine, losartan).

---

[26] Lavespere dep. at pp. 141-143 (**Attached as Appendix C**).
[27] Lavespere dep. at pp 143-145.
[28] *See* Lavespere dep. at pp. 139-140 ("[I]t's a list comprised of, besides Cogentin, all antipsychotics") and p.149 ("[M]ost of these drugs are psychotropics.")
[29] Lavespere dep. at pp. 153, 163.
[30] *See* Rec. Doc. 37-3 at ¶¶ 95-98; *see also* Lavespere dep. at pp. 165-168 (discussing Ditropan, Bentyl, Levsin, VESIcare), p. 178 (discussing antidepressants).
[31] Lavespere dep. at p. 174 (California); 182 (Iowa); *see also* Lavespere Emails 015160.03 (California); Lavespere Emails 015160.05 (Iowa) (**Attached as Appendix D**).

9

29. According to Dr. Lavespere, the P&T Committee has not considered adding those medications to the Heat Pathology Medication list.[32] In fact, the Heat Pathology Medication list has not been updated since August 21, 2018.[33] The list should be expanded to include medications known to impair thermoregulation and cause HRIs.[34]

## CONCLUSION

30. People who perform compulsory agricultural labor on Angola's Farm Line—including those who are younger and relatively healthier—are at substantial risk of serious harm due to their prolonged exposure to heat indices above 88° Fahrenheit. Individuals with medical or mental health conditions that make them more susceptible to heat-related injuries, or who are taking certain medications that adversely affect the body's ability to thermoregulate, are particularly at risk.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 26, 2024, in New York, NY.

*Susi Vassallo M.D.*
Susi U. Vassallo, M.D., M.S.

---

[32] *See* Lavespere dep. at pp. 176-183 ("They never considered the packet"); p. 184 (calling the DPSC list "very complete").
[33] Lavespere dep. at p. 141.
[34] *See* Lavespere dep. at p. 153 ("Now, what has been brought to my attention as a result of this litigation is a lot of ancillary medications that we use every day. I don't think that they are absolute qualifiers for a heat precaution duty status, but they need to start being looked at.").