# Exhibit 16

THE UNITED STATES DISTRICT COURT FOR

THE MIDDLE DISTRICT OF LOUISIANA

VOICE OF THE EXPERIENCED, a
membership organization on
behalf of itself and its
members; and MYRON SMITH,
DAMARIS JACKSON, NATE
WALKER, DARRIUS WILLIAMS,
KEVIAS HICKS, JOSEPH              Civil Action No.
GUILLORY, KENDRICK               3:23-cv-1304-BAJ-EWD
STEVENSON, and ALVIN
WILLIAMS, on behalf of
themselves and all others
similarly situated

Vs.

JAMES LEBLANC, in his
official capacity as
Secretary of the Louisiana
Department of Public Safety
and Corrections; TIMOTHY
HOOPER, in his official
capacity as Warden of
Louisiana State
Penitentiary; MISTY STAGG,
in her official capacity as
Director of Prison
Enterprises, Inc.; the
LOUISIANA DEPARTMENT OF
PUBLIC SAFETY & CORRECTIONS;
and PRISON ENTERPRISES, INC.

    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

REMOTE VIDEOTAPED DEPOSITION OF

CARL J. KELDIE, M.D.


September 20, 2024

Carl J. Keldie, M.D.
September 20, 2024

1    they have gathered a status of trust.  And over a

2    number of years, I don't know how long it takes,

3    Lydia, but they do behavior, schooling, et cetera.

4         They have a status where they have a

5    little more freedom.  They don't have -- they go

6    out and mow the lawn, and there's nobody watching

7    them while they're out mowing the lawn.

8         Q.  When were you retained by the Department

9    of Corrections in this case?

10        A.  It was at the very end of June.  I don't

11   know the exact date.  But it was towards the very

12   end of June when Keogh Cox called me about the

13   case.

14        Q.  So the end of June 2024?

15        A.  That is correct.

16        Q.  And what is the field of your expertise?

17        A.  I am an emergency medicine physician.  I

18   practiced emergency medicine for 20 years.  And

19   I'm now a correctional physician, member of the

20   American College of Correctional Physicians.

21        So my area of expertise at this point is

22   correctional health care.  I would not be

23   qualified to testify on an emergency medicine case

24   from a civilian emergency department.

25        Q.  So your expertise is in correctional

Carl J. Keldie, M.D.
September 20, 2024

1    health care but not in emergency health care?

2        A.  I have expertise in emergency medicine; I

3    don't have certification anymore.  I let my

4    certification expire in 2021, as I would really

5    not be practicing in an emergency department going

6    forward.

7        Q.  In your report that you wrote in this

8    case, you stated that you have augmented expertise

9    in exertional heat illness.

10       A.  Yes.

11       Q.  What does "augmented expertise" mean?

12       A.  It means I have had a pretty unmitigated

13   focus since the last week in June on exertional

14   heat illness.

15       Q.  Why have you had an unmitigated focus

16   since the last week in June on exertional heat

17   illness?

18       A.  Because I am tasked with reviewing the

19   allegations, the reports, the patients' charts,

20   the self-declared emergencies, and in order to do

21   that, I have had to clarify in my mind the

22   different stages of exertional heat illness.

23            And so it's like I've done a number of

24   times over the years, I have -- I've developed

25   expertise in HIV care, developed expertise in

Carl J. Keldie, M.D.
September 20, 2024

1    hepatitis C.  There are probably very few people

2    that have managed more patients with hepatitis C

3    than I have.

4         I would no longer say I was an expert in

5    HIV disease because I don't do that on a regular

6    basis, but I continue to see patients with

7    hepatitis C in my work.  I occasionally see an HIV

8    patient, but they're taken care of at Temple, and

9    their care is par excellence.

10    Q.  So you developed your expertise in

11    exertional heat illness through your work on this

12    case?

13    A.  No.  I've been involved in exertional heat

14    illness since the early 2000s when we had a heat

15    wave in the Northeast.  And actually, Deleca

16    Barnes, a Pharm.D, who's been retained in this

17    case, and I actually worked together at that time

18    because I think it was -- I think it was Baltimore

19    County that -- or Baltimore City jail where they

20    were having a heat wave, and we developed there.

21         And over the years we touched on

22    heat-related medications and heat-related

23    illnesses.  But, frankly, we've never -- in the

24    20-something years that I've practiced and

25    reviewed cases, we've never seen a significant

Carl J. Keldie, M.D.
September 20, 2024

1    cohort of individuals affected by exertional heat

2    illness in, frankly, any of the jails or prisons

3    that I've supervised.

4        Q.  You testified that you developed an

5    augmented expertise in exertional heat illness.

6        A.  Uh-huh.

7        Q.  Was that augmented expertise developed as

8    a result of the work that you have done on this

9    case?

10       A.  Yes.

11       Q.  What were you asked by the DOC to do?  And

12   when I use the term "DOC," I'm referring to the

13   Louisiana Department of Public Safety and

14   Corrections.

15       A.  Correct.

16       Q.  What were you asked by the DOC to do?

17   What was your task?

18       A.  I was initially asked by their legal

19   representatives, Andrew Blanchfield, Chelsea

20   Payne, I was asked to consider taking the case.

21   And it was actually the same day that I was called

22   from the State of Texas and asked to represent

23   them in a heat-related case.

24           And I actually considered taking both of

25   the cases, but in a matter of days, I realized

Carl J. Keldie, M.D.
September 20, 2024

1    that it was going to be too much work product to

2    try to do both of the cases.  And, frankly, Texas

3    had such draconian language in their contract,

4    like I had to indemnify them for any mistakes I

5    might make, and I said, Well, I've never signed

6    anything like that in my life and I'm not starting

7    now.

8         So anyway, I was asked to consider taking

9    the case, and after -- after a number of days and

10   reviewing a number of documents, I signed up to be

11   a testifying expert in this case.  And what I

12   was -- what I was asked to do was to review the

13   policies, the procedures, some of the complaints,

14   many of the depositions, and the patient medical

15   records for the eight plaintiffs.  And so I began

16   that task in early July.

17        Q.  What were you asked to opine about

18   specifically?

19        A.  Are patients -- are patients on the farm

20   line at risk of significant exertional-related

21   heat illnesses.

22        Q.  You said you reviewed some complaints.

23   What complaints did you review?

24        A.   I think the complaints were in the form of

25   the complaints under -- in the lawsuit, in -- I

Carl J. Keldie, M.D.
September 20, 2024

1    think the first one I remember was the December

2    filing by VOTE, and it was the -- gosh, what's the

3    term?  It was the --

4        Q.  The amended complaint?

5        A.  The modified -- whatever the term for the

6    second modified complaint.

7        Q.  The amended complaint.

8        A.  The amended complaint, there's the word.

9            So it was mainly amended complaints, so

10   that was the complaint I was talking about.

11       Q.  Did you review any grievances or ARPs that

12   had been filed by inmates?

13       A.  I don't know the acronym "ARP."

14       Q.  Meaning grievances filed under the

15   administrative remedies procedure.

16       A.  I have to tell you, I reviewed such a

17   plethora of documents, I don't know if I reviewed

18   grievances.  I feel like I did, but I couldn't

19   tell you a single grievance that I reviewed.  I

20   think I was supplied with a number of them.  They

21   would be on the list that Chelsea supplied if, in

22   fact, I reviewed them.

23       Q.  Everything that you reviewed is in your

24   report or in the list of references that Ms. Payne

25   sent yesterday?

Carl J. Keldie, M.D.
September 20, 2024

1      A.  To the best of my knowledge.  There may be
2    a one-off out there somewhere that I missed.
3      Q.  Dr. Keldie, have you ever opined as an
4    expert on the topic of thermoregulation before?
5      A.  No.
6      Q.  Have you ever opined as to correctional
7    health care workflow at the Louisiana State
8    Penitentiary before?
9      A.  No.
10      Q.  Have you reached any opinions in this case
11    with respect to correctional health care workflow
12    at LSP?
13      A.  I've seen the correctional health care
14    workflow.  I've seen correctional health care
15    workflow in approximately -- approximately 300
16    jails, prisons, forensic hospitals all over the
17    country.  And it's kind of like you see how they
18    comport themselves, you see the security checks.
19          I went through security checks going to
20    Camp D, I went through the security process in
21    every compound.  So I see the workflow.  And was
22    I -- was I taking meticulous notes and the officer
23    moved to the left when he did this, no.  But I --
24    I've seen it enough to know that the correctional
25    workflow comports with my experience in

Carl J. Keldie, M.D.
September 20, 2024

1    correctional health care over the past 20-plus

2    years.

3        Q.  So your opinion is that the correctional

4    health care workflow at the Louisiana State

5    Penitentiary comports with correctional health

6    care workflow that you've seen in other jails and

7    prisons over the course of your career?

8        A.  Yes.

9        Q.  What do you mean by "correctional health

10   care workflow"?

11       A.  Maybe I didn't explain it well enough.  So

12   the security, custody, and control is the mission

13   of the correctional security officers.  And you

14   have security officers at different stages

15   throughout Louisiana State prison.

16            You have security officers at the main

17   gate who have specific duties and specific

18   assignments.  And on our way out we had to pop our

19   trunk because that's their -- that's what they do.

20   They want to -- they want to be aware of what's

21   coming into the compound and what's going out of

22   the compound.

23            The security workflow at the camps we went

24   to was pretty standard community workflow.

25   Camp D, when we first went in, actually had pretty

Carl J. Keldie, M.D.
September 20, 2024

```
 1   enhanced security workflow.  They had a -- they
 2   had a piece of equipment that you stood on and it
 3   scanned you, and similar to a -- similar to the
 4   equipment that we used in our prisons in Victoria,
 5   Australia, where I think there's kind of an
 6   enhanced...
 7          And then as you make your way from hallway
 8   to hallway, from building to building, you have
 9   security officers along the way.  And they're
10   doing their job, they're watching -- they're
11   watching movement, they're watching visitors
12   coming in.  This is not an everyday event for
13   them.  And so they have to -- they have to be
14   aware.  And so that kind --
15          Q.  What do you mean --
16          A.  They have to be aware that there's
17   something different going on at a facility.  And
18   they're there to -- they're there to protect us as
19   well.  It's -- and different facilities have all
20   sorts of different workflows with how visitors are
21   given access around -- around the building.
22          My -- one of my first times behind bars
23   was at Rikers Island, and that was New Year's Eve
24   of 2020.  At midnight we took over the contract,
25   which is what typically happens in corrections.
```

Carl J. Keldie, M.D.
September 20, 2024

1    That's when you have changes in contractors.

2            And the next thing I know, I'm at Rose

3    M. Singer, the women's jail there at Rikers, and

4    I'm unescorted going from -- between one building

5    to the other.  And I'm going, I'm a little bit

6    afraid here.  So it's like -- I don't think I'm

7    explaining it very well.

8            But the -- I've seen it everywhere.  And I

9    got the -- we moved from numerous buildings to

10   buildings being -- some of the escort -- even when

11   the Warden Hooper, escorted us, they know his

12   face, he is all over that compound all the time,

13   that's the appearance, but they were still doing

14   their job of security, custody, and control.

15   Q.  You mentioned that the first time you were

16   behind bars was at Rikers Island, New Year's Eve

17   of 2020; is that right?

18   A.  It was December 31st of 2020 going to

19   January 1st of 2021.

20   Q.  And that was the first time you had been

21   in a prison or a jail?

22   A.  I said it was one of the first.  I was

23   pretty new to corrections at that time.  I'd just

24   started with PHS in October of 2020.  I'd been

25   behind bars at a couple facilities but nothing

Carl J. Keldie, M.D.
September 20, 2024

1        Q.  Tell me, who works the farm line at LSP?

2            MR. BLANCHFIELD:

3                Object to the form.

4        A.  So are you talking about who does the

5    manual labor in the field or the farm line?

6    BY MS. WRIGHT:

7        Q.  Yes.

8        A.  That would be inmate workers.

9        Q.  And how are they assigned to the farm

10   line?

11       A.  I don't know.

12       Q.  Is there an age cutoff to assignment to

13   the farm line?

14       A.  I don't know.

15       Q.  In your report you state that no one is

16   assigned to the field in their first two weeks at

17   LSP.

18           Do you recall that?

19       A.  I do recall that.

20       Q.  How do you know that to be true?

21       A.  That is what I was told.

22       Q.  Who told you that?

23       A.  I'm not sure.  It may have been

24   Dr. Lavespere.  I'm not sure.  But it's -- that's

25   what I was told.

Carl J. Keldie, M.D.
September 20, 2024

```
 1          Q.  You were told that during your site
 2    inspection on September 4th?
 3          A.  Either during the site inspection or on
 4    the one call that we had together prior to me
 5    going to the site inspection.  I don't know which,
 6    Lydia.
 7          Q.  You're talking about the one call that you
 8    had with Dr. Lavespere prior to September 4th?
 9          A.  Yes.
10          Q.  And what did you discuss on that call with
11    Dr. Lavespere?
12              MR. BLANCHFIELD:
13                  That's -- there was attorneys present.
14              That's attorney-client privilege, that
15              whole meeting.
16    BY MS. WRIGHT:
17          Q.  Do you recall when that meeting occurred?
18          A.  I don't.
19          Q.  Was it by Zoom or phone?
20          A.  By Zoom.
21          Q.  What tasks do inmates typically do on a
22    farm line?
23          A.  The task they do is -- appears to be farm
24    work.
25          Q.  Like what?
```

Carl J. Keldie, M.D.
September 20, 2024

1      A.  Like plant -- from planting to harvesting.

2   The only thing that I actually saw was planting.

3      Q.  Do you have any other understanding of any

4   tasks that inmates do on a farm line other than

5   planting?

6      A.  From reading -- from reading reports,

7   though I've read so many reports they're hard to

8   cite which they do.  They do what -- what I did

9   working in a citrus nursery when I was a young

10   lad.  And I did everything from planting to some

11   degree of weeding to some degree of pruning.

12         I didn't really do the harvesting in the

13   citrus nursery.  But I imagine they plant much of

14   what they grow, they care for it during the

15   season, and then they harvest from the plants.

16      Q.  You just testified that inmates working on

17   the farm line participate in planting, weeding,

18   pruning, caring for the crops, and harvesting the

19   crops.

20         How do you know that they do those

21   activities?

22      A.  As I've said, from the multiple reports

23   I've read from the officers, from attestations,

24   from declarations.  From what I'm told, they do.

25      Q.  And who told you that they do those tasks?

Carl J. Keldie, M.D.
September 20, 2024

1      A.  It's in multiple reports, affidavits.  And

2   I don't know that Roland and I discussed the other

3   work, I don't remember that.

4      Q.  You state in your report that shade, iced

5   water and Gatorade, and rest periods of 15 minutes

6   every 45 minutes are provided on the farm line.

7          Do you recall that?

8      A.  Yes.

9      Q.  How do you know that to be true?

10     A.  I was told that by Andrew when he

11   recounted a meeting with Warden Hooper and told

12   Warden Hooper that we would -- that the schedule

13   would be, on a heat alert, then we would revert to

14   that.

15          And Warden Hooper said, No, we're going

16   to -- we're not waiting for a heat alert, we're

17   going to do that right out of the box.  And

18   they're going to --

19     Q.  So they -- I'm sorry.

20     A.  They'll get 45-minute breaks -- they'll

21   get breaks every 45 minutes for 15 minutes.

22     Q.  So you know that shade, iced water and

23   Gatorade, and rest periods of 15 minutes every

24   45 minutes are provided at LSP because Andrew

25   Blanchfield told you that?

```
 1            MR. BLANCHFIELD:

 2                 Object to the form.

 3       A.  Yes.

 4  BY MS. WRIGHT:

 5       Q.  But you didn't witness any rest periods at

 6  LSP?

 7       A.  As I stated before, I did not witness a

 8  rest period.

 9       Q.  Have you reviewed any documentation of

10  rest periods provided to inmates working the farm

11  line?

12       A.  I have not.

13       Q.  You also opined that risk mitigation

14  measures are now being enhanced at the beginning

15  of the day when the heat index is at or below a

16  very pleasant 83 degrees Farenheit.

17                 Do you recall that opinion?

18       A.  I do.

19       Q.  What do you mean by "very pleasant"?

20       A.  A heat index of 83 degrees is a very

21  comfortable temperature -- heat index to walk in,

22  to run in, to stroll in, to play basketball in, to

23  play baseball in, to work on the farm line.

24       Q.  Does the heat index change in the sun?

25       A.  The heat index is a formula that's based
```

Carl J. Keldie, M.D.
September 20, 2024

1    on the relative humidity and the measured

2    temperature.  And the heat index, to my knowledge,

3    doesn't -- that number doesn't change in the sun.

4        Q.  When a heat index is calculated using the

5    relative humidity and the temperature, is the

6    temperature taken in the sun or the shade?

7        A.  The heat index -- I don't know.  The heat

8    index is taken at the airport.  I don't know where

9    that's -- that's where the National Weather

10   Service does the heat index.  I don't know if it's

11   in the shade or the sun.

12       Q.  If a temperature is taken in the shade,

13   would you assume that the temperature would be

14   higher if it was taken in the sun?

15       A.  No.

16       Q.  So the temperature is constant, whether in

17   the shade or in the full sun?

18       A.  I think the question was if the

19   temperature is taken in the shade, will it be

20   higher than in the sun, and I said I don't think

21   the temperature in the shade is going to be higher

22   than in the sun.

23       Q.  Would it be hotter -- I'm sorry.  Go

24   ahead.

25       A.  No, you go ahead.

Carl J. Keldie, M.D.
September 20, 2024

1      Q.  Would it be hotter in the shade or the sun

2   typically?

3      A.  I would think in the sun.

4      Q.  So you discussed risk mitigation measures

5   that are now being enhanced at LSP.  How do you

6   know that risk mitigation measures are now being

7   enhanced at LSP?

8      A.  From the previous series of questions,

9   that they now get a 15-minute break every

10  45 minutes, they now have shade available.  Those

11  are -- and that starts at the first of the day,

12  not waiting until the heat -- the first heat index

13  is called.

14     Q.  And do you know that -- let me back up.

15         So the risk mitigation measures that

16  you're aware of include 15-minute breaks and

17  shade.  Are there any other risk mitigation

18  measures that are new that you are aware of?

19     A.  Not that come to mind.

20     Q.  And you are aware of these new risk

21  mitigation measures how?

22     A.  Well, I saw the shade when I was there.

23  And the rest of that question has -- I've answered

24  twice.  I can answer a third time if you'd like.

25         Drew Blanchfield recounted a conversation

Carl J. Keldie, M.D.
September 20, 2024

1    that he had with Warden Hooper in which he

2    described that we would be required to take these

3    breaks at the time of the heat index.  And his

4    response was, Let's not wait until the heat index

5    is at a number, let's do the breaks at the start

6    of the day.

7        Q.   Do you know why Warden Hooper wanted to

8    provide 15-minute breaks at the start of the day?

9        A.   I do not.  Did not ask him.

10       Q.   Okay.  You opined that the level of heat,

11   duration of exposure, and level of exertion on the

12   farm line is mild to moderate in the fields at

13   LSP.

14       A.   Correct.

15       Q.   Do you recall that?

16       A.   Absolutely.

17       Q.   What is the level of heat in the fields at

18   LSP?

19       A.   The level of the heat is measured by the

20   heat index.  It varies from, as I said, a very

21   comfortable heat index below 83 degrees to an

22   uncomfortable heat index that exceeds the lower

23   100s.

24       Q.   How do you know that?

25       A.   I know that from looking at multiple heat

Carl J. Keldie, M.D.
September 20, 2024

 1    that type of work really my whole life and to

 2    current, and I know that by comparison to the kind

 3    of activities that I've seen inmates across the

 4    country participate in real exertional work in the

 5    form of athletics, from the sunshine of Florida to

 6    the sunshine of Alabama.

 7          I did not witness it in the sunshine of

 8    Louisiana but was told that there is a lot of

 9    activity in the yard during the heat of the sun.

10    Now, that's real work.  What they're doing in the

11    field is really modest-level work.  It's easy

12    to -- you know, this is not draconian labor that

13    they're doing in the field.

14    Q.  What do you mean by "draconian labor"?

15    A.  Hard labor.

16    Q.  What is hard labor?

17    A.  Hard labor is hard work.

18    Q.  You said that you were told that there was

19    a lot of activity in the yard in the heat of the

20    sun.  Who told you that?

21    A.  The officer that I met with while we were

22    visiting the ATU, which I didn't put his name in

23    the report.  I don't remember his name.

24          But he showed me the schedule of their

25    athletic activities and the different sports that

Carl J. Keldie, M.D.
September 20, 2024

```
1    they do from full-court basketball -- which is
2    becoming more and more unusual behind bars because
3    they suffer more injuries and more prisons and
4    jails have reduced full court to half court.
5            They're playing full-court basketball,
6    they're playing flag football, they're playing
7    soccer, they're running, they're doing their
8    weights in the afternoon.  So that's -- that's one
9    of the ways I know.
10    Q.  You mentioned that you are able to
11    quantify the level of exertion in the field at LSP
12    because of experiential reasons, because you've
13    been doing "that kind of work my whole life."
14            What did you mean by that?
15    A.  I've done manual labor in the outdoors
16    since I was eight years old.
17    Q.  What kind of --
18    A.  I did manual labor in the outdoors last
19    year when I was clearing the field beside my home
20    in the mountains of North Carolina.
21    Q.  And based on that experience, that's how
22    you are able to quantify the level of exertion in
23    the fields at LSP?
24    A.  That is one of the parameters I use.  The
25    other parameter is the United States Army chart,
```

Carl J. Keldie, M.D.
September 20, 2024

1   which I submitted.

2       Q.  And it is your opinion that the activities

3   on the farm line are not excessive, exhausting,

4   and certainly don't approach the effort of

5   jogging; is that right?

6       A.  That's right.

7       Q.  You also state that this activity level,

8   meaning, I think, the mild to moderate activity

9   level, is met or exceeded on basketball courts and

10  sports fields with no apparent suffering and no

11  heatstrokes; is that right?

12      A.  I don't know that those were my exact

13  words, but if you're reading from my expert report

14  exactly, then I'll say yes, that's what I said.

15      Q.  What did you mean by "no apparent

16  suffering"?

17      A.  There has been no exertional heatstrokes

18  reported from LSP.  There are no known heat

19  exhaustion events per the staff at LSP.  And I

20  would -- I would assume, given the current milieu

21  and the legal issues, they would -- if there

22  were -- if they were suffering heat injuries, such

23  as acute kidney injury or heat exhaustion and

24  certainly heatstroke, that would be information

25  that's readily available.

Carl J. Keldie, M.D.
September 20, 2024

1    Q.  How do you know that there have been no
2    exertional heatstrokes reported at LSP?
3    A.  I asked.
4    Q.  Who did you ask?
5    A.  I asked the staff there, and I think
6    through Dr. Lavespere and Dr. Toce and, frankly,
7    through Drew as well, and I was told that the only
8    heat event on record was a couple of years ago,
9    and that was a nonexertional heatstroke from one
10   of the cellblocks in a patient that was also using
11   illicit drugs.
12   Q.  And how do you know that there are no
13   known heat exhaustion events at LSP?
14   A.  Same question and the same answer:  That's
15   what I was told.
16   Q.  In reaching your expert opinions in this
17   case, did you review any census or staffing
18   information at LSP?
19   A.  De minimis in terms of staffing.  I think
20   at one point I saw some census that approached
21   4,000 ADP, but I'm not -- I wouldn't -- I wouldn't
22   hang my hat on that number.
23   Q.  What do you mean by "ADP"?
24   A.  Average data population.
25   Q.  Did you review any staffing information

Carl J. Keldie, M.D.
September 20, 2024

1    pertaining to the number of physicians or NPs or

2    LPNs on staff?

3        A.  I did not.

4        Q.  Did you review any credentialing or

5    licensing files?

6        A.  No.

7        Q.  Did you review any peer-review files?

8        A.  I did not.

9        Q.  Did you review any quality improvement

10   documents?

11       A.  No.

12       Q.  Did you review any death reports?

13       A.  No.

14       Q.  Did you review any mortality reviews?

15       A.  No.

16       Q.  Did you review the medical records of any

17   patients in hospice?

18       A.  I did not.

19       Q.  Did you review any directives or

20   procedures related to the Americans with

21   Disabilities Act?

22       A.  Ask that again, please.

23       Q.  Did you review any directives or

24   procedures related to the Americans with

25   Disabilities Act?

Carl J. Keldie, M.D.
September 20, 2024

1      A.  I am pretty sure I did.  I'm pretty sure
2  one of the directives that I was -- I was given to
3  review included with the health care policies was
4  related to ADA.
5      Q.  Would that be listed in your report?
6      A.  Yes.  If it's not in the report, I didn't
7  review it.
8      Q.  Did you review the medical records of any
9  patients other than the eight named plaintiffs?
10     A.  No, I did not.
11     Q.  Did you review any duty status directives
12  or protocols?
13     A.  Yes.
14     Q.  Did you review any sick call protocols?
15     A.  I'm pretty sure the answer is no.
16     Q.  You find in your report that there is no
17  need for PPE on the field lines at LSP.  What is
18  PPE?
19     A.  Personal protective equipment.
20     Q.  What's the basis for your opinion that
21  there is no need for personal protective equipment
22  on the field lines at LSP?
23     A.  Personal protective equipment are used
24  around, for instance, when you're -- when you're
25  working in furnace conditions in a plant and you

Carl J. Keldie, M.D.
September 20, 2024

1   have to have personal protective equipment.

2   Personal protective equipment comes in a number of

3   different forms.

4           But I didn't see or didn't read any

5   activities that the inmates are participating in

6   that requires personal protective equipment, like

7   respirators or anything like that.

8       Q.  I'm going to show you what we will mark as

9   Exhibit 101.

10          (Exhibit 101, remotely introduced and

11          provided electronically to the reporter.)

12  BY MS. WRIGHT:

13      Q.  I'm going to share this document on my

14  screen.  Okay.

15          Dr. Keldie, can you see on your screen a

16  document?  At the top it says, "Carl James Keldie,

17  M.D.; Fellow, American College of Correctional

18  Physicians"?

19      A.  Yes.

20      Q.  You see this on your screen?

21      A.  Yes, I do.

22      Q.  Let me know if at any time it's not clear.

23          At the top there's a file stamp that

24  indicates that this was Document 800-2 in a Case

25  15-318.  I will represent to you that this was

Carl J. Keldie, M.D.
September 20, 2024

1    one-off work with -- that Tom and I mutually

2    agreed upon doing.

3        Q.  When did you leave full-time employment

4    with Wellpath?

5        A.  That was December 31st of 2022.

6        Q.  And when you left, you had the title of

7    senior vice president, clinical affairs?

8        A.  Yes.

9        Q.  Did you have any role in securing

10   contracts with correctional facilities during your

11   time at Wellpath or Correct Care Solutions?

12       A.  I had more of a role at Correct Care

13   Solutions.  I had de minimis role with Wellpath

14   because it was only a short period of time.

15            And, frankly, I should -- hindsight,

16   biased, I should have continued to be a part of

17   the procurement process, but Tom and his new team

18   wanted to be in charge of that, and so they

19   participated in bidding some pretty significant

20   contracts with Wellpath.

21       Q.  Were any of those contracts with the State

22   of Louisiana?

23       A.  No.

24       Q.  When you were the chief clinical officer

25   at Correct Care Solutions and then the senior vice

Carl J. Keldie, M.D.
September 20, 2024

1    president of clinical affairs at Wellpath, were

2    you responsible for assessing the quality of care

3    provided to incarcerated people?

4         A.   Yes.

5         Q.   How did you make those assessments?

6         A.   That was actually a pretty intricate

7    process.  We had a continuous quality improvement

8    department that was headed by actually a social

9    worker, and she reported directly to our patient

10   safety officer, Judd Bazzel.

11        It was -- in the first year and a half or

12   so we became affiliated with a patient safety

13   organization out of Missouri, the fourth oldest

14   patient safety organization in the country.

15        And so we were able to run all of our

16   patient safety work product, all of your sentinel

17   events, mortality reviews, suicides, DKA, drug

18   overdoses, et cetera, through the patient safety

19   organization, which allowed us to be more

20   transparent without having the risk of disclosing

21   our patient safety work product.

22        Did that make any sense?

23        Q.   Well, what is "DKA"?

24        A.   Diabetic ketoacidosis.

25        And we didn't have many cases of it, but

Carl J. Keldie, M.D.
September 20, 2024

1   when we took care of a large cohort of patients

2   with diabetes, and when someone's diabetes got so

3   bad that they became sick enough to have to be

4   hospitalized and were in ketoacidosis, that was

5   one of the sentinel events that I talked about

6   earlier that we were doing.

7        Q.  You are now a correctional health care

8   consultant and you have been since September of

9   2013; is that right?  Actually, excuse me, since

10  July of 2011, according to your CV.

11       A.  Correct.

12       Q.  What does that mean?

13       A.  I mainly do expert work.  And it's work I

14  described doing with some -- representing some

15  plaintiffs and representing some defense --

16  defense -- defendants over those years.  And I

17  think you asked me for a list of those cases,

18  which will be forthcoming.

19       Q.  Have you ever been qualified by a court as

20  an expert?

21       A.  I have.

22       Q.  How many times?

23       A.  By a court, three times; twice in the

24  Gomes case from Lake County, Illinois, and once in

25  state court last January when I testified in

Carl J. Keldie, M.D.
September 20, 2024

1    Catawba County, North Carolina.

2        Q.  Were these the three cases that you told

3    me about this morning?

4        A.  Yes, I did.  Yes.

5        Q.  And the court found that you were

6    qualified as an expert in both cases?  There's two

7    cases?

8        A.  Yes.

9        Q.  An expert in what?

10       A.  Correctional health care.

11       Q.  Have you ever been certified as an expert

12   in thermoregulation?

13       A.  I have not.

14       Q.  How do you -- how do you get clients in

15   your current position as a correctional health

16   care consultant?

17       A.  I -- mainly by word of mouth.

18       Q.  Have you ever been appointed by a court to

19   monitor a consent decree or implement a remedial

20   plan?

21       A.  No.  But I stand ready, willing, and able.

22       Q.  When did you last treat patients?

23       A.  This morning.

24       Q.  Via telemedicine?

25       A.  Yes.

Carl J. Keldie, M.D.
September 20, 2024

```
 1        Q.  How many patients do you currently treat?
 2        A.  I see -- I see ten patients each morning
 3   twice a week, and occasionally I follow some of
 4   the patients that I see on an ongoing basis.  I
 5   have patients scheduled through February of next
 6   year.
 7        And there are basically two cohorts of
 8   patients that I see, people that are due for a
 9   chronic care visit, or there's a term that I think
10   is pretty specific to Pennsylvania, and it's a
11   preventative health risk assessment.
12        And chronic care is pretty
13   straightforward; they have a chronic condition,
14   from hypertension to diabetes, hepatitis C, a
15   whole spectrum.  And I see them for usually
16   every-six-month chronic care visits.
17        The preventative health risk assessment is
18   a little bit of a different piece.  I make sure
19   that we've done appropriate screening tests for
20   sexually transmitted diseases and bloodborne
21   pathogens, the hepatitises and HIV.  I make sure
22   that they're up to date with their immunizations.
23        And I actually review their medical record
24   above and beyond what I really have to do because
25   that's somewhat in my nature.  And I do most of
```

Carl J. Keldie, M.D.
September 20, 2024

1    that on my own time.  And so I -- I, on a fairly

2    regular basis, I de-diagnose patients and I do

3    de-prescribing and I do some new prescribing.

4            So those are two cohorts I see.  And it's

5    one of my better parts of the week, getting to see

6    patients.

7        Q.  Are those patients incarcerated?

8        A.  Every one of them.

9        Q.  When was the last time that you treated

10   patients in an emergency setting?

11       A.  That would have been Labor Day of 2020.

12       Q.  Was that when you were working for

13   Wellpath?

14       A.  I'm getting my decades wrong again.  It

15   was Labor Day of 2000.

16       Q.  So the last time that you treated patients

17   in an emergency room setting was Labor Day of

18   2000?

19       A.  Correct.

20       Q.  Going back for a moment, when you were

21   observing the farm line on September 4, 2024, did

22   you observe any inmates placing a sick call or

23   self-declared emergency?

24       A.  No, I did not.

25       Q.  Did you observe anybody receiving medical

Carl J. Keldie, M.D.
September 20, 2024

1    treatment in the field?

2         A.  I did not.

3         Q.  Did you observe any EMTs or RNs or medical

4    staff reporting to the field for any reason?

5         A.  No.

6         Q.  Did you have any discussions with any

7    EMTs?

8         A.  I did not.

9         Q.  What's your understanding of the term

10    "EMT"?

11         A.  Emergency medical technician.

12         Q.  Dr. Keldie, do you hold a current medical

13    license?

14         A.  Yes, I do.

15         Q.  For which state?

16         A.  I am licensed in North Carolina,

17    Pennsylvania, Tennessee, Colorado.

18         Q.  You're not licensed in Louisiana?

19         A.  No, I'm not.

20         Q.  Do you hold any current board

21    certifications?

22         A.  I do not.

23         Q.  Your -- you were certified by the American

24    Board of Emergency Medicine, but that expired in

25    2021?

Carl J. Keldie, M.D.
September 20, 2024

1    your medical history.  Do not attend classes if

2    it's not safe for you.  If you have any serious

3    medical conditions, please check with your doctor

4    before exercising in our hot studio."

5         Did you check with your doctor before

6    starting Hot Pilates?

7         A.  I did not.

8         Q.  Did you sign a waiver when you started Hot

9    Pilates?

10        A.  I sign a waiver with every studio I've

11   ever entered, and that's in excess of 100 to 200

12   studios around the country.  So, yes, I did sign a

13   waiver, just like most of the software waivers you

14   read on your computer, you go in and sign it.

15        Q.  We're about to shift topics.  Do you need

16   a break?

17        A.  I -- I'm good.

18        Q.  Okay.

19        A.  Do we have any -- you were asking me how

20   many time -- how much time I spent in the -- in

21   the hospice unit.  Do you have any guesstimate of

22   how much time we have left?

23        Q.  Significant.

24        Does that change whether you'd like a

25   break?

Carl J. Keldie, M.D.
September 20, 2024

```
1        A.   That changes what I'm going to tell my
2   lovely bride.  Yeah, let's take five.
3        Q.   Sure thing.  Take five.
4             THE VIDEOGRAPHER:
5                  Going Off the record.  The time is
6             6:57 p.m. UTC, 1:57 p.m. Central.
7             (A break was taken.)
8             THE VIDEOGRAPHER:
9                  Back on the record.  The time is
10            7:05 p.m. UTC, 2:05 p.m. Central.
11   BY MS. WRIGHT:
12        Q.   Dr. Keldie, what is "UTD"?
13        A.   UpToDate.
14        Q.   What is UpToDate?
15        A.   UpToDate is a -- is a clinical decision
16   support tool that has a broad breadth of diagnoses
17   that is kept up-to-date on -- there's probably 20
18   or 30 different permutations on diabetes, another
19   dozen on hypertension, and it just goes on and on.
20             And it's a resource that I've used for --
21   off and on for 15 years as one of the resources I
22   use.
23        Q.   What do you usually use UpToDate for?
24        A.   I use it for practicing medicine.  I look
25   up stuff related to patient care every week when
```

Carl J. Keldie, M.D.
September 20, 2024

```
 1    I'm taking care of patients.  I look up drug-drug
 2    interactions, drug-disease interactions.  So I'm
 3    pretty familiar, I think, when I -- when I looked
 4    this morning I was just short of 70 hours of CME
 5    on UpToDate this year.  So I use it pretty
 6    frequently.
 7        Q.  What do you mean, "70 hours of CME on
 8    UpToDate this year"?
 9        A.  One of the features is, if you use their
10    service and you answer some very aggravating
11    questions about how good the service is, as long
12    as you answer the questions, they are CME Level I
13    providers, so I can get CME on UpToDate.
14        Q.  What is "CME"?
15        A.  Continuing medical education.
16        Q.  So you've used UpToDate at least 70 hours
17    in 2024 so far?
18        A.  That is correct.
19        Q.  And so it must be a reliable source of
20    information in your practice?
21        A.  I think it's reliable, I think that's a
22    good term.
23        Q.  Dr. Keldie, what is your understanding of
24    the term "thermoregulation"?
25        A.  My understanding of the term
```

Carl J. Keldie, M.D.
September 20, 2024

1    "thermoregulation" is the -- how the body

2    maintains a core temperature in a fairly narrow

3    range.

4        Q.  What is the fairly narrow range that

5    you're referring to?

6        A.  Depends on what source you read, but it's

7    98.6 plus or minus a half to a degree and a half.

8    Some sources get a little broader range, some

9    sources a little more narrow range.

10       Q.  Would you agree that thermoregulation is

11   an important physical process of the human body?

12       A.  Yes.

13       Q.  Is it true that some medications impair a

14   person's ability to thermoregulate?

15       A.  Yes.

16       Q.  Is it correct that some illnesses or

17   conditions can also impair a person's ability to

18   thermoregulate?

19       A.  That is correct.

20       Q.  And you agree that clinicians have long

21   recognized that certain chronic illnesses and

22   specific medications may impair a patient's

23   ability to fully thermoregulate?

24       A.  Yes.

25       Q.  Is it correct that impaired

1    thermoregulation can lead to adverse health

2    outcomes?

3        A.   "Impaired" is -- is a relative term,

4    and -- but significantly impaired can lead to

5    health care outcomes -- bad health care outcomes.

6        Q.   So significantly impaired thermoregulation

7    can lead to adverse health outcomes?

8        A.   Yes.

9        Q.   What is your understanding of the term

10   "heat-related illness"?

11       A.   Heat-related illness is a spectrum, but

12   it's not a spectrum on a continuum.  In the --

13   it -- it can be from -- anything from a prickly

14   heat rash, and a prickly heat rash does not beget

15   an episode of heat syncope, which does not

16   progress to an episode of heat injury to the body

17   or heat exhaustion or heatstroke.

18            And I left out cramps in there.  It's not

19   a progression from prickly heat to cramps to

20   syncope.  But those are -- those are generally

21   recognized as six buckets of heat illness.

22       Q.   So heat illness is illness caused by

23   exposure to heat?

24       A.   Yes.

25       Q.   And what's exertional heat illness?

Carl J. Keldie, M.D.
September 20, 2024

1          A.   Exertional heat illness is significantly

2     different than the kind of heat illness that you

3     get during a heat wave.   That's the more

4     non-exertional classic.

5               But exertional heat illness is what

6     happens when you are exerting yourself in hot

7     conditions.   And the same six illnesses are listed

8     in the spectrum of exertional heat illness,

9     although Dr. O'Connor, in the UpToDate article

10    that we talked about -- or we haven't talked about

11    yet, he actually kind of clarifies that syncope

12    and hot weather is -- it's a little different than

13    being caused by heat.

14               It clarifies that most -- what we refer

15    to -- a colloquialism as a heat cramp is not

16    really a heat cramp, and the pathophysiology of a

17    heat cramp is still poorly understood.

18               I know there are references that say it's

19    due to electrolyte imbalances and dehydration, but

20    the science of both exertional heat illness and

21    non-exertional heat illness is really based on a

22    lot more observational studies, correlations, and

23    experiential.

24               Pure double-blinded studies around either

25    exertional or non-exertional heat injury have not

Carl J. Keldie, M.D.
September 20, 2024

1    been done and probably never will be done.  You're

2    not going to take a cohort of patients and expose

3    them with different medical conditions and

4    different combinations of medications and measure

5    outcomes.

6            So the science is -- the science is

7    decent, but it's not, for instance, like the

8    science of Clozaril.  Clozaril is one of the

9    antipsychotics on the heat list because it does

10   have anticholinergic effects, but Clozaril is an

11   antipsychotic, and it has real and known side

12   effects; that has been measured.

13           Clozaril is one of the most efficacious

14   antipsychotic drugs in our armamentarium, but it

15   has the known side effect of developing agranular

16   cytosis or a very low white blood count.  So they

17   have, as an example -- and I'm sorry to go a

18   little off on a tangent -- but it is a

19   psychotropic medication that's in use in pretty

20   much the first six months.

21           In order to get your next week of

22   Clozaril, you have to have a white blood count up.

23   And they measure your absolute neutrophil count to

24   see if your white blood counts are being impaired,

25   and if they're impaired at a level, they stop the

Carl J. Keldie, M.D.
September 20, 2024

1    medication.

2         And they do it every week for six months

3    and then every other week for six months and then

4    once a month for as long as you're on Clozaril.

5    That is a known, measured, scientifically studied

6    side effect.

7         No study that I'm aware of, no study that

8    I saw cited in the UpToDate article by

9    Dr. O'Connor actually has done pure science around

10   a double-blinded study mixing medications,

11   diseases, that arrive at real science for

12   thermoregulation.

13        Q.  So there are no peer-reviewed studies of

14   exertional heat illness?

15        A.  There are no double-blinded studies where

16   you truly have -- the observers don't know and the

17   patients don't know.  That's the -- that's the --

18   the most sound science.

19        And I doubt there ever will be studies

20   done anywhere like that unless the pharma industry

21   finds a medication that could attenuate the

22   effects of heat on the human body and spends

23   hundreds of millions of dollars trying to develop

24   it.  And it's possible they do -- they do

25   something like that.  But the science is still