# Exhibit 17

THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF LOUISIANA

CASE NO.: 3:23-cv-1304-BAJ-EWD

VOICE OF THE EXPERIENCED, a membership
organization on behalf of itself and its
members; and MYRON SMITH, DAMARIS JACKSON,
NATE WALKER, DARRIUS WILLIAMS,
KEVIAS HICKS, JOSEPH GUILLORY,
KENDRICK STEVENSON, and ALVIN
WILLIAMS, on behalf of themselves and
all others similarly situated,

       Plaintiffs,

      -vs-

JAMES LE BLANC, in his official capacity as
Secretary of the Louisiana Department of
Public Safety & Corrections; TIMOTHY HOOPER,
in his official capacity as Warden of
Louisiana State Penitentiary; MISTY STAGG,
in her official capacity as Director of Prison
Enterprises, Inc.; the LOUISIANA DEPARTMENT
OF PUBLIC SAFETY & CORRECTIONS; and PRISON
ENTERPRISES, INC.

       Defendants.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

VIDEOTAPED

DEPOSITION OF:      DELECA REYNOLDS-BARNES

DATE TAKEN:       September 27, 2024

TIME:            9:00 A.M.

PLACE:           BY VIDEOCONFERENCE

REPORTED BY:      MICHELLE PULIDO STUBBEN, FPR,
                  COURT REPORTER, NOTARY PUBLIC

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

Deleca Reynolds-Barnes
September 27, 2024

1   heat.  Specific to heat.

2       Q.   So the anticholinergic risk profile does take

3   into account the potential cognitive and behavioral

4   effects of a drug?

5       A.   Ask that again, please.

6       Q.   Does the anticholinergic risk profile take

7   into account potential cognitive and behavioral effects

8   of a drug?

9       A.   The anticholinergic risk profile is a measure

10  of a drug's ability to block acetylcholine.  And then

11  within blockage of acetylcholine, there is a myriad of

12  potential risk.

13          One of those is the ability to respond to

14  decreased sweating and the ability to respond to heat.

15  One of those risks is an elderly patient's -- there is

16  the potential for cognitive decline.  That's -- that's

17  the anticholinergic risk profile.

18      Q.   Okay.  I'm going to pull up your report again.

19          Please -- sorry.  I'm having slight technical

20  difficulties.  One moment.  Here we go.  Are you seeing

21  your report on the screen now?

22      A.   I am.

23      Q.   Okay.  Great.  And I believe we already marked

24  this as Plaintiff's Exhibit 104.

25          I'm going to scroll down to the bottom of

1    page 3 in the section titled, Development of the Heat

2    Pathology Duty Status Medication List.

3            In the first sentence of the last paragraph on

4    this page, you wrote, Significant time was spent

5    completing primary, secondary and tertiary literature to

6    ensure a logical update to the heat pathology duty

7    status medication list.

8            What does this mean?

9    A.    Sure.  As previously discussed, that is a

10   review of the literature.  Some of it was primary

11   literature.  Some was meta-analysis, which is a

12   combination of multiple pieces of literature.

13           Again, the goal was reviewing not only any new

14   literature on new meds with new reports of risk for heat

15   pathology, new pathways to induce -- for medications to

16   induce heat medication -- heat-related med illness.

17           So is there anything new in the literature?

18   Looking at the various anticholinergic risk profile and

19   risk score documents in the literature and reviewing med

20   list on those, seeing is there anything, again,

21   different, new, how do they compare with each other, how

22   might they contrast with each other?

23           Again, for the ability to update the current

24   list, that was primarily psychotropics.

25   Q.    So it is important to consider the scientific

Deleca Reynolds-Barnes
September 27, 2024

1    literature when deciding what medications to include on

2    the heat pathology medication list.  Right?

3         A.    It was important to me so that I could justify

4    what I added and did not add.

5         Q.    Okay.  Can you just give me a brief overview

6    of what is the difference between primary, secondary and

7    tertiary literature to us nonscientists in the room?

8         A.    Sure.  I think the easiest is primary is going

9    to be an individual peer-reviewed study where someone,

10   you know, had 20 patients on a concern drug and looked

11   at the adverse event of a heat-related illness related

12   to those meds and the outcome.  Or maybe 20 patients on

13   meds, 20 patients not on meds.

14            Tertiary literature may be -- and it is

15   probably the most common, is when there is a

16   meta-analysis or an analysis where there are multiple --

17   other people have done the studies and someone else

18   brings in some number of studies to compare and

19   contrast.  And they'll reference all of those

20   individuals.  So it tends to be a summary of multiple

21   studies.

22            And so one of the ways you would use that is

23   you might take -- you may start big and say, Okay, well,

24   that is what they said in that study.  Let me go find

25   the original and see what -- did they summarize it

Deleca Reynolds-Barnes
September 27, 2024

1    right?  Did they originally say that?  Did it say

2    something different?

3           So it is just -- it is -- one is a much more

4    global focus, bringing in everything, trying to either

5    give a synopsis of -- you know, they may say, We

6    reviewed 100 studies and the most likely drugs would be

7    these, based on these 100 studies.

8           This one may say, We reviewed this drug in 100

9    people, primary.  And 100 people, this likely occurred

10   in 25 percent.

11          One is a lot more global and brings in

12   multiple, one is not.  It seems to be singularly

13   focused.  I think that's the cleanest way.

14      Q.   Okay.  Have you prepared a list of the various

15   literature that you...

16      A.   And I did not keep a list of everything.  I

17   mean, some things got pulled.  Some things I just

18   reviewed online.

19      Q.   Do you have -- would you be able to give a

20   ballpark of how many articles you reviewed?

21      A.   At least 30.

22      Q.   In this paragraph above, you wrote, Upon

23   review of the heat pathology duty status medication

24   list, it was apparent that the list was focused on

25   assigning heat pathology duty status to those patients

Deleca Reynolds-Barnes
September 27, 2024

1   with psychotropic medications.

2           Psychotropic medications are antipsychotics.

3   Correct?

4       A.   No.

5       Q.   Oh.  Please correct me.

6       A.   Sure.  So psychotropics are meds that

7   affect -- are used in the treatment -- are used in the

8   treatment of psychiatric conditions.

9           So an antipsychotic may be used to treat

10  psychosis.  An antidepressant may be used to treat

11  depression, which is a -- is psychotropic illness, but

12  it is not antipsychotic.

13          So if you look on the list, one of the drugs

14  that are on the list is Cogentin.  So Cogentin is

15  frequently prescribed by a psychiatrist to treat

16  movement disorder that occurs when someone is on

17  antipsychotic.  But Cogentin in and of itself is not a

18  psychotropic.

19      Q.   In the next sentence you wrote, The reason for

20  the focus is related to the fact that many psychotropics

21  have the highest anticholinergic profile and, as

22  previously stated, put patients at risk for heat-related

23  pathology.

24          How do psychotropics put patients at increased

25  risk for heat-related pathology?

Deleca Reynolds-Barnes
September 27, 2024

1    A.   So many of those that are on that list have a

2  high -- with the exception of lithium -- have a high

3  anticholinergic profile, which decreased the ability for

4  the patient to sweat and/or also affect the

5  hypothalamus, that when it tells the patient to sweat,

6  the patient then has that decreased ability.

7          The inability to sweat when exposed to heat,

8  you know, is the compensatory mechanism that is blocked.

9    Q.   When you say the -- you say here they have

10 the -- and I'm emphasizing this word -- highest

11 anticholinergic risk profile.

12         What do you mean by "highest"?

13   A.   So it is the blockade of acetylcholine that we

14 previously discussed.

15         And so in the literature there will be various

16 studies that will rank drugs.  It is really -- it is the

17 affinity, the ability -- the stickiness to block that

18 from happening.  And so many antipsychotic meds and

19 antihistamines have a high affinity to block

20 acetylcholines.

21         There is some meds that have zero ability.

22 They don't block acetylcholine at all.  So they have

23 zero anticholinergic risk profiles.  And so many meds

24 that are on the list significantly block acetylcholine,

25 i.e., anticholinergic.

Deleca Reynolds-Barnes
September 27, 2024

1          So anticholinergic, then that meant the risk

2     profile would be highest or the ability to block

3     anticholinergic -- acetylcholine were highest with those

4     medications.

5          Q.   Let's go to the next page of your report.  We

6     are now looking at page 4.  And the top heading refers

7     to a category of three types of drugs, which if I

8     pronounce them incorrectly I will ask for your patience

9     and correction.

10          It lists phenothiazines, butyrophenones and

11     antihistamines.

12          How did I do?

13          A.   Very good.

14          Q.   You see the section of the report that I'm

15     looking at?

16          A.   Yes.

17          Q.   And what are phenothiazines?

18          A.   Well, so each one of -- phenothiazine and

19     butyrophenones are actually just chemical structures.

20          So those are -- those are -- you know, when

21     you take your chemistry classes, those are circles and

22     the octagons that make up a chemical structure.

23          You can then take -- many of the chemical

24     structures of phenothiazine then become antipsychotic.

25     So that -- that structure is the structure that is often

Deleca Reynolds-Barnes
September 27, 2024

1        A.    Correct.

2        Q.    Because the anticholinergic properties of a

3   drug are only one way that a drug can increase the

4   patient's risk of heat pathology.  Correct?

5        A.    For -- for certain -- certain drugs have

6   different mechanisms of heat pathology.  Correct.

7        Q.    And the ACH risk score only takes into account

8   the anticholinergic mechanism of increasing rate --

9   excuse me, risk of heat pathology.  Correct?

10       A.    Correct.

11       Q.    So a drug that is in Category zero to one

12  could have a high risk profile, but that risk profile is

13  just caused by other mechanisms other than the

14  anticholinergic properties of the drug?

15       A.    Yes.  The list is ranked that one is -- it is

16  a -- it is a zero sum list.  Everything on the list has

17  a risk for heat pathology.  It is not ranked high --

18  high to low.  It is just giving that caveat.

19             And it speaks to earlier when I said you could

20  have certain drugs that have low anticholinergic risk of

21  one but maybe be on multiple drugs.  So you've got

22  multiple blockades.

23       Q.    That is very helpful.

24             So we are getting at this, but can you just

25  describe at a high level how you would recommend that

1  this list be implemented in practice?

2      A.   Sure.  So, I mean, obviously there has to be

3  some understanding and acceptance of the list and its

4  expansion because the disease states are expended from

5  what they have historically had.

6           Then given that, an understanding of the

7  column number 4, which is the pathology of the why, you

8  know, why was this added -- really is an educational

9  tool, why was this added, and what are the risks that we

10  would be needing to look for in an individual patient.

11  And then the implementation would be if there is a

12  patient that is on one of these meds, then that patient

13  needs to be evaluated for heat-duty status to make that

14  determination.

15           And then the -- and -- and in the

16  implementation of this list, there may be patients that

17  are already on these meds, are long term on these meds.

18  They may even have had a duty status that had them

19  outside, and they've had no adverse event.  And so in

20  that, there may need to be a conversation with the

21  patient and -- there is a list, this list would then

22  change your duty status, and make sure that the patient

23  is as much a part of that decision-making as possible

24  because a patient may opt to, depending on their duty, I

25  don't want my duty status changed, I would rather you

Deleca Reynolds-Barnes
September 27, 2024

1   make an adjustment in my medication or I would like to
2   be able to, you know, refuse the duty status change.
3            I'm not sure exactly the total, but that is
4   the conversation of how I would like for the providers
5   to take that list concept.
6            But use it as a -- as truly as a decision
7   support tool to say, I made these clinical decisions for
8   my patient, I now have this new tool that is going to
9   inform some of those decisions.  How do I either change
10  the patient's duty status or change the patient's meds
11  in order to have -- to have the overall best outcome for
12  the patient?
13       Q.   Is it your understanding that patients are --
14  that providers are having those kinds of conversations
15  with patients at LSP?
16       A.   I did not observe any clinical interaction
17  between a patient and the provider.  So I can't speak to
18  that.
19            But your question was how would I like to see
20  the list used.  That is how I would like to see it used,
21  and I have seen those interactions in other correctional
22  organizations.
23       Q.   Are you aware that providers at LSP often
24  express skepticism as to the patient's own articulations
25  of their symptoms or other medical needs?

Deleca Reynolds-Barnes
September 27, 2024

1         A.   I did not observe that during the time I was

2    there.

3         Q.   Let's say you were aware of that fact, would

4    that change the way that you would want to see the list

5    be implemented?

6         A.   It would not change my implementation of the

7    list because I think the list is an educational tool for

8    the providers and they need to understand the reasons

9    for the change.

10              And so being aware of that, I think the list

11   might even -- if that were in fact the case, I think the

12   development of the list went beyond just a list of

13   drugs, but the reasons why those drugs were added to the

14   list may actually further improve the care because there

15   is an educational component to it beyond just a list of

16   drug names.

17        Q.   So in your opinion are there classes of drugs

18   on this list that should automatically trigger the

19   provision of heat precaution duty status?

20        A.   Everything on the list should automatically

21   trigger the consideration of a heat-duty status.  That

22   is -- that is the reason for the list.  Everything on

23   the list should trigger that.  The only time that the

24   heat-duty status should not be assigned is in

25   combination -- in conversation with the patient.

Deleca Reynolds-Barnes
September 27, 2024

1          There -- there is some clinical reason that is

2     not obvious to us just in the development of a piece of

3     paper where you wouldn't do it.

4          Q.    Understood.

5          So the way this list should be implemented is

6     that as a default, anyone taking any of these drugs

7     should be granted heat precaution duty status unless in

8     the course of having a clinical conversation with that

9     patient the patient and/or the provider determined that

10    that heat-duty status is not appropriate?

11         A.    That is how I would implement the list.

12    Correct.

13         Q.    If a patient requests heat precaution duty

14    status, do you think the default should be that the heat

15    precaution duty status is provided to that person?

16         A.    Can you give more context to that question?

17    Do you mean if they are on one of these meds and they

18    request it?

19         Q.    Yes, that is what I meant.

20         A.    I think the list goes beyond a patient

21    request.  The list should clinically trigger the

22    heat-duty status unless there is a specific patient

23    reason not to have it, there is something specific and

24    unique to that patient.

25         Q.    As an example of a time, would be that if the

1   patient wanted to continue with their -- their job

2   classification, then you would recommend essentially

3   changing the medication rather than changing the duty

4   status?

5        A.   It would truly depend on its part of the

6   implementation.  Again, if you had a patient that wanted

7   to continue their duty status, we have now implemented a

8   new list.  The new list contains a med that the patient

9   has been on long term and they have had no change in

10  their clinical status, then the provider and the patient

11  may have an exception with certain monitoring or

12  something additional.

13           I just think that there could be a clini- -- I

14  think clinically there -- there is no rule called thou

15  shall not.  It does not really -- their -- their

16  patients are unique.  And so to use the word always,

17  every clinical -- I think that sets a trap that

18  clinically there might be a reason to do something

19  different and you would definitely want to give that

20  leeway to the patient and a provider.

21           It would be the exception but -- and not the

22  rule, though.

23       Q.   And these exceptions that you are referencing,

24  those would be made on a case-by-case basis based on the

25  medical needs of that patient.  Correct?

Deleca Reynolds-Barnes
September 27, 2024

```
1           A.   That is correct.  That is correct.

2           Q.   So those exceptions shouldn't be made, for

3    example, on the basis of an institutional need of the

4    prison?

5           A.   So my list is truly a clinical list, and so

6    the needs of the prison were not taken into account in

7    this at all.

8           Q.   So you -- you mentioned that -- just to

9    summarize our conversation, the takeaway is that the

10   default should be anyone taking drugs listed on this

11   page, which we have marked Plaintiff's Exhibit 103,

12   should be given heat precaution duty status except for

13   when an exception is appropriate with that patient on a

14   case-by-case basis based on that patient's medical

15   profile and conversations with that patient.

16              When we're -- is that accurate so far?

17          A.   Yes.

18          Q.   When we're discussing this case-by-case basis

19   upon which a medical provider might provide an exception

20   to granting heat precaution duty status for someone

21   taking one of those medications, how should a medical

22   provider make that evaluation?

23          A.   I need a little more context on the how -- I'm

24   trying to understand your question about how they make a

25   determination.
```

Deleca Reynolds-Barnes
September 27, 2024

1  e-mail.  I think that was the question, was the only

2  feedback that I got.  I think he questioned one of the

3  classes and not specifically sure which one or what it

4  was.  But I think that was it.

5      Q.   And when he questioned one of the classes,

6  what did you do in response?

7      A.   I think whatever he was questioning, I agreed

8  with it.  The list was presented of -- similar to how we

9  have done it.

10         Obviously this is how the list is set up, this

11  is what it means, this is the importance of the

12  anticholinergic risk score, these are the mechanisms of

13  action.

14         So it -- you know, as you can tell, there is

15  quite a bit of information on the two pages.  And so he

16  then took the list to absorb kind of the thoughts and

17  what went into it and then obviously the practice of the

18  DOC.  And so he came back I think with a question about

19  one specific category.  I don't remember specifically

20  what that was.

21      Q.   Is the list that we are looking at right now

22  the same as the list that you presented on September 6th

23  or have changes been made?

24      A.   I think the list -- the initial list on

25  September 6th, there has been some changes.  There were

Deleca Reynolds-Barnes
September 27, 2024

1   some drugs that were highlighted on the list where --

2   this is why I'm removing -- you know, giving some

3   context to why I'm removing and why I did not include

4   certain things.

5            And so this is kind of at the end of that

6   meeting.  It was kind of, this is the final list, but

7   giving context to him as to why the list looked like it

8   looked.

9   Q.   So the changes that were made to the list

10  primarily include you removing certain classes of drugs

11  between September 6th and --

12  A.   So the changes --

13  Q.   Sorry.

14  A.   I think that is a misstatement.

15  Q.   Okay.

16  A.   The changes were -- when I -- the list

17  initially had other agents.  And they were agents that I

18  could say things like, Let me explain why I don't have

19  the non -- the dihydropyridine calcium channels.

20           So they may have all been there, but they were

21  highlighted in yellow.  And so as I am explaining the

22  context of why, what happened, what the change was, then

23  we could remove those.  But I wanted it to be a little

24  more collaborative than me just saying this is --

25  obviously this is exactly what I did, this is what you

Deleca Reynolds-Barnes
September 27, 2024

1    need to take forward.

2                So there were other things on the list.  But

3    trying to give context as to why I did not recommend

4    them continue to be on the list.

5        Q.   I see.  So how -- thinking about the list that

6    you had in your mind as your recommended list prior to

7    the September 6th meeting and the list that we are

8    looking at now, have there been any changes in terms of

9    your recommendations as to what should and should not be

10   included on the list?

11       A.   I cannot remember the -- this -- this is

12   pretty close to the list that was presented, you know,

13   at the end of our meeting on the 6th.

14                There may be one change.  I just don't

15   remember the context to it.  I think the other thing

16   that may be different is I did go in and make sure that

17   I cleaned up all the brand names and generic names to

18   make sure that they had both on the list because in some

19   cases I just had the generic name.  So there was a

20   little formatting cleanup.

21                There may have been a drug that was changed,

22   but I don't have context.  But, as a whole, the list was

23   the list.

24       Q.   Okay.  So just taking a step back, the focus

25   of your work in this case -- actually, I'm going to take

1    this down now.

2            The focus of your report and your work in this

3    case has been around the DOC's heat pathology medication

4    list.  Right?

5        A.   Correct.

6        Q.   Fair to say that in this case you are not

7    rendering an opinion as to the list of chronic

8    conditions that DOC uses to assign heat-duty status?

9        A.   That is correct.

10       Q.   You don't plan to testify at trial regarding

11   the list of chronic conditions that Dr. Keldie prepared.

12   Right?

13       A.   That is correct.

14       Q.   You are not in this case offering an opinion

15   as to whether or not 88 degrees Fahrenheit is the

16   threshold that the DOC should use for declaring heat

17   alerts.  Right?

18       A.   That is correct.

19       Q.   You are not offering an opinion as to the

20   quality of the medical care of LSP.  Right?

21       A.   That is correct.

22       Q.   You are not offering an opinion as to the

23   quality of the training of the medical providers at LSP.

24   Right?

25       A.   That is correct.

Deleca Reynolds-Barnes
September 27, 2024

1        Q.    You are not offering an opinion as to the

2   competency of the medical providers at LSP?

3        A.    That is correct.

4        Q.    You are not offering an opinion as to the

5   access to and availability of first responder equipment

6   and supplies at LSP.  Correct?

7        A.    The only opinion around first responder

8   medical supplies that I rendered as part of this

9   testimony was the availability of Narcan for opioid

10  overdose.  Other than that, no other opinion.

11       Q.    And what is your opinion as to the

12  availability of Narcan for opioid overdose?

13       A.    It is part of the -- of the tour and a part of

14  the conversation, as previously stated with the

15  corrections officers, just the significant availability

16  in multiple locations.  Is was carried on their person

17  by all other correctional officers, readily available in

18  every med room that I went to as well as in all of their

19  emergency stations.

20             And that is just looking at the pharma- --

21  pharmaceuticals.  So in each station, obviously as a

22  pharmacist, I reviewed the pharmaceuticals that were

23  stored there.

24       Q.    But you are not rendering any opinion as to

25  the efficacy of LSP's practices around providing Narcan.

Deleca Reynolds-Barnes
September 27, 2024

1   Correct?

2          You are only opining that you saw it

3   physically present at the facility?

4          A.   That is correct.

5          Q.   Are you offering an opinion as to the level of

6   exertion required to perform labor on the farm at

7   Angola?

8          A.   I am not.

9          Q.   You are not offering an opinion as to the

10  adequacy of the supplies and other protective equipment

11  provided to the men working on the farm line.  Correct?

12         A.   I did observe that.  I don't know whether or

13  not I would be asked -- that is not in my expert opinion

14  given in writing.

15         Q.   Would you have a basis to provide testimony as

16  to the adequacy of the supplies?

17         A.   Only to the extent of what I observed.

18         Q.   Do you have any specialized knowledge in --

19  with respect to the supplies that should or should not

20  be provided to men working in agricultural labor?

21         A.   As it relates to medication and the adequacy

22  of the sunscreen and/or sunblock in the SPF, then as a

23  pharmacist, yes, I would have an opinion.

24         Q.   Okay.  And the sunscreen and sunblock would be

25  the extent of your expertise with respect to supplies

1   provided in the fields.  Correct?

2        A.   Yes.

3        Q.   Okay.  You are not offering an opinion as to

4   the safety of the conditions present in the farm fields

5   at Angola.  Correct?

6        A.   Correct.

7        Q.   Okay.  Let's take a short break, and I think I

8   can wrap up quickly.

9             THE VIDEOGRAPHER:  Okay.  Going off the

10            record.  The time is 7:42 p.m. UTC, 2:42 p.m.

11            central.

12            (Break taken from 2:42 p.m. to 2:49 p.m.)

13            THE VIDEOGRAPHER:  Back on the record.  The

14            time is 7:49 p.m. UTC, 2:49 p.m. central.

15   BY MS. WEISER:

16        Q.   All right.  Before we took that break, you

17   mentioned that you saw sunscreen and sunblock in the

18   fields at LSP.

19             Beyond your site visit at LSP earlier this

20   month, do you have any other knowledge as to the

21   provision of sunscreen and sunblock at LSP?

22        A.   I do not.

23        Q.   Do you know what type of sunscreen or sunblock

24   was offered in the fields on the day that you visited

25   LSP?

Deleca Reynolds-Barnes
September 27, 2024

1         A.    I only know the SPF, the protection factor.

2         Q.    What was the SPF?

3         A.    50.

4         Q.    Do you know how often sunscreen or sunblock

5    was offered to men working in the fields at LSP on the

6    day that you visited?

7         A.    The day I observed it was -- the bottles were

8    out -- they were out on the coolers when we arrived on

9    the field.  They have a little cooler table on the

10   field, and it was -- they were not taken and put up.

11   They were just readily available and left out the entire

12   time I was there.

13         So they could -- they could use them as

14   frequently -- and when I observed as frequently as

15   needed because they were just -- they were there and

16   available.

17        Q.    Are you aware of the brand of sunblock or

18   sunscreen that was provided?

19        A.    I'm not.

20        Q.    Are you -- do you have any knowledge as to how

21   long LSP has been providing sunblock and sunscreen to

22   the people working in the fields?

23        A.    I do not.

24        Q.    Do you have any knowledge as to whether LSP is

25   under any legal obligation to provide sunscreen or

Deleca Reynolds-Barnes
September 27, 2024

1    sunblock to the people working in the fields?

2           A.   I do not know if there is a legal obligation.

3           Q.   Do you know if LSP has any policies around

4    providing sunscreen or sunblock to the people working in

5    the fields?

6           A.   I don't know.  I think there is, but I don't

7    know that.  I don't know that.

8           Q.   You would not be equipped to testify at trial

9    about any policies regarding sunscreen.  Correct?

10          A.   No, no, not without reviewing the heat-duty

11   policy again and only if it is specifically addressed in

12   that policy.  And at this point I don't know that I

13   actually saw it there.

14          Q.   In your expert opinion, should sunscreen or

15   sunblock be made available to people working in the

16   fields at LSP?

17          A.   Yes.

18          Q.   Would it surprise you to learn that prior to

19   this litigation, sunscreen was not made available to

20   people working in the fields at LSP?

21          MR. BLANCHFIELD:  Object to the form of your

22          question; foundation.

23   BY MS. WEISER:

24          Q.   You can answer.

25          A.   I would still stand by that I would expect

Deleca Reynolds-Barnes
September 27, 2024

1  that people should have sunblock or sunscreen in

2  working -- not just working -- in the sun.

3       Q.   Okay.  One drug that we have not discussed yet

4  is called Remeron.  Are you familiar with the drug

5  called Remeron?

6       A.   Yes.

7       Q.   What class of drug does Remeron fall into?

8       A.   It is an antidepressant, not an SSI.  It is a

9  different mechanism of action.

10      Q.   Fair to call it a tetracyclic antidepressant?

11      A.   That is not the chemical structure.  I don't

12 think that's the class it falls into, but that is the

13 chemical structure.

14      Q.   Okay.  What class does it fall into?

15      A.   It is -- now you've asked me.  And the word --

16 what is coming to mind is it's not traditional, it's not

17 non nontraditional, but it is not an SSRI.  And I can't

18 give you the specific class.

19      Q.   Does Remeron have any heat pathology

20 implications?

21      A.   I think the Remeron affects the hypothalamus,

22 but it does not block the body's ability to react.  And

23 so while it may continue to make a person feel warm,

24 their actual body should be able to compensate.

25      Q.   Did you consider adding Remeron and this class

Deleca Reynolds-Barnes
September 27, 2024

1    of drugs to the heat pathology medication list?

2         A.    I looked at all the antidepressant classes,

3    Remeron included, and reviewed kind of the frequency

4    that it would appear in studies, case reports of

5    heat-related illness, and chose not to add Remeron to

6    the list.

7         Q.    And the reason you did not add Remeron to the

8    list was because in your review, it did not appear in a

9    sufficient amount of studies to warrant inclusion?

10        A.    In my opinion, the risk of a heat pathology

11   with Remeron was -- was not likely.

12              And, again, my goal was to come up with the

13   best list, not every single drug that has ever had one

14   incidence of heat-related status.

15        Q.    And your opinion that Remeron was not likely

16   to increase risk of heat pathology, that was based on

17   your literature review?

18        A.    My understanding of my literature review,

19   correct.

20        Q.    And just to circle back to that, you did not

21   keep track of the studies and other literature that you

22   reviewed in the course of this project?

23        A.    I don't have -- I mean, I kept some, but I

24   don't have everything that I reviewed.

25              And back to your other question, Remeron is

Deleca Reynolds-Barnes
September 27, 2024

1    considered a non- -- nontraditional antidepressant.  I

2    kept thinking atypical was the word that we used.  I

3    couldn't think of the word "atypical."

4         Q.   So you said you kept some of the studies and

5    literature that you reviewed.  Can you elaborate on

6    that?

7         A.   Sure.  Sometimes I would download it, and if I

8    needed to download it because I was going to read it in

9    another location -- this happened over -- this review of

10   literature happened over a period of time.  It wasn't

11   like a day where I just sat down and did everything.

12        So some things, if I downloaded it, I may have

13   kept a copy.  If I wanted to refer back to it later, I

14   may have kept a copy.  Some things it was -- you know,

15   when I wanted -- let me go back and refresh my thoughts

16   on this concept or this thought, then I would not have

17   kept a copy.

18        So it would have been like, okay, that is kind

19   of what I thought that was.

20        Q.   Okay.

21             MS. WEISER:  I have no further questions at

22        this time.

23             MR. BLANCHFIELD:  No questions here.  Thank

24        you.

25             MS. WEISER:  Thank you so much for your time.

Deleca Reynolds-Barnes
September 27, 2024

1        It was nice to meet you.

2              THE WITNESS:  Nice to meet you as well.

3              THE VIDEOGRAPHER:  This concludes today's

4        deposition.  The time is 7:57 p.m. UTC, 2:57 p.m.

5        central.  We are off the record.

6              THE REPORTER:  Mr. Blanchfield, did you need a

7        copy of this?

8              MR. BLANCHFIELD:  Yes.

9              (Deposition concluded at 2:58 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Deleca Reynolds-Barnes
September 27, 2024

```
 1                REPORTER'S CERTIFICATE

 2

 3  STATE OF FLORIDA

 4  COUNTY OF ORANGE

 5

 6          I, MICHELLE PULIDO STUBBEN, Court Reporter and

 7  Notary Public, certify that I was authorized to and did

 8  stenographically report the foregoing deposition of

 9  AMBER VITTORIO; that a review of the transcript was not

10  requested; and that the transcript, Pages 4 through 187,

11  is a true record of my stenographic notes.

12          I FURTHER CERTIFY that I am not a relative,

13  employee, attorney, or counsel of any of the parties'

14  attorneys or counsel connected with the action, nor am I

15  financially interested in the action.

16          The certification does not apply to any

17  reproduction of the same by any means unless under the

18  direct control and/or direction of the reporter.

19          DATED September 29, 2024.

20

21

22  _____

23  MICHELLE PULIDO STUBBEN, Court Reporter

24

25
```