# Exhibit 31



# The NEW ENGLAND JOURNAL of MEDICINE

## Perspective
OCTOBER 5, 2023

FOSSIL-FUEL POLLUTION AND CLIMATE CHANGE

# Preventing Heat-Related Illness among Outdoor Workers — Opportunities for Clinicians and Policymakers

Rosemary K. Sokas, M.D., M.O.H., and Emily Senay, M.D., M.P.H.

Dressed in black, Mr. R., a 60-year-old worker hired through a temporary agency by an Ohio roofing company, started work at 6:30 a.m. on a sunny August day. The foreman assigned him a relatively light task and told all the workers that water, rest, and shade were available when needed, but Mr. R. received no training or acclimatization, according to a government inspection. Coworkers later noted that Mr. R. appeared to be "clumsy"; at approximately 11:40 a.m., when the ambient temperature was 82°F, with 51% relative humidity, he collapsed and was then transported to a hospital, where his core body temperature was 105.4°F. Three weeks later, he died from complications of heat stroke. His preexisting conditions included congestive heart failure.

Mr. R.'s death was preventable but not unique; mortality from heat stroke among outdoor workers has risen over the past two decades as temperatures have climbed. Approximately 32 million people in the United States work outdoors in industries such as construction, transportation, sanitation, agriculture, groundskeeping, and emergency and protective services. Farm workers in particular are 35 times as likely as the general population to die of heat exposure.[1] Many other workers face serious heat exposure inside buildings, including warehouses, bakeries, and foundries. Yet federal and state data substantially underestimate heat-related mortality owing to underrecognition, misclassification, and failure to capture heat-associated exacerbations of underlying conditions and increases in traumatic injuries. Advocacy organizations suggest that heat causes up to 2000 worker deaths per year in the United States.[1]

Information is also emerging about long-term health problems associated with heat injury, including renal failure, cardiovascular disease, ischemic stroke, and death.[2] But efforts to implement heat-safety protections are falling short. There are no federal heat-safety rules, and the handful of existing state regulations have important shortcomings, leaving workers at risk. Failure to protect workers as the climate crisis worsens will have consequences for families, communities, the economy, and the food and other resources on which society depends.

The climate is warming faster than previously predicted by climate scientists. The global mean temperature has increased more

The New England Journal of Medicine is produced by NEJM Group, a division of the Massachusetts Medical Society.
Downloaded from nejm.org on March 18, 2025. For personal use only.
No other uses without permission. Copyright © 2023 Massachusetts Medical Society. All rights reserved.

than 1.1°C (2.0°F) since preindustrial times. Heat is the most common cause of weather-related deaths. The World Meteorological Organization has warned that global temperatures will increase to record levels over the next 5 years because of ongoing greenhouse gas emissions and the climate pattern known as El Niño.

Lost productivity — an inevitable result of the effects of heat on stroke volume, heart rate, and maximum oxygen uptake — can further impoverish low-wage workers and their families. One analysis of the likely results if minimal or no global action were taken on greenhouse gas emissions found that the number of days per year with a heat index higher than 100°F in the United States could increase by a factor of four by midcentury, which would reduce safe work time for more than 18 million outdoor workers and could result in $55.4 billion in annual income losses.[3] Annual employer costs associated with heat-related lost productivity are estimated at $100 billion.

Older age is associated with greater vulnerability to heat, and the U.S. workforce is aging rapidly: the average age of workers is now roughly 42 years, and people must work until they are 67 to qualify for full Social Security benefits. Because of systemic racism, Black and Latinx workers are disproportionately represented in low-wage, high-risk jobs; they are also more likely than White workers to sustain heat-related injuries. Labor shortages and harmful immigration policies result in substantial numbers of undocumented people working in agriculture (by some estimates accounting for 50% of the agricultural workforce), residential housing construction, and transient clean-up after climate disasters. At $7.25 per hour, the federal minimum wage for workers keeps families below federal poverty levels, and the United States is the only advanced industrial country where labor laws don't require paid sick leave and where "at will" employment policies mean employers can fire workers without reason.[4] Among low-wage workers and those who are living paycheck to paycheck or are paid by the amount of work they complete, the incentive is to avoid taking breaks.

In 2021, after decades of advocacy by workers, unions, and occupational safety organizations, President Joe Biden called for the Occupational Safety and Health Administration (OSHA) to develop a federal heat-safety standard, a process that could take years because of complex requirements previously imposed by congressional roadblocks and unfavorable court decisions. Trade-group opposition to rules deemed unfriendly to business could further undermine prospects for swift progress. Although Congress could enact legislation forcing OSHA to act more quickly, attempts to do so have failed in successive congressional sessions. In early 2023, attorneys general from seven states petitioned OSHA to issue an emergency temporary standard. OSHA has declined similar requests in the past.

OSHA has used a temporary National Emphasis Program to increase outreach, education, training, and resources for employers in this area; the announcement of a heat "hazard alert" in July 2023 furthered such efforts. Under its General Duty Clause, which requires employers to provide worksites that are reasonably free of known serious hazards, OSHA has attempted to increase enforcement activity. Without a federal heat-safety standard, however, citations can be easily overturned, as occurred in Mr. R.'s case, when the Occupational Safety and Health Review Commission determined that his employer couldn't have reasonably anticipated his risk of heat stroke.

Although OSHA sets and enforces national standards, about half of states have their own worker-safety programs. Rules in these "state-plan states" must be at least as protective as OSHA's standards but can provide additional protections. California was the first state to adopt a heat-illness–prevention standard for outdoor workers and is adopting a standard for indoor workers. Oregon and Washington have outdoor heat standards that detail required protections (e.g., water, shade, and rest provisions at trigger temperatures, as well as first-aid procedures) and penalties for employer noncompliance. Minnesota has an indoor heat standard, and Colorado has passed a law containing outdoor-worker protections. Texas, the state with the highest number of heat-related fatalities, however, recently passed legislation nullifying local ordinances that required water and rest breaks for outdoor workers.

Even in states with heat-safety rules, there are two important gaps in protections. First, there is a need for more careful medical oversight, particularly of high-risk workers. Although regulations call for training of workers to prevent heat-related illness, the list of conditions that exacerbate risk is complex. No rules require clinical evaluation of workers or management of their care. Cost concerns have precluded even basic

The New England Journal of Medicine is produced by NEJM Group, a division of the Massachusetts Medical Society.
Downloaded from nejm.org on March 18, 2025. For personal use only.
No other uses without permission. Copyright © 2023 Massachusetts Medical Society. All rights reserved.

### Clinical Guide to Heat-Illness Prevention.*

#### Risk Factors

| External Risk Factors | Partial List of Individual Risk Factors | |
|---|---|---|
| **Climate** | **Chronic and Acute Conditions** | **Medication and Substance Use** |
| Temperature | Cardiovascular conditions | Angiotensin-converting–enzyme inhibitors |
| Humidity | Diabetes | Angiotensin-receptor blockers |
| Wind velocity | Hypertension | Beta blockers |
| Heat index (includes temperature and humidity) | Pulmonary conditions | Anticholinergics |
| Wet-bulb globe temperature (includes wind velocity and radiant heat) | Neurologic conditions | Anticonvulsants |
| Direct sunlight | Renal conditions | Diuretics |
| Radiant heat source | Obesity | Tricyclic antidepressants |
| Heat waves | Mental illness | Amphetamines |
| Urban heat islands | Deconditioning | Benzodiazepines |
|  | Fever | Antipsychotics |
|  | Gastroenteritis | Antihistamines |
|  |  | Alcohol, opioids, and cocaine |
| **Occupational Factors** | **Other Factors** |  |
| Exertion level | Age |  |
| Combined risks: heat, air pollution, and safety and health hazards | Pregnancy status |  |
| Acclimatization | Previous heat illness or heat stroke |  |
| Access to water, rest, and shade |  |  |
| Use of heat-retaining protective gear (e.g., Tyvek suits, firefighting gear) |  |  |

#### Evaluation, Counseling, and Prevention

| Advice for Patients | Medical Surveillance | Medical Management |
|---|---|---|
| Acclimatize (new workers should begin slowly, starting at about 20% of daily work effort and adding 20% each day); take more frequent breaks. | Ask about occupation, setting, tasks, use of personal protective equipment, etc. | Provide basic heat-related advice to all patients. |
| Recognize and respond to symptoms of heat stress: headache and nausea; rest and drink cool water. | Ask about home air conditioning. | Modify medications, if possible. |
| Recognize and respond to signs of heat stroke in others: hot and dry to the touch or sweating but confused; call 911, remove from heat, and apply ice. | Screen for medications that increase risk and for substance use. | Work to reduce chronic conditions using lifestyle modifications. |
| Self-monitor. | Screen for history of previous heat-related illness. | Measure baseline renal function in higher-risk patients. |
| Have a buddy. | Evaluate to assess the need for accommodations and offer to write a note if patient is willing; if not, renew self-care advice. | Advise more prolonged acclimatization and additional rest breaks for higher-risk patients. |
| Wear light-colored and lightweight clothes. |  | Offer more frequent follow-up for higher-risk patients. |
| Wear a hat with a brim. | Recognize that low-income patients are vulnerable to job loss and may decide to work regardless of preexisting conditions. | Physiological monitoring may be available in high-performing organizations that take heat-illness–prevention seriously (e.g., the U.S. military). Guidance on prevention and treatment of heat- and cold-stress injuries is available from the U.S. Navy Environmental Health Center (https://www.med.navy.mil/Portals/62/Documents/NMFA/NMCPHC/root/Occupational%20and%20Environmental%20Medicine/5Heat_and_Cold_final_June07.pdf). |
| Frequently drink water, rest, and use shade. |  |  |
| Take breaks in air conditioning, if available. | Identify modifiable risk factors (e.g., substance use disorder, obesity). |  |
| Drink 6 oz of cool water several times per hour. |  |  |
| Keep urine light yellow. | Additional clinical information is available in Tustin et al.[5]; extensive information about prevention is available from NIOSH (https://www.cdc.gov/niosh/docs/2016-106/pdfs/2016-106.pdf). |  |
| Avoid overexertion as temperature climbs, especially when new to a job, when returning after time away, or during a heat wave. |  |  |
| Consider using apps to check heat index and air quality periodically to guide protective measures. |  |  |

#### Ancillary Services

Consult NIOSH work–rest cycle recommendations (https://www.cdc.gov/niosh/mining/UserFiles/works/pdfs/2017-127.pdf).
Distribute worker information materials from NIOSH (https://www.cdc.gov/niosh/topics/heatstress/) and OSHA (https://www.osha.gov/heat-exposure).
Consult materials from the Migrant Clinicians Network for clinicians, community health workers, and patients (https://www.migrantclinician.org/explore-environmental-justice-and-worker-health/heat-related-illness.html).
Consider developing mechanisms for referral to local unions, worker centers, or legal clinics for workers in difficult situations fearing job loss.
Offer to write accommodation letters or to contact employers, with patient consent.
Consider having a staff member contact the local OSHA office to identify local resources and get advice about facilitating a complaint, if necessary.

* NIOSH denotes National Institute for Occupational Safety and Health and OSHA Occupational Safety and Health Administration.

The New England Journal of Medicine is produced by NEJM Group, a division of the Massachusetts Medical Society.
Downloaded from nejm.org on March 18, 2025. For personal use only.
No other uses without permission. Copyright © 2023 Massachusetts Medical Society. All rights reserved.

approaches such as worker-completed, clinician-reviewed questionnaires to identify workers needing a face-to-face visit to determine reasonable work accommodations (which wouldn't involve clinicians telling low-wage workers they can't work).[5] Second, although acclimatization and modified work–rest cycles as temperatures rise are critical to preventing heat-related illness, regulators have avoided interfering with work rates or organization. Consequently, rules for acclimatization only require supervisors to pay attention to new workers, despite evidence-based recommendations that new workers increase their workload gradually over 1 week, and rest requirements typically mandate only 10 minutes of rest for every 2 hours of work, despite recommendations that workers have 45 minutes of rest for every 15 minutes of heavy work in very hot weather (≥105°F).

*An audio interview with Rosemary Sokas is available at NEJM.org*

Given these gaps, clinicians can help support their patients who may be at risk for heat-related illness. All clinicians, but especially those in primary care, could identify patients whose work may expose them to heat, review medical histories for risk factors, and educate patients on how to recognize and respond to heat exhaustion. Patients should understand the need for a buddy system to recognize signs of heat stroke in others — the person is either hot and dry to the touch or continuing to sweat but confused — and understand that heat stroke is a life-threatening emergency requiring rapid cooling with ice and transportation to a hospital (see table).

For clinicians at safety-net clinics that often care for low-income or immigrant workers, the Migrant Clinicians Network provides extensive resources for both providers and patients. When possible, a staff member familiar with local worker centers, advocacy groups, legal services, and the local OSHA office could offer additional guidance to vulnerable workers. Most important, clinicians could work with their member organizations to advocate for meaningful regulatory and legislative action to protect workers amid the escalating climate crisis.

Disclosure forms provided by the authors are available at NEJM.org.

From the Department of Human Science, Georgetown University, Washington, DC (R.K.S.); and the Department of Environmental Medicine and Public Health, Icahn School of Medicine at Mount Sinai, New York (E.S.).

This article was published on August 30, 2023, at NEJM.org.

1. Fulcher J. Report: hot take — urgent heat crisis for workers. The demand for immediate worker protections increases as dangerous temperatures rise. Public Citizen, May 25, 2023 (https://www.citizen.org/article/hot-take/).
2. Wang J-C, Chien W-C, Chu P, Chung C-H, Lin C-Y, Tsai S-H. The association between heat stroke and subsequent cardiovascular diseases. PLoS One 2019;14(2):e0211386.
3. Dahl K, Licker R. Too hot to work: assessing the threats climate change poses to outdoor workers. Union of Concerned Scientists, August 17, 2021 (https://doi.org/10.47923/2021.14236).
4. Support decent work for all as a public health goal in the United States. Washington, DC: American Public Health Association, November 8, 2022 (https://www.apha.org/Policies-and-Advocacy/Public-Health-Policy-Statements/Policy-Database/2023/01/18/Decent-Work-for-All).
5. Tustin A, Sayeed Y, Berenji M, et al. Prevention of occupational heat-related illnesses. J Occup Environ Med 2021;63(10):e737-e744.

DOI: 10.1056/NEJMp2307850
*Copyright © 2023 Massachusetts Medical Society.*

---

# Countering the Health Disinformation Machine

Alex S. Keuroghlian, M.D., M.P.H.

On the morning of August 31, 2022, a staff member of the Fenway Institute's National LGBTQIA+ Health Education Center in Boston, which I direct, checked the office voicemail system. One voice message was anything but routine. "You sick [expletives], you're all gonna burn. There's a group of people on their way to handle [victim]. You signed your own warrant, [victim]. Castrating our children. You've woken up enough people. And upset enough of us. And you signed your own ticket. Sleep well, you [expletive]." The staff member reported this message to the organization's leaders and the security department, which notified law enforcement.

Three months later, on December 2, the U.S. Attorney's Office announced that the Federal Bureau of Investigation had arrested a 38-year-old owner of an ammunition business from Comfort, Texas, who was charged with transmitting interstate threats.[1] At the time, I hoped naively that coverage of the arrest by the *New York Times*, the *Washington Post*, *CNN*, and other news organizations might deter threats against transgender and gender-diverse young people, their families, the clinicians who care for them, and the educators who teach clinicians how to do so. Little did I

The New England Journal of Medicine is produced by NEJM Group, a division of the Massachusetts Medical Society.
Downloaded from nejm.org on March 18, 2025. For personal use only.
No other uses without permission. Copyright © 2023 Massachusetts Medical Society. All rights reserved.