**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **VOICE OF THE EXPERIENCED,** a membership organization on behalf of itself and its members; **and MYRON SMITH, DAMARIS JACKSON, NATE WALKER, DARRIUS WILLIAMS, KEVIAS HICKS, JOSEPH GUILLORY,  KENDRICK STEVENSON,** and **ALVIN WILLIAMS,** on behalf of themselves and all others similarly situated, | * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * | **CIVIL ACTION** <br><br> **NO.:  3:23-cv-1304** <br><br> **JUDGE BRIAN A. JACKSON** |
| **VERSUS** | * <br> * | |
| **JAMES LEBLANC,** in his official capacity as Secretary of the Louisiana Department of Public Safety and Corrections**; TIMOTHY HOOPER,** in his official capacity as Warden of Louisiana State Penitentiary; **MISTY STAGG**, in her official capacity as Director of Prison Enterprises, Inc.; the **LOUISIANA DEPARTMENT OF PUBLIC SAFETY & CORRECTIONS;** and **PRISON ENTERPRISES, INC.** | * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * | **MAGISTRATE JUDGE ERIN WILDER-DOOMES** |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## <u>DEFENDANTS' RESPONSE TO PLAINTIFFS' APPLICATION FOR SECOND TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>

**NOW INTO COURT,** through undersigned counsel, come Defendants herein, **LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS, JAMES LEBLANC,** in his official capacity as Secretary of the Louisiana Department of Public Safety and Corrections, **TIMOTHY HOOPER,** in his official capacity as Warden of Louisiana State Penitentiary, and the **LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS** ("Defendants"), who file this Response to Plaintiffs' Application for Second

1

Temporary Restraining Order and Preliminary Injunction (R.Doc. 201). Plaintiffs fail to meet their heavy burden of proof for a preliminary mandatory injunction and their motion should be denied.

First, the injunction that Plaintiffs seek is nearly identical to the July 2 injunction that has long expired. The PLRA does not contemplate successive identical preliminary injunctions, nor can Plaintiffs circumvent the PLRA's expiration period to revive an expired injunction. Second, Plaintiffs seek agency wide policy changes that are in contradiction to the PLRA, which prohibits precisely such changes. In fact, in this case, the Fifth Circuit has already held that the very order that Plaintiffs seek was overbroad and violates the PLRA.  The motion should be denied on these reasons alone.

Even if the merits are reached, Plaintiffs fail to meet their heightened burden of proof for a mandatory preliminary injunction. They cannot show a substantial likelihood of success on the merits that they would be entitled to any policy changes they seek or that Defendants are deliberately indifferent.

For example, in a bizarre about face, Plaintiffs now argue that the National Weather Service heat index tracking is deficient, despite previously recommending this method and advising the Court it was the "gold standard." R.Doc. 64. Further, Plaintiffs seek to enjoin the DPSC's decision to add a cease work requirement when the heat index reaches 113. Plaintiffs call this decision "cavalier" despite the fact that this Court also recommended that additional measures be taken when the heat index reaches 113 degrees. Plaintiffs cannot show deliberate indifference with respect to the heat alert threshold of 91 degrees, which is supported by the National Weather Service and other national guidance. Plaintiffs' attempt hold DPSC to a higher standard than agriculture workers around the country, where there are no standards in place as to heat alert thresholds or cease work requirements.

In short, Plaintiffs seek authority to write DPSC policy under the guise of a preliminary injunction. Such authority lies exclusively with the State. The principles of federalism, as well as the limitations under the PLRA, prohibit such an injunction.

## I.     Procedural Background

Plaintiffs filed this purported class action in September 2023 seeking an injunction to "end compulsory agricultural labor" at LSP. R.Doc. 1. The initial scheduling order set a trial date for March of 2026, with expert disclosures due in May 2025. R.Doc. 25. After minimal discovery, in May of 2024, Plaintiffs filed an Application for Preliminary Injunction seeking an order from the Court to "enjoin all operations on the Farm Line when heat index values reach or exceed eighty-eight degrees Fahrenheit." R.Doc. 37-1. Defendants were given 10 days to respond to the preliminary injunction. Within the limited time frame, and prior to the retention of experts, Defendants opposed the preliminary injunction, submitting evidence that disputed Plaintiffs' characterization of the conditions of the Farm Line.

A hearing on the preliminary injunction was held on June 18, 2024. At the hearing, this Court suggested that LSP directly provide sunscreen to offenders working the Farm Line and to provide shade. LSP immediately implemented these measures and advised this Court. R.Doc. 64. The Court also required the parties to propose a plan to monitor the temperature at LSP. Plaintiffs proposed, and Defendants agreed, to use the National Weather Service data at the New Roads False River Regional Airport. R.Doc. 64. Plaintiffs advised this court that "[t]he parties agree that the heat data collected by the National Weather Service ("NWS") is the gold standard." R.Doc. 64.

On July 2, 2024, this Court granted in part Plaintiffs' preliminary injunction. Defendants appealed this ruling and filed a motion to stay with the Fifth Circuit. On Defendants' motion to stay, the Fifth Circuit found that the following portions of the injunction ruling were overbroad

and therefore violated the PLRA: (1) requiring Defendants to "[s]ubmit a revised and expanded Heat Pathology Medications list"; (2) requiring Defendants to "[c]reate a procedure to ensure that all incarcerated persons suffering from health conditions that significantly inhibit thermoregulation are assessed by medical personnel and are granted heat precaution duty status"; and (3) requiring Defendants to "[d]evelop an additional heat-related policy to protect those laboring outdoors when heat index values reach or exceed 113 degrees Fahrenheit, the temperature at which the National Weather Service issues excessive heat warnings." R.Doc. 201-4. The Fifth Circuit found that the preliminary injunction extended to all Louisiana inmates rather than the putative Plaintiffs. The Fifth Circuit declined to stay the portion of the injunction requiring adequate shade and rest as well as provision of sunscreen.[1]

Following the preliminary injunction, this Court set a fast-track scheduling order that included discovery, expert and class certification deadlines. Expert reports and discovery were completed in September 2024. R.Doc. 106. After the class certification motion and Defendants' Daubert motions were filed, on October 18, 2024, this Court continued the trial without date. R.Doc. 131. On October 21, 2024, Defendants notified the Court of recent changes to HCP8, the policy at issue. R.Doc. 136.

On December 6, 2024, this Court set a new trial date for April 21, 2025. R.Doc. 158. The Court further set a deadline for Plaintiff to file their motion for a court appointed expert as mentioned in correspondence to the Court. *Id*. On January 10, 2025, Plaintiffs withdrew their informal request for a court appointed expert. R.Doc. 174. This Court continued the April trial without date. R.Doc. 193.

---

[1] All parties agree that this preliminary injunction has expired.

The appeal on the July 2 preliminary injunction remains pending at the Fifth Circuit. Oral argument is scheduled for April 30, 2025. While both parties agree that the injunction expired, the Fifth Circuit set oral argument, which suggests the Fifth Circuit's forthcoming decision may speak on the merits of the July 2 injunction and thereby affect the issues raised in Plaintiffs' motion.

This is especially true because the injunction that Plaintiffs seek nearly mirrors the injunction that the Fifth Circuit found overbroad and in violation of the PLRA. Plaintiffs seek an injunction order from this Court essentially "re-writing" HCP8, a DPSC-wide policy that applies to all offenders at DPSC facilities across the State. Plaintiffs seek to change the heat alert threshold in HCP8, the medication list and medical conditions list in Attachments A and B to HCP8, the temperature monitoring set forth in HCP8, the heat season set forth in HCP8 and the threshold to cease outdoor work set forth in HCP8. This requested relief extends to all offenders in DPSC custody, as well as offenders at LSP who are not assigned to the Farm Line or assigned to other outdoor work.

## II.    Factual Background
### A.  The "Farm Line"

In accordance with state law and the constitution, every inmate at LSP has a job. Each inmate's job depends on their own "duty status" as determined by a medical health care provider, as well as their interests and the needs of the facility.[2]

This case involves the job assignment at LSP that Plaintiffs refer to as the "Farm Line." LSP grows various fruits and vegetables that are harvested for inmate consumption. LSP provides 2,500 pounds of vegetables each day to feed the roughly 4,000 offenders at LSP.[3] These vegetables are not sold on the open market and LSP does not profit from this job assignment.[4]

---

[2] R.Doc. 49-4.
[3] Deposition of Warden Sylvester, p. 49, R.Doc. 136-2.
[4] Id.

While Plaintiffs define the "Farm Line" as Lines 15, 24, 25 and 15b, only lines 24, 25 and 15 perform agricultural work. Line 15b is a grass cutting crew, which is a mobile line that performs weed eating.[5] These offenders will weed eat a certain area, and then travel on a bus to the next area.[6]

Plaintiffs' Complaint and their first preliminary injunction espoused inaccurate descriptions of the conditions at LSP. Nevertheless, LSP has made changes to their procedures and provided additional protections. Regardless of the time of year or temperature each day, LSP employs the following procedures:

- Required 15 minute breaks every 45 minutes;
- Shaded rest areas;
- Unlimited ice and water;
- Access to sunscreen;
- Unlimited cups for drinking;
- Allow offenders to take breaks as needed outside of the required 15 minute breaks.[7]

For the lines that go to the fields – and in response to this Court's directives – LSP constructed shade wagons, which are covered trailers with bench seating.[8] Water, ice and cups are stored in elevated position on the shade wagons.[9] For the grass cutting crew, because this job assignment requires periodic travel by bus and offenders are not confined to one area, offenders take their rest breaks on the bus, where ice and water are stored. Offenders may also take breaks in the shade that is provided by the bus.[10]

As Defendants' expert Dr. Keldie opines:

There is little or no risk to field workers who have been acclimated to the environment, have access to risk mitigation measures including shade, iced water

---

[5] 30(b)(6) Deposition of Warden Sylvester, p. 42, R.Doc. 201-35.
[6] *Id.*
[7] Affidavit of Roland Sylvester, Exhibit B.
[8] 30(b)(6) Deposition of Warden Sylvester, p. 42, R.Doc. 201-35; R.Doc. 135-1, 135-2, 135-3, 135-4.
[9] 30(b)(6) Deposition of Warden Sylvester, p. 40-43, R.Doc. 201-35; R.Doc. 148-1.
[10] 30(b)(6) Deposition of Warden Sylvester, p. 40-43, R.Doc. 201-35; R.Doc. 148-1.

and Gatorade and rest periods of 15 minutes every 45 minutes and who perform easy level work the majority of the time with occasional moderate level workload.[11]

The Farm Line serves legitimate institutional purposes, to include needs of the institution, feeding offenders vegetables, job assignments for offenders, and disciplinary requirements.

Even in preparation for the upcoming heat season, LSP continues to assess additional protections. Most recently, LSP constructed a prototype for shade pavilions to be placed throughout the fields.[12] The 24x24 pavilion has a roof for shade, benches for seating, electricity, four large fans, and access to two water spigots on each side.[13] LSP plans to, and has received approval from DPSC, to construct an additional 6 shade pavilions throughout the facility, which will be located next to or in the work area.[14] LSP will also continue to utilize the shade wagons as needed.

## B.  Heat Pathology Policy – HCP8

Health Care Policy 8 is a DPSC policy that applies to all offenders in DPSC custody across all DPSC facilities. HCP8 "establish[es] provisions for the reduction of heat pathology and to reduce the exposure to offenders identified as more vulnerable to heat."[15]  The Heat Pathology policies set forth both indoor and outdoor procedures to be followed from May 1 to October 31 each year.[16] The policy provides that offenders identified by a healthcare practitioner with a chronic illness that may be affected by heat or those prescribed medication that may impact sensitivity to heat shall be evaluated and educated for potential adverse reactions concerning heat or photosensitivity related pathology.[17] Certain medications or illness may require that an offender be provided a Heat Precautions Duty status, which means that an offender cannot work outdoors

---

[11] Expert report of Dr. Keldie, R.Doc. 136-5.
[12] Affidavit of Ashli Oliveaux, Exhibit A.
[13] *Id*.
[14] *Id*.
[15] HPC8, updated October 20, 2024, Exhibit D.
[16] Defendants note that the heat season set forth in HCP8 was approved by this Court in *Ball v. LeBlanc*, 13-cv-368, R.Doc. 475-1.
[17] HPC8, updated October 20, 2024, Exhibit D.

once a heat alert is issued.[18] However, offenders who have chronic illnesses or co-morbidities will have a more restrictive duty status, such as no duty, out of field, sit to work, etc.[19]

Following consultation and with recommendations from Defendants' experts, Defendants made modifications to HPC8. Defendants have expanded the Heat Pathology Medication list and added medications.[20] Dr. Deleca Barnes, the only PharmD expert in this case, created recommendations for the revised Heat Pathology Medication list.[21] Dr. Barnes identified medications that affect the ability for a person to compensate when they are exposed to heat, to include the ability to sweat, other metabolic processes, including heart rate, urinary frequency and dehydration that would prevent a person's ability to compensate for heat.[22] Dr. Barnes assessed the anticholinergic risk profile of medications, which measures a drug's ability to block acetylcholine.[23] Even for medications that have a low anticholinergic risk profile, Dr. Barnes assessed whether other side effects affect the ability for persons to compensate for heat.[24]

DPSC further added a medical condition list to HCP8, which is in place to assist with clinical decision making and includes a clinical support tool. The medication list includes 9 general categories and 33 illnesses, a far cry from Plaintiffs' allegations of "under inclusiveness." Further, Plaintiffs' assertion that the list fails to include certain illnesses is completely false.[25]

HCP 8 now codifies some of the current procedures implemented by LSP on the Farm Line, to include 15-minute rest breaks every 45 minutes, rest breaks in shaded areas, and sunscreen made

---

[18] HPC8, updated October 20, 2024, Exhibit D.
[19] R.Doc. 120-33, p. 22.
[20] HPC8, updated October 20, 2024, Exhibit D; HCP8 Attachment A, updated November 2024, Exhibit E.
[21] Affidavit of Dr. Barnes, Exhibit F; Expert Report of Dr. Barnes, Exhibit J.
[22] Deposition of Dr. Barnes.
[23] Affidavit of Dr. Barnes; Expert Report of Dr. Barnes, Exhibit J.
[24] Id.
[25] Affidavit of Dr. Keldie, Exhibit G.

available.[26] HCP8 now also provides that outdoor work shall cease if the heat index exceeds 113 degrees.[27] Because HCP8 is a general policy that applies to all DPSC facilities and varying work assignments, it does not incorporate the very specific procedures that LSP implements with respect to the agricultural work, such as the shade wagons and various personal protective equipment provided to workers. These measures continue to be implemented by LSP.[28]

HCP8 also provides that the heat indexes shall be monitored every two hours via the National Weather Service. Once the heat index reaches 91 degrees, a heat alert is called and additional protections are required. DPSC increased the heat alert threshold from 88 to 91 degrees based on the opinions of Dr. Keldie, which are supported by the US Army, the National Weather Service and NOISHI.[29]

### C. LSP's Implementation of HCP8

The updated version of HCP8 was officially signed in October 2024. Immediately, LSP began its process of implementing the changes to this policy at LSP. LSP had an immense task of providing duty statuses to offenders who were prescribed medications on Attachment A and medical conditions on Attachment B.

LSP made the decision to provide duty statuses to all offenders who are prescribed a medication on Attachment A or are diagnosed with a medical condition on Attachment B, unless the offender opts out of the duty status after the offender has been educated on the risks.[30] Beginning January 20, 2025, for all new intakes, every offender who was prescribed a medication on Attachment A or a medical condition on Attachment B was educated on heat pathology and

---

[26] HPC8, updated October 20, 2024, Exhibit D, Exhibit E.
[27] HPC8, updated October 20, 2024, Exhibit D.
[28] Affidavit of Sylvester, Exhibit B; R.Doc. 111-3.
[29] Affidavit of Dr. Keldie, Exhibit G.
[30] Affidavit of Oliveaux; R.Doc. 201-17.

provided a duty status.[31] For offenders already at LSP,  LSP pulled a list of all offenders who were prescribed a medication on Attachment A. These offenders (totaling about 1500) were automatically provided a heat precautions duty status.[32] LSP medical providers then performed chart reviews for every offender (who had not previously been provided a heat precautions duty status based on a medication) and assessed whether any offender had a medical condition listed on Attachment B.[33] An additional 300 duty statuses were issued based on medical conditions on Attachment B.[34] LSP has educated each of these offenders on heat pathology.[35] All of this was accomplished well in advance of the heat season beginning May 1.

Because LSP's focus was the immense task of issuing over 1800 duty statuses and educating each inmate on the same, the process of updating HCP8's corresponding directive 13.067 was not complete. As Ashli Oliveaux advised in her deposition on February 12, 2025, the directive was in "workflow" and, as plaintiffs are well aware, would be completed prior to May 1.[36]  In fact, the updated version of Directive 13.067 was signed on April 8, 2025, well in advance of May 1.[37] While Directive 13.067 follows HCP8, LSP also codified certain measures that LSP had already been undertaking, such as measuring heat index every hour beginning at 8:00 am.[38]

Plaintiffs' request for an injunction requiring LSP to update a policy, when they are well aware that the process was underway, is nonsensical.

---

[31] Affidavit of Oliveaux.
[32] Id.
[33] Id.
[34] Affidavit of Oliveaux.
[35] Id.
[36] Deposition of Oliveaux, R.Doc. 201-7, p. 61.
[37] See Directive 13.067, Exhibit A-1.
[38] See Directive 13.067.

## I.      Law and Argument
### A.  The heightened burden for preliminary mandatory injunction

A preliminary injunction is an "extraordinary and drastic remedy" that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.[39] A preliminary injunction is the exception, not the rule.[40] A plaintiff seeking a preliminary injunction must establish (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) that their substantial injury outweighs the threatened harm to the party whom they seek to enjoin; and (4) that granting the preliminary injunction will not disserve the public interest.[41] If the movant fails to carry the "heavy burden" to show each of these prerequisites, a preliminary injunction is not warranted.[42]

The decision to grant or deny a preliminary injunction is discretionary with the district court.[43] However, because a preliminary injunction is an extraordinary remedy, it "should not be granted unless the party seeking it has clearly carried the burden of persuasion on all four requirements."[44]

In addition, mandatory preliminary relief "which goes well beyond simply maintaining the status quo pendente lite, is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party."[45] Because "[a]n indispensable prerequisite to issuance of a preliminary injunction is prevention of irreparable injury, [o]nly in rare instances is the issuance of a mandatory preliminary injunction proper."[46]

---

[39] *Munaf v. Geren*, 553 U.S. 674, 689, 128 S.Ct. 2207, 171 L.Ed.2d 1 (2008).
[40] *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985).
[41] *Planned Parenthood Ass'n of Hidalgo Cty. Tex., Inc. v. Suehs*, 692 F.3d 343, 348 (5th Cir. 2012); accord *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974).
[42] See *Enterprise Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985).
[43] *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985).
[44] *Suehs*, 692 F.3d at 348.
[45] *Three Expo Events, L.L.C. v. City of Dallas, Texas*, 182 F.Supp.3d 614, 622 (N.D. Tex. 2016)(quoting *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976)).
[46] *Tate v. American Tugs, Inc.*, 634 F.2d 869, 870 (5th Cir. 1981) (internal quotation marks omitted).

In the context of injunctions against correctional facilities, based on the PLRA, "preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the violation of the federal right, and be the least intrusive means necessary to correct the harm."[47] Public policy, and the Supreme Court, counsels federal courts to "eschew toward minimum intrusion into the affairs of state prison administration."[48] The Supreme Court warned against federal courts making decisions regarding "the day-to-day functioning of state prisons and involv[ing] the judiciary in issues and discretionary decisions that are not the business of federal judges."[49] Stated differently, "[w]hen weighing any form of injunctive relief, federal courts must be mindful not to jump at the chance to take prison administration into their own hands and out of the hands of the people entrusted with such tasks by the state."[50]

This is exactly what Plaintiffs ask this Court to do: take prison administration out of the hands of LSP and DPSC and write their own policy, which is clearly in contravention with the PLRA and federalism.

**B. Plaintiffs fail to meet their burden for a preliminary mandatory injunction**
**1. The PLRA Bars Plaintiffs' Request for Successive Preliminary Injunctive Relief**

At the outset, the Court cannot reach the merits of Plaintiffs' preliminary-injunction motion because the PLRA bars such successive requests. Under the PLRA, "[p]reliminary injunctive relief shall automatically expire on the date that is 90 days after its entry, unless the court makes the findings required under subsection (a)(1) for the entry of prospective relief and makes the order final before the expiration of the 90-day period."[51] All parties agree that this Court's July 2, 2024

---

[47] *Ball v. Sanders*, No. CIV.A. 13-282-JWD, 2015 WL 58872, at *1 (M.D. La. Jan. 5, 2015).
[48] *Alex A. by & through Smith v. Edwards*, No. CV 22-573-SDD-RLB, 2022 WL 4445499, at *18 (M.D. La. Sept. 23, 2022).
[49] *Mecham v. Fano*, 427 U.S. 215, 228-229 (1976).
[50] *Alex A. by & through Smith v. Edwards*, No. CV 22-573-SDD-RLB, 2022 WL 4445499, at *18 (M.D. La. Sept. 23, 2022). See also *Creel v. City of Baton Rouge/Par. of E. Baton Rouge*, No. CV 20-880-SDD-EWD, 2021 WL 856710, at *1 (M.D. La. Mar. 8, 2021).
[51] 18 U.S.C. § 3626(a)(2).

preliminary injunction has long expired because the requisite conditions precedent were not satisfied. Accordingly, the present question is whether Plaintiffs may nonetheless obtain a successive preliminary injunction consistent with the PLRA. They may not—for at least two reasons.

*First*, the best reading of the PLRA is that a plaintiff may never obtain multiple preliminary injunctions in the same litigation. The PLRA expressly permits a court, "[i]n any civil action with respect to prison conditions," to "enter *a* temporary restraining order or *an* order for preliminary injunctive relief."[52] Although the singular article ordinarily includes the plural (absent contextual clues otherwise), *see* 1 U.S.C. § 1, "[t]he Dictionary Act does not transform every use of the singular 'a' into the plural 'several.'"[53] And that is the case here—for the same PLRA provision saves a preliminary injunction from expiration only if, among other things, the court "makes the [injunction] order *final*."[54] Finality here means "dispositive of the entire case"—and it stands "in direct contrast to interlocutory orders," which address only intermediate matters in the case.[55] For that reason, "*an* order for preliminary injunctive relief" is best understood to mean *one* permitted preliminary injunction. Otherwise, the PLRA created a framework where courts can enter seriatim preliminary injunctions that never actually approach finality—this, even though "curbing the equitable discretion of district courts was one of the PLRA's principal objectives."[56] "[I]t would have been odd for Congress" to do so.[57] This Court should thus deny the Motion on that independent basis.

---

[52] *Id.* (emphases added).

[53] *Niz-Chavez v. Garland*, 593 U.S. 155, 164 (2021).

[54] § 3626(a)(2) (emphasis added).

[55] *Georgia Advocacy Office v. Jackson*, 4 F.4th 1200, 1211 (11th Cir. 2021), *vacated on settlement grounds* 33 F.4th 1325 (11th Cir. 2022) (citation omitted).

[56] *Miller v. French*, 530 U.S. 327, 339 (2000).

[57] *Id.*

*Second*, at a minimum, the PLRA bars the type of successive preliminary injunction demanded by Plaintiffs—*i.e.*, one that functionally seeks to extend the expired July 2 injunction. As outlined above, a PLRA preliminary injunction automatically expires after 90 days "unless the court makes the findings required under subsection (a)(1) for the entry of prospective relief and makes the order final before the expiration of the 90-day period."[58] In particular, "the entry of a permanent injunction is necessary to prevent a preliminary injunction from expiring by operation of law after 90 days under the PLRA's 'unless' clause."[59] By the same token, moreover, a plaintiff cannot let his injunction expire and then ask the Court to enter a virtually identical preliminary injunction—for that would "circumvent" Congress's precise conditions for the extension of preliminary relief, in a statute designed to thwart such circumvention no less, *see Miller*, 530 U.S. at 328. *Cf. Robinson v. Labrador*, 2025 WL 673930 (D. Idaho Mar. 3, 2025) (relying on deeply misguided Ninth Circuit precedent to enter the third of back-to-back, identical preliminary injunctions).

Yet that is precisely what Plaintiffs have done here by seeking to effectively extend the expired July 2 injunction. They demand TRO and injunctive relief that

- incorporates "the remedial measures ordered by the Court in its August 15, 2024 order," which implemented the July 2 injunction, ECF 201-1 at 1;

- orders the State to "expand the list of medications and conditions" regarding heat precaution duty status, *id.*; *compare* ECF 170 at 77 (injunction requiring the State to "[s]ubmit and revised expanded Heat Pathology medications list" and "[c]reate a procedure to ensure that all incarcerated persons suffering from health conditions that significantly inhibit thermoregulation are assessed by medical personnel and are granted heat precaution duty status");

---

[58] 18 U.S.C. § 3626(a)(2).

[59] *Jackson*, 4 F.4th at 1211; *see Banks v. Booth*, 3 F.4th 445, 448 (D.C. Cir. 2021) ("[I]f a judge enters a preliminary injunction in a suit covered by this section, that injunction will terminate on its 90th day unless the court has rendered it permanent ....").

- orders the State to "update LSP Directive 13.067 to reflect ... the additional relief sought herein," ECF 201-1 at 1; *compare* ECF 170 at 77 (injunction requiring the State to "[c]orrect the deficiencies of Directive No. 13.067 noted herein"); and

- orders the State to "lower the threshold for all outdoor work to cease from a heat index of 113°F to a heat index of 103°F," ECF 201-1; *compare* ECF 170 at 77 (injunction requiring the State to "[d]evelop an additional heat-related policy to protect those laboring outdoors when heat index values reach or exceed 113 degrees Fahrenheit").

Plaintiffs have simply retooled the expired July 2 injunction, added on a few more requests, and submitted a request to effectively extend the expired injunction. That circumvention of the PLRA's express conditions for extending preliminary relief is unlawful and should be rejected on that independent basis as well.

### 2. Even if Successive Preliminary Injunctions were Allowed, Plaintiffs Fail to Demonstrate a Likelihood of Success on the Merits

#### a. The heat index threshold is constitutionally appropriate and supported by science and national guidance

First, Plaintiffs seek an injunction requiring DPSC to revise HCP8 (which applies to all DPSC facilities) to decrease the heat alert threshold to 88 degrees. Plaintiffs solely rely on Dr. Vassallo's opinions. However, the 88-degree heat index threshold is not the "standard" in exertional heat recommendations. In fact, there is no national standard currently in place as to when individuals are at a substantial risk of harm for exertional heat related injuries.

The National Weather Service, which Plaintiffs have called "the gold standard,"[60] outlines the likeliness of heat disorders with certain temperatures. In all cases, regardless of humidity, 88-degree heat index is classified at "Caution." An 80-degree heat index is in the same category of an 88-degree heat index. Only once the heat index reaches 91 degrees does National Weather Service increase the risk:

---

[60] R.Doc. 64.



Likewise, NOSHI, which has been relied upon by Plaintiffs' experts, sets forth that the risk level is low for heat indexes below 91 degrees. The risk is only classified at moderate from 91 degrees to 103 degrees, which requires implementation of precautions.

### Table C-1. Heat index–associated protective measures for worksites

| Heat index | Risk level | Protective measure |
|---|---|---|
| Less than 91°F (33°C) | Lower (caution) | Basic health and safety planning |
| 91°F to 103°F (33°C to 39°C) | Moderate | Implement precautions and heighten awareness |
| 103°F to 115°F (39°C to 46°C) | High | Additional precautions to protect workers |
| Greater than 115°F (46°C) | Very high to extreme | Even more aggressive protective measures |

Adapted from OSHA [2012c].

Additional information about protective measures mentioned in the above table can be found on OSHA's website.

Note: The presence of a radiant heat source may decrease the accuracy and usefulness of the above heat index.

16

This guidance is exactly what DPSC relied on in setting the heat alert threshold. As NOISHI recommends, DPSC's HCP8 "implements precautions" when the heat index reaches 91 degrees, i.e., bringing in offenders with heat precaution duty statuses, requiring organized 15-minute rest breaks every 45 minutes, modified work schedules if needed.

DPSC also relied on the opinions of their expert, Dr. Keldie. As Dr. Keldie explains, the United States Army is the preeminent guidance on exertional heat response.[61] The US Army provides that zero interventions are necessary with an "Easy Work Load" when the heat index is 91 degrees.[62] DPSC provides extensive interventions when the heat index reaches 91 degrees.[63]

As of today, there are no national standards regarding when additional heat mitigation measures should be triggered. While not yet approved, OSHA proposes a heat trigger of 90 degrees heat index.[64] OSHA further noted that some states, such as California and Colorado, impose a high heat trigger of 95 degrees heat index.[65] This guidance further demonstrates that Dr. Vassallo's conclusory opinions as to 88 degrees is unfounded and in fact disputed in the field.[66]

In support of her opinions, Dr. Vassallo cites to studies that are not relevant here. These studies are based on urban data that tracks classic heat illnesses, not exertional heat illness.[67] While classic heat illness concerns prolonged (days) exposure to very hot environments, such as an unairconditioned home, exertional heat illness is the ability to cool oneself during high levels of exertion (such as working outdoors).[68] These two types of heat illnesses have different causes, risk

---

[61] Exhibit G, Affidavit of Dr. Keldie.
[62] *Id.*
[63] *Id.*
[64] Proposed Rule: Heat Injury Prevention in Outdoor and Indoor Work Settings
[65] https://www.govinfo.gov/content/pkg/FR-2024-08-30/pdf/2024-14824.pdf
[66] Exhibit G, Affidavit of Dr. Keldie.
[67] *Id.*
[68] *Id.*

factors, symptoms, and mortality rates. Applying studies that review classic heat illness data to a situation concerning exertional heat illness is improper and has no relevancy here.[69]

Second, the actual data that Dr. Vassallo relies on within these studies does not support her opinions that there is a substantial risk of harm for heat related illness once the heat index reaches 88 degrees. The magnitude of the increased risk (in various graphs in this article) is neither "substantial" nor clinically significant from a population standpoint.[70]

For the first time, plaintiffs assert that relying on the Nation Weather Service standards is insufficient because heat index **can** (not will) increase with sunlight **up to** 15 degrees. This argument is completely contradicted by Dr. Vassallo's prior opinions, which solely relied on 88 degrees heat index as outlined by the Nation Weather Service. Dr. Vassallo has not taken into account a possible 15 degree increase in her support of an 88-degree heat index threshold. To now argue that an increase of 3 degrees (in accordance with supported national guidance) constitutes deliberate indifference is disingenuous at best.

Even though there is no national standard for heat alert thresholds for outdoor workers, DPSC includes a 91 degree threshold where additional protective measures are provided for outdoor workers. This threshold is supported by the National Weather Service and NOISHI guidance, which provides that protective measures should be put in place when the heat index reaches 91 degrees. It is further supported by the US Army standards. Far from deliberate indifference, DPSC's policy in place goes above and beyond what is called for by the NWS, NOISHI, the US Army, and the Constitution.

---

[69] *Id.*
[70] *Id.*

What Plaintiffs further ignore is that LSP continues to provide risk mitigation measures to field workers year-round and regardless of the heat index. While HCP8 requires certain measures to be taken during heat season and once a heat alert is issued, it is undisputed that LSP provides the shade wagons to field workers since their completion and outside of the "heat season."[71] Every day, offenders are provided ice, water, cups, shade and 15 minute rest breaks every 45 minutes. These measures are provided regardless of the temperature.[72]   As such, Plaintiffs' arguments in brief that offenders have no protections unless the heat index reaches 91 degrees is simply false.

In short, Plaintiffs cannot show a substantial risk of harm to offenders working outdoors where offenders are provided 15-minute rest breaks every 45 minutes, offenders are allowed to take rest breaks as needed, ice and water are provided, shaded rest areas are provided. Plaintiffs cannot show likelihood of success on the merits that the heat alert threshold of 91 degrees is unconstitutional. As Defendants have consistently stated in discovery responses and in depositions, the decision to increase the heat alert threshold was based on Dr. Keldie's recommendation and the National Weather Service (which plaintiffs had previously referred to as the "gold standard"). Dr. Keldie's recommendation was based on the National Weather Service Guidelines, military Guidelines and OSHA.  Even further, Texas heat policies have a threshold of 95 degrees to remove those with heat sensitivity from outdoor work.

The retention of experts and implementation of policy changes based upon this guidance is the antithesis of deliberate indifference. While Dr. Vassallo opines that 88 degrees is the correct threshold, this opinion is refuted by Dr. Keldie, OSHA and the United State Army. One disputed opinion cannot form the basis for a preliminary injunction.

---

[71] Affidavit of Roland Sylvester, Exhibit B.
[72] *Id*.

**b. The threshold to stop outside work at 113 degrees is supported by this Court and the National Weather Service**

Based on the National Weather Service, this Court previously suggested additional measures be put in place once the heat index reaches 113 degrees. R.Doc. 70. This Court relied on the NWS issuance of excessive heat warnings when the heat index reaches 113 degrees. R.Doc. 70.[73]

The prior version of HCP8 did not include a threshold to cease work. DPSC consulted with its experts, as well at the National Weather Service data and revised HCP8 to include that all outdoor work will cease when the heat index reaches 113 degrees. Plaintiffs now assert that these additional protections at 113 degrees are "cavalier," despite the fact that this Court, and the National Weather Service, endorsed this temperature.

Again, there is no national standard in which all outdoor work should cease. OSHA guidance only provides risk levels and types of protective measures that should be in place as the risk increases.[74] None of these protective measures includes ceasing work.[75] Nevertheless, DPSC revised its policy to cease work when the heat index reaches 113 degrees.

There is no basis under NWS or OSHA Guidelines to cease work at all, much less at 103 degree heat index that Dr. Vassallo suggests.[76] "Prison officials should not be held to a higher standard of care than that practiced by responsible farmers in the surrounding agricultural community." *Sampson v. King*, 693 F.2d 566, 568 (5th Cir. 1982). Issuing an injunction to cease work at 103 degrees heat index would hold DPSC to a higher standard than all agricultural workers across the country. Such a requirement is not required under the Constitution and further violates the PLRA.

---

[73] https://www.weather.gov/lix/wwa_criteria#Heat%20Products
[74] Affidavit of Dr. Keldie, Exhibit G.
[75] *Id*.
[76] Dr. Vassallo's new opinions on this issue are subject to a separately filed motion to strike.

### c. The procedures for monitoring the heat index were proposed by Plaintiffs

In a surprising reversal, Plaintiffs now contend that the heat index monitoring methods, which Plaintiffs themselves proposed and called the "gold standard," are inadequate.

In June 2021, this Court tasked the parties with creating a protocol for the collection of heat data at LSP. On June 21, 2024, Plaintiffs advised the Court that the parties agreed upon a joint proposal for monitoring heat conditions at LSP:

> The parties agree that the heat data collected by the National Weather Service ("NWS") is the gold standard. In addition, the parties have determined that the closest NWS data collection site to Angola is located at the New Roads False River Regional Airport, which is approximately 20 miles from Angola. The NWS website for this location tracks and reports on relevant weather data, including temperature, relative humidity, and heat index, at 20-minute intervals over a three-day period. The parties believe that the NWS website adequately and accurately captures the information needed for the parties and this Court to determine the relevant heat index at Angola. R.Doc. 64.

Plaintiffs now argue that there are 50 miles between the weather station and the worksite, which is a blatant misrepresentation.[77]

Defendants have been monitoring the heat index through the methods agreed upon by the parties. Incredibly, Plaintiffs now assert that this method (that Plaintiffs chose) evidences deliberate indifference. Plaintiffs cannot show a likelihood of success on the merits that Defendants are deliberately indifferent in monitoring heat index as proposed by Plaintiffs.

Second, Plaintiffs argue for the first time that HCP8's requirement of two-hour temperature monitoring is deficient. But, HCP8 applies to all DPSC facilities and Plaintiffs cannot seek to re-write this policy by injunction to fit their narrow purposes. And in any event, beginning in June

---

[77] R.Doc. 201-3.

21

2024, LSP began monitoring temperatures every hour. LSP will continue this monitoring every hour and have included this practice in the updated Directive 13.067.[78]

### d. A Heat Season is constitutionally appropriate and accepted by Courts

For the first time in this litigation, Plaintiffs now argue that the heat pathology policy is deficient because it applies a heat season from May to October.[79] At the outset, HCP8 is a DPSC-wide policy that applies to all DPSC facilities, not only the Farm Line. As such, any injunction regarding when HCP8 heat season is triggered would be overbroad and violate the PLRA.

Second, the Fifth Circuit, as well as this Court, have consistently approved heat policies and procedures that only apply during a specific time of year, i.e., a heat season. In *Ball v. LeBlanc*, this Court approved remediation plans and a settlement that monitored heat conditions indoors during a heat season.[80] Likewise, in *Gates v. Cook*, 376 F.3d 323, 336 (5th Cir. 2004), this Fifth Circuit approved a plan that included providing remediation measures from May through September.

Ironically, the very studies that Vassallo relies on only include data from May through September. The concept of a heat season that would trigger additional protections regarding exposure to heat is widely accepted by the Courts. To argue that DPSC was deliberately indifferent in including a heat season, from May 1 to October 31, in HCP8 is simply misguided.

### e. The Medication List in HCP8 is more than required under the Constitution

Despite the fact that DPSC revised HCP8 to add over 40 medications to its policy, Plaintiffs seek a preliminary injunction to add additional medications to the list. HCP8 is a DPSC-wide policy that applies to all DPSC facilities across the state. This injunction request far exceeds the

---

[78] See 13.067, Exhibit A-1.
[79] Dr. Vassallo's new opinions on this issue are subject to a separately filed motion to strike.
[80] See *Ball v. LeBlanc*, 13-cv-368, R.Doc. 475-1.

PLRA. Further, despite the fact that DPSC's new Heat Pathology Medication List was based on the recommendations of qualified experts, Plaintiffs attempt to use this injunction request to have this Court write DPSC's policies. Not only does this request violate federalism principles, but it violates the PLRA.

Dr. Barnes, who is the only PharmD expert in this case, reviewed the Heat Pathology list and made recommendations based on her expert opinion.[81] Dr. Vassallo, who is not a PharmD and was not even aware of the concept of the anticholinergic scale,[82] now opines that the medication list is underinclusive. Dr. Vassallo fails to offer any clinical studies or scientific evidence to support these opinions and simply cites to prior declarations for her statement.[83]

 Contrary to Dr. Vassallo and Plaintiffs' assertions, Dr. Barnes did not solely focus on anticholinergic medications, as evidence by Dr. Barnes' inclusions of medications that are low on the anticholinergic scale.[84] In reality,  Dr. Barnes identified medications that affect the ability for a person to compensate when they are exposed to heat, to include the ability to sweat, other metabolic processes, including heart rate, urinary frequency and dehydration that would prevent a person's ability to compensate for heat.[85] Dr. Barnes also assessed the anticholinergic risk profile of medications, which measures a drug's ability to block acetylcholine.[86]

Specifically with respect to the medications subject of Plaintiffs' motion, Dr. Barnes reviewed the anticholinergic risk profiles of each of these medications. However, even if a

---

[81] Affidavit of Dr. Barnes. Exhibit F.
[82] Deposition of Vassallo, p. 88-89, Exhibit I.
[83] See Fourth Declaration, para. 39, 42, wherein she cites to her first Declaration.
[84] Affidavit of Dr. Barnes Exhibit F.
[85] Affidavit of Dr. Barnes Exhibit F.
[86] Id.

medication had a low anticholinergic risk, Dr. Barnes analyzed other side effects of each medication that may affect the ability to compensate for heat exposure.[87]

Dr. Barnes opines that SSRIs do not have enough anticholinergic activity to prevent the body from compensation from heat.[88] This opinion is supported by recent studies that concluded that "there was no effect of [SSRIs] on core temperature when pooled across all conditions."[89] Dr. Barnes opines that "there is no clinical evidence that SSRIs, as an isolated marker, should be represented on the list."[90]

As to calcium channel blockers, Dr. Barnes opines that these medications lower blood pressure. However, only the non- dihydropyridine channel blockers affect the heart, which is the only increased risk associated with compensating for heat.[91] The dihydropyridine channel blockers only affect the blood vessels and therefore do not impose an increased risk regarding the ability to compensate for heat.[92] Dr. Vassallo makes general overbroad assertions that are not supported. Bottom line is that non- dihydropyridine channel blockers affect the heart and are therefore included on the list; dihydropyridines do not have a direct effect on cardiac muscle and therefore allows for additional compensatory support for heat exposure.[93]

DPSC retained well qualified experts to provide recommendations as to adding medications to the Heat Pathology List that would have an impact on an offender's ability to compensate for heat during work assignments, either outdoors or other warm environments. These recommendations, which are based on medical literature, clinical studies and the expertise of a

---

[87] Affidavit of Dr. Barnes, Exhibit F.
[88] *Id.*
[89] *Id.*
[90] *Id.*
[91] *Id.*
[92] *Id.*
[93] *Id.*

PharmD, were implemented. LSP has issued over 1500 duty statuses for the upcoming heat season based on the Medication List.[94]

Dr. Vassallo's unsupported opinions do not support a finding of likelihood of success on the merits or deliberate indifference. The preliminary injunction should be denied.

### f.  The Medical Exclusion List

The prior policy listed four illnesses that may or may not make an offender more vulnerable to heat. Now, HCP8 specifically provides 9 general categories and 33 chronic illness that would require a health care provider to evaluate an offender for a heat Precaution Duty Status.[95]

Yet, Plaintiffs argue that the list is "deficient" because it does not include specific illnesses. At the outset, the list is intended to give support to clinicians. HPC8 is not intended to usurp medical judgment.[96] Clinicians can and do provide duty statuses in accordance with an offender's medical conditions.[97] Individuals with severe chronic illnesses will likely have a more restrictive duty status than a heat precaution duty status.[98]

Second, Plaintiffs' characterization of HCP8 as underinclusive is not supported. Dr. Vassallo asserts that the list is underinclusive because it does not include coronary artery disease.[99] In fact, the list does include ischemic heart disease. There is no basis to include stable coronary disease, and the list includes the actual risk factor, ischemic heart disease.[100]

Further, while Plaintiffs assert that diabetes is not included, the medical list does include a diabetic who is morbidly obese. Individuals with controlled diabetes would not have a substantial

---

[94] Affidavit of Oliveaux, Exhibit A.
[95] HPC8, updated October 20, 2024, Attachment B, Exhibit D.
[96] See Attachment A and B to HCP8, Exhibits D and E.
[97] Deposition of Dr. Lavespere, R.Doc. 120-33, p. 22.
[98] Id.
[99] Dr. Vassallo Fourth Declaration, R.Doc. 201-3.
[100] Affidavit of Dr. Keldie, Exhibit G.

risk of harm with exposure to heat.[101] In fact, individuals with diabetes can go into remission with diet and exercise.[102] As such individuals with diabetes can benefit from working outdoors. A heat precaution duty status to every person with diabetes is not medically sound, and would potentially cause more harm.[103] Further, Plaintiffs have failed to point to one instance of an offender with diabetes who is assigned to the Farm Line that is experiencing serious difficulty thermoregulating. As such, they have failed to show that any substantial risk of harm of any potential class member, which is independently fatal to their preliminary injunction. Once again, Plaintiffs come nowhere close to establishing deliberate indifference.

**g.   The Plaintiffs cannot show likely to succeed on the merits on their ADA claim**

At the outset, Defendants incorporate their arguments in opposition to Plaintiffs' motion for class certification (R.Doc. 136) namely that Plaintiffs' ADA claims are barred because the same class, with the same claim, and seeking the same relief, is being litigated in *Lewis v. Cain*.

Second, while Plaintiffs makes conclusory statements that thermoregulation is a major life activity, Plaintiffs have failed to identify one named Plaintiff whose ability to thermoregulate would be impaired if the heat index reached 88 degrees. This is fatal to their ADA claim. See *Ball v. LeBlanc*, 792 F.3d 584, 597 (5th Cir. 2015).

**3.   Plaintiffs fail to establish the likelihood of success on the deliberate indifference standard**

"Deliberate indifference is an extremely high standard to meet."[104] In a constitutional claim alleging deliberate indifference to the conditions of a prisoner's confinement, the plaintiff must satisfy both the "subjective and objective requirements" of the Eighth Amendment inquiry.[105] To

---

[101] Deposition of Dr. Lavespere, p. 137-138, R.Doc. 201-6; Affidavit of Dr. Keldie, Exhibit G.
[102] Affidavit of Dr. Keldie, Exhibit G.
[103] *Id*.
[104] *Cadena v. El Paso Cty*., 946 F.3d 717, 728 (5th Cir. 2020).
[105] *Farmer v. Brennan*, 511 U.S. 825, 846, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

satisfy the objective requirement, the plaintiff must show an "objectively intolerable risk of harm."[106] To satisfy the subjective requirement, the plaintiff must show that the defendant: "(1) was 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists'; (2) subjectively 'dr[e]w the inference' that the risk existed; and (3) disregarded the risk."[107] In *Farmer*, the Supreme Court held that deliberate indifference requires the defendant to have a subjective "state of mind more blameworthy than negligence,"[108] akin to criminal recklessness.[109] Although a court may disagree with a defendant's actions, "mere disagreement" "does not establish deliberate indifference."[110]

Here, plaintiffs cannot show that Defendants have a subjective state of mind. As evidenced above, DPSC relied on its well-qualified experts, national guidance from the "gold standard" on temperature monitoring, recommendations from OSHA and NOISHI and even suggestions from this Court. The measures and changes implemented demonstrate a lack of deliberate indifference.

In *Valentine v. Collier*, 956 F.3d 797, 802 (5th Cir. 2020), an inmate sought a preliminary injunction regarding COVID-19 precautions. It was undisputed that the prison has a COVID-19 policy in place. With regards to the deliberate indifference standard, the Fifth Circuit held that the district court collapsed the objective and subjective component. The Fifth Circuit held that the district court treated alleged inadequate measures as dispositive of Defendants' mental state, which resembled the standard of civil negligence that has been rejected by the Supreme Court. The question was not how the prison's policies were being administered, but whether Defendants subjectively believed the measures they were taking were inadequate.

---

[106] *Id*.
[107] *Cleveland v. Bell*, 938 F.3d 672, 676 (5th Cir. 2019).
[108] *Farmer*, 511 U.S. at 835, 114 S.Ct. 1970
[109] *Id*. at 839–40, 114 S.Ct. 1970.
[110] *Valentine v. Collier*, 956 F.3d 803.

The same reasoning applies here. In response to this litigation, Defendants hired well-qualified experts to review its policy. DPSC implemented measures that are not even required by industry standards. Defendants have continued to implement new measures in the field, to include the shade wagons and the soon to be constructed shade pavilions, which will have seating, shade and fans. There is no evidence that given the current policies in place, coupled with the safe operation of the Farm Line, Defendants subjectively believe that the measures they are taking are inadequate. Plaintiffs' mere disagreement with policy provisions cannot establish deliberate indifference.[111]

Plaintiffs' other arguments that LSP does not follow their policies on breaks in an attempt to prove deliberate indifference are simply untrue. For example, plaintiffs cite to Line 15b on September 16 and argue that one break was given two hours after a heat alert was called. A simple reading of the document proves these accusations false. On September 16, offenders on Line 15b began weed eating at 9:18. R.Doc. 201-47. Thirty-five minutes later at 9:53, work stopped and a count was called. At 10:35, offenders left the worksite and went to the processing plan for lunch. A heat alert was called while the offenders were on their lunch break at 11:04. Offenders did not finish lunch and begin working again until 11:43 (over a one-hour lunch break). At 12:30, forty-five minutes later, a 15-minute break was announced. Work began again at 12:45. Offenders completed work for the day forty-five minutes later. To claim that these offenders received their first break two hours after a heat alert was called is a fabrication.

---

[111] *Valentine v. Collier*, 956 F.3d 803.

Regarding the heat precautions duty statuses, at LSP, every offender is issued a hard copy of their duty status.[112] It is the offender's responsibility to present his duty status to security and during his work assignments.[113]

The procedures for heat precaution duty statuses follow this general requirement of duty statuses. Once a heat alert is called over the radio, all work stops and offenders are notified that a heat alert is called.[114] It is the responsibility of an offender with a heat precaution duty status to present that duty status to the officer so that the offender can be brought indoors.[115] Even if an offender does not have a copy of his duty status, the offender can advise the officer who will radio Medical to confirm the duty status.[116] While LSP provides a heat precaution duty status list to officers, the list includes hundreds of names, and the line rosters for each line will vary from day to day. As such, to ensure that the heat precaution duty status is followed, the offender is required to provide the duty status during work assignments.[117]

Plaintiffs created Exhibit 37 that purportedly evidences instances where an offender with a heat precaution duty status was not brought indoors. Most of the entries on the exhibit created by counsel are simply false. For example, Plaintiffs claim that on July 16, 2024, Quintylan Richard was not removed from line 24/25 when a heat alert was issued. However, the roster indicates that Richard was a "call out" on July 16, meaning he had a medical appointment or an educational program.[118] Richard did not work on July 16. Plaintiffs further claim that Nathaniel Trahan was

---

[112] Affidavit of Sylvester, Exhibit B.
[113] Affidavit of Sylvester, Exhibit B; R.Doc. 148-1.
[114] *Id*.
[115] *Id*.
[116] *Id*.
[117] Affidavit of Sylvester, Exhibit B.
[118] Affidavit of Sylvester, Exhibit B.

not removed from the Farm Line from August 5 through August 9. The job roster shows that Trahan **did not work the week of August 5 through August 9 due to his duty status**.[119]

While most of the exhibit is a complete misinterpretation of the records, even if an offender was not brought indoors once a heat alert was called, it is because the offender did not notify officers of his duty status once he was advised that a heat alert was issued. For example, the majority of the exhibit created by Plaintiffs pertains to Michael Halford. LSP officers advised that Halford enjoys working outdoors, which would explain why he did not present his duty status once heat alerts were called.[120] In fact, Halford recently opted out of his heat precaution duty status, citing the reason for opting out is that he works during the summer.[121] Records that Plaintiffs fail to attach show that the daily line counts are replete with examples of inmates with heat precautions duty statuses being brought indoors once a heat alert was issued, meaning those duty statuses were presented to officers.[122]

### 4. Plaintiffs fail to show irreparable harm

The Supreme Court has held that for a preliminary injunction, the standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction.[123] The Fifth Circuit has explained the heavy burden to establish irreparable harm or injury  where adequate relief is available under the plaintiff's asserted cause of action:  Federal courts have long recognized that, when 'the threatened harm is more  than de minimis, it is not so much the magnitude but the irreparability  that counts for purposes of a preliminary injunction.'"[124]

---

[119] R. Doc. 201-39, p. 38.
[120] Affidavit of Oliveaux, Exhibit A.
[121] *Id*.
[122] Exhibit H, Line Counts.
[123] *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 22, 129 S. Ct. 365, 375, 172 L. Ed. 2d 249 (2008).
[124] *Enter. Int'l, Inc.  v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir.1985) (quoting *Canal Auth. v. Callaway,* 489 F.2d 567, 575 (5th Cir.1974)).

"The possibility that adequate compensatory  or other corrective relief will be available at a later

date, in the ordinary  course of litigation, [weighs] heavily against a claim of irreparable  harm."[125]

As explained by Dr. Keldie, there is no evidence that plaintiffs, or even the purported class

members, will suffer irreparable harm.[126] There have been no instances of serious exertional heat

illness for offenders assigned to the Farm Line.[127] The field workers at LSP do what is generally

regarded as easy work and do not engage in prolonged periods of work similar to community

agricultural workers.[128] Adequate rest breaks, water, shade and sunscreen are provided every day.

Dr. Vassallo's opinions as to whether any offender suffers a substantial risk of harm when the heat

index is below 91 degrees is not supported and is in fact refuted by national guidance. Further, the

science simply does not support that individuals taking SSRIs and dihydropyridine channel

blockers have an inability to compensate when exposed to heat.[129]

5. **Defendants will suffer certain and immediate harm if the injunction is granted that outweighs plaintiffs' speculation of potential injury if the injunction is denied**

"[A]ny time a State is enjoined by a court from effectuating statutes enacted by

representatives of its people, it suffers a form of irreparable injury."[130] Here, as in *Valentine*, the

State of Louisiana has "assigned the prerogatives" of administration of prison policy to

Defendants, and the Court's injunction would "prevent the State from effectuating the Legislature's

choice and hence imposes irreparable injury."[131] As the *Valentine* court explained, the Supreme

Court "has repeatedly warned that it is difficult to imagine an activity in which a State has a

stronger interest, or one that is more intricately bound up with state laws, regulations, and

---

[125] (emphasis added) *Morgan v. Fletcher*, 518 F.2d 236, 240 (5th Cir.1975) (quoting *Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C.Cir.1958)).
[126] Affidavit of Dr. Keldie, Exhibit G.
[127] Affidavit of Dr. Keldie, Exhibit G.
[128] *Id*.
[129] *Id*.; Affidavit of Barnes.
[130] *Valentine*, 956 F.3d at 803.
[131] *Id*.

procedures, than the administration of its prisons."[132] As such, like the *Valentine* defendants, Defendants will be irreparably harmed if the injunction is granted.

The preliminary injunction requested by Plaintiffs would irreparably intrude on State sovereignty. See *Rizzo v. Goode*, 423 U.S. 362, 379 (1976) (when federal courts interfere with state prisons, "appropriate consideration must be given to principles of federalism"). Indeed, the preliminary injunction request seeks to strip the State of its ability to create and enforce its own policies and seeks to order the State to replace them with policies of the Plaintiffs' choosing.

### 6. Public interest is served if the motion is denied

While Plaintiffs assert it is "always" in the public interest to prevent the violation of constitutional rights, there are limits to this sweeping statement. Indeed, "when a state statute vests state officials with broad discretionary authority concerning [prison operations], the Constitution affords the prisoners no constitutionally protected interests that might outweigh defendants' or the public interests in prison administration."[133]

Louisiana courts have held it is "against the public interest to issue an injunction based solely on plaintiff's disagreement with the health care being provided" by "corrections officials who are presently charged with that obligation."[134] Again, the Supreme Court "has continuously cautioned federal courts from assuming a greater role in decisions affecting prison administration."[135]

### 7. The requested injunctive relief far exceeds the PLRA

---

[132] *Id*. (quotations omitted).

[133] *Patterson v. Daniels*, No. 12-1674, 2010 WL 2100546, at *21 (E.D. La. March 22, 2013).

[134] *Hawkins v. Hawkins*, No. 3:11–cv–1325, 2012 WL 601426, at *9 (W.D. La. Jan. 2, 2012) (where plaintiff inmate complained of denial of prompt and appropriate medical care and requested injunctive relief for same).

[135] *Id*. (collecting cases); see also *Zantiz v. Seal,* No. 12-1580, 2013 WL 357069, at *4 (E.D. La. Jan. 29, 2013) ("To issue an injunction against this facility would limit those best equipped to make decisions about the proper procedures to maintain safety, and would therefore disserve the public interest in maintaining the safety of the prisoners and officers at the facility.").

Under the PLRA, plaintiffs are not entitled to the most effective available remedy; they are entitled to a remedy that eliminates the constitutional injury.[136] In Eighth Amendment cases, plaintiffs can only obtain a remedy that reduces the risk of harm to a socially acceptable level.[137] Some risk is permissible and perhaps unavoidable.[138]

As with the prior preliminary injunction, Plaintiffs seek relief to change DPSC's policies that are not limited to the challenged conditions at LSP or even to LSP itself. Plaintiffs seek an order from the court to change HCP8 – a policy that applies to all DPSC facilities. The Fifth Circuit already held that an order requiring changes to HCP8's Heat Pathology medication list and to develop additional heat related policies violated the PLRA.[139] This is exactly what Plaintiffs are asking the Court to do; change HCP8, a DPSC-wide policy. This requested relief extends to all offenders in DPSC custody, as well as offenders at LSP who are not assigned to the Farm Line or assigned to other outdoor work. The injunction request violates the PLRA.

Further, the injunction request violates the PLRA because it seeks to grant relief to "putative class members" prior to class certification. This contravenes the PLRA's text and this the Fifth Circuit's precedents. See *Ball v. LeBlanc*, 792 F.3d 584, 599 (5th Cir. 2015) ("The PLRA limits relief to the particular plaintiffs before the court."). The fact that this is a "putative class action" does not remove it from the PLRA's limitation on relief to "a particular plaintiff or plaintiffs."[140] Because no class has been certified here, absent putative class members are not "particular ... plaintiffs" in any sense of that term—they are just potential plaintiffs. Requesting relief on their behalf therefore, directly violates the PLRA.

---

[136] See *Westefer v. Neal*, 682 F.3d 679, 683–84 (7th Cir.2012) (vacating an injunction under the PLRA because it exceeded what was required under the Due Process Clause).

[137] *Ball v. LeBlanc*, 792 F.3d 584, 599 (5th Cir. 2015).

[138] *Id.*

[139] R.Doc. 201-4.

[140] 18 U.S.C. § 3626(a)(1)(A).

**8.  Plaintiffs' Request for a court appointed expert must be denied**

Earlier this year, Plaintiffs suggested in a letter to the Court that the Court should appoint an expert. This Court provided a deadline for Plaintiffs to file their motion for a court appointed expert.[141] Plaintiffs then advised the Court that they withdrew their request for a court appointed expert.[142]

Now, Plaintiffs' preliminary injunction motion devotes three sentences to their request to appoint a court expert to monitor WBGT and to consult the court regarding Defendants' policies. Plaintiffs base this request on Dr. Vassallo's new opinions that fail to comply with FRCP 26 and are the subject of a separate motion to strike. Even so, Plaintiffs' counsel proposed using the National Weather Services to monitor heat conditions at LSP.[143] The parties have been monitoring the heat conditions, and reporting to the Court, in accordance with the procedures set forth by Plaintiffs. Now Plaintiffs demand for Defendants to pay for an expert to monitor temperatures using a completely different mechanism, one that will not correlate to the policies in place for heat index. Neither Plaintiffs nor Dr. Vassallo have opined as to what WBGT would necessitate the calling of a heat alert, or when work should cease. The two measurements do not compare and measuring WBGT would not assist the court or the parties, as the policy at issue and the prior procedures agreed to by the parties rely on heat index.

The issues in this case are not so complicated as to require the appointment of an expert witness to assist the Court. *Duncan v. Nunez*, No. 1:17-CV-1623-P, 2020 WL 13721392, at *2 (W.D. La. Jan. 24, 2020); *see also Woodroffe v. Oregon*, 2014 WL 1383400, at *5 (D. Or. April 8, 2014) ("This Rule permits a court to appoint a neutral expert to assist the court to understand

---

[141] R.Doc. 158.
[142] R.Doc. 174.
[143] R.Doc. 64.

complex, technical, or esoteric subject matter."); *In re Joint E. & S. Districts Asbestos Litig.*, 830 F. Supp. 686, 693 (E.D. N.Y. 1993) (noting that court appointment of experts is appropriate only in "rare circumstances" and should be reserved for "exceptional cases" in which the ordinary adversarial process does not suffice, such as complex mass tort problems); *McKinney v. Anderson*, 924 F.2d 1500, 1510-11 (9th Cir. 1991) (noting court's discretion to appoint expert in case involving complex scientific issues concerning effects of secondary cigarette smoke), vacated on other grounds, *Helling v. McKinney*, 502 U.S. 903 (1991). In addition, Plaintiffs' overt focus on the Rules of Evidence appears designed to circumvent the PLRA's specific procedures for special masters, including how they are selected and who pays for them, which independently signals the unlawfulness of their demand. 18 U.S.C. § 3626(f). Plaintiffs' request should be denied.

| | |
|---|---|
| **CERTIFICATE OF SERVICE**<br>    I hereby certify that I have this date electronically filed the foregoing with the Clerk of Court by utilizing the CM/ECF system, and a copy of the above and foregoing was this day forwarded by the Court's ECF Delivery System to all counsel of record.<br><br>    Baton Rouge, Louisiana, this 11th day of April, 2025.<br><br>        s/Andrew Blanchfield<br>        Andrew Blanchfield | Respectfully submitted,<br>**LIZ MURRILL**<br>**Attorney General**<br><br>By:   s/Andrew Blanchfield<br>Andrew Blanchfield, T.A. (#16812)<br>Email: ablanchfield@keoghcox.com<br>Christopher K. Jones (#28101)<br>Email: cjones@keoghcox.com<br>C. Reynolds LeBlanc (#33937)<br>Email: rleblanc@keoghcox.com<br>Chelsea A. Payne (#35952)<br>Email: cpayne@keoghcox.com<br>Special Assistant Attorneys General<br>Post Office Box 1151<br>Baton Rouge, Louisiana 70821<br>Telephone: (225) 383-3796<br>Facsimile: (225) 343-9612 |