Page 1

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| VOICE OF THE EXPERIENCED, A MEMBERSHIP ORGANIZATION ON BEHALF OF ITSELF AND ITS MEMBERS; ET AL | CIVIL ACTION NO.3:23-CV-1304 |
| VS. | JUDGE BRIAN A. JACKSON |
| JAMES LEBLANC, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS; ET AL | MAGISTRATE JUDGE ERIN WILDER-DOOMES |


Testimony of

DR. SUSI U. VASSALLO

taken on Tuesday, September 24, 2024, before

Caroline D. Escude', Certified Court Reporter in

and for the State of Louisiana, via Zoom

Videoconferencing.


COURT REPORTERS OF LOUISIANA, L.L.C.
9522 Brookline Avenue, Suite 217
Baton Rouge, Louisiana 70809
PHONE (225) 201-9650 * FAX (225) 201-9651
E-Mail: depos@courtreportersla.com

Veritext Legal Solutions

```
 1                    I N D E X

 2

 3                                              Page

 4    Caption                                    1

 5    Appearances                                3

 6    Agreement of Counsel                       4

 7    Examination

 8        BY MR. BLANCHFIELD                     5

 9

10    Reporter's Certificate                   142

11                    *  *  *  *  *

12    Exhibits:

13        (None.)

14

15

16

17

18

19

20

21

22

23

24

25
```

SUSI VASSALLO

```
 1   APPEARANCES:  (All via Zoom Videoconferencing)

 2   Representing the Plaintiffs:

 3       THE PROMISE OF JUSTICE INITIATIVE
         1024 Elysian Fields Avenue
 4       New Orleans, Louisiana  70117

 5       BY:  MS. LYDIA A. WRIGHT
              MS. KARA CRUTCHER
 6            MS. SAMANTHA BOSALAVAGE

 7                   and

 8       PAUL WEISS RIFKIND WHARTON & GARRISON, LLP
         1285 Avenue of the Americas
 9       New York, New York 10019

10       BY:  MR. JEREMY A. BENJAMIN
              MS. LEAH WEISER
11
     Representing the Defendants:
12
         LIZ MURRILL, ATTORNEY GENERAL
13       OFFICE OF THE ATTORNEY GENERAL
         P. O. Box 1151
14       Baton Rouge, Louisiana  70821

15       BY:  MR. ANDREW BLANCHFIELD
              Special Assistant Attorney General
16       KEOGH, COX & WILSON, LTD.
         701 Main Street
17       Baton Rouge, Louisiana  70802

18                   and

19       LOUISIANA DEPARTMENT OF PUBLIC
         SAFETY & CORRECTIONS
20       504 Mayflower Street
         Baton Rouge, Louisiana  70802
21
         BY:  MR. JONATHAN R. VINING
22            General Counsel

23   Reported by:

24       Caroline D. Escude', Certified
         Court Reporter No. 91182 in and
25       for the State of Louisiana
```

1                S T I P U L A T I O N

2

3        It is stipulated and agreed by and among

4    Counsel that the deposition of DR. SUSI U.

5    VASSALLO, on Tuesday, September 24, 2024, is hereby

6    being taken under the Federal Rules of Civil

7    Procedure for all purposes as permitted under law.

8        The witness reserves the right to read and

9    sign the deposition.  The original is to be

10   delivered to and retained by Mr. Andrew Blanchfield

11   for proper filing with the Clerk of Court.

12       All objections, except those as to the form of

13   the questions and/or the responsiveness of the

14   answers, are reserved until the time of the trial

15   of this cause.

16

17

18

19

20

21                    * * * * *

22      Caroline D. Escude', Certified Court Reporter

23   in and for the State of Louisiana, officiated in

24   administering the oath to the witness.

25

SUSI VASSALLO

```
 1                    DR. SUSI U. VASSALLO

 2    New York University Grossman School of Medicine,

 3    New York, New York 10016, having been first duly

 4    sworn, was examined and testified as follows:

 5                         EXAMINATION

 6    BY MR. BLANCHFIELD:  (Beginning at 9:00 AM)

 7         Q.    Good morning, Doctor.  How are you doing

 8    today?

 9         A.    Good morning, sir.

10         Q.    Doctor, I'm Drew  Blanchfield.  I'm here

11    to take your deposition today.  I think we met at

12    the cucumber patch back in July.  Good to see you

13    this morning.

14         A.    Likewise.

15         Q.    Doctor, I know you've given a number of

16    depositions, so I don't really need to go through

17    all of the ground rules.  I just ask that if any of

18    my questions are unclear or don't make sense or are

19    confusing or you think I'm confused, just tell me

20    so that I can rephrase the question and we can

21    understand each other, okay?

22         A.    Yes, sir.

23         Q.    I don't expect to be all day here, but we

24    do have some ground to cover so if at any time you

25    want to take a break just let us know and we'll do
```

SUSI VASSALLO

1    that.

2        A.    Okay.  Will you have your video off the

3    whole time, sir?

4        **Q.    Oh, I didn't even know I had it off.  Let**

5    **me see.  There we go (indicating).  Okay.  I have**

6    **reviewed your CV.  Can you tell me -- you know,**

7    **we're in 2024.  What are you doing these days**

8    **professionally?**

9        A.    I'm a professor of emergency medicine --

10   clinical professor of emergency medicine at the New

11   York University Grossman School of Medicine.  I

12   practice emergency medicine in the NYU Tisch

13   Emergency Department.

14           I am also practicing mostly medical

15   toxicology at Bellevue, so I have privileges at

16   Bellevue Hospital and the Tisch Emergency

17   Department.  I'm backing up -- I'm a member of the

18   faculty of the medical toxicology fellowship

19   program, so I take call and back up the follow-ons

20   regularly.

21           Of course -- so that -- basically I'm

22   seeing patients, I'm supervising residents and

23   medical students and practicing clinical toxicology

24   as part of the faculty of the medical toxicology

25   fellowship program.

Page 7

1      Q.     Okay.

2      A.     Additionally, I should just say that I am

3   the -- in terms of professionally, I am the medical

4   monitor for the federal consent decree in New

5   Orleans' jails, also the federal monitor in the

6   Mays Consent Decree in Sacramento.  I'm a subject

7   medical expert for the US Department of Justice in

8   Charleston, South Carolina as well as Riverside

9   County, Los Angeles and Los Angeles County.

10     Q.     Okay.  The last one you mentioned in

11  California, is that active?

12     A.     Well, they want us -- we're just going to

13  meet in November, and the jail is inactive because

14  we're writing, reading and -- that's Riverside

15  County.  The one at Los Angeles Sheriff's

16  Department jails is -- I already wrote my report

17  and they're at a different stage where they haven't

18  contacted me so much right now.  So maybe I would

19  say it's active, but I'm not active with that

20  currently unless they call on me for some reason.

21     Q.     Understood.  And so you are on the staff

22  of two hospitals, Bellevue and Tisch?  Is that

23  T-i-s-c-h?

24     A.     Yes.

25     Q.     Okay.  So you're actively seeing patients

Page 8

 1    in the field of emergency room medicine?

 2        A.    That's right.

 3        Q.    And supervising residents?

 4        A.    Yes.

 5        Q.    All right.  You are -- I see you're board

 6    certified in emergency room medicine; is that

 7    correct?

 8        A.    Correct.

 9        Q.    And that is -- you receive a

10    recertification every 10 years?

11        A.    Correct.

12        Q.    And the last certification was in 2018?

13        A.    Yes.

14        Q.    Will you be recertified in 2028?

15        A.    Yes, I will.

16        Q.    Okay.  Tell me about the medical

17    monitoring in New Orleans.  What is -- what's the

18    status of that?

19        A.    Well, it's an active monitoring position.

20    The federal judge has just asked for a report to

21    the court.  It's very active.  We are -- almost

22    every day in the last three weeks we have been

23    trying to assist them in completing the federal

24    court's -- Judge Africk's orders for them to

25    produce certain things in a certain timeframe, so

SUSI VASSALLO

Page 9

```
 1   it's very active.
 2       Q.     Okay.  Have you visited the parish
 3   prison?
 4       A.     It's a jail.  I'm in the jail regularly.
 5   Every six months for sure.
 6       Q.     Since 2022?
 7       A.     I believe that's correct.  All of last
 8   year was '23.  Yes, correct.
 9       Q.     And we're just -- we're just talking
10   about one jail?
11       A.     The Orleans Parish Jail, yeah, right in
12   downtown New Orleans.
13       Q.     What's the population -- the inmate
14   population there?
15       A.     Couple of thousand.
16       Q.     And that was a result of this litigation
17   with Lashawn Jones?
18       A.     That's correct.
19       Q.     What are the basic allegations in that
20   case?
21       A.     The majority of it has to do with mental
22   healthcare and inadequate mental healthcare and
23   there's a number of aspects of the consent decree
24   that have to do also with withdrawal, the care of
25   detoxification, which I'm responsible for, as well
```

1    as the whole seventh section, C7, is all medical

2    care, so inadequate medical care and inadequate

3    mental healthcare.

4        **Q.    In your role as a monitor were you**

5    **selected by parties or by Judge Africk?**

6        A.    Well, the head monitor, Sheriff Margo

7    Frasier, asked me to join the group and Judge

8    Africk approved it.

9        **Q.    And how many are in the group?**

10       A.    Well, there's myself, there's the

11   forensic psychiatrist, there's the sanitation

12   person, there's the custody person and Margo.

13   Approximately five.

14       **Q.    Okay.  And you-all are in the process of**

15   **preparing a report for the court?**

16       A.    Well, it's been prepared for this session

17   and now we're going to be returning there in

18   December.  I think it's December 15th.  And so

19   every six months we try to get that report out

20   within a month or two and then we go back.  In the

21   meantime we're looking at the things that are going

22   on as they go in between the -- our visits.

23       **Q.    Okay.  And then tell me about the Mays**

24   **Consent Decree.  What are you doing with respect to**

25   **that?**

1      A.    It's a -- it's a consent decree that's

2    heavily weighted on medical care.  I spent last

3    week in Sacramento with the two other experts.  We

4    spend a lot of time in the jail.  We look at each

5    aspect of the consent decree and review it and have

6    meetings with all of the staff members of adult

7    correctional health and all of the security

8    personnel.

9      **Q.    How long has that been going on?**

10     A.    Well, I can tell you that I joined it --

11   that was only my second visit.  This one that I

12   just finished last week -- I think the decree has

13   been since approximately -- a total of maybe four

14   years, maybe three years.

15     **Q.    Okay.  And then you mentioned Riverside**

16   **County.  What are you involved in there?**

17     A.    At this time it's been record review and,

18   of course, their upcoming meeting there, or site

19   visit I should call it, is in November.  And then

20   we will go from there with reviewing the medical

21   care at the jail there.

22     **Q.    Okay.  On your CV one of the appointments**

23   **you list from 2016 to 2018 is for the Department of**

24   **Homeland Security Civil Rights and Civil Liberties**

25   **medical expert.  What did you do for the Department**

Page 12

1   of Homeland Security?

2       A.    I was a medical subject matter expert.

3   We went to site visits and we wrote reports.  I

4   wrote reports based on the quality of the medical

5   care based on the practice-based national standards

6   so that the Homeland Security could know something

7   about the medical care and write reports -- I guess

8   they wrote reports; I didn't see their final

9   reports on any site -- regarding the quality and

10  the problems associated with the medical care.

11      Q.    What specific sites did you evaluate?

12      A.    Well, I remember a couple of them real

13  clearly.  One was in Key West, I think it's the

14  county, and then went up to Krome, K-r-o-m-e,

15  that's in Miami.

16            Also, there was one in California, one in

17  Arizona.  I don't remember all of those -- the

18  names of those facilities, but my memory is there

19  were approximately seven facilities.

20      Q.    Okay.  And did you visit all seven

21  facilities or was it just records review?

22      A.    Those were the seven facilities that I

23  visited.  So if I -- I think it's seven.  It could

24  be six.  I don't have a memory of that, but we

25  visited those facilities.

1    Q.    Okay.  Are you compensated -- were you

2    compensated by the hour with Homeland Security?

3    A.    Yes.

4    Q.    And the multiple medical monitoring cases

5    that you mentioned, compensated by the hour in

6    those as well?

7    A.    Yes.

8    Q.    Now, other than those things we just

9    mentioned, are you involved in any active

10   litigation right now besides this case?

11   A.    No.  Florida has asked me to look at the

12   heat conditions in Florida.  I don't think I've

13   signed a contract.  I don't know, but Florida --

14   there's a justice initiative in Florida that I'm

15   going to be involved in or they're waiting to hear

16   more from me.

17         And then, of course, I was just in

18   federal court here in Austin, Texas providing the

19   temperature in the prisons of Texas.  I don't know

20   that that's going to have any more further activity

21   for me.

22   Q.    Okay.  To your knowledge, is the Florida

23   case similar to this VOTE case?

24   A.    To my knowledge, it is similar only in

25   that it has to do with the temperatures and I -- my

1    understanding; I haven't read -- is that it's

2    inside the prisons, not on -- but I don't know for

3    sure if it's going to have to do with outside the

4    prisons such as farming or anything like that.

5        Q.    Okay.  Do you know if they farm in

6    Florida prisons?

7        A.    I don't.  I don't know.

8        Q.    Okay.  Do you know if this Florida case

9    involves more than one facility or just one?

10        A.    I don't really know anything about the

11    Florida case at this time.

12        Q.    Okay.  Tell me about the case in Austin,

13    Texas.  What's the status of that?

14        A.    Well, the trial was completed.  I

15    testified in August and there was approximately a

16    full week trial.  And other than that I don't know

17    that the federal judge has rendered his opinion at

18    this time.  I haven't heard that he has.

19        Q.    Okay.  And you testified as an expert in

20    that case?

21        A.    Yes.

22        Q.    And in what field were you tendered?

23        A.    Thermoregulation.  And emergency --

24    excuse me, and emergency medicine, I think, and

25    toxicology, those three.

1      Q.    So that thermoregulation, emergency room

2   medicine and toxicology, that's your understanding

3   of the fields in which you were tendered in the

4   Austin case?

5      A.    Yes.

6      Q.    Is -- is thermoregulation a field like

7   toxicology?

8      A.    Well, thermoregulation is -- medical

9   toxicology and emergency medicine are recognized

10  specialties by the American Board of Medical

11  Specialties and thermoregulation is not recognized

12  by the American Board of Medical Specialties.

13     Q.    There's no board certification in

14  thermoregulation, correct?

15     A.    Correct.

16     Q.    But despite that you were tendered as an

17  expert in thermoregulation to the best of your

18  recollection?

19     A.    I'm not sure that -- exactly how the

20  lawyers -- how the attorneys worded that in front

21  of the federal judge.

22     Q.    Okay.  A number of -- in many specialties

23  would you agree that you are exposed to the issue

24  of thermoregulation?

25     A.    Well, there are some specialties -- I

Page 16

1    mean, basically I'm not quite sure what you're

2    asking.

3        Q.    Well, an internal medicine specialist

4    wouldn't necessarily receive training in the field

5    of thermoregulation as they go through medical

6    school and residencies and things like that?

7        A.    So an internal medicine resident should

8    receive information and training about the ability

9    of the body to thermoregulate, yes.

10        Q.    The same is true for, like, a

11    psychiatrist?

12        A.    I think medical school should train

13    something about the -- how the body cools and that

14    would be a physio -- a part of physiology.

15        Q.    Are you currently writing any articles

16    relating to thermoregulation?

17        A.    Well, in one sense, yes, in that I have

18    been writing, but it's -- nothing is published and

19    nothing is completed.  I have a few ideas and the

20    answer, I think, would be no because I haven't yet

21    started to -- I don't have anything that I could

22    hand you, for example, or -- so I guess I'm not

23    really sure, so I guess the answer is no.

24        Q.    Okay.  Is there some idea about working

25    towards publishing an article that relates to

1    thermoregulation?

2         A.    Yes.

3         Q.    **And do you know what that specific topic**

4    **would be in that -- in thermoregulation?**

5         A.    It would be the effective heat on

6    prisoners in unair-conditioned spaces?

7         Q.    **Inside?  Would it be limited to inside?**

8         A.    Well, I don't actually have any limits on

9    the article yet.  I haven't thought about it in

10   terms of outside and inside.

11        Q.    **Okay.  What about books or chapters in**

12   **books, are you currently involved in working on any**

13   **of those?**

14        A.    No.

15        Q.    **How much time do you spend teaching in**

16   **the classroom?**

17        A.    Well, our job as clinical professor is

18   not a classroom job.  So, I mean, for example, on

19   Wednesday I'll go to Wednesday morning -- every --

20   actually, every morning at 8:15 is a morning report

21   that's done by Zoom where the fourth-year resident

22   presents a couple of us, myself and one other

23   person, and sometimes one other or all of us are on

24   that Zoom or almost always on that Zoom.  I'm not

25   on it this morning.

Page 18

1          And we listen to the case and we counsel

2     and teach.  So, in a sense, the class -- that would

3     be a classroom setting because there's no patient

4     present.  We have weekly didactics on Wednesdays.

5     Also, that can be either in person or by Zoom.  And

6     other than that I'm not in a classroom.

7          Q.     Okay.  And are these Zooms related to

8     emergency room medicine as opposed to toxicology?

9          A.     It can be anything that the patient -- I

10    mean anything that the fourth-year resident chooses

11    to present about, any -- any topic.

12         Q.     Are there any other professors present?

13         A.     Yes.

14         Q.     Who else is present for those Zooms?

15         A.     Dr. Neal Lewin.  Actually, it's called

16    Lewin Morning Report because it's been going on for

17    a long time and he is the most consistent in

18    driving that through COVID and drives that --

19    matter of fact, he wasn't on today.  He asked me to

20    cover for him, but I didn't because of this, what

21    we're doing right now.

22         Q.     Okay.  What is his specialty?

23         A.     He was trained in internal medicine.  He

24    is triple boarded, I believe, internal medicine,

25    emergency medicine and medical toxicology.

Page 19

1       Q.      You don't have a degree in pharmacology?

2       A.      No, mine is medical toxicology.

3       Q.      Okay.  And you're not a psychiatrist or a

4   psychologist, correct?

5       A.      Correct.

6       Q.      I want to briefly discuss some of the

7   cases that you've been involved in here in

8   Louisiana.  What was the first case that you were

9   involved in?

10      A.      Well, you know, it's funny because I

11  certainly went to -- I mean, I went to the Lewis

12  case, but it had a previous name.  I don't remember

13  the previous name of the Lewis case.  And then

14  there was the case of the adolescents on the old

15  death row that was very recent, maybe last summer,

16  and, similar to those, the heat on -- in death row

17  at Louisiana State Penitentiary.

18              There was the medical care as a whole for

19  Louisiana State Penitentiary and most recently

20  there was the presence of juveniles on the old

21  death row.  Those are the three cases in Louisiana

22  that I'm remembering.

23      Q.      Okay.  Is the heat on death row, is that

24  the oldest case?

25      A.      In Louisiana, yes, I believe so.

Page 20

1        Q.      Yeah.  That's the Ball case?

2        A.      Correct.

3        Q.      Yeah.  And so what was your role in the

4    Ball case?

5        Q.      My role was to look at the conditions on

6    death row, the temperatures, and to opine on the

7    effect of the heat in death row or on death row on

8    the prisoner who was held there.

9        Q.      Okay.  Was your opinion limited to the

10   three plaintiffs in the Ball case?

11       A.      Well, this was a case of the three

12   plaintiffs, yes.

13       Q.      And did you visit death row?

14       A.      I did.

15       Q.      How many times?

16       A.      I don't remember.

17       Q.      Do you remember about what year that was?

18       A.      No.  I think -- I think I just read the

19   Fifth Circuit report on that case in the last week.

20   I swear it might have been rendered in 2015, the

21   opinion on that case.

22       Q.      I believe you're right.  Looks like July

23   of 2015.

24       A.      That's right.

25       Q.      And what -- what was the occasion for you

Page 21

 1    to visit -- revisiting that opinion?

 2        A.    In preparation for this deposition.

 3        Q.    Okay.  Did you testify in Ball?

 4        A.    Yes.

 5        Q.    And that was in front of Judge Brian

 6    Jackson?

 7        A.    Yes.

 8        Q.    And can you give me just a general

 9    description of what your testimony was in that

10    case?

11        A.    Yes.  It was the effect of heat on the

12    physiology of a human being and the -- that was a

13    general description of it.

14        Q.    The three plaintiffs at issue in Ball, is

15    it true that they were described as being extremely

16    vulnerable to serious heat-related injuries?

17        A.    I don't remember the wording of the

18    complaint.

19        Q.    Okay.  Do you remember that these three

20    plaintiffs were medically compromised?

21        A.    I don't remember exactly the details of

22    the three plaintiffs.

23        Q.    Do you remember them as being unhealthy

24    for lack of a better word?

25        A.    I don't remember their conditions at this

Page 22

1    time.

2        Q.    Do you know if any of them are still

3    alive?

4        A.    I don't.

5        Q.    Do you remember the -- well, the opinion

6    from the Fifth Circuit, do you remember if it was

7    based in part on the fact that each of the inmates

8    were described as suffering from conditions that

9    rendered them extremely vulnerable to serious

10   heat-related injuries?

11       A.    I'm not able to really tell you the

12   wording of the Fifth Circuit's opinion at this time

13   without having that report in front of me.

14       Q.    Now, in the Lewis case, which related to

15   medical care at LSP, did you visit LSP in that

16   case?

17       A.    Yes.

18       Q.    Let me -- let me backtrack.  In the Ball

19   case did you visit anywhere besides death row at

20   LSP?

21       A.    I don't remember my visiting.  I do know

22   I visited death row.

23       Q.    What about Lewis, you visited LSP in

24   Lewis?

25       A.    Yes.

 1      Q.      More than once?

 2      A.      Yes.

 3      Q.      How many times?

 4      A.      I'm not sure.  I think maybe three times,

 5   but it could be two.  I don't remember now.

 6      Q.      Okay.  Do you know what areas of LSP you

 7   looked at when you visited?

 8      A.      No.  I was responsible for looking

 9   particularly at the emergency care, so I certainly

10   looked at the assessment and treatment unit.  I

11   have certainly been in that unit twice.  And I did

12   look at other areas, but I can't tell you we, you

13   know, toured the prison I should say.  And I went

14   to other camps.  Which ones, I don't remember.

15      Q.      Okay.  When's the last time you did any

16   work on the Lewis case?

17      A.      I would say it was at trial in the Lewis

18   case in front of Judge Dick.

19      Q.      And when is the last time you visited LSP

20   in the Lewis case?

21      A.      I don't remember the year.

22      Q.      Would it have been prior to 2020?

23      A.      I don't remember.  Because I was just out

24   there at the old death row, it's -- looking at the

25   juveniles in that case with Mr. Archey and so

09/24/2024

Page 24

1    forth, I -- the number of times I've been into the

2    other main prison and into just the old death row,

3    those -- and the number of years that have passed,

4    I'm not sure.

5        Q.    Okay.  Do you know what year you issued

6    your report in Lewis?

7        A.    No.

8        Q.    Do you know what timeframe was covered in

9    your report in Lewis?

10       A.    I did not review my Lewis report or other

11   -- the Lewis report in preparation for this

12   deposition, so I would have to refer back, which I

13   have not done.

14       Q.    Okay.  So tell me about the juvenile case

15   with Mr. Archey.  When were you at LSP for that?

16       A.    Either this past summer, but I think it

17   seems like it was probably the summer before this

18   past summer.

19       Q.    The summer of 2022?

20       A.    I believe so, but -- yes.

21       Q.    Do you know the status of the Lewis case?

22       A.    No.  I -- excuse me for taking that back.

23   I know that Judge Dick said that the -- some of the

24   medical conditions were unconstitutional and that's

25   the last thing I either read or heard.

1      Q.    Okay.  You're not aware of any appeals

2    taken in that case?

3      A.    I'm not watching the case anymore at this

4    time.

5      Q.    Okay.  All right.  The juvenile case, you

6    were -- to the best of your recollection, you were

7    out there in the summer of 2022?

8      A.    Yes.

9      Q.    And you -- I assume you went in the area

10   where they were holding the juveniles?

11     A.    Yes.

12     Q.    When you visited were the juveniles

13   actually there?

14     A.    Yes.

15     Q.    And what did you do in your inspection in

16   the summer of 2022?

17     A.    Primarily visit, and I don't remember if

18   we were allowed to speak with the juveniles or if

19   we just had -- we visited, we looked around at the

20   facility and -- actually, I think I did speak with

21   the juveniles.

22     Q.    Did you prepare a report in that case?

23     A.    Yes.

24     Q.    And can you give me a general description

25   of your opinions and findings in that report?

SUSI VASSALLO

1          A.    The findings were that of -- concerning

2    regarding the temperatures in the unair-conditioned

3    death row or if the air conditioners that -- they

4    had put in portable air conditioners shortly before

5    my visit.  And so, once again, it was the same, the

6    effect of heat on the human physiology and the

7    risks associated with that.

8          **Q.    Did you -- in the Ball case did you**

9    **testify that the risk of heat injury significantly**

10   **increases when you reach a heat index of 88 degrees**

11   **Fahrenheit?**

12         A.    I don't remember.

13         **Q.    Do you -- have you ever testified to**

14   **that?**

15         A.    Yes.

16         **Q.    Did you testify to that in the juvenile**

17   **case?**

18         A.    I don't remember my testimony there, but

19   that is the number, that the heat index at 88

20   degrees Fahrenheit is the number that I have

21   testified to, written reports about.  Whether or

22   not I wrote that in the report or testified in

23   court, I don't remember.

24         **Q.    Okay.**

25         A.    But that's been a consistent number for

Page 27

1   some time anyway.

2        Q.    Do you know if you have ever testified to

3   that before the Ball case?

4        A.    I don't remember -- I'm not sure what you

5   mean.  Testified to 88 degrees Fahrenheit heat

6   index?

7        Q.    Yes.

8        A.    I don't remember.

9        Q.    Do you know -- is that your number?  Did

10  you come up with that or did someone else come up

11  with it?

12       A.    That's -- the scientific literature is --

13  has many scientific articles that -- that show that

14  that number is the number at which the rate of

15  heat-related illnesses increase.  There's a large

16  literature on that.

17       Q.    Is that number supported by the National

18  Weather Service Data?

19       A.    Well, the National Weather Service Data

20  has several categories of risk and so that is in a

21  category of risks.  So the National Weather Service

22  chart with several -- four different colors does

23  have 88 as a caution zone.  And every time, of

24  course, I use 88 -- if I say degrees, I mean heat

25  index.

Page 28

```
 1      Q.    Right.  Yeah.  We'll have that
 2  understanding unless you say otherwise.
 3      A.    Okay.
 4      Q.    Is there any way for you to estimate for
 5  me the percentage of time you spend as an
 6  academician versus your work relating to litigation
 7  and investigations?
 8      A.    Well, my job is a -- my job is a
 9  clinician at NYU School of Medicine.  That's my
10  job.  This has been a particularly busy period in
11  the last few months.  There's been a confluence of
12  cases as you just heard.  I would say that my job
13  is 75 percent of my time.
14      Q.    And in matters of litigation have you
15  ever been retained by a department of corrections
16  or a jail facility or a correctional institution?
17      A.    Yes.
18      Q.    Tell me what cases.
19      A.    The -- they were in New York City, Rikers
20  Island cases, and I would have to refer back to my
21  CV or -- to know the name of those cases.  They
22  were primarily cases that had to do with the use of
23  force and I was testifying on the part of the
24  department of corrections and -- concerning the use
25  of force and that's what I did.
```

1      Q.     Okay.  And what field were you tendered

2  as an expert in that case?

3      A.     Emergency medicine.

4      Q.     And what -- tell me, how was your

5  testimony relevant to the use-of-force issues?

6      A.     Upon reviewing all of the information I

7  was provided in the case I looked at that

8  information and opined as to whether or not the use

9  of force that is alleged would have resulted or

10  could result or did result in the injuries as they

11  were -- as they were described.

12      Q.     How long ago was that case?

13      A.     I think it was about -- well, it was more

14  than just one case and it was about -- it's already

15  2023.  I don't really remember.

16      Q.     Okay.  Did you visit Rikers in

17  conjunction with your work on those cases?

18      A.     Yes, I've been at Rikers a few times

19  because I was also the medical expert on the

20  conditions of confinement at Rikers.  That was a

21  position that the department of corrections and the

22  plaintiffs agreed that I would be a -- the medical

23  expert.  That was an agreed-upon position.  I

24  forget the names of the departments, but basically

25  both sides had to agree that I would be the medical

Page 30

1    expert regarding the conditions there.

2        Q.    **Did you issue a report on the conditions**

3    **of confinement at Rikers?**

4        A.    I did.

5        Q.    **And --**

6        A.    And in court as well.

7        Q.    **You testified?**

8        A.    I did.

9        Q.    **Okay.  What was your testimony?  Was it**

10    **favorable to Rikers or unfavorable?**

11        A.    I think there was a little bit of both.

12    I certainly expressed concern about the

13    temperatures in the cells as the -- approximated

14    the outdoor temperatures in New York City in the

15    unair-conditioned areas.

16        Q.    **Okay.  Do you know when was the first**

17    **time you testified in a case that involved issues**

18    **of heat either inside or outside at prisons?**

19        A.    I believe that started with Rikers and I

20    don't remember the year for that.

21        Q.    **Have you been contacted --**

22        A.    Excuse me -- excuse me, Mr. Blanchfield.

23    I don't think that's totally correct, because the

24    first time I was ever contacted was in the Gates

25    case in Mississippi, the conditions on death row in

Page 31

1    Mississippi State Penitentiary known as Parchman.

2    That was the first time I ever worked on anything

3    in the area of thermoregulation.  So that would

4    have been the first time.  It was a condition of

5    confinement case and I went to Parchman's death

6    row.

7        **Q.    And that was some time ago, the Gates**

8    **case, I believe, huh?**

9        A.    Yes.

10       **Q.    Have you -- in the last five years or so**

11   **have you been contacted by any Louisiana attorneys**

12   **to assist them in litigation and declined?**

13       A.    Mr. Archey's law group, law firm, through

14   his assistant or secretary there asked me to

15   participate for him.  He was not specific about

16   what case or what the facts were of the case.  He

17   just said -- he just asked me to join them as an

18   expert.

19       **Q.    When was that?**

20       A.    After the last time he and I were both in

21   Judge -- in front of Judge Dick in the Lewis case.

22       **Q.    And you declined?**

23       A.    Yes.  I -- it was an e-mail from someone

24   in his office.  I never -- he never asked me

25   directly except in a joking manner.

Page 32

1    Q.    Okay.  Was there a reason that you

2    declined?

3    A.    Yes.

4    Q.    What was that?

5    A.    Well, first of all, I didn't know what I

6    was being asked to do.  He wasn't specific.  He

7    just said come on over to our side kind of e-mail

8    and I didn't really know what that meant.  There

9    were no specifics.

10    Q.    Okay.  Any other Louisiana lawyers that

11    have contacted you in the last five years to help

12    them out with a case?

13    A.    No.  Not that I remember, no.  I think he

14    was the one that had contacted me to help him out.

15    Q.    Okay.  Are you currently consulting with

16    anyone else we haven't talked about?

17    A.    No.

18    Q.    So are you employed by --

19    A.    I take that back.  I have not consulted

20    or spoken with anybody but California -- I

21    understand that there might be the possibility that

22    I will speak with somebody in the California system

23    about the temperature in unair-conditioned -- so

24    the answer is no because I haven't done it, but I

25    did say I would be willing to talk with them and

Page 33

 1    that's -- there's no appointment or anything.  I

 2    don't know what their -- anything about that except

 3    that they said, Will you discuss it, and I said,

 4    Yes, I'll discuss it.

 5         Q.    Okay.  Are you planning on coming to

 6    Louisiana in October?

 7         A.    Yes.

 8         Q.    You will be at the October 3rd inspection

 9    at LSP?

10         A.    Not October 3rd.  I'm working clinically

11    October the 3rd.

12         Q.    Okay.  When are you planning to come to

13    Louisiana?

14         A.    I've been asked to come to trial -- to

15    the trial, to testify in court at trial.

16         Q.    Okay.  And I believe that's November

17    18th.  Is that what --

18         A.    If that's the date, then that's the date.

19         Q.    Okay.  So that's the next time you're

20    scheduled to come to Louisiana?

21         A.    Yes, sir.

22         Q.    Okay.  So are you -- are you employed by

23    NYU?

24         A.    Yes.

25         Q.    You're a W-2 employee?

Page 34

```
 1        A.    Yes.
 2        Q.    Are you employed by any other entities?
 3        A.    No.
 4        Q.    And the litigation work and the work for
 5   the government, you do that individually or do you
 6   have an LLC or how does that work?
 7        A.    It's individual.  I don't have an LLC or
 8   any of those things that a person can have.
 9        Q.    Okay.  Have you ever been involved in
10   litigation as a party, as a plaintiff or a
11   defendant?
12        A.    No.
13        Q.    You have never been sued?
14        A.    Wait a minute.  There's one -- I was told
15   in front of Judge Shelly Dick that somebody had
16   done one of those things where they bring a case
17   themselves.  What's that, pro se?  Is that the
18   word?
19        Q.    Yes, it is.
20        A.    I had never heard of it and I turned to
21   Judge Dick and said, I hate to come to the
22   Louisiana -- it was discontinued or wasn't ever --
23   it didn't go anywhere, but Mr. Archey told me that
24   in the courtroom.  I had never heard of it.  The
25   Bellevue or any of the -- any of the risk
```

1  management people had never informed me of anything

2  like that, but he told me that in the courtroom.

3  And then apparently it was completely discontinued,

4  never -- nothing happened in it.

5      Q.   Okay.  But at some point you were named

6  as a defendant in a case?

7      A.   Yes.  I mean, when I -- when Mr. Archey

8  told me something, I don't know if that's called

9  named as a defendant, but that's all I know.  Mr.

10  Archey told me and I said, I never heard of it.

11     Q.   Okay.

12     A.   That's it.  That's when I heard of it.

13     Q.   All right.  You've never been sued for

14  medical malpractice?

15     A.   I was discontinued from one case.

16     Q.   When was that?

17     A.   Many years ago.  The gentleman bit a

18  piece of hard bread and his tooth broke and he was

19  suing the oral surgeons because he signed a consent

20  to have a bridge placed and he didn't want his

21  bridge placed.  That really had nothing to do with

22  me in the emergency department and I don't know

23  what ever happened to that.  I knew that I didn't

24  have anything to do with oral surgeons and a bridge

25  and all the care for his broken tooth.

SUSI VASSALLO

Page 36

1      Q.    Okay.  No other medical malpractice

2   cases?

3      A.    No.

4      Q.    Have you been involved in any other cases

5   besides medical malpractice cases as a party?

6      A.    No.

7      Q.    Are you currently familiar with the

8   conditions of confinement on death row at LSP?

9      A.    I have not been on death row at LSP since

10  we were -- years ago in the case where -- that I

11  testified in.  I have not been back there, so the

12  answer would be no.

13     Q.    Okay.  Are you aware of changes that have

14  occurred on death row in the last eight to 10

15  years?

16     A.    I'm not aware of the conditions since I

17  last testified in that case, so no.

18     Q.    Okay.  Let's talk about what you have

19  reviewed in this case.  Let's start with what you

20  have done to prepare for today, say, in the last

21  couple of weeks.  What have you done?

22     A.    Well, my preparation for this case really

23  started on Friday when I returned from Sacramento.

24  And so I was reviewing the materials that it says

25  that I reviewed.  You know, I have here my three

Page 37

1    reports.

2       Q.    Right.

3       A.    Would you like me to look at what I

4    reviewed?  But basically that's what I reviewed.

5       Q.    Yeah.  Let's see.  I have them as well.

6    I think it was the third one that you listed

7    materials that you reviewed?

8       A.    It appears to me that -- okay, I have

9    that one.  I have it.  I'm just getting one, two

10   and three (indicating).

11      Q.    Let's -- before we -- before we get into

12   that, Doctor, I'm just noticing that on the back of

13   your CV there's testimony from 2018 to 2023.  I

14   want to be sure that I'm familiar with these cases.

15   The first case, Jeffrey Krueger, what was -- well,

16   what is the status of that case?

17      A.    That is finished.  I don't know the

18   outcome, but I -- I -- I mean, that's over.

19      Q.    Okay.

20      A.    For me it's over.

21      Q.    What did you do in that case?

22      A.    I don't remember if that was -- exactly

23   what that case was about at this time.  I want to

24   say it was about hypo -- low -- temperatures, but

25   I'm not sure anymore.

1     Q.     Okay.  And it says that you gave a

2  deposition in July of 2018?

3     A.     I was deposed, yes.

4     Q.     And did you have any further involvement

5  after July of 2018 in that case?

6     A.     No.  I was never in the courtroom on that

7  case, but I was -- I remember being -- I think it

8  was a deposition, yes.

9     Q.     Okay.  And then the next case is Lewis V

10  Cain, which we've already talked about, and then

11  Swayzer versus Clarke in the Eastern District of

12  Wisconsin, deposition testimony in February of '19.

13  What was that case about?

14     A.     I don't remember.

15     Q.     Would you have a copy of your deposition

16  testimony from that case?

17     A.     No.  I usually don't get copies of the

18  deposition testimony.  Recently I had, but not in

19  that case.

20     Q.     Okay.  Do you think that it related to

21  heat?

22     A.     I don't remember.

23     Q.     Okay.  All right.  Let's talk about items

24  that you have reviewed in this case.  You created a

25  list of those items?

1      A.     Yes.

2      **Q.     And I don't have it in front of me.  I**

3  **apologize.  Let me quick pull it up.  Give me one**

4  **second.  Okay.  Is it an exhibit to one of your**

5  **declarations?**

6      A.     What I'm looking at right now is it says

7  Declaration of Dr. Susi Vassallo in Support of

8  Plaintiff's Motion for a Preliminary Injunction and

9  Temporary Restraining Order, and I'm looking at

10  page five of that report.

11      **Q.     Perfect.  Thank you.  Okay.  Okay.  It's**

12  **under paragraph 11, page five, and it's A through**

13  **F.  Those are -- those are the documents that you**

14  **have reviewed prior to what I'm going to call your**

15  **initial declaration?**

16      A.     Those are the documents I reviewed prior

17  to this declaration.

18      **Q.     Okay.  Now, since that declaration have**

19  **you reviewed any additional documents?**

20      A.     Yes.

21      **Q.     Okay.  Tell me about that.  What**

22  **documents?**

23      A.     Well, I have reviewed, for example,

24  documents I was sent regarding the California and

25  Iowa Department of Corrections heat medication

Page 40

1    list.  I have reviewed e-mails from Dr. Lavespere.

2    I have reviewed self-declared emergencies.  I have

3    reviewed temperature data -- well, that's already

4    listed under Number 13, temperature and heat index

5    logs, so if you see on 11 A through F and then 13,

6    so let's see here.

7         Q.    Well, 13 says, I have not been able to

8    obtain.

9         A.    Right.  Now, this will serve as a

10   reminder of some of the things that I have --

11        Q.    Okay.

12        A.    -- have reviewed, so that will be

13   helpful.

14        Q.    So you have now had the chance to review

15   temperature data?

16        A.    Yes.

17        Q.    And is that the data that the parties

18   submit to the court on a weekly basis?

19        A.    I don't know if it's submitted to the

20   court on a weekly basis.

21        Q.    But it was provided to you by the

22   plaintiffs' attorneys in this case?

23        A.    Everything that I have reviewed was

24   provided to me by the plaintiffs' attorneys.

25        Q.    Okay.  All right.  What else besides --

Page 41

1    you listed four things.  What else have you

2    reviewed since the initial declaration?

3        A.    Medical records for the named plaintiffs.

4    I'm being reminded by 13 D, like dog, there that we

5    have, of course, been to the site and looked at the

6    operations in the farm line.  Declarations, I don't

7    think -- I'm looking here to see if declarations

8    were done before listed on A -- 11 A through F and

9    it's not.  The deposition testimony of Orlando

10   Scott.  I've reviewed the deposition testimony of

11   Dr. Toce, the deposition testimony of Dr. Barnes,

12   the doctor of pharmacy, and the deposition

13   testimony of Dr. Lavespere.

14       Q.    So, with respect to Dr. Barnes, your

15   understanding is that she is a doctor in

16   pharmacology?

17       A.    She has a doctorate of pharmacy.  Not

18   pharmacology, pharmacy.

19       Q.    Pharmacy.  She has not been deposed.

20   Would you be referring to her report perhaps?

21       A.    Yes, I am.

22       Q.    Okay.  I think she's scheduled to be

23   deposed but not -- not yet.

24       A.    You're correct.

25       Q.    Okay.

Page 42

1      A.     I mean, it's her report, correct.

2      Q.     **All right.  So, essentially, three**

3  **depositions, Orlando Scott, Dr. Toce and Dr.**

4  **Lavespere, correct?**

5      A.     Yes.

6      Q.     **Any other depositions?**

7      A.     I don't believe so, no, because Dr.

8  Barnes, as you said, is a report.

9      Q.     **Okay.  You mentioned declarations and I**

10  **think there are both declarations and supplemental**

11  **declarations by the eight named plaintiffs.  Is**

12  **that what you're referring to?**

13      A.     Yes.

14      Q.     **Okay.  Have you reviewed any other**

15  **declarations besides those?**

16      A.     Not to my memory.

17      Q.     **Okay.  Have you reviewed anything else?**

18      A.     Well, I hate to go from memory, but there

19  are definitely e-mails and, I mean, I can go to the

20  room and look at what I have printed out, some of

21  those things.  There's e-mails from the pharmacist.

22  There's conversations about -- through e-mail --

23  regarding the heat pathology and the medications.

24  There's -- there -- I think -- I think if you tell

25  me I've -- like you've corrected me with reviewing

SUSI VASSALLO

Page 43

1    Dr. Barnes and it wasn't a deposition, it was a

2    report.  So if you want to spur my memory, please

3    do so.

4         Q.    Okay.  What about any kind of pleadings

5    filed in this matter, have you reviewed any of

6    that?

7         A.    I have not.  Pleadings, you mean

8    pleadings like things that the defendants and

9    plaintiffs put in front of the court, pleadings?

10        Q.    Yeah, like the complaint, the answer.

11        A.    No, I haven't been following that.

12        Q.    Okay.  And is it accurate to assume that

13   the items that you receive for review were selected

14   by the plaintiffs' attorneys?

15        A.    Yes.

16        Q.    Have you at any time told them, Hey, I

17   need to review this or some other item?

18        A.    No.  I mean, I haven't said to them, I

19   need more information about this, that or the

20   other.  So, you know, I've reviewed what they sent

21   me, that's correct.

22        Q.    Okay.  Are you active in the state of

23   Texas at all?  I see you have a license, medical

24   license in Texas.

25        A.    Yes.  And I have a DEA number.  I'm not

1  practicing medicine here currently.  I have always

2  over the last years, but it's been -- I always have

3  kept my Texas medical license.  Intermittently over

4  the time I was in New York being a faculty member I

5  would work here, but it's been many years since

6  I've worked here in -- I'm in my home in Austin,

7  Texas, my home town.

8      Q.    Oh, so you're in Austin right now?

9      A.    I am.

10     Q.    How much time do you spend in Austin?

11     A.    Not enough, because I'm still a Texas --

12 a New York resident.  I have to pay New York state

13 taxes, so not enough.

14     Q.    Okay.  And you are there in your office?

15     A.    You could call it that.

16     Q.    Okay.  Is anyone there with you?

17     A.    No, but Falcon, my old, blind, deaf dog

18 is down here sleeping.

19     Q.    Okay.

20     A.    Nobody is here.

21     Q.    And I apologize if I already asked you

22 about this, but your work for the US Department of

23 Justice in Charleston, is that still active?

24     A.    It is.  That's, yes, very active.

25     Q.    And what exactly are you doing in that

Page 45

1    case?

2        A.    I'm looking at the medical care provided

3    and writing a report which is -- I'm in the middle

4    of that report regarding the medical care in the Al

5    Cannon Detention Center in Charleston, South

6    Carolina.

7        Q.    **Have you made any findings?**

8        A.    Well, yes, but I have not yet issued even

9    an executive summary to them.

10        Q.    **What's the time table on that if you have**

11    **one?**

12        A.    Well, maybe September the 30th.  I'm

13    praying I can make that.

14        Q.    **Okay.  I feel your pain.  All right.  In**

15    **your report at page four, paragraph eight, you say,**

16    **I was retained by plaintiffs' counsel to provide**

17    **expert opinions on the impact of prolonged exposure**

18    **to heat on the incarcerated men who perform**

19    **compulsory agricultural labor on Angola's <u>farm</u>**

20    **line.**

21        A.    Sir, could you tell me one more time

22    where you're reading from, page --

23        Q.    **Yeah.  I'm at page four, the top of page**

24    **four, paragraph number eight.**

25        A.    Got it.

1    Q.    And I just read that first sentence to

2    you.

3    A.    Yes.

4    Q.    Is there any way you are able to quantify

5    the term prolonged exposure for me?

6    A.    Yes.  In this case the majority of those

7    men are not held in air-conditioning when they are

8    not in the field and so, therefore, they are

9    exposed to heat while they are indoors and then

10    again when they get outdoors, so that would be

11    prolonged.

12    Q.    Okay.

13    A.    I'm not aware of any of those men who are

14    held in what Dr. Toce said were approximately 400

15    of air-conditioned beds.  So prolonged would be

16    pretty much in the summer months, which is kind of

17    May to September, October in this litigation.  They

18    are always in the heat.

19    Q.    All day; is that correct?

20    A.    Whether night and day they are held in

21    unair-conditioned -- an unair-conditioned

22    situation.  So I think that's all day and all night

23    data.

24    Q.    Are the dangers associated with heat

25    exposure at LSP more pronounced during the daytime

Page 47

1    as opposed to nighttime?

2        A.    The reason that I cannot agree with that

3    statement -- not that you're asking me to agree --

4    is that nighttime temperatures very much affect the

5    daytime risk when one is in heat.

6            So someone, for example, who is in an

7    air-conditioned environment at night and spends

8    their -- that's a heat stress on the body day and

9    night.  Does that answer your question?

10       Q.    I'm not sure it does.  Are you saying

11   that you're not able to answer that with a yes or a

12   no?

13       A.    Well, let me let you ask it again.

14       Q.    Yeah.  I'm wondering, the dangers

15   associated with heat exposure, are they more

16   pronounced during the daytime hours than they are

17   at the nighttime hours?

18       A.    Well, then I agree that I'm -- that it's

19   a bidirectional thing.  If you're -- I think when

20   you're -- it depends on the heat indices and -- as

21   to when it's hotter and when you're in the direct

22   sunlight and so -- as opposed to night and day,

23   assuming it's cooler at night.  Usually it cools

24   down at night.  The degree to which the indoor

25   temperatures cool down in the prison, it is cooler,

Page 48

1  but what I'm trying to say is that the nighttime

2  heat indices impact the danger of the daytime heat

3  indices.

4      **Q.    Okay.  You don't have any data**

5  **documenting the indoor nighttime heat at LSP?**

6      A.    No.

7      **Q.    Are you aware that there are fans?  And**

8  **I'm specifically talking about Camps C and Camp D,**

9  **that there are fans within those camps.**

10     A.    I do believe there are fans, yes.

11     **Q.    And there's ice water available to the**

12  **inmates?**

13     A.    I haven't been to Camp C and D for some

14  time and looked inside, but if you tell me that

15  there are I have no reason to doubt what you're

16  saying.

17     **Q.    Okay.  And showers available to the**

18  **inmates as well?**

19     A.    I do believe they have showers.

20     **Q.    And you would agree that those items,**

21  **fans, ice water and showers, operate to mitigate**

22  **any dangers associated with heat exposure?**

23     A.    Well, that's a long answer.  Hot showers

24  or being wet -- being wet with a shower and having

25  water on your body mitigates -- cools you during

1  the period that the water is evaporating off of

2  your body, so in that case a hot shower is not

3  necessarily cool because it's hot.  But the

4  evaporative -- the evaporation is helpful during

5  the period that the water is on your body and it's

6  evaporating.  That's cooling only during that

7  period.

8      **Q.      Why do you say hot showers?  Do you feel**

9  **like the showers that they take are with hot water**

10  **only?**

11      A.    I don't have a feeling.  I'm not aware of

12  the functioning in those areas of the temperatures

13  of the shower water.  It's not something I know.

14      **Q.      In your experience in New York or in**

15  **Austin taking showers, you have the ability to take**

16  **what I will refer to as a cool shower, don't you?**

17      A.    Well, this home has -- well, my home does

18  have working showers with both hot and cold.

19      **Q.      Is there any reason for you to think that**

20  **that's not replicated at LSP in their showers?**

21      A.    I don't know if it's the case at LSP or

22  not.

23      **Q.      Okay.  Now, with respect to the documents**

24  **that we discussed that you reviewed, you mentioned**

25  **SDEs.  Are those the -- I think it's 130-odd SDEs**

Page 50

```
 1    that have been produced in this matter.  Does that
 2    sound correct?
 3         A.    Yes.
 4         Q.    And the medical records are for the eight
 5    named plaintiffs?
 6         A.    Yes.
 7         Q.    And did you review all those records?
 8         A.    Yes.
 9         Q.    Have you reviewed -- other than the SDEs
10    and the medical records for eight plaintiffs, have
11    you reviewed any other medical records in this
12    matter?
13         A.    No.
14         Q.    Is it accurate to say that the only time
15    you observed activity on the farm line at LSP was
16    your visit in July when they were harvesting
17    cucumbers?
18         A.    Yes.  The only other times I've ever seen
19    the line is driving in from the gate to the main
20    jail during the other litigation that we've spoken
21    of.  Otherwise, I haven't seen the lines and I
22    don't know what they were doing.  I just looked out
23    and I saw the men in the fields, so --
24         Q.    Have you ever -- have you ever done any
25    farming?
```

Page 51

```
 1      A.    No.

 2      Q.    You've never had a garden in your back

 3   yard?

 4      A.    Well, I didn't -- I didn't equate -- yes,

 5   I didn't really equate farming with gardening.  I

 6   cut yards for years in the summertime.  Does that

 7   count for farming?  I don't think so.  I was

 8   cutting yards.  I had a whole bunch of neighbors

 9   that I cut their yards.  I was the girl yard cutter

10   growing up here in Austin.  They thought it was

11   really something to have a girl who cut their

12   yards.

13      Q.    And you cut yards with a lawnmower?

14      A.    Yes.  And I didn't sit on it.  I pushed

15   it.  I edged.  I did all that, but I still don't

16   think that's farming or of much relevance here.

17      Q.    But it's work in the heat?

18      A.    Yeah.  I played tennis for the University

19   of Texas.  I've -- I mean -- I mean, I do -- I do

20   work in the heat, if that's what you mean by

21   farming.

22      Q.    Yeah.  Well, that's helpful.  So you

23   played college tennis?

24      A.    For UT.

25      Q.    What year was that?
```

Page 52

```
 1      A.    Well, let's see.  I went to the
 2  University of Texas and got my degree in three
 3  years.  So I graduated from high school in -- I
 4  hate to tell you, but I graduated in '77, so that
 5  would have been '77 to '80 and then from '80 to '84
 6  I was in medical school in Houston.  I used to go
 7  hit with the Rice tennis team.
 8      Q.    Okay.  Well, that's -- I graduated in
 9  '77, so don't be embarrassed by that.  Do you still
10  play tennis?
11      A.    Yes.
12      Q.    Do you have a UTR rating?
13      A.    No.  I'm -- no.
14      Q.    You don't -- you just -- not -- you don't
15  play in tournaments or competitive tennis?
16      A.    Not at this time.
17      Q.    You play singles or doubles?
18      A.    Well, when I was playing competitively I
19  played competitively a lot of doubles on the teams.
20  I'm not playing competitively anymore.
21      Q.    Where do you play?
22      A.    The Courtyard Tennis Club, neighborhoods,
23  but these days I'm playing at the Courtyard.
24      Q.    That's in Austin?
25      A.    Yes.
```

1       Q.      Are you playing singles or doubles at

2    Courtyard Tennis Club?

3       A.      Right now I'm mostly hitting against the

4    ball machine, which my time down here is relatively

5    short, so I don't have a lot of tennis partners,

6    but I have to say the ball machine is incredibly

7    steady.

8       Q.      Yeah.  It doesn't miss.

9       A.      It never misses.

10       Q.      What about in New York, you play tennis

11    in New York?

12       A.      Almost never now.

13       Q.      And when is the last time you had an

14    active tennis match?

15       A.      Years.

16       Q.      But you're familiar of the strenuous

17    nature of playing tennis?

18       A.      I am.

19       Q.      When you played at UT were you playing

20    outside?

21       A.      Yes.

22       Q.      In the summer months?

23       A.      Well, the summer is off, but I always --

24    I mean, as a -- I was very competitive at that time

25    of my life, so I played all the time, summer months

Page 54

1    absolutely.

2        Q.    And including the afternoons?

3        A.    Yes.  I still play in the afternoon.

4        Q.    Okay.  And the heat index in Austin in

5    the afternoons in the summer months can often

6    exceed a hundred degrees; is that fair to say?

7        A.    It certainly can.

8        Q.    And I assume you have played tennis in

9    Austin when the heat index exceeds a hundred

10   degrees?

11       A.    I think so.

12       Q.    Do you participate in any other forms of

13   exercise besides tennis?

14       A.    I race-walk.  I used to be a competitive

15   race walker.  Now I just do it for fun.

16       Q.    Okay.  Do you do that in Austin?

17       A.    I do.

18       Q.    And how often do you do that?

19       A.    Regularly when I'm here -- I have to be

20   in Austin.  I do it up in New York too.  I don't

21   compete in race walking.  I just go out -- once the

22   knees get bad it's better to be a race walker than

23   to be a jogger.

24       Q.    How far on a given day do you race walk?

25       A.    Generally from four to six miles.

Page 55

1      Q.      And how long does it take you to race-

2   walk four miles?

3      A.      Well, these days it's about 15 minutes

4   per mile, which is pretty bad.

5      Q.      I'm not so sure about that.  Do you

6   monitor your heart when you do that?

7      A.      I do.

8      Q.      How do you do that?

9      A.      I have an Apple watch which I have

10  carefully put in the other room.  See (indicating),

11  no Apple watch.

12     Q.      Is there a specific heart rate range that

13  you attempt to be in during your race walking?

14     A.      No.

15     Q.      Is there a particular limit that you

16  don't like to exceed as a heart rate?

17     A.      No.

18     Q.      Do you let your heart rate get up over

19  140 at any time?

20     A.      Yes.

21     Q.      150?

22     A.      Yes.

23     Q.      160?

24     A.      Well, that's awfully painful.  160, no,

25  not race walking.

1      Q.     Do you do any kind of resistance

2  training?

3      A.     You know, it's so painful to have to tell

4  you about how bad my exercise has been recently.

5  Not so much right now.

6      Q.     Are you a member of any other clubs

7  besides the Courtyard Tennis Club?

8      A.     Equinox in New York City.

9      Q.     And is that just kind of like a standard

10  health club with weights and aerobic machinery and

11  things like that?

12      A.     Yes.

13      Q.     When is the last time you were there at

14  Equinox?

15      A.     Actually, in the last few weeks I would

16  think.

17      Q.     And what kind of things do you do there

18  when you visit Equinox?

19      A.     Usual cycling.

20      Q.     So you're fairly active it seems.  Are

21  you on any medication?

22      A.     Well, I don't really want to get into my

23  medical history.

24      Q.     Can you tell me if you take any blood

25  pressure medicine?

Page 57

```
 1                      MS. WRIGHT:
 2                           Objection.  Drew, this is not
 3      a deposition about the witness's medical history.
 4      BY MR. BLANCHFIELD:
 5          Q.    And I'm not -- I don't mean to pry,
 6      Doctor, but, you know, we're talking about activity
 7      of inmates that are on medicine.  You've just
 8      described a fairly active lifestyle doing exercise
 9      with a heart rate into the 150s, which is pretty
10      significant, and I'm just wondering if you are on
11      any of these medications that we're going to be
12      discussing today.
13                      MS. WRIGHT:
14                           If you'd like to ask a
15      question about the litigation, please do, but,
16      otherwise, I think that the witness has already
17      declined to address her own medical history.
18                      MR. BLANCHFIELD:
19                           She did decline to discuss
20      her history.
21      BY MR. BLANCHFIELD:
22          Q.    And if you don't want to answer it,
23      Doctor, just tell me I'm not going to discuss any
24      kind of blood pressure medicine.
25          A.    Well, you know, there's vast literature
```

Page 58

1    on the effects of antihypertensives in the

2    literature.  I just don't think that my own medical

3    history -- it just so happens I don't take any

4    antihypertensives, but I just -- I don't have

5    hypertension, but I just think that that should be

6    the limit of talking about my own medical history,

7    not that it's so extensive or not extensive.  It

8    just doesn't seem that when there's a -- that it's

9    really that relevant to this litigation.

10        Q.    Fair enough.  Thank you for that.  Okay.

11   In your report you describe the activity in the

12   farm line as being strenuous manual labor.  Is that

13   correct?

14        A.    I wouldn't be at all surprised if I said

15   that and I do believe it's strenuous.  Did you want

16   to point me to something or can I just let you --

17        Q.    Yeah.  Yeah.  Yeah, let's look at page

18   six, paragraph 15.

19        A.    Yes, I see the sentence.

20        Q.    Okay.  Now, in fairness I think you wrote

21   this before you had your visit to LSP, correct?

22        A.    Yes, I believe so.

23        Q.    And do you maintain that the activity,

24   the picking of cucumbers, that you witnessed in

25   July is what you would define as strenuous

Page 59

1    activity?

2        A.    I do.

3        Q.    **Is it as strenuous as you playing tennis**

4    **in the afternoon?**

5        A.    There are a number of reasons that it's

6    more strenuous.

7        Q.    **More strenuous than you playing tennis?**

8        A.    Well, you know, the -- it's really --

9    yes, it is.

10       Q.    **More strenuous than your race walking**

11   **when your heart rate is in the 150s?**

12       A.    I think that it may be, yes.

13       Q.    **And how can that possibly be?**

14       A.    The individuals, they are being pushed by

15   the pushers.  They have -- some have medical

16   conditions.  Each individual has his own individual

17   makeup and degree of fitness.  So that's how it

18   could possibly be.

19       Q.    **So are you saying it's possible that some**

20   **-- that some of them are experiencing a strenuous**

21   **activity in picking cucumbers that you do in all of**

22   **the exercise that you've described to me?**

23       A.    Yes.

24       Q.    **And this pushed by pushers, where do you**

25   **get that from?**

Page 60

1    A.    Master Sergeant Orlando Scott talked

2    about that in his deposition.

3    **Q.    Did he not say that they essentially work**

4    **at their own pace?**

5                MS. WRIGHT:

6                    Object to form.  You can

7    answer it, Dr. Vassallo, if you can.

8    A.    That was my not -- not my understanding

9    of the testimony.  There are punishments and

10   consequences if -- to him consequences in terms of

11   his superiors providing feedback that his men in

12   the field are not accomplishing enough and

13   certainly consequences to the -- to the -- for the

14   prisoners if they don't work.

15   BY MR. BLANCHFIELD:

16   **Q.    And I think during your visit in July you**

17   **did not see any evidence of any of the correctional**

18   **officers telling the men they weren't working fast**

19   **enough?**

20   A.    In front of me, the gentleman did not

21   tell the men they weren't working fast enough,

22   correct.

23   **Q.    And do you have any evidence that there**

24   **at any time this summer was any sort of quota**

25   **required of the farm line inmates?**

Page 61

1      A.    My understanding from Orlando Scott is

2   there's not a quota but there's an expectation and

3   the expectation should be met.

4      **Q.    And was it your understanding that the**

5   **expectation was met on that day when you visited**

6   **the cucumber patch?**

7                MS. WRIGHT:

8                     Object to form.

9      A.    When the -- the day that I visited was a

10  day where everything was being observed and the

11  pusher on that day was not pushing.  It was an

12  observation day and he wasn't pushing.

13  BY MR. BLANCHFIELD:

14     **Q.    Your answer suggests to me that you think**

15  **that there was -- for lack of a better word -- a**

16  **show was put on for the observation day as opposed**

17  **to what actually happens day-to-day out there.**

18     A.    Are you asking me if I think a show was

19  put on?

20     **Q.    Yeah, I am.**

21     A.    I wouldn't characterize it as a show, no.

22     **Q.    Are you aware how many days the farm**

23  **lines -- and farm line is defined in this**

24  **litigation -- I think you're familiar with it, but**

25  **are you aware of how many days the farm lines go**

Page 62

1    out on a weekly basis during the summer months?

2        A.    It could be up to five times is my

3    understanding.  Not on the weekends.

4        Q.    Okay.  Do you have any information of the

5    number of days they actually have gone out this

6    summer?

7        A.    No.

8        Q.    You have been provided with information

9    that they generally quit work by 11:30 each day?

10       A.    Yes.

11              MS. WRIGHT:

12                   Object to form.

13   BY MR. BLANCHFIELD:

14       Q.    Is it fair to say that generally speaking

15   the heat index outside on the farm line in the

16   summer months increases from the early morning

17   hours until the afternoon hours?

18       A.    No.  I mean, they have called heat alerts

19   at 8:30 in the morning when the heat index exceeded

20   or met, I should say, 88 degrees Fahrenheit.  So

21   your question is does it continue to go up?  I

22   can't really tell you that because sometimes

23   humidity is higher in the mornings than it will be

24   when the sun burns off the humidity.  But I think

25   the important point is that sometimes the 88

1    degrees has been -- of heat index -- has been met

2    at 8:30 in the morning according to my review of

3    the records.

4        Q.    And what percentage of days is the heat

5    index at 88 at 8:30 in the morning?

6        A.    I don't know.

7        Q.    Is it fair to say that the ambient

8    temperature -- I'm not talking heat index -- in

9    Louisiana generally increases as the day

10    progresses?

11        A.    I think in the summer months that's -- as

12    the sun comes up stronger, in direct sunlight, yes,

13    I do think so, but I haven't been provided any

14    information about that.  But that's common sense.

15    I'm -- I'm -- I'm speaking to Texas summers.

16    That's common sense.

17        Q.    That would apply in Austin, Texas?

18        A.    Yes.

19        Q.    And you know as a tennis player that if

20    you go out at 3:00 in the afternoon in the summer

21    it's going to be a lot hotter than it would be if

22    you had gone out at 8 AM?

23        A.    The temperature is higher in the

24    afternoon, yes, under most circumstances, yes.

25        Q.    Okay.  We've been at it for an hour and a

Page 64

```
 1    half.  Can we take a short break?

 2        A.    Do you want to take a break?

 3        Q.    Yeah, I think so.

 4                    MR. BLANCHFIELD:

 5                        Would that be all right,

 6    Lydia?

 7                    MS. WRIGHT:

 8                        Okay.

 9                    THE WITNESS:

10                        When should I be back?

11                    MR. BLANCHFIELD:

12                        You want to say 10 minutes?

13                    THE WITNESS:

14                        Okay.  I have 10:32, so

15    10:42?

16                    MR. BLANCHFIELD:

17                        Perfect.  Thank you, Doctor.

18            (A recess was taken at 10:32; resuming at

19    10:42 AM)

20                    MR. BLANCHFIELD:

21                        Okay.  Are we ready?

22                    THE WITNESS:

23                        Yes.

24                    MR. BLANCHFIELD:

25                        All right.  Lydia, are you
```

Page 65

1    there?

2                    MS. WRIGHT:

3                         Yes.

4    BY MR. BLANCHFIELD:

5        **Q.    Okay.  Doctor, I want to -- you know,**

6    **there's a lot of different terms with respect to**

7    **heat used in your report and other reports and I'd**

8    **like to discuss if we can get some definitions or**

9    **at least your definitions.  If we could start with**

10   **heat injury, what would you define that to be?**

11       A.    Well, it's a -- a heat injury can be two

12   broad buckets.  One is where heat is causing one of

13   the heat syndromes that's called like heat rash,

14   heat syncope, which is fainting, heat exhaustion,

15   heat stroke, but there are other injuries that the

16   heat causes that is worsening of underlying

17   conditions such as the worsening of pulmonary

18   disease, the worsening of cardiopulmonary disease,

19   the worsening of mental illness and psychological

20   damage or injury.

21            So I would put heat injury into those two

22   buckets, those illnesses that are directly related

23   to heat and those conditions that are worsened by

24   the heat that do not result in heat stroke, for

25   example.

SUSI VASSALLO

1        Q.      Okay.  And with respect to those

2   syndromes that you mentioned, heat syncope, what

3   would you define that as?

4        A.      Heat syncope is fainting in the heat

5   where the heat is the cause of the faint.

6        Q.      Okay.  And heat exhaustion?

7        A.      Heat exhaustion is, again, directly

8   related to the heat in terms of there is -- the

9   heat stress is such that the body is having

10  difficulty handling that heat stress and symptoms

11  develop, short of an alteration in mental status

12  which would then better describe heat stroke.

13       Q.      And once you have an alteration in mental

14  status it would progress to heat stroke?

15       A.      No.

16       Q.      Okay.  Explain that to me if you could.

17       A.      So there -- well, as soon as the mental

18  status is altered in heat stroke that means there

19  is either confusion, coma, anything that you want

20  to call it.  It could be delirium.  It could be --

21  that's -- and the temperature rises above 140 --

22  104 degrees or 105, depending on the definition,

23  that defines heat stroke.

24            Now, a heat stroke is widely recognized,

25  including up-to-date, to occur suddenly and

Page 67

1   precipitously and not necessarily on a continuum.

2   So there -- in other words, it doesn't happen that

3   you have to have heat exhaustion before being in a

4   life-threatening heat -- heat stroke situation.

5            On the other hand, it could be a

6   progression.  One could show symptoms of heat

7   illness such as heat exhaustion and progress to

8   heat stroke, but the reverse is not true.

9       Q.    Okay.  You know that Dr. Keldie was

10   deposed this week?

11      A.    Yes.

12      Q.    Did you read an uncertified rough draft

13   of his deposition?

14      A.    I did not.

15      Q.    So heat-related injuries, if I understand

16   you, are not necessarily on a continuum?

17      A.    That's correct.

18      Q.    And let's talk about heat stroke.  What

19   symptoms are necessary before you would classify

20   something as heat stroke?

21      A.    Heat stroke is classified as a core body

22   temperature of 105.5 Fahrenheit, although sometimes

23   it's a temperature of 104 depending on the

24   literature and altered mental status.

25      Q.    In the review of all of your materials in

Page 68

1    this matter did you see anyone who had heat stroke?

2        A.    Not in these materials.  Previously in

3    the Lewis case there were two heat strokes that I

4    came across that fit that definition and were heat

5    strokes.

6        Q.    And those were in your report?

7        A.    No.  Well, I mean, they were in the Lewis

8    report, but not in this report.

9        Q.    Yeah.  I'm sorry.  I meant the Lewis

10   report.

11       A.    Yeah.

12       Q.    Were either of those individuals in the

13   Lewis report who had heat stroke working on the

14   farm lines?

15       A.    I don't remember that.  I just -- matter

16   of fact, I don't know that I knew or didn't know.

17   I just know that they had a heat stroke.

18       Q.    And what were the outcomes of those two

19   individuals?

20       A.    My memory is that one survived and one

21   didn't, but I'm not sure anymore.

22       Q.    How long ago was that that they

23   experienced heat stroke?

24       A.    Those two individuals --

25       Q.    Yeah.

1      A.      -- that were in the report?  So whenever

2  that litigation was, that's when I reviewed those

3  two individuals.

4      Q.      Okay.  And other than those two

5  individuals you're not aware of anyone at LSP

6  experiencing heat stroke?

7      A.      I am not aware.

8      Q.      Is it true that younger people -- younger

9  children are more susceptible to heat stroke than

10  older folks?

11      A.      Could you be more specific?  What do you

12  mean?

13      Q.      Yeah, let's take an age one to six, more

14  susceptible to heat stroke than individuals aged 20

15  to 50?

16      A.      No.

17      Q.      That's not the case?

18      A.      That's not the case.

19      Q.      Are females more susceptible to heat

20  stroke than males?

21      A.      No.

22      Q.      What about if we take the broad category

23  that we discussed, heat injury.  Are females more

24  susceptible to heat injury than males?

25      A.      No.

1    **Q.    Same question for the young children**
2    **question I asked, are they more susceptible to heat**
3    **injury than the older folks?**

4    A.    No.

5    **Q.    In your report at page 12, paragraph 40,**
6    **there's a short statement, Heat stroke comes on**
7    **rapidly.  Is that true all the time?**

8    A.    It's not -- it doesn't have to be, but it
9    occurs.

10    **Q.    It can occur -- I mean, I guess my**
11    **question is, are you saying heat stroke can come on**
12    **rapidly or it necessarily always comes on rapidly?**

13    A.    It does not always come on rapidly, but
14    it can come on rapidly without warning.

15    **Q.    Do you have any literature that**
16    **quantities how often heat stroke comes on rapidly?**

17    A.    There is no literature that quantifies
18    how often, no.

19    **Q.    Do you have an opinion as to what**
20    **percentage of heat stroke cases come on, quote,**
21    **rapidly?**

22    A.    Yes.

23    **Q.    What is that opinion?**

24    A.    My opinion is that heat stroke frequently
25    comes on rapidly with little or no warning.

SUSI VASSALLO

1    Q.    More than half the time?

2    A.    I wouldn't be able to give you a number.

3    Q.    Okay.  All right.  On the next page, 13,

4    of your initial declaration, at the bottom,

5    paragraph 45, it says, Many more people die each

6    year from heat-induced exacerbations of underlying

7    medical vulnerabilities than die from heat stroke.

8    Do you see that?

9    A.    I do.

10    Q.    Okay.  What do you base that -- do you

11    base that on any literature or any studies?

12    A.    There's a vast literature -- every

13    article that's epidemiological makes that point.

14    Q.    Okay.  And is it fair to say that the

15    incidence of heat stroke in healthy individuals is

16    rare?

17    A.    No.

18    Q.    But the incidence of heat strokes in

19    medically-compromised people is greater than those

20    who are healthy?

21    A.    I disagree with that.

22    Q.    Why do you disagree with that?

23    A.    Well, it depends on the group that you're

24    looking at, right?  If you're looking at football

25    players or military recruits, most of those people

Page 72

1    -- military recruits are young and healthy.  Maybe

2    you have to re-ask the question.

3            So let's put it like -- let me see if I'm

4    answering this.  If you're old and sickly, you're

5    more likely -- in the right circumstances you are

6    at great risk.  If you are young and healthy,

7    you're at lesser risk.  But when it comes to

8    exercising there is an enormous literature, the

9    science is clear, that young, healthy people can

10   have heat stroke.  Did that answer your question?

11       **Q.    I think so.  But isn't it true that in**

12   **that literature when you're looking at young,**

13   **healthy people and you mentioned, you know,**

14   **athletes and things like that, when these**

15   **individuals are suffering from heat-related**

16   **injuries the level of activity, the amount of**

17   **strenuous activity that they are engaging in is**

18   **significant?**

19       A.    No.  And, you know, the Dr.

20   Keldie's reference on the Louisiana heat illness,

21   it lists that 40 percent of all the heat illnesses

22   are in young, healthy -- they don't say healthy,

23   but certainly young, from 20 to 39.  So in the

24   state of Louisiana, from his reference, the numbers

25   are highest in the 20 to 39 age group.  So his

1    reference is clear about the risks to young people.

2            In the vast majority of literature, like

3    the CDC and the morbidity, mortality, they talk

4    about the risks in older people.

5        **Q.    But isn't that due to the fact that these**

6    **young folks are working out strenuously in the**

7    **heat?**

8        A.    Could you re- -- could you ask me the

9    question afresh?

10        **Q.    Yeah.  Isn't it -- isn't that true that**

11    **these incidents of heat injury in young people --**

12    **because it's these young kids who are out there**

13    **working strenuously in the heat --**

14            MS. WRIGHT:

15                Object to form.

16        A.    You're asking me if the young kids are

17    working out strenuously in the heat?  Some are and

18    some aren't.

19    BY MR. BLANCHFIELD:

20        **Q.    Well, the ones who are having heat**

21    **injuries and are producing the data that you**

22    **referenced, aren't these individuals who are out**

23    **working hard in the hot sun?**

24        A.    The majority of those young people in the

25    report that Dr. Keldie references, the report makes

Page 74

1   the general statement like some of these people are

2   out in outside occupational -- occupations which

3   are outdoors.  That's what that report says.

4          Your -- I really can't answer your

5   definition of hard work.  I don't know.  To me, I

6   don't really know what your definition of hard work

7   is, so I can't answer your question.

8      **Q.    Okay.  Let's talk about strenuous**

9   **activity.  Would you describe your race walking as**

10  **strenuous activity?**

11     A.    No.

12     **Q.    What about your tennis in the afternoon,**

13  **is that strenuous activity?**

14     A.    No.

15     **Q.    What about picking cucumbers, is that**

16  **strenuous activity?**

17     A.    Yes.  I mean, it may or may not be,

18  right?  I mean, I picked cucumbers.  I picked eight

19  cucumbers and I went back inside.  Picking

20  cucumbers may be strenuous activity.  Playing

21  tennis in the heat may be strenuous activity.

22     **Q.    What about full-court basketball that's**

23  **outside in the Louisiana heat in the afternoon, is**

24  **that strenuous activity?**

25     A.    It depends on the level at which the

Page 75

 1   individual chooses to do it, right?  They can -- it

 2   can be strenuous or they can just -- you know, it

 3   can be not strenuous.  It could just be that they

 4   stand at one end and wait for the ball.  Strenuous

 5   activity depends on the individual and how they are

 6   performing the activity.

 7        **Q.    You have an athletic background; you're**

 8   **familiar with competitive full-court basketball?**

 9        A.    Yes.

10        **Q.    If the inmates at LSP at Camps C and D in**

11   **the yard are playing competitive full-court**

12   **basketball in the afternoon hours, would you**

13   **consider that to be strenuous activity?**

14        A.    I'm sure some are performing at strenuous

15   -- in a strenuous manner and some are not.

16        **Q.    And those who are performing at a**

17   **strenuous manner, would you say that it's more**

18   **strenuous than picking cucumbers in the morning?**

19        A.    I'm not really able to answer that.

20        **Q.    Why not?**

21        A.    Because you're labeling an activity

22   strenuous.  You would have to define strenuous for

23   me.  It is possible that playing full-court

24   basketball with somebody highly motivated to win

25   and -- to compete and to win could be strenuous.

1          On the other hand, somebody who's being

2     pushed at the risk of some kind of disciplinary

3     action, that may also be strenuous.  So it's

4     difficult for me to answer your question because

5     either could be more strenuous depending on the

6     circumstances of their play or work.

7          Q.    **What about if the inmates are playing**

8     **soccer in the afternoon heat in the yards, would**

9     **you consider that to be strenuous activity?**

10         A.    It depends on how each individual is

11    playing whether it is or is not strenuous.

12         Q.    **Would it depend on heart rate?**

13         A.    Are you asking if you can measure

14    strenuous by their individual heart rate?

15         Q.    **Yes.**

16         A.    No.

17         Q.    **If we have a relatively healthy**

18    **individual who is playing full-court basketball and**

19    **has a heart rate in the 150s, would you necessarily**

20    **define the full-court basketball as strenuous**

21    **activity?**

22         A.    No.

23         Q.    **Why not?**

24         A.    Because 150 is not that fast.  I mean, a

25    well-conditioned athlete may have a heart rate of

1    150 and maybe it has to be at 200 to be -- or 180.

2    I don't know for any individual.  I cannot make

3    that -- I'm sorry, I'm getting messages about

4    morning report, so let me just --

5        **Q.    That's okay.**

6        A.    I didn't know how to deactivate that.

7    So, anyway, I already know morning report is

8    tomorrow morning.  Your question?  I'm sorry about

9    the interruption.

10       **Q.    That's all right.  That's okay.  You were**

11   **explaining that -- we were talking about heart rate**

12   **and a conditioned athlete may have a heart rate in**

13   **the 180s or 200s.**

14       A.    Yeah, so for each individual athlete

15   strenuous will have a different definition, as well

16   as each individual working on the farm line.

17       **Q.    Are you aware of the activities that go**

18   **on at Camp -- at the yards in Camp C and Camp D in**

19   **the afternoon hours during the summer at LSP?**

20       A.    I am aware from reading the depositions

21   that people play sports in the afternoon in the

22   heat at LSP, yes.

23       **Q.    Are you aware if there are any farm line**

24   **-- inmates assigned to the farm line who are**

25   **participating in athletic activities in the yards**

1    in the afternoon?

2        A.    I read in the depositions that they do.

3        **Q.    And those activities -- are you aware**

4    **that those activities in addition to full-court**

5    **basketball and soccer include softball and weight-**

6    **lifting?**

7        A.    I think the depositions specifically

8    refer to basketball and maybe soccer.  I have no

9    doubt that there are other activities, but I didn't

10   hear anything about softball in the depositions,

11   unless I just forgot.

12       **Q.    Okay.  When you were out there did see**

13   **the weight yard or any of the weight yards?**

14       A.    We were really in the -- I mean, I have

15   been to -- I have seen weights at Ang- -- at

16   Louisiana State Penitentiary.  The only weights I

17   saw on this visit was they were already discarded,

18   but I absolutely know that there are weights at

19   LSP.

20       **Q.    Okay.  Do you have an opinion as to**

21   **whether or not lifting weights is a strenuous**

22   **activity?**

23       A.    Well, I mean, lifting weights can be very

24   strenuous.  The way in which any of these prisoners

25   perform it, I don't know if it's strenuous or not.

1      Q.      What would that depend -- what would

2   factor into whether or not it's strenuous?  Would

3   it be the amount of weight?

4      A.      The amount of weight would be one factor

5   for sure.

6      Q.      The amount of repetitions?

7      A.      The speed of the repetitions, the number

8   of repetitions, all of that would make a difference

9   for what is strenuous in weight-lifting.

10      Q.      Have you ever lifted weights?

11      A.      Yes.

12      Q.      When you were at UT, was part of your

13   tennis training -- did it involve resistance

14   training?

15      A.      Yes.

16      Q.      Did you bench-press?

17      A.      No.

18      Q.      What kind of resistance training did you

19   do?

20      A.      You know, resistance training wasn't so

21   big back then.  I do that regularly in New York.

22   My bench here in Austin seems to be a place to put

23   books.

24      Q.      Do you do any kind of bench-pressing or

25   push-ups or anything like that currently?

Page 80

1      A.    Yes.  I think currently should be

2  expanded out of these two weeks or three weeks to

3  in general in my life at this age and this time,

4  yes.

5      **Q.    Fair enough.  In your review of this**

6  **matter did you see any information that any inmate**

7  **who worked on the farm line committed suicide?**

8      A.    I did not see any information regarding

9  that, no.

10     **Q.    That would include gestures, suicidal**

11 **gestures?**

12     A.    Well, in my review of the records of the

13 named plaintiffs there was a history of suicidal

14 gestures and suicide watch in one of them.  So the

15 answer there would be yes, one person in the

16 medical record did have that history that I

17 remember.

18     **Q.    Do you know if the reference to the**

19 **suicidal gesture was at a time period when the**

20 **individual was actually working on the farm line?**

21     A.    I don't know.

22     **Q.    Okay.  Do you agree that as the ambient**

23 **temperature increases the risk of heat injury goes**

24 **up for someone exposed to it?**

25     A.    No.  The reason I say that is because I'm

Page 81

1    -- I'm only going to refer to heat index.

2    **Q.    Okay.  Well, let me ask the same question**

3    **and use the word heat index.**

4    A.    Okay.  Could you re-ask it for me?

5    **Q.    I sure can.  Do you agree that as the**

6    **heat index rises the risk of heat injury to an**

7    **individual exposed to the heat index increases?**

8    A.    It's clear from the National Weather

9    Service chart that that is -- that that risk

10   increases with increasing heat index.  So in that

11   sense, yes, I do agree with you.

12   **Q.    Okay.  And that risk would also increase**

13   **based on the duration of exposure to an elevated**

14   **heat index?**

15   A.    Well, a longer duration at a higher heat

16   index is more dangerous, but that is not to say

17   that a short duration could not also be very

18   dangerous to any -- at a high heat index, whatever

19   that is, whatever number you're talking about;

20   let's just use the National Weather Service -- that

21   also could be a risk to an individual.

22   **Q.    Okay.  But is it true that -- and we'll**

23   **pick 88 as a heat index.  Is it true that the**

24   **longer the duration to the -- that you're in that**

25   **level of heat, the greater the risk of heat injury?**

Page 82

1    A.    I think as a general matter the longer

2    that you're subjected to high heat indices the more

3    dangerous it is for some individuals.

4    **Q.    I assume by your answer that some**

5    **individuals do not experience a greater risk of**

6    **heat injury when the duration in the heat**

7    **increases?**

8    A.    I disagree.  There's a large literature,

9    it's all epidemiological, and it's stated for --

10   and basically including Dr. Keldie's report from

11   Spain that has exactly the same hockey stick or

12   J-shaped curve, that medical illnesses are

13   occurring at certain heat indices, very similar to

14   the vast literature that exists in the epidemiology

15   center -- literature -- epidemiological literature;

16   that is, as the temperature or the heat indices

17   rise in that sudden, abrupt way, that ER visits,

18   morbidity, mortality, hospitalizations and death

19   rise, as do worsening of underlying medical

20   conditions, which we have already gone through.

21   And his literature speaks to that as well.

22   **Q.    Okay.  And just going back, when we spoke**

23   **about the things you reviewed -- you just mentioned**

24   **Dr. Keldie's report -- I don't think we mentioned**

25   **that when we talked about documents reviewed, but**

Page 83

```
 1   obviously you reviewed his report?
 2       A.    That's true, and I have a copy of it here
 3   (indicating).  That's the only other thing I have
 4   here.
 5       Q.    Okay.  All right.  And you also reviewed
 6   Dr. Barnes' report?
 7       A.    Right.
 8       Q.    Okay.  Now, one more question on the
 9   increased risk of heat injury.  Do you agree that
10   with an increase in the level of exertion the risk
11   of heat injury increases?
12       A.    Are you asking me if the increased level
13   of exertion results in more -- what are you asking?
14   Could you --
15       Q.    Okay.  Yeah, I'll be more specific.
16   That's fair.  Let's take -- let's take a healthy
17   individual, his outside -- the heat index is 88.
18   He's been out there for an hour and he has been
19   doing whatever activity.  Those things being equal,
20   as that individual's level of exertion increases,
21   is it fair to say that the risk of heat injury
22   increases as well?
23                    MS. WRIGHT:
24                         Object to form.
25   BY MR. BLANCHFIELD:
```

Page 84

1    Q.    I thought it was a good question, but you

2    can answer it, Doc.

3    A.    Well, re-ask it.  I'm sorry.

4    Q.    That's all right.  It was kind of long.

5    I'm just seeing if I can -- my focus is on the

6    level of exertion and how that impacts the risk of

7    heat injury.  And the point I'm trying to make, in

8    my review of all this it seems if you exert

9    yourself more you're going to have a greater risk

10   of heat injury.

11   A.    The reason I disagree with that statement

12   is because it depends on the individual.  So when

13   you're speaking of exertional heat injury, you are

14   -- when an individual will suffer harm or heat

15   injury -- and when I'm talking about heat injury

16   here, I'm only talking about heat stroke, heat

17   exhaustion and backwards, right, heat syncope and

18   so forth.

19        And generally in the exertional heat

20   stroke literature it's -- the vast majority of the

21   exertional heat stroke literature is from athletics

22   and military recruits.  The enormous literature on

23   heat-related illness is epidemiological and they're

24   not all exerting themselves.

25        And so the degree to which one -- any one

Page 85

1    individual is exerting himself or herself is going

2    -- and the consequences of that exertion will

3    depend on a number of physiological factors

4    concerning that one individual.

5         Q.    **And what are those physiological factors?**

6         A.    Well, one is the condition of the heart.

7    Another one is the condition of the sweat glands,

8    their ability to vasodilate.  There's a big genetic

9    component that is increasingly spoken of in the

10   literature and described.  There's -- and that is

11   very well laid out in the military recruits,

12   looking at heat shock proteins and who produces

13   what and so forth.

14        So there are -- so the -- I could go into

15   great detail here, but I would ask you to ask me

16   specific questions.  So I'm talking about the

17   physiology which is laid out in my report is laid

18   out very excellently in the references that Dr.

19   Keldie cites.  And so if you could ask me another

20   question, because I've lost track of my answer.

21        Q.    **Okay.  You're familiar with Dr. Keldie?**

22        A.    No.

23        Q.    **You've never met him?**

24        A.    I never have met him.

25        Q.    **You've never seen any of his works?**

Page 86

```
 1      A.    No.
 2      Q.    Never seen any of the litigation that he
 3   might have been involved in?
 4      A.    No.  I don't recognize the name.  Matter
 5   of fact, I mis- -- no, I don't recognize his name.
 6      Q.    Okay.  Okay.  I want to move on to a
 7   discussion of medications that impact
 8   thermoregulation.  When you issued your initial
 9   declaration did you have a list of the heat
10   pathology medications from LSP?
11      A.    Let me go to page five of what you first
12   referred to of what I had reviewed.  So I'm on page
13   five, 11 A through F.
14      Q.    Yeah, it looks like under B the
15   Attachment A?
16      A.    Yes.  The answer is yes.
17      Q.    Okay.  And I assume that your opinion is
18   that Attachment A, the heat pathology medications
19   dated August 21, 2018, is underinclusive?
20      A.    That's correct.
21      Q.    And what is your understanding about --
22   well, let's say Exhibit A is predominantly
23   antipsychotic medications, fair to say?
24      A.    I would agree with the fact that there
25   are many antipsychotics on this list.
```

Page 87

1    Q.    And what is your understanding with

2  respect to inmates who were being prescribed one of

3  those medications with respect to work on the farm

4  line?

5    A.    My understanding is that individuals on

6  antipsychotics for mental illness are not on the

7  farm line or they are not supposed to be.  They are

8  given a heat exemption.

9    Q.    And that -- in your opinion, is that

10 appropriate?

11   A.    Yes.

12   Q.    I want to discuss with you what

13 medications you feel should be on that list

14 entitling the inmates to what you refer to as a

15 heat exemption.  Can we do that?

16   A.    Yes.

17   Q.    Okay.  Where do you want to start?

18   A.    Wherever you want to, sir.

19   Q.    Let's see.  Let's look at your report.

20 Well, let me just ask you a general question.  Is

21 it your opinion that any medication that has any

22 anticholinergic propensities should be put on that

23 list?

24   A.    That's too broad.

25   Q.    Okay.  So there are some medications that

Page 88

1    are known to have some anticholinergic properties

2    that don't have to be on the list?

3        A.    That's too broad.  Let me put it this

4    way.  Anticholinergic -- medications with

5    anticholinergic properties impair the ability of

6    the sweat gland to work.  They often also hit the

7    hypothalamus, the anterior hypothalamus which is

8    let's say the monitor that controls the processes

9    of vasodilation.

10            And so they -- the anticholinergic

11   medications have effects both at the sweat glands

12   and at the hypothalamus.  The degree to which they

13   affect it is different and sometimes it could be

14   dose-related, but it's -- anticholinergic

15   properties of medications impair thermoregulation.

16       Q.    And some of the medications impair

17   thermoregulation more than others?

18       A.    Are you saying some of the

19   anticholinergic medications?

20       Q.    Yes, ma'am.

21       A.    Yes.  Some of them are more specific to

22   one receptor and not the other.  As their dose

23   increases, the specificity of receptor blockade is

24   lost.

25       Q.    Are you familiar with what I have seen

Page 89

1    referred to as anticholinergic risk scales?

2        A.    No.

3        Q.    **Are you familiar with any literature that**

4    **quantifies the anticholinergic effect of certain**

5    **medications?**

6        A.    As a medical toxicologist I'm very

7    familiar with the literature regarding

8    anticholinergics and their effects on the body.

9    Other than that, I don't understand your question.

10       Q.    **Are you familiar with the way Dr. Keldie**

11   **and Barnes created an anticholinergic scale with**

12   **respect to certain medications?**

13       A.    I read -- I read -- I read what they

14   wrote.  That's my familiarity with that.

15       Q.    **Are you in agreement with the principle**

16   **that some of these medications have a substantially**

17   **more anticholinergic effect than others?**

18                   MS. WRIGHT:

19                        Object to form.

20       A.    There's a -- there's one medication that

21   is Claritin, which is primarily a histamine Type 1

22   receptor blocker.  As the dose increases it loses

23   its specificity and becomes also an H2 blocker, so

24   there's a more anticholinergic toxic effect.  But

25   if I had to give the newer generation, the best at

Page 90

1    this is Claritin in this prison, or less

2    anticholinergic than the rest of them on the list.

3    Again, it's dose-dependent.

4    BY MR. BLANCHFIELD:

5        **Q.    Okay.  But if we're assuming about the**

6    **general recommended dosage of these medications,**

7    **you are in agreement that some of them have a**

8    **greater anticholinergic effect than others?**

9              MS. WRIGHT:

10                  Object to form.  Drew, do you

11    want to put the list in front of Dr. Vassallo so

12    that you're speaking the same language here?

13              MR. BLANCHFIELD:

14                  No.  I can at some point, but

15    that's not really what I'm asking right now.

16              MS. WRIGHT:

17                  Okay.  Well, Dr. Vassallo,

18    you can answer the question as best you can.

19        A.    The list as I have looked at it is -- as

20    it stands at LSP, the only drug there -- because of

21    its specificity for H1 receptors -- the only drug

22    that would have less anticholinergic effect than

23    the others is Claritin, Loratadine.

24    BY MR. BLANCHFIELD:

25        **Q.    Okay.  In your report -- I'm referencing**

Page 91

1  page 17 if you want to turn to it -- the last

2  paragraph, which is numbered 57, it says, Many if

3  not most or all medications used to treat mental

4  illness, including Synthyroid (sic), Benadryl,

5  Zyprexa, Zyrtec, Losartan, Elavil, increase the

6  risk of heat-related health problems.  You see

7  where that is, Doctor?

8      A.   Yes.

9      Q.   Is it your opinion that those particular

10 medications referenced in paragraph 57 should be on

11 the heat pathology medication list?

12     A.   Well, four of them are.  Right now Zyrtec

13 is -- I don't remember if Zyrtec is or is not and

14 Synthroid is thyroid.  Thyroid -- if the patient is

15 maintained in a normal thyroid level, Synthroid

16 doesn't have to be on it.  If there's toxic

17 obviously or -- then -- then, of course, that would

18 be a different story.

19     Q.   Okay.  What about Benadryl?

20     A.   What about it?

21     Q.   Should it be on the list?

22     A.   A hundred percent.

23     Q.   Is Benadryl generally a short-term

24 medication?

25     A.   There's no generalities about Benadryl.

1    **Q.    In your review of all the records did you**
2    **see any inmates who are on what I'm going to call**
3    **long-term Benadryl in excess of 30 days?**
4    A.    How long you're on Benadryl doesn't make
5    a difference.  If you're on Benadryl one day and
6    you go to the field or you're in high-heat
7    situations, on that day when your sweat glands are
8    not functioning you're at risk.
9    **Q.    Okay.  And if you take that Benadryl for**
10   **one day and then stop, are you at that same risk**
11   **the next week?**
12   A.    Someone who is not on Benadryl, which is
13   Diphenhydramine, doesn't take it, then it doesn't
14   provide a risk to them outside of the time of the
15   duration of action of that drug.  As some know, if
16   you take a Benadryl or if I take a Benadryl right
17   now, I might still be a little sleepy by tonight or
18   even tomorrow morning, but the duration of action
19   for each individual, depending on their metabolism,
20   their enzymes, it's always different.  But
21   fundamentally if you don't take Benadryl you're not
22   going to have the anticholinergic effect of
23   Benadryl.
24   **Q.    Okay.  So your opinion -- which I'm**
25   **trying to figure out here -- your opinion is if**

Page 93

1    someone is on Benadryl they should not be out

2    working in the -- on the farm line?

3        A.    My opinion is that Benadryl -- duration

4    of action can be a little longer or a little less

5    depending on the individual and that their sweat

6    glands won't work, and that there are case reports

7    of an individual taking one Benadryl and having an

8    acute heat stroke in the setting of hiking in this

9    case under the influence of or with Benadryl.  So

10   that's my answer.  I hoped it answered your

11   question.

12       Q.    Okay.  Is it your opinion, though, that

13   once -- you talk about the duration or the action

14   of the medication.  Once there's no more impact

15   from Benadryl, an individual could then return to

16   working on the farm line?

17       A.    So my opinion is in the discussion of

18   Diphenhydramine if somebody is not on a drug and

19   it's not in their system, then Diphenhydramine will

20   not have an effect on the sweat glands.

21       Q.    Okay.  What about Zyprexa?  If someone is

22   on Zyprexa should they have a heat exemption?

23       A.    Yes.

24       Q.    What about Zyrtec, same question?

25       A.    What's the generic for Zyrtec?  I'm

1    sorry.  I can -- y'all don't have anything to look

2    it up, but I think Claritin -- well, anyway, of all

3    the drugs, if I had to -- it's unclear to me

4    exactly.  I think Zyrtec is Cetirizine.  All of

5    these are anticholinergic, but Cetirizine and

6    Loratadine are the least anticholinergic.  There

7    are more that are like -- they're less

8    anticholinergic than the others.  They're

9    antihistamines.

10        Q.    And these antihistamines that are less

11   anticholinergic than others, would you agree that

12   if an inmate is on one of those medications it

13   would be okay to have them work on the farm line?

14              MS. WRIGHT:

15                   Object to form.

16        A.    That's too general, sir.  Your question

17   is too general.  Could you please make it more

18   specific?

19   BY MR. BLANCHFIELD:

20        Q.    I don't know how to make it more

21   specific.  If some -- if a relatively healthy

22   inmate is on -- the only medication he's on is

23   Zyrtec, would you say he should not be working out

24   on the farm line because of the Zyrtec?

25        A.    I would -- I would then look at that

Page 95

```
 1  individual's -- relatively healthy, I don't know,

 2  but I would say that there is less risk from Zyrtec

 3  than the other medications listed n this particular

 4  sentence.

 5       Q.    Okay.  So what about Losartan?

 6       A.    What about it?

 7       Q.    That's a blood pressure medication?

 8       A.    Yes.  There's no question that Losartan

 9  puts the patient at risk because it affects the

10  cardiovascular system.  It's an antihypertensive.

11       Q.    And is that -- is that generic Cozaar,

12  Losartan?

13       A.    Losartan is a trade name.  It's a -- you

14  can give me -- you know, I'm much better with

15  generics because we don't use trade names in

16  general.  But Losartan is a -- my memory of

17  Losartan is an angiotensin Type B receptor

18  antagonist.  There's no question that that puts the

19  person at risk for heat-related illnesses as well

20  as the condition that they are taking Losartan for

21  puts them at risk, so it's a double whammy.

22       Q.    Okay.  And what about Elavil, same

23  question?

24       A.    Elavil is a strong anticholinergic.  It's

25  a tricyclic antidepressant with a long history of
```

Page 96

1    relation to heat stroke and it's a very

2    psychoactive medication.  So all of the tricyclic

3    antidepressants should be on the list.

4          And my memory -- and I -- is that there

5    are tricyclic antidepressants on the list, but I

6    would have to look at the list to make certain.

7    **Q.    Okay.  So if we're looking at paragraph**

8    **57, the strongest anticholinergic medications --**

9    **correct me if I'm misunderstanding you -- seem to**

10   **be Losartan and Elavil?**

11   A.    Losartan is not anticholinergic.

12   Losartan is an angiotensin Type B receptor blocker.

13   **Q.    Okay.**

14   A.    Elavil is Imip- -- Imipramine (sic).

15   It's very anticholinergic.  It's -- when we're

16   talking about just anticholinergic, which, of

17   course, this -- this paragraph is not talking about

18   just anticholinergic, but if you -- if you ask --

19   if the question is, which one of these drugs is

20   anticholinergic, Benadryl, which is

21   Diphenhydramine, is very anticholinergic.  Zyprexa,

22   Olanzapine, is also anticholinergic.  Zyrtec is

23   less so.  Losartan is not -- is not an

24   anticholinergic drug.  We've talked about that.

25   And Elavil or Imipramine is obviously a tricyclic

Page 97

1    antidepressant and that is highly anticholinergic.

2        Q.    Okay.  If we move to the next page,

3    paragraph 58, it references among other things beta

4    blockers.  I assume it's your opinion that -- well,

5    let me ask you.  Is it your opinion that all beta

6    blockers should be on the heat pathology medication

7    list?

8        A.    Yes.

9        Q.    What about calcium channel blockers?

10       A.    Calcium channel blockers should be on the

11   heat pathology list because they interfere with

12   inotrophy, which is the ability to squeeze and the

13   ability to beat fast, and that's why they should be

14   on the list of drugs that render the patient more

15   susceptible to the heat.

16       Q.    Okay.  Would that include all calcium

17   channel blockers?

18       A.    It does.  Contrary to Dr. Barnes' report,

19   yes.

20       Q.    And all beta blockers?

21       A.    Absolutely.

22       Q.    Okay.  Paragraph 59, diuretics, in your

23   opinion all diuretics should be on the heat

24   pathology medication list?

25       A.    Yes.  Contrary to Dr. Barnes, absolutely.

Page 98

1    Excuse me, Mr. Blanchfield, I just want to make

2    sure that when you keep -- when you say heat

3    pathology list, I'm understanding you to be asking

4    me if these drugs render an individual more

5    susceptible to the heat.  Is that correct?

6        **Q.    Well, I'm glad you bring that up.  We**

7    **were talking about Attachment A, heat pathology**

8    **medications, and that those individuals who are**

9    **taking -- who were taking those medications, you**

10   **mentioned heat exemption.  So I'm really not --**

11   **what I'm asking is, in your opinion should every**

12   **inmate who is on a beta blocker receive a heat**

13   **exemption and not be put out to work in the farm**

14   **line?**

15       A.    So I have not used the word heat

16   exemption today and my opinion is that these drugs

17   that I -- that these drugs that we have been

18   discussing and my understanding of the heat

19   pathology list are that those drugs render an

20   individual more susceptible to the heat, the

21   conditions -- in some cases the conditions for

22   which these drugs are being used are also worsened

23   by the heat or make the individual more susceptible

24   to the heat.

25       **Q.    Is it your understanding that the inmates**

Page 99

1  at LSP who are on any of the medications listed on

2  Exhibit A are entitled to a heat-related duty

3  status?

4      Q.    You would have to show me the list,

5  please, refresh my memory, but that is not my

6  understanding.  But you could show it to me.

7      Q.    You don't have the documentation in front

8  of you?

9      A.    No.  I was specifically told to have only

10  three things, so I practically emptied out the

11  whole office.  I have covers over here on

12  everything (indicating).  It's a little overboard,

13  I guess, but, no, I don't have it.

14      Q.    Okay.  Well, I will get -- maybe during

15  the next break I will get it.  I'm not prepared to

16  share my screen, but I can probably get that done

17  so we can --

18                  MR. BLANCHFIELD:

19                      Unless, Lydia, you want to do

20  it.

21                  MS. WRIGHT:

22                      I'm not going to run exhibits

23  for you, Drew.  If you want to show her something

24  you can figure out how to do it.

25                  MR. BLANCHFIELD:

Page 100

1                          I will.  I just thought it

2     might expedite things, but okay.

3     BY MR. BLANCHFIELD:

4         **Q.    So let me back up here.  Doctor, your**

5     **understanding with respect to those medications**

6     **listed on Exhibit A is not that they are entitled**

7     **to a heat-related duty status?**

8         A.    The list in that exhibit seems to be a

9     moving target right now.  There's e-mails

10    concerning incorporation of something from

11    California DOC or Iowa.  So my understanding of the

12    state of things right now with regards to the heat

13    pathology, I do know that Dr. Lavespere said let's

14    look at this list and maybe we should consider

15    putting some other things on it.  So exactly what's

16    on it today or even when I last looked at it and

17    what actions have been taken and what it means is

18    unclear to me as I sit here.

19        **Q.    Okay.  Okay.  So your understanding is**

20    **that there is some discussion about modifying that**

21    **list, correct?**

22        A.    I read the e-mails and I -- and there are

23    e-mails and maybe deposition testimony.  I forget

24    exactly where it comes from.  I know that there is

25    -- that the registered pharmacist has put forth the

Page 101

1    California and Iowa lists.  I saw that he has

2    marked -- put a line through some of the drugs that

3    are currently on the LSP list and there are others

4    that are not currently on the list.  The state of

5    that right now, I don't know.

6        **Q.    Okay.  And, similarly, you don't know**

7    **what the impact of putting a drug on that list has**

8    **with respect to whether or not someone gets a**

9    **heat-related duty status?**

10                MS. WRIGHT:

11                    Object to form.

12        A.    The -- I am very clear about Dr.

13    Lavespere saying if the drug is on -- if the drug

14    is a psychotropic, is the word he uses, that they

15    don't go to the farm line; they get a heat

16    exemption or a duty status that exempts them.

17    That's what I understand from his deposition

18    testimony.

19    BY MR. BLANCHFIELD:

20        **Q.    Okay.  And what is your understanding of**

21    **what a heat-related duty status is?**

22        A.    My understanding is that they don't have

23    to go and work in the field.

24        **Q.    And if we go back to paragraph 57 where**

25    **we talked about all of those medications, is it**

Page 102

1    your opinion that individuals who are on those

2    medications should automatically receive a

3    heat-related duty status?

4         A.    Well, Benadryl, Zyprexa, Losartan and

5    Elavil, yes.  I am allowing a little room for

6    Zyrtec because it's primarily an H1 receptor

7    antagonist, unless you go outside of the normal

8    dose of 10 milligrams, then it starts to lose its

9    specificity and also is more anticholinergic.

10        Q.    Okay.  Any other medicines besides Zyrtec

11   that --

12        A.    Well, I'm referring to the list on 17.  I

13   don't have the list memorized, but -- so --

14        Q.    What are you referring to, the list from

15   17?

16        A.    What I'm saying is on page 17 you

17   directed my attention to this -- on the bottom of

18   page 17 you directed my attention to these

19   medications and I just listed the ones that --

20        Q.    Okay.  And my question -- my initial

21   question was whether or not in your opinion someone

22   on these medications should receive a heat-related

23   duty status --

24                    MS. WRIGHT:

25                         Object to form.

SUSI VASSALLO

1    BY MR. BLANCHFIELD:

2        **Q.      -- and you said -- you qualified Zyrtec.**

3    **Are there any other medicines in that list on page**

4    **17 that you would qualify?**

5        A.      On the bottom of 17 I would qualify

6    Synthroid.  In other words, if you have a low

7    thyroid level and you're on the proper dose of

8    Synthroid to establish proper thyroid function so

9    that your physiology is working normally, I don't

10   think that should be on the list.

11       **Q.      Okay.**

12       A.      If you're toxic from it, then it should

13   be on the list, but let's just -- so I've been

14   clear about Diphen- -- Benadryl, Zyprexa, Losartan

15   and Elavil.  Zyrtec, I'm talking about doses and

16   individuals.  When it comes to Synthroid, if it's

17   used properly to restore thyroid function at the

18   physiological normal range, then it should not be

19   on the list.

20       **Q.      Okay.  Thank you.**

21       A.      Okay.

22       **Q.      That clears it up.  And then the same**

23   **question if we turn to the next page, the beta**

24   **blockers.  In your opinion, if someone is on a beta**

25   **blocker, would they -- should they be entitled to a**

Page 104

1    heat-related duty status?

2        A.    So my expertise is in medicine and my

3    point of view is beta blockers -- I might -- the

4    facts -- the fact is that beta blockers decrease

5    the ability to dissipate heat.  All of them.  Do I

6    think that every individual who takes a beta

7    blocker has to be off the farm line?  I think there

8    are other individual considerations.

9            I'm just saying that if you're on a beta

10   blocker your heart doesn't function normally, your

11   vessels don't function normally, you -- and so a

12   number of things.  So it puts you at increased risk

13   for heat illness.

14       **Q.    Okay.  And if I understand what you're**

15   **saying, before we would automatically take someone**

16   **off on the farm line who's on a beta blocker,**

17   **there's other things we need to look at?**

18       A.    Yes.

19       **Q.    Okay.  Calcium channel blockers, same**

20   **question?**

21       A.    Well, same answer.  Calcium channel

22   blockers and beta blockers won't impair the ability

23   of the patient or the individual, the prisoner, to

24   dissipate heat and the literature is clear that

25   these drugs put the patient at risk, the individual

SUSI VASSALLO

1   at risk.

2           So should they come off the heat -- off

3   the farm line in the hottest days is probably the

4   safest.  So the question is, what is that

5   individual's risk of, you know, harm, and the risk

6   of harm is increased when they are on those drugs

7   and have the conditions that these drugs treat.

8       **Q.    Okay.  Then moving on to paragraph 59,**

9   **Hydrochlorothiazide, diuretics, if someone is on a**

10  **diuretic would you advocate automatically that he**

11  **get a heat-related duty status?**

12      A.    I'm not ready to talk about that policy.

13  I'm ready to talk about what Hydrochlorothiazide

14  does to the body.  It impairs by affecting vascular

15  reactivity by removing certain sodium electrolytes

16  and changing the plasma volume, all diuretic.

17  That's why they're called a diuretic.  They have

18  certain effects that render the individual more

19  susceptible to heat.

20      **Q.    Okay.  So do you have an opinion whether**

21  **someone who is on a diuretic should not be placed**

22  **out on the farm line?**

23              MS. WRIGHT:

24                  Object to form.

25      A.    I -- I -- I -- I'll tell you my opinion.

SUSI VASSALLO

1  My opinion is this individual on this medication is

2  at increased risk of heat illness.  The condition

3  that they are treating by diuretic puts them at

4  increased risk of, for example, a heart attack,

5  myocardial infarction.  It puts them at increased

6  risk of dehydration and heat exhaustion.  It puts

7  them at increased -- those are the main -- it puts

8  them at increased risk of electrolyte disorders.

9         Those are my opinions.  If we get into

10  the policy, then I'm -- I haven't made a policy

11  here.  What I'm doing is, I'm saying that these

12  drugs, the conditions which they treat, render the

13  individual more susceptible to heat and the

14  condition for which they are treating is also --

15  puts them at risk.

16         So if they're on a -- if they have

17  hypertension or congestive heart failure or

18  whatever cardiac -- there are many cardiac

19  conditions -- and that they are at increased risk

20  of heat causing a problem.

21  BY MR. BLANCHFIELD:

22     Q.    Okay.

23     A.    Other than that, I don't think I can

24  further answer your question.

25     Q.    Okay.  So this -- this is a discovery

1    deposition.  You're aware of that, right?

2        A.    Well, I know it's a deposition.

3        Q.    Well, it is a discovery deposition and

4    one of the things that I'm trying to determine are

5    all of your opinions.  The reason that we do this

6    -- it's called discovery -- is so that we're not

7    surprised when we get to trial and -- you know, we

8    want to know your testimony in advance.

9              So, with that backdrop, I want to know,

10   you know, in November when we go to trial Dr.

11   Vassallo is not going to say that any inmate who is

12   on a diuretic should not be placed on the <u>farm</u>

13   line.

14                      MS. WRIGHT:

15                          Is that a question?

16                      MR. BLANCHFIELD:

17                          Yes.

18        A.    I understand the point, sir.

19   BY MR. BLANCHFIELD:

20        Q.    What is that?

21        A.    I understand the point you're making

22   about discovery.

23        Q.    Okay.  Will you testify to that?  Do you

24   know?

25                      MS. WRIGHT:

 1                          Object to form.

 2      A.    I'll tell you that I am testifying right

 3  now exactly how I'm going to testify.

 4  BY MR. BLANCHFIELD:

 5      **Q.    Okay.**

 6      A.    So to the extent that your question is

 7  left unanswered, I can't help you any more.  I feel

 8  like I've been very thorough in my point of view,

 9  my position and where my expertise lies.

10      **Q.    And I guess my question with respect to a**

11  **diuretic, if someone is on a diuretic would you**

12  **think that is an automatic disqualifier for working**

13  **on the farm line?**

14                      MS. WRIGHT:

15                          Object to form.

16  BY MR. BLANCHFIELD:

17      **Q.    You can answer.**

18      A.    My answer is, nothing is automatic here,

19  but an individual -- there is -- except at LSP

20  currently.  It's supposed to be automatic according

21  to Dr. Lavespere if the patient is on a

22  psychotropic.  The problem is that some of these

23  medications have effects on the mentation that he

24  doesn't call psychotropic.  So I feel like I've

25  answered your question in this discovery deposition

1    to the extent I'm able.

2        Q.    Okay.  Moving on to paragraph 60, common

3    nasal decongestants and over-the-counter cold

4    remedies, are those anticholinergics?

5        A.    No, they're sympathomimetic.  It's

6    chapter -- I mean, it's Number 60, right?  It says

7    they're sympathomimetic.

8        Q.    Yes.

9        A.    Some of them are combinations, but in

10   this chapter -- excuse me -- paragraph 60 I'm

11   simply asking -- speaking to sympathomimetics.

12       Q.    Okay.  Let's -- let's turn the page here

13   and let's go to the SSRIs.  Would you agree that

14   SSRIs have a very low anticholinergic effect?

15       A.    SSRIs interfere with thermoregulation not

16   because they are anticholinergic.  They interfere

17   with thermoregulation by their effect on the

18   neurotransmission at the hypothalamus.  It's

19   clearly stated in UpToDate, the reference that Dr.

20   Keldie references, that SSRIs and SS- -- SRNIs

21   should be on the list.  And it's stated in another

22   reference he has.

23            So this antidepressant is clearly stated

24   in the literature to be a risk.  And the main

25   action there is neurotransmission at the

SUSI VASSALLO

1   hypothalamus, the interference with hypothalamic

2   neurotransmission.

3       Q.    Okay.  All right.  I'm going to move on

4   to another topic.  It is noon.  Can we take another

5   10-minute break?

6       A.    Okay.  If you say so, surely.

7       Q.    Okay.

8       A.    What time will we come back?

9       Q.    We'll come back at 10 after 12.

10                  MR. BLANCHFIELD:

11                       Is that all right, Lydia?

12                  MS. WRIGHT:

13                       Sounds good.

14                  MR. BLANCHFIELD:

15                       Okay.  Thanks.

16          (A recess was taken at 12:00; resuming at

17   12:10 PM)

18   BY MR. BLANCHFIELD:

19       Q.    Okay.  Are we ready?

20       A.    Yes.

21       Q.    All right.  Okay.  Doctor, I want to turn

22   to page 21 of your initial declaration, if you

23   could, the topic of adverse medical and mental

24   health outcomes.

25       A.    I'm there.

SUSI VASSALLO

1      Q.    Okay.  You reference a CDC -- a 2008 CDC

2   study of heat-related deaths among crop workers

3   reported from 1992 to 2006.  That applies to crop

4   workers not in an incarcerated setting; is that

5   correct?

6      A.    Yes, as far as I know it does.  They

7   didn't delineate where they were working, but I

8   have no reason to think that this is incarcerated

9   individuals.

10      Q.    Okay.

11      A.    But I also don't have any reason to know

12   if it has one or two individuals who were

13   incarcerated.  It didn't say.

14      Q.    All right.  Fair enough.  In your mind is

15   there any difference in the risk of heat injury

16   experienced by crop workers who are not

17   incarcerated to the crop workers at LSP?

18                   MS. WRIGHT:

19                      Object to form.

20      A.    Yes.

21   BY MR. BLANCHFIELD:

22      Q.    Yes, there is a difference?

23      A.    There is a difference.

24      Q.    In the risk?

25      A.    Would you like me to expound on my

1    answer?

**2         Q.      Yeah, that would be helpful.**

3         A.      Okay.  So when I think of somebody

4    incarcerated who's working with crops, I know that

5    there's -- at LSP there's a pusher, there's --

6    there are certain punishments that may go along

7    with not following the order of the pusher to

8    either work faster or harder or maybe even produce

9    more -- picked or planted more product.

10             The people who are in LSP return to a

11    nonair-conditioned environment, meaning the heat

12    stress is cumulative there, and -- and, of course,

13    it's possible that all crop workers have some kind

14    of medical condition -- I mean both incarcerated

15    and not incarcerated -- have medical conditions or

16    are on certain medications.

17             But the reason I say it's different is

18    because in the free world a crop worker may be able

19    to make his or her own decisions about

20    productivity, speed of work and to make his or her

21    own decision as to when they start to feel badly

22    and -- or are having some kind of adverse

23    consequence to the crop work that they're doing.

24    Those are what -- so I just -- those are why my

25    answer was as it is.

1      Q.      Further in that paragraph it says that 95

2   percent of the deaths occurred during the hottest

3   months, June, July and August, and that most of the

4   deaths occurred during the hottest time of the day,

5   the afternoon, correct?

6      A.      Yes.

7      Q.      And it's your understanding that the farm

8   line does not operate in the afternoon hours during

9   the summer months?

10      A.      That's correct.

11      Q.      Are you familiar with other activities at

12   LSP involving work outdoors, like the grass-cutting

13   crews or the building maintenance crews or welding

14   in the yard crews, mechanics working outside, are

15   you familiar with any of that?

16                  MS. WRIGHT:

17                      Object to form.

18      A.      I'm familiar with the fact that there are

19   those workers.

20   BY MR. BLANCHFIELD:

21      Q.      Okay.

22      A.      And there are those who are actually

23   sorting -- you know, they're sorting, not picking

24   cucumbers or whatever -- they're either sorting or

25   cleaning the vegetables or sorting, yes.

SUSI VASSALLO

Page 114

1    Q.    Are you able to tell me whether or not

2    these individuals are at greater risk to heat

3    injury or lesser risk to heat injury when compared

4    to the farm line workers?

5    A.    I'm not able to tell you.  I'm not

6    familiar with their conditions of work at all.

7    Q.    Okay.  On the top of page 23 you

8    reference under threat of severe punishment if

9    their work is considered inadequate.  In your

10   review of all of the materials in this matter did

11   you see any evidence of any inmate being sanctioned

12   or punished for inadequate work on the farm line?

13   A.    Could you just tell me what paragraph

14   you're reading from?

15   Q.    I'm sorry.  It's the top of page 23.

16   It's actually the second line from the top.

17   A.    I don't have any custody records of their

18   punishment or not, so I don't have those records.

19   Those would be custody and correctional side

20   records.  I didn't see those.

21   Q.    And when you say that is your

22   understanding, you're getting that from the inmates

23   themselves?

24   A.    Yes, and from Orlando Scott.  I feel like

25   he clearly implied that there were -- could be some

SUSI VASSALLO

1   sanctions against the inmates who didn't follow

2   orders.  You can't have people out there not

3   following orders.  That's what he said.  He talked

4   about that.

5        **Q.    On page -- paragraph 79 on that same**

6   **page, at the bottom of that paragraph you state,**

7   **Once in the fields there are no scheduled breaks or**

8   **shade.  Do you know different now since you have**

9   **issued this declaration?**

10       A.    I'm aware of the 10 foot -- 10 foot by 10

11  foot -- approximately; looks square to me -- tent

12  that was there when I was there.  I'm aware of the

13  five minutes on every 30-minute break schedule.

14  I'm aware that there is now more documentation than

15  there was done previously.  According to Mr. Scott

16  he has to keep records and I did see some records

17  recently suggesting that that was happening.

18       **Q.    Okay.  Are you aware that the break times**

19  **and length of times have been modified?**

20       A.    I'm aware that the policy has changed for

21  modification, yes.

22       **Q.    And what is your understanding of how**

23  **it's been modified?**

24       A.    My understanding is that it's been 15

25  minutes for every 45 minutes.  That's my memory of

1    it.

2       Q.    Okay.  The next paragraph, 80, you

3    reference quotas.  Do you know better now that

4    there are no quotas for the amount of vegetables to

5    be picked?

6               MS. WRIGHT:

7                  Object to form.

8       A.    Well, you know, I know that the prisoners

9    are supposed to produce.  If that's a quota like

10   how many actual we'll call them baskets, even

11   though we know they're square containers that you

12   carry books in, how many of those and how full they

13   have to be, I'm not using quota like that.

14            I'm -- so to the extent that the word

15   quota means a number, what I'm saying is they have

16   to produce.  How much they need to produce I'm not

17   prepared to say and I haven't seen anybody who says

18   they have to produce five boxes of cucumbers or do

19   this or that.  I do know that they are pushed to

20   produce and that if the pusher doesn't produce he

21   also will be sanctioned for his inadequate running

22   of his crew, according to Mr. Scott.

23   BY MR. BLANCHFIELD:

24      Q.    Now, in paragraph 81 you state, They also

25   report -- "they" meaning the inmates, correct?

1        A.      In paragraph 81, plaintiffs and class

2    members also report --

3        **Q.      That --**

4        A.      Yeah.

5        **Q.      Go ahead.  That their drinking water is**

6    **not always available in the fields.  When it is,**

7    **it's often dirty.  Ice is rarely, if ever,**

8    **provided.  Do you now know that not to be true?**

9        A.      Let's go one by one.

10       **Q.      Okay.**

11       A.      The water is -- has black flecks on it.

12   I don't know if it was -- I don't know what that

13   is.  I don't know that I would call it dirty.  I

14   would have drank it.  Ice, I can't tell you how

15   often ice is -- so I don't know if that is true or

16   not, if it's always there or if it's sometimes not

17   there.  I do know that sometimes it arrives late

18   for the -- later than the individuals start

19   working.

20            Those are the things I -- I do -- my

21   understanding is that drinking water is available.

22   The word dirty is -- is a subjective word.  The day

23   that I was observing it wasn't dirty.  It just had

24   a little bit of dirt in it.

25            Ice is rarely, if ever, provided.  I'm

SUSI VASSALLO

1    not sure.  I only saw evidence that these things

2    sometimes arrived to the field after the workers

3    arrived.

4        **Q.    Do you know if the correctional officers**

5    **actually drank from the same vessels that the**

6    **inmates are drinking from?**

7                    MS. WRIGHT:

8                        Object to form.

9        A.    I don't know.  I can tell you the day I

10   was there I would have drunk the water if I was

11   thirsty.  That's all I meant.

12   BY MR. BLANCHFIELD:

13       **Q.    Fair enough.**

14       A.    I don't really care about black flecks in

15   my water.

16       **Q.    All right.  Paragraph 82 references**

17   **expensive co-pays.  Since writing that paragraph**

18   **have you been provided any new information that**

19   **would cause you to modify paragraph 82?**

20       A.    Well, at the time that I wrote this my

21   understanding of the co-pay for a self-declared

22   emergency most recently was two dollars.  My

23   understanding is now it's decreased to one dollar.

24       **Q.    Okay.  If you could turn to page 25,**

25   **paragraph 87, you state, I understand certain**

Page 119

1  plaintiffs and class members suffer from a range of

2  disabilities and health conditions that decrease

3  the body's thermoregulation function placing them

4  at higher risk of heat-related illness.

5        That understanding -- where do you get

6  that understanding from, from review of the medical

7  records?

8    A.    Yes.

9    Q.    On the eight plaintiffs; is that correct?

10   A.    Yes, and -- yes, it's from the

11  plaintiffs, but it's also from my knowledge of

12  Louisiana State Penitentiary and that the class --

13  my understanding of the class is everybody in the

14  prison.  And I'm aware that when you look at

15  everybody in the prison that there are prisoners

16  who have the conditions that I've listed here or

17  are taking medications that make them heat

18  intolerant.

19   Q.    Are you aware of any modifications made

20  to medical treatment at LSP in the last 24 months?

21              MS. WRIGHT:

22                  Object to form.

23   A.    That's too broad.  I just -- could you

24  ask it specifically one by one what modification

25  you're referencing?

Page 120

1  BY MR. BLANCHFIELD:

2      Q.    Well, let me ask it this way.  Have you

3  been provided any information suggesting

4  modifications made with respect to the delivery of

5  healthcare at LSP in the last two years?

6                  MS. WRIGHT:

7                      Object to form.

8      A.    Well, you know what I have reviewed and

9  your question is still -- I'm happy to answer it,

10  but you -- I really need you to be more specific.

11  BY MR. BLANCHFIELD:

12      Q.    More specific than any changes in the

13  delivery of healthcare?

14      A.    Yes.

15      Q.    Let's move on to paragraph 88.  You say,

16  I provided evidence in federal court in Texas that

17  the risks accelerate sharply at a heat index of 88

18  degrees Fahrenheit.  Was that testimony in federal

19  court or a deposition?

20      A.    Well, most recently I was in federal

21  court here in Austin and -- so that would be in

22  court.  We had an extensive discussion about this

23  with the relevant literature being quoted in court,

24  some of it.  I mean, we didn't get into all of it

25  because it's so much.  I don't remember the last

1   time I was in federal court in Houston in front of

2   Judge Ellison if we discussed the 88-degree epidem-

3   -- the number or not.

4           Well, actually, I very -- I don't

5   remember the year, but that was the Pack Unit up by

6   Dallas and I think I probably discussed it then.

7   So the answer to you -- your question is in court,

8   not just deposition.

9       Q.    Okay.  And what is the name of that case?

10      A.    The one here in Austin or the one in

11  Houston?  It was -- in Houston it was -- we -- I

12  referred to it as the Pack Unit.  I don't really

13  know the specific names of the cases, but I'm sure

14  you could find it.

15      Q.    Okay.  So where you say I provided

16  evidence in federal court in Texas, are you

17  referring to both of those cases or just one?

18      A.    Yes.

19      Q.    Okay.

20      A.    I don't remember exactly what date I

21  wrote this, but I think that I -- I'm pretty sure

22  that this is dated -- well, I'm going to look just

23  to make sure.  One moment.  Yeah, so this was

24  executed on May 8th.  At that time it would have

25  been the Houston case.  Because I testified just in

Page 122

1    August here in Austin in federal court this now

2    refers to federal court in Houston and in Austin,

3    but at the time I wrote this it only referred to

4    federal court in Houston.

5         Q.    Okay.  All right.  The next page, page

6    **26, you reference, I would not dare to keep my dog**

7    **in these conditions for fear of my dog dying.  Is**

8    **that -- that's the dog that's with you today in**

9    **this deposition?**

10        A.    Well, you know, what interested me so

11   much is Dr. Toce listed the air-conditioned areas

12   of the 400 beds and the dog pen.  So the dog pen at

13   LSP, he testified, is air-conditioned.  And it's

14   true I would air-condition my dog and it seems to

15   be that they are -- that his testimony is that the

16   dog pen is air-conditioned at LSP.

17        **Q.    You base that on his testimony that the**

18   **dogs pen are air-conditioned?**

19        A.    Well, that was his testimony, yes.

20        **Q.    You're -- is that -- is that kind of a**

21   **recycled rhetoric from an earlier case?  Did you**

22   **use that statement in other cases like Lewis about**

23   **your dog or --**

24        A.    I have always known that if an animal is

25   kept in extreme heat it might be a violation for

Page 123

 1    the owners.  I understand that some animals are

 2    only outdoors.  I know that the pigs in Texas

 3    prisons are air-conditioned for their health and I

 4    know from Dr. Toce that the dogs in LSP are

 5    air-conditioned.

 6        Q.    The reference in that paragraph, the safe

 7    drinkable water, you know that the inmates are now

 8    provided with safe drinkable water, correct?

 9        A.    Which paragraph, sir?

10        Q.    It's the same paragraph.  It says --

11        A.    Page 27, paragraph 93?

12        Q.    No, not -- page 26, paragraph 91, your

13    dog reference.  It says, Keeping a dog in this heat

14    without safe drinkable water.  My question is, you

15    know now that the inmates working the farm line are

16    provided safe drinkable water?

17        A.    I do believe that the inmates on the farm

18    line have access to water, yes.

19        Q.    And do you believe that they are able to

20    access that water whenever they want?

21        A.    No.

22        Q.    Paragraph 92, I want to just basically --

23    generally discuss -- you mention acclimatize.  Do

24    you believe that individuals can acclimatize to

25    heat?

1     A.     Well, yes.

2     Q.     **Can you explain that to me?  How does**

3     **that -- how does that work?**

4     A.     Well, the process of acclimatization is

5     one in which the individual starts to sweat at a

6     lower body temperature, so earlier in the process

7     of heat stress, the process by which the

8     electrolytes change in their sweat content, meaning

9     that Aldosterone kicks in.  It retains sodium so

10    that your sweat is less salty and, therefore,

11    maintaining your plasma volume.

12         And the process of acclimatization

13    requires no inter- -- no interference from

14    medications, no interference -- or medications that

15    interfere with hypothalamus function, sweat glands,

16    skin, vasodilation or mentation.

17         And so acclimatization is a physiological

18    process and -- did I answer your question?

19    Q.     **I think you did.  Thank you.  And in**

20    **conjunction with that is there -- I'll just give**

21    **you a general principle.  You know, if I have some**

22    **friends who live in the north in Wisconsin and**

23    **Michigan come down here in the middle of the summer**

24    **and play singles tennis very actively, it impacts**

25    **them so much more than individuals who are down**

1    here playing on a daily basis.  Is that a principle

2    that you're familiar with?

3                    MS. WRIGHT:

4                        Object to form.

5        A.    Well, I mean, you're pre-assuming that

6    the individual who plays tennis for two hours a day

7    and comes back to their home or their office is

8    acclimatized.  In Louisiana or Texas they are not

9    acclimatized.  So their -- so the process of

10   acclimatization is particularly carefully laid out,

11   UpToDate lays it out, but not nearly to the extent

12   that Dr. Keldie's military recruits article does.

13                   The CDC, there are multiple articles that

14   lay out what it takes to acclimatize, the amount of

15   time you have to be in the heat, what you do

16   between the heat, how many days, how quickly you

17   lose acclimatization.

18                   So do I think the guy from the north

19   says, Wow, it's hot down here in Louisiana?  I do

20   think so.  And whereas -- although I have to tell

21   you that everybody I walk around here in Austin,

22   they all say, Wow, it's so hot.  It's been so hot.

23                   So this is not acclimatization.  What we

24   are talking about is the physiological adaption to

25   heat stress.  So if you're acclimatized you'll be

Page 126

1    in better shape than somebody who's not

2    acclimatized.

3    BY MR. BLANCHFIELD:

4        **Q.    What does it take to get acclimatized?**

5        A.    Well, there are regimens, particularly --

6    the Army particularly wants to be careful about

7    this, so they are careful to introduce -- to have

8    certain periods of rest, a certain number of hours

9    or a certain numbers of days after which

10   acclimatization is lost.  It's believed that the

11   process of acclimatization takes a couple of weeks

12   and maybe a few days to lose.

13          I'm sure that differs for some

14   individuals, but what doesn't differ is that the

15   individual with a heart condition and all of the

16   other things in his physiological derangement or

17   medication may not acclimatize, even when they're

18   in the heat.

19          For example, we have Losartan there.

20   Losartan interferes -- as I already mentioned, it's

21   an angiotensin-renin system, so that individual may

22   not be able to acclimatize.  There are many

23   examples like that.

24       **Q.    So if someone is on Losartan you don't**

25   **think they have the ability to acclimatize?**

1      A.    What I'm saying is that the process of

2  acclimatization requires an intact physiology.  It

3  requires certain exposure to the heat, a certain

4  number of days that it could be lost.  And if we

5  look in the military literature, the Army is --

6  speaks about this extensively.

7      **Q.    You mentioned UpToDate.  Is that**

8  **something that you use?**

9      A.    Well, do I ever use it?  I do use it on a

10  shift sometimes, but Dr. Keldie used it

11  extensively.  So I looked at what he looked at.  I

12  looked at his references.

13      **Q.    On page 30 of your declaration, paragraph**

14  **101, you reference 10 incarcerated people died due**

15  **to the heat in the summer of 2011.  Did you -- is**

16  **that in conjunction with work on the cases that you**

17  **referenced in Texas?**

18      A.    This was in conjunction with the Houston

19  cases.  There's a lot more testimony in the record

20  from Austin in the month of August of this -- you

21  know, last month I guess that is.  There's a lot

22  more evidence about heat stroke and there was -- it

23  was debated in court.  There were a number of

24  individuals who had temperatures of 108, 106, on

25  and on, some people who felt hot to the touch, did

1    not have their temperatures taken.  There's a lot

2    -- so present day and at that time.  So this is

3    2011.  And now we're -- now we're bringing to light

4    other heat stroke deaths in the Texas prison

5    system.

6        Q.    **Your conclusion on page 31 in your**

7    **initial declaration is that the farm line at Angola**

8    **is unsafe for every incarcerated person, especially**

9    **for people with disabilities and health conditions**

10   **that impede their ability to thermoregulate.  If I**

11   **understand it, your opinion does not extend to**

12   **inmates who are given other job assignments at**

13   **Angola?**

14       A.    I just had to replay your question.  Your

15   question is -- well, this opinion is referring to

16   the farm line, so that's what my conclusion is

17   about.  Does that answer your question?  Are you

18   saying anybody who is outside at Angola, is my

19   opinion talking about if they are hammering a nail

20   and fixing a board on the fence for an hour?

21       Q.    **Or running cattle or running horses or**

22   **cutting grass or welding metal?**

23       A.    My opinion is concerning the farm line.

24       Q.    **So you have no opinion with respect to**

25   **those other jobs?**

SUSI VASSALLO

Page 129

1    A.    I haven't been provided any information

2    about those other jobs.

3    **Q.    And it is your opinion that the risk of**

4    **heat injury encountered by the individuals who are**

5    **exercising in the afternoon heat, playing full-**

6    **court basketball, playing softball, weight-lifting,**

7    **playing soccer, is no greater than the risk of heat**

8    **injury that these farm line workers are exposed to**

9    **in the morning?**

10                   MS. WRIGHT:

11                         Object to form.

12    A.    My opinion is that the harm -- the farm

13    line, because of the -- because of the nature of

14    the work with the pusher with the possibility of

15    punishment, those things make the farm line --

16    distinguish the farm line from playing basketball

17    or any other sport where somebody could stop work

18    and sit on the sideline or be playing -- hardly

19    exercising because they're just standing there

20    visiting.  So the farm line has special -- is

21    distinct from voluntary sports.

22    BY MR. BLANCHFIELD:

23    **Q.    You would agree that an individual who is**

24    **on anti- -- an antipsychotic medication is at an**

25    **increased risk of heat injury compared to someone**

1    who is not?

2        A.    Someone on antipsychotics is at increased

3    risk.  Someone with congestive heart failure and an

4    LVAD -- I mean, it could be a number of conditions

5    that that individual has that could even put them

6    at greater risk or the same risk.  So I can't do

7    that comparison without knowing who you're

8    comparing.

9        **Q.    If I'm comparing it to a relatively**

10   **healthy individual who doesn't have any of those**

11   **conditions, would you --**

12       A.    Well, if this is a healthy individual

13   with no medical conditions, no genetic

14   predisposition, never had heat stroke before, has

15   not had a preceding illness, diarrhea, fever,

16   nothing, because all of those are -- put the

17   individual at risk in the exercising military

18   recruit literature.

19            The point -- I'm trying to answer your

20   question -- is that I agree completely that

21   antipsychotics put the individual at risk, but I

22   can't compare it to a hypothetical physiological

23   thing unless you delineate -- if you're saying that

24   person has -- is 20 years old and has nothing, but

25   that person is 20 years old, 20 to 39 years old and

SUSI VASSALLO

Page 131

1    is being pushed by a pusher on the farm line, I can

2    -- that person could have heat stroke.

3           The psycho- -- the person who's on

4    psychotropics also being pushed is at greater risk.

5    The guy who's -- so there's a degree of risk.  Risk

6    differs according to the conditions and medications

7    and the age and everything we've been talking

8    about.

9    **Q.    The use of psychotropic medicine, someone**

10   **who is taking a psychotropic medicine, increases**

11   **his risk for a heat-related injury; is that**

12   **correct?**

13   A.    Correct.

14   **Q.    Okay.  Now, once -- if that individual**

15   **stops taking the psychotropic medicine, all things**

16   **being equal, the risk then goes down?**

17                MS. WRIGHT:

18                     Object to form.

19   A.    You know, it's interesting because Dr.

20   Bouchama did a wonderful meta-analysis that showed

21   even patients with mental illness were at greater

22   risk than those who were not, significantly -- a

23   couple of times greater.  So now you have an

24   individual with untreated mental illness -- is how

25   I'm reading your question -- and he's out there and

Page 132

1   that individual is also at greater risk than

2   someone who is not mentally ill.

3           I'm withholding someone's psychotropics

4   in order that they can work on the farm line is --

5   still, that individual with mental illness is at

6   greater risk than a person without mental illness,

7   well -- well-established.

8   BY MR. BLANCHFIELD:

9       Q.      **Can people recover from mental illness?**

10      A.      Well, I don't use the word recovery.  For

11  example, if you have a heart attack -- no, let's

12  use a different one -- you have appendicitis, your

13  appendix is taken out and you recover.  Mental

14  illness is -- you can be more or less mentally ill

15  and you can get better.  You can get better.  If

16  that's what you mean by recover, you can get

17  better, yes.  You can get worse; you can get

18  better.  Absolutely you can get better.

19      **Q.      What about, like, a situational**

20  **depression?**

21      A.      Excuse me, sir.  Let me try to stop --

22  okay, I just got rid of whatever clicked up or

23  whatever it was.  It was distracting.  Okay.

24      **Q.      What about something like a situational**

25  **depression, is that something you can experience**

SUSI VASSALLO

09/24/2024
Page 133

Page 133

1   the impact from and recover?  I know that's not a

2   word you use, but --

3                   MS. WRIGHT:

4                         Object to form.

5      A.    Let's say your mother dies and you're in

6   grief.  Can you recover?  Yes.

7   BY MR. BLANCHFIELD:

8      Q.    Okay.

9      A.    That's a situation that causes you to

10  feel a sad mood and grief-struck.  Yes, you can

11  recover.

12     Q.    Okay.  And let's say if during that

13  period -- during the period of depression you are

14  prescribed some medication that increases your risk

15  to a heat-related injury.  Once you stop taking

16  that medicine does that risk go away?

17     A.    The risk of taking the medication goes

18  away.  Whether or not the mental illness persists

19  or gets worse because you're off the medication, I

20  don't understand that hypothetical there.

21          You know, the mental illness that they're

22  discussing here are -- many of them are bipolar and

23  schizophrenic.  These are genetic illnesses, mental

24  illnesses where people have a genetic

25  predisposition.  What you're talking about is

1  situational depression, a death of a family member,

2  whatever it is.  That is very different than

3  serious mental illness such as schizographic --

4  schizophrenia, bipolar, major depression and those

5  kinds of things.

6      **Q.    Do you have any idea of the number of --**

7  **well, let me ask you, do you know how many inmates**

8  **are at LSP?**

9      A.    Well, it's interesting because Dr. Toce

10  used the word 6,000 because he said 400

11  air-conditioned beds was about 10 percent of 6,000,

12  even though we know that 600 is about 10 percent.

13  Elsewhere, I see the number 4,200, so I

14  think there's a range on the daily count, but those

15  are the -- those are the numbers that are present

16  in the materials that I reviewed.

17      **Q.    Of that population do you have any idea**

18  **of how many inmates have duty statuses that**

19  **prohibit them from working outside?**

20      A.    I don't remember reading that number.

21      **Q.    Do you have any information of the**

22  **percentage of individuals who have a heat-related**

23  **duty status?**

24      A.    I don't.  I don't remember reading that

25  number right now.

1    Q.    Okay.  How do you check for dehydration

2    if someone comes in to see you?

3    A.    We start with the physical examination.

4    Start with the physical examination.  Obviously

5    there is the mucous membranes, the moisture of the

6    mucous membranes, the presence of tinting or the --

7    of the skin, the specific gravity of the urine.

8         When those things and the medical history

9    that somebody gives me a reason or some kind of

10   history that might be consistent with dehydration,

11   then those things with the physical exam.  The

12   vital signs are amplified in the physical exam.

13        For example, a very low blood pressure

14   and a very fast pulse could be sepsis.  It's

15   probably not just dehydration.  It could be.

16   There's a differential diagnosis, but if the person

17   is well -- has wet mucous membranes, a normal

18   specific gravity, a normal color of urine and no

19   history that goes with dehydration, then the vital

20   signs -- be it whatever abnormal vital sign you

21   want to say, well, this is dehydration, that's --

22   well, you have to have a history and physical

23   that's consistent and, therefore, you have a

24   differential diagnosis and you decide if

25   dehydration is part of the problem or not.  Excuse

Page 136

1    me.  Laboratory values may amplify that.

2         **Q.    You would include that in the vital sign**

3    **list, lab values?**

4         A.    No, laboratory is blood draw, blood and

5    urine.  Vital signs -- history, physical, vital

6    signs, and if you really want to look at baseline

7    laboratory values and then you look at the

8    laboratory values that are obtained at the time

9    that you're trying to figure out what's wrong with

10   the patient.

11        **Q.    Okay.  Doctor, do you know if you're**

12   **scheduled to review any more documentation in this**

13   **case?**

14        A.    You know, I don't know what I'm scheduled

15   to do next.

16        **Q.    Okay.**

17        A.    Except appear in Baton Rouge at some

18   point.  I don't even know what the attorneys will

19   be sending or if they are going to be sending

20   anything.  I don't know.

21        **Q.    Okay.  But you know you're coming to**

22   **trial whenever the trial date is set?**

23        A.    That's all I know.  And I can't be sure

24   of the date, but I know that when they first gave

25   me the date I requested it off from work, so I'll

SUSI VASSALLO

1    be there.

2        Q.    Okay.  And your reports in this matter

3    consisted of actually three separate declarations,

4    correct?

5        A.    Yes.

6        Q.    Okay.  Okay.  I need about five minutes

7    to go over a few notes.  I think I'm just about

8    done, Doc.

9        A.    Okay.

10        Q.    If we --

11        A.    I'll just wait.  I'll just wait.

12        Q.    Okay.  All right.  It shouldn't be more

13    than five minutes.

14        A.    Okay.

15              (A recess was taken at 12:57; resuming at

16    1:03 PM).

17              (Ms. Crutcher left the Zoom.)

18    BY MR. BLANCHFIELD:

19        Q.    Doctor, just one or two more.  I may have

20    asked you about this already.  I apologize if I

21    have, but are you aware of any published

22    anticholinergic risk scales?

23        A.    Risk of what?

24        Q.    Well, there are published -- I mean,

25    there's a whole bunch of different risk scales,

1  different risks and if you would simply Google it

2  I'm just wondering if you are familiar with those?

3      A.    I'm aware of them because Dr. Barnes and

4  Dr. Keldie spoke to them.  I would have to review

5  the articles from which those are derived.  I can

6  tell you that that is not something that the

7  physician medical toxicologists rely on.

8          So the answer is, I'm aware, and unless I

9  look carefully at the -- at the original articles

10  and how they were derived, at this time -- which I

11  will do -- they have no meaning to me.

12      Q.    Okay.  Same question for published load

13  scales of anticholinergics?  Same answer?

14                  MS. WRIGHT:

15                      Object to form.

16      A.    I don't know what you mean by load for

17  anticholinergics.  Are you talking about heat

18  stress load?

19  BY MR. BLANCHFIELD:

20      Q.    Uh-huh.

21      A.    What load are we talking about?

22      Q.    Heat stress load.

23      A.    Yeah, those have -- I'm only aware of

24  them from reading about them and I will read them.

25  So the answer is, I'm aware of their being

Page 139

1    published, but their relevance is something I will

2    have to look into, if they have anything to do with

3    this versus if they are just the degree of

4    specificity of any particular receptor.

5        Q.    Okay.  You know, Doc, I think that's all

6    I have.  I appreciate your time.  I enjoyed

7    speaking with you today.

8        A.    Thank you, Mr. Blanchfield.  I look

9    forward to seeing you in New -- not in New Orleans;

10   in Baton Rouge.

11       Q.    Me too.  Thank you.

12       A.    Thank you.

13                 MS. WRIGHT:

14                     I have no questions for the

15   witness.

16                 MR. BLANCHFIELD:

17                     All right.  Then we're done.

18            (End of testimony at 1:07 PM)

19

20

21

22

23

24

25

Page 140

1                    WITNESS'S CERTIFICATE

2

3

4         I, DR. SUSI U. VASSALLO, the undersigned, do

5    hereby certify that I have read the foregoing

6    deposition taken on September 24, 2024, and it

7    contains a true and accurate transcript of the

8    testimony given by me:

9

10

11         (   )  Without corrections

12

13         (   )  With corrections as reflected on the

14   Errata Sheet(s) prepared by me and attached hereto

15   consisting of _____ pages.

16

17

18                      _____

19                          DR. SUSI U. VASSALLO

20                      _____

21                                DATE

22

23

24   Reported by:  Caroline D. Escude', CCR

25

Page 141

1          R E P O R T E R ' S   C E R T I F I C A T E

2

3          I, Caroline D. Escude', Certified Court

4    Reporter, Certificate #91182, in and for the State

5    of Louisiana, as the officer before whom this

6    testimony was taken, do hereby certify that DR.

7    SUSI U. VASSALLO, after having been duly sworn by

8    me upon authority of R.S. 37:2554, did testify as

9    hereinbefore set forth in the foregoing 140 pages

10   on September 24, 2024; that this testimony was

11   reported by me in stenographic machine shorthand,

12   was prepared and transcribed by me or under my

13   personal direction and supervision, and is a true

14   and correct transcript to the best of my ability

15   and understanding; that the transcript has been

16   prepared in compliance with transcript format

17   guidelines required by statute or by the rules of

18   the board and that I am informed about the complete

19   arrangement, financial or otherwise, with the

20   person or entity making arrangements for deposition

21   services; that I have acted in compliance with the

22   prohibition on contractual relationships, as

23   defined by Louisiana Code of Civil Procedure

24   Article 1434 and in the rules and advisory opinions

25   of the board; that I have no actual knowledge of

1  any prohibited employment or contractual

2  relationship, direct or indirect, between a court

3  reporting firm and any party litigant in this

4  matter nor is there any such relationship between

5  myself and a party litigant in this matter; that I

6  am not related to counsel or to the parties herein,

7  nor am I otherwise interested in the outcome of

8  this matter.

9       This certification is valid only for a

10  transcript accompanied by my original signature and

11  original required seal or my certified digital

12  signature on this page.

13  Signed:  September 25, 2024

14  _Caroline D. Escude'_

15       Caroline D. Escude', CCR #91182

16

17

18

19

20

21

22

23

24

25