<pre>
 1                 UNITED STATES DISTRICT COURT

 2                 MIDDLE DISTRICT OF LOUISIANA

 3

 4   VOICE OF THE EXPERIENCED, ET AL    *    CIVIL ACTION

 5   VERSUS                             *    NO. 3:23-CV-1304-BAJ

 6   JAMES LEBLANC, ET AL               *    APRIL 24, 2025

 7   * * * * * * * * * * * * * * * * *       VOLUME 3 OF 3

 8

 9
            REDACTED MOTIONS HEARING FOR CLASS CERTIFICATION
10            BEFORE THE HONORABLE BRIAN A. JACKSON
                  UNITED STATES DISTRICT JUDGE
11

12

13   APPEARANCES:

14   FOR THE PLAINTIFFS:          PAUL, WEISS, RIFKIND, WHARTON &
                                  GARRISON, LLP
15                                BY:  ARIELLE B. MCTOOTLE, ESQ.
                                       JEREMY A. BENJAMIN, ESQ.
16                                     RICHARDO R. SABATER, ESQ.
                                       MICHAEL C. MCGREGOR, ESQ.
17                                1285 AVENUE OF THE AMERICAS
                                  NEW YORK, NEW YORK 10019
18
                                  PROMISE OF JUSTICE INITIATIVE
19                                BY:  SAMANTHA B. POURCIAU, ESQ.
                                       KARA C. CRUTCHER, I, ESQ.
20                                1024 ELYSIAN FIELDS
                                  NEW ORLEANS, LOUISIANA 70117
21
                                  RIGHTS BEHIND BARS
22                                BY:  LYDIA WRIGHT, ESQ.
                                       AMARIS MONTES, ESQ.
23                                416 FLORIDA AVE. NW
                                  WASHINGTON, DC 20001
24

25
</pre>

```
 1   FOR THE DEFENDANTS:          KEOGH COX & WILSON, LTD.
                                  BY:  ANDREW BLANCHFIELD, ESQ.
 2                                     CHRISTOPHER K. JONES, ESQ.
                                       CHELSEA A. PAYNE, ESQ.
 3                                701 MAIN STREET
                                  BATON ROUGE, LOUISIANA 70802
 4
     OFFICIAL COURT REPORTER:     SHANNON L. THOMPSON, CCR
 5                                UNITED STATES COURTHOUSE
                                  777 FLORIDA STREET
 6                                BATON ROUGE, LOUISIANA 70801
                                  SHANNON_THOMPSON@LAMD.USCOURTS.GOV
 7                                (225)389-3567

 8        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY USING
               COMPUTER-AIDED TRANSCRIPTION SOFTWARE
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        INDEX
 2   DEFENDANTS' WITNESSES:                        PAGE
 3   ROLAND SYLVESTER
```

 4        DIRECT EXAMINATION BY MR. BLANCHFIELD        6
 5        CROSS-EXAMINATION BY MS. POURCIAU           18
 6        REDIRECT EXAMINATION BY MR. BLANCHFIELD     27
 7   JUSTIN COLEY, RN
 8        DIRECT EXAMINATION BY MR. BLANCHFIELD       32
 9        CROSS-EXAMINATION BY MS. POURCIAU           35
10   CARL KELDIE, M.D.
11        VOIR DIRE BY MR. BLANCHFIELD                44
12        VOIR DIRE BY MS. WRIGHT                     48
13        DIRECT EXAMINATION BY MR. BLANCHFIELD       54
14        CROSS-EXAMINATION BY MS. WRIGHT             79
15        REDIRECT EXAMINATION BY MR. BLANCHFIELD    113

```
16
17
18
19
20
21
22
23
24
25
```

|     |                                                                      |
|-----|----------------------------------------------------------------------|
| 1   | **(APRIL 24, 2025)**                                                  |
| 2   | **(CALL TO THE ORDER OF COURT)**                                     |
| 3   | **THE COURT:**  GOOD MORNING, EVERYONE.                              |
| 4   | BE SEATED.                                                            |
| 5   | ALL RIGHT.  WE ARE BACK ON THE RECORD IN THE                        |
| 6   | CASE OF *VOTE, ET AL VERSUS LEBLANC*.                                |
| 7   | LET THE RECORD REFLECT THAT COUNSEL FOR BOTH THE                    |
| 8   | DEFENDANTS -- THE PLAINTIFFS AND THE DEFENDANTS ARE PRESENT, AS      |
| 9   | IS MR. JACKSON, ONE OF THE NAMED PLAINTIFFS IN THE CASE.            |
| 10  | LET ME THANK THE GENTLEMEN FROM ANGOLA FOR YOUR                     |
| 11  | EFFORTS TO GET MR. JACKSON HERE ON TIME THIS MORNING DESPITE        |
| 12  | THE BAD WEATHER.  WE REALLY APPRECIATE YOU-ALL PLANNING AHEAD       |
| 13  | AND MAKING SURE THAT HE'S HERE ON TIME.                             |
| 14  | ALL RIGHT.  SO WHEN WE ADJOURNED YESTERDAY, I                       |
| 15  | BELIEVE, MR. BLANCHFIELD, ON BEHALF OF THE DEFENDANTS, YOU HAD      |
| 16  | THREE OR MAYBE FOUR -- MAYBE MORE WITNESSES THAT YOU WOULD LIKE     |
| 17  | TO CALL.  IS THAT CORRECT?                                          |
| 18  | **MR. BLANCHFIELD:**  YES, YOUR HONOR.  WE HAVE THREE               |
| 19  | WITNESSES, TWO OF WHOM WILL BE VERY SHORT.                          |
| 20  | **THE COURT:**  YES.                                                |
| 21  | **MR. BLANCHFIELD:**  AND THEN AN EXPERT.                           |
| 22  | **THE COURT:**  OKAY.  I DON'T THINK YOU HAVE TO BEND              |
| 23  | DOWN.  IF YOU JUST KIND OF POSITION THE MICROPHONE --              |
| 24  | **MR. BLANCHFIELD:**  OKAY.                                         |
| 25  | **THE COURT:**  -- WE SHOULD BE ABLE TO HEAR YOU.                  |

1            **MR. BLANCHFIELD:**  OKAY.

2            **THE COURT:**  I DON'T WANT YOU TO HAVE TO SEND ME AN

3    INVOICE FOR YOUR DOCTOR'S VISIT BECAUSE YOU HAVE A BAD BACK.

4    OKAY.

5            **MR. BLANCHFIELD:**  THERE WILL BE VISITS REGARDLESS OF

6    WHETHER I'M BENDING OVER, JUDGE.

7            **THE COURT:**  OKAY.  WE ARE AT THAT AGE.  RIGHT?

8            **MR. BLANCHFIELD:**  YES.

9            **THE COURT:**  OKAY.  BEFORE THE NEXT WITNESS IS CALLED,

10    ARE THERE ANY OTHER MATTERS WE SHOULD TAKE UP?

11                ANYTHING FROM THE PLAINTIFF?

12            **MS. POURCIAU:**  NO, YOUR HONOR.

13            **THE COURT:**  FROM THE DEFENSE?

14            **MR. BLANCHFIELD:**  NO, YOUR HONOR.

15            **THE COURT:**  ALL RIGHT.  WELL, LET'S GO ON AND

16    PROCEED, AND YOU MAY NOW CALL YOUR NEXT WITNESS.

17            **MR. BLANCHFIELD:**  THANK YOU, YOUR HONOR.

18                WE WILL CALL ASSISTANT WARDEN ROLAND SYLVESTER.

19            **THE COURT:**  WARDEN, YOU MAY STEP FORWARD.

20                        **ROLAND SYLVESTER,**

21      **HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:**

22            **THE COURT:**  PLEASE BE SEATED.

23            **THE DEPUTY CLERK:**  CLEARLY STATE AND SPELL YOUR NAME,

24    FOR THE RECORD.

25            **THE WITNESS:**  ROLAND SYLVESTER.  R-O-L-A-N-D,

1   S-Y-L-V-E-S-T-E-R.

2               **THE DEPUTY CLERK:**  PLEASE COME FORWARD AND SPEAK INTO

3   THE MICROPHONE.

4               **THE COURT:**  THANK YOU.

5                   YOU MAY PROCEED, MR. BLANCHFIELD.

6           **MR. BLANCHFIELD:**  THANK YOU, JUDGE.

7                       **DIRECT EXAMINATION**

8   BY MR. BLANCHFIELD:

9   **Q.**   GOOD MORNING, WARDEN SYLVESTER.

10  **A.**   GOOD MORNING.

11  **Q.**   CAN YOU STATE YOUR FULL NAME FOR THE RECORD FOR US,

12  PLEASE?

13  **A.**   ROLAND SYLVESTER.

14  **Q.**   AND, SIR, BY WHOM ARE YOU EMPLOYED?

15  **A.**   LOUISIANA STATE PENITENTIARY.

16  **Q.**   AND WHAT IS YOUR TITLE AT --

17  **A.**   ASSISTANT WARDEN, FIELD OPERATIONS.

18  **Q.**   AND AS ASSISTANT WARDEN, FIELD OPERATIONS, WHAT ARE YOUR

19  DUTIES?

20  **A.**   MY DUTIES ARE TO MAINTAIN THE CROPS AND THE GROUNDSKEEPING

21  ON THE PENITENTIARY.

22  **Q.**   AND, SIR, HOW LONG HAVE YOU BEEN WITH LSP?

23  **A.**   THIRTY YEARS AND A FEW MONTHS.

24  **Q.**   AND HOW LONG HAVE YOU BEEN IN FIELD OPERATIONS?

25  **A.**   THIRTY YEARS AND A FEW MONTHS.

1    **Q.**    CAN YOU GIVE THE COURT AN IDEA OF -- WE'RE NOW IN 2025.
2    IN THE LAST, SAY, 2024, 2025, ON AVERAGE, HOW MANY INMATES ARE
3    BROUGHT OUT INTO THE PRODUCE FIELDS?
4    **A.**    FROM THE TIME I STARTED TILL NOW OR --
5    **Q.**    LET'S GIVE A LITTLE HISTORY, IF YOU CAN.
6    **A.**    OKAY.  WHEN I FIRST STARTED IN 1995, WE WORKED
7    APPROXIMATELY EIGHT TO NINE HUNDRED INMATES A DAY IN THE FIELD
8    OPERATIONS.
9        AND CURRENTLY WE WORK APPROXIMATELY A HUNDRED, A
10   HUNDRED AND TEN.
11   **Q.**    AND ON ANY GIVEN DAY CURRENTLY, ABOUT HOW MANY INMATES ARE
12   OUT IN THE FIELD?
13   **A.**    ON THE FIELD LINES NOW, ROUGHLY I GET ANYWHERE FROM 20 TO
14   30 A DAY.
15   **Q.**    AND WITH THAT REDUCTION, HOW HAS THAT IMPACTED THE
16   PRODUCTION OF FRESH VEGETABLES AT LSP?
17   **A.**    DRAMATICALLY.
18   **Q.**    ARE YOU STILL ABLE TO FEED THE 4,000 INMATES FRESH
19   VEGETABLES?
20   **A.**    NO, SIR.  WITHIN THE LAST YEAR WE'VE HAD TO START USING A
21   BUNCH OF CANNED VEGETABLES BECAUSE WE CAN'T PICK ENOUGH PRODUCE
22   TO PUT IN THE PROCESSING PLANT.
23   **Q.**    THERE'S BEEN SOME TESTIMONY AND SOME DECLARATIONS ABOUT
24   ROTTEN PRODUCE IN THE FIELDS.  IS THAT TRUE?
25   **A.**    PRODUCE GOING BAD BECAUSE OF NOT BEING ABLE TO PICK IT?

1   YES.

2   **Q.**   OKAY.  IF YOU HAD MORE MANPOWER, YOU'D BE ABLE TO PICK IT?

3   **A.**   YES, SIR.

4   **Q.**   NOW, THE OPERATIONS THAT WE'RE TALKING ABOUT, THE FIELD

5   OPERATIONS, THEY OCCUR OUTSIDE THE SECURED PERIMETER AT LSP?

6   **A.**   YES, SIR.

7   **Q.**   ARE THERE ANY OTHER ACTIVITIES OR JOBS THAT OCCUR OUTSIDE

8   THE SECURED PERIMETER?

9   **A.**   ANY OTHER JOBS?  EXPLAIN.

10  **Q.**   ANY OTHER JOBS OR ACTIVITIES THAT INMATES ARE INVOLVED IN

11  THAT OCCUR OUTSIDE THE SECURED PERIMETER?

12  **A.**   NO MORE THAN PICKING VEGETABLES AND CUTTING GRASS AND

13  MAINTAINING THE FARM.

14  **Q.**   OKAY.  I WANT TO -- YOU'RE FAMILIAR WITH THE HEAT ALERT?

15  **A.**   YES, SIR.

16  **Q.**   AND WHAT'S YOUR UNDERSTANDING OF THE HEAT ALERT?

17  **A.**   WHEN A TEMPERATURE GETS TO A CERTAIN TEMPERATURE, THE --

18  ANGOLA WILL CALL AND SAY, "WE'RE NOW UNDER A HEAT ALERT."  THE

19  FIELD LINES CEASE WORK, AND WE EXPLAIN TO THEM WE'RE UNDER A

20  HEAT ALERT, AND THEY GET A 15-MINUTE BREAK EVERY 45 MINUTES.

21  **Q.**   NOW, WHEN THE HEAT ALERT IS CALLED, ALL WORK STOPS?

22  **A.**   YES, SIR.

23  **Q.**   AND THE INMATES ARE INFORMED THE REASON ALL WORK IS BEING

24  STOPPED IS BECAUSE OF A HEAT ALERT?

25  **A.**   YES, SIR.  THEY ARE NOTIFIED THAT WE'RE UNDER A HEAT

1  ALERT.

2  **Q.**  AND ARE THOSE INMATES WHO HAVE HEAT PRECAUTION DUTY

3  STATUSES, DO THEY COME FORWARD WITH THEIR DUTY STATUSES AT THAT

4  TIME?

5  **A.**  SOME DO.

6  **Q.**  AND I ASSUME, BY YOUR ANSWER, SOME DON'T?

7  **A.**  WE HAD A FEW OCCASIONS WHERE THE INMATES DIDN'T PROCLAIM

8  THEIR DUTY STATUS.

9  **Q.**  WHY?

10  **A.**  THEY JUST DIDN'T PROCLAIM IT.  THEY DIDN'T WANT TO GO IN.

11  **Q.**  SOME INMATES, ALTHOUGH THEY HAVE THIS HEAT PRECAUTION DUTY

12  STATUS, WANT TO STAY OUT?

13  **A.**  YES, SIR.

14  **Q.**  IF SOMEONE COMES UP TO YOU AND SAYS, "I HAVE A

15  HEAT-RELATED DUTY STATUS BUT I DON'T HAVE IT ON ME," WHAT ARE

16  YOUR OPTIONS?

17  **A.**  THE FIELD OFFICER WILL CALL MEDICAL 3 AND PROCLAIM HIS

18  NUMBER, AND THEY WILL AIR HIS DUTY STATUS OVER THE RADIO TO

19  THAT OFFICER.

20  **Q.**  SO THERE IS A WAY OF CONFIRMING THAT DUTY?

21  **A.**  YES.

22  **Q.**  OKAY.  NOW, THERE'S ALSO BEEN SOME DISCUSSION ABOUT THE

23  GRASS-CUTTING LINES.  ARE YOU FAMILIAR WITH THAT?

24  **A.**  YES.

25  **Q.**  THE BUSES BRING THE -- THOSE ASSIGNED TO THE GRASS-CUTTING

1  LINE OUT TO THE LINE?

2  **A.**   YES.

3  **Q.**   IS THAT A -- IS THAT A MOVING LINE?

4  **A.**   YES.

5  **Q.**   AND DO THE BUSES STAY WITH THE GRASS-CUTTING LINE?

6  **A.**   YES.  THEY MOVE AS THE LINE PROCEEDS.

7  **Q.**   AND ARE THE INMATES ABLE TO TAKE BREAKS ON THE BUSES?

8  **A.**   YES.  A LOT OF TIMES THEY'LL TAKE THEIR BREAK ON THE BUS

9  OR THEY'LL SIT ALONG THE SIDE THE BUS IN THE SHADE.

10 **Q.**   THE BUS PROVIDES SOME LEVEL OF SHADE OUT THERE?

11 **A.**   YES.

12 **Q.**   AND THE SAME THINGS APPLY TO THE GRASS-CUTTING LINE?  WHEN

13 A HEAT ALERT IS CALLED, THE SAME THINGS OCCUR?

14 **A.**   YES, SAME PROTOCOL.

15 **Q.**   SAME PROTOCOL.

16       OKAY.  NOW, MASTER SERGEANT ORLANDO SCOTT TESTIFIED

17 HERE YESTERDAY AND WE SAW SOME FORMS LISTING DAILY LINE COUNTS,

18 LISTING THE TERM "PUSHER."  AND HE IS DESCRIBED AS A PUSHER.

19 WHERE DID THAT TERM COME FROM?

20 **A.**   HE IS IN CHARGE OF THE LINE.

21 **Q.**   OKAY.

22 **A.**   HE DOES THE LINE CHECKOUTS AND KEEPS UP WITH THE TOTAL

23 LINE COUNTS AND WHAT'S GOING ON ON THAT LINE.

24 **Q.**   IS HE REQUIRED TO HAVE THE INMATES MEET A QUOTA, A CERTAIN

25 AMOUNT OF PRODUCE TO BE PICKED IN ANY GIVEN HOUR OR ANY GIVEN

1    DAY?

2    **A.**    THERE'S NO QUOTA.

3    **Q.**    THERE'S BEEN SOME SUGGESTION THAT HE, QUOTE, PUSHES THE

4    LINE.  ARE THEY PUSHED, OR ARE THEY ABLE TO WORK AT THEIR OWN

5    PACE?

6    **A.**    THEY WORK AT THEIR OWN PACE, BREAK WHENEVER THEY NEED.

7    **Q.**    IS THERE ANY LIMITATION ON THEM GETTING WATER?

8    **A.**    NEVER.

9    **Q.**    ARE THEY PROVIDED WITH HATS AND GLOVES AND --

10   **A.**    THEY HAVE HATS AND GLOVES.

11   **Q.**    AND IF THEY -- IF THEY -- AND CUPS?

12   **A.**    YES.

13   **Q.**    IF THEY -- IF THEY RUN OUT OF ANY OF THOSE MATERIALS, ARE

14   THEY ABLE TO GET MORE?

15   **A.**    IT'S BROUGHT TO THEM.

16   **Q.**    OKAY.  THERE'S ALSO BEEN SOME DISCUSSION ABOUT THE GUN

17   GUARDS.  THERE ARE GUN GUARDS AT THE -- ON THE FIELD OPERATION?

18   **A.**    YES.

19   **Q.**    IS THAT A -- FOR PURPOSES OF SECURITY?

20   **A.**    YES.  THEY PROVIDE A PERIMETER, A SECURED PERIMETER.

21   **Q.**    BECAUSE THERE IS NO SECURED PERIMETER OUT THERE?

22   **A.**    NO, SIR.

23   **Q.**    THERE'S BEEN SOME DISCUSSION ABOUT GUN GUARDS FIRING THEIR

24   GUNS.  ARE YOU AWARE OF THAT?

25   **A.**    A GUN GUARD WILL FIRE HIS WEAPON IN A SAFE DIRECTION FOR A

1  WARNING SHOT IF AN INMATE CROSSES THE PERIMETER LINE.

2  **Q.**   AND ARE YOU -- HAVE YOU WITNESSED THAT EVER HAPPEN?

3  **A.**   FIRING A WARNING SHOT?  YES, I HAVE.

4  **Q.**   HOW MANY TIMES?

5  **A.**   OH, THROUGH MY CAREER, I'VE FIRED THEM, AND I'VE SEEN THEM

6  DONE, YES.

7  **Q.**   OKAY.  ANY IN RECENT YEARS, THE LAST COUPLE OF YEARS?

8  **A.**   RECENTLY I'D SAY MAYBE TWO, THREE TIMES.

9  **Q.**   OKAY.

10        **MR. BLANCHFIELD:**  NOW, YOUR HONOR, WE HAVE TWO

11  EXHIBITS, DX-5 AND DX-6.  THEY ARE VERY BRIEF SNIPPETS OF

12  VIDEO, LESS THAN 30 SECONDS EACH, THAT I WOULD LIKE TO PLAY,

13  AND THEN ASK THE WITNESS ABOUT THEM.

14        **THE COURT:**  SURE.  ALL RIGHT.

15        **MS. POURCIAU:**  YOUR HONOR, WE OBJECT TO THE ADMISSION

16  OF THESE EXHIBITS.  THEY WERE PRODUCED TO US ON MONDAY.

17        **THE COURT:**  OKAY.  WELL, LET ME TAKE A LOOK AT THEM,

18  AND THEN I WILL GIVE YOU A FULL OPPORTUNITY ON DIRECT TO OFFER

19  YOUR OBJECTIONS.  OKAY.

20        ALL RIGHT.  LET'S PROCEED.

21     **(WHEREUPON, DEFENDANTS' EXHIBIT NO. 5 WAS PLAYED.)**

22        **THE COURT:**  IS THERE ANY AUDIO HERE OR JUST THE

23  VIDEO?

24        **THE DEPUTY CLERK:**  NO AUDIO.

25        **THE COURT:**  OKAY.  THANK YOU.

1          OKAY.  PLEASE IDENTIFY THE VIDEO, THE EXHIBIT.

2          **MR. BLANCHFIELD:**  YES, YOUR HONOR.  THE FIRST ONE

3     THAT WAS SHOWN IS DX-5.

4          **THE COURT:**  OKAY.  AND NOW WE ARE PUBLISHING DX-6.

5     CORRECT?

6          **MR. BLANCHFIELD:**  DX-6, YES, YOUR HONOR.

7          **(WHEREUPON, DEFENDANTS' EXHIBIT NO. 6 WAS PLAYED.)**

8          **MR. BLANCHFIELD:**  THAT'S IT, JUDGE.

9          **THE COURT:**  OKAY.  ALL RIGHT.  AND LET'S TAKE UP THE

10    OBJECTION AT THIS TIME.

11         **MS. POURCIAU:**  PLAINTIFFS OBJECT BECAUSE OF THE LATE

12    DISCLOSURE.  THESE WERE SENT TO PLAINTIFFS ON MONDAY.

13         **THE COURT:**  OKAY.  AND I CERTAINLY UNDERSTAND THAT,

14    MS. POURCIAU.

15         MR. BLANCHFIELD, WHAT IS YOUR RESPONSE?

16         **MR. BLANCHFIELD:**  MY RESPONSE, YOUR HONOR, IS THAT

17    THIS WAS ACTUALLY AN INSPECTION ASKED FOR BY PLAINTIFFS'

18    COUNSEL.  THEY WERE THERE.  YOU COULD SEE IN THE VIDEO THEY HAD

19    THEIR OWN VIDEOGRAPHERS THERE TAKING THE SAME VIDEOS THAT WE

20    TOOK.  THERE'S NO PREJUDICE HERE.  THEY ALL KNOW -- YOU KNOW,

21    MR. BENJAMIN WAS THERE, MS. WRIGHT WAS THERE.  THERE'S NO

22    SURPRISE HERE.

23         **THE COURT:**  ALL RIGHT.  AND THANK YOU FOR CLARIFYING

24    THAT, MR. BLANCHFIELD.  I DON'T -- THIS IS WHAT I WOULD TREAT

25    AS A PROFFER.  OBVIOUSLY THIS IS NOT A JURY TRIAL, SO IT'S NOT

```
 1   NECESSARY TO HAVE THE WITNESS IDENTIFY THE PERSONS DEPICTED IN
 2   THE VIDEO.
 3              MS. POURCIAU, IS IT TRUE THAT YOU OR PERHAPS
 4   MEMBERS OF THE PLAINTIFFS' TEAM, IF YOU WILL, WERE PRESENT WHEN
 5   THE VIDEO WAS TAKEN?
 6              MS. POURCIAU:  YES, YOUR HONOR.
 7              THE COURT:  ALL RIGHT.  DO YOU BELIEVE YOU ARE
 8   PREJUDICED OR YOUR CLIENT IS PREJUDICED IN ANY WAY BY THE
 9   COURT'S CONSIDERATION OF THE VIDEO?
10              MS. POURCIAU:  NO, YOUR HONOR.
11              THE COURT:  OKAY.  AND YOU'RE RIGHT, I MEAN, THERE IS
12   A TECHNICAL ISSUE THERE WITH RESPECT TO WHEN YOU RECEIVE THE
13   VIDEO.  BUT GIVEN THAT, YOU KNOW, YOU ACKNOWLEDGE THAT THERE IS
14   NO PREJUDICE TO YOUR CLIENT, I'M GOING TO GO ON AND ADMIT THE
15   VIDEOS -- THAT IS, DX-5 AND DX-6 -- OVER THE PLAINTIFFS'
16   OBJECTION, BUT, OF COURSE, YOUR OBJECTION IS NOTED.
17              THE DEPUTY CLERK:  YOU HAVE TO UPLOAD THEM.
18              MR. BLANCHFIELD:  I HAVE TO UPLOAD THEM?
19              THE COURT:  YES.  SO YES, IF YOU COULD UPLOAD IT, MS.
20   PAYNE, WHENEVER YOU -- AND YOU CAN -- WHENEVER THE HEARING IS
21   OVER, YOU CAN UPLOAD THEM.  OKAY.
22              MR. BLANCHFIELD:  THANK YOU, JUDGE.  WE'LL BE SURE TO
23   DO THAT.
24   BY MR. BLANCHFIELD:
25   Q.   WARDEN SYLVESTER, WERE YOU OUT THERE ON THAT DAY?
```

1   **A.**   YES.

2   **Q.**   AND THE SECOND VIDEO, IT DEPICTS WHAT WE'VE BEEN REFERRING

3   TO AS THE SHADE WAGONS?

4   **A.**   YES.

5   **Q.**   TELL THE COURT ABOUT THE SHADE WAGONS.  HOW DID THEY COME

6   TO BE?

7   **A.**   THE SHADE WAGONS WAS DESIGNED TO GIVE THE OFFENDERS A

8   PLACE TO SIT, OUT OF THE SUN, IN THE SHADE TO TAKE THEIR

9   15-MINUTE BREAKS EVERY 45.

10  **Q.**   OKAY.  I ALSO SEE A PORTA-POTTY STATION.  WAS THAT -- IS

11  THAT OUT IN THE FIELD AS WELL?

12  **A.**   YES.

13  **Q.**   OKAY.  IS THERE A HAND-WASHING STATION AS WELL?

14  **A.**   YES.

15  **Q.**   OKAY.  NOW, IT APPEARED THAT NOT ONLY IS THERE A SHADE

16  WAGON, BUT IN THIS PARTICULAR FIELD THERE'S A LOT OF SHADE THAT

17  IS GIVEN OFF BY THE PECAN TREES THEMSELVES?

18  **A.**   YES.  IT'S A PECAN ORCHARD.

19  **Q.**   OKAY.  AND WHAT IS DONE WITH THE PECANS?

20  **A.**   THE PECANS ARE PICKED AND THEY'RE SHELLED AND FED TO THE

21  INMATE POPULATION SO THEY CAN HAVE PECAN PIES FOR THE HOLIDAYS.

22  **Q.**   NOW, IT SEEMED TO ME THAT THERE WAS SOME PICKING GOING ON,

23  BUT THERE WAS ALSO SOME EATING GOING ON?

24  **A.**   CORRECT.

25  **Q.**   THEY'RE PERMITTED TO EAT THE PECANS AS THEY PICK SOME OF

1  THEM?

2  **A.**   YES.  WE DON'T TELL THEM TOO MUCH.

3  **Q.**   OKAY.

4          **THE COURT:**  DO YOU GIVE THEM PECAN CRACKERS?  YOU

5  GIVE THEM THE LITTLE --

6          **THE WITNESS:**  YES, SIR.

7          **THE COURT:**  -- TO CRACK THEM OPEN?

8          **THE WITNESS:**  WELL, NO, WE DON'T HAVE THE CRACKERS IN

9  THE FIELD.

10          **THE COURT:**  ALL RIGHT.

11          **THE WITNESS:**  WE PICK THEM AND WE STORE THEM.  AND

12  THEN ONCE WE GET CLOSER TO THE HOLIDAYS, WE'LL GO TO THE

13  PROCESSING PLANT WHERE THEY HAVE THE CRACKERS AND STUFF.

14          **THE COURT:**  GOT IT.

15          **THE WITNESS:**  AND THEY SHELL THEM.  IT TAKES

16  APPROXIMATELY 350 POUNDS OF SHELLED PECANS FOR ONE MEAL.

17          **THE COURT:**  OH, OKAY.  I WAS WONDERING.  AND IN THE

18  VIDEO, IT SHOWS SOME -- THE INMATES PICKING SOMETHING UP FROM

19  THE GROUND.

20          **THE WITNESS:**  YES.

21          **THE COURT:**  I DIDN'T KNOW WHAT IT WAS.

22          **THE WITNESS:**  THAT'S HOW THEY PICK THE PECANS.

23          **THE COURT:**  I DIDN'T REALIZE IT WAS PECANS.

24          **THE WITNESS:**  YES, SIR.

25          **THE COURT:**  BUT THANK YOU FOR THAT.  OKAY.  ALL

1    RIGHT.

2    **BY MR. BLANCHFIELD:**

3    **Q.**    WARDEN SYLVESTER, DOES LSP HOLD FROZEN VEGETABLES

4    HARVESTED ON THE PREMISES IN FREEZERS?

5    **A.**    YES.  WE HAVE A PROCESSING PLANT.  THE INMATES, OFFENDERS,

6    PICK THE VEGETABLES IN THE FIELD, AND THEN WE GO TO OUR GRADING

7    SHED AND WE GRADE THEM FOR QUALITY, BECAUSE NATURALLY IN YOUR

8    PICKING THINGS GET DAMAGED.  WE TAKE THE TOP QUALITY, AND WE

9    SEND TO OUR PROCESSING PLANT WHERE THEY ARE PROCESSED, BLAST

10   FROZEN, AND PUT INTO STORAGE.  WE TAKE THE OTHER VEGETABLES AND

11   WE FREEZE.  ALL OF THE KITCHEN IS FRESH VEGETABLES ON A DAILY

12   BASIS.  AND WHEN OUR FRESH PICKINGS RUNS OUT, WE FALL BACK ON

13   OUR FROZEN PRODUCE TO MAINTAIN UNTIL THE NEXT CROP COMES IN.

14   **Q.**    HOW MUCH FROZEN PRODUCE DO WE HAVE IN STORAGE NOW?

15   **A.**    RIGHT NOW, I HAVE MAYBE 60,000 POUNDS.

16   **Q.**    OKAY.  AND HOW DOES THAT COMPARE TO, SAY, TEN YEARS AGO?

17   **A.**    I HAD OVER A MILLION.

18   **Q.**    A MILLION POUNDS?

19   **A.**    YES.  I PROCESSED OVER A MILLION POUNDS IN A YEAR.  ALL

20   OUR FREEZERS WERE FULL AND WE WAS RENTING STORAGE SPACE HERE IN

21   BATON ROUGE TO MAINTAIN.  WE WOULD MAKE ENOUGH VEGETABLES FOR

22   US, AND THEN WE WOULD SEND TO THREE OTHER INSTITUTIONS.  NOW WE

23   CAN'T MAINTAIN OURSELF.

24   **Q.**    OKAY.  WARDEN SYLVESTER, I APPRECIATE YOUR TIME.

25          **MR. BLANCHFIELD:**  THAT'S ALL THE QUESTIONS I HAVE.

1    THANK YOU.

2              **THE COURT:**  ALL RIGHT.  THANK YOU, MR. BLANCHFIELD.

3                   CROSS-EXAMINATION?

4              **MS. POURCIAU:**  YES, YOUR HONOR.  ONE MOMENT, IF

5    THAT'S OKAY?

6              **THE COURT:**  SURE.

7                   ALL RIGHT, MS. POURCIAU.  ARE YOU PREPARED?

8              **MS. POURCIAU:**  YES, YOUR HONOR.

9              **THE COURT:**  OKAY.

10                        **CROSS-EXAMINATION**

11   **BY MS. POURCIAU:**

12   **Q.**   GOOD MORNING, WARDEN SYLVESTER.

13   **A.**   GOOD MORNING.

14   **Q.**   YOU DISCUSSED THE HEAT-ALERT POLICY ON DIRECT.  CORRECT?

15   **A.**   YES, MA'AM.

16   **Q.**   AND THAT'S REGULATED BY HEALTH CARE POLICY 8 ON HEAT

17   PATHOLOGY.  CORRECT?

18   **A.**   YES, MA'AM.

19   **Q.**   THAT POLICY STATES THAT THE WARDEN, OR HIS DESIGNEE, IS IN

20   CHARGE OF IMPLEMENTING THE OUTDOOR PROCEDURES THAT GO INTO

21   EFFECT FROM MAY 1ST TO OCTOBER 31ST?

22   **A.**   YES, MA'AM.

23   **Q.**   AND YOU ARE THAT DESIGNEE WITH RESPECT TO FIELD

24   OPERATIONS.  CORRECT?

25   **A.**   YES, MA'AM.

1   **Q.**   SO YOU ENSURE THAT POLICY APPLIES TO EVERYONE OUT IN THE
2   FIELD LINES?
3   **A.**   YES.
4   **Q.**   ANGOLA HAS TRACTORS, DITCHING MACHINES, AND CULTIVATORS.
5   CORRECT?
6   **A.**   YES.
7   **Q.**   THOSE MACHINES ARE OPERATED BY TRUSTEES?
8   **A.**   YES, MA'AM.
9   **Q.**   TRUSTEES DON'T WORK THE VEGETABLE-PICKING FARM LINES.
10  RIGHT?
11  **A.**   NO, MA'AM, THEY DON'T PICK.
12  **Q.**   THE MEN ON THE VEGETABLE-PICKING FARM LINES CAN'T USE THAT
13  KIND OF MACHINERY.   CORRECT?
14  **A.**   NO, MA'AM.
15  **Q.**   YOU TESTIFIED ON DIRECT ABOUT HOW OVER THE PAST YEARS, THE
16  NUMBERS ON THE LINE HAVE BEEN DECREASING.   CORRECT?
17  **A.**   YES.
18  **Q.**   AND YOU WOULD LIKE FOR MORE PEOPLE TO GO OUT ON THE FARM
19  LINE?
20  **A.**   IT WOULD BE NEEDED TO MAINTAIN THE ASPECT OF THE FIELD
21  OPERATIONS.
22  **Q.**   IN FACT, YOU'VE REQUESTED FOR MORE PEOPLE TO BE SENT OUT
23  TO THE FARM LINE?
24  **A.**   YES.
25  **Q.**   YOU TESTIFIED ON DIRECT ABOUT THERE BEING NO QUOTA.

1  CORRECT?

2  **A.**   YES.

3  **Q.**   INCARCERATED WORKERS ON THE FARM LINE ARE EXPECTED TO WORK

4  THEIR ASSIGNED ROWS WITH REASONABLE SPEED AND EFFICIENCY,

5  THOUGH?

6  **A.**   RIGHT.

7  **Q.**   AND IF SOMEONE DOES NOT WORK WITH REASONABLE SPEED AND

8  EFFICIENCY, THEY'RE WRITTEN UP PER LSP'S DISCIPLINARY POLICY?

9  **A.**   IF THEY'RE NOT WORKING WITH REASONABLE SPEED AND

10 EFFICIENCY, THEY ARE TALKED TO AND SAID, "YOU NEED TO KEEP UP

11 WITH THE REST OF THE OFFENDERS."

12 **Q.**   AND IF THEY DON'T, THEY WILL GET A RULE VIOLATION?

13 **A.**   YES.

14        **THE COURT:**  OKAY.  ASSISTANT WARDEN, CAN YOU MOVE UP

15 JUST A LITTLE BIT?

16        **THE WITNESS:**  YES, SIR.  I'M SORRY.

17        **THE COURT:**  MOVE THE MICROPHONE A LITTLE BIT CLOSER

18 TO YOU.

19        **THE WITNESS:**  YES.

20           IS THIS BETTER?

21        **THE COURT:**  MUCH BETTER.  THANK YOU.

22 **BY MS. POURCIAU:**

23 **Q.**   REGARDING MAINTAINING THE SECURITY OUT IN THE FIELD, YOU

24 TESTIFIED THERE ARE TWO GUN GUARDS ASSIGNED TO MAINTAIN THE

25 PERIMETER.  CORRECT?

1   **A.**   CORRECT.

2   **Q.**   THE GUN GUARDS CARRY AN AR-15 AND A PISTOL?

3   **A.**   CORRECT.

4   **Q.**   AND AS YOU TESTIFIED, THEY FIRE A WARNING SHOT IF AN

5   INCARCERATED PERSON BREACHES THE SECURED PERIMETER?

6   **A.**   IF THEY CROSS THE SECURED PERIMETER, YES.

7   **Q.**   AND YOU TESTIFIED YOU, YOURSELF, HAVE FIRED SUCH A WARNING

8   SHOT?

9   **A.**   YES, MA'AM.  IN RECENT YEARS WHEN I WAS A LINE PUSHER.

10  **Q.**   AND AT THE TIME OF YOUR DEPOSITION IN THIS CASE, THE FIRST

11  DEPOSITION ON AUGUST 2ND, 2024, A WARNING SHOT HAD OCCURRED

12  WITHIN THAT SAME YEAR.  CORRECT?

13  **A.**   I'M NOT FOR SURE, BUT I'M MORE THAN SURE IT HAS.

14  **Q.**   IN THE INCIDENT YOU DESCRIBED, THE INCARCERATED PERSON WAS

15  NOT TRYING TO ESCAPE, THOUGH.  CORRECT?

16  **A.**   IF HE CROSSED -- AT ANY TIME HE CROSSES THE SECURED

17  PERIMETER --

18  **Q.**   UH-HUH.

19  **A.**   -- A WARNING SHOT IS FIRED MAINLY TO GET THE ATTENTION OF

20  THE LINE PUSHER SO WE CAN ADDRESS THE SITUATION.

21  **Q.**   AND IF THE INCARCERATED PERSON DOESN'T STOP AFTER THE

22  WARNING SHOT IS FIRED, THE POLICY IS TO SHOOT TO DISABLE.

23  CORRECT?

24  **A.**   CORRECT.  IF THE INMATE PROCEEDS TO LEAVE.

25  **Q.**   AND IN YOUR TENURE AT LSP, THAT HAS HAPPENED ONCE WHERE

```
1    THE INCARCERATED PERSON DIED AS A RESULT.  CORRECT?
2  A.    YES.
3  Q.    AND IN THE TIME RECENTLY THAT A WARNING SHOT WAS FIRED,
4    THE INCARCERATED PERSON HAD CROSSED OVER THE SECURED PERIMETER
5    LINE TO GO TO ANOTHER PICKING -- TO ANOTHER FIELD TO PICK
6    SOMETHING OUT OF IT AND GOT CAUGHT.  CORRECT?
7  A.    YES.
8  Q.    THE VIDEOS THAT WERE SHOWN ON YOUR DIRECT EXAMINATION
9    OCCURRED WHEN THERE WERE TWO VIDEOGRAPHERS PRESENT.  CORRECT?
10 A.    THAT'S ON THE VIDEO WE SEEN A MOMENT AGO IN --
11 Q.    CORRECT.
12 A.    -- THE PECAN ORCHARD?  YES.
13 Q.    AND THERE WERE MULTIPLE ATTORNEYS ALL AROUND INSPECTING
14    THE FARM LINE.  CORRECT?
15 A.    YES.
16 Q.    THAT WAS ONE OF THE -- I BELIEVE IT WAS EITHER LINE 15 OR
17    LINE 24 OR 25.  IS THAT YOUR RECOLLECTION?
18 A.    I DON'T RECALL WHICH LINE IT WAS.
19 Q.    IT WASN'T LINE 15-B, THOUGH.  CORRECT?
20 A.    NO, NO.
21 Q.    AND 15-B IS THE LINE THAT UTILIZES THE BUSES, AS YOU
22    TESTIFIED, AS THE SHADE?
23 A.    CORRECT.
24 Q.    AND SOME OF THOSE BUSES HAVE AIR CONDITIONING?
25 A.    CORRECT.
```

1    **Q.**  BUT IN THOSE BUSES, THE AIR IS NOT TURNED ON WHEN THE

2    INCARCERATED INDIVIDUALS ON THE BUS ARE SEEKING THEIR SHADE

3    BREAK.  CORRECT?

4    **A.**  NO.

5    **Q.**  AND THAT'S BECAUSE YOU BELIEVE THAT THE BODY CAN'T ADJUST

6    IF IT HAS TO GO FROM THE COLD BACK OUT INTO THE HEAT.  CORRECT?

7    **A.**  CORRECT.

8    **Q.**  BUT THEY COULD BE TURNED ON?

9    **A.**  IF THEY WERE TURNED ON -- THE BUS DOESN'T RUN ALL THE

10   TIME.  IT SITS THERE WHILE -- THE BUS BRING THE OFFENDERS TO

11   THE WORK SITE, THEN THE PUSHER GETS OFF OF THE BUS AND WALKS

12   AMONGST THEM WHILE THEY ARE WORKING.

13   **Q.**  SO THE BUS COULD BE TURNED ON DURING THE BREAKS TO HAVE

14   AIR CONDITIONING.  CORRECT?

15   **A.**  CORRECT.

16   **Q.**  I'D LIKE TO SHOW YOU A VIDEO OF THE 15-B LINE FROM THAT

17   SAME DAY OF THE SITE INSPECTION.  PLAINTIFFS' EXHIBIT TWENTY --

18   -- ONE MOMENT.  I NEED ONE MOMENT.

19           **MS. POURCIAU:**  CAN I HAVE THE COURT'S INDULGENCE?

20           **THE COURT:**  SURE.

21           **MS. POURCIAU:**  CAN WE FLIP THE MONITOR ON?

22               AND WE'D LIKE TO PULL UP PX-23.  WE'D MOVE TO

23   ADMIT PX-23 INTO EVIDENCE AT THIS TIME.

24           **THE COURT:**  ANY OBJECTION, MR. BLANCHFIELD?

25           **MR. BLANCHFIELD:**  NO OBJECTION, YOUR HONOR.

1    **THE COURT:**  WITHOUT OBJECTION, PLAINTIFFS' EXHIBIT 23
2   IS ADMITTED.
3    **MS. POURCIAU:**  AND WE'D ALSO LIKE TO PULL UP PX-22.
4    **(WHEREUPON, PLAINTIFFS' EXHIBIT NO. 22 WAS PLAYED.)**
5    **MS. POURCIAU:**  AND WE'D LIKE TO MOVE PX-22 INTO
6   EVIDENCE AS WELL.
7    **MR. BLANCHFIELD:**  NO OBJECTION, JUDGE.
8    **THE COURT:**  THANK YOU.
9    WITHOUT OBJECTION, PLAINTIFFS' EXHIBIT 22 IS
10   ADMITTED.
11    **MS. POURCIAU:**  AND --
12    **THE COURT:**  JUST A MOMENT.
13    **MS. POURCIAU:**  I'M SORRY.
14    **THE COURT:**  MS. POURCIAU, I'VE BEEN INFORMED THAT WE
15   HAVE MULTIPLE ITEMS THAT HAVE BEEN IDENTIFIED AS PLAINTIFFS'
16   EXHIBIT 22 AND 23.
17    **MS. POURCIAU:**  I BELIEVE THAT MAYBE THERE WERE PDF'S
18   UPLOADED AS LIKE KIND OF PLACE COVERS, AND THEN THE VIDEOS WERE
19   SEPARATELY UPLOADED.
20    **THE DEPUTY CLERK:**  IT DOESN'T PULL UP LIKE THAT.  IF
21   YOU LOOK AT THE EXHIBIT LIST --
22    **MS. POURCIAU:**  UH-HUH.
23    **THE DEPUTY CLERK:**  -- I DON'T KNOW --
24    **MS. POURCIAU:**  WHICH ONE IS --
25    **THE DEPUTY CLERK:**  -- WHICH IS WHICH.  AND SOME ARE

1  SEALED.  I DON'T KNOW.

2         **THE COURT:**  WELL, LET ME ASK YOU THIS.  DO YOU --

3  WITH RESPECT -- LET'S BEGIN WITH EXHIBIT 22.  IS IT YOUR

4  INTENTION TO SIMPLY OFFER THE VIDEO THAT WE JUST SAW AS 22?

5         **MS. POURCIAU:**  YES, YOUR HONOR.

6         **THE COURT:**  SO THE OTHER ITEMS THAT ARE MARKED AS 22,

7  YOU STILL WANT THOSE INTO EVIDENCE?

8         **MS. POURCIAU:**  NO, YOUR HONOR.

9         **THE COURT:**  WERE THOSE MERELY PLACEHOLDERS FOR THE

10  VIDEO OR --

11         **MS. POURCIAU:**  THOSE WERE MERELY PLACEHOLDERS.

12         **THE COURT:**  OKAY.  SO LET'S GO ON, ELIZABETH, AND

13  MAKE SURE THAT PLAINTIFFS' EXHIBIT 22 IS ONLY -- AND THE SAME

14  THING WITH 23, I WOULD ASSUME.  CORRECT?

15         **MS. POURCIAU:**  YES, YOUR HONOR.  ANY VIDEO FILE

16  THAT'S IN THE RECORD IS THE RIGHT ONE.

17         **THE COURT:**  ALL RIGHT.  QUESTION?

18         **THE DEPUTY CLERK:**  I HAVE A QUESTION.  SO I HAVE

19  PLAINTIFFS' 22 EXHIBIT LABELED TWO DIFFERENT THINGS:  ONE IS A

20  FARM LINE AND ONE IS AN OCTOBER SITE VISIT VIDEO.

21         **THE COURT:**  THE SAME THING?

22         **MS. POURCIAU:**  YES, YOUR HONOR.

23         **THE COURT:**  OKAY.  SO WE'LL CALL IT FARM LINE -- JUST

24  CALL BOTH OF THEM "SITE VISIT VIDEOS."

25         **MS. POURCIAU:**  YEAH.  I BELIEVE IT WAS -- THE NAMING

1  WAS THE SAME AND WE WERE TRYING TO DIFFERENTIATE.

2          **THE COURT:**  OKAY.

3          **MS. POURCIAU:**  BUT THEY'RE THE SAME.  THE ACTUAL

4  EXHIBIT IS THE SAME.  BUT THE OCTOBER 22ND IS AN INSPECTION --

5  IS THE ONE WE CAN USE.

6          **THE COURT:**  ALL RIGHT.  OKAY.  LET'S PROCEED.

7          **MS. POURCIAU:**  AND WE'D LIKE TO PULL UP PX-24 AS

8  WELL.

9          **THE COURT REPORTER:**  ARE YOU SAYING PAGE 24?

10          **MS. POURCIAU:**  PX, PLAINTIFFS' EXHIBIT.

11      **(WHEREUPON, PLAINTIFFS' EXHIBIT NO. 24 WAS PLAYED.)**

12          **THE COURT:**  OKAY.

13          **MS. POURCIAU:**  AND AT THIS TIME WE'D MOVE FOR PX-24

14  TO BE ADMITTED INTO EVIDENCE.

15          **THE COURT:**  ANY OBJECTION?

16          **MR. BLANCHFIELD:**  NO OBJECTION, YOUR HONOR.

17          **THE COURT:**  OKAY.  WITHOUT OBJECTION, PX-24 IS

18  ADMITTED.

19  **BY MS. POURCIAU:**

20  **Q.**   AND, WARDEN SYLVESTER, ALL OF THESE VIDEOS WERE OF LINE

21  15-B.  CORRECT?

22  **A.**   YES.

23  **Q.**   WHICH UTILIZES THE BUS INSTEAD OF ANY OTHER TYPE OF

24  SHADE -- THE UN-AIR-CONDITIONED BUSES INSTEAD OF ANY OTHER TYPE

25  OF SHADE STRUCTURE?

1   **A.**   CORRECT.

2   **Q.**   THANK YOU.

3           **MS. POURCIAU:**  NO FURTHER QUESTIONS.

4           **THE COURT:**  ALL RIGHT.  ANY REDIRECT, MR.

5   BLANCHFIELD?

6           **MR. BLANCHFIELD:**  YES, YOU HONOR.

7                    **REDIRECT EXAMINATION**

8   **BY MR. BLANCHFIELD:**

9   **Q.**   WARDEN SYLVESTER, THE SHADE TRAILERS THAT WE SAW IN THE

10  VIDEO, THEY GO OUT EVERY DAY?

11  **A.**   EVERY DAY.

12  **Q.**   THEY GO OUT IN FEBRUARY, MARCH --

13  **A.**   WITHOUT FAIL, THEY HAVE NOT STOPPED.  ALL WINTER THEY WAS

14  IN THE FIELD.

15  **Q.**   OKAY.  WHY ARE THESE VEGETABLES PICKED BY HAND?

16  **A.**   BECAUSE A LOT OF THESE VEGETABLES AND STUFF, THAT'S THE

17  ONLY WAY FOR THEM TO BE PICKED.

18  **Q.**   LIKE CUCUMBERS?

19  **A.**   CUCUMBERS, TOMATOES, THAT'S ALL A HAND-PICKED COMMODITY.

20  **Q.**   IS THAT IN THE FREE WORLD, TOO?

21  **A.**   UNLESS YOU ARE INTO THE MASS ACREAGE, YES.

22  **Q.**   ALL RIGHT.  NOW, THE LAST VIDEO THAT WE JUST SAW, THERE

23  WAS A FELLOW WITH A -- IT LOOKED LIKE A BROOM?

24  **A.**   RAGMAN.

25  **Q.**   RAGMAN?

1    **A.**   YES.  HE USED TO WORK IN THE FIELD LINE FOR ME 25 YEARS

2    AGO.  HIS JOB ON THAT LINE -- HE'S AN OLD OFFENDER.  HE DOES

3    NOT WANT A DUTY STATUS.  HE WANTS TO COME OUT.  SO HIS JOB ON

4    THAT LINE IS TO WALK AROUND AND PICK UP PAPER.

5              **MS. POURCIAU:**  OBJECTION.  HEARSAY, YOUR HONOR.

6              **THE COURT:**  OVERRULED.

7              LET'S PROCEED.

8    **BY MR. BLANCHFIELD:**

9    **Q.**   GO AHEAD.  WOULD YOU -- CAN YOU CONTINUE?  HIS JOB IS

10   WHAT?

11   **A.**   HIS JOB IS TO PICK UP PAPER AND TRASH.  WHILE THEY ARE

12   WEED-EATING, IF HE FINDS A CUP OR A CAN, HE PICKS IT UP.  HE

13   PICKED UP THE BROOM.  HE'S JUST DOING THAT TO HAVE SOMETHING TO

14   DO.  HE WAS NOT MADE TO DO THAT.

15   **Q.**   HE'S NOT TOLD TO SWEEP THE GRASS?

16   **A.**   NO.

17   **Q.**   HOW LONG --

18   **A.**   THAT'S JUST RAGMAN.  THAT'S HIS M.O.

19   **Q.**   HOW LONG HAVE YOU KNOWN HIM?

20   **A.**   I'VE BEEN KNOWING HIM OVER 25 YEARS.  'CAUSE WHEN I WAS A

21   LINE PUSHER, HE WORKED IN MY LINE.

22   **Q.**   OKAY.  THANK YOU, WARDEN.  I APPRECIATE IT.

23             **MR. BLANCHFIELD:**  THAT'S IT, YOUR HONOR.

24             **THE COURT:**  THANK YOU, MR. BLANCHFIELD.

25             WARDEN, I HAVE JUST A COUPLE OF QUESTIONS FOR

1  YOU.

2         NOW, YOU'VE TESTIFIED THAT YOU, TOO, WERE A LINE

3  PUSHER.  IS THAT CORRECT?

4         **THE WITNESS:**  THAT I WAS A LINE PUSHER?

5         **THE COURT:**  YES.

6         **THE WITNESS:**  YES, SIR.

7         **THE COURT:**  AND DO LINE PUSHERS CARRY FIREARMS?

8         **THE WITNESS:**  NO, SIR, NOT THE LINE PUSHER.  ONLY THE

9  LINE GUARDS.

10        **THE COURT:**  THANK YOU.

11        AND COULD YOU SHARE WITH US THE CIRCUMSTANCES

12  UNDER WHICH THE INMATE THAT YOU DESCRIBED EARLIER WAS SHOT?

13  YOU SAID THAT HE WAS SHOT.  MY RECOLLECTION IS THAT YOU SAID HE

14  WAS SHOT BY A LINE PUSHER, BUT HE WAS SHOT BY A GUN GUARD.

15  CORRECT?

16        **THE WITNESS:**  THE ONLY -- THE ONLY ONE I'VE EVER SEEN

17  SHOT IN MY 30 YEARS WAS AT THE CHECKOUT GATE.  THE LINE WAS

18  CHECKING OUT TO COME TO WORK.  AND WHEN THE GATES ARE OPEN, YOU

19  HAVE A ARMED GUARD SITTING IN THE FRONT OF THE GATE TO MAINTAIN

20  SECURITY WHILE THE INMATES COME OUT TO BE GUARDED.  THIS

21  OFFENDER THAT WAS SHOT AND KILLED RUN STRAIGHT OUT THE GATE TO

22  THE OFFICER.  AND WHEN THE OFFICER WENT -- HE PULLED HIS RIFLE

23  UP TO FIRE A WARNING SHOT, THE RIFLE JAMMED.  HE PULLED OUT HIS

24  SIDEARM, HE SHOT THE OFFENDER.  AND WHEN THE OFFENDER FELL, HE

25  WAS AT THE OFFICER'S FEET.

1          **THE COURT:**  OKAY.

2          **THE WITNESS:**  THAT WAS MY ONLY OCCURRENCE IN 30

3    YEARS.

4          **THE COURT:**  ALL RIGHT.  AND MY LAST QUESTION TO YOU:

5    YOU MENTIONED THAT -- IN RESPONSE TO MR. BLANCHFIELD'S

6    QUESTION ABOUT HOW THE CROPS ARE HARVESTED AND YOU SAID THAT

7    THEY ARE HARVESTED BY HAND AT ANGOLA ESSENTIALLY BECAUSE

8    THERE'S NOT -- "MASS ACREAGE" WAS THE TERM YOU USED.  HOW MANY

9    ACRES ARE DEDICATED TO THE FARM LINE AT ANGOLA?

10         **THE WITNESS:**  ON THE FARM LINE FOR ANGOLA FOR THE

11   CROPS, WE HOLD OUT ABOUT 350 ACRES, WHICH THEY'RE NOT ALL

12   PLANTED BECAUSE YOU ROTATE YOUR CROPS DIFFERENT PLACES EVERY

13   YEAR FOR DISEASE PURPOSES AND STUFF.  SO NORMALLY WE HAVE

14   ROUGHLY -- BETWEEN ALL OF THE CROPS, I WOULD SAY 60 TO 75 ACRES

15   --

16         **THE COURT:**  ALL RIGHT.

17         **THE WITNESS:**  -- GROWING PRODUCE AT ONE TIME.

18         **THE COURT:**  AND WHAT WOULD YOU DESCRIBE THE ACREAGE

19   FOR WHICH YOU CALL A MASS ACREAGE OPERATION?

20         **THE WITNESS:**  OH, YOU'D BE TALKING ABOUT A COUPLE OF

21   THOUSAND ACRES.

22         **THE COURT:**  OKAY.  ALL RIGHT.

23         **THE WITNESS:**  'CAUSE THE MASS PRICE OF THIS

24   EQUIPMENT, IT'S JUST -- I MEAN, SOME OF THESE PICKERS AND STUFF

25   IS THREE-QUARTERS OF A MILLION DOLLARS.

|     |                                                              |
| --- | ------------------------------------------------------------ |
| 1   | **THE COURT:**  UNDERSTOOD.                                   |
| 2   | THANK YOU FOR JOINING US TODAY, WARDEN.                       |
| 3   | **THE WITNESS:**  THANK YOU.                                  |
| 4   | **THE COURT:**  THAT CONCLUDES YOUR TESTIMONY.               |
| 5   | YOU ARE NOW EXCUSED.                                          |
| 6   | **THE WITNESS:**  THANK YOU, SIR.                            |
| 7   | **THE COURT:**  ALL RIGHT.                                   |
| 8   | **THE WITNESS:**  Y'ALL HAVE A NICE DAY.                    |
| 9   | **THE COURT:**  ALL RIGHT.  MR. BLANCHFIELD, YOU MAY CALL    |
| 10  | YOUR NEXT WITNESS.                                            |
| 11  | **MR. BLANCHFIELD:**  THANK YOU, YOUR HONOR.                 |
| 12  | WE WOULD CALL REGISTERED NURSE SUPERVISOR JUSTIN             |
| 13  | COLEY.                                                        |
| 14  | **THE COURT:**  YOU MAY COME FORWARD, SIR.                  |
| 15  | **JUSTIN COLEY,**                                            |
| 16  | **HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:**           |
| 17  | **THE COURT:**  PLEASE BE SEATED.                           |
| 18  | **THE DEPUTY CLERK:**  CLEARLY STATE AND SPELL YOUR NAME,   |
| 19  | FOR THE RECORD.                                              |
| 20  | **THE WITNESS:**  YES, MA'AM.  JUSTIN COLEY.               |
| 21  | J-U-S-T-I-N, C-O-L-E-Y.                                     |
| 22  | **THE COURT:**  LET'S PROCEED.                              |
| 23  | **MR. BLANCHFIELD:**  THANK YOU, JUDGE.                     |
| 24  |                                                              |
| 25  |                                                              |

|   |   |
|---|---|
| 1 | **DIRECT EXAMINATION** |
| 2 | **BY MR. BLANCHFIELD:** |
| 3 | **Q.**   SIR, COULD YOU STATE YOUR FULL NAME FOR US, FOR THE |
| 4 | RECORD? |
| 5 | **A.**   YES, SIR.  JUSTIN COLEY. |
| 6 | **Q.**   AND WHAT IS YOUR POSITION AT LSP? |
| 7 | **A.**   I AM A RN MANAGER. |
| 8 | **Q.**   AND WHAT ARE YOUR DUTIES AS AN RN MANAGER? |
| 9 | **A.**   I SUPERVISE THE ATU, WHICH IS THE ASSESSMENT TRIAGE UNIT, |
| 10 | AND SDE, WHICH IS SELF-DECLARED EMERGENCIES. |
| 11 | **Q.**   AND "RN," THAT'S REGISTERED NURSE? |
| 12 | **A.**   YES, SIR. |
| 13 | **Q.**   YOU HAVE THAT DEGREE? |
| 14 | **A.**   FOR APPROXIMATELY 20 YEARS. |
| 15 | **Q.**   AND HOW LONG HAVE YOU BEEN WORKING AT LSP? |
| 16 | **A.**   ABOUT TEN AND A HALF YEARS. |
| 17 | **Q.**   WHAT DID YOU DO BEFORE THAT? |
| 18 | **A.**   I WORKED AT LANE, WHICH IS A LOCAL HOSPITAL, AND I DID ER, |
| 19 | ICU FOR THE LAST EIGHT YEARS, AND HOUSE SUPERVISOR. |
| 20 | **Q.**   ALL RIGHT.  NOW, "SDE," THAT'S SELF-DECLARED EMERGENCIES. |
| 21 | CORRECT? |
| 22 | **A.**   YES, SIR. |
| 23 | **Q.**   AND THAT'S PART OF YOUR JOB DUTY TO SUPERVISE THOSE? |
| 24 | **A.**   YES, SIR. |
| 25 | **Q.**   AND THE SDE'S, ARE THEY FOR ANYTHING THAT OCCUR OUTSIDE |

1   THE SECURED PERIMETER?

2   **A.**   IT IS.

3   **Q.**   OKAY.  AND YOU ALSO MENTIONED "TRIAGE."  WHAT IS MEANT BY

4   THAT?

5   **A.**   THAT'S THE ASSESSMENT TRIAGE UNIT.  THAT'S SIMILAR TO WHAT

6   SOME PEOPLE CAN THINK OF AS AN EMERGENCY ROOM.

7   **Q.**   THIS LITIGATION IS ABOUT THE FARMING OPERATIONS.  THE

8   INMATES ON THE FARMING OPERATIONS HAVE THE ABILITY TO DECLARE

9   SELF-DECLARED EMERGENCIES?

10  **A.**   YES, SIR.  24 HOURS A DAY, SEVEN DAYS A WEEK.

11  **Q.**   AND WHAT HAPPENS WHEN THAT OCCURS?

12  **A.**   THEY MAKE A SELF-DECLARED EMERGENCY.  THEY NOTIFY THE

13  SECURITY OFFICER THAT THEY WOULD LIKE TO DECLARE AN EMERGENCY.

14  AT THAT POINT THE OFFICER WOULD CALL IT IN TO THE ATU.  THE

15  PERSON THAT ANSWERS THE PHONE LOGS IT INTO A BOOK AND

16  DISPATCHES THE NURSE TO GO OUT AND SEE THEM AT THAT LOCATION,

17  DEPENDING ON WHERE THEY ARE, OR THEY CAN COME TO THE TREATMENT

18  CENTER.

19  **Q.**   NOW, DOES -- DO YOU SUPERVISE NURSES THAT RESPOND OUTSIDE

20  THE PERIMETER TO ANYTHING BEYOND THE FARM LINE?

21  **A.**   YES, SIR.

22  **Q.**   WHAT ELSE -- WHAT OTHER AREAS DO THEY HAVE TO RESPOND TO?

23  **A.**   THERE'S CAMP C, CAMP D, DEATH ROW, CAMP F, TU, WHICH IS

24  TRANSITIONAL UNIT, AND THEN ANY OTHER ISSUES LIKE THE COMPOUNDS

25  THAT THEY'RE -- YOU KNOW, THE GRASS-CUTTING CREWS, THE AUTO

1   MECHANICS, TRACTOR REPAIR, ANYWHERE ON THE FARM.

2   **Q.**   ALL OF THOSE AREAS HAVE THE ABILITY TO CALL A SDE?

3   **A.**   YES, SIR.  THERE'S DOG PIN ALSO.  BUT THERE'S NUMEROUS

4   ONES I MAY HAVE MISSED AS WELL.

5   **Q.**   THE POLICY IS TO RESPOND TO THE CALL IN A TIMELY MANNER?

6   **A.**   CORRECT.

7   **Q.**   AND IS THERE -- IS THAT DEPENDENT UPON THE LEVEL OF THE

8   COMPLAINT?

9   **A.**   I WOULDN'T SAY NECESSARILY THE LEVEL OF THE COMPLAINT.

10  IT'S MORE TO DO WITH WHAT'S GOING ON AT THE TIME.  IF WE HAVE A

11  SELF-DECLARED THAT WAS DECLARED FOR SOMEONE WITH CHEST PAIN,

12  THEN THAT'S GOING TO TAKE PRECEDENCE OVER SOMEONE WITH A

13  SPRAINED ANKLE OR A TOOTHACHE.  BUT WE DO TRY TO MAKE EVERY

14  ATTEMPT TO SEE THEM AS SOON AS WE CAN.

15  **Q.**   AND SPRAINED ANKLES AND TOOTHACHES, THOSE ARE SOME

16  EXAMPLES OF SELF-DECLARED EMERGENCIES THAT YOU RECEIVE?

17  **A.**   CORRECT.

18  **Q.**   THERE'S NO KIND OF LIMITATION PLACED ON THE INMATES IF

19  THEY CALLED A SDE ON A TUESDAY?  YOU DON'T TELL THEM "YOU CAN'T

20  CALL AN SDE ON A WEDNESDAY"?

21  **A.**   NO, SIR.

22  **Q.**   WE RESPOND REGARDLESS?

23  **A.**   REGARDLESS.  AND SOMETIMES THEY CALL MULTIPLE ONES IN ONE

24  DAY AND WE STILL RESPOND TO THEM.

25  **Q.**   THANK YOU, NURSE COLEY.

1          **MR. BLANCHFIELD:**  THAT'S ALL THE QUESTIONS I HAVE,
2    YOUR HONOR.
3          **THE COURT:**  THANK YOU, MR. BLANCHFIELD.
4              ANY CROSS-EXAMINATION?
5          **MS. POURCIAU:**  YES, YOUR HONOR.
6          **THE COURT:**  AND FOR THE RECORD, THAT'S MS. POURCIAU.
7    CORRECT?
8          **MS. POURCIAU:**  YES, YOUR HONOR.
9          **THE COURT:**  ALL RIGHT.  I GOT IT RIGHT THAT TIME.
10   OKAY.
11                    **CROSS-EXAMINATION**
12   BY MS. POURCIAU:
13   **Q.**   NURSES AT ANGOLA WHO ARE COVERING THE SDE'S IN THE FIELD
14   MUST FOLLOW THE SET ITO'S, OR INDIVIDUAL TREATMENT ORDERS, TO
15   PROVIDE TREATMENT THEMSELVES WITHOUT CONSULTING A HIGHER LEVEL
16   OF CARE.  CORRECT?
17   **A.**   NOT MUST, THEY CAN.
18   **Q.**   IN ORDER TO PROVIDE ANY TREATMENT WITHOUT CONSULTING A
19   HIGHER LEVEL OF CARE, THE ITO MUST BE CONSULTED.  CORRECT?
20   **A.**   YES, MA'AM.
21   **Q.**   I'M PULLING UP WHAT HAS BEEN MARKED AS PX-30 -- OR MR.
22   STEVENSON IS PULLING UP WHAT HAS BEEN MARKED AS PX-30.
23           IS THIS THE ITO POLICY I JUST ASKED YOU ABOUT?
24   **A.**   YES, MA'AM.
25           **MS. POURCIAU:**  AT THIS TIME WE'D MOVE TO ADMIT PX-30

1  INTO EVIDENCE.

2          **THE COURT:**  ANY OBJECTION?

3          **MR. BLANCHFIELD:**  NO OBJECTION, YOUR HONOR.

4          **THE COURT:**  WITHOUT OBJECTION, PLAINTIFFS' EXHIBIT 30

5  IS ADMITTED.

6  **BY MS. POURCIAU:**

7  **Q.**   AND THE OPERATIVE ITO POLICY CAME OUT IN JANUARY OF 2024.

8  CORRECT?

9  **A.**   YES, MA'AM.

10  **Q.**   AND THE NEW POLICY APPLIES TO EVERYONE BEING SEEN BY

11  NURSES IN THE FIELD.  CORRECT?

12  **A.**   YES, MA'AM.

13  **Q.**   IT WASN'T ALWAYS THE POLICY FOR NURSES TO BE SENT OUT FOR

14  SDE'S, THOUGH.  CORRECT?

15  **A.**   IN THE PAST, I THINK EMS WAS.

16  **Q.**   THE NEW POLICY TO HAVE NURSES GO OUT CAME OUT IN EARLY

17  2024.  CORRECT?

18  **A.**   I'M NOT SURE OF WHEN THE DATES WAS, BUT IT SOUNDS WITHIN

19  THE LAST COUPLE YEARS.

20  **Q.**   AND THAT NEW POLICY APPLIES TO EVERYONE WHO'S WORKING IN

21  THE FIELD?

22  **A.**   AS FAR AS NURSING?  YES, MA'AM.

23  **Q.**   EXCUSE ME.  NOT THE INDIVIDUAL TREATMENT ORDER.  THE NEW

24  POLICY THAT EVERYONE WHO DECLARES A SELF-DECLARED EMERGENCY IS

25  SEEN BY A NURSE?

1    **A.**    YES, MA'AM.

2    **Q.**    AND AS YOU'VE TESTIFIED ON DIRECT, THE NURSES WHO COVER

3    THE FIELDS ALSO COVER OUTER CAMPS AND OTHER PLACES OUTSIDE THE

4    MAIN PRISON COMPOUND.   CORRECT?

5    **A.**    CORRECT.

6    **Q.**    I'D LIKE TO PULL UP WHAT HAS BEEN MARKED AS PX-32.

7             DO YOU RECOGNIZE THIS DOCUMENT?

8    **A.**    YES, MA'AM.

9    **Q.**    WHAT IS IT?

10   **A.**    THAT WAS FROM A MEDICAL DIRECTOR'S MEETING -- OR A NURSE

11   MEETING.

12   **Q.**    AND IS IT YOUR RECOLLECTION THAT THIS IS THE MEETING WHERE

13   THAT NEW POLICY TO HAVE NURSES COME OUT INSTEAD OF EMT'S WAS

14   DISCUSSED?

15   **A.**    IT LOOKS LIKE IT, YES, MA'AM.

16   **Q.**    TURNING TO PAGE 3 OF THIS DOCUMENT, CAN YOU PLEASE READ

17   THE LINE THAT SAYS "TIME FRAME TO BE SEEN" IN THE MIDDLE OF THE

18   PAGE?

19   **A.**    YES, MA'AM.  "TRY TO SEE EACH CALL WITHIN 30 MINUTES.

20   ABSOLUTELY HAS TO BE COMPLETED WITHIN THREE HOURS."

21   **Q.**    SO DURING THE MEETING WHERE HEALTH CARE PROVIDERS AT

22   ANGOLA WERE TRAINED ON THE NEW SDE POLICY, THREE HOURS WAS THE

23   UPPER LIMIT TIME PROVIDED TO CONDUCT AN ASSESSMENT TO A PATIENT

24   AFTER THE SDE IS CALLED IN.  CORRECT?

25   **A.**    THAT WAS SOMETHING THAT I THINK MS. CASHIO -- I'M NOT SURE

1   IF ITS MS. OR MRS. CASHIO.  THAT WAS SOMETHING THAT EMS
2   FOLLOWED, AND THAT WAS THEIR RECOMMENDATION.  HOWEVER, THAT IS
3   NOT THE POLICY.
4   **Q.**   ARE YOU AWARE THAT ON APRIL 2ND, 2025, AN INCARCERATED
5   PERSON LABORING ON THE FARM LINE MADE AN SDE WHEN HE BEGAN TO
6   FEEL DIZZY AND NAUSEATED BUT WAS NOT SEEN BY A PROVIDER BEFORE
7   THE LINE WAS BROUGHT IN; AND WHEN THE LINE PUSHER WENT TO THEIR
8   SUPERVISOR ABOUT IT WITH THE INCARCERATED WORKER, THE
9   SUPERVISOR SAID THAT MEDICAL HAS THREE HOURS TO RESPOND TO AN
10  SDE?
11  **A.**   WHAT WAS YOUR QUESTION?
12  **Q.**   ARE YOU AWARE OF THAT HAPPENING?
13  **A.**   NOT NECESSARILY THAT THAT'S HOW IT -- WHAT WAS SAID.
14          **MS. POURCIAU:**  CAN I HAVE THE COURT'S INDULGENCE FOR
15  ONE MINUTE?
16          **THE COURT:**  SURE.
17  **BY MS. POURCIAU:**
18  **Q.**   NURSE COLEY, YOU KNOW DR. PAUL TOCE.  CORRECT?
19  **A.**   YES, MA'AM.
20  **Q.**   HE'S THE MEDICAL DIRECTOR AT LOUISIANA STATE PENITENTIARY?
21  **A.**   CORRECT.
22          **MS. POURCIAU:**  I'D LIKE TO PULL UP JX-23, WHICH IS
23  DR. TOCE'S DEPOSITION TRANSCRIPT IN THIS CASE.
24          **MR. BLANCHFIELD:**  YOUR HONOR, I OBJECT TO THIS.
25  FIRST, IT'S BEYOND THE SCOPE OF MY DIRECT.  SECOND, I DON'T

1    KNOW WHY SHE'S TRYING TO ADMIT THE DEPOSITION TESTIMONY.

2                    THE COURT:  THANK YOU, MR. BLANCHFIELD.

3                    IT REALLY IS BEYOND THE SCOPE.  SECOND, I DON'T

4    THINK YOU HAVE LAID A FOUNDATION TO SHOW THAT THIS WITNESS

5    WOULD HAVE ANYTHING TO -- ANY KNOWLEDGE WHATSOEVER OF ANYONE --

6    ANY OTHER WITNESS'S TESTIMONY.

7                    MS. POURCIAU:  ALL RIGHT.  I WILL WITHDRAW JX-23.

8                    THE COURT:  THANK YOU.

9                    MS. POURCIAU:  AND I HAVE NO FURTHER QUESTIONS AT

10   THIS TIME.

11                   THE COURT:  ALL RIGHT.  ANY REDIRECT?

12                   MR. BLANCHFIELD:  NO, YOUR HONOR.

13                   THE COURT:  THANK YOU, COUNSEL.

14                   I HAVE JUST A COUPLE OF QUESTIONS FOR YOU, MR.

15   COLEY.

16                   MS. POURCIAU:  OH, EXCUSE ME, YOUR HONOR.  I'D LIKE

17   TO MOVE TO ADMIT EXHIBIT 32.

18                   THE COURT:  ANY OBJECTION?

19                   MR. BLANCHFIELD:  NO OBJECTION, YOUR HONOR.

20                   THE COURT:  ALL RIGHT.  PLAINTIFFS' EXHIBIT 32 IS

21   ADMITTED.

22                   SO, MR. COLEY -- IT'S COLEY.  CORRECT?

23                   THE WITNESS:  IT'S COLEY, BUT I'M USED TO IT.

24                   THE COURT:  COLEY.  SORRY ABOUT THAT.

25                   THE WITNESS:  OH, YES, SIR.  NO PROBLEM.

1          **THE COURT:**  HOW MANY NURSES OR OTHER MEDICAL

2     PROFESSIONALS ARE AVAILABLE TO RESPOND TO SELF-DECLARED MEDICAL

3     EMERGENCIES IN THE FIELD?

4          **THE WITNESS:**  WE STAFF TWO 24 HOURS A DAY; TWO ON

5     EACH SHIFT.  IT'S A 12-HOUR ROTATING SHIFT.

6          **THE COURT:**  OKAY.

7          **THE WITNESS:**  AND THEN ALSO I HAVE MYSELF, WHO IS A

8     RN MANAGER.  AND I HAVE -- WE HAVE RN SUE BEA AS WELL AS A

9     FLOAT NURSE.  AND WE ALL KIND OF ASSIST, IF NEEDED TO.  BUT

10    THERE'S TWO THAT'S PRIMARILY SCHEDULED ON THE SCHEDULE FOR

11    SELF-DECLARED NURSING.

12         **THE COURT:**  AND I ASSUME THAT THAT STAFF FACTORS INTO

13    THE TIME WITHIN WHICH YOU CAN RESPOND TO A SELF-DECLARED

14    MEDICAL EMERGENCY IN THE FIELD?

15         **THE WITNESS:**  YES, SIR.  THE MORE STAFF WE HAVE, THEN

16    OBVIOUSLY THE FASTER, YOU KNOW, WE CAN RESPOND IF WE'RE NOT ON

17    OTHER CALLS.  BUT WE TRY TO KEEP TWO AT ALL TIMES JUST BECAUSE

18    OF THE SIZE OF THE FARM.

19         **THE COURT:**  AND I BELIEVE YOU ALSO TESTIFIED THAT IT

20    DEPENDS ON THE NATURE OF THE SELF-DECLARED MEDICAL EMERGENCY AS

21    WELL.  RIGHT?

22         **THE WITNESS:**  YES, SIR.  'CAUSE WE HAVE THREE LEVELS.

23    WE HAVE ROUTINE SICK CALL WHERE THE OFFENDER, YOU KNOW, IS --

24    PLACES A ROUTINE SICK CALL, IS SEEN THE NEXT DAY BY A PROVIDER

25    ON THE TV SCREEN OR TELEMED.  WE HAVE SELF-DECLARED EMERGENCIES

1    AS FAR AS THE -- IF YOU WOULD WANT TO -- KIND OF AN AFTER-HOURS
2    CLINIC WHERE IT CAN'T WAIT TILL THE NEXT DAY, BUT IT'S A LITTLE
3    BIT MORE SEVERE.  THEN WE ALSO HAVE, YOU KNOW, THE ATU, WHICH
4    IS EQUAL -- YOU KNOW, CONSIDERED AS AN EMERGENCY ROOM.
5                    SO IF IT GETS TO WHERE THEY NEED FURTHER CARE
6    THAN A SELF-DECLARED EMERGENCY, THEN THEY DISPATCH AN AMBULANCE
7    AND THE AMBULANCE GOES OUT THERE AND BRINGS THEM TO THE ATU FOR
8    A, YOU KNOW, PROVIDER TO SEE AT THAT MOMENT.  SO THERE'S THREE
9    LEVELS AND IT DEPENDS ON WHAT THE OFFENDER FEELS HE NEEDS AT
10   THAT TIME.
11                    **THE COURT:**  ALL RIGHT.  MY FINAL QUESTION TO YOU, MR.
12   COLEY, IS -- AND I DON'T KNOW IF YOU CAN ANSWER THIS.  WE
13   HAVEN'T SEEN ANY DOCUMENTATION THAT WOULD REVEAL THIS, BUT DO
14   YOU HAVE A SENSE OF HOW OFTEN YOU RECEIVE OR HAVE TO RESPOND TO
15   SELF-DECLARED MEDICAL EMERGENCIES IN THE -- ON THE FARM LINE,
16   SAY, WITHIN A 30-DAY PERIOD?
17                    **THE WITNESS:**  I WOULD SAY -- WE DO KEEP DOCUMENTATION
18   OF THAT SEPARATE.  IT WOULD PROBABLY AVERAGE FOUR TO FIVE A
19   DAY.
20                    **THE COURT:**  A DAY?
21                    **THE WITNESS:**  SOMETIMES LESS.  YES, SIR.
22                    **THE COURT:**  ALL RIGHT.  VERY WELL.
23                    **THE WITNESS:**  BUT YES, SIR.
24                    **THE COURT:**  OKAY.  THANK YOU, MR. COLEY.
25                    THAT CONCLUDES YOUR TESTIMONY.

Case 3:23-cv-01304-BAJ-EWD    Document 239    05/06/25    Page 42 of 141

42

```
1              YOU ARE NOW EXCUSED.
2         THE WITNESS:  YES, SIR.  THANK YOU.
3         THE COURT:  THANK YOU FOR JOINING US, SIR.
4              ALL RIGHT.  MR. BLANCHFIELD, YOU MAY CALL YOUR
5    NEXT WITNESS.
6         MR. BLANCHFIELD:  YOUR HONOR, WE'RE LEFT WITH ONE
7    WITNESS.
8         THE COURT:  OKAY.
9         MR. BLANCHFIELD:  WOULD THE COURT INDULGE ME WITH A
10   FIVE-MINUTE BREAK TO GET OUR STUFF TOGETHER AND USE THE
11   RESTROOM?
12        THE COURT:  SURE.  ABSOLUTELY.
13             WE'LL TAKE A TEN-MINUTE BREAK.  AND WHEN WE
14   RETURN, YOU CAN CALL YOUR NEXT WITNESS.  OKAY.
15        MR. BLANCHFIELD:  THANK YOU, YOUR HONOR.
16        THE COURT:  THANK YOU.
17             COURT IS IN RECESS.
18        THE LAW CLERK:  ALL RISE.
19             THE COURT IS IN RECESS.
20        (WHEREUPON, THE COURT WAS IN RECESS.)
21        THE COURT:  BE SEATED.
22             OKAY.  WE'RE BACK ON THE RECORD IN THE CASE OF
23   VOTE VERSUS LEBLANC.
24             LET THE RECORD REFLECT THAT COUNSEL FOR BOTH
25   SIDES ARE PRESENT AS WELL AS PLAINTIFF, MR. JACKSON.
```

1          MR. BLANCHFIELD, YOU MAY NOW CALL YOUR NEXT
2    WITNESS.
3          **MR. BLANCHFIELD:**  THANK YOU, YOUR HONOR.
4          WE CALL DR. CARL KELDIE.
5          **THE COURT:**  OKAY.
6                    **CARL KELDIE, M.D.,**
7      **HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:**
8          **THE DEPUTY CLERK:**  CLEARLY STATE AND SPELL YOUR NAME
9    FOR THE RECORD.
10          **THE WITNESS:**  CARL, C-A-R-L, AND KELDIE IS
11    K-E-L-D-I-E.
12          **THE COURT:**  BEFORE WE BEGIN YOUR EXAMINATION, DR.
13    KELDIE --
14          **THE WITNESS:**  YES, SIR.
15          **THE COURT:**  -- YOU INFORMED ME YESTERDAY THAT YOU HAD
16    A BACK PROBLEM WHEN YOU SIT FOR A LONG PERIOD OF TIME.  IF
17    YOU'D LIKE TO STAND DURING THE COURSE OF YOUR TESTIMONY, LET ME
18    KNOW.  WE'LL HAVE A HANDHELD MICROPHONE WE CAN GIVE YOU.  OKAY.
19          **THE WITNESS:**  I'M USED TO -- I'M USED TO -- I CAN
20    PROBABLY DO IT LIKE THIS.
21          **THE COURT:**  ARE YOU --
22          **THE WITNESS:**  BUT I'M FEELING PRETTY GOOD.
23          **THE COURT:**  ARE YOU MORE COMFORTABLE STANDING THAN
24    SITTING OR --
25          **THE WITNESS:**  ABSOLUTELY.  BUT LET ME -- LET ME START

1  SITTING.

2        **THE COURT:**  OKAY.  THAT'S FINE.  AT ANY TIME YOU WISH

3  TO STAND --

4        **THE WITNESS:**  I APPRECIATE IT.

5        **THE COURT:**  -- THAT'S FINE.  AGAIN, WE'LL HAVE A --

6  WE'LL GIVE YOU THE -- WE'LL JUST GIVE YOU THE MICROPHONE RIGHT

7  NOW.  OKAY.

8        **THE WITNESS:**  OH, EVEN BETTER.

9        **THE COURT:**  ALL RIGHT.  LET'S PROCEED.

10        **MR. BLANCHFIELD:**  THANK YOU, YOUR HONOR.

11                              **VOIR DIRE**

12  BY MR. BLANCHFIELD:

13  **Q.**  WOULD YOU STATE YOU FULL NAME FOR THE RECORD, PLEASE?

14  **A.**  CARL KELDIE.

15  **Q.**  AND, DR. KELDIE, CAN YOU GIVE THE COURT A LITTLE

16  INFORMATION ABOUT YOUR EDUCATIONAL BACKGROUND?

17  **A.**  YES, SIR.  I WENT TO UNDERGRADUATE AND MEDICAL SCHOOL AT

18  THE UNIVERSITY OF SOUTH FLORIDA IN TAMPA, AND THEN DID A

19  ROTATING INTERNSHIP AT CARRAWAY METHODIST IN BIRMINGHAM,

20  ALABAMA, PRIOR TO COMPLETING A COMMITMENT WITH THE NATIONAL

21  HEALTH SERVICE CORPS IN BENSON, NORTH CAROLINA.

22  **Q.**  DID YOU RECEIVE ANY TRAINING IN EMERGENCY MEDICINE?

23  **A.**  I DID NOT DO A RESIDENCY IN EMERGENCY MEDICINE.

24  **Q.**  HAVE YOU EVER BEEN BOARD CERTIFIED IN EMERGENCY ROOM

25  MEDICINE?

1    **A.**   YES, I HAVE.

2    **Q.**   WHEN WERE YOU CERTIFIED?

3    **A.**   IN '91, RECERTED TEN YEARS LATER, AND A SECOND RECERT TEN

4    YEARS AFTER THAT.

5    **Q.**   CAN YOU TELL THE COURT YOUR EXPERIENCE IN CORRECTIONAL

6    CARE AND CORRECTIONAL CARE MEDICINE?

7    **A.**   I SURE CAN.  SO SINCE THE YEAR 2000, I'VE BEEN WORKING IN

8    THE FIELD OF CORRECTIONAL HEALTH CARE IN BOTH ADMINISTRATIVE

9    AND CLINICAL ROLES.  AND I HAVE -- I HAVE DONE THIS FOR 25

10   YEARS.  I CONTINUE TO SEE PATIENTS VIA TELEMEDICINE IN A PRISON

11   IN PENNSYLVANIA.

12          I'VE ACTUALLY -- I'VE ACTUALLY SUPERVISED AND

13   PROVIDED CARE FOR PATIENTS IN BETWEEN TWO AND THREE HUNDRED

14   JAILS, PRISONS, FORENSIC HOSPITALS, IN THIRTY-PLUS STATES, AND

15   IN MELBOURNE, AUSTRALIA.  SO I'VE BEEN BEHIND BARS AT

16   FACILITIES ALL OVER THE COUNTRY.

17          **THE COURT:**  IN A PROFESSIONAL SENSE?

18          **THE WITNESS:**  WELL, THERE WAS A -- YES, IN A

19   PROFESSIONAL SENSE.

20          **THE COURT:**  THANK YOU.  OKAY.  ALL RIGHT.

21   BY MR. BLANCHFIELD:

22   **Q.**   SO YOU'VE ACTUALLY WORKED IN THE PRISON SETTING ITSELF AS

23   A MEDICAL CARE PROVIDER?

24   **A.**   YES, SIR.

25   **Q.**   PROVIDING MEDICAL CARE TO INMATES?

1    **A.**   YES, SIR.

2    **Q.**   DO YOU HAVE ANY PARTICULAR EXPERIENCE IN HEAT PATHOLOGY?

3    **A.**   YES, SIR, I DO.

4    **Q.**   CAN YOU TELL THE COURT ABOUT THAT?

5    **A.**   I CAN.  WHEN I MOVED TO BENSON, NORTH CAROLINA, AS THE --

6    AS THE TOWN DOCTOR -- BENSON IS IN THE PIEDMONT OF NORTH

7    CAROLINA AND MOVED THERE IN SEVENTY -- THE SUMMER OF '79.  AND

8    THAT'S WHEN NORTH CAROLINA WAS A BIG TOBACCO STATE.  I KNEW

9    MANY OF THE LANDOWNERS.  AND IN JULY -- LATE JULY AND EARLY

10   AUGUST THEY HARVESTED TOBACCO.

11        WHILE I WAS THERE I ACTUALLY DID MOONLIGHTING IN THE

12   ER, SO I SAW A NUMBER OF PEOPLE THAT HAD BEEN WORKING

13   HARVESTING TOBACCO THAT EITHER CAME TO THE OFFICE OR THE

14   EMERGENCY ROOM.  MOST OF THE COMPLAINTS WERE MINOR.  I NEVER

15   SAW SOMEBODY WITH A CERTIFIED HEATSTROKE FROM THE AGRICULTURAL

16   COMMUNITY.

17        AND THEN IN EMERGENCY MEDICINE, I WORKED AROUND THE

18   SOUTHEAST.  I STARTED IN OKEECHOBEE, FLORIDA.  IT'S A TOWN IN

19   CENTRAL FLORIDA; AGRICULTURAL, A HUGE CATTLE INDUSTRY.  AND I

20   WORKED IN THAT EMERGENCY ROOMY AND I SEE -- I SAW PEOPLE FROM

21   THE FIELDS, FARMS AND -- ON A PRETTY FREQUENT BASIS.

22        AND THE SAME THING WHEN I WORKED AT HIALEAH HOSPITAL,

23   WHICH IS IN MIAMI.  WE WERE A LEVEL II TRAUMA HOSPITAL.  SO I

24   GOT -- I GOT SOME WORKERS FROM HOMESTEAD WITH PERIODICITY BUT

25   PROBABLY MY MOST EXPERIENCE WITH HEAT PATHOLOGY WAS WHEN I WAS

1    AT THE MARINE NAVAL AIR STATION IN CORPUS CHRISTI, TEXAS.  THAT

2    IS THE EASTERN PART OF NORTH CAROLINA AND A VERY SMALL

3    EMERGENCY ROOM, BUT IT WAS A TRAINING GROUND FOR MARINES.  AND

4    WE ROUTINELY HAD YOUNG MARINES COME IN DEHYDRATED, OCCASIONALLY

5    A HEAT EXHAUSTION.  AND ON ONE OCCASION I SAW THE ONLY

6    EXERTIONAL HEATSTROKE THAT I'VE EVER SEEN IN A YOUNG RECRUIT

7    WITH A CORE TEMPERATURE OF 106.  THERE WAS NO MISTAKING HIM FOR

8    SOMEBODY WHO HAD TAKEN DRUGS.  HE WAS HOT TO TOUCH.  HE WAS

9    TACHYCARDIC, TACHYPNEIC.  HE WAS BREATHING FAST, HAD A FAST

10   HEART RATE, AND VERY MUCH AN ALTERED MENTAL STATUS.

11          THE REAL QUESTION THAT I HAD AS WE STARTED THE

12   RECITATION WAS WHETHER I NEEDED TO PROTECT HIS AIRWAY, WHETHER

13   I NEEDED -- HIS MENTAL STATUS WAS SO ALTERED.  BUT IN -- AND

14   FRANKLY, THE TEAM THERE KNEW WHAT TO DO.  I MEAN, ICE, COOL HIM

15   DOWN, FLUIDS, ET CETERA, AND THEN HE WAS TRANSFERRED TO

16   BETHESDA, THE REGIONAL NAVAL HOSPITAL.  AND HE SURVIVED, WHICH

17   IS PRETTY COMMON OF PEOPLE WITH AN EXERTIONAL HEATSTROKE.

18   Q.    DOCTOR, HAVE YOU BEEN TENDERED AND ACCEPTED AS AN EXPERT

19   IN CORRECTIONAL CARE MEDICINE IN ANY COURTS?

20   A.    YES, SIR.

21   Q.    WHERE IN THE NATION?

22   A.    IN CHICAGO.

23   Q.    OKAY.

24   A.    I'VE TESTIFIED IN A NUMBER OF CASES IN FLORIDA AS WELL,

25   BUT MOST OF THE CASES DON'T ACTUALLY GET TO THE COURTROOM.

1    **MR. BLANCHFIELD:**  YOUR HONOR, IN CONJUNCTION WITH THE
2    TESTIMONY, WE WOULD TENDER DR. KELDIE AS AN EXPERT IN THE FIELD
3    OF CORRECTIONAL CARE MEDICINE.  I THINK WE'VE HAD A STIPULATION
4    AS TO THAT.
5         **MS. WRIGHT:**  I DO HAVE A FEW QUESTIONS.
6         **THE COURT:**  ALL RIGHT.  AND THAT'S MS. WRIGHT.
7    CORRECT?
8         **MS. WRIGHT:**  YES.
9         **THE COURT:**  ALL RIGHT.  JUST SO THAT --
10        **MS. WRIGHT:**  LYDIA WRIGHT FOR THE PLAINTIFFS.
11        **THE COURT:**  WE HAVE A LOT OF COUNSEL ON THE
12   PLAINTIFFS' SIDE.
13        **MS. WRIGHT:**  WE CERTAINLY DO.
14        **THE COURT:**  SO WE WANT TO MAKE SURE THAT THE RECORD
15   ACCURATELY REFLECTS WHO CONDUCTS THE EXAMINATION, OF COURSE.
16        **MS. WRIGHT:**  THANK YOU.
17        **THE COURT:**  YOU MAY PROCEED, MS. WRIGHT.
18                          **VOIR DIRE**
19   BY MS. WRIGHT:
20   **Q.**   NOW, DR. KELDIE, YOU WERE RETAINED BY THE DEPARTMENT OF
21   CORRECTIONS AT THE END OF JUNE OF 2024.  IS THAT CORRECT?
22   **A.**   THAT IS CORRECT.
23   **Q.**   AND IN YOUR SEPTEMBER 20TH, 2024 DEPOSITION IN THIS CASE,
24   YOU TESTIFIED THAT YOU HAVE AN AUGMENTED EXPERTISE IN
25   EXERTIONAL HEAT ILLNESS.  DO YOU RECALL THAT?

1  **A.**   IF YOU'RE READING FROM IT, I BELIEVE YOU.

2  **Q.**   AND YOU TESTIFIED THAT THAT AUGMENTED EXPERTISE WAS

3  DEVELOPED AS A RESULT OF THE WORK YOU HAVE DONE IN THIS CASE.

4  CORRECT?

5  **A.**   IF YOU'RE READING FROM THE DOCUMENT -- IF YOU WANT TO SHOW

6  IT TO ME, I'LL ANSWER MORE ASSUREDLY, BUT I TRUST YOU.

7  **Q.**   WE CAN LOOK AT THE DOCUMENT.

8         LET'S PULL UP DR. KELDIE'S DEPOSITION TRANSCRIPT,

9  WHICH IS ALREADY IN THE RECORD IN THIS CASE AT JX-16.  WE'LL

10  LOOK AT PAGE 19.  LET'S LOOK AT PAGE 21, LINE 7 TO 10.

11         DO YOU RECALL WHEN I ASKED YOU, "WAS THAT AUGMENTED

12  EXPERTISE DEVELOPED AS A RESULT OF THE WORK YOU'VE DONE ON THIS

13  CASE?"  YOU RESPONDED, "YES."

14  **A.**   YES.

15  **Q.**   NO COURT HAS EVER QUALIFIED YOU AS AN EXPERT ON THE TOPICS

16  OF HEAT-RELATED MEDICAL CARE AND DISORDERS OR THERMOREGULATION.

17  CORRECT?

18  **A.**   CORRECT.

19  **Q.**   YOU HAVE NO EXPERTISE IN THOSE TOPICS?

20  **A.**   THAT'S NOT TRUE.

21  **Q.**   YOU'VE NEVER BEEN QUALIFIED AS AN EXPERT IN THOSE TOPICS?

22  **A.**   THAT IS TRUE.

23  **Q.**   AND BEFORE NOW, YOU HAVE NEVER -- YOU HAVE NEVER OPINED AS

24  AN EXPERT IN THOSE TOPICS.  CORRECT?

25  **A.**   THAT IS CORRECT.

1  **Q.**   YOU'VE BEEN QUALIFIED BY A COURT AS AN EXPERT IN TWO
2  CASES:  "ONE IN LAKE COUNTY, ILLINOIS; AND THE OTHER IS CATAWBA
3  COUNTY, NORTH CAROLINA.  CORRECT?
4  **A.**   CORRECT.
5  **Q.**   AND IN BOTH CASES YOU WERE QUALIFIED AS AN EXPERT IN
6  CORRECTIONAL HEALTH CARE?
7  **A.**   YES.
8  **Q.**   NOW, DR. KELDIE, YOU DO NOT HAVE ANY CURRENT BOARD
9  CERTIFICATIONS, INCLUDING IN EMERGENCY MEDICINE OR ANYTHING
10  ELSE.  CORRECT?
11  **A.**   THAT IS CORRECT.
12  **Q.**   YOU HAVE NOT PUBLISHED ANY ARTICLES, BOOKS, CHAPTERS, OR
13  SCIENTIFIC STUDIES ON ANY TOPIC.  CORRECT?
14  **A.**   THAT IS CORRECT.
15  **Q.**   YOU HAVE NOT PARTICIPATED IN PEER REVIEW OF ANY SCIENTIFIC
16  ARTICLES?
17  **A.**   I HAVE NOT.
18  **Q.**   THE LAST TIME YOU TREATED ANY PATIENTS IN AN EMERGENCY
19  ROOM SETTING WAS 25 YEARS AGO, LABOR DAY OF 2000?  YES?
20  **A.**   CORRECT.
21  **Q.**   AND SINCE 2000, YOU'VE WORKED FOR A VARIETY OF PRIVATE
22  FOR-PROFIT PRISON HEALTH CARE CONTRACTORS.  CORRECT?
23  **A.**   CORRECT.
24  **Q.**   THAT INCLUDES PRISON HEALTH SERVICES?
25  **A.**   YES.

1    **Q.**    WHICH BECAME CORIZON HEALTH, LLC?

2    **A.**    CORRECT.

3    **Q.**    AND IN MARCH OF 2013, YOU WERE TERMINATED FROM CORIZON.

4    RIGHT?

5    **A.**    THAT IS CORRECT.

6    **Q.**    YOU NEVER ASKED WHY YOU WERE FIRED?

7    **A.**    SAY THE DATE AGAIN.  I'M SORRY.

8    **Q.**    MARCH OF 2013 YOU WERE FIRED FROM CORIZON?

9    **A.**    YES.

10   **Q.**    AND YOU NEVER ASKED WHY YOU WERE FIRED?

11   **A.**    THAT'S CORRECT.

12   **Q.**    IN MAY OF 2015 YOU BECAME THE CHIEF MEDICAL OFFICER AT

13   CORRECT CARE SOLUTIONS, LLC, WHICH LATER BECAME WELLPATH

14   INCORPORATED.  RIGHT?

15   **A.**    CORRECT.

16   **Q.**    AND WELLPATH IS A PRIVATE EQUITY-OWNED FOR-PROFIT COMPANY?

17   **A.**    YES.

18   **Q.**    WELLPATH CONTRACTS WITH FEDERAL AND STATE PRISONS TO

19   PROVIDE HEALTH CARE SERVICES?

20   **A.**    YES.

21   **Q.**    AND YOU STILL WORK FOR WELLPATH TWO HALF DAYS A WEEK?

22   YES?

23   **A.**    CORRECT.

24   **Q.**    AND YOU'RE ALSO SELF-EMPLOYED AS A CORRECTIONAL HEALTH

25   CARE CONSULTANT?

1  **A.**   CORRECT.

2  **Q.**   AND IN THAT ROLE, YOU MAINLY DO EXPERT WORK?

3  **A.**   YES.

4  **Q.**   BUT YOU HAVE NEVER BEEN HIRED OR APPOINTED BY A COURT TO

5  MONITOR A CONSENT DECREE OR IMPLEMENT A REMEDIAL PLAN.

6  CORRECT?

7  **A.**   THAT IS CORRECT.

8  **Q.**   HOWEVER, YOU STAND READY, WILLING AND ABLE TO DO SO, IF

9  HIRED?

10 **A.**   IT'S GETTING A LITTLE LATE IN THE CAREER, BUT I WOULD

11 CONSIDER IT.

12 **Q.**   AND, IN FACT, IN THE *LEWIS* CASE, THE LOUISIANA DEPARTMENT

13 OF CORRECTIONS ASKED JUDGE DICK TO APPOINT YOU AS AN EXPERT TO

14 CREATE AND IMPLEMENT A REMEDIAL PLAN FOR THE HEALTH CARE SYSTEM

15 AT LSP.  RIGHT?

16 **A.**   THAT WAS UNBEKNOWNST TO ME.

17          **THE COURT:**  WELL -- BUT THAT'S NOT THE QUESTION.  THE

18 QUESTION IS:  IS THAT CORRECT?

19          **THE WITNESS:**  I DON'T EVEN KNOW.

20          **THE COURT:**  OKAY.

21 **BY MS. WRIGHT:**

22 **Q.**   YOU DON'T RECALL DISCUSSING THAT IN YOUR DEPOSITION IN

23 THIS CASE?

24 **A.**   I -- I REMEMBER YOU BRINGING IT UP, AND I WAS KIND OF LIKE

25 SURPRISED BECAUSE I HAD NEVER MYSELF AUTHORIZED ANYONE TO PUT

1    MY NAME FORTH AS A POTENTIAL EXPERT.

2    **Q.**    AND YOU ARE -- ARE YOU AWARE THAT YOU'RE STILL UNDER

3    CONSIDERATION FOR THAT JOB?  JUDGE DICK HAS NOT ISSUED ANY

4    RULING.

5    **A.**    I AM -- I AM NOT AWARE THAT I'M BEING CONSIDERED FOR THAT

6    JOB.

7    **Q.**    OKAY.

8            **MS. WRIGHT:**  PLAINTIFFS WOULD -- DR. KELDIE MAY WELL

9    BE AN EXPERT IN CORRECTIONAL MEDICAL CARE, BUT PLAINTIFFS WOULD

10   OPPOSE ANY EXPERT TESTIMONY ON THE TOPIC OF HEAT-RELATED

11   MEDICAL CARE DISORDERS BECAUSE DR. KELDIE HAS NO EXPERTISE IN

12   THAT PARTICULAR SUBJECT AND ANY POTENTIAL EXPERTISE WAS

13   DEVELOPED BECAUSE OF AND DURING THIS LITIGATION.

14           **THE COURT:**  SO LET ME BE CLEAR.  I JUST WANT TO

15   UNDERSTAND, MS. WRIGHT.

16           FIRST OF ALL, DO YOU OPPOSE THE DESIGNATION OF

17   DR. KELDIE AS AN EXPERT IN CORRECTIONAL CARE MEDICINE?

18           **MS. WRIGHT:**  WE DO NOT OPPOSE THAT.

19           **THE COURT:**  ALL RIGHT.  WITHOUT OBJECTION, DR.

20   KELDIE -- I'M NOT QUITE DONE.  WITHOUT OBJECTION, DR. KELDIE

21   WILL BE ADMITTED AS AN EXPERT IN THE FIELD OF CORRECTIONAL CARE

22   MEDICINE.

23           NOW, MS. WRIGHT, IF YOU BELIEVE AT SOME POINT

24   THE DIRECT EXAMINATION OF THE WITNESS EXCEEDS THE SCOPE OF THAT

25   AREA OR FIELD OF EXPERTISE, YOU'RE GOING TO BE RESPONSIBLE, OF

1  COURSE, FOR CALLING THAT TO MY ATTENTION IN THE FORM OF AN
2  OBJECTION AND I'LL RULE ACCORDINGLY.  OKAY.
3          **MS. WRIGHT:**  UNDERSTOOD.
4          **THE COURT:**  ALL RIGHT.  MR. BLANCHFIELD.
5          **MR. BLANCHFIELD:**  THANK YOU, YOUR HONOR.
6          **THE COURT:**  AND THAT -- BY THE WAY, MR. BLANCHFIELD,
7  FOR YOUR PLANNING PURPOSES, BY MY CALCULATION, THAT WAS ABOUT A
8  SIX-MINUTE VOIR DIRE, SO THAT'S NOT -- THAT'S BEING CREDITED
9  BACK TO YOU.  OKAY.
10         **MR. BLANCHFIELD:**  THANK YOU.  I APPRECIATE THAT, YOUR
11 HONOR.
12                    **DIRECT EXAMINATION**
13 BY MR. BLANCHFIELD:
14 **Q.**   OKAY.  DR. KELDIE, WHAT WERE YOU ASKED TO DO IN THIS CASE?
15 **A.**   I WAS ASKED TO REVIEW SPECIFIC POLICIES AND PROCEDURES,
16 INCLUDING HEALTH CARE POLICY 8 AND ITS TWO ATTACHMENTS,
17 ATTACHMENT A AND B, THE MEDICATION LIST, HEAT PATHOLOGY
18 MEDICATION LIST, AND THE HEAT PATHOLOGY DIAGNOSES OR MEDICAL
19 LIST.  I WAS ALSO ASKED TO REVIEW WHAT WAS THEN EIGHT
20 PLAINTIFFS' MEDICAL RECORDS IN THE CASE, AND THEN I WAS ASKED
21 TO DO A SITE VISIT TO LSP.  AND THEN WHEN WE HAD THE
22 SELF-DECLARED EMERGENCIES AUDITED IN MAY THROUGH AUGUST OF
23 2024, I WAS ASKED TO REVIEW THOSE.
24 **Q.**   OKAY.  YOU WERE PROVIDED WITH HCP 8 AS IT EXISTED AT THAT
25 TIME WITH EXHIBITS A AND B.  CORRECT?

1    **A.**   I WAS.

2    **Q.**   AND EXHIBIT 1 OF THE EXHIBITS LISTED WHAT WE HAVE ALREADY

3    SEEN HERE; BASICALLY THE ANTI-PSYCHOTROPIC MEDICATIONS.

4    CORRECT?

5    **A.**   CORRECT.

6    **Q.**   AND THE MEDICAL CONDITION LIST, WHICH WAS LISTED IN A

7    PARAGRAPH IN HCP 8.  IS THAT CORRECT?

8    **A.**   CORRECT.

9    **Q.**   AND WE WILL LOOK AT THOSE.

10          BUT YOU ALSO REVIEWED THE EIGHT PLAINTIFFS' MEDICAL

11    RECORDS?

12    **A.**   THAT IS CORRECT.

13    **Q.**   HOW MANY PAGES WAS THAT?

14    **A.**   THEY WERE IN EXCESS OF ABOUT 8,000 PAGES BETWEEN ALL

15    EIGHT.

16    **Q.**   AND YOU MENTIONED SELF-DECLARED EMERGENCIES.  HOW MANY

17    SELF-DECLARED EMERGENCIES DID YOU REVIEW?

18    **A.**   I THINK THERE WERE ABOUT 135.

19    **Q.**   AND WHAT WAS THE TIME PERIOD ON THOSE SELF-DECLARED

20    EMERGENCIES?

21    **A.**   FROM MAY OF 2024 THROUGH AUGUST OF 2024.

22    **Q.**   OKAY.  YOU SAID YOU HAD --

23          **THE WITNESS:**  I THINK I'LL TAKE YOU UP ON THAT OFFER.

24          **THE COURT:**  YES, YOU MAY STAND.  ALL RIGHT.

25    **BY MR. BLANCHFIELD:**

1    **Q.**   -- A SITE VISIT AT LSP?

2    **A.**   CORRECT.

3    **Q.**   TELL THE COURT ABOUT THAT.  WHAT DID YOU DO THERE?

4    **A.**   CAN YOU HEAR ME?

5              **THE COURT:**  ELIZABETH.

6    **BY THE WITNESS:**

7    **A.**   HELLO, HELLO.

8              **THE COURT:**  OKAY.  ALL RIGHT.

9    **BY THE WITNESS:**

10   **A.**   I PRETTY MUCH CANVASSED THE ENTIRE FACILITY.  I WENT TO

11   THE FARM LINE.  WE PRETTY MUCH STARTED THERE, AND THEN I WENT

12   AROUND THE FACILITY, EVERYWHERE FROM THE HOSPICE UNIT TO THE

13   ACUTE TREATMENT UNIT.  WE VISITED THE SKILLED NURSING CENTER, A

14   NUMBER OF THE UNITS.  AND PRETTY MUCH THE EXTENT --

15   **Q.**   AND --

16             **MS. WRIGHT:**  EXCUSE ME.  I'M SO SORRY.  WOULD IT BE

17   POSSIBLE TO TURN UP THE VOLUME ON THE MICROPHONE?

18             **THE COURT:**  I NEED YOU TO SPEAK UP A LITTLE BIT

19   LOUDER.

20             **MS. WRIGHT:**  THANK YOU.

21             **THE COURT:**  WE'RE GOING TO TURN UP THE MICROPHONE AS

22   MUCH AS WE CAN, BUT WE'LL NEED YOU TO JUST PROJECT A LITTLE BIT

23   MORE, DOCTOR.  OKAY.

24             **THE WITNESS:**  ARE YOU TURNING IT UP?

25             **THE COURT:**  YES.  WE'LL TAKE CARE OF IT ON THIS END.

1    OKAY.

2         **THE WITNESS:**  IS THAT BETTER?

3         **THE COURT:**  MUCH BETTER.

4         **MR. BLANCHFIELD:**  THANK YOU.

5    **BY MR. BLANCHFIELD:**

6    **Q.**   NOW, YOU OBSERVED THE INMATES ACTUALLY WORKING IN THE

7    FIELD?

8    **A.**   YES, SIR.

9    **Q.**   WHAT WERE THEY DOING?

10   **A.**   THEY WERE ACTUALLY PLANTING SEEDLINGS.  THEY HAD HAD A

11   DROUGHT THAT YEAR.  AND I DON'T KNOW WHAT THE CROP WAS, BUT

12   THEY WERE PLANTING A NEW CROP FROM SEEDLINGS THAT THEY HAD

13   GROWN THEMSELVES.  AND SO THERE WERE A NUMBER OF DIFFERENT

14   ROWS, AND THEY WERE PLANTING SEEDLINGS.

15   **Q.**   WHAT MONTH WAS THAT?

16   **A.**   THAT WAS IN SEPTEMBER.

17   **Q.**   AND YOU WERE ABLE TO OBSERVE FOR AN HOUR OR TWO THE

18   ACTIVITIES?

19   **A.**   YES.

20   **Q.**   DID YOU PERCEIVE ANY RISK OF HARM TO THE INMATES DURING

21   THAT TIME PERIOD?

22   **A.**   NO, SIR.

23   **Q.**   DID YOU NOTICE IF THE INMATES WERE GIVEN BREAKS?

24   **A.**   I DIDN'T -- I DIDN'T SEE A STRUCTURED BREAK WHERE

25   EVERYTHING STOPPED WHILE I WAS THERE.  THERE WERE -- THERE WERE

1    PRISONERS THAT ACTUALLY CAME TO THE WATERCOOLER ON THEIR OWN

2    VOLITION.  BUT WHILE I WAS THERE, I DID NOT WITNESS A 15-MINUTE

3    BREAK.

4    **Q.**    THERE WAS NO HEAT ALERT CALLED WHILE YOU WERE THERE IN

5    SEPTEMBER?

6    **A.**    NO, SIR.

7    **Q.**    WAS IT A WARM DAY?

8              **THE COURT:**  WAIT JUST A MOMENT.  IS THERE --

9              **THE WITNESS:**  I WAS JUST ASKING IF I WAS LOUD ENOUGH.

10             **THE COURT:**  YES.  YOU'RE DOING GREAT.  THANK YOU.

11   **BY THE WITNESS:**

12   **A.**    I'M SORRY.

13   **Q.**    WAS IT A WARM DAY?

14   **A.**    IT WAS WARM.  IT WAS NOT A HOT DAY.

15   **Q.**    OKAY.  NOW, YOU MENTIONED THE EIGHT PLAINTIFFS' MEDICAL

16   RECORDS.  YOU'RE AWARE OF DR. VASSALLO'S SECOND DECLARATION

17   WHERE SHE RUNS THROUGH EACH OF THE EIGHT PLAINTIFFS' MEDICAL

18   RECORDS AND MEDICAL CONDITIONS?

19   **A.**    YES, SIR, I AM.

20   **Q.**    YOU HAVE REVIEWED THAT?

21   **A.**    YES, SIR.

22   **Q.**    AND HAVE YOU LOOKED AT THOSE PLAINTIFFS' MEDICAL RECORDS

23   TO CROSS-REFERENCE THEM TO THE DECLARATION FROM DR. VASSALLO?

24   **A.**    YES, SIR.

25   **Q.**    OKAY.  IN FACT, YOU IN YOUR INITIAL AFFIDAVIT, WHICH HAS

1  BEEN ADMITTED INTO THIS RECORD AS JOINT EXHIBIT 76 -- I THINK
2  YOU DISCUSS SOME OF THOSE PLAINTIFFS?
3  **A.**   YES, SIR.
4  **Q.**   I WANT TO TALK ABOUT A FEW OF THOSE PLAINTIFFS, IF WE
5  COULD, DOCTOR.
6       ARE WE ABLE TO BRING UP JX-76?
7  **A.**   I'LL SIT BACK DOWN.
8  **Q.**   OKAY.  IF WE COULD GO TO PAGE 12.
9       **MS. WRIGHT:**  EXCUSE ME.  THIS DOCUMENT IS
10  CONFIDENTIAL, SUBJECT TO A PROTECTIVE ORDER.  THERE'S PERSONAL
11  IDENTIFYING INFORMATION AND MEDICAL INFORMATION.  THAT'S WHY I
12  BELIEVE IT WAS FILED UNDER SEAL INTO THE RECORD.
13       **THE COURT:**  AND WHAT'S THE NATURE OF THE PERSONAL
14  IDENTIFYING INFORMATION?
15       **MS. WRIGHT:**  THERE'S PERSONAL MEDICAL INFORMATION IN
16  THIS.
17       **THE COURT:**  ALL RIGHT.  SO WHAT WE'LL DO -- MR.
18  BLANCHFIELD, I'M SURE YOU CAN FIGURE OUT A WORK-AROUND ABOUT
19  THAT.
20       **MR. BLANCHFIELD:**  YES, YOUR HONOR.
21       **THE COURT:**  IN OTHER WORDS, YOU'RE A PROFESSIONAL
22  HERE.  YOU KNOW, YOU'RE AWARE OF THE CONCERNS AND I TRUST THAT
23  YOUR QUESTIONS TO THE WITNESS WILL ACCOUNT FOR THE FACT THAT
24  THIS IS A DOCUMENT THAT IS UNDER SEAL, AT LEAST -- AND LET ME
25  BE CLEAR.  THE INFORMATION IN THE DOCUMENT -- WHICH I HAVEN'T

1    REVIEWED.  BUT I WOULD ASK THAT IF YOU QUESTION THE WITNESS

2    ABOUT THE INFORMATION IN THIS DOCUMENT, THAT YOU TRY TO OMIT

3    ANYTHING THAT IS PROTECTED BY THE PRIVACY ACT AND OTHER

4    RELEVANT FEDERAL PROVISIONS.  OKAY?

5              **MR. BLANCHFIELD:**  YES, YOUR HONOR.

6              **THE COURT:**  IF YOU CAN DO SO.  IF YOU FEEL LIKE YOU

7    CANNOT DO SO, WE'LL HAVE TO CLEAR THE COURTROOM AND WE'LL ALLOW

8    THE WITNESS TO TESTIFY UNDER SEAL, AT LEAST AT THIS PORTION OF

9    HIS TESTIMONY.

10             **MR. BLANCHFIELD:**  AND, YOUR HONOR, I CAN REFER TO

11   THEM AS PATIENT -- YOU KNOW, PATIENT NO. 1.

12             **MS. WRIGHT:**  AND --

13             **THE COURT:**  IS THAT SATISFACTORY, MS. WRIGHT?

14             **MS. WRIGHT:**  THE PERSONAL IDENTIFYING INFORMATION IS

15   STILL BROADCASTED.  IT'S STILL PUBLICIZED IN OPEN COURT.

16             **THE COURT:**  OKAY.

17             **MS. WRIGHT:**  SO WE WOULD ASK THAT THAT IS --

18             **THE COURT:**  WE CAN ELIMINATE --

19             **THE WITNESS:**  I HAVE A HARD COPY.

20             **THE COURT:**  ALL RIGHT.

21             **MS. WRIGHT:**  THANK YOU.

22             **THE COURT:**  THERE WE GO.

23                 DO YOU SEE THAT BEFORE YOUR MONITOR?

24             **THE WITNESS:**  YES, I DO.

25             **THE COURT:**  WAIT.  LET ME READ THE DOCUMENT, FIRST OF

1  ALL.

2          ALL RIGHT.  LET'S PROCEED.  I NOW UNDERSTAND

3  YOUR POINT.

4          **MS. WRIGHT:**  THANK YOU.

5          **THE COURT:**  THE NAME OF THE INMATE IS INCLUDED HERE

6  AND WAS BRIEFLY PUBLISHED.

7          ALL RIGHT.  LET'S PROCEED.

8          **MR. BLANCHFIELD:**  OKAY.

9  BY MR. BLANCHFIELD:

10 **Q.**  IF WE COULD, WITH RESPECT TO PATIENT NO. 1, DR. KELDIE,

11 YOU ARE AWARE OF THE REPRESENTATIONS MADE BY DR. VASSALLO IN

12 HER SECOND DECLARATION WITH RESPECT TO PATIENT NO. 1?

13 **A.**  YES, I AM.

14 **Q.**  OKAY.  AND YOU ACTUALLY REVIEWED THE MEDICAL RECORDS OF

15 PATIENT NO. 1?

16 **A.**  YES, I DID.

17 **Q.**  AND WHAT DID THAT -- YOUR REVIEW OF THOSE RECORDS REVEAL

18 TO YOU?

19 **A.**  I REVIEWED THE RECORDS, AS I NORMALLY DO RECORDS, NOT JUST

20 THE PAGES THAT DR. VASSALLO HAD REFERENCED, BUT I SPECIFICALLY

21 LOOKED AT THE DIAGNOSES OR MEDICAL CONDITIONS THAT SHE ALLEGED

22 IN THE DOCUMENT, WHICH WERE BASICALLY FOUR.  ONE WAS

23 HYPERTENSION; ONE WAS TUBERCULOSIS; ONE WAS PULMONARY DISEASE;

24 AND ONE WAS MOBILITY IMPAIRMENT, FOUR MEDICAL CONDITIONS THAT

25 WERE IDENTIFIED AND DECLARED AS PUTTING HIM AT RISK OF HAVING A

1    SERIOUS HEAT ILLNESS OR INJURY.

2            **MS. WRIGHT:**  AND, YOUR HONOR, I WOULD OBJECT TO THIS

3    TESTIMONY AS OUTSIDE THE SCOPE OF THE EXPERT'S EXPERTISE.

4            **THE COURT:**  MR. BLANCHFIELD?

5            **MR. BLANCHFIELD:**  YOUR HONOR, HE IS A PHYSICIAN WHO'S

6    BEEN QUALIFIED IN CORRECTIONAL CARE MEDICINE.  HE OBVIOUSLY HAS

7    THE ABILITY TO REVIEW A MEDICAL CHART AND OPINE ON DIAGNOSES,

8    MEDICATION.  HIS EXPERTISE THAT HE EXPLAINED TO THIS COURT IN

9    DEALING WITH HEAT EXERTIONAL INJURIES, HEAT PATHOLOGY, OVER 20

10   YEARS.

11           **THE COURT:**  MS. WRIGHT, PLEASE COME TO THE -- USE THE

12   MICROPHONE TO THE RIGHT OF THE PODIUM, PLEASE.

13               WHAT'S YOUR RESPONSE TO MR. BLANCHFIELD'S REPLY?

14           **MS. WRIGHT:**  DR. KELDIE, AGAIN, MAY WELL BE AN EXPERT

15   IN CORRECTIONAL MEDICINE.  HE IS NOT AN EXPERT IN HEAT

16   PATHOLOGY OR HEAT-RELATED MEDICAL CARE.  SIMPLY HAVING A

17   MEDICAL DEGREE DOES NOT MAKE SOMEONE AN EXPERT IN NEPHROLOGY OR

18   PEDIATRIC ONCOLOGY OR RESPIRATORY DISEASE.  DR. KELDIE HAS

19   ABSOLUTELY NO EXPERIENCE SPECIFICALLY -- OR EXPERTISE

20   SPECIFICALLY TREATING HEAT-RELATED ILLNESS, AND HE CANNOT NOW

21   LOOK AT A PATIENT'S MEDICAL RECORD AND DRAW SOME CONCLUSION

22   ABOUT EXERTIONAL HEAT ILLNESS OR ANY OTHER KIND OF HEAT ILLNESS

23   WITHOUT THAT EXPERTISE.

24           **THE COURT:**  OKAY.  DOCTOR, HAVE YOU EVER BEEN

25   QUALIFIED IN THE FIELD OF THERMOREGULATION OF THE BODY?

1       **THE WITNESS:**  NO, SIR.

2       **THE COURT:**  OKAY.  WELL, MR. BLANCHFIELD, I DON'T

3   THINK HE'S COMPETENT TO ANSWER THIS.  NOW, IF YOU WANT TO

4   QUESTION HIM ABOUT PRACTICES, PROCEDURES -- BECAUSE IT'S, YOU

5   KNOW, MY UNDERSTANDING, BASED UPON HIS QUALIFICATIONS, IS THAT

6   HE'S CERTAINLY CAPABLE OF TESTIFYING ABOUT PRISON MEDICAL CARE

7   SYSTEMS, PROCEDURES.  HE HASN'T EXAMINED THIS INMATE.  HE'S

8   MERELY REVIEWED THE -- OR THE REPORT OF A PHYSICIAN WHO IS A

9   QUALIFIED -- AND HAS BEEN QUALIFIED AS AN EXPERT IN

10  THERMOREGULATION OF THE BODY.  I DON'T SEE HOW HE CAN NOW OPINE

11  ABOUT WHETHER DR. VASSALLO'S CONCLUSIONS ARE VALID OR INVALID,

12  BECAUSE THAT IS NOT HIS AREA OF EXPERTISE.  WHAT AM I MISSING?

13      **MR. BLANCHFIELD:**  WHAT YOU'RE MISSING, YOUR HONOR, IS

14  I ASKED HIM AND HE TESTIFIED THAT DR. VASSALLO LOOKED AT THE --

15  WHATEVER SHE LOOKED AT AND SAID THERE ARE FOUR DIAGNOSES.

16  THERE'S HYPERTENSION, TUBERCULOSIS, PULMONARY DISEASE.  HE'S

17  REVIEWED THE RECORD, AND I'M GOING TO ASK HIM WHAT HIS REVIEW

18  IS.  IT HAS NOTHING TO DO WITH THERMOREGULATION.  HE CAN TELL

19  IF THIS -- IF THIS INDIVIDUAL HAS HYPERTENSION.  HE'S CERTAINLY

20  QUALIFIED TO --

21      **THE COURT:**  SO LET ME UNDERSTAND.  SO YOU'RE ASKING

22  THIS WITNESS TO GO BACK AND TESTIFY AS TO WHETHER ANOTHER

23  WITNESS IS CORRECT -- IN THIS CASE DR. VASSALLO -- IN HER

24  CONCLUSIONS THAT THIS GENTLEMAN WAS DIAGNOSED WITH

25  HYPERTENSION?

1          IN OTHER WORDS, STATED DIFFERENTLY, I DON'T --
2   IS IT YOUR CONTENTION, MS. WRIGHT, THAT A PHYSICIAN ON-SITE, ON
3   STAFF AT ANGOLA DIAGNOSED THIS INDIVIDUAL WITH HYPERTENSION?
4          **MS. WRIGHT:**  THAT IS MY UNDERSTANDING, YES.  AND IT'S
5   STATED IN DR. VASSALLO'S --
6          **THE COURT:**  HIGH BLOOD PRESSURE -- SO I GUESS, AGAIN,
7   MR. BLANCHFIELD, A DOC PHYSICIAN HAS ALREADY REACHED THESE
8   CONCLUSIONS ABOUT THIS INMATE.  AS I APPRECIATE IT, DR.
9   VASSALLO HAS ACCEPTED THOSE CONCLUSIONS, NOT HAVING EXAMINED
10  THE INMATE HERSELF, BUT RELIED ON A DOC DETERMINATION OF SUCH.
11         SO I'M ASKING, AGAIN:  WHAT IS IT THAT YOU'RE
12  ASKING THIS WITNESS TO NOW DO WITH RESPECT TO DR. VASSALLO'S
13  ACCEPTANCE OF THAT INFORMATION?
14         **MR. BLANCHFIELD:**  BECAUSE THAT IS NOT WHAT HAPPENED.
15  THERE IS NO DIAGNOSIS OF TUBERCULOSIS IN THAT RECORD.  SHE SAYS
16  THERE IS.  THERE IS NOT.
17         **THE COURT:**  OKAY.  I WILL --
18         **MR. BLANCHFIELD:**  NO ONE AT DOC --
19         **THE COURT:**  I'LL ALLOW THAT TESTIMONY.  IF THAT'S THE
20  CASE, THAT'S FINE.
21         **MS. WRIGHT:**  NO OBJECTION TO THAT TESTIMONY.
22         **THE COURT:**  VERY WELL.
23         **MS. WRIGHT:**  THANK YOU.
24         **THE COURT:**  OKAY.  LET'S PROCEED.
25  **BY MR. BLANCHFIELD:**

1    Q.   DR. KELDIE, IF WE COULD TRY TO PICK UP WHERE WE LEFT OFF
2    ON THE FOUR DIAGNOSES ON PATIENT NO. 1.
3    A.   HE WAS NEVER DIAGNOSED WITH HYPERTENSION.  THERE WAS AN
4    ENTRY THAT I FOUND THAT COMMENTED THAT HE HAD HAD VERY RARE
5    BLOOD PRESSURE ELEVATIONS.  AT THE TIME OF THAT VISIT, HIS
6    BLOOD PRESSURE WAS COMPLETELY NORMOTENSIVE.  AND, IN FACT, IN
7    OCTOBER, NOVEMBER, AND DECEMBER OF 2023, WHICH WERE THE LAST
8    THREE ENCOUNTERS IN THE MEDICAL RECORD, HE WAS COMPLETELY
9    NORMOTENSIVE.  HE DOES NOT HAVE HIGH BLOOD PRESSURE.
10   Q.   WHAT ABOUT TUBERCULOSIS?
11   A.   HE DOES NOT HAVE TUBERCULOSIS.
12   Q.   WHAT ABOUT PULMONARY DISEASE?
13   A.   WELL, THE PULMONARY DISEASE APPEARED TO BE TIED TO THE
14   FACT THAT DR. VASSALLO ERRONEOUSLY ENTERED A DIAGNOSIS OF
15   TUBERCULOSIS.  SO THERE WAS NO PULMONARY DISEASE AND THERE WAS
16   NO TUBERCULOSIS.
17   Q.   THERE'S A MENTION THAT A MEDICATION RIFAMPIN WAS USED TO
18   TREAT TUBERCULOSIS.  IS THAT CORRECT?
19   A.   NO, SIR.
20   Q.   WAS HE PRESCRIBED RIFAMPIN?
21   A.   YES, HE WAS.  HE WAS PRESCRIBED RIFAMPIN FOR A SEVEN-DAY
22   COURSE.  RIFAMPIN TO TREAT EVEN LATENT TUBERCULOSIS IS THREE OR
23   FOUR MONTHS, AT LEAST.  AN ACTIVE TUBERCULOSIS IS A YEAR PLUS.
24   IT WAS PRETTY OBVIOUS AND IT WAS ACTUALLY ONE OF THE DOCUMENTS
25   THAT SHE LISTED NUMERICALLY IN HER STATEMENT, THE RIFAMPIN WAS

1   PRESCRIBED FOR SEVEN DAYS BECAUSE OF SOFT TISSUE INFECTION.  IT
2   REALLY LOOKED TO BE A CASCADE BECAUSE HE HAD LATENT
3   TUBERCULOSIS -- THAT MEANS HE HAD HAD AN EXPOSURE.  IT WAS
4   WELL-DOCUMENTED THAT HE WAS TREATED FOR LATENT.  HE DOESN'T
5   HAVE TB.  BUT THEN IT'S TB, PULMONARY DISEASE, AND RIFAMPIN
6   USED TO TREAT TB, WHICH ARE ERRORS.
7   **Q.**  IS THERE ANY PRESENTATION IN THOSE MEDICAL RECORDS THAT
8   YOU REVIEWED THAT WERE SUGGESTIVE OF AN EXERTIONAL HEAT INJURY?
9   **A.**  NO, SIR.
10         **MS. WRIGHT:**  AND I OBJECT.  BEYOND THE SCOPE --
11  EXCUSE ME -- BEYOND THE SCOPE OF THE EXPERT'S EXPERTISE.
12         **THE COURT:**  WELL, HE CAN CERTAINLY TESTIFY ABOUT HIS
13  REVIEW.
14         WELL, LET ME ASK YOU, DOCTOR.  DID YOU REVIEW
15  NOT JUST DR. VASSALLO'S REPORT, BUT DID YOU REVIEW THE ACTUAL
16  MEDICAL RECORD ITSELF?
17         **THE WITNESS:**  OH, YES, SIR.
18         **THE COURT:**  ALL RIGHT.  SO I'LL ALLOW THAT AND, OF
19  COURSE, YOU CAN COVER THAT ON CROSS-EXAMINATION.
20         NOW, MR. BLANCHFIELD, PLEASE POSITION THE
21  MICROPHONE BECAUSE I'M HAVING DIFFICULTY HEARING YOU.
22         **MR. BLANCHFIELD:**  SORRY, JUDGE.
23         **THE COURT:**  THAT'S ALL RIGHT.
24         ALL RIGHT.  LET'S PROCEED.
25         **MR. BLANCHFIELD:**  OKAY.

1    **BY MR. BLANCHFIELD:**

2    **Q.**   IF WE COULD MOVE TO PAGE 34 OF PX-76, PATIENT NO. 2.

3          DID YOU REVIEW THE MEDICAL RECORDS OF PATIENT NO. 2?

4    **A.**   XXXXXXX XXXXXXXX, YES.

5          **THE COURT:**  SIR, YOU CANNOT MENTION --

6          **THE WITNESS:**  OH, I'M SORRY.

7          **THE COURT:**  THAT IS PROTECTED BY --

8          **THE WITNESS:**  MY BAD.

9          **THE COURT:**  -- THE PRIVACY ACT.

10         **THE WITNESS:**  MY BAD.

11         **THE COURT:**  PLEASE DO NOT MENTION, THROUGH THE COURSE

12   OF YOUR TESTIMONY, ANYTHING THAT IDENTIFIES THE PATIENTS.

13   OKAY.  THANK YOU.

14   **BY MR. BLANCHFIELD:**

15   **Q.**   WE'RE GOING TO CALL HIM PATIENT NO. 2.

16   **A.**   YES.  I REMEMBER PATIENT NO. 2.

17   **Q.**   AND WHAT DID HIS MEDICAL RECORDS REFLECT?

18   **A.**   AT THE TIME OF MY REPORT, HE WAS 33 YEARS OLD.  AND THERE

19   WERE -- THERE WERE THREE MEDICAL CONDITIONS DESCRIBED AS

20   INJURIES OR PAIN.  THERE WAS A LEFT SHOULDER INJURY, WHICH WAS

21   A AC SEPARATION, THE ACROMIOCLAVICULAR JOINT.  HE HAD HAD A

22   SEPARATION PRIOR TO HIS INCARCERATION IN 2009 WHEN HE -- I

23   THINK HE WAS A LATE TEENAGER AT THAT TIME.  AND WHILE HE WAS IN

24   PRISON, THERE WERE A COUPLE OF EPISODES WHERE HE WAS EVALUATED

25   AND HE ACTUALLY SAW AN ORTHOPEDIC SURGEON THAT DETERMINED THAT

1  HE DID NOT NEED FURTHER INTERVENTIONS FOR A HEALED

2  ACROMIOCLAVICULAR SEPARATION.

3          **THE COURT:**  WAIT JUST A MOMENT, MR. BLANCHFIELD.

4              SHANNON, LET'S GO ON AND ENSURE THAT THE

5  PATIENT'S NAME IS REDACTED FROM THE RECORD, FROM THE

6  TRANSCRIPT.

7          OKAY.  ALL RIGHT.  LET'S PROCEED.

8          **MR. BLANCHFIELD:**  THANK YOU, YOUR HONOR.

9  BY MR. BLANCHFIELD:

10 **Q.**  WITH RESPECT TO PATIENT NO. 2, DR. KELDIE, DID YOU SEE ANY

11 PRESENTATIONS THAT WERE SUGGESTIVE OF ANY EXERTIONAL HEAT

12 INJURY?

13 **A.**  NO, SIR.

14 **Q.**  LET'S MOVE ON TO PAGE 30 OF JX-76 WHERE WE SEE WHAT WE'RE

15 GOING TO CALL PATIENT NO. 3.

16          DID YOU REVIEW THE FULL MEDICAL CHART OF PATIENT

17 NO. 3?

18 **A.**  YES, I DID.

19 **Q.**  AND WHAT DID YOUR REVIEW OF THE RECORDS INDICATE?

20 **A.**  SO THE -- PATIENT NO. 3 WAS IN HIS EARLY 40'S.  AND THERE

21 WERE MEDICAL CONDITIONS LISTED AS HYPOTHYROIDISM, HYPERTENSION,

22 HEPATITIS C, HYPERLIPIDEMIA, ASTHMA, AND AN ALLERGY TO GRASS.

23          SPECIFICALLY RELATED TO ASTHMA AND HEPATITIS C, HE

24 HAD NEITHER ONE OF THOSE DISEASES.  ASTHMA WAS MENTIONED IN THE

25 MEDICAL RECORD, BUT IT WAS MENTIONED AT A -- AS A PERTINENT

1    NEGATIVE.  HE WAS SEEN EITHER IN SICK CALL OR THE ATU, AND THE

2    CLINICIAN DOCUMENTED "NO HISTORY OF ASTHMA," WHICH IS AN

3    IMPORTANT DOCUMENTATION IF YOU'RE TAKING CARE OF SOMEBODY

4    THAT'S COMPLAINING OF A CHEST COLD.  SO HE HAS NO HISTORY OF

5    ASTHMA.

6    **Q.**    DID HE HAVE HEPATITIS?

7    **A.**    HIS HEPATITIS C WAS CURED IN 2021.

8         SO THERE WERE THREE OTHER DIAGNOSES:  HYPERTENSION.

9    HE HAD STAGE 1 HYPERTENSION, VERY MILD HYPERTENSION; ON A VERY

10   LOW DOSE OF LISINOPRIL, WHICH IS AN ACE INHIBITOR, WHICH DR.

11   BARNES TALKED ABOUT YESTERDAY.

12        HAVE I SAID HIS NAME?

13        SO IT'S STAGE 1 HYPERTENSION.  HE HAD VERY MODEST

14   HYPERLIPIDEMIA.  I ACTUALLY -- I SEE PATIENTS WITH

15   HYPERLIPIDEMIA EVERY WEEK.  AND THERE'S A CALCULATOR THAT I USE

16   IN MY ELECTRONIC MEDICAL RECORD.  AND SO I PUT HIS METRICS INTO

17   THE CALCULATOR TO DETERMINE WHAT KIND OF RISKS HE HAD, AND HE

18   WAS CONSIDERED TO BE VERY LOW RISK OF HAVING ANY SORT OF

19   CARDIOVASCULAR EVENT OVER THE NEXT TEN YEARS.  HE'S IN THAT

20   CATEGORY THAT I WOULDN'T HAVE EVEN STARTED HIM ON A STATIN.

21   **Q.**    PATIENT NO. 3, WAS HE PRESCRIBED MEDICATION?  DID YOU

22   REVIEW THAT IN THE MEDICAL RECORDS?

23   **A.**    YES, HE WAS.

24        CAN YOU MOVE TO -- YEAH, IF YOU'D MOVE TO PAGE 32.

25        SO IN -- YOU SEE HE'S -- WHAT THIS ACTUALLY LISTS ARE

1    NINE MEDICATIONS -- ARE LISTED.

2    **Q.**    I'M SORRY.  NINE?

3    **A.**    NINE MEDICATIONS ARE LISTED.  EIGHT OF THOSE MEDICATIONS

4    HAD NOT BEEN ADMINISTERED.  THEY WERE ADMINISTERED BETWEEN

5    EIGHT AND 19 YEARS AGO.  EIGHT OF THOSE MEDICATIONS LISTED HE'S

6    NOT TAKEN ESSENTIALLY IN OVER A DECADE.

7            ONE OF THE MEDICATIONS, THE LEVOTHYROXINE FOR HIS

8    HYPOTHYROIDISM, HE'S TAKEN IT SEVEN SUMMERS SINCE HE HAD HIS

9    THYROID REMOVED.  AND HE'S GOING TO TAKE IT EVERY SUMMER GOING

10   FORWARD.

11   **Q.**    AGAIN, YOUR REVIEW OF PATIENT NO. 3'S MEDICAL RECORDS,

12   WERE THERE EVER ANY PRESENTATIONS THAT WERE SUGGESTIVE OF AN

13   EXERTIONAL HEAT INJURY?

14   **A.**    NO, SIR.

15   **Q.**    OKAY.  IF WE COULD GO TO PAGE 19 OF THIS EXHIBIT.

16           THIS IS GOING TO BE PATIENT NO. 4, FOR REFERENCE.

17           DID YOU REVIEW THE FULL MEDICAL CHART OF PATIENT

18   NO. 4?

19   **A.**    I'M TAKING A MINUTE SO THAT I DON'T ACTUALLY DIVULGE A

20   NAME 'CAUSE I'M VERY FAMILIAR WITH ALL -- ALL SEVEN OF THE

21   PATIENTS.

22           I DID -- I DID REVIEW PATIENT 3'S MEDICAL RECORD.

23   **Q.**    THIS IS 4 NOW.

24   **A.**    IT'S 4?  OKAY.

25   **Q.**    THIS IS PATIENT 4, YES.

1  **A.**   AND -- SO I HAVE REVIEWED IT, YES.

2  **Q.**   OKAY.  AND WHAT DID YOUR REVIEW OF PATIENT NO. 4'S MEDICAL

3  RECORDS REVEAL?

4  **A.**   WELL, I SPECIFICALLY LOOKED AT TWO ENCOUNTERS THAT WERE

5  CHARACTERIZED AS AN ILLNESS OR SYMPTOM CONSISTENT WITH HEAT

6  STRESS DISORDER.  ONE WAS AN ENTRY ON JANUARY 14TH OF 2008, AND

7  IT WAS AN ENTRY WHERE HE CAME TO THE ATU WITH PRETTY CLASSIC

8  SYMPTOMS OF A VIRAL ILLNESS.

9       IN DR. VASSALLO'S REPORT SHE DOES SAY HE WAS ASSIGNED

10  TO THE FARM LINE AND, IN FACT, HE WAS.  BUT HE CAME TO THE

11  EMERGENCY ROOM ON A MONDAY MORNING, JUST AFTER 7 A.M., WAS

12  DIAGNOSED WITH A VIRAL ILLNESS, WAS PRESCRIBED MEDICATION, AND

13  WAS PUT AT BEDREST FOR, I THINK, FOUR DAYS.

14  **Q.**   AND THAT WAS 22 YEARS AGO?

15  **A.**   THAT WAS 2008.  I DON'T THINK THAT'S QUITE 22 YEARS.

16  **Q.**   I'M SORRY.

17  **A.**   BUT I THINK THE NEXT ONE IS.  AND THIS WAS AN AMBULANCE

18  REPORT THAT WAS FROM AUGUST OF 2003.  AND HE WAS BROUGHT BY

19  AMBULANCE TO THE ATU.  AND DR. VASSALLO CORRECTLY REPORTED THAT

20  HE HAD VOMITED WHILE HE WAS IN THE FIELD.  BUT HE ACTUALLY

21  VOMITED ONCE ON HIS WAY TO THE ATU.  AND HE TOLD THE CLINICIANS

22  THERE THAT HE HAD HAD MIGRAINE HEADACHES SINCE HE WAS 14 YEARS

23  OLD.  AND HIS SYMPTOMS WERE VERY CONSISTENT WITH MIGRAINE

24  HEADACHES.

25  **Q.**   DID PATIENT NO. 4, IN YOUR REVIEW OF ALL OF HIS MEDICAL

1    RECORDS, EVER MAKE ANY PRESENTATION THAT WAS SUGGESTIVE OF AN
2    EXERTIONAL HEAT INJURY?
3    **A.**   NO, SIR.
4    **Q.**   IN FACT, YOU REVIEWED THE MEDICAL RECORDS OF ALL EIGHT --
5    THEN EIGHT PLAINTIFFS.  ONE PLAINTIFF HAS DISMISSED HIS CLAIM.
6    BUT YOU REVIEWED ALL EIGHT CHARTS.  CORRECT?
7    **A.**   CORRECT.
8    **Q.**   DID ANY OF THOSE CHARTS SHOW ANY PRESENTATIONS BY ANY OF
9    THOSE EIGHT INDIVIDUALS THAT WERE IN ANY WAY SUGGESTIVE OF
10   EXERTIONAL HEAT INJURY?
11   **A.**   THAT'S -- THAT'S A GOOD QUESTION.  THERE MAY HAVE BEEN A
12   PRESENTATION SOMEWHERE IN THE MEDICAL RECORDS OF THOSE SEVEN
13   THAT COULD HAVE BEEN THOUGHT OF AS A HEAT-RELATED -- I DIDN'T
14   FIND IT.  AND SPECIFICALLY THE -- THE CHART NUMBERS THAT WERE
15   REFERENCED IN DR. VASSALLO'S DECLARATION, I DID NOT FIND ANY.
16   **Q.**   OKAY.  NOW --
17           **THE COURT:**  FIVE MINUTES LEFT ON YOUR FIRST DIRECT.
18           **MR. BLANCHFIELD:**  OKAY.
19   BY MR. BLANCHFIELD:
20   **Q.**   SDE'S.  DOCTOR, YOU SAID YOU REVIEWED I THINK
21   APPROXIMATELY 135 SDE'S FOR THE SUMMER PERIOD OF LAST YEAR.  IS
22   THAT CORRECT?
23   **A.**   CORRECT.
24   **Q.**   AND WHAT DID YOU DO WITH THOSE SDE'S?
25   **A.**   I DID WHAT I NORMALLY DO WHEN I'M REVIEWING A COHORT OF

```
1   ANY SORTS OF PATIENTS, IS I LOOK FOR PATTERNS AND I ACTUALLY
2   CATEGORIZE THE PATIENTS THAT I DO WHEN I DO AUDITS.  AND I'VE
3   DONE AUDITS FOR 25 YEARS.  SO I LOOKED AT TRYING TO SEE IF I
4   SAW A PATIENT THAT HAD AN ACTUAL EXERTIONAL HEAT ILLNESS.
5   THERE WERE NONE.
6   Q.   OUT OF THE 135, NONE?
7   A.   NONE.
8   Q.   OKAY.
9   A.   MY --
10  Q.   NOW, DOCTOR, YOU WERE INVOLVED IN THE CREATION OF THE NEW,
11  WE'RE GOING TO CALL, MEDICAL CONDITION LIST?
12  A.   YES, SIR.
13  Q.   NOW, COULD WE PULL UP THE INITIAL MEDICAL CONDITION LIST
14  OF HCP 8?
15       OKAY.  IF WE LOOK THERE AT NO. 5, THE POLICY, "IN
16  ADDITION, OFFENDERS WITH SPECIFIC CHRONIC ILLNESSES, SUCH AS
17  MORBID OBESITY, CARDIOVASCULAR DISEASE, RESPIRATORY DISEASE AND
18  DIABETES MELLITUS, MAY HAVE A HIGHER RISK OF HEAT PATHOLOGY."
19       IS THAT WHAT YOU WERE PROVIDED WITH?
20  A.   YES, SIR.
21  Q.   THAT WAS YOUR UNDERSTANDING OF THE PRIOR MEDICAL CONDITION
22  LIST.  CORRECT?
23  A.   YES.
24  Q.   NOW, IF WE COULD GO TO THE -- WHAT WE CALL THE NEW LIST.
25  AND YOU WERE INTIMATELY INVOLVED IN CREATING THIS NEW LIST?
```

1   **A.**   YES, SIR.

2   **Q.**   AND HOW DID YOU GO ABOUT CREATING THE NEW LIST?

3   **A.**   WE BASICALLY LOOKED AT SIX ORGAN SYSTEMS, AND THEN WE

4   LOOKED AT THREE SPECIALTIES:   RHEUMATOLOGY, INFECTIOUS DISEASE,

5   AND HEMATOLOGY/ONCOLOGY.   AND SO IN THOSE CATEGORIES WE -- WE

6   ACTUALLY PUT EXAMPLES FOR THE CLINICIANS.   IT WOULD BE

7   IMPOSSIBLE -- OR IT WOULD NOT BE A TOOL.   THIS IS A CLINICAL

8   DECISION SUPPORT TOOL.   IF WE APPROACH PUTTING THOUSANDS OF THE

9   OVER 10,000 ICD-10 CODES -- BUT THESE ARE REPRESENTATIVE

10  SAMPLES FROM THE CENTRAL NERVOUS SYSTEM, CARDIOVASCULAR,

11  PULMONARY, GI TRACT, ET CETERA, RHEUMATOLOGY, INFECTIOUS

12  DISEASE AND HEMATOLOGY/ONCOLOGY.   AND THEN WITH THIS DOCUMENT,

13  WE ACTUALLY HAVE THREE PAGES OF REFERENCE SO THEY HAVE AN IDEA

14  OF SOMEONE THAT HAS CHRONIC RENAL DISEASE, THAT THEY SHOULD BE

15  WORRIED ABOUT.

16  **Q.**   DID YOU WORK IN CONJUNCTION WITH DR. LAVESPERE IN CREATING

17  THIS LIST?

18  **A.**   HE REVIEWED THE LIST.   WORK IN CONJUNCTION?   I DID MOST OF

19  THE HEAVY LIFTING, BUT I DEFINITELY HAD SOME PARTICIPATION WITH

20  DR. LAVESPERE.

21  **Q.**   AND IS THIS THE LIST THAT YOU PROVIDED TO THE DEPARTMENT

22  OF CORRECTIONS AND RECOMMENDED THAT IT ADOPT WITH RESPECT TO

23  HCP 8?

24  **A.**   YES, SIR.

25  **Q.**   OKAY.   DOCTOR, IF YOU COULD BRIEFLY DESCRIBE THE

1   DIFFERENCE BETWEEN CLASSIC AND EXERTIONAL HEAT ILLNESS.  DO YOU
2   WANT TO GO -- YOU HAVE A CHART IN YOUR PX -- I'M SORRY --
3   JX-76.
4   **A.**  YES.
5           **MS. WRIGHT:**  AND I WILL OBJECT AS IT'S OUTSIDE THE
6   SCOPE OF THIS EXPERT'S EXPERTISE.
7           **THE COURT:**  OKAY.  WELL, LET'S TAKE A LOOK AT IT.
8   LET'S GO ON AND PUBLISH IT.
9           **MR. BLANCHFIELD:**  IT'S ACTUALLY DX-3 AT PAGE 3 OF 7.
10          **THE COURT:**  SO IT'S NOT A JOINT DOCUMENT.  CORRECT?
11          **THE DEPUTY CLERK:**  YOU SAID DX-3?
12          **MR. BLANCHFIELD:**  DX-3.
13             THERE IT IS.
14  **BY MR. BLANCHFIELD:**
15  **Q.**  AND THIS IS PART OF YOUR SECOND AFFIDAVIT, DOCTOR?
16  **A.**  YES, SIR.
17  **Q.**  ALL RIGHT.  CAN YOU EXPLAIN THE DIFFERENCE BETWEEN
18  EXERTIONAL VERSUS CLASSIC HEAT ILLNESS?
19  **A.**  YEAH.
20          **MS. WRIGHT:**  I REURGE MY OBJECTION.  THIS IS OUTSIDE
21  THE SCOPE OF HIS EXPERTISE.
22          **THE COURT:**  WELL, WHY DON'T YOU LAY A FOUNDATION FOR
23  THE FACT THAT THIS WITNESS MAY KNOW THE DIFFERENCE.
24          **MR. BLANCHFIELD:**  YES.
25          **THE COURT:**  IS THAT THE NATURE OF YOUR OBJECTION, MS.

1  WRIGHT?

2       **MS. WRIGHT:**  IT IS.

3  BY MR. BLANCHFIELD:

4  **Q.**  IN YOUR PRACTICE, DOCTOR, WITH RESPECT TO THE HISTORY OF

5  YOUR PRACTICE AND IN DEALING WITH HEAT EXERTIONAL INJURIES AND

6  HEAT PATHOLOGY, DO YOU COME ACROSS CLASSIC VERSUS EXERTIONAL

7  HEAT INJURY?

8  **A.**  MOST OF MY EXPERIENCE HAS ACTUALLY BEEN IN EXERTIONAL HEAT

9  ILLNESS.  I HAVE SEEN PEOPLE WITH CLASSIC HEAT ILLNESS.

10      **MR. BLANCHFIELD:**  YOUR HONOR, IT'S A COMMON KNOWN

11  ISSUE REPLETE IN THE LITERATURE, THE DIFFERENCE BETWEEN CLASSIC

12  HEAT INJURY LIKE THE *BALL* CASE AND EXERTIONAL HEAT INJURIES

13  LIKE THIS CASE.

14      **THE COURT:**  UNDERSTOOD.

15          AND HE'S TESTIFIED AS TO HIS UNDERSTANDING OF

16  IT, BUT YOU NEED TO WRAP UP.  DO YOU HAVE ANY OTHER QUESTIONS

17  FOR THE WITNESS, MR. BLANCHFIELD?

18      **MR. BLANCHFIELD:**  YES.  JUST --

19      **THE COURT:**  A COUPLE OF MORE QUESTIONS BECAUSE YOU'VE

20  EXCEEDED YOUR TIME, BUT I'LL ALLOW YOU TO ASK A COUPLE MORE.

21      **MR. BLANCHFIELD:**  OKAY.

22      **THE COURT:**  OKAY.

23  BY MR. BLANCHFIELD:

24  **Q.**  DOCTOR, JUST TWO MORE AREAS.  YOUR RECOMMENDATION WITH

25  RESPECT TO HEAT INDEX AT WHICH A HEAT ALERT WAS TO BE CALLED

1  WAS WHAT?

2  **A.**  WELL, I ORIGINALLY POSITED 95 DEGREES, AND THEN WE HAD

3  DISCUSSIONS AND WE LOWERED IT TO 91 DEGREES.

4  **Q.**  AND IS THAT A REASONABLE NUMBER IN AN EXERTIONAL HEAT

5  SITUATION?

6  **A.**  ABSOLUTELY.

7          **MS. WRIGHT:**  AGAIN, OBJECT.

8  **BY MR. BLANCHFIELD:**

9  **Q.**  AND --

10         **THE COURT:**  WAIT, WAIT, WAIT.  JUST A MOMENT.

11             THE OBJECTION?

12         **MS. WRIGHT:**  OUTSIDE THE SCOPE OF HIS EXPERTISE.

13         **THE COURT:**  ALL RIGHT.  WELL, I'LL ALLOW HIM AT LEAST

14  TO -- BECAUSE THE EVIDENCE IS THAT THE DEPARTMENT MADE THE

15  CHANGE, THE MODIFICATION BASED UPON HIS RECOMMENDATION.  SO

16  I'LL AT LEAST ALLOW HIM TO EXPLAIN WHY HE BELIEVED THAT THAT

17  WOULD BE THE APPROPRIATE STANDARD.

18         **MS. WRIGHT:**  THANK YOU.

19         **THE COURT:**  BUT YOUR OBJECTION IS NOTED.

20  **BY MR. BLANCHFIELD:**

21  **Q.**  AND FINALLY, DOCTOR, THE RECOMMENDATION OF WORK CESSATION

22  AT A 113-DEGREE HEAT INDEX, WAS THAT YOUR RECOMMENDATION?

23  **A.**  YES, SIR.

24  **Q.**  AND WHAT DID YOU BASE THAT ON?

25  **A.**  I BASED THAT ON A NUMBER OF SOURCES, WHETHER IT WAS DR.

1  O'CONNOR'S DOCUMENT AND UPTODATE DOCUMENTATION FROM THE CDC,
2  FROM THE U.S. ARMY, ET CETERA.
3  **Q.**    OKAY.
4          **MR. BLANCHFIELD:**  AND, YOUR HONOR, WE WOULD MOVE TO
5  INTRODUCE DX-3.
6          **THE COURT:**  ANY OBJECTION?
7          **MS. WRIGHT:**  THIS IS DR. KELDIE'S AFFIDAVIT THAT HE
8  SUBMITTED RECENTLY WITH RESPECT TO THE SECOND TRO/PI.  WE WOULD
9  NOT OBJECT TO ADMISSION OF THIS DOCUMENT AS LONG AS DR.
10 VASSALLO'S FOURTH DECLARATION IS ALSO MOVED TO BE ADMITTED.
11         **THE COURT:**  IT ADDRESSES --
12         **MS. WRIGHT:**  CAN ALSO BE ADMITTED.
13         **THE COURT:**  -- THE SAME ISSUES.  IS THAT YOUR POINT?
14         **MS. WRIGHT:**  IT WAS ALSO SUBMITTED IN SUPPORT OF THE
15 SECOND TRO.
16         **THE COURT:**  ALL RIGHT.  ANY OBJECTION?
17         **MR. BLANCHFIELD:**  WE DO NOT OBJECT TO ADMITTING THAT
18 INTO EVIDENCE.  WE DO, HOWEVER, PRESERVE -- WE DID FILE A
19 MOTION TO STRIKE HER TWO NEW THEORIES, YOUR HONOR.
20         **THE COURT:**  SUBJECT TO YOUR OBJECTIONS ALREADY FILED
21 INTO THE RECORD?
22         **MR. BLANCHFIELD:**  YES.
23         **THE COURT:**  VERY WELL.  AT LEAST PROVISIONALLY, THOSE
24 DOCUMENTS -- OR THESE EXHIBITS WILL BE ADMITTED INTO THE
25 RECORD.

1          **MS. WRIGHT:**  THANK YOU.

2                  AND THAT'S PX-36.

3          **THE COURT:**  OKAY.  ALL RIGHT.  THANK YOU FOR THE

4    CLARIFICATION.

5          **MR. BLANCHFIELD:**  THANK YOU, JUDGE.

6          **THE COURT:**  THANK YOU, MR. BLANCHFIELD.

7          **MR. BLANCHFIELD:**  DO I HAVE ANY TIME LEFT?

8          **THE COURT:**  NO.  YOU'VE EXCEEDED YOUR TIME BY FOUR

9    MINUTES, ACTUALLY.

10                 ALL RIGHT.  CROSS-EXAMINATION.

11         **MS. WRIGHT:**  JUST FOR --

12         **THE COURT:**  AND BY THE WAY, MR. BLANCHFIELD, YOU DO

13   HAVE AN ADDITIONAL -- ALTHOUGH YOU'RE AT THE 44-MINUTE MARK,

14   I'LL GIVE YOU ANOTHER THREE OR FOUR MINUTES FOR REDIRECT.

15   OKAY.

16         **MR. BLANCHFIELD:**  THANK YOU, JUDGE.

17         **THE COURT:**  ALL RIGHT.

18                        **CROSS-EXAMINATION**

19   BY MS. WRIGHT:

20   **Q.**   NOW, DR. KELDIE, YOU WERE HIRED BY THE DOC IN JUNE OF 2024

21   TO DETERMINE WHETHER PATIENTS ON THE FARM LINE ARE AT RISK OF

22   SIGNIFICANT EXERTIONAL RELATED HEAT ILLNESSES.  CORRECT?

23   **A.**   THAT WAS ONE OF THE THINGS I WAS -- PARDON ME.  YES.

24   **Q.**   AND YOU REACHED THE CONCLUSION THAT THERE IS ALMOST ZERO

25   RISK OF EXERTIONAL HEATSTROKE TO INCARCERATED MEN WORKING IN

1  THE FIELD AT LSP.  RIGHT?

2  **A.**   CORRECT.

3  **Q.**   YOU HAVE NOT SEEN ANY EVIDENCE OF PATIENTS EITHER

4  EXPERIENCING SIGNIFICANT EXERTIONAL HEAT ILLNESS OR BEING AT

5  RISK OF EXPERIENCING SERIOUS EXERTIONAL HEAT ILLNESS AT LSP.

6  RIGHT?

7  **A.**   THAT IS CORRECT.

8  **Q.**   AND IN YOUR OPINION, THERE IS DE MINIMIS RISK AND ZERO

9  FINDINGS OF HARM FROM EXERTIONAL HEAT ILLNESS ON THE FARM LINES

10  AT LSP?

11  **A.**   YES.

12  **Q.**   AND YOU OPINE THAT CLASSIC OR NON-EXERTIONAL HEATSTROKES

13  AFFECT PEOPLE WHO CAN'T REMOVE THEMSELVES FROM A HOT

14  ENVIRONMENT OR WHO HAVE LIMITED ACCESS TO HYDRATION OR COOLING

15  MODALITIES.  CORRECT?

16  **A.**   THOSE ARE SOME OF THE CHARACTERISTICS, YES.

17  **Q.**   BUT IN YOUR OPINION, THOSE CONDITIONS ARE NOT EXPERIENCED

18  AT LSP?

19  **A.**   THAT'S CORRECT.

20  **Q.**   IN REACHING YOUR OPINIONS, YOU DID NOT REVIEW ANY DEATH

21  REPORTS, DID YOU?

22  **A.**   NO, I DID NOT.

23  **Q.**   YOU DID NOT REVIEW ANY PEER-REVIEW FILES?

24  **A.**   I'M NOT SURE WHAT A PEER-REVIEW FILE IS.

25  **Q.**   DID YOU REVIEW ANY PEER-REVIEW FILES?

1  **A.**   I'M NOT SURE WHAT YOU'RE DEFINING A PEER-REVIEW FILE AS.

2  **Q.**   LET'S PULL UP YOUR DEPOSITION AT PAGE 132, LINE 7.

3        DO YOU RECALL WHEN YOU WERE DEPOSED UNDER OATH IN

4  THIS CASE -- AND IF YOU COULD KINDLY SWITCH THE -- THANK YOU.

5        AND I ASKED:  "DID YOU REVIEW ANY PEER-REVIEW FILES?"

6        AND YOU REPLIED:  "I DID NOT."

7        DO YOU REMEMBER THAT?

8  **A.**   I SEE IT WRITTEN DOWN.  I DON'T SPECIFICALLY REMEMBER THE

9  QUESTION OR THE ANSWER, BUT YES, I DO.

10  **Q.**   YOU DID NOT REVIEW ANY QUALITY IMPROVEMENT DOCUMENTS, DID

11  YOU?

12  **A.**   THAT IS CORRECT.

13  **Q.**   YOU DIDN'T REVIEW ANY MORTALITY REVIEWS?

14  **A.**   I DID NOT.

15  **Q.**   YOU DIDN'T REVIEW ANY CREDENTIALING OR LICENSING FILES?

16  **A.**   NO, I DID NOT.

17  **Q.**   YOU DIDN'T REVIEW ANY SICK CALL PROTOCOLS?

18  **A.**   I DON'T -- NO, I DID NOT.

19  **Q.**   YOU DIDN'T REVIEW ANY STAFFING INFORMATION PERTAINING TO

20  THE NUMBER OF PHYSICIANS OR NURSE PRACTITIONERS OR LPNS OR ANY

21  OTHER STAFF AT LSP, DID YOU?

22  **A.**   I DID NOT.

23  **Q.**   YOU DID NOT REVIEW ANY EXPERT REPORTS, FILINGS, OR

24  DISCOVERY FROM *LEWIS V. CAIN*, ALSO KNOWN NOW AS *PARKER V.*

25  *HOOPER*, WHICH IS THE LAWSUIT CHALLENGING MEDICAL CARE AT LSP,

1    DID YOU?

2    **A.**    I DID NOT.

3    **Q.**    NOW, YOU TESTIFIED THAT YOU REVIEWED THE MEDICAL RECORDS

4    OF THE EIGHT ORIGINAL NAMED PLAINTIFFS IN THIS ACTION?

5    **A.**    YES.

6    **Q.**    DO YOU REMEMBER THAT?

7    **A.**    YES, I DO.

8    **Q.**    BUT, IN FACT, YOU DID NOT PERSONALLY REVIEW ALL OF THOSE

9    MEDICAL RECORDS, DID YOU?

10   **A.**    I REVIEWED EACH AND EVERY ONE OF THE MEDICAL RECORDS.  I

11   DID NOT REVIEW EVERY PAGE OF EVERY MEDICAL RECORD.

12   **Q.**    LET'S LOOK AT YOUR DEPOSITION AT PAGE 39, LINE 1.

13          YOU ACTUALLY HAD HELP REVIEWING THE MEDICAL RECORDS,

14   DIDN'T YOU?  IF WE LOOK AT LINE 5.

15   **A.**    THAT IS CORRECT.

16   **Q.**    AND YOU PERSONALLY REVIEWED THREE MEDICAL RECORDS, DIDN'T

17   YOU, OF THE EIGHT?

18   **A.**    OF THE COMPLETE MEDICAL RECORD WHERE I REVIEWED EVERY

19   PAGE.

20   **Q.**    THAT'S CORRECT?

21   **A.**    CORRECT.

22   **Q.**    NOW, IN YOUR OPINION, THERE HAS BEEN A SINGLE HEAT DEATH

23   AT LSP OVER THE LAST DECADE?

24   **A.**    YES.

25   **Q.**    THAT'S WHAT YOU WERE TOLD BY DOC'S COUNSEL?

1    **A.**    YES.

2    **Q.**    YOU WERE TOLD THAT A PATIENT SUFFERED A CLASSIC HEATSTROKE

3    WHILE USING ILLICIT DRUGS?

4    **A.**    CORRECT.

5    **Q.**    YOU DON'T KNOW WHO THAT PATIENT WAS AND YOU DID NOT REVIEW

6    HIS MEDICAL RECORDS?

7    **A.**    THAT IS CORRECT.

8    **Q.**    SO YOU DON'T KNOW IF YOU AGREE?

9    **A.**    THAT IS CORRECT.

10    **Q.**    YOU DON'T KNOW WHETHER THERE HAVE BEEN ANY HEAT INJURIES

11    AMONG PEOPLE INCARCERATED AT LSP OVER THE LAST DECADE, DO YOU?

12    **A.**    I DO NOT.

13    **Q.**    YOU WERE NOT PROVIDED THAT INFORMATION BY DOC'S COUNSEL?

14    **A.**    NO.

15    **Q.**    AND YOU DIDN'T ASK FOR IT?

16    **A.**    CORRECT.

17    **Q.**    SO, IN FACT, YOU DON'T KNOW WHETHER THERE HAVE BEEN ANY

18    MORTALITIES OR INJURIES -- EXCUSE ME -- OR DEATHS IN THE LAST

19    DECADE CAUSED BY HEAT INJURY AT LSP?

20    **A.**    CORRECT.

21    **Q.**    IT REMAINS YOUR OPINION THAT THERE HAVE BEEN NO KNOWN HEAT

22    EXHAUSTION EVENTS AT LSP.    CORRECT?

23    **A.**    CORRECT.

24    **Q.**    AND THAT'S WHAT YOU WERE TOLD BY DOC'S COUNSEL?

25    **A.**    I ASSUME SO.    YES.

1  **Q.**  BUT YOU DON'T ACTUALLY KNOW WHETHER THERE MAY HAVE BEEN
2  ANY KNOWN HEAT EXHAUSTION EVENTS AT LSP, DO YOU?
3  **A.**  CORRECT.
4  **Q.**  YOU LIKEWISE DON'T KNOW WHETHER ANYONE AT LSP HAS EVER
5  SUFFERED FROM OR PRESENTED WITH EXERTIONAL HEATSTROKE, DO YOU?
6  **A.**  I DO NOT.
7  **Q.**  SO YOU DON'T KNOW WHETHER THERE HAVE BEEN ANY INSTANCES OF
8  HEAT INJURY, HEAT EXHAUSTION, OR EXERTIONAL HEATSTROKE AT LSP
9  OVER THE LAST DECADE, ASIDE FROM THE SINGLE PURPORTED
10  NON-EXERTIONAL HEATSTROKE MORTALITY IN 2022, WHICH DOC'S
11  COUNSEL TOLD YOU WAS FROM DRUG USE?
12  **A.**  CAN YOU READ BACK THAT QUESTION?
13  **Q.**  YOU DON'T KNOW WHETHER THERE HAVE BEEN ANY INSTANCES OF
14  HEAT INJURY, HEAT EXHAUSTION, OR EXERTIONAL HEATSTROKE AT LSP
15  IN THE LAST DECADE, ASIDE FROM THE SINGLE PURPORTED
16  NON-EXERTIONAL HEATSTROKE MORTALITY IN 2022, WHICH DOC'S
17  COUNSEL TOLD YOU WAS BECAUSE OF ILLICIT DRUG USE?
18  **A.**  CAN I PARSE THAT INTO TWO PARTS?  ONE, THE QUESTION ABOUT
19  BEING TOLD ABOUT THE CLASSIC HEATSTROKE, I HAVE PARTICIPATED IN
20  THE REVIEW OF BETWEEN APPROXIMATELY EIGHT DECADES OF MEDICAL
21  RECORDS.  THAT'S -- IF YOU LOOK AT THE PERIODS OF INCARCERATION
22  OF THE ORIGINAL EIGHT PLAINTIFFS, IT'S PROBABLY CLOSER TO A
23  HUNDRED YEARS OF MEDICAL RECORDS.  IN THOSE MEDICAL RECORDS,
24  THERE WERE NO EXERTIONAL HEAT INJURIES AND CERTAINLY NO -- NONE
25  OF THE PLAINTIFFS HAD A HEATSTROKE OR DIED FROM A HEATSTROKE.

1    **Q.**   LET'S LOOK AT YOUR DEPOSITION AT PAGE 198, LINE 7.

2            DO YOU REMEMBER WHEN I ASKED YOU:  "DO YOU KNOW

3    WHETHER THERE HAVE BEEN ANY INSTANCES OF HEAT INJURY, HEAT

4    EXHAUSTION, OR HEATSTROKE AT LSP IN THE LAST DECADE, ASIDE FROM

5    THE MORTALITY WE JUST DISCUSSED IN 2022?"

6            DO YOU RECALL THAT?

7    **A.**   I SEE.

8    **Q.**   AND YOU RESPONDED:  "I DON'T KNOW ABOUT HEAT INJURY OR

9    HEAT EXHAUSTION," DIDN'T YOU?

10   **A.**   THAT'S THE RESPONSE ON THE PAGE.

11   **Q.**   NOW, YOU AGREE THAT THERMOREGULATION IS AN IMPORTANT

12   PROCESS OF THE HUMAN BODY.  CORRECT?

13   **A.**   I DO.

14   **Q.**   AND YOU AGREE THAT IMPAIRED THERMOREGULATION CAN LEAD TO

15   ADVERSE HEALTH OUTCOMES?

16   **A.**   I DO.

17   **Q.**   AMONG OTHER THINGS, IT CAN IMPAIR A PERSON'S NEUROLOGICAL,

18   RESPIRATORY, CIRCULATORY FUNCTION.  CORRECT?

19   **A.**   YES.

20   **Q.**   AND YOU UNDERSTAND THAT THE TERM "HEAT ILLNESS" REFERS TO

21   ILLNESS CAUSED BY EXPOSURE TO THE HEAT.  CORRECT?

22   **A.**   FOR THE MOST PART.

23   **Q.**   LET'S LOOK AT YOUR DEPOSITION AT PAGE 165.

24            DO YOU RECALL WHEN I ASKED YOU:  "SO HEAT ILLNESS IS

25   ILLNESS CAUSED BY EXPOSURE TO HEAT?"  AND YOU RESPONDED:

1    "YES."

2    **A.**    OKAY.

3    **Q.**    DO YOU RECALL THAT?

4    **A.**    I -- I'M READING IT.  I DO NOT RECALL THE QUESTION OR

5    ANSWER INDEPENDENTLY OF READING THE DOCUMENT.

6            **THE COURT:**  ALL RIGHT.  I'LL TELL YOU WHAT WE'LL DO,

7    WE'LL GIVE YOU A COPY OF THE DEPOSITION, DOCTOR, AND WE'LL

8    ALLOW YOU SOME TIME TO REVIEW IT.  IN OTHER WORDS, ARE YOU

9    TESTIFYING THAT YOU DON'T RECALL YOUR TESTIMONY DURING THE

10   DEPOSITION?

11           **THE WITNESS:**  IF -- IF --

12           **MS. WRIGHT:**  I CAN MOVE ON FROM THIS.

13           **THE COURT:**  NO.  WAIT, WAIT.

14              WERE YOU PROVIDED A COPY OF THE DEPOSITION?  DID

15   YOU CERTIFY THE ACCURACY OF THE DEPOSITION AFTER YOU -- AFTER

16   THE DEPOSITION?  IT'S A SIMPLE "YES" OR "NO," DOCTOR.  DO YOU

17   RECALL?  I'LL TELL YOU WHAT, IT'S THREE OPTIONS:  "YES"; "NO";

18   "I DON'T RECALL."

19           **THE WITNESS:**  I DON'T RECALL.

20           **THE COURT:**  ALL RIGHT.  DID YOU -- WERE YOU PROVIDED

21   A COPY OF YOUR DEPOSITION PRIOR TO YOUR TESTIMONY TODAY?

22           **THE WITNESS:**  YES.

23           **THE COURT:**  DID YOU READ IT?

24           **THE WITNESS:**  I READ PART OF IT.

25           **THE COURT:**  ALL RIGHT.  LET'S GO ON AND PROVIDE IT.

1    **MS. WRIGHT:**  MAY I APPROACH?

2    **THE COURT:**  YES.

3    **MS. WRIGHT:**  ALL RIGHT.

4    **THE COURT:**  WHY DON'T YOU GO AHEAD AND APPROACH AND

5    TURN TO THE PAGE.

6    BY MS. WRIGHT:

7    **Q.**   SO THE QUESTION IS:  DO YOU STILL AGREE THAT HEAT ILLNESS

8    IS ILLNESS CAUSED BY EXPOSURE TO HEAT?

9    **A.**   I -- I -- I BELIEVE THAT THAT'S ONE OF THE PRIMARY

10   DETERMINANTS OF A HEAT ILLNESS, IS EXPOSURE TO HEAT.

11   **Q.**   AND HEAT ILLNESS CAN HARM A PERSON'S HEALTH BUT NOT

12   NECESSARILY RESULT IN DEATH.  IS THAT RIGHT?

13   **A.**   YES.

14   **Q.**   AND SYMPTOMS OF HEAT INJURY CAN MANIFEST AFTER THE INJURY

15   IS SUSTAINED.  CORRECT?

16   **A.**   CORRECT.

17   **Q.**   SOME ILLNESSES OR CONDITIONS CAN IMPAIR A PERSON'S ABILITY

18   TO THERMOREGULATE.  ISN'T THAT TRUE?

19   **A.**   THAT IS CORRECT.

20   **Q.**   AND PEOPLE WHO TAKE MEDICATIONS -- CERTAIN MEDICATIONS

21   MIGHT HAVE A HIGHER RISK OF HEAT PATHOLOGY?

22   **A.**   YES.

23   **Q.**   THOSE MEDICATIONS MIGHT AFFECT THE HEART RATE,

24   TEMPERATURE, METABOLISM, AND SWEATING.  CORRECT?

25   **A.**   CORRECT.

1    **Q.**   YOU UNDERSTAND THAT THE DEPARTMENT OF CORRECTIONS IS

2    ALREADY TREATING SOME PEOPLE, INCLUDING PLAINTIFFS IN THIS

3    ACTION, AS HEAT SENSITIVE BECAUSE OF THE MEDICATIONS THEY TAKE.

4    RIGHT?

5    **A.**   I AM NOT INDEPENDENTLY AWARE OF THAT.  I DID NOT REVIEW

6    ANY DOCUMENTS BEYOND WHAT I DID THROUGH IN MY REPORT LAST

7    SEPTEMBER.

8    **Q.**   IN YOUR VIEW --

9          **THE COURT:**  WAIT, WAIT, WAIT.  I'M CONFUSED NOW,

10   DOCTOR.  I THOUGHT YOU TESTIFIED THAT YOU REVIEWED HUNDREDS OF

11   -- HOW MANY MEDICAL RECORDS DID YOU REVIEW?

12         **THE WITNESS:**  NO.  I -- I CHARACTERIZED THE EIGHT

13   MEDICAL RECORDS AS SPANNING A PERIOD OF CLOSE TO A HUNDRED

14   YEARS.  BUT I WAS -- I THINK THE QUESTION WAS:  DID I KNOW THAT

15   THERE ARE PLAINTIFFS THAT HAD BEEN DESIGNATED FOR HEAT-DUTY

16   STATUS?  AND I HAVEN'T LOOKED AT THEIR MEDICAL RECORD.  THEY

17   WERE THROUGH NOVEMBER OF '23 PRETTY MUCH.  SO I DON'T KNOW

18   THEIR DUTY STATUS CURRENTLY, SIR.

19         **THE COURT:**  AND THAT'S WHAT I DON'T UNDER -- WELL,

20   LET ME LET YOU CONCLUDE YOUR CROSS-EXAMINATION.

21              GO RIGHT AHEAD.

22   **BY MS. WRIGHT:**

23   **Q.**   NOW, DR. KELDIE, IN YOUR VIEW, SSRI'S, OR SELECTIVE

24   SEROTONIN REUPTAKE INHIBITORS, HAVE LITTLE OR NO EFFECT ON

25   HEAT PATHOLOGY.  CORRECT?

1    **A.**   CORRECT.

2    **Q.**   IN YOUR VIEW, THERE IS AN ALMOST NONEXISTENT RISK THAT

3    SSRI'S CAN INCREASE HEAT-RELATED MORBIDITY OR INJURY BY CAUSING

4    INCREASED SWEATING, PROMOTING DEHYDRATION, OR CAUSING

5    ELECTROLYTE DERANGEMENTS.   CORRECT?

6    **A.**   YES.

7    **Q.**   AND IN THE LIST OF REFERENCES ACCOMPANYING YOUR FIRST

8    DECLARATION, YOU CITE A 2024 ARTICLE FROM HEALTH.COM ENTITLED

9    "SSRI'S AND HEAT:  WHY DOCTORS ARE URGING PEOPLE ON

10   ANTIDEPRESSANTS TO KEEP COOL THIS SUMMER."

11              DO YOU REMEMBER THAT?

12   **A.**   YES.

13   **Q.**   I CAN ALSO REFRESH YOUR RECOLLECTION.  LET'S LOOK AT

14   IMPEACHMENT EXHIBIT 6 AT PAGE 2.  LET'S LOOK AT PAGE 2.

15              THIS ARTICLE THAT YOU CITE AS A REFERENCE FOR

16   REACHING YOUR OPINIONS IN THIS CASE ACTUALLY EXPLAINS THAT

17   SSRI'S CAN PREDISPOSE PERSONS TO HEAT SENSITIVITY AND RESULT IN

18   A HIGHER CHANCE OF DEVELOPING HEAT EXHAUSTION AND HEATSTROKE.

19   RIGHT?

20   **A.**   YES.  I SEE THAT.

21   **Q.**   AND AT PAGE 3 OF THE ARTICLE FROM HEALTH.COM THAT YOU

22   RELIED UPON IN REACHING YOUR CONCLUSIONS, IT STATES, "THE

23   RESEARCH HAS ALSO SHOWN THAT SSRI'S MAY IMPAIR THE FUNCTION OF

24   THE HYPOTHALAMUS, A CERTAIN AREA OF THE BRAIN RESPONSIBLE FOR

25   REGULATING INTERNAL BODY TEMPERATURE."

1          DO YOU SEE THAT?

2    **A.**   I SEE THAT IT SAYS THEY "MAY IMPAIR."

3    **Q.**   NOW, YOU UNDERSTAND THAT THE HEAT INDEX IS A FORMULA BASED

4    ON RELATIVE HUMIDITY AND THE MEASURED TEMPERATURE.  CORRECT?

5    **A.**   CORRECT.

6    **Q.**   AND YOUR UNDERSTANDING IS THAT THE HEAT INDEX DOES NOT

7    CHANGE IN THE SUN?

8    **A.**   I DON'T KNOW THAT I -- I DON'T KNOW THAT I SAID THAT OR

9    AGREE WITH THAT.

10   **Q.**   LET'S LOOK AT YOUR DEPOSITION AT PAGE 119.

11   **A.**   CERTAINLY.

12   **Q.**   WE'LL LOOK AT LINE 24.

13          WHEN I ASKED YOU "DOES THE HEAT INDEX CHANGE IN THE

14   SUN?"  YOU ANSWERED "THE HEAT INDEX, TO MY KNOWLEDGE,

15   DOESN'T -- THE NUMBER DOESN'T CHANGE IN THE SUN."

16   **A.**   I SEE THAT.

17   **Q.**   CORRECT?

18   **A.**   YES, THAT'S WHAT I ANSWERED.

19   **Q.**   YOU AGREE THAT THE LEVEL OF HEAT IN THE FIELDS AT LSP CAN

20   EXCEED THE LOWER 100'S.  RIGHT?

21   **A.**   YES.

22   **Q.**   AND IN YOUR OPINION, THERE IS NO SUBSTANTIVE SCIENCE

23   SUPPORTING SETTING A HEAT ALERT THRESHOLD AT A HEAT INDEX OF 88

24   DEGREES FAHRENHEIT?

25   **A.**   CORRECT.

1   **Q.**   IN YOUR VIEW, IT WOULD BE, QUOTE, VERY REASONABLE AND
2   EXTREMELY SAFE TO SET A HEAT ALERT THRESHOLD TO A HEAT INDEX OF
3   95 DEGREES?
4   **A.**   YES.
5   **Q.**   IN YOUR OPINION, A HEAT INDEX OF 103 DEGREES IS A MODERATE
6   LEVEL OF HEAT.   CORRECT?
7   **A.**   YES.
8   **Q.**   LET'S LOOK AT PLAINTIFFS' EXHIBIT 4, WHICH IS ALSO
9   EXHIBIT --
10              **THE COURT:**   WAIT, WAIT.
11                   ELIZABETH, WHAT DO YOU NEED?
12                   OKAY.   SO, MS. WRIGHT, IF YOU CAN JUST KIND OF
13   SLOW DOWN TO MAKE SURE THAT OUR COURT REPORTER --
14              **MS. WRIGHT:**   THANK YOU.   I'M SO SORRY.
15              **THE COURT:**   MY JA'S JOB IS TO -- OBVIOUSLY THEY WORK
16   AS A TEAM.   AND SO --
17              **MS. WRIGHT:**   DR. VASSALLO IS HERE IF ANYBODY IS
18   SUFFERING FROM A HEADACHE FROM MY SPEED.
19              **THE COURT:**   OKAY.
20              **MS. WRIGHT:**   I WILL DO MY BEST.   I'M SORRY.
21              **THE COURT:**   ALL RIGHT.   THANK YOU.
22   BY MS. WRIGHT:
23   **Q.**   WE ARE LOOKING NOW AT PLAINTIFFS' EXHIBIT 4, WHICH YOU
24   INCLUDED AS EXHIBIT 4 TO YOUR FIRST DECLARATION.   AND IN
25   REACHING YOUR OPINION REGARDING THE HEAT INDEX THRESHOLD THAT

1    YOU BELIEVE IS APPROPRIATE, 95 DEGREES, YOU RELIED ON THIS
2    CHART.  CORRECT?
3    A.    IT WAS ONE OF THE CHARTS, YES.
4    Q.    AT THE BOTTOM OF THIS PAGE THERE'S A HYPERLINK TO YOUR
5    EXHIBIT.  LET'S LOOK AT THE -- LET'S LOOK AT THE DOCUMENT
6    LOCATED AT THAT HYPERLINK, WHICH IS ALREADY IN THE RECORD.  IT
7    IS -- WAS PLAINTIFFS' EXHIBIT 5, BUT IT'S ALREADY BEEN ENTERED
8    INTO THE RECORD HERE.  THIS IS A PUBLICATION BY OSHA.  DO
9    RECOGNIZE THIS DOCUMENT?
10   A.    I RECOGNIZE IT FROM -- I THINK YESTERDAY IT WAS PUT UP.
11   Q.    AND THIS IS THE DOCUMENT THAT IS LINKED TO IN YOUR OWN
12   REPORT, ISN'T IT?
13   A.    CORRECT.
14   Q.    LET'S LOOK AT PAGE 3, PARAGRAPH 2.
15          ISN'T IT TRUE THAT OSHA REPORTS THAT PHYSICAL LABOR
16   INCREASES THE HEAT EXPERIENCED BY WORKERS?
17   A.    YES.
18   Q.    ISN'T IT TRUE THAT OSHA RECOMMENDS THE USE OF WET BULB
19   GLOBE TEMPERATURE MONITORING TO MEASURE WORKPLACE ENVIRONMENTAL
20   HEAT?
21   A.    YES.
22   Q.    ISN'T IT TRUE ON PAGE 6 THAT OSHA WARNS THAT OUTDOOR
23   WORKERS HAVE DIED OF HEATSTROKE WHEN THE DAY'S MAXIMUM HEAT
24   INDEX WAS ONLY 86 DEGREES FAHRENHEIT?
25   A.    I SEE THAT STATEMENT.

1  **Q.**   AND ISN'T IT TRUE THAT OSHA HAS FOUND THAT LESS SEVERE
2  HEAT-RELATED ILLNESSES CAN HAPPEN AT EVEN LOWER HEAT INDEX
3  VALUES?
4  **A.**   I SEE THAT STATEMENT AS WELL.
5  **Q.**   ON PAGE 8 OF THE DOCUMENT THAT YOU REFERRED TO AND RELIED
6  UPON IN REACHING YOUR OPINIONS HERE, DOESN'T IT -- DOESN'T OSHA
7  LIST PICKING FRUITS AND VEGETABLES, RAKING, USING HAND TOOLS,
8  AND CONTINUOUS NORMAL WALKING AS EXAMPLES OF MODERATE WORKLOAD
9  ACTIVITIES?
10 **A.**   LET ME JUST LOOK AT THE DOCUMENT FOR A MINUTE, PLEASE.
11 CAN I SEE PAGE 7?  THIS IS PAGE 8, I THINK.  AND IF YOU'LL
12 INDULGE ME, PLEASE, CAN I SEE PAGE 9?  AND BACK TO THE PAGE
13 THAT YOU ASKED ME TO REVIEW.  I'M SORRY.
14 **Q.**   MY QUESTION WAS:  ISN'T IT CORRECT THAT OSHA LISTS PICKING
15 FRUITS OR VEGETABLES, RAKING, USING HAND TOOLS, AND CONTINUOUS
16 NORMAL WALKING AS EXAMPLES OF MODERATE WORKLOAD ACTIVITIES?
17 **A.**   THEY DO.
18       **MS. WRIGHT:**  I WOULD MOVE AT THIS TIME TO ADMIT
19 PLAINTIFFS' EXHIBIT 4 INTO THE RECORD.
20       **THE COURT:**  ANY OBJECTION?
21       **MR. BLANCHFIELD:**  NO OBJECTION, YOUR HONOR.
22       **THE COURT:**  ADMITTED.
23 BY **MS. WRIGHT:**
24 **Q.**   LET'S LOOK NOW AT PLAINTIFFS' EXHIBIT 51, WHICH IS THE
25 U.S. ARMY CHARTS THAT YOU INCLUDE AS EXHIBIT 5 TO YOUR INITIAL

1    DECLARATION.

2    **A.**    YES.

3    **Q.**    AND LET'S RETURN TO YOUR OPINION THAT IT WOULD BE VERY

4    REASONABLE AND EXTREMELY SAFE TO INCREASE THE HEAT ALERT

5    THRESHOLD TO 95 DEGREES FAHRENHEIT.

6            NOW, THIS CHART -- THIS IS THE CHART THAT YOU BELIEVE

7    SETS A THRESHOLD FOR HEAT PRECAUTIONS.  CORRECT?

8    **A.**    YES.

9    **Q.**    THIS CHART DOES NOT MEASURE THE HEAT INDEX, DOES IT,

10   THOUGH?  IT MEASURES THE WET BULB GLOBE TEMPERATURE?

11   **A.**    THAT IS THE REFERENCE POINT IN THIS DOCUMENT.

12   **Q.**    SO THAT'S CORRECT?

13   **A.**    ASK THE QUESTION AGAIN.  I'M SORRY.

14   **Q.**    THIS CHART DOES NOT MEASURE THE HEAT INDEX, DOES IT?  IT

15   MEASURES THE WET BULB GLOBE TEMPERATURE?

16   **A.**    THE CHART DOESN'T MEASURE ANYTHING.  THE CHART IS A

17   COMPILATION OF MEASUREMENTS THAT ARE REFLECTIVE BY WET BULB

18   GLOBE TEMPERATURES.  THIS PARTICULAR CHART DOES NOT HAVE

19   MEASUREMENT CAPABILITIES.

20   **Q.**    THIS CHART DOES NOT REFER TO THE HEAT INDEX.  IT REFERS TO

21   THE WET BULB GLOBE TEMPERATURE, DOESN'T IT?

22   **A.**    THAT IS CORRECT.

23   **Q.**    AND, IN FACT, THAT CHART INDICATES THAT A WET BULB GLOBE

24   TEMPERATURE OF 78 DEGREES FAHRENHEIT IS CATEGORIZED AS A LEVEL

25   1, WHILE A WET BULB GLOBE TEMPERATURE OF 90 DEGREES OR ABOVE IS

1  CATEGORIZED AS A LEVEL 5, A BLACK CATEGORY.  CORRECT?

2  **A.**   CORRECT.

3  **Q.**   AND YOU DON'T KNOW WHETHER THIS CHART FACTORS IN THE

4  PHYSICAL ACTIVITIES OF THE PERSON DOING THE WORK, DO YOU?

5  **A.**   IT CERTAINLY APPEARS TO ME THAT THERE IS A FACTOR OF EASY,

6  MODERATE, HEAVY, AND VERY HEAVY WORK IDENTIFIED ON THE CHART.

7  I'M NOT SURE I UNDERSTAND THE QUESTION.

8  **Q.**   LET'S TURN TO PAGE 107 OF YOUR DEPOSITION AT LINE 23 WHERE

9  I ASKED:  "DOES THE U.S. ARMY CHART YOU'RE REFERRING TO FACTOR

10  IN THE PHYSICAL ABILITIES OF THE PERSON DOING THE WORK TO

11  DETERMINE WHETHER IT'S EASY WORK OR NOT?"  AND YOU RESPONDED:

12  "I'M NOT SURE, TO TELL THE TRUTH.  I'M NOT SURE WHETHER IT DOES

13  OR NOT."

14       DO YOU REMEMBER THAT?

15  **A.**   I SEE THAT RECORDED IN MY DEPOSITION.

16  **Q.**   AND THE ARMY CHART THAT YOU RELIED UPON ALSO DOES NOT

17  CONSIDER ENVIRONMENTAL CONDITIONS OR THE WEATHER IN ITS

18  DEFINITION OF "EASY WORK," DOES IT?

19  **A.**   APPARENTLY NOT.

20       **MS. WRIGHT:**  WE WOULD MOVE TO ADMIT PLAINTIFFS'

21  EXHIBIT 51.

22       **THE COURT:**  ANY OBJECTION?

23       **MR. BLANCHFIELD:**  NO OBJECTION, JUDGE.

24       **THE COURT:**  ADMITTED.

25  **BY MS. WRIGHT:**

1    Q.   NOW, LET'S TALK ABOUT THE TOUR THAT YOU TOOK OF LSP ON
2    SEPTEMBER 4TH, 2024.  YOU AND DR. REYNOLDS-BARNES VISITED LSP
3    TOGETHER ON THAT DATE, DIDN'T YOU?
4    A.   YES.
5    Q.   AND THAT WAS YOUR VERY FIRST VISIT TO LSP?
6    A.   YES.
7              THE COURT:  WHAT WAS THAT DATE, MS. WRIGHT?
8              MS. WRIGHT:  SEPTEMBER 4TH, 2024, A WEDNESDAY.
9              THE COURT:  THANK YOU.
10   BY MS. WRIGHT:
11   Q.   YOU WERE NOT ACCOMPANIED BY THE PLAINTIFFS' ATTORNEYS,
12   COUNSEL FOR PLAINTIFFS, A VIDEOGRAPHER, WERE YOU?
13   A.   NO.
14   Q.   YOU TOURED -- IN THAT MORNING AND AFTERNOON, YOU TOURED
15   THE HOSPICE UNIT, THE SKILLED NURSING UNIT, SEVERAL HOUSING
16   UNITS, THE ATU, THE RECOVERY UNIT, MEDICATION ROOMS, A CHURCH,
17   A SEMINARY COLLEGE, THE GRADING SHED, AND A FIELD, DIDN'T YOU?
18   A.   YES.
19   Q.   AND YOU ALSO ATE LUNCH IN THE OFFICER DINING HALL WITH
20   THEN WARDEN TIMOTHY HOOPER?
21   A.   YES, I DID.
22   Q.   YOU WERE LEFT WITH THE IMPRESSION THAT LSP IS MORE LIKE A
23   COMMUNITY THAN A PRISON?
24   A.   YES.
25   Q.   DURING YOUR TOUR YOU OBSERVED THE FARM LINE FOR LESS THAN

1    45 MINUTES?

2    **A.**   I -- IS THAT WHAT I -- IF THAT'S WHAT I SAID IN MY

3    DEPOSITION, I DON'T -- I DIDN'T CARRY A STOPWATCH AND -- BUT

4    I'M -- IT WAS NOT A LENGTHY VISIT THERE.

5    **Q.**   LET'S LOOK AT PAGE 109 OF YOUR DEPOSITION AT LINE 24.

6            I ASK YOU:  "HOW LONG DID YOU OBSERVE THE FARM LINE

7    OPERATING IN THE FIELDS?"  AND YOU RESPONDED:  IT WAS LESS THAN

8    AN HOUR.  THEY HADN'T TAKEN THEIR 45-MINUTE BREAK."

9            DO YOU REMEMBER THAT?

10   **A.**   WHICH LINE ARE YOU REFERRING TO?

11   **Q.**   24, PAGE 109.

12           WE'LL MOVE ON.

13           SO YOU OBSERVED THE FARM LINE FOR LESS THAN 45

14   MINUTES.  DO YOU RECALL?

15   **A.**   I THINK I -- I THINK WHAT YOU JUST READ ME IS THAT I -- IT

16   WAS LESS THAN AN HOUR.  BUT 45 MINUTES IS FINE.

17   **Q.**   AND YOU DID NOT OBSERVE LSP OFFICIALS ISSUE A HEAT ALERT,

18   DID YOU?

19   **A.**   NO.

20   **Q.**   BECAUSE IT WASN'T A HOT DAY?

21   **A.**   NO.

22   **Q.**   YOU DID NOT OBSERVE A BREAK PERIOD?

23   **A.**   I DID NOT.

24   **Q.**   YOU DID NOT OBSERVE ANY PERSON PLACE A SICK CALL OR A

25   SELF-DECLARED EMERGENCY FROM THE FIELD, DID YOU?

1    **A.**   NO.

2    **Q.**   YOU DID NOT SEE ANYONE RECEIVE MEDICAL TREATMENT IN THE

3    FIELD?

4    **A.**   I DID NOT.  CORRECT.

5    **Q.**   YOU DID NOT SEE ANY EMT'S OR RN'S OR MEDICAL STAFF REPORT

6    TO THE FIELD FOR ANY REASON?

7    **A.**   I DID NOT.

8    **Q.**   YOU DID NOT HAVE ANY DISCUSSIONS WITH EMT'S?

9    **A.**   IN THE FIELD?

10   **Q.**   CORRECT.

11   **A.**   CORRECT.

12   **Q.**   AND, IN FACT, YOU DID NOT SPEAK AT ALL TO ANY OF THE 17

13   MEN WHO WERE WORKING THE FARM LINE THAT DAY?

14   **A.**   THAT IS CORRECT.

15   **Q.**   IN YOUR OPINION, THERE IS NO NEED FOR PERSONAL PROTECTIVE

16   EQUIPMENT, OR PPE, ON THE FIELD LINES AT LSP?

17   **A.**   YEAH.  I MISUNDERSTOOD THE QUESTION.

18        WHEN I THINK OF "PPE," I'M THINKING OF WEARING A

19   RESPIRATOR OR GOING INTO AN ICU.  I WAS NOT THINKING OF HATS

20   AND GLOVES AND SHIRTS.

21        **THE COURT:**  SO I HAVE TO INTERRUPT.

22        DOCTOR, ARE YOU FAMILIAR WITH THE TERM "PPE"?

23   HAVE YOU HEARD THAT TERM BEFORE?

24        **THE WITNESS:**  MANY TIMES, YES, SIR.

25        **THE COURT:**  DID YOU HEAR IT, LET'S SAY, DURING THE

1    COVID ERA, BETWEEN 2020 AND 2023?

2              **THE WITNESS:**  ABSOLUTELY.

3              **THE COURT:**  AND DURING YOUR DEPOSITION YOU DID NOT

4    IDENTIFY PPE AS MASKS, GLOVES?  YOU IMMEDIATELY ASSUMED THAT

5    PPE WAS A RESPIRATOR?

6              **THE WITNESS:**  I MADE A MISTAKE, YOUR HONOR.  I

7    APOLOGIZE.

8              **THE COURT:**  AND YOU'VE BEEN A PRACTICING PHYSICIAN

9    FOR HOW LONG?

10             **THE WITNESS:**  I'VE BEEN A PRACTICING PHYSICIAN FOR 45

11   YEARS.

12             **THE COURT:**  LET'S PROCEED.

13   **BY MS. WRIGHT:**

14   **Q.**  IN THE FIELD THAT DAY YOU OBSERVED THAT SOME MEN WORE

15   RUBBER BOOTS AND OTHERS WORE TENNIS SHOES?

16   **A.**  CORRECT.

17   **Q.**  SOME WORE DO-RAGS, SOME HAD BASEBALL CAPS?

18   **A.**  CORRECT.

19   **Q.**  AN OFFICER TOLD YOU THAT INMATES COULD CHOOSE WHAT TO

20   WEAR?

21   **A.**  CORRECT.

22   **Q.**  BUT YOU DID NOT ASK ANY INCARCERATED PERSON WHETHER THAT

23   WAS TRUE?

24   **A.**  I DID NOT.

25   **Q.**  YOU WORE A FLY-FISHING HAT WITH A THREE-INCH BRIM AND

1  SUNSCREEN, DIDN'T YOU?

2  **A.**  I DID.

3  **Q.**  NOW, IT'S YOUR OPINION THAT SHADE, ICE WATER, AND GATORADE

4  AND REST PERIODS OF 15 MINUTES EVERY 45 MINUTES ARE PROVIDED ON

5  THE FARM LINE.  CORRECT?

6  **A.**  CORRECT.

7  **Q.**  BECAUSE THAT'S WHAT DOC'S COUNSEL TOLD YOU.  RIGHT?

8  **A.**  CORRECT.  AND IT'S ACTUALLY WHAT --

9  **Q.**  YOU DID NOT OBSERVE --

10  **A.**  -- THE WARDEN TOLD ME AT LUNCH.

11  **Q.**  WHAT THE WARDEN TOLD YOU AT LUNCH?

12  **A.**  YES.

13  **Q.**  YOU DID NOT OBSERVE A BREAK PERIOD?

14  **A.**  I DID NOT.

15  **Q.**  YOU DID NOT REVIEW ANY DOCUMENTATION INDICATING THAT A

16  15-MINUTE REST PERIOD IS ACTUALLY PROVIDED TO MEN WORKING THE

17  FARM LINE?

18  **A.**  NO, I DID NOT.

19  **Q.**  AND, AGAIN, YOU DID NOT ACTUALLY ASK ANY INCARCERATED

20  PERSON ABOUT THEIR EXPERIENCE?

21  **A.**  I DID NOT.

22  **Q.**  SO YOU DON'T ACTUALLY KNOW WHETHER MEN ON THE FARM LINE

23  ARE GETTING 15-MINUTE BREAKS WHERE THEY CAN REST IN THE SHADE

24  AND HYDRATE?

25  **A.**  I DO NOT.

1  **Q.**  NOW, IN YOUR OPINION, THE LEVEL OF HEAT, DURATION, AND

2  EXPOSURE TO HEAT AND LEVEL OF EXERTION ON THE FARM LINE RANGES

3  FROM MILD TO MODERATE.  IS THAT RIGHT?

4  **A.**  YES.

5  **Q.**  AND IT'S YOUR UNDERSTANDING THAT PEOPLE INCARCERATED AT

6  LSP ARE ASSIGNED TO FIELD WORK AS A PUNISHMENT FOR A

7  DISCIPLINARY VIOLATION?

8  **A.**  CORRECT.

9  **Q.**  YOU DID NOT ASK ANY INCARCERATED PERSON WHETHER THEY ARE

10  SUBJECT TO QUOTAS OR OTHER PUNISHMENT IF THEIR WORK IS DEEMED

11  UNSATISFACTORY?

12  **A.**  I DID NOT.

13  **Q.**  DURING YOUR TOUR, YOU WERE TOLD BY AN LSP EMPLOYEE THAT NO

14  ONE IS ASSIGNED TO THE FIELD IN THEIR FIRST TWO WEEKS AT LSP.

15  CORRECT?

16  **A.**  THAT'S WHAT I SAID IN MY DEPOSITION.  THAT'S WHAT I THINK

17  I HEARD, YES.

18  **Q.**  BUT, AGAIN, YOU DID NOT ASK ANY INCARCERATED PERSON

19  WHETHER THAT WAS TRUE?

20  **A.**  I DID NOT.

21  **Q.**  NOW, IN YOUR OPINION, DR. KELDIE, THERE ARE FAR TOO MANY

22  MINOR COMPLAINTS OR COMPLAINTS WITH NO MERIT LODGED FROM THE

23  FIELD AT LSP?

24  **A.**  THAT IS CORRECT.

25  **Q.**  THERE'S A MOUNTAIN OF FRIVOLOUS MEDICAL COMPLAINTS AT LSP,

1    ISN'T THERE?

2    **A.**    YES.

3    **Q.**    AND IN YOUR VIEW, FINDING A MERITORIOUS MEDICAL COMPLAINT

4    THERE IS LIKE LOOKING FOR A NEEDLE IN A HAYSTACK?

5    **A.**    AND I THINK THAT WAS A QUOTE FROM A JUDGE IN THE CASE, AND

6    I QUOTED IT.  AND BASED ON -- AND BASED ON 135 SELF-DECLARED

7    EMERGENCIES, I THINK THAT'S A FAIR CHARACTERIZATION.

8             **THE COURT:**  WHAT JUDGE?

9             **THE WITNESS:**  IT'S IN MY REPORT.  I DON'T REMEMBER

10   THE NAME.

11            **THE COURT:**  MR. BLANCHFIELD, I'M GOING TO ASK YOU TO

12   CITE THE JUDGE WHO MADE THAT OBSERVATION.

13              OKAY.  LET'S PROCEED.

14   **BY MS. WRIGHT:**

15   **Q.**    LET'S TALK ABOUT THOSE SELF-DECLARED EMERGENCIES.  NOW,

16   YOU REVIEWED 137 SELF-DECLARED EMERGENCIES THAT HAVE BEEN FILED

17   BY INCARCERATED MEN WORKING IN THE FIELD DURING THE SUMMER OF

18   2024, DIDN'T YOU?

19   **A.**    I THINK MY 137 NUMBER IN MY REPORT WAS INCORRECT.  I WENT

20   BACK AND DID THE MATH AGAIN.  I THINK IT WAS 135.

21   **Q.**    AND YOU DETERMINED, ACROSS ALL OF THOSE 135 SDE'S, THAT

22   THERE WAS NOT A SINGLE CLINICAL SCENARIO OF LEGITIMATE

23   EXERTIONAL HEAT ILLNESS, DIDN'T YOU?

24   **A.**    THAT'S CORRECT.

25   **Q.**    MEANING YOU SAW NO EVIDENCE AMONG THOSE 135 SDE'S OF HEAT

1    RASH, HEAT CRAMPS, HEAT SYNCOPE, EXERTIONAL HEAT INJURY, HEAT

2    EXHAUSTION, OR HEATSTROKE?

3    **A.**    CAN YOU ASK THAT QUESTION AGAIN?

4    **Q.**    YOU SAW NO EVIDENCE AMONG THOSE 135 SDE'S OF HEAT RASH,

5    HEAT CRAMPS, HEAT SYNCOPE, EXERTIONAL HEAT INJURY, HEAT

6    EXHAUSTION, OR HEATSTROKE?

7    **A.**    I DID NOT SEE HEAT EXHAUSTION OR HEATSTROKE.

8    **Q.**    SO YOU DID SEE EVIDENCE OF HEAT RASH, HEAT CRAMPS AND HEAT

9    SYNCOPE, AND EXERTIONAL HEAT INJURY?

10   **A.**    HEAT CRAMPS IS A MISNOMER.  IT HAS BEEN IN THE LITERATURE

11   FOR A LONG TIME.  BUT HEAT CRAMPS -- IT IS KNOWN THAT ATHLETES

12   CRAMP ON AN ICE SKATING RINK.  HEAT CRAMPS IS A MISNOMER.

13   HEAT SYNCOPE HAS LITTLE TO DO WITH THE HEAT.  IT'S MORE RELATED

14   TO STANDING FOR A LONG PERIOD OF TIME AND FAINTING.  IT'S --

15   THAT'S -- THOSE DEFINITIONS ARE BEING MODIFIED BECAUSE IT'S --

16   THAT'S THE SCIENCE OF THAT.

17   **Q.**    LET'S LOOK AT PAGE 243 OF YOUR DEPOSITION.

18          WE WERE TALKING ABOUT EXERTIONAL HEAT INJURY, HEAT

19   EXHAUSTION AND HEATSTROKE, AND YOU SAID THAT YOU DIDN'T SEE ANY

20   RASH CONSISTENT WITH PRICKLY HEAT.  YOU DIDN'T SEE ANYBODY WITH

21   A CRAMP CONSISTENT WITH EXERTION AND HEAT.  YOU DIDN'T SEE

22   ANYBODY THAT HAD SYNCOPATED.  RIGHT?

23   **A.**    CORRECT.

24   **Q.**    AND TO MAKE THIS DETERMINATION, YOU CATEGORIZED THE SDE'S

25   INTO FOUR PRIORITY LEVELS, DIDN'T YOU?

1  **A.**   I DID.

2  **Q.**   YOU PERSONALLY CREATED THAT CLASSIFICATION SYSTEM FOR THIS

3  LAWSUIT?

4  **A.**   I CREATED IT FOR THE REVIEW OF THE 135 SDE'S THAT I

5  REVIEWED.

6  **Q.**   SO THE ANSWER --

7           **THE COURT:**  SO THE ANSWER IS "YES."  CORRECT?

8           **THE WITNESS:**  CORRECT.

9           **THE COURT:**  THANK YOU.

10  BY MS. WRIGHT:

11  **Q.**   NOW, ACCORDING TO YOUR CLASSIFICATION SYSTEM, PRIORITY 3

12  PATIENTS ARE THOSE WITH A LEGITIMATE SELF-DECLARED EMERGENCY

13  POTENTIAL RELATED TO EXERTIONAL HEAT ILLNESS WHO ARE EVALUATED

14  IN THE FIELD AND TRIAGED APPROPRIATELY AND DID NOT HAVE AN

15  EXERTIONAL HEAT INJURY?

16  **A.**   WOULD YOU MIND PUTTING THAT ON THE SCREEN, PLEASE?

17  **Q.**   WE CAN LOOK AT YOUR DEPOSITION AT PAGE 244.

18           JUST ONE MOMENT, PLEASE, AND WE'LL PUT IT UP ON THE

19  SCREEN FOR YOU.

20  **A.**   OKAY.

21  **Q.**   OKAY.  WE'LL LOOK AT JX-76 AT PAGE 41, PLEASE.

22           AND ON THAT PAGE WE'LL LOOK AT THE DEFINITION THAT

23  YOU CREATED IN YOUR CLASSIFICATION SYSTEM FOR PRIORITY 3

24  PATIENTS.  THOSE ARE PATIENTS WITH A LEGITIMATE SDE POTENTIAL

25  RELATED TO EHI, OR EXERTIONAL HEAT ILLNESS, WHO WERE EVALUATED

1    IN THE FIELD AND WERE TRIAGED APPROPRIATELY AND DID NOT HAVE AN

2    EHI.  DO YOU SEE THAT?

3    **A.**   I DO.

4    **Q.**   OKAY.  WE CAN TAKE THIS DOWN.

5              NOW, YOU ARE AWARE THAT A 57-YEAR-OLD MAN PLACED AN

6    SDE FROM THE FIELD ON MAY 30TH OF 2024?

7    **A.**   YES.

8    **Q.**   AND ACCORDING TO HIS SDE, HE PRESENTED WITH CHIEF

9    COMPLAINTS OF FEELING LIGHT-HEADED AND DIZZY?

10   **A.**   DO YOU MIND SHOWING THAT TO ME?

11   **Q.**   LET'S LOOK AT YOUR DEPOSITION.

12   **A.**   YEP.

13   **Q.**   PAGE 244, STARTING AT LINE 13.

14              **MS. WRIGHT:**  WE'VE REDACTED THE NAME OF THIS

15   INDIVIDUAL, AND I BELIEVE THERE'S NO MORE PII IN THIS.

16              **THE COURT:**  ALL RIGHT.  THANK YOU.

17   **BY MS. WRIGHT:**

18   **Q.**   WE'LL LOOK AT LINE 13.

19              NOW, THIS INDIVIDUAL PRESENTED WITH CHIEF COMPLAINTS

20   OF FEELING LIGHT-HEADED AND DIZZY.  CORRECT?

21   **A.**   CORRECT.

22   **Q.**   HIS BODY MASS INDEX, OR BMI, WAS 30.93.  CORRECT?

23   **A.**   CORRECT.

24   **Q.**   HIS BLOOD PRESSURE WAS 90/60?  THAT'S AT LINE 22.

25   CORRECT?

1  **A.**   CORRECT.

2  **Q.**   HIS ACTIVE PROBLEMS INCLUDED HYPERTENSION AND

3  HYPERLIPIDEMIA.  RIGHT?

4  **A.**   I DON'T SEE THAT ON THE -- WHAT I'M LOOKING AT THERE.

5  **Q.**   YOU CAN LOOK AT PAGE 245, LINE 9.

6  **A.**   I'M ON PAGE 244.

7  **Q.**   NOW, HIS ACTIVE PROBLEMS INCLUDE HYPERTENSION AND

8  HYPERLIPIDEMIA.  CORRECT?

9  **A.**   CORRECT.

10  **Q.**   LET'S LOOK AT LINE 14 OF THIS PAGE, 245.

11          "UNDER 'NURSING ASSESSMENT,' THE NURSE WROTE, 'THE

12  PATIENT COMPLAINS OF FEELING LIGHT-HEADED, DIZZY, AND CRAMPING.

13  PATIENT IS IN THE FIELD, HAS A SWEATSHIRT ON THAT HAS A LOT OF

14  SWEAT ON IT.  SKIN SWEATY.  AMBULATES WITH A SWEATY GAIT.  HAS

15  SLIGHT SWAY WHEN STANDING.  BREATH SOUNDS CLEAR.  PATIENT SENT

16  TO ATU FOR FURTHER EVALUATION.'"  CORRECT?

17  **A.**   I HAVE NEVER HEARD THE TERM "AMBULATES WITH A SWEATY

18  GAIT."

19  **Q.**   THIS IS YOUR DEPOSITION.  DO YOU RECALL SITTING FOR A

20  DEPOSITION IN SEPTEMBER IN THIS CASE UNDER OATH?

21  **A.**   YES, I DO.

22  **Q.**   AND LET'S CONTINUE LOOKING AT YOUR DEPOSITION.

23  **A.**   CAN --

24  **Q.**   AT PAGE 246 --

25  **A.**   CAN I GO BACK TO THAT QUESTION?  BECAUSE I JUST -- I WAS A

1  LITTLE BIT FLUMMOXED BY THE QUESTION.  DO YOU MIND DOING THAT

2  ONE MORE MINUTE?

3            NOW, WAS -- AND WHERE DID THIS QUOTE COME FROM?

4  **Q.**  THIS IS FROM THE NURSING ASSESSMENT IN THE PATIENT'S

5  RECORDS, WHICH WE DISCUSSED DURING YOUR DEPOSITION.

6  **A.**  OKAY.  IT'S PROBABLY IRRELEVANT, BUT I'VE NEVER HEARD THE

7  TERM "SWEATY GAIT."  IT'S STEADY GAIT.  AND I DON'T KNOW IF

8  THAT GOT LOST IN THE TRANS- --

9  **Q.**  IT'S POSSIBLE.  IT'S POSSIBLE.

10  **A.**  YES.

11  **Q.**  BUT DO YOU AGREE WITH THE NURSE'S ASSESSMENT IN THIS CASE;

12  THAT THIS PATIENT SHOULD HAVE BEEN SENT TO THE ATU FROM THE

13  FIELD FOR FURTHER EVALUATION?

14            **THE COURT:**  THAT WOULD BE A "YES" OR A "NO," DOCTOR.

15            **THE WITNESS:**  I'M --

16            **MR. BLANCHFIELD:**  YOUR HONOR --

17            **THE WITNESS:**  I'M TRYING TO --

18            **THE COURT:**  WAIT, WAIT, WAIT.  TIME OUT.

19            **MR. BLANCHFIELD:**  I WOULD OBJECT.  IF HE'S GOING TO

20  BE ASKED THAT QUESTION, HIS DEPOSITION IS NOT CONTROLLING.  BUT

21  THE MEDICAL RECORD OF THAT ENCOUNTER WOULD BE CONTROLLING.

22  SHOW HIM THE MEDICAL RECORD.

23            **THE COURT:**  BUT I THOUGHT HE -- WAS HE SHOWN THE

24  MEDICAL RECORD --

25            **MS. WRIGHT:**  HE WAS.

1    **THE COURT:**  -- AT THE TIME OF THE DEPOSITION?

2    **MS. WRIGHT:**  HE WAS.

3    **THE COURT:**  SO I GUESS, MR. BLANCHFIELD -- I'M NOT

4   TRYING TO BE UNFAIR TO YOUR WITNESS, BUT IT SUGGESTS TO ME THAT

5   HE -- BEFORE THE DEPOSITION HE REVIEWED THE DOCUMENT.  IF YOU

6   HAVE IT -- IT'S A VERY SIMPLE QUESTION, IT SEEMS TO ME.  DO YOU

7   AGREE WITH THE ASSESSMENT MADE BY THE ON-SITE MEDICAL

8   PROFESSIONAL WHO ACTUALLY EVALUATED AND EXAMINED THE PATIENT AT

9   THE TIME OF THE INCIDENT?  OR PUT ANOTHER WAY, DO YOU HAVE ANY

10   REASON TO QUESTION THE COMPETENCY OR THE PROFESSIONAL

11   ASSESSMENT AND CONCLUSIONS REACHED BY THE MEDICAL PROFESSIONAL

12   WHO ACTUALLY EXAMINED THE PATIENT AT THE TIME OF THE INCIDENT?

13    **MR. BLANCHFIELD:**  AND, YOUR HONOR, MY OBJECTION

14   STANDS.  GIVE HIM THE MEDICAL RECORD SO HE CAN ANSWER THAT.

15   THAT WAS A --

16    **THE COURT:**  NO, NO, NO.  MR. BLANCHFIELD, I DON'T

17   WANT TO CUT YOU OFF, SIR, BUT WE DON'T HAVE TIME AT THIS POINT.

18   HE HAS TESTIFIED THAT HE HAS REVIEWED AT LEAST EIGHT, PERHAPS

19   MORE RECORDS.

20    IS THIS ONE OF THE EIGHT?

21    **MS. WRIGHT:**  NO, THIS IS NOT.  AND IT'S ACTUALLY

22   THREE THAT HE REVIEWED PERSONALLY.

23    **THE COURT:**  HE REVIEWED THREE.

24    SO I GUESS MY QUESTION IS -- THIS IS NOT THE

25   TIME FOR HIM TO -- FOR US TO STOP THIS HEARING AND FOR HIM TO

1    REVIEW THE MEDICAL RECORDS IN ORDER TO FORM AN OPINION ABOUT
2    THE COMPETENCY AND CAPABILITIES OF THE MEDICAL PROFESSIONAL AT
3    LSP WHO MADE THE DIAGNOSIS.  THAT SHOULD HAVE BEEN TAKEN CARE
4    OF A LONG TIME AGO.  WE DON'T HAVE TIME AT THIS STAGE FOR HIM
5    TO GO BACK AND REVIEW AN, IN EFFECT, WHAT APPEARS TO ME TO BE
6    SECOND-GUESSING SOMEBODY WHO MADE THEIR BEST PROFESSIONAL
7    MEDICAL ASSESSMENT.  DO YOU UNDERSTAND MY POINT, SIR?
8             **MR. BLANCHFIELD:**  I DO, JUDGE.  IT'S A TWO-PAGE --
9    IT'S A TWO-PAGE DOCUMENT.  HE WAS ASKED IN A SEVEN-HOUR
10   DEPOSITION MONTHS AGO ABOUT IT, AND IT JUST SEEMS FAIR, IF
11   YOU'RE GOING TO ASK HIM ABOUT IT, LET HIM SEE IT.
12            **THE COURT:**  AND I'M SURE IN THAT SEVEN-HOUR
13   DEPOSITION THERE WERE CERTAIN BREAKS TAKEN IN A SEVEN-HOUR
14   DEPOSITION THAT TOOK -- THAT IS NOT ENTIRELY UNREASONABLE OR
15   UNUSUAL IN FEDERAL LITIGATION.
16            DO YOU HAVE THE TWO-PAGE DOCUMENT?
17            **MS. WRIGHT:**  I'M SURE THAT WE CAN FIND IT AND PRINT
18   IT IF IT IS NECESSARY.
19            **THE COURT:**  IF WE CAN FIND IT AND PRINT IT WITHIN THE
20   NEXT FIVE OR TEN MINUTES, LET'S DO IT, BUT WE'RE NOT GOING TO
21   HOLD UP ON THIS.
22            **MS. WRIGHT:**  MAY I CONTINUE MY QUESTIONING WHILE MY
23   TEAM FINDS IT?
24            **THE COURT:**  PLEASE DO SO.
25            **MS. WRIGHT:**  THANK YOU.

1    **BY MS. WRIGHT:**

2    **Q.**   NOW, IN THIS PARTICULAR ASSESSMENT OF ONE OF THE SDE'S

3    THAT YOU REVIEWED, WE'VE DISCUSSED THAT THE NURSE'S ASSESSMENT

4    WAS THAT THIS PATIENT WAS PRESENTING WITH SYMPTOMS SUCH THAT HE

5    SHOULD BE SENT TO THE ATU FOR FURTHER EVALUATIONS.  CORRECT?

6    **A.**   YES.

7    **Q.**   AND IN THE ATU AT LINE 6, PAGE 246, THIS PATIENT WAS

8    TREATED WITH -- FOR DEHYDRATION WITH IV FLUIDS.  CORRECT?

9    **A.**   CORRECT.

10   **Q.**   AND AT LINE 11 HE WAS DIAGNOSED WITH HYPOTENSION AND

11   DIZZINESS.  RIGHT?

12   **A.**   CORRECT.

13   **Q.**   AND YOU AGREE THAT HYPOTENSION CAN BE CAUSED BY

14   CONDITIONS OF HIGH HEAT.  CORRECT?

15   **A.**   CORRECT.

16   **Q.**   HYPOTENSION ACTUALLY OCCURS WHEN YOU GET TO EXTREME

17   CONDITIONS OF HEAT INJURY OR EVEN TO THE POINT OF HEAT

18   EXHAUSTION OR HEATSTROKE.  CORRECT?

19   **A.**   IT CAN OCCUR BEFORE THEN, YES.

20   **Q.**   SO THIS PATIENT THAT WE ARE DISCUSSING, THIS 57-YEAR-OLD

21   MAN WITH A BMI OF 30, WHO WAS WORKING IN THE FIELD AND WAS

22   DIAGNOSED WITH CLINICAL DEHYDRATION, HYPOTENSION AND DIZZINESS

23   AND WAS TREATED IN THE ATU WITH AN IV, YOU DID NOT CLASSIFY IN

24   YOUR METHODOLOGY THIS PATIENT AS A PRIORITY 3, DID YOU?

25   **A.**   I DON'T REMEMBER.

```
 1              THE COURT:  YOU HAVE APPROXIMATELY SEVEN MINUTES
 2   LEFT.
 3              MS. WRIGHT:  THANK YOU.
 4   BY MS. WRIGHT:
 5   Q.   LET'S LOOK AT YOUR DEPOSITION AT PAGE 247, LINE 9.
 6              I ASKED:  "WHY DON'T YOU CONSIDER THIS PATIENT TO BE
 7   A PRIORITY 3 PATIENT?"  AND YOU RESPONDED:  "WHY DON'T I
 8   CONSIDER HIM TO BE A PRIORITY 3 PATIENT?"
 9              I SAID:  "YES."  AND YOU SAID:  "BECAUSE HE'S SOMEONE
10   WITH SYMPTOMS THAT COULD HAVE JUST BEEN CREATED IN THE FIELD."
11              DO YOU SEE THAT?
12   A.   YES, I DO.
13   Q.   YOU DID NOT INCLUDE --
14              THE COURT:  WAIT, WAIT, WAIT.  WHAT DOES THAT MEAN,
15   DOCTOR?  WHAT DID YOU MEAN BY THAT?
16              THE WITNESS:  CAN WE -- CAN WE GO BACK TO THAT
17   STATEMENT?
18              MS. WRIGHT:  THIS IS LINES 9 TO 15 ON PAGE 247.
19              THE WITNESS:  I'M NOT SURE WHAT I MEANT BY THAT AT
20   THE TIME, YOUR HONOR.
21              THE COURT:  SURELY YOU DIDN'T MEAN THAT SOMEONE COULD
22   SUDDENLY DEVELOP HIGH BLOOD PRESSURE OR OTHER MORBIDITIES WHILE
23   JUST SUDDENLY WORKING IN THE FIELD AND WOULD REPORT IT IN AN
24   EFFORT TO GET OUT OF THE OBLIGATION TO WORK IN THE FIELD?  IS
25   THAT WHAT YOU MEANT?
```

1      **THE WITNESS:**  I'M NOT SURE WHAT I MEANT AT THAT TIME,

2   YOUR HONOR.

3      **THE COURT:**  SO YOU BELIEVE IT IS POSSIBLE THAT

4   SOMEONE COULD SUDDENLY DEVELOP OR BE DIAGNOSED WITH HIGH BLOOD

5   PRESSURE FOR THE FIRST TIME WHILE WORKING THE FARM LINE AT

6   ANGOLA?

7      **THE WITNESS:**  I DON'T SEE WHERE WE SAID HIGH BLOOD

8   PRESSURE.

9      **THE COURT:**  SIR, SIR, I'M NOT REFERENCING.  I'M

10   SIMPLY ASKING THE QUESTION.

11      IS IT YOUR TESTIMONY THAT YOU BELIEVE THAT

12   SOMEONE WHO HAS HERETOFORE NOT BEEN DIAGNOSED WITH HIGH BLOOD

13   PRESSURE, HYPOTENSION, OR ANY OTHER MEDICAL CO-MORBIDITY ISSUES

14   CAN SUDDENLY -- WHILE WORKING ON THE FARM LINE CAN FOR THE

15   FIRST TIME DECLARE THAT "I HAVE HIGH BLOOD PRESSURE"?  IS THAT

16   YOUR CONCERN?  YOU BELIEVE THAT'S THE WAY THIS WORKS?

17      **THE WITNESS:**  I DON'T MEAN TO BE OBTUSE, BUT I DON'T

18   UNDERSTAND THE QUESTION.

19      **THE COURT:**  WELL -- OKAY.  WELL, LET ME ASK YOU THIS

20   THEN.  I'LL PHRASE IT ANOTHER WAY.

21      YOU TELL ME WHAT YOU MEANT WHEN YOU SAID THAT

22   "SOMEONE WITH SYMPTOMS COULD HAVE BEEN JUST CREATED IN THE

23   FIELD."

24      **THE WITNESS:**  AND I COMMENTED EARLIER, I'M NOT QUITE

25   SURE WHAT I MEANT BY THAT, YOUR HONOR.

1    **THE COURT:**  SO YOU -- ALL RIGHT.  I DON'T WANT TO
2    ARGUE WITH YOU, BUT LET'S MOVE ON.
3    **MS. WRIGHT:**  I HAVE NO FURTHER QUESTIONS, YOUR HONOR.
4    **THE COURT:**  ALL RIGHT.  ANY REDIRECT?
5    **MR. BLANCHFIELD:**  COULD WE PULL UP JX-76, PAGE 8?
6    **REDIRECT EXAMINATION**
7    BY MR. BLANCHFIELD:
8    **Q.**  THERE WAS SOME DISCUSSION OF THE WET BULB GLOBE
9    TEMPERATURE AND CORRELATING WITH HEAT INDEX.  DID YOU CORRELATE
10   WET BULB GLOBE TO HEAT INDEX IN YOUR AFFIDAVIT?
11   **MS. WRIGHT:**  YOUR HONOR, THIS IS BEYOND THE SCOPE OF
12   THIS WITNESS'S EXPERTISE.
13   **THE COURT:**  WELL, THERE WAS TESTIMONY ABOUT THE WET
14   BULB GLOBE.  LET'S GO ON AND I WILL ALLOW SOME QUESTIONS ABOUT
15   THAT.  LET'S PROCEED.
16   **MR. BLANCHFIELD:**  THANK YOU.
17   BY MR. BLANCHFIELD:
18   **Q.**  CAN YOU ANSWER THE QUESTION, DOCTOR?
19   **A.**  YES.
20   **Q.**  AND DID YOU CORRELATE IT TO THE HEAT INDEX AND CAN YOU
21   EXPLAIN HOW YOU DID THAT?
22   **A.**  THERE IS A WAY TO CONVERT WET BULB -- WET BULB GLOBE
23   TEMPERATURE TO A HEAT INDEX, AND THAT WAS DONE, AS YOU CAN SEE
24   HERE.
25   **Q.**  OKAY.  NOW, YOU WERE ALSO ASKED ABOUT YOUR OPINION ON

1    SSRI'S.  CORRECT?

2    **A.**    CORRECT.

3    **Q.**    YOU FELT THAT THERE WAS NO REASON TO INCLUDE SSRI'S ON THE

4    MEDICATION LIST THAT WAS MODIFIED BY THE DEPARTMENT OF

5    CORRECTIONS ON HCP 8?

6    **A.**    CORRECT.

7    **Q.**    YOU ALSO WERE HERE -- WERE PRESENT FOR THE TESTIMONY OF

8    DR. DELECA BARNES, THE ONLY PHARM-D TO TESTIFY HERE IN THIS

9    CASE?

10    **A.**    YES.

11    **Q.**    AND WAS HER OPINION SIMILAR WITH RESPECT TO THE SSRI'S?

12    **A.**    YES.

13    **Q.**    AND IN -- ALTHOUGH YOU WORKED IN CONJUNCTION WITH DR.

14    BARNES ON ISSUES OF MEDICATION AND WHETHER OR NOT THEY SHOULD

15    BE INCLUDED ON THE MEDICATION LIST, WOULD YOU DEFER TO HER

16    EXPERTISE IN MAKING THAT DETERMINATION?

17    **A.**    YES, SIR.

18    **Q.**    AND IF WE COULD GO TO -- I BELIEVE MS. WRIGHT PULLED UP

19    PX-4, THE CHART.  THIS IS THE CHART THAT SHE WAS TALKING ABOUT.

20    IF WE LOOK AT THE -- AGAIN, THIS IS NOT AMBIENT TEMPERATURE,

21    THIS IS HEAT INDEX AND THE STEPS TO BE TAKEN TO MITIGATE THE

22    RISK.  IF WE LOOK AT THE TOP, WE HAVE IN THE LOWER-RISK LEVEL

23    THE HEAT INDEX NUMBER OF LESS THAN 91 DEGREES FAHRENHEIT.

24    CORRECT?

25    **A.**    CORRECT.

1  **Q.**  AND IS THAT ONE OF THE MANY REASONS THAT YOU RECOMMENDED

2  91 DEGREES AS A HEAT INDEX BEFORE A HEAT ALERT IS CALLED?

3  **A.**  THAT AND ACTUALLY THE NEXT LINE THAT SHOWS 91 TO 103.  A

4  COMBINATION OF THOSE, YES.

5  **Q.**  WHICH IS A -- WHICH IS A MODERATE RISK?

6  **A.**  YES.

7  **Q.**  THANK YOU, DOCTOR.

8        **MR. BLANCHFIELD:**  THAT'S ALL THE QUESTIONS I HAVE,

9  JUDGE.

10       **THE COURT:**  ALL RIGHT.  THANK YOU, MR. BLANCHFIELD.

11            NOW, DOCTOR, HOW MANY TIMES HAVE YOU BEEN

12  QUALIFIED AS AN EXPERT?

13       **THE WITNESS:**  TWO.

14       **THE COURT:**  FEDERAL COURT, STATE COURT, BOTH?

15       **THE WITNESS:**  BOTH.

16       **THE COURT:**  WHICH FEDERAL COURT?

17       **THE WITNESS:**  IN CHICAGO.

18       **THE COURT:**  THAT WOULD BE THE NORTHERN DISTRICT OF

19  ILLINOIS, AS FAR AS YOU KNOW?

20       **THE WITNESS:**  YES, SIR.

21       **THE COURT:**  YOU WERE NOT QUALIFIED AS AN EXPERT ON

22  THERMOREGULATION OF THE BODY, WERE YOU?

23       **THE WITNESS:**  I WAS NOT.

24       **THE COURT:**  AND YOU WERE NOT QUALIFIED AS AN EXPERT

25  IN MEDICAL TOXICOLOGY; THAT IS, THE STUDY OF THE EFFECTS OF

1  CERTAIN DRUGS ON THE BODY.  CORRECT?

2           **THE WITNESS:**  CORRECT.

3           **THE COURT:**  AND SO YOUR RECOMMENDATION TO THE DOC TO

4  RAISE THE HEAT INDEX LEVEL THAT WOULD TRIGGER CERTAIN

5  PROTECTIONS FROM 88 TO 91 IS BASED SOLELY ON WHAT YOU HAVE READ

6  IN THE LITERATURE AND NOT ON YOUR OWN STUDIES.  IS THAT

7  CORRECT?

8           **THE WITNESS:**  THAT'S CORRECT.

9           **THE COURT:**  ALL RIGHT.  SO THESE TWO CASES YOU SAID

10  YOU TESTIFIED PREVIOUSLY AS AN EXPERT, DID YOU -- IN BOTH CASES

11  DID YOU TESTIFY AS AN EXPERT FOR THE CORRECTIONAL INSTITUTIONS?

12           **THE WITNESS:**  CORRECT.

13           **THE COURT:**  HAVE YOU EVER TESTIFIED AS AN EXPERT FOR

14  A NON-CORRECTIONAL INSTITUTION IN ANY CASE?

15           **THE WITNESS:**  I HAVE NOT.

16           **THE COURT:**  NOW, YOU TESTIFIED THAT YOU, YOURSELF,

17  WORE SUNSCREEN DURING YOUR VISIT TO LSP, BUT YOU DON'T BELIEVE

18  THAT SUNSCREEN IS REQUIRED FOR PERSONS WHO WORK ON THE FARM

19  LINE.  IS THAT CORRECT?

20           **THE WITNESS:**  I BELIEVE THAT SUNSCREEN IS -- SHOULD

21  BE AN OPTION OF PEOPLE WORKING ON THE FARM LINE.

22           **THE COURT:**  SO IT SHOULD BE AN OPTION.  AND SO IN

23  YOUR -- LET ME UNDERSTAND NOW.  IN YOUR MEDICAL JUDGMENT, YOU

24  DON'T BELIEVE THAT -- WELL, AGAIN, I'M GOING TO ASK YOU.  I'LL

25  PUT IT TO YOU THIS WAY.  ARE THERE ANY CIRCUMSTANCES UNDER

1    WHICH YOU BELIEVE THAT SUNSCREEN SHOULD NOT BE WORN BY ANY

2    PERSON WHO IS EXPOSED TO SUNLIGHT FOR A PERIOD OF, LET'S SAY,

3    OVER TEN MINUTES?

4              **THE WITNESS:**  NO, SIR.

5              **THE COURT:**  DO YOU REMEMBER THE TEMPERATURE OR THE

6    APPROXIMATE TEMPERATURE WHEN YOU VISITED LSP IN SEPTEMBER OF

7    2024?

8              **THE WITNESS:**  I DO NOT.

9              **THE COURT:**  DO YOU REMEMBER THE TIME OF DAY THAT YOU

10   VISITED?

11             **THE WITNESS:**  I THINK WE ARRIVED ABOUT 6:30 IN THE

12   MORNING AT THE FACILITY AND WE WERE AT THE FARM LINE BY 8:30,

13   9:00.

14             **THE COURT:**  SO YOU WEREN'T AT THE FARM LINE AT, SAY,

15   10:30 IN THE MORNING?

16             **THE WITNESS:**  NO, SIR.

17             **THE COURT:**  YOU WEREN'T AT THE FARM LINE AT NOON?

18             **THE WITNESS:**  NO, SIR.

19             **THE COURT:**  YOU WEREN'T AT THE FARM LINE AT 3:00 IN

20   THE AFTERNOON?

21             **THE WITNESS:**  I WAS NOT.

22             **THE COURT:**  AND I WANT TO FULLY UNDERSTAND YOUR

23   TESTIMONY REGARDING THE MEDICAL RECORDS AT ANGOLA.  NOW, YOU

24   TESTIFIED THAT THERE ARE MEDICAL RECORDS, YOU SAY, THAT GO BACK

25   TO A HUNDRED YEARS.  IS THAT -- WAS THAT YOUR TESTIMONY, SIR?

1          **THE WITNESS:**  NO, SIR.  IF YOU -- IN THE EIGHT

2     CLIENTS, THEIR TOTAL PERIOD OF INCARCERATION WAS ABOUT A

3     HUNDRED YEARS OF INCARCERATION.

4          **THE COURT:**  ALL RIGHT.  SO YOU WERE SPECIFICALLY

5     DESCRIBING YOUR UNDERSTANDING OF THE RECORDS FOR THE EIGHT

6     PERSONS WHO WERE SELECTED?

7          **THE WITNESS:**  CORRECT.

8          **THE COURT:**  ALL RIGHT.  BUT YOU ONLY REVIEWED THREE

9     OF THE RECORDS YOURSELF?

10         **THE WITNESS:**  I REVIEWED -- I REVIEWED ALL OF THE

11    MEDICAL RECORDS.  I DID NOT REVIEW EVERY PAGE OF ALL OF THE

12    MEDICAL RECORDS.

13         **THE COURT:**  SO I'LL REPHRASE THAT.

14              YOU ONLY REVIEWED THREE OF THE RECORDS IN THEIR

15    ENTIRETY?

16         **THE WITNESS:**  THAT IS CORRECT.

17         **THE COURT:**  ALL RIGHT.  AND I WANT TO BE CLEAR ALSO

18    ON THIS POINT THAT YOU MADE THAT YOU HAVE NOT SEEN ANY EVIDENCE

19    TO SHOW THAT ANYONE AT LSP ON THE FARM LINE DIED OF HEATSTROKE

20    OR A HEAT-RELATED MEDICAL EMERGENCY.  IS THAT YOUR TESTIMONY?

21         **THE WITNESS:**  YES, IT IS.

22         **THE COURT:**  AND YOU FORMED THAT OPINION BASED NOT ON

23    YOUR REVIEW OF THE EIGHT MEDICAL RECORDS, BUT IT WAS BASED UPON

24    WHAT YOU WERE TOLD BY PRISON OFFICIALS.  IS THAT CORRECT?

25         **THE WITNESS:**  WELL, I KNOW NONE OF THE EIGHT DIED.

1      **THE COURT:**  WELL, THAT'S NOT MY QUESTION, SIR.

2      **THE WITNESS:**  WELL --

3      **THE COURT:**  IT'S A VERY SIMPLE QUESTION.  YOU KNOW,

4  YOU'VE TESTIFIED FOR A LONG TIME.  YOU WERE DEPOSED A NUMBER OF

5  TIMES.  YOU'VE TESTIFIED.  IT'S A VERY SIMPLE QUESTION.  HAVE

6  YOU -- DID YOU REACH THE CONCLUSION THAT THERE HAVE BEEN NO

7  HEAT-RELATED DEATHS ON THE FARM LINE AT LSP BECAUSE SOMEONE

8  TOLD YOU THAT?

9      **THE WITNESS:**  CORRECT.

10     **THE COURT:**  YOU DIDN'T MAKE ANY INDEPENDENT

11 ASSESSMENT OF ANY MEDICAL RECORDS OTHER THAN THE EIGHT THAT

12 WERE PROVIDED TO YOU BY PRISON OFFICIALS?

13     **THE WITNESS:**  THE EIGHT MEDICAL RECORDS AND THE 135

14 SELF-DECLARED EMERGENCIES.

15     **THE COURT:**  WELL, THE ONE HUNDRED AND --

16 SELF-DECLARED EMERGENCIES.  NOW, WE HAD TESTIMONY, SIR, AND YOU

17 WERE PRESENT DURING THE TESTIMONY OF MR. COLEY WHO TESTIFIED

18 THAT THERE ARE APPROXIMATELY -- OF THE APPROXIMATE, LET'S SAY,

19 UNIVERSE OF 40 PRISONERS WHO WORK ON THE FARM LINE DURING THE

20 SUMMER CURRENTLY, THERE ARE TYPICALLY FOUR OR FIVE

21 SELF-DECLARED MEDICAL EMERGENCIES DAILY.  DO YOU RECALL THAT

22 TESTIMONY?

23     **THE WITNESS:**  I WAS HERE.  YES, SIR.

24     **THE COURT:**  ALL RIGHT.  AND SO IT'S STILL YOUR

25 OPINION THAT THERE'S NO EVIDENCE TO BELIEVE THAT OF THOSE -- I

1    DON'T KNOW -- HUNDREDS OF CALLS WITHIN WHATEVER -- AND WE'LL

2    TALK ABOUT THE PERIOD FROM MAY 1ST TO OCTOBER 31ST.  DID YOU

3    REVIEW ANY DOCUMENTS FROM THAT -- WELL, DID YOU REVIEW ALL OF

4    THE DOCUMENTATION FROM THAT PERIOD OF TIME IN 2024?  ALL OF

5    THE -- DID YOU REVIEW ALL OF THE DOCUMENTS OF SELF-DECLARED

6    HEAT-RELATED MEDICAL EMERGENCIES FROM MAY 1ST, 2024 TO

7    OCTOBER 31ST, 2024?

8            **THE WITNESS:**  I DON'T THINK IT WAS OCTOBER.  I THINK

9    IT ONLY WENT THROUGH SEPTEMBER, YOUR HONOR.

10            **THE COURT:**  BUT YOU --

11            **THE WITNESS:**  BUT I DID REVIEW THE 135.

12            **THE COURT:**  YOU REVIEWED 130 MEDICAL EMERGENCIES OR

13    DOCUMENTATION OF MEDICAL EMERGENCIES?

14            **THE WITNESS:**  SELF-DECLARED EMERGENCIES, YES, SIR.

15            **THE COURT:**  OKAY.  AND YOU SAW NOTHING IN THOSE

16    DOCUMENTS THAT SUGGESTED TO YOU THAT THESE WERE LEGITIMATE,

17    FROM A MEDICAL STANDPOINT, LET'S SAY -- FROM A MEDICAL

18    STANDARD -- LEGITIMATE MEDICAL EMERGENCIES?

19            **THE WITNESS:**  NO, SIR.  THAT'S NOT HOW I MEANT TO --

20    THAT'S NOT HOW I THINK I CHARACTERIZED IT.  I DIDN'T SEE A -- I

21    SAW MEDICAL EMERGENCIES THAT I THOUGHT SHOULD GO TO THE ATU.  I

22    DID NOT SEE AN EMERGENCY THAT APPEARED TO BE AN EXERTIONAL HEAT

23    ILLNESS.

24            **THE COURT:**  AND WHAT DID YOU BELIEVE THAT THE

25    EMERGENCY WAS ATTRIBUTABLE TO?

1          **THE WITNESS:**  THERE WERE PEOPLE THAT HAD TURNED OVER

2    A TRACTOR.  THERE WERE PEOPLE THAT WERE COMPLAINING OF BEING

3    DEHYDRATED.  THERE WERE PEOPLE THAT WERE -- THAT IT WAS -- IT

4    WAS APPROPRIATE WITH AN ABUNDANCE OF CAUTION THAT THEY GO TO

5    THE ATU.

6          **THE COURT:**  DID YOU MAKE AN ASSESSMENT OR ATTEMPT TO

7    MAKE AN ASSESSMENT WHETHER ANY SUCH INDIVIDUALS WHO PERHAPS

8    COMPLAINED OF DEHYDRATION WERE TAKING CERTAIN MEDICATIONS THAT

9    WERE OR WERE NOT ON THE LSP LIST?

10         **THE WITNESS:**  WE REVIEWED MEDICATIONS AS WE WERE

11   REVIEWING THE CHARTS, YES, SIR.

12         **THE COURT:**  AND SO YOU DIDN'T FIND ANY CORRELATION

13   BETWEEN ALLEGATIONS OR REPORTS OF DEHYDRATION AND ANY OTHER

14   MEDICAL ISSUES?

15         **THE WITNESS:**  CORRECT.

16         **THE COURT:**  OKAY.  SO, AGAIN, I JUST WANT TO BE

17   CLEAR.  BASED UPON THE -- YOUR CONCLUSION -- OR SHOULD I SAY

18   YOU HAVE REACHED YOUR CONCLUSION THAT THERE WERE NO

19   HEAT-RELATED MEDICAL CASES ASSOCIATED WITH THE FARM LINE, YOU

20   REACHED THAT CONCLUSION BASED UPON WHAT YOU WERE TOLD BY

21   OFFICIALS AT LSP.  CORRECT?

22         **THE WITNESS:**  YES, SIR.

23         **THE COURT:**  ALL RIGHT.  THANK YOU, DOCTOR.  THAT

24   CONCLUDES YOUR TESTIMONY.  I APPRECIATE YOU COMING ON IN TO

25   TESTIFY.  YOU CAN RETURN TO YOUR SEAT.

1    ANY OTHER WITNESSES FROM THE DEFENDANT?

2         **MR. BLANCHFIELD:** NO, YOUR HONOR.

3         **THE COURT:** ALL RIGHT.  ALL RIGHT.  LET ME TURN NOW

4    TO THE PLAINTIFF.  I ASSUME THERE'S NO REBUTTAL TESTIMONY THAT

5    YOU WISH TO PRESENT?

6         **MS. POURCIAU:** NO REBUTTAL TESTIMONY, YOUR HONOR.

7         **THE COURT:** ALL RIGHT.  LET ME GIVE EACH SIDE FIVE

8    MINUTES TO OFFER ANY STATEMENTS OR ARGUMENT YOU WISH TO MAKE,

9    AFTER WHICH I WILL PROVIDE DETAILS AND INSTRUCTIONS ON HOW WE

10   WILL PROCEED.

11        **MS. POURCIAU:** YES, YOUR HONOR.

12        **MR. BENJAMIN:** THANK YOU, YOUR HONOR.

13            MAY I APPROACH?

14        **THE COURT:** YES.

15        **MR. BENJAMIN:** YOUR HONOR, I'M JUST PASSING OUT SOME

16   POWERPOINT SLIDES.  WE'VE PROVIDED THESE TO DEFENSE COUNSEL AS

17   WELL.

18        **THE COURT:** ALL RIGHT.  WE DON'T HAVE A WHOLE LOT OF

19   TIME.  LET'S GO ON AND ACTIVATE THE MONITORS.

20        **MR. BLANCHFIELD:** YOUR HONOR, WE'VE JUST BEEN

21   PROVIDED A COPY OF THIS POWERPOINT.  WE HAVEN'T HAD TIME TO

22   LOOK AT IT, BUT I DO NOTE THAT THERE IS AN EXHIBIT ON THE

23   POWERPOINT THAT YOU SPECIFICALLY HAVE EXCLUDED.

24        **THE COURT:** OKAY.  ALL RIGHT.  WELL -- AND THANK YOU

25   FOR POINTING THAT OUT, MR. BLANCHFIELD, BUT I WILL -- THE COURT

1   WILL TREAT THIS MERELY AS A DEMONSTRATIVE AID.  IT WILL NOT BE

2   ENTERED INTO EVIDENCE.  AND YOU'RE RIGHT, BECAUSE OTHERWISE MY

3   RULE, AS MR. BLANCHFIELD WELL KNOWS, IS THAT COUNSEL EXCHANGE

4   DEMONSTRATIVE AIDS THAT ARE USED -- FOR USE IN OPENING

5   STATEMENTS.  I DO NOT TYPICALLY ALLOW DEMONSTRATIVE AIDS IN

6   CLOSING ARGUMENTS, BUT YOU CAN POINT TO THE EVIDENCE.  THIS IS

7   NOT A TRIAL, SO I WILL RELAX THAT RULE FOR THIS -- THIS STAGE

8   OF THE HEARING.  BUT JUST TO BE CLEAR, THIS WILL BE MARKED AS

9   MERELY A DEMONSTRATIVE AID.

10          **MR. BENJAMIN:**  UNDERSTOOD.

11              THANK YOU, YOUR HONOR.

12          **THE COURT:**  ALL RIGHT.  LET'S PROCEED.

13          **MR. BENJAMIN:**  FANTASTIC.

14              YOUR HONOR, PLAINTIFFS HAVE PRESENTED TWO

15  CLASSES:  A GENERAL CLASS CONSISTING OF ALL PEOPLE INCARCERATED

16  AT LSP WHO CURRENTLY ARE OR MAY IN THE FUTURE BE ASSIGNED TO

17  THE FARM LINE, AND AN ADA SUBCLASS OF ALL PERSONS INCARCERATED

18  AT LSP WHO CURRENTLY ARE OR MAY IN THE FUTURE BE ASSIGNED TO

19  THE FARM LINE AND WHO HAVE DISABILITIES THAT MAY CAUSE, OR THAT

20  ARE TREATED WITH MEDICATIONS THAT MAY CAUSE, IMPAIRED

21  THERMOREGULATION.

22              NOW, THE EVIDENCE HAS SHOWN THAT EACH OF THE

23  REQUIREMENTS FOR RULE 23(A) AND 23(B)(2) ARE SATISFIED WITH

24  RESPECT TO EACH OF THESE CLASSES.

25              NOW, JUST TO GO THROUGH THEM VERY QUICKLY.

1    NUMEROSITY.  AS YOUR HONOR KNOWS, NUMEROSITY IS
2    PRESUMED WHERE THERE ARE 40 OR MORE PEOPLE IN A CLASS THAT IS
3    CONSTANTLY INFLUX COUNSELS IN FAVOR OF NUMEROSITY.

4    WITH RESPECT TO THE GENERAL CLASS, WE HAVE
5    DONE -- WE HAVE PROVEN THAT WITH UNDISPUTED EVIDENCE ALMOST ALL
6    NEW ARRIVALS AT ANGOLA HAVE AS THEIR FIRST ASSIGNMENT THE FARM
7    LINE.  THE CLASS IS CONSTANTLY INFLUX AND IT IS LARGE.
8    OFFICER SCOTT TESTIFIED THAT HE WAS RESPONSIBLE FOR UP TO 40
9    PEOPLE ON A GIVEN DAY IN HIS ROLE AS A PUSHER.  ASSISTANT
10   WARDEN TODAY -- ASSISTANT WARDEN SYLVESTER TODAY TESTIFIED THAT
11   APPROXIMATELY 20 TO 30 PEOPLE A DAY WERE WORKING ON THE FARM
12   LINE LAST SUMMER.  AND THE FARM LINE DAILY LINE COUNTS AND
13   ROSTERS THAT ARE IN EVIDENCE DEMONSTRATE THAT NUMEROSITY IS
14   SATISFIED.

15   WITH RESPECT TO THE ADA SUBCLASS, IT'S EVEN
16   CLEARER.  DEPUTY WARDEN ASHLI OLIVEAUX SAID THAT APPROXIMATELY
17   1,500 PEOPLE HAVE BEEN RECOGNIZED AS HEAT SENSITIVE BASED ON
18   THEIR TAKING MEDICATIONS ON HCP 8, ATTACHMENT A, AND THAT AN
19   ADDITIONAL THREE TO FOUR HUNDRED HEAT-SENSITIVE PEOPLE HAVE
20   BEEN IDENTIFIED BECAUSE OF THEIR DIAGNOSES WHICH ARE LISTED ON
21   HCP 8, ATTACHMENT B.  AND DOC'S POLICY IS THAT ALL OF THOSE
22   INDIVIDUALS WILL BE GRANTED HEAT PRECAUTION DUTY STATUS.

23   DR. SUSI VASSALLO HAS SAID THAT THERE ARE
24   ADDITIONAL HEAT-SENSITIVE PEOPLE BASED ON MEDICATIONS OR
25   CONDITIONS THAT THEY HAVE.

1        COMMONALITY.  CLASS MEMBERS MUST RAISE AT LEAST

2   ONE CONTENTION THAT IS CENTRAL TO THE VALIDITY OF EACH CLASS

3   MEMBER'S CLAIMS.  AND EVEN IN AN INSTANCE OF INJURIOUS CONDUCT,

4   WHICH WOULD USUALLY RELATE MORE DIRECTLY TO THE DEFENDANTS'

5   LIABILITY THAN TO THE CLAIMANTS' DAMAGES, MAY CONSTITUTE THE

6   SAME INJURY AND SATISFY COMMONALITY.  PLENTIFUL EVIDENCE ON

7   THIS.

8        DR. SBICCA, IN UN-REBUTTED TESTIMONY, SAID THAT

9   THE FARM LINE IS ANOMALOUS AND SITS OUTSIDE OF CONTEMPORARY

10  PRISON AND SOCIAL NORMS.  UN-REBUTTED TESTIMONY THAT THE FARM

11  LINE RESEMBLES ONCE COMMON, NOW OUTLAWED, FORMS OF PUNISHMENT

12  THAT WERE ABANDONED BECAUSE OF THEIR CLOSE ASSOCIATION WITH

13  CHATTEL SLAVERY.  THERE WAS TESTIMONY FROM DR. SBICCA, DR.

14  HAMMONDS, MR. JACKSON, MR. JONES, MAJOR PIDGEON, AND MAJOR

15  SERGEANT SCOTT THAT THE FARM LINE SIMULATES THE CONDITIONS OF

16  CHATTEL SLAVERY; THAT DEFENDANTS ARE AWARE OF THE RESEMBLANCE;

17  THAT MEN EXPERIENCE THE FARM LINE AS AN ASSAULT ON THEIR

18  FUNDAMENTAL HUMAN DIGNITY; AND THAT THEY ARE AT RISK OF

19  PSYCHOLOGICAL HARM; AND THAT THE CULTURAL ASSOCIATIONS WITH

20  CHATTEL SLAVERY ADDS DEGRADATION BEYOND HARD LABOR.

21        THERE WAS ALSO EVIDENCE, UN-REBUTTED, ON THE

22  HEAT CLAIMS.  DR. SUSI VASSALLO AND DR. LAVESPERE INDICATED

23  THAT THERE ARE -- THAT DEFENDANTS' POLICIES ARE ARBITRARY, THEY

24  ARE INADEQUATE, THEY ARE UNSUPPORTED, INCLUDING BY THE AGENCY

25  GUIDELINES THAT THE DOC CLAIMED TO HAVE RELIED UPON, SUCH AS

1    THE NATIONAL WEATHER SERVICE AND OSHA GUIDELINES.

2                    THE FACT WITNESSES CONFIRMED THIS:  EVERYONE ON

3    THE FARM LINE PERFORMS THE SAME WORK UNDER THE SAME CONDITIONS.

4    THEY'RE OVERSEEN BY A PUSHER.  THEY'RE SURVEILLED BY A GUN

5    GUARD.  THEY'RE SUBJECT TO THE SAME RULES AND THE SAME

6    REQUIREMENTS.  THEY'RE SUBJECT TO THE SAME DISCIPLINARY ACTIONS

7    IF THEY REFUSE OR FAIL TO WORK FAST ENOUGH.  THEY'RE EXPOSED TO

8    THE SAME DANGEROUS HEAT AND OTHER CONDITIONS AND WORKING IN THE

9    SAME FIELDS PERFORMING THE SAME TASKS UNDER THE SAME DANGEROUS

10   CONDITIONS.

11                   SO SOME OF THE COMMON QUESTIONS FROM THE GENERAL

12   CLASS -- AND WE ONLY NEEDED ONE, BUT HERE ARE FOUR.  AND

13   THERE'S PLENTY MORE.  DOES THE FARM LINE COMPORT WITH

14   CONTEMPORARY STANDARDS OF DECENCY?  DOES THE FARM LINE DEPRIVE

15   MEN OF THEIR BASIC HUMAN DIGNITY?  DO CONDITIONS ON THE FARM

16   LINE ADD PUNISHMENT BEYOND A SENTENCE OF HARD LABOR?  ARE

17   DEFENDANTS' REVISED HEAT POLICIES AND PRACTICES SUFFICIENT TO

18   MITIGATE THE HEAT-RELATED RISKS?  THESE ARE ALL COMMON

19   QUESTIONS CAPABLE OF COMMON ANSWERS THAT WILL AFFECT THE ENTIRE

20   GENERAL CLASS.

21                   FOR THE SUBCLASS, ALSO PLENTIFUL COMMON

22   QUESTIONS.  DOC AND LSP POLICIES IDENTIFY THAT ALL PEOPLE

23   TAKING MEDICATIONS LISTED ON ATTACHMENT A OR DIAGNOSED WITH

24   CONDITIONS LISTED ON ATTACHMENT B TO HCP 8 ARE HEAT SENSITIVE

25   AND WILL GET HEAT PRECAUTION DUTY STATUS.  AND AS I MENTIONED,

1    THE EVIDENCE SHOWS THAT THERE ARE OTHER HEAT-SENSITIVE

2    INDIVIDUALS AS WELL.  THAT'S THE SUBCLASS.  SO SOME OF THE

3    QUESTIONS THAT ARE COMMON TO THAT ENTIRE CLASS:  ARE

4    HEAT-SENSITIVE PEOPLE ADEQUATELY PROTECTED BY A 91-DEGREE HEAT

5    ALERT THRESHOLD?  ARE HEAT-SENSITIVE PEOPLE ADEQUATELY

6    PROTECTED OUTSIDE OF THE MAY 1 THROUGH OCTOBER 31 HEAT SEASON?

7    ARE HEAT PRECAUTION DUTY STATUS AND A PROHIBITION ON

8    ASSIGNMENTS TO THE FARM LINE ON DAYS WHERE THE HEAT INDEX IS

9    PROJECTED TO EXCEED THE HEAT ALERT THRESHOLD A REASONABLE

10   ACCOMMODATION?  THOSE ARE ALL COMMON QUESTIONS TO THE ADA

11   SUBCLASS.  WE SHOWED PLENTIFUL UNIFORM POLICIES AND PRACTICES

12   THAT ARE APPLICABLE TO THE GENERAL AND THE SUBCLASS.

13                TYPICALITY AND ADEQUACY.  YOU HEARD FROM MR.

14   JACKSON, A NAMED PLAINTIFF IN THIS ACTION, AND MR. JONES, A

15   CLASS REPRESENTATIVE -- I'M SORRY -- A PUTATIVE CLASS MEMBER.

16   THERE IS NO DAYLIGHT BETWEEN THEIR CLAIMS.  MR. JACKSON IS

17   REPRESENTING THE INTERESTS OF THE CLASS ENTIRELY.  HIS CLAIMS

18   ARE TYPICAL OF THOSE OF THE CLASS THAT HE'S LOOKING TO

19   REPRESENT.  MR. JACKSON HAS ALSO SHOWN HIMSELF TO BE AN

20   ADEQUATE PLAINTIFF.  IN FACT, FAR MORE THAN ADEQUATE.  HE HAS

21   SAT HERE FOR TWO DAYS OBSERVING THESE PROCEEDINGS, GOING

22   THROUGH THE TROUBLE OF -- AND IT IS A DIFFICULT JOURNEY HERE

23   FROM ANGOLA.  HE HAS CHOSEN TO COME BEYOND THE TIME THAT HE WAS

24   REQUIRED IN ORDER TO TESTIFY SO THAT HE CAN SIT, REMAIN ENGAGED

25   AT COUNSELS' TABLE.  EVERYTHING ABOUT -- HE HAS BEEN ENGAGED IN

1    THIS CASE ALL ALONG.  HE HAS BEEN DEPOSED.  HE HAS PUT IN

2    DECLARATIONS, AND HE REMAINS ENGAGED TODAY.  I HOPE THAT YOU

3    SEE THAT MY CO-COUNSEL ARE WORKING DILIGENTLY, SKILLFULLY, AND

4    PROFESSIONALLY TO PURSUE THESE CLAIMS THAT ARE ADEQUATE AS

5    CLASS COUNSEL.

6                AND IN TERMS OF RULE 23(B)(2), WE SATISFY THAT

7    AS WELL.  23(B)(2) REQUIRES THAT THE PARTY OPPOSING THE CLASS

8    HAS ACTED OR REFUSED TO ACT ON GROUNDS THAT APPLY GENERALLY TO

9    THE CLASS SO THAT THE FINAL INJUNCTIVE RELIEF OR CORRESPONDING

10   DECLARATORY RELIEF IS APPROPRIATE, RESPECTING THE CLASS AS A

11   WHOLE.

12               AGAIN, ALL -- BOTH WITH RESPECT TO THE GENERAL

13   CLASS AND THE ADA SUBCLASS, THEY ARE SUBJECT TO THE SAME

14   POLICIES.  THEY'RE EXPOSED TO THE SAME CONDITIONS AND THE SAME

15   INJURIOUS CONDUCT, AND THEY ARE SEEKING THE SAME RELIEF;

16   NAMELY, ENDING THE FARM LINE AS A PRACTICE OF DEGRADING,

17   DANGEROUS, COMPELLED LABOR.

18               **THE COURT:**  THANK YOU, MR. BENJAMIN.

19               ALL RIGHT.  MR. BLANCHFIELD.

20          **MR. BLANCHFIELD:**  THANK YOU, YOUR HONOR.

21               THIS IS A CLASS CERTIFICATION HEARING, JUDGE.

22   IT'S A PROCEDURAL ANALYSIS THAT THIS COURT HAS TO PERFORM.

23   I'VE NEVER REALLY SEEN -- I MEAN, THIS WAS A MERITS -- THIS WAS

24   LIKE A LITTLE MINI-MERITS CLAIM.  WE GOT -- WE SPENT MORE TIME

25   ON THE MERITS AS OPPOSED TO CLASS CERTIFICATION ISSUES.  YOU

1    KNOW, THOSE ISSUES -- NUMEROSITY, COMMONALITY, TYPICALITY AND

2    ADEQUACY -- ARE THERE FOR THE COURT TO DETERMINE.  WE HAVE

3    BRIEFED THEM EXTENSIVELY ON THESE ISSUES.

4                    I WOULD EMPHASIZE THE COMMONALITY ISSUE.  YOU

5    HEARD FROM DR. VASSALLO.  EVEN THEIR OWN WITNESS DISCUSSED THE

6    INDIVIDUAL DIFFERENCES AMONG THE CLASS MEMBERS:  DIFFERENCES IN

7    AGE, GENETIC DISPOSITION, PRE-EXISTING MEDICAL HISTORY, MENTAL

8    ILLNESSES, ON-GOING MEDICAL TREATMENTS, HOW EACH INDIVIDUAL

9    REACTS TO AN EXPOSURE TO OR HAS A SENSITIVITY TO HEAT.  WE

10   DON'T BELIEVE THEY MEET THE COMMONALITY PORTION OF RULE 23.

11            **THE COURT:**  SO HOW DO YOU SQUARE THAT WITH -- LET'S

12   TAKE A MORE RECENT CASE WHERE THE DISTRICT COURT AND THE FIFTH

13   CIRCUIT HAVE AGREED THAT THERE WAS COMMONALITY.  LET'S SAY THE

14   *DEEPWATER HORIZON*.  SOME CLAIMANTS HAD RESPIRATORY ILLNESSES,

15   SOME HAD DERMATOLOGICAL ILLNESSES, SOME SUFFERED PROPERTY

16   DAMAGES.  THERE WAS A VARIETY OF DAMAGES AND INJURIES ASSERTED

17   IN THAT CASE, AND YET -- SO YOU CAN IN YOUR POST-HEARING BRIEFS

18   ADDRESS THAT.

19                    BUT YOU DO AGREE THAT WE HAVE, AS MR. BENJAMIN

20   HAS POINTED OUT, INDIVIDUALS, GRANTED, OF VARIOUS AGES, WHO

21   WORKED IN THE SAME CONDITIONS, SAME LOCATIONS, SAME PERIOD OF

22   TIME UNDER THE SAME TEMPERATURES AND WHO SUFFERED VARIOUS TYPES

23   OF ILLNESSES?  IS THAT IN DISPUTE?

24            **MR. BLANCHFIELD:**  THAT'S NOT IN DISPUTE, YOUR HONOR.

25   BUT THE COMMONALITY, BECAUSE OF ALL THESE DIFFERENCES, I THINK

1    IS LACKING IN THIS CASE.

2            **THE COURT:**  SO, THEN, LET ME ASK YOU, MR.

3    BLANCHFIELD, SO I CAN FULLY UNDERSTAND YOUR ARGUMENT TO ME.

4    SHOULD WE HAVE A SUBCLASS OR A CLASS OF PERSONS WHO ARE BETWEEN

5    30 AND 35 WHO ARE NOT OBESE BUT WHO SUFFER FROM HIGH BLOOD

6    PRESSURE, AND THEN ANOTHER CLASS OF PERSONS 35 TO 40 WHO ARE

7    OBESE?  IN OTHER WORDS, HOW WOULD -- DO YOU -- PUT ANOTHER WAY,

8    DO YOU BELIEVE THAT A CLASS CAN EVEN BE DEFINED UNDER THESE

9    CONDITIONS?

10           **MR. BLANCHFIELD:**  THERE ARE FAR TOO MANY VARIABLES TO

11   CREATE ENOUGH CLASSES AND SUBCLASSES.

12           **THE COURT:**  SUCH AS?

13           **MR. BLANCHFIELD:**  YOU KNOW, DO YOU HAVE A HEAT

14   SENSITIVITY; YOUR HEALTH; YOUR GENETIC PREDISPOSITION; ARE YOU

15   ATHLETIC; ARE YOU OBESE.

16           **THE COURT:**  I DON'T RECALL SEEING OR HEARING ANY

17   MEDICAL EVIDENCE OR TESTIMONY THAT ATHLETICISM IS A FACTOR.  I

18   MEAN, I --

19           **MR. BLANCHFIELD:**  WELL, THEY --

20           **THE COURT:**  I'VE WATCHED FOOTBALL ON TV AND

21   BASKETBALL, AND SOMETIMES HEAT CERTAINLY IS A -- ESPECIALLY

22   WITH FOOTBALL WHERE THERE'S A COMMON ISSUE; TRACK EVENTS.

23           **MR. BLANCHFIELD:**  THERE'S TESTIMONY ABOUT

24   ACCLIMATIZATION, YOU KNOW, AND ATHLETES ARE ACCLIMATIZED TO THE

25   HEAT.  THEY HANDLE IT BETTER.  THEY HAVE LESS NEGATIVE

1    OUTCOMES.

2          **THE COURT:**  SO LET ME UNDERSTAND, MISTER -- YOU'RE

3    TALKING ABOUT PROFESSIONAL ATHLETES WHO TRAIN ALMOST, IF NOT 12

4    MONTHS OUT OF A YEAR, TEN HOURS A DAY, IN HEAT CONDITIONS, NOT

5    HEAT CONDITIONS -- YOU'RE COMPARING THEM -- AND YOU BELIEVE

6    THAT INMATES WHO ARE NOT PROFESSIONAL ATHLETES WHO DON'T HAVE

7    THE TYPE OF TRAINING REGIMEN AS PROFESSIONALS, BUT THEY SHOULD

8    BE TREATED AS IF THEY HAVE THOSE -- THEY HAVE THOSE FACILITIES

9    AVAILABLE TO THEM AND THAT TRAINING AVAILABLE TO THEM?

10          **MR. BLANCHFIELD:**  I'M NOT COMPARING THEM TO

11    PROFESSIONAL ATHLETES.  BUT, YOU KNOW, I'VE DEPOSED THESE --

12    THE EIGHT PLAINTIFFS AND SOME OF THEM ARE REMARKABLY ATHLETIC.

13    THEY'RE WORKING --

14          **THE COURT:**  WAIT A MINUTE.  BUT THERE'S BEEN NO

15    EVIDENCE INTRODUCED IN THIS HEARING ABOUT THAT, SIR.  I HAVE TO

16    MAKE A DECISION BASED UPON THE RECORD OF EVIDENCE THAT HAS BEEN

17    OFFERED BY THE TESTIMONY AND THE DOCUMENTS IN -- FOR THIS

18    MOTION.  I HAVE SEEN NOTHING IN THE WAY OF DEPOSITION TESTIMONY

19    FROM INMATES WHO MAY BE MORE INVOLVED IN ATHLETIC EVENTS AT THE

20    PRISON OR WHO MAY IN -- BEFORE THEIR INCARCERATION WERE

21    ATHLETIC AND WHO WERE INVOLVED IN ATHLETIC EVENTS BEFORE THEIR

22    INCARCERATION.  SO I CAN'T FACTOR THAT IN.  I CAN'T ASSUME THAT

23    THAT SHOULD BE A FACTOR THAT THE COURT CAN CONSIDER HERE.

24          **MR. BLANCHFIELD:**  DR. VASSALLO EXPLAINED THE

25    DIFFERENCES, YOUR HONOR, AND THAT'S OUR ARGUMENT.  SHE

1  EXPLAINED THE DIFFERENCES IN AGE, GENETIC DISPOSITION,

2  CONDITION OF THE INDIVIDUAL, MEDICAL HISTORY, MENTAL ILLNESS,

3  ONGOING MEDICAL TREATMENTS.

4        **THE COURT:**  SO LET ME JUST ASK YOU:  IS IT YOUR

5  ARGUMENT THAT THERE -- UNDER NO CIRCUMSTANCES CAN THERE EVEN BE

6  A CLASS, GIVEN ALL OF THE FACTORS THAT YOU'VE JUST CITED?

7        **MR. BLANCHFIELD:**  YEAH.  I BELIEVE IF YOU DO A

8  RIGOROUS ANALYSIS WITH RESPECT ESPECIALLY TO THE ISSUE OF

9  COMMONALITY, YES, THAT'S OUR POSITION.

10        **THE COURT:**  ALL RIGHT.

11        **MR. BLANCHFIELD:**  AND, YOUR HONOR, MOVING ON TO THE,

12  YOU KNOW, ADA SUBCLASS, WE'VE TAKEN THE POSITION FROM THE

13  BEGINNING THAT IT'S BARRED BY *LEWIS*.  I'M SURE THE COURT KNOWS

14  THAT THE PETITION FOR REHEARING EN BANC IN *LEWIS* WAS GRANTED

15  THIS WEEK.  IT'S GOING TO BE HEARD EN BANC.  YOU KNOW, IT COULD

16  POTENTIALLY IMPACT THE ADA SUBCLASS, WHICH IS THE SAME

17  DEFINITION OF THE ADA SUBCLASS THAT WE HAVE HERE.  YOU KNOW, WE

18  CAN SEE HOW THAT ALL PANS OUT.

19        BUT, YOU KNOW, THERE WAS SO MUCH MERIT

20  TESTIMONY; AND, ARGUABLY, YOU KNOW, UNDER 23(B)(2), YOU KNOW,

21  THE COURT IS INSTRUCTED TO TAKE A LOOK BACK INTO SOME OF THE

22  MERITS.  AND, YOU KNOW, WE DID HEAR A LOT ABOUT THAT.  WE HEARD

23  FROM THEIR OWN WITNESS, PATRICK JONES, WHO DESCRIBED THE

24  CHANGES OUT THERE AS DRAMATIC.  HE EXPLAINED ALL OF THAT.

25        AND, YOUR HONOR, YOU KNOW, I KNOW THIS MIDDLE

1    DISTRICT IS OVERWHELMED.  WE WOULD ASK THAT YOU COME OUT AND

2    SET ASIDE A DATE TO DO THAT, TO TAKE A LOOK AT WHAT IS THERE SO

3    YOU CAN SEE FIRSTHAND, BECAUSE I THINK IT'S IMPORTANT.  THEY

4    LOVE TO CALL MASTER SERGEANT ORLANDO SCOTT A PUSHER, YOU KNOW,

5    FROM THE OLD DAYS.  THAT'S AN OLD, ANTIQUATED TERM.  BUT

6    THERE'S NO PUSHING GOING ON OUT THERE.  YOU KNOW, COME OUT AND

7    SEE IT, YOU KNOW.

8              AND FINALLY, YOU KNOW, THIS DOC AS AN AGENCY DID

9    MORE THAN I'VE EVER SEEN AN AGENCY DO, AND THEY HIRED EXPERTS.

10   AND YOU HEARD FROM DELECA BARNES, ALL THE THINGS THAT SHE DID.

11   AND YOU SAW THE MEDICATION LIST AND YOU COMMENDED THAT.  AND

12   YOU SAW THE MEDICAL CONDITION LIST THAT EXPLODED EXPONENTIALLY

13   AND YOU COMMENDED THAT.  AND WE FOLLOWED THOSE EXPERTS.  AND

14   WHEN I TOLD YOU THAT WE FOLLOWED THE EXPERTS ON THE 91 DEGREE,

15   YOU CALLED IT ARBITRARY.  AND I DON'T -- IN ALL FAIRNESS, I

16   DON'T THINK THAT'S FAIR.  YOU KNOW, WE DID WHAT -- WE FOLLOWED

17   OUR EXPERTS, NOT JUST IN SOME INSTANCES BUT IN ALL INSTANCES.

18             AND AT THE END OF THE DAY, THIS IS AN EIGHTH

19   AMENDMENT CLAIM FOR CRUEL AND UNUSUAL PUNISHMENT.  THESE FOLKS

20   ARE SENTENCED TO HARD LABOR.  WE DON'T BELIEVE THERE'S A

21   SUBSTANTIAL RISK OF SERIOUS HARM.  AND ABOVE ALL, AFTER ALL

22   THAT YOU'VE HEARD TODAY AND SEEN TODAY AND HOPEFULLY WILL

23   WITNESS FIRSTHAND IF YOU CAN GET OUT THERE, WE'RE NOT

24   INDIFFERENT.

25             **THE COURT:**  THANK YOU, MR. BLANCHFIELD.

1           AND JUST TO BE CLEAR, I AGREE, I DON'T -- AS I
2   MENTIONED PREVIOUSLY, I THINK THE LSP OR THE DOC OFFICIALS HAVE
3   CERTAINLY REACTED TO THE ALLEGATIONS IN THE LAWSUIT, AND THAT'S
4   TO THEIR CREDIT.  I USED THE WORD "ARBITRARY" IN THE TRO
5   HEARING.  WHETHER IT IS, IN FACT, ARBITRARY IS YET TO BE SEEN.
6   YOU'VE PRESENTED EVIDENCE TO SUGGEST THAT IT WASN'T MERELY
7   ARBITRARY; IT WAS BASED UPON SOME RESOURCES AND AUTHORITY, THE
8   OPINIONS OF YOUR EXPERT.  I'LL MAKE THAT DETERMINATION IN DUE
9   COURSE.  WHETHER THIS IS THE STAGE TO MAKE THAT DETERMINATION
10  OR TO DEFER UNTIL, AS YOU HAVE SUGGESTED, WE REACH THE MERITS
11  OF THE CASE, WE'LL SEE ABOUT THAT.
12          BUT, AGAIN, I OFFERED THAT AS MERELY A
13  CLARIFICATION, BECAUSE ULTIMATELY IT WILL BE AN ISSUE BECAUSE I
14  HAVE TO RELY ON AT SOME POINT THE CONCLUSIONS REACHED BY
15  EXPERTS THAT I'VE DETERMINED TO BE CREDIBLE, AT LEAST IN THE
16  FIELD OF THE EXPERTISE THAT HAVE FORMED THE ISSUES IN THIS
17  CASE.
18          WITH RESPECT TO YOUR REQUEST THAT I VISIT THE
19  FARM LINE, THAT'S A VALID REQUEST.  IT IS SOMETHING THAT I WILL
20  DO.  I'M COMMITTED TO VISITING, AS I'VE DONE BEFORE, I'VE
21  VISITED THE FACILITY.  I THINK THAT IS IMPORTANT FOR ME TO MAKE
22  MY OWN OBSERVATIONS AND TO LEARN MORE ABOUT WHAT THE DOC HAS
23  DONE IN RECENT YEARS AND IN PARTICULAR IN RESPONSE -- IF
24  ANYTHING, IN RESPONSE TO THE FILING OF THIS LAWSUIT.  I THINK
25  IT'S CLEAR THAT THE DOC -- AGAIN, TO ITS CREDIT -- HAS DONE

1  SOMETHING.  SO YES, I AM EAGER TO LEARN MORE ABOUT THAT.  OKAY.

2  **MR. BLANCHFIELD:**  AND FINALLY, YOUR HONOR, I'VE BEEN

3  COMING BEFORE THIS MIDDLE DISTRICT FOR 40 YEARS, AND I'VE

4  ALWAYS MANAGED TO FOLLOW THE STAND-UP RULE, WHICH I DON'T KNOW

5  WHAT HAPPENED YESTERDAY AND I MEANT IT AS NO DISRESPECT TO THIS

6  COURT, BUT I APOLOGIZE, JUDGE.

7  **THE COURT:**  NO.  THANK YOU FOR THAT, MR. BLANCHFIELD.

8  AND I UNDERSTAND THAT.  AND I'VE KNOWN YOU FOR A LONG TIME.

9  YOU'VE PRACTICED BEFORE ME.  I DID BELIEVE IT TO BE A LITTLE

10  UNUSUAL AND OUT OF CHARACTER FOR YOU, BY THE WAY.  SO -- BUT I

11  APPRECIATE YOU MENTIONING THAT.  OKAY.

12  **MR. BLANCHFIELD:**  THANK YOU, JUDGE.

13  **THE COURT:**  AGAIN, YOU'VE ALWAYS COMPORTED YOURSELF

14  TO THE HIGHEST STANDARD OF PROFESSIONALISM IN MY COURT, AND I

15  APPRECIATE YOU DOING THAT.

16  **MR. BLANCHFIELD:**  THANK YOU, JUDGE.

17  **THE COURT:**  ALL RIGHT.  SO LET'S TALK ABOUT WHERE WE

18  GO FROM HERE.

19  AS I MENTIONED, I WILL PROVIDE BOTH SIDES AN

20  OPPORTUNITY TO PROVIDE POST-TRIAL -- POST-HEARING BRIEFS.  WE

21  HAVE A NUMBER OF THINGS GOING ON IN THIS VERY, VERY BUSY

22  DISTRICT, AS MR. BLANCHFIELD HAS ALLUDED TO.  THE TRANSCRIPT IN

23  THIS MATTER WILL BE MADE AVAILABLE TO YOU IN APPROXIMATELY TWO

24  WEEKS.  LET'S SAY AT THE VERY LATEST ON MAY 12TH.

25  THE COURT IS CERTAINLY COGNIZANT OF THE

1    COMPELLING ISSUES IN THIS CASE, AND I'M COMMITTED TO MAKING A
2    DECISION ABOUT THESE MATTERS AS QUICKLY AS POSSIBLE BUT IN A
3    WAY, OF COURSE, THAT'S FAIR TO EVERYONE.  SO I WILL SET A
4    DEADLINE FOR THE SUBMISSION OF THE POST-HEARING BRIEFS FOR
5    JUNE 2ND, 2025.
6              I WOULD ASK COUNSEL TO SPECIFICALLY ADDRESS --
7    THERE'S NOTHING COMPLICATED HERE -- YOU KNOW, THE FOUR
8    PREREQUISITES TO A CLASS CERTIFICATION.  BUT I WILL ALSO ASK
9    YOU TO TREAT THIS ESSENTIALLY AS YOU WOULD TREAT A MOTION FOR
10   SUMMARY JUDGMENT.  IN OTHER WORDS, IN YOUR ARGUMENTS, BE SURE
11   YOU CITE TO THE RECORD EVIDENCE IN THE CASE, TO THE EXHIBITS,
12   TO THE TESTIMONY.  AGAIN, YOU WILL ALL HAVE THE BENEFIT OF THE
13   TRANSCRIPT OF THE PROCEEDING AS WELL AS THE DOCKETS.  YOU CAN
14   FREELY REVIEW THE DOCKET TO DETERMINE WHAT IS AND WHAT IS NOT
15   IN EVIDENCE, BUT I WOULD SPECIFICALLY URGE YOU TO CITE TO THE
16   RECORD EVIDENCE IN THE CASE.  THAT WILL ALLOW ME TO MAKE A
17   DECISION IN AN EXPEDITED MANNER.
18             ALL RIGHT.  AND, OF COURSE, THAT WOULD
19   PERTAIN -- AND I'M DIRECTING THESE COMMENTS TO THE PLAINTIFFS,
20   COUNSEL FOR THE PLAINTIFFS.  MY INSTRUCTIONS TO YOU PERTAIN TO
21   BOTH THE GENERAL CLASS AND THE SUBCLASSES, OF COURSE.
22             ALL RIGHT.  ANY QUESTIONS ABOUT HOW WE WILL
23   PROCEED?
24             ANY QUESTIONS FROM THE PLAINTIFF?
25        **MS. POURCIAU:**  JUST A COUPLE, YOUR HONOR.  AS THE

1    COURT IS AWARE, DISCOVERY HAS CLOSED IN THIS CASE IN SEPTEMBER

2    OF 2024, AND THERE WAS LIMITED DISCOVERY ALLOWED FOR THE NEW

3    PROMULGATED HEAT PATHOLOGY POLICY FOR DOC IN FEBRUARY OF 2025.

4    BUT WE CURRENTLY HAVE NO DISCOVERY DEADLINES, SO PLAINTIFFS

5    WOULD REQUEST A SCHEDULING ORDER AS SOON AS PRACTICAL ONCE THE

6    COURT RULES ON THE CLASS CERTIFICATION MOTION.

7         **THE COURT:**  ALL RIGHT.  WHAT'S THE DEFENSE'S RESPONSE

8    TO THE REQUEST?  IT SEEMS LIKE A REASONABLE REQUEST TO ME.

9    WE'RE TALKING ABOUT A NEW POLICY.  RIGHT?

10        **MR. BLANCHFIELD:**  YEAH.  WELL, WE ALREADY DID ALL THE

11   DISCOVERY ON THE NEW POLICY.  I DON'T KNOW WHAT OTHER DISCOVERY

12   COULD POSSIBLY BE NEEDED.

13        **THE COURT:**  MS. POURCIAU?

14        **MS. POURCIAU:**  WE DID DISCOVERY ON THE HEALTH CARE

15   POLICY 8 THAT DOC PROMULGATED.  THE LSP DIRECTIVE CAME OUT

16   APRIL 8TH, 2025.  THE DISCOVERY ON HCP 8 WAS CLOSED BY FEBRUARY

17   OF 2025, SO WE HAVE NOT HAD AN OPPORTUNITY TO CONDUCT DISCOVERY

18   INTO THE LSP DIRECTIVE COROLLARY.  PLAINTIFFS DON'T NECESSARILY

19   ASK FOR DISCOVERY RIGHT NOW ON THAT, BUT WE WANT TO NOTE THAT

20   WE AREN'T PERMITTED TO DO DISCOVERY RIGHT NOW.

21        **THE COURT:**  WELL, IF YOU BELIEVE THAT YOU SHOULD

22   PROPOUND ADDITIONAL DISCOVERY ON THE POLICY THAT WAS -- CAME

23   INTO EFFECT EARLIER THIS MONTH -- THAT'S WHAT WE'RE TALKING

24   ABOUT.  CORRECT?

25        **MS. POURCIAU:**  WE WOULD JUST LIKE TO HAVE DISCOVERY

1    ON CURRENT CONDITIONS.  AND IF THE COURT -- DEPENDING ON THE
2    OUTCOME OF THE CLASS CERTIFICATION MOTION, WE WOULD LIKE TO
3    HAVE A CLASS DISCOVERY PERIOD ON THE SCHEDULING ORDER, BUT WE
4    ALSO DON'T WANT TO WAIT TOO LONG TO UNDERSTAND THE CURRENT
5    CONDITIONS THIS SUMMER.  SO PERHAPS WE WOULD WANT TO DO
6    DISCOVERY IN --
7              **THE COURT:**  WHY DON'T YOU DO THIS.  WHY DON'T YOU
8    FILE YOUR FORMAL MOTION AND MR. BLANCHFIELD WILL HAVE AN
9    OPPORTUNITY TO REPLY TO IT.  OKAY?
10             **MS. POURCIAU:**  YES, YOUR HONOR.
11             **THE COURT:**  I THINK THAT'S THE FAIR WAY TO APPROACH
12   THAT.
13             **MS. POURCIAU:**  AND ONE --
14             **THE COURT:**  ANYTHING ELSE FROM THE PLAINTIFFS?
15             **MS. POURCIAU:**  FOR THE COURT'S SITE INSPECTION,
16   PLAINTIFFS REQUEST THAT IT WOULD BE AN UNANNOUNCED SITE
17   INSPECTION, AND ALSO REQUEST THAT PLAINTIFFS' COUNSEL CAN
18   ATTEND THAT SITE INSPECTION.
19             **THE COURT:**  ALL RIGHT.  MR. BLANCHFIELD, DO YOU HAVE
20   ANY RESPONSE TO THAT?
21             **MR. BLANCHFIELD:**  I'M SORRY.  UNANNOUNCED?
22             **MS. POURCIAU:**  CORRECT.
23             **MR. BLANCHFIELD:**  WELL, I DON'T HAVE ANY PROBLEM WITH
24   THAT, JUDGE.
25             **THE COURT:**  ALL RIGHT.

1          **MR. BLANCHFIELD:**  BUT IF YOU'RE GOING TO TELL THEM,

2    TELL ME, TOO.

3          **THE COURT:**  THAT ACTUALLY SEEMS PRETTY REASONABLE TO

4    ME.

5          WELL, LET ME JUST -- AGAIN, MS. POURCIAU, I

6    UNDERSTAND THAT PRESUMABLY YOUR REASON FOR AN UNANNOUNCED SITE

7    INSPECTION IS THAT SO PRECAUTIONS ARE NOT MADE PRIOR TO THE

8    COURT'S SCHEDULED VISIT?

9          **MS. POURCIAU:**  YES, YOUR HONOR.

10         **THE COURT:**  OKAY.  ALL RIGHT.  WELL, I CANNOT COMMIT

11   TO THAT, AND I CANNOT COMMIT TO THAT BECAUSE, AS YOU KNOW,

12   THERE ARE SOME PRETTY EXTRAORDINARY SECURITY MEASURES THAT HAVE

13   TO BE IMPLEMENTED WHEN A FEDERAL JUDGE ENTERS A CORRECTIONAL

14   FACILITY.  I'M GOING TO HAVE TO RELY ON MY U.S. MARSHAL, WHO IS

15   RESPONSIBLE -- AS I OFTEN REMIND MY GOOD FRIEND MARSHAL BROWN,

16   THE MOST IMPORTANT DUTY IS TO PROTECT FEDERAL JUDGES.  YES,

17   SERVING WARRANTS, APPREHENDING DANGEROUS FELONS IS IMPORTANT,

18   TOO, BUT AS FAR I'M CONCERNED, HE'S GOT TO PROTECT ME AND HE

19   DOES A FINE JOB DOING THAT -- HE AND HIS VERY CAPABLE STAFF.

20         SO I WILL NOTE YOUR REQUEST.  I CANNOT COMMIT TO

21   THAT.  I HAVE TO CONFER WITH THE SECURITY PROFESSIONALS BEFORE

22   WE PROCEED, BUT BE ASSURED, OF COURSE, THAT YOU-ALL WILL

23   RECEIVE ADEQUATE NOTICE.  AND WE'LL TRY TO DO IT IN A WAY THAT

24   MIGHT MINIMIZE ANY ATTEMPTS -- AND I DON'T THINK THAT DOC

25   WOULD, YOU KNOW, TRY TO ARRANGE SOMETHING, CONCOCT SOMETHING

```
 1   SOLELY FOR THE VISIT, BUT WE'LL TRY TO BE SENSITIVE TO YOUR
 2   IMPLIED CONCERNS.
 3            MS. POURCIAU:  THANK YOU, YOUR HONOR.
 4            THE COURT:  ALL RIGHT.  ANYTHING FURTHER?
 5            MS. POURCIAU:  NO, YOUR HONOR.
 6            THE COURT:  MR. BLANCHFIELD?
 7            MR. BLANCHFIELD:  NOTHING, YOUR HONOR.  THANK YOU.
 8            THE COURT:  ALL RIGHT.  WELL, LET ME -- LET ME THANK
 9   BOTH SIDES.  THIS WAS VERY, VERY HELPFUL, I MUST SAY.  THIS IS
10   WHY I SCHEDULED THE EVIDENTIARY HEARING AFTER THE ORAL
11   ARGUMENT, THE FIRST HEARING ON THE CLASS CERTIFICATION.  IT WAS
12   IMPORTANT THAT I HEAR FROM THE WITNESSES AND LEARN MORE ABOUT
13   THE RESOURCES AND OTHER INFORMATION THAT REALLY FORM THE BASIS
14   OF SOME OF THE POLICIES AT ISSUE HERE.  SO, AGAIN, THIS IS VERY
15   HELPFUL TO THE COURT.  I APPRECIATE BOTH SIDES BEING VERY WELL
16   PREPARED TO ADDRESS THESE ISSUES.
17            AGAIN, I WILL COMMIT MYSELF TO ENTERING AN ORDER
18   AS SOON AS THE BRIEFS ARE IN.  AND IN THE MEANTIME, WE WILL
19   BEGIN TO THINK ABOUT APPROPRIATE DATES FOR THE SITE VISIT.
20            ALL RIGHT.  THERE BEING NO FURTHER BUSINESS FOR
21   THE COURT, COURT IS NOW ADJOURNED.
22            THE LAW CLERK:  ALL RISE.
23            COURT IS NOW ADJOURNED.
24            (WHEREUPON, THIS MATTER WAS ADJOURNED.)
25                              * * *
```

1           **<u>CERTIFICATE</u>**

2           I, SHANNON THOMPSON, CCR, OFFICIAL COURT REPORTER FOR THE

3    UNITED STATES DISTRICT COURT, MIDDLE DISTRICT OF LOUISIANA,

4    CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT, TO

5    THE BEST OF MY ABILITY AND UNDERSTANDING, FROM THE RECORD OF

6    PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

7

8                          *Shannon Thompson*

9                          SHANNON THOMPSON, CCR

10                         OFFICIAL COURT REPORTER

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25