Janet are yoIN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **VOICE OF THE EXPERIENCED**, a membership organization on behalf of itself and its members; and **MYRON SMITH, DAMARIS JACKSON, NATE WALKER, DARRIUS WILLIAMS, KEVIAS HICKS, JOSEPH GUILLORY, KENDRICK STEVENSON,** and **ALVIN WILLIAMS,** on behalf of themselves and all others similarly situated, | |
| *Plaintiffs*, | Civil Action No. 3:23-cv-1304-BAJ-EWD |
| v. | |
| **JAMES LEBLANC**, in his official capacity as Secretary of the Louisiana Department of Public Safety and Corrections; **TIMOTHY HOOPER**, in his official capacity as Warden of Louisiana State Penitentiary; **MISTY STAGG**, in her official capacity as Director of Prison Enterprises, Inc.; the **LOUISIANA DEPARTMENT OF PUBLIC SAFETY & CORRECTIONS**; and **PRISON ENTERPRISES, INC.,** | |
| *Defendants*. | |

### PLAINTIFFS' POST-HEARING BRIEF IN SUPPORT OF MOTION FOR A SECOND TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

## <u>TABLE OF CONTENTS</u>

**Page**

BACKGROUND & FACTS................................................................................................1

ARGUMENT................................................................................................................2

I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR HEAT CLAIMS. ....................2

     A.     Plaintiffs Are Likely to Prevail on Their Eighth Amendment Claims....................2

          1.     The Imposition of a "Heat Season" Is Arbitrary and Dangerous.................3

          2.     Defendants Unilaterally Increased the Heat Alert Threshold, Exponentially Increasing Risk Without Justification. ................................5

          3.     The Outdoor Work-Stop Threshold Is Dangerously High and Does Not Take Direct Sun into Account............................................................10

          4.     Defendants Fail to Enforce Policies They Have Purported to Adopt............................................................................................................11

     B.     LSP's Treatment of People on the Farm Line with Impaired Thermoregulation Violates Both the Eighth Amendment and the ADA. ..............12

          1.     Defendants Cannot Justify Obvious Exclusions from the Heat Pathology Medication and Medical Exclusion Lists. ................................13

          2.     Updated Policies and Supposed Expert "Approval" Are Insufficient to Shield Defendants' Deliberate Indifference. .....................16

          3.     Defendants Concede Plaintiffs' ADA Claims Relating to Those with Impaired Thermoregulation. ...............................................................18

II.     DEATH AND SERIOUS INJURY ARE PLAINLY IRREPARABLE ...........................18

III.     THE EQUITIES AND PUBLIC INTEREST FAVOR AN INJUNCTION.....................19

IV.     THE REQUESTED RELIEF IS APPROPRIATE UNDER THE PLRA.........................20

V.     APPOINTMENT OF A FRE 706 EXPERT IS WARRANTED.....................................21

CONCLUSION...........................................................................................................24

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ahlman* v. *Barnes*,
2020 WL 3547960 (9th Cir. June 17, 2020) ..........................................................13

*United States* v. *Alabama*,
2015 WL 3796526 (M.D. Ala. June 18, 2015) ......................................................23

*Armstrong* v. *Brown*,
768 F.3d 975 (9th Cir. 2014) ...............................................................................22

*Ball* v. *LeBlanc*,
792 F.3d 584 (5th Cir. 2015) ...................................................................... *passim*

*Ball* v. *LeBlanc*,
No. 3:13-cv-00368 (M.D. La. Nov. 5, 2018) ..........................................................5

*Benjamin* v. *Fraser*,
343 F.3d 35 (2d Cir. 2003)....................................................................................23

*Book People, Inc.* v. *Wong*,
91 F.4th 318 (5th Cir. 2024) ................................................................................19

*Braggs* v. *Dunn*,
2017 WL 5665334 (M.D. Ala. Nov. 27, 2017)......................................................23

*Brown* v. *Plata*,
563 U.S. 493 (2011)...........................................................................17, 19, 20

*Carranza* v. *Reams*,
614 F. Supp. 3d 899 (D. Colo. 2020).....................................................................13

*Chatman* v. *Otani*,
2021 WL 2941990 (D. Haw. July 13, 2021)..........................................................13

*Coleman* v. *Brown*,
2018 WL 6250852 (E.D. Cal. Nov. 29, 2018)........................................................22

*Criswell* v. *Boudreaux*,
2020 WL 5235675 (E.D. Cal. Sept. 2, 2020).........................................................13

*Farmer* v. *Brennan*,
511 U.S. 825 (1994)........................................................................................12, 18

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*Gates* v. *Cook*,
    376 F.3d 323 (5th Cir. 2004) ................................................................3, 4, 11, 16

*Hadix* v. *Caruso*,
    465 F. Supp. 2d 776 (W.D. Mich. 2006) ...............................................................23

*Handberry* v. *Thompson*,
    446 F.3d 335 (2d Cir. 2006).................................................................................23

*Harding* v. *Edwards*,
    487 F. Supp. 3d 498 (M.D. La. 2020)...................................................................18

*Harris* v. *Angelina Cnty., Tex.*,
    31 F.3d 331 (5th Cir. 1994) .................................................................................16

*Hathaway* v. *Bazany*,
    507 F.3d 312 (5th Cir. 2007) ...............................................................................14

*Helling* v. *McKinney*,
    509 U.S. 25 (1993).................................................................................................19

*United States* v. *Hinds Cnty. Bd. of Supervisors*,
    128 F.4th 616 (5th Cir. 2025) ........................................................................19, 20

*Jensen* v. *Shinn*,
    609 F. Supp. 3d 789 (D. Ariz. 2022) ...................................................................17

*Jordan* v. *Gardner*,
    986 F.2d 1521 (9th Cir. 1993) .............................................................................17

*Laube* v. *Campbell*,
    333 F. Supp. 2d 1234 (M.D. Ala. 2004) ..............................................................23

*Lewis* v. *Cain*,
    2021 WL 1219988 (M.D. La. Mar. 31, 2021) ........................................................2

*Mays* v. *Dart*,
    453 F. Supp. 3d 1074 (N.D. Ill. 2020) .................................................................13

*Slaughter* v. *S. Talc Co.*,
    919 F.2d 304 (5th Cir. 1990) ...............................................................................14

*Turner* v. *Cnty. of San Bernardino*,
    2018 WL 6617638 (C.D. Cal. Dec. 14, 2018) .......................................................22

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*Van Nortrick* v. *Lavespere*,
2019 WL 852121 (M.D. La. Feb. 22, 2019) .......................................................22

*Viterbo* v. *Dow Chem. Co.*,
826 F.2d 420 (5th Cir 1987) ...........................................................................14

*Voice of the Experienced* v. *LeBlanc*,
2024 WL 3279899 (M.D. La. July 2, 2024) ...................................................14, 19

*Voice of the Experienced* v. *Westcott*,
No. 24-30420 (5th Cir. Jan. 9, 2025) .................................................................4

*Webb* v. *Livingston*,
618 F. App'x 201 (5th Cir. 2015) ......................................................................2

*Yates* v. *Collier*,
868 F.3d 354 (5th Cir. 2017) ...........................................................................8

**Statutes**

Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ................................ *passim*

**Other Authorities**

Ctrs. for Disease Control and Prevention,
Heat and Medications – Guidance for Clinicians (June 18, 2024),
https://www.cdc.gov/heat-health/hcp/clinical-guidance/heat-and-medications-
guidance-for-clinicians.html .............................................................................12

Fed. R. Evid. 706 ...........................................................................................2, 22, 23

Shannon Heckt, *LSU climatologist warns DOGE NOAA cuts may disrupt weather
forecasting*, WGNO ABC (Mar. 12, 2025),
https://wgno.com/news/louisiana/lsu-climatologist-warns-doge-noaa-cuts-
may-disrupt-weather-forecasting/?nxsparam=7 ...................................................22

U.S. Const. amend. VIII............................................................................... *passim*

Plaintiffs respectfully submit this post-hearing brief in further support of their Motion for a Second Temporary Restraining Order and Preliminary Injunction. ECF 201 (the "Motion").[1]

## BACKGROUND & FACTS

The relevant facts are set forth in detail in Plaintiffs' opening brief, as supplemented by the April 22, 2025 oral argument on the Motion, Ex. 54; the April 23, 2025 testimony of Dr. Susi Vassallo, Ex. 55 at 36:3–120:18; and supporting documents that the Court deemed relevant, Exs. 56–59 & ECF 37-45, and admitted with respect to the Motion, Ex. 55 at 118:6–120:17, 172:18–173:20.[2]

Through their prior submissions, Plaintiffs have demonstrated, *with respect to Defendants' operation of the Farm Line*, entitlement to: (i) a TRO requiring Defendants to issue a "heat alert" whenever the heat index meets or exceeds 88°F and to monitor the heat index every 30 minutes; (ii) a preliminary injunction, requiring Defendants to: (a) continue the aforementioned heat alert and monitoring practices; (b) prohibit the assignment of people with HPDS to the Farm Line on days when the NWS projects the heat index will meet or exceed 88°F; (c) expand the list of medications and conditions qualifying a person for HPDS; (d) promptly grant HPDS to all persons taking such medications or diagnosed with such conditions; (e) ensure all protections afforded under HCP8 and any preliminary relief ordered by the Court are available to all Farm Lines; (f) lower the threshold for Farm Line work to cease from a heat index of 113°F to a heat index of 103°F; and (g) update LSP Directive 13.067 to reflect the remedial measures ordered by the Court

---

[1] Capitalized terms have the meanings given to them in Plaintiffs' opening and reply briefs. *See* ECF 201-1 ("Pls.' Br."), ECF 224 ("Reply").

[2] The Court admitted Plaintiffs' Exhibits 40, 41, 42, 43, and 49, and the testimony of Dr. Susi Vassallo from the class certification evidentiary hearing, as evidence bearing on the instant Motion. Ex. 55 at 107:4–108:4, 118:6–120:17, 172:18–173:20. Plaintiffs reserve the right to move to strike or, in the alternative, to reply to any use by Defendants of testimony or evidence that is outside of this record.

in its August 15, 2024 order, ECF 109, and the additional relief sought herein;[3] and (iii) <u>an expert appointed pursuant to FRE 706</u> to record the WBGT and to consult the Court regarding Defendants' heat-related practices.  Accordingly, Plaintiffs' Motion should be granted.

## **ARGUMENT**

I.    **PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR HEAT CLAIMS.**

    **A.    Plaintiffs Are Likely to Prevail on Their Eighth Amendment Claims.**

Prison conditions violate the Eight Amendment when they "pose 'an unreasonable risk of serious damage' to a prisoner's health—an objective test—and prison officials [] have acted with deliberate indifference to the risk posed—a subjective test."  *Ball* v. *LeBlanc*, 792 F.3d 584, 592 (5th Cir. 2015) (quoting *Helling* v. *McKinney*, 509 U.S. 25, 33–35 (1993)).  Defendants do not and cannot challenge the objective danger of high heat, nor their awareness of those dangers.  The only question is whether they have taken reasonable steps to eliminate the unconstitutional risk of serious harm posed by extreme heat on the Farm Line.  *See Webb* v. *Livingston*, 618 F. App'x 201, 209 n.7 (5th Cir. 2015) ("[T]he mere presence of remedial measures would not end the inquiry, as such measures must be adequate."); *Lewis* v. *Cain*, 2021 WL 1219988, at *39 (M.D. La. Mar. 31, 2021) ("Efforts to correct systemic deficiencies that 'simply do not go far enough,' when weighed against the risk of harm," may "also constitute deliberate indifference because such insufficient efforts are not 'reasonable measures to abate' the identified substantial risk of serious harm.") (citation omitted).

Defendants have consistently failed to mitigate the known risks of harm that are faced by

---

[3]    On April 8, 2025, LSP updated its heat pathology directive, LSP Directive 13.067, which largely mirrors HCP8. *See* ECF 212-4.  That directive still does not incorporate several of the remedial measures ordered by the Court last summer, for example, codifying the requirement that shade structures be large enough for incarcerated persons to rest without encroaching on others' space; that water, ice, and clean cups be broadly available; that there be some form of chair or surface to sit on; and that individuals forced to labor on the Farm Line be provided with boots, sun hats, long-sleeve shirts, socks, and gloves.  *See* ECF 109 at 5–7.

men on the Farm Line. They have doubled down on arbitrarily limiting the availability of heat protections to a few months of the year, raised the threshold for heat alerts, and imposed a stop-work threshold at a temperature well exceeding the recognized "Danger" threshold; all while knowingly relying on incomplete and unreliable temperature reporting. Without offering any coherent methodology or scientific basis, Defendants continue to force men who take medications or who have medical conditions known to impair thermoregulation to labor on the Farm Line in high heat. And even after all of that, Defendants' implementation of their heat policies is inconsistent at best.

In short, whether Defendants' failures are viewed individually or under the totality of the circumstances, Defendants' deliberate indifference to the health and safety of men on the Farm Line is unmistakable. *See Gates* v. *Cook*, 376 F.3d 323, 333 (5th Cir. 2004) (evaluating the sufficiency of remedial measures based on the totality of circumstances, given that the combined impact of systemic deficiencies may "have a mutually enforcing effect that produces the deprivation of a single, identifiable human need"); *Ball*, 792 F.3d at 595 (evaluating defendant's subjective state of mind based "on the totality of the record evidence" about defendant's efforts to reduce known heat risks).

### 1.    The Imposition of a "Heat Season" Is Arbitrary and Dangerous.

Defendants' use of a "heat season" arbitrarily limits heat protections to only certain months of the year regardless of atmospheric conditions. ECF 201-10 at 5–7. Thus, the Farm Line frequently operates in dangerously high heat without the protections in HCP8. *See, e.g.*, ECF 201-13.

At oral argument, Defendants were unable to provide any legitimate justification for why the heat precautions in HCP8 are only in effect from May 1 to October 31, and likewise, they did not identify any burden imposed by extending practices they already undertake for half of the year

to the other half.  Ex. 54 at 44:21–45:19; *see also id.* at 42:18–24 (rationalizing LSP's use of a heat season because that has been its historical practice).   Indeed, Defendants concede that from November 1 to April 30 of every year, LSP is not required to monitor the temperature every two hours, people with heat precaution duty status are no longer required to be brought indoors, and the rest of HCP8's heat precautions are no longer mandated at all.  ECF 201-6 at 145:9–15, 129:23–130:7, 52:1–4 (Lavespere).   Defendants, however, are fully aware that the temperature can regularly exceed 88°F outside of their prescribed heat season.  *See, e.g.*, ECF 201-12 at 65:21–24 (Toce) (agreeing that heat index can exceed 88°F outside of heat season window); Appellants' Reply Brief at 11–12, *Voice of the Experienced* v. *Westcott*, No. 24-30420 (5th Cir. Jan. 9, 2025) (acknowledging in another brief in this litigation that temperatures regularly exceed 88°F during currently designated off-season).  Defendants are also aware that as recently as April of this year, *i.e.*, before the 2025 heat season began, two men identified as heat sensitive called in Self-Declared Emergencies based on symptoms consistent with heat-related illness.  *See* ECF 242-1, Carter Decl.; ECF 242, Tutt Decl.; Ex. 54 at 42:10–21.  There can be no doubt, then, that Defendants are aware of and yet disregard the risks associated with the heat season they arbitrarily impose.

Defendants' argument that a heat season was "approved" in *Ball* and *Gates* is irrelevant and inaccurate.  *See* Resp. at 22; Ex. 54 at 43:13–44:17.  There was no challenge to the appropriateness of a heat season in those cases.  *See generally*, *Ball*, 792 F.3d 584; *Gates*, 376 F.3d 323.  In *Gates*, the Fifth Circuit affirmed injunctive relief that included implementing heat protections during a heat season or whenever the heat index exceeded 90°F—but not both.  376 F.3d at 339.  And the parties in *Ball* settled, and by way of their settlement agreed that LSP would monitor the heat index indoors from *April* through October, not the "heat season" as defined in HCP8.  *Ball* v. *LeBlanc*, No. 3:13-cv-00368-BAJ-EWD, ECF 475-1 at 2 (M.D. La. Nov. 5, 2018).

In sum, and as Dr. Vassallo has stated, "[f]rom a medical perspective, this time limitation is arbitrary," as "[t]he relevant consideration is not the calendar, but instead the combination of atmospheric conditions that contribute to heat stress."  ECF 201-3, Fourth Vassallo Decl. ¶ 7. Defendants' refusal to revise their heat season limitation in HCP8 and LSP 13.067 is deliberate indifference.

   2. *Defendants Unilaterally Increased the Heat Alert Threshold,*
     *Exponentially Increasing Risk Without Justification.*

Under DOC's and LSP's heat pathology policies, a heat alert triggers a number of important protections, including the requirement that people with HPDS be taken off the Farm Line and brought indoors.  Defendants' decision to increase the heat index threshold at which a heat alert issues from 88°F to 91°F exponentially increases the risk of heat-related illness, and yet has no scientific or other legitimate basis.

The only expert in thermoregulation and heat-related disorders in this litigation, Dr. Vassallo, has opined that the prior HCP8 threshold of 88°F was the appropriate trigger for heat protections, and she has cited a body of scientific literature to support that opinion.  ECF 201-3 ¶¶ 14–15 nn.7–9 (citing Ex. 56 (Petitti), Ex. 57 (Basu), Ex. 58 (Skarha), Ex. 59 (Davis)); ECF 201-16 ¶ 18 n.16 (citing ECF 37-45); *see also* Ex. 55 at 59:20–60:19.  On the basis of that literature, Dr. Vassallo opines that the risk of heat-related disorders and death "increases sharply" when the heat index reaches the mid to high-80s, and as such, any increase beyond 88°F poses a much higher risk.  ECF 201-3 ¶¶ 15–16, Fourth Vassallo Decl.; ECF 201-5 ¶ 33, First Vassallo Decl.; Ex. 55 at 59:5–19.  As the below chart cited by Dr. Vassallo demonstrates, every degree past a heat index (*i.e.*, "apparent temperature," or "AT") of approximately 86°F (30°C) counts:  after that threshold, risk (mortality) no longer increases with temperature in a linear fashion, it increases almost *exponentially*.



ECF 201-3 ¶ 15, Fourth Vassallo Decl. (citing Ex. 59 (Davis)); Ex. 55 at 57:5–59:19. Because the heat index is taken in the shade while men on the Farm Line labor in direct sun, a heat index reading of 91°F may correspond to an actual heat index of up to 106°F. *See* ECF 201-3, Fourth Vassallo Decl. ¶ 20; ECF 201-23 at 2; ECF 201-6 at 94:11–14 (Lavespere). Defendants know this, but they refuse, absent an order from this Court, to account for the effect of direct sun, including when determining the appropriate heat alert threshold. *See* ECF 201-6 at 96:5–25 (Lavespere). Thus, men with impaired thermoregulation are knowingly left out on the line in heat exceeding what Defendants acknowledge is dangerous. *See, e.g.*, *id*. at 94:1–18 (Lavespere).

Consistent with Dr. Vassallo's opinions, Defendants themselves have recognized, for years, that heat indices exceeding 88°F pose an unreasonable risk of harm to individuals forced to labor on the Farm Line without additional precautions. *See* ECF 201-34 at 4. Defendants cannot explain why they abandoned the 88°F threshold that they had long maintained, ECF 201-6 at 70:19–72:1 (Lavespere), and they cannot defend the new threshold, other than to say that their experts "told [them] to do it." Ex. 54 at 57:19–22; *see also id.* at 58:4–5. That excuse, inadequate on its face, is also belied by the record—Dr. Barnes has never opined on this issue. ECF 201-6 at 75:11–20 (Lavespere). And Dr. Keldie—a non-credible witness generally—is not an expert in thermoregulation or heat-related disorders, and is not competent to opine on what heat index

should trigger heat alert protection.[4]  *See* ECF 201-18 at 18:16–24 (Keldie).

The guidance that Defendants claim to rely on from NWS, OSHA, NIOSH, and the U.S. Army does not support, and in fact undermines, the heat alert policy Defendants have adopted:

- **National Weather Service.**  The NWS states that "extreme caution" should be taken at a heat index of 90°F.  ECF 201-23 at 2.  It emphasizes that the heat index values in its chart "are for shady locations" and "the heat index value can be increased by up to 15°F" in direct sun.  *Id.*

- **Occupational Safety and Health Administration.**  OSHA states that "[e]mployers should not rely on Heat Index alone" and should instead utilize the WBGT, which "has important advantages over other environmental heat measurements," including that it "accounts for *all four* major environmental heat factors—temperature, humidity, radiant heat, and wind."  ECF 201-22 at 4–5.  OSHA cautions that deaths have occurred at heat indices of 86°F, and that other heat-related injuries have occurred at lower heat indices.  *Id.* at 6.  OSHA instructs that heat monitoring should occur at the location where labor is performed, and explains that direct sun and other factors must be accounted for when determining protections for outdoor workers.  *Id*. at 5.

- **National Institute for Occupational Safety and Health.**  NIOSH emphasizes WBGT as the most frequently used and recommended standard throughout the world, and recommends a WBGT of 82.4°F as "the upper limit" for moderate labor like that on the Farm Line.  ECF 201-24 at 143, 147.

- **United States Army.**  The U.S. Army's heat danger chart, which Dr. Keldie claims supports a 91°F heat index threshold, does not actually set a heat index threshold at which protections are warranted.  ECF 212-14 ¶ 14; *but see* ECF 224-4 at 2.  The chart does not refer to heat index at all, and instead categorizes risk based on WBGT, a measurement that Defendants refuse to utilize.  ECF 224-4 at 2.

To be clear, between their interrogatory responses and current briefing, not one of the sources Defendants purported to have relied upon supports a heat alert trigger of 91°F heat index. ECF 201-17 at 5; Resp. at 19.  Despite relying on sources that emphasize the superiority of WBGT, and conceding that it provides a more accurate measurement of heat stress, Defendants refuse to implement that system.  *See* Resp. at 15–17 (citing sources like OSHA); *but see* ECF 201-22 at 5– 6 (OSHA guidance advising that the heat index is not as accurate as the WBGT); *see* Ex. 54 at

---

[4]    During the class certification hearing, for example, Dr. Keldie was found to not be competent to testify as to thermoregulation or heat-related medical care disorders and was permitted to testify as an expert *only* on the subject of correctional care medicine.  Ex. 60 at 48:1–4, 53:8–54:2, 61:17–63:12.

59:15–23 (conceding that WBGT is scientifically more accurate); *but see* Ex. 54 at 61:12–20 (maintaining objection to monitoring the WBGT).

No other scientific literature supports the 91°F threshold, either. *See* Ex. 55 at 59:5–19 (Vassalo). As Dr. Vassalo testified, there is no science supporting a heat index threshold of 91°F or 95°F, and "the higher you set the heat index . . . the more death you'll have." *Id.*

Finally, as the Court noted during oral argument, an 88°F threshold has been accepted by the Fifth Circuit and lower courts in other heat cases. *See* Ex. 54 at 49:24–50:9. Contrary to Defendants' contentions, *id.* at 51:2–23, the Fifth Circuit indeed affirmed an 88°F heat threshold in *Yates* v. *Collier*, 868 F.3d 354, 368 (5th Cir. 2017) (affirming injunctive relief that required defendants to "maintain[] a heat index of 88 degrees or lower"). Similarly, the Fifth Circuit in *Ball* held that the district court "did not abuse its discretion by deciding to issue an injunction" that required Louisiana DOC to "develop a plan to reduce and maintain the heat index in the Angola death row tiers at or below 88 degrees Fahrenheit." 792 F.3d at 598.

Defendants' counterarguments are unconvincing. *See* Resp. at 17–18; Ex. 54 at 51:21–25. Defendants contend that Dr. Vassalo's opinions, sources, and the authorities above are all tied to classic heat illness rather than exertional heat illness, and therefore do not bear on the instant case. Resp. at 15–18 ("While classic heat illness concerns prolonged (days) exposure to very hot environments, such as an unairconditioned home, exertional heat illness is the ability to cool oneself during high levels of exertion (such as working outdoors)."). This is no real distinction, as Plaintiffs are at risk of both classic and exertional heat illness. Ex. 55 at 44:24–45:6 (Vassalo).

First, as Dr. Vassalo explained, the effects of heat on the body are cumulative. Ex. 55 at 48:7–22. And importantly, "most living quarters at LSP are not air-conditioned. As a result, incarcerated men simply cycle from a hot dormitory or cellblock to a hot field, and back again."

ECF 201-16, Vassallo Second Supp. Decl. ¶ 25 (citing ECF 120-26 at 214:11–25 (Toce)). Accordingly, the "classic" versus "exertional" heat illness distinction is not apt for the population at hand, for whom existing heat exposure is exacerbated and compounded by exertion. Ex. 55 at 92:18–93:14 (Vassallo); *see also* ECF 201-22 at 2 (OSHA guidance citing increased heat risk from environmental conditions which exacerbate heat stress, "such as air temperature, humidity, sunlight, and air speed," as well as impact of exertion, or "the workload leading to body heat production").

Second, Defendants focus almost exclusively on *deaths* caused by classic heat illness. ECF 223-12, Keldie Aff. ¶¶ 25–39. But this case and the Eighth Amendment's guarantee to be free from cruel and unusual punishment has never been limited so narrowly. *See, e.g.*, *Ball*, 792 F.3d at 593–96 (affirming Eighth Amendment violation based on exposure to heat-related injuries not limited to death). Defendants' policies and practices cause a substantial risk of any number of heat-related injuries and illnesses—which can manifest in the field, in the dorm, or even years later in the form of chronic disease caused or exacerbated by cumulative exposure to excessive heat. *See* Ex. 55 at 58:5–22, 60:15–62:1; ECF 201-5, First Vassallo Decl. ¶¶ 71, 73.

In sum, Defendants willfully ignore the vast epidemiological, medical, and public health literature demonstrating the exponential increase in not just illness but death at heat indices above 88°F. Defendants invent agency guidelines that do not exist. And their only medical expert, Dr. Keldie, is neither competent to opine on this issue nor is he able to muster a *single* source— scientific, governmental, or otherwise—to support his misguided opinion that a heat index threshold of 95°F is "extremely safe." ECF 120-19 at 225:22–226:1, 226:18–227:3 (Keldie). The scientific literature and agency guidance make clear that Defendants' goal is not safety. Instead, their change in policy has increased the risk of harm to all class members, and especially to the

ADA Subclass members. Defendants acknowledge that ADA Subclass members are heat sensitive, but still force them to labor in the hot fields until the heat tracking protocol captures a heat index of 91°F or higher.

       3.    *The Outdoor Work-Stop Threshold Is Dangerously High and Does Not Take Direct Sun into Account.*

Defendants' decision to set a 113°F heat index as the threshold for work on the Farm Line to cease, without taking into account direct sun and other factors identified in the agency guidance that Defendants purportedly relied upon, is unsupportable.

Based on other NWS Guidance that *both parties* have relied on in this litigation, "heat indices meeting or exceeding 103°F can lead to dangerous heat disorders with prolonged exposure and/or physical activity in the heat." ECF 201-23 (discussed by ECF 201-3, Fourth Vassallo Decl. ¶¶ 29–30); Resp. at 15–16 (referencing chart from ECF 201-23). Accordingly, Dr. Vassallo has likewise opined that "all outdoor work at LSP should cease at a heat index of 103°F" and that "a heat index of 113°F is well within the [NWS's] 'danger' zone, such that heat exhaustion is likely and heat stroke is possible." ECF 201-3, Fourth Vassallo Decl. ¶¶ 29–30. The 113°F heat index Defendants have imposed is far too high. In fact, when accounting for the effect of direct sun, a 113°F heat index could feel like 128°F—the "extreme danger" zone, where "heat stroke is highly likely." ECF 201-23; *see also* ECF 201-21.

Defendants respond that "[i]ssuing an injunction to cease work at 103 degrees heat index would hold DPSC to a higher standard than all agricultural workers across the country." Resp. at 20. This is a red herring. Neither agricultural workers nor workers in any other industry in this country are forced to work in 113°F heat indices on threat of solitary confinement if they refuse. *See* Ex. 55 at 104:15–105:3 (Vassallo) (noting that comparisons to industry are "irrelevant" as "this is not a case about roofers in the free world."). The threat of heat illness is also particularly

acute for incarcerated men at LSP as compared to those working in "the free world," as only the former may lack the ability to return to a cool environment at the end of a shift on the Farm Line. ECF 120-61, Vassallo Second Supp. Decl. ¶ 25.  Considering the compounding nature of heat stress, *see id.*, this constant, unavoidable exposure makes Defendants' comparisons to the practices of "responsible farmers in the surrounding agricultural community" even less appropriate.  Resp. at 20 (quoting *Sampson* v. *King*, 693 F.2d 566, 568 (5th Cir. 1982)).

Moreover, Defendants cannot treat the absence of a national standard as proof of such a standard without presenting any evidence whatsoever as to what common practices across the agricultural sector even are.  Even if this were an appropriate inference to draw, such a standard would not be dispositive if the conditions at issue otherwise posed a substantial risk of serious harm.  *See Gates*, 376 F.3d at 337 ("But it is absurd to suggest that the federal courts should subvert their judgment as to alleged Eighth Amendment violations" based on "relevant standards.").

### 4. *Defendants Fail to Enforce Policies They Have Purported to Adopt.*

Defendants' deliberate indifference is also evidenced by deficiencies in and noncompliance with their existing heat protection policies and practices.

When Defendants revised HCP8 in response to this lawsuit, they recognized it as an opportunity to review all of the provisions of the policy.  *See* ECF 201-6 at 24:4–20  (Lavespere). Yet, in the revised policy, Defendants failed to mandate the protections previously ordered in the Court's now expired first injunction—an omission they cannot explain.  *Id.* at 161:14–164:1.

Defendants tout the increased availability of shade on the Farm Line.  Resp. at 6.  But as this Court observed and Frank Carter attested, Defendants' shade wagons are insufficient to actually protect men from the sun.  Ex. 54 at 21:17–25, 28:17–29:7; ECF 242-1,Carter Decl. (describing that shade trailer does not provide shade at certain times of the day).  Defendants have provided no information about the purported "shade pavilions"—such as how far they will be from

11

worksites, or when construction will be complete.[5]  Defendants still have no compelling plan to offer shade to Line 15b, beyond offering access to a hot bus an untold distance away from the actual worksite.  Ex. 54 at 29:8–25; ECF 201-35 at 47:6–10 (Sylvester); ECF 201-36, Green Decl. ¶ 11.

Defendants' Daily Line Counts reflect that LSP officials routinely fail to provide breaks as required.  *See* Pls.' Br. at 12–13 (detailing events of August 6, 2024, when Defendants failed to timely call a heat alert and, once one was finally called, also failed to promptly provide breaks).  Defendants' ongoing indifference is a far cry from the "attitude and conduct" of an institution committed to making the Farm Line safer.  *See Farmer* v. *Brennan*, 511 U.S. 825, 827 (1994) (noting that "current attitudes and conduct" as reflected in "developments that postdate the pleadings and pretrial motions" are relevant to subjective factor).

### B.  LSP's Treatment of People on the Farm Line with Impaired Thermoregulation Violates Both the Eighth Amendment and the ADA.

The list of medications (the "Heat Pathology Medication List") and the list of medical conditions (the "Medical Exclusion List") that LSP utilizes to screen people for HPDS—HCP8 Attachments A and B, respectively—are grossly underinclusive.[6]  Defendants have *removed* diabetes as a heat risk factor and refuse to provide basic heat precautions to men who take medications that even the CDC states impair thermoregulation.[7]  Ex. 54 at 72:16–20 ("SSRI's are a non-starter.  Ain't going to happen.").  This unjustified departure from widely accepted clinical

---

[5]   Besides, at temperatures exceeding 90 degrees, fans are not effective at reducing risk of harm.  Ex. 55 at 47:16–25 (Vassallo).

[6]   These same attachments apply to LSP 13.067.

[7]   *See, e.g.*, Centers for Disease Control and Prevention, Heat and Medications – Guidance for Clinicians (June 18, 2024), https://www.cdc.gov/heat-health/hcp/clinical-guidance/heat-and-medications-guidance-for-clinicians.html (listing among "medications that may increase risk of harm on hot days," calcium channel blockers, ACE inhibitors, ARBs, SSRIs, and SNRIs) discussed by Dr. Vassallo at  ECF 201-3, Fourth Vassallo Decl. ¶ 34 n.24.

guidance is unreasonable under the Eighth Amendment—especially since courts have regularly found prisons' failure to adequately conform to CDC recommendations constitutes deliberate indifference.[8]  And it is certainly a violation of the ADA, as is Defendants' failure to reasonably accommodate even those men who have been given HPDS by forcing them to labor on the Farm Line in heat indices exceeding 88°F.

      1.     *Defendants Cannot Justify Obvious Exclusions from the Heat Pathology Medication and Medical Exclusion Lists.*

Defendants' Heat Pathology Medication List and Medical Exclusion List are both underinclusive, such that men taking medications or diagnosed with conditions known to impair thermoregulation are not given HPDS when they clearly should be.  As to the Medical Exclusion List, the most egregious omission is diabetes, a chronic condition that Defendants had for years previously recognized as carrying a higher risk of heat pathology.  ECF 201-34 at 2.  They now seek to justify not listing diabetes on the Medical Exclusion List on the basis that diabetes can supposedly be "cured," claim that working the Farm Line is a useful "treatment" for diabetes, and even go so far as to suggest that sparing diabetics and pre-diabetics from forced manual labor in heat indices exceeding 91°F would do them more harm than good.  ECF 212-14, Keldie Aff. ¶ 60.  Not only is this explanation so insouciant as to itself constitute deliberate indifference, it is directly

---

[8]    This issue arose frequently during the COVID-19 pandemic, where despite the fact that prisons were responding to a global health crisis, courts nonetheless found incomplete compliance with CDC recommendations to be deliberate indifference.  *See Ahlman* v. *Barnes*, 2020 WL 3547960, at *4 (9th Cir. June 17, 2020) (finding prison was not likely to succeed on merits in defending an Eighth Amendment claim where COVID-19 mitigation practices fell "significantly short" of CDC guidelines); *Criswell* v. *Boudreaux*, 2020 WL 5235675, at *18, 20 (E.D. Cal. Sept. 2, 2020) (finding failure to implement certain CDC guidelines constituted deliberate indifference, despite defendant having implemented some guidance); *Carranza* v. *Reams*, 614 F. Supp. 3d 899, 914 (D. Colo. 2020) (same, finding it significant that "defendant ha[d] not identified any impediment to formulating" a plan that would implement certain CDC guidelines); *Mays* v. *Dart*, 453 F. Supp. 3d 1074, 1098 (N.D. Ill. 2020) (same, involving failure to implement testing policy, despite CDC guidelines stating that testing should be undertaken "if feasible"); *Chatman* v. *Otani*, 2021 WL 2941990, at *19 (D. Haw. July 13, 2021) (finding likelihood of Eighth Amendment success despite defendants purporting to follow certain CDC recommendations, as Plaintiffs' evidence "painted a different picture" in reality).

contradicted by the record:  this Court's findings of fact in support of its July 2, 2024 Order note several men with a history of pre-diabetes who called in Self-Declared Emergencies while working on the Farm Line.  *Voice of the Experienced* v. *LeBlanc*, 2024 WL 3279899, at *15, *26 (M.D. La. July 2, 2024).

As Dr. Vassallo has stated repeatedly, based on multiple peer-reviewed studies, men with diabetes are at an increased risk of heat-related harm and diabetes should be on the Medical Exclusion List.  *See, e.g.*, ECF 201-5, First Vassallo Decl. ¶¶ 45, 49, 53, 87; ECF 201-3, Fourth Vassallo Decl. ¶ 48 (discussing ECF 201-33 at 1255 (Sokas) (New England Journal of Medicine listing diabetes as an individual risk factor on "Clinical Guide to Heat-Illness Prevention")); Ex. 55 at 58:7–22, 69:13–16, 96:2–22 (discussing findings in Ex. 61 (Knowlton) that during a California heat wave, emergency department visits related to diabetes "showed significant increases").

The Heat Pathology Medication List is no better.  Prior to Defendants' response to the instant Motion, Dr. Reynolds-Barnes, who created the Heat Pathology Medication List for HCP8 Attachment A, had produced no basis—not a single scholarly article, agency guidance, or even a Google search result—to justify which medications should and should not be added.[9]  ECF 120-62 at 3 (stating that she conducted a review of the "literature" in determining which medications and illnesses should qualify a person for HDPS).  These opinions would not even be admissible at trial;[10] they certainly cannot conclusively justify conditions violating the Constitution and ADA.

---

[9]   Dr. Reynolds-Barnes's testimony during the hearing on class certification is not part of the record with respect to the instant Motion.  Plaintiffs will address the inadequacy of Dr. Reynolds-Barnes's testimony and opinions in their post-hearing briefing regarding Plaintiffs' Motion for Class Certification.

[10]   *Slaughter* v. *S. Talc Co.*, 919 F.2d 304, 307 (5th Cir. 1990) (explaining that expert reports that are "nothing more than bare conclusions" are inadmissible because they offer no value to the trier of fact); *Hathaway* v. *Bazany*, 507 F.3d 312, 318 (5th Cir. 2007) ("[T]he existence of sufficient facts and a reliable methodology is in all instances mandatory."); *Viterbo* v. *Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987) ("Without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible.").

Dr. Reynolds-Barnes's new affidavit, ECF 212-13, filed in response to the instant Motion, does not remedy these deficiencies. Dr. Reynolds-Barnes now cites a single article purporting to support her position that SSRIs do not impact "core temperature" and therefore should not be included on the Heat Pathology Medication List. *Id.* at ¶ 8 (citing Hospers, Lily, et al., *The effect of prescription and over-the-counter medications on core temperature in adults during heat stress: a systematic review and meta-analysis*, 77 EClinicalMedicine, 1 (2024)). But this article (published *after* HCP8 was revised) is deeply flawed. It was not relied upon in crafting DOC's policy, it does not support the much broader affirmative assertion Dr. Reynolds-Barnes makes about SSRIs' impact on thermoregulation,[11] and it could in fact be read to cast doubt on Dr. Reynolds-Barnes's entire methodology.[12] In any event, this new support is too little, too late, and yet another example of Defendants' tendency to cherry-pick isolated parts of the scientific literature that support their desired outcomes while ignoring parts that do not.

Dr. Vassallo, citing peer-reviewed medical studies, testified as to the deficiencies in Dr. Reynolds-Barnes's approach. *See* ECF 201-3, Fourth Vassallo Decl. ¶¶ 34–44; 48–51; Ex. 55 at 70:2–6 ("[A]s a clinician and a medical toxicologist, we see that people who have too much serotonin get heat stroke . . . and so we know that too much serotonin affects temperature and causes heat stroke."); at 115:9–116:3; (noting that Dr. Reynolds-Barnes is "distinguishing between

---

[11] The article focuses exclusively on core temperature, but core temperature is only one of many variables that effect thermoregulation and the risk of heat-related illness. *See* ECF 201-3, Fourth Vassallo Decl. ¶¶ 39–40 (describing that SSRIs make individuals prone to heat related illness because they "impair the function of the hypothalamus" and lead to "increased sweating promoting dehydration, electrolyte derangements (e.g., hyponatremia).").

[12] For example, the study found that even medications that all parties agree should be on the Heat Pathology Medication List—such as antipsychotics, diuretics, beta blockers, antihistamines, sympathommetics, and medications with anticholinergic properties of two or lower—have no effect on thermoregulation. *Id.* at 12; *s*e*e* ECF 120-62, Reynolds-Barnes Report; ECF 223-10, 2024 HCP8 Attachment A. LSP even previously included some of these medications, including antipsychotics, in its 2018 Heat Pathology Medication List. *See* ECF 37-63, 2018 HCP8 Attachment A.

one group of calcium channel blockers and the other," but "[a]ll calcium channel blockers render an individual heat sensitive," depending on the dose); ECF 201-3 ¶¶ 41–43; Ex. 55 at 95:3–19 (discussing issues with acclimatization for those on an ACE inhibitor or ARB, both of which affect the kidneys and therefore the ability to decrease the amount of salt in the sweat—a core process involved in acclimatization) (cleaned up); ECF 201-3 ¶ 44; Ex. 55 at 69:17–70:6.

In short, the exclusion of medical conditions and medications widely known to impair thermoregulation is unjustified.  It is also a violation of the Eighth Amendment and the ADA.

> ### 2. Updated Policies and Supposed Expert "Approval" Are Insufficient to Shield Defendants' Deliberate Indifference.

Defendants do not meaningfully defend against deficiencies in their Heat Pathology Medication List and Medical Exclusion List.  Rather, they hide behind the fact that they have expanded those lists since last summer, and contend that because those lists supposedly were blessed by their litigation "experts," LSP's treatment of men with impaired thermoregulation cannot, as a matter of law, violate the Eighth Amendment.  Those arguments fail.

First, that Defendants have taken some steps to improve their grossly inadequate policies does not discharge an allegation of deliberate indifference.  Resp. at 27.  Courts regularly find deliberate indifference despite that defendant took—sometimes even extensive—remedial measures.  *See Ball*, 792 F.3d at 595–96  (affirming deliberate indifference to known risk of heat injury, despite providing misting, fans, access to ice water, and daily showers); *Gates*, 376 F.3d at 340–41 (affirming findings of deliberate indifference, despite prison's remedial efforts towards cell cleanliness, pests, healthcare, and lighting); *Harris* v. *Angelina Cnty., Tex.*, 31 F.3d 331, 335–36 (5th Cir. 1994) (affirming prison's deliberate indifference to crowding risks, despite building dormitory, transferring incarcerated people, and offering alternatives to incarceration).

Second, that Defendants supposedly consulted their litigation experts in updating these lists

is not dispositive of whether Defendants acted with deliberate indifference, as Defendants suggest. Resp. at 24–25. Defendants essentially ask this Court to accept as gospel the opinions of Drs. Keldie and Reynolds-Barnes, regardless of the basis for their conclusions or whether the conditions they approve satisfy the constitutional minimum. That is not the law. *Jordan* v. *Gardner*, 986 F.2d 1521, 1529 (9th Cir. 1993) ("It is not enough to say that before enacting a policy prison authorities considered an issue carefully . . . Prison authorities are also required to afford sufficient weight to the constitutional rights of individuals."); *see Brown* v. *Plata*, 563 U.S. 493, 539–42 (2011) (approving district court's evaluation of competing expert testimony and setting goals for prison population levels somewhere in the middle).

Third, Defendants did not hire Dr. Reynolds-Barnes or Dr. Keldie to review the facts and create a meaningful remedial plan. Resp. at 28. In fact, the record indicates that Dr. Keldie's opinions were influenced by Defendants' litigation strategy, not the other way around. ECF 201-06 at 70:2–18 (Lavespere) (testifying that while Dr. Keldie had originally posited a heat alert threshold of 95°F, it was lowered to 91°F after "discussions" with counsel).

Defendants blindly relied on the opinions of Dr. Keldie and Dr. Reynolds-Barnes, with no actual inquiry into the cause, effect, or treatment of heat-related injuries suffered by men on the Farm Line. *See* Pls.' Br. at 9–10, 21; Reply at 7–8; ECF 201-06 at 24:4–28:11 (Lavespere); *cf. Jensen* v. *Shinn*, 609 F. Supp. 3d 789, 867 (D. Ariz. 2022) (citing defendant official's failure to follow up on letter to prison's corporate stakeholders, read the expert declarations in the case, or otherwise engage with "[p]laintiffs' factual contentions" as evidence of deliberate indifference).

Ultimately, it is irrelevant how many additions have been made to Defendants' Heat Pathology Medication List and Medical Exclusion List, and how many additional incarcerated men now have HPDS. Ex. 54 at 65:3–21. Those modifications have not eliminated the substantial risk

of serious harm to every ADA Subclass member.  Defendants thus remain deliberately indifferent. *Farmer*, 511 U.S. at 843 ("[I]t does not matter . . . whether a prisoner faces an excessive risk . . . for reasons personal to him or because all prisoners in his situation face such a risk.").

       3.       *Defendants Concede Plaintiffs' ADA Claims Relating to Those with Impaired Thermoregulation.*

Rather than addressing the substance of Plaintiffs' ADA claim on behalf of those with impaired thermoregulation, Defendants ask the Court to dismiss it, incorporating by reference arguments made in their class certification briefing.  Resp. at 26.  Plaintiffs, in turn, incorporate by reference their opposition to that flawed argument in the class certification reply brief and at oral argument.  ECF 147 at 9–10; Ex. 54 at 68:12–69:7.  Defendants do not contest, and therefore concede, the substantive arguments and evidence supporting a TRO and preliminary injunction with respect to people with impaired thermoregulation.  *See* Resp. at 21–26.  Specifically, Defendants do not dispute that people with impaired thermoregulation are qualified persons under the ADA, that the Farm Line is a "service" for purposes of the ADA, or that the accommodations Plaintiffs seek—granting HPDS to all persons on the Farm Line with impaired thermoregulation; prohibiting such persons from being assigned to the Farm Line when NWS projects the heat index will exceed 88°F; and removing them from the Farm Line whenever the heat index does exceed 88°F—are unreasonable.

## II.    DEATH AND SERIOUS INJURY ARE PLAINLY IRREPARABLE

Plaintiffs have provided plentiful evidence that conditions on the Farm Line create a substantial risk of serious heat-related injury, including potential death.  Defendants cannot seriously contend that this is not irreparable.  *Harding* v. *Edwards*, 487 F. Supp. 3d 498, 527 (M.D. La. 2020) ("[T]here can be no injury more irreparable" than a risk of serious injury or death).

Further, Defendants' claim that "there have been no instances of serious exertional heat

illness" for individuals forced to labor on the Farm Line, Resp. at 31, is directly contradicted by the record, including facts found in this Court's prior Order. *See Voice of the Experienced* v. *LeBlanc*, 2024 WL 3279899, at *25 (noting that each of the named Plaintiffs has suffered and the emergency sick call records reflect individuals forced to labor on the Farm Line experiencing "symptoms consistent with significant to severe heat-related illness" while laboring on the Farm Line); *see also* Ex. 55 at 72:14–20 (Vassallo) (affirming that she has observed evidence that the Plaintiffs have presented with symptoms consistent with heat-related illness).

Defendants' argument is also beside the point, as it is well understood that "[a] remedy for unsafe conditions need not await a tragic event." *Helling*, 509 U.S. at 33.

## III.    THE EQUITIES AND PUBLIC INTEREST FAVOR AN INJUNCTION

Where, as here, a constitutional violation is occurring, the public interest favors an injunction. *Book People, Inc.* v. *Wong*, 91 F.4th 318, 341 (5th Cir. 2024). Even while remaining "sensitive" to the State's interests in prison management, this Court "must not shrink from [its] obligation to enforce the constitutional rights of all persons, including prisoners." *Brown*, 563 U.S. at 511 (cleaned up).

The narrow relief requested here—*i.e.*, to remedy unconstitutionally dangerous conditions on the Farm Line—does not infringe on the State's interests in prison management. Plaintiffs simply ask that with respect to the Farm Line, Defendants revert to the status quo in issuing heat alerts, accurately record temperatures in the fields, and modestly extend policies and practices in line with steps Defendants have already taken (or claim to already be taking). ECF 212-14, Keldie Aff. ¶ 40. That the requested relief complies with PLRA suffices to discharge Defendants' purported concerns about judicial overreach. *See United States* v. *Hinds Cnty. Bd. of Supervisors*, 128 F.4th 616, 637 (5th Cir. 2025).

## IV.    THE REQUESTED RELIEF IS APPROPRIATE UNDER THE PLRA

Even under the PLRA, "[c]ourts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Brown*, 563 U.S. at 511.

Defendants concede that Plaintiffs are entitled—not to reduction or mitigation of—but to *elimination* of the unconstitutional risk of serious harm posed by extreme heat on the Farm Line. Resp. at 33; *see also Ball*, 792 F.3d at 599 (noting that plaintiffs "are entitled to a remedy that eliminates the constitutional injury").  Plaintiffs will prove at trial that only permanently enjoining the Farm Line as it currently operates would eliminate the risk posed by Defendants' systemic and deliberate failures.  In the interim, however, the remedies sought in Plaintiffs' request for a preliminary injunction are the bare minimum required to maintain the status quo and prevent serious and imminent heat-related health crises.

"To be sure, 'the scope of a district court's equitable powers' to craft a remedy for constitutional violations uncorrected by state or local authorities 'is broad, for breadth and flexibility are inherent in equitable remedies,'" including under the PLRA.  *Hinds*, 128 F.4th at 636 (citing *Swann* v. *Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971)).  Moreover, as the Fifth Circuit recently recognized, a defendant's demonstrated unwillingness to fully comply with court orders or to improve deficient conditions bears on whether subsequent relief is sufficiently narrow and nonintrusive under the PLRA.  *Hinds*, 128 F.4th at 637 (citing failure of other measures to ensure people in custody's safety, "the need for compliance with the court's orders," and a "lack of leadership . . . necessary to ensure compliance" in approving more extensive relief).

Defendants' borderline "bad faith" response to this Court's initial preliminary relief Order and the need for a robust remedial order last year underscore the appropriateness and necessity of

the relief sought here. ECF 109 at 2; *see also* Pls.' Br. at 4. Left to their own devices, Defendants have made clear that their goal is not to facilitate, but to resist efforts to remedy the constitutional violation identified last year. ECF 201-6 at 83:21–84:7; 96:16–25 (Lavespere) (responding to whether Defendants will account for the effect of direct sun on the heat index in their next review of HCP8, "[t]o be honest with you, I'd have to say it depends on how this court case comes out.").

Defendants' only real challenge[13] to the scope of relief requested here, Resp. at 33, is a false trail: Plaintiffs have made clear the requested relief extends only to the Farm Line at LSP, Pls.' Br. at 25; Reply at 12; Ex. 54 at 11:4–12:7. This requested relief is well in line with what the Fifth Circuit has previously approved. *See* ECF 201-4 at 2, 5, 8 (refusing to stay parts of court order requiring Defendants to address certain deficiencies in Directive No. 13.067 and correct problems in additional equipment policies).

## V.     APPOINTMENT OF A FRE 706 EXPERT IS WARRANTED.

Defendants conceded at oral argument that WBGT is a more accurate measurement than heat index, Ex. 54 at 59:15–21, and this Court should require that conditions at LSP be measured using WBGT rather than the NWS heat index. Defendants themselves continue to rely on evidence that supports the use of WBGT as a more accurate measurement. *See* Resp. at 15–17; ECF 224-4 (U.S. Army relying on a WBGT Index); *see also* ECF 201-22 at 3 ("OSHA recommends the use of wet bulb globe temperature (WBGT) monitor to measure workplace environmental heat"); ECF 201-24 at 35 (NIOSH stating that "[i]n most situations environmental heat exposures should be assessed by the Wet Bulb Globe Thermometer (WBGT) method"); Ex. 54 at 61:2–11.

When asked to explain their "objection to monitoring" the WBGT, Defendants pointed to

---

[13] Defendants' secondary challenge—that class-wide relief cannot be granted prior to class certification—has been rejected by the Fifth Circuit, ECF 41-1 at 6–7. Similarly, Defendants' argument that the PLRA bars Plaintiffs from obtaining a second preliminary injunction rests on flawed statutory interpretation that has been resoundingly rejected by the courts. Reply at 2–3.

a single filing from last summer in which the parties agreed to use NWS heat index data. *See* Ex. 54 at 61:12–18; ECF 64. As it has turned out, the NWS data has been unreliable and sporadic,[14] a disappointing trend that appears poised to continue as a result of federal budget cuts.[15]

Defendants' arguments opposing the appointment of a Rule 706 expert are similarly unavailing. Defendants argue that the issues are not sufficiently complicated to require appointment of a Rule 706 expert. Resp. at 34. However, one of the primary policy justifications for Rule 706's allowance for court-appointed expert witnesses "is to promote accurate factfinding." *Van Nortrick* v. *Lavespere*, 2019 WL 852121, at *7 (M.D. La. Feb. 22, 2019) (noting that key rationale for Rule 706 expert is "providing the trier of fact with a neutral and more reliable perspective on the issues and providing the parties themselves with reason to moderate their views and move toward settlement.") (internal citation omitted). Plaintiffs have proposed exactly this: appointment of a neutral expert to track the WBGT on the Farm Line and otherwise advise the Court regarding Defendants' heat-related policies and practices. Pls.' Br. at 31.

Further, contrary to Defendants' assertions, it is not "unlawful" for the Court to appoint a Rule 706 expert instead of a special master to assist it with fact-finding. *See* Resp. at 35. In fact, federal courts nationwide have appointed experts pursuant to Rule 706 to engage in similar functions in the prison litigation context.[16] And it does not "circumvent" the PLRA to appoint a

---

[14] *See, e.g.*, ECF 82 (explaining in July 15, 2023 letter that "heat data was not available at New Roads False River Airport [("New Roads")] for certain time spans beginning on July 8"); ECF 90 (reporting missing heat data at New Roads for certain time spans on July 15, 16, 17, 18, and 19); ECF 107 at 1 (same, for period of July 29 through August 2); ECF 108 at 1 (same, for period of August 5 through August 9); ECF 110 at 1 (same, for period of August 12 through August 16); ECF 114 at 1 (same, for period of August 19 through August 23); ECF 116 at 1 (same, for period of August 26 through August 30).

[15] *See* Shannon Heckt, LSU climatologist warns DOGE NOAA cuts may disrupt weather forecasting, WGNO (Mar. 12, 2025), https://wgno.com/news/louisiana/lsu-climatologist-warns-doge-noaa-cuts-may-disrupt-weather-forecasting/?nxsparam=7 (LSU professor discussing potential impact of budget cuts on NWS's ability to provide up-to-date weather information).

[16] *See Turner* v. *Cnty. of San Bernardino*, 2018 WL 6617638, at *7 (C.D. Cal. Dec. 14, 2018) (appointing experts under Rule 706 to advise the court concerning compliance with just-approved consent judgment); *Coleman* v.

Rule 706 expert instead of a special master, since not all court-appointed agents must be regarded as special masters. *Benjamin* v. *Fraser*, 343 F.3d 35, 45–46 (2d Cir. 2003) ("Nothing in the text of § 3626(f) expressly reveals Congress's intent" to "prohibit a court from appointing agents to perform functions that differ from the quasi-judicial activities of special masters.").[17]  Plaintiffs do not request a special master because there is simply *no need* for the appointed agent to have quasi-judicial powers such as ruling on the admissibility of evidence or subpoenaing witnesses— the Court would be aided through the appointment of an expert pursuant to Rule 706. *See id.* at 45.

Accordingly, this Court should appoint an expert pursuant to FRE 706 to survey the conditions on the Farm Line.  When the difference of a few degrees can thrust someone working in the field into danger, accuracy is critical. *See supra*, at 5–9; ECF 201-03 ¶ 15 (citing Ex. 59 (Davis)); *see also Ball*, 792 F.3d at 590 (discussing district court's appointment of monitor to ensure accurate temperature readings at Angola).  Given Defendants' checkered history in recording the heat index and Defendants' "bad faith" application of their remedial measures, ECF 109 at 2, a neutral observer is necessary to track the WBGT and report to the Court regarding

---

*Brown*, 2018 WL 6250852, at *5 (E.D. Cal. Nov. 29, 2018) (appointing "independent investigator" under Rule 706 to assess whether defendants presented false information to the court), *appeal dismissed sub nom. Coleman* v. *Newsom*, No. 19-15006, 2020 WL 3549090 (9th Cir. 2020); *see also Armstrong* v. *Brown*, 768 F.3d 975, 987 (9th Cir. 2014) (discussing permissible bounds of delegated authority to Rule 706 experts, with no reference to a bar against Rule 706 experts under the PLRA).

[17]   *See also, e.g.*, *Handberry* v. *Thompson*, 446 F.3d 335, 351–52 (2d Cir. 2006) (applying *Benjamin* holding to find "special monitor" in jail education case not governed by PLRA special master provisions); *Braggs* v. *Dunn*, 2017 WL 5665334, at *12 (M.D. Ala. Nov. 27, 2017) (distinguishing appointed mediator from a special master under the PLRA); *United States* v. *Alabama*, 2015 WL 3796526, at *2–4 (M.D. Ala. June 18, 2015) (approving consent judgment including corrections expert monitor; making PLRA findings without reference to monitor); *Laube* v. *Campbell*, 333 F. Supp. 2d 1234, 1239–40 (M.D. Ala. 2004) (applying *Benjamin* to find "healthcare monitor" was not special master under the PLRA); *Hadix* v. *Caruso*, 465 F. Supp. 2d 776, 810–11 (W.D. Mich. 2006) (appointing monitor for medical care system without reference to the PLRA's special master provision or *Benjamin*), *amended on reconsideration*, 2007 WL 162279 (W.D. Mich. Jan. 16, 2007).

Defendants' heat-related policies and practices on the Farm Line.[18]

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their Motion.

Dated:  May 16, 2025

**THE PROMISE OF JUSTICE INITIATIVE**

*/s/ Samantha Pourciau*
Samantha Pourciau, La. Bar No. 39808
Kara Crutcher (PHV) IL Bar No. 6337639
1024 Elysian Fields Avenue
New Orleans, LA 70117
Tel: (504) 529-5955
sbosalavage@defendla.org
kcrutcher@defendla.org

**RIGHTS BEHIND BARS**

*/s/ Lydia Wright*
Lydia Wright, La. Bar No. 37926416
Amaris Montes (PHV) MD Bar No. 2112150205
1800 M St. NW Fnt. 1 #33821
Washington, D.C. 20033
Tel: (202) 455-4399
lydia@rightsbehindbars.org
amaris@rightsbehindbars.org

**PAUL, WEISS, RIFKIND, WHARTON
 & GARRISON LLP**

*/s/ Joshua Hill Jr.*
Joshua Hill Jr. (PHV) NY Bar No. 4297826
Jeremy A. Benjamin (PHV) NY Bar No. 4770277
Michael McGregor (PHV) NY Bar No. 5510490
Arielle B. McTootle (PHV) NY Bar No. 5993217
Ricardo Sabater (PHV) NY Bar No. 5993217
Leah R. Weiser (PHV) NY Bar No. 6027601
Chizoba D. Wilkerson (PHV) NY Bar No. 5903943
1285 Avenue of the Americas
New York, NY 10019-6064
Tel: (212) 373-3000
jhill@paulweiss.com

---

[18]    Not only is WBGT most accurate but Defendants have articulated no burden—cost or otherwise—in acquiring the device.

jbenjamin@paulweiss.com
mmcgregor@paulweiss.com
amctootle@paulweiss.com
rsabater@paulweiss.com
lweiser@paulweiss.com
cwilkerson@paulweiss.com

*Attorneys for Plaintiffs and the Proposed Classes*