# Exhibit 55

<div style="border">

1   **UNITED STATES DISTRICT COURT**

2    **MIDDLE DISTRICT OF LOUISIANA**

3

4 VOICE OF THE EXPERIENCED
 ET AL       :CIVIL ACTION

5

 VERSUS      :NO. 23-CV-01304-BAJ-EWD

6

 JAMES LEBLANC, ET AL  :APRIL 23, 2025

7

 =========================================================

8  MOTIONS HEARING FOR CLASS CERTIFICATION
   BEFORE THE HONORABLE BRIAN A. JACKSON

9   UNITED STATES DISTRICT JUDGE

10    **VOLUME 2 OF 3**

11   A P P E A R A N C E S

12

 FOR THE PLAINTIFFS:

13

   PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

14  BY: JEREMY A. BENJAMIN, ESQUIRE
   BY: ARIELLE B. McTOOTLE, ESQUIRE

15  BY: MICHAEL C. McGREGOR, ESQUIRE
   BY: RICARDO R. SABATER, ESQUIRE

16  1285 AVENUE OF THE AMERICAS
   NEW YORK, NEW YORK 10019

17

   RIGHTS BEHIND BARS

18  BY: LYDIA WRIGHT, ESQUIRE
   BY: AMARIS MONTES, ESQUIRE

19  416 FLORIDA AVENUE NW #26152
   WASHINGTON, D.C. 20002

20

   THE PROMISE OF JUSTICE INITIATIVE

21  BY: SAMANTHA POURCIAU, ESQUIRE
   BY: KARA CELESTE CRUTCHER, I, ESQUIRE

22  1024 ELYSIAN FIELDS AVENUE
   NEW ORLEANS, LOUISIANA 70117

23

24 FOR THE DEFENDANTS:

25  KEOGH, COX & WILSON, LTD
   BY: ANDREW BLANCHFIELD, ESQUIRE

</div>

```
 1        BY: CHRISTOPHER K. JONES, ESQUIRE
          BY: CHELSEA ACOSTA PAYNE, ESQUIRE
 2        701 MAIN STREET
          BATON ROUGE, LOUISIANA 70802
 3

 4

 5

 6

 7

 8        REPORTED BY:  NATALIE W. BREAUX, RPR, CRR
                  UNITED STATES COURTHOUSE
 9                  777 FLORIDA STREET
            BATON ROUGE, LOUISIANA 70801
10                  (225) 389-3565
            NATALIE_BREAUX@LAMD.USCOURTS.GOV
11

12   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY USING
            COMPUTER-AIDED TRANSCRIPTION SOFTWARE
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    ALL RIGHT.  COUNSEL, YOU MAY CALL YOUR

2  NEXT WITNESS.

3    **MS. WRIGHT:**  PLAINTIFFS CALL DR. SUSI

4  VASSALLO.

5    **THE COURT:**  BEFORE WE SWEAR THE NEXT

6  WITNESS, LET ME JUST CONFIRM ON THE RECORD THAT WITH

7  RESPECT TO THE HEARING CONDUCTED YESTERDAY ON THE

8  APPLICATION FOR THE TEMPORARY RESTRAINING ORDER, THAT

9  NEITHER SIDE HAVE ANY ADDITIONAL EVIDENCE TO OFFER.

10  CORRECT?  I BELIEVE WE ESTABLISHED THAT AT THE BENCH

11  CONFERENCE, BUT IF YOU WOULD SIMPLY ESTABLISH THAT ON

12  THE RECORD, GENTLEMEN.

13    **MR. BENJAMIN:**  THAT'S CORRECT FROM

14  PLAINTIFFS.

15    **MR. BLANCHFIELD:**  THAT'S CORRECT FROM THE

16  DEFENDANTS, YOUR HONOR.

17    **THE COURT:**  THANK YOU.

18    ALL RIGHT.  LET'S GO ON AND ADMINISTER

19  THE OATH TO THE WITNESS.

20    **(WHEREUPON, SUSI VASSALLO, BEING DULY SWORN,**

21  **TESTIFIED AS FOLLOWS.)**

22    **THE WITNESS:**  GOOD MORNING, YOUR HONOR.

23    **THE COURT:**  GOOD MORNING, DOCTOR.

24    **THE COURTROOM DEPUTY:**  CLEARLY STATE AND

25  SPELL YOUR NAME FOR THE RECORD.

 1              THE WITNESS:  SUSI VASSALLO.  V, AS IN

 2   VICTOR, A-S-S-A-L-L-O.  FIRST NAME IS SUSI.  IT'S

 3   SPELLED S-U-S-I.

 4              THE COURT:  THANK YOU.

 5                   YOU MAY PROCEED.

 6         MS. WRIGHT:  GOOD MORNING.  LYDIA WRIGHT FOR

 7   THE PLAINTIFFS.

 8                   YOUR HONOR, MAY I APPROACH THE BENCH TO

 9   DELIVER A BOOK OF EXHIBITS?

10         THE COURT:  YES.  YOU MAY HAND IT TO MY

11   COURTROOM DEPUTY.

12         MS. WRIGHT:  THANK YOU.

13                        VOIR DIRE

14   BY MS. WRIGHT:

15      Q    GOOD MORNING, DR. VASSALLO.

16      A    GOOD MORNING.

17      Q    NOW, DR. VASSALLO, DEFENDANTS HAVE ALREADY

18   STIPULATED IN THIS CASE AS TO YOUR EXPERTISE IN

19   EMERGENCY MEDICINE, MEDICAL TOXICOLOGY AND

20   CORRECTIONAL MEDICINE, BUT LET'S TALK ABOUT YOUR

21   EXPERTISE IN THERMOREGULATION.

22              WITHIN THE FIELD OF MEDICAL TOXICOLOGY YOU

23   HAVE A FOCUS ON THERMOREGULATION.  IS THAT CORRECT?

24      A    IT IS.

25      Q    WHAT IS THERMOREGULATION?

1    **A**    THERMOREGULATION IS THE PHYSIOLOGICAL

2  PROCESS BY WHICH THE BODY MAINTAINS A TEMPERATURE OF

3  APPROXIMATELY 98.6, WITHIN A DEGREE OR SO OF THAT

4  TEMPERATURE.

5    **Q**    AND WHY IS THERMOREGULATION A FOCUS WITHIN

6  TOXICOLOGY?

7    **A**    THE REASON IS THAT MANY PROCESSES AFFECT

8  THERMOREGULATION.  FOR EXAMPLE, WITHDRAWAL FROM

9  CERTAIN DRUGS CAN CAUSE FEVER AND ALTERATION OF

10  THERMOREGULATION.  THERE ARE MANY XENOBIOTICS, WHICH

11  WE USUALLY CALL SUBSTANCES, WHICH CAN ALSO AFFECT

12  THERMOREGULATION AND CAN CAUSE ILLNESS.

13    **Q**    DR. VASSALLO, DO YOU HAVE PARTICULAR

14  EXPERTISE ON THE NATURE, CAUSES, TREATMENT, RARITY

15  AND SEVERITY OF HEAT-RELATED ILLNESS?

16    **A**    I DO.

17    **Q**    AND THE FIFTH CIRCUIT IN *GATES* SAID THAT YOU

18  HAVE, QUOTE, LECTURED EXTENSIVELY ON THERMOREGULATION

19  AND HYPERTHERMIA, OR HEAT ILLNESS, AND THAT YOU HAVE

20  AUTHORED THE "THERMOREGULATORY PRINCIPLES" CHAPTER OF

21  GOLDFRANK'S *TOXICOLOGIC EMERGENCIES*, A TEXTBOOK ON

22  MEDICAL TOXICOLOGY.  DID THE FIFTH CIRCUIT GET THAT

23  RIGHT?

24    **A**    YES.

25    **Q**    AND IN *COLE*, THE SOUTHERN DISTRICT OF TEXAS

1  WROTE THAT THE COURT HAS NO BASIS UPON WHICH TO

2  QUESTION DR. VASSALLO'S CHOICE OF 88 DEGREES

3  FAHRENHEIT AS A THRESHOLD ABOVE WHICH THE RISK OF

4  HEAT-RELATED ILLNESS INCREASES.  DID THAT COURT GET

5  IT RIGHT?

6      **A**    THAT'S CORRECT.

7      **Q**    AND THE FIFTH CIRCUIT IN *YATES* DESCRIBED YOU

8  AS A RECOGNIZED EXPERT IN THE FIELD OF

9  THERMOREGULATION AND HYPERTHERMIA WITH OVER 25 YEARS

10 TREATING HEAT STROKE AND HEAT-RELATED DISORDERS.  IS

11 THAT CORRECT?

12     **A**    THAT'S CORRECT.

13     **Q**    AND YOU'VE BEEN ACCEPTED AS AN EXPERT IN

14 THERMOREGULATION BY THIS COURT AND MANY OTHERS?

15     **A**    THAT'S CORRECT.

16     **Q**    DID YOU RELY ON YOUR SPECIALIZED KNOWLEDGE

17 AND EXPERTISE IN EMERGENCY MEDICINE, CORRECTIONAL

18 MEDICINE, TOXICOLOGY AND PARTICULARLY

19 THERMOREGULATION WHEN RENDERING YOUR CONCLUSIONS IN

20 THIS CASE?

21     **A**   YES, I DID.

22         **MS. WRIGHT:**  YOUR HONOR, WE WOULD TENDER DR.

23 VASSALLO AS AN EXPERT IN EMERGENCY MEDICINE, MEDICAL

24 TOXICOLOGY, CORRECTIONAL MEDICINE, AND

25 THERMOREGULATION.

1          **MR. BLANCHFIELD:**  YOUR HONOR --

2          **THE COURT:**  WAIT, WAIT.  JUST A MOMENT.  LET

3   ME MAKE SURE I GOT THIS RIGHT.

4                EMERGENCY MEDICINE, MEDICAL

5   TOXICOLOGY --

6          **MS. WRIGHT:**  YES.

7          **THE COURT:**  -- THERMOREGULATION.

8          **MS. WRIGHT:**  YES.  AND CORRECTIONAL

9   MEDICINE.

10         **THE COURT:**  ALL RIGHT.  ANY OBJECTION OR

11  WOULD THE DEFENSE LIKE TO VOIR DIRE THE WITNESS?

12         **MR. BLANCHFIELD:**  NO NEED TO VOIR DIRE, YOUR

13  HONOR.  AND AS MS. WRIGHT HAS REPRESENTED, WE HAD

14  ALREADY AGREED TO THE THREE AREAS OF HER TENDER.  THE

15  ONLY OBJECTION THAT WE MAKE IS A TENDER IN THE FIELD

16  OF THERMOREGULATION.

17         **THE COURT:**  WOULD YOU LIKE TO CONDUCT VOIR

18  DIRE OF THE WITNESS?

19         **MR. BLANCHFIELD:**  NO, YOUR HONOR.  JUST TO

20  MAKE A COMMENT THAT THERE IS NO MEDICAL SPECIALTY FOR

21  THERMOREGULATION; THAT MANY, MANY OF --

22  PSYCHIATRISTS, INTERNISTS, FAMILY MEDICINE, THEY'RE

23  ALL EXPOSED TO THAT ISSUE, THEY'RE ALL TRAINED IN

24  THAT ISSUE.  PSYCHIATRISTS WHO PRESCRIBE

25  ANTIPSYCHOTICS THAT ARE VERY HIGH IN ANTI-PULMONARY

1  PROPERTIES ARE VERY FAMILIAR WITH THERMOREGULATION.

2          WE JUST DON'T THINK IT'S A PROPER FIELD

3  OF EXPERTISE TO BE TENDERED IN LIKE EMERGENCY ROOM

4  MEDICINE AND TOXICOLOGY.

5          **THE COURT:**  ALL RIGHT.  MS. WRIGHT, WOULD

6  YOU LIKE TO CONDUCT ADDITIONAL VOIR DIRE WITH RESPECT

7  TO DR. VASSALLO'S QUALIFICATIONS IN THAT FIELD?

8          **MS. WRIGHT:**  I DON'T THINK IT'S NECESSARY,

9  YOUR HONOR.

10          **THE COURT:**  HAS SHE BEEN QUALIFIED OR

11  ACCEPTED AS AN EXPERT IN THAT FIELD BY OTHER COURTS?

12          **MS. WRIGHT:**  YES.

13          **THE COURT:**  WHAT COURTS, IF YOU KNOW?

14          **MS. WRIGHT:**  *COLE* IN THE SOUTHERN DISTRICT

15  OF TEXAS.  IN *McCOLLUM*, WHICH IS A 2017 CASE FROM THE

16  SOUTHERN DISTRICT OF TEXAS, DR. VASSALLO WAS

17  QUALIFIED AS AN EXPERT IN THERMOREGULATION.  THE

18  FIFTH CIRCUIT HAS CALLED HER AN EXPERT IN

19  THERMOREGULATION IN *YATES*.

20          **THE COURT:**  I'M SATISFIED --

21          **MS. WRIGHT:**  THANK YOU.

22          **THE COURT:**  -- MS. WRIGHT.  THANK YOU.

23          THE COURT WILL ACCEPT DR. VASSALLO AS

24  AN EXPERT IN THE FIELDS OF EMERGENCY MEDICINE,

25  MEDICAL TOXICOLOGY, THERMOREGULATION AND CORRECTIONAL

1 MEDICINE.  LET'S PROCEED.

2                    **DIRECT EXAMINATION**

3 **BY MS. WRIGHT:**

4      **Q**    DR. VASSALLO, WHAT WAS YOUR ASSIGNMENT IN

5 THIS MATTER?

6      **A**    MY ASSIGNMENT WAS TO LOOK AT THE FARM LINE

7 AT THE LOUISIANA STATE PENITENTIARY AND LOOK AT THE

8 EFFECTS OF THE HEAT ON THOSE INDIVIDUALS WORKING ON

9 THE FARM LINE.

10      **Q**    WERE YOU ABLE TO REACH A CONCLUSION?

11      **A**    YES, I WAS.

12      **Q**    WHAT WAS YOUR CONCLUSION?

13      **A**    THE -- MY CONCLUSION WAS THAT THE HEAT AND

14 THE CONDITIONS ON THE FARM LINE RENDER THOSE

15 INDIVIDUALS WHO WORK THERE AT RISK OF SUBSTANTIAL

16 RISK OF SERIOUS HARM.

17      **Q**    IN REACHING THAT OPINION, WHAT WAS YOUR

18 METHODOLOGY?

19      **A**    WELL, FIRST OF ALL, I'VE BEEN STUDYING THIS

20 FOR 35 YEARS.  I'VE BEEN A CLINICIAN AND I CONTINUE

21 TO BE A CLINICIAN SEEING PATIENTS IN THE EMERGENCY

22 DEPARTMENT.  I REVIEWED POLICIES, PROCEDURES.  I READ

23 DEPOSITIONS, DECLARATIONS.  I READ -- AND I'M WELL

24 VERSED IN THE LITERATURE OF THE LAST 35 YEARS.

25      **Q**    YOU REVIEWED PATIENT MEDICAL RECORDS AS

1  WELL?

2      **A**    I DID.  AND I VISITED THE FARM LINE AND I

3  SPOKE TO INDIVIDUALS WORKING ON THE FARM LINE THAT

4  DAY.

5      **Q**    AND YOU'RE REFERRING TO THE SITE INSPECTION

6  ON JULY 22, 2024?

7      **A**    THAT'S CORRECT.

8      **Q**    AND, OF COURSE, YOU'VE BEEN TO ANGOLA

9  NUMEROUS TIMES PRIOR BECAUSE OF YOUR WORK AS AN

10  EXPERT IN *LEWIS V* --

11      **A**    THAT'S RIGHT.

12          **THE REPORTER:**  *LEWIS V*?

13          **MS. WRIGHT:**  *LEWIS V CAIN*.

14  **BY MS. WRIGHT:**

15      **Q**    AND *ALEX A* AND *BALL V LEBLANC*?

16      **A**    THAT'S CORRECT.

17      **Q**    ARE YOUR OPINIONS IN THIS CASE RENDERED TO A

18  REASONABLE DEGREE OF CERTAINTY?

19      **A**    YES.

20      **Q**    LET'S TALK ABOUT THE SCIENCE OF

21  THERMOREGULATION.  CAN YOU PROVIDE A BRIEF OVERVIEW

22  OF THE TWO PRIMARY MECHANISMS OF THERMOREGULATION?

23  WHAT ARE THEY?

24      **A**    WELL, FIRST OF ALL, ONE HAS TO SWEAT AND ONE

25  VASODILATES.  AND BOTH OF THOSE PRIMARY MECHANISMS OF

1  HEAT LOSS ARE DIRECTED BY THE BRAIN.  AND THE

2  HYPOTHALAMUS IS A PART OF THE BRAIN WHICH HELPS TO

3  DIRECT THAT.  IT'S A -- THE ANTERIOR AND THE

4  POSTERIOR HYPOTHALAMUS ARE AREAS OF THE BRAIN THAT

5  HAVE -- SPEAK TO EACH OTHER THROUGH NEUROTRANSMITTERS

6  AND ACCEPT SIGNALS FROM THE SKIN, FROM THE CORE BODY

7  TEMPERATURE, AND DIRECT THE BRAIN TO -- THE BRAIN

8  DIRECTS SWEATING AND VASODILATION.

9     **Q**    SO THERMOREGULATION REQUIRES THE PROPER

10 FUNCTIONING OF THE BRAIN AND THE CENTRAL NERVOUS

11 SYSTEM?

12    **A**    YES.

13    **Q**    COULD IMPAIRED THERMOREGULATION IMPAIR A

14 PERSON'S ABILITY TO THINK OR WORK OR COMMUNICATE?

15    **A**    YES.  I MEAN, AS THE BODY TEMPERATURE RISES

16 TO THE POINT OF EVEN HEAT STROKE, OF COURSE THERE IS

17 ASSOCIATED CHANGE IN MENTAL STATUS, ABILITY TO THINK.

18 AND THAT IS A PART OF THE DEFINITION OF HEAT STROKE.

19    **Q**    SO BASED ON EVERYTHING THAT WE'VE JUST

20 DISCUSSED AND IN YOUR FOUR DECLARATIONS IN THIS CASE,

21 IS THE ABILITY TO THERMOREGULATE IMPORTANT TO DAILY

22 LIFE?

23    **A**    YES; VITAL.

24    **Q**    NOW, YOUR REPORTS IN THIS CASE COVER BOTH

25 EXERTIONAL AND NONEXERTIONAL HEAT STROKE.  IS THAT

1  RIGHT?

2      **A**    THAT'S CORRECT.

3      **Q**    IS IT YOUR OPINION THAT MEN WORKING ON THE

4  FARM LINE ARE AT AN UNACCEPTABLE RISK OF EITHER TYPE

5  OF HEAT STROKE?

6      **A**    YES.

7      **Q**    WHAT HAPPENS TO THE BODY'S TISSUES AND

8  ORGANS DURING A HEAT STROKE?

9      **A**    WELL, THE CELLS THAT ARE SUBJECTED TO THOSE

10  TEMPERATURES DIE.  AND SO AS THE CELLS OF THE LIVER

11  DIE, ONE STARTS TO BLEED, BECAUSE THE LIVER IS

12  RESPONSIBLE FOR COAGULATION.  AS THE CELLS AND THE

13  BRAIN DIE, ONE BECOMES ALTERED IN THEIR ABILITY TO

14  THINK, REASON, AND THEIR JUDGMENT.  AS THE CELLS OF

15  THE HEART ARE DAMAGED, THE HEART BECOMES LESS ABLE TO

16  DO WHAT IT NEEDS TO DO, WHICH IS TO INCREASE THE

17  CARDIAC OUTPUT, WHICH IS A PRODUCT OF THE ABILITY TO

18  SQUEEZE AND THE ABILITY TO BEAT RAPIDLY.  SO -- AND,

19  OF COURSE, SO BASICALLY ALL OF THE CELLS OF THE BODY,

20  AS HEAT STROKE OCCURS, THEY START TO DIE AND THE

21  MANIFESTATION OF HEAT STROKE BECOMES VISIBLE.

22      **Q**    IS IT THE CASE THAT A PERSON MAY NOT BE

23  AWARE THEY ARE IN IMMINENT DANGER OF HEAT STROKE

24  UNTIL IT'S TOO LATE?

25      **A**    THIS IS VERY CLEAR FROM MILITARY RECRUITS,

1    IT'S VERY CLEAR FROM ATHLETICS, AND IT'S CLEAR IN ALL

2    OF THE EPIDEMIOLOGY.  SO THAT SOMEBODY CAN BE

3    REACHING THAT POINT OF COLLAPSE AND ALTERATION OF

4    MENTAL STATUS AND NOT REALIZE IT.

5        Q    NOW, YOU'VE MENTIONED THE ALTERED MENTAL

6    STATUS THAT CAN INDICATE THAT BRAIN FUNCTION IS

7    FAILING.  IN CORRECTIONAL SETTINGS HOW MIGHT THE

8    ALTERED MENTAL STATUS MANIFEST?

9        A    WELL, THE PROBLEM IN CORRECTIONAL

10   SETTINGS -- AND THIS IS -- I'VE SEEN THIS MANY TIMES

11   IN TEXAS AS WELL -- IS THAT THEIR JUDGMENT, THEIR

12   BEHAVIOR, THEIR ABILITY TO FOLLOW INSTRUCTION, AND

13   THE IRRITABILITY AND THE -- IS IMPAIRED.  AND THEY --

14   OFTEN THOSE SYMPTOMS OF IMPENDING HEAT-RELATED

15   ILLNESS OR HEAT STROKE ARE MISINTERPRETED BY STAFF AS

16   JUST WILLFUL DISOBEDIENCE.

17       Q    SO INAPPROPRIATE BEHAVIOR COULD ACTUALLY BE

18   A PHYSIOLOGICAL RESPONSE TO EXCESSIVE HEAT?

19       A    IT IS.

20       Q    NOW, YOU'VE TESTIFIED THAT HEAT STROKE IS

21   CHARACTERIZED IN PART BY AN INCREASE IN CORE

22   TEMPERATURE.  ARE THERE HEAT-RELATED ILLNESSES THAT

23   ARE NOT CHARACTERIZED BY AN INCREASE IN CORE

24   TEMPERATURE?

25       A    YES.  I MEAN, THE -- THERE ARE SIMPLE THINGS

1  LIKE HEAT RASH; THERE ARE THINGS LIKE FAINTING DUE TO

2  THE HEAT.  REMEMBER, WHEN YOU ARE UNDER HEAT STRESS,

3  THE VASODILATION MEANS THAT BLOOD IS IN THE

4  PERIPHERY; THAT IS, OUT IN YOUR ARMS AND YOUR LEGS

5  AND YOUR SKIN.  AND THEN YOU CAN FAINT BECAUSE THERE

6  IS SO MUCH BLOOD OUT THERE AND NOT ENOUGH TO THE

7  BRAIN.  AND THE -- OVERWHELMINGLY THE BODY WILL

8  MAINTAIN BLOOD PRESSURE, SO YOU'RE GOING TO FAINT SO

9  THAT YOUR BLOOD PRESSURE IS MAINTAINED.  SO THE

10 ANSWER IS YES, THERE ARE DIFFERENT WAYS.

11     Q    THROUGH THE COURSE OF YOUR WORK ON THIS CASE

12 AND IN YOUR CAREER STUDYING ANGOLA, HAVE YOU SEEN

13 EVIDENCE OF HEAT ILLNESS AMONG PEOPLE WORKING THE

14 FARM LINE?

15     A    YES.

16     Q    NOW, DOES USING A FAN OUTSIDE LOWER THE RISK

17 OF DEATH FROM EXCESSIVE HEAT TO A STATISTICALLY

18 SIGNIFICANT DEGREE?

19     A    THE ANSWER IS NO.  THIS IS SHOWN AND

20 DESCRIBED IN THE LITERATURE AT -- IN FACT, WHEN THE

21 TEMPERATURE IS ABOVE 90 DEGREES AND THE HUMIDITY IS

22 AROUND 35 -- AND, OF COURSE, THE TEMPERATURE AND THE

23 DEGREE OF HUMIDITY DIFFER IN THE LITERATURE.  THE

24 FANS ARE SHOWN TO INCREASE HEAT STRESS AS BLOWING HOT

25 AIR OVER THE BODY.  SO FANS, ALSO IN BOUCHAMA'S META-

1   ANALYSIS, WERE ALSO SHOWN TO BE NOT HELPFUL IN HOT

2   CONDITIONS.

3       **Q**    ARE THERE --

4       **A**    OR PROTECTIVE IS WHAT -- EXCUSE ME FOR

5   INTERRUPTING.  PROTECTIVE; THEY'RE NOT PROTECTIVE

6   AGAINST HEAT-RELATED ILLNESS.

7       **Q**    ARE THERE EFFECTIVE WAYS TO MITIGATE THE

8   RISK OF HEAT ON THE FARM LINE?

9       **A**    WELL, YES, THERE ARE SUCH WAYS.  THE --

10  OBVIOUSLY YOU CAN'T AIR-CONDITION THE FARM LINE;

11  ALTHOUGH YOU COULD PROBABLY PROVIDE AIR CONDITIONING

12  AT THE FARM LINE.  OF COURSE, IF PEOPLE SPEND THE

13  OTHER 20 DAYS -- 20 HOURS A DAY IN AIR CONDITIONING,

14  IT WOULD LESSEN THE RISK ON THE FARM LINE.  BUT THESE

15  PRISONERS ARE ALSO IN THE HOT CONDITIONS IN THE

16  PRISON.  AND ONE THING THAT'S CLEAR FROM THE SCIENCE

17  IS THAT PEOPLE WHO ARE SLEEPING IN HOT CONDITIONS AND

18  EXISTING IN HOT CONDITIONS OUTSIDE OF THEIR TIME THAT

19  THEY'RE WORKING ARE AT GREATER RISK.

20      **Q**    THERE IS A CUMULATIVE EFFECT OF HEAT ON THE

21  BODY?

22      **A**    ABSOLUTELY.

23      **Q**    I'D LIKE TO LOOK AT SOME STUDIES THAT YOU

24  RELIED ON IN REACHING YOUR OPINIONS.  AND WE'LL START

25  WITH PLAINTIFFS' EXHIBIT 40, WHICH IS BEHIND TAB 1 IN

1  YOUR BINDER.

2         **MR. JONES:**  YOUR HONOR, DEFENDANTS OBJECT

3  TO --

4         **THE REPORTER:**  INTO THE MIC, PLEASE, MR.

5  JONES.

6         **THE COURT:**  YES, JUST PULL THE MIC.  YES,

7  THERE YOU GO.

8         **MR. JONES:**  DEFENDANTS OBJECT TO PLAINTIFFS'

9  EXHIBIT 40 ON THE BASIS THAT THIS EXHIBIT WAS NOT

10 IDENTIFIED, RELIED UPON, OR PRODUCED IN RESPONSE

11 TO -- IN SUPPORT OF THE MOTION FOR CLASS

12 CERTIFICATION THAT WE TALKED ABOUT BEFORE.

13         I WILL NOTE THAT THIS PARTICULAR

14 EXHIBIT WAS CITED BY DR. VASSALLO IN HER FOURTH

15 DECLARATION TO WHICH DEFENDANTS HAVE FILED A MOTION

16 TO STRIKE BECAUSE THAT DECLARATION WAS PRODUCED AND

17 FILED AFTER THE DATE OF HER REPORT AND AFTER THE

18 BRIEFING ON CLASS CERTIFICATION HAD ENDED.

19         SO ON THAT BASIS, WE WOULD OBJECT TO

20 THE INTRODUCTION OF THIS EXHIBIT IN SUPPORT OF THEIR

21 MOTION FOR CLASS CERTIFICATION.

22         **THE COURT:**  MS. WRIGHT?

23         **MS. WRIGHT:**  DR. VASSALLO RELIED ON THIS

24 STUDY AND MANY OTHERS TO DETERMINE THAT THE RISK OF

25 HEAT-RELATED HARM -- SPECIFICALLY DEATH -- SHARPLY

1  INCREASES AT A HEAT INDEX OF 88 DEGREES FAHRENHEIT.

2  SHE INCLUDED THE GRAPH THAT WE'RE GOING TO LOOK AT,

3  HOPEFULLY TODAY, IN HER FOURTH DECLARATION.  BUT IN

4  HER VERY FIRST DECLARATION, ECF 37-1 AT PARAGRAPH 33,

5  WHICH WAS FILED LAST SUMMER, SHE WROTE "THE RISK FOR

6  HEAT" -- "THE RISK FOR HEAT STROKE AND HEAT-RELATED

7  DISORDERS INCREASES SHARPLY WHEN THE HEAT INDEX

8  EXCEEDS 88 DEGREES."  THIS IS SIMPLY WHAT SHE RELIED

9  ON.

10           THE COURT:  SO WHEN WAS THIS PRODUCED TO THE

11  DEFENSE?

12           MS. WRIGHT:  AT THE VERY LEAST, IT WAS

13  PRODUCED -- IT WAS CITED IN DR. VASSALLO'S FOURTH

14  DECLARATION, WHICH WAS FILED INTO THE RECORD, I

15  BELIEVE, IN MARCH.

16           THE COURT:  SO IT WAS CITED BUT NOT --

17           MS. WRIGHT:  AND IT WAS PRODUCED LAST WEEK

18  WHEN WE EXCHANGED EXHIBITS.

19           THE COURT:  IT WAS CITED AT AN EARLIER POINT

20  IN THE LITIGATION?

21           MS. WRIGHT:  YES.

22           THE COURT:  I UNDERSTAND YOUR POINT, MR.

23  JONES.  SHE CITED IT IN EARLIER DEPOSITIONS.  I WILL

24  ALLOW SOME LIMITED TESTIMONY ON IT, BUT -- HOW MANY

25  MORE DOCUMENTS DO WE HAVE LIKE THIS?

1          MS. WRIGHT:  THERE IS FOUR THAT WE ARE GOING

2    TO -- THAT WE'D LIKE TO DISCUSS TODAY.

3          THE COURT:  IS THERE A REASON THAT THEY WERE

4    PRODUCED SO LATE?

5          MS. WRIGHT:  WELL, THEY'RE ALL SCIENCE THAT

6    DR. VASSALLO RELIED UPON TO REACH THE 88-DEGREE

7    FIGURE OR NOT.  AND REALLY THE J-SHAPED CURVE FIGURE

8    THAT I'D LIKE TO DISCUSS WITH DR. VASSALLO RIGHT NOW

9    I THINK WILL BE HELPFUL TO THE COURT TO VISUALIZE

10   WHAT HAPPENS AT AN 88-DEGREE THRESHOLD AND WHY DR.

11   VASSALLO HAS FOR DECADES USED THAT NUMBER THAT'S BEEN

12   RECOGNIZED BY THE COURT.

13         THE COURT:  SO WHEN WAS THIS ARTICLE

14   PUBLISHED?

15         MS. WRIGHT:  2003.

16         THE COURT:  YOU CAN GO ON AND DISPLAY THE

17   ARTICLE.  I MEAN, THIS IS NOT --

18         MR. JONES:  JUDGE, IF I CAN ADD TO CLARIFY,

19   IF SHE RELIED ON IT, SHE SHOULD HAVE INCLUDED IT IN

20   HER REPORT WHEN SHE PRODUCED IT WAY BACK MANY MONTHS

21   AGO BEFORE CLASS CERTIFICATION BRIEFING OCCURRED, OF

22   COURSE.  AND SO THAT'S REALLY THE ISSUE HERE.

23         THE COURT:  SO WHAT WE HAVE IS A SITUATION

24   WHERE IT WAS NOT INCLUDED IN THE REPORT BUT IT WAS,

25   AS I UNDERSTAND IT, MR. JONES, REFERENCED, HOWEVER,

1  IN HER EARLIER DEPOSITION.  IS THAT RIGHT?

2          **MR. JONES:**  I DON'T KNOW IF THAT'S CORRECT.

3  IT CERTAINLY WASN'T IDENTIFIED AS A SOURCE UPON WHICH

4  SHE WAS RELYING, AND SO SHE PUT TWO OF THESE IN HER

5  FOURTH DECLARATION THAT WAS FILED A MONTH AGO.

6          **THE COURT:**  ALL RIGHT.  MS. WRIGHT?

7          **MS. WRIGHT:**  YOUR HONOR, MR. BLANCHFIELD

8  YESTERDAY IN HIS OPENING STATEMENT DISPUTED THAT ANY

9  SCIENCE EXISTS TO SUPPORT THE 88-DEGREE FIGURE.

10 SCIENCE EXISTS, AND THAT'S WHAT WE WOULD LIKE TO

11 DEMONSTRATE TODAY.

12          WHETHER THIS IS ENTERED INTO EVIDENCE

13 IN THIS CASE OR WHETHER WE CAN SIMPLY REFER TO IT AS

14 A DEMONSTRATIVE IS NOT RELEVANT -- OR IT'S NOT AN

15 ISSUE TO US.

16          **THE COURT:**  SO, MR. JONES, HOW WOULD YOU

17 PROPOSE CURING ANY PREJUDICE THAT MAY RESULT FROM THE

18 LATE DISCLOSURE?

19          **MR. JONES:**  DR. VASSALLO IS HERE TO TESTIFY

20 ABOUT HER OPINIONS, AND SHE CAN CERTAINLY TESTIFY ON

21 THAT.  NOW, WHAT WE'RE TRYING TO DO IS TO -- WE'RE

22 OBJECTING TO THE INTRODUCTION OF THIS ADDITIONAL

23 EVIDENCE THAT WAS NOT DISCLOSED TO US UNTIL THIS LATE

24 DATE AFTER BRIEFING WAS CLOSED.

25          **THE COURT:**  NO, I UNDERSTAND THAT.  BUT MY

1    QUESTION TO YOU, MR. JONES, IS -- AS YOU KNOW, I

2    MENTIONED THIS EARLIER -- MOTIONS IN LIMINE,

3    SIMILARLY THE DENIAL OF A REQUEST TO INCLUDE

4    EVIDENCE, ESPECIALLY IF IT MAY BE RELEVANT EVIDENCE,

5    IS STRONGLY DISFAVORED.  SO THE COURTS ALWAYS HAVE TO

6    LOOK FOR WAYS TO CURE ANY POTENTIAL PREJUDICE THAT

7    COULD RESULT TO A PARTY BECAUSE OF THE LATE

8    DISCLOSURE.

9           NOW, ONE OF THE OPTIONS WAS FOR ME TO

10   MAYBE PUT THIS OFF FOR 30 DAYS TO ALLOW YOU TO REVIEW

11   IT OR HAVE YOUR EXPERTS REVIEW IT, WORK WITH THE

12   PLAINTIFFS TO SCHEDULE ANOTHER DEPOSITION.  AND

13   FRANKLY, THAT'S STILL AVAILABLE TO THE COURT.  BUT IF

14   IT'S RELEVANT EVIDENCE ON A CRITICAL ELEMENT OF THE

15   PLAINTIFFS' CLAIM, I'M NOT INCLINED TO DENYING THIS

16   WITNESS'S ABILITY TO REFERENCE IT, ESPECIALLY IF, AS

17   I MENTIONED EARLIER, IT HAD BEEN REFERENCED -- EVEN

18   IF IT WAS INDIRECTLY SO -- IN SOME PRIOR

19   DECLARATIONS.  IT WAS OUT THERE, AS I APPRECIATE IT,

20   SHE SAID, *BECAUSE IN A PRIOR DECLARATION I RELIED ON*

21   *THIS ARTICLE.*

22          NOW, THE DEFENSE MAY NOT HAVE ACTUALLY

23   PHYSICALLY PRESENTED THE ARTICLE TO YOU, BUT IT WAS

24   OUT THERE IN EVIDENCE IN THE DISCOVERY IN THIS CASE.

25   I DON'T NECESSARILY -- AND I DON'T THINK YOU HAVE ANY

1  LEGAL OBLIGATION NECESSARILY TO SAY, *OKAY, WELL,*

2  *WAIT.  I'M GOING TO TAKE IT UPON MYSELF TO GO ON AND*

3  *GATHER ALL OF THESE THINGS THAT AN EXPERT HAS*

4  *IDENTIFIED AS HAVING RELIED ON*.

5            BUT AGAIN, I GO BACK TO MY QUESTION:

6  TO THE EXTENT THAT YOU BELIEVE YOUR CLIENT IS

7  PREJUDICED, GIVEN THAT IT IS RELEVANT TESTIMONY,

8  GIVEN THAT IT'S, AGAIN, STRONGLY DISFAVORED TO NOT

9  OFFER THIS, WE HAVE -- IN OTHER WORDS, WE HAVE -- I

10 CAN'T OVERSIMPLIFY THIS BY SAYING IT'S A MERE

11 TECHNICALITY, BECAUSE IT'S MUCH MORE SERIOUS THAN

12 THAT.

13           WHAT I'M SAYING IS -- WE DON'T HAVE A

14 TRIAL DATE SET.  WE HAVE PLENTY OF TIME TO ALLOW YOU

15 TO REVIEW THE INFORMATION, TO REVIEW THE MATERIALS,

16 TO HAVE YOUR EXPERTS REVIEW THE MATERIALS.  IF WE

17 HAVE TO COME BACK INTO COURT FOR YET ANOTHER

18 EXAMINATION OF THE WITNESS, I'M PREPARED TO DO THAT.

19           **MR. JONES:**  I'D LIKE TO RESPECTFULLY REQUEST

20 IN THOSE COMMENTS THAT DR. VASSALLO BE ALLOWED TO

21 TESTIFY ABOUT THE ARTICLES BUT NOT ALLOW THE

22 INTRODUCTION OF THE ARTICLES THEMSELVES.

23           **THE COURT:**  MS. WRIGHT?

24           **MS. WRIGHT:**  DEMONSTRATIVES ARE FINE.

25           **THE COURT:**  ALL RIGHT.  VERY WELL.  OKAY.

1  BY MS. WRIGHT:

2      Q    DR. VASSALLO, WE'RE LOOKING AT PLAINTIFFS'

3  EXHIBIT 40, THE DAVIS ARTICLE FROM 2003.  HOW, IF AT

4  ALL, DID THIS STUDY INFORM YOUR OPINION?

5          THE COURT:  ACTUALLY -- I APOLOGIZE, DR.

6  VASSALLO.

7              SO LET ME JUST BE CLEAR, MR. JONES.

8  ARE YOU SATISFIED AT THIS POINT YOU HAVE, IN

9  FACT, RECEIVED EVERYTHING, OR DO YOU KNOW?

10         MR. JONES:  WELL, THERE IS A WHOLE LIST OF

11 PLAINTIFFS' EXHIBITS THAT MAY COME UP LATER.  BUT

12 WITH RESPECT TO DR. VASSALLO, APPARENTLY THIS IS IT,

13 THE FIVE THAT HAVE BEEN IDENTIFIED.  AND SO I KNOW

14 IT'S BEING REFERENCED AS PLAINTIFFS' EXHIBITS 40, 41,

15 42, 45 AND 49, BUT AS I APPRECIATE WHAT WE'RE DOING

16 AT THIS POINT IS THAT THEY'RE GOING TO BE CONSIDERED

17 DEMONSTRATIVE AIDS BUT THEY'RE NOT GOING TO BE

18 INTRODUCED INTO EVIDENCE IN SUPPORT OF THE MOTION FOR

19 CLASS CERTIFICATION.

20         THE COURT:  AND SHE CAN TESTIFY ABOUT THAT,

21 BUT THAT'S RIGHT.

22         MR. JONES:  THANK YOU.

23         THE COURT:  BUT TO BE SURE, ARE THERE ANY

24 OTHER -- HAVE YOU PRODUCED EVERYTHING TO THE

25 DEFENDANTS AT THIS TIME?

 1          **MS. WRIGHT:**  YES.

 2          **THE COURT:**  AND YOU'RE SATISFIED WITH THAT,

 3  MR. JONES?  EVEN THOUGH THEY WERE LATE, YOU HAVE NO

 4  REASON TO BELIEVE --

 5          **MR. JONES:**  I APOLOGIZE.

 6          **THE COURT:**  NO, NO, NO APOLOGIES.

 7          **MR. JONES:**  PLAINTIFFS' EXHIBIT 40 WAS CITED

 8  IN DR. VASSALLO'S FOURTH DECLARATION.  PLAINTIFFS'

 9  EXHIBIT 41 WE BELIEVE WAS CITED IN HER -- EITHER IN

10  HER REPORT OR AN ADDITIONAL DECLARATION.  PLAINTIFFS'

11  EXHIBIT 42 WAS CITED IN THE FOURTH DECLARATION.  WE

12  HAVE NOT IDENTIFIED PLAINTIFFS' EXHIBIT 45 OR

13  PLAINTIFFS' EXHIBIT 49 CITED ANYWHERE OTHER THAN

14  BEING INCLUDED ON THIS PLAINTIFFS' EXHIBIT LIST.

15          **THE COURT:**  OKAY.  SO WHAT WE'LL DO, WE'LL

16  ALLOW DR. VASSALLO TO TESTIFY ABOUT THOSE REPORTS TO

17  THE EXTENT THEY FORMED HER OPINION AND -- BUT THEY,

18  AGAIN, WILL BE TREATED AS A DEMONSTRATIVE AID -- OR

19  DEMONSTRATIVE AIDS.  OKAY?

20          **MS. WRIGHT:**  THANK YOU.

21              AND IF I MAY JUST RESPOND TO ONE THING.

22  PLAINTIFFS' EXHIBIT 49, WHICH IS A REPORT FROM THE

23  LOUISIANA DEPARTMENT OF HEALTH, WAS CITED IN DR.

24  VASSALLO'S INITIAL DECLARATION, ECF 37-3 AT PARAGRAPH

25  92.  AND, IN FACT, THE GRAPH THAT I WOULD LIKE TO

1  LOOK AT WITH DR. VASSALLO IS REPLICATED IN THE

2  DECLARATION.

3        **THE COURT:**  VERY WELL.

4  **BY MS. WRIGHT:**

5     **Q**    BUT TURNING BACK TO THE DAVIS STUDY FROM

6  2003, DR. VASSALLO, HOW, IF AT ALL, DID THIS STUDY

7  INFORM YOUR OPINIONS IN THIS CASE?

8     **A**    THIS IS ONE OF NUMEROUS SCIENTIFIC TREATISES

9  THAT DEMONSTRATE A SHARP J-SHAPED OR A HOCKEY STICK

10  SHAPED INCREASE IN MORTALITY.  THIS IS THE MORTALITY

11  AND NOT THE MORBIDITY.  WE CAN LOOK AT OTHER THINGS,

12  AND THERE ARE MANY ARTICLES OTHER THAN THE TWO THAT

13  YOU AND I WERE GOING TO SPEAK ABOUT TODAY THAT

14  DEMONSTRATE THIS.

15        SO WHAT WE SEE HERE IS AT 30 DEGREES HEAT

16  INDEX APPARENT TEMPERATURE, WHICH IS ANOTHER WAY TO

17  SAY HEAT INDEX, THE MORTALITY INCREASED SHARPLY LIKE

18  A "J."

19     **Q**    SO DAVIS USED A SCATTER PLOT TO EXAMINE THE

20  RELATIONSHIP BETWEEN THE APPARENT TEMPERATURE OR THE

21  HEAT INDEX AND THE RISK OF HEAT-RELATED MORTALITY,

22  WHICH IS DEATH.  IS THAT RIGHT?

23     **A**    THAT'S CORRECT.

24     **Q**    AND THESE SCATTER PLOTS FORM A J-SHAPED

25  CURVE WHICH INDICATES A SHARP INCREASE IN PATIENT

1   DEATH AS THE APPARENT TEMPERATURE HITS 30 DEGREES

2   CELSIUS, WHICH IS 86 DEGREES FAHRENHEIT.  IS THAT

3   RIGHT?

4       **A**    THAT IS CORRECT.

5       **Q**    DID THIS J-SHAPED CURVE APPEAR IN OTHER

6   RESEARCH?

7       **A**    THIS J-SHAPED CURVE APPEARS IN THE GLOBAL

8   LITERATURE MANY TIMES, MANY CITIES, MANY STUDIES.

9   THIS IS -- A J-SHAPED IS MORTALITY.  AND I SHOULD

10  ALSO SAY THIS IS NOT JUST FROM HEAT STROKE.  THIS IS

11  FROM ALL CAUSED MORTALITY.

12          SO ONE OF THE ISSUES AT PLAY IN THIS

13  LITIGATION AND IN MY OPINION IS THE IMPORTANCE OF THE

14  INCREASED DEATH NOT ONLY FROM JUST HEAT STROKE, WHICH

15  CAUSES DEATH, AND NOT JUST FROM THE HARMS OF OTHER

16  LESSER HEAT-RELATED PROBLEMS, BUT ALSO FROM THE HARMS

17  WHEN PEOPLE PRESENT WITH COMPLICATIONS OF DIABETES,

18  CARDIOVASCULAR DISEASE, MORE HEART ATTACKS, MORE

19  STROKES, WORSENING OF THE PULMONARY DISEASE AND SO

20  FORTH.  SO THIS IS ONE OF MANY GRAPHS THAT APPEAR IN

21  THE LITERATURE AND THE SCIENTIFIC LITERATURE IN THE

22  LAST 20 YEARS.

23      **Q**    NOW, YOU OPINE IN THIS CASE, DR. VASSALLO --

24  AS YOU DID IN *BALL*, AS YOU DID IN G*ATES,* AS YOU DID

25  ELSEWHERE -- THAT THE HEAT ALERT THRESHOLD AT LSP

1 SHOULD BE SET AT A HEAT INDEX OF 88 DEGREES

2 FAHRENHEIT.  IS IT -- IS YOUR OPINION BASED ON THIS

3 SCIENCE THAT WE HAVE BEEN TESTING?

4    **A**   YES.

5    **Q**   ARE THERE ANY STUDIES OR ANY SCIENCE THAT

6 YOU'RE AWARE OF THAT WOULD SUPPORT SETTING THE HEAT

7 ALERT THRESHOLD AT 91 DEGREES OR 95 DEGREES?

8    **A**   NO.  ALL THESE CURVES I'VE TALKED ABOUT --

9 WHICH WE'RE ONLY DEMONSTRATING ONE HERE WITH THE

10 DAVIS ARTICLE, OR IF WE DEMONSTRATE WE COULD HAVE THE

11 WHOLE -- A DAY WITH THESE ARTICLES.  THE IMPORTANCE

12 IS THAT -- THAT THE -- IF YOU SET -- THE HIGHER YOU

13 SET THE HEAT INDEX OR THE TEMPERATURE ON THAT "J"

14 POINT, THE MORE DEATH YOU'LL HAVE.  SO IF YOU WANT TO

15 ACCEPT MORE DEATHS FROM CARDIOVASCULAR DISEASE, IF

16 YOU WANT TO ACCEPT MORE DEATHS FROM HEAT-RELATED

17 ILLNESSES, YOU JUST MOVE RIGHT UP THAT CURVE.  YOU

18 CAN MOVE ALL THE WAY TO WHATEVER NUMBER YOU DECIDE IS

19 ACCEPTABLE NUMBER OF PREVENTABLE DEATHS.

20    **Q**   LET'S LOOK AT PLAINTIFFS' EXHIBIT 41, WHICH

21 IS TAB 2 IN YOUR BINDER, WHICH WE WILL USE AS A

22 DEMONSTRATIVE.  THIS IS A STUDY FROM PETITTI FROM

23 2016.  AND LOOK SPECIFICALLY AT PAGE 5 OF THAT STUDY,

24 FIGURE 5.  HOW, IF AT ALL, DID THE PETITTI STUDY

25 INFORM YOUR OPINIONS IN THIS CASE?

1    **A**    WELL, PETITTI -- THIS IS AN ENORMOUSLY

2    IMPORTANT EPIDEMIOLOGICAL STUDY CONDUCTED IN MARICOPA

3    COUNTY IN ARIZONA.  AND IT STARTS WITH JUST LOOKING

4    AT -- IT'S TRYING TO ESTABLISH THRESHOLDS AT WHICH

5    PEOPLE -- AND IT DID ESTABLISH -- THAT EMERGENCY

6    DEPARTMENT VISITS, THE RELATIVE RISK.  AND HERE

7    SIMILARLY YOU SEE THAT "J" POINT INCREASING.  IT

8    STARTS ABOUT 27.  BUT I HAVE CHOSEN SOMEWHERE BETWEEN

9    WHERE THERE IS A STEEP UNQUESTIONABLE INCREASE IN

10   RISK.  SO THAT'S FOR EMERGENCY DEPARTMENT VISITS.

11         THEN THE NEXT IS HOSPITALIZATIONS, PEOPLE

12   WHO PRESENT AND GET HOSPITALIZED; AND THEN MORTALITY,

13   WHICH IS DEATHS.  AND THOSE, AGAIN, ARE HAPPENING

14   RIGHT AROUND THE 88-DEGREE HEAT INDEX THRESHOLD.

15   **Q**    SO PETITTI TELLS US IT'S NOT JUST DEATH THAT

16   OCCURS AT THAT THRESHOLD BUT THAT 88 DEGREES

17   FAHRENHEIT ALSO SIGNIFICANTLY INCREASES THE RISK OF

18   HEAT-RELATED INJURIES OR MORBIDITY?

19   **A**    THAT'S RIGHT.

20   **Q**    NOW, PETITTI USED ADMINISTRATIVE DATA LIKE

21   ICD-10 CODES TO ASSESS HOSPITALIZATION AND EMERGENCY

22   DEPARTMENT VISITS.  IS THAT RIGHT?

23   **A**    THAT'S RIGHT.  AND THE PROBLEM WITH THAT IS

24   THAT IT -- IT UNDERESTIMATES THE NUMBER OF DEATHS AND

25   THE NUMBER EFFECTS DUE TO HEAT.  FOR EXAMPLE, WE SEE

1  THAT IN THE REVIEW OF THE RECORDS HERE, MR. ALVIN

2  WILLIAMS WAS DIAGNOSED WITH DEHYDRATION UPON COMING

3  IN FROM DANCING AROUND IN THE FIELD.  HE WAS NOT

4  INTOXICATED.  BUT THE DIAGNOSIS BY THE NURSE

5  PRACTITIONER WAS DEHYDRATION.  SO DEHYDRATION WOULD

6  NOT NECESSARILY BE CAPTURED HERE ON THE FARM LINE AS

7  A RESULT OF WORKING ON THE FARM LINE.

8       THIS IS DISCUSSED IN THE PUBLICATIONS OF THE

9  CDC, THE MMWR, THE MORBIDITY AND MORTALITY WEEKLY

10 REVIEW, AND IN MULTIPLE OTHER -- AND INCLUDING THE

11 AMERICAN FORENSIC MEDICAL EXAMINER GROUP.  THEY SPEAK

12 CLEARLY TO THE FACT THAT HEAT AS A CONTRIBUTING

13 FACTOR OR AS A DIRECT CAUSE OF A ILLNESS -- IN THE

14 CASE OF FORENSICS IS DEATH -- IS UNDERESTIMATED.

15   Q   IS THERE ALSO EVIDENCE THAT HEAT-RELATED

16 ILLNESS SHORT OF HEAT STROKE AND SHORT OF DEATH IS

17 ALSO UNDERREPORTED?

18   A   YES.  BECAUSE HEAT CRAMPS, WHICH IS

19 PERFECTLY IN THE LITERATURE, SYNCOPE, FAINTING, HEAT

20 EXHAUSTION, ALL THOSE THINGS CAN BE -- OR ELECTROLYTE

21 DISTURBANCE; MAYBE YOUR SODIUM'S LOW BUT YOU'VE BEEN

22 ON THE FARM LINE; MAYBE YOU'VE BEEN IN THE HEAT,

23 WHATEVER.  ALL THOSE THINGS MATTER.  IT MAY NOT BE

24 CAPTURED AS HEAT BEING A CONTRIBUTING CAUSE.

25 SIMILARLY, IF YOU HAVE A HEART ATTACK, AND MAYBE HEAT

1  AS A CONTRIBUTING CAUSE WILL NOT BE CAPTURED.

2     **Q**    DR. VASSALLO, YOU OPINE THAT EVEN YOUNGER

3  AND RELATIVELY HEALTHIER PEOPLE ARE AT RISK OF

4  HEAT-RELATED MORBIDITY AND MORTALITY.  DOES THE

5  LITERATURE SUPPORT YOUR VIEW?

6     **A**    YES.

7     **Q**    HOW SO?

8     **A**    WELL, WHEN YOU LOOK -- I MEAN, LATER ON

9  WE'LL PROBABLY LOOK AT THE LOUISIANA DEPARTMENT OF

10  HEALTH THAT SHOWS THE MAJORITY OF PRESENTATIONS

11  ARE -- IN THE STATE OF LOUISIANA WHERE PEOPLE ARE

12  SUPPOSEDLY USED TO THE HEAT, WHATEVER THAT MEANS, OR

13  ACCLIMATIZED, WHICH I KNOW WELL WHAT THAT MEANS --

14  THE MAJORITY OF PEOPLE PRESENTING IN EMERGENCY

15  DEPARTMENTS ARE IN THE YOUNGER AGE GROUPS.

16        THE SAME GOES FOR AGRICULTURAL WORK.  AND OF

17  COURSE THE OLDER AND MORE INFIRM AND MORE

18  CO-MORBIDITIES ARE AT GREATER RISK.  BUT TO SAY THAT

19  YOUNG PEOPLE ARE NOT AT RISK WHO ARE YOUNG AND

20  SUPPOSEDLY HEALTHY IS TO IGNORE THE VAST LITERATURE

21  IN THIS AREA.

22     **Q**    LET'S LOOK AT THAT STUDY FROM THE LOUISIANA

23  DEPARTMENT OF HEALTH.  IT'S PLAINTIFFS' EXHIBIT 49,

24  TAB 5 OF YOUR BINDER.

25        NOW, THIS IS A 2024 STUDY FROM LDH.  HOW DID

1  THIS -- AND LET'S LOOK AT THE CHART ON PAGE 17.  HOW

2  DID THIS CHART INFORM YOUR OPINIONS IN THIS CASE, IF

3  AT ALL?

4      **A**   SO THIS SHOWS ALL CASES OF HEAT-RELATED

5  ILLNESS.  AND IT SAYS HERE, CLEARLY, INDIVIDUALS FROM

6  20 TO 39 YEARS OLD ACCOUNTED FOR 40 PERCENT OF ALL

7  HEAT-RELATED EMERGENCY DEPARTMENT VISITS.  AND THAT

8  WAS FOLLOWED BY THE 40- TO 59-YEAR-OLD AGE GROUP.

9  AND SO WHEN YOU LOOK AT THIS GRAPH -- BUT I -- WE'RE

10  NOT DEMONSTRATING IT -- THOUSANDS OF YOUNG PEOPLE --

11  THOUSANDS -- PRESENTED WITH -- TO EMERGENCY

12  DEPARTMENTS WITH HEAT-RELATED.  AND THIS IS IN

13  LOUISIANA WHERE PEOPLE ARE LIVING.

14      **Q**   LET'S LOOK AT THE CHART ON THE NEXT PAGE,

15  PAGE 18.  HOW DID THIS CHART INFORM YOUR OPINIONS, IF

16  AT ALL?

17      **A**   SO THIS CHART WAS JUST WORKERS IN LOUISIANA.

18  AND IT SHOWS THAT WORKERS OF THE AGES 34 YEARS AND

19  YOUNGER HAD THE HIGHEST RATES OF EMERGENCY DEPARTMENT

20  VISITS FOR HEAT-RELATED ILLNESS.  AND THIS WAS

21  WORKERS.  AND SO, AGAIN, THERE IS HUNDREDS OF PEOPLE

22  PRESENTING IN THE STATE OF LOUISIANA WHO ARE YOUNG.

23      **Q**   AND IN YOUR PRACTICE IN EMERGENCY MEDICINE

24  AND CORRECTIONAL MEDICINE, HAVE YOU PERSONALLY SEEN

25  YOUNGER, RELATIVELY HEALTHIER PEOPLE SUFFER INJURY OR

1  DEATH DUE TO THE HEAT?

2    **A**   YES.  AND A NUMBER OF THOSE ARE EXERCISING.

3  THEY ARE -- AND, OF COURSE, WE HAVE ENORMOUS

4  LITERATURE FROM THE ARMED SERVICES THAT SHOW THAT

5  MILITARY RECRUITS WILL SUCCUMB AND DIE IN THE 50s

6  ALREADY.  WE HAD A HUNDRED PEOPLE WHO WERE -- HAD

7  AUTOPSIES WHO WERE YOUNG, HEALTHY RECRUITS WHO DIED

8  AND WERE AUTOPSIED.  SO THIS IS A LONGSTANDING

9  LITERATURE.

10    **Q**   LET'S LOOK AT THE SKARHA STUDY FROM 2023,

11  PLAINTIFFS' EXHIBIT 42, TAB 3 OF YOUR BINDER.  AND

12  WE'LL LOOK AT PAGE 5 OF THAT STUDY.

13        NOW, SKARHA STUDIES THE IMPACTS OF HEAT ON

14  INCARCERATED POPULATIONS IN PARTICULAR IN TEXAS.  HOW

15  DID THIS STUDY IMPACT YOUR OPINIONS IN THIS CASE?

16    **A**   SKARHA LOOKED AT -- FIRST OF ALL, THE STATE

17  OF TEXAS REQUIRES JAILS TO HAVE TEMPERATURES -- JAILS

18  LIMITED TO 85-DEGREE HEAT INDEX BUT NOT PRISONS.  SO

19  THE PRISONS OF TEXAS ARE UN-AIR-CONDITIONED LARGELY.

20  AND SHE LOOKED AT AIR-CONDITIONED PRISONS VERSUS

21  UN-AIR-CONDITIONED, AND SHE LOOKED AT THE MORTALITY.

22        SHE FOUND THAT OVER THE 11 OR SO YEARS THAT

23  SHE WAS LOOKING, 11 -- EXCUSE ME -- 14 EXTRA PEOPLE

24  DIED PER YEAR FROM THIS PREVENTABLE CAUSE OF HEAT AND

25  ABOUT 15 PERCENT OF -- 15 PERCENT GREATER RISK OF

1  DEATH.

2        AND SO THE POINT IS THAT WHEN YOU HAVE AN

3  UN-AIR-CONDITIONED PRISON, MANY, MANY MORE PEOPLE

4  WILL DIE THAN IF YOU HAVE AIR CONDITIONING IN THE

5  PRISON.

6     **Q**   IS IT THE CASE THAT INCARCERATED POPULATIONS

7  ARE PARTICULARLY VULNERABLE TO HIGH TEMPERATURE?

8     **A**   YES.  BECAUSE, FIRST OF ALL, WHEN YOU'RE

9  INCARCERATED, THERE IS ACCEPTANCE IN THE LITERATURE

10 THAT PEOPLE GET -- CHRONOLOGICALLY THEIR AGE MAY BE

11 50 BUT PHYSIOLOGICALLY, BECAUSE OF THE STRESSORS AND

12 THE CONDITIONS IN WHICH THEY'RE HELD, INCLUDING THE

13 HEAT IN THIS PRISON AT LSP, THAT THEY'RE MUCH OLDER

14 PHYSIOLOGICALLY.  AND INTERESTINGLY SKARHA FOUND IN

15 HER DEATHS THAT THE AVERAGE AGE WAS 54, NOT 65.  IT

16 WAS 54.  SO THIS IS IN KEEPING WITH THE VAST

17 LITERATURE THAT WHERE -- WHO DIED IN THIS SKARHA

18 STUDY IN THESE UN-AIR-CONDITIONED PRISONS.

19        **THE COURT:**  JUST FOR TIME MANAGEMENT, MS.

20 WRIGHT, YOU'RE ALMOST AT ABOUT THE 15 MINUTES

21 REMAINING MARK.  OKAY?

22        **THE WITNESS:**  I'LL SPEAK A LITTLE FASTER,

23 YOUR HONOR.

24        **THE COURT:**  THAT'S -- THAT INCLUDES TEN

25 MINUTES AND THEN YOUR ADDITIONAL FIVE FOR REDIRECT.

1  OKAY?

2       **MS. WRIGHT:**  I APPRECIATE THAT.  THANK YOU.

3  **BY MS. WRIGHT:**

4     **Q**   LET'S TALK ABOUT LSP IN PARTICULAR.  YOU

5  HAVE NEARLY A DECADE OF EXPERIENCE STUDYING THE

6  MEDICAL CARE SYSTEM AT LSP THROUGH YOUR WORK IN *LEWIS*

7  *V CAIN*.  DO YOU HAVE ANY OPINION AS TO WHETHER THE

8  POPULATION AT LSP IN PARTICULAR IS PARTICULARLY

9  VULNERABLE TO HIGH HEAT?

10     **A**   YES.  THE POPULATION IN THIS GROUP OF PEOPLE

11  WHO ARE WORKING, AS WELL AS THE ENTIRE, HAVE A NUMBER

12  OF CO-MORBIDITIES AND THEY'RE ON A NUMBER OF

13  MEDICATIONS AND A NUMBER OF MENTAL HEALTH PROBLEMS

14  THAT RENDER THEM AT RISK.

15     **Q**   NOW, THE STATE CLAIMS THAT THERE IS NO RISK

16  OF HEAT STROKE AT LSP.  DO YOU AGREE?

17     **A**   WELL, THAT'S ABSURD, RIGHT?  WE'RE IN

18  LOUISIANA.  WE HAVE STUDIES FROM LOUISIANA THAT SHOW

19  THAT PEOPLE DIE OF HEAT STROKE.  I PERSONALLY SAW TWO

20  RECORDS OF PEOPLE WHO DIED IN HEAT -- OF HEAT STROKE;

21  ONE WHO DIED AND ONE WHO GOT SICK, BACK IN THE *LEWIS*

22  CASE.  SO THAT'S ABSURD.  AND SO THERE IS ONLY ONE

23  WAY THAT CAN HAPPEN:  EITHER YOU'RE NOT DIAGNOSING

24  IT, YOU'RE NOT CALLING IT, OR YOU'RE NOT TAKING

25  TEMPERATURES, WHICH HAPPENED IN TEXAS.

1    Q    YOU MENTIONED EARLIER THE CONCEPT OF

2   MALINGERING.   IN YOUR DECADES OF EXPERIENCE IN

3   CORRECTIONAL MEDICINE, HAVE YOU FORMED ANY OPINIONS

4   AS TO WHETHER PREJUDICE AMONG CORRECTIONAL STAFF

5   IMPACTS THE HEALTH CARE OUTCOMES OF INCARCERATED

6   PEOPLE?

7    A    I SEE THE WORD IN THE *LEWIS* CASE, AND EVEN

8   HERE THE WORD "MALINGERING" APPEARS FREQUENTLY, SO

9   THERE IS A BELIEF THAT THERE IS SECONDARY GAIN FROM

10  PRESENTING WITH A COMPLAINT.   YOU GET OUT OF FIELD,

11  YOU GET IN THE AIR CONDITIONING; IF THE INFIRMARY IS

12  AIR-CONDITIONED, THEY'RE SECONDARY.   SO THIS KIND OF

13  CYNICISM RESULTS IN THE DEATH AND MORBIDITY.

14        FOR EXAMPLE, IN THE *LEWIS* CASE WE SAW

15  MULTIPLE PEOPLE WHO WERE THOUGHT TO BE INTOXICATED

16  AND WERE COMPLETING THEIR STROKES AND HAD THE BRAIN

17  INJURY DUE TO COMPLETION OF STROKES WHILE THEY'RE

18  BEING OBSERVED FOR WHATEVER INTOXICATION THEY WERE

19  BELIEVED TO BE HAVING.

20    Q    NOW, THE STATE CLAIMS ALSO THAT INCARCERATED

21  PEOPLE WHO PLAY SPORTS OUTSIDE ARE AT GREATER RISK OF

22  HEAT INJURY THAN THOSE WORKING THE FARM LINE.   HOW DO

23  YOU RESPOND?

24    A    IF YOU DO PLAY BASKETBALL WHEN YOU'RE IN

25  PRISON, YOU ARE DOING THAT WILLFULLY.   YOU CAN DO

1 WHATEVER YOU WANT.  YOU CAN SIT DOWN IN THE SHADE AND

2 TALK TO YOUR FRIENDS, YOU CAN STAND AT ONE GOAL POST,

3 LIKE I MIGHT CHOOSE TO DO, AND WAIT FOR EVERYBODY TO

4 RUN BACK TO THE OTHER END.  AND IT'S NOT COERCED.

5 THERE IS NO FORCE USED, AND YOU DON'T HAVE THE PUSHER

6 PUSHING YOU.  BECAUSE THE TESTIMONY FROM THE PUSHER,

7 THE CORRECTIONS OFFICER, WAS THAT HE ALSO UNDERGOES

8 SOME KIND OF DISCIPLINE -- NOT DISCIPLINE, BUT HE HAS

9 PRESSURE TO MAKE HIS GROUP WORK.

10    Q    SO IT'S JUST NOT AN APPLES-TO-APPLES

11 COMPARISON?

12    A    NO.

13    Q    DR. VASSALLO, YOU'VE MENTIONED THAT THERE

14 ARE CERTAIN CHRONIC HEALTH CONDITIONS THAT INCREASE A

15 PATIENT'S RISK OF HEAT-RELATED ILLNESS.  WHAT DOES

16 THE LITERATURE INDICATE ABOUT THE IMPACT OF DIABETES

17 ON A PATIENT'S ABILITY TO THERMOREGULATE?

18    A    DIABETES IS A MICROVASCULAR DISEASE

19 AFFECTING -- AS WE ALL KNOW, IF SOMEBODY HAS A LITTLE

20 WOUND TO THEIR FOOT, THEY MAY END UP WITH AN

21 AMPUTATION BECAUSE OF THE PROBLEMS WITH THE

22 AMPUTATE OF THE VASCULATURE.  WE KNOW THEY HAVE MORE

23 HEART ATTACKS AND SO FORTH.  SO WE KNOW THAT DIABETES

24 IS A RISK FACTOR FOR HEAT-RELATED ILLNESS BECAUSE IT

25 AFFECTS THE HEART AND THE ABILITY OF THE VASODILATION

1  AND EVEN THE SWEAT --

2          **THE REPORTER:**  SWEAT AND?

3          **THE WITNESS:**  EVEN THE SWEAT GLAND FUNCTION,

4  WHICH IS CLOSELY INTEGRATED WITH VASODILATION.

5  **BY MS. WRIGHT:**

6      **Q**    AND WHAT DOES THE LITERATURE INDICATE ABOUT

7  OBESITY AND THERMOREGULATION?

8      **A**    THERE IS NO QUESTION THAT OBESITY, BECAUSE

9  OF THE LARGE SURFACE AREA AND BECAUSE OF THE WARMING

10 OF THE CORE, THE NEED TO BRING THE BLOOD TO THE

11 SURFACE, IS A RISK.  IT'S SO -- STATED SO IN MULTIPLE

12 ARTICLES.

13     **Q**    IN YOUR OPINION, SHOULD A PERSON

14 INCARCERATED AT LSP WHO HAS DIABETES OR WHO IS OBESE

15 RECEIVE A HEAT PRECAUTION DUTY STATUS?

16     **A**    YES.

17     **Q**    PEOPLE TAKING CERTAIN MEDICATIONS ARE AT AN

18 INCREASED RISK OF HEAT ILLNESS.  DO SSRIs IN

19 PARTICULAR RENDER A PERSON ESPECIALLY VULNERABLE TO

20 HEAT?

21     **A**    YES.  THE CDC STATES THIS CLEARLY IN 2024

22 WHEN THEY REVISED THEIR HEAT LIST; THE WORLD HEALTH

23 ORGANIZATION.  DR. KELDIE RELIES FREQUENTLY ON

24 UPTODATE.  UPTODATE SAYS IT'S A RISK.  AND THE

25 LITERATURE SHOWS THAT THE HYPOTHALAMUS AND THE

1  TEMPERATURE THERMOSTAT IN THE BRAIN HAS CERTAIN

2  SEROTONIN RECEPTORS.  AND AS A CLINICIAN AND A

3  MEDICAL TOXICOLOGIST, WE SEE THAT PEOPLE WHO HAVE TOO

4  MUCH SEROTONIN GET HEAT STROKE, AND SO WE HAVE TO --

5  AND SO WE KNOW THAT TOO MUCH SEROTONIN AFFECTS

6  TEMPERATURE AND CAUSES HEAT STROKE.

7      **Q**    AND TO BE CLEAR, YOUR OPINIONS IN THIS CASE

8  ARE NOT FOCUSED SOLELY ON HEAT STROKE BUT ON THE

9  MYRIAD OF OTHER HEAT-RELATED ILLNESS, INCLUDING

10  EXACERBATION OF UNDERLYING CONDITIONS THAT CAN BE

11  CAUSED BY --

12      **A**    IT'S SO IMPORTANT THAT --

13          **THE REPORTER:**  EXCUSE ME, PLEASE.  YOU'RE

14  GOING TO HAVE TO SLOW DOWN --

15          **THE WITNESS:**  EXCUSE US.  WE KNEW THAT WE

16  WERE SHORT ON TIME.

17          **MS. WRIGHT:**  THAT TIMER IS KEEPING US BUSY.

18  LET ME ASK THE QUESTION AGAIN.

19          **THE REPORTER:**  PLEASE REPEAT YOUR QUESTION.

20  **BY MS. WRIGHT:**

21      **Q**    DR. VASSALLO, YOUR OPINIONS IN THIS CASE ARE

22  NOT LIMITED TO HEAT STROKE BUT THEY ALSO CONSIDER THE

23  MANY OTHER HEAT-RELATED ILLNESSES AND INCLUDING THE

24  EXACERBATION OF UNDERLYING CO-MORBIDITIES?

25      **A**    SO THERE'S -- IT'S UNQUESTIONABLE IN THE

1  SCIENTIFIC LITERATURE THAT HEAT EXACERBATES

2  CARDIOVASCULAR, CEREBROVASCULAR, AND PULMONARY

3  DISEASES.  IT'S CLEARLY SHOWN IN EXHIBIT 1 OF DR.

4  KELDIE, ALSO; DR. KELDIE'S EXHIBIT.  IT'S VERY CLEAR

5  THAT THE RELATIVE RISK RATIOS ARE ENORMOUSLY HIGHER.

6  IT'S SHOWN IN BOUCHAMA'S.  AND I CAN KEEP ON TALKING

7  ABOUT THE NUMBER OF ARTICLES, BUT WE HAVE NO TIME.

8      Q    IN YOUR OPINION, SHOULD A PERSON

9  INCARCERATED AT LSP WHO TAKES AN SSRI RECEIVE A HEAT

10  PRECAUTION DUTY STATUS?

11     A    YES.

12         **THE COURT:**  FIVE MINUTES ON YOUR DIRECT.

13         **MS. WRIGHT:**  I APPRECIATE IT.  THANK YOU.

14         **THE COURT:**  YOUR FIRST DIRECT.

15         **MS. WRIGHT:**  MY FIRST DIRECT.

16  **BY MS. WRIGHT:**

17     Q    SO WHAT ABOUT IF A PERSON HAS HYPERTENSION

18  AND DIABETES OR TAKES AN SSRI AND HAS ASTHMA?  WHAT'S

19  THE EFFECT ON A PERSON'S ABILITY TO THERMOREGULATE?

20     A    THEY'RE SYNERGISTIC.  WHEN -- THEY'RE

21  SYNERGISTIC.

22     Q    MEANING THAT IT WOULD EXACERBATE THE IMPACTS

23  OF --

24     A    THAT'S RIGHT.

25     Q    -- HEAT ILLNESS?

1          NOW, DR. VASSALLO, YOU REVIEWED SOME MEDICAL

2    RECORDS OF THE PLAINTIFFS IN THIS CASE, BUT YOU

3    DIDN'T CONDUCT COMPLETE CHART REVIEWS.  IS THAT

4    RIGHT?

5      **A**    THAT'S CORRECT.

6      **Q**    DID YOU SEE ANY EVIDENCE SUGGESTING THAT THE

7    PLAINTIFFS HAVE CO-MORBIDITIES OR TAKE MEDICATIONS

8    THAT INCREASED THEIR VULNERABILITY TO HEAT?

9      **A**    YES.  THEY HAVE MENTAL HEALTH CONDITIONS,

10   THEY TAKE MEDICATION FOR THAT.  THEY HAVE ALL OF THE

11   CARDIOVASCULAR, DIABETES AND THOSE KINDS OF THINGS

12   THAT WE'VE TALKED ABOUT IN THE LITERATURE AS REPLETE

13   WITH, YES.

14     **Q**    HAVE YOU SEEN EVIDENCE INDICATING THAT THE

15   PLAINTIFFS HAVE PRESENTED WITH SYMPTOMS CONSISTENT

16   WITH HEAT-RELATED ILLNESS?

17     **A**    YES.  THERE IS DIZZINESS, THERE IS

18   LIGHTHEADEDNESS, THERE IS LACK OF ENERGY, THERE IS

19   NAUSEA, VOMITING.  ALL OF THOSE ARE SIGNS OF

20   HEAT-RELATED ILLNESS.

21     **Q**    CHANGES IN MENTAL ACUITY?

22     **A**    THAT'S RIGHT.

23     **Q**    IN YOUR OPINION, WOULD THOSE IMPAIRMENTS

24   ENTITLE THE PLAINTIFFS TO RELIEF FROM HEAT?

25     **A**    YES.

1    **Q**    THEY SHOULD RECEIVE A HEAT PRECAUTION DUTY

2    STATUS?

3    **A**    YES.

4    **Q**    FINAL QUESTION, DR. VASSALLO:  FROM A

5    MEDICAL PERSPECTIVE, DOES THE FARM LINE EXPOSE PEOPLE

6    TO A RISK OF HEAT-RELATED HARMS?

7    **A**    IT EXPOSES PEOPLE TO A SUBSTANTIAL RISK OF

8    SERIOUS HARM, YES.

9    **Q**    WHAT DO YOU MEAN BY THAT?

10    **A**    WELL, SUBSTANTIAL --

11    **MR. BLANCHFIELD:**  YOUR HONOR, WE'RE GOING TO

12    OBJECT TO LEGAL CONCLUSION "SUBSTANTIAL RISK OF

13    SERIOUS HARM."

14    **THE COURT:**  SHE'S ENTITLED TO ANSWER THAT IN

15    HER PROFESSIONAL OPINION AS A PHYSICIAN, AS AN EXPERT

16    IN THESE OTHER AREAS.

17    YOU MAY ANSWER THE QUESTION, MA'AM.

18    THE OBJECTION IS OVERRULED.

19    **BY THE WITNESS:**

20    **A**    SUBSTANTIAL MEANS IT'S MEASURABLE, IT'S

21    STATISTICALLY SIGNIFICANT AND, AS A PHYSICIAN, IT'S

22    IMPACTFUL AND IT AFFECTS THE HEALTH OF THE

23    INDIVIDUALS.  THAT'S WHAT IT IS.  AND JUST TO THINK

24    ABOUT SERIOUS, SERIOUS IS NOT JUST TODAY; DO YOU GET

25    DIZZY TODAY.  WHAT IS HAPPENING TO CARDIOVASCULAR

1  DISEASE DOWN THE ROAD?  WHAT IS HAPPENING TO YOUR

2  OVERALL PHYSIOLOGY?  SO ALL OF THOSE THINGS ARE

3  SERIOUS AND NOT TRIVIAL.  AND THAT'S WHY I SAY IT'S A

4  SUBSTANTIAL RISK AND THE HARMS CAN BE SERIOUS.

5      **Q**    AND JUST TO FOLLOW UP, THE HARMS CAN

6  MANIFEST LATER FROM HEAT-RELATED ILLNESS?

7      **A**    THAT'S RIGHT.

8      **Q**    THANK YOU.

9          **THE COURT:**  ALL RIGHT.  THANK YOU, MS.

10 WRIGHT.  YOU HAVE OFFICIALLY 11 -- EXCUSE ME -- SIX

11 MINUTES LEFT.

12          **MS. WRIGHT:**  I'LL TAKE THEM.

13          **THE COURT:**  NOW, I CREDITED YOU TWO MINUTES

14 AS WE ADDRESSED THE EVIDENTIARY ISSUES THAT WERE

15 RAISED, YOU KNOW, BY MR. JONES, SO YOU HAVE SIX

16 MINUTES LEFT, AGAIN, ON YOUR REDIRECT.

17          WHY DON'T WE GO ON AND TAKE A BREAK AT

18 THIS TIME.  WE'LL BE IN RECESS FOR TEN MINUTES.

19          NOW, IN THE MEANTIME, DR. VASSALLO, YOU

20 HAVE TESTIFIED SEVERAL TIMES NOT ONLY IN THIS

21 COURTROOM AND OTHERS.  AS YOU WELL KNOW, YOU ARE

22 STILL UNDER OATH.  HOWEVER, DURING THE TEN-MINUTE

23 BREAK, RECESS, I SPECIFICALLY INSTRUCT YOU NOT TO

24 DISCUSS YOUR TESTIMONY WITH ANYONE, NOT THE LAWYERS,

25 NOT THE CLIENT, NO ONE.  OKAY?

1          THE WITNESS:  I THINK I'LL STAY HERE, YOUR

2    HONOR.

3          THE COURT:  YOU'RE CERTAINLY ENTITLED TO DO

4    SO.

5             ALL RIGHT.  COURT IS IN RECESS.

6          THE LAW CLERK:  ALL RISE.

7             COURT IS IN RECESS.

8          (WHEREUPON, A RECESS WAS TAKEN.)

9          THE LAW CLERK:  ALL RISE.  COURT IS NOW IN

10   SESSION.

11         THE COURT:  BE SEATED.

12            OKAY.  WE ARE NOW BACK ON THE RECORD IN

13   THE CASE OF *VOTE VERSUS LEBLANC*.  AT THIS TIME WE

14   WILL BEGIN THE CROSS-EXAMINATION OF DR. VASSALLO.

15            AND, DOCTOR, LET ME REMIND YOU THAT YOU

16   ARE STILL UNDER OATH.  OKAY?

17         THE WITNESS:  YES, SIR.

18              CROSS-EXAMINATION

19   BY MR. BLANCHFIELD:

20      Q   GOOD MORNING, DR. VASSALLO.

21      A   GOOD MORNING, MR. BLANCHFIELD.

22         THE COURT:  NOW, LET ME JUST MENTION

23   SOMETHING TO YOU, GENTLEMEN.  AS YOU ALL KNOW, UNDER

24   OUR LOCAL RULES -- MR. JONES RAISED THE OBJECTIONS TO

25   THE EXHIBITS THAT THE PLAINTIFF WOULD RELY ON.  AS

1  YOU WELL KNOW, UNDER OUR RULES, ONLY THE LAWYER THAT

2  EXAMINES THE WITNESS CAN RAISE OBJECTIONS.  SO I JUST

3  WANT TO MAKE SURE GOING FORWARD THAT WE KNOW THE

4  RULES -- THE LOCAL RULES OF THIS COURT.  OKAY?

5          **MR. BLANCHFIELD:**  YES, YOUR HONOR.

6          **MR. JONES:**  YES, YOUR HONOR.

7          **THE COURT:**  I'M NOT ASCRIBING ANY BAD

8  MOTIVES OR ANYTHING LIKE THAT, BUT I WANT TO MAKE

9  SURE EVERYBODY UNDERSTANDS THE RULES.  SO GOING

10 FORWARD, IF YOU'RE NOT GOING TO EXAMINE THE WITNESS,

11 YOU CANNOT RAISE THE OBJECTION.

12          ALL RIGHT, LET'S PROCEED.

13          **MR. BLANCHFIELD:**  THANK YOU, JUDGE.

14 **BY MR. BLANCHFIELD:**

15     **Q**   DR. VASSALLO, WE HEARD YOUR TENDER WITH

16 RESPECT TO A NUMBER OF SPECIALTIES.  YOU ARE NOT A

17 PHARM-D, ARE YOU?

18     **A**   I AM NOT A PHARMACIST, NO, SIR.  I'M A MED-

19 --

20     **Q**   YOU'RE A TOXICOLOGIST?

21     **A**   I'M A MEDICAL PHYSICIAN.  AND MY TRAINING,

22 FELLOWSHIP IS -- AFTER RESIDENCY IS TWO MORE YEARS OF

23 SPECIALIZED TRAINING OF -- IN MEDICAL TOXICOLOGY.

24     **Q**   YOU ARE FAMILIAR WITH THE PROFESSIONAL

25 DEGREE OF A DOCTORATE OF PHARMACY?

1    **A**    I AM.

2    **Q**    NOW, HAVE YOU EVER BEEN EMPLOYED IN A PRISON

3    OR A JAIL PROVIDING MEDICAL CARE ON A DAILY BASIS TO

4    INMATES LIKE THE RANDY LAVESPERES OF THIS WORLD?

5    **A**    I HAVE NOT.

6    **Q**    ARE YOU A MEMBER OF THE AMERICAN COLLEGE OF

7    CORRECTIONAL PHYSICIANS?

8    **A**    NO.

9    **Q**    ARE YOU A CERTIFIED CORRECTIONAL HEALTH CARE

10   PROFESSIONAL?

11   **A**    I DON'T EVEN KNOW WHAT THAT IS.  I'M

12   CERTIFIED AS A CORRECTIONAL -- BY THE NATIONAL

13   COMMISSION ON CORRECTIONAL HEALTH CARE.

14   **Q**    BY THE NATIONAL COMMISSION OF CORRECTIONAL

15   HEALTH CARE YOU ARE CERTIFIED?

16   **A**    YES.  I'M A CC --

17        **THE REPORTER:**  I'M SORRY.  CC?

18        **THE WITNESS:**  CCHP.  EXCUSE ME.  I'LL DO

19   BETTER.

20   **BY MR. BLANCHFIELD:**

21   **Q**    NOW, THERE WAS SOME DISCUSSION ABOUT ONE

22   OF -- I THINK IT WAS YOUR SECOND DECLARATION WHERE

23   YOU DESCRIBED THE THEN EIGHT PLAINTIFFS, NOW SEVEN

24   PLAINTIFFS.  DO YOU RECALL THAT?

25        **A**    NOT SPECIFICALLY, SIR.

1    **Q**    WELL, WE HAVE YOUR DECLARATION WHERE YOU GO

2    THROUGH -- YOU START OUT WITH ALVIN WILLIAMS, DAMARIS

3    JACKSON, KENDRICK STEVENSON.  DO YOU RECALL THAT?

4    **A**    YES.

5    **Q**    OKAY.  AND WAS IT YOUR INTENT IN THIS -- IN

6    CREATING THIS DECLARATION TO SUGGEST THAT THESE THEN

7    EIGHT PLAINTIFFS SHOULD NOT BE WORKING ON THE FARM

8    LINE?

9    **A**    MY JOB AND MY INTENT IS TO LOOK AT THE

10   EFFECT OF HEAT ON ALL MEMBERS WHO WORK ON THE FARM

11   LINE.  THAT'S IT.

12   **Q**    BUT YOU WENT THROUGH -- I MEAN, SOME OF

13   THESE INMATES HAVE BEEN AT LSP FOR MANY, MANY YEARS.

14   YOU WENT THROUGH THEIR MEDICAL HISTORY, DID YOU NOT?

15   **A**    NOT COMPLETELY.  I WAS -- I THINK THAT THE

16   DEFENSE ONLY OFFERED PART OF THE MEDICAL RECORDS, SO

17   I SAW A SMALL PART OF THEIR MANY YEARS OF MEDICAL

18   RECORDS.

19          **MR. BLANCHFIELD:**  FOR THE RECORD, YOUR

20   HONOR, WE FILED INTO THE RECORD, AS THE JUDGE -- AS

21   YOU TOLD ME TO, THE ENTIRE MEDICAL RECORD OF EVERY

22   EIGHT PLAINTIFFS, SO --

23          **THE COURT:**  WELL, THANK YOU FOR THAT

24   CLARIFICATION.

25   **BY MR. BLANCHFIELD:**

1    Q    WAS IT YOUR INTENT -- ALTHOUGH YOU DID NOT

2   DO A RECORD -- A FULL RECORDS REVIEW AS YOUR REPORT

3   INDICATED, WAS IT YOUR INTENT TO ACCURATELY REFLECT

4   THE MEDICAL CONDITIONS AND MEDICATIONS THAT THESE

5   EIGHT PLAINTIFFS RECEIVED?

6    A    THE -- MY INTENT WAS TO LOOK AT THE MEDICAL

7   RECORD THAT I WAS PROVIDED AND TO LOOK AT THE MEDICAL

8   CONDITIONS AS THEY WERE LISTED IN THE MEDICAL RECORD

9   AND LOOK AT THE MEDICATIONS LIST AND TO OPINE ON THE

10  EFFECT OF MEDICATIONS ON HEAT TOLERANCE IN THE ENTIRE

11  POPULATION.

12   Q    NOW, YOU AND I MET OUT IN THE CUCUMBER PATCH

13  AT LSP.  CORRECT?

14   A    I ACTUALLY DIDN'T REALIZE IT WAS YOU.  BUT

15  IF YOU SAY SO, IT'S MY FAULT.

16   Q    THAT'S OKAY.  WE RODE ON A BUS, WE WENT AND

17  WE WATCHED THEM PICK CUCUMBERS.  DO YOU RECALL THAT?

18   A    I TOTALLY RECALL THE PICKING OF THE

19  CUCUMBERS AND THE BUS AND THE WHOLE THING EXCEPT FOR

20  YOU, SIR.  I DON'T REMEMBER YOU BEING THERE.  I DON'T

21  THINK I KNEW YOU WERE THE LAWYER.  THAT'S ALL.

22   Q    THAT'S FINE.  WAS IT YOUR FEELING OUT THERE

23  OBSERVING IT THAT THE PICKING OF CUCUMBERS YOU WOULD

24  DESCRIBE AS A STRENUOUS ACTIVITY?

25   A    YOU WANT TO KNOW MY FEELING?  THE FEELING IS

1  THAT -- HOW I FEEL ABOUT PICKING CUCUMBERS, IS THAT

2  RELEVANT TO THIS PHASE?

3      Q    YES.  IS IT A STRENUOUS ACTIVITY?  WE SPENT

4  A LOT OF TIME IN YOUR DEPOSITION TALKING ABOUT

5  EXERTION AND STRENUOUS ACTIVITIES AND THINGS LIKE

6  THAT.

7      A    RIGHT.

8      Q    THAT'S MY QUESTION.

9      A    YES, I DO THINK THAT PICKING CUCUMBERS CAN

10  BE STRENUOUS.  YES.

11      Q    AND IS IT ALSO FAIR TO SAY THAT WHEN WE'RE

12  TALKING ABOUT EXERTION AND STRENUOUS, THINGS LIKE

13  THAT, IT'S GOING TO IMPACT AN INDIVIDUAL DIFFERENTLY

14  FROM INDIVIDUAL TO INDIVIDUAL?

15      A    WELL, SOME PEOPLE WHO -- OR WILL BE IMPACTED

16  MORE THAN OTHERS DEPENDING ON THEIR CONDITION, THEIR

17  MEDICAL PROBLEMS, THE CONDITIONS IN WHICH THEY'RE

18  HELD.  IF THEY GO HOME AND THEY'RE IN AIR

19  CONDITIONING, I'M SURE THAT WORKING ON THE CUCUMBER

20  PATCH WOULD BE LESS STRENUOUS TO THEIR PHYSIOLOGY

21  THAN IF THEY STAY AND GO BACK TO PRISON AND ARE

22  UN-AIR-CONDITIONED CIRCUMSTANCES.  SO YES, IT CAN.

23      Q    YOU REMEMBER EXPLAINING TO ME IN YOUR

24  DEPOSITION THAT EACH INDIVIDUAL HAS ITS OWN

25  INDIVIDUAL MAKE-UP AND DEGREE OF FITNESS SO IT'S

1    GOING TO IMPACT EACH -- FROM INDIVIDUAL TO INDIVIDUAL

2    DIFFERENTLY?

3        **A**    I EXPLAINED THAT TO YOU IN ANSWER TO MY

4    QUESTION.  BUT THE LITERATURE SHOWS THAT ALL OF THOSE

5    INDIVIDUAL DIFFERENCES ARE ACCOUNTED FOR BY THE

6    PUBLIC HEALTH EPIDEMIOLOGY OF WHO'S IMPACTED BY THE

7    HEAT.  SO WE COULD LOOK AROUND AT THE CUCUMBER PATCH

8    AND SAY SOME PEOPLE ARE IMPACTED MORE THAN SOME OR

9    OTHERS.  BUT THOUSANDS AND THOUSANDS OF PEOPLE ARE

10   INVOLVED IN THE LITERATURE REGARDING THE WORSENING OF

11   UNDERLYING HEAT CONDITIONS AND THE RISK OF HARM FROM

12   THE HEAT.  SO IN SOME OF THOSE THEY HAVE A CONDITION

13   SUCH AS ONE OF THESE INDIVIDUALS.  SOME ARE MORE

14   HEALTHIER THAN OTHERS AND SOME ARE NOT.  BUT ALL

15   PEOPLE SUBJECTED TO THE CUCUMBER PATCH AND THE FARM

16   LINE, ACCORDING TO THE FARM -- THE EPIDEMIOLOGY, ARE

17   AT RISK.

18           SO I AGREE THAT YOU ASKED ME ABOUT

19   INDIVIDUALS, BUT THIS CASE IS NOT AN INDIVIDUAL

20   INJURY CASE.  THIS IS ABOUT A GROUP OF PEOPLE THAT IS

21   WELL REPRESENTED AND WELL-GENERALIZED TO THE VAST

22   NUMBER OF PEOPLE IN THE PUBLIC HEALTH LITERATURE.

23       **Q**    IN YOUR DEPOSITION I ASKED YOU TO AGREE THAT

24   IF YOU EXERT YOURSELF MORE, YOU'RE GOING TO HAVE A

25   GREATER RISK OF HEAT INJURY, AND YOU SAID, "I

1   DISAGREE WITH THAT STATEMENT BECAUSE IT DEPENDS ON

2   THE INDIVIDUAL."  IS THAT STILL YOUR OPINION?

3       **A**    WELL, IT DOES.  I MEAN, IF I EXERT MYSELF

4   VERSUS YOU EXERTING YOURSELF VERSUS, YOU KNOW, SOME

5   YOUNG MILITARY RECRUIT THAT DOES IT ALL DAY, YES, IT

6   DOES DE- -- BUT THAT IS NOT WHAT THIS IS ABOUT.  THIS

7   IS ABOUT SOMETHING VERY DIFFERENT THAN AN INDIVIDUAL.

8       **Q**    THIS IS ABOUT EXERTIONAL HEAT, THOUGH, IS IT

9   NOT?

10      **A**    NO, SIR, IT'S NOT.

11      **Q**    IT'S NOT?

12      **A**    NO, SIR.

13      **Q**    HOW IS --

14      **A**    THIS IS -- EXCUSE ME, SIR.

15      **Q**    GO AHEAD.

16      **A**    THIS IS ABOUT THE IMPACT OF HEAT ON THE

17  PHYSIOLOGY AND THE HEALTH OF THE PEOPLE ON THE FARM

18  LINE.  THE PEOPLE ON THE FARM LINE ARE

19  WELL-REPRESENTED BY THE THOUSANDS OF PAPERS AND

20  THOUSANDS OF PEOPLE WITHIN THOSE VAST POPULATIONS,

21  SO -- POPULATION.  SO -- AND THEY -- THERE IS A

22  COMBINATION OF EXERTION AND JUST BEING PRESENT IN

23  THAT HEAT, AND SO THIS IS NOT JUST ABOUT EXERTION.

24  THIS IS YOU CAN -- THIS IS ABOUT THE EFFECT OF HEAT.

25  THEY MAY BE EXERTING THEMSELF A LOT, THEY MAY BE

1  EXERTING THEMSELF JUST SITTING THERE.  BUT THIS IS

2  ABOUT THE UNDERLYING CONDITIONS, THE WORSENING AND AS

3  WELL AS JUST EXERTION.  SOME PEOPLE ARE EXERTING

4  THEMSELVES ON THE FARM LINE, SOME PEOPLE ARE JUST

5  SITTING OUT THERE IN THE HEAT.  ONE GUY DIDN'T WANT

6  TO WORK IN THE HEAT.  HE SAID HE DIDN'T WANT TO DO

7  THAT, SO HE SAT THERE.

8      Q    HE SAT THERE ON THE MILK CRATE?

9      A    THAT'S RIGHT.  HE SAID HE DIDN'T WANT TO BE

10  FARMER JOE.

11     Q    AND NOTHING HAPPENED TO HIM.  THEY JUST LET

12  HIM SIT THERE.

13     A    I HAVE NO IDEA WHAT HAPPENED TO HIM.

14     Q    YOU WERE THERE.  YOU SAW HIM JUST SITTING

15  THERE FOR --

16     A    I DON'T KNOW WHAT HAPPENED TO HIM WHEN HE

17  WENT INSIDE.  THE MAN IS MENTALLY ILL.  VERY SEVERELY

18  MENTALLY ILL.  HE WAS OUT ON THAT FARM LINE SITTING

19  ON THAT BOX.  I HAVE NO IDEA.

20     Q    YOU DON'T HAVE THE CAPACITY OR COMPETENCY TO

21  DIAGNOSE THAT GUY AS BEING MENTALLY ILL, DO YOU?

22     A    OH, YES.  HE WAS MENTALLY ILL.

23     Q    AND YOU JUDGE THAT FROM HIM SITTING ON THE

24  MILK CART?

25     A    NO, SIR.  I SPENT A LOT OF TIME TALKING TO

1  HIM.

2      **Q**    YOU SAID THAT -- WHEN I ASKED YOU THE

3  CONSEQUENCES OF EXERTION -- YOU TOLD ME, ACTUALLY,

4  THE CONSEQUENCES OF EXERTION WILL DEPEND ON A NUMBER

5  OF PHYSIOLOGICAL FACTORS CONCERNING ONE INDIVIDUAL.

6  DO YOU REMEMBER TELLING ME THAT?

7      **A**    IF YOU JUST READ THAT, I'M SURE I TOLD YOU

8  THAT.  SO ONE INDIVIDUAL WILL -- MAY RESPOND IN ONE

9  WAY IN ONE DAY DEPENDING ON THE DEGREE OF SLEEP,

10  DEPENDING ON WHAT MEDICINE HE DID OR DIDN'T TAKE,

11  DEPENDING ON HIS PHYSIOLOGY ON THAT DAY.  BUT THIS IS

12  NOT A CASE -- THIS IS NOT AN INDIVIDUAL HARM CASE.

13  THIS IS A CASE ABOUT THE RISK TO A POPULATION OR A

14  CLASS OF PEOPLE OR A GROUP OF PEOPLE.  AND THAT RISK

15  OR GROUP OF PEOPLE IS ON THE FARM LINE AND THE

16  ARTICLES ARE GENERALIZABLE TO THE FARM LINE.

17      **Q**    THOSE PHYSIOLOGICAL FACTORS THAT YOU

18  MENTIONED, THOUGH, THERE ARE MORE THINGS.  IT DEPENDS

19  ON THE CONDITION OF THE HEART.  ISN'T THAT ONE OF THE

20  THINGS?

21      **A**    THE ABILITY TO WITHSTAND HEAT AND THE

22  STRESSORS OF HEAT DO DEPEND ON THE CONDITION OF THE

23  HEART AND THE ABILITY TO INCREASE THE CARDIAC OUTPUT,

24  THE SPEED OF THE HEART BEATING, AS WELL AS THE AMOUNT

25  OF BLOOD THAT COMES OUT OF THE HEART WITH EACH BEAT.

1    Q    CONDITION OF THE SWEAT GLANDS WOULD BE

2  ANOTHER FACTOR?

3    A    YES, THAT'S RIGHT.

4    Q    AN INDIVIDUAL'S ABILITY TO VASODILATE WOULD

5  BE ANOTHER FACTOR?

6    A    THOSE ARE -- SWEATING AND VASODILATION AND

7  GOOD FUNCTION OF THE BRAIN ARE ALL KEY PIECES OF

8  THERMOREGULATION, YES.

9    Q    AND THOSE DIFFER FROM INMATE TO INMATE, DO

10  THEY NOT?

11    A    SOMETIMES THEY DO.  I THINK THAT EACH

12  INDIVIDUAL HAS HIS INDIVIDUAL PHYSIOLOGY.

13    Q    NOW, IN YOUR VIEW OF THIS MATTER, IN LOOKING

14  AT THE LEVEL OF ACTIVITY, EXERTION OR STRENUOUSNESS

15  OF THE FARM LINE, DID YOU COMPARE IT TO OTHER JOBS AT

16  LSP?

17    A    NO.

18    Q    DID YOU -- YOU WERE PROVIDED INFORMATION

19  THAT A NUMBER OF INDIVIDUALS WHO ARE WORKING ON THE

20  FARM LINE IN THE MORNING HOURS, KNOCKING OFF AT

21  11:30, GOING BACK TO HAVE LUNCH, THEN ENGAGE IN

22  COMPETITIVE FULL-COURT BASKETBALL?

23    A    WHAT WAS THE QUESTION, SIR?

24    Q    WERE YOU AWARE OF THAT?

25    A    YES.

1      **Q**    WERE YOU PROVIDED THAT INFORMATION?

2      **A**    YES.

3      **Q**    AND THEY -- THIS COMPETITIVE BASKETBALL,

4   THEY HAVE LEAGUES, THEY PLAY IN THE AFTERNOON HOURS

5   IN THE SUMMER IN THE HOTTEST TIME OF THE YEAR.  WERE

6   YOU PROVIDED THAT INFORMATION?

7      **A**    YES.

8      **Q**    THESE INDIVIDUALS WHO WORK ON THE FARM LINE,

9   THEY LIFT WEIGHTS, THEY PLAY FLAG FOOTBALL, THEY PLAY

10  SOCCER, THEY PLAY SOFTBALL.  WERE YOU PROVIDED THAT

11  INFORMATION?

12          **MS. WRIGHT:**  YOUR HONOR, I'M GOING TO

13  OBJECT.  I DON'T KNOW IF THERE IS A QUESTION HERE OR

14  IF MR. BLANCHFIELD IS TESTIFYING.

15          **THE COURT:**  MR. BLANCHFIELD?

16          **MR. BLANCHFIELD:**  YOUR HONOR, THIS IS CROSS-

17  EXAMINATION OF AN EXTREMELY EXPERIENCED INDIVIDUAL.

18  I'M -- IT IS A QUESTION.  I ASKED HER, "WERE YOU

19  PROVIDED THIS INFORMATION?"  VERY SIMPLE QUESTION.

20          **THE COURT:**  I WILL ALLOW THE QUESTION TO BE

21  ANSWERED.

22          WERE YOU PROVIDED SUCH INFORMATION,

23  DOCTOR?

24  **BY THE WITNESS:**

25      **A**    I THINK I WAS PROVIDED INFORMATION THAT

1  PEOPLE EXERCISE IN THE AFTERNOONS.  WHETHER THEY DO

2  IT ON THE DAYS THEY WORK ON THE FARM LINE OR NOT, I

3  DON'T KNOW.  BUT I DO BELIEVE IF YOU -- IF YOU

4  REPRESENT TO ME THAT PEOPLE WHO WORK ON THE FARM LINE

5  IN THE MORNING SOMETIMES GO AND PLAY SPORTS IN THE

6  AFTERNOON, I ACCEPT IT.

7      **Q**    AND WOULD YOU AGREE THAT THE RISK OF HARM TO

8  THESE INDIVIDUALS IS MORE SIGNIFICANT IN THE HOT

9  AFTERNOON HOURS PLAYING FULL-COURT BASKETBALL THAN IT

10  WOULD BE PICKING CUCUMBERS?

11      **A**    NO.

12      **Q**    WHY WOULD THAT NOT BE A MORE SERIOUS RISK?

13      **A**    WELL, BECAUSE WHEN -- IF WE -- IF THEY GO

14  AND PLAY BASKETBALL, IT'S NOT COMPULSORY.  IT'S NOT

15  FORCED.  THERE IS NOT A PUSHER TELLING THEM TO RUN UP

16  AND DOWN AND DON'T STAND AROUND AND WAIT FOR THE BALL

17  TO BE THROWN TO THEM, SO -- AND THEY HAVE THE CHOICE.

18  THEY CAN STOP PLAYING BASKETBALL, THEY CAN GO TO PLAY

19  BASKETBALL; WHEREAS THE FARM LINE IS COMPULSORY.

20  THEY HAVE TO DO IT.

21          AND I -- THIS COMPARISON OF PLAYING

22  VOLITIONAL *I WANT TO PLAY SPORTS IN THE AFTERNOON*

23  WITH COMPULSORY WORK IS -- IS SO LACK OF MERIT.

24  THERE IS SUCH A LACK OF MERIT BETWEEN COMPARING

25  AGRICULTURAL WORK WITH THE NEW ENGLAND -- NEW ENGLAND

1  JOURNAL CLEARLY STATED, IN OCTOBER OF LAST YEAR, THE

2  DEATH RATE, MORTALITY WITH AGRICULTURAL WORKERS IS 35

3  TIMES HIGHER THAN ANY OTHER OF THE GENERAL

4  POPULATION, SO THAT IS THAT PERSON UNDER THE

5  COMPULSORY FARM LINE.  AND NOW WE'RE TALKING ABOUT

6  SOMEBODY WHO GOES AND PLAYS BASKETBALL WITH HIS

7  FRIENDS WHEN IT'S HOT.

8      **Q**    WELL, IT'S COMPETITIVE IN A LEAGUE, FULL

9  COURT --

10         **THE COURT:**  THIS IS GETTING ENTIRELY TOO

11  ARGUMENTATIVE.  LET'S STICK TO THE ISSUES IN THIS

12  CASE.  AND LET ME BE CLEAR, WE ARE TALKING ABOUT

13  COMPELLED COMPULSORY LABOR HERE.  WE'RE NOT TALKING

14  ABOUT VOLUNTEER ACTIVITIES.  THAT'S CLEAR FROM THE

15  FACTS.

16            NOW, IF THE LSP WOULD LIKE TO ADOPT

17  POLICIES THAT MAKE IT NONCOMPULSORY FOR FOLKS THAT

18  WORK IN THE FIELDS, THEN WE CAN -- WE HAVE AN

19  APPLES-TO-APPLES SITUATION.  SO LET'S MOVE ON TO

20  SOMETHING MORE RELEVANT TO THE ISSUES HERE.

21         **MR. BLANCHFIELD:**  THAT'S FINE, JUDGE.

22  **BY MR. BLANCHFIELD:**

23      **Q**    NOW, YOU KEEP TALKING ABOUT PUSHING AND

24  WE'VE HEARD TESTIMONY ABOUT QUOTAS.  YOU WERE OUT

25  THERE.  WAS ANYONE BEING PUSHED IN THE FIELD THAT

1    DAY?

2        **A**    WELL, SIR, WHEN YOU HAVE A -- WHEN YOU HAVE

3    AN OBSERVATION BY PEOPLE WHO ARE -- THE THINGS THAT

4    HAPPEN WHEN THEY'RE BEING OBSERVED ARE DIFFERENT THAN

5    THE THINGS THAT HAPPEN ON REGULAR DAYS.  SO WHEN I

6    SPOKE TO THE INDIVIDUALS, THEY SAID THAT THEY -- THIS

7    IS A VERY DIFFERENT CIRCUMSTANCE TODAY THAN IT

8    USUALLY IS.  AND I BELIEVE THAT, BECAUSE IF I'M BEING

9    OBSERVED BY MY SUPERIORS, MY BEHAVIOR AND MY WORK

10   EVERY -- I'M GOING TO DO MY BEST.  I'M GOING TO HAVE

11   MY DESK CLEAR.  EVERYTHING THAT I SHOULD DO SHOULD BE

12   PERFECT.

13       **Q**    SO IF I UNDERSTAND YOUR TESTIMONY, YOU

14   BELIEVE THAT WHAT TRANSPIRED THE DAY THAT YOU WERE

15   OUT THERE DIFFERS FROM WHAT GOES ON DURING THE DAYS

16   THAT YOU WERE NOT OUT THERE.  IS THAT WHAT YOU'RE

17   TESTIFYING TO?

18       **A**    THAT IS AN INCOMPLETE SUMMARY OF MY OPINION.

19   FIRST OF ALL, THERE IS A DEPOSITION OF ONE OF THE

20   CORRECTIONS OFFICERS WHO IS DESCRIBED AS A PUSHER.

21   HE IN HIS DEPOSITION STATED THAT IF HE DOES NOT GET A

22   CERTAIN AMOUNT OF WORK OUT OF HIS -- HIS -- OF THE

23   PRISONERS WHO ARE WORKING UNDER HIM ON THAT DAY,

24   THERE WILL BE REPERCUSSIONS FOR HIM.  HE WILL BE

25   CONSIDERED TO NOT BE DOING HIS JOB SATISFACTORILY.

1  THAT WAS HIS TESTIMONY.

2         I DO BELIEVE THAT PEOPLE -- THERE ARE SOME

3  ASPECTS OF WHAT I OBSERVED ON THE LINE THAT DAY WERE

4  OF COURSE TYPICAL.  THERE WERE CUCUMBERS TO BE

5  PICKED.  SOME WERE -- PEOPLE WERE SLOWER, SOME WERE

6  FASTER.  THE GUY WHO SAT ON THE CART SPENT 45 MINUTES

7  TO AN HOUR IN THE BATHROOM.  SO I UNDERSTAND THAT

8  THESE THINGS HAPPEN.

9         BUT I ALSO UNDERSTAND THAT THE PUSHER MAY

10 NOT HAVE BEEN BEHAVING IN THE WAY THAT HE NORMALLY

11 PUSHES BECAUSE I'M OBSERVING HIM, BECAUSE ALL OF THE

12 LAWYERS ARE THERE THAT DAY AND HE -- AND HE'S -- AND

13 SO THAT -- THE PROCESS OF OBSERVING A PROCESS CAN

14 CHANGE THE PROCESS.

15    Q   YOU'RE ALSO AWARE, THOUGH, OF THE TESTIMONY

16 THAT YOU REVIEWED, THAT THERE IS NO PUSHING GOING ON;

17 THERE IS NO QUOTAS OUT THERE BY THE INDIVIDUALS WHO

18 ARE ACTUALLY CHARGED WITH WORKING OUT ON THE FARM

19 LINE?

20    A   I DON'T UNDERSTAND THAT.  WHAT I UNDERSTAND

21 IS THAT I READ THE DEPOSITION TESTIMONY OF ONE OF THE

22 CORRECTIONS OFFICERS THAT CLEARLY STATED THAT THERE

23 IS A -- THAT HE IS NOT SEEN OR PERCEIVED AS DOING HIS

24 JOB IF THEY COME IN WITH NO CUCUMBERS, FOR EXAMPLE,

25 IF YOU WANT TO USE CUCUMBERS.  YOU COME IN WITH A

1  BUNCH OF EMPTY BOXES OR JUST FIVE BOXES OR TEN, I

2  MEAN, HE'S NOT DOING HIS JOB.  THAT IS WHAT HE SAID.

3  THAT'S WHAT'S IMPORTANT TO ME.

4      **Q**    YOU TESTIFIED IN THE *YATES V COLLIER* CASE,

5  DID YOU?

6      **A**    YES.

7      **Q**    AND ARE YOU AWARE THAT THE FIFTH CIRCUIT, IN

8  DISCUSSING WHETHER OR NOT THERE WAS A SUBSTANTIAL

9  RISK OF SERIOUS HARM, LOOKED AT THE HISTORY AND FROM

10  A HISTORICAL PERSPECTIVE STATED THAT THERE WERE 20

11  DEATHS IN THAT PRISON?

12      **A**    IS -- *YATES* HAD A PREVIOUS NAME.  THAT'S

13  TEXAS?

14      **Q**    CORRECT.

15      **A**    OKAY.  AND YOUR QUESTION IS AM I AWARE OF

16  THE OPINION OF THE FIFTH CIRCUIT AND WHAT THEY SAID?

17  YOU WOULD HAVE TO READ IT TO ME FOR ME TO BE UP TO

18  DATE ON WHAT THE FIFTH CIRCUIT SAID.

19      **Q**    WERE YOU AWARE THAT THERE WERE 20 DEATHS IN

20  THAT TEXAS PRISON?

21      **A**    I KNOW THAT TEXAS HAS HAD AND CONTINUES TO

22  HAVE MANY DEATHS FROM HEAT STROKE, YES.  IF THAT'S

23  WHAT YOU'RE ASKING ME, YES.

24      **Q**    AND ARE WE TALKING ABOUT CLASSIC HEAT

25  INJURY?

1      **A**    WELL, *THE NEW ENGLAND JOURNAL* IS VERY CLEAR

2  ABOUT THIS DELINEATION OF EXERTIONAL VERSUS CLASSICAL

3  HEAT STROKE.  SO CLASSICAL HEAT STROKE HAS BEEN

4  DESCRIBED AS OCCURRING IN THE INFIRM AND THE ELDERLY.

5  EXERTIONAL HAS BEEN DESCRIBED AS IN THE YOUNG IN A

6  SPORADIC NATURE.  ON THE OTHER HAND, THERE IS SOME

7  CROSSOVER.  OBVIOUSLY THE PEOPLE WHO MIGHT GET

8  EXERTIONAL HEAT STROKE MIGHT BE YOUNG, THEY MAY BE

9  OLD PEOPLE EXERTING THEMSELVES, AND THE YOUNG PEOPLE

10 COULD HAVE UNDERLYING DISEASES.  SO I DO NOT AGREE

11 WITH YOU THAT IT'S CLASSICAL HEAT STROKE ONLY IN

12 TEXAS.

13     **Q**    THE 20 PEOPLE WHO DIED IN THE *YATES* CASE,

14 THEY WERE ALL CLASSIC HEAT INJURY CASES, WERE THEY

15 NOT?

16     **A**    COULD YOU TELL ME HOW YOU DESCRIBE CLASSICAL

17 HEAT?  AND THEN I'LL BE ABLE TO ANSWER IT.

18     **Q**    WHY DON'T YOU EXPLAIN TO ME THE DIFFERENCE

19 BETWEEN CLASSIC HEAT INJURY AND EXERTIONAL HEAT

20 INJURY.

21     **A**    OKAY.  I HAVE -- FIRST OF ALL, IT'S VERY

22 EASY TO SAY WHAT EXERTIONAL HEAT INJURY IS.  PEOPLE

23 ARE EXERTING THEMSELVES.  THESE ARE THE MILITARY

24 RECRUITS.  THESE COULD BE THE FOOTBALL PLAYERS.  IN

25 AMERICA TODAY, IT'S ONE OF THE LEADING CAUSES OF

1  DEATH IN HIGH-SCHOOL FOOTBALL PLAYERS.  IT --

2  MILITARY RECRUIT ACTUALLY -- ACTUALLY, BECAUSE OF THE

3  NUMBERS OF DEATH IN THESE YOUNG, HEALTHY PEOPLE, THEY

4  PUT FORTH IN THE 1950s THE WET GLOBE BULB TEMPERATURE

5  AS A BETTER MEASURE OF THE RISK TO THOSE MILITARY

6  RECRUITS.  AND AFTER THEY DID THAT, THEY DECREASED.

7  SO EXERCISE WE UNDERSTAND.

8          NOW, IF YOU'RE -- IF YOU ARE SITTING IN A

9  PRISON LIKE WITH THE PRESSURE -- THE IMPACT OF THE

10  HEAT, DAY AND NIGHT, AND THEN YOU GO TO THE FARM

11  LINE, THERE IS A COMBINATION OF CLASSIC, WHICH IS EL-

12  -- UNHEALTHY PEOPLE OR HEALTHY PEOPLE LYING THERE,

13  AND THERE IS A COMBINATION.  THIS IS NOT A CLEAN

14  EXERTION-VERSUS-CLASSICAL GROUP.

15    Q    THE POINT I'M TRYING TO MAKE, DOCTOR, IS:

16  IN THE *YATES* CASE IN WHICH YOU TESTIFIED, THESE

17  INDIVIDUALS WHO DIED FROM HEAT, THEY WERE INDIVIDUALS

18  WHO WERE IN THE DORMS ON A DAY-TO-DAY BASIS.  IT WAS

19  NOT OUTSIDE DOING ANY KIND OF EXERTIONAL ACTIVITIES.

20  IS THAT CORRECT?

21    A    THE PEOPLE WHO DIED IN TEXAS WERE IN THE

22  DORMS IN THE HEAT.  THEY WERE NOT OUT IN THE FIELD

23  ALSO ADDITIONALLY EXERCISING.

24    Q    NOW, YOU MENTIONED -- OR YOU WERE ASKED

25  ABOUT MEDICATIONS AND MEDICATIONS THAT IMPACT THE

1  BODY'S ABILITY TO THERMOREGULATE.  IS IT FAIR TO SAY

2  THAT IF SOMEONE IS ON ONE OF THOSE MEDICATIONS AND

3  THEN STOPS TAKING THAT MEDICATION, THE RISK GOES AWAY

4  AT LEAST WITH RESPECT TO THAT MEDICATION?

5      **A**    IT DEPENDS ON THE LENGTH OF TIME.  FOR

6  EXAMPLE, WITH THE SSRI, IF YOU STOP AN SSRI TWO WEEKS

7  AGO AND YOU START THEM ON SOMETHING ELSE TO INCREASE

8  THE SEROTONIN, LIKE MANY OF THE DRUGS INCREASE

9  SEROTONIN, YOU MAY STILL GET SEROTONIN SYNDROME.  SO

10  IT DEPENDS ON THE DURATION OF ACTION AND THE

11  EXISTENCE OF THAT DRUG IN THE BODY.  SO IT'S NOT A

12  DEFINITE CUT-OFF.  WE'RE VERY CAREFUL ABOUT SOME

13  DRUGS THAT WE STOP IT AND WAIT WEEKS BEFORE WE START

14  ANOTHER DRUG WITH A SIMILAR OR SYNERGISTIC EFFECT.

15      **Q**    SOMETIMES WE DON'T RESTART ANY DRUG, THOUGH.

16  ISN'T THAT FAIR TO SAY?

17      **A**    WHAT ARE YOU ASKING?

18      **Q**    WELL, IF SOMEONE IS TAKING AN

19  ANTICHOLINERGIC DRUG AND THE TREATING PHYSICIAN

20  DECIDES, *OKAY, WE'RE GOING TO TAKE YOU OFF THIS*

21  *MEDICINE* AND THEY DON'T GO BACK ON ANOTHER MEDICINE,

22  THAT RISK GOES AWAY, DOES IT NOT?

23      **A**    THE RISK OF THE MEDICATION GOES AWAY BECAUSE

24  THEY DON'T HAVE IT IN THEIR SYSTEM WHATSOEVER.  AND

25  THEN YOU HAVE TO TELL ME WHAT DISEASE OR CONDITION

1  ARE THEY TREATING, BECAUSE THEN NOW YOU HAVE AN

2  UNTREATED DISEASE OR CONDITION.

3      **Q**    NOW, YOU AGREE THAT PEOPLE CAN ACCLIMATIZE

4  TO HEAT?

5      **A**    HEALTHY PEOPLE WITH WORKING HEARTS, NO

6  MEDICATIONS, NO COMORBIDITIES PUT INTO VERY

7  CAREFUL -- LIKE THE MILITARY DOES -- VERY CAREFUL

8  REGIMENS CAREFULLY PRESCRIBED CAN ACCLIMATIZE.  THE

9  PEOPLE ON THE FARM LINE AND THE PEOPLE AT -- AT --

10 CANNOT NECESSARILY ACCLIMATIZE DUE TO THEIR

11 COMORBIDITIES AND THEIR CONDITIONS.  FOR EXAMPLE,

12 SOMEONE WITH DIABETES WILL NOT BE ABLE TO ACCLIMATIZE

13 PURELY.  SOMEBODY ON AN ACE INHIBITOR, AN

14 ANGIOTENSIN-CONVERTING ENZYME INHIBITOR OR

15 ANGIOTENSIN-CONVERTING ENZYME BLOCKER, THOSE PEOPLE,

16 IT AFFECTS THE KIDNEYS.  A LARGE PART OF

17 ACCLIMATIZATION IS THE ABILITY TO DECREASE THE AMOUNT

18 OF SWEAT IN THE SWEAT -- THE AMOUNT OF SALT IN THE

19 SWEAT.  THAT IS A FUNCTION OF THE KIDNEY.

20          AND THE ANGIOTENSIN-ALDOSTERONE SYSTEM IS AT

21 PLAY IN THAT.  SO IF YOU HAVE ANY KIND OF ENDOCRINE

22 PROBLEM, A HEART PROBLEM, OR YOU'RE NOT SUBJECTED TO

23 THE PROPER -- THE PROPER TIMES THAT YOU'RE IN HEAT,

24 THE ABILITY -- YOU WILL NOT ACCLIMATIZE.  SO

25 ACCLIMATIZATION IN AND OF ITSELF IS A SCIENCE, AND

1  THE MILITARY KNOWS AN ENORMOUS AMOUNT ABOUT THIS.

2      **Q**    YOU MENTIONED A NUMBER OF TIMES DIABETES.

3  IT'S NOT YOUR TESTIMONY THAT EVERY DIABETIC, EVEN ONE

4  WHO IS CONTROLLED, SHOULD NOT BE PUT OUT ON THE FARM

5  LINE?

6      **A**    WHAT I WOULD LIKE TO SAY ABOUT THAT IS THE

7  HEAT -- THE PRESENTATIONS OF PEOPLE WITH DIABETES IN

8  THIS -- THE VAST LITERATURE TALKING ABOUT THAT, AND

9  INCLUDING THE NOLTON STUDY THAT WE DIDN'T LOOK AT

10 TODAY, CLEARLY THOSE PEOPLE -- AND YOU'RE LOOKING AT

11 ALL OF CALIFORNIA IN THE NOLTON STUDY, FOR EXAMPLE,

12 WHICH WE DIDN'T GET TO SHOW OR TALK ABOUT TODAY.

13 YOU'RE TALKING ABOUT MILLIONS OF PEOPLE IN

14 CALIFORNIA.  AND THEIR -- THE INCREASE, THE RELATIVE

15 RISK FOR THOSE PEOPLE WITH DIABETES IS GREATER.  IT'S

16 NOT 14 TIMES GREATER LIKE THOSE PEOPLE OVER THE AGE

17 OF 65 IN AND OF THEMSELF, BUT IT'S GREATER.

18      AND WHEN YOU'RE TALKING ABOUT THOUSANDS --

19 4,000 PEOPLE, THAT'S GOING TO BE SOME PEOPLE WHO ARE

20 AT GREATER RISK.  AND IF YOU'RE TALKING ABOUT

21 POPULATION LEVEL THINGS, THOUSANDS OF PEOPLE WILL BE

22 AT GREATER RISK BECAUSE THEY HAVE DIABETES.

23      **Q**    IN YOUR DEPOSITION WE TALKED A LOT ABOUT

24 MEDICATIONS AND WHETHER OR NOT SOMEONE ON A

25 PARTICULAR MEDICATION SHOULD AUTOMATICALLY RECEIVE A

1  HEAT PRECAUTION DUTY STATUS.  DO YOU RECALL SOME OF

2  THAT TESTIMONY?

3      **A**    I RECALL YOU ASKING ABOUT THAT, BUT I DON'T

4  RECALL THE ACTUAL TESTIMONY.

5      **Q**    OKAY.  WE TALKED ABOUT A NUMBER OF THINGS

6  INCLUDING DIURETICS, AND YOU SAID, "I'M NOT PREPARED

7  TO SAY THAT DIURETICS WOULD AUTOMATICALLY GET A

8  HEAT-RELATED DUTY STATUS."  DO YOU REMEMBER SAYING

9  THAT?

10     **A**    NO.  IF YOU JUST READ FROM MY DEPOSITION, I

11 BELIEVE I SAID IT.

12     **Q**    ALL RIGHT.  AND I ASKED YOU "IF SOMEONE IS

13 ON A DIURETIC, IS THAT A AUTOMATIC DISQUALIFIER FOR

14 WORKING ON THE FARM LINE?"  YOU SAID -- "ANSWER:

15 NOTHING IS AUTOMATIC HERE.  WE NEED TO LOOK AT MORE."

16     **A**    OKAY.  SO --

17         **MS. WRIGHT:**  YOUR HONOR, I'LL JUST OBJECT.

18 I DON'T KNOW IF MR. BLANCHFIELD IS ATTEMPTING TO

19 IMPEACH THE WITNESS.  IF HE IS, IT'S INACCURATE,

20 INCORRECT IMPEACHMENT.  IF HE COULD PUT THE

21 DEPOSITION TRANSCRIPT IN FRONT OF THE WITNESS, THAT

22 MIGHT HELP.

23         **THE COURT:**  WELL, LET'S SEE IF SHE NEEDS IT.

24 IT SOUNDS TO ME LIKE HE'S SIMPLY ASKING SOME

25 CLARIFICATIONS.

1          BUT WOULD YOU BETTER UNDERSTAND THE

2   QUESTION IF YOU HAD THE OPPORTUNITY TO REVIEW YOUR

3   DEPOSITION?

4          **THE WITNESS:**  YOUR HONOR, DEFINITELY.

5   BECAUSE IT'S, IN MY EXPERIENCE, THAT STATEMENTS LIKE

6   WERE JUST MADE ARE TAKEN TOTALLY OUT OF CONTEXT OF

7   THE CONVERSATION.

8          **THE COURT:**  WELL, LET'S GO ON AND PROVIDE

9   HER THE COPY OF THE DEPOSITION THAT YOU'RE CITING.

10         **MR. BLANCHFIELD:**  WE CAN PULL UP THE

11  DEPOSITION AT PAGE -- STARTING AT PAGE 104.

12         **THE COURT:**  ALL RIGHT, DOCTOR.  CAN YOU SEE

13  THAT?

14         **THE WITNESS:**  NO, YOUR HONOR.  MY MONITOR IS

15  NOT ON.  I MEAN, IT'S NOT ON MY MONITOR.

16         **THE COURT:**  DO YOU SEE IT NOW?

17         **THE WITNESS:**  NO, SIR.  I CAN PUNCH THIS,

18  BUT IT LOOKS LIKE IT'S ON.  IT'S BLUE.  THAT WOULD

19  SUGGEST THE MONITOR IS ON, BUT IT'S NOT TRANSMITTING

20  TO -- WHOOPS -- TO MY MONITOR.

21         **THE COURT:**  GO ON AND ACTIVATE IT,

22  ELIZABETH.

23         **THE COURTROOM DEPUTY:**  I HAVE, SIR.  THE

24  WITNESS BUTTON IS PRESSED.  IS THE MONITOR ON?

25         **THE WITNESS:**  YEAH, IT'S ON.  I'LL PUSH IT

1  AND NOW IT'S OFF.  AND NOW IT'S OFF.  IT SHOWS THE --

2  NOW IT'S COMING BACK ON AFTER I PUSHED IT.

3          **THE COURT:**  WHY DON'T YOU GO ON AND TOGGLE

4  TO THE MONITOR.  DO YOU SEE IT?

5          **THE WITNESS:**  OKAY.

6              GO AHEAD.  OH, IT JUST WENT OFF.  I

7  DIDN'T TOUCH IT.

8          **THE COURT:**  IT'S OFF.

9          **THE LAW CLERK:**  IT'S OFF FOR EVERYBODY.

10         **THE WITNESS:**  OKAY.

11         **THE COURT:**  CAN YOU SEE IT, DOCTOR?

12         **THE WITNESS:**  YES.

13         **THE COURT:**  LET'S PROCEED.

14  **BY THE WITNESS:**

15      A   OKAY.  THIS IS PAGE 104.  BUT IN ORDER FOR

16  ME TO KNOW WHAT THE LINE OF QUESTIONING, WE NEED TO

17  GO TWO PAGES BEFORE.  OKAY.  SO THIS IS PAGE 103.

18              SO IT LOOKS TO ME FROM PAGE 102 THAT WE'RE

19  DISCUSSING THE LIST -- A LIST.  RIGHT, SIR?

20      **Q**   CORRECT.

21      **A**   OKAY.  SO LET'S TALK ABOUT THE LIST.  YOU'RE

22  WANTING ME TO TALK ABOUT THE LIST.  OKAY?  SO "WHAT

23  I'M SAYING IS ON PAGE 17 YOU DIRECTED MY ATTENTION TO

24  THIS -- ON THE BOTTOM OF PAGE 17 YOU DIRECTED MY

25  ATTENTION TO THESE MEDICATIONS AND" -- "OKAY.  MY

1  QUESTION -- MY INITIAL QUESTION WAS WHETHER OR NOT IN

2  YOUR OPINION SOMEONE ON THESE MEDICATIONS SHOULD

3  RECEIVE A HEAT-RELATED DUTY STATUS."  AND THEN

4  MS. WRIGHT OBJECTED.

5          "AND YOU SAID -- YOU QUALIFIED ZYRTEC.  ARE

6  THERE ANY OTHER MEDICATIONS IN THAT LIST ON PAGE 17

7  THAT YOU WOULD QUALIFY?"  SO I QUALIFIED THIS

8  SYNTHROID.  THIS IS NOW PAGE 103.  SYNTHROID, IF

9  YOU -- WE DISCUSSED SYNTHROID A BIT.  AND YOU SAY

10  "OKAY."  THEN WE TALK ABOUT ANOTHER -- OF OTHER

11  MEDICATIONS.

12          AND WHERE IS IT -- THE PIECE THAT YOU WANT?

13  THEN YOU SAID AND THEN -- SO THEN YOU SAY, "THAT

14  CLEARS IT UP."  I'M NOT SURE WHAT.  "AND THEN THE

15  SAME QUESTION IF WE TURN TO THE NEXT PAGE" -- THAT'S

16  WHAT IT SAYS -- "THE BETA BLOCKERS.  IN YOUR OPINION,

17  IF SOMEONE IS ON A BETA BLOCKER, WOULD THEY -- SHOULD

18  THEY BE ENTITLED TO A HEAT-RELATED DUTY STATUS?"

19          AND I AM SURE THAT I AGREED.  AND I SEE HERE

20  THAT I TALKED ABOUT THE INABILITY TO DISSIPATE HEAT,

21  THE EFFECT OF BETA BLOCKERS ON THE INABILITY TO

22  INCREASE THE CHRONOTROPY, THE SPEED AND THE SQUEEZE

23  OF A BETA PLAYER (SIC).  SO YES.

24    Q    MY POINT IN THIS DOCUMENT, YOU SAY, "DO I

25  THINK THAT EVERY INDIVIDUAL WHO TAKES A BETA BLOCKER

1  HAS TO BE OFF THE FARM LINE?  I THINK THERE ARE OTHER

2  INDIVIDUAL CONSIDERATIONS."

3       SO THE FACT THAT SOMEONE IS ON A BETA

4  BLOCKER IN AND OF ITSELF, IN YOUR OPINION, WOULD NOT

5  MEAN THAT HE SHOULD NOT BE ON THE FARM LINE?

6    **A**   WELL, MY ANSWER IS A LITTLE BIT DIFFERENT,

7  SIR.  IT SAYS THAT "THE FACT IS THAT BETA BLOCKERS

8  DECREASE THE ABILITY TO DISSIPATE HEAT.  ALL OF THEM.

9  DO I THINK THAT EVERY INDIVIDUAL WHO TAKES A BETA

10  BLOCKER HAS TO BE OFF THE FARM LINE?  I THINK THERE

11  ARE OTHER INDIVIDUAL CONSIDERATIONS."

12       **MR. BLANCHFIELD:**  COULD WE GO TO THE NEXT

13  PAGE, PLEASE; 105?

14  **BY THE WITNESS:**

15    **A**   SO THEN YOU ASKED ME:  "THEN MOVING ON TO

16  PARAGRAPH 59, HYDROCHLOR-" --

17       **MS. WRIGHT:**  I'M SORRY.  I DON'T UNDERSTAND

18  WHAT THE QUESTION IS.

19       **THE COURT:**  YES.  SO WHAT'S --

20       **MS. WRIGHT:**  WHAT'S THE POINT?

21       **THE COURT:**  THAT'S A VALID POINT.  WHAT IS

22  YOUR QUESTION, MR. BLANCHFIELD?

23       **MR. BLANCHFIELD:**  YOUR HONOR, IN THE

24  DEPOSITION SHE SAYS THAT WITH RESPECT TO --

25       **THE COURT:**  LET ME JUST -- I DON'T NEED TO

1  KNOW WHAT -- WOULD YOU SIMPLY ASK THE QUESTION?

2        **MR. BLANCHFIELD:**  YES.

3        **THE COURT:**  BECAUSE RIGHT NOW WE HAVE A

4  NARRATIVE ANSWER.  SHE'S READING A TRANSCRIPT.  I

5  TELL YOU WHAT.  WHY DON'T Y'ALL INTRODUCE IT IF IT'S

6  NOT ALREADY IN EVIDENCE.  I'LL READ THE DEPOSITION

7  TRANSCRIPT MYSELF.  BUT WHY DON'T YOU GO ON TO THE

8  NEXT QUESTION.

9        **MR. BLANCHFIELD:**  WE'LL ASK ONE QUESTION.

10 BY MR. BLANCHFIELD:

11    **Q**   WITH RESPECT TO THE MEDICATIONS THAT WE'RE

12 DISCUSSING IN YOUR DEPOSITION, YOUR TESTIMONY WAS

13 THAT THE FACT THAT THEY'RE ON THESE INDIVIDUAL

14 MEDICATIONS DO NOT IN AND OF ITSELF DISQUALIFY THEM

15 FROM WORKING ON THE FARM LINE?

16    **A**   THAT MISCHARACTERIZES MY TESTIMONY, SIR.

17        **MR. BLANCHFIELD:**  JUDGE, WE'LL INTRODUCE IT,

18 PAGE 104 THROUGH 107.  I THINK IT'S PRETTY CLEAR AND

19 I'LL MOVE ON.

20        **THE COURT:**  ALL RIGHT.

21 BY MR. BLANCHFIELD:

22    **Q**   YOU WOULD AGREE THAT WITH RESPECT TO SOUTH

23 LOUISIANA, PARTICULARLY IN THE SUMMERTIME, THE

24 HIGHEST HEAT INDEXES THAT WE RECEIVE GENERALLY COME

25 IN THE AFTERNOON HOURS?

1    **A**    I THINK IN GENERAL ANYBODY WHO IS BORN AND

2  RAISED IN THE SOUTH, LIKE I'M TEXAN, KNOW THAT IT

3  SEEMS TO BE HOTTER IN THE AFTERNOON TEMPERATURE-WISE.

4  BUT THE HUMIDITY SOMETIMES IS HIGHER IN THE MORNING

5  AND THEN IT BURNS OFF, LIKE YOUR DR. KELDIE MADE THAT

6  POINT HIMSELF IN HIS REPORT.  SO --

7    **Q**    AND YOU'RE WELL FAMILIAR WITH AFTERNOON

8  TEMPERATURES.  YOU'VE SPENT -- YOU WENT TO THE

9  UNIVERSITY OF TEXAS; YOU LIVED IN AUSTIN?

10    **A**    YES, SIR.

11    **Q**    YOU WERE VERY -- YOU PLAYED DIVISION I

12  SINGLES TENNIS IN THE AFTERNOON HOURS IN THE SUMMER?

13    **A**    YES, SIR.  WE HAD A LOT OF NICE DISCUSSION

14  ABOUT OUR TENNIS GAMES, IT'S TRUE.

15    **Q**    WE DID.  AND YOU'RE ALSO A SPEED WALKER

16  WHERE YOU WALK AND YOUR HEART RATE GETS UP INTO THE

17  150s, SO YOU'RE VERY AWARE OF EXERTIONAL ISSUES, ARE

18  YOU NOT?

19    **A**    I KNOW WHAT EXERTION IS, YES.

20    **Q**    YOU -- IN YOUR VISIT TO LSP YOU SAW THAT

21  INMATES HAD ESSENTIALLY UNLIMITED ACCESS TO WATER?

22    **A**    THERE WAS WATER PRESENT.  WHETHER OR NOT ON

23  DAYS THAT I'M NOT OBSERVING THEY'RE ALLOWED TO GO OFF

24  THE LINE AND KEEP GETTING WATER AND SIT THERE AND --

25  I DON'T BELIEVE THAT TO BE THE CASE, BUT I DON'T

1  KNOW.

2      **Q**    WHY DON'T YOU BELIEVE THAT TO BE THE CASE?

3      **A**    BECAUSE IF YOU SPENT THE DAY AT THE

4  WATERCOOLER, YOU COULDN'T PICK ANY CUCUMBERS.

5      **Q**    THERE WAS NOTHING THERE THAT DAY THAT

6  PRECLUDED A FARM WORKER FROM ACCESSING WATER.  IS

7  THAT FAIR TO SAY?

8      **A**    I THINK SO.  I THINK THAT ON THE DAY I WAS

9  THERE, THE FARM WORKERS WERE GOING TO BE ALLOWED TO

10  HAVE AS MUCH WATER AS THEY NEEDED, YES.

11      **Q**    NOW, IN ONE OF YOUR DECLARATIONS YOU MENTION

12  THAT THERE ARE 32 MILLION PEOPLE WORKING OUTDOORS OUT

13  IN THE FREE WORLD.  DO YOU REMEMBER THAT?

14      **A**    NO, I DON'T.

15      **Q**    OKAY.  AND LET ME ASK YOU.  THIS FACT THAT

16  THERE ARE THAT MANY WORKERS WORKING OUTSIDE, DOTD

17  WORKERS POURING ASPHALT IN THE AFTERNOON IN JULY,

18  ROOFERS WORKING ON ROOFS WHEN THE HEAT INDEX IS OVER

19  120, DOES THAT FACTOR INTO ANY OF YOUR ANALYSIS IN

20  THIS CASE IN FORMULATING YOUR OPINIONS?

21      **A**    NO.

22      **Q**    AND IT'S NOT RELEVANT?

23      **A**    THIS ISN'T -- SIR, THIS IS NOT A CASE ABOUT

24  ROOFERS IN THE FREE WORLD.  THIS IS NOT A CASE ABOUT

25  DEPARTMENT OF TRANSPORTATION WORKERS LAYING ASPHALT

1    IN THE AFTERNOON.  THIS IS NOT ABOUT THAT.  THIS IS

2    ABOUT A PRISON, PENITENTIARY FARM LINE, WORKING ON

3    THE FARM LINE.  THAT'S WHAT IT'S ABOUT.

4        **Q**    NO ONE ON THE FARM LINE AT LSP HAS EVER

5    DIED, HAVE THEY?

6        **A**    WELL, FIRST OF ALL, I THINK THAT YOU'RE --

7    I'M SURE -- I MEAN, WE'RE ALL GOING TO DIE, SO

8    SOMEBODY WHO WORKED ON THE FARM LINE IN THE WORLD HAS

9    DIED.

10           **THE COURT:**  DOCTOR, IF YOU KNOW THE ANSWER

11   TO THE QUESTION, YOU CAN SIMPLY ANSWER THE QUESTION.

12   IF YOU DON'T KNOW, YOU CAN SIMPLY STATE THAT YOU

13   DON'T KNOW.

14           **THE WITNESS:**  THANK YOU, YOUR HONOR.

15   **BY THE WITNESS:**

16       **A**    I DON'T KNOW.

17       **Q**    DO YOU HAVE ANY INFORMATION OF ANYONE DYING

18   FROM A HEAT-RELATED INJURY ON THE FARM LINE?

19       **A**    I HAVE NO INFORMATION ABOUT DEATHS OF

20   INDIVIDUALS ON THE FARM LINE AT THE TIME THEY'RE ON

21   THE FARM LINE, THE NEXT DAY, WHICH IS ALSO WHEN

22   PEOPLE DIE WHO HAVE BEEN SUBJECTED TO EXCESSIVE WEEK,

23   OR THE NEXT WEEK, BECAUSE THEY CONTINUE TO HAVE THE

24   SAME STRESSORS AND THE DETERIORATION OF THEIR

25   CONDITIONS.

1    **Q**    YOU TOLD ME IN YOUR DEPOSITION THAT YOU

2    ADMITTED THAT THERE WAS NO INFORMATION THAT ANYONE

3    WORKING ON THE FARM LINE EVER HAD HEAT STROKE.

4    CORRECT?

5    **A**    WELL, THERE IS NO INFORMATION.

6    **Q**    AND YOU MENTIONED THE *LEWIS* CASE.  THE ONE

7    DEATH -- THAT DEATH HAD NOTHING TO DO WITH THE FARM

8    LINE, DID IT?

9    **A**    IT WAS HEAT STROKE.  I ACTUALLY DON'T KNOW

10   WHERE -- WHY HE HAD HEAT STROKE.

11   **Q**    YOU DON'T KNOW THAT IT HAD NOTHING TO DO

12   WITH THE FARM LINE?

13   **A**    I DON'T.  YOU'VE TOLD ME THAT A COUPLE OF

14   TIMES TODAY, AND ACTUALLY -- BUT I DON'T KNOW.  I

15   DIDN'T KNOW WHERE HE WAS BROUGHT FROM, WHY HE GOT

16   HEAT STROKE, OR WHY HE DIED OF HEAT STROKE.  I DON'T

17   KNOW.

18   **Q**    WAS THAT TEN YEARS AGO OR MORE?

19   **A**    IT WAS IN THE *LEWIS* CASE.

20   **Q**    AND THAT *LEWIS* CASE EVALUATED MEDICINE BACK

21   10, 15 YEARS AGO, DID IT NOT?

22   **A**    IF YOU REPRESENT IT WAS THAT LONG AGO, THEN

23   I'M SURE IT WAS.

24   **Q**    THANK YOU, DOCTOR.  THAT'S ALL THE QUESTIONS

25   I HAVE.  I APPRECIATE YOUR TIME.

1        **A**    THANK YOU, SIR.

2               **THE COURT:**  ALL RIGHT.  ANY REDIRECT?

3               **MS. WRIGHT:**  NO REDIRECT.

4               **THE COURT:**  ALL RIGHT.  SO, COUNSEL, LET ME

5    TELL YOU WHAT I'M GOING TO DO.  IT OCCURS TO ME THAT

6    MUCH OF THE TESTIMONY THAT THE COURT HEARD TODAY WITH

7    RESPECT TO THE CLASS CERTIFICATION ISSUES, AND MORE

8    SPECIFICALLY THE MINIMUM TEMPERATURE THAT MAY TRIGGER

9    SOME RELIEF HERE, ALSO PERTAINS TO THE UNDERLYING

10   ISSUES IN THE TRO -- THE SECOND TRO; THAT IS, WHETHER

11   THE 91-DEGREE STANDARD SHOULD BE ADOPTED OR PERMITTED

12   BY THE COURT OR SHOULD THE COURT ORDER THAT THE

13   STANDARD BE RETURNED TO 88 DEGREES.  SO I WANT

14   EVERYONE TO BE ON NOTICE THAT I FIND THIS TESTIMONY

15   TO BE RELEVANT TO THE ISSUES IN THE TRO.

16               FOR THAT REASON, I WILL GIVE EACH SIDE

17   AN ADDITIONAL TEN MINUTES TO QUESTION THE WITNESS, IF

18   YOU WISH, WITH RESPECT TO ANY ISSUES YOU BELIEVE

19   PERTINENT THAT THE COURT HAS NOT ALREADY ACCEPTED

20   TODAY WITH RESPECT TO THE ISSUES IN THE TRO.

21               NOW, I WILL ALSO TELL YOU THAT IF YOU

22   BELIEVE THAT YOU'RE PREJUDICED BY THIS -- I MEAN,

23   EVERYBODY KNOWS WHAT THIS TESTIMONY WOULD HAVE BEEN.

24   THIS WITNESS HAS BEEN DEPOSED, SHE'S PROVIDED

25   DECLARATIONS.  NO ONE IS TAKEN BY SURPRISE BY HER

1   TESTIMONY AND THE FACT THAT SHE HAS AN OPINION ABOUT

2   WHAT THE RELEVANT TEMPERATURE STANDARD SHOULD BE.

3   BUT I WILL GIVE ANYBODY WHO WISHES AN ADDITIONAL

4   OPPORTUNITY TO QUESTION THE WITNESS ON THAT ISSUE.

5          WOULD THE PLAINTIFF LIKE AN ADDITIONAL

6   OPPORTUNITY TO QUESTION DR. VASSALLO ABOUT THE 88-

7   VERSUS 91-DEGREE STANDARD?

8       **MS. WRIGHT:**  NOT ABOUT THAT STANDARD, YOUR

9   HONOR.  BUT IF THE -- IF THE OPPORTUNITY IS AVAILABLE

10  TO PROVIDE ADDITIONAL INFORMATION PERTAINING TO THE

11  SECOND TRO, THEN WE WOULD TAKE THAT OPPORTUNITY.

12      **THE COURT:**  WHAT EXACTLY WOULD YOU LIKE TO

13  QUESTION THIS WITNESS ABOUT WITH RESPECT TO THE

14  SECOND TRO?

15      **MS. WRIGHT:**  THE WET BULB GLOBE TEMPERATURE

16  MONITORING MECHANISM AS SUPERIOR TO THE HEAT INDEX

17  TAKEN BY THE NATIONAL WEATHER SERVICE.

18      **THE COURT:**  ALL RIGHT.  MR. BLANCHFIELD,

19  WOULD YOU LIKE TO QUESTION THE WITNESS WITH RESPECT

20  TO THE 88-DEGREE TEMPERATURE STANDARD?

21      **MR. BLANCHFIELD:**  NO, YOUR HONOR.  I THINK

22  THAT ISSUE HAS BEEN BRIEFED.

23      **THE COURT:**  ALL RIGHT.  SO LET'S TALK ABOUT

24  THE WET BULB GLOBE PROCESS OR STANDARD.  WHAT EXACTLY

25  WOULD YOU LIKE -- IF YOU WOULD OFFER A PROFFER AT

1  THIS TIME, WHAT EXACTLY WOULD YOU LIKE TO ESTABLISH

2  THROUGH THE WITNESS'S TESTIMONY THAT HASN'T ALREADY

3  BEEN ESTABLISHED?

4        **MS. WRIGHT:**  WELL, YOUR HONOR MAKES A GOOD

5  POINT, CLEARLY.  I THINK OUR BRIEFING CLEARLY

6  ESTABLISHES THAT THE --

7        **THE REPORTER:**  COULD YOU COME TO A

8  MICROPHONE, PLEASE?

9        **MS. WRIGHT:**  YES, OF COURSE.  I'M SO SORRY.

10            I THINK THE BRIEFING AND THE EXHIBITS

11  ATTACHED TO THE BRIEFING CLEARLY ESTABLISH THAT THE

12  WET BULB GLOBE TEMPERATURE MONITORING SYSTEM IS

13  GLOBALLY FOUND TO BE THE INDUSTRY STANDARD.  IT IS

14  EFFECTIVE, IT IS ACCURATE, IT IS EFFICIENT IN

15  MONITORING ACTUAL ATMOSPHERIC CONDITIONS IN THE FIELD

16  AT LSP; WHEREAS THE HEAT INDEX MONITORING IS TAKEN BY

17  THE NATIONAL WEATHER SERVICE MANY MILES AWAY IN THE

18  SHADE, WHEREAS, OF COURSE, THE MEN IN THE FIELD DO

19  NOT BENEFIT FROM THE SHADE.

20        **THE COURT:**  SO -- BUT, MS. WRIGHT, MY ISSUE

21  IS THAT SHE'S NOT -- SHE'S BEEN ESTABLISHED IN THE

22  FIELD OF EMERGENCY MEDICINE -- FOUR DIFFERENT AREAS.

23  I DON'T SEE HOW SHE WOULD BE QUALIFIED AS AN EXPERT

24  IN THIS TYPE OF TECHNOLOGY.

25        **MS. WRIGHT:**  FAIR ENOUGH, YOUR HONOR.  AND

1  IF IT WOULD NOT ASSIST THE COURT IN RESOLVING THE TRO

2  ON THAT POINT, THEN WE WOULD NOT NEED -- WE CAN MOVE

3  ON.

4          **THE COURT:**  I DON'T ON THIS ISSUE.

5              MR. BLANCHFIELD, WOULD YOU LIKE TO BE

6  HEARD ON THAT?

7          **MR. BLANCHFIELD:**  YES, YOUR HONOR.  AND I

8  DON'T -- TO BEAT THE PROVERBIAL DEAD HORSE HERE, BUT

9  WE ASK THAT THAT PORTION OF HER OPINION BE STRICKEN

10  BECAUSE WE'VE BEEN ALL ALONG THAT THE NATIONAL

11  WEATHER SERVICE WAS THE GOLD STANDARD, AS THE PARTIES

12  AGREED, AND THEN AT THIS LAST MINUTE ALL OF A SUDDEN

13  WE'RE INDIFFERENT FOR NOT HAVING A WET BULB.  SO WE

14  WOULD OBJECT TO THAT.

15          **THE COURT:**  VERY WELL.  YOUR OBJECTION IS

16  NOTED.  I WILL TAKE THE MATTER -- THAT PART OF THE

17  COURT'S DETERMINATION -- THAT IS, THE SECOND TRO --

18  UNDER ADVISEMENT.

19              SO LET ME ASK YOU A COUPLE OF QUESTIONS

20  HERE, DOCTOR.

21              YOU'VE TESTIFIED THAT YOU VISITED

22  ANGOLA AND SPECIFICALLY THE CUCUMBER PATCH THERE.  DO

23  YOU RECALL WHEN YOU VISITED ANGOLA?

24          **THE WITNESS:**  IN JULY OF -- I THINK IT WAS

25  ACTUALLY ALREADY -- I THINK IT WAS -- WAS IT LAST

1  YEAR OR THE YEAR BEFORE?

2          **THE COURT:**  SO EITHER 2023 OR 2024?

3          **THE WITNESS:**  YES, SIR.

4          **THE COURT:**  BUT YOU REMEMBER THAT IT WAS

5  DURING THE MONTH OF JULY?

6          **THE WITNESS:**  YES, SIR.

7          **THE COURT:**  SO YOU ALSO TESTIFIED ABOUT THE

8  DIFFERENCE BETWEEN AN INDIVIDUAL MEDICAL ASSESSMENT

9  THAT WOULD CONSIDER THE PHYSIOLOGICAL CHARACTERISTICS

10  OF AN INDIVIDUAL INMATE VERSUS AN ANALYSIS OF THE

11  RISK TO A POPULATION OF INMATES, SOME OF WHICH I

12  ASSUME SHARE SIMILAR CHARACTERISTICS; THAT IS,

13  PHYSIOLOGICAL CHARACTERISTICS.  IS THAT RIGHT?

14          **THE WITNESS:**  YES.

15          **THE COURT:**  WHAT CHARACTERISTICS DO YOU

16  BELIEVE OR HAVE YOU CONSIDERED, I SHOULD SAY, AMONG

17  THIS INMATE POPULATION IN FORMING YOUR OPINION?

18          **THE WITNESS:**  WELL, FIRST OF ALL, THERE IS

19  THE ISSUE OF AGE; THEY'RE YOUNG, HEALTHY PEOPLE WHO

20  WORK IN THE FARM LINE.  THERE ARE ALSO ELDERLY AND

21  INFIRM INDIVIDUALS.  THERE ARE THOSE INDIVIDUALS WITH

22  UNKNOWN MEDICAL PROBLEMS THAT THEY'RE GOING TO

23  DEVELOP OR GENETIC PREDISPOSITIONS.  THAT'S IMPORTANT

24  IN THE LITERATURE.  THERE ARE THOSE WHO ALREADY HAVE

25  DIABETES, HYPERTENSION, MENTAL ILLNESS, AND PULMONARY

1  PROBLEMS SUCH AS ASTHMA, WHICH IS ALSO WORSENED BY

2  THE HEAT.  AND THEN THERE ARE THOSE INDIVIDUALS WHO

3  HAVE MENTAL ILLNESS AND THEN THERE ARE ALL THOSE

4  INDIVIDUALS WHO ARE BEING TREATED FOR THOSE MEDICAL

5  CONDITIONS.

6          **THE COURT:**  ALL RIGHT.  SO -- LET'S SEE NOW.

7  SOME OF THE MEMBERS OF THE POPULATION -- SO WE'RE

8  TALKING ABOUT INMATES WHO HAVE BEEN PRESCRIBED

9  CERTAIN MEDICATIONS.  CORRECT?

10          **THE WITNESS:**  YES, SIR.

11          **THE COURT:**  AND WE HAVE INMATES THAT HAVE

12  BEEN DIAGNOSED WITH CERTAIN DISABILITIES?

13          **THE WITNESS:**  YES.

14          **THE COURT:**  HAVE YOU LOOKED AT BOTH OF THOSE

15  POPULATIONS?

16          **THE WITNESS:**  YES.

17          **THE COURT:**  AND WHAT IS YOUR OPINION WITH

18  RESPECT TO ANY INCREASED RISK OF HARM OR MEDICAL

19  TRAUMA IN ANY WAY THAT COULD RESULT IN THOSE

20  POPULATIONS IF THE TEMPERATURE EXCEEDS 88 DEGREES?

21          **THE WITNESS:**  SO MY OPINION IS THAT THIS

22  GROUP OF PEOPLE ON THE FARM LINE ARE WELL-REPRESENTED

23  IN THE VAST LITERATURE CONCERNING THIS.  THE

24  LITERATURE HERE IN THE LOUISIANA DEPARTMENT OF HEALTH

25  POINTED OUT THAT YOUNG, HEALTHY PEOPLE PRESENTED TO

1  EMERGENCY DEPARTMENTS.  SO THAT'S THE YOUNG, HEALTHY

2  PEOPLE PART.

3          THERE ARE MANY OTHER STUDIES THAT TALK

4  ABOUT THE HUNDREDS OF PEOPLE WHO DIED WHO WERE

5  SUPPOSEDLY YOUNG AND HEALTHY.  WE -- AND SO WHAT I'D

6  LIKE TO SAY IS THAT THE GROUP OF PEOPLE, THE 4,000

7  PEOPLE OR SO AND THOSE WHO WORK ON THE FARM LINE ARE

8  GENERALIZABLE TO THE GENERAL SCIENCE IN THIS COUNTRY

9  ABOUT WHO IS AT RISK OF DEVELOPING DIRECT HEAT

10 ILLNESS, HARM FROM HEAT, HEAT STROKE, HEAT

11 EXHAUSTION, DEHYDRATION, ELECTROLYTE ABNORMALITIES,

12 ACUTE KIDNEY FAILURE OR OTHER DISEASES OF THE

13 KIDNEYS.

14      **THE COURT:**  SO WHAT POPULATIONS WOULD BE AT

15 RISK OF DEHYDRATION IF THE TEMPERATURE EXCEEDS 88

16 DEGREES?

17      **THE WITNESS:**  WELL, BASICALLY ANY -- THE

18 LITERATURE SUGGESTS THAT ANYBODY WHO IS IN THAT

19 TEMPERATURE COULD BECOME DEHYDRATED.

20      **THE COURT:**  WHEN YOU SAY "ANYONE," ARE YOU

21 TALKING ABOUT PERSONS ON MEDICATION, PERSONS WITH

22 DISABILITIES, OR DO YOU KNOW?

23      **THE WITNESS:**  YES, I DO KNOW.  SO THERE ARE

24 CERTAINLY PEOPLE ON MEDICATIONS.  CERTAINLY A

25 DIURETIC IS A -- IS A DEHYDRATING MEDICATION.

1  ANYBODY WHO IS NOT DRINKING SUFFICIENT AMOUNTS OF

2  WATER, ANYBODY WITH KIDNEY PROBLEMS, BECAUSE THE

3  KIDNEY -- OR ANYBODY WITH AN ENDOCRINE PROBLEM.  THE

4  MEDICATIONS THAT AFFECT THE KIDNEY, I ALREADY TALKED

5  TO WHAT THEY CALL RAAS SYSTEM.  THAT'S THE RENIN-

6  ANGIOTENSIN-ALDOSTERONE SYSTEM THAT'S RESPONSIBLE FOR

7  MAINTAINING SALT AND WATER BALANCE IN THE KIDNEY.  SO

8  THERE ARE A -- I THINK IF -- I'VE ANSWERED YOUR

9  QUESTION, SIR.  IF I HAVEN'T, PLEASE LET ME CONTINUE.

10       THE COURT:  NO, YOU'VE ANSWERED.

11            NOW, YOU'VE ALSO BEEN ESTABLISHED AS AN

12  EXPERT IN MEDICAL TOXICOLOGY.

13       THE WITNESS:  YES, SIR.

14       THE COURT:  IS THAT RIGHT?

15            AND THERMOREGULATION.  HAVE YOU HAD AN

16  OPPORTUNITY TO REVIEW THE ADDITIONAL DRUGS THAT WERE

17  PLAYED OR HAVE BEEN PLACED ON THE DEPARTMENT OF

18  CORRECTIONS' LIST OF MEDICATIONS THAT MIGHT RESULT IN

19  A INMATE BEING REMOVED FROM THE FARM LINE?

20       THE WITNESS:  YES, YOUR HONOR.

21       THE COURT:  IN YOUR PROFESSIONAL OPINION,

22  ARE THERE ANY ADDITIONAL DRUGS NOT ON THAT LIST THAT

23  YOU BELIEVE SHOULD BE ADDED?

24       THE WITNESS:  YES.  ANYTHING THAT BLOCKS

25  SEROTONIN REUPTAKE INHIBITION THAT RESULTS IN

1  INCREASED SEROTONIN CAN RENDER THE INDIVIDUAL

2  HEAT-SENSITIVE.

3        THE COURT:  SO HAVE YOU HAD THE CHANCE TO

4  REVIEW THE REVISED LIST -- I'LL REFER TO IT AS THE

5  REVISED LIST OF PHARMACEUTICALS -- WITH -- AND

6  COMPARE THAT TO THE STUDIES THAT YOU HAVE CONSIDERED

7  IN DETERMINING WHETHER THE LIST IS ADEQUATE?  HAVE

8  YOU AT LEAST HAD THAT OPPORTUNITY?

9        THE WITNESS:  YES, SIR.  AND ONE THING

10  THAT'S MISSING FROM THAT LIST -- DR. BARNES IS

11  INSTRUMENTAL IN PUTTING TOGETHER THAT LIST AS A

12  DOCTOR OF PHARMACY.  AND SHE IS DISTINGUISHING

13  BETWEEN CALCIUM CHANNEL BLOCKERS, ONE --

14  ANTIHYPERTENSIVE, ONE DRUG.  AND SHE'S DISTINGUISHING

15  BETWEEN ONE GROUP OF CALCIUM CHANNEL BLOCKERS AND THE

16  OTHER.  ALL CALCIUM CHANNEL BLOCKERS RENDER AN

17  INDIVIDUAL HEAT-SENSITIVE.

18        THE COURT:  ALL RIGHT.  AND CAN YOU POINT TO

19  SPECIFIC DATA THAT SUPPORTS YOUR CONCLUSION?

20        THE WITNESS:  YES.  AND THE REASON IS THIS:

21  EVERY DRUG HAS THE EFFECT OF HAVING MORE OR LESS OF

22  AN EFFECT.  FOR EXAMPLE, SOME DRUGS LIKE BENADRYL,

23  DIPHENHYDRAMINE, ARE VERY ANTICHOLINERGIC.  SOME ARE

24  LESS ANTICHOLINERGIC, THAT'S TRUE.  DEPENDING HOW

25  MUCH -- SOME DRUGS ARE SPECIFIC FOR A CERTAIN

1  RECEPTOR.  BUT AS THE DOSE RISES -- OR MAYBE THERE IS

2  A SPECIAL VULNERABILITY ON THAT PERSON.  AS THE DOSE

3  RISES, THE SPECIFICITY IS LOST.

4        THE COURT:  SO IN OTHER WORDS, BASED UPON

5  YOUR OPINION AS AN EXPERT IN THERMOREGULATION OF THE

6  BODY, YOU DO NOT BELIEVE -- OR IF I'M -- I DON'T WANT

7  TO MISCHARACTERIZE ANYTHING AND SO YOU HAVE TO

8  CORRECT ME HERE.  BUT IS IT FAIR TO SAY THAT IT IS

9  YOUR OPINION THAT THAT IS NOT AN EXHAUSTIVE OR

10 ALL-INCLUSIVE LIST OF DRUGS THAT SHOULD BE CONSIDERED

11 WHEN DECIDING WHETHER TO PULL SOMEONE OFF THE FARM

12 LINE?

13       THE WITNESS:  THAT'S CORRECT, YOUR HONOR.

14       THE COURT:  NOW, YOU ALSO REFERENCED A

15 PUBLICATION -- YOU WERE SHOWN DURING THE COURSE OF

16 YOUR DIRECT EXAMINATION A PUBLICATION FROM THE

17 LOUISIANA DEPARTMENT OF HEALTH.  AND IT REFLECTED

18 DATA AND OTHER CHARTS.  DO YOU RECALL THAT DOCUMENT?

19       THE WITNESS:  YES, SIR.

20       THE COURT:  DO YOU KNOW IF THE LOUISIANA

21 DEPARTMENT OF HEALTH ITSELF HAS ESTABLISHED A MINIMUM

22 TEMPERATURE FOR OUTDOOR ACTIVITIES THAT MIGHT TRIGGER

23 A HEAT-RELATED ILLNESS?  DO YOU KNOW?

24       THE WITNESS:  THERE ARE HEAT WARNINGS,

25 BUT -- THERE ARE HEAT WARNINGS.  I'M NOT SURE WHAT

1  THAT IS.  I THINK MANY TIMES HEAT WARNINGS DO LOOK AT

2  HEAT WAVES.  ON THE OTHER HAND -- SO I'M NOT TALKING

3  ABOUT HEAT WAVES.

4          THE COURT:  BUT YOU DON'T KNOW IF THE LDH

5  ITSELF HAS --

6          THE WITNESS:  I DO NOT.

7          THE COURT:  -- EMPHATICALLY AFFIRMATIVELY

8  ESTABLISHED A MINIMUM HEAT STANDARD THAT WOULD

9  REQUIRE CERTAIN PRECAUTIONS.  CORRECT?

10          THE WITNESS:  I DON'T BELIEVE IT HAS, SIR.

11          THE COURT:  NOW, YOU ALSO WERE SHOWN A

12  DOCUMENT THAT I BELIEVE MADE REFERENCE TO A SCAR

13  STUDY, S-C-A-R.  DO YOU RECALL THAT?

14          THE WITNESS:  YES.

15          THE COURT:  DO YOU RECALL WHAT SCAR -- WHAT

16  THAT STANDS FOR?

17          THE WITNESS:  WELL, THAT'S -- JULIANNE

18  SKARHA IS HER NAME.  THAT'S HER -- THE FIRST AUTHOR.

19  AND SHE LOOKED AT THE NUMBER OF PEOPLE WHO DIED IN

20  PRISONS IN TEXAS.  SHE STARTED AT 85 DEGREES HEAT

21  INDEX AND THEN SHE WENT FROM THERE AND SAW THAT FOUR

22  -- IN UN-AIR-CONDITIONED PRISONS VERSUS

23  AIR-CONDITIONED PRISONS THERE WAS A 15 PERCENT

24  GREATER RISK OF DEATH.  APPROXIMATELY 14 EXTRA PEOPLE

25  DIED PER YEAR OVER THE TEN YEARS SHE LOOKED AT

1   UN-AIR-CONDITIONED PRISONS IN TEXAS VERSUS THOSE THAT

2   WERE AIR-CONDITIONED.

3          THE COURT:  DID THAT STUDY ACCOUNT FOR ANY

4   OUTDOOR TEMPERATURES OR ACTIVITIES?

5          THE WITNESS:  NO.

6          THE COURT:  ARE THERE ANY OTHER DOCUMENTS OR

7   STUDIES THAT YOU CAN POINT TO -- AND I KNOW THAT WE

8   HAVE A NUMBER OF RESOURCES ALREADY IN EVIDENCE AT

9   THIS TIME OR THAT HAVE BEEN SUBMITTED AS ATTACHMENTS

10  TO VARIOUS PLEADINGS.  IF YOU COULD CITE TO -- IF

11  IT'S POSSIBLE -- I DON'T KNOW IF YOU CAN CITE TO ONE

12  STUDY THAT YOU BELIEVE IS MOST DIRECTLY ON POINT ON

13  THE ISSUES IN THIS CASE; THAT IS, THE MINIMUM

14  TEMPERATURE FOR OUTDOOR ACTIVITY DURING THE SUMMER

15  MONTHS WORKING IN THE AGRICULTURAL SECTOR.  DO YOU

16  HAVE --

17         THE WITNESS:  WELL, I WOULD CITE FIRST TO

18  BASU, THE AUTHOR BASU, WHO DEMONSTRATED THAT FOR

19  EVERY TEN-DEGREE RISE IN TEMPERATURE, THERE WAS A 2.3

20  PERCENT INCREASE IN MORBIDITY.

21         THE COURT:  NOW, WHERE WAS --

22         THE WITNESS:  DEATH.  EXCUSE ME.

23         THE COURT:  -- THAT PUBLICATION?

24         THE WITNESS:  I DON'T HAVE IT -- I MEAN,

25  IT'S JUST ONE OF MANY.  IT'S -- THE AUTHOR IS BASU.

1        **THE COURT:**  CAN YOU SPELL THE NAME, PLEASE?

2        **THE WITNESS:**  B-A-S-U.  I HAVE NOTES AT THE

3  BACK THAT TELL ME EXACTLY THE YEAR.

4        **THE COURT:**  IS THAT CITED IN ANY OF YOUR

5  REPORTS?

6        **THE WITNESS:**  I DON'T REMEMBER, SIR.  I DO

7  KNOW THAT THE NEW OSHA -- WE DID CITE THE OSHA

8  GUIDELINES THAT -- THEY'RE VERY LARGE.  AND THAT IS

9  ONE OF THE CITES THERE.

10            SO TO THE EXTENT THAT I THINK THE OSHA

11  REPORT INCLUDES MANY REFERENCES THAT ARE CRITICAL TO

12  THIS CASE AND CRITICAL TO MY UNDERSTANDING OF THE

13  RISKS TO THE INDIVIDUALS ON THE FARM LINE.

14        **THE COURT:**  DO YOU KNOW IF THIS BASU STUDY

15  WAS PEER-REVIEWED?

16        **THE WITNESS:**  FOR A HUNDRED PERCENT.  IT'S

17  CALLED -- IT'S FREQUENTLY REFERRED TO.  AND YES, IT

18  IS.

19        **THE COURT:**  DO YOU RECALL WHEN IT WAS

20  PUBLISHED, APPROXIMATELY?

21        **THE WITNESS:**  SOMEWHERE BETWEEN 10 AND 20

22  YEARS AGO.

23        **THE COURT:**  THANK YOU.

24        **MR. BLANCHFIELD:**  YOUR HONOR, WE DON'T HAVE

25  THAT REPORT.

1          **THE COURT:**  MS. WRIGHT?

2          **MS. WRIGHT:**  THE BASU STUDY IS PLAINTIFFS'

3   EXHIBIT 43.  AND IT'S ALSO CITED AT FOOTNOTE 7 IN ECF

4   201-3, WHICH IS DR. VASSALLO'S FOURTH DECLARATION.

5   THE FULL CITATION AND I BELIEVE THE HYPERLINK TO THE

6   STUDY IS THERE.

7          **THE COURT:**  THANK YOU, MS. WRIGHT.  THANK

8   YOU FOR THE CLARIFICATION.

9          **MR. BLANCHFIELD:**  EXHIBIT 43 IS NOT IN --

10  HAS NOT BEEN INTRODUCED IN THIS CASE, YOUR HONOR.

11         **THE COURT:**  IS THAT --

12         **MS. WRIGHT:**  WE WOULD MOVE TO INTRODUCE

13  PLAINTIFFS' EXHIBIT 43, IF IT WOULD AID THE COURT.

14         **THE COURT:**  OBJECTION?  NO OBJECTION?

15         **MR. BLANCHFIELD:**  OBJECTION.

16         **THE COURT:**  OVERRULED.  IT WILL BE ADMITTED.

17              THANK YOU VERY MUCH, DOCTOR.

18         **THE WITNESS:**  THANK YOU, YOUR HONOR.

19         **THE COURT:**  THE PLAINTIFF MAY CALL ITS NEXT

20  WITNESS.

21         **MS. CRUTCHER:**  GOOD MORNING, YOUR HONOR.

22  KARA CRUTCHER.  WE'D LIKE TO CALL THE NAMED

23  PLAINTIFF, DAMARIS JACKSON.

24         **THE COURT:**  OKAY.  BROOKE, LET ME SEE YOU.

25              **(OFF THE RECORD)**

1    IN THIS COURTROOM.  NOW, TYPICALLY WE ONLY ALLOW

2    COUNSEL OF RECORD -- NOT JUST ANY LAWYER BUT COUNSEL

3    OF RECORD -- TO BRING A CELL PHONE INTO THIS

4    COURTHOUSE.  I'VE BEEN INFORMED BY THE MARSHAL THAT

5    CERTAIN PERSONS WHO MAY BE PRESENT MAY HAVE ASKED

6    LAWYERS TO BRING CELL PHONES WITH THEM INTO THE

7    COURTROOM, INTO THE COURTHOUSE, OF COURSE.

8             SO TO BE CLEAR, WHEN WE RETURN FROM

9    LUNCH, ONLY COUNSEL OF RECORD -- AND I'VE MADE ONE

10   EXCEPTION TO THE I.T. SPECIALIST FOR THE PLAINTIFF.

11   NO OTHER PERSON INCLUDING EXPERT WITNESSES ARE

12   PERMITTED TO BRING CELL PHONES INTO THE COURTHOUSE,

13   ABSENT A COMPELLING REASON TO DO SO AND WITHOUT THE

14   EXPRESS PERMISSION OF THE COURT.  I TRUST THAT

15   EVERYONE WILL ABIDE BY THIS COURTHOUSE -- THE RULES

16   OF THIS COURTHOUSE WHEN YOU RETURN FROM THE LUNCH

17   BREAK.

18             IS THERE ANYTHING ELSE WE SHOULD TAKE

19   UP AT THIS TIME OF A HOUSEKEEPING MATTER OR OTHERWISE

20   BEFORE WE TAKE OUR LUNCH BREAK?

21             ANYTHING FROM THE PLAINTIFF?

22        MS. WRIGHT:  BRIEFLY, YOUR HONOR.

23   CONSIDERING WHAT I UNDERSTAND TO BE THE COURT'S

24   CONSIDERATION OF DR. VASSALLO'S TESTIMONY WITH

25   RESPECT TO THE SECOND TRO/PI MOTION, I WOULD MOVE

1  AGAIN TO ADMIT AS EVIDENCE THE STUDIES THAT WE

2  DISCUSSED DURING HER TESTIMONY.  THOSE WOULD BE PX40,

3  WHICH IS THE DAVIS STUDY WITH THE J-SHAPED CURVE;

4  PX41, WHICH IS -- SIMILARLY HAS THE J-SHAPED CURVE;

5  PX42, WHICH IS THE SKARHA STUDY ABOUT INCARCERATED

6  POPULATIONS; AND THEN PX49, WHICH IS THE LOUISIANA

7  DEPARTMENT OF HEALTH REPORT.

8          **THE COURT:**  MR. JONES?

9          **MR. JONES:**  FOR CLARIFICATION, IN CONNECTION

10 WITH THE MOTION -- THE APPLICATION FOR TRO OR FOR --

11 WITH RESPECT TO THE MOTION FOR CLASS CERTIFICATION?

12         **THE COURT:**  I BELIEVE THAT IT'S THE

13 MOTION -- THE MOTION IS FOR THE COURT TO CONSIDER

14 THAT -- THOSE EXHIBITS IN CONNECTION WITH DR.

15 VASSALLO'S TESTIMONY ON THE TRO APPLICATION.

16         **MR. JONES:**  I DON'T THINK WE HAVE ANY

17 OPPOSITION EXCEPT -- OR ANY OBJECTION AS LONG AS IT'S

18 NOT RELATED TO THE MOTION FOR CLASS CERTIFICATION.

19         **THE COURT:**  I UNDERSTAND.  THANK YOU, MR.

20 JONES.

21             ANYTHING ELSE FROM THE PLAINTIFF?

22             ANYTHING FROM THE DEFENSE?

23        **MR. BLANCHFIELD:**  NO, YOUR HONOR.

24        **THE COURT:**  I HOPE YOU-ALL ENJOY YOUR LUNCH.

25 COURT IS NOW IN RECESS.