# Exhibit 60

1            UNITED STATES DISTRICT COURT

2            MIDDLE DISTRICT OF LOUISIANA

3

4  VOICE OF THE EXPERIENCED, ET AL    *    CIVIL ACTION

5  VERSUS                             *    NO. 3:23-CV-1304-BAJ

6  JAMES LEBLANC, ET AL               *    APRIL 24, 2025

7  * * * * * * * * * * * * * * * * *       VOLUME 3 OF 3

8

9
         REDACTED MOTIONS HEARING FOR CLASS CERTIFICATION
10          BEFORE THE HONORABLE BRIAN A. JACKSON
                UNITED STATES DISTRICT JUDGE
11

12

13  APPEARANCES:

14  FOR THE PLAINTIFFS:          PAUL, WEISS, RIFKIND, WHARTON &
                                 GARRISON, LLP
15                               BY:  ARIELLE B. MCTOOTLE, ESQ.
                                      JEREMY A. BENJAMIN, ESQ.
16                                    RICHARDO R. SABATER, ESQ.
                                      MICHAEL C. MCGREGOR, ESQ.
17                               1285 AVENUE OF THE AMERICAS
                                 NEW YORK, NEW YORK 10019
18
                                 PROMISE OF JUSTICE INITIATIVE
19                               BY:  SAMANTHA B. POURCIAU, ESQ.
                                      KARA C. CRUTCHER, I, ESQ.
20                               1024 ELYSIAN FIELDS
                                 NEW ORLEANS, LOUISIANA 70117
21
                                 RIGHTS BEHIND BARS
22                               BY:  LYDIA WRIGHT, ESQ.
                                      AMARIS MONTES, ESQ.
23                               416 FLORIDA AVE. NW
                                 WASHINGTON, DC 20001
24

25

```
 1   FOR THE DEFENDANTS:          KEOGH COX & WILSON, LTD.
                                  BY:  ANDREW BLANCHFIELD, ESQ.
 2                                     CHRISTOPHER K. JONES, ESQ.
                                       CHELSEA A. PAYNE, ESQ.
 3                                701 MAIN STREET
                                  BATON ROUGE, LOUISIANA 70802
 4
     OFFICIAL COURT REPORTER:     SHANNON L. THOMPSON, CCR
 5                                UNITED STATES COURTHOUSE
                                  777 FLORIDA STREET
 6                                BATON ROUGE, LOUISIANA 70801
                                  SHANNON_THOMPSON@LAMD.USCOURTS.GOV
 7                                (225)389-3567

 8       PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY USING
                 COMPUTER-AIDED TRANSCRIPTION SOFTWARE
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    MR. BLANCHFIELD, YOU MAY NOW CALL YOUR NEXT
 2    WITNESS.
 3              MR. BLANCHFIELD:  THANK YOU, YOUR HONOR.
 4                    WE CALL DR. CARL KELDIE.
 5              THE COURT:  OKAY.
 6                        CARL KELDIE, M.D.,
 7        HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:
 8              THE DEPUTY CLERK:  CLEARLY STATE AND SPELL YOUR NAME
 9    FOR THE RECORD.
10              THE WITNESS:  CARL, C-A-R-L, AND KELDIE IS
11    K-E-L-D-I-E.
12              THE COURT:  BEFORE WE BEGIN YOUR EXAMINATION, DR.
13    KELDIE --
14              THE WITNESS:  YES, SIR.
15              THE COURT:  -- YOU INFORMED ME YESTERDAY THAT YOU HAD
16    A BACK PROBLEM WHEN YOU SIT FOR A LONG PERIOD OF TIME.  IF
17    YOU'D LIKE TO STAND DURING THE COURSE OF YOUR TESTIMONY, LET ME
18    KNOW.  WE'LL HAVE A HANDHELD MICROPHONE WE CAN GIVE YOU.  OKAY.
19              THE WITNESS:  I'M USED TO -- I'M USED TO -- I CAN
20    PROBABLY DO IT LIKE THIS.
21              THE COURT:  ARE YOU --
22              THE WITNESS:  BUT I'M FEELING PRETTY GOOD.
23              THE COURT:  ARE YOU MORE COMFORTABLE STANDING THAN
24    SITTING OR --
25              THE WITNESS:  ABSOLUTELY.  BUT LET ME -- LET ME START
```

1  SITTING.

2          **THE COURT:**  OKAY.  THAT'S FINE.  AT ANY TIME YOU WISH

3  TO STAND --

4          **THE WITNESS:**  I APPRECIATE IT.

5          **THE COURT:**  -- THAT'S FINE.  AGAIN, WE'LL HAVE A --

6  WE'LL GIVE YOU THE -- WE'LL JUST GIVE YOU THE MICROPHONE RIGHT

7  NOW.  OKAY.

8          **THE WITNESS:**  OH, EVEN BETTER.

9          **THE COURT:**  ALL RIGHT.  LET'S PROCEED.

10          **MR. BLANCHFIELD:**  THANK YOU, YOUR HONOR.

11                              **VOIR DIRE**

12  BY MR. BLANCHFIELD:

13  **Q.**  WOULD YOU STATE YOU FULL NAME FOR THE RECORD, PLEASE?

14  **A.**  CARL KELDIE.

15  **Q.**  AND, DR. KELDIE, CAN YOU GIVE THE COURT A LITTLE

16  INFORMATION ABOUT YOUR EDUCATIONAL BACKGROUND?

17  **A.**  YES, SIR.  I WENT TO UNDERGRADUATE AND MEDICAL SCHOOL AT

18  THE UNIVERSITY OF SOUTH FLORIDA IN TAMPA, AND THEN DID A

19  ROTATING INTERNSHIP AT CARRAWAY METHODIST IN BIRMINGHAM,

20  ALABAMA, PRIOR TO COMPLETING A COMMITMENT WITH THE NATIONAL

21  HEALTH SERVICE CORPS IN BENSON, NORTH CAROLINA.

22  **Q.**  DID YOU RECEIVE ANY TRAINING IN EMERGENCY MEDICINE?

23  **A.**  I DID NOT DO A RESIDENCY IN EMERGENCY MEDICINE.

24  **Q.**  HAVE YOU EVER BEEN BOARD CERTIFIED IN EMERGENCY ROOM

25  MEDICINE?

1  **A.**   YES, I HAVE.

2  **Q.**   WHEN WERE YOU CERTIFIED?

3  **A.**   IN '91, RECERTED TEN YEARS LATER, AND A SECOND RECERT TEN

4  YEARS AFTER THAT.

5  **Q.**   CAN YOU TELL THE COURT YOUR EXPERIENCE IN CORRECTIONAL

6  CARE AND CORRECTIONAL CARE MEDICINE?

7  **A.**   I SURE CAN.  SO SINCE THE YEAR 2000, I'VE BEEN WORKING IN

8  THE FIELD OF CORRECTIONAL HEALTH CARE IN BOTH ADMINISTRATIVE

9  AND CLINICAL ROLES.  AND I HAVE -- I HAVE DONE THIS FOR 25

10  YEARS.  I CONTINUE TO SEE PATIENTS VIA TELEMEDICINE IN A PRISON

11  IN PENNSYLVANIA.

12         I'VE ACTUALLY -- I'VE ACTUALLY SUPERVISED AND

13  PROVIDED CARE FOR PATIENTS IN BETWEEN TWO AND THREE HUNDRED

14  JAILS, PRISONS, FORENSIC HOSPITALS, IN THIRTY-PLUS STATES, AND

15  IN MELBOURNE, AUSTRALIA.  SO I'VE BEEN BEHIND BARS AT

16  FACILITIES ALL OVER THE COUNTRY.

17              **THE COURT:**  IN A PROFESSIONAL SENSE?

18              **THE WITNESS:**  WELL, THERE WAS A -- YES, IN A

19  PROFESSIONAL SENSE.

20              **THE COURT:**  THANK YOU.  OKAY.  ALL RIGHT.

21  BY MR. BLANCHFIELD:

22  **Q.**   SO YOU'VE ACTUALLY WORKED IN THE PRISON SETTING ITSELF AS

23  A MEDICAL CARE PROVIDER?

24  **A.**   YES, SIR.

25  **Q.**   PROVIDING MEDICAL CARE TO INMATES?

1  A.   YES, SIR.

2  Q.   DO YOU HAVE ANY PARTICULAR EXPERIENCE IN HEAT PATHOLOGY?

3  A.   YES, SIR, I DO.

4  Q.   CAN YOU TELL THE COURT ABOUT THAT?

5  A.   I CAN.  WHEN I MOVED TO BENSON, NORTH CAROLINA, AS THE --

6  AS THE TOWN DOCTOR -- BENSON IS IN THE PIEDMONT OF NORTH

7  CAROLINA AND MOVED THERE IN SEVENTY -- THE SUMMER OF '79.  AND

8  THAT'S WHEN NORTH CAROLINA WAS A BIG TOBACCO STATE.  I KNEW

9  MANY OF THE LANDOWNERS.  AND IN JULY -- LATE JULY AND EARLY

10 AUGUST THEY HARVESTED TOBACCO.

11         WHILE I WAS THERE I ACTUALLY DID MOONLIGHTING IN THE

12 ER, SO I SAW A NUMBER OF PEOPLE THAT HAD BEEN WORKING

13 HARVESTING TOBACCO THAT EITHER CAME TO THE OFFICE OR THE

14 EMERGENCY ROOM.  MOST OF THE COMPLAINTS WERE MINOR.  I NEVER

15 SAW SOMEBODY WITH A CERTIFIED HEATSTROKE FROM THE AGRICULTURAL

16 COMMUNITY.

17         AND THEN IN EMERGENCY MEDICINE, I WORKED AROUND THE

18 SOUTHEAST.  I STARTED IN OKEECHOBEE, FLORIDA.  IT'S A TOWN IN

19 CENTRAL FLORIDA; AGRICULTURAL, A HUGE CATTLE INDUSTRY.  AND I

20 WORKED IN THAT EMERGENCY ROOMY AND I SEE -- I SAW PEOPLE FROM

21 THE FIELDS, FARMS AND -- ON A PRETTY FREQUENT BASIS.

22         AND THE SAME THING WHEN I WORKED AT HIALEAH HOSPITAL,

23 WHICH IS IN MIAMI.  WE WERE A LEVEL II TRAUMA HOSPITAL.  SO I

24 GOT -- I GOT SOME WORKERS FROM HOMESTEAD WITH PERIODICITY BUT

25 PROBABLY MY MOST EXPERIENCE WITH HEAT PATHOLOGY WAS WHEN I WAS

1    AT THE MARINE NAVAL AIR STATION IN CORPUS CHRISTI, TEXAS.  THAT
2    IS THE EASTERN PART OF NORTH CAROLINA AND A VERY SMALL
3    EMERGENCY ROOM, BUT IT WAS A TRAINING GROUND FOR MARINES.  AND
4    WE ROUTINELY HAD YOUNG MARINES COME IN DEHYDRATED, OCCASIONALLY
5    A HEAT EXHAUSTION.  AND ON ONE OCCASION I SAW THE ONLY
6    EXERTIONAL HEATSTROKE THAT I'VE EVER SEEN IN A YOUNG RECRUIT
7    WITH A CORE TEMPERATURE OF 106.  THERE WAS NO MISTAKING HIM FOR
8    SOMEBODY WHO HAD TAKEN DRUGS.  HE WAS HOT TO TOUCH.  HE WAS
9    TACHYCARDIC, TACHYPNEIC.  HE WAS BREATHING FAST, HAD A FAST
10   HEART RATE, AND VERY MUCH AN ALTERED MENTAL STATUS.
11           THE REAL QUESTION THAT I HAD AS WE STARTED THE
12   RECITATION WAS WHETHER I NEEDED TO PROTECT HIS AIRWAY, WHETHER
13   I NEEDED -- HIS MENTAL STATUS WAS SO ALTERED.  BUT IN -- AND
14   FRANKLY, THE TEAM THERE KNEW WHAT TO DO.  I MEAN, ICE, COOL HIM
15   DOWN, FLUIDS, ET CETERA, AND THEN HE WAS TRANSFERRED TO
16   BETHESDA, THE REGIONAL NAVAL HOSPITAL.  AND HE SURVIVED, WHICH
17   IS PRETTY COMMON OF PEOPLE WITH AN EXERTIONAL HEATSTROKE.
18   **Q.**   DOCTOR, HAVE YOU BEEN TENDERED AND ACCEPTED AS AN EXPERT
19   IN CORRECTIONAL CARE MEDICINE IN ANY COURTS?
20   **A.**   YES, SIR.
21   **Q.**   WHERE IN THE NATION?
22   **A.**   IN CHICAGO.
23   **Q.**   OKAY.
24   **A.**   I'VE TESTIFIED IN A NUMBER OF CASES IN FLORIDA AS WELL,
25   BUT MOST OF THE CASES DON'T ACTUALLY GET TO THE COURTROOM.

1      **MR. BLANCHFIELD:**  YOUR HONOR, IN CONJUNCTION WITH THE
2  TESTIMONY, WE WOULD TENDER DR. KELDIE AS AN EXPERT IN THE FIELD
3  OF CORRECTIONAL CARE MEDICINE.  I THINK WE'VE HAD A STIPULATION
4  AS TO THAT.
5          **MS. WRIGHT:**  I DO HAVE A FEW QUESTIONS.
6          **THE COURT:**  ALL RIGHT.  AND THAT'S MS. WRIGHT.
7  CORRECT?
8          **MS. WRIGHT:**  YES.
9          **THE COURT:**  ALL RIGHT.  JUST SO THAT --
10         **MS. WRIGHT:**  LYDIA WRIGHT FOR THE PLAINTIFFS.
11         **THE COURT:**  WE HAVE A LOT OF COUNSEL ON THE
12  PLAINTIFFS' SIDE.
13         **MS. WRIGHT:**  WE CERTAINLY DO.
14         **THE COURT:**  SO WE WANT TO MAKE SURE THAT THE RECORD
15  ACCURATELY REFLECTS WHO CONDUCTS THE EXAMINATION, OF COURSE.
16         **MS. WRIGHT:**  THANK YOU.
17         **THE COURT:**  YOU MAY PROCEED, MS. WRIGHT.
18                         **VOIR DIRE**
19  BY MS. WRIGHT:
20  **Q.**   NOW, DR. KELDIE, YOU WERE RETAINED BY THE DEPARTMENT OF
21  CORRECTIONS AT THE END OF JUNE OF 2024.  IS THAT CORRECT?
22  **A.**   THAT IS CORRECT.
23  **Q.**   AND IN YOUR SEPTEMBER 20TH, 2024 DEPOSITION IN THIS CASE,
24  YOU TESTIFIED THAT YOU HAVE AN AUGMENTED EXPERTISE IN
25  EXERTIONAL HEAT ILLNESS.  DO YOU RECALL THAT?

**A.**   IF YOU'RE READING FROM IT, I BELIEVE YOU.

**Q.**   AND YOU TESTIFIED THAT THAT AUGMENTED EXPERTISE WAS DEVELOPED AS A RESULT OF THE WORK YOU HAVE DONE IN THIS CASE. CORRECT?

**A.**   IF YOU'RE READING FROM THE DOCUMENT -- IF YOU WANT TO SHOW IT TO ME, I'LL ANSWER MORE ASSUREDLY, BUT I TRUST YOU.

**Q.**   WE CAN LOOK AT THE DOCUMENT.

LET'S PULL UP DR. KELDIE'S DEPOSITION TRANSCRIPT, WHICH IS ALREADY IN THE RECORD IN THIS CASE AT JX-16.  WE'LL LOOK AT PAGE 19.  LET'S LOOK AT PAGE 21, LINE 7 TO 10.

DO YOU RECALL WHEN I ASKED YOU, "WAS THAT AUGMENTED EXPERTISE DEVELOPED AS A RESULT OF THE WORK YOU'VE DONE ON THIS CASE?"  YOU RESPONDED, "YES."

**A.**   YES.

**Q.**   NO COURT HAS EVER QUALIFIED YOU AS AN EXPERT ON THE TOPICS OF HEAT-RELATED MEDICAL CARE AND DISORDERS OR THERMOREGULATION. CORRECT?

**A.**   CORRECT.

**Q.**   YOU HAVE NO EXPERTISE IN THOSE TOPICS?

**A.**   THAT'S NOT TRUE.

**Q.**   YOU'VE NEVER BEEN QUALIFIED AS AN EXPERT IN THOSE TOPICS?

**A.**   THAT IS TRUE.

**Q.**   AND BEFORE NOW, YOU HAVE NEVER -- YOU HAVE NEVER OPINED AS AN EXPERT IN THOSE TOPICS.  CORRECT?

**A.**   THAT IS CORRECT.

1  **Q.**   YOU'VE BEEN QUALIFIED BY A COURT AS AN EXPERT IN TWO
2  CASES:  "ONE IN LAKE COUNTY, ILLINOIS; AND THE OTHER IS CATAWBA
3  COUNTY, NORTH CAROLINA.  CORRECT?
4  **A.**   CORRECT.
5  **Q.**   AND IN BOTH CASES YOU WERE QUALIFIED AS AN EXPERT IN
6  CORRECTIONAL HEALTH CARE?
7  **A.**   YES.
8  **Q.**   NOW, DR. KELDIE, YOU DO NOT HAVE ANY CURRENT BOARD
9  CERTIFICATIONS, INCLUDING IN EMERGENCY MEDICINE OR ANYTHING
10 ELSE.  CORRECT?
11 **A.**   THAT IS CORRECT.
12 **Q.**   YOU HAVE NOT PUBLISHED ANY ARTICLES, BOOKS, CHAPTERS, OR
13 SCIENTIFIC STUDIES ON ANY TOPIC.  CORRECT?
14 **A.**   THAT IS CORRECT.
15 **Q.**   YOU HAVE NOT PARTICIPATED IN PEER REVIEW OF ANY SCIENTIFIC
16 ARTICLES?
17 **A.**   I HAVE NOT.
18 **Q.**   THE LAST TIME YOU TREATED ANY PATIENTS IN AN EMERGENCY
19 ROOM SETTING WAS 25 YEARS AGO, LABOR DAY OF 2000?  YES?
20 **A.**   CORRECT.
21 **Q.**   AND SINCE 2000, YOU'VE WORKED FOR A VARIETY OF PRIVATE
22 FOR-PROFIT PRISON HEALTH CARE CONTRACTORS.  CORRECT?
23 **A.**   CORRECT.
24 **Q.**   THAT INCLUDES PRISON HEALTH SERVICES?
25 **A.**   YES.

1  **Q.**  WHICH BECAME CORIZON HEALTH, LLC?

2  **A.**  CORRECT.

3  **Q.**  AND IN MARCH OF 2013, YOU WERE TERMINATED FROM CORIZON.

4  RIGHT?

5  **A.**  THAT IS CORRECT.

6  **Q.**  YOU NEVER ASKED WHY YOU WERE FIRED?

7  **A.**  SAY THE DATE AGAIN.  I'M SORRY.

8  **Q.**  MARCH OF 2013 YOU WERE FIRED FROM CORIZON?

9  **A.**  YES.

10  **Q.**  AND YOU NEVER ASKED WHY YOU WERE FIRED?

11  **A.**  THAT'S CORRECT.

12  **Q.**  IN MAY OF 2015 YOU BECAME THE CHIEF MEDICAL OFFICER AT

13  CORRECT CARE SOLUTIONS, LLC, WHICH LATER BECAME WELLPATH

14  INCORPORATED.  RIGHT?

15  **A.**  CORRECT.

16  **Q.**  AND WELLPATH IS A PRIVATE EQUITY-OWNED FOR-PROFIT COMPANY?

17  **A.**  YES.

18  **Q.**  WELLPATH CONTRACTS WITH FEDERAL AND STATE PRISONS TO

19  PROVIDE HEALTH CARE SERVICES?

20  **A.**  YES.

21  **Q.**  AND YOU STILL WORK FOR WELLPATH TWO HALF DAYS A WEEK?

22  YES?

23  **A.**  CORRECT.

24  **Q.**  AND YOU'RE ALSO SELF-EMPLOYED AS A CORRECTIONAL HEALTH

25  CARE CONSULTANT?

1    **A.**    CORRECT.

2    **Q.**    AND IN THAT ROLE, YOU MAINLY DO EXPERT WORK?

3    **A.**    YES.

4    **Q.**    BUT YOU HAVE NEVER BEEN HIRED OR APPOINTED BY A COURT TO

5    MONITOR A CONSENT DECREE OR IMPLEMENT A REMEDIAL PLAN.

6    CORRECT?

7    **A.**    THAT IS CORRECT.

8    **Q.**    HOWEVER, YOU STAND READY, WILLING AND ABLE TO DO SO, IF

9    HIRED?

10   **A.**    IT'S GETTING A LITTLE LATE IN THE CAREER, BUT I WOULD

11   CONSIDER IT.

12   **Q.**    AND, IN FACT, IN THE *LEWIS* CASE, THE LOUISIANA DEPARTMENT

13   OF CORRECTIONS ASKED JUDGE DICK TO APPOINT YOU AS AN EXPERT TO

14   CREATE AND IMPLEMENT A REMEDIAL PLAN FOR THE HEALTH CARE SYSTEM

15   AT LSP.  RIGHT?

16   **A.**    THAT WAS UNBEKNOWNST TO ME.

17           **THE COURT:**  WELL -- BUT THAT'S NOT THE QUESTION.  THE

18   QUESTION IS:  IS THAT CORRECT?

19           **THE WITNESS:**  I DON'T EVEN KNOW.

20           **THE COURT:**  OKAY.

21   **BY MS. WRIGHT:**

22   **Q.**    YOU DON'T RECALL DISCUSSING THAT IN YOUR DEPOSITION IN

23   THIS CASE?

24   **A.**    I -- I REMEMBER YOU BRINGING IT UP, AND I WAS KIND OF LIKE

25   SURPRISED BECAUSE I HAD NEVER MYSELF AUTHORIZED ANYONE TO PUT

1  MY NAME FORTH AS A POTENTIAL EXPERT.

2  **Q.**  AND YOU ARE -- ARE YOU AWARE THAT YOU'RE STILL UNDER

3  CONSIDERATION FOR THAT JOB?  JUDGE DICK HAS NOT ISSUED ANY

4  RULING.

5  **A.**  I AM -- I AM NOT AWARE THAT I'M BEING CONSIDERED FOR THAT

6  JOB.

7  **Q.**  OKAY.

8          **MS. WRIGHT:**  PLAINTIFFS WOULD -- DR. KELDIE MAY WELL

9  BE AN EXPERT IN CORRECTIONAL MEDICAL CARE, BUT PLAINTIFFS WOULD

10 OPPOSE ANY EXPERT TESTIMONY ON THE TOPIC OF HEAT-RELATED

11 MEDICAL CARE DISORDERS BECAUSE DR. KELDIE HAS NO EXPERTISE IN

12 THAT PARTICULAR SUBJECT AND ANY POTENTIAL EXPERTISE WAS

13 DEVELOPED BECAUSE OF AND DURING THIS LITIGATION.

14         **THE COURT:**  SO LET ME BE CLEAR.  I JUST WANT TO

15 UNDERSTAND, MS. WRIGHT.

16         FIRST OF ALL, DO YOU OPPOSE THE DESIGNATION OF

17 DR. KELDIE AS AN EXPERT IN CORRECTIONAL CARE MEDICINE?

18         **MS. WRIGHT:**  WE DO NOT OPPOSE THAT.

19         **THE COURT:**  ALL RIGHT.  WITHOUT OBJECTION, DR.

20 KELDIE -- I'M NOT QUITE DONE.  WITHOUT OBJECTION, DR. KELDIE

21 WILL BE ADMITTED AS AN EXPERT IN THE FIELD OF CORRECTIONAL CARE

22 MEDICINE.

23         NOW, MS. WRIGHT, IF YOU BELIEVE AT SOME POINT

24 THE DIRECT EXAMINATION OF THE WITNESS EXCEEDS THE SCOPE OF THAT

25 AREA OR FIELD OF EXPERTISE, YOU'RE GOING TO BE RESPONSIBLE, OF

1  COURSE, FOR CALLING THAT TO MY ATTENTION IN THE FORM OF AN

2  OBJECTION AND I'LL RULE ACCORDINGLY.  OKAY.

3           **MS. WRIGHT:**  UNDERSTOOD.

4           **THE COURT:**  ALL RIGHT.  MR. BLANCHFIELD.

5           **MR. BLANCHFIELD:**  THANK YOU, YOUR HONOR.

6           **THE COURT:**  AND THAT -- BY THE WAY, MR. BLANCHFIELD,

7  FOR YOUR PLANNING PURPOSES, BY MY CALCULATION, THAT WAS ABOUT A

8  SIX-MINUTE VOIR DIRE, SO THAT'S NOT -- THAT'S BEING CREDITED

9  BACK TO YOU.  OKAY.

10          **MR. BLANCHFIELD:**  THANK YOU.  I APPRECIATE THAT, YOUR

11 HONOR.

12                     **DIRECT EXAMINATION**

13 **BY MR. BLANCHFIELD:**

14 **Q.**   OKAY.  DR. KELDIE, WHAT WERE YOU ASKED TO DO IN THIS CASE?

15 **A.**   I WAS ASKED TO REVIEW SPECIFIC POLICIES AND PROCEDURES,

16 INCLUDING HEALTH CARE POLICY 8 AND ITS TWO ATTACHMENTS,

17 ATTACHMENT A AND B, THE MEDICATION LIST, HEAT PATHOLOGY

18 MEDICATION LIST, AND THE HEAT PATHOLOGY DIAGNOSES OR MEDICAL

19 LIST.  I WAS ALSO ASKED TO REVIEW WHAT WAS THEN EIGHT

20 PLAINTIFFS' MEDICAL RECORDS IN THE CASE, AND THEN I WAS ASKED

21 TO DO A SITE VISIT TO LSP.  AND THEN WHEN WE HAD THE

22 SELF-DECLARED EMERGENCIES AUDITED IN MAY THROUGH AUGUST OF

23 2024, I WAS ASKED TO REVIEW THOSE.

24 **Q.**   OKAY.  YOU WERE PROVIDED WITH HCP 8 AS IT EXISTED AT THAT

25 TIME WITH EXHIBITS A AND B.  CORRECT?

1   **A.**   I WAS.

2   **Q.**   AND EXHIBIT 1 OF THE EXHIBITS LISTED WHAT WE HAVE ALREADY

3   SEEN HERE; BASICALLY THE ANTI-PSYCHOTROPIC MEDICATIONS.

4   CORRECT?

5   **A.**   CORRECT.

6   **Q.**   AND THE MEDICAL CONDITION LIST, WHICH WAS LISTED IN A

7   PARAGRAPH IN HCP 8.  IS THAT CORRECT?

8   **A.**   CORRECT.

9   **Q.**   AND WE WILL LOOK AT THOSE.

10          BUT YOU ALSO REVIEWED THE EIGHT PLAINTIFFS' MEDICAL

11   RECORDS?

12   **A.**   THAT IS CORRECT.

13   **Q.**   HOW MANY PAGES WAS THAT?

14   **A.**   THEY WERE IN EXCESS OF ABOUT 8,000 PAGES BETWEEN ALL

15   EIGHT.

16   **Q.**   AND YOU MENTIONED SELF-DECLARED EMERGENCIES.  HOW MANY

17   SELF-DECLARED EMERGENCIES DID YOU REVIEW?

18   **A.**   I THINK THERE WERE ABOUT 135.

19   **Q.**   AND WHAT WAS THE TIME PERIOD ON THOSE SELF-DECLARED

20   EMERGENCIES?

21   **A.**   FROM MAY OF 2024 THROUGH AUGUST OF 2024.

22   **Q.**   OKAY.  YOU SAID YOU HAD --

23          **THE WITNESS:**  I THINK I'LL TAKE YOU UP ON THAT OFFER.

24          **THE COURT:**  YES, YOU MAY STAND.  ALL RIGHT.

25   **BY MR. BLANCHFIELD:**

1  **Q.**  -- A SITE VISIT AT LSP?

2  **A.**  CORRECT.

3  **Q.**  TELL THE COURT ABOUT THAT.  WHAT DID YOU DO THERE?

4  **A.**  CAN YOU HEAR ME?

5         **THE COURT:**  ELIZABETH.

6  **BY THE WITNESS:**

7  **A.**  HELLO, HELLO.

8         **THE COURT:**  OKAY.  ALL RIGHT.

9  **BY THE WITNESS:**

10 **A.**  I PRETTY MUCH CANVASSED THE ENTIRE FACILITY.  I WENT TO

11 THE FARM LINE.  WE PRETTY MUCH STARTED THERE, AND THEN I WENT

12 AROUND THE FACILITY, EVERYWHERE FROM THE HOSPICE UNIT TO THE

13 ACUTE TREATMENT UNIT.  WE VISITED THE SKILLED NURSING CENTER, A

14 NUMBER OF THE UNITS.  AND PRETTY MUCH THE EXTENT --

15 **Q.**  AND --

16        **MS. WRIGHT:**  EXCUSE ME.  I'M SO SORRY.  WOULD IT BE

17 POSSIBLE TO TURN UP THE VOLUME ON THE MICROPHONE?

18        **THE COURT:**  I NEED YOU TO SPEAK UP A LITTLE BIT

19 LOUDER.

20        **MS. WRIGHT:**  THANK YOU.

21        **THE COURT:**  WE'RE GOING TO TURN UP THE MICROPHONE AS

22 MUCH AS WE CAN, BUT WE'LL NEED YOU TO JUST PROJECT A LITTLE BIT

23 MORE, DOCTOR.  OKAY.

24        **THE WITNESS:**  ARE YOU TURNING IT UP?

25        **THE COURT:**  YES.  WE'LL TAKE CARE OF IT ON THIS END.

1  OKAY.

2  **THE WITNESS:**  IS THAT BETTER?

3  **THE COURT:**  MUCH BETTER.

4  **MR. BLANCHFIELD:**  THANK YOU.

5  **BY MR. BLANCHFIELD:**

6  **Q.**  NOW, YOU OBSERVED THE INMATES ACTUALLY WORKING IN THE

7  FIELD?

8  **A.**  YES, SIR.

9  **Q.**  WHAT WERE THEY DOING?

10  **A.**  THEY WERE ACTUALLY PLANTING SEEDLINGS.  THEY HAD HAD A

11  DROUGHT THAT YEAR.  AND I DON'T KNOW WHAT THE CROP WAS, BUT

12  THEY WERE PLANTING A NEW CROP FROM SEEDLINGS THAT THEY HAD

13  GROWN THEMSELVES.  AND SO THERE WERE A NUMBER OF DIFFERENT

14  ROWS, AND THEY WERE PLANTING SEEDLINGS.

15  **Q.**  WHAT MONTH WAS THAT?

16  **A.**  THAT WAS IN SEPTEMBER.

17  **Q.**  AND YOU WERE ABLE TO OBSERVE FOR AN HOUR OR TWO THE

18  ACTIVITIES?

19  **A.**  YES.

20  **Q.**  DID YOU PERCEIVE ANY RISK OF HARM TO THE INMATES DURING

21  THAT TIME PERIOD?

22  **A.**  NO, SIR.

23  **Q.**  DID YOU NOTICE IF THE INMATES WERE GIVEN BREAKS?

24  **A.**  I DIDN'T -- I DIDN'T SEE A STRUCTURED BREAK WHERE

25  EVERYTHING STOPPED WHILE I WAS THERE.  THERE WERE -- THERE WERE

1   PRISONERS THAT ACTUALLY CAME TO THE WATERCOOLER ON THEIR OWN

2   VOLITION.  BUT WHILE I WAS THERE, I DID NOT WITNESS A 15-MINUTE

3   BREAK.

4   **Q.**   THERE WAS NO HEAT ALERT CALLED WHILE YOU WERE THERE IN

5   SEPTEMBER?

6   **A.**   NO, SIR.

7   **Q.**   WAS IT A WARM DAY?

8           **THE COURT:**  WAIT JUST A MOMENT.  IS THERE --

9           **THE WITNESS:**  I WAS JUST ASKING IF I WAS LOUD ENOUGH.

10          **THE COURT:**  YES.  YOU'RE DOING GREAT.  THANK YOU.

11  **BY THE WITNESS:**

12  **A.**   I'M SORRY.

13  **Q.**   WAS IT A WARM DAY?

14  **A.**   IT WAS WARM.  IT WAS NOT A HOT DAY.

15  **Q.**   OKAY.  NOW, YOU MENTIONED THE EIGHT PLAINTIFFS' MEDICAL

16  RECORDS.  YOU'RE AWARE OF DR. VASSALLO'S SECOND DECLARATION

17  WHERE SHE RUNS THROUGH EACH OF THE EIGHT PLAINTIFFS' MEDICAL

18  RECORDS AND MEDICAL CONDITIONS?

19  **A.**   YES, SIR, I AM.

20  **Q.**   YOU HAVE REVIEWED THAT?

21  **A.**   YES, SIR.

22  **Q.**   AND HAVE YOU LOOKED AT THOSE PLAINTIFFS' MEDICAL RECORDS

23  TO CROSS-REFERENCE THEM TO THE DECLARATION FROM DR. VASSALLO?

24  **A.**   YES, SIR.

25  **Q.**   OKAY.  IN FACT, YOU IN YOUR INITIAL AFFIDAVIT, WHICH HAS

1  BEEN ADMITTED INTO THIS RECORD AS JOINT EXHIBIT 76 -- I THINK
2  YOU DISCUSS SOME OF THOSE PLAINTIFFS?
3  **A.**   YES, SIR.
4  **Q.**   I WANT TO TALK ABOUT A FEW OF THOSE PLAINTIFFS, IF WE
5  COULD, DOCTOR.
6          ARE WE ABLE TO BRING UP JX-76?
7  **A.**   I'LL SIT BACK DOWN.
8  **Q.**   OKAY.  IF WE COULD GO TO PAGE 12.
9          **MS. WRIGHT:**  EXCUSE ME.  THIS DOCUMENT IS
10 CONFIDENTIAL, SUBJECT TO A PROTECTIVE ORDER.  THERE'S PERSONAL
11 IDENTIFYING INFORMATION AND MEDICAL INFORMATION.  THAT'S WHY I
12 BELIEVE IT WAS FILED UNDER SEAL INTO THE RECORD.
13         **THE COURT:**  AND WHAT'S THE NATURE OF THE PERSONAL
14 IDENTIFYING INFORMATION?
15         **MS. WRIGHT:**  THERE'S PERSONAL MEDICAL INFORMATION IN
16 THIS.
17         **THE COURT:**  ALL RIGHT.  SO WHAT WE'LL DO -- MR.
18 BLANCHFIELD, I'M SURE YOU CAN FIGURE OUT A WORK-AROUND ABOUT
19 THAT.
20         **MR. BLANCHFIELD:**  YES, YOUR HONOR.
21         **THE COURT:**  IN OTHER WORDS, YOU'RE A PROFESSIONAL
22 HERE.  YOU KNOW, YOU'RE AWARE OF THE CONCERNS AND I TRUST THAT
23 YOUR QUESTIONS TO THE WITNESS WILL ACCOUNT FOR THE FACT THAT
24 THIS IS A DOCUMENT THAT IS UNDER SEAL, AT LEAST -- AND LET ME
25 BE CLEAR.  THE INFORMATION IN THE DOCUMENT -- WHICH I HAVEN'T

1    REVIEWED.  BUT I WOULD ASK THAT IF YOU QUESTION THE WITNESS

2    ABOUT THE INFORMATION IN THIS DOCUMENT, THAT YOU TRY TO OMIT

3    ANYTHING THAT IS PROTECTED BY THE PRIVACY ACT AND OTHER

4    RELEVANT FEDERAL PROVISIONS.  OKAY?

5             **MR. BLANCHFIELD:**  YES, YOUR HONOR.

6             **THE COURT:**  IF YOU CAN DO SO.  IF YOU FEEL LIKE YOU

7    CANNOT DO SO, WE'LL HAVE TO CLEAR THE COURTROOM AND WE'LL ALLOW

8    THE WITNESS TO TESTIFY UNDER SEAL, AT LEAST AT THIS PORTION OF

9    HIS TESTIMONY.

10            **MR. BLANCHFIELD:**  AND, YOUR HONOR, I CAN REFER TO

11   THEM AS PATIENT -- YOU KNOW, PATIENT NO. 1.

12            **MS. WRIGHT:**  AND --

13            **THE COURT:**  IS THAT SATISFACTORY, MS. WRIGHT?

14            **MS. WRIGHT:**  THE PERSONAL IDENTIFYING INFORMATION IS

15   STILL BROADCASTED.  IT'S STILL PUBLICIZED IN OPEN COURT.

16            **THE COURT:**  OKAY.

17            **MS. WRIGHT:**  SO WE WOULD ASK THAT THAT IS --

18            **THE COURT:**  WE CAN ELIMINATE --

19            **THE WITNESS:**  I HAVE A HARD COPY.

20            **THE COURT:**  ALL RIGHT.

21            **MS. WRIGHT:**  THANK YOU.

22            **THE COURT:**  THERE WE GO.

23                DO YOU SEE THAT BEFORE YOUR MONITOR?

24            **THE WITNESS:**  YES, I DO.

25            **THE COURT:**  WAIT.  LET ME READ THE DOCUMENT, FIRST OF

1  ALL.

2          ALL RIGHT.  LET'S PROCEED.  I NOW UNDERSTAND

3  YOUR POINT.

4          **MS. WRIGHT:**  THANK YOU.

5          **THE COURT:**  THE NAME OF THE INMATE IS INCLUDED HERE

6  AND WAS BRIEFLY PUBLISHED.

7          ALL RIGHT.  LET'S PROCEED.

8          **MR. BLANCHFIELD:**  OKAY.

9  BY MR. BLANCHFIELD:

10 **Q.**  IF WE COULD, WITH RESPECT TO PATIENT NO. 1, DR. KELDIE,

11 YOU ARE AWARE OF THE REPRESENTATIONS MADE BY DR. VASSALLO IN

12 HER SECOND DECLARATION WITH RESPECT TO PATIENT NO. 1?

13 **A.**  YES, I AM.

14 **Q.**  OKAY.  AND YOU ACTUALLY REVIEWED THE MEDICAL RECORDS OF

15 PATIENT NO. 1?

16 **A.**  YES, I DID.

17 **Q.**  AND WHAT DID THAT -- YOUR REVIEW OF THOSE RECORDS REVEAL

18 TO YOU?

19 **A.**  I REVIEWED THE RECORDS, AS I NORMALLY DO RECORDS, NOT JUST

20 THE PAGES THAT DR. VASSALLO HAD REFERENCED, BUT I SPECIFICALLY

21 LOOKED AT THE DIAGNOSES OR MEDICAL CONDITIONS THAT SHE ALLEGED

22 IN THE DOCUMENT, WHICH WERE BASICALLY FOUR.  ONE WAS

23 HYPERTENSION; ONE WAS TUBERCULOSIS; ONE WAS PULMONARY DISEASE;

24 AND ONE WAS MOBILITY IMPAIRMENT, FOUR MEDICAL CONDITIONS THAT

25 WERE IDENTIFIED AND DECLARED AS PUTTING HIM AT RISK OF HAVING A

1   SERIOUS HEAT ILLNESS OR INJURY.

2           **MS. WRIGHT:**  AND, YOUR HONOR, I WOULD OBJECT TO THIS

3   TESTIMONY AS OUTSIDE THE SCOPE OF THE EXPERT'S EXPERTISE.

4           **THE COURT:**  MR. BLANCHFIELD?

5           **MR. BLANCHFIELD:**  YOUR HONOR, HE IS A PHYSICIAN WHO'S

6   BEEN QUALIFIED IN CORRECTIONAL CARE MEDICINE.  HE OBVIOUSLY HAS

7   THE ABILITY TO REVIEW A MEDICAL CHART AND OPINE ON DIAGNOSES,

8   MEDICATION.  HIS EXPERTISE THAT HE EXPLAINED TO THIS COURT IN

9   DEALING WITH HEAT EXERTIONAL INJURIES, HEAT PATHOLOGY, OVER 20

10  YEARS.

11          **THE COURT:**  MS. WRIGHT, PLEASE COME TO THE -- USE THE

12  MICROPHONE TO THE RIGHT OF THE PODIUM, PLEASE.

13          WHAT'S YOUR RESPONSE TO MR. BLANCHFIELD'S REPLY?

14          **MS. WRIGHT:**  DR. KELDIE, AGAIN, MAY WELL BE AN EXPERT

15  IN CORRECTIONAL MEDICINE.  HE IS NOT AN EXPERT IN HEAT

16  PATHOLOGY OR HEAT-RELATED MEDICAL CARE.  SIMPLY HAVING A

17  MEDICAL DEGREE DOES NOT MAKE SOMEONE AN EXPERT IN NEPHROLOGY OR

18  PEDIATRIC ONCOLOGY OR RESPIRATORY DISEASE.  DR. KELDIE HAS

19  ABSOLUTELY NO EXPERIENCE SPECIFICALLY -- OR EXPERTISE

20  SPECIFICALLY TREATING HEAT-RELATED ILLNESS, AND HE CANNOT NOW

21  LOOK AT A PATIENT'S MEDICAL RECORD AND DRAW SOME CONCLUSION

22  ABOUT EXERTIONAL HEAT ILLNESS OR ANY OTHER KIND OF HEAT ILLNESS

23  WITHOUT THAT EXPERTISE.

24          **THE COURT:**  OKAY.  DOCTOR, HAVE YOU EVER BEEN

25  QUALIFIED IN THE FIELD OF THERMOREGULATION OF THE BODY?

1      **THE WITNESS:**  NO, SIR.

2      **THE COURT:**  OKAY.  WELL, MR. BLANCHFIELD, I DON'T

3  THINK HE'S COMPETENT TO ANSWER THIS.  NOW, IF YOU WANT TO

4  QUESTION HIM ABOUT PRACTICES, PROCEDURES -- BECAUSE IT'S, YOU

5  KNOW, MY UNDERSTANDING, BASED UPON HIS QUALIFICATIONS, IS THAT

6  HE'S CERTAINLY CAPABLE OF TESTIFYING ABOUT PRISON MEDICAL CARE

7  SYSTEMS, PROCEDURES.  HE HASN'T EXAMINED THIS INMATE.  HE'S

8  MERELY REVIEWED THE -- OR THE REPORT OF A PHYSICIAN WHO IS A

9  QUALIFIED -- AND HAS BEEN QUALIFIED AS AN EXPERT IN

10  THERMOREGULATION OF THE BODY.  I DON'T SEE HOW HE CAN NOW OPINE

11  ABOUT WHETHER DR. VASSALLO'S CONCLUSIONS ARE VALID OR INVALID,

12  BECAUSE THAT IS NOT HIS AREA OF EXPERTISE.  WHAT AM I MISSING?

13      **MR. BLANCHFIELD:**  WHAT YOU'RE MISSING, YOUR HONOR, IS

14  I ASKED HIM AND HE TESTIFIED THAT DR. VASSALLO LOOKED AT THE --

15  WHATEVER SHE LOOKED AT AND SAID THERE ARE FOUR DIAGNOSES.

16  THERE'S HYPERTENSION, TUBERCULOSIS, PULMONARY DISEASE.  HE'S

17  REVIEWED THE RECORD, AND I'M GOING TO ASK HIM WHAT HIS REVIEW

18  IS.  IT HAS NOTHING TO DO WITH THERMOREGULATION.  HE CAN TELL

19  IF THIS -- IF THIS INDIVIDUAL HAS HYPERTENSION.  HE'S CERTAINLY

20  QUALIFIED TO --

21      **THE COURT:**  SO LET ME UNDERSTAND.  SO YOU'RE ASKING

22  THIS WITNESS TO GO BACK AND TESTIFY AS TO WHETHER ANOTHER

23  WITNESS IS CORRECT -- IN THIS CASE DR. VASSALLO -- IN HER

24  CONCLUSIONS THAT THIS GENTLEMAN WAS DIAGNOSED WITH

25  HYPERTENSION?

1              IN OTHER WORDS, STATED DIFFERENTLY, I DON'T --

2    IS IT YOUR CONTENTION, MS. WRIGHT, THAT A PHYSICIAN ON-SITE, ON

3    STAFF AT ANGOLA DIAGNOSED THIS INDIVIDUAL WITH HYPERTENSION?

4              **MS. WRIGHT:**  THAT IS MY UNDERSTANDING, YES.  AND IT'S

5    STATED IN DR. VASSALLO'S --

6              **THE COURT:**  HIGH BLOOD PRESSURE -- SO I GUESS, AGAIN,

7    MR. BLANCHFIELD, A DOC PHYSICIAN HAS ALREADY REACHED THESE

8    CONCLUSIONS ABOUT THIS INMATE.  AS I APPRECIATE IT, DR.

9    VASSALLO HAS ACCEPTED THOSE CONCLUSIONS, NOT HAVING EXAMINED

10   THE INMATE HERSELF, BUT RELIED ON A DOC DETERMINATION OF SUCH.

11             SO I'M ASKING, AGAIN:  WHAT IS IT THAT YOU'RE

12   ASKING THIS WITNESS TO NOW DO WITH RESPECT TO DR. VASSALLO'S

13   ACCEPTANCE OF THAT INFORMATION?

14             **MR. BLANCHFIELD:**  BECAUSE THAT IS NOT WHAT HAPPENED.

15   THERE IS NO DIAGNOSIS OF TUBERCULOSIS IN THAT RECORD.  SHE SAYS

16   THERE IS.  THERE IS NOT.

17             **THE COURT:**  OKAY.  I WILL --

18             **MR. BLANCHFIELD:**  NO ONE AT DOC --

19             **THE COURT:**  I'LL ALLOW THAT TESTIMONY.  IF THAT'S THE

20   CASE, THAT'S FINE.

21             **MS. WRIGHT:**  NO OBJECTION TO THAT TESTIMONY.

22             **THE COURT:**  VERY WELL.

23             **MS. WRIGHT:**  THANK YOU.

24             **THE COURT:**  OKAY.  LET'S PROCEED.

25   **BY MR. BLANCHFIELD:**