## IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **VOICE OF THE EXPERIENCED**, a membership organization on behalf of itself and its members; and **MYRON SMITH, DAMARIS JACKSON, NATE WALKER, DARRIUS WILLIAMS, KEVIAS HICKS, JOSEPH GUILLORY, KENDRICK STEVENSON, and ALVIN WILLIAMS**, on behalf of themselves and all others similarly situated,<br><br>     *Plaintiffs*,<br><br>   v.<br><br>**JAMES LEBLANC**, in his official capacity as Secretary of the Louisiana Department of Public Safety and Corrections; **TIMOTHY HOOPER**, in his official capacity as Warden of Louisiana State Penitentiary; **MISTY STAGG**, in her official capacity as Director of Prison Enterprises, Inc.; the **LOUISIANA DEPARTMENT OF PUBLIC SAFETY & CORRECTIONS**; and **PRISON ENTERPRISES, INC.**<br><br>     *Defendants*. | Civil Action No.: 3:23-cv-1304-BAJ-EWD |

## PLAINTIFFS' POST-HEARING BRIEF IN FURTHER SUPPORT OF
## MOTION FOR CLASS CERTIFICATION

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ....................................................................................................................1

FACTS .....................................................................................................................................1

    A.    Plaintiffs and Claims.................................................................................1

    B.    Plaintiffs' Class Certification Motion.......................................................3

    C.    Nearly Everyone at LSP Is Subject to the Farm Line's Inhumane Conditions................................................................................................4

    D.    Inadequate Medical Care on the Farm Line...............................................9

    E.    Punishment that Echoes Chattel Slavery ................................................11

    F.    The Farm Line Operates Pursuant to Uniform Policies and Practices..................14

        1.    Defendants' Heat Pathology Policies........................................14

        2.    Defendants' ADA Policies.......................................................17

        3.    Other Policies..........................................................................18

    G.    Expert Witness Testimony .......................................................................21

        1.    Dr. Sbicca...............................................................................21

        2.    Dr. Hammonds........................................................................23

        3.    Dr. Vassallo............................................................................25

        4.    Dr. Keldie................................................................................26

        5.    Dr. Reynolds-Barnes...............................................................27

ARGUMENT ..........................................................................................................................29

I.    THE PROPOSED CLASSES SATISFY THE REQUIREMENTS OF RULE 23(a) ......................................................................................................................29

    A.    The General Class and the ADA Subclass Satisfy the Numerosity and Ascertainability Requirements...............................................................29

    B.    The General Class and ADA Subclass Satisfy the Commonality Requirement.............................................................................................31

        1.    Defendants Operate the Farm Line Pursuant to Policies and Practices Applicable to All Class Members...............................32

        2.    The Evidence Demonstrates That Class Members Are Subject to Common Conditions on the Farm Line ...................................33

        3.    The Evidence Demonstrates the Existence of Numerous Common Questions Capable of Class-Wide Resolution ...........................34

        4.    Defendants Offer No Evidence to Rebut Plaintiffs' Showing of Commonality...........................................................................35

    C.    The General Class and ADA Subclass Satisfy the Typicality Requirement ........37

## TABLE OF CONTENTS
### (Continued)

Page

D.    The Named Plaintiffs and Plaintiffs' Counsel Are Adequate Representatives ........................................................................................................38

II.    THE PROPOSED CLASSES SATISFY THE REQUIREMENTS OF RULE 23(b)(2) ........................................................................................................................40

III.    THE ADA SUBCLASS IS NOT BARRED UNDER *GILLESPIE*.................................41

CONCLUSION.............................................................................................................................43

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alex A. by and through Smith* v. *Edwards*,
  2023 WL 5628592 (M.D. La. Aug. 31, 2023) .........................................................................29

*Austin* v. *Hopper*,
  15 F. Supp. 2d 1210 (M.D. Ala. 1998) ..................................................................................34

*Cole* v. *Livingston*,
  2016 WL 3258345 (S.D. Tex. June 14, 2016) ...............................................................31, 34

*In re Deepwater Horizon*,
  739 F.3d 790 (5th Cir. 2014) ........................................................................................31, 35

*Equal Access for El Paso* v. *Hawkins*,
  428 F. Supp. 2d 585 (W.D. Tex. 2006), *rev'd on other grounds and remanded*,
  509 F.3d 697 (5th Cir. 2007) ...............................................................................................42

*Frame* v. *City of Arlington*,
  657 F.3d 215 (5th Cir. 2011) ................................................................................................34

*Frey* v. *First Nat. Bank Southwest*,
  602 F. App'x 164 (5th Cir. 2015) .........................................................................................31

*Gillespie* v. *Crawford*,
  858 F.2d 1101 (5th Cir. 1988) .......................................................................................41, 43

*Hope* v. *Pelzer*,
  536 U.S. 730 (2002)..............................................................................................................34

*J.D.* v. *Nagin*,
  255 F.R.D. 406 (E.D. La. 2019)...........................................................................................29

*Jordan* v. *Gardner*,
  986 F.2d 1521 (9th Cir. 1993) ..............................................................................................34

*Lewis* v. *Cain*,
  2021 WL 1219988 (M.D. La. Mar. 31, 2021) ......................................................................42

*Lewis* v. *Cain*,
  324 F.R.D. 159 (M.D. La. 2018) ...............................................................................32, 36, 37

*Lewis* v. *Cain*,
  701 F. Supp. 3d 361 (M.D. La. 2023)...................................................................................42

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Madlock* v. *Collins*,
   3 F.3d 438 (5th Cir. 1993) ..................................................................41

*In re Monumental Life Ins. Co.*,
   365 F.3d 408 (5th Cir. 2004) ..............................................................31

*Mullen* v. *Treasure Chest Casino, L.L.C.*,
   186 F.3d 620 (5th Cir. 1999) .........................................................29, 37

*Parker* v. *Hooper*,
   134 F. 4th 867 (5th Cir. 2025) .............................................................42

*In re Pool Prods. Distribution Mkt. Antitrust Litig.*,
   310 F.R.D. 300 (E.D. La. 2015)...........................................................38

*M.D. ex rel. Stukenberg* v. *Perry*,
   294 F.R.D. 7 (S.D. Tex. 2013)..............................................................38

*Tellis* v. *LeBlanc*,
   2021 WL 4267513 (W.D. La. Sept. 20, 2021)................................35, 40

*Ward* v. *Hellerstedt*,
   753 Fed. App'x 236 (5th Cir. 2018) ...............................................40, 41

*Yates* v. *Collier*,
   868 F.3d 354 (5th Cir. 2017) .............................................35, 36, 40, 41

**Statutes**

Americans With Disabilities Act ............................................................17, 34

Rehabilitation Act Section 504 ..............................................................34, 35

**Other Authorities**

Fed. R. Civ. P. 23 .............................................................................. *passim*

Fed. R. Civ. P. 65(b)(2)...............................................................................15

La. Admin. Code tit. 22 § I-341 ..................................................................20

U.S. Constitution, Eighth Amendment .......................................1, 34, 38, 41

Pursuant to the Court's minute entry dated April 24, 2025, *see* ECF No. 235, Plaintiffs respectfully submit the following post-hearing brief in further support of Plaintiffs' Motion for Class Certification, *see* ECF No. 120 (the "Motion").

## INTRODUCTION

Through briefing, oral argument, and a three-day evidentiary hearing, Plaintiffs provided voluminous evidence—almost entirely unrebutted—demonstrating that Plaintiffs and the putative classes satisfy all required elements of Federal Rule of Civil Procedure 23. Taken together, the documentary evidence and testimony of the parties' expert and fact witnesses establish that with respect to both the General Class and the ADA Subclass, Plaintiffs satisfy every element of Rules 23(a) and 23(b)(2). The putative classes should be certified.

## FACTS

### A.    Plaintiffs and Claims

Plaintiffs, individually and on behalf of the proposed classes defined below, challenge Defendants' operation of the Farm Line, an unlawful, degrading, and dangerous disciplinary practice through which Defendants compel men incarcerated at Louisiana State Penitentiary ("LSP" or "Angola") to labor under conditions reminiscent of chattel slavery. Plaintiffs allege that the Farm Line is unlawful under the U.S. Constitution, Title II of the Americans with Disabilities Act (the "ADA"), and Section 504 of the Rehabilitation Act of 1973 ("Section 504").

Plaintiffs Myron Smith, Damaris Jackson, Nate Walker, Darrius Williams, Kevias Hicks, Joseph Guillory, and Alvin Williams (the "Named Plaintiffs") allege that the Farm Line constitutes cruel and unusual punishment in violation of the Eighth Amendment for three fundamental reasons: *first*, Defendants force men to labor on the Farm Line under high heat conditions that expose them to a substantial risk of serious physical harm without adequate mitigation to abate that risk ("Heat Theory"); *second*, Defendants use the Farm Line to punish men by subjecting them

to debasing, inhumane conditions reminiscent of chattel slavery, thereby stripping them of their fundamental human dignity, deviating from contemporary standards of decency, and adding degradation on top of their sentence to hard labor ("Dignitary Harm Theory"); and *third*, Defendants expose class members to a substantial risk of serious psychological harm by forcing them to labor under those same conditions ("Psychological Harm Theory").

Damaris Jackson, Nate Walker, Kevias Hicks, and Joseph Guillory (the "ADA Plaintiffs") additionally allege that the Farm Line runs afoul of the ADA and Section 504 because Defendants fail to reasonably accommodate people with the disability of impaired thermoregulation who are forced to work on the Farm Line, and because Defendants administer their policies and procedures in a manner that subjects people with impaired thermoregulation to discrimination on the basis of that disability.

Each Named Plaintiff is currently incarcerated at LSP, has worked on the Farm Line, and faces reassignment to the Farm Line at any time. *See* ECF No. 37-11 (Guillory Decl.); ECF No. 37-12 (Hicks Decl.); ECF No. 37-13 (Jackson Decl.); ECF No. 37-14 (Smith Decl.); ECF No. 37-16 (Walker Decl.); ECF No. 37-17 (A. Williams Decl.); ECF No. 37-18 (D. Williams Decl.); *see also* JX-61, JX-62 (letters between Plaintiffs' and Defendants' counsel discussing Jackson's July 2024 reassignment to the Farm Line). Each ADA Plaintiff has one or more disabilities that may cause, or that are treated with medications that may cause, impaired thermoregulation. Each has had his request to be removed from the Farm Line on the basis of his disabilities denied. *See e.g.*, JX-46 (Walker ARP); JX-47 (Jackson ARP); ECF No. 37-42 (Hicks ARP); *see also* ECF No. 37-11 ¶¶ 2, 15–16 (Guillory Decl.); ECF No. 37-12 ¶¶ 2–4, 11–12 (Hicks Decl.); ECF No. 37-13 ¶¶ 4–7, 11 (Jackson Decl.); ECF No. 37-16 ¶¶ 2, 4, 10–11 (Walker Decl.).

Throughout this litigation, the Named Plaintiffs have diligently pursued the class claims. They have prepared for and testified at depositions, filed numerous sworn declarations, responded to discovery requests, and communicated regularly with counsel.  *See, e.g.*, JX-64 ¶ 8 (Guillory Supp. Decl.); JX-65 ¶6 (Jackson Supp. Decl.); JX-68 ¶ 9 (D. Williams Supp. Decl.); 4/23 Tr. 123:13–124:11 (Jackson testifying that he has been deposed and has signed declarations in this litigation).  Mr. Jackson also testified at and attended multiple days of the hearing on behalf of himself and his fellow class members.  4/23 Tr. 34:10–35:5, 121:21–147:6; 4/24 Tr. 4:3–13.

### B.    Plaintiffs' Class Certification Motion

On September 30, 2024, Plaintiffs filed their Motion seeking certification of two classes:

- **The General Class**, represented by the Named Plaintiffs and comprising all people incarcerated at LSP who currently are, or may in the future be, assigned to the Farm Line; and

- **The ADA Subclass**, represented by the ADA Plaintiffs and comprising all people incarcerated at LSP who currently are or may in the future be assigned to the Farm Line and who have disabilities that may cause, or that are treated with medications that may cause, impaired thermoregulation.[1]

The parties have now fully briefed the Motion, submitting nearly 100 exhibits, including fact and expert declarations, policies, and other documentary evidence.  On February 19, 2025, the Court heard oral argument on the Motion.  *See* Ex. 1, February 19, 2025 Transcript of Oral Argument on Plaintiffs' Motion for Class Certification ("2/19 Oral Arg. Tr.").  Then, from April 22 to 24, 2025, the Court held a three-day evidentiary hearing.  *See* Ex. 2, April 22, 2025 Transcript of Class Certification Hearing ("4/22 Tr."); Ex. 3, April 23, 2025 Transcript of Class Certification Hearing ("4/23 Tr."); Ex. 4, April 24, 2025 Transcript of Class Certification Hearing ("4/24 Tr.").

---

[1]    Plaintiffs narrowed the definition of the ADA Subclass during oral argument on Plaintiffs' Motion for Class Certification.  *See* 2/19 Oral Arg. Tr. 44:16–45:1; *see also* 4/22 Tr. 19:23–20:6; 4/24 Tr. 123:14–21.

At the hearing, Plaintiffs entered over 100 exhibits and took direct and cross-examination from 12 witnesses. The fact witnesses included two men who are currently incarcerated at LSP, class representative Damaris Jackson and putative class member Patrick Jones, who both testified regarding their personal experiences on the Farm Line, including experiencing heat-related injury while working on the Farm Line.

The Court also heard testimony from DOC and LSP officials regarding LSP's policies and practices regarding the Farm Line, including from DOC Chief Medical Officer Dr. Randy Lavespere, Assistant Warden of Field Operations Roland Sylvester, and Master Sergeant Orlando Scott. Deputy Warden Ashli Oliveaux, who is responsible for administering the ADA at LSP, testified regarding LSP's ADA policies, and Registered Nurse Supervisor Justin Coley, who supervises LSP's Assessment Triage Unit ("ATU"), testified regarding LSP's response to emergency medical requests on the Farm Line.

In addition to these fact witnesses, Plaintiffs called three expert witnesses: Dr. Joshua Sbicca, Dr. Evelynn Hammonds, and Dr. Susi Vassallo. Defendants called Dr. Deleca Reynolds-Barnes and Dr. Carl Keldie.

The evidence and testimony presented at the hearing demonstrates without question that the General Class and ADA Subclass satisfy all requirements for class certification.

**C.     Nearly Everyone at LSP Is Subject to the Farm Line's Inhumane Conditions**

Defendants operate the Farm Line as a form of unconstitutionally cruel punishment. Each day, Defendants subject a rotating crew numbering dozens of men to unnecessarily difficult, dangerous, degrading, and dehumanizing conditions on the Farm Line. Thousands more face reassignment to the Farm Line as punishment for any misstep, real or perceived.

Indeed, nearly every one of the approximately 4,000 men incarcerated at Angola is at risk of being assigned to the Farm Line at any time and for any reason. *See, e.g.*, JX-12 20:18–25

(Davis Dep.); JX-20 32:12–15 (Hooper Dep.); JX-15 76:15–18 (Vittorio Dep.); JX-11 60:12–16 (Hebert Dep.); 4/23 Tr. 225:6–226:21 (Oliveaux acknowledging that LSP policy requires new arrivals to work on the Farm Line, subject to medical clearance); 4/23 Tr. 151:8–11 (Jones testifying that the Farm Line is the first work assignment given to men upon arrival to Angola). Defendants' records list the hundreds of men who are assigned to the Farm Line at any given time. JX-19, JX-48, JX-52, JX-60 (LSP field operations logs and line and job rosters showing hundreds of men assigned to the Farm Line in summer 2024. And, according to Defendants' own testimony, several dozens of men are forced to labor on the Farm Line each day, and over a hundred already have been forced to work on the Farm Line in 2025 alone. *See, e.g.*, 4/23 Tr. 329:23–330:3 (Scott testifying that as a line pusher for one of the four Farm Lines, he is responsible for up to 40 men a day); 4/24 Tr. 7:1–14 (Sylvester testifying that 20 to 30 men work on the Farm Line each day, and that 100 to 110 men have worked on the field in 2025).

Among those presently under threat of assignment to the Farm Line are approximately 1,800 people LSP has identified as being heat sensitive, as well as scores of other heat sensitive people LSP has yet to identify. *See* 4/23 Tr. 239:23–240:24 (Oliveaux testifying that LSP has identified 1,500 men taking medications that make them heat sensitive and 300 to 400 additional men with medical conditions that make them heat sensitive); JX-45 104:4–10 (Oliveaux testifying that people may develop ADA-qualifying disabilities while in LSP's custody).

On the Farm Line, Defendants force these men to perform unnecessarily strenuous manual agricultural labor. *See* JX-19 (field operations log documenting that Farm Lines were tasked with planting sweet potatoes, tomatoes, and peppers; picking cucumbers and potatoes; and cutting grass); *see also* JX-8 76:1–16, 80:25–81:10 (Gulino Dep.) (testifying that class members are forced to pick vegetables or cut grass); JX-26 (video showing class members bending, lifting, and hand

picking crops in overgrown fields); JX-29 (photograph showing the same); PX-35 (same); PX-23 (video showing men cutting grass on the edges of a steep ditch near alligators). This work is physically difficult for everyone who is forced to perform it, requiring constant bending, lifting heavy loads, and walking through uneven terrains and overgrown fields rife with tripping hazards. JX-56 ¶¶ 4–5 (Green Supp. Decl.); *see also* 4/22 Tr. 86:8–19 (Dr. Sbicca testifying that work on the Farm Line appeared to be strenuous "based on the sweat that was pouring from their brow and bent over in the positions that they were working"); 4/23 Tr. 79:12–80:10 (Dr. Vassallo testifying that she observed men performing "strenuous" labor on the Farm Line in July 2024).

Although LSP has modern farming machinery—and, indeed, uses that machinery in its profit-geared Prison Enterprises agricultural operations—Defendants uniformly force class members to plant, water, weed, and harvest crops by hand. JX-8 181:9–12, 182:2–20 (Gulino Dep.) (explaining that men on the Farm Line pick vegetables by hand and do not use machinery); *id.* at 31:12–21, 37:17-21 (Gulino explaining Prison Enterprises is responsible for production and harvesting of "row crops" like corn and soy at LSP); *id.* at 86:13–87:1 (Gulino stating that tractors are used for Prison Enterprise's row crop operations); JX-20 27:19–28:12, 28:22–25 (Hooper Dep.) (Prison Enterprises sells row crops "for profit"); *see also* 4/23 Tr. 126:16–20 (Jackson testifying that he was never provided machinery on the Farm Line); 4/23 Tr. 153:11–23 (Jones testifying that class members are "always picking [crops] by hand"); 4/24 Tr. 19:4–14 (Sylvester testifying that only "trustees" are allowed to operate LSP's tractors, ditching machines, and cultivators, and that class members are not allowed to use this machinery). Master Sergeant Scott, who has supervised and directed the Farm Line for years, admitted that LSP rarely provides class members with even simple hand tools to pick vegetables. 4/23 Tr. 318:20–319:9, 330:21–331:18; *see also* JX-28 34:8–37:11 (Green Dep.) (agricultural expert Margee Green noting that the Farm

6

Line is "clearly not designed for worker safety" and that "vegetable production [is] not the intention either").

Defendants' uniform policies and practices of operating the Farm Line to maximize physical pain is only part of what makes the punishment cruel and unusual; they maximize psychological pain and degradation too. At LSP, Defendants can levy severe discipline against any class member assigned to the Farm Line. The Farm Line is overseen by "line pushers" who ensure that men are working with reasonable speed and efficiency, or face further discipline. JX-9 at 36–37 (Disciplinary Rules and Procedures for Adult Inmates); 4/23 Tr. 324:11–14 (Scott testifying that men must work with reasonable speed and efficiency or face disciplinary action); 4/24 Tr. 20:3–13 (Sylvester confirming the same); *see also* JX-13 92:23–93:14 (Sylvester Dep.); JX-10 48:5–11 (Scott Dep.). Such disciplinary sanctions that class members face if they refuse to work or fail to work fast enough include solitary confinement, loss of wages and access to the canteen, and loss of visitation or phone time with their families. The threat of these sanctions adds further degradation and humiliation to their assignment to the Farm Line. *See* 4/23 Tr. 134:3–15 (Jackson testifying he was "sent to [solitary] confinement" and lost visitation and phone privileges when he refused to work the Farm Line in July 2024); JX-62 at 5.

LSP's policies also incentivize line pushers to demand class members complete their work quickly, regardless of the circumstances. Line pushers themselves are subject to disciplinary action, loss of wages, and even loss of employment if class members fall short. 4/23 Tr. 324:15–325:18 (Scott).

On the perimeter of the fields, Defendants station gun guards armed with AR-15 rifles and pistols. Defendants instruct those gun guards to fire "warning shots" at any class member who steps outside the work area. 4/24 Tr. 20:23–22:7 (Sylvester); JX-13 15:16–21, 20:24–21:4

(Sylvester Dep.); *see also* JX-66 ¶ 3 (Jones Decl.) (describing incident where a gun guard "cocked his gun and ordered [Jones] to get back in line" when Jones "stepped out of line" to request a job change); 4/23 Tr. 164:18–165:1 (Jones testifying about the gun guard incident); JX-14 (video showing gun guards). Assistant Warden Sylvester, who oversees all field operations, testified that a warning shot was fired on the Farm Line *within the past year*, when a class member wandered into a neighboring field to pick a crop. 4/24 Tr. 21:10–22:7; JX-13 17:19–18:7 (Sylvester Dep.). He recalled several similar instances in the last several years, 4/24 Tr. 11:23–12:8, and acknowledged that at least one incarcerated man was killed by a gun guard at the check-out gate during the operation of the Farm Line, 4/24 Tr. 29:11–25; JX-13 18:8–19:6 (Sylvester Dep.).

This looming threat of physical violence has a direct impact on all men assigned to the Farm Line. Mr. Jackson, for example, testified about hearing shots in the field "on several occasions" and recalls that everyone on the Farm Line "fell to the ground when [they] heard the shot." 4/23 Tr. 142:3–12; *see also* 4/23 Tr. 134:24–135:12 (Jackson detailing that shots have been fired but no one at the time knew why). Mr. Jones testified that he has had dreams about being shot while on the Farm Line. 4/23 Tr. 163:14–164:13.

Conditions on the Farm Line become even more dangerous in the notorious Louisiana heat and humidity, as men are forced to labor under direct sun on even the hottest days. *See, e.g.*, PX-22 (video showing men cutting grass in direct sun); 4/23 Tr. 205:5–21 (Lavespere acknowledging that, absent cloud cover, the Farm Line is generally exposed to direct sun). Heat indices on the Farm Line regularly exceed 88°F. *See, e.g.*, ECF Nos. 114, 116, 117. Under these conditions, heat-related illness occurs frequently, even outside of summer months and among men who are relatively young and healthy. *See* JX-27, JX-31, JX-32, JX-33, JX-34, JX-35, JX-36 (SDEs showing apparent symptoms of heat-related illness); 4/23 Tr. 150:4–5, 162:10–17 (Jones, age 32,

testifying that he fainted working on the Farm Line twice); 2/19 Oral. Arg. Tr. 40:21–41:11 (describing heat-related incidents experienced on the Farm Line by two men under the age of 40); ECF No. 232-1 (Tutts Decl.) (describing experiencing heat-related illness on the Farm Line in April 2025); ECF No. 232-2 (Carter Decl.) (same).

The heat on the Farm Line is exacerbated by the "cumulative" effects of heat exposure to which Defendants expose men at LSP:  because "most living quarters at LSP are not air-conditioned[,]" class members "simply cycle from a hot dormitory or cellblock to a hot field, and back again."  JX-58 ¶ 25 (Vassallo Second Supp. Decl.); *see also* 4/23 Tr. 48:7–22 (Vassallo). And to the extent Defendants have implemented modest measures on the Farm Line since last summer, those measures are still inadequate to mitigate the heat-related risks for any class member forced to labor on the Farm Line.  *See generally* PX-36 (Vassallo Fourth Decl. describing how Defendants' heat mitigation measures remain "insufficient to adequately protect men on the Farm Line" from the risk of serious heat-related harm).

### D.    Inadequate Medical Care on the Farm Line

Despite these dangerous conditions, medical care on the Farm Line is woefully inadequate. When a class member falls ill on the Farm Line, they place a "self-declared emergency," or "SDE," by notifying a line pusher that they are experiencing a medical emergency.  4/24 Tr. 33:7–18 (Coley).  Class members who experience medical emergencies on the Farm Line cannot seek medical care directly; instead, they must report their emergency to the line pusher, who will then call one of two medical teams—either Medical 3, which will dispatch a nurse, or Medical 4, which will dispatch an ambulance—to the field to assess the individual.  4/24 Tr. 33:11–18 (Coley); JX-13 83:15–84:19 (Sylvester Dep.); 4/23 Tr. 319:12–18 (Scott).  In the end, line pushers, who are not medical professionals and have no medical training, are tasked by Defendants with using their judgment to decide whether to call Medical 3 or Medical 4.  4/23 Tr. 320:17–25 (Scott).

In periods of high heat, Defendants regularly receive four to five SDEs from the Farm Line *every day*. 4/24 Tr. 41:11–19 (Coley). Nurses take anywhere from 30 minutes to three hours to respond to these SDEs. PX-32 at 3 (Medical Director's SDE Meeting Minutes); *see also* 4/23 Tr. 321:2–12 (Scott testifying that it could take up to 45 minutes to an hour for a medical provider to arrive at the Farm Line); JX-10 54:21–55:10 (Scott Dep.) (same); JX-58 ¶ 8 (Vassallo Second Supp. Decl.) (stating that even though emergency care should occur within the first 10-15 minutes of a heat-related emergency, patients on the Farm Line sometimes wait over an hour before medical arrives). Only two nurses are on staff for each 12-hour shift. 4/24 Tr. 40:1–18 (Coley).

Defendants routinely ignore the wellbeing of class members. LSP's Medical Director, Dr. Paul Toce, has said that class members routinely "connive their way out of the field" and "fake" illnesses to avoid the Farm Line. JX-23 194:6–195:2 (Toce Dep.); *see also id.* at 198:7–199:5 (expressing his belief that class members "are going to fake their depression symptoms and anxiety symptoms" to be prescribed medications like Prozac and Remeron so they can "get[] out of the field," using the "excuse" of their medications to "manipulate the system for secondary gain"); *id.* at 215:1–12 (explaining his belief that men intentionally avoid drinking water and wear excessive clothing so they can dehydrate themselves, pass out, and get taken off the Farm Line). This biased and cynical assumption that incarcerated people are liars is shared by DOC's Medical Director, Dr. Lavespere. JX-30 234:21–236:16 (Lavespere Dep.) (claiming that class members frequently lie to doctors to receive accommodations, including "out of the field" duty status). Master Sergeant Scott, a line pusher responsible for triaging SDEs, similarly testified that class members lie "a lot" and "fake their injuries to get off the Farm Line." 4/23 Tr. 321:24–322:10.

Dr. Carl Keldie feels the same way. 4/24 Tr. 101:21–24 ("[T]here are far too many minor complaints or complaints with no merit lodged from the field at LSP"); 4/24 Tr. 101:25–102:2

10

("There's a mountain of frivolous medical complaints at LSP."); 4/24 Tr. 102:3–12 ("[F]inding a meritorious medical complaint there is like looking for a needle in a haystack."); JX-16 248:21–249:15 (Keldie Dep.) (expressing the same views). Indeed, Dr. Keldie demonstrated on the stand exactly how this bias can result in serious harm to class members. Dr. Keldie purportedly reviewed 135 SDEs placed by class members from the field last summer. 4/24 Tr. 102:15–20. He claimed to find not a *single* clinical scenario of "legitimate" heat illness—i.e., heat injury, heat exhaustion, heat stroke, heat cramps, or heat syncope—among any of those cases. 4/24 Tr. 102:21–103:23.

In reaching this unlikely conclusion, Dr. Keldie reviewed the SDE records of a 57-year-old putative class member with a body mass index of 30.93 and a low blood pressure of 90/60. 4/24 Tr. 105:4–106:1; *see* JX-27 at 4 (SDE dated May 30, 2024). This individual presented *in the field* with clear symptoms of heat-related illness, including "feeling light-headed, dizzy, and cramping," swaying when standing, and being covered in sweat. 4/24 Tr. 106:10–107:10 (Keldie); JX-27 at 8. He was taken to the ATU, where he was diagnosed with clinical dehydration, hypotension, and dizziness, and treated with IV fluids. 4/24 Tr. 110:7–19 (Keldie); JX-27 at 5.

And yet, Dr. Keldie does not believe this putative class member had a "legitimate" SDE potentially related to exertional heat illness. 4/24 Tr. 104:21–105:3, 110:20–24, 111:5–12. Why? Because, he testified, the patient's symptoms "could have just been created in the field." 4/24 Tr. 110:20–24, 111:5–12. Obviously, and as Dr. Vassallo testified, "this kind of cynicism results in . . . death and morbidity." 4/23 Tr. 67:1–19.

### E.    Punishment that Echoes Chattel Slavery

The Farm Line is widely considered by staff and incarcerated individuals alike to be the lowest, least desirable form of labor at Angola. *See* JX-23 194:6–195:25 (Toce Dep.); JX-12 47:7–19 (Davis Dep.); JX-63 ¶ 4 (Faria Decl.). Dr. Toce explained it best:

> The Farm Line is considered to be punishment. The Farm Line is considered to be degrading. . . . [Class members are] considered subpar inmates if they can't connive their way out of the field, if they can't work some kind of false medical claim or fake some illness or act out and get locked up, if they can't do something besides working in the field.

JX-23 194:6–195:2. There is no debate: the Farm Line is not educational or vocational training, nor does it serve any rehabilitative purpose. 4/22 Tr. 74: 13–15 (Sbicca testifying that the Farm Line does not have vocational "drivers"); 4/23 Tr. 171:1–12 (Jones testifying about how the Farm Line's lack of rehabilitative purpose stands in contrast to other training-focused programs at LSP); JX-55 ¶ 86 (Sbicca Rep.) ("The Farm Line functions as a means to inflict harsh discipline rather than to provide vocational training that would provide benefits upon release. . . . It is menial, backbreaking labor."). It is punishment achieved through degradation.

At the core of the "negative" social connotations of the Farm Line is its historical connection to slavery. *See* 4/23 Tr. 18:14–19:18 (Hammonds testifying that the Farm Line's location atop a former plantation is significant because "in most people's views, [it] is a place where there was compelled labor, menial labor, and a site of exploitation" and "there is a stigma associated with that kind of work."); 4/22 Tr. 78:22–79:9 (Sbicca opining that there is a "cultural understanding" that slavery was a system that "dehumanized and degraded people[,]" and "that cultural understanding is what gets passed down socially" and creates a "traumatic association" with the Farm Line). Precisely because of its location on the grounds of a former slave plantation, the Farm Line is anomalous among the vast majority of prison agricultural programs in the country. *See* 4/22 Tr. 76:6–19 (Sbicca testifying that it is "very rare that [prison] agricultural operations take place . . . on a former slave plantation").

Defendants in no way dispute the Farm Line's connection to slavery. In fact, Defendants' witnesses recognize the "resemblance" between "slaves working in the field . . . [and] a Farm Line working in the field." JX-18 158:10–159:12 (Pidgeon Dep.); *see also* JX-15 60:13–25 (Vittorio

Dep.) (recognizing that LSP's status as a former slave plantation "is a very sensitive subject" that LSP seeks to avoid); JX-17 at 2 (email from LSP official noting that "[w]e really don't talk about Angola being a plantation anymore due to the sensitivity of that subject"); JX-3 at 2 (LSP document noting that "[t]he name Angola comes from an area in Africa where former slaves came from" and that LSP was "a pre-civil war plantation owned by one of the biggest slave traders").

In Dr. Sbicca's unrebutted expert opinion, the legacy of slavery carries "a historical memory that persists" among LSP officials and incarcerated men alike, who recognize how the Farm Line could "be interpreted" to resemble slavery. 4/22 Tr. 60:21–61:5, 64:5–19; *see also* 4/23 Tr. 154:6–19 (Jones testifying that the Farm Line "is the only job assignment in Angola that subjects you to slavery"); 4/23 Tr. 129:1–130:3 (Jackson testifying about the connection between the Farm Line and his own family's history as sharecroppers in Louisiana). In Dr. Sbicca's view, class members are "referencing that history and . . . interpreting [their] experiences on the Farm Line through that lens." 4/22 Tr. 67:24–68:22; *see also* 4/22 Tr. 89:22–90:16 (describing his conversation with a white man on the Farm Line wearing a hat with "slave" written on it).

Class members are aware of the Farm Line's connection to slavery, and experience dignitary and psychological harm as a result. *See* JX-64 ¶¶ 2–7 (Guillory Supp. Decl.); JX-66 ¶¶ 4–12 (Jones Decl.); JX-67 ¶¶ 3–7 (Morehead Decl.). Mr. Jackson testified, for example, that working on the Farm Line without tools, for no incentive pay, was a degrading experience for him. 4/23 Tr. 127:6–9, 131:17–19; *see also* 4/23 Tr. 154:6–19 (Jones describing that work on the Farm Line makes incarcerated men feel like "less than a human being"). The dignitary and psychological harm posed by the Farm Line results and compounds every time a line pusher denigrates a class member using the term "boy" and every time a medical provider ignores patients

13

because they believe incarcerated people "connive their way out of the field."  *See* JX-64 ¶¶ 2–3 (Guillory Supp. Decl.); JX-57 ¶¶ 21, 23, 28 (Hammonds Rep.); JX-23 194:6–195:2 (Toce Dep.).

### F. The Farm Line Operates Pursuant to Uniform Policies and Practices

Defendants operate the Farm Line pursuant to various uniform policies and practices that apply to every class member.  Defendants do not contest this.

#### 1. *Defendants' Heat Pathology Policies*

Defendants have two primary heat pathology policies:  Health Care Policy No. 8 ("HCP8"), Defendants' DOC-wide heat pathology policy, JX-78 (2024 HCP8); *see* 4/23 Tr. 177:20–21 (Lavespere), and LSP Directive 13.067, the functional equivalent to HCP8 that applies only to LSP, PX-21 (2025 LSP Directive 13.067); *see* JX-30 125:7–16 (Lavespere Dep.) (agreeing that HCP8 and LSP Directive 13.067 contain the same operative language).  Each policy applies uniformly to all men at LSP and thus to all men assigned to the Farm Line.  *See* 4/23 Tr. 177:20–23, 178:25–179:3, 188:18–189:7 (Lavespere); 4/23 Tr. 224:10–225:2, 240:25–241:25 (Oliveaux); 4/24 Tr. 18:14–19:3 (Sylvester).

Defendants' heat pathology policies apply only between May 1 to October 31.  JX-78 at 4; 4/23 Tr. 179:12–19 (Lavespere).  Defendants have no heat pathology policy for the other six months of the year.  *See* 4/23 Tr. 179:12–19 (Lavespere).

Only between May and October, the heat pathology policies require LSP to track the heat index, issue a "heat alert" when the heat index exceeds a certain threshold, and provide other heat mitigation measures.  *See* JX-78 at 5–6; *see also* 4/23 Tr. 182:17–183:2 (Lavespere agreeing that, "if the heat index exceeds 91 degrees today, April 23rd, LSP is not required to issue a heat alert at all," and "LSP is not required to bring a man with heat precaution duty status . . . inside").  That threshold used to be 88°F but, in October 2024, during this litigation, Defendants *increased* it to

91°F, making their heat alert policies *less* protective.[2]  *Compare* JX-37 (2018 HCP8), JX-38 (2019 LSP Directive 13.067) *with* JX-78, PX-21; *see also* 4/23 Tr. 180:17–181:5, 181:15–21 (Lavespere conceding that a heat alert of 88°F would be "more protective" than 91°F).  The new policies require all outdoor work to stop when the heat index exceeds 113°F between May to October.  JX-78 at 6; PX-21 at 5.  The policies also mandate that between May and October LSP provide water, ice, shade, and sunscreen to all men in outdoor areas.  JX-78 at 5; PX-21 at 4; 4/23 Tr. 183:10–22 (Lavespere).  Additionally, during that same time period, when a heat alert issues, LSP must provide 15-minute breaks every 45 minutes and ensure that water and ice are available every 30 minutes.[3]  JX-78 at 5; PX-21 at 4.

Defendants acknowledge that certain ADA Subclass members are particularly sensitive to heat due to their medical conditions or medications, and pursuant to HCP8 and LSP Directive 13.067, provide some of them with a "Heat Precaution Duty Status."  JX-78 at 2–3; PX-21 at 2–3; 4/23 Tr. 195:1–7, 199:9–13 (Lavespere).  The heat pathology policies state that, when a heat alert issues—i.e., when the heat index exceeds 91°F[4] and only between May and October—all class members with Heat Precaution Duty Status should be brought indoors.  *See* JX-78 at 4; PX-21 at 3; 4/23 Tr. 182:8–16 (Lavespere).

In practice, there are two ways that a person in DOC or LSP custody will automatically receive Heat Precaution Duty Status:  if he takes a medication listed on the "Heat Pathology

---

[2]   Given the parties' recent briefing on Plaintiffs' Second Motion for a Temporary Restraining Order and Preliminary Injunction, Plaintiffs respectfully presume the Court's familiarity with Defendants' changes to HCP8 since the start of this litigation.

[3]   Defendants assert that they apply some of HCP8 and LSP Directive 13.067's heat protections year round.  To the extent that may be true, those practices would also be uniformly applicable to all men assigned to the Farm Line.

[4]   The Court's May 23, 2025 Ruling and Order granting Plaintiffs' Application for a Second Temporary Restraining Order requires Defendants to abide by an 88°F heat alert threshold, ECF No. 253 at 38, but this relief does not change the 91°F threshold that is written in Defendants' formal policies, and this relief is only temporary—it will expire on June 6, 2025, 14 days after it was issued, *see* Fed. R. Civ. P. 65(b)(2).

Medication List," Attachment A to the heat pathology policies, *see* PX-2 (2024 HCP8 Attachment A), or if he is diagnosed with a medical condition listed on the "Medical Exclusion List," Attachment B to the heat pathology policies, *see* JX-78 at 11 (2024 HCP8 Attachment B); *see also* 4/23 Tr. 195:1–7, 199:9–13 (Lavespere testifying that taking a listed medication or being diagnosed with a listed condition automatically results in a grant of Heat Precaution Duty Status); 4/23 Tr. 199:2–4 (Lavespere confirming that the Heat Pathology Medication List and Medical Exclusion List are both in effect at LSP).

Some subclass members take medications that impair thermoregulation but that are nonetheless omitted from the Heat Pathology Medication List. Those medications include selective serotonin reuptake inhibitors ("SSRIs"), angiotensin-converting enzyme ("ACE") inhibitors, angiotensin receptor blockers ("ARBs"), and dihydropyridine calcium channel blockers. Subclass members who take any of those medications will not receive a Heat Precaution Duty Status on that basis, because Defendants have opted to exclude those medications from the Heat Pathology Medication List. 4/23 Tr. 195:11–197:3 (Lavespere); *see also* 4/23 Tr. 58:5–22, 68:13–70:6, 95:3–96:1, 114:21–116:12 (Vassallo opining that each of these medications renders a person especially vulnerable to heat); *see also* PX-36 ¶¶ 40–44 (same).

Similarly, Defendants will only automatically issue a Heat Precaution Duty Status based on a subclass member's medical condition if that condition is included on LSP's Medical Exclusion List. As a result, subclass members with certain conditions known to impair thermoregulation but omitted from LSP's list (like diabetes or obesity) will not receive the necessary duty status on this basis. 4/23 Tr. 199:19–200:10 (Lavespere testifying that Defendants opted to remove a "flag" for diabetes from the Medical Exclusion List); *see also* 4/23 Tr. 68:13–69:4 (Vassallo explaining why "diabetes is a risk factor for heat-related illness"); 4/23 Tr. 69:6–

16 (Vassallo explaining that persons with diabetes or who are obese should receive Heat Precaution Duty Status).

##### 2. *Defendants' ADA Policies*

Defendants have two policies that govern their compliance with the ADA. Health Care Policy No. 37 ("HCP37") is the DOC policy that requires all facilities, including LSP, to comply with the ADA, setting forth the formal procedures by which incarcerated men may request accommodations for ADA-qualifying disabilities. JX-42 (HCP 37); 4/23 Tr. 229:8–17 (Oliveaux). LSP Directive 13.063 sets forth LSP's duty status classification system, which regulates the type of work an incarcerated person can do based on their medical conditions or physical limitations. JX-43 (LSP Directive 13.063); 4/23 Tr. 227:6–228:2 (Oliveaux). Pursuant to HCP37, a reasonable accommodation can include an adjustment of a person's duty status as defined by LSP Directive 13.063. 4/23 Tr. 235:14–236:16 (Oliveaux). Under these policies, for example, heat sensitive people are to be given Heat Precaution Duty Status, an accommodation that limits their work requirements.[5] JX-43 at 2, 5.

Deputy Warden Ashli Oliveaux, LSP's ADA coordinator, who is responsible for ensuring that LSP's policies and practices comply with the ADA and Section 504, testified that HCP37 and LSP Directive 13.063 apply uniformly to everyone at Angola, including everyone on the Farm Line. 4/23 Tr. 223:9–13, 224:10–225:2, 228:23–229:3, 229:8–17. DOC's ADA Coordinator has conceded that thermoregulation is a qualifying disability under the ADA, JX-51 63:19–64:10 (Spears Dep.), and on the stand, Deputy Warden Oliveaux provided no basis to disagree with this

---

[5]    LSP Directive 13.063 is inconsistent with HCP 8 and LSP Directive 13.067. LSP Directive 13.063 defines Heat Precaution Duty Status to limit work activity for people taking "medications with documented heat related side effects and/or adverse reactions and are exposed to apparent temperatures above 88 degrees Fahrenheit," JX-43 at 2, whereas HCP8 and LSP Directive 13.067 set a threshold heat index of 91°F before work limitations kick in, JX-78 at 4; PX-21 at 3.

conclusion, 4/23 Tr. 233:1–22.   LSP has identified Heat Precaution Duty Status as an accommodation for people with impaired thermoregulation.   4/23 Tr. 182:1–7 (Lavespere); 4/23 Tr. 236:10–16 (Oliveaux explaining that a modification to a person's duty status can be a reasonable accommodation).

As noted, people with impaired thermoregulation, because they take medications (like SSRIs) not listed on the Heat Pathology Medication List or have conditions (like diabetes) not listed on the Medical Exclusion List, will not be automatically granted Heat Precaution Duty Status.   4/23 Tr. 195:11–196:8, 200:8–19 (Lavespere); 4/23 Tr. 238:6–239:1 (Oliveaux).   As explained, this means that from May to October, under DOC and LSP policies, people with Heat Precaution Duty Status are no longer accommodated once the heat index exceeds 88°F and must remain on the Farm Line until heat indices exceed 91°F.   *See* 4/23 Tr. 180:17–181:5, 182:1–13 (Lavespere).   For the rest of the year, they receive no accommodation at all and must remain on the Farm Line regardless of the heat index.   4/23 Tr. 182:8–25 (Lavespere).   Likewise, people with impaired thermoregulation who were not granted Heat Precaution Duty Status because the medication they take or condition they have is not listed on the Heat Pathology Medication List or Medication Conditions List also are not accommodated and must remain on the Farm Line at all times, in all conditions, throughout the entire year.   4/23 Tr. 182:1–13, 195:11–196:8, 199:19–200:19 (Lavespere).

### 3.    Other Policies

Defendants operate the Farm Line through a number of related policies and practices, including job assignment, disciplinary, incentive pay, and medical care policies, that apply uniformly to all class members.   *See* 4/23 Tr. 224:10–225:2 (Oliveaux testifying that all departmental regulations and LSP directives apply to everyone at LSP); 4/23 Tr. 170:22–25 (Jones testifying that there is a single disciplinary policy applied uniformly to all men at Angola).

18

*Job Assignment.*  LSP Directive 19.003 requires everyone at Angola to work, subject to any medical restrictions.  JX-82 at 2 (LSP Directive 19.003); JX-21 at 28 (LSP Offender Orientation Information/Manual).  According to LSP's orientation manual, new arrivals to LSP are overwhelmingly assigned to the Farm Line.  JX-21 at 28 ("All new intake offenders arriving at Louisiana State Penitentiary are required to work in the field/Farm Line for at least six months."); *see also* 4/23 Tr. 225:6–226:21 (Oliveaux); 4/23 Tr. 309:5–7 (Scott); 4/23 Tr. 151:3–11 (Jones testifying that working on the Farm Line was his first job at Angola and generally is the first assignment given when men arrive at Angola); 4/23 Tr. 125:10–18 (Jackson testifying the same).  LSP policy also provides that men can be reassigned to the Farm Line at any time as a result of disciplinary action or based on the needs and resources of LSP.  *See* JX-12 20:19–25 (Davis Dep.); JX-20 32:12–15 (Hooper Dep.); JX-15 76:15–18 (Vittorio Dep.); *see also* JX-22 at 2 (email to Defendant Warden Hooper describing officers threatening to assign man to the Farm Line as punishment for insisting he did not have information regarding missing supplies from the prison kitchen).

*Discipline*.  LSP's disciplinary policies, set forth in the Disciplinary Rules and Procedures for Adult Inmates ("Disciplinary Handbook"), apply to everyone on the Farm Line.  *See* JX-9; 4/23 Tr. 243:13–20 (Oliveaux); 4/23 Tr. 322:25–323:3 (Scott).  Pursuant to the Disciplinary Handbook, men can be punished—including being sent to the "dungeon" for solitary confinement—for refusing to work on the Farm Line or for not working quickly or efficiently enough.  *See* JX-9 at 37, 38 (men can be sent to solitary confinement for work offenses which include refusal to work or failure to work with reasonable efficiency); *see also* 4/23 Tr. 322:20–324:14 (Scott testifying the same); JX-11 86:12–24 (Hebert Dep.); 4/23 Tr. 128:8–10 (Jackson testifying that he was sent to dungeon for refusing to work in the field); 4/23 Tr. 159:5–8 (Jones

testifying the same). Indeed, Mr. Jackson testified that, despite LSP's standing directive to remove any Named Plaintiffs from the Farm Line, he was nonetheless reassigned to the Farm Line in July 2024, and when he subsequently refused to go out in the field, he was "sent to confinement." 4/23 Tr. 134:3–15; *see also* JX-61, JX-62.

Defendants claim that class members "work at their own pace." *See* 4/23 Tr. 308:8–11 (Scott); 4/24 Tr. 11:3–6 (Sylvester). But, on the stand, Assistant Warden Sylvester admitted that Defendants' disciplinary policy requires class members to work with "reasonable speed and efficiency" and failure to do so will result in a disciplinary write-up. 4/24 Tr. 20:3–13; *see also* 4/23 Tr. 324:2–19 (Scott testifying that, if an incarcerated person is "working at a slow pace where he can't finish his assignment," he will receive a disciplinary write-up).

*Incentive Pay.* Angola's incentive wage system is another mechanism by which Defendants ensure the Farm Line remains a degrading and cruel punishment. "Incentive pay" is "compensation paid to an inmate in the physical custody of the department and who is eligible to receive incentive wages and who has performed satisfactory work in the compensation grade in which he has been classified." La. Admin. Code tit. 22 § I-341. Defendants pay class members two to four cents an hour, but often nothing at all, for their labor on the Farm Line. *See* JX-24 at 5–6 (LSP Directive 19.001); JX-15 86:17–89:22 (Vittorio Dep.); 4/23 Tr. 163:5–8 (Jones testifying that no jobs at Angola pay less than the Farm Line). As with nearly every other aspect of the Farm Line, Defendants intentionally wield incentive pay as a means of reinforcing their message that class members are of negligible value. *See* 4/23 Tr. 19:19–20:5 (Hammonds).

*Medical Care.* LSP's policies governing the provision of emergency medical care, *see* PX-29 (LSP Directive 13.061); PX-30 (Form HCP50-a), apply uniformly to all men at LSP who may be forced to work on the Farm Line, 4/24 Tr. 35:13–37:1 (Coley); 4/23 Tr. 242:1–243:12

(Oliveaux). Pursuant to policy, nurses are permitted up to *three hours* to respond to SDEs in the field. PX-32 at 3. In addition, as a matter of policy, LSP can—and does—charge incarcerated men co-payments for requesting SDEs from the Farm Line. *See* PX-29 at 5 (stating that co-payments may be charged per DOC Health Care Policy No. 14 ("HCP14")); JX-27 at 3 (SDE from May 30, 2024 stating that pursuant to HCP14 co-payments should not be charged for "work-related incidents" but nonetheless charging a $2.00 co-payment to a putative class member who suffered from dizziness while unloading zucchini on the Farm Line); 4/23 Tr. 138:11–14 (Jackson testifying that he has been charged a co-payment for requesting medical care on the Farm Line); 4/23 Tr. 162:22–24 (Jones testifying that he was charged co-payments after passing out in the field).

### G.    Expert Witness Testimony

#### 1.    Dr. Sbicca

Dr. Joshua Sbicca is an Associate Professor of Sociology at Colorado State University whose work and research focuses on the history and sociology of prison agricultural labor systems throughout the United States. He is also the Director of the Prison Agricultural Lab, the first-of-its-kind nationwide study of prison agricultural labor programs. 4/22 Tr. 49:7–16, 50:11–16; JX-85 (Sbicca CV). The Court credited Dr. Sbicca as an expert in the sociology of prison agricultural labor. 4/22 Tr. 53:25–54:3.

Dr. Sbicca presented credible, *unrebutted* testimony that the Farm Line operates in ways that resemble chattel slavery, and that it therefore risks exposing people to the same types of dignitary harms suffered by enslaved people under chattel slavery in the United States. 4/22 Tr. 88:10–20. Dr. Sbicca explained that historical practices like convict leasing and chain gangs are post-slavery institutions that replicated and continued the legacy of chattel slavery after its abolition. 4/22 Tr. 56:16–57:7. Over time, convict leasing and chain gangs were abandoned, in large part because of evolving social norms, which recognized the parallels between these practices

and chattel slavery and condemned them as an unacceptable affront to human dignity.  4/22 Tr. 62:4–25.

As Dr. Sbicca described in unrebutted testimony, the Farm Line—like convict leasing and chain gangs—replicates some of the key trappings of chattel slavery:  it is widely regarded as the "lowest" and "hardest" work at LSP, which imposes labor hierarchies akin to those present on plantations during chattel slavery; class members are at risk of punishment—including solitary confinement—for refusing to work on the Farm Line; and class members work under the constant threat of violence.  4/22 Tr. 57:8–59:17; *see also* JX-5 at 2 ("Angola Museum" webpage noting that the convict leasing system persisted for 56 years at LSP); JX-6 at 13 (article explaining that during LSP's "brutal" convict leasing period, approximately 3,000 incarcerated people died).  Dr. Sbicca explained that when incarcerated men are forced to labor under conditions that look like slavery on the grounds of a former slave plantation, that history informs how the Farm Line is interpreted by both class members and LSP staff.  *See* 4/22 Tr. 60:15–61:19, 64:5–19.

Dr. Sbicca testified that class members, regardless of their race or personal background, are subject to the harmful, internalized social stigma associated with working on the Farm Line under conditions reminiscent of chattel slavery.  *See* 4/22 Tr. 78:22–79:12, 89:18–91:6.  As Dr. Sbicca explained, human dignity was at the core of why other archaic systems that resemble chattel slavery were abandoned:  "It's understood that . . . there is an inherent and inviable self-worth that people have[,] and that if there is a system that is replicating or perceived to be akin to something like chattel slavery, which is ostensibly one of the most dehumanizing, degrading systems, that changing social norms would suggest . . . people want to change things."  4/22 Tr. 63:11–25.

This, Dr. Sbicca testified, is reflected in the experiences of class members.  Reviewing class member declarations, Dr. Sbicca concluded that Defendants' operation of the Farm Line is

"dehumanizing" and makes men feel "subhuman or nonhuman . . . reminiscent of the ways in which people during chattel slavery were turned into private property and weren't afforded basic human dignity." 4/22 Tr. 67:6–69:8; *see also* JX-64 ¶¶ 2, 7 (Guillory Supp. Decl.).  Defendants did not even attempt to rebut this testimony.

Dr. Sbicca also offered unequivocal and unrebutted testimony that the Farm Line is "anomalous" compared to other prison agricultural programs in this country. 4/22 Tr. 75:23–76:5, 88:7–9.  Dr. Sbicca's extensive nationwide prison survey revealed that today, the most common types of prison agricultural labor programs are focused on skills like horticulture and landscaping, and are commonly motivated by vocational and educational objectives through which prisons aim to offer training and learning opportunities. 4/22 Tr. 72:17–25, 76:6–12; *see also* JX-55 ¶¶ 64–66 (Sbicca Rep.).  By stark contrast, the Farm Line is a cropping operation that is predominantly operated to serve the aim of "idleness reduction"—namely, to set the expectation of work at the threat of punishment. 4/22 Tr. 74:7–75:6.  Further, not only are men punished for failing to work satisfactorily on the Farm Line, assignment to the Farm Line itself is wielded as a tool by LSP to punish and degrade the men incarcerated there. *See supra* pp. 11–14, 19.  Dr. Sbicca has opined that this practice is "anachronistic" and renders the Farm Line unique not only among other prison agricultural programs in this country, but even "within LSP itself." JX-2 56:7–20 (Sbicca Dep.). According to Dr. Sbicca's unrebutted testimony, the punitive way in which the Farm Line operates, along with its location on the grounds of a former plantation, further cements it as an outlier relative to other prison agricultural programs nationwide. 4/22 Tr. 76:6–19.

### 2.      Dr. Hammonds

Dr. Evelynn Hammonds was credited as an expert in History of Science, History of Medicine, Epidemiology, and African-American Studies. 4/23 Tr. 7:6–12, 7:25–8:2; *see also* JX-

84 (Hammonds CV). Dr. Hammonds presented credible, *unrebutted* testimony that the conditions of the Farm Line pose a risk of psychological and dignitary harm. *See* 4/22 Tr. 41:22–42:6.

Dr. Hammonds opined that many characteristics of the Farm Line are similar to chattel slavery, including that class members are unable to seek medical help on their own, work under armed guards, and are compelled to complete menial work. *See* 4/23 Tr. 10:12–11:10, 13:21–14:19.

Dr. Hammonds also testified about similarities between the accounts of LSP medical providers and those found in the historical literature of medical providers operating in regimes such as chattel slavery and Nazi Germany, where classes of people were deemed subhuman. She observed that LSP medical providers appeared dismissive of the medical needs of class members based on the assumption that class members were "feigning illness" in order to avoid work, and opined that this behavior was "reminiscent of the kinds of attitudes" of physicians who tended to enslaved people who "routinely discounted" enslaved people's experiences. 4/23 Tr. 16:9–18:1. She emphasized that similar attitudes also pervaded medicine under the Nazi Germany regime. Similarly "reminiscent" to the Farm Line is what "historians refer to as Nazi medicine," which focused not on the "health needs of the individual but rather . . . to support and ensure that these people could continue to work under the conditions that they were forced to work under." 4/23 Tr. 17:15–18:9. Dr. Hammonds testified that these attitudes caused negative health effects to everyone subject to those regimes and that she would expect a similar result for class members. *See* 4/23 Tr. 9:22–10:1, 22:12–20.

Dr. Hammonds opined that together with the Farm Line's resemblance to slavery, conditions on the Farm Line, including *de minimis* pay and working under a constant threat of violence, were also likely to create a risk of serious psychological harm by causing "a great deal

of stress, fear and anxiety," particularly from working "under conditions that [class members] cannot control." 4/23 Tr. 19:19–20:10, 21:8–22:20. She testified that she would expect the Farm Line to "produce psychological distress for anybody working under those conditions." 4/23 Tr. 24:10–17. Defendants offered no testimony rebutting Dr. Hammonds's opinions.

### 3. Dr. Vassallo

Dr. Susi Vassallo is a licensed physician and an expert in emergency medicine, medical toxicology, thermoregulation, and correctional medicine. 4/23 Tr. 41:22–42:1; *see also* JX-86 (Vassallo CV). In granting Plaintiffs' second Application for a Temporary Restraining Order, this Court determined that Dr. Vassallo credibly testified that class members are at substantial risk of serious harm due to their prolonged exposure to heat indices above 88°F. ECF No. 253 at 21; *see also id.* at 25 (finding Dr. Vassallo's opinions in this case "credible, thorough, and supported by scientific literature").

While Plaintiffs will not recount the Court's extensive and accurate findings here, the following facts based on Dr. Vassallo's testimony are particularly salient to this Motion:

- The risk of heat-related death (mortality) and injury (morbidity) increases almost *exponentially* at a heat index of 86°F.[6]

- The risk includes exertional and classic heat stroke, heat syncope, heat exhaustion, heat rash, and the onset or exacerbation of underlying conditions caused by cumulative exposure to high heat.[7]

- This substantial risk of mortality and morbidity exists for *all* class members, regardless of age or physiological differences.[8]

---

[6] *See* 4/23 Tr. 57:5–23, 59:20–61:7; *see also* 4/23 Tr. 59:5–19 ("[T]he higher you set the heat index or the temperature . . . the more death you'll have."); PX-36 ¶ 15.

[7] 4/23 Tr. 44:24–45:2, 46:20–47:10, 82:8–83:7, 91:24–93:14, 112:18–113:13; *see also* 48:7–22 (discussing cumulative effect of heat on the body).

[8] *See* 4/23 Tr. 62:2–63:22 (discussing heat-related illness among young and healthy workers in Louisiana); 80:23–81:22 ("[T]his case is not an individual injury case. This is about a group of people that is well represented and well-generalized to the vast number of people in the public health literature."); 113:14–19 (discussing dehydration).

Finally, Dr. Vassallo catalogued the deficiencies of HCP8 and in particular Defendants' decision to omit certain medications and conditions well known to impair a patient's ability to thermoregulate from the Heat Pathology Medications List and Medical Exclusion List.  *See* 4/23 Tr. 43:20–44:8 (explaining the mechanisms of thermoregulation).  For instance, Dr. Vassallo explained that a class member with diabetes, or who is taking an SSRI, ACE inhibitor, or dihydropyridine calcium channel blocker, is at elevated risk of heat-related illness and should therefore automatically receive a Heat Precaution Duty Status.  *See* 4/23 Tr. 58:5–22, 68:13–70:6, 95:3–96:1, 114:21–116:12; PX-36 ¶¶ 40–44.

### 4.    Dr. Keldie

This Court has already explained that "Dr. Carl Keldie was wholly uncredible."  ECF No. 253 at 25; *see also id.* at 31 ("The Court credits Dr. Vassallo's opinion and discredits Dr. Keldie's opinion.").

Without belaboring the point, Dr. Keldie's opinions merely parrot Defendants' talking points without applying a shred of independent analysis.  *See, e.g.*, 4/24 Tr. 121:16–22 (there have been no heat-related medical cases associated with the Farm Line, because Defendants said so); 4/24 Tr. 119:3–9 (no heat-related deaths on the Farm Line, because Defendants said so); 4/24 Tr. 100:3–12 (shade, water, Gatorade, and rest are provided on the Farm Line, because Defendants said so); 4/24 Tr. 101:13–17 (no one is assigned to the Farm Line in their first two weeks at LSP, because Defendants said so); 4/24 Tr. 83:21–25 (no known heat exhaustion events at LSP, because Defendants' counsel said so); 4/24 Tr. 83:10–16 (admitting no knowledge of heat injuries or heat exhaustion among class members, because Defendants did *not* say so).

Of course, Dr. Keldie failed to ask a *single* class member about their experiences on the Farm Line, despite having ample opportunity to do so.  4/24 Tr. 100:15–21; 101:9–20.  This is

perhaps unsurprising. *See* 4/24 Tr. 101:21–102:12 (suggesting that incarcerated people are not truthful and should not be trusted).

Finally, it is telling that Defendants rejected Dr. Keldie's recommendation to increase the heat alert threshold to a "very reasonable and extremely safe" 95°F. *See* 4/24 Tr. 91:1–4. On advice of counsel, Defendants instead chose a heat threshold they wagered "would be more reasonable to the Court." 4/23 Tr. 202:11-23 (Lavespere). This Court has already corrected Defendants' mistaken assumption. ECF No. 253 at 26–32; *see also* 4/23 Tr. 59:5–19 (Dr. Vassallo explaining there is no scientific basis for setting a heat threshold at 95 or 91°F).

### 5. *Dr. Reynolds-Barnes*

Defendants proffered Dr. Reynolds-Barnes, a PharmD, to testify about her role in updating the Heat Pathology Medication List. The Court found Dr. Reynolds-Barnes qualified to testify as an expert in the "field of pharmacy with a specific experience in correctional care medicine as it relates to pharmacy." 4/23 Tr. 250:11–251:2; *see also* JX-87 (Reynolds-Barnes CV).

Dr. Reynolds-Barnes was tasked by Defendants with evaluating the Heat Pathology Medication List attached to the 2018 version of HCP8. 4/23 Tr. 251:6–15. Her immediate reaction was that the list "obviously" needed to be updated. *See* 4/23 Tr. 279:9–14. In performing her work, Dr. Reynolds-Barnes focused on the anticholinergic properties of medications; she also agreed that some medications without high anticholinergic properties nevertheless impair thermoregulation, and she added some of those medications to the list. 4/23 Tr. 254:15–255:23, 280:2–5; *see also* JX-59 at 3 (Reynolds-Barnes Rep.) ("The focus when it comes to the increased risk of heat pathology is the anticholinergic risk profile of medications.").

The crux of Plaintiffs' disagreement with Dr. Reynolds-Barnes concerns her conclusion that four classes of drugs—SSRIs, ARBs, ACE inhibitors, and dihydropyridine calcium channel blockers—do not belong on the Heat Pathology Medication List. Although Dr. Reynolds-Barnes's

methodology rested on reviewing literature, she cited only one article, a study from *The Lancet*, in support of excluding SSRIs, ARBs, and ACE inhibitors from the List. 4/23 Tr. 282:22–283:1, 291:13–16, 293:7–11. However, her sole reliance on this article is riddled with inconsistencies. For one, this study largely contradicts well-established global authorities, such as the World Health Organization, that include medications like SSRIs on lists of medications that cause heat-related illness. 4/23 Tr. 284:7–285:7. Additionally, *The Lancet* study covered only two SSRIs of many and *no* ACE inhibitors. 4/23 Tr. 285:8–286:5, 293:12–294:4. The article also contradicts Dr. Reynolds-Barnes's and Defendants' own prior statements—the article concluded that there was no evidence to support a finding that antipsychotics and diuretics have an effect on thermoregulation, but Defendants' prior Heat Pathology Medications List included almost exclusively antipsychotics, and Dr. Reynolds-Barnes recommended that the new List include both antipsychotics and diuretics. *See* 4/23 Tr. 289:17–290:23. Further, on cross-examination, Dr. Reynolds-Barnes admitted that she did not *actually* rely upon *The Lancet* article because it was published after she issued her recommendations. 4/23 Tr. 283:2–25. And, Dr. Reynolds-Barnes did not cite any sources whatsoever to support her recommendation to exclude dihydropyridine calcium channel blockers. 4/23 Tr. 296:6–13.

In rendering the decision to exclude SSRIs from the Heat Pathology Medications List, Dr. Reynolds-Barnes did not review an article cited by her co-expert, Dr. Keldie, which states that SSRIs may impair the function of the hypothalamus and can cause increased heat sensitivity and higher risks of heat exhaustion and heat stroke. 4/23 Tr. 290:24–291:11; 4/24 Tr. 89:7–90:2 (Keldie). Dr. Reynolds-Barnes also agreed that serotonin, which is present in SSRIs, is a neurotransmitter, rather than an enzyme, which can impact the hypothalamus and thus can cause hyperthermia and increased heat retention. 4/23 Tr. 281:15–22, 291:17–292:5. Dr. Reynolds-

28

Barnes acknowledged that SSRIs should be on the Heat Pathology Medications List if there was sufficient literature concluding that SSRIs contribute to heat-related illness.  4/23 Tr. 292:6–12.

In support of her recommendation to exclude ACE inhibitors and ARBs from the Heat Pathology Medications List, Dr. Reynolds-Barnes again cited *The Lancet* article, even though this study did not analyze those drugs at all.  4/23 Tr. 293:7–294:4.  Furthermore, although she stated that her recommendation to exclude ACE inhibitors and ARBs from the Heat Pathology Medications List was because she was not aware of specific clinical case studies directly linking these drugs to heat stroke, she agreed that heat stroke is not the only form of heat-related illness and that there are many other potential types of heat-related illness or symptoms which pose a serious risk of harm.  4/23 Tr. 294:5–25.

## ARGUMENT

## I.   THE PROPOSED CLASSES SATISFY THE REQUIREMENTS OF RULE 23(a)

### A.   The General Class and the ADA Subclass Satisfy the Numerosity and Ascertainability Requirements

Plaintiffs have established through unrebutted evidence that the General Class and ADA Subclass satisfy Rule 23(a)'s numerosity requirement.  Numerosity is presumed when the class comprises 40 or more people or when the makeup of the class is constantly in flux.  *See Mullen* v. *Treasure Chest Casino, L.L.C.*, 186 F.3d 620, 624 (5th Cir. 1999) (classes with over 40 members are presumed numerous); *Alex A. by and through Smith* v. *Edwards*, 2023 WL 5628592, at *4 (M.D. La. Aug. 31, 2023) (numerosity presumed in prison classes made up of "present and future members" because they are "constantly in flux").  Plaintiffs are not required to prove the "exact class size."  *J.D.* v. *Nagin*, 255 F.R.D. 406, 414 (E.D. La. 2019).

The General Class includes nearly every one of the 4,000 men incarcerated at LSP because anyone can be assigned to the Farm Line at any time.  *See* JX-1; JX-12 25:19–26:6 (Davis Dep);

JX-15 55:14–56:8 (Vittorio Dep.).  Testimony from Mr. Jackson about his reassignment to the Farm Line in July 2024 confirms this.  4/23 Tr. 134:3–15; *see also* JX-61; JX-62.

Defendants' own testimony and documents further confirm that the General Class is constantly in flux and sufficiently large.  Pursuant to policy, new arrivals to Angola are assigned to the Farm Line as their first job assignment.  JX-21 at 28; 4/23 Tr. 225:6–226:21 (Oliveaux); 4/23 Tr. 309:5–7 (Scott).  Hundreds of people are assigned to the Farm Line at any time, and dozens go out into the field in a given week or day.  *See* JX-60 (Job Roster showing hundreds of men assigned to the FL last summer); 4/23 Tr. 329:23–330:3 (Scott testifying that he is responsible for up to 40 people each day).

Likewise, the ADA Subclass is large, and its composition is in flux.  Defendants have identified, pursuant to the Heat Pathology Medication List and Medical Exclusions List, approximately 1,800 men who take medications or have conditions that impair their ability to thermoregulate and will be granted Heat Precaution Duty Status.  4/23 Tr. 239:23–240:24 (Oliveaux); 4/23 Tr. 199:9–13 (Lavespere).  All of these individuals are members of the ADA Subclass.  And there are more subclass members, too, because the Heat Pathology Medication List and Medical Exclusions List fail to capture all people with impaired thermoregulation.  *See, e.g.*, 4/23 Tr. 71:8–25 (Vassallo testifying that people taking SSRIs have heightened heat sensitivity but are not granted Heat Precaution Duty Status under HCP8); 4/23 Tr. 68:13–69:12 (Vassallo testifying that people with diabetes and obesity are especially vulnerable to harm from heat but are not granted Heat Precaution Duty Status under HCP8).  In addition, the ADA Subclass is in flux, as it includes people who may be diagnosed with conditions or prescribed medications that impair thermoregulation in the future.  4/23 Tr. 240:10–20 (Oliveaux); JX-45 104:4–10 (Oliveaux Dep.).

The General Class and ADA Subclass also satisfy any ascertainability requirement.[9] Like numerosity, ascertainability does not require that the court "know the identity of each class member before certification; ascertainability only requires that the court be able to identify class members at some stage of the proceedings." *Frey* v. *First Nat. Bank Southwest*, 602 F. App'x 164, 168 (5th Cir. 2015) (internal quotations omitted). It is sufficient that membership of both the General Class and ADA Subclass can be identified based on Defendants' own records. *Cole* v. *Livingston*, 2016 WL 3258345, at *6 (S.D. Tex. June 14, 2016) (noting that correctional facility could ascertain class members by referencing its own records). For the General Class, Defendants' custodial records, including Daily Line Counts and Job Rosters, list class members who are currently or may in the future be assigned to the Farm Line. For the ADA Subclass, Defendants already have a list of 1,800 individuals who were granted Heat Precaution Duty Status and can use medical records to identify additional individuals with impaired thermoregulation. 4/23 Tr. 239:23–240:24 (Oliveaux); 4/23 Tr. 215:11-25 (Lavespere).

**B.     The General Class and ADA Subclass Satisfy the Commonality Requirement**

Commonality is established when all class members are harmed by the same injurious conduct by Defendants, such that all class members' claims share at least one common question which is capable of class-wide resolution. *In re Deepwater Horizon*, 739 F.3d 790, 810–11 (5th Cir. 2014). Plaintiffs have shown that this requirement is satisfied through ample evidence.

---

[9]     While the Fifth Circuit has not ruled squarely on the issue, it has recognized that other courts have held that the ascertainability requirement of a "precise class definition" is "not as critical" for a Rule 23(b)(2) class that seeks only injunctive or declaratory relief and that does not request notice and opt-out rights, as is the case here. *See In re Monumental Life Ins. Co.*, 365 F.3d 408, 413 (5th Cir. 2004).

1.    *Defendants Operate the Farm Line Pursuant to Policies and Practices Applicable to All Class Members*

Plaintiffs have established conclusively that Defendants subject all class members to the same injurious conduct by way of Defendants' uniform policies and practices that govern the operation of the Farm Line. *See Lewis* v. *Cain*, 324 F.R.D. 159, 169 (M.D. La. 2018) (commonality met based on "proof that Defendants operated under a general policy that subjected all inmates to unreasonable risks of serious harm"). *See* 2/19 Oral Arg. Tr. 31:3–32:8. Defendants' common policies that apply to all class members include:

- Heat Pathology Policies: Defendants' heat pathology policies, HCP8 and LSP Directive 13.067, apply uniformly to all who are or may be forced to work on the Farm Line. The relevant provisions that apply to all men at LSP include the provisions stating that heat protections are only required from May to October; the provisions raising the heat alert threshold from 88 to 91°F; the provision setting a 113°F stop-work threshold; and the Heat Pathology Medication List and the Medical Exclusion List. *See supra* pp. 14–17.

- ADA Policies: Defendants have policies related to the implementation of the ADA. Those policies, including HCP37 and LSP Directive 13.063, apply uniformly, including their provisions defining a qualifying disability under the ADA, and setting forth procedures for requesting ADA accommodations. *See supra* pp. 17–18.

- Job Assignment Policies: Pursuant to LSP Directive 19.003, everyone at Angola is required to have a job, subject to medical clearance. LSP's Orientation Policy states that all new arrivals at LSP are required to work on the Farm Line for at least six months, as long as they are medically cleared to work. *See supra* p. 19.

- Disciplinary Policies: Defendants' Disciplinary Handbook provides that anyone on the Farm Line can be disciplined, including being sent to solitary confinement, for refusing to work or failing to work with reasonable speed or efficiency. *See supra* pp. 19–20.

- Incentive Pay Policies: LSP has incentive pay policies like Directive 19.001, which apply to all class members, including by setting forth that men will be paid a rate of two cents per hour for their labor on the Farm Line, if they are eligible for any pay at all. *See supra* p. 20.

- Medical Care Policies: LSP has common policies, including LSP Directive 13.061 and HCP50-a, that govern the provision of emergency medical care, including co-payments and apply uniformly to all class members. *See supra* p. 20–21.

Beyond these formal policies, all class members are subject to Defendants' common practices with respect to the Farm Line. To name just a few examples:

- Defendants' practice is that, outside the months of May to October, no heat alerts will issue even if the heat index exceeds 91°F, and that people with Heat Precaution Duty Status or impaired thermoregulation will not be removed from the Farm Line outside this date range regardless of the heat index. *See supra* p. 14, 18.

- Defendants' practice is that all men taking any medication on the Heat Pathology Medication List or diagnosed with any condition on the Medical Exclusions List automatically receives Heat Precaution Duty Status, but Defendants have decided that men taking other medications, like SSRIs, or with other conditions, like diabetes, that impair thermoregulation will not receive Heat Precaution Duty Status on that basis. *See supra* pp. 15–17, 18.

- Defendants' common practice is to push class members at a pace sufficient to complete their assignment. *See supra* pp. 7, 19–20.

- Defendants' common practice is to force men to labor under the constant watch of gun guards armed with AR-15s and pistols. *See supra* pp. 7–8.

- Defendants' common practice is to deny class members even basic hand tools to facilitate their tasks. *See supra* p. 6.

    2.    *The Evidence Demonstrates That Class Members Are Subject to Common Conditions on the Farm Line*

As a result of these common policies and practices, all class members assigned to the Farm Line go to the same fields to perform the same work, under the same high heat and other conditions. Everyone on the Farm Line labors under threat of further disciplinary action by line pushers, or even violence by gun guards trained to shoot if men step out of line. These conditions, as Dr. Sbicca and Dr. Hammonds explained, resemble chattel slavery and other now-condemned forms of punishment that were abandoned precisely because of their association with chattel slavery; these "slave-like conditions" create a "stigma" that stems from the cultural and social associations with chattel slavery and that attaches to all class members. 4/22 Tr. 89:18–90:16 (Sbicca).

The conditions on the Farm Line are also physically dangerous. As Dr. Vassallo, the only qualified expert to testify regarding thermoregulation, opined, exposure to extreme heat on the

Farm Line poses a significant risk of harm to all class members, including young and healthy class members, regardless of their physiological characteristics. *See supra* pp. 25–26. And the conditions, Dr. Vassallo explained, are not remedied by Defendants' heat pathology policies, which are inadequate to mitigate these dangers. *See supra* pp. 25–26.

In all, Defendants' operation of the Farm Line through common policies creates common conditions to which all men in the General Class and ADA Subclass are subjected.

> 3. *The Evidence Demonstrates the Existence of Numerous Common Questions Capable of Class-Wide Resolution*

The evidence establishes that the Eighth Amendment claim brought by the General Class, under each theory of harm, and the ADA and Section 504 claims brought by the ADA Subclass, generate common dispositive questions that are capable of resolution on a class-wide basis.[10] Only one is needed to certify the class. *See* 2/19 Oral Arg. Tr. 11:9–21. Plaintiffs present several common questions for each claim. Among these:

- <u>Heat Theory</u>: Does exposing class members to heat indices exceeding 88°F create a substantial risk of serious harm? Are Defendants' revised heat policies and practices sufficient to mitigate the heat-related risks? *See Cole*, 2016 WL 3258345, at *8 (endorsing nearly identical questions for commonality).

- <u>Dignitary and Psychological Harm Theory</u>: Does the Farm Line replicate conditions of chattel slavery? Does the Farm Line deprive men of their basic human dignity? Do conditions on the Farm Line, because of their resemblance to slavery, add degradation beyond a sentence of hard labor? Does the Farm Line expose men to a substantial risk of serious psychological harm? Does the Farm Line comport with contemporary standards of decency? *See Hope* v. *Pelzer*, 536 U.S. 730, 745 (2002) (punitive practices that "our system of justice has consistently moved away from," like hitching posts, are "antithetical to human dignity" and "offend contemporary standards of decency," and thus violate the Eighth Amendment); *Jordan* v. *Gardner*, 986 F.2d 1521, 1526, 1531 (9th Cir. 1993) (punitive practices that implicate plaintiffs' history of trauma create substantial risk of psychological harm); *Austin* v. *Hopper*, 15 F. Supp. 2d 1210, 1220–21, 1259 (M.D. Ala. 1998) (recognizing that chain-gangs are historically anachronistic punitive practice that cause substantial dignitary and psychological harm).

---

[10] Courts interpret Title II of the ADA and Section 504 of the Rehabilitation Act *in pari materia*. *See Frame* v. *City of Arlington*, 657 F.3d 215, 223–24 (5th Cir. 2011).

- <u>ADA and Section 504</u>:  Are heat-sensitive people adequately protected by a 91°F heat alert threshold?  Are heat-sensitive people adequately protected outside of the May 1 through October 31 heat season?  Are Heat Precaution Duty Status and a prohibition on assignments to the Farm Line on days where the heat index is projected to exceed the heat alert threshold a reasonable accommodation?  *See Tellis* v. *LeBlanc*, 2021 WL 4267513, at \*8 (W.D. La. Sept. 20, 2021) (granting certification of ADA-subclass with heat-related common questions).

    4.    *Defendants Offer No Evidence to Rebut Plaintiffs' Showing of Commonality*

The evidence and testimony Defendants have offered not only fails to rebut Plaintiffs' showing of commonality, it is strikingly unresponsive to the issues actually before the Court on this Motion.  Defendants present no evidence to rebut any of the common policies, conditions, or questions posed by Plaintiffs' claims.  Instead, they argue against commonality by citing differences between individual class members—for General Class members, differences across their race and physiology, and for ADA Subclass members, differences across their disabilities.  But factual differences amongst class members do not defeat commonality under binding Fifth Circuit precedent.  *See Yates* v. *Collier*, 868 F.3d 354, 361–66 (5th Cir. 2017) (commonality satisfied for general class and ADA subclass in spite of variations among class members' susceptibility to heat-related harm); *Deepwater Horizon*, 739 F.3d at 810–11 (commonality is "satisfied by an instance of the defendant's injurious conduct, even when the resulting injurious effects—the damages—are diverse" across the class).

Dr. Sbicca and Dr. Hammonds both testified credibly that the risk of dignitary harm and psychological harm that results from exposure to a punitive practice that replicates conditions of chattel slavery is experienced by everyone, regardless of race.  *See supra* pp. 21–25.  Certainly Defendants have not even attempted to proffer any evidence to the contrary.  Differences in race, therefore, have no bearing on the commonality of the General Class's Dignitary and Psychological Harm theories.

Defendants also made no attempt to prove that differences in physiology defeat commonality on the General Class's Heat Theory. *See, e.g.*, 4/24 Tr. 130:10–131:23 (the Court noting that there was no evidentiary basis for Defendants' arguments, raised for the first time during closing remarks, that supposed variations in athleticism among class members defeat commonality). While Plaintiffs acknowledge that Defendants have implemented some heat mitigation policies since this litigation started, *see* 4/23 Tr. 154:20–155:8 (Jones), Dr. Vassallo— the only expert qualified to opine about thermoregulation—testified that those policies are wholly insufficient to abate the risk of heat-related harm for every class member, *see* 4/23 Tr. 42:6–16; PX-36. *Yates*, 868 F.3d at 361 (holding that differences in vulnerability to heat do not defeat commonality when heat mitigation measures do not abate the risk of harm for anyone); *see also* 2/19 Oral Arg. Tr. 11:13–21. Dr. Vassallo's unrebutted expert testimony demonstrates that the measures Defendants have put into place in response to this lawsuit do not negate the "common complaint" that all class members continue to be exposed to an unreasonable risk of heat-induced harm. *See supra* pp. 25–26; *Lewis* v. *Cain*, 324 F.R.D. 159, 171 (M.D. La. 2018).

The testimony offered at the hearing proves that Defendants' heat pathology policies are arbitrary, unsupported by science, and inadequate to abate the risk of harm across the board for the General Class. Dr. Vassallo, the only credible witness to address the topic, opined that a substantial risk of heat-related harm exists for everyone starting at 88°F. 4/23 Tr. 58:23–59:4. Nevertheless, Defendants raised the heat alert threshold under HCP8 to 91°F, even though the sources that Defendants cited as support for this change in actuality state that there is a high risk of heat-related harm at much lower heat indices. 4/23 Tr. 204:10–205:2 (Lavespere conceding that the National Weather Service reference page, which DOC purported to rely upon in raising threshold, states that extreme caution is necessary at a heat index of 90°F *in the shade*); 4/23 Tr. 206:23–207:1

(Lavespere conceding that OSHA guidance, which DOC purported to rely on, is silent with regard to a 91°F heat index). In addition, Defendants limit HCP8 to the period of May to October, despite their awareness that high heat indices can occur outside that period. 4/23 Tr. 182:17–20 (Lavespere agreeing that, "[i]f the heat index exceeds 91 degrees today, April 23rd, LSP is not required to issue a heat alert at all.").

Neither Defendants' witnesses nor their experts pointed to any evidence supporting the decision to so limit the heat pathology protections in HCP8. Indeed, Dr. Lavespere testified that LSP could modify Directive 13.067 so that the heat pathology policies apply at LSP year-round, or so that the heat alert threshold at LSP is 88°F rather than 91°F, but refused to make either change. *See* 4/23 Tr. 179:20–180:15, 189:15–190:9 (testifying that LSP could make heat pathology policy apply year-round); 4/23 Tr. 181:9–14 (testifying that LSP could lower the heat alert threshold); *see also* 4/23 Tr. 218:17–24 ("LSP could have, had it chosen to . . . included specific provisions applicable to the Farm Line in LSP Directive [13.067]").

Nor do differences in class members' medical conditions or medications defeat commonality for the ADA Subclass. "'Courts regularly certify classes of inmates who are disabled, even if [the class members] do not have the same disability.'" *Lewis* v. *Cain*, 324 F.R.D. at 170 (quoting *Cole*, 2016 WL 3258345, at *6). The key issue for commonality is whether the Subclass members are subject to common policies and procedures, the adequacy of which dictates whether the Subclass members are accommodated lawfully under the ADA. Here, all of the ADA Subclass are subject to the same ADA policies, and Defendants have presented no evidence to rebut this fact. Commonality is thus satisfied for the ADA Subclass.

### C.    The General Class and ADA Subclass Satisfy the Typicality Requirement

"[T]ypicality . . . focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent." *Mullen*, 186 F.3d at 625

(internal citation omitted). While "[c]ommonality requires showing that, in fact, all members of the proposed class share a common claim . . . [t]ypicality requires showing that, in fact, the proposed representatives have that claim." *M.D. ex rel. Stukenberg* v. *Perry*, 294 F.R.D. 7, 29 (S.D. Tex. 2013).

There is no dispute here—the Named Plaintiffs' claims are identical to the claims brought by the General Class and ADA Subclass. *See* 2/19 Oral Arg. Tr. 42:7–43:5. The Named Plaintiffs assert that the Farm Line violates their Eighth Amendment rights and seek the same relief as the General Class. For example, testimony from Mr. Jackson, a Named Plaintiff, and Mr. Jones, a member of the General Class, exemplifies that Mr. Jackson's claims are, like Mr. Jones's claims, based on the heat-related, dignitary, and psychological risk of harm caused by the Farm Line. *See* 4/23 Tr. 134:24–136:4, 138:19–139:8 (Jackson); 4/23 Tr. 154:6–19, 157:24–158:16 (Jones).

Likewise, the ADA Plaintiffs bring the same legal theories and seek the same relief as the ADA Subclass: like the absent subclass members, ADA Plaintiff Mr. Jackson claims that Defendants fail to reasonably accommodate his impaired thermoregulation in their operation of the Farm Line and fail to adequately identify people with impaired thermoregulation who may be assigned to the Farm Line. *See* 4/23 Tr. 137:12–138:6 (Jackson testifying that despite having high blood pressure and taking medication for it, he has been sent to work on the Farm Line and does not have Heat Precaution Duty Status). Typicality is therefore satisfied.

### D.    The Named Plaintiffs and Plaintiffs' Counsel Are Adequate Representatives

The Named Plaintiffs are more than adequate representatives of the General Class and ADA Subclass. Adequacy is satisfied where the class representatives are "aligned with the interests of the class" because they "raise identical claims relating to the same alleged conduct and according to the same theory of damages" as the absent class members. *In re Pool Prods. Distribution Mkt. Antitrust Litig.*, 310 F.R.D. 300, 310 (E.D. La. 2015). The Named Plaintiffs'

claims arise out of the same conduct—Defendants' operation of the Farm Line—as those of the General Class and ADA Subclass, and they seek the same declaratory and injunctive relief to end the Farm Line.  No conflict of interest exists between the Named Plaintiffs and class members.

The Named Plaintiffs have further demonstrated their adequacy by diligently pursuing their claims on behalf of absent class members.  They have played an active role in every stage of the litigation:  reviewing filings and decisions in this case; meeting with counsel on numerous occasions; sitting for depositions; and submitting multiple declarations.  *See, e.g.*, JX-64 ¶ 9 (Guillory Supp. Decl.), JX-65 ¶ 6 (Jackson Supp. Decl.), JX-68 ¶ 9 (D. Williams Supp. Decl.).  Additionally, Mr. Jackson testified at the instant evidentiary hearing and attended the proceedings, sitting at counsel's table and listening intently.  *See* 4/23 Tr. 34:8–13, 122:17–147:3; 4/24 Tr. 4:7–13.

Regarding appointment of class counsel under Rule 23(b), Defendants do not dispute that Plaintiffs' counsel have proven to be zealous, competent, and experienced advocates for the Named Plaintiffs and absent class members.  *See* JX-69; JX-70; JX-71 (Hill, Nimni, and Wright Decls., respectively).  On this Motion alone, Plaintiffs' counsel defended the motion at oral argument and, at the evidentiary hearing, called or cross examined 12 witnesses, including seven fact witnesses and five expert witnesses, and presented more than 100 exhibits.  In addition, over the past year, Plaintiffs' counsel have, among other things, filed and partially prevailed on two motions for preliminary relief, *see* ECF No. 37, ECF No. 70, ECF No. 109, ECF No. 201, and ECF No. 253, engaged in substantial written discovery, and taken or defended over 40 depositions.  There can be no dispute that Plaintiffs' counsel are adequate under Rule 23(a)(5) and should be appointed class counsel under Rule 23(g).

## II.  THE PROPOSED CLASSES SATISFY THE REQUIREMENTS OF RULE 23(b)(2)

Rule 23(b)(2) requires Plaintiffs to show that Defendants have "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED. R. CIV. P. 23(b)(2).  It is well established in the Fifth Circuit that this requirement is satisfied by showing that (i) all class members "have been harmed in essentially the same way"; (ii) injunctive relief "predominate[s] over money damage claims"; and (iii) the injunctive relief sought is "specific."  *Yates*, 868 F.3d at 366–67 (quoting *Maldonado* v. *Ochsner Clinic Found.*, 493 F.3d 521, 524 (5th Cir. 2007)).[11]  It is undisputed that the second element is satisfied because Plaintiffs do not seek money damages.

As to the first element, Plaintiffs have proven that all class members have been harmed in essentially the same way because they have shown that Defendants engage in common behavior towards all class members by way of LSP's common policies and procedures regarding the Farm Line.  *See Yates*, 868 F.3d at 368 (explaining that Rule 23(b)(2) is satisfied by a showing of "common behavior by the defendant[s] toward the class" including being "subject to the *same* polic[ies]") (emphasis added).  Specifically, Defendants act uniformly towards all class members by way of LSP's assignment policies, *see supra* p. 19, disciplinary policies, *see supra* pp. 19–20, and heat pathology policies, *see supra* pp. 14–17, which govern whether each class member will be assigned to the Farm Line and dictates the conditions he will be subject to if he is so assigned. Defendants' policies directed towards all class members form the basis for the claims of the General Class and the ADA Subclass, satisfying the first Rule 23(b)(2) requirement.  *See Ward* v. *Hellerstedt*, 753 Fed. App'x 236, 249 (5th Cir. 2018) (Rule 23(b)(2) is satisfied when class

---

[11]  Rule 23(b)(2) class actions seeking only injunctive or declaratory relief thus stand in contrast to Rule 23(b)(3) class actions seeking damages, because Rule 23(b)(3) imposes two additional, demanding requirements for class certification: predominance and superiority.  Because Plaintiffs seek to certify only Rule 23(b)(2) classes, the predominance and superiority elements are not at issue here.

members "have each been subject to the same allegedly wrongful *policy*, despite variations in the degree of damages suffered by each"); *Tellis*, 2021 WL 4267513, at *12–13 (Rule 23(b)(2) is satisfied in "prisoner litigation cases" when "Plaintiffs seek to challenge policies and procedures that are broadly applicable to the class and subclass").

As to the third element, the specificity requirement demands only that plaintiffs explain "how a court could define or enforce meaningful injunctive relief" for the class. *Ward*, 753 Fed. App'x. at 249 (quoting *Maldonado*, 493 F.3d at 525). When this case proceeds to trial on the merits, Plaintiffs intend to prove that Defendants' operation of the Farm Line in its current form is cruel and unusual, in violation of the Eighth Amendment, and fails to accommodate the disabilities of men with impaired thermoregulation, in violation of the ADA and RA.

In accordance with Plaintiffs' Eighth Amendment claim, the General Class seeks one common, specific form of relief: an injunction ending the Farm Line. The ADA Subclass similarly seeks relief that is specific and common across the subclass: an order prohibiting LSP from forcing ADA Subclass members to work on the Farm Line when the heat index is projected to exceed 88°F or when the heat index does exceed that threshold. These requested injunctions are sufficiently specific to enable the Court to craft and implement appropriate relief as to each claim, after Plaintiffs have proven them on the merits. *See Yates*, 868 F.3d at 368 ("Rule 23(b)(2) does not require that every jot and tittle of injunctive relief be spelled out at the class certification stage; it requires only 'reasonable detail' as to the 'acts required.'") (quoting *Stukenberg*, 675 F.3d at 848).

## III.    THE ADA SUBCLASS IS NOT BARRED UNDER *GILLESPIE*

The Court should reject Defendants' invitation to deny certification of the ADA Subclass pursuant to the principles set forth in *Gillespie* v. *Crawford*, 858 F.2d 1101 (5th Cir. 1988). *See* 2/19 Oral Arg. Tr. 45:8–47:16. *Gillespie* stands for the narrow proposition that courts should proceed with caution before issuing equitable relief when the subject matter of a pre-existing

41

injunction, which is already in effect and issued by another court, overlaps substantively with the relief that is requested.  *See id.* at 1103; *Madlock* v. *Collins*, 3 F.3d 438, *1 (5th Cir. 1993) (*Gillespie* bars "separate individual suits for equitable relief within the subject matter" of a prior action).  On the other hand, when an action raises claims that are not "within the subject matter" of the prior case and the pre-existing injunction, the claims are not barred.  *See Equal Access for El Paso* v. *Hawkins*, 428 F. Supp. 2d 585, 626–27 (W.D. Tex. 2006), *rev'd on other grounds and remanded*, 509 F.3d 697 (5th Cir. 2007).

*Gillespie* thus does not apply here because, contrary to Defendants' hand-waving, Plaintiffs' ADA claims do not seek equitable relief within the subject matter of *Lewis* v. *Cain*.  *Lewis* addresses the DOC's failure in medical care staffing, architectural accessibility such as creating ramps for people who use wheelchairs, and insufficiencies in tracking and processing requests for accommodation under the ADA when they are filed in the administrative remedy procedure.  *See Lewis* v. *Cain*, 701 F. Supp. 3d 361, 380–81 (M.D. La. 2023).  Importantly, the *Lewis* court dismissed claims in that case related to work assignments and duty statuses at LSP over four years ago.  *See Lewis* v. *Cain*, 2021 WL 1219988, at *54 (M.D. La. Mar. 31, 2021).  At issue here, by contrast, is whether LSP's policies, practices, and procedures for identifying and providing reasonable accommodations to persons with impaired thermoregulation are inadequate as it pertains to the Farm Line.  Put simply, Heat Precaution Duty Statuses for work on the Farm Line explicitly are not within the subject matter of the *Lewis* case, so *Gillespie* is inapplicable.

Further, *Lewis* is currently administratively stayed, so there is no injunction in that case with which the relief sought here would interfere.  *See Parker* v. *Hooper*, 134 F. 4th 867 (5th Cir. 2025) (ordering en banc hearing in *Lewis* appeal).  This, too, distinguishes the circumstances here from those in *Gillespie*, where the court expressed concern that the requested injunction would

"interfere with the orderly administration" of the existing injunction and pose a "risk [of] inconsistent adjudications." 858 F.2d at 1103. Here, there is no existing injunction to interfere with or risk inconsistency with, so there are no *Gillespie* concerns.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their Motion, certify the General Class and ADA Subclass under Rule 23(a) and (b)(2), and appoint the undersigned as class counsel under Rule 23(g).

Dated: June 2, 2025

**THE PROMISE OF JUSTICE INITIATIVE**

*/s/ Samantha Pourciau*
Samantha Pourciau, La. Bar No. 39808
Kara Crutcher (PHV) IL Bar No. 6337639
1024 Elysian Fields Avenue
New Orleans, LA 70117
Tel: (504) 529-5955
sbosalavage@defendla.org
kcrutcher@defendla.org

**RIGHTS BEHIND BARS**

*/s/ Lydia Wright*
Lydia Wright, La. Bar No. 37926416
Amaris Montes (PHV) MD Bar No. 2112150205
1800 M St. NW Fnt. 1 #33821
Washington, D.C. 20033
Tel: (202) 455-4399
lydia@rightsbehindbars.org
amaris@rightsbehindbars.org

**PAUL, WEISS, RIFKIND, WHARTON
 & GARRISON LLP**

*/s/ Jeremy A. Benjamin*
Joshua Hill Jr. (PHV) NY Bar No. 4297826
Jeremy A. Benjamin (PHV) NY Bar No. 4770277
Michael McGregor (PHV) NY Bar No. 5510490
Arielle B. McTootle (PHV) NY Bar No. 5993217
Ricardo Sabater (PHV) NY Bar No. 5993217
Leah R. Weiser (PHV) NY Bar No. 6027601
Chizoba D. Wilkerson (PHV) NY Bar No. 5903943
1285 Avenue of the Americas

New York, NY 10019-6064
Tel: (212) 373-3000
jhill@paulweiss.com
jbenjamin@paulweiss.com
mmcgregor@paulweiss.com
amctootle@paulweiss.com
rsabater@paulweiss.com
lweiser@paulweiss.com
cwilkerson@paulweiss.com

*Attorneys for Plaintiffs and the Proposed Classes*

44