# Exhibit 1

```
 1              UNITED STATES DISTRICT COURT

 2              MIDDLE DISTRICT OF LOUISIANA

 3

 4   VOICE OF THE EXPERIENCED, ET AL :CIVIL ACTION

 5   VERSUS                          :NO. 23-CV-01304-BAJ-EWD

 6   LEBLANC, ET AL                  :FEBRUARY 19, 2025

 7   =========================================================
                          MOTIONS HEARING
 8          BEFORE THE HONORABLE BRIAN A. JACKSON
                UNITED STATES DISTRICT JUDGE
 9

10                  A P P E A R A N C E S

11
     FOR THE PLAINTIFFS:
12
         PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
13       BY: ARIELLE B. McTOOTLE, ESQUIRE
         BY: JEREMY A. BENJAMIN, ESQUIRE
14       1285 AVENUE OF THE AMERICAS
         NEW YORK, NEW YORK 10019
15
         RIGHTS BEHIND BARS
16       BY: D DANGARAN, ESQUIRE
         BY: LYDIA WRIGHT, ESQUIRE
17       416 FLORIDA AVENUE NW #26152
         WASHINGTON, D.C. 20002
18
         THE PROMISE OF JUSTICE INITIATIVE
19       BY: SAMANTHA BOSALAVAGE POURCIAU, ESQUIRE
         BY: KARA CELESTE CRUTCHER, ESQUIRE
20       1024 ELYSIAN FIELDS AVENUE
         NEW ORLEANS, LOUISIANA 70117
21

22   FOR THE DEFENDANTS:

23       KEOGH, COX & WILSON, LTD
         BY: ANDREW BLANCHFIELD, ESQUIRE
24       BY: CHRISTOPHER K. JONES, ESQUIRE
         BY: CHELSEA ACOSTA PAYNE, ESQUIRE
25       701 MAIN STREET
         BATON ROUGE, LOUISIANA 70802
```

1

2          REPORTED BY:  NATALIE W. BREAUX, RPR, CRR
                UNITED STATES COURTHOUSE
3                    777 FLORIDA STREET
              BATON ROUGE, LOUISIANA 70801
4                      (225) 389-3565
              NATALIE_BREAUX@LAMD.USCOURTS.GOV
5

6

7

8

   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY USING
9          COMPUTER-AIDED TRANSCRIPTION SOFTWARE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              (FEBRUARY 19, 2025)

2                  PROCEEDINGS

3        THE LAW CLERK:  ALL RISE.

4            (CALL TO THE ORDER OF COURT.)

5        THE COURT:  GOOD MORNING, EVERYONE.  BE

6   SEATED.

7              PLEASE CALL THE CASE.

8        THE COURTROOM DEPUTY:  CIVIL CASE NO.

9   23-1304, VOICE OF THE EXPERIENCED, ET AL VERSUS

10  LEBLANC, ET AL.

11       THE COURT:  ALL RIGHT.  GOOD MORNING, LADIES

12  AND GENTLEMEN.

13              I WILL ASK YOU AT THIS TIME, AS IS MY

14  PRACTICE, TO ASK EACH OF YOU TO COME TO THE FORWARD

15  PODIUM TO ENTER YOUR APPEARANCES.  AND WE WILL BEGIN

16  WITH COUNSEL FOR THE PLAINTIFFS.

17       MS. McTOOTLE:  ARIELLE McTOOTLE FROM PAUL,

18  WEISS, RIFKIND, WHARTON & GARRISON, FOR THE

19  PLAINTIFFS.

20       THE COURT:  MS. McTOOTLE.

21       MX. DANGARAN:  GOOD MORNING, YOUR HONOR.

22              MY NAME IS D DANGARAN FROM RIGHTS

23  BEHIND BARS, FOR THE PLAINTIFFS.

24       THE COURT:  THANK YOU, MX. DANGARAN.

25       MS. WRIGHT:  GOOD MORNING.
```

```
1              LYDIA WRIGHT WITH RIGHTS BEHIND BARS.
2         THE COURT:  MS. WRIGHT.
3         MR. BENJAMIN:  GOOD MORNING, YOUR HONOR.
4              JEREMY BENJAMIN FROM PAUL, WEISS,
5  RIFKIND, WHARTON & GARRISON, FOR THE PLAINTIFFS.
6         THE COURT:  MR. BENJAMIN.
7         MS. POURCIAU:  GOOD MORNING, YOUR HONOR.
8              SAMANTHA POURCIAU WITH THE PROMISE OF
9  JUSTICE INITIATIVE ON BEHALF OF PLAINTIFFS.
10        THE COURT:  MS. POURCIAU.
11        MS. CRUTCHER:  GOOD MORNING, YOUR HONOR.
12             KARA CRUTCHER ON BEHALF OF THE
13 PLAINTIFFS, ALSO WITH PROMISE OF JUSTICE INITIATIVE.
14        THE COURT:  ALL RIGHT.  WELL, THANK YOU.
15             AND FOR THE DEFENDANTS.
16        MR. JONES:  GOOD MORNING, YOUR HONOR.
17             CHRISTOPHER JONES WITH KEOGH, COX &
18 WILSON, ON BEHALF OF THE DEFENDANTS JAMES LEBLANC,
19 TIMOTHY HOOVER, AND THE LOUISIANA DEPARTMENT OF
20 CORRECTIONS.
21        THE COURT:  MR. JONES.
22        MR. BLANCHFIELD:  GOOD MORNING, JUDGE.
23             ANDREW BLANCHFIELD, ALSO WITH KEOGH,
24 COX & WILSON, ON BEHALF OF THE DEFENDANTS.
25        THE COURT:  GOOD MORNING, MR. BLANCHFIELD.
```

1          **MR. BLANCHFIELD:**  GOOD MORNING.

2          **MS. PAYNE:**  GOOD MORNING.

3              CHELSEA PAYNE WITH KEOGH, COX & WILSON

4   ON BEHALF OF DEFENDANTS.

5          **THE COURT:**  GOOD MORNING, MS. PAYNE.

6          **MR. PAYNE:**  GOOD MORNING.

7          **THE COURT:**  SO, COUNSEL, LET ME TELL YOU HOW

8   WE WILL PROCEED TODAY.  LET ME THANK YOU-ALL ONCE

9   AGAIN FOR JOINING ME IN THE STATUS CONFERENCE WE

10  CALLED LATE LAST WEEK.  THANK YOU-ALL AGAIN FOR

11  MAKING YOURSELVES AVAILABLE ON SUCH SHORT NOTICE.

12              TODAY I'M PREPARED TO HEAR ARGUMENTS ON

13  THE ISSUE OF THE CLASS CERTIFICATION, BUT I WILL TELL

14  YOU NOW THAT I MAY OR MAY NOT HAVE ENOUGH INFORMATION

15  TODAY TO MAKE A DECISION WITH RESPECT TO WHETHER THE

16  CLASS SHOULD BE CERTIFIED AT THIS POINT.  BUT WE'LL

17  MOVE FORWARD WITH IT.  I'LL HAVE A FEW QUESTIONS FOR

18  YOU.  I'LL GIVE EACH OF YOU A FULL OPPORTUNITY TO

19  ARGUE FOR -- OR ARGUE ON THE ISSUE.

20              I WILL ALSO TELL YOU -- I THINK I

21  ALLUDED TO THIS LAST WEEK -- I WILL TAKE THE MATTER

22  UNDER ADVISEMENT.  I MAY OR MAY NOT REQUEST POST-

23  HEARING BRIEFS, BUT LET'S JUST SEE HOW FAR WE GET.

24              ALL RIGHT.  SO LET'S BEGIN WITH THE

25  PLAINTIFF.  AND WHO WILL TAKE THE LEAD?

1          **MS. McTOOTLE:**  I WILL, YOUR HONOR.

2          **THE COURT:**  AND ARE YOU THE ONLY -- YOU'LL

3   BE THE ONLY, MS. McTOOTLE, LAWYER ARGUING TODAY FOR

4   THE PLAINTIFFS?

5          **MS. McTOOTLE:**  SO I WILL BE ARGUING ON

6   BEHALF OF THE GENERAL CLASS, AND MY COLLEAGUE, MX.

7   DANGARAN, WILL BE ARGUING FOR THE ADA SUBCLASS.

8          **THE COURT:**  VERY WELL.  SO JUST IDENTIFY

9   YOURSELF FOR THE RECORD JUST SO THAT THE RECORD IS

10  CLEAR AS TO WHO IS OFFERING THE ARGUMENT AT THE TIME.

11  OKAY?

12         **MS. McTOOTLE:**  ARIELLE McTOOTLE FOR THE

13  PLAINTIFFS.

14         **THE COURT:**  THANK YOU.

15         **MS. McTOOTLE:**  PLAINTIFFS SEEK TO CERTIFY A

16  GENERAL CLASS DEFINED AS ANYONE INCARCERATED AT

17  ANGOLA WHO IS NOW OR IN THE FUTURE MAY BE ASSIGNED TO

18  THE FARM LINE.

19              PLAINTIFFS BRING THIS ACTION TO

20  CHALLENGE DEFENDANTS' OPERATION OF THE FARM LINE.

21  DEFENDANTS OPERATE THE FARM LINE THROUGH A

22  COMBINATION OF POLICIES AND PRACTICES THAT ARE

23  UNIFORMLY APPLIED TO ALL PEOPLE IN THE CLASS AND

24  DEGRADING CONDITIONS TO WHICH ALL GENERAL CLASS

25  MEMBERS ARE SUBJECT.

1             PLAINTIFFS WILL SHOW THROUGH

2   OVERWHELMING EVIDENCE, COMMON TO THE ENTIRE CLASS,

3   THAT THE FARM LINE SUBJECTS MEN TO CONDITIONS OF HIGH

4   HEAT THAT POSES SUBSTANTIAL RISK OF HEAT-RELATED HARM

5   AND THAT THE FARM LINE, LIKE THE NOW CONDEMNED

6   PRACTICES OF HITCHING POSTS, CHAIN GANGS, CONVICT

7   LEASING AND CHATTEL SLAVERY, THE FARM LINE DOES NOT

8   COMPORT WITH EVOLVING STANDARDS OF DECENCY, IT ROBS

9   MEN OF THEIR FUNDAMENTAL DIGNITY, AND EXPOSES THEM TO

10  A SUBSTANTIAL RISK OF SERIOUS PSYCHOLOGICAL HARM.

11             I'LL NOW TURN TO THE CONTESTED RULE 23

12  ELEMENTS; NUMEROSITY.  NUMEROSITY IS SATISFIED HERE.

13  ON ANY GIVEN DAY, ANYWHERE BETWEEN 20 TO 75 PEOPLE GO

14  OUT ON THE FARM LINE.  IN THE SUMMER, OVER 300 PEOPLE

15  WERE ASSIGNED AND 150 WENT OUT TO THE FIELDS.

16             **THE COURT:**  HOW MANY WERE ASSIGNED?

17             MS. McTOOTLE:  OVER 300 WERE ASSIGNED TO THE

18  FARM LINE.  AND THAT'S OVER THE SUMMER MONTHS.

19             SO THIS CERTAINLY EXCEEDS THE

20  PRESUMPTION IN THIS CIRCUIT THAT A CLASS WITH MORE

21  THAN 40 MEMBERS SATISFIES NUMEROSITY.

22             IN ADDITION, THE GENERAL CLASS IS FLUID

23  AND IN FLUX, WHICH COURTS IN THIS DISTRICT HAVE HELD

24  WEIGHS IN FAVOR OF NUMEROSITY.  PEOPLE ARE

25  OVERWHELMINGLY ASSIGNED TO THE FARM LINE AS THEIR

1    FIRST WORK ASSIGNMENT.  AND ONCE AT ANGOLA, PEOPLE

2    CAN BE REASSIGNED AT ANY TIME BASED ON DISCIPLINARY

3    ACTION.

4         **THE COURT:**  CAN YOU CITE A SPECIFIC POLICY

5    TO SUPPORT YOUR ARGUMENT?

6         **MS. McTOOTLE:**  THE POLICY IS THE

7    DISCIPLINARY MATRIX, WHICH IS EXHIBIT -- FORGIVE ME,

8    YOUR HONOR.  ONE SECOND.

9         **THE COURT:**  SO I JUST WANT TO BE CLEAR ON

10   THE RECORD PRECISELY WHAT POLICY IS AT ISSUE HERE.

11        **MS. McTOOTLE:**  SO THE POLICIES AT ISSUE ARE

12   A COMBINATION OF POLICIES.  THE DEFENDANTS OPERATE

13   THE FARM LINE THROUGH A COMBINATION OF POLICIES,

14   INCLUDING THEIR CLASSIFICATION POLICIES, THEIR

15   DISCIPLINARY POLICIES, THEIR INCENTIVE PAY POLICIES,

16   THEIR POLICIES AS IT APPLIES TO THE WORK THAT'S

17   PERFORMED ON THE FARM LINE.

18             SO ALL OF THOSE POLICIES TOGETHER ARE

19   UNIFORMLY APPLIED TO THE ENTIRE CLASS, AND THOSE ARE

20   THE POLICIES AT ISSUE HERE.

21        **THE COURT:**  SO LET ME ASK YOU THIS NOW --

22   AND I DON'T WANT TO GET TOO FAR INTO THE UNDERLYING

23   ISSUES AND UNDERLYING CLAIMS.  BUT AS I UNDERSTAND

24   IT, YOU'RE NOW ASKING ME TO DECLARE WORK ON THE FARM

25   LINE -- IN FACT, THE MERE -- THE EXISTENCE OF THE

1   FARM LINE AND THE POLICY THAT REQUIRES INMATES TO

2   WORK THE FARM LINE -- WHETHER THEY'RE MERELY ASSIGNED

3   TO ANGOLA OR FOR DISCIPLINARY PURPOSES, YOU'RE ASKING

4   ME TO FIND THAT, AGAIN, REQUIRING INMATES TO WORK ON

5   THE FARM LINE IS ITSELF UNCONSTITUTIONAL?

6        **MS. McTOOTLE:**  WHAT WE'RE SAYING AND WHAT

7   PLAINTIFFS ARE ASSERTING IS THAT THE MANNER IN WHICH

8   DEFENDANTS OPERATE THE FARM LINE NOW, THE CURRENT

9   POLICIES UNDER WHICH THEY OPERATE THE FARM LINE,

10  THOSE VIOLATE THE EIGHTH AMENDMENT.  AND SO

11  PLAINTIFFS AREN'T CONTESTING THAT PEOPLE AT -- IN

12  PRISON AND INCARCERATED CAN BE REQUIRED TO WORK.

13  THAT'S NOT THE BASIS OF PLAINTIFFS' CHALLENGE.

14            THEIR CHALLENGE IS THAT CURRENTLY, AS

15  THE FARM LINE IS OPERATED, IT VIOLATES THE EIGHTH

16  AMENDMENT.  AND PLAINTIFFS DO SEEK AN INJUNCTION TO

17  STOP THE FARM LINE BECAUSE THE CONDITIONS ON THE FARM

18  LINE ARE UNLAWFUL, SUCH THAT STOPPING THE FARM LINE

19  IS THE SINGLE INJUNCTION --

20        **THE COURT:**  SO DO YOU --

21        **MS. McTOOTLE:**  -- THAT WOULD CURE --

22        **THE COURT:**  -- DO YOU AGREE THAT FOLLOWING

23  THE COURT'S -- THE ENTRY OF THE COURT'S PREVIOUS

24  ORDER WHEN YOU WERE SEEKING INJUNCTIVE RELIEF, THAT

25  MANY OF THOSE CONDITIONS HAVE NOW BEEN ADDRESSED,

1   PERHAPS EVEN ABATED?

2           **MS. McTOOTLE:**  NO, YOUR HONOR.  PLAINTIFFS'

3   POSITION IS THAT, IN FACT, A LOT OF THE POLICIES HAVE

4   NOT BEEN ABATED.  SO DEFENDANTS, ON THE EVE OF FILING

5   THEIR OPPOSITION, THEY PUT INTO PLACE NEW HEAT

6   PATHOLOGY POLICIES.  AND IT'S PLAINTIFFS' POSITION

7   THAT THESE POLICIES DO NOT ABATE THE RISK OF HARM AT

8   ALL.

9           IF YOU'LL JUST GIVE ME ONE SECOND.

10          **THE COURT:**  SO -- AND LET ME JUST -- WHILE

11  YOU'RE LOOKING, LET ME JUST SHARE WITH YOU MY -- IT'S

12  NOT NECESSARILY CONCERNS BUT AN ISSUE HERE; AND THAT

13  IS, ARE YOU, AT BOTTOM, ASKING THE COURT TO DECLARE

14  THAT FORCED WORK ON A FARM LINE IS PER SE

15  UNCONSTITUTIONAL?

16          **MS. McTOOTLE:**  AGAIN, NO, YOUR HONOR, WE'RE

17  NOT ASKING THE COURT TO SAY THAT PER SE WORK --

18  REQUIRING PEOPLE TO WORK IS UNCONSTITUTIONAL.  WHAT

19  WE'RE SAYING IS THAT THE CURRENT FORM IN WHICH THE

20  FARM LINE IS OPERATED VIOLATES THE EIGHTH AMENDMENT

21  FOR THE VARIOUS THEORIES OF HARM THAT WE'VE

22  PRESENTED.

23          **THE COURT:**  AND AGAIN, WITH RESPECT TO --

24  AND AGAIN, I DON'T WANT TO GET TOO DEEP INTO THE

25  UNDERLYING CONDITIONS, BUT THIS IS IMPORTANT, BECAUSE

1  IN ORDER FOR ME TO CONSIDER CERTIFYING THE CLASS, I

2  NEED TO HAVE A LITTLE BIT MORE INFORMATION ABOUT WHAT

3  YOU'RE SEEKING.

4            AND SO THE QUESTION IS -- WE KNOW THAT

5  THE DEFENDANT, WHETHER FORCED TO DO SO BY THE COURT

6  OR ON ITS OWN VOLITION, MADE CERTAIN CHANGES TO THE

7  CONDITIONS OF THE FARM LINE.  DO YOU AGREE WITH THAT?

8        **MS. McTOOTLE:**  YES, YOUR HONOR.

9        **THE COURT:**  OKAY.  WHAT CURRENT CONDITIONS

10  OF THE FARM LINE DO YOU STILL DEEM TO BE

11  UNCONSTITUTIONAL AND IN VIOLATION OF THE EIGHTH

12  AMENDMENT?

13        **MS. McTOOTLE:**  RIGHT.  SO WITH RESPECT TO

14  THE HEAT THEORY, DEFENDANTS HAVE PUT INTO PLACE THESE

15  POLICIES THAT THEY CLAIM THAT MITIGATE THE RISK OF

16  HARM.  BUT THE QUESTION IN THE FIFTH CIRCUIT WHEN

17  PRESENTED WITH SUCH MEASURES IS WHETHER THE

18  MITIGATION MEASURES HAVE THE EFFECT OF NEGATING

19  PLAINTIFFS' COMMON COMPLAINT, WHICH IS THAT ALL

20  PEOPLE ON THE FARM LINE ARE EXPOSED TO A SUBSTANTIAL

21  RISK OF HARM.

22            IN *YATES V COLLIER,* WHICH WAS ANOTHER

23  HEAT-RELATED EIGHTH AMENDMENT CASE CHALLENGING

24  EXTREME HEAT IN TEXAS HOUSING -- PRISON HOUSING

25  AREAS, THE DEFENDANTS MADE THE SAME ARGUMENT; THAT

1    THE MEASURES THAT THEY HAD IN PLACE ABATED THE RISK

2    OF HARM.  AND THE COURT HELD THAT THE MEASURES DIDN'T

3    DEFEAT COMMONALITY AND DIDN'T DEFEAT CLASS

4    CERTIFICATION BECAUSE THERE WAS STILL SUBSTANTIAL

5    PROOF THAT ALL PEOPLE WERE STILL EXPOSED TO A

6    SUBSTANTIAL RISK OF HARM.

7                 AND THAT'S THE CASE HERE.  PLAINTIFFS

8    CAN SHOW AND WILL SHOW AT TRIAL THAT THE POLICIES

9    THAT DEFENDANTS HAVE PUT INTO PLACE DO NOT ABATE THE

10   RISK OF HARM AT ALL.  AND RATHER THAN REDUCING THE

11   SUBSTANTIAL RISK OF HARM, THEY ACTUALLY EXACERBATE

12   THAT RISK.

13                 FOR INSTANCE, DEFENDANTS INCREASED THE

14   RISK OF HARM BY RAISING THE HEAT ALERT THRESHOLD IN

15   THEIR POLICY FROM 88 DEGREES TO 91 DEGREES.  THEY DID

16   THIS DESPITE TESTIMONY OR EVIDENCE FROM DR. VASSALLO

17   THAT EVERYONE IS AT RISK OF SERIOUS HEAT-RELATED HARM

18   WHEN THE HEAT INDEX REACHES 88 DEGREES.

19                 AND DESPITE THIS COURT'S FINDING IN THE

20   PRELIMINARY INJUNCTION THAT IT IS LIKELY A

21   SUBSTANTIAL RISK OF HARM STARTING AT 88 DEGREES, NOW

22   HCP8, WHICH IS DEFENDANTS' POLICY, INCREASES THE RISK

23   OF HARM THAT PEOPLE FACE AT 88 DEGREES, LEAVING THEM

24   WITHOUT ANY KIND OF PROTECTIONS AT ALL.

25                 AND THIS INCREASED THRESHOLD FOR THE

1  HEAT ALERT IS NOT JUST THEORETICAL.  JUST A FEW DAYS

2  AFTER DEFENDANTS IMPLEMENTED THEIR POLICY ON OCTOBER

3  30TH, THE HEAT INDEX REACHED 88 -- OR EXCEEDED 88

4  DEGREES.  UNDER THE OLD POLICY, A HEAT ALERT WOULD

5  HAVE ISSUED.  BUT UNDER THE NEW POLICY, NONE WAS

6  ISSUED AND MEN WERE STILL OUTSIDE WORKING ON THE FARM

7  LINE.

8          **THE COURT:**  BECAUSE YOU BELIEVE THAT THE

9  STANDARD WAS FAR TOO LOW?

10         **MS. McTOOTLE:**  I'M SORRY?

11         **THE COURT:**  THE HEAT STANDARD THAT -- THE

12 REVISED HEAT STANDARD WAS NOT -- WAS STILL

13 INADEQUATE?

14         **MS. McTOOTLE:**  YES.  SO BY RAISING IT TO 91,

15 THEY'RE LEAVING PEOPLE UNPROTECTED FROM 88 TO 90.9

16 DEGREES.  AND THAT'S DESPITE EVIDENCE FROM

17 DR. VASSALLO THAT THE SUBSTANTIAL RISK OF HARM BEGINS

18 AT AT LEAST 88 DEGREES.

19             SO THE POLICY FAILS TO ABATE THE RISK

20 AT ALL AS SOON AS THE HEAT INDEX REACHES 88 DEGREES,

21 EVEN THOUGH THERE IS EVIDENCE THAT EVERYONE IS

22 EXPOSED TO A SUBSTANTIAL RISK OF HARM STARTING THERE.

23         **THE COURT:**  SO WOULD YOU BE SATISFIED IF THE

24 DEFENDANTS AMENDED THE POLICY TO TRIGGER THE -- I

25 GUESS THE REMOVAL OF THE INMATES FROM THE FARM LINE

1  AT 81 DEGREES?

2          **MS. McTOOTLE:**  AT 81 DEGREES?

3          **THE COURT:**  WHAT WAS DR. VASSALLO'S

4  TESTIMONY?

5          **MS. McTOOTLE:**  DR. VASSALLO'S TEST -- HER --

6          **THE COURT:**  OR HER OPINION.

7          **MS. McTOOTLE:**  -- OPINION IS THAT THE

8  SUBSTANTIAL RISK OF HARM STARTS AT 88 DEGREES.

9          AND IN RESPONSE TO YOUR QUESTION, I

10  THINK THAT'S SOMETHING FOR THE MERITS BASED ON

11  DR. VASSALLO'S TESTIMONY AND OTHER EXPERT WITNESS

12  TESTIMONY ABOUT WHAT WOULD BE NECESSARY TO ABATE THE

13  RISK OF HARM.  BUT AT MINIMUM, BY RAISING THE

14  THRESHOLD TO 91 DEGREES, DEFENDANTS DON'T ABATE THE

15  RISK OF HARM PRESENTLY.

16          ANOTHER MANNER IN WHICH THE HARM IS NOT

17  ABATED, OR THE RISK OF HARM IS NOT ABATED, IS DESPITE

18  DEFENDANTS' AWARENESS AND ACKNOWLEDGMENT THAT HEAT

19  POLICIES ARE REQUIRED AT HIGH HEAT INDICES, THE HEAT

20  PATHOLOGY POLICY IS ONLY IN EFFECT FROM MAY TO

21  OCTOBER, SO DEFENDANTS HAVE ARBITRARILY LIMITED THEIR

22  POLICY TO THESE MONTHS.  AND OUTSIDE OF THOSE MONTHS,

23  THERE ARE NO PROTECTIONS FOR ANYONE TO MITIGATE THE

24  RISK OF HEAT-RELATED HARM.

25          AND AGAIN, THIS IS A REAL RISK.  THERE

1   HAVE BEEN SEVERAL DAYS OUTSIDE OF THOSE MONTHS IN

2   WHICH THE HEAT INDEX HAS REACHED 88 AND EVEN 91

3   DEGREES.  BUT UNDER DEFENDANTS' POLICIES, MEN DON'T

4   HAVE ANY KIND OF HEAT PROTECTIONS.  AND THERE IS NO

5   POLICY IN PLACE DURING THOSE TIMES AND MEN ARE STILL

6   OUT WORKING ON THE FARM LINE.

7              ANOTHER WAY IN WHICH DEFENDANTS'

8   HEAT-RELATED POLICIES FAIL TO ABATE THE RISK IS THERE

9   IS A RISK OF HARM FOR ANYONE, INCLUDING HEALTHY

10  PEOPLE WHO FALL ILL WHILE OUTSIDE WORKING ON THE FARM

11  LINE.  DR. VASSALLO HAS OPINED THAT MEN SHOULD BE

12  REMOVED FROM THE HEAT AS SOON AS THEY EXHIBIT SIGNS

13  OF HEAT-RELATED ILLNESS.  DR. VASSALLO SAYS IN HER

14  SECOND SUPPLEMENTAL DECLARATION THAT TELLING A

15  PATIENT TO WAIT OUTSIDE WITHOUT ANY STRATEGY TO

16  CONTROL THEIR EXPOSURE TO HIGH HEAT SO THAT THEY CAN

17  COOL DOWN IS, QUOTE, NOT AN EFFECTIVE STRATEGY TO

18  PREVENTING OR TREATING THEIR HEAT-RELATED ILLNESS.

19              BUT THAT IS EXACTLY WHAT WE'RE SEEING

20  ON THE FARM LINE.  WE SUBMITTED EVIDENCE IN OUR

21  OPENING BRIEF AT EXHIBIT 31.  ONE PERSON FELL ILL

22  OUTSIDE.  HE STARTED FEELING DIZZY FOR AN HOUR AND HE

23  WAS FORCED TO REMAIN OUTSIDE IN THE HEAT UNTIL THE

24  END OF HIS SHIFT BUT WAS NOT REMOVED FROM THE HEAT.

25              SO NEITHER DEFENDANTS' POLICIES NOR

1    PRACTICE ABATE THE RISK OF HEAT-RELATED HARM FOR

2    PEOPLE WHO ARE FALLING ILL ON THE FARM LINE.  THEIR

3    POLICY DOES NOT PROVIDE FOR ANY REMOVAL FROM THE LINE

4    WHEN SOMEONE EXPERIENCES HEAT-RELATED ILLNESS.  AND

5    IN PRACTICE, MEN ARE MADE TO WAIT OUTSIDE AND NOT

6    REMOVED FROM THE HEAT.

7              SO TAKEN TOGETHER, ALL OF THIS SHOWS

8    THAT DEFENDANTS' POLICIES DON'T ABATE THE RISK OF

9    HARM FOR ANYONE ON THE FARM LINE.  AND SO THERE's

10   STILL COMMON QUESTIONS ABOUT WHETHER THEIR POLICIES

11   ARE ADEQUATE TO MITIGATE THE RISK.  AND SO PLAINTIFFS

12   SATISFY THE COMMONALITY REQUIREMENT EVEN WITH

13   DEFENDANTS' HEAT PRECAUTION POLICIES IN PLACE.

14         **THE COURT:**  ALL RIGHT.  SO IT COMES DOWN

15   TO -- YOU ARGUE THAT THE DEFENDANTS' POLICY WITH

16   RESPECT TO WHATEVER THAT TRIGGERING TEMPERATURE IS,

17   EITHER HEAT INDEX OR AMBIENT TEMPERATURE, IS

18   INADEQUATE -- THAT IS, THE POLICY INADEQUATE -- in

19   THAT IT DOESN'T ACCOUNT FOR A NUMBER OF FACTORS.  YOU

20   BELIEVE THAT THAT NUMBER SHOULD BE LOWERED.  CORRECT?

21         **MS. McTOOTLE:**  THAT'S JUST ONE OF MANY WAYS

22   IN WHICH THE POLICY IS INADEQUATE.  BUT YES, YOUR

23   HONOR.

24         **THE COURT:**  AND THEN THE RESPONSE; IF

25   SOMEONE HAS -- BECOMES OVERHEATED, THE POLICY THAT

1   GUIDES THE CORRECTIONAL OFFICER'S RESPONSE IS

2   INADEQUATE?  IN OTHER WORDS, THEY'RE -- I ASSUME THAT

3   YOU BELIEVE THAT THE CORRECTIONAL OFFICER HAS THE

4   DISCRETION TO ALLOW THE INMATE TO REMAIN OUT THERE IN

5   THE HEAT BUT NOT WORK, MAYBE BE SEATED AND THAT SORT

6   OF THING BUT NOT TAKEN FOR MEDICAL -- FOR ANY TYPE OF

7   MEDICAL CARE.  CORRECT?

8           **MS. McTOOTLE:**  RIGHT.  THE POLICY IS SILENT

9   ON ACTUALLY REMOVING PEOPLE FROM THE HEAT.  BUT AS TO

10  EVERY ASPECT OF -- THAT'S REQUIRED TO -- FOR THE

11  POLICY TO ACTUALLY ABATE THE RISK, THAT IS SOMETHING

12  THAT WILL BE FLESHED OUT AT TRIAL BASED ON THE

13  TESTIMONY OF DR. VASSALLO.

14          BUT AT THIS TIME, BASED ON THE EVIDENCE

15  THAT'S AT ISSUE IN THIS MOTION, THOSE ARE JUST THREE

16  EXAMPLES OF THE WAY THAT THE POLICY IS INADEQUATE.

17          **THE COURT:**  OKAY.  AND HOW DOES ALL THIS

18  RELATE TO THE REQUIREMENTS OF RULE 23?

19          **MS. McTOOTLE:**  SO UNDER RULE 23, THE

20  POLICIES -- THE QUESTION OF THE POLICIES REALLY GOES

21  TO COMMONALITY; WHETHER THERE IS STILL COMMON

22  QUESTIONS ABOUT THE SUBSTANTIAL RISK OF HARM AS TO

23  ALL CLASS MEMBERS.  AND --

24          **THE COURT:**  SO LET ME INTERRUPT YOU THERE.

25  SO YOU'RE ASKING THE COURT TO DECLARE THAT ALL

1   APPROXIMATELY 4,000 INMATES AT ANGOLA WOULD BE

2   INCLUDED IN THE CLASS BECAUSE THEY ARE SUSCEPTIBLE TO

3   BEING ORDERED TO THE FARM LINE?

4          **MS. McTOOTLE:**  CORRECT.  EVERYONE WHO IS

5   ELIGIBLE TO WORK IS AT RISK OF BEING ASSIGNED TO THE

6   FARM LINE AT ANY TIME.

7          **THE COURT:**  OKAY.  SO THE RELIEF YOU SEEK

8   IS, AGAIN, SOME INJUNCTIVE OR DECLARATORY RELIEF THAT

9   PERSONS CAN ONLY BE MADE TO WORK ON THE FARM LINE

10  UNDER CERTAIN CONDITIONS?

11         **MS. McTOOTLE:**  WELL, THE INJUNCTION THAT

12  PLAINTIFFS HAVE ALLEGED AND HAVE ASSERTED IS FOR A

13  COMPLETE STOPPAGE OF THE FARM LINE.  AND THAT

14  INJUNCTION SATISFIES RULE 23(B)(2).  IT'S SPECIFIC.

15  IT LAYS OUT IN DETAIL, CLEAR DETAIL, WHAT'S REQUIRED

16  OF DEFENDANTS.  IT'S AN INJUNCTION THAT WOULD APPLY

17  TO THE ENTIRE CLASS.  STOPPING THE FARM LINE WOULD

18  NECESSARILY APPLY TO EVERYONE ON THE FARM LINE.

19              AND THE INJUNCTION STEMS FROM THE FACT

20  THAT PLAINTIFFS ARE HARMED IN THE -- ESSENTIALLY THE

21  SAME WAY AS THE RULE REQUIRES.  AND THAT'S BECAUSE

22  THEY'RE AFFECTED BY THESE COMMON POLICIES AND THEY

23  BRING THE SAME LEGAL THEORIES.  SO THE RULE -- THE

24  REQUIREMENTS OF RULE 23(B)(2) ARE SATISFIED.

25         **THE COURT:**  ALL RIGHT.  I HAVE A FEW MORE

1    QUESTIONS FOR YOU OR MX. DANGARAN.  I DON'T KNOW WHO

2    IS GOING TO ARGUE.  BUT LET ME HEAR FROM THE

3    DEFENDANTS AND GIVE THEM AN OPPORTUNITY TO REPLY.

4         **MS. McTOOTLE:**  OKAY.

5         **THE COURT:**  MR. JONES, I NEED NOT REPEAT OR

6    RECHARACTERIZE THE ARGUMENTS OF YOUR OPPONENT.

7    WHAT'S YOUR RESPONSE?

8         **MR. JONES:**  YOUR HONOR, MAY IT PLEASE THE

9    COURT.

10            WE'RE OBVIOUSLY HERE ON A MOTION FOR

11   CLASS CERTIFICATION.  THIS IS NOT A MERITS TRIAL.

12   THAT'S GOING TO HAPPEN AT ANOTHER TIME DEPENDING ON

13   THE OUTCOME OF THIS MOTION.

14            BUT IT IS OUR POSITION THAT THIS CASE

15   SEEKS TO CERTIFY A CLASS OF PERSONS AS A CLASS AND

16   SUBCLASS WHO ARE OR MAY BE ASSIGNED TO THE FARM LINE

17   AT ANGOLA DESPITE AND WITHOUT REGARD TO THEIR

18   INDIVIDUAL MEDICAL CONDITIONS, THEIR UNIQUE MEDICAL

19   HISTORIES, HOW THEY MAY BE UNIQUELY IMPACTED BY HEAT

20   EXPOSURE, THEIR ASSIGNED DUTY STATUSES, WHAT

21   DISABILITIES THEY MAY OR MAY NOT HAVE, AND OTHER

22   UNIQUE AND FACTUALLY DISTINGUISHABLE DIFFERENCES

23   BETWEEN THE CLASS AND THE SUBCLASS MEMBERS.

24            AND SO THESE UNIQUE AND INDIVIDUAL

25   DIFFERENCES BETWEEN EACH ONE OF THE MEMBERS OF THE

1    CLASS OR THE SUBCLASS -- AND I GUESS WE'RE SEPARATING

2    THE GENERAL CLASS AND THE ADA SUBCLASS.  BUT THESE

3    INDIVIDUAL AND UNIQUE CIRCUMSTANCES BETWEEN TWO AND

4    HOW THE ALLEGED VIOLATIVE POLICIES APPLY TO THEM IS

5    WHAT PRETERMITS A FINDING THAT EACH OF THE

6    REQUIREMENTS OF RULE 23 ARE SATISFIED.

7          THE COURT:  SO WHAT DISPARATE SORT OF

8    FACTORS OR VARYING FACTORS SHOULD THE COURT CONSIDER?

9    YOU'VE HEARD YOUR OPPONENT SAY, WELL, LISTEN, ANYBODY

10   THAT'S, AGAIN, CAN BE ORDERED OUT TO THE FARM LINE --

11   AND THAT'S 4,000 INMATES -- AT ANY TIME, FOR

12   DISCIPLINARY REASONS OR OTHERWISE, COULD BE ORDERED

13   OUT TO THE FARM LINE, PRESUMABLY WHETHER THEY'RE --

14   WHATEVER THEIR AGE, HEALTH STATUS.  THE MERE FACT --

15   AND I HAVEN'T REACHED A CONCLUSION YET, BUT I BELIEVE

16   THE ARGUMENT IS THAT DESPITE THEIR HEALTH CONDITIONS,

17   THE CONDITIONS COULD BE SO ONEROUS AND PRESENT SUCH A

18   RISK TO PUBLIC HEALTH, TO ANYBODY, THAT IT'S

19   UNCONSTITUTIONAL.

20          MR. JONES:  WELL, CONSIDER THIS.  OUT OF THE

21   4,000 INDIVIDUALS THAT WOULD COMPRISE THIS CLASS,

22   WHICH IS EVERYBODY, ACCORDING TO THE PLAINTIFFS, AS

23   THEY ALLEGE, THINK ABOUT ALL THE DIFFERENCES.  JUST

24   THINK ABOUT THE DIFFERENCES BETWEEN EACH INDIVIDUAL

25   NAMED PLAINTIFF.  WE HAVE ANY NUMBER OF DIFFERENT

1  CONDITIONS, OR YOU MAY HAVE INDIVIDUALS THAT COMPRISE

2  THAT CLASS THAT HAVE NO MEDICAL CONDITIONS, NO

3  PREDISPOSITIONS TO HEAT EXPOSURE, NO INDIVIDUAL

4  ISSUES THAT WOULD BE IMPACTED BY ANY EXPOSURE

5  WHATSOEVER.

6          **THE COURT:**  BUT IT'S THE TESTIMONY FROM --

7  THE MEDICAL TESTIMONY IS THAT IT DOESN'T MATTER,

8  AGAIN, A PERSON'S AGE OR HEALTH CONDITION.  THERE ARE

9  CERTAIN -- THERE IS A NUMBER; THAT ONCE THAT -- THE

10 HEAT INDEX REACHES THAT NUMBER, OR THE AMBIENT

11 TEMPERATURE REACHES THAT NUMBER, IT IS A RISK TO

12 EVERYONE.

13         **MR. JONES:**  WELL, TWO POINTS.  FIRST OF ALL,

14 THE PLAINTIFFS' OWN EXPERT, DR. VASSALLO,

15 TESTIFIED -- I'M QUOTING FROM HER REPORT -- SOME

16 HEALTHY PEOPLE WITH NO KNOWN MEDICAL PROBLEMS WILL

17 TOLERATE HEAT MORE EASILY.  AND SO --

18         **THE COURT:**  BUT ARE WE HERE TO TALK ABOUT

19 HEAT TOLERANCE OR IS THAT THE SAME THING AS A RISK TO

20 HUMAN HEALTH?

21         **MR. JONES:**  WELL, WITH RESPECT TO THE

22 POLICIES -- AND I THINK ONE OF THE POLICIES AT ISSUE

23 FOR CERTAIN IS THE HEALTH CARE POLICY NO. 8, WHICH

24 HAS BEEN ATTACHED AND AMENDED OVER THE DURATION OF

25 THIS LAWSUIT.  AND SO THE CHANGES THAT HAVE BEEN MADE

1   ARE IMPORTANT, BUT THOSE CHANGES IN THE POLICIES THAT

2   ARE APPLIED IN THERE ARE INTENDED TO ADDRESS HOW THE

3   DEPARTMENT IS GOING TO ADDRESS THESE ISSUES WITH

4   RESPECT TO EACH ONE OF THE CLASS MEMBERS.

5              AND SO HOW THAT'S IMPLEMENTED IS GOING

6   TO BE ACROSS THE BOARD.  YOU'RE GOING TO HAVE

7   INDIVIDUALS WITH DIFFERENT DUTY STATUSES.  THEY'RE

8   GOING TO BE INDIVIDUALLY ASSESSED TO DETERMINE WHAT

9   THEIR DUTY STATUS IS BASED UPON THEIR INDIVIDUAL

10  MEDICAL HISTORY, MEDICATIONS, AND HEAT SENSITIVITIES.

11             AND SO WHILE THEIR INDIVIDUAL

12  DIFFERENCES ARE GOING TO IMPACT THOSE SENSITIVITIES

13  AND HOW THEY'RE IMPACTED, IT'S OUR POSITION -- AND WE

14  BELIEVE IT WILL BE PROVEN AT TRIAL -- THAT THOSE

15  POLICIES ARE SUFFICIENT TO BE COMPLIANT WITH THE

16  EIGHTH AMENDMENT AND THAT ARE NOT NONVIOLATIVE OF

17  THAT REQUIREMENT.  AND SO WE THINK THAT THAT'S GOING

18  TO PERMEATE AND THESE ISSUES ARE GOING TO PERMEATE

19  THROUGHOUT EACH ONE OF THE REQUIREMENTS OF CLASS

20  CERTIFICATION, WHICH, OF COURSE, AS YOU KNOW, EVERY

21  ONE OF THOSE REQUIREMENTS OF RULE 23 HAVE TO BE

22  SATISFIED OR A CLASS CANNOT BE CERTIFIED.

23             **THE COURT:**  CORRECT.  SO YOU BELIEVE THAT

24  WITH RESPECT TO THE 4,000 INMATES, THAT THEY ALL

25  DON'T SHARE SOME COMMON TRAITS OR CHARACTERISTICS TO

1    JUSTIFY SUCH A BROAD CLASS.  CORRECT?

2            **MR. JONES:**  WELL, AS AN EXAMPLE, SOME OF

3    THEM ARE NOT AT RISK OF EVER ENDING UP ON THE FARM

4    LINE, BECAUSE THEY HAVE DUTY STATUSES THAT PREVENT

5    THEM FROM DOING SO.  AND SO THEY --

6            **THE COURT:**  BUT AS THE PLAINTIFFS HAVE

7    POINTED OUT, YOUR OWN EXPERT, DR. LAVESPERE, SAYS

8    "BUT THAT'S JUST TEMPORARY."  I MEAN -- AND I'M SURE

9    THERE MAY BE A CATEGORY OF WORK STATUS DESIGNATIONS

10   THAT MIGHT BE MORE; I MEAN, SOMEONE WHO IS SUFFERING

11   FROM -- I DON'T KNOW -- BLINDNESS OR ACUTE DIABETES

12   OR SOME OTHER ACUTE DISEASE.

13            BUT YOU WOULD AGREE THAT AT LEAST THOSE

14   OUTSIDE OF THAT CLASS ARE STILL SUSCEPTIBLE TO BEING

15   ORDERED TO WORK ON THE FARM LINE.  RIGHT?

16            **MR. JONES:**  WELL -- AND I WANT TO DRAW THIS

17   BACK TO THE CONTEXT OF RULE 23, WHICH IS, YOU KNOW,

18   WHY WE'RE HERE.  SPECIFICALLY JUST STARTING WITH

19   NUMEROSITY, ASKING -- HAVING TO ASK THOSE QUESTIONS

20   IS WHAT WE ARGUE PREVENTS THIS CASE FROM PROPERLY

21   BEING CERTIFIED.

22            AND SO THEY WANT TO SAY THAT NUMEROSITY

23   IS SATISFIED BECAUSE THERE IS 4,000 INMATES.  AND

24   WE'VE SHOWN IN OUR OPPOSITION AND THE EVIDENCE THAT

25   WE'VE SUBMITTED THAT THAT'S JUST NOT TRUE; THAT

1  EVERYBODY IS POTENTIALLY SUSCEPTIBLE OR COULD BE

2  ASSIGNED TO THE FARM LINE IN THE FUTURE.

3            THAT'S -- AND SO IN THAT WAY, HAVING TO

4  ASK THOSE QUESTIONS TO DETERMINE WHETHER THEY FALL

5  WITHIN THE CLASS OR THE SUBCLASS IS NECESSARY BEFORE

6  YOU CAN EVER DETERMINE WHETHER NUMEROSITY AND THIS --

7  AND THEN IT PERMEATES THROUGHOUT TO COMMONALITY,

8  TYPICALITY AND ADEQUACY.

9       **THE COURT:**  SO IN THE *YATES* CASE, THE FIFTH

10  CIRCUIT FOUND THAT JUDGE ELLISON WAS RIGHT; 1400

11  PRISONERS -- I DON'T KNOW IF THERE WAS ANY EVIDENCE

12  THAT ALL 1400 PRISONERS EVER WERE SUSCEPTIBLE -- AND

13  THIS IS NOT A FARM LINE CASE, GRANTED.  IT'S A HEAT

14  CASE.  IT'S PROBABLY MORE RESEMBLING *BALL VERSUS*

15  *LEBLANC*.

16            BUT THE FIFTH CIRCUIT THERE HELD THAT

17  THE FACT THAT THESE 1400 INMATES WERE STILL

18  SUSCEPTIBLE TO HIGH HEAT INDEXES, EVEN IN THEIR

19  CELLS, WAS SUFFICIENT TO FIND THAT THE ELEMENT OF

20  COMMONALITY UNDER 23(A) WAS SATISFIED.

21       **MR. JONES:**  WELL, WHAT I'LL SUBMIT TO YOU,

22  YOUR HONOR -- AND I THINK WE PUT THIS IN OUR -- PUT

23  THIS INTO THE RECORD IN OUR LETTER I THINK THAT WAS

24  SUBMITTED IN OCTOBER WITH RESPECT TO CHANGES IN

25  HPC8 -- THAT THOSE POLICIES WERE UPDATED IN

1  CONFORMITY WITH THE NATIONAL WEATHER CENTER

2  DIRECTIVES WITH RESPECT TO WHEN A HEAT ADVISORY NEEDS

3  TO BE ISSUED.  AND SO WE'RE COMPLYING WITH -- WE'RE

4  COMPLYING WITH WHAT THEY BASICALLY TOLD US --

5          **THE COURT:**  WITH WHAT THE NATIONAL WEATHER

6  SERVICE --

7          **MR. JONES:**  CORRECT.  CORRECT.

8              AND SO -- AND I'LL MAKE ANOTHER COMMENT

9  THAT COUNSEL, YOU KNOW, WAS ADDRESSING, IS THAT THE

10 POLICY IS SILENT WITH RESPECT TO INDIVIDUAL

11 DETERMINATIONS BY THE GUARDS, YOU KNOW, THE -- IN THE

12 PROCESS OF, YOU KNOW, WHEN THE INDIVIDUALS ARE

13 WORKING ON THE FARM LINE AND THEY NOTICE SOMETHING

14 THAT'S OUTSIDE THE SCOPE OF WHAT'S DIRECTLY PROVIDED

15 IN THE POLICY, THEY CAN STEP IN AND HANDLE THAT.  AND

16 THEY'RE PREPARED TO DO THAT.

17              BUT AGAIN, IN THE CONTEXT OF CLASS

18 CERTIFICATION, THOSE INDIVIDUAL DETERMINATIONS AND

19 DECISIONS ARE EXACTLY WHAT WE BELIEVE PREVENT THIS

20 CASE FROM PROPERLY BEING CERTIFIED AS A CLASS ACTION.

21          **THE COURT:**  SO, MR. JONES, ARE THOSE

22 CORRECTIONAL OFFICERS NOW BEING TRAINED?  I MEAN,

23 IT'S CLEAR THAT, I GUESS TO THE CREDIT OF THE

24 DEPARTMENT OF CORRECTIONS, IT HAS REVISED, I'LL SAY,

25 ITS POLICIES, AT LEAST TO SOME EXTENT.

1          BUT IT'S STILL UNCLEAR TO ME ABOUT HOW
2   EFFECTIVE THOSE ARE FOR A NUMBER OF REASONS, ONE OF
3   WHICH IS:  HAVE CORRECTIONAL OFFICERS BEEN TRAINED ON
4   HOW TO IDENTIFY INMATES WHO MAY BE UNDERGOING SOME
5   MEDICAL DISTRESS?  I'M NOT SURE THAT -- I MEAN,
6   APPLYING SORT OF A REASONABLE MAN STANDARD HERE, I'M
7   NOT SURE THAT'S SUFFICIENT.
8          MR. JONES:  WELL -- AND I DON'T HAVE AN
9   ANSWER TO YOU -- FOR YOU ON THAT SPECIFIC QUESTION.
10  BUT WHAT I DO -- WOULD LIKE TO REQUEST THE
11  OPPORTUNITY TO DO IS TO PROVIDE SOME SUPPLEMENTAL
12  BRIEFING ON THE IMPLEMENTATION OF THE CHANGES THAT
13  HAVE BEEN MADE TO HPC8.  OBVIOUSLY THAT HAPPENED AT
14  THE TIME THE UPDATES WERE MADE IN OCTOBER.  BRIEFING
15  OCCURRED, I WANT TO SAY, IN NOVEMBER.  AND, OF
16  COURSE, WE HAVE THE NEXT HEAT SEASON NOT OCCURRING
17  UNTIL THIS COMING SUMMER.
18          AND SO WE WOULD LIKE THE OPPORTUNITY TO
19  UPDATE.  WE CAN CERTAINLY ADDRESS THAT SPECIFIC
20  QUESTION.
21          THE COURT:  SO IN OTHER WORDS, THE CHANGES
22  HAVE BEEN MADE, BUT THEY WERE MADE -- THEY BECAME
23  EFFECTIVE DURING THE TIME OF YEAR NOT IN THE SUMMER
24  MONTHS, SO --
25          MR. JONES:  WELL, LET ME --

1          **THE COURT:**  -- THEY HAVEN'T BEEN TESTED.

2          **MR. JONES:**  LET ME BE CLEAR.  HPC8 EXISTED.

3   IT WAS JUST UPDATED AS THIS CASE HAS PROGRESSED.

4          AND SO WE BELIEVE -- AND WE BELIEVE

5   THAT WE WILL PROVE AT TRIAL -- THAT THOSE UPDATES --

6   ALTHOUGH THE ORIGINAL POLICY WAS SUFFICIENT, THAT THE

7   UPDATES EVEN FURTHER STRENGTHEN OUR ARGUMENT THAT

8   THOSE ARE SUFFICIENT.

9          **THE COURT:**  OKAY.  THANK YOU, MR. JONES.

10          **MR. JONES:**  THANK YOU.

11          AND WE'RE GOING TO TALK NEXT ABOUT THE

12   ADA SUBCLASS?

13          **THE COURT:**  YES.  WE'LL GET TO THAT IN JUST

14   A MOMENT.  BUT -- LET ME SEE NOW.

15          MS. McTOOTLE, DO YOU WISH TO REPLY?

16          **MS. McTOOTLE:**  YES, YOUR HONOR.

17          SO I THINK THE FIRST THING THAT I WOULD

18   LIKE TO REPLY TO IS:  WHAT I THINK IS MISSING IN THIS

19   DISCUSSION IS THE FUNDAMENTAL REQUIREMENT OF

20   COMMONALITY; AND THAT'S THAT THERE ARE COMMON

21   QUESTIONS THAT ARE AT ISSUE THAT ARE CAPABLE OF

22   GENERATING COMMON ANSWERS THAT WILL RESOLVE ISSUES

23   THAT ARE CENTRAL TO THE CASE CLASSWIDE.  AND THIS

24   DISCUSSION ABOUT THE -- WHETHER OR NOT HCP8 IS

25   EFFECTIVE, THAT IS A COMMON QUESTION.

1          **THE COURT:**  IT'S A COMMON -- WELL, OKAY.  IT

2    IS -- AND, OF COURSE, THE COURT IS NOT AT THIS

3    POINT -- I MEAN, THAT GOES TO THE UNDERLYING CLAIMS.

4          **MS. McTOOTLE:**  RIGHT.  AND IN ADDITION, THE

5    QUESTION OF INDIVIDUALIZED INQUIRIES WITH RESPECT TO

6    THE HEAT-RELATED HARM, THAT -- THAT ARGUMENT HAS BEEN

7    CONFRONTED AND REJECTED BY THE FIFTH CIRCUIT AND

8    OTHER COURTS IN THIS DISTRICT.  DIFFERENCES IN THE

9    RISK OF HARM OR DIFFERENCES IN INJURIES DO NOT DEFEAT

10   COMMONALITY WHEN THERE IS EVIDENCE THAT ALL PEOPLE

11   ARE SUBJECTED TO A SUBSTANTIAL RISK OF HARM.

12          AND THAT'S WHAT PLAINTIFFS ARE

13   ASSERTING HERE; THAT BY RAISING THE HEAT ALERT

14   THRESHOLD, BY HAVING A POLICY THAT'S ONLY IN EFFECT

15   FROM MAY TO OCTOBER, FROM -- HAVING PEOPLE NOT

16   REMOVED FROM THE HEAT, THOSE WAYS AND MORE THAT

17   DR. VASSALLO WILL TESTIFY TO AT TRIAL, THOSE -- THAT

18   SHOWS THAT THE POLICY IN PLACE IS NOT SUFFICIENT TO

19   ABATE THE SUBSTANTIAL RISK OF HARM FOR EVERYONE.

20          I DO ALSO WANT TO TAKE A MOMENT TO

21   ADDRESS COUNSEL'S COMMENTS ABOUT NUMEROSITY.  COUNSEL

22   CLAIMED THAT PLAINTIFFS HAVEN'T SATISFIED NUMEROSITY

23   BECAUSE PEOPLE MAY HAVE DUTY STATUSES.

24          WHAT IS AT ISSUE, AND I THINK WHAT YOUR

25   HONOR RECOGNIZED, IS THAT THE CLASS DEFINITION IS ALL

1  PEOPLE WHO ARE AT RISK OF BEING ASSIGNED TO THE FARM

2  LINE.  SO WHETHER OR NOT THEY HAVE DUTY STATUSES,

3  WHICH CAN BE CHANGED AT ANY TIME, IS NOT REALLY THE

4  INQUIRY.  AND IN ANY EVENT, PLAINTIFFS, BASED ON THE

5  EVIDENCE THAT DEFENDANTS SUBMITTED, HAVE SHOWN THAT

6  300 PEOPLE WERE ASSIGNED TO THE FARM LINE THIS SUMMER

7  AND 150 PEOPLE WENT OUT -- OVER 150 PEOPLE WENT OUT

8  ON THE LINE.  SO NUMEROSITY IS SATISFIED.

9           AND ONE OTHER COMMENT THAT I WOULD LIKE

10  TO MAKE IS WITH RESPECT TO PLAINTIFFS' OTHER CLAIMS.

11  WE'VE BEEN SPENDING A LOT OF TIME TALKING ABOUT THE

12  HEAT THEORY, BUT I DO WANT TO ALSO NOTE THAT ALL OF

13  THE ELEMENTS OF RULE 23 ARE SATISFIED AS TO

14  PLAINTIFFS' OTHER THEORIES OF HARM; THE DIGNITARY

15  HARM THEORY AND THE PSYCHOLOGICAL HARM THEORY.

16           I'LL JUST TAKE A MOMENT TO BRIEFLY

17  SUMMARIZE PLAINTIFFS' DIGNITARY HARM CLAIM --

18           **THE COURT:**  SURE.

19           **MS. McTOOTLE:**  -- IF IT PLEASES THE COURT.

20           SO THE SUPREME COURT IN *HOPE VERSUS*

21  *PELZER* EXPLAINED THAT THE EIGHTH AMENDMENT IS ABOUT,

22  QUOTE, NOTHING LESS THAN THE DIGNITY OF MAN, AND

23  FORMS A PUNISHMENT THAT OFFEND SOCIETY'S EVOLVING

24  STANDARDS OF DECENCY AND HUMAN DIGNITY ARE PROHIBITED

25  UNDER THE EIGHTH AMENDMENT.  AND FOR THAT REASON, THE

1  COURT IN *HOPE VERSUS PELZER* CONDEMNED A PRISON'S

2  PRACTICE OF HANDCUFFING MEN TO HITCHING POSTS,

3  FINDING THAT IT VIOLATED THE EIGHTH AMENDMENT'S

4  PROTECTION OF BASIC HUMAN DIGNITY BECAUSE, QUOTE, OUR

5  SYSTEM OF JUSTICE HAS CONSISTENTLY MOVED AWAY FROM

6  SIMILAR FORMS OF PUNISHMENT.

7              IN A RELATED CASE, *AUSTIN VERSUS*

8  *HOPPER,* THE DISTRICT COURT APPROVED SETTLEMENT OF A

9  CLASS CHALLENGING THE USE OF CHAIN GANGS, NOTING THE

10 PRACTICES' HISTORICAL ORIGINS AND TESTIMONY FROM

11 PLAINTIFFS THAT THEY WERE HUMILIATED AND DEGRADED AND

12 MADE TO FEEL LIKE SLAVES.

13             THESE CASES DEMONSTRATE THAT FORMS OF

14 PUNISHMENT THAT ARE BASED ON NOW CONDEMNED PUNITIVE

15 PRACTICES THAT DO NOT COMPORT WITH OUR CONTEMPORARY

16 STANDARDS OF DECENCY, THAT DEGRADE AND HUMILIATE,

17 DEPRIVE PEOPLE OF THEIR BASIC HUMAN DIGNITY IN

18 VIOLATION OF THE EIGHTH AMENDMENT, THAT IS WHAT

19 PLAINTIFFS ALLEGE HERE; DEFENDANTS' OPERATE THE FARM

20 LINE AS A FORM OF DISCIPLINE MODELED AFTER SLAVERY

21 AND OTHER NOW CONDEMNED LABOR REGIMES THAT DON'T

22 ALIGN WITH OUR CONTEMPORARY STANDARDS OF DECENCY.

23 AND BY SUBJECTING MEN TO CONDITIONS AKIN TO SLAVERY,

24 DEFENDANTS' OPERATION OF THE FARM LINE AS DEGRADATION

25 TO PLAINTIFFS' SENTENCES AT HARD LABOR AND STRIPS

1  THEM OF THEIR BASIC HUMAN DIGNITY, IN VIOLATION OF

2  THE EIGHTH AMENDMENT.

3          AND THIS HARM IS COMMON TO THE ENTIRE

4  CLASS.  DEFENDANTS SUBJECT ALL CLASS MEMBERS TO A

5  COMBINATION OF POLICIES AND PRACTICES THAT APPLY

6  UNIFORMLY TO EVERY MEMBER OF THE GENERAL CLASS AND

7  THAT REPLICATE CONDITIONS AKIN TO SLAVERY.  FOR

8  INSTANCE, THE FARM LINE IS WIDELY UNDERSTOOD TO BE

9  THE LOWEST JOB AT ANGOLA.  MEN ARE ASSIGNED TO THE

10 FARM LINE AS THEIR FIRST JOB WITH THE PURPOSE OF

11 BREAKING THEM INTO SUBMISSION.  DEFENDANTS'

12 DISCIPLINARY POLICIES APPLY UNIFORMLY TO ALL GENERAL

13 CLASS MEMBERS.  AND UNDER THOSE POLICIES, PEOPLE ARE

14 REASSIGNED TO THE FARM LINE AFTER A DISCIPLINARY

15 VIOLATION.

16          ONCE ON THE FARM LINE, THE DISCIPLINARY

17 MATRIX, DEFENDANTS' DISCIPLINARY HANDBOOK, PUNISHES

18 EVERY CLASS MEMBER IF THEY FAIL TO WORK -- I'M

19 SORRY -- IF THEY FAIL TO MEET WORK QUOTAS OR IF THEY

20 FAIL TO WORK FAST ENOUGH.  AND EVERYONE ON THE FARM

21 LINE IS SUBJECTED TO THE SAME INCENTIVE PAY POLICIES,

22 POLICIES THAT DEGRADE AND DENIGRATE THEIR LABOR.

23 THEY'RE PAID BETWEEN TWO TO FOUR CENTS PER HOUR OR

24 NOTHING AT ALL, AND THAT'S THE LOWEST PAY --

25 INCENTIVE PAY RATE AT ANGOLA.  IT'S ALSO A PAY RATE

1  OF WHICH ALL PLAINTIFFS HAVE ALLEGED THAT THEY HAVE

2  TO WORK HUNDREDS OF HOURS TO AFFORD BASIC NECESSITIES

3  LIKE DEODORANT OR SOAP.

4          SO THESE POLICIES ALL APPLY CLASSWIDE.

5  AND AS DR. HAMMONDS AND DR. SBICCA WILL TESTIFY, THEY

6  ALL CONTRIBUTE TO CREATING CONDITIONS REMINISCENT OF

7  CHILD SLAVERY.  SO THOSE ARE THE COMMON POLICIES AT

8  ISSUE WITH THE DIGNITARY HARM CLAIM.

9          AND AS SET OUT IN OUR BRIEFS,

10 PLAINTIFFS' DIGNITARY HARM CLAIMS GIVE RISE TO

11 SEVERAL COMMON QUESTIONS THAT CAN BE ANSWERED ON A

12 CLASSWIDE BASIS AND RESOLVE ISSUES CENTRAL TO

13 PLAINTIFFS' CLAIMS, NONE OF WHICH DEFENDANTS CONTEST.

14          BUT A FEW MORE EXAMPLES.  WHETHER

15 DEFENDANTS' OPERATION OF THE FARM LINE UNDER

16 CONDITIONS AKIN TO SLAVERY DEPRIVES MEN OF THEIR

17 BASIC HUMAN DIGNITY, THAT'S A COMMON QUESTION.

18 WHETHER THE OPERATION OF THE FARM LINE AS A FORM OF

19 DISCIPLINE THAT SIMULATES AND SUBJECTS MEN TO

20 CONDITIONS AKIN TO SLAVERY COMPORTS WITH EVOLVING

21 STANDARDS OF DECENCY, THAT IS ANOTHER COMMON

22 QUESTION.

23          AND I'LL TURN TO PLAINTIFFS'

24 PSYCHOLOGICAL HARM THEORY NEXT.

25          THE COURT:  OKAY.  WELL, LET ME ASK YOU A

1  FEW QUESTIONS HERE.

2         **MS. McTOOTLE:**  YES.

3         **THE COURT:**  FIRST LET ME BACK UP WITH

4  RESPECT TO THE ISSUE OF COMMONALITY AND NUMEROSITY

5  AND MAYBE A FEW OTHER RULE 23 FACTORS.  AND AGAIN, I

6  WANT TO BE CLEAR THAT I UNDERSTAND YOUR ARGUMENT

7  THAT, AGAIN -- AND I SORT OF SUMMARIZED THIS WHEN I

8  WAS ADDRESSING MR. JONES OR HE WAS ADDRESSING THE

9  COURT.

10        YOU KNOW, IN THE *YATES* CASE, THE COURT

11 ADDRESSED THE CLASS OF -- OR AT LEAST THE CLASS

12 REPRESENTATIVES, AS FAR AS I COULD TELL, RANGED IN

13 AGE FROM 60 TO 72.  YOU'RE SUGGESTING, HOWEVER, THAT

14 INMATES FAR YOUNGER THAN THAT ARE ALSO SUSCEPTIBLE TO

15 CERTAIN HEAT-RELATED ILLNESSES AND CONDITIONS AS A

16 RESULT OF BEING FORCED TO WORK ON THE FARM LINE.  IS

17 THAT WHAT YOU'RE ARGUING?

18        **MS. McTOOTLE:**  YES, YOUR HONOR.

19 DR. VASSALLO OPINES THAT EVERYONE IS AT RISK OF

20 SUBSTANTIAL -- IS AT SUBSTANTIAL RISK OF HARM, EVEN

21 HEALTHY PEOPLE, EVEN YOUNG PEOPLE, WHEN THE

22 TEMPERATURE REACH -- OR THE HEAT INDEX, I'M SORRY,

23 REACHES 88 DEGREES.  SHE CITES STUDIES THAT RATES OF

24 MORBIDITY AND MORTALITY DRAMATICALLY INCREASE FOR

25 EVERYONE WHEN HEAT INDICES REACHED THE MID-80s.

1      **THE COURT:**  DO YOU KNOW IF ANY INMATES, IN

2  FACT, IN THEIR, SAY, 30s RECEIVED ANY MEDICAL

3  TREATMENT AS A RESULT OF CONDITIONS ON THE FARM LINE?

4      **MS. McTOOTLE:**  I DON'T HAVE THAT INFORMATION

5  AT MY FINGERTIPS, YOUR HONOR, BUT WE CAN, OF COURSE,

6  SUPPLEMENT.

7      **THE COURT:**  AND I'M SURE YOU UNDERSTAND WHY

8  I'M ASKING.  I MEAN, WE HAVE TO BE VERY, VERY

9  CAREFUL -- I MEAN, TO THE EXTENT I FIND THAT THERE IS

10  A DEFINABLE CLASS HERE, I'VE GOT TO BE VERY CAREFUL

11  IN TERMS OF HOW IT'S DEFINED, HOW IT'S TAILORED.  I

12  HAVE TO TAILOR IT QUITE NARROWLY.  I CAN'T JUST VERY

13  BROADLY SAY "ANYBODY."  AND SO THAT'S WHY I ASK THE

14  QUESTION.

15      I WILL TELL YOU NOW IT'S WHY I WILL

16  LIKELY CONCLUDE THAT I HAVE TO HEAR TESTIMONY FROM

17  SOME OF THE INMATES THEMSELVES.  I UNDERSTAND THAT

18  DR. VASSALLO HAS MADE AN ASSESSMENT.  I UNDERSTAND

19  THAT SHE'S CONDUCTED EXTENSIVE RESEARCH ON THE ISSUE.

20  BUT I MAY REQUIRE MORE; A GREATER FACTUAL BASIS, IN

21  OTHER WORDS.  AND IF THAT'S THE CASE, I WILL SET A

22  HEARING AND YOU WILL BE ALLOWED TO PRESENT THE

23  TESTIMONY OF YOUR CLIENTS OR PROSPECTIVE CLIENTS.

24  OKAY?

25      **MS. McTOOTLE:**  YES, YOUR HONOR.

1              I THINK -- IN RESPONSE TO YOUR COMMENT,

2   I THINK THE QUESTION OF WHETHER YOUNG PEOPLE ARE

3   EXPERIENCING ACTUAL HARM GOES TO THE MERITS OF

4   PLAINTIFFS' EIGHTH AMENDMENT CLAIMS.  AS FAR AS HOW

5   THE CLASS IS STRUCTURED, PLAINTIFFS DO BRING THEIR

6   DIGNITARY AND PSYCHOLOGICAL HARM CLAIMS.  AND THOSE

7   ALLEGATIONS APPLY BROADLY TO THE ENTIRE CLASS, JUST

8   AS THE HEAT ALLEGATIONS DO.

9              **THE COURT:**  UNDERSTOOD.  AND THAT'S WHY I

10  WANTED TO HEAR YOUR PSYCHOLOGICAL CLAIMS OR YOUR

11  PSYCHOLOGICAL HARM CLAIMS, BECAUSE I'M NOT SUGGESTING

12  THAT ANY HARM WOULD BE CONFINED TO PHYSICAL INJURIES.

13  TO THE CONTRARY.

14              BUT AGAIN, I WILL TELL YOU NOW THAT,

15  AGAIN, I'M LIKELY TO REQUIRE SOME TESTIMONY FROM ANY

16  PERSONS SO AFFECTED, AS YOU ARGUE.  OKAY?

17             **MS. McTOOTLE:**  YES, YOUR HONOR.

18             **THE COURT:**  NOW, LET ME ALSO ASK YOU ABOUT

19  THE -- YOU ARGUE THAT THE CONTEMPORARY STANDARDS OF

20  DECENCY ARE SUCH -- IN 2025 -- SUCH AS TO FIND THIS

21  KIND OF CONDUCT, THIS KIND OF POLICY ABHORRENT TO

22  CONTEMPORARY STANDARDS.  CORRECT?

23             **MS. McTOOTLE:**  YES, YOUR HONOR.

24             **THE COURT:**  IN A NUTSHELL, THAT'S WHAT YOU

25  ARGUE.  RIGHT?

1           **MS. McTOOTLE:**  YES, YOUR HONOR.

2           **THE COURT:**  WELL, HOW IS THE COURT -- AND

3    INDEED, THE SUPREME COURT HAS RECOGNIZED PRECISELY

4    THAT; THAT THERE ARE, AS THE SUPREME COURT HAS NOTED,

5    EVOLVING STANDARDS OF DECENCY.  AND THE QUESTION

6    BECOMES:  HOW IS THE FINDER OF FACT IN THIS CASE --

7    AND THIS IS A CASE -- THIS IS A QUESTION FOR YOU TO

8    THINK ABOUT PRIOR TO THE TRIAL.  BY WHAT STANDARD

9    SHOULD THE FINDER OF FACT CONCLUDE THAT THE STANDARDS

10   OF DECENCY IN OUR DEMOCRACY AND IN OUR EVOLVING

11   VALUES AND STANDARDS -- HOW IS THAT TO BE JUDGED?

12          I MOST CERTAINLY CAN'T JUST OUT OF THIN

13   AIR DECLARE THAT, IN MY OPINION, THIS IS THE -- THIS

14   IS AN ABHORRENT PRACTICE.  IT MIGHT VERY WELL BE.

15   BUT WHAT AUTHORITY SHOULD I TURN TO IN MAKING THAT

16   DECISION?

17          **MS. McTOOTLE:**  SO I THINK YOUR HONOR IS

18   CORRECT; THAT'S -- IT IS ULTIMATELY A QUESTION FOR

19   THE MERITS AND SOMETHING THAT WILL BE FLESHED OUT AS

20   WE GO TO TRIAL.

21          DR. SBICCA AND DR. HAMMONDS WILL

22   PROVIDE TESTIMONY AS TO -- TO ASSIST THE FACT-FINDER

23   IN ESTABLISHING WHAT THE CONTEMPORARY STANDARDS OR

24   THE EVOLVING STANDARDS OF DECENCY ARE.  AND AT THIS

25   POINT, FOR THE PURPOSES OF CLASS CERTIFICATION, THE

1  EVOLVING STANDARDS OF DECENCY, OF COURSE, IS A COMMON

2  QUESTION:  WHAT ARE THE EVOLVING STANDARDS OF DECENCY

3  SUCH THAT THE FARM LINE DOESN'T COMPORT WITH THOSE?

4         SO FOR THE PURPOSES OF RULE 23, YOUR

5  QUESTION, YOUR HONOR, PRESENTS A COMMON QUESTION TO

6  BE RESOLVED CLASSWIDE.  AND ON THE MERITS, THAT'S --

7  THAT IS SOMETHING THAT WILL BE DEVELOPED THROUGH

8  EXPERT TESTIMONY, PLAINTIFFS' TESTIMONY, OTHER

9  DOCUMENTATION AND TESTIMONY AT TRIAL.

10      **THE COURT:**  ALL RIGHT.  LET ME GIVE MR.

11  JONES AN OPPORTUNITY AT THIS POINT -- WE'LL COME BACK

12  TO YOU IN JUST A MOMENT.

13      **MS. McTOOTLE:**  THANK YOU, YOUR HONOR.

14      **THE COURT:**  MR. JONES, LET ME GIVE YOU AN

15  OPPORTUNITY TO REPLY.

16      **MR. JONES:**  SURE.  AND AGAIN, I KNOW I'VE

17  BEEN --

18      **THE COURT:**  I DON'T KNOW WHY MR. BLANCHFIELD

19  IS MAKING YOU DO ALL THE WORK HERE, YOU KNOW.

20      **MR. JONES:**  I'M NEW.

21      **THE COURT:**  OR MS. PAYNE.  I DON'T KNOW

22  WHY -- THEN AGAIN, YOUR OPPONENT HAS A TABLE -- WELL,

23  I ASSUME THAT I'LL HEAR FROM SOME OF THE OTHERS AS

24  WELL AT SOME POINT.

25      **MR. JONES:**  I THINK THAT YOU'RE ASKING SOME

1  EXCELLENT QUESTIONS, ALL OF WHICH I BELIEVE ARE GOING

2  TO GO TO THE MERITS -- OR MANY OF WHICH ARE GOING TO

3  GO TO THE MERITS.  AND, OF COURSE, IN THE CONTEXT OF

4  CONSIDERATION OF A MOTION FOR CLASS CERTIFICATION,

5  THE RULE 23 REQUIREMENTS, IT IS A PROCEDURAL

6  DETERMINATION, BUT YOU CAN'T JUST TAKE THE

7  ALLEGATIONS AS THEY ARE, AND YOU'RE OBLIGATED TO LOOK

8  PAST THE PLEADINGS AND LOOK AT THE ACTUAL MERITS OF

9  THE CASE TO DETERMINE WHETHER EACH OF THE

10  REQUIREMENTS OF CLASS CERTIFICATION CAN BE SATISFIED.

11           AND SO AS AN EXAMPLE, TO YOUR QUESTION

12  OF THE EVOLVING STANDARDS OF DECENCY, THE -- IT IS

13  OUR POSITION, AS WE HAVE BRIEFED TO YOU, THAT THE

14  INDIVIDUAL DETERMINATIONS AS TO EACH INDIVIDUAL CLASS

15  MEMBER ARE NECESSARY TO DETERMINE WHETHER THAT

16  STANDARD IS MET OR NOT OR SATISFIED OR NOT.

17           TO USING YOUR EXAMPLE, YOU KNOW, THERE

18  IS GOING TO BE A DIFFERENT DETERMINATION ON THAT AND

19  WHETHER THE POLICIES AND PROCEDURES ARE APPLIED AND

20  HOW THEY'RE APPLIED AND WHETHER THEY'RE -- WHETHER

21  THEY'RE IMPACTING INDIVIDUALS.  IT'S GOING TO BE

22  DIFFERENT FOR A 20-YEAR-OLD THAT HAS NO

23  PREDISPOSITION, HAS NO MEDICAL CONDITION, IS NOT

24  TAKING ANY MEDICATIONS, TO SOMEBODY WHO IS 75 YEARS

25  OLD.  I MEAN, THAT'S AN EASY EXAMPLE.  BUT, YOU KNOW,

1  WE'RE TALKING ABOUT DIFFERENT CONDITIONS AND

2  DISABILITIES THAT A FACT-INTENSIVE, CASE-BY-CASE

3  DETERMINATION IS GOING TO HAVE TO BE MADE TO

4  DETERMINE THE ANSWERS TO THE EXACT QUESTIONS THAT

5  YOU'RE ASKING.

6          NOW, ONE THING THAT WE HAVEN'T TALKED

7  ABOUT YET BUT IS A NECESSARY DETERMINATION

8  REQUIREMENT TO CERTIFY A CLASS UNDER RULE 23 IS THE

9  RULE 23(B) REQUIREMENT, WHICH THE PLAINTIFFS ARE

10 SEEKING INJUNCTIVE RELIEF UNDER 23(B)(2).  AND I JUST

11 WANT TO ADDRESS THAT FOR A SECOND BECAUSE WE HAVEN'T

12 TALKED ABOUT IT.

13         THE -- UNDER 23(B)(2), YOU HAVE

14 BASICALLY TWO ELEMENTS:  THAT THE DEFENDANTS' ACTION

15 OR INACTIONS MUST BE BASED ON GROUNDS GENERALLY

16 APPLICABLE TO ALL CLASS MEMBERS AND -- "AND" -- FINAL

17 INJUNCTIVE RELIEF MUST BE APPROPRIATE FOR THE CLASS

18 AS A WHOLE.

19         NOW, THE INJUNCTIVE RELIEF THAT THEY'RE

20 SEEKING IS A COMPLETE STOPPAGE OF THE FARM LINE.  AND

21 I'M NOT HERE TO DISAGREE THAT IF YOU STOP THE FARM

22 LINE, THAT THAT'S GOING TO, YOU KNOW, ADDRESS THE

23 ALLEGED HARM.

24         HOWEVER, I'M MORE INTERESTED IN THE

25 SECOND ELEMENT OF THAT.  THE BETTER QUESTION, IN OUR

1    OPINION, IS WHETHER THIS RELIEF, A COMPLETE STOPPAGE,

2    IS APPROPRIATE FOR EVERY CLASS MEMBER.  IS IT

3    APPROPRIATE FOR THE CLASS AS A WHOLE WHEN YOU HAVE

4    SUCH VAST DIFFERENCES BETWEEN EACH OF THE CLASS

5    MEMBERS; AGAIN, THE MEDICAL HISTORIES, THE

6    MEDICATIONS, THE HEAT SENSITIVITIES, THE DUTY

7    STATUSES, AND THE LIST GOES ON.

8              AND SO THAT'S I THINK YET ANOTHER

9    ELEMENT THAT IS NOT SATISFIED.  AND THE BLANKET

10   DETERMINATION IN INJUNCTIVE RELIEF THAT THEY'RE

11   SEEKING IS NOT GOING TO APPLY TO THE CLASS AS A

12   WHOLE.  THE CLASS OF 4,000 INDIVIDUALS AT ANGOLA, NO

13   MATTER WHO THEY ARE AND WHAT THEIR PREDISPOSITIONS

14   ARE, THAT'S -- THAT IS NOT GOING TO APPLY TO THEM AS

15   A WHOLE.  THAT'S A REQUIREMENT UNDER 23(B)(2) AND IS

16   YET ANOTHER REASON THAT THE REQUIREMENTS ARE NOT

17   SATISFIED.

18         **THE COURT:**  ALL RIGHT.  THANK YOU, MR.

19   JONES.

20         **MR. JONES:**  THANK YOU.

21         **THE COURT:**  MS. McTOOTLE, DO YOU HAVE

22   ANYTHING ELSE YOU'D LIKE TO OFFER?

23         **MS. McTOOTLE:**  YES, YOUR HONOR.  JUST ONE

24   SECOND.

25              SO THE FIRST THING I WOULD LIKE TO

1    OFFER, I -- MY COLLEAGUE WAS ABLE TO PULL UP SOME

2    EVIDENCE OF TWO PEOPLE WHO EXPERIENCED HEAT-RELATED

3    ILLNESS UNDER THE AGE OF 40.  ONE MAN, WHO'S AGE 21,

4    MADE A SELF-DECLARED EMERGENCY COMPLAINING OF BEING

5    WEAK AND DIZZY ON MAY 21, 2024.  HE WAS INSTRUCTED TO

6    GIVE -- TO DRINK WATER.  ANOTHER PERSON, AGE 35,

7    SUFFERED FROM DEHYDRATION ON MAY 15TH OF 2024, AND HE

8    WAS GIVEN HEAT PRECAUTION DUTY STATUS AS A RESULT.

9    SO THERE IS SOME EVIDENCE OF PEOPLE HAVING

10   HEAT-RELATED ILLNESS UNDER THE AGE OF --

11           **THE COURT:**  AT A YOUNGER AGE, LET'S SAY.

12           **MS. McTOOTLE:**  YES.  YES.

13               IN RESPONSE TO COUNSEL'S COMMENTS ABOUT

14   RULE 23(B)(2), IN A WAY, THIS MISAPPREHENDS THE LAW.

15   WHAT'S REQUIRED FOR RULE 23(B)(2) IS THAT A SINGLE

16   INJUNCTION WOULD PROVIDE RELIEF FOR THE ENTIRE CLASS

17   BASED ON WHAT PLAINTIFFS -- THE INJUNCTION SOUGHT.

18   THE MERITS OF THE INJUNCTION, HOW THE COURT ACTUALLY

19   STRUCTURES THE INJUNCTION IN THE END IS NOT

20   APPROPRIATE AT THE CLASS CERTIFICATION STAGE.  WHAT

21   MATTERS IS THE INJUNCTION THAT PLAINTIFFS SEEK.  AND

22   PLAINTIFFS SEEK AN INJUNCTION TO STOP THE FARM LINE,

23   AND THERE IS NO QUESTION THAT THAT WOULD APPLY

24   BROADLY TO THE ENTIRE CLASS.

25           **THE COURT:**  OKAY.  SO LET ME, WITH THE TIME

1  WE HAVE REMAINING HERE -- I THINK YOU'VE ADDRESSED

2  SOME OF THE RULE 23(A) FACTORS:  NUMEROSITY,

3  COMMONALITY.  TYPICALITY, DO YOU WANT TO ADDRESS THAT

4  OR -- THE ADEQUACY OF THE REPRESENTATIVE PARTIES OR

5  PLAINTIFFS REPRESENTING THE CLASS, DO YOU WISH TO

6  ADDRESS ALL THAT BEFORE WE MOVE ON?

7          **MS. McTOOTLE:**  SURE, I CAN BRIEFLY ADDRESS

8  TYPICALITY.

9              TYPICALITY IS MET HERE BECAUSE THE

10  NAMED PLAINTIFFS AND CLASS CLAIMS STEM FROM THE SAME

11  POLICIES, THE POLICIES THAT WE HAVE DISCUSSED AT

12  LENGTH TODAY.  AND THEY ASSERT THE SAME LEGAL

13  THEORIES; THE SAME HEAT THEORY, DIGNITARY HARM

14  THEORY, AND PSYCHOLOGICAL HARM THEORY.  THEY'RE --

15  FOR THAT REASON, TYPICALITY IS SATISFIED.

16              DEFENDANTS RAISE IN THEIR OPPOSITION

17  THE ARGUMENT THAT TYPICALITY IS NOT SATISFIED BECAUSE

18  THE NAMED PLAINTIFFS ARE NOT CURRENTLY ON THE FARM

19  LINE.  BUT THIS ARGUMENT IS -- IT'S A STRAWMAN.  AND

20  IT SIMPLY DOES NOT MATTER THAT THE NAMED PLAINTIFFS

21  ARE NOT CURRENTLY ON THE LINE BECAUSE THEY, LIKE

22  EVERYONE ELSE AT -- IN THE GENERAL CLASS ARE AT RISK

23  OF BEING ASSIGNED TO THE FARM LINE.

24              AND, IN FACT, TWO OF THE NAMED

25  PLAINTIFFS, MR. DAMARIS JACKSON AND MR. DARRIUS

1   WILLIAMS, HAVE BEEN REASSIGNED TO THE FARM LINE

2   DURING THE COURSE OF THIS LITIGATION.  AND THAT'S

3   DESPITE THE DEFENDANTS', QUOTE, STANDING DIRECTIVE

4   THAT ALL NAMED PLAINTIFFS WILL NOT BE ASSIGNED TO THE

5   FARM LINE.

6          **THE COURT:**  LET ME GIVE YOU AN OPPORTUNITY

7   TO ADDRESS ONE OF MR. JONES' ARGUMENTS ABOUT THE

8   FAILURE TO SATISFY THE REQUIREMENTS UNDER RULE 23(B).

9          WOULD YOU LIKE TO ADDRESS THAT OR WOULD

10  YOU LIKE ONE OF YOUR COLLEAGUES TO ADDRESS THAT?

11         **MS. McTOOTLE:**  WELL, AS I SAID EARLIER, YOUR

12  HONOR, MY UNDERSTANDING OF COUNSEL'S ARGUMENT IS THAT

13  THE RELIEF -- IS A QUESTION OF WHETHER THE RELIEF IS

14  APPROPRIATE FOR EVERY CLASS MEMBER.  AND AS I SAID,

15  THE TEST FOR RULE 23(B)(2) IS WHETHER A SINGLE

16  INJUNCTION WOULD PROVIDE RELIEF FOR THE ENTIRE CLASS.

17  AND PLAINTIFFS SEEK AN INJUNCTION TO STOP THE FARM

18  LINE, AND THAT INJUNCTION WOULDN'T NECESSARILY APPLY

19  TO THE ENTIRE CLASS.  STOPPING THE FARM LINE -- THERE

20  IS NO QUESTION THAT IF YOU STOP THE FARM LINE, THAT

21  WOULD AFFECT EVERY SINGLE GENERAL CLASS MEMBER.

22         AND SO THE QUESTION IS NOT ABOUT THE

23  APPROPRIATENESS OF THE INJUNCTION THAT THE COURT

24  ULTIMATELY REACHES.  THAT'S A QUESTION FOR THE

25  MERITS.  FOR RULE 23(B)(2), THE QUESTION IS ABOUT THE

1  INJUNCTION THAT PLAINTIFFS SEEK.

2          **THE COURT:**  OKAY.  ALL RIGHT.  THANK YOU,

3  MS. McTOOTLE.

4          **MS. McTOOTLE:**  THANK YOU, YOUR HONOR.

5          **THE COURT:**  NOW, THERE IS SOMETHING ELSE --

6  SOME OTHER ISSUES THAT YOU-ALL -- MX. DANGARAN, DID

7  YOU WANT TO ADDRESS THE COURT?

8          **MX. DANGARAN:**  YES, YOUR HONOR.

9          **THE COURT:**  AND TELL ME WHAT ISSUE UNDER

10  RULE 23 WILL YOU ADDRESS.

11          **MX. DANGARAN:**  YOUR HONOR, I'M ADDRESSING

12  THE ADA SUBCLASS.

13          **THE COURT:**  VERY GOOD.

14          **MX. DANGARAN:**  D DANGARAN FOR THE

15  PLAINTIFFS.  I'LL TRY MY BEST TO SPEAK SLOWLY.

16          FIRST, YOUR HONOR, PLAINTIFFS ARE

17  NARROWING OUR PROPOSED ADA SUBCLASS TO TIE IT

18  SPECIFICALLY TO IMPAIRED THERMOREGULATION.

19  PLAINTIFFS HAVE FOUND THIS NECESSARY AFTER CONDUCTING

20  THREE 30(B)(6) DEPOSITIONS LAST WEEK.  PLAINTIFFS

21  SEEK TO CERTIFY A SUBCLASS OF, QUOTE, ALL PERSONS

22  INCARCERATED AT LSP WHO CURRENTLY ARE OR MAY IN THE

23  FUTURE BE ASSIGNED TO THE FARM LINE AND WHO HAVE

24  DISABILITIES THAT MAY CAUSE, OR THAT ARE TREATED WITH

25  MEDICATIONS THAT MAY CAUSE, IMPAIRED

1  THERMOREGULATION.  *COLE* AND *TELLIS* ARE TWO OTHER

2  DISTRICT COURTS IN THIS CIRCUIT THAT HAVE CERTIFIED

3  SIMILAR SUBCLASSES.  NOTABLY *COLE* CERTIFIED AN EVEN

4  MORE SPECIFIC SUBCLASS FOR A HEAT-SENSITIVE GROUP

5  ALONGSIDE ITS ADA SUBCLASS THAT RESEMBLES OURS.  THE

6  FIFTH CIRCUIT AFFIRMED *COLE'S* CLASS CERTIFICATION IN

7  *YATES*.

8            NEXT I'D LIKE TO JUST START OFF BY

9  ADDRESSING DEFENDANTS' ARGUMENTS REGARDING *GILLESPIE*

10 AND *LEWIS* VERSUS *CAIN*.

11            *GILLESPIE* DOES NOT BAR CLASS

12 CERTIFICATION FOR AT LEAST TWO REASONS.  FIRST,

13 PLAINTIFFS' ADA CLAIMS DO NOT SEEK EQUITABLE RELIEF

14 WITHIN THE SUBJECT MATTER OF *LEWIS*.  *LEWIS* ADDRESSES

15 THE DOC'S FAILURE IN STAFFING, ARCHITECTURAL

16 ACCESSIBILITIES SUCH AS CREATING RAMPS FOR PEOPLE WHO

17 USE WHEELCHAIRS, AND FAILING TO TRACK AND PROCESS

18 REQUESTS FOR ACCOMMODATION UNDER THE ADA WHEN THEY

19 ARE FILED IN THE ADMINISTRATIVE REMEDY PROCEDURE, OR

20 ARP.  IMPORTANTLY, THE *LEWIS* COURT DISMISSED THOSE

21 PLAINTIFFS' CLAIMS RELATED TO WORK ASSIGNMENTS AND

22 DUTY STATUSES NEARLY FOUR YEARS AGO.

23            DEFENDANTS CONCEDED DURING THIS COURT'S

24 JUNE 18, 2024 HEARING THAT, QUOTE, HEAT-RELATED

25 MEDICAL ISSUES THAT MIGHT ARISE IN THE CONTEXT OF

1   WORKING ON THE FARM LINE, END QUOTE, DID NOT COME UP

2   IN *LEWIS*.  AT ISSUE HERE, BY CONTRAST --

3          **THE COURT:**  WAS THE FARM LINE, NOT MEDICAL

4   CARE.  CORRECT?

5          **MX. DANGARAN:**  EXACTLY.  THE FARM LINE

6   DIFFERENTIATES OUR CASE FROM *LEWIS*, IN SHORT.

7              WE ARE FOCUSED ON WHETHER LSP'S

8   POLICIES, PRACTICES, AND PROCEDURES FOR IDENTIFYING

9   AND PROVIDING REASONABLE ACCOMMODATIONS TO PERSONS

10  WITH IMPAIRED THERMOREGULATION ARE INADEQUATE AS IT

11  PERTAINS TO THE FARM LINE SPECIFICALLY.

12             DEFENDANTS POINT TO A DISTRICT COURT

13  CASE CALLED *PAPPILLION* TO SHOW WHY THIS CASE LIKE

14  THAT ONE SHOULD NOT MOVE FORWARD.  BUT *PAPPILLION*

15  AGREED THAT -- ARGUED THAT LSP FAILED TO PROVIDE

16  ADEQUATE MEDICAL CARE, WHICH IS ACTIVELY AT ISSUE IN

17  *LEWIS*.  HEAT PRECAUTION DUTY STATUSES FOR WORK ON THE

18  FARM LINE EXPLICITLY ARE NOT AT ISSUE.

19             AN ANALOGOUS CASE FOR THIS KIND OF

20  DIFFERENTIATION IS *EQUAL ACCESS FOR EL PASO VERSUS*

21  *HAWKINS* OUT OF THE WESTERN DISTRICT OF TEXAS.  IT

22  ALLOWED TWO CLAIMS ABOUT DIFFERENT PARTS OF THE

23  MEDICAID PROVISIONS TO GO FORWARD SIMULTANEOUSLY.

24         **THE COURT:**  SO LET ME ASK YOU THIS.  HOW

25  MANY PERSONS ARE IN THE PROPOSED SUBCLASS, IF YOU

1  KNOW?

2      **MX. DANGARAN:**  YOUR HONOR, THE NUMBER'S IN

3  FLUX.  BUT RECENTLY -- WE HAVE TESTIMONY FROM

4  DEFENDANTS' COUNSEL AT THE TRO HEARING THAT THERE ARE

5  ABOUT 500 PEOPLE WITH IMPAIRED THERMOREGULATION DUTY

6  STATUSES PROVIDED.  THAT NUMBER HAS SINCE NEARLY

7  TRIPLED JUST AS TO THOSE WITH -- THE GROUP THAT

8  THEY'VE ALREADY IDENTIFIED.  THEY HAVEN'T FINISHED

9  IDENTIFYING EVERYONE.  AND THERE ARE TWO ATTACHMENTS

10 TO THE NEW POLICY HCP8.  SO WE KNOW WE'VE SATISFIED

11 NUMEROSITY, GIVEN THEIR REPRESENTATIONS.

12      JUST ONE QUICK OTHER POINT ABOUT

13 *GILLESPIE*.  EVEN APART FROM THE MERITS, RIGHT NOW

14 *LEWIS VERSUS CAIN* IS ADMINISTRATIVELY STAYED, SO

15 THERE IS ACTUALLY AN INJUNCTION THAT THIS WOULD BUTT

16 UP AGAINST.

17      I WILL -- I'M HAPPY TO ADDRESS

18 NUMEROSITY, ADEQUACY AND TYPICALITY, BUT I THINK I

19 WANT TO FOCUS ON COMMONALITY, WHICH I THINK IS THE

20 BIGGEST ISSUE HERE.

21      **THE COURT:**  YES, I THINK THAT'S RIGHT.

22      **MX. DANGARAN:**  FIRST I'LL JUST POINT OUT

23 THAT DEFENDANTS' COUNSEL STATED JUST NOW THAT HOW

24 HCP8 -- HOW THAT'S IMPLEMENTED WILL BE ACROSS THE

25 BOARD.  THAT IS PRECISELY WHY CLASS CERTIFICATION IS

1  NECESSARY FOR THIS SUBCLASS.  POINTING TO THE POLICY

2  AND SAYING IT WILL BE IMPLEMENTED ACROSS THE BOARD

3  MAKES IT A COMMON QUESTION.  WE ARE FOCUSED AGAIN ON

4  POLICIES HCP8, WHICH IS FOUND AT ECF 132-5, AND LSP

5  DIRECTIVE 13.067, WHICH IS FOUND AT ECF 120-41.

6          YOUR HONOR, ALTHOUGH OUR MOTION AND

7  REPLY BRIEF ASSERTED THAT WE RAISED ONLY A METHODS OF

8  ADMINISTRATION CLAIM, PLAINTIFFS' COMPLAINT RAISED

9  BOTH A REASONABLE ACCOMMODATION CLAIM AND A METHODS

10  OF ADMINISTRATION CLAIM.  AND THE TWO CLAIMS REALLY

11  GO HAND IN GLOVE, AS HIGHLIGHTED BY DEFENDANTS'

12  RECENT REPRESENTATIONS REGARDING HOW THEY ARE

13  PURPORTEDLY IMPLEMENTING THIS REVISED HCP8.

14  ACCORDINGLY, WE WILL BE PURSUING OUR REASONABLE

15  ACCOMMODATION CLAIM AS A SUBCLASS ALONGSIDE THE

16  METHODS OF ADMINISTRATION CLAIM.

17          WHILE WE ONLY NEED ONE COMMON QUESTION

18  OF LAW OR FACT, OUR SUBCLASS RAISES AT LEAST FOUR.

19  FIRST TO THE REASONABLE ACCOMMODATION CLAIM, AT ISSUE

20  IS WHETHER HCP8 PROVIDES REASONABLE ACCOMMODATIONS

21  FOR ANY OF THE SUBCLASS MEMBERS.  EACH SUBCLASS

22  MEMBER SEEKS REMOVAL FROM THE FARM LINE DURING

23  PERIODS OF HIGH HEAT -- WHICH DR. VASSALLO AND

24  PREVIOUSLY ALSO DEFENDANTS DEFINED AS 88 DEGREES AS A

25  HEAT INDEX -- AS A REASONABLE ACCOMMODATION FOR THEIR

1 DISABILITY.

2             BECAUSE THE HEAT PRECAUTION DUTY STATUS

3 UNDER THIS CURRENT HCP8 POLICY GOES INTO EFFECT ONLY

4 WHEN THE HEAT INDEX REACHES 91 DEGREES FAHRENHEIT FOR

5 ONLY PART OF THE YEAR RATHER THAN AT 88 DEGREES

6 FAHRENHEIT THROUGHOUT THE ENTIRE YEAR, PLAINTIFFS

7 CHALLENGE WHETHER IT IS AN ADEQUATE REASONABLE

8 ACCOMMODATION FOR ANYONE IN THE ADA SUBCLASS.

9        **THE COURT:** SO IF THE DEFENDANTS SIMPLY

10 CHANGED THE POLICY TO LOWER IT TO 88 DEGREES, YOU'D

11 BE SATISFIED WITH THAT?

12        **MX. DANGARAN:** NO, YOUR HONOR, WHICH LEADS

13 TO OUR METHODS OF ADMINISTRATION CLAIM.  THAT CLAIM

14 ADDRESSES HOW LSP ACTUALLY ADMINISTERS THE HEAT

15 SAFETY MITIGATION EFFORTS THAT THEY'VE OUTLINED IN

16 HCP8 AS WELL AS IN THEIR REPRESENTATIONS OTHER THAN

17 HCP8 ITSELF, INCLUDING, ONE, WHETHER DEFENDANTS

18 AUTOMATICALLY PROVIDE HEAT PRECAUTION DUTY STATUSES

19 TO ALL THOSE WITH IMPAIRED THERMOREGULATION, AS THEY

20 HAVE REPRESENTED, EVEN THOUGH HCP8 DOES NOT ON ITS

21 FACE INDICATE AUTOMATIC ENFORCEMENT.

22             TWO, WHETHER ALL THOSE WHO HAVE

23 ALLEGEDLY RECEIVED A HEAT PRECAUTION DUTY STATUS HAVE

24 BEEN INFORMED OF THEIR NEW STATUS AND ACTUALLY

25 PROVIDED THE PIECE OF PAPER THEY CARRY AROUND THAT

1  STATES THEY HAVE THAT STATUS, WHICH WE HAVE EVIDENCE

2  SHOWING THEY HAVE NOT.

3          AND THREE, WHETHER LSP HAS FAILED TO

4  UPDATE ITS DIRECTIVE 13.067 TO ALIGN WITH THE NEW

5  HCP8 POLICY AND THIS COURT'S ORDER, WHICH, AGAIN,

6  THEY HAVE NOT.  SO THE LSP DIRECTIVE IS ACTUALLY

7  ENFORCING THE OLD POLICY; WHEREAS THE NEW REVISED

8  POLICY HAS EXPANDED A LIST BROADLY AND BROUGHT THE

9  HEAT INDEX UP TO 91 DEGREES.  SO THERE ARE TWO

10 COMPETING POLICIES, AND HOW THEY'RE ACTUALLY

11 ENFORCING THAT IS A COMMON QUESTION OF FACT.

12          SO I -- AS TO PLAINTIFFS'

13 EXPERIENCES -- THIS GOES PERHAPS TO COMMONALITY AND

14 PERHAPS TO TYPICALITY -- THERE ARE AFFIDAVITS ALREADY

15 IN THE RECORD OF PLAINTIFFS' EXPERIENCES SUPPORTING

16 THE PRELIMINARY INJUNCTION MOTION AS WELL AS THE

17 CLASS CERT MOTION.  AND I BELIEVE THAT DR. SUSI

18 VASSALLO IN HER SUPPLEMENTAL DECLARATION AT ECF 52-3

19 HAS OUTLINED OUR NAMED CLASS REPRESENTATIVES' MEDICAL

20 HISTORIES AS WELL.  I JUST NOTE, BECAUSE AGE HAS COME

21 UP, THAT ONE OF OUR NAMED CLASS REPRESENTATIVES,

22 MR. KEVIAS HICKS, IS AGE 34.  HE HAS SHOWN SYMPTOMS

23 OF HEAT STRESS DISORDERS WHILE ON THE FARM LINE.

24          **THE COURT:**  HOW OLD IS HE?

25          **MX. DANGARAN:**  HE'S 34 YEARS OLD, YOUR

1  HONOR.

2          **THE COURT:**  THANK YOU.

3          **MX. DANGARAN:**  I'LL JUST CONCLUDE BY NOTING

4  THAT DEFENDANTS' COUNSEL ALSO DISCUSSED THE

5  IMPLEMENTATION OF THIS NEW POLICY.  AS I'VE SHOWN

6  WITH THE METHODS OF ADMINISTRATION CLAIM, THAT GOES

7  TO THE MERITS.  AND THE SUBCLASS CHALLENGES IT.

8  THEREFORE, THAT IS A COMMON QUESTION OF LAW.  HOW

9  EXACTLY THEY'RE IMPLEMENTING THE NEW POLICY IS A

10 COMMON QUESTION OF LAW.

11              AND I'LL JUST END BY NOTING, REGARDING

12 23(B)(2), THE REAL QUESTION IS DEFENDANTS' BEHAVIOR.

13 AND DEFENDANTS' BEHAVIOR HERE IS THE SAME AS TO ALL

14 SUBCLASS MEMBERS AS CODIFIED IN HCP8 AND LSP

15 DIRECTIVE 13.067.

16         **THE COURT:**  THAT CERTAINLY IS THE --

17 CERTAINLY THAT IS THE STANDARD UNDER 23(B), BUT --

18 OKAY.  LET ME HEAR FROM MR. JONES.

19         **MR. JONES:**  YOUR HONOR, WE RESPECTFULLY

20 SUBMIT THAT -- THIS IS AN EASY ONE -- THE ADA

21 SUBCLASS IS BARRED BY RES JUDICATA UNDER THE *LEWIS*

22 CASE.  AND ACTUALLY THERE IS A RULING JUST THIS PAST

23 WEEK IN THE *LEWIS* CASE -- ACTUALLY *LEWIS PARKER* --

24 FROM THE FIFTH CIRCUIT -- AND THE CITE IS 2025

25 WESTLAW -- OR WL 473408 FROM FEBRUARY 12TH -- THAT

1    ACTUALLY LIFTED THE STAY AND DISMISSED THE APPEAL.

2                    AND SO WHAT I DO WANT TO READ FOR YOU

3    TO COMPARE IS THE CLASS THAT WAS CERTIFIED IN THE

4    *LEWIS* CASE VERSUS THE SUBCLASS THAT THEY'RE SEEKING

5    TO CERTIFY HERE.  IN THE *LEWIS* CASE, WHAT WAS

6    CERTIFIED IN 2018 WAS ALL QUALIFIED INDIVIDUALS WITH

7    A DISABILITY AS DEFINED BY THE ADA/RA WHO ARE OR WILL

8    BE IN THE FUTURE INCARCERATED AT LSP.  THAT'S THE

9    *LEWIS* CLASS.

10                    THE CLASS THAT THEY'RE SEEKING TO

11   CERTIFY AS A SUBCLASS HERE IS A SUBCLASS COMPRISING

12   ALL PERSONS INCARCERATED AT LSP WITH DISABILITIES

13   THAT SUBSTANTIALLY LIMITS ONE OR MORE OF THEIR MAJOR

14   LIFE ACTIVITIES WHO CURRENTLY ARE OR MAY IN THE

15   FUTURE BE ASSIGNED TO THE FARM LINE.  IT IS A

16   SLIGHTLY MORE LIMITED SUBCLASS, BUT IT IS SUBSUMED

17   WITHIN THE CLASS THAT'S ALREADY BEEN CERTIFIED BY

18   *LEWIS*.

19                    AND THE *PAPPILLION* CASE THAT WE'VE

20   CITED SPECIFICALLY PROVIDES THAT INDIVIDUAL CLAIMS

21   ARE NOT MAINTAINABLE IF THOSE CLAIMS ARE SUBSUMED IN

22   THE *LEWIS* CLASS ACTION.  SO THE ADA SUBCLASS IS

23   BARRED BY RES JUDICATA.

24                    AND I'LL MENTION THE RESULT OF THE

25   RECENT *LEWIS PARKER* CASE THAT OCCURRED JUST LAST WEEK

1   WAS THAT THE REMEDIAL ORDER THAT WAS ISSUED BY THE

2   DISTRICT COURT WAS NOT A FINAL JUDGMENT, AND THE

3   REMEDIAL ORDER CONTEMPLATES THAT THE COURT WILL ISSUE

4   A REMEDIAL PLAN THAT WILL ADDRESS THE CLASS THAT WAS

5   CERTIFIED.

6             AND SO, AGAIN, WE BELIEVE THAT THIS IS

7   AN EASY ONE.  BEFORE YOU EVER GET TO ANY OF THE RULE

8   23 REQUIREMENTS, IT HAS BEEN SUBSUMED WITHIN THE

9   *LEWIS* CLASS THAT THEY'RE SEEKING TO CERTIFY HERE AND

10  IT'S BARRED BY RES JUDICATA.

11            **THE COURT:**  SO THERE SHOULD NOT EVEN BE --

12  THE COURT SHOULD NOT EVEN CONSIDER A SUBCLASS?

13            **MR. JONES:**  CORRECT.  CORRECT.  BECAUSE IT'S

14  ALREADY BEEN CERTIFIED.

15            **THE COURT:**  OKAY.  WELL, THAT'S -- I

16  UNDERSTAND THAT.  AND I FEEL OBLIGATED TO ALLOW YOUR

17  OPPONENT AT THIS STAGE OF THE HEARING -- AND I'LL

18  GIVE YOU AN OPPORTUNITY RIGHT NOW, BUT LET ME SEE --

19  COUNSEL, WHAT IS YOUR RESPONSE?  I'M SURE YOU'RE

20  FAMILIAR WITH THE *LEWIS* LITIGATION.  AND WHAT'S YOUR

21  RESPONSE ON THE RES JUDICATA ISSUE?

22            **MX. DANGARAN:**  YOUR HONOR, I ADDRESSED

23  *GILLESPIE* FIRST FOR THIS EXACT REASON.  FIRST, *PARKER*

24  DID NOT ACTUALLY GO INTO EFFECT YET.  THE MANDATE HAS

25  BEEN STAYED BY ORDER OF THE COURT THE DAY AFTER THE

1  OPINION WAS FILED.  AND FOOTNOTE 1 OF THE *PARKER*

2  OPINION STATES THAT THE STAY WILL REMAIN IN PLACE

3  UNTIL THE MANDATE ISSUES.  BECAUSE A JUDGE OF THAT

4  COURT HAS ALREADY UPHELD THE MANDATE, THE OPINION

5  ITSELF HAS NOT GONE INTO EFFECT; AND THEREFORE, THERE

6  IS NO REMEDY -- REMEDIAL PLAN TO BE COMING SOON.  WE

7  DON'T KNOW WHEN IT'S GOING TO COME, BUT --

8         **THE COURT:**  BUT DO YOU AGREE THAT THE FIFTH

9  CIRCUIT HAS AT LEAST OFFERED SOME GUIDANCE ON

10 CERTIFICATION OF SUBCLASSES UNDER SIMILAR

11 CIRCUMSTANCES?

12        **MX. DANGARAN:**  SO "UNDER SIMILAR

13 CIRCUMSTANCES" IS THE ENTIRE QUESTION.  THE MATTER IS

14 NOT THE SAME.  WHEN YOU READ *LEWIS* AS WELL AS

15 *PAPPILLION* AND COMPARE WHAT'S ACTUALLY AT ISSUE,

16 YOU'LL SEE WHY OUR CASE IS NOT UNDER THE SAME MATTER.

17 THEY LISTED FORMS OF THE ADA METHODS OF

18 ADMINISTRATION CLAIM THAT RELATE.  BUT EVERYTHING IN

19 *LEWIS* GOES TO WHETHER THE ADA GRIEVANCE IS UNDERSTOOD

20 TO BE AN ADA ACCOMMODATION CLAIM RATHER THAN JUST

21 WITHIN THE ARP SYSTEM.  WE HAVE NOT ALLEGED THAT

22 CLAIM.  OUR CLAIM IS ABOUT THE FARM LINE.  *LEWIS*

23 DOESN'T TOUCH THE FARM LINE.

24        *LEWIS* IS EXTREMELY DETAILED IN LISTING

25 IN SUB ELEMENTS TO THE METHODS OF ADMINISTRATION

1  CLAIM AS WELL AS THE REASONABLE ACCOMMODATION CLAIM

2  AND AT THE LIABILITY STAGE TOOK OUT -- DENIED THE

3  CLAIMS REGARDING WORK DUTY STATUSES.  FOR THAT

4  REASON, *LEWIS* IS NOT A BAR UNDER *GILLESPIE*.

5          **THE COURT:**  THANK YOU.

6          MR. JONES?

7          **MR. JONES:**  I DO APPRECIATE THE ATTEMPT TO

8  DISTINGUISH; HOWEVER -- AND I DON'T WANT TO READ IT

9  FOR YOU AGAIN, BUT -- YOU CAN READ IT FOR YOURSELF --

10 THE TWO CLASSES -- THIS PROPOSED SUBCLASS, I DON'T

11 KNOW HOW YOU COULD POSSIBLY ARGUE THAT IT DOES NOT

12 FALL, AS DEFINED IN THEIR BRIEF AND IN THEIR MOTION,

13 INTO THE CLASS THAT'S ALREADY BEEN CERTIFIED.

14          SO I'LL MOVE ON FROM THAT, BECAUSE WE

15 DO BELIEVE, ASIDE FROM THE RES JUDICATA ISSUE IN THE

16 *LEWIS* CASE, THAT THE MERITS OR THE REQUIREMENTS OF

17 RULE 23 ARE STILL NOT SATISFIED.  AND IT'S EVEN A

18 FURTHER REACH FOR THE SUBCLASS, THE ADA SUBCLASS, FOR

19 EACH OF THEM TO BE CERTIFIED, MOSTLY FOR A LOT OF THE

20 SAME REASONS THAT WE'VE ALREADY ARGUED TODAY, WHICH

21 IS THE INDIVIDUAL DIFFERENCES BETWEEN EACH SUBCLASS

22 MEMBER SPECIFICALLY WITH RESPECT TO THEIR DISABILITY.

23          AND AGAIN, IN ORDER TO DETERMINE

24 WHETHER SOMEBODY IS IN THE CLASS -- IN THE SUBCLASS,

25 YOU HAVE TO DETERMINE THAT THEY HAVE A DISABILITY

1   THAT -- IT IS ONE THAT SUBSTANTIALLY LIMITS ONE OR

2   MORE OF THEIR MAJOR LIFE ACTIVITIES WHO WERE ON THE

3   FARM LINE OR MAY IN THE FUTURE BE ASSIGNED TO THE

4   FARM LINE.  SO ALL OF THESE QUESTIONS HAVE TO BE

5   ANSWERED FROM EACH INDIVIDUAL CLASS MEMBER OR

6   SUBCLASS MEMBER TO DETERMINE WHETHER THEY EVEN FALL

7   WITHIN THE CLASS.

8              AND SO IT'S INTERESTING THAT THEY COME

9   UP HERE AND THEY WANT TO IDENTIFY TO YOU INDIVIDUAL

10  CIRCUMSTANCES OR INDIVIDUAL CASES, INDIVIDUAL

11  POTENTIAL CLASS MEMBERS AND THEIR CIRCUMSTANCES ON

12  THE FARM LINE.  AND THAT'S OUR POINT, IS THAT YOU

13  HAVE TO LOOK -- AND I HAVE ABOUT TEN OTHER QUESTIONS

14  FOR EVERY ONE OF THOSE EXAMPLES THAT WOULD NEED TO BE

15  DETERMINED TO DETERMINE WHETHER THEY'RE IN THE CLASS

16  OR NOT.

17             AND SO WITH RESPECT TO COMMONALITY,

18  YOU'RE GOING TO HAVE TO GO THROUGH AND ANSWER ALL

19  THESE QUESTIONS TO DETERMINE WHETHER IT'S A

20  QUALIFYING DISABILITY.  I MEAN, THE EXAMPLE THAT

21  WE'VE -- THAT -- I DON'T KNOW IF WE ADDRESSED IT IN

22  OUR BRIEF OR NOT, BUT THE DISABILITY OF DYSLEXIA, IS

23  THAT A DISABILITY THAT IS GOING TO BE IMPACTED BY THE

24  POLICIES THAT THEY'RE COMPLAINING ABOUT?

25             **THE COURT:**  BUT I THINK THE PLAINTIFFS ARE

1  PRETTY CLEAR; THEY'RE TALKING ABOUT THERMOREGULATION

2  OF THE BODY.  WE'RE NOT TALKING ABOUT SOME SORT OF

3  EMOTIONAL ISSUES, SOME SORT OF COGNITIVE ISSUES.

4  IT'S ABOUT -- I THINK THEY'VE PRETTY NARROWLY DEFINED

5  IT TO IDENTIFY THOSE WHO, AGAIN, BECAUSE OF

6  MEDICATIONS OR THE DIAGNOSIS OF MEDICAL CONDITIONS,

7  AGAIN, AFFECT THERMOREGULATION.  AND THAT'S PRETTY

8  EASY TO DEFINE, IT SEEMS TO ME; DOES THIS MEDICINE

9  YOU TAKE, DOES THE HEAT INDEX, DOES THE DIET, DOES

10  WHATEVER AFFECT THE THERMOREGULATION -- THE ABILITY

11  OF YOUR BODY TO THERMOREGULATE?

12          **MR. JONES:**  BUT THAT'S NOT WHAT THE CLASS --

13  THE SUBCLASS IS DEFINED AS.  AND SO IN THAT WAY, AT

14  THE VERY LEAST --

15          **THE COURT:**  I UNDERSTAND.  SO YOU --

16          **MR. JONES:**  -- IT'S OVERLY EXPANSIVE.  AND

17  SO -- BECAUSE MY EXAMPLE OF DYSLEXIA IS A QUALIFYING

18  DISABILITY UNDER THE ADA.  AND ACCORDING TO THEIR

19  SUBCLASS DEFINITION, IT WOULD QUALIFY.  AND SO IT

20  DOESN'T MENTION ANYTHING ABOUT THERMOREGULATION OR

21  ANY OF THE OTHER ISSUES THAT THEY'VE SPECIFICALLY

22  ALLEGED OR COMPLAINED ABOUT.

23          **THE COURT:**  SO LET ME HEAR FROM THE

24  PLAINTIFFS AND SEE -- SO THAT I HAVE SOME

25  CLARIFICATION ABOUT THAT, MR. JONES.  THANK YOU.  AND

1  I'LL GIVE YOU AN OPPORTUNITY TO WRAP UP IN JUST A

2  MOMENT.

3          **MX. DANGARAN:**  I THINK -- YOUR HONOR, MAYBE

4  I WASN'T CLEAR.  WE ARE NARROWING OUR SUBCLASS TO

5  IMPAIRED THERMOREGULATION.  SO SOMEONE WITH DYSLEXIA

6  WHO DOES NOT HAVE ANY CONDITION NOR TAKE ANY

7  MEDICATION THAT IMPAIRS THERMOREGULATION WILL NOT BE

8  PART OF THE SUBCLASS.  MR. JONES WAS RESPONDING TO

9  OUR BRIEFING, WHICH WE'VE NARROWED.

10          AND I THINK SOME OF HIS COMMENTS ALSO

11  GO TO ASCERTAINABILITY.  THEY HAVE SHOWN THROUGH

12  THEIR REPRESENTATIONS THAT THEY ARE ABLE TO ASCERTAIN

13  WHO HAS IMPAIRED THERMOREGULATION.  THAT IS PRECISELY

14  WHAT HCP8 INTENDS TO DO.  AND THEY'VE TAKEN STEPS,

15  THEY'VE ALLEGED, TO PROVIDE HEAT PRECAUTION DUTY

16  STATUSES TO THOSE ON THEIR ATTACHMENT A, AND THEY'RE

17  GOING TO DO IT FOR ATTACHMENT B, WHICH ARE CONDITIONS

18  AND MEDICATIONS.  I DON'T KNOW WHICH IS WHICH.  I'M

19  SORRY.  BUT THEY'VE STARTED FOR HALF OF THE GROUP.

20          AND SO IT IS UP TO THE DOCTORS AND

21  FOLKS IN THEIR TEAM TO PROVIDE THOSE STATUSES AS

22  NECESSARY.  AND IMPAIRED THERMOREGULATION IS

23  SOMETHING THAT IN *YATES* AND IN *COLE* IS AN

24  ASCERTAINABLE DEFINITION.

25          **THE COURT:**  THANK YOU FOR THAT

1  CLARIFICATION, MX. DANGARAN.

2          ALL RIGHT.  MR. JONES, DO YOU CARE TO

3  WRAP UP OR DO YOU HAVE ANY OTHER ISSUES YOU WISH TO

4  ADDRESS VERY BRIEFLY?

5          **MR. JONES:**  I'M HAPPY TO DO SO BRIEFLY.

6          I GUESS TO WRAP UP AND TO KIND OF PUT

7  THIS IN PERSPECTIVE WITH RESPECT TO RULE 23 AND THE

8  ADA SUBCLASS SPECIFICALLY, OUR POINT, OF COURSE, IS

9  THAT THE POTENTIAL SUBCLASS MEMBERS THAT HAS NOW BEEN

10  FURTHER LIMITED TO IMPAIRED THERMOREGULATION

11  CONDITION FALL ANYWHERE ON -- STILL FALL ANYWHERE ON

12  THE MEDICAL OR PHYSIOLOGICAL SPECTRUM.  AND THE

13  UNIQUE INDIVIDUAL DIFFERENCES AMONGST EACH CLASS

14  MEMBERS IS GOING TO BE REQUIRED STILL TO DETERMINE

15  HOW THE POLICIES POTENTIALLY AFFECT THEM OR DON'T AND

16  HOW THAT'S GOING TO BE IMPLEMENTED.

17          AND AGAIN, WE DO REALLY -- WE REALLY

18  APPRECIATE THE OPPORTUNITY TO ADDRESS HOW HP -- THE

19  CHANGES TO HPC8 HAVE BEEN UPDATED AND CHANGED AND HOW

20  IT'S BEING IMPLEMENTED IN THIS CONTEXT TO ADDRESS

21  EXACTLY WHAT WE'RE TALKING ABOUT HERE.

22          AND THEN I GUESS LASTLY -- I'M SORRY,

23  BUT I'M A LITTLE HUNG UP ON (B)(2) BECAUSE THAT'S

24  WHAT WE'RE TALKING ABOUT.  WE'RE NOT TALKING ABOUT

25  MONEY DAMAGES.  WE'RE TALKING ABOUT INJUNCTIVE

1   RELIEF.

2          **THE COURT:**  CORRECT.

3          **MR. JONES:**  AND AGAIN, THE FINAL INJUNCTIVE

4   RELIEF MUST BE APPROPRIATE FOR THE CLASS AS A WHOLE.

5   THAT'S THE -- YOU KNOW, WHAT THEY -- WHAT THE

6   INJUNCTIVE RELIEF HAS SOUGHT, BUT IT'S EVEN -- YOU

7   KNOW, FOR THE GENERAL CLASS THEY WANT TO STOP WITH

8   THE FARM LINE.  THAT'S THE INJUNCTIVE RELIEF.

9              FOR THE ADA SUBCLASS INJUNCTIVE RELIEF,

10  THEY WANT REMOVAL OF MEMBERS OF THE ADA SUBCLASS FROM

11  ASSIGNMENT TO THE FARM LINE AS REQUIRED BY THE

12  ADA AND, I GUESS, BUT ONLY FOR INDIVIDUALS WITH

13  IMPAIRED THERMOREGULATION CONDITIONS NOW.

14             AND SO THAT -- DOES THAT REQUESTED

15  INJUNCTIVE RELIEF -- DOES THAT ADDRESS THE ENTIRE

16  SUBCLASS AS A WHOLE?  THAT'S THE REQUIREMENT UNDER

17  (B)(2).  AND WE SUBMIT TO YOU THAT IT DOES NOT

18  BECAUSE OF ALL THE INDIVIDUAL AND UNIQUE DIFFERENCES

19  BETWEEN THE CLASS MEMBERS, ESPECIALLY SO WITH RESPECT

20  TO THE INDIVIDUALS THAT WOULD POTENTIALLY COMPRISE

21  THE ADA SUBCLASS.

22          **THE COURT:**  DO YOU THINK THAT IT WOULD BE

23  MORE EASILY -- OR EASIER TO IDENTIFY PERSONS WHO MAY

24  SATISFY THE ELEMENTS OF THE SUBCLASS; THAT IS,

25  PERSONS WHO HAVE SOME THERMOREGULATION ISSUE OR COULD

1  SUFFER SOME THERMOREGULATION ISSUES?

2          **MR. JONES:**  I WILL CONCEDE THAT, YOU KNOW --

3  AND THIS IS PART OF OUR ARGUMENT, WHICH IS THAT

4  EVERYBODY IS GOING TO GET A DUTY STATUS.  THEY'RE

5  GOING TO BE INDIVIDUALLY ASSESSED BY MEDICAL STAFF.

6  AND IT MAY BE THAT CERTAIN INDIVIDUALS WITH A

7  CONDITION OR THAT THEY'RE ON A MEDICATION -- WHICH,

8  AGAIN, I THINK WE'VE INDICATED THAT OVER 2,000

9  INMATES ARE ON MEDICATION THAT IS ON THE LIST THAT

10 HAS BEEN UPDATED AT HPC8.

11         AND SO IT CAN BE DETERMINED, BUT, YOU

12 KNOW, YOU AND I ARE DIFFERENT AND EVERYBODY IN THIS

13 ROOM IS DIFFERENT.  AND SO, YOU KNOW, HOW THOSE

14 INDIVIDUAL DIFFERENCES ARE GOING TO -- HOW WE'RE

15 GOING TO BE IMPACTED FROM, YOU KNOW, THE HEAT

16 SENSITIVITIES OR THE HEAT IS A COMPLETELY UNIQUE

17 DETERMINATION.

18         **THE COURT:**  OKAY.  THANK YOU, MR. JONES.

19         ALL RIGHT.  COUNSEL, LET ME THANK

20 YOU-ALL FOR COMING ON IN TODAY.  THIS HAS BEEN QUITE

21 HELPFUL.

22         AS I INDICATED PREVIOUSLY, I WILL

23 CERTAINLY CONSIDER YOUR ARGUMENTS.  I WILL PROVIDE

24 FURTHER GUIDANCE ON WHETHER I WILL REQUIRE ADDITIONAL

25 BRIEFING ON THE ISSUE OR PERHAPS EVEN EVIDENCE OR

1  TESTIMONY ON THESE ISSUES.  VERY IMPORTANT ISSUES

2  HERE.  WE JUST -- OF COURSE, BOTH SIDES AND THE COURT

3  WANT TO MAKE SURE WE GET THINGS RIGHT AND MAKE SURE

4  THAT THE EVIDENCE, OF COURSE, IS HERE TO SUPPORT WHAT

5  THE PLAINTIFFS ARE ASKING.  SO MORE TO FOLLOW.

6            LET ME THANK COUNSEL FOR YOUR

7  ARGUMENTS.  AGAIN, I APPRECIATE YOU-ALL BEING VERY

8  WELL-PREPARED AND OFFERING SOME ARGUMENTS, AGAIN,

9  THAT GO DIRECTLY INTO SOME OF THESE ISSUES, WHICH, OF

10 COURSE, MAKES MY JOB A LOT EASIER.  SO AGAIN, THERE

11 WILL BE FURTHER GUIDANCE OR I MAY SIMPLY ISSUE THE

12 RULING.  IF I REQUIRE ANYTHING ELSE, I'LL CERTAINLY

13 LET YOU-ALL KNOW.  ALL RIGHT?

14            THERE BEING NO FURTHER BUSINESS FOR THE

15 COURT, COURT IS NOW ADJOURNED.

16       **THE LAW CLERK:**  ALL RISE.

17            COURT IS NOW ADJOURNED.

18       **(WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)**

19            **C E R T I F I C A T E**

20       **I CERTIFY THAT THE FOREGOING IS A CORRECT**

21 **TRANSCRIPT FROM THE RECORD OF THE PROCEEDINGS IN THE**

22 **ABOVE-ENTITLED NUMBERED MATTER.**

23 **S:/NATALIE W. BREAUX**

24 **NATALIE W. BREAUX, RPR, CRR**

25 **OFFICIAL COURT REPORTER**