# Exhibit 2

```
 1          UNITED STATES DISTRICT COURT

 2          MIDDLE DISTRICT OF LOUISIANA

 3

 4  VOICE OF THE EXPERIENCED,
    ET AL                      :CIVIL ACTION
 5
    VERSUS                     :NO. 23-CV-01304-BAJ-EWD
 6
    JAMES LEBLANC, ET AL       :APRIL 22, 2025
 7
    ========================================================
 8       MOTIONS HEARING FOR CLASS CERTIFICATION
         BEFORE THE HONORABLE BRIAN A. JACKSON
 9          UNITED STATES DISTRICT JUDGE

10              VOLUME 1 OF 3

11           A P P E A R A N C E S

12  FOR THE PLAINTIFFS:

13      PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
        BY: JEREMY A. BENJAMIN, ESQUIRE
14      BY: ARIELLE B. McTOOTLE, ESQUIRE
        BY: MICHAEL C. McGREGOR, ESQUIRE
15      1285 AVENUE OF THE AMERICAS
        NEW YORK, NEW YORK 10019
16
        RIGHTS BEHIND BARS
17      BY: LYDIA WRIGHT, ESQUIRE
        416 FLORIDA AVENUE NW #26152
18      WASHINGTON, D.C. 20002

19      THE PROMISE OF JUSTICE INITIATIVE
        BY: SAMANTHA POURCIAU, ESQUIRE
20      1024 ELYSIAN FIELDS AVENUE
        NEW ORLEANS, LOUISIANA 70117
21

22  FOR THE DEFENDANTS:

23      KEOGH, COX & WILSON, LTD
        BY: ANDREW BLANCHFIELD, ESQUIRE
24      BY: CHRISTOPHER K. JONES, ESQUIRE
        BY: CHELSEA ACOSTA PAYNE, ESQUIRE
25      701 MAIN STREET
        BATON ROUGE, LOUISIANA 70802
```

```
REPORTED BY:  NATALIE W. BREAUX, RPR, CRR
            UNITED STATES COURTHOUSE
               777 FLORIDA STREET
          BATON ROUGE, LOUISIANA 70801
                (225) 389-3565
          NATALIE_BREAUX@LAMD.USCOURTS.GOV


PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY USING
      COMPUTER-AIDED TRANSCRIPTION SOFTWARE
```

1                    **I N D E X**

2 OPENING STATEMENTS:                                    **PAGE**

3      BY MS. POURCIAU ...............................18

4      BY MR. JONES ..................................27

5 PLAINTIFFS' WITNESSES:

6   EVELYNN HAMMONDS (VIA ZOOM VIDEOCONFERENCE)

7      VOIR DIRE BY MR. McGREGOR .....................38

8      VOIR DIRE BY MR. BLANCHFIELD ..................43

9   JOSHUA SBICCA

10      VOIR DIRE BY MS. McTOOTLE .....................49

11      VOIR DIRE BY MR. BLANCHFIELD ..................52

12      DIRECT EXAMINATION BY MS. McTOOTLE ............54

13      CROSS-EXAMINATION BY MR. BLANCHFIELD ..........77

14      REDIRECT EXAMINATION BY MS. McTOOTLE ..........87

15

16

17

18

19

20

21

22

23

24

25

```
 1                    (APRIL 22, 2025)

 2                    PROCEEDINGS

 3        THE LAW CLERK:  ALL RISE.

 4        (CALL TO THE ORDER OF COURT)

 5        THE COURT:  ALL RIGHT.  THANK YOU.  BE

 6   SEATED.

 7             OKAY.  AT THIS TIME WE WILL TAKE UP THE

 8   MOTION FOR CLASS CERTIFICATION FILED BY THE

 9   PLAINTIFFS.

10             PRIOR TO TODAY'S HEARING THE COURT

11   CONFERRED WITH BOTH SIDES AND INSTRUCTED THAT EACH

12   SIDE WOULD FIRST BE ALLOTTED A BRIEF OPPORTUNITY TO

13   ADDRESS THE COURT IN WHAT WE WOULD OTHERWISE IN TRIAL

14   CALL AN OPENING STATEMENT.  THIS IS NOT, OF COURSE, A

15   TRIAL.  BUT APPARENTLY BOTH SIDES BELIEVE THAT A

16   BRIEF OPENING STATEMENT IS IMPORTANT, SO I WILL GIVE

17   EACH SIDE -- WHAT DID I SAY, BROOKE?  FIVE MINUTES OR

18   TEN?

19        THE LAW CLERK:  TEN.

20        THE COURT:  -- TEN MINUTES TO ADDRESS THE

21   COURT, AFTER WHICH WE WILL HEAR FROM THE PLAINTIFFS'

22   FIRST EXPERT WITNESS, AS I MENTIONED BEFORE WE TOOK

23   OUR BREAK.

24             NOW, JUST A REMINDER, EACH SIDE HAS UP

25   TO 40 MINUTES.  LET ME EMPHASIZE THE TERM "UP TO 40
```

1   MINUTES."  YOU DON'T HAVE TO TAKE 40 MINUTES.

2            SO ON THE PLAINTIFFS' SIDE, I WOULD ASK

3   YOU TO INFORM THE COURT HOW YOU WISH TO APPORTION

4   YOUR TIME.  IF YOU WOULD LIKE TO DO 30 MINUTES FOR

5   YOUR DIRECT EXAMINATION AND TEN MINUTES FOR REBUTTAL,

6   THAT'S FINE, HOWEVER YOU WISH TO DO IT.  I'LL GIVE

7   YOU A TEN-MINUTE OR A FIVE-MINUTE WARNING, IF YOU

8   WILL, SO THAT YOU CAN WRAP UP.  AND THE SAME THING ON

9   THE DEFENSE SIDE.

10           I DON'T KNOW HOW MANY WITNESSES WE'LL

11  BE ABLE TO GET THROUGH TODAY.  AT LEAST ONE.  BUT WE

12  HAVE, JUST AS A REMINDER, THE NEXT TWO DAYS TO GET

13  THROUGH THE WITNESSES, SO I THINK WE'LL HAVE

14  SUFFICIENT TIME TO GET TO EVERYONE, AT LEAST ON THE

15  ISSUES OF CLASS CERTIFICATION.

16           ANYTHING WE SHOULD TAKE UP BEFORE THE

17  OPENING STATEMENTS?  ANYTHING FROM THE PLAINTIFFS'

18  SIDE?

19           MS. POURCIAU:  YOUR HONOR, A FEW

20  HOUSEKEEPING ISSUES, IF I COULD COME TO THE LECTERN,

21  AND THEN I CAN DO THE OPENING STATEMENT?

22           THE COURT:  PLEASE.  AND, MS. POURCIAU,

23  WOULD YOU JUST STATE YOUR NAME FOR THE RECORD SO THAT

24  IT IS CLEAR WHO IS ADDRESSING THE COURT?

25           MS. POURCIAU:  SAMANTHA POURCIAU FROM THE

1  PROMISE OF JUSTICE INITIATIVE ON BEHALF OF THE

2  PLAINTIFFS.

3          **THE COURT:**  YES, MA'AM.

4          **MS. POURCIAU:**  SO, YOUR HONOR HAD I THINK

5  SAID 45 MINUTES PER EXPERT WITNESS.  JUST HOLDING YOU

6  TO WHAT YOU HAD SAID.

7          **THE COURT:**  I SHOULD HAVE HAD MY COURT

8  REPORTER WITH ME ON THAT CALL.  YES, 45 MINUTES I

9  THINK.  WAS THAT -- DO YOUR NOTES REFLECT 45?

10          **THE LAW CLERK:**  I DON'T HAVE THEM IN FRONT

11  OF ME, BUT I TRUST MS. POURCIAU.

12          **THE COURT:**  DO YOU REALLY?

13          **THE LAW CLERK:**  I DO.

14          **THE COURT:**  DO YOU REALLY TRUST MS.

15  POURCIAU?

16          **THE LAW CLERK:**  I DO.

17          **THE COURT:**  I DON'T KNOW IF I TRUST ANYBODY

18  FROM NEW ORLEANS, BUT ANYWAY, THAT'S ANOTHER STORY.

19  I'M KIDDING, OF COURSE, MS. POURCIAU.

20          **MS. POURCIAU:**  I'M GLAD I HAVE YOUR CLERK'S

21  TRUST.

22          I WANTED TO TRY TO GET AHEAD OF SOME OF

23  THE EXHIBITS BEFORE WE BEGIN THE EVIDENCE.  THE

24  PARTIES HAVE STIPULATED TO MOVE IN A NUMBER OF JOINT

25  EXHIBITS, AND WE'D ASK FOR THOSE TO BE MOVED INTO

1  EVIDENCE AT THIS TIME.

2         **THE COURT:**  WONDERFUL.  AND WE HAVE A

3  WITNESS LIST, DON'T WE?  DO WE HAVE A WITNESS LIST?

4  CAN I GET -- I KNOW THAT MY STAFF GAVE ME A LIST.  OF

5  COURSE, I PROBABLY LEFT IT --

6         **THE COURTROOM DEPUTY:**  I DON'T HAVE A

7  WITNESS LIST, JUDGE.

8         **THE COURT:**  NO, AN EXHIBIT LIST.  YES, THE

9  EXHIBIT LIST THAT I LEFT IN CHAMBERS.  THANK YOU.

10  ALL RIGHT.

11         AND SO I HAVE -- JUST TO RUN THROUGH IT

12  HERE, I'VE GOT -- ACCORDING TO THE JOINT -- WELL, THE

13  EXHIBIT LIST THAT'S BEEN PROVIDED, WE HAVE 88 JOINT

14  EXHIBITS.  CORRECT?

15         **MS. POURCIAU:**  CORRECT.

16         **THE COURT:**  VERY WELL.  ANYTHING MORE ABOUT

17  THE JOINT EXHIBITS, MS. POURCIAU?

18         **MS. POURCIAU:**  NOT ABOUT THE JOINT EXHIBITS.

19  BUT PLAINTIFFS WOULD LIKE TO REQUEST A RULING ON AN

20  OMNIBUS OBJECTION THAT DEFENDANTS HAVE MADE TO ANY

21  ADDITIONAL EXHIBITS BEYOND THE JOINT EXHIBITS.  THE

22  JOINT EXHIBITS WERE ALL OF THE ATTACHMENTS TO THE

23  BRIEFING THAT'S ALREADY BEFORE THE COURT, AND SO THE

24  DEFENDANTS HAVE MADE AN OMNIBUS OBJECTION TO ANY

25  OTHER DOCUMENTS.  AND IF THE COURT WOULD TAKE UP THAT

1 OBJECTION AT THIS TIME --

2          **THE COURT:**  BUT THEY'RE ALREADY IN THE

3 RECORD.  IS THAT WHAT YOU'RE SUGGESTING TO ME?

4          **MS. POURCIAU:**  ALL OF THE JOINT EXHIBITS ARE

5 IN THE RECORD.  THEN WE HAVE PX EXHIBITS THAT ARE NOT

6 IN THE RECORD.

7          **THE COURT:**  MR. JONES, WHY DON'T YOU COME ON

8 UP.  YOU CAN USE EITHER -- THAT'S FINE.  THE PODIUM

9 IS FINE.

10          **MR. JONES:**  YES, YOUR HONOR.  CHRISTOPHER

11 JONES FOR THE DEFENDANTS.

12          SO MS. POURCIAU IS CORRECT; THERE WERE

13 PRIOR JOINT EXHIBITS TO WHICH THERE -- THEY WERE

14 EITHER ATTACHED TO THE BRIEFING AND SO THERE ARE --

15 THOSE HAVE BEEN LISTED OUT.  THERE ARE A NUMBER OF

16 ADDITIONAL EXHIBITS THAT THE PLAINTIFFS HAVE PROPOSED

17 OFFERING INTO EVIDENCE IN SUPPORT OF THEIR MOTION FOR

18 CLASS CERTIFICATION TO WHICH WE OBJECT.

19          THE BASIS OF THE OBJECTION IS THAT THIS

20 CASE HAS BEEN PENDING FOR A YEAR AND A HALF, WE'VE

21 GONE THROUGH EXTENSIVE DISCOVERY, THE COURT HAS SET A

22 NUMBER OF DEADLINES.  THERE WAS A DEADLINE FOR CLASS

23 CERTIFICATION DISCOVERY FOR BRIEFING ON THE MOTION

24 FOR CLASS CERTIFICATION.  WE EVEN HAD A HEARING ON

25 CLASS CERT.  SO NOW, LESS THAN EIGHT DAYS AGO, WE GET

1 | --
2 |      **THE COURT:**  THIS IS THE SECOND HEARING ON
3 | CLASS CERTIFICATION.
4 |      **MR. JONES:**  I REALIZE THAT, EXCEPT THAT THE
5 | LIST OF THE ADDITIONAL DOCUMENTS THAT THEY INTENDED
6 | TO OFFER AS EXHIBITS WERE PRODUCED TO US ABOUT EIGHT
7 | DAYS AGO.  AND SO WE'VE HAD NO OPPORTUNITY TO RESPOND
8 | TO THEM IN WRITING, TO SUPPLEMENT OUR CLASS
9 | CERTIFICATION BRIEFING.  AND IT'S -- THAT'S THE ISSUE
10 | AND THAT'S THE BASIS FOR OUR OBJECTION.
11 |      **THE COURT:**  I UNDERSTAND THAT.
12 |      MS. POURCIAU, SO THE QUESTION IS -- IT
13 | IS RATHER LATE -- WHY SHOULD I ALLOW YOU TO USE THESE
14 | DOCUMENTS AT THIS STAGE?
15 |      **MS. POURCIAU:**  THIS IS AN EVIDENTIARY
16 | HEARING WHERE NEW EVIDENCE IS COMING IN FROM
17 | DEFENDANTS' NEW HEAT PATHOLOGY POLICIES.  MOST OF THE
18 | EXHIBITS THAT PLAINTIFFS HAVE ON OUR LIST ARE THINGS
19 | THAT CAME OUT THROUGH THAT LIMITED DISCOVERY YOUR
20 | HONOR ALLOWED ON THE UPDATED HEAT PATHOLOGY POLICIES.
21 | THAT WAS -- THAT POLICY WENT INTO EFFECT AFTER
22 | BRIEFING CLOSED.
23 |      **THE COURT:**  I SEE.
24 |      DO YOU DISPUTE THAT, MR. JONES?
25 |      **MR. JONES:**  THAT'S AN ACCURATE STATEMENT

```
 1  WITH RESPECT TO --
 2           THE COURT:  INACCURATE OR ACCURATE?
 3           MR. JONES:  ACCURATE WITH RESPECT TO 18 OF
 4  THE 51 PROPOSED EXHIBITS.  THE OTHERS -- AND IF YOU
 5  LOOK ON YOUR EXHIBIT LIST FOR THE PLAINTIFFS'
 6  EXHIBITS, YOU'LL SEE THE DATES ON A LOT OF THEM FROM
 7  BACK IN 2024 CERTAINLY THAT EXISTED AND WERE PRODUCED
 8  IN DISCOVERY AND EXISTED OR CREATED MANY, MANY MONTHS
 9  AGO.
10           AND SO I WOULD SUBMIT TO THE COURT THAT
11  WHILE THEY'RE, YOU KNOW, AS A -- I GUESS A SUPPLEMENT
12  TO OUR OBJECTION, WITH RESPECT TO THE 18, THEY DID
13  RELATE TO UPDATES TO HCP 8.  THE REMAINING -- AND MY
14  MATH IS TERRIBLE, BUT THE REMAINING 30 OR SO WERE
15  NOT.  THEY COULD HAVE BEEN PRODUCED TO US A LONG TIME
16  AGO.  THEY COULD HAVE ATTACHED THEM TO THEIR
17  BRIEFING.
18           THE COURT:  MS. POURCIAU?
19           MS. POURCIAU:  YOUR HONOR, WE ARE JUST
20  LOOKING FOR THE 18 TO BE STIPULATED AND ADMITTED INTO
21  EVIDENCE NOW -- INTO EVIDENCE NOW.  THE REMAINING
22  EXHIBITS WE WOULD BRING WITH EACH WITNESS AND GO
23  THROUGH THE PROCESS OF PUTTING THEM INTO EVIDENCE,
24  AND THE DEFENDANTS CAN MAKE THEIR OBJECTIONS AT THAT
25  TIME.  WE DON'T THINK IT'S A GOOD USE OF JUDICIAL
```

1  RESOURCES TO GO THROUGH ALL OF THOSE 30 EXHIBITS

2  RIGHT NOW.

3          **THE COURT:**  WE'RE NOT GOING TO GO THROUGH

4  ALL OF THEM RIGHT NOW.  I TELL YOU WHAT WE'LL DO.  GO

5  ON -- USE THEM OR OFFER THEM AS YOU BELIEVE

6  APPROPRIATE.  MR. JONES, YOU CAN OBJECT TO IT.

7              AS YOU BOTH KNOW, THIS IS ESSENTIALLY A

8  MOTION IN LIMINE THAT'S BEEN FILED, AND YOU BOTH KNOW

9  THAT UNDER FIFTH CIRCUIT LAW, MOTIONS IN LIMINE ARE

10  HIGHLY DISFAVORED IF THEY -- IF WE CAN FIND A

11  WORK-AROUND; THAT IS, IF WE CAN FIND A WAY TO ALLOW

12  THE PROPONENT OF AN EXHIBIT TO OFFER THEM WITHOUT

13  DOING PREJUDICE TO THE OPPONENT.  AND THAT'S WHAT

14  WE'RE GOING TO HAVE TO FIGURE OUT HERE.  VERY OFTEN

15  THE WAY WE DEAL WITH THIS, AS YOU ALL KNOW, IS WE'LL

16  CONTINUE A TRIAL DATE OR A HEARING DATE TO ALLOW FOR

17  BOTH SIDES A FAIR OPPORTUNITY TO REVIEW THE PROPOSED

18  EVIDENCE AND TO, IF NECESSARY, FIND A WITNESS WHO MAY

19  CONTRADICT THE EVIDENCE OR CHALLENGE THE EVIDENCE ON

20  ITS MERITS.

21              SO, MR. JONES, LET ME ASK YOU:  IF I

22  GIVE YOU MORE TIME -- I KNOW YOU'VE ONLY HAD, AS YOU

23  SAID, EIGHT DAYS TO REVIEW THE EVIDENCE.  WON'T ANY

24  PREJUDICE TO YOUR CLIENT BE CURED IF I GAVE YOU MORE

25  TIME?  I MEAN, I INTEND TO GO FORWARD ON THIS HEARING

1  TODAY.  AND BY THE WAY, I MEAN, I WOULD -- WHAT I

2  WOULD ENVISION IS SIMPLY HAVING YOU OBJECT TO ANY

3  DOCUMENTS THAT ARE OFFERED DURING THE COURSE OF THE

4  EXHIBIT TODAY.

5                     MS. POURCIAU?

6          **MS. POURCIAU:**  YEAH.  YOUR HONOR, JUST TO

7  CLARIFY, THE DEFENDANTS HAVE ALREADY GIVEN US THEIR

8  WRITTEN OBJECTIONS.  AND WE ARE NOT ASKING -- WE ARE

9  ASKING FOR A RULING JUST ON WHETHER EVIDENCE THAT WAS

10 NOT ATTACHED TO THE BRIEFING CAN BE ADMITTED.

11         **THE COURT:**  THAT WAS NOT ATTACHED TO THE

12 BRIEFING?

13         **MS. POURCIAU:**  CORRECT.

14         **THE COURT:**  BUT THAT YOU'VE ALREADY

15 FURNISHED TO THE DEFENDANT?

16         **MS. POURCIAU:**  CORRECT.  AND EVEN -- AND ALL

17 OF THE PLAINTIFFS' EXHIBITS ARE EITHER PRODUCED FROM

18 DEFENDANTS OR WERE DISCLOSED TO THEM, MAYBE WITH THE

19 EXCEPTION OF FOUR THINGS, BEFORE EIGHT DAYS AGO.

20 EIGHT DAYS AGO IS WHEN WE GAVE THEM THE LIST OF WHAT

21 WE WERE INTENDING TO USE.

22         **MR. JONES:**  THERE IS NO OBJECTION TO

23 ANYTHING THAT WAS PREVIOUSLY SUBMITTED IN BRIEFING IN

24 SUPPORT OF THE MOTION FOR CLASS CERTIFICATION.  THOSE

25 ARE THE JOINT EXHIBITS, BASICALLY.  THE OBJECTION IS

1  TO EVERYTHING ELSE THAT WE RECEIVED A LIST OF.

2           NOW, WAS IT DISCLOSED AND EXCHANGED IN

3  DISCOVERY?  YES.  HOWEVER, THE PROBLEM IS THAT, YOU

4  KNOW, WE BRIEFED EVERYTHING, WE TAILORED OUR

5  ARGUMENTS, WE PREPARED FOR THE LAST CLASS

6  CERTIFICATION HEARING AND THIS ONE IN CONNECTION WITH

7  THE EVIDENCE THAT HAD BEEN SUPPORTED IN THE ARGUMENTS

8  THAT WERE MADE IN CONNECTION WITH THAT EVIDENCE.

9           **THE COURT:**  THE JOINT EXHIBITS?

10          **MR. JONES:**  WELL, WITH THE JOINT EXHIBITS,

11  NOT WITH THE NEWLY DISCLOSED EXHIBITS.  I'M GOING TO

12  CALL THEM NEWLY DISCLOSED BECAUSE THEY DIDN'T GIVE US

13  THIS LIST UNTIL EIGHT DAYS AGO, THE ADDITIONAL 51

14  DOCUMENTS.

15          **THE COURT:**  YOU HAD THE EXHIBITS.  YOU JUST

16  DIDN'T KNOW THAT THEY WOULD BE OFFERED AT THIS

17  HEARING?

18          **MR. JONES:**  CORRECT.  YOU'RE CONSTRAINED BY

19  WHAT HAS BEEN ATTACHED TO THE BRIEFING IN SUPPORT OF

20  YOUR MOTION.

21          **THE COURT:**  SO WHAT WE'LL DO, MR. JONES,

22  WE'LL JUST GO ON AND PROCEED.  LET'S JUST WORK

23  THROUGH IT.  AND IF PLAINTIFFS OFFER AN EXHIBIT

24  DURING THE COURSE OF A WITNESS TESTIMONY THAT YOU

25  BELIEVE SHOULD NOT BE CONSIDERED BY THE COURT OR BY

1 THE WITNESS, YOU KNOW, YOU CAN RAISE YOUR OBJECTION,

2 CERTAINLY OFFER YOUR OBJECTION ON THE RECORD.

3 NOW, AS YOU BOTH KNOW, THIS IS NOT A

4 JURY TRIAL.  IT'S A BENCH TRIAL.  SO IF YOU BELIEVE

5 THAT THERE IS A BASIS THAT I SHOULD EXCLUDE IT OR NOT

6 CONSIDER IT, AGAIN, I'LL HEAR YOUR ARGUMENTS ON IT AS

7 WE WORK THROUGH IT.

8 **MR. JONES:**  NOW -- AND I THANK YOU FOR THAT.

9 ONE THING THAT I WOULD SUGGEST OR ASK

10 THE COURT, I GUESS, IS WITH RESPECT TO THE 18 OF THE

11 51 NEW EXHIBITS -- PROPOSED EXHIBITS THAT RELATE TO

12 UPDATES TO THE HCP 8, I GUESS THE QUESTION IS:  IF

13 YOU ISSUED A RULING ABOUT WHETHER THOSE WOULD BE

14 ADMITTED OR NOT AS A -- ON A GLOBAL BASIS, WE HAVE

15 BASICALLY MADE A -- TAKEN A COMPROMISED POSITION WITH

16 RESPECT TO THOSE.  NOW, OUTSIDE OF THOSE 18 WE HAVE

17 THE SAME OBJECTION, AND WE CAN CERTAINLY RESPOND IN

18 THAT FASHION.  IT WOULD PROBABLY STREAMLINE THINGS.

19 **THE COURT:**  BUT THE 18 ARE ACTUAL POLICIES

20 OF THE D.O.C.  CORRECT?

21 **MR. JONES:**  WELL, THEY'RE RELATED TO UPDATES

22 TO THE HCP 8.  AND IT'S RELATED TO ADDITIONAL

23 DISCOVERY THAT HAS OCCURRED OR TRANSPIRED SINCE

24 BRIEFING.

25 **THE COURT:**  WELL, THIS IS BECOMING QUITE

1   CONFUSING, I MUST TELL YOU.  SO LET'S JUST WORK

2   THROUGH IT AND LET'S JUST SEE WHAT IT IS, BECAUSE I

3   CAN'T REALLY ISSUE A RULING IN THE ABSTRACT.  IT

4   COULD BE RELEVANT AND IT COULD BE IMPORTANT.  AND SO

5   IF IT'S RELEVANT, I DON'T WANT TO GET BOGGED DOWN ON

6   WHAT MIGHT VERY WELL BE A LEGITIMATE PROCEDURAL

7   IMPEDIMENT.  SO LET'S JUST -- BUT I MAY HAVE TO.

8   RIGHT?  SO LET'S JUST WORK THROUGH AND SEE WHERE WE

9   GO.  ALL RIGHT?

10       MS. POURCIAU:  SO THEN ON THAT NOTE, WHEN

11  OBJECTIONS ARE BEING ARGUED, THE PLAINTIFFS WOULD

12  LIKE TO REQUEST THAT THE TIME STOPS FOR THE --

13       THE COURT:  YES, THAT'S -- WE'RE GOING TO

14  WORK THROUGH THOSE PRETTY QUICKLY AS WELL.  IT WON'T

15  BE AS LONG AS THIS LAST ONE, LET ME ASSURE YOU OF

16  THAT.

17       MS. POURCIAU:  WE WERE TRYING TO MAKE IT

18  QUICKER, BUT -- AND I THINK SECOND TO LAST, IN YOUR

19  ORDER REQUIRING THE APPEARANCE OF THE TWO

20  INCARCERATED WITNESSES FOR TOMORROW, MR. JACKSON

21  MR. JONES, THE COURT HAD ORDERED THE MARSHALS TO HAVE

22  THEM APPEAR BOTH TOMORROW AND THURSDAY.  WE'RE ONLY

23  GOING TO BE HAVING THEM TESTIFY TOMORROW, SO WE WOULD

24  REQUEST THAT THEY WOULD NOT BE TRANSPORTED ON

25  THURSDAY.

1          **THE COURT:**  VERY WELL.  I THINK THE MARSHALS

2   WILL BE HAPPY TO HEAR THAT, AS WELL AS THE FOLKS OVER

3   AT D.O.D.  RIGHT, MR. VINING?

4          **MR. VINING:**  YES, SIR.

5          **THE COURT:**  OKAY.

6          **MS. POURCIAU:**  AND THEN LASTLY, WE WANTED TO

7   KNOW WHEN WE'LL BE ADJOURNING FOR THE DAY, IF YOU

8   KNOW.

9          **THE COURT:**  I THINK WE'RE ONLY GOING TO HAVE

10  TIME TO GO THROUGH ONE WITNESS.  ALL RIGHT?  SO I

11  THINK ROUGHLY 45 MINUTES FROM NOW WE MAY TAKE A

12  BREAK.  THAT WILL PUT US PRETTY MUCH AT FIVE O'CLOCK.

13         **MS. POURCIAU:**  THANK YOU, YOUR HONOR.

14         **THE COURT:**  SO IF YOU HAVE ANOTHER WITNESS

15  WHO IS EITHER PRESENT -- IT'S UP TO YOU WHETHER YOU

16  WANT TO DISMISS YOUR WITNESS FOR THE DAY.

17         **MS. POURCIAU:**  IS THERE A CHANCE TO GO PAST

18  FIVE O'CLOCK?

19         **THE COURT:**  I DON'T REALLY WANT TO GO PAST

20  FIVE O'CLOCK.  WHY WOULD WE HAVE TO GO PAST FIVE

21  O'CLOCK TODAY?  IS THERE A COMPELLING REASON TO DO

22  SO?

23         **MS. POURCIAU:**  WE HAVE A WITNESS WHO IS

24  PLANNING ON GOING TODAY WHO HAD ARRANGED TO LEAVE

25  TOMORROW, BUT WE CAN PUSH THAT IF NEED BE.

1          **THE COURT:**  YOU KNOW, WE'VE GOT -- THAT

2    REQUIRES A LOT OF COORDINATION WITH THE MARSHALS

3    SERVICE TO KEEP THE COURTHOUSE OPEN.  BELIEVE IT OR

4    NOT, THE GSA LIKES TO SHUT THE AIR DOWN AT 5:30.

5    THAT TAKES COORDINATION.  AND I KNOW THAT SOUNDS

6    SILLY, BUT IT CAN BE A VERY CUMBERSOME PROCESS WHEN

7    WE TRY TO KEEP THE COURTHOUSE OPEN LATE INTO THE

8    EVENING.  TYPICALLY I WILL KEEP A JURY HERE TILL

9    ABOUT SIX.  AND THE ONLY TIME THAT I WILL GO BEYOND

10   SIX IS IF THE JURY IS DELIBERATING AND THEY ELECT TO

11   STAY.

12          SO I THINK LET'S JUST PLAN ON GETTING

13   THROUGH ONE WITNESS TODAY.  WE'LL TRY TO MAKE THIS AS

14   EFFICIENT AS POSSIBLE SO THAT YOUR WITNESS CAN RETURN

15   HOME AS EARLY AS POSSIBLE TOMORROW.  OKAY?

16          **MS. POURCIAU:**  THANK YOU, YOUR HONOR.

17          **THE COURT:**  ANY HOUSEKEEPING MATTERS ON THE

18   DEFENSE SIDE?

19          **MR. JONES:**  NO, YOUR HONOR.

20          **THE COURT:**  ALL RIGHT.  VERY WELL.

21          OKAY.  LET'S PROCEED WITH, AGAIN, VERY

22   BRIEF OPENING STATEMENTS, BEGINNING WITH THE

23   PLAINTIFF.

24          NOW, MS. POURCIAU, IF YOU'D LIKE, WE

25   COULD TAKE YOUR LIVE WITNESS RIGHT NOW AND WE CAN

1  TAKE YOUR ZOOM WITNESS TOMORROW.  WANT TO TAKE A

2  MOMENT TO THINK ABOUT THAT?

3       **MS. POURCIAU:**  YES, YOUR HONOR.

4            WE'LL STICK WITH -- WE'LL DO THE ZOOM

5  WITNESS AFTER THE OPENING.

6       **THE COURT:**  COME AGAIN?

7       **MS. POURCIAU:**  WE'LL DO THE OPENING AND THEN

8  THE ZOOM WITNESS AND THEN WE'LL HAVE THE SECOND

9  WITNESS LIVE TOMORROW.

10      **THE COURT:**  VERY WELL.  OKAY.  ALL RIGHT.

11      **MS. POURCIAU:**  IF THE MONITOR CAN BE TOGGLED

12  TO THE LECTERN.  OKAY.

13           GOOD AFTERNOON, YOUR HONOR.  WE ARE

14  HERE TODAY FOR THE EVIDENTIARY HEARING ON PLAINTIFFS'

15  MOTION FOR CLASS CERTIFICATION.  WE JUST FINISHED UP

16  THE ARGUMENT FOR THE SECOND PI AND TRO AND NOW WE ARE

17  PROCEEDING TO THE HEARING ON CLASS CERTIFICATION.

18           IT'S IMPORTANT TO BEGIN BY SITUATING

19  OURSELVES IN THE RELEVANT HISTORICAL CONTEXT.  AND AS

20  DEFENDANTS' OWN TOUR GUIDE OUTLINE ACKNOWLEDGES, THE

21  LOUISIANA STATE PENITENTIARY, WHICH IS COMMONLY

22  REFERRED TO AS ANGOLA AND IS LOCATED IN THE TOWN OF

23  ANGOLA, IS NAMED AFTER THE COUNTRY IN AFRICA WHERE

24  PEOPLE WERE TAKEN FROM, ENSLAVED, AND FORCED TO LABOR

25  THE SAME LAND THAT THE MEN AT ANGOLA TODAY ARE FORCED

1  TO LABOR ON THE FARM LINE.

2              HERE YOU CAN SEE WHAT THE FARM LINE IS.

3  IT IS THE CONTINUITY OF THAT HISTORY TO MODERN DAY.

4  IT IS A FORM OF PUNISHMENT THAT HARNESSES THAT LEGACY

5  OF SLAVERY THAT DEGRADES, DEHUMANIZES, AND PUTS

6  PEOPLE IN DANGEROUS CONDITIONS.  THIS IMAGE IN

7  PARTICULAR IS FROM THE FIRST SITE INSPECTION

8  PLAINTIFFS CONDUCTED ON JULY 22, 2024, WITH OUR

9  EXPERTS DR. VASSALLO AND DR. SBICCA, WHO YOU WILL

10 HEAR FROM.  AND YOU CAN SEE PUTATIVE CLASS MEMBER

11 PATRICK JONES HERE, WHO YOU WILL ALSO HEAR FROM.

12             THE COMMON KNOWLEDGE ABOUT ANGOLA'S

13 HISTORY AS A FORMER PLANTATION BOTH CONTRIBUTES TO

14 THE DIGNITARY AND PSYCHOLOGICAL HARMS THE PLAINTIFFS

15 AND PROPOSED CLASS EXPERIENCE AND GOES TO THE

16 DEFENDANTS' DELIBERATE INDIFFERENCE TO THAT HARM.

17 THIS SPEAKS TO OUR GENERAL CLASS CLAIM THAT THE

18 CURRENT OPERATION OF THE FARM LINE VIOLATES THE

19 EIGHTH AMENDMENT BY WORKING A DIGNITARY HARM AND A

20 PSYCHOLOGICAL HARM TO ALL PEOPLE INCARCERATED AT LSP

21 WHO CURRENTLY ARE OR MAY IN THE FUTURE BE ASSIGNED TO

22 THE FARM LINE.

23             PLAINTIFFS ALSO BRING THE HEAT HARM

24 THEORY ON BEHALF OF THE GENERAL CLASS AND A DISTINCT

25 HEAT HARM THEORY AS VIOLATIVE OF THE ADA AND RA

1    SUBCLASS'S RIGHTS, WHICH PLAINTIFFS HAVE NARROWED TO

2    BE DEFINED AS ALL PERSONS INCARCERATED AT LSP WHO

3    CURRENTLY ARE OR MAY IN THE FUTURE BE ASSIGNED TO THE

4    FARM LINE AND WHO HAVE DISABILITIES THAT MAY CAUSE,

5    OR THAT ARE TREATED WITH MEDICATIONS THAT MAY CAUSE,

6    IMPAIRED THERMOREGULATION.

7              DURING ORAL ARGUMENT ON THE CLASS

8    CERTIFICATION MOTION ON FEBRUARY 19TH, MY CO-COUNSEL

9    WALKED THROUGH HOW PLAINTIFFS HAVE SATISFIED THE

10   REQUIREMENTS OF RULE 23(A) AND 23(B)(2).  AND TODAY

11   WE WILL BE PRESENTING EVIDENCE TO FURTHER SUPPORT

12   THOSE ARGUMENTS.

13             WITH RESPECT TO NUMEROSITY, EACH WEEK A

14   VARYING NUMBER OF INCARCERATED MEN ARE FORCED TO

15   LABOR ON THE FARM LINE, AS THE COURT HAS SEEN OVER

16   THE COURSE OF THE JOINT LETTERS FILED INTO THE RECORD

17   OVER THE SUMMER LAST YEAR.  JUST EARLIER THIS MONTH,

18   ON APRIL 2, 2025, 52 MEN LABORED ON FARM LINE 15,

19   DEMONSTRATING BOTH NUMEROSITY AND ASCERTAINABILITY.

20             DEFENDANTS' POLICY STATES THAT THE

21   MAJORITY OF NEW ARRIVALS TO ANGOLA ARE SENT TO THE

22   FARM LINE AS THEIR FIRST JOB ASSIGNMENT.  AND ONCE AT

23   ANGOLA, PEOPLE CAN BE REASSIGNED AT ANY TIME BASED ON

24   DISCIPLINARY ACTION.  THESE POLICIES MAKE FOR A FLUID

25   AND FLUCTUATING CLASS WHICH FAVORS A FINDING OF

1   NUMEROSITY.

2          THE ADA SUBCLASS ITSELF HAS RECENTLY

3   BEEN IDENTIFIED BY DEFENDANTS AS HAVING, AT MINIMUM,

4   1500 PEOPLE BASED ON MEDICATIONS THEY ARE PRESCRIBED,

5   PLUS 300 PEOPLE WITH DOCUMENTED MEDICAL CONDITIONS.

6   PLAINTIFFS ARGUE THAT THESE 1800 PEOPLE ARE NOT

7   PROPERLY ACCOMMODATED WITH DEFENDANTS' NEW HEAT

8   PATHOLOGY POLICY THAT INCREASES THE THRESHOLD TO

9   TRIGGER A HEAT ALERT TO A HEAT INDEX OF 91 DEGREES.

10  THE SUBCLASS IS NOT LIMITED TO THESE 1800 PEOPLE,

11  THOUGH, BECAUSE ON TOP OF THEM IT INCLUDES PEOPLE

12  WITH IMPAIRED THERMOREGULATION BUT WHO ARE NOT GIVEN

13  ANY HEAT PRECAUTION DUTY STATUS AT ALL UNDER THE NEW

14  POLICY, SUCH AS THE INDIVIDUALS ON SSRIs.  NUMEROSITY

15  AND ASCERTAINABILITY ARE EASILY SATISFIED HERE.

16          COMMONALITY IS SATISFIED IN THIS CASE

17  WHERE PLAINTIFFS' CLAIMS STEM OUT OF DEFENDANTS'

18  POLICIES SEEN HERE THAT UNIFORMLY DICTATE, AMONG

19  OTHER THINGS, WHO IS ASSIGNED TO THE FARM LINE, THE

20  DISCIPLINARY SANCTIONS THEY CAN BE GIVEN FOR NOT

21  WORKING WITH REASONABLE SPEED AND EFFICIENCY WHILE ON

22  THE FARM LINE, THE ABILITY TO ACCESS INCENTIVE PAY,

23  IF AT ALL, THE ACCESS TO MEDICAL CARE ON THE FARM

24  LINE, THE COST OF THAT MEDICAL CARE, AND THE ABILITY

25  TO SEEK ACCOMMODATIONS FOR THEIR DISABILITIES.

1      PLAINTIFFS' EXPERTS' TESTIMONY WILL
2  ALSO CONFIRM THAT COMMONALITY IS SATISFIED.  THE
3  COURT WILL HEAR FROM THREE OF PLAINTIFFS' EXPERT
4  WITNESSES:  DR. HAMMONDS, DR. SBICCA, AND DR.
5  VASSALLO.  EACH EXPERT'S TESTIMONY SPEAKS TO
6  ANSWERING QUESTIONS THAT ARE COMMON TO THE CLASS.
7  THIS CASE FAR EXCEEDS THE REQUIREMENT TO MEET
8  COMMONALITY OF AT LEAST ONE COMMON QUESTION OF LAW OR
9  FACT CAPABLE OF GENERATING A COMMON ANSWER THAT
10 APPLIES CLASSWIDE AND RESOLVES A CENTRAL ISSUE IN ONE
11 STROKE.
12      DR. HAMMONDS, A PROFESSOR AT HARVARD
13 FOCUSING ON THE FIELDS OF EPIDEMIOLOGY, HISTORY OF
14 SCIENCE, HISTORY OF MEDICINE, AND AFRICAN-AMERICAN
15 HISTORY, WILL ADDRESS THE FOLLOWING COMMON QUESTIONS:
16 WHETHER THE FARM LINE AS A SYSTEM THAT REPLICATES
17 CONDITIONS OF CHATTEL SLAVERY IS LIKELY TO EXPOSE
18 PEOPLE TO A SUBSTANTIAL RISK OF PSYCHOLOGICAL HARM
19 AND WHETHER THE FARM LINE OPERATES AS OTHER SOCIAL
20 REGIMES WHERE CERTAIN GROUPS ARE MISDIAGNOSED OR
21 MISTREATED.
22      DR. SBICCA, A SOCIOLOGIST AND EXPERT IN
23 THE HISTORY AND SOCIOLOGY OF PRISON AGRICULTURAL
24 LABOR THROUGH HIS WORK FOUNDING AND DIRECTING THE
25 PRISON AGRICULTURE LAB, WILL ADDRESS THE COMMON

1  QUESTIONS OF WHETHER THE FARM LINE IS ANOMALOUS AMONG

2  PRISON AGRICULTURAL LABOR NATIONWIDE, WHETHER THE

3  OPERATION OF THE FARM LINE AS A FORM OF DISCIPLINE

4  THAT SIMULATES AND SUBJECTS MEN TO CONDITIONS AKIN TO

5  SLAVERY COMPORTS WITH EVOLVING STANDARDS OF DECENCY,

6  AND WHETHER THE FARM LINE, BECAUSE OF ITS RESEMBLANCE

7  TO CHATTEL SLAVERY, DEPRIVES PLAINTIFFS OF THEIR

8  BASIC HUMAN DIGNITY.

9           DR. VASSALLO, A WIDELY RECOGNIZED

10 EXPERT ON MEDICAL TOXICOLOGY AND THERMOREGULATION BY

11 COURTS ACROSS THE COUNTRY, INCLUDING THIS ONE, WILL

12 ADDRESS THE COMMON QUESTIONS OF WHETHER DEFENDANTS'

13 OPERATION OF THE FARM LINE WHEN HEAT INDICES EXCEED

14 91 DEGREES EXPOSES THE GENERAL CLASS TO A SUBSTANTIAL

15 RISK OF HARM AND WHETHER THE REVISED HEAT PATHOLOGY

16 POLICY IN GENERAL ADEQUATELY ABATES THE SUBSTANTIAL

17 RISK OF HEAT-RELATED HARM FOR THE GENERAL CLASS.

18           YOU WILL ALSO HEAR FROM DEFENDANTS'

19 EXPERTS, DR. KELDIE AND DR. BARNES, WHO ARE LIKELY TO

20 JUSTIFY THE REVISED HEAT PATHOLOGY POLICY.  AND WHILE

21 PLAINTIFFS WILL PROVE AT TRIAL THAT THOSE OPINIONS

22 ARE UNSUPPORTED, EVEN IF THEY WERE RIGHT, THEIR

23 TESTIMONY WILL SPEAK TO THOSE SAME COMMON QUESTIONS.

24           PLAINTIFFS WILL CALL DEFENDANTS'

25 DESIGNEES TO ILLUSTRATE ADDITIONAL COMMON QUESTIONS,

1   SUCH AS WHETHER DEFENDANTS ARE AWARE OF THE

2   HEAT-RELATED RISKS ON THE FARM LINE AND HAVE TAKEN

3   ADEQUATE STEPS TO MITIGATE THOSE RISKS, WHETHER THE

4   IMPLEMENTATION OF D.O.C.-WIDE POLICY ON HEAT

5   PATHOLOGY AT ANGOLA THROUGH LSP DIRECTIVE 13.067

6   ADEQUATELY ABATES THE RISK OF HEAT-RELATED HARM, AND

7   WHETHER IT ADEQUATELY ACCOMMODATES MEMBERS OF THE ADA

8   SUBCLASS.

9           DEFENDANTS WILL LIKELY ARGUE THAT

10  INDIVIDUAL ISSUES ABOUND FOR THE ADA SUBCLASS MEMBERS

11  BECAUSE DETERMINING WHETHER AN INDIVIDUAL HAS A

12  DISABILITY IS AN INDIVIDUAL INQUIRY.  HOWEVER, IT IS

13  UNDISPUTED THAT THERE IS A COMMON QUESTION DIRECTLY

14  RELEVANT TO THE ADA SUBCLASS.  AMONGST THOSE 1800

15  PEOPLE THAT LSP ITSELF HAS IDENTIFIED AS HAVING A

16  HEAT SENSITIVITY, DOES THE DECISION TO FORCE THEM TO

17  LABOR UNTIL THE HEAT INDEX REACHES 91 DEGREES VIOLATE

18  THEIR RIGHT TO BE ACCOMMODATED FOR THAT DISABILITY.

19          YOU WILL HEAR FROM TWO INCARCERATED

20  WITNESSES, NAMED PLAINTIFF DAMARIS JACKSON WHO SEEKS

21  TO REPRESENT THE GENERAL CLASS AND THE ADA SUBCLASS,

22  AND PUTATIVE CLASS MEMBER PATRICK JONES.  THEIR

23  TESTIMONY WILL ILLUSTRATE HOW THE NAMED PLAINTIFFS

24  AND CLASS MEMBERS ARE SUBJECTED TO THE SAME POLICIES,

25  HOW THE NAMED PLAINTIFFS' CLAIMS ARE TYPICAL OF THE

1  CLASS MEMBERS' CLAIMS THEY SEEK TO REPRESENT, AND HOW

2  THE NAMED PLAINTIFFS ARE ADEQUATE CLASS

3  REPRESENTATIVES.

4             YOU WILL HEAR FROM BOTH MR. JACKSON AND

5  MR. JONES ABOUT BEING FORCED TO LABOR ON THE FARM

6  LINE UPON ARRIVAL TO ANGOLA AS YOUNG MEN IN THEIR

7  20s --

8             **THE COURT:**  THREE MORE MINUTES, COUNSEL.

9             **MS. POURCIAU:**  -- THE PARTICULAR DIFFICULTY

10 PHYSICALLY OF LABORING THE FARM LINE IN THE HEAT OF

11 THE SUMMER, AND THE WAY THE FORCED SIMULATION OF

12 SLAVERY IS PARTICULARLY HARMFUL PSYCHOLOGICALLY AND

13 TO THEIR INHERENT DIGNITY.

14             WITH RESPECT TO ADEQUACY, YOU WILL HEAR

15 LIVE TESTIMONY FROM NAMED PLAINTIFF DAMARIS

16 JACKSON -- WHICH IS FURTHER BOLSTERED BY THE EVIDENCE

17 IN THE RECORD FROM OTHER NAMED PLAINTIFFS -- THAT

18 EACH PLAINTIFF HAS UNDERTAKEN A RESPONSIBILITY TO

19 SEEK RELIEF ON BEHALF OF AN ENTIRE CLASS AND HAS

20 FULFILLED THE DUTIES TO ADEQUATELY DO SO BY STAYING

21 ENGAGED IN THE LITIGATION.  YOU WILL HEAR FROM

22 MR. JACKSON THAT EVEN WITH DEFENDANTS' REPRESENTATION

23 THAT THE NAMED PLAINTIFFS WOULD NOT BE REASSIGNED TO

24 THE FARM LINE, HE WAS REASSIGNED IN JULY 2024.  AND

25 AFTER REFUSING TO GO OUT, HE GOT A VIOLATION AND

1  COUNSEL HAD TO INTERVENE ON HIS BEHALF.  YOU WILL

2  HEAR HOW HE LIVES IN CAMP D AMONG MEN WHO ARE FORCED

3  TO GO OUT AND LABOR ON THE FARM LINE EVERY DAY.

4             LASTLY, RULE 23(B)(2) IS SATISFIED

5  BECAUSE, AS DISCUSSED WITH THE EVIDENCE YOU WILL HEAR

6  TO PROVE COMMONALITY AND TYPICALITY, DEFENDANTS

7  SUBJECT THE ENTIRE CLASS TO THE SAME POLICIES AND

8  PRACTICES IN THEIR OPERATION OF THE FARM LINE.  AND

9  PLAINTIFFS INTEND TO PROVE AT TRIAL THAT THE ONLY WAY

10 TO END THE HARM PERPETUATED BY THE FARM LINE FOR THE

11 GENERAL CLASS IS THROUGH A SINGLE SPECIFIC INJUNCTION

12 TO END THE FARM LINE.

13            FOR THE ADA SUBCLASS, PLAINTIFFS SEEK A

14 SPECIFIC INJUNCTION FOR DEFENDANTS TO REMEDY THEIR

15 HEAT PATHOLOGY POLICIES AND PRACTICES TO PROPERLY

16 ACCOMMODATE ADA SUBCLASS MEMBERS.  FOR THESE REASONS,

17 PLAINTIFFS RESPECTFULLY REQUEST TO CERTIFY THE CLASS

18 AND THE ADA SUBCLASS.

19            THANK YOU, YOUR HONOR.

20       THE COURT:  SO, MS. POURCIAU, I KNOW THIS

21 ISN'T ARGUMENT, BUT, YOU KNOW, I JUST HAVE TO RESPOND

22 TO YOUR REQUEST THAT I ISSUE AN ORDER ELIMINATING THE

23 FARM LINE.  ONE OF THE QUESTIONS THAT WE WILL DISCUSS

24 AT A LATER AND MORE APPROPRIATE TIME IS WHETHER THIS

25 COURT HAS THE AUTHORITY TO DO THAT, WHETHER ANY COURT

1  HAS EVER ORDERED THAT A FARM LINE BE TERMINATED.  SO

2  THAT'S ULTIMATELY GOING TO BE PROBABLY THE GREATEST

3  ISSUE BEFORE THE COURT AT THIS TIME BASED UPON WHAT

4  YOU ARE REQUESTING.  YOU AGREE WITH THAT.  RIGHT?

5          **MS. POURCIAU:**  YOUR HONOR, THAT IS A

6  QUESTION FOR THE MERITS.  AND WHEN PLAINTIFFS SEEK AN

7  END TO THE FARM LINE, WE ARE NOT SEEKING AN END TO

8  ALL AGRICULTURAL LABOR AT ANGOLA.  WE ARE

9  SPECIFICALLY SEEKING AN END TO THE WAY THAT

10 DEFENDANTS RUN THE FARM LINE AS A TOOL OF

11 DISCIPLINARY PUNISHMENT.  AND SO IT IS STILL POSSIBLE

12 THAT DEFENDANTS WOULD BE ABLE TO RUN A FARM LINE, BUT

13 THE PLAINTIFFS SEEK RELIEF OF ENDING THE FARM LINE AS

14 IT CURRENTLY OPERATES TODAY.

15         **THE COURT:**  OKAY.  THANK YOU FOR THE

16 CLARIFICATION, MS. POURCIAU.

17         ALL RIGHT.  MR. JONES?

18         **MR. JONES:**  YOUR HONOR, MAY IT PLEASE THE

19 COURT.  CHRISTOPHER JONES ON BEHALF OF THE

20 DEFENDANTS.

21         WHAT I'D LIKE TO START WITH IN MY BRIEF

22 TIME IS --

23         **THE COURT:**  LET ME JUST -- APPARENTLY I WAS

24 IN ERROR.  I GAVE YOU LESS TIME THAN -- I APOLOGIZE

25 TO YOU, MS. POURCIAU, BUT YOU DID A GOOD JOB.  OKAY?

1          **MS. POURCIAU:**  THANK YOU, YOUR HONOR.

2          **THE COURT:**  FOR WHAT IT'S WORTH.  I STILL

3   HAD TEN MINUTES IN MY MIND, NOT 15.  I HAVE TO BLAME

4   BROOKE, MY HERETOFORE BLAMELESS LAW CLERK FOR THAT.

5   I'M JUST KIDDING, BROOKE.

6          **MR. JONES:**  WHAT I'D LIKE TO START OUT WITH,

7   YOUR HONOR, IS THAT I'D LIKE TO RESTATE AND REMIND

8   THE COURT OF THE PLAINTIFFS' BURDEN IN THE CONTEXT OF

9   THIS MOTION AND THIS HEARING, BECAUSE WHAT WE'RE HERE

10  ABOUT TODAY IS, OF COURSE, NOT THE MERITS, IT'S NOT

11  THE TRO, THE -- REQUEST.  IT IS ON WHETHER THE

12  PROCEDURAL REQUIREMENTS OF RULE 23 ARE SATISFIED.

13  AND THAT'S IT.

14          NOW, TO YOUR COMMENT THAT YOU JUST MADE

15  ABOUT -- AND MS. POURCIAU'S COMMENT ABOUT THAT

16  QUESTION GOING TO THE MERITS, YOU CAN LOOK BACK

17  BEHIND THE CURTAIN OF THE MERITS IN ORDER TO

18  DETERMINE WHETHER EVERY ONE OF THE CLASS

19  CERTIFICATION REQUIREMENTS ARE SATISFIED.  AND I

20  ENCOURAGE YOU TO DO THAT BECAUSE THAT'S PART OF YOUR

21  RESPONSIBILITY; TO CONDUCT THE RIGOROUS ANALYSIS THAT

22  THE LAW REQUIRES TO DETERMINE THAT EVERY ONE, NOT

23  JUST SOME OR A FEW, BUT ALL OF THE REQUIREMENTS OF

24  RULE 23 ARE SATISFIED.

25          NOW, I DON'T -- TRY NOT TO BE

 1  REPETITIVE, BUT I DO WANT TO PUT THIS IN THE CORRECT

 2  CONTEXT AND FRAMEWORK IN ANTICIPATION OF THE

 3  TESTIMONY AND EVIDENCE THAT YOU'RE GOING TO HEAR ON

 4  THIS MOTION OVER THE NEXT COUPLE OF DAYS.  SO WE

 5  HAVE, OF COURSE, THE RULE 23(A) REQUIREMENTS OF

 6  NUMEROSITY, COMMONALITY, TYPICALITY AND ADEQUACY.

 7            WITH RESPECT TO NUMEROSITY, IT IS OUR

 8  FIRM POSITION, AS WE HAVE BRIEFED AND ARGUED BEFORE,

 9  THAT THE PLAINTIFFS HAVE NOT SATISFIED THE BURDEN.

10  AND THAT REQUIREMENT IS USUALLY THE EASIEST TO

11  SATISFY.  IN THIS CASE WE ARGUE THAT IT IS NOT

12  SATISFIED BECAUSE THEY HAVE NOT PUT ON ANY EVIDENCE

13  OF THE NUMBER OF INDIVIDUALS THAT ARE GOING TO

14  COMPRISE EITHER THE CLASS OR THE ADA SUBCLASS.

15            THERE IS NO EVIDENCE OF WHO IS WORKING

16  ON THE FARM LINE, WHO WILL OR IS -- HAS THE

17  POSSIBILITY OF WORKING ON THE FARM LINE.  THERE IS NO

18  EVIDENCE OF WHO HAS A DUTY STATUS THAT PREVENTS THEM

19  OR WILL PREVENT THEM FROM WORKING ON THE FARM LINE.

20  AND WITH RESPECT TO THE ADA SUBCLASS, THERE IS NO

21  PROOF OF THE NUMBER OF OFFENDERS WITH QUALIFYING

22  DISABILITIES.  AND AS WE MOVE -- AND NONE OF THE

23  WITNESSES THAT YOU'RE GOING TO HEAR FROM OVER THE

24  NEXT COUPLE OF DAYS ARE GOING TO TESTIFY ON THIS

25  REQUIREMENT OR THIS EVIDENCE THAT'S NECESSARY TO

1   SATISFY THAT FIRST ELEMENT OF RULE 23(A).

2            MOVING ON TO COMMONALITY, I'LL POINT

3   OUT, AS WE HAVE DONE SO BEFORE, THAT THE ALLEGATIONS

4   OF -- JUST MERE ALLEGATIONS OF SYSTEMIC VIOLATIONS OF

5   LAW WILL NOT AUTOMATICALLY SATISFY THE COMMONALITY

6   REQUIREMENT.  AND I WANT TO REMIND THE COURT AGAIN

7   THAT WHAT WE BELIEVE IS IMPORTANT IS TO LOOK TO THE

8   UNIQUE DIFFERENCES OF THE INDIVIDUAL CLASS MEMBERS TO

9   ASSESS WHETHER COMMONALITY IS SATISFIED BECAUSE, OF

10  COURSE, PREDOMINANCE AND UNIQUE -- AND INDIVIDUAL

11  DIFFERENCES BETWEEN THE CLASS MEMBERS ARE NECESSARILY

12  AN ISSUE IN THIS CASE; WHETHER THEY HAVE CERTAIN

13  MEDICAL HISTORIES THAT MAKE THEM SENSITIVE TO HEAT,

14  WHETHER THEY HAVE COMORBIDITIES OR THEY TAKE CERTAIN

15  MEDICATIONS THAT MAY OR MAY NOT BE ON A LIST THAT

16  PREVENTS THEM OR ASSIGNS THEM TO A CERTAIN DUTY

17  STATUS.  ALL OF THOSE INDIVIDUALIZED QUESTIONS HAVE

18  TO BE ANSWERED TO DETERMINE WHETHER AN INDIVIDUAL

19  SHOULD BE INCLUDED IN THE CLASS AND PARTICULARLY THE

20  ADA SUBCLASS.

21            AND AGAIN, NONE OF THE WITNESSES THAT

22  YOU'RE GOING TO HEAR FROM ARE GOING TO TESTIFY ABOUT

23  THE UNIQUE DIFFERENCES AND INDIVIDUALIZED

24  CIRCUMSTANCES THAT ARE GOING TO NECESSARILY BE

25  ANSWERED AS TO ALL THE CLASS MEMBERS TO DETERMINE

1  THEIR INCLUSION IN THE CLASS.

2              WITH RESPECT TO TYPICALITY, THE

3  PLAINTIFFS SEEK TO REPRESENT MULTIPLE SUBSETS OF

4  PERSONS, PERSONS WITH DIFFERENT DUTY STATUSES.  THEIR

5  DUTY STATUSES COULD CHANGE -- THEY COULD CHANGE OVER

6  TIME; DIFFERENT MEDICATIONS, MEDICAL CONDITIONS, HEAT

7  SENSITIVITIES, AND THE LIST GOES ON AND ON.

8              WITH RESPECT TO ADEQUACY, NONE OF THE

9  NAMED PLAINTIFFS ARE CURRENTLY ON THE FARM LINE, AND

10 NONE COULD TESTIFY AS TO THE CURRENT CONDITIONS OF

11 THE FARM LINE -- WHICH, OF COURSE, WE'RE TALKING

12 ABOUT A 23(B)(2) CLASS WITH RESPECT TO INJUNCTIVE

13 RELIEF -- AND GO FORWARD RESPONSIBILITY.

14             AND THEN LASTLY WITH RESPECT TO RULE

15 23(B)(2), WHICH IS THE INJUNCTIVE RELIEF PORTION OF

16 THE REQUIREMENTS OF RULE 23, THEY WANT A COMPLETE

17 STOPPAGE OF THE FARM LINE.  AND I WILL -- I THINK

18 I'VE ADMITTED IT ALREADY THAT IF YOU COULD STOP THE

19 FARM LINE, OF COURSE THAT'S GOING TO ADDRESS

20 EVERYBODY THE SAME BECAUSE NOBODY IS GOING TO BE ON

21 THE FARM LINE.

22             BUT THE BETTER QUESTION IS WHETHER THIS

23 RELIEF IS APPROPRIATE FOR THE CLASS AS A WHOLE WHEN

24 CONSIDERING THE RISKS OF HARM -- AND AGAIN, THIS IS

25 WHERE I THINK THAT YOU HAVE TO PEEK BEHIND THE

1  CURTAIN WITH RESPECT TO THE MERITS -- AND WHETHER

2  THIS SPECIFIC -- WHETHER THIS INJUNCTIVE RELIEF IS

3  THE APPROPRIATE MANNER OF ADDRESSING AND DETERMINING

4  WHETHER THE RULE 23 REQUIREMENTS ARE SATISFIED; IS

5  THIS RELIEF APPROPRIATE FOR THE CLASS AS A WHOLE WHEN

6  YOU HAVE VAST DIFFERENCES BETWEEN EACH CLASS MEMBERS

7  INVOLVING THEIR MEDICAL HISTORIES, MEDICATIONS AND

8  EVERYTHING THAT I'VE ALREADY TALKED ABOUT?  AND

9  AGAIN, YOUR HONOR, IF YOU FIND THAT EVEN ONE OF THESE

10 REQUIREMENTS ARE LACKING, THEN CERTIFICATION IS NOT

11 THE APPROPRIATE RELIEF HERE.  IT'S A DENIAL OF THE

12 PLAINTIFFS' MOTION FOR CLASS CERTIFICATION.

13           I WOULD BE REMISS NOT TO MENTION ALSO,

14 WITH RESPECT TO THE ADA SUBCLASS, TO GIVE THE COURT

15 AN UPDATE, WHICH I'M SURE YOU'RE PROBABLY AWARE OF.

16 WE DID ARGUE AND WE HAVE SUBMITTED THAT THAT'S

17 SUBJECT TO RES JUDICATA; THAT THERE HAS BEEN A

18 CERTIFIED CLASS WITH RESPECT TO THE ADA SUBCLASS.

19 IT'S THE SAME CLASS THAT'S IN THE *LEWIS* CASE.

20 NOTHING HAS HAPPENED.  MANDATE HAS STILL NOT BEEN

21 ISSUED.  THE PARTIES HAVE PETITIONED THE FIFTH

22 CIRCUIT FOR EN BANC REHEARING AND NOTHING HAS

23 OCCURRED WITH THAT.  SO OUR POSITION STANDS.  UNLESS

24 AND UNTIL SOMETHING CHANGES, THAT'S OUR POSITION WITH

25 RESPECT TO THE PROCEDURAL CHALLENGE TO THE ADA

1  SUBCLASS, INDEPENDENT OF ANY MERITS CHALLENGES UNDER

2  RULE 23.

3         NOW, THE LAST THING I WANT TO TOUCH ON,

4  YOUR HONOR, IS YOU MADE -- YOU'VE MADE A COMMENT --

5  AND THIS CASE HAS BEEN MENTIONED A COUPLE OF TIMES

6  TODAY ALREADY -- IS THE *YATES VERSUS COLLIER* CASE

7  FROM THE FIFTH CIRCUIT, WHEREIN THE FIFTH CIRCUIT

8  AFFIRMED CLASS CERTIFICATION OF WHAT WE'LL REFER TO

9  AS A HEAT CASE.  BUT I WANT TO POINT OUT, WHILE THAT

10 MAY BE A -- PROVIDES A FRAMEWORK OR A GUIDEPOST, I

11 WANT TO POINT OUT SOME OF THE VERY DISCRETE AND

12 IMPORTANT DIFFERENCES BETWEEN THE *YATES* CASE AND WHAT

13 WE'RE DEALING WITH TODAY.

14         **THE COURT:**  OTHER THAN THAT -- THAT

15 ADDRESSED INDOOR --

16         **MR. JONES:**  INDOOR.

17         **THE COURT:**  -- TEMPERATURE, I THINK IS

18 CERTAINLY A SIGNIFICANT FACTOR, AS WE DISCUSSED

19 EARLIER.

20         **MR. JONES:**  RIGHT.  YOUR HONOR, SO THAT

21 INCLUDES THAT IT WAS AN INDOOR HEAT CASE.  THAT'S THE

22 MOST OBVIOUS.  IN THAT CASE THAT PRISON DEALT WITH 30

23 OR MORE HEAT-RELATED DEATHS LEADING UP TO THE LAWSUIT

24 BEING FILED OVER THE YEARS.  THERE WERE NO CHANGES TO

25 THE HEAT POLICIES UNTIL AFTER THE LAWSUIT WAS FILED.

1   OF THE SIX NAMED PLAINTIFFS, ONLY ONE WAS YOUNGER

2   THAN 60 YEARS OLD AND HAD NO HEAT SENSITIVITY MEDICAL

3   CONDITION.  THE REMAINING FIVE WERE BETWEEN OR OVER

4   THE AGE OF 60, UP TO THE AGE OF 72, AND HAD ONE OR

5   MORE CONDITIONS THAT MADE THEM PARTICULARLY SENSITIVE

6   TO HEAT.

7              IT WAS BASICALLY UNDISPUTED IN THAT

8   CASE THAT HEAT EXPOSURE RESULTED IN A SUBSTANTIAL

9   RISK OF HARM TO EVERY CLASS MEMBER.  IT WAS BASICALLY

10  UNDISPUTED, IF YOU READ THE CASE CAREFULLY.  EXPERT

11  TESTIMONY ALSO SET FORTH THAT THE REMEDIES

12  IMPLEMENTED BY THE DEFENDANT DID NOT EFFECTIVELY

13  REDUCE THE RISK, WHICH YOU'VE ALREADY HEARD ARGUMENT

14  AND RECEIVED BRIEFING THAT THE EXACT OPPOSITE, IN OUR

15  OPINION, IS THE CASE HERE.  ALSO, THE PLAINTIFFS ONLY

16  ASSERTED A SINGLE HEAT CLAIM.  HERE PLAINTIFFS ARE

17  PURSUING MORE THAN JUST AN EIGHTH AMENDMENT HEAT

18  CLAIM.  IT'S ALSO A DIGNITARY HARM THEORY, ALSO A

19  PSYCHOLOGICAL HARM THEORY, WHICH THAT EVEN FURTHER

20  EMPHASIZES OUR POSITION THAT YOU HAVE TO LOOK AT THE

21  INDIVIDUALIZED DIFFERENCES AMONGST THE CLASS MEMBERS

22  TO DETERMINE WHETHER THOSE CLAIMS ARE MERITORIOUS OR

23  NOT, WHICH IS, AGAIN, RELEVANT TO THE ISSUE OF CLASS

24  CERTIFICATION.

25              AGAIN, YOU MENTIONED THAT THIS IS AN

1  OUTDOOR EXERTIONAL HEAT CASE, WHICH IS GOING TO BE --

2  YOU'RE GOING TO HEAR FROM THE EXPERTS AND THEY'RE

3  GOING TO TESTIFY ABOUT DIFFERENCES THERE.  AND YOU

4  HAVE TO LOOK AT THE AGE, HEALTH CONDITIONS,

5  SENSITIVITIES OF EVERY CLASS MEMBER TO DETERMINE

6  WHETHER THEIR UNIQUE DIFFERENCES ARE GOING TO IMPACT

7  THEIR CLAIMS.  AND YOU'LL HEAR FROM DR. VASSALLO, THE

8  PLAINTIFFS' EXPERT, THAT -- THIS IS BASICALLY

9  ADMITTED -- THAT EACH INDIVIDUAL IS A DIFFERENT

10 PERSON AND THEY'RE GOING TO BE IMPACTED DIFFERENTLY.

11            NOT ONLY -- AND THIS IS -- I WANTED TO

12 END WITH THIS BECAUSE I THINK IT'S IMPORTANT.  THE

13 HISTORY LEADING UP TO THE *YATES* CASE WAS 20 DEATHS.

14 IT WAS CLEARLY AN ISSUE THAT THE COURT RECOGNIZED.

15 HERE WE'VE HAD NO HEAT-RELATED DEATHS, WE'VE HAD NO

16 HEAT-RELATED ILLNESSES.  AND THAT'S, I THINK, A VERY,

17 VERY IMPORTANT DISTINCTION.  AND IT DIRECTLY IMPACTS

18 THE ANALYSIS OF THE EXISTENCE OR NOT OF THE

19 SUBSTANTIAL RISK OF HARM, WHICH APPEARED TO BE

20 ADMITTED IN *YATES*.  IT IS NOT HERE.

21            AND SO, AGAIN, WHILE *YATES* IS HELPFUL

22 TO PROVIDE US SOME GUIDEPOSTS AND FRAMEWORK, THE

23 DIFFERENCES BETWEEN THAT CASE AND THIS ONE ARE

24 GLARING AND WE THINK IMPORTANT AND DIRECTLY IMPACT

25 THE COURT'S ANALYSIS UNDER RULE 23.

1                SO THAT CONCLUDES MY ARGUMENT.  I WANT

2    TO MAKE ONE POINT.  AND THIS GOES TO THE EVIDENTIARY

3    ISSUES THAT WE TALKED ABOUT BEFORE WE STARTED.

4    THE -- AND LET ME MAKE SURE I GET THESE RIGHT.  AND

5    AGAIN, I DON'T WANT TO BELABOR THIS.

6                **THE COURT:**  THAT'S OKAY.  TAKE YOUR TIME.

7                **MR. JONES:**  BUT IN THE POWERPOINT, WHICH I'M

8    SURE WILL BE OFFERED FOR INTRODUCTION INTO THE

9    RECORD, THERE ARE A FEW DOCUMENTS THAT ARE REFERENCED

10   TO WHICH WE MAINTAIN OUR OBJECTION.  AND

11   SPECIFICALLY -- AND FOR THE RECORD, I'LL MENTION

12   PLAINTIFFS' EXHIBIT 34, PLAINTIFFS' EXHIBITS 29 --

13   I'M SORRY -- 26, 29 AND 30.  AND THAT'S IT.

14               **THE COURT:**  AND, OF COURSE, MR. JONES, YOU

15   AND MS. PAYNE AND MR. BLANCHFIELD CAN THROUGHOUT THE

16   TESTIMONY RAISE YOUR OBJECTION.  AND YOU'RE FREE TO

17   OFFER THE OBJECTIONS AND THE REASONS, OF COURSE, FOR

18   THE OBJECTIONS ON THE RECORD CONTEMPORANEOUS TO THE

19   TESTIMONY.

20               **MR. JONES:**  AND WE WILL DO SO.  I'M JUST

21   MENTIONING THAT FOR PURPOSES OF THE POWERPOINT THAT I

22   DIDN'T OBVIOUSLY CONTEMPORANEOUSLY OBJECT YET.

23               THANK YOU.

24               **THE COURT:**  THANK YOU.

25               ALL RIGHT.  LET ME ASK THE

1  PLAINTIFFS -- COUNSEL FOR THE PLAINTIFFS TO CALL YOUR

2  FIRST WITNESS.  WHO IS GOING TO TAKE THE WITNESS?

3  AND AGAIN, PLEASE IDENTIFY YOURSELF FOR THE RECORD SO

4  THAT IT'S CLEAR.

5          **MR. McGREGOR:**  GOOD AFTERNOON, YOUR HONOR.

6                MICHAEL McGREGOR FROM PAUL WEISS ON

7  BEHALF OF THE PLAINTIFFS.

8          **THE COURT:**  VERY WELL.

9                ALL RIGHT.  OKAY.  FOR THE RECORD, MR.

10  McGREGOR, PLEASE CALL YOUR FIRST WITNESS.

11          **MR. McGREGOR:**  YOUR HONOR, PLAINTIFFS CALL

12  PROFESSOR EVELYNN HAMMONDS.

13          **THE COURT:**  GOOD AFTERNOON, PROFESSOR

14  HAMMONDS.  CAN YOU HEAR ME?

15          **THE WITNESS:**  YES, I CAN.  GOOD AFTERNOON.

16          **THE COURT:**  I'M GOING TO ASK YOU TO SPEAK UP

17  A LITTLE LOUDER.  I CAN BARELY HEAR YOU.  AS YOU

18  KNOW, HAVING TESTIFIED IN HEARINGS PREVIOUSLY, IT'S

19  VERY IMPORTANT THAT WE BE ABLE TO HEAR YOU CLEARLY.

20  ONE OF OUR I.T. SPECIALISTS IS NOW TRYING TO ADJUST

21  THE VOLUME.  CAN YOU HEAR ME?

22          **THE WITNESS:**  YES, I CAN.

23          **THE COURT:**  ALL RIGHT.  DR. HAMMONDS, LET ME

24  ASK YOU TO RAISE YOUR RIGHT HAND TO TAKE THE OATH

25  FROM THE CLERK.

1        (WHEREUPON, EVELYNN HAMMONDS, BEING DULY

2    SWORN, TESTIFIED AS FOLLOWS VIA ZOOM

3    VIDEOCONFERENCE.)

4        **THE COURT:**  DR. HAMMONDS, PLEASE STATE AND

5    SPELL YOUR NAME FOR THE RECORD.

6        **THE WITNESS:**  EVELYNN, E-V-E-L-Y-N-N,

7    HAMMONDS, H-A-M-M-O-N-D-S.

8        **THE COURT:**  THANK YOU.

9        YOU MAY PROCEED.

10        **MR. McGREGOR:**  THANK YOU, YOUR HONOR.

11                        **VOIR DIRE**

12    BY MR. McGREGOR:

13    **Q**    DR. HAMMONDS, WHERE DO YOU WORK?

14    **A**    I WORK AT HARVARD UNIVERSITY.

15    **Q**    WHAT POSITIONS DO YOU CURRENTLY HOLD AT

16    HARVARD UNIVERSITY?

17    **A**    I AM THE BARBARA GUTMANN ROSENKRANTZ

18    PROFESSOR OF THE HISTORY OF SCIENCE, PROFESSOR OF

19    AFRICAN AND AFRICAN-AMERICAN STUDIES, AND PROFESSOR

20    OF SOCIAL AND BEHAVIORAL SCIENCES AT THE HARVARD

21    SCHOOL OF PUBLIC HEALTH, AND THE INTERIM DIRECTOR OF

22    THE CHARLES WARREN CENTER FOR STUDIES IN AMERICAN

23    HISTORY.

24    **Q**    AND HOW LONG HAVE YOU BEEN A PROFESSOR AT

25    HARVARD UNIVERSITY?

1    **A**    TWENTY-THREE YEARS.

2    **Q**    DO YOU TEACH ANY COURSES AT HARVARD?

3    **A**    YES.  I TEACH UNDERGRADUATE AND GRADUATE

4    COURSES.

5    **Q**    CAN YOU PLEASE PROVIDE A BRIEF OVERVIEW OF

6    YOUR EDUCATIONAL BACKGROUND?

7    **A**    I HAVE A BACHELOR'S DEGREE IN PHYSICS FROM

8    SPELMAN COLLEGE, A BACHELOR'S IN ELECTRICAL

9    ENGINEERING FROM GEORGIA TECH, A MASTER'S DEGREE IN

10   PHYSICS FROM MIT, AND A PH.D. IN THE HISTORY OF

11   SCIENCE FROM HARVARD.

12        **THE COURT:**  MR. McGREGOR, LET ME JUST

13   INTERRUPT YOU.  I NEGLECTED TO TELL YOU, OF COURSE,

14   YOU'RE ON THE CLOCK.  HOW MUCH TIME WOULD YOU LIKE TO

15   APPORTION FOR YOUR REDIRECT?

16        **MR. McGREGOR:**  APPROXIMATELY FIVE TO TEN

17   MINUTES.

18        **THE COURT:**  THANK YOU.

19   **BY MR. McGREGOR:**

20    **Q**    DR. HAMMONDS, WHAT IS THE ACADEMIC

21   DISCIPLINE OF THE HISTORY OF SCIENCE?

22    **A**    THE HISTORY OF SCIENCE IS THE STUDY OF

23   SCIENTISTS, OF SCIENTIFIC DISCOVERIES, SCIENTIFIC

24   INNOVATIONS, SCIENTIFIC INSTITUTIONS, THE

25   RELATIONSHIP BETWEEN SCIENCE AND GOVERNMENT AND

1 REGULATIONS, SCIENTIFIC POLICY, AND SCIENCE IN

2 SOCIETY.

3     **Q**   AND WHAT IS THE ACADEMIC DISCIPLINE OF

4 AFRICAN-AMERICAN STUDIES?

5     **A**   AFRICAN-AMERICAN STUDIES IS THE STUDY OF THE

6 LIVED EXPERIENCES OF AFRICAN AMERICANS SINCE THE TIME

7 THEY ARRIVED AND THEY WERE BROUGHT TO THE UNITED

8 STATES IN 1619.  IT STUDIES THEIR HISTORY, THEIR

9 SOCIAL LIFE, CULTURAL ISSUES, POLITICAL ISSUES, EVERY

10 ASPECT OF LIFE FOR AFRICAN-AMERICAN PEOPLES IN THIS

11 COUNTRY.

12     **Q**   WHAT IS THE ACADEMIC DISCIPLINE OF

13 EPIDEMIOLOGY?

14     **A**   SO EPIDEMIOLOGY IS THE STUDY OF DISEASE IN

15 POPULATIONS.  SO WE STUDY THE ORIGINS OF DISEASES, WE

16 STUDY THE WAYS PATHOGENS TRAVEL THROUGH PARTICULAR

17 POPULATIONS.  WE LOOK AT PREVENTIVE EFFORTS AND WE

18 ANALYZE THE WAYS IN WHICH THE PATHOGENS AFFECT SOCIAL

19 STRUCTURES, POLITICAL STRUCTURES, AND INSTITUTIONS IN

20 A GIVEN SOCIETY.

21     **Q**   AND WHAT IS THE ACADEMIC DISCIPLINE OF THE

22 HISTORY OF MEDICINE?

23     **A**   THE HISTORY OF MEDICINE -- IT'S LIKE THE

24 HISTORY OF SCIENCE.  IT'S THE STUDY OF MEDICAL

25 THEORIES, MEDICAL PRACTICES.  INSTITUTIONS IS WHERE

1   PHYSICIANS ARE TRAINED, MEDICAL INNOVATIONS AND

2   DISCOVERIES AND THE APPLICATION OF THOSE THEORIES AND

3   PRACTICES TO VARIOUS POPULATIONS.

4        **Q**   HAVE YOU CONDUCTED RESEARCH IN ANY OF THESE

5   ACADEMIC DISCIPLINES?

6        **A**   MY WORK SITS AT THE INTERSECTION OF THE

7   HISTORY OF SCIENCE AND THE HISTORY OF MEDICINE AND

8   THE HISTORY OF EPIDEMIOLOGY AND AFRICAN-AMERICAN

9   STUDIES, AND SO I HAVE WRITTEN AND DONE SCHOLARLY

10  WORK IN ALL OF THOSE FIELDS.

11       **Q**   HAVE YOU GIVEN LECTURES RELATING TO ANY OF

12  THESE ACADEMIC DISCIPLINES?

13       **A**   YES.

14       **Q**   WHICH ONES?

15       **A**   ALL OF THEM.

16       **Q**   HAVE YOU PUBLISHED BOOKS OR ARTICLES IN ANY

17  OF THESE ACADEMIC DISCIPLINES?

18       **A**   I'VE PUBLISHED BOOKS IN THE HISTORY OF

19  SCIENCE AND THE HISTORY OF MEDICINE AND ARTICLES IN

20  AFRICAN-AMERICAN STUDIES AND THE HISTORY OF

21  EPIDEMIOLOGY.

22       **Q**   DR. HAMMONDS, WHAT WAS YOUR ASSIGNMENT FOR

23  THIS CASE?

24       **A**   MY ASSIGNMENT WAS TO EXAMINE THE PRACTICES

25  AT THE FARM LAND -- FARM -- SORRY -- LINE AT THE

1    LOUISIANA STATE PENITENTIARY -- THROUGH THE

2    PERSPECTIVE OF MY HISTORICAL WORK IN THE FIELDS I

3    JUST DELINEATED -- TO ASSESS WHETHER OR NOT THERE --

4    I VIEW THERE ARE SERIOUS RISK TO -- I'M SORRY --

5    PHYSICAL AND PSYCHOLOGICAL HARM BASED ON COMPULSORY

6    WORK CONDITIONS AT THE FARM LINE.

7        **Q**    GENERALLY WHAT IS YOUR UNDERSTANDING OF THE

8    FARM LINE?

9        **A**    MY -- SORRY.  MY UNDERSTANDING OF THE FARM

10   LINE IS THAT IT IS A COMPULSORY AGRICULTURAL WORK

11   PROGRAM ASSOCIATED WITH THE PENITENTIARY.

12       **Q**    WERE YOU ABLE TO REACH A CONCLUSION WITH

13   REGARD TO YOUR ASSIGNMENT?

14           **MR. BLANCHFIELD:**  YOUR HONOR, ARE WE GOING

15   TO HAVE A TENDER HERE BEFORE WE GET INTO OPINIONS?

16           **THE COURT:**  MR. McGREGOR, DO YOU BELIEVE IT

17   NECESSARY TO GO INTO HER -- TO DR. HAMMONDS' FINDINGS

18   AT THIS POINT OR DO YOU WISH TO OFFER HER AS AN

19   EXPERT AT THIS POINT?

20           **MR. McGREGOR:**  I CAN ACCELERATE THROUGH THE

21   TENDERING PROCESS.

22           **THE COURT:**  YES, WHY DON'T WE DO THAT.

23           **MR. McGREGOR:**  AT THIS TIME, YOUR HONOR,

24   PLAINTIFFS MOVE TO QUALIFY DR. HAMMONDS AS AN EXPERT

25   IN THE HISTORY OF SCIENCE, AFRICAN-AMERICAN STUDIES,

1  EPIDEMIOLOGY, AND THE HISTORY OF MEDICINE.

2          **THE COURT:**  THANK YOU, MR. McGREGOR.

3              WOULD THE DEFENSE LIKE TO CONDUCT ANY

4  VOIR DIRE OF THE PROPOSED EXPERT?

5          **MR. BLANCHFIELD:**  YES, YOUR HONOR.

6          **THE COURT:**  ALL RIGHT.  YOU MAY DO SO AT

7  THIS TIME.

8              JUST HAVE A SEAT AT COUNSEL TABLE, MR.

9  McGREGOR.  ALL RIGHT.

10                      **VOIR DIRE**

11  BY MR. BLANCHFIELD:

12     **Q**    PROFESSOR HAMMONDS, GOOD TO SEE YOU AGAIN.

13  GOOD AFTERNOON.

14     **A**    GOOD AFTERNOON.

15     **Q**    IF I UNDERSTAND IT, YOU HAVE NEVER VISITED

16  LOUISIANA STATE PENITENTIARY, HAVE YOU?

17     **A**    I HAVE NOT.

18     **Q**    YOU HAVE NEVER VISITED ANY PRISON THROUGHOUT

19  THIS NATION, HAVE YOU?

20     **A**    I HAVE NOT.

21     **Q**    YOU HAVE NOT MET THE PLAINTIFFS IN THIS

22  CASE, HAVE YOU?

23     **A**    NO.

24     **Q**    YOU HAVE NOT HAD AN OPPORTUNITY TO INTERVIEW

25  THEM OR TO QUESTION THEM ABOUT THEIR EXPERIENCES?

1       **A**    NO, I HAVE NOT.

2       **Q**    YOU HAVE NOT READ THEIR INSTITUTIONAL FILES,

3  YOU HAVE NOT READ THEIR MEDICAL RECORDS, HAVE YOU?

4       **A**    I HAVE NOT.

5       **Q**    YOU'RE NOT A PSYCHOLOGIST?

6       **A**    NO.

7       **Q**    YOU'RE NOT A PSYCHIATRIST, YOU'RE NOT A

8  MEDICAL DOCTOR.  CORRECT?

9       **A**    CORRECT.

10       **Q**    NOW, YOU'RE AWARE THAT JOSH SBICCA, AN

11  EXPERT IN THIS CASE, HAS TESTIFIED THAT THERE IS FARM

12  LABOR IN OVER 600 PRISONS THROUGHOUT THIS NATION?

13       **THE COURT:**  ARE YOU AWARE OF THAT, MA'AM?

14  **BY THE WITNESS:**

15       **A**    I'M SORRY?

16       **Q**    ARE YOU AWARE OF THAT?

17       **A**    NO, I WAS NOT AWARE OF THAT.

18       **MR. BLANCHFIELD:**  THAT'S ALL THE QUESTIONS I

19  HAVE, JUDGE.

20       **THE COURT:**  ALL RIGHT.  THANK YOU.

21            MR. McGREGOR, ANY ADDITIONAL QUESTIONS

22  FOR DR. HAMMONDS WITH RESPECT TO HER QUALIFICATIONS

23  AS AN EXPERT?

24  **BY MR. McGREGOR:**

25       **Q**    DR. HAMMONDS, WHAT DID YOU REVIEW IN

1   PREPARATION OF YOUR CONCLUSIONS IN THIS MATTER?

2       **A**   I REVIEWED THE DEPOSITIONS OF PERSONNEL AT

3   THE PENITENTIARY AND DEPOSITIONS OF PERSONNEL OF THE

4   INMATES AND MY OWN HISTORICAL (INAUDIBLE) ON THE

5   HISTORY OF -- IN THE HISTORY OF MEDICINE AND THE

6   HISTORY OF SCIENCE AND THE HISTORY OF EPIDEMIOLOGY,

7   AND VIDEO FOOTAGE OF THE FARM LINE.

8       **Q**   THANK YOU.

9           **THE COURT:**  ARE YOU PREPARED TO OFFER DR.

10  HAMMONDS AS AN EXPERT WITNESS IN THIS MATTER?

11          **MR. McGREGOR:**  YES, YOUR HONOR.

12          **THE COURT:**  IN WHAT FIELDS, SIR?

13          **MR. McGREGOR:**  IN THE FIELDS OF HISTORY OF

14  SCIENCE, AFRICAN-AMERICAN STUDIES, EPIDEMIOLOGY, AND

15  THE HISTORY OF MEDICINE.

16          **THE COURT:**  OKAY.  THE HISTORY OF MEDICAL

17  SCIENCE --

18          **MR. McGREGOR:**  NO.  SORRY.  THE HISTORY OF

19  SCIENCE, AFRICAN-AMERICAN STUDIES, EPIDEMIOLOGY, AND

20  THE HISTORY OF MEDICINE.

21          **THE COURT:**  AFRICAN-AMERICAN -- OKAY.

22  SCIENCE, AFRICAN-AMERICAN HISTORY?

23          **MR. McGREGOR:**  YES.  AFRICAN-AMERICAN

24  STUDIES.

25          **THE COURT:**  AFRICAN-AMERICAN STUDIES.

```
 1        MR. McGREGOR:  EPIDEMIOLOGY, AND THE HISTORY
 2  OF MEDICINE.
 3        THE COURT:  OKAY.  IS THERE AN OBJECTION?
 4        MR. BLANCHFIELD:  YOUR HONOR, ONLY TO THE
 5  EXTENT THAT --
 6        THE COURT:  MR. BLANCHFIELD, IT'S FEDERAL
 7  COURT.  YOU CAN REMAIN THERE AND -- JUST STAND WHEN
 8  ADDRESSING THE COURT, PLEASE.
 9        MR. BLANCHFIELD:  YOUR HONOR -- YES.
10        THE COURT:  YOU CAN JUST FLIP THE MICROPHONE
11  UP.  THAT SHOULD BE FINE.
12        MR. BLANCHFIELD:  I APOLOGIZE, YOUR HONOR.
13        THE COURT:  THAT'S ALL RIGHT.
14        MR. BLANCHFIELD:  ONLY TO THE EXTENT THAT,
15  AS I POINTED OUT, THAT SHE HAS SO LITTLE CONTACT TO
16  THE ACTUAL ISSUES IN THIS CASE.  YOU KNOW, WE HAD
17  OUR -- A DAUBERT MOTION, YOU RULED ON IT LAST NIGHT.
18  YOU TALKED ABOUT SOFT SCIENCES.  YOU SAID
19  SPECIFICALLY THAT -- YOU CITED THE FIFTH CIRCUIT CASE
20  FROM 2006:  IN INSTANCES OF SOFT SCIENCE, INDICIA OF
21  RELIABILITY ARE CONSIDERED, INCLUDING EXPERIENCE,
22  EDUCATION, TRAINING AND OBSERVATIONS.  HER --
23        THE COURT:  THAT'S NOT WHAT I SAID.  IT'S
24  WHAT THE FIFTH CIRCUIT SAID, AS YOU POINT OUT.  BUT
25  GO AHEAD.
```

1          **MR. BLANCHFIELD:**  SO WE BELIEVE THAT THAT'S

2    DIRECTLY RELEVANT TO HER TENDER HERE, AND THAT'S THE

3    BASIS OF OUR OBJECTION.

4          **THE COURT:**  MR. McGREGOR?

5          **MR. McGREGOR:**  MAY I ASK DR. HAMMONDS

6    ADDITIONAL QUESTIONS?

7          **THE COURT:**  SURE.

8    **BY MR. McGREGOR:**

9      **Q**   DR. HAMMONDS, IN YOUR WORK, HAVE YOU

10   OBTAINED AN UNDERSTANDING OF CHATTEL SLAVERY?

11         **THE COURT:**  OF WHAT?

12         **MR. McGREGOR:**  CHATTEL SLAVERY.

13         **THE COURT:**  CHATTEL SLAVERY?

14         **MR. McGREGOR:**  YES.  BUT I BELIEVE SHE'S

15   FROZEN.

16         **THE COURT:**  DR. HAMMONDS?

17              WE HAVE AN ISSUE.  DR. HAMMONDS JUST

18   FROZE, BRANDON.  DO YOU THINK IT'S ON OUR END OR HER

19   END?

20         **MR. BROUSSARD:**  PROBABLY ON HER END.

21         **THE COURT:**  DO WE HAVE A MEANS TO

22   COMMUNICATE WITH DR. HAMMONDS?  CAN ANYONE CALL HER

23   RIGHT NOW AND ASK HER TO PERHAPS REFRESH OR REBOOT?

24         **MR. McGREGOR:**  YES.  I WILL TURN MY PHONE ON

25   AND GIVE HER A CALL.

1       **THE COURT:**  LET'S GO OFF THE RECORD AT THIS

2   TIME.  AND WE CAN ACTIVATE THE WHITE NOISE.

3                   **(OFF THE RECORD)**

4       **THE COURT:**  LET'S -- WE'RE BACK ON THE

5   RECORD.

6               LET'S DO THIS.

7               NATALIE, CAN I SEE YOU?

8                   **(OFF THE RECORD)**

9       **THE COURT:**  PLAN B.  PLEASE CALL YOUR NEXT

10  WITNESS.

11              THANK YOU FOR LETTING ME PICK ON YOU,

12  MR. BLANCHFIELD.

13          **MR. BLANCHFIELD:**  I'M USED TO IT, JUDGE.

14          **THE COURT:**  OKAY.  WHO'S NEXT UP?

15          **MS. McTOOTLE:**  YOUR HONOR, PLAINTIFFS

16  CALL -- ARIELLE McTOOTLE FOR THE PLAINTIFFS, AND

17  PLAINTIFFS CALL DR. JOSHUA SBICCA.

18          **(WHEREUPON, JOSHUA SBICCA, HAVING BEEN DULY**

19  **SWORN, TESTIFIED AS FOLLOWS.)**

20          **THE COURTROOM DEPUTY:**  CLEARLY STATE AND

21  SPELL YOUR NAME FOR THE RECORD.

22          **THE WITNESS:**  MY NAME IS JOSHUA,

23  J-O-S-H-U-A, AND LAST NAME SBICCA, S-B-I-C-C-A.

24          **MS. McTOOTLE:**  YOUR HONOR, BEFORE WE BEGIN,

25  MAY I APPROACH TO PROVIDE DR. SBICCA AND THE COURT

1  WITH -- AND DEFENDANTS -- WITH EXHIBITS THAT WE'RE

2  GOING TO BE USING?

3          **THE COURT:**  SURE.

4          **MS. McTOOTLE:**  THANK YOU.

5                    **VOIR DIRE**

6  BY MS. McTOOTLE:

7      **Q**   GOOD AFTERNOON, DR. SBICCA.  TO BEGIN, DO

8  YOU HOLD ANY DEGREES?

9      **A**   YES.  I HOLD A BACHELOR'S IN SCIENCE IN

10  SOCIOLOGY AND A BACHELOR'S IN SCIENCE IN POLITICAL

11  SCIENCE FROM SANTA CLARA UNIVERSITY, AND I HAVE A

12  MASTER'S AND A PH.D. IN SOCIOLOGY FROM THE UNIVERSITY

13  OF FLORIDA.

14      **Q**   WHAT IS YOUR CURRENT JOB TITLE?

15      **A**   I'M AN ASSOCIATE PROFESSOR OF SOCIOLOGY AT

16  COLORADO STATE UNIVERSITY.

17      **Q**   DO YOU HOLD ANY OTHER TITLES?

18      **A**   I'M ALSO THE DIRECTOR OF THE PRISON

19  AGRICULTURAL LAB, WHICH IS ALSO RUN OUT OF COLORADO

20  STATE UNIVERSITY.

21      **Q**   IS THERE A PARTICULAR AREA OF SOCIOLOGY THAT

22  YOU FOCUSED ON IN YOUR CAREER?

23      **A**   YES.  I'VE STUDIED FOOD SYSTEMS AND I'VE

24  LOOKED AT FOOD AND ENVIRONMENTAL INEQUALITIES AND

25  I'VE STUDIED PRISON AGRICULTURAL SYSTEMS AND PRISON

1  LABOR IN AGRICULTURAL SYSTEMS.

2      **Q**    AND HAVE YOU PUBLISHED ANY ACADEMIC

3  LITERATURE IN THE FIELD OF PRISON AGRICULTURAL LABOR

4  SYSTEMS?

5      **A**    YES, I HAVE.

6      **Q**    HAS ANY OF YOUR WORK INVOLVED COMPARING THE

7  HISTORY AND LEGACY OF SLAVERY TO THE DEVELOPMENT OF

8  PRISON AGRICULTURAL LABOR IN THE U.S.?

9      **A**    YES.  IN SOME OF MY PEER-REVIEWED RESEARCH

10  AS WELL AS AN ONGOING BOOK PROJECT.

11      **Q**    YOU MENTIONED THE PRISON AGRICULTURAL LAB

12  EARLIER.  WHAT IS THE PURPOSE OF THE LAB?

13      **A**    THE LAB WAS FOUNDED IN 2019 IN ORDER TO

14  CATALOG WHERE, WHAT, AND WHY PRISON AGRICULTURE IS

15  TAKING PLACE THROUGHOUT THE UNITED STATES TO CONDUCT

16  A FIRST OF ITS KIND NATIONWIDE STUDY.

17      **Q**    AND SO BASED ON YOUR WORK WITH THE PRISON

18  AGRICULTURAL LAB, DO YOU HAVE FAMILIARITY WITH

19  NATIONWIDE TRENDS IN PRISON AGRICULTURAL LABOR?

20      **A**    YES, I DO.

21      **Q**    DR. SBICCA, FROM YOUR PERSPECTIVE, WHAT WAS

22  YOUR ASSIGNMENT FOR THIS CASE?

23      **A**    MY ASSIGNMENT WAS TO EVALUATE THE FARM LINE

24  AND TO SOCIOLOGICALLY CONSIDER ITS PRACTICES.

25      **Q**    AND GENERALLY, AT A HIGH LEVEL, WHAT IS YOUR

1  UNDERSTANDING OF THE FARM LINE?

2      **A**    THE FARM LINE IS A WORK PROGRAM AT LOUISIANA

3  STATE PENITENTIARY WHERE INCARCERATED MEN ARE

4  REQUIRED TO WORK.  IT'S A PRACTICE THAT MANY MEN WHEN

5  THEY FIRST GET TO LOUISIANA STATE PENITENTIARY MUST

6  WORK ON.  AND IT'S A PROGRAM WHERE, IF PEOPLE WORK,

7  THEY'RE PAID ANYWHERE FROM ZERO TO FOUR CENTS AN

8  HOUR.

9      **Q**    AND IN REACHING YOUR OPINION, WHAT, IF ANY,

10  EVIDENCE DID YOU REVIEW IN THIS CASE?

11          **MR. BLANCHFIELD:**  EXCUSE ME, YOUR HONOR.  IF

12  WE'RE GETTING TO OPINIONS, THERE HAS NOT BEEN A

13  TENDER.

14          **THE COURT:**  YES, I UNDERSTAND THAT, MR.

15  BLANCHFIELD.  I'M A LITTLE CONCERNED ABOUT THAT AS

16  WELL.

17          HAVE YOU COMPLETED YOUR EXAMINATION OF

18  HIS EXPERTISE, BONA FIDES?

19          **MS. McTOOTLE:**  I CAN SPEED THROUGH IT.

20          **THE COURT:**  YES, LET'S DO THAT.

21          **MS. McTOOTLE:**  SO AT THIS TIME, YOUR HONOR,

22  PLAINTIFFS MOVE TO QUALIFY DR. JOSHUA SBICCA AS AN

23  EXPERT IN THE SOCIOLOGY OF PRISON AGRICULTURAL LABOR.

24          **THE COURT:**  OKAY.  MR. BLANCHFIELD, ANY VOIR

25  DIRE?

1          **MR. BLANCHFIELD:** YES, YOUR HONOR, JUST

2  BRIEFLY.

3          **THE COURT:** YOU CAN USE THE PODIUM, PLEASE.

4                          **VOIR DIRE**

5  BY MR. BLANCHFIELD:

6      **Q**    DR. SBICCA, YOU ARE NOT A PSYCHOLOGIST.

7  CORRECT?

8      **A**    I'M A SOCIOLOGIST.

9      **Q**    AND YOU ARE NOT A MEDICAL DOCTOR.  CORRECT?

10     **A**    CORRECT.

11     **Q**    YOU'VE HAD NO FORMAL MEDICAL TRAINING?

12     **A**    CORRECT.

13     **Q**    YOU HAVE NOT INTERVIEWED ANY OF THE INMATES

14 AT LOUISIANA STATE PENITENTIARY, HAVE YOU?

15     **A**    I'VE SPOKEN DIRECTLY WITH THEM DURING MY

16 FARM VISIT LAST JULY.

17     **Q**    DID YOU INTERVIEW THEM ABOUT THEIR

18 EXPERIENCES AND CONDITIONS ON THE FARM LINE?

19     **A**    I TALKED TO THEM ABOUT THEIR EXPERIENCES AND

20 CONDITIONS ON THE FARM LINE, YES.

21     **Q**    DID YOU REPORT THAT ANYWHERE?

22     **A**    NO, I DID NOT REPORT THAT ANYWHERE.

23     **Q**    IT'S NOT IN YOUR EXPERT REPORT?

24     **A**    MY OBSERVATIONS IN MY EXPERT REPORT WERE IN

25 PART, INFORMED BY MY EXPERIENCES WITNESSING WHAT WAS

1  HAPPENING OUT ON THE FARM LINE.

2      **Q**    BUT NOT SPECIFICALLY INTERVIEWING THE

3  INMATES ON THE FARM LINE.  IS THAT CORRECT?

4      **A**    I DON'T QUOTE ANYBODY DIRECTLY.

5          **MR. BLANCHFIELD:**  THAT'S ALL I HAVE, YOUR

6  HONOR.

7          **THE COURT:**  THANK YOU, MR. BLANCHFIELD.

8              DOCTOR -- IS IT SBICCA?

9          **THE WITNESS:**  SBICCA.

10          **THE COURT:**  SBICCA.

11          **THE WITNESS:**  YES, SBICCA.

12          **THE COURT:**  YOU DID NOT CONDUCT A MEDICAL

13  ANALYSIS OF ANY KIND FOR ANY SPECIFIC INMATE THAT IS

14  AT LEAST REPORTED IN YOUR REPORT.  RIGHT?

15          **THE WITNESS:**  NO, NO MEDICAL EVALUATION.

16          **THE COURT:**  ALL RIGHT.  MS. McTOOTLE, ARE

17  YOU PREPARED TO OFFER DR. SBICCA AS AN EXPERT AT THIS

18  TIME?

19          **MS. McTOOTLE:**  YES, WE ARE, YOUR HONOR.

20          **THE COURT:**  IN WHAT FIELD?

21          **MR. McTOOTLE:**  IN THE FIELD OF THE SOCIOLOGY

22  OF PRISON AGRICULTURAL LABOR.

23          **THE COURT:**  IS THERE AN OBJECTION?

24          **MR. BLANCHFIELD:**  NO, YOUR HONOR.

25          **THE COURT:**  WITHOUT OBJECTION, DR. JOSHUA

1  SBICCA WILL BE ACCEPTED BY THE COURT AS AN EXPERT IN

2  THE FIELD OF SOCIOLOGICAL -- SOCIOLOGY -- THE

3  SOCIOLOGY OF PRISON AGRICULTURAL LABOR.

4              YOU MAY PROCEED.

5                    **DIRECT EXAMINATION**

6  BY MS. McTOOTLE:

7      **Q**    DR. SBICCA, IF YOU COULD TURN TO TAB 2 OF

8  YOUR BINDER, PLEASE.  THIS HAS BEEN ENTERED INTO

9  EVIDENCE AS CLASS CERT JX55.

10             DO YOU RECOGNIZE THIS DOCUMENT?

11     **A**    YES.  THIS IS MY EXPERT REPORT.

12     **Q**    AND IF WE COULD TAKE A LOOK AT PARAGRAPH 31.

13     **A**    OKAY.

14     **Q**    YOU STATE THAT, QUOTE, THE HISTORY AND

15  DEVELOPMENT OF PENAL LABOR SYSTEMS IS DIRECTLY

16  CONNECTED TO THE HISTORY OF SLAVERY IN THE UNITED

17  STATES.  CAN YOU EXPLAIN WHAT YOU MEAN HERE?

18     **A**    SURE.  WHEN CHATTEL SLAVERY WAS ABOLISHED

19  DURING THE RECONSTRUCTION PERIOD, THERE WERE THE

20  DEVELOPMENT OF WHAT I REFER TO AS THE BLACK CODES,

21  WHICH WERE A SERIES OF LAWS THAT CRIMINALIZED MUCH OF

22  LIFE FOR RECENTLY FREED ENSLAVED PEOPLE.  THAT --

23  THOSE SET OF LAWS WERE THEN USED TO INCARCERATE MANY

24  PEOPLE WHO WERE RECENTLY FREED.

25             AND THE NEXT SET OF PRACTICES THAT EVOLVED,

1    ESPECIALLY IN THE SOUTHERN PRISON SYSTEMS THAT CAME

2    FROM CHATTEL SLAVERY, WAS CONVICT LEASING.  AND

3    CONVICT LEASING WAS THE PRACTICE OF LEASING OUT

4    INCARCERATED PEOPLE TO WORK, IN MANY CASES, IN

5    AGRICULTURAL OPERATIONS BUT ALSO IN A VARIETY OF

6    OTHER KINDS OF OPERATIONS IN MANY RESPECTS, OR IN

7    MANY CASES, TO FORMER PLANTATION OWNERS WHERE SOME OF

8    THESE PEOPLE MAY HAVE BEEN ENSLAVED IN THE PAST.

9          IN ADDITION, THERE WAS THE IMPLEMENTATION

10   AND DEVELOPMENT OF CHAIN GANGS, WHICH WAS REMINISCENT

11   OF CHATTEL SLAVERY INSOFAR AS IT PUT PEOPLE IN A FORM

12   OF BONDAGE AND FORCED WORK ABOVE AND BEYOND THE KIND

13   OF LABOR THAT WOULD BE PERFORMED WITHOUT THAT.

14         **MS. McTOOTLE:**  COULD I ASK THE COURT TO

15   SWITCH THE FEED SO THAT OUR TEAM CAN DISPLAY?

16         **THE COURT:**  SURE.  MS. McTOOTLE, I NOTED

17   THAT YOUR EXAMINATION OF THE WITNESS BEGAN AT 4:15,

18   SO IF YOU WOULD LIKE FIVE MINUTES, I'LL GIVE YOU A

19   FIVE-MINUTE WARNING, IF YOU WILL.  OR TEN MINUTES.

20         **MS. McTOOTLE:**  YES.  I WOULD LIKE TO RESERVE

21   FIVE MINUTES FOR REDIRECT.

22         **THE COURT:**  VERY WELL.

23   BY MS. McTOOTLE:

24      **Q**   SO IF WE COULD TAKE A LOOK AT PARAGRAPHS 89

25   AND 92 OF YOUR REPORT.  STARTING WITH THE SENTENCE,

1   QUOTE, WHILE PRISON LABOR EXISTS IN ALL STATES,

2   COMPELLED LABOR UNDER CONDITIONS LIKE THOSE ON THE

3   FARM LINE DOES NOT.  THERE ARE FEW EXAMPLES OF PENAL

4   PUNISHMENT LEFT THAT SO BRAZENLY ADOPT THE TRAPPINGS

5   OF SLAVERY TO ENFORCE PENAL PHILOSOPHIES.  AND THEN

6   YOU POINT TO CONVICT LEASING AND CHAIN GANGS AS

7   PRACTICES THAT HAVE BEEN, QUOTE, ABOLISHED AND,

8   QUOTE, ABANDONED AND CONDEMNED RESPECTIVELY.  IS THAT

9   CORRECT?

10       **A**   CORRECT.

11       **Q**   AND THEN IN PARAGRAPH 92 OF YOUR REPORT YOU

12   SAY THE FARM LINE, QUOTE, PUNISHES THROUGH ITS

13   TRAUMATIC ASSOCIATION OF FORCED AGRICULTURAL LABOR TO

14   CHATTEL SLAVERY.  IS THAT CORRECT?

15       **A**   CORRECT.

16       **Q**   SO TAKING THOSE ONE BY ONE, WHEN YOU SAY

17   THAT THERE ARE FEW EXAMPLES LEFT OF PRACTICES THAT

18   ADOPT THE TRAPPINGS OF CHATTEL SLAVERY, ARE CONVICT

19   LEASING AND CHAIN GANGS PRACTICES THAT ADOPT THE

20   TRAPPINGS OF CHATTEL SLAVERY, IN YOUR OPINION?

21       **A**   YES, THEY DO.

22       **Q**   HOW SO?

23       **A**   WELL, IN THE CASE OF CONVICT LEASING, YOU

24   HAD A FORCED WORK SYSTEM IN MANY RESPECTS ON

25   PLANTATIONS THEMSELVES WHERE PEOPLE WEREN'T AFFORDED

1   ANY RIGHTS OR ANY PROTECTIONS AND WERE TREATED SIMPLY

2   AS A LABOR INPUT.  IN THE CASE OF CHAIN GANGS, YOU

3   HAD REMINISCENT OF CHATTEL SLAVERY INSOFAR AS DURING

4   THE PERIOD OF CHATTEL SLAVERY YOU WOULD HAVE ENSLAVED

5   PEOPLE CHAINED AND FORCED TO WORK.  AGAIN, THIS

6   SYSTEM THEN HAPPENS IN A POST-CIVIL WAR AND

7   POST-RECONSTRUCTION PERIOD.

8       Q    IS THE FARM LINE, IN YOUR OPINION, ANOTHER

9   EXAMPLE OF A PRACTICE THAT ADOPTS THE TRAPPINGS OF

10  CHATTEL SLAVERY?

11      A    YES.

12      Q    SO LATER IN PARAGRAPH 92 WHEN YOU SAY, "THE

13  FARM LINE PUNISHES THROUGH ITS TRAUMATIC ASSOCIATION

14  OF FORCED AGRICULTURAL LABOR TO CHATTEL SLAVERY,"

15  WHAT DO YOU MEAN HERE?

16      A    WELL, WE CAN FIRST LOOK AT, FOR INSTANCE,

17  THE WAY IN WHICH AGRICULTURAL LABOR IS CONSIDERED THE

18  LOWEST KIND OF WORK ON A SLAVE PLANTATION.  YOU KNOW,

19  IF YOU LOOK AT THE LABOR HIERARCHY ON A PLANTATION,

20  YOU HAD PEOPLE THAT WORKED IN, SAY, THE MASTER'S

21  HOUSE VERSUS PEOPLE WHO WORKED OUT IN THE FIELDS.

22  AND IT WAS UNDERSTOOD THAT FIELDWORK WAS THE HARDEST,

23  MOST LABORIOUS KIND OF WORK.

24           IN THE CASE OF THE FARM LINE, YOU KNOW, WHEN

25  MEN FIRST COME TO LSP, MOST OF THEM ARE ASSIGNED TO

1  THE FARM LINE, AND IT'S UNDERSTOOD BY MEN

2  INCARCERATED THERE THAT THIS IS SOME OF THE HARDEST

3  WORK AT THAT PRISON.  MOREOVER, THERE ARE BETTER

4  JOBS, SAY, INSIDE THE PRISON LIKE IN THE KITCHEN, FOR

5  EXAMPLE; AND SO THERE IS A CLEAR CARRYOVER IN TERMS

6  OF THE WAY THESE HIERARCHIES ARE UNDERSTOOD.

7       THERE IS ALSO THE FACT THAT MEN FACE

8  PUNISHMENT FOR REFUSING TO WORK.  SO DURING THE

9  PERIOD OF CHATTEL SLAVERY, IF ONE DIDN'T WORK, ONE

10 COULD BE WHIPPED OR BEATEN OR CONFINED IN SOME

11 DEGRADING FASHION.  SIMILARLY, OUT AT THE FARM LINE

12 YOU HAVE:  IF PEOPLE REFUSE TO WORK, THEY CAN FACE

13 DISCIPLINARY INFRACTIONS SUCH AS LOSS OF PRIVILEGES

14 LIKE CANTEEN OR PHONE, OR THEY COULD BE, IN THE WORST

15 CASE SCENARIO, SENT TO SOLITARY CONFINEMENT.

16    Q    SO YOU'VE MENTIONED A FEW THINGS HERE.

17 WOULD YOU SAY THAT YOU'RE GENERALLY FAMILIAR WITH

18 POLICIES AND PRACTICES THAT YOU BELIEVE GOVERN THE

19 OPERATION OF THE FARM LINE?

20    A    YES.

21    Q    AND BASED ON YOUR WORK AND YOUR RESEARCH IN

22 THIS CASE, DO YOU THINK THAT ANY OF THE POLICIES THAT

23 YOU JUST MENTIONED CONTRIBUTE TO THE FARM LINE'S

24 SIMILARITY TO CHATTEL SLAVERY?

25    A    YES.

1    **Q**    AND HOW SO?

2    **A**    WELL, AS I WAS JUST ARTICULATING, IF YOU

3    LOOK AT THE LABOR HIERARCHY WITHIN LSP AND THE ROLE

4    THAT THE FARM LINE PLAYS, IT'S UNDERSTOOD THAT THE

5    FARM LINE IS THE HARDEST, MOST DIFFICULT KIND OF WORK

6    WHERE ONE CAN BE PUNISHED FOR NOT ONLY NOT WORKING,

7    BUT IF THERE IS A DISCIPLINARY INFRACTION ELSEWHERE

8    WITHIN THE PRISON, THAT PEOPLE CAN BE SENT TO THE

9    FARM LINE.  AND THE IDEA BEING THAT IF YOU DO

10   SOMETHING WRONG, THE CONSEQUENCES ARE TO BE PUT OUT

11   IN A SET OF WORK CONDITIONS THAT ARE GENERALLY AGREED

12   TO BE THE WORST.

13        SO AGAIN, THIS -- YOU KNOW, I'M KIND OF

14   REPEATING MYSELF A BIT, BUT THOSE ARE SOME OF THE

15   REASONS.  AND THEN THE OTHER PIECE HAS TO DO WITH THE

16   THREAT OF VIOLENCE AT ALL TIMES WHILE WORKING, SO

17   WORKING ESSENTIALLY AT THE POINT OF A GUN.

18   **Q**    I'D LIKE TO TURN TO TAB 3 OF YOUR BINDER.

19   THIS WAS ADMITTED INTO EVIDENCE AS CLASS CERT JX18.

20   DO YOU RECOGNIZE THIS DOCUMENT?

21   **A**    YES, I DO.

22   **Q**    AND HAVE YOU REVIEWED THIS FOR THIS

23   LITIGATION?

24   **A**    YES.

25   **Q**    AND DO YOU KNOW WHO HUEY PIDGEON IS?

1    **A**    YES.  MR. PIDGEON IS A STAFF MEMBER AT LSP.

2    **Q**    I'D LIKE TO DIRECT YOUR ATTENTION TO PAGES

3    158 AND 159.  WE'LL ALSO BE ABLE TO WATCH THE

4    TESTIMONY HERE.

5         **(WHEREUPON, JOINT EXHIBIT 18 WAS PLAYED.)**

6         **THE COURT:**  WAIT JUST A MOMENT.  WHY DON'T

7    WE PAUSE IT.

8              I NEED THE VOLUME -- SOMEBODY NEEDS TO

9    RAISE THE VOLUME.

10        **THE COURT:**  SO CAN YOU CONTROL -- IS IT UP

11   AS HIGH AS IT GOES?  ALL RIGHT.  OKAY.  WELL, LET'S

12   PROCEED.

13        **(WHEREUPON, JOINT EXHIBIT 18 WAS PLAYED.)**

14   BY MS. McTOOTLE:

15   **Q**    DR. SBICCA, CAN YOU EXPLAIN TO ME YOUR

16   UNDERSTANDING OF THIS TESTIMONY?

17   **A**    MR. PIDGEON IS ARTICULATING HOW IF SOMEBODY

18   TOOK TWO PICTURES ONE OF THE FARM LINE AND ONE OF A

19   SLAVE PLANTATION WITH PEOPLE WORKING, THAT SOMEBODY

20   COULD SEE A RESEMBLANCE.

21   **Q**    DID THIS TESTIMONY HAVE ANY BEARING ON YOUR

22   CONCLUSION THAT -- ABOUT THE FARM LINE'S SIMILARITY

23   TO SLAVERY?

24   **A**    YES.  IT SPEAKS TO THE FACT THAT THERE IS A

25   HISTORICAL MEMORY THAT PERSISTS INTO THIS MOMENT AND

1  SPEAKS TO THE FACT THAT PEOPLE WORKING AT LSP -- AT

2  LEAST SOME OF THEM -- UNDERSTAND HOW THESE KINDS OF

3  PRACTICES CAN BE INTERPRETED TO BE THE SAME -- OR NOT

4  THE SAME BUT COULD -- AS HE PUT IT, THERE IS A

5  RESEMBLANCE.

6      Q    AND WHY DOES THAT MATTER FROM A SOCIOLOGICAL

7  PERSPECTIVE?

8      A    WELL, IT SPEAKS TO THE WAY THAT CULTURAL

9  MEMORY PERSISTS; THAT THERE ARE CERTAIN PRACTICES

10  THAT WE REMEMBER AND WE INTERPRET THEM THROUGH

11  CONTEMPORARY LENSES.  AND IN THIS CASE, LOOKING --

12  KNOWING THAT CHATTEL SLAVERY WAS LARGELY A

13  PLANTATION-BASED SYSTEM OF EXPLOITATION AND

14  DEHUMANIZATION AND DEGRADATION, THAT -- THAT WHEN

15  PEOPLE SEE SOMETHING LIKE THE FARM LINE WHERE PEOPLE

16  ARE LIVING UNDER CONDITIONS OF UNFREEDOM AND FORCED

17  TO WORK, THAT IN THE MEMORY AND IN KIND OF CULTURAL

18  VALUES OF SOME PEOPLE, THEY MAY SEE THAT THAT IS

19  SIMILAR.

20      Q    AND DOES IT CHANGE YOUR OPINION THAT MR.

21  PIDGEON IS ALSO SAYING THAT WHAT'S GOING ON IS TWO

22  DIFFERENT THINGS?

23      A    NO.

24      Q    I'D LIKE TO RETURN TO YOUR TESTIMONY ABOUT

25  CONVICT LEASING AND CHAIN GANGS.  IF YOU COULD TURN

1  BACK TO TAB 2 IN YOUR BINDER AND SPECIFICALLY

2  PARAGRAPH 89.

3        **A**   OKAY.

4        **Q**   AND SO AS WE DISCUSSED EARLIER, YOU WRITE

5  HERE THAT PRACTICES -- THAT CONVICT LEASING AND CHAIN

6  GANGS ARE PRACTICES THAT ARE NOW CONDEMNED BY SOCIETY

7  BECAUSE THEY ADOPT THE TRAPPINGS OF SLAVERY.  IS THAT

8  RIGHT?

9        **A**   CORRECT.

10       **Q**   HOW DO YOU KNOW FROM A SOCIOLOGICAL

11 PERSPECTIVE THAT CONVICT LEASING AND CHAIN GANGS HAVE

12 BEEN CONDEMNED?

13       **A**   WELL, IN PART, THEY WERE CONDEMNED BECAUSE

14 OF CHANGING SOCIAL NORMS.  SO IN THE CASE OF CONVICT

15 LEASING, YOU KNOW, MOST STATES ABOLISHED IT IN THE

16 SORT OF LIKE EARLY 1900s, 1920s'ISH.  AND AT THAT

17 TIME PERIOD IT WAS UNDERSTOOD BY A LOT OF SOCIAL

18 PERFORMERS THAT CONVICT LEASING WAS, IN FACT, WORSE

19 THAN SLAVERY, AND SO THERE WAS A CLEAR CULTURAL

20 UNDERSTANDING OF -- AND A COMPARISON BETWEEN WHAT HAD

21 BEEN HAPPENING UNDER CONDITIONS OF CHATTEL SLAVERY

22 AND THEN THE WAYS IN WHICH CONVICT LEASING

23 PERPETUATED THAT PARTICULAR SYSTEM, ALBEIT THROUGH

24 THE INSTITUTION OF PRISONS.

25             IN THE CASE OF CHAIN GANGS, AGAIN, YOU SAW

1   CHANGING SOCIAL NORMS, SO IN THE 1960s IS WHEN YOU

2   SEE CHAIN GANG -- 1950s AND 1960s IS WHEN YOU SEE

3   CHAIN GANGS BEGIN TO BE ABOLISHED SORT OF DURING THE

4   CIVIL RIGHTS ERA, AGAIN, CHANGING NORMS AROUND

5   PRACTICES WITHIN THE PRISON SYSTEM.  AND IT WAS

6   UNDERSTOOD THAT CHAIN GANGS LIKE CONVICT LEASING WERE

7   AN AFFRONT TO PEOPLE'S DIGNITY, AND PEOPLE WERE

8   WANTING TO CHANGE THAT AND STAND UP FOR THE INHERENT

9   SELF-WORTH OF PEOPLE TO NOT BE SUBJECT TO THOSE KINDS

10  OF CONDITIONS.

11      Q    AND SO YOU MENTIONED DIGNITY.  FROM A

12  SOCIOLOGICAL PERSPECTIVE, IS THAT ONE OF THE

13  REASONS -- THE IMPACT ON DIGNITY, IS THAT ONE OF THE

14  REASONS THAT THESE PRACTICES HAVE BEEN SINCE

15  CONDEMNED?

16      A    YES.  IT'S UNDERSTOOD THAT, YOU KNOW, THERE

17  IS AN INHERENT AND INVIABLE SELF-WORTH THAT PEOPLE

18  HAVE AND THAT IF THERE IS A SYSTEM THAT IS

19  REPLICATING OR PERCEIVED TO BE AKIN TO SOMETHING LIKE

20  CHATTEL SLAVERY, WHICH IS OSTENSIBLY ONE OF THE MOST

21  DEHUMANIZING, DEGRADING SYSTEMS, THAT CHANGING SOCIAL

22  NORMS WOULD SUGGEST IN SOME CASES THAT THEY WANT TO

23  -- PEOPLE WANT TO CHANGE THINGS BASICALLY AND PEOPLE

24  WANT TO CHANGE THE LAWS ASSOCIATED WITH HOW THESE

25  PRACTICES ARE GOVERNED.

1    **Q**   AND SO YOU TESTIFIED EARLIER THAT YOU

2  BELIEVE THAT THE FARM LINE RESEMBLES CHARACTERISTICS

3  OF CHATTEL SLAVERY.  CORRECT?

4    **A**   CORRECT.

5    **Q**   AND SO FROM A SOCIOLOGICAL PERSPECTIVE,

6  WOULD AN INSTITUTION THAT'S STRUCTURED IN THIS WAY TO

7  SIMULATE CHARACTERISTICS OF SLAVERY BE LIKELY TO HAVE

8  THE SAME EFFECT ON AN INDIVIDUAL'S DIGNITY?

9    **A**   YOU KNOW, WHEN, YOU KNOW, SOCIOLOGISTS WOULD

10 LOOK AT WHAT PEOPLE ARTICULATE AS THEIR EXPERIENCES

11 AND INTERPRETATIONS OF THE WORLD -- AND IN THIS CASE

12 WHEN LOOKING AT THE PLAINTIFFS' DECLARATIONS -- AND

13 IN MY EXPERIENCES TALKING WITH PEOPLE, YOU KNOW, IT

14 WAS CLEAR THAT THEY'RE INTERPRETING THEIR EXPERIENCES

15 THROUGH THE LENS OF ENSLAVED MEN.  AND SO YOU CAN SEE

16 THE WAY IN WHICH, AGAIN, THAT CULTURAL MEMORY

17 PERSISTS BUT ALSO THE WAYS IN WHICH SOCIAL

18 UNDERSTANDINGS GET SHAPED BY INSTITUTIONS AND

19 SPECIFIC PRACTICES.

20   **Q**   SO I'D LIKE TO TURN TO TAB 5 AT THIS TIME.

21 THIS HAS BEEN ADMITTED INTO EVIDENCE AS CLASS CERT

22 JX64.

23      **MR. BLANCHFIELD:**  YOUR HONOR, DR. SBICCA'S

24 REPORT WAS PREPARED IN AUGUST OF 2024.  IT DOESN'T

25 CONTAIN ANY REFERENCE TO ANY OF THESE DECLARATIONS

1  BECAUSE THESE DECLARATIONS CAME AFTER HIS REPORT.  I

2  WAS NEVER AFFORDED THE OPPORTUNITY TO TAKE HIS

3  DEPOSITION ON THIS, AND I OBJECT TO REFERENCE TO ANY

4  OF THESE DECLARATIONS THAT WERE ALL DONE AFTERWARDS.

5          THE COURT:  THANK YOU, MR. BLANCHFIELD.  I

6  UNDERSTAND YOUR CONCERNS.

7              SO THAT'S TAB 5, YOU SAID, MS.

8  McTOOTLE?

9          MS. McTOOTLE:  YES.  AND IF I MAY, YOUR

10 HONOR.  IN DR. SBICCA'S REPORT -- I'M LOOKING FOR THE

11 EXACT PARAGRAPH -- HE DOES INDICATE THAT HE IS

12 CONTINUING TO REVIEW MATERIALS IN THE CASE AND WILL

13 SUPPLEMENT HIS OPINION AS APPROPRIATE.

14         THE COURT:  OKAY.

15         MR. BLANCHFIELD:  WELL --

16         THE COURT:  NOW, THIS DECLARATION WAS TAKEN

17 IN SEPTEMBER OF 2024.  CORRECT?

18         MS. McTOOTLE:  THE -- I'M SORRY.  THE

19 EXPERT -- DR. SBICCA'S DECLARATION, OR --

20         THE COURT:  NO.  WE'RE TALKING ABOUT THE

21 DECLARATION OF MR. GUILLORY?

22         MS. McTOOTLE:  YES.  THAT WAS IN SEPTEMBER

23 OF 2024.

24         THE COURT:  WAS THAT NOT PROVIDED -- WHEN

25 WAS THIS PROVIDED TO THE DEFENSE?

1          **MS. McTOOTLE:**  THE DECLARATION WAS PROVIDED

2    TO THE DEFENSE WITH OUR MOTION FOR CLASS

3    CERTIFICATION.

4          **THE COURT:**  SO, MR. BLANCHFIELD, WHEN DID

5    YOU GET THIS?  THIS WAS AFTER YOU SAID YOU HAD AN

6    OPPORTUNITY TO DEPOSE THE WITNESS?

7          **MR. BLANCHFIELD:**  YEAH.  IT'S NOT IN HIS

8    EXPERT REPORT AT ALL, YOUR HONOR, BECAUSE IT CAME

9    AFTER.  IN FACT --

10          **THE COURT:**  I'LL ALLOW SOME LIMITED

11    TESTIMONY WITH THAT CAVEAT.  AND AGAIN, I UNDERSTAND

12    YOUR CONCERN AND YOU'LL HAVE AN OPPORTUNITY TO CROSS-

13    EXAMINE THE WITNESS.  AND AFTER YOU HAVE A CHANCE TO

14    DO SO, LET'S REVISIT THE ISSUE.  OKAY?

15          **MR. BLANCHFIELD:**  OKAY.  AND FOR

16    CLARIFICATION, YOUR HONOR, ALL -- THE REMAINING

17    EXHIBITS ARE ALL DECLARATIONS.

18          **THE COURT:**  SAME THING, RIGHT.  VERY GOOD.

19          **MR. BLANCHFIELD:**  SOME WERE DONE ON THE SAME

20    DATE.

21          **THE COURT:**  SO JUST TO BE CLEAR FOR THE

22    RECORD, THAT'S THE EXHIBIT AT TAB 5, 6, 7, 8 AND 9.

23    IS THAT CORRECT, MS. McTOOTLE?

24          **MS. McTOOTLE:**  I WILL ONLY BE --

25    **BY MS. McTOOTLE:**

1    **Q**    DR. SBICCA, I'M ONLY ASKING QUESTIONS ABOUT

2  THE EXHIBITS AT TAB 5.

3         **THE COURT:**  VERY GOOD.  THANK YOU FOR THE

4  CLARIFICATION.

5  **BY MS. McTOOTLE:**

6    **Q**    SO, DR. SBICCA, DO YOU RECOGNIZE THIS

7  DOCUMENT?

8    **A**    YES.

9    **Q**    AND DID YOU REVIEW THIS DOCUMENT?

10    **A**    YES.

11    **Q**    IS THIS THE TYPE OF EVIDENCE THAT A

12  SOCIOLOGIST WOULD TYPICALLY CONSIDER?

13    **A**    YES.  IT'S VERY COMMON FOR SOCIOLOGISTS TO

14  REVIEW STATEMENTS BY INDIVIDUALS, EITHER COLLECTED

15  THROUGH DIRECT INTERVIEWS OR THROUGH WRITTEN

16  STATEMENTS.

17    **Q**    AND WHO IS JOSEPH GUILLORY, TO YOUR

18  KNOWLEDGE?

19    **A**    MR. GUILLORY IS CURRENTLY INCARCERATED AT

20  LSP.

21    **Q**    IF WE COULD LOOK AT PARAGRAPHS 2 AND 7 OF

22  THE DECLARATION.

23    **A**    OKAY.

24    **Q**    I'M GIVING YOU A CHANCE TO REVIEW.  CAN YOU

25  DESCRIBE FOR THE COURT WHAT THIS SAYS, IN YOUR

1  OPINION?

2      **A**    WELL, IN PARAGRAPH 2 HE'S ARTICULATING THE

3  WAYS IN WHICH HE SEES THE ASSOCIATION OF THE FARM

4  LINE TO SLAVERY, IN PARTICULAR TALKING ABOUT THE

5  EMASCULATING LANGUAGE THAT'S USED BY THE GUARDS IN

6  THIS CASE.  AND THIS IS AKIN TO CHATTEL SLAVERY,

7  USING THE WORD "BOY," FOR EXAMPLE, A TERM THAT COMES

8  OUT OF THAT TIME PERIOD AS A WAY TO DENIGRATE AND

9  SUBJECT PEOPLE TO A LOWER STATUS.

10            AND THEN IN THE CASE OF PARAGRAPH 7, HE'S

11 TALKING ABOUT THE WAY IN WHICH THE FARM LINE IS

12 ESSENTIALLY DEHUMANIZING.  SO HE HAS REFERENCE TO

13 ANIMALS HERE AND -- AND THAT, YOU KNOW, HE SAYS,

14 "LIKE WILD HORSES, THEY NEED TO BE WORKED AND BROKEN

15 INTO OBEDIENCE," THE IDEA BEING THAT, YOU KNOW, WHEN

16 YOU'RE WORKING ON THE FARM LINE YOU'RE ESSENTIALLY

17 SUBHUMAN OR NONHUMAN, AGAIN, SORT OF REMINISCENT OF

18 THE WAYS IN WHICH PEOPLE DURING CHATTEL SLAVERY WERE

19 TURNED INTO PRIVATE PROPERTY AND WEREN'T AFFORDED

20 BASIC HUMAN DIGNITY.  AND SO HE'S SORT OF, AGAIN,

21 REFERENCING THAT HISTORY AND SORT OF INTERPRETING HIS

22 EXPERIENCES ON THE FARM LINE THROUGH THAT LENS.

23     **Q**    DID YOU COME TO ANY CONCLUSIONS BASED ON

24 YOUR REVIEW OF MR. GUILLORY'S DECLARATION?

25     **A**    YES.  I MEAN, THIS DECLARATION IS VERY

1   SIMILAR TO MANY OF THE OTHER DECLARATIONS THAT I'VE

2   REVIEWED IN THIS CASE.  AND THERE IS A STRONG PATTERN

3   ACROSS ALL OF THEM.  AND AS A SOCIOLOGIST, WE WOULD

4   LOOK ACROSS THE EXPERIENCES AND ARTICULATED SORT OF

5   IDEAS OF PEOPLE AND DRAW CONCLUSIONS ABOUT WHAT THAT

6   GROUP IS EXPERIENCING VIS-A-VIS AN INSTITUTION IN

7   THIS CASE, THE PRISON SYSTEM, MEN SPECIFICALLY

8   WORKING ON THE FARM LINE.

9       Q    AND WOULD IT MATTER, IN YOUR OPINION,

10  WHETHER SOMEONE HAS DIRECT ANCESTRAL TIES TO ENSLAVED

11  PEOPLE?

12      A    THAT'S NOT THE MOST IMPORTANT POINT IN THIS

13  CASE.

14      Q    AND SO IN THE CONTEXT OF THE FARM LINE AND

15  FROM A SOCIOLOGICAL PERSPECTIVE, WOULD THE RISK OF

16  HARM YOU'VE DESCRIBED APPLY TO EVERYONE SUBJECTED TO

17  A PRACTICE THAT RESEMBLES SLAVERY?

18      A    YES.

19          MR. BLANCHFIELD:  YOUR HONOR --

20  BY THE WITNESS:

21      A    SO THERE IS A STIGMA STATUS THAT ATTACHES --

22          THE COURT:  WAIT, WAIT, WAIT.  JUST A

23  MOMENT.

24          MR. BLANCHFIELD:  YOUR HONOR, THAT'S CALLING

25  FOR A LEGAL CONCLUSION.

1          **THE COURT:**  YOU CAN REPHRASE THE QUESTION,
2     IF YOU'D LIKE.
3          **MS. McTOOTLE:**  SURE.
4          **THE COURT:**  OR YOU CAN MOVE ON.
5     **BY MS. McTOOTLE:**
6          **Q**    YOU MENTIONED THAT YOU REVIEWED OTHER
7     DECLARATIONS IN THIS CASE.  CORRECT?
8          **A**    THAT'S CORRECT.
9          **Q**    AND DID THOSE DECLARATIONS LEAD YOU TO THE
10    SAME CONCLUSIONS?
11         **A**    YES.
12         **Q**    AND WHY IS THAT?
13         **A**    WELL, ACROSS DECLARATIONS IT'S CLEAR THAT
14    WORKING ON THE FARM LINE COMES WITH STIGMA, AND THE
15    STIGMA IS ASSOCIATED WITH THE INTERPRETATION THAT
16    WORKING IN THESE KINDS OF CONDITIONS IS AKIN TO
17    SLAVERY.  AND SO ANYBODY SUBJECT TO A SYSTEM LIKE
18    THAT WILL RECEIVE THAT STIGMA STATUS.  IT DOESN'T
19    MATTER WHO YOU ARE.  WHAT MATTERS IS YOU'RE WORKING
20    UNDER THOSE KINDS OF CONDITIONS IN THAT KIND OF
21    INSTITUTION WITH THIS PARTICULAR HISTORICAL REALITY.
22         **Q**    AND MY LAST QUESTION ON THIS POINT:  IS IT
23    YOUR UNDERSTANDING THAT SOME PEOPLE AT LSP HAVE BEEN
24    SENTENCED TO HARD LABOR?
25         **A**    YES.

1    Q    DOES YOUR OPINION CHANGE BASED ON THIS FACT;
2    THAT MEN AT LSP ARE SENTENCED TO HARD LABOR?
3    A    NO.
4    Q    SWITCHING GEARS, I'D LIKE TO TURN TO YOUR
5    WORK WITH THE PRISON AGRICULTURAL LAB.  YOU RECENTLY
6    COAUTHORED A STUDY THROUGH THE LAB.  COULD YOU
7    DESCRIBE FOR US WHAT THE PURPOSE OF THAT STUDY WAS?
8    A    SURE.  YEAH.  AT THE TIME PERIOD THERE WAS
9    NO NATIONAL ACCOUNTING OF AGRICULTURAL OPERATIONS
10   WITHIN PRISONS IN THE UNITED STATES, AND SO OUR LAB
11   CONDUCTED A NATIONWIDE STUDY AND WE IDENTIFIED 662
12   OUT OF AROUND 1100 ADULT STATE-RUN PRISONS THAT HAVE
13   AGRICULTURAL OPERATIONS OF SOME KIND.
14   Q    SO TO CLARIFY, YOUR STUDY ENCOMPASSED
15   PRISONS THROUGHOUT ALL 50 STATES?
16   A    CORRECT.
17   Q    SO TURNING TO TAB 2 OF YOUR BINDER, JX55, AT
18   PARAGRAPH 65 --
19   A    OKAY.
20   Q    -- YOU MENTION IN YOUR REPORT ONE TREND THAT
21   YOU EXAMINED IS TYPES OF AGRICULTURAL -- OR BROAD
22   AGRICULTURAL TYPES.  CAN YOU EXPLAIN WHAT YOU MEAN BY
23   "TYPES" HERE?
24   A    SURE.  WHAT KIND OF AGRICULTURAL OPERATION
25   IS TAKING PLACE.  SO THERE IS FOUR BROAD TYPES:

1  ANIMAL AGRICULTURE, CROPS AND SILVICULTURE, FOOD

2  PROCESSING AND PRODUCTION, AND HORTICULTURE AND

3  LANDSCAPING.  AND THEN WITHIN THAT ARE A WHOLE BUNCH

4  OF MORE FINE-GRAIN CATEGORIES.

5     **Q**    AND NOW AT PARAGRAPH 69 YOU ALSO DESCRIBE

6  WHAT YOU CALL DRIVERS.  WHAT DO YOU MEAN BY

7  "DRIVERS"?

8     **A**    SO DRIVERS ARE THE STATED RATIONALIZATION OR

9  PURPOSE FOR THE AGRICULTURAL OPERATIONS.  AND SO WE

10  DERIVED THIS INFORMATION FROM TALKING DIRECTLY WITH

11  PEOPLE WORKING AT PRISONS, ANNUAL REPORTS, DEPARTMENT

12  OF CORRECTION WEBSITES AND, LIKE, OTHER PLACES TO

13  INDUCTIVELY COME TO THESE CATEGORIES.  SO FINANCIAL,

14  IDLENESS REDUCTION, REPARATIVE AND TRAINING.  AND

15  THEN IN EACH OF THOSE BROAD CATEGORIES ARE MORE

16  SPECIFIC REASONS.

17     **Q**    AND DID YOU FIND ANY CORRELATION BETWEEN

18  TYPES OF AGRICULTURAL LABOR ON THE ONE HAND AND THE

19  DRIVERS BEHIND AGRICULTURAL LABOR ON THE OTHER?

20     **A**    YES, WE DID.  SO STARTING WITH THE MOST

21  COMMON PRACTICE ACROSS THE COUNTRY WAS HORTICULTURE

22  AND LANDSCAPING TAKING PLACE IN ALL 50 STATES.  AND

23  IT IS VERY COMMON THAT THOSE KINDS OF ACTIVITIES WERE

24  ASSOCIATED WITH TRAINING PURPOSES, SO EDUCATION OR

25  VOCATIONAL TRAINING.

1           IN THE CASE OF CROPPING OPERATIONS, IT WAS

2    FAR MORE COMMON THROUGHOUT THE U.S. THAT THESE

3    OPERATIONS ARE TIED TO IDLENESS REDUCTION AND

4    FINANCIAL PURPOSES; SIMILARLY WITH ANIMAL

5    AGRICULTURE.

6       **Q**    IS THERE ANY HISTORICAL SIGNIFICANCE TO

7    IDLENESS REDUCTION AS A DRIVER BEHIND PRISON

8    AGRICULTURAL LABOR?

9       **A**    I'M SORRY.  CAN YOU REPHRASE THE QUESTION?

10      **Q**    YES.  IS THERE ANY HISTORICAL SIGNIFICANCE

11   TO THE CONNECTION BETWEEN CROP -- AGRICULTURAL

12   PROGRAMS AND IDLENESS REDUCTION?

13      **A**    YES.  SO WHEN YOU LOOK AT THE HISTORY OF

14   PRISON DEVELOPMENT, PARTICULARLY IN THE SOUTH,

15   AGRICULTURAL OPERATIONS WERE CENTRAL TO KIND OF

16   BUILDING AND THEN EXPANDING THOSE PRISONS.  AND IT

17   WAS EXPLICITLY UNDERSTOOD THAT, YOU KNOW, PRISONS

18   WERE MEANT TO PUT PEOPLE TO WORK.  AND, YOU KNOW,

19   THERE IS THE IDEA THAT IDLE HANDS MAKE THE DEVIL'S

20   WORK, AND SO IDLENESS REDUCTION IS VERY CENTRAL TO

21   WORK REGIMES WITHIN PRISONS, INCLUDING AGRICULTURAL

22   OPERATIONS, WHICH, LIKE I SAID, WERE FUNDAMENTAL TO

23   THE BUILDING OF THE PRISON SYSTEM.

24      **Q**    AND DID YOU IDENTIFY ANY SPECIFIC TRENDS IN

25   THE TYPES AND DRIVERS OF AGRICULTURAL PROGRAMS IN

1  LOUISIANA SPECIFICALLY?

2      **A**    SO IN LOUISIANA IT'S COMMON TO HAVE A LOT OF

3  CROPPING OPERATIONS, ALTHOUGH THERE IS A GREAT

4  DIVERSITY ACROSS THE STATE.  BUT IN TERMS OF DRIVERS,

5  THEY'RE COMMONLY DRIVEN BY IDLENESS REDUCTION AND

6  FINANCIAL REASONS.

7      **Q**    SO I WANT TO TALK ABOUT THE FARM LINE

8  SPECIFICALLY AND HOW THAT FITS INTO YOUR RESEARCH.

9  BASED ON YOUR DEFINITION OF TYPES IN YOUR STUDY, WHAT

10  TYPE OF AGRICULTURAL LABOR IS PERFORMED ON THE FARM

11  LINE?

12      **A**    THEY'RE CROPPING OPERATIONS.

13      **Q**    AND BASED ON YOUR DEFINITION IN YOUR STUDY,

14  WHAT ARE THE MAIN DRIVERS BEHIND THE FARM LINE?

15      **A**    IDLENESS REDUCTION AND FINANCIAL.

16      **Q**    WOULD YOU SAY THAT ONE PREDOMINATES OVER THE

17  OTHER?

18      **A**    I WOULD SAY THAT IDLENESS REDUCTION

19  PREDOMINATES AND SPECIFICALLY THE EXPECTATION OF

20  WORK.  AGAIN, WHEN, YOU KNOW, MEN COME TO LSP, THEY

21  ARE REQUIRED TO WORK ON THE FARM LINE IN MANY

22  INSTANCES.  AND MOREOVER, THERE IS AN EXPLICIT

23  UNDERSTANDING THAT IF PEOPLE DON'T WORK, THEN THEY'RE

24  PUNISHED, SO THE IDEA THAT WORK IS ELEVATED -- THE

25  VALUE OF WORK IS ELEVATED THROUGH THE FARM LINE.

1          NOW THAT SAID, SOME OF THE PRODUCE THAT IS

2    COMING OFF OF THE FARM LINE IS GOING INTO THE

3    KITCHENS, AND SO FINANCIAL REASONS WOULD BE

4    ESSENTIALLY COST SAVINGS.  BUT MY VIEW, BECAUSE THE

5    FARM LINE IS USED TO PUNISH PEOPLE, THAT IDLENESS

6    REDUCTION IS MORE SIGNIFICANT.

7       **Q**    SO --

8          **THE COURT:**  MS. McTOOTLE, ONE MINUTE.

9    **BY MS. McTOOTLE:**

10      **Q**    -- BASED ON YOUR WORK --

11         **THE COURT:**  MS. McTOOTLE, JUST ONE MINUTE,

12   PLEASE.

13         **MS. McTOOTLE:**  I'M SORRY.  I THOUGHT YOU

14   MEANT ONE MINUTE LEFT.

15         **THE COURT:**  NO, YOU HAVE MORE TIME.

16         **MS. McTOOTLE:**  OKAY.  THANK YOU.

17         **THE COURT:**  SORRY FOR THE --

18         **MS. McTOOTLE:**  NO, THAT'S OKAY.

19                   **(OFF THE RECORD)**

20         **THE COURT:**  THANK YOU, MS. McTOOTLE.  LET'S

21   PROCEED.

22   **BY MS. McTOOTLE:**

23      **Q**    SO, DR. SBICCA, BASED ON YOUR WORK WITH

24   PRISON AGRICULTURAL LAB, YOUR STUDY OF PRISON

25   AGRICULTURAL PROGRAMS NATIONWIDE, YOUR REVIEW OF THE

1  EVIDENCE IN THIS CASE, YOUR PERSONAL OBSERVATION OF

2  THE FARM LINE, HAVE YOU REACHED A CONCLUSION ABOUT

3  HOW THE FARM LINE COMPARES TO OTHER PRISON

4  AGRICULTURAL PROGRAMS?

5      **A**    YES.  BY COMPARISON, IT'S ANOMALOUS.

6      **Q**    AND CAN YOU SAY A LITTLE BIT MORE ABOUT

7  THAT?

8      **A**    SURE.  I MEAN, IF YOU LOOK AT NATIONWIDE

9  TRENDS, AS I MENTIONED EARLIER, FOR EXAMPLE,

10  HORTICULTURE AND LANDSCAPING PROGRAMS TIED TO THINGS

11  LIKE VOCATIONAL TRAINING ARE PREDOMINANT THROUGHOUT

12  THE UNITED STATES.  MOREOVER, IT'S VERY RARE THAT

13  AGRICULTURAL OPERATIONS TAKE PLACE, FOR INSTANCE, ON

14  A FORMER SLAVE PLANTATION.  SO THERE IS BOTH

15  GEOGRAPHIC DIFFERENCES.  THERE IS ALSO PRACTICAL

16  DIFFERENCES IN TERMS OF THESE OPERATIONS THEMSELVES.

17  AND, IN PARTICULAR, THE STRICTLY PUNITIVE DIMENSION

18  OF THESE OPERATIONS PUTS IT OUT AT THE OUTER END OF

19  THE SPECTRUM.

20      **Q**    THANK YOU, DR. SBICCA.

21          **MS. McTOOTLE:**  NO FURTHER QUESTIONS AT THIS

22  TIME.

23          **THE COURT:**  ALL RIGHT.  YOU HAVE MORE THAN

24  ONE MINUTE NOW, MS. McTOOTLE.

25          **MS. McTOOTLE:**  I KNOW.  I'LL SAVE IT FOR

1   REDIRECT.  THANK YOU.

2              **THE COURT:**  MR. BLANCHFIELD?

3              **MR. BLANCHFIELD:**  THANK YOU, JUDGE.

4                        **CROSS-EXAMINATION**

5   BY MR. BLANCHFIELD:

6        **Q**   DR. SBICCA, HOW ARE YOU DOING?

7        **A**   GOOD TO SEE YOU AGAIN.

8        **Q**   GOOD TO SEE YOU.

9              SO IN YOUR EXPERT REPORT YOU STATE "IT IS MY

10  BELIEF ANGOLA'S FARM LINE SHOULD BE ENDED."  CORRECT?

11       **A**   CORRECT.

12       **Q**   YOU DO RECOGNIZE THAT THERE ARE --

13             **THE COURT:**  I'M SORRY.  MR. BLANCHFIELD, LET

14  ME STOP YOU RIGHT THERE.  UNFORTUNATELY -- WELL, HOW

15  MUCH TIME DO YOU THINK YOU --

16             **MR. BLANCHFIELD:**  NOT LONG, JUDGE.

17             **THE COURT:**  OKAY.  LET'S ROLL.

18             **MR. BLANCHFIELD:**  YOU KNOW, 10 OR 15

19  MINUTES, I'M THINKING.

20             **THE COURT:**  PERFECT.

21  BY MR. BLANCHFIELD:

22       **Q**   YOU DO -- I DO THINK YOU TOLD ME THAT YOU

23  RECOGNIZE THAT THERE ARE FARMING OPERATIONS IN SOME

24  600 PRISONS THROUGHOUT THE UNITED STATES?

25       **A**   THAT'S CORRECT.

1    **Q**    ALL RIGHT.  YOU STATE FURTHER IN THAT SAME

2    PORTION OF YOUR REPORT THAT THE FARM LINE PUNISHES

3    THROUGH ITS TRAUMATIC ASSOCIATION OF FORCED

4    AGRICULTURAL LABOR TO CHATTEL SLAVERY, THROUGH SAFE

5    AND EXPLOITIVE FARM CONDITIONS, WHICH TOGETHER

6    PRODUCE OR RISK PRODUCING PSYCHOLOGICAL AND PHYSICAL

7    HARMS.  SUCH HARM HEAPS CRUELTY UPON THE PUNISHMENT

8    OF INCARCERATION.  YOU ARE AWARE THAT EVERYONE AT LSP

9    IS ASSIGNED A JOB?

10    **A**    CORRECT.

11    **Q**    AND YOU MENTIONED KITCHEN WORKERS.  AND SOME

12    OF THE KITCHEN WORKERS ARE ASSIGNED TO CLEAN UP THE

13    ROTTEN VEGETABLES.  THEY CALL THEM SLOP HOLES.  IS

14    THAT MORE DEHUMANIZING THAN WORK ON THE FARM LINE

15    PICKING CUCUMBERS?

16    **A**    NO.

17    **Q**    IT'S NOT?

18    **A**    NO.

19    **Q**    WE HAVE PEOPLE WHO ARE IN CHARGE OF CLEANING

20    TOILETS.  SAME QUESTION.

21    **A**    NO.

22    **Q**    WHAT IS IT ABOUT THE FARM LINE THAT MAKES IT

23    DEHUMANIZING?

24    **A**    IT'S THE TRAUMATIC ASSOCIATION WITH CHATTEL

25    SLAVERY.  SO CHATTEL SLAVERY WAS A PLANTATION-BASED

1    SYSTEM THAT DEHUMANIZED AND DEGRADED PEOPLE BY

2    FORCING THEM TO WORK.  IN THE CASE OF THE FARM LINE,

3    IT'S ANOTHER SYSTEM THAT DEGRADES AND DEHUMANIZES

4    PEOPLE BY FORCING THEM TO WORK IN PLANTATION STYLE

5    AGRICULTURE.  AND SO THAT CULTURAL UNDERSTANDING IS

6    WHAT GETS PASSED DOWN SOCIALLY.  AND IT'S

7    COLLECTIVELY UNDERSTOOD THAT THAT RELATIONSHIP

8    PRODUCES STIGMA AND, THEREFORE, IS DISTINCT FROM

9    THESE OTHER PRACTICES THAT YOU JUST ARTICULATED.

10        Q    IF WE ASSUME, DOCTOR, THAT 25 PERCENT OF THE

11   INMATE POPULATION ARE CAUCASIANS, HOW DO THEY FIT

12   INTO YOUR THEORY OF ADOPTING THE TRAPPINGS OF CHATTEL

13   SLAVERY?

14        A    WELL, WHEN PRACTICES FROM THE PAST GET

15   REPLICATED IN VARIOUS FORMS IN THE PRESENT, THERE CAN

16   BE STIGMA ASSOCIATED WITH THEM.  SO IF SOMEBODY --

17   LET'S SAY A WHITE INDIVIDUAL, AS YOU'RE REFERRING

18   TO -- IS FORCED TO WORK ON A PRISON PLANTATION THAT

19   OPERATES IN WAYS THAT REPLICATE SOME OF THE LOGICS OF

20   CHATTEL SLAVERY, THAT THOSE CONDITIONS ATTACH TO ANY

21   INDIVIDUAL WHO WORKS IN THOSE KIND OF CONDITIONS,

22   REGARDLESS OF THEIR RACE, DUE TO THE HISTORICAL

23   ASSOCIATION IN THIS CASE WITH CHATTEL SLAVERY.

24        Q    SO WITH RESPECT TO SOME OF THE OPINIONS THAT

25   YOU HAVE ISSUED HERE TODAY, YOU DO NOT DIFFERENTIATE

80

1  BETWEEN AFRICAN AMERICAN AND CAUCASIAN?

2      **A**    NO.

3      **Q**    THEY SUFFER THE SAME?

4      **A**    THEY EXPERIENCE THE SAME STIGMA.  I MEAN,

5  CLEARLY, YOU KNOW, AS SOMEBODY WHO IS WHITE, YOUR

6  ANCESTRAL LINEAGE MAY BE DISTINCT, BUT THAT'S FOR ME

7  NOT THE MOST IMPORTANT PIECE.  WHAT'S THE MOST

8  IMPORTANT PIECE IS THE STIGMA OF A SYSTEM THAT'S RUN

9  BY AN INSTITUTION THAT HAS A PARTICULAR INSTITUTIONAL

10  HISTORY AND SET OF PRACTICES THAT PERSIST THROUGH

11  TIME, AND THEN PEOPLE WORK UNDER THOSE PARTICULAR

12  SETS OF SYSTEMS AND RULES.

13      **Q**    NOW, IN THE 600 PRISONS THROUGHOUT THE

14  NATION THAT YOU REFERENCE, SOME OF THESE PRISONS DO

15  FARMING FOR PROFIT?

16      **A**    CORRECT.

17      **Q**    AND YOU'RE AWARE THAT LSP DOES NOT FARM FOR

18  PROFIT?

19      **A**    WHAT IN PARTICULAR ARE YOU REFERRING TO?

20  LIKE PRISON ENTERPRISES OR --

21      **Q**    NO.  PRISON ENTERPRISES IS NOT IN THIS

22  LAWSUIT.  I'M TALKING ABOUT THE FOLKS WHO -- THE

23  INMATES WHO ARE PICKING CUCUMBERS AND SQUASH.

24      **A**    I'M JUST TRYING TO CLARIFY WHAT SPECIFIC

25  THING YOU'RE REFERRING TO.  SO YOU'RE JUST TALKING

1  ABOUT THE FARM LINE?

2       **Q**    CORRECT.

3       **A**    NO, IT'S NOT FOR PROFIT.  IT'S COST SAVINGS

4  IN THE FORM OF FEEDING INCARCERATED PEOPLE.

5       **Q**    IT, IN FACT, FEEDS 4,000 INMATES FRESH

6  VEGETABLES EVERY DAY.  YOU'RE AWARE OF THAT?

7       **A**    THAT'S WHAT I'VE READ.

8       **Q**    NOW, YOU ARE ALSO AWARE THAT LOUISIANA LAW

9  IS THAT THESE FELONS ARE TO BE SENTENCED TO HARD

10 LABOR.  CORRECT?

11      **A**    CORRECT.

12      **Q**    WHAT'S YOUR UNDERSTANDING OF "HARD LABOR"?

13      **A**    I THINK A COMMON-SENSE UNDERSTANDING OF

14 LABOR THAT'S CHALLENGING.  AND IN THIS CASE, YOU

15 KNOW, IT WOULD BE DIFFICULT -- NOT DIFFICULT, BUT IT

16 WOULD BE CHALLENGING.  JUST HARD WORK.  SWEATING A

17 LITTLE BIT.  I DON'T KNOW.

18      **Q**    CERTAINLY THERE IS JOBS OVER AT LSP THAT ARE

19 A LOT TOUGHER THAN PICKING CUCUMBERS.  YOU WOULD

20 AGREE WITH THAT, WOULDN'T YOU?

21      **A**    DO YOU HAVE EXAMPLES?

22      **Q**    I GAVE YOU ONE.  CLEANING A TOILET, CLEANING

23 THE KITCHEN SLOP HOLES, RUNNING CATTLE IN A JULY

24 AFTERNOON.

25      **A**    I GUESS IT'S SUBJECTIVE.

1    **Q**    IT'S SUBJECTIVE?

2    **A**    WELL, IN THE SENSE OF LIKE I DON'T -- I

3    HAVEN'T WORKED THOSE, LIKE I DON'T KNOW LIKE A

4    KITCHEN JOB OR SOMETHING LIKE THAT BEING HARDER OR

5    NOT.

6          **THE COURT:**  SO THE ANSWER TO YOUR QUESTION

7    IS YOU DON'T KNOW?

8          **THE WITNESS:**  YEAH, I DON'T -- I DON'T KNOW.

9    **BY MR. BLANCHFIELD:**

10   **Q**    YOU DON'T HAVE AN OPINION ON THAT?

11   **A**    NO.

12   **Q**    WHAT ABOUT THE PURPOSES OF INCARCERATION?

13   YOU WOULD AGREE THAT ONE OF THE PURPOSES OF

14   INCARCERATION IS RETRIBUTION, PUNISHMENT FOR CRIMES

15   AGAINST SOCIETY, DEPRIVING CRIMINALS OF THEIR FREEDOM

16   IN A WAY, MAKING THEM PAY A DEBT TO SOCIETY FOR THEIR

17   CRIMES.  DO YOU AGREE WITH THAT PURPOSE OF

18   INCARCERATION?

19   **A**    I AGREE THAT THAT IS A PURPOSE OF

20   INCARCERATION, YES.

21   **Q**    DO YOU AGREE WITH IT?  YOU, YOURSELF, DO YOU

22   AGREE THAT THAT'S A PROPER PURPOSE FOR INCARCERATION?

23   **A**    I AGREE, LIKE I SAID, THAT THAT IS A COMMON

24   UNDERSTANDING FOR WHY INCARCERATION EXISTS.

25   **Q**    ANOTHER PURPOSE FOR INCARCERATION IS

1    INCAPACITATION, REMOVAL OF CRIMINALS FROM SOCIETY SO

2    THAT THEY CAN NO LONGER HARM INNOCENT PEOPLE.  DO YOU

3    UNDERSTAND THAT TO BE A PURPOSE OF INCARCERATION?

4        **A**    THAT'S ANOTHER PENAL PHILOSOPHY.

5        **Q**    DO YOU AGREE WITH THAT PHILOSOPHY?

6        **A**    I KNOW THAT IT'S ANOTHER PENAL PHILOSOPHY

7    THAT EXISTS.

8        **Q**    I'M ASKING YOU FOR YOUR OPINION.  DO YOU

9    AGREE WITH THAT?

10       **A**    I AGREE THAT IT IS --

11       **THE COURT:**  WAIT, WAIT, WAIT.  I DON'T

12   UNDERSTAND.  ARE YOU ASKING THE WITNESS DOES HE AGREE

13   THAT THIS IS A CITED REASON FOR INCARCERATION OR ARE

14   YOU ASKING IF IT'S A -- IN HIS PERSONAL OPINION OR

15   PERHAPS EVEN HIS PROFESSIONAL OPINION -- WHERE IS A

16   VALID REASON FOR INCARCERATION?  BECAUSE I'M NOT SURE

17   THAT HIS PERSONAL OPINION COUNTS IN THIS CONTEXT.

18   HE'S NOT HERE TO TESTIFY ABOUT HIS PERSONAL OPINION.

19   HE'S HERE TO TESTIFY ABOUT HIS PROFESSIONAL RESEARCH,

20   HIS ANALYSIS BASED UPON THE DOCUMENTS HE'S ALREADY

21   CITED THAT HE'S REVIEWED AND HAS FORMED A BASIS BASED

22   UPON NOT HIS PERSONAL OPINION.  AS EXPERTS HE IS HERE

23   TO TESTIFY, AS EVERY EXPERT IS REQUIRED TO TESTIFY,

24   ABOUT HIS PROFESSIONAL OPINION BASED UPON HIS

25   RESEARCH AND ANALYSIS.  SO LET'S BE CLEAR ABOUT IT.

```
 1              SO DO YOU HAVE A PROFESSIONAL OPINION,
 2   SIR, ABOUT WHETHER THAT IS A CITED REASON FOR
 3   INCARCERATION?
 4              THE WITNESS:  YES, YOUR HONOR, IT IS A CITED
 5   REASON.  IT'S ONE OF MANY PENAL PHILOSOPHIES.
 6   BY MR. BLANCHFIELD:
 7       Q    ANOTHER PURPOSE IS DESCRIBED AS DETERRENCE.
 8   DETERRENCE MEANING THE PREVENTION OF FUTURE CRIME.
 9   SAME QUESTION.
10       A    THAT'S ANOTHER PENAL PHILOSOPHY.
11       Q    THE FOURTH IS REHABILITATION.  IS THAT
12   ANOTHER ONE?
13       A    YES, IT IS.
14       Q    ARE YOU AWARE OF ANY OF THE REHABILITATIVE
15   EFFORTS AT LSP?
16       A    I BELIEVE IN OUR LAST CONVERSATION WE
17   COVERED THIS.
18              THE COURT:  IN YOUR --
19              THE WITNESS:  YES.  YES.  SORRY.
20   BY MR. BLANCHFIELD:
21       Q    AND WHAT --
22              THE COURT:  YOU'VE GOT TO ANSWER -- IF YOU
23   KNOW.
24              THE WITNESS:  YES.  YES.
25   BY MR. BLANCHFIELD:
```

1    **Q**    WHAT'S YOUR UNDERSTANDING OF WHAT -- DO YOU

2   HAVE ANY UNDERSTANDING OF THE NEW MAN PROGRAM AT LSP?

3    **A**    I DON'T KNOW THE DETAILS.

4    **Q**    DO YOU HAVE ANY UNDERSTANDING OF THE REENTRY

5   PROGRAM AT LSP?

6    **A**    I DON'T KNOW THE DETAILS.

7    **Q**    DO YOU HAVE ANY UNDERSTANDING OF THE REENTRY

8   PROGRAM AT LSP?

9    **A**    I DON'T KNOW THE INS AND OUTS.

10    **Q**    NOW, MANY STATES THROUGHOUT THIS NATION WITH

11   FARM LABOR DO NOT PAY ANYTHING TO THE INMATES FOR

12   LABOR.  IS THAT CORRECT?

13    **A**    THAT'S THE EXCEPTION.

14    **Q**    TEXAS, GEORGIA, ARKANSAS, ALABAMA, NONE OF

15   THOSE STATES PAY ANYTHING.  CORRECT?

16    **A**    RIGHT.  BUT THE OTHER 45 SOME-ODD DO.

17    **Q**    IS IT YOUR UNDERSTANDING THAT THERE ARE NO

18   LAWS IN LOUISIANA REQUIRING THAT AN INMATE BE PAID

19   ANYTHING FOR ANY JOB AT LSP?

20    **A**    YES.

21    **Q**    THAT'S YOUR UNDERSTANDING?

22    **A**    UH-HUH.

23        **THE REPORTER:**  IS THAT A "YES"?

24        **THE WITNESS:**  YES.  SORRY.

25   **BY MR. BLANCHFIELD:**

1    **Q**    WHAT ABOUT COLORADO?  IS THERE AGRICULTURAL

2  FARMING OPERATIONS IN SOME OF THE PRISONS IN

3  COLORADO?

4    **A**    YES.

5    **Q**    ARE THEY FOR PROFIT?

6    **A**    THEY WERE.  A LOT OF THOSE PRACTICES HAVE

7  BEEN CHANGING IN RECENT TIMES.

8    **Q**    NOW, YOU ACTUALLY VISITED LSP AND WITNESSED

9  THE PICKING OF CUCUMBERS.  IS THAT CORRECT?

10    **A**    CORRECT.

11    **Q**    DID YOU CONSIDER THAT TO BE A STRENUOUS

12  ACTIVITY?

13    **A**    BASED ON WHAT THE MEN TOLD ME, THAT WAS

14  THEIR INTERPRETATION.  AND BASED ON THE SWEAT THAT

15  WAS POURING FROM THEIR BROW AND BENT OVER IN THE

16  POSITIONS THAT THEY WERE WORKING, IT APPEARED

17  STRENUOUS.

18    **Q**    IT APPEARED TO YOU TO BE STRENUOUS?

19    **A**    UH-HUH.  YES.

20    **Q**    IS THAT THE ONLY TIME THAT YOU VISITED

21  LOUISIANA STATE PENITENTIARY?

22    **A**    YES.

23    **Q**    HAVE YOU VISITED ANY OTHER PRISONS AND

24  OBSERVED FARMING ACTIVITY AT THESE PRISONS?

25    **A**    NO.

1      **Q**   THANK YOU, DOCTOR.

2           **MR. BLANCHFIELD:**  THAT'S ALL I HAVE.

3           **THE COURT:**  THANK YOU, MR. BLANCHFIELD.

4               MS. McTOOTLE, ANY REDIRECT?

5           **MS. McTOOTLE:**  BRIEF REDIRECT, YOUR HONOR.

6                    **REDIRECT EXAMINATION**

7  BY MS. McTOOTLE:

8      **Q**   SO, DR. SBICCA, WE WERE TALKING A LITTLE BIT

9  ABOUT THE DIFFERENT DRIVERS BEHIND THE FARM LINE.

10  BASED ON YOUR PERSONAL OBSERVATION OF THE FARM LINE

11  WHEN TALKING ABOUT THE FINANCIAL DRIVERS, IS THERE A

12  REASON THAT YOU BELIEVE THAT THE FINANCIAL DRIVERS DO

13  NOT PREDOMINATE OVER IDLENESS REDUCTION DRIVERS?

14      **A**   THE MAIN REASON IS BECAUSE -- EVEN BASED ON

15  THE DEPOSITIONS THAT I REVIEWED, THAT WHILE THERE ARE

16  MEN BEING FED FROM THE FARM LINE COMPARED TO EVEN 10,

17  15 YEARS AGO, THE AMOUNT OF FOOD COMING OFF OF THESE

18  FARM LINES IS FAR, FAR LESS AND SERVES AS LIKE A, YOU

19  KNOW, SEEMINGLY MUCH SMALLER SUPPLEMENT THAN IT ONCE

20  DID.

21           AND IN ADDITION TO THAT, THOUGH, IS THE FACT

22  THAT THE FARM LINE IS USED IN THIS PUNITIVE FASHION

23  TO WORK PEOPLE AND TO POSITION PEOPLE WITHIN A LARGER

24  LABOR HIERARCHY WITHIN THE PRISON SYSTEM ITSELF, SO

25  THAT WORK REQUIREMENT APPEARS FAR MORE PREDOMINANT.

1      **Q**    DR. SBICCA, IS IT YOUR OPINION THAT THE FARM
2   LINE IS ANOMALOUS FROM --
3           **THE REPORTER:**  I'M SORRY.  FROM?
4           **MS. McTOOTLE:**  I CAN REPEAT THE WHOLE
5   QUESTION.
6   BY MS. McTOOTLE:
7      **Q**    DR. SBICCA, IS IT YOUR OPINION THAT THE FARM
8   LINE IS ANOMALOUS FROM CONTEMPORARY PRISON NORMS?
9      **A**    YES.
10     **Q**    AND, DR. SBICCA, IS IT YOUR OPINION THAT THE
11  FARM LINE RESEMBLES CHARACTERISTICS OF CHATTEL
12  SLAVERY?
13     **A**    YES.
14     **Q**    IS IT YOUR OPINION THAT FROM A SOCIOLOGICAL
15  PERSPECTIVE, THAT INSTITUTIONS THAT RESEMBLE
16  CHARACTERISTICS OF CHATTEL SLAVERY ARE CONDEMNED
17  BECAUSE HISTORICALLY THEY RISK EXPOSING PEOPLE TO THE
18  SAME TYPE OF DIGNITARY HARM EXPERIENCED BY THOSE
19  SUBJECTED TO CHATTEL SLAVERY?
20     **A**    YES.
21     **Q**    THANK YOU.
22          **MS. McTOOTLE:**  NO FURTHER QUESTIONS.
23          **THE COURT:**  I JUST HAD A COUPLE OF QUESTIONS
24  FOR YOU.
25              THANK YOU, MS. McTOOTLE.

1          YOU MENTIONED THIS CONCEPT OF CULTURAL

2   MEMORY AND YOU BELIEVE THAT THAT'S RELEVANT IN THIS

3   LITIGATION.  TELL ME WHY YOU BELIEVE THAT TO BE

4   RELEVANT.

5          **THE WITNESS:**  WELL, CULTURALLY ONE OF THE

6   WAYS IN WHICH THINGS PASS IS HOW WE INTERPRET THE

7   PAST.  AND SO IN THE CASE OF SOMETHING LIKE CHATTEL

8   SLAVERY, IT'S THROUGH TELLING STORIES AND REFERENCING

9   CONTEMPORARY PRACTICES VIS-A-VIS THOSE STORIES THAT

10  WE INTERPRET THE WORLD AROUND US AND INTERPRET OUR

11  FEELINGS IN THIS WORLD, WHAT WE CONSIDER TO BE MORAL

12  OR IMMORAL PRACTICES OR ETHICAL OR UNETHICAL

13  PRACTICES.

14          AND SO THAT CULTURAL MEMORY IS VERY

15  SIGNIFICANT FOR WHY WE MAKE DECISIONS AS A SOCIETY,

16  FOR INSTANCE, WHETHER OR NOT WE WANT TO CONTINUE WITH

17  CERTAIN POLICIES OR PRACTICES OR NORMS.

18          **THE COURT:**  NOW, MR. BLANCHFIELD ASKED YOU

19  ABOUT NONMINORITY INMATES.  TO YOUR KNOWLEDGE, ARE

20  THERE NONMINORITY INMATES THAT WORK ON THE FARM LINE?

21          **THE WITNESS:**  YES.  AND I MET SOME OF THEM.

22          **THE COURT:**  DO YOU BELIEVE THAT THE SAME

23  CULTURAL MEMORY ISSUE RESONATES WITH THEM?

24          **THE WITNESS:**  THEIR CULTURAL MEMORY IS GOING

25  TO BE SHAPED BY THEIR SOCIAL POSITION, AND SO, YOU

1  KNOW, THERE ARE DIFFERENCES THAT ARE IMPORTANT TO

2  ACCOUNT FOR.  SO SOMEONE WHO IS AFRICAN AMERICAN --

3  THE STORIES THAT THEY GREW UP HEARING, FOR INSTANCE,

4  AREN'T GOING TO BE INTERPRETED NECESSARILY THE SAME.

5  BUT THE STIGMA STATUS THAT CAN COME FROM WORKING

6  UNDER THOSE CONDITIONS CAN ATTACH TO, FOR INSTANCE,

7  WHITE INDIVIDUALS.

8           SO I HAD AN INDIVIDUAL WHO WAS WORKING

9  OUT ON THE FARM LINE ONE DAY WHO HAD A HAT ON WHERE,

10 YOU KNOW, HE WROTE ON HIS HAT "SLAVE."  AND THE WAY

11 HE TALKED ABOUT WORKING ON THE FARM LINE WAS AKIN TO

12 WORKING UNDER SLAVE-LIKE CONDITIONS, AND SO HE SORT

13 OF WAS ARTICULATING THAT THIS STIGMA HAD ATTACHED TO

14 HIM, BASICALLY.

15          **THE COURT:**  WHAT WAS HIS RACE?

16          **THE WITNESS:**  HE WAS WHITE.

17          **THE COURT:**  SO DO YOU BELIEVE THAT THIS

18 CULTURAL MEMORY ISSUE THAT YOU'VE DISCUSSED APPLIES

19 TO ALL OF THE MEMBERS OF THE PROPOSED CLASS?

20          **THE WITNESS:**  WELL, YOU KNOW, TALKING ABOUT

21 CULTURAL MEMORY IN THE SENSE THAT WE ALL LIVE IN A

22 POST-CHATTEL SLAVERY WORLD, THAT THERE CONTINUES TO

23 BE ECHOES OF THAT WORLD IN VARIOUS POLICIES AND

24 PRACTICES AND NORMS.  AND SO THAT CULTURAL MEMORY

25 EXISTS MORE BROADLY IN SOCIETY AND PEOPLE PICK UP ON

1  IT IN DIFFERENT WAYS DEPENDING ON THE CIRCUMSTANCES

2  THAT THEY'RE LIVING UNDER.

3            SO LIVING UNDER CONDITIONS OF

4  CONFINEMENT IN SOMETHING LIKE A PRISON IN CONDITIONS

5  OF UNFREEDOM, IT'S A PARTICULARLY ACUTE WAY IN WHICH

6  PEOPLE TAP INTO THAT CULTURAL MEMORY.

7            **THE COURT:**  ALL RIGHT, DOCTOR.  THANK YOU SO

8  MUCH.  THAT CONCLUDES YOUR TESTIMONY.  WE APPRECIATE

9  YOU JOINING US.  YOU ARE NOW EXCUSED.

10            **THE WITNESS:**  THANK YOU, YOUR HONOR.

11            **THE COURT:**  I'M NOT GOING TO ASK YOU ABOUT

12  THE COLORADO/COLORADO STATE GAME LAST YEAR.

13            **THE WITNESS:**  DON'T.  THAT WAS A HARD ONE.

14            **THE COURT:**  KIND OF A LOPSIDED GAME, IF I

15  RECALL.  STATE RIVALS.  RIGHT?

16            **THE WITNESS:**  YES, WE ARE.

17            **THE COURT:**  ALL RIGHT.  SO, COUNSEL, LET'S

18  GO ON AND RESUME TOMORROW MORNING.  I TELL YOU WHAT

19  WE'RE GOING TO DO.  WHAT I'D LIKE TO DO IS BEGIN AS

20  EARLY AS POSSIBLE SO WE CAN GET THROUGH AS MUCH OF

21  THIS AS POSSIBLE.  I WOULD ASK YOU TO BE IN MY

22  COURTROOM NO LATER THAN 8:15 TOMORROW MORNING.  IF

23  YOU'RE HERE AT 8:15, WE WILL START AT 8:20 AND WE CAN

24  GET THIS SHOW ON THE ROAD.  BUT IN NO CASE WILL WE

25  START AFTER 8:30, SO PLEASE BE HERE IN MY COURTROOM.

1   THE MARSHALS SERVICE WILL ASSURE THAT THE COURTHOUSE
2   IS OPEN BRIGHT AND EARLY TOMORROW.  THE COURTROOM
3   WILL BE OPEN NO LATER THAN EIGHT O'CLOCK, SO WE
4   SHOULD BE READY TO GO.
5              IN THE MEANTIME, YOU CAN -- YOU'RE FREE
6   TO LEAVE ALL OF YOUR DEVICES HERE AND YOUR DOCUMENTS,
7   YOUR FILES HERE IF YOU'D LIKE.  OBVIOUSLY THE
8   COURTROOM WILL BE SECURED DURING THE OVERNIGHT HOURS.
9              IS THERE ANYTHING WE SHOULD TAKE UP
10  BEFORE WE ADJOURN FOR THE EVENING?  AND LET ME JUST
11  SAY THAT I EXPECT THAT TOMORROW WHEN WE RESUME I'M
12  GOING TO GO ON AND ASK THE PLAINTIFFS -- DO YOU HAVE
13  A SENSE OF WHETHER WE WILL PICK UP TOMORROW MORNING
14  WITH DR. HAMMONDS OR IS IT YOUR PLAN TO CALL THE
15  INMATE WITNESSES FIRST?
16       **MS. POURCIAU:**  PLAINTIFFS INTEND TO CALL DR.
17  HAMMONDS FIRST, FOLLOWED BY OUR OTHER EXPERT, DR.
18  VASSALLO.
19       **THE COURT:**  VERY WELL.
20              AND JUST MAKE SURE THAT THE INMATES ARE
21  BROUGHT -- I THINK -- WHAT? -- 7:30 I THINK IS THE
22  DEADLINE.  IS THAT RIGHT?  TOMORROW MORNING?
23       **MS. POURCIAU:**  8 A.M.
24       **THE COURT:**  EIGHT IS WHAT THEY -- SO YES, IF
25  YOU GET HERE BEFORE EIGHT O'CLOCK, THAT'S FINE, TOO.

1   THERE SHOULD BE DEPUTY -- THERE WILL BE DEPUTY

2   MARSHALS TO RECEIVE THEM, TO PROCESS THEM, AS THEY'RE

3   REQUIRED TO DO BEFORE ANY INCARCERATED PERSON COMES

4   INTO MY COURTROOM.

5           ANY QUESTIONS ABOUT ANYTHING BEFORE WE

6   ADJOURN FOR THE EVENING?

7       **MR. BLANCHFIELD:**  JUST, YOUR HONOR, I WANT

8   TO BE SURE.  SOME OF THEIR WITNESSES ARE OUR FOLKS.

9   I WANT TO BE SURE THE TIMING ON THAT.  WHEN AM I TO

10  BRING DR. LAVESPERE, ASHLI OLIVEAUX?

11      **THE COURT:**  SO LET ME ASK YOU TO GO ON AND

12  CONFER OFF-LINE OUTSIDE THE PRESENCE OF THE COURT,

13  WHATEVER AGREEMENTS YOU-ALL REACH.  BUT I'M SURE

14  THEY'LL BE ACCOMMODATING TO YOU.  OR IF YOU WANT TO

15  TAKE THAT UP NOW, I MEAN -- SO WE'LL HAVE

16  DR. HAMMONDS.  AND WHO IS NEXT?  THE INMATE WITNESSES

17  OR DR. LAVESPERE?

18      **MS. POURCIAU:**  DR. VASSALLO WILL GO AFTER

19  DR. HAMMONDS AND THEN WE'LL CALL OUR TWO INCARCERATED

20  WITNESSES, FOLLOWED BY DR. LAVESPERE.

21      **THE COURT:**  VERY GOOD.  THANK YOU-ALL.

22  YOU-ALL HAVE A GOOD NIGHT.  COURT IS NOW ADJOURNED.

23      **THE LAW CLERK:**  ALL RISE.

24          COURT IS NOW ADJOURNED.

25      **(WHEREUPON, THE PROCEEDINGS WERE ADJOURNED**

1  UNTIL APRIL 23, 2025 AT 8:15 A.M.)

2              C E R T I F I C A T E

3        I CERTIFY THAT THE FOREGOING IS A CORRECT

4  TRANSCRIPT FROM THE RECORD OF THE PROCEEDINGS IN THE

5  ABOVE-ENTITLED NUMBERED MATTER.

6  S:/NATALIE W. BREAUX

7  NATALIE W. BREAUX, RPR, CRR

8  OFFICIAL COURT REPORTER

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25