# Exhibit 3

```
 1              UNITED STATES DISTRICT COURT

 2              MIDDLE DISTRICT OF LOUISIANA

 3

 4  VOICE OF THE EXPERIENCED
    ET AL                        :CIVIL ACTION
 5
    VERSUS                       :NO. 23-CV-01304-BAJ-EWD
 6
    JAMES LEBLANC, ET AL         :APRIL 23, 2025
 7
    =========================================================
 8         MOTIONS HEARING FOR CLASS CERTIFICATION
           BEFORE THE HONORABLE BRIAN A. JACKSON
 9              UNITED STATES DISTRICT JUDGE

10                   VOLUME 2 OF 3

11              A P P E A R A N C E S

12

    FOR THE PLAINTIFFS:
13
        PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
14      BY: JEREMY A. BENJAMIN, ESQUIRE
        BY: ARIELLE B. McTOOTLE, ESQUIRE
15      BY: MICHAEL C. McGREGOR, ESQUIRE
        BY: RICARDO R. SABATER, ESQUIRE
16      1285 AVENUE OF THE AMERICAS
        NEW YORK, NEW YORK 10019
17
        RIGHTS BEHIND BARS
18      BY: LYDIA WRIGHT, ESQUIRE
        BY: AMARIS MONTES, ESQUIRE
19      416 FLORIDA AVENUE NW #26152
        WASHINGTON, D.C. 20002
20
        THE PROMISE OF JUSTICE INITIATIVE
21      BY: SAMANTHA POURCIAU, ESQUIRE
        BY: KARA CELESTE CRUTCHER, I, ESQUIRE
22      1024 ELYSIAN FIELDS AVENUE
        NEW ORLEANS, LOUISIANA 70117
23

24  FOR THE DEFENDANTS:

25      KEOGH, COX & WILSON, LTD
        BY: ANDREW BLANCHFIELD, ESQUIRE
```

```
 1        BY: CHRISTOPHER K. JONES, ESQUIRE
          BY: CHELSEA ACOSTA PAYNE, ESQUIRE
 2        701 MAIN STREET
          BATON ROUGE, LOUISIANA 70802
 3

 4

 5

 6

 7

 8        REPORTED BY:  NATALIE W. BREAUX, RPR, CRR
                  UNITED STATES COURTHOUSE
 9                 777 FLORIDA STREET
            BATON ROUGE, LOUISIANA 70801
10                 (225) 389-3565
            NATALIE_BREAUX@LAMD.USCOURTS.GOV
11

12   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY USING
          COMPUTER-AIDED TRANSCRIPTION SOFTWARE
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1             I N D E X

2                                              **PAGE**

PLAINTIFFS' WITNESSES:

3
  EVELYNN HAMMONDS (VIA ZOOM VIDEOCONFERENCE)

4
      CONTINUED DIRECT EXAMINATION BY MR. McGREGOR ...6

5
      CROSS-EXAMINATION BY MR. BLANCHFIELD ..........25

6
      REDIRECT EXAMINATION BY MR. McGREGOR ..........30

7
  SUSI VASSALLO

8
      VOIR DIRE BY MS. WRIGHT ......................37

9
      DIRECT EXAMINATION BY MS. WRIGHT .............42

10
      CROSS-EXAMINATION BY MR. BLANCHFIELD ..........75

11
  DAMARIS JACKSON

12
      DIRECT EXAMINATION BY MS. CRUTCHER ...........122

13
      CROSS-EXAMINATION BY MR. BLANCHFIELD .........139

14
      REDIRECT EXAMINATION BY MS. CRUTCHER .........145

15
  PATRICK SETH JONES

16
      DIRECT EXAMINATION BY MS. CRUTCHER ...........148

17
      CROSS-EXAMINATION BY MR. BLANCHFIELD .........166

18
      REDIRECT EXAMINATION BY MS. CRUTCHER .........170

19
  RANDY LAVESPERE

20
      DIRECT EXAMINATION BY MR. BENJAMIN ...........175

21
      CROSS-EXAMINATION BY MR. BLANCHFIELD .........210

22
      REDIRECT EXAMINATION BY MR. BENJAMIN .........218

23
  ASHLI OLIVEAUX

24
      DIRECT EXAMINATION BY MR. SABATER ...........222

25

1  DEFENDANTS' WITNESSES:

                                                    **PAGE**

2      DELECA REYNOLDS-BARNES

3      VOIR DIRE EXAMINATION BY MR. BLANCHFIELD .....247

4      DIRECT EXAMINATION BY MR. BLANCHFIELD ........251

5      CROSS-EXAMINATION BY MS. MONTES ..............272

6   ORLANDO SCOTT

7      DIRECT EXAMINATION BY MR. BLANCHFIELD ........299

8      CROSS-EXAMINATION BY MS. POURCIAU ............308

9      REDIRECT EXAMINATION BY MR. BLANCHFIELD ......328

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                   (APRIL 23, 2025)

 2                     PROCEEDINGS

 3          THE LAW CLERK:  ALL RISE.

 4               (CALL TO THE ORDER OF COURT)

 5          THE COURT:  GOOD MORNING, EVERYONE.  BE

 6   SEATED.

 7               ALL RIGHT.  WELL, WELCOME BACK, LADIES

 8   AND GENTLEMEN.  THIS IS THE CASE OF *VOTE VERSUS*

 9   *LEBLANC*.  WE ARE NOW BACK ON THE RECORD.

10               IS THERE ANYTHING WE SHOULD TAKE UP

11   BEFORE WE RESUME THE EXAMINATION OF THE -- OR

12   BEGIN -- ACTUALLY, RESUME THE EXAMINATION OF THE NEXT

13   PLAINTIFFS' WITNESS?

14          MS. POURCIAU:  ONE SMALL THING, YOUR HONOR.

15   COUNSEL WOULD LIKE TO SEEK PERMISSION TO USE OUR CELL

16   PHONES FOR THE TIMER FUNCTION TO KEEP TRACK OF

17   WITNESSES.

18          THE COURT:  YES, THAT WOULD BE FINE.

19               OKAY.  ARE WE ALL SET UP NOW?  WE HAVE

20   EVERYTHING WORKED OUT NOW WITH THE ZOOM -- ZOOM

21   ISSUES HOPEFULLY ARE RESOLVED.

22          THE COURTROOM DEPUTY:  YES, YOUR HONOR.

23          MR. BLANCHFIELD:  YOUR HONOR, DO WE KNOW HOW

24   MUCH TIME PROFESSOR HAMMONDS HAS LEFT OF HER 45

25   MINUTES?
```

1           THE COURT:  LET'S SEE.  LET ME CHECK MY

2  NOTES.

3              ALL RIGHT.  MY NOTES REFLECT THAT DR.

4  HAMMONDS TESTIFIED FOR APPROXIMATELY FOUR MINUTES.

5  ALL RIGHT?  SO AGAIN, I'LL GIVE YOU -- REMIND ME NOW,

6  MR. McGREGOR:  YOU WANT THE FIVE-MINUTE WARNING OR

7  THE TEN-MINUTE WARNING?

8           MR. McGREGOR:  GOOD MORNING, YOUR HONOR.  I

9  WOULD LIKE THE TEN-MINUTE WARNING, PLEASE.

10          THE COURT:  VERY WELL.  ALL RIGHT.

11              GOOD MORNING, DR. HAMMONDS.  HOW ARE

12  YOU?  CAN YOU HEAR ME?

13          THE WITNESS:  YES, I CAN.  GOOD MORNING.

14          THE COURT:  GOOD MORNING.  AND WE CAN HEAR

15  YOU A LOT BETTER TODAY AS WELL.  LET ME --

16          THE WITNESS:  GOOD.

17          THE COURT:  LET ME REMIND YOU, MA'AM, THAT

18  YOU ARE STILL UNDER OATH.  AND AT THIS TIME MR.

19  McGREGOR WILL RESUME THE DIRECT EXAMINATION.

20          THE WITNESS:  THANK YOU.

21             DIRECT EXAMINATION (CONTINUED)

22  BY MR. McGREGOR:

23      Q   GOOD MORNING, DR. HAMMONDS.

24      A   GOOD MORNING.

25      Q   IN YOUR PROFESSIONAL EXPERIENCE, IS IT

1  GENERALLY ACCEPTABLE PRACTICE FOR SOCIAL SCIENTISTS

2  TO OBTAIN AN UNDERSTANDING OF THE SUBJECT BY

3  REVIEWING PRIMARY AND SECONDARY SOURCES?

4       **A**    YES, IT IS.  THAT'S WHAT WE DO.

5       **Q**    DID YOU OBTAIN --

6            **THE COURT:**  LET ME MAKE SURE THAT I

7  UNDERSTAND.  YOU DID OFFER DR. HAMMONDS AS AN EXPERT

8  IN THE AREA OF -- THE FIELD OF HISTORY OF SCIENCE,

9  AFRICAN-AMERICAN STUDIES, AND EPIDEMIOLOGY?

10           **MR. McGREGOR:**  AND THE HISTORY OF MEDICINE.

11           **THE COURT:**  AND THE HISTORY OF MEDICINE.

12  ALL RIGHT.

13           IS THERE AN OBJECTION TO DR. HAMMONDS,

14  AT LEAST WITH RESPECT TO HER QUALIFICATIONS?

15           **MR. BLANCHFIELD:**  YOUR HONOR, DR. HAMMONDS

16  IS CERTAINLY QUALIFIED IN THOSE FOUR FIELDS.  IN MY

17  QUESTIONING OF HER WE DO QUESTION THE RELEVANCY OF

18  THIS TESTIMONY AT A CLASS CERTIFICATION HEARING.  AND

19  IT'S EVEN MORE PRONOUNCED WITH PROFESSOR HAMMONDS

20  AS -- HER DISCONNECT AS NEVER BEING TO LSP, NEVER

21  BEING TO ANY JAIL, NEVER MEETING ANY OF THE

22  WITNESSES.  WE WOULD LIKE TO MAKE SURE THAT OUR

23  OBJECTION TO THAT IS MAINTAINED ON THE RECORD.

24           **THE COURT:**  YOUR OBJECTION INDEED IS NOTED

25  FOR THE RECORD.  NONETHELESS, THE COURT WILL ACCEPT

1  DR. HAMMONDS AS AN EXPERT IN THE FIELDS THAT WE JUST

2  DISCUSSED.

3              ALL RIGHT.  LET'S PROCEED.

4          **MR. McGREGOR:**  THANK YOU, YOUR HONOR.

5  **BY MR. McGREGOR:**

6      **Q**    DR. HAMMONDS, BASED ON YOUR RESEARCH AND

7  REVIEW OF THE RECORD EVIDENCE, CAN YOU DESCRIBE THE

8  CHARACTERISTICS OF THE FARM LINE?

9      **A**    THE FARM LINE IS A COMPULSORY AGRICULTURAL

10 PROGRAM ASSOCIATED WITH THE LOUISIANA STATE

11 PENITENTIARY AT ANGOLA.

12     **Q**    DID YOU -- DURING YOUR REVIEW OF THE RECORD

13 EVIDENCE, DID YOU IDENTIFY ANY CHARACTERISTICS OF THE

14 FARM LINE THAT HAD ANY HISTORICAL SIGNIFICANCE?

15     **A**    THE HISTORICAL SIGNIFICANCE OF THE

16 CONDITIONS OF THE FARM LINE ARE THAT THE WORK IS

17 COMPULSORY, THE WORK IS DONE UNDER SURVEILLANCE OF

18 ARMED GUARDS, THE INMATES HAVE NO CONTROL OVER THE

19 WORKING CONDITIONS OR HOW THEY DO THE WORK.  THEY

20 HAVE NO CONTROL OVER WHEN THEY HAVE BREAKS, HOW MANY

21 BREAKS THEY HAVE PER DAY.  THEY ARE WORKING ON A

22 CORPS SYSTEM WHERE THEY HAVE TO PRODUCE A CERTAIN

23 AMOUNT OF OUTPUT EVERY DAY OR BE POSSIBLE -- POSSIBLY

24 BE SUBJECTED TO PUNISHMENT.  THEY HAVE NO ACCESS

25 TO -- DIRECT ACCESS TO MEDICAL PERSONNEL.  THEY HAVE

1    TO ASK FOR MEDICAL ASSISTANCE FROM THE GUARDS WHO

2    THEN DIRECT THEIR REQUESTS TO APPROPRIATE MEDICAL

3    PERSONNEL.  AGAIN, THEY HAVE NO CONTROL OVER THE

4    CONDITIONS OF THEIR WORK.

5        Q    IN YOUR OPINION, ARE THERE ANY SIMILARITIES

6    OF THESE -- BETWEEN THESE CHARACTERISTICS YOU

7    IDENTIFIED WITH ANY CHARACTERISTICS OF HISTORICAL

8    LABOR REGIME?

9        A    SO THE HISTORICAL LABOR REGIMES THAT I STUDY

10   ARE CHATTEL SLAVERY.  I CERTAINLY AM FAMILIAR ALSO

11   WITH THE CONDITIONS UNDER WHICH PEOPLE WERE PUT WHEN

12   THEY WERE TRANSPORTED TO CONCENTRATION CAMPS UNDER

13   NAZI GERMANY, AND SO THERE THE CONDITIONS OF

14   COMPULSORY WORK OF NOT BEING ABLE -- OF INDIVIDUALS

15   NOT BEING ABLE TO CONTROL THEIR WORKING OR LIVING

16   CONDITIONS, BEING SURVEILLED AND UNDER OBSERVATION

17   ALWAYS BY ARMED GUARDS, THOSE ARE CHARACTERISTICS.

18   AS WELL AS -- I'M SORRY -- AS WELL AS ACCESS TO -- NO

19   DIRECT ACCESS TO MEDICAL TREATMENT OR ATTENTION,

20   THOSE ARE CHARACTERISTICS BOTH OF WHAT HAPPENED UNDER

21   CHATTEL SLAVERY AND ALSO IN CONCENTRATION CAMPS.

22       Q    IN THOSE HISTORICAL EXAMPLES OF CHATTEL

23   SLAVERY AND CONCENTRATION CAMPS IN NAZI GERMANY, WHO

24   WAS MOST AT RISK TO EXPERIENCE HARM?

25       A    ANY INDIVIDUAL WHO IS SUBJECTED TO THOSE

1  CONDITIONS WOULD BE AT RISK FOR PSYCHOLOGICAL HARM.

2      **Q**   CAN YOU DESCRIBE --

3      **A**   (INAUDIBLE) --

4          **THE REPORTER:**  I'M SORRY.  YOU'LL HAVE TO

5  REPEAT THAT.

6  **BY MR. McGREGOR:**

7      **Q**   COULD YOU PLEASE REPEAT THAT FOR THE COURT

8  REPORTER?

9      **A**   ANY INDIVIDUAL WHO IS SUBJECTED TO THOSE

10 CONDITIONS WOULD BE AT RISK FOR PSYCHOLOGICAL AND

11 PHYSICAL HARM.

12     **Q**   COULD YOU DESCRIBE THE CHARACTERISTICS OF

13 CHATTEL SLAVERY IN THE UNITED STATES?

14     **A**   SO CHATTEL SLAVERY IN THE UNITED STATES IS

15 THE SYSTEM -- IS THE LABOR SYSTEM THAT IS -- AFRICANS

16 WHO ARE BROUGHT HERE TO THIS COUNTRY WERE SUBJECTED

17 TO.  THEY WERE BOUGHT BY VARIOUS -- THE OWNERS OF

18 PLANTATIONS.  THEY WERE PUT TO WORK UNDER --

19 CERTAINLY IN LARGE PLANTATIONS IN AGRICULTURAL WORK,

20 THEY WERE -- THEY WERE PROPERTY.  THEY WERE NOT HUMAN

21 BEINGS WITH FULL -- THEY WERE NOT TREATED AS HUMAN

22 BEINGS WITH FULL RIGHTS.  THEY WORKED IN FIELDS UNDER

23 CONDITIONS THAT THEY HAD NO CONTROL OVER, LIVING

24 CONDITIONS AS WELL.  THEIR STATUS AS SLAVES WAS AN

25 INHERITED CONDITION.  IT WAS A PERMANENT STATUS.  AND

1  THE CHILDREN WOULD INHERIT THE STATE OF BEING SLAVES

2  AS WELL.  THEY WERE ALSO SUBJECTED TO PHYSICAL

3  VIOLENCE BY THE PEOPLE WHO OVER -- WHO OVERSAW THEIR

4  WORK.

5       AND AN ADDITIONAL POINT IS THAT IF THEY HAD

6  MEDICAL ISSUES, IT WAS THE SLAVE OWNER WHO CALLED FOR

7  MEDICAL ATTENTION.  AND THE PURPOSE OF THAT WAS FOR A

8  PHYSICIAN TO MAKE SURE THAT THE SLAVES COULD CONTINUE

9  TO WORK BUT NOT NECESSARILY TO PROVIDE THEM WITH

10  HEALTH CARE.

11  **Q**   CAN YOU DESCRIBE THE CHARACTERISTICS OF

12  CONCENTRATION CAMPS IN NAZI GERMANY?

13  **A**   CONCENTRATION CAMPS IN NAZI GERMANY, PEOPLE

14  WERE TRANSPORT -- THEY WERE TAKEN FROM THEIR HOMES.

15  THEY WERE TRANSPORTED TO THESE CAMPS.  THEY WERE

16  BRANDED WITH A NUMBER ON THEIR BODIES.  THEY WERE

17  SUBJECTED TO VARIOUS KINDS OF WORK.  DIFFERENT

18  CONCENTRATION CAMPS INVOLVED DIFFERENT KINDS OF WORK,

19  BUT THESE WERE ALL COMPELLED LABOR CONDITIONS.  THEY

20  WERE OVERSEEN BY ARMED GUARDS.  AGAIN, THEY HAD NO

21  CONTROL OVER THEIR LIVING CONDITIONS, THEIR WORK

22  CONDITIONS IN TERMS OF BREAKS OR FOOD OR WATER OR ANY

23  OTHER KINDS OF ASSISTANCE.

24       AND AGAIN, THEY WERE ALSO SUBJECTED TO -- IF

25  THEY HAD MEDICAL CONDITIONS, THE GUARDS WOULD

1  APPROACH -- REQUEST HELP FROM PHYSICIANS, BUT THE

2  PHYSICIANS WERE ALSO EMPLOYED BY THE STATE.  AND ALSO

3  IN CONCENTRATION CAMPS PEOPLE WERE SUBJECTED TO

4  MEDICAL EXPERIMENTATION.

5      **Q**    WERE BOTH OF THESE LABOR REGIMES LEGAL AT

6  THE TIME THEY WERE IN PLACE?

7      **A**    YES, THEY WERE.

8      **Q**    ARE THEY STILL LEGAL TODAY?

9      **A**    NO, THEY ARE NOT.

10     **Q**    WHAT EPIDEMIOLOGICAL RESEARCH DID YOU RELY

11  ON TO REACH THE CONCLUSION THAT THESE LABOR REGIMES

12  CAUSED NEGATIVE HEALTH OUTCOMES?

13     **A**    SO THE EPIDEMIOLOGICAL RESEARCH LOOKS AT

14  WHAT KINDS OF CONDITIONS PRODUCE ILL HEALTH EFFECTS

15  IN VARIOUS POPULATIONS.  AND SO THE HISTORICAL

16  LITERATURE AND RESEARCH THAT HAS BEEN CONDUCTED SHOWS

17  THAT PEOPLE WHO ARE WORKING UNDER SOME KINDS OF

18  COMPULSORY CONDITIONS WHERE THEY ARE NOT GIVEN

19  ADEQUATE FOOD, REST OR -- AND ALSO CONTROL OVER THEIR

20  CONDITIONS AT ALL -- PRODUCE POOR HEALTH OUTCOMES.

21  THE HISTORICAL LITERATURE SHOWS THAT AFRICAN

22  AMERICANS CERTAINLY POST -- DURING CHATTEL SLAVERY

23  AND THROUGH THE PERIOD OF JIM CROW -- THAT IS, INTO

24  THE 20TH CENTURY -- THAT WORKING UNDER THESE KINDS OF

25  CONDITIONS THAT I'VE DESCRIBED ACTUALLY PRODUCE

1  HEALTH DISPARITIES; THAT IS, THAT PRODUCE ILL HEALTH

2  OUTCOMES IN AFRICAN-AMERICAN POPULATIONS FROM AS

3  EARLY AS THE 17TH CENTURY INTO THE PRESENT.

4      **Q**    AND FROM AN EPIDEMIOLOGICAL PERSPECTIVE, DID

5  THIS REGIMES CAUSE PSYCHOLOGICAL HARM?

6      **A**    THE REPORTS THAT WE HAVE, ORAL HISTORIES

7  FROM PEOPLE WHO WERE ENSLAVED UNDER CHATTEL SLAVERY

8  INDICATE THAT IT DID CAUSE PSYCHOLOGICAL HARM.  THEY

9  TALK ABOUT FEELINGS OF INFERIORITY, THEY TALK ABOUT

10 ANXIETY, PRESSURE AND IN SOME CASES, IN SOME OF THE

11 REPORTS, DOCUMENT THAT THESE INDIVIDUALS PERHAPS

12 SUFFERED POST-TRAUMATIC STRESS SYNDROME AND OTHER

13 KINDS OF MENTAL HEALTH EFFECTS THAT WERE NOT

14 ADDRESSED IN THE -- UNDER THE CONDITIONS OF WHICH

15 THEY WORKED.

16     **Q**    AND IN CHATTEL SLAVERY AND CONCENTRATION

17 CAMPS, WHO WAS AT RISK TO EXPERIENCE PSYCHOLOGICAL

18 HARM AS A RESULT OF THE REGIME?

19     **A**    ANYBODY WHO WORKED UNDER THOSE CONDITIONS

20 WOULD BE AT RISK FOR PSYCHOLOGICAL HARM.

21     **Q**    IN YOUR OPINION, IS THE FARM LINE SIMILAR TO

22 CHATTEL SLAVERY?

23     **A**    THERE ARE SOME SIMILARITIES TO CHATTEL

24 SLAVERY, CERTAINLY.  IT IS THE COMPULSORY WORK ASPECT

25 OF IT, IT IS THE KIND OF WORK, THE MENIAL WORK, THE

1    INABILITY OF INDIVIDUALS TO CONTROL THEIR WORKING

2    CONDITIONS AS IF ESTABLISHING BREAKS, HAVING PROPER

3    SUSTENANCE UNDER DIFFICULT ENVIRONMENTAL CONDITIONS,

4    THE INABILITY TO ASK FOR -- TO RECEIVE MEDICAL

5    ATTENTION UNLESS IT WAS PROVIDED BY OTHER PERSONNEL

6    WHO WERE -- THEY WERE SUBJECTED TO WORK UNDER ARMED

7    GUARDS IN MANY CASES.  AND SO THOSE ARE THE

8    CONDITIONS THAT ARE SIMILAR TO WHAT OCCURRED UNDER

9    CHATTEL SLAVERY.

10       Q    AND WHAT EVIDENCE SUPPORTS YOUR OPINION?

11       A    SO THERE IS A LONG HISTORY THAT IS --

12   WELL-DOCUMENTS WHAT HAPPENED, WHAT THE WORKING

13   CONDITIONS WERE UNDER CHATTEL SLAVERY.  HISTORIANS --

14   THERE ARE MANY, MANY, MANY BOOKS THAT DESCRIBE THESE

15   CONDITIONS, AND SO THAT IS THE EVIDENCE THAT WE HAVE,

16   AS WELL AS IN THE EARLY 20TH CENTURY THE SOCIOLOGICAL

17   AS WELL AS EPIDEMIOLOGICAL STUDIES DOCUMENTED THE

18   CONDITIONS OF WORK THAT OCCURRED UNDER CHATTEL

19   SLAVERY AND ALSO CONTINUE PAST IN SOME RESPECTS.

20       Q    DR. HAMMONDS, WHAT EVIDENCE DID YOU REVIEW

21   IN THIS CASE THAT SUPPORTS YOUR OPINION?

22       A    I REVIEWED THE HISTORICAL LITERATURE, I

23   REVIEWED THE EPIDEMIOLOGICAL LITERATURE, AND I ALSO

24   REVIEWED THE DEPOSITIONS THAT -- FROM INMATES AND

25   MEDICAL PROFESSIONALS, AND A GUARD ON THE FARM LINE,

1  AS WELL AS SOME VIDEO FOOTAGE.

2      **Q**    IN YOUR OPINION, IS THE FARM LINE SIMILAR TO

3  FORCED LABOR IN NAZI GERMANY?

4      **A**    IT HAS SOME SIMILARITIES TO FORCED LABOR IN

5  NAZI GERMANY, YES.

6      **Q**    BASED ON YOUR RESEARCH AND WORK, HOW IS THE

7  FARM LINE SIMILAR TO FORCED LABOR IN NAZI GERMANY?

8      **A**    SO THE SPECIFIC WAYS ARE THE FACT THAT THE

9  WORK IS COMPELLED, THAT PEOPLE ARE -- THAT INMATES

10  ARE ASKED -- ARE -- I'M SORRY -- WORK UNDER

11  SURVEILLANCE BY ARMED GUARDS.  THEY HAVE -- AGAIN,

12  THEY HAVE NO CONTROL OVER THEIR WORKING CONDITIONS.

13  IN A GIVEN DAY THEY HAVE TO PRODUCE A QUOTA AND COULD

14  BE SUBJECTED TO PUNISHMENT IF THEY DO NOT MEET THAT

15  QUOTA.  AND AGAIN, THE CONDITIONS UNDER WHICH THEY

16  ARE ABLE OR NOT ABLE TO RECEIVE MEDICAL CARE THAT

17  THEY BELIEVE THAT THEY NEED.

18      **Q**    AND WHAT EVIDENCE SUPPORTS YOUR OPINION?

19      **A**    SO MY OPINION OF WHAT HAPPENED ON -- I'M

20  SORRY.  MY OPINION OF WHAT HAPPENED ON THE FARM LINE?

21      **Q**    OR HOW THE FARM LINE IS SIMILAR TO FORCED

22  LABOR IN NAZI GERMANY.

23      **A**    BECAUSE I SEE THOSE SIMILARITIES IN THE

24  EVIDENCE THAT I JUST MENTIONED AS WELL AS WHAT I KNOW

25  FROM THE HISTORICAL RECORD OF WHAT HAPPENED IN

1 CONCENTRATION CAMPS.

2    **Q**   AND SPECIFICALLY WHAT EVIDENCE IN THE RECORD

3 SUPPORTS YOUR OPINION?

4    **A**   AGAIN, IT'S THE CONDITIONS THAT -- IT IS THE

5 INFORMATION FROM THE DEPOSITIONS THAT I RECEIVED AS

6 WELL AS WITH RESPECT TO THE FARM LINE AND IN -- FOR

7 CONCENTRATION CAMPS, AS I SAID, IT IS IN THE

8 HISTORICAL RECORD.

9    **Q**   AND FROM A HISTORY OF MEDICINE PERSPECTIVE,

10 WHAT CONCLUSIONS DID YOU DRAW FROM HOW LOUISIANA

11 STATE PENITENTIARY'S MEDICAL PROFESSIONALS TREAT

12 INCARCERATED MEN ON THE FARM LINE?

13    **A**   SO THERE IS -- IN THE HISTORY OF MEDICINE,

14 AGAIN, THERE IS VERY LONG AND DETAILED HISTORY OF

15 PHYSICIANS WHO WERE CALLED -- WHO WERE -- HAD

16 RECORDED -- PHYSICIANS WHO WERE CALLED TO ATTEND TO

17 ENSLAVED PEOPLES UNDER CHATTEL SLAVERY.  THERE IS A

18 LONG HISTORY DEMONSTRATING AND DOCUMENTED THAT THEY

19 TENDED OVERALL TO DISMISS THE SYMPTOMS THAT WERE

20 PRESENTED TO THEM BY THE ENSLAVED PEOPLE THAT THEY

21 WERE CALLED TO ATTEND TO.  THEY TENDED TO DOWNPLAY

22 THEIR SYMPTOMS, THEY TENDED -- DID NOT GIVE THEM MUCH

23 BASIS FROM THEIR OWN OBSERVATIONS.

24        THEY ALSO ROUTINELY -- AND THERE IS A LOT OF

25 EVIDENCE OF THIS AS WELL -- ROUTINELY BELIEVED THAT

1    THE ENSLAVED PEOPLE WERE FEIGNING ILLNESS AND

2    FEIGNING ILLNESS IN ORDER TO AVOID WORK.  AND SO THAT

3    IS SOMETHING THAT, AS I SAID, IS A -- THERE'S A LONG

4    HISTORY OF HISTORICAL WORK ON THAT.  WE KNOW ABOUT

5    THAT FROM THE RECORDS OF PHYSICIANS AS WELL AS FROM

6    THE ORAL HISTORIES OF THE ENSLAVED PEOPLES.

7        Q    WHAT EVIDENCE DID YOU REVIEW TO SUPPORT THIS

8    VIEW?

9        A    SO AGAIN, I REVIEWED THE DEPOSITIONS THAT I

10   RECEIVED IN PARTICULAR.  I PAID ATTENTION TO THE

11   KINDS OF ASSESSMENTS THAT I SAW IN THE DEPOSITIONS

12   MADE BY THE MEDICAL PERSONNEL AS WELL AS THE -- MY

13   OTHER WORK AS -- YOU KNOW, AS A HISTORIAN, SO I

14   REVIEWED THIS RECORD AS WELL.

15       Q    IN YOUR OPINION, IS THE BEHAVIOR OF

16   LOUISIANA STATE PENITENTIARY'S MEDICAL PROFESSIONALS

17   COMPARABLE TO THE BEHAVIOR OF MEDICAL PROFESSIONALS

18   DURING CHATTEL SLAVERY OR CONCENTRATION CAMPS IN NAZI

19   GERMANY?

20       A    SO I WOULDN'T NECESSARILY USE THE WORD

21   "COMPARABLE," BUT I WOULD SAY THAT IT IS REMINISCENT

22   OF THE KINDS OF ATTITUDES THAT ARE WELL-DOCUMENTED

23   THAT INDICATE THAT THE PHYSICIANS BROUGHT TO --

24   AGAIN, TO TEND TO THE MEDICAL CONDITIONS OF ENSLAVED

25   PEOPLES ROUTINELY DISCOUNTED THE SLAVES -- THE

1    ENSLAVED PEOPLE'S EXPERIENCE.  THAT IS ALSO TRUE

2    UNDER -- IN CONCENTRATION CAMPS UNDER WHAT WE REFER

3    TO AS -- HISTORIANS REFER TO AS NAZI MEDICINE.

4         AGAIN, THE GOAL OF THE MEDICAL TREATMENT WAS

5    NOT -- MEDICAL ATTENTION, I SHOULD SAY -- WAS NOT TO

6    ATTEND TO THE HEALTH NEEDS OF THE INDIVIDUAL BUT

7    RATHER ONLY THERE TO SUPPORT AND ENSURE THAT THESE

8    PEOPLE COULD CONTINUE TO WORK UNDER THE CONDITIONS

9    THAT THEY WERE FORCED TO WORK UNDER.

10    **Q**   DR. HAMMONDS, WHERE IS LOUISIANA STATE

11    PENITENTIARY LOCATED?

12    **A**   IT'S MY UNDERSTANDING IT'S LOCATED IN -- ON

13    TOP OF A FORMER PLANTATION IN ANGOLA.

14    **Q**   IN YOUR OPINION, IS THE FACT THAT LOUISIANA

15    STATE PENITENTIARY SITS ATOP A FORMER PLANTATION SITE

16    SIGNIFICANT?

17    **A**   IT'S SIGNIFICANT BECAUSE OF THE FACT THAT

18    THE VERY IDEA OF PLANTATION LABOR IS SOMETHING THAT

19    GENERATES, IN -- IN MOST PEOPLE'S VIEWS, IS A PLACE

20    WHERE THERE WAS COMPELLED LABOR, MENIAL LABOR, AND A

21    SITE OF EXPLOITATION.

22    **Q**   IN YOUR OPINION, IS THE FACT THAT MEN

23    ASSIGNED TO THE FARM LINE ARE COMPELLED TO PICK CROPS

24    ON THE GROUNDS OF A FORMER PLANTATION SITE

25    SIGNIFICANT?

1    **A**    IT WOULD CERTAINLY -- IT WOULD CERTAINLY BE

2  SIGNIFICANT BECAUSE, AGAIN, IF THE WORK IS SIMILAR TO

3  -- THE WORK IS -- THE WORK ON A PLANTATION IS

4  UNDERSTOOD BY MOST PEOPLE IN PARTICULAR WAYS AS BEING

5  MENIAL WORK, AS BEING COMPELLED -- WORK THAT IS

6  COMPELLED UNDER THREAT OF VIOLENCE.  AND THOSE ARE

7  COMMON ASSERTIONS ABOUT WHAT PLANTATION WORK WAS

8  LIKE.  AND THERE IS A STIGMA ASSOCIATED WITH THAT

9  KIND OF WORK.

10         SO THE WAYS IN WHICH ANGOLA HAS BEEN

11  REFERRED TO BY SOME COMMENTS IN THE DEPOSITIONS AS --

12  AND SOME OF THE INMATES REFER TO IT AS A SITE OF --

13  THAT THEY FELT LIKE SLAVES.  THERE WERE OTHER

14  COMMENTS FROM A GUARD WHO NOTED THAT IT WAS LIKE

15  SLAVERY.  THAT NOTION THAT -- THAT SENSE THAT IT WAS

16  LIKE SLAVERY I THINK IS SOMETHING THAT -- CERTAINLY

17  FOR PEOPLE WHO ARE DESCENDANTS OF ENSLAVED PEOPLES,

18  THAT HAS A CERTAIN KIND OF SIGNIFICANCE.

19    **Q**    WHAT IS YOUR UNDERSTANDING OF THE

20  COMPENSATION STRUCTURE OF THE FARM LINE?

21    **A**    MY UNDERSTANDING IS, IT'S A FAIRLY

22  NEGLIGIBLE PAY, NOT ENOUGH FOR SOMEONE TO BE ABLE TO

23  TAKE CARE OF THEIR PERSONAL NEEDS.

24    **Q**    IN YOUR OPINION, IS THE FACT THAT MEN

25  ASSIGNED TO THE FARM LINE RECEIVE NEGLIGIBLE PAY

1    SIGNIFICANT?

2        **A**    AGAIN, NEGLIGIBLE PAY FOR ANY KIND OF WORK

3    IS CERTAINLY UNDERSTOOD TO BE A SIGN THAT THE WORK IS

4    NOT VALUED AND THE PERSON DOING THE WORK IS NOT

5    VALUED.

6        **Q**    IN YOUR OPINION, IS THE FACT THAT THERE ARE

7    ARMED GUARDS ON THE FARM LINE SIGNIFICANT?

8        **A**    I WOULD SAY THE SIGNIFICANCE OF THE ARMED

9    GUARDS IS THAT THERE IS THE CONSTANT AND PERSISTENT

10   THREAT OF VIOLENCE.

11       **Q**    FROM THE PERSPECTIVE OF AFRICAN-AMERICAN

12   STUDIES, WHAT IS THE --

13           **THE REPORTER:**  WHAT IS THE WHAT?

14           **MR. McGREGOR:**  WHAT IS THE QUOTA SYSTEM.

15   **BY MR. McGREGOR:**

16       **Q**    I'M SORRY.  I'M CLEANING IT UP FOR THE COURT

17   REPORTER.  QUOTA SYSTEM.

18       **A**    SO A QUOTA SYSTEM IS ONE THAT -- YOU KNOW,

19   PARTICULARLY WITH RESPECT TO AGRICULTURAL WORK, IT

20   MEANS THAT PEOPLE HAVE TO PRODUCE A CERTAIN AMOUNT

21   OF -- HARVEST A CERTAIN AMOUNT OF VEGETABLES, FOR

22   EXAMPLE, BY THE END OF A PARTICULAR PERIOD OF TIME.

23   AND IF THEY DO NOT DO SO, THEY CAN BE SUBJECTED TO

24   SOME SORT OF PUNISHMENT.

25       **Q**    DO YOU UNDERSTAND PEOPLE ON THE FARM LINE

1   ARE SUBJECT TO STRICT QUOTA REQUIREMENTS?

2       **A**    THAT IS WHAT I UNDERSTAND.

3       **Q**    IN YOUR OPINION, IS THE FACT THAT ANGOLA

4   USES A QUOTA REQUIREMENT SIGNIFICANT?

5       **A**    IT -- IT IS SIGNIFICANT TO THE EXTENT THAT

6   IT -- IT ADDS TO -- IT WOULD ADD TO THE SENSE OF NOT

7   HAVING CONTROL OVER ONE'S WORK.

8       **Q**    HAVE SIMILAR PRACTICES -- THE PROVISION OF

9   MINIMAL OR NO COMPENSATION FOR LABORERS, SUPERVISION

10  BY ARMED GUARDS OR USE OF A QUOTA SYSTEM -- BEEN USED

11  IN THE LABOR REGIMES WE DISCUSSED EARLIER?

12      **A**    YES.

13      **Q**    DID THESE PRACTICES CONTRIBUTE TO THE

14  INDIVIDUALS SUBJECT TO THOSE LABOR REGIMES BEING

15  DEPRIVED OF THEIR DIGNITY?

16      **A**    FROM THE ORAL HISTORIES THAT WE HAVE OF

17  ENSLAVED PEOPLES -- FROM ENSLAVED PEOPLES AND ALSO

18  ORAL HISTORIES FROM PEOPLE WHO WERE IN CONCENTRATION

19  CAMPS, THEY INDICATE THAT HAVING TO WORK UNDER A

20  QUOTA SYSTEM IS SIGNIFICANT PSYCHOLOGICAL PRESSURE

21  FOR THEM.

22      **Q**    AND WHAT ABOUT THE FACT OF -- STRIKE THAT.

23          WHAT ABOUT THE FACT OF HAVING TO WORK UNDER

24  ARMED GUARDS?

25      **A**    I WOULD SAY THAT HAVING TO WORK UNDER ARMED

1  GUARDS IS PROBABLY -- IS ONE OF THE MORE SIGNIFICANT

2  ASPECTS OF COMPULSORY WORK THAT IS RECORDED IN THE

3  HISTORICAL RECORD THAT PRODUCES A GREAT DEAL OF

4  STRESS, FEAR, AND ANXIETY.

5     Q    AND DO THESE PRACTICES CONTRIBUTED -- STRIKE

6  THAT.

7        DO THESE PRACTICES CONTRIBUTE TO THE

8  INDIVIDUALS SUBJECT TO THOSE LABOR REGIMES

9  EXPERIENCING PSYCHOLOGICAL HARM?

10    A    YES.  THAT IS THE INTERPRETATION OF

11 HISTORIANS ABOUT THOSE.

12    Q    FROM AN EPIDEMIOLOGICAL PERSPECTIVE, WHAT

13 HEALTH OUTCOMES WOULD YOU EXPECT TO SEE IN MEN

14 ASSIGNED TO THE FARM LINE?

15    A    SO WHAT WE WOULD EXPECT TO SEE ARE MEN AT

16 THE FARM LINE EXPERIENCING ANXIETY, FEAR, PRESSURE TO

17 WORK UNDER CONDITIONS THAT THEY CANNOT CONTROL, AND

18 TO, YOU KNOW -- THERE COULD BE OTHER KINDS OF MENTAL

19 HEALTH EFFECTS.  BUT THOSE ARE THE ONES THAT HAVE

20 BEEN NOTED IN THE LITERATURE.

21    Q    WHAT EPIDEMIOLOGICAL RESEARCH SUPPORTS THIS

22 CONCLUSION?

23    A    SO THIS IS THE -- THIS IS THE -- LOOKING AT

24 -- THIS IS THE ANALYSIS OF RESEARCHERS WHO HAVE

25 LOOKED AT THE HEALTH OUTCOMES OF PEOPLES WHO HAVE

1  BEEN SUBJECTED TO DIFFICULT WORKING CONDITIONS, AND

2  THAT WHAT WE'VE SEEN THERE IS THAT THEY PRODUCE

3  NEGATIVE HEALTH OUTCOMES, INCLUDING MENTAL HEALTH

4  OUTCOMES.

5     Q    AND WHAT OTHER EVIDENCE DID YOU REVIEW THAT

6  SUPPORTS THIS CONCLUSION?

7     A    THE -- I'M SORRY.  THE OTHER EVIDENCE?  I

8  LOOKED AT THE EPIDEMIOLOGICAL LITERATURE, I LOOKED AT

9  THE HISTORICAL LITERATURE, THE COMMENTS, AND

10 CERTAINLY COMMENTS IN THE DEPOSITIONS.

11    Q    AND FROM THE PERSPECTIVE OF AFRICAN-AMERICAN

12 STUDIES, HAVE YOU SEEN ANY EVIDENCE THAT MEN ASSIGNED

13 TO THE FARM LINE MAY BE SUBJECTED TO CONDITIONS

14 SIMILAR TO THOSE THAT PEOPLE EXPERIENCED DURING

15 CHATTEL SLAVERY?

16    A    IT IS CERTAINLY IN THE COMMENTS THAT I READ

17 THAT -- AS I NOTED, THE CONDITIONS UNDER CHATTEL

18 SLAVERY HAVE TO DO WITH THE WORK BEING COMPELLED, THE

19 PERSISTENT AND ROUTINE OF BEING OVER SOME PERSISTENT

20 THREAT OF VIOLENCE AND THE INABILITY TO CONTROL ONE'S

21 WORK SEEM -- APPEAR TO ME, AND FROM WHAT I READ IN

22 THE DEPOSITIONS, TO BE SIMILAR TO THOSE KINDS OF

23 CONDITIONS.  AND (INAUDIBLE) -- EXPRESSIONS OF

24 PSYCHOLOGICAL HARM.

25    Q    AND BASED ON YOUR RESEARCH AND EXPERTISE,

1  HAVE YOU SEEN ANY EVIDENCE THAT MEN ASSIGNED TO THE

2  FARM LINE MAY BE SUBJECT TO CONDITIONS SIMILAR TO

3  THOSE THAT MEN EXPERIENCED DURING CONCENTRATION CAMPS

4  IN NAZI GERMANY?

5      A    CERTAINLY THE HISTORICAL RECORD SHOWS THAT

6  PEOPLE WHO WORKED UNDER THE CONDITIONS THAT EXISTED,

7  THE REPORTS ARE THAT THEY EXPERIENCED SEVERE

8  PSYCHOLOGICAL HARM UNDER THOSE -- HAVING WORKED UNDER

9  THOSE CONDITIONS IN CONCENTRATION CAMPS.

10     Q    AND IN THE HISTORICAL EXAMPLES OF REGIMES

11 YOU PROVIDED, WHO WOULD YOU EXPECT TO EXPERIENCE

12 ADVERSE HEALTH OUTCOMES -- THE ADVERSE HEALTH

13 OUTCOMES YOU IDENTIFIED?

14     A    SO FROM THE RECORD, WE KNOW THAT THE

15 SPECIFIC KINDS OF WORK CONDITIONS THAT I DESCRIBED

16 WOULD PRODUCE PSYCHOLOGICAL DISTRESS FOR ANYBODY

17 WORKING UNDER THOSE CONDITIONS.

18     Q    AND FROM AN EPIDEMIOLOGICAL PERSPECTIVE, WHO

19 WOULD YOU EXPECT TO EXPERIENCE ADVERSE HARM -- STRIKE

20 THAT.

21         FROM AN EPIDEMIOLOGICAL PERSPECTIVE, WHO

22 WOULD YOU EXPECT TO EXPERIENCE THE ADVERSE HEALTH

23 OUTCOMES YOU IDENTIFIED DUE TO THE OPERATION OF THE

24 FARM LINE?

25     A    ANYBODY WHO IS COMPELLED TO WORK THERE.

1    **Q**    AND I JUST WANT TO CLARIFY ONE ITEM.  YOU

2   TESTIFIED EARLIER TO YOUR UNDERSTANDING OF THE STRICT

3   QUOTA SYSTEM AT ANGOLA.  WERE YOU REFERRING TO THE

4   REQUIREMENTS THAT INMATES WORK WITH REASONABLE SPEED

5   AND EFFICIENCY OR ELSE FACE DISCIPLINARY SANCTIONS?

6    **A**    I WAS REFERRING TO THE FACT THAT -- THE

7   COMMENTS INDICATED TO ME THAT THE MEN HAD TO DO A

8   CERTAIN AMOUNT OF WORK IN A PARTICULAR KIND OF WAY

9   OVER THE TIME THAT THEY WERE SUPPOSED TO BE WORKING.

10   THAT'S WHAT I WAS REFERRING TO.

11    **Q**    THANK YOU, DR. HAMMONDS.

12        **THE COURT:**  ALL RIGHT.

13        **MS. POURCIAU:**  YOUR HONOR --

14        **THE COURT:**  CROSS-EXAMINATION.

15            YES.

16        **MS. POURCIAU:**  -- I THINK THAT THE PLAINTIFF

17   IS HERE, AND WE WANTED TO SEE IF IT WOULD BE POSSIBLE

18   FOR HIM TO BE BROUGHT TO COUNSEL TABLE.  HE WASN'T

19   HERE WHEN WE GOT MR. JACKSON.

20        **THE COURT:**  THAT'S A REASONABLE REQUEST.

21   LET'S GO ON AND COMPLETE THE TESTIMONY OF THIS

22   WITNESS AND THEN I'LL ADDRESS THAT.  OKAY?

23        **MS. POURCIAU:**  THANK YOU, YOUR HONOR.

24        **THE COURT:**  THANK YOU.

25                **CROSS-EXAMINATION**

1  BY MR. BLANCHFIELD:

2      **Q**    GOOD MORNING, DR. HAMMONDS.  GOOD TO SEE YOU

3  AGAIN.

4      **A**    GOOD MORNING.

5      **Q**    YOU ARE AWARE THAT LOUISIANA STATE PRISON IS

6  A MAXIMUM SECURITY PRISON?

7      **A**    YES.

8      **Q**    AND ARE YOU AWARE THAT EVERYONE AT THE

9  PRISON, ALL 4,000 INMATES, ARE ASSIGNED A JOB?

10     **A**    YES.

11     **Q**    AND THAT IF THEY -- AND THEY ARE REQUIRED TO

12 WORK IN THAT JOB?

13     **A**    YES.

14     **Q**    AND IF THEY DO NOT WORK IN THAT JOB, THEY

15 CAN EXPOSE THEMSELVES TO DISCIPLINARY SANCTIONS.  DO

16 YOU UNDERSTAND THAT?

17     **A**    YES.

18     **Q**    WOULD YOU NOT EXPECT THAT ANYONE WHO HAS

19 BEEN SENTENCED TO A MAXIMUM SECURITY PRISON FOR THE

20 CRIMES THAT THEY HAVE COMMITTED AGAINST SOCIETY WOULD

21 EXPERIENCE SOME LEVEL OF ANXIETY?

22     **A**    YES.

23     **Q**    AND IN YOUR OPINION -- I JUST HEARD YOU

24 TESTIFY THAT THEY WOULD BE SUBJECT TO SOME LEVEL OF

25 ANXIETY OR EXPERIENCE SOME LEVEL OF ANXIETY IF THEY

1  ARE COMPELLED TO WORK.  THAT'S CORRECT?

2      **A**    YES.

3      **Q**    REGARDLESS OF WHAT THAT JOB MAY BE?

4      **A**    I THINK -- YES.

5      **Q**    YOU'RE NOT FAMILIAR -- YOU'VE NEVER BEEN

6  THERE.  YOU'RE NOT FAMILIAR WITH SOME OF THE,

7  ARGUABLY, MORE DIFFICULT JOBS THAN HARVESTING

8  CUCUMBERS AT LSP?

9      **A**    I AM NOT AWARE OF THE OTHER JOBS.

10     **Q**    ARE YOU AWARE THAT -- YOU ARE AWARE THAT THE

11 WORK ON THE FARM LINE OCCURS OUTSIDE THE SECURED

12 PERIMETER OF THE FACILITY?

13     **A**    I DO UNDERSTAND THAT.

14     **Q**    AND THAT THERE IS OTHER FUNCTIONS THAT ARE

15 DONE OUTSIDE WHAT WE CALL THE SECURED PERIMETER OF

16 THE FACILITY?

17     **A**    YES, I UNDERSTAND THAT.

18     **Q**    AND ARE YOU -- DO YOU UNDERSTAND THAT AS A

19 MATTER OF SECURITY, WITHOUT A PERIMETER SECURING

20 THEM, LSP UTILIZES GUARDS TO PROVIDE SECURITY FOR

21 THAT REASON?  ARE YOU AWARE OF THAT?

22     **A**    I DON'T KNOW ALL OF THE DETAILS OF THE

23 SUPERVISION, BUT --

24     **Q**    OKAY.  NOW, I KNOW THAT YOU'VE REVIEWED SOME

25 TESTIMONY IN THIS MATTER, INCLUDING TESTIMONY OF

1    INDIVIDUALS FROM THE DEPARTMENT OF CORRECTION WHO ARE

2    OUT THERE ON THE FARM LINE ON A DAY-TO-DAY BASIS.  IS

3    THAT CORRECT?

4         **A**    YES.

5         **Q**    AND ISN'T IT TRUE THAT THE TESTIMONY IS

6    ACTUALLY THAT THERE ARE NO QUOTAS WITH RESPECT TO THE

7    HARVESTING OF PRODUCE ON THE FARM LINES?

8         **A**    THAT WAS NOT MY UNDERSTANDING.

9         **Q**    ISN'T IT TRUE THAT THE TESTIMONY WAS THAT

10   THE INMATES WORKING ON THE FARM LINE CAN JUST WALK

11   OVER AT ANY TIME THEY WANT AND TAKE A WATER BREAK?

12        **A**    THAT WAS NOT MY UNDERSTANDING.

13        **Q**    ISN'T IT TRUE THAT A LOT OF THE TESTIMONY IS

14   THAT THESE INDIVIDUALS ARE NOT PUSHED AT ALL, THAT

15   THEY'RE NOT REQUIRED TO WORK AT A CERTAIN PACE, THAT

16   THEY ESSENTIALLY WORK AT THEIR OWN PACE?  ISN'T THAT

17   THE ACTUAL TESTIMONY OF THE INDIVIDUALS FROM THE

18   DEPARTMENT OF CORRECTIONS?

19        **A**    THAT WAS NOT MY UNDERSTANDING.

20        **Q**    AND ISN'T THE TESTIMONY CLEAR IN THIS RECORD

21   THAT ANY INMATE WHILE WORKING ON THE FARM LINE AT ANY

22   TIME CAN DECLARE HIMSELF AN EMERGENCY AND OBTAIN

23   MEDICAL CARE?

24        **A**    THAT WAS NOT MY UNDERSTANDING.

25        **Q**    AND WHERE DID YOU GET THAT UNDERSTANDING

1  FROM?

2      **A**   I'M SORRY.  HOW DID I GET WHICH -- I'M

3  SORRY.  I'M --

4      **Q**   I BELIEVE THE TESTIMONY IS THAT ANY -- ANY

5  INMATE CAN DECLARE HIMSELF AN EMERGENCY AT ANY TIME

6  AND OBTAIN MEDICAL TREATMENT.  YOU'RE TELLING ME THAT

7  YOUR UNDERSTANDING IS DIFFERENT FROM THAT.  WHERE DID

8  YOU GET THAT UNDERSTANDING?

9      **A**   SO MY UNDERSTANDING IN ONE OF THE

10  DEPOSITIONS THAT I WAS -- THAT I READ SUGGESTED THAT

11  THE INMATE WAS -- ASKED FOR MEDICAL ATTENTION.  THAT

12  WAS REPORTED TO THE GUARDS.  THAT WAS REPORTED TO --

13  APPARENTLY THAT WAS REPORTED TO THE MEDICAL

14  PERSONNEL, BUT THAT PERSON DID NOT RECEIVE THAT

15  ATTENTION.

16      **Q**   AND THAT'S WHERE YOU GOT THAT UNDERSTANDING?

17      **A**   YES.

18      **Q**   YOU TOLD ME WHEN WE MET IN YOUR DEPOSITION

19  THAT IF THE FARM LINE WAS OCCURRING ON A PLACE THAT

20  WAS NOT A FORMER PLANTATION, THAT THAT WOULD NOT

21  CHANGE YOUR OPINION.  IS THAT CORRECT?

22      **A**   YES, THAT IS CORRECT.

23      **Q**   IF SOME OF THE WORKERS RECEIVED AN

24  ADDITIONAL PAY, WOULD THAT IMPACT YOUR OPINION?

25      **A**   IT WOULD IMPACT MY OPINION BASED ON, YOU

1  KNOW, WHAT THAT -- WHAT LEVEL OF PAY THAT WAS AND HOW

2  PEOPLE UNDERSTOOD THAT.

3      Q    ARE YOU AWARE OF ANY REQUIREMENT IN

4  LOUISIANA OR ANY OTHER STATE, FOR THAT MATTER, THAT

5  REQUIRES PAYMENT OF INMATES FOR LABOR WHILE THEY ARE

6  INCARCERATED?

7      A    I AM NOT AWARE OF THAT.

8      Q    ARE YOU AWARE OF TESTIMONY FROM DEPARTMENT

9  OF CORRECTION GUARDS THAT WHAT OCCURS ON THE FARM

10 LINE IS NOTHING AT ALL COMPARABLE TO CHATTEL SLAVERY?

11     A    I AM AWARE THAT THERE WERE COMMENTS TO THAT

12 EXTENT, YES.

13     Q    AND YOU DIDN'T CITE THOSE COMMENTS IN YOUR

14 REPORT, DID YOU?

15     A    I DID NOT.

16     Q    THANK YOU.

17         MR. BLANCHFIELD:  THAT'S ALL I HAVE, JUDGE.

18         THE COURT:  ALL RIGHT.  REDIRECT?

19                    REDIRECT EXAMINATION

20 BY MR. McGREGOR:

21     Q    DR. HAMMONDS, DO YOU RECALL TESTIFYING

22 DURING YOUR DEPOSITION THAT THE FACT THAT LOUISIANA

23 STATE PENITENTIARY IS ATOP A FORMER SLAVE PLANTATION

24 IS SIGNIFICANT TO YOUR OPINION?

25     A    YES.

1      **Q**    AND THAT OPINION HAS NOT CHANGED.  CORRECT?

2      **A**    IT HAS NOT.

3      **Q**    DR. HAMMONDS, SOME LEVEL OF ANXIETY FOR ALL

4   COMPELS -- STRIKE THAT.

5            DR. HAMMONDS, YOU ARE NOT TESTIFYING TODAY

6   ABOUT THE -- STRIKE THAT.

7            DO YOU RECALL READING THE DECLARATIONS FROM

8   SEVERAL INCARCERATED MEN IN REGARD TO THEIR

9   EXPERIENCES ON THE FARM LINE?

10     **A**    YES.

11     **Q**    AND DID THOSE DECLARATIONS INFORM YOUR

12  CONCLUSIONS IN YOUR EXPERT -- YOUR EXPERT REPORT?

13     **A**    YES, THEY DID.

14     **Q**    AND DID THOSE DECLARATIONS ALSO INFORM YOUR

15  TESTIMONY TODAY?

16     **A**    YES.

17     **Q**    DR. HAMMONDS, WITH REGARD TO OTHER JOBS THAT

18  POTENTIALLY ARE AVAILABLE AT ANGOLA, COULD YOU PLEASE

19  SPEAK TO WHETHER OR NOT THOSE HISTORICAL CONDITIONS

20  ARE RELATED TO CHATTEL SLAVERY OR THE CONDITIONS THAT

21  MAY HAVE BEEN PRESENT IN CONCENTRATION CAMPS IN NAZI

22  GERMANY?

23     **A**    SO WHAT I CAN SPEAK TO IS THAT, FIRST,

24  CONCENTRATION CAMPS IN NAZI GERMANY, THEY WERE

25  DIFFERENT KINDS OF CAMPS.  THERE WAS DIFFERENT KINDS

1  OF LABOR THAT WERE REQUIRED IN THE DIFFERENT CAMPS

2  AND DIFFERENT KINDS OF WORK THAT WAS ASKED -- WAS

3  COMPELLED BY THE STATE.  AND THE ISSUE IS THAT THE

4  CONDITIONS OF WORK, HOWEVER, WERE SIMILAR IN THE

5  FOLLOWING WAYS IN THAT IT WAS COMPELLED, IT WAS UNDER

6  THREAT OF VIOLENCE BY ARMED GUARDS.  IN MANY

7  INSTANCES MEDICAL PERSONNEL WERE INVOLVED IN USING

8  THE PEOPLE WHO WERE BROUGHT TO CONCENTRATION CAMPS

9  FOR MEDICAL EXPERIMENTATION.  AGAIN, THE PEOPLE

10  WORKING IN THOSE CAMPS HAD NO CONTROL OVER THE

11  WORKING CONDITIONS THAT THEY ARE SUBJECTED TO.

12       SIMILARLY, IN CHATTEL SLAVERY THERE ARE

13  DIFFERENT KINDS OF WORK OTHER THAN AGRICULTURAL WORK,

14  BUT I WAS PAYING ATTENTION TO THE CONDITIONS UNDER

15  CHATTEL SLAVERY OF AGRICULTURAL WORK.  AND THEY

16  SEEMED, FROM MY INTERPRETATION OF THE DATA, TO BE

17  ABOUT THE -- AGAIN, THE CONDITIONS OF WORK, THE FACT

18  THAT THE ENSLAVED PEOPLES COULD NOT DETERMINE HOW

19  MUCH WORK THEY WOULD DO IN A GIVEN DAY, WHAT KIND OF

20  WORK THEY WOULD DO IN A GIVEN DAY, HOW MANY HOURS

21  THEY WOULD WORK, AND THE OTHER ISSUES THAT I'VE

22  COMMENTED ON.

23    Q    SO IS FORCED AGRICULTURAL LABOR HISTORICALLY

24  MORE SIGNIFICANT IN THE UNITED STATES THAN OTHER

25  TYPES OF FORCED LABOR THAT --

```
 1        THE COURT:  MR. McGREGOR, LET ME STOP THERE.
 2  I THINK THAT'S GOING WELL BEYOND THE DIRECT
 3  EXAMINATION.
 4        MR. McGREGOR:  UNDERSTOOD.
 5        THE COURT:  EXCUSE ME.  THE CROSS-
 6  EXAMINATION.  SO LET'S TRY TO CONFINE THE QUESTIONS
 7  TO THOSE ISSUES THAT WERE RAISED ON CROSS.  OKAY?
 8  BY MR. McGREGOR:
 9     Q    IS THE FACT THAT ANGOLA SITS ATOP A FORMER
10  PLANTATION RELEVANT TO YOUR OPINION?
11     A    YES.
12        THE COURT:  I THINK WE'VE ALREADY COVERED
13  THAT, HAVEN'T WE?
14  BY MR. McGREGOR:
15     Q    HOW?
16        THE COURT:  WAIT, WAIT.  MR. McGREGOR, I
17  THINK WE'VE COVERED THAT.  I THINK THAT'S ALREADY
18  BEEN ASKED OF THE WITNESS AND I THINK SHE'S
19  ADEQUATELY ADDRESSED THAT.
20  BY MR. McGREGOR:
21     Q    AND THEN -- OKAY.  THANK YOU SO MUCH FOR
22  YOUR TIME, DR. HAMMONDS.
23        THE COURT:  THANK YOU, MR. McGREGOR.
24           DR. HAMMONDS, I HAVE NO QUESTIONS FOR
25  YOU, MA'AM.  THANK YOU VERY MUCH FOR JOINING US.
```

1  SORRY ABOUT THOSE TECHNICAL ISSUES THAT WE

2  EXPERIENCED YESTERDAY, BUT WE APPRECIATE YOUR -- WE

3  APPRECIATE YOU MAKING YOURSELF AVAILABLE TODAY.

4  OKAY?

5          **THE WITNESS:**  THANK YOU.

6          **THE COURT:**  THANK YOU.  YOU ARE NOW EXCUSED.

7  AND WE CAN GO ON AND CLOSE THE ZOOM AT THIS TIME.

8              ALL RIGHT.  SO IS THERE A REQUEST FROM

9  COUNSEL FOR THE PLAINTIFF?

10         **MS. POURCIAU:**  YES.  WE WOULD REQUEST THAT

11  MR. JACKSON BE BROUGHT TO COUNSEL TABLE.

12         **THE COURT:**  YES, HE MAY.  HE'S CERTAINLY A

13  PARTY TO THIS CASE.  HE IS ENTITLED TO BE PRESENT.

14             DO WE KNOW IF THE CORRECTIONAL OFFICERS

15  ARE PRESENT AND ABLE TO ESCORT HIM TO THE COURTROOM

16  AT THIS TIME?  LET'S GO ON AND ALLOW THE MARSHAL TO

17  CALL.

18             ARE BOTH PLAINTIFFS HERE?

19         **MS. POURCIAU:**  ONE IS A PLAINTIFF.  THE

20  OTHER PERSON IS A PUTATIVE CLASS MEMBER, SO --

21         **THE COURT:**  SO ONLY THE PLAINTIFF CAN JOIN

22  US AT THIS TIME.  GLEN, ONLY THE PLAINTIFF, OKAY?

23  MR. JACKSON.

24         **MS. POURCIAU:**  YOUR HONOR, WE'D ASK THAT MR.

25  JACKSON HAVE ONE HAND UNSHACKLED.

1          **THE COURT:**  WAIT JUST A MOMENT.

2               YOU CAN ESCORT HIM IN AT THIS TIME.

3    AND HE IS ENTITLED TO BE SEATED AT COUNSEL TABLE, OF

4    COURSE.

5               ALL RIGHT.  SO, MS. POURCIAU --

6          **MS. POURCIAU:**  POURCIAU.

7          **THE COURT:**  POURCIAU, YES.  WHAT IS YOUR

8    REQUEST NOW?

9          **MS. POURCIAU:**  WE'D REQUEST THAT MR. JACKSON

10   CAN HAVE ONE HAND UNSHACKLED TO BE ABLE TO TAKE NOTES

11   AND DRINK WATER.

12         **THE COURT:**  I WILL GRANT THAT REQUEST, BUT

13   THE -- HE WILL HAVE TO BE SHACKLED TO THE CHAIR.

14   OKAY?  ONE HAND SHACKLED TO THE CHAIR -- THE ARM OF

15   THE CHAIR.  THE OTHER WILL BE UNSHACKLED.

16                    **(OFF THE RECORD)**

17         **THE COURT:**  ALL RIGHT.  OKAY.  WE'RE ALL

18   SET.  I THINK THE MARSHALS ARE SATISFIED WITH THE

19   CONDITIONS OF RESTRAINT, SO WE'LL NEED ONE OF THE

20   CORRECTIONAL OFFICERS TO BE SEATED CLOSER TO --

21   COUNSEL, IF YOU CAN MOVE OVER JUST ONE SEAT, I

22   THINK -- OR AT COUNSEL TABLE, IF YOU'D LIKE.

23               WE HAVE PRETTY THICK SECURITY POLICIES

24   HERE WHEN INCARCERATED PERSONS ARE BROUGHT TO THE

25   COURTROOM, SO I APPRECIATE EVERYONE'S COOPERATION.

1          ALL RIGHT.  COUNSEL, YOU MAY CALL YOUR

2   NEXT WITNESS.

3          **MS. WRIGHT:**  PLAINTIFFS CALL DR. SUSI

4   VASSALLO.

5          **THE COURT:**  BEFORE WE SWEAR THE NEXT

6   WITNESS, LET ME JUST CONFIRM ON THE RECORD THAT WITH

7   RESPECT TO THE HEARING CONDUCTED YESTERDAY ON THE

8   APPLICATION FOR THE TEMPORARY RESTRAINING ORDER, THAT

9   NEITHER SIDE HAVE ANY ADDITIONAL EVIDENCE TO OFFER.

10  CORRECT?  I BELIEVE WE ESTABLISHED THAT AT THE BENCH

11  CONFERENCE, BUT IF YOU WOULD SIMPLY ESTABLISH THAT ON

12  THE RECORD, GENTLEMEN.

13         **MR. BENJAMIN:**  THAT'S CORRECT FROM

14  PLAINTIFFS.

15         **MR. BLANCHFIELD:**  THAT'S CORRECT FROM THE

16  DEFENDANTS, YOUR HONOR.

17         **THE COURT:**  THANK YOU.

18          ALL RIGHT.  LET'S GO ON AND ADMINISTER

19  THE OATH TO THE WITNESS.

20         **(WHEREUPON, SUSI VASSALLO, BEING DULY SWORN,**

21  **TESTIFIED AS FOLLOWS.)**

22         **THE WITNESS:**  GOOD MORNING, YOUR HONOR.

23         **THE COURT:**  GOOD MORNING, DOCTOR.

24         **THE COURTROOM DEPUTY:**  CLEARLY STATE AND

25  SPELL YOUR NAME FOR THE RECORD.

1    **THE WITNESS:** SUSI VASSALLO. V, AS IN

2   VICTOR, A-S-S-A-L-L-O. FIRST NAME IS SUSI. IT'S

3   SPELLED S-U-S-I.

4    **THE COURT:** THANK YOU.

5    YOU MAY PROCEED.

6    **MS. WRIGHT:** GOOD MORNING. LYDIA WRIGHT FOR

7   THE PLAINTIFFS.

8    YOUR HONOR, MAY I APPROACH THE BENCH TO

9   DELIVER A BOOK OF EXHIBITS?

10   **THE COURT:** YES. YOU MAY HAND IT TO MY

11  COURTROOM DEPUTY.

12   **MS. WRIGHT:** THANK YOU.

13   **VOIR DIRE**

14  BY MS. WRIGHT:

15   **Q** GOOD MORNING, DR. VASSALLO.

16   **A** GOOD MORNING.

17   **Q** NOW, DR. VASSALLO, DEFENDANTS HAVE ALREADY

18  STIPULATED IN THIS CASE AS TO YOUR EXPERTISE IN

19  EMERGENCY MEDICINE, MEDICAL TOXICOLOGY AND

20  CORRECTIONAL MEDICINE, BUT LET'S TALK ABOUT YOUR

21  EXPERTISE IN THERMOREGULATION.

22   WITHIN THE FIELD OF MEDICAL TOXICOLOGY YOU

23  HAVE A FOCUS ON THERMOREGULATION. IS THAT CORRECT?

24   **A** IT IS.

25   **Q** WHAT IS THERMOREGULATION?

1    **A**    THERMOREGULATION IS THE PHYSIOLOGICAL

2  PROCESS BY WHICH THE BODY MAINTAINS A TEMPERATURE OF

3  APPROXIMATELY 98.6, WITHIN A DEGREE OR SO OF THAT

4  TEMPERATURE.

5    **Q**    AND WHY IS THERMOREGULATION A FOCUS WITHIN

6  TOXICOLOGY?

7    **A**    THE REASON IS THAT MANY PROCESSES AFFECT

8  THERMOREGULATION.  FOR EXAMPLE, WITHDRAWAL FROM

9  CERTAIN DRUGS CAN CAUSE FEVER AND ALTERATION OF

10  THERMOREGULATION.  THERE ARE MANY XENOBIOTICS, WHICH

11  WE USUALLY CALL SUBSTANCES, WHICH CAN ALSO AFFECT

12  THERMOREGULATION AND CAN CAUSE ILLNESS.

13    **Q**    DR. VASSALLO, DO YOU HAVE PARTICULAR

14  EXPERTISE ON THE NATURE, CAUSES, TREATMENT, RARITY

15  AND SEVERITY OF HEAT-RELATED ILLNESS?

16    **A**    I DO.

17    **Q**    AND THE FIFTH CIRCUIT IN *GATES* SAID THAT YOU

18  HAVE, QUOTE, LECTURED EXTENSIVELY ON THERMOREGULATION

19  AND HYPERTHERMIA, OR HEAT ILLNESS, AND THAT YOU HAVE

20  AUTHORED THE "THERMOREGULATORY PRINCIPLES" CHAPTER OF

21  GOLDFRANK'S *TOXICOLOGIC EMERGENCIES*, A TEXTBOOK ON

22  MEDICAL TOXICOLOGY.  DID THE FIFTH CIRCUIT GET THAT

23  RIGHT?

24    **A**    YES.

25    **Q**    AND IN *COLE*, THE SOUTHERN DISTRICT OF TEXAS

1  WROTE THAT THE COURT HAS NO BASIS UPON WHICH TO

2  QUESTION DR. VASSALLO'S CHOICE OF 88 DEGREES

3  FAHRENHEIT AS A THRESHOLD ABOVE WHICH THE RISK OF

4  HEAT-RELATED ILLNESS INCREASES.  DID THAT COURT GET

5  IT RIGHT?

6    **A**    THAT'S CORRECT.

7    **Q**    AND THE FIFTH CIRCUIT IN *YATES* DESCRIBED YOU

8  AS A RECOGNIZED EXPERT IN THE FIELD OF

9  THERMOREGULATION AND HYPERTHERMIA WITH OVER 25 YEARS

10  TREATING HEAT STROKE AND HEAT-RELATED DISORDERS.  IS

11  THAT CORRECT?

12    **A**    THAT'S CORRECT.

13    **Q**    AND YOU'VE BEEN ACCEPTED AS AN EXPERT IN

14  THERMOREGULATION BY THIS COURT AND MANY OTHERS?

15    **A**    THAT'S CORRECT.

16    **Q**    DID YOU RELY ON YOUR SPECIALIZED KNOWLEDGE

17  AND EXPERTISE IN EMERGENCY MEDICINE, CORRECTIONAL

18  MEDICINE, TOXICOLOGY AND PARTICULARLY

19  THERMOREGULATION WHEN RENDERING YOUR CONCLUSIONS IN

20  THIS CASE?

21    **A**    YES, I DID.

22    **MS. WRIGHT:**  YOUR HONOR, WE WOULD TENDER DR.

23  VASSALLO AS AN EXPERT IN EMERGENCY MEDICINE, MEDICAL

24  TOXICOLOGY, CORRECTIONAL MEDICINE, AND

25  THERMOREGULATION.

1          **MR. BLANCHFIELD:**  YOUR HONOR --

2          **THE COURT:**  WAIT, WAIT.  JUST A MOMENT.  LET

3  ME MAKE SURE I GOT THIS RIGHT.

4               EMERGENCY MEDICINE, MEDICAL

5  TOXICOLOGY --

6          **MS. WRIGHT:**  YES.

7          **THE COURT:**  -- THERMOREGULATION.

8          **MS. WRIGHT:**  YES.  AND CORRECTIONAL

9  MEDICINE.

10          **THE COURT:**  ALL RIGHT.  ANY OBJECTION OR

11  WOULD THE DEFENSE LIKE TO VOIR DIRE THE WITNESS?

12          **MR. BLANCHFIELD:**  NO NEED TO VOIR DIRE, YOUR

13  HONOR.  AND AS MS. WRIGHT HAS REPRESENTED, WE HAD

14  ALREADY AGREED TO THE THREE AREAS OF HER TENDER.  THE

15  ONLY OBJECTION THAT WE MAKE IS A TENDER IN THE FIELD

16  OF THERMOREGULATION.

17          **THE COURT:**  WOULD YOU LIKE TO CONDUCT VOIR

18  DIRE OF THE WITNESS?

19          **MR. BLANCHFIELD:**  NO, YOUR HONOR.  JUST TO

20  MAKE A COMMENT THAT THERE IS NO MEDICAL SPECIALTY FOR

21  THERMOREGULATION; THAT MANY, MANY OF --

22  PSYCHIATRISTS, INTERNISTS, FAMILY MEDICINE, THEY'RE

23  ALL EXPOSED TO THAT ISSUE, THEY'RE ALL TRAINED IN

24  THAT ISSUE.  PSYCHIATRISTS WHO PRESCRIBE

25  ANTIPSYCHOTICS THAT ARE VERY HIGH IN ANTI-PULMONARY

1  PROPERTIES ARE VERY FAMILIAR WITH THERMOREGULATION.

2           WE JUST DON'T THINK IT'S A PROPER FIELD

3  OF EXPERTISE TO BE TENDERED IN LIKE EMERGENCY ROOM

4  MEDICINE AND TOXICOLOGY.

5           **THE COURT:**  ALL RIGHT.  MS. WRIGHT, WOULD

6  YOU LIKE TO CONDUCT ADDITIONAL VOIR DIRE WITH RESPECT

7  TO DR. VASSALLO'S QUALIFICATIONS IN THAT FIELD?

8           **MS. WRIGHT:**  I DON'T THINK IT'S NECESSARY,

9  YOUR HONOR.

10          **THE COURT:**  HAS SHE BEEN QUALIFIED OR

11  ACCEPTED AS AN EXPERT IN THAT FIELD BY OTHER COURTS?

12          **MS. WRIGHT:**  YES.

13          **THE COURT:**  WHAT COURTS, IF YOU KNOW?

14          **MS. WRIGHT:**  *COLE* IN THE SOUTHERN DISTRICT

15  OF TEXAS.  IN *McCOLLUM*, WHICH IS A 2017 CASE FROM THE

16  SOUTHERN DISTRICT OF TEXAS, DR. VASSALLO WAS

17  QUALIFIED AS AN EXPERT IN THERMOREGULATION.  THE

18  FIFTH CIRCUIT HAS CALLED HER AN EXPERT IN

19  THERMOREGULATION IN *YATES*.

20          **THE COURT:**  I'M SATISFIED --

21          **MS. WRIGHT:**  THANK YOU.

22          **THE COURT:**  -- MS. WRIGHT.  THANK YOU.

23          THE COURT WILL ACCEPT DR. VASSALLO AS

24  AN EXPERT IN THE FIELDS OF EMERGENCY MEDICINE,

25  MEDICAL TOXICOLOGY, THERMOREGULATION AND CORRECTIONAL

1  MEDICINE.  LET'S PROCEED.

2                    **DIRECT EXAMINATION**

3  **BY MS. WRIGHT:**

4      **Q**   DR. VASSALLO, WHAT WAS YOUR ASSIGNMENT IN

5  THIS MATTER?

6      **A**   MY ASSIGNMENT WAS TO LOOK AT THE FARM LINE

7  AT THE LOUISIANA STATE PENITENTIARY AND LOOK AT THE

8  EFFECTS OF THE HEAT ON THOSE INDIVIDUALS WORKING ON

9  THE FARM LINE.

10     **Q**   WERE YOU ABLE TO REACH A CONCLUSION?

11     **A**   YES, I WAS.

12     **Q**   WHAT WAS YOUR CONCLUSION?

13     **A**   THE -- MY CONCLUSION WAS THAT THE HEAT AND

14 THE CONDITIONS ON THE FARM LINE RENDER THOSE

15 INDIVIDUALS WHO WORK THERE AT RISK OF SUBSTANTIAL

16 RISK OF SERIOUS HARM.

17     **Q**   IN REACHING THAT OPINION, WHAT WAS YOUR

18 METHODOLOGY?

19     **A**   WELL, FIRST OF ALL, I'VE BEEN STUDYING THIS

20 FOR 35 YEARS.  I'VE BEEN A CLINICIAN AND I CONTINUE

21 TO BE A CLINICIAN SEEING PATIENTS IN THE EMERGENCY

22 DEPARTMENT.  I REVIEWED POLICIES, PROCEDURES.  I READ

23 DEPOSITIONS, DECLARATIONS.  I READ -- AND I'M WELL

24 VERSED IN THE LITERATURE OF THE LAST 35 YEARS.

25     **Q**   YOU REVIEWED PATIENT MEDICAL RECORDS AS

1   WELL?

2       **A**   I DID.  AND I VISITED THE FARM LINE AND I

3   SPOKE TO INDIVIDUALS WORKING ON THE FARM LINE THAT

4   DAY.

5       **Q**   AND YOU'RE REFERRING TO THE SITE INSPECTION

6   ON JULY 22, 2024?

7       **A**   THAT'S CORRECT.

8       **Q**   AND, OF COURSE, YOU'VE BEEN TO ANGOLA

9   NUMEROUS TIMES PRIOR BECAUSE OF YOUR WORK AS AN

10  EXPERT IN *LEWIS V* --

11      **A**   THAT'S RIGHT.

12          **THE REPORTER:**  *LEWIS V*?

13          **MS. WRIGHT:**  *LEWIS V CAIN*.

14  **BY MS. WRIGHT:**

15      **Q**   AND *ALEX A* AND *BALL V LEBLANC*?

16      **A**   THAT'S CORRECT.

17      **Q**   ARE YOUR OPINIONS IN THIS CASE RENDERED TO A

18  REASONABLE DEGREE OF CERTAINTY?

19      **A**   YES.

20      **Q**   LET'S TALK ABOUT THE SCIENCE OF

21  THERMOREGULATION.  CAN YOU PROVIDE A BRIEF OVERVIEW

22  OF THE TWO PRIMARY MECHANISMS OF THERMOREGULATION?

23  WHAT ARE THEY?

24      **A**   WELL, FIRST OF ALL, ONE HAS TO SWEAT AND ONE

25  VASODILATES.  AND BOTH OF THOSE PRIMARY MECHANISMS OF

1  HEAT LOSS ARE DIRECTED BY THE BRAIN.  AND THE

2  HYPOTHALAMUS IS A PART OF THE BRAIN WHICH HELPS TO

3  DIRECT THAT.  IT'S A -- THE ANTERIOR AND THE

4  POSTERIOR HYPOTHALAMUS ARE AREAS OF THE BRAIN THAT

5  HAVE -- SPEAK TO EACH OTHER THROUGH NEUROTRANSMITTERS

6  AND ACCEPT SIGNALS FROM THE SKIN, FROM THE CORE BODY

7  TEMPERATURE, AND DIRECT THE BRAIN TO -- THE BRAIN

8  DIRECTS SWEATING AND VASODILATION.

9      Q    SO THERMOREGULATION REQUIRES THE PROPER

10  FUNCTIONING OF THE BRAIN AND THE CENTRAL NERVOUS

11  SYSTEM?

12      A    YES.

13      Q    COULD IMPAIRED THERMOREGULATION IMPAIR A

14  PERSON'S ABILITY TO THINK OR WORK OR COMMUNICATE?

15      A    YES.  I MEAN, AS THE BODY TEMPERATURE RISES

16  TO THE POINT OF EVEN HEAT STROKE, OF COURSE THERE IS

17  ASSOCIATED CHANGE IN MENTAL STATUS, ABILITY TO THINK.

18  AND THAT IS A PART OF THE DEFINITION OF HEAT STROKE.

19      Q    SO BASED ON EVERYTHING THAT WE'VE JUST

20  DISCUSSED AND IN YOUR FOUR DECLARATIONS IN THIS CASE,

21  IS THE ABILITY TO THERMOREGULATE IMPORTANT TO DAILY

22  LIFE?

23      A    YES; VITAL.

24      Q    NOW, YOUR REPORTS IN THIS CASE COVER BOTH

25  EXERTIONAL AND NONEXERTIONAL HEAT STROKE.  IS THAT

1  RIGHT?

2      **A**    THAT'S CORRECT.

3      **Q**    IS IT YOUR OPINION THAT MEN WORKING ON THE

4  FARM LINE ARE AT AN UNACCEPTABLE RISK OF EITHER TYPE

5  OF HEAT STROKE?

6      **A**    YES.

7      **Q**    WHAT HAPPENS TO THE BODY'S TISSUES AND

8  ORGANS DURING A HEAT STROKE?

9      **A**    WELL, THE CELLS THAT ARE SUBJECTED TO THOSE

10  TEMPERATURES DIE.  AND SO AS THE CELLS OF THE LIVER

11  DIE, ONE STARTS TO BLEED, BECAUSE THE LIVER IS

12  RESPONSIBLE FOR COAGULATION.  AS THE CELLS AND THE

13  BRAIN DIE, ONE BECOMES ALTERED IN THEIR ABILITY TO

14  THINK, REASON, AND THEIR JUDGMENT.  AS THE CELLS OF

15  THE HEART ARE DAMAGED, THE HEART BECOMES LESS ABLE TO

16  DO WHAT IT NEEDS TO DO, WHICH IS TO INCREASE THE

17  CARDIAC OUTPUT, WHICH IS A PRODUCT OF THE ABILITY TO

18  SQUEEZE AND THE ABILITY TO BEAT RAPIDLY.  SO -- AND,

19  OF COURSE, SO BASICALLY ALL OF THE CELLS OF THE BODY,

20  AS HEAT STROKE OCCURS, THEY START TO DIE AND THE

21  MANIFESTATION OF HEAT STROKE BECOMES VISIBLE.

22      **Q**    IS IT THE CASE THAT A PERSON MAY NOT BE

23  AWARE THEY ARE IN IMMINENT DANGER OF HEAT STROKE

24  UNTIL IT'S TOO LATE?

25      **A**    THIS IS VERY CLEAR FROM MILITARY RECRUITS,

1  IT'S VERY CLEAR FROM ATHLETICS, AND IT'S CLEAR IN ALL

2  OF THE EPIDEMIOLOGY.  SO THAT SOMEBODY CAN BE

3  REACHING THAT POINT OF COLLAPSE AND ALTERATION OF

4  MENTAL STATUS AND NOT REALIZE IT.

5      Q    NOW, YOU'VE MENTIONED THE ALTERED MENTAL

6  STATUS THAT CAN INDICATE THAT BRAIN FUNCTION IS

7  FAILING.  IN CORRECTIONAL SETTINGS HOW MIGHT THE

8  ALTERED MENTAL STATUS MANIFEST?

9      A    WELL, THE PROBLEM IN CORRECTIONAL

10  SETTINGS -- AND THIS IS -- I'VE SEEN THIS MANY TIMES

11  IN TEXAS AS WELL -- IS THAT THEIR JUDGMENT, THEIR

12  BEHAVIOR, THEIR ABILITY TO FOLLOW INSTRUCTION, AND

13  THE IRRITABILITY AND THE -- IS IMPAIRED.  AND THEY --

14  OFTEN THOSE SYMPTOMS OF IMPENDING HEAT-RELATED

15  ILLNESS OR HEAT STROKE ARE MISINTERPRETED BY STAFF AS

16  JUST WILLFUL DISOBEDIENCE.

17      Q    SO INAPPROPRIATE BEHAVIOR COULD ACTUALLY BE

18  A PHYSIOLOGICAL RESPONSE TO EXCESSIVE HEAT?

19      A    IT IS.

20      Q    NOW, YOU'VE TESTIFIED THAT HEAT STROKE IS

21  CHARACTERIZED IN PART BY AN INCREASE IN CORE

22  TEMPERATURE.  ARE THERE HEAT-RELATED ILLNESSES THAT

23  ARE NOT CHARACTERIZED BY AN INCREASE IN CORE

24  TEMPERATURE?

25      A    YES.  I MEAN, THE -- THERE ARE SIMPLE THINGS

1   LIKE HEAT RASH; THERE ARE THINGS LIKE FAINTING DUE TO

2   THE HEAT.  REMEMBER, WHEN YOU ARE UNDER HEAT STRESS,

3   THE VASODILATION MEANS THAT BLOOD IS IN THE

4   PERIPHERY; THAT IS, OUT IN YOUR ARMS AND YOUR LEGS

5   AND YOUR SKIN.  AND THEN YOU CAN FAINT BECAUSE THERE

6   IS SO MUCH BLOOD OUT THERE AND NOT ENOUGH TO THE

7   BRAIN.  AND THE -- OVERWHELMINGLY THE BODY WILL

8   MAINTAIN BLOOD PRESSURE, SO YOU'RE GOING TO FAINT SO

9   THAT YOUR BLOOD PRESSURE IS MAINTAINED.  SO THE

10  ANSWER IS YES, THERE ARE DIFFERENT WAYS.

11     Q    THROUGH THE COURSE OF YOUR WORK ON THIS CASE

12  AND IN YOUR CAREER STUDYING ANGOLA, HAVE YOU SEEN

13  EVIDENCE OF HEAT ILLNESS AMONG PEOPLE WORKING THE

14  FARM LINE?

15     A    YES.

16     Q    NOW, DOES USING A FAN OUTSIDE LOWER THE RISK

17  OF DEATH FROM EXCESSIVE HEAT TO A STATISTICALLY

18  SIGNIFICANT DEGREE?

19     A    THE ANSWER IS NO.  THIS IS SHOWN AND

20  DESCRIBED IN THE LITERATURE AT -- IN FACT, WHEN THE

21  TEMPERATURE IS ABOVE 90 DEGREES AND THE HUMIDITY IS

22  AROUND 35 -- AND, OF COURSE, THE TEMPERATURE AND THE

23  DEGREE OF HUMIDITY DIFFER IN THE LITERATURE.  THE

24  FANS ARE SHOWN TO INCREASE HEAT STRESS AS BLOWING HOT

25  AIR OVER THE BODY.  SO FANS, ALSO IN BOUCHAMA'S META-

1  ANALYSIS, WERE ALSO SHOWN TO BE NOT HELPFUL IN HOT

2  CONDITIONS.

3      **Q**    ARE THERE --

4      **A**    OR PROTECTIVE IS WHAT -- EXCUSE ME FOR

5  INTERRUPTING.  PROTECTIVE; THEY'RE NOT PROTECTIVE

6  AGAINST HEAT-RELATED ILLNESS.

7      **Q**    ARE THERE EFFECTIVE WAYS TO MITIGATE THE

8  RISK OF HEAT ON THE FARM LINE?

9      **A**    WELL, YES, THERE ARE SUCH WAYS.  THE --

10  OBVIOUSLY YOU CAN'T AIR-CONDITION THE FARM LINE;

11  ALTHOUGH YOU COULD PROBABLY PROVIDE AIR CONDITIONING

12  AT THE FARM LINE.  OF COURSE, IF PEOPLE SPEND THE

13  OTHER 20 DAYS -- 20 HOURS A DAY IN AIR CONDITIONING,

14  IT WOULD LESSEN THE RISK ON THE FARM LINE.  BUT THESE

15  PRISONERS ARE ALSO IN THE HOT CONDITIONS IN THE

16  PRISON.  AND ONE THING THAT'S CLEAR FROM THE SCIENCE

17  IS THAT PEOPLE WHO ARE SLEEPING IN HOT CONDITIONS AND

18  EXISTING IN HOT CONDITIONS OUTSIDE OF THEIR TIME THAT

19  THEY'RE WORKING ARE AT GREATER RISK.

20      **Q**    THERE IS A CUMULATIVE EFFECT OF HEAT ON THE

21  BODY?

22      **A**    ABSOLUTELY.

23      **Q**    I'D LIKE TO LOOK AT SOME STUDIES THAT YOU

24  RELIED ON IN REACHING YOUR OPINIONS.  AND WE'LL START

25  WITH PLAINTIFFS' EXHIBIT 40, WHICH IS BEHIND TAB 1 IN

1  YOUR BINDER.

2         **MR. JONES:**  YOUR HONOR, DEFENDANTS OBJECT

3  TO --

4         **THE REPORTER:**  INTO THE MIC, PLEASE, MR.

5  JONES.

6         **THE COURT:**  YES, JUST PULL THE MIC.  YES,

7  THERE YOU GO.

8         **MR. JONES:**  DEFENDANTS OBJECT TO PLAINTIFFS'

9  EXHIBIT 40 ON THE BASIS THAT THIS EXHIBIT WAS NOT

10 IDENTIFIED, RELIED UPON, OR PRODUCED IN RESPONSE

11 TO -- IN SUPPORT OF THE MOTION FOR CLASS

12 CERTIFICATION THAT WE TALKED ABOUT BEFORE.

13         I WILL NOTE THAT THIS PARTICULAR

14 EXHIBIT WAS CITED BY DR. VASSALLO IN HER FOURTH

15 DECLARATION TO WHICH DEFENDANTS HAVE FILED A MOTION

16 TO STRIKE BECAUSE THAT DECLARATION WAS PRODUCED AND

17 FILED AFTER THE DATE OF HER REPORT AND AFTER THE

18 BRIEFING ON CLASS CERTIFICATION HAD ENDED.

19         SO ON THAT BASIS, WE WOULD OBJECT TO

20 THE INTRODUCTION OF THIS EXHIBIT IN SUPPORT OF THEIR

21 MOTION FOR CLASS CERTIFICATION.

22         **THE COURT:**  MS. WRIGHT?

23         **MS. WRIGHT:**  DR. VASSALLO RELIED ON THIS

24 STUDY AND MANY OTHERS TO DETERMINE THAT THE RISK OF

25 HEAT-RELATED HARM -- SPECIFICALLY DEATH -- SHARPLY

1  INCREASES AT A HEAT INDEX OF 88 DEGREES FAHRENHEIT.

2  SHE INCLUDED THE GRAPH THAT WE'RE GOING TO LOOK AT,

3  HOPEFULLY TODAY, IN HER FOURTH DECLARATION.  BUT IN

4  HER VERY FIRST DECLARATION, ECF 37-1 AT PARAGRAPH 33,

5  WHICH WAS FILED LAST SUMMER, SHE WROTE "THE RISK FOR

6  HEAT" -- "THE RISK FOR HEAT STROKE AND HEAT-RELATED

7  DISORDERS INCREASES SHARPLY WHEN THE HEAT INDEX

8  EXCEEDS 88 DEGREES."  THIS IS SIMPLY WHAT SHE RELIED

9  ON.

10         THE COURT:  SO WHEN WAS THIS PRODUCED TO THE

11  DEFENSE?

12         MS. WRIGHT:  AT THE VERY LEAST, IT WAS

13  PRODUCED -- IT WAS CITED IN DR. VASSALLO'S FOURTH

14  DECLARATION, WHICH WAS FILED INTO THE RECORD, I

15  BELIEVE, IN MARCH.

16         THE COURT:  SO IT WAS CITED BUT NOT --

17         MS. WRIGHT:  AND IT WAS PRODUCED LAST WEEK

18  WHEN WE EXCHANGED EXHIBITS.

19         THE COURT:  IT WAS CITED AT AN EARLIER POINT

20  IN THE LITIGATION?

21         MS. WRIGHT:  YES.

22         THE COURT:  I UNDERSTAND YOUR POINT, MR.

23  JONES.  SHE CITED IT IN EARLIER DEPOSITIONS.  I WILL

24  ALLOW SOME LIMITED TESTIMONY ON IT, BUT -- HOW MANY

25  MORE DOCUMENTS DO WE HAVE LIKE THIS?

1          MS. WRIGHT:  THERE IS FOUR THAT WE ARE GOING

2     TO -- THAT WE'D LIKE TO DISCUSS TODAY.

3          THE COURT:  IS THERE A REASON THAT THEY WERE

4     PRODUCED SO LATE?

5          MS. WRIGHT:  WELL, THEY'RE ALL SCIENCE THAT

6     DR. VASSALLO RELIED UPON TO REACH THE 88-DEGREE

7     FIGURE OR NOT.  AND REALLY THE J-SHAPED CURVE FIGURE

8     THAT I'D LIKE TO DISCUSS WITH DR. VASSALLO RIGHT NOW

9     I THINK WILL BE HELPFUL TO THE COURT TO VISUALIZE

10    WHAT HAPPENS AT AN 88-DEGREE THRESHOLD AND WHY DR.

11    VASSALLO HAS FOR DECADES USED THAT NUMBER THAT'S BEEN

12    RECOGNIZED BY THE COURT.

13         THE COURT:  SO WHEN WAS THIS ARTICLE

14    PUBLISHED?

15         MS. WRIGHT:  2003.

16         THE COURT:  YOU CAN GO ON AND DISPLAY THE

17    ARTICLE.  I MEAN, THIS IS NOT --

18         MR. JONES:  JUDGE, IF I CAN ADD TO CLARIFY,

19    IF SHE RELIED ON IT, SHE SHOULD HAVE INCLUDED IT IN

20    HER REPORT WHEN SHE PRODUCED IT WAY BACK MANY MONTHS

21    AGO BEFORE CLASS CERTIFICATION BRIEFING OCCURRED, OF

22    COURSE.  AND SO THAT'S REALLY THE ISSUE HERE.

23         THE COURT:  SO WHAT WE HAVE IS A SITUATION

24    WHERE IT WAS NOT INCLUDED IN THE REPORT BUT IT WAS,

25    AS I UNDERSTAND IT, MR. JONES, REFERENCED, HOWEVER,

1    IN HER EARLIER DEPOSITION.  IS THAT RIGHT?

2            **MR. JONES:**  I DON'T KNOW IF THAT'S CORRECT.

3    IT CERTAINLY WASN'T IDENTIFIED AS A SOURCE UPON WHICH

4    SHE WAS RELYING, AND SO SHE PUT TWO OF THESE IN HER

5    FOURTH DECLARATION THAT WAS FILED A MONTH AGO.

6            **THE COURT:**  ALL RIGHT.  MS. WRIGHT?

7            **MS. WRIGHT:**  YOUR HONOR, MR. BLANCHFIELD

8    YESTERDAY IN HIS OPENING STATEMENT DISPUTED THAT ANY

9    SCIENCE EXISTS TO SUPPORT THE 88-DEGREE FIGURE.

10   SCIENCE EXISTS, AND THAT'S WHAT WE WOULD LIKE TO

11   DEMONSTRATE TODAY.

12           WHETHER THIS IS ENTERED INTO EVIDENCE

13   IN THIS CASE OR WHETHER WE CAN SIMPLY REFER TO IT AS

14   A DEMONSTRATIVE IS NOT RELEVANT -- OR IT'S NOT AN

15   ISSUE TO US.

16           **THE COURT:**  SO, MR. JONES, HOW WOULD YOU

17   PROPOSE CURING ANY PREJUDICE THAT MAY RESULT FROM THE

18   LATE DISCLOSURE?

19           **MR. JONES:**  DR. VASSALLO IS HERE TO TESTIFY

20   ABOUT HER OPINIONS, AND SHE CAN CERTAINLY TESTIFY ON

21   THAT.  NOW, WHAT WE'RE TRYING TO DO IS TO -- WE'RE

22   OBJECTING TO THE INTRODUCTION OF THIS ADDITIONAL

23   EVIDENCE THAT WAS NOT DISCLOSED TO US UNTIL THIS LATE

24   DATE AFTER BRIEFING WAS CLOSED.

25           **THE COURT:**  NO, I UNDERSTAND THAT.  BUT MY

1 QUESTION TO YOU, MR. JONES, IS -- AS YOU KNOW, I

2 MENTIONED THIS EARLIER -- MOTIONS IN LIMINE,

3 SIMILARLY THE DENIAL OF A REQUEST TO INCLUDE

4 EVIDENCE, ESPECIALLY IF IT MAY BE RELEVANT EVIDENCE,

5 IS STRONGLY DISFAVORED.  SO THE COURTS ALWAYS HAVE TO

6 LOOK FOR WAYS TO CURE ANY POTENTIAL PREJUDICE THAT

7 COULD RESULT TO A PARTY BECAUSE OF THE LATE

8 DISCLOSURE.

9           NOW, ONE OF THE OPTIONS WAS FOR ME TO

10 MAYBE PUT THIS OFF FOR 30 DAYS TO ALLOW YOU TO REVIEW

11 IT OR HAVE YOUR EXPERTS REVIEW IT, WORK WITH THE

12 PLAINTIFFS TO SCHEDULE ANOTHER DEPOSITION.  AND

13 FRANKLY, THAT'S STILL AVAILABLE TO THE COURT.  BUT IF

14 IT'S RELEVANT EVIDENCE ON A CRITICAL ELEMENT OF THE

15 PLAINTIFFS' CLAIM, I'M NOT INCLINED TO DENYING THIS

16 WITNESS'S ABILITY TO REFERENCE IT, ESPECIALLY IF, AS

17 I MENTIONED EARLIER, IT HAD BEEN REFERENCED -- EVEN

18 IF IT WAS INDIRECTLY SO -- IN SOME PRIOR

19 DECLARATIONS.  IT WAS OUT THERE, AS I APPRECIATE IT,

20 SHE SAID, *BECAUSE IN A PRIOR DECLARATION I RELIED ON*

21 *THIS ARTICLE.*

22           NOW, THE DEFENSE MAY NOT HAVE ACTUALLY

23 PHYSICALLY PRESENTED THE ARTICLE TO YOU, BUT IT WAS

24 OUT THERE IN EVIDENCE IN THE DISCOVERY IN THIS CASE.

25 I DON'T NECESSARILY -- AND I DON'T THINK YOU HAVE ANY

1   LEGAL OBLIGATION NECESSARILY TO SAY, *OKAY, WELL,*

2   *WAIT.  I'M GOING TO TAKE IT UPON MYSELF TO GO ON AND*

3   *GATHER ALL OF THESE THINGS THAT AN EXPERT HAS*

4   *IDENTIFIED AS HAVING RELIED ON.*

5          BUT AGAIN, I GO BACK TO MY QUESTION:

6   TO THE EXTENT THAT YOU BELIEVE YOUR CLIENT IS

7   PREJUDICED, GIVEN THAT IT IS RELEVANT TESTIMONY,

8   GIVEN THAT IT'S, AGAIN, STRONGLY DISFAVORED TO NOT

9   OFFER THIS, WE HAVE -- IN OTHER WORDS, WE HAVE -- I

10  CAN'T OVERSIMPLIFY THIS BY SAYING IT'S A MERE

11  TECHNICALITY, BECAUSE IT'S MUCH MORE SERIOUS THAN

12  THAT.

13         WHAT I'M SAYING IS -- WE DON'T HAVE A

14  TRIAL DATE SET.  WE HAVE PLENTY OF TIME TO ALLOW YOU

15  TO REVIEW THE INFORMATION, TO REVIEW THE MATERIALS,

16  TO HAVE YOUR EXPERTS REVIEW THE MATERIALS.  IF WE

17  HAVE TO COME BACK INTO COURT FOR YET ANOTHER

18  EXAMINATION OF THE WITNESS, I'M PREPARED TO DO THAT.

19         **MR. JONES:**  I'D LIKE TO RESPECTFULLY REQUEST

20  IN THOSE COMMENTS THAT DR. VASSALLO BE ALLOWED TO

21  TESTIFY ABOUT THE ARTICLES BUT NOT ALLOW THE

22  INTRODUCTION OF THE ARTICLES THEMSELVES.

23         **THE COURT:**  MS. WRIGHT?

24         **MS. WRIGHT:**  DEMONSTRATIVES ARE FINE.

25         **THE COURT:**  ALL RIGHT.  VERY WELL.  OKAY.

1  BY MS. WRIGHT:

2      Q    DR. VASSALLO, WE'RE LOOKING AT PLAINTIFFS'

3  EXHIBIT 40, THE DAVIS ARTICLE FROM 2003.  HOW, IF AT

4  ALL, DID THIS STUDY INFORM YOUR OPINION?

5          THE COURT:  ACTUALLY -- I APOLOGIZE, DR.

6  VASSALLO.

7              SO LET ME JUST BE CLEAR, MR. JONES.

8  ARE YOU SATISFIED AT THIS POINT YOU HAVE, IN

9  FACT, RECEIVED EVERYTHING, OR DO YOU KNOW?

10         MR. JONES:  WELL, THERE IS A WHOLE LIST OF

11 PLAINTIFFS' EXHIBITS THAT MAY COME UP LATER.  BUT

12 WITH RESPECT TO DR. VASSALLO, APPARENTLY THIS IS IT,

13 THE FIVE THAT HAVE BEEN IDENTIFIED.  AND SO I KNOW

14 IT'S BEING REFERENCED AS PLAINTIFFS' EXHIBITS 40, 41,

15 42, 45 AND 49, BUT AS I APPRECIATE WHAT WE'RE DOING

16 AT THIS POINT IS THAT THEY'RE GOING TO BE CONSIDERED

17 DEMONSTRATIVE AIDS BUT THEY'RE NOT GOING TO BE

18 INTRODUCED INTO EVIDENCE IN SUPPORT OF THE MOTION FOR

19 CLASS CERTIFICATION.

20         THE COURT:  AND SHE CAN TESTIFY ABOUT THAT,

21 BUT THAT'S RIGHT.

22         MR. JONES:  THANK YOU.

23         THE COURT:  BUT TO BE SURE, ARE THERE ANY

24 OTHER -- HAVE YOU PRODUCED EVERYTHING TO THE

25 DEFENDANTS AT THIS TIME?

1            MS. WRIGHT:  YES.

2            THE COURT:  AND YOU'RE SATISFIED WITH THAT,

3  MR. JONES?  EVEN THOUGH THEY WERE LATE, YOU HAVE NO

4  REASON TO BELIEVE --

5            MR. JONES:  I APOLOGIZE.

6            THE COURT:  NO, NO, NO APOLOGIES.

7            MR. JONES:  PLAINTIFFS' EXHIBIT 40 WAS CITED

8  IN DR. VASSALLO'S FOURTH DECLARATION.  PLAINTIFFS'

9  EXHIBIT 41 WE BELIEVE WAS CITED IN HER -- EITHER IN

10  HER REPORT OR AN ADDITIONAL DECLARATION.  PLAINTIFFS'

11  EXHIBIT 42 WAS CITED IN THE FOURTH DECLARATION.  WE

12  HAVE NOT IDENTIFIED PLAINTIFFS' EXHIBIT 45 OR

13  PLAINTIFFS' EXHIBIT 49 CITED ANYWHERE OTHER THAN

14  BEING INCLUDED ON THIS PLAINTIFFS' EXHIBIT LIST.

15            THE COURT:  OKAY.  SO WHAT WE'LL DO, WE'LL

16  ALLOW DR. VASSALLO TO TESTIFY ABOUT THOSE REPORTS TO

17  THE EXTENT THEY FORMED HER OPINION AND -- BUT THEY,

18  AGAIN, WILL BE TREATED AS A DEMONSTRATIVE AID -- OR

19  DEMONSTRATIVE AIDS.  OKAY?

20            MS. WRIGHT:  THANK YOU.

21            AND IF I MAY JUST RESPOND TO ONE THING.

22  PLAINTIFFS' EXHIBIT 49, WHICH IS A REPORT FROM THE

23  LOUISIANA DEPARTMENT OF HEALTH, WAS CITED IN DR.

24  VASSALLO'S INITIAL DECLARATION, ECF 37-3 AT PARAGRAPH

25  92.  AND, IN FACT, THE GRAPH THAT I WOULD LIKE TO

1  LOOK AT WITH DR. VASSALLO IS REPLICATED IN THE

2  DECLARATION.

3          **THE COURT:** VERY WELL.

4  **BY MS. WRIGHT:**

5     **Q** BUT TURNING BACK TO THE DAVIS STUDY FROM

6  2003, DR. VASSALLO, HOW, IF AT ALL, DID THIS STUDY

7  INFORM YOUR OPINIONS IN THIS CASE?

8     **A** THIS IS ONE OF NUMEROUS SCIENTIFIC TREATISES

9  THAT DEMONSTRATE A SHARP J-SHAPED OR A HOCKEY STICK

10 SHAPED INCREASE IN MORTALITY.  THIS IS THE MORTALITY

11 AND NOT THE MORBIDITY.  WE CAN LOOK AT OTHER THINGS,

12 AND THERE ARE MANY ARTICLES OTHER THAN THE TWO THAT

13 YOU AND I WERE GOING TO SPEAK ABOUT TODAY THAT

14 DEMONSTRATE THIS.

15          SO WHAT WE SEE HERE IS AT 30 DEGREES HEAT

16 INDEX APPARENT TEMPERATURE, WHICH IS ANOTHER WAY TO

17 SAY HEAT INDEX, THE MORTALITY INCREASED SHARPLY LIKE

18 A "J."

19    **Q** SO DAVIS USED A SCATTER PLOT TO EXAMINE THE

20 RELATIONSHIP BETWEEN THE APPARENT TEMPERATURE OR THE

21 HEAT INDEX AND THE RISK OF HEAT-RELATED MORTALITY,

22 WHICH IS DEATH.  IS THAT RIGHT?

23    **A** THAT'S CORRECT.

24    **Q** AND THESE SCATTER PLOTS FORM A J-SHAPED

25 CURVE WHICH INDICATES A SHARP INCREASE IN PATIENT

1   DEATH AS THE APPARENT TEMPERATURE HITS 30 DEGREES

2   CELSIUS, WHICH IS 86 DEGREES FAHRENHEIT.  IS THAT

3   RIGHT?

4       **A**    THAT IS CORRECT.

5       **Q**    DID THIS J-SHAPED CURVE APPEAR IN OTHER

6   RESEARCH?

7       **A**    THIS J-SHAPED CURVE APPEARS IN THE GLOBAL

8   LITERATURE MANY TIMES, MANY CITIES, MANY STUDIES.

9   THIS IS -- A J-SHAPED IS MORTALITY.  AND I SHOULD

10  ALSO SAY THIS IS NOT JUST FROM HEAT STROKE.  THIS IS

11  FROM ALL CAUSED MORTALITY.

12          SO ONE OF THE ISSUES AT PLAY IN THIS

13  LITIGATION AND IN MY OPINION IS THE IMPORTANCE OF THE

14  INCREASED DEATH NOT ONLY FROM JUST HEAT STROKE, WHICH

15  CAUSES DEATH, AND NOT JUST FROM THE HARMS OF OTHER

16  LESSER HEAT-RELATED PROBLEMS, BUT ALSO FROM THE HARMS

17  WHEN PEOPLE PRESENT WITH COMPLICATIONS OF DIABETES,

18  CARDIOVASCULAR DISEASE, MORE HEART ATTACKS, MORE

19  STROKES, WORSENING OF THE PULMONARY DISEASE AND SO

20  FORTH.  SO THIS IS ONE OF MANY GRAPHS THAT APPEAR IN

21  THE LITERATURE AND THE SCIENTIFIC LITERATURE IN THE

22  LAST 20 YEARS.

23      **Q**    NOW, YOU OPINE IN THIS CASE, DR. VASSALLO --

24  AS YOU DID IN *BALL*, AS YOU DID IN G*ATES,* AS YOU DID

25  ELSEWHERE -- THAT THE HEAT ALERT THRESHOLD AT LSP

1  SHOULD BE SET AT A HEAT INDEX OF 88 DEGREES

2  FAHRENHEIT.  IS IT -- IS YOUR OPINION BASED ON THIS

3  SCIENCE THAT WE HAVE BEEN TESTING?

4       **A**   YES.

5       **Q**   ARE THERE ANY STUDIES OR ANY SCIENCE THAT

6  YOU'RE AWARE OF THAT WOULD SUPPORT SETTING THE HEAT

7  ALERT THRESHOLD AT 91 DEGREES OR 95 DEGREES?

8       **A**   NO.  ALL THESE CURVES I'VE TALKED ABOUT --

9  WHICH WE'RE ONLY DEMONSTRATING ONE HERE WITH THE

10 DAVIS ARTICLE, OR IF WE DEMONSTRATE WE COULD HAVE THE

11 WHOLE -- A DAY WITH THESE ARTICLES.  THE IMPORTANCE

12 IS THAT -- THAT THE -- IF YOU SET -- THE HIGHER YOU

13 SET THE HEAT INDEX OR THE TEMPERATURE ON THAT "J"

14 POINT, THE MORE DEATH YOU'LL HAVE.  SO IF YOU WANT TO

15 ACCEPT MORE DEATHS FROM CARDIOVASCULAR DISEASE, IF

16 YOU WANT TO ACCEPT MORE DEATHS FROM HEAT-RELATED

17 ILLNESSES, YOU JUST MOVE RIGHT UP THAT CURVE.  YOU

18 CAN MOVE ALL THE WAY TO WHATEVER NUMBER YOU DECIDE IS

19 ACCEPTABLE NUMBER OF PREVENTABLE DEATHS.

20      **Q**   LET'S LOOK AT PLAINTIFFS' EXHIBIT 41, WHICH

21 IS TAB 2 IN YOUR BINDER, WHICH WE WILL USE AS A

22 DEMONSTRATIVE.  THIS IS A STUDY FROM PETITTI FROM

23 2016.  AND LOOK SPECIFICALLY AT PAGE 5 OF THAT STUDY,

24 FIGURE 5.  HOW, IF AT ALL, DID THE PETITTI STUDY

25 INFORM YOUR OPINIONS IN THIS CASE?

1    **A**    WELL, PETITTI -- THIS IS AN ENORMOUSLY

2    IMPORTANT EPIDEMIOLOGICAL STUDY CONDUCTED IN MARICOPA

3    COUNTY IN ARIZONA.  AND IT STARTS WITH JUST LOOKING

4    AT -- IT'S TRYING TO ESTABLISH THRESHOLDS AT WHICH

5    PEOPLE -- AND IT DID ESTABLISH -- THAT EMERGENCY

6    DEPARTMENT VISITS, THE RELATIVE RISK.  AND HERE

7    SIMILARLY YOU SEE THAT "J" POINT INCREASING.  IT

8    STARTS ABOUT 27.  BUT I HAVE CHOSEN SOMEWHERE BETWEEN

9    WHERE THERE IS A STEEP UNQUESTIONABLE INCREASE IN

10   RISK.  SO THAT'S FOR EMERGENCY DEPARTMENT VISITS.

11        THEN THE NEXT IS HOSPITALIZATIONS, PEOPLE

12   WHO PRESENT AND GET HOSPITALIZED; AND THEN MORTALITY,

13   WHICH IS DEATHS.  AND THOSE, AGAIN, ARE HAPPENING

14   RIGHT AROUND THE 88-DEGREE HEAT INDEX THRESHOLD.

15   **Q**    SO PETITTI TELLS US IT'S NOT JUST DEATH THAT

16   OCCURS AT THAT THRESHOLD BUT THAT 88 DEGREES

17   FAHRENHEIT ALSO SIGNIFICANTLY INCREASES THE RISK OF

18   HEAT-RELATED INJURIES OR MORBIDITY?

19   **A**    THAT'S RIGHT.

20   **Q**    NOW, PETITTI USED ADMINISTRATIVE DATA LIKE

21   ICD-10 CODES TO ASSESS HOSPITALIZATION AND EMERGENCY

22   DEPARTMENT VISITS.  IS THAT RIGHT?

23   **A**    THAT'S RIGHT.  AND THE PROBLEM WITH THAT IS

24   THAT IT -- IT UNDERESTIMATES THE NUMBER OF DEATHS AND

25   THE NUMBER EFFECTS DUE TO HEAT.  FOR EXAMPLE, WE SEE

1  THAT IN THE REVIEW OF THE RECORDS HERE, MR. ALVIN

2  WILLIAMS WAS DIAGNOSED WITH DEHYDRATION UPON COMING

3  IN FROM DANCING AROUND IN THE FIELD.  HE WAS NOT

4  INTOXICATED.  BUT THE DIAGNOSIS BY THE NURSE

5  PRACTITIONER WAS DEHYDRATION.  SO DEHYDRATION WOULD

6  NOT NECESSARILY BE CAPTURED HERE ON THE FARM LINE AS

7  A RESULT OF WORKING ON THE FARM LINE.

8       THIS IS DISCUSSED IN THE PUBLICATIONS OF THE

9  CDC, THE MMWR, THE MORBIDITY AND MORTALITY WEEKLY

10  REVIEW, AND IN MULTIPLE OTHER -- AND INCLUDING THE

11  AMERICAN FORENSIC MEDICAL EXAMINER GROUP.  THEY SPEAK

12  CLEARLY TO THE FACT THAT HEAT AS A CONTRIBUTING

13  FACTOR OR AS A DIRECT CAUSE OF A ILLNESS -- IN THE

14  CASE OF FORENSICS IS DEATH -- IS UNDERESTIMATED.

15  Q    IS THERE ALSO EVIDENCE THAT HEAT-RELATED

16  ILLNESS SHORT OF HEAT STROKE AND SHORT OF DEATH IS

17  ALSO UNDERREPORTED?

18  A    YES.  BECAUSE HEAT CRAMPS, WHICH IS

19  PERFECTLY IN THE LITERATURE, SYNCOPE, FAINTING, HEAT

20  EXHAUSTION, ALL THOSE THINGS CAN BE -- OR ELECTROLYTE

21  DISTURBANCE; MAYBE YOUR SODIUM'S LOW BUT YOU'VE BEEN

22  ON THE FARM LINE; MAYBE YOU'VE BEEN IN THE HEAT,

23  WHATEVER.  ALL THOSE THINGS MATTER.  IT MAY NOT BE

24  CAPTURED AS HEAT BEING A CONTRIBUTING CAUSE.

25  SIMILARLY, IF YOU HAVE A HEART ATTACK, AND MAYBE HEAT

1   AS A CONTRIBUTING CAUSE WILL NOT BE CAPTURED.

2       **Q**   DR. VASSALLO, YOU OPINE THAT EVEN YOUNGER

3   AND RELATIVELY HEALTHIER PEOPLE ARE AT RISK OF

4   HEAT-RELATED MORBIDITY AND MORTALITY.  DOES THE

5   LITERATURE SUPPORT YOUR VIEW?

6       **A**   YES.

7       **Q**   HOW SO?

8       **A**   WELL, WHEN YOU LOOK -- I MEAN, LATER ON

9   WE'LL PROBABLY LOOK AT THE LOUISIANA DEPARTMENT OF

10  HEALTH THAT SHOWS THE MAJORITY OF PRESENTATIONS

11  ARE -- IN THE STATE OF LOUISIANA WHERE PEOPLE ARE

12  SUPPOSEDLY USED TO THE HEAT, WHATEVER THAT MEANS, OR

13  ACCLIMATIZED, WHICH I KNOW WELL WHAT THAT MEANS --

14  THE MAJORITY OF PEOPLE PRESENTING IN EMERGENCY

15  DEPARTMENTS ARE IN THE YOUNGER AGE GROUPS.

16          THE SAME GOES FOR AGRICULTURAL WORK.  AND OF

17  COURSE THE OLDER AND MORE INFIRM AND MORE

18  CO-MORBIDITIES ARE AT GREATER RISK.  BUT TO SAY THAT

19  YOUNG PEOPLE ARE NOT AT RISK WHO ARE YOUNG AND

20  SUPPOSEDLY HEALTHY IS TO IGNORE THE VAST LITERATURE

21  IN THIS AREA.

22      **Q**   LET'S LOOK AT THAT STUDY FROM THE LOUISIANA

23  DEPARTMENT OF HEALTH.  IT'S PLAINTIFFS' EXHIBIT 49,

24  TAB 5 OF YOUR BINDER.

25          NOW, THIS IS A 2024 STUDY FROM LDH.  HOW DID

1  THIS -- AND LET'S LOOK AT THE CHART ON PAGE 17.  HOW

2  DID THIS CHART INFORM YOUR OPINIONS IN THIS CASE, IF

3  AT ALL?

4      **A**   SO THIS SHOWS ALL CASES OF HEAT-RELATED

5  ILLNESS.  AND IT SAYS HERE, CLEARLY, INDIVIDUALS FROM

6  20 TO 39 YEARS OLD ACCOUNTED FOR 40 PERCENT OF ALL

7  HEAT-RELATED EMERGENCY DEPARTMENT VISITS.  AND THAT

8  WAS FOLLOWED BY THE 40- TO 59-YEAR-OLD AGE GROUP.

9  AND SO WHEN YOU LOOK AT THIS GRAPH -- BUT I -- WE'RE

10 NOT DEMONSTRATING IT -- THOUSANDS OF YOUNG PEOPLE --

11 THOUSANDS -- PRESENTED WITH -- TO EMERGENCY

12 DEPARTMENTS WITH HEAT-RELATED.  AND THIS IS IN

13 LOUISIANA WHERE PEOPLE ARE LIVING.

14     **Q**   LET'S LOOK AT THE CHART ON THE NEXT PAGE,

15 PAGE 18.  HOW DID THIS CHART INFORM YOUR OPINIONS, IF

16 AT ALL?

17     **A**   SO THIS CHART WAS JUST WORKERS IN LOUISIANA.

18 AND IT SHOWS THAT WORKERS OF THE AGES 34 YEARS AND

19 YOUNGER HAD THE HIGHEST RATES OF EMERGENCY DEPARTMENT

20 VISITS FOR HEAT-RELATED ILLNESS.  AND THIS WAS

21 WORKERS.  AND SO, AGAIN, THERE IS HUNDREDS OF PEOPLE

22 PRESENTING IN THE STATE OF LOUISIANA WHO ARE YOUNG.

23     **Q**   AND IN YOUR PRACTICE IN EMERGENCY MEDICINE

24 AND CORRECTIONAL MEDICINE, HAVE YOU PERSONALLY SEEN

25 YOUNGER, RELATIVELY HEALTHIER PEOPLE SUFFER INJURY OR

1  DEATH DUE TO THE HEAT?

2      **A**    YES.  AND A NUMBER OF THOSE ARE EXERCISING.

3  THEY ARE -- AND, OF COURSE, WE HAVE ENORMOUS

4  LITERATURE FROM THE ARMED SERVICES THAT SHOW THAT

5  MILITARY RECRUITS WILL SUCCUMB AND DIE IN THE 50s

6  ALREADY.  WE HAD A HUNDRED PEOPLE WHO WERE -- HAD

7  AUTOPSIES WHO WERE YOUNG, HEALTHY RECRUITS WHO DIED

8  AND WERE AUTOPSIED.  SO THIS IS A LONGSTANDING

9  LITERATURE.

10      **Q**    LET'S LOOK AT THE SKARHA STUDY FROM 2023,

11  PLAINTIFFS' EXHIBIT 42, TAB 3 OF YOUR BINDER.  AND

12  WE'LL LOOK AT PAGE 5 OF THAT STUDY.

13          NOW, SKARHA STUDIES THE IMPACTS OF HEAT ON

14  INCARCERATED POPULATIONS IN PARTICULAR IN TEXAS.  HOW

15  DID THIS STUDY IMPACT YOUR OPINIONS IN THIS CASE?

16      **A**    SKARHA LOOKED AT -- FIRST OF ALL, THE STATE

17  OF TEXAS REQUIRES JAILS TO HAVE TEMPERATURES -- JAILS

18  LIMITED TO 85-DEGREE HEAT INDEX BUT NOT PRISONS.  SO

19  THE PRISONS OF TEXAS ARE UN-AIR-CONDITIONED LARGELY.

20  AND SHE LOOKED AT AIR-CONDITIONED PRISONS VERSUS

21  UN-AIR-CONDITIONED, AND SHE LOOKED AT THE MORTALITY.

22          SHE FOUND THAT OVER THE 11 OR SO YEARS THAT

23  SHE WAS LOOKING, 11 -- EXCUSE ME -- 14 EXTRA PEOPLE

24  DIED PER YEAR FROM THIS PREVENTABLE CAUSE OF HEAT AND

25  ABOUT 15 PERCENT OF -- 15 PERCENT GREATER RISK OF

1 DEATH.

2          AND SO THE POINT IS THAT WHEN YOU HAVE AN

3 UN-AIR-CONDITIONED PRISON, MANY, MANY MORE PEOPLE

4 WILL DIE THAN IF YOU HAVE AIR CONDITIONING IN THE

5 PRISON.

6     **Q**   IS IT THE CASE THAT INCARCERATED POPULATIONS

7 ARE PARTICULARLY VULNERABLE TO HIGH TEMPERATURE?

8     **A**   YES.  BECAUSE, FIRST OF ALL, WHEN YOU'RE

9 INCARCERATED, THERE IS ACCEPTANCE IN THE LITERATURE

10 THAT PEOPLE GET -- CHRONOLOGICALLY THEIR AGE MAY BE

11 50 BUT PHYSIOLOGICALLY, BECAUSE OF THE STRESSORS AND

12 THE CONDITIONS IN WHICH THEY'RE HELD, INCLUDING THE

13 HEAT IN THIS PRISON AT LSP, THAT THEY'RE MUCH OLDER

14 PHYSIOLOGICALLY.  AND INTERESTINGLY SKARHA FOUND IN

15 HER DEATHS THAT THE AVERAGE AGE WAS 54, NOT 65.  IT

16 WAS 54.  SO THIS IS IN KEEPING WITH THE VAST

17 LITERATURE THAT WHERE -- WHO DIED IN THIS SKARHA

18 STUDY IN THESE UN-AIR-CONDITIONED PRISONS.

19          **THE COURT:**  JUST FOR TIME MANAGEMENT, MS.

20 WRIGHT, YOU'RE ALMOST AT ABOUT THE 15 MINUTES

21 REMAINING MARK.  OKAY?

22          **THE WITNESS:**  I'LL SPEAK A LITTLE FASTER,

23 YOUR HONOR.

24          **THE COURT:**  THAT'S -- THAT INCLUDES TEN

25 MINUTES AND THEN YOUR ADDITIONAL FIVE FOR REDIRECT.

1  OKAY?

2        MS. WRIGHT:  I APPRECIATE THAT.  THANK YOU.

3  BY MS. WRIGHT:

4      Q    LET'S TALK ABOUT LSP IN PARTICULAR.  YOU

5  HAVE NEARLY A DECADE OF EXPERIENCE STUDYING THE

6  MEDICAL CARE SYSTEM AT LSP THROUGH YOUR WORK IN *LEWIS*

7  *V CAIN*.  DO YOU HAVE ANY OPINION AS TO WHETHER THE

8  POPULATION AT LSP IN PARTICULAR IS PARTICULARLY

9  VULNERABLE TO HIGH HEAT?

10     A    YES.  THE POPULATION IN THIS GROUP OF PEOPLE

11  WHO ARE WORKING, AS WELL AS THE ENTIRE, HAVE A NUMBER

12  OF CO-MORBIDITIES AND THEY'RE ON A NUMBER OF

13  MEDICATIONS AND A NUMBER OF MENTAL HEALTH PROBLEMS

14  THAT RENDER THEM AT RISK.

15     Q    NOW, THE STATE CLAIMS THAT THERE IS NO RISK

16  OF HEAT STROKE AT LSP.  DO YOU AGREE?

17     A    WELL, THAT'S ABSURD, RIGHT?  WE'RE IN

18  LOUISIANA.  WE HAVE STUDIES FROM LOUISIANA THAT SHOW

19  THAT PEOPLE DIE OF HEAT STROKE.  I PERSONALLY SAW TWO

20  RECORDS OF PEOPLE WHO DIED IN HEAT -- OF HEAT STROKE;

21  ONE WHO DIED AND ONE WHO GOT SICK, BACK IN THE *LEWIS*

22  CASE.  SO THAT'S ABSURD.  AND SO THERE IS ONLY ONE

23  WAY THAT CAN HAPPEN:  EITHER YOU'RE NOT DIAGNOSING

24  IT, YOU'RE NOT CALLING IT, OR YOU'RE NOT TAKING

25  TEMPERATURES, WHICH HAPPENED IN TEXAS.

1    **Q**    YOU MENTIONED EARLIER THE CONCEPT OF

2    MALINGERING.    IN YOUR DECADES OF EXPERIENCE IN

3    CORRECTIONAL MEDICINE, HAVE YOU FORMED ANY OPINIONS

4    AS TO WHETHER PREJUDICE AMONG CORRECTIONAL STAFF

5    IMPACTS THE HEALTH CARE OUTCOMES OF INCARCERATED

6    PEOPLE?

7    **A**    I SEE THE WORD IN THE *LEWIS* CASE, AND EVEN

8    HERE THE WORD "MALINGERING" APPEARS FREQUENTLY, SO

9    THERE IS A BELIEF THAT THERE IS SECONDARY GAIN FROM

10   PRESENTING WITH A COMPLAINT.    YOU GET OUT OF FIELD,

11   YOU GET IN THE AIR CONDITIONING; IF THE INFIRMARY IS

12   AIR-CONDITIONED, THEY'RE SECONDARY.    SO THIS KIND OF

13   CYNICISM RESULTS IN THE DEATH AND MORBIDITY.

14       FOR EXAMPLE, IN THE *LEWIS* CASE WE SAW

15   MULTIPLE PEOPLE WHO WERE THOUGHT TO BE INTOXICATED

16   AND WERE COMPLETING THEIR STROKES AND HAD THE BRAIN

17   INJURY DUE TO COMPLETION OF STROKES WHILE THEY'RE

18   BEING OBSERVED FOR WHATEVER INTOXICATION THEY WERE

19   BELIEVED TO BE HAVING.

20   **Q**    NOW, THE STATE CLAIMS ALSO THAT INCARCERATED

21   PEOPLE WHO PLAY SPORTS OUTSIDE ARE AT GREATER RISK OF

22   HEAT INJURY THAN THOSE WORKING THE FARM LINE.    HOW DO

23   YOU RESPOND?

24   **A**    IF YOU DO PLAY BASKETBALL WHEN YOU'RE IN

25   PRISON, YOU ARE DOING THAT WILLFULLY.    YOU CAN DO

1   WHATEVER YOU WANT.  YOU CAN SIT DOWN IN THE SHADE AND

2   TALK TO YOUR FRIENDS, YOU CAN STAND AT ONE GOAL POST,

3   LIKE I MIGHT CHOOSE TO DO, AND WAIT FOR EVERYBODY TO

4   RUN BACK TO THE OTHER END.  AND IT'S NOT COERCED.

5   THERE IS NO FORCE USED, AND YOU DON'T HAVE THE PUSHER

6   PUSHING YOU.  BECAUSE THE TESTIMONY FROM THE PUSHER,

7   THE CORRECTIONS OFFICER, WAS THAT HE ALSO UNDERGOES

8   SOME KIND OF DISCIPLINE -- NOT DISCIPLINE, BUT HE HAS

9   PRESSURE TO MAKE HIS GROUP WORK.

10      Q    SO IT'S JUST NOT AN APPLES-TO-APPLES

11  COMPARISON?

12      A    NO.

13      Q    DR. VASSALLO, YOU'VE MENTIONED THAT THERE

14  ARE CERTAIN CHRONIC HEALTH CONDITIONS THAT INCREASE A

15  PATIENT'S RISK OF HEAT-RELATED ILLNESS.  WHAT DOES

16  THE LITERATURE INDICATE ABOUT THE IMPACT OF DIABETES

17  ON A PATIENT'S ABILITY TO THERMOREGULATE?

18      A    DIABETES IS A MICROVASCULAR DISEASE

19  AFFECTING -- AS WE ALL KNOW, IF SOMEBODY HAS A LITTLE

20  WOUND TO THEIR FOOT, THEY MAY END UP WITH AN

21  AMPUTATION BECAUSE OF THE PROBLEMS WITH THE

22  AMPUTATE OF THE VASCULATURE.  WE KNOW THEY HAVE MORE

23  HEART ATTACKS AND SO FORTH.  SO WE KNOW THAT DIABETES

24  IS A RISK FACTOR FOR HEAT-RELATED ILLNESS BECAUSE IT

25  AFFECTS THE HEART AND THE ABILITY OF THE VASODILATION

1  AND EVEN THE SWEAT --

2          **THE REPORTER:**  SWEAT AND?

3          **THE WITNESS:**  EVEN THE SWEAT GLAND FUNCTION,

4  WHICH IS CLOSELY INTEGRATED WITH VASODILATION.

5  **BY MS. WRIGHT:**

6      **Q**    AND WHAT DOES THE LITERATURE INDICATE ABOUT

7  OBESITY AND THERMOREGULATION?

8      **A**    THERE IS NO QUESTION THAT OBESITY, BECAUSE

9  OF THE LARGE SURFACE AREA AND BECAUSE OF THE WARMING

10  OF THE CORE, THE NEED TO BRING THE BLOOD TO THE

11  SURFACE, IS A RISK.  IT'S SO -- STATED SO IN MULTIPLE

12  ARTICLES.

13      **Q**    IN YOUR OPINION, SHOULD A PERSON

14  INCARCERATED AT LSP WHO HAS DIABETES OR WHO IS OBESE

15  RECEIVE A HEAT PRECAUTION DUTY STATUS?

16      **A**    YES.

17      **Q**    PEOPLE TAKING CERTAIN MEDICATIONS ARE AT AN

18  INCREASED RISK OF HEAT ILLNESS.  DO SSRIs IN

19  PARTICULAR RENDER A PERSON ESPECIALLY VULNERABLE TO

20  HEAT?

21      **A**    YES.  THE CDC STATES THIS CLEARLY IN 2024

22  WHEN THEY REVISED THEIR HEAT LIST; THE WORLD HEALTH

23  ORGANIZATION.  DR. KELDIE RELIES FREQUENTLY ON

24  UPTODATE.  UPTODATE SAYS IT'S A RISK.  AND THE

25  LITERATURE SHOWS THAT THE HYPOTHALAMUS AND THE

1  TEMPERATURE THERMOSTAT IN THE BRAIN HAS CERTAIN

2  SEROTONIN RECEPTORS.  AND AS A CLINICIAN AND A

3  MEDICAL TOXICOLOGIST, WE SEE THAT PEOPLE WHO HAVE TOO

4  MUCH SEROTONIN GET HEAT STROKE, AND SO WE HAVE TO --

5  AND SO WE KNOW THAT TOO MUCH SEROTONIN AFFECTS

6  TEMPERATURE AND CAUSES HEAT STROKE.

7      Q    AND TO BE CLEAR, YOUR OPINIONS IN THIS CASE

8  ARE NOT FOCUSED SOLELY ON HEAT STROKE BUT ON THE

9  MYRIAD OF OTHER HEAT-RELATED ILLNESS, INCLUDING

10  EXACERBATION OF UNDERLYING CONDITIONS THAT CAN BE

11  CAUSED BY --

12      A    IT'S SO IMPORTANT THAT --

13          THE REPORTER:  EXCUSE ME, PLEASE.  YOU'RE

14  GOING TO HAVE TO SLOW DOWN --

15          THE WITNESS:  EXCUSE US.  WE KNEW THAT WE

16  WERE SHORT ON TIME.

17          MS. WRIGHT:  THAT TIMER IS KEEPING US BUSY.

18  LET ME ASK THE QUESTION AGAIN.

19          THE REPORTER:  PLEASE REPEAT YOUR QUESTION.

20  BY MS. WRIGHT:

21      Q    DR. VASSALLO, YOUR OPINIONS IN THIS CASE ARE

22  NOT LIMITED TO HEAT STROKE BUT THEY ALSO CONSIDER THE

23  MANY OTHER HEAT-RELATED ILLNESSES AND INCLUDING THE

24  EXACERBATION OF UNDERLYING CO-MORBIDITIES?

25      A    SO THERE'S -- IT'S UNQUESTIONABLE IN THE

1  SCIENTIFIC LITERATURE THAT HEAT EXACERBATES

2  CARDIOVASCULAR, CEREBROVASCULAR, AND PULMONARY

3  DISEASES.  IT'S CLEARLY SHOWN IN EXHIBIT 1 OF DR.

4  KELDIE, ALSO; DR. KELDIE'S EXHIBIT.  IT'S VERY CLEAR

5  THAT THE RELATIVE RISK RATIOS ARE ENORMOUSLY HIGHER.

6  IT'S SHOWN IN BOUCHAMA'S.  AND I CAN KEEP ON TALKING

7  ABOUT THE NUMBER OF ARTICLES, BUT WE HAVE NO TIME.

8      Q    IN YOUR OPINION, SHOULD A PERSON

9  INCARCERATED AT LSP WHO TAKES AN SSRI RECEIVE A HEAT

10 PRECAUTION DUTY STATUS?

11     A    YES.

12         **THE COURT:**  FIVE MINUTES ON YOUR DIRECT.

13         **MS. WRIGHT:**  I APPRECIATE IT.  THANK YOU.

14         **THE COURT:**  YOUR FIRST DIRECT.

15         **MS. WRIGHT:**  MY FIRST DIRECT.

16 **BY MS. WRIGHT:**

17     Q    SO WHAT ABOUT IF A PERSON HAS HYPERTENSION

18 AND DIABETES OR TAKES AN SSRI AND HAS ASTHMA?  WHAT'S

19 THE EFFECT ON A PERSON'S ABILITY TO THERMOREGULATE?

20     A    THEY'RE SYNERGISTIC.  WHEN -- THEY'RE

21 SYNERGISTIC.

22     Q    MEANING THAT IT WOULD EXACERBATE THE IMPACTS

23 OF --

24     A    THAT'S RIGHT.

25     Q    -- HEAT ILLNESS?

1          NOW, DR. VASSALLO, YOU REVIEWED SOME MEDICAL

2    RECORDS OF THE PLAINTIFFS IN THIS CASE, BUT YOU

3    DIDN'T CONDUCT COMPLETE CHART REVIEWS.  IS THAT

4    RIGHT?

5    **A**    THAT'S CORRECT.

6    **Q**    DID YOU SEE ANY EVIDENCE SUGGESTING THAT THE

7    PLAINTIFFS HAVE CO-MORBIDITIES OR TAKE MEDICATIONS

8    THAT INCREASED THEIR VULNERABILITY TO HEAT?

9    **A**    YES.  THEY HAVE MENTAL HEALTH CONDITIONS,

10   THEY TAKE MEDICATION FOR THAT.  THEY HAVE ALL OF THE

11   CARDIOVASCULAR, DIABETES AND THOSE KINDS OF THINGS

12   THAT WE'VE TALKED ABOUT IN THE LITERATURE AS REPLETE

13   WITH, YES.

14   **Q**    HAVE YOU SEEN EVIDENCE INDICATING THAT THE

15   PLAINTIFFS HAVE PRESENTED WITH SYMPTOMS CONSISTENT

16   WITH HEAT-RELATED ILLNESS?

17   **A**    YES.  THERE IS DIZZINESS, THERE IS

18   LIGHTHEADEDNESS, THERE IS LACK OF ENERGY, THERE IS

19   NAUSEA, VOMITING.  ALL OF THOSE ARE SIGNS OF

20   HEAT-RELATED ILLNESS.

21   **Q**    CHANGES IN MENTAL ACUITY?

22   **A**    THAT'S RIGHT.

23   **Q**    IN YOUR OPINION, WOULD THOSE IMPAIRMENTS

24   ENTITLE THE PLAINTIFFS TO RELIEF FROM HEAT?

25   **A**    YES.

1  **Q**    THEY SHOULD RECEIVE A HEAT PRECAUTION DUTY

2  STATUS?

3  **A**    YES.

4  **Q**    FINAL QUESTION, DR. VASSALLO:  FROM A

5  MEDICAL PERSPECTIVE, DOES THE FARM LINE EXPOSE PEOPLE

6  TO A RISK OF HEAT-RELATED HARMS?

7  **A**    IT EXPOSES PEOPLE TO A SUBSTANTIAL RISK OF

8  SERIOUS HARM, YES.

9  **Q**    WHAT DO YOU MEAN BY THAT?

10  **A**    WELL, SUBSTANTIAL --

11  **MR. BLANCHFIELD:**  YOUR HONOR, WE'RE GOING TO

12  OBJECT TO LEGAL CONCLUSION "SUBSTANTIAL RISK OF

13  SERIOUS HARM."

14  **THE COURT:**  SHE'S ENTITLED TO ANSWER THAT IN

15  HER PROFESSIONAL OPINION AS A PHYSICIAN, AS AN EXPERT

16  IN THESE OTHER AREAS.

17        YOU MAY ANSWER THE QUESTION, MA'AM.

18        THE OBJECTION IS OVERRULED.

19  **BY THE WITNESS:**

20  **A**    SUBSTANTIAL MEANS IT'S MEASURABLE, IT'S

21  STATISTICALLY SIGNIFICANT AND, AS A PHYSICIAN, IT'S

22  IMPACTFUL AND IT AFFECTS THE HEALTH OF THE

23  INDIVIDUALS.  THAT'S WHAT IT IS.  AND JUST TO THINK

24  ABOUT SERIOUS, SERIOUS IS NOT JUST TODAY; DO YOU GET

25  DIZZY TODAY.  WHAT IS HAPPENING TO CARDIOVASCULAR

1  DISEASE DOWN THE ROAD?  WHAT IS HAPPENING TO YOUR

2  OVERALL PHYSIOLOGY?  SO ALL OF THOSE THINGS ARE

3  SERIOUS AND NOT TRIVIAL.  AND THAT'S WHY I SAY IT'S A

4  SUBSTANTIAL RISK AND THE HARMS CAN BE SERIOUS.

5      **Q**    AND JUST TO FOLLOW UP, THE HARMS CAN

6  MANIFEST LATER FROM HEAT-RELATED ILLNESS?

7      **A**    THAT'S RIGHT.

8      **Q**    THANK YOU.

9          **THE COURT:**  ALL RIGHT.  THANK YOU, MS.

10 WRIGHT.  YOU HAVE OFFICIALLY 11 -- EXCUSE ME -- SIX

11 MINUTES LEFT.

12          **MS. WRIGHT:**  I'LL TAKE THEM.

13          **THE COURT:**  NOW, I CREDITED YOU TWO MINUTES

14 AS WE ADDRESSED THE EVIDENTIARY ISSUES THAT WERE

15 RAISED, YOU KNOW, BY MR. JONES, SO YOU HAVE SIX

16 MINUTES LEFT, AGAIN, ON YOUR REDIRECT.

17              WHY DON'T WE GO ON AND TAKE A BREAK AT

18 THIS TIME.  WE'LL BE IN RECESS FOR TEN MINUTES.

19              NOW, IN THE MEANTIME, DR. VASSALLO, YOU

20 HAVE TESTIFIED SEVERAL TIMES NOT ONLY IN THIS

21 COURTROOM AND OTHERS.  AS YOU WELL KNOW, YOU ARE

22 STILL UNDER OATH.  HOWEVER, DURING THE TEN-MINUTE

23 BREAK, RECESS, I SPECIFICALLY INSTRUCT YOU NOT TO

24 DISCUSS YOUR TESTIMONY WITH ANYONE, NOT THE LAWYERS,

25 NOT THE CLIENT, NO ONE.  OKAY?

1          THE WITNESS:  I THINK I'LL STAY HERE, YOUR

2    HONOR.

3          THE COURT:  YOU'RE CERTAINLY ENTITLED TO DO

4    SO.

5               ALL RIGHT.  COURT IS IN RECESS.

6          THE LAW CLERK:  ALL RISE.

7               COURT IS IN RECESS.

8          **(WHEREUPON, A RECESS WAS TAKEN.)**

9          THE LAW CLERK:  ALL RISE.  COURT IS NOW IN

10   SESSION.

11         THE COURT:  BE SEATED.

12              OKAY.  WE ARE NOW BACK ON THE RECORD IN

13   THE CASE OF *VOTE VERSUS LEBLANC*.  AT THIS TIME WE

14   WILL BEGIN THE CROSS-EXAMINATION OF DR. VASSALLO.

15              AND, DOCTOR, LET ME REMIND YOU THAT YOU

16   ARE STILL UNDER OATH.  OKAY?

17         THE WITNESS:  YES, SIR.

18                   **CROSS-EXAMINATION**

19   BY MR. BLANCHFIELD:

20      **Q**   GOOD MORNING, DR. VASSALLO.

21      **A**   GOOD MORNING, MR. BLANCHFIELD.

22         THE COURT:  NOW, LET ME JUST MENTION

23   SOMETHING TO YOU, GENTLEMEN.  AS YOU ALL KNOW, UNDER

24   OUR LOCAL RULES -- MR. JONES RAISED THE OBJECTIONS TO

25   THE EXHIBITS THAT THE PLAINTIFF WOULD RELY ON.  AS

1  YOU WELL KNOW, UNDER OUR RULES, ONLY THE LAWYER THAT

2  EXAMINES THE WITNESS CAN RAISE OBJECTIONS.  SO I JUST

3  WANT TO MAKE SURE GOING FORWARD THAT WE KNOW THE

4  RULES -- THE LOCAL RULES OF THIS COURT.  OKAY?

5          **MR. BLANCHFIELD:**  YES, YOUR HONOR.

6          **MR. JONES:**  YES, YOUR HONOR.

7          **THE COURT:**  I'M NOT ASCRIBING ANY BAD

8  MOTIVES OR ANYTHING LIKE THAT, BUT I WANT TO MAKE

9  SURE EVERYBODY UNDERSTANDS THE RULES.  SO GOING

10 FORWARD, IF YOU'RE NOT GOING TO EXAMINE THE WITNESS,

11 YOU CANNOT RAISE THE OBJECTION.

12          ALL RIGHT, LET'S PROCEED.

13          **MR. BLANCHFIELD:**  THANK YOU, JUDGE.

14 **BY MR. BLANCHFIELD:**

15   **Q**   DR. VASSALLO, WE HEARD YOUR TENDER WITH

16 RESPECT TO A NUMBER OF SPECIALTIES.  YOU ARE NOT A

17 PHARM-D, ARE YOU?

18   **A**   I AM NOT A PHARMACIST, NO, SIR.  I'M A MED-

19 --

20   **Q**   YOU'RE A TOXICOLOGIST?

21   **A**   I'M A MEDICAL PHYSICIAN.  AND MY TRAINING,

22 FELLOWSHIP IS -- AFTER RESIDENCY IS TWO MORE YEARS OF

23 SPECIALIZED TRAINING OF -- IN MEDICAL TOXICOLOGY.

24   **Q**   YOU ARE FAMILIAR WITH THE PROFESSIONAL

25 DEGREE OF A DOCTORATE OF PHARMACY?

1    **A**    I AM.

2    **Q**    NOW, HAVE YOU EVER BEEN EMPLOYED IN A PRISON

3  OR A JAIL PROVIDING MEDICAL CARE ON A DAILY BASIS TO

4  INMATES LIKE THE RANDY LAVESPERES OF THIS WORLD?

5    **A**    I HAVE NOT.

6    **Q**    ARE YOU A MEMBER OF THE AMERICAN COLLEGE OF

7  CORRECTIONAL PHYSICIANS?

8    **A**    NO.

9    **Q**    ARE YOU A CERTIFIED CORRECTIONAL HEALTH CARE

10 PROFESSIONAL?

11    **A**    I DON'T EVEN KNOW WHAT THAT IS.  I'M

12 CERTIFIED AS A CORRECTIONAL -- BY THE NATIONAL

13 COMMISSION ON CORRECTIONAL HEALTH CARE.

14    **Q**    BY THE NATIONAL COMMISSION OF CORRECTIONAL

15 HEALTH CARE YOU ARE CERTIFIED?

16    **A**    YES.  I'M A CC --

17        **THE REPORTER:**  I'M SORRY.  CC?

18        **THE WITNESS:**  CCHP.  EXCUSE ME.  I'LL DO

19 BETTER.

20 **BY MR. BLANCHFIELD:**

21    **Q**    NOW, THERE WAS SOME DISCUSSION ABOUT ONE

22 OF -- I THINK IT WAS YOUR SECOND DECLARATION WHERE

23 YOU DESCRIBED THE THEN EIGHT PLAINTIFFS, NOW SEVEN

24 PLAINTIFFS.  DO YOU RECALL THAT?

25    **A**    NOT SPECIFICALLY, SIR.

1    Q    WELL, WE HAVE YOUR DECLARATION WHERE YOU GO

2  THROUGH -- YOU START OUT WITH ALVIN WILLIAMS, DAMARIS

3  JACKSON, KENDRICK STEVENSON.  DO YOU RECALL THAT?

4    A    YES.

5    Q    OKAY.  AND WAS IT YOUR INTENT IN THIS -- IN

6  CREATING THIS DECLARATION TO SUGGEST THAT THESE THEN

7  EIGHT PLAINTIFFS SHOULD NOT BE WORKING ON THE FARM

8  LINE?

9    A    MY JOB AND MY INTENT IS TO LOOK AT THE

10  EFFECT OF HEAT ON ALL MEMBERS WHO WORK ON THE FARM

11  LINE.  THAT'S IT.

12    Q    BUT YOU WENT THROUGH -- I MEAN, SOME OF

13  THESE INMATES HAVE BEEN AT LSP FOR MANY, MANY YEARS.

14  YOU WENT THROUGH THEIR MEDICAL HISTORY, DID YOU NOT?

15    A    NOT COMPLETELY.  I WAS -- I THINK THAT THE

16  DEFENSE ONLY OFFERED PART OF THE MEDICAL RECORDS, SO

17  I SAW A SMALL PART OF THEIR MANY YEARS OF MEDICAL

18  RECORDS.

19        MR. BLANCHFIELD:  FOR THE RECORD, YOUR

20  HONOR, WE FILED INTO THE RECORD, AS THE JUDGE -- AS

21  YOU TOLD ME TO, THE ENTIRE MEDICAL RECORD OF EVERY

22  EIGHT PLAINTIFFS, SO --

23        THE COURT:  WELL, THANK YOU FOR THAT

24  CLARIFICATION.

25  BY MR. BLANCHFIELD:

1   Q   WAS IT YOUR INTENT -- ALTHOUGH YOU DID NOT

2   DO A RECORD -- A FULL RECORDS REVIEW AS YOUR REPORT

3   INDICATED, WAS IT YOUR INTENT TO ACCURATELY REFLECT

4   THE MEDICAL CONDITIONS AND MEDICATIONS THAT THESE

5   EIGHT PLAINTIFFS RECEIVED?

6   A   THE -- MY INTENT WAS TO LOOK AT THE MEDICAL

7   RECORD THAT I WAS PROVIDED AND TO LOOK AT THE MEDICAL

8   CONDITIONS AS THEY WERE LISTED IN THE MEDICAL RECORD

9   AND LOOK AT THE MEDICATIONS LIST AND TO OPINE ON THE

10  EFFECT OF MEDICATIONS ON HEAT TOLERANCE IN THE ENTIRE

11  POPULATION.

12  Q   NOW, YOU AND I MET OUT IN THE CUCUMBER PATCH

13  AT LSP.  CORRECT?

14  A   I ACTUALLY DIDN'T REALIZE IT WAS YOU.  BUT

15  IF YOU SAY SO, IT'S MY FAULT.

16  Q   THAT'S OKAY.  WE RODE ON A BUS, WE WENT AND

17  WE WATCHED THEM PICK CUCUMBERS.  DO YOU RECALL THAT?

18  A   I TOTALLY RECALL THE PICKING OF THE

19  CUCUMBERS AND THE BUS AND THE WHOLE THING EXCEPT FOR

20  YOU, SIR.  I DON'T REMEMBER YOU BEING THERE.  I DON'T

21  THINK I KNEW YOU WERE THE LAWYER.  THAT'S ALL.

22  Q   THAT'S FINE.  WAS IT YOUR FEELING OUT THERE

23  OBSERVING IT THAT THE PICKING OF CUCUMBERS YOU WOULD

24  DESCRIBE AS A STRENUOUS ACTIVITY?

25  A   YOU WANT TO KNOW MY FEELING?  THE FEELING IS

1   THAT -- HOW I FEEL ABOUT PICKING CUCUMBERS, IS THAT

2   RELEVANT TO THIS PHASE?

3       Q    YES.  IS IT A STRENUOUS ACTIVITY?  WE SPENT

4   A LOT OF TIME IN YOUR DEPOSITION TALKING ABOUT

5   EXERTION AND STRENUOUS ACTIVITIES AND THINGS LIKE

6   THAT.

7       A    RIGHT.

8       Q    THAT'S MY QUESTION.

9       A    YES, I DO THINK THAT PICKING CUCUMBERS CAN

10  BE STRENUOUS.  YES.

11      Q    AND IS IT ALSO FAIR TO SAY THAT WHEN WE'RE

12  TALKING ABOUT EXERTION AND STRENUOUS, THINGS LIKE

13  THAT, IT'S GOING TO IMPACT AN INDIVIDUAL DIFFERENTLY

14  FROM INDIVIDUAL TO INDIVIDUAL?

15      A    WELL, SOME PEOPLE WHO -- OR WILL BE IMPACTED

16  MORE THAN OTHERS DEPENDING ON THEIR CONDITION, THEIR

17  MEDICAL PROBLEMS, THE CONDITIONS IN WHICH THEY'RE

18  HELD.  IF THEY GO HOME AND THEY'RE IN AIR

19  CONDITIONING, I'M SURE THAT WORKING ON THE CUCUMBER

20  PATCH WOULD BE LESS STRENUOUS TO THEIR PHYSIOLOGY

21  THAN IF THEY STAY AND GO BACK TO PRISON AND ARE

22  UN-AIR-CONDITIONED CIRCUMSTANCES.  SO YES, IT CAN.

23      Q    YOU REMEMBER EXPLAINING TO ME IN YOUR

24  DEPOSITION THAT EACH INDIVIDUAL HAS ITS OWN

25  INDIVIDUAL MAKE-UP AND DEGREE OF FITNESS SO IT'S

1  GOING TO IMPACT EACH -- FROM INDIVIDUAL TO INDIVIDUAL

2  DIFFERENTLY?

3      **A**    I EXPLAINED THAT TO YOU IN ANSWER TO MY

4  QUESTION.  BUT THE LITERATURE SHOWS THAT ALL OF THOSE

5  INDIVIDUAL DIFFERENCES ARE ACCOUNTED FOR BY THE

6  PUBLIC HEALTH EPIDEMIOLOGY OF WHO'S IMPACTED BY THE

7  HEAT.  SO WE COULD LOOK AROUND AT THE CUCUMBER PATCH

8  AND SAY SOME PEOPLE ARE IMPACTED MORE THAN SOME OR

9  OTHERS.  BUT THOUSANDS AND THOUSANDS OF PEOPLE ARE

10  INVOLVED IN THE LITERATURE REGARDING THE WORSENING OF

11  UNDERLYING HEAT CONDITIONS AND THE RISK OF HARM FROM

12  THE HEAT.  SO IN SOME OF THOSE THEY HAVE A CONDITION

13  SUCH AS ONE OF THESE INDIVIDUALS.  SOME ARE MORE

14  HEALTHIER THAN OTHERS AND SOME ARE NOT.  BUT ALL

15  PEOPLE SUBJECTED TO THE CUCUMBER PATCH AND THE FARM

16  LINE, ACCORDING TO THE FARM -- THE EPIDEMIOLOGY, ARE

17  AT RISK.

18          SO I AGREE THAT YOU ASKED ME ABOUT

19  INDIVIDUALS, BUT THIS CASE IS NOT AN INDIVIDUAL

20  INJURY CASE.  THIS IS ABOUT A GROUP OF PEOPLE THAT IS

21  WELL REPRESENTED AND WELL-GENERALIZED TO THE VAST

22  NUMBER OF PEOPLE IN THE PUBLIC HEALTH LITERATURE.

23      **Q**    IN YOUR DEPOSITION I ASKED YOU TO AGREE THAT

24  IF YOU EXERT YOURSELF MORE, YOU'RE GOING TO HAVE A

25  GREATER RISK OF HEAT INJURY, AND YOU SAID, "I

1    DISAGREE WITH THAT STATEMENT BECAUSE IT DEPENDS ON

2    THE INDIVIDUAL."  IS THAT STILL YOUR OPINION?

3       A    WELL, IT DOES.  I MEAN, IF I EXERT MYSELF

4    VERSUS YOU EXERTING YOURSELF VERSUS, YOU KNOW, SOME

5    YOUNG MILITARY RECRUIT THAT DOES IT ALL DAY, YES, IT

6    DOES DE- -- BUT THAT IS NOT WHAT THIS IS ABOUT.  THIS

7    IS ABOUT SOMETHING VERY DIFFERENT THAN AN INDIVIDUAL.

8       Q    THIS IS ABOUT EXERTIONAL HEAT, THOUGH, IS IT

9    NOT?

10      A    NO, SIR, IT'S NOT.

11      Q    IT'S NOT?

12      A    NO, SIR.

13      Q    HOW IS --

14      A    THIS IS -- EXCUSE ME, SIR.

15      Q    GO AHEAD.

16      A    THIS IS ABOUT THE IMPACT OF HEAT ON THE

17   PHYSIOLOGY AND THE HEALTH OF THE PEOPLE ON THE FARM

18   LINE.  THE PEOPLE ON THE FARM LINE ARE

19   WELL-REPRESENTED BY THE THOUSANDS OF PAPERS AND

20   THOUSANDS OF PEOPLE WITHIN THOSE VAST POPULATIONS,

21   SO -- POPULATION.  SO -- AND THEY -- THERE IS A

22   COMBINATION OF EXERTION AND JUST BEING PRESENT IN

23   THAT HEAT, AND SO THIS IS NOT JUST ABOUT EXERTION.

24   THIS IS YOU CAN -- THIS IS ABOUT THE EFFECT OF HEAT.

25   THEY MAY BE EXERTING THEMSELF A LOT, THEY MAY BE

1  EXERTING THEMSELF JUST SITTING THERE.  BUT THIS IS

2  ABOUT THE UNDERLYING CONDITIONS, THE WORSENING AND AS

3  WELL AS JUST EXERTION.  SOME PEOPLE ARE EXERTING

4  THEMSELVES ON THE FARM LINE, SOME PEOPLE ARE JUST

5  SITTING OUT THERE IN THE HEAT.  ONE GUY DIDN'T WANT

6  TO WORK IN THE HEAT.  HE SAID HE DIDN'T WANT TO DO

7  THAT, SO HE SAT THERE.

8      Q    HE SAT THERE ON THE MILK CRATE?

9      A    THAT'S RIGHT.  HE SAID HE DIDN'T WANT TO BE

10 FARMER JOE.

11     Q    AND NOTHING HAPPENED TO HIM.  THEY JUST LET

12 HIM SIT THERE.

13     A    I HAVE NO IDEA WHAT HAPPENED TO HIM.

14     Q    YOU WERE THERE.  YOU SAW HIM JUST SITTING

15 THERE FOR --

16     A    I DON'T KNOW WHAT HAPPENED TO HIM WHEN HE

17 WENT INSIDE.  THE MAN IS MENTALLY ILL.  VERY SEVERELY

18 MENTALLY ILL.  HE WAS OUT ON THAT FARM LINE SITTING

19 ON THAT BOX.  I HAVE NO IDEA.

20     Q    YOU DON'T HAVE THE CAPACITY OR COMPETENCY TO

21 DIAGNOSE THAT GUY AS BEING MENTALLY ILL, DO YOU?

22     A    OH, YES.  HE WAS MENTALLY ILL.

23     Q    AND YOU JUDGE THAT FROM HIM SITTING ON THE

24 MILK CART?

25     A    NO, SIR.  I SPENT A LOT OF TIME TALKING TO

1    HIM.

2        **Q**    YOU SAID THAT -- WHEN I ASKED YOU THE

3    CONSEQUENCES OF EXERTION -- YOU TOLD ME, ACTUALLY,

4    THE CONSEQUENCES OF EXERTION WILL DEPEND ON A NUMBER

5    OF PHYSIOLOGICAL FACTORS CONCERNING ONE INDIVIDUAL.

6    DO YOU REMEMBER TELLING ME THAT?

7        **A**    IF YOU JUST READ THAT, I'M SURE I TOLD YOU

8    THAT.  SO ONE INDIVIDUAL WILL -- MAY RESPOND IN ONE

9    WAY IN ONE DAY DEPENDING ON THE DEGREE OF SLEEP,

10   DEPENDING ON WHAT MEDICINE HE DID OR DIDN'T TAKE,

11   DEPENDING ON HIS PHYSIOLOGY ON THAT DAY.  BUT THIS IS

12   NOT A CASE -- THIS IS NOT AN INDIVIDUAL HARM CASE.

13   THIS IS A CASE ABOUT THE RISK TO A POPULATION OR A

14   CLASS OF PEOPLE OR A GROUP OF PEOPLE.  AND THAT RISK

15   OR GROUP OF PEOPLE IS ON THE FARM LINE AND THE

16   ARTICLES ARE GENERALIZABLE TO THE FARM LINE.

17       **Q**    THOSE PHYSIOLOGICAL FACTORS THAT YOU

18   MENTIONED, THOUGH, THERE ARE MORE THINGS.  IT DEPENDS

19   ON THE CONDITION OF THE HEART.  ISN'T THAT ONE OF THE

20   THINGS?

21       **A**    THE ABILITY TO WITHSTAND HEAT AND THE

22   STRESSORS OF HEAT DO DEPEND ON THE CONDITION OF THE

23   HEART AND THE ABILITY TO INCREASE THE CARDIAC OUTPUT,

24   THE SPEED OF THE HEART BEATING, AS WELL AS THE AMOUNT

25   OF BLOOD THAT COMES OUT OF THE HEART WITH EACH BEAT.

1    Q    CONDITION OF THE SWEAT GLANDS WOULD BE

2  ANOTHER FACTOR?

3    A    YES, THAT'S RIGHT.

4    Q    AN INDIVIDUAL'S ABILITY TO VASODILATE WOULD

5  BE ANOTHER FACTOR?

6    A    THOSE ARE -- SWEATING AND VASODILATION AND

7  GOOD FUNCTION OF THE BRAIN ARE ALL KEY PIECES OF

8  THERMOREGULATION, YES.

9    Q    AND THOSE DIFFER FROM INMATE TO INMATE, DO

10  THEY NOT?

11    A    SOMETIMES THEY DO.  I THINK THAT EACH

12  INDIVIDUAL HAS HIS INDIVIDUAL PHYSIOLOGY.

13    Q    NOW, IN YOUR VIEW OF THIS MATTER, IN LOOKING

14  AT THE LEVEL OF ACTIVITY, EXERTION OR STRENUOUSNESS

15  OF THE FARM LINE, DID YOU COMPARE IT TO OTHER JOBS AT

16  LSP?

17    A    NO.

18    Q    DID YOU -- YOU WERE PROVIDED INFORMATION

19  THAT A NUMBER OF INDIVIDUALS WHO ARE WORKING ON THE

20  FARM LINE IN THE MORNING HOURS, KNOCKING OFF AT

21  11:30, GOING BACK TO HAVE LUNCH, THEN ENGAGE IN

22  COMPETITIVE FULL-COURT BASKETBALL?

23    A    WHAT WAS THE QUESTION, SIR?

24    Q    WERE YOU AWARE OF THAT?

25    A    YES.

1    **Q**    WERE YOU PROVIDED THAT INFORMATION?

2    **A**    YES.

3    **Q**    AND THEY -- THIS COMPETITIVE BASKETBALL,

4    THEY HAVE LEAGUES, THEY PLAY IN THE AFTERNOON HOURS

5    IN THE SUMMER IN THE HOTTEST TIME OF THE YEAR.  WERE

6    YOU PROVIDED THAT INFORMATION?

7    **A**    YES.

8    **Q**    THESE INDIVIDUALS WHO WORK ON THE FARM LINE,

9    THEY LIFT WEIGHTS, THEY PLAY FLAG FOOTBALL, THEY PLAY

10   SOCCER, THEY PLAY SOFTBALL.  WERE YOU PROVIDED THAT

11   INFORMATION?

12        **MS. WRIGHT:**  YOUR HONOR, I'M GOING TO

13   OBJECT.  I DON'T KNOW IF THERE IS A QUESTION HERE OR

14   IF MR. BLANCHFIELD IS TESTIFYING.

15        **THE COURT:**  MR. BLANCHFIELD?

16        **MR. BLANCHFIELD:**  YOUR HONOR, THIS IS CROSS-

17   EXAMINATION OF AN EXTREMELY EXPERIENCED INDIVIDUAL.

18   I'M -- IT IS A QUESTION.  I ASKED HER, "WERE YOU

19   PROVIDED THIS INFORMATION?"  VERY SIMPLE QUESTION.

20        **THE COURT:**  I WILL ALLOW THE QUESTION TO BE

21   ANSWERED.

22        WERE YOU PROVIDED SUCH INFORMATION,

23   DOCTOR?

24   **BY THE WITNESS:**

25    **A**    I THINK I WAS PROVIDED INFORMATION THAT

1  PEOPLE EXERCISE IN THE AFTERNOONS.  WHETHER THEY DO

2  IT ON THE DAYS THEY WORK ON THE FARM LINE OR NOT, I

3  DON'T KNOW.  BUT I DO BELIEVE IF YOU -- IF YOU

4  REPRESENT TO ME THAT PEOPLE WHO WORK ON THE FARM LINE

5  IN THE MORNING SOMETIMES GO AND PLAY SPORTS IN THE

6  AFTERNOON, I ACCEPT IT.

7      Q    AND WOULD YOU AGREE THAT THE RISK OF HARM TO

8  THESE INDIVIDUALS IS MORE SIGNIFICANT IN THE HOT

9  AFTERNOON HOURS PLAYING FULL-COURT BASKETBALL THAN IT

10 WOULD BE PICKING CUCUMBERS?

11     A    NO.

12     Q    WHY WOULD THAT NOT BE A MORE SERIOUS RISK?

13     A    WELL, BECAUSE WHEN -- IF WE -- IF THEY GO

14 AND PLAY BASKETBALL, IT'S NOT COMPULSORY.  IT'S NOT

15 FORCED.  THERE IS NOT A PUSHER TELLING THEM TO RUN UP

16 AND DOWN AND DON'T STAND AROUND AND WAIT FOR THE BALL

17 TO BE THROWN TO THEM, SO -- AND THEY HAVE THE CHOICE.

18 THEY CAN STOP PLAYING BASKETBALL, THEY CAN GO TO PLAY

19 BASKETBALL; WHEREAS THE FARM LINE IS COMPULSORY.

20 THEY HAVE TO DO IT.

21          AND I -- THIS COMPARISON OF PLAYING

22 VOLITIONAL *I WANT TO PLAY SPORTS IN THE AFTERNOON*

23 WITH COMPULSORY WORK IS -- IS SO LACK OF MERIT.

24 THERE IS SUCH A LACK OF MERIT BETWEEN COMPARING

25 AGRICULTURAL WORK WITH THE NEW ENGLAND -- NEW ENGLAND

1  JOURNAL CLEARLY STATED, IN OCTOBER OF LAST YEAR, THE

2  DEATH RATE, MORTALITY WITH AGRICULTURAL WORKERS IS 35

3  TIMES HIGHER THAN ANY OTHER OF THE GENERAL

4  POPULATION, SO THAT IS THAT PERSON UNDER THE

5  COMPULSORY FARM LINE.  AND NOW WE'RE TALKING ABOUT

6  SOMEBODY WHO GOES AND PLAYS BASKETBALL WITH HIS

7  FRIENDS WHEN IT'S HOT.

8      Q    WELL, IT'S COMPETITIVE IN A LEAGUE, FULL

9  COURT --

10         THE COURT:  THIS IS GETTING ENTIRELY TOO

11  ARGUMENTATIVE.  LET'S STICK TO THE ISSUES IN THIS

12  CASE.  AND LET ME BE CLEAR, WE ARE TALKING ABOUT

13  COMPELLED COMPULSORY LABOR HERE.  WE'RE NOT TALKING

14  ABOUT VOLUNTEER ACTIVITIES.  THAT'S CLEAR FROM THE

15  FACTS.

16             NOW, IF THE LSP WOULD LIKE TO ADOPT

17  POLICIES THAT MAKE IT NONCOMPULSORY FOR FOLKS THAT

18  WORK IN THE FIELDS, THEN WE CAN -- WE HAVE AN

19  APPLES-TO-APPLES SITUATION.  SO LET'S MOVE ON TO

20  SOMETHING MORE RELEVANT TO THE ISSUES HERE.

21         MR. BLANCHFIELD:  THAT'S FINE, JUDGE.

22  BY MR. BLANCHFIELD:

23      Q    NOW, YOU KEEP TALKING ABOUT PUSHING AND

24  WE'VE HEARD TESTIMONY ABOUT QUOTAS.  YOU WERE OUT

25  THERE.  WAS ANYONE BEING PUSHED IN THE FIELD THAT

1  DAY?

2       **A**    WELL, SIR, WHEN YOU HAVE A -- WHEN YOU HAVE

3  AN OBSERVATION BY PEOPLE WHO ARE -- THE THINGS THAT

4  HAPPEN WHEN THEY'RE BEING OBSERVED ARE DIFFERENT THAN

5  THE THINGS THAT HAPPEN ON REGULAR DAYS.  SO WHEN I

6  SPOKE TO THE INDIVIDUALS, THEY SAID THAT THEY -- THIS

7  IS A VERY DIFFERENT CIRCUMSTANCE TODAY THAN IT

8  USUALLY IS.  AND I BELIEVE THAT, BECAUSE IF I'M BEING

9  OBSERVED BY MY SUPERIORS, MY BEHAVIOR AND MY WORK

10 EVERY -- I'M GOING TO DO MY BEST.  I'M GOING TO HAVE

11 MY DESK CLEAR.  EVERYTHING THAT I SHOULD DO SHOULD BE

12 PERFECT.

13      **Q**    SO IF I UNDERSTAND YOUR TESTIMONY, YOU

14 BELIEVE THAT WHAT TRANSPIRED THE DAY THAT YOU WERE

15 OUT THERE DIFFERS FROM WHAT GOES ON DURING THE DAYS

16 THAT YOU WERE NOT OUT THERE.  IS THAT WHAT YOU'RE

17 TESTIFYING TO?

18      **A**    THAT IS AN INCOMPLETE SUMMARY OF MY OPINION.

19 FIRST OF ALL, THERE IS A DEPOSITION OF ONE OF THE

20 CORRECTIONS OFFICERS WHO IS DESCRIBED AS A PUSHER.

21 HE IN HIS DEPOSITION STATED THAT IF HE DOES NOT GET A

22 CERTAIN AMOUNT OF WORK OUT OF HIS -- HIS -- OF THE

23 PRISONERS WHO ARE WORKING UNDER HIM ON THAT DAY,

24 THERE WILL BE REPERCUSSIONS FOR HIM.  HE WILL BE

25 CONSIDERED TO NOT BE DOING HIS JOB SATISFACTORILY.

1    THAT WAS HIS TESTIMONY.

2         I DO BELIEVE THAT PEOPLE -- THERE ARE SOME

3    ASPECTS OF WHAT I OBSERVED ON THE LINE THAT DAY WERE

4    OF COURSE TYPICAL.  THERE WERE CUCUMBERS TO BE

5    PICKED.  SOME WERE -- PEOPLE WERE SLOWER, SOME WERE

6    FASTER.  THE GUY WHO SAT ON THE CART SPENT 45 MINUTES

7    TO AN HOUR IN THE BATHROOM.  SO I UNDERSTAND THAT

8    THESE THINGS HAPPEN.

9         BUT I ALSO UNDERSTAND THAT THE PUSHER MAY

10   NOT HAVE BEEN BEHAVING IN THE WAY THAT HE NORMALLY

11   PUSHES BECAUSE I'M OBSERVING HIM, BECAUSE ALL OF THE

12   LAWYERS ARE THERE THAT DAY AND HE -- AND HE'S -- AND

13   SO THAT -- THE PROCESS OF OBSERVING A PROCESS CAN

14   CHANGE THE PROCESS.

15      Q   YOU'RE ALSO AWARE, THOUGH, OF THE TESTIMONY

16   THAT YOU REVIEWED, THAT THERE IS NO PUSHING GOING ON;

17   THERE IS NO QUOTAS OUT THERE BY THE INDIVIDUALS WHO

18   ARE ACTUALLY CHARGED WITH WORKING OUT ON THE FARM

19   LINE?

20      A   I DON'T UNDERSTAND THAT.  WHAT I UNDERSTAND

21   IS THAT I READ THE DEPOSITION TESTIMONY OF ONE OF THE

22   CORRECTIONS OFFICERS THAT CLEARLY STATED THAT THERE

23   IS A -- THAT HE IS NOT SEEN OR PERCEIVED AS DOING HIS

24   JOB IF THEY COME IN WITH NO CUCUMBERS, FOR EXAMPLE,

25   IF YOU WANT TO USE CUCUMBERS.  YOU COME IN WITH A

1   BUNCH OF EMPTY BOXES OR JUST FIVE BOXES OR TEN, I

2   MEAN, HE'S NOT DOING HIS JOB.  THAT IS WHAT HE SAID.

3   THAT'S WHAT'S IMPORTANT TO ME.

4       **Q**   YOU TESTIFIED IN THE *YATES V COLLIER* CASE,

5   DID YOU?

6       **A**   YES.

7       **Q**   AND ARE YOU AWARE THAT THE FIFTH CIRCUIT, IN

8   DISCUSSING WHETHER OR NOT THERE WAS A SUBSTANTIAL

9   RISK OF SERIOUS HARM, LOOKED AT THE HISTORY AND FROM

10  A HISTORICAL PERSPECTIVE STATED THAT THERE WERE 20

11  DEATHS IN THAT PRISON?

12      **A**   IS -- *YATES* HAD A PREVIOUS NAME.  THAT'S

13  TEXAS?

14      **Q**   CORRECT.

15      **A**   OKAY.  AND YOUR QUESTION IS AM I AWARE OF

16  THE OPINION OF THE FIFTH CIRCUIT AND WHAT THEY SAID?

17  YOU WOULD HAVE TO READ IT TO ME FOR ME TO BE UP TO

18  DATE ON WHAT THE FIFTH CIRCUIT SAID.

19      **Q**   WERE YOU AWARE THAT THERE WERE 20 DEATHS IN

20  THAT TEXAS PRISON?

21      **A**   I KNOW THAT TEXAS HAS HAD AND CONTINUES TO

22  HAVE MANY DEATHS FROM HEAT STROKE, YES.  IF THAT'S

23  WHAT YOU'RE ASKING ME, YES.

24      **Q**   AND ARE WE TALKING ABOUT CLASSIC HEAT

25  INJURY?

1    **A**    WELL, *THE NEW ENGLAND JOURNAL* IS VERY CLEAR

2  ABOUT THIS DELINEATION OF EXERTIONAL VERSUS CLASSICAL

3  HEAT STROKE.  SO CLASSICAL HEAT STROKE HAS BEEN

4  DESCRIBED AS OCCURRING IN THE INFIRM AND THE ELDERLY.

5  EXERTIONAL HAS BEEN DESCRIBED AS IN THE YOUNG IN A

6  SPORADIC NATURE.  ON THE OTHER HAND, THERE IS SOME

7  CROSSOVER.  OBVIOUSLY THE PEOPLE WHO MIGHT GET

8  EXERTIONAL HEAT STROKE MIGHT BE YOUNG, THEY MAY BE

9  OLD PEOPLE EXERTING THEMSELVES, AND THE YOUNG PEOPLE

10  COULD HAVE UNDERLYING DISEASES.  SO I DO NOT AGREE

11  WITH YOU THAT IT'S CLASSICAL HEAT STROKE ONLY IN

12  TEXAS.

13    **Q**    THE 20 PEOPLE WHO DIED IN THE *YATES* CASE,

14  THEY WERE ALL CLASSIC HEAT INJURY CASES, WERE THEY

15  NOT?

16    **A**    COULD YOU TELL ME HOW YOU DESCRIBE CLASSICAL

17  HEAT?  AND THEN I'LL BE ABLE TO ANSWER IT.

18    **Q**    WHY DON'T YOU EXPLAIN TO ME THE DIFFERENCE

19  BETWEEN CLASSIC HEAT INJURY AND EXERTIONAL HEAT

20  INJURY.

21    **A**    OKAY.  I HAVE -- FIRST OF ALL, IT'S VERY

22  EASY TO SAY WHAT EXERTIONAL HEAT INJURY IS.  PEOPLE

23  ARE EXERTING THEMSELVES.  THESE ARE THE MILITARY

24  RECRUITS.  THESE COULD BE THE FOOTBALL PLAYERS.  IN

25  AMERICA TODAY, IT'S ONE OF THE LEADING CAUSES OF

1  DEATH IN HIGH-SCHOOL FOOTBALL PLAYERS.  IT --

2  MILITARY RECRUIT ACTUALLY -- ACTUALLY, BECAUSE OF THE

3  NUMBERS OF DEATH IN THESE YOUNG, HEALTHY PEOPLE, THEY

4  PUT FORTH IN THE 1950s THE WET GLOBE BULB TEMPERATURE

5  AS A BETTER MEASURE OF THE RISK TO THOSE MILITARY

6  RECRUITS.  AND AFTER THEY DID THAT, THEY DECREASED.

7  SO EXERCISE WE UNDERSTAND.

8        NOW, IF YOU'RE -- IF YOU ARE SITTING IN A

9  PRISON LIKE WITH THE PRESSURE -- THE IMPACT OF THE

10 HEAT, DAY AND NIGHT, AND THEN YOU GO TO THE FARM

11 LINE, THERE IS A COMBINATION OF CLASSIC, WHICH IS EL-

12 -- UNHEALTHY PEOPLE OR HEALTHY PEOPLE LYING THERE,

13 AND THERE IS A COMBINATION.  THIS IS NOT A CLEAN

14 EXERTION-VERSUS-CLASSICAL GROUP.

15   Q   THE POINT I'M TRYING TO MAKE, DOCTOR, IS:

16 IN THE *YATES* CASE IN WHICH YOU TESTIFIED, THESE

17 INDIVIDUALS WHO DIED FROM HEAT, THEY WERE INDIVIDUALS

18 WHO WERE IN THE DORMS ON A DAY-TO-DAY BASIS.  IT WAS

19 NOT OUTSIDE DOING ANY KIND OF EXERTIONAL ACTIVITIES.

20 IS THAT CORRECT?

21   A   THE PEOPLE WHO DIED IN TEXAS WERE IN THE

22 DORMS IN THE HEAT.  THEY WERE NOT OUT IN THE FIELD

23 ALSO ADDITIONALLY EXERCISING.

24   Q   NOW, YOU MENTIONED -- OR YOU WERE ASKED

25 ABOUT MEDICATIONS AND MEDICATIONS THAT IMPACT THE

1  BODY'S ABILITY TO THERMOREGULATE.  IS IT FAIR TO SAY

2  THAT IF SOMEONE IS ON ONE OF THOSE MEDICATIONS AND

3  THEN STOPS TAKING THAT MEDICATION, THE RISK GOES AWAY

4  AT LEAST WITH RESPECT TO THAT MEDICATION?

5      **A**    IT DEPENDS ON THE LENGTH OF TIME.  FOR

6  EXAMPLE, WITH THE SSRI, IF YOU STOP AN SSRI TWO WEEKS

7  AGO AND YOU START THEM ON SOMETHING ELSE TO INCREASE

8  THE SEROTONIN, LIKE MANY OF THE DRUGS INCREASE

9  SEROTONIN, YOU MAY STILL GET SEROTONIN SYNDROME.  SO

10 IT DEPENDS ON THE DURATION OF ACTION AND THE

11 EXISTENCE OF THAT DRUG IN THE BODY.  SO IT'S NOT A

12 DEFINITE CUT-OFF.  WE'RE VERY CAREFUL ABOUT SOME

13 DRUGS THAT WE STOP IT AND WAIT WEEKS BEFORE WE START

14 ANOTHER DRUG WITH A SIMILAR OR SYNERGISTIC EFFECT.

15     **Q**    SOMETIMES WE DON'T RESTART ANY DRUG, THOUGH.

16 ISN'T THAT FAIR TO SAY?

17     **A**    WHAT ARE YOU ASKING?

18     **Q**    WELL, IF SOMEONE IS TAKING AN

19 ANTICHOLINERGIC DRUG AND THE TREATING PHYSICIAN

20 DECIDES, *OKAY, WE'RE GOING TO TAKE YOU OFF THIS*

21 *MEDICINE* AND THEY DON'T GO BACK ON ANOTHER MEDICINE,

22 THAT RISK GOES AWAY, DOES IT NOT?

23     **A**    THE RISK OF THE MEDICATION GOES AWAY BECAUSE

24 THEY DON'T HAVE IT IN THEIR SYSTEM WHATSOEVER.  AND

25 THEN YOU HAVE TO TELL ME WHAT DISEASE OR CONDITION

1  ARE THEY TREATING, BECAUSE THEN NOW YOU HAVE AN

2  UNTREATED DISEASE OR CONDITION.

3      **Q**    NOW, YOU AGREE THAT PEOPLE CAN ACCLIMATIZE

4  TO HEAT?

5      **A**    HEALTHY PEOPLE WITH WORKING HEARTS, NO

6  MEDICATIONS, NO COMORBIDITIES PUT INTO VERY

7  CAREFUL -- LIKE THE MILITARY DOES -- VERY CAREFUL

8  REGIMENS CAREFULLY PRESCRIBED CAN ACCLIMATIZE.  THE

9  PEOPLE ON THE FARM LINE AND THE PEOPLE AT -- AT --

10 CANNOT NECESSARILY ACCLIMATIZE DUE TO THEIR

11 COMORBIDITIES AND THEIR CONDITIONS.  FOR EXAMPLE,

12 SOMEONE WITH DIABETES WILL NOT BE ABLE TO ACCLIMATIZE

13 PURELY.  SOMEBODY ON AN ACE INHIBITOR, AN

14 ANGIOTENSIN-CONVERTING ENZYME INHIBITOR OR

15 ANGIOTENSIN-CONVERTING ENZYME BLOCKER, THOSE PEOPLE,

16 IT AFFECTS THE KIDNEYS.  A LARGE PART OF

17 ACCLIMATIZATION IS THE ABILITY TO DECREASE THE AMOUNT

18 OF SWEAT IN THE SWEAT -- THE AMOUNT OF SALT IN THE

19 SWEAT.  THAT IS A FUNCTION OF THE KIDNEY.

20         AND THE ANGIOTENSIN-ALDOSTERONE SYSTEM IS AT

21 PLAY IN THAT.  SO IF YOU HAVE ANY KIND OF ENDOCRINE

22 PROBLEM, A HEART PROBLEM, OR YOU'RE NOT SUBJECTED TO

23 THE PROPER -- THE PROPER TIMES THAT YOU'RE IN HEAT,

24 THE ABILITY -- YOU WILL NOT ACCLIMATIZE.  SO

25 ACCLIMATIZATION IN AND OF ITSELF IS A SCIENCE, AND

1 THE MILITARY KNOWS AN ENORMOUS AMOUNT ABOUT THIS.

2      Q    YOU MENTIONED A NUMBER OF TIMES DIABETES.

3 IT'S NOT YOUR TESTIMONY THAT EVERY DIABETIC, EVEN ONE

4 WHO IS CONTROLLED, SHOULD NOT BE PUT OUT ON THE FARM

5 LINE?

6      A    WHAT I WOULD LIKE TO SAY ABOUT THAT IS THE

7 HEAT -- THE PRESENTATIONS OF PEOPLE WITH DIABETES IN

8 THIS -- THE VAST LITERATURE TALKING ABOUT THAT, AND

9 INCLUDING THE NOLTON STUDY THAT WE DIDN'T LOOK AT

10 TODAY, CLEARLY THOSE PEOPLE -- AND YOU'RE LOOKING AT

11 ALL OF CALIFORNIA IN THE NOLTON STUDY, FOR EXAMPLE,

12 WHICH WE DIDN'T GET TO SHOW OR TALK ABOUT TODAY.

13 YOU'RE TALKING ABOUT MILLIONS OF PEOPLE IN

14 CALIFORNIA.  AND THEIR -- THE INCREASE, THE RELATIVE

15 RISK FOR THOSE PEOPLE WITH DIABETES IS GREATER.  IT'S

16 NOT 14 TIMES GREATER LIKE THOSE PEOPLE OVER THE AGE

17 OF 65 IN AND OF THEMSELF, BUT IT'S GREATER.

18      AND WHEN YOU'RE TALKING ABOUT THOUSANDS --

19 4,000 PEOPLE, THAT'S GOING TO BE SOME PEOPLE WHO ARE

20 AT GREATER RISK.  AND IF YOU'RE TALKING ABOUT

21 POPULATION LEVEL THINGS, THOUSANDS OF PEOPLE WILL BE

22 AT GREATER RISK BECAUSE THEY HAVE DIABETES.

23      Q    IN YOUR DEPOSITION WE TALKED A LOT ABOUT

24 MEDICATIONS AND WHETHER OR NOT SOMEONE ON A

25 PARTICULAR MEDICATION SHOULD AUTOMATICALLY RECEIVE A

1  HEAT PRECAUTION DUTY STATUS.  DO YOU RECALL SOME OF

2  THAT TESTIMONY?

3     **A**    I RECALL YOU ASKING ABOUT THAT, BUT I DON'T

4  RECALL THE ACTUAL TESTIMONY.

5     **Q**    OKAY.  WE TALKED ABOUT A NUMBER OF THINGS

6  INCLUDING DIURETICS, AND YOU SAID, "I'M NOT PREPARED

7  TO SAY THAT DIURETICS WOULD AUTOMATICALLY GET A

8  HEAT-RELATED DUTY STATUS."  DO YOU REMEMBER SAYING

9  THAT?

10     **A**    NO.  IF YOU JUST READ FROM MY DEPOSITION, I

11  BELIEVE I SAID IT.

12     **Q**    ALL RIGHT.  AND I ASKED YOU "IF SOMEONE IS

13  ON A DIURETIC, IS THAT A AUTOMATIC DISQUALIFIER FOR

14  WORKING ON THE FARM LINE?"  YOU SAID -- "ANSWER:

15  NOTHING IS AUTOMATIC HERE.  WE NEED TO LOOK AT MORE."

16     **A**    OKAY.  SO --

17          **MS. WRIGHT:**  YOUR HONOR, I'LL JUST OBJECT.

18  I DON'T KNOW IF MR. BLANCHFIELD IS ATTEMPTING TO

19  IMPEACH THE WITNESS.  IF HE IS, IT'S INACCURATE,

20  INCORRECT IMPEACHMENT.  IF HE COULD PUT THE

21  DEPOSITION TRANSCRIPT IN FRONT OF THE WITNESS, THAT

22  MIGHT HELP.

23          **THE COURT:**  WELL, LET'S SEE IF SHE NEEDS IT.

24  IT SOUNDS TO ME LIKE HE'S SIMPLY ASKING SOME

25  CLARIFICATIONS.

```
 1                    BUT WOULD YOU BETTER UNDERSTAND THE
 2   QUESTION IF YOU HAD THE OPPORTUNITY TO REVIEW YOUR
 3   DEPOSITION?
 4           THE WITNESS:  YOUR HONOR, DEFINITELY.
 5   BECAUSE IT'S, IN MY EXPERIENCE, THAT STATEMENTS LIKE
 6   WERE JUST MADE ARE TAKEN TOTALLY OUT OF CONTEXT OF
 7   THE CONVERSATION.
 8           THE COURT:  WELL, LET'S GO ON AND PROVIDE
 9   HER THE COPY OF THE DEPOSITION THAT YOU'RE CITING.
10           MR. BLANCHFIELD:  WE CAN PULL UP THE
11   DEPOSITION AT PAGE -- STARTING AT PAGE 104.
12           THE COURT:  ALL RIGHT, DOCTOR.  CAN YOU SEE
13   THAT?
14           THE WITNESS:  NO, YOUR HONOR.  MY MONITOR IS
15   NOT ON.  I MEAN, IT'S NOT ON MY MONITOR.
16           THE COURT:  DO YOU SEE IT NOW?
17           THE WITNESS:  NO, SIR.  I CAN PUNCH THIS,
18   BUT IT LOOKS LIKE IT'S ON.  IT'S BLUE.  THAT WOULD
19   SUGGEST THE MONITOR IS ON, BUT IT'S NOT TRANSMITTING
20   TO -- WHOOPS -- TO MY MONITOR.
21           THE COURT:  GO ON AND ACTIVATE IT,
22   ELIZABETH.
23           THE COURTROOM DEPUTY:  I HAVE, SIR.  THE
24   WITNESS BUTTON IS PRESSED.  IS THE MONITOR ON?
25           THE WITNESS:  YEAH, IT'S ON.  I'LL PUSH IT
```

 1  AND NOW IT'S OFF.  AND NOW IT'S OFF.  IT SHOWS THE --

 2  NOW IT'S COMING BACK ON AFTER I PUSHED IT.

 3          **THE COURT:**  WHY DON'T YOU GO ON AND TOGGLE

 4  TO THE MONITOR.  DO YOU SEE IT?

 5          **THE WITNESS:**  OKAY.

 6              GO AHEAD.  OH, IT JUST WENT OFF.  I

 7  DIDN'T TOUCH IT.

 8          **THE COURT:**  IT'S OFF.

 9          **THE LAW CLERK:**  IT'S OFF FOR EVERYBODY.

10          **THE WITNESS:**  OKAY.

11          **THE COURT:**  CAN YOU SEE IT, DOCTOR?

12          **THE WITNESS:**  YES.

13          **THE COURT:**  LET'S PROCEED.

14  **BY THE WITNESS:**

15      A    OKAY.  THIS IS PAGE 104.  BUT IN ORDER FOR

16  ME TO KNOW WHAT THE LINE OF QUESTIONING, WE NEED TO

17  GO TWO PAGES BEFORE.  OKAY.  SO THIS IS PAGE 103.

18              SO IT LOOKS TO ME FROM PAGE 102 THAT WE'RE

19  DISCUSSING THE LIST -- A LIST.  RIGHT, SIR?

20      **Q**    CORRECT.

21      **A**    OKAY.  SO LET'S TALK ABOUT THE LIST.  YOU'RE

22  WANTING ME TO TALK ABOUT THE LIST.  OKAY?  SO "WHAT

23  I'M SAYING IS ON PAGE 17 YOU DIRECTED MY ATTENTION TO

24  THIS -- ON THE BOTTOM OF PAGE 17 YOU DIRECTED MY

25  ATTENTION TO THESE MEDICATIONS AND" -- "OKAY.  MY

1  QUESTION -- MY INITIAL QUESTION WAS WHETHER OR NOT IN

2  YOUR OPINION SOMEONE ON THESE MEDICATIONS SHOULD

3  RECEIVE A HEAT-RELATED DUTY STATUS."  AND THEN

4  MS. WRIGHT OBJECTED.

5        "AND YOU SAID -- YOU QUALIFIED ZYRTEC.  ARE

6  THERE ANY OTHER MEDICATIONS IN THAT LIST ON PAGE 17

7  THAT YOU WOULD QUALIFY?"  SO I QUALIFIED THIS

8  SYNTHROID.  THIS IS NOW PAGE 103.  SYNTHROID, IF

9  YOU -- WE DISCUSSED SYNTHROID A BIT.  AND YOU SAY

10  "OKAY."  THEN WE TALK ABOUT ANOTHER -- OF OTHER

11  MEDICATIONS.

12        AND WHERE IS IT -- THE PIECE THAT YOU WANT?

13  THEN YOU SAID AND THEN -- SO THEN YOU SAY, "THAT

14  CLEARS IT UP."  I'M NOT SURE WHAT.  "AND THEN THE

15  SAME QUESTION IF WE TURN TO THE NEXT PAGE" -- THAT'S

16  WHAT IT SAYS -- "THE BETA BLOCKERS.  IN YOUR OPINION,

17  IF SOMEONE IS ON A BETA BLOCKER, WOULD THEY -- SHOULD

18  THEY BE ENTITLED TO A HEAT-RELATED DUTY STATUS?"

19        AND I AM SURE THAT I AGREED.  AND I SEE HERE

20  THAT I TALKED ABOUT THE INABILITY TO DISSIPATE HEAT,

21  THE EFFECT OF BETA BLOCKERS ON THE INABILITY TO

22  INCREASE THE CHRONOTROPY, THE SPEED AND THE SQUEEZE

23  OF A BETA PLAYER (SIC).  SO YES.

24    Q    MY POINT IN THIS DOCUMENT, YOU SAY, "DO I

25  THINK THAT EVERY INDIVIDUAL WHO TAKES A BETA BLOCKER

1    HAS TO BE OFF THE FARM LINE?  I THINK THERE ARE OTHER

2    INDIVIDUAL CONSIDERATIONS."

3            SO THE FACT THAT SOMEONE IS ON A BETA

4    BLOCKER IN AND OF ITSELF, IN YOUR OPINION, WOULD NOT

5    MEAN THAT HE SHOULD NOT BE ON THE FARM LINE?

6      **A**    WELL, MY ANSWER IS A LITTLE BIT DIFFERENT,

7    SIR.  IT SAYS THAT "THE FACT IS THAT BETA BLOCKERS

8    DECREASE THE ABILITY TO DISSIPATE HEAT.  ALL OF THEM.

9    DO I THINK THAT EVERY INDIVIDUAL WHO TAKES A BETA

10   BLOCKER HAS TO BE OFF THE FARM LINE?  I THINK THERE

11   ARE OTHER INDIVIDUAL CONSIDERATIONS."

12           **MR. BLANCHFIELD:**  COULD WE GO TO THE NEXT

13   PAGE, PLEASE; 105?

14   **BY THE WITNESS:**

15     **A**    SO THEN YOU ASKED ME:  "THEN MOVING ON TO

16   PARAGRAPH 59, HYDROCHLOR-" --

17           **MS. WRIGHT:**  I'M SORRY.  I DON'T UNDERSTAND

18   WHAT THE QUESTION IS.

19           **THE COURT:**  YES.  SO WHAT'S --

20           **MS. WRIGHT:**  WHAT'S THE POINT?

21           **THE COURT:**  THAT'S A VALID POINT.  WHAT IS

22   YOUR QUESTION, MR. BLANCHFIELD?

23           **MR. BLANCHFIELD:**  YOUR HONOR, IN THE

24   DEPOSITION SHE SAYS THAT WITH RESPECT TO --

25           **THE COURT:**  LET ME JUST -- I DON'T NEED TO

 1  KNOW WHAT -- WOULD YOU SIMPLY ASK THE QUESTION?

 2          MR. BLANCHFIELD:  YES.

 3          THE COURT:  BECAUSE RIGHT NOW WE HAVE A

 4  NARRATIVE ANSWER.  SHE'S READING A TRANSCRIPT.  I

 5  TELL YOU WHAT.  WHY DON'T Y'ALL INTRODUCE IT IF IT'S

 6  NOT ALREADY IN EVIDENCE.  I'LL READ THE DEPOSITION

 7  TRANSCRIPT MYSELF.  BUT WHY DON'T YOU GO ON TO THE

 8  NEXT QUESTION.

 9          MR. BLANCHFIELD:  WE'LL ASK ONE QUESTION.

10  BY MR. BLANCHFIELD:

11      Q    WITH RESPECT TO THE MEDICATIONS THAT WE'RE

12  DISCUSSING IN YOUR DEPOSITION, YOUR TESTIMONY WAS

13  THAT THE FACT THAT THEY'RE ON THESE INDIVIDUAL

14  MEDICATIONS DO NOT IN AND OF ITSELF DISQUALIFY THEM

15  FROM WORKING ON THE FARM LINE?

16      A    THAT MISCHARACTERIZES MY TESTIMONY, SIR.

17          MR. BLANCHFIELD:  JUDGE, WE'LL INTRODUCE IT,

18  PAGE 104 THROUGH 107.  I THINK IT'S PRETTY CLEAR AND

19  I'LL MOVE ON.

20          THE COURT:  ALL RIGHT.

21  BY MR. BLANCHFIELD:

22      Q    YOU WOULD AGREE THAT WITH RESPECT TO SOUTH

23  LOUISIANA, PARTICULARLY IN THE SUMMERTIME, THE

24  HIGHEST HEAT INDEXES THAT WE RECEIVE GENERALLY COME

25  IN THE AFTERNOON HOURS?

1    **A**    I THINK IN GENERAL ANYBODY WHO IS BORN AND

2   RAISED IN THE SOUTH, LIKE I'M TEXAN, KNOW THAT IT

3   SEEMS TO BE HOTTER IN THE AFTERNOON TEMPERATURE-WISE.

4   BUT THE HUMIDITY SOMETIMES IS HIGHER IN THE MORNING

5   AND THEN IT BURNS OFF, LIKE YOUR DR. KELDIE MADE THAT

6   POINT HIMSELF IN HIS REPORT.  SO --

7    **Q**    AND YOU'RE WELL FAMILIAR WITH AFTERNOON

8   TEMPERATURES.  YOU'VE SPENT -- YOU WENT TO THE

9   UNIVERSITY OF TEXAS; YOU LIVED IN AUSTIN?

10    **A**    YES, SIR.

11    **Q**    YOU WERE VERY -- YOU PLAYED DIVISION I

12   SINGLES TENNIS IN THE AFTERNOON HOURS IN THE SUMMER?

13    **A**    YES, SIR.  WE HAD A LOT OF NICE DISCUSSION

14   ABOUT OUR TENNIS GAMES, IT'S TRUE.

15    **Q**    WE DID.  AND YOU'RE ALSO A SPEED WALKER

16   WHERE YOU WALK AND YOUR HEART RATE GETS UP INTO THE

17   150s, SO YOU'RE VERY AWARE OF EXERTIONAL ISSUES, ARE

18   YOU NOT?

19    **A**    I KNOW WHAT EXERTION IS, YES.

20    **Q**    YOU -- IN YOUR VISIT TO LSP YOU SAW THAT

21   INMATES HAD ESSENTIALLY UNLIMITED ACCESS TO WATER?

22    **A**    THERE WAS WATER PRESENT.  WHETHER OR NOT ON

23   DAYS THAT I'M NOT OBSERVING THEY'RE ALLOWED TO GO OFF

24   THE LINE AND KEEP GETTING WATER AND SIT THERE AND --

25   I DON'T BELIEVE THAT TO BE THE CASE, BUT I DON'T

1  KNOW.

2      **Q**    WHY DON'T YOU BELIEVE THAT TO BE THE CASE?

3      **A**    BECAUSE IF YOU SPENT THE DAY AT THE

4  WATERCOOLER, YOU COULDN'T PICK ANY CUCUMBERS.

5      **Q**    THERE WAS NOTHING THERE THAT DAY THAT

6  PRECLUDED A FARM WORKER FROM ACCESSING WATER.  IS

7  THAT FAIR TO SAY?

8      **A**    I THINK SO.  I THINK THAT ON THE DAY I WAS

9  THERE, THE FARM WORKERS WERE GOING TO BE ALLOWED TO

10  HAVE AS MUCH WATER AS THEY NEEDED, YES.

11      **Q**    NOW, IN ONE OF YOUR DECLARATIONS YOU MENTION

12  THAT THERE ARE 32 MILLION PEOPLE WORKING OUTDOORS OUT

13  IN THE FREE WORLD.  DO YOU REMEMBER THAT?

14      **A**    NO, I DON'T.

15      **Q**    OKAY.  AND LET ME ASK YOU.  THIS FACT THAT

16  THERE ARE THAT MANY WORKERS WORKING OUTSIDE, DOTD

17  WORKERS POURING ASPHALT IN THE AFTERNOON IN JULY,

18  ROOFERS WORKING ON ROOFS WHEN THE HEAT INDEX IS OVER

19  120, DOES THAT FACTOR INTO ANY OF YOUR ANALYSIS IN

20  THIS CASE IN FORMULATING YOUR OPINIONS?

21      **A**    NO.

22      **Q**    AND IT'S NOT RELEVANT?

23      **A**    THIS ISN'T -- SIR, THIS IS NOT A CASE ABOUT

24  ROOFERS IN THE FREE WORLD.  THIS IS NOT A CASE ABOUT

25  DEPARTMENT OF TRANSPORTATION WORKERS LAYING ASPHALT

1   IN THE AFTERNOON.  THIS IS NOT ABOUT THAT.  THIS IS

2   ABOUT A PRISON, PENITENTIARY FARM LINE, WORKING ON

3   THE FARM LINE.  THAT'S WHAT IT'S ABOUT.

4       **Q**   NO ONE ON THE FARM LINE AT LSP HAS EVER

5   DIED, HAVE THEY?

6       **A**   WELL, FIRST OF ALL, I THINK THAT YOU'RE --

7   I'M SURE -- I MEAN, WE'RE ALL GOING TO DIE, SO

8   SOMEBODY WHO WORKED ON THE FARM LINE IN THE WORLD HAS

9   DIED.

10           **THE COURT:**  DOCTOR, IF YOU KNOW THE ANSWER

11  TO THE QUESTION, YOU CAN SIMPLY ANSWER THE QUESTION.

12  IF YOU DON'T KNOW, YOU CAN SIMPLY STATE THAT YOU

13  DON'T KNOW.

14           **THE WITNESS:**  THANK YOU, YOUR HONOR.

15  **BY THE WITNESS:**

16      **A**   I DON'T KNOW.

17      **Q**   DO YOU HAVE ANY INFORMATION OF ANYONE DYING

18  FROM A HEAT-RELATED INJURY ON THE FARM LINE?

19      **A**   I HAVE NO INFORMATION ABOUT DEATHS OF

20  INDIVIDUALS ON THE FARM LINE AT THE TIME THEY'RE ON

21  THE FARM LINE, THE NEXT DAY, WHICH IS ALSO WHEN

22  PEOPLE DIE WHO HAVE BEEN SUBJECTED TO EXCESSIVE WEEK,

23  OR THE NEXT WEEK, BECAUSE THEY CONTINUE TO HAVE THE

24  SAME STRESSORS AND THE DETERIORATION OF THEIR

25  CONDITIONS.

1   **Q**   YOU TOLD ME IN YOUR DEPOSITION THAT YOU

2   ADMITTED THAT THERE WAS NO INFORMATION THAT ANYONE

3   WORKING ON THE FARM LINE EVER HAD HEAT STROKE.

4   CORRECT?

5   **A**   WELL, THERE IS NO INFORMATION.

6   **Q**   AND YOU MENTIONED THE *LEWIS* CASE.  THE ONE

7   DEATH -- THAT DEATH HAD NOTHING TO DO WITH THE FARM

8   LINE, DID IT?

9   **A**   IT WAS HEAT STROKE.  I ACTUALLY DON'T KNOW

10  WHERE -- WHY HE HAD HEAT STROKE.

11  **Q**   YOU DON'T KNOW THAT IT HAD NOTHING TO DO

12  WITH THE FARM LINE?

13  **A**   I DON'T.  YOU'VE TOLD ME THAT A COUPLE OF

14  TIMES TODAY, AND ACTUALLY -- BUT I DON'T KNOW.  I

15  DIDN'T KNOW WHERE HE WAS BROUGHT FROM, WHY HE GOT

16  HEAT STROKE, OR WHY HE DIED OF HEAT STROKE.  I DON'T

17  KNOW.

18  **Q**   WAS THAT TEN YEARS AGO OR MORE?

19  **A**   IT WAS IN THE *LEWIS* CASE.

20  **Q**   AND THAT *LEWIS* CASE EVALUATED MEDICINE BACK

21  10, 15 YEARS AGO, DID IT NOT?

22  **A**   IF YOU REPRESENT IT WAS THAT LONG AGO, THEN

23  I'M SURE IT WAS.

24  **Q**   THANK YOU, DOCTOR.  THAT'S ALL THE QUESTIONS

25  I HAVE.  I APPRECIATE YOUR TIME.

1        **A**    THANK YOU, SIR.

2              **THE COURT:**  ALL RIGHT.  ANY REDIRECT?

3              **MS. WRIGHT:**  NO REDIRECT.

4              **THE COURT:**  ALL RIGHT.  SO, COUNSEL, LET ME

5    TELL YOU WHAT I'M GOING TO DO.  IT OCCURS TO ME THAT

6    MUCH OF THE TESTIMONY THAT THE COURT HEARD TODAY WITH

7    RESPECT TO THE CLASS CERTIFICATION ISSUES, AND MORE

8    SPECIFICALLY THE MINIMUM TEMPERATURE THAT MAY TRIGGER

9    SOME RELIEF HERE, ALSO PERTAINS TO THE UNDERLYING

10   ISSUES IN THE TRO -- THE SECOND TRO; THAT IS, WHETHER

11   THE 91-DEGREE STANDARD SHOULD BE ADOPTED OR PERMITTED

12   BY THE COURT OR SHOULD THE COURT ORDER THAT THE

13   STANDARD BE RETURNED TO 88 DEGREES.  SO I WANT

14   EVERYONE TO BE ON NOTICE THAT I FIND THIS TESTIMONY

15   TO BE RELEVANT TO THE ISSUES IN THE TRO.

16              FOR THAT REASON, I WILL GIVE EACH SIDE

17   AN ADDITIONAL TEN MINUTES TO QUESTION THE WITNESS, IF

18   YOU WISH, WITH RESPECT TO ANY ISSUES YOU BELIEVE

19   PERTINENT THAT THE COURT HAS NOT ALREADY ACCEPTED

20   TODAY WITH RESPECT TO THE ISSUES IN THE TRO.

21              NOW, I WILL ALSO TELL YOU THAT IF YOU

22   BELIEVE THAT YOU'RE PREJUDICED BY THIS -- I MEAN,

23   EVERYBODY KNOWS WHAT THIS TESTIMONY WOULD HAVE BEEN.

24   THIS WITNESS HAS BEEN DEPOSED, SHE'S PROVIDED

25   DECLARATIONS.  NO ONE IS TAKEN BY SURPRISE BY HER

1  TESTIMONY AND THE FACT THAT SHE HAS AN OPINION ABOUT

2  WHAT THE RELEVANT TEMPERATURE STANDARD SHOULD BE.

3  BUT I WILL GIVE ANYBODY WHO WISHES AN ADDITIONAL

4  OPPORTUNITY TO QUESTION THE WITNESS ON THAT ISSUE.

5           WOULD THE PLAINTIFF LIKE AN ADDITIONAL

6  OPPORTUNITY TO QUESTION DR. VASSALLO ABOUT THE 88-

7  VERSUS 91-DEGREE STANDARD?

8       MS. WRIGHT:  NOT ABOUT THAT STANDARD, YOUR

9  HONOR.  BUT IF THE -- IF THE OPPORTUNITY IS AVAILABLE

10 TO PROVIDE ADDITIONAL INFORMATION PERTAINING TO THE

11 SECOND TRO, THEN WE WOULD TAKE THAT OPPORTUNITY.

12      THE COURT:  WHAT EXACTLY WOULD YOU LIKE TO

13 QUESTION THIS WITNESS ABOUT WITH RESPECT TO THE

14 SECOND TRO?

15      MS. WRIGHT:  THE WET BULB GLOBE TEMPERATURE

16 MONITORING MECHANISM AS SUPERIOR TO THE HEAT INDEX

17 TAKEN BY THE NATIONAL WEATHER SERVICE.

18      THE COURT:  ALL RIGHT.  MR. BLANCHFIELD,

19 WOULD YOU LIKE TO QUESTION THE WITNESS WITH RESPECT

20 TO THE 88-DEGREE TEMPERATURE STANDARD?

21      MR. BLANCHFIELD:  NO, YOUR HONOR.  I THINK

22 THAT ISSUE HAS BEEN BRIEFED.

23      THE COURT:  ALL RIGHT.  SO LET'S TALK ABOUT

24 THE WET BULB GLOBE PROCESS OR STANDARD.  WHAT EXACTLY

25 WOULD YOU LIKE -- IF YOU WOULD OFFER A PROFFER AT

1  THIS TIME, WHAT EXACTLY WOULD YOU LIKE TO ESTABLISH

2  THROUGH THE WITNESS'S TESTIMONY THAT HASN'T ALREADY

3  BEEN ESTABLISHED?

4          **MS. WRIGHT:**  WELL, YOUR HONOR MAKES A GOOD

5  POINT, CLEARLY.  I THINK OUR BRIEFING CLEARLY

6  ESTABLISHES THAT THE --

7          **THE REPORTER:**  COULD YOU COME TO A

8  MICROPHONE, PLEASE?

9          **MS. WRIGHT:**  YES, OF COURSE.  I'M SO SORRY.

10              I THINK THE BRIEFING AND THE EXHIBITS

11  ATTACHED TO THE BRIEFING CLEARLY ESTABLISH THAT THE

12  WET BULB GLOBE TEMPERATURE MONITORING SYSTEM IS

13  GLOBALLY FOUND TO BE THE INDUSTRY STANDARD.  IT IS

14  EFFECTIVE, IT IS ACCURATE, IT IS EFFICIENT IN

15  MONITORING ACTUAL ATMOSPHERIC CONDITIONS IN THE FIELD

16  AT LSP; WHEREAS THE HEAT INDEX MONITORING IS TAKEN BY

17  THE NATIONAL WEATHER SERVICE MANY MILES AWAY IN THE

18  SHADE, WHEREAS, OF COURSE, THE MEN IN THE FIELD DO

19  NOT BENEFIT FROM THE SHADE.

20          **THE COURT:**  SO -- BUT, MS. WRIGHT, MY ISSUE

21  IS THAT SHE'S NOT -- SHE'S BEEN ESTABLISHED IN THE

22  FIELD OF EMERGENCY MEDICINE -- FOUR DIFFERENT AREAS.

23  I DON'T SEE HOW SHE WOULD BE QUALIFIED AS AN EXPERT

24  IN THIS TYPE OF TECHNOLOGY.

25          **MS. WRIGHT:**  FAIR ENOUGH, YOUR HONOR.  AND

1  IF IT WOULD NOT ASSIST THE COURT IN RESOLVING THE TRO

2  ON THAT POINT, THEN WE WOULD NOT NEED -- WE CAN MOVE

3  ON.

4          **THE COURT:**  I DON'T ON THIS ISSUE.

5              MR. BLANCHFIELD, WOULD YOU LIKE TO BE

6  HEARD ON THAT?

7          **MR. BLANCHFIELD:**  YES, YOUR HONOR.  AND I

8  DON'T -- TO BEAT THE PROVERBIAL DEAD HORSE HERE, BUT

9  WE ASK THAT THAT PORTION OF HER OPINION BE STRICKEN

10 BECAUSE WE'VE BEEN ALL ALONG THAT THE NATIONAL

11 WEATHER SERVICE WAS THE GOLD STANDARD, AS THE PARTIES

12 AGREED, AND THEN AT THIS LAST MINUTE ALL OF A SUDDEN

13 WE'RE INDIFFERENT FOR NOT HAVING A WET BULB.  SO WE

14 WOULD OBJECT TO THAT.

15         **THE COURT:**  VERY WELL.  YOUR OBJECTION IS

16 NOTED.  I WILL TAKE THE MATTER -- THAT PART OF THE

17 COURT'S DETERMINATION -- THAT IS, THE SECOND TRO --

18 UNDER ADVISEMENT.

19             SO LET ME ASK YOU A COUPLE OF QUESTIONS

20 HERE, DOCTOR.

21             YOU'VE TESTIFIED THAT YOU VISITED

22 ANGOLA AND SPECIFICALLY THE CUCUMBER PATCH THERE.  DO

23 YOU RECALL WHEN YOU VISITED ANGOLA?

24         **THE WITNESS:**  IN JULY OF -- I THINK IT WAS

25 ACTUALLY ALREADY -- I THINK IT WAS -- WAS IT LAST

1  YEAR OR THE YEAR BEFORE?

2        THE COURT:  SO EITHER 2023 OR 2024?

3        THE WITNESS:  YES, SIR.

4        THE COURT:  BUT YOU REMEMBER THAT IT WAS

5  DURING THE MONTH OF JULY?

6        THE WITNESS:  YES, SIR.

7        THE COURT:  SO YOU ALSO TESTIFIED ABOUT THE

8  DIFFERENCE BETWEEN AN INDIVIDUAL MEDICAL ASSESSMENT

9  THAT WOULD CONSIDER THE PHYSIOLOGICAL CHARACTERISTICS

10 OF AN INDIVIDUAL INMATE VERSUS AN ANALYSIS OF THE

11 RISK TO A POPULATION OF INMATES, SOME OF WHICH I

12 ASSUME SHARE SIMILAR CHARACTERISTICS; THAT IS,

13 PHYSIOLOGICAL CHARACTERISTICS.  IS THAT RIGHT?

14        THE WITNESS:  YES.

15        THE COURT:  WHAT CHARACTERISTICS DO YOU

16 BELIEVE OR HAVE YOU CONSIDERED, I SHOULD SAY, AMONG

17 THIS INMATE POPULATION IN FORMING YOUR OPINION?

18        THE WITNESS:  WELL, FIRST OF ALL, THERE IS

19 THE ISSUE OF AGE; THEY'RE YOUNG, HEALTHY PEOPLE WHO

20 WORK IN THE FARM LINE.  THERE ARE ALSO ELDERLY AND

21 INFIRM INDIVIDUALS.  THERE ARE THOSE INDIVIDUALS WITH

22 UNKNOWN MEDICAL PROBLEMS THAT THEY'RE GOING TO

23 DEVELOP OR GENETIC PREDISPOSITIONS.  THAT'S IMPORTANT

24 IN THE LITERATURE.  THERE ARE THOSE WHO ALREADY HAVE

25 DIABETES, HYPERTENSION, MENTAL ILLNESS, AND PULMONARY

1  PROBLEMS SUCH AS ASTHMA, WHICH IS ALSO WORSENED BY

2  THE HEAT.  AND THEN THERE ARE THOSE INDIVIDUALS WHO

3  HAVE MENTAL ILLNESS AND THEN THERE ARE ALL THOSE

4  INDIVIDUALS WHO ARE BEING TREATED FOR THOSE MEDICAL

5  CONDITIONS.

6          **THE COURT:**  ALL RIGHT.  SO -- LET'S SEE NOW.

7  SOME OF THE MEMBERS OF THE POPULATION -- SO WE'RE

8  TALKING ABOUT INMATES WHO HAVE BEEN PRESCRIBED

9  CERTAIN MEDICATIONS.  CORRECT?

10          **THE WITNESS:**  YES, SIR.

11          **THE COURT:**  AND WE HAVE INMATES THAT HAVE

12  BEEN DIAGNOSED WITH CERTAIN DISABILITIES?

13          **THE WITNESS:**  YES.

14          **THE COURT:**  HAVE YOU LOOKED AT BOTH OF THOSE

15  POPULATIONS?

16          **THE WITNESS:**  YES.

17          **THE COURT:**  AND WHAT IS YOUR OPINION WITH

18  RESPECT TO ANY INCREASED RISK OF HARM OR MEDICAL

19  TRAUMA IN ANY WAY THAT COULD RESULT IN THOSE

20  POPULATIONS IF THE TEMPERATURE EXCEEDS 88 DEGREES?

21          **THE WITNESS:**  SO MY OPINION IS THAT THIS

22  GROUP OF PEOPLE ON THE FARM LINE ARE WELL-REPRESENTED

23  IN THE VAST LITERATURE CONCERNING THIS.  THE

24  LITERATURE HERE IN THE LOUISIANA DEPARTMENT OF HEALTH

25  POINTED OUT THAT YOUNG, HEALTHY PEOPLE PRESENTED TO

1  EMERGENCY DEPARTMENTS.  SO THAT'S THE YOUNG, HEALTHY

2  PEOPLE PART.

3        THERE ARE MANY OTHER STUDIES THAT TALK

4  ABOUT THE HUNDREDS OF PEOPLE WHO DIED WHO WERE

5  SUPPOSEDLY YOUNG AND HEALTHY.  WE -- AND SO WHAT I'D

6  LIKE TO SAY IS THAT THE GROUP OF PEOPLE, THE 4,000

7  PEOPLE OR SO AND THOSE WHO WORK ON THE FARM LINE ARE

8  GENERALIZABLE TO THE GENERAL SCIENCE IN THIS COUNTRY

9  ABOUT WHO IS AT RISK OF DEVELOPING DIRECT HEAT

10 ILLNESS, HARM FROM HEAT, HEAT STROKE, HEAT

11 EXHAUSTION, DEHYDRATION, ELECTROLYTE ABNORMALITIES,

12 ACUTE KIDNEY FAILURE OR OTHER DISEASES OF THE

13 KIDNEYS.

14        **THE COURT:**  SO WHAT POPULATIONS WOULD BE AT

15 RISK OF DEHYDRATION IF THE TEMPERATURE EXCEEDS 88

16 DEGREES?

17        **THE WITNESS:**  WELL, BASICALLY ANY -- THE

18 LITERATURE SUGGESTS THAT ANYBODY WHO IS IN THAT

19 TEMPERATURE COULD BECOME DEHYDRATED.

20        **THE COURT:**  WHEN YOU SAY "ANYONE," ARE YOU

21 TALKING ABOUT PERSONS ON MEDICATION, PERSONS WITH

22 DISABILITIES, OR DO YOU KNOW?

23        **THE WITNESS:**  YES, I DO KNOW.  SO THERE ARE

24 CERTAINLY PEOPLE ON MEDICATIONS.  CERTAINLY A

25 DIURETIC IS A -- IS A DEHYDRATING MEDICATION.

1    ANYBODY WHO IS NOT DRINKING SUFFICIENT AMOUNTS OF

2    WATER, ANYBODY WITH KIDNEY PROBLEMS, BECAUSE THE

3    KIDNEY -- OR ANYBODY WITH AN ENDOCRINE PROBLEM.  THE

4    MEDICATIONS THAT AFFECT THE KIDNEY, I ALREADY TALKED

5    TO WHAT THEY CALL RAAS SYSTEM.  THAT'S THE RENIN-

6    ANGIOTENSIN-ALDOSTERONE SYSTEM THAT'S RESPONSIBLE FOR

7    MAINTAINING SALT AND WATER BALANCE IN THE KIDNEY.  SO

8    THERE ARE A -- I THINK IF -- I'VE ANSWERED YOUR

9    QUESTION, SIR.  IF I HAVEN'T, PLEASE LET ME CONTINUE.

10             THE COURT:  NO, YOU'VE ANSWERED.

11             NOW, YOU'VE ALSO BEEN ESTABLISHED AS AN

12   EXPERT IN MEDICAL TOXICOLOGY.

13             THE WITNESS:  YES, SIR.

14             THE COURT:  IS THAT RIGHT?

15             AND THERMOREGULATION.  HAVE YOU HAD AN

16   OPPORTUNITY TO REVIEW THE ADDITIONAL DRUGS THAT WERE

17   PLAYED OR HAVE BEEN PLACED ON THE DEPARTMENT OF

18   CORRECTIONS' LIST OF MEDICATIONS THAT MIGHT RESULT IN

19   A INMATE BEING REMOVED FROM THE FARM LINE?

20             THE WITNESS:  YES, YOUR HONOR.

21        THE COURT:  IN YOUR PROFESSIONAL OPINION,

22   ARE THERE ANY ADDITIONAL DRUGS NOT ON THAT LIST THAT

23   YOU BELIEVE SHOULD BE ADDED?

24        THE WITNESS:  YES.  ANYTHING THAT BLOCKS

25   SEROTONIN REUPTAKE INHIBITION THAT RESULTS IN

1  INCREASED SEROTONIN CAN RENDER THE INDIVIDUAL

2  HEAT-SENSITIVE.

3        THE COURT:  SO HAVE YOU HAD THE CHANCE TO

4  REVIEW THE REVISED LIST -- I'LL REFER TO IT AS THE

5  REVISED LIST OF PHARMACEUTICALS -- WITH -- AND

6  COMPARE THAT TO THE STUDIES THAT YOU HAVE CONSIDERED

7  IN DETERMINING WHETHER THE LIST IS ADEQUATE?  HAVE

8  YOU AT LEAST HAD THAT OPPORTUNITY?

9        THE WITNESS:  YES, SIR.  AND ONE THING

10 THAT'S MISSING FROM THAT LIST -- DR. BARNES IS

11 INSTRUMENTAL IN PUTTING TOGETHER THAT LIST AS A

12 DOCTOR OF PHARMACY.  AND SHE IS DISTINGUISHING

13 BETWEEN CALCIUM CHANNEL BLOCKERS, ONE --

14 ANTIHYPERTENSIVE, ONE DRUG.  AND SHE'S DISTINGUISHING

15 BETWEEN ONE GROUP OF CALCIUM CHANNEL BLOCKERS AND THE

16 OTHER.  ALL CALCIUM CHANNEL BLOCKERS RENDER AN

17 INDIVIDUAL HEAT-SENSITIVE.

18       THE COURT:  ALL RIGHT.  AND CAN YOU POINT TO

19 SPECIFIC DATA THAT SUPPORTS YOUR CONCLUSION?

20       THE WITNESS:  YES.  AND THE REASON IS THIS:

21 EVERY DRUG HAS THE EFFECT OF HAVING MORE OR LESS OF

22 AN EFFECT.  FOR EXAMPLE, SOME DRUGS LIKE BENADRYL,

23 DIPHENHYDRAMINE, ARE VERY ANTICHOLINERGIC.  SOME ARE

24 LESS ANTICHOLINERGIC, THAT'S TRUE.  DEPENDING HOW

25 MUCH -- SOME DRUGS ARE SPECIFIC FOR A CERTAIN

1  RECEPTOR.  BUT AS THE DOSE RISES -- OR MAYBE THERE IS

2  A SPECIAL VULNERABILITY ON THAT PERSON.  AS THE DOSE

3  RISES, THE SPECIFICITY IS LOST.

4         THE COURT:  SO IN OTHER WORDS, BASED UPON

5  YOUR OPINION AS AN EXPERT IN THERMOREGULATION OF THE

6  BODY, YOU DO NOT BELIEVE -- OR IF I'M -- I DON'T WANT

7  TO MISCHARACTERIZE ANYTHING AND SO YOU HAVE TO

8  CORRECT ME HERE.  BUT IS IT FAIR TO SAY THAT IT IS

9  YOUR OPINION THAT THAT IS NOT AN EXHAUSTIVE OR

10  ALL-INCLUSIVE LIST OF DRUGS THAT SHOULD BE CONSIDERED

11  WHEN DECIDING WHETHER TO PULL SOMEONE OFF THE FARM

12  LINE?

13         THE WITNESS:  THAT'S CORRECT, YOUR HONOR.

14         THE COURT:  NOW, YOU ALSO REFERENCED A

15  PUBLICATION -- YOU WERE SHOWN DURING THE COURSE OF

16  YOUR DIRECT EXAMINATION A PUBLICATION FROM THE

17  LOUISIANA DEPARTMENT OF HEALTH.  AND IT REFLECTED

18  DATA AND OTHER CHARTS.  DO YOU RECALL THAT DOCUMENT?

19         THE WITNESS:  YES, SIR.

20         THE COURT:  DO YOU KNOW IF THE LOUISIANA

21  DEPARTMENT OF HEALTH ITSELF HAS ESTABLISHED A MINIMUM

22  TEMPERATURE FOR OUTDOOR ACTIVITIES THAT MIGHT TRIGGER

23  A HEAT-RELATED ILLNESS?  DO YOU KNOW?

24         THE WITNESS:  THERE ARE HEAT WARNINGS,

25  BUT -- THERE ARE HEAT WARNINGS.  I'M NOT SURE WHAT

1   THAT IS.  I THINK MANY TIMES HEAT WARNINGS DO LOOK AT

2   HEAT WAVES.  ON THE OTHER HAND -- SO I'M NOT TALKING

3   ABOUT HEAT WAVES.

4          **THE COURT:**  BUT YOU DON'T KNOW IF THE LDH

5   ITSELF HAS --

6          **THE WITNESS:**  I DO NOT.

7          **THE COURT:**  -- EMPHATICALLY AFFIRMATIVELY

8   ESTABLISHED A MINIMUM HEAT STANDARD THAT WOULD

9   REQUIRE CERTAIN PRECAUTIONS.  CORRECT?

10         **THE WITNESS:**  I DON'T BELIEVE IT HAS, SIR.

11         **THE COURT:**  NOW, YOU ALSO WERE SHOWN A

12  DOCUMENT THAT I BELIEVE MADE REFERENCE TO A SCAR

13  STUDY, S-C-A-R.  DO YOU RECALL THAT?

14         **THE WITNESS:**  YES.

15         **THE COURT:**  DO YOU RECALL WHAT SCAR -- WHAT

16  THAT STANDS FOR?

17         **THE WITNESS:**  WELL, THAT'S -- JULIANNE

18  SKARHA IS HER NAME.  THAT'S HER -- THE FIRST AUTHOR.

19  AND SHE LOOKED AT THE NUMBER OF PEOPLE WHO DIED IN

20  PRISONS IN TEXAS.  SHE STARTED AT 85 DEGREES HEAT

21  INDEX AND THEN SHE WENT FROM THERE AND SAW THAT FOUR

22  -- IN UN-AIR-CONDITIONED PRISONS VERSUS

23  AIR-CONDITIONED PRISONS THERE WAS A 15 PERCENT

24  GREATER RISK OF DEATH.  APPROXIMATELY 14 EXTRA PEOPLE

25  DIED PER YEAR OVER THE TEN YEARS SHE LOOKED AT

1  UN-AIR-CONDITIONED PRISONS IN TEXAS VERSUS THOSE THAT

2  WERE AIR-CONDITIONED.

3       **THE COURT:**  DID THAT STUDY ACCOUNT FOR ANY

4  OUTDOOR TEMPERATURES OR ACTIVITIES?

5       **THE WITNESS:**  NO.

6       **THE COURT:**  ARE THERE ANY OTHER DOCUMENTS OR

7  STUDIES THAT YOU CAN POINT TO -- AND I KNOW THAT WE

8  HAVE A NUMBER OF RESOURCES ALREADY IN EVIDENCE AT

9  THIS TIME OR THAT HAVE BEEN SUBMITTED AS ATTACHMENTS

10  TO VARIOUS PLEADINGS.  IF YOU COULD CITE TO -- IF

11  IT'S POSSIBLE -- I DON'T KNOW IF YOU CAN CITE TO ONE

12  STUDY THAT YOU BELIEVE IS MOST DIRECTLY ON POINT ON

13  THE ISSUES IN THIS CASE; THAT IS, THE MINIMUM

14  TEMPERATURE FOR OUTDOOR ACTIVITY DURING THE SUMMER

15  MONTHS WORKING IN THE AGRICULTURAL SECTOR.  DO YOU

16  HAVE --

17       **THE WITNESS:**  WELL, I WOULD CITE FIRST TO

18  BASU, THE AUTHOR BASU, WHO DEMONSTRATED THAT FOR

19  EVERY TEN-DEGREE RISE IN TEMPERATURE, THERE WAS A 2.3

20  PERCENT INCREASE IN MORBIDITY.

21       **THE COURT:**  NOW, WHERE WAS --

22       **THE WITNESS:**  DEATH.  EXCUSE ME.

23       **THE COURT:**  -- THAT PUBLICATION?

24       **THE WITNESS:**  I DON'T HAVE IT -- I MEAN,

25  IT'S JUST ONE OF MANY.  IT'S -- THE AUTHOR IS BASU.

1           **THE COURT:**  CAN YOU SPELL THE NAME, PLEASE?

2           **THE WITNESS:**  B-A-S-U.  I HAVE NOTES AT THE

3    BACK THAT TELL ME EXACTLY THE YEAR.

4           **THE COURT:**  IS THAT CITED IN ANY OF YOUR

5    REPORTS?

6           **THE WITNESS:**  I DON'T REMEMBER, SIR.  I DO

7    KNOW THAT THE NEW OSHA -- WE DID CITE THE OSHA

8    GUIDELINES THAT -- THEY'RE VERY LARGE.  AND THAT IS

9    ONE OF THE CITES THERE.

10          SO TO THE EXTENT THAT I THINK THE OSHA

11   REPORT INCLUDES MANY REFERENCES THAT ARE CRITICAL TO

12   THIS CASE AND CRITICAL TO MY UNDERSTANDING OF THE

13   RISKS TO THE INDIVIDUALS ON THE FARM LINE.

14          **THE COURT:**  DO YOU KNOW IF THIS BASU STUDY

15   WAS PEER-REVIEWED?

16          **THE WITNESS:**  FOR A HUNDRED PERCENT.  IT'S

17   CALLED -- IT'S FREQUENTLY REFERRED TO.  AND YES, IT

18   IS.

19          **THE COURT:**  DO YOU RECALL WHEN IT WAS

20   PUBLISHED, APPROXIMATELY?

21          **THE WITNESS:**  SOMEWHERE BETWEEN 10 AND 20

22   YEARS AGO.

23          **THE COURT:**  THANK YOU.

24          **MR. BLANCHFIELD:**  YOUR HONOR, WE DON'T HAVE

25   THAT REPORT.

1          **THE COURT:**  MS. WRIGHT?

2          **MS. WRIGHT:**  THE BASU STUDY IS PLAINTIFFS'

3    EXHIBIT 43.  AND IT'S ALSO CITED AT FOOTNOTE 7 IN ECF

4    201-3, WHICH IS DR. VASSALLO'S FOURTH DECLARATION.

5    THE FULL CITATION AND I BELIEVE THE HYPERLINK TO THE

6    STUDY IS THERE.

7          **THE COURT:**  THANK YOU, MS. WRIGHT.  THANK

8    YOU FOR THE CLARIFICATION.

9          **MR. BLANCHFIELD:**  EXHIBIT 43 IS NOT IN --

10   HAS NOT BEEN INTRODUCED IN THIS CASE, YOUR HONOR.

11         **THE COURT:**  IS THAT --

12         **MS. WRIGHT:**  WE WOULD MOVE TO INTRODUCE

13   PLAINTIFFS' EXHIBIT 43, IF IT WOULD AID THE COURT.

14         **THE COURT:**  OBJECTION?  NO OBJECTION?

15         **MR. BLANCHFIELD:**  OBJECTION.

16         **THE COURT:**  OVERRULED.  IT WILL BE ADMITTED.

17              THANK YOU VERY MUCH, DOCTOR.

18         **THE WITNESS:**  THANK YOU, YOUR HONOR.

19         **THE COURT:**  THE PLAINTIFF MAY CALL ITS NEXT

20   WITNESS.

21         **MS. CRUTCHER:**  GOOD MORNING, YOUR HONOR.

22   KARA CRUTCHER.  WE'D LIKE TO CALL THE NAMED

23   PLAINTIFF, DAMARIS JACKSON.

24         **THE COURT:**  OKAY.  BROOKE, LET ME SEE YOU.

25              **(OFF THE RECORD)**

1          **THE COURT:**  OKAY.  I UNDERSTAND THAT MR.

2    JACKSON WOULD LIKE TO USE THE REST ROOM BEFORE HE

3    TESTIFIES, SO WE WILL TAKE A FIVE-MINUTE RECESS.

4    AGAIN, COURT IS IN RECESS.

5          **THE LAW CLERK:**  ALL RISE.

6               THE COURT IS IN RECESS.

7          **(WHEREUPON, A RECESS WAS TAKEN.)**

8          **THE COURT:**  BE SEATED.

9          **THE LAW CLERK:**  COURT IS NOW IN SESSION.

10         **THE COURT:**  OKAY.  SO AS A HOUSEKEEPING

11   MATTER, LET ME REMIND BOTH SIDES THAT EACH SIDE IS

12   ALLOTTED 30 MINUTES FOR EACH FACT WITNESS.  I WILL

13   GIVE EACH SIDE A FIVE-MINUTE WARNING AT THE 25-MINUTE

14   MARK.

15              AGAIN, YOU MAY NOW CALL YOUR NEXT

16   WITNESS.

17         **MS. CRUTCHER:**  PLAINTIFFS CALL NAMED

18   PLAINTIFF DAMARIS JACKSON TO THE STAND.

19         **THE COURT:**  OFFICER, WHY DON'T YOU SIT

20   BACK -- THERE IS A CHAIR BEHIND THE WITNESS STAND.

21   IF YOU WOULD BE KIND ENOUGH TO SIT THERE.

22         **(WHEREUPON, DAMARIS JACKSON, BEING DULY**

23   **SWORN, TESTIFIED AS FOLLOWS.)**

24         **THE COURT:**  PLEASE BE SEATED.

25         **MS. CRUTCHER:**  AND, YOUR HONOR, MAY I

1  REQUEST THAT HE HAVE ONE HAND UNSHACKLED SO HE CAN --

2        **THE REPORTER:**  MA'AM, YOU'RE GOING TO HAVE

3  TO SPEAK UP.  YOU'RE VERY SOFT-SPOKEN.

4        **MS. CRUTCHER:**  I WOULD LIKE TO REQUEST THAT

5  HE HAVE ONE HAND UNSHACKLED SO HE MAY BE ABLE TO

6  DRINK WATER THROUGHOUT HIS TESTIMONY.

7        **THE COURT:**  WELL, IF HE NEEDS -- OKAY.  WE

8  CAN ACCOMMODATE YOU.

9        **MS. CRUTCHER:**  THANK YOU.

10        **THE COURTROOM DEPUTY:**  CLEARLY STATE AND

11  SPELL YOUR NAME FOR THE RECORD.

12        **THE WITNESS:**  DAMARIS JACKSON.  DAMARIS,

13  D-A-M-A-R-I-S, JACKSON, J-A-C-K-S-O-N.

14        **THE COURT:**  YOU MAY PROCEED.

15                    **DIRECT EXAMINATION**

16  **BY MS. CRUTCHER:**

17     **Q**    GOOD MORNING.

18     **A**    GOOD MORNING.

19     **Q**    CAN YOU PLEASE INTRODUCE YOURSELF TO THE

20  COURT?

21     **A**    I'M DAMARIS JACKSON.  I'VE BEEN INCARCERATED

22  AT ANGOLA SINCE 2002.

23        **THE COURT:**  THERE IS NO NEED FOR US, MR.

24  JACKSON, TO TELL YOU -- TELL US WHY YOU WERE

25  INCARCERATED, BUT WE APPRECIATE YOU PROVIDING THAT

1  HISTORY.  OKAY?

2  **BY MS. CRUTCHER:**

3      **Q**    ARE YOU A PLAINTIFF IN THIS LAWSUIT?

4      **A**    YES, MA'AM.

5      **Q**    CAN YOU TELL THE COURT WHY YOU BROUGHT THIS

6  ACTION?

7      **A**    I WANTED TO BE A SPOKESMAN FOR EVERYBODY

8  THAT WAS AFRAID TO SPEAK UP AND THOSE WHO ARE

9  MENTALLY CHALLENGED THAT CAN'T SPEAK UP FOR

10  THEMSELVES.

11      **Q**    DID YOU FILE THIS LAWSUIT TO MAKE MONEY?

12      **A**    NO, MA'AM.

13      **Q**    WHAT DOES IT MEAN TO YOU TO BE A CLASS

14  REPRESENTATIVE IN THIS LAWSUIT?

15      **A**    IT'S VERY HUMBLING.  IT'S VERY HUMBLING TO

16  STAND UP FOR -- FOR THOSE OF US THAT'S BEEN DEGRADED

17  ON ANGOLA FARM LINE.

18      **Q**    AND YOU WERE DEPOSED IN THIS LAWSUIT ON JULY

19  19, 2024?

20      **A**    YES, MA'AM.

21      **Q**    WHAT DID YOU DO TO PREPARE FOR YOUR

22  DEPOSITION?

23      **A**    SPEAK TO MY ATTORNEYS ON EVERY OCCASION.

24          **THE COURT:**  CAN YOU HEAR OKAY?

25          **THE REPORTER:**  NO, SIR.

1           THE COURT:  WELL, MAYBE -- LET'S GO ON --

2    WOULD YOU ADJUST THE MICROPHONE JUST TO MAKE SURE?

3           THE WITNESS:  OKAY.

4           THE COURT:  AND BE SURE YOU SPEAK UP AND

5    INTO THE MICROPHONE.  OKAY?

6           THE WITNESS: YES, SIR.

7    BY MS. CRUTCHER:

8      Q    AND YOU SIGNED DECLARATIONS THAT HAVE BEEN

9    SUBMITTED TO THE COURT FOR THE PURPOSES OF THIS

10   LITIGATION?

11     A    YES, MA'AM.

12     Q    DID YOU COME HERE TODAY TO BATON ROUGE IN

13   RESTRAINTS BECAUSE THE FARM LINE IS SO CRUEL THAT YOU

14   FELT LIKE YOU NEEDED TO TAKE A STAND AGAINST IT?

15     A    YES, MA'AM.

16          MR. BLANCHFIELD:  OBJECTION, YOUR HONOR.

17   LEADING QUESTION.

18          THE COURT:  SUSTAINED.

19          MS. CRUTCHER:  I'LL REPHRASE.

20   BY MS. CRUTCHER:

21     Q    DO YOU FIND THE FARM LINE TO BE CRUEL?

22     A    YES, MA'AM.

23     Q    AND IS THAT CRUELTY WHY YOU FELT THAT IT WAS

24   IMPORTANT TO COME HERE TODAY AND TESTIFY IN THIS

25   LITIGATION?


**A** YES, MA'AM.
**Q** HOW OLD ARE YOU?
**A** FORTY-FOUR.
**Q** HOW LONG HAVE YOU BEEN INCARCERATED AT ANGOLA?
**A** SINCE 2002.
**Q** DURING YOUR INCARCERATION AT ANGOLA, HAVE YOU LABORED ON THE FARM LINE?
**A** YES, MA'AM.
**Q** WAS THE FARM LINE THE FIRST WORK ASSIGNMENT GIVEN TO YOU AT ANGOLA?
**A** YES, IT WAS.
**Q** DID YOU CHOOSE TO WORK ON THE FARM LINE?
**A** NO, MA'AM.
**Q** IS IT YOUR UNDERSTANDING THAT WORKING ON THE FARM LINE IS THE FIRST WORK ASSIGNMENT GIVEN TO INCARCERATED MEN WHEN THEY ARRIVE AT ANGOLA?
**A** YES, IT IS.
**Q** HAVE YOU OBSERVED ANYTHING ABOUT THE HABITS OF PEOPLE WHEN THEY WORK ON THE FARM LINE?
**A** MOST PEOPLE THAT WORK ON THE FARM LINE GET IRRITATED, BEGIN WALKING AROUND IN A DAZE; THEY STOP SHOWERING, STOP COMMUNICATING WITH THEIR FAMILY, BEGIN TO DO -- KEEP FOOD OVERNIGHT SOMETIMES FOR TWO OR THREE DAYS AND TRY TO EAT IT. JUST BECOME

1  DISRUPTIVE.

2      **Q**    HAVE YOU EVER STOPPED TALKING TO YOUR FAMILY

3  BECAUSE YOUR WORK ON THE FARM LINE WAS IMPACTING YOU?

4      **A**    YES, MA'AM.  I ALSO CANCELED MY VISITS.

5      **Q**    HOW DO THE CONDITIONS ON THE FARM LINE ON

6  YOUR FIRST DAY WORKING RESEMBLE THE CONDITIONS ON THE

7  FARM LINE THE LAST FEW TIMES YOU WENT OUT TO WORK ON

8  THE LINE?

9      **A**    WHEN I FIRST STARTED GOING OUT ON THE FARM

10  LINE, THEY WERE -- THE FREE FOLKS USED TO RIDE ON

11  HORSEBACK.  NOW THEY PUT US ON A BUS TO BRING US TO

12  THE JOB SITE.

13      **Q**    CAN YOU CLARIFY WHAT YOU MEAN BY "THE FREE

14  FOLKS"?

15      **A**    THE CORRECTIONS OFFICERS.

16      **Q**    AND HAVE YOU EVER BEEN PROVIDED WITH FARMING

17  MACHINERY SUCH AS A TRACTOR OR AN IRRIGATION SYSTEM

18  TO CARRY OUT THE LABOR FORCED OF YOU ON THE FARM

19  LINE?

20      **A**    NO, MA'AM.

21      **Q**    HOW DOES IT FEEL TO KNOW THAT SOME OF THE

22  WORK THAT YOU ARE MADE TO DO COULD BE DONE MORE

23  EFFICIENTLY WITH PROPER TOOLS SUCH AS A TRACTOR OR AN

24  IRRIGATION SYSTEM?

25          **MR. BLANCHFIELD:**  YOUR HONOR, I OBJECT TO

1  LEADING QUESTION AND I OBJECT TO THE LACK OF

2  FOUNDATION.

3       **THE COURT:**  WELL, WHY DON'T YOU REPHRASE THE

4  QUESTION.

5  **BY MS. CRUTCHER:**

6     **Q**    HOW DOES IT FEEL TO KNOW THAT SOME OF THE

7  WORK THAT YOU ARE MADE TO DO ON THE FARM LINE COULD

8  BE DONE DIFFERENTLY?

9     **A**    VERY DISRESPECTING AND DEGRADING.

10     **Q**    AND, MR. JACKSON, CAN YOU DESCRIBE FOR THE

11  COURT WHAT A WORK OFFENSE IS?

12     **A**    IT'S WHEN YOU REFUSE TO WORK OR YOU'RE NOT

13  WORKING FAST ENOUGH FOR THE LINE PUSHER.

14     **Q**    AND WHAT HAPPENS WHEN YOU GET A WORK

15  OFFENSE?

16     **A**    YOU GET SENT TO THE DUNGEON.

17     **Q**    CAN YOU EXPLAIN TO THE COURT WHAT THE

18  DUNGEON IS?

19     **A**    SOLITARY CONFINEMENT.  SOMETIMES YOU PUT IN

20  A CELL BY YOURSELF, SOMETIMES YOU'LL HAVE A CELL

21  MATE.  BUT IT'S REALLY HOT.  SOMETIMES YOUR -- YOU

22  MAY GET YOUR FOOD, SOMETIMES YOU MAY NOT GET THE

23  FOOD.  DEPENDS ON WHAT TIME IT IS WHEN THEY FEED YOU

24  LAST CHOW.  PEOPLE CRY OUT, FEAR, ANGER.  SOMETIMES

25  WHEN YOU HAVE TO -- WHEN A CORRECTIONAL OFFICER HAVE

1    TO COME DOWN TO DO SOMEBODY, THEY SPRAY MACE ON THE
2    TIER, WHICH AFFECTS EVERYBODY ON THE TIER.
3        Q    ARE THERE ANY OTHER CONDITIONS THAT YOU'VE
4    EXPERIENCED IN THE DUNGEON?
5        A    YES, MA'AM.  I HAVE LOST -- I HAVE NOT
6    TALKED TO MY FAMILY.  COULDN'T GET TO THE PHONE.
7    SOMETIMES NOT EVEN ABLE TO SHOWER.
8        Q    AND HAVE YOU BEEN SENT TO THE DUNGEON FOR
9    REFUSING TO WORK IN THE FIELD?
10       A    YES, MA'AM.
11       Q    AND IS THIS OUTCOME A RESULT OF THE
12   DISCIPLINARY POLICY THAT YOU RECEIVED UPON ARRIVAL AT
13   ANGOLA AND THAT APPLIES TO ALL INCARCERATED PEOPLE
14   THERE?
15       A    YES, MA'AM, IT IS.
16       Q    AND THIS DISCIPLINARY POLICY IS APPLIED
17   UNIFORMLY TO INCARCERATED MEN AT ANGOLA?
18       A    YES, IT IS.
19       Q    DO YOU KNOW WHETHER OTHER INCARCERATED MEN
20   HAVE BEEN DISCIPLINED FOR WORK OFFENSES RELATED TO
21   THE FARM LINE?
22       A    YES, THEY HAVE.
23       Q    HAVE YOU EVER BEEN DISCIPLINED FOR REFUSING
24   TO PICK COTTON?
25       A    YES, MA'AM; SEVERAL TIMES.

1    **Q**    WHAT DISCIPLINE DID YOU RECEIVE DUE TO

2    REFUSING TO PICK COTTON?

3    **A**    I HAVE RULE INFRACTION, A RULE 28, WHY I WAS

4    SENT TO SOLITARY CONFINEMENT.  AND MY PHONE PRIVILEGE

5    WAS TAKEN, MY YARD WAS TAKEN, MY COMMISSARY WAS

6    TAKEN, AND I WAS FORCED TO STAY IN THE CELL FOR

7    SEVERAL DAYS.

8    **Q**    DID YOU KNOW THAT YOU WOULD GET SENT TO THE

9    DUNGEON FOR REFUSING TO PICK COTTON?

10    **A**    YES, MA'AM.

11    **Q**    AND WHY HAVE YOU REFUSED TO PICK COTTON

12    KNOWING THAT YOU COULD BE PUNISHED IN THIS WAY?

13    **A**    BECAUSE STORIES WAS TOLD, PASSED DOWN FROM

14    MY GREAT-GRANDPARENTS ABOUT PICKING COTTON IN EAST

15    FELICIANA PARISH, WHICH IS IN SLAUGHTER, LOUISIANA,

16    AND HOW HARD IT WAS FOR THEM BACK THEN SHARECROPPING

17    AND THE THINGS THAT THEY WENT THROUGH.  SO I FELT

18    THAT IT WAS ON ME TO TAKE A STAND NOT TO GO THROUGH

19    WHAT MY ANCESTORS WENT THROUGH AT THAT TIME.

20          **MR. BLANCHFIELD:**  YOUR HONOR, WE'RE TALKING

21    ABOUT CURRENT CONDITIONS ON THE FARM LINE.  COTTON

22    HADN'T BEEN PICKED ON THAT FARM TIME IN A LONG, LONG

23    TIME.  I OBJECT TO THAT.

24          **THE COURT:**  COUNSEL?

25          **MS. CRUTCHER:**  YOUR HONOR, THIS IS RELEVANT

1  BECAUSE IT MAKES IT MORE OR LESS PROBABLE THAT THE

2  FARM LINE CAUSES PSYCHOLOGICAL HARMS BECAUSE OF THE

3  CONDITIONS THAT ARE ASSOCIATED WITH CHATTEL SLAVERY.

4            **THE COURT:**  WELL, WHY DON'T WE GO ON TO

5  SOMETHING THAT MAY BE A LITTLE BIT MORE CONTEMPORARY.

6            I'M NOT SUGGESTING THAT IT'S NOT.  I'M

7  JUST -- OBVIOUSLY WE'RE DEALING WITH CURRENT

8  CONDITIONS OR -- SO WHY DON'T WE MOVE ON TO THOSE

9  AREAS.  OKAY?

10           **MS. CRUTCHER:**  WILL DO.  THANK YOU.

11 **BY MS. CRUTCHER:**

12    **Q**   WHAT ARE SOME OF THE OTHER TASKS YOU'VE BEEN

13 ASSIGNED TO DO WHEN YOU'VE GONE TO LABOR ON THE FARM

14 LINE?

15    **A**   CUT GRASS, PICK COTTON, PICK ZUCCHINI,

16 SQUASH, OKRA, GREENS, WHATEVER IS OUT THERE TO PICK

17 TO HARVEST.

18    **Q**   AND WAS OCTOBER 2023 THE LAST TIME YOU WENT

19 OUT TO WORK ON THE FARM LINE?

20    **A**   YES, MA'AM, IT WAS.

21    **Q**   BECAUSE YOU'RE NOT CURRENTLY WORKING ON THE

22 FARM LINE, HOW DO YOU KNOW WHAT'S HAPPENING OUT THERE

23 TODAY?

24    **A**   VERY OBSERVANT.  I'M ASKING QUESTIONS TO ALL

25 THE BROTHERS THAT'S GOING IN AND OUT OF THE FARM LINE

1   FIVE DAYS A WEEK ABOUT THE CONDITIONS OUT THERE.

2       **Q**    AND WHAT WAS THE FARM LINE LIKE IN 2023 WHEN

3   YOU LAST WENT OUT TO WORK?

4       **A**    PRETTY MUCH THE SAME.  THE LINE PUSHERS WAS

5   STILL PUSHING US KIND OF HARD.  OTHER THAN HAVING THE

6   GUN GUARDS ON HORSEBACK, THEY WERE BRINGING US OUT ON

7   A BUS OR WALKING US TO A CLOSE SITE, BUT PRETTY MUCH

8   RESEMBLE THE SAME ACTIONS.

9       **Q**    IS IT THE CASE THAT SOMETIMES INCARCERATED

10  INDIVIDUALS ARE PAID TO DO WORK ON THE FARM LINE?

11      **A**    SOMETIMES.

12      **Q**    HOW MUCH ARE THEY PAID?

13      **A**    FOUR CENT AN HOUR.

14      **Q**    IS THERE ANOTHER AMOUNT THAT THEY MAY BE

15  PAID FOR THEIR WORK ON THE FARM LINE?

16      **A**    I DON'T KNOW.

17      **Q**    WHAT DOES IT FEEL LIKE TO BE PAID THIS RATE

18  FOR YOUR LABOR ON THE FARM LINE?

19      **A**    IT'S VERY DEGRADING.  VERY, VERY DEGRADING.

20      **Q**    AND WHAT DO YOU AND OTHER PEOPLE WORKING ON

21  THE FARM LINE USE THIS MONEY FOR?

22      **A**    COMMISSARY, AS FAR AS SOAP, TOOTHPASTE,

23  DEODORANT, WATER, THINGS, PHONE TIME.

24      **Q**    MR. JACKSON, HOW MUCH DOES IT COST TO

25  PURCHASE ONE BAR OF SOAP?

1      **A**    A DOLLAR AND 50 CENT.

2      **Q**    SO IS IT YOUR UNDERSTANDING THAT IT TAKES

3  OVER 50 HOURS OF LABOR ON THE FARM LINE MAKING, LET'S

4  SAY, TWO CENTS AN HOUR TO BUY ONE BAR OF SOAP TO

5  CLEAN YOURSELF WITH?

6      **A**    YES, MA'AM.

7      **Q**    AND CAN YOU DESCRIBE TO THE COURT:  WHAT IS

8  JPAY?

9      **A**    IT'S A MEAN TO WHERE WE CAN USE THE COMPUTER

10  TO EMAIL OUR FAMILY, KEEP IN CONTACT WITH FAMILY AND

11  FRIENDS.

12      **Q**    AND IS IT THE CASE THAT IN ORDER TO CONTACT

13  YOUR FAMILY VIA JPAY, YOU MUST USE FUNDS EITHER

14  EARNED FROM YOUR WORK ON THE FARM LINE OR DEPOSITED

15  INTO YOUR ACCOUNT BY A LOVED ONE?

16      **A**    YES, MA'AM.

17      **Q**    HAS THE PAY FOR THE LABOR ON THE FARM LINE

18  INCREASED SINCE YOU'VE BEEN INCARCERATED AT ANGOLA?

19      **A**    NO, MA'AM.

20      **Q**    AND WHY DO YOU NEED TO PURCHASE ITEMS AT

21  CANTEEN IF THE PRISON PROVIDES ALL OF YOUR BASIC

22  NECESSITIES?

23      **A**    THEY DON'T.

24      **Q**    HAVE ANGOLA OFFICIALS TOLD YOU THAT YOU

25  WOULD NOT BE WORKING ON THE FARM LINE BECAUSE YOU ARE

1  A PLAINTIFF IN THIS LAWSUIT?

2      **A**    YES, MA'AM.

3      **Q**    AND DID ANGOLA OFFICIALS REASSIGN YOU TO THE

4  FARM LINE DURING THE COURSE OF THIS LITIGATION

5  DESPITE INFORMING YOU THAT YOU WOULDN'T BE ASSIGNED

6  TO THE FARM LINE?

7      **A**    YES, THEY HAVE.

8      **Q**    AND DID ANGOLA OFFICIALS REASSIGN YOU TO

9  WORK ON THE FARM LINE ON JULY 2, 2024?

10          **THE COURT:**  WAIT JUST A MOMENT.

11              SIR, I'M GOING TO ASK YOU TO SIT DOWN.

12  NO ONE CAN STAND UP IN MY COURT.

13          DO YOU HAVE A MEDICAL REASON?

14          **UNIDENTIFIED SPEAKER:**  YES, SIR.

15          **THE COURT:**  WHAT IS THAT?

16          **UNIDENTIFIED SPEAKER:**  I HAVE DISKOGENIC

17  BACK DISEASE.  I'VE HAD SURGERY.  IF I SIT VERY LONG,

18  I GET SCIATIC IN MY LEFT LEG.

19          **THE COURT:**  ALL RIGHT.  WELL, I'LL PERMIT

20  YOU TO REMAIN STANDING THROUGH THE TESTIMONY.  BUT

21  JUST IF YOU HAVE AN ISSUE LIKE THAT -- THIS IS TO

22  COUNSEL.  IF YOU HAVE A WITNESS, AN EXPERT, A PARTY

23  WHO HAS A SIMILAR ISSUE, I WILL PERMIT THEM TO REMAIN

24  SEATED.  JUST -- REMAIN STANDING.  BUT JUST NOTIFY

25  THE COURT BEFOREHAND.  OKAY?  THANK YOU.

1              LET'S PROCEED.

2    **BY MS. CRUTCHER:**

3       **Q**    DID ANGOLA OFFICIALS REASSIGN YOU TO WORK ON

4    THE FARM LINE ON JULY 2, 2024?

5       **A**    YES, MA'AM.

6       **Q**    AND DID YOU GO OUT TO WORK IN THE FIELD WHEN

7    YOU WERE RESIGNED -- EXCUSE ME -- WHEN YOU WERE

8    REASSIGNED TO THE FARM LINE AT THAT TIME?

9       **A**    NO.  I REFUSED TO.

10      **Q**    AND DID YOU RECEIVE A DISCIPLINARY VIOLATION

11   FOR REFUSING TO GO WORK ON THE FARM LINE THAT DAY?

12      **A**    YES, MA'AM.  I WAS SENT TO CONFINEMENT AND I

13   WAS -- A COUPLE DAYS LATER I WAS GIVEN A SUSPENDED

14   SENTENCE; FOUR WEEKS LOSS OF CANTEENS AND FOUR WEEKS

15   LOSS OF PHONE PRIVILEGES.

16      **Q**    AND, MR. JACKSON, IS IT CORRECT THAT YOU

17   WROTE A DECLARATION IN THIS CASE ON SEPTEMBER 23,

18   2024, WHICH WAS FILED IN SUPPORT OF PLAINTIFFS'

19   MOTION FOR CLASS CERTIFICATION?

20      **A**    YES, MA'AM.

21      **Q**    AND IN THAT DECLARATION DID YOU DESCRIBE THE

22   BEHAVIOR OF THE GUN GUARDS ON THE FARM LINE?

23      **A**    YES, I DID.

24      **Q**    COULD YOU PLEASE TELL THE COURT WHAT YOU

25   DESCRIBED IN YOUR DECLARATION ABOUT THE GUN GUARDS ON

1  THE FARM LINE?

2     **A**   THE GUN GUARDS, I REMEMBER WHEN IT WAS A

3  TIME IT WAS SO DISRESPECTFUL TO WHERE THEY WOULD TALK

4  TO US DEROGATORY, SAY DEROGATORY THINGS TO US, USE

5  THE "BOY" WORD JUST CONSTANTLY ALL DAY:  "BOY, DO

6  THIS"; "BOY, DO THAT."  SOMETIMES EVEN FIRE THEY

7  WEAPONS WHEN WE'D BE WALKING OUT TO THE WORK SITE,

8  WHERE EVERYBODY WILL JUST FALL TO THE GROUND BECAUSE

9  WE KNEW -- NOBODY KNEW WHAT THEY WERE SHOOTING AT.

10  AND THEY PICK SOMEBODY OUT THEN, SAY HE WAS DOING IT,

11  BUT -- AND SEND HIM TO THE SOLITARY CONFINEMENT FOR

12  THAT REASON.

13     **Q**   AND DID YOU ALSO DESCRIBE IN THIS

14  DECLARATION THE CONSTANT ANXIETY YOU FEEL WHILE

15  WORKING ON THE FARM LINE?

16     **A**   YES, I DID.

17     **Q**   CAN YOU PLEASE TELL THE COURT ABOUT THAT

18  ANXIETY?

19     **A**   IT'S A THING WHEN YOU GET UP IN THE MORNING

20  AND YOU'RE BEING FORCED TO GO OUT IN THE FARM LINE

21  KNOWING THAT -- NOT KNOWING THE PSYCHOLOGICAL, THE

22  MIND STATES OR THE PEOPLE OUT THERE WITH GUNS.

23  RIGHT?  SO YOU ALWAYS ON EDGE.  AND SOMETIMES EVEN

24  FIGHTS BREAK OUT IN THE MORNING BECAUSE PEOPLE DON'T

25  WANT TO GO IN THE FIELD OR PEOPLE JUST REFUSE TO GO

1   IN THE FIELD.  YOU SEE ALL KIND OF MOOD CHANGES AND

2   THINGS LIKE THAT.  SO YOU ALWAYS ON POINT, SO YOU

3   PROBABLY HAVE YOUR BACK AGAINST THE WALL WAITING FOR

4   THEM TO CALL WORK CALL.

5       Q    MR. JACKSON, HAVE YOU EVER WITNESSED ANYONE

6   SUFFER FROM AN INJURY WHILE WORKING ON THE FARM LINE?

7       A    YES, I HAVE.

8       Q    WHAT INJURIES HAVE YOU SEEN OTHERS SUFFER

9   WHILE WORKING ON THE FARM LINE?

10      A    I'VE SEEN PEOPLE SPRAIN THEIR ANKLES.  I'VE

11  SEEN PEOPLE GET HIT WITH TOOLS.  PEOPLE WILL SWING

12  TOOLS NOT INTENTIONALLY TRYING TO HIT THEM, BUT IT

13  COMES OUT THEIR HAND.  I'VE SEEN PEOPLE INTENTIONALLY

14  BREAK -- FALL DOWN AND TRY TO HURT THEMSELVES TRYING

15  TO GET OUT OF WORK.

16      Q    ARE THERE ANY OTHER INJURIES THAT YOU'VE

17  EVER SEEN ANYONE SUFFER WHILE WORKING ON THE FARM

18  LINE?

19      A    YEAH.  I'VE SEEN PEOPLE PASS OUT FROM THE

20  HEAT AND I'VE SEEN PEOPLE JUST QUIT WORKING BECAUSE

21  IT WAS TOO HOT FOR THEM TO KEEP GOING.

22      Q    HAVE YOU HAD ANY INJURIES OR MEDICAL ISSUES

23  DUE TO WORKING ON THE FARM LINE?

24      A    YEAH.  WELL, MY RIGHT LEG SWELLS UP IF I

25  STAND UP TOO LONG, AND IT SWELLS.  OKRA MAKES MY --

1  MAKE ME ITCH WHEN WE PICK OKRA.  IT'S A CONSTANT

2  ITCHING FACT.  I HAVE -- I'VE BEEN GETTING LIGHT-

3  HEADED, I'VE GOT DIZZY.  I DONE BROKE OUT IN COLD

4  SWEATS EVEN THOUGH IT'S HOT OUT THERE.

5      Q    HAVE YOU EVER BEEN DIAGNOSED WITH A

6  HEAT-RELATED ILLNESS?

7      A    I NEVER HAD MY MEDICAL RECORDS.  I CAN'T

8  SPEAK ON THAT.

9      Q    AND IS IT CORRECT THAT YOU CURRENTLY DON'T

10 HAVE A COPY OF YOUR MEDICAL RECORDS?

11     A    YES, MA'AM.

12     Q    DO YOU CURRENTLY LIVE WITH ANY MEDICAL

13 CONDITIONS?

14     A    YES, MA'AM.  HIGH BLOOD PRESSURE.

15     Q    HOW LONG HAVE YOU HAD HIGH BLOOD PRESSURE?

16     A    SEVERAL YEARS NOW.

17     Q    DO YOU TAKE ANY MEDICATION FOR HIGH BLOOD

18 PRESSURE?

19     A    YES, MA'AM.

20     Q    WERE YOU EVER SENT TO WORK -- EXCUSE ME.

21 STRIKE THAT.

22          WERE YOU EVER SENT OUT TO WORK ON THE FARM

23 LINE AFTER BEING DIAGNOSED WITH HIGH BLOOD PRESSURE?

24     A    YES, MA'AM.

25     Q    CAN YOU DESCRIBE FOR THE COURT:  WHAT IS A

1  HEAT PRECAUTION DUTY STATUS?

2      **A**    IT'S GIVEN TO SOMEBODY THAT'S

3  HEAT-SENSITIVE.

4      **Q**    HAVE ANGOLA OFFICIALS EVER ASSIGNED YOU A

5  HEAT PRECAUTION DUTY STATUS?

6      **A**    NO, MA'AM.

7      **Q**    HAVE YOU EVER REQUESTED MEDICAL CARE BECAUSE

8  OF INJURIES YOU RECEIVED WHILE WORKING ON THE FARM

9  LINE?

10     **A**    YES, MA'AM.

11     **Q**    HAVE YOU EVER BEEN CHARGED A COPAY FOR

12 REQUESTING MEDICAL CARE DUE TO INJURIES OR ILLNESSES

13 YOU FELT WHILE WORKING ON THE FARM LINE?

14     **A**    YES, MA'AM, I HAVE.

15     **Q**    IN YOUR EXPERIENCE, DO ANGOLA OFFICIALS

16 INFORM INCARCERATED MEN VIA A MEDICAL FORM OF THE

17 COST OF EMERGENCY VISITS AND ROUTINE SICK CALLS?

18     **A**    YES.

19     **Q**    MR. JACKSON, IS THERE ANYTHING ELSE YOU

20 WOULD LIKE THE COURT TO KNOW ABOUT FORCED LABOR AT

21 ANGOLA?

22     **A**    YES, MA'AM.  I FEEL LIKE BEING FORCED TO

23 WORK IN THE FIELD UNDER THE THREAT OF DISCIPLINARY

24 ACTION, YOUR GOOD TIME BEING TAKEN WHERE YOU'RE NOT

25 ABLE TO FILE FOR PAROLE OR PARDON.  I FEEL LIKE THAT

1   IS A DOUBLE STANDARD.  EITHER YOU DO IT OR YOU STAY

2   IN PRISON LONGER OR -- IT'S JUST -- I FEEL LIKE IT'S

3   VERY DISRESPECTFUL.  IT'S HARMFUL.  I SEE IT EVERY

4   DAY FIVE DAYS A WEEK.  I HAVEN'T BEEN TAKEN OUT THE

5   DORMITORY THAT I'VE BEEN IN SINCE I'VE BEEN IN CAMP D

6   OVER THE LAST SEVERAL MONTHS.  AND I WATCH MY FELLOW

7   INMATES JUST -- SOME OF THEM GIVE UP.  SOME OF THEM

8   GIVE UP.

9        FOR ME, WATCHING MY BROTHERS GIVE UP IS

10  HARD.  AND IF I HAVE TO CONTINUE TO LIVE LIKE THAT, I

11  DON'T KNOW HOW -- HOW I'M -- HOW IT'S GOING -- I'M

12  GOING TO MANAGE THIS THING.  IT'S JUST GETTING HARDER

13  AND HARDER EACH DAY THERE.

14      Q    THANK YOU.

15           MS. CRUTCHER:  NO FURTHER QUESTIONS AT THIS

16  TIME.

17           THE COURT:  ALL RIGHT.  THANK YOU.

18           ANY DIRECT -- CROSS-EXAMINATION?

19           MR. BLANCHFIELD:  YES, YOUR HONOR.  THANK

20  YOU.

21                  CROSS-EXAMINATION

22  BY MR. BLANCHFIELD:

23      Q    HELLO, MR. JACKSON.  GOOD TO SEE YOU AGAIN.

24      A    SAME HERE.

25      Q    SO THE LAST TIME THAT YOU WERE ON THE FARM

1  LINE OUT THERE WAS IN THE YEAR 2023?

2      **A**    YES, SIR.

3      **Q**    WHAT ARE YOU DOING NOW?

4      **A**    NOTHING BECAUSE OF THE LITIGATIONS GOING ON.

5      **Q**    NOW, YOU TESTIFIED YOU'VE BEEN AT LSP SINCE

6  2002.  YOU'VE DONE A LOT OF DIFFERENT JOBS?

7      **A**    YES, SIR.

8      **Q**    YOU'VE BEEN A DORM ORDERLY?

9      **A**    YES, SIR.

10     **Q**    YOU'VE BEEN A JANITOR?

11     **A**    YES, SIR.

12     **Q**    WORKED IN VEGETABLE PROCESSING?

13     **A**    YES, SIR.

14     **Q**    TEXTILE CUTTER?

15     **A**    YES, SIR.

16     **Q**    WERE THOSE JOBS DEGRADING?

17     **A**    NO, BECAUSE NOBODY STAND OVER ME WITH A

18  WEAPON TELLING ME I GOT TO DO IT.

19     **Q**    DO YOU -- DID YOU DO ANY JOBS THAT ARE

20  OUTSIDE THE SECURED PERIMETER?

21     **A**    NO, SIR.

22     **Q**    ONLY THE FARM LINE?

23     **A**    YES, SIR.

24     **Q**    NOW, IN THOSE OTHER JOBS -- SAY, VEGETABLE

25  PROCESSING --

1    **A**    YES, SIR.

2    **Q**    -- WHICH IS NOT DEGRADING.  BUT IF YOU JUST

3    TOLD THEM, *I'M NOT DOING THIS.  I'M REFUSING TO WORK,*

4    YOU WOULD BE SUBJECT TO SOME DISCIPLINARY ISSUES,

5    WOULD YOU NOT?

6    **A**    YES, SIR.

7    **Q**    EVERYONE WHO HAS A JOB, IF THEY REFUSE TO

8    WORK, REGARDLESS OF WHAT THE JOB IS AT LSP, YOU'RE

9    GOING TO FACE SOME DISCIPLINARY ISSUES, ARE YOU NOT?

10    **A**    YEAH.  SOMETIMES YOU DON'T HAVE TO DO

11    NOTHING FOR YOUR JOB TO BE TAKEN.

12    **Q**    NOW, YOUR HIGH BLOOD PRESSURE, YOU TAKE

13    MEDICINE FOR THAT?

14    **A**    YES, SIR.

15    **Q**    AND THE PHYSICIANS ARE MONITORING YOU AND

16    THEY'VE TOLD YOU THAT IT'S UNDER CONTROL.  IS THAT

17    CORRECT?

18    **A**    THAT'S CORRECT.

19    **Q**    YOUR BLOOD PRESSURES ARE GOOD.  IS THAT

20    RIGHT?

21    **A**    YES, SIR.

22    **Q**    YOUR TESTIMONY -- THERE IS GOING TO BE

23    TESTIMONY IN THIS CASE THAT NO GUN GUARD HAS FIRED A

24    GUN IN 30 YEARS.  AND YOU'RE TELLING ME THAT THOSE

25    GUNS ARE BEING FIRED?

1      **A**    I WAS TALKING ABOUT PREVIOUS.  I HAVEN'T

2  BEEN OUT IN THE FIELD IN OVER A YEAR.

3      **Q**    BUT YOU'RE TELLING ME THAT THERE IS GUNS

4  BEING FIRED IN THE FIELD?

5      **A**    YES, GUNS WAS BEING FIRED IN THE FIELD.

6      **Q**    FOR WHAT REASON?

7      **A**    FOR NO REASON AT ALL.

8      **Q**    HOW MANY TIMES?

9      **A**    ON SEVERAL OCCASIONS.

10     **Q**    WERE THEY POINTED AT INMATES?

11     **A**    I DON'T KNOW.  WE ALL FELL TO THE GROUND

12 WHEN WE HEARD THE SHOT.

13     **Q**    NOW, IN YOUR -- ALL THE OTHER JOBS THAT

14 YOU'VE HELD YOU RECEIVED PAY FOR THOSE?

15     **A**    TO MY UNDERSTANDING, YES.

16     **Q**    AND YOUR -- YOU LOOK LIKE YOU'RE PRETTY

17 ACTIVE, OR AT LEAST YOU WERE ACTIVE.  YOU PLAYED A

18 LOT OF SPORTS IN YEARS GONE BY?

19     **A**    TEN YEARS AGO.

20     **Q**    FOOTBALL, BASKETBALL?

21     **A**    BOTH.

22     **Q**    WHAT IS THE NEW MAN PROGRAM?

23     **A**    IT IS A PROGRAM WHERE WE GO AND GET

24 DIFFERENT -- DIFFERENT QUALIFICATIONS, DIFFERENT LIKE

25 SELF-HELP PROGRAMS AND THINGS OF THAT NATURE.

1      Q     DID YOU PARTICIPATE IN THAT?

2      A     YES, SIR.

3      Q     HOW WERE YOU ABLE TO GET INTO THAT PROGRAM?

4      A     I WROTE A LETTER TO THE INMATE THAT WAS OVER

5  THE PROGRAM.

6      Q     AND WHEN DID YOU DO THAT?

7      A     OCTOBER OF 2023.

8      Q     HOW LONG WAS THE PROGRAM?

9      A     SIX MONTHS.

10     Q     AND WHAT DO YOU DO IN THAT PROGRAM?

11     A     GO THROUGH CLASSES.

12     Q     WHAT KIND OF CLASSES?

13     A     ALL KIND OF CLASSES.

14     Q     GIVE ME SOME EXAMPLES.

15     A     CELEBRATE RECOVERY, A PURPOSE-DRIVEN LIFE,

16  RDAP, CRITICAL THINKING; THINGS OF THAT NATURE.

17     Q     THAT SIX-MONTH PROGRAM, THAT WAS A GOOD

18  THING, HUM?

19     A     IT WAS OKAY.

20     Q     YOU ENJOYED IT?

21     A     YES, SIR.

22     Q     YOU BENEFITED FROM IT?

23     A     YES, SIR.

24     Q     WHAT HAPPENED AFTERWARDS?

25           **MS. CRUTCHER:**  OBJECTION.

```
 1              THE COURT:  WAIT.  WHAT'S THE OBJECTION?
 2              MS. CRUTCHER:  YOUR HONOR, THIS IS
 3   IRRELEVANT.
 4              THE COURT:  COUNSEL?
 5              MR. BLANCHFIELD:  YOUR HONOR, ALL THIS
 6   TESTIMONY ABOUT ALL THE THINGS THAT HE HAS TO DO ARE
 7   DEGRADING, THERE IS A LOT OF OTHER THINGS GOING ON AT
 8   LSP, AND THAT'S WHAT I'M ASKING HIM ABOUT.
 9              THE COURT:  I'LL GIVE YOU A LITTLE BIT OF
10   LATITUDE, BUT WE'RE GOING TO HAVE TO MOVE ON.  OKAY?
11              MR. BLANCHFIELD:  YEP.
12   BY MR. BLANCHFIELD:
13      Q    AND WHAT ABOUT AFTER THE PROGRAM?
14      A    I WAS SENT BACK TO CAMP D.
15      Q    OKAY.  WERE YOU A MENTOR AT ALL AFTERWARDS?
16      A    I BRIEF STILL AM A MENTOR.
17      Q    NOW, WHEN YOU WERE WORKING IN THE FIELD THEY
18   GAVE YOU GLOVES TO WEAR.  RIGHT?
19      A    SOMETIMES THEY GIVE US GLOVES.
20      Q    RUBBER BOOTS?
21      A    YEAH.
22      Q    HATS?
23      A    NOT ALL THE TIME.
24      Q    IF YOU WANTED A HAT, YOU CAN ASK FOR IT?
25      A    NOT TO MY KNOWLEDGE.
```

1      Q    DID YOU EVER ASK FOR A HAT AND NOT RECEIVE

2  ONE?

3      A    I BROUGHT MY OWN PERSONAL HAT.

4      Q    WHAT ABOUT WATER?  YOU HAD ACCESS TO WATER?

5      A    SOMETIMES WE CAN'T EVEN GET A WATER BREAK

6  BECAUSE OF LINE PUSHERS TELLING US WE GOT TO KEEP

7  GOING DOWN THE FIELD, SO WE HAVE TO WAIT ON THEM TO

8  TELL US TO GET WATER.  IN ORDER TO KEEP WATER WHEN

9  YOU NEED IT, YOU HAVE TO BRING YOUR OWN BOTTLED WATER

10 OUT THERE TO DRINK IT.

11     Q    YOU WEREN'T PROVIDED CUPS?

12     A    YEAH, THEY PROVIDE US CUPS.

13     Q    I'M SORRY?

14     A    YEAH, THEY PROVIDE CUPS.

15     Q    THANK YOU, MR. JACKSON.  THAT'S ALL THE

16 QUESTIONS I HAVE.

17          THE COURT:  THANK YOU, MR. BLANCHFIELD,

18             MS. CRUTCHER, ANY REDIRECT?

19          MS. CRUTCHER:  YES, JUST A FEW.

20                  REDIRECT EXAMINATION

21 BY MS. CRUTCHER:

22     Q    MR. JACKSON, YOU TESTIFIED THAT YOU BROUGHT

23 YOUR OWN PERSONAL HAT AT LEAST ONE TIME WHEN YOU WENT

24 AND WORKED IN THE FIELD.  DID YOU PAY FOR THAT HAT AT

25 CANTEEN?

1      **A**    YES, MA'AM.

2      **Q**    WITH MONEY THAT EITHER YOU EARNED FROM LABOR

3   ON THE FARM LINE OR ANOTHER JOB OR FROM MONEY THAT A

4   LOVED ONE HAD TO DEPOSIT INTO AN ACCOUNT FOR YOU.  IS

5   THAT CORRECT?

6      **A**    YES, MA'AM.  MY FAMILY DEPOSIT THE MONEY IN

7   MY ACCOUNT FOR ME.

8      **Q**    AND CAN YOU EXPLAIN TO THE COURT HOW PLAYING

9   SPORTS IS DIFFERENT FROM THE LABOR THAT YOU'VE BEEN

10  FORCED TO DO WHILE WORKING ON THE FARM LINE?

11     **A**    PLAYING SPORTS IS YOU OWN FREE TIME TO RELAX

12  AND TRY TO HAVE -- TRY TO GET YOUR MIND BACK TOGETHER

13  FROM ALL THE OTHER HUSTLE AND BUSTLE OF BEING IN

14  PRISON.  YOU DON'T HAVE A GUN OVER YOU.  YOU KNOW,

15  YOU DON'T HAVE NOBODY FORCING YOU TO DO THIS, SO THIS

16  IS FREE AND VOLUNTARY.

17     **Q**    AND ARE THERE OTHER KINDS OF WORK

18  ASSIGNMENTS THAT YOU WOULD PREFER TO THE WORK ON THE

19  FARM LINE?

20     **A**    YES, MA'AM.  I WOULD LIKE TO BE A HEALTH

21  CARE ORDERLY, HELPING PEOPLE THAT CAN'T HELP

22  THEMSELVES.

23     **Q**    THAT'S ALL.  THANK YOU FOR YOUR TIME.

24        **THE COURT:**  ALL RIGHT.  THANK YOU, MS.

25  CRUTCHER.

1          THANK YOU, MR. JACKSON.  I HAVE NO

2    QUESTIONS FOR YOU.  YOU MAY NOW RETURN TO COUNSEL

3    TABLE WITH YOUR LAWYERS.

4          ALL RIGHT.  WHO IS YOUR NEXT WITNESS?

5    AND I DIRECT, OF COURSE, MY QUESTION TO COUNSEL FOR

6    THE PLAINTIFFS.

7          **MS. CRUTCHER:**  KARA CRUTCHER AGAIN FOR THE

8    PLAINTIFFS.

9          WE'D LIKE TO CALL PATRICK JONES.

10         **THE COURT:**  AND HOW LONG DO YOU ANTICIPATE

11   HIS TESTIMONY?  ABOUT THE SAME LENGTH OF TIME, YOU

12   THINK?

13         **MS. CRUTCHER:**  THAT'S RIGHT.

14         **THE COURT:**  YOU MAY CALL YOUR NEXT WITNESS.

15         **MS. CRUTCHER:**  PLAINTIFFS CALL PATRICK JONES

16   TO THE STAND.

17         **THE COURT:**  JUST A MOMENT.  I'M SORRY ABOUT

18   THAT.

19          ELIZABETH.  NATALIE.

20          **(OFF THE RECORD)**

21         **THE COURT:**  OKAY.  MS. CRUTCHER, YOU MAY

22   CALL YOUR NEXT WITNESS.

23         **MS. CRUTCHER:**  PLAINTIFFS CALL PATRICK JONES

24   TO THE STAND.

25          YOUR HONOR, WE'D LIKE TO MAKE THE SAME

1  REQUEST THAT HE HAVE ONE HAND UNSHACKLED FOR SOME

2  WATER.  THANK YOU.

3          **THE COURT:**  SURE.

4              OKAY, MR. JONES, YOU CAN COME AROUND

5  THIS WAY RIGHT HERE.

6          **THE WITNESS:**  GOOD MORNING TO Y'ALL.

7          **THE COURT:**  YOU CAN STOP RIGHT THERE.

8  PLEASE RAISE YOUR RIGHT HAND.

9          **(WHEREUPON, PATRICK SETH JONES, BEING DULY**

10 **SWORN, TESTIFIED AS FOLLOWS.)**

11         **THE COURT:**  PLEASE BE SEATED.

12         **THE COURTROOM DEPUTY:**  CLEARLY STATE AND

13 SPELL YOUR NAME FOR THE RECORD.

14         **THE WITNESS:**  PATRICK SETH JONES.

15 P-A-T-R-I-C-K, PATRICK, SETH, S-E-T-H, JONES,

16 J-O-N-E-S.

17         **THE COURT:**  YOU MAY PROCEED.

18                  **DIRECT EXAMINATION**

19 **BY MS. CRUTCHER:**

20    **Q**   GOOD MORNING.

21    **A**   GOOD MORNING.

22    **Q**   CAN YOU PLEASE INTRODUCE YOURSELF TO THE

23 COURT?

24    **A**   MY NAME IS PATRICK SETH JONES.

25    **Q**   AND ARE YOU A NAMED PLAINTIFF IN THIS

1  LAWSUIT?

2     **A**   NO, MA'AM, I'M NOT.

3     **Q**   WHY ARE YOU PARTICIPATING IN THIS LAWSUIT AS

4  A WITNESS?

5     **A**   BECAUSE THE VOICES OF THE MANY THAT HAVE

6  CRIED OUT THAT FELL ON DEAF EARS AND THE VOICES OF

7  THE MANY WHO ARE STILL CRYING OUT THAT HAVEN'T EVER

8  BEEN HEARD.  AND I'VE BEEN GIVEN A VOICE, AND THIS

9  LAWSUIT PRESENTED A PERFECT OPPORTUNITY FOR THEM TO

10  BE HEARD THROUGH ME.

11     **Q**   AND WHAT DO YOU THINK THE VOICE OF THE MANY

12  WANT TO BE HEARD ABOUT?

13     **A**   THE TRUTH OF THE FACT THAT ANGOLA IS OR WAS

14  A SLAVE PLANTATION.  AND NOW KNOWN AS THE LOUISIANA

15  STATE PENITENTIARY, IT IS A MODERN-DAY SLAVE

16  PLANTATION WHERE MEN ARE FORCED TO LABOR IN

17  CONDITIONS AND IN MANNERS THAT IS NOT RIGHT.  IT IS

18  CRUEL AND VERY UNUSUAL, AND NO MAN OR WOMAN SHOULD BE

19  SUBJECTED TO THOSE THINGS.

20     **Q**   ARE THERE ANY RISKS THAT YOU CONSIDERED

21  FACING WHEN CHOOSING TO PARTICIPATE IN THIS LAWSUIT?

22     **A**   YES, THERE ARE RISKS.  AND THOSE RISKS ARE

23  SOLITARY CONFINEMENT, BEING THREATENED BY SECURITY,

24  BEING OSTRACIZED AS AN INMATE, BEING SECLUDED, NOT

25  BEING ABLE TO DO ANYTHING, GIVEN THE NO-DUTY STATUS

1   SO THAT YOU CAN'T EVEN GET A JOB NOW AND YOU'RE

2   FORCED TO JUST SIT IN THE DORM AS -- BECAUSE YOU

3   CHOSE TO DO SOMETHING THAT WAS HELPFUL TO OTHERS.

4       **Q**   AND, MR. JONES, HOW OLD ARE YOU?

5       **A**   I'M 32.

6       **Q**   AND WHERE ARE YOU FROM?

7       **A**   I'M FROM ORANGE, TEXAS.

8       **Q**   CAN YOU TELL THE COURT ABOUT YOUR FAMILY?

9       **A**   I'M FROM A MIDDLE-CLASS FAMILY.  MY MOTHER

10  WAS A ENGLISH SCHOOL TEACHER FOR 15 YEARS AT PORT

11  ARTHUR -- IN PORT ARTHUR, TEXAS, AT WOODROW WILSON

12  MIDDLE SCHOOL.  AND MY DAD WAS A -- HE WAS

13  DYSFUNCTIONAL AND -- BUT IT WAS A OVERALL -- I WAS

14  RAISED IN THE CHURCH AND SO I'M FROM A GOOD FAMILY,

15  AND I JUST MADE SOME BAD DECISIONS.

16          AND MY MOTHER USED TO ALWAYS TELL ME ABOUT

17  MY GREAT-GRANDMOTHER -- WELL -- YEAH, MY

18  GREAT-GRANDMOTHER MARY ANNE (INAUDIBLE) WHO WAS A

19  SLAVE AND HOW -- JUST OUR HISTORY AND WHAT WE HAD TO

20  GO THROUGH AS A RACE.  AND TO BE SUBJECTED TO THAT

21  ALL OVER AGAIN IS SURREAL.

22      **Q**   HOW LONG HAVE YOU BEEN INCARCERATED AT

23  ANGOLA?

24      **A**   I'VE BEEN AT ANGOLA SINCE 2016.

25      **Q**   AND DURING YOUR INCARCERATION AT ANGOLA,

1  HAVE YOU WORKED ON THE FARM LINE?

2      **A**    YES, MA'AM.

3      **Q**    WAS THE FARM LINE THE FIRST WORK ASSIGNMENT

4  GIVEN TO YOU AT ANGOLA?

5      **A**    YES, MA'AM.

6      **Q**    DID YOU CHOOSE TO WORK ON THE FARM LINE?

7      **A**    NO, MA'AM.

8      **Q**    IS IT YOUR UNDERSTANDING THAT THE FARM LINE

9  IS THE FIRST WORK ASSIGNMENT GIVEN TO INCARCERATED

10 MEN WHEN THEY ARRIVE AT ANGOLA?

11     **A**    YES, IT IS.

12     **Q**    DO YOU CONSIDER THE FARM LINE TO BE HARMFUL?

13     **A**    ABSOLUTELY.

14     **Q**    WHY DO YOU CONSIDER THE FARM LINE TO BE

15 HARMFUL?

16     **A**    BECAUSE OF THE MANIC CONDITIONS THAT YOU ARE

17 SUBJECTED TO.  THOSE CONDITIONS ARE SUBJECTED TO

18 SLAVERY.  AND YOU CAN'T GET AROUND IT.  YOU CAN'T.

19 IT'S -- THERE IS NOTHING THAT CAN BE DONE TO GET

20 AROUND IT, BECAUSE IT'S THE TRUTH.  AND THAT

21 PSYCHOLOGICAL HARM IS DEHUMANIZING TO EVERY MAN THAT

22 IS SUBJECTED TO IT.  AND THAT IS WHAT IS MANDATORY AT

23 ANGOLA.  A CORRECTIONAL FACILITY IS NOT EVEN TRYING

24 TO CORRECT YOU.  THEY ARE TRYING TO SUBJECT YOU TO

25 SOMETHING THAT YOU ARE NOT.  SO THAT'S WHY I CONSIDER

1    IT TO BE HARMFUL.

2        **Q**    WHEN WAS THE LAST TIME YOU WERE FORCED TO DO

3    LABOR ON THE FARM LINE?

4        **A**    NOVEMBER -- NOVEMBER -- THE WEEKEND -- THE

5    WEEK BEFORE THANKSGIVING.

6        **Q**    THANKSGIVING IN 2024?

7        **A**    YES.  YES, MA'AM.  I'M SORRY.

8        **Q**    AND DID YOU LABOR ON THE FARM LINE IN THE

9    SUMMER OF 2024?

10        **A**    YES, MA'AM, I DID.

11        **Q**    DID YOU PICK CABBAGE WHILE WORKING ON THE

12    FARM LINE IN THE SUMMER OF 2024?

13        **A**    YES, MA'AM, I DID.

14        **Q**    CAN YOU DESCRIBE THE CONDITIONS OF THE FARM

15    LINE AT THAT TIME?

16        **A**    HOT, EXTREMELY HOT.  DRY HEAT.  IT'S A DRY

17    HEAT.  AND IT WAS LONG ROWS, LONG ROWS.  AND YOU ARE

18    ASSIGNED TO THREE OR FOUR DIFFERENT ROWS AT A TIME

19    TO -- SO TO NOT -- TO POKE THE HOLES DOWN ON THE ROWS

20    AND PLANT THE CABBAGE DOWN THE ROWS AND THEN GO BACK

21    AND WATER ALL OF THE CABBAGE DOWN THE ROWS.  AND

22    THAT -- THAT'S A LOT -- THAT IS A LOT OF WORK FOR ONE

23    INDIVIDUAL WHEN YOU ARE ASSIGNED TO THREE OR FOUR

24    ROWS.  AND THESE ROWS ARE LONG.  THEY'RE NOT NORMAL

25    GARDEN ROWS.  THESE ARE LONG ROWS.

1              AND YOU HAVE TO GO BACK UP AND DOWN THESE

2   ROWS ALL DAY, BECAUSE YOU HAVE TO CARRY THESE WATER

3   POTS TO WATER THEM.  AND THERE IS 12-OUNCE WATER

4   POTS, SO YOU CAN ONLY CARRY TWO AT A TIME, AND YOU

5   HAVE TO PUT A CERTAIN AMOUNT OF WATER ON THESE -- ON

6   EACH PLANT THAT THEY REQUIRE YOU.  AND SO IT TAKES A

7   LONG TIME TO DO IT, AND THAT'S THE CONDITION, THOUGH.

8       Q    AND HOW MUCH DID YOU EARN FOR YOUR LABOR ON

9   THE FARM LINE?

10      A    I WASN'T EARNING ANYTHING.

11      Q    WHAT ARE SOME OF THE TASKS YOU'VE BEEN

12  ASSIGNED TO DO WHEN YOU'VE BEEN FORCED TO LABOR ON

13  THE FARM LINE BESIDES PICKING CABBAGE?

14      A    PICK PECANS, PICK OKRA, PICK CORN, BEANS,

15  CUT GRASS.  A LOT OF DIFFERENT THINGS.  IT'S -- BALE

16  HAY, MAKE SANDBAGS, CARRY SANDBAGS AND -- YEAH.

17      Q    WHEN YOU'RE PICKING CROPS ON THE FARM LINE,

18  ARE YOU OFTENTIMES PICKING THEM BY HAND?

19      A    NO.  YOU'RE ALWAYS PICKING THEM BY HAND.

20      Q    SO IS IT THE CASE THAT YOU'VE NEVER BEEN

21  SUPPLIED WITH FARMING MACHINERY SUCH AS A TRACTOR TO

22  AID YOUR WORK PICKING CROPS ON THE FARM LINE?

23      A    NO INDEED.

24      Q    HOW DOES IT FEEL TO KNOW THAT SOME OF THE

25  LABOR THAT YOU'RE FORCED TO DO ON THE FARM LINE COULD

1   BE DONE DIFFERENTLY?

2      **A**   IT FEELS AS THOUGH EVERYTHING ELSE I FEEL IS

3   THE TRUTH AND IT FEELS THAT IT'S WRONG AND THAT

4   ANGOLA USES THAT MONEY THAT IS SUPPOSED TO BE USED TO

5   DO THAT WORK TO DO SOMETHING ELSE WITH IT.

6      **Q**   AND WHY DO YOU THINK THE LABOR ON THE FARM

7   LINE IS DIFFERENT FROM OTHER WORK ASSIGNMENTS?

8      **A**   BECAUSE IT IS -- IT IS THE ONLY JOB

9   ASSIGNMENT IN ANGOLA THAT SUBJECTS YOU TO SLAVERY, TO

10  FORCED LABOR, AND TO THOSE CONDITIONS.  IT IS THE

11  ONLY JOB THAT YOU ARE FORCED TO HAVE A GUN POINTED AT

12  YOU.  YOU ARE FORCED TO BE TALKED TO LIKE YOU ARE

13  LESS THAN A HUMAN BEING ON A -- ON A DAILY BASIS,

14  BECAUSE A LOT OF GUYS -- NOBODY WANTS TO BE OUT

15  THERE.  NOBODY.  BUT THEY ARE FORCED, SO YOU ARE --

16  YOU HAVE A LOT OF DIFFERENT ATTITUDES AND A LOT OF

17  DIFFERENT, YOU KNOW, EMOTIONS THAT ARE BEING

18  EXPRESSED, SO THAT ENERGY HAS TO BE MATCHED AND

19  SECURITY HAS NO PROBLEM MATCHING THAT ENERGY.

20     **Q**   DID YOU SEE ANY SUDDEN CHANGES TO THE FARM

21  LINE IN 2024?

22     **A**   DRAMATIC CHANGES WAS DONE IN 2024.  AND THEY

23  WERE DONE BECAUSE OF THE LAWSUIT THAT IS PENDING

24  AGAINST ANGOLA.  AND THOSE CHANGES WERE:  WE WERE

25  BEING PROVIDED WITH SHADE; WE WERE BEING PROVIDED

1  WITH SEATS TO SIT DOWN; CLOTHES EVERY DAY, HATS,

2  BOOTS EVERY DAY; WATER AND JUICE AND CUPS TO DRINK

3  THE WATER AND JUICE WERE BEING PROVIDED TO YOU EVERY

4  SINGLE DAY.  SECURITY WERE FORCED TO READ THIS -- THE

5  FIELD OPERATION PROCEDURE THAT THEY HAD TO READ EVERY

6  MORNING.  AND IT GOT TO THE POINT TO WHERE WE KNEW

7  THE FIELD OPERATION PROCEDURE BECAUSE IT WAS BEING

8  READ TO US EVERY SINGLE DAY.

9      Q    AND WAS THAT PROCEDURE READ TO YOU PRIOR TO

10  THIS LITIGATION, TO YOUR AWARENESS?

11     A    NO, MA'AM, IT WAS NOT.  NONE OF THOSE THINGS

12  WERE BEING PROVIDED BEFORE THIS LITIGATION.  I NEVER

13  HAD A SEAT EXCEPT FOR THE GROUND.  I NEVER HAD SHADE,

14  EXCEPT FOR THE CORN AND THE OKRA.  THAT WAS THE ONLY

15  SHADE THAT WAS PROVIDED.

16     Q    AND DID YOU FIND THAT THE CHANGES THAT YOU

17  OBSERVED IN 2024 HAS ADDRESSED ALL OF THE HARMS THAT

18  YOU'VE EXPERIENCED WHILE WORKING ON THE FARM LINE?

19     A    NO, NOT AT ALL.

20        MS. CRUTCHER:  AND I'D LIKE TO BRING UP

21  PLAINTIFFS' EXHIBIT 35.

22        MR. BLANCHFIELD:  YOUR HONOR, WE STILL

23  MAINTAIN OUR SAME OBJECTION.  IT WAS NOT OFFERED

24  UNTIL EIGHT DAYS AGO, THIS EXHIBIT.

25        THE COURT:  YOUR OBJECTION IS NOTED.

 1            ALL RIGHT.  LET'S PROCEED.

 2    **BY MS. CRUTCHER:**

 3        **Q**    AND, MR. JONES, WHY DO YOU THINK THAT THE

 4    CHANGES MADE IN 2024 DID NOT ADDRESS ALL OF THE HARMS

 5    YOU EXPERIENCED WHILE WORKING ON THE FARM LINE?

 6        **A**    BECAUSE THE ONLY HARM THAT YOU WERE -- THAT

 7    IS EXPERIENCED IS BEING A SLAVE.  AND THE ONLY WAY TO

 8    ADDRESS THAT ISSUE IS TO END THE FARM LINE.

 9        **Q**    AND, MR. JONES, DID YOU LABOR ON THE FARM

10    LINE ON THE DAY THAT EXPERTS IN THIS LITIGATION

11    CONDUCTED AN INSPECTION OF THE FARM LINE ON JULY 22,

12    2024?

13        **A**    YES, MA'AM, I DID.

14        **Q**    AND IS THE IMAGE ON THE SCREEN AN IMAGE OF

15    THE FARM LINE?

16        **A**    YES, MA'AM, IT IS.

17            **THE COURT:**  DO YOU NOT SEE IT ON THE MONITOR

18    BEFORE YOU?

19            **THE WITNESS:**  NO, SIR, I DON'T.

20            **THE COURT:**  IT'S STILL NOT DISPLAYED.  IT'S

21    NOT DISPLAYED ANYWHERE.

22            **THE LAW CLERK:**  MAY I APPROACH?

23            **THE COURT:**  YES.

24                DO YOU HAVE A HARD COPY OF IT?

25            **MS. CRUTCHER:**  CAN WE TURN ONE OF THESE?

1      **THE COURT:**  YES.  NO, NO, NO.

2      **THE WITNESS:**  THERE IT IS.

3      **THE COURT:**  OKAY, WE HAVE IT.

4      **MS. CRUTCHER:**  THANK YOU.

5  **BY MS. CRUTCHER:**

6    **Q**    AND, MR. JONES, IS THIS IMAGE THAT YOU'RE

7  VIEWING AN IMAGE OF YOU DOING LABOR ON THE FARM LINE

8  ON THE DAY OF THE INSPECTION?

9    **A**    YES, IT IS.  THAT'S ME IN THE BACK.  THE

10  SECOND -- I'M THE LAST INMATE.  THAT'S -- THAT'S

11  ACTUALLY JERAMIE -- THAT'S JERAMIE WALKING BEHIND ME.

12    **Q**    AND DID YOU FIND THAT ANGOLA OFFICIALS

13  ADDRESSED ALL OF THE HARMS THAT YOU EXPERIENCED WHILE

14  WORKING ON THE FARM LINE ON THE DAY OF THE INSPECTION

15  IN JULY 2024?

16    **A**    NO, MA'AM.

17    **Q**    THANK YOU.

18      **MS. CRUTCHER:**  WE CAN TAKE THE IMAGE DOWN.

19  **BY MS. CRUTCHER:**

20    **Q**    MR. JONES, DO YOU UNDERSTAND THAT THIS

21  LAWSUIT CHALLENGES THE FARM LINE AS CRUEL AND UNUSUAL

22  PUNISHMENT UNDER THE EIGHTH AMENDMENT?

23    **A**    YES, MA'AM.

24    **Q**    AND IS IT YOUR UNDERSTANDING THAT

25  PLAINTIFFS' THEORY IS, IN PART, THAT THE FARM LINE

1  HAS RETAINED CHARACTERISTICS OF SLAVERY THAT CAUSE

2  DIGNITARY AND PSYCHOLOGICAL HARM TO ALL THAT ARE

3  EXPOSED TO IT?

4      **A**    YES, MA'AM.

5      **Q**    MR. JONES, CAN YOU DESCRIBE TO THE COURT THE

6  BEHAVIOR OF THE LINE PUSHERS AND THE GUN GUARDS THE

7  LAST TIME YOU WERE FORCED TO LABOR ON THE FARM LINE

8  IN -- OR EXCUSE ME.  STRIKE THAT.

9          CAN YOU DESCRIBE TO THE COURT THE BEHAVIOR

10 OF THE LINE PUSHERS AND THE GUN GUARDS WHEN YOU WERE

11 FORCED TO LABOR ON THE FARM LINE IN THE SUMMER OF

12 2024?

13     **A**    VERY DISRESPECTFUL IN THE WAY THAT THEY TALK

14 TO YOU, THE WAY THAT THEY TREAT YOU.  VERY EMPOWERING

15 OVER YOU, DOMINEERING OVER YOU, VERY THREATENING AND

16 JUST EVIL.

17     **Q**    AND IS IT CORRECT THAT YOU HAVE REFUSED TO

18 GO WORK ON THE FARM LINE AT LEAST ONCE?

19     **A**    YES, MA'AM.

20     **Q**    AND WHY DID YOU REFUSE TO GO WORK ON THE

21 FARM LINE?

22     **A**    BECAUSE THE OFFICERS CAME IN THE DORM

23 BANGING ON OUR BED WITH STICKS, TELLING US TO GET UP.

24 AND I SAID, "MAN, I'M NOT GOING OUT THERE TODAY."

25          AND WHEN I SAID THAT, THE OFFICERS TOLD ME,

1   "YOU MIGHT AS WELL PACK YOUR STUFF."

2          AND I TOLD HIM, "IT'S ALREADY PACKED."

3          AND HE SAID, "I'LL BE BACK WHEN WE PUT THE

4   LINE OUT."

5      Q   AND SO DID YOU FACE ANY CONSEQUENCES FOR

6   REFUSING TO GO WORK ON THE FARM LINE?

7      A   I DID.  I HAD TO GO TO THE DUNGEON, TO

8   SOLITARY CONFINEMENT.

9      Q   AND CAN YOU DESCRIBE THE CONDITIONS OF THE

10  DUNGEON WHEN YOU WERE SENT TO SOLITARY CONFINEMENT

11  THAT TIME?

12     A   WELL, THE CONDITIONS OF THE DUNGEON AT THAT

13  TIME IS VERY HOT, AND YOU ARE -- IT'S LIKE -- JUST

14  SAY THAT THIS -- FROM THIS WALL TO THAT WALL, THIS IS

15  THE HALLWAY, BUT THESE ARE ALL CELL -- THERE ARE 15

16  CELLS ON THIS HALLWAY.  AND THESE CELLS ARE NOT IN --

17  THEY ARE SEPARATED, BUT THERE ARE BARS THAT -- ON THE

18  DOORS TO THE CELLS.  SO YOU ARE ABLE TO INTERACT WITH

19  OTHER PEOPLE IF YOU'RE -- YOU KNOW, WHOEVER --

20  WHATEVER CELL YOU'RE IN, YOU'RE ABLE TO INTERACT WITH

21  THE DIFFERENT PEOPLE THAT ARE IN THE VARIOUS CELLS

22  AND YELL AND TALK TO THEM.

23          SO IT'S LOUD, IT'S NASTY, IT'S INHUMAN

24  BECAUSE, YOU KNOW, GUYS THAT ARE IN THE CELLS ARE

25  EXPRESSING THEMSELVES HOWEVER THEY SEE FIT.  AND SO

1  FECES ARE BEING THROWN, URINE IS BEING THROWN, YOU

2  ARE BEING JUST TALKED TO CRAZY JUST BECAUSE.  AND IF

3  YOU RESPOND, THAT'S ALL THAT IS NEEDED TO MAKE YOUR

4  TIME JUST A LITTLE BIT HARDER.

5          THE COURT:  SO WHY DON'T YOU DESCRIBE IN

6  TERMS OF FEET OR YARDS THE DISTANCE.  BECAUSE THE

7  RECORD CAN'T SAY -- WELL, WHY DON'T YOU WALK THE

8  WITNESS THROUGH A DESCRIPTION OF THE LENGTH OF THE

9  HALLWAY THAT HE'S DESCRIBED SINCE, OBVIOUSLY, THE

10 RECORD IS NOT GOING TO SEE FROM HERE TO HERE.

11         THE WITNESS:  OKAY.  FOR ABOUT 45 -- I'M

12 SORRY.

13         THE COURT:  HOW LONG?

14         THE WITNESS:  ABOUT 45 FEET LONG.

15         THE COURT:  THANK YOU.  THANK YOU, MR.

16 JONES.

17 BY MS. CRUTCHER:

18    Q   ARE THERE ANY OTHER IMPACTS OF THIS

19 DISCIPLINARY CONSEQUENCE ON YOU THAT YOU'D LIKE TO

20 DESCRIBE TO THE COURT?

21    A   THE PSYCHOLOGICAL HARM OF IT, BECAUSE NOW

22 YOU HAVE TO -- YOU HAVE TO BE FORCED TO HEAR ALL

23 MANNER OF THINGS FOR EXTENDED PERIODS OF TIME.  THERE

24 IS NO -- THERE IS NO BREAKS, BECAUSE WHEN ONE STOPS,

25 ANOTHER ONE STARTS, AND SO IT'S JUST -- IT'S

1  CONTINUATION.  AND IT'S LIKE, MAN.

2          AND THEN YOU HEAR STORIES FROM OTHER GUYS,

3  YOUR CELLIE, BECAUSE YOU'RE NOT JUST IN THE CELL BY

4  YOURSELF.  YOU HAVE -- YOU ARE IN A SIX-BY-EIGHT WITH

5  ANOTHER MAN FOR HOWEVER LONG YOU'RE IN THE DUNGEON.

6  AND SO HE MIGHT BE ONE WHO HAS BEEN UP HERE A LONG

7  TIME AND CAN TELL YOU ABOUT THE DUDE THAT'S YELLING

8  AND TELL YOU THAT, "MAN, HE WASN'T LIKE THAT WHEN HE

9  FIRST GOT HERE.

10          "WELL, WHAT HAPPENED TO HIM?

11          "MAN JUST -- IT'S ANGOLA.  HE JUST LOST HIS

12  MIND."

13          AND IT'S LIKE, NOW, THAT'S MESSING WITH YOUR

14  MIND, LIKE, *WELL, HOW DO I -- WHAT DO I HAVE TO DO TO*

15  *PROTECT MY MIND SO I DON'T END UP LIKE THAT?*  THAT'S

16  --

17          **THE COURT:**  YOU'VE GOT FIVE MORE MINUTES

18  LEFT ON THIS ONE, SO IF YOU WANT TO -- WANT TO MOVE

19  THINGS ALONG.

20          **MS. CRUTCHER:**  YOUR HONOR, I'D ALSO JUST

21  LIKE TO REQUEST TO INTRODUCE PLAINTIFFS' EXHIBIT 35

22  INTO EVIDENCE BASED ON MR. JONES' TESTIMONY.

23          **THE COURT:**  OKAY.  NO, FIVE MINUTES ON YOUR

24  FIRST DIRECT AND FIVE MINUTES ON REDIRECT.  OKAY?

25          SO WHAT EXHIBIT IS THIS, NOW?

1          **MS. CRUTCHER:**  THIS WAS PLAINTIFFS' EXHIBIT

2    35, THE IMAGE THAT I PREVIOUSLY --

3          **THE COURT:**  VERY WELL.  ANY OBJECTION?

4          **MR. BLANCHFIELD:**  SAME OBJECTION, YOUR

5    HONOR.

6          **THE COURT:**  VERY WELL.  FOR LIMITED

7    PURPOSES -- THE OBJECTION IS OVERRULED.  THE EXHIBIT

8    WILL BE ADMITTED.

9    **BY MS. CRUTCHER:**

10      **Q**    MR. JONES, HAVE YOU EVER PASSED OUT FROM

11   WORKING ON THE FARM LINE?

12      **A**    YES, MA'AM, I HAVE.

13      **Q**    HOW MANY TIMES HAVE YOU PASSED OUT FROM

14   WORKING ON THE FARM LINE?

15      **A**    (INAUDIBLE).

16          **THE REPORTER:**  I'M SORRY.  ONE MORE TIME?

17          **THE WITNESS:**  TWICE.

18   **BY MS. CRUTCHER:**

19      **Q**    HAVE YOU EVER BEEN DIAGNOSED WITH A

20   HEAT-RELATED ILLNESS?

21      **A**    NO, MA'AM.

22      **Q**    AND WHEN YOU PASSED OUT IN THE FIELD EITHER

23   TIME, WERE YOU CHARGED A COPAY?

24      **A**    YES, MA'AM, I WAS.

25      **Q**    AND HOW MUCH HAVE YOU MADE WORKING ON THE

1   FARM LINE?

2       **A**    I CAN'T EVEN -- I CAN'T EVEN COUNT IT.  IT'S

3   VERY LITTLE, BECAUSE YOU ARE PAID FOUR CENTS AN HOUR,

4   SO THAT IS -- THAT IS NOTHING.  THAT'S NOTHING.

5       **Q**    AND ARE YOU AWARE OF ANY JOBS FOR

6   INCARCERATED PEOPLE AT ANGOLA THAT PAY LESS THAN THE

7   FARM LINE?

8       **A**    NO, MA'AM.

9       **Q**    AND IS IT CORRECT THAT YOU WROTE A

10  DECLARATION IN THIS CASE ON SEPTEMBER 23, 2024, WHICH

11  WAS FILED IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS

12  CERTIFICATION?

13      **A**    YES, MA'AM.

14      **Q**    AND IN THAT DECLARATION DID YOU DESCRIBE A

15  DREAM YOU'VE HAD ABOUT THE FARM LINE?

16      **A**    YES, MA'AM.

17      **Q**    CAN YOU DESCRIBE THAT DREAM TO THE COURT?

18      **A**    I WAS IN THE PECAN FIELD WITH THE OTHER GUYS

19  AND WE WERE JUST PICKING PECANS AND I HEARD THE GUN

20  GO OFF.  AND SO I'M LOOKING AROUND.  I'M LIKE, "MAN,

21  WHAT'S GOING ON?"

22          AND EVERYBODY JUST SAYING, "GET DOWN, GET

23  DOWN."  SO EVERYBODY STARTED GETTING DOWN ON THE

24  GROUND.  I'M LAYING DOWN ON THE GROUND AND I'M

25  LOOKING, JUST TRYING TO SEE WHAT'S GOING ON.  AND THE

1   LINE PUSHER WALKS UP AND PEOPLE START GETTING UP.

2         I GOT UP AND HE SAID, "MAN, YOU ALMOST GOT

3   YOURSELF SHOT."

4         I SAY, "FOR WHAT?"

5         HE SAID, "BECAUSE YOU WASN'T SUPPOSED TO BE

6   WAY OVER HERE IN THIS AREA."

7         BUT I'M LIKE, "MAN, I DIDN'T KNOW I WAS IN

8   THE WRONG AREA.  LIKE WE OUT HERE AND THERE IS NO

9   PERIMETER, YOU KNOW, AS FAR AS WE -- IN THE PECAN

10  FIELD."

11        AND HE WAS LIKE, "JUST STAY OVER HERE WITH

12  US AND YOU WILL BE ALL RIGHT."

13        AND I WOKE UP.

14     Q   AND IN THAT DECLARATION DID YOU ALSO

15  DESCRIBE A DAY THAT YOU LABORED ON THE FARM LINE IN

16  AUGUST 2024 AND STEPPED OUT OF LINE?

17     A   YES, MA'AM.

18     Q   CAN YOU DESCRIBE WHAT HAPPENED WHEN YOU

19  STEPPED OUT OF LINE?

20        **THE COURT:**  VERY BRIEFLY, SIR.  VERY

21  BRIEFLY, MR. JONES.

22  **BY THE WITNESS:**

23     A   WHEN I STEPPED OUT OF LINE AND TALKED TO THE

24  COLONEL, THE COLONEL SAID I BETTER GET BACK IN LINE

25  BEFORE I GET SHOT.  AND THE GUN GUARD ACTUALLY COCKED

1  HIS GUN.

2      **Q**    THANK YOU.

3          **MS. CRUTCHER:**  NO FURTHER QUESTIONS AT THIS

4  TIME.

5          **THE COURT:**  THANK YOU.  YOU STILL HAVE A

6  COUPLE MINUTES LEFT, BUT YOU'RE OKAY?  YOU'RE WRAPPED

7  UP?

8          **MS. CRUTCHER:**  IF I HAVE A COUPLE OF MINUTES

9  LEFT, I'M GOING TO TAKE THEM, YOUR HONOR.

10         **THE COURT:**  WELL, YOU HAVE -- YOU LITERALLY

11 HAVE TWO MINUTES LEFT.

12         **MS. CRUTCHER:**  I CAN WORK WITH THAT.

13 **BY MS. CRUTCHER:**

14     **Q**    MR. JONES, DO YOU THINK THAT YOUR EXPERIENCE

15 WITH THE LINE PUSHERS OR GUN GUARDS IN AUGUST 2024

16 IMPACTED THE DREAM THAT YOU HAD ABOUT THE FARM LINE?

17     **A**    ABSOLUTELY.

18     **Q**    AND ARE THERE OTHER JOBS THAT YOU PREFER TO

19 WORKING ON THE FARM LINE?

20     **A**    YES, MA'AM.

21     **Q**    DO YOU FEEL LIKE YOU NEED TO MENTALLY

22 PREPARE TO GO OUT AND WORK ON THE FARM LINE?

23     **A**    NO, I DON'T FEEL LIKE YOU NEED TO.  I KNOW

24 YOU HAVE TO.

25     **Q**    AND WHY DO YOU HAVE TO MENTALLY PARE --

1  EXCUSE ME -- MENTALLY PREPARE TO GO TO WORK OUT ON

2  THE FARM LINE?

3       **A**   BECAUSE YOU HAVE TO MENTALLY PREPARE

4  YOURSELF TO BECOME A SLAVE.

5       **Q**   THANK YOU.

6            **MS. CRUTCHER:**  NO FURTHER QUESTIONS.

7            **THE COURT:**  THANK YOU, MS. CRUTCHER.

8                CROSS-EXAMINATION?

9            **MR. BLANCHFIELD:**  THANK YOU, JUDGE.

10                **CROSS-EXAMINATION**

11  BY MR. BLANCHFIELD:

12       **Q**   MR. JONES, NICE TO SEE YOU.  I'M DREW

13  BLANCHFIELD.  I DON'T THINK WE'VE EVER MET BEFORE.

14       **A**   NO, SIR, WE HAVE NOT.

15       **Q**   SO EVERYONE AT LOUISIANA STATE PENITENTIARY

16  IS ASSIGNED A JOB.  IS THAT CORRECT?

17       **A**   YES.

18       **Q**   YOU HAVE A JOB NOW?

19       **A**   YES, I DO.

20       **Q**   WHAT ARE YOU DOING?

21       **A**   I CUT GRASS.

22       **Q**   YOU CUT GRASS?  HOW LONG HAVE YOU BEEN

23  CUTTING GRASS?

24       **A**   SINCE NOVEMBER.  WELL, NO.  ACTUALLY I

25  ACTUALLY WAS ASSIGNED TO THAT JOB IN JANUARY THIS

1    YEAR.

2        **Q**    AND WHAT DID YOU DO BETWEEN NOVEMBER AND

3    JANUARY?

4        **A**    I WAS ASSIGNED TO THE FIELD LINE.

5        **Q**    HAVE YOU EVER BEEN A DORM ORDERLY?

6        **A**    YES, SIR I HAVE.

7        **Q**    WHAT DOES A DORM ORDERLY DO?

8        **A**    DORM ORDERLY IS ASSIGNED TO CLEAN THE DORM.

9        **Q**    AND SINCE 2016, WHAT OTHER JOBS HAVE YOU HAD

10   BESIDES CUTTING GRASS, DORM ORDERLY?

11       **A**    MENTOR, HVAC SCHOOL, AND BIBLE COLLEGE.

12       **Q**    HVAC; HEATING, VENTILATION AND AIR

13   CONDITIONING?  YOU'RE TRAINED IN -- YOU WERE TRAINED

14   IN THAT?

15       **A**    THAT'S -- I WAS IN SCHOOL FOR IT.  THAT WAS

16   MY JOB.

17       **Q**    AND TELL ME ABOUT BIBLE COLLEGE.  THAT WAS

18   YOUR JOB?

19       **A**    YES, SIR, IT WAS.

20       **Q**    WHAT DID YOU DO IN THAT JOB?

21       **A**    GO TO SCHOOL.

22       **Q**    YOU WOULDN'T DESCRIBE THAT AS HARMFUL?

23       **A**    GOING TO SCHOOL?

24       **Q**    YEAH.

25       **A**    NO, SIR.

1    **Q**    THAT WAS SOMETHING GOOD?

2    **A**    ABSOLUTELY.

3    **Q**    SAME THING WITH HVAC?

4    **A**    ABSOLUTELY.

5    **Q**    THAT WAS NOT A HARMFUL JOB?

6    **A**    NO, IT'S NOT A HARMFUL JOB.  NOT GOING TO

7  SCHOOL IS NOT HARMFUL.

8    **Q**    TELL ME ABOUT BEING A MENTOR.  MENTOR FOR

9  WHOM?

10    **A**    OTHER GUYS IN PRISON.

11    **Q**    THAT WAS NOT A HARMFUL JOB?

12    **A**    IN THE CONTEXT OF WHAT YOU'RE ASKING

13  HARMFUL?  I DON'T UNDERSTAND IT.

14    **Q**    WELL, YOU'VE TESTIFIED THAT WORKING THE FARM

15  LINE IS HARMFUL.

16    **A**    PSYCHOLOGICALLY.

17    **Q**    PSYCHOLOGICALLY HARMFUL?

18        ARE THERE ANY OTHER JOBS THAT YOU HAVE HELD

19  THAT YOU FEEL WERE PSYCHOLOGICALLY HARMFUL?

20    **A**    NO.

21    **Q**    JUST THE FARM LINE?

22    **A**    SINGLY.

23    **Q**    THAT'S THE ONLY ONE?

24    **A**    THAT'S IT.

25    **Q**    FILLING SANDBAGS, WAS THAT HARMFUL?

1     **A**   YES.

2     **Q**   WHY?

3     **A**   BECAUSE OF THE PSYCHOLOGICAL EFFECT OF

4  HAVING TO BE OUT THERE.

5     **Q**   CUTTING GRASS.  HARMFUL?

6     **A**   IT IS, BECAUSE YOU'RE FORCED TO DO IT.

7     **Q**   NOW, WHEN -- THE OTHER JOBS THAT YOU HELD --

8  DORM ORDERLY -- IF YOU ONE DAY JUST SAID, "HEY, I'M

9  NOT DOING IT," YOU WOULD FACE DISCIPLINARY ACTION,

10  WOULD YOU NOT?

11     **A**   NO, YOU WOULDN'T.

12     **Q**   THEY JUST WOULD LET YOU NOT DO YOUR JOB?

13     **A**   WELL, IF -- A DORM ORDERLY IS A COLLECTIVE

14  THING.  SO YOU MIGHT HAVE 16 DIFFERENT DORM ORDERLIES

15  IN A JOB.  THEY'RE NOT COMING AROUND TO CHECK AND

16  MAKING SURE EACH DORM ORDERLY DOES THE JOB.  AS LONG

17  AS THE JOB GETS DONE, IT IS DONE.

18     **Q**   BUT THESE JOBS THAT YOU'RE GIVEN AT THE

19  STATE PENITENTIARY, YOU'RE EXPECTED TO DO THEM?

20     **A**   RIGHT.  ABSOLUTELY.

21     **Q**   AND IF YOU JUST SAY "I'M NOT DOING IT,"

22  THERE IS GOING TO BE CONSEQUENCES?

23     **A**   THERE CAN BE, YES, INDEED.

24     **Q**   THE LAST TIME YOU WERE OUT ON THE FARM LINE

25  WAS NOVEMBER OF LAST YEAR?

1     **A**    YES, SIR.

2     **Q**    WHY WERE YOU OUT THERE ON THE FARM LINE?

3    WHY DID THEY SEND YOU TO THE FARM LINE?

4     **A**    THEY SENT ME TO THE FARM LINE, THAT WAS MY

5    JOB ASSIGNMENT.

6     **Q**    AND IN NOVEMBER YOU MENTIONED THE SHADE.

7    THAT'S THE SHADE WAGONS THAT WE'VE BEEN TALKING

8    ABOUT?

9     **A**    RIGHT.  AND THE TENTS.

10     **Q**    AND THE TENTS.

11          HATS, BOOTS, WATER, CUPS, SEATS, YOU WERE

12    PROVIDED ALL OF THAT?

13     **A**    YES, SIR.

14     **Q**    THANK YOU, MR. JONES.  THAT'S ALL I HAVE.

15          **THE COURT:**  ALL RIGHT.  THANK YOU, MR.

16    BLANCHFIELD.

17          ANY REDIRECT?

18          **MS. CRUTCHER:**  YES, YOUR HONOR.  I'LL KEEP

19    IT BRIEF.

20          **REDIRECT EXAMINATION**

21    BY MS. CRUTCHER:

22     **Q**    MR. JONES, IS IT YOUR UNDERSTANDING THAT

23    ANGOLA HAS A SINGLE DISCIPLINARY POLICY THAT IS

24    UNIFORMLY APPLIED TO ALL INCARCERATED MEN AT ANGOLA?

25     **A**    YES, MA'AM.

1    Q    AND CAN YOU DESCRIBE TO THE COURT THE

2    PSYCHOLOGICAL IMPACT OF HVAC TRAINING?

3    A    THERE IS NONE.

4    Q    WHY NOT?

5    A    BECAUSE I CHOSE TO GO THERE AND IT IS

6    SOMETHING THAT WILL BENEFIT -- IT WILL BENEFIT ME AND

7    MY FAMILY AND HELP CORRECT THE WRONG THAT I DID,

8    BECAUSE I'M IN IT FOR ARMED ROBBERY.  I DIDN'T HAVE A

9    TRADE AND I DIDN'T HAVE -- I DIDN'T KNOW HOW TO MAKE

10   ANY MONEY.  SO I WAS DOING SOMETHING TO LEARN HOW TO

11   MAKE MONEY SO I DON'T HAVE TO CONTINUE TO COMMIT THE

12   SAME MISTAKES.

13   Q    THANK YOU, MR. JONES, FOR YOUR TIME.

14        MS. CRUTCHER:  I'M DONE.

15        THE COURT:  ALL RIGHT.  THANK YOU.

16        MR. JONES, I HAVE NO QUESTIONS FOR YOU,

17   SIR.  THANK YOU FOR JOINING US TODAY.  YOU ARE NOW

18   EXCUSED.

19        ALL RIGHT.  SO WE WILL NOW TAKE A LUNCH

20   BREAK.  I THINK WE CAN -- WE'LL TAKE A LITTLE OVER AN

21   HOUR.  WE WILL RESUME THE HEARING PROMPTLY AT 1:15.

22        NOW, ONE VERY IMPORTANT HOUSEKEEPING

23   MATTER BEFORE WE ADJOURN OR AT LEAST RECESS.  I'VE

24   BEEN NOTIFIED BY THE UNITED STATES MARSHAL THAT HE'S

25   VERY, VERY CONCERNED ABOUT THE NUMBER OF CELL PHONES

1    IN THIS COURTROOM.  NOW, TYPICALLY WE ONLY ALLOW

2    COUNSEL OF RECORD -- NOT JUST ANY LAWYER BUT COUNSEL

3    OF RECORD -- TO BRING A CELL PHONE INTO THIS

4    COURTHOUSE.  I'VE BEEN INFORMED BY THE MARSHAL THAT

5    CERTAIN PERSONS WHO MAY BE PRESENT MAY HAVE ASKED

6    LAWYERS TO BRING CELL PHONES WITH THEM INTO THE

7    COURTROOM, INTO THE COURTHOUSE, OF COURSE.

8              SO TO BE CLEAR, WHEN WE RETURN FROM

9    LUNCH, ONLY COUNSEL OF RECORD -- AND I'VE MADE ONE

10   EXCEPTION TO THE I.T. SPECIALIST FOR THE PLAINTIFF.

11   NO OTHER PERSON INCLUDING EXPERT WITNESSES ARE

12   PERMITTED TO BRING CELL PHONES INTO THE COURTHOUSE,

13   ABSENT A COMPELLING REASON TO DO SO AND WITHOUT THE

14   EXPRESS PERMISSION OF THE COURT.  I TRUST THAT

15   EVERYONE WILL ABIDE BY THIS COURTHOUSE -- THE RULES

16   OF THIS COURTHOUSE WHEN YOU RETURN FROM THE LUNCH

17   BREAK.

18             IS THERE ANYTHING ELSE WE SHOULD TAKE

19   UP AT THIS TIME OF A HOUSEKEEPING MATTER OR OTHERWISE

20   BEFORE WE TAKE OUR LUNCH BREAK?

21             ANYTHING FROM THE PLAINTIFF?

22        MS. WRIGHT:  BRIEFLY, YOUR HONOR.

23   CONSIDERING WHAT I UNDERSTAND TO BE THE COURT'S

24   CONSIDERATION OF DR. VASSALLO'S TESTIMONY WITH

25   RESPECT TO THE SECOND TRO/PI MOTION, I WOULD MOVE

1   AGAIN TO ADMIT AS EVIDENCE THE STUDIES THAT WE

2   DISCUSSED DURING HER TESTIMONY.  THOSE WOULD BE PX40,

3   WHICH IS THE DAVIS STUDY WITH THE J-SHAPED CURVE;

4   PX41, WHICH IS -- SIMILARLY HAS THE J-SHAPED CURVE;

5   PX42, WHICH IS THE SKARHA STUDY ABOUT INCARCERATED

6   POPULATIONS; AND THEN PX49, WHICH IS THE LOUISIANA

7   DEPARTMENT OF HEALTH REPORT.

8            THE COURT:  MR. JONES?

9            MR. JONES:  FOR CLARIFICATION, IN CONNECTION

10  WITH THE MOTION -- THE APPLICATION FOR TRO OR FOR --

11  WITH RESPECT TO THE MOTION FOR CLASS CERTIFICATION?

12           THE COURT:  I BELIEVE THAT IT'S THE

13  MOTION -- THE MOTION IS FOR THE COURT TO CONSIDER

14  THAT -- THOSE EXHIBITS IN CONNECTION WITH DR.

15  VASSALLO'S TESTIMONY ON THE TRO APPLICATION.

16           MR. JONES:  I DON'T THINK WE HAVE ANY

17  OPPOSITION EXCEPT -- OR ANY OBJECTION AS LONG AS IT'S

18  NOT RELATED TO THE MOTION FOR CLASS CERTIFICATION.

19           THE COURT:  I UNDERSTAND.  THANK YOU, MR.

20  JONES.

21              ANYTHING ELSE FROM THE PLAINTIFF?

22              ANYTHING FROM THE DEFENSE?

23           MR. BLANCHFIELD:  NO, YOUR HONOR.

24           THE COURT:  I HOPE YOU-ALL ENJOY YOUR LUNCH.

25  COURT IS NOW IN RECESS.

1        **THE LAW CLERK:**  ALL RISE.

2            THE COURT IS IN RECESS.

3        **(WHEREUPON, A LUNCH RECESS WAS TAKEN.)**

4        **THE LAW CLERK:**  ALL RISE.

5            THE COURT IS NOW IN SESSION.

6        **THE COURT:**  BE SEATED.

7            OKAY.  WE ARE BACK ON THE RECORD IN THE

8    CASE OF *VOTE VERSUS LEBLANC*.  LET THE RECORD REFLECT

9    THAT COUNSEL ARE PRESENT; HOWEVER, MR. JACKSON IS NOT

10   PRESENT AT THIS TIME.

11           SO, COUNSEL, DO YOU ANTICIPATE YOUR

12   CLIENT JOINING US FOR THE REST OF THESE PROCEEDINGS?

13       **MS. POURCIAU:**  YES, YOUR HONOR, THAT WOULD

14   BE OUR REQUEST.  THE MARSHALS WERE WAITING FOR YOU TO

15   PERMIT IT.

16       **THE COURT:**  COULD YOU CALL AND SEE -- LET

17   THE RECORD REFLECT THAT PLAINTIFF JACKSON IS PRESENT

18   AT THIS TIME.

19           AND COUNSEL FOR THE PLAINTIFFS MAY CALL

20   THEIR NEXT WITNESS.

21       **MR. BENJAMIN:**  PLAINTIFFS CALL DR. RANDY

22   LAVESPERE.

23       **THE REPORTER:**  I'M SORRY.  WHO'S SPEAKING?

24   MR. BENJAMIN?

25       **MR. BENJAMIN:**  YES, JEREMY BENJAMIN FOR THE

1    PLAINTIFFS.

2            **(WHEREUPON, RANDY LAVESPERE, BEING DULY**

3    **SWORN, TESTIFIED AS FOLLOWS.)**

4            **MR. BENJAMIN:**  YOUR HONOR, MAY I APPROACH TO

5    GIVE SOME BINDERS?

6            **THE COURT:**  YES.

7            **THE COURTROOM DEPUTY:**  CLEARLY STATE AND

8    SPELL YOUR NAME FOR THE RECORD.

9            **THE WITNESS:**  RANDY, R-A-N-D-Y, LAVESPERE,

10   L-A-V-E-S-P-E-R-E.

11                    **DIRECT EXAMINATION**

12   **BY MR. BENJAMIN:**

13      **Q**    GOOD AFTERNOON, DR. LAVESPERE.  IT'S NICE TO

14   SEE YOU AGAIN.

15      **A**    GOOD AFTERNOON.

16      **Q**    YOU'RE CURRENTLY THE CHIEF MEDICAL OFFICER

17   FOR THE LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND

18   CORRECTIONS, OR D.O.C.  RIGHT?

19      **A**    YES, I AM.

20      **Q**    AND YOU'VE HELD THAT TITLE SINCE JANUARY OF

21   2021?

22      **A**    JANUARY OF 2021.

23      **Q**    AND PRIOR TO THAT YOU WERE THE MEDICAL

24   DIRECTOR AT LOUISIANA STATE PENITENTIARY, OR LSP?

25      **A**    YES.

1    Q    AND YOU HELD THAT POSITION FROM ABOUT

2  NOVEMBER 2014 TO JANUARY 2021?

3    A    YES.

4    Q    I WANT TO BEGIN BY DISCUSSING D.O.C.'S

5  POLICIES CONCERNING HEAT.  YOU'RE FAMILIAR WITH

6  D.O.C.'S HEALTH CARE POLICY 8, OR HCP 8?

7    A    YES.

8    Q    AND HCP 8 IS D.O.C.'S POLICY CONCERNING HEAT

9  PATHOLOGY.  RIGHT?

10    A    RIGHT.

11    Q    D.O.C. MOST RECENTLY MODIFIED HCP 8 IN

12  OCTOBER OF 2024.  CORRECT?

13    A    YES.

14    Q    AND EARLIER IN THIS LITIGATION YOU WERE

15  DESIGNATED AS D.O.C.'S OFFICIAL WITNESS TO TESTIFY AS

16  TO THE MODIFICATIONS OF HCP 8 INCLUDING THE

17  DEVELOPMENT OF THOSE CHANGES.  RIGHT?

18    A    YES.

19    Q    YOU GAVE DEPOSITION TESTIMONY IN THAT

20  CAPACITY?

21    A    I DID.

22    Q    THAT WAS IN FEBRUARY OF 2025?

23    A    YES.  WITH YOU.

24    Q    YOU WERE ALSO INVOLVED IN THE HCP 8

25  MODIFICATION PROCESS.  RIGHT?

1      **A**    YES.

2      **Q**    DO YOU HAVE A BINDER IN FRONT OF YOU?

3      **A**    I DO.

4      **Q**    WOULD YOU TURN TO TAB 1 OF THAT BINDER?

5  THAT IS JX78.  DO YOU SEE A STAMP DOWN THERE ON THE

6  BOTTOM?

7      **A**    I DO.

8      **Q**    YOU'LL ALSO NOTE -- AND I'LL JUST GIVE YOU

9  THIS FOR REFERENCE BECAUSE WE'RE GOING TO GO THROUGH

10  A FEW DIFFERENT DOCUMENTS.  ON THE BOTTOM OF EACH OF

11  THESE PAGES THERE IS A DESIGNATION.  IT SAYS IN THIS

12  CASE "CLASS CERT JX78, PAGE 1 OF 20."  I MIGHT REFER

13  TO THOSE PAGE NUMBERS AS WE GO THROUGH.  OKAY?

14          IGNORING FOR A MOMENT THE ATTACHMENTS TO

15  THIS DOCUMENT JX78, THIS IS THE VERSION OF HCP 8

16  CURRENTLY IN EFFECT AT D.O.C.  RIGHT?

17      **A**    YES, IT IS.

18      **Q**    AND IT'S DATED THE 20TH OF OCTOBER 2024?

19      **A**    YES.

20      **Q**    HCP 8 APPLIES TO ALL D.O.C.'S FACILITIES?

21      **A**    IT APPLIES TO ALL D.O.C. FACILITIES.

22      **Q**    THAT INCLUDES LOUISIANA STATE PENITENTIARY?

23      **A**    INCLUDES LOUISIANA STATE PENITENTIARY.

24      **Q**    IS IT FAIR TO SAY THAT HCP 8 SETS THE

25  MINIMUM STANDARDS THAT ALL D.O.C. FACILITIES MUST

1  FOLLOW WITH RESPECT TO HEAT PATHOLOGY?

2      **A**    YES.

3      **Q**    SO INDIVIDUAL FACILITIES INCLUDING LSP CAN

4  GO ABOVE WHAT HCP 8 CALLS FOR, BUT THEY SHOULD NOT GO

5  BELOW WHAT HCP 8 CALLS FOR.  CORRECT?

6      **A**    YES.

7      **Q**    YOU'D AGREE THAT HCP 8 HAS THE GREATEST

8  EFFECT ON LSP BECAUSE LSP IS THE LARGEST D.O.C.

9  PRISON AND HAS THE LARGEST AGRICULTURAL PRODUCTION

10  GROUP?

11      **A**    I THINK IT'S MORE SO BECAUSE IT HAS THE

12  LARGEST AGRICULTURAL GROUP, NOT SO MUCH BECAUSE IT'S

13  THE LARGEST.  BUT BECAUSE IT SITS ON 18,000 ACRES,

14  THERE IS A LOT OF THINGS TO BE DONE THERE THAT RANGE

15  FROM AGRICULTURAL TO KEEPING UP THE PLACE, SO --

16      **Q**    BUT YOU'D SAY THAT HCP 8 HAS THE LARGEST --

17      **A**    YES.

18      **Q**    -- LSP?

19      **A**    I WOULD.

20          **THE REPORTER:**  HAS THE LARGEST?

21          **MR. BENJAMIN:**  EFFECT ON LSP OF ALL THE

22  D.O.C. PRISONS.

23  **BY THE WITNESS:**

24      **A**    YES.

25      **Q**    SO THE HEAT PATHOLOGY PRACTICES AND

1    PROCEDURES FROM HCP 8 APPLY TO THE FARM LINE AT LSP.

2    RIGHT?

3        **A**    THAT'S ONE ASPECT OF IT, YES.

4        **Q**    I'D LIKE TO LOOK AT SOME OF THE SPECIFIC

5    PRACTICES AND PROCEDURES.  IF YOU LOOK AT PAGES -- AT

6    PAGE 4, DO YOU SEE THE SECTION "HEAT PRECAUTIONS FROM

7    MAY 1ST THROUGH OCTOBER 31ST"?

8        **A**    YES.

9        **Q**    THAT'S THE DATE RANGE WHEN THE HEAT

10   PRECAUTIONS SPELLED OUT IN HCP 8 APPLY.  CORRECT?

11       **A**    THAT IS.

12       **Q**    SO ALL D.O.C. FACILITIES INCLUDING LSP ARE

13   REQUIRED TO FOLLOW HCP 8'S HEAT PRECAUTION MINIMUMS

14   DURING THAT MAY 1 THROUGH OCTOBER 31 DATE RANGE.

15   RIGHT?

16       **A**    YES, THEY ARE.

17       **Q**    BUT THOSE HEAT PRECAUTIONS DON'T APPLY

18   OUTSIDE OF THAT DATE RANGE.  RIGHT?

19       **A**    THEY DO NOT.

20       **Q**    JUST TO BE CLEAR, LSP COULD, IF IT WANTED

21   TO, ISSUE A DIRECTIVE THAT HEAT PRECAUTIONS AT LSP BE

22   FOLLOWED YEAR-ROUND.  RIGHT?

23       **A**    THEY WANTED TO.

24       **Q**    BETWEEN MAY 1ST AND OCTOBER 31ST, HCP 8

25   REQUIRED --

1          **THE COURT:**  WAIT, WAIT.  SO THE ANSWER,

2   DOCTOR, IS "THEY WANTED TO."  THAT'S NOT NECESSARILY

3   CLEAR ON THE RECORD.  IS YOUR ANSWER MORE *IF THEY*

4   *WANTED TO* OR *THAT THEY DID WANT TO BUT FOR SOME*

5   *REASON DID NOT?*

6          **THE WITNESS:**  THAT'S WHAT I SAID, SIR; IF

7   THEY WANTED TO.

8          **THE COURT:**  IF THEY WANTED TO.  VERY GOOD.

9          **MR. BENJAMIN:**  I'M SORRY.  I THOUGHT THAT'S

10  WHAT I HEARD.

11  BY MR. BENJAMIN:

12     **Q**   SO JUST TO BE CLEAR, IF LSP WANTED TO, IT

13  COULD MANDATE THAT THE HEAT PRECAUTIONS APPLY YEAR-

14  ROUND AT LSP?

15     **A**   YES.  THEY COULD WRITE A PENITENTIARY

16  DIRECTIVE TO THAT EFFECT.

17     **Q**   NOW, BETWEEN MAY 1ST THROUGH OCTOBER 31ST,

18  HCP 8 REQUIRES D.O.C. FACILITIES, INCLUDING LSP, TO

19  ANNOUNCE A HEAT ALERT WHEN THE HEAT INDEX EXCEEDS 91

20  DEGREES.  RIGHT?

21     **A**   THAT'S RIGHT.

22     **Q**   THE PRIOR VERSION OF HCP 8, THE ONE THAT

23  PRECEDED THIS OCTOBER 20 -- 2024 VERSION REQUIRED

24  D.O.C. FACILITIES INCLUDING LSP TO ANNOUNCE A HEAT

25  ALERT WHEN THE HEAT INDEX EXCEEDED 88 DEGREES.

1  RIGHT?

2      **A**    RIGHT.

3      **Q**    SO D.O.C. RAISED THE THRESHOLD FOR HEAT

4  ALERT IN THE NEW VERSION OF HCP 8.  CORRECT?

5      **A**    THEY DID.

6      **Q**    AND THAT RAISED HEAT ALERT THRESHOLD APPLIES

7  AT LSP?

8      **A**    IT APPLIES AT LSP.

9      **Q**    LSP COULD MANDATE A HEAT ALERT AT A LOWER

10  THRESHOLD THAN 91 DEGREES.  RIGHT?

11      **A**    IT COULD.

12      **Q**    LSP COULD MANDATE A HEAT ALERT THRESHOLD OF

13  88 DEGREES.  RIGHT?

14      **A**    THEY COULD.

15      **Q**    YOU'D AGREE THAT A HEAT ALERT THRESHOLD OF

16  88 DEGREES WOULD BE MORE PROTECTIVE THAN A HEAT ALERT

17  THRESHOLD OF 91 DEGREES?

18      **A**    A HEAT ALERT OF 78 DEGREES WOULD BE MORE

19  PROTECTIVE, TOO, YOU KNOW.  I MEAN, THAT'S --

20      **Q**    SO 88 WOULD BE MORE PROTECTIVE?

21      **A**    IT WOULD BE MORE, YEAH.

22      **Q**    AND BY THE WAY, WHEN WE'RE SAYING 88 DEGREES

23  OR 91 DEGREES, WE'RE TALKING ABOUT A HEAT INDEX OF 88

24  OR 91.  RIGHT?

25      **A**    WE ARE.  HEAT INDEX.

1    Q    NOW, YOU'RE FAMILIAR WITH THE TERM "HEAT
2    PRECAUTION DUTY STATUS."  RIGHT?

3    A    I AM.

4    Q    AND THAT'S A DUTY STATUS TO BE GIVEN TO
5    PEOPLE WITH HEAT SENSITIVITIES IN ORDER TO LIMIT
6    THEIR HEAT EXPOSURE.  IS THAT FAIR?

7    A    THAT'S FAIR.

8    Q    UNDER HCP 8, PEOPLE WITH HEAT PROTECTIVE
9    DUTY STATUS -- I'M SORRY.  I MISSPOKE.  SCRATCH THAT.

10   UNDER HCP 8, PEOPLE WITH HEAT PRECAUTION
11   DUTY STATUS WHO ARE WORKING OUTSIDE ARE TO BE BROUGHT
12   INSIDE ONCE A HEAT ALERT ISSUES.  RIGHT?

13   A    THAT'S CORRECT.

14   Q    BUT THAT'S ONLY BETWEEN MAY 1ST AND OCTOBER
15   31ST EACH YEAR.  CORRECT?

16   A    CORRECT.

17   Q    SO IF THE HEAT INDEX EXCEEDS 91 DEGREES
18   TODAY, APRIL 23RD, LSP IS NOT REQUIRED TO ISSUE A
19   HEAT ALERT AT ALL.  RIGHT?

20   A    THEY ARE NOT REQUIRED.

21   Q    AND IF THE HEAT INDEX EXCEEDS 91 DEGREES,
22   LSP IS NOT REQUIRED TO BRING A MAN WITH HEAT
23   PRECAUTION DUTY STATUS, WHO IS WORKING ON THE FARM
24   LINE, INSIDE.  RIGHT?

25   A    NOT AT THIS POINT THEY ARE NOT.

1    **Q**    THEY USED TO BE?

2    **A**    MAY 1ST TO OCTOBER 31ST.

3    **Q**    NOW, HCP 8 SETS FORTH CERTAIN OUTDOOR

4    PROCEDURES APPLICABLE BETWEEN MAY 1ST AND OCTOBER

5    31ST FOR INCARCERATED PEOPLE WORKING OUTSIDE.  RIGHT?

6    **A**    THEY DO.

7    **Q**    THAT WOULD INCLUDE PEOPLE WORKING ON THE

8    FARM LINE?

9    **A**    YES.

10    **Q**    HCP 8 DICTATES THAT WATER AND ICE, SHADED

11    AREAS FOR BREAK, AND SUNSCREEN SHOULD BE MADE

12    AVAILABLE TO ALL INCARCERATED PEOPLE IN OUTDOOR

13    AREAS.  RIGHT?  YOU CAN SEE THAT AT PAGE 5.  CORRECT?

14    **A**    I HAVE IT.  YES.

15    **Q**    SO THAT MEANS THAT ALL D.O.C. FACILITIES

16    INCLUDING LSP, PRISON OFFICIALS MUST PROVIDE AT LEAST

17    THOSE THREE THINGS TO PEOPLE WORKING OUTSIDE.  RIGHT?

18    **A**    YES.

19    **Q**    AND THAT WOULD INCLUDE LSP AND PEOPLE

20    WORKING ON THE FARM LINE?

21    **A**    THAT WOULD INCLUDE LSP AND PEOPLE WORKING ON

22    THE FARM LINE.

23    **Q**    THERE IS NOTHING IN HCP 8 THAT REQUIRES ANY

24    SPECIFIC PLACEMENT OF WHERE THE WATER AND ICE ARE.

25    RIGHT?

1      **A**    THERE IS NOTHING IN HCP 8 THAT REQUIRES

2  THAT, THAT SPECIFIES WHERE IT SHOULD BE PLACED.

3      **Q**    THERE IS NOTHING IN HCP 8 THAT SAYS ANYTHING

4  ABOUT HOW MUCH SHADE NEEDS TO BE MADE AVAILABLE.

5  RIGHT?

6      **A**    NOTHING TO THE POINT OF HOW MUCH SHADE

7  SHOULD BE AVAILABLE.

8      **Q**    THERE IS NOTHING THAT SAYS WHERE THAT SHADE

9  SHOULD BE PLACED.  CORRECT?

10      **A**    CORRECT.

11      **Q**    AND YOU DON'T KNOW THE RATIONALE FOR WHY

12  THOSE THINGS WEREN'T INCLUDED IN HCP 8.  RIGHT?

13      **A**    WELL, I THINK THEY'RE PROVIDING SHADE.  THAT

14  THERE IS NO DIRECT INDICATION WHERE THE SHADE SHOULD

15  BE.  YOU KNOW, EVEN WHEN YOU READ OTHER GUIDELINES

16  FROM OSHA AND NIOSH AND ALL, THEY DON'T SPECIFICALLY

17  POINT OUT WHERE THE SHADE SHOULD BE.  THEY SAY YOU

18  JUST NEED TO PROVIDE SHADE.  AND THAT'S WHAT LSP IS

19  DOING.

20      **Q**    AND D.O.C. CHOSE NOT TO REQUIRE OUTDOOR

21  WORKERS TO BE PROVIDED WITH CLEAN CUPS IN THIS

22  POLICY.  RIGHT?

23      **A**    IT DOESN'T SAY CLEAN CUPS.  BUT THEY'LL BE

24  PROVIDED WITH CLEAN CUPS.

25      **Q**    IT'S NOT IN THE POLICY.  RIGHT?

1      **A**    NOT IN THE POLICY.

2      **Q**    THEY'RE NOT MANDATED TO?

3      **A**    THEY'RE NOT MANDATED TO.

4      **Q**    YOU DON'T KNOW WHY THAT PROVISION WAS LEFT

5    OUT OF HCP 8.  RIGHT?

6      **A**    I DO NOT.

7      **Q**    YOU AGREE THAT WHEN HCP 8 WAS BEING REVISED,

8    THIS WAS A GOOD OPPORTUNITY TO LOOK AT EACH AND EVERY

9    PROVISION AND SEE WHAT REVISIONS WOULD BE

10   APPROPRIATE?

11     **A**    I THINK IT SHOULD HAVE BEEN STANDARD

12   PRACTICE THAT THEY GET CLEAN CUPS, SO I DON'T THINK

13   THAT REALLY NEEDED TO BE INCLUDED IN THERE, SOMETHING

14   THAT WE'RE ALREADY DOING.  I THINK THE MOST IMPORTANT

15   THINGS WERE SHADE, WATER, AND REST.

16         **THE COURT:**  SO LET ME UNDERSTAND, DOCTOR.

17   SO YOU'VE TESTIFIED THAT IT'S YOUR UNDERSTANDING THAT

18   IT WAS STANDARD PRACTICE.  BUT IT WAS NOT ENSHRINED

19   IN A POLICY, HOWEVER.  CORRECT?

20         **THE WITNESS:**  YES, SIR.

21         **THE COURT:**  THANK YOU.

22   BY MR. BENJAMIN:

23     **Q**    D.O.C. ALSO CHOSE NOT TO REQUIRE IN THIS

24   POLICY THAT OUTDOOR WORKERS BE PROVIDED WITH SUN

25   HATS, LACE-UP BOOTS, PROTECTIVE LONG-SLEEVED SHIRTS,

1  OR GLOVES.  CORRECT?

2      **A**   IT'S NOT INDICATED IN THE POLICY.

3      **Q**   IT'S NOT MANDATED.  RIGHT?

4      **A**   NOT MANDATED.

5      **Q**   AND YOU DON'T KNOW WHY THAT WASN'T PUT INTO

6  HCP 8, EITHER, DO YOU?

7      **A**   I DO NOT.

8      **Q**   I TAKE IT LSP COULD HAVE ISSUED A DIRECTIVE

9  MANDATING THE PROTECTIONS THAT WERE PREVIOUSLY

10  ORDERED BY THIS COURT TO APPLY AT LEAST AT LSP?

11     **A**   IT WAS MY UNDERSTANDING THAT THEY WERE DOING

12  THAT, BUT IT WAS NOT PUT IN THE POLICY.

13     **Q**   LSP COULD HAVE CHOSEN TO PUT IN ITS POLICY

14  THE KINDS OF PROTECTIONS THAT THIS COURT PREVIOUSLY

15  ORDERED FOR THE FARM LINE.  RIGHT?

16     **A**   YES, THEY COULD HAVE WRITTEN --

17         **MR. BLANCHFIELD:**  YOUR HONOR, I OBJECT TO

18  THE FORM, UNLESS YOU CLARIFY WHAT HE'S TALKING ABOUT

19  IN THIS COURT'S ORDER.

20         **THE COURT:**  WELL, I THINK HE DID.  BUT WHY

21  DON'T YOU JUST REPHRASE IT.

22  **BY MR. BENJAMIN:**

23     **Q**   LSP COULD HAVE PUT INTO POLICY THAT SHADE

24  WOULD BE PROVIDED THROUGHOUT THE WORK AREA.  CORRECT?

25     **A**   THEY COULD HAVE WRITTEN A PENITENTIARY

1   DIRECTIVE TO THAT EFFECT.

2      **Q**    LSP COULD HAVE PUT INTO A POLICY THAT THERE

3   BE SUFFICIENT SHADE; THAT PEOPLE WORKING ON THE FARM

4   LINE WOULD HAVE ENOUGH SPACE WITHOUT ENCROACHING ON

5   EACH OTHER'S PERSONAL SPACE.  CORRECT?

6      **A**    AGAIN, THE WORD "SUFFICIENT" IS VAGUE.  BUT

7   THEY COULD HAVE WRITTEN A PENITENTIARY DIRECTIVE TO

8   THAT EFFECT.

9      **Q**    THEY COULD HAVE WRITTEN A PENITENTIARY

10  DIRECTIVE TO SAY THAT WATER AND ICE WOULD BE PLACED

11  THROUGHOUT THE WORK AREA.  CORRECT?

12     **A**    THEY COULD HAVE.

13     **Q**    THEY COULD HAVE SAID CLEAN CUPS, LACE-UP

14  BOOTS, SUN HATS, ALL OF THE PPE THAT WE DISCUSSED --

15  THEY COULD HAVE SAID ALL OF THAT IS MANDATED BY

16  POLICY?

17     **A**    THEY COULD HAVE WRITTEN THAT.  BUT IT WAS

18  STANDARD PRACTICE, AS FAR AS I KNOW, THAT THEY WERE

19  DOING THAT ALREADY.

20     **Q**    BUT THEY CHOSE NOT TO PUT IT IN THE POLICY?

21     **A**    I DON'T KNOW IF THEY CHOSE NOT TO PUT IT IN

22  THE POLICY.  THEY PROBABLY DIDN'T THINK ABOUT PUTTING

23  IT IN THE POLICY BECAUSE IT WAS SOMETHING THAT'S

24  ACCEPTED.  IT'S STANDARD PRACTICE.

25     **Q**    YOU UNDERSTAND THAT THE COURT HAD TO ORDER

1   IT BECAUSE IT WASN'T STANDARD PRACTICE.  CORRECT?

2       **A**   CORRECT.  BUT THEY COULD HAVE WRITTEN A

3   PENITENTIARY DIRECTIVE TO THAT EFFECT.

4       **Q**   NOW, HCP 8 -- AND IF YOU LOOK AT PAGE 6, HCP

5   8 ALSO REQUIRES ALL OUTDOOR WORK TO CEASE IF THE HEAT

6   INDEX EXCEEDS 113 DEGREES FAHRENHEIT.  RIGHT?

7       **A**   RIGHT.

8       **Q**   THAT 113-DEGREE HEAT INDEX -- AND I SHOULD

9   HAVE CLARIFIED BEFORE.  THE 113-DEGREE LINE IS A HEAT

10  INDEX, NOT AN AMBIENT TEMPERATURE.  RIGHT?

11      **A**   RIGHT.

12      **Q**   AND THAT 113-DEGREE HEAT INDEX APPLIES TO

13  THE FARM LINE.  RIGHT?

14      **A**   IT DOES.

15      **Q**   LSP COULD HAVE SET A LOWER THRESHOLD FOR

16  OUTDOOR WORK TO STOP AT LSP.  CORRECT?

17      **A**   THEY COULD HAVE.

18      **Q**   CAN YOU TURN TO WHAT IS TAB 4.  THIS IS A

19  DIRECTIVE FROM LOUISIANA STATE PENITENTIARY DATED

20  APRIL 8, 2025.  IT'S CALLED DIRECTIVE 13.067.  DO YOU

21  RECOGNIZE THIS POLICY?

22      **A**   I DO.

23      **Q**   AND IS THIS LSP'S FACILITY-SPECIFIC HEAT

24  PATHOLOGY DIRECTIVE?

25      **A**   WITHIN THE DEPARTMENT OF CORRECTIONS YOU

1    HAVE THE HEALTH CARE POLICIES THAT ARE SENT OUT BY

2    HEADQUARTERS.  THE PENITENTIARY DIRECTIVES ARE -- CAN

3    BE MORE SPECIFIC TO EACH FACILITY.

4        **Q**    THIS IS THE ONE THAT IS SPECIFIC TO --

5        **A**    FOR LSP.

6        **Q**    -- TO LSP.  CORRECT?

7        **A**    YES, IT IS.

8            **MR. BENJAMIN:**  I'M GOING TO MOVE TO ENTER

9    PX21 INTO EVIDENCE.

10           **THE COURT:**  ANY OBJECTION?

11           **MR. BLANCHFIELD:**  NO, YOUR HONOR.

12           **THE COURT:**  WITHOUT OBJECTION, THE EXHIBIT

13   IS ADMITTED.

14   **BY MR. BENJAMIN:**

15       **Q**    LSP DIRECTIVE 13.067 WAS LAST UPDATED ON

16   APRIL 8, 2025.  RIGHT?

17       **A**    YES.

18       **Q**    JUST A FEW WEEKS AGO.  RIGHT?

19       **A**    RIGHT.

20       **Q**    TO THE EXTENT THAT LSP WAS DEVIATING FROM

21   THE FLOOR THAT HCP 8 SETS WITH RESPECT TO HEAT

22   PATHOLOGY, IT WOULD DO SO THROUGH THIS DIRECTIVE.

23   CORRECT?

24       **A**    YES.

25       **Q**    TURN TO PAGE 3.  DO YOU SEE THERE IS A

1  PARAGRAPH 3.  IT SAYS "HEAT PRECAUTIONS FROM MAY 1ST

2  THROUGH OCTOBER 31ST."  DO YOU SEE THAT?

3      A    YES.

4      Q    SO LSP KEPT -- CHOSE TO KEEP THE MAY 1

5  THROUGH OCTOBER 31 HEAT SEASON WE TALKED ABOUT.

6  RIGHT?

7      A    THEY DID.

8      Q    THEY DIDN'T MAKE IT YEAR-ROUND?

9      A    THEY DID NOT.

10     Q    AND IF YOU -- SORRY TO KEEP YOU HOPPING

11 AROUND.  BUT IF YOU WOULD TURN BACK TO PAGE 1, AT THE

12 VERY BOTTOM THERE IS A DESIGNATION FOR HEAT ALERT.

13 DO YOU SEE THAT?  IT SAYS, "A DESIGNATION WHEN THE

14 APPARENT TEMPERATURE (HEAT INDEX) OUTDOORS HAS

15 EXCEEDED 91 DEGREES FAHRENHEIT, REQUIRING SPECIAL

16 PROVISIONS"?

17     A    YES.

18     Q    SO LSP CHOSE TO KEEP THE NEWLY RAISED HEAT

19 ALERT THRESHOLD OF EXCEEDING 91 DEGREES FAHRENHEIT.

20 RIGHT?

21     A    RIGHT.

22     Q    IF YOU'D TURN TO PAGE 4 -- I APOLOGIZE.

23 IT'S ACTUALLY PAGE 3.  ABOUT MIDWAY THROUGH THE PAGE,

24 3A1A, IT SAYS "THE INMATE MUST BE BROUGHT INDOORS

25 FROM MAY 1ST THROUGH OCTOBER 31ST OF EACH YEAR, ONCE

THE APPARENT TEMPERATURE REACHES 91 DEGREES."  DO YOU
SEE THAT?

    **A**   YES.

    **Q**   SO LSP KEPT HCP 8'S PROVISION REGARDING THAT
HEAT ALERT THRESHOLD AT WHICH PEOPLE WITH HEAT
PRECAUTION DUTY STATUS SHOULD BE BROUGHT INSIDE?

    **A**   THEY KEPT THE SAME TIME FRAME.  YES, THEY
DID.

    **Q**   THEY KEPT IT AT 91?

    **A**   YOU'RE TALKING ABOUT THE TIME FRAME OR THE
DEGREE?

    **Q**   I'M SORRY.  THE DEGREE.

    **A**   YES, THEY KEPT IT AT 91.

    **Q**   RIGHT.  91 AND ONLY 91 WHEN IT'S BETWEEN MAY
1ST AND OCTOBER 31ST.  RIGHT?

    **A**   CORRECT.

    **Q**   IF YOU LOOK AT PAGE 5, VERY TOP OF THE PAGE,
PARAGRAPH 6:  "WHEN THE HEAT INDEX EXCEEDS 113
DEGREES FAHRENHEIT, AN ANNOUNCEMENT SHALL BE MADE"
THAT ALL -- "THE ALL OUTDOOR WORK IS TO CEASE."  DO
YOU SEE THAT?

    **A**   CORRECT.

    **Q**   SO LSP KEPT THE SAME OUTDOOR STOP-WORK
THRESHOLD THAT'S PRESENT IN THE NEWLY REVISED HCP 8?

    **A**   NOW, KEEP IN MIND, EVERYBODY WOULD HAVE

1   ALREADY BEEN BROUGHT IN FROM -- WITH A HEAT

2   PRECAUTION DUTY STATUS PRIOR TO THIS POINT.  RIGHT?

3   BUT THEY DID KEEP THE 113 THE SAME.

4        **Q**   PEOPLE WHO DIDN'T HAVE HEAT PRECAUTION DUTY

5   STATUS WOULD NOT HAVE BEEN BROUGHT IN.  CORRECT?

6        **A**   THEY WOULD NOT HAVE BEEN BROUGHT IN.

7        **Q**   THEY'D BE WORKING ALL THE WAY UP UNTIL THE

8   HEAT INDEX EXCEEDED 113 DEGREES --

9        **A**   THEY WOULD.

10       **Q**   -- FAHRENHEIT.  RIGHT?

11       **A**   CORRECT.

12           **THE COURT:**  SO, GENTLEMEN, LET ME JUST

13   REMIND YOU, IT MAKES IT VERY DIFFICULT FOR THE COURT

14   REPORTER AND REALLY FOR THE COURT IF YOU BEGIN TO

15   TALK OVER EACH OTHER, WHICH YOU'VE DONE A COUPLE OF

16   TIMES.

17           SO, DOCTOR, I WOULD ASK YOU TO JUST

18   KIND OF ALLOW MR. BENJAMIN TO COMPLETE HIS QUESTION

19   BEFORE YOU ANSWER.  I APPRECIATE YOUR WILLINGNESS TO

20   ANSWER IT PROMPTLY.  BUT IF WE COULD JUST MAKE SURE

21   HE COMPLETES HIS QUESTION.  OKAY?

22           **THE WITNESS:**  YES, SIR.

23           **THE COURT:**  THANK YOU.

24   **BY MR. BENJAMIN:**

25       **Q**   AND IF YOU LOOK BACK ON PAGE 4 UNDER

1   "OUTDOOR PROCEDURES," C1A, LSP DID NOT CHOOSE TO

2   PROVIDE ANY ADDITIONAL MANDATES AROUND THE PLACEMENT

3   OF SHADE, WATER OR ICE.  CORRECT?

4       **A**   CORRECT.

5       **Q**   THEY DIDN'T REQUIRE CUPS OR SUN HATS OR

6   LACE-UP BOOTS OR GLOVES OR ANY PROTECTIVE GEAR.

7   RIGHT?

8       **A**   CORRECT.

9       **Q**   WOULD YOU TURN TO TAB 5.  AND AT THE TOP

10  THERE IT SAYS "DEPARTMENT REGULATION NO. HCP8

11  ATTACHMENT A," AND IT'S DATED THE 7TH OF NOVEMBER

12  2024.  DO YOU SEE THAT?

13      **A**   YES.

14      **Q**   DO YOU RECOGNIZE WHAT THIS IS?

15      **A**   YES.

16      **Q**   WHAT IS THIS?

17      **A**   IT'S THE MEDICATION EXCLUSION LIST FOR HEAT

18  PATHOLOGY DUTY STATUS.

19      **Q**   IS THIS THE CURRENTLY APPLICABLE ATTACHMENT

20  A TO HCP 8?

21      **A**   IT IS.

22          **MR. BENJAMIN:**  YOUR HONOR, I'D LIKE TO MOVE

23  INTO EVIDENCE CLASS CERT PX2.

24          **THE COURT:**  ANY OBJECTION?

25          **MR. BLANCHFIELD:**  NO OBJECTION, YOUR HONOR.

1          THE COURT:  WITHOUT OBJECTION, EXHIBIT PX2

2     IS ADMITTED.

3     BY MR. BENJAMIN:

4          Q    NOW, I THINK YOU SAID SOMETHING TO THIS

5     EFFECT, BUT THIS IS A MEDICATION EXCLUSION LIST?

6          A    IT IS -- IF YOU GO --

7          THE COURT:  I THOUGHT HE SAID THE HEAT

8     PRECLUSION LIST.  HEAT PRECLUSION OR MEDICATION

9     PRECLUSION?

10          THE WITNESS:  IT'S THE MEDICATIONS THAT IF

11     PATIENTS ARE ON THEY GET A HEAT PRECAUTION DUTY

12     STATUS.

13     BY THE WITNESS:

14          A    IF I COULD JUST -- THE FIRST PARAGRAPH ON

15     HCP 8 TALKS ABOUT MEDICATIONS AND DIAGNOSES.  THIS IS

16     THE MEDICATION ASPECT OF THAT.

17          Q    I SEE.  RIGHT.  AND ATTACHMENT B IS THE

18     DIAGNOSES ASPECT?

19          A    EXACTLY.

20          Q    WE'LL GET TO THAT ONE.  I FLIPPED YOU TO

21     THIS ONE BECAUSE I BELIEVE SINCE OCTOBER 20, 2024,

22     THERE WAS A SUBSEQUENT ADJUSTMENT TO THE HEAT

23     PATHOLOGY MEDICATION LIST, AND THAT'S WHAT I'M

24     SHOWING YOU HERE FROM NOVEMBER 7TH.  IS THAT FAIR?

25          A    FAIR.

1    Q    NOW, IT'S D.O.C.'S POLICY THAT IF SOMEONE IS

2  PRESCRIBED ANY OF THE MEDICATIONS ON ATTACHMENT A,

3  WHICH IS PX2, AND IS TAKING THEM MORE OR LESS

4  CONSISTENTLY WITH THEIR PRESCRIPTION, THAT PERSON

5  AUTOMATICALLY GETS HEAT PRECAUTION DUTY STATUS.

6  RIGHT?

7    A    CORRECT.

8    Q    AND D.O.C.'S POSITION IS THAT EVERY FACILITY

9  UNDER D.O.C. NEEDS TO IMPLEMENT THAT PROGRAM.  RIGHT?

10    A    RIGHT.

11    Q    SSRIs ARE NOT AMONG THE MEDICATIONS LISTED

12  ON ATTACHMENT A.  CORRECT?

13    A    CORRECT.

14        **THE COURT:**  SSRIs?

15        **MR. BENJAMIN:**  SS -- SAM, SAM, ROBERT,

16  IGLOO® SOMETHING -- THOSE ARE THE INITIALS.  I'M

17  GOING TO MESS IT UP.  SEROTONIN INHIBITORS,

18  EFFECTIVELY.

19  **BY MR. BENJAMIN:**

20    Q    SO A PERSON WHO'S PRESCRIBED AN SSRI WOULD

21  NOT BE GRANTED HEAT PRECAUTION DUTY STATUS ON THAT

22  BASIS.  CORRECT?

23    A    CORRECT.

24    Q    ANGIOTENSIN-CONVERTING ENZYME, OR ACE

25  INHIBITORS, NOT ON THIS LIST.  RIGHT?

1    **A**    THEY ARE NOT.

2    **Q**    AND ANGIOTENSIN RECEPTOR BLOCKERS, OR ARBs,

3    ARE NOT ON THIS LIST?

4    **A**    THEY'RE NOT.

5    **Q**    SO A PERSON TAKING A PRESCRIBED ACE

6    INHIBITOR OR ARB WOULD NOT BE GRANTED HEAT PRECAUTION

7    DUTY STATUS ON THAT BASIS.  RIGHT?

8    **A**    THEY WOULD NOT.

9    **Q**    NOW, THIS LIST OF MEDICATIONS ON ATTACHMENT

10   A CAME FROM DR. REYNOLDS-BARNES.  RIGHT?

11   **A**    YES.

12   **Q**    AND D.O.C. DID NOT END UP ACCEPTING 100

13   PERCENT OF THE MEDICATIONS THAT DR. BARNES HAD

14   RECOMMENDED.  RIGHT?

15   **A**    CORRECT.

16   **Q**    FOR EXAMPLE, YOU THINK DR. BARNES

17   RECOMMENDED THAT NORVASC BE INCLUDED ON THIS LIST.

18   RIGHT?

19   **A**    NO.

20   **Q**    YOU DON'T REMEMBER DR. BARNES RECOMMENDING

21   NORVASC?

22   **A**    SHE SEPARATED OUT THE CALCIUM CHANNEL

23   BLOCKERS INTO DIHYDROPYRIDINES AND

24   NONDIHYDROPYRIDINES.  AND SHE PUT ON THE LIST THE

25   NONDIHYDROPYRIDINES BECAUSE OF THEIR EFFECT ON THE

1 HEART.  AND DIHYDROPYRIDINES, BECAUSE OF THEIR

2 EFFECTIVENESS ON THE VASCULAR SYSTEM, SHE CHOSE NOT

3 TO PUT THEM ON THERE.

4     **Q**   WHAT I'M ASKING YOU IS:  DID SHE RECOMMEND

5 NORVASC BE INCLUDED ON THIS LIST?

6     **A**   I'M NOT SURE.  THERE WERE A FEW THINGS

7 THAT -- WHEN I SAW THE LIST -- THAT I WENT THROUGH

8 THE LIST AND I HAD CONSULTATION BACK AND FORTH

9 THROUGH DREW ABOUT THE LIST.  THAT MAY HAVE BEEN ONE

10 OF THE MEDICATIONS.

11     **Q**   JUST -- AND JUST TO MAYBE REFRESH YOUR

12 RECOLLECTION --

13         **MR. BENJAMIN:**  MR. STEVENSON, COULD YOU

14 BRING UP DR. LAVESPERE'S DEPOSITION AT 39-22, 40-22?

15 **BY MR. BENJAMIN:**

16     **Q**   DO YOU SEE THAT ON YOUR SCREEN?

17     **A**   I DO.

18     **Q**   "WHAT DID SHE" -- AND THIS IS IN REFERENCE

19 TO DR. BARNES -- "SEND YOU THAT YOU DIDN'T ADOPT?"

20 THAT WAS THE QUESTION I ASKED.  AND DO YOU SEE IN

21 YOUR ANSWER YOU SAY THAT "I THINK SHE HAD MAYBE

22 NORVASC ON THAT LIST.  I THINK NORVASC WAS TAKEN OFF

23 THE LIST"?

24     **A**   RIGHT.

25     **Q**   DOES THAT REMIND YOU THAT NORVASC WAS ON THE

1  LIST ORIGINALLY?

2      **A**    IT DOES REMIND ME.

3      **Q**    AND IT'S NOT ON THE LIST ANYMORE?

4      **A**    IT DOESN'T NEED TO BE TO THE LIST.

5          **THE COURT:**  THE QUESTION IS:  "IT'S NOT ON

6  THE LIST?"

7          **THE WITNESS:**  IT'S NOT ON THE LIST.  AND IT

8  DOESN'T NEED TO BE ON THE LIST.

9  **BY MR. BENJAMIN:**

10      **Q**    NOW, NORVASC IS A DIHYDROPYRIDINE.  RIGHT?

11      **A**    YES, IT IS.

12      **Q**    AND IT'S A CALCIUM CHANNEL BLOCKER?

13      **A**    IT IS.

14      **Q**    I WANT TO GO BACK TO TAB 1.  AND THAT'S HCP

15  8.  AND IF YOU LOOK AT PAGE 11, IT'S ENTITLED

16  "MEDICAL EXCLUSIONS LIST."  DO YOU SEE THAT?

17      **A**    YOU'RE REFERRING TO ATTACHMENT B?

18      **Q**    THAT WAS GOING TO BE MY NEXT QUESTION.  IS

19  THIS MEDICAL EXCLUSIONS LIST WHICH BEGINS AT JX78,

20  PAGE 11 -- IS THIS ATTACHMENT B TO HCP 8?

21      **A**    IT IS ATTACHMENT B.

22      **Q**    THIS IS THE VERSION THAT IS CURRENTLY IN

23  EFFECT AT D.O.C.  RIGHT?

24      **A**    THAT IS THE CURRENT VERSION.

25      **Q**    I SHOULD ASK, BY THE WAY:  AT LSP -- STRIKE

1    THAT.

2         IS ATTACHMENT A THAT WE JUST LOOKED AT AND

3    THIS ATTACHMENT B -- ARE THOSE IN EFFECT AT LSP?

4    **A**    THEY ARE BOTH IN EFFECT AT LSP.

5    **Q**    NOW, ATTACHMENT B BEGINS AT 11 -- PAGE 11 OF

6    JX78.  THIS IS A LIST OF MEDICAL EXCLUSIONS THAT CAME

7    FROM DR. KELDIE?

8    **A**    YES.

9    **Q**    AND ANY PERSON IN D.O.C.'S CUSTODY WHO

10   PRESENTS WITH ONE OF THE MEDICAL CONDITIONS THAT'S

11   LISTED ON ATTACHMENT B SHOULD BE GRANTED HEAT

12   PRECAUTION DUTY STATUS UNLESS THEY OPT OUT.  RIGHT?

13   **A**    YES.

14   **Q**    AND D.O.C.'S POSITION IS THAT THAT SHOULD

15   APPLY TO ALL D.O.C. FACILITIES?

16   **A**    THAT SHOULD APPLY TO ALL D.O.C. FACILITIES.

17   **Q**    INCLUDING LSP?

18   **A**    INCLUDING LSP.

19   **Q**    AND DIABETES IS NOT LISTED ON ATTACHMENT B.

20   CORRECT?

21   **A**    IT IS NOT.

22   **Q**    DO YOU REMEMBER THAT IN THE PRIOR VERSION OF

23   HCP 8, DIABETES WOULD BE FLAGGED -- A PERSON WITH

24   DIABETES WOULD BE FLAGGED AS POTENTIALLY HAVING A

25   HIGHER RISK -- HIGHER HEAT SENSITIVITY RISK?

1    **A**    I THINK THE ACTUAL WORDING WAS "MAY HAVE,"

2    YOU KNOW.  SO IT WOULD HAVE BEEN FLAGGED WITH A -- IN

3    THAT RESPECT, YES.

4    **Q**    SO THAT PERSON WAS FURTHER EVALUATED TO

5    DETERMINE WHETHER, IN FACT, THEY DID HAVE HEIGHTENED

6    HEAT SENSITIVITY.  RIGHT?

7    **A**    RIGHT.

8    **Q**    THE NEW VERSION OF HCP 8 DOESN'T HAVE ANY

9    FLAG FOR PERSONS WITH DIABETES.  RIGHT?

10   **A**    DOES NOT.

11   **Q**    CORONARY ARTERY DISEASE IS ALSO NOT LISTED

12   ON ATTACHMENT B.  CORRECT?

13   **A**    ACTUALLY, IF YOU LOOK UNDER ISCHEMIC HEART

14   DISEASE, YOU KNOW, CORONARY ARTERY DISEASE COULD BE

15   LISTED UNDER THAT.  THERE ARE SEVERAL SUBCATEGORIES

16   OF ISCHEMIC HEART DISEASE.

17   **Q**    BUT, WRIT-LARGE, CORONARY ARTERY DISEASE IS

18   NOT LISTED.  RIGHT?

19   **A**    NOT VERBATIM, NO.

20   **THE COURT:**  YOU HAVE TEN MINUTES LEFT IN

21   YOUR FIRST DIRECT.  OKAY?

22   **MR. BENJAMIN:**  AND IS THIS ON A 45-MINUTE

23   CLOCK FOR THIS --

24   **THE COURT:**  45 MINUTES.  YOU STARTED AT

25   1:07.  I'M SORRY.  1:27.

BY MR. BENJAMIN:

   Q   LET'S TALK ABOUT THE MOVE FROM 88 VERSUS --
TO 91 DEGREES.  IF WE CAN PULL UP TAB 9.  THESE ARE
RESPONSES TO PLAINTIFFS' THIRD SET OF
INTERROGATORIES.  YOU LOOKED AT THESE DURING YOUR
DEPOSITION.  RIGHT?

   A   IT'S BEEN A WHILE AGO, BUT I REMEMBER
LOOKING AT THEM.

       MR. BENJAMIN:  I'D LIKE TO MOVE INTO
EVIDENCE PX1.

       THE COURT:  ANY OBJECTION?

       MR. BLANCHFIELD:  YOUR HONOR, WE HAVE OUR
SAME OBJECTION THAT WE'VE BEEN RAISING --

       THE COURT:  YOU'VE GOT TO STAND UP, MR.
BLANCHFIELD.  THIS IS FEDERAL COURT.

       MR. BLANCHFIELD:  SAME OBJECTION.

       THE COURT:  OKAY.  OVERRULED.  EXHIBIT PX1
IS ADMITTED.

BY MR. BENJAMIN:

   Q   ALL RIGHT.  IF YOU TURN TO PAGE 4, DO YOU
SEE THAT THE RESPONSE TO INTERROGATORY 5 LISTS A FEW
DIFFERENT SOURCES THAT D.O.C. IS CLAIMING TO RELY
UPON IN MAKING A REVISION OF THE HEAT INDEX OR HEAT
ALERT THRESHOLD.  RIGHT?

   A   YES.

1      Q    AND THAT'S DR. KELDIE'S REPORT, DR. BARNES'

2  REPORT, A NATIONAL WEATHER SERVICE LINK, AND A LINK

3  TO NIOSH GUIDANCE.  RIGHT?

4      A    AS WELL AS CDC.

5      Q    PART OF NIOSH, YEAH.  OR PART OF -- NIOSH IS

6  PART OF CDC.

7           DR. BARNES DOESN'T SAY ANYTHING ABOUT A HEAT

8  ALERT THRESHOLD IN HER REPORT OR ANY OF THE

9  ATTACHMENTS.  RIGHT?

10     A    NOT THAT I READ.

11     Q    AND DR. KELDIE HAD ACTUALLY PROPOSED A

12 95-DEGREE HEAT THRESHOLD.  RIGHT?

13     A    HE DID.

14     Q    IT WAS D.O.C.'S ATTORNEY IN THIS LITIGATION

15 THAT THOUGHT 95 WOULD BE TOO HIGH.  CORRECT?

16     A    IT WAS.

17     Q    TOO BIG OF A JUMP FOR THE COURT TO ACCEPT?

18     A    IN TRYING TO BE REASONABLE WITH THE COURT,

19 IT WAS -- WHEN WE HAD OUR MEETING, IT WAS TALKED

20 ABOUT.  AND DREW'S OPINION AND AS WELL AS CHELSEA'S

21 OPINION WAS THAT IT WAS TOO BIG A JUMP FROM 88 TO 95

22 AND 91 WOULD BE MORE REASONABLE TO THE COURT AND FAIR

23 TO PUT IT AT 91.

24     Q    SO YOU PICKED 91 AS A MEDIAN, THINKING IT

25 WOULD BE ACCEPTABLE TO THE COURT?

1      A    WELL, ACTUALLY WE PICKED 91 AS A MEDIAN

2  BASED ON THE HEAT INDEX CHART FROM THE NATIONAL

3  WEATHER SERVICE THAT SHOWS EXTREME CAUTION BEGINS AT

4  91.  IF YOU LOOK AT OSHA'S GUIDELINES, THEY GIVE A

5  TEMPERATURE RANGE FOR 80 TO 94 AS BEING, YOU KNOW --

6  YOU KNOW, 80 TO 94 WOULD BE CAUTIOUS.  ABOVE 95 WOULD

7  BE DANGER.

8      Q    WHY DON'T WE LOOK AT THOSE -- THOSE SOURCES

9  OF INFORMATION.  IF YOU TURN TO PAGE 10 -- I'M

10  SORRY -- TAB 10.  THIS IS PX6.  THIS IS THE NATIONAL

11  WEATHER SERVICE WEBSITE THAT YOU CITE TO IN THOSE

12  INTERROGATORIES.  RIGHT?

13      A    RIGHT.

14      Q    AND THIS IS THE CHART THAT YOU'RE REFERRING

15  TO IN COLOR HERE IN THE MIDDLE?

16      A    YES.

17      Q    NOW, THE VALUES IN THIS CHART ARE FOR SHADY

18  LOCATIONS ONLY.  RIGHT?  I POINT YOU TO THE LAST

19  PARAGRAPH ON THE PAGE.

20      A    OKAY.  LET ME CHECK THAT OUT.  OKAY, YES.

21      Q    RIGHT.  BECAUSE IF YOU'RE EXPOSED TO DIRECT

22  SUNLIGHT, THE HEAT INDEX VALUE CAN BE INCREASED BY UP

23  TO 15 PERCENT.  THAT'S WHAT THE -- THAT'S WHAT THE

24  NATIONAL WEATHER SERVICE SAYS.  RIGHT?

25      A    RIGHT.

1    **Q**   AND JUST ABOVE THAT IN THE PARAGRAPH -- IN

2   THE PARAGRAPH ABOVE, IT SAYS -- THERE IS A LINK.  IT

3   SAYS MORE INFORMATION -- A FULL HEAT INDEX CHART CAN

4   BE FOUND AT A CERTAIN LINK.

5         **MR. BENJAMIN:**  AND, MR. STEVENSON, IF YOU

6   COULD JUST TAKE OFF THE CALL-OUT RIGHT NOW.

7   **BY MR. BENJAMIN:**

8    **Q**   HAVE YOU EVER CLICKED THAT LINK?

9    **A**   I HAVE NOT.

10    **Q**   WOULD IT SURPRISE YOU IF IT LINKS TO A

11   NATIONAL WEATHER SERVICE HEAT INDEX CHART THAT

12   SAYS -- AND I QUOTE -- THIS TABLE USES RELATIVE

13   HUMIDITY AND AIR TEMPERATURE TO PRODUCE APPARENT

14   TEMPERATURES OR THE TEMPERATURE THE BODY FEELS.

15   THESE VALUES ARE FOR SHADY LOCATIONS ONLY.  EXPOSURE

16   TO FULL SUN CAN INCREASE THE HEAT INDEX VALUES BY UP

17   TO 15 PERCENT?  WOULD THAT SURPRISE YOU?

18    **A**   IT DOESN'T SURPRISE ME, BUT IT'S NOT AN

19   ABSOLUTE.

20    **Q**   RIGHT.  BUT IT CAN GO UP TO 15 PERCENT.

21   THAT'S WHAT THE NATIONAL WEATHER SERVICE IS ACTUALLY

22   SAYING.  RIGHT?

23    **A**   IT CAN GO, YES.

24    **Q**   AND IF YOU LOOK DOWN AT THE VERY BOTTOM OF

25   PX6, HERE IT SAYS THAT EXTREME CAUTION BEGINS AT 90.

1  RIGHT?

2      **A**   YES.

3      **Q**   AND THAT'S IN THE SHADE?

4      **A**   YES.

5      **Q**   AND YOU AGREE THAT THE FARM LINE OFTEN IS

6  WORKING UNDER DIRECT SUN?

7      **A**   AT TIMES THEY ARE.

8      **Q**   OFTEN?

9      **A**   I WOULD -- AT TIMES.

10      **THE COURT:**  WHAT TIMES WOULD THEY NOT -- LET

11  ME UNDERSTAND.  AT WHAT TIMES WOULD A FIELD OF

12  VEGETABLES NOT BE EXPOSED TO -- WHAT WAS THE TERM?

13  YOU DIDN'T USE "SUNLIGHT."

14      **MR. BENJAMIN:**  DIRECT SUNLIGHT.

15      **THE COURT:**  DIRECT SUNLIGHT.

16      **THE WITNESS:**  THERE ARE OFTEN CLOUDS AT

17  ANGOLA ALL THE TIME.

18      **THE COURT:**  SO IN OTHER WORDS, YOUR

19  TESTIMONY IS THAT IF IT'S CLOUDY, THERE WOULDN'T BE

20  DIRECT SUNLIGHT.  CORRECT?

21      **THE WITNESS:**  RIGHT.

22      **THE COURT:**  I JUST WANTED TO CLARIFY.

23      **MR. BENJAMIN:**  AND IF WE COULD -- ACTUALLY,

24  I'D LIKE TO MOVE INTO EVIDENCE PX6.

25      **THE COURT:**  ANY OBJECTION?

1          **MR. BLANCHFIELD:**  NO OBJECTION, YOUR HONOR.

2          **THE COURT:**  WITHOUT OBJECTION, PX6 -- NOW,

3    MR. BLANCHFIELD, I'M GOING TO WARN YOU ONE MORE TIME.

4    YOU ARE AN EXPERIENCED FEDERAL TRIAL PRACTITIONER.

5    YOU ARE VERY FULLY AWARE OF LOCAL RULE 83(B)(16).

6    I'M GOING TO ASK YOU ONE MORE TIME, SIR, TO PLEASE

7    ABIDE BY THE LOCAL RULES THAT EVERY JUDGE IN THIS

8    COURT, SINCE THE INCEPTION OF THIS DISTRICT IN 1972,

9    HAS REQUIRED.

10          LET'S MOVE ON.

11   **BY MR. BENJAMIN:**

12      **Q**   DR. LAVESPERE, COULD YOU TURN TO TAB 8?

13   THIS IS PX5.  THIS IS THE OSHA GUIDANCE YOU WERE

14   REFERRING TO EARLIER.  RIGHT?  THIS IS WHAT'S

15   CITED -- THIS IS WHAT'S CITED TO IN DR. KELDIE'S

16   REPORT?

17      **A**   IS THAT EXHIBIT 20?

18      **Q**   I'M SORRY.  YES, IT IS -- THE FIRST PAGE OF

19   IT SAYS EXHIBIT 20.  OR YOU'RE FAMILIAR WITH THIS

20   DOCUMENT.  WE LOOKED AT IT AT YOUR DEPOSITION.

21   RIGHT?

22      **A**   WE DID.

23      **Q**   AND THIS IS WHAT OSHA SAYS.  IT DOESN'T SAY

24   ANYTHING ABOUT A 91- OR A 95-DEGREE HEAT INDEX.

25   RIGHT?

1     **A**   IT DOES NOT.

2     **Q**   IF YOU TURN TO PAGE 6 -- IN FACT, IT'S THE

3  SECOND SENTENCE -- SAYS, "EMPLOYERS SHOULD NOT RELY

4  ON HEAT INDEX ALONE FOR THE MOST ACCURATE HAZARD

5  ASSESSMENT."  DO YOU SEE THAT?

6     **A**   YES.

7     **Q**   AND THE BEGINNING OF THE NEXT PARAGRAPH IT

8  SAYS, "OUTDOOR WORKERS HAVE DIED OF HEAT STROKE WHEN

9  THE DAY'S MAXIMUM HEAT INDEX WAS ONLY 86 DEGREES

10  FAHRENHEIT.  OSHA HAS FOUND THAT LESS SEVERE

11  HEAT-RELATED ILLNESSES CAN HAPPEN AT EVEN LOWER HEAT

12  INDEX VALUES."  DO YOU SEE THAT?

13     **A**   BUT IT'S ALSO TALKING ABOUT HEAVY AND VERY

14  HEAVY WORK.

15     **Q**   IT MAY BE SAYING THAT IN SOME RESPECTS BUT

16  NOT ON THAT PARAGRAPH.  RIGHT?

17     **A**   IT'S IN BOLD --

18     **THE COURT:**  WAIT, WAIT, GENTLEMEN.  ONE AT A

19  TIME.  WOULD YOU LIKE TO REPEAT THE QUESTION, MR.

20  BENJAMIN?  AND YOU ONLY HAVE TWO MINUTES LEFT.

21     **MR. BENJAMIN:**  YOU KNOW WHAT?  I WILL SKIP

22  THAT QUESTION.

23  **BY MR. BENJAMIN:**

24     **Q**   OSHA ACTUALLY RECOMMENDS WET BULB GLOBE

25  TEMPERATURE.  RIGHT?

1      **A**    THEY DO.

2      **Q**    SO DOES THE U.S. ARMY.  RIGHT?

3      **A**    DON'T KNOW.

4      **Q**    SO DOES NIOSH.  RIGHT?

5      **A**    DON'T KNOW.

6      **Q**    NIOSH SAYS THE UPPER LIMIT FOR MODERATE WORK

7    UNDER THE WET BULB GLOBE TEMPERATURE IS 82.4 DEGREES.

8    RIGHT?

9      **A**    I DON'T KNOW EXACTLY WHAT THE CRITERIA ARE.

10     **Q**    BUT THIS IS THE AGENCY GUIDANCE THAT

11   SUPPOSEDLY UNDERLIED D.O.C.'S DECISION TO RAISE THE

12   HEAT INDEX FROM A THRESHOLD OF 88 TO 91.  RIGHT?

13     **A**    WE USED THEIR GUIDANCE.

14     **Q**    WHAT PART OF THAT GUIDANCE DID YOU USE?

15     **A**    WE USED THE NATIONAL WEATHER SERVICE CHART

16   THAT YOU POINTED OUT.  WE LOOKED AT SOME OF THE OSHA

17   RECOMMENDATIONS.  WE LOOKED AT SOME OF THE CDC

18   RECOMMENDATIONS.  AND WE TALKED ABOUT IT WITH OUR

19   EXPERTS.

20     **Q**    WHEN I DEPOSED YOU ON FEBRUARY 12TH, YOU

21   COULDN'T POINT ME TO A SINGLE THING OTHER THAN THAT

22   ONE CHART FOR SHADY LOCATIONS.  RIGHT?

23     **A**    RIGHT.

24     **Q**    THAT WAS THE AGENCY GUIDANCE YOU RELIED ON?

25     **A**    SINCE THAT TIME I HAVE HAD CONVERSATIONS

1   ABOUT -- ABOUT OUR DEPOSITION WHERE I'VE LEARNED SOME

2   DIFFERENT THINGS.  AND THAT'S WHAT I'VE LEARNED.

3       Q    YOU WERE THE 30(B)(6) WITNESS TO TALK ABOUT

4   WHAT D.O.C. RELIED ON, AND YOU HAD NO IDEA OF

5   ANYTHING IN THAT GUIDANCE OTHER THAN THAT ONE CHART

6   SHOWING SHADE.  RIGHT?

7       A    CORRECT.

8       Q    OKAY.  DR. LAVESPERE, YOU'RE AWARE THAT --

9           **THE COURT:**  ONE MINUTE.

10  **BY MR. BENJAMIN:**

11      Q    YOU'RE AWARE THAT LSP IS OFTEN CALLED

12  ANGOLA.  RIGHT?

13      A    YES.

14      Q    YOU YOURSELF CALL IT ANGOLA ALL THE TIME?

15      A    SOMETIMES.

16      Q    ARE YOU AWARE THAT DR. KELDIE BELIEVES THAT

17  LSP STAFF DOESN'T CALL IT ANGOLA?

18      A    DR. KELDIE HADN'T BEEN AROUND PROBABLY VERY

19  MANY OF THEM.

20          **THE COURT:**  THAT COULD BE A SIMPLE "YES" OR

21  "NO," SIR.  IF YOU HAVE TO EXPLAIN OR -- IF YOU KNOW,

22  YOU KNOW.

23  **BY THE WITNESS:**

24      A    I'M NOT AWARE -- I'M NOT AWARE THAT HE --

25      Q    ARE YOU AWARE THAT HE BELIEVES --

1          **THE COURT:**  LAST QUESTION, MR. BENJAMIN.

2  **BY MR. BENJAMIN:**

3     **Q**    ARE YOU AWARE THAT HE BELIEVES THERE SHOULD

4  BE A PROHIBITION ON THE USE OF THAT TERM TO REFERENCE

5  LSP BECAUSE OF THE NEGATIVE SOCIAL CONNOTATIONS?

6     **A**    I DO NOT.

7     **Q**    ARE YOU AWARE THAT LSP USED TO HAVE TOURS

8  THAT CELEBRATED ANGOLA'S PLANTATION HISTORY?

9          **THE COURT:**  IF YOU KNOW.

10  **BY THE WITNESS:**

11    **A**    I DON'T KNOW.

12         **THE COURT:**  WHY DON'T WE WRAP IT UP, MR.

13  BENJAMIN.

14         **MR. BENJAMIN:**  NO FURTHER QUESTIONS.

15         **THE COURT:**  THANK YOU.

16            ANY CROSS-EXAMINATION?

17         **MR. BLANCHFIELD:**  THANK YOU, YOUR HONOR.

18                   **CROSS-EXAMINATION**

19  **BY MR. BLANCHFIELD:**

20    **Q**    GOOD AFTERNOON, DR. LAVESPERE.

21    **A**    GOOD AFTERNOON.

22    **Q**    SO THE COURT UNDERSTANDS, HCP 8 APPLIES TO

23  ALL D.O.C. FACILITIES.  CORRECT?

24    **A**    CORRECT.

25    **Q**    13.067 APPLIES -- THAT'S A LSP DIRECTIVE.

1  CORRECT?

2      **A**    APPLIES TO LSP.

3      **Q**    IF WE PUT THINGS IN THOSE, IT'S GOING TO

4  APPLY -- IF YOU PUT SOMETHING IN THERE ABOUT

5  OUTDOORS, IT'S GOING TO APPLY TO ALL OUTDOOR WORK,

6  NOT JUST THE FARM LINE.  CORRECT?

7      **A**    CORRECT.

8      **Q**    NOW, ARE YOU AWARE THAT LSP HAS POLICIES

9  THAT SPECIFICALLY APPLY AND MENTION THE ISSUANCE OF

10  CLOTHING?

11     **A**    I CAN'T NAME THE POLICY, BUT I KNOW THAT

12  THEY HAVE POLICIES ABOUT THAT.

13     **Q**    SO THERE WOULD BE NO REASON TO PUT CLOTHING

14  IN HCP 8 TO SOMEHOW AFFECT THE ENTIRETY OF THE D.O.C.

15  WHEN WE COULD DO IT AND HAVE DONE IT IN LSP

16  DIRECTIVE?

17     **A**    CORRECT.

18     **Q**    ARE YOU AWARE THAT LSP HAS SEPARATE POLICIES

19  REFERENCING GLOVES AND CUPS?

20     **A**    I KNOW THAT THERE ARE POLICIES.

21     **Q**    NOW, YOU WERE ASKED ABOUT THE MEDICATION

22  LIST WHICH IS ATTACHED TO HCP 8.  IS IT FAIR TO SAY

23  THAT THERE WAS A FAIR AMOUNT OF DISCUSSION ABOUT WHAT

24  MEDICINES SHOULD ACTUALLY BE PLACED ON THAT LIST?

25     **A**    VERY IN-DEPTH DISCUSSIONS.

1    **Q**    OKAY.  AND WHAT DID YOU DO -- JUST CAN YOU

2    BRIEFLY EXPLAIN TO THE COURT YOUR ROLE IN DEVELOPING

3    THAT LIST?

4    **A**    WELL, WITHIN D.O.C. WE HAVE A FORMULARY, ALL

5    THE DRUGS THAT WE USE THAT ARE -- THAT WE HAVE AT OUR

6    DISPOSAL IN THE PHARMACY.  WHEN I GOT THE LIST FROM

7    DR. BARNES, I WENT THROUGH EACH MEDICATION THAT SHE

8    HAD ON THAT LIST, LOOKED AT THE ANTICHOLINERGIC

9    ACTIVITY, SO TO SPEAK, AND TRIED TO LOOK AT THEM VERY

10   CLOSELY TO SEE IF IT'S SOMETHING THAT WE COULD LIVE

11   WITH OR NOT.  UP UNTIL THIS POINT, ALL WE HAD WAS

12   ANTIPSYCHOT- -- PSYCHOTROPICS ON THE HEAT PRECAUTION

13   DUTY STATUS LIST.  SO TO GET THIS LIST INITIALLY WAS

14   -- IT WAS REALLY MIND-BLOWING BECAUSE THAT'S A LOT OF

15   MEDICATIONS.  AND SO I DID, I WENT THROUGH EACH ONE

16   OF THEM.

17   **Q**    THIS COURT IN EARLIER DISCUSSIONS SAW THE

18   INITIAL LIST THAT WAS BASICALLY A LIST OF 22 ANTI-

19   PSYCHOTROPIC MEDICINES.  CORRECT?

20   **A**    CORRECT.

21   **Q**    THAT'S WHAT WE HAD IN EFFECT PRIOR TO THIS

22   UNDERTAKING TO MODIFY THE LIST?

23   **A**    FOR YEARS.

24   **Q**    IS IT FAIR TO SAY THAT THERE WAS SOME --

25   THEY MENTIONED NONDIHYDROPYRIDINE CALCIUM CHANNEL

1  BLOCKERS.  WAS THERE SOME DISCUSSION BETWEEN YOU AND

2  DR. BARNES AS TO WHETHER OR NOT SOME OF THESE

3  MEDICINES SHOULD BE ON THE LIST?

4      **A**    YES, THERE WERE.

5      **Q**    AND WITH RESPECT TO NORVASC, WAS THERE A

6  FINAL DECISION AS TO WHETHER OR NOT THAT MEDICINE

7  SHOULD BE ON THE LIST?

8      **A**    THERE WAS.  BASED ON THE FACT THAT IT WAS A

9  DIHYDROPYRIDINE WITH MUCH OF ITS ACTIVITY ON THE

10 VASCULATURE VASODILATION EFFECT AND NOT SO MUCH

11 EFFECT ON THE HEART, THAT IT WAS TAKEN AWAY FROM THE

12 LIST BASED ON THAT.

13     **Q**    AND DR. BARNES COMPLETELY AGREED WITH THAT?

14     **A**    SHE DID.

15     **Q**    WHAT ABOUT THE ROBAXIN?  WAS THERE SOME

16 DISCUSSION AS TO WHETHER OR NOT THAT MEDICINE SHOULD

17 BE ON THE LIST?

18     **A**    YES.

19     **Q**    AND WAS THE FINAL DECISION THAT THERE WAS NO

20 NEED TO INCLUDE THAT ON THE LIST?

21     **A**    THE FINAL DECISION WAS THAT ROBAXIN, BASED

22 ON ITS LOW ANTICHOLINERGIC ACTIVITY, DID NOT NEED TO

23 BE ON THE LIST.

24     **Q**    THERE WAS SOME 75 MEDICINES ADDED TO THE

25 LIST.  ARE YOU AWARE OF THAT?

1       **A**    YES.

2       **Q**    AND THOSE ARE IN ADDITION TO THE ALREADY 22

3   PSYCHOTROPIC MEDICINES THAT WERE ALREADY ON THE LIST.

4   IS THAT CORRECT?

5       **A**    CORRECT.

6       **Q**    NOW, THERE'S SOME DISCUSSION ABOUT THE

7   MEDICAL CONDITIONS LIST.  SPECIFICALLY THERE WAS A

8   COMPLAINT THERE IS NO MENTION OF CORONARY ARTERY

9   DISEASE.  WHAT IS CORONARY ARTERY DISEASE?

10      **A**    IT'S A DISEASE OF THE VASCULATURE.  USUALLY

11  WHEN THEY TALK ABOUT THAT, THE HEART, THE VASCULATURE

12  OF THE HEART, BLOCKAGE IN YOUR ARTERIES; THAT KIND OF

13  THING.

14      **Q**    ACCUMULATION OF PLAQUE?

15      **A**    YES.

16      **Q**    AND WHEN THE ACCUMULATION OF PLAQUE GETS

17  SEVERE ENOUGH, IT'S CALLED ISCHEMIA.  CORRECT?

18      **A**    YES.  ANGINA, THAT'S -- UNSTABLE ANGINA,

19  ANGINA, CHEST PAIN; THAT KIND OF THING.

20      **Q**    AND ISCHEMIA IS THE COMPROMISE OF BLOOD

21  FLOW.  THE BLOCKAGE GETS SO SEVERE THAT YOU HAVE

22  ISCHEMIA?

23      **A**    YES.

24      **Q**    THAT ISCHEMIA IS ACTUALLY ON OUR MEDICAL

25  CONDITION LIST?

1    **A**    ISCHEMIC HEART DISEASE.

2    **Q**    AND, IN FACT, THE MENTION ABOUT DIABETES, WE

3    DO HAVE DIABETES ON OUR LIST IF THE BODY MASS INDEX

4    IS GREATER THAN 35.  IS THAT CORRECT?

5    **A**    THAT'S CORRECT.

6    **Q**    SO WHEN YOU'RE DEALING WITH AN OBESE

7    INDIVIDUAL, IF THAT OBESE INDIVIDUAL IS A DIABETIC,

8    THEN HE WOULD QUALIFY FOR A HEAT PRECAUTION DUTY

9    STATUS?

10    **A**    HE WOULD.

11    **Q**    ONCE WE ESTABLISHED THIS LIST OF SOME NEARLY

12    80 OR 90 MEDICINES, 33 MEDICAL CONDITIONS, WERE YOU

13    INVOLVED IN ANY WAY IN THE ISSUANCE OF THE HEAT

14    PRECAUTION DUTY STATUSES?

15    **A**    I WENT TO THE MEDICAL DIRECTORS AND WE WENT

16    OVER THE POLICY, WE WENT OVER HCP 8 WITH BOTH OF ITS

17    ATTACHMENTS AT ONE OF OUR MEETINGS, MEDICAL DIRECTOR

18    MEETING.  AFTER THAT MEETING, THEY WERE TASKED WITH

19    STARTING TO WORK ON THE -- ISSUING THE HEAT

20    PRECAUTION DUTY STATUSES, BECAUSE I WANT TO SAY WE

21    HAD PROBABLY THREE MONTHS BEFORE.  AND SO I CHECKED

22    ROUTINELY WITH ANGOLA.  I THINK THE LAST TIME I

23    CHECKED WITH ANGOLA THEY WERE OVER 1800 THAT THEY HAD

24    ALREADY DONE.  I'M SURE THEY'RE TO COMPLETION NOW.

25    BUT SURE, I WAS INVOLVED FROM THAT STANDPOINT.

1   Q   IN THAT THREE-MONTH PERIOD YOU HAD
2  IDENTIFIED -- OF THE 4,000 OR SO INMATES AT LSP, YOU
3  HAD IDENTIFIED EVERY INMATE THAT WAS TAKING ONE OF
4  THOSE MEDICATIONS -- THE 80 OR 90 MEDICATIONS THAT WE
5  DETERMINED WOULD ENABLE AN INDIVIDUAL TO GET A HEAT
6  PRECAUTION DUTY STATUS?

7   A   WELL, THOSE REPORTS WERE RUN THROUGH THE
8  PHARMACY.

9   Q   WHAT ABOUT THE MEDICAL CONDITIONS?  HOW WERE
10 WE ABLE TO DO THAT?

11   A   MOST OF THE MEDICAL CONDITIONS ON THE LIST,
12 THE DUTY STATUSES THAT ARE GIVEN TO THOSE INDIVIDUALS
13 FAR OUTWEIGH ANY HEAT PATHOLOGY DUTY STATUS.  IT
14 MAKES THEM OBSOLETE, TO BE HONEST WITH YOU.

15   Q   LET'S -- EXPLAIN THAT TO THE JUDGE.

16   A   THESE GENTLEMEN THAT HAVE THESE DISEASE
17 PROCESSES THAT ARE LISTED IN OUR EXCLUSION CRITERIA,
18 MANY OF THEM ARE IN OUR ASSISTED LIVING DORMS.  MANY
19 OF THEM ARE IN OUR INFIRMARIES.  THESE ARE NOT
20 GUYS -- MANY OF THEM HAVE WHEELCHAIRS, MANY OF THEM
21 HAVE WALKERS.  THESE ARE NOT GENTLEMEN THAT YOU'RE
22 GOING TO PUT IN THE FIELD.  YOU KNOW, THEY'RE JUST
23 NOT.

24       ANY MEDICAL PROFESSIONAL CAN LOOK AT A
25 PATIENT AND DETERMINE PHYSICALLY IF THEY'RE CAPABLE

1  OF GOING IN THE FIELD.  A HEAT PRECAUTION DUTY STATUS

2  FOR THEM HAS NO BEARING AT ALL.  NONE.

3      Q    SO THERE WOULD BE NO REASON TO ISSUE A HEAT

4  PRECAUTION DUTY STATUS FOR SOMEONE IN THAT CHRONIC

5  CONDITION?

6      A    THE DUTY STATUS THAT THEY WOULD BE GIVEN

7  WILL FAR OUT -- FOR EXAMPLE, THIS WOULD BE A TYPICAL

8  DUTY STATUS FOR ONE OF THOSE INDIVIDUALS:  OUT IN THE

9  FIELD, SIT TO WORK, NO LIFTING OVER 15 POUNDS, NO

10  PUSHING OR PULLING, WHEELCHAIR FOR LONG DISTANCE,

11  WALKER FOR DORMITORY.  THAT'S THE KIND OF DUTY STATUS

12  THEY WOULD BE GIVEN.

13      Q    HOW DO WE MONITOR THAT?  ARE THESE -- ARE

14  THE INMATES SEEN ON A REGULAR BASIS?

15      A    YEAH, THROUGH THE CLINICS.  YOU KNOW, THEY

16  COME TO THEIR REGULAR HEALTH CARE CLINICS.  AND THESE

17  DUTY STATUSES ARE UPDATED.  WE CAN ONLY GIVE A DUTY

18  STATUS FOR A YEAR AND IT NEEDS TO BE UPDATED.

19      Q    THEY'RE SEEN EVERY YEAR BY A HEALTH CARE

20  PRACTITIONER?

21      A    THOSE INDIVIDUALS ARE SEEN MORE THAN EVERY

22  YEAR.

23      Q    THANK YOU, DOCTOR.  THAT'S ALL THE QUESTIONS

24  I HAVE.

25          THE COURT:  ALL RIGHT.  ANY REDIRECT?

1          **REDIRECT EXAMINATION**

2  BY MR. BENJAMIN:

3      **Q**    DR. LAVESPERE, YOU RECALL JUST BEING ASKED

4  ABOUT WHETHER HCP 8 APPLIES TO ALL D.O.C. FACILITIES?

5      **A**    YES.

6      **Q**    AND MR. BLANCHFIELD WAS SAYING THAT IT WOULD

7  HAVE RAMIFICATIONS BEYOND THE FARM LINE IF THERE WAS

8  SOMETHING ADDITIONAL IN HCP 8?

9      **A**    YES.

10     **Q**    IF THERE WERE ADDITIONAL PROTECTIONS IN HCP

11  8, IT WOULD APPLY TO THE FARM LINE.  RIGHT?

12     **A**    CAN YOU GIVE ME AN EXAMPLE?

13     **Q**    SURE.  IF HCP 8 SAID THAT THE HEAT ALERT

14  SHOULD BE ISSUED AT A HEAT INDEX OF 88, IT WOULD

15  APPLY TO THE FARM LINE.  RIGHT?

16     **A**    IT WOULD -- IT WOULD APPLY TO THE FARM LINE.

17     **Q**    AND LSP COULD HAVE, HAD IT CHOSEN TO,

18  WRITTEN A DIRECTIVE THAT WAS GEARED SPECIFICALLY TO

19  THE FARM LINE.  RIGHT?

20     **A**    THEY COULD HAVE IF THEY WANTED TO, YES.

21     **Q**    THEY COULD HAVE INCLUDED SPECIFIC PROVISIONS

22  APPLICABLE TO THE FARM LINE IN LSP DIRECTIVE 130.67.

23  RIGHT?

24     **A**    THEY COULD HAVE.

25     **Q**    AND THEY DIDN'T.  RIGHT?

1      **A**    THEY DID NOT.

2      **Q**    WHEN YOU WERE RESPONDING TO THIS LAWSUIT,

3  D.O.C. CHOSE TO REVISE HCP 8 FIRST.  RIGHT?

4      **A**    YES.

5      **Q**    IN FACT, DR. KELDIE AND DR. BARNES WERE

6  NEVER SHOWN LSP DIRECTIVE 13.067.  THEY WERE SHOWN

7  HCP 8.  RIGHT?

8      **A**    I DON'T KNOW WHAT THEY WERE SHOWN.  THEY

9  ASKED FOR ALL DOCUMENTS.  I DON'T KNOW WHAT DOCUMENTS

10  THEY WERE GIVEN.

11     **Q**    MR. BLANCHFIELD WAS ASKING YOU ABOUT THERE

12  BEING OTHER POLICIES WITH RESPECT TO CUPS, FOR

13  EXAMPLE.  RIGHT?  DO YOU REMEMBER THAT?

14     **A**    YES.

15     **Q**    DO THOSE POLICIES SAY THAT CLEAN CUPS MUST

16  BE AVAILABLE ON THE FARM LINE EVERY DAY?

17     **A**    I WOULD HAVE TO READ THEM TO SEE WHAT THEY

18  SAY.  BUT I DON'T KNOW RIGHT OFF THE TOP OF MY HEAD.

19     **Q**    DO THEY -- DO THE PROVISIONS AROUND GLOVES

20  SAY THAT GLOVES HAVE TO BE AVAILABLE ON THE FARM LINE

21  EVERY DAY?

22     **A**    I THINK THEY DO SAY THAT.

23     **Q**    YOU THINK THEY SAY -- YOU DON'T REMEMBER

24  WHAT THE POLICY SAID BUT YOU THINK THEY SAY THAT?

25     **A**    I KNOW, SINCE WE'VE STARTED THIS FARM LINE

 1  CASE, THAT GLOVES HAVE BEEN AVAILABLE EVERY DAY TO

 2  THE FARM LINE.

 3      Q    I'M REFERRING TO THE POLICY THAT --

 4      A    YEAH, I DON'T KNOW.

 5      Q    -- MR. BLANCHFIELD WAS REFERENCING.

 6      A    I WOULD NOT BE --

 7      Q    SAME QUESTION --

 8          **THE REPORTER:**  I'M SORRY.  I DIDN'T GET YOUR

 9  ANSWER.

10          **THE WITNESS:**  I WOULD NOT BE ABLE TO TELL

11  YOU ABOUT THE POLICY.

12  **BY MR. BENJAMIN:**

13      Q    AND YOU DON'T REMEMBER WHAT THE POLICIES SAY

14  ABOUT SUN HATS OR ANY OF THE REST OF THAT.  RIGHT?

15      A    I DO NOT.

16      Q    YOU WERE TALKING ABOUT GOING THROUGH THE

17  LIST OF MEDICATIONS THAT DR. BARNES HAD PROPOSED.  DO

18  YOU REMEMBER THAT --

19      A    YES.

20      Q    -- TESTIMONY?

21          YOU'RE NOT AN EXPERT IN THERMOREGULATION.

22  RIGHT?

23      A    I'M NOT.

24          **MR. BENJAMIN:**  ALL RIGHT.  NO FURTHER

25  QUESTIONS.

1          **THE COURT:** OKAY. THANK YOU.

2               NOW, MR. BLANCHFIELD, I BELIEVE THAT

3    DR. LAVESPERE WAS ON THE DEFENSE WITNESS LIST AS

4    WELL. CORRECT?

5          **MR. BLANCHFIELD:** YES, YOUR HONOR. BUT --

6          **THE COURT:** IS IT YOUR INTENTION TO CALL

7    HIM?

8          **MR. BLANCHFIELD:** NO, SIR.

9          **THE COURT:** SO AS I UNDERSTAND IT THEN,

10   DR. LAVESPERE COULD BE -- MAY BE RELEASED AT THIS

11   POINT. HIS TESTIMONY WILL NOT BE REQUIRED BY YOU AT

12   THIS -- OR IN ANY WAY FOR THE REMAINDER OF THIS

13   HEARING. CORRECT?

14         **MR. BLANCHFIELD:** THAT'S CORRECT, YOUR

15   HONOR.

16         **THE COURT:** THANK YOU.

17              DR. LAVESPERE, GOOD TO SEE YOU AGAIN.

18         **THE WITNESS:** GOOD TO SEE YOU, SIR.

19         **THE COURT:** THANKS FOR COMING ON IN. AND

20   YOU ARE NOW EXCUSED, SIR.

21         **THE WITNESS:** THANK YOU, SIR.

22         **THE COURT:** ALL RIGHT. COUNSEL FOR THE

23   PLAINTIFF MAY CALL THEIR NEXT WITNESS.

24         **MR. SABATER:** YOUR HONOR, RICARDO SABATER

25   FOR THE PLAINTIFFS.

1              WE CALL DEPUTY WARDEN ASHLI OLIVEAUX.

2              AND, YOUR HONOR, MAY I APPROACH?  WE

3   HAVE EXHIBITS AS WELL TO HAND OUT FOR THE BENCH.

4         **THE COURT:**  YES.  OKAY.

5         **(WHEREUPON, ASHLI OLIVEAUX, BEING DULY**

6   **SWORN, TESTIFIED AS FOLLOWS.)**

7         **THE COURTROOM DEPUTY:**  CLEARLY STATE AND

8   SPELL YOUR NAME FOR THE RECORD.

9         **THE COURT:**  YOU MAY BE SEATED.

10        **THE WITNESS:**  ASHLI OLIVEAUX.  A-S-H-L-I,

11  O-L-I-V-E-A-U-X.

12        **MR. SABATER:**  YOUR HONOR, MAY I PROCEED?

13        **THE COURT:**  YOU MAY PROCEED.

14                   **DIRECT EXAMINATION**

15  BY MR. SABATER:

16     **Q**   GOOD AFTERNOON, MS. OLIVEAUX.

17     **A**   GOOD AFTERNOON.

18     **Q**   IT'S GOOD TO SEE YOU.

19         MS. OLIVEAUX, YOU'RE CURRENTLY THE DEPUTY

20  WARDEN OF QUALITY MANAGEMENT AND ASSURANCE AT LSP.

21  CORRECT?

22     **A**   YES.

23     **Q**   AND YOU'VE HELD THAT POSITION SINCE ABOUT

24  MARCH OF '22.  IS THAT RIGHT?

25     **A**   YES.

1    **Q**   AS DEPUTY WARDEN OF QUALITY MANAGEMENT AND
2  ASSURANCE, YOU OVERSEE THE MEDICAL DEPARTMENT.
3  RIGHT?

4    **A**   YES.

5    **Q**   AND THE FIRE/EMS DEPARTMENT?

6    **A**   YES.

7    **Q**   AND THE LEGAL DEPARTMENT?

8    **A**   YES.

9    **Q**   AND AS THE LSP ADA COORDINATOR, YOU ARE
10 RESPONSIBLE FOR ENSURING THAT LSP'S POLICIES AND
11 PRACTICES COMPLY WITH THE AMERICANS WITH DISABILITIES
12 ACT.  CORRECT?

13   **A**   YES.

14   **Q**   MS. OLIVEAUX, D.O.C. ISSUES WRITTEN POLICIES
15 KNOWN AS DEPARTMENTAL REGULATIONS.  IS THAT RIGHT?

16   **A**   CORRECT.

17   **Q**   AND THOSE DEPARTMENTAL REGULATIONS BROADLY
18 STATE WHAT NEEDS TO BE FOLLOWED AT THE INSTITUTIONAL
19 LEVEL; IN THIS CASE LSP.  CORRECT?

20   **A**   YES.

21   **Q**   ONCE D.O.C. ISSUES A DEPARTMENTAL
22 REGULATION, EACH INSTITUTION WITHIN D.O.C. CREATES
23 ITS OWN POLICIES AND PROCEDURES THAT MUST COMPLY WITH
24 THE DEPARTMENTAL REGULATION.  RIGHT?

25   **A**   YES.

1    **Q**    AND THE POLICIES ISSUED BY LSP THAT ADHERE

2   TO THOSE DEPARTMENTAL REGULATIONS ARE CALLED LSP

3   DIRECTIVES.   CORRECT?

4    **A**    YES.

5    **Q**    MS. OLIVEAUX, AS DEPUTY WARDEN OF QUALITY

6   MANAGEMENT AND ASSURANCE AT LSP, YOU'RE RESPONSIBLE

7   FOR ENSURING THAT LSP'S DIRECTIVES COMPLY WITH

8   D.O.C.'S DEPARTMENTAL REGULATIONS.   CORRECT?

9    **A**    YES.

10    **Q**    MS. OLIVEAUX, ALL MEN INCARCERATED AT LSP

11   ARE SUBJECT TO DEPARTMENTAL REGULATIONS ISSUED BY

12   D.O.C.   CORRECT?

13    **A**    WHAT DO YOU MEAN BY THAT?

14    **Q**    I MEAN ALL DEPARTMENTAL REGULATIONS APPLY TO

15   MEN INCARCERATED AT LSP.

16    **A**    IT APPLIES TO EVERYBODY AT LSP, EMPLOYEES

17   AND THE OFFENDERS AS WELL AS --

18          **THE REPORTER:**  I'M SORRY.

19          **THE WITNESS:**  OH, I'M SORRY.

20   **BY THE WITNESS:**

21    **A**    IT WOULD APPLY TO INDIVIDUALS WORKING THERE,

22   VISITORS, THE OFFENDERS.   IT JUST DEPENDS ON WHAT THE

23   DEPARTMENTAL REG IS.

24    **Q**    UNDERSTOOD.

25          AND THE STATEMENT IS TRUE FOR ALL LSP

1  DIRECTIVES.  CORRECT?

2      **A**   YES.

3      **Q**   MS. OLIVEAUX, YOU'RE FAMILIAR WITH THE

4  INTAKE PROCESS AT LSP GENERALLY?

5      **A**   YES.

6      **Q**   AND ALL MEN SENTENCED TO LSP UNDERGO THE

7  SAME INTAKE PROCESS.  RIGHT?

8      **A**   AT LSP, YES, THEY DO.

9      **Q**   AND ALL MEN INCARCERATED AT LSP RECEIVE A

10  COPY OF THE OFFENDER ORIENTATION INFORMATION MANUAL

11  AT INTAKE.  CORRECT?

12     **A**   YES.

13     **Q**   AND IT'S TRUE, ISN'T IT, THAT ALL NEW INTAKE

14  OFFENDERS ARRIVING AT LOUISIANA STATE PENITENTIARY

15  ARE REQUIRED TO WORK IN THE FIELD/FARM LINE FOR AT

16  LEAST SIX MONTHS SUBJECT TO MEDICAL AND MENTAL HEALTH

17  CLEARANCE?

18     **A**   THAT IS NOT A TRUE STATEMENT, TO THE BEST OF

19  MY KNOWLEDGE.

20     **Q**   CAN WE PULL UP -- IF YOU COULD REFER TO TAB

21  1 IN YOUR BINDER AND PULL UP JX21 AND GO TO PAGE 28.

22         **THE COURT:**  WARDEN, DO YOU SEE THAT ON YOUR

23  SCREEN, MA'AM?

24         **THE WITNESS:**  YES, SIR.

25         **THE COURT:**  THANK YOU.

1  BY MR. SABATER:

2      **Q**    I'M QUOTING HERE WHAT'S BEEN ADMITTED AS

3  JX21: "ALL NEW INTAKE OFFENDERS ARRIVING AT

4  LOUISIANA STATE PENITENTIARY ARE REQUIRED TO WORK IN

5  THE FIELD/FARM LINE (LARGE VEGETABLE GARDENS/FIELD)

6  FOR AT LEAST SIX MONTHS, SUBJECT TO MEDICAL AND

7  MENTAL HEALTH CLEARANCE."  DO YOU SEE THAT?

8      **A**    YES.

9      **Q**    AND IT'S YOUR TESTIMONY HERE TODAY THAT THAT

10  STATEMENT IN THIS POLICY IS NO LONGER ACCURATE?

11      **A**    IF IT'S STATED IN THE POLICY, THEN IT IS.  I

12  WASN'T AWARE THAT IT WAS PRACTICED.

13      **Q**    OKAY.  SO YOU RECOGNIZE THAT IT'S STATED

14  HERE IN THE POLICY?

15      **A**    IF THIS IS THE POLICY FROM LOUISIANA STATE

16  PENITENTIARY, THEN YES.  I DON'T SEE ANY POLICY

17  NUMBERS ON THE SCREEN.

18      **Q**    THIS WAS PRODUCED BY DEFENDANTS AS VITTORIO

19  EMAILS 0019325.  SO I WILL REPRESENT TO YOU IT WAS

20  PRODUCED IN THIS LITIGATION.

21      **A**    OKAY.

22      **Q**    HERE IS THE COVER PAGE FOR YOUR REFERENCE.

23  DO YOU SEE THAT ON YOUR SCREEN?

24      **A**    YES.

25      **Q**    DO YOU RECOGNIZE THIS DOCUMENT?

1      **A**    I RECOGNIZE THE COVER PAGE, YES.

2      **Q**    AND YOU SEE THE TITLE IS "THE CLASSIFICATION

3    DEPARTMENT"; "LOUISIANA STATE PENITENTIARY" DATED MAY

4    2020?

5      **A**    YES.

6      **Q**    MS. OLIVEAUX, LSP DIRECTIVE NO. 13.063 SETS

7    FORTH THE DUTY STATUS CLASSIFICATION SYSTEM.

8    CORRECT?

9      **A**    I'M NOT -- I DON'T KNOW THE NUMBER OFF THE

10    TOP OF MY HEAD, BUT WE DO HAVE ONE THAT HAS DUTY

11    STATUSES.  THIS IS IT.

12      **Q**    IF IT'S HELPFUL TO YOU, IF YOU TURN TO TAB 2

13    IN YOUR BINDER -- IT'S BEEN ADMITTED AS JX43 -- DO

14    YOU SEE THAT IN FRONT OF YOU?

15      **A**    YES.

16      **Q**    AND DO YOU RECOGNIZE THAT AS LSP DIRECTIVE

17    13.063?

18      **A**    YES.

19      **Q**    AND THAT POLICY SETS FORTH THE DUTY STATUS

20    CLASSIFICATION SYSTEM.  CORRECT?

21      **A**    YES.

22      **Q**    AND JUST FOR CLARIFICATION, THE DUTY STATUS

23    CLASSIFICATION OR DUTY STATUS REGULATES THE TYPE OF

24    WORK AN INCARCERATED PERSON CAN DO AT LSP BASED ON

25    ANY MEDICAL CONDITIONS OR PHYSICAL LIMITATIONS OF

1    THAT INDIVIDUAL.  RIGHT?

2        **A**    YES.

3        **Q**    DUTY STATUSES ARE INTENDED TO PROTECT THE

4    HEALTH AND SAFETY OF THE INDIVIDUALS INCARCERATED AT

5    LSP.  WOULD YOU AGREE WITH THAT?

6        **A**    YES.

7        **Q**    SO YOU AGREE THAT IF SOMEONE WITH A

8    DISABILITY IS NOT PROPERLY IDENTIFIED AND ASSIGNED A

9    DUTY STATUS, IT CAN POSE A HEALTH AND/OR SAFETY RISK

10   TO THAT PERSON?

11       **A**    REPEAT YOURSELF, PLEASE.

12       **Q**    SURE.  YOU WOULD AGREE THAT IF SOMEONE WITH

13   A DISABILITY IS NOT PROPERLY IDENTIFIED AND ASSIGNED

14   A DUTY STATUS, IT CAN POSE A HEALTH AND/OR SAFETY

15   RISK TO THAT PERSON?

16       **A**    YES, IT COULD.

17       **Q**    OKAY.  AND LSP DIRECTIVE NO. 13.063 DEFINES

18   EACH DUTY STATUS.  CORRECT?

19       **A**    YES.

20       **Q**    AND THAT INCLUDES A HEAT PRECAUTION DUTY

21   STATUS?

22       **A**    YES.

23       **Q**    AND ALL MEN INCARCERATED AT LSP ARE SUBJECT

24   TO LSP DIRECTIVE NO. 13.063.  CORRECT?

25       **A**    YES.

1    Q    AND THAT INCLUDES ANYONE THAT IS CURRENTLY
2  ASSIGNED OR MAY BE ASSIGNED TO THE FARM LINE.  RIGHT?
3    A    ALL OFFENDERS, YES.
4    Q    IF YOU TURN TO TAB 3 IN YOUR BINDER -- IT'S
5  BEEN ADMITTED AS JX42, DEPARTMENTAL REGULATION NO.
6  HCP 37 -- DO YOU RECOGNIZE THIS DOCUMENT?
7    A    YES.
8    Q    AND THE PURPOSE OF THIS DEPARTMENTAL
9  REGULATION, NO. HCP 37, IS TO ENSURE COMPLIANCE WITH
10 THE ADA AS IT PERTAINS TO INCARCERATED PERSONS WITH
11 DISABILITIES.  CORRECT?
12   A    YES.
13   Q    AND IT PROVIDES THE FORMAL PROCEDURES FOR
14 ALL MEN INCARCERATED AT LSP TO REQUEST AN
15 ACCOMMODATION BASED ON AN ADA QUALIFYING DISABILITY.
16 CORRECT?
17   A    YES.
18   Q    AND HCP 37 INCLUDES THE DEFINITION OF
19 DISABILITY.  RIGHT?
20   A    YES, IT DOES.
21   Q    AND HCP 37 ALSO DEFINES DISABILITY AS A
22 PHYSICAL OR MENTAL IMPAIRMENT AFFECTING ONE OR MORE
23 BODY SYSTEMS.  CORRECT?
24   A    IT ACTUALLY DEFINES IT UNDER LETTER E AS A
25 PHYSICAL OR MENTAL IMPAIRMENT, AND THEN IT BREAKS IT

1    DOWN INTO DIFFERENT CATEGORIES.

2        **Q**    YOU ARE CORRECT.  AND IT'S HERE DISPLAYED ON

3    THE SCREEN, AND I CAN READ.  IT SAYS, "A

4    PHYSIOLOGICAL DISORDER, OR CONDITION, COSMETIC

5    DISFIGUREMENT, OR ANATOMICAL LOSS AFFECTING ONE MORE

6    OF THE FOLLOWING BODY SYSTEMS."  AND IT LISTS A

7    NUMBER OF BODY SYSTEMS.  CORRECT?

8        **A**    THAT'S CORRECT.

9        **Q**    AND THOSE BODY SYSTEMS REFERENCED IN HCP

10   37'S DEFINITION INCLUDES NEUROLOGICAL, RESPIRATORY,

11   CARDIOVASCULAR, HEMIC, LYMPHATIC, SKIN AND ENDOCRINE

12   SYSTEMS.  CORRECT?

13       **A**    YES.

14       **Q**    AND HCP 37 ALSO INCLUDES EXAMPLES OF WHAT

15   CONSTITUTES A MAJOR LIFE ACTIVITY.  RIGHT?

16       **A**    CORRECT.

17       **Q**    AND THOSE EXAMPLES THAT ARE LISTED HERE ON

18   SECTION G WHICH ARE ILLUSTRATIVE INCLUDE WALKING,

19   SEEING, HEARING, BREATHING, BENDING, LEARNING,

20   THINKING, WORKING AND REPRODUCTION AND SO FORTH?

21       **A**    YES.

22       **Q**    AND AGAIN, THESE EXAMPLES LISTED HERE ARE

23   ONLY ILLUSTRATIVE.  RIGHT?

24       **A**    YES.

25       **Q**    SO IT CAN INCLUDE OTHER ACTIVITIES?

1    **A**    IT COULD.

2    **Q**    OKAY.  AND SO PUTTING THIS TOGETHER, HCP 37

3    DEFINES DISABILITY AS A PHYSICAL OR MENTAL IMPAIRMENT

4    THAT SUBSTANTIALLY LIMITS ONE OR MORE MAJOR LIFE

5    ACTIVITY.  YES?

6    **A**    CORRECT.

7    **Q**    AND THIS IS THE DEFINITION THAT YOU REFER TO

8    WHEN YOU'RE CARRYING OUT YOUR RESPONSIBILITIES AS

9    DEPUTY WARDEN AND LSP'S ADA COORDINATOR.  RIGHT?

10   **A**    YES.  THIS IS THE POLICY -- DEPARTMENTAL REG

11   THAT I USE, YES.

12   **Q**    AND YOU RELY ON THE DEFINITION THAT'S

13   CONTAINED IN THIS DEPARTMENTAL REGULATION?

14   **A**    YES, I USE THE DEFINITIONS.

15   **Q**    OKAY.  MS. OLIVEAUX, IF YOU'RE NOT SURE

16   WHETHER A MEDICAL CONDITION QUALIFIES AS A DISABILITY

17   UNDER THE ADA, YOU WOULD CONSULT DEPUTY ASSISTANT

18   SECRETARY SPEARS, WHO IS THE ADA DIRECTOR FOR THE

19   ENTIRETY OF D.O.C.  RIGHT?

20   **A**    YES.

21   **Q**    AND MS. SPEARS IS YOUR BOSS?

22   **A**    NO, SHE IS NOT.

23   **Q**    DO YOU REPORT TO MS. SPEARS?

24   **A**    NO, I DO NOT.

25   **Q**    HAS THAT CHANGED SINCE WE LAST SPOKE IN JULY

1  OF 2024?

2  **A**  NO.  I REPORT TO THE WARDEN AT LOUISIANA

3  STATE PENITENTIARY.

4  **Q**  BUT IF YOU'RE UNSURE WHETHER A CONDITION

5  QUALIFIES AS A ADA-QUALIFYING DISABILITY, MS. SPEARS

6  WOULD BE THE FIRST PERSON YOU WOULD REACH OUT TO

7  ABOUT THAT?

8  **A**  YES, BECAUSE SHE IS THE DEPARTMENT'S

9  HEADQUARTER ADA COORDINATOR.

10  **Q**  OKAY.  MS. OLIVEAUX, YOU ARE FAMILIAR WITH

11  THE TERM "THERMOREGULATION."  CORRECT?

12  **A**  I'VE HEARD THE TERM, YES.

13  **Q**  WE DISCUSSED IT BACK IN JULY OF '24?

14  **A**  YES.

15  **Q**  YOU WERE ASKED ABOUT IT AGAIN IN FEBRUARY OF

16  '25?

17  **A**  YES.

18  **Q**  AND THAT TERM "THERMOREGULATION" REFERS TO

19  THE PHYSIOLOGICAL FUNCTION OF THE BODY TO REGULATE

20  THE INTERNAL BODY TEMPERATURE.  RIGHT?

21  **A**  THAT'S THE DEFINITION THAT Y'ALL TOLD ME IN

22  THE PAST.

23  **Q**  DO YOU HAVE ANY REASON TO HAVE A DIFFERENT

24  DEFINITION OTHER THAN THAT ONE?

25  **A**  I DON'T.

1    **Q**    MS. OLIVEAUX, DEPUTY ASSISTANT SECRETARY

2    SPEARS, WHO SERVED AS A 30(B)(6) WITNESS IN THIS

3    CASE, TESTIFIED THAT SHE WOULD CONSIDER

4    THERMOREGULATION TO BE A MAJOR LIFE ACTIVITY.  YOU

5    DON'T DISAGREE WITH HER, DO YOU?

6    **A**    I'M NOT FAMILIAR WITH THAT.  AGAIN, THAT

7    WOULD BE SOMETHING THAT, LIKE I SAID IN MY

8    DEPOSITION, THAT I WOULD HAVE TO CONSULT WITH HER

9    BECAUSE THAT'S -- I'M NOT AN EXPERT ON ANYTHING LIKE

10   THERMOREGULATION OF TEMPERATURES OR ANYTHING LIKE

11   THAT.

12   **Q**    BUT YOU WOULD CONSULT WITH MS. SPEARS ON A

13   QUESTION LIKE THAT?

14   **A**    YES, I WOULD.

15   **Q**    AND YOU DON'T HAVE ANY REASON TO DISAGREE,

16   AS I JUST REPRESENTED HERE, THAT MS. SPEARS HAD

17   TESTIFIED THAT SHE WOULD CONSIDER THERMOREGULATION TO

18   BE A MAJOR LIFE ACTIVITY?

19   **A**    IF THAT'S WHAT SHE SAYS IS A MAJOR LIFE

20   ACTIVITY, THEN THAT'S WHAT IT IS.  BUT I WOULD HAVE

21   TO CONSULT HER.  I'VE NEVER BEEN PUT IN A SITUATION

22   TO BE ASKED TO CONSULT HER OF THAT.

23   **Q**    AND MS. SPEARS FURTHER TESTIFIED THAT THE

24   DEFINITION OF "DISABILITY" UNDER --

25        **THE REPORTER:**  SIR, YOU'RE GOING TO HAVE TO

1  SLOW DOWN, PLEASE.

2        **MR. SABATER:**  SURE.  I'M SORRY ABOUT THAT.

3  I WILL REPEAT MY QUESTION.

4  **BY MR. SABATER:**

5     **Q**   MS. SPEARS FURTHER TESTIFIED THAT THE

6  DEFINITION OF "DISABILITY" UNDER HCP 37 INCLUDES A

7  PERSON WHOSE ABILITY TO THERMOREGULATE IS INHIBITED.

8  AND YOU WOULDN'T AGREE -- YOU WOULD AGREE WITH MS.

9  SPEARS.  RIGHT?

10    **A**   I CANNOT SAY THAT I WOULD A HUNDRED PERCENT

11 AGREE BECAUSE I'VE NEVER BEEN PLACED IN THAT

12 SITUATION.  AGAIN, THAT IS SOMETHING THAT I'D HAVE TO

13 RESEARCH AND REACH OUT TO MS. SPEARS.  SO I DON'T

14 WANT TO SAY THAT I AGREE TO SOMETHING THAT I HAVE NO

15 KNOWLEDGE OF OR HAVE RESEARCHED.  BUT I WOULD REACH

16 OUT TO HER FOR ADVICE.  AND THEN IF I WASN'T SURE,

17 THEN I WOULD ASK THE PHYSICIAN'S OPINION.

18    **Q**   OKAY.  AND I ASKED YOU ABOUT THIS

19 THERMOREGULATION IN PARTICULAR IN JULY OF '24?

20    **A**   UH-HUH.

21    **Q**   AND IN FEBRUARY OF '25 YOU WERE ASKED ABOUT

22 IT AGAIN?

23    **A**   YES.

24    **Q**   YOU HAVE NOT YET HAD A CONVERSATION WITH MS.

25 SPEARS AS TO WHETHER THERMOREGULATION --

1          **MR. SABATER:**  SLOW DOWN?

2          **THE REPORTER:**  YOU ARE GOING WAY TOO FAST.

3          **MR. SABATER:**  I'M SORRY ABOUT THAT.

4          **THE REPORTER:**  YOU HAVE NOT YET HAD A

5   CONVERSATION WITH MS. SPEARS AS TO WHETHER

6   THERMOREGULATION?

7          **MR. SABATER:**  QUALIFIES OR CONSTITUTES A

8   DISABILITY UNDER THE ADA.

9   **BY THE WITNESS.**

10     **A**    I'VE HAD NO REASON TO HAVE THAT CONVERSATION

11  WITH HER.  I HAVE NOT HAD A REQUEST FOR AN ADA

12  ACCOMMODATION FOR THERMOREGULATION OR TEMPERATURE OF

13  ANY NATURE LIKE THAT SORT.

14     **Q**    AND DEPARTMENTAL REGULATION NO. HCP 37 SETS

15  FORTH THE PROCEDURE FOR PERSONS WITH ADA-QUALIFYING

16  DISABILITIES TO REQUEST ACCOMMODATIONS FOR THEIR

17  DISABILITY OR DISABILITIES.  CORRECT?

18     **A**    YES.

19     **Q**    ACCORDING TO THE POLICY, INCARCERATED

20  PERSONS CAN MAKE A REQUEST FOR AN ACCOMMODATION

21  VERBALLY, IN WRITING, AND BY SUBMITTING A

22  ADMINISTRATIVE REMEDY PROCEDURE, ALSO KNOWN AS AN

23  ARP?

24     **A**    CORRECT.

25     **Q**    HCP 37 INCLUDES THE DEFINITION OF

1   "REASONABLE ACCOMMODATIONS."  RIGHT?

2       **A**    YES.

3       **Q**    THAT'S ON PAGE 5 OF YOUR -- YEAH.  AND THIS

4   DEFINITION YOU REFERRED TO IS -- EXCUSE ME.  START

5   OVER.

6           THIS IS THE DEFINITION YOU REFER TO WHEN

7   YOU'RE EVALUATING WHETHER TO PROVIDE A REASONABLE

8   ACCOMMODATION UPON REQUEST?

9       **A**    YES.

10      **Q**    AND REASONABLE ACCOMMODATION UNDER THE ADA

11  CAN INCLUDE AN ADJUSTMENT OF A PERSON'S DUTY STATUS.

12  CORRECT?

13      **A**    AN ADJUSTMENT CAN BE MADE IF NEEDED, YES.

14      **Q**    AND THAT WOULD CONSTITUTE A REASONABLE

15  ACCOMMODATION?

16      **A**    IT COULD, YES.

17      **Q**    IF YOU'D TURN TO TAB 4 IN YOUR BINDER.

18  HEALTH CARE POLICY NO. 8, OR HCP 8 WHICH WE'VE BEEN

19  DISCUSSING, IS A D.O.C. POLICY THAT IS INTENDED TO

20  SET FORTH THE PROVISIONS TO REDUCE HEAT PATHOLOGY AND

21  TO REDUCE THE EXPOSURE TO INCARCERATED PERSONS

22  IDENTIFIED AS MORE VULNERABLE TO HEAT.  CORRECT?

23      **A**    CORRECT.

24      **Q**    AND EARLIER THIS YEAR DEFENDANTS DESIGNATED

25  YOU TO TESTIFY ON BEHALF OF D.O.C. CONCERNING THE

1  IMPLEMENTATION OF THE MODIFICATIONS TO HCP 8.

2  CORRECT?  AT LSP.  EXCUSE ME.

3       **A**    CORRECT.

4       **Q**    AND HCP 8 INCLUDES AN ATTACHMENT A?

5       **A**    CORRECT.

6       **Q**    AND THAT ATTACHMENT A IS TITLED "HEAT

7  PATHOLOGY MEDICATIONS."  RIGHT?

8       **A**    I JUST WANT TO MAKE SURE THAT'S THE RIGHT

9  ATTACHMENT.

10      **Q**    I THINK IT WILL BE PAGE 8 OF YOUR BINDER.

11      **A**    YES.  IT SAYS HEAT PATHOLOGY MEDICATIONS IS

12  A.

13      **Q**    OKAY.  AND ATTACHMENT A INCLUDES A LIST OF

14  MEDICATIONS THAT MAY MAKE A PERSON MORE SUSCEPTIBLE

15  TO HEAT.  CORRECT?

16      **A**    CORRECT.

17      **Q**    AND ATTACHMENT A WAS REVISED IN NOVEMBER OF

18  '24?

19      **A**    YES.

20      **Q**    AND IF A PERSON -- EXCUSE ME.  IF A PERSON

21  TAKES ONE OF THE MEDICATIONS ON THE LIST, THEN YOU

22  WOULD AUTOMATICALLY -- THEY WOULD AUTOMATICALLY

23  RECEIVE A HEAT PRECAUTION DUTY STATUS.  IS THAT

24  CORRECT?

25      **A**    SO --

1      Q    UNLESS THEY OPT OUT?

2      A    YES.  YES.  THEY WOULD BE EDUCATED AT THE

3  TIME OF THE VISIT, AND THEN THEY WOULD HAVE -- ABOUT

4  HEAT PRECAUTIONS.  THEN THEY WOULD HAVE THE OPTION TO

5  OPT OUT, YES.

6      Q    IF THERE ARE OTHER MEDICATIONS THAT ARE NOT

7  INCLUDED ON ATTACHMENT A, THEN A PERSON INCARCERATED

8  AT LSP WOULD NOT RECEIVE A HEAT PRECAUTION DUTY

9  STATUS BASED ON THAT MEDICATION IF IT'S NOT INCLUDED

10  ON ATTACHMENT A?

11      A    SO I BELIEVE THAT WOULD BE BEST LEFT UP TO

12  THE DESCRIPTION OF THE HEALTH CARE PROVIDER PROVIDING

13  CARE FOR THEM.  IF THEY FELT THAT IT WAS NEEDED, THEN

14  THEY CAN OBVIOUSLY WRITE THE DUTY STATUS FOR THEM OR

15  CONSULT THE MEDICAL DIRECTOR FOR THE DEPARTMENT.  BUT

16  THIS LIST WAS THE LIST THAT WAS CAME UP BY OUR

17  MEDICAL DIRECTOR FOR OUR DEPARTMENT, SO --

18      Q    AND IF SOMEONE IS TAKING A MEDICATION THAT

19  IS NOT ON THAT LIST, THEY WOULD NOT AUTOMATICALLY

20  RECEIVE A HEAT PROTECTION DUTY STATUS?

21      A    REPEAT YOURSELF.

22      Q    SURE.  IF A PERSON INCARCERATED AT LSP IS

23  NOT TAKING THE MEDICATION THAT IS ON ATTACHMENT A,

24  THEY WOULD NOT AUTOMATICALLY RECEIVE A HEAT

25  PROTECTION DUTY STATUS?

1      **A**    NOT NECESSARILY, NO.

2      **Q**    AND ATTACHMENT A DOES NOT INCLUDE A

3   SEROTONIN REUPTAKE INHIBITOR, ALSO KNOWN AS AN SSRI.

4   CORRECT?

5      **A**    I WOULD HAVE TO REVIEW THE WHOLE ATTACHMENT.

6      **Q**    DO YOU HAVE ANY RECOLLECTION OF WHETHER

7   SSRIs WERE CONSIDERED OR ADDED TO ATTACHMENT A DURING

8   THE REVISION PROCESS?

9      **A**    NO, I DO NOT.

10     **Q**    IF SSRIs ARE NOT INCLUDED ON THE -- EXCUSE

11  ME.  ACTUALLY, ONE MOMENT.

12           TO YOUR KNOWLEDGE, IS THERE A POLICY AT LSP

13  THAT WOULD GRANT A PERSON TAKING AN SSRI WITH A HEAT

14  PRECAUTION DUTY STATUS ON THE BASIS OF THEIR TAKING

15  AN SSRI?

16     **A**    A DUTY STATUS IS GIVEN BASED OFF OF THE

17  OPINION OF THE PROVIDER.  THE PROVIDER HAS TO GIVE

18  THE DUTY STATUS.  I FEEL LIKE THAT IF THE PROVIDER

19  FELT THAT ANYONE FOR ANY REASON NEEDED A HEAT

20  PATHOLOGY DUTY STATUS, THEN THEY WOULD WRITE IT --

21  WRITE THEM ONE NO MATTER IF THE MEDICATION WAS ON THE

22  LIST OR NOT.

23     **Q**    AND AS OF THE DATE OF YOUR LAST DEPOSITION

24  ON FEBRUARY 12, 2025, LSP IDENTIFIED 1500 PEOPLE

25  TAKING MEDICATIONS LISTED ON THE REVISED ATTACHMENT

A.   THAT'S ACCURATE?

    **A**    APPROXIMATELY 1500, YES.

    **Q**    AND HCP 8 ALSO INCLUDES AN ATTACHMENT B
TITLED "MEDICAL EXCLUSION LIST."  RIGHT?

    **A**    YES.

    **Q**    AND ATTACHMENT B INCLUDES A LIST OF CHRONIC
CONDITIONS THAT MAY MAKE A PERSON MORE SUSCEPTIBLE TO
HEAT.  RIGHT?

    **A**    CORRECT.

    **Q**    IF A PERSON HAS ONE OF THE CONDITIONS ON THE
LIST, THEN THEY WOULD AUTOMATICALLY RECEIVE A HEAT
PRECAUTION DUTY STATUS UNLESS THEY OPT OUT.  RIGHT?

    **A**    YES, THEY WOULD.  AND IF THEY'RE NEWLY
DIAGNOSED AT THE TIME OF THE DIAGNOSIS, THEY'RE
EDUCATED ABOUT IT AS WELL AND THEY HAVE THE OPTION TO
OPT OUT.

    **Q**    I DIDN'T HEAR THE FIRST PART.

    **A**    YES, THEY WOULD.  THEY WOULD RECEIVE A DUTY
STATUS; THEY'RE EDUCATED; AND THEY HAVE THE OPTION TO
OPT OUT.

    **Q**    AND LSP HAS IDENTIFIED 300 -- APPROXIMATELY
300 INCARCERATED MEN WITH CONDITIONS ON ATTACHMENT B.
CORRECT?

    **A**    YEAH.  THREE TO FOUR HUNDRED, YES.

    **Q**    OKAY.  AND MOVING ON TO DIRECTIVE 13.067,

1  THAT IS THE LSP COROLLARY TO HCP 8.  CORRECT?

2      **A**    THAT SOUNDS LIKE THE CORRECT NUMBER, YES,

3  SIR.

4      **Q**    IT WOULD BE TAB 5 IN YOUR BINDER.

5      **A**    YES.

6      **Q**    LSP DIRECTIVE NO. 13.067 ALSO INCLUDES AN

7  ATTACHMENT A.  RIGHT?

8      **A**    YES.

9      **Q**    AND THERE ARE NO DIFFERENCES BETWEEN HCP 8'S

10  ATTACHMENT A AND LSP NO. 13.067'S ATTACHMENT A, IS

11  THERE?

12      **A**    NO.

13      **Q**    THEY'RE IDENTICAL?

14      **A**    THEY'RE IDENTICAL.

15      **Q**    AND IT'S ALSO THE CASE THAT THERE ARE NO

16  DIFFERENCES BETWEEN ATTACHMENT B IN 13.067 AND HCP 8.

17  CORRECT?

18      **A**    THEY'RE IDENTICAL.

19      **Q**    LSP DIRECTIVE NO. 13.067 APPLIES TO ALL MEN

20  ON THE FARM LINE.  CORRECT?

21      **A**    IT APPLIES TO ALL THE INMATE POPULATION, NOT

22  JUST THE ONES THAT ARE WORKING IN OUR GARDEN AREA.

23      **Q**    THAT INCLUDES ATTACHMENTS A AND B TO THAT

24  POLICY AS WELL?

25      **A**    YES.

1      **Q**    MS. OLIVEAUX, IF YOU GO TO TAB 6 IN YOUR

2   BINDER, LSP DIRECTIVE 13.061 IS THE ACCESS TO SICK

3   CALL POLICY.  DO YOU RECOGNIZE THIS DOCUMENT?

4      **A**    YES.

5           **MR. BLANCHFIELD:**  YOUR HONOR, THAT -- SAME

6   OBJECTION THAT WE'VE MADE WITH RESPECT TO TAB 6.

7           **MR. SABATER:**  I SHOULD HAVE MENTIONED THIS

8   IS PLAINTIFFS' EXHIBIT 29.  THIS IS A DOCUMENT FROM

9   DEFENDANTS.  IT'S ONE OF THEIR OWN POLICIES, YOUR

10  HONOR.

11          **THE COURT:**  YOUR OBJECTION IS NOTED.  THE

12  WITNESS CAN ANSWER THE QUESTIONS PERTAINING TO THE

13  POLICY, TO THE EXTENT SHE KNOWS THE ANSWERS.

14          **MR. SABATER:**  YES, YOUR HONOR.

15          **MR. BLANCHFIELD:**  THANK YOU, JUDGE.

16  **BY MR. SABATER:**

17     **Q**    MS. OLIVEAUX, LSP DIRECTIVE 13.061

18  ESTABLISHES THE PROCEDURE FOR INCARCERATED PERSONS TO

19  REQUEST ACCESS TO HEALTH CARE?

20     **A**    YES.

21     **Q**    AND THIS POLICY IS APPLICABLE TO ALL LSP

22  EMPLOYEES?

23     **A**    YES.

24     **Q**    AND THIS POLICY PROVIDES ALL PERSONS

25  INCARCERATED AT LSP A MECHANISM TO, QUOTE, REQUEST

1  ACCESS TO HEALTH CARE, ROUTINE AND EMERGENT, ON A

2  DAILY BASIS AND THE RESPONSE TO THOSE REQUESTS SHALL

3  BE TIMELY AND EFFICIENT.  RIGHT?

4      **A**   CORRECT.

5      **Q**   ROUTINE AND EMERGENT HEALTH CARE INCLUDES

6  ROUTINE SICK CALLS AS WELL AS SELF-DECLARED

7  EMERGENCIES.  RIGHT?

8      **A**   CORRECT.

9      **Q**   SO THIS POLICY WOULD APPLY IN THE EVENT OF

10 AN INCARCERATED PERSON REQUESTING MEDICAL CARE WHILE

11 WORKING ON THE FARM LINE?

12     **A**   YES.

13     **Q**   IF YOU TURN TO TAB 7 IN YOUR BINDER -- IT'S

14 BEEN ADMITTED AS JOINT EXHIBIT 9 -- THIS IS THE

15 DISCIPLINARY RULES AND PROCEDURES FOR ADULT INMATES

16 AT LSP.  DO YOU RECOGNIZE THIS DOCUMENT?

17     **A**   YES.

18     **Q**   AND THIS POLICY APPLIES TO ALL INDIVIDUALS

19 INCARCERATED AT LSP.  CORRECT?

20     **A**   CORRECT.

21     **MR. SABATER:**  NO FURTHER QUESTIONS, YOUR

22 HONOR.

23     **THE COURT:**  ALL RIGHT.

24        ANY CROSS-EXAMINATION?

25     **MR. BLANCHFIELD:**  YOUR HONOR, NO CROSS-

1  EXAMINATION.  AND UNLESS YOUR HONOR HAS QUESTIONS OF

2  THIS WITNESS, SHE CAN BE EXCUSED.

3          **THE COURT:**  THANK YOU, MR. BLANCHFIELD.

4                  I HAVE NO QUESTIONS FOR YOU, WARDEN.

5                  AND AS I UNDERSTAND IT, MR.

6  BLANCHFIELD, SHE WILL NOT BE CALLED BACK AS A WITNESS

7  FOR THE DEFENSE.  CORRECT?

8          **MR. BLANCHFIELD:**  THAT'S CORRECT, YOUR

9  HONOR.

10          **THE COURT:**  THANK YOU, WARDEN.  WE

11  APPRECIATE YOU COMING ON IN TODAY.  YOU ARE NOW

12  EXCUSED.

13                  ELIZABETH, NATALIE, LET ME SEE YOU.

14                  **(OFF THE RECORD)**

15          **THE COURT:**  MR. SABATER, HAVE YOU MOVED FOR

16  THE ADMISSION OF THESE DOCUMENTS?  OR AS I

17  UNDERSTAND, THESE ARE ALL JOINT EXHIBITS.  WHY DON'T

18  YOU COME FORWARD, MR. SABATER.  AM I PRONOUNCING YOUR

19  NAME CORRECTLY?

20          **MR. SABATER:**  YES.  WE WOULD MOVE TO MOVE

21  THE PLAINTIFFS' EXHIBITS INTO EVIDENCE, AND THE JOINT

22  EXHIBITS REFERENCED IN MY CROSS WOULD BE --

23          **THE COURT:**  THOSE ARE ESSENTIALLY POLICIES

24  OF THE DEPARTMENT OF CORRECTIONS.  CORRECT?

25          **MR. SABATER:**  YOU'RE CORRECT, YOUR HONOR.

```
1              THE COURT:  ANY OBJECTION?

2              MR. BLANCHFIELD:  ONLY THE OBJECTION I MADE

3   WITH RESPECT TO TAB NO. 6, YOUR HONOR, WHICH YOU

4   OVERRULED.

5              THE COURT:  OKAY.  THANK YOU.

6                   ALL RIGHT.  JUST WANTED TO CLARIFY

7   THAT.

8                   PLAINTIFFS MAY NOW CALL ITS NEXT

9   WITNESS.

10             MS. POURCIAU:  THE PLAINTIFFS REST AT THIS

11  TIME.

12             THE COURT:  OKAY.  ALL RIGHT.

13                  SO, MR. BLANCHFIELD, HOW MANY WITNESSES

14  DO YOU HAVE TO PRESENT TODAY, SIR?

15             MR. BLANCHFIELD:  I'VE GOT PLENTY, JUDGE.

16             THE COURT:  HOW MANY?

17             MR. BLANCHFIELD:  I HAVE PROBABLY SIX OR

18  SEVEN HERE TODAY.

19             THE COURT:  YOU CAN CALL YOUR FIRST WITNESS

20  RIGHT NOW.  HOW MANY MORE DO WE HAVE?  BECAUSE WE'LL

21  GO TO THE REST OF THE DAY TODAY AND THEN WE HAVE

22  TOMORROW IF WE HAVE TO, AS YOU KNOW.  BUT I'M A

23  LITTLE SURPRISED BECAUSE I THOUGHT AT OUR STATUS

24  CONFERENCE YOU INDICATED YOU HAD THREE WITNESSES.

25             MR. BLANCHFIELD:  NO.  WE --
```

1          THE COURT:  IS THAT WHAT YOU HAD?  LET ME

2    SEE.  THREE EXPERTS, OKAY.  UNDERSTOOD.

3          MR. BLANCHFIELD:  WE HAVE EXPERTS, YOUR

4    HONOR, AND WE HAVE SOME VERY, VERY BRIEF --

5          THE COURT:  FACT WITNESSES?

6          MR. BLANCHFIELD:  -- D.O.C. WITNESSES.

7          THE COURT:  OKAY.  AND SO YOU HAVE THREE

8    EXPERT WITNESSES.  NOW, ONE OF -- MY UNDERSTANDING IS

9    ONE OF THOSE INCLUDED DR. LAVESPERE.  IS THAT

10   CORRECT?

11         MR. BLANCHFIELD:  WE HAVE ESSENTIALLY TWO

12   EXPERT WITNESSES.

13         THE COURT:  OKAY.  WHY DON'T WE GO ON AND

14   GET STARTED WITH THE EXPERT WITNESSES AT THIS TIME IF

15   THEY'RE BOTH HERE.

16         MR. BLANCHFIELD:  THEY ARE.

17         THE COURT:  OKAY.  UNLESS YOU WANT TO -- I

18   DON'T WANT TO TIE YOUR HANDS.  IF YOU RATHER PRESENT

19   FACT WITNESSES, YOU'RE WELCOME TO DO THAT, TOO.

20   HOWEVER YOU WANT TO PROCEED.

21         MR. BLANCHFIELD:  I THINK IT'S A GOOD -- WE

22   WERE GOING TO START WITH DR. DELECA BARNES.

23         THE COURT:  VERY WELL.  DR. BARNES, PLEASE

24   COME FORWARD.

25              (WHEREUPON, DELECA REYNOLDS-BARNES, BEING

1   DULY SWORN, TESTIFIED AS FOLLOWS.)

2           **THE COURTROOM DEPUTY:**  CLEARLY STATE AND

3   SPELL YOUR NAME FOR THE RECORD.

4           **THE WITNESS:**  FIRST NAME IS DELECA,

5   REYNOLDS-BARNES.  FIRST NAME D-E-L-E-C-A, REYNOLDS,

6   R-E-Y-N-O-L-D-S HYPHEN BARNES, B-A-R-N-E-S.

7           **THE COURT:**  OKAY.

8           **MR. BLANCHFIELD:**  THANK YOU, JUDGE.

9                   **VOIR DIRE**

10  BY MR. BLANCHFIELD:

11      **Q**   GOOD AFTERNOON, DR. BARNES.  COULD YOU STATE

12  YOUR FULL NAME FOR US FOR THE RECORD?

13      **A**   SURE.  DELECA REYNOLDS-BARNES.

14      **Q**   AND, DR. BARNES, YOU ARE -- COULD YOU GIVE

15  US YOUR -- BRIEFLY YOUR EDUCATIONAL BACKGROUND?

16      **A**   SURE.  I HAVE A DOCTOR OF PHARMACY, PHARM-D,

17  FROM THE UNIVERSITY OF TENNESSEE HEALTH SCIENCE

18  CENTER IN MEMPHIS.  I THEN COMPLETED TWO YEARS OF

19  POST-DOC TRAINING AT THE UNIVERSITY OF CINCINNATI

20  HEALTH SYSTEMS.  THE FIRST YEAR, PGY 1 -- POST-

21  GRADUATE YEAR ONE -- RESIDENCY WAS IN PHARMACY

22  PRACTICE.  I THEN COMPLETED A SECOND YEAR, A

23  SPECIALTY RESIDENCY, POSTGRADUATE YEAR TWO, IN

24  PHARMACY PRACTICE MANAGEMENT, WHICH FOCUSES ON THE

25  DEVELOPMENT OF CLINICAL PHARMACY SERVICES AND THE

1  JUSTIFICATION OF THOSE.

2      **Q**   CAN YOU EXPLAIN TO THE COURT THE DIFFERENCE?

3  PHARM-D IS NOT A SPECIALTY THAT WE OFTEN SEE.  IT'S

4  NOT A PH.D.  CORRECT?

5      **A**   IT IS NOT.  IT IS A CLINICAL DEGREE.  IT IS

6  A DOCTORATE THAT FOCUSES ON THE PRACTICE OF PHARMACY.

7  IT IS NOW THE ENTRY-LEVEL DEGREE TO ENTER THE

8  PRACTICE OF PHARMACY.

9      **Q**   AND CAN YOU TELL US WHAT YOU'RE CURRENTLY

10  DOING THESE DAYS?

11      **A**   I AM CURRENTLY THE VICE PRESIDENT OF

12  PHARMACY SERVICES FOR A COMPANY CALLED WELLPATH, LLC.

13  WELLPATH IS A CORRECTIONAL HEALTH CARE COMPANY THAT

14  PROVIDES HEALTH CARE TO ABOUT 300,000 PATIENTS,

15  JUSTICE INVOLVED PATIENTS IN ABOUT 27 STATES.

16          AND IN MY ROLE I OVERSEE CONTRACTED PHARMACY

17  SERVICES WITH OUR VENDORS AS WELL AS THE DEVELOPMENT

18  OF PHARMACY AND MEDICATION USE POLICIES INCLUDING THE

19  FORMULARY.

20      **Q**   PHARMACY AND MEDICATION POLICIES, YOU'RE

21  INVOLVED IN DRAFTING OF THOSE?

22      **A**   YES.

23      **Q**   CAN YOU TELL THE COURT A LITTLE BIT ABOUT

24  YOUR WORK EXPERIENCE FROM THE BEGINNING?

25      **A**   SO FOLLOWING THE COMPLETION OF MY RESIDENCY,

1   MY FIRST JOB WAS ACTUALLY HERE IN BATON ROUGE.  I

2   CAME TO BATON ROUGE AS THE CLINICAL COORDINATOR FOR

3   THE BATON ROUGE GENERAL OVER ON FLORIDA AVENUE.  I

4   STAYED IN THAT ROLE ABOUT A YEAR AND THEN I WAS

5   PROMOTED TO DIRECTOR OF PHARMACY SERVICES FOR THE

6   ENTERPRISE.  AT THAT TIME THE BATON ROUGE GENERAL

7   OPERATED A HOSPITAL ON FLORIDA AVENUE AS WELL AS OUT

8   ON BLUEBONNET, SO I OVERSAW BOTH OF THOSE.

9       IN ADDITION, I WAS ALSO RESPONSIBLE FOR THE

10  AMBULATORY TREATMENT CENTER, WHICH WE OPERATED AN

11  INFUSION CENTER FOR OUTPATIENTS TO COME INTO THE

12  HOSPITAL, AND SO WE HAD NURSING STAFF AND PHARMACY

13  STAFF IN THAT LOCATION PROVIDING THOSE SERVICES.

14      FOLLOWING -- AND THEN AFTER THAT I -- AFTER

15  I LEFT BATON ROUGE, I RELOCATED BACK TO TENNESSEE.

16  TENNESSEE IS ACTUALLY MY HOME STATE.  SPENT SOME TIME

17  AT A HOSPITAL IN A -- AGAIN, IN A TEACHING HOSPITAL

18  AND A TEACHING SERVICE WORKING WITH RESIDENTS AT

19  VANDERBILT, IMPLEMENTING MANAGED CARE PROGRAMS

20  WORKING WITH THE MEDICAL RESIDENTS AT VANDERBILT

21  HOSPITAL.  AND MY ROLE WAS AT SAINT THOMAS, WHICH AT

22  THE TIME WAS A CARDIAC SPECIALTY HOSPITAL.

23      I ALSO HAVE BEEN A LONG-TERM CARE PHARMACY

24  PRACTITIONER GOING INTO LONG-TERM CARE FACILITIES AS

25  A CONSULTANT AND BECAME A CERTIFIED GERIATRIC

1  PHARMACIST AT THAT TIME SEEING PATIENTS IN THE LONG-

2  TERM CARE SETTING.  I THEN MOVED TO CORRECTIONS AND I

3  SPENT ABOUT THE LAST 20 YEARS AS A CORRECTIONAL -- IN

4  THE CORRECTIONAL HEALTH CARE SPACE; FIRST AS A -- AT

5  A LARGE MAIL ORDER PHARMACY AND A PBM FOR THE

6  CORRECTIONAL HEALTH CARE SYSTEM SERVICING HEALTH CARE

7  ORGANIZATIONS, AND THEN MORE RECENTLY MOVED TO THE

8  HEALTH CARE SIDE WITH THE MEDICAL COMPANY OVERSEEING

9  THEIR PHARMACY CONTRACTED SERVICES.

10     **Q**    THANK YOU.

11         **MR. BLANCHFIELD:**  YOUR HONOR, WE WOULD OFFER

12  DR. BARNES -- I THINK THERE HAS BEEN AN AGREEMENT

13  THAT SHE IS AN EXPERT IN THE FIELD OF PHARMACY WITH A

14  SPECIFIC EXPERIENCE IN CORRECTIONAL CARE MEDICINE AS

15  IT RELATES TO PHARMACY.

16         **THE COURT:**  ALL RIGHT.  AND WHO IS TAKING

17  DR. BARNES AS A WITNESS?

18         **MS. MONTES:**  AMARIS MONTES FOR THE

19  PLAINTIFFS.

20         **THE COURT:**  MS. MONTES, GOOD AFTERNOON.  ANY

21  OBJECTION -- FIRST OF ALL, DO YOU HAVE ANY VOIR DIRE

22  OF DR. BARNES THAT YOU'D LIKE TO CONDUCT?

23         **MS. MONTES:**  NO, YOUR HONOR.  WE HAVE

24  STIPULATED TO HER EXPERTISE.

25         **THE COURT:**  VERY WELL.  AS SUCH, THE COURT

1    WILL ACCEPT DR. BARNES IN THE PROPOSED FIELDS.  THANK

2    YOU.

3              **MR. BLANCHFIELD:**  THANK YOU, YOUR HONOR.

4                        **DIRECT EXAMINATION**

5    **BY MR. BLANCHFIELD:**

6         **Q**    DR. BARNES, CAN YOU EXPLAIN WHAT YOU WERE

7    ASKED TO DO WITH RESPECT TO THIS LITIGATION?

8         **A**    SURE.  SO MY SCOPE WAS WHAT I WOULD CONSIDER

9    RATHER NARROW.  WAS PRESENTED WITH HCP 8 AND THE

10   MEDICATION HEAT DUTY STATUS MEDICATION LIST.  THE

11   TASK WAS TO REVIEW THE CURRENT LIST, MAKE

12   RECOMMENDATIONS, IF NEEDED, AFTER A REVIEW OF THE

13   CURRENT LIST, OF ANY SUGGESTIONS OR RECOMMENDATIONS

14   TO EITHER -- TO MAKE CHANGES TO THE LIST.  ULTIMATELY

15   IT WAS AN EXPANSION OF THE LIST.

16        **Q**    THANK YOU.

17             **MR. BLANCHFIELD:**  AND CAN WE PULL UP THE

18   INITIAL ORIGINAL LIST?

19             **THE COURT:**  I'M SORRY, MR. BLANCHFIELD.

20                  NATALIE, CAN YOU HEAR MR. BLANCHFIELD?

21             **THE REPORTER:**  BARELY.

22             **THE COURT:**  THAT'S ON OUR END, MR.

23   BLANCHFIELD.  CAN WE RAISE THE VOLUME?

24             **MR. BLANCHFIELD:**  ANY BETTER?

25             **THE COURT:**  THAT'S MUCH BETTER.  THANK YOU.

1      **MR. BLANCHFIELD:**  AND I'LL TRY TO KEEP CLOSE

2  TO THE MICROPHONE.  I THINK I'M MOVING AWAY A LITTLE

3  BIT, JUDGE.

4      **THE COURT:**  THANK YOU, MR. BLANCHFIELD.

5  **BY MR. BLANCHFIELD:**

6    **Q**    OKAY.  LET'S TAKE A LOOK AT THE ORIGINAL

7  MEDICATION LIST THAT YOU -- AND YOU WERE PROVIDED

8  WITH A COPY OF THAT?

9    **A**    CORRECT.

10    **Q**    ALL RIGHT.  IT'S ENTITLED "HEAT PATHOLOGY

11  MEDICATIONS."  ESSENTIALLY WHAT KIND OF MEDICATIONS

12  ARE THESE?

13    **A**    ALL THE MEDICATIONS ON THE LIST WOULD BE

14  USED PRIMARILY FOR PSYCHIATRIC CONDITIONS.  THERE IS

15  ONE MED AT THE BOTTOM THAT WOULD TYPICALLY BE IN THE

16  CLASS OF A SEIZURE DRUG, BUT IT'S ALSO USED IN

17  BIPOLAR DISORDER FOR PSYCHIATRIC CONDITIONS.

18    **Q**    AND YOU HAVE OBVIOUSLY BEEN HERE FOR SOME OF

19  THIS TRIAL.  YOU'VE HEARD THE TERMINOLOGY

20  ANTICHOLINERGIC AND YOU'RE VERY FAMILIAR WITH THAT?

21    **A**    I AM.

22    **Q**    THESE PARTICULAR DRUGS HERE ARE WHAT WE CALL

23  VERY HIGH IN ANTICHOLINERGIC PROPERTIES?

24    **A**    THAT IS CORRECT.  THEY WOULD BE THE HIGHEST

25  OF THEM.

1    **Q**   IF YOU COULD, WALK US THROUGH THE
2  SIGNIFICANCE OF THAT.
3    **A**   SURE.  SO I THINK THAT THE BEST WAY TO
4  DESCRIBE ANTICHOLINERGIC IS THE ISSUES AROUND --
5  WE'VE ALL HEARD FIGHT-OR-FLIGHT MECHANISM SO THAT
6  WHEN THE BODY IS PRESENTED IN A DANGEROUS SITUATION,
7  THE BODY DOES WHAT IT NEEDS TO DO TO PRESERVE ITSELF.
8  AND SO THE SIGNIFICANCE OF ANTICHOLINERGICS IS IT
9  THEN COULD SUPPRESS SOME OF THE MECHANISMS THE BODY
10 WOULD DO FOR SELF-PRESERVATION.  FOR EXAMPLE, IF YOU
11 WERE IN A DANGEROUS SITUATION, ONE OF THE -- AND YOU
12 NEEDED TO RUN, ONE OF THE THINGS YOU WOULDN'T DO IS
13 YOU WOULDN'T WANT TO NEED TO GO URINATE.  YOU
14 WOULDN'T NEED TO GO EXPEL FECES.  AND SO WHAT THESE
15 DRUGS DO IS -- I'M SORRY.  YOUR BODY WILL START TO
16 MAKE ADDITIONAL FLUIDS.
17      WHAT THESE DRUGS ARE GOING TO DO IS PREVENT
18 YOUR BODY FROM DOING THAT, FROM -- PREVENT YOUR BODY
19 FROM SWEATING.  SO THE ANTICHOLINERGIC DRUGS ARE
20 SIGNIFICANT -- THE ANTICHOLINERGIC SIDE EFFECTS OF
21 THESE DRUGS ARE SIGNIFICANT WHEN IT COMES TO HEAT
22 DUTY STATUS BECAUSE IT PREVENTS THE BODY FROM BEING
23 ABLE TO PROTECT ITSELF.
24    **Q**   AND IF I UNDERSTAND IT, THE ANTICHOLINERGIC
25 MEDICINES IMPACT WHAT'S CALLED ACETYLCHOLINE.

1   CORRECT?

2       **A**    THAT'S RIGHT.

3       **Q**    ACETYLCHOLINE IS A NEUROTRANSMITTER?

4       **A**    THAT'S CORRECT.

5       **Q**    WHAT DOES IT DO?

6       **A**    SO AGAIN, IT SPEAKS TO THAT FIGHT OR FLIGHT.

7   SO ACETYLCHOLINE ARE THOSE ENZYMES THAT ARE RELEASED

8   WHEN YOU NEED TO REACT.  THE ANTICHOLINERGICS BLOCK

9   THAT REACTION.

10      **Q**    OKAY.  SO WHEN YOU WERE MET WITH THIS

11  INITIAL HEAT PATHOLOGY MEDICATIONS LIST, WHICH YOU'VE

12  SAID ARE BASICALLY THE PSYCHIATRIC MEDICATIONS, YOU

13  THEN CONSIDERED ADDING TO THIS LIST?

14      **A**    I DID.

15      **Q**    HOW DID YOU GO ABOUT DETERMINING WHAT

16  MEDICINES YOU WOULD ADD?

17      **A**    SO OBVIOUSLY THE -- FOR ME THE INITIAL

18  REVIEW WAS -- I UNDERSTOOD THE REASON WHY THE INITIAL

19  LIST LOOKED LIKE IT DID.  IT WAS DRUGS THAT WERE

20  HIGHLY ANTICHOLINERGIC -- WE'VE DISCUSSED THAT --

21  DRUGS THAT WERE USED FREQUENTLY IN A CORRECTIONAL

22  SETTING; THE ANTIPSYCHOTICS.  MY FIRST THOUGHT WAS

23  THERE ARE OTHER HIGHLY ANTICHOLINERGIC DRUGS THAT ARE

24  NOT PSYCHOTROPICS.  SO WE NEED TO FIRST LOOK AT THOSE

25  DRUGS THAT ARE RANKED HIGHLY IN THE ANTICHOLINERGIC,

1 THINGS THAT ARE USED FOR LIKE MUSCLE RELAXATION,

2 ANTISPASMODICS, OF COURSE GI CONDITIONS.  ANYTHING

3 THAT HAD A VERY HIGH ANTICHOLINERGIC RISK NEEDED TO

4 BE ADDED TO THE LIST.  THAT WAS THE FIRST REVIEW.

5          THE SECOND PART OF THAT REVIEW WERE THERE

6 WERE OTHER AGENTS THAT HAD OTHER EFFECTS ON THE

7 CARDIAC SYSTEM AND THE KIDNEYS THAT WOULD AFFECT YOUR

8 ABILITY TO BE ABLE TO RESPOND AND DO SELF-PROTECTION

9 THAT ALSO WEREN'T ON THE LIST.  SO IN DEVELOPING THE

10 LIST, IN ORDER TO USE THE -- BECAUSE THE GOAL WAS TO

11 DEVELOP NOT JUST A LIST BUT A RESOURCE TOOL,

12 SOMETHING THAT WOULD BE A TEACHING TOOL SO THAT THE

13 STAFF COULD USE IT AND ALSO CONTINUE TO UPDATE IT AS

14 THE LITERATURE CHANGES.

15          SO THE LIST WAS DEVELOPED BASED ON AN

16 ANTICHOLINERGIC RISK SCORE WHERE WE ACTUALLY ADDED

17 THE DRUGS, WE ADDED THE ANTICHOLINERGIC RISK, AND WE

18 ADDED WHAT WAS THE THERMOREGULATORY EFFECT OF THOSE

19 INDIVIDUAL DRUGS THAT WERE ADDED.  WE ALSO ADDED AT

20 THE BOTTOM OF THE LIST THINGS THAT HAD ZERO TO ONE,

21 LITTLE TO NO ANTICHOLINERGIC RISK FACTORS BUT THEY

22 AFFECTED OTHER SYSTEMS IN THE BODY AND THAT WOULD

23 PREVENT THE BODY FROM BEING ABLE TO PROTECT ITSELF.

24          **MR. BLANCHFIELD:**  CAN WE PULL UP THE

25 MODIFIED LIST?

1    BY MR. BLANCHFIELD:

2         **Q**    CAN YOU SEE THAT, DOCTOR?

3         **A**    YES.

4         **Q**    OKAY.  SO WE HAVE IN THE UPPER LEFT-HAND

5    CORNER THE ACH RISK SCORE.  EXPLAIN THAT TO THE

6    COURT.

7         **A**    THAT IS THE -- SO THERE IS A -- THAT IS A --

8    NOT A SCORE THAT I MADE UP.  IT'S A VERY COMMONLY

9    USED RISK STRATIFICATION IN THE LITERATURE.  IT

10   SOMETIMES IS MODIFIED DEPENDING ON THE RESEARCH, BUT

11   IT'S VERY COMMON IN THE DRUGS THAT FALL INTO THAT

12   LIST.

13        SO THE ACH RISK SCORE IS JUST THE

14   MEASUREMENT OF THE ABILITY FOR A DRUG'S

15   ANTICHOLINERGIC ACTIVITY, ITS ABILITY TO BLOCK THE

16   BODY'S ABILITY TO PROTECT ITSELF FROM THE --

17        **THE REPORTER:**  FROM THE WHAT?

18        **THE WITNESS:**  FROM THE BREAKDOWN OF

19   ACETYLCHOLINE.

20   BY MR. BLANCHFIELD:

21        **Q**    NOW, IN THE TOP OF THE FIRST PAGE OF THE

22   THREE PAGES OF MEDICATIONS WE HAVE THE ACH RISK SCORE

23   OF 3.  THAT'S THE HIGHEST?

24        **A**    THE HIGHEST.

25        **Q**    SO IF A MEDICATION HAD A SCORE OF 3, YOU

1    WOULD PLACE THAT MEDICATION ON THE LIST?

2        **A**    YES.

3        **Q**    AND YOU DID, IN FACT, PLACE THAT MEDICATION

4    ON THE LIST?

5        **A**    I DID.

6        **Q**    AND THAT SCORE OF 3 IS NOT SOMETHING YOU

7    MADE UP.  IT'S SOMETHING THAT IS IN THE LITERATURE

8    AND THE SCIENCE?

9        **A**    THAT'S CORRECT.

10       **Q**    THERE IS SOMETHING KNOWN AS THE

11   ANTICHOLINERGIC RISK SCORE OR RISK SCALE?

12       **A**    SCALE, CORRECT.

13       **Q**    AND THE DOCUMENT SPEAKS FOR ITSELF.  BUT WE

14   HAVE -- ON THAT FIRST PAGE ALL THE WAY DOWN TO THE

15   BOTTOM WE HAVE LISTS OF ALL MEDICINES THAT SCORED 3,

16   THE HIGHEST ON THE ANTICHOLINERGIC RISK SCALE?

17       **A**    WE DO.

18       **Q**    OKAY.  IF WE COULD GO -- AT THE BOTTOM OF

19   THAT PAGE, WE START WITH MEDICATIONS THAT HAVE A

20   SCORE OF 2.  WHY DON'T WE GO TO THE SECOND PAGE.

21            SO THERE IS -- EXPLAIN TO THE COURT THOSE

22   MEDICINES THAT SCORED IN THE 2 RANGE.

23       **A**    THEY JUST HAVE A LOWER EFFECT TO BLOCK --

24   YOU KNOW, THEY JUST HAVE A LOWER ANTICHOLINERGIC

25   RISK.  DOESN'T MEAN THEY SHOULDN'T BE ON THE LIST;

1   DOESN'T MEAN A PATIENT SHOULDN'T HAVE HEAT DUTY

2   STATUS.  THE SCALE'S JUST LOWER.  THEY JUST RANK

3   LOWER.

4       **Q**   AND FOR THE RECORD, YOU MENTIONED HEAT

5   PRECAUTION DUTY STATUS.  EVERYONE WHO HAD A

6   MEDICATION THAT WAS A 3 ON THE SCALE YOU WOULD

7   AUTOMATICALLY GIVE A HEAT PRECAUTION DUTY STATUS TO?

8       **A**   THAT'S CORRECT.

9       **Q**   WHAT ABOUT THE 2s, THE COUPLE OF MEDICINES

10  THAT SCORE A 2?

11      **A**   THAT'S CORRECT.

12      **Q**   OKAY.  WE THEN GET -- ON THE TOP OF THAT

13  PAGE WE PROGRESS TO A ACH RISK SCORE OF 1, STARTING

14  WITH ANTIPSYCHOTICS.  TELL US ABOUT THOSE.

15      **A**   SO THERE ARE ANTIPSYCHOTICS IN THE 3 SECTION

16  AND THERE ARE ANTIPSYCHOTICS IN THE 1, SO THEY HAVE

17  LESS ANTICHOLINERGIC RISK.  THE DIFFERENCE IS JUST IN

18  THE CLASS OF THE ANTIPSYCHOTIC.  SO WHAT HAPPENS,

19  THERE ARE WHAT WE CALL FIRST-GENERATION OR OLDER

20  ANTIPSYCHOTICS, AND SO THOSE MEDS HAVE A HIGHER ACH

21  RISK SCORE.  THEY'RE MORE ANTICHOLINERGIC.

22          THE NEWER SECOND-GENERATION ANTIPSYCHOTICS

23  STILL HAVE SOME ANTICHOLINERGIC ACTIVITY, BUT THAT

24  WAS PART OF THEIR DEVELOPMENT.  THEY HAD A LOWER SIDE

25  EFFECT PROFILE THAN THE FIRST-GENERATION

1  ANTIPSYCHOTIC.  SO WHILE THEY STILL MADE THE LIST --

2  AND MANY OF THEM WERE ON THE ORIGINAL LIST -- THEY

3  JUST -- WAS JUST POINTING OUT THAT THE RISK WOULD BE

4  LOWER WITH THE SECOND-GENERATION ANTIPSYCHOTICS.  AND

5  THAT'S WHY THEY WERE MOVED TO THE 1 SECTION.

6      Q    OKAY.  AND THEN, IN FACT, THERE ARE SOME ON

7  THE SCALE -- ON THE LIST THAT HAVE AN ACH RISK SCORE

8  OF ZERO --

9      A    CORRECT.

10     Q    -- BUT THEY'RE STILL ON THE LIST?

11     A    YES.

12     Q    WHY IS THAT, DOCTOR?

13     A    WELL, I THINK IT SPEAKS TO THE FACT THAT

14 THERE ARE -- ANTICHOLINERGIC ACTIVITY IS NOT THE ONLY

15 MECHANISM OF THERMOREGULATION.  AND SO WHILE I WANTED

16 TO DEVELOP THE TOOL -- AND IF YOU'LL NOTICE, EVEN

17 UNDER 3, LITHIUM IS LISTED.  AND I SPECIFICALLY PUT

18 IN PARENTHESIS IT'S NOT ANTICHOLINERGIC.  BUT IT'S

19 SUCH A RISKY DRUG, I PUT IT IN THE 3 CATEGORY BECAUSE

20 I WANTED TO MAKE SURE THAT I ALERTED, *HEY, THIS IS*

21 *ONE WE SHOULD NEVER MISS.  IT'S ON THE LIST, BUT WE*

22 *SHOULD KNOW THERE IS MORE SIDE EFFECTS THERE.*

23         ZERO TO ONE IS JUST SPEAKING TO WE STILL

24 HAVE HEAT DUTY THERMOREGULATION ISSUES; HOWEVER, THE

25 CAUSE OF THAT IS NOT RELATED TO ACETYLCHOLINE OR

1  THEIR ANTICHOLINERGIC PROFILE.  THAT IS NOT THE

2  REASON FOR IT BEING ON THE LIST.  SO IT'S MORE OF AN

3  EDUCATION TOOL, THE ZERO TO ONE, NOT DIRECTING IT TO

4  ACH.

5      Q    BUT BECAUSE THE IMPACT THAT THAT PARTICULAR

6  MEDICATION HAS ON THE BODY, YOU FELT IT APPROPRIATE

7  TO PUT IT ON THE LIST?

8      A    CORRECT.

9      Q    I ALSO NOTE ON THE BOTTOM OF PAGE 2 THERE IS

10  A LITTLE DOUBLE ASTERISK SAYING "THE RECOMMENDATIONS

11  IN THIS POLICY ARE MEANT TO SERVE AS A GUIDELINE AND

12  ARE NOT INTENDED TO SUBSTITUTE FOR THE JUDGMENT OF

13  THE PHYSICIAN OR A MID-LEVEL PROVIDER IN PROVIDING

14  APPROPRIATE HEALTH CARE."  WHAT IS MEANT BY THAT?

15      A    THAT'S THE CORE OF WHAT OUR HEALTH CARE

16  PROVIDERS DO.  NOTHING CAN REPLACE A HEALTH CARE

17  PROVIDER PUTTING AN EYE ON A PATIENT.  AND SO WHILE

18  THERE IS A LIST, THERE MAY BE, AS PREVIOUSLY STATED

19  BY MANY OTHERS, OTHER THINGS GOING ON WITH THE

20  PATIENT WHERE THERE MAY NOT BE A MED ON THE LIST;

21  THAT THE LIST IN ITSELF DOESN'T STAND AS THE ONLY

22  REASON FOR HEALTH DUTY STATUS.  THE PHYSICIAN'S

23  ABILITY TO LOOK AT THE PATIENT MAKES THAT DECISION

24  AND ALSO HOW THE MEDICATION IS USED; WHEN WAS IT

25  STARTED; HOW LONG IS IT GOING TO BE USED; WHEN IS IT

1  GOING TO BE STOPPED; AND WHAT IS THE CONDITION THAT'S

2  BEING TREATED.

3       **Q**    THANK YOU, DOCTOR.

4            NOW, WERE YOU HERE DURING THE TESTIMONY OF

5  DR. VASSALLO?

6       **A**    I WAS.

7       **Q**    AND YOU'RE FAMILIAR WITH SOME OF HER

8  DECLARATIONS THAT SHE HAS ISSUED IN THIS MATTER?

9       **A**    I AM.

10      **Q**    AND YOU'RE FAMILIAR WITH THE CRITICISM FROM

11  DR. VASSALLO IN HER DECLARATION THAT SAYS,

12  "DR. REYNOLDS-BARNES APPEARS TO HAVE FOCUSED

13  EXCLUSIVELY ON MEDICATIONS WITH ANTICHOLINERGIC

14  PROPERTIES.  SHE HAS NOT INCLUDED MEDICATIONS THAT

15  INTERFERE WITH THE NEUROTRANSMISSION IN THE

16  HYPOTHALAMUS, WHICH IS THE THERMOSTAT FOR THE BODY."

17  WHAT'S YOUR RESPONSE TO THAT CRITICISM?

18      **A**    WELL, I THINK I WILL EXPLAIN THAT I FOCUSED

19  ON MORE THAN JUST THE ANTICHOLINERGIC PROFILE OF THE

20  DRUG.  I THINK I'VE EXPLAINED THE SCALE.  I'M NOT

21  SURE THERE IS MUCH MORE EXPLANATION THAT IS NEEDED

22  THERE.

23            THE HYPOTHALAMUS, THE PITUITARY AXIS, IS

24  INVOLVED IN THERMOREGULATION.  AND IN HER DECLARATION

25  SHE ACTUALLY MENTIONED A SPECIFIC SET OF DRUGS THAT

1 WERE OMITTED.  BUT EVEN WITH THAT, IT WAS THE

2 ANTICHOLINERGIC PROFILE OF THAT SPECIFIC DRUG THAT

3 WOULD BE REVIEWED AND THE RESULT CAN BE THE REASON

4 FOR IT TO BE ADDED ON THE LIST.

5          BUT ASIDE FROM THAT, THAT CRITICISM, YOU

6 KNOW, WHILE IT'S HER OPINION, I THINK THE DOCUMENT

7 SPEAKS FOR ITSELF; THAT MORE THAN ANTICHOLINERGIC

8 ACTIVITY WAS THE FOCUS.  I JUST WANTED TO PROVIDE

9 THAT AS AN INITIAL GUIDE AS PART OF THE RESOURCE

10 TOOL.

11     Q    AND, IN FACT, AS YOU POINTED OUT, THERE ARE

12 MEDICATIONS ON YOUR LIST THAT HAVE AN ANTICHOLINERGIC

13 RISK SCORE OF ZERO THAT ARE ON THE LIST?

14     A    CORRECT.

15     Q    YOU HEARD A LOT OF TESTIMONY ABOUT SSRIs.

16 AND YOU ARE RESOLUTE IN YOUR OPINION THAT SSRIs DO

17 NOT BELONG ON THIS LIST.  IS THAT CORRECT?

18     A    THAT'S CORRECT.

19     Q    CAN YOU EXPLAIN TO THE COURT WHY?

20     A    SURE.  SO LET'S START WITH WHAT AN SSRI IS,

21 BECAUSE I THINK WE'VE KIND OF PLAYED AROUND; WE'RE

22 NOT QUITE SURE WHAT THAT MEANS.  THAT IS A SELECTIVE

23 SEROTONIN REUPTAKE INHIBITOR.  THERE ARE MULTIPLE

24 SEROTONIN ENZYMES IN THE BODY.  AN SSRI SELECTS A

25 SPECIFIC SEROTONIN AND IT PREVENTS IT FROM BEING

1    ABSORBED OR USED, SO THAT'S WHAT THIS DOES.

2            NOW, WHEN YOU LOOK AT THE LITERATURE, I CAN

3    SAY THERE IS NO SCIENCE, THERE IS NO STUDY THAT I AM

4    AWARE OF THAT SHOWS HEAT INTOLERANCE CAUSED BY

5    SELECTIVE SEROTONIN REUPTAKE INHIBITORS.  AND I'VE

6    HEARD IT COME UP FROM MULTIPLE WITNESSES OF WHY SSRIs

7    SHOULD OR SHOULD NOT BE ON THE LIST, AND I WAS

8    PERPLEXED.

9            BUT ONE OF THE THINGS IN DR. VASSALLO'S

10   TESTIMONY SHE SPOKE OF, SHE SAID, "WELL, IT CAN CAUSE

11   SEROTONIN SYNDROME."  AND SO THEN I THOUGHT, *AHA,*

12   *MAYBE THAT IS WHERE THE CONFUSION IS*.  BUT SEROTONIN

13   SYNDROME IS A UNIQUE SYNDROME THAT'S NOT RELATED TO

14   HEAT.  IT'S RELATED TO THE BODY HAVING TOO MUCH

15   SEROTONIN IN THE BODY.

16           FOR EXAMPLE, THE MOST COMMON SSRI IS PROZAC.

17   WE'VE ALL HEARD OF PROZAC.  AND THEN YOU -- THERE IS

18   A DRUG THAT PEOPLE TAKE, FOR INSTANCE, FOR MIGRAINES,

19   IMITREX.  SO IF YOU TAKE PROZAC AND IMITREX TOGETHER,

20   AND MAYBE YOU HAVE SOME PHYSIOLOGICAL FUNCTION AND

21   YOU HAVE TOO MUCH SEROTONIN, YOU COULD GET SEROTONIN

22   SYNDROME.  AND SOME OF THE EFFECT OF SEROTONIN

23   SYNDROME ACTUALLY WOULD MIMIC HEAT INTOLERANCE.  YOU

24   WOULD HAVE DELIRIUM AND THEY DO GET HYPERTHERMIA, BUT

25   THAT IS NOT RELATED TO WHAT WE'RE DISCUSSING IN THIS

1  CASE; HEAT DUTY STATUS.

2        MOST INTERESTING IS SECOND FROM THAT, *THE*

3  *LANCET*, WHICH I -- YOU KNOW, IT'S ONE OF THE PREMIER

4  MEDICAL JOURNALS -- RELEASED IN OCTOBER OF '24, THEY

5  LOOKED AT THE WHO LIST, THEY LOOKED AT THE CDC'S

6  LIST, WHICH ARE ESSENTIALLY THE SAME LISTS.  CDC JUST

7  TOOK THE WORLD HEALTH ORGANIZATION'S LIST AND PUT IT

8  OUT.  WHEN THEY LOOKED AT IT, THEY ALSO SAID, IN A

9  REVIEW OF THE LITERATURE, THERE ARE NO STUDIES TO

10 SHOW THAT SSRIs INCREASE HEAT TOLERANCE.  HAVE THE

11 WHO AND CDC CHANGED THEIR LIST?  NOT YET.  BUT THAT

12 CAME OUT IN OCTOBER.

13       BUT WHEN WE DEVELOPED THE LIST, OR WHEN I

14 DEVELOPED THE LIST, PART OF MY PROCESS WAS NOT ONLY

15 TO TAKE A LIST AND SAY, *THEIR LIST IS MY LIST*, IT WAS

16 TO SAY, *OKAY.  I THINK THIS DRUG* -- AND YOU'VE HEARD

17 THE CRITICISM *BOY, IT WENT FROM 22 TO A HUNDRED*

18 *DRUGS*.  BECAUSE I WANTED TO MAKE SURE THAT EVERY DRUG

19 THAT WAS ADDED TO THE LIST HAD LITERATURE TO

20 SUBSTANTIATE THE REASON FOR WHICH WE ADDED IT.

21    **Q**    AND THANK YOU, DOCTOR.

22       LET'S MOVE ON TO THE OTHER AREA OF

23 CRITICISM, THE CALCIUM CHANNEL BLOCKERS.  SOME OF

24 THEM ARE ON THE LIST, SOME OF THEM ARE NOT.  CAN YOU

25 EXPLAIN TO THE COURT HOW YOU MADE THAT DISTINCTION

1  AND WHY?

2      **A**    SO THERE ARE TWO GROUPS OF CALCIUM CHANNEL

3  BLOCKERS:  THE NONDIHYDROPYRIDINES AND THE

4  DIHYDROPYRIDINES.  BOTH GROUPS ARE USED TO TREAT

5  BLOOD PRESSURE.  BOTH GROUPS CAUSE VASODILATION SO

6  THEY MAKE YOUR BLOOD VESSELS BIGGER IN YOUR

7  EXTREMITIES.  THE WAY THAT DOES IS IT KEEPS THE HEART

8  FROM HAVING TO PUMP SO FAST AGAINST YOUR VESSELS, AND

9  THAT IS HOW IT LOWERS YOUR BLOOD PRESSURE.

10        THE CLASS THAT I ADDED TO THE LIST WAS THE

11  CLASS THAT DIRECTLY AFFECTED THE HEART.  SO THE

12  NONDIHYDROPYRIDINES HAVE AN EFFECT ON THE HEART IN

13  THAT YOUR HEART DOESN'T BEAT AS FAST WHEN YOU'RE ON

14  THEM, YOUR HEART DOESN'T CONTRACT AS STRONGLY WHEN

15  YOU'RE ON THEM.  THOSE TWO THINGS ARE NEEDED IF YOU

16  ARE IN A HEAT-STRESS SITUATION TO COMPENSATE.  THAT'S

17  HOW YOU'RE GOING TO COOL YOURSELF DOWN.

18        SO BY BLOCKING THAT EFFECT WITH THE

19  NONDIHYDROPYRIDINES, THAT CREATED AN INCREASED RISK.

20  THAT'S THE REASON I SEPARATED THE TWO GROUPS, SO THAT

21  I COULD BE CLEAR AND SAY, *IT'S NOT ALL CALCIUM*

22  *CHANNEL BLOCKERS.  IT'S THE NONDIHYDROPYRIDINE*

23  *CALCIUM CHANNEL BLOCKERS THAT PUT OUR PATIENTS AT*

24  *RISK, AND THOSE PATIENTS NEED A HEAT DUTY STATUS.*

25      **Q**    AND SO THE EFFECT THAT THE

1  NONDIHYDROPYRIDINES HAVE PARTICULARLY ON THE HEART IS
2  WHAT CAUSED YOU TO PUT THEM ON THE LIST?

3      A    THAT'S RIGHT.  IT PRESENTED COMPENSATION.

4      Q    WHEREAS THE DIHYDROPYRIDINE CALCIUM CHANNEL
5  BLOCKERS, THERE WAS NO REASON TO PUT THEM ON THE
6  LIST?

7      A    THAT'S RIGHT.

8      Q    ACE INHIBITORS.  YOU HEARD A DISCUSSION
9  ABOUT THAT.  WHAT CAN YOU TELL THE COURT ABOUT ACE
10  INHIBITORS?

11      A    WELL, I THINK THE MOST IMPORTANT THING IS,
12  AGAIN, THERE ARE NO STUDIES TO SUPPORT THE ADDITION
13  OF ACE INHIBITORS, THE ANGIOTENSIN-CONVERTING ENZYME
14  INHIBITORS OR THE ARBs.  SO EITHER ONE OF THEM, THERE
15  ARE NO STUDIES.  THEY DO -- I THINK DR. VASSALLO
16  DESCRIBED IT WELL.  THEY DO AFFECT SODIUM AND WATER
17  RETENTION WITHIN -- AND POTASSIUM -- WITHIN THE
18  RENIN-ANGIOTENSIN SYSTEM.  HOWEVER, THERE IS NO --
19  THERE IS NO DATA TO SAY THAT THAT SPEAKS TO THE
20  CONCEPT OF BEING ALL-INCLUSIVE; ALL ANTIHYPERTENSIVE
21  SHOULD BE ON THE LIST.  ALL ANTIHYPERTENSIVE DO NOT
22  WORK THE SAME WAY.  ALL ANTIHYPERTENSIVE SHOULDN'T BE
23  ON THE LIST.  AND ACE INHIBITORS DON'T HAVE THE
24  LITERATURE TO SUPPORT THEIR ADDITION.

25      Q    AND FINALLY, DOCTOR, BETA BLOCKERS.  THAT IS

1  AN ANTIHYPERTENSIVE MEDICATION?

2      **A**    IT IS.

3      **Q**    IS THAT SOMETHING THAT SHOULD BE ON THE

4  LIST?

5      **A**    IT SHOULD BE, AND THEY ARE.

6      **Q**    THANK YOU.

7          FINALLY, DOCTOR, YOU HEARD SOME DISCUSSION

8  WITH DR. LAVESPERE ABOUT THE BACK-AND-FORTH ON A

9  COUPLE OF MEDICATIONS; DO WE PUT IT ON, DO WE NOT.

10 ONE OF THOSE MEDICATIONS WAS NORVASC.  AND MY

11 UNDERSTANDING IS THAT MEDICATION WAS NOT PLACED ON

12 THE LIST?

13     **A**    THAT IS -- THAT MEDICATION -- I WAS TRYING

14 TO REMEMBER THAT DISCUSSION DURING HIS TESTIMONY.

15 NORVASC, AS HE SAID, WAS NOT AND SHOULD NOT HAVE BEEN

16 ON THE LIST.  IT MAY HAVE BEEN -- AND NOW I'M -- I

17 SHOULDN'T SAY THIS, BUT I'M GUESSING.  IT MAY HAVE

18 BEEN WHEN WE DIVIDED THE TWO, NONDIHYDROPYRIDINE AND

19 THE DIHYDROPYRIDINE, AND I WAS EXPLAINING IN OUR

20 MEETING WHY WE WERE MOVING THE DIHYDROPYRIDINES.  I

21 DON'T KNOW IF MAYBE I DIDN'T DELETE IT AS, YOU KNOW,

22 THIS IS WHY THIS ONE WON'T BE.  I'M NOT SURE.  BUT I

23 DON'T REMEMBER THE NORVASC BEING ON THE LIST.

24     **Q**    YOU'RE COMFORTABLE WITH IT NOT BEING ON THE

25 LIST?

1     **A**    I AM EXTREMELY COMFORTABLE WITH IT NOT BEING

2  ON THE LIST.

3     **Q**    AND THEN THE OTHER MEDICATION, ROBAXIN?

4     **A**    SO ON THE FIRST PAGE OF THE LIST I PUT THE

5  SKELETAL MUSCLE RELAXANTS.  ROBAXIN WAS ADDED FOR

6  COMPLETENESS, BUT IT WASN'T THAT -- BUT WHEN WE

7  SPOKE, THE ISSUE WAS THERE WOULD BE PATIENTS THAT

8  NEEDED INCREMENTAL SKELETAL MUSCLE RELAXANTS.  TO BE

9  ABLE TO PROVIDE ONE WITH THE LEAST ANTICHOLINERGIC

10 SIDE EFFECT PROFILE, IT WAS ROBAXIN.  SO THE DECISION

11 WAS TO HAVE ONE AVAILABLE FOR LIMITED USE, AND

12 ROBAXIN WAS LEFT ON THE LIST.

13    **Q**    AND THERE WAS SOME DISCUSSION EARLIER,

14 DOCTOR, ABOUT SOMEONE WHO IS ON A MEDICATION --

15 PERHAPS IT'S HIGH ON THE ANTICHOLINERGIC SCALE -- AND

16 HAS A HEAT PRECAUTION DUTY STATUS.  IF THAT PERSON

17 FOR WHATEVER REASON NO LONGER NEEDS THAT MEDICATION,

18 IS THERE ANY REASON, JUST BECAUSE THE INDIVIDUAL AT

19 ONE POINT HAD THE MEDICATION, THAT THAT INDIVIDUAL

20 SHOULD KEEP A HEAT PRECAUTION DUTY STATUS?

21    **A**    NO.  AND IN THE DISCUSSION, IF YOU'LL NOTICE

22 THE BOTTOM OF THE PAGE SAYS SOMETIMES THERE WOULD BE

23 LIMITED USE.  SO IF SOMEONE IS STUNG BY A BEE AND

24 THEY GET PUT ON BENADRYL FOR A BEE STING, ONCE

25 THEY'RE NO LONGER ON BENADRYL FOR THE BEE STING,

1  THERE WOULD BE NO REASON TO BE ON THE HEAT DUTY

2  STATUS BECAUSE THEY'RE NOT ON IT; IT'S METABOLIZED

3  RATHER QUICKLY.  ARE THERE SOME MEDS THAT TAKE LONGER

4  TO METABOLIZE THAT HAVE A LONGER HALF-LIFE, STAYS IN

5  THE BODY A LITTLE LONGER THAN OTHERS?  YES.

6       BUT USUALLY WHEN THAT MEDICATION IS STOPPED

7  AND THERE IS NO CORRESPONDING REASON TO CONTINUE IT,

8  THEN THEY -- THEN THE BODY THEN ELIMINATES IT AND

9  THERE WOULD BE NO REASON FOR IT TO BE THERE.

10     Q    TIME FRAME ON THAT ELIMINATION, WE'RE NOT

11  TALKING MONTHS?

12     A    NO.  NO.  WE'RE NOT TALKING MONTHS FOR

13  ANYTHING.  PROBABLY -- I THINK THERE WAS AN EXAMPLE

14  GIVEN EARLIER OF THE -- OF -- I'M TRYING TO THINK OF

15  SOMETHING THAT STAYS IN THE BODY.  IT'S NOT ON THE

16  HEAT DUTY STATUS, BUT IT TAKES THREE DAYS FOR

17  PRILOSEC, THE LITTLE PURPLE PILL, TO GET UP TO BODY

18  THERAPEUTIC LEVELS.  IT TAKES THREE DAYS FOR IT TO

19  FALL OFF, SO EVERY MED HAS ITS OWN HALF-LIFE.

20     Q    OKAY.  AND IF WE COULD GO TO THE LAST PAGE

21  OF THIS LIST, JUST TO BE SURE WE HAVE THE END.

22  NITRATES AND STIMULANTS.  THOSE -- THE ACH SCORE --

23  THERE IS NOTHING FOR EITHER OF THOSE MEDICATIONS?

24     A    THAT'S CORRECT.

25     Q    BUT THEY'RE STILL ON THE LIST?

1    **A**   YES, BECAUSE THEY STILL HAVE MECHANISMS OF

2   HEAT PATHOLOGY IN COLUMN 4.

3    **Q**   OKAY.  PARTICULARLY NITRATES, WE'RE LOOKING

4   AT PERIPHERAL VASODILATION.  WHAT IS THAT?

5    **A**   SO THAT'S SIGNIFICANT -- SO THAT IS

6   NITROGLYCERIN.  SO ALL OF US HAVE PROBABLY HAD A

7   GRANDPARENT OR SOMEONE IN THEIR FAMILY THAT CARRIED

8   THE BOTTLE.  WHEN THEY HAD A CHEST PAIN THEY'D TAKE

9   NITROGLYCERIN.  IT OPENS UP THE VASCULATURE,

10  VASODILATION.  BUT BECAUSE OF THE EFFECT, CARDIAC AND

11  DILATION, THE DECISION WAS IT NEEDED TO BE ON THE

12  LIST.

13       WITH THAT, I'LL ALSO SAY -- AND I SAID THIS

14  IN MY DECLARATION -- THE CLINICAL CONDITION OF THE

15  PATIENT MIGHT SUPERSEDE THIS, BECAUSE SOMEONE WHO HAD

16  SUCH CARDIAC PROBLEMS THAT THEY NEEDED TO BE ON

17  NITROGLYCERIN WOULD PROBABLY HAVE ISCHEMIC HEART

18  DISEASE.  SO THAT CLINICAL CONDITION BEFORE YOU GET

19  TO THE HEAT DUTY STATUS, IT ALMOST IS JUST A

20  SECONDARY SAFETY MECHANISM.

21   **Q**   AND THEN FINALLY THE STIMULANTS.  I SEE YOU

22  MENTIONED ADDERALL, KIND OF A POPULAR DRUG THESE

23  DAYS, SEEMS TO BE.  THAT IT'S ON THERE BECAUSE IT IS

24  KNOWN TO INCREASE THE BODY TEMPERATURE?

25   **A**   HAS A CENTRAL EFFECT AND IT WILL INCREASE --

1  COULD INCREASE THE BODY TEMPERATURE.

2      **Q**    DOCTOR, THIS THREE-PAGE LIST OF MEDICINES,

3  THIS IS A LIST THAT YOU ARE PROFESSIONALLY

4  COMFORTABLE WITH?

5      **A**    YES.  YES.

6      **Q**    HOW MUCH TIME DID YOU TAKE IN GETTING THIS

7  LIST TOGETHER?

8      **A**    SO THIS ISN'T A NEW SCIENCE TO ME.  I MEAN,

9  IT'S SOMETHING I'VE DONE OVER THE YEARS FOR

10  VARIOUS -- WITHIN VARIOUS ORGANIZATIONS.  BUT THE

11  REVIEW AND DEVELOPMENT -- REALLY FOR THIS ONE IT WAS

12  JUST REFINING THE LIST, MAKING SURE IS THERE ANY NEW

13  SCIENCE OUT THERE.  IT WAS MULTIPLE HOURS.  I MEAN,

14  YOU KNOW, MULTIPLE HOURS.

15      **Q**    THANK YOU, DOCTOR.

16          **MR. BLANCHFIELD:**  THAT'S ALL THE QUESTIONS I

17  HAVE, JUDGE.

18          **THE COURT:**  THANK YOU, MR. BLANCHFIELD.

19              OKAY.  AT THIS TIME WE WILL TAKE OUR

20  AFTERNOON BREAK.  WE'LL BE ON RECESS FOR TEN MINUTES.

21              NOW, DR. BARNES, I KNOW -- I'M SURE

22  YOU'VE TESTIFIED BEFORE AND YOU KNOW THE RULES.

23  DURING THE COURSE OF THE BREAK, PLEASE DO NOT DISCUSS

24  YOUR TESTIMONY WITH ANYONE, EITHER COUNSEL FOR THE

25  DEFENDANTS OR ANY PARTIES OR OTHER WITNESSES WHO ARE

1    PRESENT OR, FOR THAT MATTER, FOR THE PLAINTIFF AS

2    WELL.

3              DO YOU HAVE ANY QUESTIONS ABOUT THAT,

4    MA'AM?

5              **THE WITNESS:**  NO.  THANK YOU.

6              **THE COURT:**  THANK YOU.  ALL RIGHT.  AGAIN,

7    COURT IS IN RECESS FOR TEN MINUTES.

8              **THE LAW CLERK:**  ALL RISE.

9              THE COURT IS IN RECESS.

10             **(WHEREUPON, A RECESS WAS TAKEN.)**

11             **THE LAW CLERK:**  ALL RISE.

12             THE COURT IS NOW IN SESSION.

13             **THE COURT:**  PLEASE BE SEATED.

14             OKAY.  WE ARE BACK ON THE RECORD IN THE

15   CASE OF *VOTE VERSUS LEBLANC*.  AT THIS TIME WE WILL

16   BEGIN THE CROSS-EXAMINATION OF DR. BARNES.

17                    **CROSS-EXAMINATION**

18   **BY MS. MONTES:**

19       **Q**   GOOD AFTERNOON, DR. REYNOLDS-BARNES.  MY

20   NAME IS AMARIS MONTES.  I AM AN ATTORNEY WITH THE

21   PLAINTIFFS.  WE'VE NEVER MET, SO I JUST WANTED YOU

22   TO -- FOR ME TO INTRODUCE MYSELF.

23       **A**   NICE TO MEET YOU.

24             **THE REPORTER:**  CLOSER TO THE MICROPHONE,

25   PLEASE.

1          MS. MONTES:  OH, SURE.

2     BY MS. MONTES:

3          Q     DR. REYNOLDS-BARNES, YOU'RE SERVING AS AN

4     EXPERT WITNESS FOR THE LOUISIANA DEPARTMENT OF

5     CORRECTIONS IN PHARM-D EFFECTS OF MEDICATION AND

6     CORRECTIONAL PHARMACY SERVICES.  CORRECT?

7          A     CORRECT.

8          Q     AND YOU'VE NEVER SERVED AS AN EXPERT WITNESS

9     BEFORE?

10         A     NO.

11         Q     YOU'RE FAMILIAR WITH THE LOUISIANA STATE

12    PENITENTIARY'S HEALTH CARE POLICY 8, OR HCP 8.

13    CORRECT?

14         A     YES.

15         Q     AND ARE YOU FAMILIAR WITH ATTACHMENT A TO

16    THAT POLICY, WHICH IS A MEDICATION LIST?

17         A     YES.

18         Q     YOU AGREE THAT ONE REASON FOR THE MEDICATION

19    LIST IS, IN PART, TO IDENTIFY IF SOMEONE SHOULD

20    RECEIVE A HEAT PRECAUTION DUTY STATUS.  RIGHT?

21         A     CORRECT.

22         Q     AND YOU AGREE THAT HEAT PRECAUTION DUTY

23    STATUS IS ONE WAY TO ENSURE THAT THOSE WITH IMPAIRED

24    THERMOREGULATION ARE NOT PLACED AT RISK OF

25    HEAT-RELATED ILLNESSES.  CORRECT?

1      **A**    CORRECT.

2      **Q**    YOU AGREE THAT LSP SHOULD IDENTIFY EVERY

3  PERSON WHO TAKES ONE OR MORE OF THE MEDICATIONS ON

4  THE MEDICATION LIST ATTACHED TO HCP 8.  CORRECT?

5      **A**    YES.

6      **Q**    AND YOU AGREE THAT EVERY PERSON WHO TAKES

7  ONE OR MORE OF THE MEDICATIONS SHOULD BE CONSIDERED

8  FOR HEAT PROTECTED DUTY STATUS?

9      **A**    YES.

10     **Q**    IN FACT, YOU PREVIOUSLY STATED IN YOUR

11 DEPOSITION ON SEPTEMBER 27, 2024, THAT, QUOTE,

12 EVERYTHING ON THE LIST SHOULD AUTOMATICALLY TRIGGER

13 THE CONSIDERATION OF HEAT DUTY STATUS.  RIGHT?

14     **A**    YES.

15     **Q**    THIS MEANS THAT EVEN IF A PATIENT DOESN'T

16 REQUEST A HEAT DUTY STATUS, IF THEY'RE ON ONE OF

17 THESE MEDICATIONS ON THE LIST, THEY SHOULD

18 AUTOMATICALLY BE CONSIDERED FOR HEAT DUTY STATUS.

19 CORRECT?

20     **A**    YES.

21     **Q**    AND IT'S IMPORTANT THAT THOSE WHO NEED A

22 HEAT DUTY STATUS RECEIVE ONE TO REDUCE THE RISK OF

23 HARM.  CORRECT?

24     **A**    YES.

25     **Q**    IN ORDER TO PROTECT PATIENTS, IT'S IMPORTANT

1  THAT THE HEAT DUTY STATUS BE ASSIGNED APPROPRIATELY.

2  CORRECT?

3      **A**    YES.

4      **Q**    AND YOU AGREE THAT IF SOMEONE IS ON ONE OF

5  THE MEDICATIONS ON THE LIST, OFFICIALS SHOULD ONLY

6  RARELY DENY HEAT DUTY STATUS.  CORRECT?

7      **A**    I THINK I AGREE TO WHAT I INITIALLY SAID;

8  THEY SHOULD ALL BE CONSIDERED.  I'M NOT SURE THE

9  CONCEPT OF "ONLY RARELY" DOESN'T REALLY MEAN -- I

10 DON'T KNOW WHAT THAT MEANS, HOW YOU APPLY THAT

11 CLINICALLY.

12     **Q**    OKAY, SURE.  ISN'T IT TRUE THAT IN YOUR MOST

13 RECENT DECLARATION THAT YOU SIGNED ON APRIL 11, 2025,

14 ON PAGE 7, PARAGRAPH 18, DIDN'T YOU STATE THAT,

15 QUOTE, OFFENDERS SHALL BE EVALUATED AND IF IN RARE

16 INSTANCES HEAT DUTY STATUS IS NOT PROVIDED, THE

17 DOCUMENTATION OF THE REASONING MUST BE PLACED IN THE

18 CHART, END QUOTE?  SO YOU USED THE WORD "RARE" IN

19 THAT.

20     **A**    SO IN THAT CASE I'M -- MY FOCUS ON THAT

21 STATEMENT WAS IF SOMEONE DIDN'T HAVE HEAT DUTY

22 STATUS, THE PATIENT OPTED OUT, THERE WAS A CLINICAL

23 REASON NOT TO, IT SHOULD BE DOCUMENTED IN THE PATIENT

24 RECORD.  I DO AGREE WITH YOU.

25     **Q**    OKAY.

1          **MS. WRIGHT:**  I'M SO SORRY.  COULD YOU PLEASE

2   TURN ON THE SCREEN?  THANK YOU.  I'M SO SORRY.

3          **THE COURT:**  WAIT, WAIT.  I DON'T UNDERSTAND.

4   WHAT WAS YOUR REQUEST?

5          **MS. WRIGHT:**  I'M SORRY, JUDGE.  I THINK THE

6   SCREEN NEEDS TO BE SWITCHED SO THAT THE ATTORNEY CAN

7   USE DEMONSTRATIVES.

8          **THE COURT:**  OKAY.  SO LET ME UNDERSTAND.  SO

9   YOU -- DID YOU PUBLISH THE DOCUMENT FOR THE WITNESS?

10         **MS. MONTES:**  NO, YOUR HONOR, NOT FOR THIS

11  INSTANCE.

12         **THE COURT:**  SO THAT'S WHY I DON'T HAVE IT,

13  SO -- IT'S NOT BEEN PUBLISHED, SO -- OKAY.  WOULD YOU

14  LIKE IT PUBLISHED?

15         **MS. MONTES:**  NO.  I THINK THAT'S FINE, YOUR

16  HONOR.

17         **THE COURT:**  VERY GOOD.

18  **BY MS. MONTES:**

19     **Q**    SO YOU AGREE THAT IF SOMEONE IS NOT PROPERLY

20  IDENTIFIED AND ASSIGNED A HEAT DUTY STATUS, IT MAY

21  POSE A RISK TO HUMAN HEALTH?

22     **A**    YES.

23     **Q**    YOU WERE HIRED BY THE LOUISIANA DEPARTMENT

24  OF CORRECTIONS IN JUNE 2024 TO REVIEW THE PREVIOUS

25  HEAT PATHOLOGY MEDICATION LIST.  CORRECT?

1      **A**    YES.

2      **Q**    AND IN YOUR OPINION, IT'S BEST PRACTICE TO

3  UPDATE A HEAT PATHOLOGY MEDICATION LIST EVERY OTHER

4  YEAR?

5      **A**    IT SHOULD BE REVIEWED EVERY YEAR TO EVERY

6  OTHER YEAR.  WHETHER OR NOT IT'S UPDATED WOULD BE THE

7  RESULT OF THAT REVIEW.

8      **Q**    THE MEDICATION LIST THAT YOU WERE REVIEWING

9  WAS FROM OCTOBER OF 2018.  CORRECT?

10     **A**    I DO NOT REMEMBER THE EXACT YEAR.

11     **Q**    WE CAN PULL UP -- IT'S JX -- JOINT EXHIBIT

12  37.  AND I THINK IF YOU GO TO THE FIRST PAGE.

13         DOES THIS REFRESH YOUR MEMORY THAT IT WAS

14  FROM AUGUST 2018?  THIS IS THE LIST THAT YOU WERE

15  REVIEWING.  CORRECT?

16     **A**    THAT IS THE DATE ON THE POLICY.  I DON'T

17  KNOW IF THAT'S THE SAME DATE ON THE LIST.  IT MAY BE.

18  I JUST DON'T KNOW.  YES.

19     **Q**    HERE YOU SEE THE LIST.  DOES THAT --

20     **A**    YES.  THANK YOU.

21     **Q**    AND SO THIS MEDICATION LIST THAT WE SEE HAS

22  ALMOST EXCLUSIVELY INCLUDED ONLY PSYCHOTROPIC

23  MEDICATIONS.  CORRECT?

24     **A**    ALMOST EXCLUSIVELY.

25     **Q**    YOU AGREE THAT PSYCHOTROPIC MEDICATIONS CAN

1  IMPAIR A BODY'S ABILITY TO THERMOREGULATE.  CORRECT?

2    **A**    YES.

3    **Q**    AND A PERSON TAKING A PSYCHOTROPIC IS AT

4  RISK OF SUSTAINING HEAT-RELATED ILLNESS.  CORRECT?

5    **A**    YES.

6    **Q**    AND A HEAT-RELATED ILLNESS CAN BE SERIOUS OR

7  EVEN POTENTIALLY FATAL.  RIGHT?

8    **A**    YES.

9    **Q**    YOU AGREE THAT PSYCHOTROPIC MEDICATIONS

10 SHOULD REMAIN ON THE LIST.  CORRECT?

11   **A**    YES.

12   **Q**    MEANING AN INCARCERATED PERSON TAKING A

13 PSYCHOTROPIC MEDICATION SHOULD AUTOMATICALLY BE

14 CONSIDERED FOR A HEAT PRECAUTION DUTY STATUS.

15 CORRECT?

16   **A**    I WANT TO BE CLEAR.  ARE YOU SAYING

17 PSYCHOTROPICS OR ANTIPSYCHOTICS?  BECAUSE THOSE ARE

18 ACTUALLY TWO DIFFERENT TERMS.

19   **Q**    I JUST MEAN ANY MEDICATION THAT IS ON THIS

20 LIST.  IF A PERSON IS TAKING ONE OF THOSE

21 MEDICATIONS, THEY SHOULD AUTOMATICALLY BE CONSIDERED

22 FOR HEAT PRECAUTION DUTY STATUS?

23   **A**    YES.  THIS LIST, YES.

24   **Q**    AND THIS LIST INCLUDED ALMOST EXCLUSIVELY

25 PSYCHOTROPIC MEDICATIONS.  CORRECT?

1      **A**    ALMOST EXCLUSIVELY.

2      **Q**    BUT THERE ARE MANY MEDICATIONS OTHER THAN

3  THE PSYCHOTROPICS THAT IMPAIR THE ABILITY TO

4  THERMOREGULATE.  CORRECT?

5      **A**    YES.

6      **Q**    BUT D.O.C.'S 2018 MEDICATION LIST OMITTED

7  MANY OF THESE MEDICATIONS?

8      **A**    YES.

9      **Q**    IN FACT, YOU PREVIOUSLY STATED IN YOUR

10  DEPOSITION IN SEPTEMBER 27, 2024, THAT, QUOTE, UPON

11  REVIEW OF D.O.C.'S MEDICATION LIST, YOU OBVIOUSLY

12  FELT THE LIST NEEDED TO BE UPDATED, END QUOTE.

13  CORRECT?

14      **A**    YES, I UPDATED THE LIST.

15      **Q**    YOU RECOMMENDED THAT D.O.C. ADD ADDITIONAL

16  MEDICATIONS TO THE HEAT PATHOLOGY MEDICATION LIST

17  OVER THE COURSE OF THIS LITIGATION.  RIGHT?

18      **A**    YES.

19      **Q**    AND MANY OF THE MEDICATIONS YOU RECOMMENDED

20  WERE MEDICATIONS WITH HIGH ANTICHOLINERGIC RISK

21  PROPERTIES.  CORRECT?

22      **A**    THAT WAS SOME OF THEM, YES.

23      **Q**    ANTICHOLINERGICS ARE WELL-KNOWN TO IMPAIR

24  THERMOREGULATION AND PLACE A PATIENT AT HIGH RISK OF

25  HEAT-RELATED ILLNESS.  CORRECT?

1      **A**    YES.

2      **Q**    BUT YOU ALSO AGREE THAT SOME MEDICATIONS

3   WITHOUT ANTICHOLINERGIC PROPERTIES CAN ALSO IMPAIR A

4   BODY'S ABILITY TO THERMOREGULATE.  RIGHT?

5      **A**    I AGREE.

6      **Q**    YOU INCLUDED SOME MEDICATIONS THAT DO NOT

7   HAVE HIGH ANTICHOLINERGIC PROPERTIES BUT WHICH STILL

8   AFFECT --

9         **THE REPORTER:**  BUT WHICH STILL AFFECT?

10        **MS. MONTES:**  THE BODY'S ABILITY TO

11   THERMOREGULATE.  I'M SORRY.

12   **BY THE WITNESS:**

13      **A**    YES.

14      **Q**    YOUR REPORT INCLUDES A SCALE FOR

15   ANTICHOLINERGIC LEVEL OF MEDICATIONS FROM ZERO TO

16   THREE.  RIGHT?

17      **A**    YES.

18      **Q**    AND YOU CALL THIS AN ANTICHOLINERGIC RISK

19   SCORE.  CORRECT?

20      **A**    YES.

21      **Q**    BUT THERE ARE A NUMBER OF DIFFERENT KINDS OF

22   SCALES IN THE LITERATURE THAT WILL CATEGORIZE THE

23   ANTICHOLINERGIC RISK PROFILE OUTSIDE OF THE

24   ZERO-TO-THREE SCALE.  CORRECT?

25      **A**    THERE ARE OTHER SCALES.  BUT WHEN YOU READ

1  THOSE LITERATURES, THEY'LL USUALLY -- AND I'M GOING

2  TO -- I THINK IT'S PRONOUNCED CRIDECO -- THEY'LL ALL

3  GO BACK AND REFERENCE THAT SCALE AS THEIR STARTING

4  POINT, THE SWEDISH SCALE.  THERE'S A FEW DIFFERENT

5  ONES, BUT THEY ACTUALLY GO BACK, IF YOU LOOK IN THE

6  LITERATURE, AND REFERENCE THE PARTICULAR SCALE, THE

7  CRIDECO SCALE.

8     Q    SO YOU AGREE THAT THERE IS OTHER SCALES

9  OUTSIDE OF THE ZERO-TO-THREE SCALE?

10    A    THERE ARE OTHER SCALES, YES.

11    Q    SO NEXT I WANT TO TURN TO YOUR OPINION ABOUT

12 SSRIs.  SO SSRIs ARE NOT ON YOUR RECOMMENDED

13 MEDICATION LIST.  CORRECT?

14    A    NO.

15    Q    YOU AGREE THAT SSRIs DO AFFECT THE

16 HYPOTHALAMUS.  CORRECT?

17    A    YES.

18    Q    AND YOU AGREE THAT THE HYPOTHALAMUS IS

19 CRITICAL TO THE BODY'S DETECTION OF TEMPERATURE.

20 CORRECT?

21    A    THAT IS ONE OF THE ROLES OF THE

22 HYPOTHALAMUS, CORRECT.

23    Q    YOU PREVIOUSLY STATED THAT SSRIs WERE NOT

24 INCLUDED IN THE MEDICATION LIST BECAUSE THEY HAVE

25 LIMITED ANTICHOLINERGIC EFFECTS ON THE BODY.

1   CORRECT?

2      **A**   THEY WEREN'T INCLUDED BECAUSE THEY HAVE

3   LIMITED ANTICHOLINERGIC EFFECT AND THERE WAS NO

4   SIGNIFICANT BODY OF LITERATURE THAT I COULD FIND

5   WHERE THEY AFFECTED THE BODY'S ABILITY TO

6   THERMOREGULATE.  THERE WERE -- I COULD FIND NO CASE

7   STUDIES, NOR META-ANALYSIS TO INCLUDE THEM INTO THE

8   LIST.  AND AGAIN, THAT WAS THE REASON FOR EXCLUSION.

9   THEY WERE LOOKED AT AND I DID TRY TO REVIEW THAT BY

10  THE LITERATURE TO SEE WHY WOULD THEY BE ON THE HOST

11  SCALE, BUT THEY WEREN'T THERE.

12     **Q**   AND, YOU KNOW, YOU SPEAK OF THE STUDIES THAT

13  YOU REVIEWED.  YOU DIDN'T PROVIDE THE PLAINTIFFS WITH

14  A COMPREHENSIVE LIST OF STUDIES OR LITERATURE THAT

15  YOU REVIEWED.  CORRECT?

16     **A**   NO.

17     **Q**   IN FACT, YOU COULDN'T PROVIDE A COMPLETE

18  LIST BECAUSE YOU DID NOT KEEP TRACK OF WHAT YOU

19  REVIEWED AT LEAST AT THE TIME OF YOUR DEPOSITION IN

20  SEPTEMBER 2024.  CORRECT?

21     **A**   THAT'S CORRECT.

22     **Q**   IN FACT, YOU DIDN'T PROVIDE A SINGLE OTHER

23  CITATION OTHER THAN *THE LANCET* ARTICLE THAT YOU

24  REFERRED TO EARLIER TODAY IN YOUR CONCLUSIONS ABOUT

25  SSRIs.  CORRECT?

1    **A**   THAT'S CORRECT.

2    **Q**   SO I WANT TO TALK A LITTLE BIT ABOUT *THE*

3 *LANCET* ARTICLE THAT YOU REFERRED TO.  SO THIS

4 ARTICLE, AS YOU STATED PREVIOUSLY, WAS PUBLISHED IN

5 *THE LANCET* PUBLICATION.  IS THE TITLE OF THE

6 PUBLICATION "THE EFFECT OF PRESCRIPTION AND

7 OVER-THE-COUNTER MEDICATIONS ON CORE TEMPERATURE IN

8 ADULTS DURING HEAT STRESS:  A SYSTEMATIC REVIEW AND

9 META-ANALYSIS"?  IS THAT THE TITLE?

10   **A**   YES.

11   **Q**   AND WAS THIS ARTICLE PUBLISHED IN NOVEMBER

12 OF 2024?

13   **A**   I THOUGHT IT WAS OCTOBER, BUT IT MAY HAVE

14 BEEN NOVEMBER.

15        MS. MONTES:  WE CAN PULL UP THE ARTICLE, IF

16 WE CAN PUBLISH THAT.  IT'S -- SHOULD BE IMX2 ON PAGE

17 1.

18 **BY MS. MONTES:**

19   **Q**   DOES THIS REFRESH YOUR RECOLLECTION?

20   **A**   YES.

21   **Q**   SO YOU COULD NOT HAVE RELIED UPON THIS

22 ARTICLE TO INFORM YOUR DECISION TO EXCLUDE SSRIs IN

23 YOUR INITIAL REPORT WHICH WAS DATED IN SEPTEMBER

24 2024.  CORRECT?

25   **A**   THAT'S CORRECT.

1    **Q**    AND AS YOU EXPLAINED EARLIER IN YOUR

2    TESTIMONY, *THE LANCET* ARTICLE IS A SUMMARY REVIEW OF

3    STUDIES THAT INTERNATIONAL ORGANIZATIONS RELY UPON TO

4    PROVIDE RECOMMENDATIONS REGARDING MEDICATIONS THAT

5    IMPAIR THERMOREGULATION.  CORRECT?

6    **A**    CAN YOU REPEAT THAT?  I'M SORRY.

7    **Q**    SURE.  SO *THE LANCET* ARTICLE THAT YOU CITE,

8    IS IT -- ISN'T IT A SUMMARY REVIEW OF STUDIES THAT

9    INTERNATIONAL ORGANIZATIONS RELY UPON TO PROVIDE

10   RECOMMENDATIONS REGARDING MEDICATIONS THAT IMPAIR

11   THERMOREGULATION?

12   **A**    CORRECT.

13   **Q**    AND THE STUDY SPECIFICALLY ANALYZED THE

14   RECOMMENDATIONS OF MEDICATIONS BY THE WORLD HEALTH

15   ORGANIZATION, OR W-H-O, AS YOU REFERRED TO IT

16   EARLIER.  CORRECT?

17   **A**    SO IT SPOKE TO WHO, BUT WE UNDERSTAND THAT

18   BOTH WHO AND CDC USE THE SAME LIST.  BUT YES.

19         **THE COURT:**  WHEN YOU REFERENCE "WHO," YOU'RE

20   TALKING ABOUT THE WORLD HEALTH ORGANIZATION.

21   CORRECT?

22         **THE WITNESS:**  CORRECT.

23   **BY MS. MONTES:**

24   **Q**    SO THIS MEANS THAT THE ARTICLE ANALYZES THE

25   STUDIES OF SSRIs BECAUSE THE WORLD HEALTH

1  ORGANIZATION AND THE CDC RECOGNIZES THAT THOSE

2  MEDICATIONS IMPAIR THERMOREGULATION.  CORRECT?

3      **A**    THEY ARE ON THEIR LIST CURRENTLY, YES.

4      **Q**    AND *THE LANCET* ARTICLE FOCUSES EXCLUSIVELY

5  ON THE EFFECT OF CORE TEMPERATURE RESPONSES TO HEAT

6  STRESS.  CORRECT?

7      **A**    CORRECT.

8      **Q**    SO LET'S TALK ABOUT THE SECTION OF THE

9  ARTICLE THAT YOU RELY UPON IN YOUR MOST RECENT

10  DECLARATION THAT YOU SUBMITTED ON APRIL 11, 2025.

11          SO IN YOUR DECLARATION YOU -- A PART OF *THE*

12  *LANCET* ARTICLE THAT YOU QUOTE STATES THAT TEN

13  RANDOMIZED CONTROLLED TRIALS WERE INVESTIGATED WITH

14  PSYCHOTROPIC MEDICATIONS.  THAT'S CORRECT.  RIGHT?

15      **A**    CORRECT.

16      **Q**    BUT ONLY A PORTION OF THOSE TEN INCLUDED

17  SSRIs.  CORRECT?

18      **A**    CORRECT.

19      **Q**    AND, IN FACT, ONLY TWO SSRIs WERE STUDIED:

20  CITALOPRAM AND PAROXETINE.  CORRECT?

21      **A**    AND THEN AN NRI, CORRECT.

22      **Q**    BUT THERE ARE MANY OTHER SSRIs THAT EXIST.

23  CORRECT?

24      **A**    THERE -- THEY ARE.  BUT THEIR MECHANISM IS

25  IN THAT THEY BLOCK SEROTONIN, SO WE EXPECT A CLASS

1 EFFECT.  BUT YOU ARE CORRECT; THERE ARE THREE OR FOUR

2 OTHERS.

3     **Q**   AND THOSE SSRIs ARE NOT INCLUDED IN THIS

4 STUDY?

5     **A**   THAT IS CORRECT.

6     **Q**   SO IF WE CONTINUE ON IN THE PARAGRAPH THAT

7 YOU CITE, IT STATES THAT, QUOTE, NO SWEATING DATA WAS

8 REPORTING -- WAS REPORTED FOR ANTI-DEPRESSANTS.

9 CORRECT?

10     **A**   CORRECT.

11     **Q**   AND SWEATING DATA COULD BE IMPORTANT TO

12 ASSESS A MEDICATIONS'S EFFECT ON THERMOREGULATION.

13 CORRECT?

14     **A**   YES.

15     **Q**   IN FACT, IN YOUR DEPOSITION YOU STATED THAT

16 SSRIs SHOULD NOT BE ON THE LIST BECAUSE THEY DO NOT

17 BLOCK THE BODY'S ABILITY TO SWEAT.  CORRECT?

18     **A**   CORRECT.  THROUGH AN ANTICHOLINERGIC

19 MECHANISM.  MAKE SURE I SAY THAT.  THROUGH AN

20 ANTICHOLINERGIC MECHANISM.

21     **Q**   BUT A STUDY THAT DOESN'T COLLECT DATA ON

22 SWEATING COULD NOT CONFIRM THIS THEORY.  CORRECT?

23     **A**   COULD NOT CONFIRM WHAT THEORY?

24     **Q**   THAT SSRIs DO NOT BLOCK THE BODY'S ABILITY

25 TO SWEAT.

1    **A**    SO I FOLLOWED UP JUST NOW BY SAYING THAT THE

2    SSRIs DON'T BLOCK SWEATING THROUGH AN ANTICHOLINERGIC

3    MECHANISM.  THAT'S -- SORRY.  THAT'S THE MECHANISM TO

4    BLOCK SWEATING.  BUT THIS STUDY IS LOOKING AT ITS

5    EFFECT ON CHANGING THE CORE BODY TEMPERATURE.  SO I'M

6    NOT SURE WE'RE HAVING THE SAME CONVERSATION, LIKE I'M

7    NOT SURE WE'RE DISCUSSING THE SAME THING --

8    **Q**    OKAY.

9    **A**    -- IN THOSE TWO SEPARATE STATEMENTS.

10   **Q**    BUT IT DOESN'T SUPPORT YOUR -- ANY

11   CONCLUSION THAT SSRIs DO NOT BLOCK THE BODY'S ABILITY

12   TO SWEAT?

13   **A**    SSRIs ARE NOT ANTICHOLINERGIC.  SSRIs DO NOT

14   -- SINCE THEY DON'T HAVE AN ANTICHOLINERGIC SIDE

15   EFFECT, THEY ACTUALLY DO NOT BLOCK THE BODY'S EFFECT

16   TO SWEAT.

17   **Q**    SO YOU READ THE ENTIRE *LANCET* ARTICLE --

18   **A**    YES.

19   **Q**    -- IN RELYING ON IT FOR YOUR MOST RECENT --

20       **THE REPORTER:**  FOR YOUR MOST RECENT WHAT?

21       **MS. MONTES:**  RECENT DECLARATION.

22   **BY THE WITNESS:**

23   **A**    (MOVING HEAD UP AND DOWN.)

24   **Q**    SO IN THE ARTICLE'S CONCLUSION, DOESN'T THE

25   ARTICLE CONCLUDE THAT THEY DID NOT FIND EVIDENCE

1  SUPPORTING THE ADVERSE EFFECTS OF ANTIPSYCHOTICS ON

2  THERMOREGULATION?

3      **A**    IF YOU CAN GO TO THE EXACT STATEMENT AT THE

4  END.

5      **Q**    SURE.  SO WE CAN PULL IT UP IN THE ACTUAL

6  ARTICLE.  IT'S ON PAGE 10.

7          SO HERE IT LISTS SEVERAL DRUG CATEGORIES AND

8  ITS OVERALL CONCLUSIONS.  AND IT STATES THAT WE DID

9  NOT FIND EVIDENCE SUPPORTING THE ADVERSE EFFECTS OF

10  THE REMAINING SEVEN DRUG CATEGORIES ON HUMAN

11  THERMOREGULATION DURING HEAT STRESS, INCLUDING

12  ANTIDEPRESSANTS, ANTIHISTAMINES, ANXIOLYTICS --

13  APOLOGIES FOR MY PRONUNCIATION.

14      **A**    THAT'S CORRECT.

15      **Q**    -- ANTIPSYCHOTICS AND DIURETICS, WHILE NO

16  STUDIES ON ANTIEPILEPTICS WERE RETRIEVED.

17      **A**    CONTINUE READING.

18        **MS. MONTES:**  CAN YOU PULL UP THE REST OF

19  THAT PARAGRAPH, PLEASE?

20  **BY MS. MONTES:**

21      **Q**    ACROSS ALL DRUG CATEGORIES, THE QUALITY OF

22  EVIDENCE RANGED FROM MODERATE TO VERY LOW.

23      **A**    YES.  SO THIS SPECIFIC STUDY DID EXACTLY

24  WHAT WE WERE LOOKING FOR.  THERE IS A LIST THAT

25  PEOPLE HEAVILY RELY ON.  IT'S THE WHO LIST, WHICH IN

1  TURN BECOMES THE CDC LIST.

2          WHAT THIS STUDY WAS TRYING TO SAY IS:  LET'S

3  LOOK AT EVERY DRUG ON THAT LIST AND SEE IS THERE ANY

4  EVIDENCE OF WHY THEY WERE INCLUDED; WHERE ARE THE

5  STUDIES THAT BACKED IT UP.  AND SO THEY ARE SAYING

6  ACROSS THE BOARD MANY OF THESE DRUGS DON'T HAVE

7  CLINICAL EVIDENCE TO SUPPORT THEIR ADDITION.

8          WE HAVE TO TAKE A LITTLE BIT MORE

9  CONSERVATIVE APPROACH; AND THAT IS ONE OF THE REASONS

10 THAT I STILL CONTINUE TO RELY ON THE ANTICHOLINERGIC

11 PROFILE OF THE DRUG, BECAUSE EVEN THOUGH THIS MAY NOT

12 HAVE SHOWN SIGNIFICANT EVIDENCE THAT IT SHOULD BE ON

13 THE LIST, WE KNOW THAT THOSE DRUGS HAVE A SIDE EFFECT

14 PROFILE IN AND OF THEMSELVES THAT, UNTIL THERE IS

15 MORE DATA, WE NEED TO RELY ON THAT PROFILE.  I

16 COULDN'T MAKE THAT SAME LEAP FOR SSRIs.

17    Q    OKAY.  BUT -- SO YOU AGREE THAT THE ARTICLE

18 CONCLUDES THAT ANTIPSYCHOTICS HAVE NO EFFECT ON

19 THERMOREGULATION DURING HEAT STRESS.  CORRECT?

20    A    I AGREE THAT THE ARTICLE SAYS THEY RETRIEVED

21 NO STUDIES, THAT'S CORRECT.

22    Q    AND ANTIPSYCHOTICS WERE ON THE LSP 2018

23 MEDICATION LIST.  CORRECT?

24    A    YES.

25    Q    AND YOU PREVIOUSLY RECOMMENDED THAT

1  ANTIPSYCHOTICS STAY ON THE MEDICATION LIST BECAUSE

2  OF --

3      **A**   THAT'S CORRECT.

4      **Q**   BECAUSE OF THE RISK FOR HEAT-RELATED

5  ILLNESS.  CORRECT?

6      **A**   BECAUSE OF THEIR ANTICHOLINERGIC RISK SCORE,

7  WHICH AT THIS TIME STILL PUTS THEM AT RISK FOR

8  HEAT -- FOR CAUSING HEAT-RELATED ILLNESS, THAT IS

9  CORRECT.

10     **Q**   AND IN THE SAME CONCLUSIONS, *THE LANCET*

11 ARTICLE ALSO CONCLUDES THAT THERE IS NO EVIDENCE OF

12 ADVERSE EFFECTS ON DIURETICS ON THERMOREGULATION.

13 CORRECT?

14     **A**   CAN YOU PULL IT UP?  I'M NOT DOUBTING YOU.

15 I JUST WANT TO READ THE --

16     **Q**   SURE.  YEAH.

17     **A**   IT'S *THE LANCET* ARTICLE.

18     **Q**   IT'S THE SAME PARAGRAPH HERE, SO YOU'LL SEE

19 IN THE LIST IT ALSO INCLUDES DIURETICS?

20     **A**   CORRECT.

21     **Q**   YOU PREVIOUSLY RECOMMENDED THAT LOOP

22 DIURETICS BE ON THE MEDICATION LIST.  CORRECT?

23     **A**   YES.

24     **Q**   ARE YOU AWARE THAT DR. KELDIE PROVIDED THE

25 PLAINTIFFS WITH A LIST OF REFERENCES WHICH INCLUDED

1   AN ARTICLE FROM THE WEBSITE HEALTH ENTITLED, QUOTE,

2   SSRIs AND HEAT: WHY DOCTORS ARE URGING PEOPLE ON

3   ANTIDEPRESSANTS TO KEEP COOL THIS SUMMER, END QUOTE?

4       **A**   I DID NOT READ THAT ARTICLE.

5           **THE COURT:**  BUT YOU'RE NOT AWARE THAT THAT

6   ARTICLE WAS PROVIDED BY DR. KELDIE.  CORRECT?

7           **THE WITNESS:**  I AM NOT AWARE.

8           **THE COURT:**  SO THE QUESTION, IN OTHER WORDS,

9   WASN'T WHETHER YOU READ IT, BUT WERE YOU AWARE THAT

10  IT WAS PROVIDED TO OFFICIALS AT LSP?

11          **THE WITNESS:**  I AM NOT AWARE.

12  **BY MS. MONTES:**

13      **Q**   DID YOU PROVIDE ANY EVIDENCE OTHER THAN THIS

14  *LANCET* ARTICLE TO SHOW THAT SEROTONIN DOES NOT AFFECT

15  THERMOREGULATION?

16      **A**   I DID NOT, OUTSIDE OF MY DECLARATION.

17      **Q**   SEROTONIN IS A NEUROTRANSMITTER.  CORRECT?

18      **A**   CORRECT.

19      **Q**   IT'S NOT AN ENZYME?

20      **A**   CORRECT.

21      **Q**   AND TOO MUCH SEROTONIN CAN CAUSE

22  HYPERTHERMIA.  CORRECT?

23      **A**   IN THE SCENARIO OF I -- THAT I DISCUSSED OF

24  SEROTONIN SYNDROME, YES, IT CAN CAUSE HYPERTHERMIA.

25      **Q**   IS THAT BECAUSE IT AFFECTS THE HYPOTHALAMUS?

1    **A**   WELL, YES, IN THAT THE HYPOTHALAMUS DOES

2   CONTROL TEMPERATURE REGULATION.  AND SO WHEN YOU HAVE

3   TOO MUCH SEROTONIN -- I.E. SEROTONIN SYNDROME BECAUSE

4   YOU'VE NOW BLOCKED ITS BREAKDOWN -- THEN YES, YOU

5   WOULD HAVE INCREASED HEAT RETENTION.

6    **Q**   SO IF THERE WAS SUFFICIENT LITERATURE TO

7   SUPPORT THE IDEA THAT SSRIs IMPAIR THERMOREGULATION,

8   YOU WOULD AGREE THAT IT SHOULD BE ON HCP 8 MEDICATION

9   LIST.  CORRECT?

10    **A**   IF THERE WAS SUFFICIENT LITERATURE TO SHOW

11   THAT SSRIs DIRECTLY CONTRIBUTED TO HEAT-RELATED

12   ILLNESS, THEN YES, I WOULD ASK THAT IT BE ADDED.

13    **Q**   AND IF IT IS THAT THE MEDICATION -- IF IT

14   WAS ON THAT MEDICATION LIST, IT SHOULD AUTOMATICALLY

15   TRIGGER CONSIDERATION OF HEAT DUTY STATUS.  CORRECT?

16    **A**   IF IT'S ON THE LIST, IT SHOULD TRIGGER

17   CONSIDERATION, YES.

18    **Q**   SO NOW I WANT TO MOVE ON TO TALK A LITTLE

19   BIT ABOUT ACE INHIBITORS.  SO ACE INHIBITORS ARE

20   MEDICATIONS THAT TREAT HIGH BLOOD PRESSURE.  CORRECT?

21    **A**   THAT'S ONE OF THE THINGS THAT IT TREATS,

22   YES.

23    **Q**   AND ARBs ALSO TREAT -- OR STRIKE THAT.

24        ARBs ALSO BLOCK ANGIOTENSIN TO LOWER BLOOD

25   PRESSURE.  CORRECT?

```
 1              THE COURT:  ARBs ARE?

 2              MS. MONTES:  ANGIOTENSIN RECEPTOR BLOCKERS.

 3  BY MS. MONTES:

 4      Q    SO ANGIOTENSIN RECEPTOR BLOCKERS ALSO BLOCK

 5  ANGIOTENSIN TO LOWER BLOOD PRESSURE.  CORRECT?

 6      A    THAT'S ONE OF THE INDICATIONS, YES.

 7      Q    AND SO, AGAIN, IN YOUR MOST RECENT

 8  DECLARATION YOU CITED THIS *LANCET* ARTICLE TO SUPPORT

 9  YOUR CONCLUSION TO EXCLUDE ACE INHIBITORS AND ARBs

10  FROM THE MEDICATION LIST.  CORRECT?

11      A    IN MY MOST RECENT DECLARATION, YES.

12      Q    AND YOU CITE A PORTION OF THE ARTICLE THAT

13  STATES, QUOTE, NO STUDIES EXAMINED ANGIOTENSIN-

14  CONVERTING ENZYME INHIBITORS, ANGIOTENSIN II RECEPTOR

15  BLOCKERS OR NITRATES, END QUOTE.  CORRECT?

16      A    CORRECT.

17      Q    SO THIS MEANS THAT THE ARTICLE DID NOT

18  ANALYZE ANY STUDIES REGARDING ACE INHIBITORS AND ARBs

19  AT ALL.  CORRECT?

20      A    IF YOU'LL PULL UP FIGURE 4.

21      Q    I BELIEVE FIGURE 4 IS ON THE NEXT PAGE, ON

22  PAGE 9.

23      A    WELL, THAT'S NOT GOING TO BE HELPFUL, IS IT?

24  THOSE ARE NOT THE --

25              MS. MONTES:  MAYBE GO UP TO THE TOP.
```

1  BY MS. MONTES:

2      **Q**    SO NONE OF THOSE MEDICATIONS LISTED ARE ACE

3  INHIBITORS.  CORRECT?

4      **A**    CORRECT.  CORRECT.

5      **Q**    FINALLY, IN THE MOST RECENT DECLARATION, IN

6  THE FOLLOWING PARAGRAPH YOU STATE THAT YOU CONTINUE

7  TO RECOMMEND ACE INHIBITORS AND ARBs TO BE EXCLUDED

8  FROM THE MEDICATION LIST BECAUSE YOU ARE AWARE OF NO

9  SPECIFIC CLINICAL CASE STUDIES DIRECTLY LINKING ACE

10  INHIBITORS SOLELY TO HEAT STROKE.  CORRECT?

11      **A**    CORRECT.

12      **Q**    BUT HEAT STROKE IS ONE OF THE MOST SEVERE

13  FORMS OF HEAT-RELATED ILLNESS.  CORRECT?

14      **A**    YES.

15      **Q**    BUT THERE ARE MANY OTHER TYPES OF

16  HEAT-RELATED ILLNESS OR SYMPTOMS OUTSIDE OF HEAT

17  STROKE.  CORRECT?

18      **A**    YES, THERE CAN BE.  THERE'S HEAT ILLNESS,

19  WHICH THEN WOULD LEAD TO HEAT STROKE.  YOU'RE

20  CORRECT.

21      **Q**    IN FACT, YOU PREVIOUSLY STATED THAT

22  ILLNESSES OR SYMPTOMS YOU INCLUDE IN YOUR DEFINITION

23  OF HEAT SICKNESS INCLUDE COGNITIVE DECLINE,

24  DIZZINESS, NAUSEA, VOMITING; THOSE THINGS?

25      **A**    THAT'S RIGHT.

1     **Q**    SO OUTSIDE OF THIS *LANCET* ARTICLE YOU CITE

2   IN YOUR MOST RECENT DECLARATION, YOU DID NOT PROVIDE

3   PLAINTIFFS WITH A COMPREHENSIVE LIST OF STUDIES OR

4   LITERATURE THAT YOU REVIEWED REGARDING ACE INHIBITORS

5   OR ARBs.  CORRECT?

6     **A**    I DID NOT.

7     **Q**    IN FACT, YOU COULD NOT PROVIDE A

8   COMPREHENSIVE LIST OF SOURCES BECAUSE YOU DID NOT

9   KEEP TRACK OF WHAT YOU REVIEWED FOR RECOMMENDING THAT

10  ACE INHIBITORS AND ARBs NOT BE PLACED ON THE LIST.

11  CORRECT?

12    **A**    THAT IS CORRECT.  I WAS NOT ASKED TO KEEP

13  TRACK OF THEM.  I WAS ASKED TO DO A LITERATURE

14  REVIEW.  AND -- OR I CHOSE TO DO A LITERATURE REVIEW

15  AS PART OF THE RESEARCH.  SO NO, THERE ISN'T A

16  COMPREHENSIVE LIST.  THIS WAS JUST PROVIDED AS THE

17  FOLLOW-UP DECLARATION.

18    **Q**    OKAY.  AND IF THERE WAS SUFFICIENT

19  LITERATURE SUPPORT FOR THE IDEA THAT ACE INHIBITORS

20  OR ARBs IMPAIR THERMOREGULATION, YOU WOULD AGREE THAT

21  IT SHOULD BE ON THE MEDICATION LIST.  CORRECT?

22    **A**    IF THERE WERE SUFFICIENT EVIDENCE AND IT

23  SPOKE TO TRUE HEAT-RELATED ILLNESS AND/OR HEAT

24  STROKE, THEN YES, I WOULD RECOMMEND IT BE ADDED TO

25  THE LIST.

1    **Q**    AND IF IT WAS ON THE MEDIATION LIST, THEN IT

2   WOULD AUTOMATICALLY TRIGGER A HEAT DUTY STATUS.

3   CORRECT?

4    **A**    IT SHOULD AUTOMATICALLY TRIGGER

5   CONSIDERATION FOR HEAT DUTY STATUS.

6    **Q**    SO I JUST HAVE A COUPLE OF QUESTIONS ABOUT

7   THE CALCIUM CHANNEL BLOCKERS AS WELL.

8       YOU DID NOT CITE ANY LITERATURE IN YOUR MOST

9   RECENT DECLARATION OR PREVIOUS DECLARATIONS OR YOUR

10   DEPOSITION TO SUPPORT THE OPINION THAT

11   DIHYDROPYRIDINES SHOULD BE EXCLUDED FROM THE LIST.

12   CORRECT?

13    **A**    THE DIHYDROPYRIDINES, CORRECT.

14    **Q**    AND, IN FACT, AGAIN, YOU COULD NOT PROVIDE A

15   LIST OF SOURCES REGARDING DIHYDROPYRIDINES BECAUSE

16   YOU DIDN'T KEEP TRACK OF WHAT YOU REVIEWED?

17    **A**    I DID NOT PROVIDE A LIST BECAUSE I DID NOT

18   KEEP TRACK.

19    **Q**    IF THERE WAS SUFFICIENT LITERATURE TO

20   SUPPORT THE IDEA THAT DIHYDROPYRIDINES IMPAIR

21   THERMOREGULATION, YOU WOULD AGREE THAT IT SHOULD BE

22   ON THE MEDICATION LIST.  CORRECT?

23    **A**    IF THAT LITERATURE SUPPORTED THAT IT

24   CONTRIBUTED TO HEAT-RELATED ILLNESS AS IT RELATES TO

25   THERMOREGULATION, THEN YES, I WOULD RECOMMEND IT BE

1  ADDED TO THE LIST.

2      **Q**   AND IF IT WAS ON THE MEDICATION LIST, IT

3  WOULD AUTOMATICALLY TRIGGER HEAT DUTY STATUS.

4  CORRECT?

5      **A**   IT WOULD AUTOMATICALLY TRIGGER CONSIDERATION

6  FOR HEAT DUTY STATUS, CORRECT.

7      **Q**   THOSE ARE ALL MY QUESTIONS.  THANK YOU SO

8  MUCH, DR. BARNES.

9      **A**   THANK YOU.

10          **THE COURT:**  THANK YOU.

11              ANY CROSS-EXAMINATION?

12          **MR. BLANCHFIELD:**  NO REDIRECT, YOUR HONOR.

13          **THE COURT:**  SORRY.  THANK YOU, MR.

14  BLANCHFIELD.  IT'S BEEN A LONG DAY.

15          **MR. BLANCHFIELD:**  IT HAS.

16          **THE COURT:**  DR. BARNES, THANK YOU FOR

17  JOINING US TODAY.  YOU ARE NOW EXCUSED.

18              ALL RIGHT.  MR. BLANCHFIELD, YOU MAY

19  CALL YOUR NEXT WITNESS.

20          **MR. BLANCHFIELD:**  YOUR HONOR, WE WOULD CALL

21  MR. ORLANDO SCOTT.

22          **MS. POURCIAU:**  YOUR HONOR, I'D LIKE TO MAKE

23  AN OBJECTION.  I BELIEVE YOUR HONOR HAD REQUESTED OF

24  THE PARTIES TO CALL THE EXPERT WITNESSES FIRST, AND

25  AT THE CONCLUSION OF COURT YESTERDAY DEFENDANTS HAD

1  REPRESENTED TO US THAT THEY WERE INTENDING TO CALL

2  THEIR EXPERTS FOR LOGICAL REASONS FIRST.  SO THAT IS

3  WHAT WE HAD ANTICIPATED TO HAPPEN TODAY.

4          THE COURT:  WELL, MR. BLANCHFIELD, WOULD YOU

5  LIKE TO BE HEARD?

6          MR. BLANCHFIELD:  YES, YOUR HONOR.  I THINK

7  YOU JUST TOLD ME ABOUT AN HOUR AGO THAT I CAN CALL

8  WHOEVER I WANT.  THIS IS MY CASE, AND THERE IS NO

9  AGREEMENT OR DICTATION AS TO WHAT ORDER I CALL MY

10 WITNESSES.  I'VE GOT SOME GUYS OUT THERE THAT HAVE

11 BEEN SITTING THERE SINCE TEN O'CLOCK THIS MORNING.

12         THE COURT:  OKAY.  DO YOU BELIEVE YOUR

13 CLIENT WILL BE PREJUDICED IF WE TAKE A FACT WITNESS

14 AT THIS TIME?

15         MS. POURCIAU:  WE PREPARED FOR THE EXPERT

16 WITNESS, SO WE WILL BE PREJUDICED.

17         THE COURT:  WELL, WHAT WE'LL -- WHETHER WE

18 TAKE THE EXPERT WITNESS TODAY OR TOMORROW, YOU'LL

19 STILL HAVE A SHOT.  RIGHT?  SO --

20         MS. POURCIAU:  WE DID NOT PREPARE FOR THE

21 FACT WITNESS.

22         THE COURT:  OH, YOU DID NOT PREPARE FOR THE

23 FACT WITNESS.

24         MS. POURCIAU:  BUT WE ARE HAPPY TO PROCEED

25 IF THAT IS HOW THE COURT WOULD LIKE TO PROCEED.

1          THE COURT:  WELL, LET'S GO ON AND PROCEED

2    WITH THE FACT WITNESS.  AND IF YOU BELIEVE THAT WE

3    SHOULD AT SOME POINT CALL A WITNESS BACK, I WILL

4    CONSIDER DOING SO.  OKAY?

5          MS. POURCIAU:  YES, YOUR HONOR.

6          THE COURT:  MR. BLANCHFIELD, YOU MAY CALL

7    YOUR NEXT WITNESS.

8          MR. BLANCHFIELD:  YES, YOUR HONOR.  WE CALL

9    MR. ORLANDO SCOTT.

10          THE COURT:  MR. SCOTT, PLEASE COME FORWARD.

11          **(WHEREUPON, ORLANDO SCOTT, BEING DULY SWORN,**

12    **TESTIFIED AS FOLLOWS.)**

13          THE COURTROOM DEPUTY:  CLEARLY STATE AND

14    SPELL YOUR NAME FOR THE RECORD.

15          THE WITNESS:  MY NAME ORLANDO SCOTT.

16    ORLANDO, O-R-L-A-N-D-O, SCOTT, S-C-O-T-T.

17          THE COURT:  THANK YOU.

18              ONE MOMENT, MR. BLANCHFIELD.

19              NATALIE, CAN I SEE YOU?

20              **(OFF THE RECORD)**

21          THE COURT:  OKAY.  LET'S PROCEED.

22          MR. BLANCHFIELD:  THANK YOU, JUDGE.

23              **DIRECT EXAMINATION**

24    BY MR. BLANCHFIELD:

25      **Q**   MR. SCOTT, COULD YOU STATE YOUR FULL NAME

1    FOR THE RECORD, PLEASE?

2        **A**    ORLANDO SCOTT.

3        **Q**    AND WHO ARE YOU EMPLOYED BY, SIR?

4        **A**    EMPLOYED BY LOUISIANA STATE PENITENTIARY.

5        **Q**    AND WHAT IS YOUR CURRENT POSITION AND

6    DUTIES?

7        **A**    MY CURRENT POSITION IS I WORK ON SHAKEDOWN

8    AND WE SHAKE -- SHAKE DOWN OFFENDERS IN DIFFERENT

9    AREAS.

10       **Q**    HOW LONG HAVE YOU BEEN IN THAT POSITION?

11       **A**    ABOUT THREE MONTHS NOW.

12       **Q**    NOW, BEFORE -- BACK BEFORE THE THREE MONTHS,

13   WHAT WERE YOU DOING?

14       **A**    I WAS FIELD FOREMAN IN THE FIELD.

15       **Q**    A FOREMAN IN THE FIELD?

16       **A**    (MOVING HEAD UP AND DOWN.)

17       **Q**    HOW LONG DID YOU WORK AS A FOREMAN IN THE

18   FIELD?

19       **A**    I WORKED AS A FOREMAN IN THE FIELD FOR ABOUT

20   SEVEN AND A HALF YEARS.

21       **Q**    AND AS A FOREMAN IN THE FIELD, WHAT -- TELL

22   THE JUDGE WHAT YOUR DUTIES ARE.

23       **A**    FOREMAN IN THE FIELD, MY DUTIES?  I CHECK

24   OUT FIELD LINE, MAKE SURE EVERYTHING IS SECURED.  I

25   LINE OUT THE DIFFERENT -- THE OFFENDERS, CHECK THE

1  GUARD LINES, MAKE SURE THE OFFENDERS DOING THEIR JOB

2  PROPERLY PICKING THE VEGETABLES, MAKING SURE THEY

3  SAFE, MAKING SURE MY FELLOW OFFICERS ARE SAFE, MAKING

4  SURE THAT THEY GOT THE PROPER EQUIPMENT, PPE THAT

5  THEY NEED, AND MAKE SURE EVERYBODY IS SAFE AND

6  ACCOUNTED FOR.

7      Q    ALL RIGHT.  LET'S TALK ABOUT PPE.  THAT

8  INCLUDES BOOTS?

9      A    PPE INCLUDE BOOTS, HATS, GLOVES, SUN HATS IF

10 THEY NEED IT.  AND WE PROVIDE THEM SUNSCREEN.

11     Q    DO THEY USE SUNSCREEN?

12     A    NO.  WE OFFER IT TO THEM, BUT THEY DON'T

13 TAKE IT.

14     Q    IF SOMEONE ASKS YOU FOR A HAT, ARE YOU ABLE

15 TO GIVE IT TO THEM?

16     A    IF THEY ASK FOR A HAT, I CALL MY SUPERVISOR

17 AND GET THEM A HAT.

18     Q    SAME THING FOR THE GLOVES?

19     A    SAME THING FOR GLOVES, CUPS.

20     Q    NOW -- SO SEVEN AND A HALF YEARS AS A

21 FOREMAN.  YOU WOULD HAVE BEEN OUT THERE IN THE FIELD

22 FOR SEVEN -- THE PAST SEVEN SUMMERS:  '24, '23 AND

23 FIVE SUMMERS BEFORE THAT?

24     A    YES, SIR.

25     Q    AND DURING THOSE HOT SUMMER MONTHS, DID YOU

1 EVER SEE ANYONE PASS OUT IN THE FIELDS?

2     **A**    NO, SIR.

3     **Q**    THERE HAS BEEN SOME DISCUSSION BY SOME

4 INMATES ABOUT GUN GUARDS FIRING GUNS.  HAVE YOU EVER

5 KNOWN, IN THE SEVEN AND A HALF YEARS, ANYONE TO SHOOT

6 A GUN?

7     **A**    NOT WHILE I WAS WORKING IN THE FIELD.

8     **Q**    DID THEY EVER POINT THEIR RIFLES AT AN

9 INMATE?

10     **A**    NO, SIR, NOT THAT I KNOW OF.

11     **Q**    YOU'VE NEVER KNOWN AN OFFICER EVER TO FIRE

12 WHAT HAS BEEN REFERRED TO AS A, QUOTE, WARNING SHOT?

13     **A**    NO, SIR.

14     **Q**    IF A SHOT IS FIRED, ARE THEY REQUIRED TO

15 FILE A REPORT, A SHOOTING REPORT?

16     **A**    YES, SIR, IF A SHOT IS FIRED.

17     **Q**    DO MAJORITY OF THE INMATES OUT WORKING IN

18 THE GARDENS -- DO THEY COMPLAIN ABOUT THE HEAT?

19     **A**    THEY COMPLAIN ABOUT THE HEAT.  IT'S COMMON

20 ABOUT THE HEAT.

21     **Q**    WHAT ABOUT THE WORK?

22     **A**    THEY ALWAYS COMPLAIN ABOUT THE WORK.

23     **Q**    NOW, DO THEY EVER TELL YOU THAT THEY HAVE A

24 DUTY STATUS THAT STOPS THEM FROM WORKING IN THE

25 PRODUCE GARDENS?

1    **A**    THEY -- IF THEY -- THEY COME UP AND SAY THEY

2    GOT A DUTY STATUS, WE CHECK IT RIGHT IN FRONT OF THE

3    INMATE.

4    **Q**    HOW DO YOU CHECK IT?

5    **A**    CALL MEDICAL 4 OVER THE RADIO AND GET A DUTY

6    STATUS CHECK.

7    **Q**    YOU CAN ALSO -- THEY CARRY THEIR DUTY STATUS

8    WITH THEM?

9    **A**    THEY CARRY -- THEY SUPPOSED TO CARRY THEY

10   DUTY STATUS IN THEY -- ON THEY PERSON, BUT MOST OF

11   THE TIME THEY LEAVE IT IN THE DORM.

12   **Q**    AND IF THEY TELL YOU THEY HAVE IT, YOU CAN

13   CALL IN AND CHECK?

14   **A**    CAN CALL IN AND CHECK.

15   **Q**    WHEN THEY SAY THEY HAVE IT, DO THEY ALWAYS

16   HAVE THE DUTY STATUS?

17   **A**    NO.

18   **Q**    SO SOMETIMES THEY TELL YOU THEY HAVE A DUTY

19   STATUS WHEN THEY REALLY DON'T?

20   **A**    SOMETIMES THEY TELL ME THEY HAVE A DUTY

21   STATUS BUT THEY DON'T HAVE, AND WE CALL MEDICAL 4 AND

22   CONFIRM.

23   **Q**    WHY DO THEY TELL YOU THEY HAVE A DUTY STATUS

24   WHEN THEY DON'T?

25   **A**    THAT'S JUST TO GET OUT OF WORK.  THEY DON'T

1   WANT TO WORK OR DON'T WANT TO GO TO WORK.

2       **Q**   NOW, YOU WERE -- YOU WERE WORKING ON THE DAY

3   THAT THERE WAS AN INSPECTION.  CAMERAMAN -- THIS WAS

4   LAST SUMMER.  CAMERAMAN CAME OUT AND FILMED THE

5   CUCUMBER PATCH?

6       **A**   YES.  YES, SIR.

7       **Q**   YOU WERE THERE AND WITNESSED THAT?

8       **A**   EXCUSE ME.  YES, SIR.

9       **Q**   DID YOU HEAR THE INMATES TELL THE CAMERAMAN

10  THAT THEY DIDN'T HAVE ANY CUPS?

11      **A**   YES, SIR.

12      **Q**   WAS THAT TRUE?

13      **A**   NO, SIR.

14      **Q**   WHY WAS IT NOT TRUE?

15      **A**   BECAUSE EVERY -- ALL -- THEY WAS ISSUED

16  CUPS.  THEY WAS ALL ISSUED CUPS.  INMATE HID THE CUPS

17  AND THEY SAID THEY WANT TO GET ON CAMERA BECAUSE THEY

18  GOT THE PEOPLE THERE.  AND THEY WENT TO SAYING THEY

19  DIDN'T HAVE CUPS.  SO I NOTIFIED MY SUPERVISOR TO --

20  THAT WE NEEDED SOME CUPS --

21          **MS. POURCIAU:**  OBJECTION --

22  **BY THE WITNESS:**

23      **A**   -- AND WE GOT CUPS.

24          **MS. POURCIAU:**  -- HEARSAY.

25          **THE COURT:**  WELL, INDEED IT IS HEARSAY, BUT

1    I WILL ALLOW THE TESTIMONY.  MS. POURCIAU, YOU'RE

2    ABSOLUTELY RIGHT, IT IS.  BUT FOR OUR PURPOSES HERE,

3    I WILL ALLOW IT.

4              YOU MAY CONTINUE, SIR.

5    **BY MR. BLANCHFIELD:**

6        **Q**    YOU NOTIFIED YOUR SUPERVISOR?

7        **A**    TO BRING SOME CUPS.

8        **Q**    TO BRING SOME CUPS.  WERE MORE CUPS BROUGHT

9    OUT?

10       **A**    MORE CUPS WERE BROUGHT OUT.

11       **Q**    AND HOW DID YOU KNOW THAT THEY WERE HIDING

12   THEIR CUPS?

13       **A**    BECAUSE WHEN I WALKED THE ROWS, I FOUND CUPS

14   UNDER THE CUCUMBER VINES.

15       **Q**    IF SOMEONE ASKED FOR A CUP OR SAYS THEY LOST

16   THEIR CUP OR DON'T HAVE A CUP, YOU GIVE THEM A CUP?

17       **A**    WE PROVIDE THEM ANOTHER CUP.

18       **Q**    THEY HAVE UNLIMITED ACCESS TO WATER?

19       **A**    UNLIMITED ACCESS TO WATER, SQWINCHER.  IF

20   THEY RUN OUT, WE CALL THE SUPERVISOR TO BRING SOME

21   MORE.

22       **Q**    HAVE YOU EVER TOLD ANYBODY OUT THERE IN THE

23   FIELD, *NO, YOU CAN'T STOP AND TAKE A DRINK*?

24       **A**    NO, SIR.

25       **Q**    DO YOU EVER WORK OUT ON THE GRASS-CUTTING

1  LINE, 15B?

2      **A**   YES, SIR.

3      **Q**   DO THOSE INMATES TAKE BREAKS?

4      **A**   TAKE BREAKS ALL THE TIME.

5      **Q**   AND WHERE DO THEY TAKE BREAKS?

6      **A**   ON THE BUS.

7      **Q**   IS THERE WATER ON THE BUS?

8      **A**   WATER AND SQWINCHER ON THE BUS.  AND EXTRA

9  CUPS.

10     **Q**   BUS WINDOWS ARE OPEN?

11     **A**   YES, SIR.

12     **Q**   BUS PROVIDES SHADE?

13     **A**   YES, SIR.

14     **Q**   IS IT THE BUS THAT BRINGS THEM TO WHEREVER

15 THEY'RE WORKING?  IT'S A MOVING CREW?

16     **A**   YES, SIR.

17     **Q**   WHAT IF IT RAINS?

18     **A**   IF IT RAINS, WE -- WE'LL LOAD THEM UP ON THE

19 BUS.  AND IF IT SEEM LIKE THE RAIN AIN'T GOING TO

20 STOP, WE WILL BRING THEM IN MOST OF THE TIME TO

21 THE -- WE'LL BRING THEM TO THE PROCESSING PLANT WHERE

22 THEY CAN GO INSIDE, OR WE'LL -- IF IT AIN'T GOING TO

23 STOP, WE'LL TAKE THEM TO THE CAMP.

24     **Q**   WHEN THE -- IF THE IGLOO® COOLERS ARE EMPTY

25 OF WATER, WHAT DO YOU DO?

1          **A**    WE GET THEM REFILLED.

2          **Q**    WHO BRINGS THEM OUT THERE?  WHO BRINGS THE

3     --

4          **A**    MY SUPERVISOR.

5          **Q**    IS PART OF YOUR FUNCTION OUT THERE TO BE

6     SURE THAT EVERYONE IS PROPERLY HYDRATED AND DRINKS

7     WATER?

8          **A**    YES, SIR.

9          **Q**    DO YOU DRINK WATER WITH THEM?

10         **A**    I DRINK WATER WITH THEM.

11         **Q**    DO YOU DRINK FROM THE SAME IGLOO® COOLER

12    THAT THEY DO?

13         **A**    SAME COOLER.

14         **Q**    WHAT DO YOU DO IF AN INMATE SAYS "I NEED

15    MEDICAL HELP"?

16         **A**    IF AN INMATE COME UP AND SAY HE NEED MEDICAL

17    ATTENTION, HE DECLARE A MEDICAL EMERGENCY, I CALL

18    OVER THE RADIO TO MEDICAL 3 AND GIVE HIS NAME, D.O.C.

19    AND THEY'LL GIVE THEM A LOCATION SO THEY CAN COME AND

20    GIVE MEDICAL TREATMENT.

21         **Q**    AND MEDICAL COMES OUT?

22         **A**    MEDICAL COME OUT.

23         **Q**    HOW LONG DOES IT USUALLY TAKE FOR THEM TO

24    GET OUT THERE?

25         **A**    IT DEPENDS.

1    **Q**   NOW, AS YOU'RE OUT THERE AS THE FOREMAN, DO

2  YOU EVER ESTABLISH A QUOTA OR TELL SOMEONE THAT THEY

3  ABSOLUTELY HAVE TO PICK A CERTAIN AMOUNT OF CUCUMBERS

4  OR SQUASH OR PEPPERS?

5    **A**   NO, SIR.

6    **Q**   DO YOU EVER HOLLER AT THEM TO MOVE FASTER?

7    **A**   NO, SIR.

8    **Q**   DO THEY WORK AT THEIR OWN PACE?

9    **A**   WORK AT THEIR OWN PACE, JUST AS LONG AS THEY

10  WORKING.  AS LONG AS THEY STAY ON THEY ROW, THEY WORK

11  AT THEIR OWN PACE.

12    **Q**   OKAY, MR. SCOTT.  I APPRECIATE YOUR

13  TESTIMONY.  THANK YOU.

14        **MR. BLANCHFIELD:**  THAT'S ALL I HAVE, JUDGE.

15        **THE COURT:**  ALL RIGHT.  THANK YOU.

16            CROSS-EXAMINATION.

17            JUST A MOMENT.

18            ALL RIGHT.  MS. POURCIAU, I THINK WE'RE

19  PREPARED TO PROCEED.

20                **CROSS-EXAMINATION**

21  BY MS. POURCIAU:

22    **Q**   GOOD AFTERNOON, MR. SCOTT.

23        ARE YOU AWARE THAT LSP IS LOCATED ON A

24  FORMER SLAVE PLANTATION?

25    **A**   YES, MA'AM.

1    **Q**    AND YOU'VE HEARD INCARCERATED MEN

2   COMPLAINING THAT BEING FORCED TO WORK IN THE FIELDS

3   OF A FORMER PLANTATION IS AKIN TO SLAVERY.  CORRECT?

4    **A**    YES, MA'AM.

5    **Q**    TYPICALLY AN INCARCERATED PERSON'S FIRST JOB

6   AT ANGOLA IS THE FARM LINE.  CORRECT?

7    **A**    YES, MA'AM.

8    **Q**    AND THEY CAN BE REASSIGNED TO THE FARM LINE

9   LATER ON IF THEY GET A DISCIPLINARY ACTION AGAINST

10  THEM OR IF THEY'RE MOVED TO ANOTHER CAMP.  CORRECT?

11       **MR. BLANCHFIELD:**  YOUR HONOR, THAT'S BEYOND

12  THE SCOPE OF MY DIRECT.

13       **THE COURT:**  SUSTAINED.

14       **MS. POURCIAU:**  I'LL MOVE ON.

15  **BY MS. POURCIAU:**

16   **Q**    THE FARM LINE IS NOT VOLUNTARY.  CORRECT?

17   **A**    NO.

18       **MR. BLANCHFIELD:**  STILL BEYOND THE SCOPE OF

19  MY DIRECT, YOUR HONOR.

20       **MS. POURCIAU:**  YOUR HONOR, MR. BLANCHFIELD

21  ASKED IF THEY CAN WORK AT THEIR OWN PACE.

22       **THE COURT:**  I'LL ALLOW THE QUESTION.  I

23  ASSUME YOU'RE TRYING TO PROVIDE, I GUESS, SOME

24  CONTEXT TO YOUR NEXT QUESTIONS -- SET OF QUESTIONS?

25       **MS. POURCIAU:**  YES, YOUR HONOR.

1        **THE COURT:**  OKAY.

2   **BY MS. POURCIAU:**

3        **Q**    THE FARM LINE IS NOT VOLUNTARY.  CORRECT?

4        **A**    NO, MA'AM.

5        **Q**    INCARCERATED PEOPLE CANNOT DECIDE ON WHAT

6   ASSIGNMENT THEY ARE GOING TO HAVE ON THE FARM LINE IN

7   A PARTICULAR DAY; WHAT VEGETABLE THEY'LL PICK, FOR

8   INSTANCE?

9        **A**    NO.

10       **Q**    AND YOU'VE HAD INCARCERATED PEOPLE COMPLAIN

11  TO YOU FREQUENTLY ABOUT THEIR ASSIGNMENT ON THE FARM

12  LINE?  I BELIEVE YOU TESTIFIED TO THAT JUST NOW.

13       **A**    YEAH, SOME COMPLAIN.  I MEAN, NOT ALL OF

14  THEM.

15       **Q**    BUT YOU HAVE HAD INCARCERATED PEOPLE

16  COMPLAIN TO YOU ABOUT THEIR ASSIGNMENT ON THE FARM

17  LINE.  CORRECT?

18       **A**    YES, MA'AM.

19       **Q**    IT'S KNOWN TO BE A HARD JOB AT ANGOLA?

20       **A**    NO, IT'S NOT A HARD JOB.

21       **Q**    AS THE PUSHER, IT'S YOUR JOB TO PUSH THE

22  INMATES TO WORK AND DO THEIR JOB?

23       **A**    IT'S MY JOB TO ASSIGN THEM A JOB, A ROW, A

24  CUT AND MAKE SURE THEY ARE DOING WHAT THEY SUPPOSED

25  TO BE DOING.

1    **Q**    MR. SCOTT, DO YOU REMEMBER GIVING A
2    DEPOSITION IN THIS CASE ON JULY 31, 2024?
3    **A**    YES, MA'AM.
4    **Q**    AND DO YOU REMEMBER ME ASKING YOU ABOUT YOUR
5    JOB AND YOU SAYING, "SO THAT'S MY JOB, TO PUSH THE
6    INMATES TO WORK TO DO THEIR ASSIGNED JOB"?
7    **A**    YES, THAT'S MY JOB.  I'M OUT THERE TO MAKE
8    SURE THEY DOING WHAT THEY SUPPOSED TO DO, NOT TO BE
9    STANDING AROUND AND SLEEPING, ALL THE OTHER STUFF
10   THEY WANT TO DO.
11   **Q**    YOU TESTIFIED ON DIRECT JUST NOW IT'S YOUR
12   JOB TO, QUOTE, MAKE SURE THE OFFENDERS ARE DOING
13   THEIR JOB PROPERLY.  CORRECT?
14   **A**    PROPERLY.
15   **Q**    SO YOU ARE PUSHING THEM TO DO THEIR JOB?
16   **A**    I'M A LINE PUSHER, SO THAT'S IT.
17   **Q**    AND INMATES ARE GOING TO PUSH BACK.  RIGHT?
18   **A**    THEY GOING TO COMPLAIN BECAUSE THEY DON'T
19   WANT TO DO IT NO WAY, SO --
20   **Q**    THE FIELD LINES PICK MUSTARD GREENS,
21   CAULIFLOWER, BROCCOLI, SWEET POTATOES, COLLARD
22   GREENS, PEAS, CARROTS AND OKRA.  RIGHT?
23   **A**    YES, MA'AM.
24   **Q**    AND PART OF YOUR JOB AS THE PUSHER IS TO
25   KEEP A DAILY LINE COUNT.  CORRECT?

1      **A**    YES, MA'AM.

2      **Q**    AND THE DAILY LINE COUNT IS ESSENTIALLY THE

3   LOG OF WHAT'S GOING ON IN THE FIELDS KEPT BY THE

4   PUSHER?

5      **A**    YES, MA'AM.

6      **Q**    I'D LIKE TO PULL UP WHAT HAS PREVIOUSLY BEEN

7   MARKED AS PX34 AND PAGE 6 OF 24.

8           THIS IS AN EXAMPLE OF THE DAILY LINE COUNT

9   FROM APRIL 2, 2025.  CORRECT?

10          **THE COURT:**  WAIT JUST A MOMENT.

11          **MR. BLANCHFIELD:**  YOUR HONOR --

12          **THE COURT:**  IS THERE AN OBJECTION?

13          **MR. BLANCHFIELD:**  YEAH, THERE IS.  THIS IS

14   WELL BEYOND THE SCOPE OF MY DIRECT.  AND IF THEY

15   WANTED TO CALL THIS GENTLEMAN AS A WITNESS TO TALK

16   ABOUT DAILY LINE COUNTS, THEY COULD HAVE, BUT THEY

17   DIDN'T.

18          **THE COURT:**  YOUR RESPONSE?

19          **MS. POURCIAU:**  YOUR HONOR, THIS IS A DAILY

20   LINE COUNT THAT WAS PRODUCED BY DEFENDANTS MARCH

21   31ST.  I WAS HOPING WE COULD STIPULATE TO IT AS A

22   JOINT EXHIBIT EARLIER, BUT I -- AND I HAVE INCLUDED

23   IT IN MY OPENING POWERPOINT SLIDE, SO I WAS TRYING TO

24   AUTHENTICATE IT TO MOVE IT INTO EVIDENCE.  I'M NOT

25   PLANNING ON ASKING ANY QUESTIONS ABOUT IT.  I WAS

1  JUST HOPING TO MOVE IT INTO EVIDENCE.

2          **THE COURT:**  MR. BLANCHFIELD?

3          **MR. BLANCHFIELD:**  YOUR HONOR, HE'S NOT EVEN

4  THE PUSHER ON THIS -- ON THIS DOCUMENT, SO --

5          **THE COURT:**  OKAY.  WHY DON'T WE -- HE'S

6  ALREADY MENTIONED HE'S A LINE PUSHER.  HE HAS A RIGHT

7  TO -- COUNSEL HAS A RIGHT TO EXPLORE WHAT THAT MEANS.

8  HE SAYS HE PUSHES DOWN THE LINE.  IF THIS DOCUMENT IS

9  RELEVANT TO THE TESTIMONY, I'LL ALLOW IT.

10          THE PROBLEM HERE IS, AS MR. BLANCHFIELD

11  HAS POINTED OUT, HE DIDN'T MAKE THIS DOCUMENT, HE

12  DIDN'T ADOPT THIS DOCUMENT.  I'M NOT SURE HOW IT

13  COMES IN UNDER THE RULES OF EVIDENCE IF HE DIDN'T

14  MAKE THE DOCUMENT.

15          **MS. POURCIAU:**  YOUR HONOR, THIS WAS PRODUCED

16  BY DEFENDANTS, SO I GUESS I MISSPOKE WHEN I SAID

17  "AUTHENTICATION."  I MEANT JUST HE CAN IDENTIFY AND

18  EXPLAIN WHAT THE DIFFERENT LINES MEAN BECAUSE HE

19  FILLS THEM OUT IN THE REGULAR COURSE OF HIS JOB.

20          **THE COURT:**  I WILL ALLOW HIM TO -- IF HE

21  KNOWS.  IF HE KNOWS.

22          AND AGAIN, YOUR OBJECTION IS NOTED FOR

23  THE RECORD, MR. BLANCHFIELD.  BUT IF HE DOESN'T KNOW,

24  LET'S FIND OUT.

25          **MR. BLANCHFIELD:**  THANK YOU, JUDGE.

1  BY MS. POURCIAU:

2     **Q**   MR. SCOTT, SO THIS IS JUST THE FORM YOU FILL

3  OUT WHEN YOU DO YOUR DAILY JOB AS A LINE PUSHER.

4  CORRECT?

5     **A**   IT'S A DAILY LINE COUNT, BUT THIS AIN'T THE

6  ONE I FILLED OUT.

7     **Q**   YEAH.  THIS IS NOT YOUR HANDWRITING, BUT

8  THIS IS THE FORM YOU USE.  CORRECT?

9     **A**   YEAH, THAT'S THE FORM.

10     **Q**   AND SO, FOR INSTANCE, WHERE IT SAYS "AM

11  COUNT: 52" TIMES, THAT IS THE NUMBER OF INCARCERATED

12  PEOPLE WHO ARE BEING PUSHED ON THE LINE THAT DAY.

13  CORRECT?

14     **A**   YES, MA'AM.

15        **MS. POURCIAU:**  AT THIS TIME I'D LIKE TO MOVE

16  PX34 INTO EVIDENCE.

17        **THE COURT:**  I WILL TREAT THIS AS A

18  DEMONSTRATIVE AID BECAUSE, AGAIN, AS MR. BLANCHFIELD

19  HAS POINTED OUT, IT'S -- WELL, FIRST OF ALL, HE

20  HASN'T MADE THE DOCUMENT, HE HASN'T ADOPTED IT.  SO

21  FOR THOSE REASONS, I FIND THAT IT IS INADMISSIBLE

22  UNDER THE FEDERAL RULES OF EVIDENCE.  BUT AGAIN, I

23  WILL ALLOW IT AS A DEMONSTRATIVE.

24        NOW, AGAIN, IF YOU WISH TO CALL WHAT

25  APPEARS TO BE SERGEANT ANDREWS OR MASTER SERGEANT

1    BOWDERS OR BORDERS OR WHOEVER, YOU'RE FREE TO DO

2    THAT.  BUT AGAIN, I CANNOT ALLOW THIS UNDER THE RULES

3    OF EVIDENCE.

4         **MS. POURCIAU:**  YOUR HONOR, I WOULD LIKE TO

5    JUST ADMIT THEN THE OPENING SLIDES PRESENTATION AS A

6    DEMONSTRATIVE.  I WAS HOPING TO ADMIT ALL OF THE

7    EXHIBITS SHOWN ON THERE IN EVIDENCE SO THEY WOULD BE

8    IN THE RECORD.  BUT IF IT WILL BE JUST USED AS A

9    DEMONSTRATIVE FOR THE COURT, AT THIS TIME I'D LIKE

10   TO --

11        **THE COURT:**  YES, MERELY AS A DEMONSTRATIVE.

12        **MR. BLANCHFIELD:**  YOUR HONOR, THE POWERPOINT

13   WE'RE TALKING ABOUT?

14        **THE COURT:**  NO, NO.  THE POWERPOINT IS A

15   DEMONSTRATIVE.

16        **MR. BLANCHFIELD:**  I'M NOT SURE WHAT SHE'S

17   TRYING TO ADMIT.

18        **THE COURT:**  MY UNDERSTANDING IS THAT THE

19   POWERPOINT IS A DEMONSTRATIVE BUT THE INFORMATION IN

20   THE DEMONSTRATIVE SHE WANTS TO ADMIT INTO EVIDENCE.

21   IS THAT CORRECT?

22        **MS. POURCIAU:**  NO.  I'M WANTING TO MOVE THE

23   POWERPOINT PRESENTATION THAT I USED IN THE OPENING AS

24   A DEMONSTRATIVE, THE SAME WAY THAT THE

25   PRESENTATION --

**THE COURT:** YES. IT WILL BE TREATED AS A DEMONSTRATIVE, BUT IT'S NOT EVIDENCE.

**MS. POURCIAU:** CORRECT. AND I WAS TRYING TO ADMIT THE PLAINTIFFS' EXHIBITS THAT WERE FEATURED IN THE OPENING SLIDES INTO EVIDENCE SO THE COURT COULD CONSIDER THOSE. BUT IF THE COURT WANTS TO CONSIDER THIS --

**THE COURT:** BUT THE PROBLEM IS: THAT HAS TO COMPORT WITH THE RULES OF EVIDENCE. AND SO FOR THAT REASON, AGAIN, I CANNOT ADMIT THIS DOCUMENT.

**MS. POURCIAU:** I WITHDRAW THE REQUEST TO ADMIT THE DOCUMENT.

**BY MS. POURCIAU:**

**Q** OVER THE SUMMER OF 2023, YOU WERE NOT PUSHING IN THE VEGETABLE FIELDS. CORRECT?

**A** REPEAT THAT.

**Q** OVER THE SUMMER OF 2023, YOU WERE NOT WORKING AS A PUSHER IN THE VEGETABLE FIELDS. CORRECT? MAYBE MY NEXT QUESTION WILL HELP YOU.

OVER SUMMER OF 2023, YOU WERE WORKING IN THE PROCESSING PLANT PRIMARILY WITH LINES 6A AND 6B. CORRECT?

**A** 2023? I WAS AT THE PROCESSING PLANT.

**Q** SO YOU WEREN'T OUT IN THE FIELD OVER SUMMER 2023 EXPERIENCING WHAT THE VEGETABLE-PICKING LINES

1  WERE PICKING?

2     **A**   I WAS OUT THERE ON AND OFF.

3     **Q**   OVER THE SUMMER OF 2024 YOU WERE KEEPING THE

4  DAILY LINE COUNTS WITH MORE DETAIL THAN YOU HAD

5  PREVIOUSLY.  CORRECT?

6     **A**   YES.

7     **Q**   SPECIFICALLY, YOU PREVIOUSLY WERE NOT

8  WRITING DOWN WHEN BREAKS TOOK PLACE, BUT THEN YOU

9  STARTED TO NOTE BREAKS IN 2024?

10     **A**   WELL, THE -- WASN'T NOTING BREAKS, BUT THEY

11  WAS GIVEN BREAKS.  I MEAN, WASN'T WRITING IT DOWN.

12     **Q**   IN 2024 IS WHEN YOU DECIDED TO START NOTING

13  THE BREAKS ON THE DAILY LINE COUNTS?

14     **A**   IT'S WHEN -- ABOUT THE HEAT PRECAUTION AND

15  ALL THAT WAS WRITING -- MAKE SURE WE WRITE THE BREAKS

16  DOWN.

17     **Q**   YOU WERE INSTRUCTED TO START WRITING THE

18  BREAKS DOWN IN THE DAILY LINE COUNTS?

19     **A**   WE WAS TAKING NOTES OF THE BREAKS, WHEN WE

20  WAS GIVING THE BREAKS.

21     **Q**   YOU WERE ALSO INSTRUCTED TO TRACK WHEN WATER

22  WAS DELIVERED, FOR INSTANCE?

23     **A**   I TOOK IT UPON MYSELF TO MAKE SURE I WRITE

24  DOWN EVERYTHING THAT CAME TO THE FIELD AND LEFT THE

25  FIELD.

1    **Q**    LSP TRIES TO GET THE WATER DELIVERED BEFORE

2    THE INCARCERATED WORKERS ARE OUT THERE WORKING, BUT

3    SOMETIMES IT DOESN'T GET DELIVERED UNTIL AFTER

4    THEY'VE ALREADY STARTED THE WORKDAY.  CORRECT?

5    **A**    THE WATER BE DELIVERED WHEN -- YOU KNOW,

6    BEFORE THEY GET TO THE FIELD.  BUT SOMETIMES IT SHOWS

7    UP AFTER THEY GET TO THE FIELD.  BUT WORK DON'T START

8    TILL THEY GOT ALL THE PPE AND THE WATER AND

9    EVERYTHING SET UP.

10    **Q**    IF YOU ISSUE TOOLS, DO YOU ALSO NOTE THAT ON

11    THE DAILY LINE COUNT?

12    **A**    IF THEY ISSUED TOOLS, IT WOULD BE WROTE ON

13    THE DAILY LINE COUNT.

14    **Q**    IT'S NOT OFTEN THAT INCARCERATED WORKERS ARE

15    ISSUED TOOLS ON THE FARM LINE.  CORRECT?

16    **A**    CERTAIN THINGS WE DO DON'T REQUIRE TOOLS.

17    **Q**    SO IT ISN'T OFTEN THAT THEY GET TOOLS.

18    CORRECT?

19    **A**    SAY AGAIN.

20    **Q**    IT IS NOT OFTEN THAT INCARCERATED WORKERS

21    ARE GIVEN TOOLS TO WORK ON THE FARM LINE?

22    **A**    IT DEPENDS ON WHAT WE DOING IN THE FIELD.

23    **Q**    DO YOU REMEMBER GIVING A DEPOSITION IN THIS

24    CASE ON JULY 31, 2024?

25    **A**    DO I REMEMBER?

1        **Q**    YES.

2        **A**    YES, MA'AM.

3        **Q**    AND YOU -- WHEN I ASKED YOU ABOUT THE TOOLS,

4    YOU ANSWERED:  "IT AIN'T OFTEN THEY GET TOOLS."  DOES

5    THAT REFRESH YOUR RECOLLECTION?

6        **A**    YEAH.  IT DEPENDS ON WHAT WE DOING IN THE

7    FIELD.  SO WE DOING POTATOES, YOU MIGHT NEED A RAKE

8    TO RAKE THE POTATOES.  BUT WE PICKING MUSTARD GREENS,

9    YOU DON'T NEED TOOLS.

10            **MS. POURCIAU:**  YOU CAN TAKE THIS DOWN.

11    **BY MS. POURCIAU:**

12        **Q**    PEOPLE GET INJURED ON THE FARM LINE.  RIGHT?

13        **A**    SOMETIMES.

14        **Q**    YOU -- WHEN AN INCARCERATED PERSON ON THE

15    FARM LINE NEEDS MEDICAL ATTENTION, YOU CALL FOR

16    EITHER MEDICAL 3 TO SEND OUT A NURSE OR MEDICAL 4 TO

17    SEND OUT AN AMBULANCE?

18        **A**    YES, MA'AM.

19        **Q**    AND YOU USE YOUR BEST JUDGMENT TO DECIDE

20    BETWEEN CALLING BETWEEN THOSE TWO OPTIONS.  CORRECT?

21        **A**    NO, MA'AM.

22        **Q**    WHO --

23        **A**    IF THE INMATE --

24        **Q**    EXCUSE ME.  I'D STRIKE THAT.

25        **A**    IF THE INMATE DECLARE A MEDICAL EMERGENCY, I

1   CALL IMMEDIATELY.  IF AN INMATE NEED AN AMBULANCE, I

2   CALL IMMEDIATE.  SO IF THE INMATE COME UP OR HAVE AN

3   ACCIDENT, I CALL FOR MEDICAL.

4       **Q**   AND YOU HAVE TWO OPTIONS OF MEDICAL.  YOU

5   HAVE MEDICAL 3 WHICH WILL BRING A NURSE TO DO A

6   SELF-DECLARED EMERGENCY EVALUATION OR MEDICAL 4 WHICH

7   WILL BRING AN AMBULANCE.  CORRECT?

8       **A**   (INAUDIBLE).

9       **Q**   AND YOU USE YOUR --

10          **THE REPORTER:**  I'M SORRY.  I DIDN'T GET AN

11  ANSWER.

12          **MS. POURCIAU:**  I THOUGHT I HEARD HIM SAY

13  "YES."

14          **THE REPORTER:**  WHAT WAS YOUR ANSWER, SIR?

15          **THE WITNESS:**  "YES."

16  **BY MS. POURCIAU:**

17      **Q**   AND YOU USE YOUR BEST JUDGMENT BETWEEN

18  CALLING MEDICAL 3 OR MEDICAL 4?

19      **A**   IT DEPENDS.  IF AN INMATE COME UP TO ME AND

20  DECLARE A MEDICAL EMERGENCY, CALL MEDICAL 3.  BUT IF

21  A INMATE HAVE AN ACCIDENT, CALL THE AMBULANCE,

22  MEDICAL 4.

23      **Q**   YOU DID NOT -- YOU ARE NOT A MEDICAL

24  PROFESSIONAL YOURSELF.

25      **A**   NO, MA'AM.

1      **Q**   CORRECT?

2          YOU TESTIFIED ON DIRECT THAT IT DEPENDS FOR

3   HOW LONG IT TAKES FOR MEDICAL TO GET OUT TO THE

4   FIELD.  RIGHT?

5      **A**   YES, MA'AM.

6      **Q**   IN YOUR EXPERIENCE NOW, IT SOMETIMES TAKES

7   LONGER BECAUSE THEY HAVE NURSES COMING OUT WHO ARE

8   ALSO COVERING THE OUTER CAMPS.  AND SO IF THEY GET

9   TIED UP IN THE OUTER CAMPS, IT COULD TAKE UP TO AN

10  HOUR -- 45 MINUTES TO AN HOUR FOR THEM TO COME OUT

11  THERE.  CORRECT?

12     **A**   YES, MA'AM.

13     **Q**   WHEN MEDICAL COMES OUT, THEY ASSESS THE

14  INCARCERATED PERSON THERE AND EITHER RELEASE THEM

15  BACK TO WORK, TAKE THEM TO THE TREATMENT CENTER FOR

16  FURTHER EVALUATION, OR SEND THEM BACK INTO THEIR CAMP

17  FOR THE REST OF THE DAY.  IS THAT CORRECT?

18     **A**   YES, MA'AM.

19     **Q**   AND YOU'RE PRESENT FOR THAT MEDICAL

20  ENCOUNTER.  SO THE PROVIDER WILL TELL YOU WHAT --

21  WHICH OF THOSE THREE OUTCOMES IS GOING TO HAPPEN.

22  CORRECT?

23     **A**   YES, MA'AM.

24     **Q**   AND OFTEN INCARCERATED PEOPLE WILL CALL FOR

25  MEDICAL BECAUSE THEY DON'T WANT TO WORK?

1      **A**   YES, MA'AM.

2      **Q**   AND OFTEN, AS YOU TESTIFIED, THEY LIE?

3      **A**   A LOT.

4      **Q**   PEOPLE FAKE THEIR INJURIES TO GET OFF THE

5  FARM LINE?

6      **A**   THEY DO.

7      **Q**   SO IF MEDICAL CLEARS THEM TO WORK, THEY'LL

8  COME UP WITH SOME OTHER KIND OF EXCUSE TO GET OFF THE

9  FARM LINE?

10     **A**   THEY DO.

11     **Q**   YOU CARRIED DISCIPLINARY FORMS WITH YOU ON

12 THE CLIPBOARD YOU HAVE AS THE PUSHER IN THE FIELD

13 WHEN YOU USED TO DO THAT.  CORRECT?

14     **A**   YES, MA'AM.

15     **Q**   AND YOU CARRY THOSE FORMS WITH YOU; WHEN YOU

16 NEED TO ISSUE A WRITE-UP, YOU CAN FILL IT OUT FOR ANY

17 RULE VIOLATION THAT TAKES PLACE WHILE YOU'RE PUSHING

18 ON THE LINE.  CORRECT?

19     **A**   YES, MA'AM.

20     **Q**   AND YOU CARRY THE DISCIPLINARY RULE BOOK TO

21 MAKE SURE THAT YOU'VE GOT THE RIGHT RULE NUMBER WHEN

22 YOU ARE WRITING UP AN INCARCERATED PERSON FOR A

23 DISCIPLINARY OFFENSE.  CORRECT?

24     **A**   YES, MA'AM.

25     **Q**   AND THAT RULE BOOK APPLIES TO ALL OF THE

1 INCARCERATED PEOPLE ON THE FARM LINE EQUALLY.

2 CORRECT?

3     **A**    YES, MA'AM.

4     **Q**    YOU OFTEN WRITE INCARCERATED WORKERS UP FOR

5 A RULE 5 VIOLATION, WHICH IS AGGRAVATED DISOBEDIENCE.

6     **A**    YES, MA'AM.

7     **Q**    CORRECT?

8     **A**    YES, MA'AM.

9     **Q**    YOU OFTEN WRITE INCARCERATED WORKERS UP FOR

10 A RULE 28 VIOLATION, WHICH IS AN AGGRAVATED WORK

11 OFFENSE.  CORRECT?

12     **A**    YES, MA'AM.

13     **Q**    AND THOSE COULD INCLUDE, FOR INSTANCE, AN

14 INCARCERATED PERSON NOT FOLLOWING AN ORDER?

15     **A**    YES, MA'AM.

16     **Q**    OR NOT DOING THEIR ASSIGNED TASK?

17     **A**    YES, MA'AM.

18     **Q**    SO IF, FOR INSTANCE, AN INCARCERATED PERSON

19 TELLS YOU THAT THEY DON'T WANT TO GO BACK TO WORK

20 AFTER THEY'VE TAKEN A BREAK, HE CAN GET BOTH AN

21 AGGRAVATED WORK OFFENSE BECAUSE HE REFUSED TO GO BACK

22 TO WORK AND AN AGGRAVATED DISOBEDIENCE BECAUSE HE

23 REFUSED AN ORDER FROM YOU TO GO BACK TO WORK.

24     **A**    YES, MA'AM.

25     **Q**    IS THAT CORRECT?

1    **A**    YES, MA'AM.

2    **Q**    AND IF AN INCARCERATED PERSON IS NOT

3  REFUSING TO WORK BUT IS WORKING AT A SLOW PACE WHERE

4  HE CAN'T FINISH HIS ASSIGNMENT, HE CAN ALSO GET A

5  WORK OFFENSE WRITE-UP.  ISN'T THAT TRUE?

6    **A**    DEPENDS ON HOW EVERYTHING PLAYED OUT,

7  BECAUSE HE CAN BE DISOBEDIENT THE WAY HE PRESENTS

8  HISSELF OR THE WAY HE ACT TOWARDS ME WHEN HE DOING

9  HIS JOB.  BUT IF HE DON'T FINISH HIS WORK, YES,

10  MA'AM.

11    **Q**    SO IF HE DOESN'T FINISH HIS WORK, HE COULD

12  GET A RULE 27 OFFENSE, WHICH IS NOT WORKING WITH

13  REASONABLE SPEED AND EFFICIENCY.  CORRECT?

14    **A**    YES, MA'AM.

15    **Q**    BECAUSE YOU HAVE TO MAKE SURE THE

16  INCARCERATED PEOPLE ARE WORKING CONSISTENTLY SO THAT

17  THE NUMBER OF VEGETABLES HARVESTED AT THE END OF THE

18  DAY DOES NOT REFLECT POORLY ON YOU AS THE PUSHER?

19    **A**    I GOT TO MAKE SURE THEY COMPLETE THE TASK.

20    **Q**    SO IT DOESN'T REFLECT POORLY ON YOU, BECAUSE

21  YOU COULD GET DISCIPLINARY ACTION YOURSELF IF THEY'RE

22  NOT HARVESTING ALL OF THE VEGETABLES?

23    **A**    YES, MA'AM.

24    **Q**    AND IF A PUSHER DOESN'T PUSH THE LINE TO

25  WORK, THEY COULD END UP GETTING SANCTIONED WAGES AND

1   EVENTUALLY FIRED.  CORRECT?

2        **A**    REPEAT THAT.

3        **Q**    IF YOU AS THE PUSHER DIDN'T MAKE SURE THE

4   LINE WORK WAS FINISHED, YOU COULD END UP GETTING

5   SANCTIONED WAGES OR EVEN FIRED EVENTUALLY?

6        **A**    IT DEPENDS.

7            **THE COURT:**  BUT THE QUESTION WAS:  "COULD

8   YOU BE FIRED?"

9            **THE WITNESS:**  BE FIRED?  NO.

10  **BY MS. POURCIAU:**

11       **Q**    DO YOU REMEMBER GIVING A DEPOSITION IN THIS

12  CASE WHERE YOU -- I WAS ASKED A PUSHER -- I ASKED

13  YOU:  "SO IF A PUSHER DOESN'T PUSH THE LINE TO WORK,

14  THEY COULD END UP GETTING SANCTIONED WAGES AND

15  EVENTUALLY FIRED?" AND YOU ANSWERED:  "YES, MA'AM.

16  BECAUSE YOU AIN'T DOING THE JOB."

17       **A**    YEAH, YOU CAN GET WROTE UP AND EVENTUALLY --

18  YOU AIN'T DOING YOUR JOB, YOU'RE GOING TO GET FIRED.

19       **Q**    WHEN YOU HEAR A HEAT ALERT COME THROUGH ON

20  YOUR RADIO, THE POLICY REQUIRES YOU TO NOTIFY YOUR

21  SUPERVISOR THAT ANY INMATES WITH A HEAT PRECAUTION

22  DUTY STATUSES THAT WERE CHECKED OUT NEED TO BE

23  BROUGHT INSIDE.  CORRECT?

24       **A**    YES, MA'AM.

25       **Q**    AND THE INCARCERATED PEOPLE THEN WAIT UNTIL

1  YOUR SUPERVISOR COMES TO TRANSPORT THEM BACK TO THE

2  CAMP.  CORRECT?

3      A    YES, MA'AM.

4      Q    AND THAT CAN TAKE UP TO HALF AN HOUR?

5      A    YES, MA'AM.

6      Q    AS OF THE DATE OF YOUR DEPOSITION ON JULY

7  31, 2024, YOU HAD NEVER RECEIVED A FORMAL TRAINING

8  ABOUT HEAT-RELATED ILLNESSES.  CORRECT?

9      A    FORMAL TRAINING ABOUT HEAT, HEAT-RELATED

10  ILLNESS?  WE HAD A MEMO ON IT.  WENT OVER.

11     Q    AS OF THE DATE OF YOUR DEPOSITION ON JULY

12  31, 2024, WHEN I ASKED YOU IF YOU -- "HAVE YOU BEEN

13  TRAINED ABOUT HEAT-RELATED ILLNESS?" YOU ANSWERED:

14  "TRAINED, NO, MA'AM."

15         DOES THAT REFRESH YOUR RECOLLECTION PERHAPS?

16     A    YES.

17     Q    YOU'RE NOT SURE EXACTLY WHAT THE SYMPTOMS OF

18  HEAT-RELATED ILLNESS SUCH AS HEAT STROKE OR HEAT

19  EXHAUSTION ARE?

20     A    I KNOW SOME -- SOMETHING ABOUT IT, BUT WE

21  HAD A MEMO -- MEMO OR SOMETHING ON HEAT ALERT, HEAT

22  EXHAUSTION.  WE WENT OVER IT BEFORE IN ROLL CALL.

23     Q    YOU'VE NEVER CALLED MEDICAL 4 FOR AN

24  AMBULANCE WHEN AN INMATE HAS SAID THAT THEY FEEL

25  DIZZY IN THE HIGH HEAT.  CORRECT?

1      **A**    I CALL MEDICAL 3.

2      **Q**    WHICH CAN TAKE UP TO AN HOUR, AS WE

3  DISCUSSED EARLIER?

4           **THE COURT:**  IS THAT A QUESTION?

5           **MS. POURCIAU:**  YES.

6  BY MS. POURCIAU:

7      **Q**    WHICH CAN -- CAN IT TAKE UP TO AN HOUR?

8      **A**    IT DEPENDS.

9      **Q**    MR. BLANCHFIELD REFERENCED HOW YOU WERE

10  PRESENT AT THE SITE INSPECTION ON JULY 22, 2024, AND

11  COLONEL HEBERT TOLD YOU BEFORE YOU SAW US THAT WE

12  WOULD BE THERE THAT DAY.  CORRECT?

13     **A**    YES, MA'AM.

14     **Q**    AND IT IS NOT A NORMAL EVERYDAY PRACTICE FOR

15  YOU TO ISSUE GLOVES TO ALL OF THE INCARCERATED

16  WORKERS WHEN THEY ARRIVE IN THE FIELD.  CORRECT?

17     **A**    IT'S -- WHEN WE GET TO THE FIELD, MY

18  SUPERVISOR BRING GLOVES TO THE FIELD.  EVERY ONCE IN

19  A WHILE WE MIGHT HAVE SOME ON THE BUS, BUT THEY BRING

20  THEM TO THE FIELD.

21     **Q**    I'M NOT --

22          **THE COURT:**  WHY DON'T YOU REPEAT THE

23  QUESTION.

24  BY MS. POURCIAU:

25     **Q**    IT IS NOT A NORMAL PRACTICE FOR YOU TO GIVE

1 OUT GLOVES TO EVERYONE ON THE FIELD EVERY DAY?

2   **A**   IT IS NOT A NORMAL PRACTICE?  NO, WE ISSUE

3 GLOVES OUT EVERY DAY.

4   Q   I'D LIKE TO PULL UP YOUR DEPOSITION FROM

5 JULY 31ST WHERE I ASKED YOU:  "YOU DO THAT EVERY

6 DAY?" AND YOU ANSWERED:  "DON'T DO THAT EVERY DAY

7 BECAUSE THEY GET ISSUED GLOVES, BUT IF ONE NEED SOME

8 GLOVES, I'LL CALL THE SUPERVISOR AND GET HIM SOME

9 GLOVES.  BUT THAT'S NOT AN EVERYDAY THING.  IF THEY

10 GET GLOVES -- THEY GET ISSUED GLOVES, THEY GOT TO

11 KEEP UP WITH THEY GLOVES."

12   **A**   YEAH.  SOME OF THEM KEEP THEY GLOVES.  BUT

13 WE DO ISSUE THEM GLOVES.

14   **Q**   THE POLICY IS THAT THEY'RE GIVEN GLOVES

15 EVERY SIX MONTHS.  CORRECT?

16   **A**   YES, MA'AM.

17       **MS. POURCIAU:**  CAN I HAVE THE COURT'S

18 INDULGENCE FOR ONE MOMENT?

19       **THE COURT:**  SURE.

20       **MS. POURCIAU:**  NO FURTHER QUESTIONS.

21       **THE COURT:**  OKAY.  THANK YOU.

22         ANY REDIRECT?

23       **MR. BLANCHFIELD:**  JUST BRIEFLY, YOUR HONOR.

24               **REDIRECT EXAMINATION**

25 BY MR. BLANCHFIELD:

1    **Q**   MR. SCOTT, DO YOU EVER REMEMBER ATTENDING

2  ANY ANNUAL TRAININGS THAT DISCUSSED HEAT-RELATED

3  ISSUES AND THEN YOU HAD TO SIGN A SHEET SAYING THAT

4  YOU WERE THERE?

5    **A**   YEAH.  BEFORE ROLL CALL WE'LL HAVE A -- GO

6  OVER HEAT-RELATED ILLNESS MEMO AND WE'LL SIGN OFF ON

7  IT.

8    **Q**   NOW, IN YOUR SEVEN YEARS IN THE FIELD, HAVE

9  YOU EVER BEEN DISCIPLINED OR TOLD THAT YOU'RE NOT

10  GETTING ENOUGH PRODUCE PICKED; CUCUMBERS, PEPPERS,

11  SQUASH?

12    **A**   NO, SIR.

13    **Q**   NEVER?

14    **A**   NEVER.

15    **Q**   THANK YOU.

16    **THE COURT:**  I HAVE A COUPLE OF QUESTIONS.

17  FIRST OF ALL, IS IT SERGEANT SCOTT?  IS THAT YOUR

18  RANK, SIR?

19    **THE WITNESS:**  MASTER SERGEANT SCOTT.

20    **THE COURT:**  MASTER SERGEANT SCOTT.  WELL,

21  EXCUSE ME.  YOU'VE EARNED THAT RANK, SO I WANT TO

22  MAKE SURE I ADDRESS YOU APPROPRIATELY.  OKAY?

23    SO HOW MANY MEN, MASTER SERGEANT SCOTT,

24  UNDER YOUR AUSPICES ARE YOUR RESPONSIBILITY AS A LINE

25  PUSHER?

1        **THE WITNESS:**  HOW MANY?

2        **THE COURT:**  YES.

3        **THE WITNESS:**  I HAD UP TO 40.

4        **THE COURT:**  SO -- AND YOU WERE THE ONLY

5   PUSHER THAT WAS RESPONSIBLE FOR THOSE 40?

6        **THE WITNESS:**  I'M THE ONLY PUSHER.  I HAVE

7   TWO GUN GUARDS.

8        **THE COURT:**  TWO WHAT?

9        **THE WITNESS:**  GUN GUARDS.

10        **THE COURT:**  BUT THEY DON'T DIRECT --

11        **THE WITNESS:**  THEY DON'T DIRECT.

12        **THE COURT:**  LET ME JUST FINISH SO -- BECAUSE

13   ONLY ONE OF US CAN SPEAK AT ONE TIME TO MAKE SURE WE

14   HAVE AN ACCURATE RECORD OF PROCEEDINGS.

15             SO THOSE GUN GUARDS, AS THEY'RE

16   DESCRIBED, DO NOT DIRECT THE INMATES -- THE INMATE

17   WORKERS ON WHAT TO DO OUT IN THE FIELD, HOW TO

18   HARVEST THE PRODUCE, AND THAT SORT OF THING.

19   CORRECT?

20        **THE WITNESS:**  CORRECT.

21        **THE COURT:**  ALL RIGHT.  AND I'M JUST

22   CURIOUS, JUST FOR MY OWN EDIFICATION HERE.  YOU KNOW,

23   I'M KIND OF A BACKYARD GARDENER.  MY GRANDFATHER WAS

24   A REAL FARMER.  HOW DO YOU -- I'M JUST CURIOUS.  AND

25   IT MAY NOT HAVE ANYTHING TO DO WITH THIS.  BUT HOW

1  DOES ONE HARVEST VEGETABLES WITHOUT A SHARP

2  IMPLEMENT, A SHARP KNIFE, OR CLIPPERS OR ANYTHING

3  LIKE THAT?

4         **THE WITNESS:**  GREENS?  YOU DON'T NEED A

5  KNIFE FOR GREENS.

6         **THE COURT:**  RIGHT.  YOU JUST REMOVE IT.

7  IT'S A ROOT VEGETABLE.  YOU CAN JUST PULL IT FROM THE

8  GROUND.  RIGHT?

9         **THE WITNESS:**  YOU DON'T PULL IT FROM THE

10  GROUND.  YOU BREAKS THE LEAVES OFF IT.  PEPPERS, YOU

11  JUST PICK THEM OFF THE BUSH.  CUCUMBERS, YOU BREAK

12  THEM OFF THE VINE.

13         **THE COURT:**  YOU BREAK THE STEM?

14         **THE WITNESS:**  BREAK THE STEM OFF THE VINE.

15         **THE COURT:**  SO INMATES ARE NOT GIVEN A KNIFE

16  OR CLIPPERS OR ANYTHING LIKE THAT?

17         **THE WITNESS:**  NO, SIR, NOT FOR GREENS.

18         **THE COURT:**  I WAS JUST CURIOUS.  SO THANK

19  YOU FOR CLARIFYING THAT FOR ME.

20         I HAVE NO FURTHER QUESTIONS FOR YOU.

21  YOU ARE NOW EXCUSED AND WE APPRECIATE YOU COMING ON

22  IN TODAY.  OKAY?

23         **THE WITNESS:**  ALL RIGHT.  THANK YOU.

24         **THE COURT:**  NOW, MR. BLANCHFIELD, I KNOW YOU

25  HAVE ADDITIONAL WITNESSES.  HOW MUCH LONGER DO YOU

1  THINK YOUR NEXT WITNESS -- IF YOU CALL A NEXT

2  WITNESS, HOW LONG DO YOU THINK YOUR WITNESS WILL BE?

3       **MR. BLANCHFIELD:**  ABOUT THE SAME LENGTH AS

4  MR. SCOTT.

5       **THE COURT:**  OKAY.  WHY DON'T WE TRY TO GO

6  THROUGH IT.  WE'LL TRY TO GO POWER THROUGH THIS NEXT

7  WITNESS.  HOW MANY TOTAL WITNESSES DO YOU HAVE?

8       **MR. BLANCHFIELD:**  I HAVE TWO FACT WITNESSES

9  AND ONE EXPERT.

10       **THE COURT:**  OKAY.  LET ME --

11       **MS. POURCIAU:**  YOUR HONOR, MAY I SUGGEST

12  THAT WE START WITH THE EXPERT WITNESS AND THEN WE CAN

13  RESUME THE EXPERT WITNESS TESTIMONY TOMORROW WHEN WE

14  COME BACK?

15       **THE COURT:**  THAT'S A GOOD IDEA.  BUT I NEVER

16  LIKE TO JUST BREAK IN THE MIDDLE OF DIRECT TESTIMONY

17  FOR ANYONE.  NOW, I DON'T MIND -- HOW LONG DO YOU

18  THINK YOUR EXPERT WITNESS TESTIMONY WILL LAST?

19       **MR. BLANCHFIELD:**  I'LL BE --

20       **THE COURT:**  YOUR FULL 45 MINUTES?

21       **MR. BLANCHFIELD:**  YES, YOUR HONOR.

22       **THE COURT:**  OKAY.  I SUSPECTED THAT WAS THE

23  ANSWER I WOULD GET.  AND LISTEN, I DON'T BLAME YOU.

24  EXPERTS ARE QUITE IMPORTANT HERE.

25            NATALIE, LET ME SEE YOU.

1          **(OFF THE RECORD)**

2          **THE COURT:**  ALL RIGHT.  I TELL YOU WHAT

3   WE'RE GOING TO DO.  IT'S BEEN A LONG DAY.  IT WAS A

4   VERY LONG DAY FOR US YESTERDAY BECAUSE WE HAD

5   PROCEEDINGS IN THE MORNING BEFORE THIS CASE STARTED,

6   SO WE'RE GOING TO GO ON AND ADJOURN FOR THE DAY.  WE

7   WILL AGAIN RESUME THE HEARING PROMPTLY AT 8:15

8   TOMORROW.

9              ARE THERE ANY HOUSEKEEPING MATTERS WE

10  SHOULD TAKE UP AT THIS TIME, BEGINNING WITH THE

11  PLAINTIFF?

12          **MS. POURCIAU:**  YES, YOUR HONOR.  THE

13  MARSHALS ARE SAYING THEY'RE STILL PLANNING ON

14  TRANSPORTING MR. JONES AND MR. DAMARIS TOMORROW,

15  SO -- MR. JACKSON, EXCUSE ME.  I DON'T KNOW IF THERE

16  NEEDS TO BE SOMETHING ENTERED INTO THE RECORD

17  OFFICIALLY FOR THEM TO NOT DO THAT.  I HAD THOUGHT

18  THE COURT'S ORAL ORDER WOULD HAVE BEEN SUFFICIENT.

19          **THE COURT:**  LET'S GO AND WE'LL GET AN ORDER

20  ENTERED INTO THE RECORD BEFORE -- WE'LL GET THAT

21  DOCKETED THIS EVENING.  MR. JACKSON, AGAIN, HAS THE

22  RIGHT TO BE HERE.  NOW, MR. JONES DOES NOT.  HE'S NOT

23  A PARTY -- DIRECT PARTY TO THIS LAWSUIT, BUT MR.

24  JACKSON IS ENTITLED TO BE PRESENT.

25              SO, GENTLEMEN, IF YOU WOULD NOTIFY THE

1 FOLKS -- AND THANK YOU, SIR, FOR STANDING.  AND

2 WARDEN.  THANK YOU, WARDEN.

3          **UNIDENTIFIED SPEAKER:**  I SPOKE WITH MY

4 SUPERVISOR.  WE ALREADY NOTIFIED --

5          **THE COURT:**  YOU SPOKE TO YOUR SUPERVISOR.

6 HE'S ALREADY --

7          **UNIDENTIFIED SPEAKER:**  HE'S GOING TO BE HERE

8 TOMORROW.

9          **THE COURT:**  WELL, I GUESS WE -- THANK YOU,

10 WARDEN.  WE'LL DISPENSE WITH THE NECESSITY OF ISSUING

11 A WRIT.

12          **WARDEN VANNOY:**  HE'LL DEFINITELY BE HERE

13 TOMORROW.

14          **THE COURT:**  THANK YOU SO MUCH, WARDEN.  WE

15 APPRECIATE YOUR COOPERATION.

16          ONE MOMENT.

17                  **(OFF THE RECORD)**

18          **THE COURT:**  SO JUST A POINT OF

19 CLARIFICATION.  THERE HAS BEEN REFERENCE TO

20 PLAINTIFFS' EXHIBIT 5.

21          **MS. POURCIAU:**  I WAS JUST ABOUT TO ASK TO

22 MOVE IT INTO EVIDENCE.

23          **THE COURT:**  AND YOU SEE HOW CAPABLE MY STAFF

24 IS.  RIGHT?  BECAUSE I'M JUST DEALING WITH OTHER

25 STUFF, BUT THEY'RE ON TOP OF IT.

1          SO I ASSUME THAT THE PLAINTIFFS WISH TO

2     ENTER EXHIBIT 5 INTO THE RECORD PROCEEDINGS IN

3     THIS -- FOR THIS -- PURPOSES OF THIS MOTION.

4     CORRECT?

5          **MS. POURCIAU:**  YES, YOUR HONOR.

6          **THE COURT:**  ANY OBJECTION?

7          **MR. JONES:**  YOUR HONOR, I DON'T KNOW WITH

8     RESPECT TO WHAT WITNESS THEY ATTEMPTED TO

9     AUTHENTICATE OR --

10         **THE COURT:**  I THINK WE'VE ALREADY HAD --

11         **MR. BENJAMIN:**  GO AHEAD.  PLEASE FINISH.

12         **THE COURT:**  WELL, NO.  LET ME -- AS THE

13    PROPONENT OF THE EXHIBIT, LET ME ALLOW YOU TO DEFEND

14    IT.

15         **MR. BENJAMIN:**  THANK YOU, YOUR HONOR.

16          THIS WAS PUT IN FRONT OF DR. LAVESPERE.

17    IT IS THE EXHIBIT -- IT IS FROM THE WEBSITE THAT IS

18    CITED IN PLAINTIFFS' INTERROGATORY RESPONSE.  IT'S

19    DIRECTLY PULLED FROM THERE.  I'M SORRY.  DEFENDANTS'

20    INTERROGATORY RESPONSE TO PLAINTIFFS' THIRD

21    INTERROGATORIES.

22         **MR. JONES:**  I WILL RESPOND ONLY THAT WE WILL

23    MAINTAIN THE SAME OBJECTION THAT WE'VE HAD BEFORE

24    WITH RESPECT TO THE DISCLOSURE OF THIS EXHIBIT AS

25    MANY OTHERS; THAT THEY WERE NOT PROVIDED TO US

1   UNTIL -- OR THE LIST WAS NOT PROVIDED TO US.  BUT

2   WITH RESPECT TO -- OTHER THAN THAT OBJECTION,

3   THAT'S --

4            **THE COURT:**  WELL, THANK YOU.  AND AGAIN,

5   YOUR OBJECTION IS NOTED, MR. JONES.  BUT THE EXHIBIT

6   WILL BE ENTERED INTO THE RECORD WITH RESPECT TO THIS

7   MOTION.

8            **MR. BENJAMIN:**  THANK YOU, YOUR HONOR.

9            **THE COURT:**  ANY OTHER ISSUES BY THE

10  PLAINTIFFS BEFORE WE ADJOURN FOR THE DAY?

11           **MS. POURCIAU:**  NO, YOUR HONOR.

12           **THE COURT:**  ANY FROM THE DEFENSE?

13           **MR. BLANCHFIELD:**  NO, YOUR HONOR.

14           **THE COURT:**  OKAY.  THANK YOU.  SO JUST SO

15  THAT I -- FOR OUR PURPOSES SO THAT WE CAN PREPARE FOR

16  OUR DAY TOMORROW -- BECAUSE WE HAVE OTHER THINGS

17  GOING ON OTHER THAN THIS CASE.  SO WE HAVE ONE EXPERT

18  WITNESS AND TWO FACT WITNESSES REMAINING.  IS THAT

19  CORRECT?

20           **MR. BLANCHFIELD:**  CORRECT, YOUR HONOR.

21           **THE COURT:**  JUST SO YOU KNOW THAT AT THE

22  CONCLUSION OF THE PROCEEDINGS I WILL ALLOW BOTH SIDES

23  A SHORT OPPORTUNITY, IF WE HAVE TIME, DEPENDING ON

24  WHEN WE WRAP UP, TO MAKE SOME VERY BRIEF SUMMARY

25  REMARKS.  I WILL CALL THEM SUMMARY REMARKS, NOT

1   CLOSING ARGUMENT.  AND I AM LIKELY TO ALSO ALLOW BOTH

2   SIDES TO FILE POST-HEARING BRIEFS.  AND I'LL PROVIDE

3   FURTHER DEADLINES ABOUT THAT.  SO JUST BE THINKING

4   ABOUT THAT AND ANYTHING ELSE YOU-ALL WOULD LIKE

5   BEFORE WE ADJOURN TOMORROW.  OKAY?

6          **MR. BLANCHFIELD:**  THANK YOU, JUDGE.

7          **THE COURT:**  THANK YOU.

8              WARDEN, THANK YOU FOR ENSURING THAT THE

9   PLAINTIFF AND THE WITNESS WERE ALL HERE BRIGHT AND

10  EARLY.  I KNOW I GOT HERE BRIGHT AND EARLY AND THEY

11  WERE HERE BEFORE I WAS HERE, SO THANK YOU AND YOUR

12  VERY CAPABLE STAFF FOR THAT.  OKAY?

13             ALL RIGHT.  THERE BEING NO FURTHER

14  BUSINESS FOR THE COURT, COURT IS NOW ADJOURNED.

15         **THE LAW CLERK:**  ALL RISE.

16             COURT IS NOW ADJOURNED.

17         **(WHEREUPON, THE PROCEEDINGS WERE ADJOURNED**

18  **UNTIL APRIL 24, 2025 AT 8:15 A.M.)**

19             C E R T I F I C A T E

20      **I CERTIFY THAT THE FOREGOING IS A CORRECT**

21  **TRANSCRIPT FROM THE RECORD OF THE PROCEEDINGS IN THE**

22  **ABOVE-ENTITLED NUMBERED MATTER.**

23  **S:/NATALIE W. BREAUX**

24  **NATALIE W. BREAUX, RPR, CRR**

25  **OFFICIAL COURT REPORTER**