# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **VOICE OF THE EXPERIENCED,** a membership organization on behalf of itself and its members; **and MYRON SMITH, DAMARIS JACKSON, NATE WALKER, DARRIUS WILLIAMS, KEVIAS HICKS, JOSEPH GUILLORY, KENDRICK STEVENSON,** and **ALVIN WILLIAMS,** on behalf of themselves and all others similarly situated, | * * * * * * * * * * * * | **CIVIL ACTION** <br><br> **NO.: 3:23-cv-1304** <br><br> **JUDGE BRIAN A. JACKSON** |
| **VERSUS** | * * | |
| **JAMES LEBLANC,** in his official capacity as Secretary of the Louisiana Department of Public Safety and Corrections**; TIMOTHY HOOPER,** in his official capacity as Warden of Louisiana State Penitentiary; **MISTY STAGG**, in her official capacity as Director of Prison Enterprises, Inc.; the **LOUISIANA DEPARTMENT OF PUBLIC SAFETY & CORRECTIONS;** and **PRISON ENTERPRISES, INC.** | * * * * * * * * * * * * * | **MAGISTRATE JUDGE ERIN WILDER-DOOMES** |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

# POST TRIAL MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

**NOW INTO COURT,** through undersigned counsel, come Defendants herein, **JAMES LEBLANC,** in his official capacity as Secretary of the Louisiana Department of Public Safety and Corrections, **TIMOTHY HOOPER,** in his official capacity as Warden of Louisiana State Penitentiary, and the **LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS** ("Defendants"), who, as ordered by the Court, file this post-trial opposition to Plaintiffs' Motion for Class Certification. Plaintiffs failed to meet their burden of proof to certify the general and ADA Subclass.

1

Most of the testimony elicited from Plaintiffs at the hearing centered around the ultimate merits issue – Plaintiffs' attempt to condemn the Farm Line as a whole. However, LSP has exceeded constitutional requirements and guidelines for private employers to protect all offenders from heat related issues.

Plaintiffs cannot show commonality for the general class because they cannot show a substantial risk of harm to all offenders working the Farm Line. Plaintiffs' expert opinions presented at the hearing regarding only the heat index temperature, without considering the mitigation measures applied on a daily basis, cannot establish the common questions of whether **all** offenders face a substantial risk of harm. Further, the alleged harms associated with psychological and dignitary harm are inherently based on individualized issues and experiences. Plaintiffs' own expert identified individualized issued present with each of their three theories, which necessarily implicate different harms.

Likewise, with the ADA Subclass, the issues of whether each putative subclass member has a qualifying disability, is being denied access to programs by reason of that disability, or whether the ADA would require that the accommodation be complete stoppage of Farm Line, would not be common. For the same reasons, Plaintiffs fail to establish typicality and adequacy. Class certification should be denied.

## 1. The ADA Subclass is Barred

Under the principals of res judicata, and the Fifth Circuit's ruling in *Gillespie v. Crawford*, 858 F.2d 1101, Plaintiffs ADA Subclass is barred because they pursue claims identical to the claims asserted and litigated in the *Lewis v. Cain* class action.

In Plaintiffs' class certification motion, Plaintiffs asserted that "The ADA Subclass raises a methods of administration claim alleging that Defendants' policies, practices, and procedures for

identifying and providing accommodations for men with disabilities are inadequate as it pertains to the Farm Line." R.Doc. 120-1, p. 22.  Plaintiffs are barred from seeking certification of the ADA Subclass because this very same subclass and same claim is being litigated in the *Lewis v. Cain* class action.

At the first class certification hearing, Plaintiffs' counsel attempted to distinguish the *Lewis* class action ADA claim with their claims here. However, Plaintiffs' argument does not hold up when the two cases are compared:

| | *Lewis v. Cain* | *VOTE v. LeBlanc* |
|---|---|---|
| Class definition | "all qualified individuals with a disability, as defined by the ADA/RA, who are now, or will be in the future, incarcerated at LSP." *Lewis v. Cain*, 324 F.R.D. 159, 176 (M.D. La. 2018). | "all persons incarcerated at LSP who currently are or may in the future be assigned to the Farm Line and who have disabilities that may cause, or that are treated with medications that may cause, impaired thermoregulation." Class Certification Hearing Transcript, February 19, 2025, pp. 44-45. |
| Claim | Methods-of-administration claim alleging that LSP "fails to appropriately process accommodation requests and disability-related grievances" and "fails to identify and track patients' disabilities and accommodation requests." *Lewis v. Cain*, No. 3:15-CV-318, 2021 WL 1219988, at *48-50 (M.D. La. Mar. 31, 2021). | "methods of administration claim alleging that Defendants' policies, practices, and procedures for identifying and providing accommodations for men with disabilities are inadequate." R.Doc. 120-5, p. 22; Class Certification Hearing Transcript, February 19, 2025, p. 46. |

Plaintiffs cannot dispute that the proposed ADA subclass in this case is encompassed in the *Lewis* class action. Further, Plaintiffs cannot dispute that their methods of administration claim mirrors the *Lewis* claims. The fact that Plaintiffs' claims here are more specific does cure the fact that the same claims have been litigated in *Lewis*.

3

Certifying the same class and allowing the ADA Subclass to bring the same claims that have been adjudicated in *Lewis* would interfere with the *Lewis* class action and risk inconsistent adjudications. *Gillespie v. Crawford*, 858 F.2d 1101, 1103 (5th Cir. 1988); *Pappillion v. Louisiana Dep't of Pub. Safety & Corr.*, No. CV 19-117-SDD-SDJ, 2021 WL 4484992, at *3 (M.D. La. Sept. 3, 2021), report and recommendation adopted, No. CV 19-117-SDD-SDJ, 2021 WL 4480991 (M.D. La. Sept. 29, 2021). As such, Plaintiffs cannot maintain an ADA Subclass in this lawsuit.

At the first class certification hearing, presumably recognizing this roadblock, Plaintiffs' counsel attempted to expand its class certification motion by arguing that they also bring "failure to accommodate" claims. However, even if Plaintiffs could expand the relief sought in their class certification motion (they cannot), the ADA Subclass does not seek "reasonable accommodations." They seek complete stoppage of the Farm Line. R.Doc. 120-1, p. 27.

## 2. Plaintiffs Fail to Meet Their Burden of Proof on Commonality

"Pursuant to Rule 23(a)(2), there must be "'questions of law or fact common to the class.'" *Ibe*, 2016 WL 4729446, at *7. The United States Supreme Court has explained that "[c]ommonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury." *Ibe*, 2016 WL 4729446, at *7, quoting *Wal-Mart Stores, Inc.*, 564 U.S. at 349 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982)). "Dissimilarities among class members should be considered to determine whether a common question is truly presented." *Ibe*, 2016 WL 4729446, at *7, quoting *Wal-Mart Stores, Inc.*, 564 U.S. at 359.

Rule 23(a)(2)'s commonality requirement demands more than the presentation of questions that are common to the class because "'any competently crafted class complaint literally raises common questions.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, 131 S. Ct. 2541, 2551, 180 L. Ed. 2d 374 (2011). Further, the members of a proposed class do not establish that "their

claims can productively be litigated at once," merely by alleging a violation of the same legal provision by the same defendant. *Id.* ("[T]he mere claim by employees of the same company that they have suffered a Title VII injury, or even a disparate-impact Title VII injury, gives no cause to believe that all their claims can productively be litigated at once.").

A.    ***In re Deepwater Horizon***

This Court requested that the parties specifically address *In re Deepwater Horizon*, 739 F.3d 790 (5th Cir. 2014) with regards to commonality. *In re Deepwater Horizon* concerned class certification for settlement purposes only in the BP oil spill litigation. On appeal, BP argued that Rule 23(a)(2) requirements were not met because the class members did not suffer the same injury. The Fifth Circuit rejected this argument, but under a completely different legal and factual scenario than this case. At the outset, *In re Deepwater Horizon* was certified for the purposes of settlement. The Fifth Circuit noted that had the class been certified for merits issued, the district court may have applied a stricter evidentiary standard. *Id*. at 806. Further, from the beginning of the litigation, the district court had anticipated that "issues relating to damages" would be "severed and tried separately" from other issues relating to liability. *Id* at 816. The initial phases of that litigation would therefore have focused on common questions, including which defendants bore responsibility for the well blowout, how much oil escaped from the Macondo reservoir, who bore responsibility for the inability of the defendants to contain the flow earlier, where the oil finally came to rest, and how the efforts to disperse the oil were conducted.

As such in the *In re Deepwater Horizon* case, the common contention centered around defendants' liability, and not the damages suffered by plaintiffs. Further, because the damages portion of the claims were tried separately, individualized issues with damages were not relevant in the certifying a class for settlement purposes.

Unlike *In re Deepwater Horizon*, where common questions on liability were the key issues, Plaintiffs' theories in this case create individual issues, including whether individual offenders are heat sensitive, whether individual offenders are at a substantial risk of harm given the precautions in place, whether individual offenders alleged suffer psychological harm, and the work conditions between vegetable farming and grass cutting lines.

Further, in this case, Plaintiffs' claims involve alleged <u>constitutional</u> violations. For the heat theory, Plaintiffs must prove that Defendants were deliberately indifferent to a substantial risk of harm, i.e. whether each inmate was subject to a substantial risk of harm for a heat related injury with the current mitigation measure in place, and whether Defendants were deliberately indifferent. The individualized issues with regards to the heat theory outweigh any common questions. For instance, as Plaintiffs' expert even admits, "some healthy people with no known medical problems will tolerate heat more easily"[1] and that the "degree to which…any one individual is exerting himself…and the consequences of that exertion will depend on a number of physiological factors concerning that one individual." Defendants' Exhibit 7, p. pg. 84-85. See also Transcript, Vol. 2, p. 81-82.

With regards to the Dignitary and Psychological harm theories, individualized issues exist with this alleged individualized harm. Initially, Plaintiffs' expert, Dr, Hammonds, admitted that alleged risk of psychological ham would **not** apply equally to Caucasian offenders and African American offenders. R.Doc. 126-8, p. 32. While Dr. Sbicca testified that Caucasian individuals can experience the same "stigma" of being required to work in a prison system generally, this does not correlate to whether Caucasian individuals experience an alleged substantial risk of dignitary or psychological harm similar to African American offenders. It is well established that requiring

---

[1] R.Doc. 37-3, p. 20.

6

inmates to work as a part of their sentence does not violate the constitution. See *Ali v. Johnson*, 259 F.3d 317, 317 (5th Cir. 2001); See also La. R.S. §14:2(A)(4) wherein Louisiana law defines a felony as "any crime for which an offender may be sentenced to death or imprisonment at hard labor."

Second, individualized issues exist with the work performed on each "Farm Line." Lines 24, 25 and 15 will perform vegetable harvesting work, or sometimes perform work inside the processing plant. Line 15b is a grass cutting crew that cuts grass with weed eaters. Plaintiffs' experts opined that the dignitary and psychological harm stemmed from a system that "degrades and dehumanizes people by forcing them to work in plantation style agriculture." Transcript, Vol 1, p. 79. It is undisputed that a mobile grass cutting crew is not "plantation style agricultural work." These individualized issues of psychological harm, race of the individual and the type of work performed among the different lines preclude resolving these types of claims in one stroke.

In short, the *Deepwater Horizon* case is not applicable here. The issues with individualized damages in that case cannot be applied to specific alleged constitutional violations, where the specific claims are necessarily based on individual experiences.

**B. Plaintiffs cannot show commonality because they cannot show a substantial risk of harm to all offenders working the Farm Line**

**i. The General Class**

Plaintiffs seek an injunction under Rule 23(b)(2) for a complete stoppage of the Farm Line. In other words, Plaintiffs must prove that all offenders are at a substantial risk of harm to perform **any** work on the Farm Line regardless of the temperature or all of the heat protection measures in place. This claim cannot resolved on a classwide basis because it depends on the efficacy of heat-mitigation measures as applied to each class member. Cf. *Perry*, 675 F.3d at 843 (explaining that commonality does not exist "if the merits of each class member's . . . claims depend on an

individualized inquiry regarding the harm or risk of harm experienced by each class member from the State's practices").

Dr. Vassallo's testimony at the class certification hearing focused on the heat alert threshold and the medication and medical exclusion list. These opinions do not answer class wide issues as to a substantial risk of harm to **all** offenders who work on the Farm Line, as these issues are only relevant to those claimed "heat sensitive" offenders.

The only opinions that purport to apply on a class wide basis is her opinion that all offenders are at a risk of harm when the heat index reaches 88 degrees. However, these opinions <u>fail to take into account the heat protection measures in place</u>, before and after the heat index reaches 88 degrees. Even if offenders are at a risk of harm when the heat index reaches 88 degrees, which is disputed, the measures in place are effective to reduce the risk of serious harm to a constitutionally permissible level for all inmates.

Here, Plaintiffs own expert opined that the following interventions would reduce the risk posed by exposure to heat while working on the Farm Line (1) adequate rest breaks; (2) rest areas where people can hydrate and cool down; (3) unlimited access to liquids and shade; (4) effective first aid and emergency response protocols; and (5) adequate climate control. R.Doc. 120-61; Joint Exhibit 58, para. 17.

Evidence has been presented that these "interventions" are in place. Year round, and regardless of temperature, offenders working the Farm Line are provided 15-minute rest breaks every 45 minutes. Transcript Vol 2, p. 154-155. Offenders are provided shaded break areas, either on the shade wagons if offenders are working in the field, or on buses if working on the mobile grass cutting crew. Transcript, Vol. 3, p. 15. Offenders have unlimited access to water and Gatorade. Transcript, Vol. 2, p. 305; Transcript, Vol. 3, p. 11. Offenders work at their own pace. Transcript,

Vol. 2, p. 308; Transcript, Vol. 3, p. 11. LSP has emergency response protocols in place for offenders working the Farm Line. Any offender, at any time, can declare himself a medical emergency. Transcript, Vol. 3, p. 34. Transcript, Vol. 2, p. 307-308. Medical is immediately called and the nurse determines whether the offender needs further treatment or can return to work. Transcript, Vol. 3, p. 34. LSP officials can also call an ambulance if needed for any medical emergency. Transcript, Vol. 2, p. 319-320.

As such, as to the general class, whether any offender is subject to a substantial risk of harm on the Farm Line, given the remedial measures in place (that Dr. Vassallo previously endorsed), are subject to individualized issues regarding whether these heat mitigation measures are effective for each offender.

Further, Dr. Vassallo's own declarations and deposition testimony demonstrate that individualized issues among the inmate population will affect the risk of harm while working on the Farm Line. Dr. Vassallo admitted that "some healthy people with no known medical problems will tolerate heat more easily." R.Doc. 37-3, p. 10. She further admitted that whether the work on the Farm Line is strenuous would differ depending on each offender's fitness level. Defendants' Exhibit 7, pg. 59, 76. Dr. Vassallo also testified that the risk of heat related injuries will depend on a number of physiological factors concerning that one individual. Defendants Exhibit 7, pg. 84-85; Transcript, Vol 2, p. 81-82. All of these individualized issues and dissimilarities between class members "impede the generation of common answers," and the question cannot be resolved "in one stroke." *Dukes*, 564 U.S. at 350.

In *Yates v Collier*, a case that Plaintiffs rely on, inmates at a Texas prison brought a class action lawsuit concerning excessive heat inside a dorm. *Yates v. Collier*, 868 F.3d 354, 365 (5th Cir. 2017). It was undisputed that the temperature inside the dorm was often extreme and that there was a

significant history of heat related illnesses, including more than 20 deaths as a result of excessive heat. The issue on appeal for class certification purposes was whether the heat mitigation measures in place, including showers, water and fans, were effective to reduce the risk of serious harm to a constitutionally permissible level for all inmates. Plaintiffs' experts opined that the fans and showers were ineffective to reduce the substantial risk of harm to all inmates. The district court's finding that the heat-mitigation measures were ineffective to reduce the heat-related risk of serious harm below the constitutional baseline was not clearly erroneous.

Unlike the *Yates* case, where the issue was heat mitigation measures in place at a housing unit, the issue is the mitigation measures in place during <u>short periods of time for work assignments</u> only. Further, the current measures in place at LSP mirror the measures that Plaintiffs' own expert opined were required to reduce the risk for heat exposure, including (1) adequate rest breaks; (2) rest areas where people can hydrate and cool down; (3) unlimited access to liquids and shade; (4) effective first aid and emergency response protocols. Joint Exhibit 58.

Further, unlike *Yates*, there is no evidence of any heat related deaths of offenders working the Farm Line. Even more, Dr. Keldie reviewed over 135 self-declared emergencies from the summer of 2024. Of those, zero SDEs were actual exertional heat illnesses. Transcript, Vol 3, p. 73. See also Joint Exhibit 76.[2] Dr. Keldie further reports that many SDEs made in the field are made in the morning hours shortly after the work shift begins. Even though LSP officers are aware that most inmates declare themselves medical emergencies because they do not want to work, medical personnel are called out to the field so the offender can be triaged. Transcript, Vol 2, p. 321-322.

---

[2] Dr. Keldie's review further found that of the 135 SDEs from the summer of 2024, 14 offenders required ATU level of care, unrelated to an any heat illness. 23 offenders had potential heat related illnesses, none of which were actual exertional heat illnesses and who were triaged appropriacy in the field. 68 offenders declared themselves an emergency but suffered minor, non-urgent complaints, such as toothaches, finger pain from sports injuries. Joint Exhibit 76.

ii.     **The ADA Subclass**

Even if the ADA Subclass was not barred, Plaintiffs fail to meet their burden on proof on commonality. In order to determine whether there are common questions of law or fact, a court must trace the class claims and conclude that the common questions will resolve them without the need for additional extensive individualized inquiry. *Dockery v. Fischer*, 253 F. Supp. 3d 832, 849 (S.D. Miss. 2015). Under the ADA, determining a violation requires 'a fact-specific, case-by-case inquiry that considers, among other factors, the effectiveness of ... [a possible] modification in light of the nature of the disability in question.'" *Mealey v. Gautreaux*, No. 16-716-JWD-RLB, 2020 WL 515853, *9 (M.D. La. Jan. 31, 2020). The issue of whether each putative subclass member has a qualifying disability, is being denied access to programs by reason of that disability, or whether the ADA would require that the accommodation be removal from the Farm Line, would not be common.

With regards to the class definition itself, whether an offender would even be included in the class would require an individualized inquiry. Plaintiffs seem to argue that any offender that currently has a heat precaution duty status may be a proposed class member. However, Plaintiffs also argue that other offenders should have a heat precaution duty status. This issue is contested, as demonstrated by Dr. Barnes testimony that offenders taking SSRIs, ARB, ACE inhibitors and calcium channel blockers should not be provided a heat precaution duty status. Whether an offender is on a medication that may cause "impaired thermoregulation" will require individualized review of the offender's medical records and analysis of each individual's risk with regards to the ability to thermoregulate.

While Dr. Vassallo dodged the questions at the hearing, her sworn testimony at her deposition demonstrates the various individualized issues with respect to the medication list.

Q. In your opinion, if someone is on a beta blocker, would they -- should they be entitled to a heat-related duty status?

A. So my expertise is in medicine and my point of view is beta blockers -- I might – the facts -- the fact is that beta blockers decrease the ability to dissipate heat. All of them. **Do I think that every individual who takes a beta blocker has to be off the farm line? I think there are other individual considerations.**

I'm just saying that if you're on a beta blocker your heart doesn't function normally, your vessels don't function normally, you -- and so a number of things. So it puts you at increased risk for heat illness.

Q. **Okay. And if I understand what you're saying, before we would automatically take someone off on the farm line who's on a beta blocker, there's other things we need to look at?**

A. **Yes**.

Q. Okay. Calcium channel blockers, same question?

A. Well, same answer. Calcium channel blockers and beta blockers won't impair the ability

of the patient or the individual, the prisoner, to dissipate heat and the literature is clear that these drugs put the patient at risk, the individual at risk.

So should they come off the heat — off the farm line in the hottest days is probably the safest. **So the question is, what is that individual's risk of, you know, harm, and the risk of harm is increased when they are on those drugs and have the conditions that these drugs treat**.

Dr. Vassallo admits that individualized issues arise with respect to whether certain medications would require a heat precaution duty status. Further, Dr. Vassallo contradicts her sworn testimony with new Fourth affidavit where she now claims the medication list is deficient because it does not include calcium channel blockers.

Dr. Vassallo's testimony shows that both her and Dr. Barnes at least agree on one issue: that a patient's individual circumstances should be considered in assessing whether a medication would automatically require removal from the Farm Line. See Transcript Vol 2, p. 96-97; 260-261. These individualized issues preclude a finding of commonality.

With regards to the heat protections in place for offenders that receive a heat precaution duty status, Plaintiffs focused on the heat alert temperature threshold, which governs when an individual with a heat precaution duty status in brought indoors. While Defendants adopt and

incorporate their briefing on the Second Temporary Restraining Order (R.Doc. 223 and 249), Defendants clarify issues presented in this Court's recent ruling.

First, as Dr. Vassallo admitted, there are no standards established by the Louisiana Department of Health (or any other National standards) regarding minimum heat standards that would require certain precautions for outdoor activities. Transcript Vol 2, p. 116-117. Because there are no local or National standards, Dr. Keldie reviewed recommendations implemented by the US Army.

As Dr. Keldie explained in his report and in his testimony, the US Army chart uses Wet Bulb Globe Temperature to assess protective measures that should be put in place during certain temperatures. WBGT and heat index temperatures do not correlate, and a conversion is necessary to compare the temperatures. Transcript, Vol. 3, p. 113. Dr. Keldie converted the WBGT in the chart to heat index:[3]

| Heat category | WBGT | Heat Index (high end) | Work Rest (Moderate work) |
|---|---|---|---|
| 1 (White) | 78-89.1 | 84 | NL (no limit) |
| 2 (Green) | 82-84.9 | 89 | NL (no limit) |
| 3 (Yellow) | 85-87.9 | 95 | NL (no limit) |
| 4 (Red) | 88-89.9 | 103 | 50/10 |
| 5 (Black) | >90 | > 103 | 20/40 |

A heat index of 91 degrees falls into the Yellow category. Even conservatively using "Moderate Work" which would entail patrolling with a 30 pound load, there are no limits to work rest times for a four hour shift.

---

[3] See Joint Exhibit 76, p. 8.

Plaintiffs attempted to insinuate at the hearing that a WBGT of 90 degrees is the same reading of a heat index of 90 degrees. This tactic is disingenuous at best, as Plaintiffs are well aware that these two types of temperatures do not correlate. Further, while the chart does not consider environmental conditions or the weather in its definition of "easy work," the chart itself takes into account environmental conditions and the weather; the whole purpose of the chart is **work rest guidelines for training in hot environments**.

Even the categories of caution set forth by OSHA apply to workers that are (1) without safety protocols in place; i.e. little or no protection (2) doing physically strenuous work and (3) working prolonged hours consistent with agricultural work in the community. Defendants' Exhibit 3; R.Doc. 223-12, para. 15. The 91 degree heat index threshold far exceeds what any private sector employer is required to provide to its workers. And far exceeds what the US Army implements.

Regardless, whether any individual offender who "may" have impaired ability to thermoregulate (as outlined in Plaintiffs Subclass definition) would be entitled to additional accommodations is a "'a fact-specific, case-by-case inquiry" that considers, among other factors, the effectiveness of ... [a possible] modification in light of the nature of the disability in question.'" *Mealey v. Gautreaux*, No. 16-716-JWD-RLB, 2020 WL 515853, *9 (M.D. La. Jan. 31, 2020). Whether the precautions in place that apply to the purported Subclass members are sufficient for their specific disability will require individualized determinations.

### 3. Typicality

The testimony and evidence present for class certification demonstrated that unique differences among the class members make each offenders' claim atypical of others. Plaintiffs have not shown that under their three different General class theories, whether the named Plaintiffs' alleged "heat" harm, "dignitary" harm, or "phycological" harm would be typical of other purported class members. Whether one offender may suffer dignitary or psychological harm may not be typical of

others. Plaintiffs' reliance on Dr. Hammonds, who has never visited LSP, and Dr. Sbicca, who visited the Farm Line once and did not interview any offenders for his report, cannot support an across the board opinion on every purported class member and whether their claims are typical.

Further, heat sensitivity will differ among individuals, and the named Plaintiffs' claims are not typical of other claims. The same reasoning applies to the ADA Subclass. As Dr. Vassallo admits, individual the risk of heat related injuries will depend on a number of physiological factors concerning that one individual. Defendants Exhibit 7, pg. 84-85; Transcript, Vol 2, p. 81-82.

This Court heard testimony from a putative class member who has not worked on the Farm Line since November 2024. Transcript, Vol 2, p. 169-170. However, he even admitted that he was provided shade, hats, boots, cups, water, and seating during that time period. *Id*. This testimony is vastly different from Damaris's Jackson's testimony, who was last on the Farm Line in 2023. Transcript, Vol. 2, p. 139-140. These claims and experiences are not typical of each other.

### 4. Adequacy

Rule 23(a)(4) requires a showing that "the representative parties will fairly and adequately protect the interests of the class." The named Plaintiffs cannot adequately represent the class where none of the named Plaintiffs are currently assigned to the Farm Line. As such, no named plaintiff could testify as to the current conditions of the Farm Line, to include changes made since June 2024.

### 5. Plaintiff fails to meet the requirements of Rule 23(b)(2)

Rule 23(b)(2) provides that class certification is appropriate where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive

relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed.R.Civ.P. 23(b)(2).

Plaintiffs failed to prove that the injunction that seek, i.e., complete stoppage of the Farm Line" would be appropriate respecting the class as a whole. As more fully briefed above, Plaintiffs failed to show a substantial risk of harm to all purported class members. See Section 2(B). As such, the injunctive relief requested of shutting down the Farm Line fails to meet Rule 23(b)(2) requirements.

### 6. Plaintiffs' Expert Testimony Does Not Support Certification

#### A. Dr. Vassallo's testimony

While Dr. Vassallo was accepted as an expert in thermoregulation, her opinions in this case do not support class certification. As discussed above, Dr. Vassallo admitted that many individualized issued exist with regards to whether certain persons can tolerate heat, that physiological factors of a particular individual will affect the risk of heat related injuries, and whether individualized factors should be considered as to the risk associated with some medications.

In addition, Dr. Vassallo's credibility is called into doubt concerning her prior testimony in this case regarding the medical records of the named plaintiffs. At the hearing, Defendants demonstrated that Dr. Vassallo's previous declarations filed with this court are simply not supported by the medical records. For example, Dr. Vassallo submitted a declaration outlining the alleged medical history of the named plaintiffs. For one patient, she declared that he suffered from certain medical conditions that put him at risk for having a heat injury, including hypertension, tuberculosis, pulmonary disease and mobility impairment. Dr. Keldie reviewed all of the medical records and opined that the named plaintiff did not suffer from any of those conditions. Transcript,

Vol 3, p. 65-66. For example, Dr. Vassallo's claim that the offender has hypertension was based on a "rare" blood pressure elevation, but no diagnosis of hypertension. Id. Her claim that he was mobility impaired, and therefore was at risk for a heat injury, was based on a **sprained ankle in 2015**. *Id*.

With regards to patient number 3, Dr. Vassallo claimed that the patient had hypothyroidism, hepatitis C and asthma. Transcript, Vol 3, p. 68-70. The patient's hepatitis was cured in 2021, and he was never diagnosed with asthma. Id. In fact, the only mention of asthma in his record was to say that he had no history of asthma. For patient number 4, Dr. Vassallo opined that he suffered an illness that was consistent with a heat stress disorder. The illness in questions occurred in January 2008 and he was diagnosed with a viral illness. Transcript, Vol 3, p. 71.

This Court has relied on this testimony in prior rulings. This testimony is not supported by the medical records. Defendants urge this Court to consider this issue when evaluating her testimony as a whole.

### B. Dr. Sbicca

Plaintiffs rely on Dr. Sbicca's testimony to support their theory that all proposed class members are at a substantial risk of serious psychological and physical harm while performing their jobs as a part of their hard labor sentence. Dr. Sbicca is not a psychologist or a medical doctor. Transcript Vol 1, p. 52. His expert report does not show that he interviewed or examined any of the Plaintiffs to assess whether they showed signs or symptoms of psychological or physical harm. Transcript, Vol 1, p. 52-53. Sbicca's inspection at LSP was the first time he ever visited a prison with an agricultural program. Transcript, Vol 1, p. 86. Yet, Plaintiffs seek to prove that all proposed class members are at a substantial risk of serious psychological or physical harm through his testimony.

Sbicca's opinions are speculative and based upon his own *ipse dixit*. He opines conditions caused by societal and penal systems create psychological and physical harm for workers, whether incarcerated or not. This shows Sbicca views the alleged harm as a global issue with society. Because the Farm Line utilizes "workers," it necessarily shows that Farm Line workers at LSP experience this psychological and physical harm.

When viewed as a whole, Sbicca's opinions are that any sort of work that incarcerated people perform should be ended. Sbicca testified regarding historical developments of laws governing agricultural programs at prisons and argues that these laws were designed to replicate slavery. Transcript, Vol. 1, p. 54-55. However, Courts have routinely found that labor practices at prisons, based upon the same historical framework Sbicca attacks are constitutional. *Winston v. Stacks*, 243 F. App'x 805, 807 (5th Cir. 2007); *Clarke v. Collins*, 5 F.3d 1494 (5th Cir. 1993) *Sampson v. King*, 693 F.2d 566, 568 (5th Cir. 1982). Sbicca's commentary about historical legal developments is speculative and irrelevant to the issues presented in this case. This also provides another example of Sbicca's reliance upon his own *ipse dixit* to support Plaintiffs' claim.

While Sbicca attempts to characterize the Farm Line as trapping of chattel slavery by citing to the fact that offenders working on the Farm Line are subject to discipline, it was established that with **any** job as LSP, if an offender refuses to work, he is subject to discipline. Transcript, Vol 2, p. 140-141; 169.[4] Again, Sbicca's personal bias against any incarcerated person performing any sort of job taints his opinions in this case.

Lastly, while Dr. Sbicca testified that work on the Farm Line is some of the hardest work at LSP and therefore mimics chattel slavery, Dr. Sbicca admitted that in the context of "hard labor,"

---

[4] Patrick Jones testified that the Farm Line work is psychologically harmful because "you're forced to do it." However, he later admitted that with any job at LSP, offenders are forced to work and face disciplinary consequences if they refuse to work. Transcript Vol 2, p. 168-169.

whether a particular job is hard is subjective. Transcript, Vol. 1, p. 81-82. This subjective interpretation is exactly why class certification is improper here.

### C. Dr. Hammonds

Dr. Hammonds' testimony regarding psychological harm does not support certification. Dr. Hammonds admitted that she has never visited LSP nor has she meet with any offender incarcerated at LSP. Transcript Vol 1, p. 43-44. She is neither a psychiatrist nor a psychologist. *Id*. Hammonds admitted she is not aware of farm labor practices in any other prisons in Louisiana or in the United States. R.Doc. 126-8, p. 32.

Hammonds mischaracterizes testimony to support what she identifies as one of the two factors from which Plaintiffs' alleged risk of psychological and physical harm stem. She identifies this first factor as the physical environment of the Farm Line, which engenders an "aura of traumatic memory" because LSP was once a plantation that "has never stopped being a source of compelled labor."[5] However, Hammonds testified that her opinions would not change if LSP was located in a different location without historical connections to a plantation. Transcript, Vol 2, p. 29. Therefore, the first factor of Hammonds' analysis is based solely upon the idea that the prison is a source of compelled labor.

The offenders' testimony reveals a common theme that the prisoners' alleged psychological malaise stems from the hard labor they are required to do as part of their prison sentences. Importantly, none of the testimony relates to psychological harm that is unique to conditions of the Farm Line. For example, Patrick Jones testified that the work on the Farm Line was harmful because "you're forced to do it." Transcript Vol 2, p. 168-169. He however admitted that with any job at LSP, you are required to do your job and subject to discipline if you refuse to work.

---

[5] See Hammonds' report at ¶ 16, Joint Exhibit 57 (R.Doc. 120-60). Transcript, Vol 2, p. 18-19.

Transcript Vol 2, p. 168-169. This harm arises from the opinions of Plaintiffs' experts alone. Dr. Hammonds even admitted that any offender would experience some level of anxiety for being forced to work at any prison, regardless of the job. Transcript, Vol 2, p. 26-27.

Additionally, the prisoners have been sentenced to hard labor under the Louisiana criminal code. These Defendants are not responsible for the Plaintiffs' sentences. Thus, Defendants cannot be responsible for any alleged psychological harm caused by their sentence of hard labor.

The second factor from which Hammonds' ultimate opinion stems is her characterization of the Farm Line as an "atavism," suggesting the Farm Line has "lost its use value."[6] She claims the Farm Line serves no purpose other than to punish, degrade, and dehumanize its captives beyond the fact of their imprisonment.[7] However, she acknowledged an additional purpose of the Farm Line during her deposition:

> Q:      Is it your understanding that the vegetables that are harvested
>         on the farm line are used to feed the inmates on a daily basis?
> A:      Well, yes, I do understand that.
> Q:      Okay. Is that not a purpose for which the fresh vegetables are
>         grown and harvested?
> A:      Yes, it is.[8]

Additionally, the Fifth Circuit also cites favorably to decisions that reject Hammonds' positions and describe the purpose of work like that performed on the Farm Line:

> People are not imprisoned for the purpose of enabling them to earn
> a living. The prison pays for their keep. If it puts them to work, it is
> to offset some of the cost of keeping them, or to keep them out of
> mischief, or to ease their transition to the world outside, or to equip
> them with skills and habits that will make them less likely to return
> to crime outside.

---

[6] See Hammonds' report at ⁋ 17, Joint Exhibit 57 (R.Doc. 120-60).
[7] R.Doc. 126-8.
[8] R.Doc. 126-8, pg. 31-32.

*Loving v. Johnson*, 455 F.3d 562, 563 (5th Cir. 2006), citations omitted. Thus, the second factor supporting her opinion regarding Plaintiffs' alleged harm conflicts with the Fifth Circuit's rulings about this issue.

### 7. Plaintiffs Failed to Exhaust Their Administrative Remedies for Some Claims

As explained by the Fifth Circuit, "[t]he [PLRA] mandates that '[n]o action shall be brought with respect to prison conditions ... by a prisoner ... until such administrative remedies as are available are exhausted.' 42 U.S.C.A. § 1997e(a). The Supreme Court has held that 'the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes.'" *Gates*, 376 F.3d at 329, citing *Porter v. Nussle*, 534 U.S. 516, 532, 122 S. Ct. 983, 152 L. Ed. 2d 12 (2002). In addition, the Fifth Circuit in Gates noted that at least one class member must exhaust his administrative remedies in order for the class to be certified. *Gates*, 376 F.3d at 330, citing *Oatis v. Crown Zellerbach Corp*., 398 F.2d 496, 498–99 (5th Cir. 1968).

Moreover, "[A] class of prisoner-plaintiffs certified under Rule 23(b)(2) satisfies the PLRA's administrative exhaustion requirement through 'vicarious exhaustion,' i.e., when 'one or more class members ha[s] exhausted his administrative remedies with respect to each claim raised by the class.'" *Chandler v. Crosby*, 379 F.3d 1278, 1287 (11th Cir. 2004), citing *Jones v. Berge*, 172 F. Supp. 2d 1128, 1133 (W.D. Wis. 2001).

In *Johnson v. Johnson*, the Fifth Circuit discussed how much detail is required in a grievance for purposes of effectively exhausting administrative remedies. *Johnson v. Johnson*, 385 F.3d 503 (5th Cir. 2004). The *Johnson* Court explained that one of the purposes of the exhaustion requirement is to give officials "time and opportunity to address complaints internally." Therefore,

a grievance "should be considered sufficient to the extent that the grievance gives officials a fair opportunity to address the problem that will later form the basis of the lawsuit."

All of the named Plaintiffs filed nearly identical ARPs in this matter setting forth the "Heat Theory" and alleged violations of the ADA where applicable. R.Doc. 37-40, 37-41, 37-42, 37-48, 37-51, 37-60, 37-61, 37-69.   None of the named Plaintiffs included the Dignitary Harm or the Psychological Harm allegations in their ARPs. As such, Plaintiffs failed to exhaust their administrative remedies regarding these claims and a class cannot be certified for these claims.

**8. Conclusion**

Plaintiffs fail to meet their burden of proof on class certification. For the reasons above, the Court should deny Plaintiffs' Motion for Cass Certification.

Respectfully submitted,

**LIZ MURRILL**
**Attorney General**

By:      s/Andrew Blanchfield
         Andrew Blanchfield, T.A. (#16812)
         Email: ablanchfield@keoghcox.com
         Christopher K. Jones (#28101)
         Email: cjones@keoghcox.com
         C. Reynolds LeBlanc (#33937)
         Email: rleblanc@keoghcox.com
         Chelsea A. Payne (#35952)
         Email: cpayne@keoghcox.com
         Special Assistant Attorneys General
         Post Office Box 1151
         Baton Rouge, Louisiana 70821
         Telephone:  (225) 383-3796
         Facsimile:  (225) 343-9612

**CERTIFICATE OF SERVICE**

I hereby certify that I have this date electronically filed the foregoing with the Clerk of Court by utilizing the CM/ECF system, and a copy of the above and foregoing was this day forwarded by the Court's ECF Delivery System to all counsel of record.

Baton Rouge, Louisiana, this 2nd day of June, 2025.


                s/Andrew Blanchfield
                Andrew Blanchfield