## IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF LOUISIANA

**VOICE OF THE EXPERIENCED**, *et al.*,

　　　　　　　*Plaintiffs*,

　　v.

**JAMES LEBLANC**, *et al.*,

　　　　　　　*Defendants*.

Civil Action No. 3:23-cv-1304-BAJ-EWD

### PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE FROM TRIAL THE TESTIMONY OF DR. CARL KELDIE

Dr. Carl Keldie's opinions present a textbook example of expert testimony "so fundamentally unsupported that it cannot possibly help the factfinder." *Botos v. Hartford Ins. Co. of the Midwest*, 2021 WL 806945, at *3 (M.D. La. Mar. 3, 2021) (Jackson, J.). In fact, this Court has already considered and rejected the opinions set out in Dr. Keldie's declarations, deposition testimony, and live testimony on April 24, 2025. This Court has already determined that Dr. Keldie lacks the expertise to opine on thermoregulation or heat pathology. And, with respect to any remaining "correctional care medicine" opinions he offered, this Court has found that "Dr. Carl Keldie was wholly uncredible." ECF 253 at 25; *see also id.* at 31 ("The Court credits Dr. Vassallo's opinion and discredits Dr. Keldie's opinion."). The deficiencies in Dr. Keldie's qualifications and methodology are so sweeping and fundamental as to render his opinions completely unreliable and therefore inadmissible at trial under Federal Rule of Evidence 702. Accordingly, Dr. Keldie should be precluded from testifying at trial.

1

## BACKGROUND

Dr. Keldie obtained his medical degree from the University of South Florida in 1978.[1] He does not have a specialty or any current Board certifications; has not published any articles, books, chapters, or scientific studies on any topic; and has not participated in peer review of any scientific articles.[2] Dr. Keldie last treated a patient in an emergency room setting was 25 years ago.[3] Since then, he has worked for private, for-profit prison healthcare corporations in both clinical and administrative roles.[4] In his current position, Dr. Keldie conducts telemedicine appointments two half-days per week.[5]

In June 2024, Defendants retained Dr. Keldie to opine whether "patients on the Farm Line [are] at risk of significant exertional-related heat illnesses."[6] He rendered the following opinions:

1. The Louisiana State Penitentiary (Angola) is "more like a community than a prison."[7]

2. Each of Defendants' policies and procedures related to the Farm Line are implemented exactly as Defendants claim.[8]

3. There is "almost zero" risk of exertional heatstroke to incarcerated men working in the fields at Angola.[9]

4. Classic, or non-exertional, heat stroke affects people who cannot remove themselves from a hot environment, or who have limited access to hydration or cooling modalities. Those conditions are "not experienced" at Angola.[10]

5. A heat index threshold of 95°F is "very reasonable and extremely safe."[11]

---

[1] Exhibit A (Keldie Deposition, hereinafter "Dep.") 136:11-12.
[2] Exhibit B (Transcript of 4/24/2025 Hearing, hereinafter "Tr.") 50:8-17; Dep. 136:20-21, 156:20-22.
[3] Tr. 50:18-20.
[4] Tr. 45:7-11; 50:21-51:23.
[5] Tr. 51:21-52:3.
[6] Tr. 79:20-23; Dep. 22:17-21 (Q. What were you asked to opine about specifically? A. Are patients -- are patients on the farm line at risk of significant exertional-related heat illnesses.).
[7] Tr. 96:22-24.
[8] Tr. 96:14-102:13.
[9] Tr. 79:24-80:7; Dep. 30:12-17; *see also* Exhibit C (Second Keldie Affidavit) at ¶ 11 (there is "de minimis risk and zero finding of harm from Exertional Heat Illness on the farm lines at LSP").
[10] Tr. 80:12-19; Dep. 192:18-193:22.
[11] Tr. 91:1-4.

6.  "There are far too many minor complaints or complaints with no merit lodged from the field" at Angola, and "finding a meritorious medical complaint there is like looking for a needle in a haystack."[12]

Dr. Keldie was deposed on September 9, 2024. He testified before this Court on April 24, 2025, during the multi-day evidentiary hearing on Plaintiffs' Motion for Class Certification and Application for a Second TRO. During that hearing, and based on his total lack of credentials, the Court declined to certify Dr. Keldie an expert in thermoregulation or heat pathology. The Court considered Dr. Keldie's testimony, along with the credible testimony of Plaintiffs' medical expert, Dr. Susi Vassallo, in granting Plaintiffs' Second Application for a TRO. ECF 253 at 31 ("The Court credits Dr. Vassallo's opinion and discredits Dr. Keldie's opinion."). The Motion for Class Certification, ECF 120, remains pending.

## LEGAL STANDARD

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Rule 702 reflects the Supreme Court's decisions in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).

Expert testimony must satisfy Rule 702 even where, as here, the factfinder is the Court. *See Lewis v. Cain*, 605 F. Supp. 3d 864, 867 (M.D. La. 2022) (excluding expert testimony in a bench proceeding in part because "even though the risk of juror confusion is not a concern, the

---

[12] Tr. 101:21-102:7.

integrity of the judicial process and considerations of judicial economy require that untestable opinion testimony be excluded"); *Grand Isle Shipyards, Inc. v. Black Elk Offshore Operations, LLC*, No. CV 15-129, 2021 WL 533706, at *3 (E.D. La. Feb. 12, 2021) (in a bench trial, the court may not "sidestep[ ] Rule 702 altogether and decline[ ] to perform any assessment of [expert] testimony before trial"); *Angelle v. Spartan Offshore Drilling LLC*, No. CV 17-7707, 2019 WL 3451549, at *3 (E.D. La. July 31, 2019) (in a bench trial, the court "must nevertheless faithfully apply Rule 702 and the requirements announced in *Daubert*"); *Kinnerson v. Arena Offshore, LP*, No. CV 16-720, 2019 WL 2571627, at *2 (W.D. La. June 21, 2019) ("[T]he mere fact that a case is being tried as a bench trial does not completely remove the Court's gate-keeping role.").

As proponents of Dr. Keldie's testimony, Defendants have the burden of establishing (1) that Dr. Keldie is a qualified expert; (2) that his proposed testimony is reliable and relates to matters requiring scientific, technical, or specialized knowledge; and (3) that his testimony is "sufficiently tied to the facts of the case," so that it "fits" the dispute and will assist the trier of fact. *Daubert*, 509 U.S. at 591; *Rodriguez v. Riddell Sports, Inc.*, 242 F.3d 567, 581 (5th Cir. 2001). Defendants have not and cannot satisfy a single requirement of Rule 702, let alone all three.

## <u>ARGUMENT</u>

### A. Dr. Keldie is "wholly uncredible" and not qualified to opine on the subject of his testimony.

This Court has already catalogued some of the many reasons Dr. Keldie is not qualified to opine as an expert on thermoregulation, heat-related illness, heat-related medical care, Angola's heat precaution protocol, or the appropriate heat index threshold. *See* ECF 253 at 25 (no court has ever qualified Dr. Keldie as an expert on the topics of heat-related medical care and disorders or thermoregulation); *id.* at 26 (the last time Dr. Keldie treated patients in an emergency room setting

was 25 years ago); *id.* at 25-26 (Dr. Keldie has never published anything or participated in peer review of any scientific articles). This alone is enough to exclude Dr. Keldie's testimony from trial.

Dr. Keldie's testimony on April 24, 2025 highlights an additional disqualifying fact: he admitted that he developed his purported "augmented expertise in exertional heat illness" during and due to his engagement in this litigation.[13] In determining whether individuals have sufficient expertise to offer expert testimony, "one very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." *Daubert v. Merrell Dow Pharm., Inc*., 43 F.3d 1311, 1317 (9th Cir. 1995) ("*Daubert II*"). Dr. Keldie presents the worst-case scenario: lacking any specialized training or expertise on thermoregulation or heat-related disorders, he learned his client's position (that DOC does nothing wrong) and then formed his opinions around that.

Dr. Keldie's general medical background simply does not supply an adequate basis for an opinion on a subject foreign to his clinical practice. *See Lewis*, 605 F. Supp. 3d at 870 (excluding testimony from a clinical care professional who had "no education, skill, training, or experience that equip[ed] [him] to opine in the area of Medical Leadership and Organizational Structure"); *Newton v. Roche Lab'ys, Inc*., 243 F. Supp. 2d 672, 678-79 (W.D. Tex. 2002) (excluding testimony where purported expert's lack of qualifications, methodology, or independent research indicate he was merely an "expert for hire" likely to be biased); *Sparling v. Doyle*, No. EP-13-CV-323-DCG, 2015 WL 4528759, at *23 (W.D. Tex. July 27, 2015), *objections overruled*, No. EP-13-CV-00323-DCG, 2016 WL 236266 (W.D. Tex. Jan. 20, 2016) (excluding testimony where expert's opinions "do not stem from research conducted independent of this litigation but rather, they have been

---

[13] Tr. 48:23-49:14; Dep. 21:7-10.

developed for the purpose of his testimony in this case"); *Elbert v. Howmedica, Inc., a Div. Pfizer Hosp. Products Group, Inc.*, 59 F.3d 174, 1995 WL 383409, *1 (9th Cir. 1995) (excluding expert testimony where "prior to his enlistment as an expert witness" he had no familiarity with the subject of his testimony).

To the extent Dr. Keldie offers any relevant opinions within the field of "correctional care medicine" (he does not, as discussed below), he has consistently demonstrated a disturbing bias against incarcerated people, even those suffering a medical emergency.[14] On cross examination, he demonstrated exactly how this bias can result in serious harm to class members. Dr. Keldie purportedly reviewed 135 SDEs placed by class members from the field during summer 2024.[15] He claimed to find not a single—*not one*—clinical scenario of "legitimate" heat illness—i.e., heat injury, heat exhaustion, heat stroke, heat cramps, or heat syncope—among any of those cases.[16]

But in reaching this unlikely conclusion, Dr. Keldie reviewed the SDE records of a 57-year-old putative class member with a body mass index of 30.93 and a low blood pressure of 90/60.[17] He presented in the field with textbook symptoms of heat-related illness, including "feeling light-headed, dizzy, and cramping," swaying when standing, and being covered in sweat.[18] The class member was taken to the Acute Treatment Unit (ATU), where he was diagnosed with clinical dehydration, hypotension, and dizziness, and treated with IV fluids.[19] And yet, Dr. Keldie does not believe this putative class member had a "legitimate" SDE potentially related to exertional heat illness.[20] Why? Because, Dr. Keldie testified, the patient's symptoms "could have just been

---

[14] Tr. 101:21-24 ("There are far too many minor complaints or complaints with no merit lodged from the field at LSP."); *id.* 101:25-102:2 ("There's a mountain of frivolous medical complaints at LSP."); 102:3-7 ("[F]inding a meritorious medical complaint there is like looking for a needle in a haystack."); Dep. 248:21–249:15.
[15] Tr. 102:15–20.
[16] Tr. 102:21-103:23.
[17] Tr. 105:4–106:1; JX-27 at 4 (SDE dated May 30, 2024).
[18] Tr. 106:10–107:10; JX-27 at 8.
[19] Tr. 110:7–12; JX-27 at 5.
[20] Tr. 104:21–105:3, 110:20–111:5–12.

created in the field."[21] Obviously, and as Dr. Vassallo explained, "this kind of cynicism results in . . . death and morbidity."[22]

**B. Dr. Keldie's opinions are speculative and subjective, lacking any indicia of reliability.**

Expert testimony is properly admitted only if it is "the product of reliable principles and methods" and "based on sufficient facts or data." Fed. R. Evid. 702. "[T]he existence of sufficient facts and a reliable methodology is in all instances mandatory." *Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007). The Supreme Court has warned that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Here, the chasm between the facts and Dr. Keldie's opinions cannot be bridged.

1. Dr. Keldie's opinions are *ipse dixit* pronouncements of Defendants and defense counsel.

Dr. Keldie has demonstrated that his proffered testimony is "nothing more than a willing musical instrument upon which manipulative counsel can play whatever tune desired." *Karn v. Ingersoll-Rand Co.*, 168 F.R.D. 633, 639 (N.D. Ind. 1996). Each of his opinions relies on the say-so of Defendants, rather than an evaluation of facts or data. *See, e.g.*, Tr. 121:16–22 (there have been no heat-related medical cases associated with the Farm Line, because Defendants said so); *id.* 119:3-9 (no heat-related deaths on the Farm Line, because Defendants said so); *id.* 100:3–12 (shade, water, Gatorade, and rest are provided on the Farm Line, because "that's what the Warden told me at lunch"); *id.* 101:13–17 (no one is assigned to the Farm Line in their first two weeks at LSP, because Defendants said so); *id.* 83:21–25 (no known heat exhaustion events at LSP, because

---

[21] Tr. 111:9-10.
[22] ECF 257-4 (Transcript of 4/23/2025 Hearing, Vassallo) 67:1–19.

Defendants' counsel said so); *id.* 83:10–16 (admitting no knowledge of heat injuries or heat exhaustion among class members, because Defendants did not say so).

Dr. Keldie's unyielding deference to Defendants' say-so is apparent in the following exchange with the Court:[23]

```
17          THE COURT:  ALL RIGHT.  AND I WANT TO BE CLEAR ALSO
18   ON THIS POINT THAT YOU MADE THAT YOU HAVE NOT SEEN ANY EVIDENCE
19   TO SHOW THAT ANYONE AT LSP ON THE FARM LINE DIED OF HEATSTROKE
20   OR A HEAT-RELATED MEDICAL EMERGENCY.  IS THAT YOUR TESTIMONY?
21          THE WITNESS:  YES, IT IS.
22          THE COURT:  AND YOU FORMED THAT OPINION BASED NOT ON
23   YOUR REVIEW OF THE EIGHT MEDICAL RECORDS, BUT IT WAS BASED UPON
24   WHAT YOU WERE TOLD BY PRISON OFFICIALS.  IS THAT CORRECT?
25          THE WITNESS:  WELL, I KNOW NONE OF THE EIGHT DIED.
```

```
1           THE COURT:  WELL, THAT'S NOT MY QUESTION, SIR.
2           THE WITNESS:  WELL --
3           THE COURT:  IT'S A VERY SIMPLE QUESTION.  YOU KNOW,
4    YOU'VE TESTIFIED FOR A LONG TIME.  YOU WERE DEPOSED A NUMBER OF
5    TIMES.  YOU'VE TESTIFIED.  IT'S A VERY SIMPLE QUESTION.  HAVE
6    YOU -- DID YOU REACH THE CONCLUSION THAT THERE HAVE BEEN NO
7    HEAT-RELATED DEATHS ON THE FARM LINE AT LSP BECAUSE SOMEONE
8    TOLD YOU THAT?
9           THE WITNESS:  CORRECT.
```

\* \* \*

---

[23] Tr. 118:17-119:9.

```
16          THE COURT:  OKAY.  SO, AGAIN, I JUST WANT TO BE
17    CLEAR.  BASED UPON THE -- YOUR CONCLUSION -- OR SHOULD I SAY
18    YOU HAVE REACHED YOUR CONCLUSION THAT THERE WERE NO
19    HEAT-RELATED MEDICAL CASES ASSOCIATED WITH THE FARM LINE, YOU
20    REACHED THAT CONCLUSION BASED UPON WHAT YOU WERE TOLD BY
21    OFFICIALS AT LSP.  CORRECT?
22          THE WITNESS:  YES, SIR.
```

Equally emblematic of Dr. Keldie's wholesale acceptance of Defendants' position as fact is his opinion that a heat index threshold of 95°F is "very reasonable and extremely safe."[24] Dr. Keldie cannot muster a *single* source—scientific, governmental, or otherwise—to support his misguided opinion that a heat index threshold of 95°F is "extremely safe."[25] As this Court has already determined, ECF 253 at 27-30, the authority he cites *in his own report* undermines his opinion about the appropriate heat index threshold:

- **National Weather Service.** The NWS states that "extreme caution" should be taken at a heat index of 90°F. It emphasizes that the heat index values in its chart "are for shady locations" and "the heat index value can be increased by up to 15°F" in direct sun. *See* ECF 253 at 29-31.

- **Occupational Safety and Health Administration.** OSHA cautions that deaths have occurred at heat indices of 86°F, and that other heat-related injuries have occurred at lower heat indices. OSHA instructs that heat monitoring should occur at the location where labor is performed and explains that direct sun and other factors must be accounted for when determining protections for outdoor workers. *See id.* at 27.

- **National Institute for Occupational Safety and Health.** NIOSH emphasizes Wet Bulb Globe Temperature ("WBGT") as the most frequently used and recommended standard throughout the world and recommends a WBGT of 82.4°F as "the upper limit" for "moderate workload activities" like that on the Farm Line. *See id.* at 27.

- **United States Army.** The U.S. Army's heat danger chart, which Dr. Keldie claims supports a 91°F heat index threshold, instead shows that a WBGT of 90°F or greater is categorized as the highest heat category—level 5, a black category. *See id.* at 27-28.

---

[24] Tr. 91:1-4.
[25] Dep. 225:22–226:1, 226:18–227:3.

What methodology did Dr. Keldie actually use to conclude that 95°F is "very reasonable and extremely safe?" None. In fact, Dr. Keldie's opinion was so untethered to evidence that Defendants *themselves* refused to get behind it. On advice of counsel, Defendants chose a 91°F heat index threshold they wagered "would be more reasonable to the Court."[26] Dr. Keldie then simply copied that number into his declaration.[27]

Without any discernible basis in fact or data, let alone a reliable one, Dr. Keldie's opinions are inadmissible. *See Viterbo* v. *Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987) ("Without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible."); *Wright v. Honeywell Int'l Inc.*, No. CV 22-00928-BAJ-SDJ, 2024 WL 2963460, at *7 (M.D. La. June 12, 2024), *rev'd on other grounds*, 148 F.4th 779 (5th Cir. 2025) ("The purpose of an expert witness is to help the trier of fact to understand the evidence or to determine a fact in issue based on the expert's specialized knowledge and application of reliable principles and methods, rather than to simply parrot [the party's] claims.") (cleaned up); *U.S. All. Grp., Inc. v. Cardtronics USA , Inc.*, 645 F. Supp. 3d 554, 560 (E.D. La. 2022) (excluding expert testimony that amounted to "little more than a bare recitation of [the proponent's] arguments").

2. Dr. Keldie's "no data" approach is unreliable.

Dr. Keldie repeatedly defends his conclusions as accurate because he has seen no evidence to suggest otherwise.[28] But when pressed for detail, he admits he engaged in no investigation that would yield that evidence. Dr. Keldie did not speak to a <u>single</u> person incarcerated at Angola about

---

[26] ECF 257-4 (Transcript of 4/23/2025 Hearing) 202:11-23 (Lavespere); ECF 201-06 (Lavespere Dep.) 70:2–18 (testifying that while Dr. Keldie had originally posited a heat alert threshold of 95°F, it was lowered to 91°F after "discussions" with counsel).

[27] *See* ECF 257-4 (Transcript of 4/23/2025 Hearing) 59:5-19 (Dr. Vassallo explaining there is no scientific basis for setting a heat threshold at 95 or 91°F).

[28] *See, e.g.*, Tr. 80:3-7 (testifying there is "almost zero" risk of exertional heat stroke on the Farm Line because he has not seen "any evidence of patients either (1) experiencing significant exertional heat illness or (2) being at risk of experiencing serious exertional heat illness").

their experiences on the Farm Line.[29] He did not review any death reports, peer-review files, quality improvement documents, mortality reviews, credentialing or licensing files, sick call protocols, duty status protocols, or staffing information.[30] Dr. Keldie did not even review any expert reports, filings, or discovery from *Lewis*, the lawsuit challenging medical care at Angola Prison in which Defendants have submitted his name as a potential monitor.[31]

Similarly, Dr. Keldie did not review medical records for any absent putative class members.[32] And as for the eight original class representatives, Dr. Keldie testified that he personally reviewed "each and every one of the medical records" "spanning a period of close to a hundred years."[33] But on questioning from the Court, he admitted that he actually reviewed only *three* sets of records, and conceded the *total period of incarceration* for all eight plaintiffs was about a hundred years.[34]

Dr. Keldie's apparent review of SDEs does not salvage his testimony. He claimed to find not a single—*not one*—clinical scenario of "legitimate" heat illness—i.e., heat injury, heat exhaustion, heat stroke, heat cramps, or heat syncope—among any of the 135 SDEs he reviewed.[35] But Dr. Keldie (who is unqualified to opine on thermoregulation or heat-related disorders) invented his methodology specifically for his engagement on this case.[36] And that new methodology, as explained above, inexplicably ignored material facts that would undermine his pre-selected outcome.[37] *See Emmerich Newspapers, Inc. v. Particle Media, Inc.*, No. 3:23-CV-391-TSL-RPM,

---

[29] Tr. 98:12-14; 101:9-110:20; *see also id.* at 101:21–102:7 (suggesting that incarcerated people are not truthful and should not be trusted).
[30] Tr. 80:20-81:22; Dep. 131:6-133:15.
[31] Tr. 81:23-82:2; Dep. 58:3-12.
[32] Dep. 133:8-10.
[33] Tr. 82:3-11; 88:12-14.
[34] Tr. 117:22-118:16; 82:3-21.
[35] Tr. 102:21-103:23.
[36] Tr. 103:24-104:9.
[37] Tr. 101:21-102:7 ("There are far too many minor complaints or complaints with no merit lodged from the field" at Angola, and "finding a meritorious medical complaint there is like looking for a needle in a haystack.").

2025 WL 2298951, at *3-4 (S.D. Miss. Aug. 8, 2025) (excluding testimony where purported expert invented "highly problematic" methodologies "from scratch").

Dr. Keldie's no-data approach cannot stand. *See Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012) (to be reliable, expert testimony must "be grounded in the methods and procedures of science and . . . be more than unsupported speculation or subjective belief"); *Burleson v. Tex. Dep't of Criminal Justice*, 393 F.3d 577, 587 (5th Cir. 2004) (affirming trial court's decision to exclude testimony where expert's opinion was based on "speculation, guesswork, and conjecture to support his theory"); *Whalen v. Monsanto Co.*, No. CV 19-9334, 2024 WL 3554527, at *6 (E.D. La. Jan. 22, 2024), *aff'd*, No. 24-30105, 2024 WL 4524170 (5th Cir. Oct. 18, 2024) (excluding as unreliable and inadmissible expert opinion that lacks "any application of a methodology" to any relevant studies); *Castellow v. Chevron USA,* 97 F. Supp. 2d 780, 794-96 (S.D. Tex. 2000) (excluding testimony where the expert did not cite and was unable to identify any studies supporting his opinion).

3. Dr. Keldie completely ignores contradictory evidence.

The final straw is Dr. Keldie's willingness to ignore contradictory evidence. To start, Dr. Keldie testified that "there is no substantive science supporting setting a heat alert threshold at a heat index of 88 degrees Fahrenheit."[38] This is astounding, considering the vast epidemiological, medical, and public health literature *in the record of this case* demonstrating the exponential increase in illness and death at heat indices above 88°F.[39] Dr. Keldie was even present in the courtroom when Dr. Vassallo described at length the many peer-reviewed studies demonstrating that exact point.[40]

---

[38] Tr. 90:22-25; *see also* Exhibit C (Second Keldie Affidavit) at ¶ 12.
[39] Dep. 226:2-13 ("I don't know how they got the 88. 88 is a pretty low heat index.").
[40] *See* ECF 257-4 (Transcript of 4/23/2025 Hearing) at 57:5-65:18 (Dr. Vassallo's testimony explaining the globally accepted science underlying her opinions).

Dr. Keldie also tries to justify omitting diabetes from the Medical Exclusion List on the basis that: (a) diabetes can supposedly be "cured;" (b) working the Farm Line is a useful "treatment" for diabetes; and (c) sparing diabetics and pre-diabetics from forced manual labor in heat indices exceeding 91°F would do them more harm than good.[41]  Not only is this explanation so insouciant as to itself constitute deliberate indifference, it is directly contradicted by the record: this Court's findings of fact in support of its July 2, 2024 Order note several men with a history of pre-diabetes who called in Self-Declared Emergencies while working on the Farm Line. *Voice of the Experienced* v. *LeBlanc*, 2024 WL 3279899, at *15, *26 (M.D. La. July 2, 2024).

Finally, Dr. Keldie testified (outside his purported expertise) that there is an "almost nonexistent risk" that Selective Serotonin Reuptake Inhibitors (SSRIs) can impact heat pathology by causing increased sweating, promoting dehydration, or causing electrolyte derangements.[42] But the very source upon which he relies—an article from www.health.com entitled "SSRIs and Heat: Why Doctors are Urging People on Antidepressants to Keep Cool This Summer"—explains that research *has* shown that SSRIs may impair the function of the hypothalamus, which is responsible for regulating body temperature.[43]

In sum, Dr. Keldie is unable to offer a single reliable opinion. His testimony should be excluded from trial. *See Joiner*, 522 U.S. at 146 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

---

[41] *See* Exhibit C (Second Keldie Affidavit) at ¶ 60.
[42] Tr. 88:23-89:6.
[43] Tr. 89:7-90:2.

**C. Dr. Keldie's testimony and opinions will not assist the Court to understand any relevant evidence in this case.**

To determine whether an expert's testimony "fits" the proceedings, the Court asks whether it "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). "Mere conclusions, without a hint of an inferential process, are useless to the court." *Zamecnik v. Indian Prairie School Dist. No. 204*, 636 F.3d 874, 881 (7th Cir. 2011). Dr. Keldie's willingness to reach broad conclusions based on assertions he did not validate (or challenge) demonstrates that he simply wanted to reach a particular conclusion. His opinions are not tethered to any analysis—methodic or otherwise—of the conditions at issue. As a result, Dr. Keldie's testimony cannot possibly help the Court assess any facts at issue. "[T]here is simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146.

## CONCLUSION

Dr. Keldie seeks to testify at trial despite having no expert qualifications to do so. He employs no recognizable methodology and offers no explanation why his opinions are probative of any relevant legal issues. Particularly given his lack of specialized training, lack of experience with relevant empirical research, and failure to conduct any analysis or investigation, his testimony would be based on the type of subjective belief and unsupported speculation that *Daubert* guards against. Accordingly, Plaintiffs respectfully request that their Motion is granted and Dr. Keldie is excluded from testifying at trial.

Respectfully submitted this 10th day of November, 2025.

**RIGHTS BEHIND BARS**

*/s/ Lydia Wright*
Lydia Wright, La. Bar No. 37926
Amaris Montes (PHV) MD Bar No. 2112150205
1800 M St. NW Fnt. 1 #33821
Washington, D.C. 20033

14

Tel: (202) 455-4399
lydia@rightsbehindbars.org
amaris@rightsbehindbars.org


**THE PROMISE OF JUSTICE INITIATIVE**

*/s/ Samantha Pourciau*
Samantha Pourciau, La. Bar No. 39808
Kara Crutcher (PHV) IL Bar No. 6337639
Michael Allen, La. Bar No. 41142
1024 Elysian Fields Avenue
New Orleans, LA 70117
Tel: (504) 529-5955
sbosalavage@defendla.org
kcrutcher@defendla.org
mallen@defendla.org


**PAUL, WEISS, RIFKIND, WHARTON**
 **& GARRISON LLP**

*/s/ Jeremy Benjamin*
Joshua Hill Jr. (PHV) NY Bar No. 4297826
Jeremy A. Benjamin (PHV) NY Bar No. 4770277
Arielle B. McTootle (PHV) NY Bar No. 5993217
Ricardo Sabater (PHV) NY Bar No. 5993217
Leah R. Weiser (PHV) NY Bar No. 6027601
Chizoba D. Wilkerson (PHV) NY Bar No. 5903943
1285 Avenue of the Americas
New York, NY 10019-6064
Tel: (212) 373-3000
jhill@paulweiss.com
jbenjamin@paulweiss.com
amctootle@paulweiss.com
rsabater@paulweiss.com
lweiser@paulweiss.com
cwilkerson@paulweiss.com


*Attorneys for Plaintiffs and the Proposed Classes*