### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **VOICE OF THE EXPERIENCED,** a membership organization on behalf of itself and its members; **and MYRON SMITH, DAMARIS JACKSON, NATE WALKER, DARRIUS WILLIAMS, KEVIAS HICKS, JOSEPH GUILLORY, KENDRICK STEVENSON,** and **ALVIN WILLIAMS,** on behalf of themselves and all others similarly situated, | * * * * * * * * * * * | **CIVIL ACTION**<br><br>**NO.: 3:23-cv-1304**<br><br>**JUDGE BRIAN A. JACKSON** |
| **VERSUS** | * * | |
| | * | **MAGISTRATE JUDGE** |
| **JAMES LEBLANC,** in his official capacity as Secretary of the Louisiana Department of Public Safety and Corrections**; TIMOTHY HOOPER,** in his official capacity as Warden of Louisiana State Penitentiary; **MISTY STAGG**, in her official capacity as Director of Prison Enterprises, Inc.; the **LOUISIANA DEPARTMENT OF PUBLIC SAFETY & CORRECTIONS;** and **PRISON ENTERPRISES, INC.** | * * * * * * * * * * * * | **ERIN WILDER-DOOMES** |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## OPPOSITION TO MOTION TO EXCLUDE FROM TRIAL THE TESTIMONY OF DR. CARL KELDIE

NOW INTO COURT, through undersigned counsel, come JAMES LEBLANC, in his official capacity as Secretary of the Louisiana Department of Public Safety and Corrections, TIMOTHY HOOPER, in his official capacity as Warden of Louisiana State Penitentiary, and the LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS ("Defendants"), who respectfully submit this memorandum in opposition to Plaintiffs' Motion to Exclude From Trial the Testimony of Dr. Carl Keldie (R. Doc. 336).

Plaintiffs' *Daubert* Motion is untimely, as it was filed more than one year after the deadline for filing *Daubert* motions established by this Court. Plaintiffs' Motion should not be considered on these grounds alone. Plaintiffs' Motion also should be denied because (1) Dr. Keldie's specialized knowledge will help the trier of fact understand the evidence and determine facts at issue; (2) his testimony is based on sufficient facts and data; (3) his testimony is the product of reliable principles and methods; and (4) his opinions reflect a reliable application of the principles and methods to the facts of the case. Therefore, Dr. Keldie's expert testimony is admissible under Federal Rules of Evidence Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469, 1993 U.S.

## I.    OVERVIEW OF POSITION

Defendants retained Dr. Carl Keldie to provide expert opinion on correctional health care, including heat-related medical care and disorders. Dr. Keldie is eminently qualified to testify about these topics. In brief, Dr. Keldie has decades of experience in correctional medical care, heat pathology, and pharmacotherapy.[1] Specifically, he has studied heat pathology since the early 2000s, when he began addressing heat pathology medications for correctional health care in response to a heat wave that went through the Northeastern United States.[2] Because of his expertise in the fields of heat pathology and heat-related medical care, Dr. Keldie was asked to create the medical condition list that LSP adopted to identify conditions that allow offenders to obtain heat precaution duty status at LSP.[3]

Here, Dr. Keldie was asked to offer opinions on whether offenders on the farm line at Louisiana State Penitentiary ("LSP") are at risk of significant exertional-related heat illnesses, one

---

[1] R. Doc. 223-12, at ¶2.
[2] *Id*., at ¶5.
[3] See e.g., R. Doc. 336-3, p. 76, l. 24 – p. 77, l. 17.

[2]

of the central issues presented in this case.[4] Dr. Keldie's report outlines his opinions regarding these issues. He reviewed and analyzed voluminous documents produced or created in this litigation to formulate his opinions.[5] Dr. Keldie also cites numerous reports, studies, and articles in his report that support his opinions.[6] The standards for admission of his expert testimony are met. As outlined in greater detail below, Dr. Keldie is qualified, his opinions are based upon reliable methodology, and his testimony is highly relevant to the issues presented in this case. Therefore, Plaintiffs' Daubert motion should be denied.

Additionally, this Court issued its Fourth Amended Scheduling Order on August 2, 2024, and set the deadline to file dispositive motions and *Daubert* motions on October 7, **2024**.[7] Consistent with this Court's order, Defendants produced Dr. Keldie's expert report on September 13, 2024. Dr. Keldie was deposed on September 20, 2024. Plaintiffs did not file a *Daubert* motion regarding Dr. Keldie's testimony before the passing of this Court's deadline. Instead, Plaintiffs waited until November 11, 2025, over one year after this Court's deadline, to file their *Daubert* motion.[8] Thus, Plaintiffs' *Daubert* Motion is untimely and should be denied on these grounds alone.

## II.    LEGAL STANDARD

### A.    Admission of Expert Testimony

The admissibility of expert testimony is governed by Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, which require the Court to serve as a gatekeeper, ensuring all scientific testimony is relevant and reliable. *Chevron TCI, Inc. v. Capitol House Hotel Manager, LLC*, No.

---

[4] R. Doc. 336-2, Deposition Transcript, p. 22, ll. 17-21.
[5] R. Doc. 136-5.
[6] R. Doc. 136-5.
[7] R. Doc. 106.
[8] R. Doc. 336.

CV 18-00776-BAJ-RLB, 2021 WL 2638036 (M.D. La. June 25, 2021). This gatekeeping role extends to all expert testimony. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999). Under Rule 702, amended in 2023, a qualified expert may testify in the form of an opinion or otherwise if it is more likely than not that:

1.  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
2.  the testimony is based on sufficient facts or data;
3.  the testimony is the product of reliable principles and methods; and
4.  the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

The official comments to the 2023 amendments provide, "Rule 702 requires that the expert's knowledge 'help' the trier of fact to understand the evidence or to determine a fact at issue." The Rule was amended to reaffirm that application of a "higher standard than helpfulness" is "unnecessarily strict."

The United States Supreme Court also has emphasized "the *Daubert* analysis is a 'flexible' one, and that 'the factors identified in Daubert may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Pipitone v. Biomatrix, Inc*., 288 F.3d 239, 244 (5th Cir. 2002) (quoting *Kumho Tire*, 526 U.S. at 150). Indeed, "The district court's responsibility is 'to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Id*., quoting *Kumho Tire*, 526 U.S. at 152).

This Court holds "Daubert motions are *not* appropriate when they attack 'the underlying facts upon which [an expert's] opinion was based. That approach is not contemplated under a *Daubert* challenge.'" *Chevron TCI, Inc.*, 2021 WL 2638036 at *4, citing I*n re Katrina Canal Breaches Consol. Litig*., No. 10-866, 2012 WL 4328354, at *1 (E.D. La. Sept. 20, 2012). Instead,

[4]

the reliability of the data cited to support an expert's opinion goes to the <u>weight</u> of the evidence. It is subject to cross-examination, but it does not serve as a basis for exclusion. *Chevron TCI, Inc.*, 2021 WL 2638036 at *4, citing *Tyler v. Union Oil Co. of California*, 304 F.3d 379, 393 (5th Cir. 2002).

Indeed, "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for [the fact finder's] consideration" at trial. *Louisiana Corral Mgmt., LLC v. Axis Surplus Ins*. Co., No. CV 22-2398, 2023 WL 2242137, at *2 (E.D. La. Feb. 27, 2023). The "validity or correctness of an expert's conclusions are issues for the jury to determine *after* the *Daubert* analysis." *Chevron TCI, Inc.*, at *4. In short, "the rejection of expert testimony is the exception and not the rule." *Id.*

It also is important to note that this case will be tried to the Court, not a jury. Rule 702 is designed to protect jurors from evidence that is unreliable for reasons the jurors may have difficulty understanding. *Id*. A bench trial allows for greater discretion regarding procedure and even the stringency of gatekeeping. *Id*., citing 29 Victor J. Gold, Federal Practice & Procedure § 6270 (2d ed. 2020). This Court also holds:

> In a bench trial, the principal reason for the Court's gatekeeping function is not implicated, namely to guard against jury confusion which may result from irrelevant and/or unreliable expert opinion testimony. The purpose of the Court's gatekeeping function required by *Daubert* is "to ensure that only reliable and relevant expert testimony is presented to the jury." "Most of the safeguards provided for in *Daubert* are not as essential in a case such as this where a district judge sits as the trier of fact in place of a jury."

*Id*., citing *Hunters Run Gun Club, LLC v. Baker*, No. 17-176, 2019 WL 2516876, at *1 (M.D. La. June 18, 2019) (Dick, J) (citations omitted); see also *Nassri v. Inland Dredging Co*., No. 11-853, 2013 WL 256747, at *1 (M.D. La. Jan. 23, 2013).

[5]

Stated differently, "[t]here is less need for the gate keeper to keep the gate when the gatekeeper is keeping the gate only for himself." *United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005); see also *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000) ("Most of the safeguards provided for in Daubert are not as essential in a case such as this where a district judge sits as the trier of fact in place of a jury."). Under these principles, Dr. Keldie's testimony is properly admitted, and Plaintiffs' Motion should be denied.

### B.    Plaintiffs' Late-Filed *Daubert* Motion Should Be Dismissed as Untimely.

As outlined above, Plaintiffs filed their *Daubert* motion to request exclusion of Dr. Keldie's testimony more than one year after this Court's deadline. "The [Federal] Rules of Civil Procedure endow the trial judge with formidable case-management authority." *Hernandez v. General Motors Corp.*, No. 00–332, 2001 WL 36103819, *1 (S.D.Tex. July 3, 2001).

This authority includes drafting a case-management schedule that the district court enters as an order. *Bedingfield v. Deen*, No. CIV.A. 09-369, 2011 WL 2712950, at *1 (W.D. La. July 8, 2011), aff'd sub nom. *Bedingfield ex rel. Bedingfield v. Deen*, 487 F. App'x 219 (5th Cir. 2012). It is well established that "a party who ignores any case-management deadline does so at his own peril." *Hernandez*, at *1. More specifically, "challenges to expert testimony may be waived for failure to adhere to deadlines" set forth in a scheduling order. *Bedingfield*, at *1, citing *Queen Trucking, Inc. v. GM Corp.*, No. 06–052, 2007 WL 4458919, *2 (N.D.Tex. June 8, 2007), *2; *Vienne v. American Honda Motor Co., Inc.*, No. 99–3716, 2001 WL 83260, *2 (E.D.La. Jan. 26, 2001).

Courts regularly decline to address the merits of late-filed *Daubert* motions. *Louisiana Corral Mgmt., LLC*, 2023 WL 2242137, at *2. For example, in *Hanna v. Great Plains Trucking, Inc.*, No. 19-1386, 2020 WL 13430039, at *1 (N.D. Tex. July 24, 2020), the court refused to

consider a late-filed *Daubert* motion because the Court held the mover assumed the risk it would not be able to challenge the expert with information obtained after the *Daubert* motion deadline when the parties failed to request an extension of the deadline. See also *Koch Foods, Inc. v. Pate Dawson Co., Inc.*, No. 16-355, 2018 WL 651371, at *3 (S.D. Miss. Jan. 31, 2018); and *Bedingfield*, 2011 WL 2712950 ("The Court need not consider untimely-filed Daubert challenges.").

The same result should follow here. The deadline for filing *Daubert* motions in this case was October 7, 2024. Plaintiffs did not file their *Daubert* motion until November 10, **2025**. This Court should decline to address Plaintiffs' untimely *Daubert* Motion, which was filed more than a year after this Court's deadline.

## III.    DR. KELDIE IS QUALIFIED.

Dr. Keldie obtained his medical degree from the University of South Florida in 1978.[9] He started practicing emergency medicine full time at Raulerson Memorial Hospital in Okeechobee, Florida in 1981.[10] Dr. Keldie was named the ER director at Hialeah Hospital in 1985.[11] Beginning in the mid-1990s, he served as a vice-president for Emergency Medical Services Associates, which provided primary and emergency medical care at Naval, Army, Air Force, and Marine facilities in multiple states.[12] He provided direct patient care and administrative services at these facilities.[13]

In the late 1990s, Dr. Keldie was the District Medical Director for the South Broward Hospital District in Florida, while simultaneously serving as the Medical Director for the Memorial Regional Hospital.[14] During that time, he worked shifts providing direct patient care at four

---

[9] R. Doc. 336-2, Deposition Transcript, p. 136, ll. 1-14.
[10] R. Doc. 136-5.
[11] R. Doc. 136-5.
[12] R. Doc. 136-5.
[13] R. Doc. 136-5.
[14] R. Doc. 136-5.

facilities in the hospital district.[15] Dr. Keldie later served as medical director for two of the largest companies providing correctional and forensic medicine in jails, prisons, and psychiatric hospitals in over 35 states and in Melbourne, Australia.[16] Dr. Keldie was certified in emergency medicine in 1991.[17] He recertified in 2001 and 2011. He elected not to recertify in 2021, as he no longer wanted to continue practicing emergency medicine into his 70s.[18]

Dr. Keldie began working as a Correctional Healthcare Consultant in July 2011 and continues to do so to date.[19] This includes correctional medical consulting, multiple speaking engagements at national conferences, and work as an expert witness in Tennessee, Alabama, New Mexico, Florida, Illinois, Indiana, and Colorado.[20] Dr. Keldie also served as a medical director for a prison in Wayne County in Michigan in 2020.[21] In the summer of 2020, he practiced point of care medicine and telemedicine for all five prisons in Maine. He also obtained emergency licensure to provide telemedicine and direct patient care in prisons in Massachusetts.[22] As a Senior Vice President of Clinical Affairs at Wellpath, he provides patient care directly and through telemedicine in five states.[23] Currently, Dr. Keldie is a Fellow of the American College of Correctional Physicians.[24]

Included in his background of study and practice of Patient Safety, Dr. Keldie has developed dozens of training modules, developed a litany of clinical decision support tools, authored hundreds of policies and procedures for medical practice, and evaluated the deployment

---

[15] R. Doc. 136-5.
[16] R. Doc. 136-5.
[17] R. Doc. 136-5.
[18] R. Doc. 136-5.
[19] See Dr. Keldie's CV, attached as Exhibit 1.
[20] See Dr. Keldie's CV, attached as Exhibit 1.
[21] R. Doc. 136-5.
[22] R. Doc. 136-5.
[23] See Dr. Keldie's CV, attached as Exhibit 1.
[24] R. Doc. 223-12.

of these tools through an overarching Continuous Quality Improvement program.[25] Culminating in 2017, his work led to Correct Care Solutions becoming a member of the fourth oldest patient safety organization in the country.[26] Dr. Keldie also has been a member of the Society to Improve Diagnosis in Medicine for the past decade.[27]

Dr. Keldie has decades of experience in correctional medical care, heat pathology, and pharmacotherapy.[28] Specifically, Dr. Keldie has studied heat pathology for twenty years.[29] His work in heat pathology began in the early 2000s when he worked with Dr. Deleca Barnes to address heat pathology medications in correctional healthcare following a heat wave that hit the northeast United States.[30] His study and treatment of such issues has continued since that time.

To provide additional evidence of Dr. Keldie's expertise in this area, Dr. Keldie recently gave a presentation entitled "Building a Medication List for Heat-Induced Health Risks" for the National Commission on Correctional Health Care ("NCCHC") on November 3, 2025, in Baltimore, Maryland.[31] The NCCHC recognized Dr. Keldie and his co-presenter, Dr. Deleca Barnes, as experts in the subject matter.[32]

The presentation included discussion and instruction on the following: (1) thermoregulation and the body's natural compensatory mechanisms; (2) chronic conditions that potentially inhibit the body's compensatory mechanisms; and (3) the utility of acetylcholine burden scale for developing a Medication-Induced Heat Pathology Medication List.[33] The section

---

[25] R. Doc. 223-12.
[26] R. Doc. 223-12.
[27] R. Doc. 223-12.
[28] R. Doc. 223-12.
[29] R. Doc. 223-12.
[30] R. Doc. 136-5 and R. Doc. 223-12.
[31] See Affidavit of Carl Keldie, MD FACCP, attached as Exhibit 2.
[32] *Id*. at Slide 2 of the attached presentation.
[33] *Id*. at Slide 3 of the attached presentation.

of the presentation that discussed thermoregulation addressed nonexertional/classic heat stroke and exertional heat illness.[34] The presentation then included analysis to identify patients who may be at risk for classical heat illness.[35] The presentation continued with analysis of medications that increase the risk for heat-induced illnesses, which should be considered in development of Heat Pathology Medication Lists for patients at correctional facilities.[36] Dr. Keldie's expertise on the issues presented to the NCCHC correlates directly with the issues presented in this case.

Dr. Keldie also testified that he has treated patients and has experience in heat pathology, specifically patients who worked in agricultural settings. For example, he has treated patients who worked in tobacco fields in North Carolina during July and August.[37] Dr. Keldie also has experience treating agricultural laborers throughout the United States, including but not limited to areas of central and southern Florida and at the Marine Naval Air Station in Corpus Christi, Texas.[38] Dr. Keldie's experience in heat pathology, in both clinical and research settings, is well-established.

Plaintiffs' attempts to challenge Dr. Keldie's qualifications are misguided. Plaintiffs suggest Dr. Keldie is not qualified because he lacks specialty in heat pathology or heat-related medical care. However, the American Board of Medical Specialties does not recognize "Thermoregulatory Expert" as a specialty or subspecialty.[39] Conversely, thermoregulation is a core concept in many medical fields. Accordingly, Plaintiffs' argument regarding this issue is a red herring. As outlined above, Dr. Keldie is qualified to opine on these topics.

---

[34] *Id*. at Slides 8-12 of the attached presentation.
[35] *Id*. at Slide 14 of the attached presentation, for example.
[36] See Exhibit 2, Affidavit of Carl Keldie, MD FACCP, with attached presentation.
[37] R. Doc. 336-3, p. 46, ll. 5-16.
[38] R. Doc. 336-3, p. 46, l. 17- p. 47, l. 17.
[39] R. Doc. 223-12.

Plaintiffs' additional arguments regarding Dr. Keldie's qualifications are based primarily upon references to Dr. Keldie's limited testimony offered during the class certification hearing for this matter on April 24, 2025. Because of time constraints presented at the class certification hearing, Defendants did not have the opportunity to lay the foundation for Dr. Keldie to demonstrate his expertise regarding exertional versus classic heat illness.[40]

> Q:     In your practice, Doctor, with respect to the history of your practice and in dealing with heat exertional injuries and heat pathology, do you come across classic versus exertional heat injury?
> A:     Most of my experience has actually been in exertional heat illness. I have seen people with classic heat illness.
>         MR. BLANCHFIELD:     Your Honor, it's a common known issue replete in the literature, the difference between classic heat injury like the Ball case and exertional heat injuries like this case.
>         THE COURT:     Understood.
>         And he's testified as to his understanding of it, but you need to wrap up. Do you have any other questions for the witness, Mr. Blanchfield?
>         MR. BLANCHFIELD:     Yes. Just - -
>         THE COURT:     A couple of more questions because you've exceeded your time, but I'll allow you to ask a couple more.[41]

During the brief period of time allowed for Dr. Keldie to testify about his qualifications at the class certification hearing, Dr. Keldie confirmed his experience in examination of exertional heat illness, while acknowledging that he also has treated patients with classic heat illness. He will be able to offer additional testimony to establish his expertise in this area at trial.

Plaintiffs' additional arguments are attacks on Dr. Keldie's credibility, disguised as attacks on his qualifications. To support their arguments, Plaintiffs reference statements from a vacated order that relate solely to Dr. Keldie's **credibility**.[42] However, it is the province of the trier of fact at trial to assess the credibility of an expert witness. *Schmidt v. Hubert*, No. CIV.A.05-2168, 2008

---

[40] R. Doc. 336-3, p. 75, l. 17- p. 76, ln. 21.
[41] R. Doc. 336-3, p. 76, ll. 4-20.
[42] R. Doc. 253, at p. 25. See also *Voice of the Experienced, A Membership Organization, et al. v. James M. LeBlanc, et al.*, Case No. 25-30322, Doc. 96-1, filed August 8, 2025, which vacated the order referenced in Plaintiffs' Motion.

WL 4491467 (W.D. La. Oct. 6, 2008), citing *Skidmore v. Precision Printing & Pkg., Inc.*, 188 F.3d 606, 618 (5th Cir. 1999). Plaintiffs also argue that Dr. Keldie's opinions should be excluded because of an alleged bias against Plaintiffs. Similarly, this Court holds that bias, even if shown, is typically not a ground for exclusion of expert testimony, but a matter that goes to the weight of the opinions offered. *Roake v. Brumley*, 756 F. Supp. 3d 219 (M.D. La.), *hearing in banc denied*, 132 F.4th 748 (5th Cir. 2024), and *aff'd*, 141 F.4th 614 (5th Cir. 2025), *reh'g en banc granted, opinion vacated,* 154 F.4th 329 (5th Cir. 2025). Therefore, Plaintiffs' argument that Dr. Keldie is unqualified because his opinions allegedly lack credibility or bias must fail.

Plaintiffs also improperly suggest Dr. Keldie stated he developed his expertise in heat pathology issues solely for purposes of this litigation. To support this claim, Plaintiffs reference Dr. Keldie's deposition testimony and testimony from the class certification hearing, where the merits of Plaintiffs' claims were not at issue. However, read in context, Dr. Keldie's testimony cited in Plaintiffs' Opposition serves to refute Plaintiffs' claims:

> Q:    So you developed your expertise in exertional heat illness through your work on this case?
>
> A:    **No**. I've been involved in exertional heat illness since the early 2000s when we had a heat wave in the Northeast. And actually, Deleca Barnes, a Pharm.D, who's been retained in this case, and I actually worked together at that time…
>
>     And over the years we touched on heat-related medications and heat-related illnesses. But, frankly, we've never - - in the 20-something years that I've practiced and reviewed cases, we've never seen a significant cohort of individuals affected by exertional heat illness in, frankly, any of the jails or prisons that I've supervised.
>
> Q:    You testified that you developed an augmented expertise in exertional heat illness.
>
> A:    Uh-huh.
>
> Q:    Was that augmented expertise developed as a result of the work that you have done on this case?
>
> A:    Yes.[43]

---

[43] R. Doc. 336-2, Deposition Transcript, p. 20, l. 10- p. 21, l. 10.

(Emphasis supplied).

This testimony confirms that the basis for Dr. Keldie's qualifications to opine regarding heat pathology issues did not begin with his retention in this case. It began "20-something years" ago; it *continued* to develop because of his work in this case. Plaintiffs also suggest that heat pathology is a "subject foreign to his clinical practice." However, evidence shows Dr. Keldie worked on heat pathology issues for over twenty years and has treated patients for heat illness and heat pathology symptoms for decades.[44]

Plaintiffs allege Dr. Keldie is unqualified because he demonstrates bias toward incarcerated people. Plaintiffs assert this claim even though he has spent decades providing medical treatment to incarcerated people. Plaintiffs cite testimony and language from Dr. Keldie's report regarding the difficulty prison officials can have in identifying meritorious medical complaints. However, the statements included in Dr. Keldie's report and discussed in his testimony are borrowed or paraphrased from a decision of the United States Fifth Circuit Court of Appeals, where in response to claims asserted against LSP, the Court held, "Separating the few meritorious complaints from the mountain of frivolous complaints is as difficult work for prison officials as for federal courts." *Ball v. LeBlanc*, 792 F.3d 584, 595 (5th Cir. 2015). Reference to a decision of the Fifth Circuit does not create bias, much less establish sufficient bias to exclude witness testimony.

Lastly, while Plaintiffs claim the conclusion Dr. Keldie reached following his review of SDEs in this case is "unlikely," their opinion regarding the likelihood of the doctor's conclusion does not relate to Dr. Keldie's qualifications and cannot serve as grounds for exclusion of his testimony. The Daubert analysis does not apply to the merits of an expert's conclusions. *Jones v. L.F. Grp., Inc.*, 559 F. Supp. 3d 550 (N.D. Miss. 2021). "The merits remain subject to attack at

---

[44] *Id*. See also R. Doc. 336-3, p. 76, ll. 4-20, and Dr. Keldie's credentials outlined above.

trial under traditional principles of '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Id.*, citing *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786. A disagreement with the merits of Dr. Keldie's conclusions does not show he is unqualified to make that conclusion.

For these reasons outlined above, Dr. Keldie is qualified to testify about correctional medical care, heat pathology, and pharmacotherapy. Plaintiffs challenge to his qualifications fails because it is based upon an attack of his credibility and an alleged bias, the substance of which is consistent with language from a ruling of the United States Fifth Circuit. Therefore, Plaintiffs' untimely *Daubert* motion should be denied.

## IV.   DR. KELDIES'S OPINIONS MEET THE RELIABILITY REQUIREMENT OF RULE 702.

Dr. Keldie's testimony should be admitted at trial because it is based on sufficient facts and data and is the product of reliable principles and methods. His testimony also reflects a reliable application of his methodology to the facts of this case. Therefore, it meets the requirements set forth in Rule 702. Dr. Keldie supported the opinions stated in his report with citation to numerous articles, studies, and reports on heat pathology and heat-related illnesses.[45] These include, but are not limited to, resources produced by the National Weather Service, Occupational Safety and Health Administration, National Institute for Occupational Safety and Health, and the United States Army. He reviewed declarations and reports of Plaintiffs' experts, LSP and DOC policies and directives, the medical records of the eight original, purported class members, SDEs from May

---

[45] R. Doc. 136-5.

1, 2024 through August 28, 2024,[46] deposition transcripts, and Joint Weekly Reports prepared in this matter.[47]

Dr. Keldie based his opinions on his review and analysis of these materials. Dr. Keldie also utilized the skills and expertise obtained through his experience as a medical administrator and medical practitioner and developed over the past forty years in his analysis of these materials.

Despite the list of materials Dr. Keldie identified as source material for his report, Plaintiffs mistakenly claim Dr. Keldie cannot muster a "single source" to support his conclusion regarding what qualifies as a safe heat index threshold. However, the testimony Plaintiffs cite to support this statement, which excludes that portion where Dr. Keldie explains the basis of his opinion and identifies three sources for his opinion, provides as follows and refutes Plaintiffs' claim:

> Q:      And you say that you think, given the heat index and workload at LSP, that that justifies raising the heat index bar to 95 degrees; is that correct?
> A:      That is correct.
> Q:      What is the basis for your opinion?
> A:      **It's based on a number of data points**. Number one, 95 is the heat index that's used by the Texas Department of Corrections. Number two, when you - - look at the military and OSHA parameters in the attachments, they use much higher heat indexes.
>          You could make a - - you could make a case to go for a higher number. And I'm not pretending or portending that anybody is going to go to 95, but I don't know…
> Q:      And what do you think should happen when the heat index reaches 95 degrees.
>          MR. BLANCHFIELD:
>              Object to form.
> A:      I think the same thing that happens at 88, is that I think it's very reasonable to move that number to 95. I think that would be an extremely safe number

---

[46] Regarding his review of the SDEs, Dr. Keldie organized the SDEs into a classification system for analysis. In doing so, Dr. Keldie created an audit tool to review these documents. Dr. Keldie has extensive experience, spanning over 20 years, in creating, deploying, monitoring, editing, and redeploying auditing tools, like the one he implemented in this case to analyze the SDEs, for a wide range of clinical scenarios specific to correctional health care. His use of such an audit tool in this case confirms, not challenges, the reliability of his opinions.

[47] R. Doc. 136-5.

> to move to. I don't think there's - - I don't think there's anything, especially
> given the pretty significant risk mitigation strategies that are taking place.[48]

This testimony confirms Dr. Keldie considered various data sources to formulate his opinions.[49]

Plaintiffs' disagreement with the conclusions Dr. Keldie drew from the materials cited in his report does not make his testimony inadmissible. "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for [the fact finder's] consideration." *Louisiana Corral Mgmt., LLC*, 2023 WL 2242137, at *2, citing *United States v. Ryan*, No. 20-65, 2022 WL 17844626, at *1 (E.D. La. Dec. 22, 2022). Plaintiffs' complaints regarding alleged miscalculation or misapplication of information in Dr. Keldie's sources, erroneous assumptions, or inconsistencies also present matters that should be left for trial. See *Trinity Med. Servs., L.L.C. v. Merge Healthcare Sols., Inc.*, No. 17-CV-592-JWD-EWD, 2020 WL 1309892, at *7 (M.D. La. Mar. 19, 2020), citing *Imperial Trading Co. v. Travelers Prop. Cas. Co. of Am.*, No. CIV.A. 06-4262, 2009 WL 2356292 (E.D. La. July 28, 2009).

Dr. Keldie analyzed voluminous documents and resources to develop the opinions outlined in his report. Those opinions were not the creation of Defendants or their counsel. Based upon the universe of materials and information he considered and reviewed, Dr. Keldie did not identify any heat-related illnesses or injuries. As is the case with all expert witnesses, Dr. Keldie developed his opinions, in part, from what he was told by and the information he received from the party who retained him— here, the Defendants. Again, Plaintiffs oppose this fact with reference from

---

[48] R. Doc. 336-2, Deposition Transcript, p. 225, l. 22- p. 227, l. 3.
[49] The fact that Defendants ultimately chose a lower heat index threshold than one that would be "justified" does not suggest that Dr. Keldie's methodology was unreliable. Conversely, based upon Dr. Keldie's expertise, Defendants relied upon his analysis in adopting its updated policies.

testimony offered at the class certification hearing, under time constraints for testimony, where the merits of Plaintiffs' claims were not at issue.

However, review of the testimony from the class certification hearing cited in Plaintiffs' opposition confirms that Dr. Keldie never testified that any opinion regarding heat-related injuries or medical cases was based solely upon what Defendants told him. Conversely, what Defendants told him served as a source for his ultimate conclusions. Again, questions about the sources of Dr. Keldie's opinions should be left for trial. See *Louisiana Corral Mgmt., LLC*, 2023 WL 2242137, at *2.[50]

Dr. Keldie's testimony and opinions cannot be attacked because he failed to consider materials which do not exist or materials which he had not seen, as Plaintiffs suggest. Plaintiffs have no authority to suggest that Dr. Keldie should have performed independent investigations to contradict the information he received from Defendants in connection with his retention in this case, as they claim. To the extent Plaintiffs want to present contradictory evidence to challenge Dr. Keldie's conclusions, the appropriate forum for that challenge is at trial.

Plaintiffs again misstate Dr. Keldie's opinion to suggest he testified as follows: "there is 'almost zero' risk of exertional heat stroke on the Farm Line because he has not seen 'any evidence of patients either (1) experiencing significant exertional heat illness or (2) being at risk of experiencing serious exertional heat illness.'"[51] However, Dr. Keldie did not make the statement attributed to him at the hearing. Conversely, the transcript shows he testified as follows:

> Q:     And you reached the conclusion that there is almost zero risk of exertional heatstroke to incarcerated men working in the field at LSP. Right?

---

[50] Plaintiffs also cannot show their counsel's disagreement with Dr. Keldie's interpretation of an article cited in his report referencing SSRIs, at p. 13 of their Opposition, serves as grounds for exclusion of his testimony. Dr. Keldie has studied the relationship between SSRIs and heat pathology and recommended to the NCCHC that SSRIs be excluded from heat pathology medication lists. See Affidavit of Carl Keldie, MD FACCP, Exhibit 2 at Slide 36 of the attached presentation.
[51] See R. Doc. 336-1, p. 10, fn. 28.

A:      Correct.
Q:      You have not seen any evidence of patients either experiencing significant exertional heat illness or being at risk of experiencing serious exertional heat illness at LSP. Right?
A:      That is correct.[52]

Dr. Keldie testified that he had not seen any evidence of significant exertional heat illness or risk of experiencing serious exertional heat illness. He in no way testified, agreed, or suggested he reached his conclusion- that there is almost zero risk of exertional heatstroke to incarcerated men working in the field at LSP- **because** he had not seen such evidence. Plaintiffs fabricated that causative connection. Review of Dr. Keldie's report identifies the scope of materials Dr. Keldie analyzed to formulate his conclusions, confirms his opinions are based upon evidence, and refutes Plaintiffs' argument that his claims are based on an absence of evidence.

Plaintiffs' claim that Dr. Keldie ignored contradictory evidence also lacks merit. Dr. Keldie's list of materials reviewed for his report shows he considered three declarations of Dr. Susi Vassallo, the expert Plaintiffs retained in this matter. Plaintiffs cannot show that Dr. Keldie's opinions are unreliable because they do not align with Dr. Vassallo or because he did not consider all the materials Plaintiffs selected for review by their expert.

Throughout their Opposition, Plaintiffs also frequently cite Dr. Vasallo as authority to challenge Dr. Keldie's conclusions regarding the heat pathology issues. In doing so, Plaintiffs ask the Court to weigh their expert's opinions against Dr. Keldie's opinions in its consideration of their *Daubert* Motion. By citing their expert's opinions, they challenge the weight that should attach to Dr. Keldie's testimony at trial. Plaintiffs' reference to the experts' dispute regarding whether Diabetes should be included on LSP's Medical Exclusion List requires examination of competing testimony from the experts, again addressing the weight of the testimony. However, challenges to

---

[52] See R. Doc. 336-3, p. 79, l. 24 – p. 80, l. 7.

[18]

the weight of Dr. Keldie's opinions are not appropriate in the context of a *Daubert* motion. See *Chevron TCI, Inc.*, 2021 WL 2638036 at *4.

Dr. Keldie's report identifies numerous sources and materials he reviewed and analyzed to formulate his opinions in this matter. The facts and data cited in his report are sufficient to support his testimony. He also applied his knowledge and personal experience to these materials to derive the opinions and testimony he will offer at trial. In short, his testimony is reliable, and Plaintiffs fail to show why his testimony should not be considered. Therefore, Plaintiffs' Motion should be denied.

## V.     DR. KELDIE'S OPINIONS ARE RELEVANT AND WILL HELP THE TRIER OF FACT UNDERSTAND THE ISSUES IN THE CASE.

At trial, Plaintiffs will argue they face a substantial risk of serious harm from working on the Farm Line at LSP when the heat index exceeds 88 degrees. Defendants will argue that Plaintiffs do not face a face a substantial risk of serious harm under those conditions. Defendants will rely on Dr. Keldie's expert testimony to support their defense of Plaintiffs' claims. Dr. Keldie's testimony will help the trier of fact understand these issues as they relate to correctional medical care, heat pathology, and pharmacotherapy.

As outlined above, Dr. Keldie has decades of experience with heat pathology and pharmacotherapy in both correctional facilities and the private sector. His testimony about correctional health care, heat-related medical care, and heat-related disorders is relevant to these proceedings and will help the trier of fact understand the evidence or determine facts at issue.

"Rule 702 requires that the expert's knowledge 'help' the trier of fact to understand the evidence or to determine a fact at issue." See the official comments to the 2023 amendments to Rule 702. The 2023 Amendments to the Rule were implemented, in part, because courts were

applying a "higher standard than helpfulness" that was "unnecessarily strict." An unnecessarily strict standard should not be applied here.

Plaintiffs claim Dr. Keldie's testimony will not help the Court because it allegedly is "not tethered to any analysis." However, as outlined above, that is not the case. Dr. Keldie's opinions and conclusions are supported by the data and sources cited in his report.[53] His report also demonstrates that his opinions are the product of reliable methodology and reflect reliable application of that methodology to the fact of the case.[54] Because Dr. Keldie's relevant opinions will help the trier of fact at trial, his testimony is admissible.

## CONCLUSION

Plaintiffs' Motion should be denied because it was filed more than one year after the deadline for filing *Daubert* motions established by this Court. Further, Dr. Keldie's specialized knowledge will help the trier of fact understand the evidence and determine facts at issue. His testimony is based on sufficient facts and data. His testimony is the product of reliable principles and methods, and his opinions reflect a reliable application of the principles and methods to the facts of the case. Therefore, Dr. Keldie's expert testimony is admissible under Federal Rules of Evidence Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469, 1993 U.S.

Plaintiffs' opposition to Dr. Keldie's testimony on heat pathology issues is based upon attacks of his credibility and his interpretation of the data and sources cited in support of his opinions. However, these issues are not appropriately considered in the context of a Daubert hearing and should be addressed at trial. Defendants maintain that Dr. Keldie's testimony would be admissible if this was a jury trial. However, this case will be tried by the Court, not a jury. This

---

[53] R. Doc. 136-5.
[54] *Id*.

Court holds, "Most of the safeguards provided for in *Daubert* are not as essential in a case such as this where a district judge sits as the trier of fact in place of a jury," which further supports admission of Dr. Keldie's testimony. For these reasons, Dr. Keldie is properly admitted as an expert witness, and Plaintiffs Motion should be denied.

Respectfully submitted,

**LIZ MURRILL**
**Attorney General**

By:    s/Andrew Blanchfield
       Andrew Blanchfield, T.A. (#16812)
       Email: ablanchfield@keoghcox.com
       Christopher K. Jones (#28101)
       Email: cjones@keoghcox.com
       C. Reynolds LeBlanc (#33937)
       Email: rleblanc@keoghcox.com
       Chelsea A. Payne (#35952)
       Email: cpayne@keoghcox.com
       Special Assistant Attorneys General
       Post Office Box 1151
       Baton Rouge, Louisiana 70821
       Telephone:  (225) 383-3796
       Facsimile:  (225) 343-9612
       *(Counsel for Defendants)*

[21]

**CERTIFICATE OF SERVICE**

I hereby certify that I have this date electronically filed the foregoing with the Clerk of Court by utilizing the CM/ECF system, and a copy of the above and foregoing was this day forwarded by the Court's ECF Delivery System to all counsel of record.

Baton Rouge, Louisiana, this 1st day of December, 2025.


_____s/Andrew Blanchfield_____
Andrew Blanchfield