## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

VOICE OF THE EXPERIENCED, A                    CIVIL ACTION
MEMBERSHIP ORGANIZATION ON
BEHALF OF ITSELF AND ITS
MEMBERS, ET AL.

VERSUS

JAMES LEBLANC, ET AL.                          NO. 23-01304-BAJ-EWD

## RULING AND ORDER

Before the Court is Plaintiffs' **Motion For Class Certification (Doc. 120)**.

Defendants oppose the Motion. (Doc. 136). Plaintiffs filed a Reply Brief. (Doc. 147).

The parties also submitted post-hearing briefs. (Doc. 257; Doc. 258). For the following

reasons, Plaintiffs' Motion is **GRANTED**. The above-captioned matter shall proceed

as a class action consisting of:

1) A general class consisting of all persons incarcerated at
   Louisiana State Penitentiary who currently are, or may in the future be,
   assigned to the Farm Line (the "General Class"); and

2) An Americans with Disabilities Act subclass, comprising all persons
   incarcerated at LSP who have disabilities that substantially limit one or
   more of their major life activities and who currently are, or may in the
   future be, assigned to the Farm Line (the "ADA Subclass").

## I.     OVERVIEW

This action challenges the Defendants' operation of the Farm Line at Louisiana State Penitentiary in Tunica, Louisiana, otherwise known as "Angola" or "LSP," as unconstitutional. Plaintiffs' core allegation is that the Farm Line violates the rights of the putative class members under the Eighth Amendment of the U.S. Constitution, Title II of the Americans With Disabilities Act, 42 U.S.C. § 12132, *et seq.* (the "ADA"), and Section 504 of the Rehabilitation Act, 29 U.S.C. § 701 ("Section 504"), by requiring them to work in conditions that threaten their health and safety.

Plaintiffs now seek to certify a class action to pursue claims on behalf of both the General Class and ADA Subclass. Plaintiffs also seek to appoint Myron Smith, Damaris Jackson, Nate Walker, Darrius Williams, Kevias Hicks, and Joseph Guillory, incarcerated persons at LSP who either are or have been assigned to the Farm Line, as class representatives for the General Class. Plaintiffs seek to appoint Damaris Jackson, Nate Walker, Kevias Hicks, and Joseph Guillory, incarcerated persons with qualifying disabilities as defined by the ADA, as class representatives for the ADA Subclass. (*Id.*). Finally, Plaintiffs' Counsel seeks to be designated as class counsel.

## II. FACTUAL BACKGROUND

In this case, Plaintiffs challenge the Farm Line at LSP as unconstitutional.[1] At LSP, incarcerated persons are sometimes required to perform agricultural labor

---

[1] Additional facts have been detailed at length in the Court's prior Rulings. (*See, e.g.*, Doc. 70; Doc. 253).

for a variety of prison programs.

The usefulness and sophistication of the labor involved in the various programs allegedly differs substantially, with some programs resembling modern-day farming operations and others, such as the Farm Line, serving an almost purely penological function. At this time, Plaintiffs have described the Farm Line as those compulsory, punitive agricultural or farming labor programs operated at Angola, including but not limited to Lines 15a, 15b, 24, and 25. (Doc. 37-1 at p. 8 n. 2; Doc. 223 at 6).

Plaintiffs, incarcerated persons at LSP and the Voice of the Experienced, a non-profit organization dedicated to "restoring [] human and civil rights" in the criminal justice system,[2] contend that incarcerated persons forced to work on the Farm Line are subject to an increased risk of physical, psychological, and dignitary harm due to their work on the Farm Line. (Doc. 21 at ¶ 4). Plaintiffs allege that incarcerated persons working on the Farm Line are subject to a risk of increased physical harm due to their extensive and continued exposure to high temperatures and heat indices on the Farm Line. (Doc. 21 at ¶ 61).

Named Defendants in this lawsuit are James Leblanc, in his official capacity as Secretary of the Louisiana Department of Public Safety & Corrections;[3] Timothy Hooper, in his official capacity as Warden of Louisiana State Penitentiary;[4] Misty Stagg, in her official capacity as Director of Prison Enterprises, Inc.; the

---

[2] *See Voice of the Experienced*, https://www.voiceoftheexperienced.org/ (last visited December 12, 2025).

[3] Since the initiation of this case, Leblanc has retired as Secretary of DOC.

[4] Since the initiation of this case, Timothy Hooper is no longer Warden of LSP.

Louisiana Department Of Public Safety & Corrections ("DOC"); and Prison Enterprises, Inc. (Doc. 21).

The Named Plaintiffs in the putative General Class are seven persons currently incarcerated at LSP who have labored on the Farm Line. The Named Plaintiffs in the ADA Subclass are four persons currently incarcerated at LSP who have disabilities as defined by the ADA and who have labored on the Farm Line despite requests to be removed from Farm Line assignment. (Doc. 21 at 4–8). Personal accounts of each of the Named Plaintiffs have been detailed in the Court's prior rulings. (*See* Doc. 70).

### III. PROCEDURAL HISTORY

On September 16, 2023, Plaintiffs filed this lawsuit. (Doc. 1). On December 15, 2023, Plaintiffs filed an Amended Complaint, which serves as the operative Complaint in this matter. (Doc. 21).

Defendants then moved to dismiss Plaintiffs' Thirteenth Amendment claims. (Doc. 22). The Court granted Defendants' Motion for Partial Dismissal and dismissed those claims. (Doc. 56). Plaintiffs' other claims remain.

On May 13, 2024, Plaintiffs moved for a preliminary injunction and temporary restraining order, requesting that the Court immediately enjoin all agricultural labor performed by incarcerated persons on the Farm Line at LSP when heat index values exceeded 88 degrees Fahrenheit. (Doc. 37). The matter came before the Court for a hearing. (Doc. 62).

On July 2, 2024, the Court entered an Order granting Plaintiffs' Motion for a

Preliminary Injunction and Temporary Restraining Order in part and denying it in part. (Doc. 70, the "July 2 Order"). The Court did not enjoin labor on the Farm Line at that time but ordered Defendants to alter Farm Line working conditions to protect human health and safety. (*Id.*). Specifically, the Court ordered Defendants to immediately:

1. Correct the deficiencies of Directive No. 13.067 described in the Court's Order, including the lack of shade and adequate rest provided to incarcerated persons laboring on the Farm Line ("Part (1)" of the Court's July 2 Order);

2. Correct the problems with Defendants' equipment policies, including the failure to provide sunscreen and other necessary protective clothing and equipment to those laboring on the Farm Line ("Part (2)" of the Court's July 2 Order);

3. Submit a revised and expanded Heat Pathology Medications list ("Part (3)" of the Court's July 2 Order);

4. Create a procedure to ensure that all incarcerated persons suffering from health conditions that significantly inhibit thermoregulation are assessed by medical personnel and are granted heat precaution duty status ("Part (4)" of the Court's July 2 Order); and

5. Develop an additional heat-related policy to protect those laboring outdoors when heat index values reach or exceed 113 degrees Fahrenheit, the

temperature at which the National Weather Service issues excessive heat warnings ("Part (5)" of the Court's July 2 Order).

(*Id*.). That same day, Defendants appealed the Court's July 2 Order to the U.S. Court of Appeals for the Fifth Circuit. (Doc. 71).

On May 23, 2025, the Court granted Plaintiffs' Application for a Second Temporary Restraining Order (Doc. 253), ordering Defendants to provide the following preliminary relief:

1. Defendants shall issue a "Heat Alert" on the Farm Line at LSP whenever the heat index meets or exceeds 88 degrees Fahrenheit.

2. Defendants shall monitor the heat index on the Farm Line at LSP every 30 minutes.

(Doc. 253 at 38). Defendants also appealed the Court's May 23 Order. (Doc. 254).

During the pendency of each appeal, the appeals became moot by operation of law after 90 days under the Prison Litigation Reform Act ("PLRA"). The Fifth Circuit vacated the Court's July 2 and May 23 Orders because vacatur is mandatory where an appeal has "become moot due to circumstances unattributable to any of the parties." (*See, e.g.*, Doc. 302 at 11).

Now, the matter is before the Court on Plaintiffs' **Motion For Class Certification (Doc. 120)**. Trial is set to proceed on February 3, 2026.

## IV.    LEGAL STANDARD

A federal court may certify a class for litigation if it determines, after a "rigorous analysis," that the plaintiffs seeking class certification have met all of the prerequisites of Rule 23. *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 837 (5th Cir. 2012). Factual determinations necessary to make Rule 23 findings must be made by a preponderance of the evidence. *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 228 (5th Cir. 2009) (citing authorities).

To obtain class certification under Rule 23, Plaintiffs must satisfy all requirements of subpart (a) and one of the requirements of subpart (b). Fed. R. Civ. P. 23. The "threshold requirements" of subpart (a) are:

> (1) numerosity (a class so large that joinder of all members is impracticable); (2) commonality (questions of law or fact common to the class); (3) typicality (named parties' claims or defenses are typical of the class); and (4) adequacy of representation (representatives will fairly and adequately protect the interests of the class).

*Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 613 (1997) (quotation marks and alterations omitted).

As for subpart (b), Plaintiffs ask the Court to certify the proposed class under Rule 23(b)(2), which requires a showing that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). (Doc. 120-1 at 16). The Fifth Circuit has held that Rule 23(b)(2) class members must have been harmed in essentially the same way; injunctive relief claims must predominate over monetary damage claims, and the injunctive relief sought must be specific. *Ward v. Hellerstedt,* 753 F. App'x 236, 249

(5th Cir. 2018) (internal citations omitted). "[S]atisfaction of these requirements is premised on common behavior by the defendant toward the class, as opposed to the presence of common issues." *Id*.

"The Fifth Circuit has also articulated an 'ascertainability' requirement for Rule 23 class actions." *Braidwood Mgmt., Inc., v. Equal Emp. Opportunity Comm'n*, 70 F.4th 914, 933 (5th Cir. 2023). This means that a putative class must be adequately defined with reference to objective criteria. *See Plaza 22, LLC v. Waste Mgmt. of La., LLC*, 2015 WL 1120320, at *3 (M.D. La. Mar. 12, 2015) (Dick, C.J.).

"Plaintiffs, as the party seeking class certification, bear the burden of demonstrating that the requirements of Rule 23 have been met. 'Rule 23 does not set forth a mere pleading standard.'" *Lewis v. Cain*, 324 F.R.D. 159, 167 (M.D. La. 2018) (Dick, C.J.) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)) (internal citations omitted). However, plaintiffs need not demonstrate that common questions will certainly be answered in favor of the class. *Cole v. Livingston,* No. 4:14-cv-1698, 2016 WL 3258345 (S.D. Tex. June 14, 2016), *aff'd sub nom., Yates v. Collier,* 868 F.3d 354 (5th Cir. 2017); *see also Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465–66 (2013) ("Although we have cautioned that a court's class-certification analysis must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim,' Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to

8

determining whether the Rule 23 prerequisites for class certification are satisfied.").

## V.     ANALYSIS

Plaintiffs ask the Court to certify a class action consisting of:

1) The General Class, consisting of all persons incarcerated at LSP who currently are, or may in the future be, assigned to the Farm Line; and

2) The ADA Subclass, comprising all persons incarcerated at LSP who have disabilities that substantially limit one or more of their major life activities and who currently are, or may in the future be, assigned to the Farm Line.

(Doc. 51).

Defendants contest every aspect of Plaintiffs' request for class certification, contending that Plaintiffs cannot satisfy any of the express requirements of Rule 23(a) or Rule 23(b)(2). (Doc. 136; Doc. 258). Defendants also argue that the proposed ADA Subclass is precluded under the principal of *res judicata* and that Plaintiffs failed to exhaust their administrative remedies under the Prison Litigation Reform Act ("PLRA"). (Doc. 136 at 20–21).

First, the Court will analyze each requirement under Rule 23(a). Second, the Court will analyze the requirements under Rule 23(b). Third, the Court will address the implied prerequisite of ascertainability.  Lastly, the Court will turn to the issues of *res judicata* administrative exhaustion.

### A. The Federal Rule of Civil Procedure 23(a) Requirements Are Met.

To certify the proposed classes, the Court must find that each threshold requirement under Federal Rule of Civil Procedure 23(a) is met. This includes:

(1) Numerosity, meaning a class so large that joinder of all members is impracticable;

(2) Commonality, meaning that there are questions of law or fact common to the class;

(3) Typicality, meaning the named parties' claims or defenses are typical of the class; and

(4) Adequacy of representation, meaning that the representatives will fairly and adequately protect the interests of the class.

*Amchem Prod., Inc.,* 521 U.S. at 613 (1997). For the reasons below, the Court finds that Plaintiffs have offered sufficient evidence to satisfy each requirement.

### i. Numerosity: The Proposed Classes are "So Numerous that Joinder of All Members is Impracticable."

First, the Court must determine whether the proposed classes are "so numerous that joinder of all members is impracticable." Fed R. Civ. P. 23(a)(1). "There is no magic number for determining when a class is sufficiently numerous," *Pitts v. Greenstein*, 2011 WL 2193398, at *3 (M.D. La. June 6, 2011) (Brady, J.), though "classes containing more than 40 members are generally large enough to warrant certification." *Lewis*, 324 F.R.D. at 168 ("[T]he fact that the class includes unknown, unnamed future members also weighs in favor of certification."). Ultimately, "[t]he primary consideration for courts is the practicality of joining the members of a proposed class." *Pitts*, 2011 WL 2193398 at *3. For the reasons below, the Court is satisfied by Plaintiffs' proof that the proposed General Class and ADA Subclass both contain many more than 40 persons, making joinder of individual claims impracticable.

### 1. The General Class.

Plaintiffs posit that the proposed General Class consists of "almost all" of the 4,000 persons currently incarcerated at LSP because nearly all incarcerated persons

are at risk of assignment to the Farm Line. (Doc. 120-1 at 17). Plaintiffs have provided a plethora of testimony from several Named Plaintiffs and Department of Corrections officials, showing that nearly every newly incarcerated person at LSP is assigned to the Farm Line on arrival, and that most remain at risk of being reassigned to the Farm Line as a disciplinary measure. (Doc. 120-11 at 47; Doc. 120-13 at 17; Doc. 120-18 at 21). Plaintiffs point out that Defendants' own records show that in "any given week during summer 2024, more than 100 men were assigned to and thus eligible to work on the Farm Line" and "[o]n any given day, anywhere from approximately 20 to 75 men are forced to work on the Farm Line." (Doc. 120-1 at 17). Thus, it appears that numerosity for the General Class is satisfied.

This case is analogous to the general class certified in *Cole,* where the district court found, and the Fifth Circuit affirmed, that numerosity was satisfied for the general class because it included the entire prison population, over 1,400 members, and there was "a constant flux of inmates into and out of the [prison unit]." 2016 WL 3258345 at *6 (S.D. Tex. 2016), *aff'd sub nom., Yates,* 868 F.3d 354.

Defendants counter that "many offenders would not be 'at risk' of being assigned to or working the Farm Line" because some have a "no duty status," an "out of field duty status," or "other types of duty statuses that would prevent work in the fields." (Doc. 136 at 12).

That may be the case, but the Court is not convinced that the combined population of these categories of offenders would reduce the number of incarcerated persons actually assigned to and working the Farm Line to a degree so significant

11

that numerosity for the proposed class is not met. This is particularly so in light of deposition testimony from Defendants' witnesses indicating that nearly every new arrival at LSP is assigned to the Farm Line, all incarcerated persons without exempt duty statuses remain at risk of reassignment to the Farm Line for disciplinary reasons,[5] and "a person's duty status . . . may only be temporary." (Doc. 147 at 6).

Defendants also complain that Plaintiffs have "failed to show the actual number of offenders who would fall into their [general] class definition." (Doc. 136 at 12). In response, Plaintiffs correctly note that they "are not required to prove the exact size or identity of the class." (Doc. 147 at 6 (citing *J.D. v. Nagin,* 255 F.R.D. 406, 414 (E.D. La. 2009)). Further, Plaintiffs reiterate that classes that are in flux and include future members, such as in the prison litigation context, "weigh in favor of certification." (Doc. 120-1 at 12–13; Doc. 147 at 5–6); *Pederson v. La. State Univ.,* 213 F.3d 858, 868 n.11 (5th Cir. 2000). Accordingly, Plaintiffs have met their burden

---

[5] Sidney Davis, Lt. Col. and Supervisor of Camp C at LSP, testified in his deposition:

> Q: Okay. Mr. Davis, when a person first arrives at Angola, is the farm line typically their first work assignment?
> A: Well, . . . if they're medically cleared to work in the field line, then most likely, then yes, they – first job is the field line.
> Q: Okay. So just to clarify, if a person arrives to Angola and they are medically cleared, they are most likely to be assigned to the farm line as their first assignment?
> A: Yes.
> . . .
> Q: Mr. Davis, people may also get reassigned to the farm line after they have come off the farm line; is that correct?
> A: Yes.
> Q: Okay, People can get assigned to the farm line for disciplinary reasons, correct?
> A: Yes.

(Doc. 120-15 at 7).

regarding the numerosity of the General Class.

### 2. The ADA Subclass.

Turning to the ADA Subclass, Plaintiffs extrapolate U.S. Census Bureau data to estimate the size of the class as approximately 520 persons, consisting of the current incarcerated persons at LSP with an ADA-qualifying disability. (Doc. 120-1 at 17).

Defendants aver that Plaintiffs have not met their burden to establish numerosity of the proposed ADA Subclass because they "offer no proof of the number of offenders at LSP with a qualifying disability" nor of those with a qualifying disability who may be assigned to the Farm Line. (Doc. 136 at 12). Plaintiffs direct the Court to Defendants' records which have identified "approximately 1,800 men who take medications or have conditions that impair their ability to thermoregulate and will be granted Heat Precaution Duty Status," and thus are members of the putative ADA Subclass. (Doc. 257 at 35).

Defendants point out that many "offenders who have a qualifying disability under the ADA have an out of field duty status . . . or other restrictive duty status" and therefore "would not be eligible to work on the Farm Line." (*Id.*). Plaintiffs respond that these duty statuses are only temporary and that still "many more [incarcerated persons] with qualifying ADA disabilities currently are or in the future will be at risk of assignment to the Farm Line," presumably because they do not have heat precaution duty status. (Doc. 147 at 6.) Plaintiffs contend that "the existence of duty statuses" does not "defeat[] numerosity." *Id.*

Based on evidence submitted by both parties, current LSP operations under

13

HCP8 and Directive 13.067 appear to provide automatic "Heat Precaution Duty Status" for incarcerated persons whose disabilities or medications are on LSP's current "Heat Pathology Medication List" or "Medical Exclusion List," and these persons appear to be ineligible for assignment to the Farm Line.[6] (Doc. 257 at 20–21).

Plaintiffs counter that: (1) the assigned duty statuses may be temporary; and (2) Defendants' designation of "Heat Precaution Duty Status" is underinclusive. Plaintiffs argue that putative ADA Subclass members take medications that impair thermoregulation but are omitted from the Heat Pathology Medication List. (Doc. 257 at 21). Plaintiffs assert that others have common conditions, such as diabetes, that Plaintiffs' expert Dr. Vassallo opines are "known to impair thermoregulation but that are omitted from the Medical Exclusion List." (*Id.*). Plaintiffs contend that these putative ADA Subclass members would not necessarily receive Heat Precaution Duty Status and thus would be at risk of assignment to the Farm Line. (*Id.*).

Additionally, the putative ADA Subclass includes future incarcerated persons with disabilities as defined by the ADA, as well as those currently incarcerated persons who may develop disabilities as defined by the ADA during the period of their incarceration at LSP, increasing the number of potential members. (*Id.*). As discussed, Plaintiff classes that are in flux and include future members, particularly in the prison litigation context, weigh in favor of certification. *Alex A. by and through Smith v. Edwards,* 2023 WL 5628592 at *4 (M.D. La. Aug. 31, 2023).

In *Tellis*, the court certified a similar ADA subclass in a class action brought

---

[6] LSP Policies HCP8 and Directive 13.067 are explained in detail in the Court's Ruling at Doc. 253.

by incarcerated persons asserting similar claims. *Tellis v. Leblanc*, 2021 WL 4267513, at *4 (W.D. La. Sept. 20, 2021) (Foote, J.). The court specifically found the numerosity requirement satisfied despite not having "concrete numbers" because all estimates provided by plaintiffs were greater than forty, and because the subclass both included future members and was fluid, making joinder impracticable. *Id.*

The Court finds that Plaintiffs have met their burden of establishing numerosity for the ADA Subclass.

### ii. Commonality: There are Questions of Law or Fact Common to the Class.

Second, the Court must determine whether there are questions of law or fact common to the class. The test for commonality "is met 'where there is at least one issue, the resolution of which will affect all or a significant number of the putative class members.'" *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625 (5th Cir. 1999) (quoting *Lightbourn v. Cty. of El Paso*, 118 F.3d 421, 426 (5th Cir. 1997)). "[C]laims must depend upon a common contention . . . that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 349–50.

Critically, "commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *M.D. ex rel. Stukenberg*, 675 F.3d at 839–840 (quoting *Dukes*, 564 U.S. at 349-50). However, "[e]ven an instance of injurious conduct, which would usually relate more directly to the defendant's liability than to

15

the claimant's damages, may constitute 'the same injury.'" *In Re Deepwater Horizon*, 739 F.3d 790, 810 (5th Cir. 2014). Thus, "the commonality requirement is satisfied, as long as the Class's common questions are 'dispositive of their claim and the claim arises out of a single course of conduct and on a single theory of liability.'" *Lewis*, 324 F.R.D. at 170 (quoting *Dockery v. Fischer* 253 F. Supp. 3d 832, 849 (S.D. Miss. 2015).

### 1. The General Class.

Here, Plaintiffs' core claim for the General Class is that Defendants' current operation of the Farm Line violates the putative class members' rights under the Eighth Amendment by: (1) exposing them to "heat indices that pose a threat to their health and safety, without adequate mitigation to reduce the serious risks of harm"; (2) using "a form of discipline that punishes by simulating conditions of chattel slavery," violating basic standards of dignity; and (3) "expos[ing] class members to a substantial risk of serious psychological harm by forcing them to perform labor under conditions . . . that are unnecessarily difficult, dangerous, degrading, and that exemplify indifference to human health and wellbeing." (Doc. 120-1 at 19).

Plaintiffs contend that resolution of their claims will require the Court to consider multiple common questions of fact and law applicable to the entire proposed class, including: (1) whether the Farm Line exposes class members to dangerous levels of heat; (2) whether labor on the Farm Line is unnecessarily difficult and dangerous; (3) whether the operation of the Farm Line is reminiscent of chattel slavery; and (4) whether "revisiting that history on incarcerated men constitutes cruel and unusual punishment." (*See* Doc. 120-1 at 19–21). Plaintiffs argue that each

16

of these questions is capable of classwide resolution.

Defendants argue that by putting forward three distinct theories of harm, Plaintiffs "cannot show that they suffer the same injury and the dissimilarities between the claims and theories preclude[s] a finding of commonality." (Doc. 136 at 14). However, nowhere do Plaintiffs imply that each individual class member may be harmed by any one of the three theories exclusively. Instead, Plaintiffs aver that all three theories of harm apply across the board to all putative class members, and all are part of the common question of whether Defendants' current operation of the Farm Line violates the Eighth Amendment. (Doc. 257 at 37–39). Answering those common questions is not an individualized inquiry, according to Plaintiffs, because "exposure to extreme heat on the Farm Line poses a significant risk of harm to all class members . . . *regardless of their physiological characteristics*." (Doc. 257 at 38–39) (emphasis added). Plaintiffs similarly claim that the alleged psychological and dignitary harm resulting from Defendants' operation of the Farm Line "attaches to all class members" and "is experienced by everyone, regardless of race." (Doc. 257 at 38, 40).

Defendants also argue that Plaintiffs' expert Dr. Vassallo failed to consider the heat protection measures LSP has implemented during the course of the litigation in forming her opinions about classwide risk of exposure to extreme heat. (Doc. 258 at 8). Defendants claim that purported updates to the Farm Line operation reduce the risk of harm such that "whether any offender [remains] subject to a substantial risk of harm on the Farm Line" is now "subject to individualized issues regarding whether

17

these heat mitigation measures are effective for each offender." (Doc. 258 at 8–9). However, Dr. Vassallo's Fourth Declaration filed in March 2025, after the implementation of Defendants' modifications to the Farm Line policies, indicates that she considered the updated Farm Line policies and practices and concluded, "it remains my opinion that all incarcerated men forced to work on LSP's Farm Line . . . are at substantial risk of serious harm." (Doc. 201-3 at 3).

Similar to the Fifth Circuit's finding in *Yates,* Plaintiffs' expert Dr. Vassallo has credibly testified that the conditions on the Farm Line above certain temperatures are unacceptably dangerous to all incarcerated persons, regardless of health status, and that heat-mitigation measures implemented thus far during this litigation "are ineffective to reduce the risk of serious harm to a constitutionally permissible level for any inmate, including the healthy inmates." 868 F.3d at 363. (*See* Doc. 201-3).

Plaintiffs contend that the dignitary and psychological theories of harm are similarly capable of classwide resolution and do not depend on individualized inquiry. (Doc. 257 at 40) ("[T]he risk of dignitary harm and psychological harm that results from exposure to a punitive practice that replicates conditions of chattel slavery is experienced by everyone, regardless of race.").

In *Humphrey v. LeBlanc,* this Court found the commonality prong of the class certification analysis satisfied because the claims of each class member depended on a finding that prison policies were applicable to all class members and that prison officials were "deliberately indifferent in knowing that these policies created a

18

substantial risk of harm." 2025 WL 2694604 at *46 (M.D. La. Sept. 22, 2025) (deGravelles, J.). That is precisely what Plaintiffs ask the Court to find here. Like *Humphrey*, "deliberate indifference is the central issue in this case, and variations in individual circumstances do not change that fact." *Id.*

In *Lewis*, this Court similarly found the commonality prong of the class certification analysis satisfied for a class of incarcerated persons that "offer[ed] common complaints that [d]efendants' policies pose[d] a substantial risk of serious harm to the health of all inmates and argue[d] [d]efendants [were] deliberately indifferent to this risk." 324 F.R.D. at 171. The Court was unpersuaded by defendants' arguments that differences in the individual exposure of each incarcerated person to the risk of substantial harm destroyed the commonality of the class's claims. *Id.* ("It seems unlikely that any two inmates would have the exact same exposure to a substantial risk of serious harm, but this should not destroy commonality.").

Simply put, the commonality requirement is met here because all putative class members are similarly subject to Defendants' Farm Line policies and practices, which constitute "a single course of conduct" and form the basis for "single theory of liability." *Id.* at 170. Whether Plaintiffs will ultimately prevail on the merits of this theory is a separate inquiry not at issue here. *See Amgen Inc.*, 568 U.S. at 465–66.

### 2. The ADA Subclass.

For the ADA Subclass, Plaintiffs contend that the common issue is whether the Defendants' current operation of the Farm Line, as it pertains to incarcerated persons with disabilities as defined by the ADA, violates the ADA and Section 504.

(Doc. 120-1 at 22).

Defendants again argue that commonality is defeated because the ADA requires "individualized, fact specific inquir[ies]." (Doc. 136 at 17). However, Defendants seemingly misinterpret Plaintiffs' claims. The putative subclass takes issue with the prison's methods of administration of the ADA as it pertains to the Farm Line, not with any particular incarcerated person's appropriate ADA accommodations. While those individual accounts may be relevant forms of evidence in this case, the claim that Plaintiffs seek to vindicate is classwide—that incarcerated persons with disabilities are currently subjected to prison policies that violate the ADA and Section 504. This is almost identical to the claims brought by plaintiffs in *Lewis,* where this Court found the commonality prong of the class certification analysis satisfied for an ADA subclass because "the basis of liability Plaintiffs assert is not denial of the [individual] accommodations themselves, but the denial of a system that would have the effect of ensuring that they and their fellow prisoners are appropriately accommodated." 324 F.R.D. at 170. The central, common issue for the instant ADA Subclass is whether there exists a system-wide failure to abide by the ADA and Section 504 when assigning incarcerated persons to the Farm Line. This is capable of classwide resolution.

Further, in a similar case, the Fifth Circuit affirmed, "[n]o two individuals have the exact same risk, but . . . that obvious fact [does not] destroy[] commonality." *Cole,* 2016 WL 3258345 at *7–8, *aff'd sub nom., Yates,* 868 F.3d 354 (finding the element of commonality satisfied for prisoner ADA subclass because they brought common

contention that "[prison] officials failed to provide reasonable accommodations to inmates suffering from disabilities that may impact their ability to withstand extreme heat.") Accordingly, Plaintiffs have satisfied their burden of establishing commonality for both the General Class and the ADA Subclass.

### iii. Typicality: The Named Parties' Claims or Defenses Are Typical of the Class.

Third, the Court must determine whether the named parties' claims or defenses are typical of the class. "[T]he test for typicality is not demanding. It 'focuses on the similarity between the Named Plaintiffs' legal and remedial theories and the theories of those whom they purport to represent.'" *Mullen,* 186 F.3d at 625 (quoting *Lightbourn,* 118 F.3d at 426). As the United States Court of Appeals for the Eleventh Circuit has emphasized:

> Class members' claims need not be identical to satisfy the typicality requirement; rather, there need only exist a sufficient nexus between the legal claims of the named class representatives and those of individual class members to warrant class certification. This nexus exists if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory.

*Ault v. Walt Disney World Co.*, 692 F.3d 1212, 1216 (11th Cir. 2012) (quotation marks, alterations, and citations omitted); *accord Lightbourn,* 118 F.3d at 426.

The proposed Named Plaintiffs for the General Class are incarcerated persons at LSP who are currently assigned to the Farm Line or who have been assigned to the Farm Line and are under threat of reassignment. (Doc. 120-1 at 15). The proposed Named Plaintiffs for the ADA Subclass are incarcerated persons at LSP with one or more disabilities as defined by the ADA, who have previously been assigned to work

21

on the Farm Line and who have each had their request to be removed from the Farm Line denied. (*Id.*)

Plaintiffs assert that the Named Plaintiffs' claims are identical to the claims of the members of the Class and Subclass that they seek to represent. (Doc. 120-1). Plaintiffs also aver that both the General Class and Subclass seek remedies that would benefit all class members—specifically, declaratory and injunctive relief requiring LSP to halt its operation of the Farm Line. (Doc. 120-1 at 27; Doc. 147 at 11).

Defendants reiterate the arguments they advance regarding commonality, namely, that the Named Plaintiffs' claims cannot be typical of the claims of others in the Class and Subclass because Plaintiffs assert three theories of harm and because there are individual differences in heat sensitivity. (Doc. 136 at 17). Defendants also attempt to argue that because "none of the [N]amed [P]laintiffs are currently assigned to the Farm Line," their claims cannot be typical. (*Id.*).

Plaintiffs respond that the claims of the putative class representatives and absent class members both "relate to a single, uniform course of conduct and raise the same legal and remedial theories." (Doc. 147 at 9). Plaintiffs further argue that "Named Plaintiffs' current work assignments are irrelevant, as is any difference in the degree of their injuries, because the focus of the typicality analysis is 'on whether the named representative's claims are typical, not whether the representative is.'" (*Id.*) (citing *Cole,* 2016 WL 2358345 at *8).

The Court agrees with Plaintiffs. Named Plaintiffs have each been assigned to

the Farm Line and challenge the Defendants' operation of the Farm Line as unconstitutional or as a violation of the ADA and Section 504. This is not merely typical of other putative class and subclass members' claims but is in fact the exact same claim. This Court's Ruling in *Humphrey* is instructive here as well, where the Court found that "individual factual differences between the Plaintiffs' detentions and the class members [did] not change [that a similar course of conduct pervades all claims]." 2025 WL 2694604 at *46 (citing *Angell v. GEICO Advantage Ins. Co.,* 67 F.4th 727, 736 (5th Cir. 2023) ("If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality.")).

Thus, the Court finds that there is sufficient congruence between the Named Plaintiffs' claims and those of the proposed General Class and ADA Subclass such that the typicality prong of Rule 23 is satisfied.

### iv. Adequacy of Representation: The Representatives Will Fairly and Adequately Protect the Interests of the Class.

Fourth, the Court must determine whether the representatives will fairly and adequately protect the interests of the class. Adequacy of representation is determined by two factors: "whether and to what extent the class representatives have common and/or antagonistic interests to the remaining members of the class," and "whether the named plaintiffs have retained qualified counsel." *Pitts,* 2011 WL 2193398 at *6 (citations omitted).

Plaintiffs assert that there is no risk of a conflict of interest between Named Plaintiffs' interests and those of the putative class and subclass because "each group . . . suffers the same harms, asserts the same claims, and seeks the same injunctive

23

relief." (Doc. 120-1 at 24). Plaintiffs also assert that Named Plaintiffs have played an active role in this litigation, demonstrating their adequacy to represent the Classes. (*Id.*).

For their part, Defendants recycle the argument that "[N]amed Plaintiffs cannot adequately represent the class where none of [them] are currently assigned to the Farm Line" and claim that "[n]o [N]amed Plaintiff is currently a[t] risk for being assigned to the Farm Line."[7] (Doc. 136 at 17-18). Plaintiffs respond that "the Named Plaintiffs' current assignment to the Farm Line simply is not relevant to the adequacy inquiry." (Doc. 145 at 10). The Court agrees for similar reasons described in the discussion regarding typicality.

Named Plaintiffs' claims are identical to those of the putative class and subclass members, and thus their interests are similarly aligned. An individual class representative's current work assignment does not render this less true. *See Everson v. Bunch,* 2016 WL 3255023, at *3 (M.D. La. June 13, 2016) (Dick, C.J.) (finding formerly incarcerated class representative adequate because claims were identical to the other members of the putative class.). Defendants raise no objections to the adequacy of Plaintiffs' counsel.

In sum, there is no current or foreseeable conflict between the Named Plaintiffs' interests and those of the class, and there is no dispute that Plaintiffs' Counsel are appropriately qualified and experienced. The adequacy element is

---

[7] This assertion is belied by Defendants' representatives' uncontroverted testimony that all incarcerated persons who do not have a medical exception may be reassigned to the Farm Line for disciplinary reasons at any time. (Doc. 120-15 at 7).

satisfied.

### B. The Federal Rule of Civil Procedure 23(b)(2) Requirements Are Met.

Having found that Plaintiffs satisfy each requirement of Rule 23(a), the Court moves to Rule 23(b). Plaintiffs seek certification of a class under Rule 23(b)(2), which provides for certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

"Rule 23(b)(2) certification is available if three requirements are satisfied: (1) class members must have been harmed in essentially the same way; (2) injunctive relief must predominate over monetary damage claims; and (3) the injunctive relief sought must be specific." *Yates*, 868 F.3d at 366 (quotation marks omitted). Further, "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant." *Dukes*, 564 U.S. at 360.

Here, the requirements for certification are easily met. First, as Plaintiffs contend, LSP's current Farm Line operation and assignment allegedly harms all General Class and ADA Subclass members in essentially the same ways: they are allegedly denied Eighth Amendment protections from cruel and unusual punishment and are allegedly denied accommodations as required by the ADA and Section 504, respectively. As the Fifth Circuit found in *Yates,* "there is no serious question that

Defendants have engaged in common behavior that applies generally to the classes. All inmates, regardless of their age or health, are subject to the same policy . . . and all are (allegedly) harmed in essentially the same way – i.e. by exposure to a substantial risk of serious harm because of exposure to excessive heat." (internal quotations and citations omitted). 868 F.3d at 367–68.

Second, Plaintiffs seek only declaratory and injunctive relief. Thus, there is no question that such relief predominates over monetary relief.

Finally, the injunctive relief Plaintiffs seek is specific and can be fashioned in the form of a single injunction that would provide relief to each member of the General Class and ADA Subclass. Plaintiffs seek declaratory judgment and an injunction to halt the current practice of the Farm Line at LSP. A single judgment to this effect would provide relief to each member of the General Class and ADA Subclass. Success on Plaintiffs' claims would necessarily require LSP to modify its current Farm Line practices to comport with the Eighth Amendment. By their very nature, such policy changes would be generally applicable and therefore would benefit all General Class and ADA Subclass members.

Regarding the ADA Subclass, Defendants again complain that the injunctive relief Plaintiffs seek necessitates "an individualized assessment" and "would not apply equally across the class." (Doc. 136 at 20). However, Defendants' objection fails because it is founded on the misplaced notion that class relief will require determining each subclass member's particular vulnerability to heat, when, in fact, the subclass members all seek the same relief: "an injunction of the Farm Line"

(Doc. 147 at 11) or "an order prohibiting LSP from forcing ADA Subclass members to work on the Farm Line when the heat index is projected to exceed 88 degrees Fahrenheit or when the heat index does exceed that threshold." (Doc. 257 at 46).

As noted previously, courts, including this one, have regularly certified classes with members who have different disabilities requiring different treatment regimens. *See, e.g., Yates,* 868 F.3d 354; *Lewis,* 324 F.R.D. 159; *Tellis,* 2024 WL 3470644. To imply that all incarcerated persons at LSP with a disability who are subject to Defendants' Farm Line policies do not share a grievance and could not benefit from shared injunctive relief simply because they receive necessarily individualized healthcare and accommodations misses the point of class action litigation. The class relief Plaintiffs seek is sufficiently cohesive.

Such a class definition is not "a stratospheric level of abstraction" as Defendants contend. (Doc. 136 at 19). In *Yates,* the Fifth Circuit found that asking the district court to "enjoin Defendants to maintain a safe indoor apparent temperature" by "maintaining a heat index of 88 degrees or lower" was sufficiently specific to satisfy Rule 23(b)(2). 868 F.3d at 368. Plaintiffs' request in the instant case is similarly or perhaps even more specific, in that Plaintiffs are asking the Court to declare unconstitutional and halt the Farm Line at LSP, or, to enjoin Defendants from assigning incarcerated persons with disabilities as defined by the ADA to the Farm Line when the heat index reaches 88 degrees. Thus, Rule 23(b)(2) is satisfied as to the ADA Subclass.

## C. The Proposed Classes Are Ascertainable.

Next, the Court must determine whether the proposed General Class and ADA Subclass are ascertainable. "The existence of an ascertainable class of persons to be represented by the proposed class representative is an implied prerequisite of Federal Rule of Civil Procedure 23." *John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007) (footnote omitted).

> An identifiable class exists if its members can be ascertained by reference to objective criteria. The order defining the class should avoid subjective standards (e.g., a plaintiff's state of mind) or terms that depend on resolution of the merits (e.g., persons who were discriminated against). A class definition is inadequate if a court must make a determination of the merits of the individual claims to determine whether a particular person is a member of the class.

*Plaza 22, LLC,* 2015 WL 1120320 at *3 (quotation marks and footnotes omitted). This standard does not require that the Court know the identity of each class member before certification, only that the class members are identifiable at some stage of the proceeding. *Frey v. First Nat. Bank Southwest,* 602 F. App'x 164, 168 (5th Cir. 2015). For a class that seeks only injunctive or declaratory relief, as Plaintiffs do here, this factor is "not as critical" to the class definition. *In re Monumental Life Ins. Co.,* 365 F.3d 408, 413 (5th Cir. 2004).

Plaintiffs argue that the proposed General Class is sufficiently ascertainable because it includes nearly all present and future persons incarcerated at LSP and is a group that can be identified based on Defendants' records. (Doc. 120-1 at 28). Plaintiffs also assert that the ADA Subclass can be ascertained by reference to medical records of incarcerated persons who have a disability or impaired thermoregulation, which are also in Defendants' possession. (Doc. 120-1 at 29).

28

Defendants do not dispute that the General Class and ADA Subclass are ascertainable.

Accordingly, the Court finds that Plaintiffs have met their burden in this regard and that both the General Class and ADA Subclass "can be ascertained by reference to objective criteria[,]" namely, Defendants' records. *See Waste Mgmt. of La., LLC,* 2015 WL 1120320 at *3.

### D. The Doctrine of *Res Judicata* Does Not Persuade Otherwise.

Defendants also complain that the proposed ADA Subclass cannot be certified because "the purported Subclass members are already included in a pending class action, *Lewis v. Cain,* [324 F.R.D. 159 (M.D. La. 2018)]" and Plaintiffs here bring the "exact same methods-of-administration ADA claim." (Doc. 136 at 2). Defendants argue that certifying this subclass would run afoul of the principle of *res judicata,* relying on the Fifth Circuit's ruling in *Gillespie v. Crawford,* 858 F.2d 1101 (5th Cir. 1988). (Doc. 136 at 2).

Plaintiffs respond that *Gillespie* addressed only whether an individual class member's action was barred under principles of judicial administration and has no bearing on this Rule 23 analysis. (Doc. 147 at 13).

Moreover, *Lewis* did not address the assignment of incarcerated persons with disabilities to the Farm Line at LSP but rather the distinct issue of allegedly unconstitutional medical treatment of incarcerated persons with disabilities at the prison. 324 F.R.D. 159. That is not, as Defendants would call it, the "exact same . . . claim" that the purported subclass here brings. (Doc. 136 at 2). In their post-hearing brief, Plaintiffs further distinguish *Lewis* from the instant case by noting that any

claims in *Lewis* potentially relating to ADA Subclass members' work assignments were dismissed from the suit. (Doc. 257 at 47).[8]

Defendants' reliance on *Pappillion v. Louisiana Dep't of Pub. Safety and Corr., et al.* is easily distinguished from the instant case for similar reasons. *Pappillion* involved an "individual cause of action that . . . include[d] complaints regarding *medical care* and accommodations that [were] subsumed in [*Lewis*]." 2021 WL 4480992, at *6 (M.D. La. Sept. 3, 2021) (Dick, C.J.) (emphasis added). Accordingly, the ADA subclass in the instant action is not barred by *res judicata*.

### E. Plaintiffs Have Exhausted Administrative Remedies Under the PLRA.

Finally, Defendants complain that the Named Plaintiffs have not exhausted their administrative remedies under the PLRA because "none of the named Plaintiffs included the Dignitary Harm or the Psychological Harm allegations in their ARPs." (Doc. 136 at 21). The Fifth Circuit has been clear that "a grievance should be considered sufficient to the extent that the grievance gives officials a fair opportunity to address the problem that will later form the basis of the lawsuit." *Johnson v. Johnson,* 385 F.3d 503, 516–17 (5th Cir. 2004). This means that incarcerated persons "need not present legal theories in [their] grievances." *Id.*; *see also Williams v. Estelle Unit Prison Officials,* 2024 WL 3026778, at *3 (5th Cir. June 17, 2024)

---

[8] The ultimate judgment providing relief in *Lewis* is still administratively stayed pending an *en banc* ruling from the Fifth Circuit. *See Parker v. Hooper,* 134 F. 4th 867 (5th Cir. 2025). Thus, there is no existing decree from *Lewis*. Further, as Plaintiffs point out in their post-hearing brief, this Court is intimately familiar with litigation involving LSP. For these reasons and others addressed *supra*, the concerns of the *Gillespie* court about potential inconsistent adjudications and judicial administration do not apply here.

(holding that prisoners' grievances must "identify problems, but need not necessarily advance specific legal theories.").

Here, the Named Plaintiffs clearly identified the problem by alleging to prison officials in their filed ARPs that "the Farm Line violates the Eighth Amendment, and for ADA Plaintiffs, the ADA and Section 504." (Doc. 147 at 12). That is sufficient to "give officials a fair opportunity to address the problem" that now forms the basis of this lawsuit. *Johnson,* 385 F.3d at 516–17. Moreover, Plaintiffs point out that each of the ARPs filed by the Named Plaintiffs also included language regarding "inhumane" and "punitive conditions," echoing claims that would become the "psychological harm" and "dignitary harm" theories of Plaintiffs' Eighth Amendment claim. (Doc. 147 at 12; Doc. 37-60 at 3–5). Plaintiffs are correct that "no more is necessary." (Doc. 147 at 13).

## VI.    CONCLUSION

Plaintiffs have demonstrated that the proposed classes meet all requirements of Rule 23(a) and Rule 23(b)(2). Further, judicial economy is served by certification of the class. The evidence needed to prove Plaintiffs' claims will be substantially the same for all putative class members. Finally, class certification allows both sides to conserve resources and efficiently resolve the factual and legal issues presented by the class.

Accordingly,

**IT IS ORDERED** that Plaintiffs' **Motion For Class Certification (Doc. 120)** is **GRANTED**. The classes are defined as follows:

> 1) A General Class consisting of all persons incarcerated at LSP who currently are, or may in the future be, assigned to the Farm Line; and

31

2) An ADA Subclass, comprising all persons incarcerated at LSP who have disabilities that substantially limit one or more of their major life activities and who currently are, or may in the future be, assigned to the Farm Line.

**IT IS FURTHER ORDERED** that Named Plaintiffs, by and through their legal representatives, are hereby designated as the class representatives.

**IT IS FURTHER ORDERED** that Plaintiffs' Counsel are hereby designated as class counsel.

Baton Rouge, Louisiana, this $\underline{\text{23rd}}$ day of December, 2025

_____
**JUDGE BRIAN A. JACKSON**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**