Darrel Scott Vannoy
March 13, 2026

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

------------------------------------------------------
VOICE OF THE EXPERIENCED, a
membership organization on behalf
of itself and its members; and
MYRON SMITH, DAMARIS JACKSON,
NATE WALKER, DARRIUS WILLIAMS,
KEVIAS HICKS, JOSEPH GUILLORY,
KENDRICK STEVENSON, and ALVIN
WILLIAMS, on behalf of themselves
and all others similarly situated,

       Plaintiffs,      Civil Action No.
                         3:23-cv-1304-BAJ-EWD

vs.

JAMES LEBLANC, in his official
capacity as Secretary of the
Louisiana Department of Public
Safety and Corrections; TIMOTHY
HOOPER, in his official capacity
as Warden of Louisiana State
Penitentiary; MISTY STAGG, in her
official capacity as Director of
Prison Enterprises, Inc.; the
LOUISIANA DEPARTMENT OF PUBLIC
SAFETY & CORRECTIONS; and PRISON
ENTERPRISES, INC.,

       Defendants.
------------------------------------------------------

DEPOSITION OF

DARREL SCOTT VANNOY

AS A 30(b)(6) DESIGNEE

Via Videoconference

Friday, March 13, 2026

11:59 a.m. to 1:56 p.m. CDT

Witness appearing remotely from

West Feliciana Parish, Louisiana

Trial Exhibit
PX-248
Civil Action No. 3:23-cv-1304-BAJ-EWD

Trial Exhibit PX-248, page 1 of 79

 1    Job No. 7094564-001

 2    Pages: 1 to 79

 3    Stenographically Reported By:

 4    LEAH M. WITT, CRR, RPR

 5    Appearing remotely from Nassau County, Florida

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Trial Exhibit PX-248, page 2 of 79

```
 1                    APPEARANCES

 2    (All appearances via videoconference.)

 3    On Behalf of the Plaintiffs and Proposed Class:
           PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
 4         1285 Avenue of the Americas
           New York, New York 10019
 5         (212)373-3000
           BY: JEREMY A. BENJAMIN, ESQ.
 6         BY: LEAH WEISER, ESQ.
           BY: JANET LEE, ESQ.
 7         BY: CHIZOBA D. WILKERSON, ESQ.
           BY: TOBIN KASSA, ESQ.
 8         jbenjamin@paulweiss.com
           lweiser@paulweiss.com
 9         jglee@paulweiss.com
           cwilkerson@paulweiss.com
10         tkassa@paulweiss.com

11

12         THE PROMISE OF JUSTICE INITIATIVE
           1024 Elysian Fields Avenue
13         New Orleans, Louisiana· 70117
           (504)529-5955
14         BY: SAMANTHA POURCIAU, ESQ.
           BY: MICHAEL ALLEN, ESQ.
15         BY: DARLENE DICKINSON, ESQ.
           sbosalavage@defendla.org
16

17
           RIGHTS BEHIND BARS
18         1800 M Street N.W. FNT 1 #33821
           Washington, DC 20033
19         (202)455-4399
           BY: LYDIA WRIGHT, ESQ.
20         lydia@rightsbehindbars.org

21

22

23

24

25
```

**Trial Exhibit PX-248, page 3 of 79**

Darrel Scott Vannoy
March 13, 2026

```
 1   On Behalf of the Defendants:
          KEOGH COX
 2        701 Main Street
          Baton Rouge, Louisiana· 70802
 3        (225)383-3796
          BY: ANDREW BLANCHFIELD, ESQ.
 4        ablanchfield@keoghcox.com

 5

 6

 7

 8

 9   Also Present:
          Jonathan Vining, Esq.
10        Department of Public Safety and Corrections

11        Allie Waguespack

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Trial Exhibit PX-248, page 4 of 79**

Darrel Scott Vannoy
March 13, 2026

```
 1                 INDEX OF PROCEEDINGS

 2   Deposition of DARREL SCOTT VANNOY              Page

 3   Direct Examination by Mr. Benjamin               6
     Declaration                                     77
 4   Errata Sheet                                    78
     Certificate of Reporter                         79
 5

 6

 7

 8                 PLAINTIFFS' EXHIBITS

 9   Number         Description                     Page

10   Exhibit 193    Tab 01, 30(b)(6) Deposition
                    Notice, 3/11/26                   10
11
     Exhibit 194    Tab 02, Vannoy Affidavit,
12                  3/10/26, 033473-033485            12

13

14          (Exhibits attached to transcript.)

15      *(REPORTER'S NOTE: All exhibits were remotely
            introduced and provided electronically
16                 to the court reporter.)

17                    - - - - - -

18

19

20

21

22

23

24

25
```

**Trial Exhibit PX-248, page 5 of 79**

Darrel Scott Vannoy
March 13, 2026

```
 1        Deposition taken before Leah M. Witt,
 2   Registered Professional Reporter, Certified Realtime
 3   Reporter, and Notary Public in and for the State of
 4   Florida at Large, in the above cause.
 5                    - - - - - -
 6        THE COURT REPORTER:  Mr. Vannoy, would you
 7        please raise your right hand.
 8        Under penalty of perjury, do you solemnly
 9        swear or affirm that the testimony you are
10        about to give today will be the truth, the
11        whole truth, and nothing but the truth?
12        MR. VANNOY:  I do.
13   THEREUPON,
14                    DARREL SCOTT VANNOY
15   having been first duly sworn, was examined and
16   testified as follows:
17        THE COURT REPORTER:  Thank you.  Counsel,
18        you may proceed.
19                    DIRECT EXAMINATION
20   BY MR. BENJAMIN:
21        Q.   Good afternoon, Warden.  How are you
22   doing?
23        A.   Great.  How are you today?
24        Q.   I'm good.  Nice to see you again.
25             I know that you have been deposed a couple
```

**Trial Exhibit PX-248, page 6 of 79**

Darrel Scott Vannoy
March 13, 2026

```
 1   of times in this action already, including in a

 2   30(b)(6) capacity, so I'm just going to do a very

 3   brief reminder.

 4           You're testifying today under oath.  If I

 5   ask you any questions that you don't understand,

 6   please just let me know and I will do my best to

 7   rephrase it in a way that makes it more clear.

 8           If at the end of the deposition there is

 9   anything you want to correct or change in any

10   answer, let me know.  We'll let you do that.  Just

11   let us know that you want to revise an answer.

12           And if at any point in my questioning I

13   use a term that you don't recognize or that's

14   confusing, just stop me and ask me what that term

15   refers to, okay?

16      A.   Yes, sir.

17      Q.   All right.  I don't -- I don't expect that

18   we're going to go too long today, but if we -- if

19   for any reason you need a break, you let me know

20   that and we'll accommodate as well.

21      A.   Yes, sir.  Thank you.

22      Q.   All right.  Warden, is there any reason

23   that you're not able to give truthful testimony

24   today?

25      A.   No, sir.
```

**Trial Exhibit PX-248, page 7 of 79**

Darrel Scott Vannoy
March 13, 2026

```
 1        Q.   Okay.  Are you in your office?

 2        A.   I am.

 3        Q.   Okay.  And I see Mr. Blanchfield's there.

 4             Anyone else?

 5        A.   No, sir.  Just Mr. Blanchfield.

 6        Q.   Okay.  I asked Mr. Blanchfield if he could

 7   provide you with hard copies of two different

 8   documents, the notice of the 30(b)(6) deposition and

 9   your affidavit from March 10th.

10             Do you happen to have those with you?

11        A.   I don't have my affidavit.

12             THE WITNESS:  Do you have it?

13   BY MR. BENJAMIN:

14        Q.   And I can share it on the screen.  Just

15   wanted to make it easy if it's...

16             MR. BLANCHFIELD:  I've got -- I've got an

17        extra copy, Jeremy.  I thought he had it in

18        front of him.

19             THE WITNESS:  No.

20             MR. BLANCHFIELD:  Okay.  Let me get

21        you...

22             MR. BENJAMIN:  No problem.

23   BY MR. BENJAMIN:

24        Q.   And I'll share it on the screen as well,

25   but just in case you want to be flipping through it,
```

**Trial Exhibit PX-248, page 8 of 79**

Darrel Scott Vannoy
March 13, 2026

```
 1    I wanted you to have the hard copies.

 2            Other than those two documents, the

 3    affidavit and the notice of deposition, are there

 4    any papers or notes or other reference materials in

 5    front of you?

 6        A.  I have 13.067 and a couple memos I put

 7    out, but I can -- I can put them over on the other

 8    table if you'd like for me to.

 9        Q.  Well, are those -- is that the 13.067 and

10    the three memos that were attached to your

11    March 10th, 2026, affidavit?

12        A.  Yes, sir.

13        Q.  Keep them with you.  We'll go over those.

14    So that's -- altogether that's fine.

15        A.  Okay.

16        Q.  All right.  So let's look first at the

17    document that's titled Notice of Rule 30(b)(6)

18    Deposition.

19            Have you seen this before?

20        A.  I got my affidavit.

21            MR. BLANCHFIELD:  Let's see if you got it.

22            THE WITNESS:  No, it's not in there.

23            MR. BLANCHFIELD:  It's not in there?

24            THE WITNESS:  No.

25    BY MR. BENJAMIN:
```

**Trial Exhibit PX-248, page 9 of 79**

Darrel Scott Vannoy
March 13, 2026

```
 1        Q.   I tell you what.  You know what?  I'm
 2   going to share it on the screen, and you'll see this
 3   is not going to be -- I don't think there will be
 4   too many questions on this, so the screenshare might
 5   be fine.
 6             MR. BLANCHFIELD:  Oh, wait.  We got a hard
 7        copy here too, Jeremy.
 8             MR. BENJAMIN:  Okay.
 9             THE WITNESS:  Okay.
10             MR. BENJAMIN:  Perfect.
11   BY MR. BENJAMIN:
12        Q.   So, Warden, have you seen this notice of
13   your deposition today?
14        A.   Yes, sir.
15        Q.   Okay.  On the last page, page 5 --
16             MR. BENJAMIN:  And by the way, Leah, I'm
17        going to introduce this exhibit as Plaintiffs'
18        Exhibit 193.
19             (Plaintiffs' Exhibit No. 193 marked for
20             identification at 12:03 p.m.)
21   BY MR. BENJAMIN:
22        Q.   On the very last page, Warden, there are
23   three topics listed there, and you can read them for
24   yourself, but just to shorthand, those are the
25   Vannoy affidavit, which refers to your March 10,
```

Trial Exhibit PX-248, page 10 of 79

Darrel Scott Vannoy
March 13, 2026

1    2026, affidavit; the March 9, 2026, revisions to LSP

2    Directive 13.067; and the three memos, each dated

3    March 9th, 2026, that were attached to your

4    March 10th affidavit.

5        A.   Yes, sir.

6        Q.   You've been designated to testify on

7    behalf of DOC and Secretary Westcott on each of

8    those three topics.

9             You understand that?

10       A.   Yes, sir, I do.

11       Q.   And are you prepared to testify on behalf

12   of DOC as to those topics?

13       A.   Yes, sir.

14       Q.   All right.  What, if anything, did you do

15   to prepare to testify today with respect to those

16   topics?

17       A.   I reviewed all the 13.06 and the three

18   memos I put out on March 9th.

19       Q.   Okay.

20       A.   13.067, I'm sorry.

21       Q.   That's fine.

22            And now I'm going to ask you to take a

23   look at the other document that you have in your

24   hand, which is your affidavit.

25            MR. BENJAMIN:  And, Leah, I've put that

Darrel Scott Vannoy
March 13, 2026

```
 1        into the -- into the chat as well as Tab 2,

 2        Vannoy Affidavit.  I'd like to enter that as

 3        Plaintiffs' Exhibit 194.

 4             (Plaintiffs' Exhibit No. 194 marked for

 5             identification at 12:05 p.m.)

 6             THE WITNESS:  Okay.  I've got it.  I see

 7        it.

 8   BY MR. BENJAMIN:

 9        Q.   Okay.  I'm going to put it up on the

10   screen as well just for the sake of it, but feel

11   free to thumb through it where you need.

12        A.   I'm good.  I'm ready.

13        Q.   All right.  Is this document your sworn

14   affidavit from March 9th, 20 -- March 10th, sorry.

15   Is this -- let me rephrase that.

16             Is this document your sworn affidavit from

17   March 10th, 2026?

18        A.   Yes.

19        Q.   Okay.  And on the second page at paragraph

20   2 you state in that affidavit that "At the bench

21   trial in this matter, I testified that because we

22   have onsite automatic temperature monitoring at

23   Louisiana State Penitentiary through the Perry

24   Weather System, LSP would and could monitor

25   temperature year-round."
```

**Trial Exhibit PX-248, page 12 of 79**

Darrel Scott Vannoy
March 13, 2026

```
1              Do you see that?
2         A.   Yes, sir.
3         Q.   Okay.  I'm going to read you some
4    testimony that you gave on February 3rd, 2026, which
5    was the first day of the trial.  And I'm happy to
6    show it to you on the screen, if helpful, but I'm
7    just going to read this bit of testimony that you
8    gave, and my question is going to be whether this is
9    the testimony that you're referring to in paragraph
10   2 of your affidavit.
11             On page 198 of the February 3rd transcript
12   of the trial beginning at line 9, I ask you:
13                  "Q:  Under HCP8 if the heat index
14                  exceeds 91 degrees on a day outside
15                  of May through October, the policy
16                  does not mandate a heat alert be
17                  called, right?
18                  "A:  Not in writing, no, sir.
19                  That's what I like about the Perry
20                  Weather System.  It's going to
21                  alert us now in realtime.  So if
22                  it's in March, we have a heat alert
23                  of 88 degrees, it's going to alert
24                  our control center and they're
25                  going to call a heat alert.
```

Trial Exhibit PX-248, page 13 of 79

Darrel Scott Vannoy
March 13, 2026

```
 1                    "Q:  Under the January 9th, 2026,
 2                    version of LSP Directive 13.067,
 3                    there is still a heat season of
 4                    May 1st through October 31st,
 5                    right?
 6                    "A:  Yes, sir, that's correct.
 7                    "Q:  And under LSP Directive
 8                    13.067, if the heat index meets or
 9                    exceeds 88 degrees on a day outside
10                    of the May 1st through
11                    October 31st, the policy does not
12                    mandate that a heat alert be
13                    called, right?
14                    "A:  That's correct, but, you know,
15                    I testified earlier that policy can
16                    be changed, may be changed."
17          So that -- my question, Warden, is that
18    testimony that I just read, is that the testimony
19    that you're referring to in paragraph 2 of your
20    March 10 affidavit?
21          A.   I believe so, yes, sir.
22          Q.   Was there any other testimony that you
23    were referring to in this paragraph?
24          A.   Not that I can remember.  I was up there a
25    long time on that stand.
```

Trial Exhibit PX-248, page 14 of 79

1      Q.    Okay.  Well, let me ask you this.

2           Prior to renting that Perry Weather

3     system, LSP used the National Weather Service to

4     monitor the heat index.

5           You agree that the National Weather

6     Service monitors the heat index year-round, right?

7      A.    As far as I know, yes.

8      Q.    And you previously testified that it only

9     takes a few seconds to see what the heat index that

10    the National Weather Service was reporting and to

11    call a heat alert if it exceeds the heat alert

12    threshold, right?

13     A.    Correct.

14     Q.    So LSP has had easy access to year-round

15    heat index data for a long time, right?

16           MR. BLANCHFIELD:  Object to the form of

17          your question.  You can answer.

18           THE WITNESS:  We did have access to it;

19          however, it become unreliable.  They were

20          offline some.  We had to resort to going to the

21          New Roads monitoring system, and we felt like

22          that we could have our own here that would be

23          on Angola.

24           So, you know, we're 60 miles away from

25          Baton Rouge, and sometimes our weather is

 1         different, our temperatures are different than

 2         what's in Baton Rouge, so we -- as I testified,

 3         we went to the Perry Weather system.

 4    BY MR. BENJAMIN:

 5         Q.   Now, I understand that -- I understand the

 6    rationale for why you were saying you went to the

 7    Perry Weather system, but the -- it wasn't the fact

 8    that the National Weather Service was not reporting

 9    heat index data year-round that was the reason you

10    had a heat season in the first place, right?

11         A.   Yes.

12         Q.   So let me ask you this.

13              In addition to the capabilities of the

14    Perry Weather system that you refer to in your

15    affidavit, did you have any concern that following

16    trial the court might order LSP to eliminate the

17    heat season limitation in Directive 13.067?

18         A.   No, I did not have any concern about that.

19         Q.   In paragraph 3, the -- you state,

20    "Following the trial, I began working on changing

21    Directive 13.067 to remove the 'heat season' and to

22    monitor temperature and to call heat alerts

23    year-round."

24              When exactly did you begin working on

25    changing Directive 13.067 to remove the heat season

**Trial Exhibit PX-248, page 16 of 79**

Darrel Scott Vannoy
March 13, 2026

1    and to monitor temperatures and call heat alerts

2    year-round?

3         A.   I don't remember the exact date.  Maybe a

4    couple weeks after the trial we started talking

5    about it.  I talked to my attorney.  Warden

6    Oliveaux, I had her involved.  And, you know, I

7    decided to make the change before -- before it

8    started getting really warm in Louisiana, so I

9    changed it.

10        Q.   But if you remember, trial ended in -- on

11   I think February 10th.

12             Was it in February that you began working

13   on this -- these changes?

14        A.   We -- I think I started talking to Warden

15   Oliveaux probably the last part of February.

16        Q.   And what did you discuss with Warden

17   Oliveaux at that time?

18        A.   I wanted to take the May 1st through

19   October 1st out, make it year-round.  I wanted to

20   put memos out to the employees, to our control

21   center, and to the field staff, giving them an

22   instruction on what and how we were doing this.

23             I put -- I had met with Dr. Lavespere, our

24   department doctor, medical director, and asked him,

25   you know, what was his feeling on the time after the

**Trial Exhibit PX-248, page 17 of 79**

Darrel Scott Vannoy
March 13, 2026

1    heat alert is called to have them in, and he

2    recommended the 30 minutes, so I went with the

3    30 minutes on that.  I also wrote a memo to the

4    field staff.

5        Q.   Okay.  We'll get to the 30 minutes in a

6    moment.

7             Why was it Warden Oliveaux you turned to

8    first when you were thinking about revising

9    Directive 13.067?

10       A.   Warden Oliveaux is my chief policy person.

11   I depend on her for my policies.  She helps me, and

12   she does the typing on them and puts them out for

13   me.

14       Q.   Was she involved in any of the

15   decision-making with respect to that revision, or

16   was she just typing out the changes that you had --

17       A.   She typed -- she typed out the changes I

18   wanted to make.  That was my decision.

19       Q.   Okay.  So the aspects of 13.067 that were

20   revised were at your direction and were your

21   decision, correct?

22       A.   Correct, yes, sir.

23       Q.   You also mentioned that you spoke with

24   your attorney.

25             Is that Mr. Blanchfield, or was that

**Trial Exhibit PX-248, page 18 of 79**

Darrel Scott Vannoy
March 13, 2026

1    Mr. Vining, someone else?

2        A.    Mr. Blanchfield.

3        Q.    Okay.  Did you speak with others at DOC

4    other than Dr. Lavespere, who you already mentioned?

5        A.    No.

6        Q.    Okay.  And what was the process for

7    revising Directive 13.067 beyond just typing it out?

8    Did you need approvals?  Did you need to get any

9    sort of sign-off?  What was that process?

10       A.    I didn't need approval.  I have the

11   authority.  I talked to Mr. Blanchfield, told him

12   what I was going to do, and I made the change.

13       Q.    Okay.  So really it was just your

14   decision, you instructed Warden Oliveaux what to

15   write, and then you issued the revised directive,

16   correct?

17       A.    Correct, yes, sir.

18       Q.    Is LSP currently monitoring the heat index

19   outside of the heat season?

20       A.    Yes, sir.

21       Q.    When did -- when did LSP start monitoring

22   the heat index outside of the heat season?

23       A.    March 10th.

24       Q.    So the day after this directive came out,

25   you began monitoring the heat index.

**Trial Exhibit PX-248, page 19 of 79**

Darrel Scott Vannoy
March 13, 2026

1      A.   Yes, sir.  I think that we -- I think we

2   monitored it on March the 10th, that day.

3      Q.   Is there documentation showing that LSP

4   has been monitoring the heat index since March 10th?

5      A.   You can pull a copy of the Perry Weather

6   temperature times, the times that it's logged, you

7   can pull it at the end of the day, and that's what

8   we're doing now.  Before we were writing it down in

9   a logbook, but we have that available to us now that

10   we can pull that up.

11      Q.   Okay.  So -- oh, go ahead.  I thought you

12   were finished, I'm sorry.

13      A.   No.  I'll go ahead.  When the heat index

14   reaches 88, it will give an alert to the control

15   center, on the computer, and on the cell phone that

16   we have set up.  It will alert them, and then the

17   control center will call a heat alert.

18      Q.   Previously, prior to the Perry Weather

19   service, you were writing down or LSP staff was

20   writing down the heat index and other data in a

21   logbook.

22           You remember that?

23      A.   Yes, sir.

24      Q.   So you're no longer following that

25   process.  You will now have more of a computerized

**Trial Exhibit PX-248, page 20 of 79**

Darrel Scott Vannoy
March 13, 2026

1   report, is that correct?

2       A.   Correct, yes, sir.

3       Q.   And --

4       A.   It logs it every 15 minutes or 30,

5   whichever you prefer, but we're going to do 15.

6       Q.   Oh, you're saying the computer report

7   automatically logs every 15 minutes?

8       A.   Yes, sir.  You can set it to 15, 30,

9   whatever -- however you'd like to set it, but we're

10  doing it on 15 now.

11      Q.   And what does that look like?  Does it --

12  does anybody see that log, or does it just record

13  what the temperature -- or, sorry, what the heat

14  index is at that interval?

15      A.   Yes, sir.  We pull that log daily.  The

16  control center supervisor pulls it.

17      Q.   Meaning they export it and look at what

18  the log -- what the log of the preceding day stated.

19      A.   It's for that -- you can pull it up

20  anytime you want it.  It's constantly documenting.

21      Q.   I see.

22           Is it still the case -- is it still the

23  case that there's a computer screen in the control

24  center that has the heat index information on it and

25  the person in the control center can look over at

**Trial Exhibit PX-248, page 21 of 79**

Darrel Scott Vannoy
March 13, 2026

```
 1   that screen and determine what the heat index is at
 2   Angola?
 3        A.   Correct.  We have an employee that --
 4   Mrs. Fine.  That's what she does.  She sits at that
 5   desk and monitors that computer.
 6        Q.   Okay.  And the computer is spitting out
 7   that information now every 15 minutes.
 8        A.   Yes, sir.
 9        Q.   To your knowledge has LSP produced any of
10   that documentation in this lawsuit?
11        A.   No, sir.
12        Q.   Is LSP amenable to producing the Perry
13   Weather report to Plaintiffs' counsel?
14             MR. BLANCHFIELD:  We'll consider it.
15        You're talking about three days?
16             MR. BENJAMIN:  Well, I'm thinking about it
17        in terms of the reporting that Defendants are
18        to be doing on a weekly basis, if you could
19        include those Perry Weather monitoring reports.
20             MR. BLANCHFIELD:  Yeah, we'll -- we can
21        talk about that.  I don't see why not, but I
22        don't want to requestion and commit it on
23        record, but we can talk about it.
24             MR. BENJAMIN:  All right.  Thank you.
25   BY MR. BENJAMIN:
```

**Trial Exhibit PX-248, page 22 of 79**

Darrel Scott Vannoy
March 13, 2026

1      Q.   Now, Warden, you were talking about the
2  Perry Weather system sending an alert.
3           If the heat index meets or exceeds
4  88 degrees, it will send an alert to the phones?
5      A.   To a cell phone and to the computer.
6      Q.   Has a heat alert been called since the
7  installation of the Perry Weather system?
8      A.   One day in the afternoon, at 4:30 in the
9  afternoon.  One day.  To my knowledge.  That's all
10  I've been informed about.
11     Q.   Was that in -- was that in March?
12     A.   It was either -- it was either the last
13  week of February or the -- yes, sir, the first week
14  of March.
15     Q.   And do you know whether the Farm Line was
16  operating during that time?
17     A.   They weren't out.  It was at 4:30 and I
18  think it lasted maybe 15 minutes.
19     Q.   Paragraph 4 of your affidavit states that
20  "These changes" -- and that's referring to the
21  changes to Directive 13.067.  "These changes were
22  complete and the new version of 13.067 was signed on
23  March 9, 2026."
24     A.   Correct.
25     Q.   Has -- and that new version of Directive

**Trial Exhibit PX-248, page 23 of 79**

1    13.067, has that been distributed to staff?

2        A.    Yes.

3        Q.    Which staff?

4        A.    It goes out prison-wide.  Every unit

5    should have a copy of that now.

6        Q.    I see.  So it's not -- it goes to all

7    staff.  It's not specific to certain posts.

8        A.    No, sir.  It goes to the supervisors of

9    the camp.  We have roll call training that they

10   review new directives and new policies at roll call.

11   Each officer -- each line officer here doesn't get,

12   you know, a hard copy of that.  It's in their --

13   part of their training at roll call, part of roll

14   call training.

15       Q.    I see.

16             So the supervisor for each camp receives a

17   copy and --

18       A.    Yes, sir.

19       Q.    -- informs the staff working at that camp

20   about this revision.

21       A.    Correct.  The field supervisors have a

22   copy of it.  They read it at their roll call.

23   That's their roll call training, part of their roll

24   call training.

25       Q.    Does it get distributed or explained to

Darrel Scott Vannoy
March 13, 2026

1    the incarcerated men?

2        A.   No, they probably did not receive a copy

3    of that, no, sir.

4        Q.   Would they be aware of this change to

5    remove the heat season in Directive 13.067?

6        A.   Probably -- probably not.  You know,

7    someone -- maybe their field supervisor would tell

8    them.  You know, I don't know.  But probably not

9    officially, no.

10       Q.   And other than this roll call process that

11   you're mentioning, do you know whether there's been

12   any trainings on Directive 13.067 since its latest

13   revision?

14       A.   No, sir.

15       Q.   There have not been any trainings, is that

16   what you're testifying?

17       A.   Not to my knowledge other than the roll

18   call training.

19       Q.   Okay.  The revised directive is attached

20   as Exhibit 1 to your affidavit.  It begins at

21   Bates 033475.

22            I think you have that document in front of

23   you, right?

24       A.   Yes, sir, I do.

25       Q.   And this is the Directive Number 13.067

**Trial Exhibit PX-248, page 25 of 79**

Darrel Scott Vannoy
March 13, 2026

1    dated March 9, 2026.

2         A.   Yes, sir, that's correct.

3         Q.   This is the currently operative heat

4    pathology policy at LSP, right?

5         A.   Correct.

6         Q.   Okay.  And just skipping to the end of

7    that document, the last page, which ends with

8    Bates 33480, it states that, "This policy supersedes

9    Penitentiary Directive 13.067 dated January 9,

10   2026," right?

11        A.   Yes, sir.

12        Q.   Okay.  Let me ask you, is it correct to

13   say that the only change made in this most recent

14   revision of Directive 13.067 is the removal of

15   references to the May 1st through October 31st heat

16   season that previously limited when heat precautions

17   were mandated?

18        A.   That's correct.

19        Q.   No other changes, right?

20        A.   No other changes.

21        Q.   Were any other changes considered when you

22   were making this latest revision to Directive

23   13.067?

24        A.   Not at this time, no, sir.

25        Q.   Okay.  And just to be clear, was there any

**Trial Exhibit PX-248, page 26 of 79**

Darrel Scott Vannoy
March 13, 2026

1    change to the attachments to Directive 13.067 that

2    are referenced on the page that I'm showing you on

3    the screen, Attachments A, B, and C?

4         A.    The attachments basically give a little

5    more -- it's a reminder really is what it is of how

6    to handle the heat alerts and to refresh -- to

7    remind them that, you know, water and ice,

8    sunscreen.  Just a reminder basically.

9         Q.    And you're referring right now to the

10   memos that are attached to this affidavit, right?

11        A.    Correct, yes, sir.

12        Q.    We'll take a look at those in just a

13   minute.

14             I just want to make sure that the record's

15   clear.  There wasn't any change to Attachments A, B,

16   and C to Directive 13.067, which are the heat

17   pathology medications list, the medical exclusion

18   list, and the heat pathology staff training?

19        A.    No.  No other changes, no, sir.

20        Q.    Yeah.  Okay.  Now, I see that Dr. Toce

21   cosigned this policy with you.

22             What role, if any, did Dr. Toce play in

23   the revisions to Directive 13.067?

24        A.    He did not play a role in it.

25        Q.    He just signed off at the point it was

Trial Exhibit PX-248, page 27 of 79

1  ready.

2       A.   Yes, sir.

3       Q.   Okay.  Is this the final revision you

4  anticipate making to Directive 13.067?

5            MR. BLANCHFIELD:  Object to the form.  You

6       can answer.

7            THE WITNESS:  I don't know.  It's possible

8       that, you know, as we go on, if we can -- if I

9       see something that we can improve on, we'll

10      change it.

11  BY MR. BENJAMIN:

12      Q.   Fair.

13           Let me be a little more concrete.  When

14  you previously testified, you mentioned that, for

15  example, you might revise Directive 13.067 as early

16  as this summer with respect to the wet bulb globe

17  temperature.

18           Is that still a possibility in your mind?

19      A.   It is, yes, sir.  We just -- you know, we

20  don't know yet.  I have to wait to get that data.

21      Q.   But it's possible then that there might be

22  another revision this summer.

23      A.   Yes, sir, it's possible.

24      Q.   Are there -- other than the wet bulb globe

25  temperature, are there any other items that you

1    currently have in mind that could potentially result

2    in revisions to Directive 13.067?

3        A.    I don't know if it would -- if I'd revise

4    13.067, but when I got here, I'd ordered a

5    greenhouse.  The greenhouse is in.  I'm in the

6    process of having it constructed.

7            When it's up, I met with my horticulture

8    inmate tutors.  We're ordering books.  When I get

9    the greenhouse up and we're ready, in the afternoons

10   when the guys go in, we will let them have their

11   lunch, their lunch break, and then we'll start

12   letting them go to class in a classroom setting for

13   horticulture.

14           We're going to get them, at the very

15   minimum, a certificate of completion and put it in

16   their file and, you know, they will learn

17   horticulture from the ground up, no pun intended.

18   But, you know, planting the seeds, growing the

19   plant, transplanting the plant, tending, growing it,

20   all the way through harvest.

21       Q.    And is that -- that plan that you have in

22   mind that you just described, is that what you're

23   referring to in your affidavit about the class?  You

24   referenced a class that might be offered?

25       A.    Yes, sir.  We will be doing that in the

Darrel Scott Vannoy
March 13, 2026

1   near future.

2          Q.   Okay.

3          A.   The -- as I said, the greenhouse is being

4   constructed as we speak.  It will be right over in

5   the vegetable field, the greenhouse will be.

6               I know that you're familiar with the ice

7   house.  We mentioned the ice house.  It's going to

8   be right behind that ice house right up next to that

9   vegetable field.  That's where the greenhouse will

10  be.

11         Q.   Okay.  I'm going to come back to the class

12  in just a minute, but that's helpful context.

13              So possible you might revise Directive

14  13.067 later this summer once you get some data on

15  wet bulb globe temperature.

16         A.   Correct.

17         Q.   Possible -- and it's also possible that

18  you might or might not revise Directive 13.067 to

19  include a reference to this class that you're

20  mentioning.

21              Any other issues that you have currently

22  in mind that could lead to a revision to Directive

23  13.067?

24         A.   Yeah, and I don't know if I would put

25  it -- if I would put this class.  I may make another

Trial Exhibit PX-248, page 30 of 79

Darrel Scott Vannoy
March 13, 2026

 1    directive separate and apart from 13.067.  That's

 2    probably what I'll do with the class.

 3         Q.   Okay.

 4         A.   But as of right now, no, sir, I don't have

 5    any -- anything that I'm looking at right now other

 6    than that.  We're going to try to get that off the

 7    ground, see how that works.

 8         Q.   Okay.  Looking back at your affidavit,

 9    paragraphs 5 through 7, which appear on the page

10    with the Bates stamp 33474, describe three memos

11    that you prepared to outline the changes to

12    Directive 13.067, one going to all staff, one going

13    to control center staff, and one going to field

14    staff, right?

15         A.   That's correct.

16         Q.   When did you begin working on the memos

17    referenced in paragraphs 5 through 7?

18         A.   About the time that I started with the

19    change on 13.067, taking the dates out.

20         Q.   It was all part of the same package.

21         A.   It was all part of the same package, yes,

22    sir.

23         Q.   And were the same people involved, namely

24    Warden Oliveaux, Dr. Lavespere, and your counsel?

25         A.   Correct.

**Trial Exhibit PX-248, page 31 of 79**

Darrel Scott Vannoy
March 13, 2026

1        Q.    And what was -- what was the role that

2    Dr. -- sorry, that Warden Oliveaux played with

3    respect to those memos?

4        A.    Well, the same role that she played in

5    typing up 13.067.

6        Q.    I see.

7              So she wasn't involved necessarily in the

8    deciding what was going to be included in those, but

9    she more or less transcribed what you asked for?

10       A.    I sat down and I discussed with her, you

11   know, what I wanted to do and made sure she

12   understood it, but it was my decision.

13       Q.    Okay.  And what was the role of

14   Dr. Lavespere?

15       A.    Dr. Lavespere's only role, I consulted

16   with him on what he thought was a reasonable time

17   after the heat alert was called to have them on

18   their way in, and he suggested the 30 minutes, so I

19   accepted his recommendation and we're going to do

20   the 30 minutes.  And I have reemphasized that with

21   field staff that that has to take place.

22       Q.    Okay.  Was that -- was the 30 minutes

23   based on Dr. Lavespere's sort of medical opinion

24   about what time -- I'm sorry, let me --

25       A.    I -- I asked his opinion and, you know,

Darrel Scott Vannoy
March 13, 2026

```
 1      "What do you think is a proper amount of time after
 2      the heat alert is called to have them on that bus
 3      and on their way in," and he told me 30 minutes.
 4            Q.   Okay.  Did you consult --
 5            A.   But I --
 6            Q.   Go ahead.
 7            A.   I wanted to -- I wanted to add this.  When
 8      the heat alert's called, all work is stopped.  You
 9      know, their -- until they're loaded, they're going
10      to be under that shade pavilion with a fan or ice
11      water.  Until that -- until they're loaded on that
12      bus, all work will be stopped, and they will be
13      sitting in the shade until they're ready to load
14      them on that bus.  They'll have water and fans.
15            Q.   And is that included anywhere in Directive
16      13.067?
17            A.   No, sir.
18            Q.   Is that included in the memos to your
19      recollection?
20            A.   No, sir.
21            Q.   And when you're saying all work will stop,
22      do you mean all work or all work for the men with
23      the heat precaution duty status?
24            A.   All work for the men with the heat
25      precaution duty status.
```

**Trial Exhibit PX-248, page 33 of 79**

```
 1        Q.   I see.  Okay.
 2             Did you consult with any of your security
 3   or field operations staff with respect to the three
 4   memos described in paragraphs 5 through 7?
 5        A.   No.
 6        Q.   Did you need to get any approval for those
 7   memos?
 8        A.   No, sir.
 9        Q.   So we've been talking about the directive,
10   which is an LSP policy, right?
11        A.   Correct.  It's a penitentiary directive.
12        Q.   It's a penitentiary-specific directive.
13        A.   Yes, sir.
14        Q.   And then we've been talking about memos,
15   which are the three memorandum that you sent out the
16   same day you issued the revised directive, right?
17        A.   Yes, sir.
18        Q.   Just to be clear about what the relative
19   position is with respect to a directive on the one
20   hand and a memo on the other hand, is it fair to say
21   that the memo is less formal than the DOC directive,
22   right?
23        A.   It's less formal, but it has to be
24   followed.
25        Q.   Okay.  And I think I misspoke.  I meant to
```

Trial Exhibit PX-248, page 34 of 79

 1  say the memo is less formal than the LSP directive.

 2      A.   Yes, sir, but it's -- it's basically a --

 3  you know, a written order.

 4      Q.   Is it fair to say that it's easier to

 5  issue a memo than a directive?

 6      A.   Not -- not really.  Either one of them

 7  is -- the directive is a little more detailed than

 8  what the memo is.  Those memos just outline the

 9  specific changes and are reminders of what needs to

10  be done in their job capacity.

11      Q.   The memo sort of sets some expectations

12  for staff.

13      A.   Correct.

14      Q.   And the expectations are sort of

15  formalized in the directive.

16      A.   That's correct, yes, sir.

17      Q.   And maybe -- okay.

18           Is it easier to revise a memo than it is

19  to revise a directive?

20      A.   No, sir.

21      Q.   And is it easier to withdraw a memo than

22  it is to withdraw a directive?

23      A.   No, sir.

24      Q.   Okay.  So in your mind they sort of are

25  equally formal?

Darrel Scott Vannoy
March 13, 2026

1        A.    Yeah, and I have the authority -- you
2    know, I'm not limited on my authority to do -- make
3    changes, or if I wanted to, you know, completely
4    change -- take one out and replace it, you know, I
5    have the authority to do that.
6        Q.    As long as it doesn't conflict with a DOC
7    policy, right?
8        A.    Yes, sir.  I have to -- you know, I have
9    to stay within my guidelines, but I have a lot of
10   latitude to do what I need to do.
11       Q.    What happens if there's a conflict between
12   a memo and a policy?  Which one controls?
13       A.    The policy controls, but I -- you know, I
14   would be very careful not to put out a conflicting
15   memo that would be against the departmental reg.
16       Q.    Or the facility-specific directive.
17       A.    Correct.  That's what I'm calling a
18   penitentiary directive.
19       Q.    Yeah.  Okay.
20             Let's look at the first of the three memos
21   that is -- that are attached to the affidavit.  This
22   is Exhibit 2 to the affidavit.  It is a March 9,
23   2026, memo to LSP employees bearing the subject
24   "Heat Precautions," and it begins at Bates stamp
25   33481.

Darrel Scott Vannoy
March 13, 2026

```
 1              You see that, right?

 2       A.    Yes.

 3       Q.    So this -- this memorandum went to all LSP

 4   staff?

 5       A.    Yes.

 6       Q.    And how was it distributed?  Is it through

 7   that roll call process that you mentioned?

 8       A.    Yes, sir.  As I mentioned, the line staff

 9   are not going to get a hard copy of this.  It's

10   going to be roll call training.

11       Q.    And --

12       A.    Basically this directive just reinforces

13   the Penitentiary Directive 13 -- 13.067, and it took

14   the May 1st through October 31st.  That's not

15   mentioned anymore.

16       Q.    And why does this directive -- sorry, why

17   does this memorandum need to go to everyone who

18   works at LSP?

19       A.    Well, the -- our inmates are in their

20   custody, you know, everywhere, in cell blocks,

21   whatever, and they need to know our heat precaution

22   procedures.

23       Q.    Am I --

24       A.    This was just a reinforcement from the

25   13.067 policy change.  If you'll look at number 1,
```

**Trial Exhibit PX-248, page 37 of 79**

Darrel Scott Vannoy
March 13, 2026

1    it says, "Heat Precaution Procedures shall be

2    followed year round."  That took the May 1st through

3    October 31st out.

4         Q.   Right.

5              Am I right that the -- all of the

6    directives -- all of the penitentiary directives are

7    stored in PowerDMS?

8         A.   Yes.

9         Q.   Are the memos also stored in one place so

10   that staff can access them?

11        A.   I don't know if they're in PowerDMS.  I

12   don't know that.

13        Q.   But there's -- do they exist somewhere

14   that everybody can access them?

15        A.   Yeah, all the supervisors can access them.

16   Yes, sir.

17        Q.   I see.  All the -- okay.

18        A.   An officer in a dorm or cell block, he's

19   not going to have the ability to pull that up.

20        Q.   But is he --

21        A.   But they are trained and they sign for

22   their training.

23        Q.   Has there been training on this March 9,

24   2026, memorandum?

25        A.   These memorandums are being read at roll

**Trial Exhibit PX-248, page 38 of 79**

Darrel Scott Vannoy
March 13, 2026

1   call, yes, sir.

2        Q.   Okay.  So that's the training is that they

3   get read at the roll --

4        A.   Yes.

5        Q.   -- call.  Okay.

6        A.   Absolutely.

7        Q.   All right.  So this memo states that

8   "Penitentiary Directive Number 13.067 'Heat

9   Precautions' has been updated effective March 9,

10  2026.  Some key changes in this policy are," and

11  then is lists three categories of changes, is that

12  fair?

13       A.   That's fair, yes, sir.

14       Q.   Okays.  The first one is the one you just

15  referenced, "Heat Precaution Procedures shall be

16  followed year round."

17            That refers to the removal of the heat

18  season that you've been testifying about, right?

19       A.   Correct, yes, sir.

20       Q.   Okay.  And then this memorandum lists

21  several bullets under Indoor Procedures, and several

22  more under Outdoor Procedures.

23            Do you see that?

24       A.   I do.

25       Q.   Now, none of those bullets under Indoor

**Trial Exhibit PX-248, page 39 of 79**

Darrel Scott Vannoy
March 13, 2026

 1    Procedures or Outdoor Procedures relates to any

 2    change that was made in Directive 13.067 in March of

 3    2026, right?

 4         A.   It takes the May 1st through October 31st

 5    out on the indoor procedures.  It's basically what

 6    was in 13.067.  Same with the outdoor.

 7         Q.   Right.  I guess --

 8         A.   And --

 9         Q.   I guess just to be clear, what I was

10    saying is the only change that was made in March of

11    2026 is that the heat precaution procedures shall be

12    followed year round.  They removed the May 1st

13    through October 31st limitation.

14         A.   Correct.

15         Q.   And so then the bullet points under --

16    under Indoor Procedures and Outdoor Procedures

17    basically restate or paraphrase provisions of

18    Directive 13.067 that preexisted this most recent

19    revision, right?

20         A.   Yes, sir.

21         Q.   The last bullet point under Outdoor

22    Procedures states that "When the heat index reaches

23    113 degrees Fahrenheit, an announcement shall be

24    made for all outdoor work to cease."

25              You see that?

Darrel Scott Vannoy
March 13, 2026

```
 1        A.   I do.  We're going to --

 2        Q.   And that -- I'm sorry, say that again?

 3        A.   We will stop it at 110.

 4        Q.   But the Directive 13.067 says --

 5        A.   -- stop till 113, but we're going to stop

 6   it at 110.

 7        Q.   And just to be clear, Directive 13.067

 8   mandates that work stop at 113 degrees Fahrenheit,

 9   right?

10        A.   Correct.

11        Q.   And that's what this memorandum to all

12   staff says.

13        A.   Yes, sir.

14        Q.   Okay.  The next memorandum that's attached

15   to your affidavit, it's attached as Exhibit 3, is

16   also dated March 9th, 2026, and it is sent to -- or

17   it is addressed to LSP control center staff and

18   bears the subject line "Heat Precautions."

19             Do you see that?

20        A.   Yes, sir.

21        Q.   Okay.  This memorandum, which begins at

22   Bates stamp 033483, this memorandum was provided

23   only to those LSP staff who work in the control

24   center?

25        A.   Yes, sir, it's for the control center.
```

Darrel Scott Vannoy
March 13, 2026

```
 1          Q.   And that's the building where --
 2          A.   When you took your tour --
 3          Q.   -- people were monitoring the heat
 4    index and --
 5          A.   When you came in, you saw the -- where the
 6    computer was?  That's where it's at.
 7          Q.   And that's -- this control center staff,
 8    they're the ones that are monitoring the Perry
 9    Weather system data you were describing.
10          A.   Yes, sir, that's correct.
11          Q.   Now, these same people in the control
12    center would have also received on this same date
13    the all staff memo, right?
14          A.   Yes, sir.
15          Q.   And how was this memo to control center
16    staff distributed?
17          A.   It's the same way as all of them are.
18    It's sent out to the control center supervisors, and
19    they train their staff on -- at their roll call.
20          Q.   Okay.  And this -- you -- is it fair to
21    say that you wrote this memorandum separately to set
22    forth the sort of more specific expectations for
23    control staff with respect to heat monitoring?
24          A.   Yes, sir.  The one that I put out to all
25    employees had the 113 degrees, and the control
```

**Trial Exhibit PX-248, page 42 of 79**

Darrel Scott Vannoy
March 13, 2026

1    center, they know when it gets to be 110 to put the

2    alert out and we'll stop work.

3            Also, it gives them every 30 minutes, but

4    that's recorded now, but we're doing the 15 just as

5    a precaution, as I told you a while ago, and

6    basically that's the only changes that I made for

7    the control center staff.

8        Q.   Okay.  So this memorandum states that

9    monitoring should occur every 30 minutes, right?

10       A.   But we're going to do 13, just like we're

11   going to stop that work at 110 instead of 113.

12       Q.   Fair.  I think you might have misspoken.

13           You're going to -- the memorandum says

14   that you're going to monitor every 30 minutes, but

15   you're testifying that you're actually going to do

16   it every 15 minutes?

17       A.   We have the Perry Weather where it's

18   giving us -- where on that printout, it's printing

19   out 15-minute increments.

20       Q.   And what does control center staff do

21   every 15 minutes?  Do they -- what do they do to

22   monitor this?

23       A.   Well, they have it on their -- it's on

24   their screen, the temperature and the heat index

25   temperature.  They just monitor that, and Perry

**Trial Exhibit PX-248, page 43 of 79**

Darrel Scott Vannoy
March 13, 2026

1  Weather will send the alert when it gets to be 88,

2  and then they make the proper notifications.

3          At the end of the day, they pull the

4  documentation from the Perry Weather system where

5  it's recorded the time -- the date, the time, and

6  the temperature, and they pull that and keep a copy

7  of it every day.

8      Q.   Okay.  So just bear with me to make sure I

9  understand this.

10          You got the control center staff begins

11  monitoring at eight a.m.  They look at their screen

12  and they see what the heat index -- what the Perry

13  Weather system is saying the heat index is, is that

14  right?

15      A.   Yes, sir.  There's someone at that desk

16  24/7.

17      Q.   Okay.  And then they do their work, and

18  then at 8:15 they look at the screen and they see

19  what the Perry Weather system is saying the heat

20  index is.

21      A.   Correct.  They monitor that screen, and

22  when it gets to be 88, it's going to send them, you

23  know, an alert.

24      Q.   And so say it gets to be 8:23, they

25  checked at 8:15, it was, you know, 87, at 8:23, it

Trial Exhibit PX-248, page 44 of 79

Darrel Scott Vannoy
March 13, 2026

1   hits 88 degrees.  An alert is going to come out, and

2   that will come out even though they're not looking

3   at the screen at that time?

4       A.   Yes, sir.  If they're not looking, they're

5   going to hear that alert.

6       Q.   Okay.  And then they will, again, look at

7   the heat index at 8:30, maybe it's --

8       A.   If it's 88 --

9       Q.   -- 91 -- oh, go ahead.

10      A.   If it's 88 at 8:23, like you said, the

11  work's going to stop.  They're going to go in.  If

12  it goes down, you know, below 88, those guys are

13  already -- they're going to be brought in.

14      Q.   And when you say those guys are going to

15  be brought in, you're referring only to those men

16  with the heat precaution duty status.

17      A.   That is correct, yes, sir.

18      Q.   Everybody else is going to keep working.

19      A.   Yes, sir, until it gets --

20      Q.   And --

21      A.   -- it gets to be 110, we're going to stop.

22      Q.   Okay.  So the control center staff will

23  continue looking every 15 minutes even after a heat

24  alert has been called to see what the heat index is.

25      A.   Yes, sir.

**Trial Exhibit PX-248, page 45 of 79**

Darrel Scott Vannoy
March 13, 2026

```
 1        Q.   And the guys who don't have heat
 2   precaution duty status will keep working during that
 3   time.
 4        A.   That's correct, yes, sir.
 5        Q.   And when it hits -- assume it hits 110,
 6   control staff will know that because they've
 7   continued to look at the screen every 15 minutes.
 8        A.   Yes, sir.
 9        Q.   Okay.  There's not -- is there an alert
10   that goes off at 110?
11        A.   No, sir.
12        Q.   Okay.
13        A.   We can make it do that.
14        Q.   But they're going to -- they're going to
15   pick it up because they are looking at it
16   periodically.
17        A.   Yes, sir.  And when it gets -- you know,
18   that air, when it gets 104, 105, you're looking at
19   temperature pretty regular.  It's hot.
20        Q.   And you mentioned earlier that -- well, in
21   this memorandum, I think it's stating something that
22   you were testifying about.  "As a reminder Perry
23   Weather Station will send an alert to Control Center
24   once the heat index reaches 88 degrees Fahrenheit,"
25   and you mentioned that it did reach 88 degrees
```

**Trial Exhibit PX-248, page 46 of 79**

Darrel Scott Vannoy
March 13, 2026

1    Fahrenheit in the recent weeks.

2         A.    One day, and it was at 4:30.

3         Q.    Okay.

4         A.    But everybody was in their living areas.

5    No one was out at work.

6         Q.    And do you know, did the alert go off?

7         A.    I didn't ask that specific question.  They

8    called me -- someone called me and notified me that

9    it hit 88 for 15 minutes at 4:30.

10         Q.    Okay.  Do you know whether there's

11    anything special that happens in the report when an

12    alert goes off?  Like does the report indicate that

13    an alert has gone off?

14         A.    I don't know that if that report -- it's

15    going to log the temperature.  I don't know if it's

16    going to say an alert went off.

17         Q.    Okay.

18         A.    It will log the time and the date and the

19    temperature.

20         Q.    I see.

21             And then in this memo both in the

22    paragraph that begins with the number 3 and the

23    paragraph that begins with Note, the memorandum

24    instructs that when the heat index reaches

25    110 degrees, the control center is to notify certain

**Trial Exhibit PX-248, page 47 of 79**

Darrel Scott Vannoy
March 13, 2026

1   senior staff, yourself included, and to make an

2   announcement on the radio that all outdoor inmate

3   workers shall stop and return to their housing units

4   immediately.  That's --

5       A.   Correct.

6       Q.   -- the process you were testifying about

7   earlier?

8       A.   Correct, yes, sir.

9       Q.   Has that ever happened, that the heat

10  index hit 110 degrees and control staff made this

11  call to the senior staff and made the announcement

12  over the radio?

13      A.   I don't -- I don't remember it.  I think

14  someone told me that while I was gone after I

15  retired that it did hit I think 106 one day.  They

16  told me that, but I forgot who told me that.  But

17  that was not while I was here.  I was gone.  I don't

18  recall any days of it being 110.

19      Q.   Okay.  Now, on the day -- on the same day

20  that the control staff got this memorandum stating

21  what they should do when the temperature hits

22  110 degrees, they also got the memorandum to all

23  staff saying that outdoor work should cease at

24  113 degrees.

25           Have there been any questions about which

Trial Exhibit PX-248, page 48 of 79

Darrel Scott Vannoy
March 13, 2026

1    of those two thresholds is the right one?

2        A.    They know the right one, it says to LSP

3    control center staff.  They know that one's theirs.

4        Q.    But -- and the same day they also would

5    have received Directive 13.067 itself, which states

6    that outdoor work should cease at 113 degrees,

7    though.

8        A.    Yes, they probably got that one too, but

9    this one is directed specifically to them.  They

10   know 110.

11       Q.    Was there any training other than the roll

12   call announcement that you mentioned that was given

13   to control staff on the contents of this memo?

14       A.    No, sir.  Now, during the year when they

15   have their in-service -- I think in April they're

16   trained on it.  They'll be retrained on this again.

17   I think it's April.  I have to look at the

18   directive, but I believe it's April that they do

19   in-service on heat precaution.

20       Q.    Is that April date, that's specific to

21   control center staff, or does that --

22       A.    That's all --

23       Q.    -- more widely?

24       A.    That's all the employees.

25       Q.    Okay.  Everybody at LSP's going to be

Darrel Scott Vannoy
March 13, 2026

1   trained in April on the heat pathology policies.

2       A.   Yes, sir, I think April is the month that

3   they do that training.

4       Q.   Okay.  The third memo that's attached to

5   your affidavit as Exhibit 4 begins on Bates 33484 is

6   a memorandum dated March 9, 2026, and this one is

7   addressed to LSP field operations staff, and it also

8   bears the subject "Heat Precautions."

9       A.   Correct.

10      Q.   I think this is probably going to be the

11  same answer, but was this memorandum distributed in

12  the same manner that the other two were, namely to

13  supervisors who then would read it out at roll call?

14      A.   Yes, sir.

15      Q.   Specifically, do you know who -- which

16  supervisors in the field operations staff would have

17  received this memo?

18      A.   Warden Roland Sylvester, Colonel Britt

19  Rosso for sure.  It's their responsibility to be

20  sure that that training is done at roll call.

21  They're the two responsible for that.

22      Q.   Okay.  And which -- which posts are

23  covered under the field operations staff?

24      A.   You're talking about what areas?  What --

25  can you be a little more specific about that?

Trial Exhibit PX-248, page 50 of 79

Darrel Scott Vannoy
March 13, 2026

1       Q.   Yeah, I'm just trying to find out who --

2   with the control center it's those -- it's the

3   people that work in that room with the computers and

4   monitor the Perry Weather service.  I'm trying to

5   understand who it is that qualifies as field

6   operations staff under this --

7       A.   Okay.  I gotcha.  Yes, sir, it would be

8   all supervisors that are assigned to the field

9   operations, all the line staff, the sergeants, the

10  master sergeants, the gun guard officers, the line

11  foremen.  That's the ones that are working out in

12  the vegetable fields.

13           We have another operation that falls under

14  the field, road, and levy.  That's like our heavy

15  duty equipment.  But everybody that's assigned to

16  the field operations would get this.

17      Q.   Okay.  What about the people that escort

18  men to and from the Farm Line?

19      A.   They are part of the field operations.

20      Q.   Okay.

21      A.   Most of those are supervisors --

22      Q.   I see.

23      A.   -- that do the escorting.

24      Q.   Now, this memorandum to the field

25  operations staff state -- begins by stating,

Trial Exhibit PX-248, page 51 of 79

1    "Penitentiary Directive 13.067 'heat precautions'

2    has been updated effective March 9, 2026."  And then

3    it states, "Some key reminders for Field Operation's

4    staff are," and it goes on to state a number of

5    different issues in the following bullet points,

6    right?

7         A.   Yes, sir.  The number 1 is that "Heat

8    Pathology Procedures shall be followed year round

9    effective March 10th."

10        Q.   And that first bullet point, that's the

11   thing that's changed --

12        A.   Yes, sir.

13        Q.   -- in March 2026.

14             (At 1:05 p.m., the court reporter lost

15             internet connection.)

16             (Recess taken from 1:05 p.m. to 1:19 p.m.)

17   BY MR. BENJAMIN:

18        Q.   Warden, I'm afraid we're just going to go

19   back over a couple things.  We'll try to go through

20   them quickly, and then we're getting close.

21        A.   All right.

22        Q.   So, Warden, you agree that many of the

23   bullets listed here in this memorandum do not appear

24   in Directive 13.067, right?

25        A.   Yes, sir.  The only one that -- if you go

Darrel Scott Vannoy
March 13, 2026

1  to the outdoor, 13.067, look at the outdoor on 1A

2  and on number 3 on the policy for the -- let's see.

3  I got the wrong policy.  Let me get back to the

4  right one.

5          It talks about the shade areas for breaks.

6  That's in the new 13.067, and that's on the field

7  operations memo that I put out to them on the --

8      Q.   Maybe I can be a little more specific.

9          There are things like the placement of the

10  drinking coolers that are listed in this memorandum

11  to field staff that is not included in 13.067,

12  right?

13      A.   Correct, yes, sir.

14      Q.   And there are things in the shaded area of

15  a break, for example, the time to walk to and from

16  the shaded rest area is not counted in the rest time

17  period.  That's not in 13.067, right?

18      A.   That's correct, yes, sir.

19      Q.   So there's -- there are a number of

20  different bullets in this memorandum that do not

21  appear in the directive, correct?

22      A.   Correct.

23      Q.   Okay.  Now, one of those items that

24  appears in this memorandum but not in Directive

25  13.067 is found in the first bullet point on page 2,

Trial Exhibit PX-248, page 53 of 79

1    and it says, "Once the heat alert has been

2    announced, all inmates with heat precaution duty

3    status shall be brought indoors within 30 minutes of

4    the announcement."

5              That requirement that people with heat

6    precaution duty status shall be brought indoors

7    within 30 minutes of the announcement does not

8    appear in Directive 13.067, right?

9         A.   Correct.

10        Q.   And that requirement does not appear in

11   any other policy or directive, correct?

12        A.   Not to my knowledge, no, sir.

13        Q.   So when LSP decided to revise Directive

14   13.067, even though DOC's medical director had

15   advised that men with heat precaution duty status

16   should be brought indoors within 30 minutes of the

17   issuance of a heat alert, LSP chose not to include

18   that in its revised heat pathology directive, right?

19        A.   Correct.  I thought it better in the memo

20   to the field staff.

21        Q.   And you didn't discuss whether to include

22   that provision in Directive 13.067 with anyone,

23   right?

24        A.   That's correct.

25        Q.   When LSP was revising -- well, scratch

Darrel Scott Vannoy
March 13, 2026

 1   that.

 2           Previously you testified that there may be

 3   reasons that prevented men with heat precaution duty

 4   status from being brought inside in a timely fashion

 5   after a heat alert was called, right?

 6       A.   You'll have to fresh my memory on that

 7   one.  I don't...

 8       Q.   I think you said you don't know -- do you

 9   remember we looked at a few instances where there

10   was periods a lot longer than 30 minutes and men had

11   not been brought in despite having heat duty status

12   and a heat alert being called.

13           Do you remember that?

14       A.   I remember that, yes, sir.

15       Q.   And you said you didn't know, but maybe

16   there was something going on that day that may have

17   prevented the men from being brought in.

18       A.   Correct, I remember saying that.

19       Q.   Is that still true?  There may be things

20   that are happening on a given day that may prevent

21   men from being brought in within this 30-minute

22   period?

23       A.   No, sir.  We're going to have somebody

24   bring them in.

25       Q.   What changed?

**Trial Exhibit PX-248, page 55 of 79**

1    A.    My memo.  It shall be 30 minutes.

2    Q.    So the memo means that whatever was

3    keeping people from not bringing men in after a heat

4    alert had been called --

5    A.    Well, I guess the best way I could answer

6    you, I don't know why that was -- why they were late

7    on those days that you showed me that you talked

8    about, but there will be no more late days.

9    Q.    Okay.  Now, the last bullet on this

10   memorandum to field operations staff states that,

11   "When the heat index reaches 113 degrees Fahrenheit,

12   an announcement shall be made for all outdoor work

13   to cease and all inmate shall return to their

14   housing location."

15          You see that?

16   A.    I do, yes, sir.

17   Q.    Okay.  So the expectation for field

18   operations staff is that outside work should cease

19   at 113 degrees Fahrenheit, right?

20   A.    That's correct.

21   Q.    Was there any training beyond the roll

22   call process that you described with respect to the

23   contents of this memorandum to field staff?

24   A.    No, sir.  That would be it.

25   Q.    Okay.  All right.  In paragraph 8 of your

1    affidavit, you state that, "LSP will also implement

2    an additional class offered to Farm Line workers in

3    the afternoons where inmates will learn about the

4    crops that LSP grows and how they are grown.  We

5    will offer a certification following completion of

6    this class."

7              You see that?

8         A.   Yes, sir.

9         Q.   And this is the class that you were

10   describing earlier, right?

11        A.   That's correct.

12        Q.   Okay.  You may have stated this, but am I

13   right that there's not currently a class that's

14   being offered to men on the Farm Line that teaches

15   about the crops being grown at LSP?

16        A.   No, sir, not yet.  We have ordered some

17   books for the instructors, and I'm getting the

18   greenhouse up and going before we can -- we can --

19   when our books come in, we'll probably start the

20   classroom stuff, but I'll probably have the

21   greenhouse up before the books get in, if you want

22   to know the truth.

23        Q.   When is that going to happen?

24        A.   We're putting the greenhouse up right now.

25   It's not going to take very long.  Probably

Darrel Scott Vannoy
March 13, 2026

1    two weeks it will be up.  We have to do a little

2    dirt work.  It rained real hard, and we're kind of

3    waiting on the ground to dry another day or so, but

4    we'll get the dirt work on it, it will go up quick.

5    I have a special crew assigned to it to get it up.

6        Q.   Who's assigned to put it up?

7        A.   I have a special inmate crew that are real

8    good tradesmen that are going to put it up for me.

9        Q.   Okay.  Those are not -- it's not men on

10   the Farm Line?

11       A.   No, sir.  This is -- this is carpenters

12   and stuff like that that have trade that are going

13   to put it up.

14       Q.   Okay.  When did you order the greenhouse?

15       A.   Oh, I don't remember.  It took a while for

16   it to come in.  I don't know when we ordered it.  I

17   can't remember.

18       Q.   Do you remember if it was before or after

19   trial?

20       A.   Oh, it was before trial.

21       Q.   Okay.  And you mentioned books.

22            When did you order those?

23       A.   I don't know, and I don't know the status

24   of them, but I --

25       Q.   What books -- oh, go ahead.  I'm sorry.

Trial Exhibit PX-248, page 58 of 79

      1          A.   The inmate tutors, when I met with them,

      2     they told me they needed books, and I told them, you

      3     know, to put the request in and get them ordered and

      4     we'd buy them, and as soon as they get in, we'll get

      5     started.

      6          Q.   Okay.  And which books did you order?

      7          A.   I don't know.  They -- I left that up to

      8     the tutors.  They know what they need.

      9          Q.   So is it these tutors that are going to

     10     teach the class?

     11          A.   Yes, sir.

     12          Q.   Okay.  Anybody else going to teach?

     13          A.   Not right now.  I'm actually looking for

     14     someone that's retired in the field of horticulture

     15     that I could hire, employ, to kind of oversee the

     16     tutors, but I haven't found anyone yet.  But I am --

     17     I do have a search out there.  We're looking.

     18          Q.   So you're looking to hire somebody as an

     19     LSP staff person, it's not going to be a volunteer?

     20          A.   I would take a volunteer, but if I can,

     21     you know, hire one, I'll hire one.  I would

     22     definitely take a volunteer.

     23          Q.   What credentials are you looking for for

     24     this person --

     25          A.   I'd like to have someone that has

Darrel Scott Vannoy
March 13, 2026

1    expertise in the -- you know, in the horticulture

2    field, the proper training, someone that's, you

3    know, a certified horticulture person.

4        Q.   Okay.  And you did mention inmate tutors

5    that you've been speaking with.

6             Who is that?

7        A.   It's three of them.  I don't remember

8    their names.  I've met with them one time, but I

9    can't remember their names right now.

10       Q.   Why were they selected?

11       A.   I wouldn't mind providing you their names.

12   I wouldn't mind giving them to you.

13       Q.   That's fine.  I would like that.

14            What was it that caused you to select

15   these three individuals?

16       A.   They've been through -- at one time we had

17   a horticulture teacher here, and they've got all of

18   their certifications.  They're certified.

19       Q.   Okay.  And that was part of the

20   horticultural -- sorry, the horticulture program

21   that previously existed at LSP, right?

22       A.   That we had, yes, sir.

23       Q.   And these tutors earned licenses through

24   that previous horticulture program?

25       A.   Yes, sir, and they're up to date with

**Trial Exhibit PX-248, page 60 of 79**

1    their credentials.

2        Q.   Is the class that you have in mind, is

3    that just reviving the prior horticulture program,

4    or is that something -- or is it something

5    different?

6        A.   Well, yes, sir, you know, anyone who is

7    interested in learning horticulture, but I'm going

8    to be real specific for the guys that are assigned

9    to the Farm Line.  When they're in, I'm going to let

10   them go to class in the afternoons.  There will be a

11   classroom at Camp C and a classroom at Camp D.

12       Q.   Okay.  We're talking about horticulture,

13   and then the Farm Line we've talked about as being

14   the vegetable fields or the vegetables lines.

15            Is there a difference in your mind about

16   what is horticulture versus the kind of field work

17   that operates --

18       A.   Well, I think -- I think, you know,

19   there's -- they teach landscaping.  There's lots of

20   things in horticulture.  Not only will they just

21   learn about, you know, planting crops and all, I

22   think they'll go through the whole deal.

23            They'll learn how to be, you know, a

24   landscaper, maybe a greenskeeper at a golf course.

25   There's lots of things that these guys -- even pest

Trial Exhibit PX-248, page 61 of 79

Darrel Scott Vannoy
March 13, 2026

```
 1  control, on how to take care of, you know, the bugs
 2  and that kind of thing.
 3           I talked to them and -- you know, the
 4  tutors, and they went through some of that stuff
 5  with me on what they're qualified to teach, so we're
 6  going to do the whole gamut, you know.
 7      Q.   Okay.  So it really is re-creating --
 8      A.   -- are interested in doing.
 9      Q.   I'm sorry, say that last one?
10      A.   On what the guys are interested in
11  learning, you know.  Give them everything we can
12  give them.
13      Q.   Okay.  So it really is going to be focused
14  on horticulture broadly, not just vegetable picking
15  on the Farm Line.
16      A.   No, sir.  That will certainly be -- you
17  know, on how to grow tomatoes will certainly be part
18  of it, flowers.  Not just -- you know, not just
19  vegetables, flowers.  It's a whole gamut of things.
20  They have a lot of certifications.  Those guys are
21  very impressive.
22      Q.   And are the same kinds of licenses and
23  certifications that used to be offered through the
24  horticulture program, will those also be offered
25  through this new program that you're describing?
```

**Trial Exhibit PX-248, page 62 of 79**

Darrel Scott Vannoy
March 13, 2026

1      A.   I don't know since it's inmate tutors what

2  they'll be able to get.  I know we'll get them, you

3  know, a certificate of completion.

4           If I can find someone that's, you know,

5  willing to come and work and has their credentials,

6  you know, the sky will be the limit.  They could get

7  exactly what these tutors are teaching them.  They

8  could get those kind of credentials if they're

9  interested in going that far.

10      Q.   Okay.  Do you have a syllabus or anything

11  for the program?

12      A.   I do not yet, but they are going to have

13  me one.

14      Q.   Okay.  And that's being created by these

15  three men that you described as tutors.

16      A.   These -- yes, sir.  These tutors will get

17  their lesson plans together and we'll have them.

18      Q.   And what outreach, if any, have you done

19  yet with respect to hiring the supervisor, either an

20  employee or a staff member, who would oversee the

21  whole program?

22      A.   I'm trying to -- I'm reaching out to some

23  different schools that I know of.  Over across the

24  river I know there's a school.  Actually, I have one

25  of my sister wardens going over there to see if they

**Trial Exhibit PX-248, page 63 of 79**

Darrel Scott Vannoy
March 13, 2026

1   can find somebody that's interested in coming to us.

2           I'm not saying I will be able to hire

3   anyone, but I'm certainly -- if I can find someone,

4   I will certainly hire him, he or she, if I can find

5   him -- if I can find somebody interested.

6       Q.   Meaning you have the authority, the

7   budget, the employee line to hire them.  You just

8   now need a person that fits the bill.

9       A.   Correct.  I could -- I can even hire them

10  in a security and put them on a special detail to do

11  that, which I would if I could find someone.

12      Q.   And it sounds like it will teach a range

13  of things.

14          Is one of the things that it will teach,

15  how crops are grown on commercial farms?

16      A.   I don't know that.

17      Q.   In the affidavit it's talking about

18  learned about the crops that LSP grows and how

19  they're grown.

20          I guess my question is, when you say how

21  they're grown, are we talking about how they're

22  grown at LSP or how they're grown sort of, you know,

23  out in what we'll refer to as the free world?

24      A.   Well, I'm going to assume that their

25  training was -- you know, they were trained in the

**Trial Exhibit PX-248, page 64 of 79**

Darrel Scott Vannoy
March 13, 2026

1   area of not just Angola.  You know, what's

2   acceptable, you know, what the acceptable standards

3   are of horticulture.

4        Q.   Yeah.  And I assume that part of that will

5   be on techniques that might be used out in

6   commercial farms to minimize strain on the people

7   doing the labor.

8        A.   I can assume that.  You know, I'm not

9   trained, but they're going to go through -- I think

10  some of them have seven or eight certifications.

11  That's what they're going to teach, what they're

12  certified to teach.

13       Q.   And if they teach things about techniques

14  that are used out on commercial farms or ways to

15  limit strain on laborers or ways to, you know,

16  enhance yield, are those techniques going to be

17  employed on the Farm Line?

18       A.   Sure.  Absolutely.

19       Q.   And will the people who go through this

20  program be able to propose and hopefully implement

21  those techniques?

22       A.   Sure.  I'd like to see them -- I'd like to

23  see them be motivated and get involved in those

24  kinds of things.

25       Q.   Do you have any sense yet as to how many

Trial Exhibit PX-248, page 65 of 79

Darrel Scott Vannoy
March 13, 2026

```
 1   sessions the class will be?
 2       A.   No, I don't.  I don't know.  I know it's a
 3   pretty lengthy class.  It's not, you know, a week.
 4   It's not anything like that.
 5       Q.   Are there different certifications that
 6   you'll get at different points in time, meaning
 7   maybe you've been in there a couple of months and
 8   you get something, you keep going and you'll get
 9   something else?
10       A.   That's my understanding, but I think it's
11   even going to be longer than a couple months.
12       Q.   Yep.  Yep.  And will it be open to men who
13   are not on the Farm Line?
14       A.   Yes.  If someone's interested in learning,
15   that's a rehabilitation program.  It's a learning
16   tool.  It's a job opportunity if they get out.  Yes,
17   sir.
18       Q.   Yeah.  And -- but it will be available to
19   anybody who is on the Farm Line.
20       A.   I'm going to give the Farm Line first
21   option.
22       Q.   Great.
23            And the -- if the class starts and, you
24   know, the next month somebody's assigned to the Farm
25   Line, will they be able to join the class, or do
```

**Trial Exhibit PX-248, page 66 of 79**

Darrel Scott Vannoy
March 13, 2026

1    they have to wait till --

2          A.   No, I think -- I think they'll be able

3    just to, you know, get in in the afternoons when we

4    have the class.  I think they'll be able just to get

5    in.

6          Q.   And likewise, if somebody's on the Farm

7    Line, begins the class, and then gets reassigned to

8    a different job, would they be able to continue with

9    the class you're describing?

10         A.   Sure.  That would be part of their -- you

11   know, that would be part of -- they'd do their work

12   in the morning, go to the school in the afternoon.

13   We do that a lot here.

14         Q.   And I think you were touching on this.

15              Will the class be -- will it be classified

16   as educational programming?  I may be getting the

17   wrong terms here.

18              Here's what I'm asking.  Is it going to be

19   considered educational programming or rehabilitative

20   programming, reentry programming, something like

21   that, or is it a job assignment?

22         A.   No.  It will be -- we'll consider it -- it

23   won't be like a reentry programs because that's for

24   the reentry guys that are sent here for reentry, but

25   it will definitely be a rehabilitation program.  But

```
 1    I think it is -- I think it is considered more of an
 2    educational class.
 3         Q.   Okay.
 4         A.   I'd have to double check that, but I
 5    believe it is.
 6         Q.   And is that -- is that something that
 7    classifications is working on?
 8         A.   That would be something that my education
 9    department will work on.
10         Q.   Okay.  Have they begun doing that yet?
11         A.   No.  No, sir, not yet, but we're close.
12         Q.   Okay.  Is there any sort of documentation
13    for the program that you've described, whether
14    that's in a proposal or directive or some such
15    thing?
16         A.   Not yet.  We haven't written anything yet.
17    Once we get ready to go, you know, naturally we'll
18    have to have some written procedures and some
19    guidelines and a policy that we'll have to follow
20    to -- but we will have all that.
21         Q.   Okay.  So right now it's sort of in the
22    idea stage, but you're working it out?
23         A.   We're getting it off the ground, yes, sir.
24    Got to get this -- actually, over at Camp D I'm
25    building a new education building.  We were cramped
```

**Trial Exhibit PX-248, page 68 of 79**

1    on space at Camp D for classroom space, so I'm

2    building a new education building.  The roof -- I

3    think they're putting the roof on today.

4              Probably we're two weeks out, maybe three

5    on having this education building completed.  It's

6    about 30-by-40 I would say, so it's going to be a

7    nice little -- a nice little school for them.

8        Q.   And that will be for the Camp D folks.

9              Is there something similar for Camp C?

10       A.   Camp C already has classroom -- a big

11   classroom space, yes, sir.

12       Q.   Okay.  It's got space available already.

13       A.   Yes, sir.  D was kind of -- kind of short,

14   so we're putting that building up, and we'll have

15   them ready to go in just a few weeks.

16       Q.   All right.  And the greenhouse, what's

17   going to be happening there?

18       A.   Well, we're going to be -- you know, we're

19   going to be potting plants, growing plants, getting

20   ready -- you know, have them ready for transplant.

21             I've got to, you know, see what kind -- we

22   may even grow flowers in there.  We have one

23   greenhouse that does flowers now, but, you know,

24   Angola's a big place, we like flowers, so I'm not

25   going to say -- probably will be some flowers potted

Darrel Scott Vannoy
March 13, 2026

1    and bedded and grown in there also, send out to

2    different areas.  And I think that, you know, that

3    will be separate from planting vegetables.  You

4    know, flowers are different.

5        Q.    Yeah.

6        A.    So I think it will be a nice program once

7    we get it off the ground and get it up and running,

8    and I think there will be a lot of interest in it,

9    to tell you the truth.

10       Q.    Yeah.

11             My understanding, when the horticulture

12   program existed -- and this is kind of similar to

13   what you were describing here -- the guys

14   participating in that program got their own plot to

15   work, to use, to develop their own skills, the

16   things that they had learned and to employ them.

17             Is that going to be part of this program?

18       A.    I'm going to have to see how far these

19   tutors can go.  If we can get, you know, an employee

20   to oversee this, yeah.

21             That was -- what you're talking about,

22   that was done -- basically the horticulture school

23   was limited to the main prison at that time, and

24   we're doing something different.  We're taking it to

25   the outcamps now.

Trial Exhibit PX-248, page 70 of 79

1     Q.   And likewise, is there any plan to -- you

2  know, for folks who have gone through this program

3  and learned some skills, would they -- is there any

4  plan to give them plots within the vegetable lines

5  that they could work to, you know --

6     A.   Yes, they'll do that kind of thing.  Yes,

7  sir, we're going to see how it works out.  Yes, sir,

8  we're going to take it as far as we can take it.

9     Q.   Other than yourself and the tutors, who at

10 LSP has sort of been involved in thinking up this

11 and implementing this program?

12    A.   I've got my education folks.  They're

13 going to be involved in it.  Naturally security's

14 going to be involved.  You know, they have to be.

15 They have to make sure that the guys get to class

16 when they're supposed to get there.  It's going to

17 be just like a GED class, you know.

18    Q.   Yeah.

19         I understand there's a lot of people that

20 are going to have to be involved as it gets

21 established, but right now in the thinking-up

22 period, who's involved other than yourself?

23    A.   It's going to be -- it's going to be --

24 right now, education.  Classification will have to

25 come in, you know, to make the proper assignments

1    for their afternoon classes and all, but right now

2    they're only available to tutors and one of my

3    education people.

4        Q.   Okay.  Let me move on to the next section

5    of your affidavit.  This is paragraph 9.  It states

6    that "LSP is in the process of issuing all new Heat

7    Precaution Duty Statuses to reflect that the duty

8    status is valid year-round."

9             Can you just explain why that's necessary?

10       A.   I don't really know.  We put the -- we put

11   that in there so I guess once the inmates are

12   reviewed by medical staff, they will explain the new

13   process to them, the guys that are on that heat duty

14   status.

15       Q.   Is it the case that right now the card or

16   the medical record or whatever kind of documentation

17   people have showing that they have heat precaution

18   duty status contains a heat season limitation?

19       A.   I'm not allowed to look at that, so I

20   don't even know what's in their medical record

21   because I'm not allowed to see that.

22       Q.   Are you -- what about on that card that --

23   my understanding is that people with the duty status

24   are given a card that says --

25       A.   They're given a little -- they're given a

```
 1   little slip of paper, yes, and that will be revised
 2   once they give them a new duty status.
 3        Q.   Because right now that slip of paper says
 4   not allowed to go out when it's 88 between May 1 and
 5   October 31?
 6        A.   Yeah, I would assume that's what it says,
 7   but their new duty status will reflect it's a
 8   year-round deal.
 9        Q.   Okay.  And what's involved in the process
10   that's being described here in paragraph 9?
11        A.   The medical -- their medical provider will
12   see them and issue them a new duty status.
13        Q.   Okay.
14        A.   That will be --
15        Q.   And that's just -- they'll still get the
16   criteria for a new duty status -- sorry.  Scratch
17   that.
18             The criteria for getting heat precaution
19   duty status will not change.  Everybody who
20   currently has it will continue to get it.  It just
21   will no longer reflect that that status is limited
22   to certain times of the year, is that all right?
23        A.   Yes, sir, that's generally correct.
24   That's right.
25        Q.   Okay.  So nobody's going to get kicked off
```

**Trial Exhibit PX-248, page 73 of 79**

Darrel Scott Vannoy
March 13, 2026

1    of duty status because of what's being described

2    here in --

3         A.    Not because of this.  You know, if their

4    medical provider thinks that they're -- no longer

5    need to be on medication or something, they may take

6    them off, but not because we're going to year-round.

7         Q.    I see.

8               So still the same rules apply as

9    previously.  If you've taken a medication that's

10   listed or have a condition that's listed or for some

11   other reason, you get your duty status.  That's not

12   going to change.

13        A.    Correct, yes, sir.

14        Q.    Okay.  And while this -- how long does

15   this process of issuing new heat duty statuses take?

16        A.    I don't know.  I'm assuming it's not going

17   to be a real long process.  I mean, other than just

18   giving them a new duty status, I don't think it's

19   going to require, you know, a brand new examination

20   or anything like that.

21        Q.    Yeah.  I mean, since we're outside of the

22   heat season or what used to be the heat season right

23   now, have you considered issuing a memorandum

24   stating that, you know, any heat duty status is

25   valid year-round regardless of whether that duty

1   status states a date limitation?

2        A.   I hadn't thought about it.  I wouldn't

3   have an objection to putting that out.  I hadn't

4   thought about it, but I don't see any harm in it,

5   no.  I wouldn't mind doing that.

6        Q.   But you agree we want to get this done as

7   soon as possible so people are able to -- are able

8   to use their heat duty status currently even though

9   we're outside of what used to be the heat season.

10       A.   Correct, yes, sir.

11       Q.   Okay.  Warden, give me just a couple of

12  minutes off the record, and then we'll be right

13  back.

14       A.   Yes, sir.

15            (Recess taken from 1:51 p.m. to 1:56 p.m.)

16            MR. BENJAMIN:  No further questions,

17       Warden.  We appreciate your time.

18            THE WITNESS:  Yes, sir.  Nice seeing you

19       again, Jeremy.  Take care of yourself.

20            MR. BENJAMIN:  You as well.

21            THE WITNESS:  Okay.

22            MR. BLANCHFIELD:  Thanks, Jeremy.

23            THE COURT REPORTER:  Drew, Jeremy is

24       getting this transcript later today.  Do you

25       want the same thing?

**Trial Exhibit PX-248, page 75 of 79**

Darrel Scott Vannoy
March 13, 2026

1              MR. BLANCHFIELD:  I guess so.

2                      - - - - - -

3              (The deposition was concluded at

4              1:56 p.m.)

5              (Reading and signing of the deposition was

6              not waived by the witness and all

7              parties.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Trial Exhibit PX-248, page 76 of 79

Darrel Scott Vannoy
March 13, 2026

1                  DECLARATION UNDER PENALTY OF PERJURY

2

3            I, DARREL SCOTT VANNOY, hereby certify

4    under penalty of perjury that I have read the

5    foregoing transcript of my testimony taken under

6    oath in my deposition on March 13, 2026; that I have

7    made such corrections as appear noted on the Errata

8    Sheet, attached hereto, signed by me; and that my

9    testimony as contained herein, as corrected, is true

10   and correct.

11

12

13        Dated this _____ day of _____, _____.

14

15

16                    _____
                                County, State
17

18

19                    _____
                              DARREL SCOTT VANNOY
20

21

22

23

24

25

Trial Exhibit PX-248, page 77 of 79

Darrel Scott Vannoy
March 13, 2026

1                           ERRATA SHEET

2      IN RE: Voice of the Experienced vs. James LeBlanc
                    DARREL SCOTT VANNOY
3                     March 13, 2026

4

5      Page No._____Line No._____

6      Change:_____

7      Reason for change:_____

8      Page No._____Line No._____

9      Change:_____

10     Reason for change:_____

11     Page No._____Line No._____

12     Change:_____

13     Reason for change:_____

14     Page No._____Line No._____

15     Change:_____

16     Reason for change:_____

17     Page No._____Line No._____

18     Change:_____

19     Reason for change:_____

20     Page No._____Line No._____

21     Change:_____

22     Reason for change:_____

23     _____    _____
24          DARREL SCOTT VANNOY                    Dated

25

**Trial Exhibit PX-248, page 78 of 79**

Darrel Scott Vannoy
March 13, 2026

```
 1                    CERTIFICATE OF REPORTER

 2

 3    STATE OF FLORIDA      )

 4    COUNTY OF NASSAU      )

 5

 6              I certify that this transcript,

 7         consisting of 79 pages, is a complete, true,

 8         and correct record of the video-conferenced

 9         testimony of DARREL SCOTT VANNOY held in this

10         case on Friday, March 13, 2026.

11              I also certify that prior to taking this

12         deposition, DARREL SCOTT VANNOY was duly sworn

13         to tell the truth.

14              I further certify that I am not a

15         relative or employee of any of the parties, nor

16         am I a relative or employee of any of the

17         parties' attorneys or counsel connected with

18         the action, nor am I financially interested in

19         the action.

20

21              Dated this 13th day of March, 2026.

22

23         _____
           Leah M. Witt, CRR, RPR
24         Notary Public, State of Florida
           Commission No.: HH500239
25         Commission Expires: May 26, 2028
```

Trial Exhibit PX-248, page 79 of 79