**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **VOICE OF THE EXPERIENCED,** a membership organization on behalf of itself and its members; **and MYRON SMITH, DAMARIS JACKSON, NATE WALKER, DARRIUS WILLIAMS, KEVIAS HICKS, JOSEPH GUILLORY, KENDRICK STEVENSON,** and **ALVIN WILLIAMS,** on behalf of themselves and all others similarly situated, | * * * * * * * * * * | **CIVIL ACTION** <br><br> **NO.: 3:23-cv-1304** <br><br> **JUDGE BRIAN A. JACKSON** |
| **VERSUS** | * * | |
| **JAMES LEBLANC,** in his official capacity as Secretary of the Louisiana Department of Public Safety and Corrections**; TIMOTHY HOOPER,** in his official capacity as Warden of Louisiana State Penitentiary; **MISTY STAGG**, in her official capacity as Director of Prison Enterprises, Inc.; the **LOUISIANA DEPARTMENT OF PUBLIC SAFETY & CORRECTIONS;** and **PRISON ENTERPRISES, INC.** | * * * * * * * * * * * * | **MAGISTRATE JUDGE ERIN WILDER-DOOMES** |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## <u>DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

1

**FINDINGS OF FACT**

**I.    In Accordance with State Law and the Constitution, Medically Able Inmates are Assigned Jobs.**

1. Plaintiffs, offenders sentenced to hard labor to the custody of the Department Public Safety and Corrections and housed at Louisiana State Penitentiary, challenge a job assignment within the agricultural program at LSP, which grows and harvests vegetables for inmate consumption.

2. Louisiana State Penitentiary ("LSP") is a maximum-security prison that sits on 18,000 acres. LSP is a self-sufficient facility and is responsible for maintaining the entire facility, including roads, plumbing, electricity, water, sewage and all buildings. Day 1 Tr. 304:5-21.

3. Unless medically unable, every offender at LSP is assigned a job. LSP's Classification Department works with Security to assign jobs to offenders. Day 2 Tr. 108:19-21.

4. LSP's policy is to provide as many offenders as possible the opportunity to be employed productively in internal maintenance, culinary, farm operations, and industrial assignments, consistent with their custody status, supervision requirements and the needs of the institution. Day 2 Tr. 131-132; JX 47.

5. Job assignments afford inmates the opportunity to learn job skills and develop good work habits and attitudes. Day 2 Tr. 132:20-24; JX 47.

6. Offenders may be assigned to meaningful work assignments consistent with their ability, interest, medical status, and needs of the facility. Day 2 Tr. 122: 15-20; 124:6-25; 126-127.

7.  The Classification Department, Security, Medical and Mental Health conduct an in-depth process, to include meetings with the offender, to determine custody status and job assignments. Day 2 Tr., 124:6-25; 125:1-20.

8.  At initial intake, Classification, Security and Medical/Mental Health will review prior incarceration, disciplinary issues, health concerns, and any skills an offender may have. Day 2 Tr. 124:11-25. Custody status, housing placement and job assignments are dependent on this multi-level review.

9.  LSP has three custody levels, which is the level of restriction of inmate movement within the facility. Custody assignments are based on public safety as the priority. JX 44, pg. 3. Maximum security custody level consists of working segregation, preventative segregation or closed cell restriction. Day 2 Tr. 130:12-21. Medium custody offenders are housed in dormitories. For both medium and maximum-security custody status, these offenders must be accompanied by armed security when outside of the secured perimeter. Day 2 Tr. 123:6-7.

10. Trusty custody status is earned based on behavior and that an offender has been incarcerated at least ten years. Offenders with a trusty custody status can work and move outside of the secure perimeter without armed security. Day 2 Tr. 122-123.

11. Job assignments range from kitchen worker, maintenance, yard orderly, dorm orderly, paint crew, etc. Day 4 Tr. 248:7-10.

12. Generally, depending on bed space, health restrictions and custody status, one of the initial job assignments that inmates can be assigned to is the Farm Line. Day 2 Tr. 128.

13. This is a medium custody job assignment. Because the job assignment takes place outside of the secured perimeter, the offenders on the Farm Line have direct supervision during their work shift. Day 2 Tr. 128:5-22.

14. Unlike a dorm orderly who can freely roam a dorm, offenders outside of the perimeter must be accompanied by security. *Id*.

15. When offenders arrive at LSP, LSP will need to observe an offender's behavior and to determine how they will acclimate to life at LSP. Direct supervision allows for officers to observe and to ensure that the newly incarcerated inmates are suitable to transition to a job with less supervision. *Id*; Day 4 Tr. 305:3-10.

16. The same security concerns also govern assignment to the Farm Line after an offender has been sentenced to disciplinary segregation. If an offender moves from maximum custody to medium custody, the first job assignment will likely be the Farm Line. Again, if an offender is transitioning out of segregation, their job assignment will need direct supervision to monitor behavior. Day 2 Tr. 128-129.

17. After 90 days at any job at LSP without a disciplinary infraction, offenders can request a job change.   Day 4 Tr. 248.  The purpose is to allow offenders to move to jobs with less supervision and more freedom of movement throughout the facility. Day 2 Tr. 132:11-16.

**II.     The Farm Line is a Meaningful Job Assignment Whereby Offenders Harvest Vegetables for Inmate Consumption**

18. One of the many jobs at LSP is the Farm Line. The Farm Line is an agricultural work program. Undis. Facts, 59. The Farm Line is a vegetable crop farming program that provides vegetables for inmate consumption. Undis. Facts, 59. LSP does not sell these vegetables on the open market or profit from the Farm Line. Day 4 Tr. 213:19-21.

4

19. Under this agricultural program, LSP grows cucumbers, squash, zucchini, tomatoes, bell peppers, okra, broccoli, cauliflower, mustard greens, and collard greens. Day 4 Tr. 213:12-18.

20. Most vegetables are planted using a six row planter, which is pulled by a tractor. Day 3 Tr. 255-257. The only seeds planted by hand are planted in a greenhouse then transplanted to the field. Day 4 Tr. 203:10-19.

21. Plants are cultivated (weeded) using a cultivator that is pulled by a tractor. Day 3 Tr. 257:10-21.

22. Because some vegetables mature at different rates, these vegetables cannot be harvested using machinery and must be harvested by hand (or tools). Day 3 Tr. 258:19-25; 259:1-16; Day 2 Tr. 239:15-17.

23. Tools such as knives or snips are provided to harvest certain vegetables. Day 4 Tr. 205:14-22.

24. Once the vegetables are harvested, they are sent to the grading shed and graded for quality. Day 4 Tr. 214:3-7. Any vegetables that are unsuitable for consumption are discarded. Day 4 Tr. 216.

25. Some of the fresh vegetables are issued directly to the LSP kitchens. Day 4 Tr. 206:3-6. Any overages are sent through the processing plant to process, which includes blanching, cutting, packaging and freezing the vegetables.  Day 2 Tr. 57-58; Day 2 Tr. 48:20-24.

26. LSP uses about 20,000 pounds of vegetables each month to feed 4,000 inmates. Day 4 Tr. 206:13-19.

27. From January to September 2025, over 300,000 pounds of fresh vegetables were issued to LSP kitchens from the Farm Line; over 25,000 pounds of frozen vegetables were issued to LSP kitchens; and over 150,000 pounds of vegetables were processed. DX 31.

28. The Farm Line consists of Lines 15, 24 and 25. These lines run out of Camp C and Camp D. Generally, the security officer in charge of the line will arrive at the camp in the morning to check out workers for their shift. Class Cert. Tr. Vol. 2, 300:23-25; Day 4 Tr. 246-247; Day 2 Tr. 135:8-18.

29. Offenders working the Farm Line are typically accompanied by three security guards. One security guard is the field foreman (or "pusher") that directly supervises the offenders and gives instructions on what duties they are to perform. Day 2 Tr. 46: 8-13. The foremen's duties are to ensure that the offenders are all accounted for, safe and that they have PPE and anything else needed during the work shift. Class Cert Tr. Vol 2 pg. 300-301. These foremen do not carry a gun. Undis. Facts, 70; Day 3 Tr. 18:16-18.

30. Because the Farm Line is a medium custody job assignment, and because the offenders are taken outside of the secure perimeter of the camps, offenders are accompanied by two gun guards. Day 2 Tr. 56:1-25. These guards are not directly supervising the offenders and are instead located at a distance (of at least 100 feet). Day 2 Tr. 57:2-13. See Also JX 244.

31. Offenders working the Farm Line are providing the following year round and in any temperature: (1) accessible shaded area for rest breaks; (2) 15 minute rest breaks every 45 minutes (the time to walk to and from the rest area is not counted in the break time); (2) access to water coolers that are placed on raised surfaces and include ice and water; (3) sunscreen, gloves, hats and drinking cups; (4) portlet and handwashing stations. DX 48;

Day 2 Tr.  64:20-21; 55:2-24; Day 3 Tr. 8:19-25; Class Cert Tr. Vol 2 305:18-21; 307:5-13;

32. LSP has 25 shade pavilions, which have electricity, fans, access to water, and bench seating and are placed throughout the fields. The pavilions are 24 x 24, with benches along three sides, 20 feet long. Day 4 Tr. 328. The pavilions have shade canopies and roofs, which were designed so that the eastern shade canopies block the rising run. *Id*. These pavilions are used for the shaded rest breaks. DX 52; DX 48.

33. During the summer months, the daily line counts show that offenders are brought to the field around 7:30 a.m. and work ends by 11:30 a.m. See JX 32, pg. 32-111.

34. Offenders work at their own pace and can take breaks when needed. Day 2 Tr. 58: 24-25; 64:12-23; Day 3 Tr. 8:13-16; Class Cert Tr. Vol 2 308:1-11.

35. During the summer months, not every line will go out every day of the work week. Some weeks, a line may go out 3 or 4 days, some weeks, not at all. See for example JX 240 pg. 72-79, 92- 107.

36. Further, not every offender assigned to the Farm Line is called to work each time the line goes to the field. See JX 240 and 241. If an offender assigned to the Farm Line is enrolled in an educational program, has a medical appointment, an attorney call out or any other call out, they will not be expected to work that day. Day 4 Tr. 209:18-25; 210:1-14.

37. The evidence indicates that many offenders working the Farm Line return to the dorms before lunch, and engage in sports or other recreational activities outdoors in the afternoon. Day 1 Tr. 59; Day 2 Tr. 39-40; Day 4 Tr. 251-252.

**III.    LSP Has Constitutionally Appropriate Heat Pathology Policies in Place**

38. It is DPSC's policy that each "facility shall have a mechanism to identify inmates more vulnerable to heat and to enforce provisions to reduce heat pathology among inmates." JX 14.

39. HCP 8 applies to all DPS&C facilities and sets the minimum standards that the facilities must follow. Day 1 Tr. 316 2-7. HCP8 contains standards for both indoor and outdoor procedures, and apply to more than just the Farm Line. Day 3 Tr. 216:6-11.

40. LSP's corresponding Directive is 13.067. LSP has in fact implemented more protective standards for LSP offenders. Again, Directive 13.067 applies to indoor procedures, as well as any job or recreation where offenders are outdoors. Day 4 Tr. 309; DX 62.

41. Directive 13.067 outlines heat pathology procedures that must be followed year-round. DX 62, pg. 2.

42. Directive 13.067 provides a mechanism for health care providers to identify inmates who may have heat sensitivities, including inmates diagnosed with certain chronic conditions and inmates who are prescribed certain medications.

43. Directive 13.067 includes Attachment A, which lists medications that automatically qualify an offender for a heat precaution duty status, unless that offender has a more restrictive duty status. DX 62; JX 18.

44. The Heat Pathology Medication List is based on medications that affect the ability for a person to compensate when they are exposed to heat, to include the ability to sweat and other metabolic processes, like heart rate, urinary frequency and dehydration. Day 4 Tr. 128.

45. The Medication List is based on medication's anticholinergic risk score. A medication that is highly anticholinergic blocks acetylcholine, a neurotransmitter involved in many

functions, including sweating and regulating body temperature. DX 36, pg. 2-3. Even if a medication has a low anticholinergic risk score, but affects a person's compensatory mechanisms in other ways, then the medication is included on the list. Day 4 Tr. 128-129.

46. The Medication List includes the following drugs classes: (1) anticholinergics; (2) antihistamines with anticholinergic properties; (3) antipasmodic/antimuscarinics; (3) antipsychotics; (4) tricyclic antidepressants; (5) skeletal muscle relaxants; (6) mood stabilizers; (7) antiseizure medications; (8) diuretics; (9) beta-adranergic blocking agents; (10) non- dihydropyridine channel blockers; (11) nitrates; and (12) stimulants. JX 18. This includes over 75 medications on the list. *Id*.

47. LSP issued over 1500 heat precaution duty statuses to offenders based on the medication list. Day 3 Tr. 235.

48. Once offenders have been identified as taking a medication on the Medication List or having a condition on the Medical Condition List, offenders are educated on heat pathology. Day 3 Tr. 68.

49. Directive 13.067 also includes a Medical Condition List that qualifies inmates for a heat precaution duty status. This includes 35 chronic conditions, broken down by organ system. JX 16; Day 5 Tr. 143-144.

50. LSP issued over 300 heat precaution duty statuses to offenders based on the medical condition list. Day 3 Tr. 75.

51. After an offender is educated on heat pathology, offenders can opt out of the duty status. Over 400 offenders have opted out of the duty status. Day 3 Tr. 71. Many offenders have opted out of the heat precaution duty status so they can continue to work their outdoor jobs. Day 3 Tr. 75; JX 216-219.

52. Under Directive 13.067, if an offender has a heat precaution duty status, that offender should be brought indoors once the heat index reaches 88 degrees. DX 62, pg. 5.

53. Directive 13.067 provides specific outdoor procedures. At all outdoor work areas, regardless of temperature, offenders shall have access to water, ice, shaded rest break areas and sunscreen. DX 62, pg. 5.

54. The heat index is monitored and recorded in real time using Perry Weather Monitoring and Alert System which includes an immediate alert to the Warden or designee when the heat index reaches 88 degrees. DX 62, pg. 5.

55. Under Directive 13.067, when the heat index reaches 88 degrees, a heat alert is announced. Once a heat alert is announced, water and ice must be available at least every 30 minutes, DX 62, pg. 5.

56. Fifteen-minute rest breaks must occur every 45 minutes, and work hours may be adjusted to accommodate extreme temperatures. *Id*.

57. Directive 13.067 also includes a cease work requirement if the heat index reaches 113 degrees. Warden Vannoy requires that control center announce over the radio if the heat index reaches 110 degrees so that work ceases and offenders are brought indoors before the heat index can reach 113 degrees. Day 4 Tr. 310-312.

58. Directive 13.067 also requires LSP to educate offenders on heat pathology and that LSP officers respond to heat pathology symptoms. DX 62, pg. 7.

## IV.    Offenders Working the Farm Line Have Access to Sufficient Medical Care

59. LSP provides three different medical calls to offenders. Offenders can request a routine sick call and those offenders are seen the next business day. Day 4 Tr. 271, 18-25.

60. Offenders can also make a "self-declared emergency" at any time, 24 hours a day, 7 days a week. Day 4 Tr. 273:1-8. An SDE is equivalent to an urgent care. If an inmate does not want to wait for a sick-call the next day, but it is not an emergency where an ambulance is needed, that offender can declare an SDE to any officer. Day 4 Tr. 272: 1-9. A nurse is sent to the offender's location to respond to the SDE. *Id*.

61. The third option is "Medical 4" where an ambulance is dispatched and offender is taken to the ATU. Day 4 Tr. 272.

62. LSP is staffed with three nurses during the day and two nurses each night to respond to SDEs. Day 4 Tr. 273:9-12. The nurses will respond to anywhere at the facility to an SDE, to include offenders working in the field.

63. If an offender makes an SDE, they advise LSP security. Security will call the SDE into the ATU. A nurse is dispatched to the location. Nurses will have the offender's complaint and can access the offender's electronic health record prior to responding to the SDE. Day 4 Tr. 275:1-11.

64. Because nurses will respond to SDEs across the entire facility, nurses will triage complaints to determine the order of response based on the severity of the complaint. Day 4 Tr. 276.

65. Once a nurse arrives to the offender who made and SDE, the nurse performs an assessment. A full set of vital signs is taken, to include temperature, blood pressure, respiratory rate, oxygen saturation and pulse rate. Day 4 Tr. 278:1-4. Vitals are an important objective measuring tool to further assess a subjective complaint. Day 4 Tr. 277-278.

66. Especially with heat related illnesses, vitals are an important tool. Temperature, blood pressure, heart rate and mucus membranes can assist in assessing whether a heat related illness is a potential issue. Day 4 Tr. 280-281.

67. Nurses will also visually assess the offender, to include whether the offender is alert, oriented, ambulatory, signs of distress and speech. Day 4 Tr. 277-278. Further assessments are made based on the complaint. Day 4 Tr. 280:1-13.

68. Following their assessments, if any vitals are abnormal, the nurse will contact a higher level of care for further orders. A nurse can also call an ambulance or escort an offender to the ATU if further medical intervention is necessary. Day 4 Tr. 283-284.

69. Further, a higher level of care will review every SDE responded to by a nurse and can order additional testing, labs, appointments or duty statuses. Day 4 Tr. 277-278. 286:2-18.

70. The parties submitted the Self-Declared Emergencies made from outside of the perimeter during the 2025 heat season. From May 2025 to October 2025 88 SDEs were made. These SDEs show that offenders readily make use of the SDE process, and complaints ranged from finger pain, back pain, foot pain, duty status checks, mental health concerns. These medical complaints were triaged by nurses, and in some instances, inmates were referred to additional medical care at the ATU. See JX 143; Day 5 Tr. 48.

**V.    State Law Requires An Assessment of Co-pays For the Efficient Utilization of the DPSC Health Care System**

71. La. R.S. 15:831 states that DPSC "shall adopt rules requiring that copayments be made by inmates upon receiving medical or dental treatment." In accordance with this statute, DPSC's HCP 14 governs copayments for medical care.

72. HCP 14 provided that "Inmates shall pay co-payments for their health care and mental health care needs, as required by law. An inmate shall not be denied access to health care

12

or to mental health care because of an inability to pay a co-payment. Copayment fees shall not be excessive so as to discourage inmates from seeking health care or mental health care." JX 20.

73. HCP 14 further provides: Access to health care and mental health services shall be available to all inmates regardless of their ability to pay, their classification, or their housing assignments. The efficient utilization of the health care system can be achieved by using a health care co-payment program. JX 20.

74. Under HCP14, inmates shall be charged a $2.00 fee for each self-initiated request for healthcare services made during regularly scheduled sick call times. Inmates accessing health care services outside of routine sick call hours, to include self-declared emergencies, altercations, or any other unscheduled health care encounters, shall be assessed a $6.00 copayment fee. JX 20, pg. 4.

75. No inmate shall be refused medical, mental health, dental services, prescriptions, or other medication necessary for basic health care because of an inmate's financial status. *Id*.

76. Copayments apply to any offender sentenced to DPSC custody, whether they are housed at LSP, or whether they work on the Farm Line or not.

## VI. Testimony from Inmate Witnesses Was Not Credible and Was Contradicted by LSP Officers

77. Plaintiffs called several inmate witnesses to testify as to conditions of the Farm Line. Only two of those witnesses worked on the Farm Line in 2025. The inmate witness testimony was not credible and was contradicted by officials' testimony.

78. Named Plaintiff Joseph Guillory testified. Guillory last worked on the Farm Line in the summer of 2023. He had no knowledge of current conditions. Day 1 Tr. 31.

79. While not relevant to current conditions, Guillory testified that he had a medical emergency while working in the field in the summer of 2023 after he came in for lunch. Day 1 Tr. 42.

80. However, Guillory's medical records do not support his testimony. The records indicate that on July 3, 2023, he was taken to ATU for suspected intoxication at 5:40 p.m. His temperature was 98.2. JX-145, p. 22. There is no evidence that Guillory suffered an inability to thermoregulate or any sort of heat illness.

81. In fact, the next week, Guillory's records indicate he was brought back to the clinic to discuss his recent labs. He admitted that he was non-compliant with his medication. JX-145, p. 15. He had no complaints.

82. In addition, the daily line counts submitted in evidence do not indicate that Line 15 was working in July 2023. JX 226.

83. Plaintiffs also called Steven Major to testify. Major testified that he worked on the Farm Line for five months. Transcript, Day 1, 68. The job rosters show that Major worked a total of 16 days during that time period. See JX 241, p. 28, 30, 32, 34 and 36.

84. Mr. Major testified that during the 16 days that he worked on the Farm Line, he made an SDE twice. First, on June 20, 2025, Major made an SDE. Within 15 minutes of Major requesting medical, Nurse McClure came to the field to assess him. Major complained of "headache, feeling week, and being in the field while taking Zoloft and Remeron." JX 143, pg. 152. Neither Zoloft or Remeron are medications that require a heat precaution duty status. Major's vital signs were taken. His blood pressure was 110/70, his temperature was 97.9, pulse rate was 91 and pulse ox was 99. Major was in no apparent distress, his skin was sweaty and he ambulated with an even gait. *Id*. He was treated with

naproxen. The nurse advised security that Major should stay on shade trailer until the end of the shift and not go back to the field. JX 233, pg. 53. An hour and 15 minutes later, all workers finished work for the day. *Id.* The same day, at 10:57 am, Nurse Practitioner Cynthia Park reviewed the SDE and agreed with the disposition. JX 240, pg. 153.

85. Four days later, (not the "next day" as Major testified), Major made another SDE. Major complained of weakness and dizziness, which he stated began the night before. Nurse Elkins took vitals and Major's blood pressure was low. Major was sent to ATU for further evaluation. JX 143, p. 194.

86. Major was provided a heat precaution duty status on June 28, 20026, when he was prescribed hydroxyzine. JX 215, pg. 105.  Major last worked on the Farm Line on June 24, 2025. JX 241, pg. 36-90.

87. Major now works in the kitchen and is not paid anything. Transcript, Day 1, pg. 89.

88. Inmate Gregory Samuels also testified. Samuels testified that when he arrived at LSP he was provided a "no strenuous activity and allowed to rest duty status"  due to his heart condition. Day 2 Tr. 98:3-7. Samuels testified that he believed he should have had a heat precaution duty status, but admitted he never filed an ARP related to his belief that he should have had a different duty status. Day 2 Tr. 102:12-21.

89. Samuels testified that he had a medical emergency on April 15, 2025 while working in the field. The officer immediately called an ambulance which arrived within minutes and he was taken to the ATU. While Samuels insinuated that his medical emergency was caused by the heat, the temperature on April 15 at 1:00 pm at 77 degrees. Day 2 Tr. 99-101; DX 60. Samuels has not worked on the Farm Line since April 15, 2025. Day 2 Tr. 102:9-11.

15

90. Lastly, while much of Samuels' testimony concerned his heart condition, Samuels admitted that since January 2025, he tested positive twice for methamphetamine. Day 2 Tr. 102-103.

91. Plaintiffs called Norris Henderson, Executive Director of VOTE. Mr. Henderson last worked on the Farm Line in 1985.

92. Mr. Henderson confirmed that duty statuses are "valuable" and that an inmate would cut off his hand to get a duty status. Day 3 Tr. 209.

93. Mr. Henderson also confirmed that he regularly speaks and meets with Warden Vannoy to discuss any issue. Day 3 Tr. 211-212. Warden Vannoy makes himself available to Mr. Henderson when needed. Day 3 Tr. 213.

94. Huey Pidgeon, an African American Major who has worked at LSP and the fields for over 30 years, testified. He testified that work on the Farm Line is not made more difficult than it should be, nor is it more difficult than any other job at LSP. Transcript, Day 2, pg. 59-60.

95. Major Pidgeon described that security guards supervising the offenders working the Farm Line are out there in the same conditions. They break when the offenders break. They drink water when the offenders drink water. They experience the same weather conditions, and even work alongside the offenders. Day 2 Tr. 60; 63.

96. Pidgeon testified that offenders work at their own pace, take breaks as needed, are provided water and medical care if needed. Day 2 Tr. 64. Major Pidgeon testified that he has never used a racial slur towards an inmate nor has he heard a racial slur being used by one of his colleagues. Day 2 Tr. 64-65.

97. Pidgeon further testified that he personally responded to named Plaintiff Joseph Guillory's ARP. Pidgeon testified that those allegations in the ARP are false, as he personally performed the duties that Guillory claimed were not present on the Farm Line. Day 2 Tr. 62-63.

98. Master Sergeant Orlando Scott is employed by LSP and worked as a foreman in the field for seven years. Class Cert. Tr. Vol 2 300:3:20. Scott testified that his duties as field foreman included checking out the line, ensuring safety of inmates and staff, ensuring inmates are performing their tasks, ensuring that inmates have proper PPE and ensuring inmates are accounted for. Class Cert. Tr. Vol 2 300-301.

99. Scott testified that LSP provides inmates with boots, hats, gloves, and sunscreen. Class Cert. Tr. Vol 2 301:7-19.

100. Scott testified that offenders will claim that they have a certain duty status, which turns out to be false after Scott calls medical to check their duty status. Scott testified that offenders will claim to have a duty status in order to get out of work. *Id*. at 303-304. Scott testified that in his experience at LSP, inmates will often lie to get out of work and will even fake injuries. Class Cert. Tr. Vol 2 322:1-10.

101. Scott also testified that he was the field foreman during an inspection with Plaintiff counsel, experts and their videographer in July 2024. Class Cert. Tr. Vol 2 304. Scott explained that the offenders told the experts, videographer and counsel that they were not issued cups that day. These statements were untrue. The inmates hid their cups in the field that day, which Mr. Scott found hidden in the cucumber vines. Id. at 304.

102. Scott testified that inmates on the Farm Line have unlimited access to water. *Id*. at 305:18-24. The field foremen ensure that the inmates stay properly hydrated. The

foremen drink from the same coolers and take the same breaks that the inmates do. Id. at 304:5-13.

103.  Scott testified that there are no "quotas" on the Farm Line and inmates work at their own pace. *Id*. at 308:1-8. He has never yelled at an inmate to work faster. *Id*. Scott further reiterated that the Farm Line is not a hard job. *Id.* at 310:19-20.

104.  Lieutenant Michael Karisny is employed by LSP and has worked as a field foreman and a gun guard. Day 3 Tr. 7:11-21. Karisny testified that he is responsible for inmate safety as well as public safety while supervising inmates on the Farm Line. *Id*. at 8:1-13.

105.  Karisny testified that inmates on the Farm Line can work at their own pace, but some work faster than others. Inmates can take breaks to get water at any time. *Id*. at 8:19-25.

106.  Karisny has never written an inmate up for not working fast enough and has never set a quota. Id. at 9-10.

107.  Karisny confirmed that inmates on the Farm Line are provided hats, gloves, cups and are given 15 minute breaks every 45 minutes. *Id*. at 12:1-12.

108.  Karisny testified that he treats the inmates that he supervises like he would treat anyone else: with respect and dignity. *Id*. at 13-16. Karisny testified that he has harvested the produce with the offenders. *Id*. at 17-18. He has never used a racial slur nor heard any other officer use a racial slur. *Id*. at 19:9-14.

109.  As a gun guard, he has never fired his weapon or pointed it at an inmate. *Id*. at 18:3-15. As a field foreman, he does not have a weapon. *Id*. at 18:16-18.

110. Karisny testified that once an inmate declared himself a medical emergency, he is directed to sit in the shade until medical arrives. *Id*. at 12-13. In the shade pavilions, inmates have access to water, fans, seating and shade. *Id*. at 13-14. Karisny testified that when an inmate declares himself an emergency, he will always call medical, even if the inmate may not be telling the truth. *Id*. at 17:4-8.

111. Karisny testified that once a heat alert is issued, all work stops and a 15 minute break occurs. Those with a heat precaution duty status do not go back to work and instead sit in the shade pavilions. *Id*. at 15:7-13.

112. Karisny confirmed in his testimony that LSP follows the stated procedures for the Farm Line, which include: accessible shaded areas for rest breaks; 15 minute rest breaks every 45 minutes, wherein the time period to walk to the rest break area is not counted in the rest break time; sufficient drinking coolers on raised surfaces; access to water at any time; access to sunscreen , work gloves, drinking cups and hats; handwashing station and portalet. *Id*. at 29-33.

113. Assistant Warden Sylvester has been employed by LSP for 31 years. Day 4 Tr. 201:16-25. He is Assistant Warden over field operations. *Id*. He has worked in field operations his entire tenure at LSP. *Id*.

114. Warden Sylvester is a third-generation farmer. *Id*, at 202-203.

115. Warden Sylvester testified that for the Farm Line, the fields are plowed with tractors and equipment, rowed with tractors and equipment and the seeds are planted with tractors and equipment. *Id*. at 203:7-13. Hand planting seeds would be too time consuming and not feasible. Therefore, LSP uses tractors and equipment to plant and cultivate. *Id*. at 204:2-3.

116. The vegetables grown and harvested on the Farm Line are used for inmate consumption. *Id*. at 206:1-2. LSP will issue fresh vegetables to the kitchen, and will process and freeze any overages. *Id* at. 206:5-12.

117. As shown by the evidence, LSP's highest harvesting months are April through July. *Id*. at 213:2:5; DX 31.

118. Warden Sylvester confirmed that he has never observed any instances where field foreman mistreat offenders. Nor has he witnessed any racial slurs. Day 4 Tr. 221:18-25.

119. Lastly, Warden Vannoy testified. He has been employed by LSP for 47 years. Fifteen months ago, he came back to LSP as Warden. Day 4 Tr. 300:7-25.

120. Warden Vannoy explained that LSP serves two fresh farm vegetables a day, at lunch and dinner. *Id* at 13-25; DX 17. He testified that LSP serves farm vegetables because the inmates enjoy them more than canned vegetables, that they taste better and the quality of the food is better. Day 4 Tr. 302:17-25.

121. Warden Vannoy testified that the Farm Line serves a meaningful purpose at LSP. It feeds the inmates fresh vegetables, the inmates learn how to harvest vegetables and LSP can evaluate inmate behavior. *Id*. at 305:1-15.

122. Warden Vannoy testified that all offenders once eligible for incentive pay earn .02 cents an hour. This incentive pay scale does not only apply to Farm Line. An inmate that begins work in the kitchen will earn the same amount of incentive pay. *Id*. at 308:1-3.

123. Warden Vannoy testified to the numerous changes that have been implemented since he became Warden. Warden Vannoy testified that the NWS weather data became unreliable and he therefore pursued a new weather system. He wanted an onsite weather

system that provided real time data and would announce directly to control center once the heat index reached 88 degrees. *Id*. at 308-310. This was implemented in December 2025.

124. Warden Vannoy also spent over $300,000 in constructing 25 shade pavilions placed in the fields for readily accessible shade. *Id*. at 325. The Warden testified that he began constructing two shade pavilions prior to the Court's inspection. Once the Court was satisfied with the shade pavilions, he advised the Court that he would begin building them immediately. He advised the Court that he would have 18 total shade pavilion constructed, and he actually built 25. *Id.*

125. Warden Vannoy also testified that Farm Line practices were codified into Post Orders that apply to officers in the field, to include the required rest breaks, access to shade, water and appropriate PPE. *Id*. at 323-324.

126. Warden Vannoy also testified that he lowered the heat alert threshold from 91 degrees to 88-degree heat index in order to keep inmates safe. Day 1 Tr. 194.

**VII.    Testimony from Medical Experts**

127. While Dr. Vassallo has been accepted as an expert in correctional medical care and thermoregulation by different Courts, her testimony regarding patient care and review of medical records is not credible.

128. In her First Supplemental Declaration, which this Court relied upon in its initial TRO ruling, Dr. Vassallo discussed the named Plaintiff medical records. These statements and opinions were not supported by the medical records.

129. For example, Dr. Vassallo stated that named Plaintiff A.W.'s medical conditions included high blood pressure, a history of tuberculosis and mobility impairments. She

opined that people with chronic illnesses are at greater risk of heat stroke and heat-related disorders due to their body's inability to thermoregulate and that pulmonary diseases worsen in the heat and can cause serious exacerbations. Dr. Vassallo opined that A.W. has been assigned to the farm line "notwithstanding these conditions." PX 78, pg. 2-3.

130. A review of the medical records of A.W. show that he did not have pulmonary disease, and he did not have pulmonary tuberculosis. Further, A.W. did not have high blood pressure, and a latent tuberculosis infection was treated twenty years ago. The condition that Plaintiffs' expert suggests put A.W. at a higher risk of heat-related disorders clearly did not exist. Day 5 Tr. 165-166.

131. Dr. Vassallo further also described a medical incident with named Plaintiff D.J. She opined that D.J. had back pain, headache, loss of appetite, nausea, dizziness, diarrhea and vomiting, and that these symptoms are consistent with a heat-related illness. Dr. Vassallo testified that D.J. was on a medication Levsin, which is highly anticholinergic and would impact his ability to thermoregulate.

132. What Dr. Vassallo fails to mention is that this medical encounter occurred in January 2008, far outside of any heat season. Day 5 Tr. 168. There was no indication that this encounter was in any way heat related. Even further, the medication that Dr. Vassallo claims impaired D.J.'s ability to thermoregulate was prescribed in three doses in February 2005. *Id.*; JX 147 453; 413.

133. Plaintiffs' expert, Dr. Vassallo, testified that K.S. presented with symptoms consistent with heat stress illness while working in the field. He was sweating profusely, laying in the field, and could not get up. PX 78, pg. 5.

134. What Dr. Vassallo fails to mention is that a drug screen testing was performed on that day on K.S., showing positive for methamphetamines and fentanyl. K.S. hardly had a heat stress illness as represented by Dr. Vassallo. Day 5 Tr. 171; JX 149, pg. 67.

135. Dr. Vassallo maintains that M.S. (known as the rodeo champion) was prescribed a medication that impaired his ability to thermoregulate. PX 78, pg. 6.

136. Dr. Vassallo fails to mention that the medication she was referring to, Meloxicam, was prescribed long ago and stopped being prescribed to him on March 19, 2012. It is misleading at best to suggest that this medicine has any impact on him currently. Day 5 Tr. 172; JX 148, pg. 109.

137. Dr. Vassallo further testified and included in her affidavits various SDE records from 2025. Dr. Vassallo routinely states that inmates are suffering from heat related illnesses, when the medical records do not support such a conclusion.

138. For example, Dr. Vassallo stated that offender Q.R. suffered from a heat related illness on October 7, 2025. PX 85, pg. 7.

139. The medical records show that an SDE was made and responded to at 10:44 am. The heat index was 77 degrees. Q.R. was sitting on the shade trailer, in no apparent distress and smiling. Q.R. reported that he missed his morning medications and breakfast. LSP's nurse administered oral glucose based on the offender's statements that he missed breakfast and security was notified to bring Q.R. in for a meal. Given the temperature, vitals and patients statements on missed breakfast, a heat illness is highly unlikely. Day 5 Tr. 156-158. JX 143, pg. 344-345.

140. Dr. Vassallo further opined that offender C.M. suffered from heat illness. PX 85, pg. 9, n. 22.

141. On July 16, 2025, C.M. made an SDE from the field. CM complained of a headache and congestion in right nostril for two days. He complained of allergies. JX 143, pg. 237-239. His vitals were normal. Day 5 Tr. 128. There were no signs of a heat related illness.

142. Dr. Vassallo also discussed inmate A.J. PX 85, pg. 9, n. 22. On June 23, 2025, A.J. made an SDE. He refused all vitals. He requested a duty status check. He did not have a heat precaution duty status. He denied the need for medical attention. Day 5 Tr. 159-160; JX 143 pg. 175-176. This inmate admitted he had no medical needs and there was no evidence of a heat related illness.

143. Dr. Vassallo opined that inmate A.S. suffered from heat related injury. PX 85, pg. 12-13. A.S. made an SDE on June 3, 2025. His vitals and temperature were normal. He complained of being weak and dizzy. The nurse noted that he was wearing two layers of clothing. The heat index was 80 degrees at the time of assessment. He was educated to remove one layer of clothing and rest in shade. A.S. ignored that education and continued to stay in the sun and talk with other offenders. Day 5 Tr. Pg. 161-162; JX 143 pg. 79-80. There was no evidence of heat related illness for AS.

144. Defendants' expert. Dr. Carl Keldie testified. Dr. Carl Keldie has over forty years of experience in correctional care medicine. He is a fellow of the American College of Correctional Physicians, and approximately fifty physicians in the United States have this fellowship status. Day 5 Tr. 93-94.

145. In his practice, he has treated heat stroke and done significant work in the armed services as a treating physician. He has been involved in writing specific heat pathology policies and procedures like the ones that are now in place at LSP. Day 5 Tr. 119.

146. He reviewed approximately 8,000 pages of medical records of the original eight named Plaintiffs and self-declared emergencies for the heat seasons of 2024 and 2025, as well as two site visits to LSP, and interviewed a number of prison employees.

147. In his review of the extensive medical records and self-declared emergencies, there were no identified serious heat illnesses or injuries. Day 5 Tr. 187. In his review of the self-declared emergencies, he saw no evidence of heat rash, cramps, syncope, exertional heat injury, heat exhaustion or heat stroke. Day 5 Tr. 189.

148. Dr. Keldie opined that given all of the risk mitigation measures in place at LSP, including acclimatization, rest breaks, shade, ice, water, easy work load, ability to declare an emergency and modified shifts during the summer months, there is little risk for heat related illness. DX 34; DX 35.

149. Dr. Barnes also testified for Defendants. Dr. Barnes has a doctorate of pharmacy from the University of Tennessee with extensive work background. Day 4 Tr. 121-123. She was accepted by the Court as an expert in the field of pharmacy with specific experience in correctional care medicine as it relates to pharmacy. Day 4 Tr. 121-123.

150. In 2024, Dr. Barnes looked at the current LSP medication heat pathology list and reviewed it for its adequacy, and made recommendations to update the list. Day 4 Tr. 124.

151. The following is a comparison of the old list and the list updated with the recommendations from Dr. Barnes:

| 2018 Attachment A (JX 11) | Current Attachment A (JX 18) |
| --- | --- |
| | |

25

**Department Regulation No. HCP8**
**Attachment A**
**21 August 2018**

### Heat Pathology Medications

| | |
|---|---|
| Abilify | (aripiprazole) |
| Geodon | (ziprasidone) |
| Haldol | (haloperidol) |
| Navane | (thiothixene) |
| Prolixin | (fluphenazine) |
| Risperdal | (risperidone) |
| Seroquel | (quetiapine) |
| Stelazine | (trifluoroperazine) |
| Thorazine | (chlorpromazine) |
| Zyprexa | (olanzapine) |
| Cogentin | (benztropine) |
| Loxitane | (loxapine) |
| Invega | (paliperidone) |
| Clozaril | (clozapine) |
| Trilafon | (perphenazine) |
| Latuda | (lurasidone) |
| Compazine | (prochlorperazine) |
| Saphris | (asenapine) |
| Mellaril | (thioridazine) |
| Serentil | (mesoridazine) |
| Lithobid | (lithium carbonate/lithium citrate) |
| Depakote | (divalproex sodium) |

**Department Regulation No. HCP8**
**Attachment A**
**7 November 2024**

| Heat Pathology Medications List | | | |
|---|---|---|---|
| **ACH Risk Score** | **Medication Drug Class** | **Examples** | **Mechanism of Heat Pathology** |
| 3 | Anticholinergics | Benztropine (Cogentin) | Decreased sweating<br>Impaired thermoregulation |
| | Antihistamines with anticholinergic properties (*Scheduled/ daily- maintenance medication) | Cyproheptadine (Periactin)<br>Diphenhydramine (Benadryl)<br>Doxylamine (Unisom)<br>Hydroxyzine (Atarax, Vistaril) | Decreased sweating<br>Impaired thermoregulation |
| | Antispasmodic/ Antimuscarinics | Dicyclomine (Bentyl)<br>Hyoscyamine (Levsin)<br>Darifenacin (Enablex)<br>Oxybutynin (Ditropan)<br>Propantheline (Pro-Banthine)<br>Tolterodine (Detrol, Detrol LA) | Decreased sweating<br>Impaired thermoregulation |
| | Antipsychotics | Chlorpromazine<br>Clozapine (Clozaril)<br>Thioridazine (Mellaril) | Decreased sweating<br>Impaired thermoregulation |
| | Tricyclic antidepressants (TCAs) | Amitriptyline (Elavil)<br>Clomipramine (Anafranil)<br>Desipramine (Norpramin)<br>Doxepin (Sinequan)<br>Imipramine (Tofranil)<br>Nortriptyline (Aventyl, Pamelor) | Decreased sweating |
| | Skeletal Muscle Relaxants (*Scheduled/ daily- maintenance medication) | Carisoprodol (Soma)<br>Tizanidine (Zanaflex)<br>Carisoprodol (Soma, Vanadom).<br>Chlorzoxazone (Lorzone, Parafon Forte DSC).<br>Metaxalone (Metaxall, Skelaxin).<br>Dantrolene (Dantrium)<br>Orphenadrine (Norflex) | Decreased sweating<br>Impaired thermoregulation |
| | Mood stabilizer | Lithium (Eskalith, Lithobid)<br>(Not ACH Risk) | Diabetes insipidus induced water loss and risk for fainting, falls<br>Electrolyte imbalance<br>Risk for toxicity in setting of dehydration because of narrow therapeutic index |
| 2 | Antiseizure medications | Oxcarbazepine (Trileptal)<br>Topiramate (Topamax)<br>Carbamazepine (Tegretol) | Decreased sweating<br>Increased sweating<br>Increased urination<br>Dizziness and weakness, especially after increased dose |

1 of 3

**Department Regulation No. HCP8**
**Attachment A**
**7 November 2024**

| Heat Pathology Medications List | | | |
|---|---|---|---|
| **ACH Risk Score** | **Medication Drug Class** | **Examples** | **Mechanism of Heat Pathology** |
| 3 | Anticholinergics | Benztropine (Cogentin) | Decreased sweating<br>Impaired thermoregulation |
| | Antihistamines with anticholinergic properties (*Scheduled/ daily- maintenance medication) | Cyproheptadine (Periactin)<br>Diphenhydramine (Benadryl)<br>Doxylamine (Unisom)<br>Hydroxyzine (Atarax, Vistaril) | Decreased sweating<br>Impaired thermoregulation |
| | Antispasmodic/ Antimuscarinics | Dicyclomine (Bentyl)<br>Hyoscyamine (Levsin)<br>Darifenacin (Enablex)<br>Oxybutynin (Ditropan)<br>Propantheline (Pro-Banthine)<br>Tolterodine (Detrol, Detrol LA) | Decreased sweating<br>Impaired thermoregulation |
| | Antipsychotics | Chlorpromazine<br>Clozapine (Clozaril)<br>Thioridazine (Mellaril) | Decreased sweating<br>Impaired thermoregulation |
| | Tricyclic antidepressants (TCAs) | Amitriptyline (Elavil)<br>Clomipramine (Anafranil)<br>Desipramine (Norpramin)<br>Doxepin (Sinequan)<br>Imipramine (Tofranil)<br>Nortriptyline (Aventyl, Pamelor) | Decreased sweating |
| | Skeletal Muscle Relaxants (*Scheduled/ daily- maintenance medication) | Carisoprodol (Soma)<br>Tizanidine (Zanaflex)<br>Carisoprodol (Soma, Vanadom).<br>Chlorzoxazone (Lorzone, Parafon Forte DSC).<br>Metaxalone (Metaxall, Skelaxin).<br>Dantrolene (Dantrium)<br>Orphenadrine (Norflex) | Decreased sweating<br>Impaired thermoregulation |
| | Mood stabilizer | Lithium (Eskalith, Lithobid)<br>(Not ACH Risk) | Diabetes insipidus induced water loss and risk for fainting, falls<br>Electrolyte imbalance<br>Risk for toxicity in setting of dehydration because of narrow therapeutic index |
| 2 | Antiseizure medications | Oxcarbazepine (Trileptal)<br>Topiramate (Topamax)<br>Carbamazepine (Tegretol) | Decreased sweating<br>Increased sweating<br>Increased urination<br>Dizziness and weakness, especially after increased dose |

1 of 3

Department Regulation No. HCP8
Attachment A
7 November 2024

| ACH Risk Score | Medication Drug Class | Examples | Mechanism of Heat Pathology |
|---|---|---|---|
| | Antipsychotics | Trifluoperazine (Stelazine) Loxapine (Loxitane) Perphenazine (Trilafon) | Impaired sweating Impaired temperature |
| | Skeletal Muscle Relaxants (*Scheduled/ daily-maintenance medication) | Baclofen (Lioresal) Cyclobenzaprine (Fexmid, Flexeril) Dantrolene (Dantrium) | Decreased sweating Impaired thermoregulation |
| 1 | Antipsychotics | Aripiprazole (Abilify) Asenapine (Saphris) Fluphenazine (Prolixin) Haloperidol (Haldol) Olanzapine (Zyprexa) Paliperidone (Invega) Prochlorperazine (Compazine) Quetiapine (Seroquel) Risperidone (Risperdal) Ziprasidone (Geodon) | Impaired sweating Impaired temperature |
| 0-1 | Diuretics | Loop Diuretics: Acetazolamide (Diamox) Bumetanide (Bumex) Furosemide (Lasix) Metolazone (Zaroxolyn) Spironolactone (Aldactone) Torsemide (Demadex) | Electrolyte imbalance Volume depletion, dehydration and increased risk of fainting and falls Reduced thirst sensation |

152. Dr. Barnes felt the medications on the initial list were appropriate in that they all had high anticholinergic properties. Day 4 Tr. 127. Dr. Barnes explained that the anticholinergic drug blocks the breakdown of the medication. When the breakdown is blocked, it can impact things the body needs to do to compensate when exposed to high heat. Day 4 Tr. 128. The things the body needs to compensate for include things like heart rate and sweating and similar functions of the autonomic nervous system. *Id*.

153. After her review, she felt that there were additional medications that also had high anticholinergic properties that should be added to the medication list. *Id*.

154. Dr. Barnes also identified multiple medications without high anticholinergic effects that she recommended be placed on the heat pathology medication list. *Id*. at 148; JX-018.

155. Plaintiffs' expert, Dr. Susie Vassallo, criticized Dr. Barnes for not adding additional medications to the heat pathology medication list, including SSRIs.

156. Dr. Deleca Barnes fully explained the recent research from 2024 by Lily Hospers and others entitled "The Effect of Prescription and Over-the-Counter Medications on Core Temperature in Adults During Heat Stress: a Systematic Review and Meta-Analysis."

DX-061. The Hospers study looked at the World Health Organization, which warns that certain medications impair thermoregulation with limited supporting evidence. See DX-061.

157. The findings of this study reveal that current evidence supports that strong anticholinergics, nonselective betablockers, adrenaline and anti-Parkinson's agents impair thermoregulation during heat stress. However, there was no evidence indicating thermoregulation as impacted by other World Health Organization listed medications. The findings of the study specifically reference that antidepressants (such as SSRIs), diuretics or drugs with weak anticholinergic effect did not alter core temperature responses. See DX-061.

158. Dr. Deleca Barnes testified there is no reason to add SSRIs to the medication pathology list. Day 4 Tr. 140.

159. Dr. Vassallo's reliance on a very rare condition, serotonin syndrome, to say that SSRIs have an increased risk with heat related illnesses conflates the issues. Serotonin syndrome is a very rare syndrome related to having too much serotonin the body, and patients can get critically ill from that. Day 4 Tr. 141. If a patient has too much serotonin, it will look like a heat related illness. However, it is caused by too much serotonin in your body, not from a heat related illness. Day 4 Tr. 140-141.

## VIII.  Testimony from Other Experts

160. Plaintiffs called three other experts in support of their dignitary harm claim: Dr. Hammonds, Dr. Sbicca and Marguerite Green. None of these experts offered probative opinions that would assist the Court.

161. Dr. Hammonds did not interview or speak to any offenders, did not review any medical records, and did not visit LSP or any prison. Day 1 Tr. 110. Yet she opined that offenders at LSP are placed at a risk of negative health consequences. Day 1 Tr. 115.

162. Further, Dr. Hammonds based her testimony in part on the amount of incentive pay that offenders working the Farm Line make. However, she admitted that he did not look into how those incentive wages compared to other jobs at LSP. Day 1 Tr. 159. Yet, when asked if her opinion would change if offenders on the Farm Line made more money, she testified that it would depend on how much more money those offenders made, and that amount of pay relative to other positions at LSP. Day 1 Tr. 160-161.

163. Dr. Sbicca is a sociologist. He is not a psychologist, psychiatrist or a medical doctor. Day 3 Tr. 112-113. Yet, Dr. Sbicca also testified that inmates on the Farm Line experience harm. He is not qualified to provide such opinions.

164. Dr. Sbicca's opinions mainly stem from his disagreement with prison labor generally. While Dr. Sbicca opined that the Farm Line is degrading because it forces inmates to perform "plantation style" agricultural work, he also testified that his opinion would not change if LSP was not located on the grounds of a former plantation. Day 3 Tr. 178:1-3. As such, he would have the same opinion for any inmate performing any sort of agricultural work.

165. Yet, he admitted that all 50 states had prison agricultural programs. Over 600 prisons have an inmate agricultural program. Day 3 Tr. 178. And that multiple states had prison agricultural programs that paid inmates nothing for their work. *Id*. at 181-182.

166. Even more, Dr. Sbicca admitted that inmates serving at LSP are serving a hard labor sentence at a maximum-security prison and therefore any person in prison would

29

experience anxiety or stress. *Id.* at 181. As such, any alleged harm that inmates at LSP experience, which he is not qualified to testify to, could more plausibly be tied to prison-related stressors that all inmates can experience.

167.  Plaintiffs also called an agricultural expert, Marguerite Green who opined that the agricultural program was "inefficient" as compared to other farms in Louisiana. Day 2 Tr. 177.  Aside from the fact that LSP is not required to follow "industry standards" set forth by Green in running their agricultural program that feeds inmates, her testimony was largely contradicted by the yields that LSP produces from these agricultural programs, as well as the fact that LSP fulfills the purpose of the Farm Line, namely to feed fresh vegetables to 4,000 inmates daily. See DX 31.

## CONCLUSIONS OF LAW

### I.    Plaintiffs Failed to Prove Their Eighth Amendment Claims

168.  Plaintiffs bring two different theories under the Eighth Amendment: (1) that the Farm Line violates the constitution because it places inmates at a substantial risk of harm to the heat ("Heat Theory") and (2) that the Farm Line violates the constitution because it places inmates at a substantial risk of dignitary harm ("Dignitary Harm Theory"). Both claims fail.

169.  "Deliberate indifference is an extremely high standard to meet." *Cadena v. El Paso Cty.*, 946 F.3d 717, 728 (5th Cir. 2020).

170.  In a constitutional claim alleging deliberate indifference to the conditions of a prisoner's confinement, the plaintiff must satisfy both the "subjective and objective requirements" of the Eighth Amendment inquiry. *Farmer v. Brennan*, 511 U.S. 825, 846, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

171.    To satisfy the objective requirement, the plaintiff must show an "objectively intolerable risk of harm." *Id*.

172.    To satisfy the subjective requirement, the plaintiff must show that the defendant: "(1) was 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists'; (2) subjectively 'dr[e]w the inference' that the risk existed; and (3) disregarded the risk." *Cleveland v. Bell*, 938 F.3d 672, 676 (5th Cir. 2019).

173.    In *Farmer*, the Supreme Court held that deliberate indifference requires the defendant to have a subjective "state of mind more blameworthy than negligence," akin to criminal recklessness. *Farmer*, 511 U.S. at 835, 114 S.Ct. 1970.

174.    Although a court may disagree with a defendant's actions, "mere disagreement" "does not establish deliberate indifference." *Valentine v. Collier*, 956 F.3d 803.

**A.  Dissatisfaction with Job Assignment Does Not State a Constitutional Claim**

175.    A prison inmate has no constitutional right to a job of his choice and cannot base a civil rights action on general dissatisfaction with a job assignment. *Harris v. Greer*, 750 F.2d 617, 618 (7th Cir.1984).

176.    The Constitution does not mandate comfortable prisons, and to the extent that conditions of confinement may be restrictive and even harsh, they are ordinarily considered part of the penalty that criminal offenders pay for their offenses against society. See *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981).

177.    An inmate's feeling that he is being treated harshly, without more, does not qualify him for relief under section 1983. Rather, the Eighth Amendment's prohibition against cruel and unusual punishment requires a demonstration of "unnecessary and wanton

31

inflicition of pain." *Whitley v. Albers*, 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986).

178.  The Fifth Circuit previously held that work on the Farm Line at LSP does not meet threshold requirements for an Eighth Amendment claim:

> The uncomfortable conditions Clarke painstakingly describes, including the episodes with fire ants, poison ivy, cold weather, and cotton picking, do not raise questions of constitutional magnitude. They are simply part of working the agricultural line. As such, they represent "a de minimis level of imposition with which the Constitution is not concerned." *Simons v. Clemons*, 752 F.2d 1053, 1056 (5th Cir.1985).

## B.  Plaintiffs Failed to Show a Constitutional Violation Under Their "Heat Theory"

179.  Plaintiffs claim that all offenders working on the Farm Line are at a substantial risk of serious harm if the heat index exceeds 88 degrees.

180.  Merely "uncomfortable" heat does not reflect "a basic human need that the prison has failed to meet" and is not constitutionally suspect. *Woods v. Edwards*, 51 F.3d 577, 581 (5th Cir.1995).

181.  While the Fifth Circuit has recognized that heat in general can constitute a substantial risk of serious harm in some instances, the question is whether Plaintiffs have shown an objectively intolerable risk of harm. *Farmer v. Brennan*, 511 U.S. 825, 846 (1994).

182.  Unlike other cases involving heat, there have been zero deaths and zero heat strokes involving inmates working the Farm Line. Dr. Vassallo admitted that in all of the medical records and SDEs from 2023, 2024 and 2025, there was no indication that any inmate working the Farm Line had a heat stroke. Compare for example *Yates v. Collier*, 868 F.3d 354, 360 (5th Cir. 2017) wherein the Fifth Circuit explicitly noted that the Texas prison system was involved in numerous other cases alleging Eighth Amendment violations based on excessive heat in prison. See, e.g., *Hinojosa*, 807 F.3d 657, 661

(deciding appeal involving TDCJ prisoner who suffered a seizure at night due to high indoor temperatures, "[fell] out of his bed and was convulsing," and died twenty minutes later); *Webb v. Livingston*, 618 Fed.Appx. 201, 204 (5th Cir. 2015) (deciding appeal involving the "heat-related deaths of five prisoners who died while housed in facilities operated by [TDCJ]") See *also Tiede v. Collier*, 796 F. Supp. 3d 275, 326 (W.D. Tex. 2025) (Plaintiffs' experts established that nearly three hundred deaths were attributable to extreme heat in Texas prisons without air conditioning between 2001 to 2019, or an average of 14 deaths per year).

183. While Defendants acknowledge that Plaintiffs need not prove that a death has occurred, the medical records in evidence show that the risk mitigation measures in place appropriately abate the risk of heat related injuries.

184. In addition, in a Louisiana Department of Health study, it was found that the risk of heat related illness in West Feliciana Parish, where LSP is located, in extremely low. The crude rate was 8.9-12.5 per 100,000 workers. PX 116, pg. 24. Again, with an inmate population of 4,000, and even less than the entire population that are assigned to the Farm Line, the risk is extremely low, and by no means an "objectively intolerable risk of harm."

185. It is well established that in operating a prison, the state is not constitutionally required to observe all the safety and health standards applicable to private industry nor is it bound by the standards set by the safety codes of private organizations. *Sampson v. King*, 693 F.2d 566, 568 (5th Cir. 1982). Standards suggested by experts are merely advisory. *Id*.

186. Here, there is no "national standard" that currently sets forth required risk mitigation measures to employers regarding outdoor work. OSHA, which neither DOC or LSP would be required to follow, recently set forth proposed standards for risk mitigation measures for outdoor work. DX 40; 49. LSP's risk mitigation measures in place exceed what OSHA proposes.

187. The following is a comparison of the proposed OSHA rules with LSP's risk mitigation measures:

| OSHA Proposed Rule | LSP Policies |
|---|---|
| Employer must monitor heat conditions at outdoor work areas by tracking local heat index forecast provided by NWS or as close as possible to the work area, measure heat index. DX 49, pg. 6. | LSP purchases the Perry Weather System which measures the heat index on site. Day 4 Tr. 308-310. |
| Employer must monitor the heat index with sufficient frequency to determine with reasonable accuracy the employees' exposure to heat | Perry Weather System measures heat index in real-time. Day 4 Tr. 308-310. |
| At the initial heat trigger of 80 degree heat index, employers must provide: readily accessible drinking water. DX 49, pg. 8. | LSP does not require an initial heat trigger and provides access to unlimited drinking water year round. DX 62, pg. 6; DX 48, pg. 4. Day 2 Tr. 64; Class Cert. Tr. Vol 2 305:18-24; Day 3 Tr. 8:19-25. |
| At the initial heat trigger of 80 degree heat index, employers must provide: break areas that are readily accessible to work area that provide artificial shade (tent, pavilion) or natural shades (trees) that provides blockage of direct sunlight and is open to outside air. DX 49, pg. 9. | LSP does not require an initial heat trigger and provides access to shade with the 25 shade pavilions placed throughout the fields. These pavilions have fans, electricity and bench seating. DX 62, pg. 6; DX 48, pg. 4; DX 52; Day 4 Tr. 328; Day 3 Tr. 13-14. |
| At the initial heat trigger of 80 degree heat index, employers must provide: rest breaks if needed. DX 49, pg. 6. | LSP does not require an initial heat trigger and provides 15 minutes rest breaks every 45 minutes regardless of heat index. DX 48, pg. 4. Day 3 Tr. 12:1-12. Offenders can also break as needed. Day 2 Tr. 64. |
| At the initial heat trigger of 80 degree heat index, employers must provide: effective communication with employees | Offenders working the Farm Line are directly supervised at all times. Class Cert. Tr. Vol 2 300-301. |

| At the high heat trigger of 90 degree heat index, additional measures are required | Additional measures are required once the heat index reaches 88 degrees. DX 62. |
|---|---|
| Once the heat index reaches 90 degrees, employers must provide 15 minute rest breaks every two hours. DX 49, pg. 11. | LSP provides 15 minutes rest breaks every 45 minutes. DX 48, pg. 4. Day 3 Tr. 12:1-12. Offenders can also break as needed. Day 2 Tr. 64. |

188. The measures that LSP employs to reduce the risk of harm exceed the national guidance.

189. "OSHA identified and reviewed dozens of studies evaluating the effectiveness of various controls designed to reduce the risk of heat related injuries and illnesses (HRIs)." DX 40, pg. 50. OSHA reported that the totality of the evidence reviewed supports that the approach outlined in the proposed standard (described in the above table and at DX 49), will result in a substantial reduction in HRIs (range: 37–96%) and heat-related fatalities (range: 99.8–100%) in employees who would be covered under the proposed standard. Specifically, OSHA found the following:

- "rest breaks to be effective in reducing the risk of HRI by modulating increases in heat and cardiovascular strain." DX 40, pg. 55.

- "resting in shade will reduce the risk of HRI by decreasing exposure to radiant heat that contributes to heat stress and can lead to heat strain and then HRI." DX 40 ,pg. 57.

- "use of fans during work and/or rest breaks will be effective in reducing heat strain in the majority of working age adults." Id. at 59.

- "drinking adequate amounts of water is an effective intervention for preventing heat strain that could lead to HRI, and that providing cool drinking water is especially beneficial." Id. at 61

190. LSP implements every one of these recommendations.

191. Plaintiffs cannot show an objectively intolerable risk of harm where LSP employs risk mitigation measures in excess of what OSHA recommends any employer of outdoor workers to follow.

192. In Eighth Amendment cases, plaintiffs can only obtain a remedy that reduces the risk of harm to a socially acceptable level. *Ball v. LeBlanc*, 792 F.3d 584, 599 (5th Cir. 2015). Some risk is permissible and perhaps unavoidable. *Id*.

193. Dr. Vassallo's opinions as to required risk mitigation measures far exceed the "socially acceptable level" of risk. While Dr. Vassallo disagrees with OSHA's research and findings (Day 4 Tr. 101-102), her disagreement with OSHA does not prove a constitutional violation

194. Even if Plaintiffs could show an intolerable risk of harm with the risk mitigation measures in place, Plaintiffs failed to prove deliberate indifference under the subjective prong.

195. In *Farmer v. Brennan*, 511 U.S. 825 (1994), the Supreme Court held that the subjective component must be viewed in light of the prison authorities current attitudes and conduct.

196. In *Valentine v. Collier*, 993 F.3d 270 (5th Cir. 2021), the Fifth Circuit reiterated *Farmer* and held: "Deliberate indifference is determined based on prison officials' current attitudes and conduct. The evidence must show over the course of the timeline that officials knowingly and unreasonably disregarded an objectively intolerable risk of harm, and that they will continue to do so; and finally to establish eligibility for an

injunction, the inmate must demonstrate the continuance of that disregard during the remainder of the litigation and into the future." *Id*. at 282.

197. Since the filing of this lawsuit, Defendants have made significant and meaningful changes to the Farm Line.

198. In October 2024, in conjunction with experts, Defendants revised HCP8 and 13.067 to significantly expand the heat pathology medication list. Defendants added over 40 medications to the list after careful consultation with Dr. Barnes.

199. Defendants further created a medical exclusion list that includes nine categories and 33 illnesses.

200. Defendants set forth a cease work requirement of 113-degree heat index. Warden Vannoy requires field officers to be notified if the heat index reaches 110 degrees so that offenders can be brought indoors before the heat index even reaches 113 degrees. Day 4 Tr. 310-311; DX 62.

201. Defendants designed and constructed two different types of shade structures. In October 2024, Defendants constructed two shade wagons to create shaded rest break areas for offenders to take breaks on.

202. Defendants also design and constructed 25 shade pavilions. The 24x24 pavilions have a roof for shade, benches for seating, electricity, four large fans, and access to two water spigots on each side. DX 52; Day 4 Tr. 328. These pavilions were strategically placed throughout the fields to allow readily accessible shades rest areas to offenders working the Farm Line. *Id*. LSP spent over $300,000 on these shade pavilions. *Id*. at 325.

203. LSP recognized that the NWS heat index reporting became unreliable. LSP purchased the Perry Weather system, which is a weather station located at LSP that provides real time temperature monitoring. Day 4 Tr. 308-310.

204. LSP codified the Farm Line procedures in Post Orders, which require, year round and regardless of temperature:

- Accessible shaded areas for rest breaks that include a seating area for inmates. This is an organized 15-minute rest break required after 45minutes of work; the time to walk to and from the shaded rest area is not counted in the rest break time period. Field officers may utilize the constructed shade pavilions or shade trailers, or combination of both for shaded rest areas

- Sufficient drinking coolers placed on a raised surface that include ice and water, each to be refilled as needed during work hours. During the 45-minute work period, inmates shall have access to water at any time

- Sunscreen, Work Gloves, Drinking Cups and Hats are available for inmate use

- Portalet and handwashing station. JX 48.

205. Post trial, Defendants continue to make improvements. Warden Vannoy revised 13.067 to remove the requirement of a heat season, and the heat pathology policies apply year round at LSP. DX 62. Warden Vannoy also issued a memorandum to his field employees advising that once a heat alert is called, offenders with heat precautions duty status must be brought indoors within 30 minutes. *Id*.

206. Warden Vannoy also began working on a certification program for offenders working the Farm Line. Warden Vannoy ordered a green house and once construction is

complete, LSP will have horticulture class for inmates working the Farm Line. DX 62; PX 248, pg. 29-30.

207. Throughout the trial, LSP officials, and specifically Warden Vannoy, continuously testified that the priority is to keep offenders working the Farm Line safe. A far cry from deliberate indifference, Defendants' "attitudes" demonstrate that Defendants continuously work to abate any risk of harm. Plaintiffs failed to show that Defendants knowingly and unreasonably disregarded an objectively intolerable risk of harm. See *Parker v. Hooper*, 23-30825, Doc. 279-1, pg. 32 ("The Defendants' remedial efforts may prove insufficient to cure all the identified institutional problems, but they indicate concern and sincerity on the part of prison officials that negate subjective indifference.").

208. Lastly, Plaintiffs point to three instances where Defendants failed to call a heat alert in an attempt to establish deliberate indifference. These isolated incidents do not demonstrate deliberate indifference. During the 2025 heat season, the heat index reached 88 degrees while offenders were working on the Farm Line 69 days. JX 245. Of those 69 days, Plaintiffs point to three instances where they claim no heat alert was called. PDX 7. Two of the instances were on June 9, 2025. The record demonstrates that on June 9, 2025, LSP control center recorded the heat index, and the heat index did not reach 88 degrees based on the weather data relied on that day. JX 214, pg. 37. No heat alert was called because the data LSP relied on did not reach 88 degrees. This is not evidence of deliberate indifference. The third instance, October 8, 2025, is a non-starter. Plaintiffs fail to show that "no heat alert was called." In fact, the line went out after a heat alert would have been called. Within 10 minutes of arriving at the field,

LSP brought the offender with a heat precaution duty status back to the dorm. JX 245, pg. 1070.

## C. Plaintiffs Failed to Show a Constitutional Violation Under Their Dignitary Harm Theory

209. Plaintiffs assert that the Farm Line would not cause dignitary harm if: (1) it was not a job assignment that was given for new intake or offenders coming out of segregation; (2) if it was a vocational job assignment; and (3) if they were "better compensated." Day 5 Tr. 251-252. These arguments show that Plaintiffs' dignitary harm claim is foreclosed by well-settled law.

210. "'The unnecessary and wanton infliction of pain ... constitutes cruel and unusual punishment forbidden by the Eighth Amendment.'" *Hope v. Pelzer*, 536 U.S. 730, 737–38 (2002) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)) (alteration omitted). The Supreme Court has explained that "[a]mong 'unnecessary and wanton' inflictions of pain are those that are 'totally without penological justification.'" *Id*.

211. As the Supreme Court explained, the "[Eighth] Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101 (1958). In cases challenging a type of punishment, this involves two steps. First, courts consider "objective indicia of society's standards, as expressed in legislative enactments and state practice, to determine whether there is a national consensus against the sentencing practice at issue." *Graham v. Florida,* 560 U.S. 48, 61 (2010), as modified (July 6, 2010) (quotation marks omitted). In undertaking this inquiry, courts first consider whether "there is a national consensus" against the challenged punishment. *Id*. at 61, 130 S.Ct. 2011. The Supreme Court has instructed that this determination "should be informed by objective factors to the

40

maximum possible extent." *Atkins v. Virginia*, 536 U.S. 304, 312, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (internal quotation marks omitted). The "clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures." *Id*.

212. Second, courts "determine, in the exercise of our own independent judgment, whether [the practice] is a disproportionate punishment." *Roper v. Simmons*, 543 U.S. 551, 564, 125 S. Ct. 1183, 1192, 161 L.Ed.2d 1 (2005). This assessment includes consideration of "the severity of the punishment in question," "the culpability of the offenders at issue in light of their crimes and characteristics," and "whether the challenged ... practice serves legitimate penological goals." *Graham*, 560 U.S. at 67.

213. At the outset, Plaintiffs' dignitary harm claim is based on conditions that have been long held to be constitutional. The claim is nothing more than an improper attempt to use the Eighth Amendment to circumvent the Thirteenth Amendment and well settled law. *See, e.g.*, *Everytown for Gun Safety Support Fund v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 984 F.3d 30, 34 (2d Cir. 2020) (citing *Dorsey v. United States*, 567 U.S. 260, 275 (2012) ("An earlier-enacted statutory requirement cannot prevent the 'plain import' or 'fair implication' of a later-enacted statute from taking effect."). Of course, "[i]n the event of a conflict," the "later enactment governs." *Id.*; *see also United States v. Hernandez-Garcia*, 44 F.4th 1157, 1165 (9th Cir. 2022) ("[I]f the newer statute comes closer to addressing the very problem posed by the case at hand, it is as if the later-enacted statute effectively repealed the conflicting provisions of the earlier one." (citation modified)). Similarly, it is well-settled that a more specific provision of law (here, the Thirteenth Amendment) governs over the more general (here, the Eighth

41

Amendment). *See, e.g.*, *Graham v. Connor*, 490 U.S. 386, 395 (1989) ("Because the Fourth Amendment provides an explicit textual source of constitutional provision against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims."); *accord Gozlon-Peretz v. United States*, 498 U.S. 395, 407 (1991).

214. The Thirteenth Amendment specifically provides that hard labor may be imposed "as a punishment for crime whereof the party shall have been duly convicted." U.S. Const. amend. XIII. In dismissing Plaintiffs' claim under the Thirteenth Amendment, this Court has already held that "direction from the Supreme Court and the [Fifth Circuit] unequivocally points to Plaintiffs' claims being foreclosed as a matter of law." ECF No. 56 at 4. Plaintiffs—individuals convicted of crimes requiring a sentence of imprisonment at hard labor—therefore cannot press a claim under the Eighth Amendment that the Farm Line violates the Thirteenth Amendment's prohibition on slavery or involuntary servitude.

215. In addition, as the Supreme Court has noted, opinions of experts as to desirable prison conditions do not suffice to establish contemporary standards of decency. *Rhodes v. Chapman*, 452 U.S. 337, 350 (1981). Plaintiffs' reliance on a sociologist, a historian, and an agriculture expert to prove their dignitary harm claim fails to satisfy the high burden under the Eighth Amendment.

***Compelling an inmate to work without pay does not violate the Constitution.***

216.  Plaintiffs (and their experts) argue that the Farm Line causes dignitary harm because inmates are paid .02 cents an hour for the work. Because compelling an inmate to work

without any pay does not violate the Constitution, paying an inmate .02 cents an hour does not violate the Constitution.

217.    Compelling an inmate to work without pay does not violate the Constitution. *Loving v. Johnson*, 455 F.3d 562, 563 (5th Cir. 2006). In fact, "[p]eople are not imprisoned for the purpose of enabling them to earn a living. The prison pays for their keep. If it puts them to work, it is to offset some of the cost of keeping them, or to keep them out of mischief, or to ease their transition to the world outside, or to equip them with skills and habits that will make them less likely to return to crime outside." *Id.,* (citing *Bennett v. Frank*, 395 F.3d 409, 409–10 (7th Cir.2005)) (internal citations omitted).

218.    As such, the Thirteenth Amendment clearly and unambiguous allows prisons to require inmates to work without pay. Further Louisiana state law specific defines an inmate sentenced to a felony at hard labor. La. R.S. §14:2(A)(4). Based on the legislation enacted, there is no "national consensus" against the requiring inmates to work at LSP. Even further, there is no national consensus that agricultural work in prisons is against the evolving standards of decency, as Plaintiffs' own expert admitted that prisons in Texas, Georgia, Arkansas, and Alabama all have agricultural job assignments where inmates are not paid at all. Day 3 Tr. 182. In fact, Sbicca testified that all 50 states and over 600 prisons have inmate agricultural programs. Day 3 Tr. 187:5-14.

219.    Further, the evidence establishes that many jobs, other than the Farm Line, also pay .02 an hour. That is the introductory incentive pay rate for every job at LSP once an inmate can earn incentive pay. Because the incentive pay rate is not unique for the Farm Line, this cannot serve a basis for dignitary harm for the Farm Line.

220.   Lastly, Plaintiffs' expert Dr. Hammond testified that if the inmates working the Farm Line received higher wages, it would affect her opinion. Day 2 Tr. 159-161. The incentive pay rate cannot form the basis for a dignitary harm claim where under well settled law, inmates are not constitutionally entitled to incentive pay.

### *LSP is given deference in security purposes of job assignments.*

221.   "'Prison administrators are to be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'" *Umondak v. Ginsel*, 426 F. App'x 267, 269 (5th Cir. 2011), citing *Block v. Rutherford*, 468 U.S. 576, 585 (1984)

222.   Courts also recognize that flexibility must be accorded prison administrators in carrying out their responsibilities to the public and to the inmates under their care and control. *Hay v. Waldron*, 834 F.2d 481, 486 (5th Cir. 1987).

223.   When reviewing policies designed to preserve internal order, discipline and security, a court should accord broad deference to prison administrators regarding the reasonableness of the scope, the manner, the place and the justification for a particular policy. *Id*. Courts ordinarily should defer to prison administrators' expertise if a policy is reasonably related to legitimate security objectives. *Id*.

224.   The uncontested testimony and evidence shows that LSP relies on this medium custody job assignment with supervision to serve a legitimate security purpose for new offenders, as well as offenders who were recently under more restrictive confinement. Day 2 Tr. 128:5-25; 129:2-16.  The very heart of Plaintiffs' complaint turns on LSP's legitimate security objective and this Court, under settled law, will not second guess that policy.

225. Even further, testimony indicated that the Farm Line is not always the first job assignment, and further that offenders can be assigned to the Farm Line for differing reasons, even if they did not have a recent disciplinary violation. Day 1 Tr. 63-64.

***The threat of disciplinary sanctions for failure to perform job duties is not unique to the Farm Line nor unconstitutional.***

226. Plaintiffs' expert testified that the Farm Line is "compelled" and that inmates on the Farm Line face arbitrary discipline for failure to work. Day 3 Tr. 133-135. Again, prisons have discretion in administering security concerns, and the threat of disciplinary sanctions for refusal to work is not unconstitutional. *Villarreal v. Morales*, 370 F. App'x 542 (5th Cir. 2010)(State prison's requirement that prisoner engage in labor or face disciplinary charges and punishment did not violate the Constitution).

227. Further, testifying inmates established that inmates face disciplinary infractions for refusal to work any job assignment at LSP. Day 2 Tr. 102:2-8. This is not unique to the Farm Line and therefore cannot form the basis for the "dignitary harm" specifically as to the Farm Line.

***The Farm Line is meaningful and serves legitimate institutional and penological purposes.***

228. Plaintiffs' experts based most of their opinions on the faulty premise that the Farm Line serves no meaningful purpose. These opinions are contradicted by the evidence.

229. At the outset, Plaintiffs' agriculture expert, Marguerite Green, provided her opinions on the operation of the Farm Line from a for-profit perspective. She has never worked in a prison or any prison administration experience. Her testimony is not relevant to the issues here and not probative. *Sampson v. King*, 693 F.2d 566, 568 (5th Cir. 1982) (In operating a prison, the state is not constitutionally required to observe all the safety and health standards applicable to private industry nor is it bound by the standards set

by the safety codes of private organizations). Green's testimony regarding weeds, row size, and soil health is simply not relevant to the constitutionality of LSP's agricultural program.

230. Further, Green's testimony that the Farm Line is inefficient is completely contradicted by the vegetable yields introduced into evidence. For example, from January to September 2025, over 300,000 pounds of fresh vegetables were issued to LSP kitchens from the Farm Line; over 25,000 pounds of frozen vegetables were issued to LSP kitchens; and over 150,000 pounds of vegetables were processed. DX 31.

231. Warden Vannoy testified that the Farm Line was meaningful and served legitimate purposes. LSP serve two farm vegetables to all inmates each day. Day 4 Tr. 302. Warden Vannoy believes the inmate population enjoys fresh vegetables as opposed to canned. *Id*. Further, inmates working the Farm Line harvest vegetables to feed to inmate population. It allows inmates to work in a supervised environment, and allows LSP to evaluate an inmates to ensure that inmates can move to a job with more freedom of movement around the prison. *Id*. at 305. Warden Vannoy further testified that inmates learn farming operations and could grow their own gardens if they are released. *Id*. Even further, Warden Vannoy is implementing a certification program for inmates assigned to the Farm Line to take part in the afternoons. DX 62.

***Plaintiffs' dissatisfaction with their job assignments is not actionable under the Eighth Amendment.***

232. A prison inmate has no constitutional right to a job of his choice and cannot base a civil rights action on general dissatisfaction with a job assignment. *Harris v. Greer*, 750 F.2d 617, 618 (7th Cir.1984).

233.    The inmate testimony mostly centered around their dissatisfaction with the job assignment. For example, Guillory testified that the Farm Line was "burdensome" and a "drain" and that it hurts your back. Day 1 Tr. 34; 53. Steven Major testified that harvesting potatoes was "hard" because he was hunched over. Day 1 Tr. 75:17-24. Myron Smith testified that it was a "belittlement" to be patrolled by officers while working the Farm Line, which is outside of the perimeter of a maximum security prison. Even more, Smith testified that he was patrolled while working as a trustee outside of the perimeter. Tr. Day 2 14:15-17.  Smith also testified that the Farm Line is more degrading than other jobs because when you're working in the kitchen you could eat better. Day 2 Tr. 34:1-2. This testimony merely supports a dissatisfaction with a particular job, and does not support a substantial risk of serious harm. In addition, the conditions that the inmates complain of are simply necessary security measures for a maximum security prison.

## II.    Plaintiff Failed to Prove Claims Under the ADA

234.    Plaintiffs' class definition for the ADA subclass is as follows: all persons incarcerated at Louisiana State Penitentiary who currently are or may in the future be assigned to the Farm Line and who have disabilities that may cause, or that are treated with medications that may cause, impaired thermoregulation. R.Doc. 407.[1]

235.    To make out a prima facie case under Title II, a plaintiff must show "(1) that he is a qualified individual within the meaning of the ADA; (2) that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which

---

[1] Defendants maintain their objection to the certification of Plaintiff class, for all the reasons identified in Defendants' opposition to the motion for class certification, ECF 136.

the public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability." *Melton v. Dallas Area Rapid Transit*, 391 F.3d 669, 671–72 (5th Cir. 2004).

236.    The Fifth Circuit recently cautioned that district courts could not "substitute[] its view of prison management for the statutory standard, which allows some institutional flexibility in providing for disabled prisoners' needs." *Parker v. Hooper*, 23-30825, Doc. 279-1, pg. 37.

237.    Under both the ADA and RA, a person is disabled if he has "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). The statute defines a major life activity in two ways. First, major life activities include, but are not limited to: caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working. *Id.*§ 12102(2)(A).

238.    Second, a major life activity includes "the operation of a major bodily function." *Id*. § 12102(2)(B). Such functions include, but are not limited to: the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions. *Id*.

239.    As such, Plaintiffs can prove themselves disabled if their ailments substantially limit either a major life activity or the operation of a major bodily function. *Ball v. LeBlanc*, 792 F.3d 584, 596–97 (5th Cir. 2015)

240. Plaintiffs assert that impaired thermoregulation is a major life activity and a qualifying disability under the ADA. The Fifth Circuit has expressly declined to find that thermoregulation is a major life activity. See *Ball*, 792 F.3d at 597 n.11; *Hardwick v. Bowman*, No. 6:21CV201, 2023 WL 4056050, at \*12 (E.D. Tex. Apr. 26, 2023), *report and recommendation adopted*, No. 6:21-CV-00201, 2023 WL 4054687 (E.D. Tex. June 16, 2023).

241. Plaintiffs failed to present any evidence that impaired thermoregulation substantially limits either a major life activity or the operation of a major bodily function. For example, while Dr. Vassallo attempted to tie thermoregulation to brain function, she testified that a person's mental status is altered if they experience a heat stroke. Class Cert Tr. Vol 2 44:13-18. Dr. Vassallo further testified that "thermoregulation requires the proper functioning of the brain and central nervous system." Class Cert Tr. Vol 2 44:9-12. However, there is no evidence that impaired thermoregulation <u>substantially limits</u> any major life activity or bodily function.

242. Even if thermoregulation is a major life activity, Plaintiffs failed to prove that any class member experienced impaired thermoregulation. See *Ball v. LeBlanc*, 792 F.3d 584, 597 (5th Cir. 2015).

243. Dr. Vassallo testified that thermoregulation is the physiological process by which the body maintains a temperature of approximately 98.6 degrees. Class Cert Tr. Vol 2 38:1-4. See also *Ball v. LeBlanc*, 792 F.3d 584, 597 (5th Cir. 2015).

244. The parties submitted hundreds of pages of medical records and SDEs made by offenders in the field. See for example JX 143.

245. As a part of the vital signs taken by medical personnel, the medical records include each offender's temperature, unless vitals were refused. Day 4 Tr. 279:7-19. There were no instances where any offender's body temperature was elevated, nor were there any instances where the temperature was low. See JX 143.

246. While Dr. Vassallo testified that some people can suffer a "heat illness" and have normal vital signs (Day 4 Tr. 38:4-15), the definition set forth by Dr. Vassallo regarding thermoregulation, and specifically the ability to keep one's body temperature within a normal range, governs the ADA analysis. There were no instances in the medical records that indicate any potential class member has an inability to thermoregulate, which would be evidenced by an increased body temperature.

247. Dr. Vassallo's general testimony regarding risk of heat illnesses does not support the conclusion that any class member has or has ever experienced impaired thermoregulation.

248. Plaintiff further argue that Defendants failed to accommodate offenders with heat precaution duty statuses on several occasions during the 2025 heat season. At the outset, even if the offenders identified by Plaintiffs were provided a heat precaution duty status on the days identified, Plaintiffs have failed to prove that any of these offenders actually suffered from impaired thermoregulation or that they were otherwise disabled under the ADA.

249. LSP has issued 1,500 heat precaution duty statuses to offenders that may "have a higher risk of developing heat pathology." DX 62, pg. 3. However, issuing heat precaution duty statuses to offenders who may be at a higher risk for heat vulnerability does not indicate that Defendants regard any offender as disabled under the ADA or that the

offender has impaired thermoregulation. Even as Dr. Vassallo testified, symptoms of heat illness does not always stem from impaired thermoregulation. Day 4 Tr. 38:6-14.

250. As an example, Dr. Vassallo identified an offender, "C.J." who she testified that he was prescribed Zyprexa and has a "serious impairment of the thermoregulation by virtue of the medications." Day 4 Tr. 50:16-18. Dr. Vassallo testified that he was working the Farm Line when the heat index was 95 degrees. However, his temperature was taken in the field that day and was normal. Day 4 Tr. 51:3-9.

251. Second, the testimony shows that offenders have a duty to present their duty status to an officer, or request that officer to call in for a duty status check. Day 4 Tr. 218:7-11. There was also evidence presented that offenders will fail to present their duty status or otherwise violate their duty status. Day 4 Tr. 261:13-19. As such, Plaintiffs failed to show that Defendants failed to accommodate any offender.

252. As such, Plaintiffs failed to prove that any class members is disabled under the ADA, which is fatal to their ADA claim.

## III. Plaintiffs' Request Relief Far Exceeds the PLRA's Express Limits on Federal Court's Authority to Fashion Relief in State Prisons.

253. Congress passed the PLRA in 1996 to limit the oversight of state prisons by federal courts.

254. To eliminate federal court interference with state and local prison management, the PLRA "establishe[d] standards for the entry and termination of prospective relief in civil actions challenging prison conditions." *Miller v. French*, 530 U.S. 327, 331, 120 S. Ct. 2246, 2250 (2000).

255. "When weighing any form of injunctive relief, federal courts must be mindful not to jump at the chance to take prison administration into their own hands and out of the

51

hands of the people entrusted with such tasks  by the state." *Alex A. by & through Smith v. Edwards*, No. CV 22-573-SDD-RLB, 2022 WL 4445499, at *18 (M.D. La. Sept. 23, 2022). See also *Creel v. City of Baton Rouge/Par. of E. Baton Rouge*, No. CV 20-880-SDD-EWD, 2021 WL 856710, at *1 (M.D. La. Mar. 8, 2021).

256.  Federalism concerns are particularly acute in the context of prison management. *Shaw v. Murphy,* 532 U.S. 223, 228-30 (2001). The Supreme Court observed that "[i]t is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons." *Preiser v. Rodriguez*, 411 U.S. 475, 491-92 (1973).

257.  The PLRA greatly limits the ability of a court to fashion injunctive relief. *Dockery v. Hall*, 443 F. Supp. 3d 726, 737 (S.D. Miss. Dec. 31, 2019).

258.  The PLRA specifically requires that "[t]he court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 89 18 U.S.C. § 3626(a)(1). Further, the court must "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." 18 U.S.C. § 3626(a)(1).

259.  At the threshold, the PLRA bars a district court from ordering injunctive relief against alleged constitutional violations that are not "current and ongoing." *E.g.*, *Hallett v. Morgan*, 296 F.3d 732, 743 (9th Cir. 2002); *see also Dockery v. Cain*, 7 F.4th 375, 380 n.4 (5th Cir. 2021) (noting that "[c]ourts are split" on this issue but declining to decide it). Indeed, the PLRA's plain text permits injunctive relief only to address "*the* violation

of the Federal right"—*i.e.*, a then-existing violation. 18 U.S.C. § 3626(a)(1)(A) (emphasis added). "[I]f a violation no longer exists, the statute does not permit the court to order prospective relief." *Hallett*, 296 F.3d at 743. Here, for all the reasons explained, there is no such current and ongoing violation—and thus, the PLRA squarely bars any injunctive relief.

260. But the PLRA also bars injunctive relief under the need-narrowness-intrusiveness analysis. As the Fifth Circuit has explained, the PLRA's required need-narrowness-intrusiveness findings impose "strict limits on federal courts' ability to fashion civil prospective relief" in prison cases. *United States v. Hinds Cnty. Bd. of Supervisors*, 128 F.4th 616, 625 (5th Cir. 2025).

261. Even if a constitutional violation was shown (it was not), Plaintiffs' request to completely shutdown the Farm Line far exceeds the PLRA. A permanent injunction enjoining all operations on the Farm Line would be neither narrowly drawn, nor limited to the alleged constitutional violation, nor the least intrusive means to correct the alleged constitutional violation. Nor have Plaintiffs demonstrated that a lesser remedy is unavailable. The PLRA therefore prohibits the relief requested by Plaintiffs.

262. Importantly, the PLRA prohibits the requested relief because, as demonstrated above, there is no "violation of the Federal right of a particular plaintiff or plaintiffs." § 3626(a)(1)(A). Plaintiffs failed to establish a violation of their Eighth Amendment rights, under either the Heat Theory or Dignitary Harm theory. *See supra*. There is thus no violation of any Federal right to be corrected by prospective relief.

263. To the extent Plaintiffs rely on their ADA claim to support prospective relief under the PLRA, that likewise fails because Plaintiffs failed to demonstrate any ADA violation.

53

More, any prospective relief permanently enjoining all operations on the Farm Line would not be narrowly tailored to Plaintiff class, as required by the PLRA, because it would stop Farm Line operations for *all* LSP prisoners, not just Plaintiff class. *See Ball v. LeBlanc*, 792 F.3d 584, 599 (5th Cir. 2015) ("The PLRA limits relief to the particular plaintiffs before the court.").

264.    "[C]urbing the equitable discretion of district courts was one of the PLRA's principal objectives." *Miller v. French*, 530 U.S. 327, 330 (2000). To that end, the PLRA expressly bars a court from entering injunctive relief absent certain findings. Plaintiffs did not produce evidence to support the PLRA-mandated findings here. The PLRA therefore prohibits the requested relief.

<div style="margin-left:40%">

Respectfully submitted,

**ELIZABETH B. MURRILL**
**Attorney General**

By:    s/Andrew Blanchfield
       Andrew Blanchfield, T.A. (#16812)
       Email: ablanchfield@keoghcox.com
       Christopher K. Jones (#28101)
       Email: cjones@keoghcox.com
       C. Reynolds LeBlanc (#33937)
       Email: rleblanc@keoghcox.com
       Chelsea A. Payne (#35952)
       Email: cpayne@keoghcox.com
       Special Assistant Attorneys General
       Post Office Box 1151
       Baton Rouge, Louisiana 70821
       Telephone:  (225) 383-3796
       Facsimile:  (225) 343-9612

</div>

54

55

**CERTIFICATE OF SERVICE**

I hereby certify that I have this date electronically filed the foregoing with the Clerk of Court by utilizing the CM/ECF system, and a copy of the above and foregoing was this day forwarded by the Court's ECF Delivery System to all counsel of record.

Baton Rouge, Louisiana, this 31st day of March, 2026.

s/Andrew Blanchfield
Andrew Blanchfield