**IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| **VOICE OF THE EXPERIENCED**, a membership organization on behalf of itself and its members; and **MYRON SMITH, DAMARIS JACKSON, NATE WALKER, DARRIUS WILLIAMS, KEVIAS HICKS, JOSEPH GUILLORY, KENDRICK STEVENSON**, and **ALVIN WILLIAMS**, on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>**JAMES LEBLANC**, in his official capacity as Secretary of the Louisiana Department of Public Safety and Corrections; **TIMOTHY HOOPER**, in his official capacity as Warden of Louisiana State Penitentiary; **MISTY STAGG**, in her official capacity as Director of Prison Enterprises, Inc.; the **LOUISIANA DEPARTMENT OF PUBLIC SAFETY & CORRECTIONS**; and **PRISON ENTERPRISES, INC.**,<br><br>*Defendants*. | Civil Action No. 3:23-cv-1304-BAJ-EWD |

**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

## TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................................... 1

PROPOSED FINDINGS OF FACT ......................................................................................... 1

I.   Plaintiffs ......................................................................................................................... 1

II.  Defendants ...................................................................................................................... 1

III. Procedural History ......................................................................................................... 2

    A.   First Preliminary Injunction ................................................................................ 3

    B.   Second Preliminary Injunction ............................................................................ 4

    C.   Third Preliminary Injunction .............................................................................. 4

    D.   Class Certification ................................................................................................ 5

IV. Trial ................................................................................................................................ 6

    A.   Plaintiffs' Case-in-Chief ..................................................................................... 6

    B.   Defendants' Case-in-Chief ................................................................................ 11

    C.   Exhibits and Class Certification Testimony Admitted ..................................... 12

V.  Louisiana State Penitentiary ........................................................................................ 13

    A.   LSP's Historical Connection to Chattel Slavery .............................................. 13

VI. Current Conditions on the Farm Line .......................................................................... 15

    A.   The Farm Line .................................................................................................... 15

        1.   Labor on the Farm Line ......................................................................... 16

        2.   Farm Lines 15, 24, 25, and 15B ............................................................ 20

        3.   The Farm Line Is Not Rehabilitative or Educational ............................ 21

    B.   Classification and Assignment to the Farm Line .............................................. 23

    C.   Surveillance and Discipline on the Farm Line .................................................. 26

        1.   Pushers and Gun Guards on the Farm Line ........................................... 26

        2.   Discipline on the Farm Line ................................................................... 27

    D.   Incentive Pay on the Farm Line ........................................................................ 33

    E.   Medical Attitudes on the Farm Line ................................................................. 36

VII. Men Experience the Farm Line as Degrading, Dehumanizing, and Dangerous ................. 37

    A.   Joseph Guillory ................................................................................................. 37

    B.   Steven Major ..................................................................................................... 40

    C.   Gregory Samuels ............................................................................................... 41

    D.   Myron Smith ...................................................................................................... 43

**TABLE OF CONTENTS**
**(Continued)**

E.    Chadarius Morehead ................................................................................ 44

F.    Patrick Jones ........................................................................................... 46

G.    Damaris Jackson .................................................................................... 47

H.    LSP is Aware of Complaints about the Degradation that Men Experience on the Farm Line ......................................................................................... 49

VIII.  Expert Conclusions Regarding Dignitary Harm on the Farm Line ..................................... 50

A.    Dr. Evelynn Hammonds.......................................................................... 50

    1.    The Farm Line Draws on and Reenacts Historically and Culturally Significant Attributes of Chattel Slavery ............................................. 51

    2.    The Farm Line Appears Designed to Degrade, Demean, and Punish .............. 53

    3.    The Subjugation of Men Assigned to the Farm Line Increases Those Men's Risk of Negative Health Consequences.................................................. 54

B.    Dr. Joshua Sbicca.................................................................................... 55

    1.    Society Condemns and Abandons Prison Practices That Do Not Reflect Societal Values ................................................................................... 56

    2.    The Farm Line Perpetuates Key Logics of Slavery ......................................... 58

    3.    The Farm Line Deviates from Contemporary Prison Standards........................ 63

    4.    Men Experience the Farm Line as Degrading and Dehumanizing................... 64

IX.   LSP Operates the Farm Line Primarily as Punishment Rather Than a Work Assignment .................................................................................................................... 69

X.    The Farm Line Is Operated in a Manner Intended to Punish Not Produce........................ 73

A.    Use of Crops From the Farm Line .......................................................... 74

B.    LSP Purchases Produce From Commercial Vendors................................ 77

C.    Farm Line Yields .................................................................................... 77

D.    Expert Testimony of Ms. Marguerite Green............................................ 79

    1.    Field Health on the Farm Line .............................................................. 80

    2.    Weeding on the Farm Line ................................................................... 81

    3.    Irrigation on the Farm Line.................................................................. 82

    4.    Crop Rows on the Farm Line................................................................ 83

    5.    Harvesting on the Farm Line ............................................................... 84

    6.    Tools on the Farm Line........................................................................ 85

    7.    Protective Gear on the Farm Line......................................................... 87

**TABLE OF CONTENTS**
**(Continued)**

Page

8.  Ms. Green Is the Only Agricultural Expert in the Case ...................................... 89

XI.  Risk of Serious Heat-Related Injury on the Farm Line .......................................... 89

A.  Exposure to Heat Poses Serious Health Risks ............................................ 93

1.  Heat-Related Illness ........................................................................... 93

2.  Exertional and Non-Exertional Heat Illness ...................................... 95

3.  Risk of Heat-Related Illness Among All People ................................ 97

4.  Higher-Risk Groups ........................................................................... 98

5.  Heat-Related Risks Increase Sharply at a Heat Index of 88 Degrees ................ 99

6.  Cumulative Heat Load ........................................................................ 101

7.  Delayed Onset of Heat Illness Symptoms .......................................... 102

8.  Defendants' Awareness of Heat-Related Risks ................................... 103

B.  Impaired Thermoregulation Increases Heat-Related Health Risks ........................... 106

1.  Thermoregulation Is a Major Bodily Function .................................. 106

2.  Defendants Are Aware of the Increased Risks Posed by Impaired Thermoregulation .................................................................................. 107

C.  Heat Conditions on the Farm Line ............................................................... 108

1.  Provision of Medical Care on the Farm Line ..................................... 111

2.  Costs to Class Members to Receive Medical Care on the Farm Line ............. 114

D.  People on the Farm Line Have Exhibited Symptoms Consistent with Heat-Related Illness .................................................................................................. 116

XII.  Defendants' Heat Pathology Policies and Related Practices ............................................. 121

A.  Health Care Policy No. HCP8 ..................................................................... 121

B.  LSP Directive No. 13.067 ............................................................................ 123

C.  Timeline of Changes to HCP8 and Directive 13.067 ................................. 124

D.  Defendants' Litigation-Driven Changes to Heat Pathology Policies and Practices .......................................................................................................... 127

1.  Heat Alert Threshold .......................................................................... 127

2.  Heat Season ......................................................................................... 132

3.  Weather Monitoring ............................................................................ 134

4.  Defendants' Changes to the Heat Pathology Medications List and the Medical Exclusion List ...................................................................... 138

**TABLE OF CONTENTS**
**(Continued)**

**Page**

5. Defendants' Changes to Shade Available on the Farm Line ........................... 145

6. Unchanged Heat-Related Policies and Practices ............................................ 149

E. LSP's Documented Failures to Protect Heat Vulnerable Men ................................ 160

PROPOSED CONCLUSIONS OF LAW ........................................................................ 164

XIII. Conditions on the Farm Line Violate the Eighth Amendment ............................. 164

A. Dignitary Harm ....................................................................................... 164

1. Objective Prong ................................................................................ 164

2. Subjective Prong .............................................................................. 167

B. Heat-Related Harm ................................................................................. 171

1. Objective Prong ................................................................................ 171

2. Subjective Prong .............................................................................. 173

XIV. The Farm Line Violates the ADA and Rehabilitation Act ................................... 178

A. ADA Subclass Members Are Qualified Individuals with a Disability .................... 179

1. ADA Subclass Members Are Qualified Individuals with a Disability ............ 179

2. The ADA Subclass Satisfies the Remaining Requirements for a
Qualified Individual .......................................................................... 184

B. ADA Subclass Members Are Being Discriminated Against by LSP ..................... 184

1. LSP Does Not Reasonably Accommodate ADA Subclass Members .............. 185

2. LSP Administers The Farm Line In A Discriminatory Manner ..................... 187

C. Defendants' Discrimination Against ADA Subclass Members Is By Reason of
Their Disability ................................................................................... 188

D. LSP Receives Federal Funds ................................................................... 189

XV. Plaintiffs Are Entitled to Declaratory and Injunctive Relief ............................. 190

A. Declaratory Relief .................................................................................. 190

B. Permanent Injunction ............................................................................. 190

1. Plaintiffs Have Succeeded on the Merits ............................................... 190

2. Plaintiffs Face Irreparable Harm That Cannot Be Addressed By Money
Damages ......................................................................................... 191

3. The Balance of the Hardships Favors Granting the Injunction ..................... 193

4. The Injunction Serves the Public Interest .............................................. 194

XVI. The Granted Relief Satisfies the PLRA ........................................................ 195

**TABLE OF CONTENTS**
**(Continued)**

**Page**

A.   The Declaratory Relief Satisfies the PLRA .................................................. 197

B.   The Injunctive Relief Granted Satisfies the PLRA ..................................... 199

　1.   Defendants Shall Cease Assigning People to the Farm Line in
　　　Connection with Disciplinary Proceedings, Including as the First Job
　　　Assignment Given After Someone Loses a Prior Job Assignment Due to
　　　Disciplinary Sanctions ...................................................................... 200

　2.   Defendants Shall Cease Assigning People to the Farm Line as Their
　　　First Job Assignment Upon Arrival at LSP ...................................... 201

　3.   Defendants Shall Provide Educational Programming to People Assigned
　　　to the Farm Line Consistent with That Described in Warden Vannoy's
　　　Post-Trial Testimony ........................................................................ 201

　4.   Defendants Shall Provide People Assigned Farm Line Shifts During
　　　Which the Heat Index Reaches or Exceeds 88°F, with Regular, Periodic
　　　Access to Air-Conditioning on That Day, Such as on a Bus During
　　　Mandatory Rest Breaks Pursuant to Directive 13.067, or for at Least
　　　One Hour Following Such Shift ........................................................ 202

　5.   Defendants Shall Cease Assigning People with HPDS to Farm Line
　　　Shifts During which the Heat Index Is Projected to Reach or Exceed
　　　88ºF ................................................................................................... 203

　6.   Defendants Shall Expand Eligibility for HPDS to Include Any Person
　　　Assigned to the Farm Line Who Has Been Prescribed Any of the
　　　Additional Medications and/or Diagnosed with Any of the Additional
　　　Conditions. ....................................................................................... 204

　7.   Defendants Shall Cease All Farm Line Work When the Heat Index
　　　Reaches or Exceeds 103ºF ............................................................... 205

　8.   Defendants Shall Cease Charging People Assigned to the Farm Line Co-
　　　pays for Medical Care Sought for Symptoms Consistent with Heat-
　　　Related Illness Whether Such Medical Care is Sought While in the Field
　　　or Within 24 Hours Following the End of a Shift During Which the Heat
　　　Index Met or Exceeded 88ºF ............................................................ 205

　9.   Defendants Shall Provide Plaintiffs' Counsel With Regular and Ongoing
　　　Disclosures of Daily Line Counts, Rosters, Perry Weather Heat Index
　　　Reports, SDEs Made From the Field or From Camps C or D During
　　　Weeks Where the Heat Index Met or Exceeded 88ºF While the Farm
　　　Line Was Operating, and Information on the Educational Programming
　　　Described by Warden Vannoy for a Period of Two Years ............... 206

PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

## INTRODUCTION

Pursuant to the Court's minute entry dated February 10, 2026, ECF No. 411, Plaintiffs respectfully submit the following proposed findings of fact, conclusions of law, and proposed order granting declaratory and permanent injunctive relief.

## PROPOSED FINDINGS OF FACT

### I.     Plaintiffs

1.      Plaintiff Voice of the Experienced ("VOTE") is a nonprofit organization comprised of currently and formerly incarcerated people, including people who are currently incarcerated at Louisiana State Penitentiary ("LSP" or "Angola").  ECF No. 349-1 (Statement of Undisputed Facts ("SUF")) ¶ 5.

2.      Plaintiffs Myron Smith, Damaris Jackson, Nate Walker, Darrius Williams, Kevias Hicks, Joseph Guillory, and Alvin Williams (collectively, the "Individual Named Plaintiffs") are men who are currently incarcerated at LSP, have worked on the Farm Line in the past, and are at risk of being reassigned to the Farm Line now and in the future.  SUF ¶¶ 9, 14, 19, 25, 29, 34, 40, 81.

### II.     Defendants

3.      Defendant Louisiana Department of Public Safety and Corrections ("DOC") is the agency responsible for administering LSP and a recipient of federal funding.  SUF ¶¶ 46–47.

4.      Defendant Gary Westcott is the Secretary of the DOC and is sued in his official capacity.  SUF ¶ 42.  Secretary Westcott was appointed Secretary of the DOC on August 29, 2024. *Id.*  When this lawsuit was filed, Defendant James LeBlanc was Secretary of DOC and was named in his official capacity.  SUF ¶ 41.

5.      Defendant Darrel Vannoy is the Warden of LSP and is sued in his official capacity. SUF ¶ 44.  Warden Vannoy has been Warden of LSP since November 25, 2024.  *Id.*  At the time

this lawsuit was filed, Defendant Timothy Hooper was Warden of LSP and was named in his official capacity.  SUF ¶ 43.

### III.   **Procedural History**

6.      This lawsuit was initiated on September 16, 2023, when Plaintiffs filed their complaint.  ECF No. 1.  Plaintiffs filed an amended complaint, which is the operative complaint, on December 15, 2023 (the "Amended Complaint").  ECF No. 21.

7.      In their Amended Complaint, Plaintiffs challenge Defendants' operation of the "Farm Line," which they allege is an unlawful form of punishment through which Defendants compel incarcerated men to labor under degrading and dangerous conditions evoking chattel slavery.  Plaintiffs seek declaratory and injunctive relief for violations of the Eighth Amendment's ban on cruel and unusual punishment, Title II of the Americans with Disabilities Act ("ADA"), and Section 504 of the Rehabilitation Act ("Rehabilitation Act").  *See* ECF No. 21.

8.      Plaintiffs assert that Defendants' operation of the Farm Line violates the Eighth Amendment because it subjects men to a substantial risk of dignitary harm by forcing them to labor under conditions akin to chattel slavery and exposes men to a substantial risk of serious physical harm by forcing them to labor under dangerous heat conditions.  *See* ECF No. 21; *see also* ECF No. 349.

9.      Plaintiffs further assert that Defendants violate the ADA and Rehabilitation Act by discriminating against men on the basis of their disability because LSP fails to identify and protect men on the Farm Line who have an impaired ability to thermoregulate and fails to provide them with reasonable accommodation.  *See* ECF Nos. 20, 349 at 2.[1]

---

[1]   Plaintiffs also asserted that the Farm Line violates the Thirteenth Amendment because Defendants knowingly subject men who are convicted by non-unanimous juries to forced agricultural labor, even though those men have not been "duly convicted" within the meaning of the Thirteenth Amendment.  ECF No. 21.  On June 5, 2024, the Court granted Defendants' motion to dismiss this claim.  *See* ECF Nos. 22, 56.

2

A.     **First Preliminary Injunction**

10.     On May 13, 2024, with the hottest months of summer fast approaching, Plaintiffs filed their first motion for preliminary relief to address the dangerously hot conditions on the Farm Line. ECF No. 37. At that time, Plaintiffs sought to enjoin the Farm Line whenever the heat index met or exceeded 88°F. *Id.*

11.     On July 2, 2024, this Court granted Plaintiffs' motion in part, issuing an injunction (the "July 2024 Injunction") that it deemed necessary to "alter Farm Line working conditions to preserve human health and safety." ECF No. 70.

12.     Defendants sought to stay the July 2024 Injunction, but the Fifth Circuit allowed those aspects of the injunction that applied only to the Farm Line to stand while ruling that other parts of the injunction were overbroad under the Prison Litigation Reform Act ("PLRA"). *See Voice of the Experienced* v. *Westcott*, No. 24-30420 (5th Cir.) ("*VOTE I*"), No. 41-1.

13.     Defendants subsequently proposed remedial measures to address the deficiencies on the Farm Line identified by this Court, which Plaintiffs opposed. ECF Nos. 86, 95.

14.     On August 15, 2024, this Court concurred that the remedial measures then-proposed by Defendants were inadequate, reflecting a "callous disregard for human health and safety." ECF No. 109 at 5. The Court required Defendants to take specific measures to address the constitutional deficiencies on the Farm Line, including addressing the lack of shade, providing one 15-minute break every hour, and providing clean cups for drinking water. *Id.* at 4–5.

15.     The July 2024 Injunction expired by operation of law pursuant to the PLRA on September 30, 2024, 90 days after its entry. *See* 18 U.S.C. § 3626(a)(2).

16.     On August 26, 2025, the Fifth Circuit held that Defendants' appeal of the July 2024 Injunction was moot and vacated the Court's order granting the July 2024 Injunction without reaching the merits. *VOTE I*, No. 123-1.

3

### B.    Second Preliminary Injunction

17.    On March 26, 2025, with another heat season approaching, Plaintiffs filed a second motion for preliminary injunctive relief, seeking, *inter alia*, that Defendants be enjoined to (i) issue a "Heat Alert"[2] on the Farm Line whenever the heat index met or exceeded 88°F and (ii) monitor the heat index on the Farm Line every 30 minutes.[3]  ECF No. 201-1.

18.    On May 23, 2025, the Court issued the requested injunction (the "May 2025 Injunction").  ECF No. 253.

19.    Defendants appealed the Court's ruling to the Fifth Circuit.  On August 28, 2025, the Fifth Circuit held that the May 2025 Injunction had expired by operation of law on August 21, 2025—90 days after its entry—and vacated the Court's order on mootness grounds without reaching the merits.  *See Voice of the Experienced* v. *LeBlanc*, No. 25-30322 (5th Cir.) ("*VOTE II*"), No. 96-1.  On September 11, 2025, Defendants petitioned for en banc review of the *VOTE II* decision.  *VOTE II*, No. 99.  That petition was denied on March 5, 2026.  *VOTE II*, No. 119.

### C.    Third Preliminary Injunction

20.    On July 28, 2025, anticipating that the May 2025 Injunction would expire by operation of law on August 21, 2025, Plaintiffs filed a motion seeking a successive injunction providing the same relief.  ECF No. 280.

21.    This Court granted Plaintiffs' motion in part on August 22, 2025, again requiring Defendants to issue a Heat Alert whenever the heat index met or exceeded 88°F.  ECF No. 297

---

[2]    Under DOC and LSP policies, the issuance of a "Heat Alert" triggers various mandatory heat precautions.  *See infra* Section XII.A–B.

[3]    Following the expiration of the July 2024 Injunction, Defendants revised their heat pathology policies, raising the threshold for a Heat Alert from its historical 88°F heat index to a heat index exceeding 91°F.  *See infra* Section XII.C.

(the "August 2025 Injunction").  The August 2025 Injunction did not require Defendants to monitor the heat index every 30 minutes.

22.    The Fifth Circuit stayed the August 2025 Injunction on September 17, 2025.  *See Voice of the Experienced* v. *LeBlanc*, No. 25-30478 (5th Cir.) ("*VOTE III*"), No. 59-1.  Accordingly, the August 2025 Injunction was in effect at LSP from when it issued on August 22, 2025, until it was stayed by the Fifth Circuit on September 17, 2025.

23.    The August 2025 Injunction expired by operation of law on November 20, 2025, 90 days after its issuance.  *VOTE III*, No. 96-1.  On November 21, 2025, the Fifth Circuit vacated the Court's order on mootness grounds without reaching the merits.  *Id.*  Defendants subsequently filed a petition for en banc review, which was denied on February 27, 2026.  *VOTE III*, Nos. 99, 118-1.

**D.    Class Certification**

24.    On September 30, 2024, Plaintiffs moved for class certification.  ECF No. 120.

25.    Oral argument on Plaintiffs' motion for class certification was held on February 19, 2025.  ECF No. 243.  In April 2025, the Court held a three-day evidentiary hearing on the motion.  ECF Nos. 244 ("4/22/25 Class Cert. Tr."), 245 ("4/23/25 Class Cert. Tr."), 239 ("4/24/25 Class Cert. Tr.").  During the evidentiary hearing, the Court heard live testimony from 12 witnesses and admitted 108 exhibits.  *Id.*

26.    On December 23, 2025, the Court certified a General Class and an ADA Subclass (defined below).  ECF No. 364.

27.    On February 12, 2026, the Court narrowed the definition of the ADA Subclass, based on an unopposed motion by Plaintiffs.  ECF No. 407.

28.    Pursuant to the December 23, 2025 and February 12, 2026 orders, the Individual Named Plaintiffs bring this action on behalf of themselves and the following classes:  (i) a General

5

Class comprising all persons incarcerated at LSP who currently are, or may in the future be, assigned to the Farm Line (the "General Class"), ECF No. 364 at 1; and (ii) an ADA Subclass comprising all persons incarcerated at LSP who currently are or may in the future be assigned to the Farm Line and who have disabilities that may cause, or that are treated with medications that may cause, impaired thermoregulation (the "ADA Subclass").  ECF No. 407.

## IV.    Trial

29.    The Court held a five-day bench trial in this matter on February 3–5 and 9–10, 2026.  ECF Nos. 419 ("2/3/26 Tr."), 420 ("2/4/26 Tr."), 422 ("2/5/26 Tr."), 423 ("2/9/26 Tr."), 424 ("2/10/26 Tr.").

### A.    Plaintiffs' Case-in-Chief

30.    Plaintiffs called a total of 18 witnesses, including 14 fact witnesses and four expert witnesses.

31.    Plaintiffs' fact witnesses included two Individual Named Plaintiffs—Mr. **Joseph Guillory** and Mr. **Myron Smith**—and three class members—Mr. **Steven Major**, Mr. **Gregory Samuels**, and Mr. **Chadarius Morehead**—who testified about their experiences on the Farm Line.

32.    Mr. **Guillory** grew up in Baton Rouge, Louisiana, served in the military, and attended college.  He is 42 years old and has been incarcerated at LSP for almost 20 years.  He has hypothyroidism and high blood pressure, but has not been granted Heat Precaution Duty Status ("HPDS").[4]  He is a member of VOTE.  2/3/26 Tr. 30:11–31:24, 32:7–8, 46:2–12, 49:20–50:2.

---

[4]    As described below, under DOC and LSP policies, "Heat Precaution Duty Status," or "HPDS," is a duty status that should be assigned to people in custody who are medically more vulnerable to heat-related injury; people granted HPDS are entitled to enhanced heat-related protections under those polices.  SUF ¶ 98; *see also* JX-014 (HCP8 – Pharmacy and Formulary Heat Pathology); DX-062 (Directive 13.067 – Heat Pathology); JX-037 (Directive 13.063 – Duty Status Classification System).

6

33.    Mr. **Smith** is 52 years old, grew up in Shreveport, Louisiana, where he graduated from high school. He is a father and grandfather. Mr. Smith has been incarcerated at LSP for the last 27 years and is also well known for his participation in the Angola rodeo, having won the "All-Around Cowboy Award" in 2010 and the "Guts and Glory" token 24 times. 2/4/26 Tr. 8:20–9:3, 10:8–10, 11:10–16, 38:14–39:3.

34.    Mr. **Major** has been incarcerated at LSP since December 2024 and was assigned to the Farm Line during the summer of 2025. He was previously incarcerated in Virginia, where he participated in a prison agricultural labor program. 2/3/26 Tr. 67:5–7, 67:18–68:1, 73:17–20, 75:14–16.

35.    Mr. **Samuels** is 23 years old, grew up in Baton Rouge, Louisiana, graduated from high school and studied computer science at Southeastern Louisiana University. He was last assigned to the Farm Line in April 2025. Mr. Samuels was born with serious congenital heart issues that impact his ability to perform strenuous labor and his ability to thermoregulate, but was required to labor on the Farm Line in 2025. 2/4/26 Tr. 71:11–16, 72:4–16, 73:10–22.

36.    Mr. **Morehead** is 30 years old and grew up in Monroe, Louisiana where he graduated from high school. He has been incarcerated at LSP since October 2023 and was assigned to the Farm Line in the summer and fall of 2024 and 2025. Mr. Morehead's family was enslaved in Louisiana. 2/5/26 Tr. 86:12–87:3, 87:21–88:21.

37.    Plaintiffs also called Mr. **Norris Henderson** to testify on behalf of VOTE, of which he is the founder and Executive Director. Mr. Henderson testified that there are approximately 150 VOTE members incarcerated at LSP who are on or at risk of assignment to the Farm Line, and that VOTE regularly communicates with these members. Mr. Henderson also testified about

7

his personal experiences on the Farm Line during his incarceration at LSP.  2/5/26 Tr. 191:9–11, 194:22–195:22, 197:10–25, 200:3–15, 201:2–204:13.

38.    Plaintiffs called eight LSP and DOC representatives:  Dr. **Paul Toce**, Warden **Darrel Vannoy**, Dr. **Randy Lavespere**, Major **Huey Pidgeon**, Ms. **Amber Vittorio**, Nurse **Justin Coley**, Lieutenant **Michael Karisny**, and Deputy Warden **Ashli Oliveaux**.

39.    Dr. **Toce** is the Medical Director of LSP, a role he has held since 2022.  As Medical Director, Dr. Toce supervises all medical staff at LSP, provides care to incarcerated people, and handles medical complaints.  His medical license was suspended in 2010; while his license was restricted, he began working as a medical provider for DOC, and he has worked as a medical provider for DOC ever since.  2/3/26 Tr. 94:24–96:6.

40.    Defendant Warden **Vannoy** was the warden of LSP from 2015 to 2021, and has again held the role since November 2024.  As Warden, he exercises operational control and makes all administrative decisions at LSP.  2/3/26 Tr. 167:19–168:4.

41.    Dr. **Lavespere** is the Chief Medical Officer of DOC, a role he has held since January 2021.  Prior to that, from 2014 to 2021, he was the Medical Director of LSP.  2/3/26 Tr. 309:19–310:9.

42.    Major **Pidgeon** has worked at LSP for 31 years and currently oversees field operations.  He previously worked as a Gun Guard and as a Line Pusher (defined below).  2/4/26 Tr. 45:5–6, 45:15–18, 45:21–46:7, 46:14–16.

43.    Ms. **Vittorio** is the Administrative Program Director at LSP.  She oversees LSP's Classifications Department, which is responsible for assigning jobs to men incarcerated at LSP and organizing public tours at LSP.  2/4/26 Tr. 108:8–25.

44.     Nurse **Coley** is a nurse manager at LSP who supervises the Assessment and Triage Unit ("ATU") and the nurses who respond to self-declared emergencies ("Self-Declared Emergencies" or "SDEs"), including SDEs called by men on the Farm Line. 2/4/26 Tr. 273:15–23.

45.     Lieutenant **Karisny** has worked at LSP for nine years. He occasionally served as a Line Pusher and Gun Guard (defined below) on the Farm Line between March 27 and December 10, 2025. 2/4/26 Tr. 301:18–20, 302:8–13, 303:2–304:1, 305:5–7.

46.     Deputy Warden **Oliveaux**, is LSP's ADA Coordinator and is responsible for ensuring that LSP's policies and practices comply with the ADA's requirements. 2/5/26 Tr. 47:9–14, 49:15–25; Class Cert. Tr. 4/23/25 Class Cert. Tr. 223:9–13.

47.     Plaintiffs called four expert witnesses.

48.     Dr. **Evelynn Hammonds** is a professor of the history of science, African and African-American studies, and social and behavioral sciences at Harvard University. She holds a Bachelor of Science in Physics, a Bachelor of Electrical Engineering and Computer Science, a Master of Science in Physics, and a Ph.D. in the History of Science. She was qualified by the Court as an expert in the fields of the history of science, African-American studies, epidemiology, and the history of medicine. Dr. Hammonds testified regarding the history of chattel slavery in the South and described the ways that the Farm Line reflects historically and culturally significant attributes of chattel slavery. *See* JX-198 (Hammonds curriculum vitae); 2/3/26 Tr. 108:14–23, 112:3–16, 115:1–19.

49.     Ms. **Marguerite Green** is the statewide director of the Louisiana Food Policy Council, a nonprofit advocacy organization that represents the needs of farmers, fishermen, and food system stakeholders to municipal, state, and federal agencies. Prior to that, Ms. Green served

9

as Executive Director of SPROUT, a farmer technical assistance and service organization working with specialty crop farmers throughout Louisiana. Ms. Green has also been a practicing farmer since 2010. Ms. Green holds a Bachelor of Science in Plant and Soil Systems from Louisiana State University with a concentration in agriculture and olericulture, or vegetable production. Ms. Green visited LSP and observed the Farm Line in July 2024, October 2024, and November 2025. Ms. Green was qualified by the Court as an expert in agricultural production mechanisms in Louisiana. She testified that the Farm Line does not resemble any comparable Louisiana farm and described her opinion that the practices used on the Farm Line are inefficient, wasteful, and unreasonably difficult. *See* JX-211 (Green curriculum vitae); 2/4/26 Tr. 138:25–143:17, 149:17–150:2, 177:1–20.

50.     Dr. **Joshua Sbicca** is a professor of sociology, associate Chair of the Department of Sociology, and the Director and co-founder of the Prison Agriculture Lab at Colorado State University. He holds a Bachelor of Arts in Sociology and Political Science, a Master of Arts in Sociology, and a Ph.D. in sociology. Dr. Sbicca visited LSP and the Farm Line in July 2024 and conducted interviews with incarcerated men on the Farm Line in November 2025. Dr. Sbicca was qualified by the Court as an expert in sociology of prison agricultural labor, testified that prison practices must evolve with society, and explained that the Farm Line perpetuates many of the same logics underpinning the institution of chattel slavery, causes degradation and dehumanization, and deviates from contemporary prison standards. JX-199 (Sbicca curriculum vitae); 2/5/26 Tr. 109:22–110:2, 115:15–117:15, 118:8–15.

51.     Dr. **Susi Vassallo** is board certified in both emergency medicine and medical toxicology, with a specific focus on thermoregulation. She is a clinical professor of emergency medicine at NYU School of Medicine. Dr. Vassallo has lectured extensively on thermoregulation

and authored the "Thermoregulatory Principles" chapter of Goldfrank's Toxicologic Emergencies, a textbook on medical toxicology. She holds a Bachelor of Science in Biology, a Master of Science in Healthcare Management, and a Doctor of Medicine. She toured the Farm Line in July 2024 and September 2025. Dr. Vassallo was qualified by the Court as an expert in the fields of emergency medicine, medical toxicology, thermoregulation, and correctional medicine. She testified that the heat conditions on the Farm Line are unsafe and explained the reasons why the changes Defendants have made on the Farm Line are insufficient to abate the serious risks of heat-related harm. JX-210 (Vassallo curriculum vitae); 2/9/26 Tr. 7:7–14, 24:8–12, 11:18–12:12.

### B.    Defendants' Case-in-Chief

52.    Defendants, in their case-in-chief, re-called three fact witnesses that were called in Plaintiffs' case-in-chief: Dr. Lavespere, Nurse Coley, and Warden Vannoy.

53.    Defendants also called three additional fact witnesses.

54.    Mr. **Thomas Gulino** is the vegetable supervisor at LSP, responsible for deciding what vegetables to plant on the Farm Line and when to plant and harvest them. He has no formal agricultural training. 2/5/26 Tr. 252:2–14, 269:9–11, 272:4–6.

55.    Assistant Warden **Roland Sylvester** is responsible for supervising field operations at LSP. He has worked in field operations at LSP since 1995. He has no formal agricultural training. 2/9/26 Tr. 201:14–25, 237:7–13.

56.    Colonel **Sydney Davis IV** is currently a corrections colonel at LSP in the treatment unit. From 2020 to 2025, he served at Camp C where he oversaw camp operations. 2/9/26 Tr. 245:13–17, 245:21–25.

57.    Defendants called two expert witnesses.

58.    Dr. **Deleca Reynolds-Barnes** is a PharmD employed by Wellpath, a private health care company that frequently contracts with correctional facilities. She testified as a fact witness

11

regarding her personal work on revisions to Defendants' heat pathology policies, and was accepted by the Court as an expert in pharmacy with a specific experience in correctional pharmacy care. *See* 4/23/25 Class Cert. Tr. 248:9–15; 2/9/26 Tr. 121:14–122:6, 123:14–20.

59.     Dr. **Carl Keldie** is a physician and Wellpath employee who currently holds no board certifications.  He has not published any articles, books, chapters, or scientific studies on any topic, and has not participated in peer review of any scientific articles.  Dr. Keldie has never been qualified as an expert in heat-related medical care and disorders, thermoregulation, or medical toxicology.  This Court accepted Dr. Keldie as an expert in correctional medical care.  *See* 4/24/25 Class Cert. Tr. 51:21–23; 2/10/26 Tr. 102:19–103:7, 112:13–113:9.

## C.     Exhibits and Class Certification Testimony Admitted

60.     During the course of the trial, the Court admitted 303 trial exhibits.  Following trial, the Court admitted two additional exhibits, DX-062 and PX-248, upon unopposed motions of the parties.  ECF Nos. 428, 430.

61.     In addition to the trial testimony described above, the Court admitted into the trial record all testimony from the April 2025 class certification evidentiary hearing.  *See* ECF No. 399.

62.     That included testimony from Dr. **Hammonds**, Dr. **Sbicca**, Dr. **Vassallo**, Dr. **Lavespere**, Deputy Warden **Oliveaux**, Dr. **Reynolds-Barnes**, Assistant Warden **Sylvester**, Mr. **Coley**, and Dr. **Keldie**, each of whom also testified at trial.

63.     It also included testimony from Individual Named Plaintiff Mr. **Damaris Jackson**, class member Mr. **Patrick Jones**, and LSP Master Sergeant **Orlando Scott**.

64.     Mr. **Jackson** is 44 years old.  He has been incarcerated at LSP since 2022.  He has high blood pressure.  He last worked on the Farm Line in July 2024.  4/23/25 Class Cert. Tr. 122:19–22, 125:2–3, 134:3–9, 137:12–14.

12

65.     Mr. **Jones** is 32 years old and grew up in Orange, Texas.  He has been incarcerated at LSP since 2016 and was assigned to the Farm Line when he first arrived at LSP and in 2016.  His great-grandmother had been enslaved.  While at LSP, Mr. Jones has attended HVAC school.  4/23/25 Class Cert. Tr. 150:4–151:5, 167:9–16.

66.     Master Sergeant **Scott** currently works in the "shakedown" unit at LSP.  For approximately seven years, until approximately October 2024, he worked as a "Line Pusher" (defined below) on the Farm Line.  4/23/25 Class Cert. Tr. 329:16–19, 300:5–9, 300:12–301:6.

## V.     Louisiana State Penitentiary

67.     LSP is the largest maximum security prison in the United States, at approximately 18,000 acres.  SUF ¶¶ 1–2; PX-028 at 2 (LSP 2015 tour outline).  It houses approximately 4,300 incarcerated men, and its annual budget for 2026 is approximately $184 million.  2/10/26 Tr. 20:17–20, 61:2–6 (Vannoy).

68.     LSP "has national and international recognition as one of the most infamous prison systems in the South."  PX-028 at 2.  In the words of Dr. Toce, "living at [LSP] is a beast" and the men incarcerated there "should have anxiety and fear."  2/3/26 Tr. 103:20–22.

### A.     LSP's Historical Connection to Chattel Slavery

69.     Built on the grounds of a former slave plantation, LSP has a direct historical connection to the history of chattel slavery in the United States.  *See* 2/3/26 Tr. 130:24–131:18 (Hammonds); 2/4/26 Tr. 115:2–9 (Vittorio); PX-028 at 2.

70.     After the abolition of slavery in 1865, legislatures throughout the South, including in Louisiana, passed "Black Codes"—"laws that criminalized much of life for recently freed enslaved people" and "were then used to incarcerate many people who were recently freed."  4/22/25 Class Cert. Tr. 54:14–55:13 (Sbicca).  These laws transformed prison populations from predominantly white to disproportionately Black.  2/5/26 Tr. 122:2–17 (Sbicca).

13

71.     As prison populations changed, convict leasing emerged—"the practice of leasing out incarcerated people to work, in many cases, in agricultural operations . . . or in many cases, to former plantation owners where some of these people may have been enslaved in the past." 4/22/25 Class Cert. Tr. 54:14–55:13 (Sbicca); *infra* Section VIII.B.  In many ways, convict leasing was considered "worse than slavery" because incarcerated people were not afforded any rights or protections and were instead treated as labor input.  4/22/25 Class Cert. Tr. 56:22–57:7, 62:10–63:10 (Sbicca); *see also infra* Section VIII.B.

72.     This brutal system of convict leasing took root at LSP almost immediately following its establishment as the State's penitentiary.  PX-028 at 2 (LSP 2015 tour outline).  In 1869, just four years after the end of the Civil War, former Confederate Major Samuel James acquired the lease to operate LSP.  *Id.*  Under the system of convict leasing, James leased out incarcerated people to perform labor for plantation owners.  *Id.*  ("Unlike today if Mr. James liked an offender and he was a good worker he could release the offender from the system to a Plantation/Farm Owner.").

73.     In 1901, the State bought the Angola plantation from the James family, expanded the property by purchasing additional nearby plantations, and relocated LSP to the site—where it remains to this day.  PX-028 at 2.

74.     Today, LSP is commonly referred to as "Angola."  The name, according to Defendants' internal documents, "comes from an area in Africa where former slaves came from and implies the penitentiary was originally a pre-civil war plantation owned by one of the biggest slave traders in the South of the time."  PX-028 at 2.  At trial, Defendants' witnesses consistently and repeatedly referred to LSP as "Angola."  *See, e.g.*, 2/4/26 Tr. 68:2–4 (Pidgeon); 2/3/26 Tr. 167:10–18 (Vannoy); 2/5/26 Tr. 241:2–242:5 (Lavespere); 2/5/26 Tr. 252:2–4 (Gulino); 2/9/26 Tr.

14

258:22–259:17 (Davis); 2/9/26 Tr. 203:7–13 (Sylvester); 2/4/26 Tr. 114:24–115:1 (Vittorio); *see also* PX-027 (Vittorio email re "tour outline").

75.    It is common knowledge that LSP is built on the grounds of former slave plantations.  Every witness who was asked about LSP's history admitted awareness of this fact. *See, e.g.*, 2/4/26 Tr. 50:4–7 (Pidgeon); 2/4/26 Tr. 115:2–5 (Vittorio); 2/4/26 Tr. 343:10–12 (Karisny); 2/4/26 Tr. 297:11–20 (Coley); 4/23/25 Class Cert. Tr. 309:1–4 (Scott); 2/3/26 Tr. 304:19–21 (Vannoy).

76.    Defendants' Classifications Department organizes public tours of LSP that, until recently highlighted LSP's historical connection to slavery and convict leasing.  2/4/26 Tr. 109:25–110:5 (Vittorio); PX-028 at 2.

77.    The Court finds that the history of LSP is directly connected to the history and legacy of slavery and that Defendants are aware of that historical connection.

## VI.    Current Conditions on the Farm Line

78.    Based on findings set forth in further detail below, *see infra* Sections VI–X, the Court finds that the Farm Line is unlike any other job at LSP because it functions primarily as a form of degrading and dehumanizing punishment, rather than a work assignment, and forces class members to perform unnecessarily difficult, menial, and inefficient labor under conditions that perpetuate the logics of slavery.

### A.    The Farm Line

79.    Two agricultural work programs for incarcerated men exist at LSP—a commercial, commodity crop program, and a non-commercial specialty crop program.  SUF ¶¶ 4, 59–61.

80.    Prison Enterprises oversees the profit-geared commercial, commodity crop farming operation that employs modern farming equipment and is staffed by "trustees"—men incarcerated at LSP who have demonstrated "good conduct over a period of time" and are permitted "greater

15

freedom of movement at LSP" and paid higher prison wages.  SUF ¶¶ 57, 75.  Plaintiffs do not challenge this program.  *See* ECF Nos. 166; 349 at 6.

81.    Plaintiffs challenge Defendants' operation of the Farm Line—the non-commercial vegetable crop farming operations at LSP that currently runs out of Camps C and D—as an unlawful, degrading, and dangerous form of punishment.  SUF ¶¶ 53, 61, 63.

### 1.    Labor on the Farm Line

82.    The Farm Line operates on weekdays, all year-round.  2/3/26 Tr. 174:8–17 (Vannoy); *see also* JX-245 (heat letters jointly filed with the Court ("Joint Heat Letters")).  On any given workday, dozens of class members go out into LSP's fields to perform physically demanding agricultural labor in the early morning hours, with a second shift occasionally going out in the afternoon.  4/23/25 Class Cert. Tr. 329:23–330:7 (Scott); JX-226–242 (DLCs and Rosters (defined below) for Lines 15, 24, 25 from 2023 to 2025); 2/4/26 Tr. 330:13–23 (Karisny testifying to afternoon shifts).

83.    Each day, class members are transported on buses from Camps C and D to the fields within LSP.  2/3/26 Tr. 172:23–25 (Vannoy), 82:25–83:2 (Major).  There, they are forced to plant, pick, harvest, and sometimes water a variety of vegetable crops, including cucumbers, yellow squash, peppers, okra, watermelon, tomatoes, and bell peppers in the summer months and mustard greens, collard greens, broccoli, cauliflower, carrots, and beets in the winter months.  SUF ¶ 72; 2/9/26 Tr. 213:6–18 (Sylvester).

84.    LSP staff create "Daily Line Counts" or "DLCs" that document the date, the line number, the supervising officers' names, the number of men sent out in the fields, the start and stop time of work, the type of work performed, as well as any tools provided, breaks given, SDEs called, and other notable events or "unusual occurrences" on the Farm Line.  SUF ¶¶ 71, 74; 2/3/26 Tr. 175:12–18, 278:19–279:6, 295:12–15 (Vannoy); 2/4/26 Tr. 322:19–323:22 (Karisny); *see, e.g.*,

16

JX-232 (2025 DLCs – Line 15); JX-233 (2025 DLCs – Line 24); JX-234 (2025 DLCs – Line 25); *see also* 2/3/26 Tr. 175:12–18, 278:19–279:6, 295:12–15 (Vannoy).

85.    Line Rosters (also called "Job Rosters" or "Rosters") reflect the number of men assigned to each Farm Line on a weekly basis, the names of men who went out to work the Farm Line on a given day, and sometimes, certain "duty status" restrictions. *See, e.g.*, JX-240 (2025 Rosters – Line 15); JX-241 (2025 Rosters – Line 24); JX-242 (2025 Rosters – Line 25); 2/4/26 Tr. 312:7–317:15 (Karisny explaining how to read Line Rosters).

86.    The Court heard testimony establishing that the labor performed on the Farm Line is physically difficult, menial, and unnecessarily inefficient.

87.    Men primarily harvest crops on the Farm Line by hand and usually without tools, bending over rows and picking each vegetable individually. *See* 2/3/26 Tr. 174:22–175:11 (Vannoy confirming that men on the Farm Line primarily harvest vegetables by hand); 2/9/26 Tr. 204:19–22 (Sylvester testifying "all our stuff is handpicked"); 2/5/26 Tr. 259:8–16 (Gulino confirming that everything on the Farm Line is harvested by hand).

88.    Watering is likewise performed by hand, with men carrying Styrofoam cups or "watering cans," up and down rows to water crops one plant at a time. 2/3/26 Tr. 39:2–22 (Guillory testifying that men were directed to water sweet potatoes with Styrofoam cups from a five-gallon bucket); 2/4/26 Tr. 26:3–22 (Smith testifying that he was forced to repeatedly fill the Styrofoam cup from the five-gallon bucket to water watermelons); *see also* 2/5/26 Tr. 259:18–260:2, 273:16–23 (Gulino testifying that men on the Farm Line at times water the vegetables by hand from a two-gallon bucket with a spout.).

89.    Although LSP has access to modern machinery—including a six-row air planter, cane hipper, potato digger, watering tank, six-row cultivator, and a six-row field cultivator— men

17

on the Farm Line are not permitted to use them to plant and cultivate vegetables. 2/5/26 Tr. 263:2–267:1 (Gulino). Mr. Gulino confirmed that "only the trustees operate that farm equipment." 2/5/26 Tr. 266:24–267:1; *see also* 4/24/25 Class Cert. Tr. 19:4–14 (Sylvester).

90.     Defendants provide tools only on the rarest occasions. Defendants' witnesses testified that men on the Farm Line are occasionally given knives, and very rarely rakes and hoes. 2/3/26 Tr. 175:3–8 (Vannoy); 2/9/26 Tr. 204:19–205:23 (Sylvester); 2/4/26 Tr. 59:17–21 (Pidgeon). According to Warden Vannoy, when class members are given tools, they are documented on the DLCs. 2/3/26 Tr. 175:12–18; 2/10/26 Tr. 45:11–17.

91.     The use of tools was documented in DLCs only three times in 2025. JX-232 at 2, 8; JX-233 at 141. The Court credits testimony from Mr. Major who testified that he was given a knife on only one occasion but even then, knives were not available to everyone. 2/3/26 Tr. 75:25–76:3.

92.     Class members typically harvest crops out of the ground with their bare hands, picking vegetables out of the ground, spending hours bending, stooping, and crouching in a "hunched position for a long period of time." 2/3/26 Tr. 75:14–24 (Major); *see also* 2/4/26 Tr. 90:14–23 (Samuels testifying that "pulling [turnips] out the ground without gloves is difficult" and describing how he "pick[ed] each [greens] leaf individually off the plant while also worrying about bugs"); 2/3/26 Tr. 76:6–10 (Major testifying about the difficulty of snapping wet collard greens without a knife while exposed to bugs); 2/4/26 Tr. 160:8–20, 163:21–164:4 (Green testifying about observing men "bending and picking cucumbers" and placing them in milk crates, and stooping to pick up individual pecans one or two at a time).

93.     The physical demands of this type of labor—by hand and unassisted by tools—are considerable. Mr. Major testified that planting potatoes was particularly difficult because he had

18

to repeatedly hunch over to plant the potatoes. 2/3/26 Tr. 75:14–24. Mr. Samuels testified that pulling large turnips out of the ground without gloves is especially hard and that men have been forced to replant potatoes if they did not plant them in a specified manner. 2/4/26 Tr. 90:12–91:1. Mr. Smith testified that the work is strenuous and, combined with the heat, has caused his body to shut down. 2/4/26 Tr. 28:25–29:17.

94.    The labor is also menial, and class members have no agency over even its most basic aspects. Lieutenant Karisny confirmed that men on the Farm Line do not choose which fields they work in, which crops are planted, how far apart to plant them, when to harvest, or whether to use tools—all such decisions are made by LSP staff. 2/4/26 Tr. 304:2–305:4. As he acknowledged, the men "pretty much only have one task, which is to pick vegetables." 2/5/26 Tr. 305:11–14; *see also* 4/23/25 Class Cert. Tr. 310:5–9 (Scott testifying that men cannot decide their assignments on the Farm Line, including what vegetable they'll pick).

95.    Major Pidgeon testified that the work on the Farm Line is not difficult and is similar to the work he chooses to do on his personal farm. 2/4/26 Tr. 59:6–16. The Court assigns little weight to this testimony. Unlike class members, Major Pidgeon chooses to farm, he can stop whenever he pleases, his home is air-conditioned, he has access to tools, and he is not required to work at a certain pace. 2/4/26 Tr. 66:4–68:8.

96.    Instead, the Court is persuaded by Ms. Green's testimony. She explained that labor on the Farm Line involves bending, lifting, and crouching down in a way that is physically taxing, 2/4/26 Tr. 235:4–14, exacerbated by other conditions she observed on the Farm Line, 2/4/26 Tr. 193:20–196:15, 235:8–14, and is generally performed in an inefficient and unnecessarily difficult manner, 2/4/26 Tr. 236:15–24; *see infra* Section X.D; *see also* 2/9/26 Tr. 13:6–17, 15:4–17

19

(Vassallo testifying that walking, bending, lifting in the conditions on the Farm Line is "strenuous").

97.    In sum, the weight of the evidence demonstrates that the labor performed by class members on the Farm Line is unnecessarily difficult, menial, and inefficient.

### 2.    Farm Lines 15, 24, 25, and 15B

98.    LSP's agricultural operations are organized by "Lines."  SUF ¶ 62.  When an incarcerated person is assigned to work in the fields, they are assigned to a specific Line.  *Id.*  The Farm Line currently includes Lines 15, 24, and 25.  SUF ¶ 64.

99.    Historically and during the course of this litigation, the Farm Line included Line 15B.  *See, e.g.*, 4/23/25 Class Cert. Tr. 305:25–306:2 (Scott testifying in April 2025 that he oversees Line 15B sometimes).  However, LSP no longer operates Line 15B.  2/9/26 Tr. 222:18–223:2 (Sylvester).  Warden Vannoy testified that he has no intention of bringing Line 15B back, but stated that there are no formal written policies or directives stating that Line 15B is permanently retired.  2/9/26 Tr. 306:7–17; 2/3/26 Tr. 217:1–14.

100.    The Court notes Defendants' objection to evidence concerning Line 15B because it does not reflect current conditions on the Farm Line.  *See, e.g.*, 2/4/26 Tr. 27:19–28:9.  While the Court is aware that current conditions are critical in determining whether there is an Eighth Amendment violation, the Court finds, based on Warden Vannoy's testimony, that Defendants' operation of the Farm Line is not static.  *See also* 2/3/26 Tr. 173:1–10 (Vannoy testifying about his "long-range plans" to expand the Farm Line to the main prison.).  Additionally, Warden Vannoy was asked but failed to identify any testimony that would apply only to Line 15B.  2/3/26 Tr. 172:11–14.  Accordingly, the evidence suggests that Line 15B operated largely in the same manner that Lines 15, 24, and 25 currently operate.  To the extent that evidence concerning Line

20

15B applies to the current operation of the Farm Line, the Court will consider it.  The Court finds, however, that Line 15B is not currently operating.

101.    The Court admitted and considered several videos taken during site inspections conducted by the parties' attorneys, including video containing footage of Line 15B.  *See* PX-198 (July 2024 site inspection video); PX-193 (July 2024 site inspection video), PX-225 (Oct. 2024 site inspection video); PX-204 (Oct. 2025 site inspection video); PX-196 (July 2024 site inspection video).  Warden Vannoy confirmed that each of these videos is representative of current conditions on the Farm Line and that they are likely to be present in the future.  2/10/26 Tr. 45:21–49:4.  The Court finds that these videos reflect current conditions on the Farm Line to the extent they show the manner in which labor is performed on the Farm Line.

102.    The Court notes that these videos were taken prior to the construction of the shade pavilions, which will be discussed in further detail below, *see infra* Section XII.D.5, but this does not alter the Court's analysis.  The Court finds that the videos are relevant and relied on the videos in its findings to the extent that they reflect current conditions on the Farm Line.

### 3.    The Farm Line Is Not Rehabilitative or Educational

103.    The evidence demonstrates that the Farm Line is distinct from LSP's various rehabilitative programs, educational opportunities, and vocational training.

104.    Ms. Vittorio distinguished the Farm Line from "educational" or "rehabilitative" programs at LSP.  2/4/26 Tr. 119:20–120:10.

105.    Warden Vannoy distinguished the Farm Line from "educational service" or "programming," as well as "vocational" training that entails "teaching a trade."  2/9/26 Tr. 303:4–20.  He admitted that the Farm Line could be made "more educational" and that LSP "could offer a certificate at the end of the program" if it wanted the Farm Line to be more rehabilitative than punitive.  *See* 2/10/26 Tr. 51:5–21.

106.    The Court notes that approximately one month after trial, Warden Vannoy submitted an affidavit that the Court admitted into evidence.  DX-062.  In his post-trial affidavit, Warden Vannoy described various steps Defendants had taken after trial, including plans to implement a class during which men on the Farm Line "will learn about the crops that LSP grows and how they are grown" with "a certification following completion of the class."  DX-062 at 2.

107.    At a subsequent deposition, also admitted into evidence, Warden Vannoy expanded upon his plans for this class.  PX-248 56–72 (Vannoy March 2026 dep.).  He testified that LSP plans to offer a horticulture class that will teach incarcerated men a variety of topics.  *Id.* at 61–62.  He described plans to offer the class in the afternoons, and to offer a certificate of completion for men who have completed the class.  *Id.* at 62–63.

108.    To date, LSP has not started offering this class.  PX-248 at 57 (Vannoy March 2026 dep.).  Warden Vannoy admitted that the program is in the "idea stage."  *Id.* at 68.  At the time of Warden Vannoy's March 2026 deposition, there was no written documentation of any kind describing the class—no proposal, no directive, no written procedures, and no policy.  *Id.* at 68.  No syllabus or lesson plan had been created.  *Id.* at 63.  The education department had not started working on it, *see id.* at 67–68, and no credentialed horticulture professional had been identified to supervise the program, *see id.* at 63–64.  The greenhouse and one of the education buildings that the class would utilize had not yet been constructed.  *Id.* at 57–58.  No reference to this class was made before or at trial, and no documentary evidence concerning it has been submitted.

109.    The Court cannot credit Defendants for a class that does not yet exist.  The Court therefore finds that there currently is no educational or rehabilitative component of the Farm Line.

22

B.       Classification and Assignment to the Farm Line

110.     The Court finds that everyone at LSP who is medically cleared to work must have a job assignment.  *See* JX-047 at 2 (LSP Directive No. 19.003).[5]  Unlike other jobs at LSP, class members generally are assigned to the Farm Line as their first job and after a disciplinary infraction.  Nearly everyone incarcerated at LSP is at risk of being assigned to the Farm Line at any time and for any reason.

111.     New arrivals at LSP are overwhelmingly assigned to the Farm Line as their first job.  According to LSP's "Inmate Orientation Information/Manual," "[a]ll new inmates arriving at Louisiana State Penitentiary are required to work in the field/farm line (large vegetable gardens/field) for at least six months, subject to medical and mental health clearance."  JX-032 at 11.  Testimony from Defendants' witnesses and class members alike confirms this practice.  2/10/26 Tr. 61:16–62:4 (Vannoy); 2/3/26 Tr. 172:15–18 (Vannoy); 4/23/25 Class Cert. Tr. 309:5–7 (Scott); 2/3/26 Tr. 32:25–33:8 (Guillory); 2/3/26 Tr. 67:22–24 (Major); 2/4/26 Tr. 73:4–9 (Samuels); 2/5/26 Tr. 86:20–22 (Morehead); 4/23/25 Class Cert. Tr. 125:10–18 (Jackson); 4/23/25 Class Cert. Tr. 151:3–11 (Jones); *see also* 2/5/26 Tr. 201:2–21, 210:19–20 (Henderson testifying that the Farm Line was his first job when he arrived at LSP in the 1970s).

112.     Class members can be reassigned to the Farm Line at any time, including, notably, as a consequence after they have completed their time in disciplinary segregation or solitary confinement.  *See* SUF ¶¶ 56, 81; 2/3/26 Tr. 172:19–22 (Vannoy); 2/3/26 Tr. 80:12–17, 87:2–7 (Major); 2/3/26 Tr. 172:19–22 (Vannoy); 2/4/26 Tr. 49:3–18 (Pidgeon); 2/9/26 Tr. 264:13–19,

---

[5]    The Court does not dispute Defendants' assertion that work requirements are not unconstitutional, *see* ECF No. 349 at 3, but notes that this argument misses the mark.  The Court in no way finds that the existence of a work requirement alone violates the Eighth Amendment, the ADA, or the Rehabilitation Act.  However, work assignments that create conditions that violate the Eighth Amendment or any other federal statute are not permitted.  That is what Plaintiffs challenge here and that is what the Court is tasked with assessing.

266:20–22 (Davis). Men reassigned to the Farm Line following a disciplinary infraction generally do not receive a different job until they have worked on the Farm Line for 90 days without a disciplinary report. *See* 2/9/26 Tr. 246:12–247:6 (Davis); *see also* SUF ¶ 54. Major Pidgeon testified that restarting on the Farm Line after a disciplinary infraction is akin to "starting at the bottom" of the hierarchy at LSP. 2/4/26 Tr. 49:19–21.

113. Defendants' witnesses testified that LSP uses the Farm Line as the first job to evaluate and monitor new arrivals. Warden Vannoy testified that the Farm Line is a "baseline job" through which LSP can "evaluate the new guys that are coming in" and see "how they're going to adjust to prison." 2/9/26 Tr. 304:22–305:10, 334:23–335:5.

114. Ms. Vittorio likewise testified that the Farm Line is used when LSP wants to have constant surveillance over class members. When class members first arrive at LSP, they are assigned to the Farm Line so that security can "observe" them and "see how they acclimate to prison life," and men are reassigned after a disciplinary infraction so that security can "directly supervise[]" and "monitor their behavior." 2/4/26 Tr. 128:1–129:10. She further admitted that the Farm Line is unlike other "medium security jobs, whether it be in the kitchen, the laundry" because those jobs are "not going to be under direct supervision the entire time they're working." 2/4/26 Tr. 128:1–15. Ms. Vittorio also testified that LSP is aware that the subject of LSP being a former plantation is a sensitive topic to society, but conceded that LSP does not take those sensitivities into account when assigning people to work on the Farm Line—even though it *does* take those sensitivities into account when organizing tours for the public. 2/4/26 Tr. 117:16–25, 118:6–119:14; *see also* PX-027 (email from Vittorio noting that LSP "do[es]n't really talk about Angola being a plantation anymore due to sensitivity of that subject").

24

115. The Court finds that assignment to the Farm Line as the first job or after a disciplinary infraction conveys to class members that they are at the bottom of the hierarchy at LSP and that the Farm Line should be understood as part of their punishment. This finding is informed by the testimony of Dr. Toce, who admitted that he believes the Farm Line is "considered punishment" and "degrading," that "just the social connotations of the Farm Line are enough to influence behaviors," and that "men assigned to the Farm Line are considered [] sub-par inmates if they can't connive their way out of the field." 2/3/26 Tr. at 102:24–103:11. As discussed in further detail below, this testimony led Dr. Sbicca to conclude that the Farm Line is at the bottom of the social hierarchy at LSP. *See infra* Section VIII.B.

116. Class members testified to their belief that the Farm Line is assigned as the first job to "break [their] spirts" as they arrive to LSP and to signal they have "entered the plantation." 2/3/26 Tr. 34:5–17 (Guillory); 2/5/26 Tr. 139:4–22 (Sbicca discussing statements by Major).

117. Likewise, reassignment to the Farm Line after a disciplinary infraction is widely understood to be a continuation of the punishment because men are often sent immediately to the Farm Line following solitary confinement, they lose privileges like trustee status, and they must remain on the Farm Line for 90 days without a write-up before reassignment. *See* SUF ¶¶ 54, 58; 2/4/26 Tr. 11:10–16, 15:20–16:3 (Smith testifying that after receiving a disciplinary infraction, he lost his trustee status and "was assigned to Line 15B"); 2/3/26 Tr. 87:2–7 (Major testifying about his "fear" of being sent back to the Farm Line "[b]ecause all it takes is a disciplinary report and you can be shipped right back out.").

118. For the foregoing reasons, the Court finds that the class members are assigned to the Farm Line at any time, either as their first job or as a result of disciplinary action. Assignment to the Farm Line for new arrivals signals to men that they are starting at the "baseline" at LSP.

25

For men reassigned to the Farm Line following a disciplinary infraction, the Farm Line is meant to signal to them that they are "starting at the bottom" of the social hierarchy at LSP. For those reassigned after disciplinary write-ups, the Court finds that the Farm Line serves as a continuation of their punishment, rather than a pure job assignment.

### C.     Surveillance and Discipline on the Farm Line

#### 1.     Pushers and Gun Guards on the Farm Line

119.    The Farm Line is overseen by an officer known as a "Line Pusher" or "Pusher" and armed officers referred to as "Gun Guards." SUF ¶ 65; 2/4/26 Tr. 302:8–18 (Karisny); 2/9/26 Tr. 217:10–17 (Sylvester); 4/23/25 Class Cert. Tr. 330:4–9 (Scott).

120.    The job of a Pusher is to "oversee" the Farm Line. 2/4/26 Tr. 305:5–10 (Karisny); *see* 2/3/26 Tr. 176:1–11 (Vannoy). Pushers transport class members from their Camps to the fields, assign them to specific rows, and instruct them where and how much to plant or harvest. SUF ¶¶ 68–69; 2/4/26 Tr. 304:2–25 (Karisny); 4/23/25 Class Cert. Tr. 310:21–25 (Scott). They also fill out the DLCs each day. SUF ¶ 71; 2/4/26 Tr. 322:9–13 (Karisny); 4/23/25 Class Cert. Tr. 311:24–312:5 (Scott). Pushers are authorized to, and do in fact, write men up for disciplinary infractions. 2/4/26 Tr. 307:15–20 (Karisny); 4/23/25 Class Cert. Tr. 322:11–323:12 (Scott).

121.    Unlike other jobs at LSP, Line Pushers "push" men to do their work while on the Farm Line and may discipline them if they believe they are not working hard or fast enough. 2/4/26 Tr. 308:11–21 (Karisny); 4/23/25 Class Cert. Tr. 324:11–14 (Scott). As Master Sergeant Scott testified, a Pusher's role is to make sure men are "doing what they [are] supposed to be doing" and not just "standing around." 4/23/25 Class Cert. Tr. 310:21–311:10.

122.    Gun Guards, armed with a pistol and an AR-15 rifle, surveil men on the Farm Line at all times. SUF ¶ 67. They ensure "that men working on the Farm Line stay within a certain

perimeter." 2/4/26 Tr. 302:19–22 (Karisny). LSP typically assigns newer, less experienced officers as Gun Guards. 2/3/26 Tr. 176:23–177:2 (Vannoy).

### 2.    Discipline on the Farm Line

123.    The evidence demonstrates that men on the Farm Line can and do face significant disciplinary consequences if they refuse to work, or if they fail or are perceived to fail to perform their work at a certain ill-defined pace to fulfill de facto quotas.

124.    DOC has issued disciplinary rules and procedures that apply to all people incarcerated at LSP. SUF ¶¶ 77–78. This includes a "Disciplinary Matrix" which lists descriptions of DOC each disciplinary rule ("Disciplinary Rule") and its corresponding potential sanctions. SUF ¶ 78; *see also* JX-001 at 20–43.

125.    Under Disciplinary Rule 27, people in custody at LSP are required to "perform their assigned task with reasonable speed and efficiency." SUF ¶ 82; JX-001 at 36; 2/4/26 Tr. 308:3–10 (Karisny). If an incarcerated person violates Disciplinary Rule 27, they can receive up to four extra duty days, lose electronic/media privileges, lose "Canteen" privileges, lose telephone privileges, and risk confinement to their dormitory room or cell for up to 14 days. JX-001 at 36.

126.    Lieutenant Karisny and Master Sergeant Scott confirmed that, as Pushers, they enforce this rule, requiring men on the Farm Line to work with reasonable speed and efficiency and disciplining those who fail to do so. 2/4/26 Tr. 308:8–14 (Karisny); 4/23/25 Class Cert. Tr. 324:11–14 (Scott). Assistant Warden Sylvester similarly testified that men can be written up for not working at a certain pace, for example, if they do not pick a certain number of potatoes in an allotted period of time. 2/9/26 Tr. 228:10–19.

127.    "Reasonable speed and efficiency," however, is undefined and arbitrary. It is up to the Pushers, who surveil the men on the Farm Line, to decide what reasonable speed and efficiency entails. 2/4/26 Tr. 308:15–21 (Karisny); *see also* 2/9/26 Tr. 239:19–22 (Sylvester).

27

128.    It is not only class members who are disciplined for failing to maintain a certain pace on the Farm Line.  LSP officers are held accountable for Farm Line output, and LSP's policies incentivize Pushers to require class members to complete their work quickly, regardless of the circumstances, because Pushers themselves are subject to disciplinary action such as loss of wages and loss of employment if they do not "push" the line hard enough to maximize yields.  2/9/26 Tr. 239:23–240:9 (Sylvester); 4/23/25 Class Cert. Tr. 324:15–325:18 (Scott).

129.    Assistant Warden Sylvester testified that he himself got a "talking to" for decreased productivity on the Farm Line.  2/9/26 Tr. 239:23–240:9.  At the class certification hearing, Master Sergeant Scott confirmed that Pushers can be disciplined if men on the Farm Line are not working hard enough.  4/23/25 Class Cert. Tr. 324:15–325:18.

130.    In addition, "post orders"—which Warden Vannoy described as "a general job description" for a role—require field operations staff, including Pushers, to "maintain maximum effectiveness."  2/3/26 Tr. 271:3–8, 273:2–274:15; DX-048 at 033422 (post order for "Field Operations Colonel"), 033426 (post order for "Field Operations Lieutenant Colonel"), 033436 (post order for "Field Operation Major").  For Pushers, Warden Vannoy testified, this means maintaining the pace at which the men on the Farm Line complete their work.  2/3/26 Tr. 273:2–274:15 (Vannoy).

131.    Several class members credibly testified that they also understood that men on the Farm Line are disciplined if they do not work fast enough or at a specific pace.  Mr. Morehead testified that if a man on the Farm Line does not work efficiently, he is punished.  2/5/26 Tr. 96:17–20.  Mr. Guillory also testified if men on the Farm Line fail to work with reasonable speed and efficiency, they will be written up for a work offense.  2/3/26 Tr. 47:8–13.  Mr. Smith testified that he witnessed guards pushing men on the Farm Line to work faster.  2/4/26 Tr. 24:15–25:1.  Mr.

28

Samuels testified that, whenever he attempted to rest or pause while working on the Farm Line, Pushers would threaten to write him up.  2/4/26 Tr. 82:20–83:6.

132.    Defendants' witnesses testified that there is no quota system on the Farm Line and men can work at their own pace.  4/23/25 Class Cert. Tr. 308:1–5 (Scott); 4/24/25 Class Cert. Tr. 10:24–11:6 (Sylvester); 2/4/26 Tr. 64:22–23 (Pidgeon); 2/5/26 Tr. 9:25–10:9 (Karisny denying that he gave instructions about how many crates to fill on a given day).

133.    The Court, however, is not persuaded by this testimony in light of LSP's policies, the testimony from class members, and testimony from Defendants' witnesses about the discipline Pushers can face for failing to push class members to work at a certain pace.

134.    Indeed, under Disciplinary Rule 28, men can be punished for refusing to go out to work or for "[f]alling far short of fulfilling reasonable work quotas," which can lead to significant disciplinary consequences.  JX-001 at 37; SUF ¶¶ 86–87.  If an individual violates Disciplinary Rule 28, they risk confinement to their dormitory, room or cell for up to 30 days, extra duty for up to eight days, disciplinary segregation for up to 180 days, forfeiture of good time for up to 90 days, failure to earn incentive wages for up to 12 months, and loss of hobby craft for up to 12 months. JX-001 at 37; *see also* 2/4/26 Tr. 310:22–311:6 (Karisny agreeing that a Disciplinary Rule 28 violation can result in failure to earn incentive pay or disciplinary segregation).

135.    Mr. Guillory testified that if a person refuses to work on the Farm Line, he will "be written up" for aggravated disobedience or "a Rule 28, which is [an] aggravated work offense," and that the person can "get locked up" and sent to segregation.  2/3/26 Tr. 46:20–47:7; *see also* 2/3/26 Tr. 79:1–14 (Major); 2/4/26 Tr. 23:10–18 (Smith); 2/5/26 Tr. 99:10–19 (Morehead); 2/9/26 Tr. 228:21–229:1 (Sylvester); 2/9/26 Tr. 264:20–265:4 (Davis); 4/23/25 Class Cert. Tr. 128:8–129:10 (Jackson).

136. Colonel Davis explained that men who receive disciplinary segregation are forced to spend 22 hours in a cell with limited yard time. 2/9/26 Tr. 265:17–266:12. This type of isolation at Angola is commonly known as the "dungeon." *See, e.g.*, 4/23/25 Class Cert. Tr. 127:14–128:2 (Jackson). Conditions in the "dungeon" can be "very hot," "loud," "nasty," "inhuman," and unsanitary, and can have a significant detrimental impact on men subject to those conditions. 4/23/25 Class Cert. Tr. 159:9–161:16 (Jones); *see also* 2/3/26 Tr. 79:15–25 (Major); 4/23/25 Class Cert. Tr. 127:17–128:7 (Jackson).

137. Despite these conditions, some men choose to face this severe consequence rather than work on the Farm Line. Mr. Jones testified that he refused to work on the Farm Line knowing he would be sent to solitary confinement. 4/23/25 Class Cert. Tr. 158:17–159:8. Mr. Morehead testified that he went out on the Farm Line but was unable to work due to debilitating back pain. 2/5/26 Tr. 97:4–98:15. After telling the guard he was unable to continue, the guard told him to either "go to work or catch a cell," which is "solitary confinement in a two-man cell." 2/5/26 Tr. 97:4–98:17. Mr. Morehead chose the latter and was transported back to Camp D and threatened with solitary confinement. 2/5/26 Tr. 98:18–99:9. Although he ultimately was not sent to the dungeon, *see id.*, the Court finds this testimony credible in demonstrating the choice men face between enduring conditions on the Farm Line and solitary confinement.

138. Discipline on the Farm Line is also meted out by Gun Guards when class members are perceived to not fall in line. If a class member crosses the secured perimeter or steps into a neighboring field, Gun Guards are trained to fire warning shots. 2/3/26 Tr. 176:15–22 (Vannoy); 4/24/25 Class Cert. Tr. 20:23–21:6, 22:3–7 (Sylvester). If an incarcerated person does not stop after a warning shot is fired, "the policy is to shoot to disable." 4/24/25 Class Cert. Tr. 21:21–24 (Sylvester).

30

139.    Assistant Warden Sylvester testified that warning shots had been fired on the Farm Line multiple times in recent years, and described a specific instance in which a warning shot had been fired because an "incarcerated person had crossed over the secured perimeter line to go to another . . . field to pick something out of it and got caught." 4/24/25 Class Cert. Tr. 12:2–9, 21:7–22:7 (Sylvester).  He further testified that at least one person on the Farm Line has been shot and killed by a Gun Guard.  4/24/25 Class Cert. Tr. 21:21–22:2 (Sylvester).

140.    Class members confirmed that Gun Guards have pointed weapons and fired warning shots at men on the Farm Line.  For example, Mr. Smith testified that he had "seen security fire off warning shots . . . for security reasons" and witnessed a Gun Guard in 2024 "yelling and screaming" at men who were not moving quickly enough, telling them to "tighten the . . . line up" while pointing his gun at men on the Farm Line.  2/4/26 Tr. 25:2–24.  Mr. Jones described an incident in August 2024 when he "stepped out of line" to talk to a colonel supervising the Farm Line and was told he "better get back in line before [he] get[s] shot [a]nd the Gun Guard actually cocked his gun."  4/23/25 Class Cert. Tr. 164:14–165:1.

141.    The Court finds this testimony credible and consistent with Assistant Warden Sylvester's testimony.  Although Mr. Smith and Mr. Jones describe incidents in 2024, the Court notes that Defendants presented no evidence that LSP's policies or the instructions given to Gun Guards about the use of their weapons have changed.  Based on the testimony from Defendants' own witnesses and class members, the Court finds that Gun Guards can and do point their weapons at men on the Farm Line and fire warning shots at men on the Farm Line.

142.    The Court heard credible testimony there are no other jobs at LSP that have Pushers forcing class members to work at a certain pace and Gun Guards trained to shoot if class members venture into neighboring fields.

143.    Mr. Morehead testified: "When I worked as groundskeeper . . . I ain't got no guards over my shoulder, no gun guard in sight.  I could just . . . do my job. . . I ain't got nobody telling me or hollering at me like I'm not working good enough or fast enough to their liking.  But when I'm on the field, it's different.  It's the opposite."  2/5/26 Tr. 92:7–20.  Mr. Guillory credibly testified that he has worked numerous other jobs at LSP, and they were all preferable to the Farm Line because he was able to work at his own pace and was able to take breaks whenever he needed.  2/3/26 Tr. 35:3–17 (Guillory).  Mr. Samuels testified that as a dorm orderly, he was able to work at his own pace.  2/4/26 Tr. 89:18–90:7.  Mr. Jackson testified that he held four other jobs at LSP— dorm orderly, janitor, vegetable processing, and textile cutter—and none of those jobs entailed having someone "stand over [him] with a weapon telling [him he] got to do it."  4/23/25 Class Cert. Tr. 140:5–18 (Jackson).

144.    Mr. Major testified that the pace demanded by Pushers on the Farm Line is unlike other prison farms.  Specifically, Mr. Major testified that he previously worked on a farm line while incarcerated at a Virginia prison, and men there were never punished for not working hard enough or fast enough.  2/3/26 Tr. 71:17–19.

145.    There is no evidence in the record about any other jobs at LSP that have Pushers who require men to perform their tasks at a certain pace.

146.    In addition, although Defendants' witnesses testified that Gun Guards are required as a security measure because the Farm Line operates outside the secured perimeter at LSP, *see* 2/9/26 Tr. 224:3–13  (Sylvester); 2/4/26 Tr. 56:20–24 (Pidgeon); 2/4/26 Tr. 123:3–21 (Vittorio), Defendants did not identify a single other job at LSP that requires Gun Guards.

147.    Based on the weight of this evidence, the Court finds that class members are subject to extreme and often arbitrary punishment while on the Farm Line.  When they refuse to perform

32

labor under these extreme conditions, they are sent to—and sometimes choose—solitary confinement. The Court finds that class members are also punished if they do not work with reasonable speed or efficiency, that Pushers are incentivized and required to push men to maximize yields and work at a certain pace, and that the pace enforced by Pushers is ill-defined and arbitrary. This practice, the Court finds, amounts to a de facto quota.

148. The Court also notes that although the disciplinary rules requiring men to work with reasonable speed and efficiency apparently apply to everyone at LSP, the Court finds that there is no evidence that LSP enforces pacing requirements through disciplinary sanctions for any job assignment other than the Farm Line, because as noted above, *see supra* ¶ 114, the Farm Line is the only job at LSP with constant surveillance.

### D.    Incentive Pay on the Farm Line

149. Louisiana law permits prisons to pay "incentive pay" to incarcerated individuals as compensation for "perform[ing] satisfactory work in the compensation grade in which he has been classified." La. Admin. Code tit. 22 § I-341. LSP Directive No. 19.001 ("Directive 19.001") is the LSP-specific policy governing incentive pay and other wage compensation for individuals at LSP. PX-023 at 1.

150. During the first three years of their incarceration, class members are not eligible to receive any pay for work on the Farm Line. PX-023 (Directive 19.001) at 1. All other class members may receive "incentive pay" as compensation for their labor on the Farm Line.

151. Testimony from Mr. Samuels, Mr. Major, and Mr. Guillory confirms this policy. Mr. Samuels testified that he worked on Line 15 of the Farm Line from approximately February to mid-April 2025 but was not eligible for incentive pay because he had not yet served three years at Angola. 2/4/26 Tr. 71:22–24; 92:7–13. Likewise, Mr. Major, incarcerated at LSP for less than three years, testified that he too had not received any incentive pay for his work on the Farm Line.

33

2/3/26 Tr. 84:7–9.  Mr. Guillory testified that he did not receive any incentive pay for his work on the Farm Line for the first three years of his incarceration.  2/3/26 Tr. 48:14–18.

152.    After the first three years of incarceration, the incentive pay rate for eligible men on the Farm Line ranges from two to four cents per hour.  2/4/26 Tr. 120:13–121:16 (Vittorio).

153.    The Court heard unrebutted testimony that no work assignments at LSP pay less than the Farm Line.  2/3/26 Tr. 48:12–14 (Guillory); 4/23/25 Class Cert. Tr. 162:5–8 (Jones).

154.    Men working in other positions at LSP can earn substantially higher rates.  Tutors can earn between 25 cents and $1.00 per hour; mentors can earn between 50 cents and $1.00 per hour; counsel substitutes can earn between 25 cents and $1.00 per hour.  Trustees and men working Prison Enterprise agricultural jobs may earn up to 40 cents an hour.  PX-023 at 5–7 (Directive 19.001).

155.    If a class member is reassigned to the Farm Line as a result of disciplinary action, his incentive pay rate is "automatically . . . adjusted to the lowest pay rate" for work on the Farm Line—2 cents per hour—regardless of what he was earning at his previous job.  PX-023 at 3 (Directive 19.001).

156.    Notably, the incentive pay rate on the Farm Line has not changed in recent history. Warden Vannoy confirmed that the rate was 2 cents per hour in 1975 when he began working at Angola and remains the same today.  2/3/26 Tr. 300:1–14.  Mr. Henderson also testified that when he was incarcerated at LSP beginning in the 1970s, the highest incentive pay he received for Farm Line labor was four cents.  2/5/26 Tr. 204:10–13 (Henderson).

157.    The Court heard credible testimony from multiple class members that the incentive pay is not enough to support themselves or to purchase basic necessities.  Mr. Jackson testified that class members use incentive pay to buy soap, toothpaste, deodorant, and phone time because

34

the prison does not provide all of their basic necessities. 4/23/25 Class Cert. Tr. 131:20–23, 132:20–23. He described the pay as "very degrading" because it would take over 50 hours of labor at two cents per hour to buy one bar of soap. 4/23/25 Class Cert. Tr. 131:17–19. Mr. Guillory testified that at four cents per hour, "at the end of the week, you can't buy a bar of soap." 2/3/26 Tr. 48:19–49:5. Mr. Smith similarly testified that he earned between two and four cents per hour on the Farm Line and that his first priority was hygiene, including soap, toothpaste, and shampoo, but that the one bar of soap LSP provides per week was not sufficient. 2/4/26 Tr. 14:15–17. Likewise, Mr. Jones described his four cents per hour as "nothing." 4/23/25 Class Cert. Tr. 162:1–4.

158. The DOC Correctional Services Inventory Price List, dated October 15, 2025, reflects the prices of basic necessities available for purchase at LSP. The Court's review of the list indicates that soap ranges from approximately $1.53 to $2.54 per bar, toothpaste costs $2.07, a toothbrush costs $1.15, deodorant costs $3.80, and shampoo costs $1.69. PX-010, at 4.

159. At the Farm Line's base incentive pay rate of 2 cents per hour, an incarcerated individual would need to work more than 75 hours to purchase a single bar of soap at $1.53, more than 100 hours to purchase a tube of toothpaste at $2.07, and more than 190 hours to purchase deodorant at $3.80. PX-010, at 4; PX-023 at 5.

160. Warden Vannoy acknowledged in his testimony that DOC is aware that the incentive pay available to men on the Farm Line leaves them unable to purchase basic necessities. 2/3/26 Tr. 302:6–15 (Vannoy).

161. The Court finds that men on the Farm Line are paid zero cents during their first three years of incarceration and two to four cents per hour after that—the lowest pay rate at LSP. The Court further finds that level of incentive pay is not enough to purchase basic necessities..

35

162. The Court finds that evidence about LSP's incentive pay policy and the incentive pay rate for work on the Farm Line is relevant and will assist in determining the extent to which the incentive pay rate contributes to any dignitary harm experienced by class members. It will consider this evidence in evaluating Plaintiffs' Eighth Amendment claim.

### E.      Medical Attitudes on the Farm Line

163. The Court heard testimony concerning the attitudes of medical providers at LSP.

164. Dr. Toce, LSP's Medical Director, believes that 50% of medical complaints and 75% of duty status requests at LSP have no medical basis and are made solely for "secondary gain"—that is, to obtain medication, housing, or a different job rather than medical treatment. 2/3/26 Tr. 96:23–97:15. Dr. Toce considers "secondary gain" a widespread problem. 2/3/26 Tr. 97:16–19. He believes that men on the Farm Line purposely dehydrate themselves—including to the point of passing out—for "secondary gain," and that some "fake" symptoms of depression and anxiety in order to avoid field work. 2/3/26 Tr. 97:20–98:3, 103:16–19.

165. Dr. Lavespere testified that when he served as Medical Director of LSP, he believed that only about 50% of the complaints about pain were "viable." 2/3/26 Tr. 310:5–9, 312:17–20.

166. Defendants' medical expert, Dr. Keldie, displayed similar attitudes towards class members and the veracity of their medical complaints. Evaluating health records from SDEs called from the Farm Line, Dr. Keldie testified that there are far too many "minor complaints or complaints with no merit lodged from the field at LSP" and that finding a meritorious complaint is like finding a "needle in a haystack." 4/24/25 Class Cert. Tr. 101:25–102:7, 111:5–112:1.

167. Plaintiffs' experts testified to the alarming implications of these attitudes towards class members on the Farm Line. Dr. Vassallo described these attitudes as dangerous, testifying that the "belief" among LSP medical staff "that there is secondary gain from presenting with a complaint" is a "kind of cynicism that results in . . . death and morbidity." 4/23/25 Class Cert. Tr.

36

67:1–19. In her opinion, "prejudice among LSP medical providers that incarcerated patients are unreliable historians or prone to malingering further places patients at an unacceptable risk of harm." PX-083 at 5 (Vassallo Aug. 2024 decl.).

168. Dr. Hammonds opined that such attitudes can result in increased health risks, in particular the risk of inadequate care for the men on the Farm Line. 2/3/26 Tr. 151:21–152:4, *see generally* 2/3/26 Tr. 145:23–152:4. As discussed in further detail below, Dr. Hammonds likened the attitudes displayed by Dr. Toce and Dr. Lavespere to similar prevailing beliefs among physicians during chattel slavery who believed enslaved people were feigning illness to avoid work. *See infra* Section VIII.A.

169. Based on the testimony and evidence presented, the Court finds that Defendants' senior medical staff demonstrates deeply concerning attitudes toward incarcerated individuals seeking medical care, including beliefs that incarcerated men at LSP regularly lie about symptoms, fake illnesses to avoid work, and intentionally inflict self-harm to avoid the Farm Line. *See, e.g.*, 2/3/26 Tr. 97:11–98:3, 103:16–19 (Toce). The Court credits Dr. Vassallo's and Dr. Hammonds' testimony and finds that the prejudice and hostility displayed by Drs. Toce, Lavespere, and Keldie toward class members can increase the risk of inadequate medical treatment or serious physical harm.

## VII.    Men Experience the Farm Line as Degrading, Dehumanizing, and Dangerous

170. Seven class members testified about their experience on the Farm Line. Defendants called no incarcerated witnesses in rebuttal. The Court credits each class member's testimony and finds that they all experience the Farm Line as degrading and dehumanizing.

### A.    Joseph Guillory

171. Mr. Guillory testified on the first day of trial. *See generally* 2/3/26 Tr. 30:3–65:21.

172.    Mr. Guillory was assigned to the Farm Line as his first job when he arrived at LSP, despite having no farming experience.  2/3/26 Tr. 32:25–33:11.  He believes LSP assigns the Farm Line as the first job to signal to men that they have no agency and are under LSP's full control, and to "break" their spirits.  2/3/26 Tr. 33:12–34:17.

173.    Mr. Guillory has held numerous other jobs while incarcerated at LSP.  He believes that there are jobs at LSP that are more desirable than others, but the Farm Line, by contrast, is the "base job . . . at the bottom of the totem pole."  2/3/26 Tr. 34:18–35:10.

174.    Mr. Guillory testified about the ways in which the Farm Line forces men to recall and relive the history of slavery.  He testified about his family's direct connection to enslavement and testified about an instance of being offered watermelon by guards on the Farm Line.  This incident reminded him of stories from his grandmother describing watermelon as a "slave fruit" that "the slave owner would come around when the slaves do good and split the watermelon up and give[] them a treat."  He recognized the resemblance when the guards were "starting to split watermelons and pass it around."  To be reminded of this history, he testified, was "psychologically unbearable."  2/3/26 Tr. 49:20–50:2, 50:25–51:23.

175.    He testified about the use of racialized language that LSP staffs used towards men on the Farm Line, including guards repeatedly calling him "boy."  He explained:  "Boy was a word that was just thrown around [by officers] like it . . . just really didn't mean anything."  2/3/26 Tr. 50:3–24.  He described the impact of these words:  "I already feel degraded that I'm on my hands and my knees and I'm working in this dirt, and you sitting over me with a big old animal with a gun in your hand calling me 'boy.'  It's very, very degrading."  *Id.*

176.    Mr. Guillory also testified about participating in a now-defunct horticulture training program that he described as "rewarding" because it taught him farming skills he did not know,

38

such as planting, harvesting, rotating, and water crops, and as a result, he received a general standards license for his training in Louisiana agriculture, forestry, and public safety.  2/3/26 Tr. 37:3–20.

177.    He testified that the Farm Line provides nothing comparable:  it offers no training and the techniques that he learned in the horticulture training program were not being followed on the Farm Line.  2/3/26 Tr. 37:21–23, 39:2–23.  He described the Farm Line as a "degrading job" where men are "forced to work in the fields with no training at all," and are effectively "digging in the dirt and . . . trying to avoid any disciplinary reports."  *Id.* at 34:5–17.

178.    Mr. Guillory, for example, testified that while working on the Farm Line during the summer of 2023, he was forced to "water[] sweet potatoes with Styrofoam cups," which he contrasted with the irrigation methods he learned about in the horticulture program and the other irrigation methods he has observed during his incarceration at LSP.  2/3/26 Tr. 37:24–38:2, 39:2–23.  Mr. Guillory testified that his work on the Farm Line felt like "a waste of time," and described that the work was made harder by being "nonsense work."  *Id.* at 40:6–13.

179.    Mr. Guillory also described seeing tour buses while working on the Farm Line.  He testified that when the tour buses come, Pushers "are egging [them] on" to put "on a show" and people are "just passing by like the [men on the Farm Line are] entertainment."  2/3/26 Tr. 41:15–42:7.

180.    Overall, Mr. Guillory described the Farm Line as degrading, a "life sucker," a "drain," and "break your back" kind of labor.  2/3/26 Tr. 34:5–17, 53:13–54:3.

181.    The Court finds Mr. Guillory's testimony credible and finds that he experiences the Farm Line as degrading, dehumanizing, and harmful because of the ways it forces him to recall

and relive the history of slavery and because it pales in comparison to the educational value of the horticulture program.

### B.   Steven Major

182.   Mr. Major also testified on the first day of trial.  2/3/26 Tr. 66:22–92:3.

183.   Mr. Major testified that being assigned to the Farm Line when he first arrived at LSP made him feel like "a slave."  2/3/26 Tr. 85:15–20.  The "lack of tools" on the Farm Line made him feel like he "wasn't worth having a tool, like [he] wasn't good enough for that."  *Id.* at 75:25–76:25.  In addition, not being paid for his work on the Farm Line was "degrading," and that it made him "feel like an animal."  *Id.* at 85:7–14.

184.   Mr. Major also testified about observing buses touring LSP while on the Farm Line. The tours, Mr. Major explained, made him feel like he was "in a zoo," "waiting on somebody to throw a peanut out the window."  2/3/26 Tr. 86:17–24.

185.   Mr. Major also testified about the use of racialized language on the Farm Line.  He testified that it is "not a[n] uncommon thing" for guards to use racial slurs toward men on the Farm Line and recalled "quite a few" instances of this occurring.  2/3/26 Tr. 86:4–13.

186.   Mr. Major testified about his experience working on a prison farm at Powhatan Correctional Center in Virginia before he arrived at LSP, which he described as drastically different from the Farm Line.  At Powhatan, Mr. Major was responsible for planting, cultivating, and harvesting two plots of land, and he chose what to plant in those plots depending on the season. 2/3/26 Tr. 68:14–69:17.  Incarcerated people were provided tools—like hoes, rakes, wheelbarrows, shovels, and cutters—with enough for everyone to sign out during their shifts.  *Id.* at 72:11–73:1. They were never punished for not working hard or fast enough.  *Id.* at 71:17–19.  If someone did not want to work on the farm, he could sign up for another job.  *Id.* at 69:23–70:7.

40

187. Incarcerated men at Powhatan had access to shade in a large barn that was equipped with fans, air-conditioning, water, and a freezer for cold drinks. 2/3/26 Tr. 72:1–10.

188. Mr. Major was paid 45 cents per hour—approximately $50 per month—which was enough to afford basic necessities with these wages, such as deodorant, soap, toothpaste, and a few snacks. 2/3/26 Tr. 70:24–71:13. He testified that the pay incentivized him to work on the farm operation. *Id.* at 71:14–16. Compared to his experiences at Powhatan, Mr. Major testified, working on the Farm Line was "grueling" and "pretty degrading." 2/3/26 Tr. 75:14–16.

189. The Court finds Mr. Major's testimony credible and finds that his comparison of the Farm Line to his experience at Powhatan Correctional Center demonstrates that the conditions on the Farm Line—including the lack of tools, the absence of meaningful pay, the presence of Pushers, and the racialized language—are not inherent to prison agricultural work. The Court finds that Mr. Major experienced the Farm Line as degrading and dehumanizing.

### C. <u>Gregory Samuels</u>

190. Mr. Samuels testified on the second day of trial. 2/4/26 Tr. 70:1–107:4. He was first assigned to the Farm Line when he first arrived at LSP and worked there from February to mid-April 2025. *Id.* at 71:7–25.

191. Mr. Samuels suffers from pulmonary stenosis, a serious congenital heart condition, for which he has had three major surgeries that left him with a visible scar from his neck to his sternum and stomach. 2/4/26 Tr. 73:10–74:9. He testified that his heart condition makes it difficult for him to do physical labor because it causes fatigue, syncope, fainting, or difficulty breathing. 2/4/26 Tr. 78:3–79:4.

192. Because of his heart condition, Mr. Samuels testified that he was initially assigned a duty status of "no strenuous activity and allowed to rest when needed" upon arrival into DOC custody and did not have to go out on the Farm Line. 2/5/26 Tr. 76:19–77:18. However, despite

showing the guard his duty status and his chest scar, he was eventually sent to work on the Farm Line. *Id.* at 81:25–82:15. He continued to be sent out to work on the Farm Line until he had an emergency medical incident in April 2025. *See id.* at 82:10–15. Mr. Samuels testified that he sought emergency medical treatment while planting potatoes because he felt lightheaded, dizzy, dehydrated, and was having difficulty breathing. *Id.* at 82:16–84:16. He recalled that the Pusher seemed "frustrated" that he needed medical attention. *Id.* at 84:1–4. Once medical arrived, Mr. Samuels was taken by ambulance and treated for low oxygen saturation. 2/4/26 Tr. 84:17–25. Subsequently, his duty status was changed to "out of field," meaning he would not be assigned to any outdoor labor. *Id.* at 85:1–86:8.

193. Mr. Samuels has not been on the Farm Line since April 2025 but he credibly testified that he is scared of being reassigned to the Farm Line. Despite his duty status, LSP staff have "shown that if they want you on there doing something, they will." 2/4/26 Tr. 88:5–13. Mr. Samuels testified that LSP staff's attitude towards his medical conditions is "very skeptical." *Id.* at 88:14–21. He has personally been threatened by LSP staff with being sent back out on the Farm Line following this incident. *Id.* at 86:22–24.

194. Mr. Samuels testified that he can get put into disciplinary segregation for not working on the Farm Line, and choosing whether to work on the Farm Line is akin to a choice between doing something he knows he cannot physically do due to his medical conditions and "getting locked up and being put in a violent situation." 2/4/26 Tr. 88:25–89:16, 94:11–24.

195. Mr. Samuels also testified that he is familiar with the Farm Line being compared to slavery. 2/4/26 Tr. 95:16–21. He indicated that the "mindset" of LSP has not changed much, and explained that the mindset is an "oppressive, anti-inmate, psychological thing" by which LSP

42

officials "try[] to break you" and are "aware that [the Farm Line is] used as a punishment." *Id.* at 95:19–96:5.

196.     He contrasted his work on the Farm Line with his current job as a dorm orderly and explained that working as a dorm orderly feels different:  "I'm doing something that's necessary for the dorm, helping myself and the people that I live with."  2/4/26 Tr. 92:17–23.

197.     The Court finds that Mr. Samuels credibly testified that he suffers from a serious congenital heart condition that makes physical labor on the Farm Line dangerous for him, that he was still forced to work on the Farm Line despite his medical conditions, and that he fears reassignment to the Farm Line or extreme punishment if he refuses to work.  The Court also credits his testimony that he experiences the Farm Line as a form of punishment.

### D.      **Myron Smith**

198.     Mr. Smith testified on the second day of trial.  2/4/26 Tr. 8:1–44:6.

199.     Mr. Smith testified extensively about his time as a trustee and the ways in which it served as a sharp contrast to the Farm Line.  2/4/26 Tr. 11:17–16:12.  While he was a trustee, Mr. Smith worked on the range crew where he operated tractors and other machinery and tended to livestock.  *Id.* at 11:24–12:5.  He described this work as genuine rehabilitation:  "It gave me job skills, and . . . things that I could take back into society."  *Id.* at 12:8–16.

200.     Mr. Smith lost his trustee status in 2022 due to a disciplinary violation and was immediately reassigned to the Farm Line.  He described this loss of status as a "big degrade" that made him feel like "a failure."  2/4/26 Tr. 21:22–22:2.

201.     Based on his experience with the range crew at LSP, Mr. Smith testified about the use of misting fans at Angola.  *See* 2/4/26 Tr. 30:18–32:3.  He explained that he has only seen misting fans used for cattle, which makes him feel "neglected" because LSP uses them for animals but not the human beings assigned to the Farm Line.  *Id.* at 31:23–32:3.

202. Testifying about his time on the Farm Line, Mr. Smith recalled being patrolled by "free men" with guns felt like a form of "modern-day slavery" that puts him on "eggshells." 2/4/26 Tr. 22:16–23:9. He described it as "belittlement" and testified that he witnessed guards "fire off warning shots" and "point his gun at someone" as an intimidation tactic. *Id.* at 22:21–25, 25:2–24.

203. Mr. Smith also testified about his experience completing unnecessarily difficult and menial work. As discussed above, *see supra* ¶ 88, Mr. Smith specifically recalled being forced to water a row of watermelons toting a five-gallon bucket. 2/4/26 Tr. 26:3–22.

204. Like Mr. Guillory and Mr. Major, Mr. Smith testified that tour buses passing by the Farm Line was "embarrassing" and made him feel like a "tour attraction" and like he and other incarcerated men were "monkeys in a circus." 2/4/26 Tr. 20:11–21.

205. The Court finds Mr. Smith's testimony credible. The Court finds that the contrast between his experience as a trustee and his reassignment to the Farm Line demonstrates that the Farm Line functions as a punishment and has no rehabilitative purpose. The Court also finds that conditions on the Farm Line force him to recall slavery and cause him to experience the Farm Line as degrading and dehumanizing.

### E. Chadarius Morehead

206. Mr. Morehead testified on the third day of the trial. *See* 2/5/26 Tr. 85:3–104:16.

207. Mr. Morehead was assigned to the Farm Line as his first job at LSP. He expressed confusion and shock at its resemblance to slavery, testifying that his ancestors were enslaved in Louisiana and that working on the Farm Line made him feel "broken" because he was letting down people who had fought to end slavery. 2/5/26 Tr. 88:10–89:22.

208.    Mr. Morehead testified that Line Pushers "holler at you" and "threaten you" to make "you work how they want you to work" and "to get as many vegetables as they can" and do not treat men on the Farm Line with dignity and respect.  2/5/26 Tr. 100:11–25.

209.    Mr. Morehead described a series of nightmares regarding the Farm Line. 2/5/26 Tr. 89:23–91:10.  In one, he was in the pecan field and saw "bodies . . . hanging like they've been lynched off the tree," only to realize every one of them was him.  2/5/26 Tr. 90:2–15.  This dream began around the time he first started working in the pecan field while on the Farm Line.  *Id.*

210.    In another nightmare, he was picking vegetables in a field when a guard started "fussing and arguing and hollering" at him, and when Mr. Morehead said something back to the guard, the guard "walked up and shot [him]."  2/5/26 Tr. 90:16–91:2.

211.    In a third recurring nightmare, Mr. Morehead and others were "chained from [their] neck to [their] feet," lined up and walking in a direction he did not know.  2/5/26 Tr. 91:3–10.

212.    He described the Farm Line as an "ever-lasting nightmare."  2/5/26 Tr. 101:11–15. He testified that the Farm Line is "traumatizing" on a mental and spiritual level.  *Id.* at 91:11–92:2. While recognizing that conditions are not "physically" identical to slavery, Mr. Morehead insisted that the mental and spiritual effects remain the same.  *Id.*  He feels like he is "betraying" his people. *Id.*  He testified:  "We fought so many years, our ancestors fought so many years for us to not have to go through that anymore."  *Id.* at 91:18–20.

213.    The Court finds Mr. Morehead's testimony credible.  The Court finds that working on the Farm Line has caused Mr. Morehead significant trauma, including recurring violent nightmares involving lynching, being shot, and being chained.  The Court further finds that Mr. Morehead experiences the Farm Line as dehumanizing because it forces him to recall and

relive the history of slavery and as a betrayal to those who fought to end the slavery his ancestors were forced to endure.

### F.   Patrick Jones

214.   Patrick Jones testified at the class certification hearing on April 23, 2025.  4/23/25 Class Cert. Tr. 147:21–171:14.

215.   Mr. Jones was assigned to the Farm Line when he first arrived at LSP in 2016 and last worked on the Farm Line in November 2024.  4/23/25 Class Cert. Tr. 150:22–151:7, 152:2–7.  He testified that the Farm Line differs from other jobs at LSP because it is the only job during which the men are subjected to "forced labor" and "are forced to be talked to like you are less than a human being on a [] daily basis." *Id.* at 154:6–19.

216.   Mr. Jones testified that he considers the Farm Line harmful because it subjects men to conditions of slavery and inflicts "psychological harm [that] is dehumanizing to every man that is subjected to it" and because it is "mandatory at Angola." 4/23/25 Class Cert. Tr. 151:14–152:1.

217.   Mr. Jones testified about the attitudes of the Gun Guards and Pushers on the Farm Line, describing them as "very disrespectful," "threatening," and "domineering."  4/23/25 Class Cert. Tr. 158:5–16.  As discussed above, *see supra* ¶ 140, Mr. Jones testified about a specific incident in August 2024 in which a Gun Guard cocked his gun at him.  *Id.* at 164:14–165:1.

218.   He contrasted the Farm Line with other jobs he has held at LSP, such as the HVAC program—where, unlike the Farm Line, he "chose to go there" because learning a trade "will benefit [him] and [his] family and help correct the wrong that [he] did."  4/23/25 Class Cert. Tr. 171:1–12.

219.   Mr. Jones also testified about a nightmare in which he was in the pecan fields on the Farm Line, had to duck down after a shot was fired, and afterwards, he was told the shot was

fired because he was somewhere that he was not supposed to be.  4/23/25 Class Cert. Tr. 163:14–164:13.

220.    The Court finds Mr. Jones's testimony credible and finds his experience on the Farm Line, including the threatening conduct of Gun Guards and Pushers, caused him feelings of degradation.  The Court further finds that his comparison of the Farm Line to the HVAC program provides additional evidence of the Farm Line's lack of educational purpose.

**G.    Damaris Jackson**

221.    Mr. Jackson testified at the class certification hearing on April 23, 2025.  *See* 4/23/25 Class Cert. Tr. 121:17–147:6.

222.    He was assigned to the Farm Line as his first job when he arrived at LSP in 2002. 4/23/25 Class Cert. Tr. 125:4–12.

223.    He testified that he was never provided farming machinery on the Farm Line and that the pay on the Farm Line is "very degrading"—it takes more than 50 hours of work to afford one bar of soap.  4/23/25 Class Cert. Tr. 126:16–20, 131:9–132:6.

224.    Mr. Jackson testified that the Gun Guards would use "derogatory" language and tell men on the Farm Line "boy, do this," or "boy, do that."  4/23/25 Class Cert. Tr. 134:24–135:6.

225.    He also recalled occasions when Gun Guards "fire[d] the[ir] weapons when [class members would] be walking out to the work site" and men would "just fall to the ground" because "nobody knew what they were shooting at."  4/23/25 Class Cert. Tr. 134:24–135:12.

226.    Mr. Jackson testified about the constant anxiety he felt while working on the Farm Line, "being forced to go out on the Farm Line" and the "psychological" effect of not knowing the mental state of the Gun Guards.  4/23/25 Class Cert. Tr. 135:13–136:4.

227.    Mr. Jackson confirmed that men can be disciplined for refusing to work on the Farm Line.  He recalled one occasion when he refused to work on the Farm Line because he refused to

47

pick cotton knowing that he would get sent to solitary confinement as a result. 4/23/25 Class Cert. Tr. 129:1–19. He explained that he refused to pick cotton, despite facing this extreme punishment, because it reminded him of the stories passed down from his great-grandparents who were sharecroppers. *Id.* Although the Court recognizes that men on the Farm Line do not currently pick cotton and this specific task does not reflect current conditions on the Farm Line, the Court credits Mr. Jackson's testimony for the purpose of demonstrating how men perceive the work performed on the Farm Line and its connection to the history of slavery.

228. As described above, *see supra* ¶ 143, Mr. Jackson also testified on cross examination that none of the other jobs he held at LSP—including dorm orderly, janitor, vegetable processing, textile cutter—were degrading because "nobody [stood] over [him] with a weapon" telling him what he must do. 4/23/25 Class Cert. Tr. 140:5–18.

229. He also contrasted the Farm Line from playing recreational sports outdoors: "Playing sports is you[r] own free time to relax and try to . . . get your mind back together from all the other hustle and bustle of being in prison. You don't have a gun over you. . . . You don't have nobody forcing you to do this, so [it] is free and voluntary." 4/23/25 Class Cert. Tr. 146:8–16.

230. The Court credits Mr. Jackson's testimony about the degradation that he experiences on the Farm Line, in particular, the negligible incentive pay that makes it impossible to afford basic necessities, the presence of the Gun Guards and the use of derogatory and racialized language on the Farm Line, and his experience refusing to work on the Farm Line because it forced him to recall his family's connection to slavery.

**H.    LSP is Aware of Complaints about the Degradation that Men Experience on the Farm Line**

231.    The Court finds, based on evidence in the record, that Defendants are aware that men on the Farm Line experience the Farm Lines as degrading and as akin to slavery. Indeed, Dr. Toce admitted that the Farm Line is considered to be "degrading." 2/3/26 Tr. 103:2–3.

232.    Major Pidgeon acknowledged that he has heard people at LSP compare the work on the Farm Line to slave labor, and he has heard incarcerated men complain that being forced to work on a former plantation is akin to slavery. 2/4/26 Tr. 50:8–14. He testified that one "could draw some comparisons" by putting side-by-side a photograph of chattel slavery with one of the Farm Line. *Id.* 50:15–20. When pressed on what changes could be made to make the Farm Line look less like slavery, Major Pidgeon testified that he did not think anything could be changed as far as the look. *Id.* 51:4–15. He also testified that he did not know what changes could be made to the Farm Line to make it feel less like slavery. 2/4/26 Tr. 51:16–18.

233.    Lieutenant Karisny testified that he has heard men in the fields complain about the Farm Line, that the heat is a common thing men will complain about, and that he has heard men on the Farm Line say that they feel like they're a slave out there. 2/4/26 Tr. 343:1–9. He confirmed that he is aware that LSP is built on the grounds of a former slave plantation, that he has known of its history for "probably a long time," and that he has heard the term "free men" used at Angola to refer to correctional officers. *Id.* at 343:10–344:2.

234.    Master Sergeant Scott testified that he is aware that LSP is located on a former slave plantation and confirmed that he has heard incarcerated men complaining that being forced to work in the fields of a former plantation is akin to slavery. 4/23/25 Class Cert. Tr. 308:23–309:4.

235.    Warden Vannoy testified that DOC is aware of Angola's history as a slave plantation. 2/3/26 Tr. 304:19–21. When asked about complaints that the Farm Line is like modern

49

day slavery, he further testified that he understands that men assigned to the Farm Line may feel that way even if he has not personally heard it. *Id.* at 305:6–306:1.

236. Warden Vannoy also testified that LSP is aware that men on the Farm Line have made complaints about officers using racialized language on the Farm Line. 2/3/26 Tr. 306:4–7. When asked whether LSP conducts investigations into allegations of the use by officers of racialized language on the Farm Line, Warden Vannoy testified that those investigations mostly become a "he said/he said" situation. *Id.* at 306:4–11. When asked whether LSP generally takes the officer's word for it, Warden Vannoy testified that that absent definitive proof, LSP will side with the officer. *Id.* at 306:12–307:4.

237. The Court notes the testimony of several LSP officials who claim that they have never heard or used a racial slur while on the Farm Line. 2/4/26 Tr. 64:24–65:6 (Pidgeon); 2/5/26 Tr. 18:24–19:14 (Karisny). These denials, however, do not rebut the credible testimony from incarcerated witnesses, described above, who repeatedly and consistently testify that LSP officials have used racialized language toward men on the Farm Line. The Court finds that the weight of the evidence demonstrates that LSP officials can and do use racialized language toward men on the Farm Line. The Court further finds that LSP is aware that men experience this language, as well as other conditions on the Farm Line, as degrading and dehumanizing.

## VIII.   Expert Conclusions Regarding Dignitary Harm on the Farm Line

### A.   Dr. Evelynn Hammonds

238. Dr. Hammonds has been a professor of the history of science, African and African American studies, and social and behavioral sciences at Harvard University for approximately 23 years. 4/22/25 Class Cert. Tr. 38:15–39:1. In this case, she reviewed and relied upon LSP policies, depositions, interviews, videos, and historical sources to reach her conclusions. 2/3/26 Tr. 114:9–25.

239.    Dr. Evelynn Hammonds described the history of chattel slavery in the United States and its abolition due, in part, to irreconcilable tensions between the logic of slavery and the Enlightenment ideals upon which this country was founded. 2/3/26 Tr. 117:17–118:6. She reached two ultimate conclusions in this case: *first*, the Farm Line draws on and reenacts historically and culturally significant attributes of chattel slavery and it appears designed to punish, degrade, and demean by simulating the traumatic history of chattel slavery in the United States; and *second*, that groups experiencing social degradation are at a greater risk of negative health consequences. 2/3/26 Tr. 115:1–19.

240.    The Court qualified Dr. Hammonds as an expert in the fields of history of science, history of epidemiology, and African American studies. 2/3/26 Tr. 112:3–6.

241.    Defendants offered no expert witness or other testimony to rebut Dr. Hammonds.

242.    The Court finds Dr. Hammonds's analysis methodologically sound, her conclusions reliable, and her testimony highly credible. The Court credits and fully adopts each of her opinions.

### 1.    The Farm Line Draws on and Reenacts Historically and Culturally Significant Attributes of Chattel Slavery

243.    Dr. Hammonds testified that the Farm Line draws on and reenacts historically and culturally significant attributes of chattel slavery. 2/3/26 Tr. 115:5–13. While she recognized that the Farm Line is not equivalent to chattel slavery, she opined that the type, conditions, and historical context of labor on the Farm Line meaningfully evoke chattel slavery. 2/3/26 Tr. 115:23–116:3, 118:11–17.

244.    Dr. Hammonds opined that the type of work performed on the Farm Line evokes chattel slavery. 2/3/26 Tr. 118:20–25, 120:22–25. She testified that the image of enslaved people working in plantation fields has come to symbolize chattel slavery. *Id.* at 119:8–15.

51

Dr. Hammonds testified that agricultural work on large plantations was considered the most menial and degrading kind of work that enslaved people could do, and this work was considered appropriate "for people who were at the lowest level of society." *Id.* at 119:1–7, 119:16–25.

245.    Dr. Hammonds testified that agricultural work is not inherently undignified, and there are historical examples of agricultural work that is dignified.  For example, historically, agricultural work done by small family farmers who were independent and controlled their labor has been considered to be dignified.  2/3/26 Tr. 120:1–21.  Dr. Hammonds described the dignity in the work performed by those farmers as being tied to the fact that they "controlled their own land, controlled their own labor, controlled their own lives." *Id.*

246.    Dr. Hammonds next testified as to several defining conditions of work under chattel slavery:  (i) the work was compelled; (ii) there was a lack of choice and agency; (iii) the work was surveilled; (iv) there was a constant threat of violence; (v) the pace of work was controlled by the overseers; and (vi) there was no compensation for the work.  2/3/26 Tr. 121:1–20.  She opined that the Farm Line draws on and reenacts each of these conditions. *Id.* at 122:6–8.

247.    Dr. Hammonds testified about the relevant historical background of LSP, namely that LSP was built on the grounds of former slave plantations and continues to commonly be referred to as "Angola" after the place in Africa where many of the enslaved peoples who were forced to work on those plantations came from.  2/3/26 Tr. 125:3–21.  Dr. Hammonds opined that this demonstrates LSP to be closely associated with its plantation history. *Id.* at 125:12–21.

248.    Dr. Hammonds testified about the aforementioned "tour outline," a guide used for the public tours LSP facilitates that emphasizes LSP's plantation history and history of convict leasing.  2/3/26 Tr. 130:24–131:18; PX-028.  She opined that the document reflects a public history

project through LSP's museum and tours that "brings to mind [the] history of chattel slavery" to those visiting the present day prison.. *Id.* at 130:24–131:18, 133:4–11.

249.    Dr. Hammonds opined on the significance of Ms. Vittorio's statement in the email attaching the tour outline:  "The tour outline is really old. . . . We really don't talk about Angola being a plantation anymore due to sensitivity of that subject."  PX-027 at 2; 2/3/26 Tr. 133:12–17. She opined that this statement demonstrates LSP's and society's discomfort with its past even as its employees continue to invoke that history through their regular use of the moniker, "Angola." 2/3/26 Tr. 133:18–134:16; *see also id.* at 129:20–130:14 (noting Ms. Vittorio's work email signature block refers to LSP as "Angola").

250.    All of this led Dr. Hammonds to conclude that the link that is drawn between LSP and its plantation history is "very clear." 2/3/26 Tr. 134:5–16.

251.    The Court finds that Dr. Hammonds's testimony to be highly credible and finds that the type, conditions, and site of work on the Farm Line draw on and reenact culturally and historically significant attributes of chattel slavery.

**2.    The Farm Line Appears Designed to Degrade, Demean, and Punish**

252.    Dr. Hammonds opined that the Farm Line appears designed to degrade, demean, and punish.  2/3/26 Tr. 115:1–13.

253.    She testified that enslaved people occupied the lowest position in society and were dehumanized, and she described a historical record showing that enslaved people "felt that they were degraded, that they were treated as if they were less than human, [and] that this was psychologically harmful to them [and] difficult for them." 2/3/26 Tr. 119:16–25, 134:21–135:9, 135:24–136:11.

254.    Dr. Hammonds opined that the men on the Farm Line occupy a similar social status to enslaved people.  2/3/26 Tr. 135:16–23.

53

255.    Similar to enslaved people, men assigned to the Farm Line are required to do the most degrading work assignment at LSP and this implies they are lesser people than other incarcerated men.  2/3/26 Tr. 134:21–135:23.

256.    Dr. Hammonds testified that statements made by Dr. Toce describing the Farm Line as involuntary, degrading, and punitive were significant and informed her opinion that the Farm Line functions as punishment by simulating chattel slavery.  2/3/26 Tr. 137:15–138:25.

257.    The Court finds Dr. Hammonds's testimony credible and finds that the Farm Line appears designed to degrade, demean, and punish class members by forcing them to occupy a similar social position to enslaved people.

### 3.    The Subjugation of Men Assigned to the Farm Line Increases Those Men's Risk of Negative Health Consequences

258.    Dr. Hammonds opined that replicating conditions of chattel slavery in the manner described above and reflected on the Farm Line increases the risk of negative health outcomes. 2/3/26 Tr. 115:14–19.

259.    She testified that the historical record shows that there was a widely held belief among physicians during the period of chattel slavery that enslaved people were feigning illness, malingering, and trying to avoid their work by claiming to be ill.  2/3/26 Tr. 141:4–17.  She explained that such behavior put enslaved people, and relatedly, other subjugated groups, at an increased risk for health issues.  2/3/26 Tr. 141:18–143:15, 145:7–22.

260.    Dr. Hammonds opined that when medical professionals are not attendant to the needs and reports of their patients, that can lead to the "development of chronic diseases" and "people having more severe illnesses over time."  2/3/26 Tr. 144:17–145:6.

261.    Dr. Hammonds noticed similar attitudes from Defendants' medical witnesses, including Dr. Toce and Dr. Keldie, and opined that these attitudes and behavior increase the risk

of inadequate treatment for the men on the Farm Line. *See* 2/3/26 Tr. 145:23–152:4; *supra* Section VI.E.

262. The Court finds Dr. Hammonds's testimony credible. The Court finds that the attitudes and behaviors of Defendants' medical witnesses reflect prejudice and biases that are similar to those held by physicians treating enslaved people and therefore put class members at risk of receiving inadequate medical care and of negative health outcomes.

### B.    Dr. Joshua Sbicca

263. The Court accepted Dr. Joshua Sbicca as an expert in the sociology of prison agricultural labor, in light of his significant experience and academic specialization in the field of sociology and specifically prison agricultural labor. 2/5/26 Tr. 114:16–25.

264. Dr. Sbicca is an Associate Professor of Sociology at Colorado State University and the Director of the Prison Agriculture Lab, and he has published extensively on the history of prison agricultural labor, including authoring a forthcoming book on the subject. 2/5/26 Tr. 109:22–110:21; *see also* 4/22/25 Class Cert. Tr. 50:2–5. As Director of the Prison Agriculture Lab, Dr. Sbicca conducted the first-of-its-kind nationwide survey of agricultural operations within prisons in the United States. 4/22/25 Class Cert. Tr. 71:4–13. The Court finds Dr. Sbicca more than qualified to testify to the sociological significance of the Farm Line.

265. Plaintiffs did not seek to admit Dr. Sbicca as an expert in psychology or psychological harm. *See* 2/5/26 Tr. 114:4–15. Although Defendants challenged Dr. Sbicca's qualifications to opine about psychological diagnoses, the Court confined Dr. Sbicca's testimony to the sociology of prison agricultural labor, and Defendants raised no objection to his qualification in that field. *Id.* at 114:16–25. The Court finds that Dr. Sbicca's testimony did not veer into the subjects of psychology or psychological harm, and all of his opinions fell within the scope of his accepted area of expertise.

55

266. Dr. Sbicca conducted an extensive sociological analysis of the Farm Line, reviewing DOC and LSP policies, declarations, and depositions, and videos produced during this litigation; interviewing incarcerated men who recently worked on the Farm Line; conducting a site visit in July 2024; and attending the class certification hearing and every day of trial preceding his testimony.  2/5/26 Tr. 111:14–17, 115:7–12, 115:24–117:15, 118:2–7.

267. Dr. Sbicca reached four opinions in this case:  (i) prison practices must evolve to reflect societal values, and practices that no longer reflect those values have been abandoned as an affront to human dignity; (ii) the Farm Line deviates from social norms and societal values because it replicates and perpetuates certain key logics of chattel slavery; (iii) the Farm Line deviates from contemporary prison standards; and (iv) class members experience the Farm Line as degrading and dehumanizing.  2/5/26 Tr. 118:8–15.

268. Defendants put forth no expert or even fact witness to rebut Dr. Sbicca's testimony.

269. The Court finds Dr. Sbicca' testimony and opinions highly credible and persuasive and fully adopts each of Dr. Sbicca's four opinions, as described below.

### 1. Society Condemns and Abandons Prison Practices That Do Not Reflect Societal Values

270. Dr. Sbicca testified that society has historically moved away from prison practices that no longer reflect societal values and that affront human dignity "because they have produced vast harm and they have traumatized people over time."  2/5/26 Tr. 121:5–10.  The common thread among many abandoned practices, he explained, is that they reflected the core logics of chattel slavery—one of the clearest examples of an institution abolished as antithetical to human dignity. *Id.* at 119:21–120:16.

271. Dr. Sbicca defined the "logics of slavery" as culture and "practices that manifest within a particular institution or organization."  2/5/26 Tr. 120:17–121:4.  The Court credits

Dr. Sbicca's opinion and finds that the logics of slavery represent the practices and cultural patterns that originated during chattel slavery and persist in modified forms through time and through institutions like the Farm Line. By way of example, Dr. Sbicca pointed to past prison practices of convict leasing and chain gangs that adopt the logics of slavery. These practices, in Dr. Sbicca's opinion, reflect the inextricable connection between the history of slavery and the development of prison agricultural labor in the United States. 2/5/26 Tr. 121:11–15.

272. Dr. Sbicca explained that both convict leasing and chain gangs emerged after the abolition of slavery and the emergence of "Black Codes," and both maintained characteristics that harkened back to slavery. 2/5/26 Tr. 121:16–122:17; 4/22/25 Class Cert. Tr. 54:14–55:13, 56:16–21. Convict leasing involved leasing incarcerated people to work—in many cases for the owners of plantations where they may have been enslaved in the past. 4/22/25 Class Cert. Tr. 54:14–55:13; *see supra* Section V.A. Chain gangs involved forcing incarcerated people to work in bondage—often chains—a practice undeniably linked to chattel slavery when enslaved people were chained together and forced to work. 4/22/25 Class Cert. Tr. 54:14–55:13, 56:22–57:7.

273. Dr. Sbicca testified that society has condemned the practices of convict leasing and chain gangs precisely because they replicate the logics of slavery and unjustifiably affront human dignity. 4/22/25 Class Cert. Tr. 62:10–63:25.

274. The Court credits Dr. Sbicca's conclusion and finds that practices replicating key features of slavery—one of the starkest examples of an institution that was abolished by society as anathema to notions of human dignity—should be condemned because they cause similar dignitary harm to those subjected to them.

## 2.    The Farm Line Perpetuates Key Logics of Slavery

275.    Dr. Sbicca opined that the Farm Line deviates from social norms because it persists despite reflecting many of the key logics of chattel slavery—unlike convict leasing, chain gangs, and lashings, which society has abandoned.  2/5/26 Tr. 132:9–19.

276.    Dr. Sbicca credibly established four main ways in which the Farm Line reflects certain logics of slavery:  it is punitive and compelled; it replicates racial and social hierarchies that recall chattel slavery; it serves no meaningful purpose; and it upholds the cultural memory of slavery.  2/5/26 Tr. 132:20–133:5.  Based on Dr. Sbicca's testimony, the Court finds that each of these logics applies to the Farm Line.

### (a)    The Farm Line Is Punitive and Compelled

277.    Dr. Sbicca opined that the Farm Line is punitive and compelled because it is widely understood as punishment by LSP staff and incarcerated men alike, because class members face the constant threat of reassignment to the Farm Line as a result of disciplinary action, and because class members face extreme and arbitrary discipline when assigned to work on the Farm Line.  2/5/26 Tr. 133:6–14.

278.    Based on the evidence described above, *see supra* Section VI.C.2, including the "clear organizational directive within LSP" that gives wide latitude to Pushers enforcing ill-defined requirements to work with "reasonable speed and efficiency" and the fact that Pushers themselves can be disciplined for failing to push men hard enough, Dr. Sbicca concluded that the Farm Line creates "structural precarity" for men on the Farm Line subject to the punitive and compelled characteristics of the Farm Line.  *See* 2/5/26 Tr. 135:17–136:7, 137:7–138:5.

279.    Dr. Sbicca concluded that the punitive and compelled nature of the Farm Line is "predicated on many of the[] same kinds of logics" as chattel slavery—men are subjected to an

58

"agriculturally based system" and forced to labor "out in the field" while "fac[ing] punishment" and "extreme consequences" if they do not complete their tasks.  2/5/26 Tr. 138:9–25.

280.    The Court finds Dr. Sbicca's testimony persuasive, in light of the record evidence about discipline on the Farm Line described above, *see supra* Section VI.C.2.

281.    Although Defendants elicited testimony that the requirement to work with reasonable speed and efficiency applies to all job assignments at LSP, not just the Farm Line, *see, e.g.,* 2/5/26 Tr. 10:10–20 (Karisny), the Court agrees with Dr. Sbicca's explanation that this fact does not diminish the uniquely punitive dimensions of the Farm Line, *see* 2/5/26 Tr. 150:10–151:22.  Defendants presented no evidence of any person in any other job at LSP who had been sanctioned for failure to work with reasonable speed and efficiency, whereas Plaintiffs' witnesses consistently testified that de facto quotas that exist on the Farm Line are not enforced in any other job assignment they have held.  *See supra* ¶ 147.

282.    The Court finds that the punitive and compelled characteristics of the Farm Line perpetuate the logics of slavery.  The Court further finds that the arbitrary nature of punishment on the Farm Line and the manner in which LSP officials are incentivized to enforce it, taken together, subject men to a precarious social position where they must abide by shifting and uncertain expectations that can result in dire punitive consequences.  On the Farm Line, class members have no choice but to comply with these rules with no objective measure to gauge compliance.

>              (b)    *The Farm Line Replicates Social and Racial Hierarchies of Slavery*

283.    Dr. Sbicca testified that the Farm Line replicates certain logics of chattel slavery through its replication of social and racial hierarchies because it sits at the bottom of LSP's hierarchy.  2/5/26 Tr. 139:4–22.  In arriving at this conclusion, Dr. Sbicca relied on Dr. Toce's

testimony that the Farm Line carries negative "social connotations"; evidence that the Farm Line is the first job for most new arrivals and serves as a "welcome" signal that "you have entered the plantation"; and the practice of reassigning men to the Farm Line following disciplinary infractions. *Id.* at 133:23–134:8, 139:4–140:22; *see also supra* ¶¶ 112, 115–117.

284.    The Court also credits Dr. Sbicca's opinion that the incentive pay rate for the Farm Line contributes to its position at the bottom of the social hierarchy. In Dr. Sbicca's words: "if money is a representation of value, which it is, paying people that little suggests that their work is not valued, that they are undeserving and unworthy of anything else." 2/5/26 Tr. 140:23–141:7.

285.    While cross-examining Dr. Sbicca, Defendants noted that several other states pay nothing at all for prison agricultural labor. 2/5/26 Tr. 181:17–182:3. The Court concludes that this point does not undermine the weight of Dr. Sbicca's conclusions. Whether other states pay incarcerated people for agricultural labor does not change the Court's finding that the incentive pay rate on the Farm Line, viewed in the context of the Farm Line's other features, reinforces its position at the bottom of LSP's social hierarchy.

286.    Based on this evidence, the Court finds that the Farm Line replicates social hierarchies of slavery because it situates the Farm Line at the bottom of the social hierarchy.

(c)    *The Farm Line Serves No Meaningful Purpose*

287.    Dr. Sbicca concluded that the Farm Line reflects the logics of slavery because it serves no meaningful purpose and "is not meant to be rehabilitative" but rather "is deliberately inefficient." 2/5/26 Tr. 141:11–16. This conclusion was based on the testimony, described above, *see supra* Section VI.A.3, of LSP witnesses acknowledging that the Farm Line is not educational or vocational programming. This testimony underscored Dr. Sbicca's conclusion that the Farm Line is a space for punishment and forced work, rather than for the betterment of the men who work on it. 2/5/26 Tr. 142:9–20.

60

288.    Dr. Sbicca explained that his opinion was further informed by Ms. Green's testimony that the Farm Line is deliberately inefficient and inconsistent with productive agricultural practices.  2/5/26 Tr. 142:24–143:20; *see infra* Section X.D.

289.    Defendants elicited that LSP offers numerous programs—including welding school, anger management, the New Man program, Thinking for a Change, and Moral Compass— that are more rehabilitative than the Farm Line and that incarcerated men can participate in some of these programs even while assigned to the Farm Line.  2/5/26 Tr. 183:7–18.  The Court finds that the existence of genuine rehabilitative programming elsewhere at LSP makes the Farm Line's purely punitive character all the more striking, underscoring its lack of rehabilitative purpose.

### (d)    The Farm Line Upholds the Cultural Memory of Slavery

290.    Dr. Sbicca further concluded that LSP upholds the cultural memory of slavery through its operation of the Farm Line.  2/5/26 Tr. 143:24–144:11.  He defined "cultural memory" as a sociological phenomenon by which certain experiences and institutions from the past "have such force" that they can be "reproduced" and passed on "through storytelling," through families and society.  2/5/26 Tr. 149:7–150:6.  Cultural memory is an important framework through which society interprets institutions and the harm or stigma associated with those institutions.  *Id.* Dr. Sbicca testified that cultural memory can be so harmful that society chooses to challenge the institutions that perpetuate it.  *Id.*  The Court finds this concept credible and relevant to the Farm Line.  *Id.*

291.    Dr. Sbicca opined that cultural memory of slavery and the stigma that may be associated with it can attach regardless of race.  2/5/26 Tr. 164:5–24 (although chattel slavery was a fundamentally anti-Black institution, the stigmatization associated with it can attach to anyone in proximity to it).  In response to questions from the Court, Dr. Sbicca explained that he spoke with a white man working on the Farm Line during his visit to LSP in July 2024 who had the word

61

"slave" written on his hat and who described his experience on the Farm Line "as akin to working under slave-like conditions." 4/22/25 Class Cert. Tr. 89:22–90:16; *see also* PX-224 (video from July 2024 site inspection depicting same man). Dr. Sbicca explained that the "way [this man] talked about working on the Farm Line was akin to working under slave-like conditions, and so he . . . was articulating that this stigma had attached to him." 4/22/25 Class Cert. Tr. 89:22–90:14.

292.    With respect to the Farm Line, Dr. Sbicca concluded that LSP upholds the cultural memory of slavery through not only its policies and practices, but also in the language and minds of everyone at LSP, from prison officials to the incarcerated men. 2/5/26 Tr. 143:24–144:11.

293.    Dr. Sbicca concluded that LSP upholds the cultural memory of slavery through its policies and practices and through the language of everyone at LSP. As examples, Dr. Sbicca cited Warden Vannoy's awareness of LSP's history as a plantation and that men liken the Farm Line to modern-day slavery; Lieutenant Karisny's testimony that the term "free man" is used at LSP to refer to non-incarcerated people; Major Pidgeon's admission of the resemblance between a picture of the Farm Line and a picture of men working on a slave-era plantation; and Ms. Vittorio's testimony that LSP's Classifications Department does not take into account the sensitivities around LSP's history as a slave plantation when assigning people to the Farm Line. 2/5/26 Tr. 144:12–147:8, 148:4–149:1.

294.    Based on this evidence, Dr. Sbicca concluded that the Farm Line is a "unique kind of space" at LSP because it "evokes a cultural memory"—of slavery, plantations, and a painful historical past—that other jobs do not. 2/5/26 Tr. 151:1–22.

295.    On cross-examination, Defendants asked whether Dr. Sbicca's opinion would change if LSP were not on the grounds of a former plantation, to which Dr. Sbicca testified that it would not, because his opinion rests on the confluence of many factors operating simultaneously

62

on the Farm Line, not solely the geographic history.  2/5/26 Tr. 177:25–178:15.  On redirect, Dr. Sbicca clarified that while the plantation history is not the singular reason for his conclusions, it is "part of [his] larger opinion of many things happening at the same time to produce the specific kind of harm that's happening to men."  *Id.* at 184:2–12.

296.    In sum, the Court finds this testimony credible and finds that the LSP upholds the cultural memory of slavery on the Farm Line.

### 3.    The Farm Line Deviates from Contemporary Prison Standards

297.    Based on the Prison Agriculture Lab's nationwide survey of over 600 prison agricultural programs, Dr. Sbicca concluded that the Farm Line is anomalous among other prison agricultural programs in the United States.  4/22/25 Class Cert. Tr. 71:4–16, 75:23–76:5.

298.    The study categorized programs by four "types"—animal agriculture, crops and silviculture, food processing and production, and horticulture and landscaping, *see*—and by four "drivers" or the prison's stated rationale for these programs, including (1) financial or cost-saving; (2) idleness reduction; (3) reparative; and (4) training or educational drivers.  4/22/25 Class Cert. Tr. 71:20–72:16.

299.    Dr. Sbicca explained that, nationwide, the most common prison agricultural programs are horticulture and landscaping programs, typically associated with training or educational drivers.  4/22/25 Class Cert. Tr. 72:17–73:5.  By contrast, cropping operations—such as the Farm Line—are typically driven by cost-savings and idleness reduction.  *Id.*  Applying these concepts to the Farm Line, Dr. Sbicca opined that idleness reduction predominates over any purported financial aims, given the degree to which the Farm Line is used to punish and discipline, rather than to produce food efficiently.  *Id.* at 74:7–75:6.

300.    On cross examination, Defendants asserted to Dr. Sbicca that the Farm Line feeds approximately 4,000 people.  2/5/26 Tr. 179:6–12.  Dr. Sbicca acknowledged some cost-savings

but maintained that idleness reduction is the predominant driver. *Id.* at 179:1–12, 185:2–21. The Court credits Dr. Sbicca's testimony and finds that the Farm Line's purported financial benefit does not negate the risk of dignitary harm it inflicts.

301.    Dr. Sbicca further concluded that the Farm Line is anomalous compared to other prison agricultural programs because modern prisons more commonly operate horticulture and landscaping programs, often tied vocational training, rather than large-scale cropping operations, and because it is very rare for prison agricultural operations to take place on former slave plantation grounds. 4/22/25 Class Cert. Tr. 76:6–19.

302.    Although Defendants elicited that Dr. Sbicca had visited only LSP and no other prison to observe farming activity in person, *see* 4/22/25 Class Cert. Tr. 86:20–25, Dr. Sbicca's conclusions about the Farm Line's anomalous character rest on his systematic nationwide survey of over 600 prison agricultural programs—not solely on his personal site visits. The Court accords significant weight to that empirical foundation and finds that the Farm Line is anomalous compared to other contemporary prison agricultural programs.

### 4.    Men Experience the Farm Line as Degrading and Dehumanizing

303.    Dr. Sbicca concluded that class members experience degradation and dehumanization—which are "extreme representations of practices that undermine human dignity"—on the Farm Line. 2/5/26 Tr. 152:4–153:5. Taking into account all of the foregoing policies and practices that govern the Farm Line, Dr. Sbicca opined that "all of these pieces combined create the organizational conditions for the Farm Line to produce degradation and dehumanization." *Id.* at 155:5–18. Ultimately, he concluded, the "nature of this degradation and dehumanization is intimately tied to the way that the logics of chattel slavery are at play on the Farm Line itself." *Id.* at 152:4–16.

64

304. The Court agrees and finds that men on the Farm Line experience degradation and dehumanization that is directly tied to the ways in which Defendants' operation of the Farm Line perpetuates the logics of slavery.

305. Dr. Sbicca testified that Defendants' operation of the Farm Line creates a dangerous culture of subservience and fear through a combination of policies governing assignment and discipline on the Farm Line. 2/5/26 Tr. 156:2–17. This culture bears serious consequences for the men on the Farm Line: it subjects them to an "ever-present threat that keeps people working" and to trauma—a common sociological term describing what collective groups experience when exposed to a harmful institution. *Id.* at 156:2–17, 158:22–159:16.

306. Given the copious sociological literature on the historical traumas associated with slavery, as referenced by Dr. Sbicca, *see* 2/5/26 Tr. 158:22–159:16, the Court finds that Dr. Sbicca's testimony about trauma is appropriately within the scope of his expertise in the sociology of prison agricultural labor, notwithstanding Defendants' objections that such testimony ventures into psychology.

307. Dr. Sbicca testified about multiple specific examples in support of his conclusion that men on the Farm Line experience degradation and dehumanization, applying each of the four key logics of slavery of the Farm Line to explain how they produce degradation in practice. *Id.*

308. Dr. Sbicca testified that the punitive and compelled nature of the Farm Line, particularly through LSP's policies concerning assignment and discipline on the Farm Line, strips men of their autonomy, citing Mr. Smith's testimony about being reassigned to the Farm Line after receiving a disciplinary infraction, losing his trustee status and losing a job doing meaningful work on the range herd crew. 2/5/26 Tr. 157:22–158:21, 159:17–160:7; *see supra* Sections VI.B–C.

309. Turning to social and racial hierarchies on the Farm Line, Dr. Sbicca testified that class members perceive their assignment to the Farm Line as relegation to the bottom of LSP's social hierarchy, signaling that they are less worthy and less deserving than others. 2/5/26 Tr. 160:23–161:8. Dr. Sbicca testified that this degrading signal "is actually being internalized and understood by men that are working on the Farm Line." *Id.* He also cited Mr. Smith's testimony about misting fans being provided to cattle—but not men on the Farm Line—as representative of this common theme, concluding that this reflected "the fact that essentially men are treated less than human." *Id.* at 160:8–19. Dr. Sbicca noted that the awareness of their dehumanization is for class members, "a theme that has come up again and again and again." *Id.*; *see also supra* Section VII.

310. Dr. Sbicca further testified that the use of racialized language on the Farm Line reproduces racial hierarchies of slavery that contributes to the degradation and dehumanization class members experience.. 2/5/26 Tr. 161:9–22. Such language, he explained, can produce separations and differences between groups of people, by degrading and dehumanizing one group while uplifting another and is "meant to reinforce who is superior and who is inferior." *Id.*

311. As an example, Dr. Sbicca cited Mr. Guillory's testimony about being called "boy" repeatedly on the Farm Line, explaining that this type of emasculating language was fundamental to the operation of slave plantations, as it was a way to "signal to enslaved men that they were inferior" in certain ways. 2/5/26 Tr. 161:23–162:18; *see supra* Section VII.A. The replication of such language on the Farm Line, Dr. Sbicca concluded, perpetuates "a way of treating people through language that signals [their] inferiority," causing them to be "degraded and dehumanized as a result." 2/5/26 Tr. 162:13–18. Likewise, Dr. Sbicca cited Mr. Guillory's testimony about being offered watermelon on the Farm Line and Mr. Major's similar account of a Pusher making

66

comments about fried chicken and watermelon, concluding that this language was self-evidently racist and meant to degrade. 2/5/26 Tr. 162:19–163:13, 163:17–164:4; *see also supra* Sections VII.A–B.

312.    Dr. Sbicca further testified about the Farm Line's lack of rehabilitative or educational purpose, *see supra* Section VI.A.3, noting Mr. Guillory's account of the horticultural program at LSP, which shows LSP's "organizational potential" to teach meaningful agricultural skills, and concluding that this program stands in "striking contrast" with the Farm Line, which serves no rehabilitative or educational purpose. 2/5/26 Tr. 165:3–166:14.

313.    Dr. Sbicca also found that many class members experience the incentive pay rate for work on the Farm Line as degrading, explaining that several men articulated that they felt degraded because they are paid little to nothing for their work on their Farm Line, leaving them unable to afford basic necessities that make prison life more bearable. 2/5/26 Tr. 166:15–167:6.

314.    Finally, Dr. Sbicca opined that the cultural memory of slavery replicates historical trauma and contributes to the degradation and dehumanization that men on the Farm Line experience. 2/5/26 Tr. 167:10–17. The cultural understanding of chattel slavery gets passed down socially and the Farm Line's connection to slavery therefore reinforces that the stigma of slavery as it forces men to work in plantation-style agriculture while subject to similarly punishing and degrading conditions. 4/22/25 Class Cert. Tr. 78:22–79:9. Dr. Sbicca specifically referenced Mr. Morehead's recurring nightmares as illustrative of this cultural memory at work. 2/5/26 Tr. 167:18–169:19; *see supra* Section VII.E. Dr. Sbicca concluded that Mr. Morehead's testimony is representative of the collective experience of the Farm Line. 2/5/26 Tr. 168:4–169:19. He drew

further connection to *Austin* v. *Hopper*,[6] noting "similarities" between statements made by class members in that case forced to work in chain gangs and men on the Farm Line today, including expressing feelings of "extreme mental anguish" and humiliation. *Id.* at 170:11–171:25.

315.    Dr. Sbicca concluded that LSP is aware of but indifferent to the degradation that men on the Farm Line experience, a conclusion based in part on Dr. Toce's clear admission that the Farm Line is not voluntary and considered by LSP to be punishment and degrading. 2/5/26 Tr. 173:2–174:14. The Court agrees that the record supports an inference that Defendants are aware that class members experience the Farm Line as degrading and dehumanizing and an affront to their dignity.

316.    Defendants pressed Dr. Sbicca on cross-examination on the fact that every incarcerated person at LSP is sentenced to hard labor under Louisiana law, suggesting that the Farm Line is simply the fulfillment of that sentence. 2/5/26 Tr. 180:22–181:2. Dr. Sbicca acknowledged that "prison is a hard place," but explained that his opinion does not change because the "experience of working on the Farm Line is [not] just about work. The experience of working on the Farm Line is intimately tied to these logics of chattel slavery that are degrading and dehumanizing men in very particular ways." *Id.* at 181:6–10; *see also id.* at 172:4–173:1. While Defendants' cross-examination highlighted that certain features of the Farm Line—compulsory work, disciplinary rules, and low incentive pay—also exist in other contexts at LSP and at prisons nationwide, Dr. Sbicca persuasively explained that it is the confluence of these features on the Farm Line, operating within the cultural memory of slavery on a former slave plantation, that produces the unique dignitary harm at issue. The Court agrees and credits Dr. Sbicca's testimony.

---

[6]    *See Austin* v. *Hopper*, 15 F. Supp. 2d 1210 (M.D. Ala. 1998) (ruling on settlement of class action challenging prison's use of chain gangs and hitching posts).

317.    In response to questions from the Court, Dr. Sbicca testified that prison agricultural programs can be operated in ways that are not dehumanizing or humiliating.  2/5/26 Tr. 187:16–20.  This concession reinforces the Court's conclusion that it is not prison agricultural labor as such that offends constitutional norms, but the particular manner in which the Farm Line is operated.  Given Dr. Sbicca's specialized expertise in prison agriculture, the Court accords this opinion significant weight.  The Court finds that prison agricultural programs can be operated in manners that are not dehumanizing or humiliating.

## IX.    LSP Operates the Farm Line Primarily as Punishment Rather Than a Work Assignment

318.    Based on the foregoing findings of fact, *see supra* Sections VI–IX, the Court finds that the Farm Line is unlike other jobs at LSP.  It is a degrading and dehumanizing practice that evokes conditions of chattel slavery, and, unlike any other work assignment at LSP, the Farm Line is used as a form of punishment, signals to men that they are at the bottom of the social hierarchy at LSP, and serves no meaningful vocational or educational purpose.  Defendants are aware of the similarities that the Farm Line has to slavery and the degradation and dehumanization that men face on the Farm Line, they are indifferent to it, and indeed, leverage it for punitive purposes.

319.    ***The Farm Line replicates the conditions and logics of slavery.***  The Court fully adopts the opinions and testimony of Dr. Hammonds and Dr. Sbicca, all of which is credible and unrebutted.  The Court credits Dr. Hammonds's opinion that conditions of work on the Farm Line are reminiscent of conditions of agricultural labor during slavery.  The Court also agrees with Dr. Hammonds and finds that medical providers at LSP display a form of prejudice and distrust of class members' medical complaints similar to medical providers during chattel slavery, which puts men on the Farm Line at a greater risk of negative health outcomes.  *See supra* Section VII.A.  The Court also credits Dr. Sbicca's opinion that the Farm Line, like convict leasing and chain gangs,

is a prison practice that deviates from modern social and prison norms and should be abandoned because it perpetuates the logics of slavery and therefore causes degradation and dehumanization to those subject to it. *See supra* Section VII.B.

320.    The Court further finds that Defendants are aware of the Farm Line's historical connection to slavery. Defendants' witnesses are aware of LSP's plantation history. *See supra* Section V.A. They are aware that men on the Farm Line liken it to modern-day slavery. *See* 2/3/26 Tr. 305:6–306:1 (Vannoy); 2/4/26 Tr. 343:7–9 (Karisny); 4/23/25 Class Cert. Tr. 308:23–309:4 (Scott); *see supra* ¶¶ 233–235. Major Pidgeon personally sees the visual similarities between work on the Farm Line and slavery. *See* 2/4/26 Tr. 50:15–51:3; *see supra* ¶ 232. Defendants are aware of the "sensitivities" that society in general has in connecting LSP and its plantation history, and take them into account for purposes of public tours, but not when assigning men to the Farm Line. *See* PX-027; 2/4/26 Tr. 117:16–25, 118:6–119:14 (Vittorio); *see supra* ¶ 114. The Court finds this testimony concerning yet credible. The Court finds that LSP is and has been aware of public sensitivity regarding its historical connection to slavery, has adjusted in certain circumstances its public facing comments concerning that history, but has not considered those sensitivities with respect to assigning men to the Farm Line. The Court agrees with Dr. Sbicca that this reflects LSP's deliberate choice to uphold the cultural memory of slavery on the Farm Line. *See supra* Section VIII.B.

321.    ***The Farm Line is at the bottom of the social hierarchy at LSP.*** The Court finds that the Farm Line is widely understood to be the bottom of the social hierarchy at LSP by incarcerated men and prison officials. It is the first job for new arrivals and it is the assignment for men immediately following serious disciplinary action. All of this is intended to signal to class members on the Farm Line that they are, in the words of Mr. Guillory, at "the bottom of the totem

pole." 2/3/26 Tr. 34:23–35:2. Defendants recognize that the Farm Line is largely perceived as the lowest form of labor at LSP and is undesirable. *See* 2/3/26 Tr. 304:13–18 (Vannoy); *see also* 2/9/26 Tr. 248:2–16, 250:6–20 (Davis testifying that everyone assigned to the Farm Line generally "wants to move up and do different jobs" and no one says they would like to stay on the Farm Line). Similarly, Dr. Toce testified to his belief that "men assigned to the Farm Line are considered . . . sub-par inmates if they can't connive their way out of the field." 2/3/26 Tr. 103:8–11. In Dr. Sbicca's view, the Farm Line's position as the lowest job at LSP replicates social hierarchies that harken back to slavery. 2/5/26 Tr. 134:2–8, 139:4–22. The Court agrees and finds that the Farm Line, unlike other jobs at LSP, is at the bottom of the social hierarchy at LSP.

322.    ***The Farm Line is a form of punishment rather than a job assignment.*** The Court finds, based on the evidence and testimony presented, and in particular the credible testimony of class members, that the Farm Line is operated as a form of punishment, rather than a job assignment. As discussed above, *see supra* Section VI.B, it is common knowledge and common practice that when men are punished at LSP, they are sent to the Farm Line, losing any privileges they had, and must remain there for at least 90 days before they can be reassigned. In these circumstances, the Court finds, the Farm Line becomes a continuation of the punishment. Coupled with the fact that men can be punished for violating ill-defined rules prohibiting not working fast or hard enough, the Court finds that class members on the Farm Line are stuck in a cycle of punishment where they are punished by being sent to the Farm Line, and once there, punished for not fulfilling arbitrary de facto quotas, which in turn can result in further punishment and reassignment to the Farm Line. The Court credits Dr. Sbicca's opinion that the Farm Line places class members in a "structural precarity" of arbitrary discipline. *See supra* ¶ 278.

71

323.    Warden Vannoy admitted that there are many forms of discipline available to prison officials at LSP and that out in the free world, picking vegetables is not generally considered a punishment.  2/10/26 Tr. 50:5–19.  The Court finds, in light of the particular conditions on the Farm Line and the fact that it operates on the grounds of a former plantation, that Defendants use the Farm Line precisely for that purpose, because they are aware of and indifferent to the connotations of slavery it invokes.

324.    ***The Farm Line has no rehabilitative or educational purpose.***  The Court finds that the Farm Line serves no rehabilitative purpose.  Defendants acknowledge that the Farm Line is not educational or vocational programming.  *See supra* Section VI.A.3.  The Court credits Dr. Sbicca's testimony that it serves no meaningful purpose.  While the Court acknowledges the post-trial statements from Warden Vannoy about LSP's plans to start a class, the Court finds that no such class currently exists and any planning appears to be at an infancy stage.  *See supra* ¶¶ 108–109.  The Court cannot assess the rehabilitative value of promised plans that have not materialized. Given that Defendants have been on notice of the claims in this action since September 2023, the Court will not credit Warden Vannoy's promises of a planned future educational offering as indicative of current conditions on the Farm Line.

325.    ***The Farm Line subjects class members to degradation and dehumanization.***  The Court credits and wholly adopts the testimony of the seven incarcerated witnesses.  *See supra* Section VII.A–G.  The Court finds that the conditions on the Farm Line to which class members are subjected are degrading and dehumanizing.  The Court also credits the class members' testimony about the use of racialized language on the Farm Line and their testimony that the Farm Line, in many ways, makes them feel less than human and like an enslaved person.  The Court finds that class members' testimony about the similarities between the Farm Line and slavery is

evidence that the men experience degradation and dehumanization as a result of Defendants' operation of the Farm Line. The Court likewise credits the opinions and testimony of Dr. Sbicca and his conclusion that men on the Farm Line experience as degrading and dehumanizing.

326. The Court also finds that Defendants are aware of the degradation that class members experience on the Farm Line. *See supra* Section VII.H. Defendants have heard class members compare the Farm Line to slavery. *Id.* Furthermore, Defendants are aware of the policies and practices that, in Dr. Sbicca's opinion, cause this degradation. In particular, the Court finds that Dr. Toce's testimony is evidence establishing Defendants' view that the Farm Line is intended to be a degrading punishment. *See supra* ¶ 231. The Court agrees with Dr. Sbicca's opinion that the Farm Line could be operated in a way that is not dehumanizing and humiliating, *see* 2/5/26 Tr. 187:16–20, but finds that Defendants have taken no such steps.

## X.    The Farm Line Is Operated in a Manner Intended to Punish Not Produce

327. At trial, the Court heard argument from Defendants suggesting that the Farm Line is an efficient and valued agricultural program that enables LSP to grow high-quality, healthy fruits and vegetables that are fed to men in custody. *See, e.g.*, 2/3/26 Tr. 21:23–22:8 (Defendants' counsel arguing that the Farm Line is "meaningful and efficient farm work" that "feeds 4,000 inmates fresh vegetables every day," and positing that, without the Farm Line in its current form, LSP would be forced to "go to Costco" to "buy canned preservative-filled vegetables").

328. The Court's review of the facts does not bear this argument out. Indeed, the evidence presented demonstrates that LSP does not operate the Farm Line in a manner consistent with a goal of feeding healthy, fresh, high-quality fruits and vegetables to men in custody.

329. For reasons discussed below, the Court concludes that LSP's operation of the Farm Line does not evince an intent to maximize food production to provide healthy food to incarcerated men. Instead, the Court concludes that the operations of the Farm Line are inefficient and wasteful,

73

that the labor LSP requires of men on the Farm Line is more difficult than it needs to be, and that nothing in the complained-of conditions is necessary for LSP to feed its incarcerated population.

### A.    Use of Crops From the Farm Line

330.    The Court heard evidence from both parties' witnesses that supports the conclusion that a significant proportion of crops on the Farm Line are allowed to go to waste, are of poor quality, or are flash-frozen rather than being served fresh.

331.    Assistant Warden Sylvester, who oversees all field operations at LSP, confirmed that LSP will abandon crops that are considered too large, either by leaving those crops in the field to rot or by discarding them in the "grading" process after harvesting.  2/9/26 Tr. 215:22–216:19. Assistant Warden Sylvester also testified that LSP has never brought in a consultant to advise LSP on how to run the Farm Line more efficiently, and admitted that inefficient practices on the Farm Line could lead to waste.  *Id.* at 241:24–242:6.

332.    This testimony was consistent with the testimony of Plaintiff's agricultural expert, Ms. Green, who testified that, on each of her three visits to the Farm Line, she observed significant amounts of good produce being left in the field unharvested.  2/4/26 Tr. 206:16–207:12.

333.    Mr. Gulino, LSP's farm supervisor, admitted that LSP's practice of letting vegetables rot in the field is wasteful.  2/5/26 Tr. 275:11–13.

334.    Ms. Green also testified that she observed men on the Farm Line being required to harvest cucumbers that were overripe—some to the degree that they were visibly overlarge, yellowing, or even rotten, that would be inedible and not sellable by a commercial farmer.  2/4/26 Tr. 201:13–22, 204:4–21.  Corroborating this testimony, the Court saw video footage showing cucumbers harvested by the Farm Line that appeared to be severely overlarge, yellowing, with visible rotten parts.  *See* PX-199 (video of pile of large, yellowing cucumbers left in the dirt on the Farm Line); PX-195 (video of rotten cucumbers).

74

335.    Mr. Gulino testified agreeing that crops with visible rotten parts are not generally fit for human consumption.  2/5/26 Tr. 275:14–17.

336.    The Court also heard testimony and received evidence demonstrating that LSP freezes—rather than serving fresh—significant amounts of fruits and vegetables after they are harvested by men on the Farm Line.

337.    For example, when Assistant Warden Sylvester was asked what the vegetables harvested on the Farm Line are used for, his first answer was that the crops are "put in the freezers . . . for inmate consumption."  2/9/26 Tr. 205:24–206:2.  Only when asked a follow-up question by Defendants' counsel did Assistant Warden Sylvester add that LSP sometimes sends vegetables fresh straight from the Farm Line to be served by the kitchens.  2/9/26 Tr. 206:3–12.  The fact that Assistant Warden Sylvester's first answer, before follow up by Defendants' counsel, was that crops from the Farm Line are "put in the freezers" suggests to the Court that this is the treatment received by a significant proportion, and perhaps the majority, of vegetables harvested by the Farm Line.

338.    Major Pidgeon, who is currently in charge of vegetable processing at the facility, confirmed that the default at LSP is to freeze (rather than serve fresh) crops from the Farm Line: when asked what vegetable processing at LSP entails, he testified that vegetables are "washed, prepared to be processed, processed, boxed, and frozen."  2/4/26 Tr. 47:9–48:19.  He further explained that vegetable processing includes blanching, cutting, washing, bagging, and freezing the crops, before they are issued to the kitchens.  2/4/26 Tr. 48:20–24.

339.    Furthermore, while LSP's menu states that "farm vegetables" will be frozen, the menu also provides that numerous categories of vegetables are served either "[f]rozen" or "[c]anned," *see* DX-017 at 020634, and the menu page specifically referring to "vegetables planted

75

[at] LSP" provides that the availability of such vegetables "depends on harvest" and notes that vegetables may be served fresh (if "in season") or "frozen," *id.* at 020635.

340.    Ms. Green likewise testified that during her site visits to LSP, she observed freezers in the kitchens that were "packed to the gills" with "stacks and stacks" of boxes of frozen vegetables. 2/4/26 Tr. 207:13–208:25. She testified that these boxes of frozen vegetables in LSP's freezers appeared to be "quite old" due to the fact that they were accumulating ice and that some had dates, written on the sides of the boxes, that were more than a year old. *Id.*

341.    Ms. Green credibly testified that in order to freeze vegetables, as LSP appears to have done, the vegetables must first be boiled and then be flash frozen, which decreases their nutritional value. 2/4/26 Tr. 207:13–208:13.

342.    Finally, to the extent that fresh, not frozen, vegetables from the Farm Line are served at LSP, the Court heard credible testimony that these fruits and vegetables are not at all appetizing or healthy. For example, Ms. Green testified that, during one of her site inspection visits to LSP, she observed that the same large, overripe cucumbers she observed in the field seemed to have made it into the kitchen, where it was being served, cut into large hunks covered in salt and vinegar "to mask the taste." 2/4/26 Tr. 205:18–206:4. Ms. Green observed that it did not appear that many men were opting to eat the cucumbers being served in this way. *Id.*

343.    That testimony was consistent with Mr. Guillory's testimony that, while working in LSP's kitchen, he observed the produce served to usually be "overgrown," "too big," "slimy," and "not edible." 2/3/26 Tr. 35:23–36:7. Mr. Guillory testified that he had no choice but to cook this unappetizing food, because that was required of his job in LSP's kitchen. *Id.*

344.    Based on the evidence described above, the Court finds that LSP allows a significant portion of vegetables grown on the Farm Line to go to waste, and that, of the crops that are harvested, a significant portion are of poor quality or are served after being frozen, not "fresh."

**B.    LSP Purchases Produce From Commercial Vendors**

345.    The Court also heard evidence, including testimony from Warden Vannoy, that LSP already purchases the same types of produce that are grown on the Farm Line from commercial vendors in bulk orders.  *See* 2/10/26 Tr. 49:10–50:4 (Vannoy).

346.    Ms. Green testified that she was struck by the "extensive amount of food," which she described as "boxes and boxes and boxes," containing the same vegetable products that are grown on the Farm Line that appeared to have been purchased from a food-service provider. 2/4/26 Tr. 154:4–20.

347.    In light of this testimony, the Court finds that LSP does already purchase from commercial vendors bulk amounts of some of the same types of produce that are grown and harvested on the Farm Line.  This finding further undercuts Defendants' assertion that the Farm Line is necessary to enable LSP to feed vegetables to incarcerated men.

**C.    Farm Line Yields**

348.    There was testimony and evidence presented about the crop yields from the Farm Line in recent years.

349.    Some defense witnesses testified that the crop yields produced by the Farm Line have decreased in recent years.  2/9/26 Tr. 209:3–9 (Sylvester).  Assistant Warden Sylvester posited that this purported decrease is due to insufficient labor, which he attributed to more people at LSP having been granted HPDS and who, as discussed in detail below, are entitled to certain protections on the Farm Line.  2/9/26 Tr. 209:3–17.

350.    LSP's own records, however, reflect that the actual yields from the Farm Line show increased production in recent years, at least for certain months:  for example, in January 2023, zero pounds of fresh vegetables were issued by the Farm Line to LSP kitchens, whereas in January 2025, over 29,000 pounds of fresh vegetables were issued from the Farm Line to LSP kitchens. *Compare* JX-074 at 1 *with* DX-031 at 033241; *see also* 2/9/26 Tr. 231:2–232:13 (Sylvester admitting that LSP's records show that 29,000 more pounds of fresh vegetables were issued from the Farm Line to the kitchens in January of 2025 versus January of 2023).

351.    Defendants introduced a document purporting to show amounts of crops that were unable to be harvested on the Farm Line, allegedly due to "lack of inmate labor."  *See* DX-030. Assistant Warden Sylvester explained that these amounts referred to crops that were left unharvested in the field.  2/9/26 Tr. 241:7–18.  On cross examination, he clarified that the figures in this record are merely "guestimates."  2/9/26 Tr. 241:19–23.

352.    LSP witnesses testified as to LSP's staffing challenges, and acknowledged that it contributed to lower yields from the Farm Line in recent years.  2/9/26 Tr. 243:20–244:2 (Sylvester); *see also* 2/10/26 Tr. 61:7–15 (Vannoy).

353.    Finally, the undisputed evidence demonstrates that LSP has never performed any analysis of the financial impact, including the impact on yields, that would occur if changes were made to the Farm Line.  LSP has never conducted an analysis to understand the cost impact of ceasing to operate the Farm Line.  2/9/26 Tr. 243:2–5 (Sylvester); 2/9/26 Tr. 335:6–8 (Vannoy).

354.    LSP also does not know whether making the Farm Line more educational or skill-based would lead to an increase or decrease in vegetable yields.  2/10/26 Tr. 52:3–18 (Vannoy). Warden Vannoy testified that he does not think that yields would decrease.  *Id.*

78

355.    Based on this clear testimony from LSP officials, the Court finds that LSP has not attempted to understand how, if at all, yields would increase or decrease, if changes are made to the operations of the Farm Line.  The Court also finds that Defendants have not proved that "lack of inmate labor" has directly led to any significant decrease in crop yields from the Farm Line.

**D.    Expert Testimony of Ms. Marguerite Green**

356.    Plaintiffs' agricultural expert, Ms. Green, testified on similar topics, providing her opinions regarding the efficiency of LSP's farming operation and her views as to whether the Farm Line is truly operated, as Defendants seem to imply, to maximize food production.

357.    The Court accepted Ms. Green as an expert in vegetable production practices in Louisiana in light of her many years of experience running farms and working with farmers to develop and implement best agricultural practices.  2/4/26 Tr. 139:23–142:6, 142:20–143:11 149:17–150:2.  The Court also notes that Ms. Green also has a formal education in agriculture, as well as several relevant certificates.  *See id.* at 143:12–144:20.

358.    Ms. Green testified about her site visits to LSP in July 2024, October 2024, and November 2025, each in connection with her work on this case.  2/4/26 Tr. 152:12–18.  She also reviewed deposition testimony and video evidence.  *Id.* at 153:15–24, 188:4–11.

359.    Based on this work, and drawing on her extensive experience in vegetable production in Louisiana, Ms. Green reached three ultimate conclusions as to the Farm Line:

360.    First, Ms. Green concluded that the Farm Line does not operate like a farm whose goal is to maximize food production; instead, in her view, the operations of the Farm Line are inefficient and wasteful.  2/4/26 Tr. 177:1–20.

361.    Second, Ms. Green concluded that work on the Farm Line is made more unsafe and more difficult than it needs to be, as a result of LSP's practices.  2/4/26 Tr. 177:14–20.

79

362.     Third, Ms. Green testified that, despite the changes she observed on the Farm Line between July 2024 and November 2025, her conclusions about the Farm Line remained the same, because the changes she observed were "cosmetic" and did not change her ultimate conclusion that LSP does not operate the Farm Line to maximize crop yield.  2/4/26 Tr. 177:21–179:10.

363.     The Court finds Ms. Green's testimony, described in detail below, to be credible in full and adopts each of her three conclusions about the Farm Line.

### 1.    Field Health on the Farm Line

364.     Ms. Green testified credibly that any farmer whose goal is to maximize crop output would seek to ensure that their farm is a sustainable operation that is set up for long-term efficacy, including with respect to ensuring crop health and soil health.  2/4/26 Tr. 179:11–180:9.

365.     Regarding crop health, Ms. Green credibly testified that, in a squash field at LSP, she observed a very serious disease issue which, she explained, if left untreated, as it apparently was, would affect the future productivity of crops grown in that field.  2/4/26 Tr. 166:2–13; PX-204 (video from October 2024 site visit showing disease-ridden squash field).

366.     With respect to soil health, Ms. Green testified that she would expect an operation of the size of the Farm Line to engage in a practice called "cover cropping" to enhance soil health. 2/4/26 Tr. 181:23–182:3, 184:13–17. Cover cropping, Ms. Green explained, is the practice of growing vegetation on a fallow field that is not for consumption and that is instead intended to increase the health of the soil, which it does by suppressing weeds, reducing drought stress and erosion, and adding green manure back to the soil.  *Id.* at 182:7–183:11.  Cover cropping also reduces a farm's fertilizer costs and reduces labor needs.  *Id.* at 182:19–183:11.

367.     Ms. Green further explained that, in Louisiana, cover cropping is commonly practiced in the summer months, because that is the most difficult time on the soil and a time when high-value crops do not grow very well.  2/4/26 Tr. 183:12–184:3.

80

368. Ms. Green testified that she does not believe LSP attempts to maximize soil health on the Farm Line, including by practicing cover cropping. 2/4/26 Tr. 181:18–182:3, 184:4–12.

369. The Court credits and adopts Ms. Green's statement that LSP does not practice cover cropping. Ms. Green testified that she was explicitly told that LSP does not cover crop by the LSP official who drove the bus during her site inspection. 2/4/26 Tr. 184:4–12. The Court concludes that official was Assistant Warden Sylvester, who testified that he drove the bus during the site visits in this case. 2/9/26 Tr. 237:1–6. He also confirmed that LSP does not practice cover cropping. *Id.* at 242:20–22.

370. Ms. Green concluded that some consequences of LSP's decision not to practice cover cropping (or otherwise invest in its soil health) likely include decreased plant health and increased fertilizer costs, drought pressure, and erosion. 2/4/26 Tr. 184:18–185:7.

371. The Court finds credible Ms. Green's conclusion that LSP's decision not to practice cover cropping negatively impacts the efficiency of its farming operation and supports the conclusion that the Farm Line is not operated like a farm whose goal is to maximize crop yield.

### 2. Weeding on the Farm Line

372. Ms. Green next testified that during her July 2024 site visit to LSP, the cucumber field where the Farm Line was working was "shocking[ly]" over-weeded, such that she was surprised men were still being sent into it. 2/4/26 Tr. 160:25–161:17. Ms. Green explained that she would expect a typical farmer to stop producing such a field, till it under, and replant due to how bad the weed situation was. *Id.* at 195:13–19.

373. Based on what she saw, Ms. Green came to the conclusion that weed management had not been handled in a timely manner, such that the weeds in the field had been allowed to out-compete the crops LSP was trying to grow. 2/4/26 Tr. 193:20–195:7.

81

374.    Ms. Green further credibly explained that excessive weeds, such as what she observed at LSP, pose a safety risk to farm laborers, because they present a tripping hazard, obscure snakes lurking in the field, and can hide thorns that will poke the skin.  2/4/26 Tr. 193:20–195:12.

375.    Ms. Green credibly testified that it would be "very, very rare" for a typical farm to require workers to weed by hand without tools like a hoe.  2/4/26 Tr. 196:16–22.

376.    Ms. Green acknowledged that on her November 2025 site visit to LSP, the weed situation was improved as compared to her July 2024 visit.  2/4/26 Tr. 238:4–14.  She credibly testified, however, that this was unsurprising given the cooler seasonal conditions.  *Id.*  Defendants offered no evidence of any change in their weeding practices since July 2024.

377.    The Court credits Ms. Green's testimony that LSP's management of the fields on the Farm Line does not include adequate weed management and that this failure to adequately manage weeds poses safety and health risks to both people and plants, further supporting the conclusion that the Farm Line is not operated to maximize crop yield and that the working conditions on the Farm Line are more difficult and unsafe than they need to be.

### 3.    Irrigation on the Farm Line

378.    Ms. Green credibly testified that Louisiana farmers typically prioritize having consistent methods of irrigation, which is critical to ensure plant health in light of Louisiana's extremely hot summers.  2/4/26 Tr. 186:7–187:8.

379.    Based on her visits to LSP and her review of deposition testimony, Ms. Green concluded that LSP does not have any consistent irrigation methods on the Farm Line.  2/4/26 Tr. 187:9–19.  Ms. Green testified that, to her understanding, LSP relies almost exclusively on rain for irrigation, and that when LSP does water its vegetable crops, it requires men on the Farm Line

to do so by hand, which she described as inefficient, harmful to plant health, and unlike any other commercial farming practice in Louisiana. *Id.* at 187:9–188:3, 190:14–192:13.

380. The Court credits that conclusion, which was confirmed by the testimony of LSP officers, who affirmed that LSP does indeed mostly rely on rain to irrigate crops and that, when rainfall is insufficient, they require men on the Farm Line use buckets to water crops. 2/5/26 Tr. 273:3–23 (Gulino); 2/4/26 Tr. 328:1–10 (Karisny).

381. Ms. Green further credibly testified that relying on rain is not a wise farming practice, especially given Louisiana's recent drought history, and that she is not aware of any commercial farm that uses only rainwater to water their crops. 2/4/26 Tr. 189:1–22, 263:5–11.

382. Ms. Green also addressed the use of Styrofoam cups to water crops, a practice that Mr. Guillory and Mr. Smith both described being forced to perform on the Farm Line. 2/4/26 Tr. 191:19–24; *see also* 2/3/26 Tr. 39:2–23 (Guillory); 2/4/26 Tr. 26:3–22 (Smith). She testified that using Styrofoam cups to water crops is not an efficient farming practice, that the only context in which she had done something similar was when teaching toddlers how to garden, and that it would be "humiliating" to assign such work to grown men. 2/4/26 Tr. 191:25–192:9.

383. The Court finds that the Farm Line's irrigation practices are incompatible with standard farming practices in Louisiana and evidence that the Farm Line is not being run to maximize crop yield.

#### 4. Crop Rows on the Farm Line

384. Ms. Green credibly testified that studies show long crop rows are detrimental to both worker efficiency and crop health, explaining that long crop rows make it more difficult for the farm manager to see the entire field on crop walks, and negatively impact worker morale and attention to detail. 2/4/26 Tr. 196:25–198:14.

83

385.    Ms. Green testified that, based on her observations, the crop rows at LSP are approximately 500 feet long, or the length of almost two football fields.  2/4/26 Tr. 200:19–23. By comparison, she explained that she would recommend that a Louisiana farmer designing a farm use crop rows of no longer than 100 feet.  *Id.* at 198:15–19, 200:24–201:1.

386.    The Court credits Ms. Green's testimony that the crop rows at LSP are significantly longer than is typical on Louisiana farms. Warden Vannoy himself confirmed that "we do have long rows" at LSP.  2/9/26 Tr. 329:21–330:5.

387.    The Court concludes that LSP's unusually long crop rows further suggest that the Farm Line is not designed to maximize yield, and that the working conditions are made more difficult than necessary.

### 5.    Harvesting on the Farm Line

388.    Ms. Green testified that, during each of her site visits to the Farm Line, she observed an excessive amount of good, usable crop parts being left in the field after harvest, a phenomenon known in the agricultural field as crop residue.  2/4/26 Tr. 206:5–207:12.  Based on the extent of crop residue she observed, Ms. Green concluded that "good food production is not the goal of the Farm Line."  *Id.* at 206:16–207:12.  Further, Ms. Green opined that with this degree of food waste in the field, any reasonable farm would "scale their operation down to a size where they could actually manage . . . the operation meaningfully instead of letting [its] fields get so out of control and have so much waste."  *Id.* at 206:16–207:12.

389.    Regarding her November 2025 site visit to LSP, Ms. Green testified that she observed men on the Farm Line harvesting and leaving cut mustard greens directly on the soil in the full sun, including during breaks, which was corroborated by video evidence.  2/4/26 Tr. 175:10–176:16; JX-243 (video from site inspection).  Ms. Green credibly explained that this

practice would not pass food safety standards and would reduce the quality and shelf life of the crops being harvested.  2/4/26 Tr. 207:13–208:13.

390.    Finally, Ms. Green credibly testified that any farm—whether for-profit, non-profit, or education-based—that is focused on crop production would ensure that its workers receive intensive training on how to handle the harvesting process.  2/4/26 Tr. 209:1–11.  The Court credits this testimony and finds that it is logical that a farm whose priority is crop production would provide training to its workers, because, as Ms. Green explained, harvesting is the "make-it-or-break-it moment" for crops.  *Id*.  However, Ms. Green testified that she has not seen any evidence that the Farm Line offers such training.  *Id.* at 209:12–14.

391.    The Court credit's Ms. Green's testimony and finds that LSP does not abide by standard agricultural harvesting practices on the Farm Line; instead, the harvesting methods present on the Farm Line are wasteful and decrease the output of healthy, edible crop yields.

### 6.    Tools on the Farm Line

392.    Ms. Green also testified regarding her understanding that tools are generally not available on the Farm Line and opined that LSP requires men to pick by hand a number of crops that could be picked more easily using tools.  2/4/26 Tr. 209:15–211:21.

393.    For example, Ms. Green testified that she observed men on the Farm Line being forced to hand-pick pecans during her October 2024 site inspection visit to LSP.  2/4/26 Tr. 163:21–164:4.  The men were required to pick the pecans without any tools, a task that requires repeatedly bending over.  *Id.* at 210:19–211:7; PX-225 (video from site inspection).

394.    Ms. Green explained that pecans should be picked using a tool called a roller cage, which makes harvesting pecans less difficult by eliminating the need to repeatedly bend over, which reduces strain on the body and decreases the risk of lower back injury.  2/4/26 Tr. 211:18–212:8.  Ms. Green testified that this tool is cheap to buy, easy to use, and would "pay for itself

many times over in a single season." *Id.* at 211:1–212:20.  Ms. Green opined that she does not understand LSP's decision not to provide such roller cage tools to men on the Farm Line harvesting pecans.  *Id.* at 212:21–24.

395.    The Court finds this testimony credible and concludes that LSP's decision to require men on the Farm Line to harvest pecans without a roller cage—which would make the work more efficient and less strenuous—is further evidence that work on the Farm Line is made more difficult and unsafe than agricultural work needs to be.

396.    On cross-examination, Defendants' counsel implied that these cage rolling tools might pose a security threat.  2/4/26 Tr. 240:22–242:1.  However, the Court finds that consideration unsupported and not credible.  No witness testified that these tools would pose a safety threat, and it is illogical to imply that roller cages would pose more of a security threat than harvesting blades, which appear to be used, albeit rarely, on the Farm Line.  *See* PX-209 (video from November 2025 site inspection showing a man on the Farm Line with an uncovered knife blade sticking straight up out of his pocket); JX-243 (video from November 2025 site inspection showing men on the Farm Line working in the mustard green fields with knives).

397.    Next, Ms. Green testified that for both worker safety and plant health reasons, cabbage should be also harvested using a knife.  2/4/26 Tr. 214:1–17.

398.    Ms. Green testified that, based on records she reviewed, there is no indication that any knives (or any other tools) are provided to men on the Farm Line when they are required to harvest cabbages in the fields.  2/4/26 Tr. 214:18–21; *see also* JX-232 at 106 (DLC from October 2025 when men on the Farm Line worked in the cabbage field without any noted use of tools).

399.    Finally, Ms. Green testified that when knives are used for harvesting on a farm, workers should be trained in proper knife handling and must be provided sheaths to store the knives in; she explained that this is essential to ensure worker safety. 2/4/26 Tr. 219:17–220:14.

400.    Ms. Green testified that when she visited the Farm Line in November 2025, however, she observed that the men were using harvest knives to cut mustard greens but were not provided any sheaths or other protective shields. 2/4/26 Tr. 215:5–9, 217:20–218:3, 219:14–220:8. She explained that she observed an incarcerated man who had put a harvest knife into his jeans pocket, blade-up, so that the knife blade was nearly touching his torso—an extremely dangerous scenario that could result in the man's torso being punctured or him losing a finger. *Id.* at 217:20–218:3; PX-209 (video from November 2025 site inspection showing a man on the Farm Line with an uncovered knife blade sticking out of his pocket). Ms. Green also testified that knives used for agricultural work typically come with sheaths when purchased, making even more inexplicable LSP's failure to provide those sheaths to men on the Farm Line who are required to work with harvesting knives. *See* 2/4/26 Tr. 219:20–220:14.

401.    The Court credits Ms. Green's testimony regarding the lack of tools on the Farm Line, including her conclusion that LSP does not provide tools on the Farm Line for tasks that could readily be made easier or safer with simple, cheap tools, and that when tools are provided, basic worker safety precautions are not taken. The Court concludes that this is further evidence that work on the Farm Line is more unsafe and difficult than necessary.

### 7.    Protective Gear on the Farm Line

402.    Ms. Green testified that farm workers who are doing bending and harvesting work, like men forced to work on the Farm Line, should wear hats with a flap to protect the neck due from the sun exposure. 2/4/26 Tr. 220:17–221:6. She explained that rigid straw hats or baseball caps do not provide this protection because they leave the neck exposed to the sun when a person

87

is bending over.  *Id.* at 220:17–221:6, 224:7–225:3.  She testified that, during her site inspection visits, the only individuals who appeared to be wearing appropriate headwear for harvesting work were LSP staff.  *Id.* at 221:24–222:6, 223:9–224:5; *see also* PX-198 (video from July 2024 site inspection); PX-212 (video from November 2025 site inspection).

403.    Ms. Green testified that while rubber boots are appropriate for agricultural work performed in wet conditions, they are not appropriate for day-to-day work because they lack breathability, do not provide ankle support, and do not insulate from cold or hot conditions.  2/4/26 Tr. 225:20–227:5.  However, Ms. Green observed that, across each of her site visits to LSP, the vast majority of men on the Farm Line were wearing rubber boots even though the fields were not wet or muddy on any of those visits.  *Id.* at 228:8–22, 229:23–230:11; PX-196 (video from July 2024 site inspection); PX-214 (video from November 2025 site inspection).

404.    Ms. Green testified that dishwashing or rubber gloves are not appropriate for farm work because they leave the hand susceptible to being pricked by thorns and increase hand sweating, which can lead to skin problems.  2/4/26 Tr. 233:6–17.  She testified that during her site visits, she observed men inappropriately wearing dishwashing gloves.  *Id.* at 232:25–233:5; *see also* PX-224 (video from site inspection).

405.    Warden Vannoy testified that gloves and hats are made available for use on the Farm Line and that LSP's revised post orders now require this practice, *see* 2/9/26 Tr. 323:14–324:17, but the Court concludes Defendants put forth insufficient evidence to show men on the Farm Line are actually and routinely provided with proper gloves, hats, and boots.

406.    Based on Ms. Green's testimony, the Court concludes that LSP does not routinely provide appropriate protective equipment to men on the Farm Line, making their work more dangerous than necessary and adding to their risk of serious harm.

**8.      Ms. Green Is the Only Agricultural Expert in the Case**

407.    The Court concludes that Defendants put forth no rebuttal expert to Ms. Green.

408.    Mr. Thomas Gulino, LSP's farm manager, testified regarding practices on the Farm Line, but the Court concludes that Mr. Gulino is not an expert in agricultural production. Mr. Gulino's only experience with farming is from his family-owned farm, which he ran with his grandfather, and his time at LSP.  2/5/26 Tr. 269:9–12, 271:1–4.  Mr. Gulino has no formal education, training, or licenses in agriculture and does not consult outside sources to determine what industry standards in agriculture are.  *Id.* at 271:5–12, 272:4–15.  Indeed, Mr. Gulino was not familiar with the term "specialty crop," which Ms. Green testified is a commonly used term in the agricultural field to refer to all non-commodity crops including fruits, vegetables, and nuts.  *Id.* at 267:13–19.

409.    Additionally, Assistant Warden Sylvester testified about farming practices on the Farm Line, but the Court also concludes that he, too, is not an expert in agricultural production. Assistant Warden Sylvester does not hold any state licenses in farming or agriculture and does not have any vocational certificates in farming.  2/9/26 Tr. 237:7–13.  Outside of his work at LSP, Assistant Warden Sylvester's only professional farming experience was on a family farm that only grew row crops, which are not grown on the Farm Line.  *Id.* at 237:14–23, 242:17–19.

410.    Accordingly, Ms. Green is the only expert in this case capable of providing opinion testimony regarding agricultural production practices in Louisiana.  The Court recognizes her expertise and found her testimony to be wholly credible on this subject.

## XI.     Risk of Serious Heat-Related Injury on the Farm Line

411.    Plaintiffs allege that class members forced to work on the Farm Line are routinely exposed to high heat conditions that pose a substantial risk of serious bodily harm, in violation of their Eighth Amendment rights.

89

412.    The parties appear to agree that exposure to extreme heat can pose an objectively high risk of harm to human health.

413.    Defendants themselves have long maintained heat pathology policies:  Health Care Policy No. HCP8 ("HCP8"), a policy applicable to all DOC facilities, and LSP Directive No. 13.067 ("Directive 13.067"), a policy applicable to only LSP.  *See* JX-014 (HCP8); DX-062 at 3–8 (Directive 13.067).

414.    While these two policies differ in certain salient ways, discussed in detail below, both establish that, once a certain heat index threshold is met, DOC facilities, including LSP, must issue a "Heat Alert," which triggers certain precautions.  *See* JX-014 at 5; DX-062 at 6.

415.    Both policies also require that, after a Heat Alert issues, all persons who have been granted HPDS must be brought indoors.  JX-014 at 4; DX-062 at 5.

416.    Both policies also establish the same process for identifying heat-sensitive individuals:  any incarcerated person who is either prescribed a medication on Defendants' "Heat Pathology Medications List" or diagnosed with a condition on Defendants' "Medical Exclusion List" is deemed at heightened risk of heat-related illness and is granted HPDS unless the individual opts out.  *See* 2/3/26 Tr. 336:11–16 (Lavespere); 2/5/26 Tr. 56:5–13 (Oliveaux).  These lists are governed by "Attachment A" (the Heat Pathology Medications List) and "Attachment B" (the Medical Exclusion List) to HCP8 and Directive 13.067, which are identical across the two policies.  *See* JX-018; JX-016; 2/3/26 Tr. 191:17–192:5 (Vannoy); PX-248 at 27 (Vannoy March 2026 dep.).

417.    In addition to these policies, Defendants purport to follow various other heat precaution practices.  As described below, Plaintiffs contest the extent to which LSP actually abides by these practices on the Farm Line.

418.    In light of the foregoing, it is clear to the Court that the real dispute still remaining with respect to Plaintiffs' heat claims is not whether heat-related risk exists, but the seriousness of that risk, and whether the conditions currently present on the Farm Line adequately abate, that risk.

419.    To answer those central questions, both parties proffered medical experts.  Plaintiffs presented Dr. Susi Vassallo; Defendants presented Dr. Carl Keldie.  Over the past three years, the Court has heard both doctors testify twice.  Both doctors have also prepared and submitted multiple reports, all of which were admitted into the trial record on joint consent.  *See* PX-075 (Vassallo May 2024 decl.); PX-078 (Vassallo May 28, 2024 decl.); PX-083 (Vassallo Aug. 2024 decl.); PX-084 (Vassallo March 2025 decl.); PX-085 (Vassallo Nov. 2025 decl.); DX-033 (Keldie Sept. 2024 decl.); DX-034 (Keldie Apr. 2025 decl.); DX-035 (Keldie Nov. 2025 decl.).

420.    Dr. Vassallo has practiced emergency medicine since 1987 and is board certified in emergency medicine and medical toxicology, with a specific focus on thermoregulation.  PX-075 at 2–3 (Vassallo May 2024 decl.).  She has been accepted as an expert in thermoregulation and related fields by numerous federal courts.  *See, e.g.*, *Yates* v. *Collier*, 868 F.3d 354, 363 (5th Cir. 2017) (referring to Dr. Vassallo as "a recognized expert in the field of thermoregulation and hyperthermia, with over twenty-five years treating heat stroke and heat related disorders"); *Gates* v. *Cook*, 376 F.3d 323, 339 n.9 (5th Cir. 2004) ("Dr. Vassallo . . . has lectured extensively on thermoregulation and hyperthermia (heat illness) and has authored the 'Thermoregulatory Principles' chapter of Goldfrank's *Toxicologic Emergencies*, a textbook on medical toxicology."); *Ball* v. *LeBlanc*, 988 F. Supp. 2d 639, 665 (M.D. La. 2013), *vacated in part on other grounds*, 792 F.3d 584 (5th Cir. 2015)  ("Vassallo is a certified correctional health professional and an expert on the effects of drugs and illness on an individual's ability to thermoregulate (or regulate one's own body temperature)."); *Cole* v. *Collier*, 2017 WL 3049540, at *9 (S.D. Tex. July

91

19, 2017) (recognizing Dr. Vassallo as "a specialist in thermoregulation"); *McCollum* v. *Livingston*, 2017 WL 608665, at \*22 (S.D. Tex. Feb. 3, 2017) (deeming Dr. Vassallo an "expert on thermoregulation"); *Tiede* v. *Collier*, 796 F. Supp. 3d 275, 287 (W.D. Tex. 2025) (qualifying Dr. Vassallo as a "medical expert in toxicology, emergency room medicine, and heat medicine"); *see also Gumns* v. *Edwards*, 2020 WL 2510248, at \*10 (M.D. La. May 15, 2020) (calling Dr. Vassallo an "expert in correctional medicine and in the care and treatment of COVID-19 patients").

421.    This Court, too, readily accepts Dr. Vassallo as an expert in emergency medicine, medical toxicology, thermoregulation, and correctional medicine, and finds her to be extremely qualified and credible. *See* 2/9/26 Tr. 7:7–14; 4/23/25 Class Cert. Tr. 41:22–42:1.

422.    Dr. Keldie, by contrast, has never been accepted by any court as an expert in the fields of heat-related medical care and disorders, thermoregulation, medical toxicology, pharmacotherapy, or heat pathology. 4/24/25 Class Cert. Tr. 49:15–18; 2/10/26 Tr. 104:24–105:18, 112:13–16. He holds no current board certifications and has not published any articles, books, chapters, or scientific studies on any topic. 2/10/26 Tr. 102:19–103:7. He has never taught medical courses on heat pathology, studied the effects of medications on heat-related illness, conducted research on heat pathology, or written any articles on heat pathology or thermoregulation. 2/10/26 Tr. 109:22–110:8, 112:3–12. He last treated patients in an emergency department more than 25 years ago. 2/10/26 Tr. 104:5–7.

423.    Dr. Keldie testified that he believes he has an "augmented expertise in exertional heat illness," but admitted that this purported expertise was only developed as a result of his engagement in this litigation. 2/10/26 Tr. 106:3–12; 4/24/25 Class Cert. Tr. 49:7–14.

424.    Finally, Dr. Keldie admitted that he has never been hired or appointed by a court to monitor a consent decree or implement a remedial plan, and that he has never testified as an expert for a non-correctional institution in any case.  2/10/26 Tr. 103:8–14.

425.    This Court previously found Dr. Keldie to be "wholly uncredible."  ECF No. 253 at 25; *see also id.* at 31 ("The Court credits Dr. Vassallo's opinion and discredits Dr. Keldie's opinion."). Similarly, Judge Thompson in the Middle District of Alabama previously found Dr. Keldie to be "not credible or reliable." *Braggs* v. *Dunn*, 2020 WL 5909086, at *1 (M.D. Ala. Oct. 1, 2020), *vacated on other grounds*, 2020 WL 13669125 (M.D. Ala. Oct. 5, 2020).

426.    The Court accepts Dr. Keldie as an expert in correctional care medicine but finds him not competent to testify on the field of heat pathology.  2/10/26 Tr. 112:17–113:9.

427.    For the reasons described below, the Court finds Dr. Keldie's opinions—even on topics on which he was found competent to testify—to be wholly non-credible.

428.    In sum, the Court finds the opinions of Dr. Vassallo regarding the heat-related risks on the Farm Line to be highly credible and finds Dr. Keldie's opinions on this topic to be wholly non-credible.

429.    The Court's specific findings of fact with respect to Plaintiffs' heat-related claims follow.

### A.    Exposure to Heat Poses Serious Health Risks

#### 1.    Heat-Related Illness

430.    Thermoregulation is the physiological process by which the body maintains a healthy temperature, typically within one degree of 98.6°F.  4/23/25 Class Cert. Tr. 37:25–38:4 (Vassallo); PX-075 at 8 (Vassallo May 2024 decl.).

431.    The body has two primary mechanisms of thermoregulation:  sweating and vasodilation, which is the dilation of blood vessels close to the skin.  4/23/25 Class Cert. Tr. 43:20–

44:8 (Vassallo); PX-075 at 9 (Vassallo May 2024 decl.). Those mechanisms are controlled by the brain, and, in particular, by the hypothalamus. 4/23/25 Class Cert. Tr. 43:20–44:8 (Vassallo); PX-075 at 8–9 (Vassallo May 2024 decl.).

432. Heat-related illness occurs when the body is not able to properly cool itself. PX-075 at 11 (Vassallo May 2024 decl.).

433. Heat-related illness encompasses a spectrum of conditions and symptoms, ranging from mild to life-threatening. PX-116 at 6 (Louisiana Department of Health ("LDH") report). These include heat exhaustion, heat syncope (i.e., fainting due to heat), heat cramps, and heat rash. *See* PX-116 at 6 (LDH report); JX-224 at 7, 22 (National Institute for Occupational Safety and Health ("NIOSH") report); PX-075 at 11–12 (Vassallo May 2024 decl.).

434. Symptoms attendant to heat-related illness include headache; nausea or vomiting; dizziness or fainting; weakness or tiredness; muscle cramps, pain, or spasms; rashes; and cognitive changes. PX-116 at 6 (LDH report); PX-075 at 11–12 (Vassallo May 2024 decl.); 4/23/25 Class Cert. Tr. 294:21–25 (Reynolds-Barnes).

435. Some, but not all, heat-related illnesses are characterized by an increase in core temperature. 4/23/25 Class Cert. Tr. 46:20–47:10 (Vassallo); JX-224 at 22 (NIOSH report).

436. Heat stroke is the most serious heat-related illness. PX-116 at 6 (LDH report). Heat stroke occurs when the body experiences persistent heat stress and is unable to dissipate heat. PX-075 at 12 (Vassallo May 2024 decl.). During heat stroke, the body's cells that are subjected to too-high temperatures die, which can cause damage to key organs such as the brain, heart, and liver. *See* 4/23/25 Class Cert. Tr. 45:7–21 (Vassallo); PX-075 at 12 (Vassallo May 2024 decl.); JX-224 (NIOSH report) at 84.

437.    Heat stroke can come on quickly, without warning, and, if emergency treatment is not provided promptly, can cause death or permanent disability within a short period of time. *See, e.g.*, 2/9/26 Tr. 33:16–24 (Vassallo testifying that "that people can suffer from heat stroke without warning and succumb within 20 minutes"); *see* PX-075 at 13–14 (Vassallo May 2024 decl.); JX-224 at 84 (NIOSH report).

438.    Other symptoms of heat stroke include confusion, altered mental status, slurred speech, loss of consciousness, seizures, and high body temperature.  PX-116 at 6 (LDH report); PX-075 at 12 (Vassallo May 2024 decl.); JX-224 at 80 (NIOSH report).

439.    Heat stress can also cause an exacerbation of underlying comorbidities and chronic health conditions.  For example, as Dr. Vassallo credibly testified, heat stress is known to exacerbate cardiovascular, cerebrovascular, and pulmonary diseases.  4/23/25 Class Cert. Tr. 70:21–71:7.  She explained that there is a vast literature replete with scientific evidence showing that exposure to heat is associated with the worsening of underlying conditions including diabetes, cardiovascular disease, endocrine disorder, and pulmonary diseases such as asthma and chronic obstructive pulmonary disease.  2/9/26 Tr. 17:8–19.

440.    The Court finds this evidence credible and further finds that heat can exacerbate underlying or chronic health conditions.

### 2.    Exertional and Non-Exertional Heat Illness

441.    There are two types of heat illness:  "exertional" heat illness and "classic," or "non-exertional," heat illness.

442.    Exertional heat illness occurs when a person's body is producing significant amounts of heat, including through strenuous work or exercise, in a hot environment. *See* 4/23/25 Class Cert. Tr. 92:18–93:14 (Vassallo); PX-075 at 13 (Vassallo May 2024 decl.).

95

443. Classic, or non-exertional heat illness, on the other hand, is not associated with exercise; it occurs when a person is exposed to a hot environment and is not able to leave that hot environment, leaving the body unable to dissipate the heat. *See* 4/23/25 Class Cert. Tr. 92:18–93:14 (Vassallo); PX-075 at 13 (Vassallo May 2024 decl.). Classic heat illness affects people who cannot remove themselves from a hot environment or who have limited access to hydration or cooling modalities. PX-075 at 13 (Vassallo May 2024 decl.).

444. Dr. Vassallo testified credibly that men on the Farm Line are at an unacceptable risk of harm from both exertional and classic heat illness. 4/23/25 Class Cert. Tr. 44:24–45:6.

445. According to Dr. Vassallo, this is because they perform strenuous physical labor under high-heat conditions while in the fields, and, even after their work day ends, are unable to remove themselves from the heat and properly cool their bodies, because they have no regular access to air-conditioning or other cooling modalities. *See* 2/9/26 Tr. 15:18–16:8, 99:11–101:23 (Vassallo); PX-083 at 9 (Vassallo Aug. 2024 decl.).

446. Dr. Keldie gave conflicting and confused testimony on the topic of exertional and classic heat illness. On the one hand, he insisted throughout his testimony that men on the Farm Line face no risk due to heat exposure because, in his opinion, there is almost "zero" risk of exertional heat stroke on the Farm Line. *See* 2/10/26 Tr. 175:20–23; *id.* at 176:10–18 (admitting this opinion was, at least in part, based on what LSP officials told him). On the other hand, Dr. Keldie agreed that "classic or non-exertional heat stroke affects people who cannot remove themselves from a hot environment or who have limited access to hydration or cooling modalities," but then insisted these conditions are not present on the Farm Line, *see* 2/10/26 Tr. 176:19–177:4, a statement contrary to all of the uncontested evidence, *see infra* Section XI.C (discussion of heat conditions on the Farm Line and the cumulative heat burden faced by men on the Farm Line).

96

447.    The Court finds that the credible evidence shows that people on the Farm Line are indeed at substantial risk of both classical heat illness and exertional heat illness, including both types of heat stroke.  *See* 2/9/26 Tr. 99:13–101:23 (Vassallo).

### 3.    Risk of Heat-Related Illness Among All People

448.    The Court heard extensive testimony and admitted several exhibits indicating that all people, including those who are young and healthy, are at risk of heat-related illness.

449.    In a 2024 report titled "Heat-Related Illness in Louisiana," the LDH stated, "[a]nyone can develop heat-related illness."  PX-116 at 7.

450.    Dr. Vassallo opined that even younger and relatively healthier people are at risk of heat-related morbidity (i.e., injury) and mortality (i.e., death).  4/23/25 Class Cert. Tr. 62:2–6.  She credibly testified that in her practice in emergency medicine and in correctional medicine, she has personally seen younger, relatively healthier people suffer injury or death due to heat.  4/23/25 Class Cert. Tr. 63:23–64:9.

451.    Referring to the study, Dr. Vassallo explained that individuals aged 20 to 39 years old accounted for 40% of all heat-related emergency department visits statewide, demonstrating that thousands of young people in Louisiana presented to emergency departments with heat-related medical symptoms.  4/23/25 Class Cert. Tr. 62:22–63:13.  The study, Dr. Vassallo explained, also looked at workers in Louisiana in particular, and found that workers aged 34 and younger had the highest rates of emergency department visits for heat-related illness across all age groups of workers.  4/23/25 Class Cert. Tr. 63:14–22.

452.    The Court finds the above-described evidence credible and concludes that all people, including younger and healthier adults, face a substantial risk of serious heat-related illness when exposed to conditions of high heat.

97

### 4.    Higher-Risk Groups

453.    Certain groups are at heightened risk of heat-related illness.

454.    For example, the LDH's report states that "some people are at greater risk" of heat-related illness, including "[p]eople with chronic health conditions such as heart or kidney disease, breathing conditions, high blood pressure, diabetes, and obesity," and that "[c]ertain medications can also put people at risk because they interfere with their ability to thermoregulate."  PX-116 at 7.

455.    These statements are consistent with those from the Occupational Safety and Health Administration ("OSHA"), which states in a proposed rule that conditions such as cardiovascular disease, diabetes, hypertension, and obesity can be associated with increased risk of heat-related illness, and that "[c]ertain medications can also affect thermoregulation and risk of heat-related illness."  DX-040 at 30.

456.    Dr. Vassallo credibly testified that certain chronic health conditions are associated with increased risks of heat-related illness, and that certain medications can render a person especially vulnerable to heat.  4/23/25 Class Cert. Tr. 68:13–70:6; *see also* PX-075 at 16–20 (Vassallo May 2024 decl.); PX-085 at 6 (Vassallo Nov. 2025 decl.).

457.    Finally, Dr. Vassallo testified that incarcerated populations are particularly vulnerable to high temperature.  4/23/25 Class Cert. Tr. 65:6–18.  Dr. Vassallo explained that a study by Skarha—examining the relationship between extreme heat, lack of air-conditioning, and mortality in U.S. prisons—found that when a prison is un-air-conditioned, many more people will die than when a prison is air-conditioned.  4/23/25 Class Cert. Tr. 64:10–65:5.

458.    Dr. Vassallo also explained that the stressors and conditions of prison life have an aging effect on the human body, making the typical incarcerated person's body much older physiologically than their age in chronological years.  4/23/25 Class Cert. Tr. 65:6–18.  As

evidence for this, she noted that the average age of death found in the Skarha study in un-air-conditioned prisons was just 54 years old. *Id.*

459.    Based on this evidence, the Court finds that certain groups of people are at an even higher risk of significant heat-related illness.  Such people include older adults, people with mental illness, people with certain chronic diseases, and people who take medications that impair their body's ability to thermoregulate.  The Court finds that the evidence shows that incarcerated populations are at higher risk of heat-related illness.

### 5.    Heat-Related Risks Increase Sharply at a Heat Index of 88 Degrees

460.    Throughout this litigation, Dr. Vassallo has consistently and credibly opined that the risk of heat-related illness increases significantly at around a heat index of 88ºF, and her declarations and testimony have referenced and described a body of academic literature supporting the conclusion that this is a scientifically meaningful threshold.  *See* PX-075 at 11 (Vassallo averring that the "risk for heat stroke and heat-related disorders increases sharply when the heat index exceeds 88ºF"); *id.* at 26 ("The risk of heat-related illness soars when the heat index exceeds 88ºF."); *id.* at 20–21 (explaining that "[s]tudies have shown that the incidence of heat-related deaths increases sharply starting at temperatures or heat index numbers in the mid to high 80s," and explaining studies); PX-084 at 6 (Vassallo opining that "all people, including young people and those with no known medical problems, are at risk for heat related disorders during persistent exposure to a heat index above 88ºF," and describing studies showing that "the incidence of heat-related emergency department visits, hospitalizations, and death increase sharply when the heat index reaches the mid- to high-80s"); PX-085 at 2 (Vassallo stating, "[i]t remains my opinion that incarcerated men forced to work on LSP's Farm Line—including those who are younger and relatively healthier—are at substantial risk of serious harm due to their prolonged exposure to heat indices above 88ºF"); 2/9/26 Tr. 11:18–12:7; 4/23/25 Class Cert. Tr. 57:5–62:1.

461.    For example, Dr. Vassallo described a study by researcher Davis, which used a scatter plot to examine the correlation between the heat index and the risk of heat-related mortality, i.e., death.  4/23/25 Class Cert. Tr. 57:19–23.  That study, she explained, demonstrates a "sharp J-shaped or a hockey-stick-shaped increase" in mortality at a heat index of 30ºC, which is equivalent to 86ºF.  4/23/25 Class Cert. Tr. 57:24–58:4; *see also* PX-084 at 6.  Dr. Vassallo testified that this J-Shaped curve, copied below, is not isolated to the Davis study, but appears in the global scientific literature many times, across many studies investigating many geographies.  4/23/25 Class Cert. Tr. 58:5–22.



462.    Next, Dr. Vassallo credibly testified about a study by Petitti, which, she explained, was an important epidemiological study that looked at data from Maricopa County, Arizona, to look at the relative risks of heat-related illness.  4/23/25 Class Cert. Tr. 59:20–60:14.  It found that emergency room visits and rates of hospitalization increased sharply around the threshold of a heat index of 88ºF.  *Id.*  In other words, the Petitti study showed that the risk of heat-related injury

(rather than just death, which is the subject of the Davis study) also increases significantly at 88ºF. *Id.* at 60:15–19 (Vassallo).

463.    The Court finds that heat-related risks increase sharply when the heat index hits approximately 88ºF. Accordingly, the Court finds that 88ºF is a scientifically significant threshold at which a substantial risk of serious bodily harm exists absent adequate precautions. This finding is based on the extensive evidence and testimony given on the subject and supported by the vast body of scientific literature supporting this conclusion.

### 6.    Cumulative Heat Load

464.    Heat-related health risks are exacerbated by "cumulative heat burden" or "cumulative heat load." As Dr. Vassallo explained, this means that, when people work and live in hot conditions, and then sleep in hot conditions, with no opportunity to cool down, they are at a significantly greater risk of heat-related illness. *See* 4/23/25 Class Cert. Tr. 48:7–22; 2/9/26 Tr. 20:3–15, 23:15–20, 50:2–6.

465.    Dr. Vassallo further testified that cumulative heat burden also makes underlying medical conditions worse. 2/9/26 Tr. 16:2–8.

466.    Dr. Vassallo credibly testified that periodic access to air-conditioning or effective cooling mechanisms is necessary to reduce cumulative heat burden and mitigate associated risks, explaining that "an effective program to mitigate or reduce the risk of heat-related harm on the Farm Line" must include "regular, periodic exposure to air conditioning to allow the body to cool and reduce cumulative heat stress." PX-085 at 5–6 (Vassallo Nov. 2025 decl.).

467.    Dr. Vassallo noted, however, that men assigned to the Farm Line live in hot, un-air-conditioned dorms, are required to labor on the Farm Line under hot outdoor conditions, and then return to their hot, un-air-conditioned dorms, without any opportunity to access air-conditioning or otherwise adequately cool down. 4/23/25 Class Cert. Tr. 48:7–22; 2/9/26 Tr.

101

15:18–16:8.  The Court notes that the factual predicate for this testimony is consistent with unrebutted testimony from class members, detailed below, describing the lack of air-conditioning in Camps C and D.

468.    As Dr. Vassallo credibly explained, the lack of any effective cooling available to men on the Farm Line creates a "circular problem" where men are brought from the heat, back to the heat, with no meaningful opportunity for their bodies to recover.  2/9/26 Tr. 16:2–8.

469.    The Court finds Dr. Vassallo's testimony regarding cumulative heat load credible and persuasive.  Based on this testimony, the Court concludes that heat-related risks are significantly exacerbated by cumulative heat burden.

### 7.    Delayed Onset of Heat Illness Symptoms

470.    The Court further finds that symptoms of heat-related illness can manifest well after a person has left an environment of intense heat exposure, making the danger of heat-related illness often difficult to detect in real time.

471.    By way of example, Dr. Vassallo credibly explained that two thirds of heat stroke victims "experience symptoms for less than one day before being hospitalized or being found dead" and that "[s]ome victims go to sleep apparently well and are found the next day critically ill or dead").  PX-075 at 13 (Vassallo May 2024 decl.).

472.    OSHA confirms this, noting that "some effects of heat illness may be subtle or delayed," and commenting that military guidelines accordingly recommend that individuals "remain under observation" following a heat event, because impacts of the exposure may not present immediately.  *See* DX-040 at 18.

473.    The Court notes that the potential delayed effects of heat exposure are particularly exacerbated for men on the Farm Line because, as described above, *see supra* Section XI.A.6, their

heat exposure does not end when they leave their work site; they simply return from the hot fields to their hot dorms with no opportunity for true cooling off.

### 8.      Defendants' Awareness of Heat-Related Risks

474.    The Court finds that there is overwhelming evidence that Defendants are aware of the heat-related risks attendant to working on the Farm Line in conditions of high heat. Defendants' own policies, training materials, and testimony confirm this knowledge.

475.    Defendants' heat pathology policies, in effect before and throughout this litigation, confirm their awareness that exposure to high heat can be dangerous and that certain people are more vulnerable to heat.

476.    HCP8 expressly states that it was enacted with the purpose of "establish[ing] provisions for the reduction of heat pathology" and "reduc[ing] the exposure" of incarcerated men who have been "identified as more vulnerable to heat." JX-009 at 2 (HCP8, dated Aug. 21, 2018); JX-014 (HCP8, dated Oct. 20, 2024).

477.    Likewise, all versions of Directive 13.067 state that its purpose is also to "establish provisions for the reduction of heat pathology and to reduce the exposure to [incarcerated men] identified as more vulnerable to heat." *See* JX-038 at 2 (Directive 13.067, dated March 21, 2019); JX-041 at 1 (Directive 13.067, dated Apr. 8, 2025); JX-042 at 1 (Directive 13.067, dated Jan. 9, 2026); DX-062 at 3 (Directive 13.067, dated March 9, 2026).

478.    Directive 13.067 further reflects that Defendants know that people with "specific chronic illness[es]" or who take "certain types of medications" may "have increased sensitivity to heat" and thus "are at a higher risk for developing heat pathology," which is defined to include "[h]eat-induced syndromes, such as heat stroke, muscle cramps[,] and heat exhaustion." DX-062 at 3–4.

479.    Defendants' heat training, codified as Attachment C to HCP8 and Directive 13.067 ("Attachment C" or the "Heat Pathology Staff Training"), confirms institutional knowledge of the heat-related health risks discussed above.  *See* JX-017.

480.    Attachment C states that "heat related deaths and illnesses are preventable" and that "618 people in the United States are killed by extreme heat every year."  JX-017 at 1. Attachment C also describes categories of heat-related illness, including heat stroke, heat exhaustion, heat cramps, and heat rash, and identifies common symptoms for each.  *Id.* at 2–5.

481.    Attachment C corroborates Dr. Vassallo's testimony that heat stroke, the most serious form of heat illness, can come on quickly and result in death or permanent disability without emergency treatment.  JX-017 at 2.

482.    Attachment C also confirms Defendants' awareness that all people are at risk of heat-related illness, stating that "even young and healthy people can be affected" by heat "if they participate in strenuous physical activities during hot weather."  JX-017 at 2.

483.    Regarding people who have increased vulnerability to heat, Attachment C states that certain groups of people are at "highest risk" of heat-related illness, including "[o]lder adults" and "people with mental illness and chronic diseases."  JX-017 at 2.  Attachment C separately identifies factors that increase the risk of developing heat-related illness, including "obesity," "dehydration," "mental illness," "heart disease," and "prescription drug use."  *Id.* at 1.

484.    Attachment C links to reference materials, including an OSHA website[7] advising: "Outdoor workers have died of heat stroke when the day's maximum Heat Index was only 86°F. OSHA has found that less severe heat-related illnesses can happen at even lower Heat Index values. Employers who choose to monitor the Heat Index should be aware of the heat-related illness risk

---

[7]    *See* http://osha.gov/SLTC/heatillness/heat_index/.

for workers below the national and local weather service heat advisory warnings for the general public." JX-017 at 3.

485.    Attachment C links to another reference source, a U.S. Centers for Disease Control and Prevention ("CDC") website,[8] advising the use of fans only when the heat index is below 90°F, and encouraging the use of air-conditioning. JX-017 at 3.

486.    Multiple DOC witnesses testified that they are aware of the risks of heat-related illness. For example, Dr. Lavespere testified that he is aware that the term "heat pathology" describes phenomena that occur when an individual is exposed to heat that the body cannot self-regulate, and that symptoms of heat pathology can include heat cramps, heat exhaustion, heat syncope, heat rash, and heat stroke. 2/3/26 Tr. 313:19–314:8. He also testified that he is aware that the National Weather Service guidelines provide that "caution" is appropriate when the heat index hits the range of 88ºF, and that he would agree that caution is necessary to protect human health at this heat index threshold. 2/3/26 Tr. 318:11–18.

487.    Furthermore, Dr. Lavespere confirmed at trial that, during a sworn deposition, he testified that he agreed that "older adults, the very young, and people with mental illness and chronic diseases are at highest risk" from heat-related illness, and that "young and healthy people can be affected if they participate in strenuous activities during hot weather." 2/3/26 Tr. 320:24–321:8. On the stand at trial, Dr. Lavespere walked this statement back, saying that he should not have agreed with this statement and chalking up the inconsistency between his sworn testimony to a "mistake." *Id.* at 321:9–13. The Court finds Dr. Lavespere's about-face non-credible. Not only does it reflect a departure from his prior sworn testimony, it also is contradicted by statements in Attachment C and is unsupported by any other credible source in the record.

---

[8]    *See* https://www.cdc.gov/disasters/extremeheat/index.html.

488.    Warden Vannoy confirmed that he is aware that "certain people have increased sensitivities to heat-related illness," including that certain medications and certain medical conditions might cause heat sensitivities.  2/3/26 Tr. 179:7–9, 180:2–7.  Warden Vannoy also testified that he is aware that it is "particularly important to protect those individuals"—i.e., individuals with increased vulnerability to heat-related illness—"from prolonged exposure to a heat index of 88ºF or greater."  2/3/26 Tr. 179:7–16.

489.    Dr. Keldie confirmed that he is aware that "some illnesses or conditions can impair a person's ability to thermoregulate" and that "people who take . . . certain medications might have a higher risk of heat pathology."  4/24/25 Class Cert. Tr. 87:17–22.

490.    Finally, as noted, throughout this yearslong litigation Dr. Vassallo has provided consistent, credible testimony on each of the points described above, which was supported by scientific resources that she identified.  Defendants have long known of that evidence.

491.    Based on the above evidence, the Court concludes that Defendants are aware of the fact that heat-related risks are serious for all people, and that certain groups of people have increased vulnerability to heat-related health risks.

### B.    Impaired Thermoregulation Increases Heat-Related Health Risks

492.    The Court finds that the evidence at trial established that thermoregulation is a major bodily process, and that numerous medications and medical conditions—including those on LSP's Heat Pathology Medications List and Medical Exclusion List—impair the body's ability to thermoregulate.  Plaintiffs' and Defendants' experts agreed that such impairment substantially increases the risk of heat-related illness and death.

### 1.    Thermoregulation Is a Major Bodily Function

493.    This Court has already recognized the fundamental scientific fact that "thermoregulation is an essential bodily process."  *See* ECF No. 70 at 40.

494. Dr. Vassallo testified that an "[i]nability to thermoregulate properly impairs the function of multiple bodily systems, including but not limited to the nervous system, pulmonary system, cardiovascular system, gastrointestinal system, and kidney function," and that thermoregulation is essential to sustaining life. PX-075 at 8 (Vassallo May 2024 decl.); 4/23/25 Class Cert. Tr. 44:19–23 (Vassallo). Defendants offered no contrary evidence.

495. For these reasons, the Court now reaffirms its prior finding that thermoregulation is a major bodily process.

### 2. Defendants Are Aware of the Increased Risks Posed by Impaired Thermoregulation

496. The evidence is clear that Defendants are aware that certain people have impaired thermoregulation and that such individuals are especially vulnerable to heat-related risks.

497. Warden Vannoy squarely testified on this point, agreeing that "certain people have increased sensitivities to heat-related illness." 2/3/26 Tr. 179:7–9.

498. The evidence is also clear that Defendants use the designation of HPDS to identify such individuals. *See* 2/3/26 Tr. 179:17–180:7 (Vannoy confirming that HPDS "is given to men who LSP has recognized as being more vulnerable to heat-related illness").

499. Taking a step back to examine the applicable framework, the Court notes that LSP Directive No. 13.063 ("Directive 13.063"), titled "Duty Status Classification System," governs duty statuses at LSP. JX-037 (Directive 13.063, dated May 1, 2024); 2/3/26 Tr. 181:14–21 (Vannoy). Directive 13.063 provides that duty statuses at LSP are assigned "based on the individual health care needs of the inmate, to ensure he does not engage in activities that are detrimental to his basic health and/or safety." JX-037 at 3. Deputy Warden Oliveaux acknowledged that duty statuses are "intended to protect the health and safety of men incarcerated at LSP." 2/5/26 Tr. 50:9–12.

500.    HCP8 and Directive 13.067 require that incarcerated persons prescribed a medication on the Heat Pathology Medication List or diagnosed with a condition on the Medical Exclusion List be evaluated to determine whether HPDS is indicated; it is Defendants' practice that people taking a medication or diagnosed with a condition included on these lists should automatically be assigned HPDS unless they opt out.  JX-014 at 2–3 (HCP8); DX-062 at 4–5; 2/3/26 Tr. 336:11–16 (Lavespere); 2/5/26 Tr. 56:5–13 (Oliveaux).

501.    HCP8 and Directive 13.067 mandate that people with HPDS be brought indoors once the heat index reaches the applicable Heat Alert threshold.  JX-014 at 4; DX-062 at 5.

502.    The Court finds that HCP8 and Directive 13.067 thus reflect Defendants' recognition that people with impaired thermoregulation face increased risk of heat-related illness.

503.    Testimony confirms this.  For example, Dr. Lavespere testified to his belief that people who are more vulnerable to heat should be identified and that the classification of HPDS is the mechanism by which DOC accomplishes that identification.  2/3/26 Tr. 319:2–12, 322:10–25.

504.    The Court concludes that Defendants are aware that individuals with impaired thermoregulation face increased risks when working in high-heat conditions, and that such individuals require identification and protection from heat exposure.

C.    **Heat Conditions on the Farm Line**

505.    The evidence is clear that class members are routinely exposed to extreme heat conditions on the Farm Line.

506.    First, it is undisputed that the Farm Line does not cease operation when the heat index reaches or exceeds 88ºF.  SUF ¶ 101.

507.    Throughout much of this litigation, the parties jointly filed weekly letters describing the heat index reported by the National Weather Service location nearest to LSP and

108

reporting on whether the Farm Line was operating during times when the heat index was 88ºF or higher. *See* JX-245 (Joint Heat Letters).

508.    These letters and the underlying data confirm that the Farm Line often operates when the heat index meets or exceeds 88ºF:  between April 28, 2025 and December 5, 2025, the Farm Line operated on 101 days, and the heat index met or exceeded 88ºF while the Farm Line was operating on 67 of those days—approximately 66% of the time.  *See* JX-245 at *See* JX-245 at 626, 644, 662, 686, 708–09, 730–31, 755–56, 781–82, 805–06, 824–25, 843–44, 870–71, 891–92, 909–10, 930–31, 947, 965, 978, 1009–10, 1027, 1051.  In each of the last two years, the Farm Line has operated when heat indices met or exceeded 103ºF.  *See, e.g.*, JX-245 (Joint Heat Letters) at 791, 801 (July 2, 2025 National Weather Service reporting and DLC indicating Line 15 working under heat index of 103ºF); *id.* at 49, 51–53 (July 2, 2024 National Weather Service reporting and DLCs indicating Lines 15, 24 and 25 working under heat index of 108ºF); *id.* at 211, 223 (August 14, 2024 National Weather Service reporting and DLC indicating Lines 24 and 25 working under heat index of 104ºF).

509.    The record further establishes that class members forced to labor on the Farm Line are subject to an immense cumulative heat burden because they have no real reprieve from extreme heat conditions.  *See supra* Section XI.A.6.

510.    While forced to work on the Farm Line, class members labor under the direct sun and under heat indexes that, as described above, routinely exceed 88ºF.  *See* 4/23/25 Class Cert. Tr. 205:5–21 (Lavespere).

511.    Yet, when they are taken off the Farm Line, the consistent testimony is that class members have no access to air-conditioning because their dorms are not air-conditioned.  *See, e.g.*, 2/4/26 Tr. 30:11–17 (Smith testifying he lives in Camp C where there is no air-conditioning and

109

no ability to open the windows); 2/3/26 Tr. 43:24–44:5 (Guillory testifying that he has access to air-conditioning "very rarely," only when he is taken to the medical treatment center for a medical emergency or goes to church, but not in the dorms); 2/5/26 Tr. 94:17–95:10. (Morehead testifying that, while living at Camp D, he had no access to air-conditioning and could not open windows in the dorm).

512.    Additionally, Assistant Warden Sylvester testified that when men take breaks on the buses that transport them to and from the Farm Line, guards do not turn on the air-conditioning—a practice that he justified by positing that the body cannot adjust "if it goes from the cold back out into the heat." 4/24/25 Class Cert. Tr. 22:24–23:7 (Sylvester). The Court finds that Assistant Warden Sylvester's testimony about the body's ability to adjust to heat is unfounded and unpersuasive due both to his lack of any medical expertise and the fact that this testimony directly contradicts Dr. Vassallo's credible testimony about the cumulative effect of heat exposure.

513.    The Court heard testimony that LSP uses misting fans—fans connected to a water device that spray mist into the air—to provide relief from the heat to livestock, but not to men on the Farm Line. 2/4/26 Tr. 30:18–31:19 (Smith explaining that he observed misting fans in the catch pen when he worked with animals in a previous job, and noting that he would often stand with the animals to use the misting fans and get relief from the heat); 2/3/26 Tr. 284:21–285:1 (Vannoy confirming there are no misting fans available on the Farm Line); *see also* 2/4/26 Tr. 31:16–19 (Smith confirming that he has never seen misting fans used on the Farm Line).

514.    Based on the testimony described above, the Court finds that men on the Farm Line are regularly exposed to extreme heat and are never given the opportunity to reduce their cumulative heat load because they have no opportunity to access air-conditioning or cool down when they are not working on the Farm Line.

110

### 1.     Provision of Medical Care on the Farm Line

515.     The effects of extreme heat on class members is exacerbated by LSP's system for providing medical care on the Farm Line.

516.     Class members who fall ill on the Farm Line must request medical attention by calling what is referred to as a Self-Declared Emergency.  2/4/26 Tr. 274:15–275:4 (Coley).  To make an SDE, a class member must notify the Pusher that he requires medical attention.  *Id.* at 274:15–21 (Coley).  The Pusher then radios the ATU and must decide whether to call for "Medical 3," which dispatches a nurse to observe and diagnose the patient in the fields, or "Medical 4," which sends out an ambulance.  *Id.* at 273:19–23, 274:15–275:4 (Coley); 2/4/26 Tr. 340:22–341:8 (Karisny); 4/23/25 Class Cert. Tr. 319:14–18 (Scott).

517.     Notably, Pushers receive no medical training on assessing class members to determine whether to call for Medical 3 or Medical 4.  2/4/26 Tr. 341:9–12 (Karisny); 2/4/26 Tr. 289:24–291:9 (Coley).   Instead, the only basis they are given for making this important determination is to use their "common sense."  2/4/26 Tr. 341:3–19 (Karisny).

518.     Once an SDE is called into the ATU, there is no written policy setting a minimum time frame within which LSP staff must respond.  2/4/26 Tr. 285:5–9 (Coley).  In addition, while waiting for medical care, class members are typically directed to sit at the shade trailer while awaiting medical care.  2/4/26 Tr. 342:2–5, 342:18–22 (Karisny).

519.     Nurse Coley testified that he believes it is acceptable for LSP to take up to two to three hours to respond to an SDE made from the Farm Line.  2/4/26 Tr. 299:15–21.

520.     In Dr. Vassallo's opinion, however, nurses should arrive to triage a patient in an emergency setting within 10 to 15 minutes.   PX-083 at 4–5 (Vassallo Aug. 2024 decl.).  Dr. Vassallo explained that it is dangerous and physiologically significant for a patient reporting symptoms of weakness and dizziness to wait outside in the heat for long periods of time.  2/9/26

111

Tr. 40:2–9 (Vassallo commenting on an example where a person waited for medical care for 53 minutes).

521.     The record is replete with instances of class members on the Farm Line waiting for periods much longer than what Dr Vassallo testified is acceptable to wait for medical care.

522.     For example, on June 24, 2025, a class member made an SDE from the Farm Line reporting body pains, weakness, and dizziness—symptoms that Nurse Coley agreed were consistent with heat-related illness.  JX-233 at 56; 2/4/26 Tr. 288:18–289:23 (Coley).  It took LSP's medical staff 90 minutes to respond to the SDE.  *See* JX-233 at 56; 2/4/26 Tr. 288:18–289:18 (Coley admitting 90-minute wait time).

523.     On July 16, 2025, it took LSP's medical staff 80 minutes to respond to an SDE made by another class member while on the Farm Line.  JX-233 at 68; 2/4/26 Tr. 287:21–288:17 (Coley).

524.     The record contains numerous other examples of class members waiting for long periods to be seen after making SDEs from the Farm Line.  *See, e.g.*, JX-233 at 41 (85-minute delay before medical staff responded to S.S.'s SDE); *id.* at 68 (80 minute delay before medical staff responded to C.M.'s SDE); *id.* at 50 (76 minute delay before medical staff responded to R.G.'s SDE); *id.* at 59 (70 minute delay before medical staff responded to S.B.'s SDE); *id.* at 54 (65 minute delay before medical staff responded to D.B.'s SDE); JX-232 at 28–29 (77 minute delay before medical staff responded to L.D.'s SDE); *id.* at 65 (66 minute delay before medical staff responded to B.S's SDE); *id.* at 22 (57 minute delay before medical staff responded to K.L.'s SDE); *id.* at 47 (45 minute delay before medical staff responded to B.B.'s SDE); *id.* at 78 (45 minute delay before medical staff responded to J.M.'s SDE).

112

525.    Once LSP nurses finally do arrive in the field to see a patient who has made an SDE, they are required to fill out three documents:  (1) a field triage log; (2) a carbon copy of Form HCP 13-a; and (3) the patient's electronic health record.  2/4/26 Tr. 275:5–12 (Coley).  Dr. Keldie, testified that, whenever a medical professional triages a patient, it is important to take the patient's vital signs, including body temperature.  2/10/26 Tr. 148:12–149:21.  However, LSP's records contain at least 20 SDEs from 2025 where medical staff at LSP took some vital signs but did not record the patient's body temperature in the field triage log or the electronic health records.  *See* JX-143 at 50–53, 62–64, 75–77, 82–84, 95–97, 103–105, 172–174, 194–196, 251–253, 304–306 (showing multiple SDEs for heat-related incidents where temperature was not taken); JX-143 at 143–145, 320–322 (showing examples of SDEs for heat-related incidents where vitals were not taken).

526.    Additionally, whenever an SDE is made on the Farm Line, the Pusher is supposed to record the SDE on the DLC.  2/3/26 Tr. 295:12–15 (Vannoy); 2/4/26 Tr. 323:23–324:3 (Karisny).  Warden Vannoy views the failure to properly document an SDE on a DLC as a violation of the Pusher's job responsibilities deserving of disciplinary action.  2/3/26 Tr. 295:16–296:2.

527.    LSP's SDE and DLC records reflect numerous instances in 2025 where LSP officials failed to properly document such medical emergencies on the DLCs.  *See, e.g.*, 2/4/26 Tr. 324:13–327:22 (Karisny testifying that an SDE should have been recorded on the DLC on a day when he was working as a Line Pusher).

528.    Based on this evidence and testimony, the Court concludes that men on the Farm Line who call SDEs are routinely subject to long wait times before receiving emergency medical attention, and that LSP's documentation of medical emergencies on the Farm Line is inadequate. These failures increase the heat-related health risks faced by class members on the Farm Line.

113

### 2.    Costs to Class Members to Receive Medical Care on the Farm Line

529.    The trial record establishes that class members often must pay to receive medical care on the Farm Line, and that the costs of such care is prohibitively expensive.

530.    Health Care Policy No. 14 ("HCP 14") governs health care treatments and medical co-payments for men in DOC's custody. *See* JX-020; 2/3/26 Tr. 293:20–25 (Vannoy).

531.    HCP 14 was updated during the course of this litigation, with DOC issuing a new version of the policy on November 17, 2024. JX-020 (HCP 14, dated Nov. 17, 2024); 2/3/26 Tr. 293:17–19 (Vannoy); 2/4/26 Tr. 291:20–23 (Coley); *see also* JX-019 (HCP 14, dated Aug. 20, 2023).

532.    When DOC revised HCP 14 in November 2024, it tripled the co-pay rate for SDEs from $2 to $6. 2/4/26 Tr. 291:20–292:3, 292:8–20 (Coley); JX-020 at 4; JX-019 at 5.

533.    Given that the incentive pay rate available for men on the Farm Line is generally two cents per hour, a man must labor on the Farm Line for 300 hours to cover a single $6 co-pay. *See supra* Section VI.D; *see also* 2/9/26 Tr. 294:10–295:2 (Coley admitting that when he goes to the doctor, one co-pay does not cost him the equivalent of 300 hours of work).

534.    HCP 14 states that co-pays should not be charged for "work-related injuries or illnesses," JX-020 at 5, but there is no policy at LSP that memorializes what counts as a work-related incident for the purposes of deciding whether to charge a co-pay, 2/4/26 Tr. 293:20–24 (Coley). Instead, nurses who respond to SDEs in the field use their discretion to determine whether to charge a co-pay. 2/4/26 Tr. 293:20–294:3 (Coley).

535.    The evidence shows that co-pays are charged inconsistently to men who make SDEs from the Farm Line. *Compare* JX-136 at 28 (O.M. was charged a $6 co-pay for his SDE for a heat rash from working on the Farm Line.) *and* JX-136 at 4 (C.M. was charged a $6 co-pay for care and $2 co-pay for calamine lotion for a rash contracted via poison ivy while working

114

outside with Prison Enterprises) *with* JX-136 at 8 (D.L. was stung by a bee while cleaning outside and his SDE was classified as "work related" and he was not charged a co-pay.).

536.    Additionally, under the previous version of HCP 14, men with less than $200 in their account would not be charged a co-pay. *See* 2/9/26 Tr. 295:3–296:18 (Coley); JX-019 at 5. Under the current policy, however, no such limitation exists. JX-020 at 4. Now, class members are forced to accrue a debt to LSP if they are charged a co-pay with insufficient funds in their account.

537.    The Court heard testimony about Defendants' co-pay policy and its impact on whether class members at LSP seek medical care.

538.    Mr. Samuels credibly testified that the disparity between his lack of income and the cost of care makes him significantly less likely to make an SDE. 2/4/26 Tr. 93:21–94:10.

539.    Mr. Guillory testified that he assesses whether his pain is "life-threatening" before making an SDE to avoid spending his wages on medical care. 2/3/26 Tr. 45:10–20.

540.    Mr. Henderson also testified that VOTE advocates on behalf of its members regarding medical co-pays at LSP because the high cost of co-pays has created a chilling effect that discourages VOTE members from seeking medical care. 2/5/26 Tr. 196:1–197:9.

541.    Dr. Vassallo credibly opined that "the high cost of medical co[-]pays at LSP deters incarcerated people from seeking medical treatment for symptoms of heat-related illness." PX-085 at 15 (Vassallo Nov. 2025 decl.).

542.    The Court finds it self-evident that a co-pay that costs the equivalent of hundreds of hours' worth of wages (and that could cause one to incur debt if he cannot afford that cost) likely disincentivizes people from seeking medical care.

543.     Additionally, the Court finds that it would be possible for LSP to suspend co-pays during the summer months for people on the Farm Line who are symptomatic with heat-related illness, because LSP instituted a similar blanket suspension of co-pays for COVID-related issues during the COVID-19 pandemic.  2/4/26 Tr. 296:5–12 (Coley).  However, LSP has not suspended co-pays for heat-related SDEs.  *Id.* at 296:5–15 (Coley).

**D.       People on the Farm Line Have Exhibited Symptoms Consistent with Heat-Related Illness**

544.     The trial record contains numerous examples of men on the Farm Line experiencing symptoms consistent with heat-related illness, including weakness, dizziness, nausea, lightheadedness, difficulty breathing, and loss of consciousness.  The record includes (i) testimony from several Individual Named Plaintiffs and class members describing these symptoms firsthand; (ii) documentary evidence from DLCs documenting SDEs involving heat-related symptoms; and (iii) credible expert testimony from Dr. Vassallo describing specific cases of men who were inadequately treated or returned to the Farm Line despite exhibiting such symptoms.

545.     For example, Mr. Smith described an experience from the Farm Line, explaining that while being forced to cut grass on a hot morning he was "perspiring heavily" and felt his body starting "shutting down," beginning with his fingers and then progressing to his stomach, back, and legs, to the point where he "couldn't even walk."  2/4/26 Tr. 29:6–17.  He testified that he called for an EMT, who merely checked his blood pressure, told him to "drink more water," and instructed him to take the day off.  *Id.* at 29:18–25.

546.     Mr. Guillory also testified about his experiences with heat-related illness while working on the Farm Line during the summer of 2023.  He explained that working under the "burning" sun made it difficult for him to breathe and caused his body to tighten.  2/3/26 Tr. 41:3–13.  In particular, Mr. Guillory described an instance in which, after completing a shift in the sweet

116

potato field, he returned to his dorm and "ended up passing out." *Id.* at 42:8–43:11; *see supra* Section XI.A.7.

547.    Mr. Major, who suffers from mental illness and is prescribed Zoloft, Vistaril, and Remeron, testified about "feeling dizzy and nauseous" while working in the corn field in June 2025, which caused him to call an SDE. 2/3/26 Tr. 80:18–81:15. However, Mr. Major testified the medical responder took approximately one hour to arrive and, after she did arrive, all she did was take his pulse and blood pressure and instruct that he be put in the shade. *Id.* at 81:8–15; JX-169; JX-138 at 122–124. Mr. Major testified that the shade trailer at the time provided no shade, so he had to wait approximately an hour and a half in the sun before being brought back to the dorms. 2/3/26 Tr. 81:16–82:1. Days later, he suffered another medical emergency while in the corn field, this time feeling worse than before. *Id.* at 82:2–10 (Major). When the medical responder took his blood pressure and saw it was dropping, she recommended that he be sent to the ATU. *Id.* However, instead, Mr. Major was sent to his dorm, where the power was out and it was 95°F. *Id.*

548.    Mr. Samuels—who suffers from a congenital heart condition that causes fatigue, low oxygen saturation, and a propensity for syncope (fainting)—also testified that, while planting potatoes on the Farm Line in April 2025, he became lightheaded, felt like he could not breathe, experienced dizziness and "pins and needles," and felt dehydrated. 2/4/26 Tr. 78:16–21, 82:16–83:25. Mr. Samuels noted that the Farm Line did not have cups for water at the time this occurred. *Id.* at 82:16–83:25. He tried to sit down on a milkcrate to rest but was threatened with a disciplinary writeup. *Id.* at 82:16–83:6. He then called for medical, and when the ambulance arrived, his oxygen saturation was measured at 87%. *Id.* at 84:17–25. After this incident, his job was changed to dorm orderly. *Id.* at 86:15–18. Despite this job change and a change in his duty status,

117

Mr. Samuels was threatened with being sent back out to the Farm Line. *Id.* at 84:17–85:19, 86:22–87:8.

549.    The DLCs are replete with instances in which men on the Farm Line declared medical emergencies with complaints consistent with heat-related illness. *See, e.g.*, PX-085 at 11, 13 (Vassallo Nov. 2025 decl.); JX-233 at 56 (T.J. calling an SDE while on the Farm Line complaining of "body pains" and feeling "weak and dizzy".); JX-233 at 39 (A.S. calling an SDE while on the Farm Line complaining of feeling "weak and dizzy".); JX-233 at 49 (T.C. calling an SDE while on the Farm Line complaining of feeling "weak and dizzy").  For example, on June 12, 2025, one man was transported to LSP's ambulatory treatment unit after complaining he was feeling "weak and dizzy" on the Farm Line.  2/3/26 Tr. 262:17–263:4 (Vannoy).

550.    Likewise, the DLCs for June 23, 2025 reflect that one man made an SDE complaining of "feeling weak and dizzy"; another man made an SDE because he was "feeling weak and dizzy" and his head hurt; another man made an SDE because he was feeling "weak"; and yet another man made an SDE due to "feeling overheated."  JX-233 at 54.

551.    Dr. Vassallo opined that the symptoms commonly reported by men on the Farm Line—including weakness, dizziness, nausea, and feeling overheated—are "textbook symptoms of heat illness."  PX-085 at 7, 11 (Vassallo Nov. 2025 decl.).  She described specific examples of men on the Farm Line exhibiting symptoms consistent with heat-related illness.

552.    For example, Dr. Vassallo discussed the case of a man referred to as Q.R., whom has been identified by LSP as qualifying for HPDS because he takes a medication that impairs thermoregulation.  2/9/26 Tr. 34:19–35:8; PX-085 at 7–8 (Vassallo Nov. 2025 decl.).  On October 7, 2025, Q.R. was working in the fields when he began to feel weak and dizzy—classic symptoms of heat illness, particularly for a person with impaired thermoregulation.  2/9/26 Tr. 35:19–36:13

118

(Vassallo); PX-085 at 7–8 (Vassallo Nov. 2025 decl.).  In discussing Q.R.'s incident and symptoms specifically, Dr. Vassallo confirmed that these symptoms are indicative of heat illness.  2/9/26 Tr. 35:19–36:5.  However, Dr. Vassallo testified that the records she reviewed were incomplete and did not show any consideration for heat as the cause of Q.R's medical emergency.  *Id.* at 36:14–37:4.  Dr. Vassallo clarified that while Q.R.'s vital signs did not indicate he was suffering from heat illness, a patient suffering heat illness can nonetheless present with normal vital signs.  *Id.* at 38:4–39:5.

553.    Dr. Vassallo described the case of C.J., who on June 20, 2025, initiated a medical emergency from the field, complaining of feeling nauseous and weak.  2/9/26 Tr. 48:5–10.  According to the SDE, C.J. had medical conditions that interfered with his ability to thermoregulate, including hypertension (cardiovascular disease).  *Id.* at 47:4–13, 48:11–18 (Vassallo); JX-138 at 84.  At the time of the SDE, C.J. was also prescribed Zyprexa, a medication listed on the Heat Pathology Medications List, entitling C.J. to HPDS.  2/9/26 Tr. 55:2–15 (Vassallo); JX-018 at 2.  C.J. informed the clinician he was taking Zyprexa and that he did not have a HPDS.  JX-138 at 85; PX-085 at 10 (Vassallo Nov. 2025 decl.).  Later that day the medical record was appended to include a note to add HPDS.  JX-138 at 85; PX-085 at 10 (Vassallo Nov. 2025 decl.).  Despite his prescription and medical conditions, C.J. did not have a HPDS, an oversight that appears to have been identified only after C.J. declared a medical emergency and, critically, after C.J. worked in the field, including even after a Heat Alert was called, and he experienced symptoms consistent with heat illness.  2/9/26 Tr. 49:6–50:6 (Vassallo); JX-138 at 83–85; PX-085 at 10 (Vassallo Nov. 2025 decl.).  Three days later, on June 23, 2025, C.J. declared another medical emergency "complaining of feeling overheated" at 9:36 a.m., after a Heat Alert

119

was called at 9:00 a.m. C.J. was not identified as a heat-sensitive individual and brought inside. JX-233 at 54; JX-138 at 97; PX-085 at 10 (Vassallo Nov. 2025 decl.).

554. Dr. Vassallo opined that LSP medical personnel routinely fail to correctly diagnose heat illness because they rely on "pertinent negatives," such as the presence of sweating, moist mucous membranes, or normal vital signs—but that the absence of these symptoms do not, in fact, rule out heat-related illness. PX-085 at 12–14 (Vassallo Nov. 2025 decl.); 2/9/26 Tr. 37:14–39:18. Dr. Vassallo explained that normal vital signs do not preclude heat illness, and that the presence of sweating is "not a pertinent negative as the patient may be sweating and die of heatstroke." PX-085 at 14 (Vassallo Nov. 2025 decl.); 2/9/26 Tr. 37:14–39:18.

555. Dr. Keldie was of the opinion that there were no incidents of heat-illness at LSP. 2/10/26 Tr. 188:5–189:4. However, Dr. Keldie is not an expert in thermoregulation or heat-related illness, and did not review all of the SDEs himself. *Id.* at 112:17–113:8. Instead, he testified that he relied on another person to review some of the SDEs and did not keep a log of the documents he reviewed personally. *Id.* at 189:14–190:24.

556. Dr. Keldie characterized numerous SDEs in which incarcerated persons presented with symptoms of dizziness, weakness, nausea, and feeling overheated as not constituting heat-related illness. DX-033 at 41–54. However, these symptoms are universally recognized as consistent with the progression of heat-related illness, including heat exhaustion. *See* JX-026 at 1; PX-085 at 7, 11 (Vassallo Nov. 2025 decl.).

557. The Court therefore finds that the record contains extensive and credible evidence that men on the Farm Line have exhibited or presented with symptoms consistent with heat-related illnesses, including weakness, dizziness, nausea, lightheadedness, difficulty breathing, loss of consciousness, and feeling overheated. The Court further finds that Dr. Keldie's assessment that

120

the SDEs documented on the Farm Line do not reflect heat-related illness is not credible, particularly in light of his concession that the very symptoms documented in those SDEs are recognized by leading medical authorities as symptoms of heat-related illness and that place individuals at risk of progression to heat stroke and death.

## XII.    Defendants' Heat Pathology Policies and Related Practices

558.    As described below, the Court acknowledges that Defendants have made certain changes which Defendants argue adequately reduce the heat-related health risks on the Farm Line.

559.    For example, LSP has erected structures that Defendants call "shade pavilions," throughout the fields where the Farm Line labors.  *See infra* Section XII.D.5.  These shade pavilions—which are built atop concrete slabs—are permanent changes on the Farm Line.

560.    For the reasons explained below, the same cannot be said for many of the other changes Defendants purport to have made on the Farm Line.  Additionally, as detailed below, Defendants' course of conduct in making these changes demonstrates to the Court that the changes were made not to protect the health and safety of class members but for litigation purposes.  These changes do not suggest any reasonable guarantee of permanency once this litigation concludes.

561.    Finally, the Court also concludes that Defendants' heat-related policies and practices remain inadequate to address the known risks present on the Farm Line for all men and especially for the men that LSP has identified as being heat-sensitive and granted HPDS to.

### A.    Health Care Policy No. HCP8

562.    Multiple DOC witnesses explained that HCP8 applies to all DOC facilities by setting the minimum heat-related standards that each facility, including LSP, must abide by.  *See* 2/3/26 Tr. 315:21–316:11, 317:7–12 (Lavespere); 2/3/26 Tr. 183:1–8 (Vannoy).

563.    HCP8 establishes a framework for tracking and responding to extreme heat conditions.  As relevant here, HCP8 requires that, between May 1 and October 31 each year, DOC

facilities must track the heat index once every two hours and call a Heat Alert when the heat index, as reported by the National Weather Service, reaches 91°F.  *See* JX-014 at 5; *see also* 2/3/26 Tr. 184:4–17 (Vannoy); 2/3/26 Tr. 317:20–25 (Lavespere).

564.    When a Heat Alert is called, HCP8 requires that men with HPDS—men already identified by Defendants as having heightened heat-sensitivity—be brought indoors.  *See* JX-014 at 4; *see also* 2/3/26 Tr. 322:21–25 (Lavespere).

565.    HCP8 does not set a maximum time by which heat-sensitive men with HPDS must be brought inside after a Heat Alert is issued.  *See* JX-014 at 4.  Nor does it mandate any specific treatment for these men, for example, that they be placed in shaded areas, between the time a Heat Alert is called and the time they are brought inside.

566.    After a Heat Alert is called, incarcerated men who do not have HPDS generally stay in the fields working on the Farm Line.  2/3/26 Tr. 185:1–8 (Vannoy); 4/23/25 Class Cert. Tr. 192:4–11 (Lavespere).  However, once a Heat Alert issues, HCP mandates that a 15-minute rest break be offered to these men every 45 minutes and water and ice be made available every 30 minutes.  *See* JX-014 at 5.

567.    Pursuant to HCP8, the above heat precautions are required only between May 1 to October 31 each year, during the so-called "heat season"; between November 1 and April 30, no heat precautions are mandated regardless of weather conditions.  *See* JX-014; *see also* 2/3/26 Tr. 316:24–317:3 (Lavespere confirming that HCP8's heat precautions do not apply outside of the May to October range under the operative version of the policy).

568.    HCP8 also provides that, in outdoor spaces and between May and October, facilities must make available water, ice, sunscreen, and "shaded area for breaks."  JX-014 at 5.

569.    In addition to the outdoor procedures described above, HCP8 governs how DOC facilities identify and assign HPDS to people who have known heat sensitivities.  As noted above, pursuant to HCP8 and associated practices, any person taking a medication listed on the Heat Pathology Medications List or diagnosed with a condition listed on the Medical Exclusion List is entitled to HPDS.  *See supra* ¶ 416.

570.    There have been two different versions of HCP8 in effect during the course of this litigation.  JX-009 (HCP8, dated Aug. 21 2018); JX-014 (HCP8, dated Oct. 20, 2024).

**B.      LSP Directive No. 13.067**

571.    Louisiana State Penitentiary Directive No. 13.067 is LSP's facility-specific heat pathology directive.  *See* DX-062 at 3–8.

572.    The operative version of Directive 13.067 went into effect on March 9, 2026, having been revised by LSP after the trial in this action concluded.  *See* DX-062.

573.    The Court finds that the evidence conclusively demonstrates that, although LSP cannot enact lesser protections in Directive 13.067 than HCP8, LSP is empowered to enact greater protections in Directive 13.067 as compared to HCP8.  *See* 2/3/26 Tr. 183:5–8 (Vannoy confirming that "LSP can set greater protections than what are outlined in HCP8, but it can't require lesser protections"); 4/23/25 Class Cert. Tr. 178:3–6 (Lavespere agreeing that "individual [DOC] facilities including LSP can go above what HCP8 calls for, but they should not go below what HCP8 calls for").

574.    Historically, Directive 13.067 has been modeled after HCP8.  *See* 2/3/26 Tr. 189:4–7 (Vannoy); *see also* 4/23/25 Class Cert. Tr. 240:25–241:18 (Oliveaux).

575.    Directive 13.067 also adopts the same attachments as HCP8, namely the Heat Pathology Medications List at Attachment A, the Medical Exclusion List at Attachment B, and the Heat Pathology Staff Training at Attachment C.  *See* DX-062 at 8; 2/3/26 Tr. 191:17–192:5

123

(Vannoy confirming that when LSP revised Directive 13.067 in January 2026, it adopted and did not revise Attachments A, B, and C); PX-248 at 27 (Vannoy confirming that when LSP revised Directive 13.067 in March 2026, it did not make any changes to Attachments A, B, and C).

576.    Directive 13.067 does diverge from HCP8 in certain respects.  For example, it reverts to the historic 88°F Heat Alert threshold, requires LSP staff to monitor the heat index at LSP in real time using a Perry Weather monitoring system, and, as of March 2026, it eliminates the heat season and requires LSP to implement the heat precautions in Directive 13.067 year-round.

577.    There have been four versions of Directive 13.067 in effect since this litigation started in 2023, including three versions that were issued in the span of less than one year.  JX-038 (Directive 13.067, dated March 21, 2019); JX-041 (Directive 13.067, dated Apr. 8, 2025) JX-042 (Directive 13.067, dated Jan. 9, 2026); DX-062 (Directive 13.067, dated March 9, 2026).

### C.    <u>**Timeline of Changes to HCP8 and Directive 13.067**</u>

578.    When this litigation began in September 2023, both HCP8 and Directive 13.067 utilized a Heat Alert threshold of 88°F.  *See* JX-009 at 6 (HCP8, dated Aug. 21, 2018); JX-038 at 5 (Directive 13.067, dated March 21, 2019); *see also* 2/3/26 Tr. 186:7–10 (Vannoy).

579.    In October 2024, Defendants revised HCP8 to raise the Heat Alert threshold from a heat index of 88°Fto a heat index of 91°F.  *See* JX-014 at 5; 2/3/26 Tr. 318:1–10 (Lavespere).

580.    DOC's Chief Medical Officer, who was also DOC's 30(b)(6) witness on the revised HCP8, testified that the increased Heat Alert threshold was less protective than the prior version. 2/3/26 Tr. 318:19–319:1 (Lavespere); 4/23/25 Class Cert. Tr. 181:20–21 (Lavespere).

581.    The Court finds that the upward revision of the Heat Alert threshold to a heat index of 91°F, which remains in effect today in HCP8, renders heat precautions under that policy less protective.  2/3/26 Tr. 318:19–319:1 (Lavespere).

124

582.    In April 2025, Defendants revised Directive 13.067 to formalize that change.  *See* JX-041 (Directive 13.067, dated Apr. 8, 2025).  Defendants' reasoning for that revision was to bring Directive 13.067 in line with the requirements of HCP8.  *See* 2/5/26 Tr. 58:6–9 (Oliveaux).

583.    Additionally, Directive 13.067 was revised to require monitoring of the National Weather Service heat index once per hour.  *See* JX-041 at 4.

584.    In two injunctions issued in May 2025 and August 2025, this Court ordered LSP to call a Heat Alert at 88°F.  *See supra* Sections III.B–C.  Those injunctions were in effect for the periods of May 23, 2025 to August 21, 2025, and August 22, 2025 to September 17, 2025.  *Id.*

585.    The Court finds, and Defendants concede, that LSP violated each of these two preliminary injunction orders on multiple occasions by failing to issue a Heat Alert at 88°F in direct violation of this Court's orders.  *See* 2/10/26 Tr. 16:17–20, 17:7–9 (Vannoy).

586.    For example, on June 5, 2025, the National Weather Service data tracked by LSP indicates that the heat index first exceeded 88°F at 9:15 a.m.  *See* JX-245 at 689.  As required by this Court's injunction, LSP should have called a Heat Alert at or around that time.  The DLC from the same day, however, indicates that LSP did not call a Heat Alert until 9:57 a.m.—approximately 42 minutes after the heat index met the court-ordered threshold.  *Id.* at 702.

587.    Later that month, on June 17, 2025, the National Weather Service reported that the heat index reached 88°F at 7:53 a.m.  2/10/26 Tr. 15:5–9 (Vannoy); JX-245 at 736.  Accordingly, LSP should have called a Heat Alert at or around 7:53 a.m.  2/10/26 Tr. 15:10–14 (Vannoy).  Instead, LSP did not call a Heat Alert until 9:34 a.m.—one hour and 41 minutes after the heat index reached 88°F.  2/10/26 Tr. 15:18–16:1 (Vannoy); JX-245 at 743.

588.    Again, on July 29, 2025, LSP violated the Court's order:  the National Weather Service recorded that the heat index first exceeded 88°F at 8:15 a.m. but, despite a rapid increase

to 91°F by 8:35 a.m. and to 94°F by 8:55 a.m., LSP still did not call a Heat Alert until 9:00 a.m., at which point the heat index was between 94°F and 95°F.  JX-245 at 880, 886.

589.    At trial, Warden Vannoy accepted that there were other examples of LSP violating the May 2025 Injunction.  2/10/26 Tr. 16:17–20 (Vannoy).

590.    This pattern continued during the period when the Court's August 2025 Injunction was in effect.  For example, on September 11, 2025, the National Weather Service reported that the heat index first reached 88°F at 9:55 a.m.  JX-245 at 982.  Yet, LSP did not call a Heat Alert until 10:59 a.m., over an hour after the heat index reached 88°F.  *Id*. at 992.

591.    Warden Vannoy conceded that, while Defendants were appealing the August 2025 Injunction, LSP violated that order as well.  2/10/26 Tr. 16:21–17:9.

592.    The Court finds that the evidence and testimony demonstrate that LSP violated this Court's orders on numerous occasions during the summer of 2025.  The Court finds even a judicial order requiring Defendants to take certain actions to protect the health and safety of men on the Farm Line may not be enough to ensure that Defendants take those required actions.

593.    Mere weeks before trial in this action began, Defendants again revised Directive 13.067, issuing a new version on January 9, 2026.  *See* JX-042.  The revisions included: (i) reverting to the historic 88°F heat index Heat Alert threshold; and (ii) switching the source of its heat index data from the National Weather Service to an on-site Perry Weather monitoring system.

594.    At trial, Defendants' witnesses testified that they may make further changes to HCP8 and/or Directive 13.067 in the near future.  *See, e.g.*, 2/3/26 Tr. 190:18–191:1 (Vannoy testifying that Directive 13.067 may change during the 2026 heat season), 195:15–196:9 (Vannoy testifying that he believes DOC will revise HCP8); 2/10/26 Tr. 37:15–22 (Vannoy confirming that

126

there had, as of trial, been three different versions of Directive 13.067 and that he was contemplating changing it again, as soon as summer 2026).

595.  That is precisely what happened:  after trial concluded, LSP again revised Directive 13.067, eliminating the May to October heat season that had been in all other versions of Directive 13.067 and remains in HCP8.  *See* DX-062 at 2; PX-248 at 26 (Vannoy March 2026 dep.).

596.  Warden Vannoy subsequently confirmed that even this March 9, 2026 version of Directive 13.067 may soon be changed again.  *See* PX-248 at 28 (Vannoy March 2026 dep.).

597.  The Court concludes, based on this course of conduct, that the applicable heat pathology policies at LSP, HCP8 and Directive 13.067, can be, and are, revised frequently and that the terms reflected in any given version do not necessarily reflect a permanent policy.  In particular, the Court notes that the April 8, 2025 version of Directive 13.067 was in effect for only nine months, and the January 9, 2026 version of Directive 13.067 was in effect for only two months.

598.  The Court further finds that, because HCP8 continues to set 91°F Heat Alert threshold, maintains the May through October heat season, and requires heat index monitoring once every two hours using the National Weather Service, LSP maintains significant flexibility to make changes after this litigation ends that would be less protective for men on the Farm Line.

D.  **Defendants' Litigation-Driven Changes to Heat Pathology Policies and Practices**

1.  **Heat Alert Threshold**

599.  As described above, at the outset of this litigation, Defendants' operative heat pathology policies set a Heat Alert threshold at 88°F and subsequently raised that threshold to a heat index of 91°F.  *See supra* Section XI.C.

600.    Notably, Defendants have not, during the course of this litigation in which the Heat Alert threshold has been a hotly contested issue, presented any credible evidence providing a reasoned or scientific basis for setting a Heat Alert threshold at 91°F.

601.    The Court also observes that Defendants raised the Heat Alert threshold in HCP8 to 91°F, and maintained that threshold in HCP8 despite hearing Dr. Vassallo credibly opine that there is no scientific basis for it and that heat-related health risks increase sharply at a heat index of 88°F.  4/23/25 Class Cert. Tr. 59:5–60:19; *see also* PX-075 at 11 (Vassallo May 2024 decl.).

602.    Instead of basing the Heat Alert threshold on science or medical expertise, the evidence shows, and the Court finds, that DOC set the Heat Alert threshold at 91°F in HCP8 because that was a threshold Defendants thought they could get away with during this litigation. The testimony establishes that DOC initially contemplated raising the Heat Alert threshold in HCP8 to 95°F but eventually settled on raising it to 91°F after concluding that it would have been "too big a jump from 88 to 95" and that a Heat Alert threshold of 91°F would be considered "more reasonable to the Court."  4/23/25 Class Cert. Tr. 202:11–23 (Lavespere).  Dr. Keldie, who recommended the 95°F heat index threshold and even a 103°F heat index threshold, described DOC's choice of 91°F was for "optics."  2/10/26 Tr. 185:4–21.

603.    Within days of Defendants disclosing that DOC raised the Heat Alert threshold in HCP8 from 88°F to 91°F, and for months thereafter, Plaintiffs raised related concerns with this Court and Defendants, explaining that the 91°F Heat Alert threshold was dangerous and a threat to the health and safety of men on the Farm Line.  *See, e.g.*, ECF No. 144 at 3; 2/10/26 Tr. 10:10–24 (Vannoy).

604.    Nevertheless, on April 8, 2025, LSP modified Directive 13.067 to raise the Heat Alert threshold reflected in that policy to a heat index of 91°F.  *See* JX-041 at 1.

605.    Shortly thereafter, at the evidentiary hearing held by this Court on Plaintiffs' motion for class certification, Plaintiffs again raised their concern about the 91°F Heat Alert threshold. *See* 4/22/25 Class Cert. Tr. 21:6–9 (Plaintiff's counsel arguing that people with HPDS "are not properly accommodated with Defendants' new heat pathology policy that increases the threshold to trigger a Heat Alert to a heat index of 91 degrees").

606.    The Heat Alert threshold applicable to the Farm Line became the subject of two injunctions issued by this Court in May and August 2025.  ECF Nos. 253, 297.

607.    The Court notes that, in opposing those injunctions, Defendants argued in multiple appeals to the Fifth Circuit that a Heat Alert threshold of 91°F was perfectly safe and adequately supported, a position they have never abandoned.  *See* 2/3/26 Tr. 195:11–14 (Vannoy).  At the time of this filing, the Heat Alert threshold in HCP8 remains at a 91°F heat index.

608.    Notably, Defendants have acknowledged that utilizing a Heat Alert threshold of 88°F is not burdensome for LSP.  2/3/26 Tr. 296:14–16 (Vannoy).

609.    Only in the run-up to trial—in the dead of winter—did LSP revise Directive 13.067 to include the historic Heat Alert heat index threshold of 88°F.  *See* JX-042 at 1, 6.

610.    Based on the above-described evidence, the Court finds that the record clearly shows that LSP's decision to lower the Heat Alert threshold to 88°F in the January 9, 2026 version of Directive 13.067 was driven by litigation concerns.

611.    Indeed, just weeks before issuing the January 2026 version of Directive 13.067, Defendants expressed concerns about wanting to understand how their Heat Alert policies "would stand up in [C]ourt."  DX-059 at 2.

612.    The evidence is also clear that LSP's decision to revise Directive 13.067 in January 2026, and the process for that revision, was directed not by medical professionals or by scientists

129

(or even by prison officials), but by Defendants' lawyers. 2/5/26 Tr. 59:14–60:13 (Oliveaux admitting that the "exact changes made to Directive 13.067" in January 2026 were "communicated to [her] by counsel," and that those were the changes she made); s*ee also* 2/3/26 Tr. 100:19–22 (Toce testifying to his understanding that Defendants' counsel was involved in the decision to amend and revise Directive 13.067). In fact, Warden Vannoy admitted on the stand that the reason he lowered the Heat Alert threshold in Directive 13.067 was because he was instructed to do so by DOC's executive counsel, Mr. Jonathan Vining. 2/10/26 Tr. 8:4–9:2, 23:25–24:6.

613.    The manner in which the January 2026 revisions were implemented further demonstrates to the Court that these changes were made for litigation. For example, Deputy Warden Oliveaux testified at trial that she was informed by Warden Vannoy that "the department's legal counsel would reach out to [her]" to ask her to make "some changes and revisions" to Directive 13.067. 2/5/26 Tr. 58:24–59:3. She further testified that the exact changes made to Directive 13.067 in January 2026 were communicated to her "by counsel"—and that were the changes that she indeed did make to the policy. 2/5/26 Tr. 59:14–60:13.

614.    Dr. Toce's testimony also demonstrated that the January 2026 revisions to Directive 13.067 were done with this litigation in mind, rather than made because of any genuine concerns for health and safety. Dr. Toce—the most senior medical official at LSP—testified that, in his opinion, lowering the Heat Alert threshold in Directive 13.067 from 91°F to 88°F was not necessary. 2/3/26 Tr. 100:23–101:1. Nevertheless, when asked to sign off on the January 2026 revision, Dr. Toce testified that he did so by simply affixing his e-signature to the document and not substantively weighing in on the changes. 2/3/26 Tr. 99:24–100:3. Dr. Toce candidly testified that he understood that it was essential for him to sign off on the revised Directive 13.067 quickly because DOC was under a "time crunch" to get the new policy finalized before trial. 2/3/26 Tr.

130

99:13–23.  In other words, from Dr. Toce's perspective, the revision was not based on any medical reassessment or scientific bases, but on the exigency of this litigation's trial date.

615.    Indeed, the testimony at trial was clear:  in the process of creating the revised Directive 13.067 in January 2026, Defendants did not consult any experts, external reference materials, academic studies, government guidance materials, or scientific or medical research. 2/3/26 Tr. 192:6–19 (Vannoy admitting that DOC did not consult and external reference materials, academic studies regarding heat pathology, or guidance from governmental agencies in connection with the January 2026 revision); 2/3/26 Tr. 100:11–18 (Toce admitting that he did not consult any experts, other medical professionals, or scientific or medical research in connection with the January 2026 revision).

616.    Ultimately, Warden Vannoy admitted at trial that at least "part of" the reason for lowering the Heat Alert threshold when revising Directive 13.067 in January 2026 was due to litigation concerns. 2/3/26 Tr. 193:1–11.  Warden Vannoy did maintain, at the same time, that this revision was done, in part, to protect men on the Farm Line, but the Court does not find that assertion to be persuasive. *See* 2/3/26 Tr. 193:1–11.  For example, Warden Vannoy acknowledged during the trial that, when he sat for a deposition a mere two weeks before the trial, he testified under oath that the decision to revise the Heat Alert threshold in Directive 13.067 in January 2026 was "primarily driven by litigation concerns."  2/3/26 Tr. 193:12–24.

617.    Additionally, Warden Vannoy's purported concern for safety is belied by Defendants' actions:  Warden Vannoy admitted that he learned while sitting through the class certification proceeding in April 2025, that "88 degrees is the threshold that keeps [men on the Farm Line] safe," but LSP resisted adopting that threshold for another nine months, until suddenly adopting it less than one month before trial.  2/3/26 Tr. 193:1–11.

618.    In light of the evidence described above, the Court finds that Defendants' course of conduct with respect to lowering the Heat Alert threshold in the version of Directive 13.067 effective January 9, 2026, demonstrates that Defendants' changes were litigation-driven rather than motivated by genuine concern for the health and safety of men on the Farm Line. The Court further finds that there is no reasonable guarantee that LSP will not subsequently revert to the higher Heat Alert threshold established under HCP8.

### 2.    Heat Season

619.    Until very recently, both HCP8 and Directive 13.067 required that LSP track the heat index, call a Heat Alert, and provide heat-related protective measures from May 1 to October 31. *See* JX-014 at 4–5 (HCP8, dated Oct. 20, 2024); JX-042 at 3–4 (Directive 13.067, dated Jan. 9, 2026).

620.    However, the Court concludes based on the clear and undisputed record evidence, that the heat index at LSP can exceed the Heat Alert threshold outside of that heat season.

621.    For example, in November 2024, the heat index at LSP met or exceeded 88°F at times when the Farm Line was operating. JX-245 at 511–12.

622.    In April 2025, the heat index at LSP met or exceeded 88°F on eight separate days when the Farm Line was likely working. DX-060; 2/3/26 Tr. 210:9–14 (Vannoy).

623.    Dr. Vassallo has credibly testified that the heat season is arbitrary and heat precautions should be triggered based on weather conditions rather than calendar dates. 2/9/26 Tr. 30:13–21; PX-084 at 4. The Court agrees and finds that limiting heat precautions to the heat season rather than weather conditions is arbitrary and inadequately protective.

624.    The Court also finds that Defendants have long been aware that the heat index at LSP can exceed 88°F outside of the May to October heat season. *See, e.g.*, JX-245 at 511–12 (Joint Heat Letter stating that the heat index met or exceeded 88°F at times when the Farm Line

was operating in November 2024); 2/3/26 Tr. 199:21–200:19 (Vannoy confirming that Plaintiffs raised concern about the arbitrariness of LSP's heat season during the class certification evidentiary hearing in April 2025).

625.    In November 2025, when Plaintiffs deposed Warden Vannoy, he testified that it was possible that LSP would revise the heat season to require heat precautions year-round and that doing so would impose no burden on LSP.  2/3/26 Tr. 218:10–19.

626.    Yet, when LSP revised Directive 13.067 in January 2026, LSP decided not to amend the May to October heat season at that time.  JX-042 at 3; *see also* 2/3/26 Tr. 218:20–23 (Vannoy).  In fact, at that time there was no consideration of revising the heat season.  *See* 2/3/26 Tr. 219:8–13 (Vannoy); 2/3/26 Tr. 101:12–19 (Toce acknowledging that, when he signed off on the revisions to Directive 13.067 in January 2026, he did not consider changing the heat season dates even though, he agreed, it is possible for the heat index to exceed the Heat Alert threshold outside of those months).

627.    It was not until March 2026—two months after the January 2026 revisions and a month after the close of trial in this case—that LSP again revised Directive 13.067 to finally retire the arbitrary May to October heat season.  *See* DX-062.  Under this new version of the policy, LSP will now monitor the heat index year-round and call a Heat Alert anytime the heat index meets or exceeds 88°F.  PX-248 at 18–20 (Vannoy March 2026 dep.).

628.    Although this is a welcome development, the Court finds that Defendants have been on notice since November 2024 that the May to October heat season reflected in Directive 13.067 and HCP8 is arbitrary.  The Court further finds that Defendants' delay in eliminating the arbitrary heat season—despite Warden Vannoy's acknowledgment in November 2025 that year-round monitoring would impose no burden on LSP—demonstrates that Defendants' eventual revision in

133

March 2026 was litigation-driven.  Additionally, the Court notes that HCP8 still reflects a heat season of May to October, *see* JX-014 at 4–5, so LSP is technically free to revert to that policy without violating the minimum standards set forth by the department-wide policy.

### 3.    Weather Monitoring

629.    In order to accurately and promptly call Heat Alerts, LSP must track the heat index. Historically, LSP has tracked the heat index by using data gathered by the National Weather Service from its weather station at the New Roads False River Regional Airport ("New Roads"), which is the closest National Weather Service weather station to LSP.  2/3/26 Tr. 219:14–220:7 (Vannoy).

630.    Beginning in September and October 2024, DOC became aware of significant reliability issues with the National Weather Service data from New Roads.  2/3/26 Tr. 223:8–11; JX-245 at 357, 399 (Joint Heat Letters).

631.    Additionally, at the class certification evidentiary hearing in April 2025, the issue of the unreliability of National Weather Service data from New Roads was raised again; Warden Vannoy was present for this argument and recalled hearing about it.  2/3/26 Tr. 223:24–224:4.

632.    LSP's 2025 heat season began on May 1, 2025, shortly after that class certification evidentiary hearing.  2/3/26 Tr. 224:12–16 (Vannoy).

633.    And throughout that 2025 heat season, DOC continued to observe that the National Weather Service station at New Roads was often providing *no* heat data.  2/3/26 Tr. 224:17–21 (Vannoy admitting LSP's awareness of this); *see also* JX-245 at 708, 730, 755, 781, 805, 824, 1091, and 1104 (Joint Heat Letters).

634.    The Court finds that, for the period of approximately September 2024 through October 2025, Defendants were aware of the fact that the National Weather Service station at New

Roads was not reliably providing data and yet remained recklessly indifferent to this fact by not doing anything to obtain more reliable data.

635.    Indeed, in June 2025, DOC's executive counsel, Mr. Vining, emailed a weather monitoring service vendor called TSI (which was also referred to as "Quest" by some witnesses) regarding his interest in acquiring a heat monitoring system. *See* PX-241. This outreach from Mr. Vining to Quest, Warden Vannoy admitted, was undertaken in connection with this litigation. 2/3/26 Tr. 229:1–230:11; *see also* PX-241 (showing that email exchange with Quest was forwarded by Mr. Vining to Defendants' outside attorneys in this litigation).

636.    The Court finds, based on this email (PX-241) and Warden Vannoy's testimony about it, that Defendants recognized in June 2025 that National Weather Service data was inadequate for tracking the heat index (which, again, is necessary to accurately call Heat Alerts and provide necessary heat-related precautions), and that an alternative tracking method was necessary.

637.    Nevertheless, the record is clear that Defendants took no action to follow up with Quest until October 2025. *See* PX-241 (showing no follow up emails to Quest until October 9, 2025); 2/3/26 Tr. 230:12–16 (Vannoy admitting that he does not know of any communications between any LSP representatives and Quest between June 25, 2025 and October 9, 2025).

638.    Finally, in November 2025, LSP leased, for a rental term of one year with no obligation to re-lease, a weather monitoring system from a private company called Perry Weather. *See* 2/3/26 Tr. 230:22–25 (Vannoy), 197:9–12 (Vannoy admitting that Perry Weather is a private company), 234:16–23 (Vannoy admitting that Perry Weather system has been leased by LSP for only one year); 238:24–239:10 (Vannoy admitting that LSP has no obligation to re-lease the system from Perry Weather); *see also* DX-028 (DOC invoice showing payment made to Perry

135

Weather for a "yearly subscription for weather monitoring system"). To date, the Perry Weather system has not been used to call a Heat Alert while the Farm Line was operating. PX-248 at 23 (Vannoy March 2026 dep.).

639. Based on the above-described evidence and testimony, the Court finds that Defendants knew that heat index data from the National Weather Service was unreliable starting in approximately September 2024, but ignored this problem for over a year, until approximately November 2025, including by doing nothing to obtain more reliable heat index data throughout the entire 2025 heat season.

640. Indeed, although LSP installed the Perry Weather system in December 2025, it waited until March 10, 2026—a day after issuing the latest Directive 13.067—to start using it to monitor the heat index. PX-248 at 19–20 (Vannoy March 2026 dep.).

641. The following demonstrative, used at trial, illustrates the events described above.



642. The Court finds that LSP's decision to rent the Perry Weather system was primarily driven by litigation concerns (rather than genuine concern for addressing heat risks). The evidence shows

136

that this process involved extensive involvement of counsel: DOC's counsel, Mr. Vining, and Defendants' outside litigation counsel were both involved in discussions with Perry Weather about installing a system at LSP, *see* 2/3/26 Tr. 231:1–13 (Vannoy), and internal LSP communications stated that the Perry Weather system was purchased "per th[is] lawsuit," *see* PX-234. Moreover, when Perry Weather processed LSP's order, it originally listed Defendants' outside litigation counsel, as the customer on the order form rather than DOC or LSP. *See* PX-240; 2/3/26 Tr. 232:9–12 (Vannoy).

643. Warden Vannoy admitted at trial that at least "part" of LSP's decision to rent its Perry Weather system was because of this litigation. *See* 2/3/26 Tr. 233:2–11.

644. Additionally, the temporary nature of this arrangement raises additional concerns: LSP's Perry Weather system is rented for just one year, 2/10/26 Tr. 38:1–2 (Vannoy), and, despite Warden Vannoy's statement that he intends to renew LSP's lease at the end of the first lease term, he also admitted that LSP could choose not to do so, 2/3/26 Tr. 239:3–13. This is also true because HCP8—which, again, is the department-wide policy that sets the floor by which LSP must abide—does not require LSP to use the Perry Weather monitoring system and actually states that heat index monitoring should be informed by the National Weather Service. 2/3/26 Tr. 239:11–13 (Vannoy); *see also* JX-014 at 5 (HCP8, dated Oct. 20, 2024).

645. Finally, the Court finds that LSP's use of the private, on-site Perry Weather monitoring system decreases the transparency of LSP's Heat Alert procedures. This is because only DOC will have access to the weather data being recorded by LSP's Perry Weather system, and thus only DOC will know when LSP's system signals that the conditions for a Heat Alert have been triggered. 2/3/26 Tr. 240:3–11 (Vannoy). Notably, Warden Vannoy acknowledged that LSP

137

does not intend to share the data from its Perry Weather system with class members.  2/3/26 Tr. 240:12–14.

### 4. Defendants' Changes to the Heat Pathology Medications List and the Medical Exclusion List

646.    Prior to 2024, Defendants did not have a comprehensive medications list that identified medications affecting thermoregulation and increasing a person's risk of heat-related illness such that a person should receive HPDS.  In particular, the list of medications attached to the version of HCP8 in effect when this litigation began contained only 22 medications, all in the category of psychotropics.  *See* JX-009 at 8 (HCP8, dated Aug. 21, 2018; 2/9/26 Tr. 124:17–22 (Reynolds-Barnes); 4/23/25 Class Cert. Tr. 212:17–23 (Lavespere).

647.    Prior to 2024, Defendants did not have a comprehensive list of medical conditions that were considered to increase a person's risks of heat-related illness for use in identifying people who should receive HPDS.  Dr. Lavespere confirmed during cross-examination that from the time the State of Louisiana purchased Angola in 1901 through October 2024, LSP never maintained a medical exclusion list identifying conditions that placed incarcerated persons at heightened risk of heat-related illness.  2/5/26 Tr. 245:11–246:5.

648.    Instead, the version of HCP8 in effect at the start of this litigation noted that men with four specific chronic illnesses—morbid obesity, cardiovascular disease, respiratory disease, and diabetes mellitus—"may" have a higher risk of heat-related illness.  *See* JX-009 at 2 (HCP8, dated Aug. 21, 2018).

649.    In connection with revising HCP8 in October 2024, and as a result of this litigation, DOC revised both its list of heat pathology medications and its list of chronic illnesses that can qualify a person for HPDS.  2/5/26 Tr. 245:11–23, 247:9–248:4 (Lavespere testifying that this litigation was the catalyst for the revisions to the August 21, 2018 lists).

138

650.    DOC did so on reliance of the opinions of the two litigation experts it retained in connection with this case, Dr. Reynolds-Barnes and Dr. Keldie, who were hired in approximately June 2024.    *See* 2/5/26 Tr. 245:11–23 (Lavespere); 2/10/26 Tr. 113:16–114:10 (Keldie). Dr. Reynolds-Barnes was primarily involved in revising the Heat Pathology Medications List that is now reflected in Attachment A.    *See* 2/9/26 Tr. 124:2–12 (Reynolds-Barnes); 2/10/26 Tr. 114:11–15 (Keldie); *see also* JX-018 (Heat Pathology Medications List).    Dr. Keldie was primarily responsible for expanding the list of chronic conditions that is now reflected in Attachment B. 2/10/26 Tr. 114:16–20 (Keldie); 2/3/26 Tr. 341:5–8 (Lavespere); *see also* JX-016 (Medical Exclusion List).

*(a)    Changes to the Heat Pathology Medications List*

651.    Dr. Reynolds-Barnes developed the 2024 Heat Pathology Medications List as a clinical decision support tool showing anticholinergic, or "ACH," risk scores from 3 to 0.    2/9/26 Tr. 133:7–23.    In that list, an ACH risk score of 3 represents the highest risk, and medications with that score were placed on the Heat Pathology Medications List.    2/9/26 Tr. 133:14–134:18 (Reynolds-Barnes).

652.    As revised, the Heat Pathology Medications List includes:  anticholinergics, beta blockers, antispasmodics, antimuscarinics, tricyclic antidepressants, skeletal muscle relaxants, diuretics, anti-seizure medications, nitrates, stimulants, loop diuretics, and non-dihydropyridines. 2/9/26 Tr. 155:8–25 (Reynolds-Barnes); JX-018.

653.    Dr. Vassallo credibly testified that even now, the Heat Pathology Medication List remains underinclusive and omits several medications known to impair thermoregulation.  4/23/25 Class Cert. Tr. 116:4–13 (Vassallo confirming her opinion that LSP's Heat Pathology Medications List is underinclusive).    The evidence supports this conclusion for the reasons set forth below.

139

654.    Selective Serotonin Reuptake Inhibitors ("SSRIs") are not on the Heat Pathology Medications List.  JX-018; 2/3/26 Tr. 336:23–25 (Lavespere).  SSRIs are medications commonly used to treat depression and anxiety disorders.  2/9/26 Tr. 142:4–13 (Reynolds-Barnes); PX-084 at 12–13 (Vassallo March 2025 decl.).

655.    SSRIs impair the function of the hypothalamus, which in turn impacts the ability of the hypothalamus to respond to and regulate the body's temperature.  *See* PX-084 at 12–13 (Vassallo March 2025 decl.); 4/23/25 Class Cert. Tr. 69:17–70:6 (Vassallo); 4/23/25 Class Cert. Tr. 281:15–22 (Reynolds-Barnes).

656.    Dr. Vassallo testified that it is well established that SSRIs put persons at heat-related risk.  2/9/26 Tr. 17:20–18:2.

657.    Angiotensin-Converting Enzyme ("ACE") inhibitors and Angiotensin Receptor Blockers ("ARBs") are additional categories of drugs not listed on the Heat Pathology Medications List.  *See* JX-018; 2/3/26 Tr. 337:8–15 (Lavespere).

658.    Dihydropyridine calcium channel blockers are also not on the Heat Pathology Medications List.  *See* JX-018.  Dr. Lavespere testified that the Heat Pathology Medications List separated out calcium channel blockers into dihydropyridines and non-dihydropyridines, and that only the non-dihydropyridines because of their effect on the heart were placed on the list, while dihydropyridines, because of their effectiveness on the vascular system, were not included.  4/23/25 Class Cert. Tr. 196:20–197:3.

659.    Dr. Vassallo testified at trial that ARBs and ACE inhibitors are used to treat hypertension and they disturb fluid and electrides, lowering blood pressure through its effects on sodium and fluids.  2/9/26 Tr. 19:1–8.  Dr. Vassallo further testified that ACE inhibitors, ARBs,

and dihydropyridines depress cardiac function, impair cardiac output, and/or cause dehydration, all of which increase the risk of heat-related illness.  2/9/26 Tr. 19:1–22.

660.    Dr. Reynolds-Barnes acknowledged that the World Health Organization (the "WHO") and the CDC include SSRIs, ACE inhibitors, ARBs, and dihydropyridines on their heat pathology medication lists.  2/9/26 Tr. 173:19–175:10 (Reynolds-Barnes).  To the Court's surprise, Dr. Reynolds-Barnes called into question the CDC and WHO without basis or literature to support her skepticism.  2/9/26 Tr. 174:2–175:9, 177:17–178:18, 197:20–199:16.

661.    Dr. Reynolds-Barnes cited only one article, a study from Lancet, in support of excluding SSRIs, ARBs, and ACE inhibitors from the Heat Pathology Medications List.  4/23/25 Class Cert. Tr. 282:22–283:1, 291:13–16, 295:1–5 (Reynolds-Barnes).   Dr. Reynolds-Barnes admitted that she could not have relied on the Lancet article to inform her decision to exclude these medications since that article was published after she issued her report.  DX-036 (Reynold-Barnes Sept. 2024 decl.); 4/23/25 Class Cert. Tr. 283:2–25.

662.    The Court finds that the Lancet study largely contradicts well-established global authorities such as the WHO that include medications like SSRIs on lists of medications that cause heat-related illness.  Further, Dr. Reynolds-Barnes acknowledged that the Lancet article did not analyze studies of ACE inhibitors or ARBs at all.  4/23/25 Class Cert. Tr. 293:7–294:4.

663.    Dr. Reynolds-Barnes did not provide Plaintiffs or this Court with a list of studies or literature that she reviewed to reach her conclusions about the medications she decided to include on her list.  2/9/26 Tr. 153:3–12 (Reynolds-Barnes).

664.    Dr. Reynolds-Barnes did not keep track of what literature she reviewed, and therefore could not provide a complete list of the scientific literature and studies she may have relied on in support of her conclusions.  2/9/26 Tr. 153:20–23 (Reynolds-Barnes).

141

665. The Court also finds that Dr. Reynolds-Barnes ignored literature that could support the conclusion that SSRIs, ACE inhibitors, ARBs, and dihydropyridines should be on the Heat Pathology Medications List, even though she has repeatedly stated that if there was sufficient literature to support their inclusion, she would include them. *See* 2/9/26 Tr. 162:12–165:8, 167:2–169:24, 185:6–189:8; 4/23/25 Class Cert. Tr. 292:6–12, 295:18–25.

666. Based on the foregoing, the Court concludes that the revised Heat Pathology Medications List remains underinclusive, as it omits SSRIs, ACE inhibitors, ARBs, and dihydropyridine calcium channel blockers—all of which are recognized by leading global health authorities as medications that increase the risk of heat-related illness.

### (b) Changes to the Medical Exclusion List

667. The Court heard testimony and has received evidence showing that the Medical Exclusion List, dated October 20, 2024, was also revised and expanded. JX-016.

668. As a threshold matter, the Court has serious concerns regarding Dr. Keldie's credibility and qualifications as they pertain to the Medical Exclusion List and any revisions or modifications thereto. The Court previously found Dr. Keldie to be "wholly uncredible" following his testimony at the April 24, 2025 class certification evidentiary hearing. 2/10/26 Tr. 102:12–15 (Keldie acknowledging awareness of the Court's finding).

669. Dr. Vassallo testified before this Court and has opined that the revised Medical Exclusion List remains underinclusive.

670. The Medical Exclusion List does not identify diabetes mellitus as a chronic condition that, absent other comorbidities, is known to impair thermoregulation. JX-016; 2/3/26 Tr. 341:9–10 (Lavespere). The prior version of HCP8 did identify diabetes mellitus as a chronic condition that carries a higher risk of heat pathology. *See* JX-009 at 2 (HCP8, dated Aug. 21, 2018); 2/3/26 Tr. 341:11–15 (Lavespere).

142

671. Dr. Vassallo opined that it is well settled that people with diabetes or pre-diabetes are at increased risk of heat stroke and heat-related disorders because diabetes causes blood vessels to be unable to dilate adequately and unable to deliver sufficient blood and nutrients to the body, which compromises vasodilation and increases the risk of heat stroke. PX-084 at 14–15 (Vassallo March 2025 decl.); 2/9/26 Tr. 20:10–21:14 (Vassallo). The Court finds no justification in the record for the omission of diabetes mellitus from the Medical Exclusion List.

672. Coronary artery disease is not listed on the Medical Exclusion List. JX-016; 4/23/25 Class Cert. Tr. 200:11–19 (Lavespere). Dr. Keldie testified that he did not include coronary artery disease on the list, instead using only "ischemic heart disease." 2/10/26 Tr. 145:15–146:5. Dr. Vassallo opined that coronary artery disease should be on the Medical Exclusion List because reduced blood flow to the heart muscle can cause reduced cardiac output, which impairs both vasodilation and sweating, increasing the chances of heat stroke and other heat-related disorders. PX-084 at 15 (Vassallo March 2025 decl.).

673. The Court observes that the Medical Exclusion List contains several conditions that appear artificially qualified or limited without a scientific basis. Dr. Vassallo opined that Dr. Keldie lists "refractory seizure disorder" and "resistant hypertension," when in fact any seizure disorder and any hypertension will increase a patient's risk of heat stroke and heat-related disorders. PX-084 at 15 (Vassallo March 2025 decl.). The Court finds that there is no scientific basis to support the severity qualifiers proposed by Dr. Keldie; they appear to be Dr. Keldie's own creation.

674. Based on the foregoing, the Court concludes that the revised Medical Exclusion List remains underinclusive, as it omits diabetes and coronary artery disease altogether, and unqualified seizure disorder and hypertension. The omission of diabetes—a condition previously

143

recognized in HCP8 as posing a higher risk of heat pathology—is particularly troubling, as is the exclusion of coronary artery disease and the use of unsupported severity qualifiers that artificially limit the conditions that would entitle an incarcerated person to HPDS. The Court gives significant weight to the testimony of Dr. Vassallo, who is a qualified expert in thermoregulation, and gives limited weight to the opinions of Dr. Keldie on these matters, in light of his lack of qualifications, his prior credibility findings, and the absence of scientific support for his proposed severity scales.

*(c)       LSP Did Not Consider the ADA in Revising Directive 13.067.*

675.    The Court heard testimony from Deputy Warden Oliveaux, that the ADA had nothing to do with any of the revisions to Directive 13.067 in January 2026 and that the ADA "never came up" during the revision process. 2/5/26 Tr. 60:23–61:6. Deputy Warden Oliveaux played no substantive role in the March 2026 revision either. PX-248 at 18 (Vannoy confirming that Oliveaux's role was merely "typ[ing]" the changes he asked her to make).

676.    The Court finds it deeply concerning that LSP's ADA Coordinator played no substantive role in evaluating the ADA implications of Directive 13.067. As Deputy Warden Oliveaux herself testified, if someone with a disability is not properly identified and assigned a duty status, it may pose a health risk to that person. 2/5/26 Tr. 50:20–51:4 (Oliveaux). The ADA requires LSP to provide reasonable accommodations to incarcerated people with disabilities, which, at LSP, can include adjustments to their duty status. 2/5/26 Tr. 49:25–50:12 (Oliveaux). Yet the evidence shows that Defendants revised the very policy governing eligibility for and treatment of people with HPDS without any consideration of their obligations under the ADA.

677.    The Court concludes that the failure to consider the ADA in revising Directive 13.067 further undermines the adequacy of the current administrative framework and reflects a disregard for the rights of incarcerated persons with the disability of impaired thermoregulation.

144

### 5.      Defendants' Changes to Shade Available on the Farm Line

678.      The Court finds that, when this litigation began, LSP did not provide any source of shade to men laboring on the Farm Line.  *See, e.g.*, 4/23/25 Class Cert. Tr. 155:9–15 (Jones testifying that, before this litigation, he "never had shade" on the Farm Line, except for the shade provided by corn or okra plants); JX-087 at 7 (response to ARP filed by Mr. Demaris Jackson, noting that, by letter of June 2023, Mr. Jackson complained that the conditions on the Farm Line included "no shade"); JX-090 at 8 (response to ARP filed by Mr. Smith, noting the same).

679.      In approximately June 2024, LSP purchased "10x10-foot pop-up canopy tents" to use to provide shaded rest areas on the Farm Line.  JX-245 at 3; *see also* JX-229 at 54 (DLC for June 26, 2024 noting that an LSP officer brought a pop-up tent out to the Farm Line).

680.      The Court finds that this purchase of pop-up tents was done in direct response to this litigation.  *See* JX-245 at 3 (noting that, at a motions hearing on Plaintiffs' first motion for preliminary injunction, "this Court encouraged LSP . . . that shade be provided during breaks").

681.      In approximately October 2024, LSP began using structures they called "shade wagons" (or "shade trailers"), which were trailers on wheels with benches and a roof that provided some shade at some times of the day.  *See* PX-043 at 3 (Oliveaux affidavit stating that shade wagons were constructed and implemented in October 2024); PX-084 at 16 (Vassallo describing shade wagons); 4/24/25 Class Cert. Tr. 15:5–9 (Sylvester).

682.      The Court finds that LSP's shade wagons had significant limitations:  they did not provide shade except for when the sun was perfectly positioned above the roof, and they did not provide enough seating for all men working on the Farm Line to sit in the shade at the same time. *See* 2/3/26 Tr. 78:4–14 (Major testifying that there were only approximately 25 seats on LSP's shade wagons, and that the shade wagons only provided shade "for a moment, when the sun is in the right position").

145

683.    When Warden Vannoy returned to LSP as warden in November 2025, he came up with the idea of improving the shade available on the Farm Line, acknowledging that LSP could do "better."  *See* 2/9/26 Tr. 325:4–9 (Vannoy).  Warden Vannoy's idea for improving the availability of shade was to construct what he calls "shade pavilions" in the fields at LSP.  *Id.*

684.    The shade pavilions include a concrete base, a roof, benches, electricity, fans, and water spigots.  PX-043 at 3 (Oliveaux affidavit); *see also* JX-220 (image of prototype shade pavilion submitted by Defendants to the Court on April 11, 2025.

685.    In April 2025, in connection with opposing Plaintiffs' second motion for preliminary injunctive relief, Defendants represented to the Court that they had begun and would continue to construct such shade pavilions on the Farm Line to provide shade.  *See* PX-043 at 3 (Oliveaux affidavit); *see also* 2/10/26 Tr. 18:14–19 (Vannoy).

686.    However, the Court finds that this representation was not accurate:  the record demonstrates that LSP had not completed construction of the shade pavilions and class members were unable to use them until well after the peak of the 2025 heat season.  2/3/26 Tr. 291:22–292:3 (Vannoy testifying that pavilions probably were not being used during the 2025 heat seasons); *see also* 2/10/26 Tr. 19:6–9 (Vannoy acknowledging same).  In particular, Warden Vannoy admitted that LSP did not begin "working hard" on constructing its shade pavilions until after this Court toured the Farm Line in September 2025.  2/10/26 Tr. 18:20–19:17.

687.    The Court finds that approximately six months elapsed between when Defendants boasted to this Court about having shade pavilions (in April 2025) and when they actually began making shade pavilions available to men on the Farm Line (in November 2025).

146

688.    Yet, once the peak of the heat season ended, LSP was apparently able to construct shade pavilions rapidly: between November 2025 and January 21, 2026, LSP was able to construct and get 25 shade pavilions fully operational. 2/3/26 Tr. 289:14–291:5 (Vannoy).

689.    The Court finds this timing suspect: it is evident that LSP's priorities in constructing shade pavilions were not to provide shade to men on the Farm Line during the hottest months of the year in 2025, but to get shade pavilions up and running in the middle of winter in time for trial in this action.

690.    In developing the design for its shade pavilions, LSP did not seek advice from any expert or consultant, nor did LSP review any reference materials. 2/10/26 Tr. 20:4–12 (Vannoy). LSP did not even seek the advice of its own expert, Dr. Keldie. 2/10/26 Tr. 208:10–12 (Keldie).

691.    Based on this evidence, the Court concludes that LSP's construction of the shade pavilions was primarily driven by this litigation, rather than by a genuine concern for abating the heat-related health risks present on the Farm Line.

692.    Regarding whether the shade pavilions do meaningfully abate the heat-related health risks present on the Farm Line, Dr. Vassallo opined that although the shade provided by LSP's pavilions is better than nothing, shade does not effectively prevent or reduce serious heat-related risks because "the heat index isn't changed by shade" because the heat index reflects a measure *taken in* the shade. 2/9/26 Tr. 26:3–27:5 (Vassallo).

693.    Warden Vannoy likewise testified, acknowledging awareness of the scientific fact, that "being in a shaded area like under a shade pavilion does not change the heat index," and that if the heat index is, for example, 89°F, a person under a shade pavilion is being exposed to a heat index of 89°F. 2/10/26 Tr. 39:17–24. Warden Vannoy testified to his awareness that outside the shaded area, although the heat index would remain the same, it may feel even hotter because of

147

the effect of direct sunlight.  2/10/26 Tr. 39:25–40:5 (Vannoy); *see also* JX-224 at 190 (NIOSH report) ("exposure to full sunshine can increase heat index values by up to 15°F."); 4/23/25 Class Cert. Tr. 203:8–204:23 (Lavespere confirming the National Weather Service warns that heat index is for shaded areas only and that the felt heat index can feel up to 15°F hotter under direct sun).

694.    The Court also heard testimony from Dr. Vassallo that, from a medical perspective, the shade pavilions do not "provide effective cooling to class members" because "shade, rest, and water is separate from cooling," and only true "cooling" has the effect of abating the cumulative heat load experienced by men on the Farm Line.  2/9/26 Tr. 26:3–27:12, 28:8–12 ("Shade is good, but it's not cooling.").[9]  Dr. Vassallo opined that the shade pavilions currently in use at LSP "do[] not provide cooling that would reduce the substantial risk of heat-related morbidity or mortality from labor on the Farm Line" because "[t]he structures are not 'cooling stations,' as they do not cool the air or the person," and that "[w]ithout climate control (like air conditioning), fans will [] not mitigate the risk of heat-related morbidity and mortality faced by men on the Farm Line."  PX-085 at 3–4 (Vassallo Nov. 2025 decl.).  The Court finds this opinion credible.

695.    With respect to the fans installed in the shade pavilions, Dr. Vassallo credibly explained that the science is clear that fans are not effective at reducing risks of heat-related illness at high heat indexes.  2/9/26 Tr. 28:13–21, 74:2–21; *see* PX-085 at 4–6 (Vassallo Nov. 2025 decl.) *see also supra* ¶ 485.

---

[9]    Earlier in this litigation, the parties had disputed the effectiveness of the then-unfinished heat pavilions due to their distance from the fields where the Farm Line was working and the impracticality and physical effort it would take men on the Farm Line to walk such distance to access the shade.  The Court notes that the "post orders" issued on January 20, 2026 and a memo issued after the close of trial, instruct field operation staff not to count the time it takes to walk to the shaded area as part of the allocated 15-minute work break.  *See, e.g.*, DX-048 at 033418–19; *see* DX-062 at 12.  Perhaps because the shade pavilions were only completed weeks before trial and because the memoranda were issued so close to or after trial, little evidence on these issues was presented.  Because the Court finds that the shade pavilions are ineffective irrespective of their distance from the worksite, it makes no findings on this issue.

696.    Dr. Vassallo further noted that misting fans, which distribute mist droplets, can be effective to reduce some heat-related risks, even though it is her opinion that even misting fans would not substantially reduce risks of serious heat-related harm.  2/9/26 Tr. 29:3–21.

697.    LSP has not installed misting fans in the shade pavilions on the Farm Line—even though misting fans are used (or at least have in the past been used) in livestock pens at LSP. 2/3/26 Tr. 285:2–22 (Vannoy confirming that LSP previously had misting fans in the catch pen, and he has no reason to believe that has changed); 2/4/26 Tr. 30:18–31:22 (Smith testifying to seeing misting fans at LSP in the catch pens, but never on the Farm Line).

### 6.    Unchanged Heat-Related Policies and Practices

698.    Above, the Court has outlined the relevant changes made during the course of this action by Defendants to the applicable heat pathology policies and practices relevant to the Farm Line.

699.    It is also important to consider the provisions of the applicable heat pathology policies that have not changed over the course of this action.  The Court observes that LSP has revised Directive 13.067 very recently, both in January 2026 and March 2026.  Accordingly, it is highly relevant for the Court to understand what parts of that policy (or the practices governed by that policy) were not changed, especially in light of certain known deficiencies in the policy.

700.    Indeed, Warden Vannoy admitted at trial that, when LSP revised Directive 13.067 in January 2026, it knew "that the existing policy was deficient in multiple ways," but the "only things [it] chose to revise were lowering the Heat Alert threshold and implementing the Perry Weather system."  2/10/26 Tr. 23:2–10.

701.    When LSP revised the policy again in March 2026, Defendants again chose not to adopt all of the measures they knew were necessary to protect men on the Farm Line.

149

### (a)    Continued Use of Heat Index Measure

702.    Defendants have, throughout this litigation, relied on the heat index to measure heat conditions at LSP.  *See* JX-014 at 1 (HCP8); DX-062 at 3 (Directive 13.067).

703.    Heat index measures the apparent or "feels like" temperature.  *See* JX-014 at 1 (HCP8 defining the heat index as the "perceived temperature in degrees Fahrenheit derived from a combination of the temperature and humidity for the indicated hour"); PX-084 at 8 (Vassallo explaining that heat index "combines air temperature and relative humidity to represent how hot the conditions feel at rest").

704.    Heat index is measured in the shade and does not account for the impact of direct sunlight on the body.  2/9/26 Tr. 26:14–27:5 (Vassallo testifying that heat index "isn't changed by" the presence of shade); PX-084 at 7–8 (Vassallo explaining that "the heat index is measured in the shade" and "does not account for the effects of wind, sunlight, radiant heat sources, or workload"); *see also* 2/10/26 Tr. 39:17–40:11 (Vannoy agreeing that heat index does not account for influence of direct sunlight); 4/23/25 Class Cert. Tr. 204:10–19 (Lavespere conceding same).

705.    The Wet Bulb Globe Temperature ("WBGT") is an alternative method of measuring heat conditions.  *See* 2/3/26 Tr. 244:20–23 (Vannoy).

706.    WBGT is the only measure of heat that accounts for the effect on the body of direct sunlight.  *See* 2/10/26 Tr. 39:12–40:11 (Vannoy).

707.    Defendants acknowledge that WBGT is a more accurate measure of heat conditions than the heat index.  *See, e.g.*, 2/10/26 Tr. 38:17–39:4 (Vannoy admitting that after attending a demonstration with Perry Weather in November 2025, it was his understanding that WBGT was more accurate than the heat index).

708.    Additionally, government agencies including NIOSH, the CDC, and OSHA widely agree that WBGT is more accurate, efficient, and effective than heat index monitoring alone.  *See,*

150

*e.g.*, 4/23/25 Class Cert. Tr. 207:24–208:1 (Lavespere admitting that OSHA recommends WBGT); 4/24/25 Class Cert. Tr. 92:18–21 (Keldie admitting same). For example, NIOSH has recommended WBGT as the "index most frequently used and recommended for use throughout the world." PX-084 at 8 (Vassallo March 2025 decl.); JX-224 at 146 (NIOSH report). OSHA similarly states that "[w]orkplace environmental heat should be measured on-site using WBGT meters" and that "[u]se of heat index is a less desirable substitute." PX-084 at 8 (Vassallo March 2025 decl.).

709. Defendants admit that WBGT accounts for a greater number of factors that affect heat stress, including the effect of direct sunlight. 2/10/26 Tr. 39:5–14, 40:6–9 (Vannoy).

710. In fact, the National Weather Service, NIOSH, and OSHA all warn that direct sunlight can increase the heat index by 13.5°F to 15°F—a margin that could mean the difference between safe working conditions and life-threatening heat exposure for men laboring in LSP's unshaded fields. *See* PX-084 at 7 (Vassallo March 2025 decl.).

711. The Perry Weather system that LSP has leased has the capability to monitor and report on the WBGT at LSP. 2/3/26 Tr. 245:11–16 (Vannoy).

712. Yet, when LSP revised Directive 13.067 in January 2026, it did not revise the policy to adopt WBGT to monitor heat conditions at LSP. *See* JX-042 at 1, 4.

713. Notably, DOC's litigation counsel was involved in the decision not to use WBGT when calling Heat Alerts. 2/3/26 Tr. 247:24–248:3 (Vannoy).

714. When asked about this decision, Warden Vannoy claimed that LSP is "wait[ing] until the heat season to get the correlation between the heat index and what the wet bulb is going to produce . . . and take the best one." 2/3/26 Tr. 244:24–245:6.

715.    However, Perry Weather itself reports that, for situations where "precision and heat safety is required" such as "outdoor events" like the Farm Line, WBGT is preferred.  2/10/26 Tr. 41:15–20 (Vannoy).

716.    Despite LSP's ability to track the WBGT through its Perry Weather system, the latest and operative version of Directive 13.067, which was revised after trial in March 2026, continues to mandate reliance on the heat index to call Heat Alerts.  DX-062 at 3.

717.    The Court finds that there is no legitimate basis for LSP not to have incorporated WBGT into its heat pathology policies when revising Directive 13.067 in either January 2026 or March 2026.  Defendants' claims that they are waiting for the heat season to get additional data is accorded little weight as both of those revisions were undertaken after LSP definitively learned from Perry Weather that WBGT is more accurate.

### (b)    Continued Use of 113 Degree Work Stop Threshold

718.    Directive 13.067 and HCP8 contain a provision mandating LSP to stop all outdoor work at a heat index of 113°F.  DX-062 at 6, JX-014 at 6.

719.    Pursuant to this policy, all men who are not brought inside after a Heat Alert is called (i.e., all men who do not have HPDS) are required to continue to work on the Farm Line after a Heat Alert is called until the heat index reaches 113°F, at which point all outdoor work at LSP is required to stop.  2/3/26 Tr. 185:2–8 (Vannoy); PX-248 at 45 (Vannoy March 2026 dep.).

720.    Evidence in the record demonstrates that a heat index of 113°F is well over the "Danger" threshold.  *See* JX-224 at 190 (NIOSH report).  In fact, a chart originally published by the National Oceanic and Atmospheric Administration and reproduced by the National Weather Service and NIOSH—which Defendants purported to rely upon in establishing the Heat Alert and stop work thresholds in HCP8—reports a "Danger" zone when the heat index hits 103°F.  *See* JX-224 at 190 (NIOSH report); 4/23/25 Class Cert. Tr. 208:6–23 (Lavespere confirming that

152

Defendants used this chart in revising HCP8). Accordingly, Dr. Vassallo opines that all outdoor work at LSP should cease at a heat index of 103°F. PX-084 at 9 (Vassallo March 2025 decl.).

721. As noted, the heat index values in the NIOSH chart do not account for the effect of the direct sun under which the Farm Line often works. JX-224 at 190 (NIOSH report stating that "exposure to full sunshine can increase heat index values by up to 15°F").

722. Recognizing that the effect of direct sunlight may actually add significantly to the risk experienced by men on the Farm Line, the Court nevertheless finds 103°F to be a scientifically significant threshold.

723. No evidence in the record at trial indicates 113°F is a scientifically meaningful threshold, particularly for outdoor work in direct sunlight.

724. During the summer of 2025, Warden Vannoy implemented an informal practice of ceasing outdoor work once the heat index reached 110°F—a threshold still well over the "Danger" zone identified by NIOSH. *See* 2/3/26 Tr. 249:25–250:3 (Vannoy); JX-224 at 190 (NIOSH report).

725. Warden Vannoy testified that he implemented this practice because he believed it was a necessary "precaution" to allow some buffer time to bring men inside before the heat index reached 113°F. 2/3/26 Tr. 250:4–10.

726. However, no evidence in the record at trial indicates 110°F is a scientifically meaningful threshold, particularly for outdoor work in direct sunlight.

727. In November 2025, during a deposition, Warden Vannoy testified that it was "quite possible" that LSP would revise Directive 13.067 to codify the 110°F threshold. 2/3/26 Tr. 250:11–15. However, when LSP revised that policy in January 2026, it decided to maintain the 113°F threshold at which all outdoor work must cease. 2/3/26 Tr. 250:16–19 (Vannoy); *see also* JX-042 (Directive 13.067).

153

728.    At trial in February 2026, Warden Vannoy testified that he still believed that ceasing outdoor work at 110°F is "a precaution worthy of implementing."  2/3/26 Tr. 250:20–23.

729.    When LSP again revised Directive 13.067 in March 2026, LSP again chose not to revise the 113°F work stoppage threshold provision.  DX-062 at 6.

730.    Instead, in March 2026, Warden Vannoy issued a memorandum to "LSP Control Center Staff" directing them that, going forward, they should send a radio alert halting all outdoor work if the heat index at LSP reaches 110°F.  *See* DX-062 at 11.

731.    That practice—of sending a radio alert halting all outdoor work if the heat index at LSP reaches 110°F—is not codified in Directive 13.067 and, therefore, the Court finds that it lacks the permanence of a formal policy revision.

732.    Moreover, on the same day that Warden Vannoy issued the memorandum to the Control Center Staff regarding a 110°F work stoppage threshold, he also issued two additional memoranda—one to all "LSP Employees" and another to "LSP Field Operations Staff"—both stating that outdoor work is to cease at 113°F.  *See* DX-062 at 9–10, 12–13.

733.    Given the conflicting directives in these memoranda and, more importantly, the conflict with the controlling 113°F threshold in Directive 13.067 and HCP8, the Court affords little weight to the memorandum issued to LSP's Control Center Staff.

> (c)    *Decision Not to Set Maximum Time to Bring Men with HPDS Indoors*

734.    As described above, Directive 13.067 requires that men with HPDS be brought inside when a Heat Alert is called.  DX-062 at 5; 2/3/26 Tr. 258:12–15 (Vannoy).

735.    According to Warden Vannoy, putting men on the bus to bring them back from the Farm Line to the dorms is considered "inside," for the purposes of this policy, but putting them on shade wagons is not.  2/3/26 Tr. 258:16–19, 261:18–21.

736.    Despite this, the evidence demonstrates that Defendants have routinely left men with HPDS outside for prolonged periods after a Heat Alert has been called.  For example, Warden Vannoy admitted that LSP's internal records demonstrate that, on June 6, 2025, 19 people with HPDS were left outside for an hour and 15 minutes after a Heat Alert was called, before being loaded on to the bus.  *See* 2/3/26 Tr. 259:9–261:21; *see also* JX-233 at 41–42 (DLC documenting Farm Line activities for June 6, 2025).  Warden Vannoy agreed that this was "obviously too long of a wait."  2/3/26 Tr. 262:2–8.

737.    Warden Vannoy admitted that LSP's records demonstrate that on June 12, 2025, nine people with HPDS were left outside for 48 minutes after a Heat Alert was called before being loaded onto the bus, and Vannoy also admitted that this was too long to wait.  2/3/26 Tr. 262:12–263:20; *see also* JX-233 at 46–47 (DLC documenting Farm Line activities for June 12, 2025).

738.    The same thing occurred on June 17, 2025:  11 men identified by LSP as being heat-sensitive had to wait outside for an hour and 10 minutes after a Heat Alert was called before they were brought onto the bus.  2/3/26 Tr. 263:21–264:16 (Vannoy); *see also* JX-233 at 49 (DLC documenting Farm Line activities for June 17, 2025).

739.    And again, on June 18, 2025, 16 people with HPDS were left outside in the heat for an hour and five minutes after a Heat Alert was called.  2/3/26 Tr. 264:18–265:12 (Vannoy); *see also* JX-233 at 50 (DLC documenting Farm Line activities for June 18, 2025).

740.    Indeed, Warden Vannoy testified that he believes it should take no longer than 15 to 20 minutes to bring men with HPDS onto the buses after a Heat Alert has been called, and acknowledges that a delay of an hour or longer is "extremely too long."  2/3/26 Tr. 268:11–269:13.

741.    Nevertheless, when LSP revised Directive 13.067 in January 2026, it chose not to codify in the policy a maximum amount of time for bringing men with HPDS onto the bus after a

155

Heat Alert is called. 2/10/26 Tr. 24:7–19 (Vannoy admitting that LSP chose not to set a maximum time for bringing men with HPDS indoors after a Heat Alert had issued, even though there were occasions during the 2025 heat season when men with HPDS should have "been brought in a lot earlier" than they were).

742.    At trial, Plaintiffs presented evidence that, on numerous occasions during the 2025 heat season, Defendants failed to protect men with HPDS, whether by failing to call a heat alert, calling a heat alert and failing for prolonged periods to bring men with HPDS inside, or calling a heat alert and failing to identify men with HPDS altogether, in each case effectively denying those men the protections that Defendants themselves acknowledge are important to their health and safety. *See* PX-245 at 1–2 (Pls' FRE 1006 exhibit); 2/3/26 Tr. 259:9–269:16 (Vannoy); 2/10/26 Tr. 33:6–34:1 (Vannoy); 2/4/26 Tr. 331:17–332:7 (Karisny).

743.    Nevertheless, when Defendants again revised Directive 13.067 in March 2026 following the trial, LSP again decided not to codify a maximum time for bringing men with HPDS inside after a Heat Alert is called. *See* PX-248 at 54 (Vannoy March 2026 dep.); DX-062 at 3. Accordingly, the currently effective version of Directive 13.067 does not contain any language providing parameters regarding the amount of time in which LSP must bring men with HPDS indoors after a Heat Alert is called.

744.    In March 2026, Warden Vannoy issued a memorandum to LSP's Field Operation Staff purporting to impose a 30-minute limit for bringing men on to buses following the issuance of a Heat Alert. DX-062 at 12–13. The purported reason for this was that DOC's Chief Medical Officer, Dr. Lavespere, advised LSP that men with HPDS should, presumably for their health and safety, be brought indoors within 30 minutes of a Heat Alert being called. *See* PX-248 at 32 (Vannoy March 2026 dep.). Other than Dr. Lavespere, Warden Vannoy consulted no other source

to determine whether a 30-minute period after a Heat Alert is safe for men recognized to be at heightened risk of heat illness. *Id.* at 17–19, 32–33, 53–54. Dr. Lavespere has conceded that he is not an expert in thermoregulation. 4/23/25 Class Cert. Tr. 220:21–23. Dr. Vassallo, who is an expert in thermoregulation, has testified that people at high risk of heat illness should not be placed in situations where the heat index is to exceed 88°F and has repeatedly testified that heat illness can come on quickly. 2/9/26 Tr. 11:18–12:7, 33:16–24; *see also* 4/23/25 Class Cert. Tr. 45:22–46:4 (Vassallo explaining that a person may not be aware they are in imminent danger of heat stroke until it is too late).

745.    The Court therefore finds that LSP lacked a supportable basis for the 30-minute threshold set forth in Warden Vannoy's March 2026 memorandum.

746.    Moreover, despite Dr. Lavespere's advice, LSP chose to not include any time limit when it revised Directive 13.067 in March 2026. PX-248 at 54 (Vannoy March 2026 dep.).

747.    Ultimately, the requirement listed in Warden Vannoy's memorandum stating that people with HPDS shall be brought indoors within 30 minutes of the announcement of a Heat Alert still does not appear in Directive 13.067 or in any other policy or directive that applies to the Farm Line. PX-248 at 54 (Vannoy March 2026 dep.).

748.    Because the memorandum to LSP's Field Operation Staff lacks a scientifically supported basis and the permanence of a formal policy revision, the Court affords it little weight. The Court further finds that Defendants' reliance on informal memoranda—while leaving the formal policy unchanged—is further evidence of Defendants' reluctance to make binding, durable commitments to the safety of men on the Farm Line.

157

(d)    *Defendants' Temporary Informal Practice of Not Sending Men with HPDS to the Farm Line*

749.    During the summer of 2025, LSP maintained an informal practice of not sending individuals with HPDS on to the Farm Line on days where the Heat Alert threshold was forecast to be hit early on in the day.  2/3/26 Tr. 257:21–258:4 (Vannoy); 2/10/26 Tr. 36:18–37:6 (Vannoy).

750.    This practice was driven primarily by the view that it would be a "waste of time" to bring men with HPDS out on to the Farm Line if the heat index was expected to meet the Heat Alert threshold early in the day.  2/3/26 Tr. 257:21–258:7.

751.    The evidence at trial demonstrated that it was during this period, and only this period, that men with HPDS were appropriately protected from the substantial risk of heat illness on the Farm Line.  *See* PX-245 (Pls' FRE 1006 exhibit); 2/10/26 Tr. 33:6–37:4 (Vannoy).

752.    When LSP revised Directive 13.067 in January 2026, it decided not to codify this informal practice, with Warden Vannoy testifying that he "didn't feel like he needed" to codify it that point.  2/10/26 Tr. 37:7–14; *see also* 2/3/26 Tr. 258:8–11.

753.    At trial in February 2026, when presented with and questioned about the underlying evidence and Plaintiffs' summary exhibit, Defendants did not challenge the conclusion that this informal practice was the one measure LSP implemented during the summer of 2025 that effectively protected men with heat sensitivities from prolonged heat exposure, as proven by the record evidence.  *See* 2/10/26 Tr. 36:23–37:14.

754.    Yet, when LSP had the opportunity to codify this practice when it again revised Directive 13.067 in March 2026, it once again chose not to do so.  *See* DX-062.

(e)    *Practices Reflected in Post Orders*

755.    LSP maintains "post orders," which are essentially job descriptions for the roles held by LSP officers.  2/3/26 Tr. 271:3–5 (Vannoy).

756.    Post orders are easier to change than policies and are less formal.  2/3/26 Tr. 270:22–271:2 (Vannoy).

757.    When pressed during his testimony at trial, Lieutenant Karisny did not even know which post order applied to his position.  *See* 2/4/26 Tr. 305:19–306:4.

758.    On January 20, 2026, Defendants issued six new post orders for the following Field Operation positions:  Captain, Colonel, Lieutenant, Lieutenant Colonel, Major, and Security.  *See* DX-048 (compilation of post orders).  These post orders were revised in January 2026 because they had some relationship to the Farm Line.  2/3/26 Tr. 271:9–12 (Vannoy).

759.    Warden Vannoy testified that each of these positions had a post order prior to the January 20, 2026 versions, but he also acknowledged that the prior versions of those post orders were never before relevant to this litigation.  2/3/26 Tr. 271:13–22.

760.    As a result of Defendants' failure to produce to Plaintiffs or submit into the trial record the prior versions of these post orders, the Court is precluded from comparing the January 2026 post orders against their predecessors and assessing the scope or significance of any changes that were made in the January 20, 2026 revisions.

761.    The six new post orders contain instructions that officers on the Farm Line must make sure men are provided with shade, breaks, water, and gloves.  *See, e.g.*, DX-048 at 033418. Yet, throughout the trial, there was not a single witness subject to the post orders who testified that these conditions were in place on the Farm Line during the 2025 heat season.  2/10/26 Tr. 44:23–45:3 (Vannoy acknowledging that no witness testified that these conditions were in place).

762.    Given the informal nature of post orders, the ease with which LSP can modify them, and the evidence that LSP staff may not even be aware of which post order applies to their position,

159

the Court affords little weight to the January 2026 post orders as a measure of what policies and practices are followed on the Farm Line on a daily basis.

### E.       LSP's Documented Failures to Protect Heat Vulnerable Men

763.    The Court finds, based on undisputed National Weather Service data as well as LSP's own DLCs and Line Rosters, that LSP has not taken reasonable steps to protect heat-sensitive people assigned to the Farm Line.    This is because, as explained below, LSP has repeatedly exposed dozens of men with documented, medical vulnerabilities in high heat conditions for prolonged periods.  *See, e.g.*, PX-245 at 1–3 (Pls' FRE 1006 exhibit).

764.    *First*, the evidence shows that during the 2025 heat season, LSP failed to call a Heat Alert on several days despite the heat index having reached the requisite threshold.  *See* JX-245 at 716, 719–20, 829, 839–40, 1058, 1070.

765.    On these same days, there were men with HPDS working on Farm Line who, the Court concludes, were put at increased risk by LSP's failure to call a Heat Alert even though the applicable heat index had been met.  *See* PX-245 at 1 (Pls' FRE 1006 exhibit showing that men with HPDS were left outdoors after Heat Alert threshold had been met).

766.    For example, this occurred on October 8, 2025—a day where a man with HPDS was sent outside on the Farm Line 15 minutes after the heat index had already hit 91°F.  *See* JX-245 (Pls' FRE 1006 exhibit) at 1051, 1058, 1070; 2/3/26 Tr. 255:2–16 (Vannoy testifying about this incident).



Trial Exhibit PX-245, page 1 of 97

767.    *Second*, although Defendants' policies provide no maximum time by which men with HPDS should be brought indoors after a Heat Alert is called, numerous witnesses testified that it was important to bring those men in as soon as possible to protect their health and safety. 2/4/26 Tr. 331:17–332:7 (Karisny agreeing that bringing men with HPDS inside as soon as possible after a Heat Alert is important for their health and safety); 2/3/26 Tr. 179:7–16 (Vannoy agreeing it is important to protect people with HPDS from prolonged exposure to heat indexes over 88°F); 2/5/26 Tr. 53:6–10 (Oliveaux agreeing that it is important to bring men with HPDS indoors as quickly as possible when a Heat Alert is called).

768.    Warden Vannoy testified that it should take no longer than 15 minutes after a Heat Alert is called to load people with HPDS onto the buses, and that it should take only a little longer than that to bring them to the gate to be brought inside.  2/3/26 Tr. 258:20–259:3.

769.    LSP's own records show that there were numerous days during the 2025 heat season where LSP took 30 minutes or longer to bring people with HPDS inside after a Heat Alert

was called.  PX-245 at 2 (Pls' FRE 1006 exhibit showing days on which men with HPDS were left in the field for more than 30 minutes after a Heat Alert had been called).

770.    This includes several days where Defendants left 10 or more people with HPDS outside for over an hour after a Heat Alert was called.  *See* PX-245 at 2, 47–48, 51–53.



Trial Exhibit PX-245, page 2 of 97

771.    *Third*, the evidence clearly demonstrates that, on numerous days during the 2025 heat season, LSP did call a Heat Alert but failed to identify that men with HPDS were working on the Farm Line, leading to these heat-vulnerable men being left to continue working in the field long after the Heat Alert threshold had been reached, under heat indexes that put them at significant risk for heat-related injury.  *See* PX-245 at 3 (Pls' FRE 1006 exhibit showing days on which LSP called a Heat Alert, but did not identify or otherwise accommodate men with HPDS).

772.    On June 4, 2025, for example, LSP called a Heat Alert, but failed to identify and protect 11 men with HPDS who were working on the Farm Line.  As a result, these men were left to continue working out in the fields for one hour and 12 minutes until the entire line was eventually brought inside.  *See* PX-245 at 11, 13, 18–19, 21, 25, 27, 30, 34–35, 46, 73–74, 84–85.

162



Trial Exhibit PX-245, page 3 of 97

773.    The Court finds that, in totality, the evidence demonstrates that during the 2025 heat season LSP repeatedly failed to reasonably protect men on the Farm Line with HPDS. Moreover, it demonstrates the inadequacy of LSP policies and practices, specifically insofar as they fail to provide reasonable protections to men recognized as being particularly heat sensitive.

774.    The Court further finds that these failures endangered the health and safety of dozens of men whom LSP has identified as having heightened medical vulnerabilities to high heat, by nature of having assigned them HPDS.  *See* PX-245 at 1–3 (Pls' FRE 1006 exhibit).

775.    The significance of these findings is exacerbated by the fact that the documents evidencing these failures were available and known to Defendants at all times.  *See generally* JX-245 (Joint Heat Letters); PX-245 (Pls' FRE 1006 exhibit).

776.    The Court ultimately concludes that these aggregate failures despite the charge of this litigation, amount to more than mere occasional or accidental noncompliance and are indicative of significant and systemic failures in LSP's ability to credibly implement such protective practices moving forward.

**PROPOSED CONCLUSIONS OF LAW**

**XIII.  Conditions on the Farm Line Violate the Eighth Amendment**

777.    Prison officials violate the Eighth Amendment when conditions of confinement pose a substantial risk of serious harm—an objective test—and the officials are aware of but consciously disregard that risk—a subjective test.  *Farmer* v. *Brennan*, 511 U.S. 825, 833–834, 839–40 (1994).

778.    Plaintiffs allege that Defendants' operation of the Farm Line violates the Eighth Amendment because it subjects men to a substantial risk of dignitary harm by forcing them to labor under conditions that reenact and perpetuate the conditions and logics of slavery and because Defendants are deliberately indifferent to that risk.

779.    Plaintiffs also allege that conditions on the Farm Line constitute cruel and unusual punishment in violation of the Eighth Amendment because Defendants force men to labor under extreme heat conditions that expose them to a substantial risk of serious harm without adequate measures to protect them from the harm and abate that risk.

780.    For the reasons set forth below, the Court concludes that current conditions on the Farm Line violate the Eighth Amendment under both theories of harm set forth by Plaintiffs.

A.      **Dignitary Harm**

1.      **Objective Prong**

781.    "The standard for determining" whether the risked harm is "'sufficiently serious[]' is not static" but rather "focuses on whether the conditions are contrary to 'the evolving standards of decency that mark the progress of a maturing society.'"  *Wilkerson* v. *Stalder*, 639 F. Supp. 2d 654, 677 (M.D. La. 2007) (quoting *Farmer*, 511 U.S. 833–34); *see also Gates* v. *Collier*, 501 F.2d 1291, 1300 (5th Cir. 1974) (finding prison housing conditions unfit "under any modern concepts of decency"); *Gates* v. *Cook*, 376 F.3d 323, 332–33 (5th Cir. 2004) (reminding that courts must

164

measure prison conditions against "evolving standards of decency . . . and not the standards in effect during the time of the drafting of the Eighth Amendment") (cleaned up).

782. The harm need not be physical:  the Supreme Court has recognized that "[t]he basic concept underlying the Eighth Amendment is nothing less than the dignity of man."  *Trop* v. *Dulles*, 356 U.S. 86, 100 (1958); *see also Hope* v. *Pelzer*, 536 U.S. 730, 737–738 (2002) (describing Eighth Amendment harm from shackling to a hitching post as including "deprivation of bathroom breaks that created a risk of particular discomfort and humiliation").

783. Circuit courts have likewise recognized that dignitary harms may contribute to Eighth Amendment violations in a wide variety of contexts.  Whatever the specific factual allegations, "the emphasis is on man's basic dignity, on civilized precepts, and on flexibility and improvement in standards of decency as society progresses and matures."  *Jackson* v. *Bishop*, 404 F.2d 571, 579 (8th Cir. 1968) (Blackmun, J.) (holding that "the use of the strap" (or whip) violates the Eighth Amendment because it "offends contemporary concepts of decency and human dignity and precepts of civilization"); *see also Wiley* v. *Kirkpatrick*, 801 F.3d 51, 68 (2d Cir. 2015) (holding that the "qualitative offense to a prisoner's dignity" of exposure to human waste in confinement "should be given due consideration"); *Porter* v. *Pa. Dep't of Corr.*, 974 F.3d 431, 449 (3d Cir. 2020) (cognizable Eighth Amendment harms of solitary confinement include the "core facets of human dignity" of "[m]ental well-being and one's sense of self"); *Ricks* v. *Shover*, 891 F.3d 468, 473 (3d Cir. 2018) (recognizing "[s]exual abuse" as an Eighth Amendment violation which "invades the most basic of dignity interests:  to be treated as a human being"); *Parrish* v. *Johnson*, 800 F.2d 600, 605 (6th Cir. 1986) (holding treatment of an incarcerated paraplegic man violated Eighth Amendment where, among other factors, the defendant's "behavior . . . acted to strip [the plaintiff] of his dignity and reinforce the fact that [he] was dependent upon [the

165

defendant] for his continued well-being"); *Nelson* v. *Corr. Med. Servs.*, 583 F.3d 522, 534 (8th Cir. 2009) (en banc) (incarcerated pregnant woman shackled to bed through labor and delivery was "treated in a way antithetical to human dignity" in violation of the Eighth Amendment); *Disability Rts. Mont., Inc.* v. *Batista*, 930 F.3d 1090, 1097 (9th Cir. 2019) ("When the level of a prison's mental health care 'fall[s] below the evolving standards of decency that mark the progress of a maturing society,' the prison fails to uphold the constitution's dignitary principles.") (quoting *Brown* v. *Plata*, 563 U.S. 493, 505 n.3 (2011)).

784. The Court finds that, as presently operated, the Farm Line exposes men to a substantial risk of serious dignitary harm by reenacting the conditions and perpetuating the logics of slavery in contravention of contemporary standards of decency and adding degradation and dehumanization to their sentence at hard labor.

785. As demonstrated by the testimony of Plaintiffs, class members, Drs. Hammonds and Sbicca, Ms. Green, and Defendants' own witnesses, the Farm Line reenacts culturally and historically significant attributes of chattel slavery, replicates racial and social hierarchies that recall slavery, and serves no meaningful rehabilitative purpose. *See supra* Sections V–X. The Court finds such conditions "invade[] the most basic of dignity interests: to be treated as a human being," *Ricks*, 891 F.3d at 473, and fall well below contemporary standards of decency, *see Gates* v. *Collier*, 501 F.2d at 1300, 1306 (finding Eighth Amendment violations because prison conditions and conduct fell below "any modern concepts of decency" and "offend[ed] contemporary concepts of decency, human dignity, and precepts of civilization which we profess to possess").

786. The dignitary harm wrought by the Farm Line is neither alleviated nor justified by Defendants' assertion that the Farm Line produces fresh food. Indeed, the record convincingly

demonstrates that Defendants' operation of the Farm Line appears designed more to punish through degradation than to produce crop yields. *See supra* Sections IX–X.

787.    Evidence presented through the testimony of Plaintiffs and class members, *see supra* Sections VII.A–G, readily establishes that the risk of serious dignitary harm is more than substantial—such harm actually occurs. *Cf. Farmer*, 511 U.S. at 842 (Eighth Amendment does not require that actual harm "befall an [incarcerated person]").

788.    Men who have been forced to labor on the Farm Line testified that the conditions are designed to "break [their] spirits," 2/3/26 Tr. 34:5–17 (Guillory), and make them feel "like a slave," "like an animal" in a "zoo," 2/3/26 Tr. 85:10–20, 86:17–24 (Major), and like "monkeys . . . in a circus," 2/4/26 Tr. 20:11–21 (Smith). They described being forced to perform tasks that Ms. Green testified were not only unlike anything done on commercial farms, but that would be "humiliating" to assign to grown men. 2/4/26 Tr. 191:25–192:9. They described suffering nightmares, anxiety, and trauma. *See, e.g.*, 2/5/26 Tr. 90:6–92:23 (Morehead); 4/23/25 Class Cert. Tr. 163:17–165:1 (Jones); 4/23/25 Class Cert. Tr. 135:17–136:4 (Jackson).

789.    The Court concludes that Defendants' operation of the Farm Line exposes class members to an objective and substantial risk of serious dignitary harm because it forces them to labor under conditions that evoke and perpetuate the logics of slavery, make them feel less than human, and cause anxiety and trauma.

### 2.    Subjective Prong

790.    The deliberate indifference standard is satisfied when prison officials know of and consciously disregard the risk of harm or fail to take steps to abate it. *Farmer*, 511 U.S. at 837. "A prison official acts with deliberate indifference" whenever he "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Jones* v. *Tex. Dep't of Crim. Just.*, 880 F.3d 756, 759 (5th Cir. 2018) (internal quotation

167

marks omitted); *see also Taylor* v. *Riojas*, 592 U.S. 7, 9 (2020) ("at least some officers . . . were deliberately indifferent" to unconstitutional conditions where they commented on those conditions to the incarcerated person but failed to take action).

791.    Courts "may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious." *Hope*, 536 U.S. at 738 (citing *Farmer*, 511 U.S. at 842); *see also Gates* v. *Cook*, 376 F.3d at 340 (finding deliberate indifference "based on the open and obvious nature" of the unlawful condition).

792.    A "prison's penological purpose has no bearing on whether an inmate has shown 'deliberate indifference' for purposes of an Eighth Amendment claim" because "'the integrity of the criminal justice system depends on full compliance with the Eighth Amendment.'" *Garrett* v. *Lumpkin*, 96 F.4th 896, 900–902 (5th Cir. 2024) (quoting *Johnson* v. *California*, 543 U.S. 499, 511 (2005)).

793.    Here, the Court concludes that the risk of serious dignitary harm inherent in reenacting and perpetuating the conditions and logics of slavery is open and obvious.

794.    Additionally, as the evidence demonstrates, Defendants are aware of the Farm Line's resemblance to chattel slavey and of the historical and cultural connections between the Farm Line and chattel slavery.  They are aware of LSP's history as a slave plantation.  2/3/26 Tr. 304:19–21 (Vannoy); 2/4/26 Tr. 117:3–118:22 (Vittorio); 2/4/26 Tr. 297:11–20 (Coley); 2/4/26 Tr. 343:10–24 (Karisny); 2/4/26 Tr. 50:1–7 (Pidgeon); 4/23/25 Class Cert. Tr. 308:22–25 (Scott). They are aware that incarcerated men who work on the Farm Line feel like enslaved people.  2/4/26 Tr. 50:8–14 (Pidgeon); 2/4/26 Tr. 343:1–9 (Karisny); 4/23/25 Class Cert. Tr. 309:1–4 (Scott); *see also* 2/3/26 Tr. 304:22–305:16 (Vannoy testifying he understands that men assigned to the Farm Line may feel like enslaved people even if he has not personally heard it).  Major Pidgeon testified

168

to the visual resemblance between the Farm Line and chattel slavery.  2/4/26 Tr. 50:15–51:3. Ms. Vittorio acknowledged that the connection between LSP and its plantation past is sensitive to society in general, and that as a result, LSP has changed the way it speaks to tour groups about this issue but does not consider these sensitivities when assigning men to the Farm Line.  2/4/26 Tr. 117:3–10, 118:23–119:14.  Numerous witnesses testified to guards' use of racialized language and behaviors.  *See, e.g.*, 2/3/26 Tr. 50:7–52:18 (Guillory); 2/3/26 Tr. 86:4–13 (Major).  Warden Vannoy testified that he was aware of these allegations, but absent definitive proof, LSP would side with the officer in each such case.  2/3/26 Tr. 306:4–307:4.  Warden Vannoy acknowledged that out in the free world, picking vegetables is not generally considered a punishment, but at LSP, on the grounds of a former plantation, under the conditions characterizing the Farm Line, Defendants use it for just that purpose.  *See* 2/10/26 Tr. 50:14–19; 2/3/26 Tr. 172:19–22.

795.    Accordingly, the Court finds that the substantial risk of dignitary harm created by the Farm Line is open and obvious and that Defendants have actual awareness of it.

796.    Defendants have not taken reasonable steps to abate the risk of serious dignitary harm.  As Dr. Sbicca opined, LSP's organizational attitude toward that risk is "largely indifferent," despite being able to "articulat[e] the fact that the Farm Line is, in fact, degrading."  2/5/26 Tr. 173:2–174:14.  Defendants' witnesses repeatedly refer to LSP as "Angola," continually invoking the prison's plantation past, *see supra* ¶ 74; LSP's Medical Director freely acknowledges the negative social connotations of the Farm Line and describes the men on it as "sub-par," *see supra* ¶ 115; 2/3/26 Tr. 102:24–103:11 (Toce); LSP recognizes society's sensitivities to the history the Farm Line invokes, but does not consider them in assigning men to the Farm Line, *see supra* ¶ 114; 2/4/26 Tr. 117:3–10, 119:4–14 (Vittorio); guards allegedly disrespect men on the line with racialized language and tropes without investigation, *see supra* ¶¶ 236–237; and senior medical

practitioners generally disbelieve the medical complaints of men on the Farm Line, *supra* Section VI.E.

797.    At the same time, evidence presented at trial made clear that it would be possible for prison officials to make choices that would break the connection between labor on the Farm Line and slavery, but that they have not made those choices.

798.    For example, prison officials could imbue work in the fields with dignity, prioritizing rehabilitation, agency, and productivity by taking steps that might include adding educational components, professional certificates, implementing modern farming practices; instead, LSP officials offer none of these things and choose to force men to labor without proper tools or personal protective equipment.

799.    Defendants' post-trial statements regarding a planned class for men on the Farm Line do not alter the analysis of current conditions because the class described by Warden Vannoy at his post-trial deposition is, at this stage, no more than a promise. *See* PX-248 at 68–69 (Vannoy acknowledging LSP is still "getting [the class] off the ground"). The Court concludes that, although implementation of a class as described in Warden Vannoy's post-trial testimony could alleviate the risk of dignitary harm created by the Farm Line, the fact that it does not yet exist and is not incorporated into any binding policy renders that promise irrelevant to the analysis of current conditions. *See United States* v. *Hinds Cnty. Bd. of Supervisors*, 128 F.4th 616, 630 (5th Cir. 2025) (finding subjective deliberate indifference met where County had not yet implemented planned salary increase that it claimed would mitigate violence in the jail). Furthermore, this "class" only addresses one aspect of the various conditions that, together, contribute to the risk of dignitary harm attendant to the Farm Line, including the immutable fact that the Farm Line is intertwined with the history of slavery at Angola.

800.    In sum, the Court finds that Defendants are deliberately indifferent to the substantial risk of serious dignitary harm posed by the Farm Line as it currently operates.

### B.    Heat-Related Harm

#### 1.    Objective Prong

801.    The Court concludes that exposure to high heat on the Farm Line poses a substantial risk of serious harm and therefore satisfies the objective prong of the Eighth Amendment deliberate indifference standard.

802.    In cases just like this one, the Fifth Circuit has repeatedly articulated the simple rule that prison conditions that expose incarcerated men to high heat without proper mitigation satisfy the objective prong. *Ball* v. *LeBlanc*, 792 F.3d 584, 592–94 (5th Cir. 2015) (affirming this Court's finding that extreme heat conditions at LSP pose a substantial risk of serious harm); *Hinojosa* v. *Livingston*, 807 F.3d 657, 669 (5th Cir. 2015) ("[T]he Eighth Amendment guarantees inmates a right to be free from exposure to extremely dangerous temperatures without adequate remedial measures."); *Webb* v. *Livingston*, 618 Fed. App'x 201, 207 (5th Cir. 2015) ("[E]xposure to extremely hot temperatures" is a condition that "presents a substantial risk of serious harm."); *Blackmon* v. *Garza*, 484 Fed. App'x 866, 869–72 (5th Cir. 2012) (finding Eighth Amendment violation where "extreme heat in [plaintiff's] dorm caused substantial health risks" and that remedial measures were inadequate); *Valigura* v. *Mendoza*, 265 Fed. App'x 232, 235 (5th Cir. 2008) (finding that exposure to "temperatures consistently in the nineties without remedial measures" violate the Eighth Amendment); *McCollum* v. *Livingston*, 2017 WL 608665, at *19 (S.D. Tex. Feb. 3, 2017) (collecting cases and concluding that "extreme heat constitutes an Eighth Amendment violation"); *Tiede* v. *Collier*, No. 1:23-CV-1004-RP, ECF No. 19, at 4–5 (W.D. Tex. Sept. 14, 2023) (granting temporary restraining order due to the plaintiff's enhanced risk of injury or death from extreme heat).

803.    The Court concludes based on the weight of the credible testimony from Dr. Vassallo (and the lack of any credible countervailing evidence) that there is a substantial risk of serious harm to everyone forced to labor on the Farm Line under extreme heat conditions.

804.    As discussed above, *see supra* Section XI.A, Dr. Vassallo has consistently opined that the risks of heat-related morbidity and mortality exist for everyone, even younger and healthier people, when they are exposed to heat indexes above 88ºF, and that risk increases for people with an impaired ability to thermoregulate, and for people who are subjected to a cumulative heat load.

805.    The evidence establishes that heat conditions on the Farm Line consistently surpass safe levels, with the heat index exceeding 88ºF on approximately 66% of days when the Farm Line was working between April 28, 2025, and December 5, 2025, and multiple days over the past few years when heat indices met or exceeded 103ºF.  *See supra* Section XI.C.

806.    The credible evidence at trial indicates that 88ºF is a scientifically significant threshold at which point heat-related risks greatly increase.  *See supra* Section XI.A.5.  The evidence further demonstrates that Defendants' chosen stop work threshold of 113°F, or even 110°F, has no scientific support.  *See supra* Section XII.D.6.b.  Rather, the governmental guidance that Defendants purportedly consulted supports, at most, a threshold of 103°F, which is the same threshold Dr. Vassallo recommends.  *See id.*

807.    Because heat conditions on the Farm Line regularly surpass safe levels, *see supra* Section XI.C, the Court concludes that all men on the Farm Line are at an unacceptable risk of harm of serious heat-related illness (both exertional and non-exertional, as explained above, *see supra* Section XI.A.C) because they are forced to work in the fields, performing strenuous physical labor under high heat conditions, and because, even after their work day ends, they are unable to

172

remove themselves from the heat, access air-conditioning, or dissipate the dangerous heat burden that has built up.

808. Evidence that class members have repeatedly experienced heat-related illness on the Farm Line supports the Court's conclusion. *See supra* Section XI.D.

809. The Court notes that Defendants do not meaningfully dispute that there is a serious risk of heat-related illness for men on the Farm Line. They have not adduced any credible evidence or testimony demonstrating that high heat conditions do not create an objectively serious risk of harm for men on the Farm Line.

810. Moreover, while there is plentiful evidence suggesting that men on the Farm Line have, in fact, experienced heat-related injury on the Farm Line, the Eighth Amendment does not require Plaintiffs to wait until actual harm or death befall an incarcerated person. *Farmer*, 511 U.S. at 845; *see also Garrett* v. *Lumpkin*, 96 F.4th at 900 ("[T]o satisfy the objective component, a prisoner need only show a *substantial risk* of serious harm—not actual harm."); *Helling* v. *McKinney*, 509 U.S. 25, 33 (1993) ("That the Eighth Amendment protects against future harm to inmates is not a novel proposition."). All that is required is that Plaintiffs demonstrate by a preponderance of evidence that there is a substantial risk of serious physical harm created by conditions on the Farm Line. The Court concludes that Plaintiffs have satisfied this burden.

811. In sum, the Court concludes that Plaintiffs have established that an objective and substantial risk of serious heat-related harm exists for men on the Farm Line .

### 2. Subjective Prong

812. The deliberate indifference standard, stated above, takes on a further inquiry where, as is the case with respect to Plaintiffs' heat claim, prison officials have taken purportedly ameliorative measures to address the risk of harm. In such cases, the Court must consider whether

prison officials "responded reasonably to a known risk." *Farmer*, 511 U.S. at 826; *see also Hinds Cnty.*, 128 F.4th at 630.

813.    Where prison officials fail to take and effectively implement efforts to correct inadequate conditions they are deliberately indifferent.  *See Hinds Cnty.*, 128 F.4th at 630 (finding county deliberately indifferent to jail violence where it had not taken reasonable steps to secure adequate staffing); *see also Ball*, 792 F.3d at 595–96 (affirming deliberate indifference to known risk of heat injury even after LSP claimed to begin providing misting, fans, access to ice water, and daily showers); *Gates* v. *Cook*, 376 F.3d at 340–41 (affirming deliberate indifference despite prison's extensive remedial efforts regarding cell conditions and healthcare); *Harris* v. *Angelina Cnty.*, 31 F.3d 331, 335–36 (5th Cir. 1994) (affirming prison's deliberate indifference to crowding risks even where prison built a dormitory, transferred individuals, and offered alternatives to incarceration).

814.    Although courts must assess "prison officials' current attitudes and conduct," including developments during litigation, litigation-inspired changes are not inherently adequate to avoid liability.  *Farmer*, 511 U.S. at 845.  "[P]rison officials who had a subjectively culpable state of mind when the lawsuit was filed" may "prevent issuance of an injunction" only "by proving, during the litigation, that they were no longer unreasonably disregarding an objectively intolerable risk of harm and that they would not revert to their obduracy upon cessation of the litigation."  *Id*. at 846 n.9; *see also Parker* v. *Hooper¸* 2026 WL 864705, at *15 (5th Cir. Mar. 30, 2026) (responses during the litigation can defeat subjective deliberate indifference if they are reasonable and "indicate concern and sincerity" to the risk of harm); *Coleman* v. *Wilson*, 912 F. Supp. 1282, 1311 (E.D. Cal. 1995) (finding deliberate indifference where "[t]he history of

174

defendants' response to this issue demonstrates a recalcitrant refusal to address the serious issues underlying the preliminary injunction until forced to do so under pressure of this litigation").

815.    At trial, Defendants presented evidence regarding a series of measures taken since the onset of this litigation purportedly directed at abating the risk of serious harm from exposure to heat.  These include applicable policy changes such as expanding eligibility for HPDS, the use of a Perry Weather system, and longer breaks after Heat Alerts are called, as well as informal practices, such as using shade wagons, and shade pavilions.

816.    Following trial, Defendants submitted additional evidence of an updated policy, revising Directive 13.067 to eliminate the heat season limitation Defendants previously followed and promised changes to Farm Line practices, including offering educational programming.

817.    The Court holds that, individually and cumulatively, the implemented and promised measures are not adequate to sufficiently abate the risk of serious harm and demonstrate little more than litigation-driven voluntary cessation without any reasonable guarantee of permanence.

818.    Throughout this litigation, Defendants have repeatedly changed the threshold heat index at which a Heat Alert is called.  *See supra* Section XII.D.1.  Although that threshold is presently set to 88°F in Directive 13.067, that alone is not sufficient to reduce the risk of harm to a constitutionally acceptable level, particularly for people with heightened heat sensitivity.

819.    Defendants have similarly repeatedly altered how they monitor the heat index in connection with Heat Alerts.  *See supra* Section XII.D.3.  Defendants' most recent change involving the leased Perry Weather system is insufficient to reduce the risk of harm to constitutionally acceptable levels.  In addition to being a temporary arrangement, *see supra* ¶ 644, the effectiveness of which is still untested, *see* PX-248 at 23 (Vannoy March 2026 dep.),

175

Defendants' use of the Perry Weather system has the effect of reducing transparency because only LSP will have access to the weather data being recorded, *see supra* ¶ 645.

820.    Defendants have also made changes related to the availability of shade on the Farm Line. *See supra* Section XII.D.5.    For the reasons described, the Court concludes that those changes are not sufficient to reduce the risk of heat-related harm to constitutionally acceptable levels, including because access to shade does not alter the heat index and does not provide effective cooling. *See id.*; *see also* 2/9/26 Tr. 26:3–27:12, 28:8–12 (Vassallo); 2/10/26 Tr. 39:17–24 (Vannoy)

821.    After trial, Defendants eliminated the heat season limitation in Directive 13.067 such that heat precautions must now be implemented year-round. *See supra* Section XII.D.2.    That too, however, is insufficient so long as the protections that exist once a Heat Alert is called remain unreasonable.

822.    While the above changes represent potentially important improvements, the question remains whether those measures are a reasonable response to reduce the risk of heat-related illness to constitutionally acceptable levels.    The Court finds they are not.

823.    In this regard, the Court concludes that Defendants' repeated failures during the most recent heat season to protect men that they themselves identified as being at heightened risk of heat-related illness further contributes to a finding of deliberate indifference. *See supra* Section XII.E.    Defendants' multiple and repeated failures to protect men that they themselves have identified as being particularly vulnerable to heat throughout the summer months, *see* PX-245 (Pls' FRE 1006 summary exhibit), and their further failure to adopt measures that would protect those men from heat conditions that their own policies recognize as dangerous, indicates a lack of sincere concern for and deliberate indifference to the health and safety of those heat sensitive men, *cf.*

*Parker*, 2026 WL 864705, at \*15. There is no evidence that any corrective measures taken since that time will mitigate the substantial risks faced by those men.

824.    Since the onset of litigation, Defendants have expanded both the Heat Pathology Medications List and the Medical Exclusion List. *See supra* Section XII.D.4. However, based on the evidence presented at trial, the Court concludes that these lists remain inadequate to identify several categories of people who are at heightened risk of heat injury, and that Defendants' are deliberately indifferent to the resulting risk, ignoring, without scientific basis, plentiful evidence from Dr. Vassallo, as well as neutral bodies such as the WHO and CDC. *See supra* Section XII.D.4.

825.    The Court further holds that Defendants have not sufficiently demonstrated that "they would not revert to their obduracy upon cessation of the litigation." *Farmer*, 511 U.S. at 846 n.9. Given the timing of Defendants' changes to policy and practice, Defendants' own admissions, the fact that many of the recent changes are not mandated by DOC policy, and other evidence cited above, the Court finds that Defendants' ameliorative measures were motivated by a desire to avoid liability in the present litigation, and largely do not demonstrate any reasonable guarantee of permanency.

826.    The Court finds few indications that—absent an injunction—Defendants would not revert to prior practice following termination of this litigation. Indeed, during the course of this litigation, even when subject to court-ordered injunctions mandating protections at heat indexes of 88°F, Defendants repeatedly chose to violate those orders, putting men on the Farm Line at substantial risk of serious harm. *See supra* Section XII.C. This too indicates a total lack of concern and sincerity on the part of prison officials that negates subjective indifference. *Cf. Parker*, 2026 WL 864705, at \*15.

177

827.    Finally, the Court concludes that Defendants' choice to set a heat index of 113°F as the stop work threshold for outside work in Directive 13.067 demonstrates deliberate indifference that is not mitigated by Warden Vannoy's post-trial memorandum instructing the Control Center to call a work stoppage at 110°F. *See supra* Section XII.D.6.b. As described above, the guidance Defendants chose to consult in developing their heat pathology policy does not support the stop work threshold they implemented. Rather, it indicates "Danger" at a heat index of 103°F and warns that when exposed to direct sunlight—as the Farm Line is—the heat index can feel up to 15°F hotter. *See id.* Moreover, the fact that Directive 13.067 continues to mandate work stoppage only once the heat index reaches 113°F, when Warden Vannoy himself believes a lower threshold should apply, further supports a finding of deliberate indifference.

## XIV.    The Farm Line Violates the ADA and Rehabilitation Act

828.    The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

829.    Similarly, the Rehabilitation Act provides, in relevant part, that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794; 28 C.F.R. § 42.503.

830.    As relevant here, claims brought under the ADA and Rehabilitation Act "are judged under the same legal standards, and the same remedies are available under both Acts." *Kemp* v. *Holder*, 610 F.3d 231, 234 (5th Cir. 2010); *see also Delano-Pyle* v. *Victoria Cnty.*, 302 F.3d 567, 574 (5th Cir. 2002).

178

831.    To prevail on a claim for discrimination under the ADA or Rehabilitation Act, Plaintiffs must prove:    (1) they are "qualified individuals"; (2) are being excluded from participation in, or being denied the benefits of, services, programs, or activities for which the entity is responsible, or are otherwise being discriminated against by the public entity; (3) that such exclusion, denial of benefits, or discrimination is by reason of their disability; and, as required under the Rehabilitation Act, (4) that discriminating party is a public entity that receives federal funding.  *Luke* v. *Texas*, 46 F.4th 301, 305 (5th Cir. 2022); *Lightbourn* v. *County of El Paso*, Texas, 118 F.3d 421, 428 (5th Cir. 1997); 29 U.S.C. § 794.

832.    Under these standards, Plaintiffs have demonstrated an entitlement to relief.

## A.    ADA Subclass Members Are Qualified Individuals with a Disability

833.    Under the ADA and the Rehabilitation Act, a "qualified individual" is "an individual with a disability who . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  42 U.S.C. § 12131(2).

### 1.    ADA Subclass Members Are Qualified Individuals with a Disability

834.    A "disability" is defined as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."[10]  42 U.S.C. § 12102(1).

835.    The definition of disability is to be construed broadly in favor of expansive coverage to the "maximum extent permitted by the terms" of the statutes.  42 U.S.C. § 12102(4)(A).

---

[10]    "An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity."  42 U.S.C. § 12102(3)(A).

836.    Likewise, "the term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA," and "is not meant to be a demanding standard."  28 C.F.R. § 35.108(d)(1)(i).

837.    Thus, "[t]he primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of 'disability.'"  28 C.F.R. § 35.101(b).

838.    For the reasons set forth below, the Court finds that members of the ADA Subclass are "individuals with a disability" under the ADA and Rehabilitation Act.

*(a)    Thermoregulation Is A Major Life Activity*

839.    A "major life activity [] includes the operation of a major bodily function, including but not limited to, functions of the immune system, neurological, brain, respiratory, circulatory, and endocrine functions."  42 U.S.C. § 12102(2)(B).

840.    Thermoregulation involves and depends on the coordinated operation of multiple bodily systems, including the neurological system (hypothalamic regulation), circulatory system (blood flow and heat dissipation), and endocrine system (hormonal responses to temperature changes).  2/9/26 Tr. 35:13–18 (Vassallo); PX-075 at 7–10, 18–19 (Vassallo describing the interplay between various bodily functions and thermoregulatory functioning).  Interruption, or impairment, of any aspect of the delicate balance of this system, results in impaired thermoregulation.  *See, e.g.*, PX-075 at 15–16 (Vassallo describing how decreased cardiac output limits the body's ability to pump blood to the skin and the body for effective cooling).  Thermoregulation is "vital" to daily life.  4/23/25 Class Cert. Tr. 44:19–23 (Vassallo).

180

841.    Other courts have recognized thermoregulation is a major life activity.  *See McCollum*, 2017 WL 608665, at \*34; *Miller* v. *Collier*, 2021 WL 6274450, at \*4 (S.D. Tex. Nov. 9, 2021).

842.    Accordingly, the Court finds that thermoregulation—the body's ability to effectively maintain a stable internal temperature—is a major bodily function within the meaning of the ADA and Rehabilitation Act.

843.    Major life activities also include, but are not limited to, performing manual tasks such as walking, standing, lifting, bending, and working.  42 U.S.C § 12102(2)(A).  In addition to thermoregulation itself being a major life activity, the Court further finds, based on the evidence discussed above, that men laboring on the Farm Line during periods of high heat are obligated to engage in other major life activities including bending, lifting, walking and working despite their impaired thermoregulation substantially limiting their ability to perform these activities.  *See McCollum*, 2017 WL 608665, at \*34 (recognizing that, even if thermoregulation were not considered to be a major life activity, evidence showing an individual's other major life activities, such as walking, bending, lifting, and working, are impaired by their conditions is sufficient).

### (b)    People with HPDS Are Disabled.

844.    To be a "qualified individual with a disability," a person must have, or be regarded as having, an impairment that substantially limits a major life activity.  42 U.S.C. § 12102(1). Those members of the ADA Subclass who have been given HPDS clearly satisfy this standard.

845.    LSP has identified specific medications and medical conditions that impair a person's ability to maintain a stable internal temperature, and therefore increase their sensitivity to heat.  4/23/25 Class Cert. Tr. 182:1–13, 215:11–216:8 (Lavespere); 4/23/25 Class Cert. Tr. 237:17–238:5, 240:3–24 (Oliveaux); JX-018 (Heat Pathology Medications List); JX-016 (Medical Exclusion List).

181

846.    LSP maintains records of individuals in their custody who have been prescribed those medications or have been diagnosed with those specified conditions and, unless they opt out, grants those individuals HPDS.  2/3/26 Tr. 322:10–20 (Lavespere); JX-222 (individuals with HPDS based on Heat Pathology Medications List); PX-167 (individuals with HPDS based on Medical Exclusion List); DX-062 at 3 (Directive 13.067).

847.    Additionally, under LSP policies, people with HPDS must be brought indoors and shall not exercise outdoors when the heat index reaches 88°F.  DX-062 at 5; 2/3/26 Tr. 322:21–25 (Lavespere).  In other words, LSP regards people with HPDS as having impaired thermoregulation and treats them differently than their peers without HPDS.

848.    These facts indicate that anyone qualifying for HPDS because they take a medication listed on the Heat Pathology Medications List or are diagnosed with a condition listed on the Medical Exclusion List is, at minimum, "regarded as" being substantially impaired in their ability to thermoregulate.  42 U.S.C. § 12102(1).  This independently deems them as having qualifying disabilities under the ADA.

849.    Beyond being "regarded" by LSP as disabled, the Court finds that ADA Subclass members have established more than a mere theoretical risk, but rather an actual and measurable difficulty regulating their internal core body temperature.  2/9/26 Tr. 34:19–35:18 (Vassallo); *see also id.* at 13:18–14:22 (Vassallo confirming that Mr. Samuels suffers from impaired thermoregulation because his heart cannot produce the same output it needs to the lungs or body). This impairment manifests in reduced capacity to cool themselves through normal physiological mechanisms, placing them at substantially greater risk of heat-related illness and death compared to individuals without this impairment.  *See, e.g.*, 2/9/26 Tr. 35:13–18 (Vassallo); PX-075 at 16–17 (Vassallo providing an example of how impaired cardiac output hinders the thermoregulatory

process as compared to non-impaired persons). Indeed, Dr. Vassallo testified as to specific instances of men with HPDS exhibiting symptoms consistent with heat-related illness while working on the Farm Line. *See supra* ¶¶ 552–553.

850. Men with impaired thermoregulation have also exhibited difficulty performing required activities on the Farm Line. Multiple witnesses with impaired thermoregulation testified about the physical pain and difficulties they experienced while working on the Farm Line. 2/4/26 Tr. 82:16–83:23 (Samuels describing working beyond his physical capabilities and eventually feeling dizzy, light headed, dehydrated, and a "pins and needles" sensation); 2/3/26 Tr. 41:3–14 (Guillory describing work on the Farm Line as difficult and experiencing difficulty breathing while working in the heat); *id.* at 42:8–20 (Guillory recounting an incident in which he passed out after working on the Farm Line and upon returning to his dorm); 2/9/26 Tr. 34:19–35:8, 35:19–36:13 (Vassallo explaining that Q.R. is an individual with impaired thermoregulation and his medical record shows that he reported feeling "weak and dizzy" while working in the field).

851. The Court finds that people currently eligible for HPDS are "qualified individuals with a disability" for purposes of the ADA and Rehabilitation Act.

### (c)    Other Men With Impaired Thermoregulation Are Disabled.

852. While not formally recognized by LSP as having impaired thermoregulation, the evidence at trial established that several categories of medical conditions and medications not included in the Attachments to Directive 13.067 significantly impair the body's ability to thermoregulate and/or perform physical requirements of the Farm Line during periods of high heat. These categories include: people prescribed SSRIs, ACE inhibitors, ARBs, and dihydropyridine calcium channel blockers, and people diagnosed with diabetes, coronary artery disease, seizure disorder, and hypertension. *See supra* Section XII.D.4.

183

853.    The Court finds that people prescribed these medications and/or diagnosed with these conditions are qualified individuals with a disability.

### 2.    The ADA Subclass Satisfies the Remaining Requirements for a Qualified Individual

854.    As noted above, a "qualified individual" must "meet[] the essential eligibility requirements for . . . participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).  The evidence establishes that these threshold requirements are met.

855.    First, LSP is a public entity.  Under the ADA, a "public entity" means any "State or local government; any department, agency, special purpose district, or other instrumentality of a State or States or local government."  42 U.S.C. § 12131(1).  "State prisons fall squarely within th[is] statutory definition."  *Pa. Dep't of Corr.* v. *Yeskey*, 524 U.S. 206, 210 (1998) (citing 42 U.S.C. § 12131(1)(B)).

856.    Second, the Farm Line is a "program or activity."  *See* 29 U.S.C. § 794(b)(1)(A) (defining "program or activity" to include "all of the operations" of a state department, agency, or instrumentality); *see also Yeskey*, 524 U.S. at 210–11 (finding the ADA applies to even non-voluntary prison programs and services).

857.    Finally, members of the ADA Subclass remain eligible and are, in fact, routinely assigned to and labor on the Farm Line, *see* 2/3/26 Tr. 255:12–16, 260:5–11 (Vannoy), and with reasonable modifications to LSP's policies and practices can safely participate in that program. They therefore clearly satisfy the "eligibility requirements for participation" in that program.  42 U.S.C. § 12131(2).

### B.    **ADA Subclass Members Are Being Discriminated Against by LSP**

858.    The ADA and Rehabilitation Act prohibit state prisons from excluding or otherwise denying incarcerated people the benefits of a prison "program."  *See Yeskey*, 524 U.S. at 210

("[P]risons provide inmates with many recreational activities, medical services, and educational and vocational programs, all of which at least theoretically benefit the prisoners (and any of which disabled prisoners could be excluded from participation in).") (cleaned up).

859.   Discrimination may occur either because the prison fails to accommodate people with disabilities or administers its program in a discriminatory manner or in a manner which has a discriminatory effect.  *See Tellis* v. *LeBlanc*, 2022 WL 67572, at *4 (W.D. La. Jan. 6, 2022) (citing 28 C.F.R. § 35.130(b)(3) and *Dunn* v. *Dunn*, 318 F.R.D. 652, 664 (M.D. Ala. 2016)); *see also George* v. *La. Dep't of Pub. Safety Corr.*, 2016 WL 3568109, at *9 (M.D. La. June 23, 2016).  The evidence demonstrates that LSP discriminates against ADA Subclass members under both of these theories.

### 1.   LSP Does Not Reasonably Accommodate ADA Subclass Members

860.   In the prison context, a "public entity" is required to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making modifications would fundamentally alter the nature of the service, program, or activity."  *George*, 2016 WL 3568109, at *9 (quoting 28 C.F.R. § 35.130(b)(7) and citing *Garrett* v. *Thaler*, 560 F. App'x. 375, 382 (5th Cir. 2014); *see* 42 U.S.C. § 12182(b)(2)(A)(ii).

861.   While the ADA does not impose on States a particular "standard of medical care," *Carter ex rel. Carter* v. *City of Shreveport*, 144 F.4th 809, 815 (5th Cir. 2025), and although "the ADA does not require prisons to provide new services or programs for disabled prisoners, these same entities do have an affirmative obligation to make reasonable modifications so that a disabled prisoner can have meaningful access to existing public services or programs," *George*, 2016 WL 3568109, at *9 (emphasis in original) (cleaned up).  *See also Valentine* v. *Collier*, 993 F.3d 270, 289 (5th Cir. 2021).  An accommodation is "reasonable" so long as it "does not impose undue

financial and administrative burdens or fundamentally alter the nature of the service, program, or activity." *Cadena* v. *El Paso Cnty.*, 946 F.3d 717, 724 (5th Cir. 2020) (quoting 28 C.F.R. § 35.130(b)(7)) (cleaned up).

862.    Indeed, "failure to make reasonable accommodations to the needs of a disabled prisoner may have the effect of discriminating against the prisoner because the lack of an accommodation may cause the disabled prisoner to suffer more pain and punishment than non-disabled prisoners." *McCoy* v. *Tex. Dep't. of Crim. Justice*, 2006 WL 2331055, at \*7 (S.D. Tex. Aug. 9, 2006); *Levy* v. *La. Dep't of Pub. Safety and Corr.*, 371 F. Supp. 3d 274, 285 (M.D. La. 2019) (noting that "Congress recognized that failure to accommodate persons with disabilities will often have the same practical effect as outright exclusion") (cleaned up).

863.    The evidence demonstrated that people with impaired thermoregulation are at heightened safety risk and are unable to perform required tasks without additional pain and difficulty as compared to their non-disabled peers when required to labor in high heat conditions. *See supra* ¶ 548.  The ADA Subclass members therefore request an accommodation that they not be sent to work in the fields when the heat index is anticipated to meet or exceed 88°F.

864.    When LSP did briefly stop sending these heat-sensitive men out to the fields in the summer of 2025, the evidence demonstrated that it was not to accommodate these men's disability, but rather because it was perceived as a waste of time.  2/3/26 Tr. 257:21–258:7 (Vannoy).  The Farm Line itself, however, continued to operate with men who did not have HPDS.  2/10/26 Tr. 36:6–22 (Vannoy).

865.    The Court concludes that this fact demonstrates that the requested accommodation—not sending men with HPDS out when the heat index is expected to reach 88°F

186

during a Farm Line shift—would not fundamentally alter the program. Accordingly, the Court finds that the requested accommodation is reasonable.

866. Defendants did not demonstrate that the requested accommodation would fundamentally alter the Farm Line program. Although Assistant Warden Sylvester hypothesized that purported recent decreases in yields were the result of fewer people remaining on the Farm Line due to Heat Alerts, no concrete evidence, including any financial information, was presented that supports his suspicion or draws a connection between HPDS and Farm Line crop yield losses. *See* 2/9/26 Tr. 209:6–17.

867. Accordingly, the Court finds the requested accommodation reasonable.

### 2. LSP Administers The Farm Line In A Discriminatory Manner

868. A public entity may not, whether it be a work or disciplinary program, "utilize criteria or methods of administration . . . [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(3)(i).

869. Defendants administer the Farm Line in a manner that discriminates against ADA Subclass members by failing to account for their disability when assigning field work on days and at times when the heat index is projected to exceed 88°F. This method of administration results in men with impaired thermoregulation being placed at heightened safety risk and being required to perform tasks that cause them additional difficulty and pain as compared to their non-disabled peers.

870. In other words, men with impaired thermoregulation necessarily experience the Farm Line differently during periods of high heat than their non-impaired peers and, therefore, are necessarily subjected to a different form of punishment, resulting in additional pain.

187

871.    Defendants' methods of administration of the Farm Line also discriminates insofar as they systematically fail to identify several categories of people with an impaired ability to thermoregulate, and, therefore fail to grant those people HPDS.

872.    As discussed, Defendants' criteria for identifying people with impaired thermoregulation is underinclusive. *See supra* Section XII.D.4.  Additionally, medical records demonstrate that LSP personnel have failed to assign HPDS to individuals who should have been identified. *See, e.g.,* 2/9/26 Tr. 47:4–48:4, 48:11–18, 49:6–50:6, 51:24–52:10 (Vassallo); PX-085 at 10 (Vassallo Nov. 2025 decl.).  Such incidents demonstrate systemic failures in identifying individuals entitled to accommodations.

873.    Finally, the Court notes with concern that LSP's ADA Coordinator was not substantively involved in revising Directive 13.067 and does not believe that this directive falls within her purview. 2/5/26 Tr. 61:16–62:13 (Oliveaux).  No one at LSP appears to have considered how revisions to Directive 13.067 may implicate the ADA or whether its requirements were being met. *Id.* at 60:19–61:6, 61:16–62:1 (Oliveaux).  Defendants revised Directive 13.067 again as of March 9, 2026, and again Deputy Warden Oliveaux took no meaningful part in the revisions or considered its impact on people with disabilities in the prison. *See* PX-248 at 18 (Vannoy March 2026 dep.).  The Court finds no evidence to suggest that these systemic failures have been remedied and, to the contrary, the evidence shows that these failures are likely to persist.

C.    **Defendants' Discrimination Against ADA Subclass Members Is By Reason of Their Disability**

874.    Courts have recognized that a public entity's failure to reasonably accommodate the limitations of persons with disabilities satisfies the "by reason of" disability element. *Windham*

v. *Harris Cnty.*, 875 F.3d 229, 235 (5th Cir. 2017); *Valentine*, 993 F.3d at 290.[11] Further, a public entity that utilizes "criteria or methods of administration" that have the purpose or effect of defeating the public entity's accommodation of persons suffering from impaired thermoregulation also discriminates against such persons by reason of their disability.   28 C.F.R. § 35.130(b)(3)(i)(ii).

875.   As explained above, Defendants' administration of the Farm Line places heat-sensitive persons at LSP into unjustifiably dangerous and painful conditions, without reasonable administrative or policy protections.

876.   The Court finds that Plaintiffs' claims under the ADA and Rehabilitation Act are not premised on Defendants' failure to attend to or treat the medical needs of ADA Subclass members.  Rather their claim is centered on LSP's failure to accommodate these individuals in its administration of the Farm Line.  Whether conceived under a reasonable accommodation theory or a methods of administration theory, Defendants' discrimination against ADA Subclass members is by reason of their disability.

### D.      LSP Receives Federal Funds

877.   There is no dispute that DOC is in receipt of federal funding as required by Rehabilitation Act.  SUF ¶ 47; *see also* 28 C.F.R. § 41.3(d).

878.   Accordingly, for the foregoing reasons, the Court finds that Defendants' current operation of the Farm Line violates the ADA and Rehabilitation Act by failing to reasonably accommodate people with the disability of impaired thermoregulation and by administering the Farm Line in a manner that discriminates on the basis of that disability.

---

[11]   Where an individual's disability, resulting limitation, and needs are "open, obvious, and apparent," failure to take action violates the ADA regardless of whether the plaintiff identified the disability and limitation and requested in an accommodation in "direct and specific terms." *Valentine*, 993 F.3d at 290.

### XV.    Plaintiffs Are Entitled to Declaratory and Injunctive Relief

#### A.    Declaratory Relief

879.    When confronted with "a case of actual controversy within its jurisdiction," "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).  "If necessary, a court may later grant an injunction to enforce its declaratory judgment." *Texas* v. *U.S. Dep't of Homeland Sec.*, 756 F. Supp. 3d 310, 360 (E.D. Tex. 2024) (citing 28 U.S.C. §  2202).

880.    For the foregoing reasons, the Court concludes that Plaintiffs are entitled to a declaration that current conditions on the Farm Line violate the Eighth Amendment and the ADA and Rehabilitation Act.

881.    Accordingly, the Court holds and finds Plaintiffs entitled to declaratory relief.

#### B.    Permanent Injunction

882.    The Court concludes that it is appropriate to exercise its equitable discretion by issuing a permanent injunction in this case.

883.    As explained below, the Court concludes that Plaintiffs have satisfied all of the requirements for a permanent injunction:  (1) they have "suffered an irreparable injury"; (2) the "remedies available at law, such as monetary damages, are inadequate to compensate for that injury"; (3) "considering the balance of the hardships between the Plaintiffs and Defendants, a remedy in equity is warranted"; and (4) "the public interest would not be disserved by a permanent injunction." *eBay Inc.* v. *MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

##### 1.    Plaintiffs Have Succeeded on the Merits

884.    For the reasons described at length above, the Court concludes that Plaintiffs have succeeded on the merits of their Eighth Amendment claims, having proved (i) that Defendants'

operation of the Farm Line poses a substantial risk of serious harm to human dignity to which Defendants are deliberately indifferent and (ii) that men on the Farm Line are at an objectively substantial risk of serious physical harm due to exposure to heat and that Defendants continue to be deliberately indifferent to those risks.

885.    Additionally, for the reasons described above, the Court concludes that Plaintiffs have succeeded on the merits of proving that Defendants' operation of the Farm Line reflects a current and future violation of the ADA and Rehabilitation Act.

### 2.    Plaintiffs Face Irreparable Harm That Cannot Be Addressed By Money Damages

886.    The Court next concludes that a permanent injunction is necessary in this case because class members face a substantial threat of irreparable harm.

887.    "An irreparable harm is one for which there is no adequate remedy at law," such as money damages. *Book People, Inc.* v. *Wong*, 91 F.4th 318, 340 (5th Cir. 2024). The caselaw is clear that ongoing constitutional violations constitute such an irreparable harm. *See Elrod* v. *Burns*, 427 U.S. 347, 373 (1976) (finding that the loss of a constitutional freedom "for even minimal periods of time, unquestionably constitutes irreparable injury"); *Book People*, 91 F.4th at 340–41 (citing *Elrod* to conclude the loss of a constitutional right constitutes irreparable injury).

888.    As explained above, the Court concludes that Defendants' operation of the Farm Line currently violates class members' constitutional rights and that Defendants' past conduct gives rise to a reasonable likelihood of future harms. *See Valentine*, 993 F.3d at 280. This ongoing violation of constitutional rights "unquestionably constitutes irreparable injury" and justifies entry of a permanent injunction. *Book People*, 91 F.4th at 340–41; *see Gates* v. *Cook*, 376 F.3d at 343 (holding that a violation of the plaintiffs' Eighth Amendment rights justified the permanent injunction).

191

889.    The Court further concludes that the dignitary harm Plaintiffs suffer as a result of Defendants' Eighth Amendment violation is, in and of itself, an ongoing irreparable injury. *See Cupolo* v. *Bay Area Rapid Transit*, 5 F. Supp. 2d 1078, 1084 (N.D. Cal. 1997) (recognizing that "injuries to individual dignity . . . constitute irreparable injury").

890.    Irreparable harm is especially present here because Plaintiffs have proven that class members, as a result of Defendants' operation of the Farm Line, face a heightened risk of "dying or suffering from serious illness and long-term health consequences" due to exposure to extreme heat on the Farm Line. *Vazquez Barrera* v. *Wolf*, 455 F. Supp. 3d 330, 340 (S.D. Tex. 2020). This harm, too, is irreparable. *Id.*

891.    The ADA Subclass faces irreparable harm because, for the reasons explained above, Defendants' operation of the Farm Line discriminates against its members and places them at increased risk of heat-related injury. The Court holds that this harm is also irreparable, necessitating the issuance of a permanent injunction. *See Cole* v. *Collier*, 2017 WL 3049540, at *43 (S.D. Tex. July 19, 2017) (holding that "heat-sensitive inmates" faced irreparable harm due to their exposure to "a particularly high risk of suffering from heat-related illness, as their thermoregulatory functions are compromised"); *Silver* v. *City of Alexandria*, 470 F. Supp. 3d 616, 624 (W.D. La. 2020) (a "direct violation of Title II of the ADA and the Rehabilitation Act" constitutes irreparable injury that warrants entry of injunctive relief).

892.    Moreover, the Court concludes that remedies available at law, such as monetary damages, are inadequate to compensate for Plaintiffs' constitutional and statutory injuries. *Ball* v. *LeBlanc*, 988 F. Supp. 2d 639, 688 (M.D. La. 2013) ("Undoubtedly, remedies available at law, such as monetary damages, are inadequate to compensate" for the injury caused by the state's past and ongoing violation of Eighth Amendment rights); *see also Ball*, 792 F.3d at 598 (remanding as

to injunction's scope while affirming that this Court "did not abuse its discretion by deciding to issue an injunction").

### 3.    The Balance of the Hardships Favors Granting the Injunction

893.    Next, the Court holds that the balance of the hardships inquiry weighs definitively in favor of granting a permanent injunction.

894.    Balancing the hardships requires the Court to evaluate the relative harm to both parties if the injunction is granted or denied. *Def. Distributed* v. *U.S. Dep't of State*, 838 F.3d 451, 459 (5th Cir. 2016).

895.    The Court finds that Defendants have not shown any real harm from the requested injunction. Defendants' unsupported claims that they would face financial hardship if the injunction were granted cannot justify violating class members' constitutional rights. The law is clear that a defendant's hypothetical claims of resource constraints can "never be an adequate justification for depriving any person of his constitutional rights." *Udey* v. *Kastner*, 805 F.2d 1218, 1220 (5th Cir. 1986) (emphasis added); *Ball,* 988 F. Supp. 2d at 688 (citing *Udey* to conclude that defendants could not show that the harm of requested injunction outweighed the injury to plaintiffs based only on evidence about a reduced budget).

896.    The factual record is clear that Defendants have never conducted any analysis to determine whether making changes to the Farm Line would result in additional costs, large or small. At most, Defendants' witnesses testified that a complete shutdown of the Farm Line—something Plaintiffs do not seek and the injunction does not contemplate—would result in LSP expending money to purchase canned vegetables, something the record demonstrates LSP already does. *See supra* Section X.B. Defendants have not assessed, no less provided evidence of what additional costs, if any, they would bear from the narrow relief granted under the injunction. *See* 2/9/26 Tr. 334:23–335:8 (Vannoy); 2/9/26 Tr. 207:5–8, 243:2–5 (Sylvester). Defendants'

193

argument that costs to the state must outweigh the harm that will befall Plaintiffs absent an injunction thus ultimately rings hollow.

897.    Defendants also point to vague notions of state sovereignty, but such principles similarly cannot justify violating class members' constitutional rights. *See Gates* v. *Collier*, 501 F.2d at 1320 (states must run prisons in a way that does not violate the federal constitution). Defendants have no legitimate interest in maintaining the Farm Line which, in its current form, violates class members' fundamental constitutional and statutory rights, and the law is clear that the federal courts must not allow "constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Brown* v. *Plata*, 563 U.S. 493, 511 (2011); *see also Book People*, 91 F.4th at 341 (the state has no legitimate interest in maintaining a violation of federal law).

### 4.    The Injunction Serves the Public Interest

898.    Finally, granting the permanent injunction will serve the public interest.

899.    Prior decisions from the Fifth Circuit, this very Court, and other sister courts in this circuit are unanimous that the public interest is served by the preservation of constitutional rights and, accordingly, by preventing violations of constitutional rights. *See, e.g.*, *Jackson Women's Health Org.* v. *Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014) (district court did not abuse discretion in finding that injunction that would "prevent constitutional deprivations" did not disserve the public interest); *Book People*, 91 F.4th at 341 (injunctions protecting constitutional rights are always in the public interest); *Ball*, 988 F. Supp. 2d at 688 ("[I]t is beyond dispute that a permanent injunction . . . serves the public interest in that it will enforce the fundamental rights enshrined in the United States Constitution."); *Marlowe* v. *LeBlanc*, 2020 WL 1983915, at *2 (M.D. La. Apr. 27, 2020) ("The public interest supports the protection of Eighth Amendment rights."); *Cole*, 2017 WL 3049540, at *44 (explaining that it is "always in the public interest to

194

prevent the violation of a party's constitutional rights" and granting an injunction to prevent Eighth Amendment violations).

900.    Here, the Court determines that a permanent injunction will serve the public interest by preventing deprivations of class members' constitutional and statutory rights.

901.    Additionally, the Court concludes that ensuring that public institutions comport with contemporary standards of decency further serves the public interest.    Because public institutions such as prisons reflect the values held by the society that shapes them, *see* 2/5/26 Tr. 119:3–13 (Sbicca); *see also supra* Section VIII.B, permitting violations of contemporary standards of decency to persist would harm the public's interest in seeing those values upheld.

902.    The Court finds that Plaintiffs have satisfied the required factors for permanent injunctive relief.

## XVI.    <u>The Granted Relief Satisfies the PLRA</u>

903.    As a threshold matter, the Court concludes that at least one or more of the Individual Named Plaintiffs exhausted their administrative remedies prior to filing suit in satisfaction of the PLRA's administrative exhaustion requirement.    *See Gates* v. *Cook*, 376 F.3d at 330 (holding that if one named plaintiff has exhausted administrative remedies, "this is enough to satisfy the requirement for the class").    For example, Mr. Walker filed a request for administrative remedy ("ARP") regarding his forced labor on the Farm Line on June 1, 2023, which was denied by LSP at the "First Step" on June 28, 2023.    *See* JX-095 at 3, 6.    He appealed that denial on July 1, 2023, and DOC denied his appeal at the "Second Step" on July 19, 2023, fully exhausting his available administrative remedies.    *See id.* at 7, 2.    Similarly, Mr. Guillory filed an ARP regarding his forced labor on the Farm Line on August 2, 2023, which DOC denied on September 12, 2023. Mr. Guillory appealed that denial on September 18, 2023, and DOC denied his appeal on September 22, 2023.    *See* JX-083 at 2, 6, 11, 1.

904.    Turning to the remedies, the Court notes that there is authority in this Circuit that remedies issued under the ADA and Rehabilitation Act "are not subject to the PLRA." *Parker*, 2026 WL 864705, at *18.  However, because the accommodations awarded under those statutes overlaps with injunctive relief the Court separately grants for Defendants' violations of the Eighth Amendment, the Court also analyzes that relief under the PLRA standards.[12]

905.    With respect to remedies for constitutional violations, the PLRA empowers courts to provide prospective relief in prison conditions cases so long as that relief is "narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and [is] the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A).

906.    Prospective relief is "necessary" for purposes of the PLRA when there is "a fit between the remedy's ends and the means chosen to accomplish those ends." *Plata*, 563 U.S. at 531 (cleaned up) (citations omitted).  Plaintiffs are "entitled to a remedy that eliminates the constitutional injury," which is to say that it "reduces the risk of harm to a socially acceptable level." *Ball*, 792 F.3d at 599.

907.    The Fifth Circuit, in reviewing this Court's first preliminary injunction at an earlier stage of this case, made clear that satisfying the PLRA's mandate that relief "extend no further than necessary" requires ensuring that injunctive relief is focused on the individuals harmed by the identified violations of federal law.  *See VOTE I*, No. 41 at 5.  In other words, relief should be "proportional to the scope of the violation" and the "scope of the order [is] determined with reference to the constitutional violations established by the specific plaintiffs before the court." *Plata*, 563 U.S. at 531.  That does not mean, however, that "a narrow and otherwise proper remedy

---

[12]    The relief the Court awards under both the ADA and Rehabilitation Act and the Eighth Amendment requires Defendants to (i) stop sending men with HPDS into the fields when the heat index is anticipated to reach heat indices of 88ºF or above, and (ii) expand HPDS eligibility for men on the Farm Line. *See infra* Section XVI.B.5–6.  This overlapping relief is described in further detail below.

for a constitutional violation is invalid simply because it will have collateral effects." *Id.* (holding prospective relief "does not fail narrow tailoring simply because it will have positive effects beyond the plaintiff class"); *see also M.D. by Stukenberg* v. *Abbott*, 907 F.3d 237, 272 (5th Cir. 2018) (an injunction that is necessary to remedy a violation is not "per se improper on the basis that [it] achieve[s] 'collateral' benefits not directly related to the appropriately identified systemic defect.").

908.    The PLRA's requirement that any prospective relief be the least intrusive necessary presumes some level of interference with prison administration may be required.  Indeed, "[c]ourts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Plata*, 563 U.S. at 511.  In evaluating the degree of permissible intrusion, courts consider factors including expense, *see Ball* v. *LeBlanc*, 881 F.3d 346, 353 (5th Cir. 2018), and the extent to which the relief restricts administrative control, *see Hinds Cnty.*, 128 F.4th at 638, as opposed to providing flexibility, *see* Blake P. Sercye, *Need-Narrowness-Intrusiveness under the Prison Litigation Reform Act of 1995*, 2010 U. Chi. L. Forum 471, 477 & n.45 (2010) LEGAL FORUM 471, 477 n.45 (citing *Lewis* v. *Casey*, 518 U.S. 343, 362 (1996); *Bell* v. *Wolfish*, 441 U.S. 520, 562 (1979)).

909.    For the reasons set out below, the Court concludes that the declaratory and injunctive relief provided here is necessary, narrow, and minimally intrusive in compliance with the PLRA.

A.    **The Declaratory Relief Satisfies the PLRA**

910.    In light of the above-identified constitutional and statutory violations and their factual predicates, the Court concludes that Plaintiffs are entitled to a declaration stating that Defendants' current operation of the Farm Line:  (i) creates a substantial risk of serious dignitary harm by reenacting and perpetuating conditions and logics of slavery in contravention of

197

contemporary standards of decency and by adding degradation and dehumanization to a sentence at hard labor in violation of the Eighth Amendment; (ii) creates a substantial risk of serious heat-related harm in violation of the Eighth Amendment; and (iii) violates the ADA and Rehabilitation Act by failing to reasonably accommodate people with the disability of impaired thermoregulation and by administering the Farm Line in a manner that discriminates on the basis of that disability.

911.    The Court finds that the granted declaratory relief satisfies the PLRA.

912.    As a preliminary matter, having demonstrated that their rights have been violated, Plaintiffs are entitled to declaratory relief. *See Lindh* v. *Warden, Fed. Corr. Inst., Terre Haute, Ind.*, 2013 WL 139699, at \*16 (S.D. Ind. Jan. 11, 2013) (finding plaintiff entitled to declaratory relief after demonstrating a violation of his rights under the Religious Freedom Restoration Act while incarcerated in federal prison).  Additionally, declaratory relief is necessary because it ensures that Plaintiffs and class members have a legal basis on which to seek forward-looking relief, including if any or all of their prospective injunctive relief were ever found overbroad. Finally, particularly in the context of Plaintiffs' dignitary harm claim, declaratory relief formally acknowledges class members humanity and affirms their dignity and entitlement to constitutional protections.

913.    The declaratory relief is narrow, applying only to Plaintiffs and class members.

914.    The declaration is minimally intrusive. *See Pueblo of Sandia* v. *Babbitt*, 47 F. Supp. 2d 49, 54 (D.D.C. 1999) ("Declaratory relief is probably the least intrusive type of relief available to a plaintiff in federal court"); *see also Lindh*, 2013 WL 139699, at \*16 (granting declaratory relief under the PLRA, noting such "relief will not, in and of itself, impose any financial or administrative burden on Defendants").

## B.    The Injunctive Relief Granted Satisfies the PLRA

915.    Based on the evidence at trial, the Court concludes Plaintiffs are entitled to injunctive relief requiring Defendants to (i) cease assigning people to the Farm Line in connection with disciplinary proceedings, including as the first job assignment given after someone loses a prior job assignment due to disciplinary sanctions; (ii) cease assigning people to the Farm Line as a first job assignment upon arrival at LSP; (iii) make available to all people assigned to the Farm Line educational programming consistent with what Warden Vannoy described in his post-trial testimony; (iv) provide people assigned Farm Line shifts during which the heat index reaches or exceeds 88°F, with regular, periodic access to air-conditioning on that day, such as on a bus during mandatory rest breaks pursuant to Directive 13.067, or for at least one hour following such shift; (v) cease assigning people with HPDS to the Farm Line during shifts where the heat index is projected to reach or exceed 88ºF; (vi) expand eligibility for HPDS to include any person assigned to the Farm Line who has been prescribed SSRIs, ACE inhibitors, ARBs, and/or dihydropyridine calcium channel blockers (the "Additional Medications"), and/or who has been diagnosed with diabetes, coronary artery disease, seizure disorder, and hypertension (the "Additional Conditions"); (vii) stop all Farm Line work when the heat index meets or exceeds 103ºF; (viii) cease charging co-pays for medical care sought by men assigned to the Farm Line for symptoms consistent with heat-related illness whether such medical care is sought while in the field or within 24 hours following the end of a shift during which the heat index met or exceeded 88ºF; and (ix) provide Plaintiffs' counsel with Daily Line Counts, Rosters, Perry Weather system heat index reports, SDEs made from the field or from Camps C or D during weeks where the heat index met or exceeded 88ºF while the Farm Line was operating, and information on the educational programming described by Warden Vannoy (PX-248 at 56–72) for a period of two years.

916.    The Court finds that the granted injunctive relief satisfies the PLRA.

199

1.    **Defendants Shall Cease Assigning People to the Farm Line in Connection with Disciplinary Proceedings, Including as the First Job Assignment Given After Someone Loses a Prior Job Assignment Due to Disciplinary Sanctions**

917.    Enjoining Defendants to cease assigning people to the Farm Line in connection with disciplinary proceedings is necessary to cure the dignitary harm resulting from Defendants' current operation of the Farm Line.  Unlike any other job assignment at LSP, the Farm Line is used as part of the disciplinary process.  By linking the Farm Line to disciplinary proceedings, Defendants transform a work assignment into a punishment.  The record indicates that much of the dignitary harm arising from Defendants' operation of the Farm Line is tied to the punitive nature of the assignment.  Picking vegetables is not an inherently undignified job, but when that work is punitive and compelled, doled out as part of disciplinary sanctions, compelling menial agricultural labor to be performed in former plantation fields under conditions on the Farm Line, the link with chattel slavery is inescapable.  *See supra* Sections VI.B, VII.  In order to sever the links between the operation of the Farm Line and the conditions and logics of slavery, it is therefore necessary to cease assigning men to the Farm Line in connection with disciplinary proceedings.

918.    The remedy granted is narrowly tailored to relieve that harm.  It applies only to the Farm Line and the conditions that make the Farm Line constitutionally infirm.

919.    This remedy is also minimally intrusive.  Although prohibiting Defendants from using the Farm Line as punishment represents some change in operations, that change does nothing more than bring the Farm Line in line with other job assignments at LSP, none of which are made in connection with disciplinary proceedings.  There is no evidence in the record that the relief will impact the availability of men to work on the Farm Line.

**2.    Defendants Shall Cease Assigning People to the Farm Line as Their First Job Assignment Upon Arrival at LSP**

920.    This relief is also necessary to cure the ongoing dignitary harm violation.  The evidence demonstrates that the Farm Line is generally assigned as men's first job assignment at LSP in order to "break" their spirit, 2/3/26 Tr. 34:5–17 (Guillory), and "welcome [them] to the plantation," 2/5/26 Tr. 139:18–22 (Sbicca discussing statements made by Major).  The Court finds that it would not be possible to sever the link between the Farm Line and the conditions and logics of slavery without ending that practice.

921.    This remedy is narrowly tailored because it impacts only the Farm Line and the identified harm.

922.    This remedy is also minimally intrusive.  Prohibiting Defendants from using the Farm Line as the first assignment for new arrivals at LSP represents only a minor change in operations, affecting only new arrivals' first 90-day assignment.  There is no evidence in the record that the relief will impact the availability of men to work on the Farm Line.

**3.    Defendants Shall Provide Educational Programming to People Assigned to the Farm Line Consistent with That Described in Warden Vannoy's Post-Trial Testimony**

923.    An injunction requiring Defendants to provide educational programming consistent with that described in Warden Vannoy's post-trial testimony is necessary to abate the unconstitutional degradation of the Farm Line.  *See* PX-248 at 56–72 (Vannoy March 2026 dep.).  At present, methods of operating the Farm Line have the effect of and appear designed to enforce a social hierarchy in which men on the Farm Line are deprived of all agency and self-worth and are geared toward increasing pain and emphasizing punishment over efficiency, skill development, and rehabilitation.  *See supra* Section XIII.A.1.  The class Warden Vannoy described would mitigate that harm by teaching people assigned to the Farm Line how to farm in accordance with

201

contemporary standards, allowing them to earn professional licenses that would benefit them upon release, and allowing them to use their learned skills on the Farm Line (all of which, the Court notes, is likely to increase the productivity of the Farm Line and benefit the institution as a whole as well as class members). The Court concludes that such a class is necessary to eliminate the unlawfully degrading conditions of the Farm Line

924. This remedy is narrow because it requires that the class be available only to men assigned to the Farm Line.

925. The remedy is minimally intrusive because it does no more than require implementation of a program of Defendants' own design. The Court presumes that Defendants, in conceiving of the program, considered such relevant factors as budgetary and administrative needs. The injunction thus simply holds Defendants to their word that the class will be substantially implemented in due course.

### 4. Defendants Shall Provide People Assigned Farm Line Shifts During Which the Heat Index Reaches or Exceeds 88°F, with Regular, Periodic Access to Air-Conditioning on That Day, Such as on a Bus During Mandatory Rest Breaks Pursuant to Directive 13.067, or for at Least One Hour Following Such Shift

926. This remedy is necessary to cure the ongoing heat-related Eighth Amendment violations on the Farm Line. One of the specific practices shown to create intolerable risk of heat-related harm is the cumulative heat load to which class members are subject. 2/9/26 Tr. 15:18–16:8, 20:3–15, 32:23–33:24 (Vasallo). Providing access to air-conditioning to people assigned to Farm Line shifts during which the heat index reaches or exceeds 88°F is necessary to reduce that cumulative heat load.

927. This remedy is narrow because it only impacts men assigned to work a shift on the Farm Line during which the heat index meets or exceeds 88°F.

928.    This remedy is also minimally intrusive.  Rather than requiring DOC to make infrastructural changes to install air-conditioning in designated spaces, *cf. Ball*, 792 F.3d at 599, this remedy affords Defendants the flexibility to determine the best place, time, and manner in which to provide access to air-conditioning in order to minimize any financial or administrative burden, while still curing the identified violation.

### 5.    Defendants Shall Cease Assigning People with HPDS to Farm Line Shifts During which the Heat Index Is Projected to Reach or Exceed 88ºF

929.    Enjoining Defendants from assigning people with HPDS to Farm Line shifts when the heat index is projected to reach or exceed 88ºF is necessary to cure Defendants' ongoing Eighth Amendment as well as violations of the ADA and Rehabilitation Act.  The evidence demonstrates that a heat index of 88ºF is a critical threshold at which people with heightened heat vulnerability are at risk and should not be left outside.  It also demonstrates that LSP has consistently exposed such men to dangerous heat conditions and that only when LSP temporarily stopped sending men with HPDS out to work during portions of the summer of 2025 were those men protected from prolonged, unsafe heat exposure.  To remedy the ongoing constitutional violation as well as Defendants' failure to accommodate people with impaired thermoregulation and failure to administer the Farm Line in a non-discriminatory manner, the granted prohibition is required.

930.    This remedy is narrow because it impacts only men assigned to the Farm Line who have been granted HPDS and only during shifts when the heat index is projected to exceed 88ºF.

931.    This remedy is also minimally intrusive.  It requires nothing more than that LSP not send men out into heat conditions that it anticipates will rise to levels that its own policy, as well as copious scientific studies, identify as dangerous.  Again, there is no evidence that this remedy will substantially impact the number of men available to work the Farm Line.

**6.    Defendants Shall Expand Eligibility for HPDS to Include Any Person Assigned to the Farm Line Who Has Been Prescribed Any of the Additional Medications and/or Diagnosed with Any of the Additional Conditions.**

932.    Expanding HPDS eligibility for men assigned to the Farm Line who are taking any of the Additional Medications and/or diagnosed with any of the Additional Conditions is necessary to cure the ongoing violations of the Eighth Amendment, the ADA, and the Rehabilitation Act. The evidence demonstrates that such people are at heightened risk of heat illness, and yet, are not receiving the protections attendant to HPDS.  It is also necessary to rectify Defendants' identified failures to provide reasonable accommodations and administer the Farm Line in a nondiscriminatory manner.

933.    This remedy is narrow because it impacts only men assigned to the Farm Line who are taking any of the Additional Medications or suffer any of the Additional Conditions and, as to them, only during periods of extreme heat.

934.    This remedy is also minimally intrusive.  In reaching that conclusion, the Court considered whether it would be less intrusive to require Defendants to revise Directive 13.067 to include the Additional Medications and Additional Conditions on the Heat Pathology Medications List and the Medical Exclusion List, respectively.  However, because Directive 13.067 is not specific to the Farm Line, such a remedy would have implications across multiple programs at LSP and for individuals who are not assigned to the Farm Line.  In balancing the obligation to provide a remedy to cure the violation of federal law with the PLRA's requirements that such a remedy is both no more expansive than necessary and no more intrusive than necessary, the Court finds that expanding eligibility only for people assigned to the Farm Line will better meet these requirements than requiring an expansion of Directive 13.067.  Of course, if Defendants determine

204

that revising Directive 13.067 is administratively preferable to creating Farm Line-specific HPDS

eligibility criteria, they can certainly do so while fully complying with the ordered relief.

> **7.    Defendants Shall Cease All Farm Line Work When the Heat Index Reaches or Exceeds 103ºF**

935.    Requiring Defendants to cease all work on the Farm Line once the heat index meets

or exceeds 103ºF is also necessary to cure the heat-related Eighth Amendment violations.  The

evidence and testimony presented at trial make clear that a "Danger" zone is entered at a heat index

of 103ºF.  Particularly given that the Farm Line operates under direct sunlight that can make the

felt heat index up to 15ºF hotter, stopping work at that threshold is necessary in order to ensure

that risk is reduced to a constitutionally acceptable level.

936.    This remedy is narrow because it impacts only men assigned to the Farm Line.

937.    This remedy is also minimally intrusive.  As noted above, existing policy requires

Defendants to monitor the heat index and to call a work stoppage on the Farm Line when a

designated threshold is met.  The relief ordered simply adjusts that threshold as applied to the Farm

Line to reflect scientific evidence regarding the point at which the risk to human health and safety

becomes too great, even with mitigating measures in place, to permit work to proceed safely.

> **8.    Defendants Shall Cease Charging People Assigned to the Farm Line Co-pays for Medical Care Sought for Symptoms Consistent with Heat-Related Illness Whether Such Medical Care is Sought While in the Field or Within 24 Hours Following the End of a Shift During Which the Heat Index Met or Exceeded 88ºF**

938.    This remedy is necessary to cure the heat-related Eighth Amendment violation.

Enjoining Defendants to eliminate the co-pay for medical care for people who work on the Farm

Line and experience symptoms consistent with heat stress while working in high heat conditions

in the fields or within 24 hours thereafter, *see supra* XI.A.7, is necessary.  Specifically, this remedy

will ensure that financial disincentives resulting from the extreme divergence of available

205

incentive pay on the Farm Line and the cost of emergency medical care do not result in inadequate access to necessary medical care for heat-related illness.

939. This remedy is narrow because it impacts only men assigned to the Farm Line during periods of high heat.

940. This remedy is also minimally intrusive. As made clear at trial, Defendants have previously chosen to suspend co-pays for medical care under specific circumstances, such as during the COVID-19 pandemic. 2/4/26 Tr. 296:5–12 (Coley). That experience should minimize any administrative burden associated with suspending co-pays. And while this remedy undoubtedly involves some *de minimis* financial loss for Defendants, that imposition is rendered necessary by the importance of ensuring adequate access to medical care for heat-related illness in order to reduce the degree of risk of serious heat-related harm or death to a constitutionally acceptable level.

### 9. Defendants Shall Provide Plaintiffs' Counsel With Regular and Ongoing Disclosures of Daily Line Counts, Rosters, Perry Weather Heat Index Reports, SDEs Made From the Field or From Camps C or D During Weeks Where the Heat Index Met or Exceeded 88ºF While the Farm Line Was Operating, and Information on the Educational Programming Described by Warden Vannoy for a Period of Two Years

941. This remedy is necessary to ensure the effectiveness of the other remedies ordered to cure the ongoing violations of the Eighth Amendment and ADA and Rehabilitation Act. Defendants' prior behavior in this litigation, which has repeatedly put men on the Farm Line in danger and which has only been mitigated through Plaintiffs' counsel's diligent review of Defendants' records, support the Court's conclusion that disclosures are necessary to allow Plaintiffs to ensure that Defendants comply with the substantive relief ordered. *See supra* Sections XII.C, XII.E. Additionally, Defendants' change to the use of the Perry Weather system reduces transparency because records from that system are not publicly available. *See supra* Section

XII.D.3.  Information relating to SDEs called by men on the Farm Line, whether in the field or in their dorms, following periods of high heat is necessary to ensure Defendants are taking adequate protections.  Finally, Defendants have provided no documentation at all concerning the class, which was for the first time referenced following trial.  Accordingly, disclosures of DLCs, Rosters, Perry Weather system heat index reports, SDEs, and information on the forthcoming horticultural class are necessary to ensure that Defendants conform with the injunction.

942.    This remedy is narrow because the disclosures all relate specifically to operation of the Farm Line and the issues underlying the ordered substantive relief.

943.    This remedy is also minimally intrusive.  The ordered disclosures simply require Defendants to provide to Plaintiffs' counsel information that Defendants are already collecting as part of their ordinary operation of the Farm Line.  These include the DLCs and Rosters that LSP maintains in the ordinary course and have been disclosed to Plaintiffs on a weekly basis throughout this litigation, reports generated by the Perry Weather system that LSP ordinarily generates and reviews, SDEs that are already created and maintained, and documentation that the agricultural class described by Warden Vannoy is substantially implemented.  Additionally, the disclosure requirement is time-limited to two years, the same time frame permissible under 18 U.S.C. § 3626(b)(1)(A).

944.    Accordingly, the Court finds that the nine-point injunctive relief described above satisfies the PLRA.  In reaching that conclusion, the Court is cognizant that it may not "enjoin[] state facilities to follow state law," *Valentine* v. *Collier*, 956 F.3d 797, 802 (5th Cir. 2020), and it concludes that none of the injunctive remedies ordered violate that principle.  In particular, the record does not reflect any state law or policy that bars people with HPDS from being assigned to the Farm Line when the heat index is expected to reach or exceed 88°F.  Whereas it appears

Defendants momentarily adopted that "informal practice" in 2025, 2/10/26 Tr. 36:18–37:6 (Vannoy), they did so for unrelated administrative reasons, subsequently abandoned that practice, and chose not to mandate it when they revised Directive 13.067 in January 2026 and again post-trial.  Additionally, the Court has found the instruction in memoranda issued post-trial that men with HPDS be brought in within 30 minutes of a Heat Alert is insufficient and less protective than the remedy ordered.  Likewise, the class that Warden Vannoy testified to post-trial is not reflected in any directive or memoranda.

Dated:  March 31, 2026

Respectfully Submitted,

**THE PROMISE OF JUSTICE INITIATIVE**

*/s/ Samantha Pourciau*
Cecelia Trenticosta Kappel, La. Bar No. 32736
Samantha Pourciau, La. Bar No. 39808
Michael Allen, La. Bar No. 41142
1024 Elysian Fields Avenue
New Orleans, LA 70117
Tel: (504) 529-5955
ctkappel@defendla.org
sbosalavage@defendla.org
mallen@defendla.org

**RIGHTS BEHIND BARS**

*/s/ Lydia Wright*
Lydia Wright, La. Bar No. 37926
Amaris Montes (PHV) MD Bar No. 2112150205
1800 M St. NW Fnt. 1 #33821
Washington, D.C. 20033
Tel: (202) 455-4399
lydia@rightsbehindbars.org
amaris@rightsbehindbars.org

**PAUL, WEISS, RIFKIND, WHARTON
 & GARRISON LLP**

*/s/ Jeremy A. Benjamin*
Joshua Hill Jr. (PHV) NY Bar No. 4297826
Jeremy A. Benjamin (PHV) NY Bar No. 4770277
Arielle B. McTootle (PHV) NY Bar No. 5993217
Ricardo Sabater (PHV) NY Bar No. 5993217
Leah R. Weiser (PHV) NY Bar No. 6027601
Chizoba D. Wilkerson (PHV) NY Bar No. 5903943
Erica Paul (PHV) NY Bar No. 615707
Christopher A. Bilicic (PHV) NY Bar No. 6233472
Janet G. Lee (PHV) NY Bar No. 6182265
1285 Avenue of the Americas
New York, NY 10019-6064
Tel: (212) 373-3000
jhill@paulweiss.com
jbenjamin@paulweiss.com
amctootle@paulweiss.com
rsabater@paulweiss.com
lweiser@paulweiss.com
cwilkerson@paulweiss.com
epaul@paulweiss.com

209

cbilicic@paulweiss.com
jglee@paulweiss.com

*Attorneys for Plaintiffs and the Certified Classes*