UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

VOICE OF THE EXPERIENCED, A          CIVIL ACTION
MEMBERSHIP ORGANIZATION ON
BEHALF OF ITSELF AND ITS
MEMBERS, ET AL.

VERSUS

JAMES LEBLANC, ET AL.          NO. 23-01304-BAJ-EWD

## RULING AND ORDER

This matter is before the Court following a bench trial on Plaintiffs' claims of cruel and unusual punishment under the Eighth Amendment and 42 U.S.C. § 1983 and disability discrimination under the Americans with Disabilities Act ("ADA") and Rehabilitation Act ("RA"). Defendants oppose each of Plaintiffs' claims. After the conclusion of the bench trial, the Parties filed proposed findings of fact and conclusions of law. (Doc. 431; Doc. 432; Doc. 433). For the following reasons, the Court enters ruling for Defendants.

## I. PROCEDURAL HISTORY

On September 16, 2023, Plaintiffs filed this lawsuit. (Doc. 1). On December 15, 2023, Plaintiffs filed an Amended Complaint, which serves as the operative Complaint in this matter. (Doc. 21).

Defendants then moved to dismiss Plaintiffs' Thirteenth Amendment claims. (Doc. 22). The Court granted Defendants' Motion for Partial Dismissal and dismissed those claims. (Doc. 56). Plaintiffs' two remaining claims include: (1) Cruel and

unusual punishment under the Eighth Amendment and 42 U.S.C. § 1983 (Count One); and (2) Disability discrimination in violation of the ADA and RA (Count Two). (Doc. 21).

On May 13, 2024, Plaintiffs moved for a preliminary injunction and temporary restraining order ("TRO"), requesting that the Court immediately enjoin all agricultural labor performed by incarcerated persons on the Farm Line at Louisiana State Penitentiary ("LSP")[1] when heat index values exceeded 88 degrees Fahrenheit.[2] (Doc. 37). The matter came before the Court for a hearing. (Doc. 62).

On July 2, 2024, the Court entered an Order granting Plaintiffs' Motion for a Preliminary Injunction and Temporary Restraining Order in part and denying it in part. (Doc. 70, the "July 2 Order"). The Court did not enjoin labor on the Farm Line altogether but ordered Defendants to alter Farm Line working conditions to protect human health and safety. (*Id.*). Specifically, the Court ordered Defendants to immediately:

1. Correct the deficiencies in LSP Directive No. 13.067 described in the Court's Order, including the lack of shade and adequate rest provided to

---

[1] The "Farm Line" is a colloquial term used by LSP staff and incarcerated persons to refer to LSP's vegetable crop farming program that currently operates out of Camp C and Camp D. (Doc. 349-1 ¶ 63). The Farm Line is discussed in greater detail below.

[2] Merriam-Webster defines "heat index" as "a value that indicates what the ambient temperature feels like to the human body and that is derived from a calculation using air temperature and relative humidity." *Heat Index*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/heat index (last visited May 26, 2026).

incarcerated persons laboring on the Farm Line ("Part (1)" of the Court's July 2 Order);[3]

2. Correct the problems with Defendants' equipment policies, including the failure to provide sunscreen and other necessary protective clothing and equipment to those laboring on the Farm Line ("Part (2)" of the Court's July 2 Order);

3. Submit a revised and expanded Heat Pathology Medications list ("Part (3)" of the Court's July 2 Order);

4. Create a procedure to ensure that all incarcerated persons suffering from health conditions that significantly inhibit thermoregulation are assessed by medical personnel and are granted heat precaution duty status ("Part (4)" of the Court's July 2 Order);[4] and

5. Develop an additional heat-related policy to protect those laboring outdoors when heat index values reach or exceed 113 degrees Fahrenheit ("Part (5)" of the Court's July 2 Order).

(Id.).

---

[3] LSP Directive No. 13.067 is a heat pathology policy issued by LSP personnel that applies to LSP. (Doc. 349-1 ¶ 104). Directive 13.067 is discussed in greater detail below.

[4] "Heat Precaution Duty Status" is one of the duty statuses that can be assigned to an incarcerated person when it is determined that they have a condition or take medication that make them more sensitive or vulnerable to heat-related injury, as outlined in HCP8 and Directive 13.067. (Doc. 349-1 ¶ 98).

On the same day, July 2, 2024, Defendants appealed the Court's July 2 Order to the U.S. Court of Appeals for the Fifth Circuit (the "First Appeal").[5] (Doc. 71; Fifth Circuit Case No. 24-30420).

On March 26, 2025, while the First Appeal remained pending, Plaintiffs moved for the entry of a second TRO. Plaintiffs' Motion asked the Court to require Defendants to: (1) issue a "Heat Alert" whenever the heat index met or exceeded 88 degrees Fahrenheit on the Farm Line at LSP; and (2) monitor the heat index every 30 minutes on the Farm Line at LSP. (Doc. 201-1 at 7). The matter again came before

_____

[5] Defendants moved the Circuit to stay the Court's July 2 Order pending the outcome of the First Appeal. (Fifth Circuit Case No. 24-30420, Doc. 12). On July 5, 2024, the Circuit entered a temporary administrative stay until July 19, 2024. (Fifth Circuit Case No. 24-30420, Doc. 26).

After additional briefing, the Circuit considered Defendants' motion for stay pending appeal. (Fifth Circuit Case No. 24-30420, Doc. 41). The Circuit vacated the administrative stay and granted in part and denied in part Defendants' motion for stay pending appeal. (*Id.*). Specifically, the Circuit granted a stay pending appeal with respect to parts (3), (4), and (5) of the Court's July 2 Order. (*Id.* at 10). The Circuit denied a stay pending appeal with respect to parts (1) and (2) of the Court's July 2 Order. (*Id.*).

The Circuit reasoned that three portions of the Court's July 2 Order—Parts (3), (4), and (5)— were overbroad because they appeared to reach beyond LSP to cover the entire Louisiana Department of Public Safety and Corrections, rather than inmates working on LSP's Farm Line. (*Id.* at 5). The Circuit found that parts (1) and (2) of the Court's July 2 Order, however, were targeted specifically at the Farm Line, and thus were not overbroad. (*Id.*). Accordingly, the Circuit did not stay parts (1) and (2) of the Court's July 2 Order pending appeal. (*Id.* at 10).

Defendants also argued in their briefing before the Circuit that the Court's July 2 Order erred because the Court cannot issue classwide relief before certifying the class. (Fifth Circuit Case No. 24-30420, Doc. 41-1 at 6). Recognizing that "[c]lass-wide relief may be appropriate in an individual action if such is necessary to give the prevailing party the relief to which he or she is entitled[,]" the Circuit found that Defendants had not shown a likelihood of success on this issue. (*Id.* (citing *Hernandez v. Reno*, 91 F.3d 776, 781 (5th Cir. 1996)). Thus, the Circuit found that the Court did not err in granting classwide relief on a preliminary basis for parts (1) and (2) of its July 2 Order. (*Id.*).

4

the Court for a hearing, after which the Court permitted the Parties to file supplemental briefing. (Doc. 233; Doc. 235). On May 16, 2025, the Parties submitted supplemental briefing regarding Plaintiffs' request for a second TRO. (Doc. 249; Doc. 250).

On May 23, 2025, the Court granted the Motion and ordered Defendants to: (1) issue a "Heat Alert" on the Farm Line at LSP whenever the heat index met or exceeded 88 degrees Fahrenheit; and (2) monitor the heat index on the Farm Line at LSP every 30 minutes. (Doc. 253 at 38). The next day, on May 24, 2025, Defendants appealed the Court's May 23 Order (the "Second Appeal"). (Doc. 254; Fifth Circuit Case No. 25-30322).

During the pendency of the First and Second Appeals, Plaintiffs moved for renewed injunctive relief, requesting that the Court again require Defendants to: (1) issue a "Heat Alert" on the Farm Line at LSP whenever the heat index met or exceeded 88 degrees Fahrenheit; and (2) monitor the heat index on the Farm Line at LSP every 30 minutes. (Doc. 280). Plaintiffs reasoned that the Second TRO expired by operation of law under the PLRA 90 days after the issuance of the Order.

On August 22, 2025, the Court granted Plaintiffs' Motion for Renewed Injunctive Relief in part, ordering Defendants to continue issuing a "Heat Alert" on the Farm Line at LSP whenever the heat index meets or exceeds 88 degrees Fahrenheit (the "August 22 Order"). (Doc. 297 at 7–8). The Court reasoned that the issuance of a "Heat Alert" was necessary to protect human health and safety (*Id.*). The Court further reasoned:

> As the Court emphasized in its May 23 Ruling, Dr. Vassallo, a licensed physician and expert in thermoregulation, credibly testified that incarcerated persons working on the Farm Line at LSP are at substantial risk of serious harm due to their prolonged exposure to heat indices above 88 degrees Fahrenheit. (Doc. 253 at 21). Dr. Vassallo relied on data from the Occupational Health and Safety Administration, National Weather Service, and scientific literature, described extensively in the Court's May 23 Ruling. (Id. at 21–31). The Court's May 23 Ruling was also informed by the fact that the Fifth Circuit and other district courts within the Fifth Circuit have repeatedly relied on Dr. Vassallo's expertise to make similar findings. (Doc. 253 at 24–25).
>
> A Heat Alert threshold of 88 degrees Fahrenheit is also well-supported in the law—numerous courts have found that a heat index of 88 degrees Fahrenheit or higher poses a substantial risk of adverse health outcomes. (Doc. 253 at 31–32). *To protect human health and safety*, the Court finds that successive injunctive relief is warranted regarding the Heat Alert threshold.

(*Id.* at 6–7 (emphasis added)). However, the Court declined to order heat monitoring every thirty minutes as requested by Plaintiffs because LSP was monitoring the heat index hourly at that time. (*Id.* at 7). That same day, on August 22, 2025, Defendants appealed the Court's August 22 Order (the "Third Appeal"). (Doc. 298, Fifth Circuit Case No. 25-30478).

On August 22, 2025, the Court visited LSP to observe conditions on the Farm Line along with Counsel for all Parties. (Doc. 288).

On August 26, 2025, the Fifth Circuit ruled on the First Appeal. The Circuit did not address the merits of the First Appeal. Instead, the Circuit held that the First Appeal was moot because the Court's July 2 Order expired automatically by operation

6

of law under the PLRA in September 2024.[6] (Doc. 302 at 5, 7). Noting that all Parties agreed that the First Appeal was moot, and that Plaintiffs did not move to make the injunction permanent before its expiration, the Circuit vacated the Court's July 2 Order and remanded the matter to this Court for further proceedings. (Doc. 302 at 3). The Circuit concluded that vacatur "clear[s] the path for future relitigation[] between the parties on issues such as class certification, other preliminary relief, and ultimately a full bench trial on the merits and permanent relief." (*Id.* at 8 (citing *United States v. Munsingwear, Inc.*, 340 U.S. 36, 40 (1950)).[7]

On September 17, 2025, the Circuit stayed the Court's August 22 Order pending appeal. (Doc. 321).

On December 23, 2025, the Court granted class certification, designating two classes:

> 1)    A General Class consisting of all persons incarcerated at LSP who currently are, or may in the future be, assigned to the Farm Line; and
>
> 2)    An ADA Subclass, comprising all persons incarcerated at LSP who have disabilities that substantially limit one or more of their major life activities and who currently are, or may in the future be, assigned to the Farm Line.

---

[6] Under the PLRA, "[p]reliminary injunctive relief shall automatically expire on the date that is 90 days after its entry, unless the court makes the findings required under subsection (a)(1) for the entry of prospective relief and makes the order final before the expiration of the 90-day period." 18 U.S.C. § 3626(a)(2).

[7] The Fifth Circuit emphasized that this was a "heartland" application of *Munsingwear* vacatur, which requires the Circuit to vacate the district court's Order when appellate review is "prevented through happenstance." (Doc. 302 at 6–8 (citing *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 23 (1994) (quotation omitted)). The Circuit thus vacated the Court's July 2 Order to "prevent [the] unreviewable decision from spawning any legal consequences." (Doc. 302 at 8 (citing *Camreta v. Greene*, 563 U.S. 692, 713 (2011)).

(Doc. 364 at 31–32). On Plaintiffs' Unopposed Motion, the Court later clarified the ADA Subclass to comprise:

> all persons incarcerated at Louisiana State Penitentiary who currently are or may in the future be assigned to the Farm Line and who have disabilities that may cause, or that are treated with medications that may cause, impaired thermoregulation.

(Doc. 407).

At the conclusion of the bench trial on the matter, the Court ordered supplemental briefing.

On March 6, 2026, the Circuit dismissed the Third Appeal as moot.[8] (Doc. 418). On March 12, 2026, the Circuit dismissed the Second Appeal as moot.[9] (Doc. 427). On March 31, 2026, the Parties filed supplemental briefing following the trial. (Doc. 431; Doc. 432; Doc. 433). Now, the matter is ready for Ruling.

---

[8] On November 21, 2025, the Circuit originally entered Judgment dismissing the Third Appeal as moot. (Fifth Circuit Case No. 25-30478, Doc. 96-1). The Circuit, however, withheld the issuance of the Mandate, such that it was not entered into the Court's docket. (Doc. 356). On December 5, 2025, Defendant-Appellants filed a Petition for Rehearing En Banc. (Fifth Circuit Case No. 25-30478, Doc. 99). On February 27, 2026, the Fifth Circuit denied Defendant-Appellants' Petition for Rehearing En Banc because the majority of Judges did not vote in favor of rehearing. (Fifth Circuit Case No. 25-30478, Doc. 118-1). Thereafter, the Circuit withdrew the Order withholding issuance of the Mandate. (Doc. 412).

[9] On August 28, 2025, the Circuit originally entered Judgment dismissing the Second Appeal as moot. (Fifth Circuit Case No. 25-30322, Doc. 97). Defendant-Appellants timely filed a Petition for Rehearing En Banc. (Fifth Circuit Case No. 25-30322, Doc. 99). The Circuit thus withheld the issuance of the Mandate, such that it was not entered into the Court's docket. (Doc. 315). On March 3, 2026, the Circuit withdrew the Order withholding the issuance of the Mandate and denied Defendant-Appellants' Petition. (Doc. 416).

## II. LEGAL STANDARD

### A. The Eighth Amendment.

The Eighth Amendment dictates that cruel and unusual punishment shall not be inflicted, U.S. Const. amend. VIII, and it is applicable to the States by reason of the Due Process Clause of the Fourteenth Amendment. *Gates v. Cook*, 376 F.3d 323, 332 (5th Cir. 2004) (citing *Robinson v. Cal.*, 370 U.S. 660, 675 (1962)). The treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment. *Gates*, 376 F.3d at 332 (citing *Helling v. McKinney*, 509 U.S. 25, 31 (1993)).

The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones. *Gates*, 376 F.3d at 332 (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). Prison officials must provide humane conditions of confinement; they must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to ensure the safety of incarcerated persons. *Id.* The Fifth Circuit has worded the test as requiring extreme deprivation of any "minimal civilized measure of life's necessities." *Gates*, 376 F.3d at 332 (citing *Davis v. Scott*, 157 F.3d 1003, 1006 (5th Cir. 1998)). Further, mental health needs are no less serious than physical needs. *Gates*, 376 F.3d at 332 (citing *Partridge v. Two Unknown Police Officers of City of Hou., Tex.*, 791 F.2d 1182, 1187 (5th Cir. 1986)).

The U.S. Supreme Court has made clear that the standards against which a court measures prison conditions are "the evolving standards of decency that mark

9

the progress of a maturing society" and not the standards in effect during the time of the drafting of the Eighth Amendment. *Gates*, 376 F.3d at 332–33 (citing *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (internal quotation omitted)).

A prison official has violated the Eighth Amendment when he 1) shows a subjective deliberate indifference to 2) conditions posing a substantial risk of serious harm to the inmate. *Gates*, 376 F.3d at 333 (citing *Farmer*, 511 U.S. at 833–34). Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. *Gates*, 376 F.3d at 333 (citing *Farmer*, 511 U.S. at 842). Courts "may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious." *Hope v. Pelzer*, 536 U.S. 730, 737 (2002) (citing *Farmer*, 511 U.S. at 842).

Conditions of confinement may establish an Eighth Amendment violation "in combination" when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets. *Gates*, 376 F.3d at 333 (citing *Wilson v. Seiter*, 501 U.S. 294, 304 (1991)). The Supreme Court has noted that "the length of confinement cannot be ignored. . . . A filthy, overcrowded cell . . . might be tolerable for a few days and intolerably cruel for weeks or months." *Gates*, 376 F.3d at 333 (citing *Hutto v. Finney*, 437 U.S. 678, 686–87 (1978)). It is also important to note that

10

the incarcerated person need not show that death or serious illness has occurred. *Gates*, 376 F.3d at 333 (citing *Helling*, 509 U.S. at 32 ("It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them.")).

Subjecting incarcerated persons to high heat conditions for sustained periods of time, with inadequate procedures to mitigate the risks inherent in such high heat, is a violation of the Eighth Amendment when prison officials are "deliberately indifferent" to such risks. *See, e.g., Hinojosa v. Livingston*, 807 F.3d 657, 670 (5th Cir. 2015) ("[The Fifth] [C]ircuit has made very clear that inmates have a right, under the Eighth Amendment, not to be subjected to extreme temperatures without adequate remedial measures[.]"); *Ball v. LeBlanc*, 792 F.3d 584, 596 (5th Cir. 2015) ("[W]e affirm the district court's conclusion that housing these prisoners in very hot cells without sufficient access to heat-relief measures, while knowing that each suffers from conditions that render him extremely vulnerable to serious heat-related injury, violates the Eighth Amendment"); *Cole v. Collier*, No. 4:14-CV-1698, 2017 WL 3049540, at *39 (S.D. Tex. July 19, 2017) (finding that, due to continued occurrence of high heat and the inadequacy of efforts to mitigate such heat, "[t]he conditions of confinement at the Pack Unit," a prison operated by the Texas Department of Criminal Justice, "violate the Eighth Amendment").[10]

---

[10] *See also Hope*, 536 U.S. at 738 (Eighth Amendment violation was "obvious" in part because plaintiff was subjected to "unnecessary exposure to the heat of the sun"); *Gates*, 376 F.3d at 340 (holding that the probability of heat-related illness based on the conditions of confinement in a certain cellblock and the open and obvious nature of the risk thereof

Further, "prison work requirements which compel inmates to perform physical labor, which is beyond their strength, endangers their lives, or causes undue pain constitutes cruel and unusual punishment." *Howard v. King*, 707 F.2d 215, 219 (5th Cir. 1983); *see also Mendoza v. Lynaugh*, 989 F.2d 191, 194 (5th Cir. 1993) ("To be sure, if prison officials assign an inmate to a work detail and they know that such an assignment could exacerbate a serious physical ailment, then such a decision could constitute deliberate indifference."); *Calhoun v. Hargrove*, 312 F.3d 730, 734–35 (5th Cir. 2002) (finding claim sufficient to survive a motion to dismiss where prison official purportedly knew about a four-hour medical work restriction but forced inmate to work long hours, which raised blood pressure to dangerously high levels).

The adequacy of prison conditions and procedures is a fact-specific question that courts have routinely turned to experts for help answering. *See, e.g., Gates*, 376 F.3d at 339 (upholding the issuance of injunctive relief that relied on Dr. Vassallo's testimony that the conditions of confinement were such that it was "very likely" that incarcerated persons in the relevant facility would die from heat stroke or some other heat-related condition); *Ball*, 792 F.3d at 593 (affirming the district court finding that, based mainly on Dr. Vassallo's testimony, the heat conditions and procedures in place within the relevant prison put incarcerated

---

amounted to an Eighth Amendment violation); *Valigura v. Mendoza*, 265 F. App'x 232, 235 (5th Cir. 2008) ("We have held that temperatures [within confinement] consistently in the nineties without remedial measures, such as fans, ice water, and showers, sufficiently increase the probability of death and serious illness so as to violate the Eighth Amendment"); *McCollum v. Livingston*, No. 4:14-CV-3253, 2017 WL 608665, at *18 (S.D. Tex. Feb. 3, 2017) (noting that Fifth Circuit precedent provides "that, in the face of extreme heat, prison officials must fashion adequate mitigating measures").

12

persons at substantial risk of serious harm); *Cole*, 2017 WL 3049540, at *30 (relying on Dr. Vassallo's testimony to find that a particular heat-related prison policy was ineffective).

Courts will issue preliminary or emergency injunctive relief to command that prisons modify their conditions of confinement so as to preserve human life. *See, e.g., Cole*, 2017 WL 3049540, at *46; *Tiede v. Collier*, No. 1:23-CV-1004-RP, 2023 WL 6345966, at *1 (W.D. Tex. Sept. 28, 2023). However, in doing so courts remain "barred from enjoining the state to follow its own laws and procedures." *Valentine v. Collier*, 956 F.3d 797, 802 (5th Cir. 2020).

## B. The PLRA.

Congress enacted the Prison Litigation Reform Act (PLRA) in 1996 to "cabin [the courts'] jurisdiction over prison reform cases." *Parker v. Hooper,* 171 F.4th 736, 750 (5th Cir. 2026). It "establishe[d] standards for the entry and termination of prospective relief in civil actions challenging prison conditions." *Id.* (quoting *Miller v. French,* 530 U.S. 327, 331 (2000)). Should a court find that a constitutional or other violation of federal law exists, the PLRA governs remedial measures. *Id.* The PLRA provides, in part:

> Prospective relief . . . shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right[.]

*Id.* at 751 (quoting 18 U.S.C.A. § 3626(a)(1)(A)). This "needs-narrowness-intrusiveness standard" is a stringent one and the "cornerstone" of the statute. *Id.* The Fifth Circuit recently held that this provision also requires courts to consider "significant changes" to prison conditions that have occurred over the course of litigation, including those that occur after trial and a liability ruling, up "to the date of its [r]emedial [o]rder[.]" *Id.* at 752, 757. The PLRA further provides that:

> The court shall not order any prospective relief that requires or permits a government official to exceed his or her authority under State or local law or otherwise violates State or local law, unless –
>
> (i)     Federal law requires such relief to be ordered in violation of State or local law;
>
> (ii)    the relief is necessary to correct the violation of a Federal right; and
>
> (iii)   no other relief will correct the violation of the Federal Right.

18 U.S.C.A. § 3626(a)(1)(B). In cases where an Eighth Amendment violation is found, "plaintiffs can only obtain a remedy that reduces the risk of harm to a socially acceptable level." *Ball v. Leblanc*, 792 F.3d 584, 599 (5th Cir. 2015).

### C. The ADA and the RA.

The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The ADA defines a disability as: "(A) a physical or mental impairment that substantially limits one or more major

14

life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). Major life activities include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id.* § 12102(2)(A).

The RA states that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . ." 29 U.S.C. § 794(a). "The RA and the ADA are judged under the same legal standards, and the same remedies are available under both Acts." *Kemp v. Holder*, 610 F. 3d 231, 234 (5th Cir. 2010) (citations omitted). Likewise, the relevant definition of disability set forth in the ADA is applicable to claims made under the RA. *Id.* at 234–35 (citing *Dutcher v. Ingalls Shipbuilding,* 53 F.3d 723, 725 n. 4 (5th Cir.1995) (noting that the ADA's definition of a disability is "substantially equivalent" to the RA's definition).

To prevail on an ADA claim, a plaintiff must prove "(1) that he has a qualifying disability; (2) that he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) that such discrimination is by reason of his disability." *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011). The elements of a claim under the RA are the same, except that the public entity in question must be one which receives federal financial assistance. *See Kemp*, 610 F.3d at 234. Here, it is undisputed that Defendant

15

Louisiana Department of Public Safety and Corrections is a recipient of federal funding. (Doc. 349-1 ¶ 47).

The ADA "imposes an obligation on public entities to make reasonable accommodations or modifications for disabled persons, including prisoners." *See Garrett v. Thaler*, 560 F. App'x 375, 382 (5th Cir. 2014) (citing *Tennessee v. Lane*, 541 U.S. 509, 531 (2004); *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 213 (1998).

## III. FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING BENCH TRIAL.

The Court makes the following findings of fact and conclusions of law.

### A. The Parties.

1. Plaintiff Voice of the Experienced ("VOTE") is a nonprofit organization comprised of currently and formerly incarcerated persons, including persons who are currently incarcerated at Louisiana State Penitentiary ("LSP" or "Angola"). (Doc. 432 ¶ 1; Doc. 349-1 ¶ 5).

2. Plaintiffs Myron Smith, Damaris Jackson, Nate Walker, Darrius Williams, Kevias Hicks, Joseph Guillory, and Alvin Williams (collectively, the "Individual Named Plaintiffs") are men who are currently incarcerated at LSP, have worked on the Farm Line in the past, and are at risk of being reassigned to the Farm Line now and in the future. (Doc. 432 ¶ 2).

3. Defendant Louisiana Department of Public Safety and Corrections ("DOC") is the agency responsible for administering LSP. (Doc. 432 ¶ 3; Doc. 349-1 ¶ 46).

16

4. DOC is a recipient of federal funding. (Doc. 349-1 ¶ 47).

5. Defendant Gary Westcott is the Secretary of the DOC.[11] Plaintiffs sued Westcott in his official capacity. (Doc. 432 ¶ 4; Doc. 349-1 ¶ 42).

6. Defendant Darrel Vannoy is the Warden of LSP.[12] Plaintiffs sued Warden Vannoy in his official capacity. (Doc. 432 ¶ 5; Doc. 349-1 ¶ 44).

**B. Louisiana State Penitentiary.**

7. LSP is a maximum-security prison. (Doc. 349-1 ¶ 1).

8. LSP's grounds span approximately 18,000 acres, which includes, in addition to the "main prison," housing camps, including Camps C and D. (Doc. 349-1 ¶ 2).

9. There are currently approximately 4,000 men incarcerated at LSP. (Doc. 349-1 ¶ 3).

10. LSP has a commercial agricultural program operated by Prison Enterprises, Inc., and a non-commercial agricultural program operated by LSP personnel. (Doc. 349-1 ¶ 4).

**C. Classification and Work Assignments.**

11. "Classification" is the process by which incarcerated persons are assigned a custody level, job assignment, and housing. (Doc. 349-1 ¶ 48).

---

[11] James LeBlanc was the Secretary of the DOC when this case began. (Doc. 349-1 ¶ 41). Plaintiffs sued LeBlanc in his official capacity.

[12] Timothy Hooper was Warden of LSP when this case began. Plaintiffs sued Hooper in his official capacity. (Doc. 349-1 ¶ 43).

17

12. LSP Directive No. 18.002 governs the procedures for classification at LSP. LSP Directive No. 18.002 was most recently updated on February 6, 2025. (Doc. 349-1 ¶ 49).

13. The Classifications Department and Security are responsible for assigning incarcerated persons to their work assignments. (Doc. 349-1 ¶ 50).

14. LSP established a classification review board that is responsible for assigning incarcerated men at LSP to jobs based on the criteria provided in LSP Directive No. 18.002. (Doc. 349-1 ¶ 51).

15. LSP Directive No. 18.002 establishes policies for the initial classification when an incarcerated individual first arrives at LSP, and for reclassification, which is a scheduled systematic classification review of an incarcerated individual's custody level, housing, and work assignments. (Doc. 349-1 ¶ 52).

16. Currently, individuals who are assigned to the Farm Line reside in the "medium farm line dormitories," which include Camp C Bear and Wolf and Camp D Falcon and Eagle. (Doc. 349-1 ¶ 53).

17. Reclassification may be considered after an incarcerated person has maintained his current custody status, job assignment, or housing assignment for ninety days without a disciplinary report. (Doc. 349-1 ¶ 54).

18. Reclassification can occur at the request of the incarcerated individual or on the recommendation of any staff member. Education programs, treatment

programs, and other programs offered by LSP can also affect job assignments. (Doc. 349-1 ¶ 55).

19. Incarcerated persons can be reclassified and given a new work assignment, including assignment to the Farm Line, as a result of disciplinary action. (Doc. 349-1 ¶ 56).

20. "Trustee" or "Trusty" refers to an incarcerated person who has been incarcerated for at least ten years and who has demonstrated good conduct over a period of time and how has been granted a status by LSP administration that, among other things, permits greater freedom of movement at LSP. (Doc. 349-1 ¶ 57).

21. An individual with Trustee status can lose his status as a result of a disciplinary infraction and be reassigned to the Farm Line. (Doc. 349-1 ¶ 58).

**D. The Farm Line.**

22. LSP operates agricultural work programs for incarcerated persons at LSP. (Doc. 349-1 ¶ 59).

23. Prison Enterprises oversees the commercial, commodity crop farming operations at LSP. (Doc. 349-1 ¶ 60).

24. DOC, through LSP staff, oversees the non-commercial, vegetable crop farming operations at LSP. (Doc. 349-1 ¶ 61).

25. LSP's agricultural operations are organized by "Lines." When an incarcerated person is assigned to work in the fields, they are assigned to a specific Line. (Doc. 349-1 ¶ 62).

19

26. The "Farm Line" is a colloquial term used by LSP staff and incarcerated persons to refer to LSP's vegetable crop farming program that currently operates out of Camp C and Camp D. (Doc. 349-1 ¶ 63).

27. The Farm Line currently includes Lines 15, 24, and 25. (Doc. 349-1 ¶ 64).

28. The Farm Line is depicted below:



(JX-243).



(PX-193).

29. The Farm Line is typically supervised by three security guards, including two Gun Guards and one Line Pusher. (Doc. 349-1 ¶ 65).

30. Gun Guards are typically Master Sergeants and are responsible for guarding and patrolling the Farm Line. (Doc. 349-1 ¶ 66).

31. Gun Guards typically carry two guns, including a pistol and an AR-15 rifle. Gun guards carry these weapons at all times when supervising the Farm Line. (Doc. 349-1 ¶ 67).

32. Line Pushers are typically Master Sergeants and are responsible for monitoring the Lines, including transporting incarcerated persons assigned to the Farm Line from their Camps to the fields. (Doc. 349-1 ¶ 68).

33. Line Pushers are also responsible for instructing incarcerated persons on the work that will be performed each day. (Doc. 349-1 ¶ 69).

21

34. Line Pushers carry a radio and occasionally handcuffs but do not carry any other weapons or protective gear. (Doc. 349-1 ¶ 70).

35. LSP staff memorialize the work performed by incarcerated persons assigned to the Farm Line on forms known as Daily Line Counts ("DLCs"). (Doc. 349-1 ¶ 71).

36. Incarcerated persons assigned to the Farm Line perform a variety of agricultural tasks, such as planting, picking, and harvesting crops, including but not limited to yellow squash, peppers, okra, watermelons, cucumbers, tomatoes, peas, and potatoes. (Doc. 349-1 ¶ 72).

37. Some vegetables on the Farm Line are planted using a six-row planter that is pulled by a tractor. (Doc. 349-1 ¶ 73).

38. Any tools used by incarcerated persons working the Farm Line are documented on the Daily Line Counts. (Doc. 349-1 ¶ 74).

39. Only Trustees are permitted to use and operate heavy farming machinery, including but not limited to tractors, lawn mowers, and potato diggers. (Doc. 349-1 ¶ 75).

40. After three years of incarceration, incarcerated persons are eligible to receive pay of 2 to 4 cents per hour for their work on the Farm Line. (Doc. 431 ¶ 122; Doc. 432 ¶¶ 152; PX-23; Doc. 420 at 120:13–121:16).

41. Incarcerated men working in other positions at LSP can earn between 25 cents and $1.00 per hour. (Doc. 432 ¶ 154; PX-23).

### E. Duty Status.

42. LSP Directive No. 13.063 sets forth LSP's duty status classification system. LSP Directive No. 13.063 was most recently updated on May 1, 2024. (Doc. 349-1 ¶ 91).

43. Every person is assigned a duty status upon their arrival to LSP. (Doc. 349-1 ¶ 92).

44. According to LSP Directive No. 13.063, duty statuses are assigned by a LSP health care practitioner based on the individual health care needs of the person. (Doc. 349-1 ¶ 93).

45. According to LSP Directive No. 13.063, duty statuses are assigned to ensure a person does not engage in activities that are detrimental to his health or safety. (Doc. 349-1 ¶ 94).

46. LSP health care practitioners can issue a variety of duty statuses, to include regular duty, regular duty with restrictions, regular duty out of field, regular duty indoors, limited duty or no duty. Further, health care practitioners can further limit duty status. (Doc. 349-1 ¶ 95).

47. Duty statuses are required to be documented in the medical record of the person receiving the duty status. (Doc. 349-1 ¶ 96).

48. Health care practitioners are permitted to amend a duty status to avoid a specific physical activity, but they do not have authority to determine a person's work assignment. (Doc. 349-1 ¶ 97).

49. "Heat Precaution Duty Status" is one of the duty statuses that can be assigned to an incarcerated person when it is determined that they have a condition or take medication that make them more sensitive or vulnerable to heat-related injury, as outlined in HCP8 and LSP Directive 13.067. (Doc. 349-1 ¶ 98).

**F. Heat and LSP Heat Pathology Practices.**

50. Health Care Policy No. HCP8 ("HCP8") is a heat pathology policy issued by the DOC that applies to all DOC facilities across the state. (Doc. 349-1 ¶ 102).

51. HCP8 was most recently updated on October 20, 2024. (Doc. 349-1 ¶ 103).

52. LSP Directive No. 13.067 ("Directive 13.067") is a heat pathology policy issued by LSP personnel that applies specifically to LSP. (Doc. 349-1 ¶ 104).

53. Directive 13.067 was most recently updated on March 9, 2026. (DX-62).

54. The National Weather Service ("NWS") has defined guidelines for determining the likelihood of heat disorders due to prolonged exposure or strenuous activity based on the heat index. (Doc. 349-1 ¶ 99).

55. The NWS has defined the following categories: "Caution" from 88 degrees to 90 degrees Fahrenheit; "Extreme Caution" from 90 to 104 degrees Fahrenheit; "Danger" from 103 to 125 degrees Fahrenheit; "Extreme Danger" from 126 to 137 degrees Fahrenheit. (Doc. 349-1 ¶ 100).

56. Currently, as of the latest version of Directive 13.067, effective March 9, 2026, the Farm Line does not cease operation when the heat index reaches or exceeds 88 degrees Fahrenheit. (Doc. 349-1 ¶ 101; DX-62). Instead,

24

Directive 13.067 requires incarcerated men without heat precaution duty status to continue working on the Farm Line until the heat index reaches 113 degrees Fahrenheit.[13] (DX-62).

**G. Medical Care at LSP.**

57. Health care providers at LSP, including medical doctors and nurse practitioners, are authorized to write medication prescriptions for persons incarcerated at LSP. (Doc. 349-1 ¶ 105).

58. Incarcerated persons at LSP can initiate a "sick call" by submitting a "sick call request form," after which that person will be scheduled for an appointment with a healthcare practitioner at a pre-designated time. (Doc. 349-1 ¶ 106).

59. "Sick call" forms can be submitted at any time but "sick call" visits at each of the camps occur Monday through Friday. (Doc. 349-1 ¶ 107).

60. A "self-declared emergency" (or "SDE") occurs when a patient declares that they are experiencing a medical emergency. (Doc. 349-1 ¶ 108).

61. SDEs are communicated verbally by an incarcerated person to an officer. (Doc. 349-1 ¶ 109).

62. An SDE and emergency sick call have the same meaning at LSP. (Doc. 349-1 ¶ 110).

---

[13] During the summer of 2025, Warden Vannoy implemented a practice at LSP of ceasing outdoor work once the heat index reaches 110 degrees Fahrenheit. (Doc. 419 at 249:25–250:3). Nonetheless, Directive 13.067 maintains the 113-degree Fahrenheit heat index stop work threshold. This distinction is discussed in further detail below.

63. Under HCP14, Defendants charge incarcerated persons a $2.00 fee for each self-initiated request for healthcare services made during regularly scheduled sick call times. (Doc. 431 ¶ 74; JX 20). Defendants may also charge a $2.00 fee for mental health services "if circumstances warrant." (*Id.*). HCP14 dictates that incarcerated persons accessing health care services outside of routine sick call hours, to include self-declared emergencies, altercations, or any other unscheduled health care encounters, shall be assessed a $6.00 co-payment fee. (*Id.*).

64. An incarcerated person who has been incarcerated for at least three years and is thus eligible to receive pay for his work on the Farm Line must work 300 hours at a rate of 2 cents per hour to pay a $6.00 co-pay for a self-declared emergency on the Farm Line. (Doc. 432 ¶ 533).

**H. Discipline at LSP.**

65. LSP personnel are responsible for discipline of incarcerated persons consistent with DOC and LSP rules and procedures. (Doc. 349-1 ¶ 76).

66. DOC has issued disciplinary rules and procedures applicable to each person incarcerated at a DOC facility, which are codified in the Louisiana Administrative Code, LAC:22:I.Subchapter B. (Doc. 349-1 ¶ 77).

67. DOC has issued the "Disciplinary Rules and Procedures for Adult Inmates," which applies to persons incarcerated at LSP. This handbook includes the "Disciplinary Matrix" which lists disciplinary sanctions available for each rule violation. (Doc. 349-1 ¶ 78).

26

68. The Disciplinary Rules were most recently updated on June 9, 2024. (Doc. 349-1 ¶ 79).

69. Effective June 9, 2024, the Disciplinary Board may order a job change as a result of any rule violation listed in the "Disciplinary Rules and Procedures for Adult Inmates" (the "Disciplinary Rules"). (Doc. 349-1 ¶ 80).

70. Under the Disciplinary Rules, the Disciplinary Board can assign an incarcerated person to the Farm Line as the result of any rule violation. (Doc. 349-1 ¶ 81).

71. Under the Disciplinary Rules, Rule 27 is a Schedule A work offense. Under Rule 27, incarcerated persons are required to "perform their assigned tasks with reasonable speed and efficiency." (Doc. 349-1 ¶ 82).

72. Failure to answer work roll call at the proper time is a violation of Rule 27. (Doc. 349-1 ¶ 83).

73. A violation of Rule 27 can result in the disciplinary actions outlined in the Disciplinary Matrix. (Doc. 349-1 ¶ 84).

74. Under the Disciplinary Rules, Rule 28 is a Schedule B work offense. (Doc. 349-1 ¶ 85).

75. The following actions are violations of Rule 28: refusal to go out to work; participating in or advocating for a work stoppage; disobeying repeated instructions about how to perform the work; hiding out from work; leaving the work area; falling far short of fulfilling reasonable work quotas; being absent or

27

late for work roll call without a valid excuse; not reporting for Extra Duty assignment; and being late to work. (Doc. 349-1 ¶ 86).

76. A violation of Rule 28 can result in the disciplinary actions outlined in the Disciplinary Matrix. (Doc. 349-1 ¶ 87).

77. At LSP, any employee can institute a Rule Violation Report, which results in a disciplinary hearing. (Doc. 349-1 ¶ 88).

78. LSP has policies and procedures governing disciplinary hearings, which are conducted by a ranking disciplinary officer (for Schedule A violations) or the Disciplinary Board (for Schedule B violations). During these hearings, a disciplinary officer or the Disciplinary Board determines whether a rule infraction occurred, if the charged individual is guilty or not guilty, and if guilty, the appropriate sanction(s). (Doc. 349-1 ¶ 89).

79. The Disciplinary Board is comprised of a ranking security officer, a Classification officer, and a third party from another department at LSP. (Doc. 349-1 ¶ 90).

I. The 113-Degree Heat Index Stop Work Threshold.

80. The current version of Directive 13.067, implemented on March 9, 2026, contains a provision mandating LSP to stop all outdoor work at a heat index of 113 degrees Fahrenheit. (Doc. 431 ¶ 57; Doc. 432 ¶ 718; DX-62).

81. Under Directive 13.067, all men who are not brought inside after a Heat Alert is called (*i.e.*, all men who do not have Heat Precaution Duty Status) are required to continue to work on the Farm Line after a Heat Alert is called until

28

the heat index reaches 113 degrees Fahrenheit, at which point all outdoor work at LSP is required to stop. (Doc. 432 ¶ 719).

82. During the summer of 2025, Warden Vannoy implemented a practice at LSP of ceasing outdoor work once the heat index reaches 110 degrees Fahrenheit. (Doc. 419 at 249:25–250:3).

83. Warden Vannoy requires field officers to be notified if the heat index reaches 110 degrees Fahrenheit so that incarcerated persons can be brought indoors *before* the heat index reaches 113 degrees Fahrenheit. (Doc. 431 ¶ 200; Doc. 431 ¶¶ 726–32; DX-62).

84. Warden Vannoy chose the 110-degree Fahrenheit heat index threshold to allow LSP staff sufficient time to bring incarcerated persons indoors before the heat index reached 113 degrees Fahrenheit. (Doc. 419 at 250:7–10).

85. Warden Vannoy testified at trial that he believes ceasing work at a heat index of 110 degrees Fahrenheit is a precaution worthy of implementing. (Doc. 419 at 250:21–23).

86. Warden Vannoy included the 110-degree Fahrenheit heat index threshold in a post-trial Memorandum to LSP Control Center Staff, dated March 9, 2026. The Memorandum instructs LSP staff to require incarcerated persons to stop work and return to their housing units once the heat index reaches 110 degrees Fahrenheit. (DX-62).

87. However, despite the fact that LSP revised Directive 13.067 in both January and March 2026, shortly before and after the February 2026 trial, LSP

29

did not formalize the 110-degree Fahrenheit heat index cease work requirement. (JX-42; DX-62).

88. Directive 13.067 maintains the provision mandating LSP to stop all outdoor work at a heat index of 113 degrees Fahrenheit. (DX-62).

89. Dr. Vassallo is Plaintiffs' expert in emergency medicine, medical toxicology, thermoregulation, and correctional medicine.[14] (Doc. 245 at 41:23–42:1).

90. Dr. Vassallo opined that work on the Farm Line at LSP should cease at a heat index of 103 degrees Fahrenheit.[15] (PX-84 ¶ 30).

---

[14] Merriam-Webster defines "thermoregulation" as "the maintenance or regulation of temperature," specifically "the maintenance of a particular temperature of the living body." *Thermoregulation*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/thermoregulation (last visited May 26, 2026).

[15] The Fifth Circuit, this Court, and other district courts within the Fifth Circuit have repeatedly found Dr. Vassallo to be a credible expert in this field. *See* Doc. 253; *Yates v. Collier*, 868 F.3d 354, 363–64 (5th Cir. 2017) ("Dr. Vassallo is a licensed physician and a recognized expert in the field of thermoregulation and hyperthermia, with over twenty-five years treating heat stroke and heat-related disorders. Dr. Vassallo has previously served as an expert witness in lawsuits challenging prison conditions, and this court [the Fifth Circuit] has (at least) twice upheld district court findings that relied heavily on Dr. Vassallo's testimony."); *Gates v. Cook*, 376 F.3d 323, 339 (5th Cir. 2004) (upholding the issuance of injunctive relief that relied on Dr. Vassallo's testimony that the conditions of confinement were such that it was "very likely" that incarcerated persons in the relevant facility would die from heat stroke or some other heat-related condition); *Ball v. LeBlanc*, 792 F.3d 584, 593 (5th Cir. 2015) (affirming the district court finding that, based mainly on Dr. Vassallo's testimony, the heat conditions and procedures in place within the relevant prison put incarcerated persons at substantial risk of serious harm); *Cole v. Collier*, No. 4:14-CV-1698, 2017 WL 3049540, at *14 n. 16 (S.D. Tex. July 19, 2017) ("Dr. Vassallo's expert report and testimony regarding the effects of heat on the human body were extremely thorough, and that she has extensive knowledge on this subject."); *Id.* at *30 (relying on Dr. Vassallo's testimony to find that a particular heat-related prison policy was ineffective); *Bernhardt Tiede, II v. Collier*, No. 1:23-CV-01004-RP, Doc. 202, p. 11 (W.D. Tex. Mar. 29, 2025) (relying on Dr. Vassallo's testimony when evaluating vulnerability to heat, finding Dr. Vassallo's testimony to be based on "credible, published medical studies.").

91. Dr. Vassallo further opined that according to the National Weather Service heat index data, a heat index of 113 degrees Fahrenheit is well within the "danger" zone, such that heat exhaustion is likely and heat stroke is possible. (PX-84 ¶ 29).

92. Dr. Vassallo opined that heat stroke may come on quickly and occur with no prior symptoms or warning. (PX-84 ¶ 31).

93. All Parties in this case have relied on the National Institute for Occupational Safety and Health ("NIOSH") guidance regarding "Occupational Exposure to Heat and Hot Environments" ("NIOSH Guidance").[16] (JX-224; Doc. 245 at 208:14–19).

94. The NIOSH Guidance "takes into account the large amount of new scientific information on working in heat and hot environments." The NIOSH Guidance therefore "includes updated information on heat-related illnesses, risk factors affecting heat-related illness, physiological responses to heat, effects of clothing on heat exchange, and recommendations for control and prevention." (JX-224 at 5).

95. The NIOSH Guidance observes that "[o]ccupational exposure to heat can result in injuries, disease, death, and reduced productivity. Workers may be at risk for heat stress when exposed to hot environments. ***Exposure to hot***

---

[16] The NIOSH Guidance notes: "When the U.S. Congress passed the Occupational Safety and Health Act of 1970 (Public Law 91-596), it established the National Institute for Occupational Safety and Health (NIOSH). Through the Act, Congress charged NIOSH with recommending occupational safety and health standards and describing exposure levels that are safe for various period of employment[. . .]" (JX-224 at 5).

*environments and extreme heat can result in illnesses, including heat stroke, heat exhaustion, heat syncope, heat cramps, and heat rashes, or death.*" (JX-224 at 5 (emphasis added)).

96. Appendix C to the NIOSH Guidance includes the following National Oceanic and Atmospheric Administration (NOAA)'s National Weather Service heat index charts:



Adapted from NOAA [2012].

**Table C-1. Heat index–associated protective measures for worksites**

| Heat index | Risk level | Protective measure |
|---|---|---|
| Less than 91°F (33°C) | Lower (caution) | Basic health and safety planning |
| 91°F to 103°F (33°C to 39°C) | Moderate | Implement precautions and heighten awareness |
| 103°F to 115°F (39°C to 46°C) | High | Additional precautions to protect workers |
| Greater than 115°F (46°C) | Very high to extreme | Even more aggressive protective measures |

Adapted from OSHA [2012c].

Additional information about protective measures mentioned in the above table can be found on OSHA's website.

Note: The presence of a radiant heat source may decrease the accuracy and usefulness of the above heat index.

(JX-224 at 190–191).

97. Both Parties have submitted the data in the above National Weather Service ("NWS") charts to the Court as undisputed, and have stipulated to the following two facts concerning the NWS data:

a. The NWS has defined guidelines for determining the likelihood of heat disorders due to prolonged exposure or strenuous activity based on the heat index. (Doc. 349-1 ¶ 99).

b. The NWS has defined the following categories: "Caution" from 88 degrees to 90 degrees Fahrenheit; "Extreme Caution" from 90 to 104 degrees Fahrenheit; "Danger" from 103 to 125 degrees Fahrenheit; and "Extreme Danger" from 126 to 137 degrees Fahrenheit. (Doc. 349-1 ¶ 100).

33

98. The NWS data indicates that "high" risk begins at 103 degrees Fahrenheit, and that "very high to extreme" risk begins at 115 degrees Fahrenheit. (JX-224 at 191).

99. Similarly, according to the undisputed NWS chart above, the likelihood of heat disorders with prolonged exposure or strenuous activity at a heat index of 103 degrees Fahrenheit is in the "danger" zone. (JX-224 at 190).

100. Despite the fact that LSP relied on the NWS charts when drafting its policies, Directive 13.067 still maintains the requirement that incarcerated men continue to work on the Farm Line until the heat index reaches 113 degrees Fahrenheit.[17]

101. Defense Counsel argued, and the Court finds, that "everyone agrees" that the NWS is the "gold standard." (Doc. 243 at 20:11–15 ("We note that the National Weather Service, which everyone agrees is the, quote, gold standard[ . . .] If you also look to the NIOSH for guidance[. . .]")).

102. However, despite revising Directive 13.067 *three times* during the course of this litigation alone, LSP officials have not lowered the 113-degree

---

[17] Dr. Lavespere testified:

A. We used their guidance.

Q. What part of that guidance did you use?

A. We used the National Weather Service chart that you pointed out. We looked at some of the OSHA recommendations. We looked at some of the CDC recommendations. And we talked about it with our experts.

(Doc. 245 at 208:14–19).

Fahrenheit heat index stop work threshold. (JX-38 (Directive 13.067, dated March 21, 2019); JX-41 (Directive 13.067 (dated April 8, 2025); JX-42 (Directive 13.067, dated January 9, 2026); DX-62 (Directive 13.067, dated March 9, 2026)).

103.    Warden Vannoy testified at trial:

Q. [] Directive 13.067 contains the same threshold to cease all outdoor work. Right?

A. Correct.

Q. A hundred-and-thirteen-degree heat index?

A. That's correct.

Q. During the summer of 2025, you implemented a practice at LSP of ceasing outdoor work once the heat index reached 110 degrees. Right?

A. That's correct.

Q. And you decided to implement that informal practice out of precaution. Right?

A. Correct.

Q. You chose the 110-degree number to allow some buffer time to bring people inside before the heat index reached 113 degrees. Right?

A. That's correct. But it's hot at 110.

Q. At your November 2025 deposition you stated it was quite possible that you would revise LSP's heat pathology policy to codify that 110-degree heat index threshold. Right?

A. That's correct.

Q. But DOC decided to maintain the 113-degree heat index threshold to cease outdoor work when it revised Directive 13.067 in January of 2026. Right?

A. Correct, at this time.

Q. You still believe that ceasing work at 110 degrees is still a precaution worthy of implementing. Right?

A. I do.

Q. But that practice of stopping outdoor work at 110 degrees is not mandated in any policy. Right?

A. Correct.

(Doc. 419 at 249:20–251:1).

104.    Dr. Lavespere, DOC's Chief Medical Officer, testified that:

Q. And that 113-degree heat index applies to the Farm Line. Right?

A. It does.

Q. LSP could have set a lower threshold for outdoor work to stop at LSP. Correct?

A. They could have.

(Doc. 245 at 175:16–19; 188:12–17).

## J. Deliberate Indifference.

105.    In *Farmer v. Brennan*, 511 U.S. 825, 825 (1994), the United States Supreme Court held: "A prison official may be held liable under the Eighth Amendment for acting with 'deliberate indifference' to inmate health or safety only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."

106.    The Supreme Court instructed: "Whether an official had the requisite knowledge is a question of fact subject to demonstration in the usual ways, and a factfinder may conclude that the official knew of a substantial risk from the very fact that it was obvious." *Farmer*, 511 U.S. at 826.

107.    Contrarily, "prison officials may not be held liable if they prove that they were unaware of even an obvious risk or if they responded reasonably to

a known risk, even if the harm ultimately was not averted." *Farmer,* 511 U.S. at 826.

108.        In *Hope v. Pelzer,* 536 U.S. 730, 737 (2002), the Supreme Court emphasized: "We may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious." *Hope,* 536 U.S. at 737 (citing *Farmer,* 511 U.S. at 842) (emphasis added).[18]

109.        On March 30, 2026, one day before the Parties' post-trial briefing was due to be filed, the Fifth Circuit issued its Opinion in *Parker v. Hooper,* 171 F.4th 736, 755 (5th Cir. 2026), a case involving the constitutional adequacy of medical care provided to incarcerated persons at LSP.

110.        The *Parker* Court noted that the Supreme Court's test for deliberate indifference adopted a criminal standard of recklessness. *Parker,* 171 F.4th at 755 (citing *Williams v. Hampton,* 797 F.3d 276, 281

---

[18] The Court in *Hope* emphasized:

"'[T]he unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment.'" *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (some internal quotation marks omitted). We have said that "[a]mong 'unnecessary and wanton' inflictions of pain are those that are 'totally without penological justification.'" *Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). In making this determination in the context of prison conditions, we must ascertain whether the officials involved acted with "deliberate indifference" to the inmates' health or safety. *Hudson v. McMillian,* 503 U.S. 1, 8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). We may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious. *Farmer v. Brennan,* 511 U.S. 825, 842, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

*Hope,* 536 U.S. at 737–38.

(5th Cir. 2015) (en banc); *Farmer*, 511 U.S. at 839–40). "The test has two parts: [P]laintiffs' 'objective exposure to a substantial risk of serious harm'; and 'that prison officials acted or failed to act with [subjective] deliberate indifference to that risk.'" *Parker*, 171 F.4th at 755 (citing *Carlucci v. Chapa*, 884 F.3d 534, 538 (5th Cir. 2018)).

111.    Here, the Court finds that Plaintiffs are objectively exposed to a substantial risk of serious harm when laboring on the Farm Line at LSP at a heat index of 103 degrees Fahrenheit and above, as set forth in the undisputed NWS data. (JX-224 at 190–191).

112.    The Circuit's Ruling in *Parker*, however, appears to have raised the standard Plaintiffs must meet to show both subjective deliberate indifference and entitlement to injunctive relief.

113.    In *Parker,* the Circuit instructed that "[d]eliberate indifference is an 'extremely high' standard to meet." *Parker*, 171 F.4th at 755 (citing *Brewster v. Dretke*, 587 F.3d 764, 770 (5th Cir. 2009); quoting *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006)).

114.    The Circuit emphasized: "Defendants' remedial efforts may prove insufficient to cure all the identified institutional problems, but they indicate *concern and sincerity* on the part of prison officials that negate subjective indifference." *Parker*, 171 F.4th at 755 (emphasis added) (citing *Farmer*, 511 U.S. at 844; *United States v. Hinds Cnty.*, 120 F.4th 1246, 1261 (5th Cir. 2024) ("A reasonable response to inadequate prison conditions is indeed

38

sufficient to prevent a deliberate-indifference finding even if the County's attempts were unsuccessful or if the County did not choose the optimal approach to the problem.")).

115.    The Circuit concluded: "In essence, when prison officials have attempted to care for a prisoner's [] needs, even if the care falls short, they have not exhibited subjective deliberate indifference." *Parker*, 171 F.4th at 756.

116.    The Circuit instructed that "deliberate indifference 'should be determined in light of the prison authorities' current attitudes and conduct': their attitudes and conduct at the time suit is brought and persisting thereafter." *Id.* at 756 (citing Farmer, 511 U.S. at 845 (quoting *Helling v. McKinney*, 509 U.S. 25, 36 (1993); *see also Bell v. Wolfish*, 441 U.S. 520, 547–48, 562 (1979) (internal quotations omitted)).

117.    Then, "to establish eligibility for an injunction, the inmate must demonstrate the continuance of that disregard during the remainder of the litigation and into the future." *Parker*, 171 F.4th at 756 (citing *Farmer*, 511 U.S. at 846).

118.    Despite the fact that the objective NWS data that all Parties have relied on in this litigation shows that incarcerated men are in "danger" and at "high risk" when working on the Farm Line at a heat index of 103 degrees Fahrenheit or higher, under the *Parker* Ruling, the Circuit appears to foreclose relief because the Defendants have implemented various remedial measures, even though those measures do not cure the substantial risk of harm incarcerated men

face when laboring on the Farm Line at or above a heat index of 103 degrees Fahrenheit.[19] (JX-224 at 190–191; Doc. 245 at 208:14–19; Doc. 243 at 20:11–15); *Parker*, 171 F.4th at 758.

119.    The Circuit held that "Defendants' remedial efforts may prove insufficient to cure all the identified institutional problems, but they indicate concern and sincerity on the part of prison officials that **negate** subjective indifference."[20] *Parker*, 171 F.4th at 758 (emphasis added) (citing *Farmer, 511 U.S. at 844*).

120.    The record is clear that Defendants are aware of the danger created by Directive 13.067, which requires men without heat precaution duty status to continue working on the Farm Line until the heat index reaches 113 degrees Fahrenheit. (Doc. 349-1 ¶ 99–100 (undisputed facts stating that the NWS data defines the following relevant category: "Danger" from a heat index of

---

[19] The initial version of Directive 13.067, dated March 21, 2019, did not include a stop work threshold at any heat index. (JX-38 (Directive 13.067, dated March 21, 2019)). The second version of Directive 13.067, dated April 8, 2025, added the following provision, applicable from May 1 to October 31 of a given year: "If the heat index exceeds 113 degrees Fahrenheit; outdoor work shall cease." (JX-41 (Directive 13.067, dated April 8, 2025)). The third version of Directive 13.067, dated January 9, 2026, maintained the 113-degree Fahrenheit heat index stop work threshold, applicable from May 1 to October 31 of a given year. (JX-42 (Directive 13.067, dated January 9, 2026)). The fourth version of Directive 13.067, implemented after trial on March 9, 2026, maintained the 113-degree Fahrenheit heat index stop work threshold, but removed the "heat season," such that this stop work provision applies year-round. (DX-62 (Directive 13.067, dated March 9, 2026)).

[20] Black's Law Dictionary defines "negate" as "[t]o deny" or "[t]o nullify; to render ineffective." NEGATE, BLACK'S LAW DICTIONARY (12th ed. 2024). Mirriam-Webster defines "negate" as "to deny the existence or truth of" or "to cause to be ineffective or invalid[.]" *Negate*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/negate (last visited May 26, 2026).

103 to 125 degrees Fahrenheit); Doc. 243 at 20:11–15 (Defense Counsel stating that "everyone agrees" that NWS data is the "gold standard"); Doc. 245 at 208:14–19 (DOC's Chief Medical Officer Dr. Lavespere testifying that LSP relied on the NWS data when formulating its policies)). But because Defendants have taken remedial measures to cure *some* of the risks incarcerated men face when working on the Farm Line, such measures, according to the Circuit, apparently "negate" a finding of subjective indifference. *Parker*, 171 F.4th at 755–56 ("[W]hen prison officials have attempted to care for a prisoner's [] needs, even if the care falls short, they have not exhibited subjective deliberate indifference.").[21]

121.    To be clear, the Court concludes that Plaintiffs have met the burden of showing an Eighth Amendment violation here. Plaintiffs have shown: (1) an objective risk of danger caused by the 113-degree Fahrenheit stop work threshold contained in Directive 13.067; (2) that prison officials are aware of the danger to incarcerated men laboring on the Farm Line at a heat index of 103 degrees Fahrenheit and above; and (3) that prison officials have shown subjective deliberate indifference to this danger by failing to revise Directive 13.067 to account for this danger, despite revising Directive 13.067 three separate times during the course of this litigation.

---

[21] Worthy of note, the Circuit initially recognized in *Parker* that "injunctive relief is inappropriate in prison-conditions cases unless efforts to fix unconstitutional conditions are so lacking that they continue to reflect prison officials' deliberate indifference[,]" seemingly indicating that there may be occasions where prison officials' implementation of remedial measures would not negate deliberate indifference. *Parker*, 171 F.4th at 754 (citing *Valentine*, 993 F.3d at 281–82; *Farmer*, 511 U.S. at 844–47).

41

122.    The Court finds that Directive 13.067, which requires incarcerated persons without heat precaution duty status to continue laboring on the Farm Line until the heat index reaches 113 degrees Fahrenheit, creates a substantial risk of serious harm to the health and safety of incarcerated men working on the Farm Line. (DX-62). Prison officials are certainly aware of the danger incarcerated men laboring on the Farm Line face at a heat index of 103 degrees Fahrenheit and above and have even stipulated to the NWS data highlighted in this litigation. When drafting Directive 13.067, prison officials relied on this very NWS data, which indicates that the likelihood of heat disorders due to prolonged exposure or strenuous activity reaches the "danger" zone at a heat index of 103 degrees Fahrenheit and above. (Doc. 243 at 20:11–15). Nevertheless, Defendants have failed to revise Directive 13.067 to abate the substantial risk of serious harm to incarcerated persons laboring on the Farm Line at a heat index of 103 degrees Fahrenheit and above.[22]

123.    Before *Parker*, the Court would have found Defendants liable under the Eighth Amendment for acting with deliberate indifference to the health and safety of incarcerated persons under *Farmer*, in which the U.S. Supreme Court held that "[a] prison official may be held liable under the Eighth Amendment for acting with 'deliberate indifference' to inmate health or

---

[22] The fact that LSP has an informal policy of bringing incarcerated persons indoors at a heat index of 110 degrees Fahrenheit does not persuade otherwise, because 110 degrees is similarly within the "danger" zone.

safety only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 825. Under the *Parker* Ruling, however, the Court is constrained to find that Defendants' implementation of remedial measures negates a finding of subjective deliberate indifference, *even though these remedial measures are inadequate to cure the constitutional violation.*[23]

### K. Injunctive Relief.

124.    Then, if the Court were to find deliberate indifference, to establish eligibility for an injunction, an incarcerated person "must demonstrate the *continuance* of [prison officials'] disregard during the remainder of the litigation and *into the future*." *Parker*, 171 F.4th at 756 (emphasis added) (citing *Farmer*, 511 U.S. at 846). The Court pauses to note the evidentiary concerns caused by the requirement that district courts evaluate prison officials' sincerity in the implementation of prison policies both now and into the future.

125.    "Both sides may rely on ongoing developments in the prison to establish that the inmate is not entitled to an injunction." *Parker*, 171 F.4th at 756 (citing *Farmer*, 511 U.S. at 846).

---

[23] Under this standard, the question remains: What proof is sufficient for the Court to find deliberate indifference in violation of the Eighth Amendment, so long as Defendants make even one improvement to prison policies or procedures during the pendency of the litigation?

## L. Remedial Measures.

126. The Court must now evaluate the ongoing developments on the Farm Line at LSP to determine whether injunctive relief is appropriate in light of the Circuit's decision in *Parker*.

127. At the outset of this litigation, the undersigned observed: "The Court has conducted a review of operative federal and state requirements for heat safety in agricultural settings, and preliminarily concludes that [LSP] fails to meet the minimum standards set forth by such regulations." (Doc. 70 at 46).

128. On July 2, 2024, the Court emphasized:

The wealth of evidence here shows that incarcerated persons laboring on the Farm Line are not provided with shade, sunscreen, or required rest breaks. Further, the declarations from named Plaintiffs uniformly provide that breaks are seldomly given, that the water provided is dirty, that they are required to work beyond their physical capacities, and that they are not provided with other necessary protective equipment, like lace-up boots or sunhats. Defendants contest these claims, but not persuasively. As to the rest breaks, Defendants admit that they do not record them, but nonetheless assert that they are regularly taken and that inmates may rest whenever they like. There is nothing in Angola's policies which indicates that breaks may be taken at will, and Plaintiffs again uniformly aver that the failure to continue working or failure to work efficiently on the Farm Line subjects them to discipline. Further, Defendants' assertion as to why breaks have not been diligently recorded is contradicted by those dates in their records when breaks have been sporadically recorded, (*see, e.g.*, Doc. 37-62 at p. 143), and by the plain language of Directive No. 13.067, (Doc. 37-38).

[. . .]

Regarding the protective equipment, there is nothing in Defendants' heat-related or general equipment policies that confirms the provision of such gear. Defendants' equipment policy does not appear to specifically provide for lace-up boots, only "work boots," which Plaintiffs

44

have asserted refers to rubber boots that are allegedly unsafe for field labor. (Docs. 37-51 at p. 28, 37-7 at p. 12).

(Doc. 70 at 62–63).

129.    On August 15, 2024, the Court noted Defendants' then apparent resistance towards proposing meaningful and constitutionally compliant changes to conditions on the Farm Line. (Doc. 109 at 2).

130.    The Court also found that the "shaded area presently provided to those laboring on the Farm Line is grossly insufficient and reflects a callous disregard for human health and safety." (Doc. 109 at 5). The Court emphasized:

> Plaintiffs have provided the Court with various photographs which purport to capture the current conditions on the Farm Line. (Docs. 105, 105-1, 105-2). These photographs depict a ***singular pop-up tent*** in an expansive field, lacking any nearby trees or buildings to provide cover, haphazardly propped up in a dirt road adjacent to several rows of low-growing crops. (Doc. 105-1). What appear to be ***two water coolers*** are visible within the tent, one sat directly ***on the loose dirt and another on a plastic crate*** approximately one foot off the ground. (Doc. 105-2). There are no places to sit within the tented area, save for upon the dusty, rock-strewn ground. Even so, the tent is obviously not large enough to accommodate the approximately twenty men meant to use the structure. (*See* Docs. 95 at p. 7, 105). Compounding these inadequacies, based on the position of the sun and the configuration of the tent, the actual shade provided is a mere fraction of the tent's formal dimensions. (*Id.*). Defendants have contested neither the adequacy nor accuracy of the materials provided by Plaintiffs that capture Farm Line conditions.

(Doc. 109 at 3 (emphasis added)).

131.    The Court expressed concerns regarding heat-related sick calls and Defendants' response to same:

> From July 2 to August 5, the records provided by Defendants reflect that there have been approximately ***fifty sick calls*** from the Farm Line which either explicitly or potentially relate to heat-related conditions. (Docs. 74-2, 82-2, 90-2, 98-2, 107-2). The Court notes that during these

dates, heat alerts were or should have been issued during operation of the Farm Line on *thirteen occasions*. (Docs. 74, 82, 90, 98, 107). The Court further notes that for the week of July 29 alone, heat index values reached or exceeded one hundred degrees Fahrenheit at or before noon on each and every day. (Doc. 107-1). Of the sick calls referenced above, seven have resulted in the afflicted men requiring emergency medical treatment at the Acute Treatment Unit. (Docs. 74-2, 82-2, 90-2, 98-2, 107-2). In addition to these seven incidents, on eleven occasions, responding medical personnel have either excused their patients from their daily Farm Line labor or have modified the requirements thereof. (Id.). On three occasions, medical personnel have responded to complaints of heat-related conditions by instructing the afflicted men to simply drink more water. (Doc. 82-2). Perhaps most troubling, in one instance in which an inmate reported a medical emergency, medical personnel were alerted, and *no one showed up*. (Doc. 90-2 at p. 8).

(Doc. 109 at 3–4 (emphasis added)).

132.    On August 15, 2024, the Court ordered Defendants to take the following actions:

    a. "[E]rect additional pop-up tents, such that each incarcerated person on the Farm Line may rest in shade during breaks without touching or encroaching on the personal space of their fellow inmates."

    b. "The additional tents provided by Defendants shall therefore be located close to or throughout the space in which prisoners are laboring, such that inmates do not have to travel a long distance to take their breaks and/or to access water and ice."

    c. "Defendants shall provide some form of chair or surface for Farm Line laborers to rest upon during said breaks, so that they need not

sit in loose dirt, and shall make water and ice available within each of these tents."

d. "[I]n the event Plaintiffs or persons laboring on the Farm Line are not provided with or lack drinking cups during their Farm Line shift, for sanitary reasons, Defendants shall provide such person(s) with a clean cup."

e. "Plaintiffs' recommendation of one fifteen-minute break for every forty-five minutes of work for persons laboring on the Farm Line during heat alerts shall be adopted moving forward."

f. "Defendants have reported that incarcerated persons laboring on the Farm Line are provided with lace-up boots, sun hats, sunscreen, protective long-sleeve shirts, and gloves. (Docs. 49-1, 86). These items shall continue to be made available."

g. "If socks are not already provided to prisoners on the Farm Line in some manner, they shall be provided immediately."

h. "Defendants shall continue to make free medical care available to all men laboring on the Farm Line."

(Doc. 109 at 5–7).

133. On May 23, 2025, the Court ordered additional relief:

a. Defendants shall issue a "Heat Alert" on the Farm Line at LSP whenever the heat index meets or exceeds 88 degrees Fahrenheit.

  b. Defendants shall monitor the heat index on the Farm Line at LSP

   every 30 minutes.

(Doc. 253).

  134. The Court reasoned:

For the reasons below, the Court finds that Plaintiffs have shown a substantial likelihood of success on the merits of their Eighth Amendment claims regarding the Heat Alert threshold and heat index monitoring. Dr. Vassallo credibly testified that incarcerated persons working on the Farm Line at LSP are at substantial risk of serious harm due to their prolonged exposure to heat indices above 88 degrees Fahrenheit, but under Defendants' new policies, Defendants do not currently issue a Heat Alert until the heat index meets or surpasses 91 degrees Fahrenheit. (Doc. 201-3 at ¶ 4). Dr. Vassallo also credibly testified that monitoring the heat index only every two hours may not adequately protect the health of all workers on the Farm Line, particularly those who are heat sensitive. (*Id.* at ¶ 8).

The Court finds that Defendants have likely been deliberately indifferent to those risks by raising the Heat Alert threshold without sufficient thermoregulatory basis after the Court ordered Defendants to make changes on the Farm Line to protect human health and safety. Defendants' sole expert witness at the hearing admitted that no court has ever qualified him as an expert in thermoregulation, and this Court did not qualify him as an expert in thermoregulation, either. (Doc. 239 at 53:19–22; 62:24–63:1). Similarly, Defendants are aware that "significant" increases in heat index (up to 14 degrees Fahrenheit) can and do occur within a two-hour period near the Farm Line at LSP, yet have refused to revise their policies or practices to acknowledge this reality. (Doc. 201-6 at 150:7–12; Doc. 201-9).

The Court also finds that Plaintiffs have shown an immediate risk of irreparable injury because the current conditions on the Farm Line at LSP "create a substantial risk of injury or death." Finally, the Court finds that the balance of interests favors the issuance of a TRO.

(Doc. 253 at 18–19).

  135. On August 22, 2025, the Court issued similar relief. (Doc. 297).

136.    Since the filing of this lawsuit and even after the conclusion of trial, Defendants have made significant changes affecting incarcerated persons laboring on the Farm Line. (Doc. 431 ¶ 197; Doc. 432 ¶ 558).

137.    In October 2024, Defendants revised HCP8 and Directive 13.067 to expand the heat pathology medication list.[24] (Doc. 431 ¶ 198). Defendants added more than 40 medications to the medication list. (*Id.*).

138.    After the Court raised concerns regarding Defendants' choice to *raise* the Heat Alert threshold despite credible expert testimony showing that incarcerated persons working on the Farm Line at LSP are at substantial risk of serious harm due to their prolonged exposure to heat indices above 88 degrees Fahrenheit (Doc. 253), Defendants again revised Directive 13.067 on January 9, 2026, weeks before the start of trial, to *lower* the Heat Alert threshold back to 88 degrees Fahrenheit. (Doc. 432 ¶ 593).

139.    Also on January 9, 2026, Defendants revised Directive 13.067 to switch the source of its heat index data to an on-site Perry Weather monitoring system. (Doc. 432 ¶ 593). Previously, the heat index was monitored via the NWS at the New Roads False River Regional Airport, which is approximately 41 miles from LSP. Defendants represent that LSP recognized that the offsite heat index reporting became unreliable. (Doc. 431 ¶ 203; *see, e.g.*, Doc. 240). Accordingly, LSP

---

[24] HCP8 applies to all DOC facilities across the state. (Doc. 349-1 ¶ 102). Directive 13.067 applies specifically to LSP. (Doc. 349-1 ¶ 104).

purchased the Perry Weather system, which is a weather station located at LSP that provides real time on-site temperature monitoring. (*Id.*).

140.    On March 9, 2026, after the conclusion of trial in this matter, Defendants again revised Directive 13.067 to eliminate the heat season and require LSP to implement the heat precautions in Directive 13.067 year-round. (Doc. 432 ¶ 576).

141.    In October 2024, Defendants constructed two "shade wagons" to create shaded areas for incarcerated persons to take rest breaks. (Doc. 431 ¶ 201).

142.    Warden Vannoy ordered the construction and placement of 25 permanent "shade pavilions." The shade pavilions are 24x24, have a roof for shade, benches for seating, electricity, four large fans, and access to two water spigots on each side. Defendants placed the shade pavilions throughout the fields. LSP represents that it spent over $300,000 on these shade pavilions. (Doc. 431 ¶ 202). Images of the shade pavilions are below:





(DX-51).



(JX-220).

143.    The shade pavilions are permanent changes on the Farm Line. (Doc. 432 ¶ 559).

144.    LSP codified certain Farm Line procedures in "post orders," which require on a year-round basis and regardless of temperature, the following:[25]

    a. Accessible shaded areas for rest breaks that include a seating area

       for incarcerated persons;

---

[25] Warden Vannoy testified that a post order is a "general job description" for a particular post, which sets forth the expectations for persons employed in those posts. (Doc. 419 at 271:3–8).

    b. An organized 15-minute rest break requirement after 45 minutes of work. The time to walk to and from the shaded rest area is not counted in the rest break time period;

    c. Drinking coolers placed on a raised surface that include ice and water, each to be refilled as needed during work hours.

    d. During the 45-minute work period, incarcerated persons shall have access to water at any time.

    e. Sunscreen, work gloves, drinking cups and hats are available for use; and

    f. Portalets and handwashing stations are available for use. (JX 48).

(Doc. 431 ¶ 204).

145.    The new post orders contain instructions that officers on the Farm Line must ensure that men are provided with shade, breaks, water, and gloves. (Doc. 432 ¶ 761 (citing DX-048 at 033418)).

146.    Post-trial, Warden Vannoy issued a memorandum to LSP field employees advising that once a Heat Alert is called, incarcerated persons with heat precautions duty status must be brought indoors within 30 minutes. (Doc. 431 ¶ 205 (citing DX 62)).

147.    Defendants represent that LSP is constructing a greenhouse and intends to hold a horticulture class for incarcerated persons working on the Farm Line. (Doc. 431 ¶ 206).

148.     Warden Vannoy requires field officers to be notified if the heat index reaches 110 degrees so that incarcerated persons can be brought indoors before the heat index reaches 113 degrees. (Doc. 431 ¶ 200).

**M. Relief Requested**

149.     The relief Plaintiffs request has narrowed over the course of this litigation. At the outset of the case, Plaintiffs asked the Court to enjoin the Farm Line altogether. Now, Plaintiffs have revised their requests and ask the Court to implement the following relief:

   a. Defendants shall cease assigning persons to the Farm Line in connection with disciplinary proceedings, including as the first job assignment given after someone loses a prior job assignment due to disciplinary sanctions.

   b. Defendants shall cease assigning persons to the Farm Line as a first job assignment upon arrival at Louisiana State Penitentiary.

   c. Defendants shall make available to all persons assigned to the Farm Line educational programming consistent with what Warden Vannoy described in his post-trial testimony (PX-248 at 56–72).

   d. Defendants shall provide persons assigned Farm Line shifts during which the heat index reaches or exceeds 88 degrees Fahrenheit, with regular, periodic access to air-conditioning on that day, such

as on a bus during mandatory rest breaks pursuant to LSP Directive 13.067, or for at least one hour following such shift.

e. Defendants shall cease assigning persons with Heat Precaution Duty Status to the Farm Line during shifts where the heat index is projected to reach or exceed 88 degrees Fahrenheit.

f. Defendants shall expand eligibility for Heat Precaution Duty Status to include any person assigned to the Farm Line who has been prescribed Selective Serotonin Reuptake Inhibitors, Angiotensin-Converting Enzyme inhibitors, Angiotensin Receptor Blockers, and/or dihydropyridine calcium channel blockers, and/or who has been diagnosed with diabetes, coronary artery disease, seizure disorder, and/or hypertension.

g. Defendants shall cease all Farm Line work when the heat index meets or exceeds 103 degrees Fahrenheit.

h. Defendants shall cease charging co-pays for medical care sought by men assigned to the Farm Line for symptoms consistent with heat-related illness whether such medical care is sought while in the field or within 24 hours following the end of a shift during which the heat index met or exceeded 88 degrees Fahrenheit.

i. Defendants shall provide Plaintiffs' counsel with Daily Line Counts, Rosters, Perry Weather system heat index reports, Self-Declared Emergencies made from the field or from Camps C or D

during weeks where the heat index met or exceeded 88 degrees Fahrenheit while the Farm Line was operating, and information on the educational programming described by Warden Vannoy (PX-248 at 56–72) for a period of two years.

j.  Defendants shall expand eligibility for Heat Precaution Duty Status to include any person assigned to the Farm Line who has been prescribed Selective Serotonin Reuptake Inhibitors, Angiotensin-Converting Enzyme inhibitors, Angiotensin Receptor Blockers, and/or dihydropyridine calcium channel blockers, and/or who has been diagnosed with diabetes, coronary artery disease, seizure disorder, and hypertension.

(Doc. 433).

## N. Conclusion.

150.    The Court emphasizes that each of the above items of relief are well-founded, arising from consultation with experts, site visits, discussions with incarcerated persons working on the Farm Line, and several years of dedicated work on the part of Plaintiffs' Counsel to identify possible constitutional deficiencies. The Court is constrained by the Circuit's opinion in *Parker*, however, indicating that it would be inappropriate for the Court to "micromanage[] the

prison's facilities, personnel, procedures, and standards of care[.]"[26] *Parker*, 171 F.4th at 761. The Court is further constrained by the Circuit's finding that "ongoing improvements and innovations g[ive] rise to a strong legal likelihood that the Defendants [are] not guilty of continued deliberate indifference or disability

---

[26] The dissenting Judges in *Parker* emphasized, however, that "[c]ourts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Parker*, 171 F.4th at 764 (Higginson, J., dissenting) (citing *Brown v. Plata*, 563 U.S. 493, 511 (2011)).

Indeed, the U.S. Supreme Court, the Fifth Circuit, and district courts within the Fifth Circuit have repeatedly found that excessive heat without proper mitigating measures violates the Eighth Amendment. *Hope v. Pelzer*, 536 U.S. 730, 738 (2002) (Eighth Amendment violation was "obvious" in part because plaintiff was subjected to "unnecessary exposure to the heat of the sun"); *Gates v. Cook*, 376 F.3d 323 (5th Cir. 2004) (finding that an injunction requiring prison officials in the Mississippi Department of Corrections "to provide fans, ice water, and daily showers when the heat index is 90 degrees or above" was "justified by an Eighth Amendment violation."); *Gates*, 376 F.3d at 339–340 (affirming the district court's conclusion that conditions "present[ed] a substantial risk of serious harm to the inmates" when expert testimony showed that it was very likely that an inmate would die of heat stroke or some other heat-related illness because of the extreme conditions at issue); *Valigura v. Mendoza*, 265 F. App'x 232, 235 (5th Cir. 2008) ("We have held that temperatures [within confinement] consistently in the nineties without remedial measures, such as fans, ice water, and showers, sufficiently increase the probability of death and serious illness so as to violate the Eighth Amendment"); *Blackmon v. Garza*, 484 F. App'x 866, 873 (5th Cir. 2012) (finding that "the obvious nature of the risks to Blackmon would further support a jury finding that Defendants were deliberately indifferent to the risks to [plaintiff's] health" when the Warden testified that "she was aware that the summer heat was 'intense[,]'" and "the evidence set out at trial indicated that Defendants had received training making them aware of the potential dangers of heat to prisoners."); *Smith v. Sullivan*, 553 F.2d 373, 381 (5th Cir. 1977) ("If the proof shows the occurrence of extremes of temperature that are likely to be injurious to inmates' health[,] relief should be granted. . . ."); *Ball v. LeBlanc*, 792 F.3d 584, 596 (5th Cir. 2015) ("[W]e affirm the district court's conclusion that housing these prisoners in very hot cells without sufficient access to heat-relief measures, while knowing that each suffers from conditions that render him extremely vulnerable to serious heat-related injury, violates the Eighth Amendment."); *McCollum v. Livingston*, No. 4:14-CV-3253, 2017 WL 608665, at *18 (S.D. Tex. Feb. 3, 2017) (noting that Fifth Circuit precedent provides "that, in the face of extreme heat, prison officials must fashion adequate mitigating measures").

discrimination[.]"[27] *Id.* This is especially true given the absence of guidance regarding the elements or standards by which district courts should evaluate prison officials' "concern and sincerity" in the implementation of remedial measures. *Id.* Finally, the Court is constrained by the Circuit's emphasis that the Court "must maintain a delicate balance among the prerogatives of public institutions, the demands of federalism, and the judiciary's limited remedial role." *Id.* As a result, the Court will not order permanent injunctive relief.

151.     This litigation, however, has not been all for naught. For instance, Warden Vannoy has confirmed that the following revised measures have been implemented since the initiation of this litigation: (1) the revision of Directive 13.067 to expand the heat pathology medication list; (2) the addition of the on-site Perry Weather monitoring system; (3) the elimination of the heat season, meaning that LSP will implement the heat precautions included in Directive 13.067 year-round; (4) the construction of shade pavilions, which include a roof for shade, benches for seating, electricity, four large fans, and access to two water spigots on each side; (5) an organized 15-minute rest break requirement

---

[27] For this reason, the Court cannot grant the relief Plaintiffs request under their ADA and RA claim either. *See Parker*, 171 F.4th at 760 ("The district court's analysis of 'failure to accommodate' and 'programmatic accommodations' substituted its view of prison management for the statutory standard, which allows some institutional flexibility in providing for disabled prisoners' needs. In short, the district court created its own preferred standard of medical care for the prison."); *Id.* at 760–61 ("Even the Supreme Court refused to hold that the ADA imposes a 'standard of care' on States.") (citing *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 603 n.14 (1999) ("We do not in this opinion hold that the ADA imposes on the States a 'standard of care' for whatever medical services they render, or that the ADA requires States to provide a certain level of benefits to individuals with disabilities." (some internal quotations omitted)).

after 45 minutes of work, with the time to walk to and from the shaded rest area not included in the rest break time period; (6) drinking coolers placed on a raised surface that include ice and water, each to be refilled as needed during work hours; (7) access to water at any time during the 45-minute work period; (8) sunscreen, work gloves, drinking cups, and hats; and (9) access to portalets and handwashing stations. (JX 48).

152.    The Court emphasizes that in several meaningful respects, due to the committed efforts of Plaintiffs' Counsel and the class representatives, this litigation has obtained the relief Plaintiffs seek—more significant protections for incarcerated persons laboring on the Farm Line.[28] Defendants have been put on notice of the substantial risk of serious harm that incarcerated men working on the Farm Line face, particularly when the heat index meets or exceeds 103 degrees Fahrenheit, and have committed to continuing to make improvements. (Doc. 431 ¶ 205). The Court also acknowledges the apparent willingness of Warden Vannoy to take seriously the concerns raised by Plaintiffs and, commendably, to seek an appropriate resolution of these issues. The Court urges Defendants to continue to make improvements to preserve the health and safety of incarcerated persons laboring on the Farm Line and emphasizes that Plaintiffs are free to challenge these issues in the future should constitutional violations persist.

---

[28] *See, e.g.,* Doc. 245 at 219:25–220:2 (Dr. Lavespere testifying, "I know, since we've started this Farm Line case, that gloves have been available every day to the Farm Line.").

## IV. FINAL DISPOSITION

Accordingly,

**IT IS ORDERED** that judgment is entered in favor of Defendants.

Judgment will be entered separately.

Baton Rouge, Louisiana, this 26th day of May, 2026

_____
**JUDGE BRIAN A. JACKSON**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**