# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| TEXAS CITIZENS UNITED FOR REHABILITATION OF ERRANTS, INC., et al., | § | |
| Plaintiffs, | § | |
| v. | § | 1:23-CV-1004-RP |
| BOBBY LUMPKIN, | § | |
| Defendant. | § | |

**ORDER**

From March 30 through April 9, 2026, the Court held a bench trial in this case. (Dkts. 321, 322, 324, 325, 326, 327, 328, 329). Over eight days of trial, the Court took evidence and heard sworn testimony. On June 5, 2026, the parties submitted their proposed findings of fact and conclusions of law. (Dkts. 339, 340). Having considered the evidence from the trial and the preliminary injunction hearing,[1] testimony and oral arguments presented during trial and at the preliminary injunction hearing, the post-trial submissions, and the applicable law, the Court now enters the following findings of fact and conclusions of law. Any finding of fact that should be construed as a conclusion of law is so adopted. Any conclusion of law that should be construed as a finding of fact is so adopted.

## I. INTRODUCTION

It has been said that the degree of civilization in a society can be judged by entering its prisons.[2] As described below, the record in this case paints a clear picture: in a state where outdoor

---

[1] From July 30, 2024, through August 2, 2024, the Court held a hearing on Plaintiffs' Emergency Motion for Preliminary Injunction, (Dkt. 50). (Min. Entries, Dkts. 167, 172, 173, 174). By agreement of the parties, the Court may consider all evidence and testimony from the preliminary injunction hearing in deciding Plaintiffs' request for a permanent injunction. (*See* Status Conference Hr'g Tr. (Dec. 10, 2025) 7:20–9:7).

[2] Origin uncertain; frequently attributed to Fyodor Dostoevesky.

heat indexes exceed 130 degrees, inmates in Texas prisons are suffering—and in some cases dying—in extreme heat every summer. Nearly 90,000 inmates were without air conditioning this past summer. Witnesses in this case who had been incarcerated in un-air-conditioned Texas Department of Criminal Justice ("TDCJ") prisons described themselves and their fellow inmates getting sick, passing out, and reaching a level of desperation to cool off that made it "common" to splash toilet water on themselves. These are not humane conditions.

Plaintiffs are a set of advocacy organizations with members and constituents incarcerated in Texas prisons, suing Defendant Bobby Lumpkin ("Defendant" or "Director Lumpkin"), the Director of TDCJ, for violations of the Eighth Amendment to the Constitution of the United States caused by TDCJ's failure to air-condition the majority of its prisons.[3]

As is also described below, Director Lumpkin and TDCJ have not responded reasonably to address extreme heat in Texas's un-air-conditioned prisons: they have failed to meaningfully investigate and document prison temperatures and their effects, underrepresenting the scope of the problem; they have continued to rely on insufficient mitigation methods; and they have failed to act with reasonable urgency or commitment to install air conditioning. The Eighth Amendment to the Constitution prohibits the infliction of "cruel and unusual punishments." Here, the Eighth Amendment requires more of Defendant, the agency he represents, and the state of Texas.

### A. Procedural History

Bernhardt Tiede ("Mr. Tiede") originally filed suit as an individual on August 24, 2023. (Compl., Dkt. 1). He initially sued Bryan Collier ("Mr. Collier" or "former director Collier"), then the Executive Director of TDCJ; the TDCJ; Kenneth Paxton; and the Texas Office of Attorney General (collectively, "Original Defendants").

---

[3] 2d Am. Compl., Dkt. 240, at 2–4.

On April 22, 2024, Mr. Tiede moved to amend his complaint, (Dkt. 48), and on April 25, 2024, he filed a Motion for Preliminary Injunction, (Dkt. 50), based on the updated facts included in his proposed amended complaint. The Court granted the motion to amend on May 7, 2024. (Dkt. 56). The First Amended Complaint removed four of the five Original Defendants (leaving only Mr. Collier), and three of Mr. Tiede's four legal arguments (leaving only an Eighth Amendment conditions of confinement argument), and added four organizational plaintiffs: Build Up (since replaced by Lioness), TX C.U.R.E., TPCA, and Coalition for Texans with Disabilities ("CTD"). (Am. Compl., Dkt. 57). Mr. Tiede and the organizational plaintiffs brought Section 1983 claims under the Eighth Amendment against Mr. Collier in his official capacity, seeking declaratory and injunctive relief on behalf of the entire TDCJ inmate population. (*Id.* at 53–59).

On May 29, 2024, Mr. Collier filed an Amended Motion to Dismiss Plaintiffs' Amended Complaint Pursuant to Rule 12(b)(1), (Dkt. 76), and an Amended Motion to Dismiss Plaintiffs' Amended Complaint Pursuant to Rule 12(b)(6), (Dkt. 77). Plaintiffs filed responses in opposition to the motions to dismiss, (Dkts. 87, 88), and Collier filed replies, (Dkts. 91, 92). On June 14, 2024, the Court denied the two motions to dismiss, (Dkts. 76, 77). (Order, Dkt. 95); *Tiede v. Collier*, No. 1:23-CV-1004-RP, 2024 WL 3016562 (W.D. Tex. June 14, 2024) ("*Tiede I*").[4]

Meanwhile, Mr. Collier filed a response in opposition to the Motion for Preliminary Injunction, (Dkt. 52), and Plaintiffs filed a reply, (Dkt. 90). From July 30, 2024, through August 2, 2024, the Court held a hearing on Plaintiffs' Motion for Preliminary Injunction, (Dkt. 50). (*See* Min. Entries, Dkts. 167, 172, 173, 174). Plaintiffs presented thirteen witnesses. (Witness List, Dkt. 175). Collier presented eight witnesses, including Mr. Lumpkin, then the Correctional Institution Division

[4] Hereinafter, the Court will cite to its order denying Defendant's motions to dismiss as it appears on Westlaw and will not continue to include the docket number.

Director of TDCJ. (*Id.*; Prelim. Inj. Final Hr'g Tr. (August 1, 2024) at 12:1–4). At the hearing, the Court admitted 125 exhibits. (Exhibit List, Dkt. 190).

On March 26, 2025, the Court issued an order denying Plaintiffs' Motion for Preliminary Injunction. (Dkt. 202); *Tiede v. Collier*, 796 F. Supp. 3d 275 (W.D. Tex. 2025) ("*Tiede II*").[5] The Court carefully considered the extensive preliminary injunction hearing record. Based on that record, Court found that "[t]his case concerns the plainly unconstitutional treatment of some of the most vulnerable, marginalized members of our society." *Id.* at 336. The evidence showed that "Plaintiffs . . . met their burden of establishing a likelihood of success on the merits that Collier is violating the Eighth Amendment's prohibition against cruel and unusual punishment." *Id.* Plaintiffs were likely to succeed in showing that every inmate in an un-air-conditioned cell faced unconstitutionally high risk, that the mitigation measures TDCJ was using were inadequate to address that risk, and that air-conditioning was therefore necessary. *Id.* at 327, 330–32. The Court also found that, "[d]espite knowing of the risk extreme heat poses to all inmates and the inadequacy of TDCJ's mitigation measures, [then-Defendant] Collier ha[d] no concrete timeline for installing permanent or temporary air conditioning in TDCJ inmate living areas." *Id.* at 332.

However, despite the extensive evidence of ongoing, unconstitutional harm, the Court concluded that the scope of the preliminary relief sought—temporary system-wide air-conditioning—was unsuited to a preliminary injunction. The Court noted that "[p]reliminary injunctions are temporary in nature, designed to preserve the status quo and prevent irreparable harm until the court renders a decision on the merits," *id.* at 333–334 (citing *Sambrano v. United Airlines, Inc.*, No. 21-11159, 2022 WL 486610, at *4), and further noted that the Prison Litigation Reform Act ("PLRA") would have required any preliminary injunction to expire after 90 days, *id.*

---

[5] Hereinafter, the Court will cite to its preliminary injunction order as it appears on Westlaw and will not continue to include the docket number.

(citing 18 U.S.C. § 3636(a)(2)). The Court found itself "presented with the unsettling paradox that ordering preliminary relief in the form of temporary air conditioning while the case proceeds would be to the detriment to the ultimate goal of permanent air conditioning," in that installing temporary air conditioning would divert resources away from a final solution. *Id.* at 334–36. The Court also noted that two bills to install systemwide air conditioning had been introduced in the Texas Legislature between the time of the preliminary injunction hearing and its order. *Id.* at 334. As a result, the Court concluded that installing temporary air conditioning as a form of preliminary relief was not in the public interest. However, the Court emphasized that the extensive record at the preliminary injunction hearing indicated that Plaintiffs were likely to succeed on their claims. *Id.* at 336. As a result, even as it denied Plaintiffs' motion for a preliminary injunction, the Court "implored [Collier to] take to the necessary steps to be prepared" for the likely outcome that Plaintiffs would be "entitled to permanent relief in the form of expeditious installation of permanent air conditioning in all TDCJ facilities." *Id.*

On August 18, 2025, Plaintiffs moved to amend their complaint to substitute Lioness for Build Up as the proper party in interest based on a change in organizational structure,[6] (Dkt. 227), and on September 25, 2025, Defendant filed a Motion to Substitute Party because Mr. Collier had been replaced as TDCJ Director by Mr. Lumpkin, making Director Lumpkin the proper defendant in the action, (Dkt. 233). On October 1, 2025, the Court granted Defendant's motion to substitute Director Lumpkin for former director Collier, (Text Order Dated October 1, 2025), and on October 6, 2025, granted Plaintiffs' Motion to Amend their Complaint, (Dkt. 239). As a result, on October 6, 2025, Plaintiffs' Second Amended Complaint was filed. (Dkt. 240). On October 21, 2026,

[6] As the Court explained when granting the Motion to Amend, when the Organizational Plaintiffs joined the suit, "Lioness . . . was an unincorporated organization under the umbrella of Build Up, [but] has since incorporated . . . This change means that Lioness's membership, which gave Build Up its status as a real party in interest, is now solely Lioness's and no longer subsumed into Build Up's membership." (Dkt. 239, at 1).

Defendant filed an Answer to the Second Amended Complaint, (Dkt. 244), and on December 1, 2025, he filed a Motion for Summary Judgment, (Dkt. 251).

The Court granted in part and denied in part Defendant's Motion for Summary Judgment. (Dkt. 302); *Tiede v. Lumpkin*, No. 1:23-CV-1004-RP, 2026 WL 751904 (W.D. Tex. Mar. 16, 2026) ("*Tiede III*").[7] Because of changes to TDCJ's policies governing which inmates are housed in air-conditioned cells, which meant that Mr. Tiede was housed in air-conditioning due to his age, the Court concluded that Mr. Tiede's individual claims were moot. The Court also concluded that one organizational plaintiff, CTD, did not have standing to pursue its claims. However, the Court concluded that the other organizational plaintiffs—Plaintiffs now before the Court—had standing and that their claims were not subject to dismissal at the summary judgment stage.

The Court held a trial in this matter from March 30 through April 9, 2026. (*See* Min. Entries, Dkts. 321, 322, 324, 325, 326, 327, 328, 329). At trial, the Court heard testimony from thirty-three witnesses, (Witness List, Dkt. 330), and admitted more than 320 exhibits, (Ex. Log, Dkt. 334). Per the parties' agreement, evidence from the preliminary injunction hearing was not repeated and the Court can rely on that evidence in reaching its conclusions here.[8]

After trial, on April 15, 2026, the parties jointly filed deposition designations, with objected-to portions highlighted, (Dkt. 332), and on May 27, 2026, Plaintiffs filed an unobjected-to Notice of Errata with corrections to one exhibit from that joint filing, (Dkt. 337). At this time, the Court overrules each outstanding objection. On June 5, 2026, the parties filed their proposed findings of fact and conclusions of law. (Pls.' Brief, Dkt. 339; Def.'s Brief, Dkt. 340).

[7] Hereinafter, the Court will cite to its order granting in part and denying in part Defendant's motion for summary judgment as it appears on Westlaw and will not continue to include the docket number.
[8] *See* Status Conference Hr'g Tr. (Dec. 10, 2025) 7:20–9:7.

## II. FINDINGS OF FACT

### A. Plaintiffs

Plaintiffs are three advocacy organizations whose members or constituents include TDCJ inmates. Below, the Court describes the relevant features of those organizations and of their members or constituents, and the relevant scope and focus of their activities.

#### *1. Lioness Justice Impacted Women's Alliance ("Lioness")*

Lioness is a Texas-based nonprofit organization founded in 2022 by and for women, girls, and gender-expansive people who been incarcerated in Texas.[9] Its mission is to "end the incarceration and devaluation of women, girls and gender-expansive people that are impacted by the Texas criminal legal system, and build power in [its] communities."[10] Initially, Lioness was part of Build Up, Inc. a nonprofit organization formed under the laws of New Jersey.[11] On September 4, 2024, Lioness became its own entity independent of Build Up, Inc.[12] No changes were made to Lioness's membership or membership criteria.[13] Thus, in October 2025, the Court granted Plaintiffs leave to amend their complaint to substitute Lioness for Build Up, Inc.[14]

Jennifer Toon, Lioness's cofounder and Executive Director, was herself incarcerated at TDCJ facilities from age 15 to 25 and again from approximately age 30 to 40. Ms. Toon was released on December 13, 2018.[15] Marci Simmons, Lioness's Director of Communications, was incarcerated in TDCJ facilities from 2011 to 2021 and spent every summer of her incarceration in un-air-

---

[9] Trial Tr. (Apr. 1, 2026) 148:1–5, 150:3–4 (Toon). Hereinafter, "Trial Tr." refers to the final transcript from the 2026 permanent injunction trial, and "Prelim. Inj. Hr'g Tr." refers to the final transcript from the 2024 preliminary injunction hearing.
[10] *Id.* at 286:14–19 (Simmons), 148:3–7 (Toon); Pls.' Trial Ex. 535 at 1 (Lioness Bylaws and Amended Bylaws).
[11] *See* First Am. Compl. ¶ 19, Dkt. No. 57; Trial Tr. (Apr. 1, 2026) 153:12–154:4 (Toon).
[12] Lioness Certificate of Formation, Dkt. No. 227–1; *see also* Trial Tr. (Apr. 1, 2026) 153:25–154:4 (Toon).
[13] Trial Tr. (Apr. 1, 2026) 154:20–24, 158:1–4 (Toon).
[14] Order Granting Leave to Amend, Dkt. 239; *See also* Second Am. Compl., Dkt. 240.
[15] Trial Tr. (Apr. 1, 2026) 148:21–149:1, 152:14–16 (Toon).

conditioned facilities.[16] Ms. Simmons testified at the preliminary injunction hearing and at trial, and Ms. Toon testified at trial. Their testimony was unrebutted.

*Lioness's membership structure*

Lioness has a written membership policy,[17] which was adopted in August 2025.[18] That policy formalizes membership criteria and processes that Lioness had followed since its founding.[19] The organization's membership criteria did not change when the written policy was adopted.[20] To become a member, an inmate writes to Lioness expressing interest, receives and returns a membership form that includes Lioness's mission, vision, values, and community agreements, and then begins corresponding with Lioness's Director of Member Relations, Diane Thompson.[21] Ms. Toon testified that members who had joined Lioness before the written policy was adopted made clear through their ongoing correspondence with Ms. Thompson that they were members of Lioness, expressing membership in a way that was later formalized by the written policy.[22] Ms. Toon testified that Lioness's membership policy was not adopted in response to this litigation.[23]

Membership is voluntary and Lioness does not charge dues, recognizing that inmates typically lack financial resources given that incarcerated individuals in Texas are not paid for their work.[24] Incarcerated members occasionally donate financially to Lioness despite those constraints; Toon testified that inmates "occasionally" donate and that the organization's first donation came from an inmate.[25] Lioness has bylaws,[26] as well as a board of directors comprised entirely of

[16] *Id.* at 277:1–11 (Simmons).
[17] *See generally* Pls.' Trial Ex. 536 (Lioness Membership Policy).
[18] Trial Tr. (Apr. 1, 2026) 158:13–16 (Toon).
[19] *Id.* at 157:17–23 (Toon).
[20] *Id.* at 158:1–4 (Toon).
[21] *Id.* at 162:7–13 (Toon).
[22] *Id.* at 157:17–23, 158:2–4, 190:10–16 (Toon).
[23] *Id.* at 158:10–15 (Toon).
[24] *Id.* at 162:20–163:1 (Toon), 291:8–292:3 (Simmons).
[25] *Id.* at 163:2–9 (Toon).
[26] *See generally* Pls.' Trial Ex. 535 (Lioness Bylaws and Amended Bylaws).

Case 1:23-cv-01004-RP Document 350 Filed 09/22/25 Page 9 of 150

individuals who satisfy its membership criteria, all of whom were previously incarcerated in TDCJ facilities.[27]

Inmates do not serve on Lioness's board. This is because, as was credibly testified to at trial, the practical barriers to their participation are insurmountable. Ms. Toon explained that there is not "a really feasible way" to hold an effective board meeting with incarcerated members—TDCJ's rules prohibit third-party calls, and the moment a third party joins, "that call could be terminated, and then, that person would be removed from the call list."[28] Ms. Simmons confirmed this: "[Y]ou can't just hold a board meeting with incarcerated members."[29] She explained, it is "[a]bsolutely not" possible to schedule phone calls with incarcerated individuals reliably, and further explained that she has been denied permission to visit Lioness members at TDCJ facilities "several times" without explanation.[30] Again, this testimony was unrebutted.

*Lioness has approximately 400 incarcerated members, including over 100 members in un-air-conditioned facilities*

Lioness has approximately 500 members, approximately 400 of whom are currently incarcerated in TDCJ facilities.[31] Lioness has members in every TDCJ women's-only facility, including members in at least eight un-air-conditioned units.[32] Lioness maintains a written membership list,[33] reflecting approximately 416 members incarcerated in TDCJ facilities at the time of the list's preparation.[34] The affidavit of Mr. Rheams of the Office of the Attorney General, admitted at trial as Defendant's Exhibit 2 and validated as accurate by TDCJ's Timothy Fitzpatrick,

---

[27] Trial Tr. (Apr. 1, 2026) 156:16–159:11 (Toon).
[28] *Id.* at 159:12–160:5 (Toon).
[29] *Id.* at 290:5–17 (Simmons).
[30] *Id.* at 290:15–291:2 (Simmons).
[31] *Id.* at 160:7–12 (Toon).
[32] *Id.* at 161:1–9 (Toon); Pls.' Trial Ex. 62 (Lioness Members Inside Data).
[33] *See generally* Pls.' Trial Ex. 62 (Lioness Members Inside Data).
[34] Trial Tr. (Apr. 1, 2026) 160:21–25, 189:7–13 (Toon).

established that of Lioness's 416 incarcerated members, 329 remained in TDCJ custody, and approximately 118 of those members are housed in un-air-conditioned units.[35]

Lioness's members continue to suffer from exposure to extreme heat each summer in TDCJ's un-air-conditioned facilities.[36] Lioness receives "constant and consistent" correspondence and complaints about extreme heat from its members every year, increasing in volume during the summer months.[37] As an example of that correspondence, in July 2023, two Lioness members wrote to alert the organization of five inmate deaths in the Lane Murray Unit over a one-week period, including the death of Elizabeth Hagerty (discussed in Findings of Fact, Section B.1, *infra*).[38] These two Lioness members were specifically reaching out to Lioness for relief from the extreme heat in un-air-conditioned prisons, writing: "We don't want to die!!!!!"[39]

*Lioness communicates with its incarcerated members every day*

Lioness's Director of Member Relations, Diane Thompson, corresponds with incarcerated members every day—receiving six to ten electronic messages per day and approximately ten physical letters per week—and Lioness responds to every communication.[40] Ms. Simmons independently corroborated this volume, testifying that Lioness receives five to eight letters per day from incarcerated members—over a thousand per year—and that Ms. Thompson responds to every single one.[41] Communicating with Lioness's incarcerated members constitutes the entirety of Ms. Thompson's job.[42] Lioness also publishes a quarterly newsletter that it has been sending to its

[35] *Id.* at 161:4–9, 161:18–23 (Toon); Def.'s Trial Ex. 2 ¶ 16 (Rheams Decl.).
[36] Trial Tr. (Apr. 1, 2026) 175:4–6 (Toon).
[37] *Id.* at 174:22–175:3 (Toon).
[38] Pls.' Trial Ex. 544 at 1, 9 (Donations and Complaints to Lioness (4.9.26)); Def.'s Trial Ex. 39 at 2, 4 (Lioness Inside Member List).
[39] *Id.* at 1 (Donations and Complaints to Lioness (4.9.26)).
[40] *Id.* at 164:1–6 (Toon).
[41] *Id.* at 287:4–21 (Simmons).
[42] *Id.* at 287:22–24 (Simmons).

incarcerated members since its founding.[43]

As noted above, TDCJ inmates who are members of Lioness regularly communicate about their conditions of confinement—including heat conditions—to the organization, which uses that information to inform its advocacy with TDCJ officials and the Texas Legislature.[44] Ms. Simmons confirmed that Lioness's advocacy work is guided "almost a hundred percent" by input from its members who are TDCJ inmates.[45]

*Advocating for air conditioning is germane to Lioness's purpose*

Air conditioning Texas's prisons has been a priority for Lioness since its founding, "from day one."[46] Before joining this litigation, Lioness advocated for air conditioning in TDCJ facilities through legislative hearings, rallies, protests, vigils, and direct communications with TDCJ officials.[47]

Lioness was not founded to file this lawsuit or any other lawsuit and had never participated in any litigation prior to joining this case.[48] The decision to join this lawsuit was "a direct response to the concerns that Lioness received for members currently incarcerated in un[-]air-conditioned TDCJ facilities," stemming the organization's realization of "very real risks of [its] members' health, including the chance of that their lives [would] be lost."[49] Since Lioness joined the case in May 2024, no Lioness member has objected to the organization's participation in this lawsuit.[50] Lioness does not stand to gain anything financially from the lawsuit. As explained by the organization, the only benefit Lioness stands to gain is relief for its members from the harm they are experiencing from

---

[43] *Id.* at 171:15–172:4 (Toon).
[44] *Id.* at 164:7–168:11 (Toon); *see also* Pls.' Trial Exs. 62 (Lioness Members Inside Data), 544 (Donations and Complaints to Lioness (4.9.26)).
[45] Trial Tr. (Apr. 1, 2026) 288:22–289:6 (Simmons).
[46] *Id.* at 174:8–12 (Toon).
[47] *Id.* at 169:1–21, 173:11–15 (Toon), 296:1–14 (Simmons).
[48] *Id.* at 297:13–24 (Simmons).
[49] *Id.* at 297:25–298:13 (Simmons).
[50] *Id.* at 176:23–25 (Toon), 298:14–16 (Simmons).

extreme heat in un-air-conditioned prisons.[51]

The genuineness and longevity of Lioness's heat-related advocacy was confirmed by several witnesses. Professor Michele Deitch—a corrections policy expert with nearly 40 years of experience—testified that Lioness—alongside with TX C.U.R.E. and TPCA—are "very well-known in the field" of inmate advocacy, and "fixtures at the [Texas] legislature" on issues relating to prison conditions, including air conditioning.[52] Mr. Collier confirmed the same, agreeing that all three organizations are "fixtures at the legislature in terms of testifying about air conditioning," and that Ms. Toon "advocates for inmates."[53] Director Lumpkin testified that he knows Ms. Toon personally, that she regularly attends TDCJ's open meetings and speaks "very thoughtful[ly]" about the challenges facing the agency.[54] He further testified that TDCJ takes Ms. Toon's input "to heart."[55] Ms. Toon confirmed that Lioness is a "fixture" in Texas prison advocacy circles, explaining that she has communicated directly with several TDCJ officials about the extreme heat in un-air-conditioned prisons, including with Regional Director Jennifer Cozby, Correctional Institutions Division Director Eric Guerrero, and Director Lumpkin himself.[56]

*Lioness seeks systemwide relief*

Ms. Toon confirmed that the relief Lioness seeks—a court order requiring TDCJ to install air conditioning in all of its housing units—is institutional and systemwide in nature.[57] She testified that the absence of any TDCJ policy requiring its units to be air conditioned or temperature-controlled is not specific to women's units, but rather a "systemwide failure to provide or require

---

51 *Id.* at 177:2–5 (Toon), 298:17–299:1 (Simmons).
52 Trial Tr. (Mar. 31, 2026) 78:8–10 (Deitch).
53 *Id.* at 179:1–20 (Collier).
54 *Id.* at 340:1–341:4 (Lumpkin).
55 *Id.*
56 Trial Tr. (Apr. 1, 2026) 174:4–7, 169:15–21 (Toon).
57 *Id.* at 175:23–176:18 (Toon).

temperature-controlled units."[58] Ms. Simmons agreed: The lack of air conditioning in Texas prisons is "a systemwide [problem] that is … causing people's health at risk [and] taking lives," and the "only way" to change that is through a court order, at which point "lives would be saved."[59]

### *2. Texas Prisons Community Advocates ("TPCA")*

TPCA is a nonprofit organization founded in 2021 by Dr. Amite Dominick, who has served as its President since its inception.[60] Dr. Dominick first became involved in prison advocacy in 2015, when her ex-husband was incarcerated in the TDCJ system at the un-air-conditioned Gurney Unit, and she saw extreme heat's effects on him.[61] Dr. Dominick testified that "TPCA's mission is to amplify the voices of impacted individuals[,] to empower those individuals towards advocacy, to train them towards advocacy, and, to a lesser extent, to hold TDCJ accountable."[62] TPCA was founded specifically to address the crisis of extreme heat in Texas's un-air-conditioned prisons.[63] Dr. Dominick testified at both the preliminary injunction hearing and trial, and her testimony was unrebutted. Additionally, Brittany Robertson, who was then serving as TPCA's Director of Incarcerated Individuals, testified at the preliminary injunction hearing.[64]

*TPCA's constituency structure*

TPCA does not contend that it is a traditional voluntary membership organization, where everyone who is represented by the organization has affirmatively opted-in to join the organization, but instead considers TDCJ's more than 141,000 inmates and their families to be its constituents—with TPCA functioning to represent their interests whether or not they have affirmatively joined the

---

[58] *Id.* at 175:17–176:18 (Toon).
[59] *Id.* at 298:22–299:1 (Simmons).
[60] *Id.* at 231:15–25 (Dominick).
[61] *Id.* at 233:8–235:16, 267:17–18 (Dominick).
[62] *Id.* 241:11–14 (Dominick).
[63] *Id.* at 241:15–21 (Dominick).
[64] Prelim. Inj. Hr'g Tr. (July 31, 2024) 363:21–23 (Robertson).

organization.[65] *See also* Conclusions of Law, Section A.1.b., *infra*. This includes tens of thousands of inmates currently housed in un-air-conditioned units.[66] As described below, TPCA has a network of free-world and incarcerated volunteers and communicates with a broader network of individuals about the organization's activities.[67] However, TPCA does not work to represent the interests of these volunteers, except to the extent that some of those volunteers are TDCJ inmates and therefore part of TPCA's constituency. Instead, testimony at trial established that TPCA is structured to collect and represent the interests and concerns of TDCJ inmates more broadly.

TPCA does use the language of "membership" to describe how volunteers and others engage with the organization.[68] Again, given that TPCA does not hold itself out to be a traditional membership organization, the Court understands TPCA's discussion of "members" to be a way of categorizing how and when groups of constituents engage with the organization. As a result, the Court discusses both "members" and "constituents" of TPCA to match the organization's language about different ways that individuals engage with TPCA, but it is primarily TPCA's relationship with its broader constituency of TDCJ inmates that is relevant to this litigation.

TPCA has different levels of engagement by volunteers and others that TPCA refers to as "members."[69] TPCA's broadest "membership" consists of individuals writing to TPCA, receiving TPCA's newsletter, or on TPCA's email blast list.[70] As of 2026, TPCA had over 2,000 incarcerated individuals actively interacting with the organization as "members," and approximately 5,000 non-

[65] Trial Tr. (April 1, 2026) 246:10–247:10 (Dominick).
[66] *Id.* at 246:12–14 (Dominick).
[67] *Id.* at 247:11–251:8 (Dominick).
[68] *Id.* at 247:11–17 (Dominick).
[69] *Id.* at 247:11–17 (Dominick).
[70] *Id.*

incarcerated members on its email list.[71] TPCA also maintains a mailing list of its incarcerated "members."[72]

An additional subset of TPCA's "membership" consists of inmates incarcerated in TDCJ prisons who volunteer with the organization—called "core team members."[73] Inmates who wish to become "core team members" write to TPCA expressing interest in volunteering.[74] An outside volunteer screens those requests, and if capacity exists, sends the incarcerated individual an onboarding packet and a volunteer agreement[75] via Securus.[76] TPCA has approximately a dozen incarcerated core team members, all of whom have received and responded to their packets.[77] Examples of communications between these "core team members" and TPCA were submitted as Plaintiffs' Trial Exhibit 147.[78]

TPCA does not charge dues, in part because TDCJ inmates generally are not paid for their work.[79] Despite that, incarcerated constituents occasionally donate to TPCA.[80] TPCA is funded through donations and grants, with inmate donations contributing a small portion of the organization's funding.[81] TPCA has a formal board of directors that includes formerly incarcerated individuals.[82] Incarcerated individuals do not serve on the board because they cannot participate in board meetings due to TDCJ rules prohibiting third-party calls; trial testimony established that an

---

71 *Id.* at 247:19–248:5 (Dominick).
72 *Id.* at 248:9–17 (Dominick); *see, e.g.*, Pls.' Trial Ex. 146 (TPCA Mailing List of Incarcerated Individuals).
73 Trial Tr. (Apr. 1, 2026) 250:1–3 (Dominick).
74 *Id.* at 251:3–4 (Dominick).
75 *Id.* at 251:4–252:8 (Dominick); *see generally* Pls.' Trial Ex. 543–A1 (example onboarding message).
76 As Dr. Dominick explained, "Securus is a system that's used for various prisons where you can communicate through e–messaging and phone calls." (Trial Tr. (Apr. 1, 2026) 252:3–5).
77 Trial Tr. (Apr. 1, 2026) 250:4–6, 270:25–271:1 (Dominick).
78 *Id.* at 250:7–9 (Dominick).
79 *Id.* at 248:25–249:3 (Dominick), 291:8–20 (Simmons).
80 *Id.* at 253:22–255:7 (Dominick); *see generally* Pls.' Trial Ex. 543–B (Pages from 543 Donations and Complaints Regarding TPCA Constituents).
81 Trial Tr. (Apr. 1, 2026) 253:20–23, 274:18–275:9 (Dominick).
82 *Id.* at 253:4–7 (Dominick).

Case 3:23-cv-01004-RP-EWD Document 350 Filed 09/22/26 Page 16 of 150

incarcerated individual who participated in a group call could lose phone and visitation privileges as a result.[83]

*TPCA communicates with its incarcerated constituents every day*

TPCA communicates with its incarcerated constituents and their families every day through mail, telephone, and electronic messaging, and through a regular newsletter and email distribution reaching some 5,000 recipients.[84] Dr. Dominick confirmed that TPCA receives correspondence from incarcerated constituents "constantly": "I don't think I've ever gone to our mailbox and there wasn't a piece of mail in there."[85] TPCA has also sent surveys to constituents in TDCJ prisons to identify which issues they most want TPCA to focus the organization's advocacy efforts on.[86] TPCA issues a newsletter to inmate "members," and those inmates may submit material for inclusion.[87] TPCA's incarcerated constituents use their own—typically very limited—funds to communicate with TPCA through Securus, and TPCA spends its own money to respond.[88]

TPCA solicits and is guided by the concerns of its incarcerated constituents. Dr. Dominick testified that the issues raised by incarcerated constituents are "everything" in shaping the organization's priorities.[89] Incarcerated constituents consistently complain to TPCA about the extreme heat in TDCJ prisons[90]; it is "the primary thing" TPCA hears from them.[91] Brittany Robertson, TPCA's former Director of Incarcerated Individuals, communicated daily with TDCJ

[83] *Id.* at 253:8–19 (Dominick).
[84] *Id.* at 247:12–248:5, 252:3–8, 255:1–12 (Dominick).
[85] *Id.* at 255:24–256:6 (Dominick).
[86] *Id.* at 260:13–17 (Dominick).
[87] *Id.* at 255:13–16 (Dominick).
[88] *Id.* at 255:17–23 (Dominick).
[89] *Id.* at 260:15–17 (Dominick).
[90] *Id.* at 256:1–9 (Dominick).
[91] *Id.*

inmates through tablets, phone calls, e-messaging, and paper.[92] She personally received heat complaints from incarcerated constituents every day in the summer.[93]

*TPCA has incarcerated constituents and core team members in un-air-conditioned TDCJ prisons*

TPCA's incarcerated constituents suffer from exposure to extreme heat in TDCJ's un-air-conditioned facilities every summer. The record in this case includes evidence of the death of Jason Wilson, a TPCA core team member who died in July 2024 from extreme heat while incarcerated at the un-air-conditioned Coffield Unit.[94] Mr. Wilson regularly corresponded with Ms. Robertson from 2022 to 2024, including sending messages about extreme heat and inadequate water in the months and days leading up to his death. As set forth in more detail below, Plaintiffs' experts Dr. Vassallo and Dr. Uribe concluded that Mr. Wilson's death was heat-related.[95] At the time of Mr. Wilson's death, he was an active TPCA core team member.[96] Mr. Wilson fully exhausted his administrative remedies prior to his death and also before TPCA joined this case in May 2024.[97]

*Advocating for air conditioning is germane to TPCA's purpose*

The extreme heat in TDCJ's facilities has been central to TPCA's work from the inception of the organization. Dr. Dominick testified that concern about extreme heat in TDCJ prisons was "the birthing point of the whole organization."[98] Dr. Dominick has been personally and professionally engaged in advocating for air conditioning in TDCJ facilities since 2015—eight years before this lawsuit was filed in 2023.[99] Before founding TPCA, she was a board member at TX

---

[92] Prelim. Inj. Hr'g Tr. (July 31, 2024) 363:6–364:7 (Robertson).
[93] *Id.* at 364:2–7 (Robertson).
[94] Trial Tr. (Apr. 1, 2026) 262:10–265:6 (Dominick); Prelim. Inj. Hr'g Tr. (July 31, 2024) 365:8–9 (Robertson).
[95] *See* Findings of Fact, Section B.1., *infra.*
[96] Trial Tr. (Apr. 1, 2026) at 264:7–265:6 (Dominick).
[97] *See* Findings of Fact, Section A.4, *infra.*
[98] Trial Tr. (Apr. 1, 2026) 241:15–21 (Dominick).
[99] *Id.* at 241:4–7, 240:18–22 (Dominick).

C.U.R.E. and founded Texas Prisons Air Conditioning Advocates, which she dissolved when she created TPCA.[100]

Since 2019, and continuing in her role with TPCA since she founded the organization, Dr. Dominick has testified before the Texas Legislature at every hearing on air conditioning, met with the Texas Sunset Advisory Commission ("Sunset Commission")[101] on multiple occasions, and organized a full media campaign encouraging incarcerated individuals and their families to engage with the Sunset Commission process.[102] She has spoken directly with former Director Collier about the need for air conditioning.[103]

TPCA also has a substantial history of heat-related awareness campaigns, including rallies, webinars and trainings, heated mock-cell demonstrations, and its "Beat The Heat" and "85 To Stay Alive" campaigns.[104] Since 2019, TPCA has held mock-cell demonstrations, which replicate prison cell conditions during summer heat to give lawmakers, students, and community members a visceral understanding of the experience of TDCJ inmates in un-air-conditioned facilities.[105]

TPCA's decision to join this lawsuit was driven entirely by what TPCA was hearing from its incarcerated constituents. As Dr. Dominick explained, "their suffering, and their need" for safe conditions drove the organization's decision to participate in the litigation. [106] TPCA receives no financial benefit from participating in this litigation.[107] No incarcerated TPCA constituent or member has objected to TPCA's participation in this lawsuit.[108] To the contrary, Dr. Dominick

---

[100] *Id.* at 236:12–238:21 (Dominick).
[101] The Sunset Commission is a legislative body that reviews the performance and efficiency of each state agency every 12 years. The Commission makes recommendations for reform and whether to re–authorize the agency. (Trial Tr. (Mar. 31, 2026) 54:9–17 (Deitch).)
[102] Trial Tr. (Apr. 1, 2026) 257:18–260:12 (Dominick).
[103] *Id.* at 259:5–12 (Dominick).
[104] *Id.* at 235:18–236:1, 241:22–25, 243:19–246:9 (Dominick).
[105] *Id.* at 243:14–246:9 (Dominick).
[106] *Id.* at 260:23–261:2 (Dominick).
[107] *Id.* at 261:22–24 (Dominick).
[108] *Id.* at 261:12–15 (Dominick).

testified that some of most meaningful correspondence she has received comes from constituents who ask her and TPCA to "keep fighting for [them]."[109]

### *3. Texas Citizens United for Rehabilitation of Errants ("TX C.U.R.E.")*

TX C.U.R.E. is a 501(c)(3) nonprofit criminal-justice advocacy organization based in Austin, Texas.[110] Its mission is to "advocate, educate the inmates, the families, the legislature and the public about issues within the prison system."[111] Charlie Malouff has served as Texas C.U.R.E.'s Vice President and day-to-day operations manager since 2022.[112] He was incarcerated in un-air-conditioned facilities at TDCJ at various points from 2015 through June 1, 2018, totaling approximately three-and-a-half years in the Byrd, Holliday, Pack, Michael, Darrington, Dominguez, Torres, Walls, and Estelle Units.[113] Mr. Malouff testified at both the preliminary injunction hearing and the permanent injunction trial, and his testimony was unrebutted.

*TX C.U.R.E.'s organizational structure and constituents*

TX C.U.R.E. does not have formal members. Instead, like TPCA, it is organized around constituents, who include every inmate in TDCJ and their family members.[114] As a result, TX C.U.R.E. has constituents in every TDCJ unit.[115] TX C.U.R.E. does not collect dues from anyone; it is funded "[s]trictly [through] grants."[116]

Although TX C.U.R.E. does not use the term "members," its constituents actively communicate with the organization about the issues they face; constituent concerns drive the organization's policy agenda; the organization advocates behalf of constituents with TDCJ and the

---

[109] *Id.* at 261:16–21 (Dominick).
[110] Prelim. Inj. Hr'g Tr. (July 30, 2024) 176:16–19 (Malouff).
[111] Trial Tr. (Apr. 1, 2026) 200:6–9 (Malouff).
[112] *Id.* at 200:10–15 (Malouff).
[113] Prelim. Inj. Hr'g Tr. (July 30, 2024) at 178:7–179:6 (Malouff); Trial Tr. (Apr. 1, 2026) 201:4–20, 217:15–18 (Malouff).
[114] Trial Tr. (Apr. 1, 2026) 201:21–202:8, 202:24–203:10 (Malouff).
[115] *Id.* at 203:8–10 (Malouff).
[116] *Id.* at 227:9–11 (Malouff).

Case 3:23-cv-01004-B-RFW Document 350 Filed 09/22/26 Page 20 of 150

legislature; and constituents receive correspondence from TX C.U.R.E.[117] The organizations' constituents support TX C.U.R.E.'s participation in this litigation.[118]

TX C.U.R.E.'s board of directors reflects the community it serves. It currently has eight members, including a retired brigadier general who serves as president, a banking professional, a doctor in nursing, a licensed counselor supervisor, a mother whose son died in prison, and two formerly incarcerated individuals.[119] No currently incarcerated individual serves on TX C.U.R.E.'s board. This decision is not the organization's choice, but instead reflects the fact that incarcerated individuals cannot set their own schedules and cannot participate in board meetings.[120] When Mr. Malouff was incarcerated, no exceptions were made to prison rules to accommodate such participation.[121]

*TX C.U.R.E. communicates with its constituents constantly*

TX C.U.R.E. determines its priorities based on the issues its constituents raise.[122] TX C.U.R.E. maintains a mailing list of incarcerated constituents with whom it has had direct correspondence,[123]reflecting approximately 75 incarcerated individuals with whom it has had direct correspondence, and 222 unique entries total.[124] The Court notes that it considers these numbers in light of the unrebutted trial testimony about the barriers—financial and logistical—that inmates face in communicating with outside organizations.[125]

TX C.U.R.E. learns about conditions inside TDCJ both directly through letters from inmates

117 Prelim. Inj. Hr'g Tr. (July 30, 2024) 190:17–20 (Malouff); Trial Tr. (April 1, 2006) 204:15–18, 216:23–216:5 (Malouff).
118 Trial Tr. (April 1, 2006) 208:21–209:2 (Malouff).
119 *Id.* at 203:15–21 (Malouff).
120 *Id.* at 203:24–204:7 (Malouff).
121 *Id.* at 204:11–14 (Malouff).
122 *Id.* at 204:15–205:5 (Malouff).
123 *See generally* Def.'s Trial Ex. 243 (Inmate Master Mailing List 6–8–24).
124 Trial Tr. (Apr. 1, 2026) 228:25–229:6 (Malouff).
125 *Id.* at 289:7–290:14 (Simmons).

and indirectly through inmates' families and loved ones—via Facebook family groups dedicated to TDCJ issues, phone calls from family members to the organization relaying what their incarcerated loved ones are experiencing, and through direct messages at all hours of the day.[126] Mr. Malouff testified that messages from inmates and their family members to Texas C.U.R.E. start at "two or three in the morning" each day and continue "all day long."[127] He spends over 40 hours a week communicating with the organization's constituents.[128] TX C.U.R.E. responds to letters within 72 hours and to other messages as they come in.[129] TX C.U.R.E. also, as noted, communicates with the families of incarcerated constituents—Mr. Malouff described them as "the link . . . the lifeline to that inmate" given the barriers that inmates face to communicating.[130]

The issues TX C.U.R.E.'s constituents raise span the range of prison conditions—medical care, grievance access, food—but each year from April through October, extreme heat and the need for air conditioning rank consistently rank as TX C.U.R.E.'s constituents' highest concerns.[131] Since becoming involved with the organization in 2022, Mr. Malouff has received approximately "three file cabinet drawers" full of letters complaining about heat or the need for air conditioning.[132] At trial, Mr. Malouff specifically identified a constituent named Billy Mitchell, a former fellow inmate at Pack, who wrote to Mr. Malouff in his role as Vice President of Texas C.U.R.E. to complain about heat and the need for air conditioning at the Choice Moore Unit.[133] Mr. Malouff testified that the issues TX C.U.R.E.'s constituents raise guide the organization's advocacy.[134]

---

126 *Id.* at 205:10–20, 207:19–208:20 (Malouff).
127 *Id.* at 205:11–20 (Malouff).
128 *Id.* at 208:7–9 (Malouff).
129 *Id.* at 208:4–6 (Malouff).
130 *Id.* at 208:14–17 (Malouff).
131 *Id.* at 204:19–205:5 (Malouff).
132 *Id.* at 208:19–23 (Malouff).
133 *Id.* at 206:17–207:18 (Malouff); *see generally* Pls.' Trial Ex. 151 (Billy Mitchell Letter).
134 Trial Tr. (Apr. 1, 2026) at 204:15–18 (Malouff).

*Advocating for air conditioning is germane to TX C.U.R.E.'s purpose*

Obtaining air conditioning in TDCJ facilities has been a major policy goal of TX C.U.R.E. since its inception.[135] After personally advocating for air conditioning during his incarceration, Mr. Malouff has continued that work through TX C.U.R.E. since his release.[136] He has testified before the Texas Legislature at every hearing on air conditioning—three times per session at a minimum—and has spoken to every Texas state representative and senator about the issue across multiple sessions.[137]

TX C.U.R.E.'s decision to join this lawsuit was a direct response to constituents' concerns and Mr. Malouff's own experience[138]—and it was approved unanimously by the organization's board.[139] TX C.U.R.E. does not stand to gain financially from this lawsuit,[140] and no constituent has objected to TX C.U.R.E.'s participation in this lawsuit.[141]

### *4. Some members and constituents of each organizational plaintiff have exhausted administrative remedies*

While the Court ultimately concludes that the Prison Litigation Reform Act's ("PLRA") exhaustion requirement does not apply to organizational plaintiffs, like Plaintiffs here, *see* Conclusions of Law, Section A.3., *infra*, it nonetheless notes that at least one member or constituent of each Plaintiff exhausted TDCJ's two-step administrative grievance process before Plaintiffs joined this lawsuit in May 2024.

This finding rests in significant part on Director Lumpkin's own evidence. Director

---

135 *Id.* at 200:16–21 (Malouff).
136 *Id.* at 212:4–10 (Malouff).
137 *Id.* at 209:15–210:9, 212:7–2:13:9 (Malouff); *see generally* Pls.' Trial Exs. 77–79 (Mr. Malouff's legislative submissions).
138 Prelim. Inj. Hr'g Tr. (July 30, 2024) 192:15–17, 194:17–24 (Malouff); Trial Tr. (Apr. 1, 2026) 215:23–216:5 (Malouff).
139 Trial Tr. (Apr. 1, 2026) 215:20–216:5 (Malouff).
140 *Id.* at 216:9–11 (Malouff).
141 *Id.* at 208:21–209:2 (Malouff).

Lumpkin introduced the affidavit of Mr. Rheams from the Office of the Attorney General as Defendant's Exhibit 2, which TDCJ Director of Classification Timothy Fitzpatrick authenticated at trial.[142] With respect to Lioness, Mr. Rheams' affidavit states that "a total of 12 Lioness Incarcerated Members fully exhausted both their Step 1 and Step 2 administrative remedies."[143] Mr. Rheams, likewise, determined that "of the [twelve] Lioness members that had fully exhausted their administrative remedies for heat-related grievances," eleven "are still in TDCJ custody"—four of whom are in un-air-conditioned housing.[144] At least two of the members he identified as in air-conditioned housing do not have heat scores, so they can be moved into un-air-conditioned housing at any time.[145]

The broader record corroborates that at least some of Plaintiffs' constituents and members exhausted before Plaintiffs joined the case. Mr. Malouff testified that Christopher Flores, who was incarcerated in the Stiles Unit, is a "constituent of TX C.U.R.E."[146] Mr. Flores's grievances were also introduced into evidence, confirming that he exhausted by March 2023.[147] As described below, Jason Wilson was a TPCA core team member who died a heat-related death in an un-air-conditioned cell in July 2024.[148] His grievances were also admitted into evidence, confirming that he exhausted by April 2023.[149]

Director Lumpkin introduced Defendant's Exhibit 53, a summary reflecting at least some of the inmates who completed TDCJ's grievance process (and therefore exhausted their remedies)

---

142 Trial Tr. (Apr. 2, 2026) 298:8–301:11 (Fitzpatrick).
143 Def.'s Trial Ex. 2 ¶ 17 (Rheams Decl.).
144 *Id.* ¶ 18. A TDCJ prisoner need only "complete that state's two–step grievance process" to exhaust. *Favela v. Collier*, 91 F.4th 1210, 1212 (5th Cir. 2024).
145 Def.'s Trial Ex. 204 (Inmates with Heat Scores as of Feb. 23, 2026) (listing all inmates with a heat score and omitting Britney Gulley and Vanessa Cameron, two Lioness members listed on the Rheams Decl., Def.'s Trial Ex. 2, as having exhausted).
146 Trial Tr. (Apr. 1, 2026) 203:11–14 (Malouff).
147 *See generally* Pls.' Trial Ex. 269 (Texas Prison Letter Chris Flores).
148 *See* Findings of Fact, Section B.1, *infra*.
149 *See generally* Pls.' Trial Ex. 138 (Mr. Wilson's grievances).

before May 1, 2024.[150] And thousands of heat-related grievances reflecting both Step 1 and Step 2 of TDCJ's grievance process—and thus full exhaustion—were admitted into evidence without any objection as Plaintiffs' Exhibits 285A through 285K.[151] These grievances were filed before Plaintiffs joined this lawsuit on May 7, 2024,[152] and the overwhelming majority were filed before Mr. Tiede filed this lawsuit on August 24, 2023.[153] Because the Court has finds that every TDCJ inmate is a constituent of TPCA and TX C.U.R.E., *see* Conclusions of Law, Section A.1.b, *infra*, the inmates who exhausted their administrative remedies, as reflected in this evidence, necessarily include constituents of those organizations. The Court therefore finds that at least one member or constituents of each Plaintiff exhausted TDCJ's administrative grievance process.

### B. Heat Risk in Texas Prisons

As every Texan knows, Texas summers are hot. Defendant's predecessor, Collier, acknowledged that it "certainly" makes sense to him that the heat index in Texas in the summer could be as high as 113 degrees in August.[154] **Logs introduced into evidence at trial have shown outdoor heat indexes near TDCJ prisons as high as 134 degrees**.[155] Texas heat is also persistent: across the past several years, TDCJ's own indoor temperature logs have shown indoor un-air-conditioned temperatures over 85 nearly every day from May 1 through September 30.[156] **Texas summers also have been getting, and will continue to get, hotter.** Dr. Linda Mearns, a

---

150 *See generally* Def.'s Trial Ex. 53 (TDCJ Heat Related Grievances May 2022 to May 2024). Mr. Echessa agreed that Defendant's Trial Exhibit 53 does not include "the entire universe of an inmate's complaint" but is merely "a summary of it." Trial Tr. (Apr. 2, 2026) 90:23–91:1 (Echessa). Asked whether Defendant's Trial Exhibit 53 "reflect[s] the inmates who have completed the grievance process prior to May 1, 2024," Mr. Echessa answered: "Yes, ma'am." *Id.* at 83:16–20 (Echessa).
151 *Id.* at 315:10–14, 324:14–21.
152 *See* First Am. Compl., Dkt. No. 57.
153 *See* Compl., Dkt. No. 1.
154 Prelim. Inj. Hr'g Tr. (Aug. 2, 2024) 217:12-14 (Collier).
155 Def.'s Hr'g Ex. 76 at 10 (Stiles Temp Logs 07-2022); *see generally* Pls.' Trial Exs. 306-A through 306-F (425534 TDCJ Automated Temp Logs - 5.1.2025-9.1.2025 and excerpts from the same).
156 *See generally* Def.'s Trial Ex. 100 (TDCJ 2023 Rider 56 Report); Def.'s Trial Ex. 72 (TDCJ 2024 Rider 56 Report); Def.'s Trial Ex. 214 (TDCJ 2025 Rider 55 Report).

Case 3:23-cv-01004-RP-EW Document 451-1 Filed 09/22/26 Page 25 of 150

climatologist and researcher at the National Center for Atmospheric Research, opined that Texas will see "increasing temperatures, increasing extreme temperatures, and more frequent heat waves."[157] As Dr. Mearns explained, "[t]his most likely will result in an increasing heat index, and number of hours per day with extreme heat index values."[158] In other words, "[t]he trend of summer temperatures throughout Texas is certainly towards warmer temperatures [and] increasing heat index."[159] Dr. Mearns' opinions were undisputed by Defendant and the Court finds them credible.

The result of this extreme heat is that prisons in Texas are extremely—dangerously—hot in the summer months. As noted above, TDCJ logs from 2023 to 2025 have shown outdoor heat indexes as high as 134 degrees, and indoor temperatures above 85 degrees nearly every day from May 1 to September 30.[160] One witness who had been incarcerated in TDCJ facilities testified that she had seen thermometers reading 136 degrees in the summer of 2022, with another witness testifying that he had seen temperature readings of 129, 114, and 118 degrees on summer days.[161]

The Court notes the following handful of illustrative examples of indoor heat conditions in Texas's un-air-conditioned prisons from TDCJ's temperature logs. Those logs record the heat inside un-air-conditioned prisons once each day at 3 PM from April 1 through September 30, for reporting mandated by the Texas Legislature.[162] In 2025, they showed the following: By April 3, the third day that TDCJ reported temperatures, fourteen units already recorded an indoor temperature of at least

[157] Mearns Decl. ¶ 23, Dkt. No. 50–5.
[158] *Id.* ¶¶ 12–14, 23.
[159] *Id.* ¶ 18.
[160] For outdoor heat index examples, *see* Def.'s Hr'g Ex. 76 at 10 (Stiles Temp Logs 07-2022) *and see generally* Pls.' Trial Exs. 306-A through 306-F (425534 TDCJ Automated Temp Logs - 5.1.2025-9.1.2025 and excerpts from the same). For once-a-day indoor temperatures (not heat indexes), *see generally* Def.'s Trial Ex. 100 (TDCJ 2023 Rider 56 Report); Def.'s Trial Ex. 72 (TDCJ 2024 Rider 56 Report); Def.'s Trial Ex. 214 (TDCJ 2025 Rider 55 Report).
[161] Prelim. Inj. Hr'g Tr. (July 30, 2024) 30:2–20 (Simmons); 179:15–23 (Malouff).
[162] *See* Def.'s Trial Ex. 214 (TDCJ 2025 Rider 55 Report) at 13.

85 degrees, with two units reaching indoor temperatures of 94.5 and 92.3 degrees.[163] Still in early summer, on May 25, 2025, the Bradshaw Unit reached an indoor temperature of at least 98.2 degrees.[164] On that day, nineteen units recorded an indoor temperature of over 90 degrees, and thirty-three units recorded an indoor temperature over 85 degrees.[165] And still in May, the Garza West Unit recorded sixteen straight days of indoor temperatures over 90 degrees.[166] And on August 29, 2025, Garza West recorded an indoor temperature of 100 degrees.[167] In fact, across August 2025, the indoor temperature in Garza West was only recorded as being below 95 degrees at 3 PM on three days.[168] In that same month, the Briscoe Unit never recorded a daily indoor temperature below 90 degrees.[169] And high indoor prison temperatures are not geographically confined: the Dalhart Unit, the most northerly of TDCJ's units, saw indoor temperatures of 85 degrees or higher for twelve days in a fourteen-day span in August 2025, and the Baten Unit, which recorded the lowest daily temperature in TDCJ that August (73.2 degrees) still reached an indoor temperature of 89.5 degrees on August 17.[170] The Court emphasizes that these are indoor temperatures. And again, as summer temperatures generally continue to increase, Texas prisons will only get hotter, and they will stay hot for longer.

Despite this extreme heat, the majority of TDCJ inmates live in un-air-conditioned housing. TDCJ calculates its air-conditioned capacity on the basis of "cool beds," i.e., beds in proximity to full or partial air-conditioning.[171] At the time of trial, TDCJ had 52,438 cool beds, account for

---

163 *Id.* at 14–15. Those units were Garza West, Lopez, Segovia, Garza East, Briscoe, Wynne, Gurney, McConnell, Lychner, Torres, Vance, Stevenson, Lewis, and Stiles—spread across four of TDCJ's six regions. *See* Pls.' Trial Ex. 310 (TDCJ unit map with regions).
164 *Id.* at 16–17.
165 *Id.*
166 *Id.*
167 *Id.* at 22–23.
168 *Id.*
169 *Id.*
170 *Id.*
171 Prelim Inj. Hr'g Tr. (Aug. 1, 2024) 25:6–8

approximately thirty-seven percent of the TDCJ inmate population.[172] This left roughly 88,697 inmates living in un-air-conditioned housing heading into the summer of 2026.[173]

The lack of temperature controls in the majority of TDCJ's inmate housing stands in contrast to the agency's approach to other areas of its operations—including in parts of its agricultural program. For example, TDCJ has spent millions of dollars to ensure that poultry are housed in safe temperatures.[174] TDCJ's documentation specifies that "[t]he regulation of air-flow within a poultry house is of great importance because excessive moisture and heat buildup can adversely affect the overall productivity of a laying flock" and that "great care must be taken to maintain a comfortable environment for the flock," with the optimal temperature range for laying hens being 45 degrees to 75 degrees.[175] These protections do not exist in inmate housing facilities.

The result of the lack of air-conditioning in the majority of TDCJ facilities is that nearly 90,000 TDCJ inmates live in extreme heat conditions whenever the summer temperatures in Texas spike. And, when those temperatures remain elevated, inmates live in high temperatures day after day and month after month. Where restrictive housing is un-air-conditioned, inmates spend twenty-three hours a day in their cells. In other words, some inmates spend 23 hours per-day in potentially extreme heat conditions.[176] At trial, Defendant admitted that "roughly 55 to 60 percent" of restrictive housing inmates "reside in an air-conditioned bed." Accordingly, well over 1,000 TDCJ inmates are living in un-air-conditioned cells 23 hours per day.[177] And, as is discussed further at

---

172 *Compare* Trial Tr. (March 31, 2026) 330:21–331:13 (Lumpkin) *and* Pls.' Trial Ex. 281–B (LBB Inmate Population – February 2026) *with* Def.'s Trial Ex. 254 (TDCJ AC Dashboard – March 25, 2026); *see also* Trial Tr. (Apr. 6, 2026) 297:18–298:8 (Ishee).

173 Trial Tr. (Apr. 6, 2026) 298:4-8 (Ishee).

174 Trial Tr. (Apr. 9, 2026) 201:17–202:3 (Steffa); *see generally* Pls.' Trial Ex. 598 (24.10.11 TBCJ Committee Meeting Minutes).

175 Pls.' Trial Ex. 209 at 5 (Mr. Collier's Resp. to Req. for Produc. No. 17); Trial Tr. (Apr. 9, 2026) 202:8–25 (Steffa).

176 Trial Tr. (Mar. 31, 2026) 132:19–133:5 (Collier); Trial Tr. (Apr. 2, 2026) 262:2–7 (Fitzpatrick).

177 Trial Tr. (March 31, 2026) 352:14–18 (Lumpkin) "Out of our close to 2,900, roughly, I say, between 2,850 and 2,950 restrictive housing inmates, roughly 55 to 60 percent reside in an air–conditioned bed." Based on

Section C.3., *infra*, even general population inmates who have conditional access to TDCJ's air-conditioned "respite areas" still spend the vast majority of their days in un-air-conditioned settings.[178]

The health risks inmates in every un-air-conditioned Texas prison face are serious. The National Weather Service ("NWS") has found heat to be "one of the leading weather-related killers in the United States."[179] The trial record is replete with evidence of the dangers of heat, which can cause heat exhaustion, heat rash, dehydration, heat cramps, heat syncope, and heat stroke.[180] As the NWS's statement indicates, these health concerns are severe: experts from both sides agreed at trial that prolonged exposure to high temperatures can be fatal and, even where it is not, can have lasting health consequences.[181] This risk increases as the heat index—which measures the combined effect of heat and humidity[182]—increases.[183] Plaintiffs' expert Dr. Susie Vassallo[184] credibly testified that a

---

the numbers provided by Defendant, somewhere between 1,328 and 1,140 restrictive–housing inmates are not in air–conditioned cells.

178 Prelim. Inj. Hr'g Tr. (July 30, 2024) 41:15-17 (Simmons) (Ms. Simmons was only permitted to stay in respite rooms for 15 minutes to an hour), 186:10-14 (Malouff) (Mr. Malouff was only permitted to stay in respite rooms for 15-20 minutes).

179 "Heat Safety Tips and Resources," National Weather Service, *available at https://perma.cc/3NWR-2MYC*. Under Rule 201 of the Federal Rules of Evidence, the Court may take judicial notice of a fact that is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. As it previously did in its March 2025 Order, the Court finds that extreme heat's status as one of the leading weather–related killers in the United States is such a fact, and that the National Weather Service is a source whose accuracy cannot reasonably be questioned.

180 Prelim. Inj. Hr'g Tr. (July 31, 2024) 15:15–17:20, 32:20–37:23 (Vassallo); *see generally* Pls.' Trial Exs. 15, 275 (journal articles concerning heat injury risks).

181 Prelim. Inj. Hr'g Tr. (July 31, 2024) 15:15–17:20, 32:20–37:23 (Vassallo); (July 30, 2024) 75:13–23, 79:1–9 (Zanobetti); (Aug. 1, 2024) 143:12–16 (Leonardson); Trial Tr. (Apr. 7, 2026) 70:16 18 (Leonardson); *see generally* Pls.' Trial Exs. 15, 275 (journal articles concerning heat injury risks).

182 TDCJ defines "heat index" as "a measure of how hot it actually feels when the relative humidity is added to the actual air temperature." Def.'s Trial Ex. 41 at 2 (AD–10.64, Excessive Heat and Extreme Temperature Conditions in the TDCJ (Rev. 12)) (hereinafter "AD–10.64 (Rev. 12)").

183 Prelim. Inj. Hr'g Tr. (July 31, 2024) 21:6–23:17 (Vassallo); *see generally* Pls.' Trial Ex. 24 (NWS Heat Index Chart). TDCJ has incorporated an NWS chart illustrating this relationship into its heat policy. *See* Pls.' Trial Ex. 332 at 6–7 (CMHC Policy Manual D–27.2 Heat Stress (eff. Apr. 16, 2025)); Def.'s Trial Ex. 41 at 19 (AD 10.64 – Revision 12).

184 Dr. Vassallo a physician who is board certified in emergency medicine and medical toxicology, with more than 40 years of experience as a practicing physician. She specializes in the areas of thermoregulation and heat–related illness, and has extensive experience working specifically on the issue of heat in prison populations, with multiple appointments as a medical monitor. Her major research interests include

Case 2:23-cv-01004-BAR-EWD Document 350 Filed 09/22/25 Page 29 of 150

heat index of 88 degrees or higher poses a serious risk of adverse health outcomes to any individual, including young, healthy people.[185] Heat-related injuries, such as heat stroke, can progress very suddenly once they have begun; as Dr. Vassallo testified, overheated individuals can "start having cognitive problems from heat illness before they realize they" are in trouble.[186] However, despite this fast progression once injury begins, overall health risk from extreme heat increases with prolonged exposure. As Dr. Vassallo explained, it is this "accumulated heat stress" that is most important in terms of health risk because of the strain such buildup places on the human body.[187]

However, many TDCJ inmates are at yet greater risk. While the evidence shows that every individual is at significant health risk from prolonged exposure to high heat conditions, this risk is particularly acute for individuals with a range of health conditions or those who have been prescribed certain medications. These conditions, according to TDCJ's own list of "common comorbidities that may affect heat tolerance," include cardiovascular disease, cirrhosis of the liver, chronic obstructive pulmonary disease ("COPD") or asthma, cystic fibrosis, diabetes, seizure disorder, Sjogren's syndrome, sweat gland dysfunction, thyroid dysfunction, or being over the age of 65.[188] Plaintiffs' experts offered credible testimony that additional conditions, including

thermoregulation, drugs and effects on temperature, prisoner health, conditions of confinement and temperature, and drug effects on temperature regulation in prisoners. She is a Clinical Professor of Emergency Medicine at New York University School of Medicine and Bellevue Hospital Center. She is a Fellow of the American College of Emergency Physicians, the American College of Medical Toxicology, the New York Academy of Medicine, and the American Academy of Emergency Medicine. *See* Trial Tr. (Mar. 30, 2026) 94:20–953 (Vassallo); Pls.' Ex. 425 (Vassallo CV). Multiple courts, including the Fifth Circuit on several occasions, have relied on Dr. Vassallo's testimony. *Yates*, 868 F.3d at 363–64 (citing *Ball I*, 792 F.3d at 593–94; *Gates II*, 376 F.3d at 339–40). The Court found her to be highly credible.

185 Prelim. Inj. Hr'g Tr. (July 31, 2024) 23:2–38:24 (Vassallo); Trial Tr. (Mar. 30, 2026) 185:23–186:7 (Vassallo); Pls.' Trial Exs. 10, 15, 23, 42, 54, 70 (journal articles concerning heat injury risks).

186 Dkt. No. 50-42 at 135:19-136:15.

187 Prelim. Inj. Hr'g Tr. (July 31, 2024) 43:1-12 (Vassallo). *See also* Pls.' Trial Ex. 24 (NWS Heat Index Chart) (explaining that at various levels of heat index temperatures, "prolonged exposure" is a basis for risk independent of physical activity.).

188 Pls.' Trial Ex. 334 (TDCJ's list of heat–sensitive comorbidities).

hypertension, Parkison's, amyotrophic lateral sclerosis ("ALS"), and obesity increase heat sensitivity and therefore increase risk even beyond the baseline risk to the general population.[189]

Dr. Vassallo also explained that several classes of prescription drugs "impair thermoregulation," including: (1) cardiovascular drugs, (2) diuretics, (3) sympathomimetics or vasoconstrictors (such as nasal decongestants like Sudafed), (4) anticholinergics, and (5) selective serotonin reuptake inhibitors ("SSRIs").[190] TDCJ's own list of "drugs associated with heat stress" includes anticonvulsants, antipsychotics, antidepressants, SSRIs, beta blockers, calcium channel blockers, diuretics, antihistamines, angiotensin-converting enzyme inhibitors ("ACE inhibitors"), anti-Parkinson's drugs, monoamine oxidase inhibitors, and muscle relaxers.[191] As a result, individuals taking these medications are at heighted risk from heat.

Similarly, individuals with a range of mental health conditions are at heightened risk from heat, because—in addition to its detrimental physical health effects—heat exacerbates mental illness. TDCJ recognizes that "psychiatric conditions" can affect heat tolerance.[192] Plaintiffs' forensic psychiatry expert, Dr. Jhilam Biswas, offered unrebutted testimony that in high heat, individuals with mental health disorders exhibit higher rates of suicidality, agitation, irritation, anxiety, impulsivity, and slowing of cognitive processing.[193] As heat increases, there are more psychiatric emergencies, emergency room visits, and mortality in the general population.[194] High heat causes mental health episodes requiring hospitalization.[195] And in high heat, suicidality increases "by . . . a significant

---

189 Trial Tr. (Mar. 30, 2026) 110:12–113:7 (Vassallo).
190 Vassallo Decl. ¶ 37, Dkt. No. 50–2.
191 *See generally* Pls.' Trial Ex. 333 (CMHC D–27.2 Attachment A – Drugs Associated with Heat Stress); *see also* Trial Tr. (Mar. 30, 2026) 107:9–20 (Biswas).
192 Pls.' Trial Ex. 334 (TDCJ's list of heat–sensitive comorbidities).
193 Prelim. Inj. Hr'g Tr. (July 31, 2024) 167:24–170:20, 177:17–179:9 (Biswas); Trial Tr. (Mar. 30, 2026) 276:8–24 (Biswas); see generally Pls.' Trial Exs. 11, 35, 76, 103 (journal articles concerning heat injury risks).
194 *Id.* at 277:18–278:1 (Biswas); *see generally* Pls.' Trial Ex. 465 (Meadows Study).
195 Prelim. Inj. Hr'g Tr. (July 31, 2024) 180:15–181:15 (Biswas); *see generally* Pls.' Trial Ex. 33 (Risk Characterization of Hospitalizations).

amount" among inmates.[196] Dr. Biswas cited a study which examined prisons in Louisiana and found that suicide watch incidents increased by twenty-nine percent when the temperature increased from 80 degrees to 89 degrees. The study further found that suicide watch incidents increased by thirty-seven percent when the temperature increased from 90 degrees to 103 degrees.[197]

Heat also makes sleep more difficult, and lack of sleep further exacerbates symptoms of mental health disorders: individuals with bipolar disorder can be become more manic suicidal feelings can be heightened, and individuals with schizophrenia can become more irritable and agitated.[198] Beyond these effects on existing mental health conditions, Dr. Biswas also testified that heat "causes physiological stress on the body," affecting serotonergic and dopaminergic pathways and increasing production of stress hormones like cortisol, which, in turn, "dis-regulate mood."[199]

Individual with mental illnesses—in addition to people with substance abuse disorders and individuals taking psychotropic medications—are also particularly vulnerable to high heat because mental illnesses and medications can affect individuals' ability to understand their own heat risk and seek needed care, including by advocating for themselves.[200] According to Dr. Biswas, "these illnesses impact the brain, which means that it impacts the ability to make good decisions for yourself, or self-awareness, or insight and judgment."[201] According to Dr. Biswas, people with serious mental illness "lack insight and judgment" into their own condition, rendering them unable "to ask for help" or make decisions for themselves.[202] Dr. Vassallo testified that people with mental

---

[196] Prelim. Inj. Hr'g Tr. (July 31, 2024) 178:8–14, 182:6–183:19 (Biswas); *see generally* Pls.' Trial Ex. 91 (Extreme Heat and Suicide Watch).
[197] Trial Tr. (Mar. 30, 2026) 280:16–281:6 (Biswas); *see generally* Pls.' Trial Ex. 91 (Extreme Heat and Suicide Watch).
[198] Prelim. Inj. Hr'g Tr. (July 31, 2024) 177:12–178:7 (Biswas); Trial Tr. (Mar. 30, 2026) 279:14 18 (Biswas); Trial Tr. (Mar. 30, 2026) 279:20–280:4 (Biswas).
[199] Trial Tr. (Mar. 30, 2026) 277:8-18 (Biswas).
[200] *Id.* at 181:2–15, 187:9–191:18 (Biswas); *see generally* Pls.' Trial Exs. 43, 44, 50 (journal articles regarding medication–related hyperthermia).
[201] Trial Tr. (Mar. 30, 2026) 283:15–19 (Biswas).
[202] *Id.* at 283:24–285:8 (Biswas).

illness are "two to four times more likely to succumb to heat stroke and heat-related illness," in part because they cannot take the steps—like "asking for anything that they might need [or] calling for help"—that are necessary to protect themselves.[203]

Vulnerability to heat on the basis of mental illness is particularly concerning in the context of the prison population. Dr. Biswas estimated that 37% of people incarcerated in U.S. prisons have mental illnesses,[204] and Brian Nichols, the Chairman of the Texas Board of Criminal Justice, which oversees TDCJ, testified that "around 37 percent of the total TDCJ population has been diagnosed with at least one form of mental illness."[205] With a population of more than 140,000 inmates,[206] that would mean more than 51,000 TDCJ inmates have at least one form of mental illness. And, importantly, Dr. Biswas credibly testified that this is likely an undercount, because prisons struggle to diagnose all individuals with mental illness. She testified that much of the incarcerated population's mental illness is "underdiagnosed or never diagnosed at all," in part because of the stigma attached to a mental-illness diagnosis in the carceral setting, and that, as a result, there is a "huge undiagnosed population."[207]

Based on these credibly-established bases for heighted heat vulnerability, Plaintiffs asked TDCJ's medical partner, the University of Texas Medical Branch ("UTMB") to disclose all inmates who met heat-risk-increasing criteria, such as being over 65, being obese, or having a range of other diagnoses or prescriptions.[208] As of May 16, 2025, UTMB identified 100,853 inmates who met these

---

203 Trial Tr. (Apr. 2, 2026) 10:17–11:7 (Vassallo).
204 Trial Tr. (Mar. 30, 2026) 282:21–283:7 (Biswas).
205 Trial Tr. (Apr. 6, 2026) 184:2–12 (Nichols).
206 *See generally* Pls.' Trial Ex. 281–B (State Correctional Institution Population & System Capacity).
207 Trial Tr. (Mar. 30, 2026) 300:17–25, 316:17–317:7 (Biswas).
208 Pls.' Trial Ex. 437–A (Def.'s Resps. to Pls.' Second Set of Interrogs. [Redacted]). Plaintiffs asked UTMB to identify all inmates not housed in air–conditioning who met any of the following criteria: over 65 years of age; BMI of 30 or higher; diagnosed with asthma; diagnoses with COPD; diagnosed with cirrhosis of the liver, diagnosed with obesity; diagnosed with hypertension; diagnosed with diabetes; diagnosed with congestive heart failure; diagnosed with coronary artery disease; diagnosed with schizophrenia; diagnosed with schizo–affective disorder; diagnosed with bipolar disease; diagnosed with developmental disability; prescribed diuretic

criteria.[209] In other words, solely accounting for diagnosed conditions, more than 100,000 of the roughly 140,000 inmates incarcerated in TDCJ prisons had medical conditions or prescriptions increasing their heat vulnerability even beyond the serious pre-existing risk that exposure to a high heat index temperatures for extended periods of time poses for all people.

In sum: first, every TDCJ inmate—including every young and healthy inmate—has a high degree of risk from accumulated exposure to extreme heat. Second, a substantial majority of the TDCJ population faces heightened risk even beyond this baseline because of underlying medical conditions or prescribed medications. Based on accepted heat factors and TDCJ's medical partners' own figures, this group of inmates exceeds 100,000 individuals. And third, this majority is likely an undercount, particularly for individuals at heighted risk due to mental illness, because of underdiagnosis.

Regardless of whether an individual is at heightened risk, the consequences of the living conditions in TDCJ's un-air-conditioned prisons are serious: inmates housed in these prisons face significant health risks and consequences as their exposure to heat continues over time. In addition to the medical testimony discussed above, this is evidenced by both heat-related deaths and heat injuries, which the Court discusses below. Importantly, however, the negative effects of heat are not limited to health effects: extreme heat also subjects TDCJ inmates to inhumane and degrading conditions even where it does not directly cause immediate physical injuries.

---

medication; prescribed anticholinergic medication; prescribed anticonvulsant medication; prescribed antihistamine medication; prescribed antipsychotic medication; prescribed antidepressant medication; prescribed antimanic medication; prescribed beta blocker medication; prescribed calcium channel blocker medication. Defendant answered that "UTMB identified 100,853 inmates in TDCJ custody as of May 16, 2025, who met one or more of the medical criteria identified in the interrogatory." *Id.* at 3.

[209] *Id.*

### *1. Heat-related deaths*

Both historically and over the past several years, TDCJ inmates have died, at least in part, due to exposure to extreme heat. TDCJ has acknowledged that "23 people died in TDCJ facilities from heat related causes between 1998 and 2012."[210] This figure includes ten deaths in the summer of 2011 alone.[211] TDCJ has also acknowledged three further heat-related deaths in the summer of 2023.[212] Moreover, Plaintiffs presented credible evidence of additional deaths from 2023 to 2025 that were due, at least in part, to heat in housing areas. Those deaths are briefly described below. However, when discussing heat-related deaths, it is important to note that these are examples of situations where heat's effect is identifiable as at least a partial cause of death. Heat exacerbates many underlying health conditions, worsening existing physical and mental conditions of TDCJ inmates in a way that makes death more likely, without being an identifiable cause.[213] Thus, it is simply unknown how many additional deaths occur each year because of the heat exacerbating pre-existing conditions.

TCDJ has acknowledged that the 2023 deaths of Elizabeth Hagerty, John Castillo, and Patrick Womack were heat related.[214] The Court discussed these deaths in its order on the preliminary injunction and does not recount all of their details here. *See Tiede II*, 796 F. Supp. 3d at 294–297.

210 Lumpkin Dep. 120:2–5 (Dkt. No. 337-1); *see also Cole v. Collier,* No. 4:14–CV–1698, 2017 WL 3049540, at *1 (S.D. Tex. July 19, 2017).
211 Prelim. Inj. Hr'g Tr. (Aug. 2, 2024) 207:22-208:2 (Collier); Lumpkin Dep. 83:23-84:23, Dkt. No. 337-1.
212 *See generally* Pls.' Trial Ex. 254 (Mr. Collier's Resps. to First Set of Interrogs.); Pls.' Trial Ex. 102 at 5 (TDCJ 2023 Rider 56 Report); Trial Tr. (Mar. 31, 2026) 122:8–15 (Collier).
213 For example, Dr. Vassallo opined that "[i]mportantly, underlying illnesses are exacerbated from exposure to the heat . . . [t]hese include worsening of asthma, cardiovascular disease, and kidney disease," and that "having working air conditioning has been "associated . . . a 66% reduction in mortality due to cardiovascular disease." Pls.' Trial Ex. 113 at ¶¶ 25, 40 (Vassallo Declaration).
214 Trial Tr. (Mar. 31, 2026) 122:8–15 (Collier).

Case 3:23-cv-01004-AR-EW Document 4501 Filed 09/22/26 Page 36 of 151

Elizabeth Hagerty, a thirty-seven-year-old woman, was found unresponsive in a cell where the ambient temperature was 95.7 degrees.[215] Prior to her death, Ms. Hagerty had complained of heat rash over her entire body.[216] Before her death, she also experienced days of abdominal cramps and vomiting, and she was advised by medical staff to drink water.[217] At trial, Defendant's expert Dr. Felicella testified that she believed heat played a role in Ms. Hagerty's death,[218] and former Director Collier confirmed that TDCJ has now acknowledged heat to have played a role in Hagerty's death.[219]

John Castillo, a thirty-three-year-old man, was found unresponsive in his cell; when Mr. Castillo was moved to a medical unit, a nurse noted he was "hot to the touch."[220] Mr. Castillo had a core body temperature at time of his death of 107.5 degrees.[221] He died on a day when the ambient temperature inside his unit was 94.4 degrees.[222] The week prior to his death, outside temperature logs recorded triple-digit temperatures and heat indexes. In the twenty-four hours before his death, Mr. Castillo went to the water cooler twenty-three times, and the fans were on in his unit.[223] Again, Dr. Felicella testified that she believed heat played a role in his death,[224] and former Director Collier confirmed that TDCJ has now acknowledged that Mr. Castillo's death was heat-related.[225]

Patrick Womack, a fifty-year-old man, was housed in restrictive housing in the un-air-conditioned H.H. Coffield Unit in Anderson County.[226] He was found unresponsive with a core

215 Pls.' Trial Ex. 169-A at 1, 2, 11 (Elizabeth Hagerty AIG Report).
216 Pls.' Trial Ex. 169 at 6 (Elizabeth Hagerty Death Packet).
217 *Id.*; Pls.' Trial Ex. 169-A at 24 (Elizabeth Hagerty AIG Report).
218 Trial Tr. (Apr. 8, 2026) 52:7–14 (Felicella).
219 Trial Tr. (Mar. 31, 2026) 122:8–15 (Collier).
220 Pls.' Trial Ex. 161-B at 2–3, 27 (Castillo AIR Updated).
221 *Id.* at 64 (Castillo AIR Updated); Pls.' Trial Ex. 161 at 12 (Castillo Death Packet Updated).
222 Pls.' Trial Ex. 102 at 17 (TDCJ 2023 Rider 56 Report).
223 Pls.' Trial Ex. 161 at 12 (Castillo Death Packet Updated).
224 Trial Tr. (Apr. 8, 2026) 52:1–14 (Felicella).
225 Trial Tr. (Mar. 31, 2026) 122:8–15 (Collier).
226 Pls.' Trial Ex. 200 at 6 (Womack Death Packet Updated); Pls.' Trial Ex. 200–B at 1 (Womack AIR Updated).

body temperature of 106.9 degrees.[227] The night before his death, Mr. Womack was denied a respite shower because an officer said there were not enough staff, and he was not checked on during count.[228] When Mr. Womack was discovered unresponsive, the outdoor temperature was 104 degrees, with a heat index of 113 degrees.[229] TDCJ reported to the Texas Legislature that the indoor temperature at the Coffield Unit was 99.1 degrees at 3:00 p.m. on August 20 and 96.6 degrees at 3:00 p.m. on August 21.[230]

As discussed below, Plaintiffs presented credible evidence that at least six other TDCJ inmates died from the extreme heat from 2023 to 2025.

*John Southards – June 28, 2023*

John Southards was a 36-year-old man housed in restrictive housing in an un-air-conditioned cell in the Estelle Unit in Huntsville.[231] During security rounds on June 28, 2023, an officer found Mr. Southards laying down in his cell and having trouble breathing.[232] Mr. Southards was moved to the infirmary, where resuscitation efforts continued.[233] At the time, staff described him as diaphoretic (sweating heavily) and hot to the touch.[234] He was pronounced dead at 11:58 p.m.[235] The UTMB pathologist who performed the autopsy on Mr. Southards asked TDCJ for his core body temperature near the time of his death, but none was taken or recorded.[236] The ambient temperature in his cell was 85.7 degrees with a heat index of 96.2 degrees at 3:00 a.m.[237]

---

227 Pls.' Trial Ex. 200-B at 2 (Womack AIR Updated); Pls.' Trial Ex. 200 at 6 (Womack Death Packet Updated).
228 Pls.' Trial Ex. 200-B at 3, 8, 42 (Womack AIR Updated).
229 Pls.' Trial Ex. 200 at 6 (Womack Death Packet Updated).
230 Pls.' Trial Ex. 102 at 17 (TDCJ 2023 Rider 56 Report).
231 Pls.' Trial Ex. 192-B at 2 (Southards AIR Updated).
232 *Id.*
233 *Id.* at 3.
234 Pls.' Trial Ex. 192-A at 83 (Southards OIG Report Updated).
235 *Id.*
236 *Id.* at 19, 83, 88 (Southards OIG Report Updated).
237 *Id.* at 88 (Southards OIG Report Updated).

Case 3:23-cv-01304-BAJ-EWD Document 350 Filed 09/22/25 Page 37 of 150

Mr. Southards had a significant psychiatric history, including depression, anxiety, psychosis, and suicidal ideation with multiple suicide attempts.[238] His medications included (1) haloperidol (an antipsychotic), (2) oxybutynin (for bladder dysfunction), (3) venlafaxine (an SSRI), and (4) Benadryl (an antihistamine and anticholinergic).[239]

Dr. Felicella performed an autopsy on Mr. Southards's body six days after his death.[240] The findings included heat rash on his upper extremities.[241] Dr. Felicella concluded that diphenhydramine toxicity caused Mr. Southards's death, but she stated that, while "there is insufficient evidence to support heat-related stress as a contributory cause of death, given the lack of core body temperature data . . . the possibility cannot be excluded."[242] She also noted that there was "no documented information to suggest suicidal intent."[243] On December 8, 2023, however, TDCJ investigators determined that Mr. Southards had committed suicide and closed their investigation.[244]

Dr. Vassallo and Dr. Uribe opined that heat stroke caused Mr. Southards's death.[245] Both medical experts testified that Mr. Southards could not have died from diphenhydramine toxicity (i.e., a Benadryl overdose), because he was sweating when he was found, and Benadryl inhibits sweating.[246] Based on her own clinical experience and review of the medical literature, Dr. Vassallo testified that "[y]ou absolutely cannot sweat and be dead from Benadryl or dying from Benadryl."[247] The Court notes here that, to the extent that Dr. Vassallo's testimony on this point or others

238 *Id.*
239 *Id.* at 68, 83 (Southards OIG Report Updated).
240 *Id.* at 81 (Southards OIG Report Updated).
241 *Id.* at 88 (Southards OIG Report Updated).
242 *Id.*
243 *Id.*
244 *Id.* at 41 (Southards OIG Report Updated).
245 Prelim. Inj. Hr'g Tr. (July 31, 2024) 61:18–64:22 (Vassallo), 296:19–21 (Uribe).
246 Prelim. Inj. Hr'g Tr. (July 31, 2024) 63:15–22 (Vassallo), 297:1–14 (Uribe); Trial Tr. (Mar. 30, 2026) 135:17–138:25 (Vassallo).
246 Trial Tr. (Mar. 30, 2026) 138:20–140:19 (Vassallo).
247 *Id.*

conflicts with Defendant's expert Dr. Austin De La Cruz or another of Defendant's experts, the Court finds Dr. Vassallo's opinions to be more credible given Dr. Vassallo's extensive qualification and experience and her specialization in this area of work.[248] Dr. Vassallo and Dr. Uribe further concluded that the amount of Benadryl in Mr. Southards's system was not lethal.[249] Dr. Vassallo and Dr. Uribe both credibly testified that Mr. Southards would not have died if he had been in an air-conditioned cell.[250]

Defendant's expert Dr. Everitt agreed that sweating heavily is inconsistent with a Benadryl overdose.[251] Dr. Everitt also agreed that "Benadryl produces strong anticholinergic effects," including "suppressing sweat."[252] He testified that he has never treated a patient with a deadly Benadryl overdose who was sweating, is not aware of any studies or medical literature indicating that a person with a deadly Benadryl overdose can still sweat, and believes that "whether a person with a deadly Benadryl overdose can still sweat is a better question for a toxicologist," given their "area of specialty."[253] Dr. Vassallo is board-certified in medical toxicology and has specifically focused on how drugs affect heat responses in inmates.[254]

Dr. Everitt further testified that while he could not diagnose Mr. Southards with heat stroke since no body temperature was taken or reported, the heat and a hot environment would have had "a contributory effect" on Mr. Southard's death.[255] The Court finds Dr. Vassallo and Dr. Uribe's

---

[248] *See, e.g.,* Trial Tr. (April 7, 2026) 191:1–8 (De La Cruz); *see* Findings of Fact, Section B, n.184, *supra* (discussing Dr. Vassallo's qualifications). Similarly, to the extent that Dr. De La Cruz's testimony conflicted with Dr. Biswas's testimony on the effects and risks of mental illness, the Court finds Dr. Biswas to be more credible given Dr. Biswas's extensive qualifications, experience, and specialized experience in this area. *See generally* Pls.' Ex. 417 (Biswas CV) (indicating Dr. Biswas' extensive training in forensic psychiatry, including her work on psychiatry in criminal and high-security environments).
[249] Prelim. Inj. Hr'g Tr. (July 31, 2024) 64:3–19 (Vassallo), 297:15–17 (Uribe).
[250] Prelim. Inj. Hr'g Tr. (July 31, 2024) 64:23–65:1 (Vassallo), 297:23–298:2, 309:7–12 (Uribe).
[251] Trial Tr. (Apr. 6, 2026) 98:17–20 (Everitt).
[252] *Id.*
[253] *Id.* at 98:23–99:18 (Everitt).
[254] *See* Trial Tr. (Mar. 30, 2026) 94:20–953 (Vassallo); Pls.' Ex. 425 (Vassallo CV).
[255] Trial Tr. (Apr. 6, 2026) 99:19–22, 102:24–103:6 (Everitt).

opinions credible and concludes that heat was, at a minimum, a contributory factor in Mr. Southards's death, and that Mr. Southards would not have died in an air-conditioned cell.

*Armando Gonzales – August 23, 2023*

Armando Gonzales was a 42-year-old transgender woman housed in the Alfred D. Hughes Unit, a men's prison in Gatesville.[256] At 10:00 p.m. on August 21, 2023, Ms. Gonzales was found unresponsive but breathing in her cell. Responding medical staff found Ms. Gonzales lying on her left side, in a pool of vomit.[257] The autopsy noted that the "air-conditioning was out in the unit," and that the ambient temperature in Ms. Gonzales's cell at the time she was found was between 97 degrees and 100 degrees.[258]

Ms. Gonzales was taken to the onsite emergency room, where her rectal temperature was documented as 109.4 degrees on repeated measurements.[259] Ms. Gonzales was transferred by ambulance to a hospital where she was hyperthermic and in shock. Despite multiple attempts over a 48-hour period, medical providers could not resuscitate Ms. Gonzales, and she was pronounced dead at 5:32 a.m. on August 23, 2023.[260]

Ms. Gonzales had been diagnosed with Hepatitis C and manic depressive disorder with psychosis.[261] She also had a history of substance abuse.[262] She had cirrhosis of the liver,[263] and her medications included: (1) aripiprazole (to treat bipolar disorder); (2) citalopram (an SSRI);

256 Pls.' Trial Ex. 168–A at 2 (Gonzales AIR Updated).
257 *Id.* at 8 (Gonzales AIR Updated).
258 Pls.' Trial Ex. 168 at 6, 11 (Gonzales Death Packet Updated).
259 *Id.* at 6.
260 *Id.*
261 *Id.* at 5–6.
262 *Id.*
263 *Id.*

Case 3:23-cv-01004-RP-EWD Document 350 Filed 09/22/26 Page 40 of 150

(3) spironolactone (a diuretic to treat fluid retention); (4) estradiol (a hormone); and (5) bupropion (to treat depression).[264] These medications made her more sensitive to heat.[265]

A UTMB pathologist performed an autopsy on Ms. Gonzales's body thirteen days after she died.[266] The anatomic examination revealed lung hemorrhage and pneumonia, reflecting Ms. Gonzales's clinical illness.[267] Post-mortem toxicology results showed that Ms. Gonzales was positive for midazolam, a sedative hypnotic benzodiazepine drug, as well as fentanyl, an opioid analgesic.[268] However, Ms. Gonzales tested negative for opiates and benzodiazepines upon admission to the hospital; both the urine and blood test came back negative for all illicit substances.[269] The pathologist noted, additionally, that "the levels of drug may be altered by the long post mortem interval and severe degree of autolysis of tissues seen in this patient."[270] He nevertheless opined that Ms. Gonzales's death was caused by multidrug toxicity with opioid overdose and drug-related hyperthermia.[271]

Dr. Vassallo testified that Ms. Gonzales did not die from a drug overdose.[272] She explained that multiple medications (including opioids) are used in the intensive care unit to sedate patients who have suffered medical incidents like heat stroke, which could explain the toxicology results.[273] Because Ms. Gonzales had a negative toxicology upon admission to the hospital, and Dr. Vassallo explained that the medications found on autopsy were the result of being intubated at the hospital

264 *Id.* at 6 (Gonzales Death Packet Updated).
265 Trial Tr. (Mar. 30, 2026) 123:7–16 (Vassallo).
266 Pls.' Trial Ex. 168 at 4 (Gonzales Death Packet Updated).
267 *Id.*
268 *Id.* at 11 (Gonzales Death Packet Updated).
269 *Id.* at 6; Pls.' Trial Ex. 168–C at 70, 82 (Gonzales Death Investigation).
270 Pls.' Trial Ex. 168 at 11 (Gonzales Death Packet Updated).
271 *Id.*
272 Prelim. Inj. Hr'g Tr. (July 31, 2024) 54:15–56:7 (Vassallo).
273 *Id.*

Case 2:23-cv-01004-AR-EWD Document 350 Filed 09/22/26 Page 41 of 150

when medical staff tried to save Ms. Gonzales's life. In other words, the medications were not self-administered.[274]

Most importantly, Dr. Vassallo opined that it is "unquestionable" that opioids like fentanyl do not cause hyperthermia.[275] Instead, they cause hypothermia—*decreased* body temperature.[276] Thus, in Dr. Vassallo's expert opinion, fentanyl could not have caused Ms. Gonzales's 109.4 degrees body temperature. Rather, in Dr. Vassallo's expert opinion, severe environmental heat stroke caused Ms. Gonzales's death.[277] Dr. Uribe agreed that Ms. Gonzales's death was heat-related.[278] Dr. Vassallo and Dr. Uribe both credibly testified that Ms. Gonzales would not have died if she had been in an air-conditioned cell.[279]

Defense expert Dr. Felicella agreed that the autopsy report was incorrect, and that Drs. Vassallo and Uribe were correct that Ms. Gonzales died from environmental hyperthermia, not drug abuse.[280] Defense expert Dr. Everitt, likewise, agreed with Plaintiffs' experts that "Ms. Gonzales suffered a classic heat stroke" and would not have died if she were housed in air- conditioned housing.[281] Dr. Everitt also agreed that opiates and benzodiazepines do not cause 109 degrees body temperature and are both common medications that hospitals administer to patients who need to be sedated for intubation.[282]

Plaintiffs' corrections expert Dean Williams, who led state corrections agencies in Colorado and Alaska, testified that core body temperatures of 106 degrees or 107 degrees would be "cause for

---

274 Trial Tr. (Mar. 30, 2026) 121:23–124:21 (Vassallo).
275 Prelim. Inj. Hr'g Tr. (July 31, 2024) 54:22–55:24 (Vassallo).
276 *Id.* at 54:22–55:3, 55:21–24 (Vassallo).
277 *Id.* at 56:3–5 (Vassallo).
278 *Id.* at 291:10–292:6 (Uribe).
279 *Id.* at 56:6–11 (Vassallo), 292:7–9, 309:7–12 (Uribe).
280 Trial Tr. (Apr. 8, 2026) 62:7–64:21 (Felicella) (discussing Pls.' Trial Ex. 168–C (Gonzales Office of Inspector General File)).
281 Trial Tr. (Apr. 6, 2026) 97:9–19 (Everitt).
282 *Id.* at 92:24–94:18 (Everitt).

alarm across the [state government], . . . not just in the corrections system."[283] If he saw even "one death where [he] knew the core body temperature was in range of 106 degrees, 107 degrees, . . . [he] would pull the fire alarm for [the] department."[284] Like every other death in this section, Ms. Gonzales's death was not reported to the Texas Legislature as heat-related.[285]

*Jason Wilson – July 5, 2024*

Jason Wilson was a 46-year-old man with a history of obesity who was housed in the un-air-conditioned restrictive housing wing of the Coffield Unit, a prison in Tennessee Colony.[286] Mr. Wilson was a core team member with TPCA.[287] He sent multiple e-messages to TPCA in the days before his death complaining of insufficient staff and that cold water was not being passed out during the hottest parts of the day.[288]As an inmate in restrictive housing, Mr. Wilson was in his cell for twenty-three hours per day.[289] In the days leading up to his death and on the day he died, TDCJ logs consistently recorded outdoor temperatures in the high 90s and triple-digit heat indexes.[290]

In the early morning on July 5, 2024, Mr. Wilson was found unresponsive, in rigor mortis, lying on his left side on the floor of his cell.[291] Mr. Wilson's body was already cold, and he had ants crawling on him.[292] EMS pronounced Mr. Wilson dead on scene.[293] No core body temperature was taken.[294]

---

283 Prelim. Inj. Hr'g Tr. (July 31, 2024) 233:24–234:5 (Williams).
284 *Id.* at 233:10–18 (Williams).
285 *See generally* Pls.' Trial Ex. 102 (TDCJ 2023 Rider 56 Report).
286 Pls.' Trial Ex. 412-A at 2–3 (Jason Wilson OIG Report); Trial Tr. (Mar. 31, 2026) 132:15–18 (Collier).
287 Trial Tr. (Apr. 1, 2026) 262:6–18 (Dominick).
288 Pls.' Trial Ex. 137 at 5–9 (Jason Wilson Emsg); Trial Tr. (Apr. 1, 2026) 262:22–263:15, 264:15–20 (Dominick).
289 Trial Tr. (Mar. 31, 2026) 132:19–133:5 (Collier); Trial Tr. (Apr. 2, 2026) 262:2–7 (Fitzpatrick).
290 Pls.' Trial Ex. 412-B at 7–12 (Coffield Temperature Logs).
291 Pls.' Trial Ex. 412-D at 3 (Jason Wilson Autopsy Report).
292 Trial Tr. (Mar. 30, 2026) 149:1–4 (Vassallo).
293 Pls.' Trial Ex. 412-D at 3 (Jason Wilson Autopsy Report).
294 Trial Tr. (Mar. 30, 2026) 43:9–11 (Williams), 148:25–149:1 (Vassallo).

The correctional officer assigned to Mr. Wilson's wing the night before his death did not complete his last security check, and thus did not check on Mr. Wilson.[295] The officer said he failed to complete a full security check because he was "tired due to the heat" and overwhelmed by handling double duties, as the shift was short-staffed.[296] On July 7, 2024, when the TCPA's Ms. Robertson called Mr. Wilson's unit to check on him, **a TDCJ employee told her that Mr. Wilson was doing okay, even though he had, in fact, died two days earlier**.[297]

A UTMB pathologist performed an autopsy on Mr. Wilson's body eleven days after he died,[298] meaning his body was likely not delivered until nine or ten days after death.[299] The anatomic examination revealed rigor mortis in all extremities and advanced decomposition throughout the body.[300] Post-mortem toxicology was positive for synthetic cannabinoids and fentanyl.[301] The pathologist initially attributed Mr. Wilson's death to two causes: acute ischemic change in basal ganglia medullary neurons and synthetic cannabinoid toxicity.[302]

On December 22, 2025—nearly a year-and-a-half after his death—Mr. Wilson's death certificate was amended to remove the first cause, acute ischemic change, leaving synthetic cannabinoid toxicity as the sole cause of death.[303] Dr. Vassallo testified that acute ischemic change in basal ganglia medullary neurons is a type of stroke that is consistent with a heat death, whereas death due to synthetic cannabinoid toxicity is not.[304] In other words, the amendment removed the cause

---

295 Pls.' Trial Ex. 412-A at 4 (Jason Wilson OIG Report).
296 *Id.* at 68.
297 Prelim. Inj. Hr'g Tr. (July 31, 2024) 371:16–372:16, 374:3–4; Pls. Trial Ex. 152 (Wilson Death Report); Ex. 214 at 00:03:40–00:03:55 (Follow Up Call on Wellness Check for Jason Wilson); Ex. 264 (Coffield Emsg 2024).
298 Pls.' Trial Ex. 412-D at 1 (Jason Wilson Autopsy Report).
299 Trial Tr. (Apr. 8, 2026) 115:17–24 (Felicella).
300 Pls.' Trial Ex. 412-D at 1 (Jason Wilson Autopsy Report).
301 *Id.* at 7 (Jason Wilson Autopsy Report).
302 Pls.' Trial Ex. 412-A at 101 (Jason Wilson OIG Report).
303 *Id.* at 31 (Jason Wilson OIG Report).
304 Trial Tr. (Mar. 30, 2026) 151:16–152:12 (Vassallo).

that was consistent with a heat death and retained only the cause inconsistent with a heat death.[305] Mr. Williams testified that, in his years serving as a prison director, he had never seen an inmate's death certificate amended over a year after the inmate died.[306]

Dr. Vassallo disagreed with the pathologist's amended cause of death.[307] She explained that, at the time of the autopsy, the pathologist did not have any information about the environmental temperatures that Mr. Wilson was exposed to, which "is critical to a medical examiner being able to ascertain the cause of death" and any contributing factors.[308] Moreover, Dr. Vassallo testified that, based on her experience treating thousands of people with synthetic cannabinoids in their system and her review of the scientific literature, these drugs tend to cause a person to be hypotonic, sedated, and quiet, and do not generally elevate body temperature.[309] In fact, neither Dr. Vassallo nor her colleagues have ever seen a single case of synthetic cannabinoids causing heat stroke, nor has one ever been reported in the medical or scientific literature.[310] Dr. Vassallo further explained that the simple presence of synthetic cannabinoids in the blood does not, on its own, mean that it is the cause of death.[311]

Drs. Vassallo and Uribe reviewed the temperature logs from the Coffield Unit for the days leading up to Mr. Wilson's death, and observed temperatures reaching triple-digit heat indexes for multiple days in a row preceding his death, including a high of 107 degrees on the day before.[312] Dr. Vassallo credibly testified that the cumulative stress from exposure to extreme heat over multiple

---

305 *Id.* at 152:8–12 (Vassallo).
306 *Id.* at 44:23–45:1 (Williams).
307 Trial Tr. (Mar. 30, 2026) 146:12–17 (Vassallo).
308 *Id.* at 146:19–147:2 (Vassallo).
309 *Id.* at 148:2–24, 150:7–25 (Vassallo).
310 *Id.* at 148:17–24 (Vassallo).
311 *Id.* at 147:22–148:3 (Vassallo).
312 *Id.* at 149:5–150:6 (Vassallo), 230:11–19 (Uribe); *see also* Pls.' Trial Ex. 412-B (Coffield Temp Logs 06.25–07.05).

days can exacerbate underlying health conditions, such as obesity, which Mr. Wilson had.[313] In Dr. Vassallo's opinion, the prolonged and extreme environmental heat to which Mr. Wilson was exposed contributed to his death.[314] Dr. Vassallo also credibly testified that Mr. Wilson would have lived if he had been housed in air conditioning.[315] Dr. Uribe agreed that Mr. Wilson's death was heat-related.[316] In forming his opinions about the cause of Mr. Wilson's death, defense expert Dr. Everitt was not provided with Mr. Wilson's death investigation, which included the emails where Mr. Wilson reported not getting cold water, or any temperatures.[317] When presented with that information at trial, Dr. Everitt admitted that environmental heat "definitely could have played a role" in his death.[318]

During the preliminary injunction hearing, Mr. Collier told the Court that TDCJ handled Wilson's wellness check in an unprofessional manner and that he found the emails about not having access to cold water very concerning.[319] Nevertheless, neither Mr. Collier nor Defendant conducted any additional investigation into the circumstances surrounding Mr. Wilson's death.[320]

*Ryan Fairchild – August 21, 2024*

Ryan Fairchild was a 42-year-old man housed in the un-air-conditioned Michael Unit, a prison in the Tennessee Colony.[321] On August 20, 2024, at about 7:00 p.m., Mr. Fairchild was found unresponsive in the day room of the Unit laying in a pool of his own vomit, in respiratory distress,

[313] Trial Tr. (Mar. 30, 2026) 149:18–24 (Vassallo); Trial Tr. (Apr. 6, 2026) 111:14–17 (Everitt).
[314] Trial Tr. (Mar. 30, 2026) 149:22–150:4 (Vassallo).
[315] *Id.* at 150:4–6 (Vassallo).
[316] *Id.* at 231:7–13 (Uribe).
[317] Trial Tr. (Apr. 6, 2026) 112:4–113:11 (Everitt).
[318] *Id.* at 114:23–115:1 (Everitt).
[319] Prelim. Inj. Hr'g Tr. (Aug. 2, 2024) 238:10–239:11, 241:19–242:2 (Collier).
[320] Pls.' Trial Ex. 438 at 9 at Req. for Produc. & Resp. No. 57 (Def.'s Resps. to Pls.' Third Set of RFPs); Pls.' Trial Ex. 279 at 7 (TDCJ 2024 Rider 56 Report).
[321] Pls.' Trial Ex. 358-A at 1 (Ryan Fairchild Autopsy); Pls.' Trial Ex. 358-B at 1 (Ryan Fairchild Emergency Handoff).

and suffering from "hyperthermia."[322] Surveillance video footage showed that, prior to his death, Mr. Fairchild used TDCJ's heat mitigation measures, including visiting the cold water cooler multiple times and sitting on a bench in front of a fan; he then suddenly began to convulse before falling to the floor.[323] Mr. Fairchild laid on the floor for nearly two hours before correctional staff responded to him, a delay that Mr. Williams described as "striking."[324]

Mr. Fairchild was transferred to Palestine Regional Medical Center, where he was described as "very hyperthermic" with an axillary body temperature measuring as high as 108 degrees on multiple rechecks.[325] No core body temperature was taken, but both Dr. Vassallo and Dr. Everitt testified that an axillary body temperature taken from an armpit tends to be lower than an individual's core body temperature—indicating that Mr. Fairchild's core body temperature may have been higher than 108 degrees.[326] Mr. Fairchild was pronounced dead on the morning of August 21, 2024.[327]

Both sides' experts agree that Mr. Fairchild had a medical history significant for essential hypertension, type 2 diabetes, major depressive disorder, heart issues, and obesity, all of which can make an individual more heat-susceptible.[328] Mr. Fairchild was prescribed, among other medicines, propranolol, furosemide, bupropion, benztropine, aripiprazole, and amlodipine.[329] Propranolol, furosemide, benztropine, aripiprazole (an antipsychotic), and amlodipine predispose a person to

---

322 Pls.' Trial Ex. 358-C at 1, 7 (Ryan Fairchild OIG); Pls.' Trial Ex. 358-B at 12 (Ryan Fairchild Emergency Handoff).
323 Pls.' Trial Ex. 358-C at 2–3, 7–8 (Ryan Fairchild OIG).
324 Trial Tr. (Mar. 30, 2026) 32:25–33:11 (Williams).
325 Pls.' Trial Ex. 358–B at 10, 21 (Ryan Fairchild Emergency Handoff).
326 Trial Tr. (Mar. 30, 2026) 144:22–145:11 (Vassallo); Trial Tr. (Apr. 6, 2026) 105:13–17 (Everitt).
327 Pls.' Trial Ex. 358-C at 1 (Ryan Fairchild OIG).
328 Trial Tr. (Mar. 30, 2026) 143:18–144:7, 204:20–21 (Vassallo); Trial Tr. (Apr. 6, 2026) 103:13–21 (Everitt); Trial Tr. (Apr. 7, 2026) 238:24–239:9 (De La Cruz), 47:2–4 (Leonardson); Trial Tr. (Apr. 8, 2026) 113:20–114:8 (Felicella); Pls.' Trial Ex. 358–A at 1 (Ryan Fairchild Autopsy); *see generally* Pls.' Trial Ex. 334 (CMHC D–27.2 Attachment B).
329 Pls.' Trial Ex. 358–A at 1, 5 (Ryan Fairchild Autopsy).

medical complications in extreme heat, according to TDCJ policy,[330] and bupropion likewise places a person at increased risk from the heat.[331]

A UTMB pathologist performed an autopsy on Mr. Fairchild's body nine days after his death.[332] However, Mr. Fairchild's body had been embalmed prior to autopsy.[333] Embalming destroyed the evidentiary value of his vitreous fluid, which can provide circumstantial evidence of hyperthermia and hypothermia, both symptoms that can be caused by heat.[334] The embalming also made it impossible to perform toxicology testing on Mr. Fairchild's body.[335] His remains were also not delivered to UTMB until more than a week after his death, which would have similarly resulted in the degradation of vitreous fluid evidence.[336]

Dr. Felicella agreed that autopsies can provide limited information in cases like Mr. Fairchild's, where the autopsy is delayed and the body is embalmed, as either circumstance will undermine vitreous fluid evidence.[337] Mr. Williams testified that, in his experience running two states' prison systems, he had never seen a body embalmed prior to autopsy, especially not one where there was an ongoing investigation into the cause of death.[338] Mr. Williams testified that the embalming alone in these circumstances would have caused a "reckoning" with his staff regarding their protocol in death investigations.[339]

---

330 Pls.' Trial Ex. 333 (CMHC D–27.2 Attachment A – Drugs Associated with Heat Stress); Trial Tr. (Apr. 8, 2026) 125:19–24 (Felicella); Trial Tr. (Mar. 30, 2026) 143:18–25 (Vassallo).
331 Trial Tr. (Apr. 7, 2026) 239:23–240:7 (De La Cruz).
332 Pls.' Trial Ex. 358-A at 1 (Ryan Fairchild Autopsy).
333 *Id.* at 2, 5, 10 (Ryan Fairchild Autopsy); Trial Tr. (Mar. 30, 2026) 226:13–228:1 (Uribe); Trial Tr. (Apr. 8, 2026) 129:16–130:1 (Felicella).
334 *Id.* at 2, 5, 10 (Ryan Fairchild Autopsy); Trial Tr. (Mar. 30, 2026) 226:13–228:1 (Uribe); Trial Tr. (Apr. 8, 2026) 91:9–15, 121:14–21 (Felicella).
335 Pls.' Trial Ex. 358-A at 1 (Ryan Fairchild Autopsy).
336 *Id.* at 1, 3 (Ryan Fairchild Autopsy); Trial Tr. (Mar. 30, 2026) 228:2–18 (Uribe).
337 Trial Tr. (Apr. 8, 2026) 90:24–91:3, 91:9–15 (Felicella).
338 Trial Tr. (Mar. 30, 2026) 35:9–22 (Williams).
339 Trial Tr. (Mar. 30, 2026) 35:11–22 (Williams).

The Office of the Inspector General ("OIG") Report on the investigation into Mr. Fairchild's death noted that "there were no signs or indications that [Mr.] Fairchild used drugs or that any violence had occurred."[340] Apparently due to the lack of information, the UTMB's pathologist team admitted they could find "no anatomical cause of death" and simply described Mr. Fairchild as experiencing a natural "sudden cardiac death."[341] TDCJ did not record or report the temperature in the dayroom where Mr. Fairchild was found unresponsive, and did not report his extremely hyperthermic temperature to investigators or the UTMB medical examiner.[342]

The day of Mr. Fairchild's death, TDCJ staff logged the outdoor heat index at 5:30 p.m. to be 122 degrees.[343] TDCJ's log does not include a heat index for 6:30 p.m.—the space for that entry includes only the digit "1" between recordings of a heat index of 122 degrees the hour before and 117 degrees the hour after—but the ambient temperature and humidity they recorded correspond to a heat index of 131° at 6:30 p.m.[344] TDCJ reported that the ambient temperature somewhere inside the Michael Unit at 3:00 p.m. was 90.9°.[345] The Michael Unit had recorded similar indoor temperatures and outdoor heat indexes in excess of 110° every day since August 16, 2024.[346]

Dr. Vassallo agreed with the pathologist that Mr. Fairchild died of a heart attack, but explained that his cardiac risk factors were not the sole cause of his death.[347] She testified that a heart

340 Pls.' Trial Ex. 358-C at 2 (Ryan Fairchild OIG).
341 Pls.' Trial Ex. 358-A at 10 (Ryan Fairchild Autopsy).
342 Pls.' Trial Ex. 358-C at 2 (Ryan Fairchild Death Investigation); Trial Tr. (Apr. 8, 2026) 121:8–22 (Felicella).
343 Pls.' Trial Ex. 358–D at 5 (Michael Unit Temperature Logs); *see* Trial Tr. (Mar. 30, 2026) 223:23–224:7 (Uribe).
344 Pls.' Trial Ex. 358-D at 5 (Michael Unit Temperature Logs); *see also* National Weather Service, *Heat Index Calculator*, available at *https://perma.cc/2D7T-GS7W*. Under Rule 201 of the Federal Rules of Evidence, the Court may take judicial notice of a fact that is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. The Court finds that the heat index, as calculated from the temperature and humidity, is such a fact, and that the National Weather Service is a source whose accuracy cannot reasonably be questioned.
345 Pls.' Trial Ex. 279 at 13, 22 (TDCJ Legislative Report FY 2024).
346 Pls.' Trial Ex. 358-D at 1–5 (Michael Unit Temperature Logs); Pls.' Trial Ex. 279 at 22 (TDCJ 2024 Rider 56 Report).
347 Trial Tr. (Mar. 30, 2026) 142:13–143:2 (Vassallo).

attack does not cause an axillary temperature of 108 degrees; rather, that temperature can cause a heart attack.[348] Dr. Vassallo noted that the autopsy report did not mention Mr. Fairchild's axillary temperature of 108 degrees, which is "clearly heat stroke," or that Mr. Fairchild was exposed to triple-digit heat indexes as high as 122 degrees in the days before his death. These omissions indicate that the pathologist was unaware of such information while conducting the autopsy; Dr. Felicella agreed that must have been the case, because if the pathologist had that information, they would "[a]bsolutely" have documented it in the autopsy report.[349]

Dr. Vassallo credibly testified Mr. Fairchild died from heat stroke.[350] Dr. Uribe also credibly testified that environmental heat contributed to Mr. Fairchild's death.[351] In giving an opinion regarding Mr. Fairchild's death, Dr. Everitt did not have the death investigation report, the medical records showing his 108 degrees axillary temperature and diagnosis of hyperthermia, or any temperature log information.[352] When shown this information at trial, however, Dr. Everitt testified that heat "played a contributing factor" in Mr. Fairchild's death.[353] Dr. Felicella likewise testified that, based on Mr. Fairchild's autopsy report, there is "no explanation for [his] hyperthermia," and she could not rule out environmental heat as a contributing factor in his death.[354] Dr. Uribe also credibly testified that the pathologist conducting the autopsy would not have been able to determine whether heat played a role in Mr. Fairchild's death without the environmental and core body temperature information contained in TDCJ's records and the Palestine Regional Medical Center records.[355]

---

348 *Id.*
349 Trial Tr. (Apr. 8, 2026) 121:22–122:21 (Felicella).
350 Trial Tr. (Mar. 30, 2026) 141:24–142:1, 145:23–146:2 (Vassallo).
351 *Id.* at 225:14–23 (Uribe).
352 Trial Tr. (Apr. 6, 2026) 103:25–105:2, 107:13–15 (Everitt).
353 *Id.* at 111:1–9 (Everitt).
354 Trial Tr. (Apr. 8, 2026) 125:7–9, 126:12–14 (Felicella).
355 Trial Tr. (Mar. 30, 2026) 224:23–225:6 (Uribe).

From Mr. Williams's perspective, "the most troubling aspect" of Mr. Fairchild's death investigation is that "[n]owhere in the inspector general's report, the investigator's report, is there any mention . . . of the body temperature of Mr. Fairchild at the time he was found or . . . thereafter, or any ambient temperature."[356] Mr. Williams credibly testified that if he had been the Executive Director of TDCJ at the time of Mr. Fairchild's death, he would have reported it to the Texas Legislature as heat-related.[357] Mr. Williams testified that you do not "have to be a doctor in a medical field to know that a temperature of 108 degrees is beyond life sustaining."[358] Drs. Vassallo and Uribe further credibly testified that if Mr. Fairchild had been housed in air conditioning, he would have lived.[359]

*Wayne Straway – July 29, 2025*

Wayne Straway was a thirty-five-year-old man with obesity who was housed in the Ellis Unit in Huntsville.[360] He was found unresponsive on his bunk in his cell at about 2:15 p.m. with a core body temperature of 106 degrees.[361] Mr. Straway was declared dead on scene.[362] The outdoor temperature logs indicate temperatures in the 90s and triple-digit heat indexes in the days leading up to Mr. Straway's death.[363]

The pathologist conducting his autopsy attributed Mr. Straway's death to synthetic cannabinoid toxicity and methamphetamine.[364] However, both the environmental and Mr. Straway's

---

356 *Id.* at 34:4–9 (Williams).
357 *Id.* at 38:12–15 (Williams); Trial Tr. (Mar. 31, 2026) 131:22–24 (Collier).
358 Trial Tr. (Mar. 30, 2026) 38:4–15 (Williams).
359 *Id.* at 145:19–22 (Vassallo), 225:24–226:12 (Uribe).
360 Pls.' Trial Ex. 403-B at 57 (Wayne Straway EMR); Trial Tr. (Mar. 30, 2026) 159:20–22 (Vassallo).
361 Trial Tr. (Mar. 30, 2026) 157:20–23 (Vassallo); Pls.' Trial Ex. 403–B at 105 (Wayne Straway EMR); Pls.' Trial Ex. 403–A at 3 (Wayne Straway Autopsy).
362 Pls' Trial Ex. 403-B at 61 (Wayne Straway EMR).
363 Trial Tr. (Mar. 30, 2026) 160:12–22 (Vassallo); *see generally* Pls.' Trial Ex. 306–A (TDCJ Automated Temp Logs – 5.1.2025–9.1.2025).
364 Pls.' Trial Ex. 403-A at 2 (Wayne Straway Autopsy).

core body temperature were omitted from the autopsy report, indicating that the pathologist was not aware of that information at the time of the autopsy.[365]

Drs. Vassallo and Uribe credibly testified that environmental heat was a contributing factor in Mr. Straway's death.[366] They explained that, while methamphetamine intoxication can cause a heat stroke alone, that is generally because the individual is agitated and active as a result of such intoxication. There is no evidence, however, of such activity in Mr. Straway's case.[367] There is evidence of Mr. Straway's exposure to a hot environment, which can exacerbate and contribute to any elevated core body temperature attributable to methamphetamine toxicity.[368] Dr. Uribe credibly testified that methamphetamine use is more dangerous in extreme heat conditions. [369] Dr. Vassallo credibly testified that, if Mr. Straway had been house in air conditioning, he may have survived.[370]

Dr. Everitt testified that Mr. Straway's obesity made him "more susceptible to heat stroke."[371] He acknowledged that Mr. Straway's rectal temperature of 106 degrees is "way above [Dr. Everitt's] threshold for heat stroke."[372] Dr. Everitt, likewise, admitted that he did not review any temperature logs in connection with Mr. Straway's death when he initially reached his opinions.[373] After being informed of Mr. Straway's core body temperature and environmental temperature at trial, he agreed that heat "could have contributed to [Mr. Straway's] death."[374]

*Keith Pursifull – August 9, 2025*

[365] Trial Tr. (Mar. 30, 2026) 157:20–158:1, 214:9–13 (Vassallo), 237:18–21 (Uribe); Pls.' Trial Ex. 403-A (Wayne Straway Autopsy).
[366] Trial Tr. (Mar. 30, 2026) 160:23–25 (Vassallo), 237:22–238:6 (Uribe).
[367] *Id.* at 158:5–159:12 (Vassallo), 239:9–15 (Uribe).
[368] *Id.* at 158:5–159:12 (Vassallo), 238:4–13 (Uribe).
[369] *Id.* at 238:7–13 (Uribe).
[370] *Id.* at 159:13–19 (Vassallo).
[371] Trial Tr. (Apr. 6, 2026) 116:1–7 (Everitt).
[372] *Id.* at 116:8–17 (Everitt).
[373] *Id.* at 116:18–117:6 (Everitt).
[374] *Id.* at 117:7–11 (Everitt).

Keith Pursifull was a twenty-nine-year-old man housed in the Wainwright Unit in Houston County.[375] He was found unresponsive and not breathing in his single-man, restrictive housing cell just after 8:00 a.m.[376] Mr. Pursifull was announced deceased just before 9:00 a.m.[377] A core body temperature of 105.4 degrees was taken a few minutes after death.[378] Investigators found no evidence of any immediate drug use, injuries from foul play, or contraband in Mr. Pursifull's cell.[379] Vomit, however, was found in his cell, which is consistent with heat stroke.[380] The outdoor heat index reached the triple digits for multiple days in a row before Mr. Pursifull's death.[381] Moreover, Mr. Pursifull was extremely mentally ill, which made him more susceptible to heat.[382] Further, Mr. Pursifull was on an antipsychotic medication, Risperidone, that made him even more heat-sensitive.[383]

The UTMB pathologist wrote in the autopsy report that Mr. Pursifull died a "[s]udden, unexpected death," recording the cause of that death as "undetermined" at the time of Mr. Pursifull's autopsy.[384] Initial postmortem toxicology testing identified "a possible synthetic cannabinoid" below reportable levels in Mr. Pursifull's urine and blood—meaning that it was a negative result.[385] Nonetheless, additional toxicology testing was ordered to further investigate the

375 Pls.' Trial Ex. 581 at 1 (Keith Pursifull Autopsy (Redacted)); Pls.' Trial Ex. 395 at 36 (Keith Pursifull EMR). The Court notes that page 1 of Mr. Pursifull's autopsy lists an age of 30 years; however, based on his date of birth, at the time of his death, Mr. Pursifull was slightly less than 29 years and 8 months old.
376 Pls.' Trial Ex. 581 at 4 (Keith Pursifull Autopsy (Redacted)); Trial Tr. (Apr. 2, 2026) 15:16–16:1 (Vassallo).
377 Pls.' Trial Ex. 581 at 4 (Keith Pursifull Autopsy (Redacted)); Pls.' Trial Ex. 395 at 18 (Keith Pursifull EMR).
378 Pls.' Trial Ex. 395 at 18 (Keith Pursifull EMR); Trial Tr. (Apr. 2, 2026) at 11:13–19 (Vassallo).
379 Pls.' Trial Ex. 581 at 4 (Keith Pursifull Autopsy (Redacted)); Trial Tr. (Apr. 2, 2026) at 12:22–13:4 (Vassallo).
380 Trial Tr. (Apr. 2, 2026) at 31:18–32:6 (Vassallo).
381 *See generally* Pls.' Trial Ex. 581-A (Excerpt from 306–A – August 6, 2025 through August 9, 2025 at Wainwright); Trial Tr. (Mar. 30, 2026) 234:8–18 (Uribe); Trial Tr. (Apr. 2, 2026) 8:8–9:4 (Vassallo).
382 Trial Tr. (Apr. 2, 2026) 9:24–11:7 (Vassallo); Pls.' Trial Ex. 581 at 2, 4 (Keith Pursifull Autopsy (Redacted)).
383 *Id.* at 10:3–5 (Vassallo).
384 Pls.' Trial Ex. 581 at 2–3 (Keith Pursifull Autopsy (Redacted)).
385 *Id.*; Trial Tr. (Apr. 2, 2026) 13:8–22 (Vassallo).

potential presence of synthetic cannabinoids.[386] Notably, neither Mr. Pursifull's core body temperature nor the environmental temperatures leading up to his death were mentioned in the autopsy report, indicating that the pathologist did not have that information at the time of the autopsy.[387] To this day, Mr. Pursifull's cause of death remains undetermined by UTMB Health, and no amended toxicology or autopsy report has been provided to Plaintiffs or the Court.

Dr. Uribe credibly testified that, because of Mr. Pursifull's core body temperature of 105.4 degrees and the extreme temperatures he was exposed to before his death, heat should be considered in his death.[388] Dr. Vassallo testified that Mr. Pursifull's death was "definitely a heat stroke death, no doubt," and he would have survived had he been housed in air conditioned housing.[389] Dr. Vassallo testified that there was "absolutely" no way that the presence of synthetic cannabinoids below the reporting limit would have contributed to Mr. Pursifull's death, adding that cannabinoids are known to lower—not raise—body temperatures.[390] The Court therefore concludes that Mr. Pursifull's death was heat-related.

Based on the foregoing evidence presented at trial and at the preliminary injunction hearing, the Court concludes that heat continues to cause deaths in TDCJ's prisons. Again, however, the Court reiterates that—both because it is difficult to quantify the role that heat plays in worsening other health conditions that cause inmate deaths and because of data collection problems, discussed in Findings of Fact, Section C.2.a, *infra*—the deaths discussed above are almost certainly not the only deaths that have resulted from heat in Texas prisons over the past several summers.

### *2. Heat-related injuries*

[386] Pls.' Trial Ex. 581 at 2–3 (Keith Pursifull Autopsy (Redacted)); Trial Tr. (Apr. 2, 2026) 13:8–22 (Vassallo).
[387] *See generally* Pls.' Trial Ex. 581 (Keith Pursifull Autopsy (Redacted)); Trial Tr. (Apr. 2, 2026) 12:19–21, 13:8–22 (Vassallo).
[388] Trial Tr. (Mar. 30, 2026) 235:16–22 (Uribe).
[389] Trial Tr. (Apr. 2, 2026) 9:5–15, 16:8–25, 18:10–18, 30:6–31:5 (Vassallo).
[390] *Id.* at 15:5–13 (Vassallo).

Nor are the health impacts of extreme heat limited to deaths, which are only the most extreme examples of the consequences of extreme heat in Texas prisons. TDCJ inmates are also at risk of, and suffer, heat-related injuries each summer.

Mr. Collier admitted at trial that, despite heat-mitigation measures being in place, inmates suffered heat-related injuries and illness from 2023 to 2025.[391] Mr. Collier, likewise, reported to the Texas Legislature that 17 TDCJ inmates developed heat-related illnesses in 2023 alone.[392] And in 2024, according to TDCJ's own report, 29 inmates developed heat-related illnesses and one died.[393] These numbers are likely undercounts, given issues with TDCJ's data collection discussed briefly below and in more detail in Findings of Fact, Section C.2.a., *infra*. For example, at least one report from UTMB identified 37 TDCJ inmates with heat-related illnesses in a single month, June 2023.[394] Mr. Collier acknowledged that he was aware of UTMB's June 2023 heat-related illness report, but claimed, without further explanation, that the data UTMB reported to TDCJ contained "significant inaccuracies."[395]

In 2025, TDCJ reported zero heat-related inmate deaths and just six heat-related inmate illnesses or injuries.[396] Those numbers, however, are undercounts. Leonard Echessa, TDCJ's Deputy Division Director for the Administrative Review & Management Division, testified to several emails and documents demonstrating multiple errors in TDCJ's accounting of heat-related illnesses and injuries suffered by both employees and inmates in 2025.[397]

---

391 Trial Tr. (Mar. 31, 2026) 119:9–122:21 (Collier).
392 *See generally* Pls.' Trial Ex. 102 (TDCJ 2023 Rider 56 Report).
393 *See generally* Def.'s Trial Ex. 72 (TDCJ Dec 2024 Rider 56 Report).
394 Pls.' Trial Exs. 84–85 (Pulvino email and attachment).
395 Prelim. Inj. Hr'g Tr. (Aug. 2, 2024) 225:10–228:3 (Collier).
396 Pls.' Trial Ex. 280 at 7 (TDCJ 2025 Rider 55 Report).
397 Trial Tr. (Apr. 2, 2026) 122:9–130:22, 132:3–136:19, 137:9–139:14 (Echessa) (referencing Pls.' Trial Ex. 280 (TDCJ 2025 Rider 55 Report); Pls.' Trial Ex. 303 at 7 (TDCJ Inmate Heat Injuries Report (2024–2025) [516457–67]); Pls.' Trial Ex. 292 (TDCJ Workers Comp Packets (2025)); Pls.' Trial Ex. 583 (Edward Andrew Email (July 25, 2025)).

Additionally, evidence presented at trial showed that at least three additional inmate heat-related illnesses were excluded from the eleven inmate heat-related injuries TDCJ reported to the Texas Legislature. On July 25, 2025, Director Lumpkin received an email titled "DAILY OFFSITE BED DETAIL 2025-07-25" that indicated "S.S." an inmate housed on the Hutchins Unit was admitted to Methodist Charlton Medical Center hospital in Dallas and diagnosed with "Elevated CK, Heat exhaustion, Syncope."[398] TDCJ's report to the Texas Legislature excluded inmate S.S., and TDCJ reported zero instances of inmates who suffered Heat Syncope in July 2025.[399] Similarly, TDCJ's injury report to the Texas Legislature excluded inmate S.T., a forty-nine-year-old woman "at the Coleman Unit" who was "seen by medical and diagnosed with heat exhaustion" on July 15, 2025.[400] Also missing from TDCJ's 2025 legislative report was Robert Wallace, an inmate who died on June 8, 2025.[401] Two days before his death, on June 6, 2025, at 3:17 a.m., Mr. Wallace was documented by correctional staff as having "altered mental status" and reporting he overheated and vomited.[402] Later that day, at 10:12 p.m., Mr. Wallace was evaluated again after suffering nausea, vomiting, fatigue, and being over-heated.[403] Neither instance of Mr. Wallace's two heat-related illnesses on the same day were reported to the Texas Legislature.[404] As is, again, discussed in more detail in Findings of Fact, Section C.2.a, *infra*, these and other problems with TDCJ's collection and reporting of heat-related data makes it difficult to credit the agency's stated improvements or its

---

398 Pls.' Trial Ex. 583 at 4 (Edward Andrew Email (July 25, 2025)); Trial Tr. (Apr. 2, 2026) 132:5–133:13 (Echessa).

399 *Compare* Pls.' Trial Ex. 280 at 7 (TDCJ 2025 Rider 55 Report) *with* Pls.' Trial Ex. 303 at 6 (TDCJ Inmate Heat Injuries Report (2024–2025) [516457–67]) *and* Pls.' Trial Ex. 583 at 4 (Edward Andrew Email (July 25, 2025)).

400 Trial Tr. (Apr. 2, 2026) 134:15–22, 170:2–4 (Echessa); Pls.' Trial Ex. 280 at 7 (TDCJ 2025 Rider 55 Report); Pls.' Trial Ex. 303 at 6 (TDCJ Inmate Heat Injuries Report (2024–2025) [516457–67]); Pls.' Trial Ex. 584 at 3 (Cynthia Martinez Email (Sept. 18, 2025)).

401 *See* Pls.' Trial Ex. 303 at 6 (TDCJ Inmate Heat Injuries Report (2024–2025) [516457–67]); Pls.' Trial Ex. 406–B at 1 (Robert Wallace EMR); Trial Tr. (Apr. 2, 2026) 146:5–22 (Echessa).

402 Pls.' Trial Ex. 406-B at 51 (Robert Wallace EMR); Trial Tr. (Apr. 2, 2026) 143:9–144:11 (Echessa).

403 Pls.' Trial Ex. 406-B at 46 (Robert Wallace EMR); Trial Tr. (Apr. 2, 2026) 142:2–143:8 (Echessa).

404 Trial Tr. (Apr. 2, 2026) 146:5–22 (Echessa); Pls.' Trial Ex. 280 at 7 (TDCJ 2025 Rider 55 Report).

Case 2:23-cv-01004-ARF Document 451-1 Filed 09/22/26 Page 57 of 151

professions of good faith. Regardless, even the existing reported data shows that TDCJ inmates suffer heat-related illnesses and injuries each summer.

The negative health effects of extreme heat are also not limited to inmates. The risks of serious harm due to heat in TDCJ facilities are similarly reflected in heat's impact on staff—who, of course, spend less time in the heat than the inmates who live in TDCJ's facilities, but still face alarming heat effects. TDCJ's own training documents confirm that heat-related illness is the fifth-leading cause of serious injuries among TDCJ employees.[405] One document specifically recognizes that "[n]o one is immune from suffering a heat-related illness, from the fittest employee to those who may be prone to medical conditions."[406] It warns that "[i]ncreased body temperatures, if left uncontrolled, may lead to delirium, convulsions, seizures, and possibly even death."[407] And it suggests treating the person by moving them "out of direct sunlight [and] into . . . [an] air-conditioned environment if possible."[408]

The consequences of this risk for TDCJ staff are clearly documented. In 2023, TDCJ reported thirty-five instances of heat-related illnesses among TDCJ staff to the Texas Legislature.[409] And in 2024, TDCJ reported twenty-six instances of heat-related illnesses and injuries of TDCJ staff to the Legislature.[410] And in 2025, TDCJ reported to the Texas Legislature that eleven employees suffered heat-related illnesses,[411] though this appears to be an undercount.[412] And across 2022 and

---

405 Def.'s Hr'g Ex. 13-D at 15 (Pre–Service Training Lesson Plan).
406 *Id.*
407 *Id.* at 16.
408 *Id.* at 15.
409 Pls.' Trial Ex. 102 at 5 (TDCJ 2023 Rider 56 Report).
410 Def.'s Trial Ex. 72 at 7 (TDCJ 2024 Rider 56 Report).
411 Pls.' Trial Ex. 280 at 7 (TDCJ 2025 Rider 55 Report).
412 Worker's compensation records from the summer of 2025 showed that at least three TDCJ employees, Shaniqua Adams, Tremaine Brown, and John Canton, suffered heat–related illnesses but were not included in the count TDCJ reported to the Texas Legislature. Trial Tr. (Apr. 2, 2026) 125:6–18, 125:25–128:15 (Echessa); Pls.' Trial Ex. 303 at 9–11 (TDCJ Inmate Heat Injuries Report (2024–2025) [516457–67]); Pls.' Trial Ex. 292 at 2, 37, 61 (TDCJ Workers Comp Packets (2025)); Pls.' Trial Ex. 280 at 7 (TDCJ 2025 Rider 55 Report). Mr. Canton suffered a heat–related illness when he "[o]ver heated" with "[n]o water available" on the C Block of the Wynne Unit on May 16, 2025. Mr. Brown experienced fatigue and nausea after serving

Case 2:23-cv-01004-ARPW  Document 451-1  Filed 09/29/26  Page 58 of 151

2023, TDCJ staff filed nearly eighty workers' compensation claims related to the heat.[413] These are some of the employee statements[414]:

- "Overheated, got dizzy, fell down and could not move or respond."
- "I was sitting in my office and started to feel unwell and overheated. I felt liek [*sic*] I could not breath [*sic*]."
- "I was counting the wings at Beto when I became over heated. Reported to Capt. []. She then sent me to the chapel where I began to throw up, then Capt. [] sent me home."
- "Driving home from work (Torres Unit/Food Service) after being exposed to excessive heat in the food service dept. Had a stroke on the way home."
- "Heat from unit really got to me, extremely overheated causing me to get sick, really dizzy, headache, messing wiht [*sic*] my diabetes."
- "While performing officer duty at the O.M. gate, too much heat."
- "Heat exhaustion, dehydration."
- "Heat exhaustion."
- "It happened because of the heat and I was dehydrated."
- "In C Row top felt light headed, requested water, after drinking three bottles I got dizzy and felt like I was going to pass out, left side of the body went numb."
- "While watching my workers in the bath house, I got overheated, very weak, confused and unable to respond. Also, I was dry heaving and felt nauseated, I vomited blood."
- "Was working in high heat when I started to feel dizzy, then later felt chest pain and body aches."

Heat's effects on TDCJ staff is also confirmed by former inmates who testified at trial: Ms. Simmons testified that she saw "at least five" corrections officers in her unit pass out in the high heat.[415] And Mr. Collier acknowledged during the preliminary injunction hearing that TDCJ correctional officers continue to suffer from heat-related illnesses.[416]

---

"chow" to inmates in the 11 building at Alfred Hughes Unit on August 7, 2025, and suffered heat exhaustion. Pls.' Trial Ex. 292 at 37, 61 (TDCJ Workers Comp Packets (2025)). These injuries were not reported to the Legislature.

413 Pls.' Trial Ex. 207 (Mr. Collier's Resp. to Interrog. No. 10).

414 *Id.*

415 Prelim. Inj. Hr'g Tr. (July 30, 2024) 39:16–18 (Simmons).

416 Prelim. Inj. Hr'g Tr. (Aug. 2, 2024) 229:4–231:12 (Collier).

Case 3:23-cv-01004-ARPEWD Document 450-1 Filed 09/22/26 Page 59 of 151

### *3. Heat effects beyond death and injury*

**Importantly, even where heat conditions do not result in immediate injuries or death, the heat in Texas prisons creates degrading, inhumane conditions and causes severe suffering**. Witnesses who had been incarcerated in un-air-conditioned TDCJ prisons testified about the suffering caused by heat in those facilities. Marcie Simmons testified at both the preliminary injunction hearing and at trial, under oath and credibly, that it was "common" for inmates to resort to splashing themselves with toilet water to cool off during the summer heat.[417] Ms. Simmons, who was incarcerated in un-air-conditioned units for ten years, also testified that she lost her appetite, could not sleep, and became weaker and more lethargic because of the heat.[418] She saw several other inmates become lethargic, pass out, and suffer heat-induced seizures.[419] Ms. Simmons also saw "lots of women that [she] was housed with" require medical attention and be taken away in ambulances "very frequently" during the summer.[420] Ms. Simmons testified that she witnessed other inmates intentionally harm themselves—"mak[ing] it look like a suicide attempt"—just so that they would "get into the air-conditioned crisis management center" to "get a break from the heat."[421] Mr. Malouf similarly testified about how consistent exposure to extreme heat made him feel and the desperation it created: he testified that the heat felt like it "suck[ed] the oxygen right out of [him]"; that he saw other inmates pass out due to heat; and that inmates in administrative segregation would "fairly regularly" start fires so that the unit would be flooded and they could cool down by lying in the water. [422] The scale of heat-related grievances filed by TDCJ inmates confirms that this suffering

---

[417] Prelim. Inj. Hr'g Tr. (July 30, 2024) 31:17–24 (Simmons); Trial Tr. (April 1, 2026) 277:12–279:11 (Simmons).
[418] Prelim. Inj. Hr'g Tr. (July 30, 2024) 28:25–29:6 (Simmons)
[419] *Id.* at 33:14–34:9 (Simmons)
[420] *Id.* at 34:10–17 (Simmons).
[421] *Id.* at 35:17–36:8 (Simmons).
[422] *Id.* at 179:24–183:2 (Malouff).

Case 3:23-cv-01004-RP Document 450-1 Filed 09/22/26 Page 60 of 151

is both widespread and ongoing: inmates have filed nearly 15,000 heat-related grievances over the last three summers.[423]

The evidence shows that heat is creating inhumane conditions in TDCJ's un-air-conditioned prisons. As discussed in the Court's Conclusions of Law, Section B, *infra*, the Eighth Amendment does not mandate prisons that are pleasant, or even comfortable—but it does mandate prisons that are not subjecting inmates to such intolerable conditions that they resort to soaking themselves in toilet water or starting fires in their own cell blocks to seek relief.

### C. TDCJ's Response to Extreme Heat

#### *1. TDCJ is aware of the risks posed by extreme heat in un-air-conditioned facilities*

As discussed above, TDCJ acknowledges at least twenty-three inmate deaths due to heat, received nearly 15,000 inmate grievances related to heat over the last three summers, and has reported dozens of heat-related illness of TDCJ staff to the Texas Legislature.[424] During the trial, Defendant admitted that "extreme heat inside the Texas prison system has caused very serious injuries and death," that he has heard testimony that extreme heat causes suffering and that he "know[s] it has an impact."[425] He also knows that TDCJ inmates have filed "thousands of grievances related to the extreme heat" in just "the last several years."[426] Director Lumpkin has "long known that there is a danger from extreme heat inside the Texas prison system, and that danger extends to the men and women in [TDCJ's] care, as well as the correctional officers working for [him]."[427] He

[423] Pls.' Trial Ex. 102 at 4 (TDCJ 2023 Rider 56 Report) (5,811 heat–related grievances); Pls.' Trial Ex. 279 at 6–7 (2024 Report to the Legislature) (5,765 heat–related grievances); Pls.' Trial Ex. 280 at 6–7 (2025 Report to the Legislature) (4,898 heat–related grievances).
[424] Lumpkin Dep. 120:2–5 (Dkt. No. 337-1); *see also Cole v. Collier,* No. 4:14–CV–1698, 2017 WL 3049540, at *1 (S.D. Tex. July 19, 2017); Pls.' Trial Ex. 102 at 4, 5; Pls.' Trial Ex. 279 at 6–7; Pls.' Trial Ex. 280 at 6–7.
[425] Trial Tr. (March 31, 2026) 232:3–6 (Lumpkin); *see also* Lumpkin Dep. 102:2–8, Dkt. 337–1 (Q: "I'm talking about . . . heat related illnesses due to extreme heat inside the Texas prison system, right? . . . It has caused numerous worker injuries and numerous inmate injuries, hasn't it? A: "We've had some numbers, yes.").
[426] Trial Tr. (Mar. 31, 2026) 248:2–10 (Lumpkin).
[427] *Id.* at 229:25–230:5 (Lumpkin).

knows that "there have been hundreds of heat related illnesses [of inmates] over the course of the last 20 years in the Texas prison system."[428] He "know[s] about employee injuries as well as inmate injuries over the last several years due to the extreme heat,"[429] that there were at least 80 workers' compensation claims related to the heat in 2022 and 2023,[430] and that workers' compensation claims of TDCJ employees related to the heat are an "ongoing problem."[431] And Director Lumpkin admitted that he has read this Court's March 2025 Order—which found that high temperatures pose a substantial risk of serious harm to even young, healthy individuals—and that the Order states, "in no uncertain terms, [that] the agency is violating the Constitution."[432]

Moreover, TDCJ's awareness of the severity of the risks of un-air-conditioned housing for inmates is confirmed by the agency's own documents. TDCJ's employee training materials acknowledge the risk of heat-related illness, even for "the fittest employee."[433] TDCJ requires individuals who opt out of cool-bed housing assignments to complete a form "acknowledge[ing] potential or possible outcomes" of continuing to reside in un-air-conditioned housing.[434] Those outcomes, as identified by TDCJ, include "Heat Cramps, Heat Exhaustion, and Heatstroke," and "[w]orsening of [the prisoner's] diagnosed medical condition(s) up to and including death."[435]

However, the Court finds that Director Lumpkin and the agency he leads have not responded with reasonable concern to the grave danger posed by extreme heat. TDCJ officials made

---

428 Lumpkin Dep. 86:3–87:9, Dkt. 337-1; *Cole*, 2017 WL 3049540, at *20 (TDCJ has identified hundreds of inmates diagnosed with heat-related illnesses since 2011.).
429 Trial Tr. (Mar. 31, 2026) 248:10–14 (Lumpkin).
430 Lumpkin Dep. 148:23–149:2, Dkt. No. 337-1.
431 *Id.* at 149:6-7.
432 Trial Tr. (Mar. 31, 2026) 249:15–22 (Lumpkin).
433 Def.'s Hr'g Ex. 13-D at 15 (Pre–Service Training Lesson Plan).
434 Trial Tr. (Mar. 31, 2026) 112:24–113:10 (Collier); Pls.' Trial Ex. 325 at 20 (TDCJ AD 10.64 – Revision 12).
435 Pls.' Trial Ex. 325 at 20 (TDCJ AD 10.64 – Revision 12).

statements at trial expressing concern about heat conditions and commitment to fixing the issue,[436] but the agency's actions and inactions—as discussed in detail below—undermine the credibility of these statements of concern. Instead, the Court finds that TDCJ has shown that it (A) is uninterested in fully investigating, understanding, and documenting the scope of the heat problem, (B) continues to rely on insufficient mitigation methods, and (C) has not acted reasonably to install system-wide air-conditioning even on the timeframe that TDCJ itself has identified as possible.

### 2. *TDCJ has minimized the seriousness of the heat problem, including by failing to collect important data, in a manner that is inconsistent with sincere concern*

TDCJ has failed to collect reliable ambient temperature data and shown a concerning lack of interest in understanding the full scope of its data-collection issues. It has failed to make meaningful efforts to collect data that would be critical to understanding when heat is causing deaths. Its heat-score system, which the agency says identifies and protects inmates who are especially vulnerable to heat, is extremely under-inclusive—and testimony of Defendant's own witness indicated that the heat-score system is driven at least in part by the number of cool beds that are TDCJ has available, instead of inmates' actual risk. TDCJ has also failed to reasonably investigate the basis for inmates opting out of cool beds. These actions—and inactions—are inconsistent with those of an agency that is sincerely concerned about, and seeking to fully understand, the impact of extreme heat.

Further, before the Court turns to TDCJ's actions, it notes statements made at trial by Director Lumpkin and by Eric Nichols, the Chairman of the Texas Board of Criminal Justice, which oversees TDCJ, which are likewise inconsistent with the seriousness and urgency that the suffering of nearly 90,000 inmates in extreme temperatures deserves.

[436] *See, e.g.,* Trial Tr. (March 31, 2026) 354:17–20 (Lumpkin) (asserting that "TDCJ is doing everything they can do install air conditioning as fast as they can"); Trial Tr. (April 9, 2026) 246:6–247:1 (Hudson) (asserting that air conditioning has been "a priority" for TDCJ since 2016, under then-director Lumpkin).

As noted in the Court's discussion of heat risks, above, at the preliminary injunction hearing, Ms. Simmons testified about the measures she took while incarcerated to try to lower her body temperature, saying:[437]

> A: I did a lot of things to try to get my body temperature down in the summer months. I would wet my T-shirt and shorts, wear wet clothes, wear wet hair. I would lay on the concrete floor in a puddle of water trying to stay cool. When I was housed in cell block housing, the water, it had a sink-toilet combo and so, kind of the typical one you may have seen on TV, sir, and the water spout that comes out of the sink is warm water, but if you flush the toilet a couple of times, that water's cold and I would splash toilet water on my body, legs to cool off.
>
> Q. How many times in total would you say you used water from your toilet to cool yourself down?
>
> A. Sir, I was housed in cell block housing during summer months at least for two years. I can't give you an accurate number. I did it several times a day the entire summer months.
>
> Q. More times than you can count?
>
> A. Yes, sir.

When Director Lumpkin was asked at trial about Ms. Simmon's testimony from the preliminary injunction hearing that she and others had, in order to cool off, splashed toilet water on themselves, director Lumpkin called that testimony "ridiculous," saying "[i]t's ridiculous why one would have to do that when there's running water inside the cell itself. And again, that temperature of a floor, it's not to that level where one would have to splash water from the toilet to cool off the floor."[438]

Ms. Simmons reiterated at the trial that it was "common" for inmates to use toilet water to cool themselves while she was in the TDCJ system, in part because the sink water was warm and would only dispense a small amount of water.[439] In response to questions from counsel, she

---

437 Prelim. Inj. Hr'g Tr. (July 30, 2024) 31:6–24 (Simmons)
438 Trial Tr. (March 31, 2026) 334:14–24 (Lumpkin).
439 Trial Tr. (April 1, 2026) 277:12–279:16 (Simmons).

Case 2:23-cv-01004-BAR-EWD Document 350 Filed 09/29/25 Page 63 of 150

confirmed that "this is something that actually happened to [her]," "[she] didn't make it up"—it "actually took place."[440] She further confirmed that she had testified to that common experience under oath—twice—and stated, unsurprisingly, that "[i]t was not easy to say that in front of a room full of people that have not experienced that," and that "it took courage for [her] to say that [she] splashed toilet water on [herself]," that "[i]t was embarrassing for [her] to testify to that and it was embarrassing to be called ridiculous for that."[441]

The Court finds that it evinces a lack of concern for the Director of TDCJ to respond to credible, sworn testimony about inmates in the agency's care having to cool themselves with toilet water to stay safe during extreme heat by declaring that it was "ridiculous" that anyone would have to take such an action.

Additionally, at trial, Chairman Nichols testified "the thing that keeps me up at night is not the heat mitigation program. What keeps me up at night is the fact that we have a situation here in Texas where we have humans who are cooking up, putting on paper, putting in bags, dangerous drugs that are coming into our system and that are killing members of TDCJ's population."[442] While the Court understands and respects Chairman Nichols' alarm about the problem of illicit drug use in the TDCJ system, it is concerned by the implication that the leadership of the Texas prisons system does not see the risks of extreme heat as sufficiently concerning to "keep [them] up at night."[443] The Court also notes that—while drugs are undoubtedly a deadly, tragic, and widespread problem, as Chairman Nichols indicates—the heat in Texas's prisons, unlike drugs, is a condition that TDCJ imposes upon inmates. The leadership of the Texas prison system determines, and is responsible for, the environmental conditions in the state's prisons.

---

440 *Id.*
441 *Id.*
442 Trial Tr. (April 6, 2026) 164:5–13 (Nichols).
443 *Id.*

The concern raised by these statements—that Defendant and other leaders of the Texas prison system are not responding to extreme heat with a degree of seriousness that matches the scale and significance of the risk—is supported by the actions that TDCJ has taken in response to extreme heat, and by the actions it has failed to take.

*a. TDCJ has failed to collect accurate ambient temperature data, to investigate data collection issues, and to collect critical data to understand potential heat-related deaths.*

**Daily Temperature Data:**

TDCJ has demonstrated a persistent and concerning problem with collecting accurate data. At the preliminary injunction hearing, Defendant presented hand-recorded logs to the Court that showed outdoor temperatures at the Mark W. Stiles Unit, near Beaumont, Texas.[444] The specific log presented showed the outdoor temperature on July 12, 2022, as 79 degrees Fahrenheit—consistently, at each time of recording, from 12:30 AM to 4:30 PM.[445] The Court consulted an authoritative source during the hearing and took judicial notice that, on July 12, 2022, the outdoor temperature in Beaumont reached 96 degrees.[446] The log in question also (1) reported the heat index as lower than the ambient temperature, despite 90% humidity—an impossibility[447]—and (2) listed different individuals as recording the data in question, despite the records being written in the same handwriting.[448] As a result, the Court concluded during the preliminary injunction hearing that the temperature log had been fabricated.[449] During the hearing, the Court indicated that "somebody needs to look into this about how this happened, [and] why it happened."[450] And on at the close of the preliminary injunction hearing in August 2024, when Plaintiffs inquired about a specific deadline

444 Prelim. Inj. Hr'g Tr. (Aug. 2, 2024) 195:12–15, 217:20–219:1 (Collier) (admitting Def.'s Ex. 76 into evidence). *See also* Pls.' Trial Ex. 310 (TDCJ unit map).
445 Def.'s Hr'g Ex. 76 at 12 (Stiles temperature log July 2022).
446 Prelim. Inj. Hr'g Tr. (Aug. 2, 2024) 276:6–277:8.
447 *See* Pls.' Trial Ex. 24 (NWS Heat Index Chart).
448 Prelim. Inj. Hr'g Tr. (Aug. 2, 2024) 277:9–19.
449 *Id.* at 278:20–279:2.
450 *Id.* at 280:9–25.

for Defendant to provide an explanation regarding the fabricated logs, the Court further indicated that a deadline was unnecessary because the undersigned was confident that Mr. Collier and his counsel would "get right on it."[451] Defense counsel confirmed they would do so.[452]

Yet, Defendant did not provide the Court with any information about the fabricated logs until March 18, 2025.[453] In a two-page notice, Defendant explained that he did not understand there to be any need to explain the falsified evidence to the Court,[454] stating only that an investigation had been conducted, which revealed that the log was created "before the initiation of this lawsuit" and that "[n]either Defendant nor the OAG had any intent to mislead or deceive the Court with the introduction of this log, and did not have knowledge of the inaccuracies included in the log, before it became apparent during the preliminary injunction."[455]

More concerning than the lack of meaningful explanation to the Court is the apparent lack of rigor of the investigation itself and agency's internal response to that investigation. TDCJ concluded that the log in question was falsified, as were "[n]umerous" other temperature logs.[456] TDCJ's investigator concluded that it was "unlikely [staff] would have [falsified logs] without knowledge and/or consent of unit administrators."[457] Despite these findings, TDCJ's investigation did not identify who actually falsified the logs, why the logs were falsified, or exactly how widespread falsification was—the investigator said that no one had asked him to determine who falsified the logs or how widespread the problem was.[458] Defendant's own correctional system management

---

451 *Id.* at 287:3–8.
452 *Id.* at 287:9–10.
453 *See* Def.'s Advisory to the Court, Dkt. 199.
454 *Id.* The Court notes that, despite this representation, emails in evidence from the investigator looking into the falsified logs to then–Director Collier discussed whether the investigation conducted would be "enough to satisfy the judge." Pls.' Trial Ex. 448 (Investigation Materials) at 14.
455 Def.'s Advisory to the Court, Dkt. 199, at 1–2.
456 Pls.' Trial Ex. 447 at 2 (Cirrito Report).
457 *Id.* at 3.
458 *See generally* Pls.' Trial Ex. 447 (Cirrito Report); Trial Tr. (Apr. 6, 2026) 280:21–282:23 (Ishee); *see also* Trial Tr. (Mar. 30, 2026) 54:15–56:18 (Williams).

expert, Mr. Ishee, said that he "would have concerns about the thoroughness" of such an investigation.[459] There is no record of discipline for the administrators of the unit in question. To the contrary, the risk administrator and administrative director for the unit were promoted.[460]

In sum, Defendant presented falsified evidence to the Court about fundamentally important data on a life-threatening issue, and, despite the Court's inquiry, failed to identify the scale of the falsification problem, or explain the reasons why TDCJ staff falsified records. Defendant also never took any action to discipline unit administrators despite an investigation concluding that it was "unlikely" that the falsification occurred without the "knowledge and/or consent of unit administrators."[461] Given the importance of accurate temperature readings in understanding and responding to extreme heat, and given that these were records that TDCJ introduced in active litigation, the fact that the agency did not attempt to ascertain the scope of the problem significantly undermines the agency's credibility in the eyes of the Court. **Defendant's credibility is undermined both in terms of his factual representations to the Court and his professions of good faith in understanding and responding to extreme heat in TDCJ facilities**.

Unfortunately, fabricated temperature logs are not the only example of significant problems with TDCJ's data collection. At some time after the preliminary injunction hearing, TDCJ switched from handwritten logs to an automated system that pulled weather data from federal National Oceanic and Atmospheric Administration ("NOAA") weather stations every hour, feeding that data into automated logs.[462] However, thousands of the readings logged simply say "[n]o data available."[463] And many more entries repeat data, with the automated system apparently having

---

459 Trial Tr. (Apr. 6, 2026) 282:19–23 (Ishee).
460 Pls.' Trial Ex. 447 at 3 (Cirrito Report).
461 *Id.* at 2–3.
462 Trial Tr. (Apr. 2, 2026) 100:2–101:20 (Echessa).
463 *See generally* Pls.' Trial Ex. 306-A (425534 TDCJ Automated Temp Logs - 5.1.2025–9.1.2025).

reentered the exact same values hour after hour.[464] At trial, Plaintiffs highlighted multiple examples where units reported the same temperature or heat index data, every hour, day after day—in the Garza West Unit and Bartlett Units, for a week straight, and at the four co-located Hilltop, Crain, Murray, and Woodman Units, for six days.[465] These glitches continued while TDCJ's "heat strike team"—TDCJ's heat-mitigation-measure audit group—visited Garza West, Bartlett, and Hilltop and passed each unit with no deficiencies in its heat-related performance.[466] While these inaccuracies were being recorded, heat indexes in the areas near Bartlett and the four co-located units were, at times, over 102 degrees.[467] The reported heat indexes in the unit logs were in the 70s.[468]

**Heat Death Data:**

Beyond the problems with the data that TDCJ does collect, the data that TDCJ does not collect also paints a picture of an agency that is not attempting to meaningfully understand or document the dangers and impacts of heat. Instead, TDCJ's lack of data collection on critical issues again tends to show an agency that is attempting to minimize the visibility of heat impacts.

Specifically, TDCJ does not generally collect critical temperature data from potentially-heat-related deaths. Medical experts at trial repeatedly testified about the importance of temperature data to assess whether heat caused a death. The most valuable such data is core temperature data.[469] Even if core temperature data were unavailable, experts, including Defense witnesses, credibly testified that axial (armpit) temperature data, skin temperature data, or even ambient temperature data from the location of death would be more useful than no data from the individual or the specific area where the death occurred.[470] However, Defense expect Dr. Felicella confirmed that, "most of the

---

464 *Id.*
465 Trial Tr. (Apr. 2, 2026) 103:6–113:10 (Echessa).
466 *Id.* at 110:22–111:5 (Echessa).
467 *Id.* at 109:24–110:6 (Echessa).
468 *Id.* at 106:23–108:4, 112:1–113:10 (Echessa).
469 Trial Tr. (April 8, 2026) 68:4–9; 118:2–18 (Felicella).
470 *Id.*

time" when performing an autopsy on a TDCJ inmate, she is not provided with any information regarding the inmate's body temperature,[471] even though UTMB pathologists typically request that temperature information for summer deaths in TDCJ.[472] A similar gap exists for cell temperatures. Dr. Felicella testified that pathologists are "[s]ometimes" given "indoor temperatures" that turn out to be recorded at locations "very far away from where the person was housed," making them of limited to no value.[473]

TDCJ's policy on the collection of temperatures at the time of deaths is that, for "[i]nmate deaths during periods of excessive or extreme temperature, when the cause of death is unknown . . . TDCJ medical partners are encouraged to take core body temperatures of deceased inmates at the time of death."[474] Director Lumpkin, asked about the lack of core body temperatures for the majority of summer autopsies and the general lack of any useful temperature data in autopsies, indicated that these are issues where he defers to medical partners.[475] Mr. Collier similarly indicated that this is "a medical decision" outside of the director's authority to require.[476] Defendant asked medical experts at trial whether CPR should take priority over taking a core temperature, and medical experts from both sides agreed that it should.[477] Defendant's medical experts additionally testified that trained medical professionals should take core body temperatures.[478]

However, testimony that CPR should take immediate priority over taking a core body temperature does not explain why core body temperatures could not be taken immediately after CPR efforts have ceased. Likewise, evidence that core body temperature should be taken by medical

---

471 *Id.* at 96:6–9 (Felicella).
472 *Id.* at 118:2–24, 131:9–132:10 (Felicella).
473 *Id.* at 67:23–68:1 (Felicella).
474 Pls.' Trial Ex. 325 (TDCJ AD 10.64 – Revision 12) at 17.
475 Trial Tr. (Mar. 31, 2026) 285:20–286:9 (Lumpkin).
476 Trial Tr. (Mar. 30, 2026) 48:25–49:3 (Williams).
477 *E.g.,* Trial Tr. (Mar. 30, 2026) 244:23–245:13 (Uribe); Trial Tr. (April 2, 2026) 217:10–25 (DeGroot).
478 Trial Tr. (April 2, 2026) 218:1–12 (DeGroot).

professionals does not explain why TDCJ has done nothing more than encourage medical partners to take core body temperatures.

First, the Court is unconvinced that Director Lumpkin could do nothing more than encourage medical partners to take core temperatures. Mr. Williams—a former director of two state correctional systems—explained that as a director, he had "the authority and the ability to make sure all facts are gathered, including gathering core body temperatures and gathering heat indexes and gathering ambient temperatures" in death investigations.[479] He testified that prison directors are "directly responsible" for "getting accurate reporting of the deaths or the bad incidents, critical incidents" that occur in the system.[480] The Court is particularly unconvinced by Defendant's position that TDCJ cannot play a greater role in determining what medical data is collected in connection with deaths given that, when discussing autopsy drug testing, defense expert Dr. Felicella testified that "[UTMB] order[s] at the request of TDCJ the largest, most expanded panel that [a national drug testing lab] offers."[481] In other words, there is evidence from trial, that at least with regards to some issues, TDCJ can and does specifically request further, more detailed information in the autopsy process. This stands in sharp contrast to the agency's own failure to provide medical examiners with basic information about possible heat deaths, much less to do more than simply encourage core temperature collection. At a minimum, the Court concludes that Director Lumpkin could have attempted to understand why core body temperatures were often not taken, and whether TDCJ could better support medical partners in taking those temperatures.

Second, even if TDCJ cannot require medical staff to take core temperatures or make a more significant effort to support medical partners in taking core temperatures, the agency could collect other death-related temperature data. Defendant and Mr. Collier, who was the Director of TDCJ at

---

479 Prelim. Inj. Hr'g Tr. (July 31, 2024) 251:2–24 (Williams).
480 Trial Tr. (Mar. 30, 2026) 29:1–7 (Williams).
481 Trial Tr. (April 8, 2026) 69:17–23 (Felicella).

the time when most of the deaths discussed in this order occurred, did not explain why, if taking core temperatures requires medical training, TDCJ does not require its staff to collect other non-core-temperature data. Mr. Collier admitted that TDCJ staff could "[p]otentially" take skin temperature readings.[482] Defendant could also have required TDCJ staff to at least take the ambient temperature in the specific area where the death occurred, as close to the time of death as possible.

Again, Defendant and TDCJ's response to this significant shortcoming in heat-related-death investigations shows a lack of seriousness toward—and a lack of a sincere desire to understand—heat-related deaths that is inconsistent with a sincere concern about extreme heat's impacts.

*b. TDCJ's system for identifying inmates at greatest need of air-conditioning is underinclusive and driven at least in part by the availability of cool beds, not by medical need.*

Beyond these issues of data collection and non-collection, trial testimony about TDCJ's policy for determining which inmates have vulnerability to extreme heat and therefore require a cool bed also indicated that the agency is minimizing the scope of the heat problem. TDCJ's policy for determining cool-bed assignments is called a "heat score."[483] Defendant agreed at trial that the purpose of the heat-score system is to "identify the inmates who are more vulnerable than others."[484] Director Lumpkin, along with former director Collier, presented the heat score system as medically-driven, with Director Lumpkin explaining that—as with collecting core temperatures for potentially heat-related deaths—this is an area where he "depend[s] on [TDCJ's] medical professionals to make changes to the algorithm annually if they feel like they need to add those to the heat score process."[485] However, evidence from trial and the preliminary injunction hearing

---

[482] Trial Tr. (Mar. 31, 2026) 150:11–16 (Collier).
[483] *See* Def.'s Trial Ex. 206 (at hand population heat score sheet); Def.'s Trial Ex. 41, at 6 (A.D. 10.64) (directing that "TDCJ and health care staff shall work together to identify inmates susceptible to temperature-related illness due to medical conditions. As inmates arrive at intake facilities, a staff member from the medical department shall conduct an initial screening to determine if the inmate has any conditions or is on any medication that would make the inmate more susceptible to heat.").
[484] Trial Tr. (March 31, 2026) 258:6–14 (Lumpkin).
[485] *Id.* at 258:24–259:1 (Lumpkin).

show, first, that TDCJ's heat score system is highly underinclusive, and, second, that the heat score system is driven at least in part by the number of available cool beds—not medical vulnerability.

The Court first addresses under-inclusiveness. As discussed above, all individuals, including young, healthy individuals, face significant health risk from prolonged exposure to extreme heat.[486] However, even as a tool to identify a subpopulation at further heighted risk, TDCJ's heat score metric is, as the Court held at the preliminary injunction stage, "arbitrary, inadequate, and ineffective."[487] An inmate's heat score is generated using International Classification of Diseases ("ICD") codes, which also populate the "problem list" seen within the inmate's electronic medical records.[488] Inmates are given a preliminary heat score upon intake,[489] and then receive a starting heat score after the 30-day intake process has concluded.[490] If an inmate has a heat score of one or above, an inmate is placed in a cool bed.[491] Heat scores are updated multiple times a day, and TDCJ reviews a report of changes in heat scores and a report of all inmates with heat scores, which are both generated at 10 p.m. every night.[492] However, as Dr. Felicella testified, "problem lists"—which TDCJ uses to identify which inmates receive a heat score—"are problematic because they are often incomplete."[493] In other words, TDCJ's records may simply not be capturing conditions that would qualify inmates for heat scores.

However, even if all conditions reflected in TDCJ's heat-score were captured, the heat-score metric would be incomplete. Plaintiffs' experts Dr. Vassallo and Dr. Biswas both opined that the list

---

486 Trial Tr. (Mar. 30, 2026) 185:23-186:7 (Vassallo).
487 *Tiede II*, 796 F. Supp. 3d at 308.
488 Prelim. Inj. Hr'g Tr. (Aug. 1, 2024) 92:17–93:12, 94:3–23, 98:15–99:1, 111:4–9 (Leonardson); Trial Tr. (Apr. 7, 2026) 26:8–27:19 (Leonardson).
489 Prelim. Inj. Hr'g Tr. (Aug. 1, 2024) 160:6–10 (Fitzpatrick).
490 *Id.* at 160:6–161:19 (Fitzpatrick).
491 *Id.* at 196:12–13 (Fitzpatrick).
492 *Id.* at 170:22–171:6 (Fitzpatrick).
493 Trial Tr. (Apr. 8, 2026) 145:18–25 (Felicella).

Case 3:23-cv-01004-RP-EW Document 450 Filed 09/22/26 Page 72 of 150

of conditions that qualify an individual for a heat score is "under-inclusive."[494] Defense expert Dr. DeGroot agreed.[495] For example, individuals with diabetes do not automatically receive a heat score.[496] Defense expert Dr. Leonardson, a physician and the Director of Clinical Informatics for UTMB Correctional Managed Care,[497] works to design and update TDCJ's heat score.[498] Dr. Leonardson acknowledged that it would "behoove[]" TDCJ to house all diabetics in air conditioning, because TDCJ "cannot tell which [diabetics] are going to have a problem" with the heat, and "there does appear to be a disproportionate number [of diabetics] in the heat injury groups."[499] Moreover, individuals with COPD, asthma, emphysema, kidney disease, hypertension, Parkinson's, ALS, obesity, anxiety, depression, and psychosis are more sensitive to the heat,[500] yet those individuals also do not automatically receive a heat score.[501] In Dr. Vassallo's opinion, any of those conditions should automatically qualify an individual for a heat score.[502]

Dr. Vassallo explained that several classes of prescription drugs "impair thermoregulation," including: cardiovascular drugs, diuretics, sympathomimetics or vasoconstrictors (such as nasal decongestants like Sudafed), anticholinergics, and SSRIs.[503] TDCJ's own list of "drugs associated with heat stress" includes anticonvulsants, antipsychotics, antidepressants, SSRIs, beta blockers, calcium channel blockers, diuretics, antihistamines, ACE inhibitors, anti-Parkinson's drugs, monoamine oxidase inhibitors, and muscle relaxers.[504] Dr. Vassallo testified that every drug on

---

494 Trial Tr. (Mar. 30, 2026) 110:10–11 (Vassallo), 299:20–22 (Biswas).
495 Trial Tr. (Apr. 2, 2026) 234:2–10 (DeGroot).
496 Trial Tr. (Apr. 7, 2026) 51:20–52:1 (Leonardson); *see generally* Pls.' Trial Ex. 329 (At Hand Population Heat Scoring).
497 Trial Tr. (Apr. 7, 2026) 8:16–9:1 (Leonardson); Def. Ex. 265 (Leonardson CV).
498 Trial Tr. (Apr. 7, 2026) 57:14–17 (Leonardson).
499 Trial Tr. (Apr. 7, 2026) 52:2–9 (Leonardson).
500 Trial Tr. (Mar. 30, 2026) 110:12–113:7 (Vassallo), 299:9–19 (Biswas).
501 *See generally* Pls.' Trial Ex. 329 (At Hand Population Heat Scoring); Pls.' Trial Ex. 334 (TDCJ's list of heat–sensitive comorbidities).
502 Trial Tr. (Mar. 30, 2026) 110:14–112:21 (Vassallo).
503 Vassallo Decl. ¶ 37, Dkt. No. 50–2.
504 *See generally* Pls.' Trial Ex. 333 (CMHC D–27.2 Attachment A – Drugs Associated with Heat Stress); *see also* Trial Tr. (Mar. 30, 2026) 107:9–20 (Biswas).

TDCJ's "drugs associated with heat stress" list should automatically qualify an individual for a heat score without needing an accompanying comorbidity.[505] None do, except for, in the most recent iteration of the score, "Highly Active Anticholinergic[s]" prescribed for more than four days.[506] Adding this qualifying condition was one of two changes that TDCJ made to its heat score system following the preliminary injunction hearing.[507] However, medical experts testified that this classification of drugs does not have any clear definition. They further opined that the "prescribed for more than four days" requirement does not have a reasonable medical basis. Dr. Vassallo explained that "any anticholinergic medication will interfere with sweat gland function and it will do that immediately," so "[y]ou don't need to be on a medication for four days before sweat glands stop working sufficiently."[508] Defense pharmacology expert Dr. De La Cruz confirmed that the term "highly active anticholinergic" (or "HAAC")  "is not one he has "seen . . . [b]efore," and that he is "not familiar with" HAAC as a recognized pharmacological term.[509] Plaintiffs introduced evidence that roughly one thousand inmates on anticholinergics do not have a heat score, presumably as a result of the restrictions to only "highly active" anticholinergics and to a prescription duration of more than four days.[510]

505 Trial Tr. (Mar. 30, 2026) 107:11–108:15, 110:10–11 (Vassallo). Dr. De La Cruz also agreed that every drug on TDCJ's list of "drugs associated with heat stress" has "the potential to cause heat stress or sensitivity … to some degree." Trial Tr. (Apr. 7, 2026) 260:2–6, 260:14–19 (De La Cruz).
506 *See generally* Def.'s Trial Ex. 206 (At Hand Heat Score Feb. 2, 2026); Trial Tr. (Mar. 30, 2026) 107:2–108:15 (Vassallo).
507 Trial Tr. (April 2, 2026) 274:17–275:8 (Fitzpatrick).
508 Trial Tr. (Mar. 30, 2026) 103:3–10 (Vassallo).
509 Trial Tr. (Apr. 7, 2026) 257:12–19, 259:1–4 (De La Cruz).
510 Adding "highly active anticholinergics" evidently increased the heat score population by about 2,600, compared to the more than 4,000 inmates prescribed anticholinergics without a heat score the previous summer. *Compare generally* Pls.' Trial Ex. 312 (TDCJ Heat UTMB Medical Diagnosis, Sheet 1) (filtered by anticholinergic, Column X, identifying 4,132 inmates not housed in a cool bed on May 16, 2025 per Pls.' Trial Ex. 437-A at 3), *with generally* Def.'s Trial Ex. D-204 (Inmates with Heat Scores as of Feb. 23, 2026) (19,637 inmates, including opt–outs, with a heat score as of Feb. 23, 2026—after the new anticholinergic parameter as added on Feb. 2, 2026 per Def.'s Trial Ex. 206); *and* Def.'s Trial Ex. D-203 at 19 (TDCJ Resp to Webb ROG) (13,972 inmates with active heat score who have not opted out on Oct. 1, 2025); *and generally* Def.'s Trial Ex. 4 (Fitzpatrick Affdvt CB Refusals Tracking) (3,038 active opt–outs on Sep. 30, 2025).

The second change that TDCJ made to the heat-score system following the preliminary injunction hearing was providing a heat score to all inmates 65 or older.[511] As the Court discussed in its order denying a preliminary injunction, before this change, the original Plaintiff, Mr. Tiede—a 65-year-old man with diabetes, hypertension, and COPD, among other medical conditions—did not have a heat score.[512] The Court notes that, while the addition of age over 65 as a qualifying criteria caused Mr. Tiede to receive a heat score, Mr. Tiede's other conditions, including diabetes, hypertension, and COPD, would not qualify him for a heat score, despite evidence from the preliminary injunction hearing that Mr. Tiede was at a clear risk of death without air-conditioned housing.[513] More broadly, despite TDCJ's two post-hearing changes to the heat score system, Plaintiffs introduced evidence that the overwhelming majority (i.e., more than 80%) of the 100,853 inmates who meet credibly-supported medical criteria for heat sensitivity do not have a heat score.[514] Given the evidence at trial, the Court is not convinced that TDCJ's two changes were sufficient to make the heat score no longer "arbitrary, inadequate, and ineffective."[515]

Possibly even more concerning than the significant under-inclusiveness of TDCJ's heat-score system is testimony from trial indicating that the heat-score system is driven in part by the amount of air-conditioned housing that TDCJ has available, not by the medical vulnerability of inmates. Dr. Leonardson admitted that the number of inmates with heat scores turns not on the number of inmates who are vulnerable to heat, but rather on how many air-conditioned beds are available. Asked why diabetes had not been added to the heat score, despite Plaintiffs' and

---

511 Trial Tr. (April 2, 2026) 274:17–275:8 (Fitzpatrick).
512 *Tiede II*, 796 F. Supp. 3d at 309.
513 *Id.* at 327.
514 *See generally* Pls.' Trial Ex. 437-A (Def.`s Resps. to Pls.' Second Set of Interrogs. [Redacted]); Def.'s Trial Ex. 204 (Inmates with Heat Scores as of Feb. 23, 2026); Def.'s Trial Ex. 55 at 9, 12 (Heat Stress Policy); Trial Tr. (Apr. 7, 2026) 47:2–4 (Leonardson) (agreeing obesity renders a person more vulnerable to heat), 249:6–11 (De La Cruz) (same); *see also id.* at 239:3–9 (De La Cruz) (agreeing hypertension renders a person more vulnerable to heat).
515 *Tiede II*, 796 F. Supp. 3d at 308.

Defendant's experts agreeing that diabetes creates heat risk[516]—including Dr. Leonardson herself saying it would "behoove" TDCJ to house diabetics in air-conditioning[517]— Dr. Leonardson explained that diabetics are not included "[b]ecause we cannot house them until the new beds are online . . . ."[518] She confirmed specifically that "the [heat-score] system is partly designed because of a lack of air-conditioned space,"[519] and that, while she agrees that "there [are] a lot of people with BMIs over 30 at risk in the system," those people, at least "partly," do not receive heat scores because there are not enough cool beds to house them.[520]

The Court finds this testimony highly concerning. It implies that, instead of being a system that identifies the inmates who are at a heightened risk from heat—beyond the baseline significant risk borne by all individuals—TDCJ's heat score instead functions to match the number of inmates identified as vulnerable to the number of existing, available cool beds. In doing so, the heat score system artificially underrepresents the number of inmates who have a heightened need for air-conditioning. And in doing so, the heat-score system also artificially makes it appear that TDCJ is successfully housing the most vulnerable inmates in air conditioning. This conclusion is particularly clear in light of the extensive evidence that Plaintiffs presented of the heat-score system's under-inclusiveness.

As a result, the Court cannot conclude that TDCJ's heat-score system functions, or is even intended, to house the most medically vulnerable inmates in air-conditioned beds. Moreover, this approach to designing a heat score system—driven not by what vulnerabilities actually exist for the inmate population but instead by the number of inmates the agency can already accommodate without appearing to have a shortfall of cool beds—again paints a picture of an agency more

516 Trial Tr. (April 7, 2026) 261:25–262:10 (De La Cruz); Trial Tr. (April 2, 2026) 181:18–182:15 (DeGroot).
517 Trial Tr. (April 7, 2026) 52:2–9 (Leonardson).
518 *Id.* at 47:18–21 (Leonardson).
519 *Id.* at 47:22–24 (Leonardson).
520 *Id.* at 47:22–48:8 (Leonardson).

Case 3:23-cv-01004-RP-EWD Document 450 Filed 09/29/26 Page 76 of 150

concerned with appearing to address the risks of extreme heat than with actually addressing those risks.

*c. TDCJ has construed inmates opting out of cool beds as indicative of a lack of desire for air-conditioning but has not reasonably investigated the basis for opt-outs.*

Roughly 4,000 inmates who have heat scores have opted out of air-conditioned beds.[521] Defendant presumably presented evidence of these opt-outs as an indication that inmates do not want or need air-conditioned housing. However, Plaintiffs presented evidence showing that many inmate opt-outs were driven by concerns over where and how TDCJ was providing air-conditioned housing: inmates were concerned that accepting a cool-bed assignment could lead to reduced privileges, moves away from families, and loss of programming opportunities. Despite awareness of these concerns, TDCJ did not conduct any systemic investigation to understand why nearly 2,000 inmates opted out of cool beds in the eight days after TDCJ modified the heat-score criteria in April 2025.[522] Moreover, while one TDCJ witness mentioned in passing an "education campaign" to explain that TDCJ's historic use of a living area "for certain purposes" "did not tie [TDCJ's] hands to be creative and use it in a different way in the future,"[523] Defendant generally portrayed opt-outs as indicating a lack of desire for air-conditioning, and not as a possible indication of any problems with how TDCJ has implemented air-conditioned housing.

Plaintiffs introduced grievances received by TDCJ that indicate that inmates were opting out of air-conditioned housing because of fear of being separated from family, losing programming and work assignments, and spending months in isolated, transient cells in restrictive housing units.[524]

---

521 Trial Tr. (April 2, 2025) 291:12-15 (Fitzpatrick).
522 Trial Tr. (Apr. 6, 2026) 9:25–11:12, 13:15–14:1 (Fitzpatrick) (describing that the agency "reviewed many reasons as a high-level review process" but admitting that the agency collected no "statistics or data" and did ohing to assemble the most common reason or otherwise study opt-outs).
523 *Id.* at 17:18–25 (Fitzpatrick).
524 *See generally* Pls.' Trial Ex. 285-G (inmate grievances asking for their heat scores to be removed); Trial Tr. (Apr. 6, 2026) 14:2–13, 15:16–16:9 (Fitzpatrick).

Tim Fitzpatrick, the Director of TDCJ's Classifications and Records Department,[525] confirmed that some inmates spend over three months in "transient" (i.e., restrictive) housing units during transfers.[526] And Mr. Collier confirmed that TDCJ is aware of these concerns, testifying that:

> [Inmates] were uncomfortable going into [the] housing environment [where cool beds were offered]. The culture of a prison, those are restrictive housing beds so inmates see those as restrictive housing beds, and when we moved cool bed inmates into those because they had air conditioning, we had a lot of inmates who didn't want to be in that type of housing.[527]

In light of these concerns, the Court is not convinced that opt-outs are indicative of a lack of need or desire for air-conditioned housing. The inmate grievances introduced by Plaintiffs, which articulated concerns acknowledged by TDCJ officials, instead support the conclusion that opt-outs may actually show that the manner in which TDCJ is providing cool beds—or, at a minimum, inmates' understanding of the option to be in a cool-bed—is creating a barrier to inmates accessing a potentially life-saving form of relief. Regardless, TDCJ's failure to investigate the reasons for mass opt-outs, and the lack of evidence that the agency responded to known opt-out concerns by meaningfully educating inmates or otherwise changing its strategy, is, yet again, indicative of an agency that is not sincerely attempting to understand, document, and respond to the dangers of extreme heat.

Mr. Williams described that he made the "difficult" decision to testify in this case as a former corrections-system leader based on his review of how TDCJ has investigated and responded to extreme heat.[528] He described that he came to that decision because of the opinion he formed of

---

525 Trial Tr. (April 2, 2026) 256:23–257:23 (Fitzpatrick).

526 Trial Tr. (Apr. 6, 2026) 19:18–20:11, 23:12–24:8, 25:4–15 (Fitzpatrick); Pls.' Trial Ex. 285-G at 231, 233–240 (S2 Grievances 7 of 9) (grievance enumerating the conditions of transient status including a dirty cell, rats, limited movement, and restricted access to the phone).

527 Trial Tr. (March 31, 2026) 156:2–12 (Collier).

528 Trial Tr. (March 30, 2026) 62:17–63:22.

TDCJ's response—in which he saw "a through line [of] resistance and . . . denial that people are dying," which he called "[v]ery troubling."[529] The evidence at trial supports Mr. Williams' opinion.

### 3. *TDCJ is continuing to rely on clearly insufficient mitigation methods in the face of extreme heat*

During periods of extreme heat, TDCJ implements heat mitigation measures.[530] At the time of trial, these measures were largely the same as at the time of the preliminary injunction hearing.[531] TDCJ's mitigation approaches are described in the agency's Administrative Directive 10.64 ("AD 10.64") policy, which addresses both extreme cold and heat.[532] In response to heat, AD 10.64 encourages hydration, in that "[d]rinking water and cups shall always be available to inmates," and inmates are permitted to have one cup in their possession, with water intake encouraged and, at some times "liquids containing sodium may also be provided."[533] AD 10.64 also allows access to air-conditioned "respite areas"; the current version the policy directs that "staff should use good correctional judgment to accommodate as many requests for respite as possible and to allow inmates to stay in respite as long as possible."[534] The policy further provides for education of staff and inmates about heat risk, and provides for the modification of work and recreation schedules to avoid activity during the hottest part of the day. Additionally, staff are directed to conduct wellness checks during each security round, "visually monitor[ing] or observe[ing] each inmate to identify visible signs of temperature-related illness or distress."[535] Inmates are also allowed to purchase certain items

---

529 *Id.* at 63:22–65:20.
530 Pls.' Trial Ex. 325 (TDCJ AD 10.64 – Revision 12).
531 Trial Tr. (Mar. 31, 2026) 66:23–67:4 (Deitch); 117:13–118:1 (Collier); *compare generally* Pls.' Trial Ex. 324 (TDCJ AD 10.64 – Revision 11), *with* Pls.' Trial Ex. 325 (TDCJ AD 10.64 – Revision 12).
532 *See generally* Pls.' Trial Ex. 325 (TDCJ AD 10.64 – Revision 12); Trial Tr. (April 6, 2026) 147:17–22 (Nichols).
533 Pls.' Trial Ex. 325 at 5 (TDCJ AD 10.64 – Revision 12).
534 *Id* at 7.
535 *Id.* at 3, 7.

from the commissary, like fans, shorts, and electrolytes, and Defendant testified that some of these items are available for free.[536]

Additionally, "[i]n situations where the heat index is above 90˚F," units are directed to:

> (1) "Provide additional chilled water in inmate dorms, housing areas, recreational areas, and during meal times";
> (2) "Allow inmates to use and carry cooling towels";
> (3) "Allow inmates to wear shorts and t-shirts in dayrooms and recreation areas";
> (4) "Allow additional showers for inmates when possible. Lower the water temperature for single showers in each inmate housing area"; and
> (5) "Allow fans for inmates in all custody levels . . . where electrical outlets are available," creating a program to provide fans to indigent inmates, and "only . . . confiscate [fans] if altered or stolen."[537]

In sum, the core mitigation measures used by TDCJ are hydration (including chilled water); respite; education; wellness checks; cool showers; fans and cooling towels; modification of some routines and standards, like schedule changes for work and recreation and the ability to wear shorts and t-shirts; and the provision or availability for purchase of some commissary items.

Plaintiffs introduced evidence at trial that calls into question the sufficiency of these responses. Some salient limitations of the measures in the AD 10.64 are briefly discussed below.

Respite rooms provide only temporary, intermittent relief from a continuous, 24-hour exposure risk. Inmates in un-air-conditioned TDCJ facilities are not exposed to extreme heat for discrete periods during the day; they are exposed continuously while temperatures remain high, including overnight. Dr. Vassallo testified that the heat risk facing TDCJ inmates is not transient, but cumulative: "People are in these conditions all day, 24/7, and anytime day or night, they may be affected by the heat or feel that they need respite."[538] Even if TDCJ inmates get "three or four or five hours" in respite—which is unlikely, given the evidence that inmates can have as few as 15

---

[536] *Id.* at 8; Trial Tr. (March 31, 2026) 281:9–22 (Lumpkin).
[537] Pls.' Trial Ex. 325 at 8–9 (TDCJ AD 10.64 – Revision 12).
[538] Trial Tr. (Mar. 30, 2026) 99:21–100:2 (Vassallo).

Case 2:23-cv-01004-RP Document 350 Filed 09/22/26 Page 80 of 150

minutes in respite[539]—that still leaves "19 or 20 hours in these heat conditions."[540] In Dr. Vassallo's view, "it's the total accumulated heat stress for the 20 hours you're in the [extreme] temperatures" that "matters" from a risk perspective.[541] The scientific literature supports this conclusion: One study found there were ten percent more deaths among individuals who merely visited an air-conditioned location compared to those who had air conditioning in their homes full-time.[542] The inadequacy of intermittent access to respite is also supported by the testimony of witnesses who had been incarcerated in un-air-conditioned TDCJ facilities, with Mr. Malouff testifying that respite rooms were not effective at reducing the effects of the heat on him because "it was short-term," "it really didn't do anything for you, and as soon as you left, you went right back into that heat."[543] Ms. Simmons's experience was similar—she was not allowed to stay in respite for "very long periods of time," and she thought they were ineffective at reducing the physical effects of heat.[544]

Respite rooms also do not protect individuals who are unaware that they need help or unable to actively seek help by trying to enter a respite room, either because of physical or mental illness. As Dr. Vassallo testified, individuals often "don't know they are in trouble" from the heat, so they can "start having cognitive problems from heat illness before they realize they need to go to [a respite room]."[545]

Similarly, while Defendant introduced evidence that cold showers may be effective at dissipating heat—addressing someone who is "actively overheating"[546]—Defendant did not produce

---

539 Prelim. Inj. Hr'g Tr. (July 30, 2024) 41:15–17 (Simmons) (Ms. Simmons was only permitted to stay in respite rooms for 15 minutes to an hour), 186:10–14 (Malouff) (Mr. Malouff was only permitted to stay in respite rooms for 15–20 minutes).
540 Dkt. No. 50–42 at 135:16–18.
541 Prelim. Inj. Hr'g Tr. (July 31, 2024) 43:1–12 (Vassallo).
542 *Id.* at 40:16–41:19 (Vassallo); *see generally* Pls.' Trial Ex. 13 (Prognostic Factors in Heat Wave–Related Deaths).
543 Prelim. Inj. Hr'g Tr. (July 30, 2024) 186:15–21 (Malouff).
544 *Id.* at 47:23–48:13 (Simmons).
545 Dkt. No. 50–42 at 135:19–136:15.
546 Trial Tr. (Apr. 6, 2026) 61:20–22 (Everitt).

Case 3:23-cv-01004-RP-EW Document 451-1 Filed 09/22/25 Page 81 of 150

evidence that cold showers are effective at preventing heat illness. Defense expert Dr. Everitt, who testified that cold showers can effectively help someone who is "suffering from potential heat stroke" confirmed on cross examination that air conditioning—not cold showers—is "the most effective way to prevent" heat stroke.[547] Moreover, Defendant produced no evidence showing that TDCJ showers are cold enough to meaningfully address overheating. While Dr. Vassallo noted that 55 degrees is the water temperature used in ice baths by athletes for recovery[548] and Dr. DeGroot discussed immersion in ice water as a technique to treat overheating,[549] Mr. Collier testified that cold showers are only "a little cooler" than that of normal showers,[550] and Ms. Simmons described TDCJ's cold showers as one where "they turned the heat off."[551] In short, cold showers may be generally ineffective at addressing heat effects given the temperature at which they are provided by TDCJ, but even if the showers reached a much cooler temperature, they would still be insufficient to address long-term exposure because, similarly to respite rooms, they provide only temporary relief. And again, as with respite rooms, cold showers rely on inmates understanding their own heat risk to seek out the mitigation measure.

The provision of ice water for drinking also does not address heat risk in Texas prisons. Dr. Vassallo testified that meaningfully lowering core body temperature through cold water requires pumping "liters and liters of cold water into the stomach and then[] pump[ing] it out," not simply drinking it.[552] Dr. DeGroot similarly cautioned that hydration is "almost to its detriment, overemphasized [as] important," acknowledging that maintaining hydration does not independently protected against heat illness, even though it supports the body's sweating mechanism.[553] The

---

547 *Id.* at 119:11–16 (Everitt).
548 Prelim. Inj. Hr'g Tr. (July 31, 2024) 113:5–9 (Vassallo).
549 Trial Tr. (Apr. 2, 2026) 213:5–214:12 (DeGroot).
550 Trial Tr. (Mar. 31, 2026) 115:5–12 (Collier).
551 Prelim. Inj. Hr'g Tr. (July 30, 2024) 48:20–22 (Simmons).
552 Prelim. Inj. Hr'g Tr. (July 31, 2024) 112:17–113:2 (Vassallo).
553 Trial Tr. (Apr. 2, 2026) 194:7–9 (DeGroot).

Case 3:23-cv-01004-RP-EW Document 350 Filed 09/22/25 Page 82 of 150

scientific literature confirms this conclusion. A meta-analysis introduced into evidence at the preliminary injunction hearing found "insufficient data to assess" the protective effect of extra fluid intake during heat waves, and affirmatively cautioned that "encouragement to drink additional water during a heat wave has recently been associated with severe hyponatremia," a potentially fatal condition caused by dangerously low sodium levels.[554] The Court therefore finds that the provision of ice water is not an adequate response to the substantial risk of serious harm from extreme heat in TDCJ's un-air-conditioned facilities.

Trial evidence likewise confirmed that fans are inadequate to address extreme heat and can even be detrimental to cooling beyond certain temperatures and humidity levels. Dr. Vassallo testified that it is widely accepted that once ambient temperatures reach 90 degrees and higher, fans are unhelpful and can actually increase ambient temperatures by blowing hot air, like a convection oven.[555] This is consistent with guidance from the U.S. Environmental Protection Agency, which warns: "[U]sing a portable electric fan alone when heat index temperatures exceed 99° actually increases the heat stress the body must respond to by blowing air that is warmer than the ideal body temperature over the skin surface."[556] It is also consistent with the scientific literature: A metanalysis introduced at trial found that using fans during a heat wave did not produce a "statistically significant" difference in mortality rates.[557] And as Dr. Uribe noted, fans were present and working in Mr. Castillo's unit when he died—so the fact that he "was drinking water and had access to working fans did not prevent his death from heat."[558]

---

554 Pls.' Trial Ex. 13 at 5–6 (Prognostic Factors in Heat Wave Related Deaths).
555 Trial Tr. (Mar. 30, 2026) at 162:6–163:1 (Vassallo).
556 Excessive Heat Events Guidebook (Mar. 2016), U.S. Env't Prot. Agency, at 37, Dkt. No. 50–28 (emphasis added).
557 Pls.' Trial Ex. 13 at 5–6 (Prognostic Factors in Heat Wave Related Deaths).
558 Prelim. Inj. Hr'g Tr. (July 31, 2024) 289:13–25 (Uribe).

Case 3:23-cv-01004-BAJ-EWD Document 450-1 09/29/25 Page 84 of 151

Wellness checks are similarly insufficient. Defendant presented no evidence at either the preliminary injunction hearing or at trial that simply conducting welfare checks reduces—much less prevents—the risks of heat-related illness of death. Moreover, while heat risk and the health harms of heat develop as a result of heat load over time, once heat illness begins, it can develop very quickly. Plaintiffs' experts therefore opined that "the rapidity, the speed at which heatstroke strikes means that checking people that are walking around, somebody is sleeping in their bed, everything looks fine . . . , and they can still suffer a heatstroke without the correction staff realizing they're in trouble."[559] The Court accordingly finds that welfare checks are not an adequate means of detecting or preventing heat-related illness in a population continuously exposed to extreme temperatures in un-air-conditioned prisons.

Nor is the Court convinced that the other mitigation measures used by TDCJ are sufficient to meaningfully reduce risk from extreme heat. Education may be helpful for identifying signs of heat-related illness, but it does not itself provide cooling. And Defendant produced no evidence that cooling towels meaningfully change heat-related outcomes in TDCJ prisons. Moreover, changes to routines and schedules might mean that inmates are not working or recreating during the hottest part of the day, but they do not change the fact that inmates in un-air-conditioned housing are living in those conditions—with the associated accumulated heat stress and resulting health risk.

Beyond the shortcomings of specific mitigation measures, the overall ineffectiveness of TDCJ's mitigation measures is made clear by the continued occurrence of heat injuries and deaths in Texas prisons. In its order at the preliminary injunction stage, based in large part of evidence of continued deaths and injuries at that time, the Court concluded that TDCJ's "heat mitigation measures . . . are inadequate." *Tiede II*, 796 F. Supp. 3d at 331. The evidence at trial, including the

[559] Dkt. 50-42 at 135:23–136:5.

additional heat-related deaths confirmed by Plaintiffs, the ongoing occurrence of heat-related injuries, and the nearly 15,000 heat-related grievances filed over the last three summers, confirms that conclusion.

Nor was this Court the first to indicate to TDCJ that the agency's mitigation measures are insufficient to keep inmates safe. Many of the same mitigation tools have been found inadequate in the past. In 2017, United States District Court Judge Keith Ellison concluded that "the mitigation measures put in place by TDCJ are insufficient to combat the substantial risk of serious injury or death faced by the inmates at the [Wallace] Pack Unit during the summer months." *Cole v. Collier,* No. 4:14–CV–1698, 2017 WL 3049540, at *10 (S.D. Tex. July 19, 2017). The mitigation measures in place at that time included "provision of ice water, both industrial and personal fans, cool-down showers, access to respite areas, wellness checks, and the training of both correctional officers and inmates on the recognition of heat-related illnesses"—essentially the same core mitigation tools that TDCJ uses today. *See id.* Judge Ellison explained that, "[s]ince the 12 heat-related deaths in 2011 and 2012, TDCJ has implemented, and attempted to implement, many of the mitigation measures discussed by the Fifth Circuit in *Ball v. LeBlanc*." *Id.* (discussing *Ball v. LeBlanc*, 792 F.3d 584, 599 (5th Cir. 2015) [hereinafter "*Ball I*"]); *see also* Conclusions of Law, Section C.3.a., *infra* (discussing the remedies in *Ball I*). In Judge Ellison's view, however, these measures did not "reduce the substantial risk of heat-related illness faced by all of the men at the Pack Unit, and particularly not the men with heat sensitivities." *Cole*, 2017 WL 3049540, at *10. The following year, the Texas House Committee on Corrections reached the same conclusion: "Based on the medical information known about human health and heat-related health risks, TDCJ cannot rely only on mitigation factors to assure the well-being of inmates and corrections personnel."[560]

---

[560] Pls.' Hr'g Ex. 34 at 58 (Interim Report 2018 by the House Committee).

Case 1:23-cv-01004-RP Document 350 Filed 09/22/25 Page 85 of 150

Again, the tools in use by TDCJ in 2017 and 2018—ice water, fans, cool showers, respite, wellness checks, and education—are essentially the same core mitigation tools being used by TDCJ today.[561] Evidence from trial, including Defendant's testimony, indicated that the only change to mitigation measures in the current version of AD 10.64 from the previous version is in respect to the criteria for access to respite rooms.[562] Specifically, the prior version of AD 10.64 (Revision 11), which was in place at the time of preliminary injunction hearing, permitted inmates to request respite at any time and to remain in respite "as long as necessary."[563] Revision 12, however, removed the around-the-clock access language, changed "as long as necessary" to "as long as possible," and vested decisions about respite room access in corrections officers applying "good correctional judgment."[564] Director Lumpkin admitted at trial that there may be times when exercising good correctional judgment means that security concerns prevent access to respite.[565] First, the Court notes that, by its plain language and based on Defendant's testimony, this change seems likely to reduce access to respite rooms. Second, and more broadly, this change underscores a fundamental limitation of mitigation strategies. To the extent that those strategies require moving inmates into new areas, providing them with new materials, or changing their schedules—as opposed to simply having the overall environment in the prison be safe for human habitation—such strategies will always be subject to restrictions and limitations based on security concerns. TDCJ must respond to security concerns. And TDCJ must keep inmates safe, including from extreme heat. If TDCJ may have to restrict the availability of mitigation measures due to security concerns, as the AD 10.63 update implies and as Defendant testified, this points to a tension between the agency's dual

561 Trial Tr. (March 31, 2026) 66:23–67:4 (Deitch).
562 Trial Tr. (March 31, 2026) 250:20–251:7 (Lumpkin). *compare* Pls.' Trial Ex. 324 (TDCJ AD 10.64 – Revision 11), *with* Pls.' Trial Ex. 325 (TDCJ AD 10.64 – Revision 12).
563 Trial Tr. (Mar. 30, 2026) 96:1–12 (Vassallo); *see also* Pls.' Trial Ex. 324 (TDCJ AD 10.64 – Revision 11).
564 Trial Tr. (Mar. 30, 2026) 96:1–12 (Vassallo); *compare generally* Pls.' Trial Ex. 324 (TDCJ AD 10.64 – Revision 11), *with* Pls.' Trial Ex. 325 (TDCJ AD 10.64 – Revision 12).
565 Trial Tr. (March 31, 20226) 280:2–9 (Lumpkin).

obligations. That tension will continue to exist, *i.e.*, TDCJ may have to continue to compromise inmate heat safety to accommodate security needs, so long as TDCJ's heat response relies on providing mitigation instead of simply making the environment safe.

Finally, the Court addresses some of Defendant's arguments for the sufficiency of TDCJ's mitigation measures. First, while Defendant's witnesses testified to TDCJ's process for auditing the implementation of heat mitigation measures,[566] because those measures are medically insufficient, as discussed above, even perfect implementation would not be protective. The audits conducted by TDCJ's "heat strike team"[567] are not, in and of themselves, protective from heat, and they cannot make otherwise insufficient mitigation measures sufficient.

Second, the Court notes that Defendant introduced evidence at trial that TDCJ's heat-mitigation measures match certain military approaches to heat mitigation[568] and National Institute for Occupational Safety and Health ("NIOSH") standards for occupational heat mitigation.[569] However, the Court is unconvinced that these comparisons are useful, because such standards primarily deal with, respectively, exposure to heat during exertion in a primarily young and healthy population (the military),[570] and with workplace exposure to heat over the course of a workday (NIOSH).[571] These standards are therefore of limited use in considering long-term exposure to heat in housing areas for the majority of the day, every day, in a population with a high concentration of physical and mental illnesses and limited ability to make choices about where or how to spend their time, as is the concern in TDCJ's prisons. Moreover, comparison to outside standards does not

566 *See, e.g.,* Trial Tr. (April 2, 2026) 49:23–50:8 (Echessa).
567 *Id.*
568 Trial Tr. (April 2, 2026) 202:21–203:2 (DeGroot).
569 *See generally* Def. Ex. 180 (NIOSH Report "Criteria for a Recommended Standard: Occupational Exposure to Heat and Hot Environments").
570 Trial Tr. (April 2, 2026) 225:10–228:24 (DeGroot).
571 *See, e.g.*, Def. Ex. 180 at 7.

relieve TDCJ of the obligation to respond to the actual conditions occurring in its facilities.[572] Here, those conditions include ongoing heat-related illnesses and deaths.

Third, to argue that TDCJ's mitigation approach is sufficient, Defendant also relies on the testimony of Todd Ishee, the former head of the North Carolina prison system, who was retained by TDCJ to review its heat mitigation practices.[573] Ishee testified that Texas was one of the states that North Carolina "benchmarked" with when assessing North Carolina prisons' heat mitigation measures.[574] He further testified that under his direction, North Carolina "incorporated some of the elements from TDCJ's [heat mitigation] policy," because they "felt that it was a very good one."[575] However, any implication from Mr. Ishee's testimony that Texas's mitigation approach is a sufficient response to extreme heat is sharply undercut by the fact that, when he assumed control of the North Carolina prison system, Mr. Ishee immediately began to implement system-wide air conditioning.[576] In fact, Mr. Ishee testified that he immediately requested full funding for air conditioning the un-air-conditioned units in North Carolina, and that he continued making his case to the Legislature until the project was fully funded.[577] While Mr. Ishee testified that funding for air conditioning in North Carolina later became more complicated,[578] his immediate work to install system-wide air-conditioning indicates that, in North Carolina, mitigation measures were only a temporary, stopgap response while the solution—air-conditioning—was implemented. Mr. Ishee's explanation of his decision to implement air conditioning underscores this point:

> During my time in North Carolina, early on, really, as soon as I arrived in 2019, I had some onboarding briefings and became aware that our system at the time had about

[572] *See, e.g,* Trial Tr. (April 6, 2026) 270:16–21 (Ishee) (testifying as an expert in prison management and prison practices and agreeing that, to understand if a policy is working, you have to look at safety outcomes, among other evaluative metrics.).
[573] *Id.* at 244:11–18 (Ishee).
[574] *Id.* at 247:23–248:1 (Ishee).
[575] *Id.* at 248:3–9 (Ishee).
[576] *Id.* at 288:9–289:7 (Ishee).
[577] *Id.*
[578] *Id.* at 289:14–291:6 (Ishee).

Case 3:23-cv-01004-RP Document 450 Filed 09/22/25 Page 88 of 150

> 60 percent of the beds were air-conditioned and 40 percent were not. I knew that, you know, being in a southern climate, that was going to be a challenge and an issue that I felt was important to tackle. I very quickly—you know, having worked as a correction officer on the line in a non air-conditioned prison, you know, I knew the effects it had on the staff. And so, you know, I thought that that was an issue that was important enough to tackle and try to achieve systemwide cool beds throughout North Carolina.[579]

Mr. Ishee's testimony does not support a conclusion that TDCJ's mitigation policy is a sufficient response to extreme heat. Rather, the evidence discussed above shows that every TDCJ inmate housed in un-air-conditioned housing is at significant risk of serious health consequences and, even absent those health effects, faces inhumane and dehumanizing conditions due to prolonged exposure to extreme heat—and that the mitigation measures that TDCJ provides do not reasonably reduce those risks or ameliorate those conditions.

### 4. *TDCJ has not taken reasonable steps to implement air-conditioning*

TDCJ states that its ultimate goal is to install air-conditioning, and recognizes that such cooling will ultimately protect human health. Unfortunately, TDCJ's lack of progress in air-conditioning Texas prisons stands in stark contrast to Mr. Ishee's immediate actions to begin implementing statewide air-conditioning in North Carolina.

#### *a. TDCJ has Recognized that Air-Conditioning Should be Installed, and the Necessity of Air-Conditioning Matches both Medical Experts' Opinions and the Evidence of Outcomes in TDCJ Facilities.*

At the preliminary injunction stage, Defendant's predecessor, Mr. Collier, recognized that air conditioning is the best solution to reduce temperatures in TDCJ facilities and testified that it is "absolutely" the goal of the agency to install air conditioning in all housing areas.[580] And in his deposition for trial, Director Lumpkin admitted that "[a]ir conditioning is the only effective protection from the extreme heat."[581] Director Lumpkin likewise admits that air conditioning is

---

579 *Id.* at 245:23–246:10 (Ishee).
580 PI Hearing Tr. (August 2, 2024), at 179:5–9; 254:24–255:20 (Collier).
581 Lumpkin Dep. 184:14–18, Dkt. No. 337–1.

"necessary in order to protect inmates' health and safety."[582] And he admitted to understanding that "the way to solve this problem is with air conditioning," and that TDCJ has to "get rid of the heat . . . by air-conditioning the system."[583] Mr. Collier conceded that, if TDCJ had air conditioning, it could "do away with" its heat-mitigation measures entirely.[584] Systemwide air conditioning is TDCJ's "goal,"[585] and Director Lumpkin agrees that "you need to air condition the prison system."[586]

Paul Morales, TDCJ's thirty-one-year corrections veteran and correctional risk management expert at the preliminary injunction hearing, confirmed that "air conditioning units would eliminate the risk of injury from the heat."[587] John Baldwin, Mr. Collier's corrections expert at the preliminary injunction hearing, confirmed that air conditioning "completely eliminates the danger of high heat in Texas prisons," and that both he and Mr. Collier know "the solution is air conditioning."[588] And Mr. Collier himself confirmed that installing air conditioning is "the only way" he knows to "reduce the temperatures" in TDCJ prisons.[589]

Mr. Collier's Rule 30(b)(6) designee, David Sweetin, testified that installing air conditioning "is the right thing to do, it is the humane thing to do, and it is something [TDCJ] should have done a long time ago."[590] Mr. Sweetin testified that it is "the right thing to do because of the increased temperatures that the state is seeing, the increase of medication that . . . inmates are on as opposed

582 *Id.* at 111:6–9.
583 *Id.* at 32:2–5, 40:13–18.
584 Prelim. Inj. Hr'g Tr. (Aug. 2, 2024) 264:8–10 (Lumpkin).
585 Trial Tr. (Apr. 9, 2026) 241:5–242:1 (Hudson).
586 Trial Tr. (Mar. 31, 2026) 237:19–23 (Lumpkin).
587 Prelim. Inj. Hr'g Tr. (Aug. 1, 2024) 276:8–12 (Morales).
588 Prelim. Inj. Hr'g Tr. (Aug. 2, 2024) 31:16–19 (Baldwin).
589 *Id.* at 255:17–20 (Collier).
590 Pls.' Dep. Designations for Prelim. Inj. Hr'g 7, Dkt. No. 155 (304:23–305:4).

to 20 years ago, 30 years ago, 40 years ago," and because "[t]here's a lot of factors that exacerbate the need for wanting to air condition" TDCJ facilities.[591]

Other correctional experts have reached the same conclusion. As discussed above, *see* Findings of Fact, Section C.3, *supra*, Mr. Ishee immediately began working to implement system-wide air-conditioning when he assumed control of the North Carolina prison system. And Mr. Williams characterized TDCJ's reliance on heat-mitigation measures as an approach that "accepts the fact that … people are going to die" from heat rather than fixing the underlying problem, which, he explained, "can't be fixed by other means" than air conditioning.[592] Mr. Williams opined that "[t]he fix is air conditioning,"[593] and the "cure" is to air-condition the system.[594]

Credible testimony from Plaintiffs' medical experts also confirmed the need for air-conditioning. Dr. Vassallo explained that TDCJ inmates are "still dying" from extreme heat despite the mitigation measures, because those measures "do[] not remove the heat."[595] Dr. Vassallo opined that having working air conditioning has been "associated with an 80% reduction in the risk of death due to heat and cardiovascular disease and a 66% reduction in mortality due to cardiovascular disease."[596] "In one study, it was estimated that 50% of the deaths related to a heat wave could have been prevented with a working air conditioner. Lack of air-conditioning was reported in 91% of deaths in one report."[597] Dr. Vassallo opined that this data is "directly applicable [to] the Texas prisons."[598] In her view, "excess morbidity and mortality in TDCJ facilities resulting from the extreme heat of the Texas summers can only be combated by bringing the temperature in the

---

591 *Id.* at 2 (38:13–39:11).
592 Prelim. Inj. Hr'g Tr. (July 31, 2024) 255:3–256:1 (Williams).
593 Trial Tr. (Mar. 30, 2026) 61:21 (Williams).
594 Prelim. Inj. Hr'g Tr. (July 31, 2024) 255:21–256:1 (Williams).
595 Prelim. Inj. Hr'g Tr. (July 31, 2024) 39:4–12 (Vassallo).
596 Pls.' Trial Ex. 113 at ¶ 40 (Vassallo Declaration).
597 *Id.*
598 *Id.*

Case 3:23-cv-01304-BAJ-EWD Document 460-1 Filed 09/29/26 Page 92 of 151

prisons down."[599] "[P]utting everyone" in the TDCJ system "in air-conditioned housing [is] the only way to eliminate the heat risk and the deaths and illnesses."[600] Or, as Dr. Vassallo put it, if "[y]ou remove the heat" with air conditioning, then "nobody dies [from the] heat."[601]

Dr. Biswas agreed that "air conditioning is the absolute comprehensive way to reduce mental illness symptoms in the carceral setting due to heat," and it is "the only way to reduce psychiatric risk due to heat."[602] She testified that hydration and other measures do not address the root problem, because they do not "lower your core body temperature."[603] Dr. Biswas said: "[T]o lower your core body temperature, you need air conditioning and that is the most comprehensive thing you can do to reduce this serious exacerbation of mental illness we see in these populations in heat."[604]

Defense witness Dr. Everitt confirmed that air conditioning is "the most effective way to prevent" heat stroke, stating: "If you have it available, it's probably where I prefer to be or where I would prefer a patient to be is an air-conditioned area."[605]

While the Court concludes that TDCJ has not, in fact, made reasonable efforts to install air conditioning in light of the seriousness of the problem, as is discussed below, it is meaningful that even TDCJ staff recognize that air conditioning must ultimately be installed to address the problem of extreme heat. The Court likewise credits the testimony of the many witnesses—Plaintiffs' experts, defense experts, and fact witnesses—who explained why air conditioning is necessary to reasonably address the risks created by extreme heat in Texas's prisons. The need to install air conditioning is finally confirmed by the conditions in TDCJ's prisons. As discussed above, in light of continuing

---

599 *Id.* (emphasis removed).
600 Prelim. Inj. Hr'g Tr. (July 31, 2024) 71:11–14 (Vassallo).
601 *Id.* at 39:9–12 (Vassallo).
602 Trial Tr. (Mar. 30, 2026) 323:2–7 (Biswas).
603 *Id.* at 296:24–297:3 (Biswas).
604 *Id.*
605 Trial Tr. (Apr. 6, 2026) 119:11–16 (Everitt).

deaths and injuries in un-air-conditioned prisons, it is clear that mitigation methods alone are not sufficient to reduce suffering to socially acceptable levels. The remaining solution, as recognized by correctional experts, medical experts, and TDCJ's own staff, is air conditioning.

*b. TDCJ has not taken reasonable steps to install air conditioning on the timeline that it has identified as possible.*

Despite Defendant's direct acknowledgement that TDCJ must install air conditioning "as fast as [it] can,"[606] testimony at trial showed that TDCJ is not making reasonable efforts to install air-conditioning even on the timeline that the agency has repeatedly identified as possible. First, TDCJ's current pace of air-conditioning installation is far too slow to reasonably address heat risk. And second, TDCJ has never committed to a plan to install system-wide air conditioning. TDCJ's refusal to commit to a timeline for installing air-conditioning—and its lack of a current plan, as discussed below—makes it difficult for the Court to credit the agency's assertion that faster installation of air-conditioning is just around the corner.

**The Pace of Air-Conditioning Installation:**

At the time of the July 2024 preliminary injunction hearing, "[a]pproximately 96,500 of TDCJ's 142,240 beds [were] unair-conditioned."[607] At that time, the Court noted that, "even at a rate of 3,100 new air-conditioned beds per year (which is the rate TDCJ averaged in 2023 and 2024), it would take TDCJ 30 years—i.e., until 2054—to install permanent air conditioning throughout the system."[608] The Court found this 30-year timeline constitutionally deficient, as it "exposes over 95,000 inmates to the substantial risk of serious injury or death from un[-]air-conditioned prisons and, assuming normal rates of inmate turnover, would continue to expose hundreds of thousands of inmates to the substantial risk of injury or death from extreme heat over the next two to three

[606] Trial Tr. (Mar. 31, 2026) 237:19–23 (Lumpkin).
[607] *Tiede II*, 796 F. Supp. 3d at 320.
[608] *Id.*

decades."[609] Director Lumpkin agreed that a 25-year timeline to fully air condition the system is "unacceptable,"[610] and the Director's corrections expert Mr. Ishee said a 23-year timeline would be "too slow," "too long," and "too much time."[611]

However, looking at the actual pace of air-conditioning installation that TDCJ has achieved since the preliminary injunction hearing, TDCJ has not increased the pace of installation sufficiently to alter the constitutional calculus. In June 2024, TDCJ had only 45,689 cool beds available.[612] As of March 25, 2026, TDCJ had 52,438 cool beds available.[613] This means that TDCJ installed approximately 6,749 new air-conditioned beds in the 21-month period between June 2024 and March 2026—a rate of approximately 3,857 new air-conditioned beds per year.[614] It also means that 88,697 TDCJ inmates are still without air-conditioned beds.[615] Assuming the inmate population remains flat and TDCJ continues at a rate of 3,857 new air-conditioned beds per year, it would take TDCJ roughly 23 years to fully air condition the system.[616]

This 23-year timeline does not account for TDCJ's recent or estimated inmate population growth. Since June 2024, TDCJ's inmate population has increased by 7,006 inmates, from 134,129 to 141,135.[617] Over that same period, TDCJ added only 6,749 new air-conditioned beds.[618] The gap between inmates and air-conditioned beds therefore widened. And TDCJ's inmate population is expected to grow substantially for the foreseeable future: the Legislative Budget Board's most recent projections estimate that TDCJ's inmate population will increase by nearly 10,000 additional inmates

---

609 *Id.* at 332.
610 Lumpkin Dep. 214:18–22, 215:4–12, Dkt. No. 337–1.
611 Trial Tr. (Apr. 6, 2026) 301:22–25, 302:21–303:2 (Ishee).
612 *See generally* Pls.' Trial Ex. 150 (TDCJ's Cool Bed Dashboard – June 28, 2024).
613 *See generally* Def.'s Trial Ex. 254 (TDCJ AC Dashboard – March 25, 2026).
614 Trial Tr. (Apr. 6, 2026) 297:13–17 (Ishee).
615 *Id.* at 298:4–8 (Ishee).
616 *Id.* at 298:9–11 (Ishee).
617 Trial Tr. (Mar. 31, 2026) 70:17–71:2 (Deitch); *compare generally* Pls.' Trial Ex. 281-A (LBB Inmate Population – June 2024), *with* Pls.' Trial Ex. 281-B (LBB Inmate Population – February 2026).
618 Trial Tr. (Apr. 6, 2026) 297:13–17 (Ishee).

by August 2027, for a total of 151,116 inmates.[619] This means that TDCJ would need to add roughly 10,000 new air-conditioned beds between April 2026 and August 2027 just to keep up with the projected pace of population growth[620]—a rate that the agency has never yet achieved.

The Court also acknowledges that Plaintiffs introduced substantial evidence at trial indicating that TDCJ could achieve faster installation of air conditioning by adopting more streamlined project delivery methods and by bundling air-conditioning contracts, i.e., having contractors bid to perform multiple projects in an area or region together.[621] The Court does not make any definitive findings here about what project delivery method or contract structure TDCJ could most efficiently employ. However, the Court does note that—despite TDCJ having not used more streamlined project delivery methods for years[622] and having recently rejected a contractor's request to bundle projects[623]—the agency now admits that its approach is "not working" and that it intends to start utilizing bundling and possibly one of Plaintiffs' proposed project delivery methods.[624]

Defendant's witnesses argued at trial, in part on the basis that the agency is taking steps like considering bundling projects, that TDCJ is laying the groundwork for significant increases in the pace of its future air-conditioning installation.[625] However, as discussed below, TDCJ has never committed to a concrete plan to install system-wide air conditioning; the Chairman of the Texas

---

[619] Trial Tr. (Mar. 31, 2026) 74:22–24 (Deitch); *see generally* Pls.' Trial Ex. 283 (Professor Deitch's Demonstrative).

[620] Trial Tr. (Mar. 31, 2026) 76:12–16 (Deitch).

[621] See, e.g., Trial Tr. (Mar. 30, 2026) 339:18–19 (Carroll) (explaining that design-bid-build, the project delivery method TDCJ has almost exclusively used, is "absolutely the slowest possible way to get a project delivered."); Trial Tr. (Apr. 1, 2026) 134:4–20 (Ramey) (discussing the efficiencies gained by bundling).

[622] Trial Tr. (Apr. 8, 2026) 216:17–24 (Cox).

[623] Trial Tr. (Apr. 1, 2026) 54:17–55:6 (Steigerwalt) (explaining that HTX Industries, a TDCJ contractor, submitted a proposal to bundle three current projects—Hightower, Boyd, and Stevenson—into a single contract, offered a $1.5 million discount to do so, and outlined the scheduling and administrative efficiencies that would result, but that TDCJ rejected the proposal).

[624] Trial Tr. (Apr. 8, 2026) 213:8–9, 159:7–12, 176:3–10 (Cox).

[625] *See, e.g., id.* at 194:22–195:19 (Cox).

Case 3:23-cv-01004-RP Document 450 Filed 09/29/25 Page 95 of 150

Board of Criminal Justice, Mr. Nichols, called TDCJ's current plan "something a little bit more than swag"[626]; and, since trial, TDCJ has failed to request the funds necessary to follow the purported plan it presented to the Court. TDCJ's lack of commitment to installing air conditioning on any timeline and the absence of a credible plan to do so makes it difficult for the Court to credit the agency's suggested—but hypothetical—future significant improvements in the speed of air-conditioning installation.

**Plans to Install System-Wide Air-Condition:**

At the preliminary injunction hearing, TDCJ presented a "Four-Phase[]" plan to install air conditioning.[627] That plan would have seen system-wide air conditioning completed by the end of fiscal year 2030-31 biennium.[628] The Four-Phase Plan estimated that it would cost $1.1 billion to fully air condition the system and required TDCJ to request $319 million in the second phase of the plan (for the fiscal year 2026-27 biennium).[629] In actuality, as discussed below, TDCJ instead published an second plan that appeared to shift funding requests to later years.[630] Under that plan, TDCJ requested $118 million for the 2026-27 biennium for air-conditioning projects—slightly over a third of what the agency had originally projected was necessary to follow its Four-Phase plan.[631]

This second iteration of TDCJ's plan, presented in 2025, was a three-phase plan to install air conditioning.[632] That plan still projected completing air-conditioning by the end of the 2030-31 biennium.[633] TDCJ requested, and received, the first tranche of money needed under this plan: $118 million for the 2026-27 biennium[634]—but again, this sum was only slightly over a third of what

626 Trial Tr. (Apr. 6, 2026) 221:1-222:24 (Nichols).
627 Pls.' Trial Ex. 323 (Four–Phase Plan).
628 *Id.*
629 *Id.*
630 Def.'s Trial Ex. 20 (TDCJ's Three–Phase Plan).
631 Trial Tr. (March 31, 2026) 318:5–10 (Collier).
632 Def.'s Trial Ex. 20 (TDCJ's Three–Phase Plan); Def.'s Mot. for Summ. J. 12, Dkt. No. 251.
633 Def.'s Trial Ex. 20 (TDCJ's Three–Phase Plan).
634 Trial Tr. (March 31, 2026) 196:20–23 (Collier).

TDCJ had originally said it would request in that biennium under its previous plan.[635] Moreover, while under the previous Four-Phase Plan, TDCJ had projected requesting $322.4 million in the fiscal-year 2028-29 biennium, the new Three-Phase Plan indicated that TDCJ would need to request $620.4 million for 2028-29.[636] In other words, under the Three-Phase plan, TDCJ shrunk its 2026-27 request while almost doubling its projected 2028-29 request. As a result, under the Three-Phase Plan, TDCJ would have next had to request more than five times the $118 million it requested and received for the 2026-27 biennium. However, in his October 2025 deposition, Director Lumpkin refused to commit to even requesting the $620.4 million in funding identified in phase two of the Three-Phase Plan.[637] Asked whether he would request the funds, he admitted: "I can't promise it will happen."[638] At trial, Director Lumpkin again indicated refused to commit to "even asking for the amount of money that [he] knows to be necessary to air condition the system."[639] Mr. Collier, likewise, testified that the three-phase plan does not reflect any "commitment" by TDCJ to request those specific amounts from the Legislature,[640] and he acknowledged that the three-phase plan "isn't TDCJ's appropriations request to the Legislature."[641]

This repeated refusal to even commit to asking for the funds that the agency has identified as necessary is particularly troubling to the Court. The Court notes that Defendant and his witnesses suggested at trial that TDCJ cannot commit to requesting more funds from the Legislature than it can obligate in a given biennium.[642] Yet Mr. Collier indicated that the phases in the Three-Phase Plan, which he would not commit to, were based on what TDCJ "knew we could actually do and get

---

635 *See* Pls.' Trial Ex. 323 (Four–Phase Plan).
636 *Compare* Pls.' Trial Ex. 323 (Four–Phase Plan) *with* Def.'s Trial Ex. 20 (TDCJ's Three–Phase Plan).
637 Lumpkin Dep. 201:16–21, Dkt. No. 332-4 ("I couldn't commit today.").
638 *Id.* at 203:5–9.
639 Trial Tr. (March 31, 2026) 242:8–15 (Lumpkin).
640 Lumpkin Dep. 209:20–23, Dkt. No. 332-4.
641 *Id.* at 208:24–209–1.
642 *E.g.*, Trial Tr. (March 31, 2026) 243:7–13 (Lumpkin).

encumbered and get completed in projects."[643] As a result, concerns about obligating funds should not have prevented Defendant or his predecessor from committing to TDCJ's Three-Phase Plan.

Most saliently, at trial, Defendant presented a new Two-Phase Plan, published in March 2026.[644] As with TDCJ's previous plans, the Two-Phase Plan projects installing system-wide air-conditioning by the end of 2031.[645] The Two-Phase Plan estimates that TDCJ will require $774.3 million for air-conditioning in the fiscal year 2028-29 biennium and $730.7 million in the fiscal year 2030-31 biennium.[646]

Defendant introduced witnesses, including Mr. Ishee, to testify that this plan is "intentional and disciplined" and "realistic."[647] However, Chairman Nichols made clear that TDCJ has no intention of following its Two-Phase Plan. When asked whether he could commit that TDCJ will request the funding required for its plan, the Chairman responded that "[f]irst of all, when you call it a plan, I respectfully disagree with that . . . I don't think that was ever part of a plan. My understanding of that document was that it was a -- it was like a[,] how could something potentially be done. But I don't think calling that a plan, I don't think that's appropriate."[648] Chairman Nichols then called the Two-Phase Plan "something a little bit more than swag" and "when you say it's a plan, from a board perspective, that was never a situation where if somebody drafted that document thinking that we were going to get a draft [legislative appropriations request] that had 770 million in it for the first phase or 775 for the second phase, that was not . . . what that document represents."[649]

---

643 *Id.* at 198:20–199:13 (Collier).
644 Def. Tr. Ex. 256 (Two-Phase Plan).
645 *Id.*
646 *Id.*
647 Trial Tr. (Apr. 6, 2026) 303:3-6, 306:23–307:7 (Ishee).
648 Trial Tr. (April 6, 2026) 221:10–22 (Nichols).
649 *Id.* at 222:12–24

These comments make clear that the document Defendant presented at trial as evidence of TDCJ's current approach to installing system-wide air conditioning is not an actual plan and is not an approach that TDCJ intends to follow. More tellingly still, the Court takes judicial notice of TDCJ's 2028-29 biennium legislative appropriations request to the Texas Legislature—in which the agency requests $298.02 million to "fund projects identified in the agency's FY 2028-29 Capital Expenditure Plan to install HVAC in inmate housing areas."[650] This request represents significantly less than half of the $774.3 million that TDCJ estimated it could obligate in the 2028-29 biennium in its Two-Phase Plan, and is a concrete and obvious indication that the agency is not even attempting to following that plan. This is despite the fact that Mr. Collier testified that TDCJ has never received any pushback from the Legislature, the Governor's office, or anyone else with regard to the amount of funding it could request for air conditioning.[651] Nor did anyone ever tell Mr. Collier that there was a "cap or limit" on what funding TDCJ could request from the Legislature for air conditioning.[652]

---

650 Under Rule 201 of the Federal Rules of Evidence, the Court may take judicial notice of a fact that is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. The Court concludes that, as to TDCJ's legislative appropriations request, the Texas Legislative Budget Board's documentation of that request is such a source, and the amounts in that request are such a fact. *See* Texas Department of Criminal Justice Legislative Appropriations Request, Fiscal Years 2028-2029, available through *https://perma.cc/A6B8-DUQU*, at PDF page 289 (requesting $298,023,400).

651 Trial Tr. (Mar. 31, 2026) 161:15–162:16 (Collier).

652 *Id.* at 162:2–4 (Collier). The Court also notes here that, even crediting TDCJ's own estimate that system-wide permanent air conditioning would cost approximately $1.5 billion, that sum is a small fraction of the resources the State has projected as available: the Comptroller's Certification Revenue Estimate for the 2026–27 biennium projected roughly $203.63 billion in General Revenue-related funds available, which would support general-purpose spending of $198.97 billion. That is expected to result in an ending General Revenue-related certification balance of $4.66 billion. Further, the Comptroller's Certification Revenue Estimate projects an Economic Stabilization Fund balance of about $28.5 billion at the close of the biennium. Kelly Hancock, *2026-2027 Certification Revenue Estimate*, Texas Comptroller of Public Accounts, at PDF page 1 (Oct. 14, 2025), available at ____. Again, under Rule 201 of the Federal Rules of Evidence, that Court may take judicial notice of a fact that is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. The Court finds that the available fund balances and budget surplus as estimated by the Texas Comptroller of Public Accounts is such a fact, and that the Texas Comptroller of Public Accounts is a source whose accuracy cannot reasonably be questioned.

**System-Wide Air-Conditioning is Feasible:**

Finally, the Court concludes that installing system-wide air-conditioning is feasible. Defendant and his experts repeatedly asserted that the speed of air-conditioning installation is a question of prioritization and resources, not a question of whether the system *can* be air-conditioned.[653] And despite clear indications that TDCJ does not intend to pursue air-conditioning on the timeline that agency staff have identified as achievable, TDCJ witnesses, including Defendant, have consistently maintained that air-conditioning the system is possible and is—though only on some unspecified timeline—TDCJ's plan.[654]

Temperature controls implemented in other systems confirm that system-wide air conditioning is a feasible and reasonable goal. Since 1994, state-wide regulations adopted by the Texas Commission on Jail Standards have required all jails in Texas to maintain indoor temperatures between 65 degrees and 85 degrees.[655] Other buildings in Texas must maintain a temperature suitable for the comfort of the residents (e.g., between 71 degrees and 81 degrees).[656] Elsewhere in the South, North Carolina's administrative code for its jail system requires "heating, ventilation, and air conditioning systems that are capable of maintaining temperatures in confinement units at not less than 68 degrees Fahrenheit during the heating season and not more than 85 degrees Fahrenheit during the cooling season."[657] Tennessee requires that local correctional facilities "have a temperature of not less than sixty-five (65) degrees Fahrenheit and not more than eighty (80) degrees Fahrenheit."[658] And, while there are no temperature requirements under federal law, the Bureau of Prisons operations manual says that target temperatures should be 76 degrees in the summer and 68

[653] *E.g.*, Trial Tr. (April 8, 2026) 162:25–163:13 (Cox).
[654] Trial Tr. (Mar. 31, 2026) 237:19–23 (Lumpkin).
[655] 37 Tex. Admin. Code §§ 259.160, 260.154, 261.255.
[656] *See* 26 Tex. Admin. Code § 554.321(a–b).
[657] ECF 50–1, D. Williams Decl. (Apr. 11, 2024) ¶ 19 (referencing 10A N.C. Admin. Code 14J.1217).
[658] *Id.* ¶ 20 (referencing Tenn. Comp. R. & Regs. 1400–01–.04).

degrees in the winter, with the caveat that facilities may be a few degrees higher or lower.[659] There is no doubt that TDCJ is capable of implementing and operating system-wide air conditioning.

**D. Conclusion**

Every TDCJ inmate living in un-air-conditioned housing faces significant risks to health and life each summer—and the majority of TDCJ inmates face still-greater health risks because of underlying conditions and medical prescriptions.[660] Moreover, even where inmates living in un-air-conditioned prisons are not injured and do not die, they are living in conditions that cause severe human suffering.[661]

TDCJ has failed to act reasonably to investigate and understand the dangers that heat poses to inmates, despite knowing of severe risk and widespread suffering.[662] And these risks and this suffering are not reasonably abated by TDCJ's mitigation measures, nor by its woefully underinclusive heat score system.[663] TDCJ's mitigation measures have been failing to protect inmates for years, as indicated both by courts and by the Texas House Committee on Corrections, but the agency has continued to rely on those methods.[664]

What is more, while relying on insufficient mitigation measures, TDCJ has not acted with reasonable urgency to install air-conditioning. If every cool-bed-installation project that TDCJ currently has anywhere in process—in construction, in procurement, or even simply being designed—was credited as being complete today, the agency would still be leaving some 48,000 inmates living in un-air-conditioned housing.[665] The Court also notes here that, while TDCJ staff

---

659 *Id.* ¶ 16.
660 *See* Findings of Fact, Section B, *supra.*
661 *See* Findings of Fact, Section B.3, *supra.*
662 *See* Findings of Fact, Section C.2, *supra.*
663 *See* Findings of Fact, Section C.3, *supra.*
664 *Id.*
665 Defense witnesses testified that TDCJ has 12,584 beds under construction, 18,922 beds in procurement, and 9,206 beds in design. Trial Tr. (April 9, 2026) 270:10–14 (Hudson). This amounts to 40,712 beds in some stage of the process. As of March 25, 2026, TDCJ had 52,438 cool beds available. *See generally* Def.'s Trial Ex.

suggested approximate completion dates for units in construction, and dates when there units in procurement "should" be online, TDCJ staff could not generally commit to any completion date for units in design.[666] And given that TDJC's population is projected to grow, the picture is still grimmer: even crediting TDCJ's most ambitious timeline, under which the agency expects to complete 91,000 total cool beds by the end of 2027 or early 2028,[667] TDCJ's expected population growth to more than 150,000 inmates by the end of 2027[668] would leave some 59,000 inmates living in un-air-conditioned housing.

Despite this, TDCJ does not have, and has never had, a concrete plan to install system-wide air conditioning. The agency has presented the Texas Legislature with a series of plans—a Four-Phase, Three-Phase, and now Two-Phase Plan—to complete air-conditioning by the end of 2031.[669] TDCJ's own Director of Engineering, Mr. Cox, stated in his deposition and testified that, were TDCJ to obtain the necessary funds, the agency could complete air-conditioning even faster: within 36 to 51 months.[670] In fact, Mr. Cox affirmed at trial that this is a "very doable timeframe" and "not unreasonable."[671] And yet both former director Collier and Director Lumpkin refused to commit to even requesting the funding necessary to follow the agency's purported plans. And now, in its most recent legislative appropriations request, instead of demonstrating a committed attempt to meet either the timeline repeatedly identified in TDCJ's plans or the timeline identified by Mr. Cox,

254 (TDCJ AC Dashboard – March 25, 2026). If all of TDCJ's in-process beds were complete, TDCJ would have had 93,150 beds available—for a population of more than 141,000 inmates. *See* Pls.' Trial Ex. 281-B (LBB Inmate Population – February 2026).

666 See generally Trial Tr. (April 9, 2026) 270:10–278:19 (Hudson).

667 Trial Tr. (April 9, 2026) 253:11–23 (Hudson).

668 Pls.' Tr. Ex. 283 (Prof. Deitch's Demonstrative) (showing Legislative Budget Board and Texas Sunset Commission projections for TDCJ population growth).

669 Pls.' Trial Ex. 323 (Four–Phase Plan); Def.'s Trial Ex. 20 (TDCJ's Three–Phase Plan); Def. Tr. Ex. 256 (Two-Phase Plan).

670 Cox Dep. 130:5-15, Dkt. No. 332-8; Trial Tr. (Apr. 8, 2026) 163:19–22 (Cox).

671 *Id.* (testifying that, "if [the procurement steps] all worked in lockstep, yes, that is a very doable timeframe. That 36 to 51 months is not unreasonable.").

Director Lumpkin has requested less than half of the funding he identified as needed for the next step of the Two-Phase Plan.

## III. CONCLUSIONS OF LAW

### A. Standing

Under Article III of the U.S. Constitution, federal court jurisdiction is limited to cases and controversies. U.S. Const. art. III, 2, cl. 1; *Raines v. Byrd*, 521 U.S. 811, 818 (1997). A key element of the case-or-controversy requirement is that a plaintiff must establish standing to sue. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). To establish Article III standing, a plaintiff must demonstrate that she has (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *See Lujan*, 504 U.S. at 560–61. Only one plaintiff must have standing "to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006).

"The party invoking federal jurisdiction bears the burden of establishing these elements," and "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. "[A]t the final stage, those facts (if controverted) must be 'supported adequately by the evidence adduced at trial.'" *Id.* (quoting *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 115 n.31 (1979)).

Plaintiffs claim associational standing—standing to represent their members or putative members. (2d Am. Compl., Dkt. 240, at 56–57; Resp. M. Summ. J., Dkt. 257, at 27). The Supreme Court has established a three-part test for associational standing, explaining that:

> an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). The Court has repeatedly held that Plaintiffs here "meet the requirements of associational standing,"[672] and evidence presented at trial confirms that determination.

***1. Plaintiffs have standing to pursue this action***

*a. Lioness has standing as a traditional voluntary membership organization*

Lioness is a traditional "voluntary membership organization with identifiable members." *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 201 (2023) ("*SFFA III*"). The evidence shows that Lioness has hundreds of members who joined voluntarily, support the organization's mission, and are current TDCJ inmates assigned to un-air-conditioned units.[673] Lioness has had members in every TDCJ women's-only facility, including members in at least eight un-air-conditioned units.[674] Evidence introduced by Defendant at trial confirms this: the affidavit of Mr. Rheams of the Office of the Attorney General, offered as Defendant's Exhibit 2 and validated as accurate by TDCJ's Timothy Fitzpatrick, established that 329 of Lioness's members are in TDCJ custody and approximately 118 of those members are housed in un-air-conditioned units.[675]

Lioness's members would also have standing to sue in their own right. Members housed in un-air-conditioned units in particular face a "substantial risk of serious harm and death" from the extreme heat; that injury is traceable to Director Lumpkin's deliberate indifference and his refusal to take the steps necessary to protect members from the extreme summer heat; and the injunctive relief sought will redress their injuries. *See Crawford v. Hinds Cnty. Bd. of Supervisors*, 1 F.4th 371, 375 (5th Cir. 2021) (listing elements for Article III standing). Given Lioness's extensive history of prison-heat

[672] *Tiede I*, 2024 WL 3016562, at *5 (denying Collier's motion to dismiss on, among other things, standing grounds); *Tiede II*, 796 F. Supp. 3d at 321–23 (finding Plaintiffs had standing while denying their motion for preliminary injunction); *Tiede III*, 2026 WL 751904, at *10 (denying Lumpkin's motion for summary judgment).
[673] *See* Findings of Fact, Section A.1, *supra*.
[674] *See* Findings of Fact, Section A.1, *supra*.
[675] *See* Findings of Fact, Section A.1, *supra*.

advocacy and the reported frequency with which the organization hears concerns about extreme heat from its members incarcerated in the TDCJ system, this suit is clearly germane to its purpose.[676] Lioness joined the lawsuit in response to regular correspondence from its incarcerated members suffering from extreme heat in the TDCJ system, and no member has objected to its participation in this lawsuit.[677]

The Supreme Court has made clear that this is all that is required to support organizational standing, explaining that "[w]here . . . an organization has identified members and represents them in good faith, our cases do not require further scrutiny into how the organization operates." *SFFA III*, 600 U.S. at 201 (also noting that members had voluntarily joined the organization, supported its mission, received updates about the status of the case, and had the opportunity to have input on the direction of the case); *see also VanDerStok v. Garland*, 680 F. Supp. 3d 741, 762 (N.D. Tex. 2023), *vacated in part on other grounds*, 86 F.4th 179 (5th Cir. 2023) (relying on affidavits from organizations' leadership describing membership to find that they were traditional membership organizations); *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 728 F. Supp. 3d 394, 405 (N.D. Tex. 2024) (same). Lioness is therefore a traditional voluntary membership organization that has standing to sue on behalf its members.

*b. TPCA and TX C.U.R.E.'s relationships with their constituents satisfy the indicia of membership test*

TPCA and TX C.U.R.E. do not asserting standing based on traditional organizational membership. (*See* Resp. to Mot. Summ. J., Dkt. 257, at 29–30). However, an organization that "is not a traditional voluntary membership organization"—even an organization that "has no members at all"—can establish associational standing if its constituents have sufficient "indicia of membership." *Hunt*, 432 U.S. at 342, 344. The Fifth Circuit has described this inquiry into indicia of

[676] *See* Findings of Fact, Section A.1, *supra*.
[677] *See* Findings of Fact, Section A.1, *supra*.

membership as "a functional analysis to determine whether the nature of the relationship between the [organization] and the relevant interests of the individual [constituents] satisfie[s] the goals of the constitutional standing requirement." *Friends of the Earth, Inc. v. Chevron Chem. Co.,* 129 F.3d 826, 828 (5th Cir. 1997).

In *Hunt*, the Supreme Court considered apple growers and dealers' relationship to a state apple advertising commission—which had no members and to which the growers and dealers were legally required to financially contribute. *Hunt*, 432 U.S. at 342, 344–45. The Court explained that the commission, though advertising, market research, public education campaigns, and scientific research, "serve[d] a specialized segment of the State's economic community which is the primary beneficiary of its activities, including the prosecution of this kind of litigation." *Id.* at 344. Because "[i]n a very real sense, the [organization] represent[ed] the [constituents] and provide[d] the means by which they express[ed] their collective views and protect[ed] their collective interests," the Court concluded that "it would exalt form over substance" to deny associational standing. *Id.* at 345.

In reaching this conclusion, the Court—in addition to the factors noted above—discussed three "indicia of membership in an organization" that helped show the appropriate relationship between the commission and its constituents, noting that the constituents "alone elect the members of the Commission; . . . alone may serve on the Commission; . . . alone finance its activities." *Id.* at 344. Before addressing the standing of TPCA and TX C.U.R.E. specifically, the Court first briefly discusses the question of whether the "indicia of membership" inquiry is limited to the three factors identified in *Hunt*. For the reasons laid out below, the Court concludes that it is not.

First, the Fifth Circuit's application of the *Hunt* non-traditional-membership test reflects the Supreme Court's focus on the substance of the relationship between organizations and their constituents, not limited to the facts of *Hunt* or the specific indicia identified in that case. In *Friends of the Earth*, the Fifth Circuit, as noted above, described the *Hunt* test as "a functional analysis"

focused on the "nature of the relationship"—and stated that the defendant had "provided no cogent reason to limit the . . . analysis of the 'membership' requirement . . to the facts of *Hunt*." 129 F.3d at 828–29. There, the circuit court considered some indicia identified in *Hunt* (election of the governing body and financing) but also noted that, unlike in *Hunt*, "members [had] voluntarily associated themselves with [the organizational plaintiff]" and considered whether the "suit [was] clearly within [the organization's] central purpose, and thus within the scope of reasons that individuals join[] the organization." *Id.* at 829. And in *Ass'n for Retarded Citizens of Dallas v. Dallas Cnty. Mental Health & Mental Retardation Ctr. Bd. of Trs.*, 19 F.3d 241, 244 (5th Cir. 1994) [hereinafter "*ARC*"], the Fifth Circuit—while not directly addressing any of the indicia identified in *Hunt*—found no standing because the constituents of the organization at issue could not "participate in and guide the organization's efforts." ("The organization bears no relationship to traditional membership groups because most of its 'clients'—handicapped and disabled people—are unable to participate in and guide the organization's efforts.").[678]

Other circuits have similarly looked beyond the specific indicia identified in *Hunt*. *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 110 F.4th 295, 310 (1st Cir. 2024) (concluding that the

[678] The Fifth Circuit has made more direct reference to the indicia identified in *Hunt* twice when describing the *Hunt* test without applying them—*i.e.*, in dicta—both times in footnotes. Even across those two cases, different sets of factors were extracted from *Hunt*. *Compare Students for Fair Admissions, Inc. v. Univ. of Texas at Austin*, 37 F.4th 1078, 1084 n.7, 1085 (5th Cir. 2022) (describing in a footnote that "[u]nder the indicia–of–membership test, we consider whether an organization's purported 'members' (1) elect the organization's leaders, (2) serve in the organization's leadership, (3) finance the organization's activities, (4) associate voluntarily with the organization, and (5) provide sworn testimony of membership," but concluding that "applying an indicia of membership test [here] is unwarranted.") *with Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 344 n.9 (5th Cir. 2012) (describing in a footnote that "[i]f the association seeking standing does not have traditional members . . . the association establishes its standing by proving that it has 'indicia of membership': its members elect leadership, serve as the organization's leadership, and finance the organization's activities, including the case's litigation costs. . . The organization must represent the individuals it claims as members and provide 'the means by which [those individuals] express their collective views and protect their collective interests,'" but deciding the case on the grounds of injury and not reaching membership.). The Court does not conclude from these passing descriptions that—contrary to the Fifth Circuit's actual application of *Hunt*—the test for non–traditional membership organizations is rigidly focused on the indicia identified in *Hunt*.

membership indicia identified in *Hunt* are "illustrative, not exhaustive."); *Flyers Rts. Educ. Fund, Inc. v. U.S. Dep't of Transp.*, 957 F.3d 1359, 1361–62 (D.C. Cir. 2020) (it is "quite doubtful" that "the list of 'indicia' identified in *Hunt* was meant to be exhaustive"); *Or. Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1111 (9th Cir. 2003) (organization had associational standing where constituents did not fund the organization, exert exclusive control over it, or solely select its leaders); *Doe v. Stincer*, 175 F.3d 879, 886 (11th Cir. 1999) (same).

This functional approach is also reflected in how other district courts within the Fifth Circuit have applied the indicia of membership test. For example, in considering the standing of "a nonprofit legal defense and educational foundation" "supported by gun owners across the country," the United States District Court for the Northern District of Texas recently found that members "receiv[ing] information about its activities through a quarterly newsletter and regular emails about its activities," "regularly communicat[ing] their views to [the organization] about issues on which [it] should focus," and "voluntarily fund[ing] [the organization]" were sufficient indicia of membership to support standing. *Texas v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 737 F. Supp. 3d 426, 438 (N.D. Tex. 2024), *appeal docketed*, No. 24-10612 (5th Cir. July 9, 2024).

Likewise, the United States District Court for the Eastern District of Louisiana, in carefully considering the associational standing of an informally-organized nonprofit advocacy organization, reiterated that the "analysis is not formalistic" and that "[a]gain, the purpose of the indicia of membership test is to help ensure that the association provides the means by which represented individuals 'express their collective views and protect their collective interests,'" and identified a broad range of relevant factors. *Concerned Citizens Around Murphy v. Murphy Oil USA, Inc.,* 686 F. Supp. 2d 663, 676 (E.D. La. 2010). The court found that—even with no formal membership list maintained and where members were only "linked through informal networks"—there were sufficient indicia of membership where, among other involvements, "members 'chip[ed] in' to cover

Case 3:23-cv-01304-BAJ-EWD Document 359 09/22/26 Page 108 of 150

expenses" and "'pa[id]' for [organizational] activities through their own volunteer efforts." *Id.* at 676. The court also noted that "there is no indication in the record that [the organization] has any dissenting members with respect to this litigation," "[n]or is there any indication that [the organization] is unresponsive to its members. Indeed, [the organization] could not operate without the input, participation and support of its member-volunteers." *Id.* at 676-77 (also noting that, because "there [was] no evidence in the record that . . . [the organization] ha[d] reasons for instituting [the] suit other than asserting its members' interests," it was unlike organizations that "may have reasons for instituting a suit . . . other than to assert the rights of [their] supporters.") (cleaned up).

These applications again confirm that the *Hunt* test is a functional analysis of an organization's relationship with its constituents, not a narrow inquiry about funding and governing the organization. *See also Riverkeeper v. Taylor Energy Co., LLC*, 113 F. Supp. 3d 870, 876 (E.D. La. 2015) ("This is a holistic test. The purpose is to determine whether an organization provides the means by which members 'express their collective views and protect their collective interests.'"); *Env't Conservation Org. v. City of Dallas,* No. 3-03-CV-2951-BD, 2005 WL 1771289, at *2 (N.D. Tex. July 26, 2005) ("No court has ever required an organization to satisfy each and every indicia of membership. Rather, it is enough that members possess sufficient indicia to satisfy the purposes that undergird the concept of associational standing—'that the organization is sufficiently identified with and subject to the influence of those it seeks to represent as to have a 'personal stake in the outcome of the controversy.'").

The Court also notes that the Supreme Court has relatively recently clarified the requirements of associational standing for traditional membership organizations, explaining that groups do not need to be funded or controlled by their members to qualify as a "genuine membership organizations." *SFFA III.,* 600 U.S. at 200–01. While this clarification does not, of

course, directly speak to organizations that are not traditional membership organizations, it sheds light on what it could mean for such an organization to show that it "is the functional equivalent of a traditional membership organization." *See Fund Democracy, LLC v. S.E.C.,* 278 F.3d 21, 25 (D.C. Cir. 2002). It is difficult to understand how one organization would not be required to have its members fund or direct it to qualify as a traditional membership organization, but another organization—to demonstrate its equivalency to a traditional membership organization—would have to make that showing. The Court takes this as further evidence that the *Hunt* inquiry is not narrowly focused on the indicia identified in that case.

Turning to the Organizational Plaintiffs here, the evidence from trial shows that TPCA and TX C.U.R.E. satisfy the indicia of membership test.

i. TPCA

TPCA considers all of TDCJ's more than 141,000 inmates, together with their families, to be its constituents.[679] It communicates with TDCJ's inmates and their families through mail, telephone, and electronic messaging, and through a regular newsletter and email distribution, with some 2,000 inmates regularly communicating with the organization.[680] TPCA solicits and is guided by the concerns of inmates—input Dr. Dominick described as "everything" in shaping the organization's priorities—and it carries out its work through a group of incarcerated and free-world volunteers, or "core team members."[681]

TDCJ inmates also help finance TPCA through donations, notwithstanding the financial hardships of incarceration.[682] The extreme heat in TDCJ's facilities has been central to TPCA's work from the outset—it was, in Dr. Dominick's words, "the birthing point of the whole organization."[683]

[679] *See* Findings of Fact, Section A.2, *supra.*
[680] *See* Findings of Fact, Section A.2, *supra.*
[681] *See* Findings of Fact, Section A.2, *supra.*
[682] *See* Findings of Fact, Section A.2, *supra.*
[683] *See* Findings of Fact, Section A.2, *supra.*

The organization was founded because of the extreme heat Dr. Dominick's ex-husband endured while incarcerated in Texas prisons.[684] TPCA hears from inmates about extreme heat in Texas prisons on a daily basis and has surveyed them about their experiences with heat.[685] TPCA also has a substantial history of heat-related advocacy, including legislative advocacy, rallies, webinars and trainings, heated mock-cell demonstrations, and its "Beat The Heat" and "85 To Stay Alive" campaigns.[686] TPCA joined this litigation in direct response to inmates' suffering and the concerns about heat that inmates communicated to the organization.[687]

The Court previously held that: "Given TPCA's extensive communication with inmates at TDCJ facilities, stated goal to have the concerns of inmates guide the organization's activities, and network of incarcerated volunteers to facilitate that process, and activities like conducting surveys, the Court further concludes that, in a very real sense, TPCA represents its incarcerated constituents and provides the means by which they express their collective views and protect their collective interests." *Tiede III*, 2026 WL 751904, at *9. The unrebutted evidence presented at trial confirms these conclusions. In addition, TPCA serves a specialized segment of the population—*i.e.*, the segment of inmates incarcerated in TDCJ facilities—which is the primary beneficiary of its activities. *See Hunt*, 432 U.S. at 344.

These connections also distinguish TPCA from the organization in *ARC*, where the Fifth Circuit concluded that "clients . . . [were] unable to participate in and guide the organization's efforts." *ARC*, 19 F.3d at 244. TPCA also has inmate constituents who "voluntarily associated themselves" with the organization, either through receiving (and submitting information for) TPCA's newsletter, by volunteering as team members, paying to communicate with TPCA through

684 *See* Findings of Fact, Section A.2, *supra*.
685 *See* Findings of Fact, Section A.2, *supra*.
686 *See* Findings of Fact, Section A.2, *supra*.
687 *See* Findings of Fact, Section A.2, *supra*.

Securus, or making donations.[688] *See Friends of the Earth*, 129 F.3d at 829; s*ee also Concerned Citizens*, 686 F. Supp. 2d at 676 (relevant factors that "members 'chip[ped] in' to cover expenses" and "pa[id] for [organizational] activities through their own volunteer efforts."). Given TPCA's extensive history of prison-heat advocacy and the reported frequency with which the organization hears concerns about heat from inmates, this "suit clearly is within [TPCA's] central purpose, and thus within the scope of reasons that individuals join[ ] the organization." *Friends of the Earth*, 129 F.3d at 829. Dr. Dominick also confirmed TPCA receives no financial benefit from participating in the lawsuit and has no other "reasons for instituting [the] suit other than asserting its members' interests,"[689] *Concerned Citizens*, 686 F. Supp. 2d at 677, and that no TPCA constituent has objected to the organization's participation in the lawsuit.[690]

As the Court has previously held, the fact that only a few inmates have donated to TPCA and the fact that inmates do not sit on its board does not mean the organization lacks "sufficient indicia of membership." *Tiede III*, 2026 WL 751904, at *8. Trial testimony established that inmates in Texas are not paid for their work and cannot participate in board meetings.[691] As the Court explained in its order on Defendant's motion for summary judgment, "given the realities of incarceration, the Court views TPCA's receipt of some donations from inmates and the organization's consistent efforts to solicit the views of inmates as evidence supporting associational standing, not evidence of its absence." *Tiede III*, 2026 WL 751904, at *10. As was the case at the summary judgment stage, the picture painted by the evidence presented at trial is that TPCA is "an organization actively dedicated to a specific population and working to gather the concerns of that population and channel those concerns into advocacy, including this litigation." *Id.* That is precisely

---

688 *See* Findings of Fact, Section A.2, *supra*.
689 *See* Findings of Fact, Section A.2, *supra*.
690 *See* Findings of Fact, Section A.2, *supra*.
691 *See* Findings of Fact, Section A.1–3, *supra*.

the kind of organization that *Hunt* suggests has associational standing. *See* 432 U.S. at 342, 344–45 (explaining that the commission, though advertising, market research, public education campaigns, and scientific research, "serve[d] a specialized segment of the State's economic community which is the primary beneficiary of its activities, including the prosecution of this kind of litigation").

ii. TX C.U.R.E.

TX C.U.R.E.'s mission is to "advocate, educate the inmates, the families, the legislature and the public about issues within the prison system."[692] Obtaining air conditioning in TDCJ's prisons has been a major policy goal since the organization's inception.[693]

TX C.U.R.E.'s constituents are all inmates in TDCJ and their families.[694] TX C.U.R.E. maintains a mailing list of incarcerated constituents with whom it has had direct correspondence—reflecting approximately seventy-five incarcerated individuals with whom it has had direct correspondence, and 222 unique entries total.[695] The Court notes that it weighs these numbers in light of the unrebutted trial testimony about the difficulties and costs that inmates face in communicating with outside organizations[696]—therefore considering them, along with the other evidence of TX C.U.R.E.'s dedication to understanding its constituents' views, as indicative of sincere and ongoing dialogue between TX C.U.R.E. and its constituents. The organization communicates with inmates and their families regularly and at length, responding to heat-related concerns as they arise—work to which Mr. Malouff devotes more than forty hours per week.[697] The organization determines its priorities by reference to the issues inmates raise—among which extreme heat consistently ranks highest through the summer months[698]—and it is governed by a board that

---

692 *See* Findings of Fact, Section A.3, *supra*.
693 *See* Findings of Fact, Section A.3, *supra*.
694 *See* Findings of Fact, Section A.3, *supra*.
695 *See* Findings of Fact, Section A.3, *supra*.
696 *See* Findings of Fact, Section A.3, *supra*.
697 *See* Findings of Fact, Section A.3, *supra*.
698 *See* Findings of Fact, Section A.3, *supra*.

includes formerly incarcerated individuals and the mother of an inmate who died in custody.[699] TX C.U.R.E.'s decision to join this lawsuit was a direct response to inmates' concerns and Mr. Malouff's own experience while incarcerated in TDCJ prisons.[700]

Like TPCA, TX C.U.R.E. has a consistent and substantial history of advocacy on issues related to heat in Texas prisons.[701] After advocating for air conditioning during his incarceration, Mr. Malouff has continued that work through TX C.U.R.E. since his release.[702] He has testified before the Texas Legislature at every hearing on air conditioning, at least three times per session, and has spoken to every representative and senator about the issue across multiple sessions.[703]

As with TPCA, the Court previously held at the summary judgment stage that TX C.U.R.E. "serves a specialized segment of the population as the primary beneficiary of its activities, including this litigation—helping to 'express their collective views' and 'protect their collective interests.'" *Tiede III*, 2026 WL 751904, at *10 (quoting *Hunt*, 432 U.S. at 344). That conclusion is reinforced by the evidence presented at trial. Likewise, it remains true that there is no evidence that the organization had "reasons for instituting the suit other than asserting its members' interests," and that there is no evidence that any of the organization's members objected to TX C.U.R.E. participating in the lawsuit.[704] *Tiede III*, 2026 WL 751904, at *10 (citation omitted). Given TX C.U.R.E.'s significant history of advocacy on the issue of heat and its receipt of consistent concerns about heat from inmates throughout each summer, this lawsuit is clearly within TX C.U.R.E.'s central purpose and the scope of reasons for which individuals join the organization. *See Friends of the Earth*, 129 F.3d at

[699] *See* Findings of Fact, Section A.3, *supra*.
[700] *See* Findings of Fact, Section A.3, *supra*.
[701] *See* Findings of Fact, Section A.3, *supra*.
[702] *See* Findings of Fact, Section A.3, *supra*.
[703] *See* Findings of Fact, Section A.3, *supra*.
[704] *See* Findings of Fact § I.C.4., *supra*.

829. The Court therefore concludes that TX C.U.R.E. has sufficient indicia of membership to establish associational standing.

*c. Participation of Plaintiffs' individual members is not required*

Additionally, as the Court concluded when ruling on Defendant's motion for summary judgment, neither Plaintiffs' claims nor the relief they seek requires the participation of their individual members. *Tiede III*, 2026 WL 751904, at *11–12. The Court does not repeat that analysis here.

***2. The PLRA's limitations on prospective relief are not a bar to standing for Plaintiffs***

As is discussed in further detail below, the PLRA limits the scope of prospective relief by providing that "[p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. § 3626(a)(1)(A). Defendant argued at the summary judgment stage that this limitation "precludes organizational plaintiffs from bringing claims for prospective relief in conditions of confinement cases," because the organizations are not asserting their own federal rights and therefore the "Federal right of a particular plaintiff' is not at bar." (Mot. Summ. J., Dkt. 251, at 24). Notably, Defendant did not cite any authority for this interpretation of the PLRA. (*Id.*). The Court briefly recaps its analysis on this point from its Order on Defendant's Motion for Summary Judgment. *Tiede III*, 2026 WL 751904 at *11.

As Defendant recognizes, (*see* Mot. Summ. J., Dkt. 251, at 24),[705] when associations sue on behalf of their members, they are asserting the rights of those members. *See, e.g.*, *Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 771 (11th Cir. 2024) ("An organization may vindicate

[705] Elsewhere, Defendant also asserted that "in vicarious lawsuits the real parties in interest are the members whose rights and injuries are being litigated, not the organization itself . . . An associational plaintiff's claims belong to its members and in litigation those claims the association represents its members." (Mot. Summ. J., Dkt. 251, at 33 (citing *OCA–Greater Houston*, 867 F.3d at 610 and *Am. Legal Found. v. F.C.C.*, 808 F.2d 84, 90–91 (D.C. Cir. 1987)).

the rights of its members by suing on their behalf.") (citing *Students for Fair Admissions*, 600 U.S. at 199–200). This, after all, is the point of *Hunt*'s requirement that an organization's "members would otherwise have standing to sue in their own right": it is the rights of those members that are allegedly being violated, and their rights that are being vindicated by any prospective relief. *See Hunt*, 432 U.S. at 343. The Court therefore concludes that the "[f]ederal right of a particular plaintiff or plaintiffs" encompasses the federal rights of an organization's members when the organization brings suit on behalf of those members.[706] *See* 18 U.S.C. § 3626(a)(1)(A). The PLRA does not bar organizational plaintiffs, like Plaintiffs here, from pursuing prospective relief.

### *3. The PLRA's exhaustion requirement does not apply to organizational plaintiffs*

The PLRA directs that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The PLRA further provides that "[a]s used in this section, the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h).

---

[706] Defendant suggested that this reading of the PLRA cannot co-exist with the conclusion that the PLRA does not require organizational plaintiffs to exhaust administrative remedies, discussed. (Reply, Dkt. 162, at 6). However, the two PLRA provisions at issue not only have entirely distinct functions, they also use notably different language. The exhaustion provision of the PLRA refers to "a prisoner," and further defines "prisoner" as "any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(a), (h). By contrast, when limiting the scope of relief, the PLRA uses "plaintiff"—a term not defined in the statute. This supports the conclusion that, when interpreting the PLRA's scope-of-relief provision, the general understanding of the term plaintiff should apply, including the general rule that plaintiff organizations with associational standing are asserting the rights of their members. By contrast, the PLRA's use of "prisoner" in its exhaustion provision suggests that that provision is limited to the specific statutory definition of that term: a person incarcerated or detained in any facility.

Case 2:23-cv-00148-ARF-EWD Document 460-1 Filed 09/29/26 Page 117 of 151

The Court has previously held, and restates here, that the PLRA's exhaustion requirement does not apply to Plaintiffs, because "Plaintiffs are not persons capable of being incarcerated or detained, so they are not 'prisoners' as the term is defined by the PLRA." Tiede II, 796 F. Supp. 3d at 323 (citing 42 U.S.C. §§ 1997e(a), (h); *Alabama Disabilities Advoc. Pgm. v. Wood*, 584 F. Supp. 2d 1314, 1316 (M.D. Ala. 2008); *Dunn v. Dunn*, 219 F. Supp. 3d 1163, 1176 (M.D. Ala. 2016)).

Defendant argued at the summary judgment stage that *Green Haven Prison Preparative Meeting of Religious Soc'y of Friends v. New York State Dep't of Corr. & Cmty. Supervision*, 16 F.4th 67, 82–83 (2d Cir. 2021) requires a contrary result. (Mot. Summ. J., Dkt. 251, at 34). However, *Green Haven* involved a factually distinct scenario from that of Plaintiffs here. *Green Haven* involved an unincorporated organization formed entirely of eight inmates, all housed at one facility, suing in the organization's name—including two inmates who were also suing as individuals—leading the court there to conclude that "the [i]ncarcerated [p]laintiffs may not avoid the exhaustion requirement simply by forming an organization and then suing in the name of that organization." *Green Haven*, 16 F.4th at 82. That is a far cry from the situation before the Court: there is no suggestion that the Plaintiffs here—long-standing, large-scale groups, comprised of both incarcerated and non-incarcerated members—formed merely to skirt the PLRA's requirements on a technicality.

Moreover, the conclusion that organizational plaintiffs are not bound by the PLRA's exhaustion requirement fits Congress's purpose in enacting § 1997e. Congress enacted the PLRA at least in part out of concern about the number of suits about prison conditions, with the goal of "filter[ing] out [] frivolous claims"—"reduc[ing] the quantity and improv[ing] the quality of prisoner suits." *Porter v. Nussle*, 534 U.S. 516, 524–25 (2002). Allowing litigation by well-established organizations, which aggregate claims on behalf of their members, is consistent with that goal; it reduces the quantity and improves the quality of such suits. As a result, neither *Green Haven*'s concern with small groups of inmates forming nominal organizations to skirt exhaustion nor the

Case 1:23-cv-01004-RP Document 359 Filed 09/22/25 Page 117 of 150

purposes of the PLRA provide any reason to depart from the plain meaning of the statute here. The Plaintiffs are not "prisoners" and therefore are not governed by the PLRA's exhaustion requirement. *See* 42 U.S.C. § 1997e(a).[707]

### B. The Eighth Amendment

The Eighth Amendment to the Constitution prohibits "cruel and unusual punishment." U.S. Const. amend. VIII. The Constitution "does not mandate comfortable prisons." *Blackmon v. Garza*, 484 F. App'x 866, 868–69 (5th Cir. 2012) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)). However, "prison officials must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates." *Blackmon*, 484 F. App'x at 868–69 (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994), & *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)) (internal quotations omitted). In other words, the extreme deprivation of any "minimal civilized measure of life's necessities" violates the Eighth Amendment. *Davis v. Scott*, 157 F.3d 1003, 1006 (5th Cir. 1998) (citation omitted). What is cruel or unusual is not set in stone, but rather, is based on what is "socially acceptable," *Ball I*, 792 F.3d at 599, or what is consistent with "[a] sufficient national consensus," *Roper v. Simmons*, 543 U.S. 551, 562 (2005). "The Supreme Court has made clear that the standards against which a court measures prison conditions are 'the evolving

---

[707] Moreover, the Court notes that failure to exhaust is an affirmative defense for which Defendant bears the burden of proof. *See Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010). Additionally, because Plaintiffs brought this suit in a representative capacity, it is not necessary for all of Plaintiffs' members and constituents to exhaust. *Cf. Gates v. Cook*, 376 F.3d 323, 330 (5th Cir. 2004) (exhaustion of administrative remedies by a single inmate was sufficient to support class–wide relief in an action challenging the conditions of Mississippi's death row). As a result, if the exhaustion requirement applied, Director Lumpkin would have had to show that none of Plaintiffs' members or constituents exhausted their administrative remedies. To the contrary, trial evidence shows that at least one member or constituent of each Plaintiff exhausted TDCJ's two–step administrative grievance process before Plaintiffs joined this lawsuit in May 2024. *See* Findings of Fact, Section A.4, *supra*.

standards of decency that mark the progress of a maturing society'" *Gates,* 376 F.3d at 333 (quoting *Estelle v. Gamble*, 429 U.S. 97, 102 (1976)).

"To be tantamount to the infliction of cruel and unusual punishment, prison conditions must pose 'an unreasonable risk of serious damage' to a prisoner's health—an objective test—and prison officials must have acted with deliberate indifference to the risk posed—a subjective test." *Ball I*, 792 F.3d at 592 (citing *Helling v. McKinney,* 509 U.S. 25, 33–35 (1993)). To satisfy the Eighth Amendment's subjective standard, plaintiffs must show that it is substantially likely that a defendant prison official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. This knowledge can be inferred "from circumstantial evidence," and courts "may conclude that a prison official knew of a substantial risk of serious harm from the very fact that the risk was obvious." *Gates*, 376 F.3d at 333, 340 (affirming finding of deliberate indifference "based on the open and obvious nature of these conditions and the evidence that inmates had complained of symptoms of heat-related illness"); *see also Ball I,* 792 F.3d at 595 (affirming finding of deliberate indifference based "on the totality of the record evidence" showing prison official's subjective knowledge). This knowledge may also be shown by evidence that the risk is "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past," and "the circumstances suggest that the defendant-official" was exposed to that information. *Farmer*, 511 U.S. at 842–43. While the longstanding nature of risk and past acknowledgement of the risk can show knowledge on the part of a defendant official, courts consider the current actions prison officials are taking to determine whether those officials are implementing reasonable measures to abate a given risk. As the Fifth Circuit has explained, "deliberate indifference should be determined in light of the prison authorities' current attitudes and conduct: their attitudes and conduct at the time suit is brought and persisting thereafter." *Parker v. Hooper*, 171 F.4th 736, 756 (5th Cir. 2026) (quoting *Farmer*, 511 U.S. at 845) (cleaned up).

### *1. TDCJ's un-air-conditioned prisons pose an unreasonable risk of serious damage to health*

The first element of the Eighth Amendment's test for cruel and unusual punishment is met here. Credible expert testimony at trial established that all individuals, including young, healthy individuals, are at a substantial risk of serious harm from high heat indexes.[708] These risks include heat-related injuries—like heat exhaustion, heat rash, dehydration, heat cramps, heat syncope, and heat stroke—and death, either directly as a result of heat or by heat exacerbating other underlying conditions.[709] The evidence also shows, unsurprisingly, that summer temperatures and heat indexes in Texas and in the state's un-air-conditioned prisons are dangerously high, with heat indexes measured outside of TDCJ prisons reaching 134 degrees and indoor temperatures consistently exceeding 85 degrees across the system and often reaching far higher.[710] That heat is also increasing, with Texas summers projected to see generally increasing temperatures, increasing extreme temperatures, and more frequent heat waves.[711] And yet approximately 88,697 inmates, some 63 percent of the TDCJ population, were living in un-air-conditioned housing in the summer of 2026.[712] This alone, in conjunction with the evidence of ongoing heat-related harm in TDCJ prisons and the related insufficiency of TDCJ's mitigation measures, discussed below, establishes that conditions pose an unreasonable risk of serious damage to the health of all TDCJ inmates housed in un-air-conditioned facilities.

While plaintiffs bringing Eighth Amendment claims need not show that harm has actually occurred if they have established unreasonable risk, *Ball I*, 792 F.3d at 593 (citing *Helling,* 509 U.S. at 33)[713], Plaintiffs have nevertheless produced evidence of ongoing heat-related deaths and injuries, as

---

[708] *See* Findings of Fact, Section B, *supra.*
[709] *See* Findings of Fact, Section B, *supra.*
[710] *See* Findings of Fact, Section B, *supra.*
[711] *See* Findings of Fact, Section B, *supra.*
[712] *See* Findings of Fact, Section B, *supra.*
[713] In *Ball I*, the Fifth Circuit explained that that "[t]o prove unconstitutional prison conditions, inmates need not show that death or serious injury has already occurred . . . They need only show that there is a 'substantial

well as more than 15,000 heat-related grievances filed over the past three summers. This evidence includes three heat-related deaths in the summer of 2023 acknowledged by TDCJ and at least six further heat-related deaths from 2023 through 2025.[714]

What is more, evidence also shows that a substantial majority of TDCJ inmates face risks that exceed the baseline substantial risk borne by all individuals living without air conditioning in extreme temperatures. The records of TDCJ's medical partners show that more than 100,000 inmates—out of a population of roughly 140,000—have heightened vulnerability to heat.[715] As discussed in detail in the Findings of Fact, this heighted risk stems from medical conditions, mental health conditions, and prescribed medications that variously reduce inmates' ability to regulate their body temperatures and diminish inmates' ability to effectively understand their own risk or seek help.[716] Notably, the figures provided by TDCJ's medical partners do not account for underdiagnosis, particularly in regards to mental health conditions.[717]

This even-higher-risk population is not effectively captured in TDCJ's heat-score metric, which is intended to identify vulnerable individuals who have a higher need for air-conditioned housing.[718] As testified to at trial, the heat score metric is underinclusive; it leaves out many relevant conditions, including conditions that Defendant's experts recognized as increasing heat risk.[719] More concerningly still, testimony indicated that conditions are not added to the heat index if TDCJ does not have the cool beds to house the number of inmates who would consequently receive a heat score. As a result, the heat score is not, in fact, designed to capture all inmates with heightened heat

---

risk of serious harm.'" 792 F.3d at 593. In *Helling*, the Supreme Court unambiguously stated "[t]hat the Eighth Amendment protects against future harm to inmates is not a novel proposition." 509 U.S. at 33.

[714] *See* Findings of Fact, Section B.1, *supra*.

[715] *See* Findings of Fact, Section B, *supra*.

[716] *See* Findings of Fact, Section B, *supra*.

[717] *See* Findings of Fact, Section B, *supra*.

[718] *See* Findings of Fact, Section B.2.b., *supra*.

[719] *See* Findings of Fact, Section B.2.b., *supra*.

Case 3:23-cv-01004-AR-EW Document 350 Filed 09/22/25 Page 121 of 150

risk, and the fact that TDCJ houses inmates with heat scores in cool beds provides little, if any, assurance that even the most vulnerable inmates are protected from the heat.[720] Compared to the 100,853 inmates at heighted risk based on established risk criteria and TDCJ's medical partner's records, roughly 19,636 inmates had heat scores at the time of trial.[721] Again, credible testimony established that *all* inmates are at a substantial risk of serious harm when housed without air-conditioning in Texas summers, so the existence of this substantial population at still-higher risk is not necessary to the Court's conclusion that conditions in TDCJ's un-air-conditioned prisons violate the Eighth Amendment. However, the scale of heighted risk in TDCJ's inmate population drives home the severity and consequence of the agency's extreme-heat problem.

The Court's finding of risk based on heat conditions in TDCJ's prisons fits with a long line of Fifth Circuit precedent. As the Fifth Circuit explained in *Yates v. Collier*, 868 F.3d 354, 361 (5th Cir. 2017), "we have repeatedly recognized the serious risk of harm that excessive heat can pose in the prison context absent adequate mitigating measures, and we have consistently found evidence sufficient in these cases to support an Eighth Amendment violation, even when certain mitigating measures were available." *See also Gates*, 376 F.3d 323 (upholding a class-wide Eighth Amendment injunction requiring mitigation measures in response to heat even though fans were provided); *Ball I* 792 F.3d 584 (affirming a finding of substantial risk of serious harm despite access to water and ice); *Blackmon*, 484 F. App'x 866 (reversing the grant of judgment as a matter of law in favor of TDCJ officials where TDCJ had taken some steps to mitigate heat); *Smith v. Sullivan*, 553 F.2d 373, 381 (5th Cir. 1977) ("If the proof shows the occurrence of extremes of temperature that are likely to be injurious to inmates' health[,] relief should be granted.").

[720] *See* Findings of Fact, Section B.2.b., *supra*.
[721] *See* Findings of Fact, Section B., *supra*.

Case 3:23-cv-01004-RP-EWD Document 460-1 Filed 09/22/26 Page 122 of 151

And here, as was the case in *Yates*, evidence from trial and the preliminary injunction hearing shows that TDCJ's heat mitigation measures are insufficient to reduce the danger from heat below the point at which it poses an unreasonable risk of serious damage to health. In *Yates*, "the district court found, based on . . . expert testimony, that TDCJ's heat-mitigation measures in the Pack Unit—more frequent showers, cold drinking water, fans, and temporary access to air-conditioned 'respite areas'—were ineffective to reduce the risk of serious harm to a constitutionally permissible level for *any* inmate, including the healthy inmates." *Yates*, 868 F.3d at 363.

Trial evidence shows that here, TDCJ's system-wide mitigation measures include encouraging hydration (including the provision of chilled water); respite; education; wellness checks; cool showers; fans and cooling towels; modification of some routines and standards, like schedule changes for work and recreation and the ability to wear shorts and t-shirts; and the provision or availability for purchase of some commissary items.[722] Credible testimony from Dr. Vassallo—one of the experts relied on by the district court and the Fifth Circuit in *Yates* and in earlier cases on prison heat risk[723]—and other medical experts pointed to fundamental shortcomings of the most significant of these mitigation tools. The Court finds that TDCJ's mitigation measures, individually and collectively, do not reduce risk to a permissible level.

Respite rooms provide only temporary relief and do not adequately address long-term heat exposure and accumulated heat stress.[724] *See also Yates*, 868 F.3d at 364 (same). Similarly, cold showers may dissipate heat for someone who is actively overheating, but they are not an effective

---

722 *See* Findings of Fact, Section C.3, *supra*.
723 As the Fifth Circuit noted, "Dr. Vassallo is a licensed physician and a recognized expert in the field of thermoregulation and hyperthermia, with over twenty–five years treating heat stroke and heat–related disorders. Dr. Vassallo has previously served as an expert witness in lawsuits challenging prison conditions, and this court has (at least) twice upheld district court findings that relied heavily on Dr. Vassallo's testimony." *Yates*, 868 F.3d at 363–64 (citing *Ball I*, 792 F.3d at 593–94; *Gates*, 376 F.3d at 339–40).
724 *See* Findings of Fact, Section C.3, *supra*.

Case 3:23-cv-01004-RFWD   Document 350   Filed 09/22/26   Page 123 of 151

way to prevent heat stroke.[725] *See also Yates.*, 868 F.3d at 364 (explaining that expert testimony showed that "giving a person a shower and then putting them back into a very hot, humid environment has limited effect"). This is particularly clear in light of the evidence that TDCJ's cold showers may not be especially cold.[726] Both respite rooms and cold showers also require that individuals be aware of their own heat risk to seek out the relief. Such awareness may not be possible because that heat-related illnesses can cause confusion and other cognitive problems, and because individuals suffering from mental illness may have a reduced capacity to recognize danger from heat or to ask for access to relief.[727] Additionally, expert testimony at trial showed that hydration is insufficient to protect against heat illness. While hydration supports the body's sweating mechanism, medical literature shows that there is not data supporting a conclusion that higher fluid intake during heat waves is meaningfully protective.[728] Defendant's expert Dr. DeGroot also testified that the importance of hydration is "overemphasized."[729] Likewise, evidence indicated that the use of fans can be counterproductive at very high temperatures.[730] *See also Yates*, 868 F.3d at 364 ("[P]eer-reviewed publications indicat[ed] that while fans may have a mitigating effect, they are actually counterproductive at higher temperatures.").

Additionally, as discussed in the Court's Findings of Fact, the Court finds that TDCJ's remaining mitigation measures are not effective for significantly reducing heat risk.[731] For example, welfare checks are an insufficient response, particularly in light of expert testimony on the speed at which heat-related illnesses can occur.[732] Changes to work and recreation routines and dress codes

---

[725] *See* Findings of Fact, Section C.3, *supra*.
[726] *See* Findings of Fact, Section C.3, *supra*.
[727] *See* Findings of Fact, Section C.3, *supra*.
[728] *See* Findings of Fact, Section C.3, *supra*.
[729] *See* Findings of Fact, Section C.3, *supra*.
[730] *See* Findings of Fact, Section C.3, *supra*.
[731] *See* Findings of Fact, Section C.3, *supra*.
[732] *See* Findings of Fact, Section C.3, *supra*.

do not change the fact that inmates are living in high-heat conditions, producing the kind of long-term heat load that produces risk.[733] In short, medical evidence shows that TDCJ's system-wide mitigation measures are insufficient.

Moreover, the insufficiency of those mitigation measures to reduce risk to a constitutionally permissible level is apparent from the continued occurrence of heat-related deaths and injuries, as well as the thousands of heat-related grievances filed every summer. The Court therefore finds that summer heat in Texas poses an unreasonable risk of serious damage to the health of every TDCJ inmate living in un-air-conditioned housing.

***2. TDCJ Is deliberately indifferent to the risk posed***

Director Lumpkin was and is aware that heat poses a serious risk to inmates in un-air-conditioned housing. First, Director Lumpkin's own testimony directly establishes his knowledge of the risk. admitted that "extreme heat inside the Texas prison system has caused very serious injuries and death," that he has heard testimony that extreme heat causes suffering and that he "know[s] it has an impact."[734] Director Lumpkin has "long known that there is a danger from extreme heat inside the Texas prison system, and that danger extends to the men and women in [TDCJ's] care, as well as the correctional officers working for [him]."[735] Reflecting this knowledge, Director Lumpkin recognized the deaths of twenty-three inmates who died in TDCJ facilities from heat-related causes between 1998 and 2012, including ten heat-related deaths in the summer of 2011 alone.[736] He is further aware of the "thousands of grievances related to the extreme heat" filed by TDCJ inmates in just "the last several years."[737] And Director Lumpkin admitted that he has read this Court's March 2025 Order—which found that high temperatures pose a substantial risk of serious harm to even

---

733 *See* Findings of Fact, Sections B, C.3, *supra*.
734 *See* Findings of Fact, Section C.1, *supra*.
735 *See* Findings of Fact, Section C.1, *supra*.
736 *See* Findings of Fact, Sections B.1, C.1, *supra*.
737 *See* Findings of Fact, Section C.1, *supra*.

Case 3:23-cv-01004-RP Document 359 Filed 09/29/26 Page 125 of 150

young, healthy individuals—and that the Order states, "in no uncertain terms, [that] the agency is violating the Constitution."[738] Director Lumpkin has thus repeatedly confirmed under oath that he is personally aware of the substantial risk of serious harm that TDCJ inmates face in un-air-conditioned prisons.

Second, Director Lumpkin's awareness of the danger posed by extreme heat can also be inferred from TDCJ officials' past acknowledgement of heat risk, the numerous lawsuits about heat-related deaths and injuries filed against TDCJ over many years, and the agency's internal acknowledgments of the dangers of heat through official policies and forms. Like Director Lumpkin, former director Collier acknowledged the danger of heat, admitting at the preliminary injunction hearing that he was aware of multiple inmate deaths, of heat-related illnesses, and of thousands of heat-related grievances.[739] Moreover, "TDCJ officials are, or have been, defendants in numerous other cases alleging Eighth Amendment violations based on excessive heat in prison." *Yates*, 868 F.3d at 360 (citing *Hinojosa*, 807 F.3d 657, 661; *Webb v. Livingston*, 618 Fed. Appx. 201, 204 (5th Cir. 2015); *Valigura v. Mendeoza*, 265 Fed. Appx. 232, 233-34 (5th Cir. 2008)); *see also Gates*, 376 F.3d at 333; *Ball I,* 792 F.3d at 595; *Coones v. Cogburn*, No. 24-10777, 2025 WL 2092392, at *3 (5th Cir. July 25, 2025); *Blackmon*, 484 F. App'x at 873. And TDCJ's employee training documents acknowledge heat risk, noting that heat is the fifth-leading cause of serious injuries among TDCJ employees and that "[n]o one is immune from suffering a heat-related illness, from the fittest employee to those who may be prone to medical conditions."[740] Likewise, TDCJ's form for inmates to opt out of a cool bed requires those inmates to acknowledge that risks include heat cramps, heat exhaustion, and heatstroke, and "[w]orsening of . . . diagnosed medical condition(s) up to and

[738] *See* Findings of Fact, Section C.1, *supra.*
[739] PI Hearing Tr. (Aug. 2, 2024) at 221:8–12; 222:4–7; 224:10–14; 262:1–265:19
[740] *See* Findings of Fact, Section C.1, *supra.*

including death."[741] These multiple indications that TDCJ officials are, and have been, aware of the dangers of summer heat in un-air-conditioned facilities support a conclusion that Defendant is aware of that risk.

And finally, the open and obvious nature of the heat risk of extreme summer heat in un-air-conditioned prisons in Texas independently supports a finding of knowledge. The Fifth Circuit has indicated that officials' statements acknowledging that heat is intense, and evidence of training related to heat risks, together support a finding that prison heat poses an obvious risk. *See Blackmon*, 484 F. App'x at 873 ("[A] jury could reasonably conclude that the heat-related health risks to Blackmon were obvious" because of an official's stated awareness that heat was "intense" and evidence of training on the danger of heat.). As discussed above, there is evidence here of such acknowledgement and training. Moreover, even absent this specific evidence, it is hard to think of a risk as open and obvious—and inescapable—as the summer heat in Texas. As the Fifth Circuit recently explained in a case alleging a heat-related death in an un-air-conditioned TDCJ prison, "[w]e can infer that [d]efendants knew of the risk, given its open and obvious nature—the brutality of the Texas heat is well known, and [d]efendants would have been reminded of it every time they stepped outside." *Coones*, 2025 WL 2092392, at *3. *See also Hinojosa*, 807 F.3d at 667 ("In any event, the open and obvious nature of the dangerously hot conditions would also support an inference of deliberate indifference."). The Court concludes that, in a state where summer heat indexes can exceed 130 degrees, it is—as the Fifth Circuit has repeatedly observed—obvious that inmates in un-air-conditioned prisons are at risk.

Given his own statements, the general evidence of TDCJ officials' awareness of heat risks, and the open and obvious nature of the risk in un-air-conditioned prisons during the summer

[741] *See* Findings of Fact, Section C.1, *supra*.

months, the Court concludes that Director Lumpkin was and is aware of the risk to inmate health posed by TDCJ's un-air-conditioned prisons. However, despite his awareness of this risk, Director Lumpkin failed to take reasonable measures to abate heat risk. This is apparent in both TDCJ's mitigation response and its work to install air conditioning.

Director Lumpkin has unreasonably continued to rely on mitigation measures that medical experts and corrections experts indicate are insufficient, and that have not prevented ongoing deaths and heat-related injuries.[742] The Court notes, as it did at the preliminary injunction stage, that the "mere presence of remedial measures" is not a defense to an Eighth Amendment violation. *Webb*, 618 F. App'x at 209 n.7; *see also Cole*, 2017 WL 3049540, at *41 (rejecting Mr. Collier's argument that TDCJ was not deliberately indifferent simply because TDCJ "implemented several mitigating measures since the deaths in 2011 and 2012"). Prison officials cannot "insist[ ] upon a course of action that has already proven futile." *Lewis v. Cain*, 701 F.Supp.3d 361, 435 (M.D. La. 2023). Nor can they rely on mitigation measures that have nothing more than a "negligible impact" on the danger posed to inmates from extreme heat. *Laube v. Haley*, 234 F. Supp. 2d 1227, 1251 (M.D. Ala. 2002). Prison officials are instead required to implement mitigation measures that "adequate[ly] . . . protect inmates from the extreme heat." *Webb*, 618 F. App'x at 209 n.7; *see also Cole*, 2017 WL 3049540, at *41 ("[T]he effectiveness of the measures implemented by TDCJ is relevant to the Court's analysis.").

As discussed above, TDCJ's mitigation measures are unreasonably insufficient, as shown by medical testimony as well as the continuing harm to, and suffering of, TDCJ inmates.[743] Moreover, the Court finds it particularly concerning that TDCJ continues to rely, across its system, on what are essentially the same core mitigation measures that the Fifth Circuit affirmed—nine years ago—to be

---

742 *See* Findings of Fact, Section C.3, *supra*.
743 *See* Findings of Fact, Section C.3, *supra*.

insufficient to reduce heat risk in the Pack Unit.[744] *See Yates*, 868 F.3d at 363. Nor is the Fifth Circuit the only body to indicate to TDCJ that its mitigation measures have long been insufficient, given the Texas House Committee on Corrections' conclusion—nearly eight years ago—that, "[b]ased on the medical information known about human health and heat-related health risks, TDCJ cannot rely only on mitigation factors to assure the well-being of inmates and corrections personnel."[745]

At trial, Defendant argued that because the Fifth Circuit has, in past cases, directed prison systems, including TDCJ, to implement mitigation measures in response to extreme heat, he cannot be deliberately indifferent for relying on those mitigation measures. The Fifth Circuit has squarely rejected this argument. *See Yates*, 868 F.3d at 360 ("[W]e affirmed the district court's finding that the heat within a prison housing area posed a substantial risk of serious harm to inmates . . . even though the inmates had continued access to potable water and ice, and despite the defendant's argument that 'because it provide[d] the remedies [upheld in *Gates*], there can be no Eighth Amendment violation as a matter of law.'").[746] Here, as in *Yates*, the evidence indicates that TDCJ's mitigation measures are not sufficient to reduce risk to a socially acceptable level. As a result, Director Lumpkin had an obligation to do more.

Moreover, changes made by Director Lumpkin and TDCJ between the preliminary injunction hearing and trial are not sufficient to "eliminate [a] finding of ongoing deliberate

---

744 *See* Findings of Fact, Section C.3, *supra*.

745 *See generally* Findings of Fact, Section C.3, *supra*; *see specifically* Pls.' Hr'g Ex. 34 at 58 (Interim Report 2018 by the House Committee).

746 The Court notes that the Director's argument here would essentially hold that if a prison official has implemented some form of relief that a court has previously ordered for the type of harm at issue, there can be no deliberate indifference even if subsequent developments in medical knowledge or subsequent factual development show continued harm. This proposition would essentially amount to a judicial cap on a prison official's required response to a particular issue at the level of relief that the first court to address that issue had ordered; so long as subsequent officials met that standard, they could not be deliberately indifferent, and so would never have a constitutional mandate to improve conditions. This is not only practically troubling, in that it would leave no room for changes in medical understanding of risk, but is also fundamentally incompatible with the evolving standard of decency that is at the heart of the Eighth Amendment. See *Estelle*, 429 U.S. at 102. And such an approach would be particularly troubling in light of the PLRA, which mandates that courts first attempt minimal intervention into prison condition issues.

indifference." *See Parker*, 171 F.4th at 759. The Fifth Circuit recently identified the kind of "substantial improvements" that, if made by prison officials over the course of litigation, "eliminate[] any finding of ongoing deliberate indifference." *Id. Parker* involved the provision of medical care by the Louisiana Department of Corrections ("LDOC"). There, the district court issued an initial liability opinion in March 2021, finding systemic violations of the Eighth Amendment because of various shortcomings in LDOC's medical system. *Id.* at 741. "Chastened, the prison authorities immediately began renovating their facilities, upgrading personnel, and improving standards of care, as they anticipated the bifurcated remedial trial scheduled for June 2022." *Id.* In issuing its remedial opinion in November 2023, the district court considered some, but not all, of the upgrades made by LDOC before trial, but did not consider additional improvements made and submitted to the Court after the trial. *Id.* The Fifth Circuit concluded that this was an error, because LDOC had made the kind of "substantial improvements [that] should have eliminated any finding of ongoing deliberate indifference." *Id.* at 759.

The improvements made by LDOC over approximately two years—from the district court's liability finding to its remedial order—included the following: "completely over-haul[ing] sick-call procedures"; more than tripling the number of onsite specialty clinics and "substantially increase[ing] the number of specialty referrals and appointments"; revising emergency-care staffing to ensure staff were present at all hours of the day and night; increasing acute-care staffing and installing call buttons outside of the door each locked room; "fir[ing] old leaders, hir[ing] new leaders, and institute[ing] new oversight procedures for prison medical care"; as well as additional improvements not addressed by the district court. *Id.* at 758–60. After trial, LDOC also "[i]mplement[ed] an electronic records system [that] may well have 'cured' [medical-record-management] problems and many related deficiencies in prisoners' diagnostics and care." *Id.* at 751.

Case 2:23-cv-01004-ARFWD Document 359 Filed 09/29/25 Page 130 of 150

The Fifth Circuit described these "improvements and innovations" variously as "watershed" and "robust." *Id.* at 754–55, 761.

Here, TDCJ has likewise had the benefit of time to initiate substantial improvements. Roughly a year passed between the Court's March 26, 2025, order denying Plaintiffs' motion for preliminary injunction and the March 30, 2026, trial. And nearly two years passed between the 2024 preliminary injunction hearing and trial. In the Court's preliminary injunction order, it found that the evidence presented at that stage indicated that "extreme heat in TDCJ's uncooled prisons constitutes a well-established substantial risk of serious harm that constitutes cruel and unusual punishment." *Tiede II*, 796 F. Supp. at 325. The Court further found that:

> despite a significant risk of harm faced by inmates in un[-]air-conditioned TDCJ prisons, [then-Director] Collier has implemented mitigation measures he knows are inadequate—and which the Court finds are scientifically inadequate—to reduce the substantial risks of serious harm posed by extreme heat. And he has implemented (or has a plan to implement) the only reasonable mitigation measure that he knows is adequate to reduce or eliminate the risk—air conditioning—at a pace that disregards the substantial risk of harm the inmates face due to their ongoing exposure to extreme heat. Thus, based on the totality of the evidence, it is substantially likely that Collier has acted with deliberate indifference.

*Id.* at 332. The Court "implored [Collier to] take to the necessary steps to be prepared" for a possible permanent injunction. *Id.* at 336. Director Lumpkin testified that he read the Court's preliminary injunction order.[747] Defendant was therefore provided with ample opportunity to demonstrate improvements in TDCJ's heat response. And, of course, in light of the standard that "deliberate indifference should be determined in light of the prison authorities' current attitudes and conduct: their attitudes and conduct at the time suit is brought and persisting thereafter," even absent the Court's preliminary injunction order, the Court would consider what improvements, if any, TDCJ

[747] *See* Findings of Fact, Section C.1, *supra*.

has made in addressing extreme heat since this suit was initiated. *See Farmer*, 511 U.S. at 845 (cleaned up).[748]

Unfortunately, the changes implemented by TDCJ—unlike LDOC's actions in *Parker*—do not "indicate concern and sincerity on the part of prison officials that negate subjective indifference." *See Parker*, 171 F.4th at 758 (citing *Farmer*, 511 U.S. at 844 ("("[P]rison officials . . . may be found free from liability if they responded reasonably to the risk.").

First, TDCJ did not improve its heat mitigation measures in a manner that shows a reasonable and sincere response to heat risk. As discussed in the Court's findings of fact,[749] and again in the discussion of risk under the Eighth Amendment,[750] TDCJ continues to rely on the same heat mitigation methods it has used since the preliminary injunction hearing, and on largely the same measures since *Yates*. The one change in TDCJ's most recent amendment to its heat-response policy, makes access to respite rooms contingent on "good correctional judgment" and removes policy language allowing access to respite for as long as needed.[751] As Defendant's testimony confirming that security needs might at times prevent access to respite indicates, this change is likely to reduce access to respite rooms.[752] Therefore, in the nearly two years since the preliminary injunction hearing, TDCJ's mitigation approach has become, if anything, potentially *less* effective at protecting inmates against extreme heat.[753]

---

748 Defendant has not submitted any evidence to the Court showing post–trial improvements in TDCJ's heat response. To the contrary, as noted above, the Court has taken judicial notice of the post-trial development that TDCJ has requested less than half of the funding required for the next phase of the air-conditioning plan that it presented to the Court.

749 *See* Findings of Fact, Section C.3, *supra*.

750 *See* Conclusions of Law, Section B.1, *supra*.

751 *See* Findings of Fact, Section C.3, *supra*.

752 *See* Findings of Fact, Section C.3, *supra*. The Court notes that it is not making a judgment about the appropriateness of security concerns barring access to respite. As indicated in the Findings of Fact, TDCJ has an obligation to respond to security concerns. However, the relevant inquiry here is about TDCJ's response to extreme heat, and the heat-related effect of this policy change—potentially reducing access to respite—is relevant to the Court's consideration of TDCJ's response.

753 *See* Findings of Fact, Section C.3, *supra*. The Court also notes that Defendant and other TDCJ witnesses testified at trial about steps taken to ensure that heat mitigation measures are being implemented correctly,

Likewise, Defendant did not meaningfully—or even reasonably—improve TDCJ's heat score system such that at least inmates with heighted risk would be housed in air-conditioning While TDCJ added to the factors that generate the heat score system, (1) age over 65 and (2) "Highly Active-Anticholinergics" prescribed for more than four days, evidence at trial shows that the heat-score system continues to be woefully underinclusive.[754] And, at least as significantly, the testimony of Defense witness Dr. Leonardson indicated that the heat-score system is at least partially driven by the availability of cool beds, not by medical need.[755] Dr. Leonardson's admission calls into question the heat score system's basic validity as a tool for identifying the most medically vulnerable inmates.

Finally, Defendant argued at trial that TDCJ has improved its construction of air conditioning such that he cannot be deliberately indifferent. TDCJ completed 6,800 cool beds from the 2024 preliminary injunction hearing to the time of trial, adding beds at a rate of approximately 3,400 per year.[756] During the same time period, TDCJ's inmate population grew by 7,006 inmates, from 134,129 to 141,135 individuals.[757] Accordingly, TDCJ has failed to add air-conditioned beds even at a rate that keeps up with population growth in the two years since the preliminary injunction hearing. Moreover, if TDCJ's rate of air-conditioning installation since the preliminary injunction hearing—the rate that TDCJ has demonstrably achieved—was fixed, the agency would not air-condition the state's prison system for 23 years.[758] Notably, this calculation assumes no inmate

including audits of compliance by TDCJ's "heat strike" teams. *See* Findings of Fact, Section C.3, *supra*. However, as discussed in the Findings of Fact, audits in and of themselves do not provide protection from extreme heat, so these steps cannot make mitigation methods that are fundamentally insufficient into methods that are protective. Because evidence shows that TDCJ's mitigation methods are insufficient even if provided in compliance with TDCJ's policies, steps taken to encourage compliance with those policies are not sufficient to make TDCJ's mitigation approach a reasonable response to heat risk.

[754] *See* Findings of Fact, Section C.2.b., *supra*.
[755] *See* Findings of Fact, Section C.2.b., *supra*.
[756] *See* Findings of Fact, Section C.4.b., *supra*.
[757] *See* Findings of Fact, Section C.4.b., *supra*.
[758] *See* Findings of Fact, Section C.4.b., *supra*.

population growth requiring additional capacity, though TDCJ's population is projected to grow significantly.[759]

Defendant argues that TDCJ's air-conditioning installation is not linear and that the agency has been improving its installation processes. TDCJ represents that it will soon achieve significantly faster installation.[760] The Court, however, cannot credit this alleged future improvement as a sincere response to address the constitutional issue here for at least four reasons.

First, Defendant's argument here focuses in large part on the number of cool beds that TDCJ has is somewhere in the timeline towards completion—air-conditioned housing that is either in the construction, procurement, or design phase—as a result of TDCJ's work to establish air-conditioning designs and continue air-conditioning projects.[761] While TDCJ staff testified at trial about approximate dates when beds in construction and procurement would be completed, there is no clear date when cool beds currently in design will be online.[762] However, even if all of TDCJ's ongoing air-conditioning work is was credited as being complete *now*, TDCJ would still have tens of thousands of inmates in dangerous, un-air-conditioned facilities.[763] And with no overarching plan for system-wide air-conditioning, as discussed below, those inmates would be in un-air-conditioned housing for an unspecified length of time stretching into the future. More specifically, even if TDCJ is credited with completion of every cool bed currently in construction, procurement, and design, more than a third of TDCJ's current capacity would still be un-air-conditioned, leaving some 48,000 inmates exposed to unconstitutionally high heat risk.[764]

---

759 *See* Findings of Fact, Section C.4.b., *supra*.
760 *See* Findings of Fact, Section C.4.b., *supra*.
761 *See* Findings of Fact, Section C.4.b., *supra*.
762 *See* Findings of Fact, Section D., *supra*.
763 *See* Findings of Fact, Section D., *supra*.
764 And this figure does not account for anticipated population growth

Case 3:23-cv-01004-RP Document 350 Filed 09/22/25 Page 134 of 150

Second, despite TDCJ putting forward three successive plans to air condition the prison system by the end of 2031, neither Director Lumpkin nor his predecessor, Mr. Collier, would commit to meeting these plans—or even to requesting the funds necessary to attempt to meet the plans. In October 2025, when asked whether he could commit to at least requesting the funding for TDCJ's then-current Three-Phase Plan, Director Lumpkin said he could not: "I can't promise it will happen."[765] Mr. Collier, likewise, testified that the Three-Phase Plan does not reflect any "commitment" by TDCJ to request the amounts identified in the plan from the Legislature.[766] And at trial, Director Lumpkin acknowledged that without a court order, he cannot commit to obtaining the money necessary to air condition the system or "even asking for the amount of money" he knows to be necessary.[767]

Third, Chairman Nichols made it clear that, from the perspective over the board overseeing TDCJ, the agency's most recent plan was never a plan at all, testifying that "[f]irst of all, when you call it a plan, I respectfully disagree with that . . . I don't think that was ever part of a plan." Chairman Nichols further testified that TDCJ's current Two-Phase Plan is "something a little bit more than swag" and was never intended to represent amounts that TDCJ intended to seek as legislative appropriations.[768]

Fourth, and perhaps most tellingly, TDCJ has not, in fact, followed through with even requesting the funds for the next step of the Two-Phase Plan that Defendant presented at trial. Under Director Lumpkin, TDCJ's legislative appropriations request for the 2028-29 biennium, submitted after trial, asks the Texas Legislature for $298.02 million for retrofitting existing units with

[765] *See* Findings of Fact, Section C.4.b, *supra*.
[766] *See* Findings of Fact, Section C.4.b, *supra*.
[767] *See* Findings of Fact, Section C.4.b, *supra*.
[768] *See* Findings of Fact, Section C.4.b, *supra*.

air-conditioning.[769] This is less than half—only some 38%—of the $774.3 million that TDCJ's Two-Phase Plan indicates was needed.[770]

In short, despite TDCJ officials' claims that the pace of air-conditioning installation has already improved, the installation of air-conditioning since the preliminary injunction hearing has not even kept up with the increase in the prison population. And even if TDCJ is credited with completing all of the air-conditioning projects that it currently has in progress, despite a number of those projects not having a fixed deadline, roughly 48,000 inmates would still be exposed to unconstitutional conditions today. With population growth, even if TDCJ completes the units it has projected it will finish by the end of 2027, some 59,000 inmates will likely still be living in un-air-conditioned housing. Moreover, in spite of officials' claims that TDCJ is on the verge of significantly improving its installation of air-conditioning and is sincerely committed to rapidly installing air-conditioning, the Court does not find this commitment to be credible where two directors of the agency—including Defendant—have refused to make any commitment to installing air-conditioning on the timeline the agency has identified as possible; where the Chairman of TBCJ has called the agency's purported plan to install air-conditioning "something a little bit more than swag"; and where, most tellingly, TDCJ has in actuality not requested the funding needed for the next phase of its purported plan.[771]

TDCJ's response to extreme heat risk since the preliminary injunction hearing and the court's preliminary injunction order is therefore not akin to the significant and sincere improvements made by LDOC in *Parker*. To the contrary, the Court finds that TDCJ's continued failure develop a non-arbitrary heat score system, its minimal—and possibly harmful—changes to its heat mitigation strategies, and its failure to develop and commit to a genuine plan to air condition

[769] *See* Findings of Fact, Section C.4.b, *supra*.
[770] *See* Findings of Fact, Section C.4.b, *supra*.
[771] *See* Findings of Fact, Section C.4.b, *supra*.

the system are evidence of Director Lumpkin's deliberate indifference to the dangers posed by summer heat in TDCJ's un-air-conditioned prisons.

In sum: credible medical evidence shows that all inmates, including young and health inmates, in Texas's un-air-conditioned prisons face an unreasonable risk to their health due to extreme summer temperatures. Evidence also shows that a substantial majority of inmates face a still higher risk due to medical conditions and prescribed medications. Despite knowing of this risk, Director Lumpkin and TDCJ have continued to rely on clearly insufficient mitigation measures. These measures have been shown to be insufficient, individually and in combination, both by credible medical testimony and by the continued occurrence of heat-related deaths, injuries, and thousands of heat-related grievances every summer. Director Lumpkin has also not made meaningful changes to the mitigation system. Nor, more importantly, have Director Lumpkin and TDCJ increased the rate of air-conditioning installation sufficiently to even keep up with inmate population growth since the preliminary injunction hearing. And despite suggestions at trial that TDCJ will, in future, significantly increase its rate of installation, Director Lumpkin refused to commit to following TDCJ's Two Phase Plan, the most recent of TDCJ's purported plans for installing system-wide air-conditioning. And, in practice, Director Lumpkin has not followed that plan since trial, failing to even request the necessary funding for the next phase. In the face of clear evidence of risk—including ongoing injuries, deaths, and suffering every summer—Director Lumpkin's failure to enact a meaningful, committed plan to install air-conditioning on the timeline that TDCJ has repeatedly indicated is possible is deliberate indifference. The Court therefore finds that TDCJ's un-air-conditioned prisons violate the Eighth Amendment.

**C. Relief**

"[S]uccess on the merits does not, by itself, entitle a party to injunctive relief." *United States v. Texas*, 794 F. Supp. 3d 427, 452 (W.D. Tex. 2025). "Plaintiffs must still establish that the remaining

elements necessary for a permanent injunction—irreparable injury, a balance of hardships favoring relief, and consistency with the public interest—are also satisfied." *Id.* In the prison context, the PLRA also imposes additional conditions that must be satisfied before a permanent injunction can be issued. *See generally* 18 U.S.C. § 3626(a)(1)(A). As set forth in more detail below, both the general requirements for a permanent injunction and the requirements of the PLRA are met here. The Court turns first to the elements for injunctive relief.

***1. Plaintiffs' members and constituents will suffer irreparable harm absent injunctive relief***

The irreparable harm prong requires Plaintiffs to show that their members and constituents are suffering "harm for which there is no adequate remedy at law." *Daniels Health Scis., L.L.C. v. Vascular Health Scis.*, *L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013). Harm is irreparable "if it cannot be undone through monetary remedies." *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (citation modified).

"When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Book People, Inc. v. Wong*, 91 F.4th 318, 340–41 (5th Cir. 2024) ("Because [the act] threatens Plaintiffs' right to be free from compelled speech, Plaintiffs have shown an irreparable injury.") Here, Plaintiffs' constituents' and members' right to be free from cruel and unusual punishment is threatened. Indeed, the Court finds this right is already being violated by conditions in TDCJ's un-air-conditioned prisons.

Moreover, even absent the deprivation of this specific constitutional right, the harm that TDCJ inmates face is irreparable in light of the considerable evidence that heat-related injuries and deaths continue to occur in TDCJ's facilities during the summer months.[772] Death and physical injury cannot be undone through monetary damages. *See Quest Med., Inc. v. Apprill*, 90 F.3d 1080,

[772] *See* Findings of Fact, Section B.1–2., *supra*.

1091 (5th Cir. 1996) ("[U]nlike in personal injury cases where monetary damages cannot replace a lost life or restore a maimed body, the injury in this case was purely financial and an award of compensatory damages is capable of making the injured party . . . completely whole."). Nor can the injury of consistent exposure to a significant risk of injury or death. See *Ball I*, 792 F.3d at 593–94 (discussing seriousness of health risks due to heat exposure).

As a result, the Court finds that there is no adequate remedy at law for the constitutional violations caused by TDCJ's failure to provide air conditioning in its prisons. Plaintiffs are at "a significant threat of injury from the impending action," this "injury is imminent," and "money damages would not fully repair the harm." *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir. 1986).

***2. The balance of hardships favors relief, and relief is consistent with the public interest***

Courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 542 (1987). When the state or one of its officials is a party, as is the case here, the balance of hardship is considered in tandem with the public's interest. *Nken v. Holder*, 556 U.S. 418, 435 (2009); *United States v. Abbott*, No. 23-50632, 2024 WL 3580743, at *11 (5th Cir. July 30, 2024).

The balance of hardships favors relief. On one hand is the ongoing deprivation of nearly 90,000 inmates' right to be free of cruel and unusual punishment under the Eighth Amendment; a right rooted in "respect" for "the essence of human dignity inherent in all persons." *Brown v. Plata*, 563 U.S. 493, 510 (2011). These inmates—Plaintiffs' members and constituents—face possible injury or death every summer that TDCJ fails to effectuate system-wide air conditioning. While they wait, they are subjected to conditions that have left inmates so desperate to escape the heat that they

have regularly splashed themselves with toilet water, faked suicide attempts in order to reach air-conditioned areas, and started fires so that their units would be flooded with water.[773]

Balanced against this hardship is the cost and difficulty of implementing air conditioning. As discussed in greater detail below, Section C.3.a, *infra*, TDCJ already recognizes that air-conditioning must ultimately be installed in its prisons; the question at issue here is the pace of that installation. And to the extent that the question of speed is one of resources, "inadequate resources can never be an adequate justification for depriving any person of his constitutional rights." *Smith*, 553 F.2d at 378 (internal citation omitted); *see also Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 396 (1992) (O'Connor, J., concurring) ("[T]he lack of resources can never excuse a failure to obey constitutional requirements."); *see also Gates v. Collier*, 501 F.2d 1291, 1319 (5th Cir. 1974) (collecting cases where "the defenses of fund shortage and the inability of the district court to order appropriations by the state legislature, have been rejected by the federal courts").

Defendant's obligation "to eliminate existing unconstitutionalities does not depend upon what the Legislature may do, or upon what the Governor may do, or, indeed, upon what [he] may actually be able to accomplish." *Wyatt v. Aderholt*, 503 F.2d 1305, 1315 (5th Cir. 1974). As Justice Blackmun explained more than thirty years ago, the Eighth Amendment "sets minimal standards governing the administration of punishment in this country, and thus it is no answer to the complaints of the brutalized inmate that the resources are unavailable to protect him from what, in reality, is nothing less than torture." *Farmer*, 511 U.S. at 853-54 (Blackmun, J., concurring) (citation omitted); *see also Ensley Branch, N.A.A.C.P. v. Seibels*, 31 F.3d 1548, 1574 (11th Cir. 1994) ("The Constitution does not put a price on constitutional rights, in terms either of time or money. The rights guaranteed by the Constitution are to be made effective in the present." (citation omitted));

---

[773] *See* Findings of Fact, Section B.3, *supra*.

*Battle v. Anderson*, 594 F.2d 786, 792 (10th Cir. 1979) ("Constitutional treatment of human beings confined to penal institutions . . . is not dependent upon the willingness or the financial ability of the state to provide decent penitentiaries."). The balance of hardships clearly weighs in favor of relief.

The public interest is also served by an injunction that addresses the unconstitutional conditions in TDCJ's un-air-conditioned prisons. "It is always in the public interest to prevent the violation of a party's constitutional rights." *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014) (quoting *Awad v. Ziriax,* 670 F.3d 1111, 1132 (10th Cir. 2012)). It does not serve the public interest to allow prison conditions that put inmates and staff alike at risk of serious injury;[774] that have caused—and continue to cause—deaths;[775] and that cause the kind of desperation to escape heat that results in inmates frequently splashing themselves with toilet water, faking suicide to get into air-conditioning, or starting fires so their cells will be flooded.[776] And likewise, it does not serve the public interest to allow TDCJ to proceed with no concrete timeline, let alone a committed plan, to remedy those dangerous conditions.[777]

### *3. The PLRA does not bar injunctive relief*

The PLRA, 18 U.S.C. § 3626, imposes a number of restrictions on the relief that is available to remedy prison conditions. Specifically, § 3626(a)(1)(A) mandates that:

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

[774] *See* Findings of Fact, Section B.2, *supra*.
[775] *See* Findings of Fact, Section B.1, *supra*.
[776] *See* Findings of Fact, Section B.3, *supra*.
[777] *See* Findings of Fact, Section C.4.b, *supra*.

18 U.S.C. § 3626(a)(1)(A). As a result of this provision, "[t]he PLRA greatly limits a court's ability to fashion injunctive relief." *Ball I*, 792 F.3d at 598–99 (5th Cir. 2015). The purpose of these restrictions is to protect the state's strong interest in managing its own prisons. *Parker*, 171 F.4th at 750. In other words, as, "a federal court, after initially finding liability, may not simply order remedial injunctive relief that supplants prison management with federal oversight." *Id.* at 756. Likewise, the Supreme Court has explained that "[c]ourts must be sensitive to the State's interest in punishment, deterrence, and rehabilitation, as well as the need for deference to experienced and expert prison administrators faced with the difficult and dangerous task of housing large numbers of convicted criminals." *Brown*, 563 U.S. at 511.

However, as the Supreme Court has also explained the protections of the Eighth Amendment are of fundamental importance: "Prisoners retain the essence of human dignity inherent in all persons. Respect for that dignity animates the Eighth Amendment prohibition against cruel and unusual punishment. The basic concept underlying the Eighth Amendment is nothing less than the dignity of man." *Brown*, 563 U.S. at 510 (quoting *Atkins v. Virginia*, 536 U.S. 304, 311 (2002)) (cleaned up). As a result, "[a] prison that deprives prisoners of basic sustenance . . . is incompatible with the concept of human dignity and has no place in civilized society. If government fails to fulfill this obligation, the courts have a responsibility to remedy the resulting Eighth Amendment violation." *Id.* at 501–11. Given this obligation, "[c]ourts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Id.* at 511. Under the PLRA, "plaintiffs are not entitled to the most effective available remedy," but they are nevertheless "entitled to a remedy that eliminates the constitutional injury." *Ball I*, 792 F.3d at 599. In other words, the remedy must "reduce[] the risk of harm to a socially acceptable level." *Id.*

*a. Air conditioning is necessary to remedy the constitutional violation*

The Court therefore begins by considering what relief is "necessary to correct the violation of the Federal right." *See* 18 U.S.C. § 3626(a)(1)(A). To answer that question, the Court asks what relief is necessary to "eliminate[] the constitutional injury," i.e., to reduce the risk of serious harm to a socially acceptable level. *Ball I*, 792 F.3d at 599.

In depositions, at the preliminary injunction hearing, and at trial, TDCJ officials confirmed that air conditioning is the remedy that would eliminate the heat risk in Texas prisons. TDCJ knows that "the solution is air-conditioning."[778] Mr. Collier's Rule 30B(6) designee, David Sweetin, testified that installing air conditioning is "the right thing to do because of the increased temperatures that the state is seeing, the increase of medication that . . . inmates are on as opposed to 20 years ago, 30 years ago, 40 years ago," and because "[t]here's a lot of factors that exacerbate the need for wanting to air condition" TDCJ facilities.[779] Mr. Collier also confirmed that installing air conditioning is "the only way" he knows to "reduce the temperatures" in TDCJ prisons.[780] Director Lumpkin noted the same, confirming that "[a]ir conditioning is the only effective protection from the extreme heat."[781]

Medical experts also testified to the need for air conditioning. Dr. Vassallo explained that TDCJ inmates are "still dying" from extreme heat despite the mitigation measures, because those measures "do[] not remove the heat."[782] Dr. Vassallo opined that having working air conditioning has been "associated with an 80 percent reduction in the risk of death due to heat and cardiovascular disease and a 66 percent reduction in mortality due to cardiovascular disease."[783] She opined that this data is "directly applicable [to] the Texas prisons."[784] In Dr. Vassallo's view, "excess morbidity and

778 *See* Findings of Fact, Section C.4.a, *supra*.
779 *See* Findings of Fact, Section C.4.a, *supra*.
780 *See* Findings of Fact, Section C.4.a, *supra*.
781 *See* Findings of Fact, Section C.4.a, *supra*.
782 *See* Findings of Fact, Section C.4.a, *supra*.
783 *See* Findings of Fact, Section C.4.a, *supra*.
784 *See* Findings of Fact, Section C.4.a, *supra*.

Case 3:23-cv-01004-RP Document 350 Filed 09/29/25 Page 143 of 150

mortality in TDCJ facilities resulting from the extreme heat of the Texas summers can only be combated by bringing the temperature in the prisons down."[785] "[P]utting everyone" in the TDCJ system "in air-conditioned housing [is] the only way to eliminate the heat risk and the deaths and illnesses."[786]

Dr. Biswas agreed that "air conditioning is the absolute comprehensive way to reduce mental illness symptoms in the carceral setting due to heat," and it is "the only way to reduce psychiatric risk due to heat."[787] She testified that hydration and other measures do not address the root problem, because they do not "lower your core body temperature."[788] Dr. Biswas said: "[T]o lower your core body temperature, you need air conditioning and that is the most comprehensive thing you can do to reduce this serious exacerbation of mental illness we see in these populations in heat."[789] And Defense witness Dr. Everitt confirmed that air conditioning is "the most effective way to prevent" heat stroke, stating: "If you have it available, it's probably where I prefer to be or where I would prefer a patient to be is an air-conditioned area."[790]

And the testimony of correctional experts—or the action those experts took in their own systems—support the need for air conditioning in Texas prisons. Mr. Ishee immediately began working to implement system-wide air conditioning when he assumed control of the North Carolina prison system.[791] And Mr. Williams characterized TDCJ's continued reliance on heat-mitigation measures as an approach that "accepts the fact that . . . people are going to die" from heat rather than fixing the underlying problem, which, he explained, "can't be fixed by other means" than air

---

[785] *See* Findings of Fact, Section C.4.a, *supra*.
[786] *See* Findings of Fact, Section C.4.a, *supra*.
[787] *See* Findings of Fact, Section C.4.a, *supra*.
[788] *See* Findings of Fact, Section C.4.a, *supra*.
[789] *See* Findings of Fact, Section C.4.a, *supra*.
[790] *See* Findings of Fact, Section C.4.a, *supra*.
[791] *See* Findings of Fact, Section C.4.a, *supra*.

conditioning.[792] Mr. Williams opined that "[t]he fix is air conditioning," and the "cure" is to air-condition the system.[793]

While the Fifth Circuit has previously held that the evidence before it supported relief only in the form of mitigation measures to address extreme heat, that holding was on a record indicating that mitigation measures could address the risks faced by inmates. *Ball I*, 792 F.3d at 599. Indeed, in *Ball I*, the Fifth Circuit relied on Dr. Vassallo's testimony to the effect that "there are many acceptable remedies short of facility-wide air conditioning" to conclude that air conditioning was not necessary because mitigation measures might suffice. *Id.* But Dr. Vassallo has since testified that medical evidence no longer supports the efficacy of those mitigation measures, and that, accordingly, her understanding of adequate relief from extreme heat risk has changed.[794] Now, more than ten years after her testimony in *Ball I*, Dr. Vassallo was clear that "excess morbidity and mortality in TDCJ facilities resulting from the extreme heat of the Texas summers can only be combated by bringing the temperature in the prisons down."[795]

The Fifth Circuit has clearly established that new remedies for unconstitutional prison conditions can—and must—be implemented in situations where past attempts to remedy a given harm have failed. *See Yates*, 868 F.3d at 370 ("Relying on our decision in *Ball v. LeBlanc*, Defendants argue that the PLRA categorically prohibits an injunction requiring that the Pack Unit be air-conditioned. This is not so."). As the *Yates* court explained, *Ball I* "held that air-conditioning was not appropriate in that case, because other acceptable and less-intrusive remedies had yet to be tried—not that air-conditioning was an impermissible remedy." *Id.* And the *Yates* court reaffirmed the

---

792 *See* Findings of Fact, Section C.4.a, *supra.*
793 *See* Findings of Fact, Section C.4.a, *supra.*
794 *See* Prelim. Inj. Hr'g Tr. (July 31, 2024) 117:18–118:25 (Vassallo) (explaining, in reference to her past endorsement of cold showers, that her opinion has changed because "we have more literature that shows taking frequent showers doesn't help" and because she observed through subsequent experience working with prisons, that access to cold showers is not provided "reliably" due to understaffing.)
795 *Id.* (emphasis in original); *See also* Findings of Fact, Section C.4.a, *supra.*

district court's assertion that air conditioning inmate housing areas could be ordered if it was "indeed the least intrusive means of correcting the violation." *Id.* (quoting *Cole v. Livingston*, No. 4:14-CV-1698, 2016 WL 3258345, at *10 (S.D. Tex. June 14, 2016) (Ellison, J.)).

The evidence is now clear that the mitigation measures suggested in *Gates* and *Ball* do not reduce the risk of harm to a socially acceptable level.[796] As a result, such relief cannot be sufficient to meet the mandate that "plaintiffs are . . . entitled to a remedy that eliminates the constitutional injury." *Ball I*, 792 F.3d at 599. As the testimony of medical experts, correctional experts, and TDCJ's own staff indicates, that remedy that eliminates the constitutional injury here is air conditioning.

Reflecting the system-wide identity of Plaintiffs' members and constituents, air conditioning must be implemented system-wide. As the Supreme Court has explained in the context of relief under the PLRA, "[t]he scope of the remedy must be proportional to the scope of the violation." *Plata*, 563 U.S. at 531-32). Because the constitutional violation is systemwide, nothing short of systemwide relief will suffice. *See id.* ("The order also is not overbroad because it encompasses the entire prison system," given the findings of a "systemwide [constitutional] violation" and "systemwide deficiencies"). Because of the system-wide scope of Plaintiffs' membership and constituencies, the situation before the Court here is distinct from that in *Ball I*, where the Fifth Circuit rejected unit-wide air-conditioning because only three inmates were before the Court. *See Ball I,* 792 F.3d at 599 ("Ball, Code, and Magee are the only plaintiffs before the court. As a result, any relief must apply only to them, if possible.").

In short, because (1) every inmate in an un-air-conditioned cell faces serious health risk due to summer heat; (2) air conditioning is necessary to eliminate the constitutional injury, i.e., reduce

[796] *See* Findings of Fact, Section C.3, *supra*.

that risk to a socially acceptable level; and (3) every inmate is a member or constituent of the plaintiffs here, the most narrowly drawn relief that will address the injury to all plaintiffs is air conditioning across TDCJ's prisons.

*2. Directing TDCJ to meet a system-wide air-conditioning timeline that agency staff have identified as possible is the least intrusive form of relief that will remedy the constitutional violation*

The Court therefore considers how to order relief in the manner that is the least intrusive into TDCJ's correctional management while still adequately remedying the constitutional violation. For the reasons laid out below, the Court concludes that ordering TDCJ to fully air-condition Texas's prison system on the timeline that the agency itself has identified as possible across in its Four-, Three-, and Two-Phase Plans is the least intrusive remedy that is commensurate with the urgency and severity of the harm caused by TDCJ's un-air-conditioned prisons.

First, the Court notes that other correctional systems have system-wide temperature control. Since 1994, state-wide regulations adopted by the Texas Commission on Jail Standards have required all jails in Texas to maintain indoor temperatures between 65 degrees and 85 degrees.[797] Tennessee and North Carolina have, likewise, adopted temperature limits for their prisons.[798] The Federal Bureau of Prisons sets a target temperature of 76 degrees in the summer.[799] And, of course, TDCJ has indicated that it someday intends to install air-conditioning across the Texas prison system.[800] In light of the fact that a number of prison systems operate with temperature control and TDCJ's own stated desire to implement air condition, the court concludes that the solution of system-wide air-conditioning is entirely compatible with good correctional management.

Turning to timeline: across three separate plans—the Four-Phase Plan, the Three-Phase Plan, and the Two-Phase Plan—TDCJ has affirmed, and indicated to the Legislature, that system-

---

[797] *See* Findings of Fact, Section C.4.b, *supra*.
[798] *See* Findings of Fact, Section C.4.b, *supra*.
[799] *See* Findings of Fact, Section C.4.b, *supra*.
[800] *See* Findings of Fact, Section C.4.a, *supra*.

Case 3:23-cv-01004-BAH-EWD Document 460-1 09/29/26 Page 148 of 151

wide air-conditioning can be installed by the end of 2031.[801] However, Defendant's own witnesses indicated at trial that TDCJ can move faster. TDCJ's Director of Engineering, Dale Cox, estimated in his July 2025 deposition that completing systemwide air conditioning would take between 36 and 51 months.[802] Mr. Cox confirmed his 36- to 51-month estimate at trial, noting that it is "a very doable timeframe" and "not unreasonable."[803] Counting forward from the fall of 2026, Mr. Cox's estimate means air-conditioning could be completely installed by the end of 2029. Based on the estimates of TDCJ's own Director of Engineering, the Court therefore concludes that ordering TDCJ to install system-wide air conditioning by the end of 2029 is "very doable" and "not unreasonable," and is the least intrusive form of relief that will remedy the constitutional violation.

In light of the PLRA's requirements, the Court carefully weighs this form of relief against other possible remedies. First, the ordered relief is necessary: as is discussed above, air-conditioning is required to reduce the level of risk for all inmates currently housed in un-air-conditioned housing to a socially acceptable level.[804] An order directing TDCJ to install air-conditioning on an achievable but nevertheless urgent timeline is also necessary because the agency has shown that it is not committed to installing air-conditioning on the timeline TDCJ itself has identified as achievable. This is, again, evidenced by both former director Collier and Defendant, Director Lumpkin, refusing to commit to an installation timeline; by the agency's actually-achieved pace of cool-bed installation since the preliminary injunction hearing not even keeping pace with inmate population growth; by Chairman Nichols' admission that TDCJ's mooted plan is not, in fact, a plan at all; and by TDCJ's failure to request even half of the funds necessary for the next step of the plan it presented to the Court.[805]

---

801 *See* Findings of Fact, Section C.4.b, *supra*.
802 *See* Findings of Fact, Section D., *supra*.
803 *See* Findings of Fact, Section D., *supra*.
804 *See* Findings of Fact, Section C.4.a., *supra*; Conclusions of Law, Section C.3.a., *supra*
805 *See* Findings of Fact, Section C.4.b., *supra*.

And, again, by simply ordering TDCJ to meet the timeline that TDCJ's own Director of Engineering identified as very doable and not unreasonable, the Court is minimally intruding on correctional management. In developing that estimate internally, TDCJ's staff—as represented by Mr. Cox—has already had the opportunity to consider what installation pace is achievable without significant adverse impact on public safety and the operation of the criminal justice system. The Court therefore concludes that this is a timeline that appropriately balances giving substantial weight to any possible adverse impacts on public safety and the operation of the criminal justice system, as required by the PLRA, with the urgent need to many thousands of inmates from conditions that threaten their lives and health.

This approach is also less intrusive than alternative possible forms of relief. The Court is not, at this juncture, appointing a special master to monitor TDCJ's air-conditioning-installation efforts. Nor is the Court mandating the procurement and construction management methods that TDCJ must use, though the Court urges TDCJ to fully consider the alternative approaches that Plaintiffs showed might significantly expedite the agency's progress. Likewise, the Court is not crafting a detailed remedial plan that would involve it in the day-to-day running of TDCJ. For example, the Court is not implementing a heat score system under which every inmate with a heat-sensitive medical condition or taking a heat-sensitive medication would be identified and automatically placed in air-conditioned housing; such relief would require the Court to dictate, supervise, and inspect the delivery of medical care throughout TDCJ's prisons to ensure conditions were appropriately diagnosed and documented. Such relief would amount to a much more significant ongoing intrusion into correctional management. *Cf. Plata*, 563 U.S. at 531 ("This Court has rejected remedial orders that unnecessarily reach out to improve prison conditions other than those that violate the Constitution."); *Valentine*, 993 F.3d 270, 294 (5th Cir. 2021) (Oldham, J., concurring) (criticizing the "district court's highly reticulated, 17-point management plan for the Pack Unit"). Such a remedy

would likely require TDCJ to have at least 100,000 air-conditioned beds.[806] And such plan would still not remedy the constitutional violation, because even young, healthy individuals are at significant risk from long-term exposure to extreme temperatures.[807] To the contrary, the Court will—consistent with the directives of the PLRA and the Court's desire to intrude minimally on the management of TDCJ while ensuring that the agency meets its constitutional obligations—impose the minimum reporting requirements that the Court finds to be consistent with a reasonable level of accountability.

Installing air conditioning in every TDCJ prison by the end of 2029 is an urgent but entirely achievable form of prospective relief that (1) extends no further than necessary to correct the violations of the federal rights of Plaintiffs' constituents and members, (2) is as narrowly drawn as minimally intrusive as possible, and (3) gives substantial weight to any possible impacts on public safety and the operation of the Texas criminal justice system. The Court will order this relief.

## IV. CONCLUSION

Having found that the conditions of confinement in TDCJ's un-air-conditioned prisons violate the Eighth Amendment rights of all inmates housed in those facilities, including Plaintiffs' members and constituents, the Court grants Plaintiffs' request for declaratory and injunctive relief, as follows. **IT IS ORDERED** that:

1. The conditions of confinement in TDCJ's un-air-conditioned prisons are declared to violate the Eighth Amendment rights of all inmates confined in those facilities, and TDCJ's current response to heat conditions is declared to be insufficient to remedy that violation.

2. Defendant is hereby ordered to immediately develop and implement a plan to install air-conditioning in every Texas prison, with installation to be completed not later than December 31, 2029.

3. Defendant shall submit status reports to the Court every six months, with the first such report due **on or before March 22, 2027**.

[806] *See* Findings of Fact, Section B., *supra*.
[807] *See* Findings of Fact, Section B., *supra*.

4. Defendant's first status report shall describe his plan to meet the timeline identified above. Defendant's plan shall include the steps he intends to take to ensure that system-wide air-conditioning is installed on the mandated timeline, including phases of construction, procurement, and design, and any intended bundling of air-conditioning installation project. Defendant's plan shall also indicate the amounts he intends to request from the Legislature to fund each stage of the plan, with the understanding that such amounts are subject to change based on the requirements of the installation project.

5. In his first status report and in each subsequent status report, Defendant shall describe the progress made on installing system-wide air-conditioning and the next steps that Defendant intends to take. In each status report, Defendant shall identify whether he is on track to meet the deadline set by the Court. If he is not on track to meet that deadline, Defendant shall identify why he is not currently meeting that timeline and what actions he intends to take to ensure that air-conditioning installation is completed by the deadline.

6. Defendant is advised that financial considerations will not be considered a legitimate reason for his failure to comply with this Court's order. *See Collier*, 501 F.2d at 1319 ("Where state institutions have been operating under unconstitutional conditions and practices, the defense[ ] of fund shortage . . . ha[s] been rejected by the federal courts.").

**IT IS FURTHER ORDERED** that both sides may submit additional briefing on attorney's fees and costs **on or before October 20, 2026**, with any responses due **on or before November 3, 2026**, and any replies due **on or before November 10, 2026**.

**IT IS FINALLY ORDERED** that all outstanding motions to intervene, (Dkts. 331, 335, 341), which were filed after the close of trial, are **DENIED** as untimely.

The Court will enter final judgment by separate order.

**SIGNED** on September 22, 2026.



ROBERT PITMAN
UNITED STATES DISTRICT JUDGE